```
 1                     STATE OF NEW JERSEY
                     DISTRICT OF NEW JERSEY
 2

 3  _____    CIVIL NUMBERS:
    IN RE: INSULIN PRICING
 4  LITIGATION                        2:17-cv-00699-BRM-ESK &
                                      2:23-md-03080-BRM-RLS
 5
                                      MOTION FOR
 6                                    CLASS CERTIFICATION

 7  _____    **REDACTED TRANSCRIPT**

 8
    Frank R. Lautenberg Post Office and United States Courthouse
 9  Two Federal Square
    Newark, New Jersey 07102
10  November 28, 2023
    Commencing at 11:00 a.m.
11
    B E F O R E:          THE HONORABLE BRIAN R. MARTINOTTI
12                        UNITED STATES DISTRICT JUDGE

13                        THE HONORABLE JOSEPH A. DICKSON
                          UNITED STATES MAGISTRATE JUDGE (Retired)
14                        Mediator

15                        THE HONORABLE RUKHSANAH L. SINGH
                          UNITED STATES MAGISTRATE JUDGE
16
    A P P E A R A N C E S:
17

18       CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.
         BY: JAMES E. CECCHI, ESQUIRE
19           DONALD A. ECKLUND, ESQUIRE
             KEVIN G. COOPER, ESQUIRE
20           BRIAN O'TOOLE, ESQUIRE
         5 Becker Farm Road
21       Roseland, New Jersey  07068
         For the Plaintiffs
22
         Proceedings recorded by mechanical stenography.
23       Transcript produced by computer-aided transcription.

24
              Tammera M. Witte, Official Court Reporter
25                 tammera_witte@njd.uscourts.gov
                        (973) 457-8230
```

**A P P E A R A N C E S:** - Continued

LISTON & DEAS, PLLC
BY: WILLIAM L. DEAS, ESQUIRE
605 Crescent Boulevard, Suite 200
Ridgeland, Mississippi  39157
For the Plaintiffs

LEVIN PAPANTONIO RAFFERTY PROCTOR BUCHANAN
O'BRIEN BARR MOUGEY, PA
BY: TROY A. RAFFERTY, ESQUIRE
    BRANDON L. BOGLE, ESQUIRE
    BILL CASH, III, ESQUIRE
316 S. Baylen Street, Suite 600
Pensacola, Florida  32502
For the Plaintiffs

DAVID NUTT & ASSOCIATES, P.C.
BY: MATTHEW C. McDONALD, ESQUIRE
    DAVID NUTT, ESQUIRE
605 Crescent Boulevard, Suite 200
Ridgeland, Mississippi  39157
For the Plaintiffs

ROBERTS LAW FIRM, PA
BY: MICHAEL L. ROBERTS, ESQUIRE
20 Rahling Circle
Little Rock, Arkansas  72223
For the Plaintiffs

SIMMONS HANLY CONROY
BY: JAYNE CONROY, ESQUIRE
112 Madison Avenue, 7th Floor
New York, New York  10016
For the Plaintiffs

SIMMONS HANLEY CONROY
BY: MICHAEL J. ANGELIDES, ESQUIRE
One Court Street
Alton, Illinois  62002
For the Plaintiffs

WILLIAMS DIRKS DAMERON, LLC
BY: MATTHEW L. DAMERON, ESQUIRE
1100 Main Street, Suite 2600
Kansas City, Missouri  64105
For the Plaintiffs

```
 1  A P P E A R A N C E S:  - Continued

 2      ROBBINS GELLER RUDMAN & DOWD, LLP
        BY: DORY P. ANTULLIS, ESQUIRE
 3      420 Lexington Avenue, Suite 1832
        New York, New York  10170
 4      For the Plaintiffs

 5      HAGENS BERMAN SOBOL SHAPIRO, LLP
        BY: STEVE W. BERMAN, ESQUIRE
 6      1301 2nd Avenue, Suite 2000
        Seattle, Washington  98101
 7      For the Plaintiffs

 8      HAGENS BERMAN SOBOL SHAPIRO, LLP
        BY: THOMAS M. SOBOL, ESQUIRE
 9          HANNAH W. BRENNAN, ESQUIRE
        1 Faneuil Hall Square, 5th Floor
10      Boston, Massachusetts  02109
        For the Plaintiffs
11
        HAGENS BERMAN SOBOL SHAPIRO, LLP
12      BY: MARK VAZQUEZ, ESQUIRE
        455 N. Cityfront Plaza Drive, Suite 2410
13      Chicago, Illinois  60611
        For the Plaintiffs
14
        NAPOLI SHKOLNIK, PLLC
15      BY: SHAYNA E. SACKS, ESQUIRE
        360 Lexington Avenue, 11th Floor
16      New York, New York  10017
        For the Plaintiffs
17
        KELLEY & FERRARO, LLP
18      BY: JOYCE C. REICHARD, ESQUIRE
        950 Main Avenue, Suite 1300
19      Cleveland, Ohio  44113
        For the Plaintiffs
20
        THE FERRARO LAW FIRM
21      BY: NATALIA M. SALAS, ESQUIRE
        600 Brickell Avenue, Suite 3800
22      Miami, Florida  33131
        For the Plaintiffs
23

24

25
```

1   **A P P E A R A N C E S:** - Continued

2       KESSLER TOPAZ MELTZER CHECK, LLP
        BY: MELISSA L. YEATES, ESQUIRE
3           JOSEPH H. MELTZER, ESQUIRE
        280 King of Prussia Road
4       Radnor, Pennsylvania  19087
        For the Plaintiffs
5
        KELLER ROHRBACK LAW OFFICES, LLP
6       BY: DAVID KO, ESQUIRE
            JULI E. FARRIS, ESQUIRE
7       1201 Third Avenue, Suite 3200
        Seattle, Washington  98101
8       For the Plaintiffs

9       WAGSTAFF & CARTMELL
        BY: MELODY DICKSON, ESQUIRE
10      4740 Grand Avenue, Suite 300
        Kansas City, Missouri  64112
11      For the Plaintiffs

12      MSP RECOVERY LAW FIRM
        BY: JANPAUL PORTAL, ESQUIRE
13      2701 Le Jeune Road, 10th Floor
        Coral Gables, Florida  33134
14      For the Plaintiffs

15      ARMAS BERTRAN PIERI
        BY: EDUARDO BERTRAN, ESQUIRE
16      4960 SW 72nd Ave, Suite 206
        Miami, Florida  33155
17      For the Plaintiffs

18      COHN LIFLAND PEARLMAN HERRMANN & KNOPF, LLP
        BY: MATTHEW F. GATELY, ESQUIRE
19      Park 80 West-Plaza One
        250 Pehle Avenue
20      Saddle Brook, New Jersey  07663
        For the Plaintiffs
21
        WEITZ & LUXENBERG, A PC
22      BY: GREGORY STAMATOPOULOS, ESQUIRE
        3011 West Grand Boulevard, 24th Floor
23      Detroit, Michigan  48202
        For the Plaintiffs

24

25

```
 1  A P P E A R A N C E S:  - Continued

 2       KELLEY & FERRARO, LLP
         BY: JOYCE C. REICHARD, ESQUIRE
 3       950 Main Street, Suite 1300
         Cleveland, Ohio  44113
 4       For the Plaintiffs

 5       KOZYAK TROPIN & THROCKMORTON, LLP
         BY: BENJAMIN J. WIDLANSKI, ESQUIRE
 6           TAL J. LIFSHITZ, ESQUIRE
         2525 Ponce de Leon Boulevard, 9th Floor
 7       Coral Gables, Florida  33134
         For the Plaintiffs
 8
         FORMAN WATKINS & KRUTZ, LLP
 9       BY: TREY WATKINS, ESQUIRE
             TANYA D. ELLIS, ESQUIRE
10       210 E. Capitol Street, Suite 2200
         Jackson, Mississippi  39225
11       For the Plaintiffs

12       SEEGER WEISS, LLP
         BY: DAVID R. BUCHANAN, ESQUIRE
13           STEVEN J. DAROCI, ESQUIRE
         55 Challenger Road
14       Ridgefield Park, New Jersey  07660
         For the Plaintiffs
15
         BARON & BUDD, PC
16       BY: MARK P. PIFKO, ESQUIRE
         15910 Ventura Boulevard, Suite 1600
17       Encino, California  91436
         For the Plaintiffs
18
         BARON & BUDD, P.C.
19       BY: BURTON LE BLANC, ESQUIRE
         2600 CitiPlace Drive, Suite 400
20       Baton Rouge, Louisiana  70808
         For the Plaintiffs
21
         THE CICALA LAW FIRM, PLLC
22       BY: JOANNE M. CICALA, ESQUIRE
         101 College Street
23       Dripping Springs, Texas  78620
         For the Plaintiffs
24

25
```

```
 1  A P P E A R A N C E S:  - Continued

 2      NASTLAW, LLC
        BY: MICHAEL S. TARRINGER, ESQUIRE
 3      1101 Market Street, Suite 2801
        Philadelphia, Pennsylvania  19107
 4      For the Plaintiffs

 5      MORGAN & MORGAN
        BY: JUAN R. MARTINEZ, ESQUIRE
 6      PA 201 N. Franklin Street, Fl 7
        Tampa, Florida  33602
 7      For the Plaintiffs

 8      WALSH PIZZI O'REILLY FALANGA, LLC
        BY: LIZA M. WALSH, ESQUIRE
 9      Three Gateway Center
        100 Mulberry Street, 15TH Floor
10      Newark, New Jersey  07102
        For the Defendant Sanofi U.S., LLC
11
        BRIAN HOWE, ESQUIRE
12      Senior Corporate Counsel, Sanofi U.S., LLC

13      JONES DAY
        BY: WILLIAM D. COGLIANESE, ESQUIRE
14          JAMES E. GAUCH, ESQUIRE
            MELISSA LIM PATTERSON, ESQUIRE
15          MICHAEL R. SHUMAKER, ESQUIRE
            RYAN HARMANIS, ESQUIRE
16          JULIA A. McEVOY, ESQUIRE
        51 Louisiana Avenue, N.W.
17      Washington DC  20001-2113
        For the Defendant Sanofi U.S., LLC
18
        GIBBONS P.C.
19      BY: CHRISTOPHER T. WALSH, ESQUIRE
            MICHAEL R. MC DONALD, ESQUIRE
20      One Gateway Center
        Newark, New Jersey  07102
21      For the Defendant Novo Nordisk, Inc.

22      JONATHAN M. PECK, ESQUIRE, ASST. GENERAL COUNSEL
        AMER S. PHARAON, ESQUIRE, MANAGING ASST. GENERAL COUNSEL
23      800 Scudders Mill Road
        Plainsboro, New Jersey  08536
24      For the Defendant Novo Nordisk, Inc.

25
```

1 **A P P E A R A N C E S**:  - Continued

2       DAVIS POLK & WARDWELL, LLP
        BY: CHUI-LAI CHEUNG, ESQUIRE
3           JAMES P. ROUHANDEH, ESQUIRE
        450 Lexington Avenue
4       New York, New York  10017
        For the Defendant Novo Nordisk, Inc.
5
        DAVIS POLK & WARDWELL, LLP
6       BY: NEAL POTISCHMAN, ESQUIRE
            ANDREW YAPHE, ESQUIRE
7       1600 El Camino Real
        Menlo Park, California  94025
8       For the Defendant, Novo Nordisk, Inc.

9       REED SMITH, LLP
        BY: MELISSA A. GEIST, ESQUIRE
10      506 Carnegie Center, Suite 300
        Princeton, New Jersey  08540
11      For the Defendant, Eli Lilly and Company

12      KIRKLAND & ELLIS, LLP
        BY: DIANA M. WATRAL, ESQUIRE
13      300 North LaSalle
        Chicago, Illinois  60654
14      For the Defendant, Eli Lilly and Company

15      MORGAN LEWIS, COUNSELORS AT LAW
        BY: PATRICK HARVEY, ESQUIRE
16          JASON SCHERR, ESQUIRE
        1111 Pennsylvania Avenue, NW
17      Washington, DC  20004
        For the Defendant Express Scripts, Inc.
18
        ALSTON & BIRD, LLP
19      BY: STEVEN L. PENARO, ESQUIRE
        90 Park Avenue
20      New York, New York  10016
        For the Defendant Unitedhealth Group, Inc., Optum Rx, Inc.
21      and Caremark RX, Inc.

22      ALSTON & BIRD, LLP
        BY: LIZ BROADWAY BROWN, ESQUIRE
23      1201 West Peachtree Street
        Atlanta, Georgia  30309
24      For the Defendant United Healthcare Group, Inc.

