[Submitting counsel below]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**ALL CASES** | Case 2:23-md-03080-BRM-RLS<br>MDL No. 3080<br><br>**JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH** |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR PROPOSED ESI ORDER

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

1. Search methodologies should be collaborative, transparent, and validated - Section V .......................................................................................................... 2

    A. An "iterative and cooperative approach" to identifying relevant custodians and data sources is mutually beneficial – Section V ................. 3

    B. The parties have a common interest in developing effective search terms - Section V.A ................................................................................ 4

    C. Hit reports and validation should be used to test search results - Sections V & V.A ...................................................................................... 6

    D. TAR should not be "stacked" on top of search terms – Section V.B ....... 10

2. ESI should be formatted in a manner that preserves evidence - Section VI ......... 12

    A. Spreadsheets, PowerPoints, Word documents with track changes, and PDFs should be produced in native form – Section VI.D ................. 12

    B. Redacted spreadsheets can and should be redacted natively – Section VI.H ...................................................................................... 15

    C. Documents containing color should be produced in color – Sections VI.C-VI.D ................................................................................ 16

3. Responsive documents should be produced without "relevance" redactions and with all attachments – Sections VI.H & VII.A .............................................. 16

4. Withholding discoverable "lesser-included" emails is improper – Section VI.B ........................................................................................................ 19

5. Hyperlinked documents should be produced as family groups – Section VII.A ...................................................................................................... 22

6. The parties should exchange information regarding databases and other data prior to production – Section VIII ............................................................... 25

7. The parties should confer regarding inaccessible sources of ESI – Section III.C ....................................................................................................... 26

8. Defendants' proposal as to "Prior Productions" would subvert the remaining provisions in the ESI Order – Section IV ........................................... 27

i

9.      The ESI Order should apply to Defendants, class Plaintiffs, and bellwether
        Plaintiffs - Sections I.E & XIV.A ........................................................................ 27

10.     The definition of "Litigation" should include the four prior DNJ actions –
        Section II ............................................................................................................... 29

11.     The term "relevant or responsive" is preferable to "responsive" in
        referring to information within the scope of discovery – Section V.C ................ 29

CONCLUSION ............................................................................................................... 30

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    2005 WL 6429129 (D.N.J. Aug. 8, 2005) ...............................................................18

*Arconic Inc. v. Novelis Inc.*,
    2018 WL 5660142 (W.D. Pa. Aug. 28, 2018) ...........................................................8

*Board of Regents of University of Nebraska v. BASF Corp.*,
    2007 WL 3342423 (D. Neb. Nov. 5, 2007) ...............................................................1

*Calendar Research LLC v. StubHub, Inc.*,
    No. 17-cv-4062, 2019 WL 1581406 (C.D. Cal. Mar. 14, 2019)...............................24

*Cenveo Corp. v. S. Graphic Sys.*,
    2009 WL 4042898 (D. Minn. Nov. 18, 2009) .........................................................14

*Chevron Corp. v. Stratus Consulting, Inc.*,
    2010 WL 3489922 (D. Colo. Aug. 31, 2010) .........................................................14

*City of Rockford v. Mallinckrodt ARD Inc.*,
    2018 WL 3766673 (N.D. Ill. Aug. 7, 2018) .............................................................9

*Columbus Life Ins. Co. v. Wilmington Tr., N.A.*,
    344 F.R.D. 207 (D.N.J. 2023)...................................................................................17

*Covad Commc'ns Co. v. Revonet, Inc.*,
    254 F.R.D. 147 (D.D.C. 2008)..................................................................................15

*Dahl v. Bain Cap. Partners, LLC*,
    655 F. Supp. 2d 146 (D. Mass. 2009) .....................................................................14

*Deal Genius, LLC v. O2COOL, LLC*,
    2023 WL 4556759 (N.D. Ill. July 14, 2023).............................................................9

*Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*,
    2017 WL 3624262 (D.N.J. Apr. 26, 2017) ..............................................................17

*Families for Freedom v. U.S. Customs & Border Prot.*,
    2011 WL 4599592 (S.D.N.Y. Sept. 30, 2011)..........................................................18

*FCA US LLC v. Cummins, Inc.*,
    2017 WL 2806896 (E.D. Mich. Mar. 28, 2017) ......................................................11

*General Motors LLC v. Ashton*,
2023 WL 1765711 (D.N.J. Feb. 3, 2023) ...........................................................18

*Huntsman v. Sw. Airlines Co.*,
2021 WL 3504154 (N.D. Cal. Aug. 10, 2021) ...............................................11, 12

*In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*,
2023 WL 196157 (S.D.N.Y. Jan. 17, 2023) ........................................................24

*In re Actos Antitrust Litig.*,
340 F.R.D. 549 (S.D.N.Y. 2022) ........................................................................20

*In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*,
2:19-md-02921 (D.N.J. Sept. 4, 2020) ..............................................................9, 14

*In re Allergan*,
2022 WL 16630821 (D.N.J. Oct. 25, 2022)..........................................................11

*In re Allergan PLC Sec. Litig.*,
2020 WL 4034751 (S.D.N.Y. Mar. 30, 2020) ....................................................8, 9

*In re Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*,
2013 WL 1729682 (N.D. Ind. Apr. 18, 2013) ......................................................11

*In re Denture Cream Products Liab. Litig.*,
292 F.R.D. 120 (D.D.C. 2013)..............................................................................18

*In re Diisocyanates Antitrust Litig.*,
2021 WL 4295729 (W.D. Pa. Aug. 23, 2021) ..........................................6, 7, 8, 9

*In re East Palestine Train Derailment*,
4:23-cv-002242 (N.D. Ohio June 29, 2023) .......................................................24

*In re Generic Pharm. Pricing Antitrust Litig.*,
2019 WL 8106511 (E.D. Pa. Oct. 24, 2019)..........................................................8

*In re Intel Corp. Microprocessor Antitrust Litig.*,
562 F. Supp. 2d 606 (D. Del. 2008)......................................................................26

*In re Mercedes-Benz Emissions Litig.*,
2020 WL 103975 (D.N.J. Jan. 9, 2020) .................................................................7

*In re Netbank, Inc. Secs. Litig.*,
259 F.R.D. 656 (N.D. Ga. 2009)...........................................................................14

*In re Paraquat Prods. Liab. Litig.*,
3:21-md-03004 (S.D. Ill. Oct. 27, 2021)...............................................................14

*In re Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Prods. Litig.*,
2:21-mc-01230 (W.D. Pa. July 21, 2022) ...................................................................14

*In re Proton-Pump Inhibitor Prods. Liab. Litig.*,
2:17-md-02789 (Dkt. No. 73, Nov. 13, 2017) ..........................................................14

*In re Seroquel Labs*,
244 F.R.D. 650 (M.D. Fla. 2007) ...............................................................................8

*In re Verisign, Inc. Secs. Litig.*,
2004 WL 2445243 (N.D. Cal. Mar. 10, 2004) ..........................................................15

*In re Waste Mgmt. of Texas, Inc.*,
392 S.W.3d 861 (Tex. App. 2013) ...............................................................................14

*IQVIA, INC. v. Veeva Sys., Inc.*,
2019 WL 3069203 (D.N.J. July 11, 2019) ..................................................................22

*Karnoski v. Trump*,
2020 WL 2736961 (W.D. Wash. Mar. 4, 2020) ..........................................................19

*Landau v. Zong*,
2017 WL 6336630 (M.D. Pa. Dec. 12, 2017) .............................................................18

*Livingston v. City of Chicago*,
2020 WL 5253848 (N.D. Ill. Sept. 3, 2020) ...............................................................11

*Lutzeier v. Citigroup Inc.*,
2015 WL 430196 (E.D. Mo. Feb. 2, 2015) ..................................................................20

*Menefee v. ChoicePoint, Inc.*,
2009 WL 174134 (E.D. Pa. Jan. 26, 2009) .................................................................25

*Moore v. Publicis Groupe*,
287 F.R.D. 182 (S.D.N.Y. 2012) ..........................................................................7, 11

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*,
877 F. Supp. 2d 87 (S.D.N.Y. 2012) ...........................................................................7

*Pom Wonderful LLC v. Coca-Cola Co.*,
2009 WL 10655335 (C.D. Cal. Nov. 30, 2009) .........................................................24

*Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*,
254 F.R.D. 216 (E.D. Pa. 2008) ..................................................................................6

*Rodriguez-Ocasio v. Midland Credit Mgmt., Inc.*,
2019 WL 3821769 (D.N.J. July 23, 2019) ..................................................................18

