# EXHIBIT B

EXECUTION COPY

# INTEGRATED
# PRESCRIPTION DRUG PROGRAM
# AGREEMENT

**THIS AGREEMENT** is entered into as of the 1st day of November, 2010 (the "Effective Date") between Medco Health Solutions, Inc. ("Medco"), located at 100 Parsons Pond Drive, Franklin Lakes, New Jersey 07417, through Systemed, a Medco business, and County of Albany ("SPONSOR"), located at 112 State Street, Albany, NY 12207.

**WHEREAS,** SPONSOR provides for the payment of prescription drugs and related services for persons eligible to receive such benefits through affiliation with a group that has a contract or other arrangement in effect with SPONSOR; and

**WHEREAS,** Medco, provides prescription drug benefits programs and, in connection therewith, has established networks of participating retail pharmacies and operates a system for the processing, fulfillment and payment of claims for prescription drugs furnished by such pharmacies; and

**WHEREAS,** Medco's Medco By Mail mail order pharmacy affiliates are licensed pharmacies which provide prescription drugs via a mail order service; and

**WHEREAS,** SPONSOR desires to retain the services of Medco and its subsidiaries and affiliates, including Medco Health, L.L.C., which holds TPA licenses in certain states, as applicable, to provide a prescription drug benefit program (the "Program") including, but not limited to, retail pharmacy and mail order pharmacy and specialty drug pharmacy services for eligible persons, point-of-care, physician office communications and cost containment initiatives developed and implemented by Medco, which may include communications with prescribers, patients and/or participating pharmacies, and financial incentives to participating pharmacies for their participation in such initiatives (collectively, "PBM Services").

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

## 1.    DEFINITIONS

1.1.    **"AWP"** means the average wholesale price of the Covered Drug, as set forth in the current price list in recognized sources such as First DataBank's National Drug Data File if available, or other nationally recognized source determined by Medco. Under the Retail Pharmacy Program, AWP is based on the package size submitted, and for Compound Prescriptions is 1.25 times the AWP of the submitted Covered Drug. Under the Mail Order Pharmacy Program, AWP is based on package sizes of 100 units for capsules and tablets, 16 oz. quantities for liquids, and the manufacturer's smallest available package size for injectable Covered Drugs (or the next closest package size if such quantities or sizes are not available), and all other Covered Drugs will be priced as individual units or smallest package size available (e.g., per vial, per suppository, etc.). If First DataBank or other applicable source changes the methodology for calculating AWP or ceases publishing or replaces AWP, or Medco utilizes another recognized pricing source or a pricing benchmark other than AWP, including prior to the Effective Date, in a way that changes the economics of the Program, the parties agree to modify the Program Pricing Terms to preserve the parties' relative economics before such changed methodology or other event.

1.2.    **"Brand Name Drugs"** means all single-sourced drugs and multisource brand drugs as set forth in First Databank's National Drug Data File or such other nationally recognized source, as reasonably determined by Medco.

1.3.    **"Business Days"** or **"business days"** means all days except Saturdays, Sundays, and federal holidays. All references to "day(s)" are to calendar days unless "business day" is specified.

EXECUTION COPY

**1.4.** **"Compound Prescription"** means a prescription that meets the following criteria: two or more solid, semi-solid or liquid ingredients, at least one of which is a Covered Drug, that are weighed or measured then prepared according to the prescriber's order and the pharmacist's art.

**1.5.** **"Contract Quarter"** means the full five (5) month period commencing on the Effective Date, and each full consecutive three (3) month period thereafter that this Agreement remains in effect.

**1.6.** **"Contract Year"** means the full twelve (12) month period commencing on the Effective Date, and each full consecutive twelve (12) month period thereafter that this Agreement remains in effect.

**1.7.** **"Copayment"** and/or **"Coinsurance"** means the amount to be paid by an Eligible Person for each prescription or authorized refill as determined in accordance with the Plan Design(s).

**1.8.** **"Covered Drugs"** means drugs which, under state or federal law, require a prescription, including Compound prescriptions. Excluded from Covered Drugs are (i) cosmetic drugs, (ii) appliances, devices, bandages, heat lamps, braces, splints, and artificial appliances, (iii) health and beauty aids, cosmetics and dietary supplements and (iv) OTC products ("Exclusions"). Additional Covered Drugs and/or Exclusions applicable to any individual Group will be designated by SPONSOR in the applicable Plan Design.

**1.9.** **"Dispensing Fee"** means the amount payable by SPONSOR pursuant to Sections 1, 2 or 3 of Schedule A of this Agreement for a Participating Pharmacy or Medco to dispense a prescription or authorized refill to an Eligible Person.

**1.10.** **"Eligible Person"** means each person who, through affiliation with a Group, is eligible for prescription drug benefits pursuant to this Agreement, and such person's qualified dependents.

**1.11.** **"Generic Drug"** means a multisource generic drug set forth in First Databank's National Drug Data File, or such other nationally recognized source, as reasonably determined by Medco that is available in sufficient supply from multiple FDA approved generic manufacturers of such drug.

**1.12.** **"Group"** means a group of Eligible Persons that have the same Plan Design as designated by SPONSOR.

**1.13.** **"Integrated Program"** means a program in which Eligible Persons enrolled in such program may have prescriptions dispensed either (i) by a Participating Pharmacy under the Retail Pharmacy Program or (ii) by Medco under the Mail Order Pharmacy Program. Reference to the Retail Pharmacy Program and/or Mail Order Pharmacy Program herein will include services performed by Medco for Eligible Persons enrolled in the Integrated Program.

**1.14.** **"MAC"** or the **"Maximum Allowable Cost"** consists of a list of off-patent drugs subject to maximum allowable cost payment schedules developed or selected by Medco. The payment schedules specify the maximum unit ingredient cost payable by SPONSOR for drugs on the MAC list. The MAC list and payment schedules are frequently updated.

**1.15.** **"Mail Order Pharmacy Program"** means the program described in Section 4 in which Eligible Persons may submit a prescription along with the applicable Copayment/Coinsurance to Medco for dispensing via mail order.

**1.16.** **"Minimum Enrollment"** means an enrollment of not less than 3,000 Primary Eligible Participants under the Program.

**1.17.** **"Participating Pharmacy"** means a retail pharmacy that has entered into an arrangement with Medco that specifies the terms and conditions of the pharmacy's participation, including the rates

that Medco will pay the pharmacy to participate in Medco's Broad National Network servicing SPONSOR's Program including the rates that Medco will pay the pharmacy.

1.18. **"Plan Design"** means Program drug coverage, days' supply limitation, Copayment/Coinsurance, Formulary (including Formulary drug selection) and other Program specifications applicable to the Program designated by SPONSOR as set forth in this Agreement or otherwise documented between the parties.

1.19. **"Primary Eligible Participant"** means each Eligible Person, excluding Eligible Persons who are qualified dependents.

1.20. **"Program Pricing Terms"** means the (i) financial or pricing terms, allowances and guarantees set forth in Schedule A of this Agreement, and (ii) performance standards and penalties set forth in Section 5 of this Agreement.

1.21. **"Retail Pharmacy Program"** means the program described in Section 3 in which Eligible Persons may purchase Covered Drugs from a Participating Pharmacy upon verification of Program eligibility and payment of the applicable Copayment/Coinsurance, and the claim is submitted by the Participating Pharmacy to Medco for payment in accordance with this Agreement and the applicable Medco Participating Pharmacy agreement.

1.22. **"Specialty Drugs"** means pharmaceutical products that are generally biotechnological in nature, with many requiring injection or non-oral methods of administration, and that may have special shipping or handling requirements. Some of the disease categories currently in Medco's specialty pharmacy programs include cancer, multiple sclerosis, Hepatitis C, rheumatoid arthritis, cystic fibrosis, infertility, RSV prophylaxis, Gaucher disease, growth hormone deficiency, hemophilia and immune deficiency.

1.23. **"TelePAID® System" or "TelePAID®"** means Medco's real time, on-line system for adjudicating prescription drug claims submitted by retail pharmacies.

