# EXHIBIT C

**EXPRESS SCRIPTS, INC.**
**PHARMACY BENEFIT MANAGEMENT AGREEMENT**

This Pharmacy Benefit Management Agreement ("Agreement") is effective as of February 1, 2019 ("Effective Date") and is entered into by and between Express Scripts, Inc., a Delaware corporation ("ESI"), and County of Albany organized under the laws of the state of New York ("Sponsor"). Sponsor has engaged ESI to provide on an exclusive basis, either directly or through its subsidiaries, pharmacy benefit management services, including, among other things, pharmacy network contracting; pharmacy claims processing; mail and specialty drug pharmacy; cost containment, clinical, safety, adherence, and other like programs; and formulary administration ("PBM Services") pursuant to the terms described in this Agreement.

1. **DEFINITIONS**

1.1. "Ancillary Supplies, Equipment, and Services" or "ASES" means ancillary supplies, equipment, and services provided or coordinated by ESI Specialty Pharmacy in connection with ESI Specialty Pharmacy's dispensing of Specialty Products.

1.2. "Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug as identified by drug pricing services such as Medi-Span, the drug manufacturer or other source recognized in the retail prescription drug industry (the "Pricing Source"). If the Pricing Source discontinues the reporting of AWP or materially changes the manner in which AWP is calculated or reported, then ESI reserves the right to make an equitable adjustment as necessary to maintain the parties' relative economics and the pricing intent of this Agreement.

1.3. "Brand/Generic Algorithm" or "BGA" means ESI's standard and proprietary brand/generic algorithm, a copy of which may be made available for review by Sponsor or its Auditor upon request. The purposes of the algorithm are to stabilize products "flipping" between brand and generic status and to reduce Sponsor, Member and provider confusion due to fluctuations in brand/generic status. Sponsor or its Auditor may audit ESI's application of its BGA to confirm that ESI is making brand and generic drug determinations consistent with such algorithm.

1.4. "Brand Drug" means a prescription drug identified as such in ESI's master drug file using indicators from First Databank (or other source nationally recognized in the prescription drug industry) on the basis of a standard Brand/Generic Algorithm, a copy of which may be made available for review by Sponsor or its Auditor upon request.

1.5. "Copayment" means that portion of the charge for each Covered Drug dispensed to the Member that is the responsibility of the Member (e.g., copayment, coinsurance and/or deductible). Sponsor will communicate the applicable Copayment on the Set-Up Forms. A Member's Copayment charged for a Covered Drug will be the lesser of the applicable Copayment, AWP discount (e.g. MAC price for Generic Drugs), or U&C.

1.6. "Covered Drug(s)" means those prescription drugs, supplies, Specialty Products and other items that are covered under the Plan, each as indicated on the Set-Up Forms.

1.7. "Eligibility Files" means the list submitted by Sponsor to ESI in reasonably acceptable electronic format indicating persons eligible for drug benefit coverage services under the Plan.

1.8. "ESI National Plus Network" means ESI's broadest Participating Pharmacy network.

1.9. "ESI Mail Pharmacy" means a pharmacy owned or operated by ESI or one or more of its affiliates, other than an ESI Specialty Pharmacy, where prescriptions are filled and delivered to Members via mail delivery service.

1.10. "ESI Specialty Pharmacy" means Accredo Health Group, Inc., Express Scripts Specialty Distribution Services, Inc., or another pharmacy or home health agency owned or operated by ESI or its affiliates that primarily dispenses Specialty Products. When the ESI Mail Pharmacy dispenses a Specialty Product, it shall be considered an ESI Specialty Pharmacy hereunder.

1.11. "Exclusive or Limited Distribution Product" means a Specialty Product that is not generally available from most or all pharmacies but is restricted to select pharmacies as determined by a pharmaceutical manufacturer.

1.12.   "Formulary" means the list of FDA-approved prescription drugs and supplies developed by ESI's Pharmacy and Therapeutics Committee and/or customized by Sponsor, and which is selected and/or adopted by Sponsor.   The drugs and supplies included on the Formulary will be modified by ESI from time to time as a result of factors, including, but not limited to, medical appropriateness, manufacturer Rebate arrangements, and patent expirations. Additions and/or deletions to the Formulary are hereby adopted by Sponsor, subject to Sponsor's discretion to elect not to implement any such addition or deletion through the Set-Up Form process, any such election shall be considered a Sponsor change to the Formulary.

1.13.   "Generic Drug" means a prescription drug, whether identified by its chemical, proprietary, or non-proprietary name, that is therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient(s) and approved by the FDA, and which is identified as such in ESI's master drug file using indicators from First Databank (or other source nationally recognized in the prescription drug industry) on the basis of a standard Brand/Generic Algorithm, a copy of which may be made available for review by Sponsor or its Auditor upon request.

1.14.   "MAC List" means a list of prescription drugs or supplies subject to maximum reimbursement payment schedules developed or selected by ESI.

1.15.   "Manufacturer Administrative Fees" means those administrative fees paid by manufacturers to ESI in connection with ESI's invoicing, allocating and collecting the Rebates under the Rebate program.

1.16.   "Maximum Reimbursement Amount" or "MRA" means the maximum unit ingredient cost payable by Sponsor for a drug on the MAC List based on maximum reimbursement payment schedule(s) developed or selected by ESI.   The application of MRA pricing may be subject to certain "dispensed as written" (DAW) protocols and Sponsor defined plan design and coverage policies.

1.17.   "Member" means each person who Sponsor determines is eligible to receive prescription drug benefits as indicated in the Eligibility Files.

1.18.   "Member Submitted Claim" means a paper claim submitted by a Member for Covered Drugs dispensed by a pharmacy for which the Member paid cash.

1.19.   "Participating Pharmacy" means any licensed retail pharmacy with which ESI or one or more of its affiliates has executed an agreement to provide Covered Drugs to Members, but shall not include any mail order or specialty pharmacy affiliated with any such Participating Pharmacy.  Participating Pharmacies are independent contractors of ESI.

1.20.   "Pass-Through" means the actual ingredient cost and dispensing fee amount paid by ESI for the Prescription Drug Claim when the claim is adjudicated to the Participating Pharmacy, as set forth in the specific Participating Pharmacy remittances related to Sponsor's claims.

1.21.   "PEPM" means per employee per month, if applicable, as determined by ESI from the Eligibility Files.

1.22.   "PMPM" means per Member per month fee, if applicable, as determined by ESI from the Eligibility Files.

1.23.   "Plan" means any plan of insurance or self-insurance, including an administrative services only arrangement, sponsored or administered by Sponsor or a subsidiary or affiliate of Sponsor which offers or provides a prescription drug benefit.

1.24.   "Prescription Drug Claim" means a Member Submitted Claim, Subrogation Claim or claim for payment submitted to ESI by a Participating Pharmacy, ESI Mail Pharmacy, or ESI Specialty Pharmacy as a result of dispensing Covered Drugs to a Member.

1.25.   "Rebates" mean retrospective formulary rebates that are paid to ESI pursuant to the terms of a formulary rebate contract negotiated independently by ESI and directly attributable to the utilization of certain Covered Drugs by Members.  For sake of clarity, Rebates do not include, for example, Manufacturer Administrative Fees; product

DocuSign Envelope ID: 8EAA32E0-9FBF-467A-9668-18CA4PDFD65F

discounts or fees related to the procurement of prescription drug inventories by ESI Specialty Pharmacy or the ESI Mail Pharmacy; inflation protection amounts; fees received by ESI from pharmaceutical manufacturers for care management or other services provided in connection with the dispensing of products; or other fee-for-service arrangements whereby pharmaceutical manufacturers generally report the fees paid to ESI or its wholly-owned subsidiaries for services rendered as "bona fide service fees" pursuant to federal laws and regulations (collectively, "Other Pharma Revenue"). Such laws and regulations, as well as ESI's contracts with pharmaceutical manufacturers, generally prohibit ESI from sharing any such "bona fide service fees" earned by ESI, whether wholly or in part, with any ESI client.

1.26. "Set-Up Forms" means any standard ESI document or form, which when completed by Sponsor (electronic communications from Sponsor indicating Sponsor's approval of a Set-Up Form shall satisfy the foregoing), will describe the essential benefit elements and coverage rules adopted by Sponsor for its Plan.

1.27. "Specialty Product List" means the list of Specialty Products applicable to Sponsor and maintained and updated by ESI from time to time. The Specialty Product List is available to Sponsor upon request.

1.28. "Specialty Products" means those injectable and non-injectable drugs on the Specialty Product List. Specialty Products, which may be administered by any route of administration, are typically used to treat chronic or complex conditions, and typically have one or more of several key characteristics, including frequent dosing adjustments and intensive clinical monitoring to decrease the potential for drug toxicity and increase the probability for beneficial treatment outcomes; patient training and compliance assistance to facilitate therapeutic goals; limited or exclusive product availability and distribution (if a drug is only available through limited specialty pharmacy distribution it is always considered a Specialty Product); specialized product handling and/or administration requirements.

1.29. "Subrogation Claim" means subrogation claims submitted by any state or a person or entity acting on behalf of a state under Medicaid or similar United States or state government health care programs, for which Sponsor is deemed to be the primary payor by operation of applicable federal or state laws.

1.30. "Usual and Customary Price" or "U&C" means the retail price charged by a Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to ESI by the Participating Pharmacy.

2. **PBM SERVICES**

2.1. Eligibility/Set Up. Sponsor will submit completed Set-Up Forms and Eligibility Files (initial and updated) on a mutually determined basis, which ESI will accurately implement. Changes to the Set-Up Forms must be communicated to ESI in writing on ESI's standard forms or other mutually agreed upon method. Eligibility performed manually by ESI for Sponsor, or material changes to the Eligibility File processes requested by Sponsor during the term may be subject to additional fees. Sponsor will be responsible for all Prescription Drug Claims during the period of the Member's eligibility as indicated on the Eligibility File including for retroactively termed Members, except in the event that ESI does not accurately implement the Eligibility File.

2.2. Pharmacy Network.

a. Participating Pharmacies. ESI will maintain a network(s) of Participating Pharmacies. ESI maintains multiple networks and subnetworks, and periodically consolidates networks or migrates clients to other networks and subnetworks. Participating Pharmacies are independent contractors of ESI and as such ESI does not direct or exercise any control over the Participating Pharmacies or the professional judgment exercised by any pharmacist in dispensing prescriptions or otherwise providing pharmaceutical related services at a Participating Pharmacy. ESI shall have no liability to Sponsor, any Member or any other person or entity for any act or omission of any Participating Pharmacy or it agents or employees.

b. ESI Mail Pharmacy. Subject to applicable law, ESI will make Members aware of the ability to fill their prescriptions through the ESI Mail Pharmacy, communicate any applicable cost savings, and provide supporting services (e.g. pharmacist consultation) in connection with any prescription dispensed by the ESI Mail Pharmacy. ESI may suspend ESI Mail Pharmacy services to a Member who is in default of any Copayment amount due ESI.

c.   Specialty Products and ASES.  Subject to applicable law, ESI will make Members aware of the ability to fill their prescriptions through the ESI Specialty Pharmacy, communicate any applicable cost savings, and provide supporting services (e.g. pharmacist consultation) in connection with any prescription dispensed by the ESI Specialty Pharmacy. Specialty Products will be excluded from any price guarantees set forth in the Agreement.  In no event will the ESI Mail Pharmacy or Participating Pharmacy pricing specified in the Agreement apply to Specialty Products.

i.   ESI will notify Sponsor monthly of any new Specialty Products that are introduced to the market on or after the Effective Date of this Agreement. If Sponsor has expressly excluded a specific therapy class or product, Specialty Products in those classes will automatically be excluded from coverage and will reject as "NDC Not Covered".  If Sponsor later desires to cover otherwise excluded Specialty Products, Sponsor must notify ESI in writing that it desires to cover the Specialty Product before ESI may adjudicate the Specialty Product as a Covered Drug.  Sponsor must notify ESI in writing if it wants to exclude any Specialty Product from coverage.  The exclusion will be implemented within seven (7) business days after the date of ESI's receipt of such notification.  ESI will not retroactively deny Prescription Drug Claims processed prior to ESI's implementation of the exclusion as provided above and Sponsor will be responsible for the payment of such Prescription Drug Claims processed prior to the rejection of coverage.

ii.   ESI may provide ASES that is necessary for the proper administration of a Specialty Product.  Sponsor will be billed for such ASES as set forth in Exhibit A.

