# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case 2:23-md-03080**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH** |

<u>**DECLARATION OF JENNIFER PARADIS**</u>

I, Jennifer Paradis, hereby declare and state:

1.      I am a Project Manager in the Legal Department at CVS Health Corporation (together with its subsidiaries, "CVS").  I have been employed at CVS since 2019, when CVS acquired my previous employer, Aetna.  Between 1994 and 2019 I held a variety of positions at Aetna, including over 10 years as a Legal Technology Support Manager.

2.      One of my roles as Project Manager at CVS is overseeing CVS's internal document collections for the purpose of litigation discovery.  Over the course of my employment at CVS, I have acquired personal knowledge of CVS's past and present discovery capabilities, including its communications software and technology, discovery collection tools, and data sources.

3.      At the company level, CVS does not, and to my knowledge in the past has not, used Google-based services for email or document management, including but not limited to Gmail, Google Docs, or Google Sheets.

4.      Prior to 2019, CVS did not use Microsoft Office 365 for email or document management.  Between 2008 and 2019, CVS used SourceOne, a journaling and archiving tool which interacted with CVS-managed Microsoft Exchange servers, for these purposes.  CVS only began transitioning its employees to Microsoft Office 365 in 2019.  As with any large organization,

1

this process has required the investment of significant time and resources to execute. While much of the active user population has been migrated, additional work to complete the transition is still ongoing. Once users were moved to Microsoft Office 365, journaling to SourceOne was discontinued and moved to a new platform, Azure Enterprise Vault. Azure Enterprise Vault archives only for users/groups that have not yet been moved to Microsoft Office 365.

5.      To ensure the security of potentially sensitive information, CVS performs its own document collections for litigation in-house, not through an outside vendor.

6.      Today, CVS uses Microsoft Purview, to collect documents from the various data storage locations (including email, One Drive, and SharePoint) used by our custodians within Microsoft 365.

7.      When relevant custodians could potentially also have unique, un-migrated data in legacy systems, CVS also searches SourceOne and Azure Enterprise Vault to augment the Microsoft Purview collection because the data in SourceOne and Azure Enterprise Vault cannot be collected using Microsoft Purview.

8.      To my knowledge, SourceOne and Enterprise Vault do not support the collection of hyperlinked documents as family members.

9.      To my knowledge, CVS has never collected, or been asked to collect, hyperlinked files as attachments in any prior litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 1st day of May, 2024 in Hartford, CT.


Dated:  May 1, 2024

*Jennifer Paradis*
Jennifer Paradis

2

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

**IN RE: INSULIN PRICING LITIGATION**

**Case 2:23-md-03080**
**MDL No. 3080**

**JUDGE BRIAN R. MARTINOTTI**
**JUDGE RUKHSANAH L. SINGH**

---

### DECLARATION OF JAMES DALEY

I, James Daley, hereby declare and state:

1.      I am a Senior Director at Consilio.  I have been employed by Consilio since 2016 and have personal knowledge of the capabilities of certain discovery collection tools.

2.      During my time at Consilio, I have overseen discovery data collections for litigation, including collecting emails and attachments.  I submit this declaration in support of Defendants' proposal regarding the ESI Protocol in this litigation, at the request of CVS Caremark and its outside counsel, Williams & Connolly LLP.  I understand there is a dispute regarding the burden and feasibility of collecting and producing Cloud Attachments referred to with hyperlinks in any email or electronic document, and doing so in a way that maintains a family relationship between the documents.  I am familiar with the facts contained herein.

3.      When an email is sent with an embedded attachment, standard eDiscovery processing tools separate the two items, but maintain the family relationship between the email and the attachment.  The underlying email contains an encoded version of the attached document

in its entirety[1], and both the email and attachment are captured when the email is collected using standard collection tools.

4.       By contrast, senders using cloud-based email services might transmit an email with a hyperlink that points to a document stored elsewhere within the body of their email, without attaching any document(s). These are known as Cloud Attachments. These hyperlinks do not transmit the document itself, and the destination of the hyperlink points to a data repository other than the email server from which the message is being collected.  Therefore, the documents do not maintain a family relationship when they are collected without specialized tools or capabilities.

5.       Even with the newest and most advanced tools, it can be difficult, time-consuming, and sometimes impossible to collect documents referenced by hyperlinks in a way that maintains a family relationship between the documents.

6.       For example, in order to export Cloud Attachments from Microsoft Premium, each custodial account that is to be collected must have an "E5" upgraded license.  Further, it is possible that the Premium export workflow can be followed, only to find that a linked file no longer exists in the linked repository.  For Microsoft Premium to collect linked files, the files must be hosted in the Office 365 environment.

7.       Even where a document can be collected from the location referenced by a hyperlink, it is only a very specific set of circumstances in which the document retrieved will reflect the version of the document that existed at the time the message including the hyperlink

---

[1] Additional information about multi-part email messages can be found in RFC 1341 and RFC 2046, *available at* https://www.rfc-editor.org/rfc/rfc1341 and https://www.rfc-editor.org/rfc/rfc2046.

was sent.[2]   The "Version Sharing" policy must be enabled, configured, and applied to email accounts to take effect, and the relevant email accounts must have had E5 licenses.  This capability was not publicly available until May of 2023 and cannot be applied retrospectively. Therefore, historical version collection of any accounts would not be available until the date that the policy was configured and applied to the email accounts.

