<u>**VIA ECF**</u>

The Honorable Rukhsanah L. Singh, U.S.M.J.
United States District Court
District of New Jersey
Clarkson S. Fisher Fed. Bldg. & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

   **Re:**  **In re: Insulin Pricing Litigation**
     **No. 2:23-md-03080-BRM-RLS**
     **Discovery Plan Dispute – Defendants' Position Paper**

Dear Judge Singh:

  As Your Honor requested during the April 8, 2024 hearing in this matter, Defendants write

to provide their positions regarding the parties' competing Case Management Orders, attached as

Exhibit 1 (Plaintiffs' Proposed CMO) and Exhibit 2 (Defendants' Proposed CMO).

**I.**   **The Court Should Adopt Defendants' Proposed CMO and Require All Parties To Participate in Master Discovery**

  The Court should require all the parties to participate in discovery to ensure that both

Defendants and Plaintiffs obtain the information they need to pursue, or defend against, Plaintiffs'

claims.  Defendants' discovery plan accomplishes this goal by prioritizing early factual

development and flexibility.

  The parties would first serve "Master Discovery Requests," comprised of up to 30

document requests and 30 interrogatories, after the Court enters the discovery plan. Defendants'

Master Discovery Requests to Plaintiffs would address important issues (discussed in more detail

below) spanning the relevant time period. Every Defendant and every Plaintiff would then provide

responses and objections to those Master Discovery Requests and produce documents. This

approach moves discovery forward in all of the member actions in materially similar ways,

consistent with the Federal Rules of Civil Procedure. *See, e.g.*, *Sentis Grp., Inc. v. Shell Oil Co.*,

763 F.3d 919, 925 (8ᵗʰ Cir. 2014) ("Litigation in general and discovery in particular . . . are not one

sided.").  Ensuring that all parties participate in discovery would also allow the parties to resolve common objections across the board and prevent future disputes, as may occur under Plaintiffs' proposal, as to whether the deals struck in those negotiations bind all MDL parties.  *See, e.g., Home Depot USA, Inc. v. Lafarge N. Am, Inc.*, 59 F.4th 55, 61-64 (3d Cir. 2023) (discussing unique procedural challenges in MDL proceedings, such as the applicability of law of the case or issue preclusion).

Then, after the completion of written and document discovery, the parties would confer regarding the process and parameters for fact depositions and whether further staging is appropriate.  With the benefit of master discovery, the parties also could determine whether they should prioritize additional, limited case-specific discovery for certain cases.  And the parties could work together to identify common factual issues that may lend themselves to early summary judgment motions (such as statutes of limitation or deception).  After written and document discovery, the parties will be able to productively confer on those issues.  This is consistent with the proposed amendment to Federal Rule of Civil Procedure 16.1, and the Advisory Committee's commentary that the Court should consider whether "certain factual issues should be pursued through early discovery, and certain legal issues should be addressed through early motion practice."  *See* Revised Proposed Fed. R. Civ. P. 16.1(b)(3)(G) Advisory Committee's note.

Defendants' proposal would promote a fair and orderly process.  It would create uniformity across the tracks while also providing flexibility throughout the process for the parties and the Court to discuss whether and what staging is appropriate, without abandoning progress on the cases.  It would also provide Defendants the information they need to fairly assess whether the selection of exemplar or "bellwether" cases for trial is appropriate and, if so, which case or cases

would be representative.  And it would ensure that depositions take place in an orderly manner, without the prospect of disputes arising from post-deposition production of documents.

Plaintiffs' proposal, by contrast, would further complicate this already complicated case, leading to fundamentally unbalanced discovery burdens and inevitable inefficiencies.  For one thing, Plaintiffs' proposal exempts most of the Plaintiffs from meaningful discovery and curtails Defendants' ability to timely discover key facts to support its defenses.  All Plaintiffs would serve discovery on Defendants immediately, while State Attorneys General ("AG") and Self-Funded Payer ("SFP") Plaintiffs would only need to complete (yet-to-be-negotiated) Plaintiff Fact Sheets and (also yet-to-be-negotiated) document requests that the parties would first have to spend months negotiating.  During a meet and confer, Defendants asked Plaintiffs what information they would provide via Plaintiff Fact Sheets and document requests that justified their alternative and unilateral approach to master discovery, and Plaintiffs candidly stated they saw the document requests as "limited" and they "do not know" and "cannot say" the permissible scope until the Court approves their approach.  And the only justification Plaintiffs offered was a desire to "be efficient," implying that the burdens of discovery—in cases brought by Plaintiffs—should fall disproportionately on Defendants.  For example, under their plan, the parties submit proposals for bellwether discovery pools (for only the SFP and AG tracks) likely *before* the Plaintiff Fact Sheets process is even complete.  The lopsided nature of Plaintiffs' proposal is further compounded by the fact that Plaintiffs seek to proceed with depositions before the completion of written discovery and document production.

