Jennifer M. Studebaker
Tanya D. Ellis (*Admitted pro hac vice*)
Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201
Telephone: (601) 960-8600
Fax: (601) 960-8613
jennifer.studebaker@formanwatkins.com
tanya.ellis@formanwatkins.com

Anna Schneider
Bureau Chief, Office of Consumer Protection
Montana Department of Justice
P.O. Box 200151
Helena, Montana 59620-0151
Telephone: (406) 444-4500
anna.schneider@mt.gov

W. Lawrence Deas (*Admitted pro hac vice*)
Liston & Deas, PLLC
605 Crescent Boulevard
Ridgeland, Mississippi 39157
Telephone: (601) 981-1636
lawrence@listondeas.com

Matthew C. McDonald (*Admitted pro hac vice*)
David Nutt & Associates, PC
605 Crescent Boulevard
Ridgeland, Mississippi 39157
Telephone: (601) 898-7302
mattm@davidnutt.com

Josh Wackerly (*Admitted pro hac vice*)
The Cicala Law Firm PLLC
101 College Street
Dripping Springs, Texas 78620
Telephone: (512) 275-6550
josh@cicalapllc.com

***Attorneys for Plaintiff***

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MONTANA
## HELENA DIVISION

THE STATE OF MONTANA, *EX.*
*REL.*, AUSTIN KNUDSEN,
ATTORNEY GENERAL

        *PLAINTIFF,*

        V.

ELI LILLY AND COMPANY; ET AL

        *DEFENDANTS.*

Case No. 6:22-CV-00087-BMM-JTJ

**PLAINTIFF'S OPPOSITION TO
PHARMACY BENEFIT
MANAGERS' MOTION TO
DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................v

I.  INTRODUCTION ............................................................................1

II.  FACTUAL ALLEGATIONS............................................................3

III.  LEGAL STANDARD ......................................................................7

IV.  ARGUMENT....................................................................................7

    A.  The State Has Sufficiently Pled Its MCPA Claims..............................7

        i.  The PBMs Have Engaged in Deceptive Trade Practices under the MCPA. ..................................................................8

        ii.  The PBMs' Misconduct Was Unfair under the MCPA............11

    B.  The PBMs' Counterarguments Are Unavailing..................................15

        i.  The State's Claims Are Not Barred by the Statute of Limitations ...................................................................15

        ii.  The State's Claims Are Properly Pled ......................................20

            1.  Rule 9(b) Does Not Apply to the State's Claims ..........20

            2.  The State Does Not Engage in Improper "Group Pleading"..........................................................................21

        iii.  The PBMs' Misrepresentations Are Actionable......................23

            1.  The PBMs' Misrepresentations Are More Than Puffery or Aspirational Statements ................................23

            2.  *Noerr-Pennington* Does Not Apply...............................27

        iv.  The Alleged PBM Conduct Falls Within the MCPA's Scope .......................................................................................28

    C.  The State Has Properly Pled Unjust Enrichment ...............................29

    D.  The State Has Established Its Claim for Civil Conspiracy .................34

E.     The State Sufficiently Pleads its Claims Against the Parent
Companies and OptumInsight ............................................................. 35

**VI.    CONCLUSION** ............................................................................... **38**

# TABLE OF AUTHORITIES

## Cases

*Alpine Bank v. Hubbell*,
    555 F.3d 1097 (10th Cir. 2009) ........................................................................25

*Anderson v. Boyne USA, Inc*., No. 21-cv-95,
    2023 U.S. Dist. LEXIS 29638 (D. Mont. Feb. 22, 2023)............................. 16, 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................7

*Associated Management Services, Inc. v. Ruff*,
    424 P.3d 571 (Mont. 2018)..................................................................................30

*Austin v. Budget Rental Car, Inc.*,
    No. 20-cv-6229, 2020 WL 8614183 (N.D. Cal. Sept. 17, 2020) .......................22

*Baird v. Norwest Bank*,
    255 Mont. 317 (Mont. 1992) ...........................................................................7, 29

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................................7

*Bly-Magee v. California*,
    236 F.3d 1014 (9th Cir. 2001) .............................................................................21

*Christian v. Atl. Richfield Co.*,
    358 P.3d 131 (Mont. 2015)...................................................................................16

*Circle Click Media LLC v. Regus Mgmt. Group LLC*,
    No. 12-cv-4000, 2013 U.S. Dist. LEXIS 1604 (N.D. Cal. Jan. 3, 2013) ...........26

*City of Miami v. Eli Lilly and Co.*
    No. 21-cv22636, 2022 WL 198028 (S.D. Fla. Jan. 21, 2022)...................... 18, 19

*Cordis v. Allstate Ins. Co.*,
    No. 05-cv-19, 2006 WL 8435851 (D. Mont. Jan. 27, 2006)...............................38

*Diamond v. Hogan Lovells US LLP,*
    883 F.3d 1140 (9th Cir. 2018) .............................................................................31

*Ebeid ex rel. United States v. Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) ...................................................................... 21, 22

*F.T.C. v. Gill*,
    265 F.3d 944 (9th Cir. 2001) ................................................................. 26

*Friedman v. Nationwide Ins. Co. of Am.*,
    No. 16-cv-7363, 2017 U.S. Dist. LEXIS 236227 (C.D. Cal. Feb. 9, 2017) ....... 25

*FTC v. Cyberspace.com, LLC*,
    453 F.3d 1196 (9th Cir. 2006) .............................................................. 26

*FTC v. Direct Mktg. Concepts, Inc.*,
    624 F.3d 1 (1st Cir. 2010) .................................................................... 26

*FTC v. Hornbeam Special Situations, LLC*,
    308 F. Supp. 3d 1280 (N.D. Ga. 2018) .................................................. 20

*FTC v. IFC Credit Corp.*,
    543 F. Supp. 2d 925 (N.D. Ill. 2008) ...................................................... 8

*Griffin v. HSBC Mortgage Services, Inc.*,
    No. 4-cv-132, 2016 WL 1090578 (N.D. Miss. Mar. 18, 2016) ......................... 31

*Hall v. SeaWorld Ent., Inc.*,
    No. 15-cv-660, 2015 WL 9659911 (S.D. Cal Dec. 23, 2015) ........................... 21

*Haskett v. American Home Centers, LLC*,
    No. 21-cv-68, 2022 WL 11805576 (D. Mont. Oct. 20, 2022) ...................... 8, 20

*Hein v. Sott*,
    380 Mont. 85 (Mont. 2015) ...................................................... 15, 17

*In re Apple Inc. Sec. Litig.*,
    No. 19-cv-2033, 2020 WL 2857397 (N.D. Cal. June 2, 2020) ......................... 28

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................................... 20

*In re Cattle Antitrust Litig.*,
    2021 WL 7757881 (D. Minn. Sept. 14, 2021) ......................................... 20

*In re Direct Purchaser Insulin Pricing Litig.,*
    No. 20-cv-3426, 2021 WL 28862165 (D.N.J. July 9, 2021) .............................27

*In re EpiPen Direct Purchaser Litig.,*
    No. 20-cv-827, 2021 WL 147166 (D. Minn. Jan. 15, 2021) .............................27

*In re Insulin Pricing Litig.*,
    No. 17-cv-699 (D.N.J. Feb. 2, 2017) .................................................................18

*Inga v. Bellacor*,
    2020 U.S. Dist. LEXIS 1882970,  (C.D. Cal. July 17, 2020)............................10

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
    998 F.3d 397 (9th Cir. 2021) ...........................................................................21

*Johnson v. Lucent Tech. Inc.*,
    653 F.3d 1000 (9th Cir. 2011) ......................................................................7, 37

*Kearns v. Ford Motor Co*.,
    567 F.3d 1120 (9th Cir. 2009) .........................................................................21

*LabMD, Inc. v. FTC*,
    894 F.3d 1221 (11th Cir. 2018) .......................................................................12

*Mississippi ex rel. Fitch v. Eli Lilly & Co.,*
    No. 21-cv-674, 2022 WL 3222890 (S.D. Miss. Aug. 9, 2022) ............. 11, 21, 38

*Mississippi ex rel. Fitch v. Lilly*,
    No. 21-cv-674, 2022 U.S. Dist. LEXIS 236485 (S.D. Miss. Aug. 29,
    2022) ................................................................................................ 21, 26, 38

*Moody v. Ocwen Loan Servicing, LLC*,
    No. 15-cv-5186, 2016 U.S. Dist. LEXIS 190592 (C.D. Cal. Feb. 22,
    2016) ................................................................................................................25

