# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| THE STATE OF ILLINOIS, BY<br>KWAME RAOUL, ATTORNEY GENERAL,<br><br>*Plaintiff*,<br><br>v.<br><br>ELI LILLY AND COMPANY, *et al.*,<br><br>*Defendants*. | Case No. 1:23cv170<br><br>**ORAL ARGUMENT<br>REQUESTED** |

## UNITEDHEALTH GROUP INCORPORATED AND OPTUMINSIGHT, INC.'S MEMORANDUM SUPPORTING THEIR RULE 12(b)(2) MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

# <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION .......................................................................................................... 1

STANDARD OF REVIEW ............................................................................................ 3

ARGUMENT .................................................................................................................. 4

I.     The Court lacks general personal jurisdiction over UHG and OptumInsight because neither is "at home" in Illinois. ........................................................................................... 4

II.    The Court lacks specific personal jurisdiction over UHG and OptumInsight. .................. 5

CONCLUSION ............................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
    751 F.3d 796 (7th Cir. 2014) ...............................................................11

*Arkansas ex rel. Rutledge v. Eli Lilly et al.*,
    No. 22-cv-549 (E.D. Ark. July 8, 2022), ECF No. 57 ...............................8

*Chandler v. Ulta Beauty, Inc.*,
    No. 18-CV-1577, 2022 WL 952441 (N.D. Ill. Mar. 30, 2022),.....................8

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
    137 S. Ct. 1773 (2017)...........................................................................3

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
    230 F.3d 934 (7th Cir. 2000) .........................................................1, 3, 6

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)..................................................................1, 4, 5, 12

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)..........................................................................3, 5

*GMAC Real Estate, LLC v. E. L. Cutler & Assocs., Inc.*,
    472 F. Supp. 2d 960 (N.D. Ill. 2006) ......................................................1

*Hangzhou Chic Intelligent Tech. Co. v. P'ships & Unincorporated Ass'n Identified on
    Schedule "A"*,
    No. 20 C 4806, 2022 WL 2208827 (N.D. Ill. June 21, 2022) ....................7

*Heard v. Jenkins*,
    No. 1:21-CV-01374, 2022 WL 4482765 (N.D. Ill. Sept. 27, 2022) ...........4, 5

*Hyatt Int'l Corp. v. Coco*,
    302 F.3d 707 (7th Cir. 2002) ..................................................................1

*In re Sheehan*,
    48 F.4th 513 (7th Cir. 2022) .......................................2, 4, 5, 6, 7, 9, 10, 11, 13

*Kipp v. Ski Enter. Corp. of Wis., Inc.*,
    783 F.3d 695 (7th Cir. 2015) ..................................................................4, 5

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*,
    725 F.3d 718 (7th Cir. 2013) ...........................................................8, 9, 10

*Matlin v. Spin Master Corp.*,
 921 F.3d 701 (7th Cir. 2019) ...................................................................................4, 10, 13

*Mississippi ex rel. Fitch v. Eli Lilly & Co.*,
 No. 21-cv-00674 (S.D. Miss. Feb. 17, 2022), ECF No. 71 ...........................................8

*Mississippi ex rel. Fitch v. Eli Lilly & Co.*,
 No. 21-cv-674 (S.D. Miss. Aug. 15, 2022), ECF No. 112........................................3

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.*,
 338 F.3d 773 (7th Cir. 2003) ...................................................................................9, 12

*United States v. Bestfoods*,
 524 U.S. 51 (1998)...........................................................................................................7

*Walden v. Fiore*,
 571 U.S. 277 (2014)...................................................................2, 3, 5, 6, 9, 12, 13

**STATE CASES**

*Aspen Am. Ins. Co. v. Interstate Warehousing, Inc.*,
 2017 IL 121281, 418 Ill. Dec. 282, 90 N.E.3d 440 ....................................................1, 5, 10

**RULES**

Fed. R. Civ. P. 12(b)(2)...............................................................................................................1

Fed. R. Civ. P. 12(b)(6)...............................................................................................................1

**CONSTITUTIONAL PROVISIONS**

Fourteenth Amendment to the U.S. Constitution................................................................3, 4

Illinois Constitution .....................................................................................................................1

**OTHER AUTHORITIES**

*Sustainability Report* (2021), https://unitedhealthgroup.com
 /content/dam/UHG/PDF/sustainability/final/2020_SustainabilityReport.pdf .........................8

# INTRODUCTION

As explained in the PBM Defendants' forthcoming brief supporting their Rule 12(b)(6) motion to dismiss, the State's claims against UnitedHealth Group Incorporated (UHG), OptumRx, Inc., and OptumInsight, Inc. fail because there are no plausible or particularized factual allegations supporting the claims against them. But the Complaint against two of those entities—UHG and OptumInsight—also fails because there are no factual allegations establishing that the Court has personal jurisdiction over them. *See* Fed. R. Civ. P. 12(b)(2). The State has sued UHG and OptumInsight in their capacities as OptumRx's parent or affiliate companies. But those corporate affiliations are insufficient to establish personal jurisdiction. And none of the State's other threadbare allegations concerning UHG and OptumInsight describe suit-related contacts with Illinois sufficient to satisfy the constitutional due process requirements.[1]

Both UHG and OptumInsight are headquartered and have their principal places of business outside of Illinois (ECF No. 1, Compl. ¶¶ 175, 184), so neither is "at home" or subject to general jurisdiction in the State. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). Nor does the State offer factual allegations sufficient to satisfy specific personal jurisdiction over either entity. As for UHG, the State's allegations focus only on UHG's status as OptumRx's corporate parent (*see* Compl. ¶¶ 177–83), which is insufficient to confer specific jurisdiction. *See, e.g., Cent. States, Se.*

---

[1] "[I]t is only in the rare (and perhaps hypothetical) case that the federal due process analysis might actually differ from the Illinois due process analysis." *GMAC Real Estate, LLC v. E. L. Cutler & Assocs., Inc.*, 472 F. Supp. 2d 960, 963–64 (N.D. Ill. 2006); *see also Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002) ("[N]o case post-*Rollins* has an Illinois court found federal due process to allow the exercise of jurisdiction in a case where Illinois limits prohibited it."). For purposes of this motion, we focus solely on the constitutional due process inquiry. *See, e.g., Aspen Am. Ins. Co. v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 13, 418 Ill. Dec. 282, 286, 90 N.E.3d 440, 444 ("Because defendant in this case does not argue that the Illinois Constitution imposes any greater restraints on the exercise of jurisdiction than the federal constitution, we consider only federal constitutional principles.").

*& Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 945 (7th Cir. 2000) ("[J]urisdiction over a parent cannot be based merely on jurisdiction over a subsidiary."). The State's allegations about OptumInsight—an OptumRx affiliate—are no better. The State alleges that OptumInsight is registered to do business in Illinois and holds a third-party administrator license in the state (Compl. ¶¶ 185–86), but it does not tie either the registration or TPA license to the underlying claims. And other than describing its registration and TPA license, the State alleges only that "OptumInsight analyzed data and other information from the Manufacturer Defendants" to "advise Defendants" about the profitability of their rebating practices. *Id.* at ¶ 188. But that conclusory allegation does not establish that OptumInsight engaged in any suit-related conduct in or directed toward Illinois, never mind suit-related conduct creating a "substantial connection" with the State that would justify an Illinois court's exercising jurisdiction over OptumInsight. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see also In re Sheehan*, 48 F.4th 513, 522 (7th Cir. 2022).

The State tries to conceal its nonexistent allegations about UHG and OptumInsight by lumping those two entities within the definition of "OptumRx." *See* Compl. ¶ 198 ("Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., and OptumInsight, Inc., including all predecessor and successor entities, are referred to as 'OptumRx.'"). But the law requires a plaintiff to allege facts showing that *each* defendant has the required suit-related contacts with Illinois. Group pleading is not enough. The State's improper attempt to define all three entities as "OptumRx" also fails because the State alleges that it is suing "OptumRx" "in its capacities as a PBM and mail-order pharmacy." *Id.* at ¶ 199. But it fails to allege that UHG or OptumInsight provides those services—in Illinois or anywhere else.

Another federal court recently held that a nearly identical complaint by the State of Mississippi (represented by many of the same counsel as the State in this case) failed to establish personal jurisdiction over UHG and OptumInsight.[2] *See Mississippi v. Eli Lilly & Co.,* No. 21-cv-674 (S.D. Miss. Aug. 15, 2022), ECF No. 112 (Ex. A). This Court should reach the same result.

## STANDARD OF REVIEW

The State bears the burden of establishing personal jurisdiction over UHG and OptumInsight. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund*, 230 F.3d at 939. When the parties do not "urge[] that the Illinois due process analysis differs, [courts] only consider the requirements of federal due process." *Id.*

In analyzing jurisdiction under the Due Process Clause of the Fourteenth Amendment, courts consider two types of jurisdiction—general jurisdiction (sometimes called "all-purpose" jurisdiction) and specific jurisdiction (sometimes called "case-linked" jurisdiction). "A court with general jurisdiction may hear any claim against [a] defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017). Specific jurisdiction, in contrast, exists only when "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden*, 571 U.S. at 284; *see also Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).

The Seventh Circuit has enumerated the requirements for specific personal jurisdiction as follows: "First, defendants must have purposefully directed their activities at the forum state or purposefully availed themselves of the privilege of conducting business in the forum; second, the alleged injury must arise out of or relate to the defendants' forum-related activities; and third, any

---

[2] The Mississippi court also dismissed two other OptumRx parent companies (Optum, Inc. and ORx Holdings, LLC) that are not named as defendants in this case.

exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *In re Sheehan*, 48 F.4th at 522. "The second element is crucial—and [the Court] cannot simply aggregate all of a defendant's contacts with a state—no matter how dissimilar in terms of geography, time, or substance—as evidence of the constitutionally-required minimum contacts." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 706 (7th Cir. 2019) (quotation omitted).

## ARGUMENT

This Court lacks personal jurisdiction over UHG and OptumInsight. There is no general jurisdiction over either because neither company is at home in Illinois (and there is otherwise no basis for general jurisdiction). And there is no specific jurisdiction over either because there are no factual allegations establishing that either company has suit-related contacts with Illinois creating a substantial connection with the State such that exercising jurisdiction over them would comport with the Due Process Clause of the Fourteenth Amendment.

## I. THE COURT LACKS GENERAL PERSONAL JURISDICTION OVER UHG AND OPTUMINSIGHT BECAUSE NEITHER IS "AT HOME" IN ILLINOIS.

General jurisdiction attaches only if a business "is fairly regarded as at home" in a state. *Daimler*, 571 U.S. at 137. In most cases, a company's "place of incorporation and principal place of business" are the only states that satisfy that requirement. *Id.*; *Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 699 (7th Cir. 2015); *Heard v. Jenkins*, No. 1:21-CV-01374, 2022 WL 4482765, at *2 (N.D. Ill. Sept. 27, 2022).

The State alleges that UHG and OptumInsight are organized under Delaware law with their principal places of business in Minnesota. Compl. ¶¶ 175, 184. By the State's own allegations, those companies are at home in Delaware and Minnesota—not Illinois.

The Complaint contains no factual allegations that would render this an "exceptional case" when "a corporation's operations in a forum other than its formal place of incorporation or

principal place of business [are] so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S. at 139 n.19. There are no factual allegations showing that either company has "affiliations with [Illinois that] are so 'continuous and systematic' as to render them essentially at home" here. *Id.* at 127 (citation omitted). The State offers no allegation that either company's "continuous corporate operations within [Illinois] are so substantial and of such a nature as to justify suit on causes of action arising from dealings entirely distinct from those activities." *Heard*, 2022 WL 4482765, at *2 (quoting *Kipp*, 783 F.3d at 698).

Inasmuch as the State argues that OptumInsight consented to general jurisdiction in Illinois by registering to do business in the State, the Illinois Supreme Court has expressly rejected that argument. *Aspen Am. Ins. Co.*, 2017 IL 121281, ¶ 22, 418 Ill. Dec. at 288, 90 N.E.3d at 446 ("[P]laintiff maintains that, by registering to do business in Illinois, defendant has effectively consented to the exercise of general jurisdiction in this state and thereby obviated any due process concerns. Again, we disagree.").

## II. THE COURT LACKS SPECIFIC PERSONAL JURISDICTION OVER UHG AND OPTUMINSIGHT.

The Court also lacks specific personal jurisdiction over UHG and OptumInsight as a matter of due process. Specific personal jurisdiction exists only when "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden*, 571 U.S. at 284. That is, the suit must arise out of or relate to the defendant's contacts with the forum. *Ford Motor Co.*, 141 S. Ct. at 1026; *see also In re Sheehan*, 48 F.4th at 522 ("Specific personal jurisdiction depends on 'an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" (quoting *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780)). The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by

demonstrating contacts between the plaintiff (*or third parties*) and the forum State." *Walden*, 571 U.S. at 284 (emphasis added).

The State barely mentions UHG and OptumInsight in the Complaint, and when it does the allegations focus primarily on their status as OptumRx's corporate parent and affiliate, respectively. *See* Compl. ¶¶ 179–82, 188–93. But "[t]he relationship between the defendant and the forum 'must arise out of contacts that the defendant *himself* creates with the forum State.'" *In re Sheehan*, 48 F.4th at 552 (quoting *Walden*, 571 U.S. at 284) (emphasis in both). "[W]here corporate formalities are substantially observed and the parent does not dominate the subsidiary, a parent and a subsidiary are two separate entities and the acts of one cannot be attributed to the other." *Cent. States, Se. & Sw. Areas Pension*, 230 F.3d at 944. "Where two corporations are in fact separate, permitting the activities of the subsidiary to be used as a basis for personal jurisdiction over the parent violates this principle and thus due process." *Id.*

Analyzing the limited allegations in the Complaint that refer to UHG or OptumInsight for reasons other than corporate affiliation confirms that none describes suit-related contacts creating a substantial connection with Illinois.

**Paragraphs 175 and 176** contain information about UHG's places of business and incorporation, alleging only that it is an out-of-state company. Compl. ¶¶ 175–76.

**Paragraphs 177 and 178** contain general information about UHG's business, revenues, and Fortune 500 ranking. Compl. ¶¶ 177–78. Those allegations don't speak to specific jurisdiction. Paragraph 178 alleges that "[m]ore than one-third of the overall revenues of UnitedHealth Group come from OptumRx." *Id.* ¶ 178. That allegation about revenue does not identify any suit-related conduct, much less any suit-related conduct creating a "substantial connection" between Illinois and UHG. *Walden*, 571 U.S. at 284.

Paragraphs 179 contains only conclusory allegations about UHG's corporate structure and statements that UHG is "directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme." Compl. ¶ 179. The State fails to explain how UHG was "directly involved," and the allegation that UHG supposedly sets company-wide "overarching, enterprise-wide policies" (*id.* at 184) is a conclusion that has no discernable connection to Illinois. *See In re Sheehan*, 48 F.4th at 522.

Insofar as the State is trying to use the allegations in Paragraph 179 to pierce the corporate distinction between UHG and OptumRx, the allegations are insufficient. "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citation omitted). The State has not alleged facts coming close to suggesting that OptumRx and UHG are alter egos or justifying treating them as one and the same corporate entity. *See Hangzhou Chic Intelligent Tech. Co. v. P'ships & Unincorporated Ass'n Identified on Schedule "A"*, No. 20 C 4806, 2022 WL 2208827, at *2 (N.D. Ill. June 21, 2022) (allegations of "affiliation" and "association" are insufficient to confer personal jurisdiction under an alter ego theory without plausible allegations that defendants ignore "corporate formalities").

Paragraph 180 contains an allegation that "[*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail order pharmacies] . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply." Compl. ¶ 180 (brackets in complaint). The State purports to quote UHG's 2020 sustainability

report, but it took liberties with the report's text by replacing the word "we" with "UnitedHealth

Group." Here is what the quoted excerpt actually says:

> OptumRx works directly with pharmaceutical manufacturers to
> secure discounts that lower the overall cost of medications and
> create tailored formularies – or drug lists – to ensure people get the
> right medications. We then negotiate with pharmacies to lower costs
> at the point of sale. We also operate prescription home delivery . . .
> . We work directly with drug wholesalers and distributors to ensure
> consistency of the brand and generic drug supply, and a reliance on
> that drug supply.

*UnitedHealth Group 2020 Sustainability Report* (2021), https://unitedhealthgroup.com

/content/dam/UHG/PDF/sustainability/final/2020_SustainabilityReport.pdf.[3]   In context,   the

excerpt confirms that the word "we"—which the State replaced with "UnitedHealth Group" in

brackets—plainly refers to OptumRx, not UHG. Regardless, the State cannot erase the corporate

form by using the word "we" in a regulatory filing to refer to a corporate family. Veil-piercing is

improper "in the case of an ordinary parent–subsidiary relationship that observes corporate

formalities."[4] *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 733 (7th Cir. 2013).

---

[3] At the motion-to-dismiss stage, this Court may consider documents incorporated into the
complaint by reference. *See, e.g., Chandler v. Ulta Beauty, Inc.*, No. 18-CV-1577, 2022 WL
952441, at *22 (N.D. Ill. Mar. 30, 2022).

[4] The State's mischaracterization of the sustainability report would be bad enough in a vacuum,
but in this case, the State copied the doctored allegation from complaints filed by the State of
Mississippi and the State of Arkansas. And it did so *after* UHG pointed out the allegation's falsity
in moving to dismiss both Mississippi's and Arkansas's complaints. *See* Third Am. Complaint,
*Mississippi ex rel. Fitch v. Eli Lilly et al.*, No. 21-cv-00674 (S.D. Miss. Feb. 17, 2022), ECF No.
71 at ¶ 195 (Ex. B) *and* Mem. Supporting Mot. to Dismiss for Lack of Personal Jurisdiction, (S.D.
Miss. Mar. 21, 2022), ECF No. 88 at pp. 11–12 (Ex. C) (pointing out the allegation's falsity); First
Am. Compl., *Arkansas ex rel. Rutledge v. Eli Lilly et al.*, No. 22-cv-549 (E.D. Ark. July 8, 2022),
ECF No. 57 at ¶ 186 (Ex. D) *and* Mem. Supporting Mot. to Dismiss for Lack of Personal
Jurisdiction (E.D. Ark. Sept. 22, 2022), ECF No. 88 at pp. 8–9 (Ex. E) (pointing out the allegation's
falsity). And as previously noted, the Mississippi court considered the same false allegation before
ultimately concluding that the allegations were insufficient to establish personal jurisdiction over
UHG.

**Paragraph 181** contains an allegation that UHG and OptumRx executives met with Eli Lilly, Novo Nordisk, and Sanofi seven times over eight years. Compl. ¶ 181. But the State doesn't allege that any meeting took place in Illinois, and Paragraph 181 otherwise contains no factual allegations about any suit-related contacts between Illinois and UHG. *Walden*, 571 U.S. at 284 ("[T]he relationship must arise out of contacts that the defendant himself creates with the forum State." (citation and quotation marks omitted)). Nor does the State attempt to explain what happened at those purported meetings, let alone how they facilitated the alleged non-existent "scheme."

**Paragraph 182** alleges that UHG invested in building out its subsidiary OptumRx's capabilities. Compl. ¶ 182. This is exactly the type of "ordinary parent–subsidiary relationship" that the Seventh Circuit has held insufficient to support personal jurisdiction under an alter-ego theory. *KM Enters., Inc.*, 725 F.3d at 733; *see also Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 788 n.17 (7th Cir. 2003) ("Parents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent." (quotation omitted)).

**Paragraph 183** is a conclusory and threadbare allegation that "UnitedHealth Group's conduct had a direct effect in Illinois and damaged diabetics and payors in Illinois and the State." Compl. ¶ 183. That allegation is nothing more than another attempt to create jurisdiction over UHG based on its status as one of OptumRx's parent companies, and it does not establish that UHG engaged in suit-related conduct creating a substantial connection with Illinois. *See Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."). At any rate, "it is not enough that the defendant took some action that ultimately had an effect on the plaintiff in the forum." *In re Sheehan*, 48 F.4th at 523.

Paragraph 197 includes an allegation about UHG's status as a corporate parent and purports to describe "numerous interlocking directorships and shared executives" between parent and subsidiary. Compl. ¶ 197. But again, UHG's status as OptumRx's parent company is not sufficient to subject it to specific personal jurisdiction in Illinois unless the State can allege that the companies were eschewing corporate formalities. *KM Enters.*, 725 F.3d at 733. Nothing in the Complaint provides any basis to disregard the corporate distinction. The State also alleges that UHG is "directly involved in the conduct and control of OptumInsight and OptumRx's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Illinois diabetics and payors, including the State." Compl. ¶ 197. That is no more than a threadbare conclusion. It is also another attempt to impute OptumRx's contacts to UHG.

Paragraphs 184–86 allege OptumInsight's place of incorporation and principal place of business and then allege that OptumInsight is registered to do business in Illinois and holds an active "Third Party Administrator License" in the State. Compl. ¶¶ 184–86. Those allegations are not sufficient to establish general jurisdiction over OptumInsight. *Aspen Am. Ins. Co.*, 2017 IL 121281, ¶ 22, 418 Ill. Dec. at 288, 90 N.E.3d at 446 (rejecting the argument that registration to do business in Illinois confers general personal jurisdiction). Nor can they establish specific jurisdiction because the State offers no factual allegations connecting OptumInsight's alleged registration or license to the State's underlying claims. *See In re Sheehan*, 48 F.4th at 522. Those forum-linked (but not case-linked) allegations should not be considered in the overall minimum-contacts analysis. The Court cannot "simply aggregate all of a defendant's contacts with a state—no matter how dissimilar in terms of geography, time, or substance—as evidence of the constitutionally-required minimum contacts." *Matlin*, 921 F.3d at 706 (quotation omitted).

**Paragraph 187** alleges only OptumInsight's supposed predecessor entities—an allegation that does not speak to specific jurisdiction. Compl. ¶ 187.

**Paragraphs 188–193** allege that OptumInsight collaborated with the Manufacturer Defendants by "analyz[ing] data and other information" and "advis[ing] Defendants with regard to the profitability of the Insulin Pricing Scheme." Compl. ¶ 188. There are no factual allegations that OptumInsight's supposed analysis or consulting work occurred in or even was directed toward Illinois. At most, the State alleges that certain "Illinois-specific" data would have been among the data that OptumInsight analyzed. Compl. ¶ 189. But the allegation that "Illinois-specific" data was included in a dataset alongside data from every other state is not the same thing as a plausible allegation that "analytical services [were] provided in Illinois." Compl. ¶ 193. Just as a Minnesota student can study the Great Chicago Fire without creating contacts with Illinois, a Minnesota company can study data about Illinois without creating contacts with the State. In any event, the allegation does not establish *suit-related* conduct creating a substantial connection with Illinois. Even if OptumInsight analyzed "Illinois-specific" data in Minnesota, that would not constitute a "meaningful" connection to the forum and would certainly not establish that OptumInsight "purposefully directed" its actions toward the State. *In re Sheehan*, 48 F.4th at 523; *see also Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802–03 (7th Cir. 2014) ("Has the defendant, in brief, targeted Indiana somehow?"). The State's allegations do not suggest that OptumInsight's contact with Illinois is any more significant than the contact it would have with every other state in the country. If this type of allegation could confer personal jurisdiction, OptumInsight could be sued anywhere. That is not the law. *See id.* at 803 ("We need not belabor the point: if having an interactive website were enough in situations like this one, there

11

is no limiting principle—a plaintiff could sue everywhere. Such a result would violate the principles on which *Walden* and *Daimler* rest.").

The State also alleges in Paragraph 191 that the "Manufacturers utilized their relationships with OptumInsight to deepen their ties to the overall UnitedHealth Group corporate family. . . ." Compl. ¶ 191. In addition to being untethered from Illinois, that allegation concerns the manufacturers' conduct, not OptumInsight's. At bottom, each of these allegations fails to establish jurisdiction because the State never alleges what OptumInsight allegedly did wrong in Illinois.

**Paragraph 198** contains the State's attempt to manufacture specific jurisdiction over UHG and OptumInsight by lumping the companies together as "OptumRx." Compl. ¶ 198 ("Collectively, Defendants UnitedHealth Group, OptumRx, Inc., and OptumInsight, Inc., including all predecessor and successor entities, are referred to as 'OptumRx.'"). But due process requires "an individual assessment of a particular defendant's contacts with the forum state." *Purdue Research Found.*, 338 F.3d at 784. The Court could only exercise personal jurisdiction based on those allegations if the State had alleged facts showing that the Court could pierce the corporate veil under an alter ego theory, which, for the reasons stated above, it cannot. *See, e.g.,* *id.* at 788 n.17. The State's improper attempt to define all three entities as "OptumRx" also fails because the State alleges that it is suing "OptumRx" "in its capacities as a PBM and mail-order pharmacy." Compl. ¶ 199. But beyond alleging that UHG and OptumInsight are affiliated with OptumRx, the State does not allege that those companies provide PBM or mail-order pharmacy services—in Illinois or anywhere else.

The Complaint fails to establish specific jurisdiction over UHG and OptumInsight because every allegation discussed above lacks either (1) the required connection to Illinois or (2) the required connection to the claims in this case.

First, none of the allegations described above identify any connection to Illinois, much less show that either UHG or OptumInsight "purposefully directed their activities at [Illinois] or purposefully availed themselves of the privilege of conducting business in [Illinois]." *In re Sheehan*, 48 F.4th at 522.

Second, the alleged injury does not arise out of or relate to UHG's or OptumInsight's forum-related activities. In the very few instances when the State attempts to allege forum-related conduct (for instance, registration to do business in Illinois), it fails to allege how that conduct gives rise or relates to the suit. *See* Compl. ¶¶ 185–86 (OptumInsight's alleged registration to do business in Illinois). As the Seventh Circuit has noted, this second element is "crucial." *Matlin*, 921 F.3d at 706. The Court "cannot simply aggregate all of a defendant's contacts with a state— no matter how dissimilar in terms of geography, time, or substance—as evidence of the constitutionally-required minimum contacts." *Id.* (quotation omitted). The State fails to allege that UHG or OptumInsight's forum-related conduct gives rise to this suit. *In re Sheehan*, 48 F.4th at 522.

Finally, the exercise of personal jurisdiction would not comport with traditional notions of fair play and substantial justice. *See In re Sheehan*, 48 F.4th at 522. Neither UHG's nor OptumInsight's suit-related conduct "create[s] a substantial connection with the forum State." *Walden*, 571 U.S. at 284. Because this suit does not arise out of or relate to either defendant's contacts with the forum, the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *See id.*

## **CONCLUSION**

The Court should dismiss the Complaint against UHG and OptumInsight for lack of personal jurisdiction.

Dated: March 6, 2023

Respectfully submitted,

**UNITEDHEALTH GROUP,
INCORPORATED; OPTUMINSIGHT, INC.**

*/s/Patricia Brown Holmes*
Patricia Brown Holmes
Lucas Thor Rael
**RILEY SAFER HOLMES & CANCILA LLP**
70 W Madison St Suite 2900
Chicago, IL 60602
T: (312) 471-8700
pholmes@rshc-law.com
lrael@rshc-law.com

*Attorneys for UnitedHealth Group Incorporated
and OptumInsight, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Patricia Brown Holmes*
Patricia Brown Holmes

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

THE STATE OF MISSISSIPPI, EX REL.                                  PLAINTIFF
LYNN FITCH, ATTORNEY GENERAL

V.                                        CIVIL ACTION NO. 3:21-CV-674-KHJ-MTP

ELI LILLY AND COMPANY, et al.,                                     DEFENDANTS

ORDER

Before the Court is Defendants Optum, Inc., OptumInsight, Inc. ("OptumInsight"), OptumRx Holdings, LLC ("ORx Holdings"), and UnitedHealth Group, Inc.'s ("UnitedHealth") motion to dismiss. [87]. For the following reasons, the Court grants the motion.

I.     Facts and Procedural History

This case is about insulin drug prices. Plaintiff, The State of Mississippi, ex rel. Lynn Fitch, its Attorney General, ("the State") originally sued in Hinds County Chancery Court, alleging that the "Manufacturer Defendants"[1] conspired with the "Pharmacy Benefit Manager Defendants" (also called, "PBM Defendants")[2] to

---

[1] Eli Lilly and Company, Novo Nordisk, Inc., and Sanofi-Aventis U.S. LLC, collectively.
[2] CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, L.L.C., Caremark, L.L.C., CaremarkPCS Health, L.L.C., Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, L.L.C., ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc., UnitedHealth Group, Inc., Optum Inc., and OptumRx, Inc., collectively.

artificially inflate the price of insulin drugs and other diabetes medications. *See* Second Amend. Compl. at ¶ ¶ 5–16.

The State alleges that the Manufacturer Defendants manufacture the "vast majority of insulins and other diabetic medications available in Mississippi." Third Amend. Compl. [71] at ¶ 5. Likewise, the State alleges that the PBM Defendants "manage the pharmacy benefits for the vast majority of individuals in Mississippi." *Id.* at ¶ 6. As part of this work, the State alleges, the PBM Defendants "establish standard formulary offerings" that determine which of the Manufacturer Defendants' diabetes medications are covered "by nearly every payor in Mississippi." *Id.* at ¶¶ 6– 7. The State alleges that the Manufacturer Defendants and the PBM Defendants engaged in an "Insulin Pricing Scheme" to increase each type of Defendant groups' profits. *Id.* at ¶¶ 12, 19.

The heart of the "Insulin Pricing Scheme" as alleged by the State is that the Manufacturer Defendants "artificially and willingly" raise their prices to gain formulary access for their respective diabetic treatments from the PBM Defendants. *Id.* at ¶ 20. The State alleges that the Manufacturer Defendants pay a "significant, yet undisclosed, portion of that false list price back to the PBM [Defendants]." *Id.* at ¶ 20. The reason this system exists, the State alleges, is so the Manufacturer Defendants can pay rebates to the PBM Defendants in exchange for formulary access without sacrificing their profit margin. *Id.* at ¶ 23. The PBM Defendants in turn retain a significant percentage of these undisclosed rebates, while using the false list

price to generate additional profits from their own pharmacies and pharmacies in their networks. *Id.* at ¶ 24.

The State alleges that the Manufacturer Defendants' prices "have become so untethered from the actual prices realized by either Defendant group" that they "constitute a false price." *Id.* at ¶ 21. The State alleges, then, the price of certain insulins has increased by more than 1000% since 2003—the same year in which the PBM Defendants "began their rise to power." *Id.* at 278. As a result, the State sued the Defendants, alleging that it has been overcharged millions of dollars per year in its position as a payor for the at-issue drugs through its employee health plans and as a purchaser of the drugs for its state-run facilities. *Id.* at ¶ 28. The State also sued to protect its "sovereign interest in the health and economic interests of its residents, its own interests, and the integrity of its marketplace." *Id.* at ¶ 39.

The State brought claims against the Defendants for violating the Mississippi Consumer Protection Act ("MCPA"), common-law conspiracy, and unjust enrichment. *Id.* at ¶¶ 1, 518–551. Defendants UnitedHealth, Optum, Inc., ORx Holdings, and OptumInsight contend that the State only sued them in their capacity as OptumRx's parent companies. Mem. in Support of Mot. to Dismiss [88] at 1. They assert that the State failed to establish personal jurisdiction under both the Mississippi long arm statute and the purposeful availment prong of constitutional due process.

II.   Standard

Under Rule 12(b)(2), a lawsuit may be dismissed for a lack of personal jurisdiction. *See* Fed. R. Civ. 12(b)(2). "When a nonresident defendant moves to

3

dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Unified Brands, Inc. v. Teders*, 868 F. Supp. 2d 572, 577 (S.D. Miss. 2012) (quoting *Jobe v. ATR Mktg., Inc.*, 87 F.3d 751, 753 (5th Cir. 1996)). The Court must take the "allegations contained in the complaint, except insofar as controverted by opposing affidavits," as true. *Colwell Realty Invs., Inc. v. Triple T Inns of Az., Inc.*, 785 F.2d 1330, 1333 (5th Cir. 1986). If the Court does not rely on an evidentiary hearing but decides the motion based on the pleadings and exhibits on file, the plaintiff need only present a prima facie case of personal jurisdiction. *DeCarlo v. Bonus Stores, Inc.*, 413 F. Supp. 2d 770, 775 (S.D. Miss. 2006) (citing *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332 (5th Cir. 1982)). When deciding whether a prima facie case has been established, all conflicts in the facts alleged in the complaint and opposing affidavits must be resolved in the plaintiff's favor. *DeCarlo*, 413 F. Supp. 2d at 775 (citing *Thompson v. Chrysler Motors, Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985) and *DeMelo v. Toche Marine Inc.*, 711 F.2d 1260, 1270 (5th Cir. 1983)).

"The prima-facie-case requirement does not require the court to credit conclusory allegations." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

III.    Analysis

"A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over the defendant; and (2) exercise of such jurisdiction by the forum state

4

is consistent with due process under the United States Constitution." *Mink v. AAAA
Dev., LLC*, 190 F.3d 333, 335 (5th Cir. 1999).

A. Mississippi's Long Arm Statute

Mississippi's long-arm statute provides,

> Any nonresident person, firm, general or limited partnership, or any
> foreign or other corporation not qualified under the Constitution and
> laws of this state as to doing business herein, who shall make a contract
> with a resident of this state to be performed in whole or in part by any
> party in this state, or who shall commit a tort in whole or in part in this
> state against a resident or nonresident of this state, or who shall do any
> business or perform any character of work or service in this state, shall
> by such act or acts be deemed to be doing business in Mississippi and
> shall thereby be subjected to the jurisdiction of the courts of this state.

Miss. Code Ann. § 13-3-57.

Mississippi courts have interpreted the statute to contain three components:
contract, tort, and "doing-business." *Fitch v. Wine Express*, Inc., 297 So. 3d 224, 228
(Miss. 2020). In other words, to exercise jurisdiction, the Court must find that: (1) the
Moving Defendants entered into a contract to be performed, in whole or in part, in
Mississippi, (2) the Moving Defendants committed a tort, in whole or in part, in
Mississippi, or (3) the Moving Defendants were "doing business" in Mississippi.
*Farani v. File*, 565 F. Supp. 3d 804, 808 (S.D. Miss. 2021). Only one of these
components need be present to confer personal jurisdiction under the statute. *Id.*

The Moving Defendants assert that the State provided no actual allegations
that UnitedHealth, Optum, Inc., ORx Holdings, or OptumInsight contracted with any
Mississippi resident, committed a tort in Mississippi, or did business in Mississippi.
[88] at 5–6. The State contends that each Moving Defendant committed a tort and

5

does business in Mississippi. [102] at 9–11. The Court addresses the long-arm statute's applicability for each Moving Defendant.

### 1. UnitedHealth

UnitedHealth is a Delaware corporation with its principal place of business in Minnesota. [71] at ¶ 189. The State alleges that UnitedHealth "was directly involved in the conduct that caused the Insulin Pricing Scheme and as a result had a direct effect in Mississippi and damaged diabetic Mississippians and the State." *Id.* at ¶ 193. Although the Amended Complaint alleges that United Health met with executive teams from each Manufacturer Defendant to discuss "strategic initiatives" and "prioritized opportunities," the State fails to allege facts to support that these meetings were in furtherance of the alleged Insulin Pricing Scheme. *Id.* at ¶ 197. The State therefore fails to allege that UnitedHealth committed a tort in Mississippi.

The State also fails to allege that UnitedHealth does business in Mississippi. Although the State alleges that UnitedHealth has an "enterprise-wide commitment to Mississippi" with over "500 Mississippi-based employees," the State does not allege to which corporate entity these employees belong. It is not enough to simply rest on the use of a collective term, such as "Defendants," in the allegations to determine personal jurisdiction. *Smith v. Antler Insanity, LLC*, 58 F. Supp. 3d 716, 723 (S.D. Miss. 2014) (citing *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 793 (5th Cir. 2007) (citation omitted)). Here, the State fails to differentiate between each Moving Defendant's role in employing Mississippi residents. The State

6

fails to establish that UnitedHealth did business in Mississippi for the purposes of the long-arm statute.

### 2. Optum, Inc.

Optum, Inc. is a Delaware corporation with principal place of business in Minnesota. [71] at ¶ 200. The State alleges that Optum, Inc. is "directly involved in company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme." *Id.* at ¶ 202. The State also alleges that other companies in the UnitedHealth corporate family report to Optum, Inc. to "inform the at-issue formulary construction and mail order activities." *Id.* at ¶ 203. The State does not allege facts explaining how Optum, Inc.'s involvement in company policy necessarily constitutes involvement in the alleged Insulin Pricing Scheme. Nor does the State allege facts suggesting that Optum, Inc. did business in Mississippi.

These factual allegations do not allege a contract to be performed in Mississippi, a tort committed in Mississippi, or that Optum, Inc. did business in Mississippi. *See Farani*, 565 F. Supp. at 808. The Court therefore holds that the long-arm statute does not confer jurisdiction as to Optum, Inc.

### 3. ORx Holdings

ORx Holdings is a Delaware limited liability corporation with its principal place of business in California. [71] at ¶ 210. The State alleges that ORx Holdings "provides pharmacy benefit management services through its subsidiaries to various health insurance entities in Mississippi." *Id.* at ¶ 211. This is the extent of the State's

allegations about ORx Holdings individually. The Court finds that these allegations do not allege that ORx Holdings entered or performed a contract, committed a tort, or did business in Mississippi. The Court therefore finds that Mississippi's long-arm statute does not confer jurisdiction as to ORx Holdings.

### 4. OptumInsight

OptumInsight is a Delaware corporation with its principal place of business in Minnesota. *Id.* at ¶ 205. It is registered to do business in Mississippi and holds an active Third-Party Administrator license in Mississippi. *Id.* at ¶¶ 206–7. OptumInsight allegedly "provides data, analytics and consulting to companies with[in] the healthcare industry, including the Manufacturer Defendants." *Id.* ¶ 208. The State alleges that OptumInsight "coordinated directly with Manufacturer Defendants in furtherance of the Insulin Pricing Scheme" and "advised the Manufacturers with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants." *Id.* at ¶ 209.

A defendant is not necessarily subject to Mississippi's long-arm statute because it is licensed to do business in Mississippi. *See Thrash Aviation, Inc. v. Kelber Turbine, Inc.*, 72 F. Supp. 2d 709, 715 (S.D. Miss. 1999). Rather, to meet the "doing business" prong of the long-arm statute, a defendant's presence in Mississippi must be "of such a continuing and substantial nature" and "for the purpose of realizing a pecuniary benefit or otherwise accomplishing an object." *Id.* The State fails to provide facts that any of the alleged "coordination" or "advising" took place in Mississippi, that OptumInsight conducted business in Mississippi that was "continuing and

substantial," or that it tried to "realize a pecuniary benefit" or "otherwise accomplish an object" in Mississippi. *See id.* The Court therefore finds that the State failed to allege facts that OptumInsight did business in Mississippi.

Fraud is a tort in Mississippi, but the State must allege facts with particularity for the Court to find personal jurisdiction under the long-arm statute. Pursuant to Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Generally, this requires the plaintiff to plead "the who, what, when, where, and how" of the fraud. *Benchmark Elecs. V. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003).

The State fails to allege, however, how, when, or where of any alleged fraud occurred by OptumInsight specifically. As a result, the Court finds that the State did not allege facts sufficient to confer jurisdiction under the long-arm statute for OptumInsight.

### B. Due Process under the United States Constitution

Even if the long-arm statute provided the Court with personal jurisdiction over the Moving Defendants, exercising jurisdiction would not comport with federal due process. "The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'" *Mink*, 190 F.3d at 336 (quoting *Latshaw v. Johnston*, 167 F.3d

9

208, 211 (5th Cir. 1999) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945))).

Personal jurisdiction is either general or specific. *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). "If a defendant's contacts with the forum state are continuous and systematic, a court may exercise general jurisdiction over any action brought against that defendant, regardless of whether the action is related to the forum contacts." *Id.* (internal quotations and citation omitted). "If a defendant has relatively few contacts, a court may still exercise specific jurisdiction in a suit arising out of or related to the defendant's contacts with the forum." *Id.* (internal quotations and citation omitted). Only specific jurisdiction is at issue.

Courts in the Fifth Circuit may exercise specific personal jurisdiction when three conditions are met. First, the nonresident defendant must "purposefully avail itself of the privilege of conducting activities in the forum state." *Johnson v. TheHuffingonPost.com, Inc.*, 21 F.4th 314, 317 (5th Cir. 2021) (cleaned up) (citing *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021)). Second, the plaintiff's claim "must arise out of or relate to" those purposeful contacts. *Id.* Third, the Court's exercise of jurisdiction must be "fair and reasonable" to the nonresident defendant. *Id.* citing *Seiferth*, 472 F.3d at 271.

The Moving Defendants solely assert that they did not purposefully avail themselves in Mississippi. "The analysis here begins and ends with the minimum-contacts question." *Rush v. STIHL, Inc.*, 2020 WL 1276103, at *2 (S.D. Miss. Mar. 17, 2020).

For the Court to exercise specific jurisdiction, the defendant must purposefully avail itself in the forum state by having minimum contacts; these contacts must not be "random, isolated, or fortuitous." *Ford Motor Co.*, 141 S. Ct. at 1025 (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)). Rather, the contacts must stem from the defendant's choice to "reach[] out beyond" its home, such as "exploiting a market" in the forum state or entering a contractual relationship there. *Id.* (cleaned up) (citing *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

To determine whether a defendant has "minimum contacts" with a forum state, the Court must identify "some act whereby it purposely availed itself of the privilege of conducting activities there, thus invoking the benefits and protections of its laws." *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469–70 (5th Cir. 2006) (cleaned up). The defendant's actions must show that it "reasonably anticipates being haled into court" in Mississippi. *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The State asserts that the Court should apply the "effects test" established in *Calder v. Jones*, 465 U.S. 783, 788–89 (1984). For the reasons stated below, however, the Court finds that the State inadequately alleges the "effects" caused by each individual Moving Defendant. And "[e]ach defendant's contacts with the forum State must be assessed individually." *Id.* at 790.

The Court addresses each Moving Defendants' minimum contacts in turn.

1.  UnitedHealth

11

Considering all allegations in the State's Amended Complaint, and for the reasons stated in III.A.1, the Court finds that UnitedHealth has not purposefully availed itself in Mississippi by having minimum contacts. The State does not identify "some act whereby [UnitedHealth] purposefully availed itself of the privilege of conducting activities [in Mississippi], thus invoking the benefits and protections of its laws" for specific jurisdiction in this case. *See Luv N' Care, Ltd.*, 438 F.3d at 469–70.

The State alleges that UnitedHealth once sued in Mississippi, alleging that it "contracted with Mississippi residents and directly engaged in PBM business and programs in Mississippi related to 'advancing the health and well-being of individuals and communities,' and that UnitedHealth['s] business interests in Mississippi included providing PBM services to the State." [71] at ¶ 199. The State contends that this lawsuit is evidence that UnitedHealth availed itself of Mississippi laws. The Court disagrees. Taking the State's allegations of the prior complaint's contents as true, the State does not allege facts to support that these contacts were not "random, isolated, or fortuitous." *See Ford Motor Co.*, 141 S. Ct. at 1025. Just because a defendant sues in a Mississippi court does not mean that the defendant itself "reasonably anticipates being haled into court" in Mississippi. *See World Wide Volkswagen Corp*, 444 U.S. at 297.

The Court finds that it does not have personal jurisdiction over UnitedHealth because the long-arm statute does not apply, and the State's allegations do not show that UnitedHealth has sufficient minimum contacts with Mississippi.

2. Optum, Inc.

Considering all allegations in the State's Third Amended Complaint, and for the reasons stated in III.A.2, the Court finds that Optum, Inc. has not purposefully availed itself in Mississippi through minimum contacts. There are no allegations in the State's Amended Complaint that support Optum, Inc. had any contact with Mississippi or had any participation in the alleged Insulin Pricing Scheme. *See* [71] at ¶¶ 200–204. The Court finds that it does not have personal jurisdiction over Optum, Inc. because the long-arm statute does not apply, and the State's allegations do not show that Optum, Inc. has minimum contacts with Mississippi.

3. ORx Holdings

Considering all allegations in the State's Third Amended Complaint, and for the reasons stated in III.A.3, the Court finds that ORx Holdings has not purposefully availed itself in Mississippi through minimum contacts. The State does not allege that ORx Holdings had any contacts in Mississippi or engaged in the alleged Insulin Pricing Scheme in any way. *See id.* at ¶¶ 210–211.

4. OptumInsight

Considering all allegations in the State's Third Amended Complaint, and for the reasons stated in III.A.4, the Court finds that OptumInsight has not purposefully availed itself in Mississippi through minimum contacts. Aside from holding a Mississippi Third-Party Administrator license and being registered to do business in Mississippi, the State does not allege facts that ORx Holdings had any actual contact with Mississippi that was not "random, isolated, or fortuitous." *See Ford Motor Co.*,

13

141 S. Ct. at 1025. The Court finds that it does not have personal jurisdiction over OptumInsight because the long-arm statute does not apply, and the State's allegations do not show that OptumInsight has minimum contacts in Mississippi.

C. Veil Piercing

The State argues that even if none of the Moving Defendants individually are subject to personal jurisdiction, the Court should pierce the corporate veil and attribute OptumRx, Inc.'s contacts to each Moving Defendant, and each Moving Defendant's alleged contacts to each other, as alter egos. [102] at 13.

"It is a general principle of corporate law deeply ingrained in our economic legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotations a citation omitted). "Mississippi case law generally favors maintaining corporate entities and avoids attempts to pierce the corporate veil." *Canadian Nat. Ry. Co. v. Waltman*, 94 So. 3d 1111, 1115 (Miss. 2012) (citation omitted).

"[A] plaintiff's complaint alleging a piercing of the corporate veil will survive a Rule 12(b)(2) motion to dismiss only when the complaint sets forth factual allegations indicating: (1) some frustration of expectations regarding the party to whom he looked for performance; (2) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder." *Canadian Nat. Ry. Co. v. Waltman*, 94 So. 3d 1111, 1116–16 (Miss. 2012); *see also Rush v. STIHL, Inc.*, 3:17-

14

cv-915-DPJ-FKB, 2020 WL 1276103, at *7 (quoting *Waltman*, 94 So. at 1115). "In order to make a prima facie case of jurisdiction, the plaintiff must make sufficiently particularized allegations demonstrating the applicability of the piercing doctrine to the facts of the case." *Id.*

The Court finds that the State failed to make such particularized allegations. The State does not particularly allege any frustration of expectation of performance, a flagrant disregard for corporate formalities by any of the Moving Defendants, or a demonstration of fraud by any Moving Defendant.

At most, the State alleges that the Moving Defendants and OptumRx, Inc. share corporate officers, company policies, and stock ownership. [71] at ¶¶ 216–17. "The conclusory allegation that the parent companies exercise substantial control over [subsidiary companies] . . . does not make out a prima facie showing of an alter-ego relationship." *Alexander v. Global Tel Link Corp.*, 2018 WL 8997440, at *4 (S.D. Miss. May 14, 2018). "The Fifth Circuit has noted that 100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between . . . corporations." *Samples v. Vanguard Healthcare, LLC*, 2008 WL 4371371, at *3 (N.D. Miss. Sept. 18, 2008) (citing *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978). "Moreover, generally our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes." *Id.* (cleaned up) (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983). The State makes no such allegations.

15

The next factors are also relevant in determining whether a corporation constitutes an instrumentality or alter ego:

> (1) The parent corporation owns all or a majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*North American Plastics, Inc. v. Inland Shoe Mfg. Co., Inc.*, 592 F. Supp. 875, 879 (N.D. Miss. 1984) (citation omitted). Again, the State fails to allege facts supporting that each Moving Defendant is an alter ego of each other or OptumRx, Inc. And the State fails to meet its added burden under Mississippi law of providing particularized allegations detailing frustration of expectation of performance, flagrant disregard for corporate formalities by any of the Moving Defendants, or demonstration of fraud by the Moving Defendants.

As a result, the Court finds it is inappropriate to pierce the corporate veil. The Court finds it lacks personal jurisdiction over all Moving Defendants.

IV.    Conclusion

16

This Court has considered all of parties' arguments. Those the Court does not address would not have changed the outcome. The Court GRANTS Moving Defendants' Motion to Dismiss [87].

SO ORDERED AND ADJUDGED this the 15th day of August, 2022.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE

EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF MISSISSIPPI, EX REL. LYNN FITCH, ATTORNEY GENERAL | | |
| *Plaintiff,* | | |
| v. | | |
| ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICES, INC.; EXPRESS SCRIPTS PHARMACY, INC.; MEDCO HEALTH SOLUTIONS, INC; CVS HEALTH CORPORATION; CVS PHARMACY, INC; CAREMARK RX, L.L.C.; CAREMARK PCS HEALTH, L.L.C.; CAREMARK, L.L.C.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMINSIGHT, INC.; OPTUMRX HOLDINGS, LLC AND OPTUMRX INC. | | Cause No. 3:21-cv-00674-KHJ-MTP  Jury Trial Demanded |
| *Defendants.* | | |

# THIRD AMENDED COMPLAINT

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................ 1

II.    PARTIES ........................................................................ 8

     A.     Plaintiff ..................................................................... 8

     B.     Manufacturer Defendants ............................................. 9

     C.     PBM Defendants ...................................................... 14

III.   SOVEREIGN INTEREST ................................................. 41

IV.   JURISDICTION AND VENUE .......................................... 42

V.     FACTUAL ALLEGATIONS ............................................... 43

     A.     Diabetes and Insulin Therapy ...................................... 43

         •     Diabetes: A Growing Epidemic ............................. 43

         •     Insulin: A Century Old Drug ................................ 44

         •     Current Insulin Landscape ................................... 46

         •     Insulin Adjuncts: Type 2 Medications ................... 48

     B.     The Dramatic Rise in the Price of Diabetes Medications ........................... 51

         •     Defendant Manufacturers Have Increased Prices in Lockstep ........... 57

     C.     Pharmaceutical Payment and Supply Chain ................... 62

         •     Drug Costs for Diabetics ..................................... 63

     D.     PBMs' Role in the Pharmaceutical Payment Chain ................... 64

         •     The Rise of the PBMs in the Pharmaceutical Supply Chain ............ 67

         •     Insular Nature of the Pharmaceutical Industry ................... 69

     E.     The Insulin Pricing Scheme ........................................ 72

     F.     Defendants Admit That They Have Engaged in The Insulin Pricing Scheme and That It Is Harming Diabetics ................. 75

     G.     Defendants Profit Off the Insulin Pricing Scheme ................... 80

         •     PBMs Pocket a Majority of Manufacturers' Secret Payments ............. 80

- Insulin Pricing Scheme Allows PBMs To Profit Off Pharmacies..........84

- Insulin Pricing Scheme Increases PBM Mail Order Profits ................85

H. The State and Mississippi Diabetics Purchase The At-Issue Drugs From Defendants ......................................................................................86

I. Defendants Deceived Diabetic Mississippians and the State of Mississippi...............................................................................................87

- Manufacturer Defendants Deceived the State and Mississippi Diabetics ......................................................................................88

- PBM Defendants Deceived the State and Mississippi Diabetics ..........90

J. The Insulin Pricing Scheme Has Damaged the State of Mississippi and Diabetic Mississippians .................................................................99

- The Insulin Pricing Scheme Has Damaged the State as Payor and Purchaser of the At-Issue Drugs .................................................99

- The Insulin Pricing Scheme Has Damaged Mississippi Diabetics ......101

K. Defendants' Recent Efforts to Address Insulin Pricing Falls Far Short of Addressing the Problem.......................................................... 102

VI. TOLLING OF STATUTE OF LIMITATIONS ..................................... 104

A. Discovery Rule Tolling ........................................................................ 104

B. Fraudulent Concealment Tolling ......................................................... 105

C. Estoppel................................................................................................ 105

D. Continuing Violations ......................................................................... 105

VI. CLAIMS FOR RELIEF......................................................................... 106

1. Mississippi Consumer Protection Act. Miss. Code §§ 75-24-1, *et seq* (Against All Defendants)........................................................................ 106

2. Unjust Enrichment (Against All Defendants) ......................................110

3. Civil Conspiracy (Against All Defendants) ......................................... 111

VII. MOTION FOR INJUNCTION PURSUANT TO MISS. CODE 75-24-9.................................................................................................114

VIII. JURY DEMAND ...................................................................................115

IX.    **PRAYER FOR RELIEF** ......................................................................... **115**

# TABLE OF FIGURES

Figure 1: Price Increase of Insulin vs. Selected Consumer Goods from 1997-2018 .......... 4

Table 1: Diabetes medications at issue in this case ...................................................... 50

Figure 2: Rising reported prices of Humulin R (500U/mL) from 1997-2021 ................. 52

Figure 3: Rising reported prices of Humalog vials and pens from 1996-2021 .............. 53

Figure 4: Rising reported prices of Levemir from 2006-2021 ....................................... 54

Figure 5: Rising reported prices of Novolog vials and pens from 2002-2021 ............... 55

Figure 6: Rising reported prices of Lantus vials and pens from 2001-2021 .................. 56

Figure 7: Rising reported prices of long-acting insulins ............................................... 58

Figure 8: Rising reported prices of rapid-acting insulins .............................................. 59

Figure 9: Rising reported price increases for human insulins ....................................... 60

Figure 10: Rising reported prices of Type 2 drugs ........................................................ 61

Figure 11: Lockstep insulin price increases ................................................................. 62

Figure 12: Insulin distribution and payment chain ....................................................... 65

Figure 13: PBM consolidation ..................................................................................... 68

The Honorable Lynn Fitch, Attorney General, brings this action on behalf of the State of Mississippi (the "State" or "Plaintiff"), in its proprietary capacity and in its capacity as *parens patriae*, for violations of the laws of the State of Mississippi against the above-named Defendants.

## I.     INTRODUCTION

1.      Diabetes is an epidemic and a public health crisis in Mississippi. Mississippi has the highest prevalence of diabetes in the United States with 13.6% of its population—over 400,000 people—living with diabetes. An additional 750,000 Mississippi residents have prediabetes, which is when a person's blood sugar level is higher than it should be and signifies that the person is at a much greater risk for developing diabetes.

2.      Diabetes is the leading cause of blindness, kidney failure and lower limb amputations and is the seventh leading cause of death in Mississippi despite the availability of effective treatment. Over 22% of all hospitalizations in Mississippi are attributable to diabetes.

3.      The economic impact of diabetes is staggering. The total estimated cost of diagnosed diabetes in Mississippi is $3.5 billion per year. One in four health care dollars is spent caring for people with diabetes.

4.      Approximately 100,000 Mississippians rely on daily insulin treatments to survive, and 300,000 diabetics in Mississippi use either oral medications, insulin, or a combination of both to treat and control diabetes.  As a result, hundreds of thousands of Mississippi residents must rely on the companies that manufacture diabetes medications to stay alive and thus are at the mercy of these manufacturers.

5.     Defendants Eli Lilly, Novo Nordisk and Sanofi (collectively, "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic medications available in Mississippi.

6.     Defendants CVS Caremark, Express Scripts and OptumRx (collectively "PBM Defendants" or "PBMs") manage the pharmacy benefits for the vast majority of individuals in Mississippi.

7.     As part of this work, PBM Defendants establish standard formulary offerings that, among other things, set the baseline for which diabetes medications are covered and not covered by nearly every payor in Mississippi.

8.     PBM Defendants understand that their standard formulary offerings drive drug utilization.

9.     The more accessible a drug is on the PBMs' standard formularies, the more that drug will be used throughout Mississippi.

10.     Manufacturer Defendants likewise understand that the PBM Defendants' standard formularies drive drug utilization throughout Mississippi.

11.     Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous control over drug prices and drug purchasing behavior.

12.     The false and deceptive conspiracy at the root of this Third Amended Complaint—the Insulin Pricing Scheme—was born from this mutual understanding.

13.     Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, Manufacturer Defendants have in lockstep raised their prices of their respective

diabetes drugs in an astounding manner despite the fact that the cost to produce these drugs has decreased during that same time period.

14.  Insulins, which today cost Manufacturer Defendants less than $2 to produce and which were originally priced at $20 when released in the late 1990s, now range between $300 and $700.

15.  In the last decade alone, Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, taking the same increase down to the decimal point within a few days of each other.

16.  Figure 1 illustrates the rate in which Defendant Eli Lilly raised the price of its analog insulin, Humalog, compared to the rate of inflation for other consumer goods and services from 1997-2018.

**Figure 1: Price Increase of Insulin vs. Selected Consumer Goods from 1997-2018**



17. Remarkably, nothing about these medications has changed during that time period; today's $350 insulin is the exact drug Defendants originally sold for $20.

18. The current outrageously inflated price stands in stark contrast to insulin's origins: the discoverers sold the original patent for $1 to ensure that the medication would remain affordable. Today, insulin has become the poster child for skyrocketing and false drug prices.

19. Both Manufacturer and PBM Defendants play vital roles and profit immensely from the Insulin Pricing Scheme and the false list prices produced by it.

20. The Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, Manufacturer Defendants artificially and willingly raise their prices, and then pay a significant, yet undisclosed, portion of that false list price back to the PBMs. These Manufacturer Payments[1] are provided under a variety of labels, yet, however they are described, these Manufacturer Payments, along with the falsely inflated list prices, are *quid pro quo* for formulary inclusion on the PBMs' standard offerings.

21. The Manufacturers' prices have become so untethered from the actual prices realized by either Defendant group as to constitute a false price.

22. PBMs then grant preferred status on their standard formularies based upon the highest false list price—which the PBMs know to be false and which the PBMs insist

---

[1] In the context of this Complaint, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees and any other form of consideration exchanged.

that their payor clients use as the basis for the price they pay for the at-issue drugs. The at-issue drugs with the highest list prices generate the largest profits for these PBMs.

23.     The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. Manufacturer Defendants are able to make these undisclosed Manufacturer Payments to buy preferred formulary position—which significantly increases their revenue—without sacrificing their profit margins.

24.     PBM Defendants profit off the false list prices that result from the scheme in numerous ways, including: (1) retaining a significant—yet undisclosed—percentage of the secret Manufacturer Payments, (2) using the false list price produced by the Insulin Pricing Scheme to generate profits from pharmacies in their networks and (3) relying on those same false list prices to drive up the PBMs' profits through their own pharmacies.

25.     Thus, while the PBM Defendants represent both publicly and to their clients that they use their market power to drive down prices for diabetes medications, these representations are patently false.

26.     Rather the PBMs are intentionally driving up the price of the at-issue drugs. Indeed, the Manufacturer Payments the PBMs receive in exchange for preferred formulary position, along with the PBMs' actual formulary construction, are directly responsible for the skyrocketing price of insulin.

27.     Moreover, because the price paid by nearly every diabetic and payor is based upon the false list prices generated by Defendants' scheme, every diabetic and payor in Mississippi, who purchases these life-sustaining drugs, has been directly harmed by Defendants' Insulin Pricing Scheme.

28.     The State of Mississippi, as a payor for the at-issue drugs through its employee health plans and as a purchaser of the at-issue drugs at state-run facilities, has been overcharged millions of dollars a year.

29.     Mississippi diabetics have also been overcharged millions of dollars a year in out-of-pocket costs as a result of Defendants' Insulin Pricing Scheme.

30.     For diabetic Mississippians, the physical, emotional, and financial tolls of paying such excessive prices for diabetes medications is devastating. Unable to afford the drugs their doctors prescribe, many diabetics in Mississippi are forced to ration or under-dose their insulin, inject expired insulin, reuse needles, and starve themselves to control their blood sugars. This behavior is extremely dangerous and can lead to serious complications or even death.

31.     In addition to the immeasurable human costs, the insulin rationing caused by the Insulin Pricing Scheme also adds substantial costs to the Mississippi health care system by increasing preventable complications. For example, one national model found that all people with diabetes adhering to their diabetes medications would save $8.3 billion in direct medical costs per year by averting one million emergency department visits and 618,000 hospitalizations.

32.     The State shoulders the burden for much of these increased healthcare costs, spending more than $1 billion annually for diabetes and diabetes-associated complications. That number has steadily increased throughout the relevant time period and could grow exponentially in the near future given the high prevalence of prediabetes in Mississippi.

33.     Thus, in addition to being overcharged for the at-issue drugs through its employee benefit program and purchases for state-run facilities, the State has been and

will be damaged by the significant increase in health care expenditures caused by the Insulin Pricing Scheme as well.

34.     Insulin rationing and the resulting otherwise-avoidable health complications caused by the Insulin Pricing Scheme also leads to a loss in productivity and tax revenue, further damaging the State.

35.     The Honorable Lynn Fitch, Attorney General brings this action on behalf of the State of Mississippi and its citizens: (a) to protect the health and economic well-being of the hundreds of thousands of diabetic Mississippians in its *parens patriae* capacity; (b) on behalf of the State as a payor for and purchaser of the at-issue diabetes medications through its health plans and state-run facilities; and (c) on behalf of the State to recover damages for the costs it has and will incur as a result of Defendants' unlawful conduct.

36.     This action asserts causes for Defendants' violation of the Mississippi Consumer Protection Act, unjust enrichment and civil conspiracy.

37.     This action seeks injunctive relief, restitution, disgorgement, actual damages, punitive damages, civil penalties and attorneys' fees to address and abate the harm caused by the Insulin Pricing Scheme.

38.     The relevant period for damages alleged in this Third Amended Complaint is from 2003 continuing through the present.

## II.     PARTIES

### A.     Plaintiff

39.     **Plaintiff, the State of Mississippi**. The State of Mississippi is the sole Plaintiff in this action, brought in its name on relation of the Attorney General, the Honorable Lynn Fitch. Acting as a constitutional officer of the State possessing all the power and authority under the common law and statute, the Attorney General institutes

this action to protect the State's sovereign interest in the health and economic interests of its residents, its own interests and the integrity of its marketplace.

**B.     Manufacturer Defendants**

40.     **Defendant Eli Lilly and Company ("Eli Lilly)** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

41.     Eli Lilly is registered to do business in Mississippi and has been since at least 1966. Eli Lilly may be served through its registered agent: NRAI Agents, Inc., 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

42.     Eli Lilly holds a three active Drug Facility and Non-Resident Wholesaler permits with the Mississippi Board of Pharmacy (License #s: 15663/16.5a; 18295; 18281).

43.     These permits allow Eli Lilly to manufacture, distribute and sell its at-issue drugs in Mississippi.

44.     In Mississippi, Eli Lilly promotes and distributes its at-issue diabetes medications: Humulin N, Humulin R, Humalog, Trulicity and Basaglar.

45.     Eli Lilly's global revenues in 2019 were $4.13 billion from Trulicity, $2.82 billion from Humalog, $1.29 billion from Humulin and $1.11 billion from Basaglar.

46.     Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin and $801 million from Basaglar.

47.     Eli Lilly transacts business in Mississippi, targeting the State of Mississippi market for its products, including the at-issue diabetes medications.

48.     Eli Lilly employs sales representatives throughout Mississippi, to promote and sell Humulin N, Humulin R, Humalog, Trulicity and Basaglar.

49.     Eli Lilly also directs advertising and informational materials to Mississippi physicians, payors and diabetics for the specific purpose of selling more of the at-issue drugs in Mississippi and profiting from the Insulin Pricing Scheme.

50.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly caused its false list prices for the at-issue diabetes medications to be published throughout Mississippi with the express knowledge that payment and reimbursement by Mississippi diabetics and payors, including the State, would be based on those false list prices.

51.     During the relevant time period, the State spent millions of dollars per year based on Eli Lilly's false list prices for the at-issue drugs paid for through its employee health plans and purchased for use in state-run facilities.

52.     During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Eli Lilly's at-issue drugs also based on Eli Lilly's false list prices.

53.     All of the Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or purchased in Mississippi based on the specific false list prices Eli Lilly caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

54.     **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

55.     Sanofi may be served through its registered agent: Corporation Service Company, 7716 Old Canton Rd. Suite C, Madison, MS 39110.

56.     Sanofi is registered to do business in Mississippi.

57.     Sanofi holds three active Drug Facility Permits with the Mississippi Board of Pharmacy (License #s: 16521 / 16.5a, 16520 / 16.5a, and 16519 / 16.5a).

58.     These permits allow Sanofi to manufacture, distribute and sell its at-issue drugs in Mississippi.

59.     Sanofi promotes and distributes pharmaceutical drugs in Mississippi, including several at-issue diabetes medications: Lantus, Toujeo, Apidra and Soliqua.

60.     Sanofi's global revenues in 2019 were $3.50 billion from Lantus, $1.03 billion from Toujeo, $400 million from Apidra and $102 million from Soliqua.

61.     Sanofi's global revenues in 2018 were $3.9 billion from Lantus, $923 million from Toujeo, $389 million from Apidra and $73 million from Soliqua.

62.     Sanofi transacts business in Mississippi, targeting the Mississippi market for its products, including the at-issue diabetes medications.

63.     Sanofi employs sales representatives throughout Mississippi to promote and sell Lantus, Toujeo, Apidra and Soliqua.

64.     Sanofi also directs advertising and informational materials to Mississippi physicians, payors and diabetics for the specific purpose of selling more of the at-issue drugs in Mississippi and profiting from the Insulin Pricing Scheme.

65.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Sanofi caused its false list prices for the at-issue diabetes medications to be published throughout Mississippi with the express knowledge that payment and reimbursement by Mississippi diabetics and payors, including the State, would be based on those false list prices.

66.     During the relevant time period, the State spent millions of dollars per year based on Sanofi's false list prices for the at-issue drugs reimbursed through its employee health plans and purchased for use in state-run facilities.

67.     During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Sanofi's at-issue drugs also based on Sanofi's false list prices.

68.     All of the Sanofi diabetes medications related to the at-issue transactions were paid for and/or purchased in Mississippi based on the specific false and inflated prices Sanofi caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

69.     **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

70.     Novo Nordisk may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

71.     Novo Nordisk holds an active Drug Facility Permit with the Mississippi Board of Pharmacy (License #: 17784 / 16.4a).

72.     This permit allows Novo Nordisk to manufacture, distribute and sell its at-issue drugs in Mississippi.

73.     Novo Nordisk promotes and distributes pharmaceutical drugs in Mississippi, including at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza and Ozempic.

74. Nordisk's global revenues in 2019 were $2.89 billion from Novolog, $973 million from Levemir, $968 million from Tresiba, $2.29 billion from Victoza and $1.17 billion from Ozempic.

75. Novo Nordisk's global revenues in 2018 were $4.19 billion from Novolog, $1.66 billion from Levemir, $1.19 billion from Tresiba, $3.61 billion from Victoza and $185 million from Ozempic.

76. Novo Nordisk transacts business in Mississippi, targeting Mississippi for its products, including the at-issue diabetes medications.

77. Novo Nordisk employs sales representatives throughout Mississippi to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza and Ozempic.

78. Novo Nordisk also directs advertising and informational materials to Mississippi physicians, payors and diabetics for the specific purpose of selling more of the at-issue drugs in Mississippi and profiting from the Insulin Pricing Scheme.

79. At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Novo Nordisk caused its false list prices for the at-issue diabetes medications to be published throughout Mississippi with the express knowledge that payment and reimbursement by Mississippi diabetics and payors, including the State, would be based on those false list prices.

80. During the relevant time period, the State spent millions of dollars per year based on Novo Nordisk's false list prices for the at-issue drugs through its employee health plans and through purchases for use in state-run facilities.

81. During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Novo Nordisk's at-issue drugs also based on Novo Nordisk's false list prices.

82. All of the Novo Nordisk diabetes medications related to the at-issue transactions were paid for and/or purchased in Mississippi based on the specific false and inflated prices Novo Nordisk caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

83. Collectively, Defendants Eli Lilly, Novo Nordisk and Sanofi are referred to as "Manufacturer Defendants" or "Manufacturers."

**C.  PBM Defendants**

84. **Defendant CVS Health Corporation** ("CVS Health") is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout Mississippi.

85. CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

86. CVS Health, through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, and Chief Communication Officers, is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme that gave rise to the State's claims.

87. During the relevant time, CVS Health (or its predecessor)[2] has repeatedly, continuously and explicitly stated that *CVS Health:*

> a.  "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes;"[3]

---

[2] Until 2014, CVS Health was known as "CVS Caremark."  In September 2014, "CVS Caremark Corporation announced that it is changing its corporate name to CVS Health to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."

[3] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

b. "negotiate[s] with pharmaceutical companies to obtain discounted acquisition costs for many of the products on [CVS Health's] drug lists, and these negotiated discounts enable [CVS Health] to offer reduced costs to clients;"[4]

c. "utilize[s] an independent panel of doctors, pharmacists and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on [CVS Health's] drug lists."[5]

88. CVS Health publicly represents that CVS Health constructs programs that lower the cost of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including Mississippi, stating:

"*CVS Health* introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (Emphasis added).

89. In 2017, CVS Health stated that "*CVS Health* pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."

90. In 2005, 2010 and 2015, CVS Health made similar representations directly to the State. Examples include:

a. In April 2005, CVS Health represented to the State that "[*CVS Health*] provide[s] . . . the managed prescription drug program that will meet [the State's] financial objectives, maintain a high degree of plan participant satisfaction and loyalty, and actively and creatively manage the cost of buying and delivering healthcare benefits."

---

[4] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2013).
[5] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

      b.     On March 22, 2010, CVS Health represented to the State, "As the largest integrated provider of prescription drug benefits in the United States, [*CVS Health*] has the resources and proven experience to provide the highest quality of pharmaceutical care and deliver what plans want most – improved savings and improved member experience." (Emphasis added).

      c.     On March 4, 2015, the Vice President of Client Financial Analysis and Proposals for CVS Health represented to the State, "[CVS Health's] capabilities allow us to identify unique opportunities that improve member health and reduce total health care costs for our clients;" "*CVS Health* will provide consultative services regarding pharmacy benefit design including but not limited to . . . formularies, . . . implementation of programs which control utilization and optimize health, utilization review services and evaluation of drug use and cost data. [*CVS Health's*] consultative services can play a major role in support of the [State's] strategic objectives for managing pharmacy and total health care trend." (Emphasis added).

91.     CVS Health has entered into business relationships in Mississippi, including in 2015 when CVS Health announced a clinical affiliation with the University of Mississippi Medical Center to provide integrated health information in order to allow patients to better monitor their chronic diseases, such as diabetes.

92.     On March 4, 2015, CVS Health informed the State that "*CVS Health* operates 50 CVS/Pharmacy locations and support facilities [in Mississippi] in which more than 880 [CVS Health] colleagues work." (Emphasis added).

93.     In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, mail order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM and the pharmacies utilized by approximately 40 million Aetna members in the United States and in Mississippi. CVS controls the entire drug pricing chain for these 40 million Americans.

94.     Throughout the relevant time period, the Manufacturer Defendants directly engaged with CVS Health executives in furtherance of the Insulin Pricing Scheme. Each

Manufacturer Defendant has an entire team of executives dedicated exclusively to interacting with CVS Health.

95.    Manufacturer Defendants have explicitly recognized that effectuating the Insulin Pricing Scheme requires "intimacy and connect[ion]" between the Manufacturer Defendants' leaders and CVS Health's leaders in order to align on "strategic formulary management initiatives to ensure profitable access across all [standard] formularies."

96.    On a regular basis throughout the relevant period, the Manufacturer Defendants' executive teams—which at times included their CEOs—met with CVS Health executives to discuss their coordinated efforts related to the at-issue drugs. Examples include:

> a.    In 2011, 2012, and 2016 the leaders of CVS Health and Novo Nordisk participated in executive exchange meetings, which appear to have included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the Executive Vice President of CVS Health (Per Lofberg), the Chief Medical Officer of CVS Health (Dr. Troy Brennan), members of CVS Health's Enterprise Operating Committee (Matthew Leonard) and key executives from Novo Nordisk.

> b.    In 2012, the leaders of CVS Health and Eli Lilly participated in numerous executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme.  These meetings included the CEO of CVS Health (Per Lofberg), the COO of CVS Health (Jon Roberts), members of CVS Health's Enterprise Operating Committee (Matthew Leonard), the President of Eli Lilly ███████ and the Senior Vice President of Managed Care at Eli Lilly ██████████, among others.

97.    **Defendant CVS Pharmacy, Inc.** ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

98.    CVS Pharmacy owns and operates dozens of pharmacies throughout Mississippi that were directly involved in and profited from the Insulin Pricing Scheme.

99. CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, L.L.C.

100. CVS Pharmacy is registered to do business in Mississippi and has been since at least 1997.

101. CVS Pharmacy may be served through its registered agent: CT Corporation System, 645 Lakeland East Dr. Ste 101, Flowood, MS 39232.

102. During the relevant time period, CVS Pharmacy provided retail pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

103. **Defendant Caremark Rx, L.L.C.** is a Delaware limited liability company and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

104. Caremark Rx, L.L.C. is a wholly owned subsidiary of Defendant CVS Pharmacy.

105. Caremark Rx, L.L.C. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

106. During the relevant time period, Caremark Rx, L.L.C. provided PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

107. **Defendant Caremark L.L.C.** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, L.L.C. is a wholly owned subsidiary of Caremark Rx, L.L.C.

108.    Caremark, L.L.C. is registered to do business in Mississippi and has been since at least 2007. Caremark, L.L.C. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

109.    Caremark, L.L.C. holds one active Drug Facility Permit (License #: 15883 / 16.5a), one active PBM Permit (License #:140123 / 14.1) and two active Non-Resident Facility Permits (License #s: 03556 / 7.1 and 16616 / 7.1) with the Mississippi Board of Pharmacy.

110.    During the relevant time period, Caremark, L.L.C. also provided PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

111.    **Defendant CaremarkPCS Health, L.L.C.** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CaremarkPCS Health LLC is a wholly owned subsidiary of CVS Health.

112.    CaremarkPCS Health, L.L.C. provides pharmacy benefit management services.

113.    CaremarkPCS Health, L.L.C. is registered to do business in Mississippi and has been since at least 2014.

114.    CaremarkPCS Health, L.L.C. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

115.    CaremarkPCS Health, L.L.C. holds an active PBM Permit (License #:140116 / 14.1) with the Mississippi Board of Pharmacy.

116.    During the relevant time period, CaremarkPCS Health, L.L.C. provided PBM services in Mississippi, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

117.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, L.L.C., CVS Pharmacy, and CVS Health are directly involved in the conduct of and control CaremarkPCS Health, L.L.C and Caremark, L.L.C.'s operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments and mail order and retail pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

    a.    During the relevant time period, these parent and subsidiaries have had common officers and directors. Examples include:

- Thomas S. Moffatt was Vice President and Secretary of Caremark Rx, L.L.C., CaremarkPCS Health L.L.C., and Caremark, L.L.C at the same time he was a Vice President, Assistant Secretary, and Assistant General Counsel at CVS Health and Director, Vice President, and Secretary at CVS Pharmacy;

- Melanie K. Luker was the Assistant Secretary of CVS Pharmacy, Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C, and Caremark, L.L.C. at the same time she was a Senior Manager of Corporate Services at CVS Health;

- Jonathan C. Roberts was an Executive Vice President and Chief Operating Officer at CVS Health at the same time he was CEO of Caremark Rx, L.L.C.;

- Daniel P. Davison was the President of CaremarkPCS Health LLC at the same time he was a Senior Vice President at CVS Health;

- Annie E. Klis was a Vice President at CVS Health at the same time she was CEO of Caremark, L.L.C.

    b.    CVS Health directly or indirectly owns all the stock of CVS Pharmacy, Caremark Rx, L.L.C., Caremark L.L.C. and CaremarkPCS Health LLC.

    c.    All of the executives of CaremarkPCS Health, L.L.C., Caremark, L.L.C., Caremark Rx, L.L.C., and CVS Pharmacy ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

    d.    CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents and statements of CVS Health presents its subsidiaries, including CVS Pharmacy, CaremarkPCS Health, L.L.C., Caremark, L.L.C. and Caremark Rx, L.L.C. as divisions or

departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Third Amended Complaint. The CVS Health enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

118. Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, L.L.C., Caremark, L.L.C. and CaremarkPCS Health, L.L.C, including all predecessor and successor entities, are referred to as "CVS Caremark."

119. CVS Caremark is named as a Defendant in its capacities as a PBM and as mail order and retail pharmacy.

120. In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly and Sanofi regarding the false list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

121. CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 40% of the national market and a substantial portion of the Mississippi market.

122. At all times relevant hereto, CVS Caremark offered pharmacy benefit services to Mississippi payors, and derived substantial revenue therefrom, and, in doing so, made the at-issue misrepresentations (discussed below) and utilized the false prices generated by the Insulin Pricing Scheme to profit off Mississippi diabetics and payors.

123. At all times relevant hereto, CVS Caremark maintained standard formularies that are used in Mississippi. During the relevant time period, those formularies included the at-issue diabetes medications.

124.     The State currently relies on CVS Caremark to provide the at-issue PBM and pharmacy services to the State's health plan—the State and School Employees Health Insurance Management Board.

125.     From 1996-2005, CVS Caremark also provided the at-issue PBM and pharmacy services to the State's health plan.

126.     At all times relevant hereto, and contrary to all of its express representations, CVS Caremark has knowingly insisted that its payor clients, including the State, use the false list prices produced by the Insulin Pricing Scheme as the basis for payment for the price paid for the at-issue drugs.

127.     At all times relevant hereto, CVS Caremark has concealed its critical role in the generation of those false list prices.

128.     In its capacity as a mail order and retail pharmacy, CVS Caremark received payments from Mississippi diabetics and payors for, and set the out-of-pocket prices paid for, the at-issue drugs based on the false list prices produced by the Insulin Pricing Scheme and, as a result, damaged Mississippi diabetics and payors.

129.     In its capacity as a retail pharmacy, CVS Caremark further and knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the drugs at issue (an amount well below the list price generated by the Insulin Pricing Scheme), and the amounts they received from payors (which amounts were based on the false list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

130.   CVS Caremark purchases drugs from manufacturers, including the Manufacturer Defendants, and through drug wholesalers for dispensing by its mail order and retail pharmacies.

131.     At all times relevant hereto, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail order and retail pharmacies, including those located in Mississippi.

132.     **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[6]

133.     Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

134.     Evernorth, through its executives and employees including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme.  For example, during the relevant time period Evernorth's CEO Tim Wentworth was involved in communications with the Manufacturer Defendants related to the at-issue drugs and at-issue Manufacturer Payments.

135.     Evernorth's conduct had a direct effect in Mississippi and damaged diabetic Mississippians and the State.

136.     On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

137.     Throughout the relevant time period, the Manufacturer Defendants directly engaged with Evernorth executives in furtherance of the Insulin Pricing Scheme.  Each

---

[6] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc and Express Scripts Holding Company.

Manufacturer Defendant has an entire team of executives dedicated exclusively to interacting with Evernorth.

138.     Manufacturers recognize that effectuating the Insulin Pricing Scheme requires "enhanced  relationships at C Suite level" between the Manufacturers and Evernorth to "[i]mprove diabetes patient management through collaboration" and to "work synergistically within [Manufacturer Defendants] to maximize [Evernorth's] business opportunities."

139.     On a regular basis throughout the relevant time period,  these Manufacturer executive teams—which at times include the CEOs from these companies—met with Evernorth to discuss their coordinated efforts related to the at-issue drugs. Examples include:

> a.     In 2013, 2014, and 2015 the leaders of Evernorth and Eli Lilly participated in executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of Evernorth (George Paz), Senior Director of Express Scripts Pharmaceutical Strategies & Solutions (Jason Zilocchi), CEO of Eli Lilly ████████████, Head of Eli Lilly's diabetes division ████████████, among others.
>
> b.     In 2013 and 2014, the leaders of Evernorth and Novo Nordisk participated in executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme.

140.     Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Mississippi, which engaged in the activities that gave rise to this Third Amended Complaint.

141.     In December 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM and mail order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM and the mail order pharmacies utilized by approximately 15 million Cigna members in the United

States and in Mississippi. Evernorth controls the entire drug pricing chain for these 15 million Americans.

142.    In each annual report for at least the last decade, Evernorth has repeatedly, continuously and explicitly stated:[7]

> a.    "[Evernorth] is one of the largest PBMs in North America . . . [and Evernorth] help[s] health benefit providers address access and affordability concerns resulting from rising drug costs while helping to improve healthcare outcomes."
>
> b.    "[Evernorth] manage[s] the cost of the drug benefit by . . . assist[ing] clients in selecting a cost-effective formulary [and] leveraging purchasing volume to deliver discounts to health benefit providers."
>
> c.    "[Evernorth] works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes."

143.    **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

144.    Express Scripts, Inc. is registered to do business in Mississippi and has been since at least 2010.

145.    Express Scripts, Inc. may be served through its registered agent: Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, Mississippi 39910.

146.    Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Mississippi that engaged in the conduct which gave rise to this Third Amended Complaint.

---

[7] Express Scripts Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

147. During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail order pharmacy services which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

148. **Defendant Express Scripts Administrators, LLC,** doing business as Express Scripts and formerly known as Medco Health, L.L.C., is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

149. Express Scripts Administrators, LLC is registered to do business in Mississippi and has been since at least 2006.

150. Express Scripts Administrators, LLC may be served through its registered agent: Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, Mississippi 39910.

151. Express Scripts Administrators, LLC holds an active PBM Permit (License #: 140117 / 14.1) with the Mississippi Board of Pharmacy.

152. During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Mississippi discussed in this Third Amended Complaint that gave rise to the Insulin Pricing Scheme that damaged diabetic Mississippians and the State.

153. **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey.

154. Medco may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive Ste 101, Flowood, MS 39232.

155. Prior to 2012, Medco provided pharmacy benefit management services to various health insurance entities throughout the United States and in Mississippi.

156. In 2012, Express Scripts acquired Medco for $29 billion.

157. Prior to the merger Express Scripts and Medco were two of the largest PBMs in the United States and in Mississippi.

158. Prior to the merger, Medco provided the at-issue PBM and mail order services in Mississippi, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

159. Following the merger, all of Medco's PBM and mail order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

160. At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, then CEO of Medco, David B Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater [Manufacturer Payments] from drug manufacturers and other suppliers."

161. The then-CEO of Express Scripts, George Paz, during a Congressional subcommittee hearing in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."

162.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

163.    ESI Mail Pharmacy Service, Inc. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

164.    ESI Mail Pharmacy Service, Inc. holds four active Non-Resident Facility Permits (License #s: 13873 / 7.1, 13921 / 7.1, 05805 / 7.1, 02882 / 7.1) with the Mississippi Board of Pharmacy.

165.    During the relevant time period, ESI Mail Pharmacy Services provided the mail order pharmacy services in Mississippi discussed in this Third Amended Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

166.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

167.    Express Scripts Pharmacy, Inc. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

168.    Express Scripts Pharmacy, Inc. holds six active Non-Resident Facility Permits (License #s: 13393 / 7.1, 03645 / 7.1, 04548 / 7.1, 08226 / 7.1, 05397 / 7.1, 05060 / 7.1) with the Mississippi Board of Pharmacy.

169.    During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in Mississippi discussed in this Third Amended Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

170.     As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. are directly involved in the conduct of and control Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy, Inc's operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments and mail order pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

  a.     During the relevant time period, these parent and subsidiaries have had common officers and directors:

- Officers and/or directors that have been shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Secretary; Timothy Smith, Vice President; and Scott Lambert, Treasury Manager Director;

- Executives that have been shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Secretary;

- Officers and/or directors that have been shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Secretary; and Joanne Hart, Associate Treasurer;

- Officers and/or directors that have been shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Secretary; Scott Lambert, Treasury Manager Director; and Joanne Hart, Associate Treasurer; and

- Officers and/or directors that have been shared between Medco Health Solutions, Inc. and Evernorth include David Queller, President and Senior VP of Sales & Accounting, Christine Houston, VP and COO, Timothy Smith, VP and Treasurer and all of the officers of Medco Health Solutions are also officers of Express Scripts, Inc.

  b.     Evernorth directly or indirectly owns all of the stock of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.

     c.     The Evernorth corporate family does not operate as separate entities. The public filings, documents and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Third Amended Complaint. The Evernorth enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

     d.     All of the executives of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

     e.     As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. that gave rise to the State's claims in this Third Amended Complaint.

171.    Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

172.    Express Scripts is named as a Defendant in its capacities as a PBM and mail order pharmacy.

173.    In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly and Sanofi regarding the false list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Script's formularies.

174.    Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Third Amended Complaint, Express Scripts controlled 30% of the PBM market in the United States. Express Scripts has only grown larger since the Cigna merger.

175.    In Mississippi, during the relevant time period, Express Scripts controlled up to 30% of the PBM market share based on covered lives, including at certain times up to 92% of the commercial insurance market in Mississippi.

176.    In 2017, annual revenue for Express Scripts was over $100 billion.

177.    As of December 31, 2018, more than 98% of all retail pharmacies in the nation participated in one or more of Express Scripts' networks.

178.    At all times relevant hereto, Express Scripts offered pharmacy benefit services, and derived substantial revenue therefrom, in Mississippi and provided the at-issue PBM services to numerous payors in Mississippi.

179.    At all times relevant hereto, and contrary to all of their express representations, Express Scripts has knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

180.    At all times relevant hereto, Express Scripts has concealed its critical role in the generation of those false list prices.

181.    At all times relevant hereto, Express Scripts maintained standard formularies that are used in Mississippi. During the relevant time period, those formularies included the at-issue diabetes medications.

182.    During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to

negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. During these same years, OptumRx provided PBM services to the State, including Manufacturer Payment negotiations and formulary construction.

183.    In its capacity as a mail order pharmacy, Express Scripts received payments from Mississippi diabetics and payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Mississippi diabetics and payors.

184.    At all times relevant hereto, Express Scripts derived substantial revenue providing mail order pharmacy services in Mississippi.

185.    Express Scripts purchases drugs directly from manufacturers for dispensing through its mail order pharmacy.

186.    At all times relevant hereto, Express Scripts received payments from Mississippi diabetics and payors for, and set the out-of-pocket prices paid for, the at-issue drugs based on the false list prices produced by the Insulin Pricing Scheme and, as a result, damaged Mississippi diabetics and payors.

187.    Express Scripts operates the mail order pharmacy and handles the Manufacturer Payment contracting for the PBM Prime Therapeutics. Upon information and belief, through this relationship, during the relevant time period, Express Scripts negotiated Manufacturer Payments related to the at-issue purchases made by the State through its health plan.

188.    At all times relevant hereto, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the

Manufacturers' at-issue drugs sold through Express Scripts' mail order pharmacies in Mississippi.

189. **Defendant UnitedHealth Group, Inc**. **("UnitedHealth Group" or "UHG")** is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

190. UnitedHealth Group, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

191. UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2015, UnitedHealth Group reported revenue in excess of $157 billion, and the company is currently ranked sixth on the Fortune 500 list.

192. One-third of the overall revenues of UnitedHealth Group come from OptumRx.

193. UnitedHealth Group was directly involved in the conduct that caused the Insulin Pricing Scheme and as a result had a direct effect in Mississippi and damaged diabetic Mississippians and the State.

194. UnitedHealth Group, through its executives and employees, is directly involved in its enterprise-wide PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example, during the relevant time period OptumRx represented to the State that in providing PBM services, *UnitedHealth Group* has an "enterprise-wide commitment to Mississippi" with over "500 Mississippi-based employees as part of UnitedHealth Group, we are confident in our understanding of the market dynamics within [Mississippi] as well as our ability to

lower overall drug costs while providing an unparalleled customer and member experience."

195.    UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail order pharmacies] . . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."

196.    UnitedHealth Group executives structure, analyze and direct the company's overarching policies, including with respect to PBM and mail order services, as a means of maximizing profitability across the corporate family.

197.    On a regular basis throughout the relevant time period, executive teams from each Manufacturer Defendant—including at times their CEOs—met with executives from UnitedHealth Group to discuss their coordinated efforts in furtherance of the Insulin Pricing Scheme. Examples include:

> a.    In April 2015, the Executive Vice President at UnitedHealth Group, the Chief Commercial Officer at Optum Analytics, the Vice President of Optum, the Vice President of OptumInsight, among other executives met with Vice President of Market Access and the Executive Vice President of Strategic Accounts, among other executives from Novo Nordisk at UnitedHealth Group's corporate headquarters to discuss their strategic overview and prioritized opportunities in diabetes.

> b.    In October 2016, the CEO of OptumRx, Mark Thierer, and the CEO of UnitedHealth Group, Steve Hemsley, met the CEO of Eli Lilly, Dave Ricks, to discuss "strategic initiatives" between UHG/OptumRx and Eli Lilly.

198.    In addition to being a PBM and a mail order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM and the mail order pharmacies utilized by approximately 26 million UnitedHealthcare members in the United States and in Mississippi.   UnitedHealth Group controls the entire drug pricing chain for these 26 million Americans.

199.    During the relevant time period, UnitedHealth Group has availed itself of Mississippi courts, including in *UnitedHealth Group Incorporated, et al. v. Gallagher*, 3:11cv00329-HTW-LRA (S.D. Mississippi), filed Jun. 1, 2011. In the complaint that initiated that lawsuit, UHG represented that it contracted with Mississippi residents and directly engaged in PBM business and programs in Mississippi related to "advancing the health and well-being of individuals and communities," and that UnitedHealth Group's business interests in Mississippi included providing PBM services to the State.

200.    **Defendant Optum, Inc.**, is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.

201.    Optum, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

202.    Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in Mississippi and damaged diabetic Mississippians and the State.

203.    For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers." In this role Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx" and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail order activities.

204.    OptumRx represented directly to the State that in providing PBM services it "leverage[es] the power of Optum to impact cost of care . . . to address all health and savings opportunities."

205.    **Defendant OptumInsight, Inc. ("OptumInsight")** is a Delaware corporation with a principal place of business at 11000 Optum Circle, Eden Prairie, MN 55344.

206.    OptumInsight is registered to business in Mississippi and has been since 1998. OptumInsight may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

207.    OptumInsight holds one active Third Party Administrator license in Mississippi (License #:1509323).

208.    OptumInsight provides data, analytics and consulting to companies with the healthcare industry, including the Manufacturer Defendants.

209.    OptumInsight is an integral part of the Insulin Pricing Scheme and during the relevant time period OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the Insulin Pricing Scheme. OptumInsight analyzed data and

other information from the Manufacturer Defendants to advise the Manufacturers with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

210. **Defendant OptumRx Holdings, LLC**, is a Delaware limited liability corporation with a principal place of business at 2300 Main Street, Irvine, California.

211. OptumRx Holdings, LLC provides pharmacy benefit management services through its subsidiaries to various health insurance entities in Mississippi.

212. **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614.

213. OptumRx, Inc. is registered to business in Mississippi and has been since 2007. OptumRx, Inc. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

214. OptumRx, Inc. holds one active PBM Permit (License #:140113 / 14.1) and three active Non-Resident Facility Permits (License #s: 07085 / 7.1, 05333 / 2.4, 17495 / 7.1) with the Mississippi Board of Pharmacy.

215. During the relevant time period, OptumRx, Inc. provided the PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

216. As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC and Optum, Inc are directly involved in the conduct of and control OptumInsight and OptumRx, Inc.'s operations, management and business decisions related to the at-issue formulary construction, negotiations and mail order pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

a.     These parent and subsidiaries have common officers and directors, including:

- Sir Andrew Witty is president of UnitedHealth Group and CEO of Optum, Inc.;

- Dan Schumacher is president of Optum, Inc, the Chief Strategy and Growth Officer at UnitedHealth Group, Inc. and oversees OptumInsight;

- Terry Clark is a senior vice president and chief marketing officer at UnitedHealth Group and oversees the branding, marketing and advertising for UnitedHealth Group and Optum, Inc.;

- Tom Roos serves as chief accounting officer for UnitedHealth Group and Optum, Inc.;

- Heather Lang is Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and Assistant Secretary at OptumRx, Inc.; and

- Peter Gill is Vice President at UnitedHealth Group, Inc. and Treasurer at OptumRx, Inc.

- Timothy Alan Wicks, CFO and Executive Vice President of Optum, Inc., is also a director of OptumRx, Inc.

b.     UnitedHealth Group directly or indirectly owns all of the stock of Optum, Inc., OptumRx Holdings LLC, OptumInsight and OptumRx, Inc.

c.     The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents and statements of UnitedHealth Group presents its subsidiaries, including Optum, Inc., OptumRx Holdings LLC, OptumInsight and OptumRx, Inc. as divisions or departments of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Third Amended Complaint. The UnitedHealth Group enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

> d. All of the executives of Optum, Inc., OptumRx Holdings, LLC, OptumInsight and OptumRx, Inc. ultimately report to the executives, including the CEO, of UnitedHealth Group.
>
> e. As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of OptumInsight, Optum, Inc., OptumRx Holdings LLC, and OptumRx, Inc. that gave rise to the State's claims in this Third Amended Complaint.

217. Collectively, Defendants UnitedHealth Group, Inc., OptumInsight, OptumRx, Inc., OptumRx Holdings and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

218. OptumRx is named as a Defendant in its capacities as a PBM and mail order pharmacy.

219. In its capacity as a PBM, OptumRx coordinates with Novo Nordisk, Eli Lilly and Sanofi regarding the false list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on OptumRx's drug formularies.

220. OptumRx provides PBM services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.

221. In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with a revenue of $74 billion.

222. As illustrated in Figure 13, OptumRx rose to power through numerous mergers with other PBMs. For example, in 2012, a large PBM, SXC Health Solutions bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company, Catamaran Corp. Following this UnitedHealth Group bought Catamaran Corp in a deal worth $12.8 billion and combined Catamaran with OptumRx.

223.    Prior to merging with OptumRx, Catalyst Health Solutions, Inc. and Catamaran Corp. engaged in the at-issue PBM and mail order activities.

224.    At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Mississippi.

225.    From 2006-2015, OptumRx provided the at-issue PBM and pharmacy services to the State's health plan—the State and School Employees Health Insurance Management Board.

226.    At all times relevant hereto, and contrary to all of their express representations, OptumRx has knowingly insisted that its payor clients, including the State, use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

227.    At all times relevant hereto, OptumRx has concealed its critical role in the generation of those false list prices.

228.    At all times relevant hereto, OptumRx offered pharmacy benefit management services and maintained standard formularies in Mississippi. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Third Amended Complaint.

229.    In its capacity as a mail order pharmacy, OptumRx received payments from Mississippi diabetics and payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Mississippi diabetics and payors.

230.    At all times relevant hereto, OptumRx derived substantial revenue through its mail order pharmacies in Mississippi.

231. At all times relevant hereto, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies, including in Mississippi.

232. Collectively, CVS Caremark, Optum Rx and Express Scripts are referred to as "PBM Defendants" or "PBMs."

### III. Sovereign Interest

233. This action seeks, on behalf of the State of Mississippi and its citizens, legal and equitable relief to redress injury and damage, as well as injunctive relief seeking an end to the Insulin Pricing Scheme. The State of Mississippi has a sovereign interest in protecting the well-being of the hundreds of thousands of diabetic citizens of the State of Mississippi who rely on Defendants' diabetic medications and have been damaged, and continue to be damaged, by the Defendants' unlawful conduct.

234. Further, as a direct result of Defendants' false and deceptive scheme, the State of Mississippi has been damaged by having to pay millions of dollars per year in overcharges for Defendants' diabetes medications as a payor for and purchaser of the at-issue drugs and having to pay for increased healthcare costs caused by the Insulin Pricing Scheme.

235. The State of Mississippi is a real party in interest in this action. Acting as a constitutional officer of the State of Mississippi possessing all the power and authority under the common law and statute, the Attorney General institutes this action to protect the health and economic interests of its residents, its own interests and the integrity of its marketplace. The Attorney General is authorized to bring this action on behalf of the State

as *parens patriae*, representative of its citizens and chief legal officer, to recover damages, punitive damages, restitution, penalties, disgorgement, injunctive relief and to remediate all harm arising out of—and provide full relief for—violations of Mississippi laws. The Attorney General brings this action on the State's behalf pursuant to her authority granted by Miss. Const. Art. 6, § 173 and Miss. Code Ann. § 7-5-1; Miss. Code Ann. §§ 75-24-1, *et seq*.

## IV.    JURISDICTION AND VENUE

236.    This Court has personal jurisdiction over each Defendant. Each Defendant: (a) transacts business and/or is admitted to do business within Mississippi, (b) maintains substantial contacts in Mississippi, and (c) committed the violations of Mississippi statutes and common law at issue in this lawsuit within Mississippi. The Insulin Pricing Scheme has been directed at, and has had the foreseeable and intended effect of, causing injury to persons residing in, located in, or doing business in Mississippi, and to the State itself. All of the at-issue transactions occurred in Mississippi and/or involved Mississippi residents. This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Mississippi.

237.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and the actions giving rise to the Complaint took place within this District. In particular, at all times during the relevant time period, Defendants provided pharmacy benefit services, provided mail order pharmacy services, employed sales representatives, promoted and sold diabetes medications and published prices of the at issue drugs in this District.

## V. FACTUAL ALLEGATIONS

### A. Diabetes and Insulin Therapy

### Diabetes: A Growing Epidemic

238.     Diabetes is a disease that occurs when a person's blood glucose, also called blood sugar, is too high. In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the blood. When there is not enough insulin or cells stop responding to insulin, too much blood sugar stays in the bloodstream. Over time, that can cause serious health problems, such as heart disease, vision loss and kidney disease.

239.     There are two basic types of diabetes. Roughly 90-95% of diabetics developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as Type 2, this form of diabetes is often developed later in life. While Type 2 patients can initially be treated with tablets, in the long term most patients have to switch to insulin injections.

240.     Type 1 diabetes occurs when a patient completely ceases insulin production. In contrast to Type 2 patients, people with Type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.

241.     Insulin treatments are a necessary part of life for those who have diabetes and interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.

242.     The number of Americans with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over ten (10) million.  Fourteen (14) years later, the

43

count tripled again. Now over thirty (30) million people—9.4% of the country—live with the disease.

243.    Likewise, the prevalence of diabetes in Mississippi has been steadily increasing as well, approximately 400,000 Mississippi adults now live with diabetes and another 750,000 have prediabetes.

244.    The burden of diabetes is not equally distributed in Mississippi. Diabetes is significantly more prevalent in impoverished regions such as the Mississippi Delta. Nearly 1 in 4 Mississippians who earn less than $25,000 a year have diabetes.

245.    Minority communities are also disproportionally affected by this disease— nearly 20% of Black Mississippians have diabetes.

### **Insulin: A Century Old Drug**

246.    Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the health complications associated with the disease are avoidable.

247.    Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

248.    In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. After discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent of $14 today), explaining "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."

249.    After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale their production. Under this arrangement,

Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

250.    Although early iterations of insulin were immediately perceived as lifesaving, there have been numerous incremental improvements since its discovery. The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.

251.    While effective, animal-derived insulin created the risk of allergic reaction. This risk was lessened in 1982 when synthetic insulin, known as human insulin, was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institute of Health and the American Cancer Society.

252.    Over a decade later, Defendant Eli Lilly developed the first analog insulin, Humalog, in 1996.

253.    Analog insulin is laboratory grown and genetically altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.

254.    Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, with similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

255.    Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

256.   In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.

257.   In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.

258.   Even though insulin was first extracted nearly one hundred (100) years ago, only Defendants Eli Lilly, Novo Nordisk and Sanofi manufacture insulin in the United States.

259.   Many of the at-issue diabetes medications are now off patent.  However, the Manufacturers have engaged in illicit tactics to maintain their complete market dominance.

260.   Due in large part to their ability to stifle all competition, Manufacturer Defendants make 99% of the insulins in the market today.

### Current Insulin Landscape

261.   While insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions whether the overall efficacy of insulin has significantly improved over the last twenty (20) years.

262.   For example, while long-acting analogs may have certain advantages over human insulins, such as affording more flexibility around mealtime planning, it has yet to be shown that analogs lead to better long-term outcomes.

263.   A recent study published in the Journal of American Medical Association suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.

264.    When discussing the latest iterations of insulins, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are marginally different, and the clinical benefits of them over the older drugs have been zero.

265.    Moreover, all of the insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

266.    Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.

267.    Nor have the production or research and development costs increased. In fact, in the last ten (10) years, the production costs of insulin have decreased as manufacturers simplified and optimized processes. A September 2018 study published in BMJ Global Health calculated that, based on production costs, a reasonable price for a year's supply of human insulin is $48 to $71 per person and between $78 and $133 for analog insulins—which includes delivering a profit to manufacturers.

268.    Another recent study noted anecdotal evidence that the Manufacturers could be *profitable charging under $2 a vial*. While the study estimated the total cost (including device and cold-chain distribution) to produce a vial of analog insulin was $2.50, the study noted:

> If we are wrong on [the $2.50 cost estimate] it would be by *overestimating* them. In short, [while we calculate] costs are likely around $2.50 pen/vial . . . in discussion with Biocon (a foreign insulin manufacturer) we were told

insulin price in India was ~$2/vial and Biocon is "comfortably profitable" at that level. In another discussion we were told Sanofi offered Lantus at under $1.60 in certain emerging markets national tenders.

269.    These figures stand in stark contrast to the $5,705 that a diabetic spent, on average, for insulin in 2016.

270.    Further, while research and development costs often make up a large percentage of the price of a drug, in the case of insulin the initial basic research—original drug discovery and patient trials—was performed one hundred (100) years ago.

271.    Even the more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago.

272.    Today, Manufacturer Defendants only spend a fraction of the billions of dollars in revenue they generate from the at-issue drugs on research and development.

273.    Despite this decrease in production costs and no new research and development, the reported price of insulins has risen astronomically over the last fifteen (15) years.

### Insulin Adjuncts: Type 2 Medications

274.    Over the past decade, Manufacturer Defendants have also released a number of combination or non-insulin medications that help control the level of insulin in the bloodstream of Type 2 diabetics.

275.    In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity, and in 2017, Novo Nordisk did the same with Ozempic. In 2016, Sanofi released Soliqua, a combination insulin and insulin adjunct drug.

276.    Victoza, Trulicity and Ozempic are all medications known as glucagon-like peptide-1 receptor agonists ("GLP-1") and are similar to the GLP-1 hormone that is already

48

produced in the body. Each of these drugs can be used in conjunction with insulins to control diabetes. Soliqua is a combination GLP-1 and long acting human insulin analog.

277. Today, Manufacturer Defendants have a dominant position in the market for all diabetes medications. The following is a list of diabetes medications at issue in this lawsuit.

## Table 1: Diabetes medications at issue in this case

| Insulin Type | Action | Name | Company | FDA Approval | Current Price |
|---|---|---|---|---|---|
| *Human* | **Rapid-Acting** | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1994 | $1,784 (vial)<br>$689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial)<br>$312 (pens) |
| | **Intermediate** | Humulin N | Eli Lilly | 1982 | $178 (vial)<br>$566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial)<br>$566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial)<br>$312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial)<br>$312 (pens) |
| *Analog* | **Rapid-Acting** | Humalog | Eli Lilly | 1996 | $342 (vial)<br>$636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial)<br>$671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial)<br>$658 (pens) |
| | **Long-Acting** | Lantus | Sanofi | 2000 | $ 340 (vial)<br>$510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $ 370 (vial)<br>$ 555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2016 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens)<br>$622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial)<br>$610 (pens – 100u)<br>$732 (pens – 200u) |
| *Type 2 Medications* | | Trulicity | Eli Lilly | 2014 | $1,013 (pens) |
| | | Victoza | Novo Nordisk | 2010 | $813 (2 pens)<br>$1,220 (3 pens) |
| | | Ozempic | Novo Nordisk | 2017 | $1,022 (pens) |
| | | Soliqua | Sanofi | 2016 | $927.90 (pens) |

### B.    The Dramatic Rise in the Price of Diabetes Medications

278.   In 2003, PBMs began their rise to power (which will be discussed in greater detail in the next section).

279.   That same year, the price of insulin began its dramatic rise to its current exorbitant level.

280.   Since 2003, the list price of certain insulins has increased in some cases by more than 1000%; an astounding increase especially when compared to a general inflation rate of 8.3% and a medical inflation rate of 46% in this time period.

281.   By 2016, the average price per month of the four most popular types of insulin rose to $450 — and costs continue to rise, so much so that now one in four diabetics are skimping on or skipping lifesaving doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

282.   Since 1997, Defendant Eli Lilly has falsely inflated the list price of a vial of Humulin R (500U/ML) from $165 to $1784 (*See* Figure 2).

**Figure 2: Rising reported prices of Humulin R (500U/mL) from 1997-2021**



283. Since 1996, Defendant Eli Lilly has falsely inflated the list price for a package of pens of Humalog from less than $100 to $663 and from less than $50 for a vial to $342 (*See* Figure 3).

**Figure 3: Rising reported prices of Humalog vials and pens from 1996-2021**



284. Novo Nordisk has falsely inflated its list prices—from 2006 to 2020, Levemir rose from $162 to $555 for pens and from under $100 to $370 per vial (*See* Figure 4).

**Figure 4: Rising reported prices of Levemir from 2006-2021**



285. From 2002 to 2020, Novo Nordisk falsely inflated the list price of Novolog from $108 to $671 for a package of pens and from less than $50 to $347 for a vial (*See* Figure 5).

**Figure 5: Rising reported prices of Novolog vials and pens from 2002-2021**



286.    Defendant Sanofi has kept pace as well, falsely inflating the list price for Lantus, the top-selling analog insulin, from less than $200 in 2006, to over $500 in 2020 for a package of pens and from less than $50 to $340 for a vial (*See* Figure 6).

**Figure 6: Rising reported prices of Lantus vials and pens from 2001-2021**



287.    Manufacturer Defendants' non-insulin diabetes medications have experienced similar recent price increases. For example, since 2015 Eli Lilly has falsely inflated the list price of Trulicity almost 50%.

288.    Driven by these price hikes, payors' and diabetics' spending on diabetes medications has skyrocketed with totals in the tens of billions of dollars.

## **Defendant Manufacturers Have Increased Prices in Lockstep**

289.   The timing of the list price increases reveal that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatments, they have done so in perfect lockstep.

290.   In thirteen (13) instances since 2009, competitors Sanofi and Novo Nordisk raised the reported prices of their insulins, Lantus and Levemir, in tandem, taking the same price increase down to the decimal point within a few days of each other.

291.   This practice of increasing drug prices in lockstep with competitors is known as "shadow pricing" and, as healthcare expert Richard Evans from SSR Health recently stated, "is pretty much a clear signal that your competitor does not intend to price-compete with you."

292.   In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs were responsible for the highest drug price increases in the entire pharmaceutical industry.

293.   Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 7 demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 8 demonstrates this behavior with respect to Novolog and Humalog.

**Figure 7: Rising reported prices of long-acting insulins**



**Figure 8: Rising reported prices of rapid-acting insulins**



294.    Figure 9 demonstrates this behavior with respect to the human insulins, Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 9: Rising reported price increases for human insulins**




295.  Figure 10 demonstrates Defendants' lockstep price increases for their Type 2 drugs, Trulicity, Victoza, Ozempic and Soliqua.

**Figure 10: Rising reported prices of Type 2 drugs**



296.    Figure 11 shows how, collectively, Manufacturer Defendants have exponentially raised the prices of insulin products in near perfect unison.

### Figure 11: Lockstep insulin price increases



297.    Because of Manufacturer Defendants' collusive price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

### C.    Pharmaceutical Payment and Supply Chain

298.    The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third party payors, pharmacy benefit managers and patients.

299.    Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy and pharmacy to patient or (2) from manufacturer to mail order pharmacy to patient.

300.    The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the

pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is directly tied to the manufacturer's list price.

301.    There is no transparency in this pricing system; typically, only a brand drug's list price—also known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Cost (WAC)—is available. To note, "Wholesale Acquisition Cost" is not the final price that wholesalers (or any other entity in the pharmaceutical pricing chain) pay for the Manufacturers' drugs. The final price that a wholesaler pays the Manufacturers is less than WAC because of post-purchase discounts.

302.    Drug manufacturers self-report AWP or other prices upon which AWP is based to publishing compendiums such as First DataBank, Redbook and others who then publish that price.

303.    As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used reported price in reimbursement and payment calculations and negotiations for both payors and patients.

**Drug Costs for Diabetics**

304.    Whether insured or not, all Mississippi diabetics pay a substantial part of their diabetic drug costs based on the false list prices generated by the Insulin Pricing Scheme.

305.    Uninsured diabetic must pay the full, point-of-sale prices (based on the false prices generated by the Insulin Pricing Scheme) every time they fill their prescriptions. In Mississippi, 12% of the population—or 357,138 Mississippians are uninsured. Approximately 60,000 of uninsured Mississippians are diabetic. As a direct result of the

Insulin Pricing Scheme, the prices uninsured Mississippians have had to pay for the at-issue life-sustaining drugs has skyrocketed over the last fifteen years.

306.    The uninsured are not the only patients saddled with high costs. Insured diabetics also often pay a significant portion of a drug's price out-of-pocket including in deductibles, coinsurance requirements, and/or copayment requirements.

307.    Thus, nearly all Mississippi diabetics have been damaged by having to pay for diabetes medications out-of-pocket based upon the specific false prices generated by the Insulin Pricing Scheme.  In many cases, the Mississippi diabetics have been priced out of these life-sustaining drugs.

308.    In addition, these exorbitant indefensible out-of-pocket costs make it more difficult for patients to adhere to their medications, resulting in avoidable complications and higher overall healthcare costs. An American Diabetes Association working group recently noted that "people with high cost-sharing are less adherent to recommended dosing, which results in short- and long-term harm to their health." The overall economic impact from the loss of productivity and increased healthcare costs that result from diabetics underdosing on their insulin has been deeply damaging to the State.

### D.    PBMs' Role in the Pharmaceutical Payment Chain

309.    PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 12:

### Figure 12: Insulin distribution and payment chain



310.    The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that payors and diabetics pay for prescription drugs and are paid by payors for the drugs utilized by a payor's beneficiaries.

311.    PBMs also contract with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. PBMs reimburse pharmacies for the drugs dispensed.

312.    PBM Defendants also own mail-order, retail and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to patients.

313.    Often times—including for the at-issue drugs—the PBM Defendants purchase drugs from the Manufacturers and dispense them to the patients.

314.     Even where PBM Defendant's pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the Manufacturers.

315.     In addition, and of particular significance here, PBM Defendants contract with pharmaceutical manufacturers, including Manufacturer Defendants. PBMs receive from the Manufacturers rebates, fees and the other consideration that are paid back to the PBM (defined herein as Manufacturer Payments).

316.     These relationships allow PBMs to exert tremendous influence over what drugs are available throughout Mississippi, on what terms and at what prices.

317.     Thus, PBMs are at the center of the flow of money in the pharmaceutical supply chain. In sum:

- PBMs negotiate the price that payors pay for prescription drugs (based on false prices generated by the Insulin Pricing Scheme);

- they separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

- they set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on false prices generated by the Insulin Pricing Scheme);

- they set the price paid for each drug sold through their mail order pharmacies (based on false prices generated by the Insulin Pricing Scheme); and

- they negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on false prices generated by the Insulin Pricing Scheme).

318.     Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the exact same drugs.

319.     In every interaction that PBMs have within the pharmaceutical pricing chain they stand to profit from the false prices generated by the Insulin Pricing Scheme.

## The Rise of the PBMs in the Pharmaceutical Supply Chain

320.   When they first came into existence in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on a larger and larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

321.   One of the roles PBMs took on, as discussed above, was negotiating with drug manufacturers ostensibly on behalf of payors. In doing so, PBMs affirmatively represented that they were using their leverage to drive down drug prices.

322.   In the early 2000s, PBMs started buying pharmacies.

323.   When a PBM combines with a pharmacy, it has additional incentive to collude with Manufacturers to keep certain prices high.

324.   These perverse incentives still exist today with respect to both retail and mail order pharmacies housed within the PBMs' corporate families.

325.   More recently, further consolidation in the industry has afforded PBMs a disproportionate amount of market power.

326.   In total, nearly forty (40) different PBM entities have merged or otherwise been absorbed into what are now the PBM Defendants.

327.   In addition, each of the PBM Defendants are now owned by other significant players within the pharmaceutical chain: Express Scripts merged with Cigna in a $67 billion-dollar deal, Caremark was bought by the largest pharmacy in the United States, CVS for $21 billion, CVS also now owns Aetna following a $69 billion-dollar deal and OptumRx was acquired by the largest health insurance company in the United States, UnitedHealth Group.

328.   Figure 13 depicts this consolidation within the PBM market.

## Figure 13: PBM consolidation



329.   After merging or acquiring all of their competitors and now backed by multi-billion-dollar corporations, PBM Defendants have taken over the market in the past decade—controlling over 75% of the market and managing pharmacy benefits for over 270 million Americans.

330.   Business is booming for PBM Defendants. Together, they report more than $300 billion in annual revenue.

331.   PBMs are able to use the consolidation in the market as leverage when negotiating with other entities in the pharmaceutical pricing chain. Last year, industry expert Lindsay Bealor Greenleaf from the Advice and Vision for the Healthcare Ecosystem (ADVI) consulting described this imbalance in power, "it's really difficult to engage in any

type of fair negotiations when one of the parties has that kind of monopoly power . . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."

### **Insular Nature of the Pharmaceutical Industry**

332.    The insular nature of the PBM and pharmaceutical industry has provided PBM Defendants with ample opportunity for contact and communication with their competitors, as well as with Manufacturer Defendants, in order to devise and agree to the Insulin Pricing Scheme.

333.    Each Manufacturer Defendant is a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA's meetings and platforms in furtherance of the Insulin Pricing Scheme.

334.    David Ricks, CEO of Eli Lilly, Paul Hudson, CEO of Sanofi and Douglas Langa, Executive Vice President of Novo Nordisk, are all part of the members of the  PhRMA board of directors and/or part of the PhRMA executive leadership team.

335.    PBM Defendants also routinely communicate through direct interaction with the PBMs and the Manufacturers at PBM trade associations and industry conferences.

336.     Each year during the relevant time period, the main PBM trade association, the Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.

337.    The current board of the PCMA includes Amy Bricker, President of Express Scripts, Heather Cianfrocco, CEO of OptumRx, and Alan Lotvin, Executive Vice President of CVS Caremark. Past board members include John Prince, President and COO of Optum, Inc. (and former CEO of OptumRx); and Tim Wentworth, CEO of Evernorth.

338.   All PBM Defendants are members of and, as a result of their leadership positions, control the PCMA. Each Manufacturer Defendant is an affiliate member of this organization.

339.   The PCMA annual conferences appear to be at the center of the Insulin Pricing Scheme.

340.   Every year, high-level representatives and corporate officers from both PBM and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

341.   In fact, for at least the last six (6) years, all of the Manufacturer Defendants have been "Presidential Sponsors" of these PBM conferences.

342.   Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."

343.   From at least 2010-2019, representatives from each Manufacturer Defendant met privately with representatives from each PBM Defendant during both the Annual Meetings and Business Forum conferences that the PCMA held each year.

344.   Prior to these meetings dedicated teams of executives from each Defendant would spend weeks preparing PCMA "pre-reads" and reports in preparation for these meetings. These reports not only demonstrate the deep involvement of each Defendant in the Insulin Pricing Scheme, but they also reflect the tangled web that gave rise to the scheme.

345.   In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community." As PCMA members, PCMA-Connect provides PBM and Manufacturer Defendants with a year-round, non-public online forum to engage in private discussions in furtherance of the Insulin Pricing Scheme.

346.   Notably, key at-issue lockstep price increases occurred shortly after the Defendants met at PCMA meetings.  For example, on September 26 and 27, 2017 the  PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Several days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. A few weeks later Novo Nordisk recommended that the company make a 4% list price increase on January 1, 2018 to match the Sanofi increase, which was approved Nov 3, 2017.

347.   Likewise, on May 31, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi took its list price increase on Lantus and this occurred only a few weeks after a PCMA spring conference in Washington DC.

348.   Communications between PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. Examples include:

- Mark Thierer worked as an executive at the PBM Medco (now Express Scripts) until he became the CEO of OptumRx in 2016;

- Albert Thigpen was a Senior Vice President at CVS Caremark prior to becoming a Senior Vice President at OptumRx in 2011; and

- Bill Kiefer was a Vice President of Express Scripts before becoming a Senior Vice President at OptumRx in 2015.

E.    **The Insulin Pricing Scheme**

349.    The market for the at-issue diabetes medications is unique in that it is highly concentrated with little to no generic/biosimilar options and the drugs have similar efficacy and risk profiles.  In fact, PBMs and the Manufacturer Defendants treat the at-issue drugs as commodity products in constructing the PBMs' formularies.

350.    In such a market, where manufacturing costs have significantly decreased, PBMs should have great leverage in negotiating with the Manufacturer Defendants to drive prices down in exchange for formulary placement.

351.    But the PBMs do not want the prices for diabetes medications to go down because they make more money on higher prices. So do the Manufacturers.

352.    As a result, Defendants have found a way to game the system for their mutual benefit—the Insulin Pricing Scheme. Consequently, the insulin market does not function as a normal market in which competition leads to a decrease in prices.

353.    PBM Defendants' formularies are at the center of the Insulin Pricing Scheme. Given the asymmetry of information between payors and PBM Defendants and the costs associated with making formulary changes, most payors accept the standard formularies offered by the PBMs.

354.    Controlling the standard formularies gives PBM Defendants a crucial point of leverage over the system.

355.    Manufacturer Defendants recognize that because PBM Defendants have such a dominant market  share, if they chose to exclude a particular diabetes medication from their standard formularies, or give it a non-preferred position, it could mean billions of dollars in profit loss for Manufacturer Defendants.

356. For example, Olivier Brandicourt, Sanofi's Chief Executive Officer, in a recent interviewed stressed the importance of the PBMs' standard formularies: "if you look at the way [CVS Caremark] is organized in the U.S . . . 15 million [lives] are part of [CVS Caremark's standard] formulary and that's very strict, all right. So, [if we were not included in CVS Caremark's standard formulary] we wouldn't have access to those 15 million lives."

357. Manufacturer Defendants also recognize that the PBM Defendants profits are directly tied to the Manufacturers' list prices.

358. Because the Manufacturer Defendants know that—contrary to their public representations—PBM Defendants make more money from *increasing* prices, over the course of the last fifteen years and working in coordination with the PBMs, the Manufacturers have falsely inflated their list prices for the at-issue drugs exponentially and paid larger and larger amounts of Manufacturer Payments back to the PBMs.

359. In exchange for the Manufacturers inflating these prices and paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants grant Manufacturer Defendants' diabetes medications with the most elevated price and that is the most profitable to the PBMs preferred status on their standard formularies.

360. Thus—and contrary to their public representations—the PBM Defendants' agreements with the Manufacturer Defendants (and the standard formularies that result from these agreements) are incentivizing and are responsible for the precipitous price increases for the at-issue diabetes medications.

361. At all times relevant hereto the PBM Defendants have known that the list prices for the at-issue drugs are grossly inflated and false for this reason.

362. Despite this knowledge, PBMs include this false price in their contracts to set the rate that payors pay for the at-issue drugs.

73

363.     As a result of the Insulin Pricing Scheme, every diabetic and payor has been overcharged for the at-issue drugs because of these false list prices.

364.     Importantly, the Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants, that each agreed to and participated in and that created enormous profits for all of Defendants.   For example:

- Manufacturers and PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also determining the same for competing products;

- Manufacturers and PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail order pharmacy claims, internal medical efficacy studies and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx which utilizes OptumInsight and Optum Analytics; and

- Manufacturers and PBMs engage in coordinated outreach programs directly to patients, pharmacies and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients.

365.     Far from using their prodigious bargaining power to lower drug prices as they claim, Defendants use their dominant positions to work together to generate billions of dollars at the expense of Mississippi diabetics and the State.

### F. Defendants Admit That They Have Engaged in The Insulin Pricing Scheme and That It Is Harming Diabetics

366.    On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on Defendants' Insulin Pricing Scheme titled, "Priced Out Of A Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[8]

367.    Representatives from all Defendants testified at the hearing and each acknowledged before Congress that the price for insulin has increased exponentially in the past fifteen (15) years.

368.    Further, each Defendant explicitly admitted that the price that diabetics have to pay out-of-pocket for insulin is too high. For example:

- Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of meaningful competition allows the [M]anufacturers to set high [reported] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

- Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, [reported] prices for insulin have increased nearly 50 percent. And over the last ten years, [reported] price of one product, Lantus, rose by 184 percent."

- Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients . . ."

---

[8] https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3.

- Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [reported] prices of our medicines. We also know that [reported] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

369. Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased costs or improved clinical benefit.

370. None of the Defendants pointed to any other participant in the pharmaceutical pricing chain as responsible for the exorbitant price increases for these diabetes medications—nor could they—for these Defendants collectively are solely responsible for the price of almost every single vial of insulin sold in the United States.

371. Defendants admitted that they agreed to and did participate in the Insulin Pricing Scheme and that the rise in prices was a direct result of the scheme.

372. For example, at the April 2019 Congressional hearing Novo Nordisk's President, Doug Langa, explained Novo Nordisk's and PBM Defendants' role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme:

> [T]here is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [reported] prices high. And *we've been participating in that system* because the higher the [reported] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . . [I]f we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions. (Emphasis added).

373. Eli Lilly, too, has admitted that it raises reported prices as a *quid pro quo* for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:

> Seventy-five percent of our [reported] price is paid for rebates and discounts to secure [formulary position] . . . $210 of a vial of Humalog is paid for

discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].

374. Sanofi has also conceded its participation in the Insulin Pricing Scheme. When testifying at the April 2019 Congressional hearing, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified:

> The rebates are how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

375. PBM Defendants also admitted at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by Manufacturer Defendants.

376. Amy Bricker, President of Express Scripts, when asked to explain why Express Scripts did not grant an insulin with a lower reported price preferred formulary status, answered, "Manufacturers do give higher [payments] for exclusive [formulary] position . . ."

377. While all of the Defendants acknowledged their participation in the Insulin Pricing Scheme before Congress, in an effort to avoid culpability for the precipitous price increase each Defendant group pointed the finger at the other as the more responsible party.

378. PBM Defendants specifically testified to Congress that Manufacturer Defendants are solely responsible for their price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

379. This statement is objectively false. A February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California titled "The Association Between Drug Rebates and List Prices," found that an increase in the

amount that the Manufacturers pay back to the PBMs is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.

380. Further, in large part because of the increased list prices, and related Manufacturer Payments, PBMs profit per prescription has grown exponentially over the same time period that insulin prices have been increasing. By way of example, since 2003 Defendant Express Scripts has seen its profit per prescription increase over 500 percent per adjusted prescription.

381. The Manufacturers, on the other hand, argued before Congress that the PBMs were to blame for high insulin prices because of their demands for higher Manufacturer Payments in exchange for formulary placement. As a result, the Manufacturers argue, they have not been profiting off insulin due to declining net prices of these drugs.

382. However, that also is not true. A 2020 study by JAMA recently published in the *Wall Street Journal* provides data suggesting that the net prices of branded insulin products have actually increased by 51% in the past ten years.

383. In addition, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that Manufacturer Defendants are still making substantial profits from the sale of insulin products regardless of any Manufacturer Payments they are sending back to the PBMs. During the same time period when insulin price increases were at their steepest, distributions to Manufacturers' shareholders in the form of cash dividends and share repurchases totaled *$122 billion*. In fact, during this time period the Manufacturers spent

a significantly lower proportion of profits on research and development compared to shareholder payouts.

384.   In January 2021 the U.S. Senate Finance Committee issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" that detailed Congress's findings after reviewing over 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx and Cigna ("Senate Insulin Report"). The Senate Insulin Report concluded, *inter alia*:

> a.      Manufacturer Defendants are retaining more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in  Humalog  revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;
>
> b.      Manufacturer Defendants have aggressively raised the list price of  their  insulin products absent significant advances in the efficacy of the drugs; and
>
> c.      Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs.

385.   The truth is—despite their finger pointing in front of Congress— Manufacturers and PBMs are both responsible for their concerted efforts in creating the Insulin Pricing Scheme. This reality was echoed in the statement from the Senate Insulin Report, summarizing Congress's findings of their two-year probe into the Insulin Pricing Scheme[9]:

> [M]anufacturers and [PBMs] have created a vicious cycle of price increases that have sent costs for patients and taxpayers through the roof . . . This industry is anything but a free market when PBMs spur drug makers to hike

---

[9] https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf

list prices in order to secure prime formulary placement and greater rebates and fees.

## G. Defendants Profit Off the Insulin Pricing Scheme

386. For Manufacturer Defendants, the Insulin Pricing Scheme affords them the ability to pay PBM Defendants significant, yet undisclosed, Manufacturer Payments in exchange for formulary placement—which garners Manufacturer Defendants greater revenues from sales—without decreasing their profit margins. During the relevant time period, PBM Defendants granted preferred formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

387. Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated reported price.

388. PBM Defendants profit off the false prices created by the Insulin Pricing Scheme in a myriad of ways, including (1) retaining a significant—yet undisclosed— percentage of the Manufacturers Payments, (2) using the inflated price to generate profits from pharmacies in their network and (3) relying on the inflated price to drive up the PBMs' profits through their own mail order pharmacies.

### PBMs Pocket a Majority of Manufacturers' Secret Payments

389. The first way in which the PBMs profit off the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

390. The amount that the Manufacturers pay back to the PBMs has accelerated to represent a large percentage of the list price of diabetes medications.

391.     Historically, when PBMs contracted with payors, the contract allowed the PBM to keep all or at least some of the Manufacturer Payments they received, rather than pass them along to the payor.

392.     Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the Manufacturers to the PBMs. But—critically— "rebates" are only a portion of the total secret Manufacturer Payments.

393.     In this regard, PBM and Manufacturer Defendants have created a "hide-the-ball" system where the consideration exchanged between them (and not shared with payors) is labeled and relabeled. As more payors moved to contracts that require PBMs to pass a majority of the manufacturer "rebates" through to the payor, PBMs have begun renaming the Manufacturer Payments in order to keep a larger portion of this money. Payments once known as "rebates" are now called administrative fees, volume discounts, service fees, inflation fees or other industry jargon terms designed to obfuscate and distract from the substantial sums being secretly exchanged.

394.     And these renamed secret Manufacturer Payments are indeed substantial. A recent heavily redacted complaint filed by Defendant Express Scripts revealed that *Express Scripts now retains up to 13 times more in "administrative fees" than it passes through to payors in formulary rebates.*

395.     In addition, the PBMs have come up with numerous ingenious methods to hide these renamed Manufacturer Payments in order keep them for themselves.

396.     For example, with regard to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

397.   In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" in order to increase the price of their diabetes medications.  The thresholds for these payments are typically set around 6% to 8%—if the Manufacturer Defendants raise their prices by more than 6% (or 8%) during a specified time period they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the reported prices).

398.   For many of their clients, the PBMs have separate "price protection guarantees" that state that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will revert a portion of that amount back to these clients.

399.   The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 10%-15%.

400.   If the Manufacturers increase their list prices more than the 6% (or 8%) inflation fee rate but less than the 10%-15% client price protection guarantee rate, then the PBMs keep 100% of these "inflation fee" payments.   This is a win-win for the Manufacturers and PBMs—they get to mutually retain and share all of the benefit of these price increases.

401.   Another method that the PBMs have devised to hide the renamed Manufacturer Payments is through the use of "rebate aggregators."

402.   Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Manufacturer Defendants, on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

403.   These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx) and Zinc (CVS Caremark).

404.   The PBMs carefully guard the revenue streams from their rebate aggregator activities, hiding them in complex contractual relationships and not reporting them separately in their quarterly SEC filings.

405.   Certain rebate aggregator companies are located offshore, for example, in Switzerland (Express Scripts' Ascent Health) or in Ireland (Emisar Pharma Services), making oversight even more difficult.

406.   The Senate Insulin Report contained the following observation on these rebate aggregators:

> [I]t is noteworthy that industry observers have suggested that the recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

407.   Because the PBMs are able to hide (and retain) a majority of the secret Manufacturer Payments that they receive, they are able to make significant profits on the Insulin Pricing Scheme.

408.   Even in the rare cases where certain sophisticated payor clients receive a portion of the Manufacturer Payments from their particular pharmacy benefit manager (whether it is a PBM Defendant or not), those payors are still significantly overcharged as a direct result of the Insulin Pricing Scheme given the extent to which Defendants have falsely inflated the prices of the at-issue drugs.

**Insulin Pricing Scheme Allows PBMs To Profit Off Pharmacies**

409. A second way that PBM Defendants profit off the Insulin Pricing Scheme is by using the false price generated by the scheme to profit off the pharmacies with whom they contract, including those in Mississippi.

410. PBM Defendants decide which pharmacies are included in the PBM's network and how much they will reimburse these pharmacies for each drug dispensed.

411. PBMs pocket the spread between the amount that the PBMs get paid by their clients for the at-issue drugs (which are based on the false prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less).

412. PBMs do not disclose to their clients or network pharmacies how much the PBM is receiving from or paying to the other.

413. This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from PBM Defendants to take into account the cost effectiveness of a drug and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

414. The higher the Manufacturers inflate their prices, the more money the PBMs make off this spread.

415. PBMs also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR fees, based on the false prices generated by the scheme—and again, the higher the list price for each diabetes medication sold, the more the PBMs generate in these pharmacy fees.

## **Insulin Pricing Scheme Increases PBM Mail Order Profits**

416.     A third way PBMs profit off the Insulin Pricing Scheme is through the PBM Defendants own mail order and retail pharmacies. The higher the price that PBM Defendants are able to get their customers, such as Mississippi diabetics and the State, to pay for diabetes medications, the higher the profits PBM Defendants realize through their mail order pharmacies.

417.     Because the PBMs base the price they charge for the at-issue diabetes medications on the false list price, the more the Manufacturers inflate these prices, the more money the PBMs make.

418.     PBMs also charge the Manufacturer Defendants fees related to their mail order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the false prices generated by the Insulin Pricing Scheme.  Thus, once again, the higher the price is, the more money the PBMs make on these fees.

419.     A third way PBMs profit from the false prices generated by the Insulin Pricing Scheme through their pharmacies is by way of an arbitrage purchase scheme. Because of their coordinated efforts with the Manufacturers in furtherance of the Insulin Pricing Scheme, the PBMs often know when the Manufacturers are going to raise their prices.  The PBMs use this knowledge to purchase large quantities of the at-issue drugs prior to the price increases at a lower price.  The PBMs then charge diabetics and payors the higher price after the increase.

420.     In sum, every way that the PBMs make money on diabetes medications is directly tied to the false list prices generated by the Insulin Pricing Scheme. PBMs are not lowering the price of diabetes medications as they publicly represent—rather they are making billions of dollars by fueling these skyrocketing prices.

## H.    The State and Mississippi Diabetics Purchase the At-Issue Drugs From Defendants

421.    During the relevant time period, Mississippi diabetics were dispensed the at-issue drugs by, and made out of pocket payments based on the false list prices generated by the scheme to, each PBM Defendant's mail order pharmacies and to CVS Caremark's retail pharmacies throughout Mississippi.

422.    In addition, as a large government employer, the State provides health benefits to its employees, retirees and their dependents and has spent millions of dollars a year on the at-issue diabetes medications.

423.    The State also spends millions of dollars a year purchasing the at-issue diabetes medications for use at in state-run facilities.

424.    To administer its health plan's pharmaceutical programs, the State relies  on PBMs as administrative agents, for the alleged purposes of limiting administrative burden and controlling pharmaceutical drugs costs.

425.    The State currently relies on CVS Caremark to provide the at-issue PBM and pharmacy services to the State's health plan. From 1996-2005, CVS Caremark also provided PBM services to the State. These services included developing and offering formularies for the State's prescription plan,  constructing and managing the State's pharmacy network (which included CVS Caremark's retail and mail order pharmacies), processing pharmacy claims and providing mail order pharmacy services to State.

426.    In providing these  services to the State,  CVS Caremark set the amount the State paid for the at-issue drugs in coordination with the Manufacturer Defendants and utilizing the false prices generated by the Insulin Pricing Scheme.

427.    During the relevant time period, the State paid CVS Caremark for the at-issue drugs based on the false list prices generated by the Insulin Pricing Scheme.

428.    From 2006-2015, OptumRx provided PBM services to the State. These services included developing and offering formularies for the State's prescription plan, constructing and managing the State's pharmacy network (which included OptumRx's mail order pharmacies and CVS Caremark's retail pharmacies), processing pharmacy claims and providing mail order pharmacy services to State.

429.    In providing these services to the State, OptumRx set the amount the State paid for the at-issue drugs in coordination with the Manufacturer Defendants and utilizing the false prices generated by the Insulin Pricing Scheme.

430.    During the relevant time period, the State paid OptumRx for the at-issue drugs based on the false list prices generated by the Insulin Pricing Scheme.

431.    From 2016-2020, the State relied on the PBM Prime Therapeutics for pharmacy benefit services. During this time period, Prime Therapeutics outsourced its Manufacturer Payment contracting to Express Scripts' rebate aggregator entity, Ascent Health Services.  Upon information and belief, through this relationship, during the relevant time period, Express Scripts negotiated Manufacturer Payments related to the at-issue purchases made by the State through its health plan.

## I.    Defendants Deceived Diabetic Mississippians and the State of Mississippi

432.    At no time have either Defendant group disclosed the Insulin Pricing Scheme or the false list prices produced by it.

**Manufacturer Defendants Deceived the State and Mississippi Diabetics**

433.   At all times during the relevant time period, Manufacturer and PBM Defendants knew that diabetics and payors, including the State, relied on the false list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs. That is, Mississippi diabetics and payors, including the State, relied on the false list prices by purchasing diabetic medications at such prices.

434.   Manufacturer and PBM Defendants further knew that Mississippi diabetics and payors, including the State, expected and desired to pay the lowest fair-market price possible for the at-issue drugs.

435.   Manufacturer and PBM Defendants knew that the artificially inflated list prices generated by the Insulin Pricing Scheme were false and completely untethered from the actual prices that Defendants were paid for the drugs.

436.   As the list prices for the at-issue drugs detached completely from actual prices, the list prices became increasingly misrepresentative to the point of becoming unlawful.

437.   Despite this knowledge, Manufacturer Defendants caused the false list prices generated by the Insulin Pricing Scheme to be published throughout Mississippi through publishing compendia and in various promotional and marketing materials distributed by entities downstream in the drug supply chain.

438.   Manufacturer Defendants also published these prices to the PBMs and their pharmacies who then knowingly use the false prices to set the amount payors, like the State of Mississippi, and diabetics pay for the at-issue drugs.

439. By publishing their prices throughout Mississippi, the Manufacturers held these prices out as a reasonable price by which to base the prices diabetics and payor pay for the at-issue drugs.

440. These representations are false. Manufacturer Defendants knew that their false list prices were not remotely related to the actual price Defendants receive for the at-issue drugs and were not based on upon transparent or competitive factors such as cost of production or research and development.

441. Notably, during the relevant time period, the Manufacturers published prices in Mississippi of $300-$400 for the same at-issue drugs that they had profitably priced at a $1.60 in markets that had not been corrupted by the Insulin Pricing Scheme.

442. The Manufacturers false list prices were artificially and arbitrarily inflated in furtherance of the Insulin Pricing Scheme to generate profits for the Manufacturer and PBM Defendants.

443. Manufacturer Defendants affirmatively withheld the truth from Mississippi diabetics and the State and specifically made these misrepresentations in furtherance of the Insulin Pricing Scheme and to induce reliance in payors and diabetics to purchase their at-issue drugs.

444. PBM Defendants ensured that the Manufacturers' false list prices harmed diabetics and payors by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

445. PBMs perpetuate the use of the false insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom.

## **PBM Defendants Deceived the State and Mississippi Diabetics**

446.    PBM Defendants have deceived the State of Mississippi and diabetic Mississippians.

447.    The PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with their payor clients; (b) they work to lower the price of the at-issue drugs; and (c) that the Manufacturer Payments the PBMs' receive and the PBMs' formulary construction is for the benefit of diabetics and payors and is consistent, and in accordance with, their payor clients' interests of reducing drug costs and improving the health of their beneficiaries.

448.    PBMs understand that their payor clients and diabetics rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve their health.

449.    At no time have the PBM Defendants disclosed their knowledge of the false list prices for the at-issue drugs; to the contrary, the PBMs ensured that their clients and diabetics paid based on those false list prices.

450.    In addition to the general misrepresentations discussed in paragraphs 87-90, 142, 160-61, 194-95, 204 and 209 throughout the relevant time period, PBM Defendants have purposefully, consistently and routinely made misrepresentations specifically about their Manufacturer Payment negotiations and formulary construction related to the at-issue diabetes medications.  Examples include:

- In a public statement issued on May 11, 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."

90

- On June 22, 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."

- On August 31, 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts released a statement that stated "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."

  o Mr. Stettin continued on to represent that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."

- In January 2017, Tim Wentworth, CEO of Express Scripts represented that "without PBMs, and specifically without Express Scripts, our clients would pay [many times] more for [insulin]."

  o Mr Wentworth continued on to state Express Scripts is dedicated to controlling insulin prices because "we stand up for payers and patients."

- On June 1, 2018, Mark Merritt, President of PCMA, in response to a question about PBMs' role in the insulin pricing system stated, "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."

- CVS Caremark's Chief Policy and External Affairs Officer testified during the April 2019 hearings that, CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."

- Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."

- The PCMA website contains the following misrepresentations, "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins. PBMs work hard to drive down costs using formulary management and rebates."

91

451.   PBM Defendants not only falsely represent that they negotiate with Manufacturer Defendants to lower the price of the at-issue diabetes medications for *payors*, but also for diabetic *patients* as well.   Examples include:

- Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable." (Emphasis added).

- Amy Bricker, President at Express Scripts testified before Congress in April 2019, "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs." (Emphasis added).

- Amy Bricker of Express Scripts also testified at the Congressional hearing that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications." (Emphasis added).

- OptumRx's website has stated "[t]he services we provide help *improve health outcomes for patients* while making prescription drugs more affordable for plan sponsors and *individuals*, and more sustainable for the country . . . the reason is simple: drug manufacturers are responsible for the high cost of prescription drugs . . . OptumRx negotiates better prices with drug manufacturers for our customers *and consumers* . . . At OptumRx, *our mission is helping people live healthier lives* and *to help make the health system work better for everyone*. (Emphasis added).

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . in 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative." (Emphasis added).

- The PCMA website states, "PBMs have kept average out-of-pocket (OOP) payments flat for beneficiaries with commercial insurance."

452.   Not only have PBM Defendants intentionally misrepresented that they use their market power to save payors and diabetics money, they have specifically, knowingly and falsely disavowed that their conduct drives the false insulin list prices higher. Examples include:

92

- On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated, "Drugmakers set prices, and we exist to bring those prices down."

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017, "Any suggestion that PBMs are causing prices to rise is simply erroneous."

- In 2017, Express Scripts' Wentworth went on CBS News to again argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer answered, "we can't see a correlation when rebates raise list prices."

- In 2019, when testifying under oath before Congress on the rising price of insulins, Senior Vice President Amy Bricker of Express Scripts testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."

453. Throughout the relevant time period, PBM Defendants' have also misrepresented that they are transparent about the Manufacturer Payments that they receive and that they pass along (or do not pass along) to payors. As stated above, this representation is false—PBM Defendants retain many times more in total Manufacturer Payments than the traditional formulary "rebates" they may pass through—in whole or part—to payors.

454. Despite this, in 2011, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]veryday we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."

455. In a 2017 CBS News interview, Express Scripts' CEO, represented, among other things, that Express Scripts "absolutely transparent" about the Manufacturer

Payments they receive and that payors, "know exactly how the dollars flow" with respect to these Manufacturer Payments.

456.   When testifying before Congress in April 2019, Amy Bricker, President of Express Scripts had the following exchange with Representative John Sarbanes of Maryland regarding the transparency (and lack thereof) of the Manufacturer Payments:

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . [However] the reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> Mr. Sarbanes. What about if we made it completely transparent? Who would be for that?
>
> Ms. Bricker. Absolutely not . . . it will hurt the consumer.
>
> Mr. Sarbanes. I don't buy it.
>
> Ms. Bricker – prices will be held high.
>
> Mr. Sarbanes. I am not buying it. I think a system has been built that allows for gaming to go on and you have all got your talking points. Ms. Tregoning [of Sanofi], you have said you want to guarantee patient access and affordability at least ten times, which is great, but there is a collaboration going on here . . . the system is working for both of you at the expense of the patient. Now I reserve most of my frustration for the moment in this setting for the PBMs, because I think the lack of transparency is allowing for a lot of manipulation. I think the rebate system is totally screwed up, that without transparency there is opportunity for a lot of hocus-pocus to go on with the rebates. Because the list price ends up being unreal in certain ways except to the extent that it leaves certain patients holding the bag, then the rebate is negotiated, but we don't know exactly what happens when the rebate is exchanged in terms of who ultimately benefits from that. And I think we need more transparency and I do not buy the argument that the patient is going to be worse off, the consumer is going to be worse off if we have absolute transparency . . . *I know when you started out, I understand what the mission was originally with the PBMs . . . But now things have gotten out of control. You are too big and the lack of transparency allows you to manipulate the system at the expense of the patients.* So I don't buy the argument that the patient and consumer is going to get hurt if we have absolute transparency. (emphasis added)

94

457.     Moreover, in at least, 2005, 2010, 2015 and 2020, each PBM Defendant directly misrepresented to the State that it constructs formularies and negotiates with the Manufacturer Defendants for the benefit of the State and its diabetic beneficiaries by lowering the price of the at-issue drugs and by promoting the health of diabetics. Examples include:

a.     On March 23, 2010, OptumRx represented that its "formulary strategy focuses on clinical efficacy and lowest net cost" and that it "optimizes rebates for its clients" because OptumRx "is not just a vendor, but a partner with the State of Mississippi." OptumRx also represented that its programs "help patients better manage their diabetes therapy" and help "clients realize savings from a greater discount on diabetic supplies."

b.     On March 4, 2015, OptumRx represented that "its purchasing power with manufacturers enables [OptumRx] to . . . drive lower overall costs [for the State]" and that OptumRx's "pricing philosophy is focused on full-disclosure and transparency."

c.     In quarterly reports in 2010, 2011, 2012 and 2013, OptumRx made representations to the State specifically about the at-issue drugs, including:

•     "Diabetes related medications include insulin . . . continue to be a growing trend due to high utilization and costly brand name agents, however many diabetic agents have recently been added to the [OptumRx's formulary management program] and costs are expected to decrease in the coming year."

•     OptumRx's formulary management program "for the insulin class will help manage the trend in this class. Targeted medications include Levemir and Humalog products."

•     "[The State's] spend for Victoza has increased 167% in 2011 but [OptumRx] has a program in place to manage rising costs."

•     "Insulin is the main cause of increased trend in diabetes category; there is a diabetes category in [OptumRx's formulary management program] which helps manage overall trend"

•     "Medications for Diabetes are the top spend for [the State] mainly due to price increases. Insulins are part of [OptumRx's formulary management program], so [the State] is paying the lowest net cost."

d.    In April 2005, CVS Caremark represented to the State that it "successfully and cost-effectively administered the [State's] pharmacy benefit program."

e.    On March 22, 2010, CVS Caremark's Vice President of Strategic Proposals represented to the State that CVS Caremark's PBM model "improv[ed] savings for the State of Mississippi."

f.    On March 4, 2015, CVS Caremark's Vice President of Client Financial Analysis and Proposals represented to the State that "our capabilities allow us to identify unique opportunities that improve member health and reduce total health care costs for our clients" and that CVS Caremark "aggressively negotiat[es] discounts of drug prices."

g.    On April 15, 2005, Express Scripts represented to the State that "we have decided day in and day out to put our plan sponsors – not drug manufacturers – first. These decisions are reflected in the way we build our formularies, in the way we write our contracts with manufacturers, suppliers, and retail networks . . ." and that Express Scripts formulary selections are based on "products that provide the lowest cost . . ."

h.    On March 4, 2015,  Express Scripts' Senior Vice President of Sales & Account Management represented to the State that "[Express Scripts is] uniquely positioned to provide the [State] and your members with the best path for achieving your goals, with success in providing lowest net cost in the pharmacy benefit and optimal health outcomes" and that Express Scripts "collaborates with our clients to develop formularies and manage rebate contracts proven to drive lowest net cost."

458.    The PBMs representations are false.

459.    Contrary to their representations that their interests are aligned with diabetics and payors, the PBMs have used their power to negotiate Manufacturer Payments, and to construct formularies, to benefit themselves by favoring high-priced diabetic drugs (which generate larger profits for PBMs).

460.    Contrary to their representations that they lower the price of the at-issue drugs for diabetics—as Defendants now have expressly admitted before Congress—PBMs' formulary construction and Manufacturer Payment negotiations have caused the amount that diabetics pay out of pocket to significantly increase.

461. Contrary to their representations that they lower the price for payors, the PBMs' formulary construction and Manufacturer Payment negotiations have significantly driven up the net price paid for payors. Both European payors/consumers and federally administered health care programs, which purchase the at-issue drugs but are not impacted by the Insulin Pricing Scheme, pay significantly lower net/actual prices than payors affected by the Insulin Pricing Scheme, like the State.

462. Contrary to their representations that they work to promote the health of patients, as a result of the PBMs' conduct many diabetics have been priced out of these life-sustaining medications. As discussed further below, the impact of this has been severe—and in some cases fatal.

463. Both PBM and Manufacturer Defendants knew that these representations were false when they made them and affirmatively withheld the truth regarding the false list prices for diabetic treatments from the State and from diabetic Mississippians.

464. Defendants concealed the falsity of these representations by closely guarding their pricing structures, agreements and sales figures.

465. Manufacturer Defendants do not disclose to payors or the public their actual prices they receive for the at-issue drugs or the amount in Manufacturer Payments they offer to and pay to the PBM Defendants.

466. PBM Defendants do not disclose the details of their agreements with Manufacturer Defendants or the Manufacturer Payments they receive from them—nor do they disclose the details related to their agreements with payors and pharmacies.

467. Defendants do not disclose the actual prices for the at-issue drugs.

468.     Each Defendant also conceals its false and deceptive conduct by signing confidentiality agreements with any entity in the supply chain who know the actual prices of the at-issue drugs.

469.     PBM Defendants have gone as far as suing governmental entities to block the release of details on their pricing agreements with Manufacturers and pharmacies.

470.     Even when audited by payors, PBM Defendants often still refuse to disclose their agreements with Manufacturers and pharmacies, relying on overly broad confidential agreements, claims of trade secrets and other unnecessary restrictions.

471.     Each Defendant's effort to conceal its pricing structures for the at-issue drugs is evidence that each Defendant knows its conduct is false and deceptive.

472.     To make matters worse, Mississippi diabetics, and diabetic beneficiaries of the State's health plans, institutions and programs, have no choice but to pay based on Defendants' false list prices because they need these medications to survive, and Manufacturer Defendants make virtually all of the diabetes medications available in Mississippi.

473.     In sum, the entire insulin pricing structure created by the Defendants—from the false price, to the inclusion of the false price in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that their interests are aligned with diabetics and payors and that they work to lower prices and promote the health of diabetics—is false.

474.     Diabetic Mississippians and the State paid for the at-issue diabetes medications at the false prices generated by the Insulin Pricing Scheme because they relied on these prices as reasonable bases for their life sustaining medications.

475. Diabetic Mississippians and the State did not know, because the Defendants affirmatively concealed, that (i) the list prices were falsely inflated; (ii) the list prices were manipulated to satisfy PBM profit demands; and (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the at-issue drugs as they were sold to PBMs.

### J. The Insulin Pricing Scheme Has Damaged the State of Mississippi and Diabetic Mississippians

### The Insulin Pricing Scheme Has Damaged the State as Payor and Purchaser of the At-Issue Drugs

476. Defendants' Insulin Pricing Scheme has cost the State of Mississippi hundreds of millions of dollars in overcharges.

477. The State of Mississippi has been directly damaged by the Insulin Pricing Scheme as a payor/purchaser of Defendants' at-issue diabetes medications.

478. The State pays for the at-issue drugs through its health plans and for use in state-run facilities based on false list prices generated by the Insulin Pricing Scheme.

479. Importantly, because of Defendants' success in hiding the Insulin Pricing Scheme, no payor, including the State, has any idea that the prices for these particular at-issue diabetes medications have been falsely inflated such that the prices are unlawful.

480. As a result, the State has been unknowingly overpaying millions of dollars every year for Manufacturer Defendants' diabetes medications.

481. Thus, the Insulin Pricing Scheme has directly and proximately caused the State to substantially overpay for diabetes medications.

482. Because the State continues to pay for the at-issue drugs based on the false prices generated by the Insulin Pricing Scheme, the harm to the State is ongoing.

## The Insulin Pricing Scheme Has Damaged the State By Increasing its Healthcare Costs and Decreasing Productivity

483.   As discussed below, the rising price for the at-issue drugs has had a devastating effect on the health of diabetics.  It also has caused a staggering increase in healthcare costs to the State.

484.   As a direct result of the Insulin Pricing Scheme, 1 in 4 Mississippi diabetics can no longer afford their diabetes medication and are forced to ration and skip doses. This forced lack of adherence to their diabetes medications leads to substantial additional healthcare costs.

485.   One national model projected that improved adherence to diabetes medication would avert 699,000 emergency department visits and 341,000 hospitalizations annually, for a saving of $4.7 billion. The model further found that eliminating the loss of adherence would lead to another $3.6 billion in savings, for a combined potential savings of $8.3 billion.

486.   Much of the increased healthcare costs caused by the Insulin Pricing Scheme are shouldered by the State. As a result of the Insulin Pricing Scheme, the amount Mississippi spends each year on diabetes-related healthcare costs has risen dramatically during the relevant time period, now totaling more than a $1 billion a year.

487.   Dr. Stephen Farrow, executive director of the Biloxi, Mississippi-based National Diabetes and Obesity Research Institute, explained the devastating effect diabetes and lack of adherence this has on the healthcare system, "If we don't do something, our national health system will collapse. There will be too much blindness, too many people on dialysis. Our country will go broke."

488.  Lack of adherence to diabetes medications also has a significant adverse effect on labor productivity in terms of absenteeism (missing work due to health-related reasons), presenteeism (being present at work but not productive), and disability (inability to perform necessary physical tasks at work).

489.  This decrease in work productivity has further damaged the State by injuring its economy and decreasing its tax revenue.

### **The Insulin Pricing Scheme Has Damaged Mississippi Diabetics**

490.  PBM and Manufacturer Defendants have exploited the drug pricing and payment system to extract billions in profits at the expense of Mississippi diabetics.

491.  As discussed above, Mississippi diabetics have been damaged by Defendants' Insulin Pricing Scheme by having to pay at least a portion of their at-issue purchases out-of-pocket based on Defendants' false prices generated by the Insulin Pricing Scheme.

492.  If Defendants' prices were not falsely inflated as a result of the Insulin Pricing Scheme each of the above-described diabetic Mississippians would have paid significantly less for the at-issue diabetes medications during the relevant time period. Diabetic Mississippians have been overcharged by millions of dollars as a result of the Insulin Pricing Scheme.

493.  In addition to financial losses, for many diabetic Mississippians, the Insulin Pricing Scheme has cost them their health and emotional well-being. Unable to afford Defendants' price increases, many diabetics in Mississippi have begun to engage in highly risky behaviors with respect to their disease such as rationing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves, foregoing one or

even two meals a day. These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness.

494.    Even when diabetics can still afford their diabetic medications, as a direct result of PBM Defendants shifting which diabetes medications are favored on their formularies, diabetics are often forced to switch medications every few years or go through a lengthy appeal process (or try the favored drug first) before receiving the patient's preferred medication.

495.    Switching diabetic mediations can be detrimental to a diabetics' health including, negatively impacting their blood sugar control for months causing dizziness, blurred vision, weakness, fainting and shakiness.

496.    The Insulin Pricing Scheme has pushed, and will continue to push, access to these lifesaving drugs out of reach for many diabetes patients in Mississippi.

497.    Because Mississippi diabetics continue to pay for the at-issue drugs based on the false prices generated by the Insulin Pricing Scheme, the harm is ongoing.

### K.    Defendants' Recent Efforts to Address Insulin Pricing Falls Far Short of Addressing the Problem

498.    In reaction to the mounting political and public outcry, Defendants recently have introduced programs ostensibly aimed at lowering the cost of insulins.

499.    These affordability measures fail to address the structural issues that have given rise to the price hikes. Rather, these steps are merely public relations stunts that do not solve the problem.

500.    For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it

would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

501.    However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

502.    Following this a Congressional staff report was issued examining the availability of this drug.[10]   The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.

503.    The conclusion of the report was that: "Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients access to its generic alternative, this pharmaceutical behemoth is still charging astronomical prices for a drug people require daily and cannot live without."

504.    In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous. In fact, in August 2019, a Type 1 diabetic who could no longer afford his $1,200 a month insulin prescription died months after switching to ReliOn brand insulin due to complications from the disease.

---

[10] https://www.fdanews.com/ext/resources/files/2019/12-16-19-InaccessibleInsulinreport.pdf?1576536304.

505.   Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem. Mississippi diabetics and the State continue to suffer great harm as a result of the Insulin Pricing Scheme.

## VI.   TOLLING OF STATUTE OF LIMITATIONS

506.   Plaintiff State of Mississippi is not subject to any applicable statute of limitations.

507.   Even assuming, *arguendo*, that the State were subject to applicable statutes of limitations, in the alternative, the State asserts that it diligently pursued and investigated the claims asserted in this Third Amended Complaint. Through no fault of its own, the State did not receive inquiry notice nor learn of the factual basis for its claims in this Third Amended Complaint and the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

### A.   Discovery Rule Tolling

508.   Neither the State, nor Mississippi diabetics, had no way of knowing about the Insulin Pricing Scheme.

509.   As discussed above, PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants, the details of the Defendants' negotiations and payments between each other or their pricing structures and agreements—labeling them trade secrets and protecting them with confidentiality agreements.

510.   Each Defendant group also affirmatively blamed the other for the price increases described herein, and disavowed their roles in the Insulin Pricing Scheme, both during their congressional testimonies, directly to client payors and through the media.

511. The State did not discover and did not know of facts that would have caused a reasonable person to suspect, that Defendants were engaged in the Insulin Pricing Scheme, nor would a reasonable and diligent investigation have disclosed the true facts.

512. Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships and agreements between and among Manufacturer Defendants and PBM Defendants that result from the Insulin Pricing Scheme continue to obscure Defendants' unlawful conduct from the State.

513. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims identified herein.

**B. Fraudulent Concealment Tolling**

514. Any applicable statutes of limitation have also been tolled by the Defendants' knowing and active concealment and denial of the facts alleged herein throughout the time period relevant to this action, as described above.

**C. Estoppel**

515. Defendants were under a continuous duty to disclose to the State and Mississippi diabetics the true character, quality and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided.

516. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**D. Continuing Violations**

517. Any applicable statutes of limitations are also tolled because Defendants' activities have not ceased and still continue to this day and thus any causes of action are not complete and do not accrue until the tortious and anticompetitive acts have ceased.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Mississippi Consumer Protection Act. Miss. Code §§ 75-24-1, *et seq*
### (Against All Defendants)

518.    The State, on behalf of itself and as *parens patriae* on behalf of diabetic Mississippians re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

519.    The State alleges that any and all possible conditions precedent to filing this Mississippi Consumer Protection Act claim to seek damages have been performed or have occurred.  By correspondence from the Office of the Attorney to the Defendants dated May 17, 2021, prior to filing this lawsuit, the State reasonably attempted to resolve its claims through an informal dispute settlement program approved by the Attorney General with each Defendant. *See* Miss. Code Ann. § 75-24-15(2). Defendants failed to adequately respond to the State's request to resolve these claims.

520.    Defendants are "persons" within the meaning of, and subject to, the provisions of the Mississippi Consumer Protection Act, *e.g.*, Miss. Code § 75-24-3(a).

521.    By engaging in the Insulin Pricing Scheme, as described herein, Defendants have committed acts of unfair and deceptive trade practices and acts in the conduct of trade or commerce within the State, including in this District, as prohibited by Miss. Code § 75-24-5, directly or indirectly, affecting and causing harm to Mississippi diabetics and the State.

522.    Defendants have repeatedly and willfully engaged in the following conduct, which constitutes a deceptive trade practice and a violation of the Mississippi Consumer Protection Act, including but not limited to:

- "[R]epresenting that goods or services have . . . characteristics . . . which they do not have . . ." Miss. Code § 75-24-5(2)(e). In particular:

  o A characteristic of every commodity in Mississippi's economy is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value.

  o At no point did Defendants reveal that the prices associated with the lifesaving diabetic treatments at issue herein were not legal, competitive or at fair market value and were completely untethered from the actual prices realized by either Defendant group.

  o At no point did Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme.

  o In furtherance of Defendants' false and deceptive conspiracy, at least once a year for each year during the relevant time period, Defendants reported and published false prices for each at-issue drug and in doing so represented that the reported prices were the actual, legal and fair-market prices for these drugs.

  o Despite knowing these prices were false, PBM Defendants ensured that the Manufacturers' false list prices harmed diabetics and payors by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

  o In addition, with respect to the PBM Defendants, by granting the at-issue drugs preferred formulary position on their standard formularies—formulary positions that the PBMs represent are reserved for reasonably priced drugs and that are meant to promote the health of diabetics—PBM Defendants knowingly and purposefully utilized and profited from the false prices that the PBMs knew were generated by the Insulin Pricing Scheme.

  o By granting the at-issue diabetes medications preferred formulary positions, PBM Defendants ensured that prices generated by the Insulin Pricing Scheme would harm diabetics and payors, including the State.

  o PBM Defendants also misrepresented that their formularies were promoting the health of diabetic Mississippians, including diabetic beneficiaries of the State's health plans and in state-run facilities.

  o Defendants' representations are false, and at all relevant times Defendants knew they were false. Both sets of Defendants knew that the prices they reported and utilized are falsely inflated for the purpose of maximizing profits pursuant to the Insulin Pricing Scheme.

- o Defendants also knew that their formularies were not promoting the health of diabetic Mississippians, including diabetic beneficiaries of the State's health plans, facilities and programs but rather were fueling the precipitous price increases that were driving up the prices paid by diabetics and payors, including the State.

- o At all times relevant hereto, Defendants affirmatively withheld this truth from diabetic Mississippians and the State even though Defendants knew that the diabetic Mississippians' and the State's intention was to pay the lowest possible fair market price for diabetes medications and expectation was to pay a legal, competitive price that resulted from transparent market forces.

- "[M]aking false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions." Miss. Code § 75-24-5(2)(k).

- o In particular, at all relevant times, PBM Defendants made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that their formulary construction and the Manufacturer Payments that the PBM Defendants receive lower the overall price of diabetes medications and promote the health of diabetics.

- o At all times relevant hereto, these representations were false and Defendants knew they were false when they made them. At all relevant times, Defendants knew that the Manufacturer Payments and the PBMs' negotiations with the Manufacturers were not reducing the overall price of diabetes medications but rather are an integral part of the Insulin Pricing Scheme and are responsible for artificially inflating the price of diabetes medications.

- Defendants continue to make these misrepresentations and publish prices generated by the Insulin Pricing scheme; diabetic Mississippians and the State continue to purchase diabetes medications at Defendants' prices as a result of the ongoing Insulin Pricing Scheme.

523. Defendants' conduct and practice was also unfair to Mississippi consumers and the State because it was likely to cause substantial injury and cannot be reasonably avoided. *See* Miss. Code § 75-24-5(1). Furthermore, there are no countervailing benefits to consumers that result from Defendants egregiously raising the price of the at-issue drugs. In particular:

- Mississippi diabetics, including beneficiaries in the State's health plans and in state-run facilities, need these diabetes medications to survive.

- Manufacturer Defendants make nearly every single vial of insulin available in Mississippi.

- The price increases for the at-issue drugs bear no relation to manufacturing or production cost increases or changes in supply and demand conditions.

- In fact, the prices have become so untethered from production costs, that insulins, which the Manufacturer Defendants could *profitably price at less than $2 a vial*, are now priced at up to $400 a vial.

- There are no conceivable benefits to diabetic Mississippians or the State to being forced to pay these egregious prices for medicines they need to stay alive. In fact, the opposite is true—as a direct result of Defendants' egregious price increases, Mississippi diabetics' financial security, health and wellbeing have been severely and detrimentally impacted and the State has overpaid millions of dollars for the at-issue drugs and incurred substantial increased healthcare costs.

524. Defendants acted knowingly and in a willful, wanton or reckless disregard for the safety of others in committing the violations of the Mississippi Consumer Protection Act described herein.

525. Each at-issue purchase diabetic Mississippians and the State made for diabetes medications at the prices generated by the Insulin Pricing Scheme constitutes a separate violation of the Mississippi Consumer Protection Act.

526. The Attorney General has determined that the imposition of an injunction against Defendants prohibiting the conduct set forth herein is in the public interest, and the State is seeking the entry of an injunction prohibiting Defendants' conduct in violation of the Mississippi Consumer Protection Act.

527. As a direct and proximate result of Defendants' conduct in committing the above and foregoing violations of the Mississippi Consumer Protection Act, Defendants are directly and jointly and severally liable to the State for all equitable relief, restitution, damages, punitive damages, penalties and disgorgement for which recovery is sought herein, including but not limited to, diabetic Mississippians and the State paying inflated

prices generated by the Insulin Pricing Scheme for diabetes medications every time they paid for an at-issue drug. Further, due to the price inflation caused by the Insulin Pricing Scheme, many Mississippi diabetics have been priced out of these life-sustaining drugs, leading to serious health consequences. As result, the State has incurred increased healthcare costs and decreased tax revenues.

## SECOND CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

528.    The State, on behalf of itself and as *parens patriae* on behalf of diabetic Mississippians re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

529.    Defendants knowingly, willfully and intentionally deceived diabetic Mississippians and the State and have received a financial windfall from the Insulin Pricing Scheme at the expense of diabetic Mississippians and the State.

530.    Defendants wrongfully secured and retained unjust benefits from diabetic Mississippians and the State and as a result of the Insulin Pricing Scheme, in the form of amounts paid for diabetes medications and fees and payments collected based on the prices generated by the Insulin Pricing Scheme.

531.    It is inequitable and unconscionable for Defendants to retain these benefits.

532.    Defendants knowingly accepted the unjust benefits of their false and deceptive conduct.

533.    Accordingly, Defendants should not be permitted to retain the proceeds from the benefits conferred upon them by diabetic Mississippians and the State. The State seeks disgorgement of Defendants' unjustly acquired profits and other monetary benefits

resulting from their unlawful conduct and seeks restitution and/or recission, in an equitable and efficient fashion to be determined by the Court.

534.    There is no express contract governing the dispute at-issue. PBMs do not contract with payors, including the State, on an individual drug basis.  Nor do Mississippi diabetics contract on an individual drug basis.   The State's claims do not arise out of a contract, but rather are based on the larger false and deceptive scheme that drove up the at-issue false list prices for all diabetics and payors.

535.    As a direct and proximate cause of Defendants' unjust enrichment at the expense of diabetic Mississippians and the State as referenced above, diabetic Mississippians and the State suffered ascertainable losses and damages as specified herein in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Civil Conspiracy
### (Against All Defendants)

536.    The State, on behalf of itself and as *parens patriae* on behalf of diabetic Mississippians re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

537.    Defendants' entered into an agreement to artificially and unlawfully inflate the prices of insulin and diabetes medications for their profit and gain.  The Defendants' agreement to engage in such unlawful act constitutes a civil conspiracy, and Defendants' acts in furtherance thereof violated the Mississippi Consumer Protection Act and other state laws referenced in this Third Amended Complaint.

538. In particular, each of the PBM and Manufacturer Defendants agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially and egregiously inflated the price of diabetes medications.

539. Each Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

540. Manufacturer Defendants work in coordination with each other and the PBMs to raise the price of the at-issue drugs in lockstep and in furtherance of the Insulin Pricing Scheme and then pay back a significant portion of those prices to PBM Defendants.

541. Contrary to their representations, PBMs worked in coordination with each other and the Manufacturers to grant higher priced at-issue drugs preferred placement on their formularies because these drugs were more profitable for Defendants.

542. Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither PBM Defendants nor Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

543. PBM Defendants need Manufacturer Defendants to inflate the reported price of their diabetes medications and to make secret payments back to PBM Defendants in order for PBM Defendants to profit off the Insulin Pricing Scheme.

544. Manufacturer Defendants need PBM Defendants to grant their diabetes medications preferred formulary placement in order to maintain access to a majority of payors and diabetics.

545. As discussed throughout this Third Amended Complaint, the Insulin Pricing Scheme resulted from explicit agreements between the Defendants related to the at-issue Manufacturer Payments and formulary construction, constant communications between the Defendants, regular in-person meetings (which included Defendants' C-suite level

executives) and joint outreach programs between Defendants to construct, refine and promote the standard formularies and related Manufacturer Payments that fuel Defendants' fraudulent conspiracy.

546. In addition to direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that Defendants conspired to engage in false and deceptive conduct:

- Several key lockstep price increases occurred shortly after PCMA conferences, which included private executive exchanges and meetings that appear to be focused on developing and maintaining the Insulin Pricing Scheme, which all Manufacturer and PBM Defendants attended;

- During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, certain PBMs worked directly with each other to negotiate Manufacturer Payments in exchange for preferred formulary placement;

- Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

- Numerous ongoing government investigations, hearings and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants, including:

  o In 2016, Manufacturer and PBM Defendants received civil investigative demands from at least the State of Washington relating to the pricing of their insulin products and their relationships with PBM Defendants;

  o In 2017, Manufacturer Defendants received civil investigation demands from the States of Minnesota, California and Florida related to the pricing of their insulin products and their relationships with the PBMs;

  o Letters from numerous senators and representatives in recent years to the Justice Department and the Federal Trade Commission asking them to investigate potential collusion among Defendants;

  o A 2017 House Oversight committee investigation into the corporate strategies of drug companies, including Manufacturer Defendants, seeking information on the increasing price of drugs and manufacturers efforts to preserve market share and pricing power;

- o Several 2019 hearings before both the Senate Financing Committee and the House Oversight and Reform Committees on the Insulin Pricing Scheme and the collusion between the PBMs and the Manufacturers; and

- o Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs that resulted in the Senate Insulin Report.

- The astronomical rise in the price of the at-issue drugs coincides with PBM Defendants' rise to power within the pharmaceutical pricing system starting in 2003.

## VII.   MOTION FOR INJUNCTION PURSUANT TO MISS. CODE 75-24-9

547.   The State, on behalf of itself and as *parens patriae* on behalf of diabetic Mississippians re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

548.   By Defendants' violations of the Mississippi Consumer Protection Act, the State and Mississippi diabetic residents have suffered, and will continue to suffer injury, loss and damage, as discussed herein.

549.   The ongoing and threatened injury to the State and Mississippi diabetic residents outweighs the harm that an injunction might do to Defendants.

550.   As a direct and proximate result of the conduct of the Defendants in committing the above and foregoing acts, the State moves this Honorable Court for injunctive relief against the Defendants pursuant to Miss. Code 75-24-9, thereby enjoining Defendants from committing future violations of the Mississippi Consumer Protection Act.

551.   Granting an injunction is consistent with the public interest because it will protect the health and economic interests of Mississippi residents and the State, as well as the integrity of the Mississippi marketplace.

## VIII.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully requests a trial by jury on all issues so triable.

## IX.    PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the State, bringing this action on behalf of the State of Mississippi in its proprietary capacity on its own behalf, and on behalf of Mississippi residents, respectfully prays for entry of judgment against the Defendants for all the relief requested herein and to which the State may otherwise be entitled, specifically, but without limitation, to-wit:

A.    That the Court determine that Defendants have violated the Mississippi Consumer Protection Act, have been unjustly enriched and have engaged in a civil conspiracy;

B.    That this Court award Plaintiff damages, restitution, penalties, disgorgement and/or all other legal and equitable monetary remedies available under the state laws set forth in this Complaint and the general equitable powers of this Court, with interest and all exemplary and/or punitive damages that may be awarded, as necessary to address the harm caused by Defendants' acts described in this Complaint;

C.    That, in accordance with the Mississippi Consumer Protection Act (Miss. Code 75-24-9), Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or

combination alleged herein in violation of the above stated Mississippi laws, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D. That, in accordance with Miss Code. 75-24-11, this Court make any such additional orders or judgments, including restitution, as may be necessary to restore to the State and Mississippi diabetics any losses and/or damages incurred as a result of the Insulin Pricing Scheme;

E. That, in accordance with Miss Code. 75-24-19(1)(b), the State of Mississippi be awarded civil penalties of Ten Thousand Dollars ($10,000) for each purchase by the State and any Mississippi diabetic for an at-issue drug in Mississippi during the relevant time period at a price generated by the Insulin Pricing Scheme;

F. That, in accordance with Miss. Code 11-1-65, the State of Mississippi be awarded punitive damages because Defendants knowingly, willfully intentionally, with actual malice, or with reckless disregard for the rights of the State and its citizens, harmed the health, wellbeing and financial interests of diabetic Mississippians and the State;

G. That the State be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

H. That the State recover its costs of suit, including its reasonable attorney's fees, as provided by law; and

I.      That the State be awarded such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED this the 17th day of February, 2022.

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: */s/ Tricia L. Beale*
     Tricia L. Beale (MSB No. 99113)
     Ta'Shia S. Gordon (MSB No. 101228)
     Consumer Protection Division
     Mississippi Attorney General's Office
     Post Office Box 220
     Jackson, Mississippi 39201
     Telephone: 601-359-3680
     ta'shia.gordon@ago.ms.gov
     tricia.beale@ago.ms.gov

Of Counsel:

W. Lawrence Deas (MS Bar #100227)
lawrence@listondeas.com
LISTON DEAS PLLC
William Liston III (MS Bar #8482)
william@listondeas.com
Post Office Box 14127
Jackson, Mississippi 39236
Tel. (601) 981-1636

Edwin S. Gault, Jr., Esquire
Walter G. Watkins, III, Esquire
Tanya D. Ellis, Esquire
FORMAN WATKINS & KRUTZ, LLP
P. O. Box 22608
Jackson, Mississippi 39225-2608
Tel. (601) 960-8600
Win.gault@formanwatkins.com
trey.watkins@formanwatkins.com
tanya.ellis@formanwatkins.com

Matthew C. McDonald, Esquire
DAVID NUTT & ASSOCIATES
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Tel. (601) 898-7302
Mattm@davidnutt.com

Joanne Cicala, Esquire, admitted *pro hac vice*
Josh Wackerly, Esquire, admitted *pro hac vice*
THE CICALA LAW FIRM PLLC
101 College Street
Dripping Springs, Texas 78620
Tel. (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com

## CERTIFICATE OF SERVICE

I, Tanya D. Ellis, counsel of record for the Plaintiff, hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system.

This the 17th day of February, 2022.

/s/ Tanya D. Ellis
Tanya D. Ellis
Counsel for Plaintiff

EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

---

THE STATE OF MISSISSIPPI, EX REL.
LYNN FITCH , ATTORNEY GENERAL

*Plaintiff,*

v.

ELI LILLY AND COMPANY, *et al*.

*Defendants.*

---

Civil Action No. 3:21-CV00674-KHJ-MTP

**ORAL ARGUMENT REQUESTED**

---

**UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC.,**
**OPTUMRX HOLDINGS, LLC, AND OPTUMINSIGHT, INC.'S**
**MEMORANDUM SUPPORTING THEIR RULE 12(b)(2) MOTION TO DISMISS**
**THE THIRD AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................ 1

STANDARD OF REVIEW ......................................................................................... 3

ARGUMENT .............................................................................................................. 4

I.     THERE ARE NO FACTUAL ALLEGATIONS SATISFYING MISSISSIPPI'S LONG-ARM STATUTE FOR UHG, OPTUM, INC., ORX HOLDINGS, OR OPTUMINSIGHT .................................................................................................. 4

II.    THERE ARE NO FACTUAL ALLEGATIONS ESTABLISHING FEDERAL DUE-PROCESS REQUIREMENTS FOR EXERCISING JURISDICTION OVER UHG, OPTUM, INC., ORX HOLDINGS, OR OPTUMINSIGHT .................................. 7

CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alpine View Co. v. Atlas Copco AB*,
205 F.3d 208 (5th Cir. 2000) .................................................................................2, 11, 16, 17

*Am. Gen. Life Ins. Co. v. Crosswhite*,
No. CIV.A. H-09-1964, 2009 WL 3756956 (S.D. Tex. Nov. 6, 2009) .............................8, 15

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
137 S. Ct. 1773 (2017)...................................................................................................................4

*Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels.*,
1 F.4th 346 (5th Cir. 2021) ..........................................................................................................4

*Canadian Nat'l Ry. Co. v. Waltman*,
94 So. 3d 1111 (Miss. 2012)........................................................................................................11

*Carruth v. Michot*,
No. A-15-CA-189-SS, 2015 WL 6506550 (W.D. Tex. Oct. 26, 2015)....................................8

*Cunningham v. Kp Lifestyles*,
No. 4:20-cv-835-SDJ-KPJ, 2021 WL 3852039 (E.D. Tex. July 15, 2021) .............................8

*Cycles, Ltd. v. W.J. Digby, Inc.*,
889 F.2d 612 (5th Cir. 1989) .......................................................................................................3

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)..............................................................................................................2, 7, 8

*Dalton v. R & W Marine, Inc.*,
897 F.2d 1359 (5th Cir. 1990) ...................................................................................................13

*Diece-Lisa Indus. v. Disney Store U.S., LLC*,
No. 2:12-cv-00400, 2020 WL 1332881 (E.D. Tex. Mar. 23, 2020)...................................12, 17

*Downrange Operations & Training, LLC v. MGS Sales, Inc.*,
No. 3:12-CV-65, 2012 WL 2367681 (S.D. Miss. June 21, 2012) .............................................3

*Elmore v. Acre Beyond The Rye, LLC*,
No. 3:16-cv-296-HSO-JCG, 2017 WL 3754675 (S.D. Miss. Aug. 29, 2017)..........................4

*Evergreen Media Holdings, LLC v. Safran Co.*,
68 F. Supp. 3d 664 (S.D. Tex. 2014) ..........................................................................................4

*Gammill v. Lincoln Life & Annuity Distributors*,
200 F. Supp. 2d 632 (S.D. Miss. 2001)............................................................3, 9

*Gardemal v. Westin Hotel Co.*,
186 F.3d 588 (5th Cir. 1999) ..........................................................................14, 16

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011)...............................................................................................7

*Gulf Coast Bank v. Designed Conveyor Sys., LLC*,
No. CV 16-412-JJB-RLB, 2017 WL 120645 (M.D. La. Jan. 12, 2017)..................8

*Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt*,
85 F.3d 201 (5th Cir. 1996) ...................................................................................18

*Guzman v. Mem'l Hermann Hosp. Sys.*,
No. H-07-3972, 2008 WL 5273713 (S.D. Tex. Dec. 17, 2008), *aff'd*, 409 F. App'x
769 (5th Cir. 2011)................................................................................................14

*Hargrave v. Fibreboard Corp.*,
710 F.2d 1154 (5th Cir. 1983) ..................................................................... passim

*Hogrobrooks v. Progressive Direct*,
858 So. 2d 913 (Miss. Ct. App. 2003) ....................................................................4

*Horton v. Sunpath, Ltd.*,
Civil Action No. 3:20-CV-1884-B-BH, 2021 WL 982344 (N.D. Tex. Feb. 16, 2021).............8

*In re Sec. Litig. BMC Software, Inc.*,
183 F. Supp. 2d 860 (S.D. Tex. 2001) ...................................................................12

*Insurasource, Inc. v. Cowles & Connell of NY, Inc.*,
No. 2:11-CV-76-KS-MTP, 2011 WL 4397487 (S.D. Miss. Sep. 21, 2011)............6

*Klein v. Novotny*,
No. 3:15-CV-2885-K (BF), 2017 WL 4083559 (N.D. Tex. Aug. 22, 2017)..........15

*Libersat v. Sundance Energy, Inc.*,
978 F.3d 315 (5th Cir. 2020) ...........................................................................9, 13

*Licea v. Curacao Drydock Co.*,
952 F.3d 207 (5th Cir. 2015) .................................................................................18

*Lovelace v. Software Spectrum*,
78 F.3d 1015 (5th Cir. 1996) .................................................................................12

*Luvata Gren., LLC v. Danfoss, LLC*,
No. 4:14-CV-00074, 2015 WL 3484679 (N.D. Miss. June 2, 2015)......................13

iii

*Monkton Ins. Servs. v. Ritter,*
   768 F.3d 429 (5th Cir. 2014) ...................................................................7

*Nelson v. Liberty Health & Rehab of Indianola, LLC,*
   No. 4:10CV100, 2011 WL 252724 (N.D. Miss. Jan. 24, 2011) ...................6

*Omnitek Eng'g Corp. v. CNG One Source, Inc.,*
   No. 13-cv-1948, 2014 WL 10475280 (S.D. Cal. July 8, 2014) ..................10

*Rush v. Savchuk,*
   444 U.S. 320 (1980) ..................................................................................9

*Salerno Med. Assocs., LLP v. Riverside Med. Mgmt., LLC,*
   No. 20-10539, 2021 WL 2328195 (D.N.J. June 8, 2021) ...........................9

*Samples v. Vanguard Healthcare, LLC,*
   No. 3:07-CV-157, 2008 WL 4371371 (N.D. Miss. Sept. 18, 2008)..............6

*Siemer v. Learjet Acquisition Corp.,*
   966 F.2d 179 (5th Cir. 1992) ...................................................................15

*Sorrells v. R & R Custom Coach Works,*
   636 So. 2d 668 (Miss. 1994).................................................................1, 3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)................................................................................12

*United States v. Bestfoods,*
   524 U.S. 51 (1998)............................................................................11, 17

*Walden v. Fiore,*
   571 U.S. 277 (2014)......................................................................... *passim*

*Wilson v. Highpointe Hosp., Inc.,*
   62 So. 3d 999 (Miss. Ct. App. 2011) .......................................................6

**RULES**

Federal Rule of Civil Procedure 12(b)(2) .......................................................1

Federal Rule of Civil Procedure 12(b)(6) .......................................................1

**STATUTES**

Miss. Code Ann. § 13-3-57.................................................................1, 3, 6

## INTRODUCTION

As explained in the PBM Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and supporting memorandum, the State's claims against UnitedHealth Group Incorporated (UHG), Optum, Inc., OptumRx Holdings, LLC (ORx Holdings), OptumRx, Inc., and OptumInsight, Inc. fail because there are no plausible or particularized factual allegations supporting the claims against them. The State's claims against four of those entities—UHG, Optum, Inc., ORx Holdings, and OptumInsight—also fail because there are no factual allegations establishing that the Court has personal jurisdiction over those entities. *See* Fed. R. Civ. P. 12(b)(2).

The State has sued UHG, Optum, Inc., and ORx Holdings only in their capacity as OptumRx's parent companies. But under Mississippi's long-arm statute, allegations of a parent-subsidiary relationship do not establish personal jurisdiction over the parent, and there are no other factual allegations satisfying the long-arm statute's contract prong, the tort prong, or the "doing business" prong. *Sorrells v. R & R Custom Coach Works*, 636 So. 2d 668, 671 (Miss. 1994) (citing Miss. Code Ann. § 13-3-57).

The State's allegations about OptumInsight—an OptumRx affiliate—are no better and do not satisfy the long-arm statute. The State alleges only that OptumInsight "provides data, analytics and consulting to companies with [sic] the healthcare industry, including the Manufacturer Defendants" and that those services helped "advise the Manufacturers with regard to the profitability of the Insulin Pricing Scheme." Third Am. Compl. ¶¶ 208–09. That allegation does not establish that OptumInsight contracted with a Mississippi resident, committed a tort in Mississippi, or did business in Mississippi.

Long-arm statute aside, the State's allegations against UHG, Optum, Inc., ORx Holdings, and OptumInsight also fail as a matter of federal due process. The State concedes that those companies' headquarters and principal places of business are outside of Mississippi (Third Am.

Compl. ¶¶ 189, 200, 205, 210), so none is "at home" or subject to general jurisdiction in the State. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Nor are there factual allegations showing that those companies have suit-related contacts with Mississippi sufficient to establish specific jurisdiction over them. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The allegations about UHG, Optum, Inc., and ORx Holdings focus on their status as OptumRx's corporate parents (*see, e.g.*, Third Am. Compl. ¶¶ 192–97, 200, 203, 211), which is insufficient to subject them to personal jurisdiction. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983) ("[S]o long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other."); *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 219 (5th Cir. 2000) ("100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations" for personal jurisdiction (quoting *Hargrave*, 710 F.2d at 1160)). The State likewise mentions OptumInsight only a handful of times and makes no allegations of suit-related contacts with Mississippi, let alone suit-related contacts creating a substantial connection with the State.

The State tries to manufacture specific jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight by defining all those companies together as "OptumRx." *See* Third Am. Compl. ¶ 217 ("Collectively, Defendants UnitedHealth Group, Inc., OptumInsight, OptumRx, Inc., ORx Holdings and Optum, Inc., including all predecessor and successor entities, are referred to as 'OptumRx.'"). But the law requires a plaintiff to allege facts showing that *each* defendant has the required suit-related contacts with Mississippi. The State's improper attempt to define all five entities as "OptumRx" also fails because the State alleges that it is suing "OptumRx" "in its capacities as a PBM and mail order pharmacy" (Third Am. Compl. ¶ 218), but it fails to allege that UHG, Optum, Inc., ORx Holdings, or OptumInsight provide those services—in Mississippi or anywhere else.

# STANDARD OF REVIEW

This Court may exercise personal jurisdiction only if doing so complies with Mississippi's long-arm statute (Mississippi Code Ann. § 13-3-57) and federal due process. *Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 616 (5th Cir. 1989). "Mississippi's long-arm statute is not coextensive with federal due process and has a relatively restrictive scope" (*Gammill v. Lincoln Life & Annuity Distributors*, 200 F. Supp. 2d 632, 635 (S.D. Miss. 2001)), so even if there are factual allegations satisfying the long-arm statute, this Court may not exercise jurisdiction unless the defendants also separately have "sufficient contacts with the forum state such that [they] should reasonably anticipate being haled into court there." *Downrange Operations & Training, LLC v. MGS Sales, Inc.*, No. 3:12-CV-65, 2012 WL 2367681, at *4 (S.D. Miss. June 21, 2012) (internal quotation marks and citation omitted).

Under Mississippi's long-arm statute, the plaintiff must show that a defendant's alleged conduct falls within one of three categories: "the nonresident made a contract with a resident of this state to be performed in whole or in part in this state" (the contract prong); "the nonresident committed a tort in whole or in part in this state" (the tort prong); or "the nonresident did business or performed any character of work or service in this state" (the doing-business prong). *Sorrells*, 636 So. 2d at 671 (citing Miss. Code Ann. § 13-3-57). If the challenged conduct does not fall into one of those categories, a Mississippi court cannot exercise jurisdiction under the long-arm statute.

Under the federal Constitution, a court can hear a case consistent with the Due Process Clause only if it has either general jurisdiction (sometimes called "all-purpose" jurisdiction) or specific jurisdiction (sometimes called "case-linked" jurisdiction). "A court with general jurisdiction may hear any claim against [a] defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773,

1780 (2017). Specific jurisdiction, by contrast, exists only when "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden*, 571 U.S. at 284.

The State bears the burden of establishing that the court has personal jurisdiction over each defendant under both the long-arm statute and as a matter of federal due process. *Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels.*, 1 F.4th 346, 351 (5th Cir. 2021); *Hogrobrooks v. Progressive Direct*, 858 So. 2d 913, 919 (Miss. Ct. App. 2003). "Personal jurisdiction must be determined on an individual basis for each defendant" (*Evergreen Media Holdings, LLC v. Safran Co.*, 68 F. Supp. 3d 664, 671 (S.D. Tex. 2014)), so "[e]ach defendant's contacts with the forum State must be assessed individually." *Elmore v. Acre Beyond The Rye, LLC*, No. 3:16-cv-296-HSO-JCG, 2017 WL 3754675, at *6 (S.D. Miss. Aug. 29, 2017) (citation omitted).

## ARGUMENT

This Court lacks personal jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight under Mississippi's long-arm statute because the State has not alleged facts satisfying any of the statute's three prongs. Beyond that, the Court lacks personal jurisdiction over those four entities as a matter of federal due process because none is at home in Mississippi (so there is no general jurisdiction) and the State failed to plead facts showing that any of the four have suit-related contacts creating a substantial connection with Mississippi (so there is no specific jurisdiction).

## I.     THERE ARE NO FACTUAL ALLEGATIONS SATISFYING MISSISSIPPI'S LONG-ARM STATUTE FOR UHG, OPTUM, INC., ORX HOLDINGS, OR OPTUMINSIGHT.

The State has not pleaded facts satisfying any of the long-arm statute's three prongs—the contract prong, the tort prong, or the doing-business prong—for UHG, Optum, Inc, ORx Holdings, or OptumInsight.

There are no factual allegations that UHG, Optum, Inc., or ORx Holdings contracted with any Mississippi resident or that they were supposed to perform any contract in this State. Nor are there factual allegations that those companies committed a tort in Mississippi or did business in the State. Instead, the State relies only on their status as OptumRx's corporate parents. *See* Third Am. Compl. ¶¶ 192–97 (UHG); ¶ 200, 203 (Optum, Inc.); ¶ 211 (ORx Holdings). For example, the State alleges that OptumRx (not UHG) represented to the State that "in providing PBM services, *UnitedHealth Group* has an 'enterprise-wide commitment to Mississippi' with over '500 Mississippi-based employees as part of UnitedHealth Group.'" *Id.* ¶ 194. That allegation shows at most that UHG subsidiary OptumRx "provide[s] PBM services." But for purposes of the long-arm statute, UHG's subsidiaries' activities are not relevant to whether *UHG* does business in Mississippi. And the State alleges that the unidentified employees are "part of" UHG, but it doesn't allege whether they are employed by UHG or one of its subsidiaries.

For similar reasons, the State's other conclusory allegations fail to connect UHG, Optum, Inc., or ORx Holdings to any Mississippi-based conduct. For instance, the State alleges that UHG was "directly involved in the conduct that caused the Insulin Pricing Scheme" (Third Am. Compl. ¶ 193), that UHG "structure[d]" and "direct[ed]" company policies (*id.* ¶ 196), that Optum, Inc. was "directly involved . . . in the company policies that inform its PBM services and formulary construction" (*id.* ¶ 202), and that ORx Holdings "provides pharmacy benefit management services through its subsidiaries" (*id.* ¶ 211). The law is settled that those sorts of generic allegations about a parent company cannot subject it to jurisdiction based on the activities of a wholly owned subsidiary. *See, e.g.*, *Samples v. Vanguard Healthcare, LLC*, No. 3:07-CV-157, 2008 WL 4371371, at *4 (N.D. Miss. Sept. 18, 2008) (plaintiff's allegations did not satisfy Mississippi's long-arm statute because she alleged only that the court had jurisdiction over a parent company

5

because of its subsidiary's acts); *see also Hargrave*, 710 F.2d at 1160 ("[S]o long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other."); *Nelson v. Liberty Health & Rehab of Indianola, LLC*, No. 4:10CV100, 2011 WL 252724, at *2 (N.D. Miss. Jan. 24, 2011) ("Plaintiff has not carried its burden that the Mississippi Long Arm Statute provides for personal jurisdiction over [a parent company] under the 'doing business' prong" because the "parent and subsidiary maintain[ed] separate and distinct corporate entities"). Instead, as Mississippi courts have explained, there must be factual allegations establishing that, connected to the issues in the lawsuit, a parent company "purposefully performed any act or consummated any business in Mississippi" such that exercising jurisdiction would "not offend traditional notions of fair play and substantial justice." *See Wilson v. Highpointe Hosp., Inc.*, 62 So. 3d 999, 1001 (Miss. Ct. App. 2011) (citation omitted); *Insurasource, Inc. v. Cowles & Connell of NY, Inc.*, No. 2:11-CV-76-KS-MTP, 2011 WL 4397487, at *5 (S.D. Miss. Sep. 21, 2011). The State has not alleged facts satisfying that test for UHG, Optum, Inc., or ORx Holdings.

Nor has the State alleged facts satisfying the long-arm statute as to OptumInsight. The State does not allege facts showing that OptumInsight contracted with a Mississippi resident, committed a tort in Mississippi, or did business in Mississippi. *See* Miss. Code Ann. § 13-3-57. The State alleges only that OptumInsight "provides data, analytics and consulting to companies with [sic] the healthcare industry, including the Manufacturer Defendants" and that those services helped "advise the Manufacturers with regard to the profitability of the Insulin Pricing Scheme." Third Am. Compl. ¶¶ 208–09. Those allegations are not enough to satisfy the long-arm statute. *Wilson*, 62 So. 3d at 1001. Accordingly, the Court lacks jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight under Mississippi's long-arm statute.

## II. THERE ARE NO FACTUAL ALLEGATIONS ESTABLISHING FEDERAL DUE-PROCESS REQUIREMENTS FOR EXERCISING JURISDICTION OVER UHG, OPTUM, INC., ORX HOLDINGS, OR OPTUMINSIGHT.

Even if the State's allegations satisfied Mississippi's long-arm statute, the allegations do not establish that UHG, Optum, Inc., ORx Holdings, or OptumInsight is at home in Mississippi or has suit-related contacts creating a substantial connection with the State such that exercising jurisdiction over them would comport with due process.

### A. The Court lacks general jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight because none is "at home" in Mississippi.

General jurisdiction attaches only if a business "is fairly regarded as at home" in a state. *Daimler*, 571 U.S. at 137 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)). In most cases, a company's "place of incorporation and principal place of business" are the only states that satisfy that requirement. *Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014) (quoting *Daimler*, 571 U.S. at 137); *see also id.* ("It is . . . incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business.").

The State alleges that UHG, Optum, Inc., and OptumInsight are organized under Delaware law with their principal places of business in Minnesota. Third Am. Compl. ¶¶ 189–90, 200–01, 205. By the State's own allegations, those companies are at home in Delaware and Minnesota, not Mississippi.

ORx Holdings is also not at home in Mississippi. The State alleges that ORx Holdings is a Delaware LLC with its principal place of business in California. Third Am. Compl. ¶ 210. "For general jurisdiction, an LLC is considered a citizen in its state of incorporation and principal place of business" (*Cunningham v. Kp Lifestyles*, No. 4:20-cv-835-SDJ-KPJ, 2021 WL 3852039, at *4 n.4 (E.D. Tex. July 15, 2021)), so ORx Holdings is at home in Delaware and California. *See also*

*Carruth v. Michot*, No. A-15-CA-189-SS, 2015 WL 6506550, at *6 (W.D. Tex. Oct. 26, 2015) (same rule).

Nor does OptumInsight's registration or license with Mississippi matter. Third Am. Compl. ¶¶ 206–07. "[R]egistration to do business in [a state], without more, does not suffice to establish general jurisdiction." *Horton v. Sunpath, Ltd.*, Civil Action No. 3:20-CV-1884-B-BH, 2021 WL 982344, at *3 (N.D. Tex. Feb. 16, 2021); *see also Gulf Coast Bank v. Designed Conveyor Sys., LLC*, No. CV 16-412-JJB-RLB, 2017 WL 120645, at *7 (M.D. La. Jan. 12, 2017) ("[T]reating business registration as consent to general jurisdiction would have the effect of subjecting a foreign corporation to general jurisdiction in every jurisdiction in which it did business. Such a conclusion is untenable in light of *Daimler*."). And a license "does not in itself justify general jurisdiction." *Am. Gen. Life Ins. Co. v. Crosswhite*, No. CIV.A. H-09-1964, 2009 WL 3756956, at *7 (S.D. Tex. Nov. 6, 2009).

The Third Amended Complaint contains no factual allegations that UHG, Optum, Inc., OptumInsight, or ORx Holdings has "affiliations with [Mississippi that] are so 'continuous and systematic' as to render them essentially at home" in Mississippi. *Daimler*, 571 U.S. at 127.

**B. The Court lacks specific personal jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight because there are no factual allegations establishing that those companies have suit-related contacts creating a substantial connection with Mississippi.**

Specific personal jurisdiction exists only when "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden*, 571 U.S. at 284; *see also Libersat v. Sundance Energy, Inc.*, 978 F.3d 315, 321 (5th Cir. 2020). "[T]he relationship [with the forum state] must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. at 284 (citation omitted); *see also Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980) (personal jurisdiction requirements "must be met as to each defendant over whom a . . .

court exercises jurisdiction" and cannot be completed by "aggregating [defendants'] forum contacts"). There are no factual allegations satisfying that requirement for UHG, Optum, Inc., ORx Holdings, or OptumInsight.

The State mentions UHG, Optum, Inc., ORx Holdings, and OptumInsight only a handful of times in the Third Amended Complaint, mostly in allegations about the first three companies' status as OptumRx's corporate parents. But without more, a parent-subsidiary affiliation is not enough to support specific personal jurisdiction. *See, e.g.*, *Hargrave*, 710 F.2d at 1160; *see also Salerno Med. Assocs., LLP v. Riverside Med. Mgmt., LLC*, No. 20-10539, 2021 WL 2328195, at *3 (D.N.J. June 8, 2021) (court lacked personal jurisdiction over four United entities: "At most, the four defendants are alleged to be related to UHIC and Riverside within the complex United corporate family tree. . . That is not enough." (citation omitted)); *Gammill*, 200 F. Supp. 2d at 635 ("The assertion that . . . a parent company of another defendant [is] properly before this court is not a sufficient reason standing alone for asserting *in personam* jurisdiction over a non-resident parent corporation.").

Analyzing allegations in the Third Amended Complaint that refer to UHG, Optum, Inc., ORx Holdings, or OptumInsight demonstrates that none describes contacts with Mississippi that give rise to the State's claims or is otherwise sufficient to establish specific personal jurisdiction over those entities.

**Paragraphs 189 and 190** contain information about UHG's places of business and incorporation, alleging only that it is an out-of-state company.

**Paragraphs 191 and 192** contain general information about UHG's business, revenues, and Fortune 500 ranking. Third Am. Compl. ¶¶ 191–92. But this case is about an alleged manufacturer-PBM conspiracy. *Id.* ¶¶ 19–22. UHG is not a PBM, and there are no allegations

tying UHG to the challenged conduct, never mind creating a substantial connection with Mississippi.

**Paragraphs 193, 194, and 196** contain only conclusory allegations that UHG "was directly involved" in the alleged insulin-pricing scheme and that UHG was "directly involved in its enterprise-wide PBM services and formulary construction." Third Am. Compl. ¶¶ 193–94. The State never explains how UHG was "directly involved." Those allegations are conclusions that say nothing about whether UHG has case-related contacts creating a substantial connection with Mississippi. The State also alleges in Paragraph 194 that there are 500 UHG-affiliated employees in Mississippi (*id.* ¶ 194), but the State doesn't identify which company within UHG's corporate family employs those individuals, let alone plead facts showing that any of those employees was involved in the alleged conduct underlying the State's claims. *See Omnitek Eng'g Corp. v. CNG One Source, Inc.*, No. 13-cv-1948, 2014 WL 10475280, at *7 (S.D. Cal. July 8, 2014) ("General allegations of contacts with [a state] unrelated to the [underlying claims] are irrelevant to the specific personal jurisdiction inquiry . . . ."). In paragraph 196, the State also alleges that UHG sets company-wide "overarching policies" (Third Am. Compl. ¶ 196), but that allegation does not establish that UHG engaged in suit-related conduct creating a substantial connection with Mississippi any more than it would establish jurisdiction over any other corporate parent entity. *Cf. Walden*, 571 U.S. at 284.

Insofar as the State is trying to use the allegations in Paragraphs 193, 194, and 196 to pierce the corporate distinction between UHG and OptumRx, the allegations are insufficient. "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal

quotation marks and citation omitted). The State has not alleged facts that would come close to suggesting that OptumRx and UHG are alter egos. *See Canadian Nat'l Ry. Co. v. Waltman*, 94 So. 3d 1111, 1116 (Miss. 2012).

Beyond that, courts in the Fifth Circuit can pierce the corporate veil only if a plaintiff shows that an ultimate parent dominates each subsidiary in the corporate chain between the parent and the subsidiary. *See Alpine View*, 205 F.3d at 218 (the plaintiffs' "task is made more difficult by the existence of multiple levels of [the parent's] subsidiaries," including holding companies and other subsidiaries). Here, UHG and OptumRx are several degrees removed from each other: The State alleges that UHG is the corporate parent of Optum, Inc. (Third Am. Compl. ¶ 203), which owns ORx Holdings (Second Am. Compl. ¶ 168), which owns OptumRx. *Id.* There are no factual allegations showing that UHG dominates all the companies between itself and OptumRx.

If a plaintiff could establish specific jurisdiction over a parent company by alleging in conclusory fashion that the parent sets a corporate family's "overarching policies" (*compare* Third Am. Compl. ¶ 196), then the corporate form would mean nothing for most publicly held companies. That is not the law.

**Paragraph 195** contains an allegation that "[*UnitedHealth* Group] then negotiate[s] with pharmacies to lower costs" and that "[*UnitedHealth* Group] also operate[s] mail order pharmacies" (brackets in complaint). The State purports to quote UHG's 2020 sustainability report, but it took liberties with the report's text by replacing the word "we" in the report with "UnitedHealth Group." Here is what the quoted excerpt actually says:

> OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. We then negotiate with pharmacies to lower costs at the point of sale. We also operate prescription home delivery . . . . We work directly with drug wholesalers and distributors to ensure

11

consistency of the brand and generic drug supply, and a reliance on that drug supply.

*UnitedHealth Group 2020 Sustainability Report*, (2021), https://unitedhealthgroup.com/content/d am/UHG/PDF/sustainability/final/2020_SustainabilityReport.pdf.[1]  In context, the excerpt confirms that the word "We"—which the State replaced with "UnitedHealth Group" in brackets— refers to OptumRx, not UHG. Regardless, the State cannot erase the corporate form by using the word "We" in a regulatory filing to refer to a corporate family. Under the law, a parent and subsidiary are alter egos only if the parent dominates the subsidiary in such a way that the two companies are not separate and distinct entities. *Hargrave*, 710 F.2d at 1159.  The State has not even tried to allege facts along those lines. *Cf. Diece-Lisa Indus. v. Disney Store U.S., LLC*, No. 2:12-cv-00400, 2020 WL 1332881, at *3 (E.D. Tex. Mar. 23, 2020) (rejecting argument that the court had specific jurisdiction over a parent company based on alleged "judicial admissions . . . that all Disney entities are part of one big company" and that "Disney cross-markets itself as one entity").

Paragraph 197 contains an allegation that UHG, OptumRx, and OptumInsight executives met with Novo Nordisk in 2015 and Eli Lilly in 2016. But the State doesn't allege that any meeting took place in Mississippi—it says that at least one of the alleged meetings occurred in Minnesota (Third Am. Compl. ¶ 197(a))—and Paragraph 197 otherwise contains no factual allegations about any suit-related contacts between Mississippi and UHG, Optum, Inc., ORx Holdings, or

---

[1] At the motion-to-dismiss stage, this Court may consider "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017 (5th Cir. 1996) (same); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 883 (S.D. Tex. 2001) ("Courts may routinely consider not just documents named in Plaintiffs' complaint, but even documents that, if not named, are pertinent, central or integral to [Plaintiffs'] claim.") (citation omitted and internal quotation marks omitted). The State incorporated UHG's sustainability report into its complaint by citing and quoting the document.

OptumInsight. *Cf., e.g.*, *Libersat*, 978 F.3d at 320 (business connections unrelated to a lawsuit "are irrelevant to specific jurisdiction"); *Luvata Gren., LLC v. Danfoss, LLC*, No. 4:14-CV-00074, 2015 WL 3484679, at *5 (N.D. Miss. June 2, 2015) ("Without some allegation connecting [defendant's employee's] visit to the transactions giving rise to this lawsuit, the Court finds this visit to be irrelevant to the specific jurisdiction inquiry."). Nor does the State even attempt to explain what happened at that purported meeting that facilitated the alleged conspiracy.

**Paragraph 198** includes an allegation that UHG owns non-party UnitedHealthcare. That allegation has nothing to do with the claims in the case; it is an allegation of corporate parenthood, not a factual allegation establishing suit-related contacts creating a substantial connection between UHG and Mississippi.

**Paragraph 199** contains an allegation that UHG consented to jurisdiction by filing a lawsuit in Mississippi against a former employee in an unrelated case a decade ago. *See* Third Am. Compl. ¶ 199. No case supports that theory. On the contrary, it is well settled that specific jurisdiction is a claim-specific inquiry and that filing a lawsuit in one case doesn't subject a company to personal jurisdiction in another. *See Libersat*, 978 F.3d at 320 (a defendant's "involve[ment] in unrelated lawsuits[] [we]re inapposite" and were, "[b]y definition . . . irrelevant to specific jurisdiction"); *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 n.4 (5th Cir. 1990) (holding that a parent's submitting to jurisdiction in prior cases did not waive its later objection to personal jurisdiction in another case); *Guzman v. Mem'l Hermann Hosp. Sys.*, No. H-07-3972, 2008 WL 5273713, at *13 (S.D. Tex. Dec. 17, 2008) ("By submitting to jurisdiction in one case, a party does not thereby consent to jurisdiction for all future suits in that forum, even if they are related."), *aff'd*, 409 F. App'x 769 (5th Cir. 2011).

**Paragraphs 200 and 201** include allegations about Optum, Inc.'s places of business and incorporation, and the State then alleges that Optum, Inc. is a "health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc." Even taken as true, "managing" a subsidiary is not enough for specific jurisdiction over the parent. *See Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir. 1999). In any event, the State does not allege that Optum, Inc. "managed" anything related to its claims in this case, much less that Optum, Inc.'s case-related contacts create a substantial connection with the State.

**Paragraphs 202 and 203** (like Paragraphs 193, 194, and 196 for UHG) include conclusory allegations that Optum, Inc. is "directly involved" in "company policies" that "inform" PBM services. Third Am. Compl. ¶¶ 202–03. We don't know what that means, but in any case, those conclusory allegations fail for the same reasons that the conclusory allegations in Paragraphs 193, 194, and 196 fail as to UHG.

**Paragraph 204** contains an allegation that OptumRx told the State that when it provides PBM services, it "leverage[es] [sic] the power of Optum to impact cost of care." Third Am. Compl. ¶ 204 (alteration in original). It isn't clear whether the reference to "Optum" is to Optum, Inc.—when the State refers to that company elsewhere, it adds the "Inc."—but regardless, the allegation does not show that Optum, Inc. has any suit-related contacts creating a substantial connection with Mississippi.

**Paragraphs 205, 206, and 207** contain allegations about OptumInsight's places of business and incorporation along with the statement that "OptumInsight is registered to business [sic] in Mississippi" and that "OptumInsight holds one active Third Party Administrator license in Mississippi." Third Am. Compl. 205–07. This is not enough to satisfy due process. Those allegations are insufficient to establish general jurisdiction for the reasons discussed above. *See*

*Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183 (5th Cir. 1992) (explaining that registering

an agent "does not act as consent to be hauled into [a state's] courts on any dispute with any party

anywhere concerning any matter"); *Crosswhite*, No. H-09-1964, 2009 WL 3756956, at *7 (same

for state licensure); *see also Klein v. Novotny*, No. 3:15-CV-2885-K (BF), 2017 WL 4083559, at

*5 (N.D. Tex. Aug. 22, 2017) (defendant holding a license to sell insurance for more than 40 years

was not enough to create specific jurisdiction). And the State offers no factual allegations

connecting OptumInsight's alleged registration or license to the State's underlying claims, let

alone creating a substantial connection to Mississippi.

   **Paragraphs 208 and 209** contain allegations that OptumInsight "provides data, analytics and

consulting to companies with [sic] the healthcare industry, including the Manufacturer Defendants,"

and that it "analyzed data and other information from the Manufacturer Defendants to advise the

Manufacturers with regard to the profitability of the Insulin Pricing Scheme." Third Am. Compl.

¶¶ 208–09. There are no factual allegations showing that OptumInsight's supposed analysis or

consulting work occurred in Mississippi, and the State doesn't explain how that analysis or consulting

relates to its underlying claims or created a substantial connection with the State. Nor does the State

ever explain what OptumInsight allegedly did wrong. The State's threadbare allegations about

OptumInsight do not establish a substantial suit-related connection between OptumInsight and

Mississippi, and the State may not otherwise establish specific jurisdiction over OptumInsight by

virtue of its affiliation with OptumRx.

   **Paragraph 210 and 211** include allegations about ORx Holdings' places of business and

incorporation; the State then alleges in conclusory fashion that ORx Holdings "provides pharmacy

benefit management services through its subsidiaries to various health insurance entities in

Mississippi." Third Am. Compl. ¶¶ 210–11. Again, alleging that a parent acts "through its

subsidiaries" is not enough for specific jurisdiction over the parent. *Hargrave*, 710 F.2d at 1159–60; *Gardemal*, 186 F.3d at 591.

**Paragraph 216**, through various subparts, contains allegations that UHG has certain officers or employees in common with Optum, Inc., ORx Holdings, OptumRx, and OptumInsight (Paragraph 216(a)), that UHG wholly owns all four companies (Paragraph 216(b)), that UHG has referred to its corporate family as a "diversified family of businesses" in regulatory filings (Paragraph 216(c)), and that UHG is responsible for the corporate family's policies (Paragraph 216(d), (e)). Many of those allegations are false or misleading, but even if accepted as true, none suggests that the State's claims arise out of UHG's, Optum, Inc.'s, or ORx Holdings' suit-related contacts with Mississippi—much less that those non-existent suit-related contacts created a substantial connection with the State. And none is sufficient to pierce the corporate distinction between OptumRx and its parent companies.

The State's allegation in Paragraph 216(a) that there is a "commonality of officers and directors [is] not alone sufficient to establish an alter ego relationship between two corporations." *Alpine View*, 205 F.3d at 219 (quoting *Hargrave*, 710 F.2d at 1160); *see also Gardemal*, 186 F.3d at 593 (ties "through stock ownership, shared officers, financing arrangements, and the like" do not, by themselves, establish an alter-ego relationship). In any case, three out of the seven people whom the State identified—Sir Witty, Mr. Clark, and Mr. Roos—have allegedly held roles only at UHG and Optum, Inc., not at OptumRx (or OptumInsight), so that supposed overlap says nothing about whether the Court should treat those companies as OptumRx's alter egos.

The State's allegation in Paragraph 216(b) that "UnitedHealth Group directly or indirectly owns all of the stock of Optum, Inc., OptumRx Holdings, LLC, OptumInsight and OptumRx, Inc."

is no better. One company's owning another is never by itself enough to subject the parent to specific jurisdiction. *See Alpine View*, 205 F.3d at 219; *see also Bestfoods*, 524 U.S. at 61.

The State's allegation in Paragraph 216(c) that "[t]he public filings, documents and statements of UnitedHealth Group presents [sic] its subsidiaries, including Optum, Inc., OptumRx Holdings LLC, OptumInsight and OptumRx, Inc. as divisions or departments of a single company that is 'a diversified family of businesses'" is insufficient to hold UHG liable for OptumRx's conduct. A parent company does not erase its subsidiaries' corporate forms by saying that those subsidiaries represent a diversified family of businesses or that the corporate family works toward a common goal. *See Diece-Lisa Indus.*, 2020 WL 1332881, at *3.

The State's allegation in Paragraph 216(d) and (e) that Optum, Inc., ORx Holdings, OptumRx, and OptumInsight executives "ultimately report" to UHG executives and that UHG is "directly involved in the policies and business decisions of OptumInsight, Optum, Inc., OptumRx Holdings, LLC, and OptumRx, Inc. that gave rise to the State's claims in this Third Amended Complaint" comes nowhere close to justifying specific jurisdiction over UHG. Those allegations fail for all the reasons set forth above. *See Hargrave*, 710 F.2d at 1160; *Alpine View*, 205 F.3d at 219; *see also Bestfoods*, 524 U.S. at 61.

\* \* \*

What the State is really suggesting through its conclusory allegations is that, for jurisdictional purposes, courts may always impute a subsidiary's alleged acts to a parent company. But the law says otherwise. "[M]ere presence within the bosom of [a] corporate family" is never enough to pierce the corporate veil. *Licea v. Curacao Drydock Co.*, 952 F.3d 207, 213 (5th Cir. 2015) (citation omitted). The State also ignores most factors that courts consider when piercing the corporate veil—including whether the subsidiary is undercapitalized, whether the subsidiary

lacks corporate formalities, whether the parent finances the subsidiary's activities, whether the parent pays the subsidiary's employees' salaries, and whether the subsidiary receives its business only through the parent. *See, e.g.*, *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt*, 85 F.3d 201, 208–09 (5th Cir. 1996). The State does not allege facts satisfying any of those factors.

## **CONCLUSION**

The Court should dismiss the Third Amended Complaint against UHG, Optum, Inc., ORx Holdings, and OptumInsight for lack of personal jurisdiction.

DATE: March 21, 2022.

Respectfully submitted,

**UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC., OPTUMRX HOLDINGS, LLC, and OPTUMINSIGHT, INC.,** Defendants

*/s/Roy D. Campbell, III*
Roy D. Campbell, III (MSB #5562)
Jonathan M. Barnes (MSB # 105659)
**BRADLEY ARANT BOULT CUMMINGS LLP**
188 E. Capitol Street, Suite 1000
Jackson, MS 39215
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
rcampbell@bradley.com
jmbarnes@bradley.com

Brian D. Boone (*pro hac vice*)
**ALSTON & BIRD LLP**
101 S. Tyron St., Ste. 4000
Charlotte, NC 28280
T: (704) 444-1000
Fax: (704) 444-1111
brian.boone@alston.com

Elizabeth Broadway Brown (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 W. Peachtree Street, N.W., Ste. 4900
Atlanta, GA 30309-3424

18

T: (404) 881-4688
Fax: (404) 881-7777
liz.brown@alston.com

Kelley Connolly Barnaby (*pro hac vice*)
**ALSTON & BIRD LLP**
950 F. Street, NW
Washington, D.C. 20004
T: (202) 239-3300
Fax: (202) 239-3333
kelley.barnaby@alston.com

Lane Zuraw (*pro hac vice*)
**ALSTON & BIRD LLP**
506 Mission St., Ste. 2100
San Francisco, CA 94105
T: (415) 243-1000
Fax: (415) 243-1001
lane.zuraw@alston.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Roy D. Campbell, III*
OF COUNSEL

EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

THE STATE OF ARKANSAS, *EX.REL.*,
LESLIE RUTLEDGE, ATTORNEY
GENERAL

       *PLAINTIFF,*

       V.

ELI LILLY AND COMPANY; NOVO
NORDISK INC.; SANOFI-AVENTIS
U.S. LLC; EVERNORTH HEALTH,
INC. (FORMERLY EXPRESS SCRIPTS
HOLDING COMPANY); EXPRESS
SCRIPTS, INC.; EXPRESS SCRIPTS
ADMINISTRATORS, LLC; ESI MAIL
PHARMACY SERVICE, INC.;
EXPRESS SCRIPTS PHARMACY, INC.;
MEDCO HEALTH SOLUTIONS, INC;
CVS HEALTH CORPORATION; CVS
PHARMACY, INC; CAREMARK RX,
LLC; CAREMARK PCS HEALTH, LLC;
CAREMARK, LLC; UNITEDHEALTH
GROUP, INC.; OPTUM, INC.;
OPTUMRX INC.; OPTUMRX
HOLDINGS, LLC; AND
OPTUMINSIGHT, INC.

       *DEFENDANTS.*

Case No. 4:22-cv-549

Jury Trial Demanded

# FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................... 1

II.  PARTIES ................................................................................ 10

    A.   Plaintiff ................................................................................... 10

    B.   Manufacturer Defendants ....................................................... 11

    C.   PBM Defendants .................................................................... 16

III. THE STATE OF ARKANSAS'S INTEREST ..................... 45

IV.  JURISDICTION AND VENUE ............................................ 46

V.   FACTUAL ALLEGATIONS ................................................. 47

    A.   Diabetes and Insulin Therapy ................................................ 47

        1.   Diabetes: A growing epidemic ...................................... 47

        2.   Insulin: A century old drug ............................................ 49

        3.   Current insulin landscape. ............................................. 51

        4.   Insulin adjuncts: Type 2 medications ........................... 53

    B.   The Dramatic Rise in the Price of Diabetes Medications ..................... 55

        1.   Insulin price increases ................................................... 55

        2.   Manufacturers increased prices in lockstep ................. 61

    C.   Pharmaceutical Payment and Supply Chain ........................... 66

        1.   Drug Costs for Diabetics. .............................................. 67

        2.   PBMs' role in the pharmaceutical payment chain. ...................... 69

        3.   The rise of the PBMs in the pharmaceutical supply chain. ........ 71

        4.   Insular nature of the pharmaceutical industry ............................ 73

    D.   The Insulin Pricing Scheme .................................................... 77

    E.   Defendants Admit That They Have Engaged in the Insulin
        Pricing Scheme. ...................................................................... 83

F.     Defendants' Profit Off the Insulin Pricing Scheme. .................................88

    1.    Manufacturers' Profit Off Insulin Pricing Scheme.....................88

    2.    PBMs' Profit Off Insulin Pricing Scheme.....................................88

    3.    PBMs pocket most of the secret Manufacturer Payments. ........89

    4.    PBMs' profit off pharmacies. .......................................................94

    5.    Insulin Pricing Scheme increases PBM mail order profits.........95

G.    The State, and its Residents who Suffer from Diabetes, Purchase the At-Issue Drugs from Defendants ....................................97

H.    Defendants Deceived the State. ..............................................................98

    1.    Manufacturer Defendants deceived Arkansas Diabetics and the State..............................................................................98

    2.    PBM Defendants deceived Arkansas diabetics and the State................................................................................101

I.    The Insulin Pricing Scheme Has Damaged the State and Arkansans who Suffer from Diabetes...................................................111

    1.    Defendants' misconduct damaged the State as a payor for and purchaser of the at-issue drugs. ...........................111

    2.    The Insulin Pricing Scheme has damaged the State by increasing its healthcare costs and decreasing productivity ..........................................................................112

    3.    The Insulin Pricing Scheme has damaged Arkansas Diabetics. ..............................................................................113

J.    Defendants' Recent Efforts in Response to Rising Insulin Prices. ......114

VI.    TOLLING OF STATUTE OF LIMITATIONS ......................................116

A.    Discovery Rule Tolling ........................................................................116

B.    Fraudulent Concealment Tolling. .........................................................117

C.    Estoppel ...............................................................................................117

D.    Continuing Violations .........................................................................118

VI.    CLAIMS FOR RELIEF ...................................................................118

      1.   Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101 through 115, *et seq.* (Against All Defendants) ........................... 118

      2.   Unjust Enrichment (Against All Defendants) ...................................... 123

      3.   Civil Conspiracy (Against All Defendants) ........................................... 124

**VII.**  **JURY DEMAND** ................................................................................... **126**

**VIII.** **PRAYER FOR RELIEF** ....................................................................... **126**

# TABLE OF FIGURES

Figure 1: Price Increase of Insulin vs. Selected Consumer Goods from 1997-2018 .................................................................................................. 5

Figure 2: Rising list prices of Humulin R (500U/mL) from 1997-2021 ....................... 56

Figure 3: Rising list prices of Humalog vials and pens from 1996-2021 ................. 57

Figure 4: Rising list prices of Levemir from 2006-2021 ................................. 58

Figure 5: Rising list prices of Novolog vials and pens from 2002-2021 .................... 59

Figure 6: Rising list prices of Lantus vials and pens from 2001-2021 ...................... 60

Figure 7: Rising list prices of long-acting insulins ....................................... 62

Figure 8: Rising list prices of rapid-acting insulins ...................................... 63

Figure 9: Rising list price increases for human insulins ............................... 64

Figure 10: Rising list prices of Type 2 drugs .......................................... 65

Figure 11: Lockstep insulin price increases ............................................ 66

Figure 12: Insulin distribution and payment chain .................................... 69

Figure 13: PBM consolidation ........................................................... 72

Plaintiff, the State of Arkansas, *ex rel*. Leslie Rutledge, Attorney General, (the "State" or "Plaintiff"), brings this action against Eli Lilly and Company; Novo Nordisk Inc.; Sanofi-Aventis U.S. LLC; Evernorth Health, Inc. (formerly Express Scripts Holding Company); Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Medco Health Solutions, Inc; CVS Health Corporation; CVS Pharmacy, Inc; Caremark Rx, LLC; Caremark PCS Health, LLC; Caremark, LLC; UnitedHealth Group, Inc.; Optum, Inc.; OptumRx Inc.; OptumRx Holdings, LLC; and OptumInsight, Inc. (collectively, "Defendants") for violations of the laws of the State of Arkansas and alleges as follows:

## I.    INTRODUCTION

1.      Diabetes is an epidemic and a public health crisis in Arkansas. Arkansas has a high prevalence of diabetes with approximately 14% of its adult population—over 400 thousand people—living with diabetes. An additional 800 thousand Arkansas residents have pre-diabetes, which is when a person's blood sugar level is higher than it should be and signifies that the person is at greater risk for developing diabetes.

2.      Diabetes is the leading cause of blindness, kidney failure, and lower limb amputations and is the seventh leading cause of death in Arkansas, despite the availability of effective treatment.

3.      The economic impact of diabetes is staggering. The total estimated cost of diagnosed diabetes in Arkansas is $3.1 billion per year.

4.      Hundreds of thousands of diabetics in Arkansas rely on daily insulin treatments to survive, and millions more use either oral medications, insulin, or a combination of both to control their diabetes.

1

5. Defendants Eli Lilly, Novo Nordisk, and Sanofi (collectively, "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic medications available in Arkansas.

6. Defendants CVS Caremark, Express Scripts, and OptumRx collectively dominate the pricing system for the at-issue drugs (collectively, "PBM Defendants" or "PBMs").[1] The PBM Defendants' dominance results from the reality that these three corporate actors are, at once (1) the largest pharmacy benefit managers in the United States and in Arkansas (controlling approximately 80% of the PBM market) and (2) the largest pharmacies in the United States and in Arkansas (making up 3 of the top 5 dispensing pharmacies in the U.S.). These Defendant corporate conglomerates sit at 4th (CVS Caremark), 5th (OptumRx), and 13th (Express Scripts) on the Fortune 500 list ranking largest corporations by revenue.

7. As part of their work, PBM Defendants establish standard formulary offerings (i.e., approved drug lists). If a drug is not included on a formulary, then it is not covered by health insurance.

8. PBM Defendants understand that their standard formulary offerings drive drug utilization.

9. Because the three PBM Defendants control 80% of the pharmacy benefit market, unless they include a drug on one of their standard formulary offerings, it is not available to 80% of Arkansas's citizens.

---

[1] In the context of this Complaint, the "at-issue drugs" are Humulin N, Humulin R, Humalog, Trulicity, Basaglar, Lantus, Toujeo, Apidra, Soliqua, Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

10. The Manufacturers likewise understand that PBMs' standard formularies drive drug utilization—if Manufacturers want their drugs to be prescribed and paid for, they must obtain preferrable formulary position on the PBM Defendants' formularies.

11. Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous control over drug prices and drug purchasing behavior in Arkansas.

12. The unconscionable and deceptive scheme at the root of this Complaint—the Insulin Pricing Scheme[2]—was born from this mutual understanding.

13. Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, Manufacturer Defendants have raised the prices of their respective diabetes drugs in an astounding manner, even though the cost to produce these drugs has decreased during that same time period.

14. Insulins, which today cost Manufacturer Defendants less than $2 per drug to produce, and which were originally released at a list price of $20 per drug in the late 1990s, now carry list prices that range between $300 and $700 per drug.

15. In the last decade alone, Manufacturer Defendants have increased the prices of their insulins up to 1,000%.

---

[2] The Insulin Pricing Scheme is further defined in paragraph 20 below.

16.     Figure 1 illustrates the rate at which Defendant Eli Lilly raised the price of its analog insulin Humalog, compared to the rate of inflation for other consumer goods and services from 1997-2018.

4

### Figure 1: Price Increase of Insulin vs. Selected Consumer Goods
### from 1997-2018



17. Remarkably, nothing about these medications has changed; today's $350 insulin is the exact drug Defendants originally sold for $20.

18. The current outrageously inflated price stands in stark contrast to insulin's origins: the discoverers sold the original patent for $1 to ensure that the medication would remain affordable. Today, insulin has become the poster child for skyrocketing and inflated drug prices. Consumers and payors bear the brunt of this increase.

19. Both Manufacturer and PBM Defendants play vital roles and profit immensely from the Insulin Pricing Scheme and the artificially inflated prices produced by it.

20. Specifically, the Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, Manufacturer Defendants artificially and willingly raise their list prices, and then pay an undisclosed portion of that price back to the PBMs. These Manufacturer Payments[3] are provided under a variety of labels, yet, however they are described, these

---

[3] In the context of this Complaint, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price, or margin guarantees and any other form of consideration exchanged. This broad definition is necessary because PBMs historically have continued to change and evolve the nature of their payment streams to avoid disclosure to clients and disclosure pursuant to state transparency laws. While the route by which the payment streams reach the PBMs has evolved, the fact that the payments do, in fact, reach the PBMs has remained the same.

Manufacturer Payments, along with the inflated list prices, are *quid pro quo* for formulary inclusion on the PBMs' standard offerings.

21.     The published list prices for the at-issue drugs have become so untethered from the net prices realized by the Manufacturers as to constitute a false price.

22.     PBMs then grant preferred status on their standard formularies based upon the largest Manufacturer Payment and the highest inflated list price—which the PBMs know to be artificially inflated and which the PBMs insist that their payor clients use as the basis for the price they pay for the at-issue drugs.

23.     The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. Manufacturer Defendants are able to make these undisclosed Manufacturer Payments to buy preferred formulary position—which significantly increases their revenue—without sacrificing their profits.

24.     PBM Defendants profit off the inflated list prices that result from the scheme in numerous ways, including: (1) retaining a significant—yet undisclosed— percentage of the Manufacturer Payments, either directly or through wholly-owned rebate aggregators, (2) using the inflated list price produced by the Insulin Pricing Scheme to generate profits from pharmacies in their networks, and (3) relying on those same inflated list prices to drive up the PBMs' profits through their own pharmacies.

25.     Thus, while the PBM Defendants represent both publicly and to their clients that they use their market power to drive down prices for diabetes medications, these representations are patently false and intended to be deceptive and misleading.

7

26.     Rather, the PBMs are intentionally driving up the price of the at-issue drugs. Indeed, the Manufacturer Payments that the PBMs receive in exchange for preferred formulary position, along with the PBMs' actual formulary construction, are directly responsible for the skyrocketing price of the at-issue diabetes medications.

27.     Because the price paid by nearly every diabetic and payor is based upon the artificially inflated list prices generated by Defendants' scheme, the Insulin Pricing Scheme directly harms every diabetic and payor in Arkansas who purchases these life-sustaining drugs.

28.     The consequence to Arkansas public health and the public treasury from the outrageous price increases caused by the Insulin Pricing Scheme cannot be overstated. The State of Arkansas, as a payor for the at-issue drugs through its employee health plans, and as a purchaser of the at-issue drugs at state-run facilities, has been overcharged millions of dollars a year.

29.     Arkansas residents suffering from diabetes have also been overcharged millions of dollars a year in out-of-pocket costs as a result of the Insulin Pricing Scheme.

30.     For these Arkansas residents with diabetes, the physical, emotional, and financial tolls of paying such excessive prices for diabetes medications is devastating. Unable to afford the drugs their doctors prescribe, many diabetics in Arkansas ration or under-dose their insulin, inject expired insulin, reuse needles, and starve themselves to control their blood sugars. This behavior is extremely dangerous and has led to serious complications or even death.

31.     In addition to the immeasurable human costs, the Insulin Pricing Scheme also adds substantial costs to the Arkansas health care system by increasing preventable complications. For example, one national model found that all people with diabetes adhering to their diabetes medications would save $8.3 billion in direct medical costs per year by averting one million emergency department visits and 618,000 hospitalizations.

32.     Arkansas shoulders the burden for much of these increased healthcare costs, spending billions of dollars annually in healthcare-related costs for diabetes and diabetes-associated complications. The amount that Arkansas has spent on diabetes-related costs has steadily increased throughout the relevant time period and could grow exponentially given the high prevalence of pre-diabetes in Arkansas.

33.     Thus, in addition to being overcharged for the at-issue drugs through its employee benefit programs and purchases for state facilities, the significant increase in health care expenditures caused by the Insulin Pricing Scheme has also damaged the State.

34.     Insulin rationing and the resulting otherwise-avoidable health complications caused by the Insulin Pricing Scheme leads to a loss in productivity and tax revenue, further damaging the State.

35.     The State, through Leslie Rutledge, Attorney General, brings this action on behalf of the State of Arkansas and its residents: (a) to protect the health and economic well-being of the State as a whole and the heath and economic well-being of Arkansas residents in its *parens patriae* capacity; (b) on behalf of the State as a payor

for and purchaser of the at-issue diabetes medications through its health plans and state-run facilities; (c) on behalf of the State to recover damages for additional costs it has and will incur as a result of the Insulin Pricing Scheme; and (d) for injunctive relief that will halt the Insulin Pricing Scheme.

36.     This action asserts causes for Defendants' violations of the Arkansas Deceptive Trade Practices Act, unjust enrichment, and civil conspiracy.

37.     This action seeks injunctive relief, restitution, disgorgement, actual damages, treble damages, punitive damages, penalties, and attorneys' fees to address and abate the harm caused by the Insulin Pricing Scheme.

38.     The relevant period for damages alleged in this Complaint is from 2003 continuing through the present.

## II.     PARTIES

### A.     Plaintiff

39.     **Plaintiff, the State of Arkansas**. The State of Arkansas is the sole Plaintiff in this action, brought in its name on relation of the Attorney General Leslie Rutledge. The Attorney General is the chief legal officer of the State and, pursuant to Ark. Code Ann. § 4-88-104, § 4-88-105, and § 4-88-113, represents and protects the state, its subdivisions, the legitimate business community, and the general public as consumers and has the authority to bring actions for civil enforcement of the Arkansas Deceptive Trade Practices Act (the "ADTPA"). The State also brings this case in a *parens patriae* capacity to protect the marketplace in Arkansas and the safety, health, and economic well-being of its citizens.

40.     The State brings this action under, *inter alia*, provisions of the ADTPA, Ark. Code Ann. §§ 4-88-101, *et seq*., the common law of the State of Arkansas, and the common law and statutory authority of the Attorney General to represent the State.

**B.     Manufacturer Defendants**

41.     **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

42.     Eli Lilly is registered to do business in Arkansas and may be served through its registered agent: National Registered Agents, Inc., 124 W. Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

43.     Eli Lilly holds five active Wholesale Distributor Licenses (License Nos. WD00285, WD02616, WD04698, WS01286, WD01287) in Arkansas.

44.     These licenses allow Eli Lilly to manufacture, distribute, and sell its at-issue drugs in Arkansas.

45.     In Arkansas, Eli Lilly promotes and distributes several at-issue diabetes medications: Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

46.     Eli Lilly's global revenues in 2019 were $4.13 billion from Trulicity, $2.82 billion from Humalog, $1.29 billion from Humulin, and $1.11 billion from Basaglar.

47.     Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin, and $801 million from Basaglar.

48.     Eli Lilly transacts business in Arkansas, targeting Arkansas for its products, including the at-issue diabetes medications.

49.    Eli Lilly employs sales representatives throughout Arkansas to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

50.    Eli Lilly also directs advertising and informational materials to Arkansas physicians, payors, and diabetics for the specific purpose of selling more of the at-issue drugs in Arkansas and profiting from the Insulin Pricing Scheme.

51.    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Arkansas with the express knowledge that Arkansas residents with diabetes and the State's payments and reimbursements would be based on those prices.

52.    During the relevant time period, the State purchased Eli Lilly's at-issue diabetes medications at a price based on inflated list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in state-run facilities.

53.    During the relevant time period, residents in Arkansas with diabetes spent millions of dollars per year out of pocket on Eli Lilly's at-issue drugs also based on Eli Lilly's artificially inflated list prices.

54.    Arkansas diabetics and the State paid for all of the Eli Lilly diabetes medications related to the at-issue transactions in Arkansas based on the specific inflated list prices Eli Lilly caused to be published in Arkansas in furtherance of the Insulin Pricing Scheme.

55.     **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

56.     Sanofi may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

57.     Sanofi holds three active Wholesale Distributor Licenses (License Nos. WD01143, WD02241, WD04420) in Arkansas.

58.     These licenses allow Sanofi to manufacture, distribute, and sell its at-issue drugs in Arkansas.

59.     Sanofi promotes and distributes pharmaceutical drugs in Arkansas, including several at-issue diabetes medications: Lantus, Toujeo, Soliqua, and Apidra.

60.     Sanofi's global revenues in 2019 were $3.50 billion from Lantus, $1.03 billion from Toujeo, $400 million from Apidra, and $144 million from Soliqua.

61.     Sanofi's global revenues in 2018 were $3.9 billion from Lantus,     $923 million from Toujeo, $389 million from Apidra, and $86 million from Soliqua.

62.     Sanofi transacts business in Arkansas and targets Arkansas for its products, including the at-issue diabetes medications.

63.     Sanofi employs sales representatives throughout Arkansas to promote and sell Lantus, Toujeo, Soliqua, and Apidra.

64.     Sanofi also directs advertising and informational materials to Arkansas physicians, payors, and diabetics for the specific purpose of selling more of the at-issue drugs in Arkansas and profiting from the Insulin Pricing Scheme.

65. At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Sanofi caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Arkansas with the express knowledge that payment and reimbursement by Arkansas diabetics and the State would be based on these prices.

66. During the relevant time period, the State purchased Sanofi's at-issue diabetes medications at prices based on artificially inflated list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in state-run facilities.

67. During the relevant time period, residents in Arkansas with diabetes spent millions of dollars per year out of pocket on Sanofi's at-issue drugs also based on Sanofi's artificially inflated list prices.

68. Arkansas diabetics and the State paid for all of the Sanofi diabetes medications related to the at-issue transactions in Arkansas based on the specific inflated prices Sanofi caused to be published in Arkansas in furtherance of the Insulin Pricing Scheme.

69. **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

70. Novo Nordisk may be served through its registered agent: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

71.     Novo Nordisk holds one active Wholesale Distributor License (License No. WD02464) in Arkansas.

72.     This license allows Novo Nordisk to manufacture, distribute, and sell its at-issue drugs in Arkansas.

73.     Novo Nordisk promotes and distributes pharmaceutical drugs in Arkansas, including the at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

74.     Novo Nordisk's global revenues in 2019 were $2.89 billion from Novolog, $973 million from Levemir, $968 million from Tresiba, $2.29 billion from Victoza, $248.3 million from Novolin, and $1.17 billion from Ozempic.

75.     Novo Nordisk's global revenues in 2018 were $4.19 billion from Novolog, $1.66 billion from Levemir, $1.19 billion from Tresiba, $3.61 billion from Victoza, $284.5 million from Novolin, and $185 million from Ozempic.

76.     Novo Nordisk transacts business in Arkansas, targeting Arkansas for its products, including the at-issue diabetes medications.

77.     Novo Nordisk employs sales representatives throughout Arkansas to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

78.     Novo Nordisk also directs advertising and informational materials to Arkansas physicians, payors, and diabetics for the specific purpose of selling more of the at-issue drugs in Arkansas and profiting from the Insulin Pricing Scheme.

79. At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Novo Nordisk caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Arkansas with the express knowledge that Arkansas diabetics and the State paid for the at-issue drugs based on these prices.

80. During the relevant time period, the State purchased Novo Nordisk's at-issue diabetes medications at prices based on artificially inflated list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in state-run facilities.

81. During the relevant time period, residents in Arkansas with diabetes spent millions of dollars per year out of pocket on Novo Nordisk's at-issue drugs also based on Novo Nordisk's artificially inflated list prices.

82. Arkansas diabetics and the State paid for all of the Novo Nordisk diabetes medications related to the at-issue transactions in Arkansas based on the specific inflated prices Novo Nordisk caused to be published in Arkansas in furtherance of the Insulin Pricing Scheme.

83. Collectively, Defendants Eli Lilly, Novo Nordisk, and Sanofi are referred to as "Manufacturer Defendants" or "Manufacturers."

**C.   PBM Defendants**

84. **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout the United States and Arkansas.

16

85. CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

86. CVS Health, through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, and Chief Communication Officers, is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme that gave rise to the State's claims.

87. During the relevant time, CVS Health (or its predecessor)[4] has repeatedly, continuously, and explicitly stated that *CVS Health:*

   a. "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes;"[5]

   b. "negotiate[s] with pharmaceutical companies to obtain discounted acquisition costs for many of the products on [CVS Health's] drug lists, and these negotiated discounts enable [CVS Health] to offer reduced costs to clients;"[6]

   c. "utilize[s] an independent panel of doctors, pharmacists, and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on [CVS Health's] drug lists."[7]

---

[4] Until 2014, CVS Health was known as "CVS Caremark." In September 2014, CVS Caremark Corporation announced that "it is changing its corporate name to CVS Health to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."

[5] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

[6] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2013).

[7] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

88.     CVS Health publicly represents that CVS Health constructs programs that lower the costs of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including Arkansas, stating:

> "*CVS Health* introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decreased medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).

89.     In 2017, CVS Health stated that "*CVS Health* pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of nearly 10 percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."

90.     Throughout the relevant time period, the Manufacturer Defendants directly engaged with CVS Health executives in furtherance of the Insulin Pricing Scheme. Each Manufacturer Defendant has an entire team of executives dedicated exclusively to interacting with CVS Health.

91.     Manufacturer Defendants have explicitly recognized that effectuating the Insulin Pricing Scheme requires "intimacy and connect[ion]" between the Manufacturer Defendants' leaders and CVS Health's leaders in order to align on "strategic formulary management initiatives to ensure profitable access across all [standard] formularies."

92.     On a regular basis throughout the relevant period, the Manufacturer Defendants' executive teams—which at times included their CEOs—met with CVS Health executives to discuss their coordinated efforts related to the at-issue drugs. Examples include:

  a. In at least 2011, 2012, and 2016 the leaders of CVS Health and Novo Nordisk participated in executive exchange meetings, which appear to have included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the Executive Vice President of CVS Health, the Chief Medical Officer of CVS Health, members of CVS Health's Enterprise Operating Committee and key executives from Novo Nordisk.

  b. In at least 2012, the leaders of CVS Health and Eli Lilly participated in numerous executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of CVS Health, the COO of CVS Health, members of CVS Health's Enterprise Operating Committee, the President of Eli Lilly, and the Senior Vice President of Managed Care at Eli Lilly, among others.

93.     **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly-owned subsidiary of CVS Health.

94.     CVS Pharmacy owns and operates dozens of pharmacies throughout Arkansas that were directly involved in and profited from the Insulin Pricing Scheme.

95.     CVS Pharmacy is the immediate and direct parent of Defendant Caremark Rx, LLC.

96.     CVS Pharmacy may be served through its registered agent: CT Corporation System, 450 Veterans Memorial Parkway, Suite 7a, East Providence, Rhode Island 02914.

97.     During the relevant time period, CVS Pharmacy provided retail pharmacy services in Arkansas that gave rise to the Insulin Pricing Scheme, which damaged Arkansas diabetics and the State.

98.     **Defendant Caremark Rx, LLC** is a Delaware limited liability company and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

99.     Caremark Rx, LLC is a wholly-owned subsidiary of Defendant CVS Pharmacy.

100.    Caremark Rx, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

101.    During the relevant time period, Caremark Rx, LLC provided PBM and mail order pharmacy services in Arkansas that gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Arkansas, including the State.

102.    **Defendant Caremark LLC** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, LLC is a wholly-owned subsidiary of Caremark Rx, LLC

103.    Caremark, LLC is registered to do business in Arkansas and may be served through its registered agent: CT Corporate System, 124 W. Capital Avenue, Suite 1900, Little Rock, Arkansas 72201.

104.    Caremark, LLC holds one active Wholesale Distributor License (License No. WD01846), three Retail Pharmacy Licenses (License Nos. OS03001,    OS02843,

OS01456), and one Third-Party Administrator License (License No. 100116197) in Arkansas.

105.    During the relevant time period, Caremark, LLC provided PBM and mail order pharmacy services in Arkansas that gave rise to the Insulin Pricing Scheme, which damaged diabetics and payors in Arkansas, including the State.

106.    **Defendant CaremarkPCS Health, LLC** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CaremarkPCS Health LLC.

107.     CaremarkPCS Health, LLC provides pharmacy benefit management services.

108.    CaremarkPCS Health, LLC is registered to do business in Arkansas and may be served through its registered agent: CT Corporate System, 124 W. Capital Avenue, Suite 1900, Little Rock, Arkansas 72201.

109.    CaremarkPCS Health, LLC holds one active Third-Party Administrator License (License No. 100146952) and an active PBM License in Arkansas.

110.    During the relevant time period, CaremarkPCS Health, LLC provided PBM services in Arkansas, which gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Arkansas, including the State.

111.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control of CaremarkPCS Health, LLC and Caremark, LLC's

operations, management, and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail order and retail pharmacy services to the ultimate detriment of diabetics and payors in Arkansas, including the State. For example:

    a. During the relevant time period, these parent and subsidiaries have had common officers and directors, including, but not limited to:

        i. Thomas S. Moffatt was Vice President and Secretary of Caremark Rx, LLC, CaremarkPCS Health LLC, and Caremark, LLC at the same time he was a Vice President, Assistant Secretary, and Assistant General Counsel at CVS Health and Director, Vice President, and Secretary at CVS Pharmacy;

        ii. Melanie K. Luker was the Assistant Secretary of CVS Pharmacy, Caremark Rx, LLC, CaremarkPCS Health, LLC, and Caremark, LLC at the same time she was a Senior Manager of Corporate Services at CVS Health;

        iii. Jonathan C. Roberts was an Executive Vice President and Chief Operating Officer at CVS Health at the same time he was CEO of Caremark Rx, LLC;

        iv. Daniel P. Davison was the President of CaremarkPCS Health LLC at the same time he was a Senior Vice President at CVS Health; and

        v. Annie E. Klis was a Vice President at CVS Health at the same time she was CEO of Caremark, LLC.

    b. CVS Health directly or indirectly owns all the stock of CVS Pharmacy, Caremark Rx, LLC, Caremark LLC and CaremarkPCS Health LLC.

    c. All of the executives of CaremarkPCS Health, LLC, Caremark, LLC, Caremark Rx, LLC, and CVS Pharmacy ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

    d. CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents, and statements of CVS Health presents

its subsidiaries, including CVS Pharmacy, CaremarkPCS Health, LLC, Caremark, LLC, and Caremark Rx, LLC as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint. The CVS Health enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

112.    Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC, and CaremarkPCS Health, LLC, including all predecessor and successor entities, are referred to as "CVS Caremark."

113.    CVS Caremark is named as a Defendant in its capacities as a PBM, and retail and mail order pharmacy.

114.    In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially-inflated list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

115.    CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 40% of the national market. CVS Caremark's pharmacy services segment generated $141.5 billion in total revenues last year.

116.    At all times relevant hereto, CVS Caremark offered pharmacy benefit services to Arkansas payors, and derived substantial revenue therefrom. In doing so, CVS Caremark made the at-issue misrepresentations and utilized the artificially

inflated prices generated by the Insulin Pricing Scheme to profit from Arkansas diabetics, payors, and the State.

117.    At all times relevant hereto, CVS Caremark maintained standard formularies that are used nationwide, including by CVS Caremark's payor clients in Arkansas and relied on by residents in Arkansas with diabetes as lowering the cost of the at-issue drugs and improving the health of diabetics. During the relevant time period, these standard formularies included the at-issue diabetes medications.

118.    At all times relevant hereto, and contrary to all its express representations, CVS Caremark has knowingly insisted that its payor clients, including in Arkansas, use the artificially inflated list prices produced by the Insulin Pricing Scheme as the basis for payment for the price paid for the at-issue drugs.

119.    At all times relevant hereto, CVS Caremark has concealed its critical role in the generation of those artificially inflated list prices.

120.    During the relevant time period, CVS Caremark provided PBM services to the State. In doing so, CVS Caremark set the price paid by the State for the at-issue drugs utilizing the artificially inflated prices generated by the Insulin Pricing Scheme. The State also paid CVS Caremark for the at-issue drugs.

121.    In its capacity as a mail order and retail pharmacy, CVS Caremark dispensed the at-issue drugs to Arkansas diabetics and received payments from Arkansas diabetics and payors based on the artificially inflated prices produced by the Insulin Pricing Scheme and, as a result, deceived and damaged Arkansas diabetics and payors.

122.    In its capacity as a retail pharmacy, CVS Caremark further and knowingly profited from the artificially-inflated list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the drugs at issue (an amount well below the list price generated by the Insulin Pricing Scheme), and the amounts they received from payors (which amounts were based on the artificially-inflated list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

123.    During the relevant time period, CVS Caremark provided mail order pharmacy services to the State. In doing so, CVS Caremark dispensed the at-issue drugs to the State's health plan beneficiaries.

124.    CVS Caremark purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail order and retail pharmacies.

125.    At all times relevant hereto, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid to CVS Caremark and placement on CVS Caremark's standard formularies, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail order and retail pharmacies, including those located in Arkansas.

126.     **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[8]

127.     Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

128.     Evernorth, through its executives and employees, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme. For example, during the relevant time period Evernorth's CEO Tim Wentworth was involved in communications with the Manufacturer Defendants related to the at-issue drugs and at-issue Manufacturer Payments.

129.     Evernorth's conduct has had a direct effect in Arkansas and damaged diabetics, the State, and payors in Arkansas.

130.     On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

131.     Throughout the relevant time period, the Manufacturer Defendants directly engaged with Evernorth executives in furtherance of the Insulin Pricing

---

[8] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc. and Express Scripts Holding Company.

Scheme. Each Manufacturer Defendant has an entire team of executives dedicated exclusively to interacting with Evernorth.

132. Manufacturers recognize that effectuating the Insulin Pricing Scheme requires "enhanced relationships at C Suite level" between the Manufacturers and Evernorth to "[i]mprove diabetes patient management through collaboration" and to "work synergistically within [Manufacturer Defendants] to maximize [Evernorth's] business opportunities."

133. On a regular basis throughout the relevant time period, these Manufacturer executive teams—which at times include the CEOs from these companies—met with Evernorth to discuss their coordinated efforts related to the at-issue drugs. Examples include:

    a. In at least 2013, 2014, and 2015 the leaders of Evernorth and Eli Lilly participated in executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of Evernorth, Senior Director of Express Scripts Pharmaceutical Strategies & Solutions, CEO of Eli Lilly, Head of Eli Lilly's diabetes division, among others.

    b. In at least 2013 and 2014, the leaders of Evernorth and Novo Nordisk participated in executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme.

134. Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Arkansas, which engaged in the activities that gave rise to this Complaint.

135. In each annual report for at least the last decade, Evernorth has repeatedly, continuously, and explicitly stated:[9]

---

[9] Express Scripts Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

a.  "[Evernorth] is one of the largest PBMs in North America . . . [and Evernorth] help[s] health benefit providers address access and affordability concerns resulting from rising drug costs while helping to improve healthcare outcomes."

b.  "[Evernorth] manage[s] the cost of the drug benefit by . . . assists in controlling costs; evaluat[es] drugs for efficacy, value, and price to assist[ing] clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors [and better care for members] leveraging purchasing volume to deliver discounts to health benefit providers."

c.  "[Evernorth] works with clients, manufacturers, pharmacists, and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes."

136.  **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly-owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

137.  Express Scripts, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

138.  Express Scripts, Inc. holds one active Retail Pharmacy License (License No. OS01404) and one Insurance Provider License (License No. 100107370) in Arkansas.

139.  Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Arkansas that engaged in the conduct, which gave rise to this Complaint.

140. During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail-order pharmacy services, which gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Arkansas.

141. **Defendant Express Scripts Administrators, LLC,** is a Delaware limited liability company and is a wholly-owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

142. Express Scripts Administrators, LLC is registered to do business in Arkansas and may be served through its registered agent: CT Corporate System, 124 W. Capital Avenue, Suite 1900, Little Rock, Arkansas 72201.

143. Express Scripts Administrators, LLC holds one active Third-Party Administrator License (License No. 100106751) in Arkansas.

144. During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Arkansas discussed in this Complaint that gave rise to the Insulin Pricing Scheme that damaged diabetics, the State, and payors in Arkansas.

145. **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey, 07417.

146. Medco is registered to do business in Arkansas and may be served through its registered agent: CT Corporate System, 124 W. Capital Avenue, Suite 1900, Little Rock, Arkansas 72201.

147.     Prior to 2012, Medco provided the at-issue PBM and mail order services in Arkansas, which gave rise to the Insulin Pricing Scheme and damaged diabetics, the State, and payors in Arkansas.

148.     In 2012, Express Scripts merged with Medco in a $29 billion deal.

149.     Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States and in Arkansas.

150.     Prior to the merger, Medco provided the at-issue PBM and mail-order services in Arkansas, which gave rise to the Insulin Pricing Scheme and damaged diabetic Arkansas residents and the State.

151.     Following the merger, all of Medco's PBM and mail-order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered more than 155 million lives at the time of the merger.

152.     At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, then-CEO of Medco, David B Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater [Manufacturer Payments] from drug manufacturers and other suppliers."

153.     The then-CEO of Express Scripts, George Paz, during a  Congressional subcommittee hearing  in September 2011,  echoed these sentiments: "A   combined

Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."

154. **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly-owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

155. ESI Mail Pharmacy Service, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

156. ESI Mail Pharmacy Service, Inc. holds five active Retail Pharmacy Licenses (License Nos. OS01463, OS01546, OS02312, OS02347, OS01449) in Arkansas.

157. During the relevant time period, ESI Mail Pharmacy Services provided the mail order pharmacy services in Arkansas discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetics, the State, and payors in Arkansas.

158. **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly-owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

159. Express Scripts Pharmacy, Inc. is registered to conduct business in Arkansas and may be served through its registered agent: CT Corporation, 124 W. Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

160.     Express Scripts Pharmacy, Inc. holds six active Retail Pharmacy Licenses (License Nos. OS02192, OS01346, OS01412, OS01247, OS02528, OS01477) in Arkansas.

161.     During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in Arkansas discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetics, the State, and payors in Arkansas.

162.     As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. are directly involved in the conduct and control of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc's operations, management, and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail-order pharmacy services to the ultimate detriment of Arkansas diabetics, payors, and the State. For example:

    a.  During the relevant time period, these parent and subsidiaries have had common officers and directors:

        i.  Officers and directors that have been shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Secretary; Timothy Smith, Vice President; and Scott Lambert, Treasury Manager Director;

        ii.  Executives that have been shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Secretary;

        iii.  Officers and directors that have been shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley

Phillips, Chief Financial Officer; Priscilla Duncan, Associate Secretary; and Joanne Hart, Associate Treasurer;

    iv.   Officers and directors that have been shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Secretary; Scott Lambert, Treasury Manager Director; and Joanne Hart, Associate Treasurer; and

    v.   Officers and directors that have been shared between Medco Health Solutions, Inc. and Evernorth include David Queller, President and Senior VP of Sales & Accounting; Christine Houston, VP and COO; Timothy Smith, VP and Treasurer; and all of the officers of Medco Health Solutions are also officers of Express Scripts, Inc.

b.  Evernorth directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc.

c.  The Evernorth corporate family does not operate as separate entities. The public filings, documents, and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The Evernorth enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

d.  All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

e.  As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco

Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. that gave rise to the State's claims in this Complaint.

163. Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

164. Express Scripts is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

165. In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially inflated list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Script's formularies.

166. Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Complaint, Express Scripts controlled 30% of the PBM market in the United States.

167. Express Scripts has only grown larger since the Cigna merger.

168. In 2017, annual revenue for Express Scripts was more than $100 billion.

169. As of December 31, 2018, more than 68,000 retail pharmacies, representing more than 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.

170. At all times relevant hereto, Express Scripts offered pharmacy benefit services, and derived substantial revenue therefrom, in Arkansas and provided the at-issue PBM services to numerous payors and diabetics in Arkansas.

171.    At all times relevant hereto, and contrary to all of their representations, Express Scripts has knowingly insisted that its payor clients, including those in Arkansas, use the artificially-inflated list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

172.    At all times relevant hereto, Express Scripts has concealed its critical role in the generation of those artificially inflated list prices.

173.    At all times relevant hereto, Express Scripts constructed standard formularies that are used nationwide, including by Express Scripts' payor clients in Arkansas, and that are relied on by residents in Arkansas with diabetes as promoting diabetic health and lowering the price of the at-issue drugs. During the relevant time period, these standard formularies included the at-issue diabetes medications.

174.    During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. For example, in a February 2014 email released by the U.S. Senate in conjunction with its January 2021 report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" ("Senate Insulin Report"), Eli Lilly describes a "Russian nested doll situation" in which Express Scripts was negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (who later would become part of Express Scripts). OptumRx provided PBM services to the State during this time period.

175.    In its capacity as a mail order pharmacy, Express Scripts dispensed the at-issue drugs to residents in Arkansas with diabetes and received payments from Arkansas diabetics and payors based on the artificially inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Arkansas diabetics, payors, and the State.

176.    At all times relevant hereto, Express Scripts derived substantial revenue providing mail-order pharmacy services in Arkansas.

177.    Express Scripts purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail order pharmacies.

178.    At all times relevant hereto, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid to Express Scripts and placement on Express Scripts' standard formularies, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' mail order and retail pharmacies, including those located in Arkansas.

179.    **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

180.    UnitedHealth Group, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

181.     UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2015, UnitedHealth Group listed revenue in excess of $257 billion, and the company is currently ranked sixth on the Fortune 500 list. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans through its wholly-owned subsidiaries and pharmacy benefits through its PBM, OptumRx.

182.     More than one-third of the overall revenues of UnitedHealth Group come from OptumRx.

183.     UnitedHealth Group was directly involved in the conduct that caused the Insulin Pricing Scheme and as a result damaged diabetics and payors in Arkansas.

184.     UnitedHealth Group, through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example, executives of UnitedHealth Group structure, analyze, and direct the company's overarching, enterprise-wide policies, including PBM and mail order services, as a means of maximizing profits across the corporate family.

185.     On a regular basis throughout the relevant time period, executive teams from each Manufacturer Defendant—including at times their CEOs—met with executives from UnitedHealth Group to discuss their coordinated efforts in furtherance of the Insulin Pricing Scheme. Examples include:

> a. In at least April 2015, the Executive Vice President at UnitedHealth Group, the Chief Commercial Officer at Optum Analytics, the Vice President of Optum, the Vice President of OptumInsight, among other executives met with Vice President of Market Access and the Executive

Vice President of Strategic Accounts, among other executives from Novo Nordisk at UnitedHealth Group's corporate headquarters to discuss their strategic overview and prioritized opportunities in diabetes.

b. In at least October 2016, the CEO of OptumRx, Mark Thierer, and the CEO of UnitedHealth Group, Steve Hemsley, met the CEO of Eli Lilly, Dave Ricks, to discuss "strategic initiatives" between UHG/OptumRx and Eli Lilly.

186. UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail order pharmacies] . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."

187. UnitedHealth Group executives structure, analyze and direct the company's overarching policies, including with respect to PBM and mail-order services, as a means of maximizing profitability across the corporate family.

188. UnitedHealth Group's conduct had a direct effect in Arkansas and damaged diabetics and payors in Arkansas and the State.

189. **Defendant Optum, Inc.**, is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.[10]

---

[10] UnitedHealth Group, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

190.     Optum, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

191.     Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in Arkansas and damaged diabetics and payors in Arkansas, including the State.

192.     For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers." In this role, Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx" and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail-order activities.

193.     **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

194.     OptumInsight, Inc. is registered to do business in Arkansas and may be served through its registered agent: National Registered Agents, 124 W. Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

195.     OptumInsight, Inc. holds one active Third-Party Administrator License (License No. 3001019040) in Arkansas.

196.     OptumInsight provides data, analytics and consulting to companies with the healthcare industry, including the Manufacturer Defendants.

197.     OptumInsight, Inc. is an integral part of the Insulin Pricing Scheme, and during the relevant time period, OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise Defendants with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

198.     **Defendant OptumRx Holdings, LLC**, is a Delaware limited liability corporation with a principal place of business at 2300 Main Street, Irvine, California.

199.     OptumRx Holdings, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

200.     OptumRx Holdings, LLC provides pharmacy benefit management services through its subsidiaries to various payors in Arkansas.

201.     **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614.

202.     OptumRx, Inc. is registered to do business in Arkansas and may be served through its registered agent: National Registered Agents, 124 W. Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

203. OptumRx, Inc. holds one active Retail Pharmacy License (License No. OS02091), one active Third-Party Administrator License (License No. 100105349), and one PBM License in Arkansas.

204. During the relevant time period, OptumRx, Inc. provided the PBM and mail-order pharmacy services in Arkansas that gave rise to the Insulin Pricing Scheme, which damaged diabetics and payors in Arkansas.

205. As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC and Optum, Inc. are directly involved in the conduct and control of OptumInsight and OptumRx's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Arkansas diabetics and payors, including the State. For example:

    a. These parent and subsidiaries have common officers and directors, including:

        i. Sir Andrew Witty is president of UnitedHealth Group and CEO of Optum, Inc.;

        ii. Dan Schumacher is president of Optum, Inc, the Chief Strategy and Growth Officer at UnitedHealth Group, Inc. and oversees OptumInsight

        iii. Terry Clark is a senior vice president and chief marketing officer at UnitedHealth Group and also oversees the branding, marketing, and advertising for UnitedHealth Group and Optum, Inc.;

        iv. Tom Roos serves as chief accounting officer for UnitedHealth Group and Optum, Inc.;

     v.    Heather Lang is Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and also Assistant Secretary at OptumRx, Inc.;

     vi.    Peter Gill is Vice President at UnitedHealth Group, Inc. and also Treasurer at OptumRx, Inc.;

     vii.    John Santelli leads Optum Technology, the leading technology division of Optum, Inc serving the broad customer base of Optum and UnitedHealthcare and also serves as UnitedHealth Group's chief information officer;

     viii.    Eric Murphy is the Chief Growth and Commercial Officer for Optum, Inc. and has also led OptumInsight, Inc.

     ix.    Timothy Alan Wicks, CFO and Executive Vice President of Optum, Inc., is also a director of OptumRx, Inc.

b.  UnitedHealth Group directly or indirectly owns all the stock of Optum, Inc., OptumRx Holdings, LLC, OptumRx, Inc., and OptumInsight, Inc.

c.  The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group presents its subsidiaries, including Optum, Inc., OptumRx, Inc., OptumRx Holdings, LLC, and OptumInsight as divisions or departments of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The UnitedHealth Group enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

d.  All the executives of Optum, Inc., OptumRx Holdings LLC, OptumRx, Inc., and OptumInsight ultimately report to the executives, including the CEO, of UnitedHealth Group.

e.  As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc., OptumRx, Inc., OptumRx Holdings, LLC, and OptumInsight that gave rise to the State's claims in this Complaint.

206.    Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., OptumRx Holdings LLC, and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

207.    OptumRx is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

208.    In its capacity as a PBM, OptumRx coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially inflated list prices for the at-issue diabetes medications, as well as, for the placement of these firms' diabetes medications on OptumRx's drug formularies.

209.    OptumRx provides PBM services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.

210.    In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with a revenue of $74 billion.

211.    As illustrated in Figure 13, OptumRx rose to power through numerous mergers with other PBMs. For example, in 2012, a large PBM, SXC Health Solutions bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran Corp. Following this, UnitedHealth Group bought Catamaran Corp in a deal worth $12.8 billion and combined Catamaran with OptumRx.

212.    Prior to merging with OptumRx, Catalyst Health Solutions, Inc. and Catamaran Corp. engaged in the at-issue PBM and mail-order activities in Arkansas.

213. At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Arkansas.

214. At all times relevant hereto, and contrary to all their express representations, OptumRx has knowingly insisted that its payor clients, including its payor clients in Arkansas, use the artificially inflated list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

215. At all times relevant hereto, OptumRx has concealed its critical role in the generation of those artificially-inflated list prices.

216. At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used throughout Arkansas by payors and diabetics, and that are relied on by residents in Arkansas with diabetes as promoting diabetic health and lowering the price of the at-issue drugs. During the relevant time period, these standard formularies included the at-issue diabetes medications.

217. During the relevant time period, OptumRx provided PBM services to the State. In doing so, OptumRx set the price paid by the State for the at-issue drugs utilizing the artificially inflated prices generated by the Insulin Pricing Scheme. The State also paid OptumRx for the at-issue drugs.

218. In its capacity as a mail-order pharmacy, OptumRx dispensed the at-issue drugs to Arkansas diabetics and received payments from Arkansas diabetics and payors based on the artificially inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Arkansas diabetics and payors, including the State.

219. At all times relevant hereto, OptumRx purchased drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, and dispensed the at-issue medications to diabetics in Arkansas through its mail-order pharmacies.

220. During the relevant time period, OptumRx provided mail order pharmacy services to the State. In doing so, OptumRx dispensed the at-issue drugs to the State's health plan beneficiaries.

221. At all times relevant hereto, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies.

222. Collectively, CVS Caremark, OptumRx, and Express Scripts are referred to as "PBM Defendants" or "PBMs."

223. Collectively, the "PBM Defendants" and the "Manufacturer Defendants" are referred to as "Defendants."

## III. THE STATE OF ARKANSAS'S INTEREST

224. This action seeks, on behalf of the State of Arkansas and its citizens, legal and equitable relief to redress injury and damage, as well as injunctive relief seeking an end to Defendants' misconduct. The State of Arkansas has an interest in protecting the well-being of the hundreds of thousands of diabetic citizens of the State of Arkansas who rely on the at-issue diabetic medications and have been damaged, and continue to be damaged, by the Insulin Pricing Scheme.

225. Further, as a direct result of the Insulin Pricing Scheme, the State of Arkansas has been damaged by having to pay millions of dollars per year in

overcharges as a payor for and purchaser of the at-issue drugs and having to pay for increased healthcare costs caused by the Insulin Pricing Scheme.

226.    The State of Arkansas is a real party in interest in this action. Acting as an officer of the State of Arkansas possessing all the power and authority under the common law and statute, the Attorney General institutes this action to protect the health and economic interests of its residents, the State's interests, and the integrity of its healthcare system. The Attorney General is authorized to bring this action on behalf of the State under the Arkansas DTPA and in her *parens patriae* capacity as a representative of its citizens and chief legal officer, to recover damages, punitive damages, restitution, penalties, disgorgement, injunctive relief, and to remediate all harm arising out of—and provide full relief for—violations of Arkansas laws.

## IV.    JURISDICTION AND VENUE

227.    This Court has personal jurisdiction over each Defendant.  Each Defendant: (a) transacts business and/or is admitted to do business within Arkansas, (b) maintains substantial contacts in Arkansas, and (c) committed the violations of Arkansas statutes and common law at issue in this lawsuit within Arkansas. The Insulin Pricing Scheme has been directed at, and has had the foreseeable and intended effect of, causing injury to persons residing in, located in, or doing business in Arkansas, and to the State itself. All of the at-issue transactions occurred in Arkansas and/or involved Arkansas residents. This Court has personal jurisdiction over all  Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject  to  the  jurisdiction  of  a  court  of  general jurisdiction in Arkansas.

228.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and the actions giving rise to the Complaint took place within this District. In particular, at all times during the relevant time period, Defendants provided pharmacy benefit services, provided mail order pharmacy services, employed sales representatives, promoted and sold diabetes medications and published prices of the at issue drugs in this District.

## V.     FACTUAL ALLEGATIONS

### A.     Diabetes and Insulin Therapy.

#### 1.     Diabetes: A growing epidemic.

229.     Diabetes is a disease that occurs when a person's blood glucose, also called blood sugar, is too high. In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the blood. When there is not enough insulin or cells stop responding to insulin, too much blood sugar stays in the bloodstream. Over time, that can cause serious health problems, such as heart disease, vision loss, and kidney disease.

230.     There are two basic types of diabetes. Roughly 90-95% of diabetics developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as Type 2, this form of diabetes is often developed later in life. While Type 2 patients can initially be treated with medication in the form of a pill, in the long term most patients require insulin injections.

231.     The other type of diabetes, known as Type 1 diabetes, occurs when a patient completely ceases insulin production. In contrast to Type 2 patients, people with Type 1 diabetes do not produce any insulin and, without regular injections of insulin, will die.

232.     Insulin treatments are a necessary part of life for those who have diabetes. Interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.

233.     The number of Americans with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to more than 10 million people.  Fourteen (14) years later, the count tripled again. Now more than 30 million people—9.4% of the country—live with the disease.

234.     Likewise, the prevalence of diabetes in Arkansas has been steadily increasing as well. Over 400,000 Arkansas adults now live with diabetes and another 800,000 have prediabetes.

235.     The burden of diabetes is not equally distributed in Arkansas. Diabetes is significantly more prevalent in impoverished regions; nearly one in four diabetics in Arkansas who earn less than $25,000 a year have diabetes.

236.     Minority communities are also disproportionally affected by this disease— nearly 20% of Black Arkansans have diabetes.

2. Insulin: A century old drug.

237. Despite its potentially deadly impact, diabetes is a highly-treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the health complications associated with the disease are avoidable.

238. Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

239. In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. After discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent to $14 today), explaining "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."

240. After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale their production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

241. Although early iterations of insulin were immediately perceived as lifesaving, there have been numerous incremental improvements since its discovery. The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.

242. While effective, animal-derived insulin created the risk of allergic reaction. This risk was lessened in 1982 when synthetic insulin, known as human

49

insulin, was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institute of Health and the American Cancer Society.

243. Over a decade later, Defendant Eli Lilly developed the first analog insulin, Humalog, in 1996.

244. Analog insulin is laboratory grown and genetically-altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.

245. Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, with similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

246. Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

247. In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.

248. In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.

249. Even though insulin was first extracted nearly 100 years ago, only Defendants Eli Lilly, Novo Nordisk, and Sanofi manufacture insulin in the United States.

250. Many of the at-issue diabetes medications are now off patent. However, the Manufacturers have engaged in illicit tactics to maintain their complete market dominance.

251. Due in large part to their ability to stifle all competition, Manufacturer Defendants make 99% of the insulins in the market today.

        3.    <u>Current insulin landscape.</u>

252. While insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions whether the overall efficacy of insulin has significantly improved over the last twenty (20) years.

253. For example, while long-acting analogs may have certain advantages over human insulins, such as affording more flexibility around mealtime planning, it has yet to be shown that analogs lead to better long-term outcomes.

254. A recent study published in the Journal of American Medical Association suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.

255. When discussing the latest iterations of insulins, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are marginally different, and the clinical benefits of them over the older drugs have been zero.

256.    All the insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

257.    Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.

258.    The production and research and development costs have also not increased. In fact, in the last 10 years, the production costs of insulin have decreased as manufacturers simplified and optimized processes. A recent study published in BMJ Global Health calculated that, based on production costs, a reasonable price for a year's supply of human insulin is $48 to $71 per person and between $78 and $133 for analog insulins—which includes delivering a profit to manufacturers.

259.    These figures stand in stark contrast to the $5,705 that a diabetic spent, on average, for insulin in 2016.

260.    Further, while research and development costs often make up a large percentage of the price of a drug, in the case of insulin the initial basic research—original drug discovery and patient trials—was performed 100 years ago.

261.    Even the more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago by the Manufacturers.

262.    Today, Manufacturer Defendants only spend a fraction of the billions of dollars in revenue they generate from the at-issue drugs on research and development.

263.    Despite this decrease in production costs, and no new research and development, the reported price of insulins has risen astronomically over the last 15 years.

4.    Insulin adjuncts: Type 2 medications.

264.    Over the past decade, Manufacturer Defendants have also released a number of non-insulin medications that help control the level of insulin in the bloodstream of Type 2 diabetics.

265.    In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity. In 2016, Sanofi did the same with Soliqua, and in 2017, Novo Nordisk did the same with Ozempic.

266.    Victoza, Trulicity, and Ozempic are all medications known as glucagon-like peptide-1 receptor agonists ("GLP-1") and are similar to the GLP-1 hormone that is already produced in the body. Soliqua is a combination long-acting insulin and GLP-1 drug. Each of these drugs can be used in conjunction with insulins to control diabetes.

267.    Today, Manufacturer Defendants have a dominant position in the market for all diabetes medications. The following is a list of diabetes medications at issue in this lawsuit:

Case 2:23-cv-04439-RMG Document 54-75 Filed 06/07/22 Page 54 of 57 Page ID #: 4409

## Table 1: Diabetes medications at issue in this case

| Insulin Type | Action | Name | Company | FDA Approval | Current Price |
|---|---|---|---|---|---|
| *Human* | **Rapid-Acting** | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1994 | $1,784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | **Intermediate** | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| *Analog* | **Rapid-Acting** | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | **Long-Acting** | Lantus | Sanofi | 2000 | $ 340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $ 370 (vial) $ 555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2016 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| *Type 2 Medications* | | Trulicity | Eli Lilly | 2014 | $1,013 (pens) |
| | | Victoza | Novo Nordisk | 2010 | $813 (2 pens) $1,220 (3 pens) |
| | | Ozempic | Novo Nordisk | 2017 | $1,022 (pens) |
| | | Soliqua | Sanofi | 2016 | $927.90 (pens) |

### B. The Dramatic Rise in the Price of Diabetes Medications.

1. Insulin price increases.

268. In 2003, PBMs began their rise to power (which will be discussed in greater detail in the next section).

269. That same year, the price of insulin began its dramatic rise to its current exorbitant level.

270. Since 2003, the list price of certain insulins has increased in some cases by more than 1,000% — an astounding increase especially when compared to a general inflation rate of 8.3% and a medical inflation rate of 46% in this same time period.

271. By 2016, the average price per month of the four most popular types of insulin rose to $450, and costs continue to rise, so much so that now one in four diabetics is skimping on or skipping lifesaving doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

272. Since 1997, Defendant Eli Lilly has artificially inflated the list price of a vial of Humulin R (500U/ML) from $165 to $1,784 (*See* Figure 2).[11]

---

[11] *See* Appendix A for representative examples of the at-issue price increases. To note, Appendix A only provides for a representative example of the at-issue price increases. The damages period alleged in this Complaint includes 2003-present.



**Figure 2: Rising list prices of Humulin R (500U/mL) from 1997-2021**



273.    Since 1996, Defendant Eli Lilly has artificially inflated the list price for a package of pens of Humalog from less than $100 to $663, and from less than $50 to $342 per vial (*See* Figure 3).

**Figure 3: Rising list prices of Humalog vials and pens from 1996-2021**



274. Novo Nordisk has also artificially inflated the list prices—from 2006 to 2020, Levemir rose from $162 to $555 for pens, and from under $100 to $370 per vial (*See* Figure 4).

**Figure 4: Rising list prices of Levemir from 2006-2021**



275.    From 2002 to 2020, Novo Nordisk has artificially inflated the list price of Novolog from $108 to $671 for a package of pens, and from less than $50 to $347 per vial (*See* Figure 5).

**Figure 5: Rising list prices of Novolog vials and pens from 2002-2021**



276.   Defendant Sanofi has kept pace as well, artificially inflating the list price for Lantus, the top-selling analog insulin, from less than $200 in 2006, to more than $500 in 2020 for a package of pens, and from less than $50 to $340 per vial (*See* Figure 6).

**Figure 6: Rising list prices of Lantus vials and pens from 2001-2021**



277.   Manufacturer Defendants' non-insulin diabetes medications have experienced similar recent price increases. For example, since 2015, Eli Lilly has artificially inflated the list price of Trulicity by almost 50%.

278.   Driven by these price hikes, payors' and diabetics' spending on diabetes medications has skyrocketed with totals in the tens of billions of dollars.

2.     Manufacturers increased prices in lockstep.

279.     The timing of the list price increases reveal that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatments, but they have also done so in perfect lockstep as a result of their coordinated efforts in furtherance of the Insulin Pricing Scheme.

280.     In 13 instances since 2009, competitors Sanofi and Novo Nordisk raised the list prices of their insulins, Lantus and Levemir, in tandem, taking the same price increase within a few days of each other.

281.     Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs were responsible for the highest drug price increases in the entire pharmaceutical industry during 2016.

282.     Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 7 demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 8 demonstrates this behavior with respect to Humalog and Novolog.

**Figure 7: Rising list prices of long-acting insulins**



Case 2:23-cv-04422-BRM-RLS Document 59-5 Filed 01/03/22 Page 63 of 63 PageID: 4418

**Figure 8: Rising list prices of rapid-acting insulins**



283. Figure 9 demonstrates this behavior with respect to the human insulins, Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 9: Rising list price increases for human insulins**



284. Figure 10 demonstrates Manufacturer Defendants' lockstep price increases for their Type 2 drugs, Trulicity, Victoza, Soliqua, and Ozempic.

**Figure 10: Rising list prices of Type 2 drugs**



285.    Figure 11 shows how, collectively, Manufacturer Defendants have exponentially raised the prices of insulin products in near perfect unison for decades.

**Figure 11: Lockstep insulin price increases**



286.    Because of Manufacturer Defendants' collusive price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

## C.    Pharmaceutical Payment and Supply Chain.

287.    The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third party payors, pharmacy benefit managers, and patients.

288.    Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient; or (2) from manufacturer to mail-order pharmacy, and mail-order pharmacy to patient.

289.     The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is directly tied to the manufacturer's list price.

290.     There is no transparency in this pricing system; typically, only a brand drug's list price—also known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Cost (WAC)—is available. To note, "Wholesale Acquisition Cost" is not the final price that wholesalers (or any other entity in the pharmaceutical pricing chain) pay for the Manufacturers' drugs. The final price that a wholesaler pays the Manufacturers is less than WAC because of post-purchase discounts.

291.     Drug manufacturers self-report AWP, or other prices upon which AWP is based, to publishing compendiums such as First DataBank, Redbook, and others who then publish that price.

292.     As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used list price in reimbursement and payment calculations and negotiations for both payors and patients.

         1.     Drug Costs for Diabetics.

293.     Whether insured or not, all residents in Arkansas with diabetes pay a substantial part of their diabetic drug costs based on the false and deceptive list prices generated by the Insulin Pricing Scheme.

294.    Uninsured diabetics must pay the full, point-of-sale price (based on the artificial prices generated by the Insulin Pricing Scheme) every time they fill their prescription. In Arkansas, 9.1% of the population—or 275,000 residents are uninsured. Approximately 18% of uninsured Arkansans are diabetic. As a direct result of the Insulin Pricing Scheme, the prices uninsured Arkansans pay for the at-issue life-sustaining drugs has skyrocketed over the last 15 years.

295.    The uninsured are not the only patients saddled with high costs. Insured diabetics also often pay a significant portion of a drug's price out-of-pocket including in deductibles, coinsurance requirements, or copayment requirements based on the artificially inflated list prices generated by the Insulin Pricing Scheme.

296.    Thus, nearly all Arkansas diabetics have been damaged by having to pay for diabetes medications out-of-pocket based upon the artificial prices generated by the Insulin Pricing Scheme. In many cases, Arkansans cannot afford these life-sustaining drugs.

297.    The exorbitant out-of-pocket costs created by the Insulin Pricing Scheme make it more difficult, if not impossible, for patients to adhere to their doctor-prescribed medication regime. Often this results in avoidable complications and higher overall healthcare costs. An American Diabetes Association working group recently noted that "people with high cost-sharing are less adherent to recommended dosing, which results in short- and long-term harm to their health."

298.    The overall economic impact from the loss of productivity and increased healthcare costs that result from diabetics underdosing on their insulin has been deeply damaging to the State.

      2.    <u>PBMs' role in the pharmaceutical payment chain.</u>

299.    PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 12:

**Figure 12: Insulin distribution and payment chain**



300.    The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that payors pay for prescription drugs, and are paid by payors for the drugs utilized by a payor's beneficiaries.

301.    PBMs also contract with a network of retail pharmacies often owned by the PBM. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. PBMs reimburse pharmacies for the drugs dispensed.

302.    PBM Defendants also own mail order, retail, and specialty pharmacies, which purchase and take possession of prescription drugs, including those at issue here, and directly supply those drugs to patients.

303.    Often—including for at-issue drugs—the PBM Defendants purchase drugs from the Manufacturers and dispense them to the patients.

304.    Even where PBM Defendants' pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the Manufacturers.

305.    In addition, and of particular significance here, PBM Defendants contract with pharmaceutical manufacturers, including Manufacturer Defendants.

306.    These relationships allow PBMs to exert tremendous influence over what drugs are available throughout Arkansas and at what prices.

307.    Thus, PBMs are at the center of the flow of money in the pharmaceutical supply chain. In sum:

   a.  PBMs negotiate the price that payors pay for prescription drugs (for the at-issue drugs based on artificially-inflated prices generated by the Insulin Pricing Scheme);

   b.  PBMs separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

   c.  PBMs set the amount in fees that the pharmacy pays back to the PBM for each drug sold (for the at-issue drugs based on artificially-inflated prices generated by the Insulin Pricing Scheme);

    d. PBMs set the price paid for each drug sold through their mail-order pharmacies (for the at-issue drugs based on artificially-inflated prices generated by the Insulin Pricing Scheme); and

    e. PBMs negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (for the at-issue drugs based on artificially inflated prices generated by the Insulin Pricing Scheme).

308. Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the exact same drugs.

309. In every interaction that PBMs have within the pharmaceutical pricing chain they stand to profit from the artificial prices generated by the Insulin Pricing Scheme.

    3.    <u>The rise of the PBMs in the pharmaceutical supply chain.</u>

310. When they first came into existence in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on a larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

311. PBMs began negotiating with drug manufacturers ostensibly on behalf of payors.

312. In the early 2000s, PBMs started buying pharmacies.

313. When a PBM combines with a pharmacy, it has an increased incentive to collude with Manufacturers to keep certain prices high.

314. These unconscionable incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families.

315.    More recently, further consolidation in the industry has afforded PBMs a disproportionate amount of market power.

316.    In total, nearly 40 different PBM entities have merged or been absorbed into what are now the PBM Defendants.

317.    Figure 13 depicts this consolidation within the PBM market.

**Figure 13: PBM consolidation**



318.    After merging or acquiring all their competitors PBM Defendants have taken over the market—controlling more than 80% of the market and managing pharmacy benefits for more than 270 million Americans.

319.    PBM Defendants have near *complete* control over the Manufacturer Payment market. In addition to their own clients, which represents 80% of the market,

PBM Defendants or their controlled affiliate rebate aggregator companies contract with most smaller pharmacy benefit managers, including the largest of those, Prime Therapeutics, to negotiate Manufacturer Payments on their behalf.

320. Business is booming for PBM Defendants. Together, they report more than $300 billion in annual revenue.

321. PBMs are able to use the consolidation in the market as leverage when negotiating with other entities in the pharmaceutical pricing chain. Last year, industry expert Lindsay Bealor Greenleaf from Advice and Vision for the Healthcare Ecosystem (ADVI) described this imbalance in power, "it's really difficult to engage in any type of fair negotiations when one of the parties has that kind of monopoly power . . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."

4. <u>Insular nature of the pharmaceutical industry.</u>

322. The insular nature of the PBM and pharmaceutical industry has provided PBM Defendants with ample opportunity for contact and communication amongst themselves, as well as with Manufacturer Defendants, in order to devise and agree to the Insulin Pricing Scheme.

323. Each Manufacturer Defendant is a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA's meetings and platforms to promote the Insulin Pricing Scheme.

324. David Ricks, CEO of Eli Lilly, Paul Hudson, CEO of Sanofi, and Douglas Langa, Executive Vice President of Novo Nordisk, are all part of the members of the PhRMA board of directors or part of the PhRMA executive leadership team.

73

325.     PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at PBM trade associations and industry conferences.

326.      Each year during the relevant time period, the main PBM trade association, the Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.

327.     The current board of the PCMA includes Amy Bricker, President of Express Scripts, Heather Cianfrocco, CEO of OptumRx, and Alan Lotvin, Executive Vice President of CVS Caremark. Past board members include John Prince, President and COO of Optum, Inc. (and former CEO of OptumRx), and Tim Wentworth, CEO of Evernorth.

328.     All PBM Defendants are members of and, as a result of their leadership positions, control the PCMA. Each Manufacturer Defendant is an affiliate member of this organization.

329.     The PCMA annual conferences appear to be at the center of the Insulin Pricing Scheme.

330.     Every year, high-level representatives and corporate officers from both PBM and Manufacturer Defendants attend these conferences to meet in person to discuss their shared business opportunities within the pharmaceutical industry. Defendants also have used these conferences to engage in private meetings in furtherance of the Insulin Pricing Scheme.

331.    In fact, for at least the last six (6) years, all the Manufacturer Defendants have been "Presidential Sponsors" of these PBM conferences.

332.    Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."

333.    From at least 2010 to 2019, representatives from each Manufacturer Defendant met privately with representatives from each PBM Defendant during both the Annual Meetings and Business Forum conferences that the PCMA held each year.

334.    Prior to these meetings, dedicated teams of executives from each Defendant would spend weeks preparing PCMA "pre-reads" and reports in preparation for these meetings. These reports not only demonstrate the deep involvement of each Defendant in the Insulin Pricing Scheme, but they also reflect the tangled web that gave rise to the scheme

335.    In addition, all PCMA members, affiliates, and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community." As PCMA members, PCMA-Connect provides PBM and Manufacturer Defendants with a year-round, non-public online forum to engage in private discussions in furtherance of the Insulin Pricing Scheme.

336.    Notably, key at-issue lockstep price increases occurred shortly after the Defendants met at PCMA meetings. For example, on September 26 and 27, 2017, the

PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Mere days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. Novo Nordisk also recommended that their company make a 4% list price increase on January 1, 2018, to match the Sanofi increase.

337.    Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi made its list price increase on Lantus and this occurred only a few weeks after the 2014 PCMA spring conference in Washington, D.C. attended by representatives from all the PBM Defendants.

338.    Further, the PBMs control the PCMA and have weaponized it to further their interests and to hide the Insulin Pricing Scheme. The PCMA has brought numerous lawsuits and lobbying campaigns aimed at blocking drug pricing transparency efforts, including recently suing the Department of Health and Human Services (HHS) to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as direct-to-consumer discounts.

339.    Communications between PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. Examples include:

- Mark Thierer worked as an executive at the PBM Medco (now Express Scripts) until he became the CEO of OptumRx in 2016;

- Albert Thigpen was a Senior Vice President at CVS Caremark prior to becoming a Senior Vice President at OptumRx in 2011; and

- Bill Kiefer was a Vice President of Express Scripts before becoming a Senior Vice President at OptumRx in 2015.

340.    Further, the PBMs control the PCMA and have weaponized it to further their interests and to hide the Insulin Pricing Scheme. The PCMA has brought numerous lawsuits and lobbying campaigns aimed at blocking drug pricing transparency efforts, including recently suing the Department of Health and Human Services (HHS) to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as direct-to-consumer discounts.

### D.    The Insulin Pricing Scheme.

341.    The market for the at-issue diabetes medications is unique in that it is highly concentrated with, until recently, little to no generic/biosimilar options and the drugs have similar efficacy and risk profiles. In fact, PBMs treat the at-issue drugs as commodity products in constructing their formularies.

342.    In such a market, where manufacturing costs have significantly decreased, PBMs should have great leverage in negotiating with the Manufacturer Defendants to drive prices down in exchange for formulary placement.

343.    But the PBMs do not want the prices for diabetes medications to go down because they make more money on higher prices, as do the Manufacturers.

344.    As a result, Defendants have found a way to game the system for their mutual benefit—the Insulin Pricing Scheme.

345. PBM Defendants' formularies are at the center of the Insulin Pricing Scheme. Given the asymmetry of information and disparity in market power between payors and PBM Defendants, and the costs associated with making formulary changes, most payors accept the standard formularies offered by the PBMs.

346. Manufacturer Defendants recognize that because PBM Defendants have such a dominant market share, if they chose to exclude a particular diabetes medication from their standard formularies, or give it a non-preferred position, it could mean billions of dollars in profit loss for Manufacturer Defendants.

347. For example, Olivier Brandicourt, Sanofi's CEO, in a recent interview stressed the importance of the PBMs' standard formularies: "if you look at the way [CVS Caremark] is organized in the US . . . 15 million [lives] are part of [CVS Caremark's standard] formulary and that's very strict, all right. So, [if we were not included in CVS Caremark's standard formulary] we wouldn't have access to those 15 million lives."

348. Manufacturer Defendants also recognize that the PBM Defendants' profits are directly tied to the Manufacturers' list prices. For example, the January 2021 Senate Insulin Report, in summarizing the internal documents produced by the Manufacturers, noted the following:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price . . . In other words, the drug makers were aware that higher list prices meant higher revenue for PBMs.

349.    The documents released by the Senate contemporaneous with the January 2021 Senate Insulin Report further corroborate the degree to which the Manufacturers' pricing strategy is focused on the PBMs' profitability. In an internal August 6, 2015 email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug in order to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.

350.    Because the Manufacturer Defendants know that—contrary to their public representations—PBM Defendants make more money from *increasing* prices, over the course of the last 15 years and working in coordination with the PBMs, the Manufacturers have artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBMs.

351.    During the last fifteen years the amount of Manufacturer Payments paid to the PBMs has increased substantially. For example, the January 2021 Senate Insulin Report found that:

> In July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. Five years later, in 2018, Sanofi rebates were as high as 56% for preferred formulary placement. Similarly, rebates to Express Scripts and OptumRx increased dramatically between 2013 and 2019 for long-acting insulins. For example, in 2019, Sanofi offered OptumRx rebates up to 79.75% for

Lantus for preferred formulary placement on their client's commercial formulary, compared to just 42% in 2015. Similarly, Novo Nordisk offered Express Scripts rebates up to 47% for Levemir for preferred formulary placement on their client's commercial formulary, compared to 25% in 2014.

352. Beyond increased rebate demands, the PBMs have also requested and received larger and larger administrative fee payments from the Manufacturers during the relevant time period.

353. A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion.

354. In exchange for the Manufacturers inflating these prices and paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants grant preferred status on their standard formularies to the Manufacturer Defendants' diabetes medications with the most elevated price and that are the most profitable to the PBMs.

355. At all times relevant hereto, the PBM Defendants have known that the list prices for the at-issue drugs are grossly inflated. Indeed, the Manufacturers' list prices have become so untethered from the Manufacturers' net prices[12] as to constitute false and unlawful prices.

356. Despite this knowledge, PBMs include this false and deceptive price— often the AWP price—in their contracts as a basis to set the rate that payors pay for the at-issue drugs and pharmacies are reimbursed for the at-issue drugs.

---

[12] "Net Price" refers to the Manufacturers' list price minus all Manufacturer Payments paid to the PBMs.

357.     Moreover, the PBMs also use this false price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system. For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary." Likewise, in April 2019, CVS Caremark president Derica Rice stated, "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."

358.     The PBM Defendants also misrepresent the amount of "savings" they generate to their payor clients and prospective clients.

359.     In making these representations, the PBMs fail to disclose that the amount of "savings" they have generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical pricing chain and which the PBMs are directly responsible for artificially inflating.

360.     Importantly, the Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants, that each agreed to and participated in, and that created enormous profits for all of Defendants. For example:

  a. Manufacturers and PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also determining the same for competing products;

b. Manufacturers and PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail order pharmacy claims, internal medical efficacy studies, and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed, and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx which utilizes OptumInsight and Optum Analytics; and

c. Manufacturers and PBMs engage in coordinated outreach programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients. For example, the January 2021 Senate Insulin Report released an email where Eli Lilly discussed paying Defendant UnitedHealth Group and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. The email continued: "United's leadership committee made one ask of Lilly – that we are highly engaged in the communication/pull through plan.[13] I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the full breadth of Lilly resources. UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution."

361. Far from using their prodigious bargaining power to lower drug prices as they claim, Defendants use their dominant positions to work together to generate billions of dollars at the expense of Arkansas diabetics and payors, including the State. Further, this scheme endangers the lives of diabetics and payors by inflating the prices of these life-saving drugs.

---

[13] "Pull through" is an industry term that refers to an integrated process between PBMs and Manufacturers aimed at moving market share and increasing sales for a certain product following the PBM granting that product preferred placement on its formulary.

### E.    Defendants Admit That They Have Engaged in the Insulin Pricing Scheme.

362.    On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on Defendants' Insulin Pricing Scheme titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."

363.    Representatives from all Defendants testified at the hearing and each acknowledged before Congress that the price for insulin has increased exponentially in the past 15 years.

364.    Representatives from each Defendant explicitly admitted that the price that diabetics have to pay out-of-pocket for insulin is too high. For example:

    a.  Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

    b.  Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, [list] prices for insulin have increased nearly 50 percent. And over the last ten years, [list] price of one product, Lantus, rose by 184 percent."

    c.  Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

    d.  Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that

is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients . . ."

e.  Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [list] prices of our medicines. We also know that [list] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

365.    Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.

366.    None of the Defendants pointed to any other participant in the pharmaceutical pricing chain as responsible for the exorbitant price increases for these diabetes medications—nor could they—for these Defendants collectively are solely responsible for the price of almost every single vial of insulin sold in the United States.

367.    Defendants admitted that they agreed to and did participate in the Insulin Pricing Scheme and that the rise in prices was a direct result of the scheme.

368.    For example, at the April 2019 Congressional hearing, Novo Nordisk's President, Doug Langa, explained Novo Nordisk's and PBM Defendants' role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme:

[T]here is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [list] prices high. And *we've been participating in that system* because the higher the [list] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . . [I]f we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions. (emphasis added).

369. Eli Lilly, too, has admitted that it raises list prices as a *quid pro quo* for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:

> Seventy-five percent of our [list] price is paid for rebates and discounts to secure [formulary position] . . . $210 of a vial of Humalog is paid for discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].

370. Sanofi has also conceded its participation in the Insulin Pricing Scheme. When testifying at the April 2019 Congressional hearing, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified:

> The rebates are how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

371. PBM Defendants also admitted at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by Manufacturer Defendants.

372. Amy Bricker, President of Express Scripts, when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, answered, "Manufacturers do give higher [payments] for exclusive [formulary] position . . ."

373. While all Defendants acknowledged their participation in the Insulin Pricing Scheme before Congress, in an effort to avoid culpability for the precipitous price increase, each Defendant group pointed the finger at the other as the responsible party.

374. PBM Defendants specifically testified to Congress that Manufacturer Defendants are solely responsible for their price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

375. This statement is objectively false. The Manufacturers' coordinated lockstep price increases are a direct reflection of the PBMs' coordinated requests for larger Manufacturer Payments. A February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California titled "The Association Between Drug Rebates and List Prices," found that an increase in the amount that the Manufacturers pay back to the PBMs is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.

376. In addition, a recent report by the National Community Pharmacists Association estimated that Manufacturer Payments add nearly 30 cents per dollar to the price consumers pay for prescriptions.

377. Further, in large part because of the increased list prices, and related Manufacturer Payments, PBMs' profit per prescription has grown exponentially over the same time period that insulin prices have been artificially increased. By way of example, since 2003, Defendant Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.

378. The Manufacturers, on the other hand, argued before Congress that the PBMs were to blame for high insulin prices because of the PBMs' demands for higher Manufacturer Payments in exchange for formulary placement.

379. However, that also is not true. For example, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that Manufacturer Defendants are still making substantial profits from the sale of insulin products regardless of any Manufacturer Payments they are sending back to the PBMs. During the same time period when insulin price increases were at their steepest, distributions to Manufacturers' shareholders in the form of cash dividends and share repurchases totaled *$122 billion*. In fact, during this time period the Manufacturers spent a significantly lower proportion of profits on research and development compared to shareholder payouts.

380. The January 2021 Senate Insulin Report concluded, *inter alia*:

a. Manufacturer Defendants are retaining more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;

b. Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs; and

c. Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs. From 2016 to 2020, Novo Nordisk spent approximately $29 billion on stock buybacks and shareholder dividend payouts while only spending approximately $12 billion on R&D costs.

381.    The truth is—despite their finger pointing in front of Congress—Manufacturers and PBMs are both responsible for their concerted efforts in creating the Insulin Pricing Scheme. This reality was echoed in the statement from the 2021 Senate Insulin Report, summarizing Congress's findings from their two-year probe into the Insulin Pricing Scheme:

> [M]anufacturers and [PBMs] have created a vicious cycle of price increases that have sent costs for patients and taxpayers through the roof . . . This industry is anything but a free market when PBMs spur drug makers to hike list prices in order to secure prime formulary placement and greater rebates and fees.

### F.    Defendants' Profit Off the Insulin Pricing Scheme.

#### 1.    Manufacturers' Profit Off Insulin Pricing Scheme.

382.    For Manufacturer Defendants, the Insulin Pricing Scheme affords them the ability to pay the PBM Defendants significant, yet undisclosed, Manufacturer Payments in exchange for formulary placement—which garners Manufacturer Defendants greater revenues from sales—without decreasing their profit margins. During the relevant time period, PBM Defendants granted preferred formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

383.    Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated list price.

#### 2.    PBMs' Profit Off Insulin Pricing Scheme.

384.    Because of the increased list prices, and related Manufacturer Payments, PBMs' profit per prescription has grown exponentially during the relevant time

period. A recent study published in the Journal of the American Medical Association titled "Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies and Health Plans from 2014 to 2018" concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased over 150% from 2014 to 2018. In fact, for transactions where the PBM Defendants control the insurer, the PBM and the pharmacy (i.e., Aetna-Caremark-CVS pharmacy) these Defendants now capture an astonishing 50% of the money spent on each insulin prescription (up from only 25% in 2014), despite the fact that they do not contribute to the development, manufacture, innovation, or production of the product.

385. PBM Defendants profit off the artificially inflated prices created by the Insulin Pricing Scheme in a myriad of ways, including (1) retaining a significant—yet undisclosed—percentage of the Manufacturers Payments, (2) using the inflated price to generate profits from pharmacies in their networks, and (3) relying on the inflated price to drive up the PBMs' profits through their own mail order pharmacies

3. __PBMs pocket most of the secret Manufacturer Payments.__

386. The first way in which the PBMs profit off the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

387. The amount that the Manufacturers pay back to the PBMs has accelerated to represent a large percentage of the list price of diabetes medications.

388. Historically, when PBMs contracted with payors, the contract allowed the PBM to keep all or at least some of the Manufacturer Payments they received, rather than pass them along to the payor.

89

389.    Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the Manufacturers to the PBMs. But— critically—"rebates" are only a portion of the total secret Manufacturer Payments.

390.    In this regard, PBM and Manufacturer Defendants have created a "hide-the-ball" system where the consideration exchanged between them (and not shared with payors) is labeled and relabeled. As more payors move to contracts that require PBMs to pass a majority of the manufacturer "rebates" through to the payor, PBMs have begun renaming the Manufacturer Payments in order to keep a larger portion of this money. Payments once known as "rebates" are now called administrative fees, volume discounts, service fees, inflation fees, or other industry jargon terms designed to obfuscate and distract from the substantial sums being secretly exchanged.

391.    And these renamed secret Manufacturer Payments are indeed substantial. A recent heavily redacted complaint filed by Defendant Express Scripts revealed that *Express Scripts now retains up to 13 times more in "administrative fees" than it passes through to payors in formulary rebates.*

392.    Notably, on June 17, 2022, the Federal Trade Commission ("FTC") voted 5-0 to issue a policy statement expressing its intent to investigate such PBM Defendant practices related to Manufacturer Payments to determine if these practices constitute unfair and deceptive practices. In its policy statement, the FTC cited specifically to the effect that Manufacturer Payments have in the context of the exorbitant insulin prices and the devastating impact such practices have on the lives of diabetics.

393. In addition, the PBMs have come up with numerous ingenious methods to hide these renamed Manufacturer Payments in order keep them for themselves.

394. For example, with regard to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

395. In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" in order to increase the price of their diabetes medications. The thresholds for these payments are typically set around 6% to 8%—if the Manufacturer Defendants raise their prices by more than 6% (or 8%) during a specified time period, they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the artificially inflated prices).

396. For many of their clients, the PBMs have separate "price protection guarantees" that state that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will revert a portion of that amount back to these clients.

397. The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 12%-15%.

398. If the Manufacturers increase their list prices more than the 6% (or 8%) inflation fee rate, but less than the 10%-15% client price protection guarantee rate, then the PBMs can keep 100% of these "inflation fee" payments. This is a win-win for

the Manufacturers and PBMs—they get to mutually retain and share all the benefit of these price increases.

399. Another method that the PBMs have devised to hide the renamed Manufacturer Payments is through the use of "rebate aggregators." Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Defendant Manufacturers, on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

400. These rebate aggregators are often owned and controlled by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc (CVS Caremark).

401. The PBMs carefully guard the revenue streams from their rebate aggregator activities, hiding them in complex contractual relationships and not reporting them separately in their quarterly SEC filings.

402. Certain rebate aggregator companies are located offshore, for example, in Switzerland (Express Scripts' Ascent Health) and in Ireland (OptumRx's Emisar Pharma Services), making oversight even more difficult.

403. Moreover, during the relevant time period, the PBM Defendants have used their controlled rebate aggregator entities in furtherance of their conspiracy. For example, a 2017 audit conducted by a local governmental entity on Defendant

OptumRx related to its PBM activities from January 1, 2013, until December 31, 2015, concluded that the auditor was unable to verify the percentage of rebates OptumRx passed through to its client payor because OptumRx would not allow the auditor access to its rebate contracts. The audit report explained:

> Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under this model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.

404. A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc."

405. In other words, according to this audit report, OptumRx contracts with its own affiliate rebate aggregator, Coalition for Advanced Pharmacy Services, who then contracts with OptumRx's co-conspirator, Express Scripts, who then contracts with the Manufacturers for rebates related to OptumRx's client's drug utilization. OptumRx then uses this complex relationship between itself, its affiliate, and its co-conspirator to obscure the amount of Manufacturer Payments that are being generated from its client's utilization.

406. The January 2021 Senate Insulin Report contained the following observation on these rebate aggregators:

[I]t is noteworthy that industry observers have suggested that the recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

407.    Because the PBMs are able to hide (and retain) a majority of the secret Manufacturer Payments that they receive, they are able to make significant profits on the Insulin Pricing Scheme.

408.    Even in the rare cases where certain sophisticated payor clients receive a portion of the Manufacturer Payments from their particular pharmacy benefit manager (whether it is a PBM Defendant or not), those payors are still significantly overcharged as a direct result of the Insulin Pricing Scheme given the extent to which Defendants have inflated the prices of the at-issue drugs.

4.    <u>PBMs' profit off pharmacies.</u>

409.    A second way that PBM Defendants profit off the Insulin Pricing Scheme is by using the artificially inflated price generated by the scheme to profit off the pharmacies with whom they contract, including those in Arkansas.

410.    PBM Defendants decide which pharmacies are included in the    PBM's network and how much they will reimburse these pharmacies for each drug dispensed.

411.     PBMs pocket the spread between the amount that the PBMs get paid by their clients for the at-issue drugs (which is based on the artificially generated prices

generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less).

412. PBMs do not disclose to their clients or network pharmacies how much the PBM is receiving from or paying to the other.

413. This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from PBM Defendants to take into account the cost effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal. The higher the Defendant Manufacturers inflate their prices, the more money the PBMs make off this spread.

414. PBMs also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR fees[14], based on the artificially inflated prices generated by the Scheme—and again, the higher the list price for each diabetes medication sold, the more the PBMs generate in these pharmacy fees.

     5.   Insulin Pricing Scheme increases PBM mail order and retail pharmacy profits.

415. A third way PBMs profit off the Insulin Pricing Scheme is through the PBM Defendants' own mail order and retail pharmacies. The higher the price that PBM Defendants are able to get their customers, such as residents in Arkansas with diabetes and payors, including the State, to pay for diabetes medications, the higher the profits PBM Defendants realize through their mail order pharmacies.

_____

[14] "DIR" fees are post-purchase concessions pharmacies pay back to the PBMs.

416.     During the relevant time period, the PBM Defendants' mail order and retail pharmacies dispensed the at-issue drugs to and were paid by residents in Arkansas with diabetes based on the inflated list prices generated by the Insulin Pricing Scheme.

417.     Because the PBMs base the price they charge for the at-issue diabetes medications on the list price, the more the Manufacturers inflate these prices, the more money the PBMs make.

418.     PBMs also charge the Manufacturer Defendants fees related to their mail order and retail pharmacies, such as pharmacy supplemental discount fees and indirect purchase fees, that are directly tied to the false prices generated by the Insulin Pricing Scheme.  Thus, once again, the higher the price is, the more money the PBMs make on these fees.

419.     A third way PBMs profit from the inflated prices generated by the Insulin Pricing Scheme through their pharmacies is by way of an arbitrage purchase scheme. Because of their coordinated efforts with the Manufacturers in furtherance of the Insulin Pricing Scheme, the PBMs often know when the Manufacturers are going to raise their prices.  The PBMs use this knowledge to purchase large quantities of the at-issue drugs prior to the price increases at a lower price. The PBMs then charge diabetics and payors the higher price after the increase.

420.     In sum, every way that the PBMs make money on diabetes medications is directly tied to the artificially inflated list prices generated by the Insulin Pricing Scheme. PBMs are not lowering the price of diabetes medications as they publicly

represent—rather they are making billions of dollars by fueling these skyrocketing prices.

### G. The State, and its Residents who Suffer from Diabetes, Purchase the At-Issue Drugs from Defendants.

421. During the relevant time period, the PBM Defendants' mail order and retail pharmacies dispensed the at-issue drugs to and were paid by residents in Arkansas with diabetes based on the inflated list prices generated by the Insulin Pricing Scheme.

422. In addition, as a large government employer, the State provides health benefits to its employees, retirees, and their dependents. One of the benefits is the State pays a substantial portion of its beneficiaries' prescription drug costs, including for the at-issue drugs.

423. To administer its health plan's pharmaceutical programs, the State relies on PBMs for the alleged purposes of limiting administrative burden and controlling pharmaceutical drugs costs.

424. During the relevant time period, CVS Caremark and OptumRx provided PBM and pharmacy services to the State.

425. In doing so, these PBM Defendants developed and offered formularies for the State's prescription plans, constructed and managed the State's pharmacy networks (which included the PBMs' retail and mail order pharmacies), processed pharmacy claims, and dispensed the at-issue drugs to the State's health plan beneficiaries.

426.     In providing these services to the State, CVS Caremark and OptumRx set the amount the State paid for the at-issue drugs based on the inflated prices generated from the Insulin Pricing Scheme and the State paid these PBM Defendants for the at-issue drugs.

427.     The State also spends millions of dollars a year purchasing the at-issue diabetes medications for use at its State-run facilities.

**H.     Defendants Deceived the State.**

428.     At no time have either Defendant group disclosed the Insulin Pricing Scheme or the artificially inflated list prices produced by it.

    1.     <u>Manufacturer Defendants deceived Arkansas Diabetics and the State.</u>

429.     At all times during the relevant time period, Manufacturer Defendants and PBM Defendants knew that diabetics and payors, including the State, relied on the artificially inflated list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs. That is, Arkansas diabetics and payors, including the State, relied on the artificially inflated list prices by purchasing diabetic medications at such prices.

430.     Manufacturer Defendants and PBM Defendants further knew that Arkansas diabetics and payors, including the State, expected and desired to pay the lowest fair-market price possible for the at-issue drugs.

431.     Manufacturer Defendants and PBM Defendants knew that the artificially inflated list prices generated by the Insulin Pricing Scheme were false and completely untethered from the net prices that the Manufacturer Defendants were paid for the drugs.

432.     As the list prices for the at-issue drugs detached completely from actual prices, the list prices became increasingly misrepresentative to the point of becoming unlawful.

433.     Despite this knowledge, Manufacturer Defendants caused the artificially inflated list prices generated by the Insulin Pricing Scheme to be published throughout Arkansas through publishing compendia and in various promotional and marketing materials distributed by entities downstream in the drug supply chain.

434.     Manufacturer Defendants also published these prices to the PBMs and their pharmacies who then knowingly used the false prices to set the amount payors, like the State, and diabetics pay for the at-issue drugs.

435.     By publishing their prices throughout Arkansas, the Manufacturer Defendants held these prices out as a reasonable price by which to base the prices diabetics and payors pay for the at-issue drugs.

436.     These representations are false. Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to the net price they received for the at-issue drugs and were not based on transparent or competitive factors such as cost of production, or research and development.

437.     Notably, during the relevant time period, the Manufacturer Defendants published prices in Arkansas of $300-$400 for the same at-issue drugs they could have priced at $2 (or less) and still been profitable.

438.     Manufacturer Defendants have also publicly represented that they price the at-issue drugs according to each drug's value to the health care system and   the

need to fund innovation. For example, briefing materials prepared for CEO Dave Ricks as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant time period, executives from Sanofi and Novo Nordisk also represented that research and development costs were key factors driving the at-issue price increases.

439.    These statements are also false. Between 2005 and 2018, Eli Lilly only spent $680 million on R&D costs related to Humalog while earning $31.35 billion in *net* sales during that same time period. In other words, Eli Lilly made more than 46 times its reported R&D costs on Humalog during this portion of the relevant time period. And Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.

440.    The Manufacturer Defendants' list prices were artificially inflated in furtherance of the Insulin Pricing Scheme to generate profits for the Manufacturer Defendants and PBM Defendants.

441.    Manufacturer Defendants affirmatively withheld the truth from Arkansas diabetics and payors, including the State, and specifically made these misrepresentations in furtherance of the Insulin Pricing Scheme and to induce reliance in payors and diabetics to purchase their at-issue drugs.

442.    PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by selecting the highest price at-issue

drugs for preferred formulary placement and by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

443.   PBM Defendants perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom at the expense of Arkansans who need these live-saving drugs.

     2.    PBM Defendants deceived Arkansas diabetics and the State.

444.   PBM Defendants have deceived diabetics and payors in Arkansas, including the State.

445.   Throughout the relevant time period, PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with diabetics and payors; (b) they work to lower the price of the at-issue drugs and, in doing so, they achieve substantial savings for diabetics and payors; and (c) that the PBMs' construct formularies designed to improve the health of diabetics.

446.    PBM Defendants understand that diabetics, payors, and their beneficiaries rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve their health and save lives.

447.   At no time have the PBM Defendants disclosed their knowledge of the artificially inflated list prices for the at-issue drugs; to the contrary, the PBMs ensured that diabetics and payors pay based on those artificially inflated list prices.

448.   In addition to the general PBM misrepresentations discussed above in the "Parties" section, throughout the relevant time period, PBM Defendants have

purposefully, consistently, and routinely made misrepresentations specifically about the at-issue Manufacturer Payments, formulary construction, and the PBMs' role in the diabetic pricing system. Examples include:

a. In a public statement issued on May 11, 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."

b. On June 22, 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."

c. In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."

d. On August 31, 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts released a statement that stated "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."

    i. Mr. Stettin continued on to represent that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."

e. In January 2017, Tim Wentworth, CEO of Express Scripts represented that "without PBMs, and specifically without Express Scripts, our clients would pay [many times] more for [insulin]."

    i. Mr. Wentworth continued on to state Express Scripts is dedicated to controlling insulin prices because "we stand up for payers and patients."

f. On June 1, 2018, Mark Merritt, President of the PCMA, in response to a question about PBMs' role in the insulin pricing system stated, "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."

102

g. On April 4, 2019, Steve Miller Express Scripts' chief medical officer stated that Express Scripts "give[s] people who rely on insulin greater affordability and cost predictability so they can focus on what matters most: their well-being."

h. CVS Caremark's Chief Policy and External Affairs Officer testified during the April 2019 hearings that, CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."

i. Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."

j. The PCMA website contains the following misrepresentations, "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins. PBMs work hard to drive down costs using formulary management and rebates."

449. PBM Defendants not only falsely represent that they negotiate with Manufacturer Defendants to lower the price of the at-issue diabetes medications for *payors*, but also for diabetic *patients* as well. Examples of their intentional false and deceptive misrepresentations include:

a. Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable." (Emphasis added).

b. Amy Bricker, President at Express Scripts testified before Congress in April 2019, "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs." (Emphasis added).

c. Amy Bricker of Express Scripts also testified at the Congressional hearing that "Express Scripts remains committed to . . . *patients* with

103

diabetes and creating affordable access to their medications."
(Emphasis added).

d. OptumRx's website has stated "[t]he services we provide help *improve
health outcomes for patients* while making prescription drugs more
affordable for plan sponsors and *individuals*, and more sustainable for
the country . . . the reason is simple: drug manufacturers are
responsible for the high cost of prescription drugs . . . OptumRx
negotiates better prices with drug manufacturers for our customers
*and consumers* . . . At OptumRx, *our mission is helping people live
healthier lives* and *to help make the health system work better for
everyone*." (Emphasis added).

e. In its 2017 Drug Report, CVS Caremark stated that the goal of its
pharmacy benefit plans is to ensure "that the cost of a drug is aligned
with the value it delivers in terms of *patient* outcomes . . . in 2018, we
are doing even more to help keep drugs affordable with our new
Savings *Patients* Money initiative." (Emphasis added).

f. The PCMA website states, "PBMs have kept average out-of-pocket
(OOP) payments flat for beneficiaries with commercial insurance."

g. On March 12, 2019, OptumRx represented, "OptumRx is uniquely able
to deploy the broadest range of tools to rein in high drug prices, [which]
demonstrates our commitment to delivering better prices for
consumers."

450. Not only have PBM Defendants intentionally misrepresented that they

use their market power to save payors and diabetics money, but they have also

specifically, knowingly, and falsely disavowed that their conduct drives the artificially

inflated list prices higher. Examples of more of their falsehoods include:

a. On an Express Scripts' earnings call in February 2017, CEO Tim
Wentworth stated, "Drugmakers set prices, and we exist to bring those
prices down."

b. Larry Merlo, head of CVS Caremark sounded a similar refrain in
February 2017, "Any suggestion that PBMs are causing prices to rise
is simply erroneous."

c. In 2017, Express Scripts' Wentworth went on CBS News to again
argue that PBMs play no role in rising drug prices, stating that PBMs
work to "negotiate with drug companies to get the prices down."

104

d.  During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer answered, "we can't see a correlation when rebates raise list prices."

e.  In 2019, when testifying under oath before Congress on the rising price of insulins, Senior Vice President Amy Bricker of Express Scripts testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."

451.  Throughout the relevant time period, PBM Defendants have also misrepresented that they are transparent about the Manufacturer Payments that they receive and that they pass along (or do not pass along) to payors. As stated above, PBM Defendants retain many times more in total Manufacturer Payments than the traditional formulary "rebates" they may pass through—in whole or part—to payors.

452.  Despite this, in 2011, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]veryday we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."

453.  In a 2017 CBS News interview, Express Scripts' CEO, represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments it receives and that payors, "know exactly how the dollars flow" with respect to these Manufacturer Payments.

454.  When testifying before Congress in April 2019, Amy Bricker, President of Express Scripts, had the following exchange with Representative John Sarbanes of Maryland regarding the transparency (and lack thereof) of the Manufacturer Payments:

Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . [However] the reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].

Mr. Sarbanes. What about if we made it completely transparent? Who would be for that?

Ms. Bricker. Absolutely not . . . it will hurt the consumer.

Mr. Sarbanes. I don't buy it.

Ms. Bricker – prices will be held high.

Mr. Sarbanes. I am not buying it. I think a system has been built that allows for gaming to go on and you have all got your talking points. Ms. Tregoning [of Sanofi], you have said you want to guarantee patient access and affordability at least ten times, which is great, but there is a collaboration going on here . . . the system is working for both of you at the expense of the patient. Now I reserve most of my frustration for the moment in this setting for the PBMs, because I think the lack of transparency is allowing for a lot of manipulation. I think the rebate system is totally screwed up, that without transparency there is opportunity for a lot of hocus-pocus to go on with the rebates. Because the list price ends up being unreal in certain ways except to the extent that it leaves certain patients holding the bag, then the rebate is negotiated, but we don't know exactly what happens when the rebate is exchanged in terms of who ultimately benefits from that. And I think we need more transparency and I do not buy the argument that the patient is going to be worse off, the consumer is going to be worse off if we have absolute transparency . . . *I know when you started out, I understand what the mission was originally with the PBMs . . . But now things have gotten out of control. You are too big and the lack of transparency allows you to manipulate the system at the expense of the patients.* So I don't buy the argument that the patient and consumer is going to get hurt if we have absolute transparency. (Emphasis added)

455. Throughout the relevant time period, the PBMs have made the foregoing

misrepresentations consistently and directly to their payor clients, including the

State—that their interests are aligned with their payor clients, that they lower the

price of the at-issue drugs, and that their formulary construction is for the benefit of diabetics and payors. Representative examples include:

a. On August 25, 2008, CEO of OptumRx Mark Thierer stated, "We are pleased to expand our relationship with the Arkansas state employees . . . to continue our successful partnership with the State to improve care, reduce health risk, and contain cost with assisting the State to achieve their Healthy Arkansas Initiative."

b. In December 2013, OptumRx representatives represented to the State that its formulary construction targeted diabetes medications, including Victoza, Apidra, Humilin, Humalog, and Levemir, in order to "[e]ncourage the selection of clinically effective, lower-cost medications" and that OptumRx "improved cost savings opportunities" by "not chasing rebates."

c. On November 18, 2015, OptumRx representatives represented to the State that: (1) OptumRx "deliver(s) value to clients and members through enhanced services and cost trend management" and (2) OptumRx's scale and unique capabilities will help consumers and clients manage the cost and treatment challenges of pharmaceuticals."

d. In response to the State raising questions about its PBM practices, on February 9, 2018, CVS Caremark stated, "CVS Caremark is focused on providing our pharmacy benefit management clients with opportunities to improve health outcomes for their members, while also managing costs, and is committed to providing our PBM clients and their members . . ."

456. The PBMs have made also the same misrepresentations consistently and directly to Arkansas diabetics through member communications, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

457. The above stated PBM Defendants' representations are false.

458. Contrary to their representations that they lower the price of the at-issue drugs for diabetics and payors, PBM Defendants' formulary construction and the

Manufacturer Payments they receive in exchange for formulary placement have caused the price paid by diabetics and payors to significantly increase.

459.    For example, both diabetics and payors in Europe and Canada pay significantly less for their diabetes medications than diabetics in the United States who are affected by the Insulin Pricing Scheme.

460.    In addition, diabetics that receive their medications from federal programs that do not utilize PBMs also pay significantly less. For example, in December 2020, the United States House of Representatives Committee on Oversight and Reform issued a Drug Pricing Investigation Report that found that federal health care programs that negotiate directly with the Manufacturers (such as the Department of Veterans Affairs), and thus are outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program which relies on the PBM Defendants to set their at-issue drug prices (and thus are victims of the PBMs' concerted efforts to drive up the list prices).

461.    Contrary to PBM Defendants' representations that they work to promote the health of diabetics, including the State's diabetic Beneficiaries, and as a direct result of the PBMs' conduct, many diabetics have been priced out of these life-sustaining medications. As a result, many of these diabetics are forced to either ration their insulin or to skip doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

462. Both PBM Defendants and Manufacturer Defendants knew that these representations were false when they made them and affirmatively withheld the truth regarding the artificially inflated list prices, formulary construction, and Manufacturer Payments from the Arkansas diabetics and the State. Both PBM Defendants and Manufacturer Defendants intended for Arkansans to rely on their misrepresentations.

463. Defendants concealed the falsity of these representations by closely guarding their pricing structures, agreements, and sales figures.

464. Manufacturer Defendants do not disclose to diabetics, payors, or the public the actual prices they receive for the at-issue drugs, or the amount in Manufacturer Payments they pay to the PBM Defendants.

465. PBM Defendants do not disclose to diabetics, payors, or the public the details of their agreements with Manufacturer Defendants or the Manufacturer Payments they receive from them—nor do they disclose the details related to their agreements with payors and pharmacies.

466. Each Defendant also conceals its false and deceptive conduct by signing confidentiality agreements with any entity in the supply chain who knows the actual prices of the at-issue drugs.

467. PBM Defendants have gone as far as suing governmental entities to block the release of details on their pricing agreements with Manufacturers and pharmacies.

468.     Even when audited by payors, PBM Defendants often still refuse to disclose their agreements with Manufacturers and pharmacies, relying on overly broad confidentiality agreements, claims of trade secrets, and other broadly-claimed restrictions.

469.     Each Defendant's effort to conceal its pricing structures for the at-issue drugs is evidence that each Defendant knows its conduct is unconscionable and deceptive.

470.     To make matters worse, Arkansas diabetics and the State have no choice but to pay based on Defendants' artificially inflated list prices because they need these medications to live. Manufacturer Defendants make virtually all of the diabetes medications available in Arkansas, and the PBM Defendants completely dominate the pharmacy benefit services market and control nearly every Manufacturer Payment paid in the market.

471.     In sum, the entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers' misrepresentations related to the reason behind the price, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is deceptive and unconscionable.

472.     Arkansas diabetics and the State pay for the at-issue diabetes medications at the artificially inflated prices generated by the Insulin Pricing Scheme

because they relied on these prices as reasonable bases for their life sustaining medications.

473. Arkansas diabetics and the State did not know, because the Defendants affirmatively concealed, that (i) the list prices were artificially inflated; (ii) the list prices were manipulated to satisfy Defendants' profit demands; (iii) the list prices bore no relationship to the net prices paid for the at-issue drugs to the Manufacturers; and (iv) that the entire insulin pricing structure Defendants created was deceptive.

## I.    The Insulin Pricing Scheme Has Damaged the State and Arkansans who Suffer from Diabetes.

### 1.    Defendants' misconduct damaged the State as a payor for and purchaser of the at-issue drugs.

474. Defendants' Insulin Pricing Scheme has cost the State millions of dollars in overcharges.

475. The State spent millions of dollars during the relevant time period on the at-issue drugs as a health plan payor and as a purchaser for use in state-run facilities.

476. The price that the State paid for these drugs is directly tied to the artificially inflated prices generated by the Insulin Pricing Scheme.

477. Thus, because Defendants' Insulin Pricing Scheme caused the prices to substantially inflate, Defendants' pattern of deceptive and unconscionable conduct directly and proximately caused the State to substantially overpay for diabetes medications.

478. Because Defendants continue to generate exorbitant, unfair, and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to the State is ongoing.

2.  The Insulin Pricing Scheme has damaged the State by increasing its healthcare costs and decreasing productivity.

479.    As discussed below, the rising price for the at-issue drugs has had a devastating effect on the health of diabetics. It has also caused a staggering increase in healthcare costs to the State.

480.    As a direct result of the Insulin Pricing Scheme, one in four Arkansas diabetics can no longer afford their diabetes medication and are forced to ration and skip doses. This forced lack of adherence to their diabetes medications leads to substantial additional healthcare costs.

481.    One national model projected that improved adherence to diabetes medication would avert 699,000 emergency department visits and 341,000 hospitalizations annually, for a savings of $4.7 billion. The model further found that eliminating the loss of adherence would lead to another $3.6 billion in savings, for a combined potential savings of $8.3 billion.

482.    Much of the increased healthcare costs caused by the Insulin Pricing Scheme are shouldered by the State. As a result of the Insulin Pricing Scheme, the amount Arkansas spends each year on diabetes-related healthcare costs has risen dramatically during the relevant time period, now totaling in the billions of dollars per year.

483.    Lack of adherence to diabetes medications also has a significant adverse effect on labor productivity in terms of absenteeism (missing work due to health-related reasons), presenteeism (being present at work but not productive), and disability (inability to perform necessary physical tasks at work).

484.    This decrease in work productivity has further damaged the State by injuring its economy and decreasing its tax revenue.

      3.     The Insulin Pricing Scheme has damaged Arkansas Diabetics.

485.    Whether insured or not, all Arkansas diabetics pay a substantial part of their diabetic drug costs based on Defendants' artificially inflated list prices generated and thus the Insulin Pricing Scheme has directly damaged residents in Arkansas with diabetes.

486.    In addition to financial losses, for many diabetics in Arkansas, the Insulin Pricing Scheme has cost them their health and emotional well-being. Unable to afford Defendants' price increases, many diabetics in Arkansas have begun to engage in highly risky behaviors with respect to their disease such as rationing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves, foregoing one or even two meals a day. These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness, which harm not only the individual persons affected, but also harm the Arkansas healthcare system as a whole by burdening its resources and the Arkansas economy by requiring additional millions of dollars of additional revenues to be spent.

487.    Even when diabetics can still afford their diabetic medications, as a direct result of PBM Defendants shifting which diabetes medications are favored on their formularies ("non-medical switching"), diabetics are often forced to switch

medications every few years or go through a lengthy appeal process (or try the favored drug first) before receiving the patient's preferred medication.

488. Non-medical switching for biologic drugs, such as the at-issue drugs, causes increased health problems for diabetics and increased healthcare costs for diabetics, payors, and the healthcare system.

489. The Insulin Pricing Scheme has pushed, and will continue to push, access to these lifesaving drugs out of reach for many diabetes patients in Arkansas.

490. Because Arkansas diabetics continue to pay for the at-issue drugs based on the artificially inflated prices generated by the Insulin Pricing Scheme, the harm is ongoing.

**J.      Defendants' Recent Efforts in Response to Rising Insulin Prices.**

491. In reaction to the mounting political and public pressure, Defendants recently have taken action, both on Capitol Hill and in the insulin marketplace.

492. In recent years, Novo Nordisk's political action committee ("PAC") has doubled its spending on federal campaign donations and on lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, its biggest ever investment in directly influencing U.S. policymakers.

493. Eli Lilly and Sanofi have directed millions of dollars through their PACs as well in recent years.

494. Likewise, the PBM Defendants have steadily increased their political spending for the past five years as public outcry has grown against them.

495.  Defendants have also recently begun introducing programs ostensibly aimed at lowering the cost of insulins.

496.    These "affordability" measures fail to address the structural issues that have given rise to the price hikes. Rather, these steps are merely public relations stunts that do not solve the problem.

497.    For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

498.    However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

499.    Following this, a Congressional staff report was issued examining the availability of this drug. The investigative report, "*Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*," concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.

500.    The conclusion of the report was that: "Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients access to its generic alternative, this pharmaceutical behemoth is still charging astronomical prices for a drug people require daily and cannot live without."

501.    In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins

and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous.

502.    In fact, in August 2019, a Type 1 diabetic who could no longer afford his $1,200 a month insulin prescription died months after switching to ReliOn brand insulin due to complications from the disease.

503.    Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem. Arkansas diabetics and the State continue to suffer great harm as a result of the Insulin Pricing Scheme.

## VI.    TOLLING OF STATUTE OF LIMITATIONS

504.    None of the statute of limitations associated with the causes of action asserted in this Complaint run against the State.

505.    Even assuming, *arguendo*, that the State was subject to applicable statutes of limitations, the State asserts that it diligently pursued and investigated the claims asserted in this Complaint. Through no fault of its own, neither the State, nor any Arkansas diabetic, received inquiry notice or learned of the factual basis for its claims in this Complaint and the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

### A.    Discovery Rule Tolling.

506.    The State and Arkansas diabetics had no way of knowing about the Insulin Pricing Scheme.

507.    As discussed above, PBM Defendants and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants, the details of the Defendants' negotiations and payments between each other or their

pricing structures and agreements—labeling them trade secrets and protecting them with confidentiality agreements.

508.     Each Defendant group also affirmatively blamed the other for the price increases described herein, both during their congressional testimonies and through the media. Defendants essentially continued to work and conspire together to conceal their misrepresentations in their blame of the other.

509.     The State and Arkansas diabetics could not have discovered and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme, nor would a reasonable and diligent investigation have disclosed the true facts.

510.     Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships and agreements between and among Manufacturer Defendants and PBM Defendants that result from the Insulin Pricing Scheme continue to obscure Defendants' unlawful conduct.

511.     For these reasons, the discovery rule tolls all applicable statutes of limitations.

**B.     Fraudulent Concealment Tolling.**

512.     Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein, as described in detail above, also tolls any applicable statutes of limitation.

**C.     Estoppel.**

513.     Defendants were under a continuous duty to disclose to the State or Arkansas diabetics the true character, quality and nature of the prices upon   which

117

payments for diabetes medications were based, and the true nature of the services being provided.

514.    Defendants intentionally misrepresented the prices and intended for Arkansans to rely upon the misrepresentations. Due to Defendants' misrepresentations, they benefitted from inducing Arkansans to rely upon their misrepresentations.

515.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

### D.    Continuing Violations.

516.    Any applicable statutes of limitations are also tolled because Defendants' activities have not ceased and still continue to this day and thus any causes of action are not complete and do not accrue until the tortious and anticompetitive acts have ceased.

## VI.    CLAIMS FOR RELIEF

### First Cause of Action

### Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101 through 115, *et seq.* (Against All Defendants)

517.    The State re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

518.    Defendants are "persons" within the meaning of, and subject to, the provisions of the ADTPA.

519.    The at-issue drugs are "goods" as defined under Ark. Code Ann. § 4-88-102(4).

520.    The business practices of Defendants constitute the sale of "goods" or "services" under Ark. Code Ann. §§ 4-88-102(4) and (7). The same business practices constitute business, commerce, or trade under Ark. Code Ann. § 4-88-107.

521.    By engaging in the Insulin Pricing Scheme, as described herein, Defendants have committed unconscionable and deceptive trade practices in the conduct of trade or commerce within Arkansas as prohibited by the provisions of the ADTPA, Ark. Code Ann. § 4-88-107(a) & (b), directly or indirectly, affecting and causing harm to Arkansas diabetics and the State.

522.    In addition, Defendants have also repeatedly and willfully engaged in deceptive trades and practices that violate the specific enumerated prohibitions of the ADTPA, including but not limited to:

- Knowingly making false representations as to the characteristics and benefits of goods and services. Ark. Code Ann. § 4-88-107(a)(1). In particular:

  o A characteristic of every commodity in Arkansas's economy is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value.

  o At no point did Defendants reveal that the prices associated with the lifesaving diabetic treatments at issue herein were not legal, competitive or at fair market value and were completely untethered from the actual, net prices realized by Defendants.

  o At no point did Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme.

  o In furtherance of the Insulin Pricing Scheme, at least once a year for each year during the relevant time period, Defendants reported and published artificially inflated prices for each at-issue drug and in doing so represented that the reported prices were reasonably related to the net prices for the at-issue drugs.

- o Defendants also made false statements related to the reason behind their artificially inflated prices (research and developments costs).

- o Despite knowing these prices were false and artificially inflated, PBM Defendants ensured that the Manufacturers' list prices harmed diabetics and the State by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

- o By granting the at-issue diabetes medications with the highest list prices preferred formulary positions, PBM Defendants ensured that prices generated by the Insulin Pricing Scheme would harm diabetics and the State.

- o Defendants also made false representations that their formularies and the Manufacturer Payments they receive have the benefit and characteristic of lowering the price of the at-issue drugs and promoting the health of diabetics.

- Knowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of physical infirmity. Ark. Code Ann. § 4-88-107(a)(8). In particular:

  - o Diabetics in Arkansas, including beneficiaries in the State's health plans and in state-run facilities, need the at-issue diabetes medications to survive.

  - o Manufacturer Defendants make nearly every single vial of insulin available in Arkansas.

  - o PBM Defendants completely dominate the insulin pricing chain and the pharmacy benefit services market.

  - o As a result, diabetics are unable to protect their interest because they have no choice but to purchase their diabetic drugs at Defendants' egregiously inflated prices.

- Concealing, suppressing, and omitting material facts with the intent that others rely upon the concealment, suppression, or omission while selling any goods or services. Ark. Code Ann § 4-88-108(2).

  - o Manufacturer Defendants conceal the fact that their published prices were untethered from the actual, net prices they were paid for the at-issue drugs.

- PBM Defendants conceal the fact that their formularies and the Manufacturer Payments they receive are aimed at raising the price of the at-issue drugs and, as a result, damage the health of diabetics.

- Defendants conceal, suppress, and omit these material facts with the intent that diabetics and payors, including the State, rely on these concealments, suppressions, and omissions in purchasing the at-issue drugs and utilizing the at-issue formularies.

- Defendants continue to make these misrepresentations and publish prices generated by the Insulin Pricing Scheme; diabetics and the State, continue to purchase diabetes medications at Defendants' prices as a result of the ongoing Insulin Pricing Scheme.

523. Defendants made these misrepresentations with the intent to deceive Arkansas diabetics and the State.

524. Defendants' representations are false, and at all relevant times Defendants knew they were false.

525. At all times relevant hereto, Defendants affirmatively withheld this truth from diabetics and the State, even though Defendants knew that diabetics' and the State's intention was to pay the lowest possible fair market price for diabetes medications and their expectation was to pay a legal, competitive and fair market price that resulted from transparent market forces.

526. Defendants' conduct was also an unconscionable trade practice because it affronts a sense of justice, decency, and reasonableness. In particular:

- Diabetics in Arkansas, including beneficiaries in the State's health plans and in state-run facilities, need these diabetes medications to survive.

- Manufacturer Defendants make nearly every single vial of insulin available in Arkansas.

- PBM Defendants completely dominate the pharmacy benefit services market and control nearly every Manufacturer Payment paid in this market.

- The price increases for the at-issue drugs bear no relation to manufacturing or production cost increases or changes in supply and demand conditions.

- In fact, the prices have become so untethered from production costs, that insulins, which the Manufacturer Defendants could *profitably price at less than $2 a vial*, are now priced at up to $400 a vial or more.

- There are no conceivable benefits to diabetics or the State in Arkansas, including the State, to being forced to pay these egregious prices for medicines they need to stay alive. In fact, the opposite is true—as a direct result of Defendants' egregious price increases, the health and wellbeing of residents in Arkansas with diabetes, including the State's Beneficiaries, have been severely and detrimentally impacted. The State has overpaid millions of dollars for the at-issue drugs.

- Defendants' misconduct offends public policy and has caused a substantial injury to Arkansas diabetics and the State.

527. Defendants acted knowingly and in a willful, wanton or reckless disregard for the safety of others in committing the violations of the ADTPA.

528. Each at-issue purchase the State and Arkansas diabetics made for diabetes medications at the prices generated by the Insulin Pricing Scheme constitutes a separate violation of the ADTPA.

529. In addition, the imposition of an injunction against Defendants prohibiting the conduct set forth herein is in the public interest, and the State is seeking the entry of an injunction prohibiting Defendants' conduct in violation of the ADTPA.

530. As a direct and proximate result of Defendants' conduct in committing the above and foregoing violations of the ADTPA, Defendants are directly and jointly and severally liable for all equitable relief, restitution, damages, punitive damages, penalties, and disgorgement for which recovery is sought herein.

531.     The State seeks a permanent injunction against Defendants to prevent future deceptive and unconscionable trade practices under the ADTPA.

## Second Cause of Action

### Unjust Enrichment
### (Against All Defendants)

532.     The State re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

533.     Defendants knowingly, willfully, and intentionally deceived Arkansas diabetics and the State, and have received a financial windfall from the Insulin Pricing Scheme at the expense of the State and Arkansas diabetics.

534.     Defendants wrongfully secured and retained unjust benefits from Arkansas diabetics and the State, in the form of amounts paid for diabetes medications and fees and payments collected based on the artificially inflated prices generated by the Insulin Pricing Scheme.

535.     It is inequitable and unconscionable for Defendants to retain these benefits.

536.     Defendants knowingly accepted the unjust benefits of their unfair and deceptive conduct.

537.     Defendants have been enriched by revenue resulting from the Insulin Pricing Scheme while Arkansas diabetics and the State have been impoverished by Defendants' misconduct. Defendants' enrichment directly caused Arkansas diabetics' and State's impoverishment.

538.     Accordingly, Defendants should not be permitted to retain the proceeds from the benefits conferred upon them by the Insulin Pricing Scheme. The State seeks disgorgement of Defendants' unjustly acquired profits and other monetary benefits resulting from their unlawful conduct and seeks restitution and recission, in an equitable and efficient fashion to be determined by the Court.

539.     There is no express contract governing the dispute at-issue. PBMs do not contract with payors, including the State, on an individual drug basis. The State's claims do not arise out of a written contract, but rather are based on the larger unfair and deceptive Scheme that drove up the at-issue artificially inflated list prices for all Arkansas diabetics and the State.

540.     As a direct and proximate cause of Defendants' unjust enrichment, as referenced above, Arkansas diabetics and the State suffered, and continue to suffer, ascertainable losses and damages as specified herein in an amount to be determined at trial.

### Third Cause of Action

### Civil Conspiracy
### (Against All Defendants)

541.     The State re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

542.     Defendants' conduct described herein constitutes a civil conspiracy and aiding and abetting each other to violate the ADTPA and to commit unjust enrichment.

543.     In addition to the direct agreements between the Manufacturers and PBMs, as well as the agreements between the PBMs (including through their controlled rebate aggregator entities), the following circumstantial evidence demonstrates the Defendants' concerted activity:

- Key lockstep price increases occurred shortly after PCMA conferences, which included private exchanges and meetings that appear to be focused on developing and maintaining the Insulin Pricing Scheme, which all Manufacturer Defendants and PBM Defendants attended;

- Defendants' refusal to disclose the details of their pricing structures, agreements, and sales figures in order maintain the secrecy of their Scheme;

- Numerous ongoing government investigations, hearings, and inquiries have targeted the collusion between Defendants related to the at-issue drugs, including:

  o In 2016, the U.S. Attorney's Office for the Southern District of New York issued a CID for information related to the Defendants' conduct involving insulin prices;

  o In 2016, Defendants received civil investigative demands from the State of Washington, in conjunction with the Attorney Generals for California, Florida and Minnesota, related to their role in increasing insulin prices;

  o In 2017, Manufacturers received civil investigation demands from the States of Minnesota, California and Florida related to the pricing of their insulin products and their relationships with the PBMs;

  o In April 2019, U.S Congress held a hearing on the Insulin Pricing Scheme before the Senate Financing Committee in which each Defendant testified;

  o The Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme that resulted in the January 2021 Senate Insulin Report;

  o A December 10, 2021 Congressional Report prepared by the House Committee on Oversight and Reform Minority Staff titled "A View from Congress: Role of Pharmacy Benefit Managers in Pharmaceutical Markets" that concluded:

- Manufacturers raise their prices due to PBMs;

- PBMs' retail and mail order pharmacies create conflicts of interest, hurt competition and distort the market;

- PBMs' practices impact patient health; and

- PBMs use their market leverage to increase their profits, not reduce costs for consumers.

o The astronomical rise in the price of the at-issue drugs coincides with PBM Defendants' rise to power within the pharmaceutical pricing system in 2003 and increased in parallel with the PBMs increased market power.

544. As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, residents in Arkansas with diabetes and the State have suffered damages in an amount to be proven at trial. Defendants are all jointly and severally liable for the actions taken in furtherance of their joint conduct.

## VII. JURY DEMAND

Pursuant to Federal Rule of Procedure 38, the State respectfully requests a trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the State of Arkansas, *ex rel*. Leslie Rutledge, Attorney General, prays for entry of judgment against the Defendants, individually, and jointly and severally, for all the relief requested herein and to which the State may otherwise be entitled, specifically, but without limitation, to-wit:

A. The Court enter an order and judgment against Defendants and in favor of the State for each violation alleged in this Complaint;

B.  Find that Defendants' acts and practices alleged herein are violations of the ADTPA, Ark. Code Ann. §§ 4-88-101, *et seq.* and that Defendants' conduct breached and violated the statutory and common law causes of action alleged herein;

C.  Issue a permanent injunction prohibiting Defendants from engaging in any violations of the ADTPA, particularly the unlawful acts and practices described herein, pursuant to Ark. Code Ann. § 4-88-104 and § 4-88-113(a)(1);

D.  Require Defendants to pay all consumer restitution that may be owed to Arkansas consumers affected by Defendants' unlawful acts and practices, pursuant to Ark. Code Ann. § 4-88-113(a)(2)(A);

E.  Impose civil penalties to be paid to the State by Defendants in the amount of up to $10,000 for each violation of the ADTPA proved at a trial of this matter, pursuant to Ark. Code Ann. § 4-88-113(a)(3);

F.  Require Defendants to pay all of the State's costs in this investigation and litigation, including, but not limited to, expert witness fees, attorney's fees and costs, pursuant to Ark. Code. Ann. § 4-88-113(e) and other state laws;

G.  Be awarded restitution, damages, disgorgement, penalties, and all other legal and equitable monetary remedies available under the state laws set forth in this Complaint, and the general equitable powers of this Court in an amount according to proof;

H.    Be awarded punitive damages as Defendants are liable for compensatory damages and Defendants knew or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury or damage and that Defendants continued the conduct with malice or reckless disregard of the consequences, pursuant to Ark. Code Ann. § 16-55-206;

I.    Be awarded pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint; and

J.    Be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED this the 8th day of August, 2022.

STATE OF ARKANSAS
LESLIE RUTLEDGE, ATTORNEY GENERAL

By: */s/ Gary B. Rogers*
Gary B. Rogers, ABN 82139
HILBURN HARPER, Ltd.
One Riverfront Place, 8th Floor
P. O. Box 5551
North Little Rock, Arkansas 72119
Telephone: (501) 372-0110
Facsimile: (501) 372-2029
Grogers@hilburnlawfirm.com

Leslie Rutledge, ABN 2001126
**Arkansas Attorney General**
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-2007
Facsimile: (501) 682-8118
Leslie.Rutledge@ArkansasAG.gov

Shannon L. Halijan, ABN 2005136
**Deputy Attorney General**
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 683-1509

Facsimile: (501) 682-8118
Shannon.Halijan@ArkansasAG.gov

Amanda D. Land, ABN 2012135
**Senior Assistant Attorney
General**
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-2029
Facsimile: (501) 682-8118
Amanda.Land@ArkansasAG.gov

Kim DuVall Renteria, ABN 2021307
**Assistant Attorney General**
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-7383
Facsimile: (501) 682-8118
Kim.Renteria@ArkansasAG.gov

## Certificate of Service

I hereby certify that on or about the 8th day of August, 2022, a true and correct copy of the above and foregoing motion was electronically filed with the Clerk of the Court by using CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification.

So certified,

*/s/ Gary B. Rogers*
Gary B. Rogers

EXHIBIT E

Case 2:23-md-03080-BRM-RLS   Document 605-85   Filed 03/05/25   Page 1 of 22 PageID: 4486
Case 2:23-md-03080-BRM-RLS   Document 605-85   Filed 03/05/25   Page 1 of 22 PageID:
4486

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

THE STATE OF ARKANSAS, *EX.REL.*,
LESLIE RUTLEDGE, ATTORNEY GENERAL

        *Plaintiff,*

        v.

ELI LILLY AND COMPANY, *et al.*

        *Defendants*.

Case No. 4:22-cv-549-JM

**ORAL ARGUMENT REQUESTED**

## UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC., OPTUMRX HOLDINGS, LLC, AND OPTUMINSIGHT, INC.'S MEMORANDUM SUPPORTING THEIR RULE 12(b)(2) MOTION TO DISMISS <u>FOR LACK OF PERSONAL JURISDICTION</u>

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

STANDARD OF REVIEW ................................................................................. 3

ARGUMENT ...................................................................................................... 4

     I.     The Court lacks general personal jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight because none is "at home" in Arkansas. ................ 4

     II.    The Court lacks specific personal jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight because there are no factual allegations establishing that any company has suit-related contacts with Arkansas, let alone suit-related contacts creating a substantial connection with the State. ...................................... 6

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Antoon v. Securus Techs., Inc.*,
 2017 U.S. Dist. LEXIS 73179 (W.D. Ark. May 15, 2017)..........................................6, 12, 14

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
 137 S. Ct. 1773 (2017)..............................................................................................4

*Daimler AG v. Bauman*,
 571 U.S. 117 (2014)..................................................................................1, 2, 4, 5

*Epps v. Stewart Info. Servs. Corp.*,
 327 F.3d 642 (8th Cir. 2003) ...................................................................... *passim*

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
 141 S. Ct. 1017 (2021)..............................................................................................4

*Goellner-Grant v. Platinum Equity LLC*,
 341 F. Supp. 3d 1022 (E.D. Mo. Sept. 18, 2018) ...........................................11, 12

*In re NHL Players' Concussion Injury Litig.*,
 2019 U.S. Dist. LEXIS 175979 (D. Minn. Oct. 10, 2019) .....................................5

*Lawson v. Simmons Sporting Goods, Inc.*,
 2019 Ark. 84, 569 S.W.3d 865 ..............................................................................1

*Mannon v. R. A. Young & Sons Coal Co.*,
 207 Ark. 98, 179 S.W.2d 457 (1944)..................................................................8, 13

*Merryman v. JP Morgan Chase Bank, N.A.*,
 2015 U.S. Dist. LEXIS 156691 (W.D. Ark. Nov. 19, 2015)...................................5

*Morningside Church, Inc. v. Rutledge*,
 9 F.4th 615 (8th Cir. 2021) .............................................................................2, 4, 6

*Podraza v. Whiting*,
 790 F.3d 828 (8th Cir. 2015) ..................................................................................9

*Royal v. Mo. & N. Ark. R.R. Co.*,
 2016 U.S. Dist. LEXIS 109071 (W.D. Ark. Aug. 17, 2016)...................2, 4, 6, 13

*Salerno Med. Assocs., LLP v. Riverside Med. Mgmt., LLC*,
 542 F. Supp. 3d 268 (D.N.J. 2021) ...................................................................6, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)..................................................................................................9

*United States v. Bestfoods*,
524 U.S. 51 (1998) ..................................................................................................8, 10

*Valley View Agri, LLC v. Producers Coop. Oil Mill*,
2015 U.S. Dist. LEXIS 144956 (E.D. Ark. Oct. 26, 2015) ......................................5

*Walden v. Fiore*,
571 U.S. 277 (2014) ..................................................................................... *passim*

*Wesson v. Lamb Ab*,
2018 U.S. Dist. LEXIS 243939 (W.D. Ark, June 18, 2018)...................8, 10, 13, 14

*Yanmar Co. v. Slater*,
2012 Ark. 36, 386 S.W.3d 439 ...........................................................................8, 13

**RULES**

Fed. R. Civ. P. 12(b)(2) ...................................................................................................1

Fed. R. Civ. P. 12(b)(6) ...................................................................................................1

**STATUTES**

Ark. Code Ann. § 4-20-115 .......................................................................................6, 12

Ark. Code Ann. § 16-4-10 .................................................................................................3

Ark. Code Ann. § 16-4-101 ...............................................................................................1

**OTHER AUTHORITIES**

*UnitedHealth Group 2020 Sustainability Report* (2021),
https://unitedhealthgroup.com/content/dam/UHG/PDF/sustainability/final/2020_Susta
inabilityReport.pdf..............................................................................................................9

# INTRODUCTION

As explained in the PBM Defendants' forthcoming brief supporting their Rule 12(b)(6) motion to dismiss the First Amended Complaint, the State's claims against UnitedHealth Group Incorporated (UHG), Optum, Inc., OptumRx, Inc., OptumRx Holdings, LLC (ORx Holdings), and OptumInsight, Inc. fail because there are no plausible or particularized factual allegations supporting the claims against them. The State's claims against four of those entities—UHG, Optum, Inc., ORx Holdings, and OptumInsight—also fail because there are no factual allegations establishing that the Court has personal jurisdiction over them. *See* Fed. R. Civ. P. 12(b)(2). The State has sued UHG, Optum, Inc., ORx Holdings, and OptumInsight in their capacities as OptumRx's parent or affiliate companies, but as a matter of federal due process, that is insufficient to establish jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight.[1] Another federal court recently held that a nearly identical complaint by the State of Mississippi failed to establish jurisdiction over the same four entities. *See Mississippi v. Eli Lilly & Co.,* No. 21-cv-674 (S.D. Miss. Aug. 15, 2022), ECF No. 112. The same result should follow here.

The State alleges that UHG's, Optum, Inc.'s, and ORx Holdings' headquarters and principal places of business are outside of Arkansas (Am. Compl. ¶¶ 179, 189, 198), so they are not "at home" or subject to general jurisdiction in the State. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). There are likewise no allegations establishing specific jurisdiction over UHG, Optum, Inc., or ORx Holdings (all parent companies of OptumRx, Inc.). The State offers no factual allegations establishing that any of those parent companies has *any* suit-related contacts with Arkansas, much less

---

[1] Under the Arkansas long-arm statute, Ark. Code Ann. § 16-4-101, Arkansas courts can exercise personal jurisdiction to the limits of the Fourteenth Amendment's Due Process Clause. *Lawson v. Simmons Sporting Goods, Inc.*, 2019 Ark. 84, ¶ 6, 569 S.W.3d 865, 869. Accordingly, we will focus on the federal constitutional analysis.

suit-related contacts creating the required "substantial connection" with the State. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see also Morningside Church, Inc. v. Rutledge*, 9 F.4th 615, 620 (8th Cir. 2021). The allegations about UHG, Optum, Inc., and OptumRx Holdings, LLC focus only on their status as OptumRx's corporate parents (*see, e.g.*, Am. Compl. ¶¶ 179–88, 198–200), which is insufficient for specific jurisdiction over them. *See Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003) (internal citation omitted) ("A parent corporation is not liable for the debts of its subsidiary merely because the parent holds the controlling interest or because the two are managed by the same officers."); *Royal v. Mo. & N. Ark. R.R. Co.*, 2016 U.S. Dist. LEXIS 109071, at *8 (W.D. Ark. Aug. 17, 2016) ("Mere ownership of a resident company is insufficient to subject the parent to jurisdiction.") (*citing Epps*, 327 F.3d at 650), *aff'd*, 857 F.3d 759 (8th Cir. 2017).

The State's allegations about OptumInsight—an OptumRx affiliate—are no better and do not satisfy due process. The State alleges that OptumInsight's headquarters and principal place of business are outside of Arkansas (Am. Compl. ¶ 193), so it is not "at home" or subject to general jurisdiction in the State. *Daimler*, 571 U.S. at 127. The State also fails to allege facts sufficient to establish specific jurisdiction over OptumInsight. The State alleges that OptumInsight is registered to do business in Arkansas and holds a Third-Party Administrator License in Arkansas. Compl. ¶¶ 194–95. Neither allegation is sufficient to subject OptumInsight to this Court's jurisdiction. The State also alleges that this lawsuit arises from a so-called "Insulin Pricing Scheme." But the State offers no factual allegations explaining what role OptumInsight supposedly played in that purported scheme, never mind factual allegations creating a substantial connection with Arkansas. At most, the State alleges that "OptumInsight analyzed data and other information from the Manufacturer Defendants to advise Defendants with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants." *Id.* at ¶ 197. The State also claims that *OptumRx*

"utilizes" OptumInsight to "compile[], analyze[], and share[]" data, without any explanation of how those services furthered the alleged scheme, much less had a substantial suit-related connection with Arkansas. *Id.* at ¶ 360. Those conclusory allegations do not establish that OptumInsight engaged in any suit-related conduct in or directed toward Arkansas, never mind suit-related conduct creating a "substantial connection" with the State.

The State tries to manufacture specific jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight by defining all those companies together as "OptumRx." *See* Am. Compl. ¶ 206 ("Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, and Optum, Inc., including all predecessor and successor entities are referred to as 'OptumRx.'"). But the law requires a plaintiff to allege facts showing that *each* defendant has the required suit-related contacts with Arkansas. The State's improper attempt to define all five entities as "OptumRx" also fails because the State alleges that it is suing "OptumRx" "in its capacities as a PBM and mail-order pharmacy." *Id.* at ¶ 207. But it fails to allege that UHG, Optum, Inc., ORx Holdings, or OptumInsight provide those services—in Arkansas or anywhere else.

## **STANDARD OF REVIEW**

The State bears the burden of establishing personal jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight. *See e.g., Epps*, 327 F.3d at 647. Arkansas's long-arm statute extends jurisdiction over nonresidents to the limits of the Due Process Clause, so this Court may exercise personal jurisdiction only if doing so comports with due process. *See id.*; Ark. Code Ann. § 16-4-10.

There are two types of jurisdiction—general jurisdiction (sometimes called "all-purpose" jurisdiction) and specific jurisdiction (sometimes called "case-linked" jurisdiction). "A court with

general jurisdiction may hear any claim against [a] defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017). Specific jurisdiction, in contrast, exists only when "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden*, 571 U.S. at 284; *see also Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).

The Eighth Circuit applies a five-factor test for "assessing the sufficiency of the defendant's contacts" with the forum state: "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." *Morningside Church*, 9 F.4th at 619 (citation and quotation marks omitted). The first three factors are "of primary importance, while the fourth and fifth factors carry less weight." *Id.* at 620 (internal quotation marks omitted).

## ARGUMENT

This Court does not possess either general or specific jurisdiction over UHG, Optum, Inc., ORx Holdings, or OptumInsight. None of those companies is at home in Arkansas (so there is no general jurisdiction over them), and there are no factual allegations establishing that any of the companies has *any* contacts with Arkansas, much less suit-related contacts creating a substantial connection with the State (so there is no specific jurisdiction over them).

**I.      THE COURT LACKS GENERAL PERSONAL JURISDICTION OVER UHG, OPTUM, INC., ORX HOLDINGS, AND OPTUMINSIGHT BECAUSE NONE IS "AT HOME" IN ARKANSAS.**

General jurisdiction attaches only if a business "is fairly regarded as at home" in a state. *Daimler*, 571 U.S. at 137. In most cases, a company's "place of incorporation and principal place of business" are the only states that satisfy that requirement. *Daimler*, 571 U.S. at 137; *Royal*, 2016

4

U.S. Dist. LEXIS 109071, at *7 ("The Supreme Court has said that it is only in an exceptional case when a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial as to render the corporation at home in that state." (citing *Daimler*, 571 U.S. at 139 n.19)); *Valley View Agri, LLC v. Producers Coop. Oil Mill*, 2015 U.S. Dist. LEXIS 144956, at *10–11 (E.D. Ark. Oct. 26, 2015) ("It is . . . incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business.") (internal quotation marks and citation omitted).

The State alleges that UHG, Optum, Inc., and OptumInsight are organized under Delaware law with their principal places of business in Minnesota. Compl. ¶¶ 179, 189, 193. By the State's own allegations, those companies are at home in Delaware and Minnesota, not Arkansas.

ORx Holdings is also not at home in Arkansas. The State alleges that ORx Holdings is a Delaware LLC with its principal place of business in California. *Id.* ¶ 198; *see In re NHL Players' Concussion Injury Litig.*, 2019 U.S. Dist. LEXIS 175979, at *10 n.3 (D. Minn. Oct. 10, 2019) (a limited liability company is at home in its state of incorporation and principal place of business).

The Complaint contains no factual allegations that would render this an "exceptional case" when "a corporation's operations in a forum other than its formal place of incorporation or principal place of business [are] so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S. at 139 n.19. There are no factual allegations showing that any of the four companies has "affiliations with [Arkansas that] are so continuous and systematic as to render them essentially at home" in Arkansas. *Daimler*, 571 U.S. at 127 (citation omitted). The State offers no allegation that the companies' "contacts with Arkansas are more significant than the contacts they would have with any other state." *Merryman v. JP Morgan Chase Bank, N.A.*, 2015 U.S. Dist. LEXIS 156691, at *9 (W.D. Ark. Nov. 19, 2015).

5

Inasmuch as the State argues that OptumInsight consented to general jurisdiction in Arkansas by registering to do business in the State, the argument is meritless. Under Arkansas Code Ann. § 4-20-115, "[t]he appointment or maintenance in this state of a registered agent does not by itself create the basis for personal jurisdiction over the represented entity in this state." *See also Antoon v. Securus Techs., Inc.*, 2017 U.S. Dist. LEXIS 73179, at *8–9 (W.D. Ark. May 15, 2017) (interpreting § 4-20-115 and rejecting jurisdiction).

## II.   THE COURT LACKS SPECIFIC PERSONAL JURISDICTION OVER UHG, OPTUM, INC., ORX HOLDINGS, AND OPTUMINSIGHT BECAUSE THERE ARE NO FACTUAL ALLEGATIONS ESTABLISHING THAT ANY COMPANY HAS SUIT-RELATED CONTACTS WITH ARKANSAS, LET ALONE SUIT-RELATED CONTACTS CREATING A SUBSTANTIAL CONNECTION WITH THE STATE.

The Court also lacks specific personal jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight. Specific personal jurisdiction exists only when "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden*, 571 U.S. at 284; *see also Morningside Church*, 9 F.4th at 620 (the "proper question" for personal jurisdiction "is not where the plaintiff experienced a particular [alleged] injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way" (quoting *Walden*)).

The State's limited mentions of UHG, Optum, Inc., ORx Holdings, and OptumInsight in the Complaint appear mostly in allegations about the first three companies' status as OptumRx's corporate parents. But without more, a parent-subsidiary affiliation is never enough to support specific personal jurisdiction. *See, e.g.*, *Royal.*, 2016 U.S. Dist. LEXIS 109071, at *8 (citing *Epps*, 327 F.3d at 650); *see also Salerno Med. Assocs., LLP v. Riverside Med. Mgmt., LLC*, 542 F. Supp. 3d 268, 276 (D.N.J. 2021) (court lacked personal jurisdiction over four United entities: "At most, the four defendants are alleged to be related to UHIC and Riverside within the complex United corporate family tree. That is not enough." (citations omitted)).

6

Analyzing allegations in the Complaint that refer to UHG, Optum, Inc., ORx Holdings, or OptumInsight confirms that none describes contacts with Arkansas that give rise to the State's claims, much less describes suit-related contacts creating a substantial connection with the State.

**Paragraphs 179 and 180** contain information about UHG's places of business and incorporation, alleging only that it is an out-of-state company.

**Paragraphs 181 and 182** contain general information about UHG's business, revenues, and Fortune 500 ranking. Am. Compl. ¶¶ 181–82. Those allegations don't speak to specific jurisdiction. In the last sentence in paragraph 181, the State also alleges that UHG "offers" unidentified products and services "through" its subsidiary OptumRx (*id.* ¶ 181), but that conclusory allegation does not suggest that this case arises out of or relates to UHG's contacts with Arkansas, never mind that any unidentified suit-related conduct created a "substantial connection" between Arkansas and UHG. *Walden*, 571 U.S. at 284.

**Paragraphs 183 and 184** contain only conclusory allegations about UHG's corporate structure and statements that UHG is "directly involved in the conduct that caused the Insulin Pricing Scheme" and "directly involved in the company policies that inform its PBM services." Compl. ¶ 183–84. The State fails to explain how UHG was "directly involved." The State's allegation that UHG supposedly sets company-wide "overarching, enterprise-wide policies" (*id.* at 184) is a conclusion that says nothing about whether UHG has case-related contacts creating a substantial connection with Arkansas.

Insofar as the State is trying to use the allegations in Paragraphs 183 and 184 to pierce the corporate distinction between UHG and OptumRx, the allegations are insufficient. "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not

liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citation omitted). The State has not alleged facts coming close to suggesting that OptumRx and UHG are alter egos or justifying treating them as one and the same corporate entity. *See Epps*, 327 F.3d at 650; *Wesson v. Lamb Ab*, 2018 U.S. Dist. LEXIS 243939, at *16–18 (W.D. Ark, June 18, 2018); *Yanmar Co. v. Slater*, 2012 Ark. 36, at 18, 386 S.W.3d 439, 450 ("The fact that the officers of one corporation are also officers of another does not make the corporations the same, nor the acts of one the acts of the other.") (quoting *Mannon v. R. A. Young & Sons Coal Co.*, 207 Ark. 98, 103, 179 S.W.2d 457, 460 (1944)).

There is more. Under Arkansas Law, "it is only when the privilege of transacting business in corporate form has been illegally abused to the injury of a third person that the corporate entities should be disregarded." *Epps*, 327 F.3d at 649. Here, the Complaint is devoid of any allegations of illegal abuse, so there is no basis for disregarding the distinctions between UHG and OptumRx.

**Paragraph 185** contains an allegation that UHG, OptumRx, and OptumInsight executives met with Novo Nordisk in 2015 and Eli Lilly in 2016. But the State doesn't allege that any meeting took place in Arkansas—it says at least one of the alleged meetings occurred in Minnesota (Am. Compl. ¶ 185)—and Paragraph 185 otherwise contains no factual allegations about any suit-related contacts between Arkansas and UHG, Optum, Inc., ORx Holdings, or OptumInsight. *Walden*, 571 U.S. at 284 ("[T]he relationship must arise out of contacts that the defendant himself creates with the forum State.") (citation and quotation marks omitted). Nor does the State attempt to explain what happened at that purported meeting that facilitated the alleged "scheme."

**Paragraph 186** contains an allegation that "[*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail order pharmacies] . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to

ensure consistency of the brand and generic drug supply, and a reliance on that drug supply." Compl.

¶ 202 (brackets in complaint). The State purports to quote UHG's 2020 sustainability report, but it

took liberties with the report's text by replacing the word "we" with "UnitedHealth Group." Here is

what the quoted excerpt actually says:

> OptumRx works directly with pharmaceutical manufacturers to secure discounts
> that lower the overall cost of medications and create tailored formularies – or drug
> lists – to ensure people get the right medications. We then negotiate with
> pharmacies to lower costs at the point of sale. We also operate prescription home
> delivery . . . . We work directly with drug wholesalers and distributors to ensure
> consistency of the brand and generic drug supply, and a reliance on that drug
> supply.

*UnitedHealth       Group       2020       Sustainability       Report*       (2021),

https://unitedhealthgroup.com/content/dam/UHG/PDF/sustainability/final/2020_SustainabilityRe

port.pdf.[2] In context, the excerpt confirms that the word "We"—which the State replaced with

"UnitedHealth Group" in brackets—refers to OptumRx, not UHG. Regardless, the State cannot

erase the corporate form by using the word "We" in a regulatory filing to refer to a corporate

family. Under the law, "it is only when the privilege of transacting business in corporate form has

been illegally abused to the injury of a third person that the corporate entities should be

disregarded." *Epps*, 327 F.3d at 649. The State has not even tried to allege facts along those lines.[3]

---

[2] At the motion-to-dismiss stage, this Court may consider "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *accord Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015).

[3] The State's mischaracterization of the sustainability report would be bad enough in a vacuum, but in this case, the State copied the doctored allegation from a complaint that the State of Mississippi filed and did so after UHG pointed out the allegation's falsity in moving to dismiss Mississippi's complaint. *See Mississippi ex rel. Fitch v. Eli Lilly et al.*, No. 21-cv-00674 (S.D. Miss.), ECF No. 71 (Feb. 17, 2022) (Third Am. Compl. at ¶ 195) *and* ECF No. 88 (Mar. 21, 2022) (Mem. Supporting Mot. to Dismiss for Lack of Personal Jurisdiction at pp. 11–12) (pointing out the allegation's falsity).

Paragraphs 187 and 188 contain threadbare, conclusory allegations that "UnitedHealth Group executives structure, analyze and direct the company's overarching policies, including with respect to PBM and mail-order services, as a means of maximizing profitability across the corporate family" and that "UnitedHealth Group's conduct had a direct effect in Arkansas and damaged diabetics and payors in Arkansas and the State." Am. Compl. ¶¶ 187, 188. Those allegations, which are just another attempt to create jurisdiction over UHG based on its status as one of OptumRx's parent companies, do not establish that UHG engaged in suit-related conduct creating a substantial connection with Arkansas. *See Walden*, 571 U.S. at 290 ("The proper question is not whether the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

Insofar as the State is trying to use the allegations in Paragraphs 187 and 188 to pierce the corporate distinction between UHG and OptumRx, the allegations are insufficient. "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *Bestfoods*, 524 U.S. at 61 (internal quotation marks and citation omitted). The State has not alleged facts that would come close to suggesting that OptumRx and UHG are alter egos or that the corporate form has been "illegally abused" to the State's injury. *See Wesson*, 2018 U.S. Dist. LEXIS 243939, at *14 & n.4 (under Arkansas law, the corporate form should only be disregarded if "the privilege of transacting business in corporate form has been illegally abused to the injury of a third person" or "when a corporate alter ego is essentially being used to avoid the effects of the statutes in issue, thereby allowing corporations to do indirectly what they could not do directly.") (quotations omitted).

10

Paragraph 211 includes an allegation about UHG's corporate parenthood. UHG's status as OptumRx's parent company is not sufficient to subject it to specific personal jurisdiction in Arkansas.

Paragraph 360 includes an allegation that Eli Lilly discussed paying UHG and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. Am. Compl. ¶ 360. But the State alleges no substantial suit-related connection to Arkansas, which is required for the Court to exercise specific personal jurisdiction. *See, e.g., Epps*, 327 F.3d at 650.

Paragraphs 189 and 190 include factual allegations about Optum, Inc.'s place of business and incorporation and alleges that Optum, Inc. is a "health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc." Even taken as true, "managing" a subsidiary is not enough for specific jurisdiction over the parent. *See Epps*, 327 F.3d at 649; *Goellner-Grant v. Platinum Equity LLC*, 341 F. Supp. 3d 1022, 1030 (E.D. Mo. Sept. 18, 2018) ("a parent corporation may be directly involved in financing and macro-management of its subsidiaries without exposing itself to a charge that each subsidiary is merely its alter ego." (internal quotation marks and citation omitted)).

Paragraph 191 alleges that Optum, Inc. is "directly involved" in "company policies" that "inform" PBM services. Am. Compl. ¶ 191. We don't know what that means, but in any event, those allegations fail for the same reasons that the allegations in Paragraphs 183 and 184 fail as to UHG.

Paragraph 192 alleges that Optum, Inc. "is directly responsible for the 'business units—OptumInsight, OptumHealth and OptumRx' and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail-order activities." Am. Compl. ¶ 192. But, like paragraph 191, this allegation is insufficient

to subject Optum, Inc. to specific personal jurisdiction. *See Epps*, 327 F.3d at 649. This is nothing more than an allegation that Optum, Inc. manages subsidiaries, an allegation insufficient to disregard the separate corporate entities. *Goellner-Grant*, 341 F. Supp. 3d at 1030 ("[A] parent corporation may be directly involved in financing and macro-management of its subsidiaries without exposing itself to a charge that each subsidiary is merely its alter ego." (internal quotation marks and citation omitted)). And in any case, the allegation says nothing about suit-related conduct creating a connection to Arkansas, much less a substantial connection.

**Paragraphs 193–195** allege OptumInsight's place of incorporation and principal place of business and then allege that OptumInsight is registered to do business in Arkansas and holds a Third-Party Administrator License in the state. Compl. ¶¶ 193–95. Those allegations are not sufficient to establish general jurisdiction over OptumInsight. *See, e.g.,* Ark. Code Ann. § 4-20-115; *Antoon v. Securus Techs., Inc.*, 2017 U.S. Dist. LEXIS 73179, at *8–9 (W.D. Ark. May 15, 2017). The State offers no factual allegations connecting OptumInsight's alleged registration or license to the State's underlying claims, let alone creating a substantial connection to Arkansas.

**Paragraphs 196, 197, and 360** allege that OptumInsight "provides data, analytics and consulting to companies with [sic] the healthcare industry, including the Manufacturer Defendants," that OptumInsight "is an integral part of the Insulin Pricing Scheme, and during the relevant time period, OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy" by analyzing, compiling, and sharing data in furtherance of the alleged scheme. *Id.* at ¶¶ 196, 197, 360. There are no factual allegations showing that OptumInsight's supposed analysis or consulting work occurred in Arkansas, and the State doesn't explain how that analysis or consulting relates to its underlying claims or created a substantial connection with the State. Nor does the State ever explain what OptumInsight allegedly did wrong. The State's threadbare allegations about

12

OptumInsight do not establish a substantial suit-related connection between OptumInsight and Arkansas, and the State may not otherwise establish specific jurisdiction over OptumInsight by virtue of its affiliation with OptumRx.

**Paragraphs 198–200** include allegations about ORx Holdings' places of business and incorporation; the State then alleges in conclusory fashion that ORx Holdings "provides pharmacy benefit management services through its subsidiaries to various payors in Arkansas." Compl. ¶¶ 198–200. Again, without more, a parent–subsidiary affiliation is never enough to support specific personal jurisdiction. *See, e.g.*, *Royal.*, 2016 U.S. Dist. LEXIS 109071, at *8 (citing *Epps*, 327 F.3d at 650); *see also Salerno Med. Assocs.*, 542 F. Supp. 3d at 276.

**Paragraphs 205–207** contain the State's attempt to manufacture specific jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight by defining all those companies together as "OptumRx." *See* Compl. ¶ 206 ("Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, and Optum, Inc., including all predecessor and successor entities are referred to as "OptumRx."). But the law requires a plaintiff to allege facts showing that *each* defendant has the required suit-related contacts with Arkansas. *See Epps*, 327 F.3d at 650; *Yanmar Co. v. Slater*, 2012 Ark. 36, at 18, 386 S.W.3d 439, 450 ("The fact that the officers of one corporation are also officers of another does not make the corporations the same, nor the acts of one the acts of the other.") (quoting *Mannon*, 207 Ark. at 103, 179 S.W.2d at 460). The Court could exercise personal jurisdiction based on those allegations only if the State had alleged facts showing that the Court could pierce the corporate veil under an alter ego theory of "illegal abuse," which, for the reasons stated above, it cannot. *See Wesson*, 2018 U.S. Dist. LEXIS 243939, *16–18. The State's improper attempt to define all five entities as "OptumRx" also fails because the State alleges that it is suing "OptumRx" "in its capacities as a PBM and mail-order pharmacy."

Compl. ¶ 207. But beyond alleging that UHG, Optum, Inc., ORx Holdings, and OptumInsight are affiliated with OptumRx, the State does not allege that any of those companies provide PBM or mail-order pharmacy services—in Arkansas or anywhere else.

* * *

What the State is really suggesting through its conclusory allegations is that courts may always impute a subsidiary's alleged acts to a parent company for jurisdictional purposes. But there are no factual allegations that would justify this Court's taking "the extraordinary step under Arkansas law of piercing the corporate veil pursuant to an alter-ego theory." *Wesson*, 2018 U.S. Dist. LEXIS 243939, at *17.

Applying the Eighth Circuit's five-factor test also confirms that this Court lacks jurisdiction over UHG, Optum, Inc., ORx Holdings, and OptumInsight. The first three factors—which focus on the nature, quality, and quantity of the defendant's alleged contacts with the forum state—do not support the exercise of jurisdiction over UHG, Optum, Inc., ORx Holdings, or OptumInsight because the State has not alleged suit-related contacts with Arkansas for those entities, let alone suit-related contacts creating a substantial connection with the State. The State's allegations against those entities focus on their relationship to OptumRx, not on their suit-related contacts with Arkansas. And because the first three factors do not support the exercise of jurisdiction, the final two factors—which carry less weight and focus on Arkansas's interest in providing a forum for its residents and the convenience of the parties—cannot make up for the absence of constitutionally required minimum contacts with Arkansas. *See Antoon*, 2017 U.S. Dist. LEXIS 73179, at *15 (holding that where a more important factor "weighs so lopsidedly against the exercise of specific jurisdiction," it is outcome-determinative).

If a plaintiff could establish specific jurisdiction over a parent company by alleging in conclusory fashion that the parent sets a corporate family's "overarching policies" (*compare Am.*

14

Compl. ¶ 187), then the corporate form would mean nothing for most publicly held companies. That is not the law.

## **CONCLUSION**

The Court should dismiss the Complaint against UHG, Optum, Inc., ORx Holdings, and OptumInsight for lack of personal jurisdiction.

Respectfully submitted,

**UNITEDHEALTH GROUP, INCORPORATED; OPTUM, INC.; OPTUMRX HOLDINGS, LLC; OPTUMINSIGHT, INC.**

*/s/ Baxter Drennon*
Baxter D. Drennon, No. 2010147
**HALL BOOTH SMITH, P.C.**
500 President Clinton Ave., Suite RL 20
Little Rock, AR 72201
T: (501) 319-6996
bdrennon@hallboothsmith.com

Brian D. Boone (*pro hac vice*)
**ALSTON & BIRD LLP**
101 S. Tryon St., Ste. 4000
Charlotte, NC 28280
T: (704) 444-1000
brian.boone@alston.com

Elizabeth Broadway Brown (*pro hac vice*)
Andrew Hatchett (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 W. Peachtree Street, N.W., Ste. 4900
Atlanta, GA 30309-3424
T: (404) 881-4688
liz.brown@alston.com
andrew.hatchett@alston.com

Jean Richmann (*pro hac vice*)

15

**ALSTON & BIRD LLP**
506 Mission St., Ste. 2100
San Francisco, CA 94105
T: (415) 243-1000
jean.richmann@alston.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2022 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Baxter Drennon
OF COUNSEL