# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| THE STATE OF ILLINOIS, EX REL., KWAME RAOUL, ATTORNEY GENERAL<br><br>*PLAINTIFF,*<br><br>v.<br><br>ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; MEDCO HEALTH SOLUTIONS, INC; CVS HEALTH CORPORATION; CVS PHARMACY, INC; CAREMARK RX, LLC; CAREMARKPCS HEALTH, LLC; CAREMARK, LLC; UNITEDHEALTH GROUP, INC.; OPTUMRX INC.; AND OPTUMINSIGHT, INC.<br><br>*DEFENDANTS.* | Case No. 1:23-CV-00170 |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO EVERNORTH HEALTH, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND .............................................. 2

ARGUMENT .......................................................................................................... 8

  I.   Legal Standard ........................................................................................... 8

  II.  The State's Factual Allegations Are Uncontroverted, and Must Be Accepted As True..... 9

  III.  The Uncontroverted Facts Satisfy Federal Due Process for Specific Personal Jurisdiction Over Evernorth.................................................................... 9

      A.   Evernorth purposefully directed its activities at Illinois. ................................. 10

          1.   Evernorth's conduct was both intentional and tortious. ...................... 10

          2.   Evernorth's conduct was expressly aimed at Illinois. ......................... 11

          3.   Evernorth knew that the State and Illinois diabetics would be injured in Illinois.................................................................................... 13

      B.   Evernorth's contacts with Illinois directly relate to the State's claims against them. .................................................................................... 14

      C.   This Court's exercise of jurisdiction comports with fair play and substantial justice. ................................................................................... 15

  IV.  Alternatively, the State is Entitled to Jurisdictional Discovery Regarding Evernorth's Illinois Contacts, Involvement in the Scheme, and Corporate Structure........................ 17

CONCLUSION...................................................................................................... 18

## TABLE OF AUTHORITIES

### CASES

*Bishop v. Cross*,
   2015 WL 7008178 (S.D. Ill. Nov. 12, 2015) .......................................................... 5

*BRABUS GmbH v. Individuals Identified on Schedule A Hereto*,
   2022 WL 7501046 (N.D. Ill. Oct. 13, 2022) ........................................ 11, 12, 13, 17

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ......................................................................................... 10, 15

*Calder v. Jones*,
   465 U.S. 783 (1984) ......................................................................................... 10, 15

*Felland v. Clifton*,
   682 F.3d 665 (7th Cir. 2012) .............................................................. 8, 10, 11, 13

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
   141 S. Ct. 1017 (2021) .............................................................................. 9, 13, 14, 15

*Gilman Opco LLC v. Lanman Oil Co.*,
   2014 WL 1284499 (N.D. Ill. Mar. 28, 2014) ................................................. 17, 18

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) .............................................................................................. 9

*John Crane, Inc. v. Shein Law Ctr., Ltd.*,
   891 F.3d 692 (7th Cir. 2018) ................................................................................ 8

*Kosar v. Columbia Sussex Mgmt., LLC*,
   2021 WL 4499494 (N.D. Ill. June 1, 2021) ....................................................... 18

*Leong v. SAP Am., Inc.*,
   901 F. Supp. 2d 1058 (N.D. Ill. 2012) ................................................................. 9

*Lexington Ins. Co. v. Hotai Ins. Co., LTD.*,
   938 F.3d 874 (7th Cir. 2019) ............................................................................... 8

*NBA Properties, Inc. v. HANWJH*,
   46 F.4th 614 (7th Cir. 2022) ......................................................................... 12, 13

*Northwest 1 Trucking Inc. v. Haro*,
   613 F. Supp. 3d 1081 (N.D. Ill. 2020) ....................................................... 5, 15, 16

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.*,
   338 F.3d 773 (7th Cir. 2003) ............................................................................... 8

*Riverdale Plating & Heat Treating, LLC v. Andre Corp.*,
    2015 WL 5921896 (N.D. Ill. Oct. 9, 2015) ................................................................ 8

*Rose v. Franchetti*,
    713 F. Supp. 1203 (N.D. Ill. 1989) ........................................................................ 8

*Tamburo v. Dworkin*,
    601 F.3d 693 (7th Cir. 2010) ..................................................................... 9, 10, 11

*Treadwell v. McHenry Cnty*,
    193 F. Supp. 3d 900 (N.D. Ill. 2016) .......................................................................... 5

*uBID, Inc. v. GoDaddy Group, Inc.*,
    623 F.3d 421 (7th Cir. 2010) .................................................................. 13, 14, 16

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................... 12

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ......................................................................................... 15

## STATUTES

815 ILCS 505/2 ................................................................................................ 4

815 ILCS 505/7 ................................................................................................ 4

815 ILCS 510/2 ................................................................................................ 4

## EXHIBIT INDEX

Exhibit 1 - Declaration of Amy Bricker ............................................................... 5, 6, 11

The State of Illinois (the "State") submits this opposition to the Rule 12(b)(2) Motion to Dismiss filed by Defendant Evernorth Health, Inc. ("Evernorth").

## INTRODUCTION

For nearly twenty years Illinois diabetics and health plan payors have been increasingly overcharged for necessary diabetes medications due to the unfair and deceptive practices of Evernorth and other Defendants. The State of Illinois filed suit in Illinois state court to put an end to the Defendants' conduct and to recover the overpayments made by Illinois diabetics. (*See, e.g.,* ¶¶ 34–35, 498).[1] The claims are based on Illinois law, including the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), and, in part, arise from the State's sovereign interest in protecting the health and safety of Illinoisans as well as the integrity of the State's marketplace. (¶ 36–37).

Evernorth has not disputed the State's allegations regarding its involvement in the Insulin Pricing Scheme or the devastating impact the Scheme has had in Illinois. Rather, Evernorth seeks to evade suit in Illinois by mischaracterizing the State's claims to be solely based on its status as the parent company of the Express Scripts Defendants (Dkt. 50 at 4, 7-9). However, the uncontroverted allegations and evidence show that Evernorth in fact conducted Scheme-related activities that it specifically targeted at Illinois. The State's allegations against Evernorth extend far beyond its role as a parent company and include its own direct involvement in formulating and executing the Scheme, and providing PBM services in furtherance thereof. (¶¶ 121-26, 129, 156, 319-21). The conduct of Evernorth had the intended and foreseeable effect of harming Illinois diabetics and the State. (¶¶ 12, 350-51). Evernorth provided no affidavits or evidence to contest

---

[1] All references in this Memorandum to parenthetical paragraph citations are citations to the individually numbered paragraphs of the Complaint (Dkt. 1-1).

the State's allegations, about its own forum contacts or its assistance of other Defendants in violations of the ICFA and the UDTPA.

The complaint contains more than sufficient allegations of forum-related contacts by Evernorth to support this Court's exercise of jurisdiction over it. The Mississippi court's decision cited by Evernorth, (Dkt. 50 at 8-9), is inapposite because the facts and law under which this Court must assess jurisdiction are different. Under the uncontroverted factual allegations and the law of Illinois, this Court has jurisdiction over Evernorth and its Rule 12(b)(2) Motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Over 1.3 million Illinoisans live with diabetes, a disease that would severely harm or kill them without medication like insulin, a drug that now costs thousands annually for a single diabetic. (¶¶ 1, 4, 225, 250). An insulin product that was originally priced at $20 when released in the late 1990s, now ranges between $300 and $700. (¶¶ 13–14). In recent years especially, the price of the drug has skyrocketed. In the last decade alone, insulin prices have increased as much as 1000%. (¶¶ 15, 261, Figs. 2–6).

As a result, one in four diabetics skip or ration critical doses which, in turn, leads to further health complications and additional costs. (¶¶ 30, 31, 262, 289, 444, 456–57, 464). In Illinois, the State has spent billions of dollars on increased healthcare costs for diabetes and related complications. (¶¶ 31–33, 289, 456–61).

Tellingly, the drug has not changed in the past 20 years, and there has been little to no innovation in the product itself—today's $350 insulin is the exact drug originally priced at $20. (¶¶ 17, 242–54). In fact, it costs the Manufacturer Defendants less than $2 to make. (¶¶ 14, 490). Normal market forces are not at work. (¶¶ 331–34, 370–71).

*The Insulin Pricing Scheme*

The Manufacturer Defendants dominate the diabetes drug market, manufacturing 99% of insulins on the market. (¶¶ 5, 258). The Manufacturers also, in coordination with the PBMs, set the list price for their diabetes drugs. (¶¶ 20, 291, 340). The list price is the basis for the price that nearly every consumer and payor pays for the at-issue drugs. (¶¶ 27, 356).

The PBM Defendants control 80% of the market and manage the pharmacy benefits for the vast majority of Illinoisans. (¶¶ 6, 310). In this role, the PBM Defendants establish drug lists called formularies that determine which diabetes drugs are covered and not covered for nearly every payor in Illinois. (¶¶ 7, 9, 291, 335). Most prescribing doctors and patients, of course, opt for covered medications. (¶¶ 7–11). PBMs thus effectively control utilization of the at-issue drugs. (¶¶ 6–11, 335). In short, the Manufacturers control the product, the PBMs control the buyers, and collectively these two groups of Defendants control the price paid by nearly every diabetic and payor in Illinois. (¶¶ 331–51).

Knowing the importance of price, volume, and access, the Manufacturers and PBMs work together to maximize their own profits to the detriment of Illinoisans. (¶¶ 6–11, 351). Given that the PBMs and Manufacturers treat diabetes drugs as interchangeable, formulary inclusion depends on which Manufacturer increases the PBM's bottom lines the most. (¶¶ 22, 242–54, 331, 361–62). The Manufacturers, knowing formulary position directly correlates to sales volume, simply raise their reported prices and then secretly kick back a significant portion of that price to the PBM Defendants (referred to as "Manufacturer Payments"). (¶¶ 10, 20, 296–300, 336, 340, 344, 358–62). The Manufacturers also know that every way the PBMs make money off the at-issue drugs is directly tied to the inflated list prices. (¶¶ 338, 375, 385). It is a win-win for Defendants: the PBMs make money from the increased prices and the secret kick back payments, while the Manufacturers

lock in huge volume and maintain their own profit margins. (¶¶ 23–24, 372–375, 406, 409). The result, however, is unconscionable—the most expensive diabetes drugs end up on the formularies used by most Illinoisans and both Illinois diabetics and the State end up paying more so the Defendants can profit. (¶¶ 22, 333, 344–46, 351, 361–62).

### *The State's Claims*

The State brought suit in Illinois state court against the Manufacturer Defendants and the PBM Defendants for violations of the ICFA, the UDTPA, and unjust enrichment. (¶¶ 483–500). The State sued on behalf of the hundreds of thousands of Illinoisans injured by the Insulin Pricing Scheme. (¶¶ 34, 214–215).

The ICFA and UDTPA prohibit unfair and deceptive trade practices in the conduct of trade or commerce within Illinois. 815 ILCS 505/2; 815 ILCS 510/2. The complaint alleges that each Defendant's conduct and involvement in the Insulin Pricing Scheme was both unfair and deceptive in violation of the ICFA and UDTPA and caused injury in Illinois to over a million Illinois diabetics. (¶¶ 483–491). Each purchase of the at-issue drugs at prices resulting from the Insulin Pricing Scheme, by any Illinois resident, constitutes a separate violation of the Acts. 815 ILCS 505/7. Because Illinois diabetics continue to pay for the at-issue drugs based on the false prices generated by the Insulin Pricing Scheme, the harm is ongoing. (¶¶ 469).

### *Relevant Jurisdictional Facts*

The complaint sets forth the following uncontroverted facts related to Evernorth's involvement in the Insulin Pricing Scheme and related forum contacts:

- Evernorth's executives and employees, including its CEO Tim Wentworth, shape policies related to the Insulin Pricing Scheme, including the policies that inform Evernorth's PBM services and formulary construction with respect to the at-issue drugs. (¶ 121).

     o  In fact, Evernorth did more than shape policies. Evernorth's Senior Vice President of Sales, William Spehr, prepares Express Scripts' bids to payor entities. (*See* Declaration of Amy Bricker, *Cigna Corp. v. Amy Bricker and CVS Health Corp.*, E.D. Mo. Case No. 4:23-cv-0093-JMB, ECF 40-1, attached as Exhibit 1, ¶ 23).[2] These bids include rebate guarantees and formulary design, submitted to specific payor entities to induce them to hire Express Scripts as their PBM. (*Id.*). Evernorth – not some other Express Scripts Defendant – establishes the PBM sales targets, and Evernorth's sales unit, under Mr. Spehr, spends "virtually all of its time selling PBM" services. (*Id.* at ¶¶ 25, 40).

     o  Evernorth's Chief Underwriter, Frank McGoldrick, chairs the pricing committee whose purpose is to review and approve PBM client proposals. (*Id.* at ¶ 59.)

     o  Evernorth's current President and CEO, Eric Palmer, personally supervises Mr. Spehr and Mr. McGoldrick in their conduct of these functions. (*Id.* at ¶¶ 42-43.)

- Evernorth is the parent of mail order pharmacy and PBM subsidiaries ("Express Scripts Defendants") that operate throughout Illinois. (¶ 127).

- Evernorth and the Express Scripts Defendants share numerous directors and executives. Through these shared directors and executives, Evernorth had direct involvement in the at-issue formulary construction, Manufacturer Payments, and mail order pharmacy services. (¶ 156). Evernorth and the Express Scripts Defendants conduct business in Illinois, provide

---

[2] "The Court can consider facts outside the pleadings on a motion to dismiss for lack of personal jurisdiction." *Northwest 1 Trucking Inc. v. Haro*, 613 F. Supp. 3d 1081, 1086 (N.D. Ill. 2020) (Seeger, J.) (citation omitted). "Court documents are, of course, public records of which the Court can take judicial notice." *Treadwell v. McHenry Cnty*, 193 F. Supp. 3d 900, 906 (N.D. Ill. 2016) (*quoting Bishop v. Cross*, 2015 WL 7008178, at *1 n.2 (S.D. Ill. Nov. 12, 2015)).

PBM services throughout Illinois, and provide mail order pharmacy services throughout Illinois. (¶¶ 121-155).

- Evernorth executives and employees regularly communicate with, direct, and control the Express Scripts Defendants related to the at-issue PBM services, formulary activities, Manufacturer Payments, and mail order pharmacy services, including those in Illinois, which gave rise to the Insulin Pricing Scheme and injured Illinois and the State. (¶¶ 123, 126, 156).

    o As discussed above, Evernorth did more than just direct and control the Express Scripts Defendants' PBM services. Evernorth itself prepared the bids to be presented to secure PBM business, and sold the Express Scripts Defendants' PBM services. (Ex. 1 at ¶¶ 23, 25, 40.)

- Repeatedly, continuously, and explicitly throughout the relevant time period, Evernorth represented that it is one of the largest PBMs in North America, is involved in the selection of drugs for its client's formularies, offers home delivery pharmacy services, and works with drug manufacturers. (¶ 129).

