# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THE STATE OF ILLINOIS, EX REL., KWAME RAOUL, ATTORNEY GENERAL<br><br>*PLAINTIFF,*<br><br>v.<br><br>ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; MEDCO HEALTH SOLUTIONS, INC; CVS HEALTH CORPORATION; CVS PHARMACY, INC; CAREMARK RX, LLC; CAREMARKPCS HEALTH, LLC; CAREMARK, LLC; UNITEDHEALTH GROUP, INC.; OPTUMRX INC.; AND OPTUMINSIGHT, INC.<br><br>*DEFENDANTS.* | Case No. 1:23-CV-00170 |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO CVS HEALTH CORPORATION'S MOTION TO DISMISS THE COMPLAINT <u>FOR LACK OF PERSONAL JURISDICTION</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................. 2

ARGUMENT ......................................................................................................... 7

I.   Legal Standard ......................................................................................... 7

II.  CVS Health's Declaration Fails to Controvert the State's Allegations, And All Factual Allegations That Are Not Controverted Must Be Taken As True. .................................... 8

III. CVS Health Completely Ignores Key Allegations. ......................................... 11

IV. The Uncontroverted Facts Satisfy Federal Due Process for Specific Personal Jurisdiction Over CVS Health. ......................................................................... 13

     A.   CVS Health purposefully directed its activities at Illinois. ........................... 14

        1.   CVS Health's conduct was both intentional and tortious..................... 14

        2.   CVS Health's conduct was expressly aimed at Illinois........................ 15

        3.   CVS Health knew that the State and Illinois diabetics would be injured in Illinois.............................................................. 17

     B.   CVS Health's contacts with Illinois directly relate to the State's claims against it. ............................................................................... 18

     C.   This Court's exercise of jurisdiction comports with fair play and substantial justice. ................................................................................ 19

V.  Alternatively, the State is Entitled to Jurisdictional Discovery Regarding CVS Health's Illinois Contacts, Involvement in the Scheme, and Corporate Structure. .......................... 21

CONCLUSION ....................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*Bishop v. Cross,*
   2015 WL 7008178 (S.D. Ill. Nov. 12, 2015) ........................................................ 9

*BRABUS GmbH v. Individuals Identified on Schedule A Hereto,*
   2022 WL 7501046 (N.D. Ill. Oct. 13, 2022)........................................ 15, 16, 17, 21

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985) ................................................................................... 13, 19

*Café Real Estate LLC v. VSP North Am. LLC,*
   262 F. Supp. 3d 637 (N.D. Ill. 2017) ................................................................ 11

*Calder v. Jones,*
   465 U.S. 783 (1984) ................................................................................... 14, 19

*Felland v. Clifton,*
   682 F.3d 665 (7th Cir. 2012)................................................................. 7, 14, 17

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.,*
   141 S. Ct. 1017 (2021) ........................................................ 13, 17, 18, 19

*Gilman Opco LLC v. Lanman Oil Co.,*
   2014 WL 1284499 (N.D. Ill. Mar. 28, 2014).............................................. 21, 22

*Int'l Shoe Co. v. Washington,*
   326 U.S. 310 (1945)........................................................................................ 13

*John Crane, Inc. v. Shein Law Ctr., Ltd.,*
   891 F.3d 692 (7th Cir. 2018)............................................................................. 7

*Kosar v. Columbia Sussex Mgmt., LLC,*
   2021 WL 4499494 (N.D. Ill. June 1, 2021) ...................................................... 22

*Leong v. SAP Am., Inc.,*
   901 F. Supp. 2d 1058 (N.D. Ill. 2012) ............................................................. 10

*Lexington Ins. Co. v. Hotai Ins. Co., LTD.,*
   938 F.3d 874 (7th Cir. 2019)............................................................................ 7

*NBA Properties, Inc. v. HANWJH,*
   46 F.4th 614 (7th Cir. 2022)................................................................... 16, 17

*Northwest 1 Trucking Inc. v. Haro,*
   613 F. Supp. 3d 1081 (N.D. Ill. 2020) ..................................................... 9, 19, 20

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.*,
   338 F.3d 773 (7th Cir. 2003) .................................................................................. 7, 11

*Riverdale Plating & Heat Treating, LLC v. Andre Corp.*,
   2015 WL 5921896 (N.D. Ill. Oct. 9, 2015) ............................................................. 8

*Rose v. Franchetti*,
   713 F. Supp. 1203 (N.D. Ill. 1989) ..................................................................... 4, 8

*Tamburo v. Dworkin*,
   601 F.3d 693 (7th Cir. 2010) ............................................................................ 13, 14

*Treadwell v. McHenry Cnty*,
   193 F. Supp. 3d 900 (N.D. Ill. 2016) .................................................................... 9

*uBID, Inc. v. GoDaddy Group, Inc.*,
   623 F.3d 421 (7th Cir. 2010) ..................................................................... 17, 18, 20

*Walden v. Fiore*,
   571 U.S. 277 (2014) ............................................................................................. 16

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) ............................................................................................. 19

## S<span>TATUTES</span>

815 ILCS 505/2 ......................................................................................................... 4

815 ILCS 505/7 ......................................................................................................... 4

815 ILCS 510/2 ......................................................................................................... 4

# EXHIBIT INDEX

Exhibit 1 - Nov. 10, 2016 Declaration of Thomas Moffatt ....................................................... 5, 9

Exhibit 2 - Tom Moffatt LinkedIn Profile .............................................................................. 8, 10

Exhibit 3 - Declaration of Melanie Luker ..................................................................................... 9

Exhibit 4 - Corporate Disclosure Statement by PCMA ................................................................. 9

Exhibit 5 - PCMA Board of Directors ................................................................................... 10, 15

Exhibit 6 - Declaration of Brian McCarthy of PCMA................................................................ 10

Exhibit 7 - State of Arkansas' Response to Motion to Dismiss ................................................... 11

The State of Illinois (the "State") submits this opposition to the Rule 12(b)(2) Motion to Dismiss filed by Defendant CVS Health Corporation ("CVS Health").

## INTRODUCTION

For nearly twenty years Illinois diabetics and health plan payors have been increasingly overcharged for necessary diabetes medications due to the unfair and deceptive practices of CVS Health and other Defendants. The State of Illinois filed suit in Illinois state court to put an end to the Defendants' conduct and to recover the overpayments made by Illinois diabetics. (*See, e.g.,* ¶¶ 34–35, 498).[1]  The claims are based on Illinois law, including the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), and, in part, arise from the State's sovereign interest in protecting the health and safety of Illinoisans as well as the integrity of the State's marketplace. (¶ 36–37).

CVS Health claims that it cannot be sued in Illinois because the State's claims against it are based "only" on its status as a corporate parent. (Dkt. 53 at 2). Building on that faulty premise, CVS Health provides a declaration asserting that it is nothing more than a holding company with no "regularly occur[ring]" business operations in Illinois and that the CVS Defendants are separate corporate entities. (Dkt. 53-1). CVS Health then spends much of its brief attempting to rebut corporate veil and similar arguments that are not necessary to the Court's jurisdictional analysis.

The State's claims against CVS Health are not based on its status as a corporate parent, but on CVS Health's own conduct. The uncontroverted allegations in the complaint set forth specific facts regarding CVS Health's involvement in the Insulin Pricing Scheme, separate and apart from its role as a corporate parent, including:  (1) meetings and communications between CVS Health

---

[1] All references in this Memorandum to parenthetical paragraph citations are citations to the individually numbered paragraphs of the Complaint (Dkt. 1-1).

and the Manufacturer Defendants to develop and plan the Scheme including dates and the identities of executives who were involved; (2) CVS Health's participation and leadership in the PBM trade association that the Defendants used as a vehicle to plan and effectuate the Scheme; and (3) CVS Health's direct involvement in the PBM, formulary, and pharmacy services of the CVS entities through numerous shared executives and employees who are identified by name and title. None of these allegations are mentioned in CVS Health's declaration and many are ignored in CVS Health's Rule 12(b)(2) motion. The handful of allegations that CVS Health does mention in its motion are viewed in isolation, without regard for the others, and then quickly brushed aside. (*See, e.g.*, Dkt. 53 at 4-5). Contrary to CVS Health's assertion, (Dkt. 53 at 10), the State has *plentifully* alleged that CVS Health provides PBM, retail, and mail order pharmacy services in Illinois. CVS Health's Rule 12(b)(2) Motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Over 1.3 million Illinoisans live with diabetes, a disease that would severely harm or kill them without medication like insulin, a drug that now costs thousands annually for a single diabetic. (¶¶ 1, 4, 225, 250). An insulin product that was originally priced at $20 when released in the late 1990s, now ranges between $300 and $700. (¶¶ 13–14). In the last decade alone, insulin prices have increased as much as 1000%. (¶¶ 15, 261, Figs. 2–6). As a result, one in four diabetics skip or ration critical doses which, in turn, leads to further health complications and additional costs. (¶¶ 30, 31, 262, 289, 444, 456–57, 464). In Illinois, the State has spent billions of dollars on increased healthcare costs for diabetes and related complications. (¶¶ 31–33, 289, 456–61).

Tellingly, the drug has not changed in the past 20 years, and there has been little to no innovation in the product itself—today's $350 insulin is the exact drug originally priced at $20. (¶¶ 17, 242–54). In fact, it costs the Manufacturer Defendants less than $2 to make. (¶¶ 14, 490). Normal market forces are not at work. (¶¶ 331–34, 370–71).

### *The Insulin Pricing Scheme*

The Manufacturer Defendants dominate the diabetes drug market, manufacturing 99% of insulins on the market. (¶¶ 5, 258). The Manufacturers also, in coordination with the PBMs, set the list price for their diabetes drugs. (¶¶ 20, 291, 340). The list price is the basis for the price that nearly every consumer and payor pays for the at-issue drugs. (¶¶ 27, 356).

The PBM Defendants control 80% of the market and manage the pharmacy benefits for the vast majority of Illinoisans. (¶¶ 6, 310). In this role, the PBM Defendants establish drug lists called formularies that determine which diabetes drugs are covered and not covered for nearly every payor in Illinois. (¶¶ 7, 9, 291, 335). PBMs thus effectively control utilization of the at-issue drugs. (¶¶ 6–11, 335). In short, the Manufacturers control the product, the PBMs control the buyers, and collectively these two groups of Defendants control the price paid by nearly every diabetic and payor in Illinois. (¶¶ 331–51).

Knowing the importance of price, volume, and access, the Manufacturers and PBMs work together to maximize their own profits to the detriment of Illinoisans. (¶¶ 6–11, 351). Formulary inclusion depends on which Manufacturer increases the PBM's bottom lines the most. (¶¶ 22, 242–54, 331, 361–62). The Manufacturers, knowing formulary position directly correlates to sales volume, simply raise their reported prices and then secretly kick back a significant portion of that price to the PBM Defendants ("Manufacturer Payments"). (¶¶ 10, 20, 296–300, 336, 340, 344, 358–62). It is a win-win for Defendants: the PBMs make money from the increased prices and the secret kick back payments, while the Manufacturers lock in huge volume and maintain their own profit margins. (¶¶ 23–24, 372–375, 406, 409). The result, however, is unconscionable—the most expensive diabetes drugs end up on the formularies used by most Illinoisans, who end up paying more so the Defendants can profit. (¶¶ 22, 333, 344–46, 351, 361–62).

*The State's Claims*

The State brought suit in Illinois state court against the Manufacturer Defendants and the PBM Defendants for violations of the ICFA, the UDTPA, and unjust enrichment. (¶¶ 483–500). The State sued on behalf of the hundreds of thousands of Illinoisans injured by the Insulin Pricing Scheme. (¶¶ 34, 214–215).

The ICFA and UDTPA prohibit unfair and deceptive trade practices in the conduct of trade or commerce within Illinois. 815 ILCS 505/2; 815 ILCS 510/2. The complaint alleges that each Defendant's conduct and involvement in the Insulin Pricing Scheme was both unfair and deceptive in violation of the ICFA and UDTPA and caused injury in Illinois to over a million Illinois diabetics. (¶¶ 483–491). Each purchase of the at-issue drugs at prices resulting from the Insulin Pricing Scheme, by any Illinois resident, constitutes a separate violation of the ICFA and UDTPA. 815 ILCS 505/7. Because Illinois diabetics continue to pay for the at-issue drugs based on the false prices generated by the Insulin Pricing Scheme, the harm is ongoing. (¶¶ 469).

*Relevant Jurisdictional Facts*

The complaint sets forth the following facts regarding CVS Health and its involvement in the Insulin Pricing Scheme and related forum contacts, which are uncontroverted by the Declaration of Thomas Moffatt submitted in support of CVS Health's Rule 12(b)(2) Motion:[2]

- CVS Health, through its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Chief Communication Officers, and others, is directly involved in the PBM services, pharmacy services, and formulary construction at the center of the Insulin Pricing Scheme, including those in Illinois. (¶ 78). CVS Health's Chief Policy

---

[2] *See Rose v. Franchetti*, 713 F. Supp. 1203, 1205 n.1 (N.D. Ill. 1989) (for purposes of personal jurisdiction, court must take plaintiff's allegation as true where the defendant's affidavit does not squarely address the allegation and leaves ambiguity).

and External Affairs Officer, Thomas Moriarty, testified before Congress in connection with an investigation on the price of insulin, evidencing a high level of involvement and knowledge. (¶ 354).

- CVS Health and the other CVS Defendants share numerous directors and executives. Through these shared directors and executives, CVS Health had direct involvement in the at-issue formulary construction, Manufacturer Payments, and mail order and retail pharmacy services at issue in this case, including those in Illinois. (¶ 105).

- CVS Health and the other CVS Defendants conduct business in Illinois, own and operate dozens of retail pharmacies throughout Illinois, and provide PBM and mail order pharmacy services in Illinois. (¶¶ 87–104).[3]

- CVS Health senior executives are also employees of its affiliates and subsidiaries, including the CVS Defendants. CVS Health has agreements with these shared senior executives regarding their involvement with the other CVS entities. (Dkt. 53-1, at ¶ 6).

- Repeatedly, continuously, and explicitly throughout the relevant time period, CVS Health represented in its annual corporate filings that it – CVS Health – designs pharmacy benefit plans, negotiates with pharmaceutical companies, and is involved in the selection of drugs for its formularies. (¶ 79). CVS Health represents publicly that it constructs programs that lower the costs of the at-issue diabetes drugs, including programs available to CVS Health's PBM clients in Illinois. (¶ 80).[4]

---

[3] *See also*, Declaration of Thomas Moffatt, *Taylor v. CVS Pharmacy Store # 3004*, Civ. 7:16-cv-01827-TMP (N.D. Ala. Nov. 10, 2016), ECF 1-1, at ¶ 3 (attached as Exhibit 1) ("CVS Health is a holding company *that does business through its subsidiaries*." (Emphasis added)).

