# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| THE STATE OF ILLINOIS, *EX.REL.*,<br>KWAME RAOUL, ATTORNEY GENERAL<br><br>*PLAINTIFF,*<br><br>V.<br><br>ELI LILLY AND COMPANY, ET AL.<br><br>*DEFENDANTS.* | Case No. 1:23-CV-00170 |

## PLAINTIFF'S OPPOSITION TO MANUFACTURERS' MOTION
## TO DISMISS COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

FACTUAL ALLEGATIONS ......................................................................................... 1

ARGUMENT ................................................................................................................. 4

I.    **Legal Standards.** ........................................................................................... 4

    A.    Rule 12(b)(6). ....................................................................................... 4

    B.    Heightened Pleading is not Required for all of the State's Claims........................ 5

II.    **The Complaint States Claims for Relief.** .................................................. 6

    A.    The ICFA and UDTPA broadly protect Consumers. ............................. 6

    B.    Plaintiff states an ICFA Deception claim. ............................................ 6

    C.    Plaintiff states an ICFA Unfairness claim. ........................................... 9

    D.    Plaintiff's Pleading alleges Adequate, Particularized Facts. ............................ 14

III.    **The Manufacturers' Legal Defenses Are Unavailing.** ............................... 16

    A.    Irrelevant Medicare Payment Methodologies provide no Safe Harbor. ............... 16

    B.    The State's Pleading states a claim for Unjust Enrichment. ................................ 22

    C.    The State's Claims are not barred by any Statute of Limitations. ....................... 24

        i.    Acting in the Public Interest, the State is not subject to any Statute of Limitations. .............................................................. 24

        ii.    Even if any Limitations Did Apply (They Do Not), the Limitations Period Has Been Tolled. .................................................. 26

            1.    The Continuing Violations Doctrine Applies. .............................. 26

            2.    The Discovery Rule Tolls the Statute of Limitations. .................... 27

            3.    Fraudulent Concealment Tolls the Statute of Limitations. ........... 30

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Alra Laboratories, Inc.*,
    1993 WL 293995 (N.D. Ill. Aug. 4, 1993) ..................................................... 18, 19

*Ahrendt v. Condocerts.com Inc.*,
    2018 WL 2193140 (N.D. Ill. May 14, 2018) ........................................................ 13

*Am. Fin. Serv. Ass'n v. FTC*,
    767 F.2d 957 (D.C. Cir. 1985) ............................................................................ 10

*Apollo Real Estate Inv. Fund, IV, Ltd. P'ship v. Gelber*,
    398 Ill. App. 3d 773 (1st Dist. 2009) .................................................................. 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 4

*Barnett v. Abbott Laboratories*,
    492 F. Supp. 3d 787 (N.D. Ill. 2020) .................................................................... 6

*Batson v. Live Nation Ent., Inc.*,
    746 F.3d 827 (7th Cir. 2014) .............................................................................. 14

*Beard v. Gress*,
    90 Ill. App. 3d 622 (4th Dist. 1980) ...................................................................... 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................... 4

*Bell v. Publix Super Mkts., Inc.*,
    982 F.3d 468 (7th Cir. 2020) ................................................................................. 4

*Board of Education v. A, C & S Inc.*,
    131 Ill. 2d 428 (1989) ......................................................................................... 25

*Bober v. Glaxo Wellcome PLC*,
    246 F.3d 934 (7th Cir. 2001) .............................................................................. 17

*Boucher v. Finance Syst. of Green Bay, Inc.*,
    880 F.3d 362 (7th Cir. 2018) ................................................................................. 4

*Brody v. Finch Univ. of Health Sciences/The Chicago Med. Sch.*,
    298 Ill. App. 3d 146 (2nd Dist. 1998) ................................................................... 7

*Cheng v. Rizza Chevrolet, Inc.*,
    1999 WL 33312873 (N.D. Ill. Apr. 7, 1999) ....................................................... 17

*Ciampi v. Ogden Chrysler Plymouth, Inc.*,
    262 Ill. App. 3d 94 (2nd Dist. 1994) ......................................................................... 8

*Ciszewski v. Denny's Corp.*,
    2010 WL 1418582 (N.D. Ill. Apr. 7, 2010) ............................................................ 19

*City of Miami v. Eli Lilly & Co.*,
    2022 WL 198028 (S.D. Fla. Jan. 21, 2022) ................................................... 9, 20, 28

*Clark v. TAP Pharm. Products, Inc.*,
    343 Ill. App. 3d 538 (5th Dist. 2003) ........................................................................ 8

*Cooks v. Hertz Corp.*,
    2016 WL 3022403 (S.D. Ill. Apr. 29, 2016) .............................................................. 9

*DeGorter v. FTC*,
    244 F.2d 270 (9th Cir. 1957) ..................................................................................... 8

*Delisle v. McKendree Univ.*,
    2021 WL 4402474 (S.D. Ill. Sept. 27, 2021) .......................................................... 23

*Dubey v. Pub. Storage, Inc.*,
    395 Ill. App. 3d 342 (1st Dist. 2009) ...................................................................... 10

*Duncavage v. Allen*,
    147 Ill. App. 3d 88 (5th Dist. 1986) .......................................................................... 6

*Falcon Assoc, Inc. v. Cox*,
    298 Ill. App. 3d 652 (1st Dist. 1998) ......................................................................... 6

*Fergus v. Russel*,
    270 Ill. 304 (1915) .................................................................................................. 26

*Fields v. Alcon Labs, Inc.*,
    2014 WL 1041191 (S.D. Ill. Mar. 18, 2014) .......................................................... 16

*Finite Resources, Ltd. v. DTE Methane Resources, LLC*,
    521 F. Supp. 3d 754 (S.D. Ill. 2021) ...................................................................... 26

*First Midwest Bank v. Cobo*,
    90 N.E.3d 567 (Ill. App. Ct. 1st Dist. 2017) ........................................................... 23

*Flores v. United Airlines*,
    426 F. Supp. 3d 520 (N.D. Ill. 2019) ...................................................................... 13

*Ford Motor Co. v. FTC*,
    120 F.2d 1752 (6th Cir. 1941) ................................................................................... 8

*Friends of the Flathead River v. U.S. Forest Serv.,*
 2022 WL 2751772 (D. Mont. July 14, 2022) ......................................................... 3

*Galvan v. Nw. Mem'l Hosp.,*
 382 Ill. App. 3d 259 (1st Dist. 2008) ..................................................................... 13

*Giant Food Inc. v. FTC,*
 322 F.2d 977 (D.C. Cir. 1963) ................................................................................. 8

*Gibson v. City of Chicago,*
 910 F.2d 1510 (7th Cir. 1990) .................................................................................. 4

*Greenberger v. CEICO General Ins. Co.,*
 2006 WL 8461731 (N.D. Ill. Aug. 18, 2006) ......................................................... 19

*Grimaldi v. Webb,*
 282 Ill. App. 3d 174 (1st Dist. 1996) ....................................................................... 8

*Harris Cnty. v. Eli Lilly & Co.,*
 2020 WL 5803483 (S. D. Tex. Sept. 29, 2020) ..................................................... 28

*Hermitage Corp. v. Contractors Adjustment Co.,*
 166 Ill. 2d 72 (1995) .............................................................................................. 27

*Hyon Waste Mgmt. Services, Inc. v. City of Chicago,*
 214 Ill. App. 3d 757 (1st Dist. 1991) ..................................................................... 26

*Illinois v. McGraw-Hill Co., Inc.,*
 2013 WL 1874279 (N.D. Ill. May 2, 2013) ........................................................... 16

*In re Direct Purchaser Insulin Pricing Litig.,*
 2021 WL 2886216 (D.N.J. July 9, 2021) ................................................................. 9

*In re Gaslight Club, Inc.,*
 167 B.R. 507 (Bankr. N.D. Ill. 1994) ..................................................................... 26

*In re Insulin Pricing Litig.,*
 2019 WL 643709 (D.N.J. Feb. 15, 2019) ............................................................ 5, 9

*In re Pharm. Industry Average Wholesale Price Litig.,*
 491 F. Supp. 2d 20 (D. Mass. 2007) ........................................................................ 2

*Johnson v. Marshall Field & Co.,*
 57 Ill. 2d 272 (1974) .............................................................................................. 20

*Keith v. Ferring Pharms., Inc.,*
 2016 WL 5391224 (N.D. Ill. Sept. 27, 2016) ........................................................ 16

*Kenneke v. First Nat'l Bank*,
    65 Ill. App. 3d 10 (1st Dist. 1978) ........................................................................ 22

*Khan v. Deutsche Bank AG*,
    978 N.E.2d 1020 (Ill. 2012) ................................................................................ 28

*Lane v. Direct Energy Serv., LLC*,
    2020 WL 3211435 (S.D. Ill. June 15, 2020) ........................................................ 13

*Lanier v. Assoc. Fin., Inc.*,
    114 Ill. 2d 1 (1986) ............................................................................................. 17

*Mario's Butcher Shop & Food Center, Inc. v. Armour & Co.*,
    574 F. Supp. 653 (N.D. Ill. 1983) ........................................................................ 18

*Minnesota ex rel. Ellison v. Sanofi-Aventis U.S. LLC*,
    2020 WL 2394155 (D.N.J. Mar. 31, 2020) ....................................................... 5, 20

*Mississippi ex rel. Fitch v. Eli Lilly & Co.*,
    2022 WL 3222890 (S.D. Miss. Aug. 9, 2022) ....................................................... 5

*Mosier v. Village of Holiday Hills*,
    128 N.E.3d 1210 (Ill. App. Ct. 1st Dist. 2019) .................................................... 27

*MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*,
    2019 WL 1418129 (D.N.J. Mar. 29, 2019) ........................................................... 9

*Nesby v. Country Mut. Ins. Co.*,
    346 Ill. App. 3d 564 (5th Dist. 2004) .................................................................. 23

*Pavlik v. Kornhaber*,
    326 Ill. App. 3d 731 (1st Dist. 2001) ................................................................... 26

*People ex rel. Daley v. Datacom Systems Corp.*,
    146 Ill. 2d 1 (1991) ............................................................................................. 25

*People ex rel. Fahner v. Hedrich*,
    108 Ill. App. 3d 83 (2nd Dist. 1982) ............................................................... 10, 11

*People ex rel. Fahner v. Walsh*,
    122 Ill. App. 3d 481 (2nd Dist. 1984) ............................................................... 6, 10

*People ex rel. Hartigan v. Knecht Servs., Inc.*,
    216 Ill. App. 3d 843 (2nd Dist. 1991) .................................................................. 10

*People ex rel. Hartigan v. Lann*,
    225 Ill. App. 3d 236, (1st Dist. 1992) .................................................................. 25

*People ex rel. Madigan v. United Constr. of Am.*,
   981 N.E.2d 404 (Ill. App. Ct. 1st Dist. 2012) ........................................................ 7

*Price v. Philip Morris, Inc.*,
   219 Ill. 2d 182 (2005) ........................................................................... 17, 19

*Randels v. Best Real Estate, Inc.*,
   243 Ill. App. 3d 801 (2nd Dist. 1993) ..................................................................... 14

*Regina Corp. v. FTC*,
   322 F.2d 765 (3d Cir. 1963) ................................................................................. 8

*Reshal Assoc., Inc. v. Long Grove Trading Co.*,
   754 F. Supp. 1226 (N.D. Ill. 1990) ...................................................................... 30

