**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

THE STATE OF ILLINOIS, EX REL. KWAME
RAOUL, ATTORNEY GENERAL

      *PLAINTIFF,*

      v.

ELI LILLY AND COMPANY; ET AL.

      *DEFENDANTS.*

Case No. 1:23-CV-00170

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO PBM DEFENDANTS' RULE**
**12(b)(6) MOTION TO DISMISS THE COMPLAINT FOR**
**<u>FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iv

I.     INTRODUCTION ............................................................................................................. 1

II.    FACTUAL ALLEGATIONS .......................................................................................... 2

III.   LEGAL STANDARD ...................................................................................................... 5

    A.     Rule 12(b)(6) ............................................................................................................ 5

    B.     Pleading Particularity is not Required for all of the State's Claims ..................... 5

IV.    ARGUMENT ................................................................................................................... 8

    A.     The State Has Sufficiently Pled Its ICFA Claims.................................................. 8

        i.     The PBMs Have Engaged in Deceptive Trade Practices under the
ICFA .................................................................................................................. 9

            1.     PBMs Committed a Deceptive Act.................................................... 9

            2.     The PBMs Intended for Diabetic Consumers to Rely on
Their Misrepresentations and the Conduct Occurred in
Trade or Commerce ........................................................................... 11

        ii.    The PBMs' Misconduct Is Also Unfair under the ICFA ........................ 12

            1.     The PBMs' Misconduct Offends Public Policy.............................. 12

            2.     The PBMs' Misconduct is Oppressive ........................................... 14

            3.     The PBMs' Misconduct Substantially Injured Illinois
Diabetics ............................................................................................ 14

            4.     The PBMs' "Countervailing Benefits" Argument is
Meritless............................................................................................. 15

    B.     The PBMs' Counterarguments Are Unavailing.................................................. 16

        i.     The State Does Not Engage in Improper "Group Pleading" ................... 16

        ii.    The PBMs' Misrepresentations Are Actionable ...................................... 18

            1.     The PBMs' Misrepresentations Are More Than Puffery or
Aspirational Statements ................................................................... 18

            2.     *Noerr-Pennington* Does Not Apply on a Motion to Dismiss ....... 22

3. The State Alleges Facts Establishing the PBMs' Statements Are False and Material ................................................................. 23

 iii. The State Has Sufficiently Alleged Its ICFA Claims Premised on the Illinois Uniform Deceptive Trade Practices Act ("UDTPA") ............ 23

C. The State Has Properly Pled Unjust Enrichment .................................... 24

 i. The State's Unjust Enrichment Claim is Not Foreclosed by Contract ...................................................................................... 25

 ii. The State May Bring Unjust Enrichment Claims in Its *Parens Patriae* Capacity ............................................................................ 25

D. The State Sufficiently Pleads its Claims Against the Parent Companies and OptumInsight .............................................................................. 27

**VI.** **CONCLUSION** ............................................................................... **30**

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
   458 U.S. 592 (1982) ............................................................................................ 25

*Alpine Bank v. Hubbell*,
   555 F.3d 1097 (10th Cir. 2009) ......................................................................... 20

*AnchorBank, FSB v. Hofer*,
   649 F.3d 610 (7th Cir. 2011) .............................................................................. 5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 5

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   216 Ill. 2d 100 (2005) ....................................................................................... 21

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
   168 F.3d 967 (7th Cir. 1999) ............................................................................ 10

*Barbara's Sales, Inc. v. Intel Corp.*,
   227 Ill. 2d 45 (2007) ......................................................................................... 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 5

*Bologna v. Allstate Ins. Co.*,
   138 F. Supp. 2d 310 (E.D.N.Y. 2001) ............................................................... 20

*Breckenridge v. Cambridge Homes*,
   246 Ill. App. 3d 810 (2nd Dist. 1993) .............................................................. 21

*Brown v. SBC Communs., Inc.*,
   2007 WL 684133 (S.D. Ill Mar. 1, 2007) .................................................... 11, 17

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
   761 F.3d 732 (7th Cir. 2014) ............................................................................... 7

*Connick v. Suzuki Motor Co.*,
   174 Ill. 2d 482 (1996) ....................................................................................... 23

*Cooper v. Durham Sch. Servs.*,
   2003 WL 22232833 (N.D. Ill. Sept. 22, 2003) .................................................. 25

*Cripe v. Leiter*,
   184 Ill. 2d 185 (1998) ......................................................................................... 9

*Cruz v. City of Chicago*,
  2021 WL 2645558 (N.D. Ill June 28, 2021) ...................................................... 17

*Donnellan v. Travelers Co.*,
  2022 WL 170046 (N.D. Ill. Jan. 18, 2022) ...................................................... 15

*Drake v. P&G*,
  2021 WL 5359804 (S.D. Ill Nov. 17, 2021) ...................................................... 8

*Dubey v. Public Storage, Inc.*,
  395 Ill. App. 3d 342 (1st Dist. 2009) ...................................................... 12

*Ekl v. Knecht*,
  223 Ill. App. 3d 234 (2nd Dist. 1991) ...................................................... 12

*Emps.' Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*,
  905 F.3d 892 (5th Cir. 2018) ...................................................... 21

*First Midwest Bank v. Cobo*,
  90 N.E.3d 567 (Ill. App. 1st Dist. 2017) ...................................................... 25

*Fitzpatrick v. A C F Props. Grp.*,
  231 Ill. App. 3d 690 (2nd Dist. 1992) ...................................................... 23

*Forsyth v. Humana Inc.*,
  114 F.3d 1467 (9th Cir. 1977) ...................................................... 21

*Forsythe v. Clark USA, Inc.*,
  224 Ill. 2d 274 (2007) ...................................................... 28, 30

*FTC v. IFC Credit Corp.*,
  543 F. Supp. 2d 925 (N.D. Ill. 2008) ...................................................... 8

*Gibson v. City of Chicago*,
  910 F.2d 1510 (7th Cir. 1990) ...................................................... 5

*Gov't of Puerto Rico v. Carpenter Co.*,
  442 F. Supp. 3d 464 (D.P.R. 2020) ...................................................... 26

*Harris Cnty. v. Eli Lilly & Co.*,
  2022 WL 479943 (S.D. Tex. Feb. 16, 2022) ...................................................... 25

*Illinois v. Alta Colleges, Inc.*,
  2014 WL 4377579 (N.D. Ill. Sept. 4, 2014) ...................................................... 7

*Illinois v. Tri-Star Indus. Lighting, Inc.*,
  2000 U.S. Dist. LEXIS 14948 (N.D. Ill 2000) [**Exhibit A**] ...................................................... 27

*In re Apple Inc. Sec. Litig.,*
    2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................................... 22

*In re Auto. Parts Antitrust Litig.,*
    2021 WL 148004 (E.D. Mich. Jan. 15, 2021) ................................................... 26

*In re Direct Purchaser Insulin Pricing Litig.,*
    2021 WL 28862165 (D.N.J. July 9, 2021) ........................................................ 22

*In re EpiPen Direct Purchaser Litig.,*
    2021 WL 147166 (D. Minn. Jan. 15, 2021) ..................................................... 22

*In re Packaged Seafood Prods. Antitrust Litig.,*
    338 F. Supp. 3d 1079 (S.D. Cal. 2018) ........................................................... 26

*Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000 (9th Cir. 2011) ................................... 29

*Joseph v. TGI Friday's, Inc.,*
    2022 WL 17251277 (N.D. Ill. Nov. 28, 2022) ................................................ 17

*Kenneke v. First Nat'l Bank,*
    65 Ill. App. 3d 10 (1st Dist. 1978) .................................................................. 24

*Kiger ex rel. Qualcomm Inc. v. Mollenkopf,*
    2021 WL 5299581 (D. Del. Nov. 15, 2021) .................................................... 21

*Kremers v. Coca- Cola Co.,*
    712 F. Supp. 2d 759 (S.D. Ill. 2010) ............................................................... 15

*Mississippi ex rel. Fitch v. Lilly,*
    2022 WL 18401603 (S.D. Miss. Aug. 29, 2022) ................................... 8, 21, 30

*Mississippi ex rel. Fitch,*
    2022 WL 3222890 (S.D. Miss. Aug. 9, 2022) ......................................... 11, 30

*Moeckel v. Caremark Rx Inc.,*
    385 F. Supp. 2d 668 (M.D. Tenn. 2005) ......................................................... 30

*Moody v. Ocwen Loan Servicing, LLC,*
    2016 WL 8814532 (C.D. Cal. Feb. 22, 2016) ................................................. 20

*Murphy v. Foster Premier, Inc.,*
    2018 WL 3428084 (N.D. Ill. July 16, 2018) ................................................... 15

*Navient Sols. LLC v. Law Offices of Jeffrey Lohman,*
    2020 WL 1867939, (E.D. Va. Apr. 14, 2020) ................................................ 22

*Nesby v. Country Mut. Ins. Co.,*
    346 Ill. App. 3d 564 (5th Dist. 2004) .............................................................. 25

*Newman v. Metro. Life Ins. Co.*,
    885 F.3d 992, 1002-03 (7th Cir. 2018) ............................................................. 14

*People ex rel. Foxx v. Anthony's Remodeling, Painting & Decorating, Inc.*,
    2022 IL App (1st) 201135-U (2022) .................................................................. 7

*People ex rel. Hartigan v. Knecht Services, Inc.*,
    216 Ill. App. 3d 843 (2nd Dist. 1991) ........................................................ 15, 27

*People ex rel. Madigan v. United Constr. of Am.*,
    981 N.E.2d 404 (Ill. App. 1st Dist. 2012) ......................................................... 9

*Phone Recovery Servs. of Ill., LLC v. Ameritech Ill. Metro, Inc.*,
    2018 IL App (1st) 170968-U (2018) ................................................................ 17

*Ridings v. Am. Family Ins. Co.*,
    2021 WL 722856 (N.D. Ill. Feb. 24, 2021) ..................................................... 21

*Robles v. City of Chicago*,
    354 F. Supp. 3d 873 (N.D. Ill. 2019) ............................................................... 17

*Scott v. Ass'n for Childbirth at Home, Int'l*,
    88 Ill. 2d 279 (1981) ......................................................................................... 8

*Sears v. Likens*,
    912 F.2d 889 (7th Cir. 1990) ........................................................................... 17

*Siegel v. Levy Organization Dev. Co.*,
    153 Ill. 2d 534 (1992) ................................................................................. 9, 11

*Siegel v. Shell Oil Co.*,
    480 F. Supp. 2d 1034 (N.D. Ill. 2007) ....................................................... 17, 18

*Spiegel v. Sharp Elecs. Corp.*,
    125 Ill. App. 3d 897 (1st Dist. 1984) .............................................................. 21

*Totty v. Anderson Funeral Home, Ltd.*,
    448 F. Supp. 3d 928 (N.D. Ill. 2020) ............................................................... 7

