IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE STATE OF ILLINOIS, ex rel., KWAME RAOUL, ATTORNEY GENERAL<br><br>*Plaintiff,*<br><br>v.<br><br>ELI LILLY AND COMPANY, et al.<br><br>*Defendants.* | Civil Action No. 1:23-cv-170 |

**EVERNORTH HEALTH, INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 1

    I.    The State Still Fails to Show that Evernorth Ever Purposefully Directed Activities at Illinois. ................................................................................................ 1

    II.    The State Failed to Show Evernorth Intentionally Targeted Illinois. ...................... 5

    III.    The State Is Not Entitled to Jurisdictional Discovery. ............................................ 6

CONCLUSION ....................................................................................................................... 6

# TABLE OF AUTHORITIES
Page(s)

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................3

*Borislow v. Canaccord Genuity Grp. Inc.*,
  2014 WL 12580259 (S.D. Fla. June 27, 2014) ........................................................2

*BRABUS GmbH v. Individuals Identified on Schedule A Hereto*,
  2022 WL 7501046 (N.D. Ill. Oct. 13, 2022)............................................................5

*C. Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*,
  2021 WL 3725680 (E.D. Mo. Aug. 23, 2021)..........................................................2

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
  230 F.3d 934 (7th Cir. 2000) .................................................................................3, 6

*Gilman Opco LLC v. Lanman Oil Co.*,
  2014 WL 1284499 (N.D. Ill. Mar. 28, 2014)............................................................6

*IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*,
  136 F.3d 537 (7th Cir. 1998) ...................................................................................2

*Karling v. Samsara Inc.*,
  610 F. Supp. 3d 1094 (N.D. Ill. 2022) .....................................................................4

*N. Grain Marketing, LLC v. Greving*,
  743 F.3d 487 (7th Cir. 2014) ...................................................................................5

*NBA Properties, Inc. v. HANWJH*,
  46 F.4th 614 (7th Cir. 2022) ....................................................................................6

*In re Sheehan*,
  48 F.4th 513 (7th Cir. 2022) ................................................................................1, 6

*uBid, Inc. v. GoDaddy Grp., Inc.*,
  623 F.3d 421 (7th Cir. 2010) ...................................................................................6

*Whaley v. Esebag*,
  946 F.3d 447 (8th Cir. 2020) ...................................................................................2

*WorkForce Software, LLC v. Workforce.com, Inc.*,
  2021 WL 4963608 (N.D. Ill. Oct. 26, 2021)............................................................3

## INTRODUCTION

Defendant Evernorth Health, Inc. ("Evernorth"), formerly Express Scripts Holding Company, moved to dismiss under Rule 12(b)(2) the State of Illinois' claims against it for lack of personal jurisdiction. In response, the State has failed to point to allegations or evidence to support the exercise of personal jurisdiction over Evernorth, a company with no presence in Illinois.

The State concedes that Evernorth is not subject to general jurisdiction in Illinois, Opp'n at 9 n.3, and its efforts to claim the Court can exercise specific jurisdiction over Evernorth fall flat. Despite introducing extrinsic evidence, the State still fails to show that Evernorth purposefully directed any activities to Illinois or that Evernorth ever intentionally targeted Illinois in any way. Evernorth's subsidiaries are the entities that have tried to sell products and services to Illinois. Evernorth, the parent company, has not. Accordingly, it should be dismissed for lack of personal jurisdiction.

## ARGUMENT

**I.    The State Still Fails to Show that Evernorth Ever Purposefully Directed Activities at Illinois.**

At a constitutional minimum, this Court can only exercise personal jurisdiction over defendants that have "purposefully directed their activities at the forum state or purposefully availed themselves of the privilege of conducting business in the forum." *In re Sheehan*, 48 F.4th 513, 522 (7th Cir. 2022). In opposing dismissal, the State does not assert that Evernorth "purposefully availed itself" of Illinois privileges, relying instead on assertions that Evernorth "purposefully directed" its conduct at Illinois. *See* Opp'n 10. But the State fundamentally fails to show that Evernorth—as distinct from its co-defendant subsidiaries that do not challenge personal jurisdiction—ever purposefully directed any conduct at Illinois.

