

**Melissa A. Geist**
Direct Phone: +1 609 514 5978
Email: mgeist@reedsmith.com

Reed Smith LLP
506 Carnegie Center
Suite 300
Princeton, NJ 08540-7839
+1 609 987 0050
Fax +1 609 951 0824
reedsmith.com

August 30, 2024

**VIA ECF & EMAIL**
The Honorable Rukhsanah L. Singh, U.S.M.J.
United States District Court
District of New Jersey
Clarkson S. Fisher Fed. Bldg. & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

> Re: <u>In re: Insulin Pricing Litigation</u>
> <u>No. 2:23-md-03080-BRM-RLS</u>
> <u>Defendants' Position Paper Regarding Fact Sheets in</u>
> <u>Self-Funded Payer Track</u>

Dear Judge Singh:

Defendants respectfully request that the Court order Plaintiffs in the Self-Funded Payer Track ("Payers") to complete Defendants' proposed Plaintiff Fact Sheet and accompanying targeted document requests, and reject Plaintiffs' proposal to require Defendant Fact Sheets.

Defendants' proposed Plaintiff Fact Sheet (Ex. 1) is essential to inform the next phases of this MDL. Defendants' proposed Plaintiff Fact Sheet seeks information—short of full document, deposition, and expert discovery—necessary for two goals: *First,* to determine how to efficiently structure further discovery (*e.g.*, by identifying common issues to prioritize for resolution, or by grouping the 49 cases in this Track into discovery stages or representative discovery pools based on key merits issues); and *second,* to target dispositive issues for early resolution or motion practice, as contemplated by proposed Rule 16.1. To those ends, Defendants' proposed Plaintiff Fact Sheet seeks information and documents addressing the key elements of Payers' deception, misrepresentation, fraud-based, and unconscionability claims.

In contrast, Payers' proposed stripped-down Plaintiff Fact Sheet (Ex. 2) suffers from two fundamental defects: *First*, it is too limited, in that it omits questions necessary for the Court and the parties to assess how to stage Payers' cases. *Second*, Payers try to disclaim any obligation to answer their own fact sheets. Under Payers' approach, they can decline to answer questions, refuse to provide essential custodial discovery, and instead produce a hand-selected set of documents, requiring Defendants to hunt through those documents to guess at the right answer for each Payer. This would defeat the purpose of a Plaintiff Fact Sheet.

Payers' resistance to providing foundational information at the Fact Sheet stage frustrates the progression of this track. Payers do not dispute the relevance of the information and documents

requested by Defendants. Nor could they dispute that they possess at least some of the information, since Rule 11 required Payers to investigate their claims *before* filing their complaints. But they nevertheless seek to dodge responsibility for providing Defendants' requested information for all but a handful of "discovery pool" cases. Their proposal, if accepted, would leave Defendants in the dark—and for the majority of cases, Defendants would potentially *never* obtain such vital information.

And Payers now insist—in a striking reversal of their prior position—on propounding *Defendant* Fact Sheets.[1] Defendant Fact Sheets would serve no purpose, since each Defendant will already be providing full discovery to the MDL Plaintiffs. Payers recently explained that their only "rationale for defendant fact sheets is that" information from pharmacy benefit managers (PBMs) may be "necessary … to respond to plaintiff fact sheets." Ex. 4, Aug. 13, 2024 Hr'g Tr. at 10:21-11:04, 14:15-14:20.

Payers' approach has only one goal—to maximize Defendants' discovery burdens while limiting or minimizing Payers' obligation to produce discovery. In recent marketing materials, counsel actively solicit new plaintiffs by expressly promising that this *entire* case will only require potential Payers to complete a "questionnaire" and spend "a few hours of staff time." *See* Ex. 5 (highlighted portions) at 2. Whatever the benefits to Payers' counsel, such a lopsided approach will serve no legitimate purpose organizing Payers' fraud and deception claims into stages or groupings for orderly disposition. Payers' proposal should be rejected.

I.  **Background: The Payers' Shifting Claims**

Payers are counties and municipal governments bringing claims for supposed harm they suffered as third-party payers for their employees' health plans. Originally, Payers alleged Defendants engaged in a conspiracy to "artificially inflate the list price of insulin" so Manufacturers could pay "ever-increasing rebates" to PBMs (King SAC ¶¶ 1, 213, ECF No. 160), creating a "secret 'spread' between published prices and their true net prices" (Payers' JPML Br. at 9, *In re Insulin Pricing Litig.*, MDL No. 3080, ECF No. 35 (JPML June 2, 2023)). According to Payers, this "[s]cheme" caused their health plans "to overpay for these life-saving medications." King SAC ¶ 3, ECF No. 160.

