[Submitting counsel below]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case 2:23-md-03080-BRM-RLS** <br> **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** <br> **ALL CASES** | **JUDGE BRIAN R. MARTINOTTI** <br> **JUDGE RUKHSANAH L. SINGH** |

## BRIEF IN SUPPORT OF PLAINTIFFS' PROPOSED DISCOVERY PLAN

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ............................................................................... iii

**INTRODUCTION** ................................................................................................ 1

**BACKGROUND** ................................................................................................. 3

**ARGUMENT** ...................................................................................................... 4

    I.   Plaintiffs' proposed framework provides the most effective and efficient means of developing cases in this MDL. ........................................................................ 4

        A.  Master Discovery to Defendants. ........................................................ 6

        B.  Case-specific discovery in the SFP Track, consisting of Plaintiff and Defendant Fact Sheets, followed by further case-specific workup of bellwether pool cases. ........................ 8

        C.  Case-specific discovery in the State AG Track, consisting of Plaintiff Fact Sheets, followed by further case-specific workup of discovery pool cases. ...................................... 13

    II.   SFP Track Plaintiffs' proposed PFS is robust and furthers the gating function intended of a fact sheet. ............................................................................ 14

    III.   Numerous problems with Defendants' proposed PFS for SFP Track Plaintiffs render it unworkable. ........................................................................................ 17

        A.  Defendants' proposed PFS is unnecessarily burdensome at this stage. ........................ 18

        B.  Defendants' proposed PFS seeks information and documents squarely within the possession of the PBM Defendants. .................................................. 20

        C.  Defendants' proposed PFS questions focused on their statute-of-limitations defense are irrelevant and unduly burdensome. ................................................... 22

        D.  Defendants refuse to permit Plaintiffs to rely on Rule 33(d) where appropriate to provide requested information. ..................................................... 25

        E.  Defendants request damages information that requires expert input or is otherwise premature for a PFS. ....................................................... 26

    IV.   SFP Track Plaintiffs' proposed Defendant Fact Sheets are necessary and appropriate. ................................................................................. 27

**CONCLUSION** ................................................................................................. 30

## **TABLE OF AUTHORITIES**

**Cases**

*Harris v. Wyeth, Inc.*,
    2012 WL 2317338 (S.D.N.Y. June 15, 2012) ............................................................3

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
    2013 WL 12291705 (D. Del. Oct. 22, 2013)...........................................................26

*In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*,
    2022 WL 3211421 (D.N.J. Aug. 9, 2022) ...........................................................9, 21

*In re Asbestos Products Liab. Litig.*,
    718 F.3d 236 (3d Cir. 2013) ..................................................................................1

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*,
    169 F.R.D. 632 (N.D. Ill. 1996) ...........................................................................6

*Ward v. Cook Inc.*,
    2015 WL 3556060 (S.D.W. Va. June 4, 2015) ....................................................10

**Statutes**

28 U.S.C. § 1407 ...................................................................................................3

**Rules**

Fed. R. Civ. P. 33(d)............................................................................................25

Fed. R. Civ. P. 16.1.............................................................................................17

**Other Authorities**

Manual for Complex Litigation, Fourth § 22.8 .....................................................10

Eldon E. Fallon et. al., *Bellwether Trials in Multidistrict Litigation*,
    82 Tul. L. Rev. 2323 (2008) ................................................................................10

Judge David G. Campbell & Jeffrey A. Kilmark, *Advice to a New MDL Judge on Discovery Management*,
    89 UMKC L. Rev. 889 (2021)...........................................................................9, 10

GUIDELINES AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLS,
Bolch Judicial Institute, Duke Law School (2d ed. 2018)........................................9

## INTRODUCTION

When the JPML ordered centralization of these proceedings before this Court more than one year ago, it "observe[d] that this litigation involves unusually complex issues concerning an alleged multilateral, industry-wide conspiracy that revolves around a long history of rebate agreements and multitiered pricing practices for numerous insulin products" and that "[c]entralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary." Transfer Order, *In re Insulin Pricing Litig.*, No. 3080 (J.P.M.L. Aug. 3, 2023), ECF No. 91 at 3-4.  In MDLs like this one, "the very purpose of the centralization before the transferee judge is the efficient progress of the cases in preparation for trial." *In re Asbestos Products Liab. Litig.*, 718 F.3d 236, 248 (3d Cir. 2013).

Plaintiffs have been conferring with Defendants for the past *six months* about the structure and phasing of discovery in these MDL cases, the scope of master discovery and fact sheets, and a process for determining representative actions for trial. The parties' disputes stem from Defendants' refusal to acknowledge that this MDL *should be treated as an MDL*—and not merely as a collection of discrete actions. And so the parties have a fundamental disagreement as to the most reasonable and efficient way to develop the cases in this MDL.

While the parties conceptually agree that a process is needed to address the variances between master discovery and case-specific discovery in this MDL, that is where the parties' agreement ends. The parties' competing Case Management Orders demonstrate that substantial disputes remain, including:

1. ***Common-issue vs. case-specific discovery***: Whether the parties should initially focus on common-issue discovery generally applicable to all MDL cases *before* fully working up individual cases (as Plaintiffs propose) or instead engage in full-fledged case-specific written discovery in all MDL cases (as Defendants urge).

2. ***Fact Sheets in the SFP Track***: While Defendants have *nominally* agreed to a Plaintiff Fact Sheet approach in the Self-Funded Payer Track, Defendants' proposed PFS is unworkable, goes far beyond what is necessary to meaningfully assess these cases, amounts to full case-specific written discovery, and should be rejected in favor of Plaintiffs' still-robust PFS. SFP Track Plaintiffs have also proposed appropriate Defendant Fact Sheets ("DFS") to the PBM and Manufacturer Defendants, but Defendants have refused to discuss any DFS for this Track.

3. ***Master Discovery Requests***: What the appropriate limitations are, if any, on the number of interrogatories and document requests in a case of this magnitude and complexity.

4. ***Master Discovery in the State AG and Class Action Tracks***: Whether Defendants should be permitted to serve "Master Discovery" on every Plaintiff in the State AG and Class Action Tracks, the appropriate number of such Master Discovery Requests, and whether wholesale discovery on "each Plaintiff" in the State AG Track is appropriate in light of the State AGs' proposed PFS structure. Within the State AG Track, Defendants have refused to engage with the State AGs regarding a proposed PFS.

5. ***Track-specific discovery requests***: Whether there should be any mechanism for Plaintiffs to serve discovery on Track-specific issues (as Plaintiffs have proposed).

6. ***Deadline for service of discovery***: Whether Defendants should be permitted to cut off Plaintiffs' ability to serve discovery well in advance of the close of fact of discovery.

Plaintiffs propose a reasonable and efficient approach that follows the customary progression for MDLs: (a) coordinated master discovery focused on general liability, company- and industry-wide practices, and other information not specific to any MDL case; together with (b) the concurrent exchange of an appropriate Plaintiff Fact Sheet ("PFS") and, corresponding DFS in the Self-Funded Payer Track ("SFP Track"), to inform the selection of cases for discovery pools; and (c) subsequent additional case-specific workup for selected cases.

