# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **CASE NO. 2:23-MD-03080**<br>**MDL NO. 3080**<br><br>**DECLARATION OF MICHAEL PERRY IN SUPPORT OF MOTION TO SEAL** |

**THIS DOCUMENT RELATES TO:**
*County of Albany, New York v. Eli Lilly, et al.*, No. 1:22-cv-00981
*King County v. Eli Lilly et al.*, No. 2:23-cv-21178
*Lake County, Illinois v. Eli Lilly, et al.*, No. 2:23-cv-08487

I, Michael Perry, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1. I submit this declaration in support of PBM Defendants' Motion to Seal. I am over the age of 21 and am capable of making this declaration. I have personal knowledge of the facts herein stated and, if called and sworn as a witness, could and would testify to the same.

2. I am Vice President and Senior Legal Counsel for CaremarkPCS Health, L.L.C. ("Caremark"). In that role, among other things, I have general familiarity with Caremark's contractual relationships with clients and the negotiation thereof.

1

3. Caremark's clients include Plaintiff King County (the "County"). In addition to being familiar with the general manner in which Caremark pursues business from potential clients and negotiates unique, customized contracts for PBM services, I have general familiarity with the January 1, 2017 Contract between King County and Caremark, which I understand to have been filed provisionally under seal as Exhibit 1 to the PBM Defendants' Memorandum in Support of Their Motion to Dismiss the Self-Funded Payor Track Complaints (the "Agreement"). As discussed in further detail below, the Agreement contains proprietary pricing, rebate, cost and other commercial and financial information (the "Proprietary Information"). This information constitutes valuable and commercially sensitive information that, if disclosed, would substantially harm Caremark's ability to compete in the marketplace.

4. Caremark is a pharmacy benefit manager ("PBM"). It administers prescription drug benefit plans for ERISA and non-ERISA health plans, self-insured employers, union-sponsored plans, state and local governments, as well as federal health care programs.

5. The PBM industry is fiercely competitive. Clients have multiple PBMs to choose from and regularly require PBMs to compete aggressively with one another for the client's business.

6. Most of Caremark's business is won through a competitive sealed bid process. In this process, PBMs submit bids in response to "requests for proposals" issued by potential clients. At any given time, there will typically be hundreds of open RFPs to which Caremark and other PBMs are competing.

7. When Caremark submits a bid to pursue business from a potential client, Caremark usually competes with several other PBMs. Each PBM's bid contains the specific terms under which the PBM offers to provide various services to that particular client. But Caremark and the other PBMs do not know the terms that one another have offered the potential client. Each PBM must instead rely on their own information—based on their own bidding and contracting experience—to make strategic decisions about what to offer.

8. Once a client selects Caremark as a PBM, the client and Caremark begin to negotiate a contract for pharmacy benefit management services. Those negotiations are complex and comprehensive, and as a result they typically take several months.

9. Those negotiations do not result in mere "form" contracts, under which Caremark provides the same services, on the same terms and conditions, to all customers. To the contrary, each contract contains a unique combination of services and financial terms. Each unique contract generally includes reference to the client's unique benefit plan design and set of PBM services, and thus each client negotiates

customized terms and service, including pricing terms. The terms in Caremark's confidential customer contracts thus reflect the unique and confidential strategies that Caremark has developed to be competitive in the PBM marketplace.

10. Because such information is competitively sensitive, Caremark takes careful measures to protect the confidentiality of the Proprietary Information contained in its customer contracts. Not only is the Proprietary Information kept confidential with respect to the public at large, but it is not even openly disseminated within Caremark. To the contrary, the Proprietary Information is known only to Caremark's senior management, the account executive, individuals in the accounting and client contract service departments, and select personnel in Caremark's legal department. Documents containing such information are labeled as "confidential," and access to these documents is provided to Caremark employees only on a "need to know basis." The Agreement contains confidentiality terms that support the protection of Caremark confidential, proprietary and business secret information, including limitations on the disclosure of provisions of the contract to the public or third parties.

11. Caremark also has taken steps to protect the same or similar Proprietary Information from public disclosure in connection with other customer contracts. Indeed, when Caremark receives notice that a customer contract or its proprietary information is the subject of a records request, it regularly seeks to enforce its legal

rights to protect such information. These efforts have included filing declaratory judgment actions, as well as seeking, and obtaining, injunctions from courts, which have found Caremark's pricing- and marketing-related information, and other Proprietary Information, to be exempt from disclosure under public records laws.

12. The Proprietary Information contained in the Agreement is not readily ascertainable from public sources. Specifically, in the absence of statutorily mandated disclosure, disclosure otherwise approved by the parties, or improper disclosure, the exact combination of services and pricing structures that form the basis of the Agreement, including the particular services contracted for, the fees charged for Caremark's services, and other financial arrangements, could not be ascertained or duplicated, and could not be properly acquired by competitors or others who could obtain economic value from its use or disclosure.

13. Disclosure of this Proprietary Information would inflict acute competitive harm upon Caremark. Caremark's internal cost and pricing structure for the County and other customers is complex and is derived in part from proprietary research and business development activities that Caremark has conducted in connection with the needs and expectations of its customers and potential customers. If competitors or customers learned the structure of the price and non-price terms that Caremark has negotiated with the County, Caremark's competitors would have an unfair advantage in subsequent contract negotiations

with Caremark's customers or potential customers, and Caremark's customers and potential customers would have an unfair advantage in subsequent contract negotiations with Caremark.

14. Disclosure of the Proprietary Information would place Caremark at an unfair competitive disadvantage in subsequent contract negotiations with customers because customers would obtain access to Caremark's Proprietary Information, whereas Caremark would not have access to confidential information in the possession of the customer, such as the customer's negotiating strategy, or terms that other PBMs may offer to that customer in parallel contract negotiations. Competing PBMs would likewise obtain access to Caremark's Proprietary Information, but Caremark would not have access to what these competitors offered, negotiated, and/or agreed to with their clients in similar negotiations.

15. Caremark would thus be prejudiced financially if the Proprietary Information was disclosed. Disclosure of such information would, among other things, undermine Caremark's ability to negotiate on a level playing field with clients and to compete on a level playing field with other PBMs. Revealing the Proprietary Information would harm Caremark's ability to bid effectively for future business, and increase the probability that Caremark would be underbid.

16. Information regarding pricing, financial guarantees, similar financial terms remains competitively sensitive even when it is no longer current.

Competitors that acquire confidential information regarding financial terms for Caremark from past years are able to make adjustments based on their own proprietary historical information as well as publicly available historical information regarding Caremark and the market, and can then use the adjusted information to make better informed assessments regarding the financial terms that Caremark might currently offer to or negotiate with a client or potential client that is procuring PBM services.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATE: September 27, 2024  
Clayton, NC

*Michael Perry*  
Michael Perry