# Exhibit 6

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI**<br><br>**JUDGE RUKHSANAH L. SINGH**<br><br>**ORAL ARGUMENT REQUESTED** |

**THIS DOCUMENT RELATES TO:**

*County of Albany, New York v. Eli Lilly, et al.*, No. 1:22-cv-00981
*King County, Washington v. Eli Lilly et al.*, No. 2:23-cv-21178
*Lake County, Illinois v. Eli Lilly, et al.*, No. 2:23-cv-08487

# THE COUNTIES' RESPONSE IN OPPOSITION
# TO THE PBM DEFENDANTS' MOTION TO DISMISS

(Counsel listed on following pages)

| | |
|---|---|
| Christopher A. Seeger<br>cseeger@seegerweiss.com<br>David R. Buchanan<br>dbuchanan@seegerweiss.com<br>Steven J. Daroci<br>sdaroci@seegerweiss.com<br>**SEEGER WEISS LLP**<br>55 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>973-639-9100 | Benjamin J. Widlanski<br>bwidlanski@kttlaw.com<br>Tal J. Lifshitz<br>tjl@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Rachel Sullivan<br>rs@kttlaw.com<br>Brandon Sadowsky<br>bsadowsky@kttlaw.com<br>Daniel T. DiClemente<br>ddiclemente@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Telephone: (305) 372-1800 |
| Troy A. Rafferty<br>trafferty@levinlaw.com<br>Matthew D. Schultz<br>mschultz@levinlaw.com<br>William F. Cash<br>bcash@levinlaw.com<br>Brandon L. Bogle<br>bbogle@levinlaw.com<br>**LEVIN, PAPANTONIO,**<br>**RAFFERTY, PROCTOR,**<br>**BUCHANAN, O'BRIEN, BARR &**<br>**MOUGEY, P.A**.<br>316 S. Baylen St., Suite 600<br>Pensacola, Florida 32502<br>Tel: (850) 435-7140 | Russell W. Budd<br>Christine C. Mansour<br>**BARON & BUDD, P.C.**<br>3102 Oak Lawn Ave, Suite 1100<br>Dallas, Texas 75219<br>Tel.: (214) 521-3605<br>rbudd@baronbudd.com<br>cmansour@baronbudd.com |
| Roland Tellis<br>Mark P. Pifko<br>**BARON & BUDD, P.C.**<br>15910 Ventura Blvd #1600<br>Los Angeles, California 91436<br>Tel.: (818) 839-2333<br>rtellis@baronbudd.com | Burton LeBlanc<br>**BARON & BUDD, P.C.**<br>2600 Citiplace Drive, Suite 400<br>Baton Rouge, Louisiana 70808<br>Tel.: (225) 927-5441<br>bleblanc@baronbudd.com |

| | |
|---|---|
| mpifko@baronbudd.com | |
| Catherine Hancock Dorsey<br>**BARON & BUDD, P.C.**<br>600 New Hampshire Ave. NW 10th Floor<br>Washington, D.C. 20037<br>Tel.: (202) 333-4562<br>cdorsey@baronbudd.com | Archie C. Lamb, Jr.<br>alamb@archielamb.com<br>**Archie Lamb & Associates**<br>P.O. Box 2088<br>Birmingham, Alabama 35201<br>205-612-6789 (C) |
| Donald W. Davis, Jr.<br>dwdavis@bmdllc.com<br>**Brennan, Manna & Diamond, LLC**<br>75 East Market Street<br>Akron, Ohio 44308<br>P: (330) 253-5060/Fax: (330) 253-1977 | |

*Counsel for Albany County*


David J. Ko, WSBA #38299
Derek W. Loeser, WSBA #24274
Juli E. Farris, WSBA #17593
Laura R. Gerber, WSBA #34981
Matthew M. Gerend, WSBA #43276
Rachel C. Bowanko, WSBA #61298
Andrew N. Lindsay, WSBA #60386
**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 428-0563
dloeser@kellerrohrback.com
dko@kellerrohrback.com
jfarris@kellerrohrback.com
lgerber@kellerrohrback.com
mgerend@kellerrohrback.com
rbowanko@kellerrohrback.com
alindsay@kellerrohrback.com

*Counsel for King County*

| | |
|---|---|
| Benjamin J. Widlanski<br>bwidlanski@kttlaw.com<br>Tal J. Lifshitz<br>tjl@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Rachel Sullivan<br>rs@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Brandon Sadowsky<br>bsadowsky@kttlaw.com<br>Daniel T. DiClemente<br>ddiclemente@kttlaw.com<br>**KOZYAK TROPIN & THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Telephone: (305) 372-1800 | William F. Cash III<br>bcash@levinlaw.com<br>Troy A. Rafferty<br>trafferty@levinlaw.com<br>Matthew D. Schultz<br>mschultz@levinlaw.com<br>Brandon L. Bogle<br>bcash@levinlaw.com<br>**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.**<br>316 S. Baylen St., Suite 600<br>Pensacola, Florida 32502<br>Telephone: (850) 435-7140 |
| Christopher A. Seeger<br>cseeger@seegerweiss.com<br>David R. Buchanan<br>dbuchanan@seegerweiss.com<br>Steven J. Daroci<br>sdaroci@seegerweiss.com<br>**SEEGER WEISS, LLP**<br>55 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>Telephone: (973) 639-9100 | James L. Magazine<br>jim@magazinelaw.com<br>**THE MAGAZINE LAW GROUP LLC**<br>2625 McCormick Drive, Suite 102<br>Clearwater, FL 33759-1078<br>Telephone: (727) 499-9900 |
| Russell W. Budd<br>rbudd@baronbudd.com<br>Christine C. Mansour<br>cmansour@baronbudd.com<br>**BARON & BUDD, P.C.**<br>3102 Oak Lawn Ave, Suite 1100<br>Dallas, TX 75219<br>Telephone: (214) 521-3605 | Burton LeBlanc<br>bleblanc@baronbudd.com<br>**BARON & BUDD, P.C.**<br>2600 Citiplace Drive, Suite 400<br>Baton Rouge, LA 70808<br>Telephone: (225) 927-5441 |

| | |
|---|---|
| Roland Tellis<br>rtellis@baronbudd.com<br>Mark P. Pifko<br>mpifko@baronbudd.com<br>**BARON & BUDD, P.C.**<br>15910 Ventura Blvd #1600<br>Los Angeles, CA 91436<br>Telephone: (818) 839-2333 | Catherine Hancock Dorsey<br>cdorsey@baronbudd.com<br>**BARON & BUDD, P.C.**<br>600 New Hampshire Ave. NW 10th<br>Floor<br>Washington, D.C. 20037<br>Telephone: (202) 333-4562 |
| John M. Power (Ill. Bar No. 6197553)<br>jpower@coganpower.com<br>**COGAN & POWER PC**<br>1 East Wacker Drive, 38th Floor<br>Chicago, IL 60601<br>Telephone: (312) 477-2500 | |

*Counsel for Lake County*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**................................................................................ iii

**INTRODUCTION** ............................................................................................... 1

**BACKGROUND**................................................................................................. 3

    The Insulin Pricing Scheme.............................................................................. 4

    Defendants Conceal the Insulin Pricing Scheme............................................. 7

    Procedural History ........................................................................................... 9

**ARGUMENT**...................................................................................................... 9

I.    THE COUNTIES' CONTRACTS WITH THE PBMs DO NOT PREEMPT THEIR CLAIMS. ........................................................................................... 9

    A.  Contrary to the PBMs' Arguments, The Counties Do Not Challenge the Negotiated Definition of "Rebate." ...................................................... 10

    B.  Lack of Transparency Supports the Counties' Claims of Deception. .......... 12

    C.  "Spread Pricing" and "Clawbacks" Drive Up List Prices............................. 13

II.  THE COUNTIES' CLAIMS ARE NOT TIME-BARRED. ................................. 14

    A.  The Counties' RICO Claims Are Not Time-Barred. ................................... 15

    B.  The Counties Have Pled Facts to Toll All Applicable Statutes. .................. 18

III.  THE COUNTIES HAVE STATED ACTIONABLE RICO CLAIMS............. 19

    A.  The Indirect Purchaser Rule Does Not Bar the Counties' Claims.............. 20

    B.  The Counties Have Plausibly Alleged a Pattern of Racketeering Activity... 25

    C.  The Counties Have Plausibly Alleged Proximate Cause............................... 31

    D.  The Counties Plead Distinct Enterprises and Patterns of Racketeering Activity. ................................................................................................... 32

    E.  The Counties Pled that the PBMs Conducted an Enterprise's Affairs........ 34

IV.  THE COUNTIES STATE CONSUMER PROTECTION CLAIMS............. 34

    A.  The Counties' Claims Are Consumer Oriented.............................................. 35

    B.  State Consumer Protection Claims Are Not Barred by Safe Harbors ......... 36

    C.  The Counties Have Properly Pled Deceptive Practices................................. 37

    D.  Albany County Has Pled Causation and Reliance.......................................... 38

    E.  King County Adequately Alleges Unfair Conduct ........................................ 38

F.  King County's Claims Are Not Barred by the Indirect Purchaser Rule. ..... 39

V.  THE COUNTIES HAVE STATED FRAUD CLAIMS. .................................... 40

VI.  THE COUNTIES PLEAD UNJUST ENRICHMENT CLAIMS. ................. 41

A.  The PBM Contracts Do Not Bar Unjust Enrichment Claims. .................... 41

B.  Albany Alleges a Direct Benefit Conferred on PBMs. ................................... 42

C.  Albany's and Lake's Unjust Enrichment Claims May Proceed with Their Related Statutory and Common-law Claims. .......................................... 43

D.  King Has Stated a Claim Against OptumRx. ................................................. 44

VII.  KING HAS STATED AN IMPLIED COVENANT CLAIM. ...................... 45

VIII.  THE COUNTIES HAVE STATED CIVIL CONSPIRACY CLAIMS. ......... 46

IX.  THE COUNTIES PLEAD CLAIMS AGAINST ALL ENTITIES. .............. 47

**CONCLUSION** ........................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

### <u>Authorities</u>

*Accretive Tech. Grp., Inc. v. Adobe Sys., Inc.,*
2015 WL 4920079 (W.D. Wash. Aug. 17, 2015) .......................................................... 46

*Alce v. Wise, Foods, Inc.,*
2018 WL 1737750 (S.D.N.Y. Mar. 27, 2018) ............................................................... 43

*Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.,*
463 F. Supp. 3d 409 (S.D.N.Y. 2020) ........................................................................... 41

*Anderson Elec. v. Ledbetter Erection Corp.,*
503 N.E.2d 246 (Ill. 1986) ............................................................................................. 12

*Angermeir v. Cohen,*
14 F. Supp. 3d 134 (S.D.N.Y. 2014) ............................................................................. 47

*Animal Sci. Prod., Inc. v. China Minmetals Corp.,*
34 F. Supp. 3d 465 (D.N.J. 2014) .................................................................................. 20

*Antonios A. Alevizopoulos & Assocs. v. Comcast Int'l Holdings, Inc.,*
100 F. Supp. 2d 178 (S.D.N.Y. 2000) ........................................................................... 18

*Apple Inc. v. Pepper,*
587 U.S. 273 (2019) ..................................................................................... 20, 22, 23, 24

*Axiom Inv. Advisors v. Deutsche Bank AG,*
234 F. Supp. 3d 526 (S.D.N.Y. 2017) ........................................................................... 35

*Bank v. Wash. Pub. Power Supply Sys.,*
691 P.2d 524 (Wash. 1984) ........................................................................................... 45

*BCBSM, Inc. v. Walgreen Co.,*
512 F. Supp. 3d 837 (N.D. Ill. 2021) ............................................................................ 13

*Bd. of Mgrs. of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo,*
346 F. Supp. 3d 432 (S.D.N.Y. 2018) ........................................................................... 47

*Bias v. Wells Fargo & Co.,*
312 F.R.D. 528 (N.D. Cal. 2015) .................................................................................. 32

*Bingham v. Zolt,*
    66 F.3d 553 (2d Cir. 1995) ........................................................................................ 18

*Blaylock v. First Am. Title Ins. Co.,*
    504 F. Supp. 2d 1091 (W.D. Wash. 2007) ...................................................... 36

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
    65 F.3d 1406 (7th Cir. 1995) .................................................................................. 23

*Bollinger Indus. Inc. v. Walter R. Tucker Enters., Ltd.,*
    2021 WL 5585795 (N.D.N.Y. Nov. 29, 2021) ............................................. 13

*Boyle v. United States,*
    556 U.S. 938 (2009).................................................................................................... 33

*Brown v. Access Midstream Partners, L.P.,*
    141 F. Supp. 3d 323 (M.D. Pa. 2015) ............................................................. 30

*Cedric Kushner Promotions, Ltd. v. King,*
    533 U.S. 158 (2001).................................................................................................... 33

*Cetel v. Kirwan Fin. Grp., Inc.,*
    460 F.3d 494 (3d Cir. 2006) .................................................................................. 15

*City of Miami v. Eli Lilly & Co.,*
    2022 WL 198028 (S.D. Fla. Jan. 21, 2022)................................. 22, 27, 28, 37

*Clearyv. Philip Morris Inc.,*
    656 F.3d 511 (7th Cir. 2011)......................................................................... 43, 44

*Coe v. Noel,*
    2014 WL 6790298 (Wash. Ct. App. Dec. 2, 2014) ................................... 13

*Crisman v. Crisman,*
    931 P.2d 163 (Wash. Ct. App. 1997) ............................................................. 18

*Curtis v. Treloar,*
    1998 WL 1110448 (D.N.J. Aug. 27, 1998).................................................... 10

*Dentsply Int'l, Inc.,*
    424 F.3d 363 (3d Cir. 2005) ........................................................................... 20, 21

*Desiano v. Warner-Lambert Co.,*
    326 F.3d 339 (2d Cir. 2003) .................................................................................. 23

*Emcore Corp. v. PricewaterhouseCoopers LLP*,
   102 F. Supp. 2d 237 (D.N.J. 2000) ................................................................ 34

*Fetter v. Schink*,
   902 F. Supp. 2d 399 (S.D.N.Y. 2012) ........................................................... 12

*Fishon v. Peloton Interactive, Inc.*,
   620 F. Supp. 3d 80 (S.D.N.Y. 2022) .............................................................. 38

*FTC v. Sperry & Hutchinson Co.*,
   405 U.S. 233 (1972) ....................................................................................... 38

*Giles v. Phelan, Hallinan & Schmieg, L.L.P.*,
   2013 WL 2444036 (D.N.J. June 4, 2013) ....................................................... 28

*Gladysiewski v. Allegheny Energy Serv. Corp.*,
   282 F. App'x 979 (3d Cir. 2008) .................................................................... 10

