# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080** |
| | **MDL No. 3080** |
| | |
| | **JUDGE BRIAN R. MARTINOTTI** |
| | **JUDGE RUKHSANAH L. SINGH** |
| | **ORAL ARGUMENT REQUESTED** |

**THIS DOCUMENT RELATES TO:**

*County of Albany, New York v. Eli Lilly*, No. 1:22-cv-00981
*King County, Washington v. Eli Lilly*, No. 2:23-cv-21178
*Lake County, Illinois v. Eli Lilly, et al.*, No. 2:23-cv-08487

## THE COUNTIES' RESPONSE IN OPPOSITION TO THE MANUFACTURERS' MOTION TO DISMISS

(Counsel listed on following pages)

Christopher A. Seeger
cseeger@seegerweiss.com
David R. Buchanan
dbuchanan@seegerweiss.com
Steven J. Daroci
sdaroci@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
973-639-9100

Benjamin J. Widlanski
bwidlanski@kttlaw.com
Tal J. Lifshitz
tjl@kttlaw.com
Jorge L. Piedra
jpiedra@kttlaw.com
Rachel Sullivan
rs@kttlaw.com
Brandon Sadowsky
bsadowsky@kttlaw.com
Daniel T. DiClemente
ddiclemente@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

Troy A. Rafferty
trafferty@levinlaw.com
Matthew D. Schultz
mschultz@levinlaw.com
William F. Cash
bcash@levinlaw.com
Brandon L. Bogle
bbogle@levinlaw.com
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.**
316 S. Baylen St., Suite 600
Pensacola, Florida 32502
Tel: (850) 435-7140

Russell W. Budd
Christine C. Mansour
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave, Suite 1100
Dallas, Texas 75219
Tel.: (214) 521-3605
rbudd@baronbudd.com
cmansour@baronbudd.com

Roland Tellis
Mark P. Pifko
**BARON & BUDD, P.C.**
15910 Ventura Blvd #1600
Los Angeles, California 91436
Tel.: (818) 839-2333
rtellis@baronbudd.com

Burton LeBlanc
**BARON & BUDD, P.C.**
2600 Citiplace Drive, Suite 400
Baton Rouge, Louisiana 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

| | |
|---|---|
| mpifko@baronbudd.com | |
| Catherine Hancock Dorsey<br>**BARON & BUDD, P.C.**<br>600 New Hampshire Ave. NW 10th Floor<br>Washington, D.C. 20037<br>Tel.: (202) 333-4562<br>cdorsey@baronbudd.com | Archie C. Lamb, Jr.<br>alamb@archielamb.com<br>**Archie Lamb & Associates**<br>P.O. Box 2088<br>Birmingham, Alabama 35201<br>205-612-6789 (C) |
| Donald W. Davis, Jr.<br>dwdavis@bmdllc.com<br>**Brennan, Manna & Diamond, LLC**<br>75 East Market Street<br>Akron, Ohio 44308<br>P: (330) 253-5060/Fax: (330) 253-1977 | |

*Counsel for Albany County*


David J. Ko, WSBA #38299
Derek W. Loeser, WSBA #24274
Juli E. Farris, WSBA #17593
Laura R. Gerber, WSBA #34981
Matthew M. Gerend, WSBA #43276
Rachel C. Bowanko, WSBA #61298
Andrew N. Lindsay, WSBA #60386
**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 428-0563
dloeser@kellerrohrback.com
dko@kellerrohrback.com
jfarris@kellerrohrback.com
lgerber@kellerrohrback.com
mgerend@kellerrohrback.com
rbowanko@kellerrohrback.com
alindsay@kellerrohrback.com

*Counsel for King County*

| | |
|---|---|
| Benjamin J. Widlanski<br>bwidlanski@kttlaw.com<br>Tal J. Lifshitz<br>tjl@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Rachel Sullivan<br>rs@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Brandon Sadowsky<br>bsadowsky@kttlaw.com<br>Daniel T. DiClemente<br>ddiclemente@kttlaw.com<br>**KOZYAK TROPIN &<br>THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Telephone: (305) 372-1800 | William F. Cash III<br>bcash@levinlaw.com<br>Troy A. Rafferty<br>trafferty@levinlaw.com<br>Matthew D. Schultz<br>mschultz@levinlaw.com<br>Brandon L. Bogle<br>bcash@levinlaw.com<br>**LEVIN, PAPANTONIO,<br>RAFFERTY,<br>PROCTOR, BUCHANAN,<br>O'BRIEN, BARR & MOUGEY, P.A.**<br>316 S. Baylen St., Suite 600<br>Pensacola, Florida 32502<br>Telephone: (850) 435-7140 |
| Christopher A. Seeger<br>cseeger@seegerweiss.com<br>David R. Buchanan<br>dbuchanan@seegerweiss.com<br>Steven J. Daroci<br>sdaroci@seegerweiss.com<br>**SEEGER WEISS, LLP**<br>55 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>Telephone: (973) 639-9100 | James L. Magazine<br>jim@magazinelaw.com<br>**THE MAGAZINE LAW<br>GROUP LLC**<br>2625 McCormick Drive, Suite 102<br>Clearwater, FL 33759-1078<br>Telephone: (727) 499-9900 |
| Russell W. Budd<br>rbudd@baronbudd.com<br>Christine C. Mansour<br>cmansour@baronbudd.com<br>**BARON & BUDD, P.C.**<br>3102 Oak Lawn Ave, Suite 1100<br>Dallas, TX 75219<br>Telephone: (214) 521-3605 | Burton LeBlanc<br>bleblanc@baronbudd.com<br>**BARON & BUDD, P.C.**<br>2600 Citiplace Drive, Suite 400<br>Baton Rouge, LA 70808<br>Telephone: (225) 927-5441 |

| | |
|---|---|
| Roland Tellis<br>rtellis@baronbudd.com<br>Mark P. Pifko<br>mpifko@baronbudd.com<br>**BARON & BUDD, P.C.**<br>15910 Ventura Blvd #1600<br>Los Angeles, CA 91436<br>Telephone: (818) 839-2333 | Catherine Hancock Dorsey<br>cdorsey@baronbudd.com<br>**BARON & BUDD, P.C.**<br>600 New Hampshire Ave. NW 10th Floor<br>Washington, D.C. 20037<br>Telephone: (202) 333-4562 |
| John M. Power (Ill. Bar No. 6197553)<br>jpower@coganpower.com<br>**COGAN & POWER PC**<br>1 East Wacker Drive, 38th Floor<br>Chicago, IL 60601<br>Telephone: (312) 477-2500 | |

*Counsel for Lake County*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................... iii

**INTRODUCTION** ................................................................................ 1

**BACKGROUND** ................................................................................. 3

    The Insulin Pricing Scheme ................................................................ 4

    Defendants Conceal the Insulin Pricing Scheme ................................... 7

    Procedural History ............................................................................ 8

**ARGUMENT** ..................................................................................... 9

I.     THE COUNTIES' CLAIMS ARE NOT TIME-BARRED. .............................. 9

    A.  The Counties' RICO Claims Are Not Time-Barred. ..................................... 10

    B.  The Counties Have Pled Facts to Toll All Applicable Statutes. .................. 14

II.    THE COUNTIES HAVE STATED ACTIONABLE RICO CLAIMS. ......... 17

    A.  The Indirect Purchaser Rule Does Not Bar the Counties' RICO Claims... 18

    B.  The Counties Have Pled RICO Predicate Acts. ............................................ 24

    C.  The Counties Have Plausibly Pled that the Manufacturers Conducted the Affairs of a RICO Enterprise. .................................................................... 26

III.   THE COUNTIES STATE CONSUMER PROTECTION CLAIMS. ............ 28

    A.  The Consumer Protection Claims Are Not Barred by Safe Harbors. ......... 28

    B.  Albany's Claim Is Consumer Oriented. ...................................................... 29

    C.  Albany County's Claims Are Direct, Not Derivative. .................................. 31

    D.  The Counties Have Properly Pled Deception. .............................................. 32

        1.  The Counties Plead Deceptive or Misleading Practices. ....................... 33

        2.  The Counties Have Also Pled Deceptive Material Omissions. ............. 33

    E.  King County Has Properly Pled Unfairness. ................................................ 35

IV.   THE COUNTIES STATE COMMON LAW FRAUD CLAIMS. .................. 40

V.    THE COUNTIES STATE UNJUST ENRICHMENT CLAIMS. .................. 41

    A.  The Counties' Unjust Enrichment Claims May Proceed Together with Their Common Law and Statutory Claims. ................................................. 41

    B.  The Counties Are Not Required to Plead a "Direct Benefit." ..................... 42

C.  The Counties' Contracts with the PBMs Do Not Preclude Their Unjust Enrichment Claims Against the Manufacturers. .................................................... 44

VI.     THE COUNTIES HAVE STATED CONSPIRACY CLAIMS ...................... 45

VII.    THE COUNTIES HAVE PLED VIABLE GLP-1 CLAIMS. .......................... 47

A.  The Counties Adequately Plead GLP-1 Claims. ............................. 47

B.  Federal Patent Law Does Not Preempt the Counties' GLP-1 Claims ......... 48

**CONCLUSION** ......................................................................................... 50

## TABLE OF AUTHORITIES

### Authorities

*Alevizopoulos & Assocs. v. Comcast Int'l Holdings*,
  100 F. Supp. 2d 178 (S.D.N.Y. 2000) ..................................................... 15, 16

*Alexander v. Sanford*,
  325 P.3d 341 (Wash. Ct. App. 2014) ............................................. 15

*Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*,
  463 F. Supp. 3d 409 (S.D.N.Y. 2020) ............................................ 45

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019) ....................................................... 18, 22, 24

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
  234 F. Supp. 3d 526 (S.D.N.Y. 2017) .......................................... 30

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005) ............................................................ 48

*Beck v. Eins*,
  305 A.D.2d 323 (N.Y. App. Div. 2003) .......................................... 41

*Bennett v. Homesite Ins. Co.*,
  636 F. Supp. 3d 1267 (W.D. Wash. 2022) ....................................... 34

*Bingham v. Zolt*,
  66 F.3d 553 (2d Cir. 1995) ..................................................... 16

*Blaylock v. First Am. Title Ins. Co.*,
  504 F. Supp. 2d 1091 (W.D. Wash. 2007) ....................................... 28

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
  818 N.E.2d 1140 (N.Y. 2004) ................................................. 31, 32

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
  2016 WL 6612804 (E.D. Pa. Nov. 9, 2016) ...................................... 9, 14

*Carrera v. Olmstead*,
  401 P.3d 304 (Wash. 2017) .................................................... 17

*Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.*,
  973 P.2d 527 (Cal. 1999) ................................................................... 35

*Cent. Flyway Air, Inc. v. Grey Ghost Int'l, LLC*,
  2022 WL 17976099 (W.D. Wash. Dec. 28, 2022) ........................................ 46

*Cetel v. Kirwan Fin. Grp., Inc.*,
  460 F.3d 494 (3d Cir. 2006) ............................................................... 10

*City of Miami v. Eli Lilly & Co.*,
  2022 WL 198028 (S.D. Fla. Jan. 21, 2022) ........................... 20, 21, 24, 25, 44

*City of N.Y. v. Smokes-Spirits.Com, Inc.*,
  911 N.E.2d 834 (N.Y. 2009) .......................................................... 31, 32

*Clark v. Blue Diamond Growers*,
  2023 WL 4351464 (N.D. Ill. July 5, 2023) ............................................. 41

*Clinton v. Calvert*,
  1987 WL 14723 (N.D. Ill. July 17, 1987) .............................................. 40

*Collins v. Daviro*,
  160 A.D.3d 1343 (N.Y. App. Div. 2018) ............................................... 15

*Crisman v. Crisman*,
  931 P.2d 163 (Wash. Ct. App. 1997) ................................................... 15

*Curtis v. Treloar*,
  1998 WL 1110448 (D.N.J. Aug. 27, 1998) .......................................... 39, 48

*Dentsply Int'l, Inc.*,
  424 F.3d 363 (3d Cir. 2005) ............................................. 18, 19, 20, 21, 23

*Domain Name Comm'n Ltd. v. DomainTools, LLC*,
  449 F. Supp. 3d 1024 (W.D. Wash. 2020) ............................................. 36

*Dow Chem. Co. v. Exxon Corp.*,
  139 F.3d 1470 (Fed. Cir. 1998) ...................................................... 48, 49

*Emcore Corp. v. PricewaterhouseCoopers LLP*,
  102 F. Supp. 2d 237 (D.N.J. 2000) ..................................................... 26

*EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
  336 F. Supp. 3d 1256 (D. Kan. 2018) ................................................... 49

*F.T.C. v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ................................................................. 36, 39

*Farwest Steel Corp. v.Mainline Metal Works, Inc.*,
741 P.2d 58 (Wash. Ct. App. 1987) ............................................................. 45

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004) ......................................................................... 26

*Fitchett v. City of N.Y.*,
2019 WL 3430726 (S.D.N.Y. July 30, 2019) ............................................... 15

*Friedman v. Maspeth Fed. Loan & Sav. Ass'n*,
30 F. Supp. 3d 183 (E.D.N.Y. 2014) ........................................................... 32

*Gagnon v. Schickel*,
983 N.E.2d 1044 (Ill App. Div. 2012) ......................................................... 44

*Garron v. Bristol House, Inc.*,
162 A.D.3d 857 (N.Y. App. Div. 2018) ....................................................... 16

*Gladysiewski v. Allegheny Energy Serv. Corp.*,
282 F. App'x 979 (3d Cir. 2008) .................................................................. 48

*Golden v. Faust*,
766 F.2d 1339 (9th Cir. 1985) ..................................................................... 15

*Grynberg v. Eni S.p.A.*,
2007 WL 2584727 (S.D.N.Y. Sept. 5, 2007) ................................................. 9

*Guy Mitchell v. Artists Rts. Enf't Corp.*,
2013 WL 890478 (E.D. Wash. Mar. 8, 2013) ............................................... 41

*Harnish v. Widener Univ. Sch. of L.*,
833 F.3d 298 (3d Cir. 2016) ......................................................................... 37

*Harris County v. Eli Lilly & Co.*,
2022 WL 479943 (S.D. Tex. Feb. 16, 2022) ................................................. 21

*Henderson Square Condo. Ass'n v. LAB Townhomes, LLC*,
46 N.E.3d 706 (Ill. 2016) ............................................................................. 15

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*,
171 N.E.3d 1192 (N.Y. 2021) ....................................................................... 30

*Hinds Cnty. v. Wachovia Bank N.A.*,
   700 F. Supp. 2d 378 (S.D.N.Y. Mar. 25, 2010) ............................................................ 15

