# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | Case No. 2:23-md-3080 (BRM)(RLS)<br><br>MDL No. 3080<br><br>**ORAL ARGUMENT REQUESTED** |

**THIS DOCUMENT RELATES TO:** Nos. 2:23-cv-07042, 2:23-cv-08487, 2:23-cv-21178
(Self-Funded Payers Track)

## REPLY IN SUPPORT OF
## MANUFACTURERS' MOTION TO DISMISS THE
## ALBANY, KING, AND LAKE COUNTY COMPLAINTS

(Counsel listed on next page)

**McCARTER & ENGLISH, LLP**
Brian W. Carroll
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
(973) 639-2020

**DAVIS POLK & WARDWELL LLP**
James P. Rouhandeh (*pro hac vice*)
David B. Toscano (*pro hac vice*)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

**DAVIS POLK & WARDWELL LLP**
Neal A. Potischman (*pro hac vice*)
Andrew Yaphe (*pro hac vice*)
1600 El Camino Real
Menlo Park, CA 94025
(650) 752-2000

*Attorneys for Defendant Novo Nordisk Inc.*

**WALSH PIZZI O'REILLY FALANGA LLP**
Liza M. Walsh
Katelyn O'Reilly
Three Gateway Center
100 Mulberry St., 15th Floor
Newark, NJ 07102
(973) 757-1100

**JONES DAY**
Michael R. Shumaker (*pro hac vice*)
Julie E. McEvoy (*pro hac vice*)
William D. Coglianese (*pro hac vice*)
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939

*Attorneys for Defendant Sanofi-Aventis U.S. LLC*

**REED SMITH LLP**
Melissa A. Geist
Julia A. López
506 Carnegie Center, Suite 300
Princeton, NJ 08540
(609) 514-5978

**KIRKLAND & ELLIS LLP**
James F. Hurst (*pro hac vice*)
Andrew A. Kassof (*pro hac vice*)
Robert B. Ellis (*pro hac vice*)
Diana M. Watral (*pro hac vice*)
Ryan Moorman (*pro hac vice*)
Jason A. Feld (*pro hac vice*)
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

*Attorneys for Defendant Eli Lilly and Company*

# TABLE OF CONTENTS

_____

**Page**

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................3

I.    Payers' Claims Are Untimely. ..................................................3

    A.    Payers Have Been On Notice Of Their Claims For Decades. ..................................................................3

    B.    No Tolling Doctrine Salvages Payers' Claims. .........................6

II.    Payers' RICO Claims Fail On Their Merits.......................................7

    A.    The Indirect Purchaser Rule Bars Payers' RICO Claims. ..........8

    B.    Plaintiffs Do Not Allege Any RICO Predicate Act, Much Less One Involving Manufacturers...........................................10

    C.    Payers Fail To Allege That Manufacturers Conducted Any Enterprise's Affairs. ...........................................................12

III.    Payers' Consumer Protection Claims Are Barred...........................13

    A.    State-Law Bars Preclude Payers' Claims. ................................13

    B.    Payers Cannot State Deception Claims. ...................................16

    C.    King Cannot State A Claim Under The WCPA. .......................18

IV.    Payers Fail To Allege Common-Law Fraud Claims..........................20

V.    Payers Fail To State Unjust Enrichment Claims................................21

VI.    Payers Do Not State Conspiracy Claims...........................................23

VII.    Payers Do Not Plead Claims Regarding GLP-1 Drugs.......................24

CONCLUSION ...................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allianz Global Investors GmbH v. Bank of America Corp.*,
    463 F. Supp. 3d 409 (S.D.N.Y. 2020) ...............................................................23

*Annulli v. Panikkar*,
    200 F.3d 189 (3d Cir. 1999) .............................................................................10

*Blake v. Fed. Way Cycle Ctr.*,
    698 P.2d 578 (Wash. Ct. App. 1985)................................................................16

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
    818 N.E.2d 1140 (N.Y. 2004)......................................................................15, 16

*Boris v. Wal-Mart Stores, Inc.*,
    35 F. Supp. 3d 1163 (C.D. Cal. 2014) ..............................................................17

*Carter v. CIOX Health, LLC*,
    2022 WL 3499683 (W.D.N.Y. Aug. 18, 2022)..................................................17

*City of Moses Lake v. United States*,
    430 F. Supp. 2d 1164 (E.D. Wash. 2006)...........................................................7

*City of New York v. Smokes-Spirits.Com, Inc.*,
    911 N.E.2d 834 (N.Y. 2009)..............................................................................16

*Curtis v. Treloar*,
    1998 WL 1110448 (D.N.J. Aug. 27, 1998) .......................................................24

*Dehart v. HomEq Servicing Corp.*,
    679 F. App'x 184 (3d Cir. 2017)........................................................................21

*In re Direct Purchaser*,
    2021 WL 2886216 (D.N.J. July 9, 2021) ...........................................................5

*Fishbein v. Miranda*,
    670 F. Supp. 2d 264 (S.D.N.Y. 2009) ................................................................4

*Gladysiewski v. Allegheny Energy Serv. Corp.*,
  282 F. App'x 979 (3d Cir. 2008) ...................................................................24

*Gordon v. Pasquarello*,
  2023 WL 2505538 (E.D. Pa. Mar. 14, 2023) ....................................................10

*Howard Hess Dental Lab'ys. Inc. v. Dentsply Int'l, Inc.*,
  424 F.3d 363 (3d Cir. 2005) ........................................................................8

*Humana, Inc. v. Indivior, Inc.*,
  2022 WL 17718342 (3d Cir. Dec. 15, 2022) ....................................................8

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977).................................................................................8, 9

*Indep. Tr. Corp. v. Fid. Nat'l Title Ins. Co. of N.Y.*,
  577 F. Supp. 2d 1023 (N.D. Ill. 2008)...........................................................22

*In re Insulin Pricing Litig.*,
  2019 WL 643709 (D.N.J. Feb. 15, 2019) ....................................................12, 18

*In re Insulin Pricing Litig.*,
  2024 WL 416500 (D.N.J. Feb. 5, 2024) .....................................................14, 18

*Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*,
  2023 WL 415092 (D.N.J. Jan. 25, 2023)........................................................16

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  497 F. Supp. 3d 552 (N.D. Cal. 2020)...........................................................16

*Kansas v. UtiliCorp United, Inc.*,
  497 U.S. 199 (1990)...............................................................................9, 10

