# EXHIBIT 3

1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**
9                    **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11   People of the State of California, et al.
          v.                                          MDL No. 3047
12   Meta Platforms, Inc., Instagram, LLC, Meta
     Payments, Inc., Meta Platforms Technologies,     Case No. 4:22-md-03047-YGR
13   LLC                                                        4:23-cv-05448-YGR
                                                                4:23-cv-05885-YGR
14   ---------------------------------------------             4:24-cv-00805-YGR

15   Office of the Attorney General, State of Florida,  **STATE ATTORNEYS GENERAL'S**
16   Department of Legal Affairs                        **MOTION FOR RELIEF FROM**
          v.                                            **NONDISPOSITIVE PRETRIAL ORDER OF**
17   Meta Platforms, Inc., Instagram, LLC., Meta        **MAGISTRATE JUDGE**
     Payments, Inc.
18   ---------------------------------------------

19   State of Montana, *ex rel.* Austin Knudsen,        Judge: Hon. Yvonne Gonzalez Rogers
     Attorney General
20        v.                                            Magistrate Judge: Hon. Peter H. Kang
     Meta Platforms, Inc., Instagram, LLC, Facebook
21   Holdings, LLC, Facebook Operations, LLC,
     Meta Payments, Inc., Meta Platforms
22   Technologies, LLC, Siculus, Inc.

23   ---------------------------------------------

24   IN RE: SOCIAL MEDIA ADOLESCENT
     ADDICTION/PERSONAL INJURY
25   PRODUCTS LIABILITY LITIGATION

26   THIS DOCUMENT RELATES TO:
     4:22-md-03047; 4:23-cv-05448; 4:23-cv-05885;
27   4:24-cv-00805

28

---

1

The State Attorneys General, as chief law officers of their respective states, are charged with enforcing state consumer protection laws that protect their citizens from unscrupulous businesses. To do this effectively, they are empowered by state statute to pursue these actions independently of any other state agency or officer. But Meta has sought to disrupt this balance of internal state organization by insisting that the AGs themselves produce documents held by more than 270 independent nonparty state agencies—including state governors—through party discovery. By incorrectly concluding that the AGs, even when acting in their independent enforcement capacity, have legal control over unrelated state agencies' documents, the order granting in part Meta's request, Doc. 1117, is both "clearly erroneous" and "contrary to law." Fed. R. Civ. P. 72(a). The order misapplies the Ninth Circuit's standard for determining legal control of documents, *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999), misapprehends the role of independent AGs, and ignores the overwhelming weight of federal authority that respects state sovereignty. If allowed to stand, the order places the AGs in the impossible position of responding to discovery seeking documents which they have no legal right to access.

The order requires AGs to approach nonparty state agencies and officials for whom other non-consumer protection attorneys employed by their offices *may* serve as counsel in unrelated matters, demand to search their records, and seize whatever documents may be responsive to Meta's sweeping party discovery requests. These nonparties have no role in investigating or prosecuting this action, no right to any relief that may be secured by the AGs, and no firsthand knowledge of the alleged acts and omissions that gave rise to the claims in this action. And if they do not acquiesce to such unprecedented demands and seizures, the AGs risk being sanctioned by this Court despite having no legal right to force any nonparty to comply with the Court's order (except for those tools equally available to Meta, such as Rule 45 subpoenas).

At bottom, Meta seeks to force the AGs to serve as its agents for obtaining documents from independent nonparties, rather than following through itself on Rule 45 subpoenas— subpoenas that Meta has already issued to 141 state agencies and officials during the pendency of this dispute, Doc. 1120, pp. 13-14; Doc. 1110, pp. 2-8, who are working with their own counsel

1   to respond. Such an order conflicts with the Ninth Circuit's authority on what constitutes

2   "control" of documents, unnecessarily erodes the core tenet of federalism by requiring the federal

3   courts to wade into the domain of how the states organize their executive agencies and authority,

4   and places extraordinary burdens on AGs pursuing consumer protection enforcement actions in

5   federal court that ultimately will impede their ability to prosecute such actions to protect the

6   public.

7   **I. Statement of the portions of the Magistrate Judge's order to which an objection is made**

8       The AGs object to the shared portions and conclusion of the order. Doc. 1117, pp. 1-42,

9   248. The AGs also each object to the portions of the order addressing their respective states.

10      Meta first indicated its intention to take discovery of nonparty state agencies in a January

11  25, 2024, discovery case management conference. Jan. 25, 2024 DMC Tr. at 139:24-141:9.  On

12  February 27, 2024, Meta issued its First Set of RFPs to the State AGs, defining the "Plaintiff" or

13  "You" as a broad swath of state entities including: "the executive . . . branch[], agencies, offices,

14  departments, divisions, commissions, committees, agents, employees, boards,  . . . [and]

15  administrators, . . . including but not limited to [certain enumerated agencies]." The parties

16  conferred about aspects of this issue and sought the Court's guidance at Discovery Management

17  Conferences in February and March. Feb. 22, 2024 DMC Tr. at 30:16-38:4; Mar. 21, 2024 DMC

18  Tr. at 5:13-18:9. Per the Magistrate Judge's Discovery Standing Order, the AGs submitted a

19  single 2.5-page letter brief expressing their joint position opposing the issuance of party discovery

20  requests to nonparties. Doc. 685. The Magistrate Judge later ordered each AG to submit a single

21  page letter brief articulating their state-specific positions and law. Mar. 21, 2024 DMC Tr. at 6:7-

22  9:4; Doc. 736. In response to the AGs' request, the Court allowed oral argument, but discouraged

23  State AGs from appearing, stating it hoped no more than eight State AGs would appear. Apr. 22,

24  2024 DMC Tr. at 7:6-11. Given the Magistrate Judge's stated preference for limited argument, six

25  AGs presented argument on this issue. *See generally* May 6, 2024 DMC Tr. Despite the

26  Magistrate Judge limiting page counts and discouraging argument, the order addressed a number

27  of issues that the AGs never briefed nor argued.

28

Even though the AGs informed Meta they did not represent the state agencies as early as January 25, 2024, DMC Tr. at 141:14-143:16, Meta delayed issuing any Rule 45 subpoenas to state agencies for nearly six months—until July 17, 2024. This delay came after the Magistrate Judge repeatedly pointed out to Meta that it was making a tactical choice not to issue subpoenas during the pendency of the dispute, even to the subset of agencies from which it most wanted information. Feb. 22, 2024 DMC Tr. at 37:8-23; Apr. 22, 2024 DMC Tr. at 7:20-9:11; May 6, 2024 Hearing Tr. At 103:9-104:9. As of the date of the order, Meta represented that approximately 40% of the agencies who had contacted Meta in response to subpoenas were represented by State AGs, while the majority were presumably represented by counsel outside of the State AGs. Doc. 1120 p. 14.

**II. Statement of the Court action requested**

The order holds that AGs who bring actions in their independent enforcement capacities have control over documents in the custody of nonparty state agencies and officials that have no role in the enforcement action, but whom the AGs' offices *may* represent in different capacities on unrelated matters. This holding conflicts with the Ninth Circuit's binding precedent, is based on a misreading of state laws, and ignores the overwhelming weight of federal authority on this issue. The AGs ask the Court to hold that this conclusion is "clearly erroneous" and "contrary to law." Fed. R. Civ. P. 72(a). Further, the AGs ask the Court to hold that Meta has failed to meet its "burden of proving that the [AGs] ha[ve] such control," *United States v. Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989), and deny Meta's request to seek party discovery from state agencies under Rule 34.

The State AGs request oral argument on their common objections to the order. As of the filing of this motion, 21 State AGs request oral argument to address the order's state-specific conclusions.

**III. Statement of the reasons and authority supporting the motion**

**A. Common Arguments**

**1. The AGs are independent state officials that do not have "legal control" over the documents of independent state agencies.**

Under the Federal Rules of Civil Procedure, in response to a valid discovery request, a party must produce only what is within its "possession, custody, or control." Fed. R. Civ. P. 34. Relevant here, Ninth Circuit authority holds that "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litig.*, 191 F.3d at 1107 (citation omitted). "[P]roof of theoretical control is insufficient; a showing of actual control is required." *Id.* The Ninth Circuit has expressly refused "to define 'control' in a manner that focuses on the party's practical ability to obtain the requested documents." *Id.* As the Ninth Circuit explained, the legal control test is the proper standard because "[o]rdering a party to produce documents that it does not have the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of getting those documents." *Id.* at 1108. "The party seeking production of the documents . . . bears the burden of proving that the opposing party has such control." *Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d at 1452.

Here, the order relies entirely on a legally flawed foundational premise that the AGs have the legal right to obtain agency documents on demand because an AG is "presumptively counsel for its state agencies." Doc. 1117, p. 27. This is contrary to law for at least four independent reasons: (1) it fundamentally misapprehends the role of AGs acting as outside counsel to independent state agencies; (2) it misapplies controlling Ninth Circuit authority; (3) it disregards federal authority respecting state sovereignty in this context; and (4) it disregards the structure of state governments.

**a. The order fundamentally misapprehends the role of AGs acting as outside counsel to independent state agencies.**

The order erroneously treats all state agencies and officials, and the AGs who may represent them in unrelated matters, as a monolith. AGs have two distinct and separate roles. On the one hand, AGs bring lawsuits, such as this one, in their independent enforcement capacities under their states' respective consumer protection laws and under federal laws like COPPA. The decisions to pursue these actions are typically made by AGs as statewide elected officials,[1]

---

[1] New Jersey's AG is appointed, not elected, *see* N.J. Const. Art. V, Sec. 4, Para. 3, but nevertheless has the independence to interpret state law and decide which cases to prosecute or

(continued…)

1   independent of the governor and executive branch agencies. *See United States v. Am. Express*
2   *Co.*, No. 10CV04496, 2011 WL 13073683, at *2 (E.D.N.Y. July 29, 2011); *see also People ex*
3   *rel. Lockyer v. Superior Court*, 19 Cal. Rptr. 3d 324, 337 (Cal. Ct. App. 2004) ("[S]tate agencies,
4   in the ordinary course of their duties, are distinct and separate governmental entities, third parties
5   under the discovery statutes that can be compelled to produce documents only upon a
6   subpoena."). On the other hand, some AGs are statutorily mandated to counsel or represent
7   certain state agencies and other officials, at least some of the time in certain circumstances. *See*
8   *Am. Express Co.*, 2011 WL 13073683, at *2. Those agencies and officials are typically housed
9   within a state's executive branch and in many cases report to separately elected constitutional
10  officers, like the state's governor. In the first role, AGs act as independent elected officials; in the
11  second role, AGs act as counsel to their clients. *Id.* at *2-3. AGs have different authority, rights,
12  and obligations depending on the function they perform. As relevant here, when AGs are
13  exercising their independent enforcement authority, they are not acting as agency counsel and
14  certainly do not have any legal right to access documents. *See*, *e.g.*, Docs. 738-8 (GA); 738-16
15  (ME); 738-20 (MO); 738-22 (NE); 738-27 (OH).[2]

16      The order fails to grapple with these dual roles, including by holding that if one lawyer in
17  an AG's Office represents an agency, the entire office represents that agency. Doc. 1117, p. 39.

18  _____

19  defend. The Hawaiʻi AG is also appointed, not elected. Haw. Rev. Stat. § 26-31 ("each principal
    department shall be headed by a single executive, who shall be nominated and, by and with the
20  advice and consent of the senate, appointed by the governor[.]"). But the Hawaiʻi AG may not be
    removed by the Governor without the consent of the state senate. Haw. Rev. Stat. § 26-31. The Maine
21  Attorney General is elected by the state legislature. Me. Const. art. IX, § 11. So, these AGs
    exercise a similar level of independence from state governors as elected AGs. *Cf. Am. Express*
22  *Co.*, 2011 WL 13073683, at *2 n.5 (discussing independence of non-elected New Hampshire and
    Tennessee AGs).

23      [2] Indeed, in some cases, AGs' offices do not or would not represent the agencies in
24  question. *See*, *e.g.*, Doc. 738-7 (FL AG requires agreement to represent agency); 738-13 (KS
    agencies represented by independent counsel, not AG); 738-14 (KY AG does not represent
25  agencies in question); 738-15 (most LA agencies, including those in question, represented by
    independent counsel). In other cases, agencies are not required to seek representation by their
26  state AG. *See*, *e.g.*, Docs. 738-3 (CA); 738-19 (MN); 738-24 (NY); 738-30 (RI). This is contrary
    to what was said in the order. Doc. 1117 at 31 ("it appears that all (or virtually all) of the state
27  Attorneys General will represent both the named plaintiff and the state agencies at issue…").
    Only in certain states is agency representation mandatory. *See*, *e.g.*, Docs. 738-4 (CO); 738-9
28  (HI). The order similarly misconstrues or disregards state laws which explicitly state that AGs do
    not control agency documents, see, e.g., Docs. 738-6 (DE); 738-31 (SC).

That conclusion is contrary to a number of state laws and inconsistent with state sovereignty because it disregards how state legislatures have chosen to organize AGs' offices. *Colorado v. Warner Chilcott Holdings Co. III*, No. CV 05-2182, 2007 WL 9813287, at *4 (D.D.C. May 8, 2007) ("For reasons of federalism and comity, [courts] give great deference to the State and its Legislature to define how governmental entities are to be separate and distinct and how they relate to one another as a whole; this is 'uniquely an exercise in state sovereignty.'" (citation omitted)). For example, some AGs' Offices can and do separately represent state agencies that are adverse to one another, *see, e.g.*, Doc. 738-9 (HI), 738-23 (NJ), and can and do act adverse to state agencies they may otherwise represent, *see, e.g.*, Doc. 738-8 (GA); 738-14 (KY); 738-24 (NY); 738-26 (ND), demonstrating that one lawyer's representation of an agency cannot necessarily be imputed to the entire office.

Based on these erroneous applications of state law, and contrary to the Ninth Circuit's holding in *Citric Acid*, the order holds that a federal court's inherent authority to manage discovery allows it to require AGs acting in their independent enforcement capacity to access and produce the documents of state agencies and other officials. *See* Doc. 1117, p. 9. This is legal error. As is true here, those state agencies and officials are not parties to independent AG enforcement actions and so are not bound by a court's discovery orders in those cases. *See*, *e.g.*, *Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1222 (9th Cir. 2018) (holding that "a nonparty's attendance generally can be compelled only by subpoena" (citation omitted)). And the order fails to identify any legal right that the AGs could assert to obtain the documents of such agencies. *See In re Citric Acid Litig.*, 191 F.3d at 1108 ("Ordering a party to produce documents that it does not have the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of getting those documents."). While AGs could perhaps submit open records requests or subpoena state agencies to seek those documents, those paths are equally available to parties like Meta, and in no way constitute a "right to obtain documents *on demand*" as required by *Citric Acid*.[3] *Id.* at 1107 (emphasis added).

---

[3] The order cites *Flagg v. City of Detroit*, 252 F.R.D. 346, 355–57 (E.D. Mich. 2008), addressing a public records law and legal control. This case is inapplicable here, as it examines a public entity's right to access documents from a nonparty contractor.