25

```
 1  A P P E A R A N C E S:  - Continued

 2      ALSTON & BIRD, LLP
        BY: KELLEY CONNOLLY BARNABY, ESQUIRE
 3      950 F Street, N.W.
        Washington DC  30309
 4      For the Defendant United Healthcare Group, Inc.

 5      ALSTON & BIRD, ATTORNEYS AT LAW
        BY: BRIAN D. BOONE, ESQUIRE
 6      1120 South Tryon Street, Suite 300
        Charlotte, North Carolina  28203
 7      For the Defendant United Healthcare Group, Inc.

 8      O'TOOLE SCRIVO, LLC
        BY: THOMAS P. SCRIVO, ESQUIRE
 9      14 Village Park Road
        Cedar Grove, New Jersey  07009
10      For the Defendant Unitedhealth Group, Inc., Optum Rx, Inc.
        and Caremark Rx, Inc.
11
        WILLIAMS & CONNOLLY
12      BY: ENU MAINIGI, ESQUIRE
            DONALD DOCKERY, ESQUIRE
13      680 Maine Avenue SW
        Washington, DC  20024
14      For the Defendant CVS Health Corporation

15      MARINO TORTORELLA & BOYLE, P.C.
        BY: KEVIN H. MARINO, ESQUIRE
16          JOHN D. TORTORELLA, ESQUIRE
        437 Southern Boulevard
17      Chatham, New Jersey  07928
        For the Defendant CVS Health Corporation

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2


 3
        ORAL ARGUMENT BY:                        PAGE
 4
        MR. BERMAN                                11,64
 5      MR. CECCHI                             27,46,78
        MR. ROUHANDEH                             33,59
 6      MR. GAUCH                                 50,68

 7


 8

 9                 I N D E X   T O   E X H I B I T S

10

        EXHIBIT                                  PAGE
11
        Plaintiffs' Exhibit 1 marked for identification   14
12      Defense Exhibit 1 marked for identification        37

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (**PROCEEDINGS** held in person before

2        **The HONORABLE BRIAN R. MARTINOTTI,**

3      United States District Judge, at 11:00 a.m.)

4          THE COURT:  Welcome back, everyone.  The courtroom

5    will be sealed.

6          Just to confirm, those who are in the courtroom are

7    bound by the confidentiality order.  Before anyone leaves the

8    courtroom, please give a card to either Lissette or Tammy so

9    that we can note who was in the courtroom.

10          Any objection to that procedure?

11          (No response.)

12          THE COURT:  Everyone agrees to be bound?

13          (No response.)

14          THE COURT:  You all may be seated.

15          We are here for oral argument.  I was just suggesting

16    that there is no press here.  Is that fair?  I would be a

17    little dismayed if there were but just confirming that.

18          We are on the record.  Counsel, your appearances for

19    the record, please.

20          MR. BERMAN:  Good morning, Your Honor.  Steve Berman.

21    With me are Hannah Brennan, Mark Vasquez, Donald Ecklund.

22          MR. CECCHI:  Good morning, Your Honor.  James Cecchi.

23          MR. WALSH:  Good morning, Your Honor.

24    Christopher Walsh from Gibbons on behalf of Novo Nordisk.  With

25    me this morning are James Rouhandeh, Andrew Yaphe of Davis Polk

1    & Wardwell, both of whom have been admitted *pro hac vice*.

2            THE COURT:  Did we miss any appearances?

3            MS. WALSH:  Good morning again.  Liza Walsh on behalf

4    of Sanofi.  With me from Jones Day is James Gauch and

5    William Coglianese.

6            THE COURT:  Thank you.

7            All right.  This is your motion.  Counsel, your

8    appearance for the record.

9            MR. BERMAN:  Steve Berman, Your Honor.

10           THE COURT:  So tell me what impact does the pending

11   motion for approving the Eli Lilly settlement have on this

12   case?

13           MR. BERMAN:  On this motion you mean?

14           THE COURT:  This motion.

15           MR. BERMAN:  It has no impact.  I mean, Sanofi is not

16   part of -- I mean, Lilly is not part of this motion.

17           THE COURT:  Understood.  If I deny this motion, what

18   happens to that motion?

19           MR. BERMAN:  I haven't contemplated a denial in my

20   scenarios, but if you did that, Your Honor, we would have to

21   read it and figure out whether there was grounds to reopen --

22   file a new motion.

23           THE COURT:  And if you -- go ahead.

24           MR. BERMAN:  I thought the question you were going to

25   ask was if you -- maybe you did ask and I didn't understand it.

1   If you deny the motion for preliminary approval and you've

2   granted class cert in the interim --

3           THE COURT:  That was going to be my next question.

4   You can answer that one.  It's a pretty good one.  Go ahead.

5           MR. BERMAN:  Then I think what we would do is to then

6   refile a motion against Lilly.  So we would have a class

7   granted, preliminarily approval denied, then we go ahead and

8   bring a motion against Lilly.

9           THE COURT:  And does President Biden's Inflation

10  Reduction Act including a cap have any effect on this case?

11          MR. BERMAN:  It may have some effect.  We haven't

12  fully analyzed it.  But it will have no effect on the damages

13  that have been incurred prior implementation.  Right?

14          And it's unclear to me that it would cover every class

15  member in this class at this point.  That's something that we

16  would look at when we brought the motion for injunction.  So

17  all we're doing today is asking for the (b)(2) class to be

18  certified.

19          We haven't told you yet -- and we don't have to under

20  the case law -- what our injunction would look like.

21          THE COURT:  Well, they seem to think you do.

22          Is that fair?

23          MR. ROUHANDEH:  Yes, Your Honor.

24          MR. BERMAN:  I've never seen that done.

25          Take, for example, last week or two weeks ago

1   Judge Wilkins certified my NCAA payment case.  She certified a

2   (b)(2) class.  And then she certified a (b)(3) class.

3          I haven't put forward what injunction I want.  All

4   I've said is:  Here are the NCAA rules I'm challenging.  That's

5   what unites the class.  And here we have conduct we're

6   challenging that unites the class, sufficient for (b)(2)

7   certification.

8          THE COURT:  And so there's a motion to exclude the

9   testimony of your expert.

10         MR. BERMAN:  Correct.

11         THE COURT:  What happens to your case if I grant that

12  motion?

13         MR. BERMAN:  The case can't be certified.

14         THE COURT:  So shouldn't that be the motion we talk

15  about first?

16         MR. BERMAN:  If that's what you would like me to talk

17  about first, I will do so.

18         THE COURT:  Let's go.

19         MR. BERMAN:  So I have given you a slide deck,

20  Your Honor.

21         THE COURT:  Do we actually have something that this is

22  going to be produced on?

23         MR. BERMAN:  You have a copy; they have a copy.

24         THE COURT:  Okay.

25         MR. BERMAN:  We're all good to go.  I'm going to start

1    on slide 33.

2            THE COURT:  I'm going to break tradition and move away

3    from the podium.

4            MR. BERMAN:  I have an extra copy I can give your

5    fellow judge if you want.

6            THE COURT:  I will go back to my safe spot.

7            MR. BERMAN:  May I approach, Your Honor.

8            THE COURT:  Sure.  33?

9            MR. BERMAN:  Yes, sir.

10           THE COURT:  Go ahead.

11           MR. BERMAN:  First, I think you would want to know

12   what is it you're supposed to do when you have competing

13   experts?  And the way we read the law is you're supposed to

14   determine whether we've provided a reliable expert methodology.

15   You don't know have to decide who wins.  You just have to

16   decide have we done something that's reliable.

17           THE COURT:  Just for the purposes of the record, we're

18   going to mark this as P-1 for identification, which is your

19   class certification slideshow.  And now you are on page 33.

20   Thank you.  I apologize.

21           (Plaintiffs' Exhibit No. P-1 was marked for

22   identification.)

23           MR. BERMAN:  So the basis or the heart of

24   Dr. Rosenthal's methodology is the structural break test.  And

25   frankly, we were shocked to see the defendants' opposition.  In

1    their opening brief, they said Dr. Rosenthal made this test up,

2    made it up for this case.

3         But that's not right, Your Honor.  There's actually a

4    chapter in many economic textbooks that define the structural

5    break test.  I've given you an example of one here.

6         One of the things the Third Circuit looks at in

7    determining admissibility is whether the test or method the

8    expert is using is used outside the litigation.  And as I show

9    you -- and we put this in our brief as well -- slide 36, the

10   structural break test is used by investors in the investment

11   community.  It is used by the public health community when it

12   is trying to decide, for example, if there's been an impact on

13   COVID implementation policies.  It's used by police and crime

14   fighters to see if the measures they're implementing has been

15   successful.

16        As I point out on slide 38, it's been used by courts

17   repeatedly in cases just like this.  We've given the Court here

18   four examples of cases where the structural break test was the

19   heart of the expert's testimony.

20        In the *Broiler Chicken* case, Judge Durkin, Northern

21   District of Illinois, involves the sale of chickens pretty much

22   to every American.  He relied on the structural break test and

23   he called it indisputably reliable and widely used.

24        Now the defendants say, well, that test has only been

25   used in antitrust cases.  That's not true.  This *Syngenta*,

1  S-Y-N-G-E-N-T-A, case was a tort case and it was not an

2  antitrust case.  So it's been widely used.  That is really the

3  heart of their attack on Dr. Rosenthal.

4         Let me talk about their attacks on Dr. Rosenthal for a

5  second.  I'm going to go to slide 41.

6         I'm just going to be blunt, Your Honor.  Their attacks

7  are a bunch of thrown spaghetti on the wall hoping it sticks.

8  Let me give you a few examples.  Let's just take slide 43.

9         They attack Dr. Rosenthal through Dr. Baker by

10 claiming that uninsured class members are not harmed because

11 they never would have been a beneficiary of rebates to begin

12 with.  So what.  It's nothing to do with our case.

13        Our case is that uninsureds paid based on list price

14 and the list price was inflated because of the rebate inflation

15 scheme.  So clearly the uninsureds are hurt.  This kind of

16 criticism is so wrong.  I don't even -- throw it in the

17 garbage.

18        Let's take another one.  Slide 44.  He says that

19 Dr. Rosenthal can't identify uninsured consumers.  Well, that's

20 just wrong.  As Dr. Rosenthal points out in her rebuttal, the

21 pharmacy data, the data, contains a field that identifies cash

22 transactions.  So he's just wrong.  We can identify cash payers

23 right out of the data.

24        Criticism number three.  He says, well -- I'm on

25 slide 45.  Individual consumers are responsible for their own

1    high insulin costs due to choices they make when selecting

2    health plans.

3         First of all, there's no methodology or treatise that

4    he relies on.  It's itself not an admissible criticism, but

5    more importantly, as Dr. Rosenthal points out, it doesn't make

6    sense.

7         Let's just take -- every one of us goes and has an

8    insurance plan handed to us by our employer.  We don't get to

9    go to the employer and say:  Well, gosh, you know, one of these

10   drugs on this plan is really expensive.  Go pick another plan.

11        That's just not the way world works.  But that's the

12   criticism Dr. Baker levels against Dr. Rosenthal, and it's just

13   not credible.

14        Now I have several other slides on that issue, and

15   I'll just leave them to your reading if you would like to read

16   them.  But the bottom line is -- on Dr. Rosenthal, she's

17   followed the structural break test.  It's a widely accepted

18   test.  And the only thing they can really point to that they

19   think they have an "ah-ha" moment on Dr. Rosenthal is her

20   supposed mistake.  The mistake she made.

21        Let's take a look at that mistake for a second,

22   Your Honor, and that's slide 58.

23        And I think this mistake she made -- sure.  We don't

24   want experts to make mistakes, but it's a nothing burger.  It's

25   a nothing burger.  She went and used a screenshot from the

1  plaintiffs' pharmacy data and the screenshot had some erroneous

2  information.

3          As she points out in her rebuttal, that's not the

4  information she's going to be using to identify class members.

5  She's going to be using data from the PBMs, transactional data,

6  the exact same transactional data that was approved by the

7  *Valsartan* court.  Right?  Judge Kugler approved that exact

8  dataset that we're using here.

9          THE COURT:  Let's talk about that opinion and the

10 effect that the Third Circuit not taking the appeal has on this

11 case.

12         What does that mean as far as Judge Kugler's opinion,

13 in your mind?

14         MR. BERMAN:  In my mind, it means that you should

15 certify this case, because the *Valsartan* case was way more

16 complicated than this case.

17         THE COURT:  Well, maybe that's an issue.  Maybe this

18 case needs to be more complicated because there were more

19 classes in that case and subclasses, weren't there?

20         MR. BERMAN:  There were more but I don't think we need

21 more here because we're going to give you -- as Mr. Cecchi is

22 going to explain, he's going to do the state law issues.

23         We're going to give you three doors to go through.

24 You've got the nationwide door.

25         THE COURT:  Right.

1          MR. BERMAN:  You've got the 1418 state door.

2          THE COURT:  Right.

3          MR. BERMAN:  And if you don't like our multistate

4    groupings, we could do single state classes for each of those

5    states.  It's less than the 52 states and 93 subclasses that

6    were approved in *Valsartan*.

7          THE COURT:  But once you go through those doors,

8    Judge Kugler had more doors to go through and in fact went

9    through those doors.

10          MR. BERMAN:  Because he had a more complicated claim.

11   We have claims that are relatively simple.  Either they follow

12   the substantial injury test or the four states have their

13   unconscionable test, so we don't have to go through more doors.

14   He just had more complicated claims.

15          THE COURT:  So you're saying that the circuit not

16   taking the case, even though they had an absolute right to, in

17   effect puts their imprimatur on his ruling?

18          MR. BERMAN:  I think it should give you comfort

19   because that was a super complicated case, and everyone

20   wondered, I suppose, is the Third Circuit going to take that,

21   and it didn't.

22          This is a less complicated case.  They had numerous