*Saliga v. Chemtura Corp.*,
2013 WL 6182227 (D. Conn. Nov. 25, 2013) ........................................................14

*Shenwick v. Twitter, Inc.*,
2018 WL 5735176 (N.D. Cal. Sept. 17, 2018) ......................................................22

*Splunk Inc., v. Cribl, Inc. et al.*,
3:22-cv-07611 (N.D. Cal. Aug. 24, 2023) ............................................................23

*Stitch Editing v. TikTok*,
2022 WL 17363054 (C.D. Cal. 2022).....................................................................24

*U & I Corp. v. Advanced Med. Design, Inc.*,
251 F.R.D. 667 (M.D. Fla. 2008)...........................................................................19

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
250 F.R.D. 251 (D. Md. 2008).................................................................................7

*Wesley v. Muhammad*,
2008 WL 4386871 (S.D.N.Y. Sept. 17, 2008).......................................................24

*William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*,
256 F.R.D. 134 (S.D.N.Y. 2009) .............................................................................7

*Youngevity Inter. Corp. v. Smith*,
2019 WL 1542300 (S.D. Cal. April 9, 2019).........................................................11

**Statutes**

28 U.S.C. § 1407(a) ......................................................................................................28

**Rules**

Fed. R. Civ. P. 26 ............................................................................................1, 3, 6, 26, 30

Fed. R. Civ. P. 34 ............................................................................................12, 16, 18, 20, 22

Fed. R. Evid. 106 .........................................................................................................19

## INTRODUCTION

Plaintiffs' proposed ESI Order adheres to current best eDiscovery practices in complex litigation by emphasizing early cooperation and transparency in ESI collection and production. It establishes efficient, cost-effective discovery methods consistent with many ESI protocols successfully used in other MDLs, assures that the parties comply with their Rule 26 obligations, reduces gamesmanship, and ensures "forthright sharing . . . with the aim of expending case progress, minimizing burden and expense, and removing contentiousness." *Sedona Cooperation Proclamation*, 10 Sedona Conf. J. 331, 332 (2009) (citing *Board of Regents of University of Nebraska v. BASF Corp.*, 2007 WL 3342423, at *5 (D. Neb. Nov. 5, 2007)). In doing so, Plaintiffs' proposal rejects the outdated, inefficient approach (urged by Defendants) of having each side unilaterally decide what it thinks is a "reasonable" search and production, followed by rounds of discovery disputes as deficiencies in unilaterally determined productions are identified.

Defendants' proposed ESI Order (i) eschews collaboration, transparency, and disclosure in favor of a unilateral, "black box" approach, (ii) artificially degrades—rather than preserves—responsive documents and other evidence, and (ii) suppresses information that should be freely exchanged under the Federal Rules. Defendants' proposal—together with their adamant and ongoing refusal to produce information necessary to allow any meaningful assessment of the reasonableness of their ESI collection and review processes—is a red flag in a case of this size and complexity. The result of Defendants' approach is that Plaintiffs will be hindered in their ability to obtain relevant discovery and to effectively and efficiently prosecute their claims.

When the parties began negotiating a proposed ESI Order over four months ago in November 2023, the starting point was—at Defendants' insistence—the ESI protocol negotiated more than four years ago in the *In re Insulin Pricing* Indirect Purchaser Consumer Action (2:17-cv-699) ("Consumer ESI Protocol"). Starting from that template, Plaintiffs' modifications aim to

increase transparency and cooperation, minimize ambiguity, and modernize the protocol to appropriately address current eDiscovery issues. And while Defendants purport to follow that prior protocol in their new proposal, they do so *only* when it suits them. Their current positions are *less* transparent, *less* collaborative, and *more* obstructive than the provisions contained in the Consumer ESI Protocol. While the parties have been able to resolve and narrow certain disputes,[1] key differences between their proposals remain. For the reasons below, the Court should wholly adopt Plaintiffs' proposed ESI Order. *See* Ex. 1 (Pls.' proposed ESI Order); Ex. 2 (redline comparison of Pls.' proposed ESI Order against Defs.' proposed ESI Order).[2]

## ARGUMENT

**1.  Search methodologies should be collaborative, transparent, and validated - Section V**

This is a large-scale, complex MDL concerning life-sustaining insulins sold over decades. Document discovery will be complex—spanning many years and involving numerous Defendants, custodians, and data sources. All of this demands expeditious progress in discovery, safeguards to ensure robust collection and reasonable productions, and search methods able to handle the job. Plaintiffs' proposed ESI Order accomplishes these objectives by providing for: (i) an "iterative and cooperative approach" to identifying relevant custodians and data sources; (ii) the exchange of information that will improve the effectiveness of search terms; and (iii) the exchange of "hit count" reports as part of the negotiation of search terms, and validation of the parties' search methodologies—all of which Defendants reject. The parties also dispute whether Defendants

---

[1] The parties have exchanged several draft ESI Orders and engaged in four meet-and-confer calls (on Nov. 27, 2023; Dec. 13, 2023; Jan. 4, 2024; and Feb. 14, 2024).

[2] All citations to "Ex. ___" refer to exhibits to the Declaration of David R. Buchanan filed herewith. In addition, Exhibit A to Defendants' ESI submission [ECF No. 120-1] is the parties' joint chart listing Plaintiffs' and Defendants' key disputed provisions.

should be permitted to narrow the review universe and significantly limit their responsive ESI production by applying search terms in conjunction with TAR.

### A.    An "iterative and cooperative approach" to identifying relevant custodians and data sources is mutually beneficial – Section V

The Federal Rules of Civil Procedure and Local Civil Rules require the parties to exchange information regarding the persons possessing relevant information and from whom documents will be produced, information technology infrastructure, and ESI sources, among other things.[3] Defendants have shirked their duty to disclose this information in the parties' discovery conferences to date (suggesting instead that such disclosures were more appropriate under the ESI Order), while simultaneously rejecting Plaintiffs' transparent and cooperative disclosure process.

Because the disclosure of custodians and data sources is a central component of any ESI protocol and discovery plan, Plaintiffs proposed anodyne language requiring the parties to "participate in an iterative and cooperative approach with respect to the identification of relevant custodians and information sources." Ex. 1, § V. Defendants rejected this language, essentially seeking to create a "black box" around their identification of the sources of discoverable information. Under Defendants' proposal, the parties "may identify" discoverable ESI and documents by *unilaterally* "identifying and selecting the custodians, databases, and non-custodial sources" most likely to possess discoverable information. Ex. 2, § V.

Defendants' one-sided and opaque approach invites downstream disputes over what data sources exist, what sources are accessible, and what sources should be searched for relevant information. Defendants' approach also significantly departs from the Consumer ESI Protocol,

---

[3] A discovery plan must state the parties' views and proposals on "any issues about disclosure, discovery, or preservation of [ESI], including the form or forms in which it should be produced." Fed. R. Civ. P. 26(f)(3)(C). Local Rule 26.1(b)(2)(d) similarly requires discovery plans to include information on the parties' discussions about computer-based and other digital discovery matters.

which required the defendants to provide the plaintiffs with detailed information on data sources, including "[a]n initial list of custodians . . . likely to possess relevant ESI, along with each such custodian's job title and a brief summary of his or her primary responsibilities," and "a list of non-custodial data sources (such as databases, servers, group shares, cloud-based storage, etc.) that may contain relevant information." Ex. 3, § IV.C.1.i. In this case, involving six separate defendant groups, allowing each Defendant to dictate the scope of its relevant data sources—without any obligation to cooperate with Plaintiffs on this topic—will set in motion a series of follow-up requests as Plaintiffs learn of additional data sources. Considering too the coordination anticipated among the Plaintiff tracks, collaboration on the front end among all parties is essential.[4]

**B.      The parties have a common interest in developing effective search terms - Section V.A**

Plaintiffs' proposed ESI Order would require the parties to meet and confer regarding search terms to be used, "as well as information to improve the effectiveness of the search terms (e.g., relevant project and code names, code words, acronyms, abbreviations, and nicknames, if