## 2.    SPONSOR FURNISHED INFORMATION

SPONSOR will promptly furnish, in a format acceptable to Medco, all information necessary for Medco to render the services set forth herein. Such information will include, but is not limited to:

2.1. A file of Eligible Persons, and subsequent timely additions and deletions to such file as changes occur. SPONSOR will pay for any Covered Drug dispensed to a person reported by SPONSOR as no longer an Eligible Person, if such notification is not received by Medco at least two (2) full business days prior to the dispensing date of such prescription.

2.2. Designation, in writing, of those Plan Design features to be determined by SPONSOR.

2.3. The reimbursement terms applicable to direct reimbursement claims submitted by Eligible Persons under the Retail Pharmacy Program.

2.4. The type, number, and description of Medco identification cards ("Identification Cards") required under the Retail Pharmacy Program.

## 3.    RETAIL PHARMACY PROGRAM

The specific features of the Retail Pharmacy Program are as follows:

3.1. **Program Coverage** - The Program coverage (Covered Drugs/Exclusions) and days supply limitation covered under the Retail Pharmacy Program will be as designated by SPONSOR. Up to

a thirty (30) day supply of Covered Drugs per prescription or refill may be dispensed under the Retail Pharmacy Program.

3.2. **Participating Pharmacy Networks** - Medco will maintain a Participating Pharmacy Network reasonably necessary to provide services under the Retail Pharmacy Program.

3.3. **Identification Cards** - Medco will (i) produce Identification Cards for those Eligible Persons designated by SPONSOR, with an accompanying explanatory brochure, and (ii) make direct reimbursement claim forms available through the www.medco.com internet site for use by Eligible Persons who have not received their Identification Cards, or have had them lost or stolen. Medco will distribute Identification Cards and claim forms to the designated Eligible Persons unless otherwise designated by the SPONSOR. All costs associated with distributing and/or mailing such materials are the responsibility of SPONSOR.

3.4. **Claim Adjudication** - Medco will adjudicate claims for prescription drug benefits in accordance with Medco's *TelePAID* System and the applicable Plan Design. Disapproved claims will be transmitted via *TelePAID* to the submitting pharmacy with a brief explanation of the cause or causes for disapproval. Should SPONSOR determine that a previously disapproved claim should be approved, and so direct Medco, adjudication of the claim will be accomplished promptly by Medco. Medco is obligated to pay Participating Pharmacies for all claims adjudicated through the *TelePAID* System. SPONSOR will pay Medco for these claims pursuant to Schedule A, Section 1. Medco will promptly refer to SPONSOR all non-routine inquiries by insurance departments, attorneys, claimants, or other persons following the denial of any claims.

3.5. **Administrative Services** – Medco will provide, as applicable, the Base Administrative Services and the Additional Administrative Services set forth in Schedule A.

3.6. **Pricing** - The Program Pricing Terms applicable to the Retail Pharmacy Program are set forth in Schedule A, in addition to the performance standards and penalties set forth in Section 5.

# 4.   **MAIL ORDER PHARMACY PROGRAM**

4.1. **Program Coverage**

4.1.1.   The Program coverage (Covered Drugs/Exclusions) and days supply limitation under the Mail Order Pharmacy Program will be as designated by SPONSOR in the applicable Plan Design.

4.1.2.   Medco's mail order pharmacies will not be required to dispense prescriptions for greater than a ninety (90) day supply of Covered Drugs per prescription or refill, subject to the professional judgment of the dispensing pharmacist, limitations imposed on controlled substances and manufacturer's recommendations. Prescriptions may be refilled providing the prescription so states. Prescriptions will not be filled (i) more than twelve (12) months after issuance, (ii) more than six (6) months after issuance for controlled drug substances, or (iii) if prohibited by applicable law or regulation.

4.2. **Dispensing Procedures**

4.2.1.   Medco's mail order pharmacies will dispense Covered Drugs to Eligible Persons, and dispense generic drugs when authorized, in accordance with (i) applicable law and regulations in the state in which Medco's mail order pharmacy is located, and (ii) the terms of this Agreement and Plan Design(s). Any prescriptions that are not dispensed will be returned to the applicable Eligible Person with an explanation as to why it could not be dispensed in accordance with Medco's standard operating procedures.

EXECUTION COPY

4.2.2. All matters pertaining to the dispensing of Covered Drugs or the practice of pharmacy in general are subject to the professional judgment of the dispensing pharmacist.

4.2.3. Any drug which cannot be dispensed in accordance with Medco's mail order pharmacy dispensing protocols due to FDA or manufacturer requirements, or which requires special record-keeping procedures, may be excluded from dispensing by Medco.

4.3. **Claim Adjudication** - Medco will adjudicate and pay approved claims for prescription drug benefits in accordance with Medco's *TelePAID* System and the applicable Plan Design. Should SPONSOR determine that a previously disapproved claim should be approved, and so direct Medco, adjudication of the claim will be accomplished promptly by Medco. SPONSOR will pay Medco for claims adjudicated through the *TelePAID* System, pursuant to Schedule A, Section 2. Medco will promptly refer to SPONSOR all non-routine inquiries by insurance departments, attorneys, claimants, or other persons following the denial of any claims.

4.4. **Pricing** - The Program Pricing Terms applicable to the Mail Order Pharmacy Program are set forth in Schedule A, in addition to the performance standards and penalties set forth in Section 5. Medco will have the responsibility to contract with drug wholesalers and manufacturers regarding Medco's purchase of drugs that are dispensed by it under the Mail Order Pharmacy Program. Medco receives and retains purchase discounts for such purchases from certain manufacturers and wholesalers. Medco will be responsible for any amounts that it owes drug wholesalers or manufacturers that exceeds the amounts it charges and receives from SPONSOR or Eligible Persons, as specified in Section 2 of Schedule A. Medco will retain any payment that it receives from SPONSOR or Eligible Persons as specified in Section 2 of Schedule A that is in excess of the amounts it is obligated to pay to drug wholesalers or manufacturers for the purchase of such drugs that are dispensed under the Mail Order Pharmacy Program.

## 5. <u>PERFORMANCE STANDARDS AND PENALTIES</u>

5.1. The following performance standards will apply during the Initial Term of this Agreement:

5.1.1. The Dispensing Accuracy Rate for each Contract Year will be 99.996% or greater. SPONSOR may assess a penalty against Medco in the amount of 20% of the total amount at risk for each Contract Year that the Dispensing Accuracy Rate is less than 99.996% for a Contract Year. "Dispensing Accuracy Rate" means (i) the number of all mail order pharmacy prescriptions dispensed by Medco in a Contract Year less the number of those prescriptions dispensed by Medco in such Contract Year which are reported to Medco and verified by Medco as having been dispensed with the incorrect drug or strength, divided by (ii) the number of all mail order pharmacy prescriptions dispensed by Medco in such Contract Year.

5.1.2. Medco will make available a toll-free member service telephone line for use by Eligible Persons. The target Average Speed of Answer ("ASA") of the member service telephone line each Contract Year will be thirty (30) seconds or less from the time the Eligible Person selects either the IVRU (Interactive Voice Response Unit) option or Member Service Representative option. This ASA standard excludes calls to the toll-free telephone line separately established for Specialty Drugs. SPONSOR may assess a penalty against Medco for failure to meet this standard in the amount of 10% of the total amount at risk for each Contract Year that this standard is not met measured on a Contract Year basis.

5.1.3. The Telephone Abandonment Rate of the member service telephone line will be 5% or less of all incoming calls received during each Contract Year. This standard excludes calls to the toll-free telephone line separately established for Specialty Drugs.

EXECUTION COPY

SPONSOR may assess a penalty against Medco in the amount of 10% of the total amount at risk for each Contract Year that this standard is not met measured on a Contract Year basis. "Telephone Abandonment Rate" means (i) the number of incoming telephone calls received by the customer service telephone line during a Contract Year which are abandoned by the caller after a selection is made either to the IVRU (Interactive Voice Response Unit) system or a Member Services Representative, divided by (ii) the total number of incoming telephone calls received by the customer service telephone line during such Contract Year.