2.3.  Claims Processing.

a.   Claims Processing

i.   ESI will perform claims processing services for Covered Drugs dispensed by Participating Pharmacies, ESI Mail Pharmacy and ESI Specialty Pharmacy.

ii.   If elected by Sponsor, ESI will, for an applicable fee, process Member Submitted Claims in accordance with the rules in the Set-Up Forms and ESI's standard procedures.

iii.   If authorized by Sponsor on the Set-Up Forms, ESI will, for an applicable fee, process Subrogation Claims in accordance with applicable federal and state laws.  If Sponsor does not authorize ESI to process Subrogation Claims, ESI will reject any Subrogation Claims and refer claimants to Sponsor, in accordance with applicable federal and state laws.

iv.   ESI will defer to Sponsor or its third party designee (as applicable) regarding the coverage of any claim under a Plan.  In other words, the Sponsor will have the final responsibility for all decisions with respect to coverage of a Prescription Drug Claim and the benefits allowable under the Plan, including determining whether any rejected or disputed claim will be allowed.

b.   Prior Authorization.  ESI will, for an applicable fee, provide prior authorization ("PA") services as specified and directed by Sponsor for drugs designated on the Set-Up Forms.  Prior authorized drugs must meet Sponsor-approved coverage criteria ("Guidelines") before they are deemed to be Covered Drugs.  In determining whether to authorize coverage of such drug under the PA program, ESI will apply only the Guidelines and will rely upon information about the Member and the diagnosis of the Member's condition provided by the prescriber.  If prior authorization for a medication is not immediately available, a 72-hour emergency supply may be dispensed when the pharmacist on duty recommends it as clinically appropriate and when the medication is needed without delay.  ESI will not make a determination of medical necessity, make diagnoses or substitute ESI's judgment for the professional judgment and responsibility of the prescriber.

2.4  Claims for Benefits.  If applicable, ESI will process Member Submitted Claims and prior authorization ("PA") requests consistent with the ERISA claims rules set forth in 29 CFR Part 2560 (or applicable state law if a non-ERISA plan)

DocuSign Envelope ID: 8EAA32E9-9F5F-467A-9668-18CA4PDFD65F

("Claims Rules"). Sponsor may elect to have ESI perform appeals services in connection with denied PA requests and denied Member Submitted Claims in exchange for an applicable fee, or facilitate such services through Sponsor or a third party of Sponsor's choice. If Sponsor elects to conduct its own appeals or facilitate appeals through a third party, ESI will route Member appeals to Sponsor or other Sponsor designated entity. If Sponsor elects to have ESI perform appeals services, Sponsor agrees that ESI may perform such services through a third-party contracted with ESI for the performance of appeals (the "UM Company"). Through its contract with ESI, the UM Company has agreed to be, and will serve as, the named fiduciary for its performance of such appeals. ESI also agrees to accept fiduciary status solely with respect to its performance of any appeal.

    a.    <u>UM Company</u>. In the event ESI performs appeals services, or facilitates the performance of appeals services through a UM Company, ESI or the UM Company, as applicable, will be responsible for conducting the appeal on behalf of Sponsor in accordance with the Claims Rules. ESI represents to Sponsor that UM Company has contractually agreed that: (A) UM Company will conduct appeals in accordance with the Claims Rules and Sponsor's plan, (B) Sponsor is a third party beneficiary of UM Company's agreement with ESI (a copy of which is available upon request) and the remedies set forth therein, and (C) UM Company will indemnify Sponsor for third party claims caused by the UM Company's negligence, willful misconduct, or breach of the UM Company's agreement with ESI in providing the appeal services.

    b.    <u>External Review Services</u>. ESI will not conduct any external review services (as defined in the Patient Protection and Affordable Care Act of 2010 and its implementing regulations (the "ACA")); provided, however, Sponsor may elect to have UM Company facilitate the provision of external review services through UM company contracted independent review organizations ("IROs") (as such term is defined in the ACA), for the applicable fees. Sponsor must execute a standard ESI External Appeals Services Set-Up Form, which may be requested through ESI Account Management, in order to receive such services from UM Company.

**2.5**    <u>Account Management</u>.

    a.    <u>Account Team</u>. ESI will provide account team support for Sponsor. The account team will be Sponsor's primary point of contact with ESI.

    b.    <u>Sponsor/Member Call Center</u>. ESI will provide toll-free telephone, IVR and Internet support to assist Sponsor, Sponsor's agents and Members with Member eligibility and benefits verification, location of Participating Pharmacies or other related Member concerns.

**2.6**    <u>Formulary Support and Rebate Management</u>.

    a.    <u>Formulary Adherence and Clinical Programs</u>. ESI may provide clinical, safety, adherence, and other like programs as appropriate. ESI will not implement any program for which Sponsor may incur an additional fee without Sponsor's prior written approval and election of such program.

    b.    <u>Rebates</u>. Subject to the remaining terms of this Agreement, ESI will pay to Sponsor the amounts set forth on <u>Exhibit A</u>.

**2.7**    <u>Exclusivity</u>. During the Term, ESI will be Sponsor's exclusive provider of PBM Services for Sponsor's Plans offering a prescription benefit. The financial terms set forth in <u>Exhibit A</u> are conditioned on that exclusivity.

**2.8**    <u>Sponsor Audits</u>. Provided that this Agreement has been executed and Sponsor is current in the payment of invoices under this Agreement, Sponsor may, upon no less than thirty (30) days prior written request, audit ESI's provision of services hereunder, the scope of which shall be to verify compliance with the financial terms of this Agreement, on an annual basis consistent with the Audit Protocol set forth in <u>Exhibit B</u>. Sponsor may use an independent third party auditor ("Auditor"), so long as such Auditor is not engaged in providing services for Sponsor or otherwise that conflict with the scope or independent nature of the audit (as determined by ESI acting reasonably and in good faith), and provided that Sponsor's Auditor executes a mutually acceptable confidentiality agreement. Any request

by Sponsor to permit an Auditor to perform an audit will constitute Sponsor's direction and authorization to ESI to disclose PHI to the Auditor.

2.9 <u>Performance Standards</u>. ESI will conform to the performance standards set forth on <u>Exhibit E</u> hereto. The payments set forth in <u>Exhibit E</u> will be Sponsor's sole monetary remedy for any failure by ESI to meet a performance standard in addition to any correction or reimbursement associated with payment or billing errors.

**3   FEES, BILLING AND PAYMENT**

3.1 <u>Fees</u>. In consideration of the PBM Services provided by ESI, Sponsor will pay the applicable claims reimbursement amounts ("Claims Reimbursements") and other administrative fees ("Administrative Fees") pursuant to the terms set forth on <u>Exhibit A</u> ("Claims Reimbursements," "Administrative Fees" and any other charge or fee that is the responsibility of Sponsor as may be described elsewhere in this Agreement are hereinafter referred to collectively as "Fees").

3.2 <u>Billing and Payment</u>. Sponsor will pay ESI as set forth in <u>Exhibit A</u>.

3.3 <u>Deposit</u>. If, at any time: (i) Sponsor has two or more invoices past due and outstanding, or (ii) ESI has reasonable grounds to believe Sponsor may be delinquent in payment of fees based on Sponsor's financial condition (e.g., persistent negative cash flow, bankruptcy or insolvency), ESI may require that the Sponsor provide to ESI a deposit in an amount equal to the average of the last three (3) months of billing history as the basis for determining the one (1) month deposit amount or, if three (3) months billing history is not available, the most recent month of billing history as the basis. ESI will retain the deposit until the earlier of termination of this Agreement (following any run-off period), or six (6) consecutive months of timely payments of all Fees following submission of the deposit, and may apply the deposit to delinquent fees until return of the deposit.

**4   HIPAA AND CONFIDENTIAL INFORMATION**

4.1 <u>HIPAA</u>. The parties agree that (a) as relates to use and disclosure of PHI, electronic transaction standards and security of electronic PHI under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended, they are subject to the terms of the Business Associate Agreement set forth in <u>Exhibit C</u> and (b) ESI Specialty Pharmacy and ESI Mail Pharmacy are acting as covered entities under HIPAA and not as business associates to the Plan and shall abide by all HIPAA requirements accordingly.

4.2 <u>Confidential Information</u>.

a.   Each party agrees that the terms of this Agreement and information of the other party, including, but not limited to the following, will constitute confidential and proprietary information ("Confidential Information"): (i) with respect to ESI: ESI's reporting and other web-based applications, eligibility and adjudication systems, system formats and databanks (collectively, "ESI's Systems"), clinical or formulary management operations or programs, fraud, waste and abuse tools and programs, anonymized claims data (de-identified in accordance with HIPAA); ESI Specialty Pharmacy and ESI Mail Pharmacy data; information and contracts relating to Rebates and Manufacturer Administrative Fees, prescription drug evaluation criteria, drug pricing information, and Participating Pharmacy agreements; and (ii) with respect to Sponsor:  Sponsor and Member identifiable health information and data, Eligibility Files, Set-Up Form information, business operations and strategies. Neither party will use the other's Confidential Information, or disclose it or this Agreement to any third party (other than Sponsor attorneys and accountants), at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement or upon prior written consent, which will not unreasonably be withheld. Upon termination of this Agreement, each party will cease using the other's Confidential Information, and all such information will be returned or destroyed upon the owner's direction. Confidential Information does not include information which is or becomes generally available to the public; was within the recipient's possession or knowledge prior to its being furnished to the recipient pursuant to this Agreement, or is independently developed by the recipient under circumstances not involving a breach of this Agreement.

b.   Sponsor will not, and will not permit any third party acting on Sponsor's behalf to, access, attempt to access, test or audit ESI's Systems or any other system or network connected to ESI's Systems. Without limiting the foregoing, Sponsor will not: access or attempt to access any portion or feature of ESI's Systems, by circumventing ESI's Systems access control measures, either by hacking, password "mining" or any other means; or probe, scan, audit or test the vulnerability of ESI's Systems, nor breach the security or authentication measures of ESI's Systems.

5.   **COMPLIANCE WITH LAW, FIDUCIARY ACKNOWLEDGMENTS, FINANCIAL DISCLOSURE**

5.1   Compliance with Law; Change in Law. Each party shall be responsible for ensuring its compliance with any laws and regulations applicable to its business, including maintaining any necessary licenses and permits. Sponsor shall be responsible for any governmental or regulatory charges and taxes imposed upon or related to the services provided hereunder. With respect to any Plan that is subject to the provisions of ERISA, Sponsor (or the plan sponsor if a party other than Sponsor) shall ensure that its activities in regard to such program are in compliance with ERISA, and shall be responsible for disclosing to Members any and all information relating to the Plan and this Agreement as required by law to be disclosed, including any information relating to Plan coverage and eligibility requirements, commissions, rebates, discounts, or provider discounts. If there is a new or change in federal or state laws or regulations or the interpretation thereof, or any government, judicial or legal action that, among other things, materially burdens ESI, requires ESI to increase payments or shorten payment times for Covered Drugs to Participating Pharmacies, or materially changes the scope of services hereunder (a "Change in Law"), then there shall be an appropriate modification of the services, reimbursement rates, Administrative Fees and/or Rebates hereunder.

5.2   Fiduciary Acknowledgements. ESI offers pharmacy benefit management services, products and programs for consideration by all clients, including Sponsor. The general parameters of these products and the systems that support these products, have been developed by ESI as part of ESI's administration of its business as a PBM. The parties agree that they have negotiated the financial terms of this Agreement in an arm's-length fashion. Sponsor acknowledges and agrees that, except for the limited purpose set forth in Section 2.4, neither it nor the Plan intends for ESI to be a fiduciary (as defined under ERISA or state law) of the Plan, and, except for the limited purpose as set forth in Section 2.4, neither will name ESI or any of ESI's wholly-owned subsidiaries or affiliates as a "plan fiduciary." Sponsor further acknowledges and agrees that neither ESI nor any of ESI's wholly-owned subsidiaries or affiliates: (a) have any discretionary authority or control respecting management of the Plan's prescription benefit program, or (b) exercise any discretionary authority or control respecting management or disposition of the assets of the Plan or Sponsor. Sponsor further acknowledges that all such discretionary authority and control with respect to the management of the Plan and plan assets is retained by Sponsor or the Plan. Upon reasonable notice, ESI will have the right to terminate PBM Services to any Plan (or, if applicable, Members) located in a state requiring a pharmacy benefit manager to be a fiduciary to Sponsor, a Plan, or a Member in any capacity.