8.      CVS has been a client of Consilio or a business they have acquired for at least ten years.  Consilio has worked on numerous matters for CVS.  CVS performs its own data collections in house, and Consilio performs various other eDiscovery services, including data processing, secure data hosting, review, production, and project management.  I have personal knowledge of CVS's discovery capabilities.  Because CVS does not use the Google product suite, Microsoft Premium is the only tool for collecting linked files that could be used with CVS's systems, and that would be subject to the limitations, burdens, and difficulties discussed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on the 30th day of April, 2024 in Seminole, FL

Dated:  April 30, 2024

*James M. Daley Jr*
James Daley

---

[2] "Collecting the version shared in a file attachment (preview)" https://learn.microsoft.com/en-us/purview/ediscovery-cloud-attachments#collecting-the-version-shared-in-a-cloud-attachment-preview (accessed April 30, 2024)

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(RLS)**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH** |

**THIS DOCUMENT RELATES TO: ALL CASES**

### Declaration of Yaniv Schiff

I, Yaniv Schiff, do hereby declare and state as follows:

**I.    Background**

1.    I am a Director of Forensics for Consilio, and work from its offices at 550 W. Van Buren, Chicago, Illinois, 60607. Consilio is a global provider of electronic discovery ("eDiscovery") and digital forensic services to clients including Eli Lilly and Company ("Lilly"). These services include collection, preservation, processing, and analyzing electronically stored information ("ESI"). I have worked in the Digital Forensics and eDiscovery industry since 2006 and have been a Director at Consilio since 2014.

2.    I am a Certified Computer Examiner (CCE) through the International Society of Forensic Computer Examiners and a member of the High Technology Crime Investigation Association. I received extensive training in the field of computer forensics and eDiscovery from the SANS organization, LexisNexis, and other institutions.

3.    Additionally, I have served as an adjunct faculty member at Loyola University teaching computer forensics to graduate and undergraduate students.

4.       I have previously provided testimony and have been admitted as a computer forensics expert in both federal and state courts. I have also given numerous presentations and seminars to law firms, judicial bodies, and other organizations.

5.       My current curriculum vitae is attached hereto.

6.       Through my experience in computer forensics, I am familiar with commonly used and accepted processes and technology for collecting and reporting on data, storage, and operating systems of computers, servers, networks, and mobile devices. I have assisted with and drafted numerous eDiscovery and forensic protocols which govern forensic collection procedures, keyword searches, and, ultimately, production of ESI.

7.       The contents of this declaration are true and correct to the best of my knowledge. The information I provide is based on my knowledge of Lilly's IT environment, Microsoft's capabilities as they relate to the matters discussed, as well as referenced documentation on the subjects from Microsoft's own resources at the time of this Declaration. If called upon as a witness in this action, I could and would testify competently to the matters discussed in this Declaration.

8.       I submit this Declaration on behalf of Lilly in support of Defendants' Proposed ESI Order at the Court's request to address the question of why it would constitute an undue burden for Lilly to collect, process or produce emails or other documents together with any documents referenced via hyperlinks within those emails or other documents as a "document family." *See In re Insulin Pricing Litigation*, Case No. 2:23-md-03080 ("*Insulin*"). Dkt. 143 (Tr. From Case Management Conference re: Dispute re ESI Protocol).

## II.       The Collection Tools Suggested by Plaintiffs and Their Expert Would Not Be Effective Within Lilly's Data Environment and Systems

2

9.      In his Declaration supporting Plaintiffs' version of the ESI Order, Douglas Forrest claims that "[d]efendants should be able to collect email with modern attachments." He suggests that Microsoft Purview for Microsoft, Google Vault, or Metaspike's Forensic Email Collector for Google can be used to collect emails along with hyperlinked documents from their respective document repositories. However, none of these tools would allow Lilly to collect emails[1] with their hyperlinked documents[2] that existed at the time of transmittal efficiently (or accurately) in these cases.

10.      Lilly does not use the Google suite of products, so the Google Vault tool is not relevant to Lilly and would not provide an option for Lilly to collect email with hyperlinked documents. Likewise, Metaspike's Forensic Email Collector is designed for use with Google products as it relates to hyperlinked documents, so it also is not relevant for Lilly's collections.

11.      Lilly uses the Microsoft suite of tools within the Microsoft 365 ("M365") platform, and specifically, Microsoft Purview eDiscovery (Standard) ("Purview Standard") for eDiscovery purposes. Microsoft has another tool, Microsoft Purview eDiscovery (Premium) ("Purview Premium"), that is available under its premium subscription license.

12.      Based on the limitations described in more detail below, neither Purview Standard, Purview Premium, nor any other commercially available tool will allow Lilly to collect, process, or produce emails together with the version of hyperlinked documents that existed at the time of transmittal as a "document family," as sought by Plaintiffs.

---

[1] As used in this Declaration, email includes other Microsoft messages, such as instant messages.
[2] Hyperlinked documents are referred to by Microsoft as "cloud attachments" or "modern attachments" but are not, in fact, attachments. Unlike traditional email attachments, which are static components of an email file and stored in the same container as the email file, hyperlinks function as connections or pointers to a separate, external location for the referenced item as it exists at the time the email was sent.

3

**A.    Lilly Cannot Use Purview Premium to Collect Hyperlinked Documents Sent Via Email Prior to February 13, 2023 Because Lilly's Complete Archive of Emails From Prior to that Date Is Not Within M365**

13.     Purview Standard cannot be used to collect hyperlinked documents.

14.     Purview Premium can collect a transmitted email with a version—but not necessarily the "as sent" version—of the hyperlinked document under certain circumstances: if (i) the transmitted email is stored within the organization's M365 environment, (ii) the linked documents are also stored within M365 (e.g., SharePoint or OneDrive), and (iii) the linked document has not been moved or deleted in the ordinary course.