The Court should not countenance Plaintiffs' one-sided approach for several reasons.

***First***, **forcing Defendants to rely on Plaintiff Fact Sheets would prejudice Defendants because they need robust custodial document discovery from Plaintiffs to defend against**

**Plaintiffs' claims.**  For example, Defendants' statute of limitations defense turns on *when* Plaintiffs had notice of their claims, which requires document discovery into what specific information the Plaintiffs knew, when they knew it, and what they did with their information.  *See, e.g.*, *Gentleman v. Massachusetts Higher Educ. Assistance Corp.*, 272 F. Supp. 3d 1054, 1069 (N.D. Ill. 2017) (noting that "[a]n ICFA claim accrues when the plaintiff knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused").  Defendants should not have to continue to take Plaintiffs' word—through Plaintiff Fact Sheets—that they were not on notice of their claims.

Many Plaintiffs also bring common law fraud claims.  Defending against those claims requires discovery into Plaintiffs' reliance, including whether that reliance was reasonable.  Like the statute of limitations defense, these claims require specific detail into what Plaintiffs knew and how they acted on that information, which Defendants are entitled to discover.  *See, e.g.*, *BP W. Coast Prods. LLC v. SKR Inc.*, 989 F. Supp. 2d 1109, 1120 (W.D. Wash. 2013) (listing "reliance on the truth of the representation" as one of nine elements of a common law fraud claim).

Finally, Plaintiffs' unconscionability theories also require specific document discovery. Under many states' laws, unconscionability turns on the choices available to Plaintiffs.  *See, e.g.*, *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 833 (N.D. Ill. 2009) (determining that inflated prices of at-issue product did not establish an unfair practices claim pursuant to the ICFA because plaintiff had alternative options).  Defendants expect discovery to reveal that Plaintiffs entered complex commercial agreements with PBMs after extensive bidding processes and negotiations aided by knowledgeable consultants.  Defendants expect those entities' contracts and, critically, communications about the negotiation and performance of those contracts, to show that Plaintiffs knew about and aggressively negotiated to receive the benefit of the drug rebates they now claim

4

are unlawful.  Defendants accordingly require discovery into the information Plaintiffs considered in negotiating those contracts, and why Plaintiffs selected the plans, formularies, and rebate structures they now complain about in these lawsuits.  State AG and SFP Plaintiffs' proposal that they fill out a fact sheet with self-serving answers to these critical topics will severely prejudice Defendants' ability to evaluate and defend against Plaintiffs' claims, and unnecessarily deviates from the Master Discovery Requests proposal that the parties agree to for Third Party Payer ("TPP") Plaintiffs.[1]

**Second**, Plaintiffs' suggestion that Plaintiff Fact Sheets are customary or appropriate in MDLs misconstrues the cases they cite.  Those cases are usually personal injury or product liability cases in which simple answers to straightforward questions from ordinary consumers or individuals provide significant value.[2]  *See Manual for Complex Litigation* § 40.52, at 777-78 (4th ed.) (providing for fact sheets in the sample "Mass Tort Case-Management Order").  At the same time, the individuals who are plaintiffs in those cases often lack the significant discoverable information that the State AG and SFP Plaintiffs in this MDL—all sophisticated government entities—have in their systems.  The key information Defendants need in this case is not available through limited non-custodial document discovery or narrow questions on a Plaintiff Fact Sheet. In cases like this that turn on misrepresentations Defendants allegedly made and Plaintiffs'

---

[1] Where Defendants and TPP Plaintiffs, disagree, however, is in whether TPP Plaintiffs are entitled to double the number of requests for production (as well as adding 15 interrogatories and an unspecified number of requests for admission) that they can serve on Defendants, without a commensurate expansion of discovery for Defendants to serve on TPP Plaintiffs.  *See* Exhibit 1 at 5.  This uneven expansion of discovery for only TPP Plaintiffs is both unnecessary and inequitable.

[2] *See, e.g.*, Case Management Order No. 8, *In re Juul Labs Inc., Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 19-md-02913 (N.D. Cal. Mar. 27, 2020), ECF No. 406 (authorizing, in product liability case, plaintiff fact sheet asking whether claimant used the at-issue product); Case Management Order No. 8, *In re Elmiron (Pentosan Polysulfate Sodium) Prods. Liab. Litig.*, No. 2:20-md-02973 (D.N.J. May 5, 2021), ECF No. 39 (authorizing, in product liability case, plaintiff fact sheet asking the dates that claimant took at-issue drug); Case Management Order No. 5, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-2873 (D.S.C. Aug. 7, 2019), ECF No. 205 (providing for, in product liability case, plaintiff fact sheet asking for all locations that claimant was allegedly exposed to at-issue product).

subsequent decision-making, courts hold that Plaintiff Fact Sheets are not appropriate. *See* Order Relating to Individual Publisher Actions, *In re Google Digit. Advert. Antitrust Litig.*, No. 1:21-md-03010 (S.D.N.Y. Mar. 22, 2023), ECF No. 513 (rejecting bellwethers because plaintiff discovery responses in complex antitrust cases may "vary greatly," especially when compared to individual personal-injury claims in mass tort actions where bellwethers are often used).