*Morrow v. Bank of America*, N.A.,
    375 Mont. 38 (Mont. 2014) .............................................................................12

*Navient Sols. LLC v. Law Offices of Jeffrey Lohman,*
    No. 19-cv-461, 2020 WL 1867939 (E.D. Va. Apr. 14, 2020)...........................28

*Paatalo v. J.P. Morgan Chase Bank, N.A*.,
    No. 10-cv-119, 2011 WL 13130862 (D. Mont. May 18, 2011)........................34

*Parvin v. CNA Fin. Corp.*,
    646 Fed. Appx. 562 (9th Cir. 2016).....................................................28

*Pfau v. Mortenson*,
    858 F. Supp. 2d 1150 (D. Mont. 2012)...............................................22

*Rohrer v. Knudson*,
    203 P.3d 759 (Mont. 2009).............................................................9, 12

*Rustad v. Bank of Am. Corp.*,
    No. 16-cv-72, 2017 U.S. Dist. LEXIS 61338, at *10 (D. Mont. Apr. 20,
    2017) ......................................................................................................16

*Silingo v. Wellpoint, Inc.*,
    904 F.3d 667 (9th Cir. 2018) ...............................................................22

*Sterling Drug, Inc. v. FTC*,
    741 F.2d 1146 (9th Cir. 1984) .............................................................26

*Sternhagen v. Dow Co.*,
    711 F. Supp. 1027 (D. Mont. 1989).....................................................19

*Tri-Tron International v. Velto*,
    525 F.2d 432 (9th Cir. 1975) ...............................................................11

*U.S. v. Corinthian Colleges*,
    655 F.3d 984 (9th Cir. 2011) ...............................................................22

*United States v. Alameda Gateway Ltd.*,
    213 F.3d 1161 (9th Cir. 2000) .............................................................28

*United States v. Bestfoods*,
    524 U.S. 51 (1998)...............................................................................36

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
    728 F.3d 354 (4th Cir. 2013) ...............................................................27

**Statutes**

MONT. CODE ANN § 30-14-111 .................................................................36

MONT. CODE ANN. § 27-2-102 ...................................................................15

MONT. CODE ANN. § 27-2-202 ...................................................................15

MONT. CODE ANN. § 27-2-211 ................................................................15

MONT. CODE ANN. § 30-14-103 ...................................................... passim

MONT. CODE ANN. § 30-14-104 ..........................................................8, 20

MONT. CODE ANN. § 33-2-2401, *et seq.* ..............................................13

MONT. CODE ANN. § 33-2-2405 ..............................................................13

MONT. CODE ANN. § 33-2-2406 ..............................................................13

MONT. CODE ANN. § 33-2-2407 ..............................................................13

## Other Authorities

Ellis Juhlin,
  *Bill to cap insulin at $35 passes state senate with bipartisan support*,
  MTPR (Mar. 2, 2023), https://www.mtpr.org/montana-news/2023-03-
  02/bill-to-cap-insulin-at-35-passes-state-senate-with-bipartisan-support ..........14

Federal Trade Commission, *Rebates and Fees in Exchange for Excluding
  Lower-Cost Drug Products* (June 16, 2022),
  https://www.ftc.gov/system/files/ftc_gov/pdf/Policy%20Statement%20of
  %20the%20Federal%20Trade%20Commission%20on%20Rebates%20an
  d%20Fees%20in%20Exchange%20for%20Excluding%20Lower-
  Cost%20Drug%20Products.near%20final.pdf. ...................................................14

Restatement (Third) of Restitution and Unjust Enrichment, § 48 (2011) ..............31

S.B. 340, 68th Cong. (Mont. 2023)..........................................................13

## Rules

FED. R. CIV. P. 12(b)(6)...........................................................................7

FED. R. CIV. P. 15(a)(2) .........................................................................39

FED. R. CIV. P. 8 .....................................................................................21

Fed. R. Civ. P. 9(b) .................................................................. 20, 21, 22

MONT. ADMIN. R. 23.19.101 .......................................................... 8, 9, 10

# I.    INTRODUCTION

The Insulin Pricing Scheme has had a direct and devastating impact on Montana diabetics and the State. As a result of Defendants' scheme, insulin—a drug that was first introduced one-hundred years ago, a drug that tens of thousands of Montana diabetics need to stay alive, and a drug that could be profitably priced at under $2—now costs over $400. (¶¶ 234, 430).[1]

The consequence to Montana public health and the public treasury from the Insulin Pricing Scheme cannot be overstated. The insulin price increases have caused dire health and financial consequences for diabetics and significant economic harm to the State. Both sets of Defendants—the Manufacturers[2] ("Manufacturers" or "Manufacturer Defendants") and the PBMs[3] ("PBMs" or "PBM Defendants")—are independently and jointly liable for their unfair and deceptive conduct that gave rise to these substantial harms. Yet rather than engage on the merits of the State's

---

[1] All references herein to (¶) are citations to the paragraphs of the First Amended Complaint (Dkt. 40), referred to herein as the "complaint."

[2] The Manufacturer Defendants are Eli Lilly and Company ("Eli Lilly"), Sanofi-Aventis U.S. LLC ("Sanofi"), and Novo Nordisk Inc. ("Novo Nordisk"). (¶ 83). The complaint identifies the at-issue drugs in Table 1.

[3] The PBM Defendants are (a) Evernorth Health Inc., Express Scripts Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy Inc., and Medco Health Solutions Inc., collectively referred to as "Express Scripts"; (b) CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx LLC, CaremarkPCS Health LLC, and Caremark LLC, collectively referred to as "CVS Caremark"; and (c) UnitedHealth Group, Inc.; OptumRx Inc. and OptumInsight, Inc., collectively referred to as "OptumRx."

allegations, the PBMs' Motion to Dismiss mischaracterizes the State's claims, disregards the relevant law, and ignores dozens of allegations in the complaint.

The PBMs' Motion is extraordinary in several respects. The Motion attempts to reduce all of the PBM alleged misconduct—hiding/obfuscating manufacturer payments, excluding lower priced insulins from formularies, coordinating with the Manufacturers to increase the availability of higher-priced insulins, forcing diabetics into switching their insulins to the detriment of their health, intentionally pricing diabetics out of the insulins they need to stay alive, and lying about all of it—to a case simply about whether the rebates that the Manufacturers pay to the PBMs are legal or not. This argument is disingenuous and disallowed at the pleading stage.

The Motion also asserts arguments that have been rejected by several federal courts that have considered insulin related claims, including a recent opinion in a case brought by the Mississippi Attorney General against these same PBMs. It disregards the majority of relevant Montana Unfair Trade Practices and Consumer Protection Act ("MCPA") holdings. And it incongruously—and incorrectly—argues for a heightened pleading standard and then ignores dozens of allegations that plead misrepresentations with the particularity that the PBMs assert is lacking.

The PBMs' arguments for dismissal are unsupported and meritless. Taking all the complaint's allegations as true and construing them in favor of the State, respectfully, the PBM's Motion should be denied.

## II.    FACTUAL ALLEGATIONS

There are two sets of actors responsible for the Insulin Pricing Scheme: the three drug Manufacturer Defendants who control 99% of the diabetic drug market (¶¶ 245–246, 258) and the three PBM Defendants who control the terms of over 270 million Americans' pharmacy benefits and operate among the largest retail and mail order pharmacies in the country (including in Montana). (¶¶ 313–314, 316). Given their unusual power in this concentrated market, these Defendants control the price that nearly every diabetic and payor pays for the diabetic treatments at issue in this case. (¶¶ 27, 463).

Each Defendant, individually and in concert, has deliberately caused the prices of the at-issue drugs to artificially inflate in order to generate profits at the expense of Montana diabetics. (¶¶ 18–26, 355, 433–434, and Figs. 1-11 at ¶¶16, 268–281). As a direct result of the PBMs' conduct, the list prices for these diabetic drugs have become so inflated and untethered from the actual prices paid to the Manufacturers as to constitute false prices. (¶¶ 18–19, 21, 27, 349, 424). The PBMs then insist that these prices be used as the basis for all payments they make and receive and, in doing so, ensure that the egregious price inflation harms diabetics. (¶¶ 22, 51–54, 65-68, 79–82, 119, 172, 212, 350, 426–428, 435).