- Evernorth is a member of the Pharmaceutical Care Management Association ("PCMA"), the main trade association for PBMs. Indeed, Tim Wentworth, the CEO of Evernorth, served as a member of the PCMA's Board of Directors. (¶¶ 319-20). Through this leadership position, Evernorth exercises control over the PCMA, which is central to the Insulin Pricing Scheme. (¶¶ 318-21). Evernorth and the other PBM Defendants have utilized the PCMA to further their interests and to hide the Insulin Pricing Scheme by filing lawsuits and launching lobbying campaigns aimed at blocking drug pricing transparency efforts. (¶ 330).

- Multiple times a year, from at least 2010 to 2019, Evernorth representatives attended PCMA meetings and met privately with each of the Manufacturer Defendants for the purpose of developing and maintaining the Insulin Pricing Scheme. (¶¶ 318, 322, 325). Notably, key at-issue lockstep price increases were made shortly after these Scheme-related meetings. (¶¶ 328-29).

- Throughout the relevant period, Evernorth executives, including its CEO Tim Wentworth, directly engaged with the Manufacturer Defendants in furtherance of the Insulin Pricing Scheme. (¶¶ 121, 124). Each of the Manufacturers has a team of executives dedicated exclusively to interacting with Evernorth. (¶ 124). The Manufacturers and Evernorth, through the intimacy and connection of their leaders, develop and agree on strategic initiatives used to effectuate the Insulin Pricing Scheme. (¶ 125).

- In at least 2013, 2014, 2015, 2017, and 2018, Evernorth executives met with executives of Manufacturer Eli Lilly to discuss their coordinated efforts related to the at-issue drugs, in furtherance of the Insulin Pricing Scheme. (¶ 126).

- In at least 2013, 2014, and 2016, leaders of Evernorth also held executive meetings with leaders of Manufacturer Defendant Novo Nordisk to discuss their coordinated efforts related to the at-issue drugs, in furtherance of the Insulin Pricing Scheme. (¶ 126).

- In at least 2014, 2015, 2016, and 2017, the Chairman and CEO of Evernorth, among others Evernorth leaders, participated in "Customer Exchange" and PCMA executive meetings with executives of Manufacturer Defendant Sanofi, in furtherance of the Scheme. (¶ 126).

- Evernorth's conduct has had a direct effect in Illinois and damaged diabetics and payors in Illinois. (¶ 122).

# ARGUMENT

This Court has personal jurisdiction over Evernorth and its Rule 12(b)(2) motion should be denied.

## I. Legal Standard

"A federal court may exercise personal jurisdiction over a foreign defendant only to the extent permitted by the forum state's long-arm statute and by the Due Process Clause." *Lexington Ins. Co. v. Hotai Ins. Co., LTD.*, 938 F.3d 874, 878 (7th Cir. 2019). Illinois' long-arm statute is co-extensive with federal constitutional requirements; therefore, the Court must only determine if the exercise of personal jurisdiction over Evernorth comports with due process. *John Crane, Inc. v. Shein Law Ctr., Ltd.*, 891 F.3d 692, 695 (7th Cir. 2018).

"[W]here, as here, [personal jurisdiction] is raised on a motion to dismiss, the plaintiff need only make a prima facie showing of jurisdictional facts." *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). In evaluating the *prima facie* showing, the "plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citation omitted). The Court does not merely construe explicitly contradictory disputes in the plaintiff's favor; even ambiguities and uncertainties in a defendant's evidence are construed in a light most favorable to personal jurisdiction. *Rose v. Franchetti*, 713 F. Supp. 1203, 1205 n.1 (N.D. Ill. 1989). "District courts ruling on Rule 12(b)(2) motions . . . must perform a flexible, all-things-considered inquiry into whether the defendant has 'purposefully avail[ed]' itself of the forum State's laws such that it would be 'fair' to subject it to suit there." *Riverdale Plating & Heat Treating, LLC v. Andre Corp.*, 2015 WL 5921896, at *3 (N.D. Ill. Oct. 9, 2015) (alteration in original).

8

## II. The State's Factual Allegations Are Uncontroverted, and Must Be Accepted As True.

As set forth above, the complaint alleges more than sufficient facts to demonstrate Evernorth's involvement in the Scheme and suit-related contacts with the State. It is telling that, while Evernorth attempts to minimize the State's allegations, mischaracterizing the claims as being based on its capacity as the Express Scripts Defendants' parent, (Dkt. 50 at 4, 7-9), it does not provide any affidavit or evidence to contradict the allegations. As a result, the allegations of the complaint are taken as true. *Leong v. SAP Am., Inc.*, 901 F. Supp. 2d 1058, 1061 (N.D. Ill. 2012) (in ruling on a 12(b)(2) motion, "[t]he Court must accept the plaintiff's uncontroverted allegations as true").

## III. The Uncontroverted Facts Satisfy Federal Due Process for Specific Personal Jurisdiction Over Evernorth.

The State's allegations are sufficient to support the exercise of specific personal jurisdiction over Evernorth based on its own involvement in the Scheme and contacts with Illinois.[3] The State alleges that Evernorth had suit-related contacts in Illinois. Moreover, its actions taken elsewhere were purposely directed at Illinois and had a foreseeable and intended effect in Illinois, thus subjecting it to jurisdiction here.

Federal due process requires a defendant have "such contacts with the forum State that the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). "[J]urisdiction cannot be avoided merely because the defendant did not physically enter the forum State." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (citing *Burger*

---

[3] The State does not contend that this Court has general jurisdiction over Evernorth.

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotations omitted). The key question is whether the defendant had minimum contacts and "should reasonably anticipate being haled into court there." *Id.* (internal quotations omitted).

The Seventh Circuit considers three elements to evaluate whether the exercise of specific jurisdiction comports with due process:

> (1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice.

*Felland*, 682 F.3d at 673 (citations omitted).

### A. Evernorth purposefully directed its activities at Illinois.

"Where a plaintiff's claim is for an intentional tort, the inquiry focuses on whether the conduct underlying the claim[] was purposely directed at the forum state." *Felland*, 692 F.3d at 674 (citations and internal quotations omitted). The Seventh Circuit applies the effects test established by *Calder v. Jones*, 465 U.S. 783 (1984), to analyze purposeful direction. *Id.* It has "distilled three requirements from *Calder* for determining whether conduct was 'purposefully directed' at the forum state":

> (1) intentional conduct (or 'intentional and allegedly tortious conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt – that is, the plaintiff would be injured – in the forum state.

*Felland*, 692 F.3d at 674-75 (citation omitted). "If the plaintiff makes these three showings, he has established that the defendant purposefully directed his activity at the forum state." *Id.* at 675 (internal quotations omitted).

### 1. Evernorth's conduct was both intentional and tortious.

The Seventh Circuit has noted a circuit split on whether the first prong of the *Calder* test requires conduct that is only intentional, or intentional and tortious. *Tamburo*, 601 F.3d at 704. It

has not taken a side, however, because the plaintiffs' allegations in the cases before it met the requirements of both intent and tortiousness. *Id.*; *Felland*, F.3d at 674, n.2. The same is true here.

As alleged by the State, Evernorth was directly involved in PBM services, pharmacy services, formulary construction, mail order pharmacy services, and Manufacturer Payments in furtherance of the Insulin Pricing Scheme, and publicly touted its involvement in those functions, though misrepresenting its aims. (¶¶ 121-23, 129, 156). In reality, evidence shows that Evernorth *itself* designed and approved the PBM bids for potential clients, including the rebate and formulary aspects at issue in this case, and then sold those PBM services through its own sales unit. (Ex. 1 at ¶¶ 23, 25, 40, 42-43, 59). Evernorth specifically offered the Evernorth-designed and -approved PBM services in Illinois, created formularies for use in Illinois, and dispensed the at-issue drugs in Illinois through its mail-order pharmacies. (¶¶ 157, 164, 167, 170, 174). These PBM, pharmacy, and formulary construction functions were ongoing throughout the relevant period, and plainly constitute intentional acts by Evernorth. Further, by carrying out these functions in the manner alleged by the State, Evernorth's intentional conduct was also tortious.

The State further alleges that Evernorth was a member of the PCMA and exerted control over the PCMA through PCMA board positions. (¶¶ 319-20). It alleges that the PCMA, under Evernorth's control, brought numerous lawsuits and lobbying campaigns to block drug pricing transparency efforts, and block rebate regulations that would impede the Scheme. (¶ 330). Evernorth engaged in these efforts to conceal the Insulin Pricing Scheme. (*Id.*). These acts by Evernorth are also intentional and tortious.

### 2. Evernorth's conduct was expressly aimed at Illinois.

In *BRABUS GmbH v. Individuals Identified on Schedule A Hereto*, the defendant online retailer disputed personal jurisdiction for claims that it attempted to sell counterfeit goods into Illinois. 2022 WL 7501046, at *2 (N.D. Ill. Oct. 13, 2022) (Seeger, J.). The record included (1) a

screenshot showing the retailer was willing to sell to a buyer in Illinois, and (2) a chat-log confirming the retailer could ship a product to Illinois and providing a quote on the seller's price to ship to that zip code. *Id.* at *3. The Court held that:

> Those communications are more than enough to show purposeful availment. Defendant was ready, willing, and able to ship products to a specific address in the Chicagoland suburbs. It purposefully directed its actions toward Illinois. Defendant subjected itself to jurisdiction here by demonstrating a willingness to sell products here.

*Id. See also NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 622 (7th Cir. 2022) (reiterating prior opinion that, when a company stands ready to do business with Illinois residents, that is a key fact in finding contacts sufficient to satisfy due process).

Evernorth cites to *Walden v. Fiore*, 571 U.S. 277 (2014), and suggests that its suit-related conduct does not connect it to Illinois. (Dkt. 50 at 6). However, the facts of *Walden* are highly distinguishable from the facts alleged here. The defendant in *Walden* was a law enforcement officer working at the Atlanta airport as part of a drug interdiction program. *Walden*, 51 U.S. at 279. The officer, in Atlanta, seized cash of questionable origin from the plaintiffs, who happened to be residents of Nevada traveling through the Atlanta airport. *Id.* at 280. Because the officer had acted entirely in Georgia, in no way targeting Nevada, the Supreme Court held that Nevada lacked jurisdiction. *Id.* at 291.

Here, in direct contrast to *Walden*, Evernorth intentionally designed bids for PBM services to *Illinois* payors, sold those PBM services to *Illinois* payors, provided PBM services *to Illinoisans*, created formularies for use *in Illinois*, and dispensed the at-issue drugs *to Illinoisans in Illinois*. Evernorth also intentionally, through the PCMA, brought lawsuits and campaigns to perpetuate the Scheme and hide it from the State and Illinoisans. Each of these intentional acts was expressly aimed at Illinois. Evernorth's Illinois-aimed conduct is markedly more extensive than the contacts

12

alleged in *BRABUS* and *NBA Properties*, where this Court and the Seventh Circuit found jurisdiction proper. *See BRABUS*, 2022 WL 7501046, at *3 (sufficient basis for jurisdiction based on *willingness* to sell into Illinois, without evidence of actual sale); *NBA Properties*, 46 F.4th at 617-18 (single online sale to Illinois sufficient to support jurisdiction, even where the sale was to an investigator and defendant submitted an affidavit stating it never made any other sales to Illinois residents).

Whether its intentional acts were "uniquely directed" at Illinois, (Dkt. 50 at 4), or also aimed elsewhere, is beside the point. *Ford*, 141 S.Ct. at 1027 (explaining that if a company's business deliberately extended into a particular state, that state's courts may exercise jurisdiction, even if the company's business *also* deliberately extended into other states). *See also BRABUS*, 2022 WL 7501046, at *3 (jurisdiction found without any allegation that Illinois was exclusive targeted by online retailer); *NBA Properties*, 46 F.4th at 623 (reaffirming "[t]here is no per se requirement that the defendant *especially* target the forum in its business activity" (emphasis added) (citation and internal quotations omitted)); *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 428 (7th Cir. 2010) (finding purposeful availment, despite lack of evidence that GoDaddy specifically targeted advertising at Illinois, because "it is easy to infer that GoDaddy's national marketing campaign is intended to reach as large an audience as possible, including the 13 million potential customers in the nation's fifth most populous state.").

The State's uncontroverted allegations establish express aiming by Evernorth.

### 3. Evernorth knew that the State and Illinois diabetics would be injured in Illinois.

The final prong of the effects test asks whether the defendant knew injury would occur in the forum state. *Felland*, 692 F.3d at 674-75 (citation omitted). Evernorth cannot plausibly deny knowledge that its conduct in designing, selling, and providing PBM services; constructing

formularies; dispensing the at-issue drugs; and blocking transparency was likely to cause harm to Illinoisans, in Illinois, through falsely inflated prices which Illinois diabetics were forced to pay. Indeed, its acts were *designed* to have that effect, and Evernorth profited from the harm to Illinois.

Evernorth is "aware that it earns many millions of dollars annually from Illinois customers, and it cannot be unhappy to have had such success in the state. Its contacts cannot fairly be described as random, fortuitous, or attenuated." *GoDaddy*, 623 F.3d at 428-29.

Because Evernorth purposefully directed its activities at Illinois, the first factor of the federal due process analysis is satisfied.

**B.      Evernorth's contacts with Illinois directly relate to the State's claims against them.**

As to the second factor, the State's claims must also "arise out of or relate to the defendant's contacts with the forum." *Ford*, 141 S. Ct. at 1026. The *Ford* Court recently reiterated that a defendant's in-state contacts need only "relate to" the litigation—a causative relationship is not necessary. *Id.* Here, Evernorth through its own work as an Illinois PBM utilized the false prices arising from the Insulin Pricing Scheme and knowingly insisted that Illinois payors pay for the at-issue drugs on the basis of those prices, while concealing its role in the generation of the prices. (¶¶ 157, 164-72). Evernorth also directly controlled, assisted, and aided its subsidiaries in violating the ICFA and UDTPA, with knowledge of the facts giving rise to the violations (¶¶ 121, 126, 156-57, 164-74), purposefully availing itself of the privileges of conducting business in Illinois.[4] The State's claims against Evernorth directly relate to its contacts with Illinois.

---

[4] As discussed in the State's Opposition to the PBM Defendants' Rule 12(b)(6) Motion, a parent company can be directly liable under Illinois law if it is a direct participant in its subsidiaries' conduct, as the State alleges against Evernorth. *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 237 (Ill. 2007).