[4] While CVS Health argues that "CVS Health" is defined in these filings to include its subsidiaries, the filings do not state that the subsidiaries carry out these functions. Mr. Moffatt's declaration also fails to state whether these functions are among the "certain other functions" CVS Health performs (Dkt. 53-1 at ¶

- CVS Health is a member of the Pharmaceutical Care Management Association ("PCMA"), the main trade association for PBMs. (¶¶ 318–21). Indeed, CVS Health's Executive Vice President Alan Lotvin is a member of the PCMA's Board of Directors, and Jon Roberts, another CVS Health Executive Vice President, was a PCMA former board member. (¶ 319). Through these leadership positions, CVS Health controls the PCMA, which is central to the Insulin Pricing Scheme. (¶¶ 318–320). Multiple times a year, from 2010 to 2019, CVS Health attended PCMA meetings where it met privately with each of the Manufacturer Defendants for the purpose of developing and maintaining the Insulin Pricing Scheme. (¶¶ 318, 322, 325). Notably, key at-issue lockstep price increases were made shortly after these Scheme-related meetings. (¶¶ 328–29).

- CVS Health, throughout the relevant period, directly engaged with the Manufacturer Defendants in furtherance of the Insulin Pricing Scheme. (¶ 82). Each of the Manufacturers has a team of executives dedicated exclusively to interacting with CVS Health. (*Id.*). The Manufacturers and CVS Health, through the intimacy and connection of their leaders, develop and agree on strategic initiatives used to effectuate the Scheme. (¶ 83).

- In a least 2011, 2012, 2014, and 2016, CVS Health executives met with executives from Manufacturer Novo Nordisk to discuss their coordinated efforts related to the at-issue drugs, in furtherance of the Insulin Pricing Scheme. These executive exchange meetings included the Executive Vice President and Chief Medical Officer of CVS Health, as well as members of CVS Health's Enterprise Operating Committee. (¶ 84).

---

4), or whether CVS Health performs them through its senior executives who are also employed by CVS Health subsidiaries and affiliates (*id.* at ¶ 6).

- In at least 2012, 2013, and 2017, CVS Health's CEO, COO (Jon Roberts, who was also a former board member of the PCMA), and members of its Enterprise Operating Committee met with senior leaders of Manufacturer Eli Lilly numerous times to discuss their coordinated efforts related to the at-issue drugs, in furtherance of the Scheme. (¶ 84).

- In at least 2012 and 2016, the leaders of CVS Health and Sanofi participated in executive meetings which included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of CVS Health, the COO of CVS Health, and members of CVS Health's Enterprise Operating Committee, among others. (¶ 84(c)).

## ARGUMENT

This Court has personal jurisdiction over CVS Health and its Rule 12(b)(2) motion should be denied.

## I.     Legal Standard

"A federal court may exercise personal jurisdiction over a foreign defendant only to the extent permitted by the forum state's long-arm statute and by the Due Process Clause." *Lexington Ins. Co. v. Hotai Ins. Co., LTD.*, 938 F.3d 874, 878 (7th Cir. 2019). Illinois' long-arm statute is co-extensive with federal constitutional requirements; therefore, the Court must only determine if the exercise of personal jurisdiction over CVS Health comports with due process. *John Crane, Inc. v. Shein Law Ctr., Ltd.*, 891 F.3d 692, 695 (7th Cir. 2018).

"[W]here, as here, [personal jurisdiction] is raised on a motion to dismiss, the plaintiff need only make a prima facie showing of jurisdictional facts." *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). In evaluating the *prima facie* showing, the "plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citation omitted). The Court

does not merely construe explicitly contradictory disputes in the plaintiff's favor; even ambiguities and uncertainties in a defendant's evidence are construed in a light most favorable to personal jurisdiction. *Rose v. Franchetti*, 713 F. Supp. 1203, 1205 n.1 (N.D. Ill. 1989). "District courts ruling on Rule 12(b)(2) motions . . . must perform a flexible, all-things-considered inquiry into whether the defendant has 'purposefully avail[ed]' itself of the forum State's laws such that it would be 'fair' to subject it to suit there." *Riverdale Plating & Heat Treating, LLC v. Andre Corp.*, 2015 WL 5921896, at *3 (N.D. Ill. Oct. 9, 2015) (alteration in original).

## II. CVS Health's Declaration Fails to Controvert the State's Allegations, And All Factual Allegations That Are Not Controverted Must Be Taken As True.

In support of its motion, CVS Health submitted the declaration of Thomas S. Moffatt in his capacity as an employee and officer of a separate CVS Defendant – *CVS Pharmacy, Inc.* (Dkt. 53-1). According to Mr. Moffatt, "[i]n that capacity, I am familiar with the corporate structure of CVS Health Corporation." (*Id.* ¶ 3). Notably, Mr. Moffatt is also an employee and officer of each of the other four CVS Defendants, including CVS Health (¶ 105), a fact that is alleged in the complaint and curiously avoided in Mr. Moffatt's declaration.[5] The State alleges that CVS Health is directly involved in the Scheme and relevant conduct of the other CVS entities through "interlocking directorships and shared executives," *including through Mr. Moffatt specifically.* (*Id.*). Again, Mr. Moffatt did not mention or refer to these allegations in his declaration. He acknowledges that CVS Health "has agreements with" senior executives who are officers of CVS Health and who are "employed by and provide services to" CVS Health's subsidiaries. (Dkt. 53-1

---

[5] Mr. Moffatt in fact publicly represents that he "[c]urrently serves as assistant corporate secretary of [CVS Health Corporation], as well as president and/or director for several hundred subsidiary entities[.]" Moffatt LinkedIn Profile, *available at* https://www.linkedin.com/in/tom-moffatt-5b274190/ (last visited Apr. 5, 2023) (attached as Exhibit 2).

at ¶ 6).[6] Yet, with no further explanation or discussion as to how or whether he and the other CVS Health senior executives segregate their work for the different entities, Mr. Moffatt provides the self-serving and somewhat contradictory assertion that CVS Health has "no direct involvement in directing, managing, or supervising the operations *or the employees* of any of its direct or indirect subsidiary companies." (*Id.*) (emphasis added).

Mr. Moffatt further asserts that "CVS Health Corporation is a holding company . . . [and] has no operations unrelated to its status as a holding company." (*Id.* at ¶ 4). This assertion, however, is belied by the State's factual allegations regarding CVS Health's repeated, explicit public statements concerning its operations (¶¶ 79–80), its membership in and control over the PCMA—a trade association for PBMs (¶¶ 318-21), and its testimony before Congress in insulin pricing investigations (¶¶ 354, 431). These allegations are not denied or even mentioned in Mr. Moffatt's declaration.

CVS Health's status as a mere holding company is further belied by public court filings. In a separate lawsuit filed by the PCMA challenging the validity of an Arkansas law that would regulate certain PBM practices, CVS Health Corp. is identified as a member of the PCMA. *See* Corporate Disclosure Statement by PCMA, *Pharm. Care Mgmt. Ass'n v. Rutledge*, Civ. No. 4:15-cv-510-BSM, ECF 4 (attached as Exhibit 4).[7] CVS Health's Executive Vice President, Jon

---

[6] Mr. Moffatt's declaration also stated that CVS Health has no employees in Illinois. (Dkt. 53-1 at ¶ 5). The true meaning of this is uncertain, in light of a prior representation made to this Court by CVS Defendants that "CVS Health is a holding company . . . and has *no employees*" at all. *See* Declaration of Melanie Luker, *Ma v. CVS Pharmacy, Inc., et al.*, N.D. Ill. No. 1:19-cv-03367, ECF 42-1, at ¶ 4 (emphasis added) (attached as Exhibit 3). (*But see* Ex. 1 at ¶ 2 (Mr. Moffatt stating he was Vice President and Assistant Secretary of CVS Health in 2016)).

[7] "The Court can consider facts outside the pleadings on a motion to dismiss for lack of personal jurisdiction." *Northwest 1 Trucking Inc. v. Haro*, 613 F. Supp. 3d 1081, 1086 (N.D. Ill. 2020) (Seeger, J.) (citation omitted). "Court documents are, of course, public records of which the Court can take judicial notice." *Treadwell v. McHenry Cnty.*, 193 F. Supp. 3d 900, 906 (N.D. Ill. 2016) (quoting *Bishop v. Cross*, 2015 WL 7008178, at *1 n.2 (S.D. Ill. Nov. 12, 2015)).

Roberts, is identified as a member of the PCMA's board of directors. *See* PCMA Board of Directors, *Pharm. Care Mgmt. Ass'n*, E.D. Ark. Civ. No. 4:15-cv-510-BSM, ECF 61-1 (attached as Exhibit 5). According to a declaration submitted by the PCMA's chief operating officer, CVS Health is a member of the PCMA, is among "the largest PBMs in the country," and "conducts business nationwide." *See* Declaration of Brian McCarthy of PCMA, *Pharm. Care Mgmt. Ass'n*, E.D. Ark. Civ. No. 4:15-cv-510-BSM, ECF 75-3, at ¶¶ 2, 3, 8 (attached as Exhibit 6).

Membership, participation and leadership in the PBM trade association is undoubtedly beyond the scope of the holding company "functions," as described in Mr. Moffatt's declaration.[8,9] (*See* Dkt. 53-1 at ¶ 4 (describing the issuance of stock and filing of reports with the Securities and Exchange Commission)). Thus, Mr. Moffatt's conclusory assertion that CVS Health is simply a holding company is not to be credited, and the State's allegations must be taken as true. *Leong v. SAP Am., Inc.*, 901 F. Supp. 2d 1058, 1061 (N.D. Ill. 2012) (in ruling on a 12(b)(2) motion, "[t]he Court must accept the plaintiff's uncontroverted allegations as true").

Neither does CVS Health provide any evidence, in Mr. Moffatt's declaration or otherwise, to contradict the State's allegations that it met with and conspired with the Manufacturer Defendants numerous times, throughout the relevant time period, in furtherance of the Insulin Pricing Scheme. These allegations must also be taken as true.

---

[8] Further to this point, Mr. Moffatt's LinkedIn profile describes his employment with CVS Health to include responsibility for the licensing of the company's 10,000-plus facilities; interaction with the DEA, state boards of pharmacy and alcohol boards; and negotiation of "a wide range of contracts for multiple business units, including merchandising, logistics, information services, strategic procurement, and tax." (Ex. 2). These too are well beyond mere holding company functions.

[9] CVS Health has also settled allegations by the United States Department of Justice arising from the filling of invalid prescriptions and improper record keeping by its Rhode Island pharmacies. https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

The State of Arkansas, in its parallel case, pointed out these very same shortcomings in a nearly identical declaration submitted by CVS Health. *See* Response to Motion to Dismiss, *State of Ark. v. Eli Lilly, et al.*, E.D. Ark. Case No. 4:22-cv-549-JM, ECF 100, at 13-15 (attached as Exhibit 7). Yet, CVS Health provides nothing more in this matter to counter the State's allegations about its involvement with the PCMA or its meetings with Manufacturers. This is telling.

As the Seventh Circuit has held, when a court makes a personal jurisdiction determination on the pleadings and affidavits, "the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Purdue Research Found.*, 338 F.3d at 782 (citation omitted). Because no contradictory affidavit or evidence was submitted with regard to CVS Health's conspiracy with the Manufacturer Defendants and involvement with the PCMA, the allegations of the complaint should be taken as true, even if Mr. Moffatt's declaration is credited.

## III. CVS Health Completely Ignores Key Allegations.

CVS Health purports to go paragraph-by-paragraph through the complaint allegations pertaining to it, to explain why each is insufficient to confer personal jurisdiction over it. (Dkt. 53 at 6-9). First, "defendants' case-related contacts with Illinois must be viewed in the aggregate" – not individually. *Café Real Estate LLC v. VSP North Am. LLC*, 262 F. Supp. 3d 637, 640 (N.D. Ill. 2017). To the extent CVS Health suggests that none of the State's allegations, standing alone, supports jurisdiction, its premise is flawed. *Id.* Further, CVS Health omits several paragraphs with factual allegations about its involvement in the Scheme. For example:

- **Paragraph 85** explains how CVS Health built itself into a company that controls the entire drug pricing chain for 40 million Americans, amassing the market power to drive the Scheme.

- **Paragraph 105**[10] alleges that CVS Health was directly involved in and controlled each of the key functions at issue (formulary construction, Manufacturer Payments, mail order and retail pharmacy services). In support of the State's assertion, Paragraph 112 names several specific individuals who simultaneously served as officers or directors of CVS Health and other CVS Defendants. One of these officers is Thomas Moffatt, whose declaration is the basis for CVS Health's motion. Paragraph 112 further alleges that CVS Health directly or indirectly owns all the stock of the other CVS Defendants, and that all of the executives of the other CVS Defendants report to CVS Health executives.

- **Paragraphs 319-21** allege that CVS Health's Executive Vice Presidents Alan Lotvin and Jon Roberts were board members of the PCMA; that these leadership positions allowed control over the PCMA; and that the PCMA appears to be at the center of the Insulin Pricing Scheme.

- **Paragraph 347** provides a statement from CVS Health's Executive Vice President Derica Rice that epitomizes the PBM Defendants' misrepresentations about their alleged success in saving money for their clients, when in fact they were key players in causing the skyrocketing false prices.

- **Paragraph 354**, in the same vein, quotes the Congressional testimony of CVS Health's Chief Policy and External Affairs Officer and General Counsel, Thomas Moriarty, who testified in an investigation into insulin pricing. His testimony

---

[10] CVS Health references Paragraph 105 but avoids discussion of its content. (Dkt. 53 at 6).

likewise provided a virtue-signaling admission that insulin was too expensive, without acknowledgement that CVS Health's actions were a key cause.

CVS Health addressed none of these allegations and they are therefore uncontroverted.

## IV. The Uncontroverted Facts Satisfy Federal Due Process for Specific Personal Jurisdiction Over CVS Health.

The State's allegations are sufficient to support the exercise of specific personal jurisdiction over CVS Health based on its own involvement in the Scheme and contacts with Illinois.[11] The State alleges that CVS Health has suit-related contacts in Illinois. Moreover, CVS Health's actions taken elsewhere were purposely directed at Illinois and had a foreseeable and intended effect in Illinois, thus subjecting it to jurisdiction here.

Federal due process requires a defendant have "such contacts with the forum State that the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). "[J]urisdiction cannot be avoided merely because the defendant did not physically enter the forum State." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotations omitted). The key question is whether the defendant had minimum contacts and "should reasonably anticipate being haled into court there." *Id.* (internal quotations omitted).

The Seventh Circuit considers three elements to evaluate whether the exercise of specific jurisdiction comports with due process:

> (1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related

---

[11] The State does not contend that this Court has general jurisdiction over CVS Health.

activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice.