*Ridings v. Am. Fam. Ins. Co.*,
   2021 WL 722856 (N.D. Ill. Feb. 24, 2021) .................................................... 13, 22

*Robinson v. Toyota Motor Credit Corp.*,
   201 Ill. 2d 403 (2002) ........................................................................... 6, 13

*Sanders v. Lincoln Service Corp.*,
   1993 WL 112543 (N.D. Ill. Apr. 5, 1993) .............................................................. 19

*Saunders v. Mich. Ave. Nat. Bank*,
   278 Ill. App. 3d 307 (1st Dist. 1996) ..................................................................... 14

*Siegel v. Shell Oil Co.*,
   612 F.3d 932 (7th Cir. 2010) .............................................................................. 14

*Siegel v. Shell Oil Co.*,
   656 F. Supp. 2d 825 (N.D. Ill. 2009) ..................................................................... 22

*Spiegel, Inc. v. FTC*,
   411 F.2d 481 (7th Cir. 1969) ........................................................................ 7, 11

*State of Illinois v. Tri-Star Industrial Lighting, Inc.*,
   2000 U.S. Dist. LEXIS 14948 (N.D. Ill. Oct. 11, 2000) [**Exhibit A**] ............................. 24, 25

*Stelzer v. Matthews Roofing Co., Inc.*,
   140 Ill. App. 3d 383 (1st Dist. 1986) ..................................................................... 21

*Stonecrafters, Inc. v. Foxfire Printing and Packaging, Inc.*,
   633 F. Supp. 2d 610 (N.D. Ill. 2009) ..................................................................... 10

*Strow v. B&G Foods, Inc.*, 2022 WL 4608948 (N.D. Ill. Sept. 30, 2022) ..................................... 4

*Sullivan's Wholesale Drug Company, Inc. v. Faryl's Pharmacy, Inc.*,
   214 Ill. App. 3d 1073 (5th Dist. 1991) ............................................................. passim

*Thacker v. Menard, Inc.*,
  105 F.3d 382 (7th Cir. 1997) ......................................................................... 6

*Toulon v. Cont'l Cas. Co.*,
  2015 WL 4932255 (N.D. Ill. Aug. 19, 2015) ....................................................... 18

*Toulon v. Continental Casualty Co.*,
  877 F.3d 725 (7th Cir. 2017) ......................................................................... 14

*Toushin v. Ruggiero*,
  189 N.E.3d 1012 (Ill. App. Ct. 1st Dist. 2021) .................................................... 22

*Tri-Pex Tech. Services, Ltd. v. Jon-Don, LLC*,
  2022 WL 16709517 (Ill. Ct. App. Nov. 4, 2022) .................................................. 20

*Vanzant v. Hill's Pet Nutrition, Inc.*,
  934 F.3d 730 (7th Cir. 2019) ..................................................................... 5, 19

*Wendorf v. Landers*,
  755 F. Supp. 2d 972 (N.D. Ill. 2010) .............................................................. 11

*Wigod v. Wells Fargo Bank, N.A.*,
  673 F.3d 547 (7th Cir. 2012) .......................................................................... 6

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Fin. Servs., Inc.*,
  536 F.3d 663 (7th Cir. 2009) .......................................................................... 5

**Statutes**

15 U.S.C. § 1641(a) ...................................................................................... 17

15 U.S.C. § 45 ......................................................................................... 7, 11

215 ILCS 5/356z.41 ...................................................................................... 11

215 ILCS 5/513b1 ........................................................................................ 27

42 U.S.C. § 1395w .................................................................................... 17, 21

42 U.S.C. § 1395w-3a ............................................................................... 17, 21

42 U.S.C. § 1396r-8 ..................................................................................... 21

735 ILCS 5/13-205 .................................................................................. 25, 26

815 ILCS 505/1, *et seq.* ............................................................................. 1, 7

815 ILCS 505/10 ........................................................................................ 16

815 ILCS 505/2 .................................................................................................... 6, 7

815 ILCS 505/7 .................................................................................................. 24, 25

815 ILCS 510/1, *et seq.* ......................................................................................... 1

815 ILCS 510/2 .................................................................................................... 6

815 ILCS 510/4 .................................................................................................. 16

## Other Authorities

U.S. Sentate Finance Committee,
  *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, (Jan. 14, 2021), www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf .................................................... 3, 29

## Rules

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 4, 16

Fed. R. Civ. P. 15(a)(2) ........................................................................................ 30

Fed. R. Civ. P. 8 .................................................................................................. 5, 16

Fed. R. Civ. P. 9(b) ......................................................................................... 5, 14, 16

## Regulations

U.S. Dept. of Health and Human Services,
  *Fraud and Abuse; Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals,* 85 Fed. Reg. 76666 (Nov. 30, 2020) .................................... 22

## Constitutional Provisions

*Ill. Const., Art. V, § 15* ........................................................................................ 25

The State of Illinois, *ex rel*. Attorney General Kwame Raoul, submits this Opposition to the Manufacturers' Motion to Dismiss (Dkt. 59, 60). For the following reasons, the motion should be denied.

## FACTUAL ALLEGATIONS

Acting in the public interest of the State of Illinois (the "State") and its citizens, the Honorable Kwame Raoul, Attorney General, filed this action to protect the health and economic well-being of more than 5 million Illinois citizens suffering from diabetes. (¶¶ 1-4, 34, 214).[1]

Pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") [815 ILCS 505/1, *et seq.*], the Illinois Uniform Deceptive Trade Practices Act ("UDTPA") [815 ILCS 510/1, *et seq.*]*,* and common law, the State seeks restitution, civil penalties, injunctive and other relief to enjoin and address ongoing misconduct of Defendants. (¶¶ 468-469). This action is especially necessitous given the millions of Illinoisans who rely on the at-issue medications for health maintenance and even survival. (¶¶ 1, 4, 213). This action challenges the pricing of diabetes medications, which is corrupted by an Insulin Pricing Scheme [defined in Section II(B) *infra*] devised and executed by the Manufacturer Defendants[2] and the Pharmacy Benefit Manager Defendants ("PBMs").[3]

---

[1] All references herein to (¶) are citations to the paragraphs of the First Amended Complaint (Dkt. 1, Ex. A), referred to herein as the "complaint.")

[2] Manufacturer Defendants are Eli Lilly and Company ("Eli Lilly"), Sanofi-Aventis U.S. LLC ("Sanofi"), and Novo Nordisk Inc. ("Novo Nordisk"). The complaint identifies the at-issue drugs in Table 1.

[3] PBM Defendants are (a) Evernorth Health Inc., Express Scripts Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy Inc., and Medco Health Solutions Inc., collectively referred to as "Express Scripts"; (b) CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx LLC, CaremarkPCS Health LLC, and Caremark LLC, collectively referred to as "CVS Caremark"; and (c) UnitedHealth Group, Inc., OptumRx Inc., and OptumInsight, Inc., collectively referred to as "OptumRx."

Acting in concert, the Manufacturers and PBMs have inflated insulin prices to the point of fiction and falsity. The list prices for this century-old drug are not based on the costs of production and/or research and development. (¶¶ 230, 246-248, 253-254, 355, 370 422). Instead, the at-issue drugs are captive to "a vicious cycle of price increases." (¶¶ 272, 354, 371). Since 2003, the Manufacturers have inflated the list prices of the at issue drugs by more than 1000%, far outpacing the 46% rate of medical inflation over the same time period. (¶¶ 261, 270-271).

The Manufacturers and PBMs are both integral to the Scheme. (¶ 20). The Manufacturers produce 99% of all diabetes medications. To secure access on the PBMs' formularies, the Manufacturers artificially raise the list prices of these drugs to finance significant payments back to the PBMs ("Manufacturer Payments").[4] (¶¶ 20, 331-351). The Manufacturers publicly report the artificially inflated list prices in publishing compendia and marketing material knowing that their prices will serve as the basis for the amounts paid by nearly every diabetic and payor.[5] (¶¶ 48, 61, 72). The reported prices are artificially inflated, and in actuality, not paid by any entity in the pharmaceutical pricing chain.[6] (¶¶ 108, 345, 349). The PBMs, which control 80% of the market, then grant preferred, sometimes exclusive, formulary placement for the at-issue drugs with

---

[4] Manufacturer Payments are not limited to "rebates" and include all forms of remuneration, such as administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, etc. Such a broad definition is necessary because PBMs frequently reclassify and relabel these payment streams to avoid disclosure of the kickbacks formerly labeled as "rebates." (¶¶ 20 n. 2, 380).

[5] The Wholesale Acquisition Cost ("WAC") or "list price," is the starting point for all downstream pricing. For example, the WAC price is mathematically tied to the Average Wholesale Price ("AWP") (¶¶ 281-284), which is typically 20-25% above WAC. *In re Pharm. Industry Average Wholesale Price Litig.,* 491 F. Supp. 2d 20, 33 (D. Mass. 2007). While different actors pay different amounts for the same drugs, all pay more as a result of the false WAC list prices generated by the Scheme. (¶ 281).

[6] Contrary to the Manufacturers' contention, the State disputes that the Manufacturers accurately or correctly reported their list prices. The complaint is replete with allegations that the reported prices are false, artificially inflated, and unlawful. (*See e.g.,* ¶¶ 21, 48, 285, 345, 407).

the largest Manufacturer Payments and the highest inflated list prices, (¶¶ 5, 6, 22, 241, 310), and then use the false list prices to set the rate that payors and patients pay for these drugs. (¶ 346).

This Scheme is broader than just "rebates." The complaint alleges that "the entire insulin pricing structure created by the Defendants—from the false prices, to the Manufacturers' misrepresentations related to the reason behind the prices, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' [mis]representations that they work to lower prices and promote the health of diabetics—is unfair and deceptive." (¶ 454). As a result, Illinois consumers have overpaid for the at-issue drugs by millions of dollars a year. (¶¶ 29, 490).

The Manufacturers conceal the reasons for the price hikes, falsely claiming they are a result of research and development costs. (¶¶ 421-422). The PBMs conceal their involvement by misrepresenting that their formularies lower prices. (¶¶ 79, 111, 129, 167, 180, 208, 371, 431).

After a two-year investigation, including review of hundreds of thousands of pages of Defendants' internal documents, the United States Senate Finance Committee published a report in January 2021, entitled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug."[7] (¶¶ 338-339). The Senate Insulin Report was the first comprehensive publication detailing the Insulin Pricing Scheme. Among other things, the Senate Insulin Report confirmed (1) that the Manufacturer Payments related to insulin have sharply increased (¶ 341); (2) that the sharp price escalation was not the result of research and development, improvements in efficacy, or other

---

[7] *See* 2021 Senate Insulin Report, (Jan. 14, 2021), www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf; *See Friends of the Flathead River v. U.S. Forest Serv.,* 2022 WL 2751772, at *6 n. 2 (D. Mont. July 14, 2022) (court may take judicial notice of publications as indication of information in public realm).

legitimate market factors (¶ 370); and (3) that Manufacturer Payments drive up the at-issue drug prices (¶ 371).