*Totz v. Continental Du Page Acura*,
    236 Ill. App. 3d 891 (2nd Dist. 1992) ............................................................. 21

*Toulon v. Cont'l Cas. Co.*,
    2016 WL 561909 (N.D. Ill. Feb. 12, 2016) ..................................................... 23

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ........................................................................................... 28

*Vanzant v. Hill's Pet Nutrition, Inc.*,
    934 F.3d 730 (7th Cir. 2019) ................................................................... 5, 6, 8

*Vtech Data Breach Litig.*,
    2018 WL 1863953 (N.D. Ill. Apr. 18, 2018) ............................................... 7

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
    728 F.3d 354 (4th Cir. 2013) ................................................................... 22

*Wendt v. Handler, Thayer & Duggan*,
    613 F. Supp. 2d 1021 (N.D. Ill. 2009) ..................................................... 17

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*,
    536 F.3d 663 (7th Cir. 2008) ..................................................................... 6

## Statutes

15 U.S.C. § 45 ................................................................................................. 8, 13

815 ILCS 505/11a .................................................................................................. 8

815 ILCS 505/2 ................................................................................... 8, 9, 10, 13

815 ILCS 505/7 ..................................................................................................... 27

815 ILCS 510/2 .................................................................................................. 9, 10

## Other Authorities

Federal Trade Commission,
    *Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products* (June 16,
    2022),
    https://www.ftc.gov/system/files/ftc_gov/pdf/Policy%20Statement%20of%20the%20
    Federal%20Trade%20Commission%20on%20Rebates%20and%20Fees%20in%20Ex
    change%20for%20Excluding%20Lower-
    Cost%20Drug%20Products.near%20final.pdf. ................................................. 13

NASPA,
    *Illinois Governor Signs PBM Legislation*, (Aug. 29,
    2019),https://naspa.us/2019/08/illinois-governor-signs-pbm-legislation/ ............. 14

## Rules

14 Ill. Admin. Code § 470.110 ............................................................................ 10

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 5

Fed. R. Civ. P. 15(a)(2) ......................................................................................... 30

FED. R. CIV. P. 8 ........................................................................................................... 6

FED. R. CIV. P. 9(b) ............................................................................................... passim

## I.     INTRODUCTION

The Insulin Pricing Scheme has had a direct and devastating impact on Illinois diabetics. As a result of Defendants' Scheme, insulin—a drug that was first introduced one-hundred years ago, a drug that millions of Illinois diabetics need to stay alive, and a drug that could be profitably priced at under $2—now costs over $400. (¶¶ 230, 420).[1] The precipitous insulin price increases have caused dire health and financial consequences for diabetics, as well as substantial increased costs for the State and the Illinois healthcare system. (¶¶ 28–33, 456–469).

The State filed suit in Illinois state court under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") to put an end to the Defendants' misconduct and to recover the overpayments made by Illinois diabetics. The State alleges that both sets of Defendants—the Manufacturers[2] ("Manufacturers" or "Manufacturer Defendants") and the PBMs[3] ("PBMs" or "PBM Defendants")—engaged in unfair and deceptive trade practices that gave rise to these substantial harms.

In their 12(b)(6) Motion to Dismiss, the PBMs attempt to sidestep any responsibility for the egregious insulin price increases. The PBMs' Motion, however, is flawed in several key respects. The Motion attempts to reduce all of the alleged PBM misconduct—hiding/obfuscating manufacturer payments, excluding lower priced insulins from formularies, coordinating with the Manufacturers to increase the availability of higher-priced insulins, forcing diabetics into

---

[1] All references herein to (¶) are citations to the paragraphs of the First Amended Complaint (Dkt. 1, Ex. A), referred to herein as the "complaint."

[2] Manufacturer Defendants are Eli Lilly and Company ("Eli Lilly"), Sanofi-Aventis U.S. LLC ("Sanofi"), and Novo Nordisk Inc. ("Novo Nordisk"). The complaint identifies the at-issue drugs in Table 1.

[3] PBM Defendants are (a) Evernorth Health Inc., Express Scripts Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy Inc., and Medco Health Solutions Inc., collectively "Express Scripts"; (b) CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx LLC, CaremarkPCS Health LLC, and Caremark LLC, collectively "CVS Caremark"; and (c) UnitedHealth Group, Inc., OptumRx Inc., and OptumInsight, Inc., collectively "OptumRx."

switching their insulins to the detriment of their health, intentionally pricing diabetics out of the insulins they need to stay alive, and lying about all of it—to a case simply about whether the rebates that the Manufacturers pay to the PBMs are legal or not. This argument is disingenuous and disallowed at the pleading stage.

The Motion also asserts arguments that have been rejected by several federal courts that have considered insulin-related claims, including a recent opinion in a case brought by the Mississippi Attorney General against these same PBMs. It disregards relevant Illinois holdings. And it incongruously—and incorrectly—argues for a heightened pleading standard for all of the State's claims and then ignores dozens of allegations that plead misrepresentations with the particularity that the PBMs assert is lacking.

Taking all the complaint's allegations as true and construing them in favor of the State, respectfully, the PBM's Motion should be denied.

## II.    FACTUAL ALLEGATIONS

There are two sets of actors responsible for the Insulin Pricing Scheme: the three drug Manufacturer Defendants who control 99% of the diabetic drug market (¶¶ 5, 241) and the three PBM Defendants who control the terms of over 270 million Americans' pharmacy benefits and operate among the largest retail and mail order pharmacies in the country (including in Illinois). (¶¶ 6, 310–311). These Defendants control the price that nearly every diabetic and payor pays for the diabetic treatments at issue in this case. (¶¶ 27, 453).

Each Defendant, individually and in concert, has caused the prices of the at-issue drugs to artificially inflate in order to generate profits at the expense of Illinois diabetics. (¶¶ 19–26, 350, 423–424, and Figs. 1-11 at ¶¶16, 263–277). As a direct result of the PBMs' conduct, the list prices for these diabetic drugs have become so inflated and untethered from the actual prices paid to the

Manufacturers as to constitute false prices. (¶¶ 21, 345, 414). The PBMs then insist that these prices be used as the basis for all payments they make and receive and, in doing so, ensure that the price inflation harms diabetics. (¶¶ 22, 48–50, 61-63, 72–74, 112, 165, 206, 346, 416–418, 425).

Millions of diabetic Illinois residents rely on the at-issue drugs for health and even survival. (¶¶ 4, 462-469). Given the degree of price inflation caused by Defendants' misconduct, many diabetics have been forced to extreme measures: rationing or underdosing their insulin, injecting expired insulin, or even starving themselves to control their blood sugars. (¶¶ 30, 464). Indeed, notwithstanding their general inclination to blame each other, the Manufacturers and PBM Defendants do at least agree on one key fact: the current price of insulin is unjustifiably high and denies diabetics access to these essential drugs. (¶¶ 353–354). The financial harm is likewise undeniable. Nearly every diabetic and payor has been directly harmed because their payments are based on the inflated list prices generated by Defendants' misconduct. (¶¶ 22, 27-29, 456-469).

Each PBM Defendant is responsible for ensuring these harms occur. More specifically, each PBM develops standard formularies that establish which diabetes medications are paid for by insurance and which are not. (¶¶ 7–9, 335–337). Given their market dominance, each PBM wields enormous control over the at-issue drug sales, as their formularies drive utilization of diabetic drugs. (¶¶ 6–11, 307-313, 335–337, 453). No drug is dispensed unless it is paid for, and the PBM Defendant formularies are the keys to such payment. (¶¶ 7, 10–11, 336–337).

Cognizant of this fact—and cognizant that PBMs make more money from higher prices—the Manufacturer Defendants intentionally raise their prices and then pay significant sums back to the PBMs in the form of rebates, administrative fees, and other consideration ("Manufacturer Payments") to ensure favorable placement of their diabetes drugs on PBM formularies. (¶¶ 19-23, 336-343, 372). The PBMs, in turn, grant preferred formulary status to the drugs with the highest

list price and largest Manufacturer Payments and, in turn, exclude lower priced, more affordable insulins from their formularies. (¶¶ 22, 344). The PBMs also hide, obfuscate, and launder these payments through their affiliated entities in order to keep a large percentage of these payments (¶¶ 374, 376–397, 446–451). The PBMs further engage in a practice known as "non-medical switching"—changing which insulins they make available on their formularies in order to generate additional profits—to the detriment of diabetics' health. (¶¶ 465–467).

Both the Manufacturers and PBMs then work together to promote the highest priced diabetic drugs to patients, pharmacies and prescribing physicians because they are the most profitable to Defendants, further increasing utilization of the very diabetes medications they have caused to be so unnecessarily expensive. (¶ 350).

Each PBM Defendant is driving up the prices for the at-issue drugs because they profit in numerous ways from the inflated prices. (¶¶ 24, 375–409). The PBMs ensure that the inflated prices also serve as the basis for the prices paid by payors and diabetics. (¶¶ 425–426). Through mail-order and retail pharmacies, each of the PBMs utilize the inflated list prices to set the out-of-pocket amounts that Illinois diabetics pay to obtain their diabetes medications. (¶¶ 88, 115, 170, 209, 287–288, 298, 410, 417).

And, critically, each PBM Defendant obscures these truths. Indeed, each PBM holds itself out as doing the exact opposite of what the State alleges—each PBM Defendant misrepresents that it (1) uses its market power and formularies to lower the prices of diabetes medications and (2) chooses drugs for formulary placement that promote the health of diabetics. (¶ 79–81, 129, 180, 347, 351, 364–365, 409, 428–438, 444, 454, 486). Each PBM has made these misrepresentations to the public, to diabetics, to Wall Street, to Congress and directly to the State. *Id*. Each PBM representation is false. (¶¶ 431–432, 440-446). Even in their moving brief, the PBMs endeavor to

maintain this fiction, arguing "PBMs contract with health plans and third-party payors to administer prescription drug benefits, which includes developing tools to help manage the increasing price unilaterally set by drug manufacturers." (Dkt. 67 at 1). This assertion is directly contradicted by the State's allegations.

To this day the PBMs continue to profit from and engage in the Insulin Pricing Scheme. (¶¶ 468-469) The harm caused by the Scheme is ongoing; each time the State or an Illinois diabetic pays the artificially inflated price for insulin, a new injury is sustained. *Id*.