1

Most of the State's allegations identified in the Opposition refer to "Express Scripts" collectively rather than Evernorth specifically. *See* Opp'n at 11 (citing Compl. ¶¶ 157, 164, 167, 170, 174).[1] These allegations are of no moment to the jurisdictional question because a plaintiff "must submit evidence supporting personal jurisdiction over each defendant, and cannot simply lump them all together." *C. Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*, 2021 WL 3725680, at *4 (E.D. Mo. Aug. 23, 2021) (internal quotations and citation omitted); *Borislow v. Canaccord Genuity Grp. Inc.*, 2014 WL 12580259, at *5 (S.D. Fla. June 27, 2014) ("it is insufficient to indiscriminately lump defendants together in asserting jurisdictional allegations" (internal quotations and alterations omitted)).

Stripped of group pleading, the State can point to only five paragraphs in its pleading that purport to identify conduct by Evernorth specifically. *See* Opp'n at 11 (citing Compl. ¶¶ 121–23, 129, 156). Most of these allegations only show that Evernorth may have shared executives with subsidiaries or otherwise supervised their activities. Compl. ¶ 121 (alleging Evernorth is "involved in shaping the company policies" of its subsidiaries); ¶ 123 (alleging "Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities"); ¶ 156 (alleging "numerous interlocking dictatorships and shared executives" between Evernorth, Express Scripts, Inc. and other subsidiaries). Such allegations are unremarkable because "[p]arents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent." *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d

---

[1] Weaker still, the State points to allegations regarding the actions taken by the main PBM trade association, the Pharmacy Care Management Association ("PCMA")—an entity the State does not claim to be even a subsidiary of Evernorth. *See* Opp'n at 11 (citing Compl. ¶¶ 319–320, 330). At no point does the State allege Evernorth through its involvement in PCMA met in or directed activity towards Illinois. *Cf. Whaley v. Esebag*, 946 F.3d 447, 452 (8th Cir. 2020) (weighing meetings that took place in Arkansas in favor of specific jurisdiction, but not meetings in California).

537, 540 (7th Cir. 1998). And more to the point, they are insufficient as a matter of law because "constitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary." *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000); *see also* Evernorth Br. at 5. The State does not even argue that Evernorth engages in such a high degree of control, ceding the point.

This leaves two other allegations that actually mention Evernorth specifically. One is the textbook definition of conclusory: "Evernorth's conduct has had a direct effect in Illinois and damages diabetics and payors in Illinois." Compl. ¶ 122. Such conclusory allegations must be disregarded. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009) ("[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context."); *WorkForce Software, LLC v. Workforce.com, Inc.*, 2021 WL 4963608, at *4 (N.D. Ill. Oct. 26, 2021) (showing of personal jurisdiction must be "based on specific facts set forth in the record, rather than ... conclusory allegations.") (cleaned up)

Finally, in Paragraph 129 the State purports to quote from Express Scripts' annual reports. But the State's alterations subbing in [Evernorth] for "Express Scripts" cannot support personal jurisdiction. In reality, when Express Scripts Holding Company submitted an annual report, it made it clear that any reference to "Express Scripts" referred not just to the holding company but "Express Scripts Holding Company and its subsidiaries on a consolidated basis." Ex. 1 ("When we use the terms "Express Scripts," the "Company," "we," "us" or "our" in this Annual Report on Form 10-K, we mean Express Scripts Holding Company and its subsidiaries on a consolidated

3

basis, unless we state or the context implies otherwise."). [2] The Court can ignore this allegation contradicted by the document incorporated by reference. *See, e.g.*, *Karling v. Samsara Inc.*, 610 F. Supp. 3d 1094, 1102 (N.D. Ill. 2022) ("document outside the pleadings controls when it is incorporated by reference or attachment and directly contradicts the assertions in the complaint.").