Those allegations could never withstand scrutiny because—as Payers later admitted in their oppositions to Defendants' motions to dismiss—Payers knew that their contracts with PBMs required rebates to be passed through to them. Payers also now admit (despite their allegations of a "secret spread") that they "knew that the Manufacturers paid rebates, creating a gap between list

---

[1] There was no mention of Defendant Fact Sheets in the parties' May 2024 letters outlining their competing discovery proposals. *See* ECF Nos. 166, 168. At the hearing a week later, Payers told the Court that "Plaintiffs have not proposed to defendants that there be a defendant fact sheet." Ex. 3, May 13, 2024 Hr'g Tr. at 69:20-69:24, see also 38:19-38:22 (Payers' counsel confirming mention of a defendant fact sheet "was a slip on my part"). Accordingly, there was no mention of Defendant Fact Sheets in the resulting Case Management Order #10. *See* ECF No. 198. To the contrary, the order clearly provided that the remaining issues on which the parties were to meet and confer consisted of "Master Discovery Requests and Plaintiff Fact Sheets." *Id.* at 3.



and net prices." ECF No. 256 at 34; *see also* ECF No. 257 at 5 ("payment of rebates is a longstanding practice").

In light of these admissions, Payers' opposition significantly shifted their theory of the case. The "heart" of Payers' claims is now that some of the money Manufacturers paid to PBMs should have been—but was not—passed through to Payers under the terms of their contracts. ECF No. 256 at 13; *see also* ECF No. 257 at 1, 5, 8, 13, 25, 30, 36. Planning MDL discovery to address this new theory requires a comparison of Payers' common or varied experience soliciting, contracting for, and receiving PBM services, so it is essential that Payers answer Plaintiff Fact Sheet questions on those topics.

While those plaintiff fact sheet answers will be key, Payers also have said they still intend to present evidence of their prior theory. In conferring over the proposed fact sheet, Payers still contend that the price of diabetes medication is "artificially inflate[d]"; that the prices paid "by consumers … for diabetes medications have skyrocketed"; and that "Defendants have engineered these escalating prices to exponentially increase their profits at the expense of … [Payers'] plan beneficiaries." King SAC ¶¶ 1, 4-6, ECF No. 160. As such, Payers' insistence on also maintaining their old allegations necessitates discovery into those topics as well.

**II.   Defendants' Proposed Plaintiff Fact Sheet Requests Will Facilitate An Efficient And Informed Approach To This MDL.**

This Court previously recognized that "[c]ommon subject areas for discovery exist across each case," and instructed the parties to try to negotiate "Master Discovery Requests and/or Fact Sheets, as appropriate." ECF No. 198 at 2; *see also* Ex. 3, May 13, 2024 Hr'g Tr. at 35:21-36:03. Defendants' proposal is intended to yield the facts necessary to assess the best way to advance discovery and efficiently move the MDL forward, "conserv[ing] judicial and party resources." ECF No. 198 at 1. Conversely, Payers' proposal would fail to provide key facts and allegations on topics across cases (such as the purported misrepresentations and omissions, when Payers had notice, and Payers' choices in constructing their health insurance offerings), and would force Defendants to proceed into the next phase of this litigation with asymmetric information.

**A.   Only Defendants' proposal will yield sufficient information for the parties to determine the MDL's next phases.**

Defendants' proposed fact sheet is appropriate for several reasons.

*First*, robust Plaintiff Fact Sheets are necessary to inform the future stages of this MDL, including document discovery, depositions, expert discovery, dispositive briefing, and other pre-trial phases. After insisting that Payers should not have to provide traditional discovery under the Federal Rules and should only answer uniform fact sheets, Payers now object to those fact sheets being detailed enough to serve their stated purpose. Payers assert that Defendants are only entitled to a sliver of information at this time, because someday they will get full discovery of a small subset of "representative" cases that become part of a "discovery pool." Critically, under Payers' proposal, for the cases that are not part of a "discovery pool," Defendants will only ever receive the narrow discovery on Payers' proposed Fact Sheet. Payers' position makes it all the more

important for each Payer to provide sufficient information as part of Fact Sheet discovery.

The issue of whether representative discovery pools are appropriate—and, if so, how they should be structured—should be reserved until after fact sheets are completed. But detailed fact sheets would be necessary to choose cases for discovery pools were the Court ultimately to adopt representative discovery pools. Discovery pools comprising only a subset of cases must be representative of the other cases in the MDL, and, if necessary to choose a subset of cases, Defendants need adequate discovery to assess representativeness. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019-21 (5th Cir. 1997); *see also Morgan v. Ford Motor Co.*, 2007 WL 1456154, at *6 (D.N.J. May 17, 2007); *In re 2004 DuPont Litig.*, 2006 WL 5097316, at *2 (E.D. Ky. Mar. 8, 2006) (rejecting plaintiffs' proposal to "designate approximately 30 'bellwethers' to serve as 'representative' plaintiffs" for discovery because this proposed discovery "limitation…is premature" "until additional discovery is obtained by defendants").

Robust fact sheets also are necessary if the Court adopts an alternative to representative discovery pools. For example, cases could be grouped by common features or issues (such as those identified in Section II.B) and staggered into discovery waves such that only limited groups of Payers participate in a certain discovery stage at any one time, or discovery as to certain issues are prioritized. *See, e.g.*, Stipulation and Order Modifying Pretrial Schedule for "Track One" Direct Action Plaintiff and State AG Cases, ECF No. 3051 (July 8, 2011) & Order Re: Pretrial and Trial Schedule for Track Two Direct Action Cases, ECF No. 6105 (July 9, 2012), *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-1827 (N.D. Cal.) (setting discovery deadlines for one track that overlapped with the pretrial deadlines for a separate track); Ex. 3, May 13, 2024 Hr'g Tr. at 25:01-25:24 (discussing "prioritiz[ing] [an] issue for resolution because it's going to impact, say, a hundred as opposed to just five [cases]"); *see also Case Management Order No. 31, In re: 3M Combat Arms Earplug Products Liability Litig.,* No. 3:19-md-2885 (N.D. Fla. Nov. 22, 2021) (requiring the parties to initiate discovery in "waves" of cases, with the first three "Wave Orders" including "approximately 500 cases per wave"). Under *any* approach, Defendants need the information they request in the Fact Sheet and accompanying limited document requests in order to plan discovery's next steps.