Defendants meanwhile have failed to propose *any* real framework for the development of MDL cases, other than subjecting every MDL Plaintiff to full-fledged written discovery under the guise of "Master Discovery" in the State AG Track and Defendants' proposed PFS in the SFP Track, which seeks all-encompassing information and documents (nearly all of which is in the

possession of the PBM Defendants), premature expert discovery, and scores of irrelevant information—none of which is suitable for exchange as part of a fact sheet process.

The structure for facilitating the development of this litigation will determine whether pretrial discovery is concluded justly and efficiently in accordance with Rule 1 and 28 U.S.C. § 1407 or, conversely, whether discovery becomes bogged down in an endless series of case-specific discovery disputes that are detached from this Court's primary objective to "coordinate and complete shared pretrial matters such as generic discovery." *Harris v. Wyeth, Inc.*, 2012 WL 2317338, at *1 (S.D.N.Y. June 15, 2012).

For these reasons, and those set forth below, the Court should (i) enter Plaintiffs' proposed Case Management Order governing master discovery and fact sheets (Ex. 1),[1] (ii) implement SFP Track Plaintiffs' proposed PFS (Ex. 3) [2] and DFS (Ex. 6-7) for use in that Track, and (iii) implement the State AGs' proposed PFS (Ex. 16).

## **BACKGROUND**

The parties have been conferring over master discovery issues since March 2024. *See* ECF Nos. 94, 97 & 121 (March 2024 biweekly status reports). After the April 8, 2024 hearing and continued conferral efforts, the parties ultimately submitted competing case management orders and position papers on May 8, 2024. *See* ECF No. 166 (Defs.' position paper); ECF No. 167 (joint proposed discovery plan, with competing proposed case management orders attached as Exhibits 1-3); ECF No. 168 (Pls.' position paper). At the May 13, 2024 hearing, the Court directed the parties to continue their conferral efforts regarding master discovery and a PFS.

---

[1] All citations to "Ex. ___" refer to exhibits to the Declaration of David R. Buchanan filed by Plaintiffs with this Brief.

[2] Defendants' proposed PFS is attached as Ex. 4, and a redline comparison of Defendants' proposed PFS against Plaintiffs' proposed PFS is attached as Ex. 5.

Since that time, within the SFP Track, the parties have exchanged several versions of a proposed PFS (and Plaintiffs have proposed a separate DFS for the PBM and Manufacturer Defendants). And within the State AG track, Defendants have refused to meet and confer on the State AGs' proposed PFS or otherwise engage with the State AGs other than to reiterate that full-blown discovery is required for each State that is currently—or ever will be—a party to this MDL. *See* ECF No. 220 (State AG Position Statement on PFS). The parties have exchanged proposed Case Management Orders to govern master discovery and fact sheets (Ex. 1-2) and have conferred regarding these items but nevertheless remain at an impasse.

## ARGUMENT

I.   **Plaintiffs' proposed framework provides the most effective and efficient means of developing cases in this MDL.**

Plaintiffs propose an eminently reasonable structure for fairly and efficiently developing cases in this MDL—one that follows the natural progression of MDLs, including those that have been successfully managed by this Court and others similarly involving entity plaintiffs. *First*, there would be coordinated master discovery to Defendants and third parties, with a focus on general liability, global fact witnesses, company-wide policies and practices, industry standards, and other "central factual allegations in support of the alleged insulin pricing scheme [that] are the same in all actions." Transfer Order, *In re Insulin Pricing Litig.*, No. 3080 (J.P.M.L. Aug. 3, 2023), ECF No. 91 at 3-4.[3] *Second*, in tandem with general discovery against Defendants, Plaintiffs in the SFP and State AG Tracks would provide a PFS with information and documents necessary to guide

---

[3] According to the JPML, the "central factual allegations" common to all cases include: "the insulin manufacturers negotiate with and pay secret rebates to PBMs to ensure preferential treatment of their insulin and diabetes medications on covered drug lists known as formularies, they arbitrarily raise the list prices for the products to cover these payments, and, as a result, the published list price of the drugs are fraudulent, in contrast to reflecting legitimate market forces." *Id.*

the selection of discovery pools. *Third*, the parties in the selected cases would complete full case-specific discovery (additional written discovery, custodial productions, and case-specific depositions).

Defendants, by contrast, have failed to provide *any* definitive framework for the development of MDL cases apart from full-blown discovery for every member case, under the guise of their proposed PFS (in the SFP Track) and "Master Discovery" (in the the State AG and Class Action Tracks). Defendants have maintained their prior position that "[t]he Court should require all the parties to participate in discovery" and that they "need robust custodial document discovery from Plaintiffs to defend against Plaintiffs' claims." ECF No. 166, Defs.' Position Paper at 1, 4-5. And after this Court directed the parties to meet and confer regarding "what a plaintiff fact sheet and stipulated document request . . . would look like" (May 13, 2024 Tr. at 47:21-48:3),[4] Defendants simply shoehorned their demand for full written discovery in every case into the framework of a PFS or Master Discovery. *See infra*, Section III (describing the problems with Defendants' proposed PFS). Defendants urge the Court to require (i) each Plaintiff in the SFP Track to respond to Defendants' proposed PFS and (ii) each Plaintiff in the State AG and Class Action Tracks to respond to "Master Discovery"—but both of those approaches amount to full-fledged case-specific discovery in *all cases*.

Moreover, Defendants refuse to provide any structure for the next phases of discovery to move these cases forward toward resolution. *See, e.g.*, May 13, 2024 Tr. at 22:1-3 (Defendants "are not sure whether discovery pools are going to be feasible in this case."); 23:7-9 ("And as [Defendants have] stated before, ultimately whether or not this case is appropriate for bellwethers

---

[4] *See also* ECF No. 5, Case Management Order #1 at § 3(b) (directing parties to confer regarding "fact sheets," "coordination of cases," and "other case-management-related orders and procedures," among other things).

is a question for later.") In fact, during a recent meet-and-confer on the PFS in the SFP Track, Defendants clarified that they would not be in a position to propose a framework for post-PFS discovery until *after* they had reviewed each Plaintiff's PFS. Defendants' proposed CMO is more of the same: it provides only that SFP Track cases "will require further discovery pursuant to a future Court order" (Ex. 2), but fails to describe an approach to completing that "further discovery." And of course, Defendants' proposal in this regard is meaningless, as it could conceivably capture complete fact-deposition discovery *across all SFP Track cases*—as opposed to a subset or pool of cases—at the conclusion of the PFS process.

Defendants' proposal runs directly counter to the purpose of an MDL, as it will subsume the parties' and the Court's time and resources, will hamper the completion of discovery *common to all member cases*, and will not efficiently prepare these centralized cases for remand or trial. *See In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 169 F.R.D. 632, 638 (N.D. Ill. 1996) ("The multidistrict proceeding is not the appropriate mechanism for the conduct of *case-specific* discovery. By definition, that discovery is not of general interest to the parties in all of the individual cases which comprise the MDL.") (emphasis in original).

Plaintiffs respectfully submit that their proposal, described in further detail below and set forth in Plaintiffs' proposed CMO (Ex. 1), is consistent with the approaches used in similar MDLs involving entity plaintiffs, will ensure that all parties obtain core information related to their claims, and ultimately presents the most efficient and reasonable way for discovery to proceed.