*Great W. Ins. Co. v. Graham*,
   2020 WL 3415026 (S.D.N.Y. June 22, 2020) ................................................. 44

*Grider v. Keystone Health Plan Cent., Inc.*,
   2003 WL 22182905 n.29 (E.D. Pa. Sept. 18, 2003) ....................................... 30

*Griffith v. Centex Real Est. Corp.*,
   969 P.2d 486 (Wash. Ct. App. 1998) .............................................................. 38

*Grynberg v. Eni S.p.A.*,
   2007 WL 2584727 (S.D.N.Y. Sept. 5, 2007) .................................................. 15

*Harris Cnty. v. Eli Lilly & Co.*,
   2020 WL 5803483 (S.D. Tex. Sept. 29, 2020) .......................................... 27, 28

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*,
   171 N.E.3d 1192 (N.Y. 2021) ........................................................................ 35

*Hoffman-La Roche Inc. v. Genpharm Inc.*,
   50 F. Supp. 2d 367 (D.N.J. 1999) ................................................................... 29

*Holiday Resort Cmty. Ass'n v. Echo Lake Assocs., LLC*,
   135 P.3d 499 (Wash. Ct. App. 2006) .............................................................. 39

*Hudson v. City of Wenatchee*,
   974 P.2d 342 (Wash. Ct. App. 1999) .............................................................. 19

*Humana, Inc. v. Indivior, Inc.*,
2022 WL 17718342 (3d Cir. Dec. 15, 2022) .................................................. 23

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) .............................................................................. 20, 22

*In re Beyond Meat, Inc., Protein Content Mktg. & Sales Pracs. Litig.*,
2024 WL 726838 (N.D. Ill. Feb. 21, 2024) ................................................. 44

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2015 WL 3988488 (N.D. Ill. June 29, 2015) ............................................... 43

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012) ......................................................... 42

*In re Direct Purchaser Insulin Pricing Litig.*,
2021 WL 2886216 (D.N.J. July 9, 2021) ...................................... 16, 25, 28, 33

*In re Elec. Carbon Prod. Antitrust Litig.*,
333 F. Supp. 2d 303 (D.N.J. 2004) ............................................................ 18

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*,
2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) ............................................. 36

*In re Insulin Pricing Litigation*,
2019 WL 643709 (D.N.J. Feb. 15, 2019) ............................... 23, 27, 34, 37, 39

*In re Insulin Pricing Litigation*,
2020 WL 831552 (D.N.J. Feb. 20, 2020) ..................................................... 40

*In re JUUL Labs, Inc.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) ........................................................ 29

*In re Kaplan*,
634 B.R. 673 (Bankr. E.D. Pa. 2021) ......................................................... 30

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
27 F. Supp. 3d 447 (S.D.N.Y. 2014) .......................................................... 42

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) .................................................................... 24

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
738 F. Supp. 2d 227 (D. Mass. 2010) ......................................................... 27

*In re Processed Egg Prod. Antitrust Litig.,*
    881 F.3d 262 (3d Cir. 2018) ............................................................................ 21

*In re U.S. Foodservice Inc. Pricing Litig.,*
    729 F.3d 108 (2d Cir. 2013) ............................................................................ 31

*In reEpiPen Direct Purchaser Litig.,*
    2021 WL 147166 (D. Minn. Jan. 15, 2021) .................................................... 49

*Ins. Brokerage Antitrust Litig.,*
    618 F.3d 300 (3d Cir. 2010) ............................................................................ 26

*Insulin Pricing Litig.,*
    2024 WL 416500 (D.N.J. Feb. 5, 2024) .......................................................... 37

*Jordan v. Tilzer,*
    2022 WL 16544335 (2d Cir. Oct. 31, 2022) ................................................... 33

*Kansas v. UtiliCorp United, Inc.,*
    497 U.S. 199 (1990) ......................................................................................... 25

*Kaufman v. Cohen,*
    307 A.D.2d 113 (N.Y. App. Div. 2003) .......................................................... 18

*Kehr Packages, Inc. v. Fidelcor, Inc.,*
    926 F.2d 1406) (3d Cir. 1991) .................................................................. 26, 29

*Kermanshah v. Kermanshah,*
    580 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................ 19

*Kolar v. Preferred Real Estate,*
    361 F. App'x 354 (3d Cir. 2010) ..................................................................... 11

*Laba v. Chicago Transit Auth.,*
    2016 WL 147656 (N.D. Ill. Jan. 13, 2016) .................................................... 41

*LabMD, Inc. v. Boback,*
    47 F.4th 164 (3d Cir. 2022) ....................................................................... 15, 16

*Lavastone Cap. LLC v. Coventry First LLC,*
    2015 WL 1939711 (S.D.N.Y. Apr. 22, 2015) ................................................. 12

*Lieberson v. J&J Consumer Cos. Inc.,*
    865 F. Supp. 2d 529 (D.N.J. 2011) ................................................................. 27

*LLDVF, L.P. v. Dinicola,*
    2010 WL 3210613 (D.N.J. Aug. 12, 2010) ..................................................... 14

*MacNaughton v. Young Living Essential Oils, LC,*
    67 F.4th 89 (2d Cir. 2023) ........................................................................... 43

*Maersk, Inc. v. Neewra, Inc.,*
    687 F. Supp. 2d 300 (S.D.N.Y. 2009) .......................................................... 46

*McCarthy v. Recordex Serv., Inc.,*
    80 F.3d 842 (3d Cir. 1996) .......................................................................... 20

*Microsoft Corp. v. Motorola, Inc.,*
    963 F. Supp. 2d 1176 (W.D. Wash. 2013) ................................................... 45

*Minnesota v. Sanofi-Aventis U.S. LLC,*
    2020 WL 2394155 (D.N.J. Mar. 31, 2020) ........................................23, 35, 37

*Mississippi v. Eli Lilly & Co.,*
    2022 WL 18401603 (S.D. Miss. Aug. 29, 2022) .................................42, 49, 50

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC,*
    2019 WL 1418129 (D.N.J. Mar. 29, 2019) ....................23, 24, 26, 27, 40, 43

MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC,
    2020 WL 831578 (D.N.J. Feb. 20, 2020) ..................................................... 36

*Myun-Uk Choi v. Tower Research Cap. LLC,*
    890 F.3d 60 (2d Cir. 2018) .......................................................................... 42

*Nat'l Sec. Sys., Inc. v. Iola,*
    700 F.3d 65 (3d Cir. 2012) .......................................................................... 26

*NetJets Aviation, Inc. v. LHC Communs., LLC,*
    537 F.3d 168 (2d Cir. 2008) ........................................................................ 43

*Network Commodities, LLC v. Golondrinas Trading Co., LTD.,*
    2013 WL 1352234 (D.N.J. Apr. 1, 2013) ..................................................... 26

*Newell v. Newell,*
    942 N.E.2d 776 (Ill. App. Ct. 2011) ............................................................ 18

*Nichols v. Peterson NW, Inc.,*
    389 P.3d 617 (Wash. Ct. App. 2016) ........................................................... 12

*O'Keefe v. Ace Rest. Supply, LLC,*
2016 WL 127566 (E.D. Pa. Jan. 12, 2016) ................................................... 12

*Olson Kundig, Inc. v. 12th Ave. Iron, Inc.,*
2022 WL 4534422 (W.D. Wash. Sept. 28, 2022) ........................................ 41

*One Armoring Servs. Co. v. United States,*
152 Fed. Cl. 536 (2021) .................................................................................. 31

*Orlander v. Staples, Inc.,*
802 F.3d 289 (2d Cir. 2015) ........................................................................... 37

*Panag v. Farmers Ins. Co. of Wash.,*
204 P.3d 885 (Wash. 2009) ............................................................................. 37

*Pelman ex rel. Pelman v. McDonald's Corp.,*
396 F.3d 508 (2d Cir. 2005) ........................................................................... 38

*People v. Gen. Elec. Co.,*
756 N.Y.S.2d 520 (App. Div. 2003) ............................................................... 36

*Raintree Homes, Inc. v. Vill. of Long Grove,*
209 Ill. 2d 239 (Ill. 2004) ............................................................................... 44

*Rekhter v. State, Dep't of Soc. & Health Servs.,*
323 P.3d 1036 (Wash. 2014) ........................................................................... 45

*Rush v. Blackburn,*
361 P.3d 217 (Wash. Ct. App. 2015) ....................................................... 38, 39

*Schmidt v. Skolas,*
770 F.3d 241 (3d Cir. 2014) ........................................................................... 14

*Scholder v. Sioux Honey Ass'n Coop.,*
2022 WL 125742 (E.D.N.Y. Jan. 13, 2022) ................................................... 43

*Servs. Corp.,*
334 P.3d 1120 (Wash. Ct. App. 2014) ........................................................... 38

*Simchon v. Highgate Hotels, L.P.,*
2017 WL 6997318 (M.D. Pa. June 29, 2017) ................................................ 11

*Singleton v. Fifth Gen., Inc.,*
2016 WL 406295 (N.D.N.Y. Jan. 12, 2016) ................................................... 36

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008) ........................................................................... 17

*Stanley v. Direct Energy Servs., LLC*,
466 F. Supp. 3d 415 (S.D.N.Y. 2020) ............................................................ 19

*State Farm Fire & Cas. Co. v. Huynh*,
962 P.2d 854 (Wash. Ct. App. 1998) .............................................................. 39

*Suessenbach Fam. Ltd. P'ship v. Access Midstream Partners, L.P.*,
2015 WL 1470863 (M.D. Pa. Mar. 31, 2015) ................................................. 12

*Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*,
691 F. Supp. 2d 860 (N.D. Ill. 2010) .............................................................. 42

*Toll Processing Servs., LLC v. Kastalon, Inc.*,
2014 WL 1379676 (N.D. Ill. Apr. 8, 2014) ..................................................... 14

*Tredici Enoteca, LLC v. Dodge*,
2021 WL 3051916 (E.D. Pa. July 19, 2021) ................................................... 11

*Trustpilot Damages LLC v. Trustpilot Inc.*,
2022 WL 2124865 n.5 (2d Cir. June 13, 2022) .............................................. 36

*Union Bank, N.A. v. CBS Corp.*,
2009 WL 1675087 (S.D.N.Y. June 10, 2009) ................................................. 41

*United States v. Console*,
13 F.3d 641 (3d Cir. 1993) ....................................................................... 32, 33

*United States v. Nissenbaum*,
50 F. App'x 87 (3d Cir. 2002) ......................................................................... 29

*United States v. Omnicare, Inc.*,
2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021) ................................................ 50

*United States v. Parise*,
159 F.3d 790 (3d Cir. 1998) ............................................................................ 34

*United States v. Riley*,
621 F.3d 312 (3d Cir. 2010) ............................................................................ 26

*UnitedStates v. Bestfoods*,
524 U.S. 51 (1998) ........................................................................................... 48

x

*Van Buskirk v. Carey Canadian Mines, Ltd.*,
   760 F.2d 481 (3d Cir. 1985) ........................................................................ 14

*Vogt v. Seattle-First Nat'l Bank*,
   817 P.2d 1364 (Wash. 1991) ...................................................................... 36

*Warrick v. N.J. Off. of Att'y Gen.*,
   2022 WL 1763855 (D.N.J. May 31, 2022) ................................................ 18

*Wash. MLB Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co.*,
   202 P.3d 924 (Wash. 2009) ........................................................................ 19

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
   728 F.3d 354 (4th Cir. 2013) ...................................................................... 29

*Wilson v. Nw. Mut. Ins. Co.*,
   625 F.3d 54 (2d Cir. 2010) ......................................................................... 35

## Statutes

18 U.S.C. § 1961(5) ........................................................................................ 26

18 U.S.C. §§ 1962(c) and (d) ....................................................................... 9

42 U.S.C. § 1395w-3a(c)(6)(B), app ............................................................ 36

740 ILCS 10/7(2) ........................................................................................... 42

NYGBL § 349 .................................................................................................. 9

RCW § 48.200.010(3) .................................................................................... 19

RCW § 48.200.280(2)(h) ............................................................................... 39

RCW § 4.16.160 .............................................................................................. 19

## Rules

N.Y.C.P.L.R. § 213(8) ................................................................................... 15

## INTRODUCTION

This case arises from a multibillion-dollar price-fixing scheme orchestrated by the three largest pharmacy benefit managers in the United States, Defendants CVS Caremark, Express Scripts, and Optum (the "PBMs") and the leading manufacturers of diabetes medications, Defendants Eli Lilly & Co., Novo Nordisk, Inc., and Sanofi-Aventis U.S. LLC (the "Manufacturers"). Over the past twenty years, these Defendants have artificially inflated the prices of twenty-six insulin-based and GLP-1 diabetes medications far beyond their reasonable value. These price increases were not the product of a competitive market. The Manufacturers control the U.S. market for insulin, while the PBMs control the market for pharmacy-benefit management services, serving more than 80% of Americans. The Insulin Pricing Scheme was borne from the coincidence of both groups' unchecked power; the list prices for these medications skyrocketed because Defendants colluded to set false prices and line their pockets at payors' expense.

Because they operate in closed markets, the PBMs and Manufacturers can increase prices at will and exploit the PBMs' relationships with payors like the plaintiff-counties (the "Counties") to extract billions of dollars in unearned revenue from prescription sales. Defendants do just that. For years, the Manufacturers have increased the prices of the at-issue drugs routinely and in lockstep to cover the cost of unearned rebates that they kick back to the PBMs. Because the PBMs' contracts with clients require them to pass through all rebates, Defendants relabel unearned rebates as "fees," "discounts," and "credits," which places them beyond the reach of contractual pass-through provisions and audit rights. In

1

exchange for these payments, the PBMs prioritize the most expensive at-issue medications on their formularies, further incentivizing the Manufacturers to increase prices; the higher a medication's price, the greater the Manufacturers' profits, and the more "discounts," "credits," and "fees" the PBMs can retain.

Defendants have acted to conceal their scheme at every turn. Beyond relabeling rebates, the PBMs' and Manufacturers' contracts are confidential and key provisions of the PBMs' contracts with payors are intentionally vague and misleading. The PBMs also obfuscate rebates' payment trail using "rebate aggregators," entities formed to collect Manufacturer payments on behalf of PBM collectives. The PBMs and the Manufacturers mislead payors with promises of cost savings and transparency and by routinely disclaiming any responsibility for skyrocketing prices in the media and other public fora.