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
   545 N.E.2d 672 (Ill. 1989) ............................................................................................. 42

*Hudson v. City of Wenatchee*,
   974 P.2d 342 (Wash. Ct. App. 1999) ............................................................................ 17

*Ill. Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ...................................................................................................... 18

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000) .................................................................. 42, 43

*In re Copper Antitrust Litig.*,
   436 F.3d 782 (7th Cir. 2006) ........................................................................................ 15

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012) .......................................................................... 43

*In re Direct Purchaser Insulin Pricing Litig.*,
   2021 WL 2886216 (D.N.J. July 9, 2021) ..................................................... 11, 12, 23, 27

*In re EpiPen Direct Purchaser Litig.*,
   2021 WL 147166 (D. Minn. Jan. 15, 2021) ............................................................. 27, 34

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) .......................................................................................... 46

*In re Insulin Pricing Litig.*,
   2019 WL 643709 (D.N.J. Feb. 15, 2019) ................................ 24, 25, 33, 34, 36, 37, 39

*In re Insulin Pricing Litig.*,
   2024 WL 416500 (D.N.J. Feb. 5, 2024) .................................................................. 29, 38

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   497 F. Supp. 3d 552 (N.D. Cal. 2020) .................................................................... 31, 32

*In re LIBOR-Based Fin. Inst. Antitrust Litig.*,
   27 F. Supp. 3d 447 (S.D.N.Y. 2014) ............................................................................ 45

*In re Lipitor Antitrust Litig.*,
   336 F. Supp. 3d 395 (D.N.J. 2018) .............................................................................. 49

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993) ................................................................ 22

*In re Nat'l Prescription Opiate Litig.*,
    2019 WL 4194296 (N.D. Ohio Sept. 4, 2019) ........................................ 14

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
    738 F. Supp. 2d 227 (D. Mass. 2010) .................................................... 24

*In re RenovaCare, Inc. Sec. Litig.*,
    2024 WL 2815034 (D.N.J. June 3, 2024) ............................................... 14

*In re Schering-Plough Corp. Intron Temodar Consumer Class Action*,
    2009 WL 2043604 (D.N.J. July 10, 2009) .............................................. 14

*In re Wellbutrin XL Antitrust Litig.*,
    260 F.R.D. 143 (E.D. Pa. 2009) ............................................................. 32

*Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*,
    170 P.3d 10 (Wash. 2007) ...................................................................... 37

*Indus. Org. v. Dist. of Columbia*,
    496 F.3d 1362 (Fed. Cir. 2007) .............................................................. 50

*Insulin Pricing Litig.*,
    2020 WL 831552 (D.N.J. Feb. 20, 2020) ............................................... 48

*Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*,
    2023 WL 415092 (D.N.J. Jan. 25, 2023) ................................................ 31

*Kaufman v. Cohen*,
    307 A.D.2d 113 (N.Y. App. Div. 2003) ................................................. 15

*Kelley v. Microsoft Corp.*,
    251 F.R.D. 544 (W.D. Wash. 2008) ....................................................... 37

*Kelley v. Microsoft Corp.*,
    2011 WL 13353905 (W.D. Wash. May 24, 2011) ................................... 38

*Kermanshah v. Kermanshah*,
    580 F. Supp. 2d 247 (S.D.N.Y. 2008) .................................................... 16

*Klem v. Wash. Mut. Bank*,
    295 P.3d 1179 (Wash. 2013) ............................................................ 32, 35

*LabMD, Inc. v. Boback*,
   47 F.4th 164 (3d Cir. 2022) .......................................................................... 10

*Lackner Co. v. Quehl Sign Co.*,
   145 F.2d 932 (6th Cir. 1944)......................................................................... 50

*LLDVF, L.P. v. Dinicola*,
   2010 WL 3210613 (D.N.J. Aug. 12, 2010) ..................................................... 9

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ........................................................................ 40

*Lowell v. Am. Cyanamid Co.*,
   177 F.3d 1228 (11th Cir. 1999)..............................................................18, 19

*Maadanian v. Mercedes-Benz USA, LLC*,
   2024 WL 1579658 (W.D. Wash. Apr. 11, 2024) ........................................... 42

*Maher v. AMAG Pharms., Inc.*,
   2024 WL 1376685 (D.N.J. Mar. 28, 2024) ................................................... 36

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
   952 F.3d 832 (7th Cir. 2020)........................................................................ 24

*Martin v. Miller*,
   308, 600 P.2d 698 (Wash Ct. App. 1979) ..................................................... 40

*Mass. Eye & Ear Infirmary v. QLT Photo., Inc.*,
   559 F.3d 1 (1st Cir. 2009)............................................................................ 49

*Mathews v. Kidder, Peabody & Co.*,
   260 F.3d 239 (3d Cir. 2001) ........................................................................ 10

*McCool v. Strata Oil Co.*,
   972 F.2d 1452 (7th Cir. 1992)...................................................................... 16

*Mellon v. Reg'l Tr. Servs. Corp.*,
   334 P.3d 1120 (Wash. Ct. App. 2014) .......................................................... 35

*Menke v. Glass*,
   898 F. Supp. 227 (S.D.N.Y. 1995) ............................................................... 16

*Miami Prods. & Chem. Co. v. Olin Corp.*,
   2022 WL 3701159 (W.D.N.Y. Aug. 26, 2022) .............................................. 43

*Miller v. William Chevrolet/GEO, Inc.*,
   762 N.E.2d 1 (Ill. Ct. App. 2001) ..................................................................... 41

*Minnesota v. Sanofi-Aventis*,
   2020 WL 2394155 (D.N.J. Mar. 31, 2020) ................................................ 25, 30, 33, 48

*Mississippi ex rel. Fitch v. Eli Lilly & Co.*,
   2022 WL 18401603 (S.D. Miss. Aug. 29, 2022) ........................................ 36, 45

*Moore v. Morales*,
   415 F. Supp. 2d 891 (N.D. Ill. 2006) ............................................................ 15

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,
   2019 WL 1418129 (D.N.J. Mar. 29, 2019) ....................................13, 21, 33, 40, 41, 44

MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC,
   2020 WL 831578 ................................................................................... 30

*Mueller v. Michael Janssen Gallery Pte. Ltd.*,
   225 F. Supp. 3d 201 (S.D.N.Y. 2016) ........................................................... 45

*Myun-Uk Choi v. Tower Research Cap. LLC*,
   890 F.3d 60 (2d Cir. 2018) ........................................................................ 42

*Newell v. Newell*,
   942 N.E.2d 776 (Ill. Ct. App. 2011) ............................................................. 15

*Olson Kundig, Inc. v. 12th Ave. Iron, Inc.*,
   2022 WL 4534422 (W.D. Wash. Sept. 28, 2022) .......................................... 44

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
   647 N.E.2d 741 (N.Y. 1995) ...................................................................... 34

*Pa. Transp. Auth. v. Gilead Scis., Inc.*,
   102 F. Supp. 3d 688 (E.D. Pa. 2015) ........................................................... 50

*Panag v. Farmers Ins. Co. of Wash.*,
   204 P.3d 885 (Wash. 2009) ....................................................................... 39

*People v. Gen. Elec. Co.*,
   756 N.Y.S.2d 520 (N.Y. App. Div. 2003) ...................................................... 29

*Peterson v. Schiek Motor Exp.*,
   530 N.E.2d 1166 (Ill. Ct. App. 1988) ........................................................... 15

*Puget Sound Sec. Patrol, Inc. v. Bates,*
      389 P.3d 709 (Wash. Ct. App. 2017) ............................................................... 42

*RBS Citizens, N.A. v. Bentley Motors, Inc.,*
      2012 WL 1565457 (N.D. Ill. May 2, 2012) ....................................................... 45

*Reves v. Ernst & Young,*
      507 U.S. 170 (1993) ........................................................................................ 27

*Ruiz Torres v. Mercer Canyons Inc.,*
      835 F.3d 1125 (9th Cir. 2016) ......................................................................... 37

*S. Broward Hosp. Dist. v. MedQuist Inc.,*
      516 F. Supp. 2d 370 (D.N.J. Mar. 30, 2007) ................................................... 26

*Scan-Plast Indus. v. Scanimport Am. Inc.,*
      652 F. Supp. 1156 (E.D.N.Y. 1987) ................................................................ 50

*Schmidt v. Skolas,*
      770 F.3d 241 (3d Cir. 2014) .............................................................................. 9

*Scholder v. Sioux Honey Ass'n Coop.,*
      2022 WL 125742 (E.D.N.Y. Jan. 13, 2022) ..................................................... 41

*Securitron Magnalock Corp. v. Schnabolk,*
      65 F.3d 256 (2d Cir. 1995) .............................................................................. 30

*Siegel v. Shell Oil Co.,*
      612 F.3d 932 (7th Cir. 2010) ........................................................................... 38

*Singleton v. Fifth Gen., Inc.,*
      2016 WL 406295 (N.D.N.Y. Jan. 12, 2016) ..................................................... 28

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
      547 F.3d 406 (2d Cir. 2008) ............................................................................ 14

*Sys. Inc. v. Nippon Paper Indus. Co.,*
      281 F.3d 629 (7th Cir. 2002) ........................................................................... 18

*Thompson v. Metro. Life Ins. Co.,*
      149 F. Supp. 2d 38 (S.D.N.Y. June 27, 2001) .................................................. 15

*Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.,*
      691 F. Supp. 2d 860 (N.D. Ill. 2010) ............................................................... 45

*Toll Processing Servs., LLC v. Kastalon, Inc.*,
2014 WL 1379676 (N.D. Ill. Apr. 8, 2014) ...................................................... 9

*Trustpilot Damages LLC v. Trustpilot Inc.*,
2022 WL 2124865 n.5 (2d Cir. June 13, 2022) ............................................ 31

*U.S. Bancorp*,
190 P.3d 86 (Wash. Ct. App. 2008) ............................................................. 15

*Union Bank, N.A. v. CBS Corp.*,
2009 WL 1675087 (S.D.N.Y. June 10, 2009) .............................................. 44

*United States v. Hamilton*,
37 F.4th 246 (5th Cir. 2022) ....................................................................... 46

*United States v. Messino*,
382 F.3d 704 (7th Cir. 2004) ....................................................................... 46

*Van Buskirk v. Carey Can. Mines, Ltd.*,
760 F.2d 481 (3d Cir. 1985) .......................................................................... 9

*Wallach v. Eaton Corp.*,
837 F.3d 356 (3d Cir. 2016) .............................................................19, 20, 21

*Warrick v. N.J. Off. of Att'y Gen.*,
2022 WL 1763855 (D.N.J. May 31, 2022) .................................................. 14

*Wash. MLB Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co.*,
202 P.3d 924 (Wash. 2009) ....................................................................15, 17

*Whitaker Cable Corp. v. FTC*,
239 F.2d 253 (7th Cir. 1956) ...................................................................39, 40

*Wilson v. Nw. Mut. Ins. Co.*,
625 F.3d 54 (2d Cir. 2010) .......................................................................... 30

*Yahoo! Inc. v. XYZ Cos.*,
872 F. Supp. 2d 300 (S.D.N.Y. 2011) .......................................................... 47

*Zaloga v. Borough of Moosic*,
2011 WL 2938422 (M.D. Pa. July 19, 2011) ............................................... 15

## Statutes

15 U.S.C. § 45(n) ................................................................................................ 39

18 U.S.C. 1962(c) ............................................................................................... 26

42 U.S.C. § 1395w-3a(c)(6)(B) ..................................................................... 25, 29

NYGBL § 349 .............................................................................................. 8, 28, 32

RCW § 19.86.010 ................................................................................................ 32

RCW § 19.86.170 ................................................................................................ 28

RCW § 48.200.010(3) .......................................................................................... 17

RCW § 4.16.160 .................................................................................................. 17

## Rules

N.Y.C.P.L.R. § 213(8) ........................................................................................... 9

## **INTRODUCTION**

This case arises from a multibillion-dollar price-fixing scheme orchestrated by the three largest pharmacy benefit managers in the United States, Defendants CVS Caremark, Express Scripts, and Optum (the "PBMs") and the leading manufacturers of diabetes medications, Defendants Eli Lilly & Co., Novo Nordisk, Inc., and Sanofi-Aventis U.S. LLC (the "Manufacturers"). Over the past twenty years, these Defendants have artificially inflated the prices of twenty-six insulin-based and GLP-1 diabetes medications far beyond their reasonable value. These price increases were not the product of a competitive market. The Manufacturers control the U.S. market for insulin, while the PBMs control the market for pharmacy-benefit management services, serving more than 80% of Americans. The Insulin Pricing Scheme was borne from the coincidence of both groups' unchecked power; the list prices for these medications skyrocketed because Defendants colluded to set false prices and line their pockets at payors' expense.

Because they operate in closed markets, the PBMs and Manufacturers are able to increase prices at will and exploit the PBMs' relationships with payors like the plaintiff-counties (the "Counties") to extract unearned billions from prescription sales. Defendants do just that. The Manufacturers raise the prices of the at-issue medications routinely and in lockstep to cover the cost of unearned rebates they kick back to the PBMs. Because the PBMs' contracts with clients require them to pass through all rebates, Defendants relabel the rebates as "fees," "discounts," and "credits," which places them beyond the reach of contractual pass-through provisions and audit rights. In exchange for these payments, the

PBMs prioritize the most expensive medications on their formularies, further incentivizing the Manufacturers to raise prices; the higher the price, the greater the Manufacturers' profits, and the more "discounts," "credits," and "fees" the PBMs can retain.

Defendants have acted to conceal their scheme at every turn. Beyond relabeling rebates, the PBMs' and Manufacturers' contracts are confidential and key provisions of PBMs' contracts with payors are intentionally vague and misleading. The PBMs also obfuscate the rebates' payment trail using "rebate aggregators," entities formed to collect Manufacturer payments on behalf of PBM collectives. The PBMs and the Manufacturers mislead payors with promises of transparency and cost savings and by routinely disclaiming any responsibility for skyrocketing prices in the media and other public fora.

Defendants' efforts to hide the ball have been successful. The Insulin Pricing Scheme paid dividends for years without garnering public attention. Patients and payors observed that prices were rising but could not discern any cause. Eventually, investigations, articles, and litigation attributed high prices to growing rebates but focused on the economic injuries suffered by uninsured or underinsured patients. These sources did not report the *Counties'* injuries; and according to the Counties' contracts (and to the best of their knowledge), the rebates fueling price increases had been passed through and insurers (like the Counties) were insulated from skyrocketing prices. Nor did these sources report the mislabeling of rebates or other key aspects of Defendants' scheme. No public record reflected the full extent of the Insulin Pricing Scheme; to be sure, regulators and journalists are *still* uncovering new details about its mechanics and operation.