*Kelley v. Microsoft Corp.*,
  2011 WL 13353905 (W.D. Wash. May 24, 2011) ..........................................18, 19

*Klem v. Wash. Mut. Bank*,
  295 P.3d 1179 (Wash. 2013) ......................................................................19

*Kolar v. Preferred Real Est. Invs., Inc.*,
  361 F. App'x 354 (3d Cir. 2010) .................................................................10

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   27 F. Supp. 3d 447 (S.D.N.Y. 2014) ................................................................23

*M.P.T. Racing, Inc. v. Bros. Rsch. Corp.*,
   2022 WL 1411166 (D.N.J. Apr. 12, 2022) ........................................................16

*Maadanian v. Mercedes-Benz USA, LLC*,
   2024 WL 1579658 (W.D. Wash. Apr. 11, 2024) ..............................................22

*Malmsteen v. Berdon, LLP*,
   477 F. Supp. 2d 655 (S.D.N.Y. 2007) ................................................................4

*McCracken v. Verisma Sys., Inc.*,
   2022 WL 3566682 (W.D.N.Y. Aug. 18, 2022) ................................................17

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S., LLC*,
   2019 WL 1418129 (D.N.J. Mar. 29, 2019) ...................................................9, 21

*MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*,
   2020 WL 831578 (D.N.J. Feb. 20, 2020) .........................................................15

*New York Univ. v. Cont'l Ins. Co.*,
   662 N.E.2d 763 (N.Y. 1995) ............................................................................15

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
   281 F.3d 629 (7th Cir. 2002) ..............................................................................8

*People v. Eli Lilly and Co., et al.*,
   No. 23STCV00719 (Cal. Super. Ct. June 18, 2024) ..........................................7

*Potter v. JPMorgan Chase Bank, N.A.*,
   2012 WL 12941685 (W.D. Wash. June 29, 2012) ...........................................16

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,
   181 F.3d 410 (3d Cir. 1999) ..............................................................................6

*Silvey v. Numerica Credit Union*,
   519 P.3d 920 (Wash. Ct. App. 2022) ...............................................................16

*Singh v. City of New York*,
   217 N.E.3d 1 (N.Y. 2023) ................................................................................15

*Stephens v. Clash*,
   796 F.3d 281 (3d Cir. 2015) ...................................................................6

*Zied v. Barnhart*,
   418 F. App'x 109 (3d Cir. 2011) ...........................................................6

**Statutes**

42 U.S.C. § 1395w-3a(c)(6)(B) ...............................................11, 12, 14

RCW § 43.71C.010 ...............................................................................14

**Regulations**

84 Fed. Reg. 20,732, 20,739 (May 10, 2019) .......................................14

## INTRODUCTION

Payers now *admit* what has long been obvious—and dispositive: that they "knew that Manufacturers paid rebates, creating a gap between list and net prices." Opp. 1, 34. Unlike other insulin-pricing plaintiffs, Payers have no complaint about rebates so long as those rebates are "passed through" to Payers under their contracts with PBMs. *Id*. 2. Payers' new claim is that PBMs were not sharing all rebates. *Id.* 11. They complain that PBMs categorized some of the payments Manufacturers made to PBMs as "fees" (which Payers' contracts allegedly do not require PBMs to pass through) instead of "rebates" (which the contracts allegedly require PBMs to pass through), and thereby kept those funds from Payers.

Payers have thus disavowed the theory they claimed to be advancing in their Complaints and to the JPML: that Manufacturers "artificially inflate the list price" of insulin so they can pay "ever-increasing rebates," creating a "secret 'spread' between published prices and their true net prices" and causing Payers to "overpay for [insulin]." Payers' JPML Br. at 2-4, 9, *In re Insulin Pricing Litig.*, MDL No. 3080 (JPML June 2, 2023), ECF No. 35; King SAC ¶¶ 1-2. Indeed, Payers concede that this theory is untenable, admitting that they *knew* all about rebates and the resulting spread between list and net prices. To be sure, Payers sprinkle buzzwords about supposedly "artificially inflated" and "false" prices throughout their Opposition, and occasionally fall back to defending such a theory. But in their own

words, the "heart" of Payers' case is a dispute about which payments are properly characterized as fees under their contracts with PBMs. Opp. 13.

Payers' new theory is nothing more than a breach of contract claim. It has *nothing* to do with insulin's list prices, with the alleged impact of those prices on consumers, or with Manufacturers at all, who were not parties to—and have never seen—Payers' contracts with PBMs. It is not even about insulin; Payers allege that under their PBM contracts, the rebate pass-through terms for *all* drugs exclude fees. This breach of contract theory cannot survive Manufacturers' motion to dismiss.

*First*, Payers' claims are time-barred. Any claim against *Manufacturers*—if they had one—could only be based on the gap between list and net price that Payers now expressly concede they knew about and that has been public knowledge for years. Payers fare no better with their new theory: they have known of the contractual limitations on pass-through of rebates and fees for decades, because those limitations are in *their own* PBM contracts that Payers themselves bargained for.

*Second*, Payers still cannot get around the indirect purchaser rule, which—as this Court has repeatedly recognized—bars RICO claims by plaintiffs that did not purchase directly from the defendant. Payers invoke the co-conspirator exception, but that exception requires them to have made purchases directly from at least one Defendant—which Payers did not. Regardless, their new theory fails on the merits, since an allegation that PBMs withheld contractually owed rebates is—at most—a

breach of contract claim, not fraud, and is entirely unrelated to Manufacturers.

*Third*, Payers' state-law consumer protection claims—which allege Manufacturers should have provided more detail in their prices—cannot be reconciled with federal law that dictates exactly how Manufacturers report their prices. Those prices are protected by safe harbors and cannot be deceptive. In addition, since Payers' true complaint is that PBMs should have passed through to Payers a larger share of rebates, they are not bringing "consumer-oriented" claims vindicating the "public interest," as required by New York or Washington law.

*Fourth*, Payers' common-law fraud, unjust enrichment, and conspiracy claims fall with the other claims they bring, in addition to failing because Payers did not plead those claims' basic elements.

*Fifth*, Payers confirm that they have not stated a claim with respect to any of Manufacturers' GLP-1s. They argue that GLP-1s have two relevant similarities with insulin that justify their inclusion in the "Insulin Pricing Scheme." Payers are wrong about both and fail to address the many other differences Manufacturers identified.