If the order is upheld, every state agency would be subject to burdensome party discovery every time an AG initiated a consumer protection suit in federal court. Imagine a payday lender sued by an AG demanding to access the governor's documents through party discovery. Under the order, the AG would be required to obtain the documents, even if the governor declined to provide access, merely because the AG *might* represent the governor in an entirely different capacity. If the governor refused to provide the documents, the AG would risk sanctions from the court for failing to produce party discovery. This cannot be the consequence of the AGs availing themselves of the right to bring federal claims and related state claims in federal court and would leave those enforcement actions "vulnerable to a virtual veto by one or more independent [state] agencies." *United States v. Am. Tel. & Tel. Co.*, 461 F. Supp. 1314, 1336 (D.D.C. 1978).

**b. The order misapplies controlling Ninth Circuit authority.**

The order commits further legal error, in contravention of binding Ninth Circuit authority, *Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d at 1452, by improperly shifting the burden away from the propounding party (Meta) and placing it on the AGs to establish a *lack* of control. This legal error is repeated dozens of times throughout the order. *See*, *e.g.*, Doc. 1117, pp. 47, 57, 61, 65, 78, 85, 89, 95, 100, 105, 111, 116, 120, 128, 141, 148, 154, 166, 176, 182, 188, 195-96, 213, 219, 225-26; *but see*, *id*., p. 5 (noting, but not applying, proper burden). The fact that AGs might not be legally *prohibited* from seeking state agency documents does not mean that the AGs have the legal right to demand those documents and enforce their demands as required by *Citric Acid*. This improper burden shifting also led the Magistrate Judge to erroneously conclude that State AGs would represent agencies in responding to discovery in the vast majority of states where agency representation is not mandatory, *see* Doc. 738-1 (Category 2), without any evidence of how the agencies had exercised their discretion to select their counsel in responding to the dozens of subpoenas that had been served, and before nearly half of the agencies had yet to receive subpoenas. *See*, *e.g.*, Doc. 1117, pp. 51, 111, 144. As Meta appears to admit, the majority of agency counsel with whom they have been negotiating their Rule 45 subpoenas do not work at State AGs' offices. Doc. 1120, pp. 13-14 ("Meta calculates that, so far, over 40 percent of the state entities that have been in contact with Meta's counsel regarding a subpoena are being

8

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1    represented by the relevant State AG's Office.").

2          In any event, as discussed below, even if an AG were to act as outside counsel to a

3    nonparty agency, the attorney-client relationship in no way provides the AG as a law office with

4    the "legal right" to access nonparty clients' documents for requests propounded on the AG. *See*

5    *Am. Express Co.*, 2011 WL 13073683, at *3 ("[T]he State Attorneys General have no more power

6    to acquire documents from the non-party agencies than any law firm representing a client.").

7    Certainly, AGs cannot access nonparty documents any more than Meta's counsel in this matter,

8    Covington & Burling LLP, could legally access the documents of its numerous other nonparty

9    clients if the AGs were to seek those documents through discovery propounded on Meta or its

10   counsel. *See id*. ("Without question, the private firms here would strenuously object if in bringing

11   a law suit on behalf of one client (or even in their own name) their adversary sought documents

12   belonging to another client as party discovery.").

13         **c. The order disregards federal authority on state sovereignty.**

14         The order ignores the great weight of federal authority, relying instead on inapplicable and

15   unpersuasive cases.

16         The vast majority of federal courts to consider this issue in this context have held that

17   AGs lack legal control over independent state agency documents. *See In re Gold King Mine*

18   *Release in San Juan Cnty., Colorado*, 2021 WL 847971 at *3 (D.N.M. Mar. 5, 2021) ("The

19   United States has not cited any New Mexico law showing that the New Mexico Attorney General

20   has the power to compel other state agencies to produce documents."); *United States v. Novartis*

21   *Pharms. Corp.*, No. 11-8196, 2014 WL 6655703, at *9 (S.D.N.Y. Nov. 24, 2014) (holding that

22   "the mere fact that a state or a state agency sues does not mean that the records of all state

23   agencies may be discovered using Rule 34's tools"); *Am. Express Co.*, 2011 WL 13073683, at *2

24   ("[S]tate agencies—even those that are part of the executive branch—are neither subject to

25   common executive control nor interrelated with the State Attorneys General, and so should not be

26   aggregated together for discovery purposes."); *Warner Chilcott Holdings Co. III, Ltd.*, 2007 WL

27   9813287 at *4 (declining to order state AGs to produce discovery from state agencies because

28   AGs initiate actions "under their own authority" and agencies were not parties to litigation); *cf.*

9

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1  *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 266 (N.D.N.Y. 2006)

2  (warning of absurd, unduly burdensome, and untenable results if state agencies were subject to

3  discovery requests any time the State of New York brought a lawsuit). State courts largely agree.

4  *See Commonwealth v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.,* No. 2011-2811, 2012 WL

5  5392617, at *3 (Super. Ct. Mass. Oct. 5, 2012) (holding MA AG's office did not have control

6  over documents of other state agencies in enforcement action under state law); *People ex rel.*

7  *Lockyer*, 19 Cal. Rptr. 3d at 337.

8         Ignoring this weight of case law, the order relies heavily on two inapposite decisions: *In*

9  *re Generic Pharms. Pricing Antitrust Litig.*, 699 F. Supp. 3d 352, 355 (E.D. Pa. 2023), and

10  *Illinois ex rel. Raoul v. Monsanto Co.*, No. 22 C 5339, 2023 WL 4083934 (N.D. Ill. June 20,

11  2023). But *Generic Pharms* is an outlier decision and simply does not stand for the sweeping

12  proposition that AGs bringing independent enforcement actions have legal control over all state

13  agency documents. In *Generic Pharms*, various states brought antitrust actions against 20

14  pharmaceutical companies alleging a conspiracy to minimize competition in the generic drug

15  industry. When those companies sought party discovery from state legislatures and state agencies,

16  the Special Master found the request overbroad and limited it to a narrower set of requests. 699 F.

17  Supp. 3d at 355-56. On review, the District Court rejected in part and adopted in part the Special

18  Master's recommendation, concluding the AGs did control certain state agency documents. *Id*. at

19  357-61. The court concluded: (1) all of the states brought the antitrust actions in the name of the

20  state, not the name of the AG, and so acted in a representative capacity rather than as a party; (2)

21  generally, state agencies stood to benefit from the lawsuit; and (3) at least some states sought

22  damages on behalf of specific state agencies. *Id*. at 356-57, 360. None of that reasoning applies

23  here, where AGs bring these actions independently, to vindicate the interests of citizen

24  consumers, not state agencies.[4] Multistate Complaint, Doc. 73-2 ¶¶ 21 ("The Filing States bring

25  this action pursuant to the authority conferred on the State Attorneys General" to enforce "their

26  ───────────────
          [4] As addressed in the New Jersey specific portion of this motion, unlike the other states,
27  the New Jersey AG and the Acting Director of the Division of Consumer Affairs are both named
    plaintiffs in this matter. The analysis in this subsection therefore does not apply in full to New
28  Jersey.

respective states' Unfair and Deceptive Acts and Practices statutes.");[5] 12 ("Meta's unlawful acts and practices affect a significant number of consumers in the Filing States."). Additionally, the AGs do not seek damages on behalf of state agencies here. Doc. 685, p. 8. And even were those critical distinctions not present, nothing about the limited discovery permitted in *Generic Pharms* supports the unprecedented conclusion that AGs offices engaged in independent enforcement actions have control of all documents of all state agencies.[6]

And *Monsanto* is distinguishable because the AG coordinated with interested agencies in that case, named those agencies in the complaint, and sought damages that would compensate some of those agencies. *Monsanto,* 2023 WL 4083934, at *2. There, the court held specifically that the Illinois AG "has a legal right to obtain responsive documents *from the state agencies referenced in the Complaint.*" *Id.* at *5 (emphasis added). Here, the AGs do not bring this lawsuit on behalf of any state agencies or seek damages on behalf of state agencies. Doc. 685, p. 8.

**d. The order disregards the structure of state governments.**

The order errs by concluding that because the State AGs are parties in this case, party discovery obligations extend to the entire state government. Doc. 1117, p. 17. This argument puts form over substance, relying on the complaint's caption to find that this case is brought on behalf of state governments,[7] even though the AGs specifically plead that they bring this case to protect the interests of their states' consumers, not those of state agencies. Multistate Complaint, Doc.

---

[5] Not all states have brought claims under their Unfair and Deceptive Acts and Practices statutes.

[6] Additionally, the Third Circuit's definition of a "legal right to obtain documents on demand" is broader than that described in *Citric Acid*. Third Circuit precedent finds legal control satisfied when a closely related corporate subsidiary party "can secure documents of the [nonparty] principal-parent to meet its own business needs and documents helpful for use in the litigation," in effect, when the party has the practical ability to obtain documents from the nonparty. Doc. 1117, p. 37 (citing *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140–41 (3d Cir. 1988)). Such "practical ability" reasoning is inconsistent with *Citric Acid*'s plain holding. *See id.* (noting it has been rejected by courts in the Northern District) (citing *Seifi v. Mercedes-Benz U.S.A., LLC*, No. 12-CV-05493TEH (JSC), 2014 WL 7187111, at *2 (N.D. Cal. Dec. 16, 2014); *Dugan v. Lloyds TSB Bank, PLC*, No. 12CV02549WHANJV, 2013 WL 4758055, at *2 (N.D. Cal. Sept. 4, 2013)). The limited explanation of the AGs' purported legal right to obtain nonparty agency documents in *Generic Pharms*' reflects this different standard, and the decision is therefore inapposite.

[7] Not all states are represented on the caption; in some instances, the AG alone is listed.

1   73-2 ¶¶ 21; 12.

2       In any event, this conclusion relies on two distinguishable cases holding that one *federal*

3   agency has control of another *federal* agency's documents. *Harvey Aluminum (Inc.) v. N.L.R.B.*,

4   335 F.2d 749, 754 (9th Cir. 1964) (holding that the National Labor Relations Board was required

5   to produce statements possessed by the Department of Labor and the Department of Justice);

6   *Bank Line v. United States*, 76 F. Supp. 801, 803–04 (S.D.N.Y. 1948) (holding that the

7   Department of Justice, Department of Treasury, and Department of Navy were "agencies of one

8   government, possessed, theoretically, at least, of a single will"). In reaching this conclusion, the

9   *Harvey Aluminum* court explained, "the Departments of Justice and Labor are not sovereign, and

10  though the Board may not be able to compel them to produce documents in their possession, the

11  President . . . may do so." 335 F.2d at 754. However, the AGs differ from the heads of federal

12  agencies in one critical regard: in the states' divided executive structures, AGs are independently

13  elected. While the President can order the United States Attorney General to produce documents,

14  the governor of a state cannot order the state's independently elected AG to produce documents.

15  And by that same logic, the independently elected AG cannot order an executive branch agency,

16  which reports to the governor, to produce its documents. *Cf. United States v. AT&T,* 461 F. Supp.

17  1314, 1334–36 (D.D.C. 1978) (granting party discovery of executive branch agencies in US DOJ

18  antitrust action, but denying party discovery of independent agencies).

19      **2. Even when acting as outside-agency counsel, AGs do not have "legal control" of**

20      **client-agency documents.**

21      In some circumstances, AGs may serve as outside counsel to various state agencies. The

22  order relies on this possibility to incorrectly hold that AGs will act as agency counsel in this

23  matter and to hold that the inherent nature of the attorney-client relationship grants the attorney

24  "legal control" over client documents to produce in litigation where the client is not a party. Doc.

25  1117, pp. 27, 31. This is contrary to law.

26      The AGs agree that attorneys have a duty to supervise their clients' collection of

27  documents in discovery, when those clients are named as parties to a lawsuit in which they are

28  represented by AGs. Doc. 1117, p. 25. But this non-controversial principle does not mean that

1   attorneys have "the legal right to access those documents." Doc. 1117, p. 27; *contra, e.g., Am.*

2   *Express Co.*, 2011 WL 13073683, at *3 ("[T]he State Attorneys General have no more power to

3   acquire documents from the non-party agencies than any law firm representing a client."). The

4   order cites no Ninth Circuit caselaw supporting this proposition (and the AGs have found none),

5   instead citing to a single case standing for the general principle that "legal duties are logically

6   antecedent to legal rights." *Newman v. Sathyavagglswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002).

7        While a lawyer has a duty to supervise even an uncooperative client's collection of

8   documents, there is no authority providing a lawyer with the legal right to access their client's

9   documents. Indeed, the professional duties of lawyers prohibit them from forcibly taking their

10   client's documents and providing them to another party. *See* ABA Model Rule of Professional

11   Conduct 1.2(a) ("[A] lawyer shall abide by a client's decisions concerning the objectives of

12   representation and . . . shall consult with the client as to the means by which they are to be

13   pursued."); *see also In re Perle*, 725 F.3d 1023, 1027 (9th Cir. 2013) ("Ordinarily, a lawyer is a

14   client's agent."). And for good reason—an attorney cannot effectively counsel a client if the

15   client does not trust the attorney to act in their best interest.

16        In reaching its erroneous conclusion, the order relies on out-of-circuit cases decided under

17   a "practical ability" test rejected by *Citric Acid* and which are otherwise inapposite. For example,

18   the order cites to a single unpublished case holding that "an attorney is presumed to have control

19   over documents in its client's possession." Doc. 1117, p. 31 (citing *Perez v. Perry*, No. SA-11-

20   CV-360-OLG-JES, 2014 WL 1796661, at *2 (W.D. Tex. May 6, 2014)). But that case relies on

21   the "practical ability" test and thus is inapplicable here. *See Perez*, 2014 WL 1796661, at *1.

22        To support the incorrect conclusion that AGs have control of client documents, the order

23   also relies on a series of inapposite prison civil rights cases. *See* Doc. 1117, pp. 28, 32-33. In

24   those cases, AG offices acted in their outside counsel capacity representing named prison official

25   defendants and courts imputed party or attorney control over documents of state departments of

26   corrections which employed the prison officials. *Id.* These cases are not binding, do not use the

27

28

---

13

1   *Citric Acid* "on demand" test,[8] and moreover do not support the conclusion that AGs acting in

2   their independent enforcement capacity have control of all state agency documents.

3   **B. State Specific Arguments**

4   In addition to the common arguments made above, the following AGs argue that the order

5   erroneously interpreted their respective state laws.

6   **1. Arizona**

7   Even if this Court upholds the principle that the Arizona Attorney General's ("AGO")

8   representation of a state agency establishes control under the *Citric Acid* test, the order errs in its

9   application of this principle to the Arizona Department of Education ("ADE") and the Arizona

10  Governor's Office of Strategic Planning and Budgeting ("OSPB"). The order relies entirely on

11  Ariz. Rev. Stat. § 41-192 to conclude that AGO will represent these two agencies. (Doc. 1117, p.

12  44) But as AGO has explained, it does not, has not, and will not, represent either of these

13  agencies in this case under any circumstance. (*See* Doc. 738-7; TR 5/6/24 at 4-11.) It is unclear

14  why AGO's avowal to the Court is insufficient on this point.