23   drugs at issue, numerous doses at issue, patients taking

24   different amounts over different times.  We have one drug each

25   patient took.  And one dose, we don't have any of those issues.

1            So let me go back for a second, Your Honor, to the big

2    picture because I think something happened after all the

3    briefing was done that takes a lot of the noise that the

4    defendants made about how prices are set and the impact on

5    consumers away.

6            And I'll start on my first slide, slide 2.  And we

7    touched on this in the five-pager we gave you.  Let me start

8    with what the *Valsartan* court said and then turn to the recent

9    price cuts.

10           What the *Valsartan* court said is:  (Reading)

11           The singular fact that grounds all of

12           plaintiffs' claims is the defendants' conduct in

13           putting the drugs into the marketplace and the

14           plaintiffs paying for those drugs.

15           That was his predominance -- the key to his predominance

16    analysis.  It's the same here.  The defendants now admit

17    through these press releases that they control list prices and

18    they admit that the list price impacts patient costs.  Two

19    things that their expert disputes, they now admit.

20           THE COURT:  But that's the first link in the chain,

21    isn't it, the list price?

22           MR. BERMAN:  The first link in the chain is the list

23    price.

24           THE COURT:  Okay.  Then what happens?

25           MR. BERMAN:  Then what happens is that our class is

1    defined by people who make a payment based on that list price.

2    And what these announcements are saying is, we understand -- we

3    understand --

4         THE COURT:  But at the end of the day the people who

5    make that payment could be uninsured.

6         MR. BERMAN:  Right.

7         THE COURT:  Could be somebody with a high deductible

8    before they get to a copay; could be somebody with no

9    deductible before they get to a copay.

10        Correct?

11        MR. BERMAN:  Correct.

12        THE COURT:  Could be somebody with a better insurance

13   policy than I may have and may have less of a copay.

14        MR. BERMAN:  Correct.

15        THE COURT:  So many different individuals.

16        Correct?

17        MR. BERMAN:  That's correct.

18        THE COURT:  But the end price is not set by the

19   manufacturer.

20        MR. BERMAN:  The price, the list price, right, is what

21   everyone in our class makes their payment on.  Right?

22        THE COURT:  Okay.  Who sets the list price?

23        MR. BERMAN:  The manufacturers.

24        THE COURT:  But there's other steps between the list

25   price -- between what you pay and what the manufacturer sets in

1    the market, isn't it?

2          MR. BERMAN:  Not for our class.  Let's just take the

3    uninsured.

4          THE COURT:  Okay.

5          MR. BERMAN:  I go into Walgreens, I don't have any

6    insurance.  I pay -- as Dr. Rosenthal has put forward in her

7    report, I pay based off the list price because the pharmacy's

8    contract charges you based off list price.

9          THE COURT:  How about the insured?

10          MR. BERMAN:  The insured who is making a copayment --

11    coinsurance rather -- also is charged off list price.  Everyone

12    is charged off -- and if you look at the slides, Your Honor,

13    these slides admit as much.

14          If you look at slide 5, Sanofi is announcing that

15    they're lowering list price and they're identifying two groups

16    of consumers who are going to benefit from that.  That's our

17    class.  It's a direct link.

18          And the same thing from Novo.  If you look at slide 3,

19    Novo is lowering U.S. list prices.  So they're saying:  We

20    control the price and we're lowering it, and we're lowering it

21    to make it more affordable.  More affordable.

22          Now we say "more affordable" is unfair or

23    unconscionable in our language.  But here is a direct

24    recognition by the manufacturer that it's their conduct that

25    is affecting our class members.

1          THE COURT:  Let me hear defense on that.

2          MR. GAUCH:  First, starting with the Sanofi press

3     release that he just showed you on the slide, I think, frankly,

4     he is misinterpreting it.  Sanofi took two actions.

5          One, they lowered the list price on Lantus, which the

6     list price change will be effective January 1, 2024.

7          Two, they expanded one of their two -- one of the two

8     major patient assistance programs.  So when he's quoting some

9     of the portions that he's saying "we're admitting the impact,"

10    Sanofi admits that it has customer assistance programs which

11    are relevant to the affordability, the product.  They're

12    committed to doing that.

13         And in fact as we'll get to in other parts of the

14    argument, the plaintiffs are trying to assume away those

15    affordability programs which we think are very important to

16    what individual consumers are actually paying.  But Sanofi

17    didn't set that price for everyone; it didn't admit that it has

18    control over that price.

19         THE COURT:  So there's a list price.

20         MR. GAUCH:  There is.

21         THE COURT:  And there's an ultimate price a consumer

22    pays.  Correct?

23         MR. GAUCH:  There are, that each consumer pays, yes.

24         THE COURT:  Right.  What happens between the list

25    price and a consumer?

1          MR. GAUCH:  Well, so there is no consumer that buys

2     directly from Sanofi.  So Sanofi sells to the wholesalers.

3          THE COURT:  Then what happens?

4          MR. GAUCH:  That's negotiated.  There are rebates that

5     are provided to PBMs which are, as everyone knows in this case,

6     are huge.

7          THE COURT:  Right.

8          MR. GAUCH:  Those rebates are paid.  Those rebates

9     sometimes are passed through, in whole or part, to consumers.

10    Sometimes they're not.  Sometimes they might lower the premiums

11    the insured patients are paying.  And for the insured, the

12    rebates can have a lot of different impacts, because the money

13    is going to the PBMs, to the insurance companies, and that

14    plays into their business model in terms of how to price the

15    insurance, what the premiums are, how they calculate the

16    deductibles, that sort of thing.  Their high deductible plans,

17    low deductible plans, rebates all feed into that.

18          But when you are even dealing with the cash-paying

19    consumers who aren't -- because they're not insured the rebates

20    don't play into it that way, but for them, pharmacies set

21    prices independently.  They're making their own business

22    decisions and they are not automatically keyed to the list

23    price.  There are a lot of variations.  There's evidence.

24          THE COURT:  Well, there is an impact on the ultimate

25    consumer but are you saying that's out of the control of the

1   manufacturer?

2        MR. GAUCH:  The ultimate price is out of the control

3   of the manufacturer.  Certainly the manufacturer's list price

4   has an impact.  This is a very complicated market.  Obviously

5   what the manufacturer sells it for makes a difference.

6        The rebates have an effect on the ultimate price.  The

7   independent decisions of wholesalers pharmacies have an effect

8   on the price.  And then ultimately in terms of what the

9   consumer actually pays, their own choices have an impact

10  whether they have insurance, what kinds of insurance they have,

11  whether they take advantage of assistance programs, whether

12  they don't, whether they use coupons.  There are a lot of

13  things that affect that ultimate price.

14       And the plaintiffs are trying to define this whole

15  case.  This is an unfair, unconscionable pricing case, but they

16  are trying to take the price that the consumer ultimately pays

17  out of the equation.

18       They have set up a class where if you pay a $20 copay

19  because that is flat, you are out of the class, but if you pay

20  $20 coinsurance as a percentage of the purchase price, then you

21  are in the class.  You are paying exactly the same price, but

22  the connection to the list price is different in those two

23  instances.

24       So ultimately they are trying to take the prices

25  consumers are paying out of what is an unfair pricing case.

1    That is what makes no sense here.

2              THE COURT:  I cut you off.

3              MR. BERMAN:  Two points on this, Your Honor.  If you

4    take a look at slide 22, their own expert admits that average

5    wholesale price -- to use his own words -- has been used as a

6    benchmark by insurance payers to determine how much to

7    reimburse and pay for a given drug.  That's list price.  AWP,

8    or average wholesale price, is the wholesale acquisition cost

9    plus 20 percent.  That's AWP.

10             So what their own expert is admitting is that prices

11   are calculated off list price.  There's a reason for that.  As

12   they point out, there's 60,000 pharmacies.  There has to be a

13   standardized way for everyone to price something.  You can't

14   have thousands of drugs, 60,000 pharmacies, all pricing

15   willy-nilly.  There has to be a uniform system so they can be

16   processed by these companies.

17             This is a half-trillion dollar industry.  They have to

18   have standards and formulas and the formula here is tied to

19   list price.  And if there's any doubt about it, Your Honor, we

20   went and we didn't rely just on Dr. Rosenthal, but if you take

21   a look at slide 23, we went to the insurers, some of the

22   largest insurers in the country, we went to the pharmacies and

23   we got declarations from Walgreens, Kroger, Rite Aid, Express

24   Scripts, a PBM, CVS, that uninsured and insured patient

25   payments are tied to list price.

1          We got the evidence.  Right?  So we've -- and you

2     don't have to resolve whether he's right or we're right; all

3     you have to decide today is whether there's a reliable

4     methodology between the structural break test that has been

5     adopted and approved and evidence like this that we went and

6     got from industry players, tying payments to list price, we've

7     come up with a reliable methodology to certify this class.

8          I'm going to, unless you have more of me, I'm going to

9     save time for reply and defer to Mr. Cecchi on the application

10    of state law.

11          THE COURT:  Okay.

12          MR. CECCHI:  Thank you, Judge.

13          I want to talk about the classes that we ask

14    Your Honor to certify.  But I first just want to touch very

15    briefly on the question you asked Mr. Berman:  What is the

16    impact of the Lilly settlement approval and nonapproval?

17          One part of our proposal in that preliminary approval

18    motion is an ascertainability plan where we will obtain and

19    subpoena all of the pharmaceutical data and touch every one of

20    our putative class members.

21          So I think the Lilly settlement is relevant to the

22    extent it undeniably shows, as does *Valsartan*, why

23    ascertainability isn't an issue in this case.

24          I would also submit that the Inflation Reduction Act

25    is relevant to the extent it represents public recognition and

1    public policy that what we're talking about here is a pricing

2    scheme for many years that is unquestionably unconscionable and

3    that has impacted consumers across this country.

4         It's a recognition by policymakers that what we've

5    been saying for six years has in fact been happening.  So I do

6    believe the structural -- excuse me -- the Inflation Reduction

7    Act is relevant to suggest the verity of what we've been saying

8    all these years.

9         We have three gates for Your Honor to go through here

10   today.  The first gate is the national class, the second gate

11   is the multistate classes, which we've talked about, and the

12   third gate are single state classes which we would ask you to

13   certify.

14        This to me is the strongest case I have ever been

15   involved in and had the privilege to argue for the

16   certification of a national class against Novo and Sanofi, and

17   let me tell you why.

18        Your Honor is well aware that the test in New Jersey

19   is the substantial relationship test.  And it's important to

20   understand, because there's a lot of obfuscation by the

21   defendants, it's important to understand what the substantial

22   relationship is.  What it is related to, it's to the issue in

23   the case.

24        There is a single issue in this case which will drive

25   the result before the jury, and that issue is whether or not

1    the defendants' pricing of these drugs was unconscionable.  The

2    list price.

3         Every single fact before Your Honor, there is not a

4    single fact that didn't take place in the state of New Jersey

5    related to the setting of the list price.  Sanofi and Novo are

6    here.  We made a conscious decision, in our depositions, in our

7    discovery requests, to demonstrate that every relevant decision

8    about the setting of a list price took place in the great state

9    of New Jersey.

10        The pricing committees met here.  They decided what

11   the list price was.  They decided what the rebates would be for

12   both Sanofi and Novo.  And it shouldn't come as a great

13   surprise to Sanofi and Novo that we are asking for the

14   application of New Jersey law to the national class, because

15   they are, their principal places of business are in the state

16   of New Jersey.  They are subject to general jurisdiction here

17   and they could be sued for anything at all by anyone in the

18   United States here in the state of New Jersey.

19        It's important also to recognize a case that they

20   didn't talk about.  And I want to talk about Section 145,

21   Section 6 of the Restatement (Second).

22        But I first want to talk about *Accutane*.  *Accutane* is

23   the guiding case by the Supreme Court in New Jersey on choice

24   of law.  *Accutane* was a mass tort in the state court system

25   where 500 plaintiffs came from around the country and sued the

1    pharmaceutical defendant in New Jersey.

2          In that case, my colleague, who is not here anymore,

3    argued no, no, as do the defendants here, the place of

4    ingestion of the drug, the place of what they say the injury

5    took place should govern those states, those 50 states.  Those

6    500 plaintiffs would be subject to state laws all across the

7    country.

8          The New Jersey Supreme Court in the leading case in

9    2018 said, no, that's not what you look at.  The leading

10   factors under 145 and Section 6, which are the guiding

11   principles we have to apply here today, is -- I'm going to read

12   it for Your Honor.  (Reading)