---

[4] An ESI protocol based on cooperation and transparency is particularly important where, as here, Plaintiffs have reason to be concerned about how and where Defendants will search for relevant information. Last month, Lina Khan, Chair of the Federal Trade Commission, wrote in correspondence to U.S. Senator Chuck Grassley that the PBM Defendants were stonewalling the FTC's investigation into, among other things, "the impact of rebates and fees from drug manufacturers on formulary design and the costs of prescription drugs to payers and patients." https://www.grassley.senate.gov/imo/media/doc/ftc_to_grassley_-_pbm_6b_study.pdf (last visited Mar. 20, 2024). According to Chair Khan, these companies have flouted the FTC's compulsory orders and failed to produce "sufficient documents and data to be in full compliance with those orders." *Id.* Defendants' evasive approach in response to the FTC inquiry mirrors their response to the U.S. Senate Finance Committee's earlier insulin pricing investigation, which compelled the Committee to note in its report that "Novo Nordisk, CVS Caremark, Express Scripts, and OptumRx failed to fully respond to the Committee's document requests." Charles E. Grassley & Ron Wyden, *Staff Report on Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, *Sen. Fin. Comm.*, at 6, 54, 55 (Jan. 2021), https://www.finance.senate.gov/imo/media/doc/GrassleyWyden%20Insulin%20Report%20(FINAL%201).pdf (last visited Mar. 20, 2024).

any)." Ex. 1, § V.A. Plaintiffs' proposal is intended to streamline this process and facilitate the development of effective search terms to ensure that relevant information is not missed. Defendants refuse to include this language (*see* Ex. 2, § V.A), despite nearly identical language in the Consumer ESI Protocol. *See* Ex. 3, § IV.C.1.i (requiring defendants to provide "proposed keyword search terms and strings (including, where relevant, semantic synonyms, code words, acronyms, abbreviations, nonlanguage alphanumeric associational references to relevant ESI, etc.) to be used when searching for ESI.").

Although search terms are recognized as a way to identify potentially relevant documents, their limitations are widely understood and accepted. *See* Declaration of Douglas Forrest[5] ("Forrest Decl."), ¶¶12-13. As the Sedona Conference has noted, search terms "work best when the legal inquiry is focused on finding particular documents and when the use of language is relatively predictable" but are harder to implement where, as here, the subject matter, relevant timeframe, and causes of action are wide-ranging. *See The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 15 Sedona Conf. J. 217, 232, 244 (2014). Plaintiffs' proposal to exchange "relevant project and code names, code words, acronyms, abbreviations, and nicknames" will assist the parties' formulation of effective search terms—especially where, as here, specialized industry language is abounding with acronyms, code words, and the like. *See* Pharmaceutical Care Management Association, *The Pharmacy Benefit Brief* (Nov. 2021) ("There's a lot of jargon in the prescription drug and pharmacy distribution world, and the meaning sometimes isn't known to everyone.").[6]

---

[5] The Declaration of Douglas Forrest is being filed by Plaintiffs simultaneously herewith.

[6] *Available at* https://www.pcmanet.org/pharamcy-benefit-brief/the-pharmacy-benefit-brief-november-2021/11/18/2021/ (last visited Mar. 21, 2024). The Pharmaceutical Care Management Association is the national association representing pharmacy benefit managers. *See* https://www.pcmanet.org/about/ (last visited Mar. 21, 2024).

**C.      Hit reports and validation should be used to test search results - Sections V & V.A**

The fundamental question when parties use computerized search tools is whether those search and collection methods are reasonable under Rule 26(g). *See, e.g.*, *Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 216, 224 (E.D. Pa. 2008) (referencing the need for "proper quality assurance testing" as a determinant of "reasonableness"); *In re Diisocyanates Antitrust Litig.*, 2021 WL 4295729, at *6 (W.D. Pa. Aug. 23, 2021) ("the right of a producing party to choose a general search method – search terms rather than TAR, for example – does not mean that a court must blindly accept all of the specific details of the proffered methodology").

Plaintiffs' proposed ESI Order aims to ensure that search-efficacy metrics are applied here, so that relevant documents are identified and information necessary to assess the effectiveness of Defendants' search is exchanged. *See* Ex. 1, §§ V-V.A. These sections require the parties to employ an "iterative and cooperative approach" and for the parties to "meet and confer regarding reasonable and appropriate methods to increase the relative precision or proportion of relevant or responsive ESI and documents within the search results and production sets, including the exchange of 'hit count' reports." *Id.* Section V similarly requires the parties to confer as to "validation processes" for the parties' search methodologies. *Id.* Section I.D offers flexibility, so no party is required to do what is ineffective or technologically impracticable. *Id.* at § I.D. Defendants reject these proposals, which are designed to provide Plaintiffs with a reasonable opportunity to assess the accuracy of Defendants' keyword search methodology. Defendants instead commit only to a vague meet-and-confer process under which Plaintiffs may propose additional search terms or "other requested changes"—albeit *without* the benefit of hit reports or other any metric reflecting search quality. Ex. 2, § V.A.

Plaintiffs do not seek perfection in Defendants' searches. But history and experience prove that search terms used on large volumes of data without proper testing and validation *miss* 75-80% of relevant materials. *See* Forrest Decl., ¶¶ 12-13; *see also Moore v. Publicis Groupe*, 287 F.R.D. 182, 191-93 (S.D.N.Y. 2012) (noting keyword search has average recall rate of only 20%). Courts therefore require "careful thought, quality control, testing, and cooperation with opposing counsel in designing search terms or 'keywords' to be used to produce [ESI]" and "transparency in all aspects of . . . [ESI] production." *William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009). Conducting iterative validation testing of search terms throughout the term-development process is key to a defensible search methodology. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 256-57 (D. Md. 2008) ("The only prudent way to test the reliability of the keyword search is to perform some appropriate sampling of the documents . . ."); *see also Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 111 (S.D.N.Y. 2012) (observing that adequacy of search terms is impossible to assess "in the absence of evidence showing the efficacy of the terms").

This District Court *requires* "that appropriate validation be utilized to test search results." *In re Mercedes-Benz Emissions Litig.*, 2020 WL 103975, at *2 (D.N.J. Jan. 9, 2020) (ordering "three different kinds of validation, including validation of documents that did not hit on search terms and a four-step post-production validation process"); *see also In re Diisocyanates*, 2021 WL 4295729, at *6 (noting "obligation for the producing party to validate its search"). Plaintiffs have proposed a proven method to ensure appropriate search validation measures. First, hit reports—identifying the number of documents hit by each term and variations of those terms—are essential to evaluate the efficacy of search terms and to negotiate refinement of those terms. Many hits relative to the size of the review universe may indicate over-inclusiveness and the need for greater

refinement, while too few hits may signal the term is too narrow or is otherwise poorly designed. Absent the exchange of hit reports, Plaintiffs will be consigned to negotiate search terms blindly and left to guess which terms to omit or add, whether or how to narrow the proximity between related terms, and whether an original or modified term omits significant numbers of potentially responsive documents. *Id.*; *In re Seroquel Labs*, 244 F.R.D. 650, 660 n.6, 662 (M.D. Fla. 2007) ("[W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process . . . . Common sense dictates that sampling and other quality assurance techniques must be employed to meet requirements of completeness.").

The use and disclosure of hit reports to evaluate search terms is therefore standard in eDiscovery. *See In re Generic Pharm. Pricing Antitrust Litig.*, 2019 WL 8106511, at *2 (E.D. Pa. Oct. 24, 2019) (providing disputes over defendants' search terms were to be submitted to Special Masters with " 'hit' counts and suggested alternatives to the disputed search term(s)"); *Arconic Inc. v. Novelis Inc.*, 2018 WL 5660142, at *7 (W.D. Pa. Aug. 28, 2018) (ordering party to run search terms, provide hit report, and negotiate any need to tailor in good faith); *In re Allergan PLC Sec. Litig.*, 2020 WL 4034751, at *1 (S.D.N.Y. Mar. 30, 2020) (ordering defendants to "provide the plaintiff with the hit counts for searches run with proposed terms" because "[t]he effort to arrive at appropriate search terms must be part of a collaborative process in which the defendants must provide to plaintiff the maximum information possible.").

Of course, hit reports, while essential, are still insufficient standing alone to determine the appropriateness of a search term because the number of hits—even if voluminous—neither indicates whether the term returns (or fails to detect) substantial quantities of responsive documents, nor explains why the term might be returning too many (or too few) non-responsive

documents. Validation processes, typically including sampling and reviewing the "hits" and "non-hits," are also necessary. Plaintiffs therefore propose in their ESI Order that the parties confer regarding "validation processes," and "reasonable and appropriate methods to increase the relative precision or proportion of relevant or responsive ESI and documents within the search results and production sets." Ex. 1, §§ V-V.A.