5.1.4.   Medco will respond to (process a check or reject notice) at least 97% of direct reimbursement paper claims received at the address designated by Medco for such claims each Contract Year from Eligible Persons within an average of five (5) business days following receipt at the address designated by Medco for such claims. All claims will be responded to within ten (10) business days.  SPONSOR may assess a penalty against Medco in the amount of 10% of the total amount at risk for each Contract Year that this rate is not met measured on a Contract Year basis.

5.1.5.   The Claims Adjudication Accuracy Rate for each Contract Year will be 99% or greater. SPONSOR may assess a penalty against Medco in the amount of 10% of the total amount at risk for each Contract Year that this standard is not met measured on a Contract Year basis. "Claims Adjudication Accuracy Rate" means (i) the number of retail claims, mail order claims and directly submitted paper claims, adjudicated by Medco in a Contract Year that do not contain a material adjudication error, divided by (ii) the number of all such claims adjudicated by Medco in such Contract Year.

5.1.6.   The Member Satisfaction Rate for each Contract Year will be 90% or greater.  A penalty of 20% of the total amount at risk per Contract Year may be assessed against Medco for failure to meet this standard.  "Member Satisfaction Rate" means (i) the number of Eligible Persons responding to Medco's annual standard Patient Satisfaction Survey as being satisfied with the overall performance under the Integrated Program divided by (ii) the number of Eligible Persons responding to such annual Patient Satisfaction Survey; SPONSOR must provide timely approvals and responses, and a minimum of 20% of surveys must be returned for the performance standard in this Section 5.1.6 5.1.12 to be applicable.

5.1.7.   SPONSOR may assess a penalty in the amount of 20% of the total amount at risk if, after the first Contract Year and each successive Contract Year, those SPONSOR employees who are members of the SPONSOR benefits staff do not rate the Medco account team's performance for such Contract Year on average of 5 or better on a scale of 1 to 7 (7 being the best) based on a range of performance criteria agreed to between SPONSOR and Medco at the beginning of such Contract Year.  Additional SPONSOR staff members may be included in the survey at the request of Medco.

5.2.   Notwithstanding anything to the contrary, Medco's maximum liability under this Section 5 for any Contract Year will not exceed $20.00 per household with no more than 20% of the total amount at risk on any one guarantee during such Contract Year.

5.3.   SPONSOR will give Medco written notice pursuant to Section 14.4 of the Agreement of any facts giving rise to SPONSOR's right to assess a penalty against Medco pursuant to Section 5.1 above, within ten (10) business days after SPONSOR becomes aware of such fact, and within thirty (30) days thereafter, of SPONSOR's election to assess such penalty against Medco.  Any penalties assessed against Medco pursuant to this Agreement, will be credited against future billings to SPONSOR under the SPONSOR Program in accordance with Medco's standard procedures.

EXECUTION COPY

## 6.   **FORMULARY**

SPONSOR will be a participating plan sponsor in Medco's *Preferred Prescriptions* Formulary as set forth below for the term of this Agreement.  SPONSOR will provide Medco with advance notice of each Group that will participate in the *Preferred Prescriptions* Formulary.

6.1.   ***Preferred Prescriptions* Formulary** - The *Preferred Prescriptions* Formulary is a prescription drug formulary administered by Medco which lists FDA approved drugs that have been evaluated for inclusion on the *Preferred Prescriptions* Formulary.  The drugs included on the *Preferred Prescriptions* Formulary will be modified by Medco from time to time as a result of factors including, but not limited to, medical appropriateness, manufacturer rebate arrangements, and patent expirations.  Medco will implement Medco's formulary management programs, which may include cost containment initiatives, therapeutic interchange programs, communications with Eligible Persons, Participating Pharmacies and/or physicians (including communications regarding generic substitution programs), and financial incentives to Participating Pharmacies for their participation.  Compliance with the *Preferred Prescriptions* Formulary and Medco's formulary management program will result in Formulary Rebates as set forth below.  Medco reserves the right to modify or replace the *Preferred Prescriptions* Formulary (including any modification or replacement, the "Formulary") and formulary compliance methods and cost containment initiatives consistent with good pharmacy practice.  SPONSOR agrees that Medco will be the exclusive formulary administrator for SPONSOR's prescription drug benefit programs during the term of the Agreement.  SPONSOR is authorized to use the Formulary only for its own Eligible Persons and only as long as the Program is in effect and administered by Medco.

6.2.   **Rebates** - Medco and its subsidiaries receive formulary rebates from certain drug manufacturers as a result of the inclusion of those manufacturers' branded products on the Formulary ("Formulary Rebates").  Medco also receives additional rebates and/or fees from certain manufacturers for such products, which may take into account various factors, including the utilization of certain drugs within their respective therapeutic categories for Medco's book of business in aggregate as a result of various commitments and programs including, but not limited to, formularies ("Additional Rebates and Fees").  Formulary Rebates and Additional Rebates and Fees are jointly referred to as "Total Rebates."  Total Rebates does not include payments for services  rendered by Medco on behalf of or to pharmaceutical manufacturers, including, for example, adherence, compliance, nursing, and other patient support services; patient referral and assistance services; product launch and other support services; equipment replacement services; clinical and research studies, data and analytics; and services relating to high-risk biopharmaceuticals.  Subject to the terms of Section 7 of Schedule A Medco will provide SPONSOR with the greater of (i) 100% of the Total Rebates received by Medco based on the dispensing of each manufacturer's formulary drugs under SPONSOR's Program or (ii) the Guaranteed Rebates (as defined below) (as described in Section 7 of Schedule A).  Total Rebates will be credited against future billings to SPONSOR under the Program one hundred eighty (180) days after the end of each calendar quarter, provided SPONSOR has executed this Agreement.  Total Rebates due SPONSOR under this Agreement that are received by Medco within eighteen (18) months after termination or expiration of this Agreement will be paid to SPONSOR.  Total Rebates received thereafter will be retained by Medco.

6.3.   **Guaranteed Rebates** - After each Contract Year during the Initial Term that SPONSOR participates in the Formulary, Medco will calculate SPONSOR's Total Rebates during such Contract Year.  Provided SPONSOR complies fully with the Formulary and with the Formulary management programs implemented by Medco, if SPONSOR'S percentage share of Total Rebates for any Contract Year during the Initial Term are less than the sum of (i) the sum set forth in Chart A, Section 7, Schedule A times the total number of Brand Name Drug prescriptions billed and paid for under SPONSOR's Retail Pharmacy Program as well as such prescriptions under the Mail Order Pharmacy Program for less than forty-five (45) days' supply during such Contract Year, plus (ii) the sum set forth in Chart A, Section 7, Schedule A times the total number of Brand Name

Drug prescriptions billed and paid for under SPONSOR's Mail Order Pharmacy Program during the same Contract Year with forty-five (45) days' supply or greater (collectively the "Guaranteed Rebates"), Medco will credit such difference against future billings to SPONSOR under the Program one hundred eighty (180) days after the end of each Contract Year.

6.4. If a government action, change in law or regulation, change in the interpretation of law or regulation or action by any drug manufacturer or by SPONSOR has an adverse effect on the availability of Total Rebates or the Program Pricing Terms, Medco may modify, as applicable, the Total Rebates due SPONSOR or the Guaranteed Rebates or the Program Pricing Terms.

6.5. Any lines of SPONSOR's business, or any Group of Eligible Persons, for which SPONSOR funds less than 50% of the costs of Covered Drugs under the Plan Design will not be entitled to Formulary Rebates and Additional Rebates and Fees. Calculations and guarantees under Sections 6.2 and 6.3 will not include prescriptions dispensed for any such lines of business or Groups claims for drugs purchased by a pharmacy pursuant to the 340B program, and government subrogation claims.

## 7.    **BILLING/PAYMENT**

7.1. Medco will provide SPONSOR with a bi-weekly consolidated electronic invoice via a File Transfer Protocol (FTP) for services provided by Medco under the Program, in accordance with the Program Pricing set forth in Schedule A. All invoices will be paid in full by SPONSOR within two (2) business days of receipt by wire transfer, electronic debit, or other method approved by Medco in writing.