5.3   Disclosure of Certain Financial Matters. In addition to the Fees paid to ESI by Sponsor, ESI and ESI's wholly-owned subsidiaries or affiliates derive revenue in one or more of the ways as further described in the Financial Disclosure to ESI PBM Clients set forth in Exhibit D hereto ("Financial Disclosure"), as updated by ESI from time to time. The revenues described in the Financial Disclosure are not direct or indirect compensation to ESI from Sponsor for services rendered to Sponsor or the Plan under this Agreement. In negotiating any of the fees and revenues described in the Financial Disclosure or in this Agreement, ESI and ESI's wholly-owned subsidiaries and affiliates act on their own behalf, and not for the benefit of or as agents for Sponsor, Members or the Plan. ESI and ESI's wholly-owned subsidiaries and affiliates retain all proprietary rights and beneficial interest in such fees and revenues described in the Financial Disclosure and, accordingly, Sponsor acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues; provided, that ESI will pay Sponsor amounts equal to the amounts expressly set forth on Exhibit A.

6.   **TERM AND TERMINATION, DEFAULT, REMEDIES**

6.1   Term. The Term of this Agreement will be as set forth in Exhibit A-1.

6.2   Termination.

DocuSign Envelope ID: 8EAA32E0-9FBF-467A-9668-18SA4PDFD65F

a.   <u>Breach or Default</u>.  Either party may give the other written notice of a material, substantial and continuing breach of this Agreement.  If the breaching party has not cured said breach within thirty (30) days from the date such notice was sent, this Agreement may be terminated at the option of the non-breaching party.  If the amount of time commercially reasonable for the breach to be cured is longer than thirty (30) days, this Agreement may not be terminated by the non-breaching party pursuant to this provision until such commercially reasonable period of time has elapsed; provided, however, that in no event will such period exceed sixty (60) days.

b.   <u>Non-Payment</u>.  Notwithstanding anything to the contrary herein, ESI (and its wholly-owned subsidiaries) may terminate or suspend their performance hereunder and cease providing or authorizing provision of Covered Drugs to Members upon forty-eight (48) hours written notice if Sponsor fails to pay ESI.  ESI will attempt collection through written and verbal communications with Sponsor prior to sending the notice described herein.

c.   <u>Obligations Upon Termination</u>.  Upon notice of termination of this Agreement, the parties will mutually develop a run-off plan providing for: (i) Sponsor notification to Members of the timing of any transition to a successor pharmacy benefit manager at least thirty (30) days prior to the effective date of such termination; (ii) ESI's provision of open ESI Mail Pharmacy refill files and standard claims data and PA files for transition to the successor pharmacy benefit manager in accordance with then existing industry protocol; and (iii) whether Sponsor elects for ESI to process Participating Pharmacy or Member Submitted Claims for prescriptions filled during the Term but filed with ESI after the effective date of termination ("Termination Date").  Sponsor will continue to pay ESI in accordance with this Agreement for any Fees for PBM Services provided during the term and any run-off period.  ESI will continue filing for Rebates for claims incurred prior to the Termination Date and will, subject to final reconciliation of any outstanding amounts owed by Sponsor to ESI, pay Sponsor Rebates for such claims in accordance with the Rebate payment schedule set out herein.  Notwithstanding anything in this Agreement to the contrary, ESI shall not be obligated to provide post-transition services following the transition to the successor pharmacy benefit manager and conclusion of the run-off period, including, but not limited to, the provision of continued data reporting, reporting, consultation, or analysis.

6.3   <u>Remedies</u>.

a.   <u>Remedies Not Exclusive</u>.  A party's right to terminate this Agreement under Section 6 will not be exclusive of any other remedies available to the terminating party under this Agreement or otherwise, at law or in equity.

b.   <u>Force Majeure</u>.  Neither party will lose any rights under this Agreement or be liable in any manner for any delay to perform its obligations under this Agreement that are beyond a party's reasonable control, including, without limitation, any delay or failure due to riots, earthquakes, storms, floods or other extreme weather conditions, fires, acts of terrorism, epidemics, embargoes, war or other outbreak of hostilities, government acts or regulations, the failure or inability of carriers, suppliers, or telecommunications providers to provide services necessary to enable a party to perform its obligations hereunder, or any other reason where failure to perform is beyond the party's reasonable control, and is not caused by the negligence, intentional conduct or misconduct of the defaulting party; *provided, however,* that this clause may not be invoked to excuse a party's payment obligations hereunder.  ESI represents that it maintains and continually updates a business continuity plan designed to mitigate any disruption to the services provided by ESI under this Agreement.

c.   <u>Limitation of Liability</u>.  Except for the indemnification obligations set forth in Section 6.3(d), each party's liability to the other hereunder will not exceed the actual proximate losses or damages caused by breach of this Agreement.  In no event will either party or any of their respective affiliates, directors, employees or agents, be liable for any indirect, special, incidental, consequential, exemplary or punitive damages, or any damages for lost profits relating to a relationship with a third party, however caused or arising, whether or not they have been informed of the possibility of their occurrence.

d.   <u>Indemnification</u>.

i. ESI will indemnify and hold Sponsor harmless from and against any loss, cost, damage, expense or other liability, including, without limitation, reasonable costs and attorney fees ("Costs") incurred in connection with any and all third party claims, suits, investigations or enforcement actions ("Claims") which may be asserted against, imposed upon or incurred by Sponsor and arising as a result of (A) ESI's negligent acts or omissions or willful misconduct (including those of the ESI Mail Pharmacy and ESI Specialty Pharmacy), or (B) ESI's breach of this Agreement.

ii. Sponsor will indemnify and hold ESI harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESI and arising as a result of (A) Sponsor's negligent acts or omissions or willful misconduct, benefit design and coverage decisions, or breach of this Agreement, or (B) any improper use Sponsor, an Auditor or Vendor may make of PHI or ESI System access provided to such party.

iii. As a condition of indemnification, the party seeking indemnification will notify the indemnifying party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder, and will tender the defense of such claim to the indemnifying party. No party will be obligated to indemnify the other with respect to any claim settled without the written consent of the other.

6.4   Survival. The parties' rights and obligations under Sections 3, 4 and 5; and Sections 6.2(c), 6.3, 6.4, 7.2, 7.3, 7.4 and 7.6 will survive the termination of this Agreement.

**7.   MISCELLANEOUS**

7.1   Notice. Any notice or document required or permitted to be delivered pursuant to this Agreement must be in writing and properly addressed to the other party at the address set forth below, or at such other address as such party will specify from time to time by written notice delivered in accordance herewith:

Express Scripts, Inc.
Attn: Senior Vice President of Account Management
One Express Way
St. Louis, Missouri 63121
With copy to: Legal Department

County of Albany
Attn: Jennifer Clement
112 State Street Room 1100
Albany, New York 12207

7.2   Independent Parties. No provision of this Agreement is intended to create or will be construed to create any relationship between ESI and Sponsor other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.

7.3   Integration; Amendments. This Agreement and any Exhibits hereto constitute the entire understanding of the parties hereto and supersedes any prior oral or written communication between the parties with respect to the subject matter hereof. If there is a separate Business Associate Agreement between the parties, such an agreement will be incorporated herein for all applicable purposes. No modification, alteration, or waiver of any term, covenant, or condition of this Agreement will be valid unless in writing and signed by the parties or the agents of the parties who are authorized in writing, except as may be otherwise permitted pursuant to the terms and conditions of this Agreement or any Exhibit hereto.

7.4   Choice of Law. This Agreement will be construed and governed in all respects according to the laws in the State of Missouri, without regard to the rules of conflict of laws thereof.

DocuSign Envelope ID: 8EAA32E9-95BF-467A-9568-18CA4DDED65F

7.5   <u>Waiver</u>.  The failure of either party to insist upon the strict observation or performance of this Agreement or to exercise any right or remedy will not be construed as a waiver of any subsequent breach of this Agreement or impair or waive any available right or remedy.

7.6   <u>Trademarks</u>.  Each party acknowledges each other party's sole and exclusive ownership of its respective trade names, commercial symbols, trademarks, and service marks, whether presently existing or later established (collectively "Marks").  No party shall use the other party's Marks in advertising or promotional materials or otherwise without the owner's prior written consent.

7.7   <u>Taxes and Assessments</u>.  Any applicable sales, use, excise, or other similarly assessed and administered tax, surcharge, or fee imposed on items dispensed, or services provided hereunder, or the fees or revenues generated by the items dispensed or services provided hereunder, or any other amounts ESI or one or more of its subsidiaries or affiliates may incur or be required to pay arising from or relating to ESI's or its subsidiaries' or affiliates' performance of services as a pharmacy benefit manager, third-party administrator, or otherwise in any jurisdiction, will be the sole responsibility of Sponsor or the Member.

7.8   <u>Third Party Beneficiary Exclusion</u>.  This Agreement is not a third party beneficiary contract, nor will this Agreement create any rights on behalf of Members against ESI.  Sponsor and ESI reserve the right to amend, cancel or terminate this Agreement without notice to, or consent of, any Member.

7.9   <u>Authority to Contract</u>.  Sponsor hereby represents and warrants that it has obtained due and proper authority to enter into this Agreement through its governing body.

7.10  <u>Open Records Requests</u>.  ESI acknowledges that Sponsor, as a government agency, may be subject to applicable freedom of information or open records laws and must, upon request, disclose such materials as are covered by and not exempted from such laws.  Sponsor acknowledges that certain information contained herein or subject to this Agreement is proprietary and confidential to ESI and shall be exempt from that Act to the fullest extent permitted by law.  Sponsor agrees to give ESI notice and the minimum statutory or regulatory period of time to oppose, request redactions or limitations on any disclosures under a third party freedom of information or open records request pertaining to this Agreement or any proposal related hereto.  This provision shall survive termination of the Agreement.

**[Remainder of Page Intentionally Left Blank; Signature Page Follows]**

4108353.v1

IN WITNESS WHEREOF, the undersigned have executed this Pharmacy Benefit Management Agreement as of the day and year below set forth.

EXPRESS SCRIPTS, INC.

By: _Annalisa M. Cooper_

Printed Name: Annalisa M. Cooper

Title: Vice President, Account Management

Date: 09/24/2020 | 6:47 AM CDT

COUNTY OF ALBANY

By: _____

Printed Name: Daniel C Lynch

Title: Deputy County Executive

Federal ID Number: _____

Date: 8/19/2020

4108353.v1

DocuSign Envelope ID: 8EAA32E0-95BF-467A-9568-18CA4DDED65E

## EXHIBIT A

**PRICING TERMS AND PHARMACY PROGRAM FEES**

**Exhibit A-1**
Billing, Payment, and Miscellaneous Pricing Terms

**Exhibit A-2**
Claims Reimbursement Rates

**Exhibit A-3**
Rebates

**Exhibit A-4**
Administrative Services and Clinical Program Fees

**Exhibit A-5**
Inflation Protection Program

4108353.v1

**Exhibit A-1**

**Term, Billing, Payment, and Miscellaneous Pricing Terms**

1.  TERM.  This Agreement will commence as of October 1, 2019 and will continue for a period of three (3) years ("Initial Term").  The Initial Term plus any renewal terms will be known as the Term ("Term").  Thereafter, this Agreement will automatically renew with the same terms and conditions as set forth herein for successive one (1) year renewal terms, subject to the right of termination as otherwise provided herein.  Not less than ninety (90) days prior to the end of the Initial Term or any renewal term of this Agreement either party may notify the other party in writing that it desires to terminate this Agreement effective as of the end of the then current term.

2.  BILLING AND PAYMENT.

    a.  Billing.  ESI will invoice Sponsor: (i) weekly for Claims Reimbursements; and (ii) on a monthly basis for the Administrative Fees.

    b.  Payment.  Sponsor will pay ESI by wire, ACH transfer or pre-authorized debit within two (2) business days from the date of Sponsor's receipt of each ESI invoice.  Sponsor will be responsible for all costs of collection, and agrees to reimburse ESI for such costs and expenses, including reasonable attorneys' fees.  All amounts not paid by the due date thereof will bear interest at the rate of 1.5% per month or, if lower, the highest interest rate permitted by law.  ESI may apply amounts otherwise owed to Sponsor against any unpaid Fees.