15.     These circumstances do not exist for Lilly because Lilly's only complete source of record for emails dated prior to February 13, 2023 is in an archive outside of its M365 environment.  Even if Lilly were to acquire a larger volume of the more expensive Purview Premium licenses for this matter, Purview Premium is of no use for collecting from Lilly's email archive.

16.     In order for Lilly to associate hyperlinked documents with transmitted emails that are dated prior to February 13, 2023 stored in Lilly's archive, Lilly would have to search every possible source location where a hyperlinked document may be stored, then try to manually re-unite the hyperlinked document with the transmitted email. This would be a manual and burdensome process with no certainty that Lilly could actually pair the "as sent" hyperlinked document—or any version of the hyperlinked document—with the transmitted email.

4

**B.    For Emails dated After February 13, 2023, Even if Lilly Used Purview Premium, Lilly Could Only Collect *All* Versions or the *Latest* Version of Hyperlinked Documents**

17.    Plaintiffs seek the "as sent" version of a hyperlinked document together with the email that sent it as a "document family," like traditional email attachments. But hyperlinks are not static like traditional email attachments. Rather, hyperlinks function as links or pointers to a separate resource or location, commonly a "live" document that may be subject to change over time.

18.    By default, Purview Premium can only collect (i) the latest version of the hyperlinked document or (ii) all versions of the hyperlinked document up to the limit established in the organization's M365 environment (the Microsoft default is 500 versions).[3]

19.    Therefore, Lilly cannot use Purview Premium to target for collection the "as sent" version of any hyperlinked documents with their transmitted emails.

20.    The latest version of a hyperlinked document may not be—and in many cases will not be—the version that existed at the time of transmittal. For example, when a user sends an email with a hyperlink, and both items are stored within M365, the hyperlinked document may be edited, renamed, or deleted by anyone with access (and permissions) to the document. Users can save new versions intentionally, or the system may autosave. The dynamic nature of documents stored within M365 means that when the email recipient clicks the hyperlink, the document may look very different than the version that was sent, or the document may not exist at all.

---

[3] Microsoft also offers the Data Lifecycle Management policy that allows for a label to be tied to each version of a hyperlinked document that is sent with an email or message, which can then be used to identify the "as sent" version of a hyperlinked document in an email or message.  However, this tool was not launched until May 2023 and an organization must have this option in place at the time of transmittal. Lilly has not enabled this tool. https://learn.microsoft.com/en-us/purview/apply-retention-labels-automatically#auto-apply-labels-to-cloud-attachments

21.     If instead all versions of a hyperlinked document are collected, to my knowledge, Microsoft offers no reliable way to cross-reference any of the up-to-500 (or even more) versions that are collected to identify the version that existed at the time of transmittal.

**C.     Purview Premium Also Cannot Collect Broken Links or Linked Documents Stored in Repositories Outside of M365**

22.      In addition to the limitations described above, Purview Premium also cannot be used to collect *any* hyperlinked documents or content that resides outside of the M365 environment. As noted above, Purview Premium can only collect hyperlinked documents if both the emails and the hyperlinked documents are stored within M365. It cannot be used to collect documents stored across any of Lilly's other systems, databases, or repositories. In addition, unlike traditional email attachments, which are generally stored within the same containers as the parent email, hyperlinked documents can be moved or deleted by anyone who has access (and permissions) to the document in the ordinary course of business. By default, if a hyperlinked document is moved or deleted, the pointer or link to the document that exists in the transmitted email will be broken.

23.     Microsoft does not provide notice to the sender or recipient of an email with a hyperlink if or when the link is broken. To my knowledge, the only way for a user with access to the M365 environment to confirm whether a hyperlink is broken is to manually click on the link.

24.     In summary, Lilly cannot use Purview Premium to target for collection the version of the hyperlinked document that was shared at the time of the transmittal. I am unaware of any commercially available tools that Lilly could use to automatically collect and re-unite the "as sent" version of the hyperlinked document with the transmitted email, so that the resulting item is a "document family" similar to a traditional email attachment with its parent email. This is the case regardless of where in Lilly's current IT environment the hyperlinked documents or emails

are stored. To my knowledge, the only way Lilly could attempt to re-unite the "as sent" version of a hyperlinked document with the transmitted email would be through a burdensome manual process of analyzing every version of every hyperlinked document in every email on a document-by-document basis, with no certainty that this process could actually pair the correct version of the hyperlinked document with the transmitted email.

I declare, under penalty of perjury, that the foregoing is true and correct.

Respectfully submitted this _1st__ day of May, 2024.

Yaniv Schiff

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE: INSULIN PRICING LITIGATION

Case No. 2:23-MD-03080
MDL No. 3080

JUDGE BRIAN R. MARTINOTTI
JUDGE RUKHSANAH L. SINGH

THIS DOCUMENT RELATES TO: ALL CASES

## DECLARATION OF STEVE BRYANT

I, Steve Bryant, declare as follows:

1.      I am a Principal Engineer at Evernorth Health, Inc. (formerly known as Express Scripts Holding Company) ("Evernorth").  I am familiar with the software environment in which the business records of Evernorth and its subsidiaries[1] are or were stored.

2.      Evernorth purchases software licenses on a subscription basis from Microsoft for Microsoft 365, a cloud-powered productivity platform that includes familiar software productivity applications like Microsoft Word, Outlook, Teams, and Excel.

3.      Evernorth completed the roll out of Microsoft's M365 OneDrive or SharePoint software cloud-based solutions to Evernorth users during the first quarter of 2024.  Thus, the entirety of Evernorth only very recently completed the deployment of M365 cloud-based storage options.