**Third,** **this MDL is not too large or unwieldy to conduct bilateral discovery like it was** **in the cases Plaintiffs cite.** Three of the recent MDLs in the District of New Jersey that employed some type of bellwether process—*In re Invokana*, *Valsartan*, and *Allergan*—each consisted of close to 1,000 cases, and the MDLs that Plaintiffs cite all have similarly high numbers:

| MDL Case | Number of Cases | Number of Defendants |
|---|---|---|
| *In re Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation* | Over 5,700 cases | Dozens of defendants (ranging from manufacturers, retailers, individuals, and gas stations) |
| *In re National Prescription Opiate Litigation* | Over 2,200 cases | Dozens of defendants (ranging from manufacturers, distributors, national and local pharmacies, and PBMs) |
| *In re Elmiron Products Liability Litigation* | Over 1,900 cases | Over ten defendants |
| *In re Invokana Products Liability Litigation* | Over 900 cases | Over ten defendants |
| *In re Allergan Products Liability Litigation* | Over 900 cases | Two defendants |
| *In re Aqueous Film-Forming Foams Products Liability Litigation* | Nearly 800 cases | Dozens of defendants (ranging from manufacturers, corporations, retailers, and government agencies) |
| *In re Valsartan Products Liability Litigation* | Over 700 cases | Dozens of defendants (ranging from manufacturers, wholesalers, retail pharmacies, and PBMs) |

Here, there are fewer than 60 cases: one to three cases in the Third Party Payor Class Track ("TPP Class Track"),[3] 10 cases in the Attorneys General Track ("AG Track"), and roughly 40 cases in the Self-Funded Payer Track ("SFP Track").  Each of these cases involves, at most, the same six defendants, whereas many of the MDLs listed above contain different configurations of defendants and defendant groups involved in the various member matters.  Plaintiff Fact Sheets are also rare in such comparatively small MDLs; the Federal Judicial Center found that only 16% of MDLs with fewer than 100 actions use fact sheets.  Margaret S. Williams, Emery G. Lee III, and Jason A. Cantone, *Plaintiff Fact Sheets in Multidistrict Litigation: Products Liability Proceedings 2008-2018*, Federal Judicial Center (Mar. 2019), https://www.fjc.gov/sites/default/files/materials/49/PFS%20in%20MDL.pdf.

Indeed, the discovery pools in the cases Plaintiffs cite are larger than or comparable to ***the size of entire Plaintiff Tracks in this case***, demonstrating that there is no need to subdivide Plaintiffs here into pools.  *See, e.g.*, Case Management Order No. 17 (Bellwether Selection and Scheduling Order), *In re Elmiron (Pentosan Polysulfate Sodium) Prods. Liabil. Litig.*, No. 2:20-md-02973 (D.N.J. Oct. 6, 2021), ECF No. 93 (20 bellwether discovery cases); Case Management Order No. 13, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-2873 (D.S.C. Dec. 28, 2020), ECF No. 1049 (12 bellwether discovery cases); Stipulation and Order to Extend Deadlines Regarding Government Entity Bellwether Selection, *In re Juul Labs Inc., Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 19-md-02913 (N.D. Cal. Nov. 20, 2020), ECF No. 1157 (same).  Plaintiffs have not offered any justification for why discovery could not proceed on the limited number of cases that have been filed in this MDL.  Nor have they offered a justification

---

[3] Plaintiffs in the TPP Class Track have represented that they will be consolidating their claims into a currently undecided number of class complaints.

for their fragmented, track-by-track approach.  In meet and confer discussions, Plaintiffs did not identify any reason for treating the various tracks differently, and Defendants are unaware of any reason to do so.  The MDL process is intended to "promote . . . efficien[cy]" in discovery.  28 U.S.C. § 1407(a).  Plaintiffs' proposal clashes with that goal.