The result is nothing short of catastrophic, both in terms of cost and public health. (¶¶ 28–34, 467–483). Tens of thousands of diabetic Montana residents rely

on the at-issue drugs for health and even survival. (¶¶ 4, 220). Given the degree of price inflation caused by Defendants' misconduct, many diabetics have been forced to extreme measures: rationing or underdosing their insulin, injecting expired insulin, or even starving themselves to control their blood sugars. (¶¶ 30, 479). Indeed, notwithstanding their general inclination to blame each other, the Manufacturers and PBM Defendants do at least agree on one key fact: the current price of insulin is unjustifiably high and denies diabetics access to these essential drugs. (¶¶ 357–358). The financial harm is likewise undeniable. Nearly every diabetic and payor has been directly harmed because their payments are based on the inflated list prices generated by Defendants' misconduct. (¶¶ 22, 27, 397–413).

Each PBM Defendant is responsible for ensuring these harms occur. More specifically, each PBM develops standard formularies that establish which diabetes medications are covered and paid for by insurance and which are not. (¶¶ 7–9, 339–341). Given their market dominance, each PBM wields enormous control over the at-issue drug sales, as their formularies drive utilization of diabetic drugs. (¶¶ 6–11, 463). No drug is dispensed unless it is paid for, and the PBM Defendant formularies are the keys to such payment. (¶¶ 7, 10–11, 340–341).

Cognizant of this fact—and cognizant that PBMs make more money from higher prices—the Manufacturer Defendants intentionally raise their prices and then pay significant sums back to the PBMs in the form of rebates, administrative fees,

4

and other consideration ("Manufacturer Payments") to ensure favorable placement of their diabetes drugs on PBM formularies. (¶¶ 19–20, 23, 375–376, 435). The PBMs, in turn, grant preferred formulary status to the drugs with the highest list price and largest Manufacturer Payments and, in turn, exclude lower priced, more affordable insulins from their formularies. (¶¶ 22, 348). The PBMs also intentionally hide, obfuscate, and launder these payments through their affiliated entities in order to keep a large percentage of these payments (¶¶ 378, 382–401, 456–461). The PBMs further engage in a practice known as "non-medical switching"—changing which insulins they make available on their formularies in order to generate additional profits—to the significant detriment of diabetics' health. (¶¶ 480–481).

Both the Manufacturers and PBMs then work together to promote the highest priced diabetic drugs to patients, pharmacies and prescribing physicians because they are the most profitable to Defendants, further increasing utilization of the very diabetes medications they have caused to be so unnecessarily expensive. (¶ 354).

Each PBM Defendant is intentionally driving up the prices for the at-issue drugs because they profit in numerous ways from the inflated prices. (¶¶ 24, 379–413). The PBMs ensure that the inflated prices also serve as the basis for the prices paid by payors and diabetics. (¶¶ 435–436). Through mail-order and retail pharmacies, each of the PBMs knowingly utilize the inflated list prices to set the out-

of-pocket amounts that Montana diabetics pay to obtain their diabetes medications. (¶¶ 284, 291–292, 303, 414, 417).

And, critically, each PBM Defendant obscures these truths. Indeed, each PBM holds itself out as doing the exact opposite of what the State alleges—each PBM Defendant misrepresents that it (1) uses its market power and formularies to lower the prices of diabetes medications and (2) chooses drugs for formulary placement that promote the health of diabetics. (¶ 87–89, 137, 185, 351, 355, 368–369, 413, 438–448, 454, 464, 513). Each PBM made these misrepresentations to the public, to diabetics, to Wall Street, to Congress and directly to the State. *Id*. Each PBM representation is false. (¶¶ 441–442, 513). Even in their moving brief, the PBMs endeavor to maintain this fiction arguing "PBMs contract with health plans and third party payors to administer prescription drug benefits, which includes providing customizable drug formularies and negotiating rebates and discounts with drug manufacturers to offset the list price of drugs and lower net costs to clients." (Dkt. 97 at 1). This assertion is directly contradicted by the State's allegations.

To this day the PBMs continue to profit from and engage in the Insulin Pricing Scheme. (¶¶ 471, 483) The harm caused by the Scheme is ongoing; each time the State or a Montana diabetic pays the artificially inflated price for insulin, a new injury is sustained. *Id*.

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, the Complaint must contain sufficient factual matter to state a claim for relief that appears plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A claim appears plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

The Court must accept all allegations of material fact contained in the complaint as true when evaluating a Rule 12(b)(6) motion. *Johnson v. Lucent Tech. Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011). The Court does not weigh the facts at the Rule 12(b)(6) stage, but merely assesses the sufficiency of the plaintiff's allegations. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The Court must look at the facts in the light most favorable to the plaintiff when considering a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 678.

## IV. ARGUMENT

### A. The State Has Sufficiently Pled Its MCPA Claims

The MCPA "prohibits unfair or deceptive practices in commercial conduct." *Nelson v. Forest River, Inc.*, No. 22-cv-49, 2023 U.S. Dist. LEXIS 49856, at *17-18 (D. Mont. Mar. 23, 2023) (Morris, J) (citing MONT. CODE ANN. § 30-14-103). In applying its terms, courts should interpret the MCPA "to be broad in scope and flexible in application so as to respond to human inventiveness." *Baird v. Norwest Bank*, 255 Mont. 317, 327 (Mont. 1992).

7

Violations of the MCPA may occur through deceptive trade practices, unfair trade practices, or both. *See Haskett v. American Home Centers, LLC,* No. 21-cv-68, 2022 WL 11805576, at *4 (D. Mont. Oct. 20, 2022) (Morris, J.); *see also FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 934 n.2 (N.D. Ill. 2008) ("[Section 5] contemplates two distinct practices, those that the FTC deems to be 'unfair' and those it deems to be 'deceptive.' A practice may be unfair without being deceptive.")[4]

The State alleges that the PBM Defendants' misconduct is both deceptive and unfair under the MCPA. (¶¶ 513–516, 517).

### i.   The PBMs Have Engaged in Deceptive Trade Practices under the MCPA.

The MCPA prohibits any deceptive trade practices that affect commerce in Montana. MONT. CODE ANN. § 30-14-103. The MCPA does not specifically define what constitutes a deceptive trade practice; rather the Montana legislature has authorized the Montana Department of Justice to "make rules interpreting" deceptive conduct under the MCPA. MONT. CODE ANN. § 30-14-104(2). The Department of Justice has accordingly specified by rule a non-exhaustive list of unlawful or deceptive trade acts and practices. MONT. ADMIN. R. 23.19.101. The Montana

---

[4] The Montana legislature intended the MCPA to be construed with "due consideration and weight . . . [given] to the interpretations of the federal trade commission and the federal courts relating to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C.A. § 45(a)(1))." MONT. CODE ANN. § 30-14-104 (1).

Supreme Court has further instructed that when confronted with a matter of first impression under the MCPA, courts should look to precedent from other jurisdictions that have consumer protection acts patterned after § 5(a)(1) of the FTC Act. *See Rohrer v. Knudson*, 203 P.3d 759, 763–64 (Mont. 2009).

Here, the State alleges that PBM Defendants repeatedly represent—in their SEC filings, before Congress, to the public, and directly to clients/diabetics—that their formularies have the characteristic and benefit of lowering the price of the at-issue drugs and promoting the health of diabetics. (¶¶ 87, 137, 154–155, 174, 185, 201, 214, 438–450). These representations are false. Rather, the PBMs prefer higher priced diabetes medications and exclude lower priced insulins from their formularies because they make more money off higher list price drugs. (¶¶ 22, 25-26, 337, 348, 451). The PBMs' conduct has significantly increased prices and detrimentally impacted the health of diabetics. (¶¶ 472–83, Figs. 1-11). Such misconduct violates the MCPA. *See* MONT. CODE ANN. § 30-14-103; MONT. ADMIN. R. 23.19.101(e) (making false representations as to characteristics or benefits is a deceptive trade practice).

The State further alleges that the PBMs misrepresent that the Manufacturer Payments they receive reduce the price of the at-issue drugs for diabetics and payors, when in fact these Payments are driving up the price. (¶¶ 26, 154, 369–70, 380–402). The PBMs also use the artificially inflated list price to misrepresent the amount of

savings they generate for diabetics, payors, and the healthcare system, knowing that they are directly responsible for the inflated list price and knowing that the inflated price is not a *bona fide* price at which diabetes medications are offered to the public. (¶¶ 351–53). Both of these acts also constitute deceptive trade practices under the MCPA. *See* MONT. CODE ANN. § 30-14-103; MONT. ADMIN. R. 23.19.101(k) (making false and misleading statements concerning price or the reason for price is an MCPA violation); MONT. ADMIN. R. 23.19.101(p) (employing deceptive pricing practices including false price comparisons is an MCPA violation); *see also Inga v. Bellacor*, 2020 U.S. Dist. LEXIS 188297, at *10, (C.D. Cal. July 17, 2020) (finding a scheme that employed false prices to exaggerate "savings" generated for consumers to be deceptive).