As the United States Supreme Court recently clarified, a company "purposefully availing itself" of a certain market in a particular state "has clear notice of its exposure in that State" to lawsuits related to harms caused by that product or conduct. *See Ford*, 141 S. Ct. at 1027. Put another way, if a suit arises from efforts by a company "to serve, *directly or indirectly*, the market for its product in several or all other States, it is not unreasonable to subject it to suit in one of those States" if its product (or service) causes an injury. *Id.* (emphasis supplied) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Here, the complaint allegations and the evidence make clear that Evernorth acted in Illinois, and successfully exploited the Illinois market for its financial gain. By serving as a PBM in Illinois, and doing so in furtherance of the Insulin Pricing Scheme, Evernorth played an active role in causing the harm underlying the State's claims. Evernorth had clear notice that it would be subject to the state's jurisdiction.

The State and Illinois diabetics were injured by Evernorth's activities, and "[a]n individual injured in [Illinois] need not go to [another jurisdiction] to seek redress from persons who, though remaining in [another jurisdiction], knowingly cause the injury in [Illinois]." *Calder*, 465 U.S. at 790.

The uncontroverted facts establish that Evernorth had significant and meaningful contacts with Illinois that allowed it to handsomely profit from the Scheme in Illinois. This Court has personal jurisdiction over Evernorth for the State's claims.

### C. This Court's exercise of jurisdiction comports with fair play and substantial justice.

Having purposefully directed their activities at Illinois, it is Evernorth's burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Haro*, 613 F. Supp. 3d at 1094 (quoting *Burger King*, 471 U.S. at 477) (internal quotations omitted). It cannot do so. The Court considers the following factors:

(1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies.

*Id.*

Here, every consideration supports jurisdiction:

- **Factor 1**. Evernorth cannot claim any burden "greater than what courts routinely tolerate in the exercise of specific jurisdiction over foreign parties." *See id.* (citation and internal quotations omitted). Indeed, Evernorth's corporate family ranks 13th on the Fortune 500 list, and its business is national in scope. *See GoDaddy*, 623 F.3d at 432 (finding the burden to defend in Illinois was minimal for a corporation that operates on a national scale). Further, it shares counsel with its subsidiaries that are Defendants in this case and are not contesting personal jurisdiction.

- **Factor 2**. Illinois generally "has a significant interest in providing a forum for its residents to seek relief when they suffer harm in Illinois from a wrong that occurred at least in part in Illinois." *Id.* (citation and internal quotations omitted). Here, where Illinois' Attorney General brings claims under Illinois' ICFA and Illinois' UDTPA, Illinois' interest is not only strong, it is *exclusive*.

- **Factor 3**. The State has a strong interest in obtaining convenient and effective relief, which is best served through adjudication before this Court, along with the claims against the other Defendants, including the Express Scripts Defendants, which do not contest this Court's jurisdiction, rather than forcing the State to pursue its claims against Evernorth separately in a different forum. Further, "a finding that [Evernorth] is not subject to personal jurisdiction in a forum it has so thoroughly exploited would create significant barriers to effective relief for similarly situated plaintiffs with more limited resources." *Id.* at 432.

- <u>Factor 4</u>. For the same reasons, the interstate judicial system's interest in efficient resolution of controversies is also best served by this Court's adjudication of the State's claims against Evernorth.

- <u>Factor 5</u>. All States' collective interest in furthering substantive social policies – specifically, their interest in facilitating enforcement of consumer protections – is served by the Court's exercise of jurisdiction over Evernorth in this matter.

The State's uncontroverted allegations are more than adequate to afford this Court personal jurisdiction over Evernorth to adjudicate the State's claims. To borrow this Court's words, "Litigating here may not be convenient, but that comes with the territory . . . When the business is selling fake products abroad, part of the cost of doing business is getting sued abroad." *BRABUS*, 2022 WL 7501046, at *3.

## IV. Alternatively, the State is Entitled to Jurisdictional Discovery Regarding Evernorth's Illinois Contacts, Involvement in the Scheme, and Corporate Structure.

The State has, at minimum, shown enough to warrant jurisdictional discovery related to Evernorth's involvement in the Insulin Pricing Scheme. Evernorth attempts to obfuscate and minimize its role in the Pricing Scheme by asserting that it is merely a "holding company parent" (Dkt. 50 at 4). But currently, any information that would further illuminate its role in the Scheme and the corporate relationship or lack of corporate separateness between Evernorth and the Express Scripts Defendants is in the sole possession of those Defendants.

"Courts generally will grant jurisdictional discovery if the plaintiff 'can show that the factual record is at least ambiguous or unclear on the jurisdiction issue.'" *Gilman Opco LLC v. Lanman Oil Co.*, 2014 WL 1284499, at *6 (N.D. Ill. Mar. 28, 2014) (citation omitted). To be sure, a "plaintiff does not have an automatic right" to jurisdictional discovery; there must be some "colorable or prima facie showing of personal jurisdiction before discovery should be permitted."

17

*Id.* That standard, however, "is low." *Id.* A plaintiff only fails it where there are "'bare,' 'attenuated,' or 'unsupported' assertions of personal jurisdiction" or "clearly frivolous" claims. *Id.* (citation omitted).

Here, the State's allegations are not "bare" or "clearly frivolous." The State has made factual allegations about Evernorth's roles in the Scheme, and the ways it targeted Illinois – allegations which Evernorth did not controvert. This, especially combined with the evidence the State puts forward, meets the "low" standard for jurisdictional discovery. *Id.* After the nonmovant has put forth evidence of the defendant's contacts with the forum, the district court should not dismiss the action without permitting jurisdictional discovery. *Kosar v. Columbia Sussex Mgmt., LLC*, 2021 WL 4499494, at *2 (N.D. Ill. June 1, 2021) ("if the plaintiff can show an ambiguity exists or that some jurisdictional facts are unclear," discovery is warranted).

Throughout this Response, the State has established that this Court may exercise personal jurisdiction over Evernorth because it, individually, has sufficient minimum contacts with Illinois. Yet, if this Court decides otherwise, it is appropriate to allow a limited period of jurisdictional discovery to accurately assess its involvement in the Insulin Pricing Scheme in Illinois.

## CONCLUSION

For all the reasons discussed above, this Court should deny Evernorth's Motion to Dismiss For Lack of Personal Jurisdiction.

RESPECTFULLY SUBMITTED this the 6th day of April, 2023.

THE STATE OF ILLINOIS, by KWAME RAOUL, ATTORNEY GENERAL OF ILLINOIS

*/s/ Tanya D. Ellis*
Edwin S. Gault, Jr., IL Bar # 6314552
Walter G. Watkins, III., Bar ID # 100314
Tanya D. Ellis, Bar ID # 101525
FORMAN WATKINS & KRUTZ LLP

18

210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375
Tel: (601) 960-8600
Fax: (601) 960-8613
Win.Gault@formanwatkins.com
Tanya.Ellis@formanwatkins.com
Trey.Watkins@formanwatkins.com

David F. Buysse, IL Bar # 3126915
Deputy Chief, Public Interest Division
Illinois Attorney General's Office
100 W. Randolph Street – 12th Floor
Tel: (312) 590-7844
david.buysse@ilag.gov

Darren Kinkead, IL Bar # 6304847
Deputy Chief, Special Litigation Bureau
Office of the Attorney General of Illinois
100 W. Randolph Street – 11th Floor
Tel: (773) 590-6967
darren.kinkead@ilag.gov

Matthew C. McDonald, Bar ID # 105966
DAVID NUTT & ASSOCIATES
605 Crescent Blvd, Suite 200
Ridgeland, MS 39157
Tel: (601) 898-7302
mattm@davidnutt.com

Joanne Cicala *(pro hac vice)*
Josh Wackerly *(pro hac vice)*
R. Johan Conrod *(pro hac vice)*
THE CICALA LAW FIRM PLLC
101 College Street
Dripping Springs, TX 78620
Tel: (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com
johan@cicalapllc.com

**Certificate of Service**

      I hereby certify that on April 6, 2023, I electronically filed the foregoing, Plaintiff's Memorandum in Opposition to Evernorth Health, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction, with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

                                            */s/ Tanya D. Ellis*
                                            Tanya D. Ellis

Exhibit 1

Exhibit A – Bricker Declaration

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CIGNA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:23-cv-0093-JMB |
| | ) | |
| vs. | ) | |
| | ) | |
| AMY BRICKER and CVS HEALTH | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF AMY BRICKER

In accordance with the provisions of 28 U.S.C. § 1746, Amy Bricker, does hereby certify, under penalty of perjury, that the following is a true and correct statement of fact:

1.      I am a competent adult more than 21 years of age; am under no disability or impairment affecting my capacity to recall, appreciate and truthfully communicate those facts and events of which I have personal knowledge.

2.      On January 26, 2023, Cigna Corporation ("Cigna") filed a complaint against me and CVS Health Corporation ("CVS") in this lawsuit, and on February 2, 2023, Cigna filed its Amended Complaint against me and CVS ("Amended Complaint"). I have reviewed both. I have personal knowledge of the following facts and events referenced in or relating to the allegations made in the Amended Complaint; and, if called upon to do so, could and would testify truthfully and competently in open court to the same.

## BACKGROUND AND EDUCATION

3.      I am a citizen of the State of Missouri, where I maintain my permanent residence and live with my husband and daughters in the St. Louis, Missouri metropolitan area.

1

4.      I graduated from St. Louis College of Pharmacy in 1999.

5.      I started my career in retail pharmacy at Walgreens while in college and after graduation and then began working at BJC Healthcare in 2004. During my time with BJC Healthcare, I was promoted to Director of Community Retail Pharmacy. In this position, I led pharmacy operations for 13 BJC-owned and operated hospitals.

6.      I re-joined Walgreens in 2008 as Director of Walgreens' Health Initiatives Clinical Sales.

7.      In 2009, I was promoted to Regional Vice President of Account Management at Walgreens. In this role, I was responsible for managing and growing a $2 Billion book of business with 800 separate accounts.

## MY EXPRESS SCRIPTS EMPLOYMENT

8.      I joined Express Scripts, Inc. ("ESI") in 2010 in a Senior Director role. I was twice promoted before assuming the role of Vice President of Provider Contracting & Strategy. In this role, I directed contracting and retail network pricing strategy for ESI's nationwide network of 70,000 retail pharmacies.

9.      I remained in the VP of Provider Contracting & Strategy position through 2014 before being promoted to Vice President of Pricing and Supply Chain Strategy, and later to Senior Vice President ("SVP") of Supply Chain.

10.     All of the positions I held at ESI were devoted to ESI's PBM business.

11.     In December 2018, Cigna Corporation ("Cigna") acquired and absorbed ESI, and has since called it "Express Scripts."

12.     On October 24, 2018, prior to and in furtherance of the acquisition of ESI by Cigna, I entered into an Executive Retention Agreement with Cigna. A copy of the Executive Retention Agreement dated October 24, 2018 is attached hereto as <u>Exhibit 1</u>. The Executive Retention

Agreement was prompted by, and in furtherance of, certain commitments Cigna had made regarding synergies of the deal. I was offered a retention bonus if certain objectives were met under the Agreement, and in turn, agreed to a non-compete specific to my work for the Express Scripts PBM.

13.     I continued working in the Express Scripts PBM business as SVP Supply Chain following Cigna's acquisition of ESI.

14.     I testified to the House Committee on Energy and Commerce Subcommittee on Health in May 2019 on behalf of Express Scripts. At the time, I was SVP Supply Chain for Express Scripts. In my testimony, which Cigna attaches to the Amended Complaint as Exhibit A, I introduced myself as "Amy Bricker, R.Ph., Senior Vice President, Supply Chain *for Express Scripts*." During my testimony, I spoke about the fact that I was an executive in the supply chain of the Express Scripts PBM. My references to various "leadership roles in pharmacy network management, supply chain economics, and retail contracting strategy" referred to my experience up to that point in my career specifically in the PBM business at Express Scripts. Likewise, my statements that I was "responsible for key relationships"—in this instance, with pharmaceutical manufacturers and retail pharmacies—"and strategic initiatives across the pharmaceutical supply chain" and that my team had "responsibility for developing value-based contracts to improve affordability, access, and care," were both made in reference to my responsibilities as SVP of Supply Chain for Express Scripts, and to my Supply Chain team for the Express Scripts PBM business. Likewise, my comments regarding electronic prescribing systems were in reference to Express Scripts' relationships with Surescripts and other electronic prescribing vendors; electronic prescribing allows for efficiency in communications between prescribers and the Express Scripts' PBM providing for real-time access to drug formulary and drug coverage for their patients.

15.     In 2020, I was appointed President of Express Scripts. In that position, I became a direct report to the CEO and President of Evernorth, Eric Palmer ("Mr. Palmer").

16.      My duties and responsibilities as President of Express Scripts were virtually entirely devoted to running the Express Scripts PBM business as that PBM business' senior-most executive leader. Specifically, the role included responsibility for the PBM supply chain (which I had been responsible for in my prior role as SVP of Supply Chain) and management of Express Scripts' relationships with payor/clients, PBM consultants and brokers, as detailed below.

17.     Express Scripts replaced me as its President after I gave notice of my resignation from Express Scripts employment on January 9, 2023 (my "Resignation Date"), but I remained an Express Scripts employee through my last day of Express Scripts employment on Friday, February 3, 2023, eight days after Express Scripts sued me in this lawsuit.

18.     My last Federal Form W-2 for 2022 lists my employer as Express Scripts Strategic Development, Inc.

19.     My primary work station for Express Scripts was always in St. Louis, Missouri.

## EXPRESS SCRIPTS' PBM BUSINESS
## AND MY DUTIES AS PRESIDENT OF EXPRESS SCRIPTS

20.     In general, PBM businesses, such as Express Scripts, contract with payor clients, such as employers, unions, governmental payors and health plans ("Payor Entities"), to administer prescription drug benefit plans to such Payor Entities' individual participating members and their families. A PBM's customers or clients are Payor Entities, not individual consumers. PBM contracts with Payor Entities typically have fixed durations of three or more years before they are renewed, at which time the Payor Entities' business typically becomes subject to competition between PBMs for the business, for example through request-for-proposal ("RFP") processes.

4

Prior to the expiration of such PBM-Payor contracts, the contracting PBM's relationship with the Payor Entity is exclusive.

21.     PBMs also contract with brand pharmaceutical companies for discounts or rebates in exchange for formulary placement or preferred status on drug lists that are then adopted by Payor Entities' so that their members may access the preferred brand drugs at lower copay or co-insurance (as compared to non-preferred brand drugs on the drug list), and PBMs likewise establish contracts with retail pharmacies that become part of the pharmacy networks at which Payor Entities' enjoy discounts for the fulfillment of prescriptions dispensed to individual participating members that may go to purchase their prescription medications within such pharmacy networks.

22.     As a PBM, Express Scripts' goal is to reduce the cost of prescription medication for its clients—the Payor Entities. As President of Express Scripts, I was responsible for Express Scripts' relationships with its Payor Entity clients, as well as the tools/levers utilized to lower the cost of prescription medications.