*Felland*, 682 F.3d at 673 (citations omitted).

### A.      CVS Health purposefully directed its activities at Illinois.

"Where a plaintiff's claim is for an intentional tort, the inquiry focuses on whether the conduct underlying the claim[] was purposely directed at the forum state." *Felland*, 692 F.3d at 674 (citations and internal quotations omitted). The Seventh Circuit applies the effects test established by *Calder v. Jones*, 465 U.S. 783 (1984), to analyze purposeful direction. *Id.* It has "distilled three requirements from *Calder* for determining whether conduct was 'purposefully directed' at the forum state":

> (1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt – that is, the plaintiff would be injured – in the forum state.

*Felland*, 692 F.3d at 674-75 (citation omitted). "If the plaintiff makes these three showings, he has established that the defendant purposefully directed his activity at the forum state." *Id.* at 675 (internal quotations omitted).

### 1.      CVS Health's conduct was both intentional and tortious.

The Seventh Circuit has noted a circuit split on whether the first prong of the *Calder* test requires conduct that is only intentional, or intentional and tortious. *Tamburo*, 601 F.3d at 704. It has not taken a side, however, because the plaintiffs' allegations in the cases before it met the requirements of both intent and tortiousness. *Id.*; *Felland*, F.3d at 674, n.2. The same is true here.

As alleged by the State, CVS Health was directly involved in PBM services, pharmacy services, and formulary construction as part of the Insulin Pricing Scheme, and publicly touted its involvement in those functions, though misrepresenting its aims. (¶¶ 78-81). CVS Health specifically offered PBM services in Illinois and created formularies for use in Illinois. (¶¶ 105-

06, 110-14). CVS Health also provided retail and mail order pharmacy services in Illinois. (¶¶ 105-06, 115). While CVS Health claims to operate solely as a holding company, incorporated in Delaware with a principal place of business in Rhode Island, (Dkt. 53-1 at ¶¶ 4-5), the court filings of the PCMA support the State's allegations and confirm that CVS Health is a PBM and "administer[ed] pharmaceutical benefits on behalf of their customers" on a "nationwide" basis. (McCarthy Decl., Ex. 5 at ¶ 2). These PBM and pharmacy functions in the State of Illinois were ongoing throughout the relevant period, and plainly constitute intentional acts by CVS Health. Further, by carrying out the PBM functions in the manner alleged by the State, CVS Health's intentional conduct was also tortious.

The State further alleges that CVS Health was a member of the PCMA and exerted control over the PCMA through PCMA board positions. (¶¶ 319-20). It alleges that the PCMA, under CVS Health's control, brought numerous lawsuits and lobbying campaigns to block drug pricing transparency efforts, and block rebate regulations that would impede the Scheme. (¶ 330). CVS Health engaged in these efforts to conceal the Insulin Pricing Scheme. (*Id.*). These acts by CVS Health are also intentional and tortious.

### 2. CVS Health's conduct was expressly aimed at Illinois.

In *BRABUS GmbH v. Individuals Identified on Schedule A Hereto*, the defendant online retailer disputed personal jurisdiction for claims that it attempted to sell counterfeit goods into Illinois. 2022 WL 7501046, at *2 (N.D. Ill. Oct. 13, 2022) (Seeger, J.). The record included (1) a screenshot showing the retailer was willing to sell to a buyer in Illinois, and (2) a chat-log confirming the retailer could ship a product to Illinois and providing a quote on the seller's price to ship to that zip code. *Id.* at *3. The Court held that:

> Those communications are more than enough to show purposeful availment. Defendant was ready, willing, and able to ship products to a specific address in the Chicagoland suburbs. It purposefully directed its actions toward Illinois. Defendant

15

subjected itself to jurisdiction here by demonstrating a willingness to sell products here.

*Id. See also NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 622 (7th Cir. 2022) (when a company stands ready to do business with Illinois residents, that is a key fact in finding contacts sufficient to satisfy due process).

CVS Health cites *Walden v. Fiore*, 571 U.S. 277 (2014), suggesting that its suit-related conduct does not connect it to Illinois. (Dkt. 53 at 4-5). However, the facts of *Walden* are highly distinguishable from the facts alleged here. The defendant in *Walden* was a law enforcement officer working at the Atlanta airport as part of a drug interdiction program. *Walden*, 51 U.S. at 279. The officer, in Atlanta, seized cash of questionable origin from the plaintiffs, who happened to be residents of Nevada traveling through the Atlanta airport. *Id.* at 280. Because the officer had acted entirely in Georgia, in no way targeting Nevada, the Supreme Court held that Nevada lacked jurisdiction. *Id.* at 291.

Here, in direct contrast to *Walden*, CVS Health intentionally provided PBM services *to Illinoisans*, created formularies for use *in Illinois*, and dispensed the at-issue drugs *to Illinoisans in Illinois*. CVS Health also intentionally, through the PCMA, brought lawsuits and campaigns to perpetuate the Scheme and hide it from the State and Illinoisans. Each of these intentional acts was expressly aimed at Illinois. CVS Health's Illinois-aimed conduct is markedly more extensive than the contacts alleged in *BRABUS* and *NBA Properties*, where this Court and the Seventh Circuit found jurisdiction proper. *See BRABUS*, 2022 WL 7501046, at *3 (sufficient basis for jurisdiction based on *willingness* to sell into Illinois); *NBA Properties*, 46 F.4th at 617-18 (single online sale to Illinois supported jurisdiction, even where the sale was to an investigator and defendant submitted an affidavit stating it never made any other sales to Illinois residents).

Whether its intentional acts were also aimed elsewhere is beside the point. *Ford*, 141 S.Ct. at 1027 (explaining that if a company's business deliberately extended into a particular state, that state's courts may exercise jurisdiction, even if the company's business *also* deliberately extended into other states). *See also BRABUS*, 2022 WL 7501046, at *3 (jurisdiction found without any allegation that Illinois was exclusively targeted by online retailer); *NBA Properties*, 46 F.4th at 623 (reaffirming "[t]here is no per se requirement that the defendant *especially* target the forum in its business activity" (emphasis added) (citation and internal quotations omitted); *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 428 (7th Cir. 2010) (finding purposeful availment, despite lack of evidence that GoDaddy specifically targeted advertising at Illinois, because "it is easy to infer that GoDaddy's national marketing campaign is intended to reach as large an audience as possible, including the 13 million potential customers in the nation's fifth most populous state.").

Whether the executive meetings initially establishing the Scheme occurred elsewhere, (Dkt. 53 at 9), is also beside the point. Actions taken in furtherance of a scheme to defraud are jurisdictionally relevant, even if they occur after the scheme is devised and agreed. *See Felland*, 682 F.3d at 675-76 (citing Seventh Circuit and Northern District of Illinois cases, and finding it "well established" that minimum contacts analysis includes conduct following initial tortious acts, where the subsequent conduct is "part of a larger scheme to defraud"). The acts CVS Health aimed at Illinois *were* the carrying out of the Scheme.

The State's uncontroverted allegations establish express aiming by CVS Health.

### 3. CVS Health knew that the State and Illinois diabetics would be injured in Illinois.

The final prong of the effects test asks whether the defendant knew injury would occur in the forum state. *Felland*, 692 F.3d at 674-75 (citation omitted). CVS Health cannot plausibly deny knowledge that its conduct in providing PBM services, constructing formularies, and dispensing

the at-issue drugs was likely to cause harm to Illinoisans, in Illinois, through falsely inflated prices which Illinois diabetics were forced to pay. Indeed, its acts were *designed* to have that effect, and CVS Health profited from the harm to Illinois.

CVS Health "is aware that it earns many millions of dollars annually from Illinois customers, and it cannot be unhappy to have had such success in the state. Its contacts cannot fairly be described as random, fortuitous, or attenuated." *GoDaddy*, 623 F.3d at 428-29.

Because CVS Health purposefully directed its activities at Illinois, the first factor of the federal due process analysis is satisfied.

**B.** **CVS Health's contacts with Illinois directly relate to the State's claims against it.**

As to the second factor, the State's claims must also "arise out of or relate to the defendant's contacts with the forum." *Ford*, 141 S. Ct. at 1026. The *Ford* Court recently reiterated that a defendant's in-state contacts need only "relate to" the litigation—a causative relationship is not necessary. *Id.* Here, CVS Health through its work as an Illinois PBM utilized the false prices arising from the Insulin Pricing Scheme and knowingly insisted that Illinois payors pay for the at-issue drugs on the basis of those prices, while concealing its role in the generation of the prices. (¶¶ 106, 110-15). CVS Health also directly controlled, assisted, and aided its subsidiaries in violating the ICFA and UDTPA, with knowledge of the facts giving rise to the violations (¶¶ 105-06, 110-16), purposefully availing itself of the privileges of conducting business in Illinois.[12] The State's claims against CVS Health directly relate to its contacts with Illinois.

---

[12] As discussed in the State's Opposition to the PBM Defendants' Rule 12(b)(6) Motion, a parent company can be directly liable under Illinois law if it is a participant in its subsidiaries' conduct, as the State alleges against CVS Health. *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 237 (Ill. 2007).

As the United States Supreme Court recently clarified, a company "purposefully availing itself" of a certain market in a particular state "has clear notice of its exposure in that State" to lawsuits related to harms caused by that product or conduct. *See Ford*, 141 S. Ct. at 1027. Put another way, if a suit arises from efforts by a company "to serve, *directly or indirectly*, the market for its product in several or all other States, it is not unreasonable to subject it to suit in one of those States" if its product (or service) causes an injury. *Id.* (emphasis supplied) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Here, the allegations of the complaint make clear that CVS Health acted in Illinois, and successfully exploited the Illinois market for its financial gain. By serving as a PBM in Illinois, and doing so in furtherance of the Insulin Pricing Scheme, CVS Health played an active role in causing the harm underlying the State's claims, and had clear notice that it would be subject to the state's jurisdiction. The State and Illinois diabetics were injured by CVS Health's activities, and "[a]n individual injured in [Illinois] need not go to [another jurisdiction] to seek redress from persons who, though remaining in [another jurisdiction], knowingly cause the injury in [Illinois]." *Calder*, 465 U.S. at 790.

The uncontroverted facts establish that CVS Health had significant and meaningful contacts with Illinois that allowed CVS Health to handsomely profit from the Insulin Pricing Scheme in Illinois. This Court has personal jurisdiction over CVS Health for the State's claims.

**C.    This Court's exercise of jurisdiction comports with fair play and substantial justice.**

Having purposefully directed its activities at Illinois, it is CVS Health's burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Haro*, 613 F. Supp. 3d at 1094 (quoting *Burger King*, 471 U.S. at 477) (internal quotations omitted). It cannot do so. The Court considers the following factors:

(1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4)

the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies.

*Id*. Here, every consideration supports jurisdiction:

- <u>Factor 1</u>. CVS Health cannot claim any burden "greater than what courts routinely tolerate in the exercise of specific jurisdiction over foreign parties." *See id.* (citation and internal quotations omitted). Indeed, CVS Health ranks fourth on the Fortune 500 list and its business is national in scope. *See GoDaddy*, 623 F.3d at 432 (finding the burden to defend in Illinois was minimal for a corporation that operates on a national scale). Further, it shares counsel with its subsidiaries that are Defendants in this case, and are not contesting personal jurisdiction.

- <u>Factor 2</u>. Illinois generally "has a significant interest in providing a forum for its residents to seek relief when they suffer harm in Illinois from a wrong that occurred at least in part in Illinois." *Id.* (citation and internal quotes omitted). Here, where Illinois' Attorney General brings claims under Illinois' ICFA and Illinois' UDTPA, Illinois' interest is not only strong, it is *exclusive*.

- <u>Factors 3 and 4</u>. The State has a strong interest in obtaining convenient and effective relief, which is best served through adjudication before this Court, along with the claims against the other Defendants, including the other CVS Defendants that do not contest this Court's jurisdiction, rather than forcing the State to pursue its claims against CVS Health separately in a different forum. Further, "a finding that [CVS Health] is not subject to personal jurisdiction in a forum it has so thoroughly exploited would create significant barriers to effective relief for similarly situated plaintiffs with more limited resources." *Id.* at 432. For the same reasons, the interstate judicial system's interest in efficient resolution of controversies is also best served by this Court's adjudication of the State's claims against CVS Health.

20

- Factor 5. All States' collective interest in furthering substantive social policies – specifically, their interest in facilitating enforcement of consumer protections – is served by the Court's exercise of jurisdiction over CVS Health in this matter.

The State's uncontroverted allegations are more than adequate to afford this Court personal jurisdiction over CVS Health to adjudicate the State's claims. To borrow this Court's words, "Litigating here may not be convenient, but that comes with the territory . . . When the business is selling fake products abroad, part of the cost of doing business is getting sued abroad." *BRABUS*, 2022 WL 7501046, at *3.

## V. Alternatively, the State is Entitled to Jurisdictional Discovery Regarding CVS Health's Illinois Contacts, Involvement in the Scheme, and Corporate Structure.

The State has, at minimum, shown enough to warrant jurisdictional discovery related to CVS Health's involvement in the Insulin Pricing Scheme. CVS Health attempts to obfuscate and minimize its role in the Pricing Scheme by asserting that it is merely "a holding company." (Dkt. 53 at 2). But currently, any information that would further illuminate CVS Health's role in the Scheme and the corporate relationship or lack of corporate separateness between CVS Health and the CVS entities is in the sole possession of those Defendants.

"Courts generally will grant jurisdictional discovery if the plaintiff 'can show that the factual record is at least ambiguous or unclear on the jurisdiction issue.'" *Gilman Opco LLC v. Lanman Oil Co.*, 2014 WL 1284499, at *6 (N.D. Ill. Mar. 28, 2014) (citation omitted). To be sure, a "plaintiff does not have an automatic right" to jurisdictional discovery; there must be some "colorable or prima facie showing of personal jurisdiction before discovery should be permitted." *Id.* That standard, however, "is low." *Id.* A plaintiff only fails it where there are "'bare,' 'attenuated,' or 'unsupported' assertions of personal jurisdiction" or "clearly frivolous" claims. *Id.* (citation omitted).

Here, the State's allegations are not "bare" or "clearly frivolous." Mr. Moffatt's artfully oblique affidavit begs questions—he emphasizes CVS Health is simply "a holding company," yet he admits that it "performs certain other [unexplained] functions related to [its] primary functions" and that part of its C-suite (including Mr. Moffatt) is one and the same with those of subsidiaries. (Dkt. 53-1 at ¶¶ 4-6). This, especially combined with the evidence the State puts forward, meets the "low" standard for jurisdictional discovery. *See Gilman*, 2014 WL 1284499, at *6-7 (internally inconsistent affidavit that is also rebutted by plaintiff's evidence is "sufficient to cross the low hurdle for obtaining discovery"). After the nonmovant has put forth evidence of the defendant's contacts with the forum, the district court should not dismiss the action without permitting jurisdictional discovery. *Kosar v. Columbia Sussex Mgmt., LLC*, 2021 WL 4499494, at *2 (N.D. Ill. June 1, 2021) ("if the plaintiff can show an ambiguity exists or that some jurisdictional facts are unclear," discovery is warranted).