## ARGUMENT

### I.  Legal Standards.

#### A.  Rule 12(b)(6).

In considering a motion to dismiss under FED. R. CIV. P. 12(b)(6) , the court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Boucher v. Finance Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss, the complaint must give the defendant fair notice of the basis for the claim and be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

With respect to claims under the ICFA, a court should only dismiss an action at the pleading stage if the conduct in issue is not unfair or deceptive as a matter of law. *See Strow v. B&G Foods, Inc.*, 2022 WL 4608948, at *14 (N.D. Ill. Sept. 30, 2022). The Seventh Circuit favors a "practical and fact-intensive approach" in this analysis and cautions that courts should not readily jump to conclusions at the pleading stage. *Id.* (citing *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 478 (7th Cir. 2020)). Whether a challenged statement or conduct is deceptive or unfair is often a question of fact. *See Bell*, 982 F.3d at 478.

**B.     Heightened Pleading is not Required for all of the State's Claims.**

The ICFA allows a plaintiff to premise its claim on deceptive conduct, or unfair conduct, or both, but "the two categories have different pleading standards." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). "If the claim rests on allegations of deceptive conduct, then [Fed. R. Civ. P.] 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud." *Id.* On the other hand, because fraud is not a required element of an unfairness claim, Rule 9(b) does not apply to an allegation of unfair conduct. *Id.* at 739; *see also*, *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2009) (in accord). Rule 9(b) may be applicable to the State's claims based on deceptive conduct, but Federal Rule of Civil Procedure 8's pleading standard applies to the State's claims for unfairness under the ICFA and UDTPA.

In either event, the allegations of the State's Complaint far surpass Rule 9(b)'s particularity standard. Multiple district courts have ruled that detailed allegations of an Insulin Pricing Scheme, identical or substantially similar to those asserted in the State's Complaint, comport with the Rule 9(b) standard. *See Mississippi ex rel. Fitch v. Eli Lilly & Co.*, 2022 WL 3222890, at *6 (S.D. Miss. Aug. 9, 2022) (holding that Mississippi's 118-page complaint delineates each Manufacturer's participation in the "Insulin Pricing Scheme," including specific drugs, prices, timelines, knowledge, and intent, and sufficiently asserts the "who, what, when, where, and how" of the alleged misconduct); *Minnesota ex rel. Ellison v. Sanofi-Aventis U.S. LLC*, 2020 WL 2394155, at *17 (D.N.J. Mar. 31, 2020) (reaching same conclusion with respect to adequacy of Insulin Pricing Scheme allegations); *In re Insulin Pricing Litig.*, 2019 WL 643709, at *14-15 (D.N.J. Feb. 15, 2019) (finding Insulin Pricing Scheme allegations satisfied Rule 9(b) particularity requirement).

## II.     The Complaint States Claims for Relief.

### A.     The ICFA and UDTPA broadly protect Consumers.

The ICFA, which incorporates the UDTPA, is a regulatory and remedial statute intended to protect consumers against unfair and deceptive business practices.[8] *Barnett v. Abbott Laboratories,* 492 F. Supp. 3d 787, 800 (N.D. Ill. 2020); *Robinson v. Toyota Motor Credit Corp.,* 201 Ill. 2d 403, 416-17 (2002). These enactments provide broader consumer protection than an action for common law fraud, since recovery may be had for unfair as well as deceptive conduct.[9] *Falcon Assoc, Inc. v. Cox,* 298 Ill. App. 3d 652, 661 (1st Dist. 1998).

The statutes reflect the Illinois General Assembly's clear mandate that courts are to utilize these Acts to the utmost degree in eradicating all forms of deceptive and unfair business practices. *Id.* The Acts are to be liberally construed, and whether a given set of circumstances is unfair or deceptive must be determined on a case-by-case basis. *People ex rel. Fahner v. Walsh*, 122 Ill. App. 3d 481, 484-88 (2nd Dist. 1984).

### B.     Plaintiff states an ICFA Deception claim.

To state an ICFA claim for deception, the State must show (1) a deceptive act or practice; (2) an intent by the defendants that the plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade or commerce. *Thacker*, 105 F.3d at 386. A

---

[8] 815 ILCS 505/2 incorporates the specific "deceptive trade practices" enumerated in 815 ILCS 510/2, including but not limited to representations that goods or services have "characteristics" (*i.e.,* prices, as alleged here) they do not have. 815 ILCS 510/2(a). *Duncavage v. Allen*, 147 Ill. App. 3d 88, 100 (5th Dist. 1986).

[9] The ICFA "eliminate[s] the common law fraud requirement of scienter, and it is not necessary to prove actual reliance on the deception." *Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997). Plaintiff need only come forward with sufficient evidence for a jury to find "that the defendant committed a deceptive or unfair act and intended that the plaintiff rely on that act." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 575 (7th Cir. 2012).

plaintiff need not establish intent to deceive on the part of the defendant – even an innocent misrepresentation may be actionable under the Act. *Beard v. Gress*, 90 Ill. App. 3d 622, 627-28 (4th Dist. 1980). In addition, unlike a private litigant, the Attorney General need not demonstrate that a defendant's actions proximately harmed consumers to establish an ICFA violation. *People ex rel. Madigan v. United Constr. of Am.*, 981 N.E.2d 404, 411 (Ill. App. Ct. 1st Dist. 2012).

The allegations of the complaint, taken as true, satisfy the elements of an ICFA deception claim. The Manufacturers sell the at-issue drugs and therefore engage in "trade" and "commerce," as broadly defined in 815 ILCS 505/1(f). Additionally, the price of a good is a "material" characteristic of the product for purposes of an ICFA claim. *Sullivan's Wholesale Drug Company, Inc. v. Faryl's Pharmacy, Inc.*, 214 Ill. App. 3d 1073, 1086 (5th Dist. 1991). Further, the complaint sufficiently alleges that the Manufacturers knew and intended that consumers would rely on the list prices they published. (¶¶ 412, 445).

The only remaining question, which is an issue of fact for a jury, is whether the Manufacturers' list prices are deceptive. The complaint sufficiently alleges that the list prices are false (¶¶ 21, 48, 285, 345, 497), and Illinois and Federal Trade Commission decisions recognize that fictitious or false list prices are deceptive.

Starting with the Federal Trade Commission ("FTC"), 815 ILCS 505/2 directs that consideration "shall be given" to the "interpretations of the [FTC] and the federal courts relating to Section 5(a) of the Federal Trade Commission Act [("FTC Act")]. 15 U.S.C. § 45"; *Brody v. Finch Univ. of Health Sciences/The Chicago Med. Sch.,* 298 Ill. App. 3d 146, 159 (2nd Dist. 1998) (recognizing direction to consider FTC jurisprudence).

Federal decisions applying the FTC Act establish that false and fictitious pricing is not only unfair, but also deceptive. *See Spiegel, Inc. v. FTC*, 411 F.2d 481, 483 (7th Cir. 1969) (noting that

a fictitious price "constitutes a material influence on the consumer's decision to purchase" and has "long been held a deceptive practice"); *Giant Food Inc. v. FTC*, 322 F.2d 977, 982 (D.C. Cir. 1963) (finding fictitious "manufacturer's list price" was false and deceptive); *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir. 1963) (concluding manufacturer's dissemination of fictitious list prices constituted "unfair and deceptive" practice); *DeGorter v. FTC*, 244 F.2d 270, 281 (9th Cir. 1957) (finding manufacturer's pricing system bore the "badge of deceit").[10]

Illinois courts frequently use "unfairness" as the metric for assessment of false prices, but Illinois jurisprudence aligns with the FTC on the point that false list prices are also deceptive. *See Ciampi v. Ogden Chrysler Plymouth, Inc.*, 262 Ill. App. 3d 94, 110-12 (2nd Dist. 1994) (affirming ICFA judgment for plaintiff who alleged deception relating to artificially-inflated purchase price of automobile); *Grimaldi v. Webb*, 282 Ill. App. 3d 174, 182-83 (1st Dist. 1996) (holding that overcharged plaintiff adequately alleged "deceptive conduct" where the defendant misrepresented the cost of an auto warranty as "fixed, nonnegotiable"); *Clark v. TAP Pharm. Products, Inc.*, 343 Ill. App. 3d 538, 546-48, 553 (5th Dist. 2003) (certifying nationwide class based on ICFA claim that pharmaceutical manufacturers ***artificially inflated and "misrepresented" in publishing compendia the list price*** of prostate cancer drug in order to create a kickback paid to physicians).

The Illinois decision in *Sullivan's*, 214 Ill. App. 3d at 1073, presents analogous facts. In *Sullivan's*, a nursing home artificially inflated by 15% the costs of pharmaceuticals purchased by

---

[10] The FTC's vigilance in enjoining fictitious pricing is rooted in its policy of protecting unsophisticated consumers who are not cognizant of complex pricing structures. A method inherently unfair does not cease to be so because the falsity of the public representation has become so well known to those engaged in identical or similar enterprises as to no longer deceive them. *Ford Motor Co. v. FTC*, 120 F.2d 175, 182 (6th Cir. 1941). "The [FTC ACT] was not intended to protect sophisticates." *Giant Food*, 322 F.2d at 977. "Fictitious prices are illegal even though it is obvious to the sophisticated that the price tag is only a come-on. The law is not made for the protection of experts, but for the public – the vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions." *Id.* at 982, n. 13.

its residents, without informing the residents of the additional charge, and gave the residents the
impression that they were being billed for the actual cost of the medications. *Id.* at 1077-79.
Plaintiff alleged a violation of the ICFA, asserting that any services which the nursing home
claimed to render for the additional charge were "illusory."[11] *Id.* at 1077-81. On the issue of
deception, the court declared:

> The Defendants argue that they cannot be held liable because they engaged in no
> deceptive practice. The record showed, however, that all of the defendants
> participated in issuing bills to the residents of the nursing home which indicated
> that those residents were being charged a specified amount for specified drugs,
> when in fact the charge for pharmacy services was only 85% of what the patients
> were required to pay. A trier of fact could certainly conclude that such a practice
> was ***patently deceptive***.

*Id.* (emphasis added). Accordingly, the court in *Sullivan's* held that this question of fact precluded
entry of summary judgment. *Id.*

And, with respect to the Insulin Pricing Scheme specifically, numerous federal courts have
held that publishing, utilizing or promoting artificially inflated prices for insulin products
constitutes acts which are fraudulent or deceptive.[12]

**C.    Plaintiff states an ICFA Unfairness claim.**

Generally, Illinois courts test excessive fee claims for unfairness under the ICFA. *Cooks v.
Hertz Corp.*, 2016 WL 3022403, at *7 (S.D. Ill. Apr. 29, 2016). Deception and unfairness are
independent bases of liability under consumer protection acts because they implicate different

---

[11] On the issue of whether the nursing home rendered any *bona fide* services to justify the 15% markup, the
court in *Sullivan's* recognized the existence of a factual dispute but viewed it as immaterial. "[W]e are
aware of no authority for a 'services rendered' exception for conduct which is otherwise deceptive."
*Sullivan's*, 214 Ill. App. 3d at 1084.

[12] *See City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *8 (S.D. Fla. Jan. 21, 2022); *In re Direct
Purchaser Insulin Pricing Litig.*, 2021 WL 2886216, at *14–15 (D.N.J. July 9, 2021); *MSP Recovery
Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*, 2019 WL 1418129, at *19 (D.N.J. Mar. 29, 2019); *In re
Insulin Pricing Litig.*, 2019 WL 643709, at *14-15.

concerns. "[T]he two rationales are distinct: A practice is deceptive when the consumer is forced to bear a larger risk than expected (*e.g.,* the consumer is misled) whereas a practice is unfair when the consumer is forced to bear ***a larger risk than an efficient market would require***." *Am. Fin. Serv. Ass'n v. FTC*, 767 F.2d 957, 979 n. 27 (D.C. Cir. 1985) (emphasis added).