## III.    LEGAL STANDARD

### A.    Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* FED. R. CIV. P. 12(B)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B.    Pleading Particularity is not Required for all of the State's Claims

The ICFA allows a plaintiff to premise its claim on deceptive conduct or unfair conduct, but "the two categories have different pleading standards." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). "If the claim rests on allegations of deceptive conduct, then

Rule 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud." *Id.*

On the other hand, "[b]ecause neither fraud nor mistake is an element of unfair conduct under the [ICFA], a cause of action for unfair practices under the [ICFA] need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 670 (7th Cir. 2008). Therefore, under federal notice pleading standards, "the complaint need only provide a short and plain statement of the claim that shows, through its allegations, that recovery is plausible rather than merely speculative." *Id.*

Here, the State alleges that the PBMs' misconduct was both deceptive and unfair. (¶¶ 487-489 (deceptive); 490-91 (unfair)). Thus, Rule 9(b) applies to the State's deceptive ICFA claims, while Rule 8's notice pleading standard applies to its unfair claims. As demonstrated below, the State's allegations satisfy both pleading standards.

The PBMs argue that the Court should apply Rule 9(b) to all of the State's ICFA claims because—according to the PBMs—the same conduct establishes the unfair and deceptive theories.[4] Dkt. 62 at 6. This argument is both factually incorrect and legally spurious. Factually, the State's ICFA claims are *not* based solely on PBM misrepresentations. Rather, the entire Insulin Pricing Scheme—from obfuscating Manufacturer Payments (¶¶ 376–398), to excluding lower priced insulins and favoring higher priced ones on formularies (¶¶ 22, 344), to coordinating with the Manufacturers to increase the availability of these higher-priced drugs (¶ 350), to engaging in

---

[4] In making this argument the PBMs misrepresent the complaint's allegations—stating that "[t]he 'root' of the State's Complaint is an alleged 'deceptive scheme' by the Manufacturer Defendants and PBMs involving deceptive and unfair behavior." Dkt. 62 at 4 (citing ¶ 12). Paragraph 12 actually reads "The *unfair and deceptive* scheme at the root of this Complaint—the Insulin Pricing Scheme—was born from this mutual understanding." (¶ 12) (emphasis added).

"non-medical formulary switching" to generate additional profits (¶¶ 465–467), to pricing diabetics out of the insulins they need to stay alive (¶¶ 30, 464)—is unfair. This misconduct significantly raised the price of the at-issue drugs and damaged diabetics' health. (¶¶ 27-33, 456-469). Indeed, the State's unfair ICFA claims are not "entirely grounded in fraud." Dkt. 62 at 6.

With respect to the law, Illinois courts routinely apply different pleading standards to "deceptive" and "unfair" ICFA claims even when both rely on similar facts. *See, e.g. Illinois v. Alta Colleges, Inc.*, 2014 WL 4377579, at *5 (N.D. Ill. Sept. 4, 2014) (applying different pleading standards to unfair and deceptive claims based on a school's misrepresentations about its accreditation, costs, student loans, and student employment prospects to be both unfair and deceptive); *People ex rel. Foxx v. Anthony's Remodeling, Painting & Decorating, Inc.*, 2022 Ill. App. (1st) 201135-U, P30 (2022) (same).[5] In rejecting the same argument put forth here by the PBMs, a Southern District of Illinois court recently explained:

> The Court is not persuaded by Defendant's arguments that Plaintiff's two ICFA counts are improperly duplicative of each other. Both counts bring claims under the ICFA but premised on different theories: Count I premised on Defendant's unfair business practices and Count II premised on Defendant's deceptive acts or practices. While both claims rely on similar facts and have the same elements, the pleading requirements of each differs. Specifically, Count I for unfair practices is not subject to the heightened pleading standards of Rule 9(b) for fraud, while Count II alleging deceptive acts or practices is. Further, at the pleading stage a party may pursue alternative theories and "state as many separate claims or defenses as it has regardless of consistency." *See* Fed. R. Civ. P. 8(e)(2). Accordingly, it is permissible to plead these counts separately, although they are similar.

---

[5] The PBMs' authority is distinguishable. In each cited case, there was *identical* overlap between the facts underpinning plaintiff's deceptive and unfair claims. *See Vtech Data Breach Litig.*, 2018 WL 1863953, at *7 (N.D. Ill. Apr. 18, 2018) (allegations underlying both unfair and deceptive claims were same misrepresentations); *Totty v. Anderson Funeral Home, Ltd.*, 448 F. Supp. 3d 928, 937 (N.D. Ill. 2020) (same); *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (same). As explained above, the State's unfair and deceptive claims are not based upon all of the same conduct.

*Drake v. P&G*, 2021 WL 5359804, at *3 (S.D. Ill Nov. 17, 2021). The same applies here—the State has alleged that the PBMs engaged in misconduct that was deceptive and additional misconduct that was also unfair. Rule 8 applies to its unfair ICFA claims. *See id.*

Even if Rule 9(b) applies to all of the State's claims (it does not), the State's allegations satisfy the heightened pleading standard as well. *See, e.g., Mississippi ex rel. Fitch v. Lilly*, 2022 WL 18401603, at *3 (S.D. Miss. Aug. 29, 2022) (ruling the State of Mississippi's Insulin Pricing Scheme claims were pled with particularly).[6]

## IV.    ARGUMENT

### A.    The State Has Sufficiently Pled Its ICFA Claims

The ICFA's purpose "is to protect Illinois consumers, borrowers, and businessmen against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Scott v. Ass'n for Childbirth at Home, Int'l*, 88 Ill. 2d 279, 288 (1981). The Act is to be "liberally construed" to effectuate its purposes. 815 ILCS 505/11a.

Violations of the ICFA may occur through deceptive trade practices, unfair trade practices, or both. *See Vanzant*, 934 F.3d at 738; *see also FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 934 n.2 (N.D. Ill. 2008) ("[Section 5] contemplates two distinct practices, those that the FTC deems to be 'unfair' and those it deems to be 'deceptive.' A practice may be unfair without being deceptive.")[7]

The State alleges that the PBMs' misconduct is both deceptive and unfair. (¶¶ 486–491).

---

[6] Notably, in *Mississippi* the Southern District of Mississippi did not apply Rule 9(b) to the Mississippi consumer protection claims, but nonetheless found that particularity was satisfied. *See Mississippi*, 2022 WL 18401603, at *3 ("[t]hough liability under the [Mississippi Consumer Protection Act] does not require a finding of fraud for an act to be unfair or deceptive . . . the Court finds that the State's allegations also survive the Rule 9(b) particularity standard.")

[7] In construing the ICFA, the Illinois legislature intended "consideration [to] be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act [15 U.S.C. § 45]." 815 ILCS 505/2.

### i. The PBMs Have Engaged in Deceptive Trade Practices under the ICFA

To state a claim for deceptive trade practices under the ICFA, a plaintiff must allege: "(1) defendants committed a deceptive act or practice, (2) defendants intended for customers to rely on that deceptive act or practice, and (3) the deception occurred in the course of conduct involving trade or commerce." *People ex rel. Madigan v. United Constr. of Am.*, 981 N.E.2d 404, 411 (Ill. App. 1st Dist. 2012). The ICFA does not require actual reliance. *Siegel v. Levy Organization Dev. Co.*, 153 Ill. 2d 534, 542 (1992). Further, the plaintiff need not "establish any intent to deceive on the part of the defendant because even an innocent misrepresentation may be actionable under the Act." *Cripe v. Leiter*, 184 Ill. 2d 185, 191 (1998). And, unlike a private litigant, the Attorney General need not demonstrate that defendants' actions proximately harmed any consumers. *See Madigan*, 981 N.E.2d at 411.

In addition to the ICFA's broad prohibition on deceptive conduct, the Act also states that violations of the Illinois Uniform Deceptive Trade Practices Act ("UDTPA") [815 ILCS 510/2] constitute deceptive trade practices. 815 ILCS 505/2. To that end, the UDTPA contains a non-exhaustive list of deceptive practices. 815 ILCS 510/2. The Illinois legislature has further counseled that "in construing [the ICFA] consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission." 815 ILCS 505/2.

The State has sufficiently pled each element of its deceptive IFCA claim.

### 1. PBMs Committed a Deceptive Act

The State alleges that the PBM Defendants repeatedly represent—in their SEC filings, before Congress, to the public, and directly to clients/diabetics—that their formularies have the characteristic and benefit of lowering the price of the at-issue drugs and promoting the health of

diabetics.[8] (¶¶ 79, 129, 146–147, 167, 180, 197, 208, 428–440). These representations are false. Rather, the PBMs prefer higher priced diabetes medications and exclude lower priced insulins from their formularies because they make more money off higher list price drugs. (¶¶ 22, 25-26, 333, 344, 441). The PBMs' conduct has significantly increased prices and detrimentally impacted the health of diabetics. (¶¶ 456–469, Figs. 1-11). Such misconduct violates the ICFA. *See* 815 ILCS 505/2; 815 ILCS 510/2(5) (making false representations as to characteristics or benefits is a deceptive practice under the UDTPA).

The State further alleges that the PBMs misrepresent that the Manufacturer Payments they receive reduce the price of the at-issue drugs for diabetics and payors, when in fact these Payments are driving up the price. (¶¶ 26, 146, 365–66, 376–398). The PBMs also use the artificially inflated list price to misrepresent the amount of savings they generate for diabetics, payors, and the healthcare system, knowing that they are directly responsible for the inflated list prices and knowing that the inflated prices are not a *bona fide* price at which diabetes medications are offered to the public. (¶¶ 347–349). Both of these acts also constitute deceptive trade practices under the ICFA. *See* 815 ILCS 505/2; 815 ILCS 510/2(11) (making false/misleading statements concerning price reductions is a UDTPA violation); *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999) (using an artificial, inflated price for the purpose of enabling a subsequent offer of a large reduction in price is an unfair and/or deceptive act under the ICFA) (citing 14 ILL. ADMIN. CODE § 470.110).

In addition to being liable for their independent misconduct, the PBMs are also liable for "their collective efforts in furtherance of the Insulin Pricing Scheme." (¶ 487). As explained in the State's Response to the Manufacturers' 12(b)(6) Motion, the Manufacturers engaged in deceptive

---

[8] The PBMs do not dispute—nor could they—that the alleged conduct occurred in trade or commerce.

trade practices by publishing inflated prices for the at-issue drugs which are untethered from the actual price the Manufacturers were paid for the drugs. *See generally* Pl.'s Opp'n to Mfr. Defs' Mot. to Dismiss ("Manufacturer Resp.");[9] *see also Mississippi ex rel. Fitch*, 2022 WL 3222890, at *13 (S.D. Miss. Aug. 9, 2022) (finding the Manufacturers engaged in deceptive practices by "report[ing] exaggerated prices, knowing that other entities, including the State, relied on these prices."). The PBMs coordinated with the Manufacturers to drive up these prices, (¶ 84, 108, 126, 159, 181, 188-90, 200, 350), and ensured that these inflated prices harm diabetics by intentionally using these prices to set the amounts paid by virtually all payors and diabetics. (¶¶ 22, 27, 112, 165, 206). Thus, the PBMs are liable for their coordinated efforts with the Manufacturers as well. *See Brown v. SBC Communs., Inc.*, 2007 WL 684133, at *6 (S.D. Ill Mar. 1, 2007) (involvement in a fraudulent scheme violates the ICFA).