As an implicit recognition that its pleading fails to support jurisdiction, the State tries to salvage its claim to jurisdiction by attaching a declaration that former Express Scripts president Amy Bricker submitted in litigation Cigna Corporation initiated against her after she left for a competitor. But if anything, the declaration—written by a defendant former employee Evernorth's parent company has sued—shows that Evernorth did not engage in any PBM-related businesses directed toward Illinois. Bricker explained that the key PBM issues presented by this case—the negotiation of manufacturer rebates—remained solely in Express Scripts' wheelhouse. *See* Opp'n Ex. 1 ¶ 28 ("The Express Scripts Supply Chain SVP reported to me, as President of Express Scripts. This team has responsibility for pharmaceutical manufacturer as well as retail pharmacy contracts."). And while an Evernorth executive recently was assigned the responsibility for preparing bids to clients, those bids were for *Express Scripts* rather than Evernorth. *See id.* ¶ 23 ("I oversaw Express Scripts' competitive bidding process, but I was not responsible for preparing *Express Scripts'* bids to Payor Entities; this was done by William Spehr SVP of Sales" (emphasis added)).

The particulars are consistent with Ms. Bricker's general view that Evernorth was merely a "constellation of businesses" and not a standalone PBM. *Id.* ¶ 45. ("[E]ach of the Evernorth

---

[2] The State includes a conclusory footnote in its complaint purporting to cite the reports, but the State does not attach these Annual Reports to its pleading. An excerpt of the last publicly available annual report of Express Scripts Holding Company (Evernorth's prior name) for the fiscal year ending in 2017 is attached to the Declaration of Jason R. Scherr attached hereto.

4

Functional Business Units operated as independently siloed businesses under the Evernorth umbrella."). She even went so far as to claim that she was told that the Evernorth Senior Leadership Team "was not a decision-making body." *Id.* ¶ 49. Regardless of the veracity of Ms. Bricker's assertions against her former employer, they do not support any conclusion that Evernorth was a PBM.[3]

## II. The State Failed to Show Evernorth Intentionally Targeted Illinois.

To show that Evernorth "purposefully directed" its conduct toward Illinois, the State must show that Evernorth "intentionally targeted" Illinois in furtherance of the alleged scheme. *See N. Grain Marketing, LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014) ("The defendant's conduct and connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there"). On this front, too, the State falls short.

The State claims that Evernorth "intentionally designed bids for PBM services to *Illinois* payors, sold those PBM services to *Illinois* payors, provided PBM services to *Illinoisans*, created formularies for use in *Illinois*, and dispensed the at-issue drugs to *Illinoisans in Illinois*." Opp'n at 12. But once again, that argument is not supported by allegations or evidence. *See supra* at I. This failure to tie Evernorth specifically to actual sales of its own goods or services makes the cases they rely on inapposite as well. All three of the cases cite involve instances where a business was willing to sell infringing products in Illinois. *BRABUS GmbH v. Individuals Identified on Schedule A Hereto*, 2022 WL 7501046, at *3 (N.D. Ill. Oct. 13, 2022) (website selling infringing

---

[3] The State's failure to provide either allegations or evidence that Evernorth itself (as compared to its subsidiaries) had any contacts with Illinois also destroys its argument that the State's claims "arise out of or relate to" Evernorth's contacts with the forum. Opp'n at 14. The State argues that its claims relate to Evernorth's contacts with the State because it asserts that Evernorth does its "own work as an Illinois PBM." *Id.* But, as shown above, the State has not plausibly alleged that Evernorth is a PBM in any capacity.

5

good that stated a willingness and ability to sell into Illinois purposefully availed itself to Illinois); *NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 624 (7th Cir. 2022) (online store asserting a "willingness to ship goods to Illinois" and "internationally shipping an infringing product to the customer's designated Illinois address" purposefully directed conduct to Illinois); *uBid, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 427 (7th Cir. 2010) (GoDaddy's registration of infringing domains were available for sale in Illinois). But here, Plaintiff has not shown that Evernorth sells anything to Illinois—let alone a product or service at issue in this case.