*Second*, answers to Defendants' proposed Fact Sheet can streamline this MDL by leading to the prompt elimination of certain cases or claims, on either an individual or group basis. For example, if a Payer acknowledges that it was aware of its claims earlier than the time frame allowed by the statute of limitations, its claims may be subject to early motion practice. Defendants' proposed fact sheet includes several questions (29-34) designed to elicit this information.

*Third*, Payers' responses may identify issues for additional targeted discovery. For example, this Court has already barred payers, like those here, from pursuing RICO claims because they are indirect purchasers. *See MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S., LLC*, 2019 WL 1418129, at *14-15 (D.N.J. Mar. 29, 2019). Defendants' proposed fact sheet seeks information about from whom Payers allegedly directly purchased (Question 40). Payers' answers to this threshold question could dispose of a number of claims early on, and it could identify cases for which targeted discovery into direct purchasing claims are appropriate.

Unless Payers respond to Defendants' proposed Fact Sheet, Payers will have the benefit of

August 30, 2024
Page 5



full information about their cases—as well as hundreds of thousands of documents Manufacturer Defendants already have produced—while Defendants will be flying blind. Defendants need substantive, detailed information about Payers' claims, including the differences between Payers, *prior* to determining the MDL's next phase.[2]

### B. Defendants' proposal covers key legal and factual issues across Payers.

All of Defendants' requests for information relate to topics pertinent to all Payers, and serve the goal of efficiently advancing the SFP Track cases. For the Court's reference, Defendants have included a chart comparing the at-issue Questions and Requests in Defendants' proposal with those in Payers' proposal. *See* Ex. 6.

*Payers' Rebates and Use of Rebates* (Questions 11, 19-21, 24). Payers refuse to answer *any* questions that disclose their receipt and use of the rebates and fees passed through to them. They will not provide the amount of rebates they receive (Question 11), the pass-through percentage or minimum amount to which they claim entitlement (Question 19), or the relevant contract provisions governing rebates (Questions 19-21). *See* Ex. 6 at 1-2. That information is— in Payers' words—at the "heart" of their claims because it dictates what they were allegedly entitled to receive from PBMs under their contracts. ECF No. 256 at 13; *see also* ECF No. 257 at 1, 5, 8, 13, 25, 30, 36. All Defendants need to know which Payers negotiated to receive 100% of rebates or other Manufacturer-paid revenues, which Payers negotiated for a different revenue-sharing structure, and how Payers planned to use the revenues thus generated (Question 24), because there are different factual issues for each distinct group. Each group should be identified and accounted for in planning for future discovery.

*Direct Purchasing* (Question 40). Only plaintiffs that purchased products directly from a defendant can pursue RICO claims. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) (holding that in RICO cases "the central and dispositive issue is whether plaintiffs are 'direct purchasers'"). Yet, Payers refuse to provide even basic information about their supposed direct purchases, including whether and which Payers claim they have ever made any direct purchases and the entities from which they purchased. *See* Ex. 6 at 3. If they have not made direct purchases, that would dispense with these claims entirely, making Payers' response to Question 40 important to facilitate early resolution of, or targeted discovery related to, those claims.

*Payers' Formularies and Drug Coverage* (Questions 14, 15). Payers' proposal provides almost no information about their formularies and coverage for the at-issue drugs; they refuse to identify, for example, which drugs they covered and on which tiers of their formularies. This information is fundamental to Payers' claims. *See* Ex. 6 at 4. Payers filed lawsuits claiming their expenses for more than a dozen different drugs increased, but will not disclose which drugs they actually covered on their health insurance formularies. Defendants cannot assess which Payers

---

[2] For clarity, Defendants are not requesting that the Court rule on the appropriate next phase at this point. As requested in Section V, *infra,* Defendants believe that the parties should submit position papers on the next phase *after* Payers produce fulsome Fact Sheet responses, so that the parties' proposal is informed by the factual and legal distinctions actually present in the cases.

were allegedly injured *by which Defendants* if Payers will not identify which Manufacturers' products were covered or not covered by their formularies or which alternatives they failed to cover. Requiring Defendants to sift through the multiple, regularly updated formularies from all Payers would invite only further confusion and would unnecessarily burden Defendants.