### A.  Master Discovery to Defendants.

Under Plaintiffs' proposal, set forth in Sections I and II of their proposed CMO (Ex. 1), Plaintiffs would serve Master Discovery Requests on each Defendant. These Master Discovery Requests would be coordinated across all three Plaintiff Tracks and would seek information

generally applicable to all Plaintiffs—e.g., core liability information, Defendants' general practices and fact witnesses, and other common issues not specific to any specific case. Plaintiffs' proposal contemplates a "first set" of each form of written discovery, followed by "supplemental" requests or interrogatories to address the inevitable need for additional information as this case progresses. Master Interrogatories would be limited to 40 requests to each PBM Defendant and 20 requests to each Manufacturer Defendant.[5] Each Track would also be permitted to serve an additional 15 Track-specific Interrogatories. Rule 34 would govern limits on Master Requests for Production.

In their recently exchanged CMO, Defendants propose that Plaintiffs be limited to serving 45 document requests on each Defendant, 25 interrogatories on each PBM Defendant, and 15 interrogatories on each Manufacturer Defendant. *See* Ex. 2. Defendants unsurprisingly urge fewer restrictions on their own offensive discovery, proposing 45 document requests and 40 interrogatories be served on *every Plaintiff* in the State AG and Class Action Track. *Id.*[6]

There is no justification for the discovery limitations Defendants propose. First, as to document requests, Rule 34 imposes no numerical limitation, so there is no valid basis to restrict

---

[5] The difference between Plaintiffs' proposed limits to the Manufacturers (20) and the PBMs (40) is, at least in part, in recognition of the Manufacturer Defendants' repeated representations regarding the scope of their prior discovery efforts. Although Plaintiffs' review of Defendants' prior productions has already revealed substantial deficiencies—both with respect to the Manufacturer Defendants' productions, and the PBM Defendants' limited productions—Plaintiffs nevertheless recognize that these two Defendant groups are much differently situated with respect to their prior discovery efforts. Plaintiffs' proposed CMO has been crafted accordingly.

[6] As to the Class Action Track, Section III of Plaintiffs' CMO proposes that Defendants would be permitted to collectively serve one set of 30 Master Interrogatories upon each plaintiff group (TPPs and wholesalers) in the Class Action Track. This is a sensible and reasonable proposal that recognizes there will be common issues across two sets of plaintiff groups. Defendants' proposal, on the other hand, suggests Defendants can serve a total of 40 interrogatories on *each plaintiff*. Yet Defendants have offered no rationale at all for why separate interrogatories are needed for each plaintiff. Their proposal is unduly burdensome and should be rejected.

the number of documents requests parties may serve here—especially considering the size and complexity of this case. Moreover, imposing arbitrary numerical constrains on document requests only serves to require Plaintiffs to propound broader document requests that will inevitably invite discovery disputes that require Court intervention. Removing any numerical limitation on document requests allows the Plaintiffs—in their coordinated master discovery efforts—to request documents with greater specificity. The resulting clarity inures to the benefit of the Plaintiffs (who have been coordinating these requests for months), the Defendants (who will have to respond to these requests), and the Court (who will likely have to adjudicate disputes over these requests).

As for interrogatory limits, Plaintiffs have proposed 40 Master Interrogatories to each PBM Defendant, and 20 Master Interrogatories to each Manufacturer Defendant (plus an additional 15 Track-specific or Class interrogatories). *See* Ex. 1. Even Defendants' prior position paper contemplated 30 Master Interrogatories on each PBM Defendant and each Manufacturer Defendant. *See* ECF No. 167 at Ex. 2. Now, rather than serving 30 interrogatories on each Defendant, Plaintiffs have merely proposed a reallocation that takes into consideration the Manufacturers' prior discovery efforts.

    **B. Case-specific discovery in the SFP Track, consisting of Plaintiff and Defendant Fact Sheets, followed by further case-specific workup of bellwether pool cases.**

Plaintiffs in the SFP Track propose a two-pronged process for case-specific discovery. First, Plaintiffs propose the exchange of a PFS and DFS in each member case—in parallel with general discovery to Defendants—to supply the parties with information necessary to inform the selection of discovery or bellwether pools. *See* Ex. 1, CMO § IV. Second, Plaintiffs propose that, following the Court's order establishing the form and substance of a PFS or DFS, the parties confer regarding the number of appropriate case-specific interrogatories, requests for production, and

requests for admission in cases selected for further discovery, including as part of a discovery pool or for bellwether trial discovery. *See id*. § VI.B.

Plaintiffs' approach offers several benefits. Unlike Defendants' proposed PFS, which seeks sweeping case-specific information and documents from each Plaintiff, Plaintiffs' proposed PFS (and proposed DFS) would streamline the process for exchanging the core information "*necessary to move this consolidated proceeding through the process* and toward a resolution" without a continuous series of objections, alleged deficiencies, conferrals, and discovery motions—and would provide meaningful data that will inform the parties' selection of discovery or bellwether pools. *In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, 2022 WL 3211421, at *4 (D.N.J. Aug. 9, 2022).

Defendants' seeming complaint during a recent conferral was that Defendants will unfairly be obligated to respond to Plaintiffs' Master Discovery Requests while SFP Track Plaintiffs will only need to complete a PFS. The general discovery to be completed in this case will undeniably demanding—considering six separate Defendants/Defendant groups, multiple at-issue medications, and alleged conduct occurring over a decade. But the facts and issues developed in general discovery will help focus the the ensuing case-specific discovery. And so it only makes sense to prioritize general discovery, as MDL courts commonly recognize. For example, according to the Duke Law School MDL Guidelines, in light of the recognized goals of proportionality and cost-savings, "judges recommended focusing first on general or generic discovery." GUIDELINES AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLS, Bolch Judicial Institute, Duke Law School (2d ed. 2018). And because "individual discovery into the claims of specific individuals could become a morass or black hole," judges instead "preferred to hold off on individual discovery until a pool of cases had been selected to act as bellwethers." *Id.* Senior District Judge

David G. Campbell similarly teaches that an MDL judge's "primary focus should be on general, MDL-wide issues" and not "plaintiff-specific discovery, except for those cases which may be candidates for bellwether trials[.]" Judge David G. Campbell & Jeffrey A. Kilmark, *Advice to a New MDL Judge on Discovery Management*, 89 UMKC L. Rev. 889, 890 (2021) (noting that "discovery should focus on common-issue discovery," including "production of relevant documents from the defendants and third parties; [and] depositions of witnesses whose testimony will be relevant to all cases.").[7]

The Manual for Complex Litigation endorses Plaintiffs' view. It specifically recommends phasing discovery into general and case-specific stages can streamline the litigation and lead to more efficient case management. Because "[d]iscovery in mass tort cases generally has two distinct dimensions: one involving the conduct of the defendants, and another relating to the individual plaintiffs' conduct, causation, and injuries," it makes sense, "particularly in multidistrict litigation," for the MDL court to "direct initial discovery toward matters bearing on the defendants' liability to all plaintiffs." MCL 4th § 22.8. The MCL further points out that this approach may be especially appropriate where, as here, Defendants dispute liability. *Id.* That is precisely the approach Plaintiffs propose here: general discovery focused on Defendants' conduct, followed by full case-specific discovery relating to individual Plaintiffs selected for bellwether pools. *See* Eldon E. Fallon et. al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2360 (2008) ("Once the trial-selection pool has been assembled, each of the cases within the pool must

---

[7] Nor does the fact that general discovery may be asymmetrical at the outset warrant imposing burdensome case-specific discovery on all MDL Plaintiffs. This tit-for-tat approach urged by Defendants will only serve to hinder the efficient completion of general discovery. In fact, Defendants' counsel acknowledged during this same conferral that all of the information Defendants would want from Plaintiffs in this MDL is case-specific. That makes sense: no single Plaintiff possesses general, cross-cutting information generally applicable to all cases in the MDL.

undergo case-specific discovery."); *see also Ward v. Cook Inc.*, 2015 WL 3556060, at *1 (S.D.W. Va. June 4, 2015) ("In an effort to efficiently and effectively manage this MDL, I ordered the parties to identify fifteen cases per side, for a total of thirty cases, to be included in a 'discovery pool' wherein certain case-specific discovery would be conducted.").