Defendants' efforts to hide the ball have been successful. The Insulin Pricing Scheme paid dividends for years without garnering public attention. Patients and payors observed that prices were rising but could not discern any cause. Eventually, investigations, articles, and litigation attributed high prices to growing rebates but focused on the economic injuries suffered by uninsured or under-insured patients. These sources did not report the *Counties*' injuries. Indeed, according to the Counties' contracts (and to the best of their knowledge), the rebates fueling price increases had been passed through such that insurers (like the Counties) were insulated from skyrocketing prices. Nor did they report the mislabeling of rebates or other key aspects of Defendants' scheme. No public record reflected the full extent of the Insulin Pricing Scheme; to be sure, regulators and journalists

are *still* uncovering new details about its mechanics and operation.

The Counties seek to further that cause and recover the millions of dollars they have lost to the Insulin Pricing Scheme. They have pled detailed and plausible claims toward that end, which Defendants managed to challenge only by reframing and miscasting the Counties' allegations. The Court should deny the motions to dismiss.

## BACKGROUND

The prices of diabetes medications have skyrocketed over the past twenty years. The insulins and insulin-analogs that diabetics use today are substantially the same as twenty years ago—yet their list prices have increased as much as tenfold, while production costs have declined and research and development costs have approached zero. AC ¶¶ 1, 11, 272-79, 236-39, 243, 525-26; KC ¶¶ 4, 14, 185-91, 201; LC ¶¶ 1, 12, 270-77, 464-67. Similarly, although GLP-1s have been on the market for nearly two decades, their list prices have increased even as more GLP-1s were introduced. AC ¶¶ 256, 263-70; KC ¶¶ 291, 298-305; LC ¶¶ 255, 262-69.

A competitive market did not produce this outcome. The Manufacturers control the market for diabetes medications. AC ¶¶ 4, 20, 232-34; KC ¶¶ 10, 32; LC ¶¶ 4, 22, 227-29. They produce the twenty-six at-issue medications and strategically evergreen their patents to block the entry of generics and biosimilar competitors into the U.S. market. AC ¶¶ 233-34, 257-62, 271; KC ¶¶ 131, 144, 292-97; LC ¶¶ 228-29, 250, 256-61. The market for diabetes medications thus remains highly concentrated, with the Manufacturers retaining broad discretion over the list prices they report to publishing

compendia and other sources. AC ¶¶ 11, 16, 331-33; KC ¶¶ 10; LC ¶¶ 12, 18, 292-94.

The Manufacturers distribute the at-issue medications primarily through contracts with the PBMs. The PBM conglomerates were formed over the course of twenty years through a series of mergers and acquisitions. AC ¶¶ 349, 351-52; LC ¶¶ 307, 311-12. Today, three PBMs control more than 80% of the PBM market and manage pharmacy benefits for more than 275 million Americans. AC ¶¶ 5, 76-206, 351, 353; KC ¶¶ 16-17, 150, 160-68; LC ¶¶ 5, 74-200, 311, 313.

The PBMs are at the center of the flow of pharmaceutical money. They negotiate the payors' prices for drugs; negotiate different (and often lower) prices that in-network pharmacies receive for the same drugs; set the fees that pharmacies pay the PBMs for each drug sold; set the prices for drugs sold through their mail-order pharmacies; and negotiate the rebates and other amounts that manufacturers pay to the PBMs for each drug sold. AC ¶¶ 336-44; KC ¶¶ 152-56, 309, 329; LC ¶¶ 296-304. And critically, the PBMs control the formularies that determine which drugs are covered and prioritized by nearly every payor in the nation. AC ¶¶ 8-10; KC ¶¶ 18-20, 308, 329; LC ¶¶ 8-10. CVS Caremark and Express Scripts served as PBMs for Albany and King. AC ¶¶ 566-74; KC ¶¶ 306-10. Express Scripts and OptumRx have served as Lake's. LC ¶ 506.

## The Insulin Pricing Scheme

Defendants' control of their respective markets—and the network of close and confidential relationships they have developed, AC ¶¶ 356-74; KC ¶¶ 174-78; LC ¶¶ 316-34—provide fertile ground for the complex scheme at the heart of this litigation.

Through constant communication, the exchange of proprietary information, and careful coordination, Defendants deployed the Insulin Pricing Scheme to consolidate their control of the U.S. market for the at-issue medications, artificially inflate list prices, and exponentially increase their own profits, all at payors' expense. AC ¶¶ 1, 17, 365-72, 379, 391-92, 639; KC ¶¶ 1, 15, 153, 176, 182, 270, 371; LC ¶¶ 1, 19, 325-32, 339, 350-51, 576. The Insulin Pricing Scheme developed as follows.

The PBMs execute contracts with payors, like the Counties here, that require the payors to purchase prescription medications for their plan beneficiaries directly from the PBMs. AC ¶¶ 503-11; KC ¶¶ 36, 156, 169, 355-57; LC ¶¶ 446-452. The amounts the Counties pay the PBMs are also determined by contract. The PBMs and Manufacturers negotiate rebates as a percentage of each medication's list price, which the PBMs are bound to pass through to their clients. AC ¶¶ 324, 344, 492, 558; KC ¶¶ 153, 260, 318-19, 323, 359; LC ¶¶ 338, 375, 377. For example, Albany's and King's agreements with their PBMs provide that █████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████. AC Ex. B at §§ 6.2, 6.3; Ex. C [137-3] at Ex. A-3; KC ¶¶ 318-19, 323.

The payment of rebates is a longstanding practice. But as payors secured contract provisions guaranteeing them pass through of most, if not all, of the manufacturer rebates, Defendants began to relabel rebates as "discounts," "credits," and "fees." AC ¶¶ 17, 441-59; KC ¶¶ 260-67; LC ¶¶ 19, 415-28. This sleight of hand placed rebates

beyond the reach of negotiated pass-through clauses and audit rights. AC ¶¶ 17-18, 441-59, 493-94, 557; KC ¶¶ 260-61, 265; LC ¶¶ 19-20, 410-11, 415-28, 496. It also incentivized the Manufacturers to raise prices; the higher the price, the greater the Manufacturers' profit, and the more "discounts," "credits," and "fees" the PBMs would retain. AC ¶¶ 17-21, 24, 429, 432; KC ¶¶ 214, 264, 269; LC ¶¶ 19-23, 26, 375, 392.

These incentives fuel the Insulin Pricing Scheme. The closed market in which Defendants operate frees the Manufacturers to raise prices in lockstep. AC ¶¶ 4, 232-33, 280-88; KC ¶¶ 144, 193-97; LC ¶¶ 4, 227-28, 279-88. At the same time, the PBMs' market dominance compels most payors to accept the PBMs' formularies, which determine the medications that payors' plans will cover and prioritize. AC ¶¶ 8-10, 17, 21, 370-71, 380; KC ¶¶ 18-21, 24, 249; LC ¶¶ 8-10, 19, 23, 330-31, 340. Against this landscape, Defendants realized that artificially inflating list prices for diabetes medications would enable the Manufacturers to pay exorbitant kickbacks to the PBMs in exchange for preferred formulary placement, generating extraordinary unearned profits for Defendants. AC ¶ 381; KC ¶¶ 2, 239, 248, 309; LC ¶ 341.

Over the past two decades, Defendants have done just that. AC ¶¶ 272-88, 370-71; KC ¶¶ 2, 309, 423, 431, 490, 493, 502; LC ¶¶ 272-88, 330-31. Between 2004 and 2022, the Manufacturers raised the list prices of their insulins in tandem, often taking the same price increase down to the decimal point within hours of each other. AC ¶¶ 281, 284-87; KC ¶¶ 12-13, 193-94, 197; LC ¶¶ 280, 283-86. The Manufacturers raise prices with the PBMs in mind; they confer with the PBMs and calibrate the timing and

degree of increases to maximize the PBMs' profits. AC ¶¶ 356-74, 378-79, 391; KC ¶¶ 177-78; LC ¶¶ 316-34, 338-39, 350. As a result, over time, the prices for the at-issue drugs have increased exponentially, while the PBMs have retained billions in unearned payments from the Manufacturers. AC ¶¶ 325, 381, 392; KC ¶¶ 192, 198, 267-69; LC ¶¶ 288, 341, 351. At the same time, the PBMs' formularies promote the Manufacturers' higher list-price drugs, increasing costs for payors and maximizing the Manufacturers' profit. AC ¶¶ 17 & n.6, 169, 383, 528; KC ¶¶ 3-4, 30; LC ¶¶ 164, 343, 469.

The PBMs also profit off the Insulin Pricing Scheme by using the Manufacturers' inflated prices to extract profit from their contracted pharmacies. AC ¶ 475; KC ¶¶ 224-26, 228; LC ¶ 399. Each PBM decides which pharmacies to include in its network and how much it will reimburse them. AC ¶ 476; KC ¶¶ 225-26; LC ¶ 400. Because the PBMs base the prices they charge on the Manufacturers' list price, the more the Manufacturers inflate those prices, the more the PBMs make. The PBMs pocket the spread between the artificially inflated amounts that payors remit and the amounts the PBMs reimburse the pharmacies. AC ¶ 477; KC ¶¶ 226, 228-29; LC ¶ 401. The PBMs also profit by including clawbacks of post-purchase discount provisions in their contracts with non-affiliated pharmacies. KC ¶¶ 221-23.

### Defendants Conceal the Insulin Pricing Scheme

Defendants shroud the Insulin Pricing Scheme in secrecy. The PBM-Manufacturer contracts are confidential, so payors cannot discern how much the Manufacturers pay the PBMs for formulary placement. AC ¶¶ 345-46, 557-60; KC ¶¶

7

23, 32, 284-85, 391; LC ¶¶ 305-06, 496-99. Although payors' contracts with the PBMs grant them audit rights, those rights are limited to payments that Defendants have defined as "rebates"—they do not extend to revenue deceptively relabeled as "discounts," "credits," or "fees" or derived from spread pricing. AC ¶¶ 452, 487, 493-94 & Exs. A-C; KC ¶¶ 265, 283-85, 344-45; LC ¶¶ 404, 410-11, 421.

The PBMs further obscure any accounting of the rebates they receive by using "rebate aggregators." AC ¶ 460; KC ¶¶ 271; LC ¶ 429. Rebate aggregators are entities often owned or closely affiliated with the PBMs that negotiate and collect Manufacturer Payments on behalf of a group of pharmacy benefit managers. AC ¶¶ 460-61; KC ¶¶ 271-74; LC ¶¶ 429-30. Because they collect rebates from the Manufacturers in the aggregate, and their PBM contracts are confidential, it is impossible for payors to determine whether all rebates collected on their behalf have actually been passed through. AC ¶¶ 460-61, 464-68, 558; KC ¶¶ 274-77, 283-84; LC ¶¶ 429-30, 433-37, 497. The PBMs' use of rebate aggregators is not disclosed to payors, and audits do not include payments to and from these aggregators. KC ¶ 335-37.

Defendants also protect the Insulin Pricing Scheme from detection by disclaiming any responsibility for skyrocketing prices and misleading the public and payors as to their conduct and intentions. All three PBMs falsely represent to their clients that they work on behalf of clients and patients to lower the cost of, and increase access to, the at-issue drugs. AC ¶¶ 530-33, 536; KC ¶¶ 189, 211-212, 255; LC ¶¶ 471-74. The PBM Defendants have also withheld material information from the Counties,

including details about their agreements with the Manufacturers, the re-classification of rebates, and their collection of kickbacks from the Manufacturers as a "quid pro quo" for formulary placement—all of which drive up the cost of at-issue drugs. AC ¶¶ 17, 345, 390, 443, 448, 487-96, 512; KC ¶¶ 309-34; LC ¶¶ 19, 305, 349, 404, 411-20, 453. The Manufacturers also mislead payors by publishing inflated false prices and falsely claiming that R&D costs drive the at-issue price increases. AC ¶¶ 425, 433-34, 513, 518-26; KC ¶¶ 207-08, 241, 439-40, 502; LC ¶¶ 238-39, 393-94, 454-67.

## **Procedural History**

The Counties bring claims against all Defendants for violating the federal RICO statute, 18 U.S.C. §§ 1962(c) and (d), and civil conspiracy. AC ¶¶ 631-700, 750-62; KC ¶¶ 415-96, 532-40; LC ¶¶ 568-635, 652-67. The Counties also assert claims for common law fraud and unjust enrichment. AC ¶¶ 718-49; KC ¶¶ 497-513; *Id.* ¶¶ 636-51, 668-700. Albany brings a claim under the NYGBL § 349, AC ¶¶ 701-17, and King asserts claims against CVS Caremark and Express Scripts for breach of the implied covenant of good faith and fair dealing and violations of the Washington Consumer Protection Act ("WCPA").[1] KC ¶¶ 514-31, 541-53. Defendants have now moved to dismiss.

## **ARGUMENT**

## I. **THE COUNTIES' CONTRACTS WITH THE PBMs DO NOT PREEMPT THEIR CLAIMS.**

The PBMs' argument that their contracts with the Counties "doom" the

---

[1] Lake County withdraws its claim for violation of the Illinois Consumer Fraud Act.

Counties' claims reflects a strategy that Defendants employ throughout their motions to dismiss. Defendants hope that by reframing the Counties' claims—in fact, grossly mischaracterizing them—they might escape liability for a complex fraudulent scheme. But the mere existence of a contract within a broader deceptive scheme does not subsume all causes of action.[2]

### A. Contrary to the PBMs' Arguments, The Counties Do Not Challenge the Negotiated Definition of "Rebate."

The PBMs contend that the Counties cannot prevail on any claim because the Counties complain about contractual rebates "*they negotiated*." PBM Mem. at 8 (emphasis in original). But the contracts' definitions of "rebates" are not at issue; the Counties allege that Defendants *mislabeled* rebates as "fees," "discounts," and "credits" to avoid paying them to payors. AC ¶¶ 17, 441-59; KC ¶¶ 260-67; LC ¶¶ 19, 415-28.

The Counties also allege that mislabeled rebates are but one cog in the Insulin Pricing Scheme. The Counties plead a complex and far-reaching fraudulent scheme to maximize profits at the expense of payors and consumers, fueled by the payment of kickbacks in exchange for preferred formulary placement. This scheme involves not only mislabeled rebates and kickbacks but also fraudulent conduct and

---

[2] The PBMs cursorily assert in a footnote, referencing the Manufacturers' motion, that the Court should dismiss the Counties' claims regarding GLP-1s. PBM Mem. at 2 n.2. Incorporation by reference is insufficient to preserve this argument. *See Curtis v. Treloar*, 1998 WL 1110448, at *9 (D.N.J. Aug. 27, 1998); *Gladysiewski v. Allegheny Energy Serv. Corp.*, 282 F. App'x 979, 981 (3d Cir. 2008). To the extent this Court nevertheless considers these GLP-1 arguments, it should likewise consider those in the Counties' Opposition to the Manufacturers' motion at pp. 47-50.

misrepresentations, including (1) the PBMs' representations that they lower costs for the Counties when they actively work to do the opposite; (2) the publishing of false prices; (3) the concealment of rebates by rebate aggregators; (4) self-dealing by the PBMs; and (5) the exclusion of lower-priced medications from PBM formularies. LC ¶¶ 106, 343, 455, 470, 582, 593-596, 643, 644; KC ¶¶ 182, 309, 346-348, 357, 439, 487; AC ¶¶ 20-23, 28, 502, 528-534, 656, 660.