The Counties seek to further that cause and recover the millions of dollars they have lost to Defendants' scheme. They have pled detailed and plausible claims toward that end, which Defendants have challenged only by reframing and miscasting the complaints' allegations. The Court should deny the motions to dismiss.

## BACKGROUND

The insulins and insulin-analogs that diabetics use today are substantially the same as twenty years ago—yet their list prices have increased as much as tenfold, while production costs have declined and research and development costs have approached zero. AC ¶¶ 1, 11, 272–79, 236–39, 243, 525–26; KC ¶¶ 4, 14, 185–91, 201; LC ¶¶ 1, 12, 270–77, 464–67.[1] Similarly, although GLP-1s have been on the market for nearly two decades, their list prices have increased even as more GLP-1s were introduced to the market. AC ¶¶ 256, 263–70; KC ¶¶ 291, 298–305; LC ¶¶ 255, 262–69.

A competitive market did not produce this outcome. The Manufacturers control the market for diabetes medications. AC ¶¶ 4, 20, 232–34; KC ¶¶ 10, 32; LC ¶¶ 4, 22, 227–29. They produce the twenty-six at-issue medications and "evergreen" their patents to block the entry of generics and biosimilar competitors into the U.S. market. AC ¶¶ 233–34, 257–62, 271; KC ¶¶ 131, 144, 292–97; LC ¶¶ 228–29, 250, 256–61. The market for diabetes medications thus remains highly concentrated, with the Manufacturers retaining broad discretion over the list prices they report to publishing compendia and

---

[1] Citations to Albany County's, Lake County's, and King County's complaints are indicated by "AC," "LC," and "KC," respectively.

other sources. AC ¶¶ 11, 16, 331–33; KC ¶¶ 10; LC ¶¶ 12, 18, 292-94.

The Manufacturers distribute the at-issue medications primarily through contracts with the PBMs. The PBM conglomerates were formed over twenty years through a series of mergers and acquisitions. AC ¶¶ 349, 351-52; LC ¶¶ 307, 311-12. Today, they manage pharmacy benefits for more than 275 million Americans. AC ¶¶ 5, 76-206, 351, 353; KC ¶¶ 16-17, 150, 160-68; LC ¶¶ 5, 74-200, 311, 313.

The PBMs are therefore at the center of the flow of pharmaceutical money. They negotiate the payors' prices for prescription drugs; negotiate different (and often lower) prices that in-network pharmacies receive for the same drugs; set the fees that pharmacies pay the PBMs for each drug sold; set the prices for drugs sold through their mail-order pharmacies; and negotiate the rebates and other amounts that manufacturers pay to the PBMs for each drug sold. AC ¶¶ 336-44; KC ¶¶ 152-56, 309, 329; LC ¶¶ 296-304. And critically, the PBMs control the formularies that determine which medications are covered and prioritized by nearly every payor in the nation. AC ¶¶ 8-10; KC ¶¶ 18-20, 308, 329; LC ¶¶ 8-10. Since 2006, either CVS Caremark or Express Scripts has served as PBM for Albany and King. AC ¶¶ 566-74; KC ¶¶ 306-10. Between 2014 and 2022, either Express Scripts or OptumRx has served as Lake's PBM. LC ¶ 506.

### The Insulin Pricing Scheme

Defendants' control of their respective markets—and the network of close and confidential relationships they have developed, AC ¶¶ 356-74; KC ¶¶ 174-78; LC ¶¶ 316-34—provided fertile ground for the complex scheme at the heart of this litigation.

Through constant communication, the exchange of proprietary information, and careful coordination, Defendants deployed the Insulin Pricing Scheme to consolidate their control of the U.S. market for the at-issue medications, artificially inflate list prices, and exponentially increase their own profits, all at payors' expense. AC ¶¶ 1, 17, 365-72, 379, 391-92, 639; KC ¶¶ 1, 15, 153, 176, 182, 270, 371; LC ¶¶ 1, 19, 325-32, 339, 350-51, 576. The Insulin Pricing Scheme developed as follows.

The PBMs execute contracts with payors, like the Counties, that bind payors to purchase prescription medications for their plan beneficiaries directly from the PBMs. AC ¶¶ 503-11; KC ¶¶ 36, 156, 169, 355-57; LC ¶¶ 446-452. The amounts the Counties pay are also determined by contract. Defendants negotiate rebates as a percentage of each medication's list price, which the PBMs are bound to pass through to their clients. AC ¶¶ 324, 344, 492, 558; KC ¶¶ 153, 260, 318-19, 323, 359; LC ¶¶ 338, 375, 377. For example, certain PBM agreements provide that the PBM will pay the payor the greater of (1) 100% of the rebates the PBM receives and (2) an amount calculated according to a fixed formula. AC Ex. B at §§ 6.2, 6.3; Ex. C [137-3] at Ex. A-3; KC ¶¶ 318-19, 323.

The payment of rebates is a longstanding practice. However, as payors secured contract provisions guaranteeing their pass through, Defendants began to relabel rebates as "discounts," "credits," and "fees." AC ¶¶ 17, 441-59; KC ¶¶ 260-67; LC ¶¶ 19, 415-28. This sleight of hand placed rebates beyond the reach of negotiated "pass-through" clauses and audit rights. AC ¶¶ 17-18, 441-59, 493-94, 557; KC ¶¶ 260-61, 265; LC ¶¶ 19-20, 410-11, 415-28, 496. It also incentivized the Manufacturers to raise

5

prices; the higher the price, the greater their profit, and the more kickbacks for the PBMs. AC ¶¶ 17-21, 24, 429, 432; KC ¶¶ 214, 264, 269; LC ¶¶ 19-23, 26, 375, 392.

These incentives fuel the Insulin Pricing Scheme. The closed market in which Defendants operate frees the Manufacturers to raise prices in lockstep. AC ¶¶ 4, 232-33, 280-88; KC ¶¶ 144, 193-97; LC ¶¶ 4, 227-28, 279-88. At the same time, the PBMs' market dominance compels most payors to accept the PBMs' formularies, which determine the medications that payors' plans will cover and prioritize. AC ¶¶ 8-10, 17, 21, 370-71, 380; KC ¶¶ 18-21, 24, 249; LC ¶¶ 8-10, 19, 23, 330-31, 340. Against this landscape, Defendants realized that artificially inflating list prices for diabetes medications would enable the Manufacturers to pay exorbitant kickbacks to the PBMs in exchange for preferred formulary placement, generating extraordinary unearned profits for all Defendants. AC ¶ 381; KC ¶¶ 2, 239, 248, 309; LC ¶ 341.

Over the past two decades, Defendants have done just that. AC ¶¶ 272-88, 370-71; KC ¶¶ 2, 309, 423, 431, 490, 493, 502; LC ¶¶ 272-88, 330-31. Between 2004 and 2022, the Manufacturers raised the list prices of their insulins in tandem, often taking the exact same price increase within hours of each other. AC ¶¶ 281, 284-87; KC ¶¶ 12-13, 193-94, 197; LC ¶¶ 280, 283-86. The Manufacturers raise prices with the PBMs in mind; they confer with the PBMs and calibrate the timing and degree of the increases to maximize the PBMs' profits. AC ¶¶ 356-74, 378-79, 391; KC ¶¶ 177-78; LC ¶¶ 316-34, 338-39, 350. As a result, the prices for the at-issue drugs have increased exponentially, while the PBMs have retained billions of dollars in unearned payments

from the Manufacturers. AC ¶¶ 325, 381, 392; KC ¶¶ 192, 198, 267-69; LC ¶¶ 288, 341, 351. At the same time, the PBMs' formularies promote the Manufacturers' higher list-price drugs, increasing costs for payors and maximizing the Manufacturers' profits. AC ¶¶ 17 & n.6, 169, 383, 528; KC ¶¶ 3-4, 30; LC ¶¶ 164, 343, 469.

## Defendants Conceal the Insulin Pricing Scheme

Defendants shroud the Insulin Pricing Scheme in secrecy. The PBM-Manufacturer contracts are confidential, so payors cannot discern how much the Manufacturers pay the PBMs for formulary placement. AC ¶¶ 345-46, 557-60; KC ¶¶ 23, 32, 284-85, 391; LC ¶¶ 305-06, 496-99. Although payors' contracts with the PBMs grant them audit rights, those rights are limited to payments that Defendants have defined as "rebates"—they do not extend to revenue re-labeled as "discounts," "credits," or "fees" or derived from spread pricing. AC ¶¶ 452, 487, 493-94 & Exs. A-C; KC ¶¶ 265, 283-85, 344-45; LC ¶¶ 404, 410-11, 421.

The PBMs further obscure any accounting of the rebates they receive using "rebate aggregators." AC ¶ 460; KC ¶¶ 271; LC ¶ 429. Rebate aggregators are entities often closely affiliated with the PBMs that negotiate and collect Manufacturer Payments on behalf of a large group of pharmacy benefit managers. AC ¶¶ 460-61; KC ¶¶ 271-74; LC ¶¶ 429-30. Because they collect rebates in the aggregate, and their PBM contracts are confidential, it is impossible for payors to determine whether all rebates to which they are entitled have been passed through. AC ¶¶ 460-61, 464-68, 558; KC ¶¶ 274-77, 283-84; LC ¶¶ 429-30, 433-37, 497. The PBMs do not disclose the use of aggregators,

and audits do not include payments to and from them. KC ¶ 335-37.

Defendants also protect the Insulin Pricing Scheme from detection by disclaiming any responsibility for skyrocketing prices and misleading the public and payors as to their conduct and intentions. All three PBMs falsely claim to work for their clients to control the cost of, and increase access to, diabetes medications. AC ¶¶ 530-33, 536; KC ¶¶ 189, 211-212, 255; LC ¶¶ 471-74. The PBMs have also withheld material information from the Counties, including details about their Manufacturer agreements, the reclassification of rebates, and their collection of kickbacks from the Manufacturers as a "quid pro quo" for formulary placement. AC ¶¶ 17, 345, 390, 443, 448, 487, 494, 496, 512; KC ¶¶ 309, 311, 313-26, 331-34; LC ¶¶ 19, 305, 349, 404, 411-20, 453. The Manufacturers also mislead payors by publishing inflated false prices and falsely claiming that R&D costs drive the at-issue price increases. AC ¶¶ 425, 433-34, 513, 518-26; KC ¶¶ 207-08, 241, 439-40, 502; LC ¶¶ 238-39, 393-94, 454-67.

## **Procedural History**

The Counties bring claims for (1) federal RICO violations, (2) RICO conspiracy, (3) civil conspiracy, (4) common law fraud, and (5) unjust enrichment. Albany and King bring state consumer protection claims under (6) NYGBL § 349 and (7) the Washington Consumer Protection Act ("WCPA").[2] King also asserts (8) a breach of the implied covenant of good faith and fair dealing. Defendants have now moved to dismiss.

---

[2] Lake County withdraws its claim for violation of the Illinois Consumer Fraud Act.

## ARGUMENT

### I.  THE COUNTIES' CLAIMS ARE NOT TIME-BARRED.

Dismissal on statute of limitations grounds is warranted only when the "affirmative defense" is "apparent on the face of the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up). "Since the applicability of the statute of limitations usually involves questions of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Van Buskirk v. Carey Can. Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985); *LLDVF, L.P. v. Dinicola*, 2010 WL 3210613, at *3 (D.N.J. Aug. 12, 2010) (defendants must identify "uncontroverted evidence that irrefutably demonstrates" defense). Defendants have not come close to meeting that heavy burden.[3] When the Counties knew or should have known of their injuries and claims is a highly fact-intensive inquiry that cannot be resolved at this early juncture. *See Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 2016 WL 6612804, at *11 (E.D. Pa. Nov. 9, 2016).

---

[3] Defendants not only fail to establish when each claim accrues, but also misstate several applicable limitations periods. Lake's unjust enrichment claim is not "derivative," Mfr. Mem. at 7, *see* Section III.C, *infra*, so a five-year limitations period applies. *See Toll Processing Servs., LLC v. Kastalon, Inc.*, 2014 WL 1379676, at *3 (N.D. Ill. Apr. 8, 2014). The limitations period for New York common law fraud is not two years, Mfr. Mem. at 7; it is two years from the *discovery* of the fraud. N.Y.C.P.L.R. § 213(8). A three-year statute applies to New York unjust enrichment claims, Mfr. Mem. at 7, *only* where a plaintiff seeks damages. To the extent Albany seeks equitable relief, a six-year period applies. *See Grynberg v. Eni S.p.A.*, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007).

## A.    The Counties' RICO Claims Are Not Time-Barred.

The statute of limitations for a RICO claim is four years. *LabMD, Inc. v. Boback*, 47 F.4th 164, 179 (3d Cir. 2022). RICO claims accrue "when the plaintiff knows or should know of both its injury and the source of its injury." *Id.* This standard is both subjective and objective. *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 250 (3d Cir. 2001). To establish that a plaintiff "should have known," a defendant must show "the existence of storm warnings," or "information . . . that would alert a reasonable person to the *probability* that misleading statements or significant omissions had been made." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (emphasis added).[4]

Defendants point to several sources in an attempt to demonstrate that the Counties knew about Defendants' scheme, but none supports Defendants' claim of "storm warnings." This is so, first and foremost, because Defendants mischaracterize the Counties' claims, insisting that the Counties' "complaint is that rebates and other fees create a difference between list and net insulin prices." Mfr. Mem. at 8. Not so. The Counties plead a fraudulent scheme to *disguise* rebates and *manipulate* formularies— practices neither suggested nor disclosed by any Defendant, article, report, or lawsuit outside the applicable limitation periods.

Defendants point to rebate and other payment provisions in the Counties' contracts and RFPs and argue that these establish that the Counties were aware of—

---

[4] The burden then shifts to plaintiffs to show that "they exercised reasonable diligence but were unable to find and avoid the storm." *Cetel*, 460 F.3d at 507.

and, in fact, *negotiated*—the injuries alleged in their complaints. *See* Mfr. Mem. at 8-9. But the Counties do not contend that they were unaware of anything disclosed in their contracts or the PBMs' RFP responses. Rather, they contend that Defendants manipulated the market to *evade* payors' contracts. *See* pp. 5-6, 7-8, *supra*. So, while the Counties knew that the PBMs and Manufacturers' transactions generated fees, they did *not* know of Defendants' scheme or that the PBMs passed less than 100% of their rebates through to the Counties. *See* AC ¶¶ 445, 460-74, 494-95; KC ¶¶ 259-85, LC ¶¶ 411, 418, 429-40. The rebate provisions in the Counties' contracts and representations in RFP responses *misled* the Counties into believing they were paid 100% of all rebates.