## ARGUMENT

## I. PAYERS' CLAIMS ARE UNTIMELY.

### A. Payers Have Been On Notice Of Their Claims For Decades.

Payers' Complaints alleged that Manufacturers "artificially inflate[d] the list price of insulin" to make "rebates and other payments" to PBMs in connection with formularies. King SAC ¶¶ 1-2; *see also* Albany SAC ¶¶ 323, 381; Lake FAC ¶¶ 301,

341. But those claims are clearly time barred, since—as Payers concede—they knew everything "disclosed in their contracts," including allegedly "high prices, rebates, formulary practices, and gaps between list and net prices." Opp. 10-12.[1]

Faced with this reality, Payers try to avoid dismissal in their Opposition by discarding almost every aspect of the claims as alleged in their Complaints. They now rest their case on the idea that PBMs are allegedly contractually obliged to give Payers rebates, but that in fact "PBMs were not passing through 100% of rebates." Opp. 11, 13. That claim is time-barred, too. Payers knew about the contractual limits on pass-through well before the limitations period because *their contracts* disclosed those limits since at least 2005. Payers *admit* that their PBM contracts "narrowly define 'rebates'" (which they allege they are entitled to receive from PBMs) and "carve[] out" certain Manufacturer payments (which they allege PBMs can keep).[2]

---

[1] Payers inaccurately assess certain limitations periods. Opp. 9 n.3. Lake's unjust enrichment claim is derivative because it relies on other claims. Mot. 7. Payers' citation to an argument about NYGBL claims is irrelevant. Albany's unjust enrichment claim does not seek equitable relief, and in any event shares the primary claims' limitations period. *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 276 (S.D.N.Y. 2009); *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667-68 (S.D.N.Y. 2007).

[2] *See*, *e.g.*, Lake FAC ¶¶ 410 ("'administrative fees' … are not considered 'rebates'"), 421; King SAC ¶¶ 265 (similar), 320; Albany SAC ¶ 452 (similar); *see also*, *e.g.*, Dkt. 158-1, 2005 PharmaCare-Albany Agreement at 6 ("WellPoint will retain a portion of the rebate payments …."); Dkt. 158-2, 2010 MedCo-Albany Agreement at §6.2 (explaining what "Total Rebates do[] not include"); PBM SFP Mot. Ex. 4, 2015 ESI-Lake Agreement at 3 ("Rebates do not include [four categories of fees]"); *see also* PBM SFP Mot. Ex. 1, 2017 CVS-King Agreement at 5-6 (explaining what "[r]ebates … do not include").

That dooms their claims under all applicable statutes of limitation.

Moreover, Payers' original claim about Manufacturers' "false" and "artificially inflated" list prices is *also* time-barred based on Payers' contracts, Manufacturers' public statements, public congressional investigations, media coverage, and lawsuits this Court has been overseeing since 2017. Mot. 8-13; Opp. 10-14, 34. Payers argue those sources did not trigger a duty to investigate their claims, citing *In re Direct Purchaser Insulin Pricing Litig.*, 2021 WL 2886216 (D.N.J. July 9, 2021), and asserting they could ignore the earlier-filed cases. Both points are wrong.

In *Direct Purchaser*, the notice issue turned on articles that "were not specific to [insulin]." 2021 WL 2886216, at *19. But here, the public articles *are* specific to insulin, and describe all the features of the insulin market that Payers label the "Insulin Pricing Scheme." Mot. 11-12 & nn.11-12. Indeed, Payers concede that those articles provided notice of "high prices, rebates, formulary practices, and gaps between list and net prices"—which explains why consumers could sue nearly eight years ago. *See* Opp. 12; Complaint, *Chaires et al. v. Novo Nordisk et al.*, No. 3:17-cv-699 (D.N.J. Feb. 2, 2017), ECF No. 1. It is not plausible that those consumers' insurers somehow lacked notice of these *same* dynamics until years later.

Nor can Payers argue that they were free to ignore the insulin-pricing suits filed years before the limitations period. Mot. 10 & n.7. Contrary to Payers'

assertion, these suits—which were predicated on the gap between list and net price—were widely publicized. Opp. 13-14; Mot. 9-10 & n.8. Nor can Payers distinguish those cases on the facts. Opp. 13-14. That effort is undermined by their own representation that their cases are "identical" to the first *Insulin Pricing* case and "turn[] on the same facts and legal issues" as the earlier actions. Payers' JPML Br. at 8, 10-11; Opp. 12-13, 33, 40-41, 48. And they repeatedly try relying on decisions in those cases to support their positions. *E.g.*, Opp. 24, 25, 33, 34, 36-37, 39. Payers cannot simultaneously claim that those "identical" cases are so different that they could not have provided notice of the facts underlying their own claims.

It is clear from the Complaints and judicially noticeable documents that Payers had notice of their claims long before the limitations period. Courts routinely dismiss such claims. *See*, *e.g.*, *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.,* 181 F.3d 410, 427 (3d Cir. 1999) (affirming dismissal).

## B.    No Tolling Doctrine Salvages Payers' Claims.

Payers contend that the applicability of tolling doctrines cannot be decided at the pleading stage. Opp. 14. That is incorrect. *See*, *e.g.*, *Stephens v. Clash*, 796 F.3d 281, 291 (3d Cir. 2015); *Zied v. Barnhart,* 418 F. App'x 109, 115 (3d Cir. 2011). And the doctrines Payers cite cannot save their claims.

Payers' invocations of the discovery rule, fraudulent concealment, and equitable estoppel all fail because they require Payers to allege that they were not on

notice before the limitations period—which they have not done. As Manufacturers explained, the continuing violation doctrine applies only to "cumulative" injuries, not the "independent injur[ies]" Payers allege. Mot. 15; Opp. 16. Payers do not respond to, much less refute, that point.[3] They invoke the separate accrual doctrine, but that is equally unhelpful. Even if claims based on purchases *in* the limitations period could survive, earlier claims must be dismissed. Opp. 16-17. And the doctrine should be rejected entirely—as a court in California analyzing this issue recently held—because Payers do not allege a price increase in the limitations period. Order ¶¶ 34-41, *People v. Eli Lilly and Co., et al.*, No. 23STCV00719 (Cal. Super. Ct. June 18, 2024); Albany SAC ¶¶ 273-77; Lake FAC ¶¶ 272-76; King SAC ¶¶ 12, 187.

Nor can the *nullum tempus* doctrine save claims brought by King, the only Payer to raise the doctrine. Mot. 16. King's suit against *Manufacturers* is not "regulatory oversight" of PBMs. Its argument that "overpayments" impact "public services" implies that all damages suits would be sovereign-capacity suits, which is not the law. *City of Moses Lake v. United States*, 430 F. Supp. 2d 1164, 1178 (E.D. Wash. 2006) (city's suit for damages time-barred).