15  While the order identifies that ADE is not statutorily exempt under Ariz. Rev. Stat. § 41-

16  192(D) and should, in theory, be barred from expending state funds to secure counsel, in reality

17  ADE *does* employ its own legal counsel. *E.g.*, Ariz. Dep't of Educ., Organization Chart, *available*

18  *at* https://www.azed.gov/sites/default/files/2023/01/ADEOrgChart.pdf (listing legal services).[9]

19  And, as indicated to the Court in oral argument, there is an ongoing legal conflict between ADE

20  and AGO. *See also, e.g.*, Ariz. Dep't of Educ., Horne sues Governor, Attorney General Seeks

21  declaration that schools obey voter protected English instruction method (Sept. 7, 2023),

22  https://www.azed.gov/communications/horne-sues-governor-attorney-general-seeks-declaration-

23

24  ---

    [8] *See, e.g.*, Doc. 1117 at 32, citing *Pulliam v. Lozano*, No. 1:07-CV-964-LJO-MJS, 2011
25  WL 335866, at *1 (E.D. Cal. Jan. 31, 2011) (in court's experience, prison employee defendants
    "and/or the Attorney General can *generally* obtain" similar documents from defendants' employer
26  prison agency) (emphasis added). A nonparty having "voluntarily furnish[ed]" a party "with
    documents and information in the past" does not demonstrate the party's legal control. *Citric
    Acid*, 191 F.3d at 1108.

27  [9] This Court may take judicial notice of the documents on Arizona agency websites. *See*
28  Fed. R. Evid. 201(b)(2), (d); *State Montana Green Party v. Jacobsen*, 17 F.4th 919, 927 (9th Cir.
    2021).

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1   schools-obey-voter-protected.

2       Relatedly, while not explicitly enumerated as exempt under Ariz. Rev. Stat. § 41-192(D),

3   the OSPB is part of, and receives counsel through, the Governor's Office—which is exempt. *See,*

4   *e.g.*, OSPB, What We Do, *available at* https://azospb.gov/responsibilities.aspx. Moreover, OSPB

5   was created by the Governor via Executive Order as "an adjunct to the Governor's Office

6   reporting to the Governor." *See* Executive Order 90-22: Governor's Office of Strategic Planning

7   and Budgeting (signed Nov. 27, 1990), *available at* https://azmemory.azlibrary.gov/nodes/view/

8   44432?keywords. AGO therefore asks, at a minimum, that the Court overturn the order as it

9   applies to ADE and OSPB.

10      **2. California**

11      The order legally errs in holding that, even when acting in his independent law-

12  enforcement capacity, the Attorney General has a legal right to the documents of sister state

13  agencies led by independently elected state constitutional officers. The order runs roughshod over

14  California's dual-executive structure[10] and controlling law: "Each agency or department of the

15  state is established as a separate entity," and the Attorney General is therefore "not deemed to

16  have possession, custody or control over documents of any state agency." *Lockyer*, 19 Cal. Rptr.

17  3d at 337-38; *accord, e.g.*, *Chilcott Holdings*, 2007 WL 9813287, at *5. Nor does California law

18  provide the Attorney General with access to the records of sister state officers or agencies.

19  *Compare* Cal. Gov't Code § 8545.2 (granting access to State Auditor). Accordingly, the order is a

20  direct affront to California's sovereignty. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)

21  ("Through the structure of its government, . . . a State defines itself as a sovereign.").

22      The order commits further legal error by holding that, because the Attorney General may

23  sometimes act as outside counsel to state agencies, the Attorney General necessarily has "control"

24  over agencies' documents, even in this independent law-enforcement prosecution to which they

25  are not party. This contravenes *Citric Acid*, 191 F.3d at 1107 ("theoretical control is

26  insufficient"), and misapprehends California law, which allows state officers and agencies to

27      _____
        [10] California's Constitution "embodies a structure of divided executive power" among
28  independently elected officials. *Marine Forests Soc'y v. Cal. Coastal Com.*, 113 P.3d 1062, 1077
    (Cal. 2005) (citing Cal. Const., art. V, §§ 2, 11 & art. IX, § 2).

retain their own in-house counsel, instead of mandating use of the Attorney General as outside

counsel in every case, Cal. Gov't Code §§ 11040(c)-(d), 11041(a), and which recognizes that

conflicts may arise requiring agencies to retain separate counsel, *D'Amico v. Bd. of Med. Exs.*, 11

Cal. 3d 1, 14, n.5 (1974). In sum, the order puts the Attorney General in an impossible position:

requiring him to produce that which he has no legal right to obtain. This is no abstract concern.

Following the order's issuance, Governor Newsom's Office, which is not a party, has declined to

provide the Attorney General with access to sister agency documents for purposes of responding

to discovery in this action.

### 3. Colorado

The order, as to Colorado, is clearly erroneous and contrary to law for three reasons.

*First*, by concluding the AG has control of agency documents because it is required to

represent agencies, the order misconstrues state law. Doc. 1117, p. 59. The order ignores that the

AG and its attorneys operate in distinct capacities authorized by distinct statutes. *Compare* C.R.S.

§ 24-31-101(1)(*i*)(II) (the AG may "independently initiate and bring … actions to enforce" the

Colorado Consumer Protection Act (CCPA)); *to* § 24-31-101(1)(a) (the AG is "legal counsel …

of each … agency of state government"). Contrary to the order, the AG brings this suit solely in

its independent enforcement capacity, which state law distinguishes from the AG's representative

capacity.  *See Salazar v. Davidson*, 79 P.3d 1221, 1229-30 (Colo. 2003) (acknowledging the

AG's ability to act in its enforcement capacity against agencies it otherwise represents). For this

reason, the order incorrectly concludes the AG will represent agencies "in this matter for

discovery." Doc. 1117, p. 60. Other attorneys who are employed by the AG, but who do not

enforce the CCPA in this or other enforcement actions initiated by the AG, will represent

agencies in this case *if those agencies are subpoenaed* as third parties. But under § 24-31-

101(1)(*i*)(II), the AG attorneys enforcing the CCPA do not and would not represent agencies "in

this matter," and agencies are not parties subject to discovery orders.

*Second*, the order misreads an information-sharing statute to support its holding regarding

control. Doc. 1117, p. 61 (construing C.R.S. § 6-1-116(4)). The order reasons that the provision,

which permits, but does not require, licensing agencies to share information with the AGs, shows

the legislature intended agencies to share documents, thus the statute does not prohibit the AG from accessing documents when bringing enforcement actions. This is wrong. The legislature created a mechanism to voluntarily share information by agreement precisely because the AG does not have on-demand access to agency documents.

*Third*, the order misstates the AG's position by saying the AGs would assert privilege over communications with the agencies and relying on that assertion as support for a conclusion of control. Doc. 1117, p. 60. To the contrary, the AG stated that "when the AG independently brings a CCPA action, the enforcement team's communications with third parties, including state agencies, are generally *not* privileged...." which is consistent with the AG attorneys' position in this case that they would not represent state agencies in this case, much less control their documents by virtue of that representation. Doc. 738-4, p. 1 (emphasis added).

### 4. Connecticut

The Court should deny Meta's request to seek party discovery from any Connecticut state agencies and the Governor's Office because the order fundamentally misconstrues the limits of the authority conferred by statute to the Connecticut Office of the Attorney General ("CT AG"). Connecticut General Statutes § 3-125 prescribes the CT AG's duties as they relate to its defensive representation of state entities, and does not instill the CT AG with blanket authority to access documents controlled by the Governor or executive branch agencies. The CT AG possesses only those powers statutorily enumerated. *See Blumenthal v. Barnes*, 261 Conn. 434, 463 (2002). While "there is no statutory … rule cited which prohibits the [CT AG] from accessing the relevant documents of any of the state agencies at issue[,]" Connecticut statute does not provide the CT AG with legal control over state agency documents.[11] Doc. 1117, p. 65.

Contrary to the conclusion in the order, the CT AG indicated that upon receipt of a subpoena, Connecticut agencies would have discretion to utilize in-house counsel or retain outside counsel, which may include the CT AG. Doc. 738-1, pp. 6-7. The one exception is the

---

[11] Contrary to the conclusion in the order, *Generic Pharmaceuticals (II)* does not explicitly find that the CT AG has legal control over state agency materials. Doc. 1117, p 67; *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 358, 361.

Connecticut Department of Consumer Protection ("DCP"). While DCP is not a plaintiff in this action, the CT AG indicated he would represent DCP if served with a subpoena. *Id.* at 6. Connecticut statute requires that the Commissioner of DCP authorize the CT AG to bring Connecticut Unfair Trade Practices Act enforcement actions. Conn. Gen. Stat. § 42-110m. Connecticut statute does not create a similar relationship with any of the other identified Connecticut entities. Importantly, even though DCP has a role in authorizing enforcement actions, there still exists no Connecticut statute granting the CT AG control over DCP documents. *See Barnes,* 261 Conn. at 463.

**5. Delaware**

Delaware is one of only two states with a statute that directly addresses the issue presented – whether the AG has control of state agency documents when the AG is acting in her independent enforcement capacity. The order materially misreads this statute, and the applicability of Delaware law more generally, to erroneously conclude that the Delaware AG has legal control over the documents of other state agencies and the Office of the Governor.[12] Title 29, Section 2508(b) states that the Delaware AG does *not* have a right of access to the documents of Delaware state agencies, or the Governor's Office, "for purposes of discovery in any civil actions brought by . . . the Attorney General." Del. Code Ann. tit. 29, § 2508(b). According to the synopsis of the bill, this language was expressly enacted to clarify:

> that the Attorney General's right of access under Title 29, Section 2508(b) to the . . . documents of the State does not apply for purposes of discovery in any civil litigation brought by . . . the Attorney General, except for the [DOJ's] own documents. *This Act is intended to ensure that state agencies, . . . [and] officers, . . . will have the discovery protections afforded to non-parties in such litigation by applicable rules of civil procedure or state or federal law*.

Delaware Senate Bill 295 Detail, https://legis.delaware.gov/BillDetail?LegislationId=109498 (emphasis added).

---

[12] Given the limited state-specific space available, the Delaware AG focuses on only the most substantial errors in the Magistrate Judge's ruling, but objects in full to the other errors, clearly erroneous interpretations, and unfair accusations regarding the Delaware AG's integrity and ethics.  Doc. 1117, pp 68-76.

Case 4:22-md-03047-YGR   Document 1338-3   Filed 09/20/24   Page 20 of 60
Case 4:23-cv-05448-YGR   Document 183-3   Filed 09/20/24   Page 20 of 59
PageID: 11143

Contrary to the statute's plain language and the express legislative intent, the order found that Section 2508(b), "simply provides that the Delaware [AG] cannot rely on this statute as a substitute for discovery in that action." Doc. 1117, p. 69. This finding is clearly erroneous and must be reversed.[13]

The Order further found that, even if Section 2508(b) were correctly interpreted to restrict the Delaware AG's access to documents for purposes of discovery, it would "not operate to foreclose a finding of control under Rule 34" because "that state statute can not [sic] preempt federal law…" Doc. 1117, p. 72-773. The issue, however, is not one of preemption. Delaware concedes that Rule 34 governs, and the order is correct that the issue of control under Rule 34 "requires determining if there is a 'legal right' to access or obtain the documents upon demand." Doc. 1117, p. 72, *see* Doc. 738-6, p. 1 (citing *Deephaven Risk Arb. Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *11 (Del. Ch. July 13, 2005)). To make this determination for the Delaware AG, however, one must look to Delaware law. Section 2508(b) plainly states that, for purposes of discovery, the Delaware AG does not have a legal right to "***access***" or obtain documents from other state agencies or officers upon demand. Del. Code Ann. tit. 29, § 2508(b). The order's findings to the contrary were "clearly erroneous" and "contrary to law." F.R.C.P. 72(a). Accordingly, the order should be reversed.

**6. Florida**

The Florida AG does not have control in this matter over the non-party agencies or the Governor (State Entities). It is legal error to conclude that the Florida AG "must statutorily act" as counsel for State Entities for purposes of discovery, particularly here where the entities are not parties to the AGs' independent enforcement action. *Cf.* Doc. 1117, p. 77 with 738-7, p. 2. Absent a contractual agreement for representation, the Florida AG does not control, supervise, or represent the separate State Entities or have control over their documents. Doc. 738-7, p. 2.

---

[13] In deference to the Magistrate Judge's expressed preference for limited oral argument, the Delaware AG previously declined to present argument on this issue. Given the significance of the issue and the order's erroneous interpretation of Delaware law, the Delaware AG respectfully requests the opportunity to present argument at this time.

In this instance, no legal representation agreements exist between the State Entities and the AG. Doc. 738-7, p. 2. When in need of legal services, the State Entities can use their legal counsel, retain private counsel, or contract with the Florida AG. By statute, the Governor or Department of Agriculture & Consumer Services may retain private attorney services without any Florida AG oversight. § 287.059(2)(a), F.S. For the other agencies at issue here, the Florida AG decides for each case whether it will be counsel. *See* §§ 16.535, 287.059(3), F.S. In addition, the State Risk Management Trust Fund, operated through another agency, provides defense litigation coverage. *See* Ch. 284, Fla. Stat. Typically, it is through that agency that the Florida AG is retained to defend the agency named. Specifically, that agency shall "assign counsel" to any claim submitted by a state agency, which may not be the Florida AG. § 284.385(1), F.S.

The general duty imposed by § 16.01(4)-(5), F.S., to appear in "in behalf of the state . . . all suits or prosecutions . . . in which the state may be a party" does not require an attorney client relationship on behalf of an agency, nor does it give power to the AG to have legal control over its documents. Further, unlike the vacated *Freyre* decision on which the Magistrate relies, the state is not a party to this proceeding: the Florida AG is the "sole named plaintiff" in Florida's action. Doc. 1117, p. 30. None of the State Entities is a party to the Amended Complaint or included in Florida's Rule 26 disclosures. Receipt of a request for State Entity discovery is not a "suit[s] or prosecution[s]" under § 16.01(4)-(5), F.S. Even if it were, there is no determination here that "intervention is deemed necessary and that . . . [the Attorney General] should come in representing the State of Florida. . ." *Watson v. Caldwell*, 27 So. 2d 524, 529 (Fla. 1946). Additionally, § 16.015, F.S., does not impose an all-encompassing legal duty on the Florida AG to represent all state agencies for discovery. The entities all have in-house legal counsel, and no determination has been made that Florida AG legal services are "required." Furthermore, the Florida AG does not have a general legal right to obtain documents "upon demand" from the State Entities. Likewise, there is no statutory requirement that the State Entities provide documents to the AG.