13         The most important factors are certainty,

14         predictability and uniformity of result and ease

15         of application and determination of the law.

16         In that case in *Accutane*, the New Jersey Supreme Court

17   applied New Jersey law even though every one of those

18   plaintiffs bought the drug somewhere else, a pharmacy was

19   prescribed the drug somewhere else, and allegedly sustained an

20   injury somewhere else.

21         The court said, oh, no, no, no, in a mass tort, a

22   complex class case, the two Section 6 factors are the pole

23   stars that we have to rely upon in determining the application

24   of the law.  Every single other Section 145 and Section 6

25   factor points to New Jersey as well.

1          The place of injury, my good friend Jim Rouhandeh is

2    going to argue is paramount, is what he's going to say, drives

3    the result.  That's absolutely not the case.  This case is

4    governed by Section 145.  Every case, Judge, and we can go

5    through them, that they rely upon is either a 146 case -- 146

6    is personal injury -- or a 148 case.  148 is misrepresentation

7    and reliance.

8          We have none of that here.  This isn't a personal

9    injury case.  It's not a case where we say they relied upon a

10   label warning in some other state, there was a failure to warn.

11   146 and 148 are not the standard.  145 is.

12         Every case they rely upon is also pre-*Accutane*.

13   *Grandalski, Maniscalco*.  Every one of those cases is

14   pre-*Accutane* and every one of those cases arises under a

15   different restatement section.  And even if you apply the

16   factors of those sections, would get us in the same result, the

17   application of New Jersey law here.

18         And I just want to mention about 146 and 148 because

19   it's very important.  When you have a true personal injury case

20   or a misrepresentation reliance case, there is a presumption,

21   there is a presumption that the place -- the application of law

22   will be the place of injury.  145, there's no such presumption.

23   So if you tick through 145 and you tick through Section 6, you

24   get to New Jersey.

25         What about the vindicating -- the policies of the

1    relevant forms?  There is no conflict here between the relevant

2    policies of the forms.  Every one of these forms wants to deter

3    corporate misconduct, wants to provide consumers with a remedy.

4    The best way to get to that end is to apply New Jersey law to

5    these two defendants who made every single decision about the

6    list price in the state of New Jersey.  There is absolutely no

7    dispute about that.

8         There is also, Judge, no dispute that in

9    Dr. Rosenthal's report, the way we define our class, the prices

10   they paid, the damage they incurred, was solely occasioned as a

11   consequence of the setting of the list price.  That's all our

12   case is about, the unconscionability of that list price and how

13   it impacted our consumers.

14        What other factors should we touch on real quickly?

15   The other gate, Judge, that I think it's important to think

16   about is the multistate gate.  And this one, as easy as I think

17   application of 145 and Section 6 are here today, our multistate

18   classes are equally simple to apply.

19        There are two tests for unfair acts in the multistate

20   class.  There's eight states which we've presented which apply

21   the 1980 FTC rule.  Excuse me, yes, eight states.  And there

22   are six states which apply the third prong of what's called the

23   old Cigarette Rule.

24        The jury instructions and the standards for those

25   tests for unfair acts and unconscionability are exactly the

1    same.  So those groupings, there are no conflict in those laws.

2    There's not going to be multipage jury instructions.  There's

3    not going to be any manageability issues because the 1980 FTC

4    tests and the third prong of the cigarette test are exactly the

5    same.

6         We also ask Your Honor to certify single state

7    classes.  It's easy.  New Jersey, they're here.  We can do a

8    single state New Jersey class.  We ask also, because we have

9    plaintiffs in Texas, for a Texas single state class.

10         And while we're trying either the multistate or the

11    national case, two states which we've moved under, is for

12    Your Honor to try from the bench and that would be Kansas and

13    Utah.

14         Judge, I would like to take some questions if you have

15    any questions on national law, multistate classes.

16         THE COURT:  I want to hear what defendants have to say

17    about it.

18         MR. CECCHI:  Thank you.

19         MR. ROUHANDEH:  James Rouhandeh from Davis Polk &

20    Wardwell for Novo Nordisk.

21         Good morning, Your Honor.  Plaintiffs have decisively

22    in this case jettisoned any theory or fraud or deception or

23    misrepresentation, and the only thing that is left are these

24    claims of unfairness and unconscionability.

25         When they drop those claims of deception that really

1  was a watershed moment in this case, because what they're left

2  with is trying to demonstrate that a class should be certified

3  over unconscionability and unfairness claims and saying that --

4  so in essence the inquiry here really begins and ends with

5  whether you can certify those and we submit that they cannot.

6        Before discovery they were hoping they could certify

7  the class based on a misrepresentation made to or made public

8  or made in effect to all consumers, and the Court allowed the

9  case to go forward based on that theory.

10        They have now abandoned those claims and they are

11  saying that some people paid unfair and unconscionable prices.

12  And what that shift has done is deprived them of the ability to

13  certify a class.  We are going to come at that two different

14  ways.  Mr. Gauch is going to argue a number of the issues and I

15  will others.

16        THE COURT:  Do you agree the ultimate price is set by

17  the manufacturer?

18        MR. ROUHANDEH:  No.

19        THE COURT:  The list price drives the ultimate price;

20  do you agree with that?

21        MR. ROUHANDEH:  I'm not sure it drives the ultimate

22  price, certainly not in every case.  There's so many different

23  prices being paid and it's a market and there's so many

24  different actors.  It's kind of, sort of like any time there's

25  a market there's so many different inputs and so many different

 1    players in the market it's really hard to say it drives the

 2    price.

 3         It doesn't drive the price for the patient

 4    affordability programs.  NNI allows people free drug for 30

 5    days and it can be renewed.  If it's a family making four times

 6    the poverty level or below, they're entitled to free product.

 7    I don't think in that case it drives the price.

 8         But I think -- what I want to address, Your Honor, is

 9    I'm going to address the nationwide class and this

10    ascertainability, ascertainable loss question and then

11    Mr. Gauch will address, and this is set forth -- we have a

12    roadmap, we've handed up a slide deck as well which we won't go

13    through in great detail, but the slide one kind of lays out

14    that roadmap.

15         THE COURT:  We're just getting that.  Thank you.

16         MR. ROUHANDEH:  So I will address as it says there the

17    nationwide issue and the ascertainable loss issue.  Mr. Gauch

18    will address the multistate classes.

19         THE COURT:  We can agree numerosity is not an issue.

20    Right?

21         MR. ROUHANDEH:  No.

22         THE COURT:  We're making progress.

23         MR. ROUHANDEH:  Okay.  I met a limited number of

24    people who actually defeated a class based on numerosity.  It

25    happens every once in awhile.

1          Then Mr. Gauch will address the ascertainability issue

2    of who's in the class and who is not.  And the injunctive class

3    issue.  And then I'll come back at the end and discuss the lack

4    of a model demonstrating injury and damages.

5          This first issue is that, in a nationwide class is

6    that plaintiffs' arguments under the nationwide class run afoul

7    of absolutely clear Third Circuit precedent.  In particular,

8    *Nafar* and *Maniscalco* but there are other cases.  And they don't

9    have a case.  They cannot cite to a case in which a court has

10   certified a nationwide class applying the current conflicts of

11   law test.  And I'm referring to the test that was articulated

12   by the New Jersey Supreme Court and the Third Circuit.

13         But there's a second reason why they can't certify a

14   nationwide class and that is that they no longer have a valid

15   claim under New Jersey law.

16         So first turning to the nationwide unconscionability

17   class, the Third Circuit laid out the factors in *Nafar* and

18   *Maniscalco* that courts are to apply.

19         And *Nafar* is particularly instructive.  That's a case

20   where Judge Cavanaugh had certified a nationwide class.  The

21   Third Circuit reversed that class certification under the

22   New Jersey Consumer Fraud Act.  The Court remanded it back to

23   Judge Cavanaugh.

24         And there was a really significant reason, something

25   very significant had happened between the time Judge Cavanaugh

1    had decided the motion and the reversal of his decision, and

2    that is the New Jersey Supreme Court decided the *Jaycee* case

3    which we talked a little bit about on page 3.

4         THE COURT:  For purposes of the record this is

5    Defendants' Exhibit 1 which is a slideshow that we are

6    referring to.

7         (Defendants' Exhibit D-1 is marked for

8    identification.)

9         MR. ROUHANDEH:  That case explicitly rejected this

10   governmental interest test and replaced it with a significant

11   relationship test.  That was a paradigm shift.  That was a

12   paradigm shift in the choice of law analysis.  It was a very

13   significant change in the law.

14        And apart from being a change, what the Third Circuit

15   did in *Nafar* is they said to Judge Cavanaugh on remand:  Here's

16   how you should apply the significant relationship test.  And it

17   was obviously also speaking to other courts in the circuit and

18   they laid out the factors that need to be considered.

19        And on remand the district denied certification

20   because that change in law to the significant relationship

21   test, that was outcome determinative.

22        Now the other relevant case here is *Maniscalco*.  That

23   was also a purported nationwide class under the New Jersey

24   Consumer Fraud Act.  And once again the Third Circuit laid out

25   the appropriate test, and it did it clearly and very

1    consistently with *Nafar*.

2          And what they said was, in those cases that even

3    though the corporation was headquartered in New Jersey, the

4    home state of the plaintiffs have the most significant

5    relationship to the consumer fraud case.

6          And what they said and how they explained that is

7    hugely important to this motion because -- and Nafar said this,

8    quote, A presumption that each perspective plaintiff's home

9    state has the most significant interest in litigating its

10   resident's claims.

11         And it said further in both of those cases, the Third

12   Circuit said:    (Reading)

13         Applying New Jersey law to every potential

14         out-of-state defendant would frustrate the

15         policies of the home states of the claimants.

16         And so the Court recognized that there was, every

17   state had where a name plaintiff resided or a plaintiff resided

18   has an interest in obviously applying its law to its own

19   consumers.  And they said that interest in having its own law

20   apply to home state plaintiffs, it outweighs the interest that

21   New Jersey has in protecting non-New Jersey consumers.  And

22   that's because each plaintiff's home state has an overriding

23   interest in delineating the scope of recovery for its citizens

24   under its own laws.

25         And the other critical point, because we're talking

1    about *Accutane* which we'll come to, is that the Third Circuit,

2    the other critical thing that they said was:  The interest of

3    judicial administration must yield to the other factors in this

4    case.

5         And it was considered -- and these are the Third

6    Circuit's words, that judicial administration is to be

7    considered of lesser importance than the interest of states

8    outside New Jersey in having their own law apply to their own

9    citizens.

10         Now you might say that New Jersey is the king of

11    comity.  That is when an overriding principles in a number of

12    cases actually lead with that, because -- and it starts with

13    the New Jersey Supreme Court saying that New Jersey has

14    continuously deferred to the rights of other jurisdictions to

15    regulate conduct within their borders.

16         And so we would submit that certainly under *Maniscalco*

17    and *Nafar* there's controlling authority that this nationwide

18    class simply cannot be certified under Third Circuit law

19    because it would require the application of the differing laws

20    of the 50 states or wherever the plaintiffs come from.  I think

21    it's less than 50.

22         And here they're seeking to apply one nationwide class

23    with only New Jersey law and that just simply cannot be squared

24    with Third Circuit authority.  What do they say to all of this?

25    First they say, they completely ignore the fact that no court

1    has done this.  The Third Circuit hasn't approved a nationwide

2    class applying the Consumer Fraud Act across the country under

3    the significant relationship test.

4         And they also just repeatedly ignore the cases and the

5    standards.  They cite out-of-date cases.  They cite the *Hertz*

6    and *James* cases which didn't apply the restatement factors

7    under Section 6.

8         They say:  New Jersey law furthers this, all states

9    interests.  And that's an outdated -- it's just not good law

10   after *Maniscalco* and *Nafar*.

11        They rely on two cases in this district, *Elias* and *Dal

12   Ponte*.  Those were decided before *Jaycee* in 2008.  Those cases

13   came from earlier in 2008 and 2006.  And *Jaycee* is really the

14   critical turning point because that's the case that was decided

15   in between Judge Cavanaugh's decision and the Third Circuit

16   reversal.

17        And *Jaycee* said very explicitly that Section 145 and

18   Section 6 should be applied to the choice of law analysis,

19   rejected the governmental interest test that so many of the

20   cases plaintiffs rely on applied.  And that this is the modern

21   test.  And it's just not compatible with a parochial approach

22   that New Jersey knows best of what is best for consumers in

23   other states.

24        The restatement says in fact the place of a