Like hit reports, validation is routine in modern discovery. *See In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.* ("*In re Allergan* MDL"), 2:19-md-02921 (D.N.J. Sept. 4, 2020), ECF No. 194 (Ex. 4) at § B.2.a (ordering parties to confer "on the application, if any, of search or other filtering technologies" and "validation processes"); *see also In re Diisocyanates*, 2021 WL 4295729, at *6 (W.D. Pa. Aug. 23, 2021) (recognizing "obligation for the producing party to validate its search," including use of search terms); *City of Rockford v. Mallinckrodt ARD Inc.*, 2018 WL 3766673, at *4 (N.D. Ill. Aug. 7, 2018) (compelling defendant to conduct sampling to validate search process and provide reasonable assurance that production was complete).[7] Validation was even contemplated (though not specifically referenced) in the Consumer ESI Protocol, which provided that the parties could "agree to modify the search queries or the search methodologies during the course of the search query negotiation process if the search queries or the results of search methodologies appear underinclusive or over-inclusive." Ex. 3, § IV.C.2. The best practice—again, to avoid costly disputes and litigation delays—is for the parties to work collaboratively and transparently to test and sample the data to increase the proportion of responsive documents within the search results and production sets.

---

[7] S*ee also Deal Genius, LLC v. O2COOL, LLC*, 2023 WL 4556759, at *5 (N.D. Ill. July 14, 2023) ("To ameliorate the impact of under-inclusive search results (and other limitations with search terms), parties should adopt iterative search term development procedures and quality assurance practices that can help identify relevant information not retrieved by the original search terms.")

**D.      TAR should not be "stacked" on top of search terms – Section V.B**

The parties do not dispute that a Producing Party may use technology assisted review ("TAR") to identify potentially relevant files. Properly implemented, TAR is a transparent and collaborative review process to collect and analyze ESI by training the computer with software, quality control, testing, and validation. If a party elects to use TAR in this case, the parties agree to meet and confer "regarding how such technologies will be implemented, before the Producing Party employs any TAR." *See* Ex. 1 at § V.B; Ex. 2 at § V.B.

For TAR to be maximally effective, however, it *must* be applied to as large a data set as possible—this will properly "train" it to identify as many responsive documents as possible. *See* Forrest Decl., ¶¶ 14-16. Instead, Defendants propose to narrow the review universe and significantly limit their responsive ESI production by applying search terms *before* TAR review, increasing the risk that TAR will miss or fail to identify a significant volume of responsive ESI that does not hit on search terms. Defendants' current proposal is a notable about-face from the Consumer ESI Protocol, which specifically *prohibited* stacking TAR and search terms. *See* Ex. 3, § IV.A ("The parties may leverage [TAR] *in lieu of search terms* . . .") (emphasis added).

As courts and commentators have recognized, "stacking" search terms with TAR will inherently prejudice Plaintiffs by significantly reducing the number of relevant documents produced and would unfairly and unreasonably limit TAR's ability to locate relevant documents. The "net effect of this concoction is to achieve considerably lower recall than any of its constituent parts: when multiple information retrieval methods are used in sequence, overall recall is the

-10-

product of the recall for each constituent method." Maura Grossman & Gordon Cormack, *The eDiscovery Medicine Show*, 18 The Ohio State Technology Law Journal 1, 8 (2021).[8]

While TAR is far more accurate and cost-effective than search terms, *see, e.g.*, *Moore*, 287 F.R.D. at 191 (average recall rate of keyword searches is only 20%), it should not be used in combination with search terms. Forrest Decl., ¶¶ 12-14. For this reason, "[a]pplying TAR to the universe of electronic material *before* any keyword search" is the preferred method." *FCA US LLC v. Cummins, Inc.*, 2017 WL 2806896, at *1 (E.D. Mich. Mar. 28, 2017) (emphasis added).

This Court and others have rejected proposals to narrow the candidate document corpus against which TAR will be applied. *See, e.g.*, *In re Allergan* MDL, 2022 WL 16630821, at *4 (D.N.J. Oct. 25, 2022) ("We find that the Defendants have not set forth an adequate basis for ordering the application of TAR after the application of search terms…"); *Youngevity Inter. Corp. v. Smith*, 2019 WL 1542300, at *12 (S.D. Cal. April 9, 2019) (TAR "require[s] an 'unprecedented degree of transparency and cooperation among counsel.'").[9] At bottom, Defendants' proposed

---

[8] *Available at* https://moritzlaw.osu.edu/sites/default/files/2022-01/THE%20EDISCOVERY%20MEDICINE%20SHOW.pdf.

[9] Decisions allowing the application of search terms before TAR are readily distinguished. *See, e.g.*, *In re Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*, 2013 WL 1729682, at *2-3 (N.D. Ind. Apr. 18, 2013) (allowing use of pre-TAR search term culling only because defendant provided court with evidence under proportionality standard that it would costs millions to run TAR without pre-culling); *Livingston v. City of Chicago*, 2020 WL 5253848, at *3 (N.D. Ill. Sept. 3, 2020) (permitting pre-TAR culling with search terms only because plaintiffs proposed using search terms but noting that using TAR at onset might reveal more responsive documents overall); *Huntsman v. Sw. Airlines Co.*, 2021 WL 3504154, at *3 (N.D. Cal. Aug. 10, 2021) (where parties had agreed to an ESI Order allowing both TAR and search terms, the court found that defendant's proposal to use both was reasonable because defendants had agreed to produce limited discovery despite the court's sustaining of defendant's objections to that discovery as overbroad).

"pre-culling" with search terms *before* applying TAR creates a substantial risk that a substantial

quantity of relevant files will elude discovery in this matter and should therefore be rejected.[10]

## 2. ESI should be formatted in a manner that preserves evidence - Section VI

### A. Spreadsheets, PowerPoints, Word documents with track changes, and PDFs should be produced in native form – Section VI.D

Plaintiffs propose that (i) spreadsheet files; (ii) presentation files; (iii) word processing files

that contain track changes, comments, hidden text, or embedded file types; (iv) PDF files; and (v)

media files be produced in their "native" file format, rather than as black-and-white TIFF images

of those files. *See* Ex. 1, § VI.D.[11] Producing these file types in native format allows the parties to

view documents *as they exist* in the ordinary course of business as required under Rule 34, rather

than as static image reproductions. Defendants refuse to produce any file types in native format

other than spreadsheets, audio/video/media files, and unidentified "other files" not conducive to

production in image format—meaning that key PowerPoint files, Word documents with track

changes, and PDFs would all be produced as black-and-white TIFFs. *See* Ex. 2, § VI.D.

Defendants' proposal marks a substantial retreat from the Consumer ESI Protocol, which required

native production of all PowerPoint *and* spreadsheet files. *See* Ex. 3, § V.D.1.

"Native format" refers to the format in which a producing party created and kept the

document in the ordinary course of business. For example, native production of a letter drafted

using Microsoft Word means the document is produced as an electronic .doc or .docx file. By

---

[10] Bearing in mind the importance of this issue, and the breadth of issues addressed in this submission, Plaintiffs respectfully request oral argument related to this disputed provision. To the extent that it may assist the Court and promote the fair and efficient advancement of discovery in this case, Plaintiffs would also welcome the opportunity to submit focused supplemental briefing bearing on the resolution of this dispute or to fully respond to arguments presented by Defendants.

[11] Plaintiffs propose that the parties meet and confer as to the production format of other document types not specifically listed in their proposed ESI Order. *Id.*

contrast, Defendants' proposed "TIFF-plus" format for that same Word document would include: (i) a static image of the document; (ii) a text file containing the words in the original file; and (iii) some, but not all, metadata from the file. To produce a document in TIFF, the producing party must first collect the native file and then create TIFF images of every page of that native file. Native format provides several advantages over Defendants' proposed TIFF format:

> The immediate benefits to the producing party are speed and economy—little or nothing must be spent on image conversion, text extraction or optical character recognition. Because items produced natively are inherently searchable, functional and complete, forms of production are unlikely to be a bone of contention. The benefits to the requesting party are substantial. Using native review tools or the same applications used to create and manipulate the data, requesting parties see the items produced exactly as they appear to the producing party.

Craig Ball, *Lawyer's Guide to Forms of Production*, at 7 (2014), *available at* http://craigball.com/; *see also* Forrest Decl., ¶¶ 30-42.