7.2. SPONSOR will pay Medco for administrative products and services provided by Medco under the Program in accordance with the Administrative Fee provisions set forth in Schedule A. Medco will provide SPONSOR with an Administrative Fee invoice in accordance with Medco's four (4) week Administrative Fee cycle. SPONSOR will pay Administrative Fee invoices in full within fifteen (15) days of the invoice date.

7.3. If payments due to Participating Pharmacies for Covered Drugs under this Agreement become subject to prompt payment related legislation or regulation, SPONSOR may be required to pay a deposit in an amount to be reasonably determined by Medco, which amount may be periodically modified by Medco based on SPONSOR's actual claims experience and enrollment. This deposit may be used by Medco to offset the failure by SPONSOR, for any reason, to make any payments pursuant to the terms of this Agreement and/or to make payments due in accordance with prompt payment legislation or regulation prior to Medco's billing and receipt of SPONSOR's payment due under Section 7.1, and does not, in any way, limit other remedies available to Medco. The deposit, to the extent not utilized to offset any payment default by SPONSOR under this Agreement, will be returned, without interest, to SPONSOR within the greater of one hundred eighty (180) days following termination of this Agreement or following any agreed upon date for extended services.

7.4. Failure by SPONSOR to make any payments in accordance with the terms of this Agreement will constitute a payment default. Notwithstanding Section 10.2 of this Agreement, if SPONSOR fails to cure any such payment default within two (2) days, in addition to other available remedies, Medco may cease performing any or all of its obligations under, or may terminate this Agreement upon notice to SPONSOR. After the two (2) day grace period, there will be a late payment fee of 1% per month on the balance due, accruing as of the due date. SPONSOR will reimburse Medco for all collection costs incurred by Medco as a result of any payment default by SPONSOR under this Agreement.

## 8.   RECORDS

**8.1.**   Medco will maintain all claims records relating to services performed under this Agreement as required by applicable law. Such claims records will be in their original form, on microfilm, microfiche or other form determined by Medco. SPONSOR claims records may be audited by SPONSOR or its representative reasonably acceptable to Medco, subject to execution of a confidentiality agreement, for a maximum period of twenty-four (24) months prior to the agreed upon audit date at no cost. SPONSOR may conduct an audit once annually from January through September on an agreed upon date. Subject to Section 9.3, Medco may retain copies of such claims records for its own use.

**8.2.**   Any audit of Medco's agreements with pharmaceutical manufacturers may be conducted by a top 100 public accounting firm approved by Medco whose audit department is a separate stand alone function of its business and that carries insurance for professional malpractice of at least $2,000,000. The audit will include only those portions of the pharmaceutical manufacturer agreements as necessary to determine Medco's compliance with Section 6 above in respect to Total Rebates. The audit may be conducted once annually from January through September, at Medco's offices as scheduled by agreement of the parties, but not sooner than ninety (90) days after execution of a confidentiality agreement.

**8.3.**   Any auditor performing an audit under this Section 8 will warrant and represent that it is not providing Litigation Services to any person or entity in connection with any lawsuit, investigation, or other proceeding that is pending or contemplated against Medco. "Litigation Services" include (a) examining pharmacy claims or any other documents or information, or (b) providing advice, analysis, and/or opinions as a disclosed or undisclosed expert or consultant. The auditor must agree that, for a period of one (1) year after completion of the audit, it will not provide Litigation Services in any lawsuit, investigation, or other proceeding brought against Medco, except for Litigation Services to SPONSOR in any proceeding against Medco.

**8.4.**   Upon request, SPONSOR will furnish its most recent audited financial statement to Medco.

## 9.   CONFIDENTIAL INFORMATION

**9.1.**   The Confidential Information of a party (the "disclosing party") which is disclosed to the other party (the "receiving party") will be held by the receiving party in strictest confidence at all times and will not be used by the receiving party (or its affiliates, employees, officers, directors or limited liability company managers ("Representatives")) for any purpose not previously authorized by the disclosing party, except as necessary for Medco to perform the services under this Agreement. The Confidential Information of the disclosing party will not be disclosed or divulged by the receiving party to anyone, except with the prior written permission of the disclosing party and on the condition that the party to whom the Confidential Information is disclosed agrees in writing in advance to be bound by these terms and conditions. The receiving party may disclose the Confidential Information to those of its Representatives who need to review the Confidential Information for the purposes authorized by the disclosing party but only after the receiving party has informed them of the confidential nature of the Confidential Information and directs them to treat the Confidential Information in accordance with the terms of this Agreement. The disclosing party retains all right, title and interest in and to its Confidential Information.

The term "Confidential Information " includes, but is not limited to, any information of either the receiving or disclosing party (whether oral, written, visual or fixed in any medium of expression), relating to either party's services, operations, systems, programs, inventions, techniques, suppliers, customers and prospective customers, contractors, cost and pricing data, trade secrets, know-how, processes, plans, reports, designs and any other information of or relating to either party's business, including its therapeutic and disease management programs, but does not include

EXECUTION COPY

information which (a) was known to the receiving party before it was disclosed to the receiving party by the disclosing party, (b) was or becomes available to the receiving party from a source other than the disclosing party, provided such fact is evidenced in writing and the source is not bound by a confidentiality obligation to the disclosing party, or (c) is developed by the receiving party independently of the disclosing party's Confidential Information, provided that such fact can be documented. Each party will also keep the terms of this Agreement confidential as Confidential Information, except as required by law or regulation.

If the receiving party is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand, any informal or formal investigation by any government or governmental agency or authority, law or regulation, or otherwise) to disclose any of the Confidential Information, the receiving party will notify the disclosing party promptly in writing so that the disclosing party may seek a protective order or other appropriate remedy or, in its sole discretion, waive compliance with the terms of this Agreement. The receiving party agrees not to oppose any action by the disclosing party to obtain a protective order or other appropriate remedy. If no such protective order or other remedy is obtained, or the disclosing party waives compliance with the terms of this Agreement, the receiving party will furnish only that portion of the Confidential Information which it is advised by counsel is legally required and will exercise its reasonable best efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information.

9.2.     SPONSOR and Medco may not utilize the service marks, trademarks, or tradenames of any other party to this Agreement, or any service marks, trademarks, or tradenames so similar as likely to cause confusion, without express written approval of such other party. The programs implemented by Medco will remain the sole property of Medco and will only be used by SPONSOR in connection with the Program and so long as Medco administers the Program.

9.3.     Medco and SPONSOR will comply with all applicable laws and regulations regarding patient confidentiality as provided in the Business Associate Agreement between the parties. Medco will not furnish any SPONSOR identifiable data or information to any third party without the written consent of SPONSOR, except as reasonably necessary to implement and operate the Program and fulfill its obligations pursuant to this Agreement or as required by applicable law. The restrictions set forth in this Section 9 will not apply to claims data or information which is not identifiable on a SPONSOR basis.

## 10.    TERM OF AGREEMENT

10.1.    This Agreement will remain in effect for an initial term of one (1) year from the Effective Date (the "Initial Term") and thereafter will automatically renew for successive one (1) year terms unless either party gives written notice, at least one hundred eighty (180) days prior to the end of any such term, to the other party of its intent to terminate this Agreement as of the end of the then current term. Notwithstanding the issuance of a termination notice, Medco agrees to continue to render services hereunder and SPONSOR agrees to pay for services of Medco in accordance with the terms of this Agreement for any claims incurred for prescription drug benefits by Eligible Persons while this Agreement was in force.

10.2.    In the event of a material breach of this Agreement, the party alleging such breach will give written notice thereof to the other parties. If such breach is not cured within sixty (60) days of receipt of such notice, the non-breaching party may terminate this Agreement upon written notice to the other party.