3.  PHARMACY MANAGEMENT FUND ("PMF")

    a.  ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████

    ■  ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████

    ■  ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████
    █████████████████████████████████████████

    ■  ██████████████████████████████████████████████████
    ██████████████████████████████████████████████████

DocuSign Envelope ID: 8EAA32F9-95BF-467A-9568-18CA4DDED65F

unamortized portion of the PMF. Reimbursement to ESI by Sponsor pursuant to this Section will not be in lieu of any other rights or remedies ESI may have in connection with the termination of this Agreement, including monetary or other damages. PMF reimbursements shall not be paid prior to the Effective Date of this Agreement and are not payable until this Agreement is executed. Sponsor will have no right to interest on, or the time value of, any PMF, and unused funds shall be retained by ESI.

4.   **PRICING CONDITIONS**.  In the event one or more of the following occurs (whether between the date of the proposal and the Effective Date, or during the Term), ESI will have the right, upon notice, to make an equitable adjustment to the rates, Administrative Fees and/or Rebates, solely as necessary to return ESI to its contracted economic position as of the effective date of such event:

a.   Sponsor's Membership falls below 5,000 Members;

b.   Sponsor has Members enrolled in a 100% co-payment plan (plans where Sponsor has no liability for the payment of pharmacy claims);

c.   Sponsor has greater than 10% of total utilization for all Plans attributable to a consumer driven health plan (CDHP);

d.   There is a material change in the demographics of Sponsor's Membership compared to data provided by Sponsor;

e.   Sponsor changes its Formulary, benefit designs, implements OTC plans, clinical or trend programs or otherwise takes an action that has the effect of lowering the amount of Rebates earned hereunder or materially impacting any guarantee;

f.   Sponsor elects to use on-site clinics or pharmacies to dispense prescription drugs to Members which materially reduces Rebates and/or the number of Covered Drug claims submitted to ESI; or

g.   There is a material change to the manner in which AWP is calculated or reported for Brand Drugs and/or Generic Drugs.

4108353.v1

**Exhibit A-2**

**Claims Reimbursement Rates**

Sponsor will pay to ESI for each Prescription Drug Claim dispensed or processed pursuant to the terms of this Agreement. Sales or excise tax or other governmental surcharge, if any, will be the responsibility of Sponsor.

1. **BASE ADMINISTRATIVE FEES.**

   1.1. Sponsor will pay ESI the following base Administrative Fees on all claims processed by ESI under this Agreement. These shall be in addition to any other Administrative Fees set forth in this Agreement.

| | Per Prescription Drug Claim |
|---|---|
| Participating Retail Pharmacy | $■ |
| ESI Mail Pharmacy | $■ |

2. **PARTICIPATING PHARMACY AND ESI MAIL PHARMACY AVERAGE AGGREGATE ANNUAL INGREDIENT COST AND DISPENSING FEE GUARANTEES (DOES NOT APPLY TO SPECIALTY PRODUCTS).**

   2.1. **Participating Pharmacy Commercial Ingredient Cost and Dispensing Fee Guarantees**

   a. **ESI National Plus Network**

| National Plus Network | | (Pass Through) |
|---|---|---|
| **Brands** | **Average Annual Ingredient Cost Guarantee** | Year 1: AWP-■% |
| | | Year 2: AWP-■% |
| | | Year 3: AWP-■% |
| | | Year 4: AWP-■0% |
| | | Year 5: AWP-■% |
| | **Dispensing Fee/Rx Guarantee** | Year 1: $■ |
| | | Year 2: $■ |
| | | Year 3: $■ |
| | | Year 4: $■ |
| | | Year 5: $■ |
| **Generics** | **Average Annual Ingredient Cost Guarantee** | Year 1: AWP-■% |
| | | Year 2: AWP-■% |
| | | Year 3: AWP-■% |
| | | Year 4: AWP-■% |
| | | Year 5: AWP-■% |
| | **Dispensing Fee/Rx Guarantee** | Year 1: $■ |
| | | Year 2: $■ |
| | | Year 3: $■ |
| | | Year 4: $■ |
| | | Year 5: $■ |

15

2.2.  **ESI Mail Pharmacy Ingredient Cost and Dispensing Fee Guarantees**

a.   **Commercial Ingredient Cost and Dispensing Fee Guarantees (Does not apply to Specialty Products)**

| ESI Mail Pharmacy | | |
|---|---|---|
| **Brands** | **Average Annual Ingredient Cost Guarantee** | AWP-███% |
| | **Dispensing Fee/Rx Guarantee[1]** | $███ |
| **Generics** | **Average Annual Ingredient Cost Guarantee** | Year 1: AWP-███% |
| | | Year 2: AWP-███% |
| | | Year 3: AWP-███% |
| | | Year 4: AWP-███% |
| | | Year 5: AWP-███% |
| | **Dispensing Fee/Rx Guarantee[1]** | $███ |

[1]Dispensing fee guarantees are inclusive of shipping and handling.  If carrier rates (i.e., U.S. mail and/or applicable commercial courier services) increase during the term of this Agreement, the dispensing fee guarantee will be increased to reflect such increase(s).

3.  **SPECIALTY PRODUCT PRICING**

3.1.





4. ▮▮▮▮▮▮ ▮▮ ▮▮▮▮

5. **GENERAL PRICING TERMS**. The following terms are applicable to all pricing terms set forth in this Agreement.

   5.1. Calculation of Ingredient Cost Guarantees. ESI will guarantee an average aggregate annual discounts to Sponsor to be calculated as follows:

   [1-(total discounted AWP ingredient cost (including any retrospective pharmacy payments) but excluding dispensing fees and ancillary charges, and prior to application of Copayments) of applicable Prescription Drug Claims for the annual period divided by total undiscounted AWP ingredient cost (both amounts will be calculated as of the date of adjudication) for the annual period)]. Discounted ingredient cost will be the lesser of MAC (as applicable), U&C or AWP discount.

   5.2. Calculation of Dispensing Fee Guarantees. ESI will guarantee an average aggregate annual per Prescription Drug Claim dispensing fee to Sponsor to be calculated as follows:

   [total dispensing fee of applicable claims for the annual period divided by total claims for the annual period]. Dispensing fees will be calculated using the lesser of MRA (as applicable), U&C, or AWP discount adjudication methodology

   5.3. Guarantee Methodology. The reconciliation of the generic average annual ingredient cost discount guarantees set forth in section 2 shall not include Single Source Products in the calculation but shall include

Multi-Source Products. The reconciliation of the brand average annual ingredient cost discount guarantees set forth in section 2 shall not include Multi-Source Products in the calculation but shall include Single Source Products and "authorized" generics that are approved by the FDA under a brand name drug NDA. "Single Source Products" means a prescription medication that is: (i) approved by the FDA under a generic drug ANDA application and is licensed and then currently marketed by up to two (2) generic drug manufacturers under separate ANDA applications; or (ii) subject to patent litigation. "Multi-Source Products" means a prescription medication that: (i) is approved by the FDA under a generic drug ANDA application and licensed and then currently marketed by more than two (2) generic drug manufacturers under separate ANDA applications; and (ii) is not subject to patent litigation. The application of brand and generic pricing may be subject to certain "dispensed as written" (DAW) protocols and Sponsor or Plan defined plan design and coverage policies for adjudication and Member Copayment purposes. The application of brand or generic/MRA pricing may be subject to certain "dispensed as written" (DAW) protocols and Sponsor-defined plan design and coverage policies for adjudication and Member copayment purposes.

5.4.  <u>Guarantee Reconciliation Period</u>.  The ingredient cost and dispensing fee guarantees under this Agreement will be measured and reconciled on an annual basis within ninety (90) days and for Specialty Product guarantee one hundred eighty (180) days of the end of each contract year. ESI will pay the shortfall, if any, between Sponsor's net cost and the applicable guarantee, excluding claims with $0 cost to Sponsor. The guarantees are annual guarantees - if this Agreement is terminated prior to the completion of the then current contract year (hereinafter, a "Partial Contract Year"), then the guarantees will not apply for such Partial Contract Year. To the extent Sponsor changes its benefit design or Formulary during the term of the Agreement, the guarantee will be equitably adjusted if there is a material impact on the discount achieved. Subject to the remaining terms of this Agreement, ESI will pay the difference attributable to any shortfall between the actual result and the guaranteed result; provided, however, that ESI may use an excess achieved in one or more of the guarantees under this Agreement to make up for, and offset, a shortfall in any other guarantee under this Agreement.

5.5.  <u>Exclusions</u>.  The following will be excluded from all ingredient cost and dispensing fee guarantees under this Agreement: Specialty Products (other than specialty guarantee, if any), coordination of benefit claims, no bill/no remit, 340B Claims, Subrogation Claims, claims dispensed from an on-site or Sponsor or Plan owned pharmacy, long term care pharmacy claims, home infusion claims, I/T/U claims, Member Submitted Claims, compounds, OTCs, vaccines, and biosimilar products. Additionally, claims dispensed in Puerto Rico, Guam, Northern Mariana Islands, Virgin Islands, Hawaii, Massachusetts, Alaska, and rural pharmacies will be excluded from the guarantees.

5.6.  <u>Adjudication Rates</u> If no adjudication rates are specified herein, individual claims dispensed at Participating Pharmacies will be billed on a Pass-Through basis.

a.  At the ESI Mail Pharmacy, Sponsor will be responsible for any unpaid Member Copayment amounts if payment has not been received from the Member within one hundred twenty (120) days following dispensing. Sponsor will be billed in accordance with the claims billing and payment terms.

6.  <u>VACCINE CLAIMS</u> (NO VACCINE CLAIMS WILL BE INCLUDED IN ANY PRICING OR REBATE GUARANTEE SET FORTH IN THE AGREEMENT).

6.1.



DocuSign Envelope ID: 8EAA32E9-9EBF-467A-9568-18CA4DDED65E



4108353.v1

**EXHIBIT A-3**

**Rebates**

1. **NON-SPECIALTY REBATE AMOUNTS**

   1.1. Subject to the conditions set forth in this Agreement, ESI will pay to Sponsor an amount equal to the greater of:

   a.   100% of the Rebates received by ESI; or subject to Sponsor meeting the Plan design conditions identified in the table below, the following guaranteed amounts:

   b.   Commercial

   | Formulary: | Basic Formulary | |
   |---|---|---|
   | Copayment Design: | Minimum $15 Copayment Differential | |
   | | **Participating Pharmacies** | **ESI Mail Pharmacy** |
   | Per Paid Brand Claim (non-Specialty Products) | Year 1: $ ▉ <br> Year 2: $ ▉ <br> Year 3: $ ▉ <br> Year 4: $ ▉ <br> Year 5: $ ▉ | Year 1: $ ▉ <br> Year 2: $ ▉ <br> Year 3: $ ▉ <br> Year 4: $ ▉ <br> Year 5: $ ▉ |

   1.2. **EXCLUSIONS**

   Member Submitted Claims, Subrogation Claims, biosimilar products, Exclusive or Limited Distribution Products, multi-source brands, OTC products, claims older than 180 days, claims through Sponsor-owned, in-house, or on-site pharmacies, Specialty Products, 340b pharmacies, claims with no cost to Sponsor, and claims pursuant to a 100% Member Copayment plan are not eligible for the guaranteed Rebate amounts set forth in Section 1.1 above.

   1.3. **REBATE PAYMENT TERMS**

   a.   Subject to the conditions set forth herein, ESI shall pay Sponsor the guaranteed amounts set forth above during each calendar quarter hereunder within approximately one hundred and fifty (150) days following the end of such calendar quarter.

   b.   On an annual basis, ESI shall reconcile the percentage amount set forth above (against the guaranteed amounts paid to Sponsor quarterly) within two hundred and forty (240) days following the end of each contract year and shall credit Sponsor for any deficit on the next invoice immediately following the reconciliation. If, upon reconciliation, the annual aggregate percentage amount paid to Sponsor for the contract year is greater than the guaranteed aggregate amounts, ESI shall be entitled to make up for, and offset, a shortfall in other Rebate guarantee(s) set forth in this Agreement with such excess annual aggregate percentage amount, and such excess amount shall be applied either directly to the other shortfall guarantee(s) or applied as a credit against future Rebate payments and Manufacturer Administrative Fee payments (or as a direct invoice amount to be paid by Sponsor, if a credit is not feasible).