4.      Ever after the rollout of the cloud-based solutions, the vast majority of files are stored in other storage environments, usually on-premises.

---

[1] Such subsidiaries include including Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc.

1

5.      I understand that according to my interpretation of the license description from Microsoft, a license for a software module called Microsoft Purview eDiscovery (Premium) ("Purview Premium") can be included with Microsoft 365 subscription, but that Purview is only available to Microsoft 365 users that are licensed at the "E5" level.

6.      The vast majority of Evernorth employees are only licensed at the E3 level.  In fact, I am the only Evernorth employee that currently holds an M365 E5 license.

7.      At the E3 level, only Microsoft eDiscovery (Standard) ("eDiscovery Standard") is available.  eDiscovery Standard lacks features that Purview Premium provides under an E5 license.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 30, 2024

DocuSigned by:

Steve Bryant

71ED12C22E6941C...

Steve Bryant

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-MD-03080**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH** |

**THIS DOCUMENT RELATES TO: ALL CASES**

### DECLARATION OF BETHANY RITTER

I, Bethany Ritter, declare as follows:

1.      I am an Information Protection Advisor at Evernorth Health, Inc. (formerly known as Express Scripts Holding Company) ("Evernorth").  I am familiar with the practices in regard to eDiscovery collections and forensics for Evernorth and its subsidiaries.[1] In this position I routinely arrange for the collection of records for discovery responses, including using the discovery features of the tools discussed below.

2.      I am familiar with the Microsoft module, Microsoft eDiscovery (Standard) ("eDiscovery Standard").

3.      I understand that Microsoft has recently advertised that Microsoft Purview eDiscovery (Premium) ("Purview Premium") now permits certain so-called "cloud attachments" to be collected and linked with emails or Teams chat conversations.  *See* "Collect cloud attachments in Microsoft Purview eDiscovery (Premium)" (Apr. 23, 2024), *available at* https://learn.microsoft.com/en-us/purview/ediscovery-cloud-attachments.

---

[1] Such subsidiaries include including Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc.

DocuSign Envelope ID: DE0AA538-F9D3-4B99-B852-D756632EAFA5

4.      Evernorth only recently began using eDiscovery Standard for certain eDiscovery collections within the last six months. Evernorth has never previously used Purview Premium for eDiscovery collections.

5.      Before Evernorth began using eDiscovery Standard, Evernorth used different Microsoft software for the collection of emails as they were stored in an on-premises MSExchange environment. This software lacked any capability to collect and link cloud-based attachments. This was the collection method employed for the prior collection of Evernorth email content in the cases that became the current MDL.

6.      Even today, Evernorth uses software other than eDiscovery Standard for most eDiscovery email collections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 30, 2024

*Bethany Ritter*

Bethany Ritter

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case 2:23-md-03080**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH** |

**DECLARATION OF JAMIE BROWN**

I, Jamie Brown, declare under penalty of perjury under the laws of the United States of America as follows:

1. I am a Vice President of Global Advisory Services at Lighthouse.  I am an attorney and legal consultant, specializing in information law, which includes e-discovery.  I have over 23 years of in-house, government, and law firm experience, which I draw upon to advise clients on various challenges related to the use of information and technology in the context of litigation and investigations.  My prior experience includes working for UBS, where, as Executive Director and Global eDiscovery Counsel, I was responsible for designing, implementing, and managing the company's global e-discovery programs to support the firm's global litigation and investigation docket.  I also worked as Assistant General Counsel, Head of eDiscovery and Information Governance, in the Division of Enforcement at the U.S. Commodity Futures Trading Commission in Washington, D.C., where I served as the Agency's resident e-discovery expert.  I have managed eDiscovery for hundreds of complex litigation matters (from inception through conclusion) and consulted with hundreds of clients on various challenges associated with information and technology, particularly as it evolves.

2. I submit this declaration at the request of Novo Nordisk Inc. ("Novo Nordisk") and its outside counsel, Davis Polk & Wardwell LLP ("Davis Polk"), and in support of Defendants' proposal regarding the ESI Protocol in this litigation.  I understand a dispute has arisen involving Novo Nordisk's ability to identify, collect, and produce certain documents

1

identified via reference links in any email, chat, or electronic document.[1]  I am familiar with the facts contained herein and am prepared to testify to the extent required.

3.     In preparing this declaration, I undertook the following steps: (1) I conducted internal interviews with Lighthouse team members who have firsthand knowledge and experience with Novo Nordisk and the facts and circumstances set forth below; (2) I interviewed Charles McGovern, Associate Director of Information Governance and eDiscovery at Novo Nordisk, about Novo Nordisk's internal eDiscovery processes and use of Microsoft 365 and Microsoft Purview technology; and (3) I reviewed Defendants' Letter Motion dated 3/22/24, ECF No. 120; Plaintiffs' Brief in Support of Their Proposed ESI Order, ECF No. 123; and the Declaration of Douglas Forrest, ECF No. 123-2.

**Microsoft 365**

4.     Novo Nordisk uses Microsoft 365 ("M365"), which offers a suite of web-based applications, including but not limited to **Outlook** (for email), **OneDrive** (for individual user file storage and collaboration) and **SharePoint** (for team or department file storage and collaboration).  Novo Nordisk's version of M365 also includes a tool called **Microsoft Purview** ("Purview") that supports information governance and eDiscovery, including but not limited to the retention, preservation, collection, search and export of Microsoft data.  Depending on a company's licensing (Standard or Premium), Purview offers different capabilities.