**_Fourth_, even putting aside the fundamental fairness concerns discussed above, Plaintiffs' lopsided proposal does not provide enough time for the parties to meaningfully assess any early discovery.**  Under Plaintiffs' proposal, the parties are required to select the bellwether discovery pool cases 120 days after entry of the Discovery Plan Order.  But the parties will not even submit competing fact sheet proposals until two months after entry of the Discovery Plan Order, leaving only 60 days for (1) the Court to resolve any disputes between the parties (including scheduling an argument, should that be necessary); (2) Plaintiffs to respond to the Plaintiff Fact Sheet and produce requested documents; (3) Defendants to analyze those responses and follow up as appropriate; and (4) the parties to formulate and submit proposals about any bellwether discovery pools.  _See_ Exhibit 1 at 4-5.  This is untenable and unrealistic.  In the Consumer case, it took almost ten months for every named plaintiff (a total of 74 individuals) to complete the Plaintiff Fact Sheets in the first instance, plus additional months for further negotiations to ensure that certain responses were complete.  This was a lengthy process, even though the Plaintiff Fact Sheets in that case called only for extremely limited document productions.  Once the fact sheet process is completed, Plaintiffs' proposal envisions all progress halting for an unknown length of time in an unspecified number of cases.  In only a subset, the "discovery pool," will discovery proceed.  The ultimate result of Plaintiffs' plan will be to deny Defendants crucial discovery for years.

To compound the issue, Plaintiffs would have the parties select cases for *trial* six months after entry of an order selecting cases for bellwether discovery pools, without any resolution of key factual issues via motion practice, and potentially without significant document or deposition discovery. *See* Exhibit 1 at 5. Further, it is unclear whether these cases will be tried in the District of New Jersey or remanded to the originating jurisdiction since *Lexecon* waivers have neither been obtained nor discussed, or whether that will pose any limitations in determining which cases can be selected as bellwether discovery pool cases or, ultimately, bellwether trials.

Simply put, Plaintiffs' proposal would force the parties to prematurely resolve complex management issues without sufficient discovery or progress in this MDL. Defendants' proposal, in contrast, provides a framework for the parties to move discovery forward expeditiously, while providing sufficient flexibility for the Court to assess and adopt further necessary steps for the efficient management of this MDL.

**Fifth, even if the Court opts for trial bellwethers at some point down the road, the discovery Defendants seek in their proposal is still necessary to choose bellwethers.** Under Plaintiffs' proposal, Defendants will eventually get discovery on some of the Plaintiffs that become part of a "discovery pool," and cases from that pool will eventually be trial bellwethers. But to protect the parties' due process rights, bellwether cases must be representative of the other cases in the MDL, and Defendants must have a say in what cases are bellwether candidates. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019-21 (5th Cir. 1997); *see also Morgan v. Ford Motor Co.*, No. 06-1080, 2007 WL 1456154, at *6 (D.N.J. May 17, 2007). In a case like this one, Defendants need discovery from all Plaintiffs, not just the "discovery pool," to have a meaningful say.

Defendants need discovery to make any bellwether assessments because there are significant differences among Plaintiffs both within each track and between the tracks. *See In re*

9

*2004 DuPont Litig.*, No. 04-191, 2006 WL 5097316, at *2 (E.D. Ky. Mar. 8, 2006) (finding a bellwether approach not appropriate until additional discovery obtained by defendants).  As Judge Martinotti recognized in the Court's opinion denying class certification in the *In re Insulin Pricing* consumer case, even the *same type* of plaintiffs (i.e., consumer plaintiffs) may have "individualized issues subject to various standards of review."  *See* Redacted Op., *In re Insulin Pricing Litig.*, Case No. 17-cv-00699 (D.N.J. Jan. 24, 2024), ECF No. 725 at 65.  As applied here, each county and each state will have received different information putting them on notice of their claims, their varying plans may or may not have "shared in the rebate savings" they complain about, and each state has "variations among state consumer protection laws, . . . variations among health plans, and . . . different insurers and affiliated PBMs."  *See id.*  Various counties and AGs also engaged in separate direct negotiations with some, but not all, PBM Defendants (as well as other PBMs) and made various choices regarding their contract provisions and selected formularies, among other choices.

Defendants are at a massive, prejudicial information disadvantage under Plaintiffs' proposal because Plaintiffs know all the relevant details about their cases, while Plaintiffs will keep Defendants in the dark until after the discovery pools are selected.  To evaluate which cases are appropriate candidates for bellwether treatment, Defendants need discovery into the relevant areas of the case.  They should not be forced to take Plaintiffs' word or to accept curated document productions.

**Sixth, Plaintiffs' proposal to permit depositions to proceed before the close of document and written discovery is fundamentally unfair and invites unnecessary disputes.**  Under Plaintiffs' proposal, Defendants would not receive full custodial productions from any Attorney General or Self-Funded-Payor Plaintiff at the outset of discovery.  They would not,

therefore, be in a position to depose those Plaintiffs' witnesses.  Plaintiffs, by contrast, would be entitled to full custodial productions from Defendants, effectively giving them a head-start on depositions, factual investigation, and case development.  Even setting that imbalance aside, Plaintiffs' apparent insistence on conducting depositions before the close of document and written discovery wastes resources because it invites unnecessary disputes concerning the need to re-produce witnesses for deposition in light of factual information that will emerge in the document and written discovery process.  The more streamlined, prudent course in a case as complex as this one is to finish document and written discovery, then proceed to depositions.