In addition to being liable for their own misconduct, the PBMs are also liable for that of the Manufacturer Defendants as their co-conspirators to the Insulin Pricing Scheme. (¶¶ 354, 534-537); *see infra* at 34-35. As explained in the State's Response to the Manufacturers' 12(b)(6) Motion, the Manufacturers engaged in deceptive trade practices by publishing inflated prices for the at-issue drugs which are untethered from the actual price the Manufacturers were paid for the drugs. *See generally* Pl.'s Opp'n to Mfr. Defs' Mot. to Dismiss ("Manufacturer Response");[5]

---

[5] The State incorporates by reference herein Plaintiff's Memorandum in Opposition to Manufacturers' Motion to Dismiss First Amended Complaint Under FED. R. CIV. P. 12(b)(6).

*see also Mississippi ex rel. Fitch v. Eli Lilly & Co.,* No. 21-cv-674, 2022 WL 3222890, at *13 (S.D. Miss. Aug. 9, 2022) (finding the Manufacturers engaged in deceptive practices by "report[ing] exaggerated prices, knowing that other entities, included the State, relied on these prices."). The PBMs ensured that these artificially inflated prices harm diabetics and payors by intentionally utilizing the inflated prices to set the price paid by virtually all payors, including the State and Montana diabetics. (¶¶ 22, 27, 119, 172, 212). Thus, the PBMs are also jointly and severally liable for the Manufacturers' deceptive trade practices. *See Tri-Tron International v. Velto*, 525 F.2d 432, 438 (9th Cir. 1975) ("The utility of a civil conspiracy claim is that it permits a plaintiff to expand the number of persons who may be liable to him, under its doctrine that liability exists whether or not damage results from a person's direct action and regardless of the degree of his activity.")

The State has sufficiently alleged that the PBMs engaged in deceptive trade practices under the MCPA.

### ii.    The PBMs' Misconduct Was Unfair under the MCPA.

Under the MCPA, an "unfair act or practice is one which offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or

11

substantially injurious to consumers." *Rohrer,* 203 P.3d at 764. The State has sufficiently alleged both prongs of this unfairness standard.[6]

First, the State has alleged—and the PBMs' do not dispute—that the Insulin Pricing Scheme is substantially injurious to consumers. As detailed above, the PBMs grant preferred formulary status to higher priced at-issue drugs; exclude lower priced, more affordable insulins; hide and obfuscate Manufacturer Payments; and engage in "non-medical formulary switching" to generate additional profits. All of this conduct significantly raises the price of the at-issue drugs and damages diabetics' health. (¶¶ 27-34, 467-483).

In addition, the PBMs' misconduct offends established public policy as reflected in Montana law and recent FTC actions. For example, in January 2022, the Montana Pharmacy Benefit Manager Oversight Act became effective. MONT. CODE

---

[6] The PBMs argue that the State has failed to plead an "unfair trade practice" because the complaint "does not allege any conduct by the PBMs that is contrary *established* constitutional, statutory, or regulatory provision." Dkt. 97 at 18–19 (citing *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 & n.24 (11th Cir. 2018)) (emphasis in original). To note, the PBMs' advocated "unfairness" standard goes beyond what is required in Montana; the Montana Supreme Court has never required a showing that Defendants' conduct violates a constitutional, statutory, or regulatory provision. *See, e.g.*, *Morrow v. Bank of America*, *N.A.*, 375 Mont. 38, 56–59 (Mont. 2014) (finding a defendant bank's conduct in making conflicting representations that resulted in foreclosure "unfair" because it was "substantially injurious to consumers" without citing to any additional constitutional, statutory, or regulatory violations). Moreover, for the reasons explained in this section, the PBMs argument is otherwise unconvincing.

ANN. § 33-2-2401, *et seq.*[7] The Act reflects public policy concerns that relate directly to the issues in this case. For example, the Act:

- Prohibits PBMs from engaging in misleading marketing and advertising; *id*. at § 33-2-2405 (*see* ¶¶ 441-43, allegations of misleading marketing and advertising);

- Requires the PBMs to disclose upon request the dollar amount of all rebates and fees received from the Manufacturers for the PBM's clients related to diabetes medications. *Id*. at § 33-2-2406(c) & (d); (*see* ¶¶ 380–402, allegations that PBMs are not transparent with Manufacturer Payments); and

- Requires PBMs to submit a transparency report to the Montana Insurance Commissioner's Office (which includes requiring PBMs to aggregate prescription drug spending net of all rebates and other fees). *Id*. at § 33-2-2407 (*see* ¶¶ 444-46, 456-64, allegations of lack of transparency). [8]

---

[7] On a motion to dismiss, Courts may take judicial notice of "information . . . made publicly available by government entities." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)

[8] In addition, Montana's Senate recently passed "Act Establishing Limits on Insurance Cost-Sharing Amounts for Insulin Prescription," S.B. 340, 68th Cong. (Mont. 2023), which caps insulin copay costs at $35 a month. The bill further demonstrates the public policy in Montana for diabetics and their families to have

In addition, the MCPA expressly states that courts should give "due consideration and weight" to interpretations of § 5(a)(1) of the FTC Act by the FTC. To that end, on June 16, 2022, the FTC issued a policy statement that directly addresses the PBMs' conduct at issue here, titled, *Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products*.[9] In this policy statement, the FTC concluded that "inducing PBMs or other intermediaries to place higher-cost drugs on formularies instead of less expensive alternatives in a manner that shifts costs to payers and patients" may constitute unfair trade practices under Section 5 of the FTC Act.[10] The policy statement went on to "highlight insulin . . . as a prominent example of a prescription drug impacted by high rebates and fees to PBMs and other intermediaries."[11] Accordingly, this FTC policy statement explicitly reflects a public policy against using rebates and formulary construction to drive up the price of insulins and other diabetic treatments.

---

access to and not be priced out of the at-issue life-saving medications. *See* Ellis Juhlin, *Bill to cap insulin at $35 passes state senate with bipartisan support*, MTPR (Mar. 2, 2023), https://www.mtpr.org/montana-news/2023-03-02/bill-to-cap-insulin-at-35-passes-state-senate-with-bipartisan-support.

[9] https://www.ftc.gov/system/files/ftc_gov/pdf/Policy%20Statement%20of%20the%20Federal%20Trade%20Commission%20on%20Rebates%20and%20Fees%20in%20Exchange%20for%20Excluding%20Lower-Cost%20Drug%20Products.near%20final.pdf

[10] *Id.* at 5.

[11] *Id.* at 2

At minimum, the State has "sufficiently raise[d] the question whether the [PBMs] acted in a manner contrary to 'established public policy.'" *Nelson*, 2023 U.S. Dist. LEXIS 49856, at *18. Respectfully, the PBMs' motion on the State's MCPA claims should be denied.

## B. The PBMs' Counterarguments Are Unavailing

### i. The State's Claims Are Not Barred by the Statute of Limitations

The statute of limitations for the State's claims brought under the MCPA is two (2) years, and three (3) years for its unjust enrichment claims. *Hein v. Sott*, 380 Mont. 85, 89–90 (Mont. 2015) (citing MONT. CODE ANN. § 27-2-211(1)(c) (two-year period MCPA); MONT. CODE ANN. § 27-2-202(3) (three year period unjust enrichment)). Under Montana law, a claim or cause of action usually begins to run "when all elements of the claim or cause exist or have occurred." MONT. CODE ANN. § 27-2-102(1)(a).

There are, however, several well-known exceptions to this accrual rule that are applicable to the State's claims. First, Montana law has codified the discovery rule tolling doctrine. *See* MONT. CODE ANN. § 27-2-102(3). Under the discovery rule, the limitations period does not begin to run on any cause of action when the facts constituting a claim are concealed by their nature, or when "after causing the injury, a defendant has taken an action that prevents an injured party from discovering the

injury or its cause." *Anderson v. Boyne USA, Inc*., No. 21-cv-95, 2023 U.S. Dist. LEXIS 29638, at * 9–10 (D. Mont. Feb. 22, 2023) (Morris, J).

Here, the State alleges in detail both that the State's claims have been concealed by the nature of the opaque pharmaceutical pricing system (¶¶ 295-304), and that the PBMs have taken action to prevent the State from discovering the cause of their injuries. (¶¶ 368, 395, 456-62, 497-509). As explained in the Manufacturer Response, it was not until the release of the January 2021 Senate Insulin Report (and Insulin Pricing Scheme documents released contemporaneously) that the State had notice of Defendants' Insulin Pricing Scheme. *See* Manufacturer Response at 39-40. The discovery rule tolls the limitation period on all of the State's claim until at least then, and the State filed this lawsuit less than two years later, on September 29, 2022.