23.     Payor Entities select Express Scripts as their PBM through a competitive bidding process, during which each competing PBM would submit a bid for the Payor Entities' business. The bids would generally include pricing guarantees offered over the contracted period, in the form of brand drug rebates (discounts) or pharmacy network discounts (generic and brand), as well as other clinical solutions to manage drug spend, including prior authorization, step therapy, value-based solutions, formularies, and clinical insights that can be gleaned by combining medical and pharmacy data. I oversaw Express Scripts' competitive bidding process, but I was not responsible for preparing Express Scripts' bids to Payor Entities; this was done by William Spehr SVP of Sales at Evernorth.

24.     The Amended Complaint specifically references Express Scripts recent successful bid for the Centene contract, and that I earned a significant, one-time bonus for my integral role in achieving that business success. The bonus was $750,000. The context Cigna omits from its Amended Complaint is that the contract is worth billions of dollars to Cigna over its five-year term. Several members of the Express Scripts team received this one-time bonus which was appropriate given the magnitude of the contract and well earned.

25.     Express Scripts' clients typically hire consultants to advise them on PBM contracts. As President, I was responsible for managing those consultant relationships. As of February 2022, oversight of this aspect of Express Scripts' business shifted to Mr. Spehr, when Mr. Spehr began reporting to Mr. Palmer. Up until then, Mr. Spehr reported directly to me, selling only PBM solutions and managing all PBM consultant relationships. Mr. Palmer made this organization change in February 2022 because he wanted Mr. Spehr to have an expanded role selling all Evernorth solutions. This move was premature, as Mr. Spehr's team spends virtually all of its time selling PBM. As of my resignation, there were no other mature solutions that Evernorth offered in the market.

26.     I also oversaw the operations of the Express Scripts, which included client benefit setups that ensure the appropriate drugs are covered, that the appropriate copays are assessed, and that the overall drug benefit of our clients is setup accurately in the system as well as new client implementations. These responsibilities are owned by the Chief Operating Officer for Express Scripts, who reported to me as President of Express Scripts.

27.     Express Scripts does not now, nor did it ever, have direct-to-consumer business, and as such, does not have direct contact with the end-user consumers.  As an Express Scripts employee, I did not have direct contact with the end-user consumers. Instead, Express Scripts contracts with

the aforementioned Payor Entities. Member consumers then use the Payor Entities' contracted services as a member of a health plan or as an employee of the Payor Entity. Accordingly, any and all access to Payor Entities' member consumers was conducted by or through the Payor Entities themselves. If a Payor Entity terminated a PBM contract with Express Scripts, Express Scripts lost access to the consumer members previously served through the discontinued PBM contract. Consequently, as an Express Scripts employee, my "client contact" was not with consumers or members of PBM clients, but with representatives of the Payor Entities I have described above.

28.     The Express Scripts Supply Chain SVP reported to me, as President of Express Scripts. This team has responsibility for pharmaceutical manufacturer as well as retail pharmacy contracts. In addition, the Supply Chain develops products and tools that lower the cost of prescription medications. I will explain each area below.

29.     First, the Trade Team has responsibility for all pharmaceutical manufacturer relationships for purposes of negotiating government Payor Entity rebates/discounts, in exchange for formulary placement (this is a standard aspect of PBM business with which I will have no involvement at CVS Health). Manufacturers offer better rebates and higher discounts in exchange for market share or preferred placement on formularies. Express Scripts contracts directly with brand manufacturers for all government (e.g., Medicare/Medicaid) clients. For commercial payors, Express Scripts utilizes Ascent Health Services, a third-party rebate contracting organization which is located in Switzerland, for these services. Both the government rebate team as well as the Ascent Health Services CEO report to the SVP of Supply Chain, which previously reported to me as Express Scripts' President. While I was responsible for Ascent Health Services on behalf of Express Scripts/Cigna, I will have no role at CVS Health in regard to either PBM business generally or the rebate and discount aspect of that business, specifically. Therefore, my knowledge in the areas of

rebate and discount contracting with drug manufacturers, and Ascent, from work at Express Scripts, will be irrelevant to my work at CVS Health, as I explain in more detail below. I will have no need and no occasion at CVS Health to call upon, use or disclose to others, any PBM-related information of Express Scripts, including information about how it uses and manages rebates generally, or its business with Ascent specifically. I will not use or disclose any such information in working at CVS Health.

30.     Second, the Express Scripts Retail Network team holds contracts with virtually every retail pharmacy in the United States for purposes of serving Express Scripts' Payor Entity clients, and negotiates with pharmacy chains and independent pharmacies for dispensing brand and generic drugs to Express Scripts' Payor Entity clients. The Retail Network team holds contracts with approximately 70,000 retail pharmacies for discounts on brand and generic drug dispensing. The pharmacies that hold contracts with Express Scripts become participating pharmacies in a number of pharmacy networks that are made available to Express Scripts' Payor Entity clients. Express Scripts is able to secure deeper discounts from participating pharmacies in exchange for marketshare. CVS is a pharmacy chain in Express Scripts' networks.

31.     Third, the Supply Chain team has responsibility for  the procurement of pharmaceuticals for dispensing at Cigna owned, non-retail pharmacies, Express Scripts Home Delivery as well as the specialty pharmacy, Accredo. Procurement is contracted through Express Scripts wholesaler Amerisource Bergen or through the Express Scripts owned GPO, Econdisc. Econdisc functions to negotiate with generic pharmaceutical manufacturers for discounts on generic pharmaceuticals that are dispensed by Express Scripts Home Delivery. Express Scripts also owns a generic repackager called Quallent, whose products are dispensed by Express Scripts Home Delivery Pharmacies.

DocuSign Envelope ID: 55D48839-7376-45B1-047A-03453D50E17

32. Lastly, the Supply Chain team is responsible for creating products leveraging the relationships with manufacturers and retail pharmacies that reduce the cost of medications for PBM Payor Entity clients and their members. These are utilization management tools, like prior authorization, step therapy, drug utilization review, and value-based solutions where pharmaceutical manufacturers guarantee outcomes. If specific outcomes are not met, value is returned to clients enrolled in the programs.

33. As mentioned previously, I had responsibility for Payor Entity relationships with Express Scripts. Management of those client relationships was split between the SVP of Commercial, who managed relationships with employers, labor unions, public sector, health systems and coalition clients; and the SVP of Health Plan, Regulated Markets, and Military who had responsibility for clients that offered prescription benefits to health plans that operated in commercial markets, in managed Medicaid, Medicare Part D, Medicare Advantage, as well as other federal clients like the Department of Defense. Both the SVP of Commercial and the SVP of Health Plan, Regulated Markets, and Military reported to me as President of Express Scripts.

34. Express Scripts is a business with revenues in excess of $110 billion, and accounted for approximately two-thirds of all of Cigna's revenues across all of its lines of business. As President of Express Scripts, virtually all of my working time and attention was devoted to, and consumed by, the management of all aspects of this successful, growing PBM business. My role, responsibilities, and my business information access and use did not extend to the management, strategic planning or decision making concerning Evernorth businesses other than Express Scripts.

35. Express Scripts is a member of the Pharmaceutical Care Management Association (PCMA), which is a national association representing America's PBMs. The Chair of the PCMA rotates between representatives of key members: Express Scripts, CVS Health, OptumRx, Prime

Therapeutics and Humana. In September 2022, the leadership rotation passed to Express Scripts to be PCMA Chair, and I undertook this obligation as President of Express Scripts, as Cigna points out in the Amended Complaint.

## EVERNORTH'S BUSINESS

36.     Evernorth was created by Cigna in 2020 following its acquisition of ESI. Cigna refers to Evernorth as a Cigna "brand" in the Amended Complaint, and elsewhere, publicly, as "the health services business of Cigna Corporation."

37.     Express Scripts is one of several discrete business units that together make up Evernorth. The other business units within the Evernorth brand, in addition to Express Scripts, include: Accredo Specialty, Express Scripts Home Delivery Pharmacies; Behavioral Health; Care Delivery ("MDLive")[1]; eviCore Healthcare[2]; and VillageM.D.[3] (collectively with Express Scripts the "Evernorth Functional Business Units").

38.     Each of the Evernorth Functional Business Units had a senior executive leader devoted to it, just as I was devoted to Express Scripts, as the President of Express Scripts. Specifically, the leadership of Evernorth's distinct Functional Business Units was as follows as of my Resignation Date:

| EVERNORTH FUNCTIONAL BUSINESS UNIT | LEADER |
| --- | --- |
| Express Scripts PBM | Amy Bricker, President, Express Scripts |
| Accredo Specialty, Home Delivery Pharmacies | Matt Perlberg, President, Evernorth Pharmacy Businesses |

[1] MDLive is a virtual care and telehealth platform.
[2] eviCore provides medical benefits management, which entails prior authorization gatekeeping and utilization authorization.
[3] VillageM.D. manages partnership and investment with Walgreens.

DocuSign Envelope ID: 55D48829-7276-45B1-047A-043453D50E17

| EVERNORTH FUNCTIONAL BUSINESS UNIT | LEADER |
|---|---|
| Behavioral Health | Joan Harvey, President, Care Solutions |
| MDLive | Matthew Bennett, Sr. Vice President, Care Delivery |
| eviCore | Dave Smith, President, Medical Benefits Management Solutions, eviCore |
| VillageM.D. | Matt Totterdale |

39.     I was not responsible for managing, making strategic decisions or plans for, monitoring and enhancing financial performance, for profit and loss (P&L) of, and/or for go-to-market execution for the businesses of Accredo, Home Delivery, Behavioral Health, MDLive, eviCore, or VillageM.D.. Each of those Functional Business Units was run by their own respective leaders. I had P&L responsibility and accountability for Express Scripts PBM only.

40.     Mr. Spehr is the SVP of Evernorth Sales. While I worked closely with Mr. Spehr on all PBM sales, he made all employment decisions (hiring and firing, etc.) for Evernorth Sales employees, and established sales targets for the Evernorth sales team in collaboration with Evernorth's CEO and finance department and without my participation. I was simply informed of those goals as they related to the PBM.

41.     Home Delivery and Accredo specialty pharmacy are Cigna's two non-retail pharmacy operations (collectively "Evernorth Pharmacy"). Cigna does not own or operate retail pharmacy stores such as Walgreens, CVS, Rite-Aid, etc. I was not responsible for the operations or the decision making of the Evernorth Pharmacy team, nor did I have responsibility for financial accounting and planning, budgetary or performance metrics data relating to Evernorth Pharmacy, or either of these independent Functional Business Units. I was not responsible for the operations

DocuSign Envelope ID: 55D48839-7278-45B1-047A-03453D50E17

of the Evernorth Pharmacy team, including specifically the call centers, cost to fill, and Selling, General, and Administrative (SG&A). Matt Perlberg is the President of the Evernorth Pharmacy businesses and has responsibility for Evernorth Pharmacy. My sole involvement with Evernorth Pharmacy was that the Express Scripts Supply Chain team purchased the drugs that were dispensed by both Home Delivery and Accredo pharmacies, as outlined previously.

42.     The leaders of Evernorth's Functional Business Units all reported directly to Evernorth's President and CEO, Mr. Palmer. None reported to me.

43.     Dave Anderson is Evernorth's VP of Strategy, Mr. Spehr is SVP of Evernorth Sales, Lou Aversano is Evernorth's Chief Brand and Marketing Officer, Melissa Arkus is Evernorth's SVP Human Resources, Leah Stoecker is Evernorth's SVP and Chief Counsel, Brad Phillips is Evernorth's Chief Financial Officer, and Frank McGoldrick is Evernorth's Chief Underwriting Officer (collectively with the Functional Business Unit Leaders, Evernorth's Strategic Leadership Team, or "Evernorth SLT"). While these individuals did not all report directly to Mr. Palmer (none reported to me), they were all part of Evernorth's SLT. Unlike the Functional Business Unit leaders, these individuals had enterprise-wide responsibilities over Evernorth, and attended the weekly and monthly SLT meetings under Mr. Palmer's direction.

44.     Mr. Palmer directed all aspects of Evernorth's business' strategic direction and planning, new product initiatives, allocation of technology funding, financial performance, growth and long-term vision. Mr. Palmer specifically directed and required me and the leaders of the other Evernorth Functional Business Units, to focus our time and attention (including specifically strategic planning and execution, new initiatives and operational performance) on our respective Functional Business Units, in my case Express Scripts.

DocuSign Envelope ID: 55D48839-737E-45B1-947A-03453D50E17

45.     In the Amended Complaint, Cigna alleges that Evernorth "aspired" to bring together Cigna's "vast array of health services capabilities." This aspiration was never achieved or realized during my tenure as President of Express Scripts. Under Mr. Palmer's direction, each of the Evernorth Functional Business Units operated as independently siloed businesses under the Evernorth umbrella. As specifically directed by Mr. Palmer, I focused my time and attention on running and growing Express Scripts' large PBM business. I was not responsible in any way for the strategic direction of Evernorth as a whole or for its non-PBM businesses, or for promoting the integration and coordination of those non-PBM businesses. In fact, I do not know what the strategic direction of Evernorth was as a constellation of businesses, or if it even had an overall strategic direction at all.  If it did, that was never disclosed to me, and in no way was I involved in formulating or implementing such an overall Evernorth strategic direction.

46.     I attended weekly staff meetings with Mr. Palmer and the Evernorth SLT.  Discussions in those meetings relating to non-PBM components of Evernorth's business were conducted at a high level and were not accompanied by detailed financial information or planning discussions. The SLT did not engage in group strategic decision making or planning for component businesses. Consequently, I did not contribute to or participate in strategic planning or decision making affecting Evernorth businesses other than the Express Scripts PBM, and my counterpart Functional Business Unit leaders within the Evernorth SLT did not contribute to, or participate in strategic planning or decision making affecting the Express Scripts PBM.

47.     Mr. Palmer also had monthly "offsite" meetings that usually lasted 1.5 days. At these meetings, the Evernorth SLT would present on various issues or topics pertinent to their Functional Business Unit. These were high-level updates that usually lasted 30-45 minutes. The monthly meetings typically also included some sort of "team building" event and team dinner. Mr. Palmer

DocuSign Envelope ID: 55D48839-7376-45B1-847A-043453D50E17

would regularly expand the audience in these monthly sessions to include direct reports of the SLT. The purpose of this larger audience was to allow for visibility of talent across Evernorth. As with the weekly staff meetings, we did not engage in group strategic decision making or planning for Evernorth's component businesses at these monthly meetings. It was treated more as an opportunity for progress updates across Evernorth's various Functional Business Units.