Throughout this Response, the State has established that this Court may exercise personal jurisdiction over CVS Health because it, individually, has sufficient minimum contacts with Illinois. Yet, if this Court decides otherwise, it is appropriate to allow a limited period of jurisdictional discovery to accurately assess CVS Health's involvement in the Insulin Pricing Scheme in Illinois.

**CONCLUSION**

For all the reasons discussed above, this Court should deny CVS Health's Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction.

RESPECTFULLY SUBMITTED this the 6th day of April, 2023.

THE STATE OF ILLINOIS, by KWAME RAOUL, ATTORNEY GENERAL OF ILLINOIS

22

/s/ Tanya D. Ellis
Edwin S. Gault, Jr., IL Bar # 6314552
Walter G. Watkins, III., Bar ID # 100314
Tanya D. Ellis, Bar ID # 101525
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375
Tel: (601) 960-8600
Fax: (601) 960-8613
Win.Gault@formanwatkins.com
Tanya.Ellis@formanwatkins.com
Trey.Watkins@formanwatkins.com

David F. Buysse, IL Bar # 3126915
Deputy Chief, Public Interest Division
Illinois Attorney General's Office
100 W. Randolph Street – 12th Floor
Tel: (312) 590-7844
david.buysse@ilag.gov

Darren Kinkead, IL Bar # 6304847
Deputy Chief, Special Litigation Bureau
Office of the Attorney General of Illinois
100 W. Randolph Street – 11th Floor
Tel: (773) 590-6967
darren.kinkead@ilag.gov

Matthew C. McDonald, Bar ID # 105966
DAVID NUTT & ASSOCIATES
605 Crescent Blvd, Suite 200
Ridgeland, MS 39157
Tel: (601) 898-7302
mattm@davidnutt.com

Joanne Cicala *(pro hac vice)*
Josh Wackerly *(pro hac vice)*
R. Johan Conrod *(pro hac vice)*
THE CICALA LAW FIRM PLLC
101 College Street
Dripping Springs, TX 78620
Tel: (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com
johan@cicalapllc.com

**Certificate of Service**

I hereby certify that on April 6, 2023, I electronically filed the foregoing, Plaintiff's Memorandum in Opposition to CVS Health Corporation's Motion to Dismiss the Complaint for Lack of Personal Jurisdiction, with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Tanya D. Ellis
Tanya D. Ellis

Exhibit 1

FILED

2016 Nov-10  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

EXHIBIT A

## **AFFIDAVIT OF THOMAS MOFFATT**

Thomas S. Moffatt, having been duly cautioned and sworn, testifies as follows:

1.      My name is Thomas S. Moffatt. I am over 19 years of age. I am competent to make this affidavit, and its contents are based on my own personal knowledge.

2.      I am Vice President and Assistant Secretary for CVS Health Corporation, formerly known as CVS Caremark Corporation ("CVS Health").

3.      CVS Health is a holding company that does business through its subsidiaries, including CVS Pharmacy, Inc. ("CVS Pharmacy"), an operating subsidiary. CVS Health is not an Alabama corporation. CVS Health's state of incorporation is Delaware, and its principal place of business is in Woonsocket, Rhode Island.

4.      CVS Pharmacy Store #3004 is owned by Alabama CVS Pharmacy, L.L.C.

5.      Alabama CVS Pharmacy, L.L.C. is a limited liability company. Its sole member is CVS Pharmacy.

6.      CVS Pharmacy's state of incorporation is Rhode Island, and its principal place of business is in Woonsocket, Rhode Island.

Thomas S. Moffatt

Sworn to and subscribe before me
this _10_ day of November, 2016.

Notary Public
My Commission Exp.: _____

Mary Alice Kleiber
Notary Public
State of Rhode Island
My Commission Expires 03/13/2020

2

# Exhibit 2

## Contact

www.linkedin.com/in/tom-
moffatt-5b274190 (LinkedIn)

## Top Skills

Pharmaceutical Industry
Healthcare
Leadership

# Tom Moffatt

Vice President, Asst. Secretary & Asst. General Counsel at CVS
Health Corporation
Woonsocket, Rhode Island, United States

## Experience

CVS Health Corporation
Vice President, Asst. Secretary & Asst. General Counsel
August 1997 - Present (25 years 8 months)
Woonsocket, Rhode Island

Lead corporate counsel and assistant corporate secretary for publicly traded,
Fortune 10 integrated pharmacy health care company. Primary areas of
responsibility include:

Securities Law. Reviews all filings with the SEC. Participates in all disclosure
committee meetings. Primary responsibility for preparation of annual proxy
statement. Interacts with shareholders on governance and other matters.
Responsible for Section 16 and insider trading policy compliance. Completes
all filings with NYSE.

Mergers and Acquisitions. Has played an active role in implementing
company's growth strategy during a period when the company has increased
annual revenues from $12.7B in 1997 to over $184B in 2017.  Has served
as legal department representative for the integration team on most major
acquisitions.

Corporate Secretary's Office and Corporate Governance. Served as corporate
secretary for publicly traded parent entity from 1/2012 - 12/2013. Currently
serves as assistant corporate secretary of parent, as well as president and/
or director for several hundred subsidiary entities, including several charitable
entities associated with the company.

Licensing. Oversees licensing department, which obtains and maintains all
licenses for the company's 10,000+ facilities (over 150,000 licenses). Interacts
with government officials, including DEA, state boards of pharmacy and
alcohol boards.

Contract Review and Negotiation. Reviews and negotiates a wide range of contracts for multiple business units, including merchandising, logistics, information services, strategic procurement, and tax.

Dispute Resolution. Engages and manages outside counsel on a litigation matters related to my areas of responsibility. Provides assistance and direction on discovery matters and serves as corporate representative on corporate structure and history issues.

Legal Department Management. Supervises seven direct reports and approximately 35 indirect reports.

Mintz Levin
Associate
August 1993 - July 1997 (4 years)
Boston

My practice included public offerings, mergers and acquisitions of public and private companies, securities law matters and general corporate representation.  I also participated in attorney and summer associate mentoring program and in the hiring process.

―――――

# Education

Northeastern University School of Law
Juris Doctor (J.D.)  · (1990 - 1993)

Harvard University
Bachelor's Degree, History · (1982 - 1987)

Exhibit 3

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

BINER MA,

        Plaintiff,

    v.

**CVS PHARMACY, INC., CVS
HEALTH CORPORATION, RANDY
HATFIELD, HUMAN RESOURCES
MANAGER OF CVS HEALTH
CORPORATION,**

        Defendants.

No. 1:19-cv-03367

Honorable Robert M. Dow Jr.
Magistrate Judge Jeffrey Cole

### DECLARATION OF MELANIE LUKER
### IN SUPPORT OF DEFENDANTS' MOTION TO SUBSTITUTE
### AND/OR CLARIFY PARTY DEFENDANTS

I, MELANIE K. LUKER, declare:

1.     I am currently an Assistant Secretary for Defendant CVS Pharmacy, Inc. ("CVS Pharmacy"). I make this declaration in support of Defendants' Motion To Substitute and/or Clarify Party Defendants. All of the information set forth herein is based on my personal knowledge or based upon information and belief where stated, and if called and sworn as a witness, I could and would competently testify thereto.

2.     In my capacity as Assistant Secretary, I am readily familiar with the day-to-day business operations and corporate governance of CVS Pharmacy and its related entities, and I have access to corporate structure information.

3.     CVS Pharmacy is a wholly-owned subsidiary of CVS Health Corporation ("CVS Health"). CVS Pharmacy is the former employer of Defendant Randy Hatfield.

4.     CVS Health is a holding company previously incorporated as CVS Caremark Corporation and has no employees.

5.     CVS Pharmacy is a corporation incorporated under the laws of the State of Rhode Island with its principal place of business, headquarters, and center of direction, control, and coordination in Woonsocket, Rhode Island.

6.     Highland Park CVS, L.L.C. operates certain CVS retail stores and pharmacies located in the State of Illinois, including the CVS pharmacy located on 6510 North Sheridan Road, Chicago, Illinois.   Highland Park CVS, L.L.C. employees all the store employees, with the exception of the pharmacists.

7.     CVS Health has no direct involvement in the operation of the CVS pharmacy located on 6510 North Sheridan Road, Chicago, Illinois.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 22 day of October, 2019, at Woonsocket, Rhode Island.

MELANIE K. LUKER

# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 13 2015

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

PHARMACEUTICAL CARE MANAGEMENT
ASSOCIATION,

                Plaintiff,

v.

LESLIE RUTLEDGE,
in her official capacity as
Attorney General of Arkansas,

                Defendants.

Civil Action No. 4:15 CV 510-BSM

## CORPORATE DISCLOSURE STATEMENT

As required by Rule 7.1 of the Federal Rule of Civil Procedure, Plaintiff Pharmaceutical Care Management Association ("PCMA") provides the following information to the Court:

1.      PCMA is a non-profit 501(c)(6) corporation and, as such, does not have any parent companies or subsidiaries.  Furthermore, as a non-profit 501(c)(6) corporation, PCMA does not have any outstanding securities in the hands of the public.

2.      The following is a list of the members of PCMA, each of which may have a direct or indirect pecuniary interest in the Plaintiff's outcome in the case.  These representations are made in order that judges of this Court may determine the need for recusal:

        a. Aetna Pharmacy Management;

        b. Catamaran Corp.;

        c. Cigna Pharmacy Management;

        d. CVS Health Corp.

        e. Express Scripts:

B4416173 1

f. Humana Pharmacy Solutions;

g. LDI;

h. MedImpact Healthcare System;

i. Optum Rx;

j. Prime Therapeutics;

k. USScript.


Dated: August 13, 2015

Respectfully submitted,

PHARMACEUTICAL CARE MANAGEMENT
ASSOCIATION, INC.

By its attorneys,

Lyn P. Pruitt, Ark. Bar No. 84121
Mitchell, Williams, Selig,
Gates & Woodyard, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone: (501) 688-8869
Facsimile: (501) 918-7869
Email: lpruitt@mwlaw.com

Dean Richlin (admission *pro hac vice* pending)
Kristyn DeFilipp (admission *pro hac vice* pending)
Andrew London (admission *pro hac vice* pending)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

*Attorneys for Pharmaceutical Care Management
Association, Inc.*

B4416173 1

## CERTIFICATE OF SERVICE

I hereby certify that on August _13_, 2015, I served the foregoing on Defendant via hand

delivery, electronic mail and/or U. S. Mail, postage prepaid, addressed to the following:

Leslie Rutledge
Attorney General of Arkansas
320 Center St., Suite 200
Little Rock, AR  72201

_____
Lyn P. Pruitt

- 3 -

Exhibit 5

- 2016 Events
- 2015 Events
- 2014 Events
- 2013 Events
- 2012 Events
- 2011 Events
- 2010 Events
- 2009 Events

- Multimedia



1. Home |
2. About PCMA |
   Board of Directors

# Board of Directors

**Chairman, PCMA Board of Directors**
Tim Wentworth
*President*
Express Scripts

Jim DuCharme
*President & Chief Executive Office*r
Prime Therapeutics

William Fleming
*President, Humana Pharmacy Solutions*
Humana Inc.

Chris Hocevar
*President, Select Segment & Cigna Pharmacy Management*
Cigna Corporation

Mostafa Kamal
*Chief Executive Officer*
Magellan Rx Management

Jon Roberts
*President, CVS/caremark & Executive Vice President*
CVS Health



<u>Mark Thierer</u>
*Chief Executive Officer*
OptumRx

<u>Greg Watanabe</u>
*President*
MedImpact Healthcare Systems, Inc.

<u>Bill Wolfe</u>
*Vice President, Pharmacy*
Aetna

<u>^ BACK TO TOP</u>

 Tweet    **Like**  0

## Highlights

<u>In USA Today Article, PCMA President Mark Merritt Shines Light on Drug Manufacturer Copay Coupon Programs</u>

<u>In Interview with Pharmaceutical Commerce, PCMA President Mark Merritt Discusses Drug Prices, other Key Issues</u>

<u>"Bait-and-Switch" Billing by Drugstores Increases Drug Costs for Consumers says PCMA President and CEO Mark Merritt</u>

<u>More Highlights »</u>

## Conference Highlights



## That's What PBMs Do

Exhibit 6

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| LESLIE RUTLEDGE, in her official capacity as ATTORNEY GENERAL OF THE STATE OF ARKANSAS, | ) ) ) ) |
| Defendant. | ) ) ) |

### Declaration of Brian McCarthy

I, Brian McCarthy, am over 18 years of age and hereby declare as follows:

1.      I am the chief operating officer of the Pharmaceutical Care Management Association ("PCMA"), a position I have held since 2003. I am authorized to submit this declaration on behalf of PCMA. I am familiar with the membership and mission of PCMA, as well as the pharmacy benefit management industry as a whole. I submit this Declaration in support of Plaintiff's Motion for a Preliminary Injunction. Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge. If I were called upon as a witness, I could and would competently testify to the facts set forth below on that basis.

2.      Pharmacy Benefit Managers ("PBM" or "PBMs") administer prescription drug plans for more than 236 million Americans covered by self-funded and insured ERISA-governed employee health benefit plans, health plans offered by non-profit hospital or medical services corporations, health insurers, health maintenance organizations, and union-sponsored plans. PBMs also administer pharmaceutical benefit plans for state governments, as well as Federal



programs including Medicare Part D, Medicaid, and the Federal Employee Health Benefits Program (FEHBP). Each Member PBM conducts business nationwide.

      3.     Plaintiff PCMA is a non-profit 501(c)(6) corporation organized in 2002 under the laws of laws of the State of Delaware. It is the national trade association representing PBMs. PCMA currently comprises the following eleven member companies: Aetna, Cigna, Catamaran, CVSHealth, Express Scripts, Humana Pharmacy Solutions, LDI, MedImpact Healthcare System, Optum Rx, Prime Therapuetics, and USScript (collectively, Member PBMs"). The Member PBMs comprise the largest PBMs in the country and account for approximately 75% of annual prescription volume nationwide, as of the latest figures available, from the third quarter of 2012.

      4.     As reflected in PCMA's certificate of incorporation, a true copy of which is attached hereto as **Exhibit A**, PCMA's purpose is as follows:

> (a) to advance the common interests of these companies engaged in the business of pharmaceutical care management; (b) to improve the safety and affordability of prescription drug services; (c) to advance pharmaceutical care management as the most effective means of delivering prescription drug care; (d) to lead, educate and advocate on behalf of those companies engaged in pharmaceutical care management; and (e) to do everything necessary, proper, advisable, or convenient for the accomplishment of PCMA's purposes....