To evaluate whether a business practice is unfair, a court must ask whether it: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers. *Walsh*, 122 Ill. App. 3d at 484. All three criteria are not required. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Dubey v. Pub. Storage, Inc.*, 395 Ill. App. 3d 342, 354 (1st Dist. 2009).

While an unconscionably high price, standing alone, is insufficient to state an unfairness claim, such a claim is actionable if the defendant's conduct violates public policy, is so oppressive as to leave the consumer with little alternative except to submit to it, and injures the consumer. *People ex rel. Hartigan v. Knecht Servs., Inc.*, 216 Ill. App. 3d 843, 854 (2nd Dist. 1991). "[A] practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *Stonecrafters, Inc. v. Foxfire Printing and Packaging, Inc.*, 633 F. Supp. 2d 610, 616 (N.D. Ill. 2009).

In *People ex rel. Fahner v. Hedrich*, 108 Ill. App. 3d 83, 90-91 (2nd Dist. 1982), the court held that the owner of a mobile home park violated the ICFA by charging residents an excessive and unfair fee to sell their mobile homes. Noting that the defendant offered little or no service in exchange for the fee, the court concluded that (1) defendant's conduct violated public policy, (2) the defendant's conduct was oppressive because residents had no reasonable alternative but to pay the fee, and (3) the defendant's acts injured consumers. *Id.*

10

This Court reached a similar result in *Wendorf v. Landers,* holding that gym members stated ICFA unfairness claims against a gym for charging unavoidable fees. 755 F. Supp. 2d 972, 979 (N.D. Ill. 2010). Interpreting the meaning of "unfair practices," the Court noted that a plaintiff states ICFA unfairness claims when a defendant's conduct gives plaintiff no reasonable alternative to avoid incurring a charge or penalty. *Id.*

The State's claims in this action meet and exceed these standards. First, setting and publishing artificially-inflated and false list prices for insulin offends and violates public policy as established by statute and common law. (¶ 491). The public policy violation is apparent from FTC Act jurisprudence in the Seventh Circuit [*Spiegel*, 411 F.2d at 483 (fictitious pricing has "long been held a deceptive practice")] and Illinois jurisprudence, which holds that "charging an unconscionably disproportionate price for little or no services ... offends public policy." *Hedrich,* 108 Ill. App 3d at 90. The Manufacturers provided no services to consumers for the significant portions of their list prices which are artificially inflated; rather, the list prices are inflated to finance the ever-increasing Manufacturer Payments to the PBMs. *See Sullivan's,* 214 Ill. App. 3d at 1086 (no "social utility" in charging nursing home residents extra 15% "for goods and services they were not receiving"). Additionally, the Illinois General Assembly's act in January 2021 to cap out-of-pocket insulin costs for insured Illinois consumers [215 ILCS 5/356z.41] confirms that public policy supports ensuring that consumers must have affordable access to insulin.[13] This declaration of public policy should come as no surprise to the Manufacturers, who admit that their pricing structure deprives consumers of affordable access to insulin. (¶ 354).

---

[13] While the Manufacturers argue that this statute implicitly reflects an Illinois public policy approving rebates as applied to insulin, their argument is undercut by the fact that the statute only references "rebate" in its title and lacks any references, much less any legislative declarations, with respect to rebates in the body of the statute. 215 ILCS 5/356z.41.

The State's Complaint makes numerous, significant factual allegations which establish that the Insulin Pricing Scheme causes substantial injury to consumers. Millions of Illinoisans are impacted by diabetes, which is the seventh leading cause of death in Illinois and also causes a host of other serious medical complications. (¶¶ 1-2). Insured and uninsured Illinois citizens have been overcharged by millions of dollars, and any portion of Manufacturer Payments which flowed to health plans in Illinois did not offset the significant overcharges which insured citizens paid. (¶¶ 29, 286-287, 398). Further, the harm is not limited to economic impact—because of artificially-inflated insulin prices at least one in four Illinois diabetics are forced to ration their insulin, skip doses, or starve as a means of controlling their blood sugars. (¶¶ 444, 457).

In addition, the State alleges facts sufficient to establish that the Manufacturers' conduct was immoral, unethical, and oppressive. For Illinois diabetics, insulin is a "necessary part of life" which they must have to "survive" and avoid serious medical complications such as kidney failures and limb amputations. (¶¶ 2, 4, 213). In Illinois, and the United States, there is no source for insulin other than the Manufacturers—they produce 99% of the insulins sold in the U.S. market. (¶¶ 5, 241). Thus, Illinois diabetics had "no meaningful choice" other than to purchase insulin made by the Manufacturers and "no reasonable opportunity to avoid" the artificial and false list prices set and published by the Manufacturers. (¶ 453). The State submits that it is indeed oppressive for pharmaceutical manufacturers who dominate a market for a life-saving drug to price gouge those who have no choice but to pay the price or suffer. Immorality and unethicality are on full display, particularly given the Manufacturers' admission of the harm which their business practices are causing to consumers.[14] (¶ 490).

---

[14] *See* ¶ 354 (citing Eli Lilly testimony that "[t]oo many people today don't have affordable access to chronic medications," Sanofi testimony that the insulin pricing system "is clearly failing too many people" because

Finally, the complaint adequately alleges that Illinois consumers are provided no countervailing benefit in return for the egregiously high prices of insulin. (¶ 490). To the extent that the Manufacturers argue artificially inflated list prices allow them to "make a market" for insulin, it is a market dominated by the Manufacturer Defendants in which consumers cannot afford the product and thus this argument should be soundly rejected. Further, the Manufacturers' standing to address the alleged benefits of their Manufacturer Payments is belied by their admission that they lack visibility into how PBMs actually use these Payments. (Dkt. 60 at 13). There is substantial evidence that these Payments are not being used for their intended purpose. (¶ 360 (Sanofi testimony that rebates "are being used to finance other parts of the healthcare system and not to lower prices to the patient")).

The decisions cited by the Manufacturers in an attempt to undermine the State's unfairness claim are distinguishable. For instance, the Manufacturers cite *Galvan v. Nw. Mem'l Hosp.*, 382 Ill. App. 3d 259, 269 (1st Dist. 2008) for the argument that excessive prices may only be addressed *via* a "deliberative process of the legislature." But the quoted language restates a contention set forth in an amicus brief, not any holding or judicial declaration by the court. The other cases cited by the Manufacturers are circumstantial, in that the courts found that the complaining consumers had meaningful choices as alternatives to paying excessive prices.[15] That is not the circumstance

---

of "very real challenges of affordability," and Novo Nordisk testimony that "price matters to many, particularly those in high-deductible health plans and those that are uninsured").

[15] *See e.g.*: *Robinson*, 201 Ill. 2d at 420 (observing that "plaintiffs could have gone elsewhere to lease a car"); *Ridings v. Am. Fam. Ins. Co.*, 2021 WL 722856, at *6 (N.D. Ill. Feb. 24, 2021) (finding that plaintiff was able to cancel higher-premium insurance policy at any time); *Lane v. Direct Energy Serv., LLC,* 2020 WL 3211435, at *4 (S.D. Ill. June 15, 2020) (noting plaintiff could have avoided high energy charges by terminating the contract at any time, with no cancellation fee); *Flores v. United Airlines*, 426 F. Supp. 3d 520, 531 (N.D. Ill. 2019) (involving plaintiff who had alternative of not purchasing optional flight insurance); *Ahrendt v. Condocerts.com Inc.*, 2018 WL 2193140, at *4 (N.D. Ill. May 14, 2018) (holding plaintiff's unfairness claim failed on his admission that he could have obtained copy of deed from the Cook

at all in the instant action, since Illinois consumers have no choice but to purchase insulin from the Manufacturers who sell nearly all insulins available in Illinois.

### D. Plaintiff's Pleading alleges Adequate, Particularized Facts.

Even under Rule 9(b)'s heightened pleading standard, the complaint sets forth adequate, particularized facts which establish the Insulin Pricing Scheme and state cognizable claims under the ICFA and UDTPA. The complaint does not, as the Manufacturers contend, inappropriately "lump" them together. With respect to their involvement in the Insulin Pricing Scheme, the complaint specifically identifies each of the Manufacturers by conduct, drugs, pricing, dates, and testimonial or other admissions.

Among other things, the complaint alleges:

(1) The Manufacturer Defendants raise list prices of the at-issue drugs as a direct result of national negotiations and agreements with the PBMs (¶¶ 118, 174, 211), and the prices paid by diabetic Illinois consumers are based on the Manufacturers' list prices (¶¶ 285-288). The Manufacturers published and reported the list prices generated by the Insulin Pricing Scheme in the United States and Illinois through publishing compendia and in promotional and marketing materials, and these prices were utilized by the PBMs, pharmacies, and other downstream entities to set the prices paid by Illinois diabetics for the at-issue drugs. (¶¶ 416-417);

---

County Recorder's Office); *Toulon v. Continental Casualty Co.*, 877 F.3d 725, 741 (7th Cir. 2017) (finding that plaintiff could have avoided insurance premium increase by purchasing insurance from another company); *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 834 (7th Cir. 2014) (observing plaintiff could have avoided embedded parking fee by choosing to forego concert); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010) (rejecting plaintiff's claim that he had "no meaningful opportunity to avoid paying the higher retail price"); *Saunders v. Mich. Ave. Nat. Bank*, 278 Ill. App. 3d 307, 312-13 (1st Dist. 1996) (finding overdraft policy had been disclosed to plaintiff, and she could have selected a different bank); and *Randels v. Best Real Estate, Inc.*, 243 Ill. App. 3d 801, 806 (2nd Dist. 1993) (noting sewer ordinance in issue was a matter of public record, available to plaintiff at all times).

(2)     The Manufacturers artificially inflated the reported list prices in furtherance of the Insulin Pricing Scheme, such that the reported list prices were false, not tethered to any competitive or fair market value, and did not bear a reasonable relationship to the actual prices realized by the Manufacturers. (¶¶ 21, 48, 108, 285, 345, 349, 407). Artificial price inflation by the Manufacturers was *quid pro quo* for inclusion of the at-issue drugs on the PBMs' formularies. (¶ 20, 359);

(3)     The complaint specifically identifies the at-issue medications involved in the Insulin Pricing Scheme by drug name, manufacturer, and current price. (¶ 258, Table 1). The complaint presents specific examples of the price increases by each Manufacturer, by drug, by date, and the amount/percentage of price increase. (Dkt. 1-1, at Figures 1-3, reflecting price increases by Eli Lilly (¶¶ 16, 263-264); Figures 4-5, reflecting price increases by Novo Nordisk (¶¶ 265-266); and Figure 6, reflecting price increases by Sanofi (¶ 267)). In thirteen instances since 2009, and pursuant to the Insulin Pricing Scheme, the Manufacturers have increased their respective prices of the at-issue drugs in lockstep, even though their costs of production have decreased over the same time period. (¶¶ 13, 270-277; *see* Figures 7-9 and 11, reflecting lockstep price increases by each Manufacturer (¶¶ 274-275, 277));

(4)     Executive-level officers or representatives of the Manufacturers and/or PBMs have admitted, before Congress and other forums, that the price of insulin has increased dramatically in the past fifteen years (¶ 354-360); that there is a "lack of meaningful competition" in the insulin market (¶ 354); that diabetics lack "affordable access" to insulin (¶ 354); and that the "[reported] price" of insulin matters to both insured and uninsured diabetics (¶ 354); and

(5)     The Manufacturers, through their officers and representatives, have admitted to engaging in the overt acts which mark the Insulin Pricing Scheme: Novo Nordisk admits that "we've been participating in [the insulin pricing system] because the higher the [reported] price,

the higher the rebate" (¶ 358); Sanofi admits that "rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient" (¶ 360); and Eli Lilly admits that it raised its reported prices for insulin as *quid pro quo* for formulary position, since "*[s]eventy-five percent of our [reported] price is paid for rebates and discounts to secure [formulary position]*" (¶ 359 (emphasis added)).