### 2. The PBMs Intended for Diabetic Consumers to Rely on Their Misrepresentations and the Conduct Occurred in Trade or Commerce

With respect to the second and third deceptive elements, the State alleges that the PBM Defendants intended diabetics and payors to rely on their deceptive conduct.[10] (¶¶ 110-11 (CVS Caremark intended diabetics and payors to rely on formulary construction and representations); ¶167 (Express Scripts intended diabetics and payors to rely on formulary construction and representations); ¶¶ 206-08 (OptumRx intended diabetics and payors to rely on formulary construction and representations); ¶¶ 412; 424 (Defendants intended diabetics to rely on artificially

---

[9] The PBMs argue that Defendants' published list prices are not deceptive under the ICFA. Dkt. 62 at 12-13. This argument is meritless. As explained in the Manufacturer Response, publishing list prices that are untethered to the prices received by the Defendants is deceptive. Manufacturer Resp. at 7-9. The State incorporates by reference herein Plaintiff's Memorandum in Opposition to Manufacturers' Motion to Dismiss First Amended Complaint Under FED. R. CIV. P. 12(b)(6).

[10] The ICFA does not require actual reliance. *Siegel*, 153 Ill. 2d at 542.

inflated prices). And it is undisputed that the PBMs' deception occurred in the course of conduct involving trade or commerce.

The State has sufficiently pled each element of its deceptive ICFA claim.

### ii.     The PBMs' Misconduct Is Also Unfair under the ICFA

In addition to being deceptive under the ICFA, the PBMs' conduct is also unfair.

Illinois courts determine whether conduct is "unfair" under the Consumer Fraud Act on a case-by-case basis. *Dubey v. Public Storage, Inc*., 395 Ill. App. 3d 342, 354 (1st Dist. 2009). The requirements for evaluating unfair conduct are (1) whether the practice offends public policy, (2) whether it is immoral, unethical, oppressive, or unscrupulous, and (3) whether it causes consumers substantial injury. *Id*. All three criteria do not need to be satisfied, as a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Id*. The State has sufficiently alleged facts that satisfy each element of the unfairness standard.

### 1.     The PBMs' Misconduct Offends Public Policy

*First*, the PBMs' misconduct offends public policy as reflected in Illinois law and recent FTC actions. In making this determination, Illinois courts are to look to "whether [the alleged misconduct] is at least within the penumbra of some established concept of unfairness." *Ekl v. Knecht*, 223 Ill. App. 3d 234, 242 (2nd Dist. 1991). As alleged, "[i]t is a public policy in Illinois that diabetics and their families should have access to and not be priced out of the at-issue life-saving medications." (¶¶ 490-491, n. 13). This policy is reflected in the "swift passage" of a recent Illinois bill capping out of pocket insulin costs at $100 a month.[11] *Id*. In discussing this insulin cap

---

[11]*See also* ¶ 491, n. 13 ("Illinois Governor JB Pritzker statement on the passage of SB2969 that required insurances to cover essential diabetic tools, "But for too long, diabetics have had to make the impossible choice between obtaining this necessary medical equipment or putting food on the table. That is an unacceptable burden to ask diabetics to bear.")

bill, Illinois senator Andy Manar stated that the passage of the insulin bill "shows that Illinoisans are united by the simple belief that no family should ever be forced to ration or go without life-saving medication." *Id*. The PBMs' profit-motivated misconduct in furtherance of the Insulin Pricing Scheme directly contravenes this public policy. (¶¶ 456-69, the Insulin Pricing Scheme drives up out of pocket costs and harms diabetic health).

In addition, the ICFA expressly states that "[i]n construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45]." 815 ILCS 505/2. To that end, on June 16, 2022, the FTC issued a policy statement that directly addresses the PBMs' conduct at issue here, titled, *Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products*.[12] In this policy statement, the FTC concluded that "inducing PBMs or other intermediaries to place higher-cost drugs on formularies instead of less expensive alternatives in a manner that shifts costs to payers and patients" may constitute unfair trade practices under Section 5 of the FTC Act.[13] The policy statement went on to "highlight insulin . . . as a prominent example of a prescription drug impacted by high rebates and fees to PBMs and other intermediaries."[14] Accordingly, this FTC policy statement explicitly reflects a public policy against using rebates and formulary construction to drive up the price of insulins and other diabetic treatments, as the PBMs have done in Illinois.

---

[12] https://www.ftc.gov/system/files/ftc_gov/pdf/Policy%20Statement%20of%20the%20Federal%20Trade%20Commission%20on%20Rebates%20and%20Fees%20in%20Exchange%20for%20Excluding%20Lower-Cost%20Drug%20Products.near%20final.pdf. *See Edward Sims Jr. Trust v. Henry Cty. Bd. of Review*, 176 N.E.3d 927, 936 (Ill. App. 2020) ("It is generally accepted that a court may take judicial notice of the information on a government website.")

[13] *Id.* at 5.

[14] *Id*. at 2

The PBMs' alleged misconduct offends Illinois public policy.[15]

## 2.     The PBMs' Misconduct is Oppressive

*Second*, the PBMs' alleged misconduct is also oppressive to Illinois diabetics. Conduct is oppressive under the ICFA if it "leave[s] the consumer with little alternative except to submit to it, and injure the consumer." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002-03 (7th Cir. 2018). As alleged, the Manufacturers make nearly every vial of insulin available in Illinois, (¶¶ 241, 490), and the PBMs have near complete control of the insulin pricing system, (¶¶ 6, 9, 302-09, 311, 490). Further, diabetics need these drugs to stay alive. (¶¶ 4, 464, 490). Indeed, given this market dominance and the fact that their lives literally depend on access to these drugs, diabetics have "little alternative except to submit" to the Insulin Pricing Scheme. (¶ 452). The State's allegations satisfy the second unfairness element.

## 3.     The PBMs' Misconduct Substantially Injured Illinois Diabetics

*Third*, as detailed above, the PBMs use their market dominance to grant preferred formulary status to higher priced at-issue drugs; exclude lower priced, more affordable insulins; hide Manufacturer Payments; and engage in "non-medical formulary switching" to generate additional profits. *See supra* at 6-7. All of this conduct significantly raises the price of the at-issue drugs and damages diabetics' health. (¶¶ 28–33, 456–469). Thus, the Insulin Pricing Scheme is substantially injurious to consumers.

The State has sufficiently alleged its unfair ICFA claim.

---

[15] It is also against Illinois public policy for the PBMs to exploit their non-transparent pricing and reimbursement models in furtherance of the Insulin Pricing Scheme as reflected in the recently passed Illinois PBM legislation. *See, e.g.,* NASPA, *Illinois Governor Signs PBM Legislation*, (Aug. 29, 2019), https://naspa.us/2019/08/illinois-governor-signs-pbm-legislation/ (discussing Illinois legislation creating a regulatory framework for pharmacy benefit managers in the state that includes "[p]roviding more transparency in the pricing and reimbursement models PBMs utilize . . .")

### 4. The PBMs' "Countervailing Benefits" Argument is Meritless

The PBM Defendants' Motion does not include any discussion of—or cite to caselaw related to—the unfairness elements, nor does it argue that the State's allegations fail to satisfy them. Accordingly, those arguments are waived. *People ex rel. Hartigan v. Knecht Services, Inc*., 216 Ill. App. 3d 843, 855 (2nd Dist. 1991) ("Plaintiff has failed to offer any authority in support of this argument, we need not consider it as it is waived.")

Rather, the only argument the PBMs assert is that "the State has not pled facts establishing that the allegedly 'unfair practice' is not outweighed by any countervailing benefits . . .." Dkt. 62 at 13. This argument is contradicted by the State's allegations. The only supposed "countervailing benefits" that PBMs identify is that "by including a drug on their formulary offerings, the PBM Defendants make that drug available to 80% of Illinois citizens." Dkt. 62 at 13. The State, however, is not arguing that simply placing a drug on a formulary (without more) is unfair.[16] Certainly, the PBMs could have benefited diabetics by doing what they say they do—placing lower priced insulins in preferable formulary positions in order to drive down prices and promote diabetic health. But the State alleges that the PBMs did not do that. Rather, the PBMs drove up the price and foreclosed diabetics from medicines they need to stay alive. (¶ 490). There are surely no "countervailing benefits" to such behavior.

---

[16] As demonstrated by the PBMs' own cited authorities, the "countervailing benefit" must arise from the alleged misconduct. *See* Dkt. 62 at 13 (citing *Donnellan v. Travelers Co*., 2022 WL 170046, at *10 (N.D. Ill. Jan. 18, 2022) (insurance companies' credits alleged to be unfair benefitted consumers by lowering their premiums); *Murphy v. Foster Premier, Inc*., 2018 WL 3428084, at *4 (N.D. Ill. July 16, 2018) (excessive retrieval fees alleged to be unfair provided the benefit of providing documents on expedited basis); *Kremers v. Coca- Cola Co*., 712 F. Supp. 2d 759, 768–69 (S.D. Ill. 2010) (court ruled that the false claims about a product's recipe that were alleged to be unfair must have benefitted the consumer because he continued to purchase the product after knowing that the recipe claims were false)).

In sum, the State has sufficiently alleged that the PBMs engaged in both deceptive and unfair trade practices. Respectfully, the PBMs' motion on the State's ICFA claims should be denied.

## B. The PBMs' Counterarguments Are Unavailing[17]

### i. The State Does Not Engage in Improper "Group Pleading"

First, the PBMs argue the State's allegations fail to satisfy Rule 9(b) standards because the complaint inappropriately alleges conduct on the part of "Defendants," "PBMs", or "PBM Defendants." Dkt. 62 at 4-7.[18] As an initial matter, this argument fails as to the PBMs' unfair claims given that Rule 9(b) does not apply. *See supra* at 5-8.

Moreover, the PBMs' "group pleading" argument should be dismissed out of hand—the PBMs cite to only seven paragraphs for support, Dkt. 62 at 6 (citing ¶¶ 6, 22, 24, 26, 317, 330, 404), while disregarding the over 70 allegations that set forth the specific conduct of each PBM Defendant in furtherance of the Insulin Pricing Scheme. (¶¶ 78, 79 (3 allegations), 80–84 (9 allegations), 88, 105, 121, 125, 126 (12 allegations), 129 (3 allegations), 146-47, 151, 156, 159, 165, 168-74, 179–82, 188-93, 197, 199-211, 319, 339, 341, 347, 350, 354 (2 allegations), 362, 393-96, 431 (12 allegations), 432 (7 allegations), 433 (5 allegations), 435–37. *See also infra* at 27-30 (explaining the State's allegations against the PBM Defendant parent companies).