### III. The State Is Not Entitled to Jurisdictional Discovery.

The Court should also reject the State's alternative request for jurisdictional discovery. The State bears the burden to show discovery is necessary. As the State concedes, a "plaintiff does not have an automatic right" to jurisdictional discovery. *Gilman Opco LLC v. Lanman Oil Co.*, 2014 WL 1284499, at *6 (N.D. Ill. Mar. 28, 2014). A plaintiff is not "entitled to discovery to establish essentially speculative allegations necessary to personal jurisdiction." *In re Sheehan*, 48 F.4th 513, 527 (7th Cir. 2022). To unlock the doors to jurisdictional discovery, the State must first make a "prima facie" showing of personal jurisdiction. *Central States, Se & Sw Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000). As demonstrated above, the State has failed to make such a showing here. Accordingly, the State's request for jurisdictional discovery should be denied.

### CONCLUSION

The Court should dismiss Evernorth from this case for lack of personal jurisdiction.

Date: May 4, 2023

Respectfully submitted,

*/s/ Beth Herrington*
Beth Herrington (#624547)
Morgan, Lewis & Bockius LLP

6

110 North Wacker Drive
Chicago, Illinois 60606
Tel: (312) 324-1000
beth.herrington@morganlewis.com

-and-

Jason R. Scherr (*pro hac vice*)
Patrick A. Harvey (#995570)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 739-3000
jason.scherr@morganlewis.com
patrick.harvey@morganlewis.com

*Attorneys for Evernorth Health, Inc. (formerly Express Scripts Holding Company)*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE STATE OF ILLINOIS, ex rel.,<br>KWAME RAOUL, ATTORNEY GENERAL<br><br>*Plaintiff,*<br><br>v.<br><br>ELI LILLY AND COMPANY, et al.<br><br>*Defendants.* | Civil Action No. 1:23-cv-170 |

## DECLARATION OF JASON R. SCHERR

I, Jason R. Scherr, hereby declare as follows:

1. I am over 18 years of age, am of sound mind and body, and under no legal disability. I have personal knowledge of the facts set forth in this declaration.

2. I am a partner at the law firm Morgan, Lewis & Bockius LLP and represent Evernorth Health, Inc. (formerly Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc. (collectively, "Express Scripts") in this matter.

3. I submit this declaration in support of Defendant Evernorth Health, Inc.'s Reply in support of its Motion to Dismiss under Fed. R. Civ. P. 12(b)(2).

4. On an annual basis, Express Scripts Holding Company (Evernorth's prior name) filed a Form 10-K report, the last of which was for the fiscal year ending in 2017. An excerpt from this 10-K report is attached as E hi it .

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 4, 2023

>  _/s/ Jason R. Scherr_
>  Jason R. Scherr

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 4, 2023

                                                  _/s/ Jason R. Scherr_
                                                Jason R. Scherr

# Exhibit 1

10-K 1 esrx-12312017x10k.htm 10-K
[Table of Contents](#)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
 **FOR THE FISCAL YEAR ENDED DECEMBER 31, 2017, OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
 **FOR THE TRANSITION PERIOD FROM ____ TO ____.**

Commission File Number: 1-35490

# EXPRESS SCRIPTS HOLDING COMPANY
(Exact name of registrant as specified in its charter)

| Delaware | 45-2884094 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| One Express Way, St. Louis, MO | 63121 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (314) 996-0900
Securities registered pursuant to Section 12(b) of the Act:

| Title of Class | Name of each exchange on which registered |
|---|---|
| Common Stock $0.01 par value | Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of Registrant's voting stock held by non-affiliates as of June 30, 2017, was $36,773,795,228 based on 576,030,627 shares held on such date by non-affiliates and a closing sale price for the Common Stock on such date of $63.84 as reported on the Nasdaq Global Select Market. Solely for purposes of this computation, the Registrant has assumed that all directors and executive officers of the Registrant are affiliates of the Registrant. The Registrant has no non-voting common equity.