*Alleged Misrepresentations, Omissions, and Reliance* (Questions 27, 28; Request 6). Payers' complaints do not specifically identify the misrepresentations and omissions they are alleging, who made them and when, or how they allegedly relied on them. Yet Payers continue to refuse to identify them as part of the fact sheets. *See* Ex. 6 at 5. Those putative statements and omissions are necessarily central to Payers' fraud and deception claims, and they will be central to further discovery. Defendants cannot begin to plan the next stages of discovery until Payers explain what they are alleging. Nor is there any justification for refusing to provide this information. Payers should not have filed complaints alleging that the six separate Defendants made misrepresentations unless they identified and investigated those misrepresentations before they filed suit. In other words, this is information that all Payers should have readily available if they conducted the investigations they were obligated to conduct. If Payers cannot identify any misrepresentations in response to Questions 27 and 28, these claims can be disposed of through early briefing. And if Payers can identify purported misrepresentations and omissions, their answers can inform whether to group cases for discovery based on the type of misrepresentations or omissions alleged. Either way, this is critical information.

*PBM Selection* (Questions 25, 26; Requests 2, 3). Payers intend to provide almost no information about their PBM contracting process, including the bids or proposals they received and how and why they chose any particular PBM given the options solicited by and presented to them. *See* Ex. 6 at 6-7. Payers had options about whether to use a PBM and which PBM to select. Some (if not most) contracted with third-party organizations who retained PBMs on their behalf. Some (if not most) issued Requests for Proposals that included requirements for any PBM contract, including the pass-through of rebates or other manufacturer payments. And some (if not all) of the Payers weighed different technical and pricing priorities in selecting a particular PBM.

The questions and requests in Defendants' proposed fact sheet target the issues that relate to Payers' allegations regarding their asserted lack of inquiry notice of their claims, their reasonable reliance on representations from Defendants, and their supposed inability to reasonably avoid any injury under certain state consumer protection laws. Defendants need to know *how* each Payer claims to have selected its PBM to evaluate whether the cases proposed for prioritized or staged discovery will enable the Court to address those issues. Disclosing this information could lead to early resolution of certain claims.

*Statute of Limitations* (Questions 29, 30, 32-34, 42; Request 6). Payers will not provide key information relevant to Defendants' statute of limitations defenses, including when they claim they were first injured and how they learned of the crucial facts underlying their claims (Questions 30 and 34). *See* Ex. 6 at 8. Nor will they produce documents necessary for Defendants to test the identical, boilerplate assertions appearing in their complaints, including their allegations that the limitations period was tolled (Request 6). *See id*. The questions to which they agree—like "Identify when you first learned or discovered that Defendants' statements about the prices for the At-Issue Prices were allegedly artificially inflated" (*see* Payers' Proposed Fact Sheet Question 20 (Ex. 2 at

7))—invite conclusory responses that are not likely to advance the litigation, such as a date range without further explanation, and Payers refuse to provide custodial documents to test such conclusory responses. *See* Ex. 6 at 8. Payers also refuse entirely to answer questions about when *or* how they first learned of allegedly unlawful rebates and prices (Questions 29-30). The statute of limitations issue—which Defendants raised in their motions to dismiss—has the potential to dispense with large swaths of cases without the need for extensive further discovery, and therefore "conserve[s] judicial and party resources," as the Court's discovery plan intended. ECF No. 198 at 1. Payers also put notice at issue by alleging that the discovery rule tolled the applicable statutes of limitations. Payers should be required to provide meaningful information about notice, including to see if they have evidentiary support for their tolling arguments.

*Damages* (Questions 41, 43). Payers' proposal provides almost no insight into their damages; they have only agreed to state whether they are seeking monetary damages and the "categories" of those damages—information that they already were required to provide in their initial disclosures under Rule 26(a). *See* Payers' Question 30; Ex. 6 at 9. They are refusing to provide information about the amount and calculation of damages they are seeking—critical pieces of information Defendants need to determine which cases to prioritize and expend resources on, and how to potentially group them. To evaluate appropriate next steps, Defendants need to know *how* each Payer claims to have been damaged, as well as the approximate amount and how it was calculated. *See* Defendants' Question 43. Payers with different theories of damages, or damages of different orders of magnitude, will require different discovery approaches. These questions do not require expert analysis and commonly appear in MDL plaintiff fact sheets.[3]

*Members' Costs and Spending Decisions* (Questions 11, 13, 17, 22-23; Request 5). Payers' complaints allege that the price of insulin has harmed their residents and their employees. *See, e.g.*, Albany SAC ¶ 713, ECF No. 158 ("Beyond inflicting monetary harm, Defendants' conduct restricted affordable access to diabetes drugs, forcing diabetics to ration—or forego—necessary treatment."); King SAC ¶ 192, ECF No. 160 (Washington residents "skip doses or otherwise ration their insulin" because of the "high list price" of insulin). Those allegations put at issue the decisions by Payers in designing their health plans in ways that affect their members' out-of-pocket costs. But Payers refuse to provide any information about their members' costs, including their members' total out-of-pocket spending (Question 11), their deductibles (Question 13), or whether and what percentage of rebates were passed through to members (Question 23). *See* Ex. 6 at 10-11. For example, many health plans may have chosen not to offset the prices their members pay for insulin by, for instance, imposing high deductibles or refusing to pass on rebates they receive from PBMs and Manufacturers to people with diabetes. Those plan designs vary greatly, fracturing Payers into different groups that will need to be approached differently in the next phases of discovery. Defendants are entitled to respond to Payers' allegations by showing how their own decisions impacted out-of-pocket costs for employees, and Defendants need this information to identify those Payers for which that is the case. Payers conceded that allegations about the impact insulin pricing has on their members are no longer at the "heart" of their theory,

---

[3] *See, e.g.,* Plaintiff Fact Sheet, *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 22-md-3047, ECF No. 1075 at 10-12 (N.D. Cal. Oct. 22, 2020) (seven damages questions requiring plaintiffs to state, e.g., "how [Y]ou claim [Y]ou have been damaged").


but refused to agree that this information was "irrelevant" or that they would forgo presenting evidence at trial on these issues. If Payers plan to advance these issues in their cases, then Defendants need information about how Payers differ on these issues to assess which Payers are representative in connection with sequencing cases for discovery and trial.