Plaintiffs' approach is also consistent with that used by other MDL courts overseeing large cases involving governmental and other entity plaintiffs. For example:

1. ***In re Juul Labs Inc., Marketing, Sales Practices, and Products Liability Litigation*** – The MDL court implemented Plaintiff Fact Sheets for "all government-entity Plaintiffs (including school-district Plaintiffs)." Case No. 19-md-02913, MDL No. 2913, Case Management Order No. 13: Government Entity and School District Fact Sheet Implementation Order (ECF No. 1075). Ex. 8. Thereafter, the court effectuated a process for discovery and bellwether selection for government-entity plaintiffs. *Id.*, Stipulation and Order to Extend Deadlines Regarding Government Entity Bellwether Selection (ECF No. 1157). Ex. 9.

2. ***In re Aqueous Film-Forming Foams Products Liability Litigation*** – The MDL court implemented Plaintiff Fact Sheets for "Plaintiff water authorities, districts, or other water suppliers and for any municipality or other local or county government pursuing claims related to alleged contamination of water supplies within or impacting their jurisdictions." Case No. 2:18-mn-2873, MDL No. 2873, Case Management Order No. 5 (ECF No. 205). Ex. 10. The MDL court then implemented a two-tier process for water provider cases: (i) selecting bellwether discovery pool cases and (ii) selecting trial pool cases from such discovery pool cases. *See id.*, Initial Bellwether Selection and Protocols (ECF No. 1049). Ex. 11.

3.     ***In re National Prescription Opiate Litigation*** – In this case, Judge Polster

provided for a Plaintiff Fact Sheet for "Governmental Entities (e.g., Cities, Towns,

Counties)." *See* Case No. 1:17-md-2804, MDL No. 2804, Fact Sheet Implementation Order

(ECF No. 638). Ex. 12. And, in cases filed by third-party payors, the MDL court

implemented a fact-sheet process followed by bellwether selection. *See id.*, Bellwether

Order (ECF No. 4920). Ex. 13.

Plaintiffs' proposal is also in keeping with the process this Court has successfully used in

the prior MDLs it has managed. *See, e.g.*, *In re Allergan Biocell Textured Breast Implant Prods.*

*Liab. Litig.*, Case No. 2:19-md-02921, MDL No. 2921, Amended Special Master CMO 12 (ECF

No. 386) (fact sheets and bellwether process) & Case Management Order No. 28 (ECF No. 470)

(bellwether discovery workup); *In re Elmiron (Pentosan Polysulfate Sodium) Prods. Liab. Litig.*,

Case No. 2:20-md-02973, MDL No. 2973, Case Management Order No. 8 (ECF No. 39) (fact

sheets) & Case Management Order No. 17, Bellwether Selection and Scheduling Order (discovery

pools for bellwether cases); *In re Invokana (Canagliflozin) Prods. Liab. Litig.*, MDL No. 2750,

Case Management Order No. 18 (ECF No. 198) & Case Management Order No. 26 (bellwether

discovery workup).

Additionally, during the meet-and-confer process, and in Defendants' last position paper,

Defendants objected to the PFS and discovery-pool process on the grounds that there are not

enough cases in this MDL to justify that approach. Defendants appear to have abandoned that

position, based on the parties' conferrals over the course of the last few months. But to the extent

there is any suggestion that the number of cases in this MDL somehow cuts against a PFS and

discovery-pool approach, that is wrong. In *JUUL*, for example, the MDL court implemented a

Government Entity Fact Sheet and a separate School District Fact Sheet. *See* Ex. 8. One week prior

12

to the court's implementation of those fact sheets, there were *38 government-entity cases* brought by counties, cities, and tribes (who would respond to the Government Entity Fact Sheet) and *93 school district cases* (who would respond to the School District Fact Sheet). Ex. 14. Similarly, the MDL court in *AFFF* implemented fact sheets for water district plaintiffs at a time when *fewer than 50 municipal cases* had been filed in the MDL. *See In re AFFF*, Case No. 2:18-mn-2873, MDL No. 2873 (list of associated cases). Here, there are about 60 cases in the SFP Track (already more than the government-entity cases in *JUUL* and more than the municipal cases in *AFFF* at the time those fact sheets were implemented)—and that number continues to grow.[8]

Even with the current number of cases in the SFP Track, it will be unmanageable and inefficient to conduct full-scale discovery of the type proposed in Defendants' PFS in each and every case. Plaintiffs' two-pronged approach for case-specific discovery—a detailed PFS (and DFS) that informs bellwether pool selection, followed by more fulsome discovery in selected cases—is the most efficient way to develop MDL cases without unnecessary burden and delay.

## C. Case-specific discovery in the State AG Track, consisting of Plaintiff Fact Sheets, followed by further case-specific workup of discovery pool cases.

Plaintiffs in the State AG Track propose a two-pronged process for case-specific discovery similar to the process discussed as discussed in detail in the SFP Track section above: an initial exchange of a PFS in each State AG case to supply the parties with information necessary to inform the selection of discovery pools that would occur in parallel with Master Discovery to Defendants. *See* Ex. 1, CMO §§ I, V. Following this the parties will confer regarding case-specific discovery

---

[8] In their prior position paper, Defendants attempted to distinguish the other MDLs relied on by Plaintiffs. *See* ECF No. 166. But Defendants' figures are wrong throughout. For example, *JUUL* currently includes 1,500 government entities, not over 5,700; *AFFF* includes approximately 500 entities, not 800. The government entities in *JUUL* named two defendants, and most *AFFF* municipalities likewise named just two defendants. And as this Court is well aware, *Elmiron* and *Invokana* included one principal defendant, not over ten.

including a discovery pool process. *See id*. § VI.B. As demonstrated in the State AGs' May 8, 2024 position paper regarding discovery, the States' proposal achieves this Court's objectives set forth in CMO #10 to "promote the just and efficient conduct of this litigation, conserve judicial and party resources, minimize duplicative discovery and serve the convenience of the parties and witnesses." *See* ECF No. 168.

Moreover, Defendants have had the Plaintiffs' proposed PFS since May 30, yet have refused to provide the State AGs with any counterproposal or engage in meet-and-confers on this subject.  Given this refusal, the State AG track respectfully requests the Court implement the State AGs' proposed PFS (Ex. 16).