These allegations distinguish this case from the Third Circuit's unpublished opinion in *Kolar v. Preferred Real Estate*, 361 F. App'x 354 (3d Cir. 2010). In *Kolar*, the plaintiff alleged that the defendant had diverted partnership distributions, to which he was entitled under his partnership and separation agreements, to other entities in breach of those agreements. *Id.* The court rejected the plaintiff's RICO claim because the "essence" of the complaint "set[] forth no activity containing any deceptive elements." *Id.* at 363 (cleaned up). The plaintiff's claim was a straight breach of contract claim. *Id.*

Where a contractual relationship is one aspect of a larger scheme to defraud, however, courts routinely distinguish *Kolar* and uphold RICO claims. *See, e.g.*, *Tredici Enoteca, LLC v. Dodge*, 2021 WL 3051916, at *4 (E.D. Pa. July 19, 2021) (plaintiffs had not "refashion[ed] a contract dispute" as a RICO violation; they alleged "knowingly false representations and unauthorized actions that evince[d] a comprehensive and widespread scheme to defraud"); *Simchon v. Highgate Hotels, L.P.*, 2017 WL 6997318, at *3 (M.D. Pa. June 29, 2017) ("The mere fact that [defendant] is alleged to have perpetrated its fraudulent billing scheme with its unwitting patrons under the guise of

a contract does not insulate the company from a RICO fraud claim.").[3]

The PBMs' additional authority is similarly distinguishable. *See Fetter v. Schink*, 902 F. Supp. 2d 399, 404 (S.D.N.Y. 2012) ("Under New York law, a cause of action sounding in fraud is not viable when *the only fraud charged* relates to a breach of contract.") (emphasis added)); *Anderson Elec. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (Ill. 1986) ("[E]conomic losses are recoverable in tort where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations.") (cleaned up)); *Nichols v. Peterson NW, Inc.*, 389 P.3d 617, 623 (Wash. Ct. App. 2016) ("The test is not simply whether an injury is an economic loss arising from a breach of contract, but rather *whether the injury is traceable also to a breach of a tort law duty of care arising independently of the contract*.") (cleaned up; emphasis added)).

## B. Lack of Transparency Supports the Counties' Claims of Deception.

Defendants again mischaracterize the Counties' claims by contending that "an alleged lack of transparency is not a cause of action." PBM Mem. at 9. None of the Counties' claims depends *only* on the PBMs' lack of transparency. Instead, the Counties allege as *one element* of a larger scheme that the PBMs *promised* pricing transparency and reneged on that promise. *See, e.g.*, AC ¶¶ 39, 168, 331, 345, 488, 494, 529, 536, 542, 545-

---

[3] *See also O'Keefe v. Ace Rest. Supply, LLC*, 2016 WL 127566, at *3 (E.D. Pa. Jan. 12, 2016) (plaintiffs had not "merely refashion[ed]" a contract dispute; they alleged misrepresentations "that evince[d] a scheme to defraud"); *accord Suessenbach Fam. Ltd. P'ship v. Access Midstream Partners, L.P.*, 2015 WL 1470863, at *13 (M.D. Pa. Mar. 31, 2015); *Lavastone Cap. LLC v. Coventry First LLC*, 2015 WL 1939711, at *3 (S.D.N.Y. Apr. 22, 2015).

49, 556, 571; LC ¶¶ 163, 305, 405, 411, 470, 481, 484-88, 495, 538, 555; KC ¶¶ 255-59, 314, 392, 394, 439. These allegations support the Counties' claims.

The PBMs' argument that they owed the Counties no duty to disclose is equally unpersuasive. First, the Counties' allegations involving transparency center largely on affirmative misrepresentations: the PBMs promised pricing transparency but then concealed and laundered funds to perpetrate their scheme. *See* p. 12, *supra.*

Second, to the extent that the Counties rely on omissions, the PBMs were bound by a duty to disclose. Courts find a duty to disclose where a defendant either (1) omits facts that render a statement a half-truth or (2) possesses superior knowledge and knows that the plaintiff's understanding is mistaken. *See, e.g., Bollinger Indus. Inc. v. Walter R. Tucker Enters., Ltd.,* 2021 WL 5585795, at *5 (N.D.N.Y. Nov. 29, 2021); *BCBSM, Inc. v. Walgreen Co.,* 512 F. Supp. 3d 837, 855 (N.D. Ill. 2021); *Coe v. Noel,* 2014 WL 6790298, at*4 (Wash. Ct. App. Dec. 2, 2014). Here, the PBMs knew that the Counties expected transparency but failed to disclose how prices were calculated. *See* p. 8, 12, *supra.* The PBMs' argument that the contracts disclosed that they would receive "additional revenue" from the Manufacturers, PBM Mem. at 8-9, is squarely beside the point. Defendants did not disclose that they would *relabel* rebates as "credits," "discounts," and "fees" to circumvent audit and pass-through rights. *See* p. 5-6, 10, *supra.*

## C. "Spread Pricing" and "Clawbacks" Drive Up List Prices.

The PBMs contend that the Counties' complaints about "clawbacks" and "spread pricing" do not plausibly allege any tort or injury. PBM Mem. at 11. But the

Counties allege that these practices incentivize the PBMs to drive up list prices, injuring the Counties. *See* AC ¶¶ 386, 477-83; LC ¶¶ 345, 400-06; KC ¶¶ 221-29.

The PBMs also argue that the Counties' contracts include details about drug pricing, including one that purportedly "disclosed that [the PBM] m[ight] earn money through so-called 'spread pricing.'" PBM Mem. at 11-12. The Counties' complaints, however, explain how these "disclosures" are deceptive and how the contracts' limited audit rights concealed Defendants' practices. *See, e.g.*, AC ¶¶ 487-89; LC ¶¶ 404-06.

The Counties' contracts do not insulate the PBMs from liability for any claim.

## II.    THE COUNTIES' CLAIMS ARE NOT TIME-BARRED.

Dismissal on statute of limitations grounds is warranted only when the "affirmative defense" is "apparent on the face of the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up). "Since the applicability of the statute of limitations usually involves questions of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985); *LLDVF, L.P. v. Dinicola*, 2010 WL 3210613, at *3 (D.N.J. Aug. 12, 2010) (defendants must "produce uncontroverted evidence that irrefutably demonstrates" defense). Defendants have not come close to meeting that heavy burden here.[4] When the Counties knew or

---

[4] Not only do Defendants fail to establish when each claim accrues, they also misstate the applicable limitations period for several claims. For example, Lake's unjust enrichment claim is not "derivative"; a five-year limitations period applies. *See Toll Processing Servs., LLC v. Kastalon, Inc.*, 2014 WL 1379676, at *3 (N.D. Ill. Apr. 8, 2014).

14

should have known of their injuries and claims is a highly fact-intensive inquiry that cannot be resolved at this early stage of the proceedings.

### A. The Counties' RICO Claims Are Not Time-Barred.

RICO claims accrue "when the plaintiff knows or should know of both its injury and the source of its injury." *LabMD, Inc. v. Boback*, 47 F.4th 164, 179 (3d Cir. 2022). A defendant must show "the existence of storm warnings" or (in other words) information that would "alert a reasonable person to the probability" of his injury. *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (cleaned up).

Defendants point to several purported sources of inquiry notice, but none supports their defense. For example, Defendants cite payment provisions in the Counties' contracts and RFPs to argue that the Counties were aware of "rebates." PBM Mem. at 22. But the Counties allege that the PBMs *mislabeled* rebates, pocketing money owed to the Counties. KC ¶¶ 260-61; AC ¶¶ 445-46; LC ¶ 418.

Defendants similarly contend that their public statements triggered inquiry notice. PBM Mem. at 21. The cited statements suggest neither the Counties' injuries nor their source, as they do not reveal that the PBMs were engaged in an illegal scheme.

Defendants also contend that congressional and media reports triggered inquiry notice. PBM Mem. at 20-21. But the congressional materials did not describe illegal

---

Fraud claims in New York accrue two years from *discovery*. N.Y.C.P.L.R. § 213(8). A six-year statute applies to Albany's unjust enrichment claim to the extent it seeks equitable relief. *See Grynberg v. Eni S.p.A.*, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007).

practices. Reports of state civil investigative demands, PBM Mem. at 21, likewise fail to provide the requisite "storm warnings." Civil investigations relating to high prices would not suggest that the *Counties* were injured. The PBMs purportedly worked *for* the Counties; if growing rebates were bloating list prices, the Counties understood that those rebates would be passed through. *See* AC ¶¶ 39, 445, 536; KC ¶¶ 2, 318–19, 323, 348, 359, 522, 538; LC ¶¶ 43, 163, 301, 345.

The cited media reports describe high prices, rebates, formulary practices, and gaps between list and net prices, but not Defendants' misconduct aimed at insurers. *See, e.g.*, PBM Mem. Ex. 10 at 3 (quoting opinion that Manufacturers were "not colluding"). In fact, some of the articles explain how rebates *benefit* insurers. *See, e.g.*, PBM Ex. 8 at 3-4 (CVS Health "gives 'the vast majority of rebates' back to [its] clients"), Ex. 9 at 3-4 ("the list price is never the price, unless you're a cash-paying customer"), Ex. 11 at 4 (only those who "walk in off the street" "pay full price"). These articles did not trigger a duty to investigate. *See In re Direct Purchaser Insulin Pricing Litig.*, 2021 WL 2886216, at *19-20 (D.N.J. July 9, 2021) (finding similar public statements, reports, articles, and analyses insufficient to establish limitations defense at pleading stage).

The PBMs also reference "publicly available insulin pricing data." PBM Mem. at 20-21. This data shows how the price of insulin has skyrocketed over time. *See, e.g.*, AC ¶ 273; KC ¶¶ 204-05; LC ¶ 14. But it did *not* reveal "both [the Counties'] injur[ies] and the source of [their] injur[ies]." *Boback*, 47 F.4th at 179. As to source, the prices themselves did not indicate fraud, and Congress is *still* investigating the cause of high

prices. As to injury, public information attributed high prices to increasing rebates. But the Counties' agreements with the PBMs mandated that all rebates be passed through. *See* p. 16, *supra*. Higher prices alone would not have alerted the Counties to their injuries.

Finally, Defendants cite cases filed prior to the Counties' complaints, focusing on *In re Insulin Pricing Litigation*, where a putative class of consumers challenged high insulin prices. *See* Compl. [ECF No. 1], *In re Insulin Pricing Litig.*, No. 17-cv-699 (D.N.J. Feb. 2., 2017). The plaintiffs' injuries there were distinct; they alleged that patients who paid out of pocket were harmed while insurers (like the Counties) paid a "lower, secret 'real' price." Mfr. Mem. Ex. 3 at 4; *id.* Ex. 4 at 2 (patients are "stuck" paying balance). Neither the complaint, nor reporting about it, hinted at *the Counties'* injuries.

The cited attorney general actions also involved consumer claims and alleged injuries by those who pay the list price. *See* Compl. [ECF No. 2] at ¶¶ 67-70, *Minnesota v. Sanofi-Aventis*, 3:18-cv-14999 (D.N.J. Oct. 16, 2018); Compl. at ¶¶ 10, 28, *Kentucky v. Novo Nordisk, Inc.,* No. 19-cv-00473 (Ky. Cir. Ct. May 13, 2019). The plaintiffs in *MSP Recovery Claims, Series LLC v. Sanofi-Aventis* were assignees of third-party payors, but they did not describe the scheme alleged here. *See* Compl. [ECF No. 1], *MSP Recovery*, No. 3:18-cv-2211 (D.N.J. Feb. 15, 2018). For one thing, the plaintiffs in *MSP* did not detail mislabeled Manufacturer Payments—the core of this case. For another, unlike the Counties, the plaintiffs there were assignees of Medicare Advantage plans. Regardless, the Counties cannot be expected to monitor state and federal dockets nationwide. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 435 (2d Cir. 2008).

**B. The Counties Have Pled Facts to Toll All Applicable Statutes.**

All statutes of limitation are tolled. Whether tolling applies is a fact-intensive inquiry not suitable for a motion to dismiss. *See, e.g.*, *Warrick v. N.J. Off. of Att'y Gen.*, 2022 WL 1763855, at *6 (D.N.J. May 31, 2022).

*Discovery rule.* The discovery rule tolls accrual until a plaintiff knows or should have known all facts supporting a claim. *Crisman v. Crisman*, 931 P.2d 163, 166 (Wash. Ct. App. 1997); *Newell v. Newell*, 942 N.E.2d 776, 780-81 (Ill. App. Ct. 2011); *Kaufman v. Cohen*, 307 A.D.2d 113, 123 (N.Y. App. Div. 2003). Thus, Defendants' discovery rule arguments fail with those discussed in Section III.A.

*Fraudulent concealment and equitable estoppel.* To delay accrual using fraudulent concealment, plaintiffs must show (1) that the defendant concealed material facts, (2) preventing plaintiffs from discovering their claim, and (3) plaintiffs' due diligence. *See Antonios A. Alevizopoulos & Assocs. v. Comcast Int'l Holdings, Inc.*, 100 F. Supp. 2d 178, 183-84 (S.D.N.Y. 2000). The Counties sufficiently plead these elements. AC ¶¶ 112, 460–65, 512–63, 605–23, 627, 656–64; KC ¶¶ 252, 271–82, 376, 405–08, 439–46; LC ¶¶ 25, 453–502, 542–60, 593–600. Resolution of the third element (diligence) is for a jury. *In re Elec. Carbon Prod. Antitrust Litig.*, 333 F. Supp. 2d 303, 317 (D.N.J. 2004).

*Separate accrual and continuing violations.* Under the separate accrual rule, "a new claim accrues . . . each time a plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559-60 (2d Cir. 1995). Similarly, "where there is a series of continuing wrongs," the

18

limitations period for NYGBL claims is tolled to the "date of the commission of the last wrongful act." *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 432 (S.D.N.Y. 2020) (cleaned up). The doctrine also applies to unjust enrichment. *See, e.g.*, *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 264 (S.D.N.Y. 2008). The Counties suffered an independent injury each time they paid inflated prices and have pled "continuous, unbroken violation[s] of the law." LC ¶ 566; AC ¶ 629.