Defendants similarly contend that their public statements over the past decade triggered inquiry notice. *See* Mfr. Mem. at 12-13. Like the contracts and RFPs above, the cited statements suggest neither the Counties' injuries nor their source. None of the statements, for example, suggests that the PBMs were not passing through 100% of rebates or that the PBMs were manipulating formularies to favor the most expensive medications. *See* AC ¶¶ 248, 317–18, 320, 445, 460–74, 494–95; KC ¶¶ 20, 259–85, 329, 453, 524; LC ¶¶ 18, 246, 411, 418, 421, 429–40, 607, 643.

Defendants also point to congressional and media reports. *See* Mfr. Mem. at 8, 11. The Court correctly rejected a nearly identical argument in *In re Direct Purchaser Insulin Pricing Litig.*, 2021 WL 2886216, at *19-20 (D.N.J. July 9, 2021) ("[I]t would stretch both the standards governing Rule 12(b)(6) motions and the [c]omplaint's allegations too far to conclude that these sources triggered a duty of reasonable diligence as a matter of

law[.]"). The congressional materials described how rebates are *supposed to* operate and Defendants' general business practices, *see* Mfr. Mem. at 11, but did not describe patently illegal practices that would have triggered a duty of inquiry.

The media reports the Manufacturers cite suffer the same deficiencies. *See* Mfr. Mem. at 10. The articles variously describe high prices, rebates, formulary practices, and gaps between list and net prices, but none describes Defendants' mislabeling of rebates, formulary manipulation, or any other manner of deceit aimed at self-funded plans. In fact, some of the articles explain how rebates *benefit* insurers. *See, e.g.*, Mfr. Ex. 3 at 4 (discussing "lower, secret, 'real' price" paid by insurers); Mfr. Ex. 4 at 2 (patients are the "one group" paying "artificially inflated price"); Mfr. Ex. 5 at 4 (PBMs pass "lower, 'net' prices" to insurers). At best, these articles provided "breadcrumbs" of a market vulnerable to abuse; they did not trigger a duty to investigate. *See Direct Purchaser*, 2021 WL 2886216, at *19. Holding otherwise "would have odd consequences: those who might be RICO plaintiffs would be expected to monitor scholarship and like resources and . . . investigate a universe of possible circumstances" at any sign of fraud. *Id.*

Finally, Defendants cite civil cases filed prior to the Counties' complaints. They focus primarily on *In re Insulin Pricing Litigation*, where a putative class of consumers challenged high insulin prices. *See* Complaint [ECF No. 1], *In re Insulin Pricing Litig.*, No. 17-cv-699 (D.N.J. Feb. 2, 2017). But that case involved a different category of plaintiffs than this one (consumers), and those plaintiffs claimed economic injuries distinct from the Counties' injuries. And, again, the articles Defendants cite reported that the alleged

scheme harmed patients who paid out of pocket, while insurers like the Counties paid a lower "real" price. Mfr. Ex. 3 at 4; *see* Mfr. Ex. 4 at 2 ("The people stuck paying the balance: patients[.]"); Ex. 5 at 4 ("the people who can least afford these increases are the ones who get hit by them," referring to patients with "no insurance"). So, though *Insulin Pricing* received some media attention, neither the reporting nor the complaints hinted at *the Counties'* injuries or the scheme that caused them.

The same holds true for the Minnesota and Kentucky attorney general actions. *See* Compl. [ECF No. 2] at ¶¶ 67-70, *Minnesota v. Sanofi-Aventis*, No. 18-cv-14999 (D.N.J. Oct. 16, 2018); Compl. at ¶¶ 10, 28, *Kentucky v. Novo Nordisk,* No. 19-00473 (Ky. Cir. Ct. May 13, 2019). And although *MSP Recovery* was brought by third-party payors, the allegations there did not describe the same Insulin Pricing Scheme alleged here. *MSP Recovery* involved plaintiffs who were assignees of Medicare Advantage plans, distinct from the self-funded plans here, which purchase outside the Medicare system. And the allegations in *MSP Recovery* did not detail the mislabeled Manufacturer Payments at the heart of the Counties' complaint. *See* Compl. [ECF No. 1], *MSP Recovery Claims, Series LLC v. Sanofi-Aventis*, No. 3:18-cv-2211 (D.N.J. Feb. 15, 2018).[5]

Regardless, counties in New York, Illinois, and Washington cannot reasonably be expected to monitor out-of-state dockets for lawsuits that were not widely

---

[5] Though *MSP Recovery* was *filed* in February 2018, the first *decision* available on Westlaw was unpublished and issued more than a year later. *See MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *1 (D.N.J. Mar. 29, 2019).

publicized. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 435 (2d Cir. 2008).

Defendants have not identified any source that would have put the Counties on notice of their claims, particularly given Defendants' public denials of wrongdoing. *See, e.g.*, AC ¶¶ 601, KC ¶ 392; LC ¶ 538; *see also In re RenovaCare, Inc. Sec. Litig.*, 2024 WL 2815034, at *10 (D.N.J. June 3, 2024) (Martinotti, J.) ("Reassurances can dissipate apparent storm warnings." (cleaned up)); *Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*, 2016 WL 6612804, at *9 (E.D. Pa. Nov. 9, 2016) (factual issues remained as to "storm warnings" where defendants had publicly minimized violations and disclosures were insufficient); *In re Schering-Plough Corp. Intron Temodar Consumer Class Action*, 2009 WL 2043604, at *22 (D.N.J. July 10, 2009) (questions of fact remained about notice despite FDA warning letter, public filings, and media). "[G]iven the enormous volume and complexity of facts," a motion to dismiss is "not the appropriate vehicle for resolving questions regarding the dates these claims accrued." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4194296, at *2 (N.D. Ohio Sept. 4, 2019).

**B.    The Counties Have Pled Facts to Toll All Applicable Statutes.**

All remaining statutes of limitation are tolled under (1) the discovery rule, (2) fraudulent concealment and equitable estoppel doctrines, (3) the separate accrual rule and continuing violations doctrine, and (4) nullum tempus. Whether tolling doctrines apply is a fact-intensive inquiry not appropriate for resolution at the pleading stage. *Warrick v. N.J. Off. of Att'y Gen.*, 2022 WL 1763855, at *6 (D.N.J. May 31, 2022) ("[W]hen even a possibility of tolling applies, a complaint will not give rise to a statute-

of-limitations defense that is ripe for resolution on a motion to dismiss.").[6]

**Discovery rule.** The discovery rule tolls the date of accrual until a plaintiff knows or, by exercising due diligence, should have known all facts necessary to establish a legal claim. *Crisman v. Crisman*, 931 P.2d 163, 166 (Wash. Ct. App. 1997); *Newell v. Newell*, 942 N.E.2d 776, 781 (Ill. Ct. App. 2011) (claim does not accrue until plaintiff knew or should have known of injury, its cause, and "some indication of wrongdoing"); *Kaufman v. Cohen*, 307 A.D.2d 113, 123 (N.Y. App. Div. 2003) (fraud claim accrues when plaintiff discovers or "with reasonable diligence" could have discovered fraud). Defendants' discovery rule arguments fail as set forth in Section I.A, above.

**Fraudulent concealment and equitable estoppel.** Fraudulent concealment of a claim tolls the statute of limitations. *Aug. v. U.S. Bancorp*, 190 P.3d 86, 95 (Wash. Ct. App. 2008); *Alevizopoulos & Assocs. v. Comcast Int'l Holdings*, 100 F. Supp. 2d 178, 183 (S.D.N.Y. 2000); *Henderson Square Condo. Ass'n v. LAB Townhomes, LLC*, 46 N.E.3d 706, 716 (Ill. 2016). To show fraudulent concealment, a plaintiff must show that (1) the

---

[6] *See Alexander v. Sanford*, 325 P.3d 341, 361 (Wash. Ct. App. 2014) (discovery rule is question of fact); *Moore v. Morales*, 415 F. Supp. 2d 891, 895-96 (N.D. Ill. 2006); *Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 48-53 (S.D.N.Y. June 27, 2001). *See Collins v. Davirro*, 160 A.D.3d 1343, 1344 (N.Y. App. Div. 2018) (equitable estoppel is question of fact); *accord Golden v. Faust*, 766 F.2d 1339, 1341 (9th Cir. 1985); *Peterson v. Schiek Motor Exp.*, 530 N.E.2d 1166, 1168 (Ill. Ct. App. 1988). *See Hinds Cnty. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 400 (S.D.N.Y. Mar. 25, 2010) (fraudulent concealment is question of fact); *accord In re Copper Antitrust Litig.*, 436 F.3d 782, 792 (7th Cir. 2006). *See Zaloga v. Borough of Moosic*, 2011 WL 2938422, at *8 (M.D. Pa. July 19, 2011) (continuing violations doctrine); *accord Fitchett v. City of N.Y.*, 2019 WL 3430726, at *6-7 (S.D.N.Y. July 30, 2019). *See Wash. MLB Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co.*, 202 P.3d 924, 927-28 (Wash. 2009) (nullum tempus).

defendant concealed material facts, (2) preventing the plaintiffs from discovering its claim, and (3) the plaintiff exercised due diligence in pursuing discovery of the claim. *See Alevizopoulos*, 100 F. Supp. 2d at 183.

The Counties allege that Defendants concealed their misconduct with misrepresentations, rebate aggregators, and by other means, and that the Counties reasonably relied to their detriment. AC ¶¶ 112, 460–65, 512–63, 605–23, 627, 656–64; KC ¶¶ 252, 271–82, 376, 405–08, 439–46; LC ¶¶ 25, 453–502, 542–60, 593–600. Diligence is a jury question. *Menke v. Glass*, 898 F. Supp. 227, 233 (S.D.N.Y. 1995).

**Separate accrual and continuing violations.** Under the separate accrual rule, "a new claim accrues . . . each time a plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559-60 (2d Cir. 1995); *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992). Similarly, "where there is a series of continuing wrongs," the limitations periods for a NYGBL claim is tolled "to the date of the commission of the last wrongful act." *Garron v. Bristol House, Inc.*, 162 A.D.3d 857, 858-69 (N.Y. App. Div. 2018). The continuing-wrongs doctrine also applies to unjust enrichment claims where "the wrongful acts that could serve as the basis for unjust enrichment continued within three years" of filing suit. *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 264 (S.D.N.Y. 2008).

The Counties suffered an independent injury each time they paid false prices. Even if they were on notice of Defendants' fraud (they were not), the Counties' RICO claims arising from injuries sustained during the four years preceding their lawsuits

would be timely. The Counties allege "continuous, unbroken violation[s] of the law" that have "continued to the present day." AC ¶ 629; LC ¶ 566.

**Nullum tempus.** A Washington municipality is immune from statutes of limitation when acting in its sovereign capacity. *See* Wash. Rev. Code ("RCW") § 4.16.160. The test for sovereign function is "whether the act is for the common good" or the "specific benefit or profit of the corporate entity." *Wash. MLB*, 202 P.3d at 927. The public need not be the only beneficiary of a suit for nullum tempus to apply. *Carrera v. Olmstead*, 401 P.3d 304, 310 (Wash. 2017).

King County acted in its sovereign capacity "for the common good." The "regulatory oversight of health care benefit managers" is critical to "protect and promote the health, safety, and welfare of Washington residents." RCW § 48.200.010(3). As a municipality, King provides essential services for the public good. KC ¶¶ 43, 399. These are exercises of police powers, properly delegated to municipalities for the "promotion of the public welfare." *Hudson v. City of Wenatchee*, 974 P.2d 342, 346 (Wash. Ct. App. 1999). Defendants caused King to overpay for insulin, impeding its ability to provide public services for its residents. *See* KC ¶¶ 401-03.

## II. THE COUNTIES HAVE STATED ACTIONABLE RICO CLAIMS.

The Counties' RICO claims (A) are not barred by the indirect purchaser rule. The Counties have plausibly pled (B) predicate acts of mail and wire fraud and (C) the Manufacturers' participation in the operation or management of nine enterprises.

## A. The Indirect Purchaser Rule Does Not Bar the Counties' RICO Claims.

The Manufacturers seek to avoid RICO liability by hiding behind the indirect purchaser rule. "[T]he Supreme Court [has] established the general rule that only direct purchasers from antitrust violators may recover damages[.]" *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 369 (3d Cir. 2005); *see Ill. Brick Co. v. Illinois*, 431 U.S. 720, 727 (1977). "[I]f manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019).

But there are exceptions to this rule. As relevant here, the Third Circuit has recognized "a co-conspirator exception," which provides that the indirect purchaser rule "does not bar suits for damages by plaintiffs against an initial seller when it is alleged to have conspired in violation of the antitrust laws with the seller directly upstream from plaintiffs." *Hess*, 424 F.3d at 376 (citing *Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2002)). So, where A and B are co-conspirators, C can sue A.

This exception makes sense. For one thing, imposing liability on co-conspirators is consistent with co-conspirators' joint and several liability for their scheme: "[a]lthough the manufacturer did not sell directly to the consumer, [it] is a fellow conspirator with the direct-selling dealer and therefore jointly and severally liable with the dealer for the consumer's injury." *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1230 (11th Cir. 1999) (quoting 2 Areeda & Hovenkamp, *Antitrust Law* 264 (1995)); *see also Paper Sys.*, 281 F.3d at 632 (same). For another, where a manufacturer and dealer conspire, there will often be "no problem of duplication or apportionment because the

consumer is the only party who has paid any overcharge." *Lowell*, 177 F.3d at 1230.

The Third Circuit has set out two tests for assessing whether the co-conspirator exception applies. In cases asserting a "price-fixing conspiracy," a plaintiff must "allege that the intermediaries immediately upstream colluded with the defendants to overcharge plaintiffs." *Hess*, 424 F.3d at 376 (cleaned up). "Moreover, [the] plaintiff[] would be obliged to join the intermediaries as defendants." *Id.* (cleaned up).

In cases that do not rest on price-fixing, a plaintiff must (1) "sue[] both" the remote manufacturer and the direct seller "at once" and (2) allege that "the immediate supplier (i.e., the middleman) was so wrapped up in the conspiracy that it would be barred from seeking antitrust relief against the top-level supplier in a suit of its own." *Wallach v. Eaton Corp.*, 837 F.3d 356, 362 n.3 (3d Cir. 2016). In other words, the middleman's "involvement" must be "truly complete." *Hess*, 424 F.3d at 379.