## II.    PAYERS' RICO CLAIMS FAIL ON THEIR MERITS.

---

[3] Their cases are inapposite. *Kermanshah v. Kermanshah* does not discuss the continuing violation doctrine. 580 F. Supp. 2d 247, 264 (S.D.N.Y. 2008). And in *Garron v. Bristol House, Inc.,* the court *rejected* tolling, only allowing "damages incurred within" the limitations period. 162 A.D.3d 857, 859 (N.Y. App. Div. 2018).

### A.    The Indirect Purchaser Rule Bars Payers' RICO Claims.

Payers acknowledge that "only direct purchasers" may recover damages under RICO, and they concede they have not directly purchased any of the at-issue drugs from any Manufacturer. Opp. 18; *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728-29 (1977). That concession is fatal to Payers' RICO claims.

Nevertheless, Payers argue that the indirect purchaser rule should not apply based on a limited exception for purchases from co-conspirators. Opp. 18-22; *Howard Hess Dental Lab'ys. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 376 (3d Cir. 2005). But this exception only applies if Payers are "the *first* purchasers from outside the conspiracy." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631 (7th Cir. 2002). Payers have proposed two versions of the insulin supply chain, but they are not the first non-conspirator purchaser in either.

In the first version, Payers allege that Manufacturers sell insulin to mail-order pharmacies owned by the PBMs, who "directly supply [diabetes medications] to patients." Opp. 5, 19; Albany SAC ¶ 338; King SAC ¶ 83; Lake FAC ¶ 298. But by their own admission, Payers are not "the first non-conspirator" that purchases medications in that supply chain—patients are. Payers' later reimbursements do not transform Payers into direct purchasers. Rather, they are "textbook *indirect*[ ] purchaser[s]" further down the supply chain. *Humana, Inc. v. Indivior, Inc.*, 2022 WL 17718342, at *3 (3d Cir. Dec. 15, 2022) (affirming RICO claims' dismissal).

And this Court has already found that plans (like Payers here) are indirect purchasers. *See MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S., LLC*, 2019 WL 1418129, at \*14-15 (D.N.J. Mar. 29, 2019).

In the second version of the chain, Payers allege Manufacturers first sell insulin to wholesalers. Opp. 21-23. This iteration likewise fails because Payers' beneficiaries *and* wholesalers break the chain. Again, patients—not Payers—purchase the medications at issue. Wholesalers only add another layer of separation, as Payers do not allege that wholesalers conspired with Manufacturers or PBMs.

Allowing Payers, their beneficiaries, and wholesalers all to sue over the same putative overcharge would create "massive efforts to apportion the recovery" among "potential plaintiffs at each level in the distribution chain" that "could have absorbed part of the overcharge." *Illinois Brick*, 431 U.S. at 737. These are not hypothetical concerns: all three groups are currently trying to bring RICO claims.

Payers insist that wholesalers "seek different damages for different injuries." Opp. 22. But that does not help them: the Supreme Court has rejected an exception for indirect purchasers who seek "different, not duplicative, damages." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 212-13 (1990). Payers are also wrong: wholesalers and Payers *do* seek duplicative damages. Wholesalers seek the amount by which the "rebates and … fees" that Manufacturers paid allegedly "artificially inflated" list prices. *See*, *e.g.*, Second Amended Complaint ¶¶ 105-06, *In re Direct*

*Purchaser*, No. 20-cv-03426 (D.N.J. Nov. 8, 2022), Dkt. 261. Payers seek the "[r]ebates," including those "mislabeled" as fees, that Manufacturers paid and that supposedly "artificially inflated" list prices. Opp. 22, 31, 33. Allowing both suits to proceed would create "the very complexity that *Hanover Shoe* and *Illinois Brick* sought to avoid." *UtiliCorp*, 497 U.S. at 200.

### B. Plaintiffs Do Not Allege Any RICO Predicate Act, Much Less One Involving Manufacturers.

Payers' RICO claim—now based exclusively on the allegation that they are entitled to more rebates, which were allegedly mislabeled by PBMs—turns on whether *PBMs* complied with their contractual obligations. Opp. 2, 7, 11. Payers fail to state any predicate act involving *Manufacturers* for three independent reasons.

*First*, under settled law, breaching a contract is not fraud. *See*, *e.g.*, *Kolar v. Preferred Real Est. Invs., Inc.*, 361 F. App'x 354, 363 (3d Cir. 2010) (dismissing RICO claim because "divert[ing] and/or misappropriate[ing] monies ... due and payable" under a contract is not "fraudulent"). A defendant's failure to meet its contractual obligations—much less someone else's—is not a RICO predicate act.[4]

*Second*, Payers' breach theory is not adequately alleged. Payers allege they contractually agreed to the "narrow" "Rebates" definition and "carved out"

---

[4] *See also*, *e.g.*, *Annulli v. Panikkar*, 200 F.3d 189, 199–200 (3d Cir. 1999) ("a simple breach of contract … is not a predicate act") (overruled on other grounds); *Gordon v. Pasquarello*, 2023 WL 2505538, at *31 (E.D. Pa. Mar. 14, 2023).

payments they now complain of.[5] Because Payers allege no facts supporting a "mislabeling" claim, they have not adequately alleged it.

*Third*, even if Payers *had* alleged fraud or breach by the PBMs, Payers have not alleged any RICO predicate act by Manufacturers. A claim that "*PBMs* renamed the Manufacturer Payments" is not a claim against *Manufacturers*. Albany SAC ¶ 445; King SAC ¶ 261; Lake FAC ¶ 423 (emphasis added). And Payers have not identified any representation by any Manufacturer—much less a fraudulent misrepresentation—about how their payments to PBMs should be classified under PBMs' contracts with Payers. This is not surprising: a claim that PBMs did not pay the right amount of rebates is a (contract) claim against PBMs and nothing else.

To be sure, Payers try claiming that Manufacturers' list prices are "false" because (as they allege) PBMs passed some rebates but not others on to Payers. Opp. 2, 34.[6] But Manufacturers have no involvement in what is passed to Payers. And as Payers admit, they know Manufacturers pay rebates, and federal law requires Manufacturers to report WAC before accounting for those rebates, as this Court has previously explained. Opp. at 24-25, 34; *see* 42 U.S.C. § 1395w-3a(c)(6)(B); *In re*

---

[5] Lake FAC ¶ 412 (agreement provided PBM "may pass through certain manufacturer payments to its clients or may retain those payments for itself"); King SAC ¶ 253, 265; *see also* King SAC ¶ 313 (contracts "defined rebates in a manner replete with conditions"); Lake FAC ¶ 411 (discounts and fees are "excluded from the definition of 'rebates'"); Albany SAC ¶ 452 (similar).