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

### 7. Georgia

The Court errs when rejecting the Georgia Attorney General's Office's ("AGO") division of prosecuting attorneys from attorneys representing state agencies and officials ("agencies"). As we have explained, the AGO has both obligations as an independent constitutional officer (including statutory prosecutorial duties) *and* constitutional and statutory obligations to represent client agencies (though O.C.G.A. § 45-15-4 allows agencies to employ other counsel if the AGO consents). AGO attorneys in prosecuting divisions act in, and take into full account, the public interest, *see, e.g.,* O.C.G.A. § 10-1-397(b), irrespective any contrary agency positions. *See, e.g., Perdue v. Baker*, 277 Ga. 1, 6 (2003); *cf.* 1976 Ga. Op. Atty Gen. No. 76-93 (refusing agency's request to sue other agency as not in larger state interest). By contrast, other AGO attorneys advocate on behalf of their client agencies. Indeed, per the Georgia Supreme Court, unlike when representing agencies, the AGO is *not* controlled by ethical obligations to agencies when acting as a constitutional officer in the public interest, as the AGO is doing here. *Perdue*, 277 Ga. at 6.

To fulfill its obligations, the AGO separates attorneys into divisions based on assigned duties. These lawyers must operate independently, and segregate confidential materials produced in discovery and/or pursuant to subpoena or other investigative tool. This is with good reason— AGO prosecutorial duties and its clients' interests do not perfectly align. For example, AGO prosecutors are charged with investigating agencies that are simultaneously represented by AGO lawyers. *See, e.g.,* O.C.G.A. §§ 45-15-17 (investigating agencies), 50-18-73 (prosecuting Open Records Act violations); *see Bowers v. Bd. of Regents*, 259 Ga. 221 (1989). Notably, § 45-15-17 grants the AGO subpoena powers, which would be unnecessary if the AGO had "control" over agency documents. More fundamentally, deeming the AGO to have "control" over all documents would eviscerate necessary barriers and render the system unworkable. The State's constitutional structure, the Legislature's definition of AGO duties, and AGO compliance with those duties warrant deference. *See Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1343-44 (11th Cir. 1999).

### 8. Hawaii

Magistrate Judge Kang's ruling ignores the differences between the Hawaii Attorney General's ("HI AG") role as legal enforcer and its role as general counsel. In *State v. Klattenhoff*,

71 Haw. 598, 604, 801 P.2d 548, 551 (1990), the Hawaii Supreme Court recognized that the HI AG may simultaneously prosecute an individual in a criminal case and still represent that individual in a civil one through the creation of an internal firewall between divisions, both of which are supervised by the Attorney General. No one would argue, however, that the documents held by the deputy attorney general in the civil case were available to the deputy attorney general in the criminal one. There is a clear difference between these two roles, and one should not confuse the two merely because a single office performs them.

In its capacity as general counsel, HI AG does not have authority over its client agencies on key decisions. Although the HI AG may be legally obligated to represent the state agency pursuant to Haw. Rev. Stat. § 26-7, the client agency makes key litigation decisions, and the same analysis should apply to discovery requests. *See Chun v. Bd. of Trustees of Employees' Ret. Sys. of State of Hawaii*, 87 Haw. 152, 952 P.2d 1215 (1998) ("the Attorney General's statutory authority. . . does not authorize the Attorney General 'to assert his vision of state interest.'").

The Magistrate Judge's ruling misinterprets *Lobisch v. United States*, No. CV 20-00370 HG-KJM, 2021 WL 6497240 (D. Haw. Aug. 19, 2021). Contrary to the ruling's characterization that *Lobisch* did not involve a showing of control, the Plaintiff there argued that the Defendant United States had control over its military branches based on the statute in its letter brief to the Court. *See Brief for Plaintiff at 3, Lobisch* (Entry No. 87).

*In re Generic Pharms. Pricing Antitrust Litig.,* 699 F. Supp. 3d 352 (E.D. Pa. 2023), in addition to being non-binding, is clearly distinguishable. In *Generic Pharms. (II)*, Hawaii sought damages **on behalf of injured state agencies**. *See* Complaint at 431-32, ¶ 1440, *id.*, 2:19-cv-02407-CMR (Entry No. 1). Here, Hawaii only seeks penalties in its role as an enforcer.

### 9. Idaho

The Magistrate Judge's Order does not properly identify Plaintiff, Idaho Office of Attorney General's capacity in this matter. The Idaho Office of Attorney General brought its claim in this case under its authority granted to it by Congress through COPPA. *See* 15 U.S.C. § 6504 (a)(1). The Idaho Office of Attorney General's claim is not brought by Idaho State agencies,

22

1    nor could it be, as the right to allege a COPPA claim lies only with a state Attorney General.

2    Regardless, the Order relies on reasoning from cases where states were the named plaintiffs,

3    and/or in which the Attorney General brought the case on behalf of the state in its parens patriae

4    capacity, to find legal control over documents. This one-size-fits-all approach to concluding that

5    the Office has legal control over the documents at issue is wrong with respect to the Idaho Office

6    of Attorney General.

7        **10. Illinois**

8        The Magistrate erred with respect to: 1) Illinois law concerning the distinct capacities of

9    the AG in different kinds of cases; and 2) the facts concerning the Illinois AGs relationship with

10   agencies in this case.

11       ***First***, the Order fails to respect the legal distinction between the Illinois AG's

12   "enforcement" capacity and his "representational" capacity. Here, the AG is enforcing the Illinois

13   Consumer Fraud and Deceptive Business Practices Act on behalf of the "People of the State," 815

14   ILCS 505/7(a), not bringing or defending a claim on behalf of a state agency or the State of

15   Illinois. This stands in stark contrast to the *Monsanto* action cited in the Parties' briefs. In that

16   case, the court found the Illinois AG "controlled" certain state agencies' materials for purposes of

17   discovery because the suit was filed as a "joint effort," brought for the agencies' benefit, and with

18   the agencies' assistance. *See Monsanto*, 2023 U.S. Dist. LEXIS 106151 at *14-18. None of those

19   "representational" factors are implicated in this independent AG enforcement action.

20       ***Second***, the Order states, without support, that the AG will likely provide legal

21   representation *in this litigation* to all state agencies. Order at 94-95. In reality, the AG Brief

22   stressed that certain Illinois agencies possess the "discretion to utilize [their] in-house counsel or

23   retain outside counsel which could include the [OAG]" such that the AG "cannot speculate as to

24   how [those agencies] may choose to exercise [their] discretion." Doc. 738-11, p. 2. Indeed,

25   several state agencies served with Rule 45 subpoenas have *not* sought AG representation for their

26   responses. Disregarding this, the Order asserts that the Illinois AG "confirmed that its office

27   could represent the Illinois agencies at issue" and "appears likely to be involved in representing

28   these state agencies." Order at 94-95. Likewise, the Magistrate mistakenly concluded that the AG

23

took "the position that <u>any</u> past or future communications between the [AG] and these State agencies . . . would be covered by the attorney-client privilege." Order at 95 (emphasis added). This finding was directly contrary to the AGs' Brief which explicitly stated that, in the context of the AGs' enforcement efforts, "few, if any, pre-suit communications between the AG and State agencies would be subject to [attorney-client] privilege claims." Doc. 738-11, p. 2.

The Order is expressly based on these mistakes of law and fact and should be reversed.

**11. Indiana**

The Order's analysis as to Indiana ignores the clear text of Indiana's code, did not address applicable case law, misread and misapplied Indiana's position on privilege, and committed clear errors in the application of the *Citric Acid* test. Further, the order and Meta have failed to identify any relevant relationship between these agencies and the State's lawsuit. The order finds that INAG has legal control over agencies "which are not subject to an exception of mandatory representation." Doc. 1117, p. 98-99. But Indiana Code § 4-6-5-3 provides such an exception for each Indiana agency named by Meta[14]. Because agencies are permitted to employ legal counsel with consent of the Indiana Attorney General, agencies have a mechanism for employing their own counsel, and INAG's representation is not mandatory. Ind. Code § 4-6-5-3(a). Further, the order does not address caselaw interpreting this issue. *See Holcomb v. Bray,* 187 N.E. 3d 1268 (Ind. 2022) (Governor not required to obtain consent from attorney general before hiring counsel); *Banta v. Clark*, 398 N.E.2d 692 (1979) (attorney not excluded where written consent had been provided by INAG for outside counsel). The order also misinterpreted Indiana law regarding civil investigative demands, which are the formal *pre-suit* mechanism by which the INAG conducts investigations of violations of law by companies such as Meta. *See* Ind. Code § 4-6-3-3 (authorizing issuance to a person with documents relevant to an investigation, where "person" is defined to include "a state or local agency" in Ind. Code § 4-6-3-1). This tool would not be necessary if Indiana law provided INAG on demand access to any agency document at any time. Finally, Indiana's statement on privilege references the possible invocation of privilege for

---

[14] Meta has withdrawn its position as to the Indiana Economic Development Corporation and indicated it would pursue nonparty discovery to that entity. No R. 45 subpoena has been noticed to date.

documents arising in a representative relationship that may be considered responsive to Meta's RFPs, based on the breadth of the requests at issue and the possible inclusion of documents from a prior representative relationship between an agency and the INAG. For purposes of this action, there was not a representative relationship when Meta issued its RFPs to the Plaintiff States, as the named agencies were not involved in the investigation, preparation, or litigation of this case. The order incorrectly conflates INAG's role as outside litigation counsel with in-house counsel access.

### 12. Kansas

The Court based its determination of whether the Kansas Attorney General represents state agencies on two material misstatements of fact and law. First, the Court misread the Kansas Attorney General's statements regarding representation of state agencies. The Court stated the Kansas Attorney General "would definitely represent all of the Kansas agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 13]." Doc. 1117, p. 104, and "the Kansas Attorney General has already confirmed that their office will do so for discovery in this matter. [Dkt. 738-1 at 13]." Doc. 1117, p. 105. The opposite is true. The document cited by the Court says the Kansas Attorney General would not represent these agencies if served with a subpoena, because all identified agencies have their own in-house counsel. Doc. 738-1, p. 13.

Second, the Court misquotes relevant Kansas statute. The Court cited K.S.A. § 75-703 to suggest the Kansas Attorney General must, in all cases, represent state agencies in all actions. Doc. 1117, p. 104. However, the Court failed to note this statute is only triggered "*at the request of the governor, secretary of state, state treasurer, or state board of education*." K.S.A. § 75-703 (emphasis added). In this case, neither the governor, secretary of state, state treasurer, nor the state board of education (or any other agency identified by Meta) have requested representation for either themselves or any of their departments. The Kansas Attorney General does not represent those agencies in typical practice and will not do so in this matter, unless specifically requested by the individual agencies.

### 13. Kentucky

The Magistrate Judge's conclusion that the Kentucky Office of the Attorney General (KYOAG) has control over state agency documents is contrary to law. The Magistrate Judge incorrectly relies on the relationship created by Ky. Rev. Stat. § 15.020 to hold that the KYOAG has legal control over *all* Kentucky agencies' documents because the KYOAG is "the chief law officer of the Commonwealth" and shall appear in all cases "in which the Commonwealth has an interest." Doc. 1117, p. 110. However, Kentucky agencies "may employ . . . attorneys for legal services" and such attorneys "*shall* have authority to appear"[15] as counsel in cases or proceedings in which the agency is interested or affected and "*shall* attend to any litigation and legal business within and without the state." Ky. Rev. Stat. §§ 12.210 and 12.220 (emphasis added). The Order ignores the "shall" language of Chapter 12 and erroneously holds that these statutes do not "denigrate from Section 15.020" Doc. 1117, p. 111 when in reality, "to the extent [KRS 15.020] is in conflict with KRS 12.200 to 12.220," Ky. Rev. Stat. § 12.220 controls. Ky. Rev. Stat § 12.230. Practically, this statutory scheme reshapes the duties of the KYOAG by "authoriz[ing] the employment of other counsel for the departments and officers of the state to perform" those duties. *Johnson v. Commonwealth ex re. Meredith*, 165 S.W.2d 820, 829 (Ky. 1942). Further, the Magistrate Judge improperly conflates "cooperation" by agencies with the KYOAG under Ky. Rev. Stat. § 367.160 with the "legal right to obtain documents," Doc. 1117, p. 111 while ignoring that the statute explicitly grants the KYOAG access to the "material evidence and information" of *only two* specific agencies, neither of which is the subject of discovery from Meta. Ky. Rev. Stat. § 367.160. This grant of access would be superfluous if the "cooperation" language rendered all agency documents within the legal control of the KYOAG. The Order ignores the right of the legislature to delegate counsel duties and misconstrues cooperation as control. It is thus contrary to law and should be overturned.

The findings that there is an attorney-client relationship between the KYOAG and state agencies, and that the KYOAG is likely to represent state agencies in this matter, are clearly

---

[15] *See e.g., Commonwealth ex rel. Brown v. Stars Interactive Holding Ltd.*, 617 S.W.3d (Ky. 2020) (Governor's Executive Cabinet litigated independently of KYOAG counsel).

erroneous. This finding is clearly erroneous because it rests on zero supportive factual evidence and ignores that, when served with third party subpoenas under Fed. R. Civ. P. 45, none of the Kentucky state agencies solicited representation or counsel from the KYOAG.

**14. Louisiana**

The Court erroneously relied on La. R.S. 49:257(A) to find that the Louisiana Attorney General's Office ("LA AGO") has legal control, for the purposes of discovery, over the state agencies identified by Meta. La. R.S. 49:257(A) states, in part, "the attorney general shall represent the state and all departments and agencies of state government in all litigation arising out of or involving tort or contract." The Court found that consumer protection claims are torts and therefore, trigger La. R.S. 49:257(A) and the LA AGO is the legal representative of state agencies in this case. However, Meta has not identified any torts directly involving the identified agencies in this litigation.

The state agencies listed by Meta are not parties to this suit. Additionally, the LA AGO has not alleged that Meta committed any torts towards these state agencies, and Meta has not alleged that these state agencies committed any torts against Meta. Using the Court's logic, every time the LA AGO exercises its own independent authority under the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, et seq. ("LUTPA"), the LA AGO automatically obtains legal control of state agencies that have no connection to the LUTPA claim. Even if this suit arises from a tort, it does not arise from a tort that directly involves the listed state agencies and, therefore, La. R.S. 49:257(A) does not apply.

For the reasons above, the LA AGO does not have possession, custody, or control of any documents of the state agencies identified by Meta.

**15. Maine**

The Order in two instances relied on clearly erroneous interpretations of Maine law to find that the Attorney General has legal control of the Governor's and several executive branch agencies' documents. First, the Order incorrectly held that, by statute, the Attorney General must represent state agencies in this action. Doc. 1117, pp. 119, 123. However, the referenced statute provides that the Attorney General shall represent state agencies in "civil actions and proceedings

. . . in all the courts of the State." *See* Me. Rev. Stat. Ann. tit. 5, § 191(3). In any other proceeding, such as this one, the statute provides that the Attorney General shall represent agencies if requested by the Governor or the Legislature. *Id*. Moreover, even though the statute provides that the Attorney General shall represent state agencies in certain cases, he nonetheless retains broad discretion to decline to do so. *See Superintendent of Ins. v. Att'y Gen.*, 558 A.2d 1197, 1200 (Me. 1989). Second, the Order incorrectly held that Me. Rev. Stat. Ann. tit. 22, § 4008(1) provides the Maine Attorney General an "explicit legal right to obtain and access these documents of the Maine Department of Health and Human Services (one of the agencies at issue here) when acting as counsel for that agency." Doc. 1117, p. 121. On the contrary, the referenced provision provides that, "[w]ithin the department," records containing personally identifying information that are obtained in connection with the department's child protective activities "are available only to and may be used only by appropriate departmental personnel and legal counsel for the department in carrying out their functions." Me. Rev. Stat. Ann. tit., § 4008(1). With respect to this case, the Attorney General is not within the department and is not acting as legal counsel to the department in carrying out its statutory child protective functions under Title 22. Therefore, contrary to the Order's finding, this provision does not provide the Maine Attorney General with legal control of the department's documents.