25   plaintiff's domicil may be the single most important contact.

1    And there are many cases, state and federal courts in

2    New Jersey that have held that the center of the relationship

3    is actually where the plaintiffs purchased or used the product

4    at issue.

5           And this Section 6 which is -- you've got Section 145

6    or 146 or 148, all of which are applied interchangeably.  But

7    Section 6 is -- Section 145 is where you look at what the

8    factors are that should be considered, and Section 6 says how

9    do you weight those factors and how do you think about those

10   factors.

11          Well, Section 6, they waived any argument under

12   Section 6.  They not only keep trying to apply the governmental

13   interest test, they didn't even apply the appropriate test

14   which is to look at Section 6.  They didn't mention it in their

15   opening brief seeking certification of a nationwide class.

16          And we submit it would be unprecedented.  And in fact

17   when we challenged them and said it's unprecedented to certify

18   nationwide class they came back in the reply with one case, the

19   *International Union of Operating Engineers* which predated the

20   *Jaycee* case and was overruled.  It applied that case, they came

21   back with applied the old governmental interest test, not the

22   significant relationship test.

23          So the case law doesn't support them.  But, so they

24   argue and you heard about *Accutane*.  They argue the judicial

25   administration point.  But *Accutane* is a very different case.

1    It did consider judicial administration and put it as a primary

2    issue but it was in a different context; it was in a

3    multicounty litigation.

4         There were 500 -- it wasn't a class action, there were

5    500-plus individual actions filed around New Jersey, and the

6    Court had to manage 500 individual cases and they say that's

7    the new standard.  Well, they certainly don't cite to any

8    federal court after *Accutane* applying that in a consumer

9    protection case, and that is likely because of this confounding

10   factor that it's really not a class case and it's a multicounty

11   case.

12        And again, the Third Circuit has been crystal clear

13   that judicial administration is -- these are their words -- of

14   lesser importance than the other Section 6 factors.  And

15   *Maniscalco* said that at 709 F.3rd at 210.

16        So this case involves a straightforward application of

17   modern choice of law principles and dictates that it would not

18   only be inappropriate but unprecedented to certify the

19   nationwide class that they're seeking.

20        But even setting aside that, all the reasons why a

21   nationwide class can't be certified, there is a more

22   fundamental problem that plaintiffs have which has to do with

23   ascertainable loss.  They no longer have a valid New Jersey

24   claim.  That's because they can't show any ascertainable loss,

25   which is one of the elements.

1          Your Honor, in the motion-to-dismiss decision, said

2     plaintiffs are required to establish ascertainable loss.  There

3     are two options, an out-of-pocket theory or benefit of the

4     bargain theory.  The Court said that the out-of-pocket theory

5     doesn't work because that out-of-pocket theory is meant for

6     cases where the product is essentially worthless.  And of

7     course the Court allowed the case to go forward using the

8     benefit of the bargain theory, which required them to show that

9     they had a reasonable belief about the product that was induced

10    by a misrepresentation.

11         So I said this was a watershed moment when they took

12    that fraud claim out.  That's because they abandoned their

13    fraud theory and it's doomed the class certification decision

14    because -- their class certification motion because they're not

15    alleging any misrepresentation and they're not alleging a loss

16    as a result of an alleged misrepresentation.

17         And that really, it could not be clearer.  Here's what

18    they say in their brief at 44, page 44.  (Reading)

19         Plaintiffs do not claim that they and the class

20         members suffered pecuniary harm on account of

21         their reliance on the defendant's false

22         representations.

23         In other words, they cannot show, in the words of this

24    Court's decision they cannot show that a consumer had any

25    reasonable belief about insulin that was induced by a

1   misrepresentation.  And so they can't rely on a benefit of the

2   bargain theory.  They can't establish ascertainable loss.  And

3   they no longer have a cognizable theory.  This is what the

4   Third Circuit has said, they need to have a cognizable theory

5   of damages that could support class certification.

6          So what do they say about that?  Well, they completely

7   ignore this Court's decision on the ascertainable loss

8   requirement.  Instead they advance a price inflation theory.

9   But the New Jersey Consumer Fraud Act does not permit price

10  inflation claims so that can't save their motion.

11         With the abandonment of the fraud theory what they're

12  left with is, prices were too high.  They say this over and

13  over again.  And we list them on pages 7 and 8 of the slides.

14  They say over and over again in the complaint and in their

15  briefs that defendants artificially inflated the prices,

16  artificially inflated prices caused gross overpayments, that we

17  decided to compete for market share using inflated list prices.

18  That we set unfairly inflated list prices.

19         But as I said, the problem for them is that doesn't

20  work under the New Jersey consumer fraud statute.  And the New

21  Jersey Supreme Court said this, they said this in the *Dugan*

22  case.  Our case is -- a quote:  (Reading)

23         Our case law has consistently rejected price

24             inflation theories as a substitute for proof of

25             ascertainable loss or causation in New Jersey

1    consumer fraud claims.

2        And the Court rejected their attempt to assert

3    ascertainable loss based on a price inflation theory.  In fact

4    it said:  (Reading)

5        The plaintiffs attempt to seek to predicate a

6        class-wide finding of ascertainable loss and

7        causation on a price inflation theory, premised on

8        the contention that the defendant's unlawful

9        pricing practices empowered it to overcharge its

10        consumers, it rejected that attempt.

11        And the Third Circuit said it just as clearly,

12    rejected it.  And it's in the *Harnish* case, they refer to this

13    price inflation theory as a, quote, non-cognizable theory, and

14    we have the relevant quotes on page 6 of our slides.

15        And it's just unavailable, that theory is unavailable.

16    So what that means is they cannot certify class based on a

17    price inflation theory.  That means there's no longer a viable

18    claim at all under New Jersey law.  So one could reasonably

19    ask: what are we doing here if there's no claim under the

20    New Jersey Consumer Fraud Act, yet they are seeking to premise

21    a nationwide class on New Jersey law?

22        And I did want to, just one of the things that

23    Mr. Cecchi said I just wanted to come back to, which is, I

24    think what he was saying is *Maniscalco* was applying 148, and

25    this is a 145 case, and that there's some difference between

1   those sections of the restatement.  It's just not true.

2         I mean the courts in this district, including

3   Judge Wolfson in the *Bond* case, that was a 145 case, it applied

4   the 148 factors that were identified in *Maniscalco.*  There is

5   no reason not to apply that same set of factors and the courts

6   have done that repeatedly in multiple contexts.

7         So let me turn this over to Mr. Gauch again.  We'll

8   begin with the multistate classes.

9         MR. CECCHI:  Judge, would you like to hear the

10  response to the national class argument?

11        THE COURT:  That may be a prudent way to proceed.

12        MR. CECCHI:  Thank you, Judge.

13        Judge, this is absolutely 100 percent a significant

14  relationship test under the Restatement (Second).

15  Mr. Rouhandeh talked about cases *Camp Jaycee*, *Maniscalco*, each

16  of which apply the wrong section of the restatement and predate

17  *Accutane*.

18        What we seek Your Honor to do is follow the guiding

19  principles of the State Supreme Court which governs the choice

20  of law analysis, not *Nafar*, not *Maniscalco*.  But even if they

21  did, they don't apply the factors which are relevant here

22  today.  Section 145 and Restatement (Second) applies to general

23  tort claims, our unconscionability claim here, guided by the

24  principles of Section 6.

25        *Maniscalco*, let's talk about that.  *Maniscalco* is a

case under 148.  Mr. Rouhandeh makes light of the distinction

between 148, 146, and 145, for a good reason: he wants to blend

them together.  But even if you applied them, we still get to

New Jersey.  But 148 and 146 have presumptions in favor of the

place of injury that are not present in a 145 Section 6 case.

Again, 146 and 148, you'll have a presumption.

That's why he relies on those cases.  The restatement also says

in the comment, Comment E to Section 145, that when you're

dealing with a place of injury that is ultimately fortuitous,

that factor recedes into the background.

It recedes into the background in this case because

the conduct causing the injury comes to the fore.  That's the

primary factor along with ease of administration.  Where did

the conduct causing the injury take place?  It took place in

the state of New Jersey.  Mr. Rouhandeh didn't speak about it

because there's no dispute about it.

The place of injury is fortuitous.  I could be a

diabetic living in Florida, go on vacation in Michigan and buy

it there and my harm is still caused in our case by the setting

of the list price, which is done here.  The conduct causing the

injury under 145 is the important thing to look at.

It's not surprising in *Maniscalco* also, because

*Maniscalco*, all the conduct occurred outside of the United

States.  It occurred in Japan, the relevant conduct.

*Grandalski v Quest*, another case they reply upon, is

1    also a 148 case, starting from a presumption.  And that is a

2    false representation case where you have to determine where the

3    false representation was received, where it was read, that's

4    why you have the presumption in Section 148.

5           He talked about the policies of the form and this

6    paradigm shift.  Well, we're asking Your Honor to apply the

7    significant relationship test as articulated by the leading

8    case *Accutane*.

9           *Camp Jaycee* is an interesting case because it really

10   illustrates why you apply New Jersey law here.  *Camp Jaycee* was

11   the case involving the minor who was abused at a camp in

12   Pennsylvania but the camp was owned by a New Jersey charity

13   where there was charitable immunity.

14          So applying New Jersey law to an assault which took

15   place in Pennsylvania, which is a 146 presumption of the place

16   of injury, if you apply New Jersey law, you would frustrate a

17   very strong policy of New Jersey -- of Pennsylvania -- excuse

18   me.

19          Here you have the exact opposite.  Vindicating

20   consumer rights and deterring corporate misconduct vindicates

21   everyone's rights.  It's interesting that they rely upon the

22   idea that all these other states have some interest here.  They

23   want to grab upon those interests to further their own

24   interests, which is not to have a class, not to give anybody

25   any recovery.  That's not what the restatement tells us to do

1    when you are looking at public policy.

2           Ascertainable loss, Judge.  In Your Honor's

3    motion-to-dismiss decision you articulated where the harm took

4    place.  You articulated what our theory was from our complaint,

5    which was the list price was set before the defendants made the

6    purchase.  That's the relevant conduct at issue here, the

7    determination of the inflated unconscionable list price.

8           Talking about unconscionability claims, you sustained

9    the unconscionability prong of our complaint in your

10   motion-to-dismiss case.

11          In this courthouse, the new courthouse across the

12   street, Judge Martini, albeit a single state New Jersey class,

13   certified a pricing case, an unconscionable pricing case

14   involving prisoners who had no choice but to pay outrageous

15   prices for telephone service.  That was a strict, narrow

16   unconscionability claim just like we have here.

17          Judge Martini certified that and he relied upon the

18   New Jersey jurisprudence, starting from the seminal case of

19   *Kugler*, which said overpricing unconscionability, that is

20   absolutely a claim.  There is absolutely a straight line,

21   ascertainable loss as we explain in Dr. Rosenthal's report from

22   the list price to the damages incurred by the plaintiff.

23          Scope of recovery, that there's different types of

24   recovery.  Maybe you can get more in one state, less in

25   another.  That's not a conflicting interest; that's a policy

1    determination about vindicating rights but giving people a

2    different remedy.  That doesn't defeat class certification.

3           Fraud on the market.  Mr. Rouhandeh relied upon the

4    idea that *Widener*, which is a New Jersey Supreme Court case,

5    there they did rely upon the idea of an efficient market, sort

6    of borrowing from the securities context in terms of showing

7    ascertainable loss and damage.

8           We have nothing remotely of the sort here.  We haven't

9    argued an efficient market.  We haven't argued fraud on the

10   market.  Our damage theory, our ascertainable loss is derived

11   from what they did here to set the list price which directly

12   impacted each and every one of our plaintiffs.

13          Thank you, Judge.

14          MR. GAUCH:  Your Honor, I think that was door number

15   one that the plaintiffs have laid out for you.  I want to start

16   with the multistate class, then talk a little bit about

17   individualized inquiry, come to ascertainability last and I'll

18   try to keep the pace rolling.

19          So we're now on slide 13 of Defendant's Exhibit 1.

20   When we come to multistate class, of course we start with

21   *Grandalski* which established that plaintiffs have the burden to

22   demonstrate that the groupings are workable solutions when they

23   include multiple states, and they have to do an extensive

24   analysis of state law variances.

25          And *Grandalski* specifically criticized the plaintiffs

1  in that case for simply dismissing variations as insignificant

2  or nonexistent, said the court cannot rely on the plaintiffs'

3  *ipse dixit*.  I think part of the problem here is the