Native production provides embedded/hidden content and other important information that would otherwise be illegible or inaccessible when produced as a TIFF image. With respect to Word documents, for example, individuals communicate and collaborate using tracked changes and embedded comments. Converting these files to TIFF images destroys the usefulness of these changes and comments. Comment bubbles do not appear in full but instead are cut down with ellipses. The ability to hover over track changes to see when they were made (and who made them) is lost when natives are converted to TIFF. Color distinctions when viewing comments and redlines are similarly destroyed. Forrest Decl., ¶¶ 30-38. Beyond Word documents, presentation files "feature animated text and rich media, including sound and video, and dynamic connections to other data. Craig D. Ball, *The Case for Native Production*, at 32 (Oct. 2014).[12] PDFs also lose

---

[12] *Available at* http://www.craigball.com/LIT_OctNov2014_EDiscoveryBulletin.pdf. Craig Ball is a certified computer forensic examiner and eDiscovery consultant and is an adjunct professor at The University of Texas School of Law. *Id.*

valuable information, including comments and external links, when converted into a different format. Forrest Decl., ¶¶ 38-42. Defendants' proposal will disadvantage Plaintiffs by producing documents in a far less useable format (removing substantial evidence and functionality) than what is available to them. Defendants' basis for refusing to provide documents in native form (other than spreadsheets) remains unclear. Defendants' TIFF proposal does not seem to be based on any purported burden, and it is difficult to imagine how the collection and production of native files would create a greater burden than collection of native files, *processing and creating TIFF images of every page of those files*, and production of the processed files. And Plaintiffs are unaware of any instance in which native files could not be used by the parties in depositions or at trial. Forrest Decl., ¶¶ 52-56.

Any contention that TIFF productions are the "standard practice" or "the way it's been done in the past" is simply wrong. This Court and numerous others nationwide have ordered responding parties to produce ESI in native format. *See, e.g.*, *In re Allergan* MDL., 2:19-md-02921 (D.N.J. Sept. 4, 2020), ECF No. 194 (Ex. 4) at § B(1)(b)(i) (requiring native production of Word documents with track changes and comments, Excel spreadsheets, PowerPoint presentation files, desktop databases, image files, PDFs, and audiovisual files); *see also In re Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Prods. Litig.*, 2:21-mc-01230 (W.D. Pa. July 21, 2022), ECF No. 660 (Ex. 5) at § VI.1 (requiring native production of Excel spreadsheets, Microsoft Word and other word processing files, PowerPoint presentations, and PDFs).[13]

---

[13] *See also In re Paraquat Prods. Liab. Litig.*, 3:21-md-03004 (S.D. Ill. Oct. 27, 2021), ECF No. 466 (Ex. 6) at ¶ 37; *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 2:17-md-02789 (ECF No. 73, Nov. 13, 2017) (Ex. 7) at § B.2.; *Saliga v. Chemtura Corp*., 2013 WL 6182227, at *2 (D. Conn. Nov. 25, 2013); *Chevron Corp. v. Stratus Consulting, Inc*., 2010 WL 3489922, at *4 (D. Colo. Aug. 31, 2010); *Dahl v. Bain Cap. Partners, LLC*, 655 F. Supp. 2d 146, 150 (D. Mass. 2009); *In re Netbank, Inc. Secs. Litig*., 259 F.R.D. 656, 681-82 (N.D. Ga. 2009); *Cenveo Corp. v. S. Graphic Sys.*, 2009 WL 4042898, at *1-2 (D. Minn. Nov. 18, 2009).

Finally, many courts have likewise recognized that native productions are *less costly*—for both parties—than TIFF or PDF productions. *See In re Waste Mgmt. of Texas, Inc.*, 392 S.W.3d 861, 876 (Tex. App. 2013) (rejecting claim that PDF production was "much less costly" than native); *In re Verisign, Inc. Secs. Litig.*, 2004 WL 2445243, at *3 (N.D. Cal. Mar. 10, 2004) (rejecting argument that it would be burdensome to produce native files because "the documents need only be produced in their native format, *i.e.*, in the format that they were stored during Defendants' usual course of business."); *Covad Commc'ns Co. v. Revonet, Inc.*, 254 F.R.D. 147, 150 (D.D.C. 2008) ("Obviously, printing [documents] or converting them to TIFF files probably (and ironically) costs more so [defendant] is hard pressed to claim that producing them now in their native format is unfairly burdensome."). Commentators agree. *See* Mike Breen, *Nothing to Hide: Why Metadata Should Be Presumed Relevant*, 56 U. Kan. L. Rev. 439, 441 (2008) ("The producing party is actually obligated to do less work if required to produce electronic documents in the form in which they are produced and maintained; with metadata intact. One magistrate judge has described the process of removing metadata as laborious and counter-intuitive.").

### B.     Redacted spreadsheets can and should be redacted natively – Section VI.H

The parties could not agree on the proper format for producing redacted spreadsheets: Plaintiffs propose that they be produced in native form, while Defendants propose producing them in *either* native or "near-native" form. *See* Ex. 1, § VI.H; Ex. 2, § VI.I. During the meet-and-confer process, Defendants argued that their "near native" language was necessary to avoid technical violations of the ESI Order in instances when slight format adjustments may need to be made for some historic or legacy spreadsheet formats (*e.g.*, elderly Quattro Pro spreadsheets). Defendants failed to define or fully explain what constitutes "near native" format or how it would be applied.

There are two significant issues with Defendants' position.  First, Defendants' proposed language nowhere limits the use of "near native" format to the type of slight formatting

adjustments they described; rather, their proposed language allows them unrestricted discretion to produce *any* redacted spreadsheet in "near native" format. Ex. 2, § VI.I. Second, Defendants' stated concerns are fully addressed by Section I.D of Plaintiffs' proposed ESI Order, which requires the parties to confer if "any Producing Party identifies a circumstance where application of this ESI Order is not technologically practicable or possible." Ex. 1, § I.D. Given the flexibility offered by this section, there is no need for inclusion of undefined language allowing Defendants to redact any spreadsheet of their choosing in "near native" format.

### C.   Documents containing color should be produced in color – Sections VI.C-VI.D

Plaintiffs propose that color documents and ESI be produced in color, but Defendants propose to produce color documents and ESI in color only "where appropriate" (and provide a process for making discrete color-requests). *See* Ex. 1, §§ VI.C-VI.D; Ex. 2, §§ VI.C-VI.D. Plaintiffs' proposed native format production for spreadsheets, PowerPoints, PDFs, and image files would necessarily include any color contained in those original files. But for any files being produced as images—including hard-copy documents, emails, and Word documents without track changes—documents containing color should be produced as color images, *i.e.*, in the form in which they are maintained. *See* Fed. R. Civ. P. 34(b)(2)(E)(ii). The obstacles described above in the context of non-native productions of documents apply equally in the context of black-and-white, non-native productions. *See* Forrest Decl., ¶¶ 37-42. For these reasons, images of color documents should be produced as color images.

### 3.   Responsive documents should be produced without "relevance" redactions and with all attachments – Sections VI.H & VII.A

This Court recently entered a two-tiered Stipulated Confidentiality Order that will appropriately safeguard any private or confidential information. *See* ECF No. 117. Despite the

broad and significant protections afforded by that Order,[14] Defendants' proposed ESI Order allows for sweeping redactions of any information that: (i) is "uniquely identifying information related to non-diabetes products"; (ii) identifies members of Pharmacy & Therapeutics Committees other than PBM employees; (iii) is subject to federal, state, or foreign privacy requirements (e.g., HIPAA or GDPR); or (iv) constitutes "irrelevant personal information of an intimate or private nature." Ex. 2, § VI.I.[15] Plaintiffs' proposed ESI Order offers a sensible middle-ground position: permitting redactions for privilege or work product and providing for a meet-and-confer process (and ensuing *in camera* review, if necessary) if a Producing Party maintains that a discoverable document contains highly sensitive information that warrants protection above and beyond the "Attorneys' Eyes Only" designation provided for under the Confidentiality Order. *See* Ex. 1, § VI.H.

Additionally, allowing broad redactions for relevancy opens the door for abuse by Defendants, because once a Word, PowerPoint, or PDF file has been redacted, it no longer needs to be produced in native format—substituting degraded TIFF images in place of native files. *See* Forrest Decl., ¶¶ 57-59.

Here, the parties' Stipulated Confidentiality Order—in conjunction with Plaintiffs' proposed process to address highly sensitive information that Defendants believe warrants

---

[14] For example, under the Stipulated Confidentiality Order, "Highly Confidential – Attorneys' Eyes Only" Information includes, among other things, information about strategies for negotiating (current or historical) rebates and other price concessions; strategies for client acquisition and retention; formulary development; product pricing and marketing; Protected Personal Data; claim data based on drug utilization; and other trade secrets or other confidential information.