## 11.    FORCE MAJEURE

Neither Medco nor SPONSOR will be deemed to have breached this Agreement or be held liable for any failure or delay in the performance of all or any portion of its obligations under this Agreement if prevented

**EXECUTION COPY**

from doing so by a cause or causes beyond its control.  Without limiting the generality of the foregoing, such causes include acts of God or the public enemy, fires, floods, storms, earthquakes, riots, strikes, boycotts, lock-outs, acts of terrorism, acts of war, war-operations, restraints of government, power or communications line failure or other circumstances beyond such party's control, or by reason of the judgment, ruling or order of any court or agency of competent jurisdiction, or change of law or regulation (or change in the interpretation thereof) subsequent to the execution of this Agreement.

## 12.  INDEMNIFICATION/LIMITATION OF LIABILITY

**12.1.**  Medco will indemnify and hold SPONSOR, its subsidiaries, affiliates, and their officers, directors and employees (each a "SPONSOR Indemnified Party") harmless from and against claims, suits, actions, or causes of action ("Actions") asserted against a SPONSOR Indemnified Party arising from services rendered by Medco pursuant to this Agreement to the extent the Action arises from Medco's negligence or willful misconduct, or breach of this Agreement, provided that (a) SPONSOR has given reasonable notice to Medco of the Action, and (b) no SPONSOR Indemnified Party has, by act or failure to act, compromised Medco's position with respect to the resolution or defense of the Action.

**12.2.**  SPONSOR will indemnify and hold Medco, its subsidiaries and affiliates, and their respective officers, directors and employees (each a " Medco Indemnified Party") harmless from and against Actions asserted against a Medco Indemnified Party arising from (i) breach of this Agreement by SPONSOR, (ii) negligence or willful misconduct of SPONSOR, or (iii) the provision of patient identifiable or Program information or data by a Medco Indemnified Party to SPONSOR or SPONSOR's designees, or the subsequent use or disclosure of such information or data by SPONSOR or its designees, provided that (a) the Medco Indemnified Party has given reasonable notice to SPONSOR of the Action, and (b) no Medco Indemnified Party has, by act or failure to act, compromised SPONSOR's position with respect to the resolution or defense of the Action.

**12.3.**  Medco will maintain, during the term of this Agreement, liability coverage with limits not less than $1,000,000 per occurrence and in the aggregate per policy year, with excess liability coverage in an amount not less than $5,000,000 per policy year.  Evidence thereof will be furnished to SPONSOR upon request.

**12.4.**  Except as provided in Section 12.1 above, neither Medco nor any subsidiary, affiliate, or any of their respective directors, officers or employees, will be responsible for any Action resulting from the provision of or failure to provide pharmaceutical goods or services or any other action or failure to act by any retail pharmacy, pharmaceutical manufacturer or other pharmaceutical providers in connection with this Agreement.

**12.5.**  The liability of Medco to SPONSOR for any negligent or willful misconduct by Medco will be limited to the per occurrence liability insurance amount set forth in this Section 12.3.

**12.6.**  Medco or SPONSOR will not be liable to each other for incidental, consequential, punitive, special, or exemplary damages.

## 13.  EXCLUSIVITY

Medco will be the exclusive provider and administrator of PBM Services to SPONSOR and its subsidiaries while this Agreement is in effect.  Nothing contained herein, however, will prohibit Medco or any affiliated entity from providing or administering PBM Services and related programs and services to any other entity while this Agreement is in effect.

EXECUTION COPY

## 14.  <u>GENERAL</u>

14.1.  <u>Independent Contractor</u> - The relationship between Medco and SPONSOR will solely be that of independent contractors engaged in the operation of their own respective businesses.

14.2.  <u>Assignment</u> - This Agreement may not be assigned by any party without the written approval of the other parties provided, however, that services to be performed by Medco hereunder may be performed by its subsidiaries, affiliates, divisions and/or designees. The duties and obligations of the parties will be binding upon, and inure to the benefit of, successors, assigns, or merged or consolidated entities of the parties.

14.3.  <u>No Third-Party Beneficiary</u> - This Agreement has been entered into solely for the benefit of SPONSOR and Medco, and is not intended to create any legal, equitable or beneficial interest in any third party or to vest in any third party any interest as to enforcement or performance.

14.4.  <u>Notices</u> - All notices required under this Agreement will be in writing and sent by certified mail, return receipt requested, hand delivery or overnight delivery by a nationally recognized service addressed as follows:

> If to SPONSOR:  County of Albany
> 112 State Street
> Albany, NY  12207
> Attention:  Robert Conway, HR Commissioner
>
> If to Medco:  Medco Health Solutions, Inc.
> 100 Parsons Pond Drive
> Franklin Lakes, NJ 07417

14.5.  <u>Amendments</u> - This Agreement may be amended only in writing when signed by a duly authorized representative of each party.

14.6.  <u>Financial Responsibility</u> - If Medco has reasonable grounds to believe that SPONSOR may not meet its payment obligations under this Agreement as they become due, Medco may request information and/or reasonable assurances (including a deposit) from SPONSOR as to its financial responsibility. If the information or assurances are not furnished to Medco within five (5) days, or are not satisfactory in Medco's reasonable judgment, Medco may immediately terminate this Agreement or suspend performance pending receipt of the requested information or assurances.

14.7.  <u>Plan Design</u> - The Program Pricing Terms set forth in this Agreement are based upon the Plan Designs, Minimum Enrollment and Program specifications agreed to between the parties as reflected in this Agreement and as otherwise hereafter agreed to by the parties in writing. The Program Pricing Terms are also based upon SPONSOR funding 50% or greater of the costs of Covered Drugs for its Eligible Persons. Any modification of the Plan Design or Program specifications, failure to maintain Minimum Enrollment, or inclusion of Eligible Persons or Groups with Covered Drugs funded less than 50% by SPONSOR, may result in a retroactive modification by Medco of the Program Pricing Terms. SPONSOR will provide Eligible Persons with at least thirty (30) days' prior notice of approved Plan Design changes. If the number of SPONSOR's Eligible Persons eligible for Medicare is materially reduced or eliminated for any reason, Medco may communicate with those persons at Medco's expense regarding Part D options, including Medco Part D services, and the Program Pricing Terms may be modified to reflect the reduction or elimination.

14.8.   **ERISA Claims and Appeals**

SPONSOR will not name or represent that Medco is, and Medco will not be, a Plan Administrator or, except as specifically set forth in this section, a fiduciary of any prescription drug benefit plan (the "Plan"), as those terms are used in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., and the regulations promulgated under ERISA. SPONSOR will have complete discretionary, binding, and final authority to construe the terms of the Plan, to interpret ambiguous Plan language, to make factual determinations regarding the payment of claims or provisions of benefits, to review denied claims and to resolve complaints by Eligible Persons.

SPONSOR delegates to Medco the limited authority and discretion solely to undertake administrative and/or clinical initial determinations, first-level, second-level and urgent appeals of claims eligibility and benefit applications determinations filed by Eligible Persons with SPONSOR's Program. Medco will process and determine all filed administrative and/or clinical first-level, second-level and urgent appeals under the procedures and within the time frames specified in the Department of Labor claims processing regulations, 29 C.F.R. § 2560.503-1 (the "Claims Procedure Regulations"). For this purpose, Medco agrees that it shall be the appropriate named fiduciary in accordance with Section 2560.501-1 (h) of the Claims Procedure Regulations. Medco's decisions will be conclusive and binding and not subject to further review by SPONSOR.. If, however, with respect to a claim or appeal, any of the duties, whether delegated to Medco or not, are assumed or acted upon by SPONSOR, or by any agent or vendor of such entity ( e.g. utilization management vendor), then Medco will not have any fiduciary duties or discretionary authority with respect to such claim or appeal, and SPONSOR will be deemed to have such fiduciary duties and discretionary authority and will be solely liable for such claim or appeal. Notwithstanding the services of Medco under this section, all decisions concerning the rendering of health care services are determined by the Eligible Person's physician, hospital or other health care provider and the Eligible Person.