2. **SPECIALTY REBATE AMOUNTS**

   **2.1.**    Subject to the conditions set forth in this Agreement and Sponsor meeting the Plan design conditions identified in the table below, ESI will pay to Sponsor the following guaranteed amounts:

| Formulary: | Basic Formulary | |
|---|---|---|
| Copayment Design: | Minimum $15 Copayment Differential | |
| | Participating Pharmacies | ESI Specialty Pharmacy |
| Per Paid Brand Claim (Specialty Products) | $█████ | Year 1: $████<br>Year 2: $████<br>Year 3: $████<br>Year 4: $████<br>Year 5: $████ |

   **2.2.**    **EXCLUSIONS**

   Member Submitted Claims, Subrogation Claims, biosimilar products, Exclusive or Limited Distribution Products, multi-source brands, OTC products, claims older than 180 days, claims through Sponsor-owned, in-house, or on-site pharmacies, 340b pharmacies, claims with no cost to Sponsor, and claims pursuant to a 100% Member Copayment plan are not eligible for the guaranteed Rebate amounts set forth in Section 2.1 above.

   **2.2    REBATE PAYMENT TERMS**

   Subject to the conditions set forth herein, ESI shall pay Sponsor the guaranteed amounts set forth above within approximately one hundred and fifty (150) days following the end of each calendar quarter.

3    **CONDITIONS (APPLIES TO ALL REBATES)**

   **3.1**    ESI contracts for Rebates, if indicated to be paid above, on its own behalf and for its own benefit, and not on behalf of Sponsor.  Accordingly, ESI retains all right, title and interest to any and all actual Rebates received. ESI will pay Sponsor amounts equal to the Rebate amounts allocated to Sponsor, as specified above, from ESI's general assets (neither Sponsor, its Members, nor Sponsor's plan retains any beneficial or proprietary interest in ESI's general assets.  Sponsor acknowledges and agrees that neither it, its Members, nor its Plan will have a right to interest on, or the time value of, any Rebate payments received by ESI during the collection period or moneys payable under this Section.  No amounts for Rebates will be paid until this Agreement is executed by Sponsor.  ESI will have the right to apply Sponsor's allocated Rebate amount to unpaid Fees

   **3.2**    ESI reserves the right to adjust the Rebate guarantees if Rebate revenue is materially decreased because Brand Drugs move off-patent to generic status or due to a Change in Law.  Any Rebate guarantees apply only to claims where Sponsor incurs a claims cost.

   **3.3**    Sponsor acknowledges that it may be eligible for Rebate amounts under this Agreement only so long as Sponsor, its affiliates, or its agents do not contract directly or indirectly with anyone else for discounts, utilization, rebates or other financial incentives on pharmaceutical products or formulary programs for claims processed by ESI pursuant to the Agreement, without the prior written consent of ESI.  In the event that Sponsor negotiates or arranges for Rebates or similar discounts for any Covered Drugs hereunder, but without limiting ESI's right to other remedies, ESI may immediately withhold any Rebate amounts earned but not yet paid to Sponsor.  To the extent Sponsor knowingly negotiates and/or contracts for discounts or rebates on claims for Covered Drugs without prior written approval of ESI, such activity will be deemed to be a material breach of this Agreement, entitling ESI to suspend payment of Rebate amounts hereunder and to renegotiate the terms and conditions of this Agreement.

**3.4**  Under its Rebate program, ESI may implement ESI's Formulary management programs and controls, which may include, among other things, cost containment initiatives, and communications with Members, Participating Pharmacies, and/or physicians.  ESI reserves the right to modify or replace such programs from time to time.  Guaranteed Rebate amounts, if any, set forth herein, are conditioned on adherence to various Formulary management controls, benefit design requirements, claims volume, and other factors stated in the applicable pharmaceutical manufacturer agreements, as communicated by ESI to Sponsor from time to time. If any government action, change in law or regulation, change in the interpretation of any law or regulation, or any action by a pharmaceutical manufacturer has an adverse effect on the availability of Rebates, then ESI may make an adjustment to the Rebate terms and guaranteed Rebate amounts, if any, hereunder.

The Guaranteed Rebate Amounts set forth above for ESI's Basic Formulary require the Sponsor to implement ESI's Preferred Step Therapy Program, as amended from time to time.  Targeted drugs will be communicated to Sponsor.

**3.5**  The Rebate guarantees set forth in this Agreement are based on current market share assumptions and benefit design.  If Sponsor's mix or utilization of drugs in the Hepatitis C or PCSK9 classes materially differ from the data provided to PBM for the purposes of establishing pricing or from Sponsor's historical mix and utilization, ESI may equitably adjust the Rebate guarantees accordingly.

**3.6**  Rebate amounts paid to Sponsor pursuant to this Agreement are intended to be treated as "discounts" pursuant to the federal anti-kickback statute set forth at 42 U.S.C. §1320a-7b and implementing regulations.  Sponsor is obligated if requested by the Secretary of the United States Department of Health and Human Services, or as otherwise required by applicable law, to report the Rebate amounts and to provide a copy of this notice.  ESI will refrain from doing anything that would impede Sponsor from meeting any such obligation.

**Exhibit A-4**

**Administrative Services and Clinical Program Fees**

**I.**     **Administrative Services**



**Optional PBM Services**



4108353.v1

DocuSign Envelope ID: 8EAA32F0-05BF-467A-9568-18CA4DDED65F



**Comprehensive Consumer Directed Health (CDH) Solution**



**II.**   **Clinical/Trend Programs.**



DocuSign Envelope ID: 8EAA32E9-05BF-467A-9568-18CA4DDED65F

| ▮▮▮▮▮▮▮ | ▮ |
|---|---|
| ▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮ <br> ▮▮▮ | ▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮ |
| ▮▮▮ | ▮▮▮▮▮ |
| ▮▮▮▮▮ | ▮▮▮▮▮ |
| ▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮ |
| ▮▮▮▮▮▮▮▮▮ | |
| ▮▮▮▮▮▮ <br> ▮▮▮▮▮▮ <br> ▮▮▮▮▮▮ <br> ▮▮▮▮▮ | ▮▮▮▮▮ |
| ▮▮▮▮▮▮ <br> ▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮ <br> ▮▮▮▮▮ | ▮▮▮▮▮ |
| ▮▮▮▮▮ <br> ▮▮▮▮▮ <br> ▮▮▮ | ▮▮▮▮▮ |
| ▮▮▮▮▮▮ <br> ▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮ |
| ▮▮▮▮▮▮ | ▮▮▮▮▮ <br> ▮▮▮▮  ▮▮▮ <br> ▮▮▮▮  ▮▮▮ <br> ▮▮▮  ▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮ <br> ▮▮▮▮▮▮▮▮▮▮▮ <br> ▮▮▮ |

4108353.v1

DocuSign Envelope ID: 8EAA32E9-05BF-467A-9568-18CA4DDED65F



28



4108353.v1

DocuSign Envelope ID: 8EAA32F9-95BF-467A-9568-18CA4DDED65F

**Exhibit A-5**

**Inflation Protection Program**

1. Inflation Protection Program.  Under the Inflation Protection Program, ESI will guarantee (the "Inflation Rate Guarantee") that Sponsor's Brand Drug AWP inflation will not exceed ███% for the commercial population (will be determined based on prior year data) (the "Inflation Cap") for the initial contract year of this Agreement.  The Inflation Cap for subsequent years shall be the greater of: (i) the preceding year's Inflation Cap or (ii) the actual CYIR of the preceding contract year; and may be adjusted up or down based on differences in Sponsor's individual mix and utilization.  If the Inflation Rate Guarantee is not met, ESI will make a client inflation payment to Sponsor calculated as follows: (Contract Year Inflation Rate – Inflation Cap) * Adjusted Base AWP * Effective Discount (the "Inflation Guarantee Payment").  Any payment owed will be issued within 180 days following the end of the applicable contract year.  To remain eligible for the inflation guarantee payment in a given contract year, Sponsor's plan's formulary compliance for Brand Drugs must average at least 93.89% for the commercial population (will be determined based on prior year data) on total utilization for that contract year.

2. For the purposes of the Inflation Protection Program, the following definitions will apply:

   2.1. "Adjusted Base AWP" shall mean the PCYA adjusted to account for total quantity changes between the prior year and the current year.  Adjusted Base AWP will be calculated as follows (PCYA / Prior Year Brand Quantities) * Current Year Brand Quantities.

   2.2. "Current Calendar Year AWP" or "CCYA" shall be equal to the aggregate weighted average Brand Drug AWP amount for the calendar year for which the Inflation Guarantee is being calculated, adjusted for the previous year's dispensed Brand Drug quantities.  CCYA shall be calculated as the sum of the average unit AWP for each Brand Drug dispensed in the current calendar year multiplied by the quantities of each such Brand Drug dispensed in the preceding calendar year.

   2.3. "Current Year Brand Quantities" shall be equal to the aggregate quantities of each Brand Drug used in the calculation of CCYA dispensed during the calendar year for which the Inflation Guarantee Payment is being calculated.

   2.4. "Calendar Year Inflation Rate" or "CYIR" shall be expressed as a percentage, and calculated as (CCYA/PCYA) - 1.

   2.5. "Effective Discount" is the effective discount Sponsor has received (including the impact of Rebates and Manufacturer Administrative Fees (if applicable)) on Brand Drugs dispensed during the calendar year for which the Inflation Guarantee is being calculated.  The Effective Discount will be expressed as a percentage and calculated as (net ingredient cost paid by Sponsor for all Brand Drugs in the applicable calendar year – Rebates received by Sponsor) / Aggregate AWP for all Brand Drugs dispensed in the applicable year.

   2.6. "Prior Calendar Year AWP" or "PCYA" shall be equal to, for the same Brand Drug NDCs used for the "CCYA" calculation, the average Brand Drug AWP amount for such NDCs during the calendar year immediately preceding the calendar year for which the Inflation Guarantee payment is being calculated.

   2.7. "Prior Year Brand Quantities" shall be equal to the aggregate quantities of each Brand Drug used in the calculation of CCYA dispensed during the calendar year prior to the year for which the inflation guarantee is being calculated.

3. Terms and Conditions of the Inflation Protection Program

   3.1. In order to be eligible for the Inflation Rate Guarantee payment for a given calendar year, Sponsor must, on average, meet the specified formulary compliance percentage on its total utilization for the calendar year.  If Sponsor makes material changes to its Formulary or benefit design that negatively impact ESI's ability to control inflation relative to Sponsor's Formulary drug mix, then ESI reserves the right to make an equitable adjustment to the Inflation Rate Guarantee.

   3.2. The following claims will be excluded from all calculations related to the Inflation Protection Program: Medicare claims, Medicaid claims, any other government health care program claims, OTCs, Member Submitted Claims, Subrogation Claims, compounds, Generic Drugs, claims submitted by Sponsor owned, in-house, or on-site pharmacies, 340B claims, claims submitted through a 100% member cost-share program, Biosimilar Products, drugs where the quantity or packaging has been changed by the manufacturer from

DocuSign Envelope ID: 8FAA32F9-95BF-467A-9568-18CA4DDED65F

the past year, and drugs for which there was no utilization in the calendar year prior to the calendar year for which the Inflation Rate Guarantee payment is being determined.

3.3. ESI's Inflation Protection Program, and the underlying economics, is separate and apart from, any Rebates/Total Rebates paid to Sponsor and the amounts described above will be paid to Sponsor in addition to any Rebate/Total Rebate payments to which Sponsor is entitled. ESI contracts for inflation payments from manufacturers for its own account and ESI may realize positive margin between amounts paid to Sponsors and amounts received from pharmaceutical manufacturers. Conversely, ESI may realize negative margin if inflation payments from manufacturers are less than payments due to Sponsor. Sponsor will not be entitled to receive any amounts related to drug price inflation or a related guarantee other than as set forth above.

3.4. No payments will be made to Sponsor unless Sponsor has an executed PBM Agreement with ESI.

3.5. Notwithstanding anything in the Agreement to the contrary, to the extent that ESI has guaranteed any Ingredient Cost or Dispensing Fee amounts, ESI may use the value of any overperformance of those guarantees to offset any amounts owed to Sponsor for the Inflation Guarantee Payment or the Inflation Rate Guarantee. No payments will be made to Sponsor unless Sponsor has an executed PBM agreement with Sponsor.