5.     Lighthouse provides eDiscovery services to Novo Nordisk and has worked with Novo Nordisk since 2016.  In 2019, Novo Nordisk migrated to M365, pursuant to which it also began using Purview for, in relevant part, enabling retention, deletion and legal hold policies

---

[1]   These reference links are sometimes referred to as hyperlinks, although a hyperlink (by definition) is broader, as it also includes links to websites, web applications and data or document locations.  The practice of hyperlinking dates back 20+ years and refers to the technical capability of moving from one data location to another for various purposes.  Reference links have also been referred to as cloud "attachments," which is a misnomer to the extent the treatment of this method of file sharing is considered the same as with physical attachments.

   Cloud providers adopt their own terminology to describe their file sharing technology. Microsoft uses the term "cloud attachment," and previously used the term "modern attachment," whereas Google uses the term "linked Drive files."

against M365 data (*i.e.*, documents and information stored or communicated via a Microsoft product described above).

6.      It is my understanding that, in connection with this litigation, Novo Nordisk's eDiscovery Team has collected (and will be collecting) relevant Outlook, OneDrive and SharePoint data using Purview, which it provided (and will be providing) to Lighthouse for processing, hosting and review by its outside counsel.  This includes data that was created pre-2019 before Novo Nordisk moved to the M365 platform and when it was using Microsoft's on-premises version of Outlook (and other word processing applications).

**Background on Shared Documents / Linked Files**

7.      To provide some background, traditionally, documents have been shared by email in one of two ways:  by uploading a copy of a file as a physical attachment or by embedding the file into the message.  In both scenarios, the file was static (meaning, it was not subject to being modified by another user in the normal course of business), and metadata naturally existed that would allow for the ready association of the precise version of the referenced document to the message by an eDiscovery vendor.  Over time, this ready association paved the way for an industry standard of producing documents that were attached or embedded to an email message with the underlying message based on the notion that it was part of a "parent-child" relationship (where the message is the parent, and the child is the attachment or embedded file).

8.      Cloud-based technologies provide a very different file sharing mechanism that embeds a link within the body of the email message, chat, or electronic document that points to another document's storage location.[2]  The underlying document is *not* static, but rather is dynamic—it can be edited, moved, or deleted, depending on how the system is configured, who has access to the document, and how it is used over the course of time.  Some systems allow for file sharing only via reference links, while others allow the option of providing a traditional

---

[2] Such a document may itself contain a link pointing to *another* document's storage location.  In principle, there is no limit to the number of documents that can be referenced within a given email thread or message chain.

attachment.

9.      Cloud-based technologies also provide a different mechanism for creating versions of documents ("versioning") that is "system driven" as opposed to "user driven." System driven versioning refers to the automatic creation of a new version when changes are made to a document (based on system specifications); in practice, this can yield potentially hundreds of versions without any user intention or even knowledge that a version is being created.  In contrast, user driven versioning (which was commonplace with word processing applications until they were replaced by cloud-based systems) relies upon a user to intentionally create a new version.

10.     Versioning is material to the discussion of shared/linked documents because of how eDiscovery tools access and retrieve this information.  Typically, there are two types of tools used to access and retrieve enterprise data:  features that are built-in to a system "natively," such as those in Purview (for Microsoft data) or Vault (for Google data), or third-party collection tools that are used to access a company's systems for this purpose.  In most cases, the built-in eDiscovery features used to collect data from enterprise systems cannot readily access and retrieve the precise version of the document shared ("version shared") when collecting communications, but rather only the last version of the linked document, if any.

11.     The same is true for Purview (Standard and Premium Versions, unless specifically enabled otherwise, per the next paragraph):  if a Purview Standard user seeks to collect and export shared/linked documents, they cannot do so *as part of a message collection*; a Purview Premium user, on the other hand, *can* collect shared/linked documents as part of a message collection, but only the last version (not the version shared) of shared/linked documents.[3] They

---

[3] Purview does allow versions of documents to be retained, and thus, preserved (rendering them available) for collection as a *separate* collection activity by collecting a user's OneDrive or another location assumed to contain shared files—an activity that is manual and not part of a typical eDiscovery collection workflow—but *there is no metadata available specifically linking the shared document with the communication*, rather, there is metadata that might correlate, but no specific field that confirms the document is the one shared.

would then need to export the data and rely on an eDiscovery provider (like Lighthouse) to "parse" it using a third-party tool that attempts to re-associate the message with shared/linked files—a method that is far from precise and varies depending on the technology.

12.     The one exception is for Premium users, where Microsoft released new functionality in April 2023 to allow for the collection of document versions shared/linked as part of a message collection.  However, this requires that the company both specifically enable this feature *and* uses a Premium eDiscovery workflow to collect and export the data.  Novo Nordisk does not use a Premium eDiscovery workflow for litigation and is not in a position to use this functionality.  Also, the ability to collect and export document versions shared within Premium only applies *prospectively*, not retroactively—in other words, it applies only to documents created from the point at which the feature was enabled in OneDrive or SharePoint, and only for the locations within the scope of the policy.

13.     Thus, *even if* Novo Nordisk configured its system to utilize the Purview Premium feature that supports the collection of the precise version of the document shared/linked, this option was only available as of April of 2023, and would only apply to documents created and shared/linked prospectively.  In other words, it would not account for the hundreds of thousands of documents that Novo Nordisk has collected, processed, searched and reviewed in connection with the cases in this litigation, as they were created before this feature was available.

14.     Moreover, the collection of shared/linked documents within Purview is not perfect and is subject to Purview's ability to locate the file, which may not occur if the file has been moved or deleted in the ordinary course of business.