*Finally*, **to let Plaintiffs' organizational decisions drive discovery for this MDL is unfair and impractical.**  For one, Defendants (rightly) had no role in how Plaintiffs decided to organize themselves into different tracks.  Plaintiffs' slotting of cases into self-asserted "tracks" do not necessarily reflect principled distinctions between the cases, as demonstrated by the overlap between the so-called "Third Party Payor" and "Self-Funded Payer" tracks, for example.  And Plaintiffs themselves cannot even agree on how to best organize the tracks, as they are now seeking to restructure their proposed tracks months after their initial leadership proposal.  Tethering bellwether discovery pool groupings to these tracks (rather than substantively meaningful groupings identified after document and written discovery) will only result in further confusion and unnecessary delay.

***

Ultimately, this MDL may benefit from staging—like the staging the parties have agreed upon for motions to dismiss—in subsequent phases of the litigation.  But an unexplained and unsupported limitation on the document and written discovery Defendants can obtain from State and Self-Funded Payer Plaintiffs is prejudicial to Defendants and would result in years of delay for the majority of cases.  *See* Fed. R. Civ. P. 1 (rules of procedure should be "construed,

11

administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding"). Such a protracted process would undermine the efficiency of consolidating these separate actions into an MDL and raise significant due process concerns. Defendants ask that Your Honor adopt Defendants' proposed language and require that all parties respond to Master Discovery Requests as an initial matter.

## II.   The Default Discovery Period Should Reach from 2011 to 2021

The parties agree that the default discovery period that will apply to most topics should begin January 1, 2011. The end date is in dispute. Defendants propose June 7, 2021—the date that the Mississippi Attorney General filed its Second Amended Complaint. Plaintiffs, by contrast, propose January 1, 2024—years after many filed suit. While Defendants are willing to consider narrow exceptions for specific categories of discovery, the decade-plus period Defendants propose is already generous and beyond what this Court authorized in the Direct Purchaser Plaintiff action. Plaintiffs' demand for a discovery period running to the beginning of this year is unduly burdensome and not proportional to the needs of this action.

Under Rule 26(b)(1), discovery must be both "relevant to any party's claim or defense and proportional to the needs of the case." *In re Diisocyanates Antitrust Litig.*, 2020 WL 7427040, at *1 (W.D. Pa. Dec. 18, 2020) (emphasis in original) (explaining that "[t]he 2015 Amendments to Rule 26(b)(1) were designed to restore proportionality factors into the consideration of defining discovery"). The Rule 26 proportionality analysis requires a "careful and realistic assessment of actual need." *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 259 (3d Cir. 2016). When determining an appropriate and proportional discovery time period, this analysis considers the specific allegations in the complaints. *See, e.g., Deibler v. SanMedica Int'l,* 2021 WL 6198062, at *4 (D.N.J. Dec. 30, 2021) ("When establishing the parameters of discovery relevance, it is the claims and defenses of the parties, in the Complaint and other

12

pleadings, which set the guardrails for discoverable information."); *Alarmax Distributors, Inc. v. Honeywell Int'l Inc.*, 2015 WL 7431407, at *2 (W.D. Pa. Nov. 20, 2015) ("given the allegations in the Complaint," "the production of documents and/or information going back eleven years [as requested by plaintiff] is overly broad").

Defendants' proposed June 7, 2021 end date encompasses all of Plaintiffs' core factual allegations. For instance, the most recent facts that Plaintiffs allege regarding the role of rebate competition, exclusive or preferential formularies, and the "dramatic consolidation in the PBM industry" are from 2021. *See* Mississippi TAC ¶¶ 320-348 & fig. 13; Albany County SAC ¶¶ 347-55 & fig. 23; Direct Purchasers SAC ¶¶ 53-74. Plaintiffs' own allegations reflect that list-price increases ceased years before 2021. Mississippi SAC ¶¶ 280-294, 296-97 & figs. 2-9, 11; Albany County SAC ¶¶ 12-13, 272-285 & figs. 3-12; Direct Purchasers SAC ¶¶ 122 & n.68. Extending the discovery period until the filing of the Mississippi Complaint in 2021 would capture all of the alleged conduct involved in the purported "Insulin Pricing Scheme," with a generous buffer.