Montana courts also recognize the "continuing tort" tolling doctrine. *See Christian v. Atl. Richfield Co.*, 358 P.3d 131, 140 (Mont. 2015). "A continuing tort is one that is not capable of being captured by a definition of time and place of injury because it is an active, progressive and continuing occurrence." *Id.*. Although the doctrine is most frequently associated with nuisance and trespass claims, courts have relied on it to toll limitations period for other torts as well. *See, e.g., Anderson*, 2023 U.S. Dist. LEXIS 29638, at *10 (applying continuing tort to constructive fraud claims); *Rustad v. Bank of Am. Corp*., No. 16-cv-72, 2017 U.S. Dist. LEXIS 61338, at *10 (D. Mont. Apr. 20, 2017) (applying continuing tort to negligence and

negligent misrepresentation claims). Indeed, this Court recently found that the two-year limitation period for constructive fraud was tolled so long as the harms "continued to accumulate" because the misconduct was ongoing. *Anderson*, 2023 U.S. Dist. LEXIS 29638, at *10.

Here, the continuing tort doctrine applies because the State has pled that the Insulin Pricing Scheme continues to pollute the diabetic drug pricing system and the harms to the State and Montana diabetics are ongoing. (¶¶ 220, 471, 483, 489, 496, 509). Indeed, Defendants "cannot escape liability for ongoing, illegal action just because [they] ha[ve] been engaging in that conduct for many years." *Anderson*, 2023 U.S. Dist. LEXIS 29638, at *12.

Finally, Montana courts have held that the statute of limitations does not bar suit if some of the alleged wrongs occurred within the limitations period. *See Hein*, 380 Mont. at 90. As discussed in the Manufacturer Response and above, the State has alleged that the PBMs' deceptive and unfair conduct in furtherance of the Insulin Pricing Scheme and the related harms continue to this day.

The PBMs argue that the Court should disregard the above tolling doctrines because the State allegedly should have known about its claims "more than six years ago." Dkt. 97 at 8. The PBMs' argument is primarily based on the filing of a putative

consumer class complaint[12] in New Jersey which—according to the PBMs—should have somehow put the State on notice of its claims. [13]

Notably, this notice argument was categorically rejected by a Florida federal judge in *City of Miami v. Eli Lilly and Co*. No. 21-cv22636, 2022 WL 198028, at *11 (S.D. Fla. Jan. 21, 2022). In the *City of Miami,* the City sued the Manufacturer and PBM Defendants on an antitrust theory related to increasing insulin prices. *Id*. The PBMs, represented by the same counsel here, asserted the same limitations argument related to New Jersey class filing as here. In rejecting the argument, the Southern District of Florida stated:

> Defendants do not cite any cases to support the proposition that a plaintiff should have discovered the facts giving rise to their claim merely because a similar lawsuit was filed in another jurisdiction. The Defendants do not argue that this New Jersey-based litigation was widely publicized; therefore, the Court is left to assume that the Defendants argue that reasonable diligence means plaintiffs must trawl court filings across the country for suits involving different plaintiffs with claims that may involve similar facts. Without any authority in support, the Court will not apply such a stringent understanding of reasonable diligence. Rather, the City has adequately pled that it could not have earlier discovered facts giving rise to its fraudulent-antitrust-

---

[12] To note, the PBMs are not defendants in this consumer class case. *See* Complaint, *In re Insulin Pricing Litig.*, No. 17-cv-699 (D.N.J. Feb. 2, 2017), Dkt. 1.

[13] The PBMs also argue that a State Request for PBM Proposal should have put the State on notice of its claims. This argument is even less convincing. Knowing that "PBMs negotiate with rebates that flow through to their clients" certainly would not put the State on notice that the PBMs were engaged in all of the PBM misconduct in furtherance of the Insulin Pricing Scheme.

> based claims because of the opacity of the Defendants' pricing methods and the Defendants' refusal to disclose net prices.

*Id.*

The same is true here. The PBMs cite to no authority in support of this argument. Moreover, the CBS media article discussing this putative class action to which the PBMs do cite, includes statements from the PBMs specifically disavowing their role in the Insulin Pricing Scheme.[14] Neither the filing of a putative insulin class *which did not include PBMs as defendants* nor a CBS article *where the PBMs specifically denied and obfuscated their role in increasing insulin prices* could have put the State on notice of the PBMs' misconduct.[15] Moreover, determining whether the State was put on notice based on these events is a factual question not appropriately decided on a motion to dismiss. *See Sternhagen v. Dow Co.,* 711 F. Supp. 1027, 1031 (D. Mont. 1989).

The State's claims are not barred by any statute of limitations.

---

[14] https://www.cbsnews.com/news/insulin-price-hike-lawsuit-accuses-drug-makers-of-conspiring/ (Feb. 22, 2017) (which includes a statement from Express Scripts that concludes, among other things, "Main Takeaway: Rebates don't raise drug prices, drug makers raise drug prices.")

[15] To the extent that the PBMs argue that other state attorney general investigations should have put the State on notice, Dkt. 97 at 8 (citing ¶¶ 356-57), none of those investigations resulted in the release of public information, nor did the State participate in those investigations.

19

### ii. The State's Claims Are Properly Pled

Next, the PBMs argue the State's allegations fail to satisfy Rule 9(b) standards because the complaint inappropriately alleges "conduct on the part of 'Defendants,' 'PBMs', or 'PBM Defendants.'" Dkt. 97 at 10–13. This argument fails for two reasons: (1) Rule 9(b) does not apply to the State's claims and (2) the State has not engaged in improper group pleading.

### 1. Rule 9(b) Does Not Apply to the State's Claims

Rule 9(b) applies when a party is alleging "fraud or mistake." FED. R. CIV. P. 9(b). As this Court has recognized, the MCPA "does not limit itself to deception-based conduct." *Haskett,* 2022 WL 11805576, at *4. As a result, courts have determined that Rule 9(b)'s heightened pleading standard is not applicable to MCPA claims. *See In re Cattle Antitrust Litig.,* 2021 WL 7757881, at *12 n. 22 (D. Minn. Sept. 14, 2021) (refusing to apply Rule 9(b) to a MCPA claim); *In re Broiler Chicken Antitrust Litig.,* 290 F. Supp. 3d 772, 820 (N.D. Ill. 2017) (rejecting application of Rule 9(b) to a claim brought under MCPA's "unfair[ness] prong"); *FTC v. Hornbeam Special Situations, LLC,* 308 F. Supp. 3d 1280, 1287 (N.D. Ga. 2018) (holding Rule 9(b) does not apply to FTC Act claims).[16] Indeed, Defendants fail to

---

[16] The MCPA instructs courts to afford due consideration and weight to federal courts' interpretation of FTCA when interpreting its provisions. *See* MONT. CODE ANN. § 30-14-104.

cite to a single case where a court applied Rule 9(b)'s heightened standard to an MCPA claim.[17] Rule 8's plausibility standard applies to the State's MCPA claims.

Even if Rule 9(b) did apply (it does not), as demonstrated throughout this Response, the State has pled its MCPA claims with requisite particularity. *See, e.g., Mississippi ex rel. Fitch v. Lilly*, No. 21-cv-674, 2022 U.S. Dist. LEXIS 236485, at *14 (S.D. Miss. Aug. 29, 2022) (ruling the State of Mississippi's Insulin Pricing Scheme claims were pled with particularly).[18]

### 2.    The State Does Not Engage in Improper "Group Pleading"

The PBMs' "group pleading" argument should be dismissed out of hand—the PBMs cite to only seven paragraphs for support, Dkt. 97 at 11 (citing to ¶¶ 443, 513–518), while disregarding the nearly 80 allegations that set forth the specific conduct

---

[17] *See* Dkt. 97 at 10–11 (citing *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125 (9th Cir. 2009) (California consumer protection statutes); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (federal False Claims Act claims); *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (federal False Claims Act claims); *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 404 (9th Cir. 2021) (Securities Exchange Act claims); *Hall v. SeaWorld Ent., Inc*., No. 15-cv-660, 2015 WL 9659911, at *10 (S.D. Cal Dec. 23, 2015) (California, Texas, and Florida consumer protection statutes).