48.     One of the last monthly meetings I attended took place in Nashville, Tennessee. The entire meeting was devoted to feedback that Mr. Palmer had received from the Evernorth SLT regarding his leadership. He had a moderator attend the session and as a group, the SLT discussed our frustrations with Mr. Palmer as our boss. One of the biggest issues we discussed was Mr. Palmer's inability to make decisions, which resulted in a lack of coordination, lack of clear strategic direction and delayed launching Evernorth beyond its isolated, mature assets of Express Scripts PBM, Pharmacy and eviCore. During these discussions, I commented that Mr. Palmer had too many direct reports and that some of the Evernorth Functional Business Units with negative or minimal financial contributions should be rolled up into a single report, so that Mr. Palmer's time and energy was not being devoted to these small units. I made the point that these smaller units were not actually functioning businesses, but instead immature concepts that had not grown into business assets. The smaller units needed "care and feeding" that they were not receiving and they needed a strong leader that they did not have to ensure their evolution and success. This conversation was not welcomed by the owners of the smaller business units and Mr. Palmer did not commit to making any structural changes. The conversation then shifted to the purpose of the Evernorth SLT, including the fundamental questions of why Evernorth's SLT existed and why the SLT met. In response, Mr. Palmer stated emphatically that the Evernorth SLT was not a decision-

making body; that the Cigna ELT made necessary corporate or enterprise decisions; and that our
roles in the SLT were limited to operating our respective business units.

49.     I was not responsible for, and had only minimal and superficial insight into, Evernorth's
other Functional Business Units, aside from Express Scripts.

50.     I was not responsible for, and had only minimal, generalized and superficial knowledge of,
Evernorth's strategic direction, enterprise-wide initiatives, sales strategy, or client and health plan
relationships, aside from topics related to Express Scripts PBM.

51.     I was not responsible for, and had only minimal, generalized and superficial knowledge of,
Evernorth's client and health plan relationships. Indeed, I had no interaction with health plans
other than as Express Scripts' PBM customers.

52.     Likewise, I was not responsible for, and had only minimal, generalized and superficial
knowledge of, Evernorth's product development plans. I only had ownership over the development
of certain PBM products through Express Scripts, and not even all of those, as Ms. Harvey,
President of Evernorth Care Solutions, led clinical products for the Express Scripts PBM business.
I have no knowledge of Evernorth's care-delivery products or solutions, to the extent any exist.
My former role, as President of Express Scripts, did not include decision-making about
Evernorth's "go-to-market" strategy ; that job belonged to Mr. Spehr.  Nor was I responsible for
Evernorth's overarching product portfolio.  In September 2022, the VP of Product Strategy role
was created to report to one of my then-direct reports, Adam Kautzner, who was my successor as
Express Scripts' President.  The VP of Product Strategy was filled by Meghan Goldammer. Her
role was created to develop products for integrating Evernorth's various Functional Business
Units, with PBM products. To my knowledge, neither Ms. Goldammer, or anyone else at
Evernorth, ever developed any such products or any strategy or plan for their development as of

my Resignation Date. In fact, following my Resignation Date, I learned from Mr. Kautzner that he intended to eliminate Ms. Goldammer's position and move her into a different role. In short, I lack any detailed knowledge regarding Evernorth products offered outside the PBM. I cannot even articulate the composition or value proposition of Evernorth products outside the PBM, having had neither visibility to, nor responsibility for, non-PBM Evernorth business.

53.     Contrary to the allegations made by Cigna in the Amended Complaint, I never met with clients to sell or promote Cigna or Evernorth's capabilities aside from the capabilities of Express Scripts PBM.

54.     Cigna overstates my participation in various events and initiatives relating to Evernorth in the Amended Complaint. For example, Cigna touts my involvement as a member of the Total Cost of Care ("TCC") Executive Committee, but omits that I was only asked to sit in on the committee in  Mr. Palmer's stead in late summer/early fall of 2022. I recall attending only a single TCC committee meeting for approximately 30 minutes by phone. I do not recall specifically what was discussed at this single TCC meeting I attended.

55.     The Patient Assurance Program mentioned by Cigna in the Amended Complaint is a PBM solution relating directly to Express Scripts' PBM business.

56.     Cigna states in the Amended Complaint that I led Cigna's response to the *Dobbs v. Jackson Women's Health Organization* decision, this is only true as it relates to Express Scripts PBM. I did not direct any actions outside of the PBM. I was asked by Nicole Jones, Cigna's General Counsel, and Mr. Palmer to provide an enterprise overview of the actions the various business units were taking in response to the Dobbs decision. I consolidated the actions from Cigna Legal, Evernorth Legal, Cigna US Commercial division and Express Scripts for Cigna's ELT in memo form.  I did not influence or direct any strategy related to those actions, outside of Express Scripts PBM.

57.     I led Express Scripts and Cigna's response and readiness with the Federal Trade Commission in connection with an investigation related to the PBM. Similarly, the only "COVID-19 response client initiative" of which I was aware and with which I was involved was Express Scripts' contracting with a network of pharmacies to deliver the COVID-19 vaccine; this was, again, a business-to-business transaction and part of Express' Scripts PBM business.

58.     In 2022, I spoke at the Outcomes + conference. This event had previously been a PBM-only conference, but in 2022, it was expanded to include certain others of Evernorth's Functional Business Units. Notwithstanding that expansion, 90% or more of the attendees were current and prospective PBM clients. The goal of the conference was, in part, to answer the many open questions about what Evernorth actually did and intended to eventually do with non-confidential information that was obviously publicly disseminated. Much of the Evernorth content as well as the exhibits for the conference were aspirational. They were not capabilities that were presently available for clients to adopt. The vision for the exhibits at Outcomes+ was created by Evernorth Marketing.  Evernorth's Communications team prepared my remarks at the Outcomes + conference; the remarks attempted to provide clarity to the audience of where Evernorth was going as a health care services company.  Mr. Palmer was a speaker at this conference and led much of the discussion around the future of Evernorth beyond PBM.

59.     Cigna refers to my participation in a pricing committee in the Amended Complaint. The pricing committee is chaired by Frank McGoldrick, Evernorth's Chief Underwriter. Its purpose was to review and approve certain PBM client proposals. I was an occasional participant at the pricing committee, but I was not a voting member, since becoming President of Express Scripts in 2020. This means I had no vote in, or responsibility for, decisions made by this committee, including any budget allocation decisions across Evernorth's other Functional Business Units. This

17

committee met twice a week at least; I attended infrequently in the past two years and when I did attend, I acted only as an observer. From the meetings I attended, the only pricing that was reviewed and discussed by the pricing committee was for PBM and pharmacy (if pharmacy was part of a PBM bid), not any of Evernorth's other Functional Business Units.

## CIGNA CORPORATION'S BUSINESS

60.     Cigna is a global health services company. All Cigna products and services are provided exclusively by or through operating subsidiaries of Cigna Corporation, including, for example, the various Evernorth Functional Business Units (including Express Scripts). The Cigna subsidiaries provide medical, pharmacy, dental, disability, health insurance and related products and services in more than 30 countries and jurisdictions around the world, including the United States, Europe, China, South Korea, India, and the Middle East.

61.     Cigna's Chairman and Chief Executive Officer is David Cordani ("Mr. Cordani").

62.     Mr. Cordani heads the Cigna Executive Leadership Team ("ELT"), which, during the relevant time period preceding my Resignation Date, included the following individuals: Chuck Berg, President, U.S. Government Business and Senior Advisor; Dr. David Brailer, Chief Health Officer; Noelle Eder, Executive VP and Global Chief Information Officer, Cigna Corporation; Brian Evanko, Chief Financial Officer, Cigna Corporation; Nicole Jones, Executive VP and General Counsel, Cigna Corporation; Everett Neville, Executive VP, Solutions and Corporate Development, Cigna Corporation; Cindy Ryan, Executive VP, Chief Human Resources Officer; Jason Sadler, President, International Markets, Cigna Corporation; Paul Sanford, Executive VP, Operation, Cigna Corporation; and Mike Triplett, President, U.S. Commercial, Cigna Corporation. Mr. Palmer was a member of the Cigna ELT as the leader of Evernorth.

63.     At no point during my tenure with Express Scripts, including during my time as President of Express Scripts, was I ever a member of Cigna's ELT, nor was I ever one of Mr. Cordani's direct reports.

64.     I attended quarterly meetings with Mr. Cordani and his ELT, during which I would provide updates on Express Scripts' PBM business.  Updates would include the financial performance of the PBM, client retention and new sales updates, typically provided by Mr. Spehr, as well as any hot topics. During the past year, the updates were focused on the Centene bid and once awarded, the implementation planning as well as the launch of the Humira biosimilar. The ELT was not very familiar with the Express Scripts' PBM, and these quarterly meetings allowed them to ask questions and to become educated on the various levers impacting the PBM performance.

65.     Mr. Palmer never offered me a position on Cigna's ELT in the fall of 2022. At that time, Mr. Palmer and I discussed his desire to move eviCore under me, but this was not discussed as a promotion, nor was there any discussion of additional compensation for taking on this additional responsibility. No decision was reached at that time, and we agreed to discuss it further in January 2023. It was not until January 11, 2023 (two days after my resignation) that Mr. Palmer made the formal offer to move eviCore to me and place me in a junior role on Cigna's ELT, reporting to him (not Mr. Cordani). He did not make any offer for additional compensation to me on January 11. I politely declined.

66.     Cigna Healthcare is composed of U.S. Commercial, led by Mike Triplett and U.S. Government led by Chuck Berg and International Health led by Jason Sadler. According to Cigna's 2021 Annual Report and website:

> Cigna's U.S. Commercial products and services to include medical, pharmacy, behavioral health, dental, vision, health advocacy programs for insured and self-insured customers.

U.S. Government solutions include Medicare Advantage, Medicare Supplement and Medicare Part D plans for seniors, and individual health insurance plans both on and off the public exchanges.

International Health solutions include health care coverage in international markets, as well as health care benefits for globally mobile individuals and employees of multinational organizations.

I was not responsible for, and had no insight into or confidential or proprietary information about, Cigna Healthcare.

67.     Cigna's Healthcare executives make their own decisions about adopting or not adopting PBM products and services from Express Scripts, much as any non-affiliated PBM Payor Entity client would do. I had no role in, much less visibility to, that decision making. There is a small organization within Cigna responsible for the Cigna Healthcare Pharmacy product; this organization acts as a liaison between Express Scripts and Cigna Healthcare. The Cigna Healthcare Pharmacy team is led by Heather Dlugolenski, who reports to a non-Evernorth Cigna executive, Cigna's Executive Vice President, Solutions and Corporate Development, Everett Neville.

68.     I was not responsible for, and had no insight into or confidential or proprietary information about, Cigna's supply chain, aside from Express Scripts PBM's supply chain.  For example, I had no insight into or responsibility for Cigna's contracts with network hospitals or network medical, dental or vision providers.

69.     I was not responsible for, and had no insight into or confidential or proprietary information about, Cigna's product development plans, strategic direction, enterprise-wide initiatives, or sales strategy, aside from those topics related directly to Express Scripts PBM.

70.     I was not responsible for, and had no insight into or confidential or proprietary information about, Cigna's client and health plan relationships, aside from Express Scripts' relationships with its clients and health plans.

71.     As I can recall, I attended three Cigna Board of Director meetings throughout my tenure with Express Scripts. At each of these meetings, I was asked to present on a specific topic or provide an update relating to Express Scripts PBM, and once relating to the FTC investigation. On each of these occasions, I made my presentation and left; I did not sit through the entirety of any of these meetings and can recall nothing specifically that was discussed, aside from the topics on which I presented.

## MY RESIGNATION FROM EXPRESS SCRIPTS

72.     On my Resignation Date from Express Scripts, I offered, and Express Scripts accepted my offer, to continue working so as to assist in accomplishing an orderly, effective and businesslike transition of my employment duties and responsibilities through and including Friday, February 3, 2023, which was my last date of employment with Express Scripts.

73.     Following my resignation, on January 18, 2023, Evernorth, announced that Adam Kautzner was appointed my successor as President of the Express Scripts PBM.

74.     During my ESI and Express Scripts employment, and through the afternoon of January 24, 2023, I regularly used two iPhone cellular phones, one primarily for personal use (my "Personal iPhone") and one issued by Express Scripts for business correspondence (my "Business iPhone"). I did not conduct Express Scripts business through the use of text messages with either phone. Instead, I used the Business iPhone to access and to send business emails that I know were all stored in Express Scripts or Cigna's company servers. The information systems I have used throughout my Express Scripts employment were configured so that I could access Express Scripts documents via the Business iPhone through company-installed software on that Business iPhone, but I could not download or export any company information or documents, including that of Express Scripts or another Evernorth business, or Cigna, or print or store such information or

21

documents elsewhere, including on the Business iPhone. These features secured for Express Scripts and/or Cigna, and secured to their control, Express Scripts, Evernorth, and Cigna communications, documents and information.

75.    While I conducted all of my Express Scripts-related correspondence using the Business iPhone, I did store certain personal information, such as family photos, and personal banking applications, among others applications, on the various Business iPhones that were assigned to me during my Express Scripts employment, including the Business iPhone that was in my custody from the Resignation Date through January 24, 2023. I also sometimes accessed personal email in my private Gmail account via the Business iPhone. I also regularly received personal text messages from family and friends on my Business iPhone. This is because I was almost constantly in possession of this device and most responsive to communications sent to it.

76.    At various times during my Express Scripts /ESI employment, Express Scripts /ESI assigned to me a new and updated Business iPhone. When I was assigned an updated Business iPhone, the practice, which I believe ESI or Express Scripts initially directed me to follow and never countermanded, would be to restore the Business iPhone being replaced (a "Retired Business iPhone") to factory settings so as to remove from it any personal data, after which I returned the Retired Business iPhone to Express Scripts' information technology group. I followed this practice on multiple occasions with multiple Retired Business iPhones, including during the period from December 2018 through my Resignation Date. At no time did Express Scripts, Cigna, Evernorth, or specifically anyone in Express Scripts, Evernorth's or Cigna's IT or human resources groups, direct me not to restore a Retired Business iPhone to its factory settings before returning it.

77.    Ms. Arkus is, and for some time has been, SVP Human Resources for Cigna's Evernorth business. Not long after tendering my resignation and at various times on and after the Resignation

Date, I communicated with Ms. Arkus orally and in writing about Express Scripts, Evernorth's and Cigna's expectations of and directions to me throughout my notice period from January 9, 2023 until my last scheduled date of employment, February 3, 2023.

78.     On January 13, 2023, 3:35 p.m. Ms. Arkus sent me an email from her Cigna email (Melissa.Arkus@cigna.com) address to my personal Gmail account. A true and complete copy of this email (with my personal email address redacted) is attached to this Declaration as <u>Exhibit 2</u>. In her January 13 email, Ms. Arkus, among other things, confirmed that my separation date was to be Friday, February 3, 2023, and with specific regard to my information technology, systems and devices access, Ms. Arkus stated:

> System and Document Access: You will no longer have access to emails or our IT system as of midnight tonight. Similarly, your site access will be shut off. *We will work with Taryn to make arrangements to collect any of your IT equipment except for your iPhone during your transition period* and coordinate delivery of your personal belongings that are in the office. If you have any hard copies of documents in your possession outside of the office, please return those as well with your equipment (emphasis added).