      6.     PCMA fulfills this purpose in part by leading industry initiatives on legislation and regulation. As part of its legal strategy, PCMA also initiates litigation on behalf of Member PBMs to challenge those laws and regulations that cause the Member PBMs undue harm. On information and belief, PCMA has brought four such challenges since its founding, including the present litigation regarding Act 900.

      7.     PCMA provides leadership and standards of excellence to assure the availability of quality, safe, and cost-effective pharmaceutical care services. For example, PCMA is a member of URAC, which has developed Pharmacy Benefit Management Standards that health

B4416704.1

plans use when evaluating pharmacy benefit plans. On information and belief, each Member PBM is fully accredited under URAC's Pharmacy Benefit Management standards.

8.     None of the Member PBMs are incorporated in the State of Arkansas or have their principal place of business in Arkansas. All of them, however, operate in Arkansas and, on information and belief, each maintains the required licenses to administer pharmaceutical benefits on behalf of their customers, including health plans and their participants who reside in Arkansas. Each of the Member PBMs is subject to the provisions of Act 900, and, on information and belief, each anticipates significant harm from its application unless enforcement is enjoined.

9.     If Act 900 goes into effect, PCMA's members will suffer an imminent and immediate injury. Protecting the interests of pharmaceutical care management and advocating on behalf of companies in this industry is directly related to PCMA's purpose.

10.     PCMA's board of directors has duly approved of litigation to challenge the constitutionality of Act 900 and to challenge Act 900 as statutorily preempted by ERISA and Medicare.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on July 10, 2015.

_____
Brian McCarthy

B4411422.5

# Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

| | |
|---|---|
| THE STATE OF ARKANSAS, EX.REL., LESLIE RUTLEDGE, ATTORNEY GENERAL<br><br>*PLAINTIFF,*<br><br>v.<br><br>ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; MEDCO HEALTH SOLUTIONS, INC; CVS HEALTH CORPORATION; CVS PHARMACY, INC; CAREMARK RX, LLC; CAREMARKPCS HEALTH, LLC; CAREMARK, LLC; OPTUMRX INC.; AND OPTUMINSIGHT, INC.<br><br>*DEFENDANTS.* | Case No. 4:22-cv-549 |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO CVS HEALTH CORPORATION'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 3

ARGUMENT ...................................................................................................... 8

    I.    Legal Standard ....................................................................................... 8

    II.    CVS Health's Declaration Fails to Controvert the State's Allegations, And All Factual Allegations That Are Not Controverted Must Be Taken As True. ................................. 9

    III.    The Uncontroverted Facts Establish Minimum Contacts Sufficient for Specific Personal Jurisdiction Over CVS Health. .................................................................. 12

        A. CVS Health has sufficient minimum contacts with Arkansas to satisfy the Due Process Clause .................................................................................................... 13

        B. CVS Health's purposeful acts directed to Arkansas and causing injury in Arkansas satisfy minimum contacts regardless of where the conduct occurred .......................... 166

    IV.    The Forum Contacts of Its Co-Conspirators Are Imputed to CVS Health and Support the Court's Exercise of Personal Jurisdiction Over CVS Health ................................. 18

    V.    Alternatively, the State is Entitled to Jurisdictional Discovery Regarding CVS Health's Arkansas Contacts, Involvement in the Scheme, and Corporate Structure. .................. 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps;">CASES</span>

*Agency Servs. of Arkansas, Inc. v. Mongar*,
  2014 WL 1760894 (E.D. Ark. May 2, 2014) ....................................................... 19

*Anderson v. Dassault Aviation*,
  361 F.3d 449 (8th Cir. 2004) ............................................................................. 9

*Atl. Mut. Ins. Co. v. M/V HUMACAO*,
  169 F. Supp. 2d 211 (S.D.N.Y. 2001) ............................................................... 6

*Burlington Indus., Inc. v. Maples Indus., Inc.*
  97 F.3d 1100 (8th Cir. 1996) ........................................................................... 13

*Calder v. Jones*,
  465 U.S. 783 (1984) ........................................................................... 15, 16, 18

*Carson v. Road Knights, Inc.*,
  2020 WL 6326104 (E.D. Ark. Oct. 27, 2020) ................................................... 12

*Crain CDJ LLC v. Regency Conversions, LLC*,
  2009 WL 973490 (E.D. Ark. Apr. 9, 2009) ...................................................... 17

*CTHC Holdings, LLC v. First Cap. Real Est. Invs., LLC*,
  2018 WL 3045183 (E.D. Ark. Apr. 12, 2018) ................................................... 15

*Dakota Indus., Inc. v. Dakota Sportswear, Inc.*,
  946 F.2d 1384 (8th Cir. 1991) ......................................................................... 16

*Day v. Gilkey*,
  2018 WL 1659468 (E.D. Ark. Apr. 5, 2018) .................................................... 10

*Epps v. Stewart Info. Servs. Corp.*,
  327 F. 3d 642 (8th Cir. 2003) .......................................................................... 12

*Ex parte Reindel*,
  963 So. 2d 614 (Ala. 2007) ......................................................................... 20, 22

*Federated Mut. Ins. Co. v. FedNat Holding Co.*,
  928 F.3d 718 (8th Cir. 2019) ........................................................................ 8, 13

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
  141 S. Ct. 1017 (2021) ......................................................................... 12, 14, 15

*Gibbs v. Primelending*,
  2010 WL 4056146 (E.D. Ark. Oct. 14, 2010) ............................................. 19, 20

*Gibbs v. PrimeLending*,
    381 S.W.3d 829 (Ark. 2011) ..................................................................... 18, 19, 22

*Hand v. Beach Ent. KC, LLC*,
    425 F. Supp. 3d 1096 (W.D. Mo. 2019) ......................................................... 11, 23

*In re Blue Cross Blue Shield Anitrust Litig.*,
    225 F. Supp. 3d 1269 (N.D. Ala. 2016) ................................................... 20, 21, 23

*In re Platinum and Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) ............................................................ 21, 24

*Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*,
    449 A.2d 210 (Del. 1982) .............................................................................. 19, 22

*Kimmons v. AutoZone, Inc.*,
    2020 WL 5506446 (E.D. Ark. Sept. 11, 2020) ..................................................... 12

*K-V Pharm. Co. v. J. Uriach & CIA, S.A.*,
    648 F.3d 588 (8th Cir. 2011) .................................................................................. 9

*Lewis & Clark Outdoors, Inc. v. L.C. Indus., Inc.*,
    2008 WL 2397500 (W.D. Ark. Jun. 11, 2008) ..................................................... 10

*Mendez v. Thomas*,
    2019 WL 3806049 (W.D. Ark. Aug. 13, 2019) ................................................... 10

*Pudlowski v. The St. Louis Rams, LLC*,
    829 F.3d 963 (8th Cir. 2016) ................................................................................ 25

*Rebsamen Ins., Inc. v. Mutual Holdings Ltd.*,
    228 F.R.D. 637 (E.D. Ark. 2005) ........................................................................... 8

*SEECO, Inc. v. Hales*,
    22 S.W.3d 157 (Ark. 2000) ................................................................................... 22

*Steinbuch v. Cutler*,
    518 F.3d 580 (8th Cir. 2008) ......................................................................... 15, 25

*Twin Med, LLC v. Skyline Healthcare, LLC*,
    2022 WL 120300 (E.D. Ark. Jan. 12, 2020) .............................................. 8, 13, 25

## STATUTES

ARK. CODE ANN. § 16-4-101 ....................................................................................... 8

ARK. CODE ANN. § 4-88-107 ....................................................................................... 5

ARK. CODE ANN. § 4-88-113 ............................................................................. 2, 5, 14

The State of Arkansas (the "State") submits this opposition to the Rule 12(b)(2) Motion to Dismiss filed by Defendant CVS Health Corporation ("CVS Health").

## INTRODUCTION

For nearly twenty years Arkansas diabetics and health plan payors like the State have been increasingly overcharged for necessary diabetes medications due to the unfair and deceptive practices of CVS Health and its co-conspirators. The State of Arkansas filed suit in Arkansas state court to put an end to the Defendants' conduct and to recover the overpayments made by the State and Arkansas diabetics. (*See, e.g.,* ¶¶ 35–38, 529–30, 538).[1] The claims are based on Arkansas law, including the Arkansas Deceptive Trade Practices Act ("ADTPA"), and, in part, arise from the Arkansas Attorney General's sovereign interest in protecting the health and safety of all Arkansans as well as the integrity of the State's marketplace. (¶ 39).

CVS Health claims that it cannot be sued in Arkansas because the State's claims against it are based "only" on its status as a corporate parent. (Dkt. 91 at 2; *see also, id.* at 3, 6). Building on that faulty premise, CVS Health provides a declaration asserting that it is nothing more than a holding company with no business operations in Arkansas and that the CVS entities are separate corporate entities. (Dkt. 90-1). CVS Health then spends most of its brief attempting to rebut a corporate veil argument that is not necessary to the Court's jurisdictional analysis.

The uncontroverted allegations in the complaint set forth specific facts regarding CVS Health's involvement in the Insulin Pricing Scheme, separate and apart from its role as a corporate parent, including: (1) meetings and communications between CVS Health and the Manufacturer Defendants to develop and plan the Scheme including dates and the identities of executives who

---

[1] All references in this Memorandum to parenthetical paragraph citations are citations to the individually numbered paragraphs of the First Amended Complaint (Dkt. 57).

were involved; (2) CVS Health's participation and leadership in the PBM trade association that the Defendants used as a vehicle to plan and effectuate the Scheme; and (3) CVS Health's direct involvement in the PBM, formulary, and pharmacy services of the CVS entities through numerous shared executives and employees who are identified by name and title. Further, under the ADTPA, CVS Health is subject to jurisdiction in Arkansas and shares the liability for its subsidiaries' violations of the ADTPA if it directly or indirectly controls, facilitates, or aids their violations. ARK. CODE ANN. § 4-88-113(d). None of these allegations are mentioned in CVS Health's declaration and many are ignored in CVS Health's Rule 12(b)(2) motion. The handful of allegations that CVS Health does mention in its motion are viewed in isolation, without regard for the others, and then quickly brushed aside. (*See, e.g.*, Dkt. 91 at 6, 8).

Further, CVS Health ignores conspiracy jurisdiction in its motion, which supports the Court's jurisdiction over each of the Defendants in this case. Under Arkansas law, the forum contacts of one conspirator are treated as the contacts of all co-conspirators for purposes of determining personal jurisdiction. The State's complaint sets forth specific details of CVS Health's direct involvement with the other Defendants to implement the Scheme – allegations that CVS Health has not disputed. CVS Health's co-conspirators provided the at-issue PBM services in Arkansas, developed formularies specifically for use in Arkansas, and sold and dispensed the at-issue drugs in Arkansas at false and inflated prices, all in furtherance of the Scheme. Notably, none of the Manufacturer Defendants or the other CVS entities are contesting this Court's jurisdiction, despite being non-Arkansas entities.[2]

---

[2] It is also worth noting that the Manufacturer Defendants challenged personal jurisdiction of a Mississippi court over nearly identical claims brought by the Mississippi Attorney General. The Mississippi court soundly rejected the Manufacturers' arguments and found it had personal jurisdiction. *The State of Mississippi, ex rel. Lynn Fitch, Attorney General v. Eli Lilly and Co., et al.*, Civ. No. 3:21-cv-674-KHJ-MTP (S.D. Miss. Aug. 9, 2022), ECF 111, attached as Exhibit 5.

The complaint contains more than sufficient allegations of CVS Health's involvement in the Scheme, conspiratorial conduct, and related forum contacts to support this Court's exercise of jurisdiction over it.  Its Rule 12(b)(2) Motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Over 400,000 Arkansans live with diabetes, a disease that would severely harm or kill them without medication like insulin, a drug that now costs thousands annually for a single diabetic.  (¶¶ 1, 4, 234, 259).  An insulin product that was originally priced at $20 when released in the late 1990s, now ranges between $300 and $700. (¶¶ 13–14). In recent years especially, the price of the drug has skyrocketed.  In the last decade alone, insulin prices have increased as much as 1000%. (¶¶ 15, 270, Figs. 2–6).

As a result, one in four diabetics skip or ration critical doses which, in turn, leads to further health complications and additional costs.  (¶¶ 30, 31, 271, 297, 461, 479–80, 486, 530).  In Arkansas, the State has spent billions of dollars on increased healthcare costs for diabetes and related complications.  (¶¶ 31–34, 297, 479–84, 530).

Tellingly, the drug has not changed in the past 20 years, and there has been little to no innovation in the product itself—today's $350 insulin is the exact drug originally priced at $20. (¶¶ 17, 252–63, 380b). In fact, it costs the Manufacturer Defendants less than $2 to make.  (¶¶ 14, 526).  Normal market forces are not at work. (¶¶ 341–44, 380–81).

### *The Insulin Pricing Scheme*

The Manufacturer Defendants dominate the diabetes drug market, manufacturing 99% of insulins dispensed in Arkansas (¶¶ 5, 251, 267).  The Manufacturers also, in coordination with the PBMs, set the list price for their diabetes drugs. (¶¶ 20, 300, 350). The list price is the basis for the price that nearly every consumer and payor pays for the at-issue drugs.  (¶¶ 27, 366).

The PBM Defendants control over 75% of the market and manage the pharmacy benefits for the vast majority of Arkansans.  (¶¶ 6, 318).  In this role, the PBM Defendants establish drug lists called formularies that determine which diabetes drugs are covered and not covered for nearly every payor in Arkansas.  (¶¶ 7, 9, 300, 345).  Most prescribing doctors and patients, of course, opt for covered medications. (¶¶ 7–11).  PBMs thus effectively control utilization of the at-issue drugs.  (¶¶ 6–11, 345).  In short, the Manufacturers control the product, the PBMs control the buyers, and collectively these two groups of Defendants control the price paid by nearly every diabetic and payor in Arkansas, including the State.  (¶¶ 341–61, 366).

Knowing the importance of price, volume, and access, the Manufacturers and PBMs work together to maximize their own profits to the detriment of Arkansans and payors like the State.  (¶¶ 6–11, 361, 542–44).   Given that the PBMs and Manufacturers treat diabetes drugs as interchangeable, formulary inclusion depends on which Manufacturer increases the PBM's bottom lines the most.  (¶¶ 22, 252–63, 341, 354, 371–72).   The Manufacturers, knowing formulary position directly correlates to sales volume, simply raise their reported prices and then secretly kick back a significant portion of that price to the PBM Defendants (referred to as "Manufacturer Payments").  (¶¶ 10, 20, 305–09, 346, 350, 354, 368–72).  The Manufacturers also know that every way the PBMs make money off the at-issue drugs is directly tied to the inflated list prices.  (¶¶ 348, 385, 395). It is a win-win for Defendants: the PBMs make money from the increased prices and the secret kick back payments, while the Manufacturers lock in huge volume and maintain their own profit margins.  (¶¶ 23–24, 382–85, 417, 420).  The result, however, is unconscionable – the most expensive diabetes drugs end up on the formularies used by most Arkansans and both Arkansas diabetics and the State end up paying more so the Defendants can profit.  (¶ 22, 343, 354–56, 361, 371–72).