These allegations, along with the others set forth in the complaint and addressed herein, are sufficient to satisfy the Rule 9(b) standard with regard to the State's claim for deception and the Rule 8 standard with respect to the State's claim for unfairness, *i.e.,* violations of the ICFA and UDTPA.

## III.    The Manufacturers' Legal Defenses Are Unavailing.

### A.    Irrelevant Medicare Payment Methodologies provide no Safe Harbor.

The Manufacturers devote significant discussion to the "safe-harbor" provisions set forth in the ICFA and UDTPA.[16] Safe harbors, however, are affirmative defenses on which the Manufacturers bear the burden of proof and which are not normally appropriate for disposition under Rule 12(b)(6). *Keith v. Ferring Pharms., Inc.,* 2016 WL 5391224, at *11 (N.D. Ill. Sept. 27, 2016) (denying Rule 12(b)(6) motion to dismiss on ground of alleged statutory exemption); *Fields v. Alcon Labs, Inc.,* 2014 WL 1041191, at *2 (S.D. Ill. Mar. 18, 2014) (holding not appropriate for disposition on Rule 12(b)(6) motion); *Illinois v. McGraw-Hill Co., Inc.,* 2013 WL 1874279, at *5 (N.D. Ill. May 2, 2013) (noting that statutory exemption is an affirmative defense, not plaintiff's

---

[16] 815 ILCS 505/10b(1) of the ICFA states that nothing in this Act shall apply to actions or transactions "specifically authorized" by laws administered by a regulatory body or officer acting under statutory authority of this State or the United States. 815 ILCS 510/4(1) of the UDTPA provides that this Act does not apply to "conduct in compliance" with the orders or rules of or a statute administered by a federal, state or local government agency.

burden to disprove). Such is the case here, where relevancy of the underlying federal law is in issue and there is a factual dispute regarding the Manufacturers' compliance with the law.

The Manufacturers rely on a definition of "wholesale acquisition cost" ("WAC") set forth in a Medicare payment methodology statute, 42 U.S.C. § 1395w-3a(c)(6)(B). This statute (referred to as "Medicare WAC methodology") provides, in pertinent part:

> The term "wholesale acquisition cost" means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, . . .

The Manufacturers contend that they "exclude" rebates from the WAC. They then bootstrap this position into an alleged exemption from ICFA and UDTPA liability, arguing the statute does not require them to do anything more. Laying aside the relevancy of the Medicare WAC methodology and the Manufacturers' compliance with it, the Manufacturers' argument overlooks fundamental principles relating to ICFA/UDTPA statutory exemptions and ignores the fact that rebates form only a part of the Insulin Pricing Scheme.

Citing *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 941 (7th Cir. 2001), the Manufacturers argue that the ICFA does not impose "higher disclosure requirements" than those sufficient to satisfy federal standards. Yet, the cases on which the Manufacturers rely, including *Lanier v. Assoc. Fin., Inc.*, 114 Ill. 2d 1, 4-6 (1986),[17] involve <u>true</u> disclosure statutes or regulations, such as the Truth in Lending Act, 15 U.S.C. § 1641(a).[18] The Medicare WAC

---

[17] The holding in *Lanier* has been limited to its facts—that a creditor's actual compliance with the TILA bars liability under the ICFA. *Cheng v. Rizza Chevrolet, Inc.,* 1999 WL 33312873, at *3 (N.D. Ill. Apr. 7, 1999).

[18] Because the Medicare WAC methodology is not a disclosure statute, the following decisions that center on disclosure statutes are inapposite: *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 251 (2005) (involving FTC consent order specifically authorizing use of advertising contested by plaintiff); *Bober*, 246 F.3d at 941 (rejecting challenge of defendant's disclosures based on FDA's regulatory approval of a formulation of Zantac); *Lanier*, 114 Ill. 2d at 4-6 (holding borrower could not complain of absence of credit disclosures

methodology is not a disclosure statute; the statute requires no disclosures at all to Illinois citizens as to how the Manufacturers arrive at a WAC price. Indeed, even when rebate amounts are disclosed to Medicare, they are treated as confidential and not publicly disclosed. (Dkt. 60 at 15). Therefore, the Manufacturers' reliance on the Medicare WAC methodology for the argument that they are exempt is erroneous.

The Manufacturers also ignore the principle that where a defendant engages in "active and direct" conduct—such as here where the Manufacturers affirmatively reported and published false list prices—the defendant must demonstrate that the conduct was "affirmatively and specifically authorized" by the "relevant" regulatory body. *Toulon v. Cont'l Cas. Co.,* 2015 WL 4932255, at *5 (N.D. Ill. Aug. 19, 2015). Illinois decisions provide examples of this principle.

In *Abbott Laboratories v. Alra Laboratories, Inc.,* 1993 WL 293995, at *2 (N.D. Ill. Aug. 4, 1993), Alra alleged Abbott misrepresented to the Federal Food & Drug Administration ("FDA") that a new Abbott drug fell within the coverage of an existing Abbott patent. Abbott argued ICFA exemption, asserting that the FDA is a regulatory body which authorized its actions. *Id.* at *3. The Court rejected this argument:

> The problem with Abbott's argument is that it overlooks Alra's allegation that Abbott used FDA-authorized reporting methods in a fraudulent manner. While compliance with federal regulations may be a complete defense to [ICFA] complaints centering on particular technical issues … ***it should not be a complete defense to allegations of fraudulent schemes***.

---

not required by TILA); *Mario's Butcher Shop & Food Center, Inc. v. Armour & Co.,* 574 F. Supp. 653, 656 (N.D. Ill. 1983) (rejecting plaintiff's claim sought to impose different requirements than those set forth in regulations implementing Federal Meat Inspection Act, which Illinois legislature had also adopted as its state regulation).

*Id.* (emphasis added). *See also, Sanders v. Lincoln Service Corp.,* 1993 WL 112543, at *4 (N.D. Ill. Apr. 5, 1993) (denying ICFA exemption because defendant used federally-authorized methods to fraudulently calculate escrow payments).

The Court reached the same result in *Greenberger v. CEICO General Ins. Co.,* 2006 WL 8461731, at *3 (N.D. Ill. Aug. 18, 2006), where the insurer claimed exemption because the Illinois Insurance Code authorized it to use computer-generated repair estimates. No exemption was recognized, because plaintiff alleged that GEICO "rigged its software to underestimate repairs, deception that is neither authorized or in compliance with any regulatory authority." *Id.*

In essence, the Manufacturers argue that, with respect to pricing, they are permitted to do whatever the law does not prohibit them from doing. That is not a basis for exemption. *Price,* 219 Ill. 2d at 241 ("[C]onduct is not specifically authorized merely because it has not been specifically prohibited"); *Vanzant*, 934 F.3d at 738 (rejecting exemption argument that "wrongly equates regulatory forbearance with regulatory authorization"); *see also, Ciszewski v. Denny's Corp.*, 2010 WL 1418582, at *2 (N.D. Ill. Apr. 7, 2010) ("Denny's argument amounts to a contention that because federal … requirements do not apply, the ICFA cannot impose a disclosure requirement. Nothing in the ICFA or the law under it supports this contention.") Accordingly, arguments that the Illinois legislature has declined "to control Manufacturers' list prices" (Dkt. 60 at 10), or that the State must allege that the Manufacturers' conduct was "inconsistent with federal law" (Dkt. 60 at 19), fail to register.

In sum, the Manufacturers cite no federal or state statute or regulation which specifically authorizes the Insulin Pricing Scheme: "[T]he entire insulin pricing structure created by the Defendants—from the false prices, to the Manufacturers' misrepresentations related to the reason behind the price, to the inclusion of the false prices in payor contracts, to the non-transparent

Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is unfair and deceptive." (¶ 454). At most, the Medicare WAC methodology recognizes the existence of "rebates," a narrow term that does not encompass all the Manufacturer Payments devised by the Defendants to characterize remuneration,[19] and nothing within the Medicare WAC methodology authorizes the Manufacturers to utilize rebates for ends which unfairly or deceptively violate the ICFA or UDTPA.[20]

In addition, there is a more fundamental question of whether the U.S. Department of Health and Human Services, which administers Medicare and Medicaid, is a "relevant" regulatory body for purposes of the State's claims, which seek no recovery on behalf of Medicare or Medicaid recipients.[21] The courts which have considered this issue have found that the Medicare WAC methodology is not relevant to actions which assert the Insulin Pricing Scheme. *See Minnesota*, 2020 WL 2394155, at *14 (holding that state statute with same language as the Medicare WAC methodology was irrelevant to the deceptiveness of non-Medicare pricing representations); *City of Miami*, 2022 WL 198028, at *8, n. 8 ("[T]he City's claim is that the Manufacturer[s] inflated the price of insulin and other medications through the use of fraudulent rebates that served

---

[19] "Manufacturer Payments" are "all payments or financial benefits of any kind conferred by the Manufacturer[s] [to the] PBM[s] … includ[ing] rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates, and any other form of consideration exchanged." (¶ 20 n. 2).

[20] *Johnson v. Marshall Field & Co.*, 57 Ill. 2d 272, 279 (1974), on which the Manufacturers rely for their exemption argument, is distinguishable. The Illinois legislature passed a law which specifically directed retailers to collect the tax in issue. *Id.* In contrast, the Manufacturers point to no federal or state law which even references the type and breadth of the conduct alleged in the State's Complaint.

[21] *See Tri-Pex Tech. Services, Ltd. v. Jon-Don, LLC*, 2022 WL 16709517, at *6-7 (Ill. Ct. App. Nov. 4, 2022) (holding that defendant's compliance with OSHA Hazmat standard, requiring disclosure of presence of hazardous chemicals in workplaces, did not specifically authorize defendant to omit warnings from product label where OSHA was not a relevant regulatory body for ICFA claims unrelated to workplace safety).

as kickbacks to the PBM Defendants. The Manufacturer[s] cannot use [the Medicare WAC methodology] to avoid the City's allegations of wrongdoing.")[22]

In addition to being irrelevant, the Manufacturers' argument also misrepresents the law. Statutes, including 42 U.S.C. § 1395w(c)(6)(B), must be read as a whole. *Stelzer v. Matthews Roofing Co., Inc.*, 140 Ill. App. 3d 383, 385-86 (1st Dist. 1986). Applying this basic tenet raises the question of how the Medicare WAC methodology even applies to payments made to PBMs.