---

[17] The PBMs argue that the State fails to sufficiently allege an ICFA claim on its own behalf. Dkt. 62 at 15-16. This argument misconstrues the State's claims; the complaint does not allege damages on behalf of the State's health plan.

[18] The PBMs also assert that the "Illinois legislature has recognized that PBM negotiated rebates and other discounts from manufacturers are standard industry practice." Dkt. 62 at 4 (citing to the Manufacturers' Motion to Dismiss Plaintiff's Complaint Under FED. R. CIV. P. 12(b)(6)). As explained above, the State's claims are not limited to whether the rebates that the Manufacturers pay to the PBMs are legal or not. *See supra* at 1-2. Further, as explained in the Manufacturer Response, Defendants' argument that state and federal law "specifically authorizes" the alleged misconduct is meritless. *See* Manufacturer Resp. at 16-21.

To the extent that the complaint does refer to "PBMs" or "PBM Defendants," as this Court has recognized, "there is no 'group pleading' doctrine, *per se*, that either permits or forbids allegations against defendants collectively." *Cruz v. City of Chicago*, 2021 WL 2645558, at *4 (N.D. Ill June 28, 2021) (Seeger, J.) (citing *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019)). Rather, "[n]otice is what counts." *Id*. Indeed, even under Rule 9(b),"group pleading" allegations can provide notice where, as here, all Defendants committed the same wrongful acts. *See Joseph v. TGI Friday's, Inc.*, 2022 WL 17251277, at *4 (N.D. Ill. Nov. 28, 2022) (under Rule 9(b) allegations against "multiple defendants adequately plead personal involvement where it is clear that they pertain to all of the defendants").

The complaint's 70+ specific allegations—as well as the allegations referring to the "PBMs" or "Defendants"—certainly put each PBM Defendant on notice of the State's claims against them. *See, e.g., Brown*, 2007 WL 684133, at *6 (in applying Rule 9(b) to a deceptive scheme under the ICFA, "a plaintiff is required to plead only 'slightly more' than is demanded under ordinary notice pleading . . . by supplying 'a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants.")

The PBMs' cited authorities do not instruct otherwise. Dkt. 62 at 6-7 (discussing *Wendt v. Handler, Thayer & Duggan*, 613 F. Supp. 2d 1021, 1034 (N.D. Ill. 2009); *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1043 (N.D. Ill. 2007)).[19] The *Wendt* Court dismissed the plaintiff's claims because the complaint did not include *any* specific allegations. 613 F. Supp. 2d at 1034 (plaintiff's

---

[19] The PBMs' other cited cases are equally unpersuasive. *See* Dkt. 62 at 6 (citing *Phone Recovery Servs. of Ill., LLC v. Ameritech Ill. Metro, Inc*., 2018 IL App (1st) 170968-U, ¶ 37 (2018) (involving Illinois False Claims Act where the complaint contained no specific allegations at all with respect to several defendants); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (involving Securities Acts claims where the complaint contained "no specific information about the alleged fraudulent activities"). Unlike in *Phone Recovery* and *Sears*, the complaint here contains specific allegations with respect to each PBM Defendant's misrepresentations. *See infra* 19-20.

claims against eleven defendants asserted allegations only "against 'Defendants' generally, failing to differentiate the levels of involvement of each in the alleged fraud"). Unlike in *Wendt*, the State's complaint contains dozens of PBM-specific allegations. *See supra* at 16; *infra* at 18-20. *Siegel* is even less convincing. While the *Siegel* court did strike (without prejudice) several non-specific allegations, the court ultimately denied defendant's motion to dismiss with respect to both plaintiff's "unfair" and "deceptive" ICFA claims because "neither claim *requires* proof of an intentional misrepresentation." 480 F. Supp. 2d at 1043-45 (emphasis in original).

The State has properly pled its ICFA claims against each PBM Defendant.

### ii.    The PBMs' Misrepresentations Are Actionable

#### 1.    The PBMs' Misrepresentations Are More Than Puffery or Aspirational Statements

Next, the PBMs argue that none of their alleged misrepresentations are actionable because they are "generalized aspirational statements" or "mere puffery." Dkt. 62 at 8-13. As an initial matter, the PBMs' argument misconstrues the State's claims. The State's ICFA claims are not based solely on the PBMs' misrepresentations. Rather, as stated above, all of the PBM misconduct in furtherance of the Insulin Pricing Scheme is unfair and deceptive. *See supra* at 1-2, 7.

Nonetheless, the PBM misrepresentations alleged in the complaint certainly amount to more than mere "puffery" or "vague expressions of opinions." Dkt 62 at 8-12. In total, the complaint provides nearly 40 representative examples of PBM misrepresentations. For illustrative purposes, here are a few of these allegations:

- CVS Caremark represents that it "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes." (¶ 79)[20]

- Express Scripts represents that it "manage[s] the cost of the drug benefit . . . assists in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary." (¶ 129)[21]

- UnitedHealth Group's Sustainability Report states that OptumRx represents that it "works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies—or drug lists—to ensure people get the right medications." (¶ 180)

- In January 2016, Express Scripts president Tim Wentworth stated that "[Express Scripts] saved our clients more than $3 billion through Express Scripts National Preferred Formulary." (¶ 347)

- In April 2019, CVS Caremark President Derica Rice stated that "over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend." (¶ 347)

- On May 11, 2010, CVS Caremark released a statement focused on diabetes to "help us add value for our PBM clients to improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of

---

[20] As stated in the complaint, these statements come from CVS Caremark/CVS Health's Annual Reports (Form 10-K) (Dec. 31, 2009-2019) (¶ 79, n. 5).

[21] As stated in the complaint, these statements come from Express Scripts' Annual Reports (Form 10-K) (Dec. 31, 2009-2019) (¶129, n 9).

diabetes could save approximately $3.3 million a year in medical expenditures." (¶ 431)

- On August 31, 2016, Express Scripts Senior Vice President and Chief Innovation Officer Glen Stettin released a statement that included the following: "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease." (¶ 431)

- On August 31, 2016, Express Scripts Senior Vice President and Chief Innovation Officer Glen Stettin released a statement that Express Scripts broadens insulin options for patients and bends down the cost curve of what is currently the costliest class of traditional prescription drugs. (¶ 431).

- In January 2017, Tim Wentworth, CEO of Express Scripts, represented that "without PBMs, and specifically without Express Scripts, our clients would pay [many times] more for [insulin]." (¶ 431).

- OptumRx's website has stated the services it provides help improve health outcomes for patients while making prescription drugs more affordable for plan sponsors and individuals. (¶ 432).

These misrepresentations (as well as the other 30+ allegations in the complaint) bear no resemblance to the jingle slogans and vague opinion statements found to be "puffery" in the PBMs' cited authority. Dkt. 62 at 8-12 (citing *Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 323 (E.D.N.Y. 2001) ("You're in good hands with Allstate"); *Moody v. Ocwen Loan Servicing, LLC*, 2016 WL 8814352, at *4 (C.D. Cal. Feb. 22, 2016) ("Helping Homeowners Is What We Do!"); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106–07, 1112–13 (10th Cir. 2009) ("You take care of

your dream. We'll take care of everything else."); *Barbara's Sales, Inc. v. Intel Corp*., 227 Ill. 2d 45, 72–74 (2007) ("[Pentium Processor] 4 is better than [Pentium Processor] 3."); *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 173-74 (2005) ("quality replacement parts"); *Breckenridge v. Cambridge Homes*, 246 Ill. App. 3d 810, 823 (2nd Dist. 1993) ("expert workmanship" and "perfect home"); *Spiegel v. Sharp Elecs. Corp.*, 125 Ill. App. 3d 897, 902 (1st Dist. 1984) ("picture perfect copies"); *Ridings v. Am. Family Ins. Co*., 2021 WL 722856, at *4 (N.D. Ill. Feb. 24, 2021) ("pledges of trust and support").[22]

Rather, the complaint is replete with allegations that the PBMs misrepresent that they lower the price of insulin (with certain allegations including the exact dollar amount) and promote the health of diabetics. Such statements are representations of fact and thus actionable under the ICFA. *See Totz v. Continental Du Page Acura*, 236 Ill. App. 3d 891, 904-05 (2nd Dist. 1992) (rejecting puffing argument because the representations were of fact rather than merely defendants' opinion).

Indeed, three different federal courts have rejected the PBMs' "puffery" argument in analogous cases. In the recent Mississippi Attorney General insulin case, the Southern District of Mississippi rejected near identical puffery arguments brought by these same PBM Defendants in denying a motion to dismiss. *See Mississippi,* 2022 WL 18401603, at *3-4. In addition, in two cases before federal district courts in Minnesota and New Jersey, *In re EpiPen* and *In re Direct*

---

[22] The remaining PBM authorities are equally unconvincing. The PBMs cite to a RICO mail fraud case and two Securities Act cases, each from different jurisdictions and each involving laws with different pleading requirements and standards. Dkt. 62 at (citing *Forsyth v. Humana Inc*., 114 F.3d 1467, 1481 (9th Cir. 1977) (RICO); *Emps.' Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) (Securities Act); *Kiger ex rel. Qualcomm Inc. v. Mollenkopf*, 2021 WL 5299581, at *3 (D. Del. Nov. 15, 2021) (Securities Act)). Unlike these cases, the State's allegations recited above do not involve "highly subjective" or "aspirational statements." *Forsyth*, 114 F.3d at 1481 (finding defendant's commercial touting that it could "control costs" was too general to rely on as a method to calculate insurance premiums); *Whole Foods Mkt., Inc.*, 905 F.3d at 901 (generalized statements about quality were insufficient to support a securities fraud claim); *Kiger*, 2021 WL 5299581, at *3 (aspirational statements about "including women and racially/ethnically diverse candidates in the [nominee] pool" found to be not actionable).

*Purchaser Insulin Pricing Litig.*, the courts determined that the plaintiffs sufficiently alleged fraud based on the PBMs' (1) misrepresentations that they use their negotiating power to "reduce health plans costs" and act in the "best interests" of their clients, and (2) mischaracterizations that the payments that the PBMs received from manufacturers are "discounts," while refusing to disclose the amounts of these payments that they retained. *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *19 (D. Minn. Jan. 15, 2021); *In re Direct Purchaser Insulin Pricing Litig.,* 2021 WL 28862165 (D.N.J. July 9, 2021).

Respectfully, the Court should do the same here and reject the PBMs' puffery argument.

## 2. *Noerr-Pennington* Does Not Apply on a Motion to Dismiss

The PBMs also argue that the Court should ignore the PBMs' misrepresentations to Congress based on the *Noerr-Pennington* doctrine. Dkt. 97 at 17. This argument is not appropriate at the pleading stage.