Common stock outstanding as of January 31, 2018:  564,347,000 Shares

**DOCUMENTS INCORPORATED BY REFERENCE**

    Part III incorporates by reference portions of the definitive proxy statement for the Registrant's 2018 Annual Meeting of Stockholders, which is expected to be filed with the Securities and Exchange Commission not later than 120 days after the registrant's fiscal year ended December 31, 2017.

*Information included in or incorporated by reference in this Annual Report on Form 10-K, other filings with the Securities and Exchange Commission (the "SEC") and our press releases or other public statements, contains or may contain forward-looking statements. Please refer to a discussion of our forward-looking statements and associated risks in "Part I — Item 1 — Business — Forward-Looking Statements and Associated Risks" and "Part I — Item 1A — Risk Factors" in this Annual Report on Form 10-K.*

PART I
THE COMPANY

**Item 1 — Business**

**Industry Overview**

Prescription drugs play a significant role in healthcare today and constitute the first line of treatment for many medical conditions. For many, prescription drugs provide the hope of improved health and quality of life.

Total medical costs for employers continue to outpace the rate of overall inflation, in particular, the increase in high cost drugs to treat complex conditions such as cancer, hepatitis and multiple sclerosis. National health expenditures as a percentage of gross domestic product are expected to increase to 20% in 2026 from 18% in 2017 according to the Centers for Medicare & Medicaid Services ("CMS"). With increasing cost pressures being exerted on health benefit providers such as managed care organizations, health insurers, employers and unions, there is an increasing role for pharmacy benefit management ("PBM") companies to develop innovative strategies to put medicine within reach of patients by making better health more affordable and accessible.

PBM companies typically combine retail pharmacy claims processing and network management, formulary management, utilization management and home delivery pharmacy services to develop an integrated product offering to manage the prescription drug benefit for payors. Some PBMs also offer specialty medication services that deliver a more effective solution than many retail pharmacies in providing treatments for diseases that rely upon high-cost injectable, infused, oral or inhaled drugs. Some PBMs have also broadened their service offerings to include medication adherence programs, outcomes research, drug therapy management programs, sophisticated data analysis and distribution services.

**Company Overview**

We are the largest independent PBM company in the United States, offering a full range of services to our clients, which include managed care organizations, health insurers, third-party administrators, employers, union-sponsored benefit plans, workers' compensation plans, government health programs, providers, clinics, hospitals and others. We put medicine within reach of patients while helping health benefit providers improve access to prescription drugs by making them more affordable. We can improve patient outcomes and help control the cost of the drug benefit by:

- identifying products and offering solutions that focus on improving patient outcomes and assist in controlling costs;
- evaluating drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary;
- offering cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members;
- leveraging purchasing volume to deliver discounts to health benefit providers; and
- promoting the use of generics and lower-cost brands.

We work with clients, manufacturers, pharmacists and physicians to improve members' health outcomes and satisfaction, increase efficiency in drug distribution and manage costs of the pharmacy benefit. We believe our clients can achieve the best financial and health outcomes when they use our comprehensive set of solutions to manage drug spend. For example, our management toward greater use of generic drugs and lower-cost brand drugs has resulted in significant reductions in spending for our health benefit plan clients and their members.

We have two business segments based on the products and services we offer: PBM and Other Business Operations. See further description of our segments within "Part I — Item 1 — Business — Segment Information."

Our revenues are generated primarily from the delivery of prescription drugs through our contracted network of retail pharmacies, our home delivery pharmacies and our specialty pharmacies. Revenues from the delivery of prescription drugs represented 98.2% of our revenues in 2017, 98.3% in 2016 and 98.0% in 2015. Revenues from services, such as fees for the

2

administration of formulary management processing for certain client contracts that do not include claims adjudication and the dispensing of prescription drugs, medical benefit management services, as well as, other fee-for-service arrangements, such as medication counseling services and certain specialty services accounted for the remainder of our revenues.