*Payers' Audits* (Question 38; Request 7). Payers refuse to produce audits of their pharmaceutical spending or contracts with their auditors. They will only identify their auditors. *See* Payers' Proposed Plaintiff Fact Sheet Questions 17-18; Ex. 6 at 12. But the audits and contracts themselves will reflect key information about their knowledge and expectations about this spending and rebates and their efforts to learn more about their contractually negotiated rebates and fees. This is information that should be disclosed early. Payers that regularly audited their PBMs are not representative of Payers that never exercised their contractual audit rights. The mere identity of the auditor would not reveal any of this essential information. If anything, Payers' position seems to be that Defendants should seek third-party discovery from the auditors. But Payers cannot dodge discovery obligations or transfer them to third parties by providing abbreviated Fact Sheet answers and then relying on third parties to respond to requests that Payers themselves could answer.

**C.    Payers' responses to the Fact Sheets must include custodial document productions.**

As discussed at the May discovery conference, Defendants should not have to simply take Payers at their word in their fact sheet responses when they possess documents that will corroborate or undermine those assertions. Ex. 3, May 13, 2024 Hr'g Tr. at 35:03-37:13 ("THE COURT: That's what I'm thinking, like targeted requests. So you have a plaintiff fact sheet, there is a question about when did you receive notice of, you know, your potential claims. They say, you know, yesterday, but then you ask for documents supporting yesterday, right?"). Based on the Court's guidance, Defendants include seven document requests in the proposed Fact Sheet that will inform Defendants' assessment of Payers' claims.

Payers concede that document requests in fact sheets are appropriate (Ex. 3, May 13, 2024 Hr'g Tr. at 38:24-39:03), and have never disputed that the categories of documents Defendants seek are relevant. Instead, Payers draw a sharp but arbitrary line between custodial and non-custodial documents, and simply refuse to produce emails and other custodial files related to these relevant document categories—even if those sources have highly relevant information that directly bears on facts the parties need to evaluate the next phases of the MDL. Instead, Payers assert they should be allowed to hand select documents that are "sufficient to show" the answers they provide in their fact sheets. Ex. 2 at 10.

Payers need to conduct a reasonable search for information relevant to Defendants' requests, and some of those searches necessarily require custodial searches. Otherwise, this escape hatch would defeat the purpose of the document requests by forcing Defendants to rely on Payers' handpicked documents. Take Request 6, which seeks in part "[d]ocuments related to … the manner in which you first became aware of the allegations in [insulin pricing] actions," as an example. If Payers had notice of their claims outside the limitations period, then those claims are time-barred. Payers should not be allowed merely to assert they were not on notice when targeted document

August 30, 2024
Page 9



review and production would confirm what specific information Payers knew, when they knew it, and what they did with the information. The parties need to plan further discovery based on evidence, not mere allegations. Any of Payers' written responses that go untested or unsupported provide no evidentiary basis on which the parties can make informed judgments, creating the very real risk that both the parties' and the Court's resources will be wasted.

### D. Payers must complete fact sheets with information in their possession.

Payers suggest that they should be permitted to respond to the Fact Sheet by requesting information from PBM Defendants, or by producing documents rather than completing the form. *See* Payers' Proposed Plaintiff Fact Sheet at 1. Both proposals should be rejected.

*First*, Payers' obligation in discovery is to provide information in *their* "possession, custody, or control," and all of Defendants' requests seek such information. Fed. R. Civ. P. 34(a)(1); *see, e.g.*, Defendants' Request 6 (seeking documents "reflecting *Your* reasons for selecting or not selecting a … PBM prescription drug benefit plan.") (emphasis added). Payers do not satisfy their obligation by seeking the information from others. If they do not have the requested information, they can simply say so.

*Second*, *only* providing documents, rather than answering the questions, would frustrate the goal of the fact sheet process. The Plaintiff Fact Sheet should enable the parties to *promptly* develop a ***shared understanding*** of the key facts or allegations of Payers' cases, so both sides can negotiate next steps with the same information about what Payers are claiming. Requiring Defendants to comb through Payers' documents to reverse engineer facts Payers should have readily on hand will slow the process down further, and will only result in Defendants arriving at their own position on the facts of Payers' cases, rather than a shared understanding among all of the parties.