## II.    SFP Track Plaintiffs' proposed PFS is robust and furthers the gating function intended of a fact sheet.

At the May 13, 2024 discovery conference, when discussing plaintiff fact sheets, Defendants' counsel represented to the Court that they desired early discovery that would allow them to "understand where there are meaningful distinctions" between Plaintiffs so that they can "meaningfully participate in determining what the next stage of the litigation should be and what cases should move forward to those initial phases." May 13, 2024 Tr. at 20:10-19. Plaintiffs' proposed PFS does exactly that.

Plaintiffs' proposed PFS strikes the appropriate balance between collecting important gating information to assist in working towards the next phase of discovery while still recognizing that not *all* potentially relevant information needs to be collected and produced by all Plaintiffs at the outset of the MDL. Plaintiffs' proposed PFS offers to provide as much information—if not more—than is typically seen in plaintiff fact sheets in similarly situated government-entity MDLs.

As discussed in more detail below, Plaintiffs' proposed PFS also seeks to gain efficiencies by permitting Plaintiffs to provide responsive information in accordance with Rule 33(d) and by

providing for cooperation between the parties in producing information squarely in the possession of the PBM Defendants so that *all parties* have equal access.

Plaintiffs' proposed PFS includes 30 questions—nearly all of them substantive—and six document requests providing information regarding:

    a.  Case background (Questions 1-4);

    b.  The number of beneficiaries in each Plaintiff's health plan between 2011-2022 and the number of those beneficiaries that used the at-issue drugs over that timeframe (Questions 5-6);

    c.  Individuals and entities with relevant knowledge concerning the Plaintiff's claims (Questions 7-9);

    d.  The applicable at-issue drugs in the Plaintiff's case, together with information setting forth the amount spent by the Plaintiff on those drugs between 2011-2022 (Questions 10-11);

    e.  Plaintiff's health plan over time, the corresponding PBMs, and third parties relevant to the health plan over time (Questions 12-18);

    f.  When Plaintiff became aware of various events or facts that Defendants argue may have some bearing on applicable statutes of limitations (Questions 19-23);

    g.  Plaintiff's selection process for its health plans and PBMs, audits of Plaintiff's health plans or pharmacy benefits plans, and information concerning the individuals or entities that assisted Plaintiff as to these matters (Questions 24-27);

    h.  Organizations and other groups Plaintiff is involved in that relate to PBMs, drug pricing, and legislative reform (Questions 28-29); and

    i.  The categories of damages being sought by the Plaintiff (Question 30).

*See* Ex. 3.

Plaintiffs' proposed PFS also includes six document requests in response to which Plaintiff would provide:

    a.  Documents related to Requests for Proposal issued by Plaintiff for PBM services between 2011-2023 (Doc. Request 1);

    b.  Contracts and related documents concerning PBMs used by Plaintiff between 2011-2023 (Doc. Request 2);

c.  Documents identifying the formularies in place for Plaintiff's health plan between 2011-2023 (Doc. Request 3);

d.  Data concerning Plaintiff's expenditures on the at-issue drugs between 2011-2023 (Doc. Request 4);

e.  Documents received by Plaintiff concerning representations made by PBMs about their services or made by manufacturers concerning their drug prices (Doc. Request 5);

f.  Contracts, presentations, reports, analyses, and memoranda involving third-party advisors concerning services provided between 2011-2023 related to prescription drug benefits (Doc. Request 6).

The breadth and scope of Plaintiffs' PFS is also consistent with, and in some respects goes well beyond, the PFS implemented in similar MDLs involving governmental-entity plaintiffs. *See, e.g.*, Ex. 8, 10, 12 (plaintiff fact sheets entered in *JUUL*, *AFFF*, and *Opioids*, respectively). For example, the fact sheet for municipal water districts in the *AFFF* MDL included just *18 total questions*, half of which sought either basic case background information or purely objective facts regarding the district—e.g., locations served, number of meters, maximum and average daily demand, and type of treatment system, with the balance seeking easily accessible information regarding the alleged contaminated sites, test data, and remediation. *See* Ex. 10____.

Plaintiffs' proposed PFS would also provide much more robust data than fact sheets used for government-entity plaintiffs in *JUUL*. Although the *JUUL* fact sheet contained 50 questions, those included: 9 questions on basic case background; 8 seeking simple data (total citizens, percentage of citizens under age 18, zip codes, minimum ages to purchase tobacco or e-cigarettes); 3 questions asking for an identification of individuals with knowledge; 7 questions asking the government entities to merely identify certain relevant legislation or programs; and 7 basic questions regarding damages (with none asking for any calculation or quantification of damages). *See* Ex. 8. Plaintiffs' proposed PFS likewise exceeds the plaintiff fact sheet approved and utilized

for government-entity plaintiffs in the *Opioids* MDL. That case is one of the largest MDLs in history, yet the fact sheet utilized for government entities was under six pages long, included 23 total questions (many of which required simply a Yes/No response or identification of relevant individuals), and provided less information than what Plaintiffs have proposed here. *See* Ex. 12.[9]

### III.   Numerous problems with Defendants' proposed PFS for SFP Track Plaintiffs render it unworkable.

Despite representing to the Court during the May 13, 2024 conference that Defendants merely sought "information early on and to meaningfully understand what the next steps should be" (May 13, 2024 Tr. at 21:15-17), Defendants' proposed PFS extends far beyond that stated scope. During a recent conferral, Defendants' counsel took the position that: "As long as it's part of the case, it's fair for the fact sheet." And Defendants' proposed PFS adopts that unrestricted view. Indeed, Defendants have merely repackaged their prior proposal for wide-ranging case-specific discovery as their proposed PFS. Not only is the breadth and scope of Defendants' proposed PFS inappropriate for any fact sheet, but other serious issues—including its request for information squarely within the PBMs' own possession, its refusal to allow responses under Rule 33(d), and its premature requests for expert damages discovery and other legal contentions—render their proposed PFS completely unworkable. The Court should reject Defendants' proposed PFS and instead adopt Plaintiffs' proposed PFS.

---

[9] Plaintiffs' PFS is also consistent with the approach endorsed by proposed Rule 16.1 of the Federal Rules of Civil Procedure. This information contained within Plaintiffs' PFS will serve the intended purpose of a PFS: facilitating the exchange of core information that can be used as a "method[] to take a survey of the claims and defenses presented, largely as a management method for planning and organizing the proceedings." *See* https://www.uscourts.gov/sites/default/files/2023-03_civil_rules_committee_agenda_book_final_0.pdf. Plaintiffs' PFS has likewise been crafted "to meet the purpose to be served and avoid undue burdens." *Id.*