**Nullum tempus.** Washington municipalities are immune from statutes of limitation when acting in their sovereign capacity. *See* Wash. Rev. Code ("RCW") § 4.16.160. The applicable test is "whether the act is for the common good" or for the "specific benefit or profit of the corporate entity." *Wash. MLB Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co.*, 202 P.3d 924, 927-28 (Wash. 2009). The "regulatory oversight of health care benefit managers" is critical to protect and promote the health and welfare of Washington residents. RCW § 48.200.010(3). King provides essential public services for the "promotion of the public welfare." KC ¶¶ 43, 399; *Hudson v. City of Wenatchee*, 974 P.2d 342, 346 (Wash. Ct. App. 1999).

## III.    THE COUNTIES HAVE STATED ACTIONABLE RICO CLAIMS.

The Counties have stated RICO claims against the PBMs predicated on mail and wire fraud. Those claims (A) are not barred by the indirect purchaser rule, and the Counties have plausibly pled (B) a pattern of racketeering activity, (C) proximate causation, (D) enterprises distinct from the alleged pattern of racketeering activity, and (E) the PBMs' participation in the operation or management of nine enterprises.

### A.    The Indirect Purchaser Rule Does Not Bar the Counties' Claims

In *Illinois Brick*, "the Supreme Court established the general rule that only direct purchasers from antitrust violators may recover damages in antitrust suits." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 369 (3d Cir. 2005) (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 727 (1977)). In other words, "*Illinois Brick* established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019). For example, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator." *Id.*[5]

When determining whether a plaintiff is a direct purchaser, courts consider "the economic substance of the transaction, rather than the physical attributes of the transaction or the geographical movement of goods and services." *Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 500 (D.N.J. 2014). In *Apple*, for instance, the Supreme Court held that iPhone owners directly purchased apps from Apple because they "pa[id] the alleged overcharge directly to Apple." 587 U.S. at 281; *see also* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 346c (4th & 5th eds. May 2024) ("the fact that the plaintiffs paid their money directly to the defendants" was "dispositive").

The Third Circuit likewise looks to the payment chain to identify the direct

---

[5] These "principles" also "apply to RICO claims." *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996).

purchaser. In *Hess*, for instance, "artificial teeth" were usually distributed from "[m]anufacturers" to "[d]ealers" to "dental labs." *Hess*, 424 F.3d at 367. But the manufacturer defendant sometimes "drop shipped" the teeth directly to the labs, such that the dealer never took possession of the teeth but still paid the manufacturer. *Id.* In these circumstances, the dealer was still the direct purchaser from the manufacturer because payment still traveled from lab to dealer to manufacturer. *Id.* at 373; *see also In re Processed Egg Prod. Antitrust Litig.*, 881 F.3d 262, 275 (3d Cir. 2018) (claims not barred because plaintiffs sought to "recover for higher prices" that they "paid" directly).

Here, the Counties are direct purchasers because they contracted with the PBMs for a suite of pharmacy benefit management services and, under those contracts, paid the PBMs *directly* for their beneficiaries' prescriptions. *See, e.g.*, AC ¶¶ 27, 36, 329-30, 335, 503-11, 575-76, 685; KC ¶¶ 36, 152, 154, 156, 346-47, 352-58, 363-64, 371-72, 435, 466-67; LC ¶¶ 29-30, 40, 291, 295, 446-52, 504, 513-21, 589, 617-23. For example, Albany agreed to "pay . . . ESI for each Prescription Drug Claim" under their contract. *See* ECF No. 158-3 at Ex. A-2.[6] Each County paid its PBMs millions for the at-issue drugs. *See* AC ¶¶ 27, 505-07; KC ¶ 36; LC ¶¶ 30, 447.

---

[6] *See also, e.g.*, ECF No. 158-1 §§ III.E, VIIA (requiring Albany to pay Pharmacare for "prescription claims"); ECF No. 158-2 at Schedule A ("[Albany] will pay Medco for Covered Drugs"); PBM Mem. Ex. 1 at 69 ("[King] County shall pay Contractor the fees"); PBM Mem. Ex. 2 at 45 ("County will pay to Contractor the amounts set forth below, net of applicable Copayments"); PBM Mem. Ex. 4 at 17 ("[Lake] will pay to ESI on a per Prescription Drug Claim basis"); PBM Mem. Ex. 7 at 3, 24-25 ("Client will pay Administrator" for "Prescription Claims").

Other courts have reached this same conclusion. In *City of Miami v. Eli Lilly &
Co.*, 2022 WL 198028 (S.D. Fla. Jan. 21, 2022), for example, the city sued the
Manufacturers and PBMs for antitrust violations relating to insulin. *Id.* at *3. The district
court rejected Defendants' indirect purchaser argument, explaining that a plaintiff need
only allege that "it was an immediate buyer from an alleged . . . violator." *Id.* at *3-4
(cleaned up) (quoting *Apple*, 587 U.S. at 279). The city, like the Counties here, did so by
"alleg[ing] that it paid a PBM Defendant for insulin." *Id.*

Looking to escape this "straightforward conclusion," *Apple*, 587 U.S. at 279, the
PBMs advance four main arguments. *See* PBM Mem. at 12-18. First, they argue that the
distribution chain is dispositive. But courts look to who pays for the product, not who
receives it. *See* pp. 20-21, *supra* (citing authority).[7]

The PBMs nevertheless contend that the indirect purchaser rule "does not turn
on the 'economics of the transaction'" and "does not care about the 'pric[ing]' chain."
PBM Mem. at 16 (quoting *Apple*, 587 U.S. at 281). But *Apple* only supports the Counties.
In that case, Apple argued that consumers should be able to sue only the party who
"set[s] the . . . purchase price" for apps on Apple's App Store because that theory

---

[7] This rule—which grants the paying party the exclusive cause of action—makes sense.
*Illinois Brick* sought to encourage enforcement of the antitrust laws "by concentrating
the full recovery for the overcharge in the direct purchasers rather than by allowing
every plaintiff potentially affected by the overcharge to sue only for the amount it could
show was absorbed by it." 431 U.S. at 735. Under the PBMs' theory, the exclusive cause
of action would often lie with parties who *received* a product but did not *pay* for it, and
thus have no damages or incentive to enforce the antitrust laws. That cannot be correct.

"accords with the economics of the transaction." *Apple*, 587 U.S. at 278, 281. The Supreme Court rejected that argument, explaining that *Illinois Brick* "was not based on an economic theory about who set the price." *Id.* Instead, *Illinois Brick* set a "bright-line rule" that asked whether the plaintiffs "pa[id] the alleged overcharge directly to [the defendant]." *Id.* Under that rule, the Counties are direct purchasers.

Second, the PBMs point to *Humana, Inc. v. Indivior, Inc.*, 2022 WL 17718342 (3d Cir. Dec. 15, 2022), where the court held that insurer-plaintiffs were not direct purchasers from manufacturer-defendants. *Id.* at *1. But there, the insurer-plaintiffs sued the manufacturers for "indirect purchases," alleging that "wholesalers and retailers passed on the inflated prices of [the drug] to the [i]nsurers." *Id.* at *2 (cleaned up). No direct purchases were at issue. *Id.* at *1-3. This case is different. The Counties are direct purchasers vis-à-vis the PBMs because they paid the PBMs. *See, e.g.*, *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) (insurer was direct purchaser because "the money went directly from [the insurer] to the [c]linic"); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350 (2d Cir. 2003) ("insurance companies" that "reimburse[d] pharmacies" were "direct purchasers" of drug).

Third, the PBMs rely on this Court's rulings in *In re Insulin Pricing Litigation*, 2019 WL 643709 (D.N.J. Feb. 15, 2019); *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129 (D.N.J. Mar. 29, 2019); and *Minnesota v. Sanofi-Aventis U.S. LLC*, 2020 WL 2394155 (D.N.J. Mar. 31, 2020). But those cases are inapt for the same reason as *Humana*; the plaintiffs pursued claims *only* against the manufacturers, with

whom they never transacted. *See, e.g.*, *MSP Recovery*, 2019 WL 1418129, at *13.

Fourth, the PBMs contend that the indirect purchaser rule applies because the Counties "sue about the same overcharge the Manufacturers allegedly charged wholesalers," risking "multiple liability." PBM Mem. at 18. Though avoiding multiple liability is one goal of the indirect purchaser rule, *Apple*, 587 U.S. at 285, a risk of multiple liability does not hinder the Counties' claims for three reasons. One, a substantial portion of the diabetes medications that the Counties purchased did *not* pass through wholesalers. As the Counties explain, the PBMs operate mail-order pharmacies. And when the PBM mail-order pharmacies purchase drugs, they often cut wholesalers entirely out of the distribution *and* payment chains, such that the PBMs "purchase drugs directly from the Manufacturers and distribute them directly to the patients," with payors footing the bill. *See* AC ¶¶ 327, 338-39, 504-07; KC ¶¶ 86, 101, 116, 156, 354-57; LC ¶¶ 290, 298-99, 447. There is no risk of multiple liability with wholesalers.

Two, even where the wholesalers do participate and incur damages (such as where the payment chain goes from Counties to PBMs to pharmacies to wholesalers to manufacturers), the wholesalers and Counties largely seek *different* damages for *different* injuries. The indirect purchaser rule does not bar multiple liability where "different parties allege different injuries." *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1169 (3d Cir. 1993); *Apple*, 587 U.S. at 287 ("*Illinois Brick* did not purport to bar multiple liability" where two sets of victims rely on "different theories of harm[.]").

Here, the Counties largely seek damages unique to them. For example, the

Counties allege that the PBMs relabeled Manufacturer Payments to circumvent their obligation to pay rebates to payors. *See* pp. 10, 15, *supra*. Because rebates were due *only* to payors like the Counties, no wholesaler (or any other entity) can claim those damages. There is no possibility of multiple liability.

Three, even in the one area where damages may overlap between wholesalers and Counties—payments for the inflated list price of diabetes medications where both wholesalers and Counties were *in the same chain*—the Counties' claims are not barred. While multiple liability *may* arise in this limited circumstance,[8] the Counties would remain direct purchasers from the PBMs. *See, e.g.*, *In re Direct Purchaser*, 2021 WL 2886216, at *15 (it is "reasonable to construe the PBM Defendants' clients—and not the wholesaler plaintiffs—as the direct victims of the kickback scheme"). And the bright-line rule of *Illinois Brick*—that direct purchasers can sue—applies even where the "economic assumptions underlying the *Illinois Brick* rule [are] disproved in a specific case." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 217 (1990).[9]

**B.  The Counties Have Plausibly Alleged a Pattern of Racketeering Activity.**

A RICO "pattern of racketeering activity" requires at least two acts of

---

[8] Even there, multiple liability would be possible only if the Court finds that the co-conspirator exception renders the Manufacturers liable to indirect purchasers.

[9] The PBMs also argue that the indirect purchaser rule forecloses an independent RICO claim against any PBM with which a County did not directly contract. PBM Mem. at 17-18. But each of the PBMs partook in the conspiracy and are liable as co-conspirators under the co-conspirator exception. *See* AC ¶¶ 391, 425, 467, 653-55, 686-88; KC ¶¶ 115, 182, 241, 436, 465, 468; LC ¶¶ 109, 350, 383, 590-91, 622.

racketeering activity within a ten-year period. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d

300, 363 (3d Cir. 2010) (citing 18 U.S.C. § 1961(5)). These predicate acts may include

federal mail fraud, *id.*, which requires (1) a scheme or artifice to defraud for the purpose

of obtaining money or property, (2) participation by the defendant with specific intent

to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme.

*Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012).

"The Third Circuit has traditionally interpreted mail fraud statutes broadly." *MSP*

*Recovery*, 2019 WL 1418129, at *11. Fraud is "measured in a particular case by

determining whether the scheme demonstrated a departure from fundamental honesty,

moral uprightness, or fair play and candid dealings in the general life of the community."

*United States v. Riley*, 621 F.3d 312, 327 n.19 (3d Cir. 2010). "[A] scheme or artifice to

defraud 'need not be fraudulent on its face but must involve some sort of fraudulent

misrepresentations or omissions reasonably calculated to deceive persons of ordinary

prudence and comprehension.'" *Network Commodities, LLC v. Golondrinas Trading Co.,*

*LTD.*, 2013 WL 1352234, at *11 (D.N.J. Apr. 1, 2013) (quoting *Kehr Packages, Inc. v.*

*Fidelcor, Inc.,* 926 F.2d 1406, 1415) (3d Cir. 1991)).

The PBMs contend that Plaintiffs have not pled actionable misrepresentations,

but fail to address the fraudulent conduct at the heart of the Insulin Pricing Scheme:

the publication of false prices and manipulated formularies. *See, e.g.*, AC ¶¶ 17-22, 316,

23, 391; LC ¶¶ 18-24, 358-67, 492; KC ¶¶ 20-24, 309, 549. These false prices—held out

as legitimate by the PBMs—constitute material misrepresentations to payors, as do the

formularies, which base preference on false prices and are themselves illegitimate. *See, e.g.*, *MSP Recovery*, 2019 WL 1418129, at *11 ("excessive inflation of prices on a published index may constitute mail and wire fraud"); *Insulin Pricing Litig.*, 2019 WL 643709, at *5 (same); *City of Miami*, 2022 WL 198028, at *8 (same); *Harris Cnty. v. Eli Lilly & Co.*, 2020 WL 5803483, at *6 (S.D. Tex. Sept. 29, 2020) (same); *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 738 F. Supp. 2d 227, 239 (D. Mass. 2010) (same).

The PBMs deride the Counties' other allegations of misrepresentations as "opinion" and "puffery." PBM Mem. at 27-29. The PBMs argue that general promises of transparency and cost savings are not actionable, but their authority is inapposite. In those cases, the defendants offered "vague," "generalized," and "exaggerated" statements regarding their capabilities and commitment to transparency as guiding principles. PBM Mem. at 29. Here, the Counties allege that the PBMs made specific misrepresentations about rebates, including that the "rebate system is 100 percent transparent"; that the PBMs' interests are aligned with the Counties' and that they work to lower the prices of the at-issue drugs; that PBMs are "open and honest about our pricing structure"; that PBMs are "absolutely transparent" about the payments they receive from Manufacturers; and that payors "know exactly how the dollars flow." *See, e.g.*, AC ¶¶ 533, 544-49; LC ¶¶ 474, 483-488; KC ¶¶ 212, 255.

These statements are neither puffery nor opinion; they are specific statements denying the PBMs' involvement in the scheme. *See, e.g.*, *Lieberson v. J&J Consumer Cos. Inc.*, 865 F. Supp. 2d 529, 540 (D.N.J. 2011) ("The distinguishing characteristics of

27

puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions."); *see also, e.g., City of Miami*, 2022 WL 198028, at *8 ("representations in which the PBM Defendants state that they worked for the benefit of health plans to lower the cost of insulin" are not puffery); *Harris Cnty.*, 2020 WL 5803483, at *5-7 (similar misrepresentations were not "general, vague statements"); *Direct Purchaser Litig.*, 2021 WL 2886216, at *15 (allegations that PBMs represented that they had "secured lower [drug] prices" satisfied RICO).