The co-conspirator exception applies here. First, the Counties sued both the Manufacturers *and* the PBMs—"the intermediaries immediately upstream"—as required under both tests. *See Hess*, 424 F.3d at 376 (quotation omitted); *see also Wallach*, 837 F.3d at 362 n.3. The Counties directly paid the PBMs for at-issue drugs, so they are direct purchasers from the PBM conspirators. *See, e.g.*, AC ¶¶ 27, 36, 329-30, 335, 503-11, 575-76, 685; KC ¶¶ 36, 152, 154, 156, 346-47, 352-58, 363-64, 371-72, 435, 466-67; LC ¶¶ 29-30, 40, 291, 295, 446-52, 504, 513-21, 589, 617-23. The Counties have thus sued *both* the manufacturers *and* the direct-selling intermediaries immediately upstream.

Second, the Counties have alleged the sort of collusion that satisfies the test for

price-fixing and other conspiracies. The Counties allege a "price-fixing conspiracy" where "the intermediaries immediately upstream [the PBMs] colluded with the [Manufacturers] to overcharge plaintiffs." *Hess*, 424 F.3d at 376. For example, the Counties allege that the Manufacturers and PBMs inflated list prices to fund kickbacks to the PBMs. *See, e.g.*, AC ¶¶ 17-24, 309-24, 356-92, 636-55; KC ¶¶ 1-2, 21-32, 170-83, 258-59, 420-38; LC ¶¶ 18-24, 316-51, 573-92. Defendants have *conceded* as much. *See, e.g.*, AC ¶¶ 416-25; KC ¶¶ 234-41; LC ¶¶ 375-83. Because Defendants "colluded" on price, the Manufacturers are liable as "co-conspirators." *See Hess*, 424 F.3d at 376.

Even if this weren't a price-fixing case, the Counties have alleged that the PBMs' "involvement" was "truly complete." *Hess*, 424 F.3d at 379; *Wallach*, 837 F.3d at 362 n.3. The PBMs exploited their market power to drive list prices increasingly higher to fund kickbacks. The PBMs also worked with the Manufacturers to place rebates out of payors' reach by relabeling the payments as "fees." *See, e.g.*, AC ¶¶ 445-52; KC ¶¶ 260-70; LC ¶¶ 413-21. The PBMs drove the scheme to secure massive profits for themselves at payors' and patients' expense. *See, e.g.*, AC ¶¶ 435, 438; KC ¶ 183; LC ¶¶ 397-98.

Where, as here, a manufacturer has conspired with a direct seller, courts have held that the co-conspirator exception subjects the manufacturer to liability. *See, e.g.*, *Hess*, 424 F.3d at 376-78 (exception applied where plaintiffs "allege[d] that they made purchases from [the manufacturer's] dealers (the intermediaries immediately upstream from [the] [p]laintiffs) and that [the manufacturer] and its dealers [were] co-conspirators"); *City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *3 (S.D. Fla. Jan.

21, 2022) (denying motion to dismiss where city argued "it [was] of no moment that it d[id] not purchase medication from the Manufacturer Defendants, as it made purchases from at least one of the [PBMs], who [were] within the alleged price-fixing conspiracy").

The Manufacturers never reference the co-conspirator exception. Instead, they raise three arguments—all unconvincing. Mfr. Mem. at 16-18. First, they point to *MSP Recovery*, where this Court held that the indirect purchaser rule barred a payor's claim against the Manufacturers. 2019 WL 1418129, at *13-16. But that case only reinforces why the co-conspirator exception applies here. As the Third Circuit has explained, the co-conspirator exception is available only if the plaintiff "join[ed] the intermediaries as defendants." *Hess*, 424 F.3d at 376 (cleaned up).

In *MSP Recovery*, the co-conspirator exception was plainly inapplicable because the plaintiffs never named the PBM intermediaries as defendants, so the Court never considered whether the co-conspirator exception applied. In fact, the PBMs were not named in *any* complaint this Court has ruled on. Here, the PBMs are defendants; the Counties have sued "the alleged co-conspirators immediately upstream." *Id.* at 371.

Second, the Manufacturers rely on *Harris County v. Eli Lilly & Co.*, where the court found that the indirect purchaser rule applied because there *is* no co-conspirator exception in the Fifth Circuit. 2022 WL 479943, at *10 (S.D. Tex. Feb. 16, 2022). The law is different here. *See Wallach*, 837 F.3d at 362 n.3; *Hess*, 424 F.3d at 376-78.

Third, the Manufacturers argue that allowing the Counties to proceed may result in "duplicative liability" because the wholesalers "have also brought RICO claims

against [the] Manufacturers." Mfr. Mem. at 17-18. This argument is flawed for at least three reasons. One, the Counties have alleged that, for many purchases, the at-issue diabetes medications do not pass through the wholesalers, so the wholesalers have not—and could not—sue for those transactions. As the Counties allege, the PBMs operate mail-order pharmacies. When the PBM mail-order pharmacies purchase drugs, they often cut the wholesalers entirely out of the equation, such that the PBMs "purchase drugs directly from the Manufacturers and distribute them directly to the patients," with the Counties footing the bill. *See* AC ¶¶ 327, 338-39, 504-07; KC ¶¶ 86, 101, 116, 156, 354-57; LC ¶¶ 290, 298-99, 447. In those circumstances, the wholesalers have no claim. Payors like the Counties are the *only* entities outside of the conspiracy that can recover. There is no risk of multiple liability.

Two, even in transactions where the wholesalers participate, the wholesalers and the Counties largely seek *different* damages for *different* injuries. There is no risk of multiple liability where "different parties allege different injuries." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1169 (3d Cir. 1993); *see also Apple*, 587 U.S. at 287 (same). Here, the Counties largely sue for damages unique to them. For example, the Counties allege that "[a]s more payors moved to contracts that required PBMs to remit some or all manufacturer 'rebates' through to the payor, the PBMs renamed the Manufacturer Payments to shield them from . . . payment obligations." AC ¶ 445; *see also id.* ¶¶ 385-86, 432, 439-73; KC ¶¶ 260-70; LC ¶¶ 413-40. Rebates were *only* due to payors like the Counties. No wholesaler (or other entity) can claim those damages.

One core purpose of the indirect purchaser rule is to encourage the "enforcement of the antitrust laws" by giving direct victims the exclusive cause of action and thus the "incentive to sue." *Hess*, 424 F.3d at 381. Given the aim of *encouraging* enforcement, courts should not interpret the rule such that "no one with the proper incentive [to sue] has a cause of action." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 346c (4th & 5th eds. May 2024). But that's exactly what the Manufacturers propose. They seek to insulate themselves from *any* liability where the wholesalers are not in the chain and payors sue for the rebates owed them. The indirect purchaser rule does not afford them such immunity.

Three, even in the one area where wholesalers' and Counties' damages may overlap—payments at inflated list prices where the wholesalers and Counties both purchased the at-issue drug—the Counties' claims are not barred. While multiple liability *may* arise in this limited circumstance if this Court applies the co-conspirator exception (such that the Counties and wholesalers could *both* sue the Manufacturers and PBMs for the overcharge), this possibility for multiple liability does not bar the Counties' claims.[7] For one thing, as this Court has already suggested, it is "reasonable to construe the PBMs' clients—and not the wholesaler plaintiffs—as the direct victims of the kickback scheme." *In re Direct Purchaser*, 2021 WL 2886216, at *15.

---

[7] If this Court concludes that the co-conspirator exception is inapplicable, there is no risk of multiple liability. The wholesalers would have a cause of action only against the Manufacturers. The Counties would have a cause of action only against the PBMs.

For another, the indirect purchaser rule and the co-conspirator exception are "bright-line rule[s]" that apply regardless of whether "the rationales of *Illinois Brick* apply with equal force in [an] individual case." *Apple*, 587 U.S. at 285; *see also, e.g.*, *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 840 (7th Cir. 2020) (applying exception despite alleged difficulty calculating damages because *Illinois Brick* does not "require[] analysis of competing policy justifications in each case"). The possibility of duplicative liability does not justify straying from *Illinois Brick*'s bright-line rules.

## B.    The Counties Have Pled RICO Predicate Acts.

The Manufacturers challenge the County's allegations of mail and wire fraud, arguing that their list prices were "true" because they never represented that WAC prices were the "actual prices" they "realized." Mfr. Mem. at 18. But the Counties do not complain that the Manufacturers did not "realize" their list prices; they allege that the list prices are false because the Manufacturers load them with mislabeled rebates paid to the PBMs in exchange for preferred formulary placement. *See* p. 11, *supra*. Allegations of false prices support the Counties' claims of mail and wire fraud. *See, e.g.*, *In re Insulin Pricing Litig.*, 2019 WL 643709, at *5 (D.N.J. Feb. 15, 2019) ("Federal courts have held that excessive inflation of prices on an index . . . may constitute mail and wire fraud."); *City of Miami*, 2022 WL 198028, at *8 (same); *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 738 F. Supp. 2d 227, 239 (D. Mass. 2010) (same).

The Manufacturers attempt to defend their position by citing a federal statute that defines WAC as "the manufacturer's list price for the drug . . . not including prompt

pay or other discounts, rebates, or reductions in price." 42 U.S.C. § 1395w-3a(c)(6)(B)). That definition, however, applies only to federal payments for Medicaid-reimbursed drugs; it bears no relevance to the false prices alleged here. *See, e.g.*, *City of Miami*, 2022 WL 198028, at *8 n.8 ("The Manufacturer Defendants cannot use Section 1395w-3a(c)(6)(B) to avoid the City's allegations of wrongdoing."); *Minnesota v. Sanofi-Aventis*, 2020 WL 2394155, at *14 (D.N.J. Mar. 31, 2020) (rejecting same argument citing *Insulin Pricing Litig.*, 2019 WL 643709, at *5). And despite the Manufacturers' argument to the contrary, the Counties dispute that the Manufacturers' list prices met the federal definition. The Counties allege that the Manufacturers artificially inflated their list prices to cover mislabeled rebates paid to the PBMs. *See* p. 20, *supra*.

The Manufacturers' deception did not end with false prices. The Counties allege that the Manufacturers knowingly misattributed price inflation to R&D costs, the payment of legitimate rebates, and other factors, and conspired to pay secret kickbacks to the PBMs for preferred formulary placement. *See, e.g.*, AC ¶¶ 248, 391, 429, 523; KC ¶¶ 207, 213, 217, 245-46, 249, 309, 330; LC ¶¶ 20, 246, 389, 464, 576, 582. Together, these allegations describe the Manufacturers' role in a complex scheme to defraud. *See, e.g.*, *Insulin Pricing Litig.*, 2019 WL 643709, at *5 (plaintiffs pled mail and wire fraud by alleging that manufacturers held out "artificially increased AWPs as benchmark prices").

Finally, the Manufacturers contend that the Counties cannot state omissions-based claims because the Counties' agreements with the PBMs disclosed that the Manufacturers paid rebates and other fees to the PBMs. Mfr. Mem at 19. The

Manufacturers once again miss the point, as established in Section I.A.

## C. The Counties Have Plausibly Pled that the Manufacturers Conducted the Affairs of a RICO Enterprise.

The Manufacturers argue that the Counties have not pled that the Manufacturers "conduct[ed] or participat[ed], directly or indirectly, in the conduct of [an] enterprise's affairs," 18 U.S.C. 1962(c), because the pleadings describe only ordinary business practices bound by "normal commercial relationships." Mfr. Mem. at 19. The Counties need allege only that the Manufacturers had "some part in directing the enterprise's affairs." *Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 262 (D.N.J. 2000). They need not plead that the Manufacturers "had primary responsibility." *S. Broward Hosp. Dist.*, 516 F. Supp. 2d at 391.[8] The Counties have met their burden.

The Manufacturers again reframe the complaints' allegations. They claim that the Counties "rely on allegations of *unilateral* actions" and do not allege that the Manufacturers direct the PBMs' conduct or "provide[] greater or different incentives" when the PBMs act as directed. Mfr. Mem. at 20. This contention is refuted by the Counties' allegations of kickbacks for formulary placement. *See* pp. 5, 20, 25, *supra*. Kickbacks are, by definition, "greater or different incentives" for participation in an

---

[8] The Manufacturers contend this test is "very difficult" to satisfy, relying on an unpublished opinion which, in turn, cites a 2003 opinion from a New York district court. Mfr. Mem. at 20. But the Second Circuit later clarified that the "operation or management" test is "a relatively low hurdle for plaintiffs to clear" at the pleading stage. *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004).

illegal scheme.[9] Courts routinely find that allegations of kickbacks satisfy the operation or management test. *See, e.g.*, *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) ("An enterprise also might be 'operated' or 'managed' by others 'associated with' [it] who exert control over it . . . by bribery."); *Direct Purchaser*, 2021 WL 2886216, at *17 (plaintiffs satisfied requirement by alleging Defendants inflated list prices for formulary placement); *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *12 (D. Minn. Jan. 15, 2021) ("bribery is a . . . means of participating in . . . an enterprise's affairs").

The Counties also allege that the Manufacturers exploited a closed market by cooperating to fix artificially high prices. The Manufacturers played a significant role in the operation of the enterprises' affairs by monitoring one another's price increases, raising prices in lockstep, timing price increases to maximize PBM profits, and publishing false prices. KC ¶¶ 193-98, 439-40, 549; AC ¶¶ 16, 20, 280-315, 391, 518, 553; LC ¶¶ 279-88, 293, 459, 492. The Counties have pled relationships "beyond the realm of legitimate business practice." *Epipen*, 2021 WL 147166, at *12.

Finally, the Manufacturers' argument that the nine enterprises' common misconduct somehow establishes that the misconduct is a "normal competitive tool" or "widespread industry practice," Mfr. Mem. at 21-22, disregards the environment that facilitated Defendants' scheme. The misconduct is common only because Defendants control eighty to ninety percent of the market. AC ¶¶ 4, 5; KC ¶¶ 10, 16; LC ¶¶ 4, 5.

---

[9] *See, e.g.*, *Kickback*, *Cambridge Dictionary* (2024) ("an amount of money that is paid to someone illegally in exchange for secret help or work").

Regardless, the notion that the enterprises' common conduct somehow normalizes the payment of bribes defies both law and logic. *See* p. 27, *supra*.

## III.      THE COUNTIES STATE CONSUMER PROTECTION CLAIMS.

The Manufacturers' arguments as to the Counties' consumer protection claims fail because (A) no safe harbor provision applies, (B) Albany has alleged consumer-oriented conduct, (C) Albany's claim is not derivative, (D) Albany and King have pled deceptive misrepresentations and omissions, and (E) King has alleged unfair practices.