[6] Payers assert that they alleged other misrepresentations. *See* Opp. 25. But none of the paragraphs they cite identify allegedly false statements by any Manufacturer.

*Insulin Pricing Litig.*, No. 2:17-cv-699 (D.N.J.), ECF No. 721, at 66. A claim about rebate pass-through has nothing to do with Manufacturers.

Payers' only response is to argue that the federal statute defining WAC is not relevant because it supposedly applies only to Medicaid-reimbursed drugs. Opp. 24-25. Putting aside that these drugs *are* reimbursed by Medicaid, Payers admit that Manufacturers reported WAC prices without subtracting rebates (as federal law requires). *See* Albany SAC ¶¶ 16(c), 331; King SAC ¶ 248; Lake FAC ¶ 12; 42 U.S.C. § 1395w-3a(c)(6)(B). Payers have not explained how those accurate reports could be false. Again, this does not amount to any predicate act by Manufacturers.

Payers' inability to articulate why—on *their* theory—prices are false distinguishes this case from the insulin pricing decisions they cite. Those plaintiffs— and the other MDL Tracks—alleged that prices are false because of the "spread between the 'net price' and [WAC] price." *In re Insulin Pricing Litig.*, 2019 WL 643709, at *2 (D.N.J. Feb. 15, 2019). Setting aside that claim's problems, Payers' claim is different: they say prices are false because they contain "mislabeled rebates." But Manufacturers are not party to Payers' contracts and are not involved with any "labeling" of rebates under those contracts. Payers' argument that Manufacturers' list prices are false because of statements allegedly made by PBMs sets these cases apart from other insulin pricing cases and indeed all precedent.

### C.    Payers Fail To Allege That Manufacturers Conducted Any Enterprise's Affairs.

Payers' RICO claim also fails because each Manufacturer *unilaterally* sets its *own* list prices. This is not cooperation "outside the bounds of [a] normal commercial relationship," as required to allege conduct of an enterprise. Mot. 20. Payers' opposition merely repeats those same unavailing allegations. *See* Opp. 27 (claiming Manufacturers raised and published their own and monitored competitors' prices).

Payers nonetheless contend that Manufacturers conducted the affairs of a RICO enterprise by paying PBMs "kickbacks" and bribes through fees and other retained payments from Manufacturers. Opp. 26-27. But those payments were well within the bounds of a normal commercial relationship, since they were governed by the contracts Payers negotiated and entered into with PBMs, in which according to their own allegations, they *agreed* that PBMs would retain certain amounts. Opp. 1-2, 5, 11; *see also* King SAC ¶¶ 313-26 (PBM had "no contractual obligation" to remit payments that were "carved out" of the definition of "Rebates"); Albany FAC ¶¶ 494-95; Lake SAC ¶¶ 410-12. Manufacturers' payments to PBMs are a routine part of the PBM-Manufacturer relationship, not conduct of an enterprise.

## III.    PAYERS' CONSUMER PROTECTION CLAIMS ARE BARRED.

### A.    State-Law Bars Preclude Payers' Claims.

#### 1.    Manufacturers' Conduct Falls Within Safe Harbors.

Payers' original theory—that the "publicly-available 'list' price" "or WAC," as reported "to publishing compendia," is "false"—is squarely foreclosed by each state's safe harbor. Mot. 23-26. Payers attempt to avoid the safe harbors' application

by arguing Manufacturers' reporting of their list price is not regulated. They contend the federal law that defines "wholesale acquisition cost" comes from a Medicaid regulation, Opp. 24-25 & 29, and the parallel Washington law has "nothing to do with the false prices published on compendia." *Id*. 29 n.10. Those arguments miss the mark. Both laws prescribe the "wholesale acquisition cost" as "reported in … publications of drug … pricing data," 42 U.S.C. § 1395w-3a(c)(6)(B); RCW § 43.71C.010, so the safe harbors protect those reported prices.

If that were not the case, Manufacturers would have to report one list price to the federal government and a different list price to others—even though each of Manufacturers' medicines has a single list price, i.e., the price at which it is sold to wholesalers. *See* Medicare & Medicaid Programs, Regulation to Require Drug Pricing Transparency, 84 Fed. Reg. 20,732, 20,739 (May 10, 2019) (WAC is "a single, manufacturer-published price"). This Court already reached a similar conclusion when it stated that it "does not see" how to require Manufacturers to change that price "without causing [them] to violate federal law." *In re Insulin Pricing Litig.*, 2024 WL 416500, at *28 (D.N.J. Feb. 5, 2024).[7]

### 2.    Albany Cannot Meet The GBL's Requirements.

---

[7] Payers' suggestion that this finding was limited to the "specific injunctive relief requested by th[os]e plaintiffs" (Opp. 29) is unavailing because Payers ask for the *same* relief: an injunction that Manufacturers report "list prices" that are their "actual prices realized." King SAC at 189; Albany SAC at 232; King SAC ¶¶ 439(a), 548(a); Albany SAC ¶¶ 656(a), 708; *cf. Insulin Pricing*, 2024 WL 416500, at *26.

New York's General Business Law protects consumers, not businesses—and not Albany. That is why the law is limited to challenges to "consumer-oriented" conduct and *direct*, not derivative, injuries. *MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*, 2020 WL 831578, at *10 (D.N.J. Feb. 20, 2020); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 1144 (N.Y. 2004). Albany cannot meet those requirements.

This Court has already held that third-party payers cannot pursue claims under the NYGBL. *MSP*, 2020 WL 831578, at *10.[8] That should be the end of it. Although Albany claims it is "a county, not a business," that makes no difference, because it brought suit as a payer. *See*, *e.g.*, Albany SAC ¶¶ 16(a), 27; *Singh v. City of New York*, 217 N.E.3d 1, 7 (N.Y. 2023) (municipality's claim was not consumer oriented). The NYGBL does not cover "private contract dispute[s]," like the complaints Albany makes about PBMs' treatment of rebates. *New York Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 771 (N.Y. 1995) (dismissing NYGBL claim).