### 16. Maryland

The Magistrate Judge's Order misconstrues the capacity in which this case has been brought by Plaintiff, Office of the Attorney General of Maryland (MOAG). The MOAG brought this case solely in its own name and capacity, alleging only COPPA claims against Meta. The MO AG's claims are not brought by the State or any other State agency, nor could they be, as the right to allege a COPPA claim lies only with a state Attorney General. Regardless, the Order relies on reasoning from cases where *states* were the named plaintiffs, and/or in which the Attorney General brought the case on behalf of the state in its *parens patriae* capacity, to find legal control over documents. This one-size-fits-all approach to concluding that the MOAG has legal control over the documents at issue, is wrong with respect to the MOAG.

1    While there are Maryland statutes specifying that the Attorney General acts as legal

2    adviser to certain agencies, the Order ignores that such duty is fulfilled by designated MOAG

3    personnel who are *specifically hired* to act as counsel for a particular agency. The MOAG

4    enforcement attorneys do not act as legal adviser to independent state agencies and have no

5    attorney-client relationship with those agencies. Further, while the Order holds that "multiple

6    courts have found control over documents of a state agency based in part on the fact that the

7    governmental party was represented by and/or employed by the state Attorney General," Doc.

8    1117, p. 32, in each of the three cases cited by the Magistrate Judge, the party from whom

9    discovery was sought was an employee of a non-party agency from which documents were

10   sought. In this case neither the eight Maryland agencies nor their employees are parties. MOAG is

11   unaware of any case that holds a lawyer must produce documents simply because they are in the

12   hand of a non-party client of a different lawyer from the same firm. Rather, the correct approach

13   would be for Meta to seek the documents through Rule 45 subpoena, which it has done.[16]

14   **17. Michigan**

15   Despite recognizing that the Michigan Attorney General is both (1) an elected entity

16   separate from Michigan state agencies and (2) the exclusive plaintiff in this action under

17   Michigan's statutory scheme, the Magistrate Judge held that these facts do "not outweigh the fact

18   that the Michigan Attorney General will act as the agencies' counsel." Doc. 1117, p. 132.

19   This ruling comprised a critical error of law. In particular, it was error to mechanically

20   apply general attorney-client principles, because the Attorney General's "unique status" affords

21   an ability to serve as a party *or* agency counsel; this unique status "requires accommodation"

22   under the Rules of Professional Conduct. *Att'y Gen. v. Michigan Pub. Serv. Comm'n*, 625

23   N.W.2d 16, 28 (Mich. App. 2000). To the extent that the *Department* of Attorney General might

24   represent these agencies, the Attorney General's party status means that an independent staff

25   attorney—not the undersigned—will undertake that representation. *See id.* at 29 ("The unique

26   ───────────────
     [16] In rejecting this approach, the Magistrate Judge relies exclusively on *In re South
27   Carolina Dep't of Parks, Recreation, & Tourism*, 103 F.4th 287, 289 (4th Cir. 2024). Doc 117, pp.
     40-41. However, in that case, once again, the Plaintiff was the State of South Carolina, and in its
28   capacity as the State, the Circuit Court found it controlled the records of its state agencies. That is
     not the case with MOAG.

1  position of the attorney general requires that when his views differ from or [are] at odds with an

2  agency, then he must allow the assigned counsel . . . to represent the agency unfettered and

3  uninfluenced by the attorney general[].” (quotation omitted)).

4       Notwithstanding the Attorney General's unique status as a potential plaintiff, state

5  agencies are not subject to party discovery even by analogy to private law firms. Assuming

6  *arguendo* that a lawyer is presumed to have access to client documentation in some

7  circumstances, *Perez*, 2014 WL 1796661, at *2, that does not mean the lawyer maintains a right

8  of access in a completely distinct lawsuit on which the client was never consulted. In Michigan,

9  an attorney must consult with the client and obtain its consent to disclose client-possessed

10  documents “for the advantage of the lawyer or of a third person”—meaning the agency, not the

11  Michigan Attorney General, has custody and control of its own information vis-à-vis the instant

12  case. Mich. R. Prof. Conduct 1.6(b)(3); *see also* Mich. R. Prof. Conduct 1.7(b) & cmt.

13       By looking past the Attorney General's status as party-plaintiff in this case, and by

14  transposing a potential right of access within the confines of a given dispute onto a case in which

15  the agency client has no role or unique interest, the Magistrate Judge erred.

16       **18. Minnesota**

17       First, the order misunderstands the nature of this action, because the Minnesota AG is

18  acting as a civil prosecutor whose only “client” is the people of Minnesota, not any state agency.

19  *Ly v. Nystrom*, 615 N.W.2d 302, 313 (Minn. 2000). In such cases, “no client is readily

20  ascertainable,” the AG is “protect[ing] public rights” and works independently (not in “close

21  coordination” with agencies). *Energy Pol'y Advocs. v. Ellison*, 980 N.W.2d 146, 156 (Minn.

22  2022); *Curtis v. Altria Grp., Inc.*, 813 N.W.2d 891, 900 (Minn. 2012). The order ignores the

23  Minnesota AG's unique constitutional role, Minn. Const. Art. V, § 1, and wrongly conflates its

24  independent law enforcement duties (where the public interest is the client) with its separate

25  outside legal services role (where agencies are clients).

26       Second, the order relies on the erroneous legal assumption that the AGs' Office is a “firm”

27  or “legal services organization.” Doc. 1117, pp. 137, 139. But as a government legal department,

28  the AGs' Office is not a “firm” or “legal services organization” under Minnesota's professional

1   standards. *Humphrey on Behalf of State v. McLaren*, 402 N.W.2d 535, 543 (Minn. 1987). And

2   Minnesota's Rules of Professional Conduct recognize the different and unique status of public

3   attorneys: "lawyers on an [AG's] staff 'may be authorized to represent several government

4   agencies in intragovernmental legal controversies in circumstances where a private lawyer could

5   not represent multiple private clients.'" *Id.* (quoting the Preamble); *Mpls. Police Officers Fed'n v.*

6   *Minneapolis*, 488 N.W.2d 817, 821 (Minn. Ct. App. 1992); Minn. R. Prof'l Conduct 1.11, cmt. 2.

7          Last, the order incorrectly claims that no Minnesota law prevents access by the AG to

8   agencies' data. Under Minnesota's Data Practices Act ("MGDPA"), "government entities" cannot

9   share "not public" data and must prevent unauthorized access, including intergovernmental

10  access. Minn. Stat. § 13.05, subds. 5(a), 9. The order also misconstrues Minn. Stat. § 13.393,

11  which merely ensures that the MGDPA "does not erode the protection of the attorney-client

12  privilege as applied to government law offices." *Energy Pol'y Advocates*, 980 N.W.2d at 155.

13  Contrary to the order, section 13.393 does not provide the AG an "explicit legal right" to obtain a

14  client-agency's data, and even if it did (and to be clear, it does not) any such right would be

15  confined to the AG's distinct outside counsel function, which again is *not* the capacity in which

16  the AG is acting in this case.

17          **19. Missouri**

18          Despite acknowledging that the Missouri Attorney General ("MOAG") "is a separate

19  entity" and "bring[s] the instant action exercising its own independent authority" rather than on

20  behalf of any specific agency, the Magistrate nonetheless concluded that the MOAG has legal

21  control of agency documents because MOAG "will act as the agencies' counsel" in this matter.

22  Doc. 1117, p. 144. That conclusion is both factually and legally erroneous. Contrary to the

23  conclusion in the order, the MOAG indicated that upon receipt of a subpoena, Missouri agencies

24  would have discretion to utilize in-house counsel or seek outside counsel, which may include the

25  MOAG. Doc. 738-1, p. 17. Indeed, notwithstanding Meta's issuance of subpoenas to Missouri

26  agencies, the MOAG is not representing those agencies with respect to those subpoenas.

27          More importantly, the Magistrate's decision erroneously interprets a statute that provides

28  that the MOAG "*may . . .* appear" on behalf of agencies in proceedings where the "state's

1  interests are involved." Mo. Rev. Stat. § 27.060 (emphasis added). "The word 'may' clearly

2  connotes discretion." *Rudisill v. McDonough*, 601 U.S. 294, 310 (2024). The Magistrate's

3  decision erroneously converts the MO AGs' *discretionary* right to intervene in certain actions into

4  a *mandatory* obligation of not just legal representation but of custodial document control. This

5  ignores not only blackletter rules of interpretation, but also agencies' inherent powers of

6  representation separate from the MOAG. *See Kelly v. Hanson*, 931 S.W.2d 816, 818 (Mo. Ct.

7  App. 1996) (permitting suit by agency represented by private counsel, notwithstanding Attorney

8  General's objection, because "[s]tate officers have the capacity to bring suit to enforce their

9  powers and duties under the Missouri Constitution"); *State ex rel. McKittrick v. Missouri Pub.

10  Serv. Comm'n*, 175 S.W.2d 857, 862 (Mo. 1943) (ruling Attorney General could not intervene on

11  behalf of agency).

12      **20. Montana**

13          The order's Montana-specific findings are "clearly erroneous" and "contrary to law," and

14  should be set aside. Fed. R. Civ. P. 72. The order faults the Montana AG for not "cit[ing] any

15  statutory or legal prohibition on … representing the state agencies in this matter for the purposes

16  of discovery," but this both misconstrues the relevant standard and ignores Montana's briefing on

17  this issue. Order, ECF 1117 at 152–53 (Sept. 6, 2024). The question is not whether the Montana

18  AG is *prohibited* from representing the agencies but whether the Montana AG controls the

19  agencies' documents, even when no attorney-client relationship has been established. The order

20  ignores the law Montana cited on this point. First, the Montana agencies fall under the control of

21  *other* constitutionally independent and separately elected executive officials. Exhibit 21, ECF

22  738-21 at 2 (Apr. 1, 2024). Second, state records "are and remain the property of the public

23  agency possessing the records." Mont. Code Ann. § 2-6-1013(1). And third, even in response to a

24  subpoena, the agencies are free to use in-house counsel or hire additional counsel other than the

25  Montana AG. *Id*. § 2-15-201(4); *see* ECF 738-21 at 2. Under Montana state law and separation of

26  powers principles, the Montana AG does not control these agencies' documents.

27          The order also fundamentally misunderstands the Montana caselaw it cites by considering

28  quoted passages in isolation, without regard to their context and holdings. In *State ex rel. Olsen v.*

*Public Service Commission*, 129 Mont. 106, 283 P.2d 594 (1955), the Montana Supreme Court

held that the Montana AG could bring a case *against* a state agency because "the attorney general

is the proper party to determine the necessity and advisability of undertaking or prosecuting

actions" for the state. *Id.* at 117. The case does not hold that the Montana AG has control over

independent executive agencies' documents, nor does its reference to "broad common law duties"

permit such an inference. Common law duties cannot override the statutory authorities described,

*supra*. The agencies are under the control of other executive officials and their records are their

property alone. And *Montana Power Company v. Montana Department of Public Service

Regulation*, 218 Mont. 471, 709 P.2d 995 (1985), held that the Montana AG cannot make

litigation decisions on behalf of clients it represents, which supports Montana's position here.

Even though the agencies *may* engage the Montana AG to represent them as third parties, that

does not alter the agencies' state-law independence. The Montana AG does not control the

agencies or their documents.

### 21. Nebraska

In determining that the Nebraska Department of Justice ("NE DOJ") has "control" over

the state agencies in this case, the order fundamentally misunderstands the structure of

Nebraska's government. The order relies on the unremarkable notion that other attorneys at the

NE DOJ serve as legal counsel to state agencies and *may* be called upon by an agency to litigate

their cases. Neb. Rev. Stat. § 84-202. However, that statutory responsibility is irrelevant here. The

NE DOJ did not bring this action as counsel to any particular state agency. Instead, the NE DOJ

brings claims under its independent authority to enforce Nebraska's consumer protection laws.

Neb. Rev. Stat. § 59-1608; § 87-303.05 (NE UDTPA). In this role, the NE DOJ acts in the

interests of Nebraska's citizens, and not just in the interests of a single state agency. Just because

the NE DOJ may serve as counsel for a state agency does not subject every state agency to his

control. Nor does it mean that the NE DOJ can obtain documents from state agencies on demand.

State law is clear. Under the Nebraska Constitution, the "supreme executive power" and oversight

of the executive branch is vested in the Nebraska Governor. Neb. Const. art. IV, § 6. Each of the

agencies identified by Meta is under the direction of the governor or a governing board selected

33

1    by the Governor. Neb. Const. art. VII, § 3; Neb. Rev. Stat. § 43-4202, § 81-3114, § 81-1103. The

2    Nebraska Attorney General is an *independently* elected constitutional officer. Neb. Const. art. IV,

3    § 1. This should not permit a discovery order to rewrite the constitutional structure of Nebraska's

4    government.

5         Further, the order draws the wrong conclusions from the NE DOJ's suggestion that the

6    court look to the third-party subpoenas issued in *United States et al. v. Google LLC*, No. 1:23-cv-

7    108-LMB (E.D. Va.), writing them off as not "legally instructive or meaningful." Doc. 1117, pp.

8    162-63. To the contrary, this Court should find it instructive that a major tech company in another

9    state enforcement action decided to issue third-party subpoenas to state agencies instead of

10   seeking documents through party discovery. The fact that the docket in *Google* reflects no dispute

11   on this point, *id.*, suggests not only that Rule 45 subpoenas were the appropriate method to obtain

12   state agency discovery, but also that that process can work exceedingly well. The same is true in

13   this case, where two Nebraska state agencies have ready provided substantial initial productions

14   to Meta. The NE DOJ sees no reason why that process should not continue to play itself out.

15        **22. New Jersey**

16        The Magistrate Judge's conclusion as to New Jersey is contrary to law for three reasons.

17   First, the decision improperly conflates the NJ AG's counseling and enforcement roles. The NJ

18   AG brings this suit with the Acting Director of the NJ Division of Consumer Affairs ("DCA")

19   against Meta in his role as enforcer of the NJ Consumer Fraud Act ("CFA") and COPPA. Under

20   state law, only the NJ AG and DCA can enforce these claims. *See* N.J.S.A. 52:17B-120, -124.

21   Acting as enforcer does not give the NJ AG power to turn around and demand access to

22   documents from agencies that the NJ AG is counseling.