4  plaintiffs, as they told you, think this is easy.  It's not.

5  These differences are complicated.  There are courts throughout

6  this circuit that have been very reluctant to certify class

7  actions in consumer protection cases.

8          I'll skip over slide 14 which talks about *EpiPen*.

9  I'll come to that in a minute.

10         Here on page 15 there's a chart that breaks down, as

11  the plaintiffs explained, there are two major unfairness

12  standards in play here: the Cigarette Rule dating from 1964 and

13  the 1980 policy statement.  Each of those are three-prong

14  tests.  One prong overlaps between the two tests.

15         And the plaintiffs are right in terms of how they

16  group them.  They say this doesn't matter because it's all the

17  same.  The problem is that's not true.

18         Now it's interesting when it comes to the *EpiPen* case,

19  which we rely on which faced exactly the same issue, they were

20  looking at the same problem, it was an unfair pricing case in a

21  pharmaceutical context.  And there were 20 states in the class

22  there.  We've highlighted in orange or red or reddish-orange

23  the states that were the same in *EpiPen* as here.

24         *EpiPen* looked at exactly the same question and

25  determined that, among other things, the distinction in the

1  unfairness standards was sufficient that it could not certify a

2  class covering all of them.

3       Now one thing that's interesting here is that *EpiPen*

4  actually had Florida in the wrong column.  *EpiPen* thought that

5  Florida was a Cigarette Rule case.  As the plaintiffs

6  rightfully point out in their briefs under the *Porsche Cars*

7  case, Florida is actually a 1980 policy statement case.

8       And the Florida appellate case that decided that

9  determined that it was reversible error for the district court

10 to apply the Cigarette Rule rather than the 1980 policy

11 statement in an unfairness case.

12      So these are not the same standards.  These are the

13 kinds of standards that trigger reversible error if one is

14 applied rather than the other.  The plaintiffs just tried to

15 dismiss the differences.  They also ignore completely the

16 admitted differences in the way the states apply them.

17 Louisiana for example as we cite in our brief has a

18 particularly aggressive approach with regard to egregious

19 conduct being required.

20      Massachusetts has a, recognizes an industry standards

21 defense as a relevant factor, not dispositive, but relevant.

22 That can come into play in a case like ours where we're arguing

23 about industry pricing practices when it comes to insulin.

24 That's a meaningful distinction.

25      Then of course plaintiffs run roughshod over the fact

1   that two of the states that they try to put in this multistate

2   class have not taken a position on the unfairness standard at

3   all.  One of them in Indiana they rely on a Law Review article

4   that would place it in, they argue in the 1980 policy statement

5   category, but the article in fact argues for the modified

6   Cigarette Rule.

7            Again I mention that only because it highlights that

8   these standards are different.  They're different in

9   application, they're critically different.  And as the

10  Third Circuit said in *Grandalski*, you can't simply rely on

11  plaintiffs' *ipse dixit* that these distinctions don't matter.

12           And that's just the unfairness standard.  On the next

13  page on slide 16, we've charted out for you a few other areas.

14  We've just selected a few states.  We haven't gone through all

15  16.  This is all in our briefs.  But there are other important

16  differences, which plaintiffs don't deny, between the standards

17  that apply in these different states.

18           And I'm not going to go through all of them but I will

19  mention with respect to scienter, plaintiffs acknowledge that

20  the scienter standard is different in some of these states than

21  others; but their answer is, well, we allege intentional

22  conduct, we are going to prove intentional conduct, we're

23  meeting the highest standard, therefore you don't have to worry

24  about the distinction.

25           But that's not a solution.  If you look at the

1    *McCormick Pepper Products* case, that court recognized in a

2    class action everybody is bound.  Everybody in these states, if

3    you certify this multistate class, every consumer in every

4    state will be bound to what the plaintiffs are now proposing,

5    which is to meet the highest standard.

6         So if they are in a state where the standard is lower,

7    they'll be bound, regardless.  *Pepper Products* says you can't

8    simply ignore that difference because those class members

9    should have the benefit of their state's law when it comes to

10   those kinds of issues.

11        All of these issues we think overwhelm any assertion

12   of commonality in the multistate class and urge this Court to

13   make the same decision that *EpiPen* did in the same

14   circumstances.  Third Circuit requires nothing less.

15        But now let's turn, on page 17, let's turn to

16   individualized inquiries.  And this applies across all of the

17   classes so this would apply to all three of the plaintiffs'

18   doors.

19        Obviously as the Court knows, Third Circuit in

20   *Hydrogen Peroxide* said that:  (Reading)

21        Proof of the essential elements that cause the

22        action requires individual treatment, then class

23        certification is unsuitable.

24        Here it most certainly does.  And let's take the

25   plaintiffs at their word.  So putting aside the distinctions

1    that I've just talked about in the relevant standards, if on

2    page 18 you apply the plaintiffs' standard across the board,

3    these are the four elements and each of these elements,

4    causation, substantial injury, not reasonably avoidable by

5    consumers and is not outweighed by benefits to consumers, each

6    of those requires an individual inquiry into the consumer's

7    circumstances.

8         And we've already talked about this a little bit

9    earlier, that even if the manufacturers are setting the list

10   price, that's not the price that the consumers are ultimately

11   paying.  And there are a number of factors that come into play,

12   and those factors that come into play relate specifically to

13   the elements that the plaintiffs are arguing.

14        So let's first look at -- I won't go through all of

15   these but on the not reasonably avoidable.  Here plaintiffs and

16   defendants are essentially talking past each other because

17   there's a lot of rhetoric in their briefs about insulin being

18   vital to the treatment of consumers.

19        And we recognize that insulin is an important drug.

20   These companies developed analogue insulins.  They brought

21   benefits to all consumers by developing these products after

22   years of research.

23        And nobody is arguing about whether or not the

24   patients in question have to have insulin.  This is an unfair

25   pricing case.  The question is whether they could reasonably

1  avoid the pricing behavior that the plaintiffs are complaining

2  about.

3      And there, there are a number of individualized

4  questions that come into play about whether to have -- whether

5  to get insurance or not, what kind of insurance to get, whether

6  to use the assistance programs or not.  And all of these things

7  in the record are things that the representative plaintiffs

8  have highlighted as being meaningful in their own decisions.

9      There are plaintiffs that have testified, Mr. McCook

10 talked about choosing a plan that had higher drug costs for

11 lower premiums.  To his mind that was a benefit.

12     Ms. Whalen, (phonetic) for her son, declined employer

13 insurance and opted for an alternative that didn't provide

14 prescription drug coverage.

15     These are plaintiffs, the individual plaintiffs are

16 making choices along all these lines.  And the class members

17 are making choices along all these lines.  There are options.

18 They have to be taken into account.

19     Plaintiffs' effort to, as I said earlier, assume away

20 the price the plaintiffs actually pay is completely divorced

21 from any notion of unfair or unconscionable pricing.  Same is

22 true for the prong plaintiffs acknowledge that, that one of the

23 elements to their case is that the pricing behavior is not

24 outweighed by benefits.

25     And we've already talked about how rebates can play

into premiums.  They can play into the amounts for coinsurance,

deductibles, that sort of thing.  They can be passed through

and there's record evidence that in some cases they are passed

through to consumers.  Many cases they're not.  That differs by

individual consumer.

     And the plaintiffs in their trial plan don't even

mention this element.  They have no explanation for how they

plan to try this with common evidence.  It simply can't be done

because there are too many variations.

     Then I want to come to I think it was the third door,

it might have been the second door, plaintiffs are talking

about their individual state classes and the unconscionability

classes.  They have three individual states that they seek to

certify on unconscionability claims.

     Unconscionability, even more than unfairness, is

inherently an individualized issue in New Jersey.  The courts

have repeated this quote about pouring content into the law of

unconscionability on a case-by-case basis.  This is highly

individualized.

     In Texas, we cite a case, the *Lon Smith* case, where

courts specifically found that these cases shouldn't be

certified generally as class actions because they depend on

proof of each consumer's knowledge, ability, experience, or

capacity.

     If you look at the plaintiffs' trial plan, they

1    actually propose, in their jury form, to provide this language

2    to the jury.  They are going to have the jury decide whether or

3    not the impact of the knowledge, ability, experience, or

4    capacity of the consumer affected the pricing here, but they

5    have no explanation for how they are going to try that with

6    common evidence.  That's a question that they themselves

7    acknowledge that they have to put to the jury.

8         This is rife across all their classes.  This is a

9    problem, even if they, as they have now proposed here for the

10   first time to do individual state classes rather than

11   multistate classes, if they do that, they are going to have

12   this same problem.  And they simply haven't done the work to

13   justify asking Your Honor to develop those classes.

14        I should note it was in the briefs because they

15   haven't mentioned this before, but as the Supreme Court said in

16   the *Geratti* (phonetic) case, which the Third Circuit reiterated

17   in *Reyes v Netdeposit* in 2015, it's not the job of the district

18   court to formulate subclasses.  That burden is on the

19   plaintiffs.  They have to do the work to get there.

20        They haven't done that, and whatever you want to say

21   about *Valsartan*, in *Valsartan* the plaintiffs put in front of

22   the Court 93 separate --

23        THE COURT:  So if I were to deny the motion, do we

24   give them a chance to get there?

25        MR. GAUCH:  Your Honor, I would say they can't get

1  there because of the other issues, the other individualized

2  inquiries.  So I think even if you get down to the level of

3  individual states, they are still going to have those

4  subclasses for each state.

5          THE COURT:  You don't think they can get there?

6          MR. GAUCH:  I don't think they can get there for the

7  reasons that we have explained, but certainly on the multistate

8  class.

9          THE COURT:  I want to hear about Rosenthal from the

10  defense' perspective.

11          MR. GAUCH:  So I think Mr. Rouhandeh was prepared to

12  address the *Daubert* motion, but I will say I want to, because

13  some of this will get into ascertainability, I just want to

14  flag for Your Honor that we don't see this case as a battle of

15  the experts.  The challenge to Dr. Rosenthal is very important,

16  but I think regardless of how you decide that motion there are

17  serious ascertainability issues, which I'll talk about in a

18  moment.

19          THE COURT:  So if I grant the motion the case goes

20  forward --

21          MR. GAUCH:  If you grant --

22          THE COURT:  -- the motion to bar testimony.

23          MR. GAUCH:  Well, I think if you grant the motion to

24  bar testimony then they have nothing.  I'm saying if you deny

25  it we still should prevail.

1          MR. CECCHI:  Judge, can I have one last word on the

2     choice of law on the multistate?

3          THE COURT:  This is what we're going to do.  I'm going

4     to hear about Dr. Rosenthal and then I'm going to give each

5     side 15 minutes just to sum up, tell me what you want me to

6     hear, what I didn't hear, what you think I should hear.  Then

7     we'll give Tammy a break.

8          Let me talk about Dr. Rosenthal.

9          MR. ROUHANDEH:  Thank you, Your Honor.  Jim Rouhandeh.

10         The purported class action here fails because the

11    damages model -- I put "damages" in quotes -- the damages model

12    doesn't work, it doesn't fit.

13         Under the Supreme Court's decision in *Comcast,* the

14    plaintiffs have to propose a damages model, class-wide damages

15    model that measures the damages attributable to the only theory

16    left in the case.  In that case there were four theories, three

17    were knocked out.  It's got a fifth.

18         And the only theory that was allowed to go forward in

19    this case was the benefit of the bargaining theory of

20    ascertainable loss.  But Professor Rosenthal expressly

21    acknowledged in her deposition that she did not attempt to

22    measure injury caused by alleged misrepresentation.  That's at

23    page 274, lines 2 through 6 of her deposition transcript.

24         So what did she do?  She came up with -- or what she

25    tried to do is to come up with a bright-line test about in

1    essence who has a claim and who doesn't have a claim.  And so

2    she looked at price movements and trends and says that prices

3    on one side of the move are acceptable and prices on the other

4    side are unconscionable.

5          But it's critical that she has acknowledged that she

6    never -- has never heard of the statistical test that she's

7    using here being employed for this purpose, to find allegedly

8    unconscionable transactions.

9          And we lay out the number of flaws here with her

10   opinion on slide 35.  She's never done this before.  The

11   parties aren't aware of any peer-reviewed journal endorsing

12   this approach.  They are not aware of it ever having come into

13   evidence.

14         And what they say in their opposition is, they say

15   that the test that Professor Rosenthal uses has, quote:  Nearly