[15] Defendants' proposed permissible redactions are far broader than what was agreed to in the Consumer ESI Protocol. *See* Ex. 3, § V.H.1. (prohibiting any redactions of "substantive information regarding non-diabetes products" and any redactions that "will interfere with the Receiving Party's ability to review responsive documents").

protection beyond the "Attorneys' Eyes Only" designation—is the better way to deal with concerns about potentially confidential irrelevant information contained within responsive documents.

Defendants' proposal for broad relevancy redactions also runs directly counter to the law in this District, which "makes clear" that relevance-based redactions are improper and heavily disfavored—especially when an adequate protective order is in place *See, e.g.*, *Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, 344 F.R.D. 207, 216-17 (D.N.J. 2023) (Almonte, J.) (quoting *Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*, 2017 WL 3624262, at *4-5 (D.N.J. Apr. 26, 2017)). *See also General Motors LLC v. Ashton*, 2023 WL 1765711, at *4-5 (D.N.J. Feb. 3, 2023) (finding unilateral relevancy redactions inappropriate).[16]

In addition to broad relevancy redactions, Defendants' proposed ESI Order also would permit non-responsive attachments to be fully withheld from production; Plaintiffs, however, seek complete family productions for any relevant documents, including all non-privileged attachments. *See* Ex. 1, § VII.A; Ex. 2, § VII.A. Under Rule 34, ESI must be produced "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms." Fed. R. Civ. P. 34(b)(2)(E)(ii). Because emails are ordinarily stored with their attachments, and since an email typically needs to be paired with its attachment to be fully and fairly understood, this District and other courts that have addressed this issue have held that emails and their attachments must be produced together. *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2005 WL 6429129, at *1 (D.N.J. Aug. 8, 2005) (Bongiovanni, J.) (finding that "disclosure of some possibly irrelevant

---

[16] In *Columbus Life Insurance*, Judge Almonte reasoned that Rule 34 "provides for the production of entire 'documents,' rather than specific phrases, pictures, paragraphs, sentences, or words contained within a document." 344 F.R.D. at 216–17 (citing Fed. R. Civ. P. 34(a)(1)(A), (b)(2)(E)). For this reason, "courts view entire documents as either relevant or irrelevant; they do not weigh the relevance of particular provisions." *Id.* (quoting *Rodriguez-Ocasio v. Midland Credit Mgmt., Inc.*, 2019 WL 3821769, at *2 (D.N.J. July 23, 2019)).

material will cause no harm," that "partial disclosure may tend to distort the tenor of the reports," that "the best course of action is to require production of whole reports," and ordering production of "all attachments to e-mails responsive" to plaintiff's document requests); *Landau v. Zong*, 2017 WL 6336630, at \*3 (M.D. Pa. Dec. 12, 2017) ("As for the question of access to email attachments, we agree . . . that such attachments should be considered components of the emails themselves.").[17]

Federal Rule of Evidence 106 also supports production of email messages with attachments. The rule states that, if a part of a document is used as evidence, the party offering it may have to produce the entire document if it "ought in fairness" be considered as a whole. Fed. R. Evid. 106. *See also Karnoski v. Trump*, 2020 WL 2736961, at \*1-2 (W.D. Wash. Mar. 4, 2020) ("The Federal Rules of Evidence favor the *complete* production of non-privileged evidence if some portion of the evidence is deemed responsive."). Here, even if one or more attachments happen to contain some irrelevant information, the producing party will suffer no prejudice by its production, because all such documents are protected under the parties' Stipulated Confidentiality Order.

### 4.   Withholding discoverable "lesser-included" emails is improper – Section VI.B

Defendants' proposed ESI Order: (i) allows the use of technology to identify email threads, (ii) requires the production of *only* the most inclusive email, and (iii) provides for a meet-and-confer process for specific requests for lesser-included emails. *See* Ex. 2, § VI.B.[18] Plaintiffs'

---

[17] *See also In re Denture Cream Products Liab. Litig.*, 292 F.R.D. 120, 125 (D.D.C. 2013) (collecting cases); *Families for Freedom v. U.S. Customs & Border Prot.*, 2011 WL 4599592 at \*5 (S.D.N.Y. Sept. 30, 2011) ("Context matters. The attachments can only be fully understood and evaluated when read in the context of the emails to which they are attached. That is the way they were sent and the way they were received. It is also the way in which they should be produced."); *U & I Corp. v. Advanced Med. Design, Inc.*, 251 F.R.D. 667, 675 n.14 (M.D. Fla. 2008) (referring to "the practice of producing e-mails without attachments in federal discovery" as "dubious").

[18] Again, Defendants' proposal reaches far beyond the negotiated threading provision included in the Consumer ESI Protocol, which permitted email threading but required the party using threading to produce "metadata associated with lesser included emails…" Ex. 3, § V.B.

proposal allows email threading for a party's own internal review (or other internal processes) to reduce the volume of duplicative content within email threads but prohibits any discoverable email from being withheld because it is included in a more-inclusive email. *See* Ex. 1, § VI.B.

The practice of suppressing production of all emails which are part of a thread (a chain of related emails and responses)—except for a so-called "most-inclusive" email that includes fragments of those emails—leads to the withholding of important information under the guise of a benign but entirely non-standardized technology. *See* Forrest Decl., ¶¶ 17-29. The Federal Rules require that ESI be produced in the form "in which it is ordinarily maintained or in a reasonably usable form." Fed. R. Civ. P. 34(b)(2)(E). The 2006 Advisory Committee Notes warn that if ESI is ordinarily maintained in a searchable form, it should not be produced in a form that "significantly degrades" searchability or "makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation." Fed. R. Civ. P. 34(b), 2006 Amendment, Advisory Committee's Note. *See also Lutzeier v. Citigroup Inc.*, 2015 WL 430196, at *8 (E.D. Mo. Feb. 2, 2015) (ESI should be "searchable, sortable and paired with relevant metadata").

Plaintiffs have no issue with Defendants using thread suppression tools *internally* (for cost-savings or other purposes), but Defendants' proposal to withhold responsive earlier-in-time emails and associated metadata significantly degrades search and review functionality in contravention of Rule 34(b). Withholding responsive lesser-included emails from Defendants' production leads to the withholding of important information, including (i) attachment names plainly visible in the heading of a standalone email, which may make it impossible to determine what attachments were attached at each point in the email thread, and (ii) a significant amount of metadata, including the sender; "To," "CC," and "BCC" recipients; date and time; and custodian identity—all of which the parties can leverage to identify communications between specific individuals (such as potential

-20-

witnesses), create timelines, and map communications. Without this metadata, Plaintiffs (unlike Defendants) will be deprived of important context to assist in the review of documents and detection of gaps that might indicate production deficiencies. *See In re Actos Antitrust Litig.*, 340 F.R.D. 549, 552 (S.D.N.Y. 2022) ("Takeda's exclusion of lesser included emails from production . . . materially has reduced Plaintiffs' ability to search for all correspondence within a date range. In addition, in certain email chains, only the sender of particular emails earlier in a chain are reflected, and not the recipients of such emails.").

Beyond the suppression relevant ESI and potentially substantive evidence, thread suppression also disrupts, impedes, and thwarts normal litigation preparation tasks. For example, under Defendants' proposal, Plaintiffs' counsel will be unable to conduct simple searches to identify all of a deponent's emails, as the only person included in the "From" field will be the sender of the so-called "most-inclusive" email. *See* Forrest Decl., ¶¶ 22-29.

Additionally, emails suppressed by threading have independent significance in their original forms. For example, during depositions or cross-examination at trial, it may be essential to confront a deponent or witness with an email without presenting the witness with other emails they did not receive, or without having the witness first review all upstream and downstream communications that may be disconnected from the email in question. *Id.*, ¶ 26. This capability is impossible when emails are suppressed because they are not the so-called "most inclusive" email.

Not only does withholding lesser-included emails and metadata significantly burden Plaintiffs—it is also unfair. Defendants have access to all the lesser-included emails and their metadata and would remain able to rely on this critical information as discovery progresses—while simultaneously depriving Plaintiffs of the same opportunity. And Defendants have not articulated

any burden in producing all lesser-included emails, even while enjoying any efficiencies or cost savings purportedly offered by thread suppression techniques.