14.9.   **Taxes and TPA** - Any applicable sales, use, or other similarly assessed and administered tax imposed on items dispensed, or services provided hereunder, or any other amounts Medco may incur or be required to pay arising from or relating to Medco's performance of services as a third-party administrator in any jurisdiction, will be the sole responsibility of SPONSOR. If Medco is legally obligated to collect and remit sales, use, or other similarly assessed and administered tax in a particular jurisdiction, or to incur or pay any amount relating to third-party administrator services, the tax or other amount will be reflected on the applicable invoice or subsequently invoiced at such time as Medco becomes aware of such obligation or as such obligation becomes due.

14.10.   **Governing Law** - This Agreement will be construed and governed in accordance with the laws of the State of New Jersey. However, all matters relating to the Mail Order Pharmacy Program operations of Medco will be governed by the laws of the state in which Medco's mail order pharmacy is located.

14.11.   **Enforceability** - The invalidity or unenforceability of any of the terms or provisions hereof will not affect the validity or enforceability of any other term or provision.

14.12.   **Section Headings** - Section headings are inserted for convenience only and will not be used in any way to construe the terms of this Agreement.

14.13.   **Waiver** - The waiver of any breach or violation of any term or provision hereof will not constitute a waiver of any subsequent breach or violation of the same or any other term or provision. No waiver or relinquishment by a party of any right or remedy under this Agreement will occur unless the waiver or relinquishment is in a written document signed by an officer of the party.

14.14.   **Approvals** - Whenever approval of any party is required under this Agreement, such approval will not be unreasonably withheld.

**EXECUTION COPY**

14.15. **Organization** - Each party is duly organized, validly existing and in good standing, and has the power to own its property and to carry on its business as now being conducted by it.

14.16. **Authorization** - The execution and delivery of this Agreement and the consummation of the transactions contemplated herein on its part, has been duly authorized by all necessary action by each party.

14.17. **No Conflict of Interest or Other Restrictions** - No party has a conflict of interest which would impact its ability to perform fairly its obligations under this Agreement, and no party is subject to any restrictions, contractual or otherwise, which prevent or would prevent it from entering into this Agreement or carrying out its obligations hereunder.

14.18. **No Violation** - Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will be a violation or default of any term or provision of the party's governance documents (e.g., its certificate of incorporation or bylaws or operating agreement) or of any material contract, commitment, indenture, or other agreement or restriction to which it is a party or by which it is bound.

14.19. **Binding Effect** - This Agreement has been duly executed and delivered by each party, and is a valid and binding obligation of each party, enforceable against such party in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and general principles of equity.

14.20. **Original Agreement/Counterparts** - The parties will execute two identical originals of this Agreement. Each party will retain one of the originals. This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all counterparts taken together will constitute one instrument.

14.21. **Public Announcement** - Except as required by law or regulation, neither party will make any public announcement nor issue any press release relating to this Agreement without the written consent of the other party. This provision does not restrict either party from submitting necessary or appropriate filings with the SEC.

14.22. **Dispute Resolution** - Except for those matters subject to emergent or injunctive relief, in the event that any dispute relating to this Agreement arises between SPONSOR and Medco, either party may, by written notice, demand a meeting regarding the dispute, to be attended by executive officers of each party, who will attempt in good faith to resolve the dispute. If the dispute cannot be resolved through executive negotiations within thirty (30) business days after the date of the initial notice, each party will retain all rights to bring an action regarding such matter in accordance with law.

14.23. **Construction** - SPONSOR and Medco have participated jointly in the negotiation of this Agreement and each has had the advice of legal counsel to review, comment upon and draft this Agreement. Accordingly, it is agreed that no rule of construction shall apply against any party or in favor of any party, and any uncertainty or ambiguity shall not be interpreted against any one party and in favor of the other.

14.24. **Entire Agreement** - This Agreement, together with the Schedules hereto, embodies the entire understanding of the parties in relation to the subject matter hereof, supersedes any prior agreement among the parties in relation to the subject matter hereof, and no other agreement, understanding, or representation, verbal or otherwise, relative to the subject matter hereof exists among the parties at the time of execution of this Agreement.

EXECUTION COPY

14.25. **Compliance with Law** -- Medco and SPONSOR shall take all actions necessary and appropriate to assure that they comply with all applicable federal, state, and local laws and regulations, including, without limitation, the Anti-Kickback Statute, the Public Contracts Anti-Kickback Act, the Stark Law, and laws and regulations relating to disclosure or notification of plan benefits or the terms of rebate administration under this Agreement to SPONSOR's Groups. Medco's Code of Conduct and its policies and procedures relating to compliance with the above-named laws are available at www.medcohealth.com/medco/corporate/home.jsp by clicking on the Investors tab and then the Corporate Governance link.

14.26. **Survival** - The provisions of Sections 7.4, 9, 12, and the last sentence of 10.1 will survive the termination of this Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date indicated below.

**MEDCO HEALTH SOLUTIONS, INC.**

BY: _____
                    (signature)

NAME: Nancy Butler

TITLE: Assistant Counsel

DATE: 5/2/12

**COUNTY OF ALBANY**

BY: _____
                    (signature)

NAME: Hon. Daniel P. McCoy/Michael Perrin
              (type or print name)

TITLE: County Executive/Deputy County Executive

DATE: 4/6/12

292417.2 (4/4/12)efs
PERMFORM 50180.13 (07/01/10) efs/nmb
(Original 50180.13 – 11/19/08)

EXECUTION COPY

# SCHEDULE A
# PROGRAM PRICING TERMS

SPONSOR will pay Medco for services provided under the Program as follows:

## 1. RETAIL PHARMACY PROGRAM CLAIMS

SPONSOR will pay Medco for Covered Drugs dispensed and submitted by Participating Pharmacies under the Retail Pharmacy Program in an amount equal to the lowest of (i) the pharmacy's usual and customary price, as submitted ("U&C") plus applicable taxes, (ii) the maximum allowable cost ("MAC"), where applicable, plus the Dispensing Fee contracted with the pharmacy plus applicable taxes, or (iii) AWP less the AWP discount and Dispensing Fee contracted with the pharmacy plus applicable taxes. Payment by SPONSOR is subject to the applicable Copayment/Coinsurance amount set forth below:

**1.1. Copayment/Coinsurance** - The Copayment/Coinsurance amount for each prescription or refill dispensed by a Participating Pharmacy under the Retail Pharmacy Program will be as designated for each Group in the applicable Plan Design(s).

**1.2. Minimum Charge at Retail** - SPONSOR agrees there may be a minimum charge at retail for a Covered Drug of the lower of (a) the U&C or (b) the applicable Copayment. For prescriptions or refills where this minimum charge applies, there will be no charge/credit to SPONSOR under this Section 1.

**1.3. Direct Claims** - The reimbursement terms applicable to direct reimbursement claims submitted by Eligible Persons under the Retail Pharmacy Program will be the same as the terms set forth in this Section 1, unless otherwise provided in writing by SPONSOR to Medco.

## 2. MAIL ORDER PHARMACY PROGRAM CLAIMS

SPONSOR will pay Medco for Covered Drugs dispensed by a Medco mail order pharmacy under the Mail Order Pharmacy Program in an amount equal to an Ingredient Cost plus Dispensing Fee for each Covered Drug dispensed, less the applicable Copayment/Coinsurance amount, as such terms are defined below:

**2.1. Ingredient Cost** - The Ingredient Cost is the lower of MAC or discounted AWP for Brand Name Drugs and Generic Drugs for prescriptions with a forty-five (45) days' supply or greater. For prescriptions with less than a forty-five (45) days' supply, the pricing set forth in Section 1 of this Schedule A will apply.

**2.2. Dispensing Fee** - The Dispensing Fee per prescription or authorized refill is $0.00 for prescriptions with a forty-five (45) days' supply or greater, and as set forth in Section 1 of this Schedule A for prescriptions with less than forty-five (45) days' supply. Dispensing Fees are inclusive of postage. If postage rates (i.e., U.S. mail and/or applicable commercial courier services) increase during the term of this Agreement, the pricing will be increased to reflect such increase(s).