3.6. ESI has structured the terms of this program to comply with certain exceptions and safe harbors to the Federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(b)), including the discount exception (42 U.S.C. §1320a-7b(b)(3)(A) and safe harbor (42 C.F.R. §1001.952(h)). ESI will treat any reimbursement made to Sponsor hereunder as retrospective discounts on the price of the product paid by Sponsor. ESI will fully and accurately report such discounts on the payment advice submitted to Sponsor. ESI hereby informs Sponsor that it may be required by law to properly disclose and appropriately reflect (in any costs claimed or charges made) all such discounts. Further, ESI will refrain from taking any action that would impede or frustrate Sponsor in any such disclosure requirements. Sponsor may be required to provide information on the discount furnished to Sponsor to the Secretary of Health and Human Services, or any state or other governmental agency, upon request. ESI will comply with all applicable reporting and disclosure obligations.

4108353.v1

**EXHIBIT B**

**AUDIT PROTOCOL**

1. **AUDIT PRINCIPLES**

   ESI recognizes the importance of its clients ensuring the integrity of their business relationship by engaging in annual audits of their financial arrangements with ESI, and, where applicable (i.e. Medicare Part D), by auditing compliance with applicable regulatory requirements.  ESI provides this audit right to each and every client. In granting this right, ESI's primary interest is to facilitate a responsive and responsible audit process.  In order to accomplish this goal, for all clients, ESI has established the following Protocol.  Our intent is in no way to limit Sponsor's ability to determine that ESI has properly and accurately administered the financial aspects of the Agreement or complied with applicable regulatory requirements, but rather to create a manageable process in order to be responsive to our clients and the independent auditors that they may engage.

2. **AUDIT PREREQUISITES**

   A. There are four components of your arrangement with ESI eligible for audit on an annual basis (calendar year) from February through October, with the exception of the Medicare Part D oversight component which is available on an annual basis  from March through November:

   - Retrospective Claims
   - Rebates (subsequent to true up)
   - Performance Guarantees (subsequent to true up)
   - Compliance with Regulatory Requirements (i.e. Medicare Part D) Note: If ESI is supporting a government initiated audit on behalf of Sponsor concurrently with the Sponsor initiated oversight audit, ESI resources will primarily be utilized to address the government audit requests.  As such, ESI's response to Sponsor initiated audits may be delayed.

   Balancing the need to adequately support the audit process for all ESI clients, with an efficient allocation of resources, clients who choose to audit one or more components of the arrangement must do so for all lines of business, as applicable, through a single annual audit.

   B. ESI will provide all data reasonably necessary for Sponsor to determine that ESI has performed in accordance with contractual terms.  ESI will provide the retrospective claims and benefit information in no more than thirty (30) days from audit kickoff call and having an executed confidentiality agreement.  Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

   C. ESI engages a national accounting firm, at its sole cost and expense, to conduct a SSAE 18, SOC 1 audit on behalf of its clients.  Upon request, ESI will provide the results of its most recent SSAE 18, SOC 1 audit.  Testing of the areas covered by the SSAE 18, SOC 1 is not within the scope of Sponsor's audit rights (i.e., to confirm the financial aspects of the Agreement) and is therefore not permitted.  However, if requested, ESI will explain the SSAE 18, SOC 1 audit process and findings to Sponsor in order for Sponsor to gain an understanding of the SSAE 18, SOC 1.

3. **AUDITS**

   A. The initial audit period for a retrospective claims, rebates and performance guarantee audit covers a timeframe not to exceed twenty-four (24) months immediately preceding the request to audit (the "Audit Period").  This Audit Period allows a reasonable amount of time for both parties to conclude the audit before data is archived off the adjudication system.

   B. CMS generally modifies its requirements for administering the Medicare Part D annually.  For this reason, the initial audit period for a Medicare Part D compliance audit cover a timeframe is not to exceed the twelve (12) months immediately preceding the request to audit (collectively, the "Medicare Part D Audit Period").  This Medicare Part D Audit Period is intended to assist our clients with the CMS annual oversight requirements.  ESI will be responsible for support of all services delegated to ESI.  Mock audits intended to simulate a CMS Program Audit shall not exceed a one (1) day webinar to review three (3) samples per each data universe review.  ESI will provide data universes within ten (10) business days of Sponsor request and responses to webinar follow-up requests within fifteen (15) business days of Sponsor request.  ESI shall not be required to provide data or responses in a more aggressive timeline than CMS requirements. If Sponsor has requested that ESI assist with findings related to services not delegated during an audit, ESI may accommodate such requests, which will be provided at ESI's standard audit charges.

   C. When performing a Rebate audit, Sponsor may perform an on-site review of the applicable components of manufacturer agreements, selected by Sponsor, as reasonably necessary to audit the calculation of the Rebate payments made to Sponsor by ESI.  Our ability to drive value through the supply chain and in our negotiations with manufacturers is dependent upon the strict confidentiality and use of these agreements.  Providing access to these agreements to third parties that perform services in the industry beyond traditional financial auditing jeopardizes our ability to competitively drive value. For this reason, unless otherwise agreed by the Parties, access to and audit of manufacturer agreements is restricted to a  mutually agreed upon CPA accounting firm whose audit department is a separate stand-alone division of the business, which carries insurance for professional malpractice of at least Two Million Dollars ($2,000,000).

DocuSign Envelope ID: 8EAA32F0-9EBF-467A-9568-18CA4DDED65F

D. The Sponsor may select an initial number of manufacturer contracts to enable Sponsor to audit fifty percent (50%) of the total rebate payments due to Sponsor for two (2) calendar quarters during the twenty-four (24) month period immediately preceding the audit (the "Rebate Audit Scope and Timeframe").

E. If you have a Pass-Through pricing arrangement for Participating Pharmacy claims, ESI will provide the billable and payable amount for a sampling of claims provided by you or your auditor (i.e., ESI will provide the actual documented claim record) during the audit to verify that ESI has administered such Pass-Through pricing arrangement consistent with the terms of the Agreement. If further documentation is required, ESI may provide a sample of claims remittances to the Participating Pharmacies to demonstrate ESI's administration of Pass-Through pricing. In any instance where the audit demonstrates that the amount billed to you does not equal the Pass-Through amount paid to the Participating Pharmacy, Sponsor's Auditor may perform an on-site audit of the applicable Participating Pharmacy contract rate sheet(s).

**4. AUDIT FINDINGS**

A. Following Sponsor's initial retrospective claims audit, Sponsor (or its Auditor) will provide ESI with suspected errors, if any. In order for ESI to evaluate Sponsor's suspected errors, Sponsor shall provide an electronic data file in a mutually agreed upon format containing up to 300 claims for further investigation by ESI. ESI will respond to the suspected errors in no more than sixty (60) days from ESI's receipt of such findings. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

B. Following Sponsor's initial rebate and performance guarantee audit, Sponsor's Auditor will provide ESI with suspected errors, if any. ESI will respond to the suspected errors in no more than sixty (60) days from ESI's receipt of such findings. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

C. Following Sponsor's initial audit of Medicare Part D compliance, Sponsor (or its Auditor) will provide ESI with suspected non-compliant issues, if any. In order for ESI to evaluate Sponsor's suspected errors, Sponsor shall provide ESI with specific regulatory criteria and Medicare Part D program requirements used to cite each suspected non-compliant issue. ESI will respond to the suspected errors in no more than thirty (30) days from ESI's receipt of the findings. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

**5. FINAL REPORT**

A. Upon receipt and review of ESI's responses to Sponsor (or its Auditor), Sponsor (or its Auditor) will provide ESI with a written report of findings and recommendations. ESI will respond to the audit report in no more than thirty (30) days from ESI's receipt of the report. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort (i.e., no new issues noted) between Sponsor and/or its Auditor and ESI.

B. Sponsor agrees that once audit results are accepted by both parties, the audit shall be considered closed and final. To the extent the mutually accepted audit results demonstrate claims errors, ESI will reprocess the claims and make corresponding adjustments to Sponsor through credits to a future invoice(s). If we are unable to reprocess claims and issue corresponding credits to Sponsor through this process, ESI will make adjustments to Sponsor via a check or credit.

C. New audits cannot be initiated until all parties have agreed that the prior audit is closed.

**6. AUDITS BY GOVERNMENT ENTITIES**

A. In the event CMS, the OIG, MEDIC, or another government agency has engaged in an audit of Sponsor and/or its "first tier" and "downstream entities", Sponsor shall contact the ESI Account Management team and provide a written copy of the audit notice or request from the government agency promptly upon receipt.

B. Sponsor agrees that CMS may have direct access to ESI's and any such "downstream entity's" pertinent contracts, books, documents, papers, records, premises and physical facilities, and that ESI and such "downstream entity" will provide requested information directly to CMS unless otherwise agreed upon by ESI and Sponsor.

C. Following the government audit of Sponsor and its "first tier" and "downstream entities", Sponsor shall provide ESI with a written report of suspected non-compliant issues noted in the government audit that relate to services provided by ESI, if any. If there are such findings, ESI will work with Sponsor and/or government agency to respond to any suspected non-compliant issues.

D. Support for all such audits by government entities will be subject to ESI's standard charges. All such fees shall be reasonable and based on ESI's costs for supporting such audits.

**7. CONFIDENTIALITY**

ESI's contracts are highly confidential and proprietary. For this reason, ESI only permits on-site review rather than provide copies to our clients. During on-site contract review, Sponsor (or its Auditor) may take and retain notes to the extent necessary to document any identified errors, but may not copy (through handwritten notes or otherwise) or retain any contracts (in part or in whole) or related documents provided or made available by ESI in connection with the audit. ESI will be entitled to review any notes to affirm compliance with this paragraph.

DocuSign Envelope ID: 8EAA32E9-95BF-467A-9568-18CA4DDED65F

**EXHIBIT C**

**BUSINESS ASSOCIATE AGREEMENT**

Express Scripts, Inc. and one or more of its subsidiaries ("ESI"), and Sponsor or one of its affiliates ("Sponsor"), are parties to an agreement ("PBM Agreement") whereby ESI provides certain pharmacy benefit management services to the Sponsor's prescription drug plan (Sponsor and Sponsor's prescription drug plan collectively referred to hereinafter as "Plan"). The PBM Agreement addresses the parties' rights and obligations concerning the use and disclosure of patients' protected health information. The HIPAA Rules (as defined below) require ESI and Plan to enter into a "business associate agreement" to comply with applicable sections of the HIPAA Rules.

1.      **Definitions.**

        (a)      "Breach" shall have the same meaning as the term "breach" in 45 C.F.R. § 164.402.

        (b)      "Designated Record Set" shall have the same meaning as the term "designated record set" in 45 C.F.R. § 164.501.

        (c)      "Electronic Health Record" shall mean an electronic record of health-related information on an Individual that is created, gathered, managed, and consulted by authorized health care clinicians and staff.

        (d)      "Electronic PHI" shall have the same meaning as the term "electronic protected health information" in 45 C.F.R. § 160.103.

        (e)      "HIPAA Rules" means the collective privacy, transaction and code sets, and security regulations promulgated pursuant to the Health Insurance Portability and Accountability Act, as codified at 45 C.F.R. Parts 160, 162 and 164, as amended from time to time.

        (f)      "Individual" shall have the same meaning as the term "individual" in 45 C.F.R. § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

        (g)      "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and 45 C.F.R. Part 164, Subpart A and Subpart E, as amended from time to time.

        (h)      "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in 45 C.F.R. § 160.103, limited to the information created or received by ESI from or on behalf of Plan.

        (i)      "Required by Law" shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

        (j)      "Secretary" shall mean the Secretary of the Department of Health and Human Services or his/her designee.

        (k)      "Security Incident" shall have the same meaning as "security incident" in 45 C.F.R. § 164.304.

        (l)      "Security Standards" shall mean the Security Standards, 45 C.F.R. Part 164, Subpart C, as amended from time to time.

        (m)      "Transactions Standards" shall mean the Standards for Electronic Transactions, 45 C.F.R. Part 162, Subpart I, as amended from time to time.

        (n)      "Unsecured PHI" shall have the same meaning as the term "unsecured protected health information" in 45 C.F.R. § 164.402.

        Capitalized terms used, but not otherwise defined, in this Business Associate Agreement shall have the same meaning as those terms in the HIPAA Rules.

2.      **General Use and Disclosure Provisions.**  ESI and Plan acknowledge and agree as follows:

        (a)      *Use or Disclosure.* ESI agrees not to use or further disclose PHI other than as expressly permitted or required by this Business Associate Agreement or the HIPAA Rules or as Required by Law.