**Novo Nordisk's Data Repository**

15.     I understand that, of the documents Novo has collected to date and Lighthouse has processed in connection with the *In re Insulin Pricing Litigation*, 17-cv-00699-BRM (D.N.J.) MDL, all pre-date 2019 when Novo Nordisk migrated to M365.  This data set includes email, among other data, that leveraged a traditional method of file sharing, i.e., by attaching a physical, static copy of a document to a message.  I further understand that any emails deemed relevant

5

from prior to 2019 containing an attachment will be produced together (as a "family" per the above rationale).

16.     I further understand that, for any M365 created data, Novo Nordisk's practice in this and other litigation matters is *not* to collect shared/linked documents (version shared or last version) using Purview Standard's native capabilities due to the time, cost and burden of doing so given the nature of cloud technology (including versioning and file sharing).

**Metaspike FEC**

17.     Plaintiffs' expert, Douglas Forrest, suggests that a third party tool called Metaspike Forensic Email Collector ("FEC"), might be a viable alternative to collect the versions shared/linked (as opposed to last versions).

18.     Lighthouse uses FEC to collect email and linked documents only in certain limited matters involving small volumes of *Google data* and where the collection at issue is extremely targeted (for example, collecting an individual's personal Gmail). It does not use FEC to collected shared/linked files for M365 data, as this functionality does not exist today.

19.     In connection with this declaration, I confirmed with Arman Gungor, Founder of Metaspike, my understanding of FEC's capabilities, which do not currently extend to M365 shared/linked files. Given that Novo Nordisk's data set is comprised of Microsoft data and not Google data, FEC is not an option.

**Plaintiffs' Proposed ESI Protocol**

20.     Plaintiffs contend that Novo Nordisk can use automatic means to identify the precise version of the document shared/linked ("with the push of a button…."), which is inaccurate. As explained previously, Purview does not offer this capability (except for the one exception previously noted, which is inapplicable). In addition, there is no third party commercially available tool that would allow for the collection of the precise version of the document shared within Purview at the size and scale needed (including Metaspike). Specifically, the manual effort would involve:

   a.   Identifying all documents that contain a reference link;

   b.   For each link, identifying the document within M365 referenced in the link (which is a combination of the file path and file name), necessitating a document-by-document query (note that the potential universe of locations is highly variable – it is not limited to the user's OneDrive, but rather, includes any M365 location to which the user had access);

   c.   For each document identified, either (i) manually review the version history within the user interface to identify the version that appears to have been shared based on the time/date stamp of both the message and the document (but note that this is imprecise due to time/date stamping technology; also note that a typical administrator would not have this level of access, so this is not feasible); or (ii) recollect and export all versions of the documents, re-process into Relativity, and manually attempt to confirm which version was used using a similar method;

   d.   Once confirmed, create a family metadata relationship between the root document and the linked files for each document;

   e.   Create some quality control to validate the process, which is wholly manual;

21.     This process is not offered within a typical eDiscovery workflow, is not something Lighthouse could even support and is not recommended for this (or any) matter.

22.     Based on the scope of Novo Nordisk's prior productions in *In re Insulin Pricing Litigation*, 17-cv-00699-BRM (D.N.J.), which I understand included over 500,000 total documents, and the breadth of the potential discovery time period at issue in this litigation, which I understand could stretch back as far as 2011, the manual effort described above is simply not doable at such a scale and has never been attempted by Lighthouse.

    I affirm under penalty of perjury of the laws of the State of New York that the foregoing statement is true and correct.  Executed on May 1 , 2024 in New York, New York.

                                        *Jamie Brown*
                                        Jamie Brown

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE: INSULIN PRICING LITIGATION | Case No. 2:23-MD-03080<br>MDL No. 3080<br><br>JUDGE BRIAN R. MARTINOTTI<br>JUDGE RUKHSANAH L. SINGH |

## DECLARATION OF DAVID YERICH

I, David Yerich, declare as follows:

    1.    I am over 18 years of age, of sound mind and body, and otherwise competent to testify. I have personal knowledge of the facts set forth in this declaration and, if called to testify about those facts, could and would do so competently and under oath.

    2.    I am the Director of eDiscovery for UnitedHealth Group Incorporated and have been in this role since 2009. My job functions include designing, updating, implementing, and overseeing processes, protocols, and tools that the company employs in its electronic discovery function for regulatory and legal matters. I supervise electronic discovery for UnitedHealth Group businesses and affiliates (including for UnitedHealth Group Incorporated; OptumInsight, Inc.; OptumRx, Inc.; OptumRx Holdings LLC; and Optum, Inc. (the "UHG and Optum Defendants")). In my job, I must know and understand the capabilities of the systems and databases that the UHG and Optum Defendants collect from and utilize in electronic discovery. I also have oversight and familiarity with the document preservation and e-discovery processes utilized by the UHG and Optum Defendants.

    3.    In my role, I coordinate with UnitedHealth Group's Enterprise Records and Information Management team to help ensure that UnitedHealth Group continues to preserve

1

required information for litigation, while also managing its data needs effectively. I study the rollout of new technologies into the marketplace and within the UnitedHealth Group organization, including the impact those new technologies will have on our existing eDiscovery processes. I also oversee the impact that sunsetting, archiving, or migrating of existing platforms will have on UnitedHealth Group's preservation and litigation obligations. In addition, I have a strong working knowledge of the UHG and Optum Defendants' e-mail storage systems and their capabilities, including their Microsoft Office 365 environments and their journaling software.