Plaintiffs have failed to explain their need for a default discovery period that extends beyond 2021. The fact that certain Plaintiffs' counsel waited longer to bring some Complaints on behalf of some clients does not justify a broader discovery time period. (If anything, it shows that their claims are time-barred.) Defendants' proposed time period already extends years later than the time period for discovery in other insulin pricing cases. For example, in *In re Direct Purchaser Insulin Pricing Litig.*, No. 20-cv-3426, 2020, the Court determined the relevant time period was 2012-2018. *See* ECF No. 283 (Mar. 9, 2023 Hearing Tr.) at 29-33. And in the consumer class action case, *In re Insulin Pricing Litig.*, No. 17-cv-699, the relevant productions included custodial documents from 2011-2018. Yet Plaintiffs now seek a discovery period that extends *five years* beyond other insulin pricing cases, and over *two years* beyond Defendants' proposed MDL time

period.  There can be no dispute that "producing data for two additional years will impose a meaningful burden on Defendants." *See In re Broiler Chicken Antitrust Litig.*, 2017 WL 6569720, at *4 (N.D. Ill. Dec. 22, 2017).

Plaintiffs' conclusory references to ongoing violations, and their stray references to post-2021 documents and articles, do not justify that burden.  *See United States ex rel. Spay v. CVS Caremark Corp.*, 2013 WL 4525226, at *2-3 (E.D. Pa. Aug. 27, 2013) (rejecting proposed seven-year discovery period and limiting it to 2006 to 2008 in light of allegations in complaint, and holding that "cursory allegations" of "continuing misconduct" are "unquestionably insufficient to open the door to broad and burdensome discovery").  Plaintiffs have not specified what information post-dating the filing of the Mississippi Complaint in 2021, or the Insulin Consumer action in 2017 for that matter, would be proportional to the issues in this case.  *See In re Direct Purchaser Insulin Pricing Litig.*, No. 20-cv-3426, ECF No. 283 at 32.  The speculative possibility of Plaintiffs' need for targeted discovery into specific issues after June 2021 does not justify the burden of the full-scale collection, hosting, and production by all parties of an additional two and a half years of electronically stored information.  If Plaintiffs require targeted discovery outside the general time period, those requests can be addressed on a case-by-case basis depending upon a party's showing of need.

Similarly, conclusory allegations as to class period do not justify a broader default time period, or make that entire period "automatically relevant and discoverable." *Chow v. SentosaCare, LLC*, 2020 WL 5623976, at *4 n.1 (E.D.N.Y. July 21, 2020) ("Taken to its logical conclusion, any alleged class period would automatically entitle a Plaintiff to discovery for that entire period on "relevancy" grounds. No such default rules regarding the temporal scope of discovery exist.").

Defendants' proposal of January 1, 2011 to June 7, 2021 is reasonable and proportional, is tied to the specific allegations in the MDL Complaints, and balances the needs of the case with the burden of expansive discovery.

### III.   The Discovery Plan Is an Inappropriate Vehicle for Plaintiffs' Overly Broad Demand for Clone Discovery.

Plaintiffs attempt to mask their overly broad request for wholesale clone discovery as a provision in Plaintiffs' proposed draft CMO.   But the Federal Rules establish a bedrock requirement that discovery be limited to what is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).   Contrary to this principle, Plaintiffs' wholesale clone discovery request demands discovery of "any and all Discovery Materials previously produced or provided in" "[a]ny related insulin-pricing cases pending in other courts," "[a]ny State Attorney General investigation, civil investigative demand, and/or subpoena related to insulin pricing," and "[a]ny response to investigations or inquiries related to insulin pricing brought by the United States Senate or House of Representatives, any committee or subcommittee thereof, and/or any other legislative, administrative, regulatory, or enforcement body, whether federal or state." *See* Exhibit 1 at 8.[4]   In other words, Plaintiffs are not only seeking discovery from outside the MDL member actions, but they are also seeking discovery from outside the context of civil litigation.   To seek discovery of materials that were not confined to rules of civil procedure is an attempt to circumvent such rules in this case.   Manufacturer Defendants have

---

[4] Defendants have focused here on Plaintiffs' request for clone document discovery.  As Defendants explained in a meet and confer with Plaintiffs, Defendants believe a discussion regarding reproduction of deposition transcripts—and any attendant provisions related to the use of such transcripts in subsequent proceedings—would be more appropriate as part of the parties' separate discussion regarding depositions.  There remain a number of issues for the parties to discuss, including whether Plaintiffs will be barred from re-deposing witnesses who have already sat for over 10 hours of deposition testimony, whether Plaintiffs may use the deposition transcripts at trials in these matters, and the boundaries of the confidentiality designations given the presence in these matters of the PBM Defendants, who were not defendants in the prior litigations.

already agreed (as early as the first case management hearing) that they will reproduce documents from the Consumer case. But Plaintiffs are not entitled to make non-particularized requests for production or receive clone discovery from matters involving government entities with significantly broader investigative authority, nor is their qualifier of "related to insulin pricing" either (1) sufficiently specific for Defendants to determine whether a matter is "related to insulin pricing," or (2) sufficiently narrow to be tailored to the claims at issue here.