[18] Notably, in *Mississippi* the Southern District of Mississippi did not apply Rule 9(b) to the Mississippi consumer protection claims, but nonetheless found that particularity was satisfied. *See Mississippi,* 2022 U.S. Dist. LEXIS 236485, at *12-14 ("[t]hough liability under the MCPA does not require a finding of fraud for an act to be unfair or deceptive . . . the Court finds that the State's allegations also survive the Rule 9(b) particularity standard.")

of each PBM Defendant in furtherance of the Insulin Pricing Scheme. (¶¶ 86, 87 (3 allegations), 88–92, 96, 129, 133, 134, 137 (3 allegations), 154, 155, 159, 164, 167, 172, 175, 186–87, 193-95, 201, 206, 322, 343, 345, 351, 354, 358 (2 allegations), 362–64, 366, 397–400, 417–20, 441 (12 allegations), 442 (7 allegations), 443 (5 allegations), 445–47, 449 (4 allegations). *See also infra* at 35-38 (explaining the State's allegations against the PBM Defendant parent companies).

To the extent that the complaint does refer to "PBMs" or "PBM Defendants," such "group pleading" is permissible where, as here, Defendants committed the same wrongful acts. *See United States ex rel. Silingo v. Wellpoint, Inc*., 904 F.3d 667, 677 (9th Cir. 2018) ("[A] complaint need not distinguish between defendants that had the exact same role in a fraud. . .. A good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts.")[19]

---

[19] None of the PBMs' cited authorities are analogous to the case at bar. *See Ebeid*, 616 F.3d at 1000 (involved Rule 9(b) and false certification claim which required identification of the specific person that made the false certification); *Austin v. Budget Rental Car, Inc.*, No. 20-cv-6229, 2020 WL 8614183, at *2 (N.D. Cal. Sept. 17, 2020) (dismissed as frivolous because the complaint was "wholly incredible" and included allegations that Budget rental car company were stealing cars, the owners of the stolen cars recognized the cars and then engaged in vigilantism against the plaintiff, as well as allegations that Bank of America, Capital One, Mastercard, and Visa were overbilling the plaintiff an conspiring against him.); *U.S. v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (all of the allegations in the complaint attributable to "Individual Defendants" without any specific allegations); *Pfau v. Mortenson*, 858 F. Supp. 2d 1150 (D. Mont. 2012) (applying Rule 9(b) standard to RICO claims).

The State has sufficiently alleged its MCPA claims against each PBM Defendant.

### iii.    The PBMs' Misrepresentations Are Actionable

#### 1.    The PBMs' Misrepresentations Are More Than Puffery or Aspirational Statements

Next, the PBMs argue that none of the misrepresentations alleged in the complaint are actionable because they all are "generalized aspirational statements" or "mere puffery." Dkt. 89 at 12–13.

As an initial matter, the PBMs' argument misconstrues the State's claims. The State's MCPA claims are not based solely on the PBMs' misrepresentations. Rather, as stated above, the entire Insulin Pricing Scheme—from hiding/obfuscating Manufacturer Payments (¶¶ 387–402), to excluding lower priced insulins and favoring of higher priced insulins on formularies (¶¶ 22, 348), to coordinating with the Manufacturers to increase the availability of these higher-priced insulins (¶ 354), to forcing diabetics into switching their insulins to the detriment of their health (¶¶ 480–481), to pricing diabetics out of the insulins they need to stay alive (¶¶ 30, 479), to lying about all of it (¶¶ 441–442, 513)—is unfair and deceptive.

Nonetheless, even if viewed in isolation, the PBM misrepresentations alleged in the complaint certainly amount to more than mere "puffery" or "non-actionable statements of opinions." Dkt 97 at 15–17. In total, the complaint provides nearly 50

representative examples of PBM misrepresentations. For illustrative purposes, here are a few of these allegations:

- "CVS Caremark represented that it was focused on diabetes to 'help us add value for our PBM clients to improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures." (¶ 441)

- "Express Scripts released a statement that stated '[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease." (¶ 441)

- "[OptumRx] works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies—or drug lists—to ensure people get the right medications." (¶ 185)

- "[Express Scripts] saved our clients more than $3 billion through Express Scripts National Preferred Formulary." (¶ 351)

- "CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend." (¶ 351)

- "OptumRx's website has stated 'the services we provide help improve health outcomes for patients while making prescription drugs more affordable for plan sponsors and individuals." (¶ 442)

- OptumRx represented to the State that . . . its formulary management services target diabetes 'to effectively drive drug therapy changes . . . [and] control total healthcare costs' and drive 'safety, efficacy, and relative value." (¶ 449).

These misrepresentations (as well as the other 40+ allegations in the complaint) bear no resemblance to the jingle slogans and vague statements found to be "puffery" in the PBMs' cited authority. Dkt. 97 at 15–16. (citing *Friedman v. Nationwide Ins. Co. of Am.*, No. 16-cv-7363, 2017 U.S. Dist. LEXIS 236227, at *9 (C.D. Cal. Feb. 9, 2017) ("Nationwide is on your side"); *Moody v. Ocwen Loan Servicing, LLC*, No. 15-cv-5186, 2016 U.S. Dist. LEXIS 190592, at *10-12 (C.D. Cal. Feb. 22, 2016) ("Helping Homeowners Is What We Do!"); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106–07, 1112–13 (10th Cir. 2009) ("You take care of your dream. We'll take care of everything else."); *Circle Click Media LLC v. Regus Mgmt. Group LLC*, No. 12-cv-4000, 2013 U.S. Dist. LEXIS 1604, at *28 (N.D. Cal. Jan. 3,

2013) ("our solutions are designed to fit within your budget," "[s]imple, easy and flexible")).[20]

Indeed, three different federal courts have rejected the PBMs' "puffery" argument in analogous cases. In the recent case Mississippi attorney general insulin case, the Southern District of Mississippi rejected near identical puffery arguments brought by these same PBM Defendants in denying a motion to dismiss. *See Mississippi,* 2022 U.S. Dist. LEXIS 236485, at *12–14. In addition, in two cases before federal district courts in Minnesota and New Jersey, *In re EpiPen* and *In re Direct Purchaser Insulin Pricing Litig.*, the courts determined that the plaintiffs sufficiently alleged fraud based on the PBMs' (1) misrepresentations that they use their negotiating power to "reduce health plans costs" and act in the "best interests" of their clients, and (2) mischaracterizations that the payments that the PBMs received from manufacturers are "discounts," while refusing to disclose the amounts of these payments that they retained. *In re EpiPen Direct Purchaser Litig.,* No. 20-

---

[20] The majority of the PBMs' cited cases cut against their argument by demonstrating the broad scope of representations found to be actionable under the FTC Act. *See F.T.C. v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (attorney representations about credit repair found to be violations of FTC Act); *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200–01 (9th Cir. 2006) (finding deception based on the net impression of fine print on a solicitation); *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1150 (9th Cir. 1984) (representations about uniqueness of pain relievers found to deceptive."); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 11 (1st Cir. 2010) (statements that supplements cure cancer and promote weight loss found to be deceptive).

cv-827, 2021 WL 147166, at *19 (D. Minn. Jan. 15, 2021); *In re Direct Purchaser Insulin Pricing Litig.,* No. 20-cv-3426, 2021 WL 28862165 (D.N.J. July 9, 2021).

The PBM misrepresentations alleged in the complaint are actionable under the MCPA. *See, e.g., Nelson*, 2023 U.S. Dist. LEXIS 49856, at *16–17 (finding misrepresentations through statements in website, advertising materials, and brochures sufficiently pled to survive motion to dismiss).

## 2. *Noerr-Pennington* Does Not Apply

Finally, the PBMs argue that the Court should ignore the PBMs' misrepresentations to Congress based on the *Noerr-Pennington* doctrine. Dkt. 97 at 17. Such argument is not appropriate at the pleading stage.

At the dismissal stage, the PBM Defendants have yet to establish the predicate for invoking the *Noerr-Pennington* doctrine, and the State has had no opportunity to conduct discovery of such predicate, if any. *See Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 359–60 (4th Cir. 2013) ("[T]he *Noerr-Pennington* doctrine is an affirmative defense," and a motion to dismiss "cannot reach the merits of an affirmative defense [unless] all facts necessary to the affirmative defense clearly appear on the face of the complaint.") Accordingly, courts have routinely declined to address the *Noerr-Pennington* doctrine on a motion to dismiss. *Navient Sols. LLC v. Law Offices of Jeffrey Lohman,* No. 19-cv-461, 2020

WL 1867939, at *4 (E.D. Va. Apr. 14, 2020); *In re Apple Inc. Sec. Litig.,* No. 19-cv-2033, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020).