79.     From the bold and italicized language above, I understood that Ms. Arkus, Express Scripts, Evernorth and Cigna expected and wanted me to retain the Business iPhone in my possession on January 13 through my last date of employment, February 3. As Ms. Arkus had stated in her January 13 email, my access to emails and systems was entirely eliminated by January 14. As of that date, all business emails and any attachments to them were gone from the Business iPhone, I believe, as the result of the complete email and IT systems access shut-off Ms. Arkus referenced in her above January 13 email to me.

80.     Responding to Ms. Arkus' January 13 message at 4:44:41 p.m. on January 13, I stated:

> Note, I do have personal records and documents on my desktop that have been saved over the years, including financial documents, tax documents, photos, investment information, etc. I do not consent to Cigna accessing or keeping these documents and all should be returned to me. Please confirm your understanding and instruct on how that will be accomplished.

81.     Ms. Arkus did not disagree with or dispute my above statements regarding the privacy of my personal information on my work desktop computer. Likewise, she did not say that any company policies were inconsistent with my statement about the private information I had stored on company media, including my assigned desktop computer. Instead, on January 13, 2023 at 6:47 p.m., she sent me another email (see, Ex. 2), which stated, in part, "I will work with Exec IT to support you in transferring your personal files. We will need to arrange a time for them to come to your house to do this, and they can pick up your IT equipment at that time." On January 17, 2023 at 2:50 p.m., Ms. Arkus sent me another email (see, Ex. 2) confirming that the company's Executive IT personnel would come to my home to remove my personal files from my laptop computer and leave those personal files with me and take the computer. This meeting in my home took place as scheduled, on January 19, 2023. During this meeting in my home, however, company IT personnel said that they could not remove my personal files and photos, so they took the computer with them, claiming that they needed to take the computer back to the office, but that they would download the specified personal documents and photos and send me a thumb drive containing those overnight. They did not actually do this, and I did not receive my personal data until the afternoon of Tuesday, January 24, 2023.

82.     On the afternoon of Tuesday, January 24, 2023, Cigna Director of Security Andre Edison ("Mr. Edison") appeared at my home to return to me personal belongings that I had left behind in my office when, following my resignation, since Express Scripts directed me not to return to its offices. Mr. Edison was also there to return to me a thumb drive storing my personal files and photos that company IT had removed from my previously-assigned work laptop computer. Mr. Edison told me that he was instructed to collect my Business iPhone, and to give to me a

24

DocuSign Envelope ID: 55D48829-7376-45B1-947A-03453D50E17

replacement Business iPhone. This was the first I had heard that Express Scripts, Evernorth or Cigna wished for me to return the Business iPhone before February 3.

83.     Confused that Mr. Edison's request to exchange Business iPhones was inconsistent with Ms. Arkus' previous directions that I should keep the Business iPhone in my possession on the Resignation Date through February 3, I called Ms. Arkus on her cell phone while Mr. Edison (whom I have known for years) waited in my foyer.

84.     Ms. Arkus, with whose voice I am familiar from numerous prior interactions over a number of years, answered my call directly. After greeting her, I told her than Mr. Edison was in my home and requesting that I turn over the Business iPhone, and I asked her for clarification because Mr. Edison's request was inconsistent with Ms. Arkus' January 13 written directions to me that I keep the Business iPhone through February 3, and I did not understand why this had changed. Ms. Arkus provided no explanation for the change. Instead, she repeated that I should give the Business iPhone to Mr. Edison. Ms. Arkus also said that she knew I had personal information on the Business iPhone that I was being instructed to give to Mr. Edison, and she specifically told me to delete my personal information from that Business iPhone before turning it over to Mr. Edison.

85.     At no time during this call, or at any other time, did Ms. Arkus or anyone from Express Scripts, Evernorth or from Cigna, tell me that I should leave any information on the Business iPhone that I was instructed to give to Mr. Edison. At no time during this call, or at any other time, did Ms. Arkus or anyone from Express Scripts, Evernorth or from Cigna, direct me not to restore the Business iPhone to factory settings (as I had done on numerous prior occasions with prior Retired Business iPhones) before giving it to Mr. Edison. At no time during this call, or at any other time did Ms. Arkus, or anyone from Express Scripts, Evernorth or from Cigna, give me any other directions regarding the Business iPhone that I was told to return to Mr. Edison. In fact, no

DocuSign Envelope ID: 55D48839-7376-45B1-947A-03453D50E17

one at Express Scripts, Evernorth or from Cigna, including Ms. Arkus, has ever directed or instructed me that I should leave any contents on the Business iPhone that I turned over to Mr. Edison on January 24.

86.     It never occurred to me, and it still makes no sense to me, that I would (while Mr. Edison was waiting in my home), make Mr. Edison wait for me to examine the entire contents of the Business iPhone to selectively delete my personal and private information from it. By this time, as the result of Express Scripts and Cigna having terminated my company information systems access on January 14, 2023, there were no company emails stored on or accessible through the Business iPhone, and the app that is necessary to access such company email and the company's intranet was disabled. While no Express Scripts, Evernorth or Cigna communications or documents were accessible via the Business iPhone at this time, I understand that all such communications and documents were replicated at all times on Express Scripts or Cigna's servers and email systems, and on the devices of those with whom I had exchanged such email communications. Again, I did not use the Business iPhone that I gave to Mr. Edison on January 24 to conduct Express Scripts, Evernorth or Cigna business by text message, as I have previously informed members of Cigna's in-house commercial litigation legal team for purposes of data collection and discovery pertaining to investigations and other legal actions involving Express Scripts.

87.     Consequently, I elected the speediest and only method I had employed in the past to remove my personal information from the Business iPhones that were assigned to me. I restored this Business iPhone to factory settings, then turned it over to Mr. Edison. As the result of IT measures Express Scripts or Cigna previously took, according to Ms. Arkus as of midnight on January 14, 2023, I did not believe on January 24, 2023, and I do not believe now, that the factory reset deleted anything from the Business iPhone other than my personal information, which Ms. Arkus told me

I should remove from the Business iPhone before giving it to Mr. Edison. As to any Express Scripts, Evernorth or Cigna business information or communications previously stored in the Business iPhone before January 14, 2023, I believe that all of these were securely kept on Express Scripts or Cigna's servers, and accessible to Express Scripts, Evernorth and Cigna before, during and after the January 24, 2023 factory reset.

88.     In restoring the Business iPhone to factory settings before handing it over to Mr. Edison, I had no intention of making any Express Scripts, Evernorth or Cigna business information unavailable to Express Scripts, Evernorth or Cigna, and I do not believe that I ever did make any such business information unavailable to Express Scripts, Evernorth or Cigna in so doing.

89.     Paragraph 76 of Cigna's Amended Complaint against me and CVS Health alleges that: "[u]pon information and belief, Bricker is responsible for the deletion of Cigna's confidential information, which was not authorized and was conducted by Bricker in secret." I do not know what "information" Cigna claims to have that could prompt it to believe that I am responsible for secretly, and without authorization deleting any Cigna confidential information from the Business iPhone or from any other device at any time, but I categorically deny doing so and know this allegation to be false. At no time, including during the period between the Resignation Date and my return of the Business iPhone, did I delete any non-personal information or data, including confidential information belonging to Express Scripts, Evernorth or Cigna, from the Business iPhone. For the reasons already stated, I do not believe the Business iPhone contained any information belonging to Express Scripts, Evernorth or Cigna, including confidential information, at the time of the factory reset, which I believe to have deleted only my personal information from that phone, as I was expressly authorized by Ms. Arkus to do.

DocuSign Envelope ID: 55D48839-7376-45B1-047A-03453D50E17

## NEW ROLE WITH CVS

90.     I have accepted employment with CVS Health, and my planned first date of active employment with CVS Health is February 20, 2023.

91.     I first began to consider a move from Express Scripts in the fall of 2022 when I was contacted by an executive search firm about a potential open position at CVS. I was open to considering a move to CVS because I was unhappy with the lack of direction and leadership I had been experiencing at Cigna, under Mr. Palmer's direction and, in my view, the lack thereof. I felt that I had hit the proverbial "glass ceiling" at Cigna, and did not believe there was room for me to grow further within the organization. Despite being responsible for the business unit that accounted for two-thirds of Cigna's revenues enterprise-wide, I was not a direct report to Cigna's CEO and was not as well compensated as some of my male counterparts and predecessors. I felt undervalued by the Cigna organization as a whole.  I had previously made these concerns about my treatment and future at Cigna well known to multiple Cigna leaders, including Nicole Jones, Cigna's General Counsel; John Murabito, Cigna's former Chief Human Resources Officer; and Cindy Ryan, Cigna's current Chief Human Resources Officer.

92.     I met with Laurie Havanec, CVS's Executive Vice President and Chief People Officer, via videoconference on October 6, November 22, and again on December 6, 2022.

93.     I also met with Karen Lynch, CVS's Chief Executive Officer by videoconference on October 21, 2022.

94.     Following these meetings, I met in person with Ms. Lynch in November, and again in December of 2022. I also met with Ms. Havanec in person following my meeting with Ms. Lynch in December.

95.     I also had several phone conversations with Ms. Lynch and Ms. Havanec throughout this period.

96.     I was open about my noncompetition agreements throughout my discussions with Ms. Lynch and Ms. Havanec. At no time did they or anyone else at CVS ever disagree with me that in joining CVS, I would be expected and required to keep secret any confidential information of which I had knowledge through prior employment, including my Express Scripts employment. I also made clear to Ms. Lynch and Ms. Havanec that while I wanted to make the move to CVS, I took seriously my obligation to protect Express Scripts' confidential information and business interests *but also* I did not want to be sidelined by CVS in an uninfluential position. If I was going to make the move to CVS, it would be to further advance my career. I did not want to be set back by the move.

97.     CVS worked closely with me to understand my skills and capabilities, in order to develop a fitting role outside of the PBM space. CVS Health includes a PBM business that competes with Express Scripts and other PBMs called Caremark. I have never worked for Caremark, and have no intention of working within the Caremark PBM in the new position.

98.     Instead, the position developed through my conversations with CVS, and the one which I have accepted within the CVS Health business, as the Chief Product Officer – Consumer, will be focused on bridging CVS Health's consumer-oriented businesses—retail, health care delivery, and Aetna—to develop product capabilities at the point where these businesses intersect.

99.     This new role will focus on the individual consumer through CVS Health's retail, benefits and delivery arms. I will not be working for the Caremark PBM or for its benefit in any respect. I have also been informed that CVS maintains several Business Information Firewall Standards ("Firewalls") to limit and control certain competitively-sensitive information and protect against

unfair competition, including, crucially, a Firewall surrounding CVS Caremark. It is my understanding that the CVS Caremark Firewall will apply to me in my new role as Chief Product Officer – Consumer, as well as to my position on CVS's ELT. Because of this Firewall, I know that CVS's ELT will not discuss in full-group settings in my presence any matters related to Caremark's PBM business.

100.   As CVS's new Chief Product Officer – Consumer, I will be responsible for identifying and developing potential products—from technological platforms or functions to services—that can leverage and connect CVS Health's touchpoints with consumers to support the continuum of health care services CVS Health offers its consumer customers today. My understanding is that my new role with CVS will involve launching go-to-market product strategies to enhance services to CVS Health's existing customers.

101.   As CVS's Chief Product Officer – Consumer, I will not be in a client-facing role, nor will I be focused on or responsible for CVS's relationships with its PMB payor entity clients. I will be focused on individual consumers and their health care needs.

102.   My employment with CVS will not require me to consider, recall, use or to disclose Express Scripts' confidential information or trade secrets (or those of Evernorth or Cigna, to the extent I even possess any such information, which I do not believe that I do) because this information will be irrelevant to the work I will be doing as CVS's Chief Product Officer – Consumer. Moreover, I will abide by my confidentiality and non-disclosure obligations to Express Scripts/Cigna. In any event, I am prohibited as a condition of my employment with CVS from using or sharing with anyone else at CVS any such confidential information.

DocuSign Envelope ID: 55D48839-7376-4FB1-047A-043453D50E17

I, Amy Bricker, certify under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2023

DocuSigned by:

*[signature]*

6F905D42048847D...

Amy Bricker

DocuSign Envelope ID: 55D48849-7376-4FD1-947A-04345D50E17

# __EXHIBIT 1__

DocuSign Envelope ID: 55D48839-7376-45B1-947A-043453D50E17

**EXECUTIVE RETENTION AGREEMENT**

THIS RETENTION AGREEMENT (this "**Agreement**"), dated as of October 24, 2018, is by and between Cigna Corporation, a Delaware corporation ("**Cigna**") and Amy Bricker ("**Executive"**).

WHEREAS, Cigna and Executive are entering into this Agreement in connection with the proposed merger (the "**Merger**") as contemplated by the Agreement and Plan of Merger, dated as of March 8, 2018, by and among Cigna (together with its Affiliates (as defined below) and any successor to its business or assets that assumes and agrees to perform this Agreement by operation of law or otherwise, the **"Company"**), Express Scripts Holding Company (**"Express Scripts"**), Halfmoon Parent, Inc. (**"Holdco"**), Halfmoon I, Inc. and Halfmoon II, Inc., (the "**Merger Agreement**") in order to set forth the terms and conditions of Executive's retention awards with the Company following the effective time of the Merger (the "**Effective Time**" and the date on which the Effective Time occurs, the "**Effective Date**"); and

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1.**     **Effective Time**.   This Agreement shall become effective as of the Effective Time. In the event that the Effective Time does not occur for any reason, this Agreement shall be null and void *ab initio* and of no force and effect.

**2.**     **Executive Employment.**   As of the Effective Time, Executive shall become an employee of the Company, consistent with the terms set forth in the offer letter provided to the Executive by the Company dated October 24, 2018 (the "**Offer Letter**").

**3.**     **Retention**.

    (a)    *Performance Bonus*.

       (i) *Performance Equity*.   On the first business day after the Effective Date, if such date is during a Cigna open window period, or, if such day is not during an open trading window period, on the first day of an open trading window period following the Effective Date (the "**Grant Date**"), Executive will be granted, under the Cigna Long-Term Incentive Plan (the "**Plan**") an award of restricted shares of Holdco common stock (the "**Performance Equity Award**"). The Performance Equity Award will be subject to terms and conditions approved by the People Resources Committee (the "**PRC**") of the Board of Directors of Cigna (the "**Board**"). The Performance Equity Award shall consist of a whole number of restricted shares of Holdco common stock equal to $500,000, *divided* by the Fair Market Value as defined in the Plan for a share of Holdco common stock on the Grant Date. The Performance Equity Award shall vest on the 2nd anniversary of the Effective Date (the "**Performance Period**"), provided (i) Executive has remained continuously employed by the Company through the last day of the Performance Period; and (ii) Cigna has determined in its sole discretion, that, as of the last day of the Performance Period, Executive has fully satisfied certain performance goals which shall be mutually agreed upon between Cigna and Executive within 30 days of the Effective Date (the "**Performance Goals**").