4

*The State's Claims*

The State brought suit in Arkansas state court against the Manufacturer Defendants and the PBM Defendants for violations of the ADTPA, conspiracy to violate the ADTPA, and unjust enrichment. (¶¶ 517–44). In addition to suing on its own behalf as payor of State employee health plans and purchaser of the at-issue drugs for State-run facilities, the State sued in its *parens patriae* capacity on behalf of the hundreds of thousands of Arkansans injured by the Insulin Pricing Scheme. (¶¶ 35, 226).

The ADTPA prohibits unconscionable and deceptive trade practices in the conduct of trade or commerce within Arkansas. ARK. CODE ANN. § 4-88-107(a)-(b). The complaint alleges that each Defendant's conduct and involvement in the Insulin Pricing Scheme was both unfair and deceptive in violation of the ADTPA and caused injury in Arkansas to hundreds of thousands of Arkansas diabetics and the State. (¶¶ 517–30). Each purchase of the at-issue drugs at prices resulting from the Insulin Pricing Scheme, by the State or by any Arkansas resident, constitutes a separate violation of the ADTPA. (¶ 528). Because Arkansas diabetics and the State continue to pay for the at-issue drugs based on the false prices generated by the Insulin Pricing Scheme, the harm is ongoing. (¶¶ 478, 490). In addition to liability for its own direct violations, CVS Health is jointly and severally liable for violations by its subsidiaries, which CVS Health "directly or indirectly controls . . . facilitates, assists, acts as an intermediary for, or in any way aids" in their violation of the Act. ARK. CODE ANN. § 4-88-113(d)(1). Such involvement also constitutes purposeful availment of the privileges of conducting activities in Arkansas, subjecting CVS Health to personal jurisdiction. ARK. CODE ANN. § 4-88-113(d)(3).

### *Relevant Jurisdictional Facts*

The complaint sets forth the following facts regarding CVS Health and its involvement in the Insulin Pricing Scheme, which are uncontroverted by the Declaration of Thomas Moffatt submitted in support of CVS Health's Rule 12(b)(2) Motion:[3]

- CVS Health, through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, and Chief Communication Officers, is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme. (¶ 86). CVS Health, through numerous shared directors and executives of the other CVS entities, had direct involvement in the at-issue formulary construction, Manufacturer Payments, and mail order and retail pharmacy services. (¶ 111). The CVS entities conduct business in Arkansas, own and operate dozens of retail pharmacies throughout Arkansas, and provide PBM and mail order pharmacy services in Arkansas. (¶¶ 94–110).[4]

- CVS Health senior executives are also employees of its affiliates and subsidiaries. CVS Health has agreements with these senior executives regarding their involvement with the other CVS entities. (Moffatt Dec., Dkt. 90-1, at ¶ 6).

- Repeatedly, continuously, and explicitly throughout the relevant time period, CVS Health represented in its annual corporate filings that it – CVS Health – designs pharmacy benefit plans, negotiates with pharmaceutical companies, and is involved in the selection of drugs for its formularies. (¶ 87). CVS Health represents publicly that it constructs programs that lower the costs of the at-issue diabetes drugs, including programs available to CVS Health's PBM clients in Arkansas. (¶ 88).

- CVS Health is a member of the Pharmaceutical Care Management Association ("PCMA"), the main trade association for PBMs. (¶¶ 326–29). Indeed, CVS Health's Executive Vice President Alan Lotvin is a member of the PCMA's Board of Directors. (¶ 327).[5] Through this leadership position, CVS Health controls the PCMA, which is at the center of the Insulin Pricing Scheme. (¶¶ 327–28). Multiple times a year, from 2010 to 2019, CVS Health attended PCMA meetings where it met privately with each of the Manufacturer Defendants for the purpose of developing and maintaining the Insulin Pricing Scheme. (¶¶

---

[3] *See Atl. Mut. Ins. Co. v. M/V HUMACAO*, 169 F. Supp. 2d 211, 216 (S.D.N.Y. 2001) (discrediting defendant's affidavit in personal jurisdiction challenge when the affidavit did not squarely contradict the well-pled allegations of the complaint).

[4] *See also*, Declaration of Thomas Moffatt, *Taylor v. CVS Pharmacy Store # 3004*, Civ. 7:16-cv-01827-TMP, ECF 1-1, attached as Exhibit 6, at ¶ 3 ("CVS Health is a holding company that does business through its subsidiaries.").

[5] Alan Lotvin is Executive Vice President of CVS Health. Lotvin profile, *available at* https://www.cvshealth.com/about-cvs-health/leadership/alan-lotvin, attached as Exhibit 7.

326, 330, 333, 543).  Notably, key at-issue lockstep price increases were made shortly after these Scheme-related meetings.  (¶¶ 336–37, 543).

- CVS Health, throughout the relevant period, directly engaged with the Manufacturer Defendants in furtherance of the Insulin Pricing Scheme.  (¶ 90).  Each of the Manufacturers has a team of executives dedicated exclusively to interacting with CVS Health.  (*Id.*).  The Manufacturers and CVS Health, through the intimacy and connection of their leaders, develop and agree on strategic initiatives used to effectuate the Insulin Pricing Scheme.  (¶ 91).

- In a least 2011, 2012, and 2016, CVS Health executives met with executives from Manufacturer Novo Nordisk to discuss their coordinated efforts related to the at-issue drugs, apparently in furtherance of the Insulin Pricing Scheme.  These meetings included the Executive Vice President and Chief Medical Officer of CVS Health, as well as members of CVS Health's Enterprise Operating Committee.  (¶¶ 92, 92a).

- In at least 2012, CVS Health's CEO, COO, and members of its Enterprise Operating Committee met with senior leaders of Manufacturer Eli Lilly to discuss their coordinated efforts related to the at-issue drugs, apparently in furtherance of the Insulin Pricing Scheme. (¶¶ 92, 92b).

The complaint also sets forth the following uncontroverted facts regarding the Arkansas

contacts of CVS Health's co-conspirators, related to the Insulin Pricing Scheme:

- The Manufacturer Defendants conduct business in Arkansas related specifically to the at-issue diabetes drugs and for the purpose of furthering the Insulin Pricing Scheme.  (¶¶ 42–45, 48, 57–59, 62, 71–73, 76).  Each holds active Wholesale Distributor Licenses in Arkansas which allow them to manufacture, distribute, and sell the at-issue drugs in Arkansas.  (¶¶ 43–44, 57–58, 71–72).

- Each Manufacturer Defendant directs its at-issue drugs for sale in Arkansas through wholesalers and directly through Arkansas retail pharmacies and mail-order pharmacies, including those owned and operated by the CVS entities and the other PBM defendants. (¶¶ 125, 178, 221).

- The Manufacturer Defendants target the Arkansas market to boost sales of the at-issue drugs (¶¶ 45, 48, 59, 62, 73, 76); direct advertising and promotional materials for the at-issue drugs to Arkansas physicians, payors, and diabetics (¶¶ 50, 64, 78); and employ sales representatives in Arkansas who promote and sell the at-issue diabetes drugs throughout the State in furtherance of the Scheme.  (¶¶ 49, 63, 77).

- Further, the Manufacturer Defendants set and raise the list prices for the at-issue drugs and cause those prices to be published throughout Arkansas with knowledge and intent that Arkansas diabetics and payors like the State will pay based on those false, inflated prices. (¶¶ 20, 51, 54, 65, 68, 79, 82, 272–76, 291, 429–37, Figs. 2–6).

- The CVS entities provided the at-issue PBM services in Arkansas, and knowingly insisted that the Arkansas payors reimburse based on the artificially inflated prices generated by the Insulin Pricing Scheme.  (¶¶ 116, 118).

- The CVS entities provided PBM services to the State, collecting payment from the State based on the artificially inflated prices generated by the Insulin Pricing Scheme.  (¶ 120).

- The CVS entities created standard formularies for use in Arkansas that included the at-issue drugs, and that determined the diabetes medications to which Arkansas diabetes had access.  (¶¶ 9, 117, 345).

- The CVS entities dispensed the at-issue drugs to Arkansas diabetics through retail and mail order pharmacies, and collected payments from Arkansas diabetics and payors based on the prices generated by the Insulin Pricing Scheme.  (¶¶ 121–22).

## ARGUMENT

This Court has personal jurisdiction over CVS Health and its Rule 12(b)(2) motion should be denied.

## I.    Legal Standard

"A district court may exercise [] jurisdiction over an out-of-state defendant only to the extent permitted by the state's long-arm statute and the Constitution's due process clause." *Federated Mut. Ins. Co. v. FedNat Holding Co*., 928 F.3d 718, 720 (8th Cir. 2019) (citing *Coen v. Coen*, 509 F.3d 900, 905 (8th Cir. 2007)).  Arkansas' long-arm statute is co-extensive with federal constitutional requirements; therefore, the Court must only determine if the exercise of personal jurisdiction over CVS Health comports with due process.  *Twin Med, LLC v. Skyline Healthcare, LLC,* 2022 WL 120300, at *2 (E.D. Ark. Jan. 12, 2020) (quoting *Laymance v. Shroud*, 2019 WL 2078986, at *1 (E.D. Ark. Mar. 21, 2019)); *see also* ARK. CODE ANN. § 16-4-101.

"[T]o defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a *prima facie* showing of jurisdiction." *Rebsamen Ins., Inc. v. Mutual Holdings Ltd.,* 228 F.R.D. 637, 640 (E.D. Ark. 2005).  In evaluating the *prima facie* showing, the court should "view the evidence in the light most favorable to the plaintiff and resolve all factual

conflicts in its favor in deciding whether the plaintiff made the requisite showing." *K-V Pharm. Co. v. J. Uriach & CIA*, *S.A.*, 648 F.3d 588, 592 (8th Cir. 2011) (concluding "the totality of the circumstances" established minimum contacts necessary to exercise personal jurisdiction). "Determining the propriety of jurisdiction at a particular place always involves applying principles of fairness and reasonableness to a distinct set of facts, and the determination is not readily amenable to rigid rules that can be applied across the entire spectrum of cases." *Anderson v. Dassault Aviation*, 361 F.3d 449, 452 (8th Cir. 2004) (asserting personal jurisdiction over foreign corporation that had "symbiotic relationship" with a wholly owned subsidiary that conducted extensive business in Arkansas).

## II. CVS Health's Declaration Fails to Controvert the State's Allegations, And All Factual Allegations That Are Not Controverted Must Be Taken As True.

In support of its motion, CVS Health submitted the declaration of Thomas S. Moffatt in his capacity as an employee and officer of a separate CVS entity – *CVS Pharmacy, Inc*. (Dkt. 90-1). According to Mr. Moffatt, "in that capacity, I am familiar with the corporate structure of CVS Health Corporation." Notably, Mr. Moffatt is also an employee and officer of each of the other four CVS entities, including CVS Health (¶ 111a), a fact that is alleged in the complaint and curiously avoided in Mr. Moffatt's declaration.[6] The State alleges that CVS Health is directly involved in the conduct and control of the other CVS entities through "interlocking directorships and shared executives," *including through Mr. Moffatt specifically*. (*Id.*). Again, Mr. Moffatt did not mention or refer to these allegations in his declaration. He acknowledges that CVS Health "has agreements with" senior executives who are officers of CVS Health and who are "employed

---

[6] Mr. Moffatt in fact publicly represents that he "[c]urrently serves as assistant corporate secretary of [CVS Health Corporation], as well as president and/or director for several hundred subsidiary entities[.]" Moffatt LinkedIn Profile, *available at* https://www.linkedin.com/in/tom-moffatt-5b274190/, attached as Exhibit 8.

by and provide services to" CVS Health's subsidiaries.  (Dkt. 90-1 at ¶ 6).  Yet, with no further

explanation or discussion as to how he and the other CVS Health senior executives segregate their

work for the different entities, Mr. Moffatt provides the self-serving and somewhat contradictory

assertion that CVS Health has "no direct involvement in directing, managing, or supervising the

operations *or the employees* of any of its direct or indirect subsidiary companies."  (*Id.*) (emphasis

added).

 Mr. Moffatt further asserts that "CVS Health Corporation is a holding company . . . [and]

has no operations unrelated to its status as a holding company."  (*Id.* at ¶ 4).  This assertion,

however, is belied by the State's factual allegations regarding CVS Health's repeated, explicit

public statements concerning its operations (¶¶ 87–88) and its membership in and control over the

PCMA – a trade association for PBMs (¶¶ 326–29).  These allegations are not denied or even

mentioned in Mr. Moffatt's declaration.

 CVS Health's status as a mere holding company is further belied by public filings in this

Court.  In a lawsuit filed by the PCMA challenging the validity of an Arkansas law that would

regulate certain PBM practices, CVS Health Corp. is identified as a member of the PCMA that

"may have a direct or indirect pecuniary interest in the Plaintiff's outcome in the case."  (*Pharm.

Care Mgmt. Ass'n v. Leslie Rutledge*, Civ. No. 4:15-cv-510-BSM, ECF 4, attached as Exhibit 1).[7]

CVS Health's Executive Vice President, Jon Roberts, is identified as a member of the PCMA's

board of directors.  (*Pharm. Care Mgmt. Ass'n v. Leslie Rutledge*, Civ. No. 4:15-cv-510-BSM,

---

[7] "The Court may take judicial notice of publicly available records" and "of proceedings in other courts of record."  *Mendez v. Thomas*, 2019 WL 3806049, at *2, n.1 (W.D. Ark. Aug. 13, 2019); *Day v. Gilkey*, 2018 WL 1659468, at *1, n.1 (E.D. Ark. Apr. 5, 2018) (quotation omitted).  *See also Lewis & Clark Outdoors, Inc. v. L.C. Indus., Inc.*, 2008 WL 2397500, at *5 (W.D. Ark. Jun. 11, 2008) (court reviewing the allegations of a complaint filed by defendant in a separate matter, and finding that they, when viewed in the light most favorable to the plaintiff, supported the view that the defendant directed activities toward Arkansas, resulting in personal jurisdiction).