The Manufacturers admit they sell medications to wholesalers, and sometimes pharmacies, as direct purchasers—not to PBMs. (Dkt. 60 at 12). The definition in 42 U.S.C. § 1395w-3a(c)(6)(B) applies in the context of sales "to wholesalers or direct purchasers," not to the PBMs, which are third-party strangers to such direct purchase transactions. Otherwise, the words "wholesalers or other direct purchasers" would be meaningless. This underscores the State's claim—the Manufacturer Payments at issue are not the type of point-of-sale discounts or price reductions to the wholesalers or direct purchasers which the Medicare WAC methodology envisions; rather, the rebates which the Manufacturers cite are undisclosed amounts which they pay to PBMs to secure formulary access. The Manufacturers do not "exclude" these rebates from their list prices as the Medicare WAC methodology directs—the rebate amounts are included in their list prices in order to make the Manufacturer Payments to the PBMs while maintaining their profit margins.[23] 42 U.S.C. § 1395w-3a(c)(6)(B) is irrelevant to the State's claims and provides no basis for the Manufacturers' exemption argument under the ICFA or UDTPA.

---

[22] For the same reasons, the Manufacturers' argument that 42 U.S.C. § 1396r-8(a)(1) requires them to pay rebates to the States should be rejected. Section 1396r-8 has application only to Medicare and Medicaid. This action concerns neither program.

[23] The most recent rulemaking by the U.S. Dept. of Health and Human Services indicates that only point-of-sale rebates granted to direct purchasers will be within the safe harbor of the federal Anti-Kickback statute and recognizes that post-transaction rebates, such as those the Manufacturers pay to the PBMs, "may create a perverse incentive that rewards manufacturers for increasing their list price, while subjecting

### B.     The State's Pleading states a claim for Unjust Enrichment.

Under Illinois law, to state a cause of action based on unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience. *Kenneke v. First Nat'l Bank*, 65 Ill. App. 3d 10, 12 (1st Dist. 1978). Unjust enrichment is not a separate cause of action and must be based on unlawful or improper conduct as defined by law. *Toushin v. Ruggiero*, 189 N.E.3d 1012, 1033-34 (Ill. App. Ct. 1st Dist. 2021). The complaint meets this requirement since, as demonstrated herein, it sufficiently sets forth ICFA and UDTPA claims. Because the State alleges unlawful or improper conduct, demonstration of a quasi-contractual relationship with the Manufacturers is not necessary to state an unjust enrichment claim. *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 834-35 (N.D. Ill. 2009).

Unjust enrichment is not available where there is a valid and relevant contract between the parties [*Ridings,* 2021 WL 722856, at *7], but this point of law is of little value to the Manufacturers, which admit they have no contractual relationships with Illinois consumers.[24] This action is brought by the State on behalf of its citizen-consumers who have been overcharged for the at-issue drugs. (¶ Prayer for Relief (C), seeking restitution only on behalf of "Illinois consumers"). While certain consumers may be contractually insured by health plans or insurers,

---

consumers to higher out-of-pocket costs." *See* U.S. Dept. of Health and Human Services, *Fraud and Abuse; Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals,* 85 Fed. Reg. 76666, 76667 (Nov. 30, 2020).

[24] *See* Manufacturer Memorandum, Dkt. 60 at 12, 33: "Manufacturers do not sell insulin directly to patients, insurers or health plans," and "Manufacturers do not have any relationship or interaction with Illinois, health plans, or any individual consumers."

the Manufacturers cite no authority which allows them to "piggyback" on contracts to which they are not parties.[25]

The State has alleged facts which establish the elements of unjust enrichment. The Manufacturers have received billions of dollars in revenue from sale of the at-issue drugs (¶¶ 43-44, ¶¶ 56-57, ¶¶ 67-68); the Manufacturers knew that consumers relied on the list prices they reported in purchasing the drugs (¶ 418); the Manufacturers retained revenue generated by sales to consumers despite their engagement in unfair and deceptive trade practices; and this conduct caused Illinois diabetics to overpay by millions of dollars (¶¶ 29, 286-287).

Further, the complaint sufficiently alleges that benefits were conferred upon the Manufacturers. The Insulin Pricing Scheme created enormous profits for all Defendants, including the Manufacturers (¶ 350), and numerous studies and reports, including the 2021 Senate Insulin Report, demonstrate that the Manufacturers retained more revenue from sales than they did in the early 2000s, resulting in billions of dollars of distributions to their shareholders. (¶¶ 370-372). Not only did the Manufacturers maintain their net prices by engaging in the Insulin Pricing Scheme (¶ 369), they immensely profited.

The State rejects out-of-hand the notion that the Manufacturers retained no benefits which flowed from the purchase of insulin and diabetes medications by Illinois consumers. Without such purchases, there would be no market for insulin and no revenue flowing upward through the pharmacy pricing chain to the Manufacturers. Illinois's consumers certainly conferred benefits on the Manufacturers, albeit indirectly through third parties.

---

[25] All of the cases the Manufacturers cite for their "contractual" defense to the unjust enrichment claim involve contracts to which the litigants are parties. *See e.g., First Midwest Bank v. Cobo*, 90 N.E.3d 567, 575 (Ill. App. Ct. 1st Dist. 2017); *Delisle v. McKendree Univ.*, 2021 WL 4402474, at *3 (S.D. Ill. Sept. 27, 2021); *Nesby v. Country Mut. Ins. Co.*, 346 Ill. App. 3d 564, 567 (5th Dist. 2004).

Where, as here, a party seeks to recover a benefit conferred by a third party, unjust enrichment is proper under three circumstances: (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason has a better claim to the benefit than the defendant. *Apollo Real Estate Inv. Fund, IV, Ltd. P'ship v. Gelber*, 398 Ill. App. 3d 773, 788 (1st Dist. 2009). The factual allegations of the complaint and Illinois law establish that the State may maintain its unjust enrichment claim under circumstances (2) and (3).

Circumstance (2) is satisfied because the Manufacturer reaped benefits by artificially inflating their list prices for insulin and reporting those false list prices to publishing compendia, in violation of the ICFA and UDTPA. Circumstance (3) is satisfied because Illinois consumers have a better claim to the amounts by which they were overcharged for insulin than the Manufacturers, which participated in and executed the Insulin Pricing Scheme. *See Sullivan's,* 214 Ill. App. 3d at 1086 (nursing home performed no service for portion of pharmacy costs that were inflated, such that residents paid an extra 15% "for goods and services they were not receiving").

## C. The State's Claims are not barred by any Statute of Limitations.

### i. Acting in the Public Interest, the State is not subject to any Statute of Limitations.

The State's claims in this action are not subject to any statute of limitations.

A consumer protection claim by the Attorney General under 815 ILCS 505/7(a) may be brought in the "public interest," and the statute purposefully omits a limitations period for such claims. The Court so ruled in *State of Illinois v. Tri-Star Industrial Lighting, Inc.*, 2000 U.S. Dist. LEXIS 14948, at *7 (N.D. Ill. Oct. 11, 2000) [attached as **Exhibit A**], holding that there is no statute of limitations applicable to ICFA claims filed by the State. "The plain meaning of [815

24

ILCS 505/7(a)] is that there is no statute of limitations on Consumer Fraud Act claims filed by the State. *Id.* The Court found it instructive that the legislature included a limitations period on ICFA claims brought by private consumers but not for ICFA actions brought by the Attorney General. *Id*. at *8 (lack of limitations period for ICFA claims filed by the State "reflects a conscious legislative choice that we cannot disturb"). Attorney General actions under the ICFA are brought "to protect the public, not to benefit private parties," even though the Attorney General is statutorily authorized to make a claim for restitution to consumers. *Id.* at *9 (citing *People ex rel. Hartigan v. Lann*, 225 Ill. App. 3d 236, 240-41 (1st Dist. 1992)).

With respect to the State's claim for unjust enrichment, the five-year statute of limitations in 735 ILCS 5/13-205 does not expressly apply to the State; therefore, the statute presents no bar because the State is acting in a public capacity in bringing this action. *Board of Education v. A, C & S Inc.*, 131 Ill. 2d 428, 470-76 (1989) (noting governmental entities only subject to limitations defenses when acting in a private capacity). To assess whether a governmental action is public or private, courts should consider three factors: (1) the effect of the interest on the public, (2) the obligation of the governmental entity to act on behalf of the public, and (3) the extent to which the expenditure of public revenues is necessitated. *Id.* at 475-76.

That this action is brought in a public capacity is beyond dispute. Diabetes is a public health epidemic and costs the State billions of dollars per year. (¶¶ 1-2, 456-461). While 815 ILCS 505/7(a) makes a consumer action by the Attorney General permissive, the Attorney General is not limited in the public interests he seeks to protect [*People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 31 (1991)], and the argument that the Attorney General has no obligation to bring this action overlooks his constitutional and common-law duty to represent the broader interests of the State and its citizens. *See Ill. Const., Art. V, § 15* (observing Attorney General

"shall be the legal officer of the State" and "shall have the duties" and power prescribed by law); *Fergus v. Russel*, 270 Ill. 304, 342 (1915) (Attorney General is "only officer empowered to represent the people"). All of these factors establish that the State, in bringing this action, acts in a public capacity, and the limitations period in 735 ILCS 5/13-205 does not apply.

### ii. Even if any Limitations Did Apply (They Do Not), the Limitations Period Has Been Tolled.

#### 1. The Continuing Violations Doctrine Applies.

Where a claim involves continuing or repeated injurious behavior, the statute of limitations does not begin to run until the date of the last injury or when the harmful acts cease. *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 745 (1st Dist. 2001). A continuing violation is occasioned by continuing unlawful acts and conduct, not continual ill effects from an initial violation. *Hyon Waste Mgmt. Services, Inc. v. City of Chicago*, 214 Ill. App. 3d 757, 763 (1st Dist. 1991). The Manufacturers have persistently raised prices of insulin over "last fifteen years" (¶ 3), and the State's Complaint seeks injunctive relief because their misconduct continues to the present day. *See Finite Resources, Ltd. v. DTE Methane Resources, LLC,* 521 F. Supp. 3d 754, 757 (S.D. Ill. 2021) (wrongful conduct is of continuing nature, as defendants continue to extract methane from coal mine, and statute of limitations is not triggered).

In order to invoke the continuing violation doctrine, there must be violations within the limitations period that would entitle the plaintiff to relief, and it must have been unreasonable for plaintiff to sue separately on each violation preceding expiration of the limitations period. *In re Gaslight Club, Inc.,* 167 B.R. 507, 520 (Bankr. N.D. Ill. 1994). The instant facts satisfy these requirements, as the Manufacturers ICFA and UDTPA violations are still continuing, and it would indeed be unreasonable to expect the State, through its Attorney General, to sue the Manufacturers separately for each violation, *i.e.,* each instance in which a consumer was overcharged for insulin.

Thus, even if any of the State's claims were subject to any statute of limitations (they are not), the Court should apply the continuing violations doctrine to toll such limitations period.

## 2. The Discovery Rule Tolls the Statute of Limitations.

The discovery rule applies to actions under the ICFA and UDTPA, meaning that the statute does not begin to run until a plaintiff knows or reasonably should know of his injury "and also knows or reasonably should know that it was wrongfully caused." *Mosier v. Village of Holiday Hills*, 128 N.E.3d 1210, 1218 (Ill. App. Ct. 1st Dist. 2019). The date when a plaintiff should have discovered his cause of action is a factual question for the trial court to resolve. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 83-84 (1995).