At the dismissal stage, the PBM Defendants have yet to establish the predicate for invoking the *Noerr-Pennington* doctrine, and the State has had no opportunity to conduct discovery of such a predicate, if any. *See Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 359–60 (4th Cir. 2013) ("[T]he *Noerr-Pennington* doctrine is an affirmative defense," and a motion to dismiss "cannot reach the merits of an affirmative defense [unless] all facts necessary to the affirmative defense clearly appear on the face of the complaint.") Accordingly, courts have routinely declined to address the *Noerr-Pennington* doctrine on a motion to dismiss. *Navient Sols. LLC v. Law Offices of Jeffrey Lohman,* 2020 WL 1867939, at *4 (E.D. Va. Apr. 14, 2020); *In re Apple Inc. Sec. Litig.,* 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020).

Even assuming, *arguendo*, that the *Noerr-Pennington* argument is ripe and applies to the Congressional hearing allegations on a motion to dismiss (it does not), the State has nonetheless

sufficiently pled its ICFA claims based on factual allegations that do not arise from any congressional testimony given by the PBMs or their representatives.

### 3. The State Alleges Facts Establishing the PBMs' Statements Are False and Material

In cursory fashion, the PBMs also argue that the State fails to allege facts that would establish that the PBMs' statements are false and/or material to Illinois diabetics. Dkt. 62 at 13-14. Again, the PBMs ignore dozens of allegations setting forth the falsity of the PBMs' statements: (1) that they lower the price diabetics and payors pay for the at-issue drugs (¶¶ 357-62, 378-82, 392-398; 441-443, Figs. 1-11 (demonstrating price increases caused by PBM conduct)); (2) that they promote the health of diabetics (¶¶ 444, 456-469 (demonstrating PBMs' conduct damages health of diabetics)); and (3) that they are transparent with diabetics and payors (¶¶ 376-398, 430, 441-444 (demonstrating PBMs are not transparent with diabetics and payors)).[23] And the PBMs' representations are certainly material—they speak to the very core of the PBMs' supposed role in the pharmaceutical market.

### iii. The State Has Sufficiently Alleged Its ICFA Claims Premised on the Illinois Uniform Deceptive Trade Practices Act ("UDTPA")

In addition to alleging that the PBMs' misconduct violates the broad prohibitions of the ICFA, the State also alleges that the PBMs have violated the UDTPA (which is expressly incorporated into the ICFA, 815 ILCS 505/2) by: (1) misrepresenting "that their formularies and the Manufacturer Payments they receive have the characteristic and benefit of lowering the price

---

[23] In each of the PBMs' cited authority, the plaintiff either failed to adequately allege or produced no evidence that defendants' representations were false. *Connick v. Suzuki Motor Co.,* 174 Ill. 2d 482, 502 (1996) (failed to include any allegations explaining how misrepresentations in owner's manual were false); *Fitzpatrick v. A C F Props. Grp.,* 231 Ill. App. 3d 690, 711 (2nd Dist. 1992) (failed to produce any evidence at trial that defendants knew that their statements regarding safety were false and failed to identify person who made misrepresentations); *Toulon v. Cont'l Cas. Co.,* 2016 WL 561909, at *6 (N.D. Ill. Feb. 12, 2016). As explained above, the State's complaint sufficiently alleges that the PBMs' representations were false.

of the at-issue drugs and promoting the health of diabetics," and (2) utilizing the artificially inflated price to make false and/or misleading statements regarding the amount of savings that the PBMs generate for Illinois diabetics, payors, and the Illinois healthcare system. *See supra* at 9-12.

In conclusory fashion, the PBMs argue the State has failed to plead a UDTPA violation. Dkt. 62 at 14-15. In doing so, the PBMs only assert that the State's UDTPA claims fail "for the same reasons that the [ICFA] claims do." *Id*. For all reasons stated herein, the State has sufficiently pled that the PBMs have violated both the UDTPA and, as a result, the ICFA.

### C.  The State Has Properly Pled Unjust Enrichment

Under Illinois law, to state a cause of action for unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience. *Kenneke v. First Nat'l Bank*, 65 Ill. App. 3d 10, 12 (1st Dist. 1978).

The State has alleged facts that establish these elements. The State alleges that the Insulin Pricing Scheme created enormous profits for all Defendants, including the PBMs. (¶ 374-409; ¶ 305 (PBMs "stand to profit from the artificial prices"); ¶ 338 ("PBM Defendants' profits are directly tied to the Manufacturers' list prices" because "PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price"); ¶¶ 341-43 ("…PBMs have also requested and received larger and larger administrative fee payments from the Manufacturers" … "reaching more than $16 billion")). In other words, the PBMs received, knew of, and retained benefits from the Insulin Pricing Scheme. These benefits were a direct result of the increased insulin prices that worked to the detriment of Illinois diabetics. It would be inequitable for the PBMs to retain these profits generated by their unfair and deceptive scheme that has caused so much harm.

Rather than address these elements directly, the PBMs instead argue that because contracts exist between and among the PBMs, Manufacturers, pharmacies, and payors an unjust enrichment claim is improper. Further, the PBMs contend that the State may not pursue an unjust enrichment claim in its *parens patriae* capacity. Dkt. 62 at 16-21. Neither of these arguments has merit.

### i.      The State's Unjust Enrichment Claim is Not Foreclosed by Contract

First, the fact that the PBMs contract with the Manufacturers, pharmacies, and payors is irrelevant to the unjust enrichment claim because those contracts do not exist between the unjust enrichment claimant (here, Illinois diabetics) and the unjustly enriched beneficiaries (here, the PBMs). *See* Manufacturer Resp. at 21-22.

Each of the cases the PBMs cite for their "contractual" defense involve contracts to which the litigants are parties. *See Nesby v. Country Mut. Ins. Co*., 346 Ill. App. 3d 564, 567 (5th Dist. 2004) (unjust enrichment claim premised on contract between plaintiff policy holder and defendant insurer); *Cooper v. Durham Sch. Servs*., 2003 WL 22232833, at *6–7 (N.D. Ill. Sept. 22, 2003) (contract governed the parties' relationship); *First Midwest Bank v. Cobo*, 90 N.E.3d 567, 575 (Ill. App. 1st Dist. 2017) (same); *Harris Cnty. v. Eli Lilly & Co.*, 2022 WL 479943, at *14 (S.D. Tex. Feb. 16, 2022) (the County contracted with PBMs and did "not assert that it failed to receive the benefit of its bargain."). The same is not true here—no contract exists that governs the dispute at issue in this lawsuit.

The State's unjust enrichment claims are not barred by any contract.

### ii.      The State May Bring Unjust Enrichment Claims in Its *Parens Patriae* Capacity

The State may assert claims in its *parens patriae* capacity if a defendant's misconduct harms the physical and economic health and well-being of its residents in general. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982). Here, the State asserts claims on behalf of

millions of Illinois residents whose physical and economic health and well-being have been damaged by the Insulin Pricing Scheme. These claims include seeking restitution for the inequitable gains the PBMs have reaped through their unfair and deceptive misconduct. The State is properly acting in its *parens patriae* capacity.

The PBMs' contention that courts have "expressed skepticism at the notion of *parens patriae* standing for unjust-enrichment claims" lacks merit. Dkt. 97 at 22. In support, PBMs cite three cases. Not one of the three cases support PBMs' argument.

The decision in *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 478-79 (D.P.R. 2020), arose in an antitrust case, which is distinct from this case. Moreover, the court's decision relied on law specific to Puerto Rico and pleading elements that are not present here. *Id.* at 476-77. *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1079, 1098-1104 (S.D. Cal. 2018), did not involve the question PBMs cite it for—rather, in that case the court addressed equitable standing generally and simply dismissed the unjust enrichment count because it found that the Plaintiff had not alleged sufficient impacts on a "significant portion of its population," which was a threshold standing requirement separate and apart from the elements of unjust enrichment. *Id.* at 1096, 1101. Notably, the court dismissed the count without prejudice. *Id.* at 1104-05. The third case, *In re Auto. Parts Antitrust Litig.*, 2021 WL 148004, at *4-5 (E.D. Mich. Jan. 15, 2021), did not question whether an unjust enrichment claim was appropriate in *parens patriae* cases; it merely held that the plaintiff could not use an unjust enrichment claim to end-run a failure to establish required elements for an antitrust claim.

Finally, the PBMs' argument that unjust enrichment is unavailable here overlooks the statutory powers granted to the Attorney General by the ICFA. The ICFA authorizes the court to

exercise all powers necessary, including awarding restitution, to carry out the statute's provisions. 815 ILCS 505/7. Hence, the right to equitable relief cannot be limited as the PBMs suggest.

To note, the PBMs also argue that "the unjust enrichment claim that the State brings on its own behalf is time-barred." Dkt. 62 at 20-21. The State, however, is not asserting an unjust enrichment on its own behalf, but rather only on behalf of Illinois diabetics. The PBMs do not assert any argument—nor could they—that either the State's unjust enrichment claims or its ICFA claims on behalf of Illinois diabetics are barred by any statute of limitations. *See, e.g., Illinois v. Tri-Star Indus. Lighting, Inc*., 2000 U.S. Dist. LEXIS 14948, *7 (N.D. Ill 2000) [**Exhibit A**] (holding the ICFA statute of limitations does not apply to claims brought by the State). Accordingly, those arguments are waived. *Hartigan*, 216 Ill. App. 3d at 855; *see also* Manufacturer Resp. at 24-30, incorporated herein by reference.[24]

### D.    The State Sufficiently Pleads its Claims Against the Parent Companies and OptumInsight[25]

The State has alleged claims against each of the PBM corporate parents based on their own conduct, not merely the conduct of their subsidiaries. As set forth fully in the State's responses to the jurisdictional motions filed by these parent entities, the State is not alleging liability against these entities simply due to their size or corporate structure.[26] Rather, based on the extensive

---

[24] Even if any statute of limitations did apply to the State's claims (they do not), all limitations have been tolled and, as result, the State's claims are not barred. *See* Manufacturer Resp. at 24-30.

[25] "Parents" means Evernorth Health, Inc., CVS Health Corporation, CVS Pharmacy, Inc., OptumInsight, Inc., and UnitedHealth Group Incorporated.

[26] *See* Plaintiff's Memorandum in Opposition to UnitedHealth Group Incorporated and OptumInsight, Inc.'s Motion to Dismiss under Rule 12(b)(2) for Lack of Personal Jurisdiction; Plaintiff's Memorandum in Opposition to CVS Health Corporation's Motion to Dismiss Under Rule 12(b)(2); Plaintiff's Memorandum in Opposition to Evernorth Health, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction, incorporated herein.

information the State already possesses—even before discovery—that each of these parents was directly involved in the Insulin Pricing Scheme.[27]

Each of these parents subjected itself to jurisdiction in Illinois by violating the ICFA. Even the PBMs' own authority acknowledges that parent companies directly involved in the alleged wrongdoing may not escape the consequences of their actions through corporate gamesmanship. *See United States v. Bestfoods*, 524 U.S. 51, 64-66 (1998) (stating, "the fact that a corporate subsidiary happens to own [the entity that caused the harm] . . . does nothing, then, to displace the rule that the parent corporation is itself responsible for the wrongs committed by its agents in the course of its business."). In *Forsythe v. Clark USA, Inc.*, the Illinois Supreme Court set forth the standard by which parent entities can be held directly liable in Illinois: "direct participant liability is a valid theory of recovery under Illinois law . . . [w]here there is evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy and carried that strategy out by its own specific direction or authorization . . . that parent company could face liability." 224 Ill. 2d 274, 290 (2007). The State's allegations satisfy this standard.