Prescription drugs are dispensed to members of the health plans we serve primarily through networks of retail pharmacies under non-exclusive contracts with us and through home delivery fulfillment pharmacies, specialty drug pharmacies and fertility pharmacies we operate. More than 68,000 retail pharmacies, which represent over 98% of all United States retail pharmacies, participated in one or more of our networks as of December 31, 2017. The top ten retail pharmacy chains in the United States represent approximately 67% of the total number of stores in our largest network.

Express Scripts, Inc. ("ESI") was incorporated in Missouri in September 1986, and was reincorporated in Delaware in March 1992. Aristotle Holding, Inc. was incorporated in Delaware in July 2011. On April 2, 2012, ESI consummated a merger (the "Merger") with Medco Health Solutions, Inc. ("Medco") and both ESI and Medco became wholly-owned subsidiaries of Aristotle Holding, Inc. Aristotle Holding, Inc. was renamed Express Scripts Holding Company (the "Company" or "Express Scripts") concurrently with the consummation of the Merger. When we use the terms "Express Scripts," the "Company," "we," "us" or "our" in this Annual Report on Form 10-K, we mean Express Scripts Holding Company and its subsidiaries on a consolidated basis, unless we state or the context implies otherwise.

Our principal executive offices are located at One Express Way, Saint Louis, Missouri, 63121. Our telephone number is (314) 996-0900 and our website is www.express-scripts.com. Information included on our website is not incorporated into this annual report.

**Segment Information**

We report segments on the basis of the products and services we offer and have determined we have two reportable segments: PBM and Other Business Operations.

See "Part I — Item 1 — Products and Services" of this Annual Report on Form 10-K for further description of our products and services. See "Part II — Item 8 —Note 13 - Segment information" of this Annual Report on Form 10-K for further description of our segments.

**Products and Services**

*Pharmacy Benefit Management Services*

*Overview.* Our PBM services involve management of prescription drug utilization and cost to drive high quality, cost-effective pharmaceutical care. We consult with clients to assist in the selection of plan design features that balance clients' requirements for cost control with member choice and convenience. We focus our solutions to enable better decisions in four important and interrelated areas: benefit choices, drug choices, pharmacy choices and health choices. As a result, we believe we deliver better outcomes, higher member satisfaction and a more affordable prescription drug benefit. During 2017, 95.2% of our revenues were derived from our PBM operations, compared to 96.2% and 97.3% during 2016 and 2015, respectively.

*Clinical Solutions.* We offer innovative clinical programs to drive better health outcomes at lower cost by identifying and addressing unsafe, ineffective and wasteful prescribing, dispensing and utilization of prescription drugs and intervening with, or supporting interventions with, physicians, pharmacies and patients. RationalMed® evaluates medical, pharmacy and laboratory data to detect critical patient health and safety issues which are then addressed through timely notification to physicians, pharmacies, patients and case managers. ScreenRx® uses proprietary predictive models to detect patients at risk for nonadherence and proactively addresses the problem through interventions tailored specifically for that patient. Express*Alliance*® offers patient care coordination services that enable patient-authorized healthcare professionals to share a common view of a patient's health record and coordinate patient outreach and counseling. Advanced Opioid Management℠ solution works comprehensively with patients, prescribers and pharmacies to minimize early exposure to opioids while helping prevent progression to overuse and abuse.

*Express Scripts SafeGuardRx®.* We offer a suite of solutions targeting therapy classes that pose clinical challenges for patients and a significant budgetary threat to our clients. Our solutions focus on keeping our clients ahead of the cost curve while providing patients the care and access they need. These solutions include (but are not limited to): Pulmonary Care Value Program℠; Multiple Sclerosis Care Value Program℠; Inflammatory Conditions Care Value Program℠; Diabetes Care Value Program℠; Hepatitis Cure Value Program®; Cholesterol Care Value Program®; Oncology Care Value Program®; Market Events Protection Program®; and Inflation Protection Program℠. These solutions are offered throughout our PBM services.

3