For example, Defendants' proposed Fact Sheet asks Payers to identify the misrepresentations and omissions their suits challenge. *See* Defendants' Proposed Plaintiff Fact Sheet Questions 27–28. If, instead, Payers provide a set of documents containing purported representations, Defendants will be left guessing what Payers consider to be the "misrepresentations" in those documents, Defendants will still have no idea what "omissions" Payers claim, and Payers can dispute any conclusions Defendants reach. Requiring Payers to identify the putative misrepresentations and omissions would avoid this confusion. Likewise, in Questions 18-20, Defendants ask Payers to identify the PBM contractual provisions that govern key issues like rebate and fee pass-through and guarantees. If Payers instead produce hundreds of contracts and addendums, Defendants may—eventually—develop their own positions on which provisions of those contracts control which issues. But Defendants will still have no idea which provisions *Payers assert* are controlling.

As part of their effort to pick and choose among the discovery obligations they must bear under the Federal Rules, Payers argue that Rule 33(d), which governs interrogatories, allows them to respond to questions in the Fact Sheets by producing documents. But a plaintiff fact sheet is not a set of Rule 33 interrogatories, which have a different purpose and therefore go through a different process. Interrogatories are not intended to capture facts in a uniform manner across a group of



plaintiffs, they are typically not used to stage or prioritize cases for further discovery, and Defendants have a wider range of options—including depositions—to follow up on the responses. Having decided that they do not want to engage in discovery under the Federal Rules, Payers should not now be permitted to shift the burden of completing the fact sheets that they themselves suggested.

### E. Payers' "burden" argument lacks merit.

Payers do not meaningfully dispute the relevance of the information that Defendants seek. There also is no question this information will be useful in determining how to proceed in the next phases of discovery. Rather, Payers' principal complaint is that Defendants' proposal includes too many questions and providing this information will be burdensome. Their position is that only a handful of Payers should ever have to provide meaningful discovery and only after those cases become part of a discovery pool. Although Payers attempt to justify their approach using words like "efficient" and "structured," as well as ill-defined concepts like "case-specific" and "general discovery," their apparent goal is to make sure that as few Payers as possible will ever have to engage meaningfully in discovery or support their claims.

In fact, certain counsel have made this purpose explicit. Defendants have learned that a plaintiffs' firm is soliciting county governments to join this MDL by promising that the potential plaintiff's *only* commitment would be "to complete a court order [*sic*] discovery questionnaire which should take only a few hours of staff time." Ex. 5 (highlighted portions) at 2. Payers' version of "efficiency," which involves minimizing burdens *only on Payers*, is contrary to numerous Court orders,[4] and stands in stark contrast to the hundreds of thousands of documents that Defendants have already produced.

Payers also endeavor to justify their "less is more" approach to discovery by citing less rigorous fact sheets from other MDLs. But their examples largely come from MDLs that consist of (1) personal injury cases that (2) involve thousands of individual plaintiffs, (3) who are unlikely to keep robust records and for whom responding to questions and producing documents would be burdensome, and (4) involve claims for which simple answers to relatively few questions can provide meaningful information. None of those features exist here. These are not personal injury cases. Payers are county and municipal governments or similar sophisticated entities, capable of maintaining (and in fact, required to maintain) accurate records. They have records staff, human resources and legal departments, and are accustomed to quickly responding to requests for information. *See, e.g.,* Pa. Stat. Ann. § 67.901 (requiring Philadelphia to respond to public records requests in 5 days with the possibility of a 30-day extension); Va. Code Ann. § 2.2-3704 (requiring Alexandria to respond to public records requests in 5 days with the possibility of a 7-day extension); Md. Code Ann. § 4-203 (requiring Baltimore to respond to public records requests in 30 days). And there are only 49 plaintiffs here—not hundreds of thousands—so that a census form

---

[4] *See, e.g.*, ECF No. 198 at 3 (ordering that "[b]ilateral discovery shall proceed as to *all parties*") (emphasis added); ECF No. 186 at 4 (ordering that the ESI Protocol requirements apply to *all* parties, noting that "[t]he number of plaintiffs thus far in this MDL is not so unwieldy that an ESI Protocol should apply piecemeal to the parties").

that simply tracks the plaintiffs is not helpful. Comprehensive plaintiff fact sheets have in fact been held appropriate with similar plaintiff types. *See, e.g.*, Implementation Order and Attached Fact Sheets, *In re Social Media,* ECF No. 731 (N.D. Cal. Mar. 27, 2024) (requiring school district plaintiffs to complete two fact sheets totaling sixty-eight questions and document requests). There is no reason to allow Payers here to avoid providing the information Defendants need.

Payers' burden concerns are especially meritless given that plaintiff fact sheets already derive from the obligations of normal federal discovery—obligations Payers voluntarily assumed when they filed suit. Those obligations are particularly appropriate in MDLs of this size. Plaintiff fact sheets are rare in such comparatively small MDLs;[5] the Federal Judicial Center found that only 16% of MDLs with fewer than 100 actions use fact sheets. Margaret S. Williams, Emery G. Lee III, and Jason A. Cantone, *Plaintiff Fact Sheets in Multidistrict Litigation: Products Liability Proceedings 2008-2018*, Federal Judicial Center (Mar. 2019), https://www.fjc.gov/sites/default/files/materials/49/PFS%20in%20MDL.pdf.

Defendants' proposed Plaintiff Fact Sheet seeks information Defendants need, Payers agree is relevant, and Payers should have ready to produce. All of those factors outweigh any burden to Payers and favor adopting Defendants' proposal. Payers' alternative—that they have all of Defendants' discovery, including the substantial document productions already made, and Defendants have none for the vast majority of cases—is obviously prejudicial to Defendants.