**A.  Defendants' proposed PFS is unnecessarily burdensome at this stage.**

Defendants continue to seek information that goes far beyond what is necessary at this stage of the case. *See* Ex. 4. Defendants' proposed PFS includes 40 questions (not including subparts) and seven categories of document requests on subjects including: Plaintiff's health plan beneficiaries' out-of-pocket responsibility for each of the 32 at-issue drugs for each year between 2011-2022 (Question 11); for every health plan offered by Plaintiff between 2011-2022, the annual deductibles, copayment or coinsurance rate for each pharmaceutical tier, the annual out-of-pocket maximums, and  whether Plaintiff's health plan had first-dollar coverage for any at-issue drug (Question 13); the specific formularies Plaintiffs' health plan offered for prescription drug coverage for the 12-year period between 2011-2022 (Question 14); contract terms in the PBM agreements between Plaintiff and its PBM (Questions 19-21); all the ways in which Plaintiff uses rebates and administrative fees received from PBMs for at-issue drugs (Question 24); identification of every misrepresentation or omission by Defendants, the corresponding date, and other contentions (Questions 27-28); Plaintiff's awareness of various topics that Defendants argue relate to statute-of-limitations issues (Questions 29-35); an identification of every category of damages or monetary relief that Plaintiff alleges, together with a *specific dollar amount* for each category of damages, and an *explanation of the calculation of that amount of damages* (Question 43). *See* Ex. 4; *see also* Ex. 5 (redline comparison of Defendants' proposed PFS against Plaintiffs' proposed PFS). Defendants' proposed Question 15 alone—which asks whether each of the 32 at-issue drugs was included or excluded on any formulary Plaintiff used during the 12-year period between 2011-2022, as well as the drug's formulary tier or status, whether the drug was the lowest branded copay on the formulary, and the years that the pharmaceutical was included on the formulary—would require Plaintiffs to complete a seven-column chart covering 32 drugs across a

12-year time period—over 2,000 separate data points. *See* Ex. 4. Given the sweeping breadth and scope of these questions, in addition to the remaining questions contained in Defendants' proposed PFS, it is difficult to conceive of what additional information Defendants could even ask for as part of a full workup of written case-specific discovery.

Defendants' PFS also includes several questions that have minimal, if any, relevance to this case. For example, Defendants' PFS includes questions that are intended to gather information about the cost of the at-issue drugs to *Plaintiffs' health plan members*, rather than seeking information about the expense of these drugs as to Plaintiffs themselves. *See e.g.,* Ex. 4 at Questions 11, 13, 22-23; Doc. Request 5. Given that this case is about overpayments made by Plaintiffs, not their individual members, it is difficult to discern why this question is necessary for inclusion in a PFS.

Other questions inquire into topics with marginal relevance, such as how Plaintiffs have used funds obtained from drug rebates. *See e.g,*, Ex. 4 at Question 24.  There is simply no need to provide this information in a PFS. Similarly, Defendants' PFS asks Plaintiffs to cull specific language from their PBM contracts and fill out charts addressing whether certain language is present in various PBM contracts, as well as the legal effect of that language.[10] *See e.g.*, *id.* at Questions 19-21. This information will be readily available to Defendants from the underlying PBM contracts themselves, which Plaintiffs do not object to producing. But it is an unnecessary and burdensome use of Plaintiffs' time and resources to collect these contracts, search for specific words that Defendants ask about, and point out such language to Defendants.

---

[10] Plaintiffs do not object to producing the PBM contracts themselves. That information is directly contemplated in Question 13 and Document Request 2 of Plaintiffs' proposed PFS.

Other document requests in Defendants' proposed PFS are similarly overbroad and problematic. For example, Defendants' Document Request 2 seeks "Documents, including internal summaries, analyses, and presentations, *reflecting Your reasons* for selecting or not selecting a PBM prescription drug benefit plan for each year, including bids, *communications*, RFPs, procurement rules, guidance documents, *and related documents*, and *documents relating to negotiation for Rebates* for Your employee plan(s) or for Medicaid. *Id.* at Doc. Request 2. While a small subset of the documents requested here may make sense for a PFS, the scope of this Request, as drafted, is inappropriate.

Additionally, Defendants often combine multiple unrelated (or tangentially related) requests into a single document request to make it appear that the number of overall requests is more reasonable. For example, Defendants have a single document request that seeks *both* information about when Plaintiffs became aware of allegations in their lawsuit *and* specific documents provided by the Defendants that could demonstrate misrepresentations made to the Plaintiff. *See id.* at Doc. Request 6. This sleight of hand results in a lengthy set of wide-ranging document requests that Defendants have attempted to reframe as something less burdensome.[11]

### B. Defendants' proposed PFS seeks information and documents squarely within the possession of the PBM Defendants.

Defendants' proposed PFS seeks several categories of information and documents concerning Plaintiffs' health plans and prescription drug coverage that are undeniably in the possession of Plaintiffs' current and former PBMs. *See, e.g.*, Ex. 4 at Question 11 (total spend by Plaintiff on at-issue drugs, rebates received, and members' out-of-pocket responsibility); Question

---

[11] To be clear, Plaintiffs are not contending that Defendants are never entitled to the information requested in their proposed PFS. But the central purpose of the PFS is to provide the Defendants with the information necessary for selection into a discovery or bellwether pool, after which those Plaintiffs selected will undergo more extensive discovery.

13 (annual deductibles, copayment or coinsurance rate for each pharmaceutical tier, annual out-of-pocket maximums; and whether Plaintiff's health plan had first-dollar coverage for any at-issue drug for each health plan offered between 2011-2022); Question 14 (specific formularies Plaintiffs' health plan offered for prescription drug coverage between 2011-2022); Doc. Request 4 (documents sufficient to identify the formularies for Plaintiff's health plans between 2011-2022). Because Plaintiffs often will not have such information—especially at the granular level requested in Defendants' PFS—the simplest (and much more efficient) approach to ensure that all parties have this information is for the PBM Defendants to provide it.[12] *See In re Allergan*, 2022 WL 3211421, at *4 (affirming special master's order requiring Allergan to provide communications between Allergan sales representatives and Plaintiffs' treating physicians as part of fact-sheet process because "Allergan has this information" and because the information was "essential to both the claims and defenses in this litigation"). Like Allergan, the PBM Defendants have much of the information requested in Defendants' proposed PFS and should provide it to all parties.

To address this issue, Plaintiffs inserted language in the introductory portion of their proposed PFS providing that "to the extent any of the information requested is in the possession of one or more of the Defendants and is not currently in [Plaintiff's] possession, Plaintiffs agree to request such information from Defendants and Defendants agree to fully cooperate in providing information requested in these requests to the extent the information requested is in the possession

---

[12] It is unsurprising that Plaintiffs may not possess all of the data being requested here. The PBMs, acting as Plaintiff's representatives or agents, are the masters of this data. Frequently, Plaintiffs do receive high-level summaries of information like claims data, but they typically do not obtain this information at the detailed level the Defendants request here. This distinction is even more apparent for formulary data. These formularies are created by the PBM Defendants themselves with no involvement from Plaintiffs. While Plaintiffs may have some information regarding applicable formularies, the PBM Defendants are undoubtedly in the best position to provide detailed information regarding formularies.

of one or more of the Defendants." Ex. 3. But Defendants have refused to include this provision and disavow any obligation to participate in collecting information in the PBMs' possession.[13]

If the Court were to require the production of any such documents in Plaintiffs' possession, followed by a supplement of any of the remaining requested materials that are in the PBM Defendants' possession, then the discovery needs of all parties would be satisfied in this regard.

In short, Plaintiffs have no objection to producing claims and formulary data (among other requested information) that they actually possess, but there should be a mechanism in place to streamline the exchange of all data and information requested by Defendants that is not in Plaintiffs' possession and instead resides in the files of the PBM Defendants.

### C. Defendants' proposed PFS questions focused on their statute-of-limitations defense are irrelevant and unduly burdensome.

Perhaps the most striking example of Defendants' overreaching in their proposed PFS relates to one of their primary defenses: statute of limitations. Defendants have maintained from this case's inception that their statute-of-limitations defense requires robust custodial sweeps of every Plaintiff in this MDL, so that—in the event the Court adopts a discovery pool and bellwether structure—Defendants can meaningfully assess candidates based on the timing of their knowledge of Defendants' scheme. Defendants are wrong, for at least two reasons.