The Counties also cite direct misrepresentations that the PBMs made during the contract bidding process, including representations that the PBMs managed their formularies to effectuate cost savings, prioritized lower costs to payors, and were taking "bold" action to lower costs for "unethically priced compound drugs and exorbitantly priced therapies for conditions" including diabetes. LC ¶ 477; AC ¶ 536. The PBMs also promised "competitive pricing," to "[i]ncrease affordability and reduce unnecessary utilization/waste," and to "pay [Albany] County 100% of the non-specialty formulary rebates." AC ¶ 536. These are direct, specific misrepresentations.

The PBMs argue that the *Noerr-Pennington* doctrine shields them from liability for their executives' representations to Congress, but the doctrine does not apply. First, only a small number of the misrepresentations that the Counties rely on are statements to Congress. KC ¶ 212; AC ¶¶ 541, 546-49; LC ¶¶ 472-74. More importantly, none of the cited testimony constitutes a petition to the government for redress, which is the only category of protected speech under *Noerr-Pennington. See Giles v. Phelan, Hallinan &*

28

*Schmieg, L.L.P.*, 2013 WL 2444036, at *5 (D.N.J. June 4, 2013).

Instead, in each instance, the quoted testimony represents an attempt to *mislead* the government and further the anticompetitive Insulin Pricing Scheme. KC ¶ 212; AC ¶¶ 541, 546-49; LC ¶¶ 472-74. The "sham" exception to *Noerr-Pennington* excludes from immunity any statement to the government made with the intent to conceal a violation of federal law. *See, e.g.*, *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 362 (4th Cir. 2013) (*Noerr-Pennington* inapplicable when "petitioning activity ostensibly directed toward influencing governmental action, is a mere sham to cover . . . an attempt to violate federal law"); *Hoffman-La Roche Inc. v. Genpharm Inc.*, 50 F. Supp. 2d 367, 379 (D.N.J. 1999). Regardless, whether the sham exception applies "is generally a question of fact not appropriate for resolution on a motion to dismiss." *In re JUUL Labs, Inc.*, 497 F. Supp. 3d 552, 614 (N.D. Cal. 2020).

The PBMs also contend that the Counties cannot state RICO claims based on omissions. To the extent that the PBMs base their argument on the contention that their contracts disclosed all material facts, or that the Counties object that prices are "too high," the argument fails for the reasons articulated in Section I, above.

In any event, the PBMs' argument that they were not bound by a duty to disclose is misguided. The Third Circuit has made clear that "fraudulent misrepresentations or omissions," which constitute mail and wire fraud, "may be effected by deceitful statements of half-truths or the concealment of material facts." *United States v. Nissenbaum*, 50 F. App'x 87, 88 (3d Cir. 2002); *Kehr Packages*, 926 F.2d at 1416

("deceptive nondisclosures" sufficient); *Grider v. Keystone Health Plan Cent., Inc.*, 2003 WL 22182905, at *12 n.29 (E.D. Pa. Sept. 18, 2003) ("omission need only be reasonably calculated to deceive to constitute a scheme to defraud" (cleaned up)).

The parties' relationships here were founded on an understanding that the PBMs would provide cost-savings to the Counties, offer price transparency, and maximize rebates that would be paid to the Counties. LC ¶¶ 120, 136, 137, 348, 473, 479, 481, 490; AC ¶¶ 39, 126, 141, 142, 163, 168, 389, 532, 538, 551; KC ¶¶ 211, 212, 255, 314, 392, 439. The PBMs' concealment of the Insulin Pricing Scheme's mechanics, and particularly the relabeling and concealment of rebates, turns that understanding on its head. The notion that Defendants' failure to disclose those mechanics does not qualify as an "omission reasonably calculated to deceive" defies logic and established law. *See, e.g., In re Kaplan*, 634 B.R. 673, 687 (Bankr. E.D. Pa. 2021) ("omissions reasonably calculated to deceive also support a finding of mail or wire fraud"); *Brown v. Access Midstream Partners, L.P.*, 141 F. Supp. 3d 323, 336-37 (M.D. Pa. 2015) ("half truths" and "knowing concealment of material facts" actionable as mail and wire fraud).

Finally, the PBMs' contention that the Counties' allegations fail to satisfy Rule 9(b) depends on sleight of hand by pointing only to the RICO count's paraphrased descriptions of the PBMs' misrepresentations and omissions. PBM Mem. at 27. But the RICO count also incorporates detailed allegations of the PBMs' fraud, including the who, where, what, when, and why of each alleged misrepresentation. *See, e.g.*, LC ¶¶ 469-502, 568; AC ¶¶ 528-63, 631; KC ¶¶ 211-13, 255, 415.

**C. The Counties Have Plausibly Alleged Proximate Cause.**

The PBMs contend that the Counties have not pled proximate causation because they have not alleged direct or third-party reliance on predicate acts. PBM Mem. at 30-33. But the Counties repeatedly allege direct reliance on the PBMs' misrepresentations and omissions. AC ¶¶ 133, 516, 573, 618, 620, 626, 661, 723, 724; KC ¶¶ 368, 369, 411, 443, 503, 504; LC ¶¶ 126, 182, 457, 480, 512, 513, 555, 557, 597, 690, 697.

First, the Counties allege that they relied on Defendants' false prices. The PBMs not only presented false prices to the Counties, but also helped set them by, among other things, demanding kickbacks for preferred formulary placement. *See, e.g.*, AC ¶¶ 391, 394, 528 & n.4; KC ¶¶ 2, 309, 431; LC ¶¶ 246, 353 & n.6. The PBMs also failed to disclose their scheme or the prices' dissociation from any fair market value, in defiance of the Counties' reasonable expectations (and the PBMs' representations) that the PBMs would work to achieve the lowest prices possible. *See, e.g.*, AC ¶¶ 28, 390, 444, 496, 537, 557, 615-16; KC ¶¶ 2, 254, 256, 351, 373, 391, 440; LC ¶¶ 349, 412, 496, 537, 594. The Counties' payment of PBM invoices constitutes their reliance on the implicit representation that the amounts requested were "honestly owed." *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (payment may constitute circumstantial proof of reliance based on inference that customers who pay the amount invoiced would not have done so "absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed."); *Sq. One Armoring Servs. Co. v. United States*, 152 Fed. Cl. 536, 547 (2021) (by paying invoices, party plausibly

established that it relied on representations in the invoices); *Bias v. Wells Fargo & Co.*,
312 F.R.D. 528, 541-42 (N.D. Cal. 2015) ("[T]he civil RICO claim's reliance element
may be established by . . . the payment of the [charges].'").

The Counties also relied on the PBMs' misrepresentations that ████████████
█████████████████████████████████████████ AC Ex. B at §§ 6.2, 6.3;
Ex. C [137-3] at Ex. A-3; KC ¶¶ 318-19, 323. The PBMs did not; they retained rebates
by mislabeling them to circumvent contractual pass-through and audit rights. LC ¶¶ 19,
418-23 & n.6; AC ¶¶ 17, 260-67, 445 & n.5; KC ¶¶ 1, 21, 252, 261, 344.

The Counties also plead third-party reliance. They allege that each enterprise
relied on the false list prices negotiated and published by the other eight in setting its
own list prices and determining the value of the kickbacks paid to the PBMs. AC ¶ 662,
688; LC ¶ 598; KC ¶ 444. It was this "inter-reliance" that kept the scheme afloat; had
any one enterprise broken rank and charged *un*inflated (or less inflated) prices, the
remaining eight would not have been able to sustain their anticompetitive scheme.

Finally, the PBMs argue that the Counties cannot establish causation by relying
on facts disclosed in contracts they negotiated with the PBMs. PBM Mem. at 33. This
argument relies on a misconstruction of the Counties' complaints. *See* Section I, *supra.*

### D.  The Counties Plead Distinct Enterprises and Patterns of Racketeering Activity.

A RICO plaintiff must plead that the alleged enterprise is an "entity separate and
apart from the pattern of activity in which it engages." *United States v. Console*, 13 F.3d

641, 650 (3d Cir. 1993). This "distinctness" element is satisfied by showing that the enterprise "has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses." *Id.* at 652.

Plaintiffs have accomplished just that. The Counties have not merely pled an aggregation of predicate acts and claimed an enterprise, they have pled nine coherent associations of various Defendants organized primarily for a legitimate purpose—the manufacture, sale, and distribution of medications, products, and services including, but not limited to, the at-issue medications. LC ¶¶ 573-75; AC ¶¶ 636-38; KC ¶¶ 420-22. And, like the plaintiffs in *Direct Purchaser*, the Counties allege that the Manufacturers pay the PBMs "fees for services other than formulary placement." 2021 WL 2886216, at *18; AC ¶¶ 455-58, 493; ECF No. 158-3 at 40; LC ¶¶ 410, 425-28; KC ¶¶ 316, 324. Defendants use their legitimate enterprises as "vehicle[s] through which unlawful activity is committed." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001).

That the PBMs and Manufacturers share a "common purpose" as enterprise members does not foreclose a finding of distinctness. PBM Mem. at 34. To the contrary, the law *defines* a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009). A common purpose defeats a RICO claim only where the members' *sole* common purpose is to execute the alleged pattern of racketeering activity. *See Jordan v. Tilzer*, 2022 WL 16544335, at *2 (2d Cir. Oct. 31, 2022).

### E.  The Counties Pled that the PBMs Conducted an Enterprise's Affairs.

To satisfy RICO's "operation or management" test, a plaintiff must allege that the defendants had "some part in directing the enterprise's affairs." *Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 262 (D.N.J. 2000). The Counties easily clear this hurdle. Far from describing "routine contractual relationships," PBM Mem. at 35, the Counties allege that the PBMs and Manufacturers exploited a closed market by cooperating to fix artificially high prices. *See, e.g.*, LC ¶¶ 4, 5, 10, 22, 279-88, 335-51; AC ¶¶ 4, 10, 20, 24, 280-325, 375-92; KC ¶¶ 4, 10, 21, 182-229. Indeed, *none* of the misconduct alleged—manipulating formularies for profit, trading formulary placement for kickbacks, or mislabeling and concealing rebates, s*ee, e.g.*, LC ¶¶ 246, 358-65, 418, 429-39 & n.6; AC ¶¶ 17, 445, 316-21, 460-69, 528, 569 & n.4; KC ¶¶ 260-82, 309, 423— would "occur in competition for business in a legitimate market." *Insulin Pricing Litig.*, 2019 WL 643709, at *6 (rejecting argument that allegations were "entirely consistent with [the Manufacturers and PBMs] each going about their own business"). Instead, the conduct alleged demonstrates that the PBMs were "plainly integral to carrying out" their enterprises' activities. *See United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998).[10]

## IV.    THE COUNTIES STATE CONSUMER PROTECTION CLAIMS.

The PBMs' arguments for dismissal of the Counties' consumer protection claims lack merit because (A) the Counties' claims are consumer oriented; (B) the claims are

---

[10] The PBMs say that the Counties' RICO conspiracy claims fail because the underlying RICO claims fail. *See* PBM Mem. at 47. Because they are wrong, the Counties' RICO conspiracy claims survive.

not barred by safe harbors; (C) the Counties adequately plead deceptive practices; (D) they plausibly allege causation and reliance; (E) King County alleges unfair conduct; and (F) King County's claim is not barred by the indirect purchaser rule.

## A. The Counties' Claims Are Consumer Oriented

The PBMs engaged in consumer-oriented conduct under the NYGBL. "[A]n act or practice is consumer[] oriented [under the NYGBL] when it has a broader impact on consumers at large." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 171 N.E.3d 1192, 1197–98 (N.Y. 2021) (quotation omitted). Here, the PBMs orchestrated a scheme to inflate the price of diabetes medications, harming patients and public entities. AC ¶¶ 712-13. As this Court has recognized, the "pricing scheme directly impacts consumers." *Minnesota*, 2020 WL 2394155, at *5.

In response, the PBMs raise two flawed arguments. PBM Mot. at 37-38. First, they contend that the scheme was not consumer oriented because it involved "complex arrangements" and "sophisticated" parties. But it is only where "[t]ransactions between businesses or sophisticated parties . . . *do not affect average consumers* [that there is no] consumer-oriented conduct." *Axiom Inv. Advisors v. Deutsche Bank AG,* 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017) (emphasis added).[11]

Second, the PBMs rely on *MSP Recovery*, which dismissed a NYGBL claim

---

[11] *See also Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 65 (2d Cir. 2010) (plaintiff bringing NYGBL claim over private contract dispute could establish liability by "showing injury or potential injury to the public").

premised on "business-to-business transactions." 2020 WL 831578 (D.N.J. Feb. 20, 2020), at *10. But Albany is a county, not a business. Regardless, after *MSP*, the New York Court of Appeals in *Himmilstein* clarified that NYGBL plaintiffs *can* recover for business-to-business transactions. *See Trustpilot Damages LLC v. Trustpilot Inc.*, 2022 WL 2124865, at *3 n.5 (2d Cir. June 13, 2022).

**B.    State Consumer Protection Claims Are Not Barred by Safe Harbors**

To fall within a safe harbor, the specific conduct must be "specifically permitted" or "authorized" by the law. *Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1104 (W.D. Wash. 2007); *Singleton v. Fifth Gen., Inc.*, 2016 WL 406295, at *7 (N.D.N.Y. Jan. 12, 2016).[12] Here, the Counties allege that the PBMs engaged in deceptive and unfair practices, including demanding kickbacks, relabeling rebates as "fees," and excluding cheaper diabetes drugs from formularies. *See* pp. 6, 7, 11, *supra*. None of this conduct (or the PBMs' related misrepresentations or omissions) is authorized by law. *See People v. Gen. Elec. Co.*, 756 N.Y.S.2d 520, 524 (App. Div. 2003) (deception is not authorized).

The PBMs contend otherwise, arguing that a federal statute authorizes the list prices. But that statute, 42 U.S.C. § 1395w-3a(c)(6)(B), applies only to federal payments for Medicaid-reimbursed drugs; it has no relevance here. In any event, the list prices here did *not* comply with the statute because they included unearned fees. *See* p. 7, *supra*.

---

[12] The safe harbors are affirmative defenses that are "narrowly confined." *Vogt v. Seattle-First Nat'l Bank*, 817 P.2d 1364, 1370 (Wash. 1991); *see also In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *20 (E.D.N.Y. Aug. 29, 2013).