### A.    The Consumer Protection Claims Are Not Barred by Safe Harbors.

The Manufacturers contend that the Albany and King consumer protection claims are barred by statutory safe harbors that exempt conduct that complies with other laws. Mfr. Mem. at 23-26; *see* RCW § 19.86.170; NYGBL § 349(d). To fall within a safe harbor, the relevant conduct must be "specifically permitted" or "authorized" by law. *Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1104 (W.D. Wash. 2007); *Singleton v. Fifth Gen., Inc.*, 2016 WL 406295, at *7 (N.D.N.Y. Jan. 12, 2016).

No federal or state law specifically authorized the Manufacturers' scheme or the misrepresentations designed to conceal it. The Counties allege that the Manufacturers engaged in myriad deceptive and unfair practices, including raising list prices to fund kickbacks, hiding rebates from payors, engaging in patent evergreening, reporting false list prices, falsely claiming that R&D costs were raising prices, and negotiating exclusions to keep lower-priced drugs off formularies. *See, e.g.*, AC ¶¶ 233-34, 254, 320-21, 391, 445-74, 512-27, 600, 610; KC ¶¶ 1, 15, 56, 63, 70, 200, 238-39, 260-70, 292,

391. None of this conduct is specifically authorized by law. *See, e.g.*, *People v. Gen. Elec. Co.*, 756 N.Y.S.2d 520, 524 (N.Y. App. Div. 2003) ("[M]aking deceptive statements cannot be considered *compliance* with federal rules, regulations, and statutes[.]").

The Manufacturers claim that two aspects of their scheme were authorized by law. First, they say that a federal statute, which defines WAC as "not including . . . discounts, rebates, or reductions in price," 42 U.S.C. § 1395w-3a(c)(6)(B), authorizes their list prices.[10] As established above, this is not the case. *See* pp. 24-25, *supra*. And contrary to the Manufacturers' assertion, this Court has not already determined that section 1395w-3a(c)(6)(B) authorizes their list prices. The Court determined *only* that the specific injunctive relief requested by the plaintiffs in that case would not be consistent with the statute. *In re Insulin Pricing Litig.*, 2024 WL 416500, at *26, 28.

Second, the Manufacturers point to laws permitting and requiring disclosure of rebates. Mfr. Mem. at 25-26. But none of those statutes specifically authorizes misrepresentations about rebates. Permitting the Manufacturers to conceal the Manufacturer Payments that inflate prices would defeat the very purpose of these laws.

**B.    Albany's Claim Is Consumer Oriented.**

The Manufacturers argue that Albany's consumer protection claim fails because it is not consumer oriented. Mfr. Mem. at 26-27. "An act or practice is consumer-

---

[10] The Manufacturers also reference a definition of WAC under Wisconsin law, which mirrors the federal Medicaid definition. The state definition applies only to a reporting requirement to the state. It has nothing to do with the false prices published on compendia and does not specifically authorize the misconduct alleged here.

oriented when it has a broader impact on consumers at large." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 171 N.E.3d 1192-1197-98 (N.Y. 2021). "The critical question . . . is whether the matter affects the public interest[.]" *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).

The Manufacturers orchestrated a scheme to inflate the price of diabetes medications, inflicting harm on diabetics across the country. *See* AC ¶¶ 712-13. The scheme drove patients and public entities, including the Counties, to pay inflated prices for the at-issue drugs and forced diabetics to ration or forego necessary treatment. *Id.* As this Court has recognized, the "pricing scheme directly impacts consumers." *Minnesota*, 2020 WL 2394155, at *5. The scheme was therefore consumer oriented.

The Manufacturers raise two flawed arguments. Mfr. Mem. at 26-27. First, they contend that the scheme was not consumer oriented because it involved "complex arrangements" and "sophisticated" parties. But it is only where such transactions do not affect consumers that there is no "consumer-oriented conduct." *Axiom Inv. Advisors, LLC v. Deutsche Bank AG,* 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017).[11]

Second, the Manufacturers rely on *MSP Recovery*, where this Court dismissed a NYGBL claim because it was premised on "business-to-business transactions." 2020 WL 831578, at *10. But Albany is a county, not a business. Regardless, after this Court's ruling in *MSP Recovery*, the New York Court of Appeals in *Himmelstein* clarified that

---

[11] *See also, e.g.*, *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 65 (2d Cir. 2010) (NYGBL claim over private contract dispute viable "showing injury or potential injury to the public").

NYGBL plaintiffs *can* recover in "business-to-business transactions." *See Trustpilot Damages LLC v. Trustpilot Inc.*, 2022 WL 2124865, at *3 n.5 (2d Cir. June 13, 2022).

## C. Albany County's Claims Are Direct, Not Derivative.

The Manufacturers also contend that Albany lacks standing to pursue a NYGBL claim because the County's claims are derivative of those of its employees—the insured beneficiaries of the County's self-insured healthcare plan. *See* Mfr. Mem. at 28. "An injury is indirect or derivative when the loss arises solely as a result of injuries sustained by another party." *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 1145 (N.Y. 2004). In other words, a plaintiff cannot recover for injuries that are "entirely derivative of injuries . . . suffered by misled consumers." *City of N.Y. v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009). Here, however, Albany was the direct victim of Defendants' scheme. Albany does not allege that it suffered losses arising from deceptive conduct aimed at patients. It alleges that the Manufacturers artificially inflated their prices to cover rebates that the PBMs mislabeled to avoid paying them *to the County. See* AC ¶¶ 1, 27, 336, 388, 445-46.

In similar cases, courts have held that payors and municipalities suffered direct injuries under the NYGBL. *See, e.g., Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*, 2023 WL 415092, at *7 (D.N.J. Jan. 25, 2023) (payor suffered "direct injury because the [scheme] cause[d] [the] [p]laintiff to pay more money . . . than it otherwise would have to do"); *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 668 (N.D. Cal. 2020) (municipality's claims were direct because its

"alleged injuries d[id] not rely upon injuries sustained by any other individual").

The Manufacturers rely on three cases—none of which supports their position. *See* Mfr. Mem. at 28. In each case, the plaintiffs were not the target of the deception; they merely suffered injuries attributable to misconduct directed at others. *Philip Morris*, 818 N.E.2d at 1142 (insurer brought a subrogation claim seeking to recover for medical costs resulting from misrepresentations *directed at its insureds*); *Smokes-Spirits*, 911 N.E.2d at 837 (city sought to recover tax revenue lost as a result of misrepresentations *directed at consumers*); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 165 (E.D. Pa. 2009) (consumers sued drug manufacturers for blocking generics from the market by "*deceiv*[*ing*] *the FDA and the federal courts* by filing sham litigation and a sham citizen petition") (emphasis added)). Here, Albany directly paid inflated prices for drugs because of a deceptive scheme aimed at payors like the County.

## D. The Counties Have Properly Pled Deception.

To state a claim for deceptive acts or practices, a plaintiff must allege an act or practice in the conduct of trade or commerce that is deceptive, or has the tendency or capacity to mislead, and that plaintiff suffered injury as a result. NYGBL § 349; RCW § 19.86.010; *Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 192 (E.D.N.Y. 2014); *Klem v. Wash. Mut. Bank*, 295 P.3d 1179, 1185 (Wash. 2013). The Manufacturers unpersuasively argue that Albany and King fail to plead deception because they do not identify any misrepresentation or omission. Mfr. Mem. at 28-32.

32

1.   **The Counties Plead Deceptive or Misleading Practices.**

Defendants contend that the Counties' allegation that list prices were artificially inflated beyond fair market value does "not show that those list prices were *deceptive*." Mfr. Mem. at 29. The Counties, however, allege that the Manufacturers held their list prices out as reasonable. AC ¶¶ 513-27; KC ¶¶ 200, 548. Yet the list prices are not the product of a competitive market. To the contrary, the Manufacturers artificially inflated list prices to fund kickbacks to the PBMs and loaded the list prices with mislabeled "fees," "credits," and "discounts" to keep rebates from payors. *See* p. 20, *supra*.

The list prices are deceptive under state consumer protection statutes. *See, e.g.,* *Minnesota*, 2020 WL 2394155, at *15 (plaintiffs stated claims alleging Manufacturers "[held] out their artificially increased AWPs as benchmark prices"); *MSP Recovery*, 2019 WL 1418129, at *19 (claim stated by pleading "a fraudulent pricing scheme by virtue of misrepresentations of list prices"); *Insulin Pricing Litig.*, 2019 WL 643709, at *14 (claim stated by alleging misrepresentations that "artificially inflated publicly reported benchmark prices" were "reasonable approximations of the true cost").

In any event, the Counties allege other actionable misrepresentations (which the Manufacturers ignore). They allege, for example, that the Manufacturers misattributed price inflation to R&D costs and the payment of legitimate rebates. *See* p. 25, 28, *supra*.

2.   **The Counties Have Also Pled Deceptive Material Omissions.**

The Manufacturers also contend that omissions could not have deceived the Counties. First, they argue that the Counties "knew" about "[t]he relationship between

rebates and list and net prices." Mfr. Mem. at 30-31. This argument misses the point. The Counties knew that the Manufacturers paid rebates, creating a gap between list and net prices, but believed that all rebates would be passed to them. *See* pp. 12-13, *supra*.

The Counties did not know that the Manufacturers relabeled "rebates" as "fees" to fund kickbacks, and withheld rebates from payors; s*ee, e.g.*, AC ¶¶ 445-73, 599-603, 610, 614; KC ¶¶ 261-66, 320, 344, 525; or that the Manufacturers colluded with the PBMs to raise list prices or negotiated to exclude lower cost drugs from formularies, *see, e.g.*, AC ¶¶ 563, 599-603; KC ¶¶ 376, 390-94.

Second, the Manufacturers argue that the Counties have not alleged an actionable omission. Mfr. Mem. at 32. But the Manufacturers concede that omissions are actionable "if they create an affirmatively false impression." *Id.* (cleaned up).[12] The Manufacturers' omissions created the false impression that rising drug prices were the result of a competitive market, not a fraudulent scheme. *See, e.g.*, *EpiPen*, 2021 WL 147166, at *19 (fraudulent omission where manufacturer "promoted the EpiPen and announced its price increases without disclosing . . . the bribery-and-kickback scheme"); *Insulin Pricing Litig.*, 2019 WL 643709, at *15 (plaintiffs stated claim alleging the Manufacturers "knew, but did not disclose, the" pricing scheme).

---

[12] *See Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995); *Bennett v. Homesite Ins. Co.*, 636 F. Supp. 3d 1267, 1275 (W.D. Wash. 2022).

E.    **King County Has Properly Pled Unfairness.**

Washington's consumer protection statute recognizes unfair practices as a separate basis for recovery. *See Klem*, 295 P.3d at 1187. In determining whether a practice is unfair, courts ask whether it: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. *Mellon v. Reg'l Tr. Servs. Corp.*, 334 P.3d 1120, 1126 (Wash. Ct. App. 2014). All three criteria need not be satisfied to support a finding of unfairness. *Id.*

King County alleges facts to support unfairness under each criterion. First, King alleges that the Manufacturers violated public policy by using their market power to raise prices in lockstep and evade market forces that normally keep prices in check. *See* KC ¶¶ 10-12, 24, 32, 198, 202, 213, 233; *cf. Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999) (unfairness includes "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of . . . those laws").

Second, King County alleges that the Manufacturers' practice of artificially inflating insulin prices to fund kickbacks payors' expense, is immoral, unethical, and unscrupulous. *See, e.g.*, KC ¶¶ 147, 192, 213-15, 236, 243, 548. In response, the Manufacturers rely on cases where "price-gouging" was found insufficient. Mfr. Mem. at 37–39. But King does not base its claim on price-gouging. Unsurprisingly, none of the Manufacturers' cases involved drug manufacturers colluding on pricing, inflating prices to fund kickbacks, or relabeling payments to harm fraud victims.

In attacking this second unfairness factor, the Manufacturers also point to cases

35

requiring plaintiffs to show an "absence of choice." Mfr. Mem. at 38–39. That is exactly what King has alleged: that it had no choice but to purchase diabetes medications from Defendants, who "dominate[d]" the market. *See, e.g.*, KC ¶¶ 10, 16, 160. Even if King *could* have escaped this scheme by taking its business elsewhere, Defendants deprived the County of any reasonable, informed choice by concealing the scheme. *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010) (harm not "reasonably avoidable" because plaintiffs did not have "free and informed choice").

Third, King County has also alleged a "substantial injury" which was "not reasonably avoidable" and "not outweighed by countervailing benefits." *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1031 (W.D. Wash. 2020) (quotation omitted); *see, e.g.*, KC ¶¶ 10, 16, 34, 36, 44, 49, 160, 346, 353, 357, 374, 551. In particular, King alleges substantial injury in that it paid artificially inflated prices and was denied millions of dollars owed to it. The Manufacturers say that their "conduct benefits payers like" the Counties, noting that the Counties "specifically bargain for rebates." Mfr. Mem. at 39. But King does not challenge rebates; it challenges Defendants' conduct in artificially *inflating* drug prices and *mislabeling* rebates.

This Court—and other courts—have concluded that similar conduct is unfair. *See, e.g.*, *Insulin Pricing Litig.*, 2019 WL 643709, at *15 (plaintiffs pled unfair business practices by asserting that Defendants artificially inflated AWPs); *Mississippi ex rel. Fitch v. Eli Lilly & Co.*, 2022 WL 18401603, at *4 (S.D. Miss. Aug. 29, 2022) ("Insulin Pricing Scheme" was "unfair"); *Maher v. AMAG Pharms., Inc.*, 2024 WL 1376685, at *18 (D.N.J.

36

Mar. 28, 2024) ("selling a drug at exorbitant prices" due to misstatements was "unfair").

The Manufacturers nevertheless contend that King's unfairness claim is deficient because (1) price inflation does not state a cognizable injury under Washington law and (2) the WCPA is not intended to prohibit price-gouging. Mfr. Mem. at 33-36.