If Albany still claims to be injured because it paid "inflated prices," *see* Opp. 30, that injury is derivative. Albany only "pays" insofar as it reimburses costs

---

[8] Neither *Trustpilot Damages LLC v. Trustpilot Inc.* nor *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.* suggest *MSP* was wrong. *Trustpilot* noted without adopting an argument that *Himmelstein* allows "business-to-business" claims. 2022 WL 2124865, at *3 n.5 (2d Cir. June 13, 2022). *Himmelstein* allowed claims directed to "a subclass of consumers" and noted that "private contract disputes" would be barred. 171 N.E.3d 1192, 1197-98 (N.Y. 2021).

15

incurred by its beneficiaries. Albany SAC ¶¶ 564-65. Taking those allegations as true, Albany has failed to distinguish *Blue Cross & Blue Shield*.[9] Albany is a payer identically situated to the payer-plaintiffs in that case, and its claim should also be dismissed. 818 N.E.2d at 1144-45 & 1145 n.3; *see City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838-39 (N.Y. 2009).

### 3.    King Does Not Deny Its Claims Are Barred.

King's claims are not permitted under the WCPA for two reasons. *First,* King cannot bring indirect claims under the WCPA. Mot. 27-28. King fails to respond to that argument, forfeiting the point. *M.P.T. Racing, Inc. v. Bros. Rsch. Corp.*, 2022 WL 1411166, at *2 (D.N.J. Apr. 12, 2022). *Second*, the WCPA only regulates conduct that affects the "public interest." *Potter v. JPMorgan Chase Bank, N.A.*, 2012 WL 12941685, at *6 (W.D. Wash. June 29, 2012) (dismissing WCPA claim). A "breach of a private contract affecting no one but the parties," like PBMs' alleged failure to "pass[] through" rebates, is not a "public interest." *Id*.; Opp. 2, 34.[10]

### B.    Payers Cannot State Deception Claims.

---

[9] In the cases Albany cites, plaintiffs claimed "an independent harm separate from the injuries [of] consumers." *Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*, 2023 WL 415092, at *7 (D.N.J. Jan. 25, 2023); *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 668 (N.D. Cal. 2020) (plaintiff "not seeking to recoup the costs incurred by JUUL users").

[10] *See also Silvey v. Numerica Credit Union*, 519 P.3d 920, 930-31 (Wash. Ct. App. 2022) (affirming dismissal of WCPA claim based on breach of contract); *Blake v. Fed. Way Cycle Ctr.*, 698 P.2d 578 (Wash. Ct. App. 1985).

16

Payers argue that Manufacturers "held their list prices out as reasonable," "mislabeled" rebates, "created the false impression" that rising prices resulted from competition, and "colluded" with PBMs to raise list price and put high-price medications on formulary. Opp. 33-34. Payers do not support these assertions.

To start, Payers have not identified any statement showing "Manufacturers held their list prices out as reasonable." Opp. 33. They alleged only that Manufacturers "published" their list prices. *See*, *e.g.*, Albany SAC ¶¶ 518-20. Publishing a price is "not a representation"; it is just "the amount at which the merchant offers to sell." *Boris v. Wal-Mart Stores, Inc.*, 35 F. Supp. 3d 1163, 1169-70 (C.D. Cal. 2014). Nor is selling a product—even at an allegedly "inflated" price—fraudulent.[11] Additionally, Payers do not (and cannot) allege that *Manufacturers* "mislabeled" rebates; Manufacturers do not make representations to Payers.

Payers' remaining allegations of "false impressions" and "collu[sion]" are characterizations of the rebate-driven market dynamics Payers admit they knew about. Payers knew of the rebate agreements they contend are "collu[sion]" and that rebates impacted list prices. Opp. 33-34. They certainly knew which medications were "exclude[d] … from" *their* formularies, Opp. 34, because *they* "select[ed]"

---

[11] *McCracken v. Verisma Sys., Inc.*, 2022 WL 3566682, at *4 (W.D.N.Y. Aug. 18, 2022) (dismissing NYGBL claim alleging "inflated cost" due to a "kickback scheme"); *Carter v. CIOX Health, LLC*, 2022 WL 3499683, at *3-4 (W.D.N.Y. Aug. 18, 2022) (same).

those formularies. *See* Dkt. 158-3 at 2; PBM SFP Mot. Ex. 2, 2012 ESI-King Agreement at 5. At most, Payers allege they believed they received all of Manufacturers' payments to PBMs and would be "insulated" from any resulting price increases. Opp. 2, 11, 34. But they fail to allege that Manufacturers made any representations about how much PBMs would pass on to Payers.

### C.    King Cannot State A Claim Under The WCPA.

King's effort to defend its WCPA unfairness claim fails for three independent reasons. *First*, price inflation is not a cognizable injury for an *unfairness* claim. Mot. 32-33. King's response that it alleged "false prices" misses the point. Opp. 38. *Absent* a misrepresentation, plaintiffs who pay the price they agreed to pay, for the good they expected, have no injury. *Kelley v. Microsoft Corp.*, 2011 WL 13353905, at *4 (W.D. Wash. May 24, 2011); *Insulin Pricing Litig.*, 2024 WL 416500, at *37.

King asserts incorrectly that *Insulin Pricing* and *Kelley* are inapt because it is not bringing a class action. Opp. 37-38. In its class certification decision, this Court rejected price inflation as a "cognizable theory of damages" for purposes of "*alleg[ing]* an ascertainable loss." 2024 WL 416500, at *37 (emphasis added).[12] And in *Kelley*, the court allowed plaintiffs to pursue a price inflation theory *based*

---

[12] King quotes the *Insulin Pricing* dismissal decision, but not the section on plaintiffs' theory of injury. Opp. 37 (citing *Insulin Pricing Litig.*, 2019 WL 643709, at *15). That analysis, elsewhere in the decision, depended on plaintiffs' claim "that they were misled." *Id.* at *16.

*on deception*. 251 F.R.D. 544, 558 (W.D. Wash. 2008) (plaintiffs alleged consumers "did not receive" what they "paid for"). It later held that class members who pursued a price inflation theory absent a misrepresentation "have not identified [any] injury." *Kelley*, 2011 WL 13353905, at *4. King's unfairness claim is on equal footing with those class members: it agreed to a price and received what it paid for.

*Second*, King's assertion that the WCPA authorizes price-gouging claims is wrong. *See* Mot. 34-36. The Washington legislature did not interpret the WCPA as a price-gouging statute when it declined to regulate price-gouging. The House Bill Report King cites merely notes, without endorsing, testimony to that effect. Opp. 40; ESSB 5191, https://tinyurl.com/2phm9ymj at 4-5.