23        Second, while the decision recognizes that certain NJ entities have authority to obtain

24   counsel other than the NJ AG, *see, e.g.,* N.J.S.A. 34:1B-5(s); Executive Order 6, ¶ 10 (Florio,

25   1990), it improperly relied on the absence of outside counsel to justify its conclusion that the AG

26   must have control of all agencies' documents at all times. But notice of potential discovery

27   obligations and litigation holds do not ordinarily merit appearances by counsel. In addition, no

28   other entity has asserted any claims in this suit, nor would any remedies accrue to them. *Cf. In re*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1   *Generic Pharms.*, *supra* at III.A.1. Thus, because no other state entity had reason to obtain

2   counsel, the Court's reliance on their failure to do so is premature and misleading.

3        Finally, the order mistakenly relied on *Love v. NJ Dep't of Corr.*, No. 2:15-CV-4404-

4   SDW-SCM, 2017 WL 3477864 (D.N.J. Aug. 11, 2017), to hold that the NJ AG has control over

5   every NJ entity's documents. Unlike here, in *Love*, the AG acted in a general counsel capacity, not

6   in an independent enforcement capacity; moreover, the state entity at issue in *Love* was both the

7   defendant and a percipient witness. None of that is applicable here.

8        Because these errors are fatal to the Magistrate Judge's analysis, NJ respectfully requests

9   that the Court vacate the order.

10  **23. New York**

11       The magistrate judge erred in holding that, under New York's statutory scheme, the Office

12  of the Attorney General (OAG) necessarily will represent each agency for discovery purposes.

13  Although Executive Law § 63(1) provides that OAG "[p]rosecute and defend all actions and

14  proceedings in which the state is interested," that provision does not require OAG representation

15  when an agency responds to a third-party discovery demand because an agency in that

16  circumstance is not prosecuting or defending an action or proceeding. Executive Law § 63(1) also

17  provides that OAG shall "have charge and control of all the legal business of the departments and

18  bureaus of the state… in order to protect the interests of the state," but Meta has not shown that

19  OAG representation of the relevant state agencies would protect the interests of the state. To the

20  contrary, it is routine for New York state agencies to represent themselves when served with

21  third-party subpoenas. *See, e.g., Cannon v. Corr. Med. Care, Inc.*, No. 915CV1417GLSDJS,

22  2017 WL 2790531, at *1 (N.D.N.Y. June 27, 2017).

23       Similarly, § 63(1) does not require an agency to notify OAG every time the agency

24  receives a document request, because a document request is not an "action or proceeding

25  affecting the property or interests of the state." *Id.* To the extent that the document request

26  pertains to an action or proceeding, it is in that action or proceeding (to which the agency is not a

27  party) that the property or interests will be decided. Furthermore, even when an agency does

28  notify OAG of a document request or subpoena, OAG representation of the agency is not

1   mandatory. Upon receiving a § 63(1) notice, OAG "*may* participate or join" in the matter if OAG

2   determines that the State's interests warrant the representation. *Id.* (emphasis added).

3       Meta has not demonstrated that any agency is required to notify the State, or that OAG

4   would determine that its representation is warranted if notification is given. Meta's contention

5   that OAG has a right to access agency documents is therefore too speculative to support the

6   magistrate judge's conclusion that OAG has a current legal right to obtain documents on demand

7   within the meaning of *Citric Acid*.

8       **24. North Carolina**

9       The Order concludes that the NCAG has control of agency documents because it

10  invariably represents them. This conclusion misunderstands state law because the "agencies"

11  identified by Meta (including the Governor) may be represented by three different counsel

12  depending on the circumstances: NCAG attorneys, in-house counsel, or private counsel.

13      The Order asserts that "the requirement that the [NCAG] will act as the agencies'

14  counsel" necessarily means the NCAG will have "access to the documents." Doc. 1117, p. 175.

15  But the order relies on, and misconstrues N.C.G.S. § 147-17 (emphasis added):

16

17      No department, officer, agency, institution, commission, bureau or other organized
        activity of the State which receives support in whole or in part from the State shall

18      employ *private counsel*, except with the approval of the Governor. The Governor
        shall give his approval only if the Attorney General has advised him . . . that it is

19      impracticable for the Attorney General to render the legal services. . . [T]he
        Governor may employ private counsel *as he may deem proper or necessary* to

20      represent the interest of the State, and may fix the compensation for their services.

21

22      *First*, this statute concerns *private counsel*, not, as the Order asserted, "separate counsel."

23  *See* Doc. 1117, pp. 175-76. Consequently, while this statute bars most state agencies from hiring

24  outside counsel without the AG's permission, it does not bar state agencies from relying on their

25  own in-house lawyers. *See* N.C.G.S. § 114-2.3(d) (definition of "private counsel" does not

26  include attorneys who hold a "permanent budgeted position" within the agencies). State agencies

27  often rely on in-house counsel to handle tasks like responding to subpoenas or public records

28

1    requests. They, unlike NCAG attorneys, necessarily have access to the agency's network and

2    physical files. This is why the NCAG represented to the court that it was unsure if it would (or

3    would not, based on past practice) represent the agencies in responding to a subpoena here; state

4    law does not forbid agencies from using their own attorneys for such tasks. *See* Doc. 738-1, p. 22.

5    *Second*, §147-17(a) explicitly excepts the Governor's office from restrictions on hiring private

6    counsel in the third sentence, which the Order ignores completely. *See Martin v. Thornburg,* 359

7    S.E.2d 472, 480 (N.C. 1987) ("Defendants contend that the second sentence of [§147-17(a)]

8    limits the power of the Governor to employ special counsel to only those cases where the

9    Attorney General certifies that it is impracticable for the Attorney General to render legal

10   services. We cannot agree.").

11            **25. North Dakota**

12            The Order erroneously draws an analog to *North Dakota v. U.S.,* No. 1:19-CV-150, 2021

13   WL 6278456 (D.N.D. Mar. 24, 2021). *North Dakota* is distinguishable from this case because

14   *North Dakota*'s FTCA administrative claim and complaint identified specific federal agencies

15   "who were aware of, involved in, or contributed to the alleged tortious conduct" at issue. *Id.* at

16   *2. The Complaint in this matter does not refer to any North Dakota agency other than the North

17   Dakota Attorney General ("NDAG"). Also, the cases cited in *North Dakota* involve discovery

18   sought from federal agencies that participated or engaged in joint investigations or decision-

19   making that led to the litigation or were directly answerable to the President. *Id.* at **3-5. Here,

20   nonparty state agencies did not participate in any investigation or litigation decisions. Further,

21   North Dakota does not have a unitary executive, rather its executive power is divided among

22   several separately elected officials. *See* N.D. Const. Art. V, § 2. Therefore, while most state

23   agencies answer to the Governor, NDAG and other constitutionally elected public officials do

24   not, and vice versa.

25            The Order's finding that the NDAG has control over state agency documents is contrary

26   to the separation of powers and duties established by the North Dakota Constitution. *Id*. North

27   Dakota's Constitution establishes the Governor, NDAG, and Superintendent of Public Instruction

28   as independently elected state officers. *Id*. ND AG's powers and duties are prescribed by state law

and do not grant a right to access documents in the possession of other agencies on demand. *Id.*;

N.D. Cent. Code ch. 54-12. As the U.S. Supreme Court has recognized: "it is through the power

to 'structure ... its government, and the character of those who exercise government authority,

[that] a State defines itself as a sovereign.'" *Berger v. N. Carolina State Conf. of the NAACP*, 597

U.S. 179, 191 (2022) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). A federal court

must 'respect ... the place of the States in our federal system,' and respect for state sovereignty

must take into account the State's authority to structure its executive branch. *Cameron v. EMW*

*Women's Surgical Center, P. S. C.*, 595 U. S. 267, 277 (2022).

The legislature established the NDAG division bringing this action as a separate division

empowered to investigate and enforce laws, but not to act as counsel for other agencies. N.D.

Cent. Code § 54-12-17. Therefore, the conclusion that Plaintiff NDAG presumptively represents

and has attorney-client privilege with state agencies in this matter is clearly erroneous and

contrary to law.

**26. Ohio**

The Court's order cites R.C. 1331.16(N) as support that "Ohio state law explicitly

mandates that Ohio agencies furnish documents to the Ohio Attorney General" (p. 188).

However, R.C. 1331.01, *et seq.,* also known as the Valentine Act, specifically pertains to

monopoly and antitrust violations. *Kapenda v Parker,* 2019-Ohio-1736, ¶10 (10th Dist.) citing

*generally* R.C. Chapter 1331. The 10th District previously confirmed the clear language and

application of the Valentine Act in *Borden, Inc. v State*, 65 Ohio App. 2d, 1, 2 (10th Dist., 1979)

where it held "[t]his section empowers the Ohio Attorney General to obtain documentary

material, answers to written interrogatories, and to take testimony with regard to suspected

violations of R.C. 1331 (Antitrust), prior to the filing of any complaint alleging an antitrust

violation." Despite the sole applicability of 1331 to the Valentine Act, this Court erroneously held

that "the cited statute expressly grants the Ohio Attorney General an explicit legal right to obtain

and access these documents of the agencies at issue here." (p. 188).

Ohio's portion of the Complaint is brought under Ohio's consumer protection laws. The

Ohio Supreme Court has held that "the legislature created separate statutory schemes for antitrust

38

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1    issues and for consumer sales practices." *Johnson v Microsoft Corp.* 2005-Ohio-4985, ¶25. This

2    Court's application of Ohio antitrust law to a consumer protection case ignores those separate

3    statutory schemes and contributes to its erroneous ruling contrary to well-established Ohio law.

4    The Court cites *Bivens v Lisath*, 2007 U.S. Dist. LEXIS 40048 (S.D. Ohio, June 1, 2007)[17], as

5    precedent for the Ohio Attorney General to have "control" over documents for purposes of

6    discovery. In *Bivens*, the inmate filed a §1983 action and named certain individual prison

7    employees in their official capacity as defendants, making the Department of Rehabilitation and

8    Correction a *de facto* party represented by the Attorney General. The *Bivens* court simply

9    provided guidance for the pro se plaintiff as to how to properly obtain documents through

10   discovery. The *Bivens* ruling does not expand the Attorney General's control of documents

11   beyond the state agency that it already represented for purposes of that case.

12   **27. Oregon**

13   Preliminarily, the order indicates that Meta seeks discovery from five Oregon agencies

14   when, in fact, Meta seeks discovery from eight. The order omits Oregon Department of Human

15   Services, the Oregon Health Authority, and the Oregon Higher Education Coordinating

16   Commission from the list of agencies from whom Meta seeks documents.

17   While the order properly quotes Oregon state law, the conclusions it reaches based on

18   those laws involve unsupportable leaps of logic, as explained in the common arguments above.

19   For those reasons, Oregon joins in the Motion for Relief.

20   **28. Pennsylvania**

21   Section 208 of the Commonwealth Attorneys Act ("CAA") grants the Pennsylvania

22   Attorney General ("AG") investigative authority over Commonwealth Agencies. *In re Thirty-*

23   *Third Statewide Investigating Grand Jury*, 86 A.3d 204, 216 (Pa. 2014). Like the non-binding

24   *Generic Pharmaceuticals I*, 571 F. Supp. 3d 406, 410-11 (E.D. Pa. 2021), the Order's logic

25   erroneously follows that because the AG filed suit on behalf of the Commonwealth and that falls

26   under one of its duties in Section 208 of CAA, the door opens to making every Commonwealth

27   ───────────────

[17] The Court erroneously cited the date of the decision as Sept. 28, 2007. That is the date of a later decision on other issues. *Bivens v. Lisath*, 2007 U.S. Dist. LEXIS 75750 (S.D. Ohio Sept. 28, 2007)

28

Case 4:22-md-03047-YGR   Document 1369-3   Filed 09/20/24   Page 41 of 60
Case 4:22-cv-03803-YGR   Document 309-3   Filed 11/20/24   Page 41 of 59
PageID: 11164

1    Agency a party subject to Rule 26 discovery. The General Assembly never intended this absurd

2    result when granting investigative power to the AG under Section 208. The Order misconstrued

3    the intent of Section 208, which does not give the AG control under all circumstances to agency

4    documents especially since it is not mandatory or "necessary" that the AG represent the agencies.

5            Section 204(c) of the CAA provides the AG with the option to represent the

6    Commonwealth Agencies. Specifically, Section 204(c) does state "[t]he Attorney General shall

7    represent the Commonwealth and all Commonwealth Agencies . . . in any action brought by or

8    against the Commonwealth or its agencies," but it also provides "[t]he Attorney General may,

9    upon determining that it is more efficient or otherwise is in the best interest of the

10   Commonwealth, authorize the General Counsel or the counsel for an independent agency to

11   initiate, conduct or defend any particular litigation or category of litigation in his stead." 71 Pa.

12   Stat. § 732-204(c). Therefore, the Order erred in not considering that the Attorney General has the

13   option to represent the six non-party state agencies and that under Pennsylvania law there is not a

14   mandatory attorney-client relationship sufficient to establish that the AG has control over the state

15   agencies' documents.

16           **29. Rhode Island**

17           Pursuant to statute, the Rhode Island Department of Attorney General ("RIAG") acts as

18   outside counsel to state agencies only when they request representation. R.I. Gen. Laws § 42-9-6

19   (RIAG "*whenever requested*, shall act as the legal adviser" to agencies (emphasis added)). This is

20   both a legal and practical reality: agencies in Rhode Island employ their own counsel who

21   routinely represent those agencies in court. *See, e.g., Kyros v. Rhode Island Dep't of Health*, 253

22   A.3d 879, 880 (R.I. 2021) (agency represented solely by in-house counsel); *Apex Dev. Co., LLC*

23   *v. Rhode Island Dep't of Transportation*, 291 A.3d 995, 996 (R.I. 2023) (same). Here, the Order

24   *completely omits* any reference to the "whenever requested" modifier in R.I. Gen. Laws § 42-9-6,

25   mistakenly assuming that RIAG will necessarily represent each agency responding to a Rule 45

26   subpoena. Order at 213. Here, agencies have already received subpoenas from Defendant and not

27   one has requested representation by RIAG and undersigned counsel has learned that at least two

28   agencies have completed their response. Perhaps even more indicative of a lack of control, a

40

Case 4:22-md-03047-YGR   Document 1369-3   Filed 09/20/24   Page 42 of 59
Case 4:22-md-03047-YGR   Document 1338-3   Filed 11/20/24   Page 41 of 59
PageID: 11165

1   Rhode Island court recently denied RIAG access to Division of Motor Vehicles documents, even

2   under process, in a case brought under the Deceptive Trade Practices Act.  *State of Rhode Island*

3   *v. BTTR LLC et al.*, No. PC-2022-04492 (Oct. 28, 2022).

4        The Order also mistakenly assumes that RIAG representation of an agency in one matter

5   grants RIAG the ability to provide discovery to Defendant in this case. Order 213-217. The Order

6   states that statutorily authorized access by prosecutors in a criminal matter to certain records at

7   Department of Children, Youth, and Families ("DCYF") would give RIAG "control" over that

8   agencies' records for purposes of discovery in a wholly unrelated matter.  *Id*. at 214 (citing R.I.