16   limitless applications in fields as varied as sports, politics,

17   and epidemiology.

18         But the question is not whether this test can be used

19   in other contexts; it's whether it can be used to measure fair

20   versus unfair conduct, unconscionable versus conscionable

21   prices or conduct.  And they have not identified any expert who

22   has ever used it for that purpose.

23         It's simply a litigation opinion.  It's an opinion

24   created for litigation and created solely for litigation.  And

25   apart from the fact that it's inadmissible for that reason,

1    it's not difficult to see how kind of crude and nonsensical the

2    output of her model is.

3        We cite a couple of examples on pages 36 and 37 where

4    two transactions are done precisely at the same price.  One is

5    unconscionable and another is acceptable in

6    Professor Rosenthal's view.

7        So for example, she admits that under her model the

8    same price for the same product, $2 for a Lantus pen, was fair

9    when a consumer paid that amount in August 2016, but it was

10   unfair when that same consumer paid that same amount three

11   months later.

12       In another example she opines that a consumer who paid

13   $0.59 for a NovoLog pen should receive damages; but if the

14   consumer had paid more than twice as much of that three months

15   earlier, the consumer should not receive damages.

16       And so those examples just show how her model simply

17   makes no sense and it leads to absurd results, which the

18   plaintiffs haven't even addressed in the briefing and I didn't

19   hear them address it today.

20       But in any event she's not measuring -- her opinion is

21   inadmissible, but it also misses the mark.  It's not measuring

22   the only damages theory that was allowed to go forward, and

23   it's not really even managing -- it's even modeling damages.

24   It's really just sort of saying who's in the class and who's

25   not, according to her.

1          But the other requirement apart from having a model or

2     a plan to prove class-wide damages which Rosenthal doesn't do,

3     and even without striking her opinion, they have failed to put

4     forth any way to prove on a class-wide basis that damages can

5     be proved on a class-wide basis, or that injury can be proved

6     on a class-wide basis.  They have to show that each claimant

7     suffered an injury and she doesn't attempt to do that.  Doesn't

8     even attempt to show that.

9          And we have, discovery has shown that some of the

10    named plaintiffs, not just class members, some of the named

11    plaintiffs paid nothing for insulin.  And in other

12    circumstances there are individual consumers who may have

13    benefitted from rebates that were passed through to them by

14    their insurance plans.  And so there's no way for her to prove

15    up or for the plaintiffs to prove up class-wide injury or

16    injury of all the members of the class as well.

17         And she didn't even consider, for example, the

18    situation where 100 percent of a rebate might be passed along

19    to the consumer, which in their, plaintiffs' own theory of the

20    case, by definition, that person wouldn't have been injured but

21    she hasn't tried to exclude them.

22         So it just does not satisfy New Jersey law or *Daubert*

23    or the class certification requirements, because the model and

24    what she has put forward is incapable of proving damages or

25    injury on a class-wide basis.

1          THE COURT:  We are going to proceed as follows.

2    Whoever did not give Lissette a card that is in the courtroom,

3    please give her a card in case you need to wander in the hall.

4          We will take a ten-minute break.  I'll give each side

5    15 minutes to highlight, sum up, tell me what you want me to

6    hear.  I understand from Judge Dickson that counsel on

7    Eli Lilly may want to speak with me.

8          Is everybody still here?

9          We will set up in my jury room which is down the hall

10   after this breaks up.  So 15 minutes each and then I'll walk to

11   the jury room.  Thank you.

12                    (Brief recess.)

13         THE COURT:  We are back on the record.  I'll hear from

14   plaintiff.

15         MR. BERMAN:  Your Honor, we would like to reserve just

16   a few minutes for reply since it's our motion.  So Mr. Cecchi

17   and I will be under ten minutes.

18         But first I would like to start with a question that

19   you asked Mr. Rouhandeh.  Let's get to the point.  You said:

20   Are payments tied to list price?

21         And he said, quote:  I'm not sure.

22         Wow.  That is lawyer speak.  He wouldn't answer your

23   question, but I'm going to answer it for you.  You can

24   determine that this class shares a common injury from list

25   price by just reviewing the following, Your Honor.

1          First, Dr. Rosenthal, she ties every payment to list

2     price.  That's different than the work she did on the

3     structural break test.

4          THE COURT:  I apologize for interrupting you.  I just

5     want to make sure everybody in the courtroom is under the

6     confidentiality order and no one is new in the courtroom?

7                    (No reply.)

8          Okay, my apologies, counsel.

9          MR. BERMAN:  So Dr. Rosenthal, apart from her

10    structural break work, spent some time outlining for the Court

11    how every payment in this class is tied to list price.  They

12    have not really *Daubert* that.

13         Dr. Rosenthal is the foremost expert in the country on

14    list price.  She testified in the seminal list price case,

15    average wholesale price.  There was a verdict in our favor at

16    trial.  And so there's no one who knows more about how these

17    prices are calculated than Dr. Rosenthal, and she sets it out

18    for the Court.  And we do a summary of how every reimbursement

19    is tied to list price at page 18 to 25 of our opening brief.

20         As I pointed out earlier in one of our slides that we

21    showed you, their own expert admits that all payments are tied

22    to AWP.  And AWP is just a formulaic raising of the WAC, which

23    is what the defendant said.  And AWP is what's used for every

24    pharmaceutical transaction in America.

25         So there's no question that we have expert evidence

1  that list price impacts the class here.  We have expert

2  evidence from their expert, our expert.  But I want to take a

3  second to look at their own documents that we would put in

4  front of the jury to show the same thing.

5          Your Honor, 

1

2        So we have put before Your Honor evidence that's

3  common to the class that all members of the class are bound

4  together by two things.  They paid on list price, and if we are

5  right that the list price was unfair, they have all been

6  damaged, every one of them, based on list price.

7        And the last slide I refer you to is slide 23, just to

8  hammer this point home because he wouldn't answer your

9  question.  We went and got evidence, and I went through this

10  earlier but it's important so I'll hit it again, from the

11  insured and the uninsured, from people in the industry who

12  confirmed -- and we've given you the cites here -- that all

13  list prices that everyone, insureds and uninsureds, pay based

14  on list price.

15        So where does that leave us?  The one thing we haven't

16  talked about is superiority, and I'll leave the Court for now

17  with this thought in mind.

18        I don't think there's a case that cries out more for

19  class certification than this one.  Two presidents have

20  commented on how unfair the prices are.  Congress has held

21  hearings how unfair prices are.

22        You've got millions of people who have paid these

23  unfair prices.  And as our expert's declarations point out,

24  some of them have had to forego their doctor's prescriptions

25  because they can't afford it.  This is what class actions were

1    made for, Your Honor.

2            THE COURT:  Thank you.

3            Counsel?

4            MR. GAUCH:  Thank you, Your Honor.

5            I'll pick up with ascertainability which I didn't get

6    to so in our slide deck it starts on page 22.  So Your Honor

7    well knows ascertainability requires a reliably and

8    administratively feasible mechanism for identifying class

9    members.

10            Now, plaintiffs in their supplemental brief talked a

11    lot about the *Kelly v RealPage* case, which they say perfectly

12    answers the case here.  But the problem is that in *Kelly v*

13    *RealPage*, essentially it was a fairly simple process of

14    answering yes-or-no questions about what the class members,

15    putative class members received or what was in their file.

16    They were yes-or-no questions based on combining a couple of

17    different databases.

18            But here the case is much more like *Niaspan* where the

19    class definition is complex and you have to unpack the

20    specifics of the purchases in order to ascertain who is and

21    isn't in the class.

22            *Valsartan* is of no help here, because in *Valsartan*

23    there was a class of all purchasers.  All they had to do is

24    figure out who purchased the many drugs in question.  Big case

25    but simple question.

1          Here the question is much more complicated.  It's more

2     complicated because the way the plaintiffs have defined the

3     class.  So if you look on page 23, it highlights a few of the

4     boundaries.

5          Now, there are all sorts of issues with trying to

6     figure out whether anybody actually paid a price that was tied

7     to list price, and we have gone through that extensively in our

8     briefs.  There's a lot of material in the expert reports on

9     that.

10          But here I just want to focus on the distinctions that

11     plaintiffs admit they have to be able to make.  They admit that

12     they have to be able to distinguish between coinsurance and

13     copayments because one is percentage based, one is flat.  They

14     admit that they have to be able to distinguish between Medicare

15     and Medicaid.  They admit they have to distinguish between

16     outside financial assistance and manufacturer assistance, and

17     they can't do any of those.

18          And this, then, is exactly the situation that the

19     Third Circuit faced very recently in *Niaspan* where they said

20     that the plaintiffs can't simply assume what they have to

21     prove.  For ascertainability they have to be able to show you

22     that they can figure out who fits in what category.  And they

23     can't do that.

24          And I'll highlight just a couple of examples.  When it

25     comes to coinsurance versus copay, the plaintiffs' expert

1    Professor Rosenthal herself acknowledges that she couldn't

2    figure that out in all cases, and she adopted this work-around

3    of assuming that co-pays -- any whole dollar amount in the data

4    was a copay and anything that wasn't a whole dollar was

5    coinsurance.

6        So then our expert went through and looking closely at

7    the plan documents relating to some of those individuals were

8    able to figure out that there actually were a fair number of

9    co-pays that are not round numbers.  And we cite on page 26, we

10    illustrate a few of the key co-pays that weren't round numbers.

11        But it's all over the map.  And how he was able to

12    figure that out was looking at the plan documents that showed

13    what the co-pays under that plan actually were.  This is

14    something that would have to be done on an individual basis and

15    it's not a simple yes-or-no question like the *Kelly* case was

16    looking at.

17        Even easier and more clear is whether they can

18    identify cash-paying class members or not.  Now we have a slide

19    here that says what plaintiffs told you this morning, that they

20    have records from the four largest pharmacies, Walgreens,

21    Walmart, Rite Aid, and Kroger, that will enable them to

22    determine who is cash paying and who is not.

23        And it was Mr. Berman told you that this data, that

24    there's a field that indicates cash payers.  It's like, well,

25    fair enough, three of the four actually do have a field for

1    cash payers.  But on -- we chart on page 28, that for Walgreens

2    and Rite Aid, sure they have a field for it but they don't have

3    any data.  The field isn't populated in the data that the

4    plaintiffs have been able to obtain from those pharmacies.

5    Walmart doesn't even have a field for cash transactions.  And

6    the fourth has -- which I don't know why it's blank here --

7    that the fourth has, out of 21 million transactions over 13

8    years, they had only 3,500 transactions in that field.

9         So they had a field, there was some data in it, but

10   clearly there wasn't enough.  Plaintiffs would be the first to

11   say that there is certainly more than 3,500 cash payers in that

12   group.

13        But the data doesn't support what they are telling you

14   it shows.  That means that you are going to have to go beyond

15   the data, you are going to have to go to individualized

16   inquiries just to be able to place the putative class members

17   in one or another category that plaintiffs themselves admit

18   they have to make.

19        These are the distinctions for ascertainability that

20   they claim they can make, but they simply don't have the data

21   to do it, and they can't get the data to do it because they

22   have already tried in these instances.

23        There are 66,000 pharmacies, that's true.  I think

24   they mentioned it.  It's going to be get harder to get data for

25   the smaller ones, but even for the big ones they rely on they

1    don't have the data that they need.

2         Same is true for assistance.  We have a couple of

3    slides I'll skip over that relate to that.

4         So then finally I want to come to the injunctive

5    class, which I think is actually where we began.  And actually

6    before I get to that, I do want to answer, because I don't

7    think we have, Your Honor's question for our side about what

8    impact the Lilly settlement has here.

9         I think it's important to recognize that settlement

10   classes are much different than litigation classes.  That's

11   something Third Circuit has repeated over and over again.  In

12   *Grandalski* and *Sullivan*, they noted that when it comes to

13   settlement classes, the problems with manageability of trial

14   classes fade away.  The distinctions in legal standards, that

15   sort of thing, is not important in a settlement class because

16   there's going to be no trial so they don't have to worry about

17   it.

18        So the standard is different when it comes to trial

19   classes, these issues have be resolved.  They don't necessarily

20   have to be resolved in the course of certifying a settlement