Defendants contend that permitting Plaintiffs' counsel to request specific lesser-included emails solves these concerns. It does not. First, requiring Plaintiffs to identify the specific lesser-included emails necessarily reveals work product and litigation strategy, as it informs Defendants of the documents Plaintiffs' counsel believes are of interest. Second, requiring that these requests be made on a continuing, one-off basis interrupts Plaintiffs' workflow and ability to search for documents, even if the request is addressed in a timely fashion, given that Plaintiffs must wait for the new document to be produced and replaced. Third, requiring such replacements on a case-by-case basis imposes a significant and costly burden on Plaintiffs' litigation technology vendors. *See* Forrest Decl., ¶¶ 28-29.

### 5.    Hyperlinked documents should be produced as family groups – Section VII.A

Plaintiffs' proposed ESI Order provides that where hyperlinks are used by Defendants to link to internal company documents, such ESI should be produced as a family group. *See* Ex. 1, § VII.A; *see also* § II (definition of "Document Family"). Defendants' proposed ESI Order does not treat hyperlinked documents as conventional attachments for purposes of preserving a family relationship in productions. *See* Ex. 2, § II (definition of "Document Family").

Rule 34 requires that document families be produced intact "as they are kept in the usual course of business." As set forth above, courts have consistently held that emails and their attachments must be produced together. *See* Argument, § 3, *supra* (collecting cases). As this District and others have recently recognized, the same reasoning that supports the production of emails with their attachments also supports the production of pointer hyperlinks—which often serve an *identical* function to traditional hyperlinks. *See IQVIA, INC. v. Veeva Sys., Inc.*, 2019 WL 3069203, at *5 (D.N.J. July 11, 2019) (ordering production of documents linked to emails and

noting only producing party is capable of linking them); *Shenwick v. Twitter, Inc.*, 2018 WL 5735176, at *1 (N.D. Cal. Sept. 17, 2018) (ordering Twitter to produce documents referenced in hyperlinks and noting that "if an electronic message refers to a document, then Plaintiffs should be able to access that document.").

Defendants refuse to treat potentially responsive documents referenced in hyperlinks as attachments even though burden should be no issue. Indeed, many common tools can collect hyperlink or cloud attachments automatically or allow users to add them by checking a box during collection. *See* Forrest Decl., ¶¶ 60-65.[19] Under Defendants' proposed ESI Order, if a message refers to another document in a hyperlink, then Plaintiffs must undertake the burdensome effort of attempting to identify the missing relationship between the email and the hyperlinked document (assuming the linked document was produced with necessary metadata). Defendants' proposal will result in an endless loop of requests for additional information as Plaintiffs try to locate the correct version of the referenced document.[20] Not only does this significantly burden Plaintiffs, but it is, again, unfair. With the click of a button, Defendants can access any hyperlinked documents referenced in their communications. Yet Defendants seek to deprive Plaintiffs of the same access.

If communications are not produced together with referenced hyperlinked attachments, then potentially outcome-determinative evidence of who knew what information when will be excluded from discovery and trial. Consider a parent email stating: "Urgent that you look at <u>this</u> immediately!" Without the hyperlinked attachment (the "<u>this</u>"), the email would be impossible to

---

[19] *See also* Robert Mazzoli, *Collect cloud attachments in Microsoft Purview eDiscovery (Premium)* https://learn.microsoft.com/en-us/microsoft-365/compliance/ediscovery-cloud-attachments?view=o365-worldwide. (last visited Mar. 20, 2024). Modern discovery tools, including Purview, allow producing party to collect the current version of the linked document, the version as-shared, and all other versions of the document.

[20] *See id.*

decipher. And if the email and hyperlinked attachment are not collected as a family, then the parent email may not even be produced as a relevant or responsive document. Defendants should have to produce the hyperlinked attachment and identify the metadata, including relationship/association, with the email and hyperlinked attachment. *See, e.g., Splunk Inc., v. Cribl, Inc. et al.*, 3:22-cv-07611 (N.D. Cal. Aug. 24, 2023), ECF No. 78 (Ex. 8) at ¶ 40(b), ("[T]he Parties shall make best efforts to obtain and produce the version of the [hyperlinked Google] document that existed at the relevant time, to the extent reasonably practicable and available.").[21]

Defendants have not demonstrated the absence of technological capabilities to collect emails with their associated hyperlinked documents. Plaintiffs doubt that Defendants lack such capabilities, but no disclosure has been shared with Plaintiffs in this regard. Nor can Defendants claim undue burden or logistical difficulty for their refusal to produce potentially highly relevant discovery. Any burden or difficulty is due to Defendants' own recordkeeping system, and a party may not "shield itself from discovery by utilizing a system of recordkeeping which conceals rather than discloses relevant records or makes it unduly difficult to identify or locate them, thus rendering the production of documents an excessively burdensome and costly expenditure." *Wesley v. Muhammad*, 2008 WL 4386871, at *5 (S.D.N.Y. Sept. 17, 2008) (quotation marks and citation omitted); *Pom Wonderful LLC v. Coca-Cola Co.*, 2009 WL 10655335, at *3 (C.D. Cal.

---

[21] *See also In re East Palestine Train Derailment*, 4:23-cv-002242 (N.D. Ohio June 29, 2023), ECF No. 100 (Ex. 9) at § III.C (ordering Defendants to produce hyperlinked content); *In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, 2023 WL 196157, *5 (S.D.N.Y. Jan. 17, 2023) (providing that "modern attachments" shall be collected and produced with the parent message"); *Stitch Editing v. TikTok*, 2022 WL 17363054, at *1 (C.D. Cal. 2022) ("Documents referenced in hyperlinks . . . must be produced together with the source document containing the hyperlinks so that the association between parent document and hyperlinked document is maintained."); *Calendar Research LLC v. StubHub, Inc.*, No. 17-cv-4062, 2019 WL 1581406 (C.D. Cal. Mar. 14, 2019) (noting that when a party cannot produce ESI without assistance, it may need to engage a vendor to meet its burden).

Nov. 30, 2009) (rejecting argument that defendant "'has no method to automatically re-link emails with their alleged "missing" attachments[]' and that requiring it to do so would 'employ a tedious manual process,'" because a defendant "cannot seek to preclude plaintiff from pursuing discovery based on a record-keeping system that is plainly inadequate").

**6.    The parties should exchange information regarding databases and other data prior to production – Section VIII**

Plaintiffs anticipate significant relevant information being contained in database maintained by Defendants. While the parties' proposed language regarding databases and other structured data differs in several respects, most fundamentally the parties disagree over the timing of the meet-and-confer process. Plaintiffs propose pre-production discussions "to address the identification, production, and production format of any relevant data contained in a database or other Structured Data or aggregated data source or otherwise maintained by an application," with the parties reasonably cooperating to exchange information to facilitate such discussions. *See* Ex. 1, § VIII. Defendants, on the other hand, propose to produce such data and then, *after production*, to identify the database or platform and to meet and confer "to address any concerns with the identification, production, and production format of any relevant data." Ex. 3, § VIII.[22]

Defendants' proposed after-the-fact disclosures will allow Defendants to define the relevant criteria, reports, and production format and will leave Plaintiffs with the challenge of pressing for more information *after* the effort has already been undertaken. If potentially relevant information is stored in a database, the parties should confer *at the outset* concerning production of responsive data. *See* Forrest Decl., ¶¶ 43-51.

---

[22] Notably, the Consumer ESI Protocol more closely aligns with Plaintiffs' proposal. It provides: "Structured data should be produced in a mutually agreeable data exchange format. The Parties will meet and confer to determine the potentially relevant databases at issue, including the data fields included in such databases." Ex. 3, § VII.

Courts recognize the importance of such database disclosures. *See, e.g.*, *Menefee v. ChoicePoint, Inc.*, 2009 WL 174134, at *5 (E.D. Pa. Jan. 26, 2009) (ordering response to interrogatories seeking the format in which electronic records are kept and "the fields included in such records" unless objecting party could provide specific factual support for claims of undue burden and overbreadth, because such requests are calculated to lead to discoverable information and/or to enable plaintiff to craft follow-up requests); *In re Intel Corp. Microprocessor Antitrust Litig.*, 562 F. Supp. 2d 606, 614-16 (D. Del. 2008) (finding party's refusal "to provide either a data sample or a description of the data fields in question" was not "reasonable, resulting in a waste of time"). Plaintiffs have no access to Defendants' database applications. But Defendants do, and they should be reasonably transparent about the types of responsive data stored in each database.