**2.3. Copayment/Coinsurance** - The Copayment/Coinsurance amount for each prescription or refill dispensed by a Medco mail order pharmacy under the Mail Order Pharmacy Program shall be as designated for each Group in the applicable Plan Design(s). If the amount of the applicable Copayment/Coinsurance paid by an Eligible Person for a prescription or refill dispensed by Medco exceeds the Ingredient Cost (as defined in 2.1 above) plus Dispensing Fee (as defined in Section 2.2 above) plus any applicable taxes, then Medco shall return to the Eligible Person an amount equal to the Copayment/Coinsurance amount, less the sum of the applicable Ingredient Cost plus Dispensing Fee plus any applicable taxes, for the prescription or refill. Eligible Persons must pay the applicable Copayment or Coinsurance amount to Medco for each prescription or authorized refill under the Mail Order Pharmacy Program. Medco may suspend Mail Order Pharmacy Program services to an Eligible Person who is in default of any Copayment or Coinsurance amount due Medco. SPONSOR will be responsible for any unpaid Eligible Person

Copayment or Coinsurance amounts, in accordance with Medco's standard credit policy, if payment has not been received from the Eligible Person within one hundred twenty (120) days of dispensing. SPONSOR will be billed following the one hundred twenty (120) day collection period, with payment due in accordance with the payment terms set forth in Section 7.2 of this Agreement.

## 3. SPECIALTY PHARMACY PROGRAM

Notwithstanding anything to the contrary in Section 2 above and elsewhere in the Agreement, effective November 1, 1010, SPONSOR will pay Medco for those Covered Drugs designated as Specialty Drugs under the Mail Order Pharmacy Program on a separate ingredient cost basis plus applicable Dispensing Fee, subject to the Copayment/Coinsurance in the applicable Plan Design.

Under the Retail Pharmacy Program, SPONSOR will pay Medco for Specialty Drugs on a separate ingredient cost basis plus applicable Dispensing Fee subject to the Copayment/Coinsurance in the applicable Plan Design. For a Specialty Drug that has limited or exclusive distribution through specific retail pharmacies ("Limited Distribution Specialty Drug"), SPONSOR will pay Medco for the Limited Distribution Specialty Drugs in the same amount that Medco reimburses the retail pharmacy for the drug, including Ingredient Cost and Dispensing Fee.

Medco will be the exclusive administrator of Specialty Drugs to SPONSOR while this Agreement is in effect. Specialty Drugs may be provided by Medco or other third-party specialty pharmacy that has a written arrangement with Medco. Medco may add or delete products, or modify pricing terms on written notice to SPONSOR. Specialty Drugs are excluded from calculations, guarantees, credits and payments regarding Total Rebates under the Mail Order Pharmacy Program and the Retail Pharmacy Program set forth in this Agreement. The terms and pricing set forth in this Section 3 apply only to SPONSOR's pharmacy benefit and not to SPONSOR's medical benefit. Medco will provide a current list of Specialty Drugs and associated prices upon SPONSOR's written request.

Services for Specialty Drugs under the Mail Order Pharmacy Program consist of:

- Clinical support that provides, according to Medco's procedures:
  - Eligible Person tele-counseling from specially trained pharmacists and nurses
  - Care management, including information and support directly to the Eligible Person
  - Coordination of care with the Eligible Persons case manager and/or home care agency
- Specialty Drug educational materials and product information
  - Standard communications notifying Eligible Persons of changes in plan coverage
  - Personalized mailings and outbound phone calls by Medco Special Care Pharmacy to Eligible Persons purchasing, at retail pharmacies, Specialty Drugs that are clinically appropriate for maintenance use
- Toll-free telephone line for Eligible Persons using Specialty Drugs
- Express delivery to physician's office or Eligible Person's home
  - Standard two (2) day delivery
  - Overnight delivery as physician required (excluding Sundays)
- Logistics coordination of delivery to Eligible Person's home or physician's office
- Analysis of integrated pharmacy and medical claims databases to identify utilizers, if applicable and agreed upon
- Ancillary supplies provided with each self-injectable medication
- Drug Utilization Review applied to specialty pharmacy related prescription claims and, when available from Medco, medical claims
- Enhanced Physician services, consisting of communication materials, forms and informational hotline

Additional communications to Eligible Persons or physicians beyond these listed above will be quoted upon request.

EXECUTION COPY

## 4. ADMINISTRATIVE SERVICES AND FEES

**4.1.** SPONSOR will pay to Medco a Base Administrative Fee in the amount of $0.50 per paid claim processed by Medco under the Retail Pharmacy Program for the following Base Administrative Services, as applicable. Notwithstanding anything herein to the contrary, prescriptions filled under the Mail Order Pharmacy Program for less than a forty-five (45) day supply shall be considered to be Retail Pharmacy program claims for purposes of calculating administrative fees under this Section 4.

### Eligibility
- Administration of eligibility submitted via tape or telecommunication in a Medco standard format
- Eligibility maintenance (minimum of weekly updates)
- Dependent Eligibility Certification System (DECS)
- Medco's client support system (e-SD) via the client website for on-line access to current eligibility (equipment, installation and Internet access are responsibility of SPONSOR)[1]

### Claim Adjudication
- Administration of SPONSOR's Plan Design
- In-network claims adjudication via *TelePAID* on-line claims adjudication system
- Primary Coordination of Benefits (when flagged on eligibility records)
- Twelve (12) months on-line claims history retention (for use in claims processing)
- Processing associated with Medco by Mail Pharmacy Program prescriptions

### Member Communication Materials
- Medco Welcome Package for new designated Eligible Persons, consisting of:
  - Announcement letter(not to exceed one page)
  - Medco descriptive brochure (not to exceed eight pages)
  - Pre-addressed Mail Order form/envelope
  - Patient health profile questionnaire
  - One Medco Identification Card per Primary Eligible Participant (two per family)
  - Information on access to major Participating Pharmacy network chains
- Other available standard Medco materials, consisting of:
  - Direct reimbursement claim form (also available via www.medco.com)
  - Coordination of Benefits (COB) claim form
- TDD-TTY services for hearing impaired to access Member Service Department

### Clinical Programs
- Access capabilities to e-SD via the Client Website to support SPONSOR coverage authorization activities

### Reporting
- Medco's Prescription Drug Plan Report Package available through the Information Services Report Manager tool on the Client Website[2]

---

[1]  SPONSOR may be granted access to Medco systems and applications, in some cases requiring the grant of access to SPONSOR employees and/or representatives, including e-SD and Client Website. SPONSOR's use of such systems and applications is governed by this Agreement and the Terms of Use and privacy policies for the respective systems and applications. Medco will grant access to SPONSOR employees and/or representatives only at the discretion of SPONSOR, as provided in Medco's operating procedures, and SPONSOR will be responsible for those individuals' compliance with the terms of this Agreement and the applicable Terms of Use and privacy policies.

[2]  Includes Report Manager for up to four user IDs for SPONSOR personnel only. Additional SPONSOR user IDs may be set up at a charge of $250/user per month. External claims integration charge is separate and quoted upon request. Equipment, installation, and Internet access charges are the responsibility of SPONSOR. Specifically assigned user IDs may not be exchanged with, or used by, third parties (e.g., consultants) or other

EXECUTION COPY

- Medco's Claims Detail Layout (CDL) file every two (2) weeks

**Retail Pharmacy Network**
- Establish, maintain, credential, and contract an adequate panel of Participating Pharmacies
- Development and distribution of communication materials to Participating Pharmacies regarding the Program
- Toll-free access to Help Desk for eligibility/claims processing assistance
- Toll-free access for Participating Pharmacies to obtain DUR assistance
- Monitor Participating Pharmacy performance and compliance, including generic substitution rates, formulary program conformance, and DUR intervention conformance through Retail Network Management initiatives and reporting
- Toll-free telephone access to voice response unit for location of Participating Pharmacies in zip code area
- Medco Pharmacy Audit Program[3]

**Member Service**
- Toll-free telephone access to Member Service for the Program for use by Eligible Persons, SPONSOR benefits personnel, and physicians
- Gatekeeper Program – Medco's assistance program for older adults
- 24-hour access to a Medco pharmacist via toll-free telephone service