        (b)      *Minimum Necessary.*  ESI will take reasonable efforts to limit requests for, use and disclosure of PHI to the minimum necessary to accomplish the intended request, use or disclosure.

(c)     *Specific Use or Disclosure Provisions.*  Except as otherwise limited in this Business Associate Agreement, ESI may use and disclose PHI to properly provide, manage and administer the services required under t he PBM Agreement and consistent with applicable law to assist Plan in its operations, as long as such use or disclosure would not violate the HIPAA Rules if done  by Plan, or such use or disclosure is expressly permitted in (i) through (iv) below:

(i)     ESI may use PHI for the proper management and administration of ESI or to carry out ESI's legal responsibilities.

(ii)    ESI may disclose PHI to third parties for the proper management and administration of ESI or to carry o ut the legal responsibilities of ESI provided that the disclosures are Required by Law, or ESI obtains reasonable assurances from the person to whom the information is disclosed that: (A) the information will remain confidential, (B) the information will be used or further disclosed only as Required b y Law or for the purpose for which it was disclosed to the person, and (C) the person notifies ESI of any instances of which it is aware in which the confidentiality of the information has been breached.

(iii)   ESI may use PHI to perform Data Aggregation services  on behalf of Plan as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

(iv)    ESI may use or disclose PHI on behalf of Plan or as Plan would otherwise be permitted pursuant to HIPAA and other applicable law.

(d)     *Reporting.*  ESI agrees to promptly notify the Plan if ESI has knowledge that PHI has been used or disclosed by ESI in a manner that violates this Business Associate Agreement. To the extent that ESI creates, receives, maintains or transmits  E l e c t r o n i c PHI, ESI agrees to report promptly to the Plan any successful Security Incident, as determined by ESI, involving Plan PHI of which ESI becomes aware.   ESI shall comply with 45 C.F.R. § 164.402 and shall, following the discovery of a Breach of Unsecured PHI, n otify the Plan of such Breach, in accordance with 45 C.F.R. § 164.410.

(e)     *Safeguards.*  ESI agrees to use appropriate safeguards, consistent with applicable law, to prevent use or discl osu re of PHI in a manner that would violate this Business Associate Agreement.  ESI shall provide Plan with such information concerning such safeguards as Plan may reasonably request from time to time.   To the extent that ESI creates, receives, maintains or transmit s Electronic PHI, ESI agrees to use appropriate administrative, physical a nd technical safeguards, and comply with the Security Standards, to protect the confidentiality, integrity and availability of the Electronic PHI that ESI creates, receives, maintains or tra nsmits on be half of Plan.

(f)     *Mitigation.*  ESI agrees to mitigate, to the extent practicable, any harmful effect that is known to ESI of a use or disclosure of PHI by ESI in violation of this Business Associate Agreement or the PBM Agreement.

(g)     *Subcontractors and Agents.*  ESI agrees to ensure that any agent, including a Subcontractor, to whom it provides PHI received from, or created or received by ESI on behalf of Plan, agrees, in writing, to the same restrictions, terms and condi tions that apply through this Agreement to ESI with respect to such information, including the r equirement that it implement reasonable and appropriate safeguards and comply with Subpart C of 45 C.F.R. Part 164, to protect any Electronic PHI that is disclosed to it  by ESI.

(h)     *Access.*  Within fifteen (15) business days of a request by Plan, ESI shall provide access to Plan to PHI in a Designated Record Set in order to meet the requirements under 45 C.F.R. § 164.524.  If ESI receives a request directly from an Individua l, or if requested by Plan that access be provided to the Individual, ESI shall provide  access to the Individual to PHI in a Designated Record Se t within thirty (30) days in order to meet the requirements under 45 C.F.R. § 164.524.

(i)     *Amendment.*  Within sixty (60) days of a request by Plan or subject Individual, ESI agrees to make any appropri ate amendment(s) to PHI in a Designated Record Set that Plan directs or agrees to pursuant to 45 C.F.R. § 164.526.

(j)     *Accounting.*  Within thirty (30) days of a proper request by Plan, ESI agrees to document and make available to Plan, for a reasonable cost-based fee (under conditions permitted by HIPAA if an Individual requests an accounting more than once durin g a twelve month period), such disclosures of PHI and information related to such disclosures necessary to respond to such reques t for  an accounting of disclosures of PHI, in accordance with 45 C.F.R. § 164.528. Within sixty (60) days of proper request by subject Individua l, ESI agrees to make available to the Individual the information described above.  ESI shall retain copies of any accountings f or a  per io d of six (6) years from the date the accounting was created.

(k)     *Restrictions on Use or Disclosure.*  Within fifteen (15) business days of a request of Plan, ESI agrees to consider restrictions on the use or disclosure of PHI agreed to by Plan on behalf of an Individual in accordance with 45 C.F.R. § 164.522.

(l)     *Audit and Inspection.*  ESI agrees to make internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by ESI on behalf of Plan, available to Plan within ten (10) business days, or at the request of Plan or the Secretary, to the Secretary in a time and manner directed by the Secretary, for purposes of the Secretary determi ning Plan's compliance with the HIPAA Rules.  Any release of information regarding ESI's practices, books and records is proprietary to ESI and shall

be treated as confidential and shall not be further disclosed without the written permission of ESI, except as necessary to comply with the HIPAA Rules.

(m)     *Privacy of Individually Identifiable Health Information*. To the extent ESI is to carry out one or more of Plan's obligations under Subpart E of 45 C.F.R. Part 164, ESI agrees to comply with the requirements of subpart E that apply to the covered entity in the performance of such obligations.

**3.      Plan Obligations.**

(a)     Plan shall notify ESI of any limitation(s) in the notice of privacy practices of Plan in accordance with 45 C.F.R. § 164.520, to the extent that such limitation may affect ESI's use or disclosure of PHI.

(b)     Plan shall notify ESI of any changes in, or revocation of, permission by an Individual to use or disclose PHI, to the extent that such changes may affect ESI's use or disclosure of PHI.

(c)     Plan shall notify ESI of any restriction to the use or disclosure of PHI that Plan has agreed to in accordance with 45 C.F.R. § 164.522, to the extent that such restriction may affect ESI's use or disclosure of PHI.

(d)     Plan shall not request that ESI use or disclose PHI in any manner that would exceed that which is minimally necessary under the HIPAA Rules or that would not be permitted by a Covered Entity.

(e)     Plan agrees that it will have entered into "Business Associate Agreements" with any third parties (e.g., case managers, brokers or third party administrators) to which Plan directs and authorizes ESI to disclose PHI.

**4.      Transactions Standards.**  The HIPAA Rules provide for certain Transactions Standards for transfer of data between trading partners.  While certain of the standards may or may not be adopted by Plan (e.g., for eligibility), ESI will be prepared to accept the following in accordance with 45 C.F.R. Part 162.1502:  ASC X12N 834 – Benefit Enrollment and Maintenance.  In addition, to the extent applicable, ESI shall comply with other applicable transactions standards for claims processing functions between ESI and provider pharmacies.  Each party hereby agrees that it shall not change any definition, data condition or use of a data element or segment in a standard, add any data elements or segment to the maximum defined data set, use any code or data elements that are either marked "not used" in the standard's implementation specification or are not in the implementation specification, or change the meaning or intent of the implementation specification.

**5.      Material Breach of Business Associate Agreement; Termination.**

(a)     Without limiting the termination rights of the parties pursuant to the PBM Agreement, upon either party's knowledge of a material breach by the other of this Business Associate Agreement, the non-breaching party shall notify the breaching party of such material breach and the breaching party shall have thirty (30) days to cure such material breach.  In the event the breach is not cured, or cure is infeasible, the non-breaching party shall have the right to immediately terminate this Business Associate Agreement and the PBM Agreement or if cure of the material breach is infeasible, report the violation to the Secretary.

(b)     To the extent feasible, upon termination of the PBM Agreement for any reason, ESI shall, and shall cause any subcontractors and agents to, return or destroy and retain no copies of all PHI received from, or created or received by ESI on behalf of, Plan.  If ESI determines, in its sole discretion, that return or destruction of such information is not feasible, ESI shall continue to limit the use or disclosure of such information as set forth in this Agreement as if the PBM Agreement had not been terminated.

**6.      Indemnification.**  Each party (the "Indemnifying Party") shall indemnify and hold the other party and its officers, directors, employees and agents (each an "Indemnified Party") harmless from and against any claim, cause of action, liability, damage, cost or expense ("Liabilities") to which the Indemnified Party becomes subject to as a result of third party claims (including reasonable attorneys' fees and court or proceeding costs) brought against the Indemnified Party, which arise as a result of: (i) the material breach of this Business Associate Agreement by the Indemnifying Party; or (ii) the gross negligence or willful misconduct of the Indemnifying Party, except to the extent such Liabilities were caused by the Indemnified Party. A party entitled to indemnification under this Section 6 shall give prompt written notification to the Indemnifying Party of the commencement of any action, suit or proceeding relating to a third party claim for which indemnification is sought, subject to applicable confidentiality constraints.  The Indemnifying Party shall be entitled to assume control of the defense of such action, suit, proceeding or claim with competent counsel of its choosing. Indemnification shall not be required if any claim is settled without the Indemnifying Party's consent, which such consent shall not be unreasonably withheld.      **NOTWITHSTANDING THE FOREGOING PROVISIONS OF THIS SECTION 6, IN NO EVENT WILL AN INDEMNIFYING PARTY BE LIABLE TO AN INDEMNIFIED PARTY UNDER CONTRACT, TORT, OR ANY OTHER LEGAL THEORY FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE, OR SPECIAL LOSSES OR DAMAGES OF ANY KIND.**

**7.      Miscellaneous.**

DocuSign Envelope ID: 8EAA32F9-95BF-467A-9568-18CA4DDED65F

(a)      **Amendment**.  The parties acknowledge that the foregoing provisions are designed to comply with the mandates of the HIPAA Rules.  ESI shall provide written notice to Plan to the extent that any regulation or amendment to regulations promulgated by the Secretary requires changes to this Business Associate Agreement.  Such written notice shall include any additional amendment required by any such final regulation and the Business Associate Agreement shall be automatically amended to incorporate the changes set forth in such amendment provided by ESI to Plan, unless Plan objects to such amendment in writing within fifteen (15) days of receipt of such written notice.  In the event that Plan objects timely to such amendment, the parties shall work in good faith to reach agreement on an amendment to the Business Associate Agreement that complies with the final regulations.  If the parties are unable to reach agreement regarding an amendment to the Business Associate Agreement within thirty (30) days of the date that ESI receives any written objection from Plan, either ESI or Sponsor may terminate this Business Associate Agreement upon ninety (90) days written notice to the other party.  Any other amendment to this Business Associate Agreement unrelated to compliance with applicable law and regulations shall be effective only upon execution of a written agreement between the parties.

(b)      **Effect on PBM Agreement**.  Except as relates to the use, security and disclosure of PHI and electronic transactions, this Business Associate Agreement is not intended to change the terms and conditions of, or the rights and obligations of the parties under, the PBM Agreement.

(c)      **No Third-Party Beneficiaries**.  Nothing express or implied in the PBM Agreement or in this Business Associate Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations or liabilities whatsoever.

(d)      **Interpretation**.  Any ambiguity in this Business Associate Agreement shall be resolved in favor of a meaning that permits both parties to comply with the HIPAA Rules.

(e)      **Effective Date**.  This Business Associate Agreement shall be effective as of the effective date of the PBM Agreement.

4108353.v1

## EXHIBIT D

### FINANCIAL DISCLOSURE TO ESI PBM CLIENTS

This disclosure provides an overview of the principal revenue sources of Express Scripts, Inc. and Medco Health Solutions, Inc. (individually and collectively referred to herein as "ESI"), as well as ESI's affiliates. In addition to administrative and dispensing fees paid to ESI by our clients for pharmaceutical benefit management ("PBM") services, ESI and its affiliates derive revenue from other sources, including arrangements with pharmaceutical manufacturers, wholesale distributors, and retail pharmacies. Some of this revenue relates to utilization of prescription drugs by members of the clients receiving PBM services. ESI may pass through certain manufacturer payments to its clients or may retain those payments for itself, depending on the contract terms between ESI and the client.