4.      I have 18 years of experience managing electronic discovery for complex litigation matters, both from an in-house corporate and law firm perspective. Over my career, I have been involved in eDiscovery associations, including the Electronic Discovery Reference Model (EDRM) and the Association of Certified E-Discovery Specialists (ACEDS). I am a regular speaker on the topics of eDiscovery and a strong advocate for eDiscovery education. My experience includes collaborating with attorneys, paralegals, IT professionals, and litigation support team members on all aspects of electronic discovery, including providing oversight for document review operations and the identification, preservation, and collection of electronically stored information.

5.      I am making this declaration at the Court's request, and in support of Defendants' Proposed ESI Protocol, to address the question of why it would constitute an undue burden for the UHG and Optum Defendants to collect, process or produce emails or other documents together with any documents referenced via hyperlinks within those emails or other documents as a "document family." *See In re Insulin Pricing Litigation*, Case No. 2:23-md-03080 ("*Insulin*"). Dkt. 143 (Tr. From Case Management Conference re: Dispute re ESI Protocol).

6.     I understand that Plaintiffs in the above-referenced litigation have submitted a declaration that identifies three tools—Microsoft Purview for Microsoft, Google Vault for Google, and Metaspike's Forensic E-mail Collector—that they claim would allow the UHG and Optum Defendants to collect documents associated with hyperlinks that are included in e-mails and other communications and connect such documents to those communications to assemble document "family groups." However, the UHG and Optum Defendants' document systems are not compatible with any of those tools for the purpose of collecting hyperlinked documents. There is no way to use any of them in the UHG and Optum Defendants' current environments to collect hyperlinked documents.

7.     The UHG and Optum Defendants each use the Microsoft Office 365 Exchange e-mail platform and Outlook as their user e-mail interface. Once an individual is identified as a custodian in litigation, a snapshot of his or her mailbox is taken, which is saved in storage outside of Microsoft Exchange to an on-premise object store environment. The custodian's e-mail is then journaled, a process that creates a copy of the e-mails, preserving their metadata in an e-mail wrapper, as they are sent and received. For custodians on legal hold, these journaled e-mails are preserved.

8.     The UHG and Optum Defendants do not employ any technology that would enable hyperlink association and collection for their journaled e-mail data and are not aware of any technology that can collect hyperlinked documents identified in their journaled e-mail data. As a result, identifying the hyperlinked documents within the UHG and Optum Defendants' journaled e-mail data could only be attempted manually. Neither Google Vault nor Metaspike, whose hyperlinked file collection functions are designed to work with Google's cloud-based email systems, are compatible with the UHG and Optum Defendants' journaled e-mail data. The

Microsoft Purview tool can only be used to collect e-mails and hyperlinked documents if those e-mails and documents reside in the Microsoft 365 platform.  But the UHG and Optum Defendants' journaled e-mails are **not** stored in the Microsoft 365 platform.

9.      Based on my knowledge and experience as Director of eDiscovery, I am aware that the process of manually identifying hyperlinked documents within journaled e-mail data includes multiple steps that are time-consuming and impose incredible burden.

10.     The manual process would include: (a) identifying the produced documents that contain a reference link to a specific document; (b) for each reference link pointing to a specific document (as opposed to a generalized storage location), analyzing the link to determine whether it points to the database that houses that document; (c) determining whether the identified database continues to be active, accessible, and searchable; and (d) manually searching the database (if active, accessible, and searchable) for the document.

11.     This process is time-consuming and imposes significant burden. Further, it can prove futile given the number of conditions that have to be present before a hyperlinked document can be manually identified and accessed.

I declare under penalty of perjury under the laws of the United States that the facts in this declaration are true and correct.

Executed on May 1, 2024 in New Hope, Minnesota.

_____
David Yerich

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case 2:23-md-03080**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R.  MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH** |

**DECLARATION OF PETER AMICUCCI**
**ON BEHALF OF DEFENDANT SANOFI-AVENTIS U.S. LLC**

I, Peter Amicucci, hereby declare and state:

1. I am an eDiscovery Collections Specialist for Sanofi. I have worked with Sanofi since January 2, 2008 (as a contractor from 2008 - 2021 and as a secondee at Consilio from 2021 - present).

2. I have held my current position in eDiscovery since 2016. In this role, I perform data collections from sources including email, OneDrive, Teams, and SharePoint. I collect, migrate, and archive data in multiple areas, including from the aforementioned systems, from legacy email archive systems, and from other central sources. I have created and/or updated work instructions for tasks that tie into this role. I also work with external vendors with whom we send data to for advanced review. I am familiar with the use of Microsoft Purview in this role.

3. Prior to 2016, I was part of the Sanofi Access Management team, which was responsible for items including user account administration, RSA Token administration, network share permission administration, network share data migrations, server access administration, and Exchange related tasks.

4. Prior to my role on the Sanofi Access Management team, I was part of the ServiceDesk which oversaw most issues and requests within Sanofi, including account lockouts, password resets, Outlook-related issues, local laptop settings, laptop performance, and remote access. A broad knowledge of Sanofi's network and all the support teams involved was especially important to the ServiceDesk role. This position gave me a broad overview of everything that is Sanofi.

1

5. Over the course of my employment at Sanofi, I have acquired personal knowledge of Sanofi's electronic discovery capabilities.

6. I submit this declaration at the Court's request to address the inability of Sanofi's current systems to identify, collect, and associate hyperlinked documents as requested by Plaintiffs. Given Sanofi's current systems, as explained herein, it is impossible to collect hyperlinked documents as Plaintiffs are requesting.

**Sanofi Systems, Licenses, and Document Repositories**

7. Prior to 2020, Sanofi users had access to and primarily used internal Sanofi network drives, including their own internal Sanofi network personal home drives.  These network drives were not cloud-based repositories that would be likely to contain hyperlinked documents.  Sanofi does not use native Google file types.