"[N]umerous courts have found that requests for 'all' documents produced in another litigation, so-called 'clone' o[r] 'copycat' discovery, are inherently overbroad requests requiring the Court to considerably scale back the information that a producing party must produce from another litigation or deny it entirely on the ground that a party must do its own work." *United States v. Anthem, Inc.*, 2024 WL 1116276, at *4 (S.D.N.Y. Mar. 13, 2024) (citing *Barrella v. Village of Freeport*, 2012 WL 6103222 (E.D.N.Y. Dec. 8, 2012); *Bartlett v. Société Générale de Banque au Liban SAL*, 2023 WL 8828864 (E.D.N.Y. Dec. 21, 2023)) (additional citations omitted). Put another way, Plaintiffs cannot simply demand documents by gesturing to unnamed insulin pricing cases or investigations, as "[t]he argument that all discovery is relevant because two cases are 'substantially similar' is simply not enough." *Stellato v. Medtronic Minimed, Inc.*, 2021 WL 3134685, at *3 (M.D. Fla. Feb. 2, 2021); *see also King Cty. v. Merrill Lynch & Co., Inc.*, 2011 WL 3438491, at *3 (W.D. Wash. Aug. 5, 2011) (rejecting attempt to obtain clone discovery, stating "[a]lthough some portion of documents encompassed by Plaintiffs' request may be relevant . . . each category must be relevant to [Plaintiffs'] claims and defenses"). Plaintiffs "must do their own work and request the information they seek directly." *In re Outpatient Med. Ctr. Employee Antitrust Litig.*, 2023 WL 4181198, at *7 (N.D. Ill. June 26, 2023)).

Indeed, the reasons for rejecting cloned discovery apply with particular force here, as "reflexive production of documents previously provided to governmental entities is not appropriate." *In re Broiler Chicken Antitrust Litig.*, 2020 WL 1046784, at *2 (N.D. Ill. Mar. 4, 2020) (internal citation omitted). "The scope of [Congress's] power of inquiry," for example, "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). Consistent with this sweeping authority, investigations or inquiries conducted by legislative, administrative, regulatory, or enforcement bodies extend beyond Plaintiffs' claims. And because these entities are not subject to the protections that the Federal Rules impose upon discovery, any materials that Defendants were required to produce constitute a broader set than Plaintiffs are entitled to. Cloned discovery thus would allow Plaintiffs "to bypass the limitations on the scope of discovery established by the Rules." *Pensacola Firefighters' Relief Pension Fund v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 265 F.R.D. 589, 597 (N.D. Fla. 2010).

Defendants will produce non-privileged documents that were produced in response to government investigations, to the extent that such documents are within the scope of negotiated discovery and responsive to Plaintiffs' requests. But Defendants will not automatically produce documents here merely because those documents were produced elsewhere and in other contexts. Among other materials, Plaintiffs seek documents produced in response to Congressional investigations, including one conducted by the Senate Finance Committee ("SFC"). While Plaintiffs have not yet propounded proper document requests, those requests are unlikely to fully overlap with SFC's investigation, which, for example, covered products that are not at issue in this litigation as well as topics like the potential impact of proposed regulations. This is but one

example of the overbreadth of Plaintiffs' request and demonstrates why courts rightfully reject demands for clone discovery.

### IV. The Court Should Reject Plaintiffs' Attempt to Expand the Scope of Discovery Beyond Insulin Products.

Despite the fact that this "Insulin Pricing" MDL was created to consolidate several "actions concerning [an] alleged insulin pricing scheme," ECF. No. 1, at 3, Plaintiffs now seek unfettered discovery into a set of non-insulin products called glucagon-like peptide receptor agonists ("GLP-1s")—which they seek to accomplish by attaching a rider to their proposed discovery plan.[5] Those drugs are not insulins, and do not share the key characteristics with insulins that underpin Plaintiffs' allegations of the purported "Insulin Pricing Scheme." Nor were they at issue in the insulin pricing cases that have been litigated in this Court—and in which the vast majority of discovery to date has taken place—since 2017. The Court should not countenance Plaintiffs' attempt to have discovery encompass these drugs, for several reasons.

*First*, Plaintiffs' suggestion that the roster of "relevant" drugs for discovery in this case should be determined *by whatever products they list in an attachment to a proposed discovery plan* reflects a fundamental misunderstanding of how discovery should be conducted. Once the Court has set parameters for discovery, Plaintiffs can serve discovery requests under the Federal Rules of Civil Procedure. The parties will then meet and confer about those requests, including their scope, and to the extent any disagreements cannot be resolved in that process, they will be presented to the Court in due course via motion practice. Plaintiffs' proposal that the Court at this juncture enter an order setting forth the drugs that are "relevant" to this MDL is yet another attempt

---

[5] While Plaintiffs did not provide Defendants with the purported list of "relevant drugs" referenced in their proposed CMO, *see* Exhibit 1 at 2 ("The relevant drugs for discovery purposes are set forth in Attachment A."), Plaintiffs represented during the meet and confer process that they are seeking discovery regarding the GLP-1 products referenced in their Complaints.

at making an end-run around well-established conventions of discovery, as they have tried to do with other aspects of their proposal. And the impropriety of Plaintiffs' approach is all the more significant, given that the question of whether claims related to GLP-1s should be in this MDL at all is being litigated.