Even assuming, *arguendo*, that *Noerr-Pennington* does apply to the Congressional hearing allegations (it does not), the State has nonetheless sufficiently pled its MCPA claims based on factual allegations which do not arise from any congressional testimony given by the PBMs or their representatives.

### iv. The Alleged PBM Conduct Falls Within the MCPA's Scope

The PBMs also argue that their conduct falls outside the scope of the MCPA because they were not involved in "advertising, offering for sale, sale, or distribution" of diabetes medications. Dkt. 97 at 19. The PBMs, however, fail to cite to any authority for this argument; thus the argument may be rejected out of the gate. *Parvin v. CNA Fin. Corp.*, 646 Fed. Appx. 562, 563 (9th Cir. 2016) (arguments without legal authority are waived) (citing *United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168-69 (9th Cir. 2000)). Even if considered, the argument is meritless.

The MCPA prohibits unfair or deceptive trade practices "in the conduct of any trade or commerce." MONT. CODE ANN. § 30-14-103. The PBMs do not dispute that the sale of the at-issue drugs falls within the statutory definition of trade or commerce. Dkt. 97 at 19. And, the PBMs cannot reasonably argue that their

28

misconduct was outside the scope of "offering for sale, sale, or distribution" of the at-issue drugs.

First, the PBMs sell and distribute the at-issue drugs directly through their mail order pharmacies. (¶¶ 124-25, 176-78, 215-17) For that reason alone this argument should be rejected. In addition, the PBMs have near complete control over the diabetic drug pricing chain and the price paid for the at-issue drugs by Montana diabetics and the State has increased as a direct result of the PBMs' misconduct. The PBMs directly profited from every at-issue drug sold as a result of these price increases. Every PBM misrepresentation alleged was meant to obscure the PBMs' role in—and to hide the true reason behind—these egregious price increases, the Insulin Pricing Scheme. Such misconduct indisputably occurred in the conduct of the sale of diabetic drugs. *See Baird*, 255 Mont. at 327 (the MCPA is to be interpreted "broad in scope and flexible in application . . .")

Finally, as a result of their conspiracy with the Manufacturers, each PBM is jointly and severally liable for the Manufacturers' misconduct which certainly occurred in or affected commerce. *See infra* 34-35. The PBMs' misconduct falls squarely within the MCPA's purview.

### C.     The State Has Properly Pled Unjust Enrichment

As explained in the Manufacturer Response, unjust enrichment is an equitable claim for restitution to prevent or remedy inequitable gain by another. See

Manufacturer Resp. at 24-25 (citing *Associated Management Services, Inc. v. Ruff*, 424 P.3d 571, 595 (Mont. 2018)). The elements of unjust enrichment are: (1) a benefit conferred on one party by another; (2) the other's appreciation or knowledge of the benefit; and (3) the other's acceptance or retention of the benefit under circumstances that it would render it inequitable for the other to retain the benefit without compensating the first party for the value of the benefit. *Id.*

The State has alleged facts which establish each element. The PBMs received Manufacturer Payments and directly profited from the artificially inflated list prices of the insulin drugs (¶ 305 (PBMs "stand to profit from the artificial prices"); ¶ 342 ("PBM Defendants' profits are directly tied to the Manufacturers' list prices" because "PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price"); ¶ 345 (discussing rebates paid by Manufacturers to PBMs ranging as high as 79.75% of list price); ¶¶ 346–47 ("…PBMs have also requested and received larger and larger administrative fee payments from the Manufacturers" … "reaching more than $16 billion"); ¶¶ 405–08 (PBMs generate profits from pharmacies via the Insulin Pricing Scheme through spread pricing and DIR fees); ¶¶ 409–11 (PBMs profit from the Insulin Pricing Scheme via their own mail-order and retail pharmacies).

The PBMs and Manufacturers also conspired together and knew that consumers and other payors purchased the at-issue drugs based on the published list

prices (¶ 422; ¶ 349-55); the PBMs and Manufacturers have retained the revenue generated by the Insulin Pricing Scheme despite their engagement in unfair and inequitable practices which artificially inflated their list prices, causing the State and Montana diabetics to overpay by millions of dollars. (¶¶ 27–28; ¶¶ 527–30).[21]

The Complaint sufficiently alleges that benefits were conferred upon the PBMs. The State alleges that the Insulin Pricing Scheme created enormous profits for all Defendants, including the PBMs (¶ 354), and cites reports demonstrating that the PBMs' revenues received from sources such as rebates and administrative fees grew astronomically throughout the period in question (¶¶ 345–47. (Notably, at the same time, the Manufacturers were retaining more revenue from sales than they did in the early 2000s, resulting in billions of dollars of distributions to their shareholders. (¶¶ 373–374)). In sum, the PBMs received, knew of, and retained immense profits from the Insulin Pricing Scheme. It would be inequitable for the PBMs to retain these profits generated by their unfair and deceptive scheme that has caused so much harm.

---

[21] It is not necessary that revenue flow directly, as opposed to indirectly, from the State and Montanans to the PBMs. *See Diamond v. Hogan Lovells US LLP,* 883 F.3d 1140, 1146 (9th Cir. 2018), *citing* Restatement (Third) of Restitution and Unjust Enrichment, § 48 (2011) (no requirement of direct conferral of benefit); *see also Griffin v. HSBC Mortgage Services, Inc.,* No. 4-cv-132, 2016 WL 1090578, at *19 (N.D. Miss. Mar. 18, 2016) (not required that unjustly enriched party receive funds directly from the plaintiff). Whether the PBMs' receipt of benefits was direct or indirect, the PBMs clearly profited, as they would have no market and have received no revenue but for purchases of the drugs by end-users.

Rather than address these elements directly, the PBMs instead argue that because contracts exist between and among the PBMs, Manufacturers, pharmacies, payors and the State an unjust enrichment claim is improper. Further, the PBMs contend that the State may not pursue an unjust enrichment claim in its *parens patriae* capacity. (Dkt. 97. at 22). Neither proposition has merit.

First, the fact that the PBMs contract with the Manufacturers, pharmacies, and payors is irrelevant to the unjust enrichment claim because those contracts do not exist between the unjust enrichment claimant (here, the State) and the unjustly enriched beneficiaries (here, the PBMs). The only contracts that could possibly have relevance to the State's claim are contracts between the State and PBMs. And as even the PBMs recognize, the State has alleged that no express contract covers the claims at issue, in large part because the State does not contract with any PBM on a drug-specific basis. (¶ 532). It is axiomatic that the Court may not ignore this (true) allegation at the motion to dismiss stage.

Further, the PBMs' contention that courts have "expressed skepticism at the notion of *parens patriae* standing for unjust-enrichment claims" also lacks merit. Dkt. 97 at 22. In support, PBMs cite three cases. Not one of the three cases supports PBMs' argument.

The decision in *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 478-79 (D.P.R. 2020), arose in an antitrust case, which is distinct from this case.

Moreover, the court's decision relied on law specific to Puerto Rico and pleading elements that are not present here. *Id.* at 476-77. *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1079, 1098-1104 (S.D. Cal. 2018), did not involve the question PBMs cite it for – rather, in that case the court addressed equitable standing generally and simply dismissed the unjust enrichment count because it found that the Plaintiff had not alleged sufficient impacts on a "significant portion of its population," which was a threshold standing requirement separate and apart from the elements of unjust enrichment. *Id.* at 1096, 1101. Notably, the court dismissed the count without prejudice. *Id.* at 1104-05. The third case, *In re Auto. Parts Antitrust Litig.*, 2021 U.S. Dist. LEXIS 8201, at *4-9 (E.D. Mich. Jan. 15, 2021), did not question whether an unjust enrichment claim was appropriate in *parens patriae* cases; it merely held that the plaintiff could not use an unjust enrichment claim to end-run a failure to establish required elements for an antitrust claim.

Finally, the PBMs' argument that unjust enrichment is unavailable here overlooks the statutory powers granted to the Attorney General by the MCPA. In addition to authorizing the Attorney General to seek restitution, the MCPA authorizes the court to "enter any other order or judgment required by equity to carry out" the statute's provisions. MONT. CODE ANN. § 30-14-131(3) (Emphasis added). Hence, the right to equitable relief cannot be limited as the PBMs suggest.

### D. The State Has Established Its Claim for Civil Conspiracy

As explained fully in the Plaintiff's Manufacturer Response, relied on and incorporated herein, the State's Complaint alleges that the Manufacturers and PBMs coordinated their efforts and "agreed to and participated in" the Insulin Pricing Scheme" (¶ 354), and plausibly asserts a claim for civil conspiracy against the Defendants. (¶¶ 534–537). The facts in support thereof, alleged by the State, describe a course of conduct which plausibly suggests, if not establishes, the existence of a conspiratorial agreement. *See* Manufacturer Resp. at 27-33.