1

DocuSign Envelope ID: 55D48849-7376-4FB1-947A-0345FD50E17...

(ii) *Performance Cash Award*. Executive will be entitled to a cash award equal to $500,000 provided Executive: (i) remains continuously employed by the Company through the last day of the Performance Period; and (ii) Cigna has determined in its sole discretion, that, as of the last day of the Performance Period, Executive has fully satisfied the Performance Goals (the "**Performance Cash Award**"). The Performance Cash Award shall be payable in a single lump sum within 30 days following the end of the Performance Period; provided, however: (i) if Cigna has determined in its sole discretion that, as of the last day of the Performance Period, Executive has only satisfied a portion of the Performance Goals, then the amount payable shall equal the Performance Cash Award multiplied by the percentage of the Performance Goals achieved; and (ii) that if Executive's employment with the Company is terminated by the Company without Cause before the last day of the Performance Period, Executive will be entitled to an amount that is equal to the Performance Cash Award multiplied by a fraction the numerator of which will be to the number of months that have elapsed since the Effective Date and the denominator of which will be 15, payable no later than the 60th day following his termination of employment and subject to (A) her execution of a general release of claims in favor of the Company (the "**Release Requirement**") and (B) her continued compliance with the restrictive covenants set forth in Sections 6, 7, 8 and 9 (the "**Covenants**").

(b)     *Retention Equity Awards*.

(i) On the first business day after the Effective Date, if such date is during a Cigna open window period, or, if such day is not during an open trading window period, on the first day of an open trading window period following the Effective Date (the "**Grant Date**"), Executive will be granted, under the Cigna Long-Term Incentive Plan (the "**Plan**"), two awards of Strategic Performance Shares (the "**Retention SPS Awards**"), one with respect to the performance period 2017-2019 and one with respect to the performance period 2018-2020 (the "**Retention Equity Awards**")). The Retention Equity Awards will be subject to terms and conditions approved by the People Resources Committee (the "**PRC**") of the Board of Directors of Cigna (the "**Board**"), which terms and conditions will be no less favorable than those provided in the 2018 annual equity awards granted to executive officers of Cigna (the "**Peer Executives**").

(ii)     The Retention SPS Awards shall consist of a whole number of Strategic Performance Shares equal to an aggregate amount of $700,000 *divided* by the Fair Market Value as defined in the Plan for a share of Holdco common stock on the Grant Date. The Retention SPS Award for the performance period 2017-2019 shall consist of a whole number of Strategic Performance Shares equal to $233,333, and the Retention SPS Award for the performance period 2018-2020 shall consist of a whole number of Strategic Performance Shares equal to $466,667, in each case *divided* by the Fair Market Value as defined in the Plan for a share of Holdco common stock on the Grant Date. Each Retention SPS Award shall be subject to the performance-based and time-based vesting conditions set forth in the applicable award agreement.

(c)     For the avoidance of doubt, and notwithstanding anything herein or in any applicable plan document to the contrary, neither the Performance Bonus nor the Retention Equity Awards shall be treated as "eligible earnings" or otherwise taken into account in computing any benefits under any plan, program or arrangement of Cigna, Express Scripts or

their respective affiliates within the meaning of Rule 12b-2 (**"Affiliates"**) promulgated under the Securities Exchange Act of 1934, as amended (the **"Exchange Act"**).

(d) **Certain Definitions**. As used in this Agreement, the following terms have the meanings given below:

(i) "**Cause**" shall mean: (a) any act or acts by Executive, whether or not in connection with her employment by the Company, constituting, or Executive's conviction or plea of guilty or nolo contendere (no contest) to (whether or not any right to appeal or vacate said conviction or plea has been or may be exercised), (i) a felony under applicable law or (ii) a misdemeanor involving fraud, theft, dishonesty or moral turpitude; (b) any act or acts of gross dishonesty, including, but not limited to, directly or indirectly, the actual or attempted misappropriation by Executive of the Company's or its clients' funds or property, or the actual or attempted appropriation of a business opportunity of the Company, including knowingly allowing or overlooking any such conduct; or any act or acts of gross misconduct in the performance of Executive's duties hereunder; (c) any willful malfeasance or willful misconduct by Executive in connection with Executive's duties hereunder or any act or omission which is materially injurious to the financial condition or business reputation of the Company; or (d) any breach by Executive of the provisions of the Covenants.

Notwithstanding the foregoing, the event(s) described in clause (c) of this Section 3(d)(i) shall not be deemed to constitute "Cause" if such event is (i) primarily the result of bad judgment or negligence on the part of Executive not rising to the level of gross negligence; or (ii) primarily because of an act or omission believed by Executive in good faith to have been in, or not opposed to, the interests of the Company.

(ii) "**Good Reason**" shall mean the occurrence of any of the following without Executive's prior consent: (A) any material breach by Cigna of any of the provisions of this Agreement or the Offer Letter or any material failure by Cigna to carry out any of its obligations under this Agreement or the Offer Letter; (B) Cigna requiring Executive to be based at any office or location more than 50 miles from the work location designated in the Offer Letter, except for travel reasonably required in the performance of Executive's responsibilities to the extent substantially consistent with Executive's business travel obligations prior to the Effective Time; (C) any substantial and sustained diminution in Executive's duties, authority or responsibilities as they exist on the Effective Date; or (D) the material diminution of Executive's aggregate compensation (including salary, bonus and benefits) in effect (1) as of immediately following the Effective Date, or (2) in the case of benefits, following Executive's integration into the benefit plans of Cigna applicable to Peer Executives, as of immediately following such integration; *provided* that (i) integration of Executive into the benefit plans of Cigna applicable to Peer Executives shall not itself be deemed to constitute Good Reason, and (ii) following such integration, any amendment, modification or discontinuation of any benefits that applies uniformly to Executive and all other Peer Executives shall not be deemed to constitute Good Reason; *provided* that, in order to resign for Good Reason, (x) Executive must deliver written notice to Cigna describing in reasonable detail the circumstances alleged to constitute Good Reason within 45 days after the initial occurrence thereof, (y) Cigna must have 30 days after receipt of written notice from Executive in which to cure such circumstances, and (z) if such circumstances are not cured, Executive must actually resign within 30 days following the

expiration of such cure period.

**4. Rollover Equity**.  Upon the Effective Time, Executive's Company Stock Options and Company RSU Awards (as such terms are defined in the Merger Agreement) shall be converted into equivalent Holdco equity awards (collectively, the "**Converted Awards**") in accordance with the terms and conditions set forth in Section 1.8 of the Merger Agreement, except that Executive agrees that the definition of "Constructive Termination" included in the award agreements applicable to the Converted Awards shall be replaced in its entirety, effective as of the Effective Time, with the definition of "Good Reason" set forth in Section 3(d)(ii).

**5. Severance**.  For the period beginning on the Effective Date and ending on the 2nd anniversary of the Effective Date, Executive will continue to be eligible to participate in the Express Scripts Change in Control Severance Plan, effective as of January 1, 2017, as amended, (the "**Severance Plan**") except that Executive agrees that the definition of "Constructive Termination" included in the Severance Plan shall be replaced in its entirety, effective as of the Effective Time, with the definition of "Good Reason" set forth in Section 3(d)(ii).

**6. Noncompete; Nonsolicitation**.

In further consideration of Executive's benefits hereunder and as a condition of Executive's continued employment with the Company after the Effective Time, Executive acknowledges that during the course of Executive's employment with the Company, Executive has and will become familiar with the Company's trade secrets and with other Confidential Information concerning the Company and that Executive's services have been and shall continue to be of special, unique, and extraordinary value to the Company.  Executive agrees that:

(a)  During Executive's employment with the Company and for the 1 year period following the termination of Executive's employment with the Company for any reason (the "**Noncompete Period**"), Executive shall not engage in, enter the employment of, perform services for, consult with or for, or have any direct or indirect interest in any Business Competitor  in the United States or in any other country in which the Company conducts business; provided that nothing herein shall restrict Executive from (i) owning one percent (1.0%) or less of the securities of any Business Competitor, which securities are listed on any national securities exchange or actively traded over-the-counter and held solely as a passive investment and if Executive has no other connection in or relationship, direct or indirect, with the issuer of such securities, or (ii) becoming employed, engaged, associated or otherwise participating with a separately managed division or subsidiary of a competitive business provided that such separately managed division or subsidiary is itself not a Business Competitor and Executive's services are provided only to such division or subsidiary. For purposes of this Agreement, the term "Business Competitor" shall mean any person, firm, corporation or other entity engaged in the business of, or about to become engaged in the business of, pharmacy benefit management ("PBM");

(b)  For a period of two (2) years following Executive's termination, Executive shall not directly or indirectly, (a) solicit or otherwise do business with any actual or prospective customer (as defined below) relating to any business in which the Company is engaged and with respect to which Executive was involved at any time during Executive's employment with the

Company, or (b) otherwise cause or attempt to cause any actual or prospective customer (as defined below), (i) to divert, terminate, limit or in any manner modify or fail to enter into any actual or potential business relationship with the Company, or (ii) to do business with any other person, firm, corporation or other entity which is engaged in the business or performs services similar to or competitive with those engaged in or provided by the Company (without limiting the generality of the foregoing, "customer" includes without limitation any vendor, supplier, drug manufacturer, broker, regional marketing director, employee benefit plan or trust, or other party in any type of business relationship with the Company; provided that Executive had contact or attempted to have contact with the customer in the last two (2) years of Executive's employment with the Company or had access to non-public information regarding such customer during such period because of Executive's employment relationship with the Company); and

(c)     For a period of two (2) years following Executive's termination, Executive shall not directly or indirectly, solicit, employ, engage, induce, or cause or encourage others to employ, engage, solicit the employment of, offer employment to, or offer to enter into an independent contractor, consulting, or broker relationship with, any person who worked at the Company at any time during the one (1) year preceding Executive's termination date.

For the avoidance of doubt, the term "Company" as used in this Section 6 and in Section 7 shall include all former, current and future Affiliates of Cigna, both before and after the Effective Time, including Holdco and Express Scripts.

**7.     Confidentiality; Trade Secrets**.

(a)     Executive acknowledges that the Company continually develops Confidential Information, that Executive may develop Confidential Information for the Company, and that Executive may learn of Confidential Information during the course of Executive's employment. Executive agrees that all Confidential Information that Executive creates or to which Executive has access as a result of Executive's employment, whether before or after the date of this Agreement, is and shall remain the sole and exclusive property of the Company and that Executive will comply with the policies and procedures of the Company for protecting Confidential Information. Executive further agrees that, except as required for the proper performance of Executive's duties for the Company or as required by applicable law (and then only to the extent required), Executive will not, directly or indirectly, disclose, use for Executive's own benefit or gain, or assist others in using, applying or disclosing, any Confidential Information. Executive understands and agrees that these restrictions will continue to apply after Executive's employment terminates, regardless of the reason for termination and regardless whether Executive is receiving or is entitled to receive any payments or other benefits under this Agreement. As used in this Agreement, "**Confidential Information**" shall mean all information that is (i) disclosed to or known by Executive as a consequence of or through Executive's employment with the Company (including Executive's employment with Express Scripts and its Affiliates prior to the Effective Time) and (ii) not generally known to persons, corporations, organizations or others outside of the Company. Confidential Information includes, but is not limited to, technical or non-technical data, formulas, computer programs, devices, methods, techniques, processes, financial data, personnel data, customer-specific information, confidential customer lists, production and sales information, supplier-specific information, cost information, marketing plans and strategies, or other data or information that constitutes a trade

secret or is otherwise treated as being confidential by the Company.

(b)     Executive acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) that relate to the Company's actual or anticipated business, research and development or existing or future products or services and that are conceived, developed or made by Executive (whether alone or jointly with others) while employed by the Company, whether before or after the date of this Agreement ("**Work Product**"), belong to the Company.  Executive shall promptly disclose all patentable inventions and other material Work Product to the Board and, at the Company's expense, perform all actions reasonably requested by the Board (whether during or after Executive's employment with the Company) to establish and confirm such ownership (including, without limitation, assignments, consents, powers of attorney and other instruments).  Executive acknowledges that all Work Product shall be deemed to constitute "works made for hire" under the U.S. Copyright Act of 1976, as amended.  In accordance with Title 19, Section 805 of the Delaware Code, Executive is hereby advised that this Section 7(b) regarding the Company's ownership of Work Product does not apply to any invention for which no equipment, supplies, facilities or trade secret information of the Company was used and that was developed entirely on Executive's own time, unless (i) the invention relates to the business of the Company or to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Executive for the Company.

(c)     Notwithstanding any other provisions of this Section 7, pursuant to 18 USC Section 1833(b), Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of any Confidential Information that is a trade secret that is made: (i) confidentially to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  If Executive files a lawsuit for retaliation by Cigna for reporting a suspected violation of law, Executive may disclose such trade secret to her attorney and use the trade secret information in related court proceedings, provided that Executive files any document containing the trade secret information under seal and do not disclose the trade secret, except pursuant to court order.  Notwithstanding any provision of this Agreement to the contrary, the provisions of this Agreement are not intended to, and shall be interpreted in a manner that does not, limit or restrict Executive from exercising her legally protected whistleblower rights (including pursuant to Rule 21F under the Exchange Act).

**8.**     **Cooperation**.  Executive agrees to reasonably cooperate with the Company in all investigations, litigation and arbitrations of any kind, to reasonably assist and cooperate in the preparation and review of documents and in meetings with Company attorneys, and to provide truthful testimony as a witness or a declarant in connection with any present or future court, administrative agency, or arbitration proceeding involving the Company and with respect to which Executive has relevant information.  The Company will reimburse Executive, upon production of appropriate receipts and in accordance with Cigna's then existing Business Travel Reimbursement Policy, for the reasonable business expenses (including air transportation, hotel

and similar expenses) incurred by Executive in connection with such assistance. All receipts for such expenses must be presented for reimbursement within 45 days after the expenses are incurred in providing such assistance.

9.     **Non-Disparagement**.  Executive agrees that Executive will not disparage the Company or its current or former officers, directors, and employees in any way; further, Executive will not make or solicit any comments, statements, or the like to the media or to others that would be considered derogatory or detrimental to the good name or business reputation of any of the aforementioned entities or individuals; provided, that this section does not prohibit statements which Executive is required to make under oath or which are otherwise required by law or in connection with the enforcement of Executive's rights hereunder, provided, that such statements are truthful and made in a professional manner; further provided, that this section does not prohibit Executive from making statements which would otherwise be in violation of this section, provided such statements are made by Executive in response to public statements made by the Company, or its authorized representatives, which are derogatory or detrimental to the good name or business reputation of Executive.