ECF 61-1, attached as Exhibit 2).  According to a declaration submitted by the PCMA's chief operating officer, CVS Health:  is a member of the PCMA; is among "the largest PBMs in the country;" operates in Arkansas; and would be subject to and irreparably harmed by the Arkansas PBM regulation being challenged.  (*See Pharm. Care Mgmt. Ass'n v. Leslie Rutledge*, Civ. No. 4:15-cv-510-BSM, ECF 75-3, attached as Exhibit 3, at ¶¶ 3, 7).

Participation and leadership in the PBM trade association is undoubtedly beyond the scope of the holding company "functions," as described in Mr. Moffatt's declaration.[8,9]  (*See* Dkt. 90-1 at ¶ 4 (describing the issuance of stock and filing of reports with the Securities and Exchange Commission)).  Thus, CVS Health's conclusory assertion that it is simply a holding company is not to be credited, and the State's allegations must be taken as true.  *Hand v. Beach Ent. KC, LLC*, 425 F. Supp. 3d 1096, 1106 (W.D. Mo. 2019) ("The allegations in the Complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits") (quoting *Cantrell v. Extradition Corp. of Am.*, 789 F. Supp. 306, 308-09 (W.D. Mo. 1992)).

Neither does CVS Health provide any evidence, in Mr. Moffatt's declaration or otherwise, to contradict the State's allegations that it met with and conspired with the Manufacturer Defendants in furtherance of the Insulin Pricing Scheme.  These allegations must also be taken as true.

---

[8] Further to this point, Mr. Moffatt's LinkedIn profile describes his employment with CVS Health to include responsibility for the licensing of the company's 10,000-plus facilities; interaction with the DEA, state boards of pharmacy and alcohol boards; and negotiation of "a wide range of contracts for multiple business units, including merchandising, logistics, information services, strategic procurement, and tax."  (Ex. 8). These too are well beyond mere holding company functions.

[9] CVS Health has also settled allegations by the United States Department of Justice arising from the filling of invalid prescriptions and improper record keeping by its Rhode Island pharmacies. https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

As this Court has recently affirmed, if a court makes a personal jurisdiction determination on the pleadings and affidavits it "must look at the facts in light most favorable to the nonmoving party and resolve all factual conflicts in favor of that party." *Carson v. Road Knights, Inc*., 2020 WL 6326104, at *1 (E.D. Ark. Oct. 27, 2020); *see also Kimmons v. AutoZone, Inc.*, 2020 WL 5506446, at *2 (E.D. Ark. Sept. 11, 2020).  This standard has also been solidified by the Eighth Circuit.  *See Epps v. Stewart Info. Servs. Corp*., 327 F. 3d 642, 646–47 (8th Cir. 2003).  Because no contradictory affidavit or evidence was submitted with regard to CVS Health's conspiracy with the Manufacturer Defendants and involvement with the PCMA, the allegations of the complaint are taken as true, even if the declaration of Mr. Moffatt is credited.

## III. The Uncontroverted Facts Establish Minimum Contacts Sufficient for Specific Personal Jurisdiction Over CVS Health.

The State's allegations are sufficient to support the exercise of specific personal jurisdiction over CVS Health based on its own contacts with Arkansas.[10]  The State alleges that CVS Health has suit-related contacts in Arkansas.  Moreover, CVS Health's actions, regardless of location, had a foreseeable and intended effect in Arkansas and, thus, subject it to jurisdiction here.

Federal due process requires a defendant have "such contacts with the forum State that the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). "The defendant's conduct and connection with the forum state must be such that defendant should 'reasonably anticipate being haled into court there.'" *Burlington Indus., Inc. v.*

---

[10] The State does not contend that this Court has general jurisdiction over CVS Health.

*Maples Indus., Inc.* 97 F.3d 1100, 1102 (8th Cir. 1996) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

In addition to United States Supreme Court precedent, the Eighth Circuit applies a five-factor test when analyzing personal jurisdiction. Courts in this circuit must consider "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Federated Mut. Ins. Co.*, 928 F.3d at 720 (quoting *Burlington*, 97 F.3d at 1102)); *see also Twin Med, LLC*, 2022 WL 120300 at *2 (applying five factor test and exercising jurisdiction over out-of-state defendant that operated several companies that were registered to do business in Arkansas).

**A.    CVS Health has sufficient minimum contacts with Arkansas to satisfy the Due Process Clause.**

CVS Health recognizes the five personal jurisdiction factors established by the Eighth Circuit but fails to analyze them or apply the factors to this case. (Dkt. 91 at 4). A close analysis of all five factors, however, mandates the exercise of personal jurisdiction over CVS Health.

The first two factors, the nature and quality of contacts with Arkansas and the quantity of such contacts, weigh in the State's favor. As alleged by the State, CVS Health was directly involved in PBM services and formulary construction as part of the Insulin Pricing Scheme, and publicly touted its involvement in those functions, though misrepresenting its aims. (¶¶ 86–89). CVS Health specifically offered PBM services to Arkansas payors, including the State, and created formularies for use in Arkansas. (¶¶ 116–17, 120). The filings of the PCMA in this Court support the State's allegations, affirming that CVS Health "operate[d] in Arkansas," "to administer pharmaceutical benefits on behalf of their customers, including health plans and their participants who reside in Arkansas." (McCarthy Decl., Ex. 3 at ¶ 8). These PBM functions in the State of

Arkansas were ongoing throughout the relevant period. The nature, quality, and quantity of CVS Health's contacts with Arkansas are accordingly substantial, and support jurisdiction.

As to the third factor, the State's claims must also "arise out of or relate to the defendant's contacts with the forum." *Ford*, 141 S. Ct. at 1026. The *Ford* Court recently reiterated that a defendant's in-state contacts need only "relate to" the litigation—a causative relationship is not necessary. *Id.* Here, CVS Health through its work as an Arkansas PBM utilized the false prices arising from the Insulin Pricing Scheme and knowingly insisted that Arkansas payors, including the State, pay for the at-issue drugs on the basis of those prices, while concealing its role in the generation of the prices. (¶¶ 116–20). CVS Health also directly controlled, assisted, and aided its subsidiaries in violating the ADTPA, with knowledge of the facts giving rise to the violations, purposefully availing itself of the privileges of conducting business in Arkansas. ARK. CODE ANN. § 4-88-113(d). The State's claims against CVS Health directly relate to its contacts with Arkansas.

As the United States Supreme Court recently clarified, a company "purposefully availing itself" of a certain market in a particular state "has clear notice of its exposure in that State" to lawsuits related to harms caused by that product or conduct. *See Ford*, 141 S. Ct. at 1027. Put another way, if a suit arises from efforts by a company "to serve, *directly or indirectly*, the market for its product in several or all other States, it is not unreasonable to subject it to suit in one of those States" if its product (or service) causes an injury. *Id.* (emphasis supplied) (quoting *World-Wide Volkswagen*, 444 U.S. at 297). Here, the allegations of the complaint make clear that CVS Health acted in Arkansas, and successfully exploited the Arkansas market for its financial gain. By serving as a PBM in Arkansas, and doing so in furtherance of the Insulin Pricing Scheme, CVS Health played an active role in causing the harm underlying the State's claims, and had clear notice that it would be subject to the state's jurisdiction.

As to the fourth and fifth factors, this forum is also the "most natural State" to hear the State's claims because Arkansas is the state with the greatest interest in Arkansas statutory violations for purchases made in Arkansas that harmed Arkansas citizens. *See Ford*, 141 S. Ct. at 1031. The State and Arkansas diabetics were injured by CVS Health's activities, and "[a]n individual injured in [Arkansas] need not go to [another jurisdiction] to seek redress from persons who, though remaining in [another jurisdiction], knowingly cause the injury in [Arkansas]." *Calder v. Jones*, 465 U.S. 783, 790 (1984).

CVS Health is a company whose business extends across the nation, and specifically includes Arkansas. The burden of litigation in Arkansas is minimal for CVS Health considering its resources, and "unfairness could arise if parties which purposefully derive benefit from interstate activities were allowed to escape from consequences arising from those activities." *Steinbuch v. Cutler*, 518 F.3d 580, 588 (8th Cir. 2008) (referencing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985)); *see also CTHC Holdings, LLC v. First Cap. Real Est. Invs., LLC*, 2018 WL 3045183, at *2 (E.D. Ark. Apr. 12, 2018) (noting that "[t]here is no evidence that the Defendant[] would be inconvenienced by defending the lawsuit in Arkansas"). It is, therefore, fair and reasonable to exercise jurisdiction here.

The uncontroverted facts establish that CVS Health had significant and meaningful contacts with Arkansas that allowed CVS Health to handsomely profit from the Insulin Pricing Scheme in Arkansas. Therefore, all five personal jurisdiction factors, informed by the uncontested facts in the complaint, weigh in favor of exercising personal jurisdiction over CVS Health in Arkansas.

**B.** **CVS Health's purposeful acts directed to Arkansas and causing injury in Arkansas satisfy minimum contacts regardless of where the conduct occurred.**

CVS Health has intentionally aimed its tortious conduct towards Arkansas, and the effect of that conduct in Arkansas is more than sufficient to establish minimum contacts with the forum. There is a "sharp distinction between 'mere untargeted negligence' and 'intentional, and allegedly tortious, actions aimed expressly at the forum State.'" *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390 (8th Cir. 1991) (quoting *Calder*, 465 U.S. at 789). CVS Health's actions are the latter.

The Supreme Court has held that the *effects* of tortious conduct initiated in one state, which were intentionally directed and felt in another state, create minimum contacts in the state where the "brunt of the harm" is suffered. *Calder*, 465 U.S. at 788–89. After *Calder*, the "effects test" has been applied and repeatedly affirmed by the Eighth Circuit and the Eastern District of Arkansas.

In this case, CVS Health met and conspired with the CVS entities and the Manufacturers for the purpose of developing, maintaining, and executing the Scheme, with the intent to carry out the Scheme in Arkansas and to profit therefrom. At a minimum, those deliberate, non-fortuitous contacts violated Arkansas statutes and resulted in injury and damages in Arkansas.

After *Calder*, the Eighth Circuit applied the effects test in *Dakota Industries, Inc. v. Dakota Sportswear, Inc.* and held that the district court could exercise personal jurisdiction over the out-of-state defendant. 946 F.2d at 1391. The California-based defendant asserted that it did not have offices, agents, or property in the forum state, and it had not shipped any of its disputed product into the state. *Id.* at 1388. Nevertheless, the Eighth Circuit held it was appropriate to exercise jurisdiction over the defendant because the defendant's actions were "uniquely aimed at the forum state and the 'brunt' of the injury would be felt there." *Id.* at 1391.

16

This Court, in 2009, also applied the effects test as articulated by *Calder* and *Dakota Industries* and exercised personal jurisdiction over out-of-state defendants. *See Crain CDJ LLC v. Regency Conversions, LLC*, 2009 WL 973490 (E.D. Ark. Apr. 9, 2009). In *Crain*, the plaintiff asserted that the defendant Regency and its two employees conspired to sell modified motor vehicles throughout the United States at inflated prices, which did not reflect the accurate age of the vehicles. *Id*. at *1. As to the two employee defendants, the plaintiff specifically alleged they "acted to influence the purchase of Regency vehicles by Crain through kick-back payments to a Crain employee" and "wrongfully conspired with [a Crain employee] to influence and induce the purchase of regency vehicles by Crain through kick-back payments." *Id*. at *3.

The employee defendants moved to dismiss the action on personal jurisdiction grounds, but this Court held that the defendants had directed their actions towards Arkansas and the plaintiff had made a *prima facie* showing that personal jurisdiction existed. *Id*. Personal jurisdiction was exercised despite the fact that one employee defendant had never conducted business in Arkansas, never sold vehicles to the plaintiff, and had only been in Arkansas on one occasion while in transit. *Id*. This defendant claimed that his role in the kickback scheme was simply ministerial in nature, but the Court found that the defendant had participated in the scheme by initialing the kick-back checks, and the plaintiff was injured by this kick-back scheme in Arkansas. *Id*. The facts in *Crain* are similar to the actions taken by CVS Health, which alleges that it does not have minimum contacts in Arkansas despite its participation in the Insulin Pricing Scheme.

Here, in addition to the direct in-state contacts discussed above, CVS Health intentionally directed the Scheme towards Arkansas and knew (and intended) that injury would result here. It was directly involved in and supported the Scheme in Arkansas. CVS Health intended the at-issue drugs would be sold in Arkansas at false, inflated prices. It profited from kickbacks and other

payments from the Manufacturer Defendants, mail-order and retail pharmacy sales, and PBM services based on sales of and reimbursements for the at-issue drugs in Arkansas, all of which were based on the inflated prices produced by the Scheme.

These contacts and tortious acts[11] were not "mere untargeted negligence," rather, CVS Health's "intentional, and allegedly tortious actions were expressly aimed at [Arkansas]." *Calder*, 465 U.S. at 789. Moreover, CVS Health knew the brunt of the harm from its conduct would be felt in Arkansas. *Id.* at 784 (noting defendant knew conduct would have "potentially devastating impact" in targeted state). Accordingly, the State has established sufficient minimum contacts with Arkansas to subject CVS Health to jurisdiction in this Court.

## IV. The Forum Contacts of Its Co-Conspirators Are Imputed to CVS Health and Support the Court's Exercise of Personal Jurisdiction Over CVS Health.

The Supreme Court of Arkansas, in answer to a certified question from this Court, confirmed that Arkansas courts may exercise personal jurisdiction over out-of-state defendants based on the in-state contacts of their co-conspirators. *Gibbs v. PrimeLending*, 381 S.W.3d 829, 834 (Ark. 2011). In sum, the acts of one conspirator may be imputed to its co-conspirators, subjecting the co-conspirators to personal jurisdiction even if they lack forum contacts of their own. *Id.* at 832. Conspiracy jurisdiction may be applied when:

(1) two or more individuals conspire to do something
(2) that they could reasonably expect to lead to consequences in a particular forum, if
(3) one co-conspirator commits overt acts in furtherance of the conspiracy, and
(4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state[.]

---

[11] The First Amended Complaint addresses CVS Health's intentional conduct. (¶¶ 86–92) ("CVS Health … is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme that gave rise to the State's claims"). The PCMA's representation that CVS Health is a PBM conducting business in Arkansas further supports the State's allegations. (McCarthy Decl., Ex. 3, at ¶¶ 3, 8).