The Manufacturers pull from various sources in an attempt to block application of the discovery rule—sporadic news or opinion articles which mention rebates or question why insulin prices are increasing; testimony given by the Manufacturers' representatives in the State's absence at an April 2019 Congressional hearing; and recent Illinois legislation effective January 1, 2022 that gives health plans the right to audit PBMs for "rebates."[26]

The Manufacturers argue that the State, from these sources, should have known the facts essential to its claims over five years before filing this action. Imposing a burden on the State to ferret out not only that it was injured, but that such injury was wrongfully caused, by combing through random news articles and being cognizant of testimony given in its absence asks too much – in essence, the Manufacturers suggest the State should have exercised "extraordinary" diligence, rather than the ordinary diligence which the discovery rule requires.[27] *Khan v. Deutsche Bank AG*,

---

[26] If anything, this recent legislation codified at 215 ILCS 5/513b1(b)(5) supports the allegations of the State's Complaint that the pricing structures for insulin, including the Manufacturer Payments, are not transparent, so much so that the health plans who contract with PBMs required legislative relief.

[27] Mere knowledge of "rebates" is not enough, and the State's knowledge of the existence of rebates does not absolve the Manufacturers' conduct. *See Harris Cnty. v. Eli Lilly & Co.,* 2020 WL 5803483, at *6 (S.

978 N.E.2d 1020, 1035 (Ill. 2012) (discovery rule postpones accrual until the plaintiff knows or in the exercise of "ordinary diligence" should know of the wrongful act and resulting injury).

Additionally, but without any supporting legal authority, the Manufacturers advance a "borrowing" argument—that the State should have known about the Insulin Pricing Scheme since its Complaint borrows from the allegations of complaints in other actions in which the State was not a party, and that this somehow relates the State's discovery of the Insulin Pricing Scheme back to the date on which any earlier action was filed. The Manufacturers' borrowing argument was categorically rejected by the federal court in *City of Miami,* 2022 WL 198028, *11. Noting that the defendants cited no case to support this proposition, the court declined to interpret the discovery rule's reasonable diligence standard to require that "plaintiffs … trawl [through] court filings across the country for suits involving different plaintiffs with claims that may involve similar facts." *Id.* The district court concluded that the City adequately pled that it could not have discovered the facts giving rise to its claims earlier "because of the opacity of [d]efendants' pricing methods and the [d]efendants' refusal to disclose net prices." *Id.*

To be certain, the pricing structures and mechanisms utilized by the Manufacturers and PBMs are complex and closely guarded (¶ 446). Pharmaceutical pricing occurs in an opaque network of multiple payment structures which lack transparency. (¶¶ 279, 282, 299). Only the PBMs know what any other entity in the pharmaceutical pricing chain is paying, and they are opposed to complete transparency, as Express Scripts testified before Congress. (¶¶ 299, 437). The Manufacturers do not publicly disclose their actual net-prices or the amount of the rebates they pay. (¶ 447). The Manufacturers and PBMs conceal the documents relevant to such inquiries by

---

D. Tex. Sept. 29, 2020) (rejecting Manufacturers' argument that their disclosure of the existence of rebates insulates them from allegations of fraud, since such disclosures do "not preclude the possibility that the [manufacturers] worked with the [PBMs] in a coordinated effort to artificially raise [the] reported price[s]").

classifying them as proprietary *via* embedded confidentiality clauses. (¶¶ 449-451). Further, the Manufacturers and PBMs have misled the public for years by blaming each other for the egregious escalation of insulin prices (¶ 364)—the PBMs have, on numerous occasions, publicly asserted that rebates have no relationship to rising insulin prices (¶¶ 364, 413), and the Manufacturers have blamed the sharp rise in insulin prices on non-existent research and development costs. (¶¶ 421-422). As the Manufacturers admit, even when rebate amounts are reported to Medicare, that information is confidential and withheld from the public. (Dkt. 60 at 15).

Collectively and for over a decade, the Manufacturers and PBMs have engaged in a public misinformation campaign, as they continue to artificially inflate the price of insulin and rake in the profits. The State's Complaint alleges that, due to such concealment, Illinois diabetic consumers did not know, and could not have known, of the wrongful conduct behind the harm caused by skyrocketing insulin prices. The State's Complaint, on their behalf, clearly pleads that the Defendants have engaged in affirmative concealment of their conduct. (¶¶ 452, 455).

Issuance of the Senate Insulin Report on January 14, 2021 was a watershed event. The Report—issued after the Senate's review of the Defendants' internal documents relating to insulin—was the first reliable investigative report into insulin pricing and constituted reasonable notice to the State of not only the harm, but also the conduct that caused it. (¶¶ 338-341). The Senate Insulin Report established, among other things, (1) that escalating insulin prices are not due to research and development costs, production costs, or supply and demand, and (2) that the Manufacturer Payments demanded by the PBMs, and voluntarily paid by the Manufacturers, are driving up insulin prices. (¶¶ 370-371). Both facts were essential to the State's realization, acting in ordinary diligence, of its claims against the Manufacturers and PBMs for engaging in unfair or

deceptive trade practices violative of the ICFA and UDTPA. Any filing by the State before confirmation of these facts by a reliable authority would have been the product of guesswork.

### 3. Fraudulent Concealment Tolls the Statute of Limitations.

For the same reasons that the discovery rule applies—the Manufacturers' and PBMs' concealment of information that would have revealed the Insulin Pricing Scheme—the doctrine of fraudulent concealment is available to the State. The Defendants were not merely silent; they engaged in affirmative acts and misrepresentations which were calculated to prevent discovery of their concerted effort to artificially inflate the price of insulin and publish and enforce those false prices in the industry. *Reshal Assoc., Inc. v. Long Grove Trading Co.,* 754 F. Supp. 1226, 1237 (N.D. Ill. 1990) (observing that affirmative acts or representations are necessary; mere silence is not enough). The complaint alleges with particularity facts that authorize application of the doctrine of fraudulent concealment and toll any applicable statute of limitations.

### CONCLUSION

For the foregoing reasons, the Manufacturers have failed to establish that no claim has been stated upon which relief can be granted, and their Motion to Dismiss should be denied.

If the Court is inclined to dismiss any claims, the State respectfully requests the Court afford the State an opportunity to amend the complaint. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

RESPECTFULLY SUBMITTED this the 6th day of April, 2023.

/s/ Josh Wackerly
Joanne Cicala (pro hac vice)
Josh Wackerly (pro hac vice)
R. Johan Conrod (pro hac vice)
THE CICALA LAW FIRM PLLC
Dripping Springs, TX 78620
Tel: (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com
johan@cicalapllc.com

David F. Buysse, IL Bar # 3126915
Deputy Chief, Public Interest Division
ILLINOIS ATTORNEY GENERAL'S OFFICE
100 W. Randolph Street – 12th Floor
Tel: (312) 590-7844
david.buysse@ilag.gov

Darren Kinkead, IL Bar # 6304847
Deputy Chief, Special Litigation Bureau
ILLINOIS ATTORNEY GENERAL'S OFFICE
100 W. Randolph Street – 11th Floor
Tel: (773) 590-6967
darren.kinkead@ilag.gov

Edwin S. Gault, Jr., IL Bar # 6314552
Walter G. Watkins, III., Bar ID # 100314
Tanya D. Ellis, Bar ID # 101525
FORMAN WATKINS & KRUTZ
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375
Tel: (601) 960-8600
Fax: (601) 960-8613
Win.Gault@formanwatkins.com
Tanya.Ellis@formanwatkins.com
Trey.Watkins@formanwatkins.com

Matthew C. McDonald, Bar ID # 105966
DAVID NUTT & ASSOCIATES
605 Crescent Blvd, Suite 200
Ridgeland, MS 39157
Tel: (601) 898-7302
mattm@davidnutt.com

## <u>CERTIFICATE OF SERVICE</u>

I, Josh Wackerly, an attorney, certify that on April 6, 2023, a true and accurate copy of the foregoing Memorandum of Law in Opposition to the Manufacturers' Motion to Dismiss was served upon counsel of record at the addresses indicated by CM/ECF electronic notification.

/s/ Josh Wackerly
Josh Wackerly

# EXHIBIT A

 Neutral

As of: April 6, 2023 8:09 PM Z

# *Illinois v. Tri-Star Indus. Lighting, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

October 11, 2000, Decided ; October 12, 2000, Docketed

No. 99 C 8156

**Reporter**

2000 U.S. Dist. LEXIS 14948 *

STATE OF ILLINOIS, Plaintiff, v. TRI-STAR INDUSTRIAL LIGHTING, INC., an Illinois Corporation, Defendant.

**Disposition: [*1]** Plaintiff's renewed motion to strike defendant's affirmative defenses granted.

## Core Terms

Telemarketing, Consumer Fraud Act, statute of limitations, attorney general, affirmative defense, limitations, restitution, violations, damages

## Case Summary

**Procedural Posture**

Plaintiff renewed its motion to strike defendant's affirmative defenses to plaintiff's cause of action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, *15 U.S.C.S. § 6101 et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act, *815 Ill. Comp. Stat. 505/1 et seq.*

**Overview**

Plaintiff state filed an action against defendant under the Telemarketing and Consumer Fraud and Abuse Prevention Act, (Telemarketing Act), *15 U.S.C.S. § 6101 et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), *815 Ill. Comp. Stat. 505/1 et seq.* As an affirmative defense to both the Telemarketing Act and Consumer Fraud Act claims asserted against it, defendant argued that all or a portion of plaintiff's claim was barred by a three-year statute of limitations. Plaintiff argued that neither the Telemarketing Act nor the Consumer Fraud Act limited the time period in which the state could sue, and filed a motion to strike defendant's affirmative defense based on the statute of limitations. The court agreed with the plaintiff, noting that the plain meaning of the language in both acts was that there was no statute of limitations on Telemarketing Act claims or Consumer Fraud Act claims filed by a state.

**Outcome**

Plaintiff's renewed motion to strike defendant's affirmative defenses was granted. Three-year statute of limitations that applied to private causes of action did not apply to the plaintiff State's Consumer Fraud Act claim.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

**HN1[↓]** **Defenses, Demurrers & Objections, Motions to Strike**

*Fed. R. Civ. P. 12(f)* permits a federal district court to strike any insufficient affirmative defenses from any pleading. Motions to strike, however, are generally disfavored and may only be granted if the defense asserted is patently defective and could not succeed under any set of circumstances. If there is any set of facts that would support the affirmative defense and defeat the complaint, the motion must be denied.

Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

**HN2**[⬇] **Federal Acts, Telephone Consumer Protection Act**

See *15 U.S.C.S. § 6103*.

> Governments > Legislation > Statute of Limitations > General Overview

> Governments > Legislation > Interpretation

**HN3**[⬇] **Legislation, Statute of Limitations**

When a federal statute is unambiguous, the federal courts must enforce the plain meaning of the language enacted by Congress.

> Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telemarketing & Consumer Fraud & Abuse Prevention Act

> Governments > Legislation > Interpretation

> Governments > Legislation > General Overview

**HN4**[⬇] **Federal Acts, Telemarketing & Consumer Fraud & Abuse Prevention Act**

In determining congressional intent, the courts look to the particular statutory language at issue, as well as the design of the statute as a whole.

> Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

**HN5**[⬇] **Federal Acts, Telephone Consumer Protection Act**

See *15 U.S.C.S. § 6104*.

> Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

> Civil Procedure > Sanctions > Contempt > General Overview

> Governments > Legislation > Statute of Limitations > Time Limitations

> Criminal Law & Procedure > ... > Obstruction of Administration of Justice > Contempt > General Overview

> Governments > Legislation > Statute of Limitations > General Overview

**HN6**[⬇] **Federal Acts, Telephone Consumer Protection Act**

*15 U.S.C.S. § 6107(d)* expressly states that the two-year limitations period applies only to criminal contempt proceedings initiated by the Federal Trade Commission.

> Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

> Civil Procedure > Sanctions > Contempt > General Overview

> Governments > Legislation > Statute of Limitations > General Overview

**HN7**[⬇] **Federal Acts, Telephone Consumer Protection Act**

See *15 U.S.C.S. § 6107(d)*.

> Antitrust & Trade Law > Consumer Protection > Telemarketing

> Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telemarketing & Consumer Fraud & Abuse Prevention Act

> Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

> Governments > Legislation > Statute of Limitations > General Overview

> Governments > Legislation > Statute of Limitations > Time Limitations

**HN8**[⬇] **Consumer Protection, Telemarketing**

2000 U.S. Dist. LEXIS 14948, *1

16 C.F.R. § 310.5 contains no limitations period at all, but a record-keeping requirement for telemarketers.

Governments > Legislation > Interpretation

**HN9**[⬇] **Legislation, Interpretation**

Federal courts must interpret a state statute as that state's courts would construe it.

Governments > Legislation > Interpretation

**HN10**[⬇] **Legislation, Interpretation**

In Illinois, the primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. The best evidence of that intent is the language of the statute. Where the legislature's intent can be ascertained from the plain language of the statute, that intent must prevail and will be given effect without resort to other aids for construction.

Antitrust & Trade Law > Consumer Protection > General Overview

Governments > Legislation > Statute of Limitations > General Overview

**HN11**[⬇] **Antitrust & Trade & Law, Consumer Protection**

See 815 Ill. Comp. Stat. 505/7(a).

Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telemarketing & Consumer Fraud & Abuse Prevention Act

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Interpretation

**HN12**[⬇] **Federal Acts, Telemarketing & Consumer Fraud & Abuse Prevention Act**

The court must evaluate the language of the statute as a whole, considering each part or section in connection with every other part of section.

Antitrust & Trade Law > Consumer Protection > General Overview

Governments > Legislation > Statute of Limitations > General Overview

**HN13**[⬇] **Antitrust & Trade Law, Consumer Protection**

See 815 Ill. Comp. Stat. 505/10a(e).

Antitrust & Trade Law > Consumer Protection > General Overview

**HN14**[⬇] **Antitrust & Trade Law, Consumer Protection**

The state's request for monetary relief in an Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 et seq., suit does not transform it into a private action.

**Counsel:** For STATE OF ILLINOIS, plaintiff: John A. Ruberti, Amy Fletcher, Illinois Attorney General's Office, Chicago, IL.

For TRI-STAR INDUSTRIAL LIGHTING, INCORPORATED, defendant: David H. Latham, Attorney at Law, Jill L. Jennings, Law Offices of David H. Latham, Chicago, IL.

**Judges:** Paul E. Plunkett, Senior Judge.

**Opinion by:** Paul E. Plunkett

# Opinion

**MEMORANDUM OPINION AND ORDER**

The State of Illinois has sued defendant for its alleged violations of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101, et seq. ("Telemarketing Act"), and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1, et seq. ("Consumer Fraud Act"). The case is before the Court on plaintiff's renewed motion to strike defendant's affirmative defenses. For the reasons set

forth below, plaintiff's motion is granted.

## Discussion

*HN1*[↑] *Federal Rule of Civil Procedure 12(f)* permits this Court to strike any insufficient affirmative defenses from any pleading. Motions to strike, however, are generally disfavored and may only be granted if "the **[*2]** defense [asserted] is patently defective and could not succeed under any set of circumstances." *Carpenter v. Ford Motor Co., 761 F. Supp. 62, 65 (N.D. Ill. 1991)* (citations omitted). If there is any set of facts that would support the affirmative defense and defeat the complaint, the motion must be denied. *Bobbitt v. Victorian House, 532 F. Supp. 734, 737 (N.D. Ill. 1982)*.

As an affirmative defense to both the Telemarketing Act and Consumer Fraud Act claims asserted against it, defendant states: "All or a portion of Plaintiff's claim is barred by the applicable statute of limitations." (See Answer at 9, 10, 14.) Plaintiff contends that neither the Telemarketing Act nor the Consumer Fraud Act limits the time period in which the State can sue. The Court agrees.

In relevant part, the Telemarketing Act provides:

> *Whenever* an attorney general of any State has reason to believe that the interests of the residents of that State have been or are being threatened or adversely affected because any person has engaged or is engaging in a pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this **[*3]** title, the State, as parens patriae, may bring a civil action on behalf of its residents in an appropriate district court of the United States to enjoin such telemarketing, to enforce compliance with such rule of the Commission, to obtain damages, restitution, or other compensation on behalf of residents of such State, or to obtain such further and other relief as the court may deem appropriate.

*HN2*[↑] 15 U.S.C. § ("section") 6103 (emphasis added). The statute says nothing else about the time in which a State must sue for violations of the Act. "*HN3*[↑] When a [federal] statute is unambiguous, we must enforce the plain meaning of the language enacted by Congress." *Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp., 76 F.3d 824, 828 (7th Cir. 1996)* (internal quotation marks and citation omitted).

The plain meaning of the language in this section is that there is no statute of limitations on Telemarketing Act claims filed by a State.

A review of the other sections of the statute bolsters the plain meaning interpretation. See *Damato v. Hermanson, 153 F.3d 464, 471 (7th Cir. 1998)* ("*HN4*[↑] In **[*4]** determining congressional intent, we look to the particular statutory language at issue, as well as the design of the statute as a whole.") (internal quotation marks and citation omitted). In *section 6104*, the Telemarketing Act provides a private right of action for violations of the statute. In stark contrast to *section 6103*, however, this portion of the statute expressly limits the time in which private parties may seek relief:

> Any person adversely affected by any pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this title, or an authorized person acting on such person's behalf, may, *within 3 years after discovery of the violation*, bring a civil action in an appropriate district court of the United States against a person who has engaged or is engaging in such pattern or practice of telemarketing if the amount in controversy exceeds the sum or value of $ 50,000 in actual damages for each person adversely affected by such telemarketing.

*HN5*[↑] *15 U.S.C. § 6104* (emphasis added). As this section illustrates, Congress was conscious of limitations periods when it enacted the statute and included one **[*5]** where it thought appropriate. Thus, its failure to do so in *section 6103* evidences a deliberate legislative choice, not an oversight subject to judicial correction.

Despite this clear congressional intent, defendant argues that we can imply a two-year statute of limitations based on the limitations periods set forth in *section 6107* of the statute and *section 310.5* of the implementing regulations. A cursory review of these provisions dispatches this argument. *HN6*[↑] *Section 6107* of the statute expressly states that the two-year limitations period applies only to criminal contempt proceedings initiated by the Federal Trade Commission. *HN7*[↑] *15 U.S.C. § 6107(d)* ("The authority of the Federal Trade Commission to bring a criminal contempt action under subsection (a) of this section expires 2 years after the date of the first promulgation of rules under section 6102 of this title."). Moreover, *HN8*[↑] *section 310.5* of the regulations contains no limitations period at all, but a record-keeping requirement for

telemarketers. See *16 C.F.R. § 310.5*. Neither of these unambiguous provisions supplies any basis for imposing a two-year statute of limitations on Illinois' Telemarketing Act **[*6]** claim.

Next, we turn to the Consumer Fraud Act. "*HN9*[↑]] Federal courts must interpret a state statute as that state's courts would construe it." Brownsburg Area Patrons Affecting Change v. Baldwin, 137 F.3d 503, 507 (7th Cir. 1998). *HN10*[↑]] In Illinois, "the primary rule of statutory construction is to ascertain and give effect to the the intent of the legislature." *Bruso v. Alexian Bros. Hosp., 178 Ill. 2d 445, 451, 687 N.E.2d 1014, 1016, 227 Ill. Dec. 532 (1997)*. The best evidence of that intent is the language of the statute. Id. "Where the legislature's intent can be ascertained from the plain language of the statute, that intent must prevail and will be given effect without resort to other aids for construction." *Id., 178 Ill. 2d at 452, 687 N.E.2d at 1016*.

The plain language of the Consumer Fraud Act provides:

> *Whenever* the Attorney General or a State's Attorney has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by this Act to be unlawful, and that proceedings would be in the public interest, he or she may bring an action in the name of the People of the State against **[*7]** such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction; revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

*HN11*[↑]] *815 ILL. COMP. STAT. 505/7(a)* (emphasis added). The statute otherwise says nothing about the time in which the State can file a Consumer Fraud Act claim. The plain meaning of this provision is that there is no statute of limitations on Consumer Fraud Act claims filed by the State.

The other provisions of the statute support the plain meaning interpretation. See *Bruso, 178 Ill. 2d at 451-52, 687 N.E.2d at 1016* ("*HN12*[↑]] The court must evaluate the language of the statute as a whole, considering each part or section in connection with every other part of section."). Like the Telemarketing Act, the Consumer **[*8]** Fraud Act provides a private right of action with an explicit limitations period:

> Any [private] action for damages . . . shall be forever barred unless commenced within 3 years after the cause of action accrued; provided that, whenever any action is brought by the Attorney General or a State's Attorney for a violation of this Act, the running of the foregoing statute of limitations, with respect to every private right of action for damages which is based in whole or in part on any matter complained of in said action by the Attorney General or State's Attorney, shall be suspended during the pendency thereof, and for one year thereafter.

*HN13*[↑]] *815 ILL. COMP. STAT. 505/10a(e)*. Plainly, the Illinois Legislature is capable of creating a statute of limitations when it wishes to do so. Thus, its failure to do so for Consumer Fraud Act claims filed by the State reflects a conscious legislative choice that we cannot disturb.

Nor are we persuaded that the State's request for restitution transforms its suit into a private action subject to the three-year limitation. First, the same statutory provision that permits the State to file suit without time limitations, provides that restitution **[*9]** is one of the remedies available to it. See *815 ILL. COMP. STAT. 505/7(a)*. Second, the Illinois Appellate Court has rejected the notion that *HN14*[↑]] the State's request for monetary relief in a Consumer Fraud Act suit transforms it into a private action:

> An action filed by the Attorney General under the [Consumer Fraud] Act is essentially a law enforcement action designed to protect the public, not to benefit private parties. The statute expressly authorizes the Attorney General to enjoin illegal practices and to collect actual damages. . . . Although restitution may benefit aggrieved consumers, the remedy flows from the basic policy that those who engage in proscribed conduct or practices surrender all profits flowing therefrom. Because the nature and object of the Act and its remedies are indisputably the protection of the public interest, we believe that the legislature intended the State to be the only real party in interest, . . . .

*People ex rel. Hartigan v. Lann, 225 Ill. App. 3d 236, 240-41, 587 N.E.2d 521, 524, 167 Ill. Dec. 252 (1st Dist.*

2000 U.S. Dist. LEXIS 14948, *9

*1992).* As in <u>Lann</u>, the State has filed suit in this case to protect the public, not to benefit private **[*10]** parties. Consequently, the three-year statute of limitations that applies to private causes of action does not apply to the State's Consumer Fraud Act claim.

## <u>Conclusion</u>

For the reasons set forth above, plaintiff's renewed motion to strike defendant's affirmative defenses is granted.

**ENTER:**

**Paul E. Plunkett**

**UNITED STATES DISTRICT JUDGE**

**DATED:** <u>10-11-00</u>

End of Document