As explained in more detail in the State's jurisdictional responses, the complaint sets forth uncontroverted allegations that Evernorth, CVS Health, UnitedHealth Group and OptumInsight mandated an overall business strategy and carried out that strategy in furtherance of the Insulin Pricing Scheme. *See* Pl.'s Opp. to Evernorth Health Inc's Mot. to Dismiss for Lack of Jurisdiction; Pl.'s Opp. to CVS Health Inc's Mot. to Dismiss for Lack of Jurisdiction; Pl.'s Opp. to UnitedHealth Group Incorporated and OptumInsight's Mot. to Dismiss for Lack of Jurisdiction. Each of these parents was directly involved in the formulary construction, strategic formulary initiatives, and

---

[27] *Id.*

Manufacturer Payment negotiations that gave rise to the Insulin Pricing Scheme, including in Illinois. (¶¶ 79-81, 105 (CVS Health); 123, 129, 156 (Evernorth); 179-80, 182, 197, 350 (UnitedHealth Group)). Further, these parents, including their CEOs and top executives, carried out the Insulin Pricing Scheme by directly engaging in meetings with the Manufacturers. (¶¶ 82-84 (CVS Health), 124-26 (Evernorth), 181 (UnitedHealth Group)). The conduct of these parents had the intended and foreseeable effect of harming Illinois diabetics and the State. (¶¶ 28–33, 456–469). These allegations, taken as true for purposes of motion, sufficiently allege that the parents were engaged in the conduct that gave rise to the Insulin Pricing Scheme. *See Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011).

PBM Defendants endeavor to distract from the above substantive allegations by focusing in their 12(b)(6) motion on CVS Pharmacy Inc and OptumInsight. Dkt. 62 at 23-24. Notably, the PBMs do not put forth any specific argument with respect to any of the other parents beyond CVS Pharmacy. *Id*. However, even with respect to CVS Pharmacy, the PBMs' argument is unconvincing. Throughout the relevant time period, CVS Pharmacy dispensed millions of vials of insulin in Illinois and profited from the artificially inflated price on each of these prescriptions. (¶¶ 93-98). CVS Pharmacy was the direct point of contact between Illinois diabetics and the CVS family with respect to each at-issue drug dispensed pursuant to the Insulin Pricing Scheme. Indeed, CVS Pharmacy was an integral part of the Insulin Pricing Scheme. Likewise, OptumInsight analyzed data, including data specific to Illinois, and engaged directly with the Manufacturers to advise all Defendants on setting the at-issue list prices and constructing the at-issue formularies in a manner that was most profitable. (¶¶ 188-93, 322, 350). CVS Pharmacy and OptumInsight were also engaged in the conduct that gave rise to the Insulin Pricing Scheme.

The PBMs' cited authority does not support dismissing the PBM parents. In *Moeckel v. Caremark Rx Inc.*, the Court found that the parent was not liable for contract-based claims because only its subsidiary was a party to the contract. 385 F. Supp. 2d 668, 674 (M.D. Tenn. 2005). *Moeckel* is not applicable here as there are no contract-based claims. In addition, in both of the cited *Mississippi* holdings, the court analyzed liability based on theories of agency and alter ego and found that the plaintiff had failed to allege sufficient facts demonstrating that the parent controlled its subsidiaries. 2022 WL 3222890, at *14–16; 2022 WL 18401603, at *3. As discussed above, the State here does not have to rely on such theories because the complaint alleges that the parents were directly involved in the Insulin Pricing Scheme. *See Forsythe,* 224 Ill. 2d at 290.

Respectfully, the Court should deny the motion to dismiss with respect to the parent entities.

## VI. CONCLUSION

For the foregoing reasons, the PBM Defendants have failed to establish that no claim has been stated upon which relief can be granted, and their Motion to Dismiss should be denied.

If the Court is inclined to dismiss any claims, the State respectfully requests the Court afford the State an opportunity to amend the complaint. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave when justice so requires.")

RESPECTFULLY SUBMITTED this the 6th day of April, 2023.

/s/ Josh Wackerly
Joanne Cicala (pro hac vice)
Josh Wackerly (pro hac vice)
R. Johan Conrod (pro hac vice)
THE CICALA LAW FIRM PLLC
Dripping Springs, TX 78620
Tel: (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com
johan@cicalapllc.com

David F. Buysse, IL Bar # 3126915
Deputy Chief, Public Interest Division
ILLINOIS ATTORNEY GENERAL'S OFFICE
100 W. Randolph Street – 12th Floor
Tel: (312) 590-7844
david.buysse@ilag.gov

Darren Kinkead, IL Bar # 6304847
Deputy Chief, Special Litigation Bureau
ILLINOIS ATTORNEY GENERAL'S OFFICE
100 W. Randolph Street – 11th Floor
Tel: (773) 590-6967
darren.kinkead@ilag.gov

Edwin S. Gault, Jr., IL Bar # 6314552
Walter G. Watkins, III., Bar ID # 100314
Tanya D. Ellis, Bar ID # 101525
FORMAN WATKINS & KRUTZ
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375
Tel: (601) 960-8600
Fax: (601) 960-8613
Win.Gault@formanwatkins.com
Tanya.Ellis@formanwatkins.com
Trey.Watkins@formanwatkins.com

Matthew C. McDonald, Bar ID # 105966
DAVID NUTT & ASSOCIATES
605 Crescent Blvd, Suite 200
Ridgeland, MS 39157
Tel: (601) 898-7302
mattm@davidnutt.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 6, 2023, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to all counsel of record.

<i>/s/ Josh Wackerly</i>

Josh Wackerly

32

# EXHIBIT A

 Neutral

As of: April 6, 2023 8:09 PM Z

# *Illinois v. Tri-Star Indus. Lighting, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

October 11, 2000, Decided ; October 12, 2000, Docketed

No. 99 C 8156

## Reporter

2000 U.S. Dist. LEXIS 14948 *

STATE OF ILLINOIS, Plaintiff, v. TRI-STAR INDUSTRIAL LIGHTING, INC., an Illinois Corporation, Defendant.

**Disposition: [*1]** Plaintiff's renewed motion to strike defendant's affirmative defenses granted.

## Core Terms

Telemarketing, Consumer Fraud Act, statute of limitations, attorney general, affirmative defense, limitations, restitution, violations, damages

## Case Summary

### Procedural Posture

Plaintiff renewed its motion to strike defendant's affirmative defenses to plaintiff's cause of action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, *15 U.S.C.S. § 6101 et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act, *815 Ill. Comp. Stat. 505/1 et seq.*

### Overview

Plaintiff state filed an action against defendant under the Telemarketing and Consumer Fraud and Abuse Prevention Act, (Telemarketing Act), *15 U.S.C.S. § 6101 et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), *815 Ill. Comp. Stat. 505/1 et seq.* As an affirmative defense to both the Telemarketing Act and Consumer Fraud Act claims asserted against it, defendant argued that all or a portion of plaintiff's claim was barred by a three-year statute of limitations. Plaintiff argued that neither the Telemarketing Act nor the Consumer Fraud Act limited the time period in which the state could sue, and filed a motion to strike defendant's affirmative defense based on the statute of limitations. The court agreed with the

plaintiff, noting that the plain meaning of the language in both acts was that there was no statute of limitations on Telemarketing Act claims or Consumer Fraud Act claims filed by a state.

### Outcome

Plaintiff's renewed motion to strike defendant's affirmative defenses was granted. Three-year statute of limitations that applied to private causes of action did not apply to the plaintiff State's Consumer Fraud Act claim.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

### *HN1*[ ] **Defenses, Demurrers & Objections, Motions to Strike**

*Fed. R. Civ. P. 12(f)* permits a federal district court to strike any insufficient affirmative defenses from any pleading. Motions to strike, however, are generally disfavored and may only be granted if the defense asserted is patently defective and could not succeed under any set of circumstances. If there is any set of facts that would support the affirmative defense and defeat the complaint, the motion must be denied.

Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

2000 U.S. Dist. LEXIS 14948, *1

HN2[↓] **Federal Acts, Telephone Consumer Protection Act**

See *15 U.S.C.S. § 6103*.

    Governments > Legislation > Statute of Limitations > General Overview

    Governments > Legislation > Interpretation

HN3[↓] **Legislation, Statute of Limitations**

When a federal statute is unambiguous, the federal courts must enforce the plain meaning of the language enacted by Congress.

    Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telemarketing & Consumer Fraud & Abuse Prevention Act

    Governments > Legislation > Interpretation

    Governments > Legislation > General Overview

HN4[↓] **Federal Acts, Telemarketing & Consumer Fraud & Abuse Prevention Act**

In determining congressional intent, the courts look to the particular statutory language at issue, as well as the design of the statute as a whole.

    Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

HN5[↓] **Federal Acts, Telephone Consumer Protection Act**

See *15 U.S.C.S. § 6104*.

    Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

    Civil Procedure > Sanctions > Contempt > General Overview

    Governments > Legislation > Statute of Limitations > Time Limitations

    Criminal Law & Procedure > ... > Obstruction of Administration of Justice > Contempt > General Overview

    Governments > Legislation > Statute of Limitations > General Overview

HN6[↓] **Federal Acts, Telephone Consumer Protection Act**

*15 U.S.C.S. § 6107(d)* expressly states that the two-year limitations period applies only to criminal contempt proceedings initiated by the Federal Trade Commission.

    Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

    Civil Procedure > Sanctions > Contempt > General Overview

    Governments > Legislation > Statute of Limitations > General Overview

HN7[↓] **Federal Acts, Telephone Consumer Protection Act**

See *15 U.S.C.S. § 6107(d)*.

    Antitrust & Trade Law > Consumer Protection > Telemarketing

    Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telemarketing & Consumer Fraud & Abuse Prevention Act

    Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telephone Consumer Protection Act

    Governments > Legislation > Statute of Limitations > General Overview

    Governments > Legislation > Statute of Limitations > Time Limitations

HN8[↓] **Consumer Protection, Telemarketing**

2000 U.S. Dist. LEXIS 14948, *1

*16 C.F.R. § 310.5* contains no limitations period at all, but a record-keeping requirement for telemarketers.

Governments > Legislation > Interpretation

*HN9*[↓] **Legislation, Interpretation**

Federal courts must interpret a state statute as that state's courts would construe it.