### III. Defendant Fact Sheets Serve No Purpose Because Payers—Unlike Defendants—Can Serve General Discovery Requests.

Payers' proposed Defendant Fact Sheets serve no purpose because Payers—unlike Defendants—can already serve discovery under the Federal Rules to get the information they need to prosecute their cases. It makes no sense to require Defendants to produce millions of documents, respond to Rule 34 discovery, and—on top of that—complete Defendant Fact Sheets out of empty reciprocity, simply because Payers will have to fill out Fact Sheets (after *they* advocated for using plaintiff fact sheets).

The only rationale for Defendant Fact Sheets that Payers have put forward is to enable them to fill out *their* Fact Sheets. Aug. 13, 2024 Hr'g Tr. 14:15-14:20 ("[Payers] clarified that the rationale for defendant fact sheets is that they were necessary … to respond to plaintiff fact sheets."). That reveals the pointlessness of the proposal; as already discussed, Payers' fact sheet responses should reflect information in *their* possession, not information parroted from

---

[5] *See, e.g., In Re: Entresto (Sacubitril/Valsartan) Pat. Litig.*, No. 1:20-md-02930 (D. Del) (25 actions; no plaintiff fact sheet); *In Re: Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 1:18-cv-04171 (N.D. Ill.) (29 actions; no plaintiff fact sheet); *In Re: FCA US LLC Monostable Elec. Gearshift Litig.*, 16-md-02744 (E.D. Mich.) (39 actions; no plaintiff fact sheet); *In Re: Nat'l Football League's "Sunday Ticket" Antitrust Litig.*, 2:15-ml-02668 (C.D. Cal.) (26 actions; no plaintiff fact sheet); *In Re: Telexfree Sec. Litig.*, 4:14-md-02566 (D. Mass.) (15 actions; no plaintiff fact sheet); *In Re: Lipitor Antitrust Litig.*, 3:12-cv-02389 (D.N.J.) (34 actions; no plaintiff fact sheet); *In Re: Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489 (D.D.C.) (24 actions; no plaintiff fact sheet).

Defendants. Payers have to fill out their own fact sheets (including because Defendants do not have the information that is central to Payers' claims). Defendants cannot do it for them.

## IV. Discovery Plan.

Defendants seek to commence discovery without delay, as reflected in their Proposed Case Management Order, which includes limits similar to those in the Initial Discovery Plan (ECF No. 167-3) Defendants submitted on May 8, 2024. *See* Ex. 7, Defendants' Proposed Case Management Order ("Defendants' CMO"). By contrast, Plaintiffs' Proposed Case Management Order, which is markedly different from the discovery plan Plaintiffs already submitted to this Court, *see* ECF No. 167-2, and which Plaintiffs shared for the first time on August 21, 2024, should be rejected for several reasons. It (i) is utterly one-sided—indeed, it contains only *one* provision allowing Defendants to serve any discovery; (ii) imposes unwarranted track-specific discovery burdens on Defendants; (iii) requires unnecessary Defendant Fact Sheets; (iv) ignores that the dispute over whether Plaintiff Fact Sheets are appropriate for the State Attorneys General Track remains pending before this Court, *see* ECF Nos. 220 and 222; and (v) fails to address key aspects of the Plaintiff Fact Sheet process, including the threshold issue that Defendants need to know the final form of Plaintiff Fact Sheets before agreeing to limits on further discovery.

Defendants propose that Plaintiffs across all tracks serve (i) one consolidated set of up to 45 document requests on each Defendant and (ii) one consolidated set of up to 25 interrogatories on each PBM Defendant and up to 15 interrogatories on each Manufacturer Defendant. Defendants oppose Plaintiffs' suggestion of separate additional "Track-Specific" discovery for the State Attorneys General Track and the Self-Funded Payer Track, as Plaintiffs have not explained what distinct discovery these plaintiff tracks need and how it differs from the Master MDL discovery.

Plaintiffs' proposal also is based on a false dichotomy. Plaintiffs misleadingly describe any discovery that could help Defendants as "case-specific," while they call any discovery that might help Plaintiffs "master discovery." Under Plaintiffs' definition, *any* plaintiff discovery is "case-specific" and only appropriate at a later stage (and even then, only for a handful of cases). *See* ECF 168 (identifying "individual PBM contracts, correspondence between Defendants and each Plaintiff" as "case-specific").

Defendants propose that the parties submit a Plaintiff Fact Sheet Implementation Order within 14 court days of the Court's ruling on the form and content of the Plaintiff Fact Sheet for the Self-Funded Payers. This Implementation Order should cover, at a minimum, the following topics: (a) the definition of substantial completion; (b) the verification process; (c) the amendment process; (d) submission deadlines; (e) the transmission process to Defendants; (f) the deficiency dispute resolution process; (g) confidentiality guidelines; and (h) admissibility guidelines for the Plaintiff Fact Sheet responses. Plaintiffs' Case Management Order omits some of these essential elements, including a deficiency dispute resolution process. Plaintiffs' Case Management Order also includes provisions regarding Defendant Fact Sheets, which are unnecessary, burdensome, and irrelevant to advancing discovery in this case.