First, no plaintiff could have learned of the depths of Defendants' scheme such that a statute of limitations was triggered, because to this day no one—not even the Senate, Congress, the FTC, or the media—understands the depths of Defendants' scheme and its effects. Indeed, the Senate Finance Committee's 2021 insulin report repeatedly emphasized that Defendants' dealings were "opaque," that the amount of administrative fees funneled to the PBMs was "not known," and that

---

[13] As discussed below, this lack of cooperation by Defendants is what, in large part, necessitated Plaintiffs' proposed DFS.

Defendants' "lack of transparency even extends to health plans." The report only briefly mentioned rebate aggregators—a critical component of Defendants' scheme—and noted that these "[n]ew arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress."

To this day, Defendants have effectively concealed their scheme from the public. In February 2024, for example, FTC Chair Lina Khan explained in a letter to the Senate that the FTC's PBM investigation had been stalled—for years—because, although the FTC had issued compulsory orders to the PBMs as far back as 2022 requiring them to produce data and documents, "no company ha[d] turned over sufficient documents and data to be in full compliance with those orders." The FTC finally issued an interim report about a month ago, in July 2024, explaining that, "[a]lthough the FTC issued its Orders to the PBMs over two years ago, some of the PBM respondents have not yet fully complied" and that this "failure of certain respondents to timely produce data and documents has hindered the ability of the Commission to perform its statutory mission." The FTC's "study" remains "ongoing."

This lack of transparency mirrors Defendants' practices during the Senate Finance Committee's investigation, where the Committee explained that the "PBMs were not fully responsive to the Finance Committee's requests during th[e] investigation." And at congressional hearings, Defendants have similarly stonewalled government investigations, denying all wrongdoing and maintaining that they actually "maximiz[e] savings for employers." Just days ago, on August 28, 2024, the House Committee on Oversight and Accountability wrote to the PBMs about their July 2024 testimony before the Committee. In its letter, the Committee explained that the PBMs' testimony "contradict[ed]" the FTC's interim findings, and the Committee gave the PBMs an "opportunity to correct the record" to avoid criminal liability. If our government and

press have still not uncovered the intricacies of Defendants' misconduct because of their stonewalling, then it is equally impossible for Plaintiffs here to have done so.

Second, as the recent motion-to-dismiss briefing concerning the Self-Funded Payer Track has made clear (ECF Nos. 250, 252), not even the public reports that Defendants rely on to support their statute-of-limitations arguments could have conceivably put Plaintiffs on notice of Defendants' misconduct. The reports and public statements that Defendants have cited as potential sources of Plaintiffs' actual or constructive knowledge variously describe high prices, rebates, formulary practices, and the like, but *none* describes Defendants' mislabeling of rebates, formulary manipulation, or any other manner of deceit *aimed at self-funded plans*. Because no one had uncovered the mechanics of the scheme, this conclusion made sense. Based on the information that was publicly available—payers' contracts with the PBMs, public statements, journalism, etc.—it appeared that prices were high, in part, due to increasing rebates, which, as far as anyone knew, *were passed through to insurers* (including self-funded plans). The same holds true for the earlier litigation against these Defendants. Most of those complaints were brought by consumers (or attorneys general on behalf of consumers) whose injuries are different than Self-Funded Payer Plaintiffs because they paid the full list price for the at-issue medications. Nor did those cases describe the insulin pricing schemes with the same detail raised here; they did not, for example, describe the mislabeled Manufacturer Payments at issue in this case. And they could not have— the details available today were not public then, and journalists and regulators are *still* unearthing new facts about Defendants' deception and misconduct.

When Defendants ask in Document Request 6 of their proposal for "Documents related to . . . the manner in which you first became aware of the allegations in these actions," communications regarding the reports discussed above are precisely the kinds of documents which

they would seek and on which they intend to rely (as evidenced by the fact that many of these reports were identified specifically in a prior PFS proposal from the Defendants). But for the reasons set forth above, any knowledge of these reports is largely irrelevant. And they certainly do not justify broad custodial sweeps of every Plaintiff in this litigation.

### D. Defendants refuse to permit Plaintiffs to rely on Rule 33(d) where appropriate to provide requested information.

Not only is Defendants' proposed PFS inappropriately broad and unduly burdensome in its scope, but Defendants have also refused to allow Plaintiffs to provide responsive information in accordance with Rule 33(d). Under this Rule, "[i]f the answer to an interrogatory may be determined by examining . . . a party's business records . . . and if the burden of deriving or ascertaining the answer will be substantially the same for either party," the responding party may provide a response by "specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." Fed. R. Civ. P. 33(d).

Throughout the meet-and-confer process, Plaintiffs explored ways to provide more information than what is typically seen in a PFS, while still attempting to increase efficiencies and minimize the burden on Plaintiffs.[14] That is why, in Plaintiffs' proposed PFS, Plaintiffs included language providing that, "[t]o the extent any question can be answered through the production of documents, consistent with Federal Rule of Civil Procedure 33(d), Plaintiff may produce such documents and indicate in the response which documents are being produced to satisfy the question and specify the applicable bates ranges for the specific responsive documents." Ex. 3. Defendants, however, rejected the inclusion of this language in their proposed PFS without

---

[14] Questions 13, 15, 19, 20-22, 26, and 40 in Defendants' proposed PFS appeared to Plaintiffs to be suitable for a response in accordance with Rule 33(d).

offering any explanation for doing so. And there is no reason for Defendants to refuse this language other than a desire to burden Plaintiffs. Defendants' unwillingness to consider Rule 33(d) as a viable option to address some of the requested information has made it all the more difficult for the parties to reach an agreement as to the PFS here and is yet another reason to reject Defendants proposed PFS in favor of Plaintiffs' more reasonable PFS.

### E. Defendants request damages information that requires expert input or is otherwise premature for a PFS.

Finally, Question 43 in Defendants' proposed PFS asks Plaintiff to provide a precise calculation of their damages (to the dollar), along with an explanation of the calculation. *See* Ex. 4. This question, which calls for the premature disclosure of expert testimony, is wholly inappropriate in a fact sheet. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 2013 WL 12291705, at * 1 (D. Del. Oct. 22, 2013) ("The final calculation of damages is properly the subject of expert opinion."); *see also* 6 Moore's Federal Practice § 26.22[4][c][ii], at 26-90 to 26-91 (3d ed. 2018) (where damages calculations were "appropriately the subject of expert evidence," damages disclosure obligation "would be controlled by the expert disclosure rules").

And in *JUUL*, for example, Magistrate Judge Corley disallowed the defendants' question to government-entity plaintiffs in defendants' proposed fact sheet asking plaintiffs "to quantify the amount of damages per category suffered, and to allocate such damages among Defendants," finding that it was "inappropriate for inclusion in a fact sheet" because "[s]uch quantification and allocation is likely not possible until expert reports are prepared." *In re JUUL*, Case No. 19-md-02913, MDL No. 2913, Order Regarding Government Entity Plaintiff Fact Sheets (ECF No. 1038), Ex. 15.