The statute did not authorize this conduct. *See Minnesota*, 2020 WL 2394155, at *14 (citing *In re Insulin Pricing Litig.*, 2019 WL 643709, at *5); *City of Miami*, 2022 WL 198028, at *8 n.8. And contrary to the PBMs' assertion, this Court has not determined otherwise. *See Insulin Pricing Litig.*, 2024 WL 416500, at *26, 28 (concluding only that specific injunctive relief sought by consumers was inconsistent with the statute).

The PBMs also point to a regulation requiring PBMs to disclose rebates in the context of federal health plans. But that regulation does not authorize the PBMs to make misrepresentations about or relabel rebates.

The PBMs also invoke the Anti-Kickback Statute's safe harbor for certain rebates. But even if that federal law permits the Manufacturers to pay rebates to PBMs in certain circumstances, it does not authorize the Manufacturers and PBMs to conspire to hide rebates from payors.

## C.    The Counties Have Properly Pled Deceptive Practices.

The PBMs argue for dismissal of all consumer protection claims because the Counties have not alleged deceptive misrepresentations or omissions.[13] *See* PBM Mem. at 40. That is not the case. *See* pp. 26-28, *supra*.

The PBMs incorrectly argue that they had no duty to disclose. But in New York and Washington, a duty to disclose arises (for example) where, as here, "the facts are

---

[13] "Deception exists if there is a representation, omission or practice that is likely to mislead a reasonable consumer." *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 895 (Wash. 2009); *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (same).

known to the seller but not easily discoverable by the buyer." *Griffith v. Centex Real Est. Corp.*, 969 P.2d 486, 492 (Wash. Ct. App. 1998); *Fishon v. Peloton Interactive, Inc.*, 620 F. Supp. 3d 80, 104 (S.D.N.Y. 2022) (similar); pp. 13, 29-30, *supra*; *see, e.g.*, AC ¶¶ 345, 556, 563, 609; KC ¶¶ 377, 390, 393-94 410; LC ¶¶ 518, 536, 546.

## D.    Albany County Has Pled Causation and Reliance

The PBMs further argue that Albany County failed to plead causation or reliance. *See* PBM Mem. at 40-41. Albany alleges that it paid artificially inflated prices pursuant to a fraudulent scheme. *See, e.g.*, AC ¶¶ 17-25, 316-24. It is difficult to imagine a more direct causal connection. To the extent the PBMs argue that the County has not pled reliance, "a private action brought under § 349 does not require proof of actual reliance." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (citation omitted). Regardless, Albany has pled reliance. *See* pp. 31-32, *supra*.

## E.    King County Adequately Alleges Unfair Conduct

An unfair practice is one that (1) offends public policy, (2) is immoral, unethical, oppressive, or unscrupulous, or (3) causes substantial injury to consumers. *Rush v. Blackburn*, 361 P.3d 217, 224-25 (Wash. Ct. App. 2015) (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)). All *Sperry* factors need not be satisfied to find unfairness. *Mellon v. Reg'l Trust. Servs. Corp.*, 334 P.3d 1120, 1126 (Wash. Ct. App. 2014).

King County adequately pleads unfairness under each *Sperry* factor. First, King alleges that the PBMs violated public policy by engaging in anticompetitive conduct. *See, e.g.*, KC ¶¶ 8, 20, 21, 150, 158-59, 213-15. The PBMs also violated public policy by

using deceptive or misleading advertising, representations, or proposals in violation of Wash. Rev. Code. § 48.200.280(2)(h). *See, e.g.*, KC ¶¶ 547-48. Second, the PBMs' conduct was immoral, unethical, and unscrupulous. The PBMs drove up the prices of the at-issue drugs by demanding ever-increasing Manufacturer Payments, damaging payors. The PBMs also excluded lower-priced drugs from their formularies, rendering treatment more expensive for diabetics who depend on those drugs. *See, e.g.*, KC ¶¶ 30, 31, 34, 213, 215, 239, 254, 264, 329, 348. Third, King County alleges substantial injury in that it paid false prices. *See, e.g.*, KC ¶¶ 357, 371-72, 402-03.

Against all this, the PBMs' *only* argument is that King's unfairness claim fails with its deception claim. PBM Mem. at 41-42. Not so. Deceptive and unfair conduct are distinct causes of action under the WCPA, involving different tests and pleading standards. *See Rush*, 361 P.3d at 225. King adequately pled unfair conduct. *See, e.g.*, *In re Insulin Pricing Litig.*, 2019 WL 643709, at *15 ("Plaintiffs adequately pled unfair business practices" based on "artificially inflated AWPs").

## F. King County's Claims Are Not Barred by the Indirect Purchaser Rule.

Because King County directly purchased diabetes medications from the PBMs, pp. 21-22, *supra,* the indirect purchaser rule poses no obstacle to its claims. *See State Farm Fire & Cas. Co. v. Huynh*, 962 P.2d 854, 857 (Wash. Ct. App. 1998) (insurer was direct purchaser of doctor's services "for the benefit of its insureds"). Regardless, Washington courts apply the indirect purchaser rule only to certain per se and antitrust violations under the WCPA. *See Holiday Resort Cmty. Ass'n v. Echo Lake Assocs., LLC*,

135 P.3d 499, 504 (Wash. Ct. App. 2006). King County does not bring a per se or antitrust claim; it pleads deceptive and unfair conduct.

The PBMs point to *In re Insulin Pricing Litigation*, 2020 WL 831552 (D.N.J. Feb. 20, 2020), but that decision does not help them. First, the defendants there never argued that the indirect purchaser rule is limited to antitrust claims. Second, the plaintiffs pursued claims against only the Manufacturers, from whom they did not purchase insulin. *Id.* at *3. Here, King directly purchases drugs from the PBMs.

## V.    THE COUNTIES HAVE STATED FRAUD CLAIMS.

The PBMs say that the Counties have failed to plead misrepresentations or omissions, intent to defraud, or reasonable reliance. PBM Mem. at 42-43. Like the plaintiffs in *MSP Recovery*, the Counties plead "a fraudulent pricing scheme by virtue of misrepresentations of list prices." 2019 WL 1418129, at *19; *see* pp. 26, *supra*. They also allege false statements and omissions by the PBMs. *See* pp. 26-28, *supra*.

The Counties also plead both intent and reliance. They detail a fraudulent scheme *designed* to mislead payors by setting false list prices, mislabeling rebates, granting preference to the most expensive medications, and engaging in practices like spread pricing. *See* pp. 4-7, *supra*. The PBMs concealed their conduct with false statements and material omissions and through devices like rebate aggregators and limited audit rights. *See* pp. 7-9, 26-28, *supra*. The PBMs, with the Manufacturers, set the prices and "had reason to know that the public—and any consumer of their insulin—would rely" on their scheme. *MSP Recovery*, 2019 WL 1418129, at *19.

The Counties also allege that they *did* rely on the false prices and that they "wanted and expected to pay a price reflecting the lowest fair market value for the drugs." LC ¶¶ 457-61; AC ¶¶ 516-20; KC ¶¶ 369-71. The Counties' payment of the PBMs' invoices demonstrates their reliance. *See* p. 31, *supra*. The Counties also relied on other PBM misrepresentations and omissions. *See* p. 32, *supra*.

Finally, the PBMs assert that the Counties' fraud claims are foreclosed because they arise from a breach of contract. But these claims are far broader than a simple breach of contract. *See* Section I.A, *supra*; Section VI.A, *infra*.

## VI.   THE COUNTIES PLEAD UNJUST ENRICHMENT CLAIMS.

### A. The PBM Contracts Do Not Bar Unjust Enrichment Claims.

The PBMs argue that their contracts with the Counties preclude any unjust enrichment claim. PBM Mem. at 3, 43. But a contract does not have that effect unless it "clearly covers" the parties' dispute. *Union Bank, N.A. v. CBS Corp.*, 2009 WL 1675087, at *7 (S.D.N.Y. June 10, 2009); *accord Laba v. Chicago Transit Auth.*, 2016 WL 147656, at *5 (N.D. Ill. Jan. 13, 2016); *Olson Kundig, Inc. v. 12th Ave. Iron, Inc.*, 2022 WL 4534422, at *5-7 (W.D. Wash. Sept. 28, 2022). The PBMs' price manipulation and fraudulent scheme extended far beyond the scope of their contracts. *See* Section I.A, *supra*. The contracts say nothing about the conduct underlying Defendants' scheme. *See Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 433 (S.D.N.Y. 2020) ("where Plaintiffs allege a manipulation of the market overall, such conduct . . . does not arise out of the subject matter of the agreements").

Because the contracts do not "clearly cover" the PBMs' misconduct, they do not preclude the Counties' unjust enrichment claims. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483 (S.D.N.Y. 2014) (parties' contracts required defendants to pay plaintiffs prescribed LIBOR rate, but did not permit defendants "to manipulate LIBOR itself and thereby depress the amount they were required to pay plaintiffs"); *Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860 (N.D. Ill. 2010) (allowing unjust enrichment claim where plaintiffs alleged market manipulation to artificially raise prices); *Mississippi v. Eli Lilly & Co.*, 2022 WL 18401603, at *4 (S.D. Miss. Aug. 29, 2022) (state plausibly alleged insulin pricing claims that did not stem from its contracts with the PBMs).

## B.    Albany Alleges a Direct Benefit Conferred on PBMs.

The PBMs argue that Albany's unjust enrichment claim fails for lack of any "direct benefit" but, under New York law, "[i]t does not matter whether the benefit is directly or indirectly conveyed.'" *Myun-Uk Choi v. Tower Research Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018).[14] Only when the parties' connection "is too attenuated" will an unjust enrichment claim fail. *Id.*[15] Even if a direct benefit were required, Albany alleges that it

---

[14] The PBMs argue that Illinois and Washington prohibit unjust enrichment claims by indirect purchasers. But Illinois has passed a repealer statute. *See* 740 ILCS 10/7(2). Regardless, the Counties *are* direct purchasers. *See* pp. 21-22, *supra*.

[15] *See also In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 233 (S.D.N.Y. 2012) (denying motion to dismiss where Plaintiffs conferred benefit by purchasing through intermediaries).

"paid [ESI] and [CVS] directly for the at-issue drugs." AC ¶ 511, 685.[16]

## C. Albany's and Lake's Unjust Enrichment Claims May Proceed with Their Related Statutory and Common-law Claims.

The PBMs seek to dismiss Albany's and Lake's unjust enrichment claims (pled in the alternative) as duplicative of other claims. But dismissal on this ground is premature. *Scholder v. Sioux Honey Ass'n Coop.*, 2022 WL 125742, at *6 (E.D.N.Y. Jan. 13, 2022) (declining to dismiss unjust enrichment claim even if it "may ultimately be deemed duplicative"). Indeed, in contrast to the PBMs' 2018 authority, *Alce v. Wise, Foods, Inc.*, 2018 WL 1737750 (S.D.N.Y. Mar. 27, 2018), the Second Circuit recently recognized that a "more fully developed record" is necessary before determining whether unjust enrichment and NYGBL claims are duplicative. *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 100 (2d Cir. 2023); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *36 (N.D. Ill. June 29, 2015).[17]

That aside, dismissal of Albany's and Lake's unjust enrichment claims is unwarranted. Under New York law, claims are only duplicative "if they arise from the same facts . . . and do not allege distinct damages." *NetJets Aviation, Inc. v. LHC Commcns., LLC*, 537 F.3d 168, 175 (2d Cir. 2008). Here, the recoveries for the NYGBL

---

[16] The PBMs' citation to *MSP Recovery* is misguided. The claims there were pursued against only the Manufacturers, and the plaintiff could not satisfy New Jersey's requirement that unjust enrichment claims be supported by a direct purchase. 2019 WL 1418129, at *20.

[17] Even PBMs' authority, *Cleary v. Philip Morris Inc.*, was decided not on an initial pleading challenge, but after years of "extensive proceedings." 656 F.3d 511, 513 (7th Cir. 2011).

and unjust enrichment claims are substantively different: Albany seeks statutory and
punitive damages under the NYGBL, and equitable relief for its unjust enrichment
claim. AC at ¶¶ 706, 747-79. Moreover, Albany's unjust enrichment claim is not
duplicative because there are "circumstance[s] in which [Albany's statutory or common
law] claim[s] [c]ould fail yet [it] would still be entitled . . . to restitution." *Great W. Ins.
Co. v. Graham,* 2020 WL 3415026, at *34 (S.D.N.Y. June 22, 2020). For example, unjust
enrichment requires that the PBMs benefitted at Albany's expense, whereas the
NYGBL claim requires that Albany was injured by the PBMs' conduct.

As to Lake, as the PBMs recognize, "if an unjust enrichment claim rests on the
same improper conduct alleged in another claim, then the unjust enrichment claim will
. . . stand or fall with the related claim." *Cleary*, 656 F.3d at 517. Here, because Lake has
alleged a host of viable claims against the PBMs, Lake's unjust enrichment claim may
also proceed. *In re Beyond Meat, Inc., Protein Content Mktg. & Sales Pracs. Litig.*, 2024 WL
726838, at *14 (N.D. Ill. Feb. 21, 2024).[18]

### D.    King Has Stated a Claim Against OptumRx.

The PBMs allege that King cannot maintain an unjust enrichment claim against
OptumRx because OptumRx never served as its PBM. But Washington law does not
require a plaintiff to confer a direct benefit on the defendant, and therefore permits

---

[18] The Illinois Supreme Court and Seventh Circuit have found that an unjust enrichment
claim can stand on its own. *Cleary*, 656 F.3d at 516 (Illinois Supreme Court "appears to
recognize" unjust enrichment as independent claim); *Raintree Homes, Inc. v. Vill. of Long
Grove*, 209 Ill. 2d 239, 445 (Ill. 2004) (involving standalone unjust enrichment claim).

King's unjust enrichment. *Bank v. Wash. Pub. Power Supply Sys.*, 691 P.2d 524, 545 (Wash. 1984) ("As noted above, a Restatement's definition of benefit is quite broad."). King alleges that OptumRx participated in and benefitted from the scheme. KC ¶¶ 535-36.

## VII.   KING HAS STATED AN IMPLIED COVENANT CLAIM.

"[A] claim for breach of the good faith duty exists where the contract gives a party discretion or leeway in determining how to act and that party exercises its discretion in a manner inconsistent with the reasonable expectations of the parties." *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1190 (W.D. Wash. 2013). The PBMs' contracts afford them complete discretion in managing their formularies and determining what Manufacturer payments qualify as "rebates" and "fees." *See* KC ¶¶ 21, 260-61, 521, 522. The PBMs exercised that discretion in bad faith when they preferred more expensive drugs based, in part, on kickbacks paid by the Manufacturers, and mislabeled and withheld rebates owed to King County. *See* pp. 5-7, *supra.* The PBMs also abused their discretion by, *inter alia*, (1) using rebate aggregators to conceal rebates and their revenues therefrom, and (2) creating an illusory audit process that prevented King from understanding the PBMs' rebate provisions. *Id.* ¶¶ 523-25.