***Price Inflation Is a Cognizable Injury.*** A WCPA plaintiff "must establish that, but for the defendant's unfair or deceptive practice, [it] would not have suffered an injury." *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 22 (Wash. 2007). "Injury" is defined "liberally to include when the plaintiff's property interest or money is diminished." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1135 (9th Cir. 2016). "[T]he injury involved need not be great, or even quantifiable." *Id.*

King has adequately pled unfair trade practices by alleging "that Defendants artificially inflated [prices] thereby causing gross overpayments." *Insulin Pricing Litig.*, 2019 WL 643709, at *15; *see also Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 558 (W.D. Wash. 2008) (plaintiffs could rely on "price inflation" to show causation and damages).[13]

The Manufacturers argue that claims based on price-inflation injuries are barred. First, they point to the *Insulin Pricing Litigation*, where this Court held at class certification that, under the NJCFA, price-inflation theories are not cognizable because NJCFA

---

[13] Price-inflation theories of causation are normally relevant only in class actions, where plaintiffs must prove causation without individualized reliance inquiries. *See Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 309 (3d Cir. 2016). The Counties are not seeking class certification and allege that they relied on false prices. *See* LC ¶¶ 457-61; AC ¶¶ 516-20; KC ¶¶ 369-71. They need not invoke a price-inflation theory of causation.

plaintiffs must show that their injuries were "induced by a misrepresentation." 2024 WL 416500, at *37-38. To avoid predominance issues, the plaintiffs had argued that "their ascertainable loss theory [was] *not* based on misrepresentation." *Id.* at *37. But here, the Counties (1) sue under state statutes that do *not* require inducement to prove causation and (2) *have* alleged reliance on false prices in any event. *See* p. 37 n.13, *supra*.

Second, the Manufacturers rely on *Kelley v. Microsoft Corp.*, but that case only helps King. There, the district court recognized the viability of proving causation and damages through an inflated price under Washington law. 2011 WL 13353905, at *1 (W.D. Wash. May 24, 2011). The court simply decertified a class action because the plaintiffs' expert had failed to provide "evidence of classwide price inflation." *Id.*

Third, the Manufacturers rely on *Siegel v. Shell Oil Co.*, where the Seventh Circuit held that under *Illinois* law, "whether a practice is unfair depends on a case-by-case analysis." 612 F.3d 932, 935 (7th Cir. 2010). The court concluded that the plaintiff could not bring an unfairness claim based on inflated gas prices because plaintiff could, and did, avoid injury by buying gas from other sellers. *Id.* at 937.

*Siegel* does not help the Manufacturers. For one thing, King does not claim that the Manufacturers' practices are unfair because their prices are too high. Instead, King alleges, among other things, that the Manufacturers artificially inflated prices to fund kickbacks and relabeled those payments to avoid obligations to payors. *See* p. 20, *supra*.

For another, the injury here was unavoidable. Insulin is a life-saving medication that the Counties must purchase for health plan members, and the Manufacturers

produce almost all of it. *See, e.g.*, KC ¶¶ 10, 346, 354-55. And King did not know it was a fraud victim, so it could not have made a different choice. *See Neovi*, 604 F.3d at 1158.

**Price Gouging Is Not Excluded as a Basis for Unfairness.** The Manufacturers argue that price gouging is not "unfair" under the WCPA.[14] But King's unfairness claim is *not* a price-gouging claim. King does not allege that diabetes medications are simply priced too high. Instead, King describes a scheme replete with anticompetitive conduct, collusion, and fraud. *See* pp. 28-29, *supra*; *see also Insulin Pricing Litig.*, 2019 WL 643709, at *15.

Regardless, the Manufacturers acknowledge that nothing in the statute excludes price-gouging. *See* Mfr. Mem. at 34-36. The plain text of the statute is controlling, especially considering that the WCPA is to be construed broadly. *See, e.g.*, *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 895 (Wash. 2009). Price gouging—and the Manufacturers' conduct—also fits squarely within the FTC Act's test for unfairness: it caused the Counties (1) "substantial injury" that was not (2) "reasonably avoidable" or (3) "outweighed by countervailing benefits." 15 U.S.C. § 45(n).

The Manufacturers' reliance on *Whitaker Cable Corp. v. FTC*, 239 F.2d 253 (7th

---

[14] The Manufacturers suggest in a footnote that the Counties' efforts to regulate nationwide insulin prices through state consumer protection claims violates the Dormant Commerce Clause. Mfr. Br.at 34 n.19. That footnote is insufficient to preserve that argument. *See, e.g.*, *Curtis v. Treloar*, 1998 WL 1110448, at *9 (D.N.J. Aug. 27, 1998) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[.]") *aff'd*, 189 F.3d 463 (3d Cir. 1999). In any event, the Counties are not attempting to regulate or control prices nationwide, but to preclude Defendants from engaging in their deceptive scheme.

Cir. 1956), is misplaced. That decision does not preclude unfairness claims based on price-gouging; it holds only that "insignificant" price discrimination that does not "substantial[ly] lessen[]" competition does not violate the FTC Act. *Id.* at 256. King County alleges substantial injury from inflated prices.

Defendants' suggestion that the Washington legislature's rejection of a proposed price-gouging statute reflects its intention to exclude price-gouging claims from the WCPA is contrary to the record. The summary of testimony on the proposed bill indicates that the amendment was rejected because the WCPA already allows such claims, and the proposed bill set more restrictive standards. *See* ESSB 5191, https://tinyurl.com/2phm9ymj at 5 (testimony that "proposed bill is not necessary" and "standard for an excessive price increase" should "be discretionary"). Defendants also argue that courts are ill-equipped to address unfair acts involving price gouging "without guidance" but the three-factor unfairness test provides the relevant guidance.

## IV.    THE COUNTIES STATE COMMON LAW FRAUD CLAIMS.

Common law fraud requires "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015).[15] The Counties detail "a fraudulent pricing scheme by virtue of misrepresentations of list prices." *MSP Recovery*, 2019 WL 1418129,

---

[15] *See also Clinton v. Calvert*, 1987 WL 14723, at *6 (N.D. Ill. July 17, 1987) (similar); *Martin v. Miller*, 308, 600 P.2d 698, 700 (Wash Ct. App. 1979) (similar).

at *19; *see, e.g.,* LC ¶¶ 454-68; AC ¶¶ 513-27; KC ¶¶ 199-208.

The Counties have also alleged an intent to induce reliance. The complaints allege that the Counties relied on the Manufacturers' false list prices to pay for the at-issue drugs. *See* p. 37 n.13, *supra*. Knowing this, the Manufacturers published the list prices in compendia and other materials, which were then used to set the amount charged for the at-issue drugs. *Id.*

The Counties allege that their reliance was justified, in part, because it was based on claims of transparency. *See* AC ¶¶ 616-20; KC ¶¶ 441-45; LC ¶¶ 553-55. Whether that reliance was reasonable is a "question of fact." *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 9 (Ill. Ct. App. 2001); *accord Guy Mitchell v. Artists Rts. Enf't Corp.*, 2013 WL 890478, at *6 (E.D. Wash. Mar. 8, 2013); *Beck v. Eins*, 305 A.D.2d 323, 326 (N.Y. App. Div. 2003). As this Court has already held, "each of the elements of a common law fraud claim are adequately pled." *MSP Recovery*, 2019 WL 1418129, at *19.

## V.    THE COUNTIES STATE UNJUST ENRICHMENT CLAIMS.

### A.    The Counties' Unjust Enrichment Claims May Proceed Together with Their Common Law and Statutory Claims.

Dismissal of the Counties' unjust enrichment claims as duplicative of their other claims is inappropriate for several reasons. First, doing so at the pleading stage would be premature. *See, e.g., Scholder v. Sioux Honey Ass'n Coop.*, 2022 WL 125742, at *6 (E.D.N.Y. Jan. 13, 2022); *Clark v. Blue Diamond Growers*, 2023 WL 4351464, at *9 (N.D. Ill. July 5, 2023). Second, the Counties' unjust enrichment claims (pled in the alternative)

are not duplicative because the Counties may prevail on their unjust enrichment claims even if their related claims are ultimately dismissed. Third, even if unjust enrichment claims "stand or fall" with related claims, the Counties *have* alleged viable claims.[16]

## B.     The Counties Are Not Required to Plead a "Direct Benefit."

Contrary to the Manufacturers' assertions, no state at issue requires plaintiffs to plead a direct benefit in support of unjust enrichment. New York's requirement of a connection between the parties "requires no direct relationship" and "it does not matter whether the benefit is directly or indirectly conveyed." *Myun-Uk Choi v. Tower Research Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (cleaned up).

Washington likewise has no direct benefit requirement. *Maadanian v. Mercedes-Benz USA, LLC*, 2024 WL 1579658, at *9 (W.D. Wash. Apr. 11, 2024) (rejecting "defendants' argument that the benefit must be conferred on them directly").

Illinois allows recovery for unjust enrichment if a benefit has been *indirectly* conferred where "the defendant procured the benefit from the third party through some type of wrongful conduct." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989).

The decision in *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000), demonstrates the viability of the Counties' claims. There, the plaintiffs purchased

---

[16] The PBMs do not argue that King's unjust enrichment claim is precluded as duplicative. And for good reason. *See Puget Sound Sec. Patrol, Inc. v. Bates*, 389 P.3d 709, 716 (Wash. Ct. App. 2017) (unjust enrichment is "an independent basis of . . . liability")

medications manufactured by the defendants from an intermediary. The plaintiffs alleged that the defendant and a generic manufacturer had agreed to block entry of the generic into the market, thus "confer[ring] a benefit, in the form of overpayments and increased profits" on the brand and generic manufacturers. *Id.* at 671. The court concluded that a lack of a direct benefit did not bar the New York *or* Illinois claims. *Id.*

Here, the Counties allege that the Manufacturers benefitted at the Counties' expense through wrongful conduct. As a starting point, the Counties allege that they "unknowingly overpaid" for the at-issue drugs, "which would have cost [far] less but for the Insulin Pricing Scheme." AC ¶ 581; LC ¶ 519; KC ¶ 374. And the Manufacturers were enriched at the Counties' expense: "[b]ecause the [payor's] purchase price of every at-issue diabetes medication" "flows *from* [*each Manufacturer's*] *false list price*," "every payor in the United States that purchases these life-sustaining drugs . . . has been directly harmed." AC ¶ 25; KC ¶¶ 15, 182-83, 208, 361; LC ¶ 27.

Because the Manufacturers' inflated list prices directly affected the amounts paid by the Counties, the Counties have alleged a sufficiently close relationship with the Manufacturers. *See, e.g.*, *Miami Prods. & Chem. Co. v. Olin Corp.*, 2022 WL 3701159, at *4 (W.D.N.Y. Aug. 26, 2022) (in price-fixing litigation, "no basis" to dismiss unjust enrichment claim brought by third-party purchasers against manufacturers); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 233 (S.D.N.Y. 2012) (denying motion to dismiss where plaintiffs purchased drug through intermediaries).

The Manufacturers ask the Court to follow two inapposite decisions. In *City of*

*Miami*, the court dismissed an unjust enrichment claim because "*Florida* law requires that the plaintiff directly confer a benefit." 2022 WL 198028, at *9 (emphasis added). In *MSP Recovery*, the plaintiff's unjust enrichment claim failed only because *New Jersey* law requires a direct benefit. 2019 WL 1418129, at *20. Different law applies here.

### C. The Counties' Contracts with the PBMs Do Not Preclude Their Unjust Enrichment Claims Against the Manufacturers.

The Manufacturers argue that the Counties' PBM contracts preclude their unjust enrichment claims. Mfr. Mem. at 45-47. The mere existence of a contract does not bar these claims; the question is whether the contract "clearly covers" the dispute. *Union Bank, N.A. v. CBS Corp.*, 2009 WL 1675087, at *7 (S.D.N.Y. June 10, 2009); *accord Olson Kundig, Inc. v. 12th Ave. Iron, Inc.*, 2022 WL 4534422, at *5 (W.D. Wash. Sept. 28, 2022); *Gagnon v. Schickel*, 983 N.E.2d 1044, 1053 (Ill App. Div. 2012).

Defendants' wrongful manipulation of insulin prices went far beyond the subject matter of the PBM contracts. The Counties describe how (1) Defendants coordinated to create exclusionary formularies in exchange for kickbacks; (2) the Manufacturers' list prices were falsely inflated with relabeled "fees" to satisfy PBM profit demands; and (3) the prices paid by the Counties bore no relationship to the fair market value of the drugs. AC ¶ 563; LC ¶ 547; KC ¶ 213-14. Defendants' manipulation caused precipitous price increases, causing overcharges. AC ¶¶ 387-88; KC ¶¶ 214-15; LC ¶¶ 346-47.

By contrast, the scope of the Counties' contracts was, and remains, narrow. Under Albany's contract, for example, ESI provides pharmacy benefit management

services in exchange for "the applicable claims reimbursement amounts and other administrative fees." AC Ex. A at 1, 6; *see also* PBM Ex. 1 (King-CVS) at Ex. A; Ex. 7 (Lake-OptumRx) at Ex. B. These contracts say nothing about whether the PBMs were permitted to manipulate the list prices of diabetes drugs. *See Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 433 (S.D.N.Y. 2020) ("[W]here Plaintiffs allege a manipulation of the market overall, such conduct is not governed by ISDA Master Agreements because it does not arise out of the subject matter of the agreements.").

The Counties' PBM contracts do not preclude their unjust enrichment claims. *See, e.g., In re LIBOR-Based Fin. Inst. Antitrust Litig.*, 27 F. Supp. 3d 447, 483 (S.D.N.Y. 2014) (although contracts "required defendants to pay plaintiffs the prescribed" rate, they "did not clearly cover the subject matter"); *Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860 (N.D. Ill. 2010) (allowing unjust enrichment claim where defendants manipulated market to raise prices); *Mississippi*, 2022 WL 18401603, at *4 (insulin pricing claims "do not stem from [state's] contracts with any of the PBM[s]").[17]

## VI.    THE COUNTIES HAVE STATED CONSPIRACY CLAIMS.

Although conspiracy is not an independent tort, Mfr. Mem. at 47, the Counties

---

[17] The three cases cited by the Manufacturers for the proposition that payers cannot "sue non-parties to a contract who allegedly benefit from the contract's performance" are readily distinguishable. The first two stand for the proposition that unjust enrichment requires wrongful conduct. *RBS Citizens, N.A. v. Bentley Motors, Inc.*, 2012 WL 1565457 (N.D. Ill. May 2, 2012); *Farwest Steel Corp. v. Mainline Metal Works, Inc.*, provides the same. 741 P.2d 58 (Wash. Ct. App. 1987). And in *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201 (S.D.N.Y. 2016), the plaintiff tried to hold a third party responsible for another's breach of contract.

have stated their underlying claims. *See* Sections II-V, *supra*; Section VII, *infra*.

The Counties sufficiently plead the agreement element of their conspiracy claims. The Counties allege that the Manufacturers paid, and the PBMs accepted, kickbacks in exchange for preferred formulary placement. *See* p. 20, *supra*; *see, e.g.*, *United States v. Hamilton*, 37 F.4th 246, 257 (5th Cir. 2022) (kickbacks evidence conspiratorial agreement). They also allege that the Manufacturers engaged in shadow pricing, facilitated by the "insular nature of the pharmaceutical industry" and lockstep price increases that occurred shortly after Defendants gathered at industry meetings. AC ¶¶ 356-74; KC ¶¶ 170-81; LC ¶¶ 316-34. Finally, the Counties allege that Defendants used the PCMA to block price transparency efforts, including promoting the elimination of anti-kickback safe harbors. *See id.* The Counties have alleged more than parallel conduct.