*Third*, even setting aside those flaws, King fails to state a claim for unfairness under the traditional three-prong test. To start, King makes no effort to establish any legal violation under *Washington* law to satisfy the public-policy prong. *See Klem v. Wash. Mut. Bank*, 295 P.3d 1179, 1186 (Wash. 2013). Moreover, King cannot claim that "inflating prices to fund" rebates satisfies the immorality prong. According to King, it was entirely content with "price increases" allegedly "fuel[ed]" by rebates—as long as King itself was "insulated." Opp. 2, 35. Nor did King believe "a gap between list and net prices" was immoral as long as "all rebates would be passed to" it. Opp. 34. And King cannot allege substantial injury from *Manufacturers*' conduct, because the only injury it claims is *PBMs*' failure to pass rebates through.

19

## IV.    PAYERS FAIL TO ALLEGE COMMON-LAW FRAUD CLAIMS.

Payers cannot satisfy any element of a common law fraud claim. *First*, the list prices Payers originally took issue with, and that Manufacturers report, are *accurate* statements, which cannot support a fraud claim. *See supra*, Part II.B; Mot. 28-30, 40. Payers cannot have been defrauded by any omission about rebates causing a difference between list and net prices, because they knew this difference exists. *See supra*, Part II.B; Mot. 30-31, 40.

*Second*, Payers cannot show intent to induce reliance, since Manufacturers did not make any statements to Payers. Mot. 41. Payers have not disputed this, distinguished Manufacturers' cases, or cited contrary authority.

*Third*, Payers cannot show actual reliance because they did not allege any change in their behavior after the supposed "fraud" was revealed. *See* Mot. 41-42. Payers do not respond to this point either. Opp. 40.

*Fourth*, Payers cannot show any reliance was reasonable because they "knew [about the] gap between list and net prices." Opp. 34. That makes reliance on those prices, as supposedly reflecting "the profits and actual net prices realized by Defendants," unreasonable. King SAC ¶ 200; Albany SAC ¶ 331; Lake FAC ¶ 455; *see* Mot. 42. Payers make three nonresponsive points. They claim reasonable reliance cannot be resolved on a motion to dismiss. Opp. 41. But courts routinely

20

dismiss on that basis.[13] They claim their reliance was "justified ... based on claims of transparency." Opp. 41. But they do not identify any such claims. And they cite *MSP Recovery*, 2019 WL 1418129, at *19. But there, payments to PBMs were allegedly "undisclosed." *Id.* at *3. Here, Payers' contracts allow PBMs to retain certain payments. *See supra*, Part II.C. Payers may not reasonably rely on a statement their contracts contradict. *See* Mot. 42.

## V.    PAYERS FAIL TO STATE UNJUST ENRICHMENT CLAIMS.

Payers' unjust enrichment claims fail for four independently sufficient reasons. *First*, the unjust enrichment claims fall with the underlying claims. Contrary to Payers' opposition, Manufacturers did not argue the unjust enrichment claims were "duplicative," but rather that they "stand or fall" with the underlying claims. *See* Mot. at 42-43. Payers simply deny this, but without support.

*Second,* as Payers admit and this Court has held, many states bar unjust enrichment claims where—as here—the parties did not transact directly. Opp. 43. Payers deny that New York and Washington are such states but fail to address the cases holding otherwise. Opp. 42. Their cited decisions only prove Manufacturers' point. In their New York cases, the parties had far closer relationships than Payers

---

[13] *Dehart v. HomEq Servicing Corp.*, 679 F. App'x 184, 188–89 (3d Cir. 2017) (affirming dismissal for failure to plead justifiable reliance).

do with Manufacturers.[14] And in their sole Washington case, the parties had a *direct* relationship. *Maadanian v. Mercedes-Benz USA, LLC*, 2024 WL 1579658, at \*9 (W.D. Wash. Apr. 11, 2024) (plaintiff purchased from defendant's dealership). Payers here are at the end of a far more attenuated chain. *See* Mot. 17.[15]

Lake argues its indirect claim is permissible because "the defendant procured the benefit … through … wrongful conduct." Opp. 42. To argue this, Lake had to allege that "the property that a third party gave to the defendant"—here, wholesalers' payments for insulin—"belonged to [Lake], in any meaningful sense." *See Indep. Tr. Corp. v. Fid. Nat'l Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1050 (N.D. Ill. 2008); *see* Mot. 44. Lake does not attempt to do so because it cannot.

*Third*, Payers ignore the fact that Manufacturers *did not benefit* from any "mislabeling." *See* Mot. 45. On their theory, Payers are injured only where Manufacturers' payments are not passed to them. Opp. 1, 5, 24, 33-34, 44. Manufacturers do not *benefit* from *paying* money that PBMs keep.

---

[14] In *Choi*, it was "a near statistical certainty that [plaintiffs] directly traded with Defendants." 890 F.3d at 69. And in *Miami*, plaintiffs purchased defendants' products through a distributor. Amended Complaint ¶¶ 9, 163, *Miami Prods. & Chem. Co. v. Olin Corp.*, No. 1:19-cv-00385 (W.D.N.Y. Aug. 23, 2021), Dkt. 335.
[15] This Court should not follow *In re Cardizem CD Antitrust Litig.*, which relied on a case that did not apply New York or Illinois law. 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000). This Court also should not follow *In re DDAVP Indirect Purchaser Antitrust Litig.*, which relied on *Cardizem* despite authority from New York's highest court. 903 F. Supp. 2d 198, 234 (S.D.N.Y. 2012). Neither case authorizes indirect claims under Washington law.

*Finally,* as Payers do not dispute, express contracts bar unjust enrichment claims. Mot. 45; Opp. 44. And the "heart" of Payers' complaint is that "PBMs passed less than 100% of their rebates through" despite "[t]he rebate provisions in [Payers'] contracts." Opp. 11, 13. That is a contract claim.

The cases Payers cite are distinguishable. In *Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, the applicability of an express contract was not raised. 691 F. Supp. 2d 860 (N.D. Ill. 2010). And in the other two cases, the alleged wrongdoing was outside the contract.[16] Here, by contrast, contracts between PBMs and Payers regulate PBMs' alleged pass-through obligations, and any wrongdoing under Payers' theory depends on whether those contracts were followed. *See* Part II.B-C.