9   Gen. Laws § 42-72-8). However, the statute cited in the Order prohibits the disclosure of any

10  DCYF information "unless necessary" in connection with a criminal investigation and imposes

11  sanctions for unauthorized disclosure.  *See* R.I. Gen. Laws § 42-72-8(b), (f). That there is a statute

12  authorizing access under specific circumstances (not present here) is evidence that otherwise

13  RIAG has no right of access to agency documents. *Finnimore & Fisher Inc. v. Town of New*

14  *Shoreham*, 291 A.3d 977, 984 (R.I. 2023) ("express enumeration of items in a statute indicates a

15  legislative intent to exclude all items not listed").

16       **30. South Carolina**

17       Judge Kang based his finding that the South Carolina Attorney General has legal control

18  over the documents of several South Carolina agencies on older and more general statutory

19  provisions, while ignoring completely the recent and explicit law passed to address this precise

20  situation.[18] *See* Doc. 1117, p. 224. Under the current laws of South Carolina, when the Attorney

21  General brings an enforcement action as he has against Meta, he acts in the "public interest of the

22  State of South Carolina and not as the legal representative or attorney of any department or

23  agency of state government[.]" 2024-25 Appropriation Act Part 1B Section 59.16.[19]

24       [18] While Judge Kang holds that the issue of Attorney General control over state agency
25  documents under Rule 34 is governed by federal law, his findings with regard to South Carolina
    appear based on certain provisions of South Carolina law and whether they create legal control
26  under *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999).

27       [19] South Carolina's fiscal year ended in July 2024. Accordingly, since the original briefing
    on this matter, a new budget has passed and therefore, the citation to the law is slightly different
28  than in the original brief. The law, however, is identical. *See* 2023-24 Appropriation Act 1B Section
    59.19.

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

"Departments, agencies, or boards are not parties to these actions, *and the documents or electronically-stored information of such departments, agencies, or boards are not in the possession, custody, or control of the Attorney General.*" *Id.* (emphasis added).

Judge Kang did not misapprehend this law or find it inapplicable. He simply omitted it from his analysis despite South Carolina's briefing, *see* Doc. 736-31, relying instead on decades-old laws that primarily deal with litigation on behalf of agencies or hiring legal counsel. *See* S.C. Code Ann. §§ 1-7-80; 1-7-160. These provisions were central to the court's ruling regarding control over agency documents in *State of South Carolina v. Purdue Pharma, L.P.*, No. 2017-CP-40-04872, 2019 WL 3753945 (S.C. Com. Pl. July 05, 2019). However, that decision predated (and indeed, caused) the proviso cited above. *Purdue Pharma* is simply no longer good law. Judge Kang's ruling that "there is no statutory, legal, or administrative rule cited which prohibits the South Carolina Attorney General from accessing the documents of the state agencies at issue," Doc. 1117, p. 219, cannot find legal purchase in the face of a clear and unequivocal statement by South Carolina's lawmakers. "Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (S.C. 2000) (internal citations omitted).

**31. South Dakota**

The Magistrate Judge's decision defiles South Dakota's ("SD") statutory and constitutional scheme. The SD Attorney general ("SDAG") is an independent entity. He is an elected state officer. S.D. Const. Art. IV, §7. He is not required to litigate on behalf of the SD governor or any subdivision of the state. The SDAG litigates on behalf of the people. The SDAG "may bring a civil action," in the name of the state, as parens patriae on behalf of the natural persons residing in the state…" SDCL §37-1-23. It is the duty of the attorney general:

"When requested by the Governor or either branch of the Legislature, or whenever, in the judgment of the attorney general, the welfare of the state demands, to appear for the state and prosecute or defend… SDCL §1-11-1."

The clear use of a permissive "may" in SDCL §37-1-23 and disjunctive "or" in SDCL §1-11-1 indicates that the SDAG is not required to litigate "except when the welfare of the state demands." *Id*. Without such prerogative, the SDAG would be unable to institute and maintain a uniform legal policy that protects the public. This responsibility often requires the SDAG to take positions to which state officials or agencies object. They are independent by design.

SD's Constitution and statutes have denied the SDAG the legal right to obtain the requested documents on demand. SD's Governor is also an independently elected official. S.D. Const. Art. IV, §2. It's our Governor, not the SDAG, that can exercise control over subdivisions of the state. Art. IV §8. It's our Governor that may require the requested documents per our Constitution. Art. IV §3.

On the contrary, our law is clear that the SDAG is not permitted to obtain the requested documents without the Governor's resolution, order or consent. SDCL §1-11-10. Proof of theoretical control is insufficient; a showing of actual control is required. *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999). Hence, the Magistrate Judge erred finding there to be a mechanism to obtain the requested documents since the SDAG has no control over them.

### 32. Virginia

In determining that the Virginia Attorney General has "control" over the state agencies in this matter, the order fundamentally misunderstands the structure of the Commonwealth's government. The order relied upon the unremarkable fact that the Attorney General serves as legal counsel to state agencies in their own "civil litigation." Va. Code § 2.2-507. That statutory responsibility is irrelevant here. The Attorney General did not bring this action as counsel to any state agency. Rather, the Attorney General brought these claims under his own independent authority pursuant to Virginia Code § 2.2-517, defining his duties as Consumer Counsel, and Virginia Code § 59.1-203(A), authorizing him to enforce the Virginia Consumer Protection Act ("VCPA"). Specifically, Section 2.2-517(A) provides that within the Office of the Attorney General, there is "a Division of Consumer Counsel . . . that *shall represent the interests of the people as consumers.*" (Emphasis added). Similarly, the VCPA is "remedial legislation" to protect "the consuming public." Va. Code § 59.1-198. The Attorney General's representation here

1  is to protect the "people as consumers," and the "consuming public," in contrast to the Attorney

2  General's distinct role as civil litigation counsel for separate state agencies.

3       Merely because the Attorney General might serve as counsel for a state agency if it were

4  to be involved in its own litigation does not subject *every* agency in the Commonwealth to the

5  Attorney General's control. Nor does it grant the Attorney General *legal authority* to obtain

6  documents "upon demand" from those agencies. *See Citric Acid*, 191 F.3d at 1107. State law is

7  clear; these agencies are "separate entities under the law." *Id.* In Virginia, the "executive power"

8  and oversight of the executive branch is vested in the Governor. Va. Const. art. V, §§ 1, 2, 7, 9;

9  Va. Code, Tit. 2.2, Chapt. 1. Each of the agencies identified by META is under the direction of

10 the Governor or a governing board selected pursuant to statute, not the Attorney General. *See,*

11 *e.g.,* Va. Code §§ 2.2-1500, 2.2-2235.1, 2.2-2648, 22.1-21, 32.1-16, 32.1-17, 32.1-357, 32.1-358,

12 37.2-301, 63.2-200, 63.2-201. Unlike in the federal system, the Virginia Attorney General is a

13 *separately* elected and independent constitutional officer. Va. Const. art. V, § 15; Va. Code, Tit.

14 2.2, Chapt. 5. This Court should not permit a discovery order to rewrite the constitutional

15 structure of the Commonwealth's government.

16 **33. Washington**

17      Washington District Court Opinions Do Not Support a Finding of Legal Control in this

18 Case. The order relies on *Washington v. GEO Grp., Inc.,* but ignores factors that make *GEO*

19 inapplicable. The state agencies' own actions in *GEO* were the bases of defendants' affirmative

20 defenses of laches and unclean hands. *Washington v. GEO Grp., Inc.,* 2018 WL 9457998 at *3

21 (W.D. Wash. Oct. 2, 2018). Here, Meta has given no indication that state agencies delayed

22 bringing claims or engaged in wrongdoing. Additionally, *GEO* involved the Minimum Wage Act

23 (MWA), a statute typically enforced by a state agency. Here, the AGO has its own statutory

24 enforcement authority, as argued below. Doc. 738-34. *Wilson v. Washington et al.* is also

25 distinguishable. In *Wilson*, both a state agency and an agency employee were defendants. The

26 court compelled documents from a third-party agency that oversaw the profession of the

27 defendant agency employee. *Wilson v. Washington et al.,* WL 518615, at 7. Here, no such

28 relationship exists. Further, like *GEO*, *Wilson* involved allegations of misconduct by state

44

1    agencies. *Wilson,* Dkt. 22 at 6-14.

2        <u>The AGO Does Not Have Collective Legal Control of All Client Documents</u>. The order's

3    disregard of an attorney-client privilege[20] between AGO attorneys and client agencies and the

4    order's conclusion that AGO attorneys have legal control of all client agencies' documents

5    ignores potential adversarial interests among agencies. Doc. 1117, pp. 234-235, 238. Nor is such

6    potential adversity hypothetical. In *Washington State University v. Pac-12 Conference* (Whitman

7    Co. Sup. Ct. No. 23-2-00273-38[21]), Washington State University litigated directly against the

8    University of Washington, with both being represented by the AGO.

9        **34. West Virginia**

10       As to West Virginia, the order is mistaken as both a factual and legal matter.

11       Factually, the order mistakenly assumes that the Attorney General always represents state

12   agencies. But "State executive branch and related entities may in some circumstances employ and

13   use lawyers who are not employees of the Attorney General." *State ex rel. McGraw v. Burton*,

14   569 S.E.2d 99, 116 (W. Va. 2002); *see, e.g.*, *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th

15   Cir. 2024) (separate counsel representing the Board of Education). Although separate counsel has

16   not appeared for any state agency in this case, that's only because no agencies are parties. The

17   Attorney General here represents the State alone. *See Burton*, 569 S.E.2d at 117 n.27 (contrasting

18   the Attorney General's role in representing agencies, when he "represent[s] the entity's position,"

19   with his role representing the State, when he "assert[s] the Attorney General's view").

20       Legally, the Attorney General's role as a sometimes-lawyer for state agencies does not

21   give him possession, custody, or control over those agencies' documents. Yes, the Attorney

22   General might request or advise a particular agency to turn over documents. But the ultimate

23   decision of whether to produce always lies with the agency. *See State ex rel. Caryl v. MacQueen*,

---

24   [20] To be clear, Washington has not claimed that communications between AGO
     enforcement attorneys and state agencies or their attorneys are protected by attorney-client
25   privilege. Rather, such communications "may be protected by the common interest doctrine AGO
     attorneys representing." Doc. 738-34.  The common interest doctrine is not a privilege in itself,
26   but is instead an exception to the waiver of an existing privilege, if one exists.

27   [21] Docket available at
     https://1.next.westlaw.com/Document/I73FC202A6F5111EE9CCDF6A41696CAC0/View/FullT
28   ext.html?transitionType=Default&contextData=(sc.Default)

385 S.E.2d 646, 648 (W. Va. 1989) ("[L]ike any other client in an attorney-client relationship, [an agency] was not required to accept [the Attorney General's] advice."). This reality flows from the separation of powers in the West Virginia Constitution, under which the Governor controls the agencies and the Attorney General—a separately elected official—acts as their legal advisor. W. Va. Const., art. VII, § 1; *cf. State ex rel. Fahlgren Martin, Inc. v. McGraw*, 438 S.E.2d 338, 345 (1993) (explaining how the Attorney General does not have broad investigatory powers over state agencies). The order's approach destroys that separation. *See United States v. Am. Express Co.*, No. 10CV04496, 2011 WL 13073683, at *2 (E.D.N.Y. July 29, 2011). And it incorrectly presumes the Attorney General has authority to do whatever he is not expressly restrained from doing. West Virginia law is just the opposite. *See Cavalry SPV I, LLC v. Morrisey*, 752 S.E.2d 356, 363 (W. Va. 2013).

Lastly, the Attorney General was not asserting privilege. He was solely explaining how that privilege operates—and how it does *not* attach when, as here, "[t]he Attorney General independently brings a consumer protection action." Doc. 738-35, p. 2.

### 35. Wisconsin

In addition to the common arguments raised above, there are three distinct reasons it was clear error to conclude the Wisconsin Attorney General ("WI AG") has control over other state agencies' documents: (1) under Wisconsin law, the AG requires statutory authority to act, and no Wisconsin statute confers on him the power to obtain these records in this case; (2) contrary to the order, the WI AG is prosecuting this case in the name of the state and does not represent the Wisconsin governor; and (3) the WI AG cannot represent other agencies or constitutional officers except upon request, and no such request was made in this case.

**First**, in Wisconsin, "the attorney general's actions must be authorized by statute." *See State v. City of Oak Creek*, 2000 WI 9, ¶ 33, 232 Wis. 2d 612, 605 N.W.2d 526. Because no statute confers on the WI AG the power to obtain the records at issue, he lacks authority to obtain them.

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

**Second,** the order incorrectly concluded the WI AG represents the governor in this case.[22] The WI AG filed this action in the name of the state, not the governor or another official or agency. Under Wis. Stat. § 165.25(1m),[23] which the order cites, the WI AG, "[i]f requested by the governor," shall "represent the state, any state department, agency, official, employee, or agent . . . [in] any cause or matter." While the governor can ask the WI AG to file a case on behalf of him and/or another agency or official., *e.g., Evers v. Marklein*, 2024 WI 31, ¶ 2 n.1, 412 Wis. 2d 525, 8 N.W.3d 395, he did not do so here. The conclusion that the WI AG represents the governor in this case is factually and legally wrong.

**Third**, under Wis. Stat. § 165.25(6)(a)1, the WI AG *may* represent state agencies and/or officials only upon request. No request to represent other agencies or officials under § 165.25(6)(a)1 was made in connection with bringing this case. As the Wisconsin Supreme Court has held, independent constitutional officers (e.g., the governor or the superintendent) must be free to take legal positions contrary to the WI AG.[24] *See Koschkee v. Evers*, 2018 WI 82, ¶¶ 13-14, 382 Wis. 2d 666, 913 N.W.2d 878. The practical consequence of the order—forcing WI AG representation on independent constitutional officers—violates Wisconsin's constitutional structure.

### IV. Conclusion

The order incorrectly concludes that the AGs, acting in their independent enforcement capacity, have legal control over unrelated state agencies' documents. If allowed to stand, the order places the AGs in the impossible position of responding to discovery seeking documents to which they do not have legal access, significantly impedes the functioning of state government,

---

[22] Contrary to the order, the WI AG did not "admit" he was representing the governor in this case. Doc. 1117, p. 243. Instead, in response to a request for briefing on whether "pre-suit communications" may be privileged, *see* Doc. 716, p. 2, the WI AG observed that such communications with the governor regarding this litigation may be privileged.

[23] The order's citation to Wis. Stat. § 165.25(1) is inapposite. Doc. 1117, p. 243. That statute, by its terms, applies only to certain matters pending in Wisconsin state courts.

[24] The order ignored the fact that the superintendent, an elected constitutional officer, heads the Department of Public Instruction (DPI). *See* Wis. Const. art. X, § 1; Wis. Stat. § 15.37. The order failed to distinguish between DPI and the other relevant Wisconsin agencies. Doc. 1117, p. 244.

and imperils the ability of state AGs to bring enforcement actions in federal court. The AGs ask the Court to hold that this conclusion is "clearly erroneous" and "contrary to law." Fed. R. Civ. P. 72(a). Further, the AGs ask the Court to hold that Meta has failed to meet its "burden of proving that the [AGs] ha[ve] such control," *Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d at 1452, and to deny Meta's request to seek party discovery from state agencies under Rule 34.