21   class.  But now when it comes to --

22        THE COURT:  You take no position with the Eli Lilly

23   settlement.  Correct?

24        MR. GAUCH:  Position in terms of if you -- well, in

25   the scenarios if you prove --

1           THE COURT:  No, whether or not it should be approved

2    or not.

3           MR. GAUCH:  No, we take no position on that.  There

4    are certainly some overlap in the issues but that's something

5    that we don't take any position on.  And we certainly don't

6    think that it is in any way dispositive of the decision

7    Your Honor might make with respect to plaintiffs' motion here.

8           So then finally coming to the injunctive class, which

9    I think is where we started, the fact of the matter is that

10   plaintiffs can't simply say there ought to be an injunction and

11   we'll tell you what it's going to be later.  The plaintiffs

12   have to be able to articulate, specifically articulate the

13   relief that they are looking for.  The *Processed Egg Case* is

14   one we cited in our briefs that talks about that.  That's not

15   unique.  This is something that the courts have recognized.

16          And plaintiffs simply can't point back to their

17   complaint.  The rule -- Rule 65(d) itself recognizes they can't

18   just refer back to their complaint.  So they have to be able to

19   tell you what they want you to enjoin.  And in their briefs all

20   they have managed to come up with is that they're asking you to

21   command that the manufacturer stay within the boundaries of

22   state consumer protection laws.

23          But they don't tell you what conduct you're supposed

24   to allow or not allow.  They say that they know it when they

25   see it.  That's easy enough to do on an individual basis.  It's

1    impossible to do on a class-wide basis.  It's certainly even

2    more impossible to do on a prospective basis where there are

3    many other important considerations that come into play.

4         And here I just want to highlight, this is something

5    that the plaintiffs have been talking about all morning:  The

6    policy issues that are involved here; the fact that two

7    presidents have opined on the problems with the pricing system

8    in America; the fact that Congress continues to change the

9    standards that apply; the fact that the price changes that you

10   heard about this year are at least in part influenced by

11   significant changes in the Medicaid rebate cap that are going

12   to go into effect at the beginning of next year.

13        All of these things play into the pricing decisions.

14   These are things that are impossible to deal with as a class

15   action and are things that are more properly left to courts in

16   the executive branch.  If the system needs to be fixed, that's

17   where it needs to be fixed.

18        THE COURT:  Well, I'm glad you ended on that, because

19   counsel ended his ten minutes by saying if there was ever a

20   case that required class certification, this is the case.  And

21   our executive and legislative branches have spoken about that.

22   And I threw out a tease, flippant perhaps, that numerosity is

23   not an issue in this case.

24        So there are millions of people throughout this

25   country who throughout a certain period maybe overpaid, maybe

1    couldn't pay, and no one knows what happened to those people

2    because they couldn't get the proper medical care.

3         If not a class action, where do they go?

4         MR. GAUCH:  Well, Your Honor, unfortunately I don't

5    want to say that they should go to -- you know, we all know how

6    well or not Congress works but these --

7         THE COURT:  And they went there and there was a

8    response.  But what about you can't put the toothpaste back in

9    the tube for this period of time.

10        What do you tell the person whose spouse passed away

11   because he or she couldn't get a drug and then two years later

12   could have gotten that drug?  What do you tell that person?

13   That's not my problem, I'm just a judge and I have to follow

14   the cases and I have to follow the statutes and I have to

15   follow the Third Circuit.  And when I was before congress I

16   said I would not legislate from the bench and I will not

17   legislate from the bench.

18        But these are human beings out there.  Families that

19   could be broken because of something that could have been fixed

20   years ago.

21        What do you tell those people?

22        MR. GAUCH:  Well, Your Honor, and that's something

23   that the drug manufacturers, it is their problem, in part.

24   They have to deal with these issues and they could -- they are

25   continuing to try to do better with the affordability programs

1  which have been --

2      THE COURT:  -- prospective.

3      MR. GAUCH:  Yes, Your Honor.

4      THE COURT:  Tell me.  And maybe the answer is,

5  Nothing, sorry, that was the system and you want to file a case

6  in some county in some other state, knock yourself out.

7      MR. GAUCH:  Well, Your Honor, they certainly could

8  file cases.  If they had a claim that the pricing that they

9  faced was unconscionable, they would have a case and they would

10  have to bring that case.

11      They simply -- you can't assume away all the

12  complexities of the unconscionability and unfairness law in

13  order to get relief.  As sympathetic as they are, if they are

14  coming to court they have to be able to prove up a claim and

15  that's highly --

16      THE COURT:  I agree with that 100 percent.  But as

17  ridiculous as this may sound, wouldn't it be better, from your

18  perspective and the drug company's perspective, to have

19  everything here in one place to be adjudicated?  The JPML panel

20  thought that in certain situations.

21      Wouldn't that be a better way to handle it so you are

22  not running crazy to Cape May County trying a case and then to

23  Sussex County trying a case and then to some other state?  I do

24  not want to insult anybody so I won't mention anything where

25  God knows what you are going to get.  Texas will be different

1    than Illinois.  California will be different from Florida.

2          Isn't this really the place to do this?

3          MR. GAUCH:  Well, there's certainly some conveniences

4    to having these issues all placed in the same court, and I

5    think for the foreseeable future we are all here.  But the

6    problem comes in, you can't run roughshod over the legal issues

7    that are relevant in order to get them all into the same place.

8          THE COURT:  I understand that.  I completely

9    understand that.

10          MR. GAUCH:  So as a class action, plaintiffs are

11    purporting to bring a class certification, and again, I don't

12    want the Court to lose sight of who's not in this class.

13          If you look at the way the plaintiffs have defined

14    their class, because they are clinging to the idea that if they

15    can establish that a list price is unconscionable on some

16    abstract theory but then everybody that pays even the tiniest

17    fraction of that list price, if you paid one percent of list,

18    plaintiffs would say, well, that's unconscionable even though

19    the actual amounts might be very small.

20          At the same time if you're paying a lot but you're not

21    paying a percentage of list price, plaintiffs aren't here to

22    help.  They're defining them out of a class, so you still have

23    the same problem with some people that have suffered that are

24    going to have a very hard time getting relief.

25          THE COURT:  How about when you wake up tonight because

1    you are not sleeping and you see a commercial:  Did you overpay

2    for insulin from these dates?  Please call 1-800 whatever.  And

3    then you are going to get millions of cases filed throughout

4    the country, thinking that somebody is going to get a recovery

5    someplace, because Camp Lejeune is done and the World Trade

6    Center is done so now we're going to go into this.

7            And there's going to be lawyers that would do

8    something like that and they are going to file a case in

9    another jurisdiction and it's going to get a tagalong to here.

10           MR. GAUCH:  Fair point in terms of the tagalong,

11   Your Honor.  Now that these cases are in the MDL there are

12   going to be a lot more cases that are coming and they will all

13   be here.

14           This is something, this is a reality that the

15   manufacturers face, that they're -- that these claims have been

16   ballooning in recent years.  They have their defenses and they

17   insist on being able to make those defenses.

18           THE COURT:  And I assure you, as I assured

19   Senator Grassley, I will not legislate from the bench.  The law

20   is the law.  I will interpret it and apply it as enacted.  I

21   just wanted to throw that out there for you.

22           Thank you.

23           MR. GAUCH:  Thank you, Your Honor.

24           MR. CECCHI:  Judge, very briefly, and we want to thank

25   Your Honor for your time this morning and the attention you've

1  given to this important motion.  I agree with counsel on a

2  couple of things.

3      One, vitally important he said, Well, if they believed

4  there was unconscionable pricing, those plaintiffs could go to

5  some far away county in some far distant state and they could

6  bring an unconscionability claim.

7      That's exactly what these plaintiffs did six years

8  ago, Judge.  They filed this unconscionability pricing case

9  here in this District Court.  Many of those plaintiffs,

10 including Donald Chaires who overpaid for insulin for years at

11 the pharmacy, died during this case.  And the price that he

12 paid, the most sick member of the vast many of stakeholders now

13 in this case, the price Donald Chaires paid and the price that

14 people who have huge deductibles pay and large co-pays is

15 inextricably directly, mathematically tied indisputably to list

16 price.

17     It's an algorithm.  They cannot dispute that.  The

18 factual record before this Court is the price that

19 Donald Chaires and now his representative, the estate, paid all

20 those years is inextricably tied a straight line to list price.

21 It's a mathematical algorithm, and there's no intermediary,

22 there's nothing that happens in between.

23     Our class, the uninsured who goes to the pharmacy,

24 paid by virtue of the list price, which we claim the vast

25 common issue in this case that was inflated for years as the

1    public policymakers have recognized.  All we ask is our day in

2    court.

3        I want to agree with counsel on another thing.  I made

4    a modification to his chart.  He said under the 1980 policy

5    statement, the Cigarette Rule, they were multiple standards,

6    that's just not true.  The Supreme Court case on that point is

7    in our brief.  That's *Sperry & Hutchinson.*  The Supreme Court

8    says that the third prong of the Cigarette Rule you don't need

9    the other two prongs, is the same as the 1980 rule.

10        *EpiPen*, which they relied upon to try to take apart

11    our multistate class, did not rely upon the substantial injury

12    test.  It's not directly analogous in that sense.  We picked

13    states that replied upon the same standards.

14        Finally, Judge, they talked about how this type of

15    mass consumer harm case under New Jersey law is not suitable

16    for class treatment because of all these boogeyman of

17    individual issues.

18        Unfortunately the Supreme Court of New Jersey said the

19    exact opposite.  In *Kugler v Romain* they said:  Mass consumer

20    transactions growing out of unequal bargaining power and unfair

21    practices should not be handled on a case-by-case basis, which

22    I think is Your Honor's point.

23        Finally, Judge, *Niaspan*, it's interesting.  They said:

24    We didn't do the work that we had to do to prove up our

25    ascertainability position.  *Niaspan* was all about the work that

1    the plaintiffs didn't do.  They didn't subpoena the data.  They

2    didn't do the legwork, the hard trench work to get the data to

3    present it to the Court in a coherent whole.

4         Here we've done all of that legwork.  Mr. Berman

5    talked about the records we've subpoenaed.  Dr. Rosenthal's

6    report is grandular in that context.

7         And finally, on ascertainability, I would say, as

8    Mr. Berman noted, trillions of dollars change hands in this

9    country based upon the very data that we will rely upon to

10   ascertain this class.  It is -- looking for the right word here

11   -- it's strange that trillions of dollars can change hands but

12   they claim the data is not good enough for us to ascertain this

13   class.

14        The record as opposed to the rhetoric shows absolutely

15   otherwise.  Dr. Rosenthal's report and our affidavits are

16   clear, this is the most data-rich environment in the world and

17   that was the lynchpin of Judge Kugler's ascertainability

18   decision.

19        Judge, whichever class you believe is most

20   appropriate, and I hope you do believe a class is most

21   appropriate here, we ask to have the opportunity to present

22   this case to a jury, whether it's a New Jersey class as

23   Judge Martini did in that unconscionable pricing case, a

24   multistate class, or the most simple of all, the national

25   class.

1          Thank you, Judge.

2          THE COURT:  Thank you.  For those clients that are

3     here, you've seen extraordinarily outstanding legal work.

4     You've read the legal work that your lawyers have presented to

5     the Court.  You've seen the argument and I hope it validates

6     your decision to retain them.  They represent the best of our

7     profession.

8          I'm very fortunate to do the MDL work because I see

9     the best of the best.  And I appreciate that and we all do.

10    And it's always a great opportunity to hear good lawyers argue,

11    how they can argue the same section means three different

12    things is beyond me, but we'll figure that out at some point.

13         That being said, those of you who are here from

14    Eli Lilly, continue your conversation with Judge Dickson in my

15    jury room.  He'll get you there.  Those of you who are on your

16    way, safe travels.  Enjoy the holiday season.  Please spend

17    time with your family and significant others.  This case will

18    be here for at least another month.  Thank you very much.

19         (The motion hearing concluded.)

20

21

22

23

24

25

1                 --------------------------------------------------

2                 FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

3

4                      I certify that the foregoing is a correct transcript

5        from the record of proceedings in the above-entitled matter.

6

7

8        /S/ Tammera M. Witte, CCR, CRCR, RMR   Dated this 11/30/2023

9        Official U.S. District Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25