**7.    The parties should confer regarding inaccessible sources of ESI – Section III.C**

Plaintiffs' proposed ESI Order requires any Producing Party that identifies a data source as not "reasonably accessible" under Rule 26(b)(2)(B) to "provide sufficient information about the source to enable the parties to confer in good faith about the accessibility thereof." *See* Ex. 1, § III.C. Defendants reject this language and refuse to provide any information to Plaintiffs about data sources Defendants unilaterally deem inaccessible. *See* Ex. 2, § III.C. In complex, information-laden MDL litigation, such a process is necessary to avoid later disputes or time-consuming corrective measures regarding the accessibility of data sources. Also within Section III.C, Plaintiffs object to Defendants' proposed language that "there is no need to modify or suspend the procedures used by them in the ordinary course of business to backup data and systems for disaster recovery and similar purposes related to continuity of operations." *Id.* Defendants have neither provided Plaintiffs with their "procedures used by them . . . to backup data and systems," nor have they articulated why this provision is necessary or appropriate. *Id.*

**8.     Defendants' proposal as to "Prior Productions" would subvert the remaining provisions in the ESI Order – Section IV**

The parties agree that: (i) responsive documents that have been produced by a Producing Party in another litigation or proceeding may be reproduced in the same format as the prior production; and (ii) the parties will meet and confer as to any good-faith requests for reproduction of documents in a different format than originally produced. Defendants' proposed ESI Order, however, allows such reproduction for any documents produced in a prior proceeding, *as well as any documents "prepared for production."* Ex. 2, § IV. While Plaintiffs agree to accept prior productions, they disagree that documents merely "prepared for production," but not *actually* produced in a prior proceeding, should be produced here based on discovery agreements from years earlier. Defendants' use of the ambiguous phrase "prepared for production" fails to specify whether this provision would apply, for example, to documents that have undergone a document sweep (but not produced) in prior litigation, or even to documents that were merely referenced in a litigation hold (but neither swept nor produced). Nor have Defendants come forward with an explanation as to why this "prepared for production" language is required. The parties have negotiated important points in the ESI Order to facilitate a predictable, cost-effective, and efficient management of ESI discovery, as well as a reduction in the number of disputes relating to ESI. Defendants' insistence on their ambiguous "prepared for production" language provides them with an escape hatch that could totally undermine the rest of the ESI Order.

**9.     The ESI Order should apply to Defendants, class Plaintiffs, and bellwether Plaintiffs - Sections I.E & XIV.A**

Plaintiffs' proposed ESI Order sets forth that the obligations imposed on the parties under the ESI Order (other than preservation obligations) will become operative on individual named Plaintiff when: (i) the action in which that Plaintiff is named is selected as a bellwether action; (ii) a Plaintiff files a class action on behalf of a proposed class or is later designated by counsel as an

additional or alternative proposed class representative; (iii) agreement between the individual named Plaintiff or class Plaintiff and the Defendants; or (iv) further order of the Court. *See* Ex. 1, §§ I.E, XIV.A.[23] Defendants reject this proposal and insist that the ESI Order apply, upon entry, to "all Parties in this litigation." Ex. 2, § I.E. This MDL involves not only a variety of differently situated plaintiffs—including cities, counties, states, and health plans of varying sizes—but also plaintiffs who are differently situated from each other—*e.g.*, putative class representatives, self-funded payers, and states suing in both their individual and *parens patriae* capacities.

Section 1407 provides for the transfer of actions to a single district for consolidated or coordinated pretrial proceedings when such transfer and coordination will "promote the just and efficient conduct of such actions" and will be for "the convenience of parties and witnesses." 28 U.S.C. § 1407(a). When the JPML centralized these cases before this Court, it did so to "eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary." *In re Insulin Pricing Litig.*, MDL No. 3080 (J.P.M.L. Aug. 3, 2023), ECF No. 91 (Ex. 10) at 4. Compelling *all* Plaintiffs in this litigation to search for, collect, review, and produce documents and ESI in accordance with the ESI Order would contravene the purposes of an MDL proceeding, would lead to countless discovery disputes, and would waste—not conserve—the parties' and the Court's resources. Plaintiffs propose a sensible, near-mutual approach that would make this ESI Order applicable to cases selected as bellwethers, putative class representatives (or plaintiffs designated as additional or alternative class representatives), or any other plaintiff agreed to by the parties or ordered by the Court. *See* Ex. 1, § I.E. Beyond that, this Court in Case Management Order #2 directed the parties to meet and confer

---

[23] Plaintiffs had proposed in the alternative, during the meet-and-confer process, that this issue be subject to further discussions and subsequent case management orders.

regarding fact sheets, and Plaintiffs anticipate that, with the Court's guidance, there will be structured discovery (*i.e.*, a fact-sheet process, case-specific development, or bellwethers), as opposed to broad discovery against all Plaintiffs at once.

**10. The definition of "Litigation" should include the four prior DNJ actions – Section II**

Earlier this week, the Court entered the parties' Stipulated Confidentiality Order. *See* ECF No. 117. As set forth in that Order, the term "Action" includes all cases in the MDL, as well as the four New Jersey Actions (as defined in CMO #1).[24] Plaintiffs propose that, consistent with the Confidentiality Order, the four New Jersey actions should be specifically included in the definition of "Litigation" in the ESI Order, such that there will be a single Confidentiality Order and a single ESI Order that govern discovery in all the insulin-related cases before the Court.

Notwithstanding the fact that Defendants agreed to include the New Jersey Actions in the Confidentiality Order, Defendants refuse to include those cases in the ESI Order and instead propose that the ESI Order *exclude* those four pending actions, while adding only actions "later . . . coordinated with (pursuant to a Court order or the Parties' express written agreement)" this MDL." Defendants' inconsistent position is contrary to Judge Martinotti's statements as to how he intends for these cases to proceed, creates unnecessary complexity, and will only drive up costs. The Court should enter a single ESI Order to govern discovery in all insulin cases before the Court.

**11. The term "relevant or responsive" is preferable to "responsive" in referring to information within the scope of discovery – Section V.C**

The parties disagree over the use of the terms "responsive" (Defendants' proposal) or "relevant or responsive" (Plaintiffs' proposal) throughout the proposed ESI Orders, but

---

[24] *In re Insulin Pricing Litigation*, Case No. 17-669; *MSP Recovery Claims Series, LLC v. Sanofi Aventis U.S. LLC, et al.*, Case No. 18-2211; *Minnesota v. Sanofi-Aventis U.S. LLC, et al.*, Case No. 18-14999; and *In re Direct Purchaser Insulin Pricing Litigation*, 20-03426.

particularly as they relate to the parties' preservation, search, and review processes. *See, e.g.*, Ex. 1, § V.C; Ex. 2, § V.C. Plaintiffs' proposed language better aligns with Rule 26, which defines relevance for civil actions in federal court and does not include the word "responsive." *See also The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1 (2018) (noting that "the term 'relevant' is used to refer to information within the scope of discovery, rather than 'responsive,' which is used as appropriate when referring to information requested in discovery"). In addition, Plaintiffs' proposed language is more suitable for this ESI Order and its provisions regarding preservation, deleted files, inaccessible data sources, search, and the like.

Defendants' proposed language, by contrast, will needlessly invite granular disputes under each of these provisions as to what information is—or is not—technically "responsive" to a party's (objected-to) discovery requests. Indeed, counsel for Plaintiffs have experience in other MDL matters in which counsel for Defendants have attempted to weaponize the term "responsive" to suggest that there is no obligation to produce files unless Plaintiffs' counsel can identify a request to which such files directly respond. That position is contrary to Rule 26, and the Court should foreclose any such gamesmanship here.

## CONCLUSION

For all of these reasons, Plaintiffs respectfully request that the Court enter the ESI Order with Plaintiffs' proposed language, attached as Ex. 1, to ensure that the discovery process in this MDL is efficient, effective, and fair.

*[Counsel signatures on following page]*

Respectfully submitted,

Dated: March 22, 2024

/s/ James E. Cecchi                          /s/ David R. Buchanan
James E. Cecchi                              David R. Buchanan
CARELLA, BYRNE, CECCHI,                      SEEGER WEISS LLP
BRODY & AGNELLO, P.C.                        55 Challenger Road, 6th Floor
5 Becker Farm Road                           Ridgefield Park, NJ 07660
Roseland, NJ 07068                           973-639-9100
973-994-1700                                 dbuchanan@seegerweiss.com
jcecchi@carellabyrne.com

*Liaison Counsel for*                        *Liaison Counsel for*
*Third-Party Payer Class Track*              *Self-Funded Payer Track*


/s/ Joanne Cicala
Joanne Cicala
The Cicala Law Firm PLLC
101 College Street
Dripping Springs, TX 78620
512-275-6550
joanne@cicalapllc.com

*Liaison Counsel for*
*State Attorney General Track*

-31-