**medco.com**
- Standard Medco website capabilities, including:
  – online prescription ordering and status
  – prescription pricing information
  – coverage and benefit plan information
  – health news information

**Account Management**
- Clinical and plan consulting, analysis, and cost projections
- Annual analysis of Program utilization, impact of Plan Design changes, and intervention programs

**4.2.** SPONSOR will also pay for Additional Administrative Services requested or used by SPONSOR and provided by Medco under the Program as follows:

| **Eligibility** | |
|---|---|
| • Hard copy eligibility submission | Data entry charges |
| **Claim Adjudication** | |
| • Direct reimbursement/out-of-network claims adjudication (including check and EOB to Eligible Person) | $1.75 per claim |
| • Coordination of Benefits<br>  - Secondary Coordination of Benefits<br>    ▪ Eligible Person-submitted paper claim<br>    ▪ Retail Pharmacy-submitted electronic claim<br>  - Adjudication of government subrogation claims (unless responsibility is otherwise assigned by SPONSOR) | <br><br>$2.50 per claim<br>$1.00 per claim<br>$3.00 per paid claim |

---

SPONSOR personnel. Third parties desiring access must be approved by Medco and must sign Medco's Third-Party Access agreement, accompanied by SPONSOR's letter of authorization.

[3]    Medco will credit SPONSOR with 85% of all audit recoveries that Medco's Pharmacy Audit Program recovers on behalf of SPONSOR. Medco will retain 15% of the total recoveries to defray administrative costs of Medco's Pharmacy Audit Program.

**EXECUTION COPY**

| | |
|---|---|
| • On-line claims history retention (for use in claims processing) in excess of twelve (12) months | $0.05 per claim |
| **Drug Utilization Review/Clinical/Formulary Programs** | |
| • Set-up and load of historical records from prior vendor, supplied in Medco format | $0.07 per claim[4] |
| **Reviews and Appeals Management – Plan Design** | |
| • Reviews and Appeals Management - Plan Design<br>- Medco handles all initial determinations and first-level and, if requested by SPONSOR, second-level and urgent appeals | $55.00 per case |
| • Final and Binding Appeals Management for Medco's Coverage Authorization Programs | $5.00 per case (incremental to Utilization Management Program fee) |
| **Reporting** | |
| • Additional Ad-hoc report production, reprogramming, and testing of non-standard SPONSOR requirements | Quoted upon request |
| • SPONSOR's requests for claims data, Plan Design information, or production files for itself or its designees (subject to execution of Medco's confidentiality agreement) | Quoted upon request |
| - Requests for multiple data feeds | Additional fees per file, per cycle – quoted upon request |
| - Data feeds to third-party vendors on CD-ROM | Additional fees per file, per cycle – quoted upon request |
| **Member Communication Materials** | |
| • Replacement of any Member Communication materials, Formulary materials, or Identification Cards upon an Eligible Person's request | Quoted upon request |
| • Customization, re-issuance, or replacement of Member Communication materials, Formulary materials, or Identification Cards on a Group or SPONSOR-wide basis, if requested by SPONSOR | Quoted upon request |
| • Prescription Drug Benefit Statement:<br>- Statement to Eligible Persons providing prescription history along with specific recommended actions and related savings. Quarterly summary reporting to SPONSOR. | $1.50 per statement plus actual postage charges |
| • Eligible Person communications describing the benefit or changes to the benefit, except for initial Welcome Package for new designated Eligible Persons | Quoted upon request |
| • Customized, targeted Eligible Person mailings for closed/custom formulary | Quoted upon request |
| • Retail Refill Allowance Program Member Communications Materials | $2.50 per Primary Eligible Participant plus postage costs on reminder letters |
| • Mailings direct to Eligible Persons, physicians, or SPONSOR location | Postage charges |
| **Physician Communications** | |
| • Charges by physicians or medical practices for the completion of prior authorization forms, clarification of prescriptions, or other requests for information relating to coverage authorization or a prescribed medication | Amount Medco is required to pay physician or medical practice |
| **medco.com** | |
| • SPONSOR customization of medco.com | Quoted upon request |
| **Audit Support** | |
| • Data in excess of a rolling twenty-four (24) months | Quoted upon request |
| • Medco support of additional client audits | $35,000 per audit |

---

[4]   Fee waived for six months of claims data

EXECUTION COPY

Note: Charge for additional services not listed above will be determined by Medco and quoted upon request.

## 5. UTILIZATION MANAGEMENT PROGRAM

Medco will provide to SPONSOR Utilization Management Programs, which will be outlined in a Utilization Management Program Document (the "UMP Document") to be entered into at a date determined by the parties. The UMP Document will be effective as of the Effective Date of this Agreement and when executed, will be entered into contemporaneously with this Agreement. The UMP Document at such time that it is entered into by both parties, is incorporated by reference herein. The UMP Document may be modified in the form of a new UMP Document agreed upon by the parties in writing.

## 6. IMPLEMENTATION ALLOWANCE

After ninety (90) days following full implementation of SPONSOR's Integrated Program and for the Initial Term of this Agreement, Medco will credit up to $20,000 against future billings under SPONSOR's Program for documented expenses incurred and submitted by SPONSOR to Medco for the preparation and/or implementation of SPONSOR's Integrated Program (e.g., consulting fees, RFP preparation, or special communications associated with the Integrated Program roll-out).

## 7. MEDCO PRICING GUARANTEE

7.1     Within 180 days after the end of each Contract Year, Medco will calculate and report the actual ingredient cost discounts for Brand Name Drugs and Generic Drugs respectively, as billed to SPONSOR for the Contract Year. If the actual ingredient cost discounts, dispensing fees, guaranteed rebates or any components of the Medco Pricing Guarantee are less than the guaranteed targets described below, Medco will make up the shortfall on a dollar-for-dollar basis. Any available surplus from individually guaranteed components of any part of the Medco Pricing Guarantee may be used to offset any shortfall in another guaranteed component. The guarantees set forth herein exclude Specialty Drugs, and claims dispensed and submitted by non-traditional providers such as Long-Term Care, Home Infusion, Veteran, Military, and I/T/U (Indian/Tribal/Indian Urban) providers.

## CHART A

| Retail Network (Broad National Network) | |
|---|---|
| **Brand Pricing** | AWP minus (-) 14.70% |
| **Generic Pricing**[5] | The annual average generic discount will be equal to AWP minus (-) 65% |
| **Dispensing Fees** | Average brand and generic drugs = $1.40 |
| Mail Order Pharmacy Program (forty-five (45) days' supply or greater)[6] | |

---

[5]     The guarantee will apply to existing generics as well as new generics that come to the market during the term of this agreement that have more than two manufacturers. The Brand discount guarantee will include all claims not included in the Generic discount guarantee.

[6]     The guarantees and rebates will apply to those Mail Order prescriptions with forty-five (45) days' supply or greater. For those prescriptions with less than forty-five (45) day's supply, the retail guarantees and rebates will apply.

EXECUTION COPY

| Brand Pricing | AWP minus (-) 22% |
|---|---|
| Generic Pricing[5] | The annual average generic discount will be equal to AWP minus (-) 70% |
| Formulary Management Program | |
| Preferred Prescriptions® Formulary | |
| Per Brand Name Prescription | |
| Retail | $13.20 |
| Mail Order[6] | $40.90 |

The Ingredient Cost discounts are calculated by measuring the incremental values of the billed retail and mail order network discounts, MAC pricing, and U&C pricing, against the AWP of all prescriptions dispensed and submitted under the Program by Participating Pharmacies and mail order pharmacies in the aggregate. In the event of a material Plan Design modification, an increase or decrease in the total number of Participating Pharmacies by five (5%) percent or more, or a change in ownership of five (5%) percent or more of Participating Pharmacies, Medco may modify the Guaranteed Retail Ingredient Cost Discounts and Guaranteed Retail Dispensing Fee on an equitable basis.

7.2     So long as the guarantee set forth in this Section 7 is in effect, Medco will have no separate liability for the pricing set forth in this Agreement.