Network Pharmacies – ESI contracts for its own account with retail pharmacies to dispense prescription drugs to client members. Rates paid by ESI to these pharmacies may differ among networks (e.g., Medicare, Worker's Comp, open and limited), and among pharmacies within a network, and by client arrangements. PBM agreements generally provide that a client pays ESI an ingredient cost, plus dispensing fee, for drug claims. If the rate paid by a client exceeds the rate contracted with a particular pharmacy, ESI will realize a positive margin on the applicable claim. The reverse also may be true, resulting in negative margin for ESI. ESI also enters into pass-through arrangements where the client pays ESI the actual ingredient cost and dispensing fee amount paid by ESI for the particular claim when the claim is adjudicated to the pharmacy. In addition, when ESI receives payment from a client before payment to a pharmacy, ESI retains the benefit of the use of the funds between these payments. ESI may maintain non-client specific aggregate guarantees with pharmacies and may realize positive margin. ESI may charge pharmacies standard transaction fees to access ESI's pharmacy claims systems and for other related administrative purposes. ESI may also maintain certain preferred value or quality networks; pharmacies participating in those networks may pay or receive aggregated payments related to these networks.

Brand/Generic Classifications – Prescription drugs may be classified as either a "brand" or "generic;" however, the reference to a drug by its chemical name does not necessarily mean that the product is recognized as a generic for adjudication, pricing or copay purposes. For the purposes of pharmacy reimbursement, ESI distinguishes brands and generics through a proprietary algorithm ("BGA") that uses certain published elements provided by First DataBank (FDB) including price indicators, Generic Indicator, Generic Manufacturer Indicator, Generic Name Drug Indicator, Innovator, Drug Class and ANDA. The BGA uses these data elements in a hierarchical process to categorize the products as brand or generic. The BGA also has processes to resolve discrepancies and prevent "flipping" between brand and generic status due to price fluctuations and marketplace availability changes. The elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the BGA are available upon request. Brand or generic classification for client reimbursement purposes is either based on the BGA or specific code indicators from Medi-Span or a combination of the two as reflected in the client's specific contract terms. Application of an alternative methodology based on specific client contract terms does not affect ESI's application of its BGA for ESI's other contracts.

Maximum Allowable Cost ("MAC")/Maximum Reimbursement Amount ("MRA") – As part of the administration of the PBM services, ESI maintains a MAC List of drug products identified as requiring pricing management due to the number of manufacturers, utilization and/or pricing volatility. The criteria for inclusion on the MAC List are based on whether the drug has readily available generic product(s), is generally equivalent to a brand drug, is cleared of any negative clinical implications, and has a cost basis that will allow for pricing below brand rates. ESI also maintains MRA price lists for drug products on the MAC List based on current price reference data provided by MediSpan or other nationally recognized pricing source, market pricing and availability information from generic manufacturers and on-line research of national wholesale drug company files, and client arrangements. Similar to the BGA, the elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the MAC methodology are available upon request.

<mark>Manufacturer Programs Formulary Rebates, Associated Administrative Fees, and PBM Service Fees – ESI contracts for its own account to obtain formulary rebates attributable to the utilization of certain brand drugs and supplies (and possibly certain authorized generics marketed under a brand manufacturer's new drug application). Formulary rebate amounts received vary based on client specific utilization, the volume of utilization as well as formulary position applicable to the drug or supplies, and adherence to various formulary management controls, benefit design requirements, claims volume, and other similar factors, and in certain instances also may vary based on the product's market-share. ESI often pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's PBM agreement terms. ESI or its affiliates may maintain non-client specific aggregate guarantees and may realize positive margin. In addition, ESI provides administrative services to contracted manufacturers, which include, for example, maintenance and operation of systems and other infrastructure necessary for invoicing and processing rebates, pharmacy discount programs, access to drug utilization data, as allowed by law, for purposes of verifying and evaluating applicable payments, and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. These administrative fees are calculated based on the price of the drug or supplies along with the volume of utilization and do not exceed the greater of (i) ██% of the average wholesale price, or (ii) ██% of the wholesale acquisition cost of the products. In its capacity as a PBM company, ESI also may receive other compensation from manufacturers for the performance of various programs or services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, inflation protection programs, medical benefit management services, cost containment programs, discount programs, and the sale of non-patient identifiable claim information. This compensation is not part of the formulary rebates or associated administrative fees, and ESI may realize positive margin between amounts paid to clients and amounts received from pharmaceutical manufacturers. ESI retains the financial benefit of the use of any funds held until payment is made to the client.</mark>

DocuSign Envelope ID: 8EAA32F9-95BF-467A-9568-18CA4DDED65F

Copies of ESI's standard formularies may be reviewed at www.express-scripts.com/wps/portal/. In addition to formulary considerations, other plan design elements are described in ESI's Plan Design Review Guide, which may be reviewed at www.express-scripts.com/wps/portal/.

ESI Subsidiary Pharmacies – ESI has several licensed pharmacy subsidiaries, including our specialty pharmacies. These entities may maintain product purchase discount arrangements and/or fee-for-service arrangements with pharmaceutical manufacturers, wholesale distributors, and other health care providers. These subsidiary pharmacies contract for these arrangements on their own account in support of their various pharmacy operations. Many of these subsidiary arrangements relate to services provided outside of PBM arrangements, and may be entered into irrespective of whether the particular drug is on one of ESI's national formularies. Discounts and fee-for-service payments received by ESI's subsidiary pharmacies are not part of the PBM formulary rebates or associated administrative fees paid to ESI in connection with ESI's PBM formulary rebate programs. However, certain purchase discounts received by ESI's subsidiary pharmacies, whether directly or through ESI, may be considered for formulary purposes if the value of such purchase discounts is used by ESI to supplement the discount on the ingredient cost of the drug to the client based on the client's PBM agreement terms. From time to time, ESI and its affiliates also may pursue and maintain for its own account other supply chain sourcing relationships not described below as beneficial to maximize ESI's drug purchasing capabilities and efficiencies, and ESI or affiliates may realize an overall positive margin with regard to these initiatives.

The following provides additional information regarding examples of ESI subsidiary discount arrangements and fee-for-service arrangements with pharmaceutical manufacturers, and wholesale distributors:

ESI Subsidiary Pharmacy Discount Arrangements – ESI subsidiary pharmacies purchase prescription drug inventories, either from manufacturers or wholesalers, for dispensing to patients. Often, purchase discounts off the acquisition cost of these products are made available by manufacturers and wholesalers in the form of either up-front discounts or retrospective discounts. These purchase discounts, obtained through separate purchase contracts, are not formulary rebates paid in connection with our PBM formulary rebate programs. Drug purchase discounts are based on a pharmacy's inventory needs and, at times, the performance of related patient care services and other performance requirements. When a subsidiary pharmacy dispenses a product from its inventory, the purchase price paid for the dispensed product, including applicable dispensing fees, may be greater or less than that pharmacy's acquisition cost for the product net of purchase discounts. In general, our pharmacies realize an overall positive margin between the net acquisition cost and the amounts paid for the dispensed drugs.

ESI Subsidiary Fee-For-Service Arrangements – One or more of ESI's subsidiaries, including, but not limited to, its subsidiary pharmacies also may receive fee-for-service payments from manufacturers, wholesalers, or other health care providers in conjunction with various programs or services, including, for example, patient assistance programs for indigent patients, dispensing prescription medications to patients enrolled in clinical trials, various therapy adherence and fertility programs, administering FDA compliance requirements related to the drug, 340B contract pharmacy services, product reimbursement support services, and various other clinical or pharmacy programs or services. As a condition to having access to certain products, and sometimes related to certain therapy adherence criteria or FDA requirements, a pharmaceutical manufacturer may require a pharmacy to report selected information to the manufacturer regarding the pharmacy's service levels and other dispensing-related data with respect to patients who receive that manufacturer's product. A portion of the discounts or other fee-for-service payments made available to our pharmacies may represent compensation for such reporting.

Other Manufacturer Arrangements – ESI also maintains other lines of business that may involve discount and service fee relationships with pharmaceutical manufacturers and wholesale distributors. Examples of these businesses include a wholesale distribution business, group purchasing organizations (and related group purchasing organization fees), a medical benefit management company, and United BioSource Corporation ("UBC"). Compensation derived through these business arrangements is not considered for PBM formulary placement, and is in addition to other amounts described herein. Of particular note, UBC partners with life sciences and pharmaceutical companies to develop, commercialize, and support safe, effective use and access to pharmaceutical products. UBC maintains a team of research scientists, biomedical experts, research operations professionals, technologists and clinicians who work with clients to conduct and support clinical trials, create, and validate and administer pre and post product safety and risk management programs. UBC also works on behalf of pharmaceutical manufacturers to provide product and disease state education programs, reimbursement assistance, and other support services to the public at large. These service fees are not part of the formulary rebates or associated administrative fees.

Third Party Data Sales – Consistent with any client contract limitations, ESI or its affiliates may sell HIPAA compliant information maintained in their capacity as a PBM, pharmacy, or otherwise to data aggregators, manufacturers, or other third parties on a fee-for-service basis or as a condition of discount eligibility. All such activities are conducted in compliance with applicable patient and pharmacy privacy laws and client contract restrictions.

**October 1, 2015**

**THIS EXHIBIT REPRESENTS ESI'S FINANCIAL POLICIES. ESI MAY PERIODICALLY UPDATE THIS EXHIBIT AND THE FINANCIAL DISCLOSURES CONTAINED HEREIN TO REFLECT CHANGES IN ITS BUSINESS PROCESSES; THE CURRENT FINANCIAL DISCLOSURE IS AVAILABLE UPON REQUEST AND ACCESSIBLE ON EXPRESS-SCRIPTS.COM AT WWW. EXPRESS-SCRIPTS.COM/WPS/PORTAL/.**

4108353.v1

DocuSign Envelope ID: 8EAA32E9-05BF-467A-9568-18CA4DDED65F

## EXHIBIT E

## PERFORMANCE STANDARDS

In the event that any failure by ESI to meet any performance standard is due to a "force majeure" as defined in the Agreement, failure of Sponsor to perform its obligations under the Agreement, or actions or inactions of Sponsor that adverse ly impact ESI's ability to maintain the subject standard (e.g., faulty eligibility, changes in benefit design not adequately communicated to Members and benefit designs that substantially change the Members' rights under the Plan), ESI will be excused from compliance wi th such performance standards until such circumstances have been resolved and any existing backlogs or other related effects hav e be en eliminated.

Within ninety (90) days after the end of each year, ESI shall report to Sponsor ESI's performance under eac h performance standard.  Notwithstanding the foregoing, for purposes of determining whether ESI has met or failed to meet each performance standard, performance standards will be measured and reconciled on an annual basis and amounts due resulting from an ESI failure  to meet any performance standard(s), if any, shall be calculated and paid to Sponsor within thirty (30) days following Sponsors recei pt of reconciliation report.

No performance penalties, if any, will be paid until this Agreement is executed by Sponsor.  In no event will the sum of the payments to Sponsor, as a result of ESI's failure to meet the performance standards exceed $ ▇▇▇▇▇▇▇▇ for the annual performance standards

The following performance standards are based on 5,000 Members as of th e Effective Date and throughout the Term.  Any material change below such number may result in a renegotiation of the standards and penalties set forth below.

Performance standards for ESI Mail Pharmacy assume a minimum of 1,000 ESI Mail Pharmacy prescrip tions submitted annually.

| Service Feature | Guarantee | Penalty |
|---|---|---|
| ▇▇▇▇▇▇ ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇ ▇▇ | ▇▇▇▇▇▇▇▇ ▇▇▇▇▇ |
| ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇ | ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ |
| ▇▇▇▇▇ ▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇ | ▇▇▇▇▇ ▇▇▇▇▇ ▇▇▇▇▇ |
| ▇▇▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | ▇▇▇▇▇ ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ ▇▇▇▇▇ ▇▇▇▇▇▇▇ ▇▇▇▇▇ |

4108353.v1

DocuSign Envelope ID: 8EAA32E0-9EBE-467A-9568-18CA4DDED65E

| Service Feature | Guarantee | Penalty |
|---|---|---|
| ███████ | ███████████ | ███████ |
| | | |
| ███████ | ███████████ | ███████ |
| | | |
| ███████ | ███████████ | ███████ |
| ███████ | ███████████ | ███████ |
| ███████ | ███████████ | ███████ |
| ███████ | ███████████ | ███████ |
| ███████ | ███████████ | ███████ |

4108353.v1