8. According to internal IT teams at Sanofi, by April 2020, Sanofi completed its migration of email systems from its own Exchange servers to Microsoft's M365 cloud-based platform. Sanofi also migrated internal network share home drives to Microsoft's cloud-based OneDrive. This change meant that, instead of email files and documents being stored on a user's computer or Sanofi's internal network, a user's files were centralized to the cloud.

9. Sanofi is currently in the process of migrating to SharePoint and Teams, with an anticipated completion date of July 2025. SharePoint and Teams are both cloud-based document repositories. Teams also adds instant messaging to its functions. These changes opened up the ability to use hyperlinked documents. Sanofi users could now send links to live documents instead of a traditional static document that someone would send as an attachment in an email or access directly on a Sanofi network share location.

10. After Sanofi began using the M365 platform, Sanofi users could choose to attach either a "live" hyperlink to a document, or a copy of the document as an attachment. Live hyperlinks are only accessible to users in Sanofi's internal system. For example, if an eDiscovery vendor clicked on a document hyperlink in a collected Sanofi email, the link would not work.

11. Microsoft has several different enterprise licensing options for its M365 platform, including E3 and E5 licenses.

12. Sanofi uses the Microsoft Purview Standard eDiscovery (E3 license) for its internal workflow whereby it collects emails in their native formats, exports to PST files and then we send the data to our external vendors for processing. The E3 license does not have a tool that collects any documents that are hyperlinked to an email.

13. The E3 license also does not retain copies of the as-sent version of a document hyperlinked to a particular email.

**Microsoft E5 License Capabilities and Limitations**

14. Sanofi does not currently have the Microsoft Purview eDiscovery Premium E5 license, and has not used it in the past.

15. Microsoft Purview's E5 license claims that it can collect certain cloud attachments (i.e., ones stored on SharePoint sites) included with communications. Because Sanofi does not have an E5 license, I have not tested this tool to confirm whether this tool works as claimed. But even with an E5 license, collecting hyperlinked documents as family members of an email has significant limitations.

16. For example, E5 would only work within the Sanofi-Microsoft internal environment. This means if someone linked to a document not within Sanofi's (Teams, OneDrive, SharePoint) environment, an E5 license would not automatically collect the document as a family member of an email.

17. Here, because Sanofi is transitioning from a different document repository to SharePoint, assuming document hyperlinks existed prior to this transition, this means that they would not be part of the current Sanofi-Microsoft internal environment, and could not be automatically collected and paired as family members.

18. Furthermore, prior to 2020, Sanofi archived emails and other data in non-Microsoft systems, and thus, assuming email communications containing hyperlinks even exist prior to 2020, this tool could not be applied to any archived email communications containing hyperlinks in those non-Microsoft systems. This tool cannot identify or connect hyperlinks to any of the systems outside Microsoft SharePoint and OneDrive that Sanofi employees use.

19. Sanofi does not have a tool or application that can identify a hyperlink in one platform (i.e., in email or Teams) and then identify, collect, and associate the hyperlinked

document as a family member if the hyperlinked document exists in a separate, unrelated platform. I am not aware of a tool that can perform this.

20. Additionally, even if Sanofi upgraded to E5 licenses for its users, the E5 license cannot fully operate retroactively, as it cannot retroactively reconstruct associations between a link and the correct instance of a previously hyperlinked document. This means that, even if Sanofi purchased and implemented the E5 license now, it would only work to collect the correct instance of a document from now going forward (and again, only if that document is stored in the Microsoft systems). In other words, to the extent that the E5 license enables a party to collect the *specific* instance hyperlinked to an originating email (which I cannot confirm), because Sanofi does not currently have the E5 license, *Sanofi* cannot collect the specific instance of a hyperlinked document since the E5 license was not already activated at the time any relevant emails were sent. The E5 license cannot work retroactively to collect the specific instance of a hyperlinked document.

21. Separate from limitations of the E5 license, it is also costly to obtain this Premium license.

22. E5 licenses have not been included in Sanofi's contract negotiations, so to give an idea of the cost difference, we are limited to providing an expense comparison based on the public prices for Microsoft M365: according to Microsoft pricing, M365 E5 licenses are priced 38% higher than M365 E3 licenses. Based on these prices, if Sanofi were to upgrade, the cost difference would be ($61.91 for E5 - $38.30 for E3) = $23.61 difference in cost, multiplied by 12 months and then by 138,000 users (which is the current Sanofi E3 license users), totaling an additional $39,098,160 annually.

**Producing Hyperlinked Files as Family Members**

23. Given that Sanofi currently has an E3 license, as well as the limitations with any future acquisition of an E5 license, Sanofi can only attempt to associate as family members originating emails with a hyperlinked document by using a case-by-case manual review process. This would involve manual searching for hyperlinked files, analysis of any identifying information, and attempting to match identifying information (whether unique or not) via context clues.

24. There is no guarantee that this process would link each hyperlink to the same file and version that was originally referenced.

* * * * *

25. The contents of this declaration are true and correct to the best of my knowledge, information, and belief, and are based on my personal knowledge of Sanofi's eDiscovery capabilities as they relate to Sanofi's communication tools and data sources, materials that were provided to me and reviewed by me, and/or informed conversations with other knowledgeable employees of Sanofi. If called upon as a witness in this action, I could and would testify competently to the matters discussed in this declaration.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this Declaration on May 1, 2024, in Tenafly, NJ.

*s/ Peter Amicucci*

Peter Amicucci