*Second*, as noted above, Manufacturer Defendants recently filed a request for leave to file a Motion for Partial Judgment on the Pleadings to exclude GLP-1 products from the Mississippi AG action. ECF Nos. 131, 156. If the Court ultimately grants Defendants' motion, that ruling will presumably dispense with any argument Plaintiffs have that these novel treatments are relevant to the MDL.

*Third*, the GLP-1s are not relevant. In every Complaint in the MDL, Plaintiffs premise their claims on an alleged insulin pricing scheme that has several supposed hallmarks: (1) insulin is a century-old, off-patent product that has not "significantly improved over the last twenty (20) years"; (2) Manufacturer Defendants' expenditures on "production" and "research and development" for insulin have not "increased," but rather "decreased," in recent years; and (3) despite this, the price of insulin has "dramatically increased" in "lockstep" since 2003. Whatever may be said about the accuracy of these premises, every Plaintiff has parroted them.

Plaintiffs have belatedly attempted to tie the GLP-1s to those allegations, arguing that the GLP-1s are a part of the same alleged pricing scheme, but Plaintiffs' own Complaints make clear that the only commonalities GLP-1s have with insulin are that some of those medicines are made by some of the same Manufacturer Defendants here, and that rebates create a difference between the GLP-1s' list price and net price. The latter point is true of *every* branded pharmaceutical. If it were enough to state a claim, then every manufacturer selling any branded drug in America could be sued as part of the same "insulin pricing scheme."

The fact that the GLP-1s are still under patent protection is dispositive, as Congress—not individual states or plaintiffs suing under their consumer protection laws—is "the promulgator of patent policy." *Biotechnology Indus. Org. v. D.C.*, 496 F.3d 1362, 1373 (Fed. Cir. 2007).  Federal patent law reflects Congress's consideration of the delicate balance between "enabl[ing] innovators to obtain greater profits than could have been obtained if direct competition existed" and "keep[ing] prices reasonable for consumers." *Id.* (citation omitted).  State laws that seek to regulate the price of "patented prescription drug[s]" upset that balance and are thus preempted.  *Id.* at 1365; *Southeastern Pa. Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 703 (E.D. Pa. 2015) (state consumer protection law cannot be used to challenge a patent owner's "exercise of its exclusive patent rights to make pricing decisions").

*Fourth*, allowing discovery into GLP-1s would result in significant inefficiencies.  The Manufacturer Defendants have been litigating claims relating to an alleged "insulin pricing scheme" for over seven years.  In those cases, they have collectively produced nearly one million documents relating to certain *insulin* products.[6]  As Judge Martinotti has recognized, a "significant amount of discovery" has been completed in the insulin pricing cases.  Sept. 12, 2023 Case Management Conference, Tr. 15:14–25.  Leveraging this experience is central to the MDL's efficiencies.  To that end, the Court urged the Plaintiff groups to coordinate amongst themselves regarding "the exchange . . . of previously produced discovery" so as to avoid "reinventing the wheel." *Id.* 24:4–14.  Defendants have engaged in discovery relating to insulin for years, and will do so going forward in the MDL.  But the parties should not reset that effort and drastically expand the MDL simply on the basis that Plaintiffs have named other branded prescription drugs with no connection

---

[6] Indeed, the MDL expressly cited this Court's extensive history overseeing those earlier "insulin pricing" cases as the bases for consolidating proceedings before Judge Martinotti.  Transfer Order, *In re Insulin Pricing Litig.*, No. 3080 (J.P.M.L. Aug. 3, 2023), ECF No. 91 at 4.

to the alleged scheme in certain Complaints.  The Court should reject Plaintiffs' proposal as to the relevant drugs.


Dated: May 8, 2024                                    Respectfully submitted,


*/s/ Liza M. Walsh*                                   */s/ Jason R. Scherr*
Liza Walsh                                            Jason R. Scherr
Melissa L. Patterson                                  *Attorney for Express Scripts Defendants*
*Attorneys for Defendant*
*Sanofi-Aventis U.S. LLC*


                                                      */s/ Joshua Podoll*
*/s/ Andrew Yaphe*                                    Joshua Podoll
Andrew Yaphe                                          *Attorney for Defendant*
*Attorney for Defendant*                              *CVS Caremark*
*Novo Nordisk Inc.*


                                                      */s/ Kelley Barnaby*
*/s/ Ryan Moorman*                                    Kelley Barnaby
Ryan Moorman                                          *Attorney for Defendant*
*Attorney for Defendant*                              *OptumRx*
*Eli Lilly*