PBMs only cite two cases in support of their argument to dismiss the State's conspiracy claim. In the first, *T-4 Corp. v. McDonald's Corp.*, 2017 U.S. Dist. LEXIS 110654, *17-18, 2017 WL 3037422 (D. Mont. 2017), the plaintiff merely alleged that the two conspirators purchased goods from one another. *Id.* ("…T-4 claims that when Burnett 'sold' the campaign to McDonald's, this constituted a meeting of the minds."). The court held this minimal allegation was not sufficient. In the second, *Paatalo v. J.P. Morgan Chase Bank, N.A.*, No. 10-cv-119, 2011 WL 13130862, at *9 (D. Mont. May 18, 2011)[22], the plaintiff made only a conclusory allegation related to an agreement without providing alleging further circumstances "pointing toward a meeting of the minds." In sharp contrast to both of these cases,

---

[22] While the *Paatalo* court found that conspiracy had not been sufficiently alleged, the court granted leave to amend to assert additional allegations. *Id.* at *9.

as explained in the Manufacturer Response, the State has provided detailed allegations demonstrating the coordinated efforts between the PBMs and Manufacturers.

Finally, even if this Court finds that the State has failed to plausibly plead its conspiracy allegations against the Defendants, such a finding will not resolve the State's claims against the Defendants for their individual violations of the MCPA and for unjust enrichment.

### E. The State Sufficiently Pleads its Claims Against the Parent Companies and OptumInsight[23]

The State has alleged claims against each of the PBM corporate parents based on their own conduct, not merely because of the conduct of their subsidiaries. As set forth fully in the State's responses to the jurisdictional motions filed by these parent entities, the State is not alleging liability against these health care behemoths simply due their size or corporate structure.[24] Rather, based on the extensive information

---

[23] "Parents" means Evernorth Health, Inc., CVS Pharmacy, Inc., OptumInsight, and UnitedHealth Group Incorporated.

[24] *See* Plaintiff's Memorandum in Opposition to UnitedHealth Group Incorporated and OptumInsight, Inc.'s Motion to Dismiss under Rule 12(b)(2) for Lack of Personal Jurisdiction; Plaintiff's Memorandum in Opposition to CVS Health Corporation's Motion to Dismiss Under Rule 12(b)(2); Plaintiff's Memorandum in Opposition to Evernorth Health, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction, incorporated herein.

the State already possesses—even before discovery—that each of these parents were directly involved in the Insulin Pricing Scheme.[25]

Each of these parents subjected themselves to jurisdiction in Montana by violating and conspiring to violate the MCPA. MONT. CODE ANN § 30-14-111(3) expressly instructs the State to bring action against non-resident violators of the MCPA without a place of business in Montana in the very court in which the State initially filed.

Even the PBMs' own authority acknowledges that parent companies directly involved in the alleged wrongdoing may not escape the consequences of their actions through corporate gamesmanship. *See United States v. Bestfoods*, 524 U.S. 51, 64-66 (1998) (stating, "the fact that a corporate subsidiary happens to own [the entity that caused the harm] . . . does nothing, then, to displace the rule that the parent corporation is itself responsible for the wrongs committed by its agents in the course of its business.")

The complaint sets forth uncontroverted allegations of Evernorth, CVS Health, UnitedHealth Group and OptumInsight's direct involvement in the Insulin Pricing Scheme. *See* Pl.'s Opp. to Evernorth Health Inc's Mot. to Dismiss for Lack of Jurisdiction at 6-9; Pl.'s Opp. to CVS Health Inc's Mot. to Dismiss for Lack of Jurisdiction at 6-8; Pl.'s Opp. to UnitedHealth Group Incorporated and

---

[25] *Id.*

36

OptumInsight's Mot. to Dismiss for Lack of Jurisdiction at 7-10. The State's allegations include that these parents had direct involvement in formulating and executing the Scheme—through executives identified by name—and providing PBM services in furtherance thereof. *Id*. These parents, including their CEOs and top executives, repeatedly met with executives of the Manufacturer Defendants to discuss their coordinated efforts in furtherance of the Insulin Pricing Scheme. *Id*. OptumInsight analyzed data, including data specific to Montana, to advise the Defendants on setting the at-issue list prices and constructing the at-issue formularies in a manner that is most profitable for all Defendants. *Id*. The conduct of these parents had the intended and foreseeable effect of harming Montana diabetics and the State (¶¶ 196, 354-55). These allegations, taken as true for purposes of motion, sufficiently allege that the parents were engaged directly in the conduct that gave rise to the Insulin Pricing Scheme. *See Johnson*, 653 F.3d at 1010.

PBM Defendants endeavor to distract from the above substantive allegations by focusing in their 12(b)(6) motion on CVS Pharmacy Inc. Dkt. 97 at 27. Notably, the PBMs do not put forth any specific argument with respect to any of the other parents beyond CVS Pharmacy (and fail to even mention CVS Health at all). *Id*. However, even with respect to CVS Pharmacy, the PBMs' argument is unconvincing. Throughout the relevant time period, CVS Pharmacy dispensed thousands (if not millions) of vials of insulin in Montana and profited from the

artificially inflated price on each of these prescriptions. (¶¶ 93-98). CVS Pharmacy was the direct point of contact between Montana diabetics and the CVS family with respect to each at-issue drug dispensed pursuant to the Insulin Pricing Scheme. Indeed, CVS Pharmacy was an integral part of the Insulin Pricing Scheme.

The PBMs' cited authority does not support dismissing the PBM parents. In *Cordis v. Allstate Ins. Co.*, as well as both of the cited *Mississippi* holdings, the court analyzed liability based on theories of agency and alter ego and found that the plaintiff had fail to allege sufficient facts demonstrating that the parent controlled its subsidiaries. No. 05-cv-19, 2006 WL 8435851, at *2 (D. Mont. Jan. 27, 2006); 2022 U.S. Dist. LEXIS 236485, at *15–19; 2022 WL 3222890, at *14–16. As discussed above, the State here does not have to rely on such theories because the complaint alleges that the parents were directly involved in the Insulin Pricing Scheme.

Respectfully, the Court should deny the motion to dismiss with respect to the parent entities.

## VI.    CONCLUSION

For the foregoing reasons, the PBM Defendants have failed to establish that no claim has been stated upon which relief can be granted, and their Motion to Dismiss should be denied.

If the Court is inclined to dismiss any claims, the State respectfully requests the Court afford the State an opportunity to amend the complaint. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave when justice so requires.")

RESPECTFULLY SUBMITTED this the 31st day of March, 2023.

/s/ *Josh Wackerly*
Josh Wackerly (*Admitted pro hac vice*)
The Cicala Law Firm PLLC
101 College Street
Dripping Springs, Texas 78620
Telephone: (512) 275-6550
josh@cicalapllc.com

/s/ *Jennifer M. Studebaker*
Jennifer M. Studebaker
Tanya D. Ellis (*Admitted pro hac vice*)
Forman Watkins & Krutz LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201
Telephone: (601) 960-8600
Fax: (601) 960-8613
jennifer.studebaker@formanwatkins.com
tanya.ellis@formanwatkins.com

/s/ *Anna Schneider*
Anna Schneider
Bureau Chief, Office of Consumer
Protection
Montana Department of Justice
P.O. Box 200151
Helena, Montana 59620-0151
Telephone: (406) 444-4500
anna.schneider@mt.gov

/s/ Lawrence Deas
W. Lawrence Deas (*Admitted pro hac vice*)
Liston & Deas, PLLC
605 Crescent Boulevard
Ridgeland, Mississippi 39157
Telephone: (601) 981-1636
lawrence@listondeas.com

/s/ Matthew C. McDonald
Matthew C. McDonald (*Admitted pro hac vice*)
David Nutt & Associates, PC
605 Crescent Boulevard
Ridgeland, Mississippi 39157
Telephone: (601) 898-7302
mattm@davidnutt.com

**Attorneys for Plaintiff**

## Certificate of Service

I hereby certify that on March 31, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Josh Wackerly*
Josh Wackerly

## Certificate of Compliance

I hereby certify that the lines in this document are double spaced, that the type in this document is proportionally spaced and is in 14-point font, and that this document consists of a total of 9288 words, excluding the table of contents, table of citations, certificate of service, and certificate of compliance.

*/s/ Josh Wackerly*
Josh Wackerly