10.     **Entire Agreement**.  This Agreement shall supersede any and all prior oral or written representations, understandings and agreements of Executive and the Company or Express Scripts or any of its Affiliates with respect to Executive's employment relationship, and this Agreement contains the entire agreement of the parties with respect to those matters; no agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party that are not set forth expressly in this Agreement. Notwithstanding the prior sentence, this Agreement shall not supersede the Offer Letter, the Severance Plan (as modified by this Agreement), and any award agreements entered into between the Company and Executive with respect to the Converted Awards (as modified by this Agreement), the Performance Equity Award and the Retention Equity Awards.

11.     **Enforceability and Remedies**.

(a)     Executive agrees that the restrictions on, and other provisions relating to, Executive's activities contained in this Agreement are fully reasonable and necessary to protect the goodwill, Confidential Information, and other legitimate interests of the Company. Executive also acknowledges and agrees that, were Executive to breach the provisions of this Agreement, the harm to the Company would be irreparable. Executive therefore agrees that in the event of such a breach or threatened breach the Company shall, in addition to any other remedies available to it, have the right to obtain preliminary and permanent injunctive relief against any such breach without having to post bond. Executive further agrees that, in addition to any other relief awarded to the Company as a result of Executive's breach of any of the provisions of this Agreement, the Company shall be entitled to recover all payments made to Executive or on Executive's behalf hereunder.

(b)     Executive hereby agrees that in the event any provision of this Agreement shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too long a time, too large a geographic area, or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

(c)     Executive and the Company hereby agree that that any actions seeking emergency, temporary or permanent injunctive relief arising out of or relating to the Covenants shall be brought exclusively in the United States District Court for the Eastern District of Pennsylvania ("**Federal Court**") or in any court in the Commonwealth of Pennsylvania (collectively, "**State Court**") if the Federal Court lacks subject matter jurisdiction to adjudicate the dispute or controversy.  Additionally, Executive and the Company expressly waive any defense of inconvenient forum and any other venue or jurisdiction-related defenses that each might otherwise have in such a proceeding brought in the Federal Court or the State Court.

**12.**     **Assignment**.  Neither Cigna nor Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other; *provided*, *however*, that (a) Cigna may assign its rights and obligations under this Agreement without Executive's consent to any successor entity of Cigna and (b) this Agreement shall automatically be assigned, without any further action on the part of Cigna or Executive, to Holdco, effective as of the Effective Time, and from and after the Effective Time, references herein to "Cigna" shall be deemed to refer to Holdco.  This Agreement shall inure to the benefit of and be binding upon Cigna, its successors (including, without limitation, any transferee of all or substantially all of its assets to any successor entity of Cigna), and permitted assigns and upon Executive, Executive's executors, administrators, heirs, and permitted assigns.

**13.**     **Notices**.  Any and all notices, requests, demands, acceptances, appointments and other communications provided for by this Agreement shall be in writing (including electronic mail or similar electronic transmission) and shall be effective when actually delivered in person or, if mailed, five days after having been deposited in the United States mail, postage prepaid, registered or certified and addressed to Executive at Executive's last known address on the books of the Company or, in the case of the Company, addressed to:

> Cigna Executive Compensation
> 1601 Chestnut Street
> Philadelphia, PA 19192

**14.**     **Withholding**.  All compensation paid or provided to Executive under this Agreement shall be subject to any applicable income, payroll or other tax withholding requirements.

**15.**     **Section 409A**.

(a)     It is intended that the payments and benefits under this Agreement comply with, or be exempt from, the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "**Code**"), and this Agreement shall be so administered and interpreted. The PRC or the Company may make any changes required to conform this Agreement with applicable Code provisions and regulations relating to deferral of compensation under Section 409A of the Code; *provided, however*, that such changes shall not adversely affect the rights or net benefits to which Executive is entitled hereunder.  With respect to any amounts payable hereunder in installments, each installment shall be treated as a separate payment for purposes of Section 409A of the Code.

(b)     Notwithstanding anything to the contrary in this Agreement, if the Company

8

determines (i) that on the date Executive's employment with the Company terminates or at such other time that the Company determines to be relevant, Executive is a "specified employee" (as such term is defined under Treasury Regulation 1.409A−1(i)(1)) of the Company and (ii) that any payments to be provided to Executive pursuant to this Agreement are or may become subject to the additional tax under Section 409A(a)(1)(B) of the Code or any other taxes or penalties imposed under Section 409A of the Code ("**Section 409A Taxes**") if provided at the time otherwise required under this Agreement, then such payments shall be delayed until the date that is six months after the date of Executive's "separation from service" (as such term is defined under Treasury Regulation 1.409A−1(h)) with the Company, or such shorter period that, as determined by the Company, is sufficient to avoid the imposition of Section 409A Taxes.  For the avoidance of doubt, it is anticipated that payments qualifying for the exemption from application of Section 409A of the Code pursuant to Treasury Regulation 1.409A-1(b)(4) or 1.409A−1(b)(9)(iii) will be made during this six-month period, if applicable.  Any payments delayed pursuant to this Section 15 shall be made in a lump sum on the first day of the seventh month following Executive's "separation from service" (as such term is defined under Treasury Regulation 1.409A−1(h)), or such earlier date that, as determined by the Company, is sufficient to avoid the imposition of any Section 490A Taxes.

(c)    For purposes of any payment due hereunder upon a termination of employment that is subject to the provisions of Section 409A of the Code, such phrase or any similar phrase shall mean a "separation from service" as defined by the default provisions of Treasury Regulation 1.409A-1(h).

(d)    By accepting this Agreement, Executive hereby agrees and acknowledges that the Company makes no representations with respect to the application of Section 409A of the Code to any tax, economic, or legal consequences of any payments payable to Executive hereunder and, by the acceptance of this Agreement, Executive agrees to accept the potential application of Section 409A of the Code to the tax and legal consequences of payments payable to Executive hereunder.

**16.**    **Other Arrangements**.  If any provision of this Agreement conflicts with any other agreement, policy, plan, practice or other Company document, then the provisions of this Agreement shall control.  For the purposes of Cigna's severance plans this Agreement shall be considered an individual agreement that provides severance benefits and payments upon a termination of employment.

**17.**    **Choice of Law**.  The validity, interpretation, construction, and performance of this Agreement shall be governed by the laws of the Commonwealth of Pennsylvania without giving effect to choice of law or conflict of law rules or provisions thereof.  The parties agree that, in the event it becomes necessary to seek judicial remedies, which, for the avoidance of doubt, shall not include arbitration, for the breach or threatened breach of this Agreement, the prevailing party will be entitled, in addition to all other remedies, to recover from the non-prevailing party reasonable attorneys' fees and costs upon the entry of a final nonappealable judgment.

**18.**    **Arbitration**.  Except as otherwise provided in Section 11(c), Executive and the Company agree that any and all disagreements, disputes or claims listed below will be resolved exclusively by arbitration in the Philadelphia, Pennsylvania area.  Arbitration will be conducted

in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association. Copies of the Arbitration Policy and Rules and Procedures are available to Executive upon request. A legal judgment based upon the arbitrator's award may be entered in any court having jurisdiction over the matter. Each party shall be liable for its own costs and expenses (including attorneys' fees) of any arbitration. Except as otherwise provided in Section 11(c), Executive and the Company agree to arbitrate anything: (a) related in any way to this Agreement or how it is interpreted or implemented; and (b) that involves Executive's employment with the Company or the termination of that employment, including any disputes arising under local, state or federal statutes or common law.

**19.** **Miscellaneous**.

(a) The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement. Nothing herein shall be deemed to create an employment contract, and Executive acknowledges that Executive's employment by the Company is terminable at will by either party with or without cause and with or without notice. This Agreement and its Appendices may not be modified, waived, or discharged unless such waiver, modification, or discharge is agreed to in a writing signed by Executive and a duly authorized officer of the Company. Each party shall perform such further acts and execute and deliver such further documents as may be reasonably necessary to carry out the provisions of this Agreement.

(b) This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together constitute one and the same instrument. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

*[Signature page follows].*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the date first written above.

CIGNA CORPORATION

By:   John Murabito

_____

Its:  Executive Vice President

Amy Bricker

_____

# EXHIBIT 2

---------- Forwarded message ---------
**From:** Amy Bricker
**Date:** Tue, Jan 17, 2023 at 2:53 PM
**Subject:** Re: [External] Re: Follow up
**To:** Arkus, Melissa M W361A <Melissa.Arkus@cigna.com>

Sounds good. Thx

Sent from my iPhone

> On Jan 17, 2023, at 2:50 PM, Arkus, Melissa M W361A <Melissa.Arkus@cigna.com> wrote:

> Amy,

> Confirming that Exec IT Support for Thursday @ 9:00 am CST

> Michael.Dicesare@Cigna.com leads the ESS team and can be your point of contact if something changes  Sorry for the confusion

> Let me know if any questions

> Thanks

> Melissa

> **From:** Amy Bricker
> **Sent:** Tuesday, January 17, 2023 3:20 PM
> **To:** Arkus, Melissa M W361A <Melissa.Arkus@Cigna.com>
> **Subject:** Re: [External] Re: Follow up

> Hi Melissa

> I didn't hear from you so didn't realize you were sending them for sure.

> Would Thursday around 9am work? Or Friday before 12?

> Amy

>> On Tue, Jan 17, 2023 at 2:17 PM Arkus, Melissa M W361A <Melissa.Arkus@cigna.com> wrote:

>> Hi Amy,

>> Exec IT was at your house between 10:10-10:40 but no one was home. Let me know a better time this week and we'll coordinate accordingly.

DocuSign Envelope ID: 55D48839-7376-45B1-947A-043453D50E17

Thanks.

Melissa

---

**From:** Amy Bricker ███████████████
**Date:** January 13, 2023 at 6:49:52 PM CST
**To:** Arkus, Melissa M W361A <Melissa.Arkus@Cigna.com>
**Subject:** Re: [External] Re: Follow up

Tuesday between 10-12 works best. Thanks

Amy

Sent from my iPhone

> On Jan 13, 2023, at 6:47 PM, Arkus, Melissa M W361A <Melissa.Arkus@cigna.com> wrote:
>
> Amy,
>
> I will work with Exec IT to support you in transferring your personal files  We will need to arrange a time for them to come to your house to do this, and they can pick up your IT equipment at that time
>
> Let me know if there is a window of time on Tuesday or Wednesday that works best for you
>
> Melissa

---

**From:** Amy Bricker ███████████████
**Sent:** Friday, January 13, 2023 5:45 PM
**To:** Arkus, Melissa M W361A <Melissa.Arkus@Cigna.com>
**Subject:** Re: [External] Re: Follow up

Please see below.

Amy

Sent from my iPad

> On Jan 13, 2023, at 3:46 PM, Arkus, Melissa M W361A <Melissa.Arkus@cigna.com> wrote:
>
> Amy,
>
> Correct - Eric will communicate to the team.
>
> Melissa

DocuSign Envelope ID: 55D48829-7376-45D1-947A-043453D50E17

**From:** Amy Bricker ███████████████████
**Date:** January 13, 2023 at 4:44:41 PM EST
**To:** Arkus, Melissa M W361A <Melissa.Arkus@Cigna.com>
**Subject:** [External] Re: Follow up

Melissa

So to confirm, I will NOT join on Tuesday for team communication?

This is new news

Amy

Sent from my iPhone

> On Jan 13, 2023, at 3:35 PM, Arkus, Melissa M W361A
> <Melissa.Arkus@cigna.com> wrote:
>
>
> Amy,
>
> Per our discussion yesterday, sending over some details you requested:
>
> 1.  Separation Date:  Friday February 3, 2023.
>
> 2.  System and Document Access:  You will no longer have access to emails or our
>     IT system as of midnight tonight.  Similarly, your site access will be shut off.   We
>     will work with Taryn to make arrangements to collect any of your IT equipment
>     except for your iPhone during your transition period and coordinate delivery of
>     your personal belongings that are in the office.  If you have any hard copies of
>     documents in your possession outside of the office, please return those as well with
>     your equipment.
>
>      Note, I do have personal records and documents on my desktop that have been
>     saved over the years, including financial documents, tax documents, photos,
>     investment information, etc.  I do not consent to Cigna accessing or keeping these
>     documents and all should be returned to me.  Please confirm your understanding
>     and instruct on how that will be accomplished.
>
> 3.  Transition Period:
>
>     • Eric will inform the Evernorth and PBM leadership teams of
>       your resignation on Tuesday, January 17th. We will communicate
>       more broadly internally and externally on Wednesday, January 18th.
>       Would ask you to not share/discuss your decision until we have had
>       the chance to communicate.
>
>     • We will follow up relative to plans for the PCMA Board
>       meeting.

On the first two bullets regarding communication, I am requesting that the communications you are
distributing internally and externally be shared with me in advance and that I be given the opportunity to
provide input as to their composition.

Regarding the 1/18/23 comms, what are you planning?  Specifically to whom will those be directed and
again, what precisely are you communicating about my departure?

- We will let the team and others know that you are available by phone only for transition-related questions until Friday, February 3rd.

- You should no longer make or direct any decisions on behalf of Cigna, Evernorth or on behalf of any subsidiary or affiliate, unless Eric Palmer specifically asks you to do so.

- You should no longer represent Cigna, Evernorth or on behalf of any subsidiary or affiliate on any meeting, virtual or in person, unless Eric Palmer specifically asks you to do so.

- If you are asked to do any of the above from someone other than Eric Palmer, please re-direct to Eric and me.

- No one should be communicating to you, nor should you use, your personal email or personal text to discuss or share any business or transition related information.  We may use your personal email to exchange on HR related matters.

- You will continue to be paid and receive benefits as though you remained actively employed during this time.  You will also continue to be subject to all of Cigna's policies and procedures applicable to our employees during this time.


If you have any questions, let me know.


Melissa

--------------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information.  This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly.  Please delete it from your files if you are not the intended recipient.  Thank you for your compliance.  Copyright (c) 2022 Cigna
=========================================================================================

--------------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information.  This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly.  Please delete it from your files if you are not the intended recipient.  Thank you for your compliance.  Copyright (c) 2022 Cigna
====================================================================================

--------------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information.  This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly.  Please delete it from your files if you are not the intended recipient.  Thank you for your compliance.  Copyright (c) 2022 Cigna
====================================================================================

--------------------------------------------------------------------------------

CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information.  This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly.  Please delete it from your files if you are not the intended recipient.  Thank you for your compliance.  Copyright (c) 2022 Cigna
========================================================================

------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown.  This email transmission may contain confidential information.  This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly.  Please delete it from your files if you are not the intended recipient.  Thank you for your compliance.  Copyright (c) 2022 Cigna
========================================================================