*Id.* (emphasis added) (quoting *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982)).  The conspiracy and the overt acts must be pled with particularity.  *Agency Servs. of Arkansas, Inc. v. Mongar*, 2014 WL 1760894, at *4 (E.D. Ark. May 2, 2014).  The Supreme Court noted that "a defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws."  *Gibbs*, 381 S.W.3d at 834 (quoting *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982)) (internal quotation marks omitted).  The Supreme Court of Arkansas therefore concluded that use of conspiracy jurisdiction does not violate due process and is permissible under Arkansas law.  *Id.*

The underlying case leading to the certified question was *Gibbs v. Primelending* (hereinafter, "*Primelending*"), 2010 WL 4056146 (E.D. Ark. Oct. 14, 2010).  In *Primelending*, the plaintiff couple attempted to refinance their home but were left with two mortgages after the owner of the escrow company took for his own use the funds intended to pay off the plaintiffs' original mortgage.  *Id.* at *2.  It turned out that the escrow company's license had already been revoked. *Id.* at *1. The plaintiffs alleged that the company had been able to continue operating with the appearance of legitimacy, due to a scheme involving one defendant company that stationed an employee in the unlicensed escrow company's office to allow it to hold itself out as licensed, and several defendants who received kickbacks and other benefits for continuing to refer business despite alleged knowledge of the escrow company's compromised status.  *Id.*  A review of the operative complaint in *Primelending* reveals that the plaintiffs did not have specific knowledge of every detail of the alleged conspiracy.  *See generally, Primelending* Second Amended Complaint, attached as Exhibit 4.  However, after summarizing the alleged web of agreements and actions of

the defendants, the Court found the allegations sufficient to establish personal jurisdiction over the alleged co-conspirators. *Primelending* 2010 WL 4056146 at *3-4.

The Court's conclusion on the sufficiency of the allegations in *Primelending* is consistent with case law from other jurisdictions that recognize conspiracy jurisdiction. For example, Alabama, like Arkansas, requires plaintiffs to plead the conspiracy and the relevant overt acts with particularity. *In re Blue Cross Blue Shield Anitrust Litig.*, 225 F. Supp. 3d 1269, 1302 (N.D. Ala. 2016). In evaluating this pleading standard for conspiracy jurisdiction, the Alabama Supreme Court stated:

> To be sure, the conspiracy averments in the complaint must exceed "bald speculation" and mere conclusory assertions. However, this burden is not heavy, especially "[w]hen determination of the jurisdictional facts is intertwined with and may be dispositive of questions of ultimate liability. This is so, because "[t]o require a more substantial showing in a case alleging a civil conspiracy would be . . . 'harsh, if not impossible' in view of the difficulties of pleading and proving a conspiracy."

*Ex parte Reindel*, 963 So. 2d 614, 623 (Ala. 2007) (citations omitted). The Alabama Supreme Court went on to note that "until controverted *by the defendant's affidavits*, the plaintiff's jurisdictional allegations must be considered as true." *Id.* at 623-24 (citation and internal quotation marks omitted) (emphasis in the original). Because the defendants had not denied the existence of the alleged conspiracy, nor their participation in it, the court denied their motions to dismiss. *Id.* at 624.

In *In re Blue Cross Blue Shield Antitrust Litig.*, the plaintiffs were healthcare providers and health insurance subscribers who alleged that the defendant BCBS entities conspired to geographically allocate the market and fix prices. 225 F. Supp. 3d 1269, 1303-04 (N.D. Ala. 2016). The defendants argued plaintiffs' conspiracy allegations were vague and conclusory. The court disagreed, finding that plaintiffs' pleadings supported conspiracy jurisdiction because plaintiffs had alleged an agreement by defendants to only sell insurance within their respective

geographic areas and to limit reimbursements to rates negotiated by the BCBS plan within the healthcare provider's area. *Id.* It also found that plaintiffs adequately alleged Alabama actions in furtherance of the conspiracies, where they pled that one of the BCBS entities, BCBS-AL, "operates, sells insurance, and forms contracts with health care providers in Alabama . . . [and] that BCBS-AL acted in Alabama to further the conspiracy on behalf of the other Blue Plans, including each of the Moving Defendants." *Id.* at 1305.

In *In re Platinum and Palladium Antitrust Litig.,* the plaintiffs alleged a conspiracy to depress the prices of platinum and palladium by influencing starting bid prices on daily London auction calls ("the Fixing") that would set the prices of those metals, and misrepresenting global supply and demand. 449 F. Supp. 3d 290, 299 (S.D.N.Y. 2020). The plaintiffs alleged that New York-based metals traders employed by co-conspirators would update order information during the Fixing, and that the participants in the conspiracy were in constant communication with their co-conspirators' traders in the United States. *Id.* at 325. The court acknowledged that the complaint did not "precisely allege" what was done with this information, but found "*it is plausible to infer* that they used the information provided by the United-States-based traders to decide on the price at which they ultimately wanted the Fixing to settle." *Id.* (emphasis added). Therefore, the court determined that the complaint plausibly alleged acts in furtherance of the conspiracy, and that it could exercise personal jurisdiction over the co-conspirators. *Id.* at 325-26. The court also noted that, under the Second Circuit's decision in *Charles Schwab Corp. v. Bank of Am. Corp.,* 883 F.3d 68 (2d Cir. 2018), "*if* plaintiffs plausibly allege a profit-motivated conspiracy, then the mere sale of securities in a forum *can* constitute an act in furtherance of the conspiracy sufficient to confer jurisdiction." *In re Platinum,* 449 F. Supp. 3d at 324, n.26. It is worth noting that the Delaware Supreme Court, after examining cases from across the country, assessed that the

Southern District of New York had perhaps the most stringent standard for gaining personal jurisdiction via the conspiracy theory. *Istituto Bancario Italiano SpA*, 449 A.2d at 224.

The upshot of these cases and others from across the nation is that a complaint need not connect all the dots of a conspiracy to establish personal jurisdiction over co-conspirators. Such a requirement would be "harsh, if not impossible in view of the difficulties of pleading and proving a conspiracy," *Ex parte Reindel*, 963 So. 2d at 623, and even the most stringent courts have declined to impose that impossible standard.

Here, the State's allegations are more than adequate to meet each element of conspiracy jurisdiction required to bring CVS Health within the Court's jurisdiction, by imputing to it the forum contacts of co-conspirators.

**First**, the State has pled more than sufficient allegations to place CVS Health into conspiracy with the other Defendants in this case, and in particular with the CVS entities and the Manufacturer Defendants.[12] CVS Health does not controvert the State's allegation that the Insulin Pricing Scheme constitutes a civil conspiracy. (¶¶ 542-43). The State's allegations and evidence further establish that CVS Health was not just involved but held a leadership role in the PCMA, which facilitated the Insulin Pricing Scheme (¶¶ 326-29; Exs. 1, 2, 3); that CVS Health maintained close relationships with the Manufacturer Defendants and directly coordinated with them in

---

[12] With regard to the CVS entities, Arkansas law recognizes the ability of members of the same corporate family to form civil conspiracies with each other. *SEECO, Inc. v. Hales*, 22 S.W.3d 157, 173 (Ark. 2000) (noting it is inconsistent to argue that the entities are separate and independent on the one hand, but at the same time not sufficiently separate to engage in a civil conspiracy). Conspiracy jurisdiction follows the contours of conspiracy-based liability. *Gibbs v. PrimeLending*, 381 S.W.3d 829, 834 (Ark. 2011) ("If due process does not prevent [a] co-conspirator from being held civilly or criminally responsible based on the principle of imputed conduct, it is difficult to see why it should prevent the exercise of jurisdiction based on that same principle." (Citation and internal quotation marks omitted)).

furtherance of the Scheme (¶¶ 90, 92, 326, 330, 333, 543); and that CVS Health coordinated with the CVS entities in furtherance of the Scheme through their shared executives (¶¶ 86, 111).

Because these allegations are not meaningfully controverted, they must at this stage be accepted as true. *Hand*, 425 F. Supp. 3d at 1106; *see also Blue Cross Blue Shield*, 225 F. Supp. 3d at 1306 ("As none of the Moving Defendants have challenged the alleged conspiracies through affidavits or other evidence, the court accepts the Plaintiffs' conspiracy allegations as true at this stage of the proceedings."). The first element, of two or more parties conspiring, is met.

**Second**, the co-conspirators, including CVS Health, could reasonably expect their conspiracy to lead to consequences in Arkansas. The Insulin Pricing Scheme was national in scope, and was intended to set the prices – and therefore the co-conspirators' profits – in each and every state, including Arkansas. Indeed, the co-conspirators insisted and ensured that sales of the at-issue drugs in Arkansas be based on the false prices generated by the Insulin Pricing Scheme (¶¶ 51–54, 65–68, 79–82, 118, 120–22).

**Third and fourth**, the State has alleged that CVS entities and the Manufacturer Defendants committed overt acts in furtherance of their conspiracy with CVS Health which subjects CVS Health, as a non-resident, to personal jurisdiction under Arkansas' long-arm statute. For example, the CVS entities provided PBM services in Arkansas during the relevant period (¶¶ 116, 120); implemented and utilized in Arkansas the artificially inflated prices generated by the Insulin Pricing Scheme (¶¶ 118, 120–22); and dispensed the at-issue drugs in Arkansas through their retail and mail order pharmacies, based on the artificially inflated prices generated by the Insulin Pricing Scheme. (¶¶ 121–22). With regard to the Manufacturer Defendants, the State has alleged that each Manufacturer targeted the Arkansas market for their at-issue products (¶¶ 45, 48, 59, 62, 73, 76); employed sales representatives throughout Arkansas to promote and sell their at-issue products (¶¶

49, 63, 77); directed advertising and informational materials to Arkansas physicians, payors, and diabetics for the specific purpose of increasing the sale of the at-issue drugs in Arkansas and profiting from the Insulin Pricing Scheme (¶¶ 50, 64, 78); caused the artificially inflated prices generated by the Insulin Pricing Scheme to be published throughout Arkansas with express knowledge that Arkansas diabetics and the State paid for the at-issue drugs based on these prices (¶¶ 51, 65, 79); and in fact sold millions of dollars' worth of the at-issue drugs into Arkansas each year based on the prices generated by the Insulin Pricing Scheme (¶¶ 52–54, 66–68, 80–82).

These overt acts by CVS entities and the Manufacturer Defendants were all in furtherance of the conspiracy of which CVS Health was a part: they were the actions by which the conspiracy was implemented for profit. The co-conspirators here entered a profit-motivated conspiracy, and the provision of PBM services and sales into the forum constitute acts in furtherance of the conspiracy sufficient to confer jurisdiction. *In re Platinum*, 449 F. Supp. 3d at 324, n.26. It is beyond dispute that these actions subject the CVS entities and the Manufacturer Defendants to jurisdiction in Arkansas – and indeed, neither the CVS entities nor any of the Manufacturer Defendants, despite their foreign citizenship, challenge this Court's personal jurisdiction over them. Because their Arkansas contacts are properly imputed to CVS Health through conspiracy jurisdiction, CVS Health is likewise subject to personal jurisdiction before this Court.

## V. Alternatively, the State is Entitled to Jurisdictional Discovery Regarding CVS Health's Arkansas Contacts, Involvement in the Scheme, and Corporate Structure.

If this Court finds the State falls short of making its required *prima facie* showing of personal jurisdiction, the State has, at minimum, shown enough to warrant jurisdictional discovery related to CVS Health's involvement in the Insulin Pricing Scheme. CVS Health attempts to obfuscate and minimize its role in the Pricing Scheme by asserting that is merely "a holding company." (Dkt. 91 at 5). But currently, any information that would further illuminate CVS

Health's role in the Scheme and the corporate relationship or lack of corporate separateness between CVS Health and the CVS entities is in the sole possession of those Defendants.

"Discovery is not limited to the merits of the case; where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues." *Pudlowski v. The St. Louis Rams, LLC*, 829 F.3d 963, 964 (8th Cir. 2016) (internal quotations omitted). Jurisdictional discovery is warranted "when facts necessary to resolve a dispute over jurisdiction are unknown or disputed." *Twin Med, LLC, LLC*, 2020 WL 13179947, at *2. "Courts in the Eighth Circuit frequently allow jurisdictional discovery for the purposes of establishing personal jurisdiction." *Id*. at *4.

After the nonmovant has put forth evidence of the defendant's contacts with the forum, the district court should not dismiss the action without permitting jurisdictional discovery "to establish whether [] personal jurisdiction would be justified." *Steinbuch*, 518 F.3d at 589 (reversing district court's dismissal for lack of personal jurisdiction without permitting jurisdictional discovery).

Throughout this Response, the State has established that this Court may exercise personal jurisdiction over CVS Health because it, individually, has sufficient minimum contacts with Arkansas and the minimum contacts of its co-conspirators in the Insulin Pricing Scheme should be imputed to CVS Health. Yet, if this Court decides otherwise, it is appropriate to allow a limited period of jurisdictional discovery to accurately assess CVS Health's involvement in the Insulin Pricing Scheme in Arkansas.

## CONCLUSION

For all the reasons discussed above, this Court should deny CVS Health's Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction.

RESPECTFULLY SUBMITTED this the 24th day of October, 2022.

STATE OF ARKANSAS,
LESLIE RUTLEDGE, ATTORNEY GENERAL

By: */s/ Tanya D. Ellis* _____

Leslie Rutledge, ABN 2001126
Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel. (501) 682-2007
Fax. (501) 682-8118
Leslie.Rutledge@ArkansasAG.gov

Shannon L. Halijan, ABN 2005136
Deputy Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel. (501) 683-1509
Fax. (501) 682-8118
Shannon.Halijan@ArkansasAG.gov

Amanda D. Land, ABN 2012135
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel. (501) 682-2029
Fax. (501) 682-8118
Amanda.Land@ArkansasAG.gov

Kim DuVall Renteria, ABN 2021307
Assistant Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel. (501) 682-7383
Fax. (501) 682-8118
Kim.Renteria@ArkansasAG.gov

Gary B. Rogers, ABN 82139
Hilburn Harper, Ltd.
One Riverfront Place, 8th Floor
Post Office Box 5551
North Little Rock, Arkansas 72119
Tel. (501) 372-0110
Fax. (501) 372-2029
grogers@hilburnlawfirm.com

William Liston III (MSB #8482)
W. Lawrence Deas (MSB #100227)
Liston & Deas, PLLC
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Tel. (601) 981-1636
Fax. (601) 982-0371
william@listondeas.com
lawrence@listondeas.com

Edwin S. Gault, Jr. (MSB # 10187)
Walter G. Watkins, III (MSB # 100314)
Tanya D. Ellis (MSB # 101525)
Forman Watkins & Krutz LLP
P. O. Box 22608
Jackson, Mississippi 39225-2608
Tel. (601) 960-8600
win.gault@formanwatkins.com
trey.watkins@formanwatkins.com
tanya.ellis@formanwatkins.com

Matthew C. McDonald (MSB # 105966)
David Nutt & Associates
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Tel. (601) 898-7302
mattm@davidnutt.com

Joanne Cicala (TXB # 24052632)
Josh Wackerly (TXB # 24093311)
The Cicala Law Firm, PLLC
101 College Street
Dripping Springs, Texas 78620
Tel. (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com

**Certificate of Service**

I hereby certify that on October 24, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Tanya D. Ellis*
Tanya D. Ellis