Governments > Legislation > Interpretation

*HN10*[↓] **Legislation, Interpretation**

In Illinois, the primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. The best evidence of that intent is the language of the statute. Where the legislature's intent can be ascertained from the plain language of the statute, that intent must prevail and will be given effect without resort to other aids for construction.

Antitrust & Trade Law > Consumer Protection > General Overview

Governments > Legislation > Statute of Limitations > General Overview

*HN11*[↓] **Antitrust & Trade Law, Consumer Protection**

See *815 Ill. Comp. Stat. 505/7(a)*.

Business & Corporate Compliance > ... > Communications Law > Federal Acts > Telemarketing & Consumer Fraud & Abuse Prevention Act

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Interpretation

*HN12*[↓] **Federal Acts, Telemarketing & Consumer Fraud & Abuse Prevention Act**

The court must evaluate the language of the statute as a whole, considering each part or section in connection with every other part of section.

Antitrust & Trade Law > Consumer Protection > General Overview

Governments > Legislation > Statute of Limitations > General Overview

*HN13*[↓] **Antitrust & Trade Law, Consumer Protection**

See *815 Ill. Comp. Stat. 505/10a(e)*.

Antitrust & Trade Law > Consumer Protection > General Overview

*HN14*[↓] **Antitrust & Trade Law, Consumer Protection**

The state's request for monetary relief in an Illinois Consumer Fraud and Deceptive Business Practices Act, *815 Ill. Comp. Stat. 505/1 et seq.*, suit does not transform it into a private action.

**Counsel:** For STATE OF ILLINOIS, plaintiff: John A. Ruberti, Amy Fletcher, Illinois Attorney General's Office, Chicago, IL.

For TRI-STAR INDUSTRIAL LIGHTING, INCORPORATED, defendant: David H. Latham, Attorney at Law, Jill L. Jennings, Law Offices of David H. Latham, Chicago, IL.

**Judges:** Paul E. Plunkett, Senior Judge.

**Opinion by:** Paul E. Plunkett

# Opinion

## MEMORANDUM OPINION AND ORDER

The State of Illinois has sued defendant for its alleged violations of the Telemarketing and Consumer Fraud and Abuse Prevention Act, *15 U.S.C. § 6101, et seq.* ("Telemarketing Act"), and the Illinois Consumer Fraud and Deceptive Business Practices Act, *815 ILL. COMP. STAT. 505/1, et seq.* ("Consumer Fraud Act"). The case is before the Court on plaintiff's renewed motion to strike defendant's affirmative defenses. For the reasons set

forth below, plaintiff's motion is granted.

## Discussion

*HN1*[⬆] *Federal Rule of Civil Procedure 12(f)* permits this Court to strike any insufficient affirmative defenses from any pleading. Motions to strike, however, are generally disfavored and may only be granted if "the **[*2]** defense [asserted] is patently defective and could not succeed under any set of circumstances." *Carpenter v. Ford Motor Co., 761 F. Supp. 62, 65 (N.D. Ill. 1991)* (citations omitted). If there is any set of facts that would support the affirmative defense and defeat the complaint, the motion must be denied. *Bobbitt v. Victorian House, 532 F. Supp. 734, 737 (N.D. Ill. 1982)*.

As an affirmative defense to both the Telemarketing Act and Consumer Fraud Act claims asserted against it, defendant states: "All or a portion of Plaintiff's claim is barred by the applicable statute of limitations." (See Answer at 9, 10, 14.) Plaintiff contends that neither the Telemarketing Act nor the Consumer Fraud Act limits the time period in which the State can sue. The Court agrees.

In relevant part, the Telemarketing Act provides:

> *Whenever* an attorney general of any State has reason to believe that the interests of the residents of that State have been or are being threatened or adversely affected because any person has engaged or is engaging in a pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this **[*3]** title, the State, as parens patriae, may bring a civil action on behalf of its residents in an appropriate district court of the United States to enjoin such telemarketing, to enforce compliance with such rule of the Commission, to obtain damages, restitution, or other compensation on behalf of residents of such State, or to obtain such further and other relief as the court may deem appropriate.

*HN2*[⬆] 15 U.S.C. § ("section") 6103 (emphasis added). The statute says nothing else about the time in which a State must sue for violations of the Act. "*HN3*[⬆] When a [federal] statute is unambiguous, we must enforce the plain meaning of the language enacted by Congress." *Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp., 76 F.3d 824, 828 (7th Cir. 1996)* (internal quotation marks and citation omitted).

The plain meaning of the language in this section is that there is no statute of limitations on Telemarketing Act claims filed by a State.

A review of the other sections of the statute bolsters the plain meaning interpretation. See *Damato v. Hermanson, 153 F.3d 464, 471 (7th Cir. 1998)* ("*HN4*[⬆] In **[*4]** determining congressional intent, we look to the particular statutory language at issue, as well as the design of the statute as a whole.") (internal quotation marks and citation omitted). In *section 6104*, the Telemarketing Act provides a private right of action for violations of the statute. In stark contrast to *section 6103*, however, this portion of the statute expressly limits the time in which private parties may seek relief:

> Any person adversely affected by any pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this title, or an authorized person acting on such person's behalf, may, *within 3 years after discovery of the violation*, bring a civil action in an appropriate district court of the United States against a person who has engaged or is engaging in such pattern or practice of telemarketing if the amount in controversy exceeds the sum or value of $ 50,000 in actual damages for each person adversely affected by such telemarketing.

*HN5*[⬆] *15 U.S.C. § 6104* (emphasis added). As this section illustrates, Congress was conscious of limitations periods when it enacted the statute and included one **[*5]** where it thought appropriate. Thus, its failure to do so in *section 6103* evidences a deliberate legislative choice, not an oversight subject to judicial correction.

Despite this clear congressional intent, defendant argues that we can imply a two-year statute of limitations based on the limitations periods set forth in *section 6107* of the statute and *section 310.5* of the implementing regulations. A cursory review of these provisions dispatches this argument. *HN6*[⬆] *Section 6107* of the statute expressly states that the two-year limitations period applies only to criminal contempt proceedings initiated by the Federal Trade Commission. *HN7*[⬆] *15 U.S.C. § 6107(d)* ("The authority of the Federal Trade Commission to bring a criminal contempt action under subsection (a) of this section expires 2 years after the date of the first promulgation of rules under section 6102 of this title."). Moreover, *HN8*[⬆] *section 310.5* of the regulations contains no limitations period at all, but a record-keeping requirement for

2000 U.S. Dist. LEXIS 14948, *5

telemarketers. See *16 C.F.R. § 310.5*. Neither of these unambiguous provisions supplies any basis for imposing a two-year statute of limitations on Illinois' Telemarketing Act **[*6]** claim.

Next, we turn to the Consumer Fraud Act. "*HN9*[↑] Federal courts must interpret a state statute as that state's courts would construe it." Brownsburg Area Patrons Affecting Change v. Baldwin, 137 F.3d 503, 507 (7th Cir. 1998). *HN10*[↑] In Illinois, "the primary rule of statutory construction is to ascertain and give effect to the the intent of the legislature." *Bruso v. Alexian Bros. Hosp., 178 Ill. 2d 445, 451, 687 N.E.2d 1014, 1016, 227 Ill. Dec. 532 (1997)*. The best evidence of that intent is the language of the statute. Id. "Where the legislature's intent can be ascertained from the plain language of the statute, that intent must prevail and will be given effect without resort to other aids for construction." *Id., 178 Ill. 2d at 452, 687 N.E.2d at 1016*.

The plain language of the Consumer Fraud Act provides:

> *Whenever* the Attorney General or a State's Attorney has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by this Act to be unlawful, and that proceedings would be in the public interest, he or she may bring an action in the name of the People of the State against **[*7]** such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction; revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

*HN11*[↑] *815 ILL. COMP. STAT. 505/7(a)* (emphasis added). The statute otherwise says nothing about the time in which the State can file a Consumer Fraud Act claim. The plain meaning of this provision is that there is no statute of limitations on Consumer Fraud Act claims filed by the State.

The other provisions of the statute support the plain meaning interpretation. See *Bruso, 178 Ill. 2d at 451-52, 687 N.E.2d at 1016* ("*HN12*[↑] The court must evaluate

the language of the statute as a whole, considering each part or section in connection with every other part of section."). Like the Telemarketing Act, the Consumer **[*8]** Fraud Act provides a private right of action with an explicit limitations period:

> Any [private] action for damages . . . shall be forever barred unless commenced within 3 years after the cause of action accrued; provided that, whenever any action is brought by the Attorney General or a State's Attorney for a violation of this Act, the running of the foregoing statute of limitations, with respect to every private right of action for damages which is based in whole or in part on any matter complained of in said action by the Attorney General or State's Attorney, shall be suspended during the pendency thereof, and for one year thereafter.

*HN13*[↑] *815 ILL. COMP. STAT. 505/10a(e)*. Plainly, the Illinois Legislature is capable of creating a statute of limitations when it wishes to do so. Thus, its failure to do so for Consumer Fraud Act claims filed by the State reflects a conscious legislative choice that we cannot disturb.

Nor are we persuaded that the State's request for restitution transforms its suit into a private action subject to the three-year limitation. First, the same statutory provision that permits the State to file suit without time limitations, provides that restitution **[*9]** is one of the remedies available to it. See *815 ILL. COMP. STAT. 505/7(a)*. Second, the Illinois Appellate Court has rejected the notion that *HN14*[↑] the State's request for monetary relief in a Consumer Fraud Act suit transforms it into a private action:

> An action filed by the Attorney General under the [Consumer Fraud] Act is essentially a law enforcement action designed to protect the public, not to benefit private parties. The statute expressly authorizes the Attorney General to enjoin illegal practices and to collect actual damages. . . . Although restitution may benefit aggrieved consumers, the remedy flows from the basic policy that those who engage in proscribed conduct or practices surrender all profits flowing therefrom. Because the nature and object of the Act and its remedies are indisputably the protection of the public interest, we believe that the legislature intended the State to be the only real party in interest, . . . .

*People ex rel. Hartigan v. Lann, 225 Ill. App. 3d 236, 240-41, 587 N.E.2d 521, 524, 167 Ill. Dec. 252 (1st Dist.*

2000 U.S. Dist. LEXIS 14948, *9

*1992).* As in <u>Lann</u>, the State has filed suit in this case to protect the public, not to benefit private **[*10]** parties. Consequently, the three-year statute of limitations that applies to private causes of action does not apply to the State's Consumer Fraud Act claim.

<u>Conclusion</u>

For the reasons set forth above, plaintiff's renewed motion to strike defendant's affirmative defenses is granted.

**ENTER:**

**Paul E. Plunkett**

**UNITED STATES DISTRICT JUDGE**

**DATED:** <u>10-11-00</u>

End of Document