**V.      Conclusion.**

      For these reasons, the Court should approve Defendants' proposed Plaintiff Fact Sheet, reject any Defendant Fact Sheets, and enter the attached proposed Case Management Order that provides for the next steps in discovery. *See* Ex. 7, Defendants' Proposed Case Management Order.

      Respectfully submitted,

      [Signature page follows]

August 30, 2024
Page 14

ReedSmith

By: */s/ Melissa A. Geist, Esq.*
Melissa A. Geist, Esq.
Julia A. Lopez, Esq.
**REED SMITH LLP**
506 Carnegie Center, Suite 300
Princeton, NJ 08540
Tel.: (609) 514-5978

James F. Hurst, Esq. (*pro hac vice*)
Andrew A. Kassof, Esq. (*pro hac vice*)
Diana M. Watral, Esq. (*pro hac vice*)
Ryan Moorman, Esq. (*pro hac vice*)
Jason A. Feld, Esq. (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
333 West Wolf Point Plaza
Chicago, IL 60654
Tel: (312) 862-2000

*Attorneys for Defendant Eli Lilly and Company*

*/s/ Brian W. Carroll, Esq.*
Brian W. Carroll, Esq.
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Tel.: (973) 639-2020

James P. Rouhandeh, Esq. (*pro hac vice*)
David B. Toscano, Esq. (*pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000

Neal A. Potischman, Esq. (*pro hac vice*)
Andrew Yaphe, Esq. (*pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
1600 El Camino Real
Menlo Park, CA 94025
Tel.: (650) 752-2000

*Attorneys for Defendant Novo Nordisk Inc.*

/s/ Liza M. Walsh, Esq.
Liza M. Walsh, Esq.
Katelyn O'Reilly, Esq.
Selina Ellis, Esq.
**WALSH PIZZI O'REILLY FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Tel.: (973) 757-1100

Michael R. Shumaker, Esq. (*pro hac vice*)
Julie E. McEvoy, Esq. (*pro hac vice*)
William D. Coglianese, Esq. (*pro hac vice*)
Melissa L. Patterson, Esq. (*pro hac vice*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel.: (202) 879-3939

*Attorneys for Defendant Sanofi-Aventis U.S. LLC*

/s/ Jason R. Scherr, Esq.
Jason R. Scherr
Patrick A. Harvey
Lindsey T. Levy
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
jr.scherr@morganlewis.com
patrick.harvey@morganlewis.com
lindsey.levy@morganlewis.com
Tel: (202) 739-3000

-and-

Tanya Y. Shah
**MORGAN, LEWIS & BOCKIUS LLP**
502 Carnegie Center
Princeton, NJ 08540-6241
tanya.shah@morganlewis.com
Tel: (609) 919-6600

- and-

August 30, 2024
Page 16

**ReedSmith**

Katherine A. Vaky
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre, Thirty Second Floor
Pittsburgh, PA 15219-6401
kathryn.vaky@morganlewis.com
Tel: (412) 560-3300

*Counsel for Evernorth Health, Inc. (formerly known as Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Medco Health Solutions, Inc., and The Cigna Group.*

*/s/ Brian D. Boone, Esq.*
Thomas P. Scrivo
Young Yu
**O'TOOLE SCRIVO, LLC**
14 Village Park Road
Cedar Grove, NJ 07009
T: (973) 239-5700

Brian D. Boone
**ALSTON & BIRD LLP**
1120 S. Tryon Street, Ste. 300
Charlotte, NC 28280
T: (704) 444-1000

Elizabeth Broadway Brown
**ALSTON & BIRD LLP**
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 4900
Atlanta, GA 30309-3424
T: (404) 881-7000

Kelley Connolly Barnaby
**ALSTON & BIRD LLP**
950 F. Street, NW
Washington, D.C. 20004
T: (202) 239-3300

*Counsel for OptumRx, Inc., UnitedHealth Group Incorporated; OptumInsight, Inc.; OptumRx Holdings LLC; and Optum, Inc.*

August 30, 2024
Page 17

ReedSmith

>*/s/ John D. Tortorella*
>Kevin H. Marino, Esq.
>John D. Tortorella, Esq.
>**MARINO, TORTORELLA & BOYLE, P.C.**
>437 Southern Boulevard
>Chatham, New Jersey 07928
>T: (973) 824-9300
>F: (973) 824-8425
>kmarino@khmarino.com
>jtortorella@khmarino.com
>
>Enu Mainigi
>Craig Singer
>R. Kennon Poteat III
>A. Joshua Podoll
>Daniel Dockery
>**WILLIAMS & CONNOLLY LLP**
>680 Maine Avenue, S.W.
>Washington, D.C. 20024
>T: (202) 434-5000
>F: (202) 434-5029
>emainigi@wc.com
>csinger@wc.com
>kpoteat@wc.com
>apodoll@wc.com
>bhazelwood@wc.com
>ddockery@wc.com
>
>*Counsel for CVS Health Corporation; CVS Pharmacy, Inc.; Caremark Rx, L.L.C.; Caremark PCS Health, L.L.C.; and Caremark, L.L.C.*

cc:   All Counsel of Record (via ECF and electronic mail)