Defendants appear to acknowledge the need for expert input on damages-related questions. For example, in Questions 41-42, which seek a general description of "how" Plaintiff has been damaged by Defendants' conduct and the date Plaintiff was first injured, Defendants include qualifying language that the "request is not designed to require an expert evaluation." Ex. 4. Yet, in Question 43—which requires Plaintiffs to "identify each category of damages or monetary relief that [Plaintiff] allege[s], *a dollar amount* for the award [Plaintiff] seek[s] for each category of damages or monetary relief, *and an explanation as to how [Plaintiff] calculated that amount* of damages"—the expert proviso is noticeably absent. *Id.* (emphasis added).

Additionally, Questions 27 and 28 of Defendants' proposed PFS include detailed requests for information about every misrepresentations and omission in each Plaintiff's case. Rather than have every Plaintiff in every case identify every misrepresentation and conjure every omission made by Defendants as part of the fact-sheet process, this information is more appropriately provided at a later juncture after the selection of cases for discovery or bellwether pools.

## IV.   SFP Track Plaintiffs' proposed Defendant Fact Sheets are necessary and appropriate.

In addition, Plaintiffs have proposed separate Defendant Fact Sheets (DFS) to the PBM and Manufacturer Defendants. The DFS directed to the PBM Defendants (Ex. 6) contains just 16 questions and is narrowly tailored to seek core information easily accessible to the PBMs.

    a.  Nearly *half* of the questions merely ask the PBMs to *identify*: (i) PBM employees with responsibility over Plaintiff's health plan or prescription drug coverage, (ii) PBM employees with knowledge regarding Plaintiff's allegations, (iii) account executives or other team members assigned to Plaintiff's account, (iv) persons involved in submitting responses to Plaintiff's requests for proposal, including any third-party advisors or contractors, (vi) PBM employees charged with negotiation or management of Plaintiff's PBM contract; (vii) rebate aggregators with whom the PBM had a relationship concerning any payments received by the PBMs from the Manufacturers relating to claims by Plaintiff's beneficiaries (Questions 1-5, 7, 15).

    b.  Other questions seek basic information central to the PBM's role with respect to Plaintiff's prescription drug coverage, including: the formularies offered as part of

27

Plaintiff's health plans during the relevant timeframe (Question 8); Plaintiff's annual spend on the at-issue drugs during the relevant timeframe (Question 9); the amounts paid by Plaintiff to the PBM for PBM services for each year of the relevant time period (Question 12); and information regarding the dates of any audits requested by Plaintiff relating to the PBM's services (Question 16).

c.  The remaining four questions seek information on amounts received the PBM in *connection with claims by Plaintiff's beneficiaries for the at-issue drugs*, including: (i) the types and amounts of payments or other consideration received from Manufacturers, as well as the portion of those payments paid or passed through to Plaintiff (Question 10); (ii) the amounts paid by the PBM to any pharmacies or to any consultant or advisor (Question 11); and (iii) the total revenues and profits earned by the PBM and the amounts retained by the PBM and its affiliates (Questions 13-14).

d.  The DFS to the PBM Defendants also includes four document requests seeking (i) RFP responses submitted by the PBM to Plaintiff; (ii) contracts between the PBM and Plaintiff; (iii) formularies for Plaintiff's health plans; and (iv) any presentations, reports, analyses, or memoranda related to any audits requested by Plaintiff regarding the PBM's services.

The proposed DFS to the Manufacturers—which is keyed off of the PBM Defendants' responses to the PBM DFS—is even less burdensome. *See* Ex. 7. It consists of three questions and one document request asking the Manufacturers to:

a.  identify any employees who communicated with any of the PBM employees identified by the PBM Defendants in response to the PBMs' DFS or who otherwise have knowledge of the allegations in Plaintiff's complaint;

b.  describe any internal or external programs applicable to Plaintiff that the Manufacturer has used or funded during the relevant timeframe relating to lowering the amount of Plaintiff's spend on any of the at-issue drugs; and

c.  produce documents sufficient to identify of the programs describes in the DFS.

Plaintiffs' proposed DFSs to the PBMs and Manufacturers have been carefully considered and customized so that they narrowly seek what is required at this stage. Like Plaintiffs' proposed PFS, Plaintiffs' proposed DFS will provide core information needed to meaningfully inform the parties' selection of cases for inclusion in discovery or bellwether pools. As such, they conform to

the defendant fact sheets entered by the MDL courts in *AFFF* and *Opioids*.[15] *See AFFF*, Case No. 2:18-mn-2873, MDL No. 2873, Case Management Order No. 5 (ECF No. 205) (implementing defense fact sheet), Ex. 10; *Opioids*, Case No. 1:17-md-2804, MDL No. 2804, Fact Sheet Implementation Order (ECF No. 638) (same), Ex. 12.

Although Plaintiffs did not initially propose a DFS in their prior position paper to the Court, these proposed DFS were necessitated by the scope of Defendants' proposed PFS, which, as set forth above, seeks voluminous information squarely (if not exclusively) within the possession of the PBMs themselves *without any corresponding mechanism* for Plaintiffs to seek this information from the PBMs to provide the requested information.

Moreover, while Plaintiffs in the MDL have provided Defendants with Rule 26(a)(1) initial disclosures identifying *case-specific* individuals with knowledge, documents, and the like, Defendants have not provided reciprocal exchanges. And the disclosures that Defendants have provided are deficient on their face. For example, despite Plaintiffs' allegations of a decade-long conspiracy between the Manufacturers and PBMs, Defendants provide a smattering of individuals with discoverable information that Defendants may to use to support their defenses: Express Scripts disclosed 4 individuals, CVS disclosed 7, Optum disclosed 11, Lilly disclosed 4, Novo Nordisk disclosed 4, and Sanofi disclosed 14.

For these reasons, Plaintiffs' proposed DFS to the PBMs and Manufacturers are appropriate and warranted.

---

[15] The defense fact sheet entered in *AFFF* was far more burdensome on defendants than what Plaintiffs have proposed here. For example, the fact sheet required defendants, among other things, to (i) identify—on a site-by-site basis each contractor who it had hired for investigation or cleanup or remediation of soil, groundwater, surface water and/or drinking water with respect to contamination or potential contamination by AFFF *going back to 1960*, and (ii) provide *all results and data* for tests conducted to identify PFAS for each relevant site. *Id.*

**CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter Plaintiffs' proposed CMO governing master discovery and fact sheets (Ex. 1), implement SFP Track Plaintiffs' proposed PFS (Ex. 3) and DFS (Ex. 6-7), and implement the State AGs' proposed PFS (Ex. 16).

Dated: August 30, 2024                    Respectfully submitted,

_s/ Joanne Cicala_                          _s/ David R. Buchanan_
Joanne Cicala                              David R. Buchanan
The Cicala Law Firm PLLC                   SEEGER WEISS LLP
101 College Street                         55 Challenger Road, 6th Floor
Dripping Springs, TX 78620                 Ridgefield Park, NJ 07660
512-275-6550                               973-639-9100
joanne@cicalapllc.com                      dbuchanan@seegerweiss.com

_Liaison Counsel for_                       _Liaison Counsel for_
_State Attorney General Track_              _Self-Funded Payer Track_


_s/Matthew F. Gately_
Matthew F. Gately
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF, LLP
Park 80 West Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
(201) 845-9600
mfg@njlawfirm.com

_Liaison Counsel for Class Action Track_