The PBMs contend that an implied covenant fails if the plaintiff identifies no express contractual breach. PBM Mem. at 45. But the Washington Supreme Court has expressly rejected that argument. *See Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014). As courts have explained, "if a violation of the contract's terms were required, such a requirement would render the good faith and fair dealing

45

doctrine superfluous." *Accretive Tech. Grp., Inc. v. Adobe Sys., Inc.*, 2015 WL 4920079, at *8 (W.D. Wash. Aug. 17, 2015) (cleaned up). In any event, King attaches its claim to express contractual provisions, including its rebate and fee provisions. These specific contractual provisions are fatal to the PBMs' argument.

## VIII.   THE COUNTIES HAVE STATED CIVIL CONSPIRACY CLAIMS.

Because the Counties have properly pled their underlying claims, their civil conspiracy claims are properly pled as well.

The PBMs next argue that the Counties have not pled viable underlying claims against the PBMs with which they did not contract. They suggest, for example, that Albany cannot bring a conspiracy claim against OptumRx because it has not pled a fraud claim against OptumRx. This misses the point of civil conspiracy, for which a "plaintiff need not prove that each defendant committed every element of the underlying fraud." *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 319 (S.D.N.Y. 2009).

Finally, the PBMs argue that the Counties have not alleged an agreement to conspire and, relatedly, that allegations that the PBMs competed to secure the Counties' business undermine the existence of any agreement. PBM Mem. at 48. Defendants misconstrue the Counties' allegations. The fact that the PBMs competed on rebates is what drove insulin prices higher. *See, e.g.*, KC ¶¶ 21, 210, 213; LC ¶¶ 346; AC ¶¶ 387. In the absence of an agreement to participate, one would expect the PBMs to have "use[d] their considerable market power to drive down drug prices by forcing drug manufacturers to compete on price for formulary placement." KC ¶ 21; *see also id.* ¶ 210,

213; LC ¶¶ 19, 336, 473-74; AC ¶¶ 17, 376, 532-33. Indeed, the Insulin Pricing Scheme could not have succeeded had any Defendant declined to participate. And the "insular nature of the pharmaceutical industry" provided ample opportunity to conspire, as demonstrated by the "at-issue lockstep price increases [that] occurred shortly after the Defendants were together at PCMA meetings." LC ¶¶ 316-34; AC ¶¶ 356-74; KC ¶¶ 170-81. Taken together, these allegations support an inference that all Defendants agreed to participate. *See, e.g.*, *Bd. of Mgrs. of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 464 (S.D.N.Y. 2018) (agreement inferred where plaintiff alleged "that each Defendant benefitted financially from the scheme in the form of profits and income derived directly from their participation"); *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 155 (S.D.N.Y. 2014) (denying dismissal where complaint "support[ed] a plausible inference that the other Defendants were aware of the overall scheme and understood that they were taking actions in furtherance").

## IX.   THE COUNTIES PLEAD CLAIMS AGAINST ALL ENTITIES.

The PBMs argue that the Counties have not alleged facts sufficient to hold their corporate parents (and certain affiliates) liable. PBM Mem. at 48-50.[19] But the Counties do not seek to hold parent companies liable for their subsidiaries' conduct under a veil-piercing or alter-ego theory; the Counties seek to hold them liable for *their own conduct*.

---

[19] The PBMs seek to dismiss CVS Health Corp., CVS Pharmacy, Inc., Evernorth Health, Inc., The Cigna Group; UnitedHealth Group Inc., Optum, Inc., and OptumInsight, Inc. These entities' dismissal would not eliminate any corporate family.

Although the PBMs cite *United States v. Bestfoods*, they ignore its ruling that a parent can be directly liable for its own actions where "the alleged wrong can seemingly be traced to the parent" and "the parent is directly a participant in the wrong complained of." 524 U.S. 51, 64-65 (1998). The Counties have alleged such facts here, relying on the parents' *own admissions*. The Counties allege that CVS Health has made misrepresentations in furtherance of the Insulin Pricing Scheme, including repeated statements that it designs pharmacy benefit plans and negotiates with pharmaceutical companies to obtain the Manufacturer Payments at issue. CVS Health also has confirmed that it is directly involved with its PBM clients.[20]

Evernorth is directly involved in the Insulin Pricing Scheme, publicly maintaining that it "evaluat[es] drugs" for inclusion in clients' formularies and "offers cost-effective home delivery pharmacy and specialty services."[21] Evernorth has also contracted with the Manufacturers regarding the pricing of GLP-1s.[22]

Cigna "consults with [its own] clients on how best to structure and leverage the pharmacy benefit" and is otherwise directly involved in shaping policies that inform its PBM services and formulary construction with respect to the Insulin pricing Scheme.[23]

Finally, UnitedHealth Group "uses Optum's capabilities to . . . manage pharmacy

---

[20] AC ¶¶ 81-83; LC ¶¶ 79-81; KC ¶¶ 28, 73, 78, 211.

[21] AC ¶ 126; LC ¶¶ 120; KC ¶¶ 28, 73, 78, 211.

[22] KC ¶ 304.

[23] KC ¶ 27, 93.

benefits," "works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications," and "operate[s] [mail-order pharmacies]." UnitedHealth Group is also "involved in establishing the prices charged by retail pharmacies, determining which drugs will be included in formulary listings and . . . which retail pharmacies will be included in the network offered" to plans.[24]

More than the "general public statements" held insufficient in *EpiPen*, these allegations directly implicate the corporate parents. 2021 WL 147166, at *22 (D. Minn. Jan. 15, 2021). Indeed, the Counties' allegations plausibly demonstrate that each was directly involved in constructing formularies favoring higher-priced drugs; coordinating with the Manufacturers for Manufacturer Payments; and maximizing profits from the Insulin Pricing Scheme. *See Mississippi*, 2022 WL 18401603, at *5 (claims against CVS Health and Evernorth adequately pled based on similar allegations).[25]

The Counties have also stated claims against other corporate affiliates: CVS Pharmacy; Optum, Inc.; and OptumInsight, Inc. The Counties allege, for example, not only that CVS Pharmacy "provided retail pharmacy services," but also that the CVS Pharmacy "knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the drugs at issue . . . and

---

[24] AC ¶¶ 174-78; *see also* LC ¶¶ 170-74; KC ¶¶ 106-08.

[25] These parent entities have characterized their own corporate families as single, unified businesses. *See, e.g.*, AC ¶ 107, 151 191.

the amounts it received from payors."[26] The Counties also allege that Optum, Inc. is "directly responsible" for the OptumInsight, OptumHealth, and OptumRx business units, with the CEOs of those units reporting to Optum, Inc. regarding their policies for formulary construction and mail-order activities.[27] OptumInsight, Inc. is "an integral part of the Insulin Pricing Scheme" and "coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy," "analyz[ing] data and other information from the Manufacturer Defendants to advise the other Defendants" about the profitability of the Insulin Pricing Scheme to the benefit of all Defendants."[28]

These allegations, which must be credited at this stage, suffice to establish the liability of these parents and affiliates. *See, e.g.*, *United States v. Omnicare, Inc.*, 2021 WL 1063784, at *13-14 (S.D.N.Y. Mar. 19, 2021) (government's allegations against CVS Health "more than sufficient" where government alleged company's general role in overseeing operations and knowledge and involvement in investigations of company).

## **CONCLUSION**

The Court should deny the PBMs' motion to dismiss in its entirety.

---

[26] AC ¶¶ 91, 116; LC ¶¶ 88, 11; KC ¶¶ 74, 87. The PBMs point to *Fitch*, another insulin-pricing case, where the court dismissed CVS Pharmacy because the *only* allegation was that it "provided retail pharmacy services." 2022 WL 18401603, at *5. Here, the Counties also allege that it was a vehicle through which CVS effectuated and profited from its scheme.

[27] AC ¶¶ 181-82; LC ¶¶ 176-77; KC ¶¶ 107-08.

[28] AC ¶ 190; LC ¶ 185.

| Dated:  July 25, 2024 | Respectfully submitted, |
|---|---|
| */s/ David R. Buchanan*<br>Christopher A. Seeger<br>cseeger@seegerweiss.com<br>David R. Buchanan<br>dbuchanan@seegerweiss.com<br>Steven J. Daroci<br>sdaroci@seegerweiss.com<br>**SEEGER WEISS LLP**<br>55 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>973-639-9100 | Benjamin J. Widlanski<br>bwidlanski@kttlaw.com<br>Tal J. Lifshitz<br>tjl@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Rachel Sullivan<br>rs@kttlaw.com<br>Brandon Sadowsky<br>bsadowsky@kttlaw.com<br>Daniel T. DiClemente<br>ddiclemente@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Telephone: (305) 372-1800 |
| Troy A. Rafferty<br>trafferty@levinlaw.com<br>Matthew D. Schultz<br>mschultz@levinlaw.com<br>William F. Cash<br>bcash@levinlaw.com<br>Brandon L. Bogle<br>bbogle@levinlaw.com<br>**LEVIN, PAPANTONIO,**<br>**RAFFERTY, PROCTOR,**<br>**BUCHANAN, O'BRIEN, BARR &**<br>**MOUGEY, P.A**.<br>316 S. Baylen St., Suite 600<br>Pensacola, Florida 32502<br>Tel: (850) 435-7140 | Russell W. Budd<br>Christine C. Mansour<br>**BARON & BUDD, P.C.**<br>3102 Oak Lawn Ave, Suite 1100<br>Dallas, Texas 75219<br>Tel.: (214) 521-3605<br>rbudd@baronbudd.com<br>cmansour@baronbudd.com |
| Roland Tellis<br>Mark P. Pifko<br>**BARON & BUDD, P.C.**<br>15910 Ventura Blvd #1600 | Burton LeBlanc<br>**BARON & BUDD, P.C.**<br>2600 Citiplace Drive, Suite 400<br>Baton Rouge, Louisiana 70808 |

| | |
|---|---|
| Los Angeles, California 91436<br>Tel.: (818) 839-2333<br>rtellis@baronbudd.com<br>mpifko@baronbudd.com | Tel.: (225) 927-5441<br>bleblanc@baronbudd.com |
| Catherine Hancock Dorsey<br>**BARON & BUDD, P.C.**<br>600 New Hampshire Ave. NW 10th<br>Floor<br>Washington, D.C. 20037<br>Tel.: (202) 333-4562<br>cdorsey@baronbudd.com | Archie C. Lamb, Jr.<br>alamb@archielamb.com<br>**Archie Lamb & Associates**<br>P.O. Box 2088<br>Birmingham, Alabama 35201<br>205-612-6789 (C) |
| Donald W. Davis, Jr.<br>dwdavis@bmdllc.com<br>**Brennan, Manna & Diamond, LLC**<br>75 East Market Street<br>Akron, Ohio 44308<br>P: (330) 253-5060/Fax: (330) 253-1977 | |

*Counsel for Albany County*

David J. Ko, WSBA #38299
Derek W. Loeser, WSBA #24274
Juli E. Farris, WSBA #17593
Laura R. Gerber, WSBA #34981
Matthew M. Gerend, WSBA #43276
Rachel C. Bowanko, WSBA #61298
Andrew N. Lindsay, WSBA #60386
**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 428-0563
dloeser@kellerrohrback.com
dko@kellerrohrback.com
jfarris@kellerrohrback.com
lgerber@kellerrohrback.com
mgerend@kellerrohrback.com
rbowanko@kellerrohrback.com

alindsay@kellerrohrback.com

*Counsel for King County*

| | |
|---|---|
| Benjamin J. Widlanski<br>bwidlanski@kttlaw.com<br>Tal J. Lifshitz<br>tjl@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Rachel Sullivan<br>rs@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Brandon Sadowsky<br>bsadowsky@kttlaw.com<br>Daniel T. DiClemente<br>ddiclemente@kttlaw.com<br>**KOZYAK TROPIN &<br>THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Telephone: (305) 372-1800 | William F. Cash III<br>bcash@levinlaw.com<br>Troy A. Rafferty<br>trafferty@levinlaw.com<br>Matthew D. Schultz<br>mschultz@levinlaw.com<br>Brandon L. Bogle<br>bcash@levinlaw.com<br>**LEVIN, PAPANTONIO,<br>RAFFERTY,<br>PROCTOR, BUCHANAN,<br>O'BRIEN, BARR & MOUGEY, P.A.**<br>316 S. Baylen St., Suite 600<br>Pensacola, Florida 32502<br>Telephone: (850) 435-7140 |
| Christopher A. Seeger<br>cseeger@seegerweiss.com<br>David R. Buchanan<br>dbuchanan@seegerweiss.com<br>Steven J. Daroci<br>sdaroci@seegerweiss.com<br>**SEEGER WEISS, LLP**<br>55 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>Telephone: (973) 639-9100 | James L. Magazine<br>jim@magazinelaw.com<br>**THE MAGAZINE LAW<br>GROUP LLC**<br>2625 McCormick Drive, Suite 102<br>Clearwater, FL 33759-1078<br>Telephone: (727) 499-9900 |
| Russell W. Budd<br>rbudd@baronbudd.com<br>Christine C. Mansour<br>cmansour@baronbudd.com<br>**BARON & BUDD, P.C.** | Burton LeBlanc<br>bleblanc@baronbudd.com<br>**BARON & BUDD, P.C.**<br>2600 Citiplace Drive, Suite 400<br>Baton Rouge, LA 70808 |

| | |
|---|---|
| 3102 Oak Lawn Ave, Suite 1100<br>Dallas, TX 75219<br>Telephone: (214) 521-3605 | Telephone: (225) 927-5441 |
| Roland Tellis<br>rtellis@baronbudd.com<br>Mark P. Pifko<br>mpifko@baronbudd.com<br>**BARON & BUDD, P.C.**<br>15910 Ventura Blvd #1600<br>Los Angeles, CA 91436<br>Telephone: (818) 839-2333 | Catherine Hancock Dorsey<br>cdorsey@baronbudd.com<br>**BARON & BUDD, P.C.**<br>600 New Hampshire Ave. NW 10th<br>Floor<br>Washington, D.C. 20037<br>Telephone: (202) 333-4562 |
| John M. Power (Ill. Bar No. 6197553)<br>jpower@coganpower.com<br>**COGAN & POWER PC**<br>1 East Wacker Drive, 38th Floor<br>Chicago, IL 60601<br>Telephone: (312) 477-2500 | |

*Counsel for Lake County*

## CERTIFICATE OF SERVICE

I certify that I am a registered attorney in the State of New Jersey and a Member of the Bar of this Court and that on this date a copy of this document was served on the counsel of record in the above-captioned matter via email.

*/s/ David R. Buchanan*
David R. Buchanan
Dated: July 25, 2024