The Counties also plead that Defendants acted contrary to their individual interests by participating in the Insulin Pricing Scheme. The Counties allege that the scheme would have collapsed absent full participation by all Defendants. *See* AC ¶ 688. If Defendants operated in a competitive market, it would be in each participant's interest to cut prices to capture a larger share. *See id.* That Defendants remain in lockstep against this interest evidences an anticompetitive agreement. *Cf. In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004) (making this point).

These allegations suffice to state a conspiratorial agreement. *See, e.g.*, *United States v. Messino*, 382 F.3d 704, 709 (7th Cir. 2004) (tacit agreement suffices); *Cent. Flyway Air, Inc. v. Grey Ghost Int'l, LLC*, 2022 WL 17976099, at *10 (W.D. Wash. Dec. 28, 2022)

46

(circumstantial evidence of agreement supports claim); *Yahoo! Inc. v. XYZ Cos.*, 872 F. Supp. 2d 300, 305 (S.D.N.Y. 2011) (same).

## VII.    THE COUNTIES HAVE PLED VIABLE GLP-1 CLAIMS.

The Counties (A) state claims involving GLP-1s that (B) are not preempted.

### A.    The Counties Adequately Plead GLP-1 Claims.

The Counties allege systemic misconduct in the pricing of insulin *and* GLP-1 medications. *See* AC ¶¶ 251-71, 411; KC ¶¶ 286-305; LC ¶¶ 249-69, 370. The drugs are part of the same unlawful scheme. *See* AC ¶ 252, 265; KC ¶¶ 287, 300; LC ¶¶ 251, 264.

The Manufacturers have artificially inflated prices for insulins and GLP-1s. *See, e.g.*, AC ¶¶ 13, 263-70; KC ¶¶ 185, 298-305; LC ¶¶ 236, 262-69. They used these inflated prices to fund PBM kickbacks for both insulins and GLP-1s. *See, e.g.*, AC ¶¶ 254, 301, 383; KC ¶¶ 2, 289, 301; LC ¶¶ 253, 265, 395. Defendants relabeled those payments to conceal rebates from payors. *See* AC ¶¶ 445-74; KC ¶¶ 260-70; LC ¶¶ 418-41.

The Counties further allege that the PBMs negotiate insulins and GLP-1s together, *see* AC ¶ 252; KC ¶ 287; LC ¶ 251; Defendants publish false prices for both insulins and GLP1-s in compendia, *see* AC ¶¶ 16, 267, 270; KC ¶¶ 15, 302, 305; LC ¶¶ 18, 266, 269; and the Manufacturers employ patent thickets to maintain control over both markets, *see* AC ¶¶ 233-34, 262-63; KC ¶¶ 144, 297; LC ¶¶ 228-29, 297-98. The Counties allege one pricing scheme including both insulins and GLP-1s.

The Manufacturers assert that the scheme "could not have affected GLP-1s, because of key differences between insulins and GLP-1s." Mfr. Mem. at 48-50. But

each purported difference either contradicts the Counties' allegations or is irrelevant. For example, the Manufacturers argue that the threat of formulary exclusion has not affected GLP-1 prices, which are justified by R&D costs. The Counties allege otherwise. *See, e.g.*, AC ¶¶ 268-70, 399; KC ¶¶ 1, 303-05; LC ¶¶ 267-69, 358.

The Manufacturers' suggestion that GLP-1s' novelty is a "key difference" has no legal import. Defendants previously resisted the inclusion of "New Insulins" on the grounds that they "ha[d] only recently been introduced" and had not been subject to lockstep price increases. *See Insulin Pricing Litig.*, 2020 WL 831552, at *4. This Court rejected that argument, explaining that the plaintiffs gave "a detailed depiction of the alleged fraudulent scheme" and "included the New Insulins in the same scheme." *Id.*; *see also Minnesota*, 2020 WL 2394155, at *22. The same is true here.

### B.    Federal Patent Law Does Not Preempt the Counties' GLP-1 Claims.

The federal patent laws do not preempt claims alleging fraudulent conduct.[18] "Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law [claims]." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (cleaned up). State claims may be "preempted if they stand as an obstacle to the . . . objectives of Congress in enacting a statute." *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1473 (Fed. Cir. 1998) (cleaned up).

---

[18] Defendants include no argument in support of preemption. Instead, they incorporate by reference arguments from another brief filed in this case. Their preemption argument is forfeited. *See Curtis*, 1998 WL 1110448, at *9; *see also Gladysiewski v. Allegheny Energy Serv. Corp.*, 282 F. App'x 979, 981 (3d Cir. 2008).

Courts have recognized three objectives to patent laws: "providing an incentive to invent, promoting the full disclosure of inventions, and ensuring that that which is in the public domain cannot be removed therefrom by action of the States." *Id.* at 1474 (quotation omitted). State claims that are grounded in "misconduct in the marketplace" generally do not interfere with these objectives. *Id.* at 1475, 1477.

Here, the Counties challenge marketplace misconduct, not the Manufacturers' right to benefit from their patents. The Counties allege that Defendants have engaged in a deceptive scheme to inflate prices, among other things. *See* pp. 28-29, *supra.*

In similar cases, courts have found that federal patent laws do not preempt state claims targeting deceptive and unfair practices. In *EpiPen*, for example, the manufacturers "argue[d] that the class plaintiffs [were] using state consumer protection laws to regulate the EpiPen's price—a patented product." *EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1333 (D. Kan. 2018). The manufacturers contended that federal patent law preempted these claims. *Id.* The district court rejected this argument, noting that the plaintiffs had alleged anticompetitive "misconduct in the marketplace" and that the manufacturers identified no decision "holding that federal patent law permits a patent holder to commit unfair and deceptive practices that violate state consumer protection laws." *Id.* at 1333-34.[19]

---

[19] *See, e.g., Mass. Eye & Ear Infirmary v. QLT Photo., Inc.*, 559 F.3d 1, 3 (1st Cir. 2009) (states can regulate "less-than-upright business practices, even if they incidentally involve . . . information that may be subject to federal patent laws"); *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 411 (D.N.J. 2018) (state consumer protection claims were

Defendants do not cite a *single* case suggesting that the patent laws preempt the Counties' claims. Instead, they point to cases involving claims that patented products were too expensive. *See Biotech. Indus. Org. v. Dist. of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007) (patent laws preempted price regulation legislation); *Se. Pa. Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688 (E.D. Pa. 2015) (patent laws preempted claims that manufacturer engaged in price-gouging scheme by charging more in the United States).

Here, however, the Counties' claims are consistent with the patent laws. The Counties do not claim that diabetes medications are too expensive because they are patented. Instead, they allege that Defendants have flouted the dictates of the market, deceiving payors through their misrepresentations and omissions. The Counties here simply seek the amounts they were overcharged as a result of Defendants' fraud.

Taken to its logical conclusion, Defendants promote the argument that they are free to violate RICO, disregard consumer protection statutes, and commit common law fraud as long the product at issue is patented. This is not the law. *Cf. Lackner Co. v. Quehl Sign Co.*, 145 F.2d 932, 934 (6th Cir. 1944) ("The maintenance of the public interest is the dominant concern of the patent law; profit to the patentee is secondary.").

## CONCLUSION

The Court should deny the Manufacturers' motion to dismiss.

---

not preempted by patent laws); *Scan-Plast Indus. v. Scanimport Am. Inc.*, 652 F. Supp. 1156, 1165-66 (E.D.N.Y. 1987) ("deceptive business practices" claim not preempted).

Dated:  July 25, 2024

Respectfully submitted,

| | |
|---|---|
| */s/ David R. Buchanan*<br>Christopher A. Seeger<br>cseeger@seegerweiss.com<br>David R. Buchanan<br>dbuchanan@seegerweiss.com<br>Steven J. Daroci<br>sdaroci@seegerweiss.com<br>**SEEGER WEISS LLP**<br>55 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>973-639-9100 | Benjamin J. Widlanski<br>bwidlanski@kttlaw.com<br>Tal J. Lifshitz<br>tjl@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Rachel Sullivan<br>rs@kttlaw.com<br>Brandon Sadowsky<br>bsadowsky@kttlaw.com<br>Daniel T. DiClemente<br>ddiclemente@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Telephone: (305) 372-1800 |
| Troy A. Rafferty<br>trafferty@levinlaw.com<br>Matthew D. Schultz<br>mschultz@levinlaw.com<br>William F. Cash<br>bcash@levinlaw.com<br>Brandon L. Bogle<br>bbogle@levinlaw.com<br>**LEVIN, PAPANTONIO,**<br>**RAFFERTY, PROCTOR,**<br>**BUCHANAN, O'BRIEN, BARR &**<br>**MOUGEY, P.A.**<br>316 S. Baylen St., Suite 600<br>Pensacola, Florida 32502<br>Tel: (850) 435-7140 | Russell W. Budd<br>Christine C. Mansour<br>**BARON & BUDD, P.C.**<br>3102 Oak Lawn Ave, Suite 1100<br>Dallas, Texas 75219<br>Tel.: (214) 521-3605<br>rbudd@baronbudd.com<br>cmansour@baronbudd.com |
| Roland Tellis<br>Mark P. Pifko<br>**BARON & BUDD, P.C.**<br>15910 Ventura Blvd #1600 | Burton LeBlanc<br>**BARON & BUDD, P.C.**<br>2600 Citiplace Drive, Suite 400<br>Baton Rouge, Louisiana 70808 |

| | |
|---|---|
| Los Angeles, California 91436<br>Tel.: (818) 839-2333<br>rtellis@baronbudd.com<br>mpifko@baronbudd.com | Tel.: (225) 927-5441<br>bleblanc@baronbudd.com |
| Catherine Hancock Dorsey<br>**BARON & BUDD, P.C.**<br>600 New Hampshire Ave. NW 10th Floor<br>Washington, D.C. 20037<br>Tel.: (202) 333-4562<br>cdorsey@baronbudd.com | Archie C. Lamb, Jr.<br>alamb@archielamb.com<br>**Archie Lamb & Associates**<br>P.O. Box 2088<br>Birmingham, Alabama 35201<br>205-612-6789 (C) |
| Donald W. Davis, Jr.<br>dwdavis@bmdllc.com<br>**Brennan, Manna & Diamond, LLC**<br>75 East Market Street<br>Akron, Ohio 44308<br>P: (330) 253-5060/Fax: (330) 253-1977 | |

*Counsel for Albany County*

David J. Ko, WSBA #38299
Derek W. Loeser, WSBA #24274
Juli E. Farris, WSBA #17593
Laura R. Gerber, WSBA #34981
Matthew M. Gerend, WSBA #43276
Rachel C. Bowanko, WSBA #61298
Andrew N. Lindsay, WSBA #60386
**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 428-0563
dloeser@kellerrohrback.com
dko@kellerrohrback.com
jfarris@kellerrohrback.com
lgerber@kellerrohrback.com
mgerend@kellerrohrback.com
rbowanko@kellerrohrback.com

alindsay@kellerrohrback.com

*Counsel for King County*

| | |
|---|---|
| Benjamin J. Widlanski<br>bwidlanski@kttlaw.com<br>Tal J. Lifshitz<br>tjl@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Rachel Sullivan<br>rs@kttlaw.com<br>Jorge L. Piedra<br>jpiedra@kttlaw.com<br>Brandon Sadowsky<br>bsadowsky@kttlaw.com<br>Daniel T. DiClemente<br>ddiclemente@kttlaw.com<br>**KOZYAK TROPIN &<br>THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>Telephone: (305) 372-1800 | William F. Cash III<br>bcash@levinlaw.com<br>Troy A. Rafferty<br>trafferty@levinlaw.com<br>Matthew D. Schultz<br>mschultz@levinlaw.com<br>Brandon L. Bogle<br>bcash@levinlaw.com<br>**LEVIN, PAPANTONIO,<br>RAFFERTY,<br>PROCTOR, BUCHANAN,<br>O'BRIEN, BARR & MOUGEY, P.A.**<br>316 S. Baylen St., Suite 600<br>Pensacola, Florida 32502<br>Telephone: (850) 435-7140 |
| Christopher A. Seeger<br>cseeger@seegerweiss.com<br>David R. Buchanan<br>dbuchanan@seegerweiss.com<br>Steven J. Daroci<br>sdaroci@seegerweiss.com<br>**SEEGER WEISS, LLP**<br>55 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>Telephone: (973) 639-9100 | James L. Magazine<br>jim@magazinelaw.com<br>**THE MAGAZINE LAW<br>GROUP LLC**<br>2625 McCormick Drive, Suite 102<br>Clearwater, FL 33759-1078<br>Telephone: (727) 499-9900 |
| Russell W. Budd<br>rbudd@baronbudd.com<br>Christine C. Mansour<br>cmansour@baronbudd.com<br>**BARON & BUDD, P.C.**<br>3102 Oak Lawn Ave, Suite 1100 | Burton LeBlanc<br>bleblanc@baronbudd.com<br>**BARON & BUDD, P.C.**<br>2600 Citiplace Drive, Suite 400<br>Baton Rouge, LA 70808<br>Telephone: (225) 927-5441 |

| | |
|---|---|
| Dallas, TX 75219<br>Telephone: (214) 521-3605 | |
| Roland Tellis<br>rtellis@baronbudd.com<br>Mark P. Pifko<br>mpifko@baronbudd.com<br>**BARON & BUDD, P.C.**<br>15910 Ventura Blvd #1600<br>Los Angeles, CA 91436<br>Telephone: (818) 839-2333 | Catherine Hancock Dorsey<br>cdorsey@baronbudd.com<br>**BARON & BUDD, P.C.**<br>600 New Hampshire Ave. NW 10th Floor<br>Washington, D.C. 20037<br>Telephone: (202) 333-4562 |
| John M. Power (Ill. Bar No. 6197553)<br>jpower@coganpower.com<br>**COGAN & POWER PC**<br>1 East Wacker Drive, 38th Floor<br>Chicago, IL 60601<br>Telephone: (312) 477-2500 | |

*Counsel for Lake County*

## CERTIFICATE OF SERVICE

I certify that I am a registered attorney in the State of New Jersey and a Member of the Bar of this Court and that on this date a copy of this document was served on the counsel of record in the above-captioned matter via email.

/s/ David R. Buchanan

David R. Buchanan
Dated: July 25, 2024