## VI.    PAYERS DO NOT STATE CONSPIRACY CLAIMS.

Payers agree that conspiracy is not an independent tort. Opp. 45-46. Since Payers' underlying claims fail, so does their conspiracy claim. Mot. 47. Payers' conspiracy claim independently fails because they have not alleged any unlawful agreement. Payers' only response is that by paying rebates, Manufacturers "acted contrary to their individual interests." Opp. 46. But Payers allege the opposite: Manufacturers (rationally) pay rebates to respond to "formulary exclusion threats"

---

[16] *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483 (S.D.N.Y. 2014) (contracts required defendants to "pay plaintiffs … using … LIBOR"; they did not regulate reports used to set LIBOR); *Allianz Global Investors GmbH v. Bank of America Corp.*, 463 F. Supp. 3d 409, 416 (S.D.N.Y. 2020) (price-fixing allegations did not turn on whether a contract was followed).

from the PBMs so they can preserve Manufacturers' "revenue" and "patient access." *See*, *e.g.*, Albany SAC ¶¶ 316-17; King SAC ¶¶ 29, 213; Lake SAC ¶¶ 352-70.

## VII.  PAYERS DO NOT PLEAD CLAIMS REGARDING GLP-1 .

Payers' arguments against patent preemption are the same as Mississippi's arguments in Dkt. 231 at 13-27, and fail for the same reasons, as Manufacturers will show in their forthcoming reply in support of their Rule 12(c) motion. Dkt. 238.[17]

In any case, Payers fail to state a claim regarding GLP-1s: their allegations show the "Insulin Pricing Scheme" could not have affected GLP-1s because of several key differences between GLP-1s and insulin. Payers address only two differences and neither argument is persuasive.

*First,* Payers claim they "allege[d]" that "the threat of formulary exclusion has … affected GLP-1 prices" like insulin prices. Opp. 48. But none of the allegations they cite suggest GLP-1 exclusions are threatened. For example, they say that PBMs use "*insulin* competitors … to leverage even higher rebates on … *insulin*," Albany SAC ¶¶ 393, 399; Lake FAC ¶¶ 352, 358 (emphases added). That

---

[17] Payers assert that Manufacturers forfeited the preemption argument by incorporating it from Dkt. 200-1. The cases Payers cite do not support them; neither involved cross-references to a brief before the same court. *Curtis v. Treloar*, 1998 WL 1110448 (D.N.J. Aug. 27, 1998); *Gladysiewski v. Allegheny Energy Serv. Corp.*, 282 F. App'x 979 (3d Cir. 2008). Payers do not dispute that the Court's ruling on Dkt. 200 will apply equally to Payers. Repeating the same arguments would waste the Court's time. For the same reason, Manufacturers' Dormant Commerce Clause argument is not waived. *See* Opp. 39 n.14.

insulin-related allegation does not state a claim regarding *GLP-1s*.

*Second*, Payers suggest GLP-1s' admitted "novelty" "has no legal import," citing *Insulin Pricing*'s inclusion of "New Insulins" in the "Insulin Pricing Scheme." 2020 WL 831552, at *4 (D.N.J. Feb. 20, 2020). But Defendants there did not argue that those insulins' novelty protected them from the market dynamics that allegedly drive the "Insulin Pricing Scheme"; they only argued that it had not affected their prices yet. *Id.*; *see also Insulin Pricing* Dkt. 263-1 at 11-12. Here, Payers' allegations show that GLP-1s' novelty means they are not subject to those dynamics at all: they allege that GLP-1s are on-patent, have higher production costs, and required a massive R&D investment. Mot. 50. Payers do not deny that these features distinguish GLP-1s from insulins.

Manufacturers identified many unique features of insulin that Payers allege drive the supposed "scheme." Mot. 49. The only similarities between them are that Manufacturers sell both and rebates create a difference between list and net price. Mot. 50. If that were a basis for a claim, every branded medication sold by every manufacturer in the United States would be in the "scheme." Payers do not even address, much less try to refute, that point. Their GLP-1 claims should be dismissed.

## CONCLUSION

Respectfully, the Court should dismiss Payers' claims with prejudice.

Dated:    August 15, 2024                  Respectfully submitted,

_/s/ Brian W. Carroll_                     _/s/ Liza M. Walsh_

**McCARTER & ENGLISH, LLP**                **WALSH PIZZI O'REILLY**
Brian W. Carroll                           **FALANGA LLP**
Four Gateway Center                        Liza M. Walsh
100 Mulberry St.                           Katelyn O'Reilly
Newark, NJ 07102                           Three Gateway Center
(973) 639-2020                             100 Mulberry St., 15th floor
                                           Newark, NJ 07102
                                           (973) 757-1100

**DAVIS POLK & WARDWELL LLP**              **JONES DAY**
James P. Rouhandeh (_pro hac vice_)        Michael R. Shumaker (_pro hac vice_)
David B. Toscano (_pro hac vice_)          Julie E. McEvoy (_pro hac vice_)
450 Lexington Ave.                         William D. Coglianese (_pro hac vice_)
New York, NY 10017                         51 Louisiana Ave. NW
(212) 450-4000                             Washington, DC 20001
                                           (202) 879-3939

**DAVIS POLK & WARDWELL LLP**
Neal A. Potischman (_pro hac vice_)
Andrew Yaphe (_pro hac vice_)
1600 El Camino Real
Menlo Park, CA 94025
(650) 752-2000

_Attorneys for Defendant Novo Nordisk_     _Attorneys for Defendant Sanofi-_
_Inc._                                     _Aventis U.S. LLC_

Respectfully submitted,

*/s/ Melissa A. Geist*

**REED SMITH LLP**
Melissa A. Geist
Julia A. López
506 Carnegie Center, Suite 300
Princeton, NJ 08540
(609) 514-5978

**KIRKLAND & ELLIS LLP**
James F. Hurst (*pro hac vice*)
Andrew A. Kassof (*pro hac vice*)
Robert B. Ellis (*pro hac vice*)
Diana M. Watral (*pro hac vice*)
Ryan Moorman (*pro hac vice*)
Jason A. Feld (*pro hac vice*)
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 862-2000

*Attorneys for Defendant Eli Lilly and Company*

## CERTIFICATE OF SERVICE

I certify that I am Attorney at Law of the State of New Jersey and a Member of the Bar of this Court and that on this date I caused a copy of this document to be served on the counsel of record in the above-captioned matter via email.

By:  */s/ Melissa A. Geist*
Melissa A. Geist

Dated:  August 15, 2024
Princeton, New Jersey