1    Dated: September 20, 2024                    Respectfully submitted,

2    **KRIS MAYES**                               **ROB BONTA**
     Attorney General                            Attorney General
3    State of Arizona                             State of California

4    */s/ Laura Dilweg*                           */s/ Megan O'Neill*
5    Laura Dilweg (AZ No. 036066, CA No. 260663)  Nicklas A. Akers (CA SBN 211222)
     Chief Counsel - Consumer Protection and      Senior Assistant Attorney General
6    Advocacy Section                             Bernard Eskandari (CA SBN 244395)
     Nathan Whelihan (AZ No. 037560, CA No.       Emily Kalanithi (SBN 256972)
7    293684), *pro hac vice*                      Supervising Deputy Attorneys General
8    Assistant Attorney General                   Nayha Arora (CA SBN 350467)
     Arizona Attorney General's Office            Megan O'Neill (CA SBN 343535)
9    2005 North Central Avenue                    Joshua Olszewski-Jubelirer
     Phoenix, AZ 85004                            (CA SBN 336428)
10   Phone: (602) 542-3725                        Marissa Roy (CA SBN 318773)
     Fax:    (602) 542-4377                       Brendan Ruddy (CA SBN 297896)
11   Laura.Dilweg@azag.gov                        Deputy Attorneys General
12   Nathan.Whelihan@azag.gov                     California Department of Justice
                                                  Office of the Attorney General
13   *Attorneys for Plaintiff State of Arizona*   455 Golden Gate Ave., Suite 11000
                                                  San Francisco, CA 94102-7004
14                                                Phone: (415) 510-4400
     **PHILIP J. WEISER**                         Fax: (415) 703-5480
15   Attorney General                             megan.oneill@doj.ca.gov
     State of Colorado
16
                                                  *Attorneys for Plaintiff the People of the State*
17   */s/ Bianca E. Miyata*                       *of California*
     Bianca E. Miyata (CO Reg. No. 42012),
18   *pro hac vice*
     Senior Assistant Attorney General
19   Lauren M. Dickey (CO Reg. No. 45773)
     First Assistant Attorney General
20   Elizabeth Orem (CO Reg. No. 58309)
21   Assistant Attorney General
     Colorado Department of Law
22   Ralph L. Carr Judicial Center
     Consumer Protection Section
23   1300 Broadway, 7th Floor
     Denver, CO 80203
24   Phone: (720) 508-6651
25   bianca.miyata@coag.gov

26   *Attorneys for Plaintiff State of Colorado, ex rel.*
     *Philip J. Weiser, Attorney General*
27

28

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

| | |
|---|---|
| **WILLIAM TONG**<br>Attorney General<br>State of Connecticut | **ASHLEY MOODY**<br>Attorney General<br>State of Florida |

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Lauren H. Bidra*
Lauren H. Bidra
(CT Juris No. 440552), *pro hac vice*
Special Counsel for Media and Technology
 Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306
Fax: 860-808-5593
Lauren.Bidra@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Marion M. Quirk*
Owen Lefkon
Director of Fraud and Consumer Protection
Marion Quirk, *pro hac vice*
Director of Consumer Protection
Ryan T. Costa (DE Bar 5325), *pro hac vice*
Deputy Director of Consumer Protection
Deputy's Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8800
Marion.Quirk@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**ASHLEY MOODY**
Attorney General
State of Florida

*/s/ Victoria Ann Butler*
Victoria Ann Butler (FL Bar No. 861250),
*pro hac vice*
Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Telephone: (813) 287-7950
Victoria.butler@myfloridalegal.com

John M. Guard (FL Bar No. 374600),
*pro hac vice*
Chief Deputy Attorney General
PL-01 The Capitol
Tallahassee, FL 32399
John.guard@myfloridalegal.com

Nicholas J. Weilhammer (FL Bar No. 479322),
*pro hac vice*
Associate Deputy Attorney General for
Enforcement
PL-01 The Capitol
Tallahassee, FL 32399
Telephone: (850) 414-3861
Nicholas.weilhammer@myfloridalegal.com

Donna Cecilia Valin (FL Bar No. 96687),
*pro hac vice*
Special Counsel, Assistant Attorney General
135 West Central Blvd.
Orlando, FL 32801
Telephone: (407) 316-4840
Donna.valin@myfloridalegal.com

Karen E. Berger (FL Bar No. 72991)
*pro hac vice*
Special Counsel, Assistant Attorney General
110 SE 6th Street, 10th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 712-4600
Karen.berger@myfloridalegal.com

*Attorneys for Office of the Attorney General,
State of Florida, Department of Legal Affairs*

| | |
|---|---|
| **CHRISTOPHER M. CARR**<br>Attorney General<br>State of Georgia<br><br>*/s/ Melissa M. Devine*<br>Melissa M. Devine (GA Bar No. 403670),<br>*pro hac vice*<br>Assistant Attorney General<br>Office of the Attorney General of the State of<br>Georgia<br>2 Martin Luther King Jr. Drive, SE, Ste. 356<br>Atlanta, GA 30334<br>Phone: (404) 458-3765<br>Fax: (404) 651-9108<br>mdevine@law.ga.gov<br><br>*Attorneys for Plaintiff State of Georgia*<br><br><br>**ANNE E. LOPEZ**<br>Attorney General<br>State of Hawai'i<br><br>*/s/ Christopher T. Han*<br>Bryan C. Yee (HI JD No. 4050),<br>*pro hac vice*<br>Supervising Deputy Attorney General<br>Christopher T. Han (HI JD No. 11311),<br>*pro hac vice*<br>Deputy Attorney General<br>Department of the Attorney General<br>Commerce and Economic Development Division<br>425 Queen Street<br>Honolulu, Hawai'i 96813<br>Phone: (808) 586-1180<br>Bryan.c.yee@hawaii.gov<br>Christopher.t.han@hawaii.gov<br><br>*Attorneys for Plaintiff State of Hawai'i* | **RAÚL R. LABRADOR**<br>Attorney General<br>State of Idaho<br><br>*/s/ Nathan Nielson*<br>Nathan H. Nielson (ID Bar No. 9234),<br>*pro hac vice*<br>Deputy Attorney General<br>Attorney General's Office<br>P.O. Box 83720<br>Boise, ID 83720-0010<br>(208) 334-2424<br>nathan.nielson@ag.idaho.gov<br><br>*Attorneys for Plaintiff State of Idaho*<br><br><br>**THEODORE E. ROKITA**<br>Attorney General<br>State of Indiana<br><br>*/s/ Scott L. Barnhart*<br>Scott L. Barnhart (IN Atty No. 25474-82),<br>*pro hac vice*<br>Chief Counsel and Director of Consumer<br>Protection<br>Corinne Gilchrist (IN Atty No. 27115-53),<br>*pro hac vice*<br>Section Chief, Consumer Litigation<br>Mark M. Snodgrass (IN Atty No. 29495-49),<br>*pro hac vice*<br>Deputy Attorney General<br>Office of the Indiana Attorney General<br>Indiana Government Center South<br>302 West Washington St., 5th Floor<br>Indianapolis, IN 46203<br>Telephone: (317) 232-6309<br>Scott.Barnhart@atg.in.gov<br>Corinne.Gilchrist@atg.in.gov<br>Mark.Snodgrass@atg.in.gov<br><br>*Attorneys for Plaintiff State of Indiana* |

**KWAME RAOUL**
Attorney General
State of Illinois

 */s/ Matthew Davies*
Susan Ellis, Chief, Consumer Protection Division
(IL Bar No. 6256460)
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau (IL Bar No. 6272322)
Jacob Gilbert, Deputy Chief, Consumer Fraud
Bureau (IL Bar No. 6306019)
Adam Sokol, Consumer Counsel, Consumer Fraud
Bureau (IL Bar No. 6216883)
Matthew Davies, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6299608), *pro
hac vice*
Emily María Migliore, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6336392)
Kevin Whelan, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6321715), *pro
hac vice*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-2218
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Adam.Sokol@ilag.gov
Matthew.Davies@ilag.gov
Emily.Migliore@ilag.gov
Kevin.Whelan@ilag.gov

*Attorneys for Plaintiff the People of the State of
Illinois*

**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*

**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*
Asyl Nachabe (LA Bar No. 38846),
*pro hac vice*
L. Christopher Styron (LA Bar No. 30747),
*pro hac vice*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
NachabeA@ag.louisiana.gov
StyronC@ag.louisiana.gov

*Attorneys for State of Louisiana*

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109),
*pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*pro hac vice*
Zachary Richards (KY Bar No. 99209),
*pro hac vice*
Daniel I. Keiser (KY Bar No. 100264),
*pro hac vice*
Matthew Cocanougher (KY Bar No. 94292), *pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Michael Devine*
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8829
michael.devine@maine.gov

*Attorney for Plaintiff State of Maine*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Caitlin Micko*
Caitlin Micko (MN Bar No. 0395388)
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 724-9180
caitlin.micko@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ Elizabeth J. Stern*
Philip D. Ziperman (Maryland CPF No.
9012190379), *pro hac vice*
Deputy Chief, Consumer Protection Division
Elizabeth J. Stern (Maryland CPF No.
1112090003), *pro hac vice*
Assistant Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Mr. Ziperman)
Phone: (410) 576-7226 (Ms. Stern)
Fax: (410) 576-6566
pziperman@oag.state.md.us
estern@oag.state.md.us

*Attorneys for Plaintiff Office of the Attorney
General of Maryland*


**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482), *pro hac vice*
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
517-335-7632
PingD@michigan.gov

*Attorneys for Plaintiff State of Michigan*


**ANDREW BAILEY**
Attorney General
State of Missouri

*/s/ Michael Schwalbert*
Michael Schwalbert, *pro hac vice*
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Attorney for Plaintiff State of Missouri, ex rel.
Andrew Bailey, Attorney General*


**AUSTIN KNUDSEN**
Attorney General
State of Montana

*/s/ Anna K. Schneider*
Anna K. Schneider
Montana Attorney General's Office
Special Assistant Attorney General
Senior Counsel
Office of Consumer Protection
P.O. Box 201405
Helena, MT 59620-1405
(406) 444-4500
anna.schneider@mt.gov

David H. Thompson
Michael W. Kirk
Brian W. Barnes
Megan M. Wold
Athanasia O. Livas
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Council for Plaintiff, State of Montana*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

/s/ Colin P. Snider
Colin P. Snider (NE #27724)
Assistant Attorney General
*pro hac vice*
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: (402) 471-3840
Email: michaela.hohwieler@nebraska.gov
Email: colin.snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*


**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

/s/ Kashif T. Chand
Kashif T. Chand (NJ Bar No. 016752008),
*pro hac vice*
Section Chief, Deputy Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov

*Attorney for Plaintiffs  Matthew J. Platkin, Attorney
General for the State of New Jersey, and Cari Fais,
Acting Director of the New Jersey Division of
Consumer Affairs*


**LETITIA JAMES**
Attorney General
State of New York

/s/ Christopher D'Angelo
Christopher D'Angelo, Chief Deputy Attorney
General, Economic Justice Division
(NY Bar No. 4348744), *pro hac vice*
Christopher.D'Angelo@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of
Internet and Technology
(NY Bar No. 2848323), *pro hac vice*
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney General
(NY Bar No. 5773676), *pro hac vice*
Nathaniel.Kosslyn@ag.ny.gov
New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff the People of the State
of New York*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

**JOSHUA H. STEIN**
Attorney General
State of North Carolina

*/s/ Kevin Anderson*
Kevin Anderson (N.C. Bar No. 22635),
*pro hac vice*
Senior Counsel for Consumer Protection and
Multistate Litigation
Sarah G. Boyce
Deputy Attorney General & General Counsel
Jasmine S. McGhee
Senior Deputy Attorney General
Director, Consumer Protection Division
Josh Abram
Kunal Choksi
Special Deputy Attorneys General
Charles G. White
Assistant Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6006
Facsimile: (919) 716-6050
kander@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

**DAVE YOST**
Attorney General
State of Ohio

*/s/ Kevin R. Walsh*
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney
General Dave Yost*

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon

*/s/ Jordan M. Roberts*
Jordan M. Roberts (Oregon Bar No. 115010),
*pro hac vice*
Assistant Attorney General
Oregon Department of Justice
Consumer Protection Section
100 SW Market Street
Portland, Oregon 97201
Telephone:     (971) 673-1880
Facsimile:     (971) 673-1884
E-mail: jordan.m.roberts@doj.state.or.us

*Attorneys for State of Oregon, ex rel. Ellen
F. Rosenblum, Attorney General for the
State of Oregon*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

**DREW H. WRIGLEY**
Attorney General
State of North Dakota

*/s/ Elin S. Alm*
Elin S. Alm, *pro hac vice*
(ND Bar No. 05924)
Director/Assistant Attorney General
Christopher G. Lindblad, *pro hac vice*
(ND Bar No. 06480)
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
ealm@nd.gov

clindblad@nd.gov
*Attorneys for Plaintiff State of North Dakota, ex rel.*
*Drew H. Wrigley, Attorney General*


**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania

*/s/ Timothy R. Murphy*
Timothy R. Murphy
Senior Deputy Attorney General
(PA Bar No. 321294), *pro hac vice*
Email: tmurphy@attorneygeneral.gov
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of*
*Pennsylvania*

**ALAN WILSON**
Attorney General
State of South Carolina

*/s/ Anna C. Smith*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Clark C. Kirkland, Jr. (CA SBN 272522)
Assistant Attorney General
**OFFICE OF THE ATTORNEY**
**GENERAL OF SOUTH CAROLINA**
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-0536
annasmith@scag.gov

*Attorneys for Plaintiff the State of South*
*Carolina, ex rel. Alan M. Wilson, in His*
*Official Capacity as*
*Attorney General of the State of South*
*Carolina*


**MARTY J. JACKLEY**
Attorney General
State of South Dakota

*/s/ Jessica M. LaMie*
By: Jessica M. LaMie (SD Bar No. 4831),
*pro hac vice*
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Stephen N. Provazza*
Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice*
Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**JASON S. MIYARES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Steven G. Popps
Chief Deputy Attorney General
Thomas J. Sanford
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Section Chief
Joelle E. Gotwals (VSB No. 76779),
*pro hac vice*
Assistant Attorney General
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone:    (804) 786-8789
Facsimile:    (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of Virginia*
*ex rel. Jason S. Miyares, Attorney General*

**PATRICK MORRISEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267),
*pro hac vice*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. Patrick Morrisey, Attorney General*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Colin R. Stroud*
Colin R. Stroud
Assistant Attorney General
WI State Bar #1119457, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-9224
stroudcr@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*

1

2

**ROBERT W. FERGUSON**
Attorney General
State of Washington

3

4

*/s/ Alexandra Kory*
Alexandra Kory (WA Bar No. 49889),
*pro hac vice*
Joseph Kanada (WA Bar No. 55055),
*pro hac vice*
Rabi Lahiri
Gardner Reed
Assistant Attorneys General
Washington State Office of the Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Alexandra.Kory@atg.wa.gov

5

6

7

8

9

10

11

12

*Attorneys for Plaintiff State of Washington*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28