# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION**<br><br>**THIS DOCUMENT RELATES TO: SELF-FUNDED PAYER TRACK** | **Case 2:23-md-03080 MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI JUDGE RUKHSANAH L. SINGH** |

## DECLARATION OF DAVID R. BUCHANAN

Pursuant to 28 U.S.C. 1746, I, David R. Buchanan, hereby declare as follows:

1.      I am an attorney at law of the State of New Jersey, admitted to practice in this Court, and a partner with the law firm of Seeger Weiss LLP. I am Co-Lead Counsel for the Self-Funded Payer Track in this action. I submit this declaration in connection with the Plaintiffs' Motion for Leave to Amend Complaints.

2.      To the best of my knowledge, information, and belief, attached hereto as Exhibits 1 through 3 are true and correct copies of the following documents:

| EXHIBIT | DOCUMENT DESCRIPTION |
|---|---|
| 1 | Exemplar proposed amended complaint reflecting Plaintiffs' proposed allegations against the rebate aggregators (using the currently operative complaint filed in *County of Monmouth, New Jersey v. Eli Lilly and Company, et al.*, Case No. 2:23-cv-03916 (D.N.J.) [ECF No. 18]) |
| 2 | Redline document indicating in what respects the exemplar proposed amended complaint differs from the currently operative complaint filed in *County of Monmouth, New Jersey v. Eli Lilly and Company, et al.*, Case No. 2:23-cv-03916 (D.N.J.) [ECF No. 18] |

| EXHIBIT | DOCUMENT DESCRIPTION |
|:---:|:---|
| 3 | Administrative Complaint, Dkt. No. 9437, *In the Matter of Caremark Rx, LLC et al.*, (F.T.C. Sept. 20, 2024) |

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 31, 2025          *s/ David R. Buchanan*
David R. Buchanan

# EXHIBIT 1

Christopher A. Seeger
David R. Buchanan
Steven J. Daroci
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
(973) 639-9100

*Attorneys for Plaintiff*
*County of Monmouth, New Jersey*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-3080 (BRM)(RLS) MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** *County of Monmouth, New Jersey v. Eli Lilly and Company, et al.*, Case No. 2:23-cv-03916 | **JUDGE BRIAN R. MARTINOTTI JUDGE RUKHSANAH L. SINGH** **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiff County of Monmouth, New Jersey ("Plaintiff" or "Monmouth County"), by and through undersigned counsel, alleges as follows:

## I.    INTRODUCTION

1.    The cost of diabetes medications has skyrocketed over the past 20 years. Over that time, while the average cost of consumer goods and services has risen 1.75-

fold, the cost of some diabetes medications has risen more than tenfold. These price increases do not derive from the rising cost of goods, production costs, investment in research and development, or competitive market forces. Instead, Defendants engineered them to exponentially increase their profits at the expense of payors like Plaintiff.

2.    Diabetes is widespread. According to the American Diabetes Association, the total estimated cost of diabetes in the United States in 2022 was over $412 billion (including $306.6 billion in direct medical costs and $106.3 billion in indirect costs)—up from $327 billion in 2017. Direct health care costs attributable to diabetes have increased by $80 billion over the past ten years—from $227 billion in 2012 to $306.6 billion in 2022. One in four healthcare dollars is spent caring for people with diabetes.

3.    In New Jersey alone, diabetes costs over $9 billion per year, including $6.6 billion in direct medical expenses and $2.5 billion in indirect costs.[1]

4.    Nearly 750,000 New Jerseyans—over 10% of the adult population—have diabetes.[2] In Monmouth County, approximately 7% of adults are living with

---

[1]*See* https://diabetes.org/sites/default/files/2024-
03/adv_2024_state_fact_new_jersey.pdf (last visited Aug. 1, 2024).

[2] *Id*.

diabetes.[3]

5. Defendants CVS Caremark, Express Scripts, and OptumRx (collectively, the "PBM Defendants" or "the PBMs") are pharmacy benefit managers that work in concert with the Manufacturers of the at-issue drugs to dictate the availability and price of the at-issue drugs for most of the U.S. market.[4] The PBM Defendants are, at once, (a) the three largest PBMs in the United States (controlling more than 80% of the PBM market); (b) the largest pharmacies in the United States (comprising three of the top five dispensing pharmacies in the U.S.); and (c) owned and controlled by entities that own three of the largest insurance companies in the United States—Aetna (CVS Caremark), Cigna (Express Scripts), and UnitedHealthcare (OptumRx).

6. These conglomerate Defendants sit at 5th (UnitedHealth Group), 6th (CVS Health), and 15th (Cigna) on the Fortune 500 list.

**Figure 1: PBMs, PBM-Affiliated Insurers, and PBM-Affiliated Pharmacies**

| PBM | PBM-Affiliated Insurer | PBM-Affiliated Pharmacy |
|---|---|---|
| CVS Caremark | Aetna | CVS Pharmacy |

---

[3] New Jersey Dep't of Health, New Jersey State Health Assessment Data, *available at* https://www-doh.nj.gov/doh-shad/indicator/view/DiabetesPrevalence.County.html (last visited Aug. 1, 2024)

[4] The "at-issue drugs" or "at-issue medications" are those set forth in the table in Paragraph 274.

| Express Scripts | Cigna | Express Scripts Pharmacy Inc. |
| --- | --- | --- |
| Optum | UnitedHealthcare | OptumRx |

7.      For transactions in which the PBM Defendants control the insurer, the PBM, and the pharmacy (e.g., Aetna—CVS Caremark—CVS Pharmacy)—these middlemen capture as much as half of the money spent on each insulin prescription (up from 25% in 2014), even though they contribute nothing to the innovation, development, manufacture, or production of the drugs.

8.   The PBMs establish national formulary offerings (i.e., approved-drug lists) that determine which diabetes medications are covered by nearly every payor in the United States, including in New Jersey and, more specifically, Monmouth County.

9.   The Manufacturers and PBMs understand that the PBMs' national formularies drive drug utilization. The more accessible a drug is on the PBMs' national formularies, the more that drug will be purchased throughout the United States. Conversely, the exclusion of a drug from one or more of the PBMs' formularies can render the drug virtually inaccessible for millions of covered persons.

10.   Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical payment chain, both Defendant groups understand that the PBM Defendants wield enormous influence over drug prices and purchasing behavior.

11.   The Manufacturers set the initial list prices for their respective insulin medications. Over the last 20 years, list prices have sharply increased in lockstep, even though the cost of production has decreased. Insulins, which today cost Manufacturers as little as $2 per vial to produce, and which were priced at $20 per vial in the 1990s, now range in price from $300 to over $700.

12.   The Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, taking the same increases down to the decimal point within a few days of one another and, according to a U.S. Senate Finance Committee investigation, "sometimes mirroring" one another in "days or even hours."[5] Figure 2 below reflects the exponential rate at which Defendant Eli Lilly raised the list price of its analog insulin, Humalog, compared to the rate of inflation for other consumer goods and services during the period from 1997 through 2018.

---

[5] Charles E. Grassley & Ron Wyden, *Staff Report on Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, *Sen. Fin. Comm.*, at 6, 54, 55 (Jan. 2021), https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin %20Report%20FINAL%201).pdf (hereinafter "Senate Insulin Report").

**Figure 2: Price Increase of Insulin (Humalog) vs. Selected Consumer Goods, 1997-2018**



13.  And looking at the narrower timeframe between 2013 through 2018, prices for insulin products have increased at rates far exceeding inflation, as illustrated in the chart below from the Kaiser Family Foundation.

**Figure 3: Average annual price increases of insulins vs. inflation, 2013-2018**



14.     Today's exorbitant prices are contrary to the intent of insulin's inventors, who sold their original patent rights to the University of Toronto for $1 each, reasoning that "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly." One of the inventors, Sir Frederick Banting, stated that "[i]nsulin does not belong to me, it belongs to the world." But today, counter to its inventors' noble aims, insulin is the poster child for skyrocketing pharmaceutical prices.

15.     Little about these medications has changed over the past 100 years; today's $350 insulin is essentially the same product the Manufacturers sold for $20 in the 1990s.

### How the Insulin Pricing Scheme Works

16.     In the simplest terms, there are four classes of participants in the at-issue

medication chain.

    a.    ***Health Insurance Plans.*** Health insurance plans, often funded by employers (here, Monmouth County), provide cost coverage and reimbursements for medical treatment and care of individuals. These plans often include pharmacy benefits, meaning that the health plan pays a substantial share of the purchase price of its beneficiaries' prescription drugs, which includes the at-issue diabetes medications. Operators of these plans may be referred to as payors, plan sponsors, or PBM clients. The three main types of payors are government/public payors, commercial payors, and private payors.

    b.    ***Pharmacy Benefit Managers.*** Payors like Monmouth County routinely engage pharmacy benefit managers to manage their prescription benefits, which includes negotiating prices with drug manufacturers and (supposedly) helping payors manage drug spending. Each pharmacy benefit manager maintains a formulary—a list of covered medications. A pharmacy benefit manager's power to include or exclude a drug from its formulary should theoretically incentivize manufacturers to lower their list prices. Pharmacy benefit managers also contract with pharmacies to dispense medications purchased by the plan's beneficiaries. Pharmacy benefit managers are compensated by retaining

a portion of what—again in theory—should be shared savings on the cost of medications.

c.    ***Rebate Aggregators.*** Rebate aggregators are group purchasing organizations that negotiate and collect rebates and other fees for pharmacy benefit manager clients. Each of the three PBM Defendants here established its own rebate aggregator GPO (Defendants Zinc, Ascent, and Emisar) between 2018 and 2022, to outsource the negotiation and collection of rebates and other fees to a subsidiary, and impose new fees on the Manufacturers, purportedly for the aggregator's services. The PBM Defendants' rebate aggregators allow the PBMs to further obfuscate the rebate payment trail and extract additional profits from their contracts with payors.

d.    ***Manufacturers.*** Manufacturers produce prescription medications, including the at-issue insulin medications.[6] Each sets a list price for its

---

[6] There are three types of insulin medications. First are *biologics,* which are manufactured insulins derived from living organisms. Second are *biosimilars*, which are "highly similar" copies of biologics. They are similar in concept to "generic" drugs, but in seeking approval, biosimilars use biologics (rather than drugs) as comparators. Third, the confusingly named *authorized generics* are not true generics—they are an approved brand-name drug marketed without the brand name on the label. The FDA approved the original insulins as drug products rather than biologics, so although there was a regulatory pathway to introduce biosimilars generally (i.e., copies of biologics), companies could not introduce insulin biosimilars because their comparators were "drugs" rather than "biologics." In 2020, the FDA

products. The term "list price" is often used interchangeably with "Wholesale Acquisition Cost" or "WAC." The Manufacturers self-report their list prices to publishing compendia such as First DataBank, Medi-Span, or Redbook, who then publish those prices.[7]

17.    Given the PBMs' purchasing power and their control over formularies that dictate the availability of drugs, their involvement should theoretically drive down list prices because drug manufacturers normally compete for inclusion on the standard national formularies by lowering prices. For insulin, however, to gain access to the PBMs' formularies, the Manufacturers gain the PBMs' approval by artificially *inflating* their list prices and then paying a significant, yet undisclosed, portion of that inflated price back to the PBMs (collectively, the "Manufacturer Payments").[8] The Manufacturer Payments bear a variety of dubious labels, including rebates, discounts,

---

moved insulin to the biologic regulatory pathway, thereby opening the door to approval of biosimilars through an abbreviated approval process.

[7] The related "Average Wholesale Price" (AWP) is the published price for a drug sold by wholesalers to retailers.

[8] In this Complaint, "Manufacturer Payments" is defined to include all payments or financial benefits of any kind conferred by the Manufacturer Defendants to the PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on a PBM Defendant's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, and any other form of consideration exchanged.

credits, inflation/price protection fees, and administrative fees. But by whatever name, the inflated list prices and resulting Manufacturer Payments are a quid pro quo for inclusion and favorable placement on the PBMs' formularies.[9]

18.  Contracts between the PBM Defendants and payors like Plaintiff tie the definition of "rebates" to patient drug utilization. But the contracts between the PBMs and Manufacturers define "rebates" and other Manufacturer Payments differently, e.g., by calling rebates for formulary placement "administrative fees." Defendants consequently profit from the "rebates" and other Manufacturer Payments, which are shielded from payors' contractual audit rights, thereby precluding payors from verifying the components or accuracy of the "rebates" that payors receive.

19.  In recent years, the PBM Defendants have further obfuscated the rebate payment trail by forming group purchasing organizations ("GPOs") known as "rebate aggregators." These PBM subsidiaries—as relevant here, Defendants Zinc (CVS), Ascent (Express Scripts), and Emisar (OptumRx)—negotiate rebates and other fees on the PBMs' behalf and retain a portion of the rebates and fees collected. As a result, these fees are neither passed through to payors nor subject to audit under the terms

---

[9] Favorable or preferred placement may, for example, involve placing a branded product in a lower cost-sharing tier or relaxing utilization controls (such as prior-authorization requirements or quantity limits). Favorable placement of a relatively more expensive drug encourages use of that drug and leads to higher out-of-pocket costs for payors and co-payors.

of payors' sponsor agreements with the PBMs. Because the rebate aggregators are PBM subsidiaries, however, the PBMs secure additional profits from each drug purchase.

20.   The PBM Defendants' staggering revenues vastly exceed the fair market value of their services—both generally and with respect to the at-issue drugs.

21.   The Manufacturers' initial list prices for the at-issue drugs are not the result of free market competition for payors' business. To the contrary, their list prices are so exorbitant in comparison to the net prices they ultimately realize that the Manufacturers know that their list prices constitute false prices. These list prices reflect neither the Manufacturers' actual costs to produce the at-issue drugs nor the fair market value of those drugs. Rather, they are artificially inflated solely to facilitate the Insulin Pricing Scheme.[10]

22.   The PBM Defendants grant formulary status based on (a) the *highest inflated price*—which the PBMs know to be false—and (b) which diabetes medications generate the largest profits for themselves.

23.   The Insulin Pricing Scheme thus creates a "best of both worlds" scenario

_____

[10] "Net price" refers to the price the manufacturer ultimately realizes—that is, the list price less rebates, and other discounts (net sales divided by volume). At times, Defendants' representatives use "net price" to refer to the amount payors or plan members pay for medications. In this Complaint, "net price" refers to the former—the amount that the Manufacturers realize for the at-issue drugs, which is roughly the list price less Manufacturer Payments.

for Defendants. The PBMs get exorbitant secret Manufacturer Payments based on the Manufacturers' list prices, and the Manufacturers increase their sales and revenues by being favorably placed on formularies. As the PBMs get larger and larger Manufacturer Payments, the Manufacturers simply increase their list prices further.

24.    The PBM Defendants profit off the Insulin Pricing Scheme in many ways, including by: (a) retaining a significant, yet secret, share of the Manufacturer Payments, either directly or through rebate aggregators like Defendants Zinc, Ascent, and Emisar, (b) using the prices produced by the Insulin Pricing Scheme to generate unwarranted profits from pharmacies, and (c) relying on those same artificial list prices to drive up the PBMs' margins and pharmacy-related fees, including those relating to their mail-order pharmacies. In addition, because the PBM Defendants claim that they can extract higher rebates due to their market power, ever-rising list prices increase demand for the PBMs' purported negotiation services.

25.    As detailed below, although the PBM Defendants represent both publicly and directly to clients like Monmouth County that they use their market power to drive *down* prices for diabetes medications, these representations are false and deceptive. Rather, the exact opposite is true: the PBMs intentionally work to incentivize the Manufacturers to *inflate* their list prices. The PBMs' "negotiations" intentionally drive up the price of the at-issue drugs and are directly responsible for the skyrocketing prices of diabetes medications, conferring unearned benefits upon

the PBMs and Manufacturers alike and overcharging payors like Monmouth County.

26.  Because the purchase price of every at-issue diabetes medication flows from a false list price generated by Defendants' unfair and deceptive scheme, every payor in the United States that purchases these life-sustaining drugs, including Monmouth County, has been directly harmed by the Insulin Pricing Scheme.

27.  Even if temporary reductions in Monmouth County's costs for the at-issue drugs occur from time to time, those costs still remain significantly higher than costs that would have resulted from a transparent exchange in a free and open market.

28.  As a payor for and purchaser of the at-issue drugs, Monmouth County has been overcharged millions of dollars during the relevant period as a direct result of the Insulin Pricing Scheme. Indeed, in the eight-year period between 2016 and 2023, Monmouth County spent about *$1 million per year* on the at-issue diabetes medications.

29.  A substantial portion of this amount is attributable to the artificially inflated prices of the at-issue drugs, which arose not from transparent or competitive market forces, but from undisclosed, opaque, and unlawful conduct on the part of the Manufacturer Defendants and the PBM Defendants.

30.  This action alleges that Defendants violated the Racketeer Influenced and Corrupt Organizations Act, the New Jersey Consumer Fraud Act, and New Jersey

common law by engaging in the Insulin Pricing Scheme. The Insulin Pricing Scheme directly and foreseeably caused—and continues to cause—harm to Plaintiff.

31.     This action seeks injunctive relief, restitution, disgorgement, actual damages, statutory damages and/or penalties, punitive damages, attorneys' fees and costs, and all other available relief to address and abate the harm caused by the Insulin Pricing Scheme.

32.     The relevant period for the claims alleged is from 2003 through the present.

## II.    THE PARTIES

### A.    Monmouth County

33.     Plaintiff the County of Monmouth, New Jersey, is a political subdivision of the State of New Jersey.

34.     Monmouth County is the fifth most populous county in New Jersey, with its county seat in Freehold, New Jersey. Monmouth County has a population of 644,098, according to the latest estimates from the U.S. Census Bureau.

35.     Monmouth County provides services that are designed to foster the safety, health, and well-being of its residents, including police, fire, and first responder services; law enforcement services; judiciary services; and public health, safety, and assistance services for families and persons in need.

36.     Any increase in spending has a detrimental effect on Plaintiff's overall

budget and, in turn, negatively impacts its ability to provide necessary services to the community.

37.    The Insulin Pricing Scheme has had such an effect.

38.    Monmouth County provides health benefits to its employees, retirees, and their dependents (collectively, "Beneficiaries"). One of the benefits Monmouth County offers its Beneficiaries is paying a substantial share of the purchase price of their pharmaceutical drugs, including the at-issue diabetes medications.

39.    Monmouth County maintains self-insured health plans for its Beneficiaries. During the relevant time period, there were around 6,500 benefit-eligible employees (many of whom carried coverage for immediate family). Total enrollment fluctuated over time but generally ranged between 6,000 and just over 7,000 members.

40.    Exclusive of the costs associated with providing diabetes medications at county-run facilities, such as correctional facilities, Monmouth County spends approximately $1 million per year on the costs of providing diabetes medications for its Beneficiaries. Accordingly, during the relevant period, and to the detriment of its Beneficiaries and taxpayers, Plaintiff has paid millions of dollars more for diabetes medications than it otherwise would have paid absent Defendants' conduct.

41.    Plaintiff seeks relief for the harm suffered by Defendants' misrepresentations and omissions regarding their illegal Insulin Pricing Scheme.

### B.    Manufacturer Defendants

42.    **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

43.    Eli Lilly is, and has been since 1962, registered to do business in the State of New Jersey.

44.    In New Jersey and nationally, Eli Lilly manufactures, promotes, and distributes several at-issue diabetes medications, including: Humulin N (first U.S. approval in 1982), Humulin R (first U.S. approval in 1982), Humalog (first U.S. approval in 1996), Trulicity (first U.S. approval in 2014), and Basaglar (first U.S. approval in 2015).

45.    Eli Lilly's domestic revenues from 2019 to 2021 were $11.9 billion from Trulicity, $4.48 billion from Humalog, $2.58 billion from Humulin and $2.31 billion from Basaglar.[11]

46.    Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin, and $801 million from Basaglar.

47.    Eli Lilly transacts business in New Jersey, including in Monmouth

---

[11] Eli Lilly Annual Report (Form 10-K) (FYE Dec. 31, 2021).

County, targeting these markets for its products, including the at-issue diabetes medications.

48.    Eli Lilly employs sales representatives throughout New Jersey to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

49.    Eli Lilly also directs advertising and informational materials to New Jersey and to Monmouth County physicians and potential users of Eli Lilly's products for the specific purpose of selling the at-issue drugs in New Jersey and Monmouth County and profiting from the Insulin Pricing Scheme.

50.    At all relevant times, in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices for the at-issue diabetes medications throughout New Jersey with the express knowledge that payment and reimbursement by Plaintiff would be based on those false list prices.

51.    During the relevant period, Monmouth County purchased Eli Lilly's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

52.    All Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New Jersey based on the specific false and inflated prices Eli Lilly caused to be published in New Jersey in furtherance of the Insulin Pricing Scheme.

53.    **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited

liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

54.     Sanofi manufactures, promotes, and distributes pharmaceutical drugs both in New Jersey and nationally, including Lantus (first U.S. approval in 2000), Apidra (first U.S. approval in April 2004), Toujeo (first U.S. marketing authorization in February 2015), and Soliqua (first U.S. approval in November 2016).

55.     Sanofi touts Lantus as one of its "flagship products" and "one of Sanofi's leading products, with net sales of €2,494 million" ($2.95 billion) in 2021, as well as net sales of €2,661million ($3.04 billion) in 2020, representing 7.4% of the company's net sales for 2020.[12]

56.     Sanofi's U.S. net sales in 2019 were $1.29 billion from Lantus, $323.7 million from Toujeo, and $51.5 million from Apidra.[13]

57.     Sanofi transacts business in New Jersey and in Monmouth County, targeting these markets for its products, including the at-issue diabetes medications.

58.     Sanofi employs sales representatives throughout New Jersey and in this District to promote and sell Lantus, Toujeo, Soliqua, and Apidra.

59.     Sanofi also directs advertising and informational materials to New

---

[12] Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2021); Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2020).

[13] Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2019).

Case 2:23-md-03080-BRM-RLS    Document 406-2    Filed 01/31/25    Page 23 of 580
PageID: 12520

Jersey physicians and potential users of Sanofi's products for the specific purpose of selling the at-issue drugs in New Jersey and Monmouth County and profiting from the Insulin Pricing Scheme.

60.    At all relevant times, in furtherance of the Insulin Pricing Scheme, Sanofi published its prices of its at-issue diabetes medications throughout New Jersey for the purpose of payment and reimbursement by payors, including Monmouth County.

61.    During the relevant period, Monmouth County purchased Sanofi's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

62.    All Sanofi diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New Jersey and Monmouth County based on the specific false and inflated prices Sanofi caused to be published in New Jersey in furtherance of the Insulin Pricing Scheme.

63.    **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

64.    Novo Nordisk manufactures, promotes, and distributes pharmaceutical drugs both in New Jersey and nationally, including Novolin R (first U.S. approval in 1991), Novolin N (first U.S. approval in 1991), Novolog (first U.S. approval in June

2002), Levemir (first U.S. approval in June 2005), Victoza (first U.S. approval in January 2010), Tresiba (first U.S. approval in 2015), and Ozempic (first U.S. approval in 2017).

65.    Novo Nordisk's combined net sales of these drugs in the United States from 2018 to 2020 totaled approximately $18.1 billion ($6.11 billion for Victoza alone).[14]

66.    Novo Nordisk's global revenues for "total diabetes care" over that three-year period exceeded $41 billion.[15]

67.    Novo Nordisk transacts business in New Jersey and in Monmouth County, targeting these markets for its products, including the at-issue diabetes medications.

68.    Novo Nordisk employs sales representatives throughout New Jersey and Monmouth County to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

69.    Novo Nordisk also directs advertising and informational materials to New Jersey and Monmouth County physicians and potential users of Novo Nordisk's products for the specific purpose of selling the at-issue drugs in New Jersey and

---

[14] Novo Nordisk, Annual Report (Form 20-F) (Dec. 31, 2019).

[15] *Id*.

Monmouth County and profiting from the Insulin Pricing Scheme.

70.    At all relevant times relevant, in furtherance of the Insulin Pricing Scheme, Novo Nordisk published its prices of its at-issue diabetes medications throughout New Jersey for the purpose of payment and reimbursement by Monmouth County.

71.    During the relevant period, Monmouth County purchased Novo Nordisk's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

72.    All Novo Nordisk diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New Jersey based on the specific false and inflated prices Novo Nordisk caused to be published in New Jersey in furtherance of the Insulin Pricing Scheme.

73.    As set forth above, Eli Lilly, Sanofi, and Novo Nordisk are referred to collectively as the "Manufacturer Defendants" or the "Manufacturers."

### C.    PBM Defendants

#### *CVS Caremark*

74.    **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

75.    CVS Health transacts business and has locations throughout the United

22

States and New Jersey, including in Monmouth County.

76.    CVS Health—through its executives and employees, including its Chief Executive Officer, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents, and Chief Communication Officers—is directly involved in creating and implementing the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs involved in the Insulin Pricing Scheme.

77.    CVS Health's conduct had a direct effect in New Jersey and damaged Plaintiff as a payor and purchaser.

78.    On a regular basis, CVS Health executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

79.    In annual reports filed with the SEC throughout the last decade, CVS Health (or its predecessor) has repeatedly and explicitly stated that CVS Health itself:

a.    designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

b.    negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients; and

     c.    utilizes an independent panel of doctors, pharmacists, and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.

80.    CVS Health publicly represents that it lowers the cost of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including New Jersey, stating that CVS Health

> introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3,000 to $5,000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).[16]

81.    A 2017 CVS Health report stated: "*CVS Health* pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."

82.    In November 2018, CVS Health acquired Aetna for $69 billion and

---

[16] CVS HEALTH, *CVS Health Introduces New "Transform Diabetes Care" Program to Improve Health Outcomes and Lower Overall Health Care Costs* (Dec. 13, 2016), https://cvshealth.com/newsroom/press-releases/cvs-health-introduces-new-transform-diabetes-care-program-improve-health.

became the first combination of a major health insurer, PBM, and mail-order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM, and the pharmacies used by approximately 40 million Aetna members in the United States, including in New Jersey. CVS Health controls the entire drug payment chain for these 40 million Americans.

83.    CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout New Jersey, including CVS Pharmacy, Inc., which is registered to do business in the state. These pharmacies dispensed and received payment for the at-issue diabetes medications throughout the relevant period. According to CVS Health's 2022 Form 10-K filed with the U.S. Securities and Exchange Commission, the company "maintains a national network of approximately 66,000 retail pharmacies, consisting of approximately 40,000 chain pharmacies (which include CVS Pharmacy locations) and approximately 26,000 independent pharmacies, in the United States."[17]

84.    **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy—a wholly owned subsidiary of CVS Health—is, and has been since 1977, registered to do business int the State of New Jersey.

---

[17] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2022).

85.     CVS Pharmacy is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout New Jersey and is directly involved in these pharmacies dispensing and payment policies related to the at-issue diabetes medications.

86.     CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, LLC.

87.     CVS Pharmacy holds numerous pharmacy licenses (d/b/a CVS Health) in New Jersey.

88.     During the relevant period, CVS Pharmacy provided retail pharmacy services in New Jersey that gave rise to the Insulin Pricing Scheme, which damaged payors, including Monmouth County.

89.     **Defendant Caremark Rx, LLC** is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy-benefit-management and mail-order subsidiaries that engaged in the activities in New Jersey that gave rise to this action.

90.     Caremark Rx, LLC is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health, and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

91.     During the relevant period, Caremark Rx, LLC provided PBM and mail-order-pharmacy services in New Jersey that gave rise to the Insulin Pricing Scheme

and damaged payors in New Jersey, including Monmouth County.

92.    **Defendant Caremark, LLC** is a California limited liability company whose principal place of business is at the same location as CVS Health.

93.    Caremark, LLC is, and has been since 2009, registered to do business in New Jersey.

94.    Caremark, LLC holds one or more wholesaler licenses and holds at least three pharmacy licenses in New Jersey.

95.    Caremark, LLC is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health.

96.    During the relevant period, Caremark, LLC provided PBM and mail-order pharmacy services in New Jersey and Monmouth County that gave rise to the Insulin Pricing Scheme, which damaged payors, including Monmouth County.

97.    **Defendant CaremarkPCS Health, LLC ("CaremarkPCS Health")** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

98.    CaremarkPCS Health is a subsidiary of CaremarkPCS, LLC, which is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health.

99.    CaremarkPCS Health is, and has been since 2009, registered to do

27

business in New Jersey.

100.    CaremarkPCS Health, doing business as CVS Caremark, provides pharmacy benefit management services.

101.    During the relevant period, CaremarkPCS Health provided PBM services in the State of New Jersey, which gave rise to the Insulin Pricing Scheme and damaged payors, including Monmouth County.

102.    **Defendant Zinc Health Services, LLC** ("Zinc") is a Delaware limited liability company with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

103.    Zinc is a direct subsidiary of CVS Pharmacy, which is a direct subsidiary of CVS Health.

104.    CVS Health established Zinc as a GPO for CVS Caremark's PBM business in March 2020. Zinc was founded, at least in part, to negotiate rebates with drug manufacturers for CVS Caremark.

105.    During the relevant period, Zinc negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in New Jersey.

106.    Defendants CaremarkPCS Health and Caremark, LLC, and Zinc are agents and/or alter egos of Caremark Rx, LLC, CVS Pharmacy, and CVS Health.

107.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly

involved in the conduct of and control CaremarkPCS Health's and Caremark, LLC's operations, management, and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail-order and retail pharmacy services—to the ultimate detriment of Plaintiff. For example:

a.    During the relevant period, these parents and subsidiaries have had common officers and directors, including:

> i.    Thomas S. Moffatt, Vice President and Secretary of Caremark Rx, LLC, CaremarkPCS Health, and Caremark, LLC, has also served as Vice President, Assistant Secretary, and Senior Legal Counsel at CVS Health and the Vice President, Secretary and Senior Legal Counsel of CVS Pharmacy;
>
> ii.    Melanie K. Luker, Assistant Secretary of Caremark Rx, LLC, CaremarkPCS Health, and Caremark, LLC, has also served as Manager of Corporate Services at CVS Health;
>
> iii.    Carol A. Denale, Senior Vice President and Treasurer of Caremark Rx, LLC, has also served as Senior Vice President, Treasurer, and Chief Risk Officer at CVS Health Corporation;
>
> iv.    John M. Conroy has been Vice President of Finance at CVS Health since 2011, and has also served as President and Treasurer of Caremark, LLC and CaremarkPCS Health in 2019; and
>
> v.    Sheelagh Beaulieu has been the Senior Director of Income Tax at CVS Health while also acting as the Assistant Treasurer at CaremarkPCS Health and Caremark, LLC.

b.    CVS Health owns all the stock of CVS Pharmacy, which owns all the stock of Caremark Rx, LLC, which owns all the stock of Caremark LLC. CVS Health directly or indirectly owns CaremarkPCS Health in its

entirety.

  c. CVS Health, as a corporate unit, does not operate as separate entities. Rather, its public filings, documents and statements present its subsidiaries—including CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC, and CaremarkPCS Health—as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." CVS Health's recent public filings also disclose that the company "operates a group purchasing organization that negotiates pricing for the purchase of pharmaceuticals and rebates with pharmaceutical manufacturers on behalf of its participants," without identifying Zinc by name.[18] The day-to-day operations of this corporate unit reflect these public statements. These entities constitute a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint.[19]

  d. All executives of CaremarkPCS Health, Caremark, LLC, Caremark Rx, LLC, CVS Pharmacy, and Zinc ultimately report to the

---

[18] CVS Health Corp. Form 10-K, FYE Dec. 31, 2020, 2021, 2022, 2023.

[19] CVS Caremark/CVS Health, Annual Report (Form 10-K) (Dec. 31, 2009-2019); CVS Health, *Our Purpose*, https://cvshealth.com/about-cvs-health/our-purpose (last visited Sept. 9, 2022); CVS Health, *Quality of Care*, https://cvshealth.com/health-with-heart/improving-health-care/quality-of-care (last visited Sept. 9, 2022).

executives at CVS Health, including its President and CEO.

   e. As stated above, CVS Health's CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents and Chief Communication Officers are directly involved in the policies and business decisions by Caremark, LLC and CaremarkPCS Health that give rise to Plaintiff's claims.

108. Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC, Zinc, and CaremarkPCS Health, including all predecessor and successor entities, are referred to collectively as "CVS Caremark."

109. CVS Caremark is named as a Defendant in its capacities as a PBM, a rebate aggregator, and a mail-order pharmacy.

110. In its capacity as a PBM, CVS Caremark coordinated with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

111. CVS Caremark has the largest PBM market share based on total prescription claims managed. Its pharmacy-services segment provides, among other things, plan design offerings and administration, formulary management, retail pharmacy network management services, mail-order pharmacy, specialty pharmacy and infusion services, clinical services, and medical spend management. In 2021,

CVS Caremark's pharmacy services segment "surpassed expectations" and had a "record selling season of nearly $9 billion in net new business wins for 2022." In all, it generated just over $153 billion in total revenues (on top of total 2019-2020 segment revenues exceeding $283 billion).[20]

112.    At all relevant times, CVS Caremark offered pharmacy benefit services nationwide and to New Jersey payors, including Monmouth County, and derived substantial revenue from those services, and, in doing so, (a) made misrepresentations and omissions while concealing the Insulin Pricing Scheme, and (b) used the false prices generated by the Insulin Pricing Scheme.

113.    At all relevant times, CVS Caremark offered PBM services nationwide and maintained standard formularies that were used nationwide, including in New Jersey. Those formularies included diabetes medications, including those at issue in this action, and CVS Caremark participated in pricing the at-issue drugs based off the list prices it knew to be false.

114.    CVS Caremark purchased drugs directly from manufacturers for dispensing through its pharmacy network.

115.    During the relevant period, CVS Caremark made representations and omissions to Monmouth County through proposals to provide PBM services in

---

[20] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2021).

response to Plaintiff's requests for proposals. In doing so, CVS Caremark reinforced the false list prices for the at-issue drugs generated by the Insulin Pricing Scheme.

116.   Further, in its capacity as a retail pharmacy, CVS Caremark knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the spread between the acquisition cost for the at-issue drugs (an amount well below the list price generated by the Insulin Pricing Scheme) and the amounts it received from payors (amounts that were based on the false list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

117.   During the relevant period, CVS Caremark provided mail-order and retail pharmacy services nationwide and within the State of New Jersey and employed prices based on the false list prices generated by the Insulin Pricing Scheme.

118.   At all relevant times, CVS Caremark dispensed the at-issue medications nationwide and within the State of New Jersey through its mail-order and retail pharmacies and it derived substantial revenue from these activities in New Jersey.

119.   At all relevant times, CVS Caremark had express agreements with Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail-order

pharmacies.

### *Express Scripts*

120.    **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at One Express Way, St. Louis, Missouri 63121.[21]

121.    Evernorth, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme.

122.    Evernorth's conduct has had a direct effect in New Jersey and on Monmouth County.

123.    Evernorth executives and employees communicate with and direct Evernorth's subsidiaries on a regular basis related to the at-issue PBM services and formulary activities.

124.    Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New Jersey, which engaged in the activities that gave rise to this action.

---

[21] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc. and Express Scripts Holding Company.

125.   In 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies used by approximately 15 million Cigna members in the United States, including in New Jersey. Evernorth controls the entire drug payment chain for these 15 million Americans.

126.   In annual reports filed with the SEC throughout the last decade, Evernorth repeatedly and explicitly:

a.     Acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest stand-alone PBM company in the United States."

b.     Stated that Evernorth: "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."[22]

127.   Even after the merger with Cigna, Evernorth "operates various group

---

[22] Express Scripts Annual Reports (FY 2009-2019); Cigna Annual Report (Form 10-K) FYE 2020 & 2021).

purchasing organizations that negotiate pricing for the purchase of pharmaceuticals and formulary rebates with pharmaceutical manufacturers on behalf of their participants" and operates the company's Pharmacy Rebate Program while its subsidiary Express Scripts provides "formulary management services" that ostensibly "assist customers and physicians in choosing clinically-appropriate, cost-effective drugs and prioritize access, safety and affordability." In 2021, Evernorth reported adjusted revenues of $131.9 billion (representing 75.8% of Cigna Corporation's revenues), up from $116.1 billion in 2020.[23]

128. **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

129. Express Scripts, Inc. is, and has been since 1992, registered to do business in New Jersey.

130. Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New Jersey that engaged in the conduct that gave rise to this action.[24]

131. During the relevant period, Express Scripts Inc. was directly involved in the PBM and mail-order pharmacy services that gave rise to the Insulin Pricing

---

[23] Cigna Annual Report (Form 10-K) (FYE Dec. 31, 2021).

[24] Express Scripts Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

Scheme and damaged payors, including Monmouth County.

132.   Indeed, Express Scripts, Inc. has provided pharmacy benefit services to Monmouth County since at least 2012 based on Monmouth County's reliance upon Express Scripts, Inc.'s (or its predecessor Medco Health Solutions') response to the County's request for proposals and upon other representations made in the formation and maintenance of the relationship.

133.   **Defendant Express Scripts Administrators, LLC**, doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth, and it has operated, during the relevant time period, at locations in Franklin Lakes, New Jersey, and Morris Plains, New Jersey.

134.   Express Scripts Administrators, LLC is registered to do business in New Jersey.

135.   During the relevant period, Express Scripts Administrators, LLC provided PBM services in New Jersey discussed in this Complaint that gave rise to the Insulin Pricing Scheme that damaged payors, including Monmouth County.

136.   **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at the same address as Evernorth. Until its acquisition by Express Scripts, Medco's principal place of

business was in Franklin Lakes, New Jersey.

137. In 2012, Express Scripts acquired Medco for $29 billion.

138. Before the merger, Express Scripts and Medco were two of the largest PBMs in the United States and in New Jersey.

139. Before the merger, Medco provided the at-issue PBM and mail-order services, which gave rise to and implemented the Insulin Pricing Scheme and damaged payors, including Plaintiff, within New Jersey.

140. Following the merger, all of Medco's PBM and mail-order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers, including Monmouth County, becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

141. At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, David Snow, then-CEO of Medco, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater purchasing volume discounts [i.e., Manufacturer

38

Payments] from drug manufacturers and other suppliers."[25]

142.    At the same time, the then-CEO of Express Scripts, George Paz, provided written testimony to the Senate Judiciary Committee's Subcommittee on Antitrust, Competition Policy and Consumer Rights, stating: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines." First on Mr. Paz's list of "benefits of this merger" was "[g]enerating greater cost savings for patients and plan sponsors."[26]

143.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is the same location as Evernorth.

144.    ESI Mail Pharmacy Service, Inc. holds one or more wholesaler licenses and pharmacy licenses (d/b/a Express Scripts) in New Jersey.

145.    During the relevant period, ESI Mail Pharmacy Service, Inc. provided the mail-order pharmacy services in New Jersey discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged payors, including Monmouth

---

[25] Transcript available at https://www.judiciary.senate.gov/imo/media/doc/11-12-6SnowTestimony.pdf (last visited Apr. 5, 2024).

[26] Transcript available at https://www.judiciary.senate.gov/imo/media/doc/11-12-6PazTestimony.pdf (last visited Apr. 4, 2024).

County.

146.  **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

147.  Express Scripts Pharmacy, Inc. is, and has been since 2013, registered to do business in New Jersey.

148.  During the relevant period, Express Scripts Pharmacy, Inc. provided the mail-order pharmacy services in New Jersey discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged payors, including Plaintiff.

149.  **Defendant Ascent Health Services LLC** ("Ascent") is a Delaware limited liability company with its principal place of business at Mühlentalstrasse 36, 8200 Schaffhausen, Switzerland.

150.  Ascent is part of Evernorth and a subsidiary of Cigna Corporation.

151.  Express Scripts established Ascent in 2019 as a GPO for Express Scripts' PBM business. Ascent was founded, at least in part, to negotiate rebates with drug manufacturers for Express Scripts and now performs this service for Express Scripts and third-party clients.

During the relevant period, Ascent negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in New Jersey.

152.  As a result of numerous interlocking directorships and shared

40

executives, Evernorth (f/k/a Express Scripts Holding Company, Inc.) and Express Scripts, Inc. control Express Scripts Administrators, LLC's, ESI Mail Pharmacy Service, Inc.'s, Medco Health Solutions, Inc.'s, and Express Scripts Pharmacy, Inc.'s operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Plaintiff. For example:

a.    During the relevant period, these entities have had common officers and directors:

    i.    Officers and/or directors shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Managing Counsel; Dave Anderson, VP of Strategy; Matt Perlberg, President of Pharmacy Businesses; Bill Spehr, SVP of Sales; and Scott Lambert, Treasury Manager Director;

    ii.    Executives shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Senior Counsel;

    iii.    Officers and/or directors shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Senior Counsel; and Joanne Hart, Treasury Director; and

    iv.    Officers and/or directors shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Managing Counsel; Scott Lambert, Treasury Manager Director; and Joanne Hart, Treasury Director.

b.    Evernorth directly or indirectly owns all the stock of or otherwise

controls Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc., and Ascent.[27]

      c.    The Evernorth corporate family does not operate as separate entities. Evernorth's public filings, documents, and statements present its subsidiaries, including Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc., and Ascent, as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people," and which "includes a broad range of coordinated and point solution health services and capabilities, as well as those from partners across the health care system, in pharmacy solutions, benefits management solutions, care delivery and care management solutions and intelligence solutions to deliver custom and flexible solutions that meet the needs of our clients and customers."[28] The day-to-day operations of this corporate family reflect these public statements. All of these entities constitute a single business enterprise and should be treated as such as to all legal obligations detailed in

---

[27] Express Scripts Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

this Complaint.

d.    All of the executives of Express Scripts Administrators, LLC, ESI

Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Express Scripts,

Inc., and Ascent ultimately report to the executives, including the CEO, of

Evernorth.

e.    As stated above, Evernorth's CEO and other executives and

officers are directly involved in the policies and business decisions of Express

Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health

Solutions, Inc., Express Scripts Pharmacy, Inc., Ascent, and Express Scripts,

Inc. that gave rise to Plaintiff's claims in this Complaint.

153.   Defendants Evernorth Health, Inc., Express Scripts, Inc., Express

Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health

Solutions, Inc., Express Scripts Pharmacy, Inc., and Ascent, including all predecessor

and successor entities, are referred to collectively as "Express Scripts."

154.   Express Scripts is named as a Defendant in its capacities as a PBM,

rebate aggregator, and mail-order pharmacy.

155.   In its capacity as a PBM, Express Scripts coordinates with Eli Lilly,

Sanofi, and Novo Nordisk regarding the price of the at-issue diabetes medications, as

well as for the placement of these Manufacturers' diabetes medications on Express

Scripts' formularies.

156.    Before merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States.[29] During the period covered by this Complaint, Express Scripts controlled up to 30% of the PBM market in the United States.

157.    The Express Scripts network offers more than 68,000 retail pharmacies nationwide, including in New Jersey.

158.    Express Scripts transacts business throughout the United States and New Jersey.

159.    At all relevant times, Express Scripts derived substantial revenue from providing retail and mail-order pharmacy benefits in New Jersey using prices based on the false list prices for the at-issue drugs.

160.    At all relevant times, and contrary to its express representations, Express Scripts knowingly insisted that its payor clients, including Monmouth County, use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

161.    At all relevant times, Express Scripts concealed its critical role in the generation of those false list prices.

162.    At all relevant times, Express Scripts maintained standard formularies

---

[29] *Id.*

that are used nationwide, including in New Jersey. Those formularies included drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications.

163.    During the relevant period, Express Scripts provided PBM services to Monmouth County. In doing so, Express Scripts set the price that Monmouth County paid for the at-issue drugs, at prices based on the false list prices generated by the Insulin Pricing Scheme, and Monmouth County paid Express Scripts directly for the at-issue drugs.

164.    In its capacity as a mail-order pharmacy, Express Scripts received payments from New Jersey payors (including Monmouth County)—and set the out-of-pocket price paid—for, the at-issue drugs based on the falsely inflated prices generated by the Insulin Pricing Scheme and, as a result, damaged Monmouth County.

165.    At all relevant times, Express Scripts offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in New Jersey. During the relevant period, those formularies included diabetes medications, including all of those at issue in this action.

166.    Express Scripts purchases drugs directly from manufacturers for dispensing through its mail-order pharmacy.

167.    At all relevant times, Express Scripts dispensed the at-issue medications

nationwide and directly to Plaintiff and to Plaintiff's Beneficiaries through its mail-order pharmacies and derived substantial revenue from these activities in New Jersey.

168.   During the relevant period, in addition to its critical role in the Insulin Pricing Scheme, which detrimentally affected all payors and purchasers of the at-issue drugs, Express Scripts also provided PBM services directly to Monmouth County.

169.   In addition, during certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. For example, in a February 2014 email released by the U.S. Senate in conjunction with the January 2021 Senate Insulin Report, Eli Lilly describes a "Russian nested doll situation" in which Express Scripts was negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (which later would become part of Express Scripts).[30]

170.   At all relevant times, Express Scripts had express agreements with Defendants Eli Lilly, Sanofi, and Novo Nordisk related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as

---

[30] Letter from Joseph B. Kelley to Charles E. Grassley & Ron Wyden, S. Fin. Comm., https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf (last visited Apr. 5, 2024).

agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' pharmacies.

### *OptumRx*

171.    **Defendant UnitedHealth Group, Inc**. **("UnitedHealth Group")** is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

172.    UnitedHealth Group, is a diversified managed healthcare company. Its total revenues in 2022 exceeded $324 billion. In 2021, its revenues exceeded $287 billion. Since 2020, its revenues have increased by more than $30 billion per year. The company currently sits fifth on the Fortune 500 list.[31]

173.    UnitedHealth Group offers a spectrum of products and services, including health insurance plans through its wholly owned subsidiaries and prescription drugs through OptumRx, its PBM. Over one-third of the overall revenues of UnitedHealth Group come from OptumRx, which operates a network of more than 67,000 pharmacies.

174.    UnitedHealth Group, through its executives and employees, is directly involved in the company policies that shape its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin

---

[31] UnitedHealth Group, Inc. Annual Report (Form 10-K) (FYE Dec. 31, 2022).

47

Pricing Scheme. For example, UnitedHealth Group executives structure, analyze, and direct the company's overarching policies, including as to PBM and mail-order services, as a means of maximizing profitability across the corporate organization.

175.   UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies—or drug lists—to ensure people get the right medications. [*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail-order pharmacies] . . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."[32]

176.   In addition to being a PBM and a mail-order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM, and the mail-order pharmacies used by approximately 26 million UnitedHealthcare members in the United States, including those in New Jersey. UnitedHealth Group controls the entire drug payment chain for these 26 million Americans.

177.   UnitedHealth Group's conduct had a direct effect in New Jersey and

---

[32]

https://www.unitedhealthgroup.com/content/dam/UHG/PDF/sustainability/final/2020_SustainabilityReport.pdf (last visited Aug. 1, 2024).

damaged Plaintiff.

178.    UnitedHealth Group states in its annual reports that UnitedHealth Group "uses Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience." Its 2022 annual report states plainly that it is "involved in establishing the prices charged by retail pharmacies, determining which drugs will be included in formulary listings and selecting which retail pharmacies will be included in the network offered to plan sponsors' members…." As of year-end 2022 and 2021, UnitedHealth Group's "total pharmaceutical manufacturer rebates receivable included in other receivables in the Consolidated Balance Sheets amounted to $8.2 billion and 7.2, respectively," up even from $6.3 billion in 2020."[33]

179.    **Defendant Optum, Inc.** is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.

180.    Optum, Inc. is, and has been since 2000, registered to do business in

---

[33] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2018); UnitedHealth Group Annual Report (Form 10-K, Ex. 21) (FYE Dec. 31, 2021); UnitedHealth Group Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2022).

New Jersey.

181.    Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in New Jersey and damaged Monmouth County.

182.    For example, according to an Optum, Inc. press release, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payers, life sciences companies and consumers."[34] In this role, Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx,"[35] and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail-order activities.

183.    **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main Street, Irvine, California, 92614.

184.    OptumRx, Inc. operates as a subsidiary of OptumRx Holdings, LLC, which, in turn, operates as a subsidiary of Defendant Optum, Inc.

185.    OptumRx, Inc. is, and has been since 2001, registered to do business in

---

[34]https://www.sec.gov/Archives/edgar/data/731766/000119312511182325/dex991.htm.
[35] *Id.*

New Jersey.

186.    During the relevant period, OptumRx, Inc. provided the PBM and mail-order pharmacy services in New Jersey that gave rise to the Insulin Pricing Scheme, which damaged Monmouth County.

187.    **Defendant OptumInsight, Inc. ("OptumInsight")** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

188.    OptumInsight is, and since 1997 has been, registered to do business in New Jersey.

189.    OptumInsight is an integral part of the Insulin Pricing Scheme and, during the relevant time, period coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise the other Defendants as to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

190.    **Defendant Emisar Pharma Services LLC** ("Emisar") is a Delaware limited liability company with its principal place of business 1 Optum Circle, Eden Prairie, Minnesota 55344 and operations in the United States and Ireland.

191.    Emisar is a wholly owned indirect subsidiary of UnitedHealth Group Inc.

192.    Optum established Emisar in June 2021 as a GPO for Optum's PBM business. Emisar negotiates rebates with drug manufacturers on behalf of Optum's commercial clients.

During the relevant period, Emisar negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in New Jersey.

193. As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC, and Optum, Inc are directly involved in the conduct of and control OptumInsight's and Optum Rx, Inc.'s operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Plaintiff. For example:

  a.  These entities have common officers and directors, including:

  i.  Andrew Witty is the CEO and on the Board of Directors for UnitedHealth Group and previously served as CEO of Optum, Inc.;

  ii.  Dan Schumacher is Chief Strategy and Growth Officer at UnitedHealth Group and is CEO of Optum Insight, having previously served as president of Optum, Inc.;

  iii.  Dirk McMahon is President and COO of UnitedHealth Group. He served as President and COO of Optum from 2017 to 2019 and as CEO of OptumRx from 2011 to 2014.

  iv.  John Rex has been an Executive Vice President and CFO of UnitedHealth Group. since 2016 and previously served in the same roles at Optum beginning in 2012.

  v.  Terry Clark is a senior vice president and has served as chief marketing officer at UnitedHealth Group since 2014 while also serving chief marketing and customer officer for Optum.

  vi.  Tom Roos has served since 2015 as SVP and chief accounting officer for UnitedHealth Group and Optum, Inc.

vii.    Heather Cianfrocco joined UnitedHealth Group in 2008 and has held numerous leadership positions within the company while today she is CEO of OptumRx.

viii.    Peter Gill has served as SVP and Treasurer for UnitedHealth Group and also as Treasurer at OptumRx, Inc.

ix.    John Santelli led Optum Technology, the leading technology division of Optum, Inc. serving the broad customer base of Optum and UnitedHealthcare and also served as UnitedHealth Group's chief information officer.

x.    Eric Murphy, now retired, was the Chief Growth and Commercial Officer for Optum, Inc. and also was CEO of OptumInsight beginning in 2017.

b.    UnitedHealth Group directly or indirectly owns all the stock of Optum, Inc., OptumRx, Inc., OptumInsight, and Emisar;

c.    The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group present its subsidiaries, including Optum, Inc., OptumRx, Inc., and OptumInsight as divisions, departments, or "segments" of a single company that is "a diversified family of businesses" and that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities constitute a single business enterprise and should be treated as such as to all legal

obligations detailed in this Complaint.[36]

    d.    All executives of Optum, Inc., OptumRx, Inc., OptumInsight, and Emisar ultimately report to the executives, including the CEO, of UnitedHealth Group.

    e.    As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc., OptumRx, Inc., and OptumInsight, and Emisar that gave rise to Plaintiff's claims.

194.   Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., Optum, Inc., and Emisar, including all predecessor and successor entities, are collectively referred to as "OptumRx."

195.   OptumRx is named as a Defendant in its capacities as a PBM, rebate aggregator, and mail-order pharmacy.

196.   OptumRx is a pharmacy benefit manager and, as such, coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these Manufacturers' diabetes medications on OptumRx's drug formularies.

197.   OptumRx provides pharmacy care services to more than 65 million

---

[36] UnitedHealth Group, Quarterly Report (Form 10-Q) (Mar. 31, 2017).

people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities. It is one of UnitedHealth Group Inc.'s "four reportable segments" (along with UnitedHealthcare, Optum Health, and OptumInsight).

198.   In 2022, OptumRx managed $124 billion in pharmaceutical spending.[37]

199.   For the years 2018-2022, OptumRx managed $91 billion, $96 billion, $105 billion, $112 billion, and $124 billion in pharmaceutical spending, respectively.[38]

200.   In 2019, OptumRx's revenue (excluding UnitedHealthcare) totaled $74 billion. By 2022, it had risen to more than $99 billion.[39]

201.   At all relevant times, OptumRx derived substantial revenue providing pharmacy benefits in New Jersey.

202.   During the relevant period, OptumRx made representations and omissions to Monmouth County through proposals to provide PBM services in response to Plaintiff's requests for proposals. In doing so, OptumRx Caremark reinforced the false list prices for the at-issue drugs generated by the Insulin Pricing Scheme.

---

[37]  UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2022).

[38] *Id.*

[39] *Id.*

203.   At all relevant times, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in New Jersey. Those formularies included diabetes medications, including all of those at issue in this Complaint. Those formularies included diabetes medications, including those at issue in this action. OptumRx purchased drugs directly from manufacturers for dispensing through its pharmacy network.

204.   At all relevant times, and contrary to its express representations, OptumRx knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

205.   At all relevant times, OptumRx concealed its critical role in the generation of those false list prices.

206.   In its capacity as a mail-order pharmacy with a contracted network of retail pharmacies, OptumRx received payments from payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

207.   At all relevant times, OptumRx dispensed the at-issue medications nationwide and in New Jersey through its mail-order pharmacies and derived substantial revenue from these activities in New Jersey.

208.   OptumRx purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail-order

pharmacies and network of retail pharmacies.

209.    At all relevant times, OptumRx had express agreements with Eli Lilly, Sanofi, and Novo Nordisk related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx pharmacies.

## III.    JURISDICTION AND VENUE

### A.    Subject-Matter Jurisdiction

210.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367.

### B.    Personal Jurisdiction

211.    This Court has personal jurisdiction over each Defendant. Each Defendant: (a) transacts business and/or is admitted to do business within New Jersey; (b) maintains substantial contacts in New Jersey, and (c) committed the violations of federal statutes, New Jersey statutes, and common law at issue in this action in whole or part within the State of New Jersey. This action arises out of and relates to each Defendant's contacts with this forum. The Insulin Pricing Scheme has been directed at, and has had the foreseeable and intended effect of causing injury to

persons residing in, located in, or doing business in New Jersey, including Plaintiff. All of the at- issue transactions occurred in New Jersey and/or involved New Jersey residents.

212.   Each Defendant purposefully availed itself of the privilege of doing business within this State, including within this District. And each derived substantial financial gain from doing so. These continuous, systematic, and case-related business contacts—including the tortious acts described herein—are such that each Defendant should reasonably have anticipated being brought into this Court.

213.   Each Defendant submitted itself to jurisdiction through, among other things, pervasive marketing, encouraging the use of its products or services, and its purposeful cultivation of profitable relationships within the State of New Jersey.

214.   In short, each Defendant has systematically served a market in New Jersey relating to the Insulin Pricing Scheme and has caused injury in New Jersey such that there is a strong relationship among Defendants, this forum, and the litigation.

215.   This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

216.   This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named

Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the Court in a single action for a single trial.

### C.    Venue

217.   Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District and because a substantial part of the events or omissions giving rise to this action took place, or had their ultimate injurious impact, within this District. In particular, at all times during the relevant period, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold diabetes medications, or published prices of the at issue drugs in this District and caused injury to Plaintiff in this District.

218.   Venue is also proper in this District pursuant to 18 U.S.C. § 1965 because all Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## IV.    ADDITIONAL FACTUAL ALLEGATIONS

### A.    Diabetes and Insulin Therapy

#### 1.    The Diabetes Epidemic

219.   Diabetes occurs when a person's blood glucose is too high. In people

without diabetes, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to blood glucose. When insulin is lacking or when cells stop responding to insulin, however, blood sugar stays in the bloodstream. Over time, this can cause serious health problems, including heart disease, blindness, and kidney disease.

220. There are two basic types of diabetes: Type 1 and Type 2. Approximately 5-10% of diabetics are Type 1, which occurs when a person's pancreas does not make—or makes very little—insulin. Those with Type 1 diabetes are treated with insulin injections and other diabetes drugs.

221. Roughly 90-95% of diabetics are Type 2, which develops when a person does not produce enough insulin or has become resistant to the insulin they produce. Although Type 2 patients can initially be treated with tablets, most patients eventually must switch to insulin injections.

222. Diabetes has been on the rise for decades. In 1958, only 1.6 million Americans had diabetes. By the turn of the century, however, that number had grown to over ten million. Fourteen years later, that number had tripled. Today, more than 38 million Americans—approximately 12% of the country—live with the disease.

223. Nearly 750,000 New Jerseyans—over 10% of the adult population—

have diabetes.[40] In Monmouth County, approximately 7% of adults are living with diabetes.[41].

## 2. Insulin: A Century-Old Drug

224.   Even though diabetes is the eighth leading cause of death in the United States, it is a treatable disease and has been for a century. Patients who follow a prescribed treatment plan consistently avoid severe health complications associated with the disease.

225. In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. Banting and Best obtained a patent and then sold their patent rights to the University of Toronto for $1, reasoning that "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[42] Banting stated further that "[i]nsulin does not belong to me, it belongs to the world."[43]

226.   After purchasing the patent, the University of Toronto contracted with

---

[40] *Id.*

[41] New Jersey Dep't of Health, New Jersey State Health Assessment Data, *available at* https://www-doh.nj.gov/doh-shad/indicator/view/DiabetesPrevalence.County.html (last visited Aug. 1, 2024)

[42] Michael Bliss, *The Discovery of Insulin* (2013).

[43] *Id.*

Defendants Eli Lilly and Novo Nordisk to scale its production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

227. The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes. Although effective, animal-derived insulin created the risk of allergic reaction. This risk was reduced in 1982 when synthetic insulin—known as human insulin because it mimics the insulin humans make—was developed by Eli Lilly. Compared to animal-derived insulin, human insulin is cheaper to mass produce and causes fewer allergic reactions. Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institutes of Health and the American Cancer Society.

228. In the mid-1990s, Eli Lilly introduced the first analog insulin—a laboratory-grown and genetically altered insulin. These altered forms of human insulin are called "analogs" because they are analogous to the human body's natural pattern of insulin release and more quickly lower blood sugar. Eli Lilly released this analog in 1996 under the brand name Humalog at a cost of $21 per vial (equivalent to $40 in 2022).

229. Other rapid-acting analogs include Novo Nordisk's Novolog and Sanofi's Apidra, which have similar profiles. Rapid-acting insulins are used in

combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

230.  The Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

231.  In 2015, Sanofi introduced Toujeo, another long-acting insulin similar to Lantus. Toujeo, however, is highly concentrated, reducing injection volume as compared to Lantus.

232.  In December 2015, Eli Lilly introduced Basaglar—a long-acting insulin that is biologically similar to Sanofi's Lantus.

233.  Most insulin presently used in the United States is analog insulin and not human insulin. In 2000, 96% of insulin users used human insulin versus 19% using analog insulin. By 2010, the ratio had switched; only 15% of patients used human insulin while 92% used analog insulin. In 2017, for example, less than 10% of the units of insulin dispensed under Medicare Part D were human insulins.

234.  Even though insulin was first extracted 100 years ago, and despite its profitability, Eli Lilly, Novo Nordisk, and Sanofi still make nearly all of the insulin sold in the United States. This did not happen by chance.

235.  Many of the at-issue medications are now off-patent. The Manufacturers maintain market domination through patent "evergreening." Drugs usually face generic competition when their 20-year patents expire. While original insulin

formulas may technically be available for generic use, the Manufacturers "stack"

patents around the original formulas, making new competition riskier and more

costly. For example, Sanofi has filed more than 70 patents on Lantus—more than

95% of which were filed after the drug was approved by the FDA—potentially

providing more than three additional decades of patent "protection" for the drug. The

market therefore remains concentrated.

236.  In 2021, the U.S. House of Representatives Committee on Oversight and

Reform issued a report following its investigation into drug pricing ("Drug Pricing

Investigation").[44] It expressly included inquiry into the Manufacturer Defendants'

insulin pricing strategies,[45] and concluded: "Every company in the Committee's

investigation engaged in one or more strategies to suppress competition from generics

or biosimilars, and keep prices high."[46] It continued:

> Insulin manufacturers have also used secondary patents to extend
> their market monopolies. A 2020 study by the State of Colorado
> found, "Many insulin products have received additional patents,
> exclusivities, and extensions, adding decades of protection and
> monopoly prices." According to this study, secondary patents
> enabled Eli Lilly to add 17 years of protection for Humalog, Novo
> Nordisk to add 27 years of protection for NovoLog, and Sanofi to

---

[44] *Drug Pricing Investigation: Majority Staff Report*, Comm. on Oversight and Reform, U.S. H.R., Dec. 2021, https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf (last visited Apr. 24, 2024).

[45] *Id.*at PDF 4, n.5.

[46] *Id.* at PDF 13.

add 28 years of protection for Lantus.[47]

### 3. The Current Insulin Landscape

237.    Although insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions about whether the overall efficacy of insulin has significantly improved over the last 20 years.

238.  For example, while long-acting analogs may have certain advantages over human insulins (e.g., they provide greater flexibility around mealtime planning), it has yet to be shown that analogs lead to better long-term outcomes. Recent work suggests that older human insulins may work as well as newer analog insulins for patients with Type 2 diabetes.

239.  Moreover, all insulins at issue in this case have either been available in the same form since the late 1990s or early 2000s or are biologically equivalent to insulins that were available then.

240.  As explained in the Journal of the American Medical Association by Dr. Kasia Lipska, an endocrinologist at the Yale School of Medicine and Clinical Investigator at the Yale-New Haven Hospital Center for Outcomes Research and Evaluation:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . . [T]here's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now

---

[47] *Id.* at PDF 103.

costs ten times more.[48]

241.    Moreover, production costs have decreased in recent years. A September 2018 study in BMJ Global Health calculated that, based on production costs, a reasonable and profitable price for a *one-year supply* of human insulin is between $48 and $71 per person and between $78 and $133 for analog insulin. Another recent study found that the Manufacturers could be profitable charging as little as $2 per vial.[49] A third study, based on data collected through 2023, concluded that sustainable cost-based prices "for treatment with insulin in a reusable pen device could cost as little as $96 (human insulin) or $111 (insulin analogues) *per year* for a basal-bolus regimen, $61 *per year* using twice-daily injections of mixed human insulin, and $50 (human insulin) or $72 (insulin analogues) *per year* for a once-daily basal insulin injection (for type 2 diabetes), including the cost of injection devices and needles."[50]

242.    Yet, in 2016, diabetics spent an average of $5,705 for insulin. According to a 2020 RAND report, the 2018 list price per vial across all forms of insulin was just $14.40 in Japan, $12.00 in Canada, $11.00 in Germany, $9.08 in France, $7.52 in the United Kingdom, and less than $7.00 in Australia—versus $98.70 in the United

---

[48] Natalie Shure, *The Insulin Racket,* AMERICAN PROSPECT (June 24, 2019), https://prospect.org/health/insulin-racket/ (last visited Apr. 24, 2024).

[49] Gotham D, Barber MJ, Hill A., Production costs and potential prices for biosimilars of human insulin and insulin analogues. BMJ GLOBAL HEALTH 2018;3:e000850.

[50] Melissa J. Barber, *et al.*, *Estimated Sustainable Cost-Based Prices for Diabetes Medicines*, JAMA NETWORK: OPEN, Mar. 27, 2024.

States.[51]

243.  RAND issued an updated report in 2024 using 2022 data. In its report, RAND explained that the gross (or list) price of insulin in the United States had "increased dramatically since the early 2010s in the United States."[52] The report pointed to studies showing that "manufacturer gross prices increased annually by an average of 13 percent from 2007 to 2018," which was "far above general inflation over the same periods."[53]

244.  The RAND report again found that insulin prices in the United States far exceeded insulin prices abroad. RAND found that U.S. manufacturer gross prices were 971% (or 9.71 times) higher than in the 33 countries who belong to the Organisation for Economic Co-operation and Development (OECD) combined.[54] In other words, insulin in the United States was more than nine times higher than in 33 middle- to high-income comparison countries.[55] Once rebates and other discounts

---

[51] *The Astronomical Price of Insulin Hurts American Families*, RAND (Jan. 6, 2021), https://www.rand.org/blog/rand-review/2021/01/the-astronomical-price-of-insulin-hurts-american-families.html (last visited Apr. 24, 2024).

[52] Andrew W. Mulcahy, Daniel Schwam, *Comparing Insulin Prices in the United States to Other Countries*, RAND Corporation at 1.

[53] *Id.*

[54] *Id.* at v, 22, 30.

[55] *Id.*

were applied, net prices in the United States remained 2.33 times higher than in the OECD countries.[56] The gross price is the price paid by patients who are uninsured, in the deductible phase of their plan, or otherwise paying out-of-pocket for insulin.[57]

245.  Whereas research and development (also known as R&D) costs often contribute significantly to the price of a drug, the initial basic insulin research—original drug discovery and patient trials—occurred 100 years ago, and those costs have long since been recouped. And even recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago. In recent years, the lion's share of R&D costs is incurred in connection with the development of new insulin-related *devices and equipment*—not in connection with the drug formulations themselves.

246.  The House Committee on Oversight and Reform also found that R&D costs "d[id] not justify price increases." According to the Committee, "when drug companies did invest in R&D, those expenditures often went to research designed to protect existing market monopolies." The Committee also found that "drug companies often invested in development only after other research—much of it federally funded—demonstrated a high likelihood of financial success."

---

[56] *Id*. at v, 28, 30.

[57] *Id*. at vi.

247. In response to rising scrutiny, the Manufacturer Defendants recently announced limited pricing changes and out-of-pocket limits. On March 1, 2023, Eli Lilly announced that it would cap the prices of certain insulin medications at $35 per month, with additional reductions to follow later in the year. Specifically, Eli Lilly promised that it would list its Lispro injection at $25 per vial effective May 1, 2023, and slash the price of its Humalog and Humulin injections by 70% beginning in the fourth quarter of 2023. The price reductions to date are limited to these medications and do not apply to other Eli Lilly diabetes medications like Trulicity and Basaglar. These decisions indicate that, prior to March 1, 2023, the prices of these medications had not been raised to cover costs of research and development, manufacture, distribution, or any other necessary expense.

248. Two weeks after Eli Lilly announced that it would be implementing pricing changes, on March 14, 2023, Novo Nordisk announced that it would also lower the U.S. list prices of several insulin products by up to 75%—specifically, Levemir, Novolin, NovoLog, and NovoLog Mix 70/30. Novo Nordisk will also reduce the list price of unbranded biologics to match the lowered price of each respective branded insulin. The price reductions to date are limited to these medications and do not apply to other Novo Nordisk diabetes medications like Victoza and Ozempic. These changes went into effect on January 1, 2024, and, as with Eli Lilly's price reduction, indicate that the prices of these medications before

69

that date were not increased to cover costs of research and development, manufacture, distribution, or any other necessary expense.

249.  Two days later, on March 16, 2023, Sanofi followed suit and announced that it would also cap the out-of-pocket cost of its most popular insulin, Lantus, at $35 per month for people with private insurance, effective January 1, 2024, and lower the list price of Lantus by 78% and Apidra, its short-acting insulin, by 70%. Sanofi already capped the price of Lantus at $35 for patients without insurance. The price reductions to date are limited to these medications and do not apply to other Sanofi diabetes medications like Toujeo and Soliqua. Sanofi's decisions, like Eli Lilly's and Novo Nordisk's, indicate that the prices of Sanofi's medications before January 1, 2024, were not raised to cover costs of research and development, manufacture, distribution, or any other necessary expense.

250.  These three announcements (the "Price Cuts") are limited, prospective, and do not mitigate damages already incurred by payors like Plaintiff.

251.  The Price Cuts are limited to certain insulin medications, and do not encompass all at-issue medications. As part of the Insulin Pricing Scheme, PBMs provide preferred formulary placement to the most expensive insulins based on list prices. Accordingly, the Insulin Pricing Scheme will proceed, with the PBMs continuing to target the most expensive at-issue medications, which will likely be the at-issue medications not included in the Price Cuts.

70

252.  The Price Cuts are woefully insufficient. An Eli Lilly spokeswoman has represented that the current list price for a ten-milliliter vial of the fast-acting, mealtime insulin Humalog will drop to $66.40 from $274.70, and a ten-milliliter vial of Humulin will fall from $148.70 to $44.61.[58] These prices far exceed the Manufacturer Defendants' costs and remain significantly higher than prices for the same and similar drugs in other countries.

253.  To make matters worse, on November 8, 2023, before the 65% price cut for its long-acting insulin Levemir had taken effect, Novo Nordisk announced that it would be *discontinuing* Levemir in the United States, citing manufacturing constraints, formulary-placement issues, and "alternative treatments" for patients. Levemir is the *only* branded, long-acting insulin product for which Novo Nordisk announced a list price reduction and the *only* long-acting insulin FDA-approved for pregnancy. Yet, Novo Nordisk is discontinuing Levemir—before allowing the price reduction to take effect—with supply disruptions beginning in early 2024, followed by formal discontinuation of the Levemir FlexPen vial by the end of 2024.

---

[58] Tom Murphy, *Lilly plans to slash some insulin prices, expand cost cap*, AP NEWS (Mar. 2, 2023) (available at https://apnews.com/article/insulin-diabetes-humalog-humulin-prescription-drugs-eli-lilly-lantus-419db92bfe554894bdc9c7463f 2f3183)

### 4. Insulin Adjuncts: Type 2 Medications

254.    Over the past fifteen years, the Manufacturer Defendants have released several non-insulin medications that help control insulin levels. In 2010, Novo Nordisk released Victoza, and, thereafter, Eli Lilly released Trulicity, and Sanofi released Soliqua. Novo Nordisk further expanded their GLP-1 patent portfolio with the approval of Xultophy and Ozempic.[59] In 2022, Eli Lilly received approval for another GLP-1, Mounjaro. Each of these medications can be used in conjunction with insulins to control diabetes.

255.    The Manufacturers negotiate rebates and other fees with the PBMs for "bundles" of insulin and GLP-1 receptor agonist (GLP-1) medications, packaging them as a single class of diabetes medications. This practice is known as "bundling."

256.    The Manufacturer Defendants bundle medications to gain formulary access for multiple drugs in exchange for increased Manufacturer Payments to the PBMs.

257.    In 2013, Novo Nordisk tied its "exclusive" rebates for insulin to formulary access for GLP-1 medication, Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher

---

[59] Victoza, Trulicity, Ozempic, and Mounjaro are glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone produced in the body. Soliqua and Xultophy are combination long-acting insulin and GLP-1 drugs.

than the 18% rebate for plans that included two insulin products on their formulary. In order to qualify for the exclusive rebate, the plans would also need to list Victoza on their formulary, exclude all competing insulin products, and ensure existing patients switch from competitor diabetes medications.[60]

258.  Upon information and belief, all Manufacturer Defendants negotiate the prices of insulin and GLP-1 medications through bundling.

259.  The first GLP-1 was approved by the FDA in 2005 and was indicated for the treatment of Type 2 diabetes. Currently, the GLP-1 market is consolidated among a limited number of patent-holding entities, with Manufacturer Defendants Eli Lilly, Novo Nordisk, and Sanofi controlling much of this market.

260.  Through extensive patents and regulatory exclusivities, the Manufacturer Defendants have effectively barricaded competition from the GLP-1 market, giving them the ability to exercise comprehensive control over the price of GLP-1 medications.

261.  To date, no generic alternative exists for any GLP-1 medication. The Manufacturer Defendants will continue to enjoy patent protection of their respective GLP-1 agonist molecules through at least 2030, if not later.[61]

---

[60] Senate Insulin Report at 78, 79.

[61] Rasha Alhiary, *et al.*, *Patents and Regulatory Exclusivities on GLP-1 Receptor Agonists*, J. OF THE AM. MED. ASS'N, Vol. 33o, at 650-57 (2023).

262.   Novo Nordisk developed and sells three GLP-1 drugs indicated for Type 2 diabetes: Victoza (liraglutide), Xultophy (insulin degludec/liraglutide), and Ozempic (semaglutide). Novo Nordisk holds 62 patents related to semaglutide and liragutide, 46 of which are device patents unrelated to the therapeutic molecule of the GLP-1.[62]

263.   Eli Lilly developed and sells two GLP-1 drugs indicated for Type 2 diabetes: Trulicity (dulaglutide) and Mounjaro (tirzepatide/GIP). Eli Lilly holds 18 patents related to dulaglutide and tirzepatide. Of the four patents related to tirzepatide, two are device patents unrelated to the therapeutic molecule of the GLP-1. Eli Lilly has applied for 78 patents related to dulaglutide, 17 of which have been granted to date.[63]

264.   Sanofi developed Adylxin (lixisenatide) and Soliqua (insulin glargine/lixisenatide) but currently only sells Soliqua in the United States. Sanofi holds 42 patents related to lixisenatide, 29 of which are device patents unrelated to the therapeutic molecule of the GLP-1.[64]

---

[62] Rasha Alhiary, *et al.*, *Delivery Device Patents on GLP-1 Receptor Agonists*, J. OF THE AM. MED. ASS'N, Vol. 331, at 794-796 (2024).

[63] *Id.*

[64] *Id.*

265.    This patent stacking and evergreening ensures that generic and other branded GLP-1 cannot enter the market and gives Novo Nordisk, Eli Lilly, and Sanofi disproportionate pricing power over GLP-1 medications.

266.    In addition to the limited competition in the GLP-1 landscape, the Manufacturer and PBM Defendants use this disproportionate pricing power to inflate the prices of GLP-1s, consistent with the broader Insulin Pricing Scheme.

**Figure 4: List and net prices of GLP-1 agonists**



267.    Counterintuitively, list and net prices increased as more GLP-1 medications were approved and introduced, as shown above. Between 2007 and 2017, the average list price of GLP-1s rose 15% per year despite the introduction of

competing brands. The net price increased an average of 10% per year during the same time period.[65]

268.    The PBM Defendants are also central to these untethered price increases. As shown in the chart above, the growing disconnect between the list and net prices of these drugs further demonstrates the PBM Defendants' ill-gotten gains through identical methods to those employed with respect to insulin in the Insulin Pricing Scheme.

269.    The absence of generics in the GLP-1 market allows the Manufacturers to keep prices artificially high. PBMs then realize the benefit of these artificially high prices through manufacturer payments in exchange for formulary placement. PBMs and Manufacturers are thus incentivized to increase prices or maintain high, untethered prices for GLP-1s.

270.    Like insulin, GLP-1s are significantly more expensive in the United States than in other countries, indicating that the increasing prices of GLP-1s are untethered to any legal, competitive, or fair market price. For example, in 2023, the list price for a one-month supply of Ozempic was about $936 in the United States—

---

[65] Ameet Sarpatwari, *et al.*, *Diabetes Drugs: List Price Increases Were Not Always Reflected In Net Price; Impact Of Brand Competition Unclear*, HEALTH AFFAIRS, Vol. 40, at 772-78 (2021).

compared to $147 in Canada, $103 in Germany, $93 in the United Kingdom, $87 in Australia, and $83 in France.

271.   In 2018, Victoza's list price in the United States was more than double its average list price in 11 comparable countries and Trulicity's list price in the United States was more than six times its average list price in 11 comparable countries. One study found that drug companies could profitably sell certain GLP-1s, including Ozempic, for $0.89-$4.73 per month.

272.   In March 2024, PBM Defendant Evernorth entered into a financial guarantee agreement for GLP-1 spend with Manufacturer Defendants Novo Nordisk and Eli Lilly to limit the annual cost increase of GLP-1s to 15%.[66]

273.   Like the caps put in place for insulins, the agreement among Evernorth, Eli Lilly, and Novo Nordisk indicates that the prices of GLP-1s before March 2024 were not raised to cover costs of R&D, manufacturing, distribution, or any other necessary expense. Such cost caps and savings guarantees indicate that the increasing price of GLP-1s were untethered to any legal, competitive, or fair market price. Additionally, this agreement is prospective and does not mitigate damages already incurred by payors like Plaintiff.

---

[66]     Evernorth     Health     Services,     Mar.     7,     2024
https://www.evernorth.com/articles/evernorth-announces-industry-first-financial-guarantee-glp-1-spend

274.   The following is a table of diabetes medications at issue in this lawsuit:

| Insulin Type | Action | Name | Mfr. | FDA Appr. | Current/Recent List Price |
|---|---|---|---|---|---|
| **Human** | *Rapid-Acting* | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | *Intermediate* | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| **Analog** | *Rapid-Acting* | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | *Pre-mixed* | Humalog 50/50 | Eli Lilly | 1999 | $93 (vial) $180 (pens) |
| | | Humalog 75/25 | Eli Lilly | 1999 | $99 (vial) $140 (pens) |
| | | Novolog 70/30 | Novo Nordisk | 2001 | $203 (vial) $246 (pens) |
| | *Long-Acting* | Lantus | Sanofi | 2000 | $340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $370 (vial) $555 (pens) |

|  |  | Basaglar (Kwikpen) | Eli Lilly | 2015 | $392 (pens) |
|---|---|---|---|---|---|
|  |  | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
|  |  | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| **Type 2 Medications** | *GLP-1* | Trulicity (Dulaglutide) | Eli Lilly | 2014 | $1013 (pens) |
|  |  | Mounjaro (Tirzepatide/GIP) | Eli Lilly | 2022 | $1068 (pens) |
|  |  | Victoza (Liraglutide) | Novo Nordisk | 2010 | $813 (2 pens) $1220 (3 pens) |
|  |  | Xultophy (insulin degludec/liraglutide) | Novo Nordisk | 2016 | $1295 (pens) |
|  |  | Ozempic (Semaglutide) | Novo Nordisk | 2017 | $1022 (pens) |
|  |  | Rybelsus (semaglutide tablets) | Novo Nordisk | 2019 | $1029 (30 day supply) |
|  |  | Adylxin (lixisenatide) | Sanofi | 2016 | Discontinued 2023 |
|  |  | Soliqua (insulin glargine/lixisenatide) | Sanofi | 2016 | $928 (pens) |

## B.    The Dramatic Rise in U.S. Prices for Diabetes Medications

275.  Over the past 25 years, the list price of certain insulins has increased by

more than 1,000% (10x). By comparison, $165 worth of consumer goods and

services in 1997 dollars would, in 2021, have cost $289 (1.75x).[67]

276.  Since 1997, Eli Lilly has raised the list price of a vial of Humulin R (500U/mL) from $165 to $1,784 in 2021 (10.8x).

**Figure 5: Rising list prices of Humulin R (500U/mL) from 1997-2021**



277.  Since 1996, Eli Lilly has raised the price for a package of Humalog pens from less than $100 to $663 (6.6x) and from less than $50 per vial to $342 (6.8x).

---

[67] https://www.bls.gov/data/inflation_calculator.htm (last visited July 3, 2023). The Consumer Price Index (CPI) measures "the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services." (https://www.bls.gov/cpi/).

**Figure 6: Rising list prices of Humalog vials and pens, 1996-2021**



278.  From 2006 to 2020, Novo Nordisk has raised Levemir's list price from $162 to $555 (3.4x) for pens and from under $100 to $370 per vial (3.7x).

**Figure 7: Rising list prices of Levemir, 2006-2021**



279.  From 2002 to 2021, Novo Nordisk raised Novolog's list price from $108

to $671 (6.2x) for a package of pens and from less than $50 to $347 (6.9x) per vial.

**Figure 8: Rising list prices of Novolog vials and pens, 2002-2021**



280. Sanofi has kept pace. It manufactures a top-selling analog insulin—Lantus—which has been and remains a flagship brand for Sanofi. Lantus has been widely prescribed nationally and within New Jersey, including to Plaintiff's Beneficiaries. Sanofi has raised the list prices for Lantus from less than $200 in 2006 to more than $500 in 2020 (2.5x) for a package of pens and from less than $50 to $340 per vial (6.8x).

**Figure 9: Rising list prices of Lantus vials and pens, 2001-2021**



281. The Manufacturer Defendants have similarly increased the prices for non-insulin diabetes medications.

282. Driven by these price hikes, payors' and diabetics' spending on these drugs has significantly increased, with totals in the tens of billions of dollars.

283. In addition, the timing of the price increases demonstrates that the Manufacturers have not only dramatically increased prices for the at-issue treatments, but have also done so in lockstep.

284. Between 2009 and 2015, for example, Sanofi and Novo Nordisk raised the list prices of their insulins in tandem 13 times, taking the same price increase down to the decimal point within days of each other (sometimes within a few

hours).[68]

285.  This practice, through which competitors communicate their intention not to price-compete against one another, is known as "shadow pricing."

286.  In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs represented the highest drug price increases in the pharmaceutical industry.

287.  Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 10 demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 11 demonstrates this behavior with respect to Novolog and Humalog.

**Figure 10: Rising list prices of long-acting insulins**



---

[68] Senate Insulin Report at 53-54.

**Figure 11: Rising list prices of rapid-acting insulins**



288. Figure 12 demonstrates this behavior with respect to the human insulins—Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 12: Rising list price increases for human insulins**



86

289. Figure 13 below demonstrates Novo Nordisk and Eli Lilly's lockstep price increases for their Type 2 drugs Trulicity, Victoza, and Ozempic.

**Figure 13: Rising list prices of Type 2 drugs**



290. Figures 14 and 15 below show how the Manufacturers have raised the prices of insulin products in near-perfect unison.[69]

**Figures 14 and 15: Lockstep insulin price increases**



---

[69]  https://www.pharmaceutical-technology.com/features/insulin-pricing-could-an-e-commerce-approach-cut-costs/?cf-view&cf-closed



291. There is clear evidence that these lockstep price increases were carefully coordinated to preserve formulary placement for the at-issue drugs and to allow greater rebates to the PBMs, and further illustrate the perverse economics of competing by increasing prices in lockstep.

292. Eli Lilly, for example. was not inclined to lower prices of its insulin products to compete with the other drug makers. Documents produced to the House Committee on Oversight and Reform[70] show that Eli Lilly regularly monitored competitors' pricing activity and viewed competitors' price increases as justification to raise the prices of their own products. On May 30, 2014, a senior vice president at Eli Lilly sent a proposal to Enrique Conterno—then-President of Lilly Diabetes—for

---

[70] Drug Pricing Investigation at PDF 162.

June 2014 price increases for Humalog and Humulin. The executive reported that Novo Nordisk had just executed a 9.9% price increase across its insulin portfolio. Mr. Conterno remarked, "While the list price increase is higher than we had planned, I believe it makes sense from a competitive perspective." Eli Lilly took a 9.9% price increase shortly thereafter, on June 5, 2014.

293.  Six months later, on November 19, 2014, Mr. Conterno reported to then-CEO John Lechleiter that Novo Nordisk had taken another 9.9% price increase on NovoLog—the direct competitor to Eli Lilly's Humalog. Mr. Conterno wrote, "[a]s you are aware, we have assumed as part of our business plan a price increase of 9.9% for Humalog before the end of the year." The following Monday—just days after Mr. Conterno's initial email to the CEO—Eli Lilly took price increases of 9.9% on all Humalog and Humulin products.

294.  Sanofi also closely monitored competitors' pricing activity and planned its own pricing decisions around Eli Lilly's and Novo Nordisk's price increases. Executives knew that Sanofi's long-acting insulin competitors—particularly Novo Nordisk—would match its pricing actions on long-acting insulin. In internal documents, Sanofi leaders welcomed competitors' price increases because they allowed Sanofi to claim it was maintaining pricing "parity" with competitors.

295. Sanofi had no incentive or intention to compete to lower its insulin pricing. For example, on November 7, 2014, Sanofi executed a price increase of

approximately 12% across its family of Lantus products. The following week, a Sanofi senior vice president sent an email asking, "[d]id Novo increase the price of Levemir following our price increase on Lantus last week? I just want to confirm we can still say that Lantus and Levemir are still priced at parity on a WAC [wholesale acquisition cost] basis." The head of Sanofi pricing responded that Novo Nordisk had not yet taken the price increase, but noted, "[o]ver the past four price increases on Lantus they have typically followed within 1 month." Novo Nordisk raised the price of Levemir by 12% the following week.

296. An internal Sanofi chart shows that, between April 2013 and November 2014, each time Sanofi raised the price of Lantus, Novo Nordisk followed suit for Levemir:

**Figure 16: Sanofi price-tracking**



**Basal Insulin Price Evolution**

**Current WAC per Common Unit**

| | |
|---|---|
| Tresiba | $29.6 |
| Levemir | $26.9 |
| Toujeo | $24.9 |
| Lantus | $24.9 |

| | Lantus | | | Levemir | | |
|---|---|---|---|---|---|---|
| Date | % Incr Vial | % Incr Pen | | Date | % Incr Vial | % Incr Pen |
| | | | | 08/25/15 | 8.2% | 8.2% |
| 11/07/14 | 11.9% | 11.9% | | 11/18/14 | 11.9% | 11.9% |
| 05/30/14 | 16.1% | 9.9% | | 05/31/14 | 16.1% | 9.9% |
| 12/13/13 | 14.9% | 9.9% | | 12/19/13 | 14.9% | 9.9% |
| 08/02/13 | 14.9% | 9.9% | | 08/27/13 | 12.1% | 10.5% |
| 04/26/13 | 9.9% | 9.9% | | 05/03/13 | 9.9% | 9.9% |

* No price increases for Toujeo & Tresiba since launching

- Parity was obtained on the 5/30/14 price increase for Lantus Vial & Pen
- Tresiba currently at 19% premium and to Sanofi Glargine
- Levemir currently at 8% premium to Sanofi Glargine

SANOFI

297. The Manufacturers used their competitors' price increases as justification for their own increases.  For example, before taking price increases on Lantus, Sanofi compared the new list price to the prices of competitor products. In an April 2018 email exchange about accelerating and increasing previously planned price increases for Lantus and Toujeo (from July to April, and from 3% on Lantus to 5.3%), one senior director requested, "[p]lease confirm how the new WAC of Lantus/Toujeo would compare with the WAC of Levemir/Tresiba." In reply, another senior Sanofi leader provided a chart comparing Sanofi prices to those of its competition.

298. Sanofi also engaged in shadow pricing with its rapid-acting insulin products, including Apidra. Sanofi was not the market leader in the fast-acting insulin space and typically did not act first to raise prices. But when its competitors raised prices on their fast-acting insulins, Sanofi quickly followed suit. As a Sanofi slide deck explained: "Over the past three years, we have executed a 'fast follower' strategy for Apidra and have executed price increases only after a price increase was announced."

299. In December 2018, Sanofi's director of strategic pricing and planning emailed diabetes and cardiovascular pricing committee members seeking approval for across-the-board price increases for its rapid- and long-acting insulin products, including Lantus, Toujeo, and Apidra. The then-Senior Vice President and Head of

Sanofi's North America General Medicines group forwarded the proposal to the then-Senior Vice President and Head of Sanofi's External Affairs and inquired, "[p]rior to my approval, just confirming that we are still on for these." The Head of Sanofi's External Affairs wrote back, "Yes. As of now I don't see any alternative. Not taking an increase won't solve the broader policy/political issues, and based on intel, believe many other manufacturers plan to take increases next year as well." He added, "[s]o while doing it comes with high political risk, I don't see any political upside to not doing it."

300.  Although Sanofi generally led price increases in the long-acting insulin market with its pricing for Lantus, Novo Nordisk often led in the rapid-acting market with NovoLog. On May 8, 2017, Novo Nordisk CEO Lars Jorgenson learned that Eli Lilly had raised U.S. list prices by approximately 8% across its injectable diabetes drug portfolio. Mr. Jorgenson emailed this information to a Novo Nordisk executive and asked, "[w]hat is our price increase strategy?" The executive responded, "[Eli Lilly] followed our increase on NovoLog, so we're at parity here, so no action from us. They led with Trulicity and based on our strategy, we will follow which will likely be on June or July 1st."

301. Further illustrating the anticompetitive scheme between the Manufacturers, rather than compete by lowering prices, Sanofi raised Lantus's list price to respond to rebate and discount competition from Novo Nordisk. Novo

Nordisk manufactures two long-acting insulins called Levemir and Tresiba, as well as two rapid-acting insulins, NovoLog and Fiasp. In the long-acting insulin category, Sanofi's Lantus and Novo Nordisk's Levemir often compete to win the same accounts. According to internal memoranda, in 2013 Sanofi believed that Novo Nordisk was attempting to minimize the clinical difference between Lantus, and Levemir and was offering "increased rebates and/or portfolio offers for the sole purpose of removing Lantus from favorable formulary access." According to an internal Sanofi memo, "the strategy to close the price differential between the Lantus vial and pen before the LOE [loss of exclusivity] period was believed to be critical to the overall long-term success of the franchise."

302.  At the time, Sanofi faced increased pressure from its PBM clients to offer more generous rebates and price protection terms or face exclusion from formularies, developments that were described as "high risk for our business" that had "quickly become a reality." This market environment created an enormous challenge for Lantus and, in order to protect its flagship diabetes franchise, Sanofi increased Lantus's list price so that it could improve its rebate and discount offering to payors while maintaining net sales.

303.  Sanofi understood the risk of its decision and "went into 2013 with eyes wide open that the significant price increases planned would inflame [its] customers," and that its aggressive pricing would cause a quick reaction from Novo Nordisk. But

93

Sanofi sought to make up for "shortfalls with Lantus demand generation and global profit shortfalls," which it said "put pressure on the US to continue with the price increases to cover gaps." The company conceded that it was "difficult to determine whether we would face these risks anyway if we hadn't taken the price increases."

304. Novo Nordisk also engaged in shadow pricing with its long-acting insulin, Levemir, increasing Levemir's list price in lockstep with Lantus in a continued effort to offer increased rebates and discounts to payors and displace Lantus from preferred formulary placement. Novo Nordisk typically did not act first to raise prices. However, when its competitors raised prices, Novo Nordisk followed suit. A March 2015 Novo Nordisk pricing committee presentation slide articulated this strategy: "Levemir price strategy is to follow market leader."

305. On May 19, 2014, Novo Nordisk's pricing committee discussed how to price Levemir in response to Sanofi's 2013 pricing actions. Based on an internal presentation created for this meeting, Novo Nordisk's pricing committee discussed whether it should be a follower in the market in relation to Sanofi, and considered external factors like press coverage, payor reactions, profits, and performance. In each case, the company's strategic recommendation was to follow Sanofi's moves, rather than lead. Of note, the presentation shows that the pricing committee considered Levemir's performance, which was ahead of 2014's annual budgeting by $89 million, but that "overall company performance [was] behind." The presentation

recommends following Sanofi's pricing actions if the brand's performance is the

priority, and to lead if the company's performance is the priority. An excerpt of Novo

Nordisk's presentation is shown below:

**Figure 17: Novo Nordisk pricing committee presentation**



306. In alignment with this strategy, Novo Nordisk's pricing committee

debated potential pricing scenarios based on Sanofi's actions, which they projected

with a great deal of specificity. The presentation provided options regarding whether

the company should follow Sanofi—and increase list price in July—or lead with a

9.9% increase in August which it considered "optically less aggressive." Based on

internal memoranda, Novo Nordisk's pricing committee decided to revisit the issue

with specific recommendations once Sanofi took action.

307. Less than two weeks later, on May 30, 2014, Farruq Jafery, Vice

President of Pricing, Contract Operations and Reimbursement, emailed Novo

Nordisk's pricing committee to inform them that "Sanofi took a price increase on Lantus effective today: 16.1% vial and 9.9% pen." He further wrote that the pricing committee had "agreed that the best strategy for Levemir is to observe the market and maintain list price parity to competitors." Mr. Jafery then requested that Novo Nordisk's committee vote "ASAP" to raise the list price of Levemir effective May 31, 2014 (the next day) from $191.28 to $222.08 for vials and from $303.12 to $333.12 for pens. Only a few hours after Sanofi took its list price increase, members of the pricing committee approved Mr. Jafery's request and Novo Nordisk moved forward with a 16.1% increase on Levemir vial, and a 9.9% increase on Levemir FlexPen and FlexTouch.

308. Another series of emails shows that Novo Nordisk again shadowed Sanofi's price increase in November 2014, increasing Levemir's list price immediately after Sanofi increased Lantus vials and pens by 11.9%. On the morning of November 7, 2014, Novo Nordisk's pricing committee learned that Sanofi increased Lantus's list price overnight. By that afternoon they were asked to approve the same exact price increase for Levemir and did so hours later.

309. The speed with which Novo Nordisk reacted to Sanofi's price changes is striking. Within 25 minutes of learning of Sanofi's price increase, Rich DeNunzio, Senior Director of Novo Nordisk's Strategic Pricing, emailed Novo Nordisk's pricing committee to alert them of the change and promise a recommendation the same

afternoon after reviewing the financial impact of any move. By late afternoon, Mr. DeNunzio had requested Novo Nordisk's pricing committee to again "follow [Sanofi's] 11.9% [list price increase] on November 18th" and vote to increase Levemir's list price, which was promptly approved by Novo Nordisk's Chief Financial Officer for U.S. operations, Lars Green.

310. Novo Nordisk's pricing strategy for other diabetes products even became the subject of humorous exchanges among senior analysts within the company. After a Novo Nordisk analyst shared news of an Eli Lilly price increase for a diabetes product on December 24, 2015, a senior director of national accounts wrote, "[m]aybe Sanofi will wait until tomorrow morning to announce their price increase . . . that's all I want for Christmas." The first analyst responded, "I actually started a drinking game—I have to take a shot for every response that says 'what about Sanofi,'" and then said, "[m]y poor liver. . . .'" The senior director responded, "Ho Ho Ho!!!"

311. The back-and-forth between Novo Nordisk officials underscores how closely it was monitoring Sanofi's actions and appears to mirror the approach laid out in a January 27, 2014 presentation regarding the company's bidding strategy that hinged on CVS Caremark's business. Novo Nordisk described its bids for the CVS Caremark business as "pivotal" and laid out a game of cat-and-mouse across different accounts in which company officials sought to have Levemir be the only therapeutic

97

option on different PBM formularies. Novo Nordisk recognized that offering "attractive exclusive rebates to large, receptive customers" would "encourage a stronger response from Sanofi." However, Novo Nordisk was willing to take this risk because it would result in "immediate volume and value" for the company and could lead to an exclusive deal for CVS's commercial formulary.

312. The agreements the Manufacturers had with the PBM Defendants deterred competition on lowering prices. For example, following its April 2018 list price increase, Novo Nordisk began to face pressure from payors, the media, and Congress to reduce the prices of its insulin drugs. On May 29, 2018, Novo Nordisk's U.S. Pricing Committee debated whether it should reduce the list price of its insulin drugs by 50% after a string of news reports detailed how patients were struggling to afford their medications. Novo Nordisk understood that a 50% cut would be a meaningful reduction to patients, significantly narrow the list-to-net gap, head off negative press attention, and reduce "pressure" from Congressional hearings. But Novo Nordisk was more concerned that a list price reduction would pose significant financial risk to the company.

313. The company's primary concerns were retributive action from PBMs and other entities in the pharmaceutical supply chain who derive payments that are based on a percentage of a drug's WAC price. A PowerPoint slide created for this meeting suggests that the reasons not to lower prices were that "many in the supply will be

98

negatively affected ($) and may retaliate" and that its "[c]ompetitors may not follow

putting [Novo Nordisk] at a disadvantage":

**Figure 18: Novo Nordisk presentation on reduced list prices**



314.  Despite these concerns, internal memoranda suggest that Novo Nordisk

was still prepared to lower its list price by 2019 or 2020 if its "must haves" were met,

which included an agreement from the PBMs that they would not retaliate against

them by changing their formulary placement and would accept lower rebate

percentages.

315.  According to internal memoranda, Novo Nordisk's board of directors

voted against this strategy in June 2018 and recommended that the company continue

its reactive posture. The rationale for this decision was the "$33 million downside

identified (NovoLog only)," "risk of [PBM] backlash or demand for current rebate

on new NDC," and "high likelihood of immediate pressure to take similar action on other products." Following the decision by its board of directors, on August 30, 2018, Novo Nordisk decided to continue its strategy to "monitor the market . . . to determine if other major pharma companies are taking list price [increases]."

316. Following years of rebate and list-price increases, the Manufacturers faced increased pressure from patients, payors, and the federal government to decrease insulin's list price. However, internal memoranda and correspondence suggest that the downstream impact of lowering the list prices presented hurdles for pharmaceutical companies.

317. There is also evidence of direct communications between the Manufacturers and the PBM Defendants regarding lowering the prices of insulins. For example, a June 23, 2018 email memorializes a conversation Eli Lilly's President of the Diabetes Unit, Enrique Conterno, had with the CEO of OptumRx, who allegedly "re-stated that [OptumRx] would be fully supportive of Lilly pursuing a lower list price option," but indicated that OptumRx would encounter challenges, namely, "the difficulty of persuading many of their customers to update contracts without offering a lower net cost to them."

318. In response, an Eli Lilly executive noted, "we wouldn't be able to lower our list price without impacting our net price," and counseled waiting until early 2020 to reduce prices. Two weeks before this email, Eli Lilly executives had raised the

possibility that PBMs would object to a list price reset because it would (a) result in a reduction in administrative fees for PBMs, (b) reduce rebates, which would impact PBMs' ability to satisfy rebate guarantees with some clients, and (c) impair their clients' ability to lower premiums for patients, thereby impacting their market competitiveness. An excerpt of this email is shown below:

**Figure 19: Eli Lilly internal email re potential price reductions**



319. Insulin price increases were driven, in part, by tactics the PBMs employed in the early 2010s. At that time, the PBMs began to aggressively pressure the Manufacturers to raise list prices by implementing formulary exclusions in the insulin therapeutic class. When a drug is excluded, it means that it will not be covered by the insurer. Formulary exclusions effectively stop manufacturers from reaching large blocks of patients and require patients to either switch to a new product or pay

significantly more to stay on their preferred medication. This tactic boosted the size of rebates and catalyzed the upward march of list prices. The Manufacturers responded to these formulary-exclusion threats by raising list prices aggressively—increases that were closely timed with price changes by competitors.

320.  Internal memoranda and correspondence confirm that PBM formulary exclusion lists have contributed to higher rebates in the insulin therapeutic class. The Manufacturers have increased rebates in response to formulary exclusion threats, in order to preserve their revenue and market share through patient access. In addition, increases in rebates are associated with increased list prices, such that the PBM Defendants' demands for increased rebates directly contributed to rising insulin prices. As Eli Lilly's CEO, David Ricks, has explained, Eli Lilly agreed to raise list prices to fund higher rebates and fees for the PBMs:

> Getting on [a] formulary is the best way to ensure most people can access our medicines affordably—once again, that's how insurance is supposed to work. But that requires manufacturers to pay ever-increasing rebates and fees, which can place upward pressure on medicines' list prices. If we cannot offer competitive rebates, our medicines may be excluded from formularies, and people cannot access them. Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees. Last year, about eighty cents of every dollar spent on our insulins went to pay rebates and fees.

321.  Insulin was among the first classes of drugs to face PBM formulary

exclusions, and the number of insulins excluded has increased over time.[71] In 2014, Express Scripts and CVS Caremark excluded six and seven insulins, respectively. OptumRx excluded four insulins in 2016, its first year with an exclusion list. As of 2022, *insulins have faced 193 total plan-years of exclusion* across the PBMs since 2014:

**Figure 20: Insulin exclusions by plan year**



322. The Manufacturers have also made price-increase decisions due to countervailing pressures in their relationships with the PBMs. A higher list-price increases the dollar value of rebates, discounts, and other fees that a Manufacturer can offer to a PBM—all of which are based on a percentage of the list price. Internal

---

[71] Xcenda, *Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access* (May 2022), available at https://www.xcenda.com//media/ assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/ xcenda_pbm_exclusion_may_2022.pdf.

documents show that the Manufacturers were sensitive not only to their own bottom lines, but also to the bottom lines of PBMs that set formularies, without which a Manufacturer's product would lose significant market share.

323. Exclusions, driven in part by perverse PBM incentives, have had a significant impact on patients' access to insulin. Lower list-priced insulins have been available since 2016—including follow-on insulins[72] (Admelog, Basaglar, Lyumjev, Fiasp), "authorized generic" insulins (Lispro, Insulin Aspart),[73] and, more recently, biosimilar insulins. But PBMs often exclude these insulins from their formularies in favor of products with *higher* list prices and larger rebates. For example, two of the three PBM Defendants have excluded the two insulin authorized generics since 2020,

---

[72] The term "follow-on biologic" is a broad, overarching term. The designation of "biosimilarity" is a regulatory designation. "Follow-on biologics" are copies of originator innovator biologics. Those approved via the Biologics License Application (BLA) regulatory pathway (Public Health Service Act) are referred to as "biosimilars." Those approved via the New Drug Application (NDA) regulatory pathway (Food, Drug, and Cosmetic Act) retain the designation "follow-on" biologics. *See* Richard Dolinar, *et al.*, *A Guide to Follow-on Biologics and Biosimilars with a Focus on Insulin*, 24 Endocrine Practice 195-204 (Feb. 2018), https://www.sciencedirect.com/science/article/abs/pii/S1530891X20353982#:~:text= Follow%2Don%20biologics%20are%20copies,regulations%20involving%20biologi cs%20are%20complex (last visited Jan. 5, 2024).

[73] An authorized generic medicine is a "brand name drug that is marketed without the brand name on its label." Additionally, "even though it is the same as the brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug." *See Food and Drug Administration. FDA listing of authorized generics,* https://www.fda.gov/media/77725/download (last visited Jan. 5, 2024).

instead favoring the higher list-priced equivalents. Those PBM Defendants did so despite the fact that list prices for these authorized generic insulins can be half the list price of the brand.[74]

324.  In addition to the exclusions of authorized generic insulins, lower list-priced biosimilar insulins have also faced PBM formulary exclusions. The first biosimilar insulin was launched in 2021. Due to prevailing market dynamics, two identical versions of the product were simultaneously introduced—one with a higher list price and large rebates, and one with a lower list price and limited rebates. All three PBMs excluded the lower list-priced version in 2022, instead choosing to include the identical product with the higher list price.[75]

325.  Excluding lower list-priced medicines from formularies can substantially increase out-of-pocket costs for patients in plans using deductibles or coinsurance, where cost-sharing is typically determined based on the medicine's full list price.[76] This trend of favoring higher list-priced products has dramatically affected patient

---

[74] Tori Marsh, *Can't access generic Humalog? There's an even cheaper insulin option available*, GOODRX. (Aug. 26, 2019), https://www.goodrx.com/blog/admelog-now-cheaper-than-generic-humalog (last visited Jan. 5, 2024).

[75] Adam Fein, *Five takeaways from the big three PBMs' 2022 formulary exclusions* (Jan. 19, 2022), available at https://www.drugchannels.net/2022/01/five-takeaways-from-big-three-pbms-2022.html

[76] Adam Fein, *Express Scripts vs. CVS Health: five lessons from the 2020 formulary exclusions and some thoughts on patient impact* (Jan. 2020), available at https://www.drugchannels.net/2020/01/express-scripts-vs-cvs-health-five.html.

affordability and access to insulins.

326.  The PBM Defendants and the Manufacturers are complicit in this. There has been little, if any, attempt by the PBM Defendants to discourage the Manufacturers from increasing the list price of their products. Instead, the PBMs used their size and aggressive negotiating tactics, such as the threat of excluding drugs from formularies, to extract even more generous Manufacturer Payments from the Manufacturers, who have increased their insulin list prices in lockstep.

327. The PBMs worked to have the Manufacturers raise list prices because the rebates, discounts, and fees the PBMs receive are based on a percentage of a drug's list price—and the PBMs retain a large portion of what they negotiate. In fact, the Manufacturers have been dissuaded from decreasing list prices for their products, which would have lowered out-of-pocket costs for patients, due to concerns that the PBMs and health plans would react negatively.

328. Diabetes medications have become unaffordable for many diabetics because of the Manufacturer and PBM Defendants' collusive price increases.

## C.    The Pharmaceutical Payment and Supply Chains

329.  The prescription drug industry is comprised of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include manufacturers, wholesalers, PBMs, pharmacies, payors, and patients.

330.  Given  the  complexities  of  the  different  parties  involved  in  the

pharmaceutical industry, pharmaceuticals are distributed in many ways. Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of three ways: (a) from manufacturer to wholesaler (distributor), wholesaler to pharmacy, and pharmacy to patient; (b) from manufacturer to mail-order pharmacy to patient; or (c) from manufacturer to mail-order pharmacy, mail-order pharmacy to self-insured payor, and self-insured payor to patient.

331.   The pharmaceutical industry, however, is unique in that the payment chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity—that is, different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is necessarily tied to the price set by the manufacturer.

332.  Here is how the payment chain often works:[77]

**Figure 21: The pharmaceutical payment chain**



333.  The payment chain includes self-insured payors like Plaintiff paying PBMs directly. Here, Defendants Medco and Express Scripts invoiced Monmouth County, and Monmouth County paid Express scripts, for Monmouth County's purchases of the at-issue diabetes medications.

334.  But there is no transparency in this pricing system. Typically, there are

---

[77] *See* Karen Van Nuys, *et al.*, *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, JAMA HEALTH FORUM (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932.

two kinds of published prices. One is the WAC, which is a manufacturer's price for the drug to wholesalers (and excludes any discounts, rebates, or price reductions). The other is the AWP, which is the price wholesalers charge retailers for a drug. Both WAC and AWP, depending on the context, are sometimes colloquially referred to as "list price."[78]

335.  AWP is usually calculated by applying a significant mark-up (such as 20%) to the manufacturer's WAC.  AWP does not account for discounts available to various payers, nor is it based on actual sales transactions.

336.  Publishing compendia such as First DataBank report both the WAC and the AWP.

337.  As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used benchmark price in negotiating reimbursement and payment calculations for both payors and patients.

**D.    The PBMs' Role in the Pharmaceutical Payment Chain**

338.  Pharmacy benefit managers are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 22 below.

---

[78] In general, when this complaint references Defendants' conspiracy to inflate "list prices," Plaintiff is referring to WAC. Because AWP is based on WAC, when a manufacturer raises its WAC, that necessarily results in an increase to the AWP.

**Figure 22: Insulin distribution and payment chain**



339. Pharmacy benefit managers (including the PBM Defendants) develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that the payor will pay for prescription drugs, and are paid by the payor for the drugs utilized by the payor's beneficiaries.

340. Pharmacy benefit managers also contract with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to pharmacy benefit managers. Pharmacy benefit managers reimburse pharmacies for

the drugs dispensed.

341. The PBM Defendants also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to patients by mail.

342. Often—including for the at-issue drugs—the PBM Defendants purchase drugs directly from the Manufacturers and distribute them directly to the patients.

343. Even where the PBM Defendants' mail-order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

344. In addition, and of particular significance here, the PBM Defendants contract with drug manufacturers, including the Manufacturer Defendants. The PBMs extract from the Manufacturers rebates, fees, and other consideration that are paid back to the PBM, including the Manufacturer Payments related to the at-issue drugs.

345. The Manufacturers also interact with the PBMs in connection with services outside the Insulin Pricing Scheme's scope, such as health and educational programs and patient and prescriber outreach with respect to drugs not at issue here.

346. These relationships place PBMs at the center of the flow of pharmaceutical money and allow them to exert tremendous influence over what drugs are available nationwide, on what terms, and at what prices.

347. Historically and today, the PBM Defendants:

a.      negotiate the price that payors pay for prescription drugs (based on prices generated by the Insulin Pricing Scheme);

b.      separately negotiate a different (and often lower) price that pharmacies in their networks receive for the same drug;

c.      set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme);

d.      set the price paid for each drug sold through their mail-order pharmacies (based on prices generated by the Insulin Pricing Scheme); and

e.      negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme).

348.  Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the same drugs. This absence of transparency affords Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.

349.  In every interaction the PBMs have within the pharmaceutical payment chain, they stand to profit from the prices generated by the Insulin Pricing Scheme.

## 1. The Rise of the PBMs in the Pharmaceutical Supply Chain

350.  In the 1960s, pharmacy benefit managers functioned largely as claims processors. Over time, however, they have assumed an ever-expanding role as power brokers in pharmaceutical payment and distribution chains.

351. One key role pharmacy benefit managers took on was negotiating with drug manufacturers, ostensibly on behalf of payors. In doing so, pharmacy benefit managers affirmatively represented that they were using their leverage to *drive down* drug prices.

352. In the early 2000s, pharmacy benefit managers started buying pharmacies, thereby creating an additional incentive to collude with manufacturers to keep certain prices high.

353. These perverse incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families. Further recent consolidation in the industry has given the PBMs disproportionate market power.

354. Nearly 40 pharmacy-benefit-manager entities combined into what are now the PBM Defendants, each of which now is affiliated with another significant player in the pharmaceutical chain—e.g., Express Scripts merged with Cigna; CVS bought Caremark (and now also owns Aetna); and UnitedHealth Group acquired OptumRx.

355. Figure 23 depicts this market consolidation.

## Figure 23: PBM consolidation



356. After merging with or acquiring all competitors, and now backed by multibillion-dollar corporations, the PBM Defendants have taken over the market in the past decade, controlling more than 80% of drug benefits for more than 270 million Americans.

357. Together, the PBM Defendants report more than $300 billion in annual revenue.

358. The PBMs use this market consolidation and the resulting purchasing power as leverage when negotiating with other entities in the pharmaceutical payment chain.

## 2. The Insular Nature of the Pharmaceutical Industry

359. The insular nature of the pharmaceutical industry has afforded Defendants with ample opportunity for furtive contact and communication with their competitors, as well as the other PBM and Manufacturer Defendants, which facilitates their execution of the Insulin Pricing Scheme.

360. For example, each Manufacturer Defendant is a member of the industry-funded Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA meetings and platforms in furtherance of the Insulin Pricing Scheme. According to PhRMA's 2019 IRS Form 990, it received more than $515 million in "membership dues." All members are pharmaceutical companies.[79]

361. David Ricks (Chair and CEO of Eli Lilly), Paul Hudson (CEO of Sanofi), and Douglas Langa (President of Novo Nordisk and EVP of North American Operations) serve on the PhRMA Board of Directors and/or part of the PhRMA executive leadership team.

362. The PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at trade associations and

---

[79] PhRMA 2019 Form 990, https://projects.propublica.org/nonprofits/ organizations/ 530241211/202043189349300519/full; PhRMA, *About PhRMA*, https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/A-C/About-PhRMA2.pdf (last visited Jan. 4, 2023).

industry conferences.

363.  Each year during the relevant period, the main PBM trade association, the industry-funded Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.[80]

364.  The PCMA is governed by PBM executives. As of April 2024, the board of the PCMA included Adam Kautzner (President of Express Scripts), Patrick Conway (CEO of OptumRx), and David Joyner (Executive Vice President and President of Pharmacy Services at CVS Health).

365. All PBM Defendants are members of the PCMA and, due to their leadership positions, wield substantial control over it.

366.  Additionally, the Manufacturer Defendants are affiliate members of the PCMA.

367.  Every year, high-level representatives and corporate officers from both the PBM and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

---

[80] The PCMA's industry funding in the form of "membership dues" is set out in its 2019                                    Form                                    990, https://projects.propublica.org/nonprofits/organizations/383676760/2020429693493 01134/full (last visited Apr. 5, 2024).

368.  In fact, for at least the last eight years, all Manufacturer Defendants have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PBM conferences.

369.  Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."[81]

370.  Representatives from each Manufacturer Defendant have routinely met privately with representatives from each PBM Defendant during the annual Mmetings and business forum conferences held by the PCMA (and sponsored by the Manufacturers) each year.

371.  In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn

---

[81] PCMA, *The PCMA Annual Meeting 2021 Will Take Place at the Broadmoor in Colorado Springs, CO September 20 and 21,* https://www.pcmanet.org/pcma-event/annual-meeting-2021/ (an event "tailored specifically for senior executives from PBMs and their affiliated business partners" with "private reception rooms" and "interactions between PBM members, drug manufacturers, and other industry partners") (last visited July 3, 2023).

Group and online networking community."[82]

372. As PCMA members, the PBM and Manufacturer Defendants undoubtedly used both PCMA-Connect, as well as the private meetings at the PCMA conferences, to exchange information and to reach agreements in furtherance of the Insulin Pricing Scheme.

373. Key at-issue lockstep price increases occurred immediately after Defendants had convened at PCMA meetings. For example, on September 26 and 27, 2017, the PCMA held its annual meeting, at which each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Days later, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list price by 5.4%. Novo Nordisk recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.

374. Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir a matter of hours after Sanofi made its list price increase on Lantus. These price hikes occurred just weeks after the 2014 PCMA spring conference in Washington, D.C., attended by representatives of all three PBM Defendants.

375. The PBMs control the PCMA and have weaponized it to further their

---

[82] PCMA, *PCMA-Connect*, https://www.pcmanet.org/contact/pcma-connect/ (last visited Apr. 5, 2024).

interests and to conceal the Insulin Pricing Scheme. The PCMA has instituted numerous lawsuits and lobbying campaigns aimed at blocking drug-pricing transparency efforts, including recently suing the Department of Health and Human Services ("HHS") to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as direct-to-consumer discounts.

376.  Notably, the PCMA's 2019, 2020, and 2021 tax returns report annual revenue for "litigation support" totaling $1.01 million, $2.19 million, and $2.92 million respectively. Prior tax returns similarly reveal millions of dollars in revenue for "litigation support" (and tens of millions in revenue for "industry relations") year after year.[83]

377.  In addition, communications among the PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. For example:

   a.    Mark Thierer worked as an executive at Caremark Rx, LLC (now CVS Caremark) prior to becoming the CEO of OptumRx in 2016 (and also served as Chairman of the Board for PCMA starting in 2012);

   b.    CVS Health's current President and CEO Karen Lynch held an

---

[83] *See, e.g.*, PCMA 2019-2021 Form 990s and prior years' returns on ProPublica.

executive position at Cigna;

c.      Amar Desai served as President for Health Care Delivery at CVS Health before joining Optum Health, where he now serves as CEO.

d.      Trip Hofer served in leadership at CVS Health before becoming CEO of Behavioral Health for Optum Health.

e.      Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015 (and also served as a PCMA board member from 2015-2017 while with Aetna Rx);

f.      Derica Rice former EVP for CVS Health and President of CVS Caremark previously served as EVP and CFO for Eli Lilly;

g.      Duane Barnes was the Vice President of Medco (now Express Scripts) before becoming division President of Aetna Rx in 2006 (and also served as a PCMA board member);

h.      Everett Neville was the division President of Aetna Rx before becoming Senior Vice President of Express Scripts;

i.      Albert Thigpen was a Senior Vice President at CVS Caremark for eleven years before becoming a Senior Vice President at OptumRx in 2011;

j.      Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a Vice President at Aetna Rx in 2008; he also served as SVP Member Services Operations for CVS Caremark from

2020-2022; and

    k.   Bill Kiefer was a Vice President of Express Scripts for fourteen years before becoming Senior Vice President of Strategy at OptumRx in 2013.

**E. The Insulin Pricing Scheme**

378.  The market for the at-issue diabetes medications is unique in that it is highly concentrated with no true generics and few biosimilar options. The drugs and biosimilars have similar efficacy and risk profiles.

379.  This affords the PBMs significant leverage that, in theory, could be used to negotiate with the Manufacturer Defendants to drive *down* list prices for the at-issue drugs through open competition.

380.  But the PBMs do not want the prices for diabetes medications to decrease. A 2022 report by the Community Oncology Alliance put it this way:

> Among the different sources of revenue, the most prolific by far is in the form of rebates from pharmaceutical manufacturers that PBMs extract in exchange for placing the manufacturer's product drug on a plan sponsor's formulary or encouraging utilization of the manufacturer's drugs. . . . [T]he growing number and scale of rebates is the primary fuel of today's high drug prices. The truth is that PBMs have a vested interest to have drug prices remain high, and to extract rebates off of these higher prices. PBM formularies tend to favor drugs that offer higher rebates over similar drugs with lower net costs and lower rebates.[84]

---

[84] Community Oncology Alliance & Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers, and Taxpayers* (Feb. 2022), https://communityoncology.org/research-publications/studies/pbm-dirty-tricks-expose/.

381. The Manufacturer Defendants understand that they make more money as list prices increase. They also understand that PBM Defendants make more money as list prices increase. This is confirmed by the Senate Insulin Report after committee review of internal documents produced by the Manufacturer Defendants:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price.[85]

382. The documents eventually released by the Senate Finance Committee indicate how the Manufacturer Defendants' pricing strategy *focuses on the PBMs' profitability*. In an internal August 6, 2015, email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.[86]

383. The Manufacturer Defendants also understand that because of the PBMs'

---

[85] Senate Insulin Report at 89.

[86] Letter from Raphael A. Prober, Counsel for Novo Nordisk Inc., to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Novo_ Redacted.pdf (last visited Apr. 24, 2024).

market dominance, most payors accept the baseline national formularies offered by the PBMs with respect to the at-issue drugs.

384.  The Insulin Pricing Scheme was borne  from these understandings. Both sets of Defendants realized that if the Manufacturers artificially inflated their list prices to facilitate large, undisclosed Manufacturer Payments back to the PBMs, both the PBMs and Manufacturers would generate billions of unearned dollars. The plan worked.

385.  Over the past several years the Manufacturers have raised prices in unison and have paid correspondingly larger Manufacturer Payments to the PBMs.

386.  In exchange for the Manufacturers artificially inflating their prices and paying the PBMs substantial amounts in Manufacturer Payments, the PBM Defendants grant the Manufacturer Defendants' diabetes medications elevated prices and preferred status on their national formularies. During the relevant period, the rebate amounts (as a proportion of the list price) grew year-over-year while list prices themselves increased.

387.  For example, in July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. By 2018, five years later, Sanofi's rebates had ballooned to 56% for preferred placement. And in 2015, Sanofi offered OptumRx rebates up to 42% for Lantus for preferred formulary placement. That figure grew to *nearly 80%* by 2019. Similarly, in 2014, Novo

Nordisk offered Express Scripts 25% rebates for Levemir. That figure soared to 47% in 2017.

388. Beyond increased rebate demands, the PBM Defendants have also sought and received larger and larger administrative fees from the Manufacturers during the relevant period.

389. A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion. The study observed that although rebates were sent to payors during this period, PBMs retained the same volume of rebates in pure dollars, due to the overall growth in rebate volume, as well as increases in administrative fees and spread pricing (charging a client payor more for a drug than the PBM pays the pharmacy).

390. Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) have caused, and continue to cause, precipitous price increases for the at-issue drugs.

391. As a result of the Insulin Pricing Scheme, every payor, including Plaintiff, that pays or reimburses for the at-issue drugs has been overcharged.

392. Moreover, the PBMs use this false price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system. For

example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary."[87] Likewise, in April 2019, CVS Caremark president Derica Rice stated: "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."[88]

393. In making these representations, the PBMs fail to disclose that the amount of "savings" generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical payment chain and which the Defendants themselves are directly responsible for artificially inflating.

394. The Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants that created enormous profits for Defendants. Each of the Defendants agreed to and participated in the scheme. For example:

    a.    The Manufacturers and the PBMs are in constant communication

---

[87] Surabhi Dangi-Garimella, *PBMs Can Help Bend the Cost Curve: Express Scripts' Tim Wentworth,* AJMC (Jan. 12, 2016), https://www.ajmc.com/view/pbms-can-help-bend-the-cost-curve-express-scripts-tim-wentworth (last visited Apr. 5, 2024).

[88] CVS Health, *CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation*, Helped Reduce Member Cost, and Improved Medication Adherence in 2018 (Apr. 11, 2019), https://www.cvshealth.com/news-and-insights/press-releases/cvs-health-pbm-solutions-blunted-the-impact-of-drug-price (last visited Apr. 5, 2024).

and regularly meet and exchange information to construct and refine the PBM formularies that form and fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also in determining the same for competing products. Though their communications and written contracts, the Manufacturers and the PBMs also agree to rebates, fees, and other payments—that is, kickbacks—in exchange for preferred formulary access.

b.    The Manufacturers and the PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug-utilization tracking efforts and mail-order pharmacy claims, internal medical efficacy studies, and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and to construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed, and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx (which utilizes OptumInsight and Optum Analytics).

c.    The Manufacturers and the PBMs engage in coordinated outreach

programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients. For example, the Grassley-Wyden committee recently released an email in which Eli Lilly discussed paying Defendant UnitedHealth Group and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. The email continued: "United's leadership committee made one ask of Lilly – that we are highly engaged in the communication/pull through plan.[89] I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the full breadth of Lilly resources. UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution."

395.  Rather than using their massive bargaining power to lower drug prices—as they claim to do—Defendants used their dominant positions to work together to generate billions of dollars in illicit profits at the expense of payors and diabetics.

---

[89] "Pull through" is an industry term that refers to marketing to physicians by Manufacturers aimed at moving market share and increasing sales for a certain product following the PBM granting that product preferred placement on its formulary.

### F. The Manufacturers React to Threats of Formulary Exclusion by Increasing Rebates Offered to the PBMs

396.  Although the PBM Defendants have insisted they had no control over how the Manufacturers price their insulin products, their threats of formulary exclusion illustrate how they used new insulin competitors with lower prices to leverage even *higher rebates* on the existing insulin drugs.

397.  In the face of formulary exclusion threats based on new entrants in the insulin market, the Manufacturers have willingly met the PBM Defendants' demands for increased rebates in order to retain preferred formulary placement and block competitors. For example, in 2016, Sanofi and Novo Nordisk enhanced their rebate offers at the same time Eli Lilly introduced Basaglar, a follow-on biologic to Lantus. Basaglar is a long-acting insulin and is "[c]linically . . . very similar" to Sanofi's Lantus. Because of its near clinical equivalence, Basaglar posed a competitive threat in the long-acting insulin market. The PBMs threatened to switch to Basaglar because it was priced lower and they expected Eli Lilly to offer larger discounts in response.

398. A 2016 Sanofi memo describes the market dynamic whereby a threatened new market entrant would lead not to lower prices, but to greater rebates:

**Figure 24: Sanofi memo on introduction of Basaglar**



> • Lilly is actively engaged with Anthem for 2017 Medicare and commercial business. Anthem believes they would not have significant challenges moving to Basaglar in 2017 if the WAC price and discounts are in line with what they are thinking (20% lower WAC and discounts >40% )

399.  In an attempt to avoid PBMs switching to Basaglar, Sanofi and Novo

Nordisk increased their rebate bids to respond to Eli Lilly. For example, according to Sanofi internal memoranda, sometime around April 2016, Express Scripts requested bids for its 2017 national commercial formulary and indicated its desire to add only one insulin glargine product to its basal insulin category. Express Scripts communicated to Sanofi that "with the right competitive price, [it] would not have significant challenges moving [from Lantus and Toujeo] to Basaglar" and that Sanofi must enhance its current rebate rate of 42% to maintain access for their basal insulins.

400. An internal Sanofi memo describes the dynamic where, at "the right competitive price," Express Scripts would not have a challenge moving Basaglar into a preferred position on its formulary:

**Figure 25: Sanofi memo on Basaglar pricing**



Likely Competitive Approach and Response:

- Lilly is actively engaged with ESI for 2017 commercial business. Pricing has not been confirmed however ESI has informed that the following assumptions pose a threat to Sanofi's glargine franchise:
  - Discounts for Basaglar in the mid 60's have been communicated by ESI to Sanofi. This is likely a starter for ESI to consider excluding Lantus and Toujeo. Modeling assumed 70%.
  - Basaglar WAC will be 15% to 25% less than the WAC price of Lantus. Sanofi modeling assumed 15%.
- ESI has signaled, with the right competitive price, they would not have significant challenges moving to Basaglar in 2017 despite a follow-on biologic (Basaglar) approval.
- In addition ESI has indicated that Novo must also enhance its current rate to maintain current access for their basal insulin(s). Novo is likely to enhance its current rebates given recent Tresiba addition to part D formulary.

401. Rebate contracts confirm that Sanofi increased its offer up to almost 55% off its WAC of $248.51 for Lantus vials and $372.76 for Lantus pens.

402. For the Manufacturers, the mere threat of exclusion has pressured them to offer substantially greater rebates to maintain formulary position. This is because

formulary exclusions would cause significant loss of a Manufacturer's market share, leading to lower revenue. On the other hand, being the exclusive therapy on a formulary has the opposite effect, thereby incentivizing Manufacturers to offer large Manufacturer Payments to acquire or maintain such status. The use of formulary exclusions has thus led to a market dynamic in which Manufacturers offer ever-higher rebates to avoid exclusion, which has caused higher list prices.

403.  For example, before 2013, Sanofi offered an average rebate of 5% on Lantus. However, beginning in 2013, competitors sought to "[d]isplace Lantus in High Control Plans and Markets . . . through increased rebates" to capture market share. In response, Sanofi increased its rebate and discount offerings to remain on their formulary. A Sanofi memo further explains this dynamic:

**Figure 26: Sanofi memo on increased rebates for Lantus**



## MARKET OVERVIEW
## Lantus

- Aggressive Competitors
    - Displace Lantus in High Control Plans and Markets (i.e. Part D) through increased rebates and/or portfolio offers for the sole purpose of removing Lantus from favorable formulary access
    - Attempts to minimize the clinical differentiation between Lantus and Levemir

- Aggressive Payers
    - Price Predictability
        - Accounts requiring more value from price predictability
            - Extension of Timeline/WAC Evaluation periods lengthened, e.g. Caremark Price Protection from June 2013 thru December 2014 for the 2014 Contract, ESI Requesting 2-Year Price Protection
            - Demand for lower threshold percentages
            - Discontinue calculations that exclude prior pricing activity from carrying forward, e.g. no more Reset Calculations
    - Increased Discounts
        - Caremark increase in base rebates was needed to remain on formulary
            - Caremark Base 25% to 32% for 2014
    - Benefit Designs
        - Accounts have shown willingness and ability to remove Lantus from Formulary
        - Cigna 2012, Aetna 2013, OptumRx Saver Plus 2013, Coventry 2014

404.  While the PBM Defendants have touted that using formulary exclusions in the insulin therapeutic class was a way to drive down costs for their clients, internal correspondence and memoranda show that increased use of formulary exclusions did exactly the opposite: WAC (list) prices have continued to increase, leading to higher costs for payors like Plaintiff and higher prices for patients at the pharmacy counter.

405.  For example, in 2013, when Express Scripts threatened to move patients to other diabetes drugs in order to "break even on [the] rebate line" unless Sanofi increased its Medicare Part D rebate offer for Lantus, Sanofi considered increasing its rebate offer from 7.45% to 15% in order to prevent formulary exclusion. Sanofi also faced similar pressure to increase rebates for Express Scripts' commercial

contracts. Internal Sanofi memoranda show that "Sanofi was notified by [Express Scripts] that Lantus was positioned to be removed from the formulary effective 2013 . . . [and as a result] rebates were re-negotiated." An excerpt from this memo, discussing the threat to Lantus, illustrates that the threats used by Express Scripts to drive up rebates on Sanofi's flagship insulin product Lantus:

**Figure 27: Sanofi presentation on formulary threats to Lantus**



**Lantus Contracting History with ESI**
Account Management and Contracting have worked closely together to maintain a 5% rebate for Commercial contracts through 2012. Sanofi was notified by ESI that Lantus was positioned to be removed from formulary effective 2013. Rebates were re-negotiated resulting in a 6% Lantus Vial & 9% Lantus SoloStar rebate (no price protection).

**Lantus Overall Threat**
The Commercial business is at additional threat due to competitive rebate pressures and changing formulary design as well as Lantus pricing actions.
- ESI has shared that Novo has been extremely aggressive the last few months and this has triggered the need to revise our offer.
  - For 2014 ESI made Humalog exclusive in the RAI category, moving Novolog to Not Covered and made Byetta & Bydureon the only options in the GLP1 category, moving Victoza to Not Covered.
- Comments during discussion with ESI confirmed that modeling has occurred and that the current contracted offer will result in a Not Covered position for 2015. This is based on competitive offers by Novo and client plans requesting exclusive offers for comparison.
- They have shared that the basal category is under consideration for exclusion list status for 2015. This interest in an exclusive offer is consistent with recent actions they have taken to reduce the number of branded options available to patients.
- Lantus price increases over the past two years have positioned Sanofi as a cost driver that has triggered significant attention from ESI.

406. According to internal memoranda, in 2014, Express Scripts and its affiliated businesses managed the prescription drug claims of over 4.6 million people, representing 15% of the total business in the Medicare Part D channel. Rebate agreements confirm Sanofi renegotiated rebates and entered into an agreement to provide up to 10.625% for Lantus, effective January 1, 2014. Rebates were renegotiated again that same year, and Sanofi increased its rebate offer up to 14.625%, effective October 1, 2014.

132

407. CVS Caremark and OptumRx used similar formulary exclusion threats to drive up Lantus rebates. Around this same time, other PBMs learned that Sanofi had offered competitive rebates to Express Scripts which caused them to question their rebate status with Lantus. As a result, they too demanded higher rebates and threatened to exclude Lantus from their formulary to achieve this result.

408. For example, in 2014, OptumRx threatened to remove Lantus from its commercial formulary. Sanofi offered an enhanced rebate for FY2015 in the 15% range, but OptumRx rejected Sanofi's offer and took steps to remove Lantus from its commercial formulary. Sanofi responded with a last-minute bid of a 45% rebate for Tier 2, which OptumRx countered with 45% for Tier 3. According to Sanofi, OptumRx's counteroffer was "ultimately accepted over access concerns to future products and the need to secure access to patient lives."

409. Similarly, in 2016, Express Scripts threatened to remove Lantus and Toujeo from its Medicare Part D formulary and requested that Sanofi submit its "best and final offer" or else face formulary exclusion. According to internal memoranda, during negotiations, Express Scripts told Sanofi that it was justified in removing Lantus and Toujeo from its Medicare Part D formulary because it had allowed "quite a few years of price increases" and that Novo Nordisk's rebate offer was more competitive. In response to Express Scripts' threat, Sanofi discussed revising its rebate offer up to 40% with 4% price protection for Lantus and Toujeo.

410.  Although contracts with PBMs included larger and larger rebates, the Manufacturers still expected to remain profitable. For example, on July 28, 2017, one Sanofi official wrote to colleagues after considering their offer to CVS Caremark for placement on the Part D formulary: "After inclusion of additional fees, we are still profitable up to an 89% rebate." The official included an analysis that assumed "CVS would need to shift 68.9% of [its] glargine volume to Novo to break even (at an assumed 81% rebate offer)." In its analysis, Sanofi compared various negotiation scenarios including a "no contract" scenario, which it determined would be more profitable to the company even with the resulting reduction in sales volume and revenue. One of the deciding factors was optics. As one colleague put bluntly: "How would it look to be removed from the largest Medicare plan?"

411.  As the PBMs expanded the practice of using formulary exclusions to extract greater rebates, Sanofi's counterstrategy was to bundle unrelated products that had been excluded—Lantus and an epinephrine injection called Auvi-Q—to win formulary inclusion for both. (Bundling is a practice where manufacturers offer rebates and discounts for multiple products, but only if certain conditions are met.)

412.  Sanofi faced significant financial pressure across all accounts and sought to include bundling agreements in several of its contracts. While negotiating contracts for the 2015/16 plan year, Express Scripts advised Sanofi that it needed to be far more aggressive with rebate offers to gain access to the PBM's commercial book of

business than in past years. Internally, Sanofi officials warned in a memo that "Novo, specifically Levemir, has changed the game with regard to rebates," and that Sanofi would "need to rebate aggressively." A separate presentation describes "[c]ontracts that increase Lantus rebates if Auvi-Q is added to [the] formulary thus creating a bundled arrangement," and notes that the company had even considered a "triple product bundle" with Toujeo, despite concerns about the arrangements triggering Medicaid best price.

413.  This counterstrategy was not limited to Sanofi. An internal memo shows that Sanofi's competitors were using the same strategy: "Lantus is losing accounts and share within the institutional channel because of aggressive discounting and bundled contract offerings from Novo Nordisk and Lilly."

414. For example, Novo Nordisk secured contract terms from CVS Caremark's Part D business in 2013 that tied its "exclusive" rebates for insulin to formulary access for its Type 2 diabetes drug Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. To qualify for the exclusive rebate, the plans would also need to list Victoza, a GLP-1 agonist, on their formulary, exclude all competing insulin products, and ensure "existing patients using a [c]ompeting [p]roduct may not be grandfathered."

### G. Defendants Downplay the Insulin Pricing Scheme and Its Resulting Harms

415. On April 10, 2019, the U.S. House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[90]

416. Representatives from all Defendants testified at the hearing and admitted that the price for insulin had increased exponentially over the past 15 years.

417. Further, each Defendant conceded that the price that diabetics pay out-of-pocket for insulin is too high. For example:

a.     Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx since 2015, testified: "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

b.     Thomas Moriarty, General Counsel for CVS admitted: "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the

---

[90] Transcripts available at https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3 (last visited Apr. 24, 2024) (hereinafter *Priced Out of a Lifesaving Drug*).

last several years, prices for insulin have increased nearly 50 percent. Over the

last ten years, [the] list price of one product, Lantus, rose by 184 percent."

c.      Mike Mason, Senior Vice President of Eli Lilly, testified when

discussing how much diabetics pay out-of-pocket for insulin: "[I]t's difficult

for me to hear anyone in the diabetes community worry about the cost of

insulin. Too many people today don't have affordable access to chronic

medications."

d.      Kathleen Tregoning, Executive Vice President for External

Affairs at Sanofi, testified: "Patients are rightfully angry about rising out-of-

pocket costs for many medicines and we all have a responsibility to address a

system that is clearly failing too many people. . . . [W]e recognize the need to

address the very real challenges of affordability. . . . [S]ince 2012, average out-

of-pocket costs for Lantus have risen approximately 60 percent for patients."

e.      Doug Langa, Executive Vice President of Novo Nordisk,

testified: "On the issue of affordability, . . . I will tell you that at Novo Nordisk

we are accountable for the list prices of our medicines. We also know that list

price matters to many, particularly those in high-deductible health plans and

those that are uninsured."

418.  None of the testifying Defendants claimed that the significant increase in

the price of insulin was related to competitive factors such as increased production

costs or improved clinical benefit.

419.  Instead, the written testimony of Novo Nordisk President Doug Langa recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price. That means a pharmaceutical company fighting to remain on formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others." Likewise, Mr. Langa's responses to questions for the record conceded that "[t]he disadvantage of a system in which administrative fees are paid as a percentage of the list price is that there is increased pressure to keep list prices high." The hearing transcript records Mr. Langa's further comments in this regard:

> So as you heard from last week from Dr. Cefalu from the [American Diabetes Association], there is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And *we've been participating in that system* because the higher the list price, the higher the rebate. . . . There's a significant demand for rebates. . . . *[W]e're spending almost $18 billion a year in rebates, discount, and fees, and we have people with insurance with diabetes that don't get the benefit of that.* (emphasis added)

420.  Eli Lilly admitted that it raises list prices as a quid pro quo for formulary

positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly, testified:

> Seventy-five percent of our list price is paid for rebates and discounts . . . . $210 of a vial of Humalog is paid for discounts and rebates. . . . We have to provide rebates [to PBMs] in order to provide and compete for that [formulary position] so that people can use our insulin.

In the very next question, Mr. Langa of Novo Nordisk was asked, "[H]ave you ever lowered a list price?" His answer, "We have not."

421. Sanofi's Executive Vice President for External Affairs, Kathleen Tregoning, similarly testified:

> The rebates [are] how the system has evolved. . . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

Her written response to questions for the record acknowledged that "it is clear that payments based on a percentage of list price result in a higher margin [for PBMs] for the higher list price product than for the lower list price product."

422. The PBM Defendants also conceded at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by the Manufacturer Defendants.

423. In her responses to questions for the record, Amy Bricker—former President of Express Scripts and a former PCMA board member—confirmed that "manufacturers lowering their list prices" would give patients "greater access to

medications." Yet when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, she answered: "Manufacturers do give higher discounts [i.e., payments] for exclusive [formulary] position . . . ." When asked why the PBM would not include both costly and lower-priced insulin medications on its formulary, Ms. Bricker stated plainly, "We'll receive less discount in the event we do that."[91]

424.  As Dr. Dutta, Senior Vice President of OptumRx, reasoned, the cheaper list-priced alternative Admelog is not given preference on the formulary because "it would cost the payer more money to do that . . . [b]ecause the list price is not what the payer is paying. They are paying the net price."[92]

425.  But payors like Plaintiff do not pay the net price, even when rebates are passed through, because the PBMs receive and retain countless other forms of payments that drive up the gap between the list price and the net price retained by

---

[91] Buried in Express Scripts' 2017 10-K is the following: "We maintain contractual relationships with numerous pharmaceutical manufacturers, which provide us with, among other things administrative fees for managing rebate programs, including the development and maintenance of formularies that include particular manufacturer's products . . . ." That is, the Manufacturers pay the PBMs to effectively participate in the creation of formularies that payors are required to adopt as a condition for obtaining PBM services. Express Scripts Annual Report (Form 10-K) (FYE Dec. 31, 2017) at 24. It also notes that its business would be "adversely affected" if it were to "lose [its] relationship with one or more key pharmaceutical manufacturers." *Id.*

[92] *Priced Out of a Lifesaving Drug* at lines 1394-95. As noted in the hearing, even the "cheaper" alternative Admelog "costs over $200 a bottle." *Id.* at lines 3121-26.

drug manufacturers. By giving preference to drugs with higher list prices based on the illusion of a lower net price, the PBMs are causing health plan payors and members to pay more while the PBMs keep greater profits for themselves. In other words, under the Insulin Pricing Scheme, PBMs and Manufacturers can make a drug with a lower list price effectively more expensive for payors and then ostensibly save payors from that artificially inflated price by giving preference to drugs that had higher list prices to begin with (yielding higher Manufacturer Payments to the PBMs).

426. On May 10, 2023, the U.S. Senate Committee on Health, Education, Labor, and Pensions held a hearing titled, "The Need to Make Insulin Affordable for All Americans." At this hearing, the CEOs and presidents of the Manufacturer and PBM Defendants doubled down on their testimony from 2019. David Ricks, for example, the Chair and CEO of Eli Lilly, testified that his company raised list prices and agreed to pay ever-increasing rebates to secure formulary placement:

> Getting on formulary is the best way to ensure most people can access our medicines affordably . . . . But that requires manufacturers to pay ever-increasing rebates and fees, which can place upward pressure on medicines' list prices. . . . Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees.

427. Paul Hudson, the CEO of Sanofi, likewise indicated that PBMs prefer drugs with higher list prices and that the manufacturers have responded accordingly. In discussing a drug Sanofi introduced with a lower list price, Hudson explained: "It

just didn't get listed in any way. If price is really the motivator, it would have been listed."

428.  While all Defendants acknowledged before Congress their participation in conduct integral to the Insulin Pricing Scheme, none revealed its inner workings or the connection between their coordination and the economic harm that payors, like Plaintiff, as well as Plaintiff's Beneficiaries, were unwittingly suffering. Instead, to obscure the true reason for precipitous price increases, each Defendant group pointed the finger at the other as the responsible party.

429.  The PBM Defendants testified to Congress that the Manufacturer Defendants are solely responsible for their list price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

430.  This testimony is false. The amount the Manufacturers kick back to the PBM Defendants *is directly correlated* to an increase in list prices. On average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in list price.[93] Thus, reducing or eliminating Manufacturer Payments would lower prices and reduce out-of-pocket expenditures.

---

[93] Neeraj Sood, et al., *The Association Between Drug Rebates and List Prices*, USC Schaeffer Center for Health Policy and Economics (Feb. 11, 2020), https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/ (last visited Apr. 24, 2024).

431. Further, in large part because of the increased list prices and related Manufacturer Payments, the PBMs' profit per prescription has grown substantially over the same period that insulin prices have steadily increased. For example, since 2003, Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.[94]

432. Novo Nordisk's President Doug Langa submitted written testimony to Congress in April 2019 acknowledging "there is no doubt that the WAC [list price] is a significant component" of "what patients ultimately pay at the pharmacy counter." Yet, the Manufacturers urged upon Congress the fiction that the PBMs were solely to blame for insulin prices because of their demands for rebates in exchange for formulary placement. The Manufacturers claimed their hands were tied and sought to conceal their misconduct by falsely suggesting that they have not profited from rising insulin prices.

433. Given the Manufacturers' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would decrease list prices if rebates were restricted or eliminated. The spokespersons for Eli Lilly, Novo Nordisk, and Sanofi all said only that they would

---

[94] David Balto, *How PBMs Make the Drug Price Problem Worse*, THE HILL (Aug. 31, 2016, 5:51 p.m.), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse (last visited Apr. 24, 2024).

"consider it."

434.  In addition, a 2020 study from the Institute of New Economic Thinking, titled "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that during the time insulin price increases were at their steepest, distributions to the Manufacturers' shareholders in the form of cash dividends and share repurchases totaled $122 billion. In fact, during this time, the Manufacturers spent a significantly lower proportion of profits on R&D compared to shareholder payouts. The paper also notes that "[t]he mean price paid by patients for insulin in the United States almost tripled between 2002 and 2013" and that "per-person spending on insulin by patients and insurance plans in the United States doubled between 2012 and 2016, despite only a marginal increase in insulin use."[95]

435.  The 2022 Community Oncology Alliance report found:[96]

> [T]here are several important ways that PBM rebates increase the costs of drugs for both plan sponsors and patients. . . . PBMs employ exceedingly vague and ambiguous contractual terms to recast monies received from manufacturers outside the traditional definition of rebates, which in most cases must be shared with plan sponsors. Rebate administration fees, *bona fide* service fees, and specialty pharmacy discounts/fees are all forms of money received by PBMs and rebate aggregators which may not be shared with (or even disclosed to) the plan sponsor. These charges serve to increase

---

[95] Rosie Collington, *Profits, Innovation and Financialization in the Insulin Industry*, Inst. For New Econ. Thinking (Apr. 2020), https://www.ineteconomics.org/research/research-papers/ profits-innovation-and-financialization-in-the-insulin-industry (last visited July 3, 2023).

[96] Community Oncology Alliance, *supra* note 72.

the overall costs of drugs, while providing no benefit whatsoever to plan sponsors. . . . The total drug spend of a plan sponsor, regardless of whether it is a federal or state governmental program or a self-funded employer, will inevitably increase because PBMs are incentivized to favor expensive drugs that yield high rebates. . . .

436. In January 2021, the Senate Finance Report detailed Congress's findings after reviewing more than 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna. The report concluded, among other things:

    a.    The Manufacturer Defendants *retain more revenue from insulin than they did in the 2000s*. For example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018.

    b.    The Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs.

    c.    The Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs.

437. The truth is that, despite their finger-pointing in front of Congress, the

Manufacturers and PBMs are both responsible for their concerted efforts in creating and effectuating the Insulin Pricing Scheme.

## H. All Defendants Profit from the Insulin Pricing Scheme

438.  The Insulin Pricing Scheme affords the Manufacturer Defendants the ability to pay the PBM Defendants exorbitant, yet secret, Manufacturer Payments in exchange for formulary placement, which garners the Manufacturer Defendants greater revenues from sales without decreasing their profit margins. During the relevant period, the PBM Defendants granted national formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

439.  The Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated list price.

440.  Because of the increased list prices, and related Manufacturer Payments, the PBMs' profit per prescription has grown exponentially during the relevant period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased more than 150% from 2014 to 2018. In fact, for transactions in which the PBM Defendants control the PBM and the pharmacy (e.g., CVS Caremark-CVS pharmacy), these Defendants were capturing an astonishing 40% of the money spent on each insulin prescription (up from only 25% just four

years earlier), despite the fact that they do not contribute to the development, manufacture, innovation, or production of the product.[97]

441. The PBM Defendants profit from the artificially inflated prices created by the Insulin Pricing Scheme in several ways, including by: (a) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments, (b) using the inflated list price to generate profits from pharmacies, and (c) relying on the inflated list price to drive up the PBMs' margins through their own mail-order pharmacies.

### 1. The PBMs Pocket a Substantial Share of Manufacturers' Secret Payments

442. The first way in which the PBMs profit from the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

443. The amount that the Manufacturers pay the PBMs has increased over time both in real dollars and as a proportion of the ever-increasing list prices.

444. Historically, contracts between PBMs and payors allowed the PBMs to keep most or all of the rebates they received, rather than forwarding them to the payor.

445. Over time, payors secured contract provisions guaranteeing that PBMs would pay them all or some portion of the rebates that the Manufacturers paid to the PBMs. Critically, however, "rebates" are only one aspect of the total secret

---

[97] Van Nuys, *supra* n.65.

Manufacturer Payments, particularly as "rebates" are narrowly defined and qualified by vague exceptions in the PBM Defendants' contracts with payors.

446. Indeed, as described in the Senate Insulin Report, the PBMs and Manufacturers coordinate to determine the contract options made available to payors: "Contracts between PBMs and manufacturers provide a menu of options from which their health plan clients can choose certain terms and conditions."[98]

447. The contracts between the PBMs and Manufacturers also "stipulate terms the plans must follow regarding factors such as formulary placement and competition from other drugs in the therapeutic class."[99] Thus, the Manufacturers ultimately played a role in dictating the terms and conditions of the contracts that payors like Plaintiff entered into with PBMs. Of course, the payors were not involved in the coordination or the negotiation of the contracts between the PBMs and Manufacturers, and the PBMs disclosed only the fact that such relationships may exist. But the terms of the contracts, the consideration exchanged between the PBMs and Manufacturers, and the means of reaching these determinations all were—and remain—shrouded in secrecy.

448. The PBM and Manufacturer Defendants thus created a "hide-the-ball"

---

[98] Senate Insulin Report at 40.

[99] *Id.* at 44.

system where payors like Plaintiff are not privy to rebate negotiations or contracts between the Manufacturers and the PBMs. The consideration exchanged between Defendants (and not shared with payors) is continually labeled and relabeled. As more payors moved to contracts that required PBMs to remit some or all manufacturer "rebates" through to the payor, the PBMs renamed the Manufacturer Payments to shield them from scrutiny and from their payment obligations.

449. Payments once called "rebates" in contracts with payors like Plaintiff were then termed "administrative fees," "volume discounts," "service fees," "inflation fees," or other industry terms designed to obfuscate the substantial sums being secretly exchanged between the PBM Defendants and the Manufacturers.

450. Just last year, the Senate Commerce, Science and Transportation Committee released testimony from David Balto—a former antitrust attorney with the Department of Justice and Policy Director for the Federal Trade Commission's Bureau of Competition—from a hearing on fairness and transparency in drug pricing. Mr. Balto's testimony describes how PBMs "transformed from 'honest brokers' supposedly negotiating with drug companies to obtain lower costs for insurers and patients into oligopolists using the rebates they extract from drug manufacturers and pharmacies to enrich themselves." He further testified:

> The PBM rebate system turns competition on its head with PBMs seeking higher, not lower prices to maximize rebates and profits. In the past decade, PBM profits have increased to $28 billion annually. . . . . PBMs establish tremendous roadblocks to prevent payors from

knowing the amount of rebates they secure. Even sophisticated buyers are unable to secure specific drug by drug rebate information. PBMs prevent payors from being able to audit rebate information. As the Council of Economic Advisors observed, the PBM market lacks transparency as "[t]he size of manufacturer rebates and the percentage of the rebate passed on to health plans and patients are secret." Without adequate transparency, plan sponsors cannot determine if the PBMs are fully passing on any savings, or whether their formulary choices really benefit the plan and subscribers.[100]

451. The renamed, and still secret, Manufacturer Payments are substantial. The use of "administrative fees" instead of "rebates" is one example. A heavily redacted complaint filed by Defendant Express Scripts in 2017 revealed that Express Scripts retains up to 13 times more in "administrative fees" than it remits to payors in rebates. In fact, administrative fees can dwarf rebates. In just one alleged invoice Express Scripts was seeking payment for in that lawsuit, "administrative fees" were more than three-and-a-half times the amount billed for formulary rebates and price protection rebates *combined*.[101]

452. Although the proportion of rebates retained by PBMs remains a secret, commentators have suggested that PBMs "designate as much as 25 or 30 percent of the negotiated rebates as fees to avoid sharing the rebates."[102]

---

[100]     https://www.competitionpolicyinternational.com/pbms-the-middlemen-who-drive-up-drug-costs/ (last visited Apr. 5, 2024).

[101] *Express Scripts, Inc. v. Kaleo, Inc.*, No. 4:17-cv-01520-RLW (E.D. Mo. 2017); Balto, *supra* n.96.

[102] Joanna Shepherd, *Pharmacy Benefit Managers, Rebates, and Drug Prices: Conflicts of Interest in the Market for Prescription  Drugs*, Yale Law & Policy

453.  A review of Texas-mandated PBM disclosures also showed that PBMs retain a much greater percentage of Manufacturer rebates than they lead on.[103] Under Texas law, certain PBMs are required to report "aggregated rebates, fees, price protection payments, and any other payments collected from pharmaceutical drug manufacturers." Between 2016 and 2021, the PBMs reported that they retained between 9% and 21% of total manufacturer payments.[104] Administrative fees, the report estimated, grew from $3.8 billion in 2018 to $5.8 billion in 2022.

454. Administrative fees typically are based on a percentage of the drug price—as opposed to a flat fee—such that even if the actual "administrative" cost associated with processing two drugs is the same, the "administrative fee" would be correspondingly higher for the higher-priced drug, which again creates (by design) a perverse incentive to give preference to more expensive drugs. Moreover, the PBM Defendants' contracts with payors narrowly define "rebates" by tying them to patient drug utilization. Thus, rebates for formulary placement (which are not tied to patient drug utilization) are characterized as "administrative fees" that are not remitted to

---

Review,    https://openyls.law.yale.edu/bitstream/handle/20.500.13051/17295/auto _convert.pdf?sequence=3&isAllowed=y (last visited Apr. 20, 2024).

[103] Adam Fein, *Texas Shows Us Where PBMs' Rebates Go*, Drug Channels (Aug. 9, 2022), https://www.drugchannels.net/2022/08/texas-shows-us-where-pbms-rebates-go.html (last visited Apr. 20, 2024).

[104] *Id.*

payors. Such payments are beyond a payor's contractual audit rights because those rights are limited to "rebate" payments and these "administrative fees" have been carved out from the definition of "rebates."

455.  The opaque nature of these arrangements between the Manufacturers and PBM Defendants also makes it impossible for a given payor to discover, much less assess or confront, conflicts of interest that may affect it or its members. The Senate Insulin Report observed with respect to these arrangements that "[r]elatively little is publicly known about these financial relationships and the impact they have on insulin costs borne by consumers."[105]

456.  Not surprisingly, the PBMs have gone to great lengths to obscure these renamed Manufacturer Payments to avoid scrutiny from payors and others.

457.  For example, as to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

458. In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" to increase the price of their diabetes medications. The thresholds for these payments are typically set at around 6% to 8%—if the

---

[105] Senate Insulin Report at 4.

Manufacturer Defendants raise their prices by more than the set percentage during a specified time period, then they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the list prices).

459.  For many of their clients, the PBMs have separate "price protection guarantees," providing that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will remit a portion of the amount to the client.

460.  The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 10%-15%.

461.  Thus, if the Manufacturers increase their list prices more than the 6% (or 8%) inflation fee rate, but less than the 10%-15% client price protection guarantee rate, then the PBMs keep all of these "inflation fee" payments. This is a win-win for the Manufacturers and PBM Defendants—they share and retain the entire benefit of these price increases while the PBM contracts with payors imply that payors are protected from price hikes by their price protection guarantees.

462.  The PBM Defendants also hide the renamed Manufacturer Payments using "rebate aggregators." Rebate aggregators, also referred to as rebate GPOs, are entities that negotiate rebates and fees with, and collect payments from, drug manufacturers, including the Manufacturer Defendants, on behalf of a group of pharmacy benefit managers (including the PBM Defendants) and other entities that

contract for pharmaceutical drugs.

463.  Each PBM Defendant owns or is closely affiliated with at least one rebate aggregator. As relevant here, Express Scripts established and controls Ascent; CVS Caremark established and controls Zinc; and OptumRx established and controls Emisar.

464.  The PBMs established these GPOs between 2018 and 2021, in response to mounting pressure from payors to pass through more rebates and other payments collected from the Manufacturers and anticipated Congressional action that would have required more transparency from the PBMs.

465.  To avoid passing these rebates and other payments through to payors, the PBMs adjusted their business models by adding rebate aggregators to the pharmaceutical payment chain.

466.  As summarized by the recent Community Oncology Alliance report:[106]

> PBMs have increasingly "delegated" the collection of manufacturer rebates to "rebate aggregators," which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. . . . Even some of the major PBMs (i.e., the "Big Three" PBMs) sometimes find themselves contracting with other PBMs' rebate aggregators for the collection of manufacturer rebates. . . . In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and rebate aggregators, as well as contracts between PBMs/rebate aggregators and pharmaceutical manufacturers) are not readily available to plan sponsors.

---

[106] Community Oncology Alliance, *supra* note 72.

467. The rebate-aggregator GPOs perform the same commercial contracting function that the PBMs once handled themselves, including negotiating with and collecting rebates from the Manufacturers. They add no real value to the transactions they facilitate. The rebate aggregators, however, do retain a portion of the rebates they collect and impose additional fees on the Manufacturers, including new administrative and "data" fees, purportedly for their services.

468. Payors cannot trace these additional amounts, as they are negotiated and collected by the PBMs' affiliate-GPOs and not the PBM-entities that contract with payors. These amounts are not subject to audit, nor do the PBMs disclose the various "fees" the GPOs collect and retain to the SEC or elsewhere.

469. Additionally, further impeding adequate oversight, certain rebate aggregators are located offshore, including Defendant Ascent, in Switzerland, and Defendant Emisar, which has significant operations in Ireland.

470. All told, the advent of rebate aggregators in the already complicated chain of financial transactions between drug manufacturers, pharmacy benefit managers, and payors creates an additional veil obfuscating the rebate payment trail and facilitates the PBMs' extraction of mislabeled rebates and additional fees from the Manufacturers without adding any value.

471. In an attempt to quantify the revenue PBMs receive from retained rebates, a 2023 report calculated PBM compensation from rebates and other

kickbacks between 2018 and 2022 (the period during which rebate aggregators were introduced), and found that this compensation had *doubled*, from $3.8 billion to $7.6 billion.[107] "This growth was fueled by increases in traditional administrative fees as well as the emergence of new data and PBM contracting entity fees."[108] During the same period, "administrative fees" grew from $3.8 to $5.8 billion.[109]

472. And, as admitted by a former OptumRx executive who helped set up Emisar, OptumRx's rebate aggregator, "The intention of the G.P.O. [rebate aggregator] is to create a fee structure that can be retained and not passed on to a client."[110]

473. Before establishing Emisar, OptumRx worked with another rebate aggregator, the Coalition for Advanced Pharmacy Services, or "CAPS." CAPS is also a subsidiary of OptumRx, and ultimately of UnitedHealth Group. A 2017 audit conducted by a local governmental entity on OptumRx related to its PBM activities

---

[107] Eric Percher, Trends in Profitability and Compensation of PBMs and PBM Contracting Entities, Nephron Research (Sept. 18, 2023), https://nephronresearch.bluematrix.com/sellside/AttachmentViewer.action?encrypt=1c65fc0e-f558-4f1d-891f-21c196a9f1ad&fileId=7276_04a77b17-d298-48a2-bd15-1c5ed22a6984&isPdf=false (last visited Nov. 6, 2024).

[108] *Id.*

[109] Adam Fein, *Texas Shows Us Where PBMs' Rebates Go*, Drug Channels (Aug. 9, 2022), https://www.drugchannels.net/2022/08/texas-shows-us-where-pbms-rebates-go.html (last visited Nov. 6, 2024).

[110] Rebecca Robbins & Reed Abelson, *The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, N.Y. TIMES (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

from 2013 to 2015 was unable to verify the percentage of rebates OptumRx remitted

to its client payor because OptumRx would not allow the auditor access to its rebate

contracts. The audit report explained:

> Optum[Rx] has stated that it engaged the services of an aggregator
> to manage its rebate activity. Optum[Rx] shared that under this
> model, they are paid by their aggregator a certain amount per
> prescription referred. Then, the aggregator, through another entity,
> seeks rebates from the drug manufacturers, based upon the referred
> [Payor Client] prescription utilization, and retains any rebate
> amounts that may be received. Optum[Rx] states that they have paid
> [Payor Client] all amounts it has received from its aggregator, and
> that they do not have access to the contracts between the aggregator
> (and its contractors) and the manufacturer. However, our
> understanding is that Optum[Rx] has an affiliate relationship with its
> aggregator.[111]

474.  A footnote in the audit report clarifies that "Optum[Rx] contracted with

Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted

with Express Scripts, Inc. (ESI)."[112]

475.  In other words, according to this report, OptumRx contracted with its

own affiliate aggregator, CAPS, which then contracted with OptumRx's co-

conspirator Express Scripts, which then contracted with the Manufacturers for

rebates related to OptumRx's client's drug utilization. OptumRx then used this

---

[111] Laura Rogers & Stacey Thomas, Broward County Florida, Audit of Pharmacy
Benefit Management Services Agreement, No. 18-13 (Dec. 7, 2017), available at
https://cragenda.broward.org/docs/2018/CCCM/20180109_555/25990_2017_1212
%20Exh1_OptumRx%20-%20Revised%20Item.pdf (last visited Apr. 24, 2024).

[112] *Id.* n.3.

complex relationship to mask the amount of Manufacturer Payments generated from its client's utilization.

476. A subsequent audit by the same local entity, covering the period September 2017 to September 2018, concluded:

> Several material weaknesses in Broward's agreement with Optum were identified, many of which are commonplace across pharmacy benefit manager agreements in general. Due to contract weaknesses, a comparison of Broward's PBM agreement, including rebate amounts received, to the Consultant's marketplace data is not feasible. Broward could save an estimated $1,480,000 per year in net prescription drug benefit expenses (based upon minimum rebate guarantees) by switching from its current flawed agreement with Optum, to an agreement with its Coalition, which offers clearly defined terms, increased rebate guarantees and cost saving requirements.[113]

477. Among other "loopholes" discovered in the contract were a number of "flawed" (i.e., vague and manipulable) definitions, including (a) the definition of "Rebates," which "allows the exclusion of monies that should be included" and (b) limitations with respect to "Pass Through Transparency Pricing."

478. The January 2021 Senate Insulin Report summarized the Senate Finance Committee's findings from its two-year probe into the Insulin Pricing Scheme and contained the following observation on these rebate aggregators:

> [T]he recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling

---

[113] Broward County, Florida, *Analysis of Broward County's Prescription Drug Coverage*, https://www.broward.org/Auditor/Reports/Reports/082019_Exh1_BCRxDrug_19-15.pdf (last visited July 3, 2023).

such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.[114]

479.  Federal regulations governing Medicare attempt to capture all possible forms of Direct or Indirect Remuneration (DIR) to PBMs (and plan sponsors), defining the term as "any form of price concession" received by a plan sponsor or PBM "from any source," including "discounts, chargebacks, rebates, cash discounts, free goods contingent on a purchase agreement, up-front payments, coupons, goods in kind, free or reduced-price services, grants, legal judgment amounts, settlement amounts from lawsuits or other legal action, and other price concessions or similar benefits and specifically including "price concessions from and additional contingent payments to network pharmacies that cannot reasonably be determined at the point of sale."[115]

480.  The Department of Health and Human Services, Centers for Medicare & Medicaid Services (CMS) considers all of the following as DIR: rebates, grants, reduced price administrative services, PBM-retained rebates, PBM rebate guarantee

---

[114] Senate Insulin Report at 83.

[115] CMS, *Final Medicare Part D DIR Reporting Guidance for 2021* at 7, https://www.cms.gov/ files/document/final2021dirreportingreqsmemo508v3.pdf (last visited Jan. 15, 2023).

amounts, all post-point of sale payments by pharmacies that are not included in the negotiating price including dispensing incentive payments, prompt pay discounts, and payment adjustments. On the other hand, "bona fide service fees from pharmaceutical manufacturers" and "remuneration for administrative services with no impact on the sponsor's or PBM's drug cost (e.g., PBM incentive payments)" are *not* considered DIR *but only to the extent they reflect fair market value for services rendered.*[116]

481. Because the PBM Defendants retain and conceal most of the secret Manufacturer Payments that they receive, they reap exorbitant profits from the Insulin Pricing Scheme.

482. Even when payor clients receive a portion of the Manufacturer Payments from their PBM, the payors are significantly overcharged, given the extent to which Defendants have deceptively and egregiously inflated the prices of the at-issue drugs.

483. On September 20, 2024, the Federal Trade Commission brought suit against the PBM Defendants and their affiliated rebate aggregators for violations of Section 5 of the Federal Trade Commission Act "for engaging in anticompetitive and unfair rebating practices that have artificially inflated the list price of insulin drugs, impaired patients' access to lower list price products, and shifted the cost of high

---

[116] *Id.* at 6-7.

insulin list prices to vulnerable patients."

484.  Specifically, the recent FTC Complaint revealed, among other things, (a) that the PBM Defendants' affiliated rebate aggregators "now perform the same commercial contracting function that the PBMs previously handled directly" and that the PBM Defendants "simply moved their commercial rebate contracting functions" to their affiliated rebate aggregators; (b) that the rebate aggregators solicit commercial bids from manufacturers using rebate grids "with different rebate rates for different levels of exclusivity: exclusive coverage (1 of 1 manufacturer), dual coverage with another manufacturer (1 of 2), and multiple manufacturers (1 of many)"; and (c) that the rebate aggregators extract WAC-based fees from drug manufacturers as part of commercial negotiations but "provide no additional services to justify the higher payout on higher list price drugs from the assortment of WAC-based fees" the rebate aggregators extract from the manufacturers.

## 2. The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies

485.  A second way the PBM Defendants profit off the Insulin Pricing Scheme is by using the Manufacturers' inflated price to derive profit from the pharmacies with whom they contract nationwide.

486. Each PBM Defendant decides which pharmacies are included in the PBM's network and how much it will reimburse these pharmacies for each drug dispensed.

487.    The PBMs pocket the spread between the amount that the PBMs are paid by their clients, like Monmouth County, for the at-issue drugs (which are based on the prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less). In other words, the PBMs charge a client payor more for a drug than the PBM pays the pharmacy and pockets the difference.

488.  More specifically, the PBM Defendants negotiate with their client payors a reimbursement rate that the client pays the PBM for each prescription drug dispensed by a pharmacy. The PBM Defendants negotiate a separate rate that they pay to pharmacies for each drug dispensed.

489.  These rates are tied to AWP. For example, a PBM may purchase an insulin from the pharmacy at a rate of AWP-15%, and the client may reimburse the PBM at a rate of AWP-13%.  The PBM pockets the spread (2% of AWP in this example) between the rates.

490.  Because the PBM Defendants' revenue from the spread pricing is tied to AWP, the higher the AWP, the greater the amount of money made by the PBMs. In the above example, if the AWP is $100 for a drug, the PBM would make $2 on the spread, but if the AWP is $1000 for the same drug, the PBM would make $20 on the spread from the same sale (AWP-15% = $850; AWP-13% = 870).

491.  When a PBM is affiliated with a retail pharmacy, the PBM earns the

entire retail margin in addition to the pricing spread described above.

492.  The PBM Defendants, therefore, like the Manufacturers, directly benefit from inflated insulin prices.

493.  In addition, because the PBM Defendants' client payors pay for thousands of different prescription drugs, the client payors cannot practically keep track of the AWP for each prescription drug on a given formulary or how those prices change over time.  The client payors, therefore, are unlikely to independently observe the AWP inflation resulting from the Insulin Pricing Scheme. And the PBM Defendants have no incentive to alert their client payors to increasing AWPs since the PBM Defendants directly profit from those increases.

494.  In addressing this form of spread pricing, the National Association of Insurance Commissioners states: "Pharmacy pricing is complex, and the process is not transparent. Plan sponsors are often unaware of the difference between the amount they are billed and the pharmacy reimbursement."[117]

495.  A bipartisan bill introduced in the Senate in 2022 (the Pharmacy Benefit Manager Transparency Act—S. 4293)—would have criminalized this practice of spread pricing, which the bill defined as "[c]harg[ing] a health plan or payer a

---

[117] NAIC, Guide to Understanding Pharmacy Benefit Manager and Associated Stakeholder Regulation—NAIC White Paper Draft as of April 16, 2023, available at: https://content.naic.org/sites/default/files/inline-files/NACDS%20Comments _0.pdf (last visited Apr. 24, 2024).

different amount for a prescription drug's ingredient cost or dispensing fee than the amount the pharmacy benefit manager reimburses a pharmacy for the prescription drug's ingredient cost or dispensing fee where the pharmacy benefit manager retains the amount of any such difference." The bill has not yet been enacted.[118]

496.  The PBMs' industry-funded trade association, PCMA, spent $7.8 million on lobbying in 2021, $8.66 million on lobbying in 2022, and $15.43 million on lobbying in 2023.[119]

497.  The PBMs often disclose the general concept of spread pricing to payors, but only in vague terms that require no accountability. And because the spread-pricing revenue is not defined as a "rebate" in PBM contracts with payors, it falls outside payors' audit rights.

498.  This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from the PBM Defendants to consider the cost-effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

499.  The higher the Manufacturers' list prices, the more money the PBMs

---

[118] https://www.govtrack.us/congress/bills/117/s4293 (last visited Jan. 10, 2023). A new PBM Transparency Act (S.127) was introduced in July 3, 2023.

[119] OpenSecrets, *Client Profile: Pharmaceutical Care Management Ass'n Annual Lobbying Totals*, https://www.opensecrets.org/orgs/pharmaceutical-care-management-assn/lobbying?id=D000028342 (last visited Apr. 16, 2024).

make off the spread. At the same time, a Beneficiary's out-of-pocket co-pay or deductible cost often is more than if the client had simply paid cash outside of his or her plan. On top of this, the PBM contracts generally allow no rebates to payors where the Beneficiary is responsible for 100% of the drug cost, e.g., under his or her deductible.

500.    The PBM Defendants also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR (Direct or Indirect Remuneration) fees, based on the list prices—and again, the higher the list price for each diabetes medication sold, the greater the fees the PBMs generate. They also apply "retrospective" discounts so, for example, a payor's (and member's co-pay or deductible) cost may be $100, but the price may be discounted post-purchase between the PBM and the (often self-owned) pharmacy to $90, with the spread going to the PBM.

501.    CMS addressed these and similar DIR issues in a proposed rule in 2017. While noting the growth of "pharmacy price concessions" that "are negotiated between pharmacies and their sponsors or PBMs," CMS nevertheless concluded:

> When manufacturer rebates and pharmacy price concessions are not reflected in the price of a drug at the point of sale, beneficiaries might see lower premiums, but they do not benefit through a reduction in the amount they must pay in cost-sharing, and thus, end up paying a larger share of the actual cost of a drug. Moreover, given the increase in manufacturer rebates and pharmacy price concessions in recent years, the point-of-sale price of a drug that a Part D sponsor reports on a PDE record as the negotiated price is rendered less transparent

. . . .[120]

CMS expressed further concern that when rebates and other price concessions are not reflected in the negotiated point-of-sale drug price, it "can impede beneficiary access to necessary medications, which leads to poorer health outcomes and higher medical care costs for beneficiaries . . . ."[121]

502. So, the PBM Defendants make money "coming and going." In a pre-PBM world, a competitively priced drug might have a (hypothetical) net cost to a health plan of $50, and that is what it paid. Now, the PBMs coordinate with Manufacturers to increase the list price to $150. The PBMs then "negotiate" the inflated price down to $100 and take a $50 rebate, some of which may be forwarded to the payor, whose net cost is less than the inflated list price, but whose real-world cost is considerably more than if the PBMs were not involved.

503. At the same time, the PBMs receive "administrative fees" for including certain drugs on its formularies, which are not considered "rebates." The PBMs also receive "service fees" or other payment for "administrative services" provided to the Manufacturers such as "formulary compliance initiatives," "education services," or the sale of non-patient identifiable claim information. All of these revenue streams

---

[120] Medicare Program; Contract Year 2019 Policy and Technical Changes, 82 Fed. Reg. 56336 (Nov. 29, 2017), https://www.govinfo.gov/content/pkg/FR-2017-11-28/pdf/2017-25068.pdf.

[121] *Id.*

are outside the typical definition of "rebates" found in contracts between the PBM

Defendants and payors.

504. The PBMs then charge payors administrative fees for providing

pharmacy benefit management services and charges for drug costs (a/k/a ingredient

costs) and per-prescription dispensing fees, as well as additional administrative fees

for services not included in the PBMs' general administrative obligations. The PBMs

then receive rebates and/or discounts (pre-purchase or post-purchase) from the

pharmacies, which the PBMs often own. These too are excluded from the definition

of "rebates." These and other vaguely described revenue streams are sometimes

disclosed, but only in hazy, overly generalized terms. And they are beyond a payor's

contractual rights to audit for "transparency" purposes because they are not defined

"rebates."

505. Additionally, the PBMs may take months to pay rebates to payors and

the PBMs retain all interest on, and the time-value of, the rebates pending payment.

This is one example of a PBM "disclosure" excerpted from a payor's PBM contract

with Express Scripts:

> This disclosure provides an *overview* of the *principal* revenue
> sources of Express Scripts, Inc. and Medco Health Solutions, Inc.
> (individually and collectively referred to herein as "ESI"), as well as
> ESI's affiliates. In addition to administrative and dispensing fees
> paid to ESI by our clients for pharmaceutical benefit management
> ("PBM") services, ESI and its affiliates derive revenue from other
> sources, including arrangements with pharmaceutical manufacturers,
> wholesale distributors, and retail pharmacies. *Some* of this revenue
> relates to utilization of prescription drugs by members of the clients

receiving PBM services. ESI *may* pass through certain manufacturer payments to its clients or *may* retain those payments for itself, depending on the contract terms between ESI and the client. . . . Formulary rebate amounts vary based on the volume of utilization as well as formulary position applicable to the drug or supplies, and adherence to *various* formulary management controls, benefit design requirements, claims volume, and *other similar factors*, and *in certain instances* also *may* vary based on the product's market-share. ESI *often* pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's PBM agreement terms. ESI retains the financial benefit of the use of any funds held until payment of formulary rebate amounts is made to the client. In addition, ESI provides administrative services to formulary rebate contracted manufacturers, which include, *for example*, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. (emphasis added)

506.  Payors have no access to, and no knowledge of, the intricacies of the dealings between the PBM Defendants and the Manufacturers that are shrouded by such vague "disclosures" (which vary in detail, but not in substance, in all three of the PBM Defendants' adhesive contracts). These disclosures could be summed up in a single sentence: "We pass along 'rebates' to our client payors, except when we don't."

### 3.  The Insulin Pricing Scheme Increases PBM Mail-Order Profits

507.  Another way the PBM Defendants profit from the Insulin Pricing Scheme is through their mail-order pharmacies. The higher the price that PBM Defendants can get customers to pay for diabetes medications, the greater the profits PBM Defendants realize through their mail-order pharmacies.

508. Because the PBMs base the prices they charge for the at-issue diabetes medications on the Manufacturers' prices, the more the Manufacturers inflate their prices, the more money the PBMs make.

509. When a PBM has its own mail-order pharmacy, its profits are even greater than when they are dispensed through its retail network pharmacies. When a PBM dispenses prescription drugs through its own mail-order pharmacy, it captures the entire retail margin as increased by the Insulin Pricing Scheme.

510. The PBM Defendants have colluded with the Manufacturers so that the PBMs often know when the Manufacturers are going to raise their prices. The PBMs purchase a significant volume of the at-issue drugs before the price increase goes into effect. Then, after the Manufacturers raise their price, the PBMs charge their mail-order customers based on the increased prices and pocket the difference. The PBMs make significant amounts of money through this arbitrage scheme.

511. The PBM Defendants also charge the Manufacturer Defendants fees related to their mail-order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the Manufacturers' price. Once again, the higher the price is, the more money the PBMs make on these fees.

512. In sum, each way in which the PBM Defendants make money on diabetes medications *is tied directly to coordination with the Manufacturers to establish artificially higher prices and inducing ever-increasing secret Manufacturer*

*Payments*. The PBMs are not lowering the price of diabetes medications as they represent publicly and directly to their payor clients like Monmouth County. On the contrary, they are making billions of dollars *at the expense of their clients* and their clients' Beneficiaries by fueling these skyrocketing prices.

**I. Monmouth County Purchased At-Issue Drugs Directly from Express Scripts**

513.  As a government employer, Monmouth County serves its residents by providing public safety, emergency management, and health services, among other vital roles. As more federal and state responsibilities are passed on to local government, Monmouth County has a growing list of demands on a limited budget. Consequently, any significant increase in spending can have a severe detrimental effect on Monmouth County's overall budget and, in turn, negatively impact its ability to provide necessary services to the community.

514. One benefit Monmouth County provides the Beneficiaries of its healthcare plan is payment for a large portion of their pharmaceutical purchases. In this role, Monmouth County has spent significant amounts on the at-issue diabetes medications during the relevant period.

515. Because Monmouth County maintains a self-funded plan, it does not rely on a third-party insurer to pay for its insured's medical care, pharmaceutical benefits, or prescription drugs. Rather, Monmouth County directly contracts with, and directly pays, PBMs (and their affiliated pharmacies) for pharmaceutical

benefits and prescription drugs, including the at-issue medications.

516. Specifically, during the relevant time period, Monmouth County contracted with Express Scripts and, prior to that time, Medco (now Express Scripts).

517. Monmouth County is the only named party that pays the full purchase price for the at-issue drugs, and the only named party that has not knowingly participated in the Insulin Pricing Scheme. Neither the PBM Defendants nor the Manufacturer Defendants suffer losses from the Insulin Pricing Scheme. Instead, they both benefit from—and have conspired together to orchestrate—the scheme.

518. As part of purchasing the at-issue drugs from Express Scripts (and its predecessor, Medco), Monmouth County directly pays and paid these PBMs artificially inflated costs resulting from the Insulin Pricing Scheme, including fees like "claims reimbursements," "ingredient costs," "dispensing fees," "administrative fees," "inflation fees," "discounts," and more—all of which are associated with Plaintiff's purchase of the at-issue drugs from these PBMs. Because the at-issue drugs are potentially life-saving medications, and because the Defendants control the market for these drugs, Monmouth County has had no choice but to pay these exorbitant, artificially inflated prices directly to Express Scripts.

519. Diabetes medications have consistently been a significant financial expense for Plaintiff. For example, in each year since 2016, Plaintiff has spent over

$800,000, with costs for these drugs steadily increasing and eclipsing $1 million in each year since 2020.

520. In addition to purchasing the at-issue drugs from Express Scripts, Monmouth County also relies (and has relied) on Express Scripts as an administrative agent, for the supposed purposes of limiting its administrative burden and controlling pharmaceutical drugs costs.

521. In providing PBM services to Monmouth County, including developing and offering formularies for Monmouth County's prescription plan, constructing and managing Monmouth County's pharmacy network (which included the PBM's retail and mail-order pharmacies), processing pharmacy claims, and providing mail-order pharmacy services, Defendant Express Scripts—in direct coordination with the Manufacturer Defendants and utilizing the false prices generated by the Insulin Pricing Scheme—set the amounts Monmouth County paid for the at-issue medications. Monmouth County paid Express Scripts directly for the at-issue drugs and to manage pharmacy benefits related to the at-issue drugs.

## J. Defendants Deceived Plaintiff

522. At no time has either Defendant group disclosed the Insulin Pricing Scheme or the false list prices produced by it.

### 1. The Manufacturer Defendants Deceived Plaintiff

523. At all relevant times, the Manufacturer Defendants knew that the list

prices, net prices, and payors' net costs (purchase prices) generated by the Insulin Pricing Scheme were false, excessive, and untethered to any legal, competitive, or fair market price.

524.  The Manufacturer Defendants knew that these prices did not bear any rational relationship to the actual costs incurred or prices realized by Defendants, did not result from transparent or competitive market forces, and were artificially and arbitrarily inflated for the sole purpose of generating profits for Defendants.

525.  The insulin market, and Defendants' business arrangement relating to it, exhibits the key features of an oligopoly—the concentration of numerous competitors into a small group of firms that dominates the market, high barriers to entry, the ability to set and control prices, firm interdependence, and maximal revenues.

526.  The Manufacturer Defendants also knew that payors, including Plaintiff, relied on the false list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs.

527.  The Manufacturer and PBM Defendants further knew that Monmouth County—like any reasonable consumer and particularly one with fiduciary obligations to its Beneficiaries—expected to pay a price reflecting the lowest fair market value for the drugs (which was not necessarily the same as the lowest price in the market, given that all prices were inflated due to the Insulin Pricing Scheme).

528.  Despite this knowledge, the Manufacturer Defendants published list

prices generated by the Insulin Pricing Scheme throughout the United States and New Jersey in publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain, and directly to pharmacies, who then used these prices to set the amount that the pharmacies charged for the at-issue drugs.

529.  The Manufacturer Defendants also published these prices to the PBMs, who then used them to charge diabetics and payors for the at-issue drugs.

530.  By publishing their prices in every U.S. state, the Manufacturers held each of these prices out as a reasonable price on which to base the prices payors actually pay for the at-issue drugs.

531.  These representations are false. The Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to their cost, their fair market value in a competitive market, or the net price received for the at-issue drugs.

532.  During the relevant period, the Manufacturer Defendants published prices in every state within the U.S. in the hundreds of dollars per dose for the same at-issue drugs that would have been profitable to Manufacturers at prices less than $10 per dose.

533.  The Manufacturer Defendants also have publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for Dave

Ricks, Eli Lilly CEO, as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant period, executives from Sanofi and Novo Nordisk also falsely represented that research and development costs were key factors driving the at-issue price increases.[122]

534. Contrary to the Manufacturer Defendants' representations, between 2005 and 2018, Eli Lilly spent $680 million on R&D costs related to Humalog while earning $31.35 billion in *net* sales during that same period. In other words, Eli Lilly made more than 46 times its reported R&D costs on Humalog during this portion of the relevant period, i.e., R&D costs amounted to about 2% of *net* sales (whereas R&D costs for pharmaceuticals typically amount to around 20% of *total* revenues). Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.[123]

535. The Senate Insulin Report found that the PBMs consider insulins to be "interchangeable" from "a clinical perspective" and that Manufacturers "focus their R&D efforts on new insulin-related devices, equipment, and other mechanical parts that are separate from insulin's formulation."[124]

---

[122] Drug Pricing Investigation at PDF 188-94.

[123] *Id.*

[124] Senate Insulin Report at 5, 17.

536. A House Oversight Committee staff report concluded that "drug companies' claims that reducing U.S. prescription drug prices will harm innovation is overblown" and that "[m]any drug companies spent a significant portion of their R&D budget on finding ways to suppress generic and biosimilar competition while continuing to raise prices, rather than on innovative research."[125]

537. In sum, the Manufacturer Defendants affirmatively withheld the truth from Plaintiff and specifically made misrepresentations in furtherance of the Insulin Pricing Scheme and to induce Plaintiff's reliance to purchase the at-issue drugs.

### 2. The PBM Defendants Deceived Plaintiff

538. The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by preferring *the highest-priced at-issue drugs* for preferred formulary placement and by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

539. The PBM Defendants perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing

---

[125] U.S. House of Representatives, *Drug Pricing Investigation: Industry Spending on Buybacks, Dividends and Executive Compensation* (July 2021) at PDF 3, https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/CO R%20Staff%20Report%20-%20Pharmaceutical%20Industry%20Buybacks%20Dividends%20Compared%20to % 20Research.pdf (last visited Jan. 10, 2023).

chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom at the expense of payors nationwide.

540. At all times relevant, the PBMs have purposefully, consistently, and routinely misrepresented that they negotiate with Manufacturer Defendants and construct formularies for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics. Representative examples include:

a. CVS Caremark has for the past decade stated in its annual reports that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness, and convenience of prescription drugs. CVS Caremark has further stated that it maintains an independent panel of doctors, pharmacists, and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of CVS Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

b. Express Scripts has consistently represented that it works with clients, manufacturers, pharmacists, and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes. Its annual reports consistently claim

that in making formulary recommendations, Express Scripts' Pharmacy &
Therapeutics Committee considers the drug's safety and efficacy, without any
information on or consideration of the cost of the drug, including any discount
or rebate arrangement that Express Scripts negotiates with the Manufacturer,
and that Express Scripts fully complies with the P&T Committee's clinical
recommendations regarding drugs that must be included or excluded from the
formulary based on their assessment of safety and efficacy.

c.      OptumRx has stated in its annual reports over the past decade that
OptumRx's rebate contracting and formulary management assist customers in
achieving a low-cost, high-quality pharmacy benefit. It has consistently
claimed that it promotes lower costs by using formulary programs to produce
better unit costs, encouraging patients to use drugs that offer improved value
and that OptumRx's formularies are selected for health plans based on their
safety, cost, and effectiveness.[126]

541. In addition to these general misrepresentations, the PBM Defendants
have purposefully, consistently, and routinely made misrepresentations about the at-
issue diabetes medications. Representative examples include:

a.      In a public statement issued in November 2010, CVS Caremark

---

[126] *See, e.g.*, CVS Health Annual Reports (Form 10-K) (FY 2010-2019); OptumRx
Annual Reports (Form 10-K) (FY 2010-2019); Express Scripts Annual Reports (Form
10-K) (FY 2010-2017).

represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."[127]

b.    In 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark, stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."[128]

c.    In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."[129]

---

[127] Chain Drug Review, *CVS Expands Extracare for Diabetes Products* (May 11, 2010), https://www.chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/ (last visited Apr. 17, 2024).

[128] CBS News, Diabetes Epidemic Growing (June 22, 2010, 11:29 a.m.), https://www.cbsnews.com/news/diabetes-epidemic-growing/ (last visited Apr. 17, 2024).

[129] Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year*, WALL ST. J. (Nov. 8, 2012), Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year*, WALL ST. J. (Nov. 8, 2012), http://online.wsj.com/article/SB10001424127887324439804578107040729812454.html (last visited Apr. 17, 2024).

d.     In 2017, Express Scripts' CEO, discussing a program involving insulin, "disputed the idea that Express Scripts contributes to rising drug costs."[130]

e.     In 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts, said in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."[131] Mr. Stettin also claimed that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[132]

---

[130] Katie Thomas, *Express Scripts to Offer Cheaper Drugs for Uninsured Customers*, N.Y. TIMES, May 8, 2017, available at https://www.nytimes.com/2017/05/08/health/express-scripts-drug-prescriptions-prices.html (last visited Apr. 18, 2024).

[131] Angela Mueller, *Express Scripts Launches Program to Control Diabetes Costs,* ST. LOUIS BUS. J. (Aug. 31, 2016), https://www.bizjournals.com/stlouis/news/2016/08/31/express-scripts-launches-program-to-control.html (last visited Apr. 17, 2024).

[132] Express Scripts, PR NEWSWIRE, *Express scripts Launches Diabetes Care Value Program$^{SM}$, Guaranteeing More Affordable, High-Quality Diabetes Care*, Aug. 23, 2016, https://www.prnewswire.com/news-releases/express-scripts-launches-diabetes-care-value-program-guaranteeing-more-affordable-higher-quality-diabetes-care-300320485.html#:~:text=The%20new%20program%20%E2%80%93%20part%20of,anticipated%20increase%20in%20diabetes%2Ddrug (last visited Apr. 17, 2024).

f.      In a 2018 Healthline interview, Mark Merritt, long the President

of the PBM trade association, PCMA, misrepresented that: "[Through their

formulary construction], PBMs are putting pressure on drug companies to

reduce insulin prices."[133]

g.      CVS Caremark's Chief Policy and External Affairs Officer

claimed in the April 2019 hearings that CVS Caremark "has taken a number

of steps to address the impact of insulin price increases. We negotiate the best

possible discounts off the manufacturers' price on behalf of employers, unions,

government programs, and beneficiaries that we serve."[134]

h.      Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx,

testified before the U.S. Congress in the April 2019 hearing that for "insulin

products . . . we negotiate with brand manufacturers to obtain significant

discounts off list prices on behalf of our customers."[135] In May 2023,

OptumRX's CEO, Heather Cianfrocco, told the U.S. Senate Committee on

Health, Education, Labor, and Pensions that OptumRx "has been at the

forefront of efforts to improve access to affordable insulin and provide

---

[133] Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?*, Population Health Learning Network (Dec. 2016), https://www.hmpgloballearningnetwork. com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part (last visited Apr. 17, 2024).

[134] *Priced Out of a Lifesaving Drug* at lines 715-18.

[135] *Id.* at lines 903-06.

comprehensive care to patients with diabetes."[136]

    i.    The PBM-funded trade association PCMA's website acknowledges that "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins," but then misleadingly claims that "PBMs work hard to drive down costs using formulary management and rebates."[137]

542. The PBM Defendants falsely represent that they negotiate with the Manufacturer Defendants to lower the price of the at-issue diabetes medications not only for *payors*, but also for diabetic *patients*. For example:

    a.    Express Scripts' code of conduct, effective beginning in 2015, states: "At Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer

---

[136] Heather Cianfrocco Written Testimony, *The Need to Make Insulin Affordable for All Americans* (May 10, 2023), https://www.help.senate.gov/imo/media/doc/Cianfrocco%20Written%20Testimony%20HELP%20Committee%20_Final.pdf.

[137] PCMA, *PCMA on National Diabetes Month: PBMs Lowering Insulin Costs, Providing Support to Patients* (Nov. 16, 2020), https://www.pcmanet.org/pcma-on-national-diabetes-month-pbms-lowering-insulin-costs-providing-support-to-patients/ (last visited Apr, 17, 2024); Visante, *Insulins: Managing Costs with Increasing Manufacturer Prices* (2020), https://www. pcmanet.org/ wp-content/uploads/ 2020/08/PCMA_Visante-Insulins-Prices-and-Costs-.pdf.

and more affordable."[138]

   b.    Amy Bricker—former President of Express Scripts and PCMA board member—testified before Congress in April 2019: "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs."[139]

   c.    Ms. Bricker also testified that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications."[140]

   d.    OptumRx CEO John Prince testified to the Senate: "We *reduce the costs of prescription drugs* [and] we are leading the way to ensure that *those discounts directly benefit consumers*. . . . OptumRx's pharmacy care services business is *achieving better health outcomes for patients*, *lowering costs* for the system, and *improving the healthcare experience for consumers*. . . . OptumRx negotiates better prices with drug manufacturers *for our*

---

[138] Express Scripts, *Code of Conduct*, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited Apr. 16, 2024).

[139] *Priced Out of a Lifesaving Drug* at lines 803-06.

[140] *Id*. at lines 838-40.

*customers and for consumers.*[141]

e.      In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . [I]n 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative."[142]

f.      The PCMA website touts PBMs as "the only entity in the prescription drug supply and payment chain dedicated to reducing drug costs" and (contradicting the PBM representatives' Congressional testimony), that "when new manufacturers enter the market at a lower list price, PBMs use the competition to drive costs down."[143]

543.    Not only have the PBM Defendants intentionally misrepresented that they use their market power to save payors money, but they have also specifically and falsely disavowed that their conduct drives prices higher. Representative examples include:

a.      On an Express Scripts' earnings call in February 2017, CEO Tim

---

[141] Senate Insulin Report—*Hearing Transcript* at 174, available at https://www.finance.senate.gov/imo/media/doc/435631.pdf (last visited Apr. 17, 2024).

[142] CVS Health, *2017 Drug Trend Report* (Apr. 5, 2018), (last visited Apr. 17, 2024).

[143] PCMA, *PBMs Reduce Insulin Costs: PBMs are working to improve the lives of patients living with diabetes and their families,* https://www.pcmanet.org/insulin-managing-costs-with-increasing-manufacturer-prices/ (last visited Apr. 17, 2024).

Wentworth stated: "Drugmakers set prices, and we exist to bring those prices down."[144]

b.    Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017: "Any suggestion that PBMs are causing prices to rise is simply erroneous."[145]

c.    In 2017, Express Scripts' Wentworth went on CBS News to argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[146]

d.    During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer Sumit Dutta answered, "we can't see a correlation just when rebates raise list prices."[147]

---

[144] Samantha Liss, *Express Scripts CEO Addresses Drug Pricing 'Misinformation'*, St. Louis Post-Dispatch (Feb. 17, 2017), https://www.stltoday.com/business/local/express-scripts-ceo-addresses-drug-pricing-misinformation/article_8c65cf2a-96ef-5575-8b5c-95601ac51840.html (last visited Apr. 17, 2024).

[145] Lynn R. Webster, *Who Is To Blame For Skyrocketing Drug Prices?*, THE HILL (July 27, 2017, 11:40 AM), https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices (last visited Apr. 17, 2024).

[146] CBS News, *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices* (Feb. 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited Apr. 17, 2024).

[147] *Priced Out of a Lifesaving Drug* at lines 1019-22.

e.    In 2019, when testifying Congress on the rising price of insulins, Amy Bricker—then with Express Scripts, now with CVS—testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."[148]

544.  All of the PBM Defendants' public statements regarding insulin pricing have been consistent with the misrepresentations above and below. None has contradicted those misrepresentations or revealed the Insulin Pricing Scheme.

545.  Although Plaintiff's employees responsible for managing Monmouth County's health plans were not following the various Congressional hearings when they occurred and were not exposed to the misrepresentations detailed above (or all of those detailed below), the Defendants' public pronouncements have been consistent with those misrepresentations.

546.  Monmouth County's direct interactions with the PBM Defendants were consistent with those misrepresentations, which were made in furtherance of, and in order to conceal, the Insulin Pricing Scheme.

547.  For example, in its recent 2023 response to Plaintiff's RFP, Express Scripts represented to Monmouth County, among other things, that:

a.    Express Scripts was "look[ing] forward to renewing our relationship and expanding the partnership we've built over 10 years to help

---

[148] *Id*. at lines 1016-17.

solve your toughest challenges in the pharmacy benefit [sic] today and in the future."

b.     Express Scripts wanted "to continue our partnership and deliver best in class service" to the County's members as the County's "trusted advisor."

c.     Express Scripts' services make prescription drugs more affordable.

d.     Express Scripts recognized its clients' need for cost solutions.

e.     Express Scripts "will collaborate with County of Monmouth . . . and work with County of Monmouth to create goals and action plans related to . . . cost containment" and "coordinates with internal partners and corporate resources to maximize County of Monmouth's success."

f.     Express Scripts would assign Monmouth County a financial analyst who would "assess County of Monmouth's program performance, including cost-effectiveness . . ."

g.     That Express Scripts' own "research has shown that most members want exactly with plan sponsors want: lower costs and optimal health."

h.     That Express Scripts' mission was "simple, affordable, and predictable."

548. Express Scripts made similar representations to Monmouth County in connection with earlier-submitted RFP responses, which ultimately resulted in the continued renewal of Express Scripts' standing agreement with Monmouth County.

549. Of course, Express Scripts has never revealed to Monmouth County that it had coordinated with the Manufacturers to determine the contract terms that would be presented to payors like Monmouth County, to create the formulary Monmouth County was required to adopt, and to set prices based upon the false list prices at Monmouth County's expense and in furtherance of the Insulin Pricing Scheme.

550. While bombarding Monmouth County with misrepresentations and half-truths like those above, none of the PBMs revealed the details of their relationships with the Manufacturer Defendants or the existence of the Insulin Pricing Scheme.

551. Throughout the relevant period, the PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with their payor clients; (b) they work to lower the price of the at-issue drugs and, in doing so, achieve substantial savings for diabetics and payors; and (c) that monies they receive from manufacturers and their formulary choices are for the benefit of payors and diabetics.

552. Indeed, the PBM Defendants have promised to avoid conflicts of interest. For example, the PCMA has Principles of Professional and Ethical Conduct

to which all PCMA members, including the three PBM Defendants, have agreed.[149]

This code of ethics requires the PBM Defendants to "[a]void any and all conflicts

of interest and advise all parties . . . of any situations where a conflict of interest

exists."[150]

553. Each PBM Defendant has also published a code of conduct requiring

employees and entities to avoid conflicts of interest.[151] Despite these obligations,

the PBM Defendants have substantial pecuniary interests that conflict with their

duties to Monmouth County. The PBM Defendants artificially inflate the price of

insulin for their profit, to the detriment of payors, including Monmouth County.

554. The PBM Defendants understand that payors like Monmouth County

rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct

formularies designed to improve access to medications. Monmouth County did so.

Indeed, Express Scripts' CEO told the U.S. Senate that PBMs "exist to help solve the

---

[149] *Principles of Professional and Ethical Conduct*, PCMA, https://www.pcma.org/about/principles-of-professional-and-ethical-conduct/ (last visited Apr. 20, 2024).

[150] *Id.*

[151] Code of Conduct, Express Scripts, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited Apr. 20, 2024); Code of Conduct, CVS Caremark, https://media.corporate-ir.net/media_files/irol/99/99533/corpgov/codeofconduct03.pdf (last visited Apr. 20, 2024); Code of Conduct, UnitedHealth Group, https://professionals.optumrx.com/content/dam/optum3/professional-optumrx/resources/FWA_CoCs_2018.pdf (last visited Apr. 20, 2024).

challenge[]" of rising drug prices, including insulin, by "negotiating with large pharmaceutical manufacturers to lower the cost of drugs for employers, health plans, federal and state governments, and most importantly, patients."[152]

555. Throughout the relevant period, the PBM Defendants also falsely claimed they are transparent about the Manufacturer Payments and that the amounts remitted (or not) to payors. In fact, the PBM Defendants' disclosures of their ties to the Manufacturer Defendants were vague, equivocal, and misleading. Their manner of defining "rebates" in payor contracts is misleading and subject to undefined and indeterminable conditions and exceptions. The PBM Defendants thereby facilitated and obtained secret Manufacturer Payments far above and beyond the amounts of "rebates" remitted to payors.

556. The PBM Defendants' internal processes and accounting were and are abstruse and opaque, allowing them to overtly mislead the public and payors like Plaintiff.

557. In 2011, for example, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . . Every day we strive to show our commitment to our clients, and one element of that commitment is to be open and

---

[152] Adam Kautzner, Testimony Before the U.S. S. Comm. on Health, Educ., Labor, and Pensions, *The Need to Make Insulin Affordable for All Americans* (May 10, 2023), https://www.help.senate.gov/imo/media/doc/Kautzner%20Express%20Scripts%20HELP%20Hearing%20Testimony%2005102023.pdf.

honest about our pricing structure."[153]

558.  In a 2017 CBS News interview, Express Scripts' CEO represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments they receive and that payors "know exactly how the dollars flow" with respect to these Manufacturer Payments.[154]

559.  When testifying before the Senate Finance Committee, CVS Executive Vice President Derica Rice stated, "[A]s it pertains to transparency overall, we at CVS Caremark are very supportive. We provide full visibility to our clients of all our contracts and the discounts that we negotiate on their behalf. . . . And transparency— today we report and fully disclose not only to our clients, but to CMS [Medicare]."[155]

560.  At the same hearing, Steve Miller of Cigna (Express Scripts) testified: "we are really a strong proponent for transparency for those who pay for health care. So the patient should know exactly what they are going to pay. Our plan sponsors

---

[153] UnitedHealth Group, *Prescription Solutions by OptumRx Receives 4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards* (Sept. 13, 2011), https://web.archive.org/web/20210805182422/https://www.unitedhealthgroup.com/newsroom/2011/0913tipps.html (last visited Apr. 17, 2024).

[154] CBS News, *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices* (Feb 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited Apr. 17, 2024).

[155] Senate Insulin Report Hearing Transcript at 28, 32, https://www.finance.senate.gov/imo/media/doc/ 435631.pdf (last visited Apr. 17, 2024).

need to know exactly what is in their contract."[156]

561. John Prince of OptumRx chimed in: "Senator, if our discounts were publicly available, it would hurt our ability to negotiate effectively. Our discounts are transparent to our clients."[157]

562. And when testifying before Congress in April 2019, Amy Bricker, then a Senior Vice President of Defendant Express Scripts, touted transparency with payors and echoed Mr. Prince's need for confidentiality around discounts:[158]

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . The reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> ***
>
> Mr. Sarbanes. Yeah, because it is a secret. What about if we made it completely transparent? Who would be for that?
>
> ***
>
> Ms. Bricker. Absolutely not . . . . It will hurt the consumer. . . because . . . prices will be held high.

563. Consistent with the PBM Defendants' intention in creating these rebate aggregators—"to create a fee structure that can be retained and not passed on to a

---

[156] *Id.* at 32.

[157] *Id.*

[158] *Priced Out of a Lifesaving Drug* at lines 2469-2506.

client"[159]—the PBMs also intentionally withhold information about their use of affiliated rebate aggregators (like Defendants Zinc, Ascent, and Emisar) to negotiate and collect rebates and additional fees from the Manufacturers. The PBMs use these GPOs to obfuscate the payment trail of rebates and these additional "fees," which are promised to payors under their sponsor agreements with the PBMs. The PBMs do not disclose the amounts collected by or details about the rebate aggregators in their SEC filings, nor do they disclose their existence or activity to payors publicly, in sponsor agreements or RFP responses, or in other communications. These amounts are also not subject to audit because they are not classified as rebates collected by the PBMs.

564.  As recently as May 2022, JC Scott—President of the PBM trade group PCMA—testified before the Senate Commerce Committee:

> PBMs are proud of the work they do to reduce prescription drug costs, expand affordable access to medications, and improve patient outcomes. PBMs negotiate with drug companies to lower prescription drug costs PBMs advocate for patients in the fight to keep prescription drugs accessible and affordable.

Mirroring the PCMA website, Mr. Scott also testified, "The PBM industry is the only stakeholder in the chain dedicated to seeking lower costs."[160]

565.  During the relevant period—as seen above—the PBM Defendants,

---

[159] Robbins & Abelson, *supra* note 114.
[160]      https://www.pcmanet.org/jc-scott-testifies-before-a-senate-panel-about-pbm-value/ (last visited Apr. 17, 2024).

including Express Scripts, represented to Monmouth County that they constructed formularies and negotiated with the Manufacturer Defendants for the benefit of payors and patients to maximize drug cost savings while promoting the health of diabetics.

566. Throughout the relevant period, the PBMs consistently made similar misrepresentations directly to payors nationwide through bid proposals, member communications, invoices, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

567. All such representations are false—the Manufacturer and PBM Defendants in fact coordinated to publish the false prices and to construct the PBM formularies, causing the price of the at-issue drugs to skyrocket. For example:

    a.    In 2018, the United States spent $28 billion on insulin compared with $484 million in Canada. The average American insulin user spent $3,490 on insulin in 2018 compared with $725 among Canadians.[161]

    b.    Diabetics who receive their medications from federal programs that do not use the PBMs also pay significantly less. In December 2021, the United States House of Representatives Committee on Oversight and Reform issued its Drug Pricing Investigation Report finding that federal health care

---

[161] Schneider, T., Gomes, T., Hayes, K. N., Suda, K. J., & Tadrous, M., Comparisons of Insulin Spending and Price Between Canada and the United States. *Mayo Clinic Proceedings*, *97*(3), 573–578 (2022).

programs that negotiate directly with the Manufacturers (like the Department of Veterans Affairs), and which are thus outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program, which relies on the PBM Defendants to set their at-issue drug prices.[162]

568.  Defendants knew that their representations were false when they made them and coordinated to withhold the truth from payors, including Plaintiff.

569. Defendants concealed the falsity of their representations by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

570.  The Defendants have never revealed the full amount of any drug-specific Manufacturer Payments exchanged between them. Despite the claims of transparency to Plaintiff and to the public and despite Plaintiff's contracts with Express Scripts, Plaintiff does not know, and cannot learn, of the full extent of the Manufacturer Payments and other agreements between PBMs and the Manufacturer Defendants.

571.  The PBM Defendants do not disclose the terms of the agreements they make with the Manufacturers or the Manufacturer Payments they receive. Nor do

---

[162]    https://www.fiercepharma.com/pharma/house-oversight-committee-blasts-pharma-for-outrageous-prices-and-anticompetitive-conduct (last visited Apr. 5, 2024).

they disclose the details related to their agreements (formal or otherwise) with pharmacies. All those revenue streams are beyond the scope of the payors' contractual audit rights.

572. Further, although PBMs negotiate drug-specific rebates with Manufacturers,[163] the PBM rebate payments to payor clients and summaries of such payments are in the aggregate, rather than on a drug-by-drug basis. It is impossible for payors like Plaintiff to tease out drug-specific rebates, much less the other undisclosed Manufacturer Payments. This allowed the PBM Defendants to hide the large Manufacturer Payments that they receive for the at-issue diabetes medications.

573. The PBM Defendants have gone so far as to sue governmental entities to block the release of details on their pricing agreements with the Manufacturers and pharmacies.

574. Even when audited by payors, the PBM Defendants routinely refuse to disclose their agreements with the Manufacturers and pharmacies by relying on overly broad confidential agreements and claims of trade secrets and by erecting other unnecessary roadblocks and restrictions.

575. Beneficiaries of the Plaintiff's health plans have no choice but to pay prices flowing from the Manufacturers' inflated list prices because Beneficiaries need these medications to survive and the Manufacturer Defendants produce virtually all

---

[163] Senate Insulin Report at 40.

diabetes medications available in the United States. The list prices generated by the Defendants' coordinated efforts directly impact out-of-pocket costs at the point of sale.

576.  In sum, the entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers' misrepresentations related to the reasons behind the prices, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is both unconscionable, deceptive, and unfair and immensely lucrative for Defendants.

577.  Plaintiff did not know, because the Defendants affirmatively concealed, (a) that the Manufacturers and PBMs coordinated to create the PBM formularies in exchange for money and other consideration; (b) that the list prices were falsely inflated; (c) that the list prices were manipulated to satisfy PBM profit demands; (d) that the list prices and net costs (purchase prices) paid by Plaintiff bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBMs in coordinating their pricing; or (e) that the entire insulin pricing structure Defendants created was false.

**K. The Insulin Pricing Scheme Has Damaged Monmouth County**

578.  Monmouth County provides health and pharmacy benefits to its

Beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period.

579.   As stated above, one of the benefits that Monmouth County offers its Beneficiaries through its employee health plans is payment of a significant portion of the Beneficiaries' prescription drug purchases.

580.   Monmouth County has for years interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications.

581.   Since 2012 through the present, Monmouth County has had a PBM service agreement in place with Express Scripts. Before then, Monmouth County had a PBM service agreement in place with Medco, until Medco was acquired by Express Scripts in 2012.

582.   In addition, Plaintiff interacted with CVS Caremark and OptumRx when they responded to requests for proposal by Monmouth County for PBM services. In providing those bids each made representations in furtherance of the Insulin Pricing Scheme.

583.   During the relevant time period, Monmouth County was unaware of the Insulin Pricing Scheme.

584.   Monmouth County relied on Defendants' statements and material omissions made in furtherance of the Insulin Pricing Scheme.

585.    Plaintiff relied on Defendants' misrepresentations in paying for the at-issue diabetes medications at prices that would have been lower but for the Insulin Pricing Scheme.

586.    Defendants' Insulin Pricing Scheme has cost Plaintiff millions of dollars in overcharges. Since 2016 alone, Monmouth County has spent more than *$7.4 million* on the at-issue diabetes medications.

587.    Express Scripts failed to adhere to principles of good faith and fair dealing in carrying out their PBM contracts with the County. Express Scripts' relationship with Monmouth County was inherently unbalanced and its contracts adhesive. Express Script had superior bargaining power and superior knowledge of its relationships with the Manufacturer Defendants, including those that ultimately dictate the drug costs Monmouth County incurred. Although Express Scripts was supplying a vital service of a quasi-public nature, it exploited its superior position to mislead Monmouth County and thwart its expectations, all at great expense to Monmouth County.

588.    These misrepresentations, omissions, and misconduct—including and as manifested in the Insulin Pricing Scheme—directly and proximately caused economic damage to Monmouth County as a payor/purchaser of Defendants' at-issue diabetes medications.

589.    A substantial proportion of the money Monmouth County spent on

diabetes medications is attributable to Defendants' inflated prices, which did not arise from competitive market forces but, instead, exist solely by virtue of the Insulin Pricing Scheme.

590.  Because of Defendants' success in concealing the Insulin Pricing Scheme through act and omission, no payor, including Monmouth County, knew (or should have known) during the relevant period that the prices for the at-issue diabetes medications were (and are) artificially inflated due to the Insulin Pricing Scheme.

591.  As a result, despite receiving some rebates and incurring drug costs based on discounts off list prices, Monmouth County has unknowingly overpaid for the Manufacturer Defendants' diabetes medications, which would have cost far less but for the Insulin Pricing Scheme.

592.  In short, the Insulin Pricing Scheme has directly and proximately caused Plaintiff to substantially overpay for diabetes medications.

593.  Because Defendants continue to generate exorbitant, unfair, and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Plaintiff is ongoing.

## L. Defendants' Recent Efforts in Response to Rising Insulin Prices

594.  In reaction to mounting political and public outcry, Defendants have taken steps on Capitol Hill and in the public relations space to protect and further the Insulin Pricing Scheme.

595. First, in response to public criticism, Defendants have increased their spending to spread their influence in Washington D.C.

596. For example, in recent years Novo Nordisk's political action committee has doubled its spending on federal campaign donations and lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, which (at that point) was its biggest ever investment in directly influencing U.S. policymakers. By 2023, that number had risen to over $5.1 million. Eli Lilly and Sanofi also have contributed millions of dollars through their PACs in recent years. In 2023, Eli Lilly spent over $8.4 million in lobbying and Sanofi spent over $5.4 million.

597. Second, Defendants have recently begun publicizing programs ostensibly aimed at lowering the cost of insulins.

598. These affordability measures fail to address the structural issues that caused the price hikes. Rather, these are public relations measures that do not solve the problem.

599. For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

600. At the time, Eli Lilly told the Senate Finance Committee that "we can

provide a lower-priced insulin more quickly without disrupting access to branded Humalog, on which thousands of insured patients depend and which will remain available for people who want to continue accessing it through their current insurance plans."[164]

601. When it launched Lispro, its press release said the drug was the "same molecule" as Humalog yet would be sold at half the price of Humalog. Eli Lilly expressly said it was to help make insulin medications "more affordable."[165]

602. What Eli Lilly failed to tell the Committee and the public was that its rebate deals with the PBMs incentivized them to exclude Lispro from their formularies. For example, even though Lispro at $137.50 would be available at half the price of Humalog, which remained on-formulary, Express Scripts' exclusion list for 2019[166] specifically blocked it from its formulary.[167]

603. Likewise, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies. Following

---

[164] Joseph B. Kelly Letter to S. Fin. Comm., Mar. 8, 2019.

[165] Eli Lilly and Co., March 4, 2019, Press Release, *Lilly to Introduce Lower-Priced Insulin*, available at https://investor.lilly.com/node/40881/pdf> (last viewed Apr. 17, 2024).

[166] *See* Express Scripts 2019 National Preferred Formulary Exclusions, https://www.express-scripts.com/art/pdf/Preferred_Drug_List_ Exclusions2019.pdf

[167] Todd Boudreaux, *Express Scripts Won't Cover Lilly's Generic Insulin*, https://beyondtype1.org/express-scripts-wont-cover-generic-insulin/ (last visited Apr. 17, 2024).

these news reports, the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug. The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.[168]

604.  Eli Lilly did lower the price of Lispro by 40% effective January 1, 2022; but as of January 2023, Lispro did not appear on CVS Caremark's formulary and Humalog had been removed. The January 2023 formularies for Express Scripts and OptumRx expressly excluded Lispro.

605.  In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous. In any event, ReliOn is not included on any of the PBM Defendants' formularies as of January 2023.

---

[168] Sen. Elizabeth Warren & Sen. Richard Blumenthal, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, (Dec. 2019), https://www.warren.senate.gov/imo/media/doc/Inaccessible%20Insulin%20report.pdf (last visited Apr. 17, 2024).

606.  Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem and the PBMs continue to exclude drugs with lower list prices despite their assurances of cost-savings for payors and Beneficiaries.

## V.    TOLLING OF THE STATUTES OF LIMITATION

607.  Monmouth County has diligently pursued and investigated the claims asserted herein. Through no fault of its own, Monmouth County did not learn, and could not have learned, the factual bases for its claims or the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

### A.    Discovery Rule

608.  Monmouth County did not know about the Insulin Pricing Scheme until shortly before filing its original Complaint in this action. Monmouth County was unaware that it was economically injured and unaware that any economic injury was wrongfully caused. Nor did Monmouth County possess sufficient information concerning the injury complained of here, or its cause, to put Monmouth County or any reasonable person on inquiry notice to determine whether actionable conduct was involved.

609.  The PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants or the details of Defendants' negotiations and payments between each other or their pricing structures and agreements—Defendants labeled these trade secrets, shrouded them in

confidentiality agreements, and circumscribed payor audit rights to protect them.

610.  Each Defendant group also affirmatively blamed the other for the price increases described herein, both during their Congressional testimonies and through the media. All disavowed wrongdoing and falsely claimed that their dealings with payors like Plaintiff were honest and transparent.

611.  Monmouth County did not discover until shortly before filing its original Complaint facts sufficient to cause a reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme or that Monmouth County had suffered economic injury as a result of any or all Defendants' wrongdoing. Nor would diligent inquiry have disclosed the true facts had Monmouth County been aware of any cause to undertake such an inquiry.

612.  Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships, and agreements between and among the Manufacturer Defendants and the PBM Defendants, i.e., the essence of the Insulin Pricing Scheme, continue to obscure Defendants' unlawful conduct from Plaintiff and the general public. Indeed, a June 2024 *New York Times* report noted that PBM Defendants "often escape attention, because they operate in the bowels of the health care system and cloak themselves in such opacity and complexity that many people

don't even realize they exist."[169]

613.  A July 2024 FTC report similarly noted that "PBMs oversee critical decisions about access to and affordability of medications without transparency or accountability to the public. Indeed, PBM business practices and their effects remain extraordinarily opaque."[170]

614.  For these reasons, the applicable statutes of limitations did not begin to run until 2022, at the earliest.

### B.    Fraudulent Concealment

615.  Through the acts, omissions, and misrepresentations alleged throughout this Complaint, Defendants fraudulently concealed the fact of Monmouth County's economic injury and its cause.

616.  Defendants cannot rely upon any statute-of-limitations defense because they purposefully concealed the Insulin Pricing Scheme, their generation of false list prices, and the fact that the prices for the at-issue diabetes medications were

---

[169] *See, e.g.*, N.Y. Times, The Opaque Industry Secretly Inflating Prices for Prescription Drugs (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

[170] Federal Trade Commission, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies, Interim Staff Report (July 2024), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

artificially inflated. The Defendants deliberately concealed their behavior and active role in the Insulin Pricing Scheme and other unlawful conduct.

617. Defendants' acts, omissions, and misrepresentations were calculated to—and did—lull and induce payors, including Monmouth County, into forgoing legal action or any inquiry that might lead to legal action. Defendants' acts, omissions, and representations were intended to and, in fact, did prevent Monmouth County from discovering its claims.

618. Defendants knowingly and fraudulently concealed the facts alleged herein. Defendants knew of the wrongful acts set forth above, had information pertinent to their discovery, and concealed them from the public. As a result of Defendants' conduct, Monmouth County did not know, and could not have known through the exercise of reasonable diligence, of the existence or scope of the Insulin Pricing Scheme or of Monmouth County's causes of action.

619. Defendants continually and secretly engaged in the Insulin Pricing Scheme. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

620. As alleged herein, and among other things, Defendants affirmatively concealed: (a) that the Manufacturers and PBMs coordinated to create the PBM

formularies in exchange for money and other consideration; (b) that the list prices were falsely inflated and manipulated; (c) that the list prices and net costs (purchase prices) paid by payors and patients bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBMs in coordinating their pricing; (d) that the at-issue insulin drugs were selected for inclusion or preferred status on the formularies based on higher prices (and greater potential revenues for Defendants) rather than because of cost-effectiveness or because they were beneficial to payors' Beneficiaries; (e) the exchange of various payments and pricing agreements between the Manufacturers and PBMs; or (f) that the entire insulin pricing structure Defendants created was false.

621. As alleged herein, the PBM Defendants have blocked drug pricing transparency efforts.

622. As alleged herein, the Manufacturer Defendants have testified to Congress that they were not responsible for skyrocketing insulin prices, claiming that they had no control over the pricing, blaming the PBM Defendants for the high prices, and suggesting that they have not profited from astronomical insulin prices.

623. Meanwhile, the PBM Defendants testified to Congress that the Manufacturer Defendants were solely responsible for the list price increases and that the payments that the PBMs receive from the Manufacturer Defendants are unrelated to rising insulin prices.

624.  As alleged herein, the PBM Defendants concealed the Insulin Pricing Scheme through vague and manipulable definitions of terms in their contracts, including by hiding the fees that the Manufacturer Defendants paid to the PBM Defendants and which the PBM Defendants retained and did not pass along to payors as Rebates.

625.  The PBM Defendants also concealed payments they received from the Manufacturer Defendants through their affiliated rebate aggregators, hiding them in complex contractual relationships—often with other Defendants—and not reporting them on their quarterly SEC filings.

626.  Defendants coordinated to affirmatively withhold the truth about the Insulin Pricing Scheme from payors, including Monmouth County, patients, and the public and concealed the falsity of representations made to payors, including Monmouth County, by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

627.  Monmouth County did not know, and could not reasonably have discovered, the full extent of agreements between the PBM Defendants and the Manufacturer Defendants or payments the Manufacturer Defendants made to the PBMs because Defendants actively concealed these agreements and payments.

628.  Despite the claims of transparency made to payors, including Monmouth

County, and to the public, Defendants have never revealed the full amount of drug-specific payments they have exchanged or received. Payors, including Monmouth County, and patients reasonably relied on Defendants' claims of transparency.

629. Defendants intended that their actions and omissions would be relied upon by the public, to include payors and patients. Monmouth County did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

630. Payors, including Monmouth County, and patients reasonably relied on Defendants' affirmative statements to Congress and the public, and in contracts between PBMs and their clients, that Defendants were working to lower insulin prices and provide payors with cost savings.

631. The purposes of the statute of limitations are satisfied because Defendants cannot claim any prejudice due to an alleged late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

632. In light of the information set forth above, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

633. Any applicable statutes of limitation therefore have been tolled.

C.    **Equitable Estoppel**

634. Defendants were under a continuous duty to disclose to Monmouth County the true character, quality, and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided—all of which would be and are now material to Monmouth County.

635. Instead of disclosing these facts, Defendants knowingly misrepresented and concealed them with a reasonable expectation that Monmouth County would act upon the misrepresentations and omissions.

636. Being unaware of the true facts and the economic harm it was suffering, and having no cause to inquire further, Plaintiff did indeed rely in good faith to its detriment on Defendants' misrepresentations and omissions.

637. In short, through Defendants' acts, omissions, and misrepresentations as alleged throughout this Complaint, Defendants knowingly misrepresented and concealed material facts with the expectation that Monmouth County would act upon them, which Monmouth County did in good faith and to its detriment.

638. Accordingly, Defendants are equitably estopped from relying on any statutes of limitations in defense of this action.

### D.    Continuing Violations

639. The acts, omissions, and misrepresentations alleged throughout this Complaint have continued to the present day. Defendants' systematic misconduct constitutes a continuous, unbroken violation of the law that has caused, and continues

to cause, continuous economic harm to Monmouth County.

640.  Accordingly, all applicable statutes of limitations are tolled.

## VI.    CLAIMS FOR RELIEF

### <u>COUNT I</u>
### Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)
### (Against all Defendants)

641.  Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

642.  Plaintiff brings this count against all Defendants for violations of 18 U.S.C. § 1962(c).

643.  Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are (1) culpable "persons" who (2) willfully and knowingly (3) committed and conspired to commit two or more acts of mail and wire fraud (4) through a "pattern" of racketeering activity that (5) involves an "association in fact" enterprise, (6) the results of which had an effect on interstate commerce.

### A.    Defendants Are Culpable "Persons" Under RICO

644.  Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark, separately, are "persons" as that term is defined in 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

645. Each one of Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are separate entities and "persons" that are

distinct from the RICO enterprises alleged below.

## B.    The Manufacturer-PBM RICO Enterprises

646.  For the purposes of this claim, the RICO enterprises are nine separate associations-in-fact consisting of one of each of the PBM Defendants and one of each of the Manufacturer Defendants, including those entities' directors, employees, and agents. They are the Eli Lilly-CVS Caremark Enterprise; the Eli Lilly-Express Scripts Enterprise; the Eli Lilly-OptumRx Enterprise; the Novo Nordisk-CVS Caremark Enterprise; the Novo Nordisk-Express Scripts Enterprise; the Novo Nordisk-OptumRx Enterprise; the Sanofi-CVS Caremark Enterprise; the Sanofi-Express Scripts Enterprise; and the Sanofi-OptumRx Enterprise.

647.  These association-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Enterprises."

648. Each Manufacturer-PBM Enterprise is a separate, ongoing, and continuing business organization consisting of corporations and individuals associated for the common purpose of manufacturing, selling, and facilitating the purchase of the Manufacturer Defendants' products, including the at-issue drugs. For example:

a.    Each of the three Eli Lilly enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Eli Lilly medications including Prozac, Cymbalta, and Zyprexa, as well as

the at-issue Eli Lilly insulin and insulin-analog medications (Trulicity, Humulin N, Humulin R, Humalog, and Basaglar), which are Eli Lilly's primary source of revenue.

  b. Each of the three Novo Nordisk Enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Novo Nordisk medications for the treatment of obesity, hemophilia, and hormone imbalance, as well as the at-issue Novo Nordisk insulin and insulin-analog medications (Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic), which account for more than three-quarters of Novo Nordisk's revenue.

  c. Each of the three Sanofi Enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Sanofi medications including Ambien, Plavix, and Dupixent, as well as the at-issue Sanofi insulin and insulin-analog medications (Lantus, Toujeo, Apidra, and Soliqua).

649.  Each Manufacturer-PBM Enterprise engaged in the shared purpose of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs in order to control the market for diabetes medications and profit off diabetics and payors, including the Plaintiff.

650.  The members of each enterprise are bound by contractual relationships,

financial ties, and the ongoing coordination of activities.

651. There is also a common communication network by which each Manufacturer-PBM Enterprise shares information and meets on a regular basis. These communications include, but are not limited to, communications relating to the use of false list prices for the at-issue diabetes medications and the regular flow of Manufacturer Payments from each Manufacturer Defendant to each PBM Defendant in exchange for formulary placement.

652. Each Manufacturer-PBM Enterprise functions as a continuing but separate unit separate and apart from the pattern of racketeering activity in which it engages. Each Manufacturer-PBM Enterprise, for example, engages in the manufacture, distribution, and sale of medications and other products other than the at-issue insulin and insulin-analog medications. Additionally, each Manufacturer engages in conduct other than mail and wire fraud in furtherance of the Insulin Pricing Scheme.

653. At all relevant times, each of the Manufacturer-PBM Enterprises was operated and conducted for unlawful purposes by each Manufacturer Defendant and PBM Defendant, namely, carrying out the Insulin Pricing Scheme.

654. Each Manufacturer-PBM Enterprise derived secret profits from these activities that were greater than those any one of the Manufacturer Defendants or PBMs could obtain absent their misrepresentations regarding and collusion in their

pricing schemes.

655. The Manufacturer-PBM Enterprises resulted in benefits for the Defendants that could not have been achieved absent the enterprises. For example, the Manufacturer Defendants achieved formulary access without real price reductions by raising list prices and paying kickbacks to the PBM Defendants. The PBM Defendants likewise could not have obtained inflated rebates, administrative fees, and other payments without colluding with the Manufacturers to raise list prices. In other words, each Manufacturer-PBM Enterprise engaged in a scheme to corrupt the insulin market by artificially inflating list prices in exchange for preferred formulary placement.

656. To accomplish this common purpose, each Manufacturer Defendant periodically and systematically inflated the prices of the at-issue drugs and then secretly paid a significant, yet undisclosed, portion of this inflated price back to Express Scripts, CVS Caremark, and OputmRx in the form of Manufacturer Payments.

657. Each Manufacturer-PBM Enterprise did so willfully and with knowledge that Plaintiff paid for the at-issue drugs at prices directly based on the false list prices.

658. Each Manufacturer-PBM Enterprise's inflation of the list prices and secret Manufacturer Payments was a quid pro quo exchange for preferred formulary

placement.

659.  Each Manufacturer-PBM Enterprise concealed from Plaintiff that these false prices and secret Manufacturer Payments resulted in each Manufacturer gaining formulary access without requiring significant price reductions and resulted in higher profits for the PBM Defendants, whose earnings increase the more inflated the price is and the more payments they receive from each Manufacturer Defendant.

660.  Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating the use of the false list prices for the at-issue drugs as the basis for the price that payors, including the Plaintiff, and diabetics pay for diabetes medications.

661.  The Manufacturer Defendants would not be able to offer large pricing spreads to the PBMs in exchange for favorable formulary positions without the use of the false list prices as the basis for the price paid by diabetics and payors, including the Plaintiff, for the at-issue drugs.

662.  The PBM Defendants share this common purpose because nearly all profit and revenue generated from the at-issue drugs is tied to the false inflated prices generated by the Insulin Pricing Scheme. Without diabetics and payors, including Plaintiff, paying for diabetes medications based on the inflated list prices, their profits from the Insulin Pricing Scheme would decrease.

663.  As a result, CVS Caremark, Express Scripts, and OptumRx have, with the knowing and willful participation and assistance of each Manufacturer

Defendant, engaged in hidden profit-making schemes falling into four general categories: (1) garnering undisclosed Manufacturer Payments from each Manufacturer Defendant that each PBM retains to a large extent; (2) generating substantial profits from pharmacies because of the falsely inflated prices; (3) generating profits on the diabetes medications sold through the PBMs' own mail-order and retail pharmacies; and (4) keeping secret discounts each Manufacturer Defendant provides in association with the PBMs' mail-order and retail operations.

664.  At all relevant times, each PBM and each Manufacturer Defendant has been aware of their respective Manufacturer-PBM Enterprise's conduct, has been a knowing and willing participant in and coordinator of that conduct and has reaped profits from that conduct.

665.  None of the PBMs or Manufacturers alone could have accomplished the purposes of the Manufacturer-PBM Enterprises without the other members of their respective enterprises.

## C.    The Enterprises Misrepresent and Fail to Disclose Material Facts in Furtherance of the Insulin Pricing Scheme

666. Each Manufacturer-PBM Enterprise knowingly made material misrepresentations to the public and to the Plaintiff in furtherance of the Insulin Pricing Scheme, including publishing artificially inflated prices for insulin on published indices and representing that:

      a.    the false list prices for the at-issue diabetes medications were

reasonably related to the actual prices realized by Defendants and were a reasonable and fair basis on which to base the price Plaintiff paid for these drugs;

b.      each Manufacturer priced its at-issue drugs according to each drug's value to the healthcare system and the need to fund innovation;

c.      the Manufacturer Payments paid back to the PBMs for each at-issue drug were for Plaintiff's benefit;

d.      all "rebates" and discounts negotiated by the PBMs with the Manufacturer Defendants were passed through to the Plaintiff;

e.      the "rebates" negotiated by the members of each enterprise saved Plaintiff money;

f.      each Manufacturer Defendant and PBM was transparent with Plaintiff regarding the Manufacturer Payments and the PBMs did not retain any funds associated with prescription drug rebates or any the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies; and

g.      The PBM Defendants constructed formularies in a manner that lowered the price of the at-issue drugs and promoted the health and safety of diabetics.

667. Each false list price published by the Manufacturer Defendants

constituted a material misrepresentation to Plaintiff and the public, in that each purported to be a fair market price for the medication at issue, and each failed to disclose the fraudulent spread between the list price and the net price of the medication or the basis therefor.

668. Examples of other specific affirmative representations by each RICO Defendant in furtherance of each enterprise's Insulin Pricing Scheme are set forth in paragraphs 504-58, among others.

669. At all times relevant to this Complaint, each Manufacturer-PBM Enterprise knew the above-described representations to be false.

670. At all times relevant to this Complaint, each Manufacturer-PBM Enterprise intentionally made these representations for the purpose of inducing Plaintiff into paying artificially inflated prices for diabetes medications.

671. Plaintiff relied on the material misrepresentations and omissions made by each Manufacturer-PBM Enterprise in paying prices for the at-issue diabetes medications based upon the false prices generated by Insulin Pricing Scheme.

672. Additionally, each PBM-Manufacturer Enterprise relied on the list prices negotiated and published by the other PBM-Manufacturer enterprises in setting their own list prices and determining the value of the kickbacks paid to the PBMs. Plaintiff was injured by the inflated prices that arose as a result.

673. Express Scripts and Medco convinced Plaintiff to pay prices for the at-

issue drugs based upon the false list prices by using the misrepresentations listed above to convince Plaintiff that they had secured lower prices when, in fact, they did the opposite, all while concealing the Insulin Pricing Scheme.

674. Without these misrepresentations and each Defendant's failure to disclose the Insulin Pricing Scheme, each Manufacturer-PBM Enterprise could not have achieved its common purpose, as Plaintiff would not have been willing to pay these false list prices.

### D. Defendants' Use of the U.S. Mails and Interstate Wire Facilities

675. Each of the Manufacturer-PBM Enterprises engaged in and affected interstate commerce because each engaged in the following activities across state boundaries: the sale, purchase and/or administration of diabetes medications; the setting and publishing of the prices of these drugs; and/or the transmission of pricing information of diabetes medications; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission of diabetes medications through mail-order and retail pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of diabetes medications; and/or the negotiations and transmissions of contracts related to the pricing of and payment for diabetes medications.

676. Each Manufacturer-PBM Enterprise participated in the administration of diabetes medications to millions of individuals located throughout the United

States, including in Monmouth County and elsewhere in New Jersey.

677. Each Manufacturer Defendant's and PBM Defendant's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

678. The nature and pervasiveness of the Insulin Pricing Scheme, which included each Manufacturer Defendant's and PBM Defendant's corporate headquarters operations, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with each other and with pharmacies, physicians, payors, and diabetics in Monmouth County and throughout New Jersey and the United States.

679. Each Manufacturer-PBM Enterprise's use of the U.S. mails and interstate wire facilities to perpetrate the Insulin Pricing Scheme involved thousands of communications including:

a.    marketing materials about the published prices for diabetes medications, which each Manufacturer Defendant sent to the PBM Defendants located across the country, including in Monmouth County and throughout New Jersey;

b.    written and oral representations of the false list prices of diabetes

medications that each Manufacturer Defendant and PBM Defendant made at least annually and, in many cases, several times during a single year to the public;

c.       thousands of written and oral communications discussing, negotiating, and confirming the placement of each Manufacturer Defendant's diabetes medications on the PBM Defendants' formularies;

d.       written and oral representations made by each Manufacturer Defendant regarding information or incentives paid back to each PBM Defendant for each diabetes medications sold and/or to conceal these incentives or the Insulin Pricing Scheme;

e.       written communications made by each Manufacturer Defendant, including checks, relating to Manufacturer Payments paid to the PBM Defendants to persuade them to advocate the at-issue diabetes medications;

f.       written and oral communications with U.S. government agencies that misrepresented what the published prices were or that were intended to deter investigations into the true nature of the published prices or to forestall changes to reimbursement based on something other than published prices;

g.       written and oral communications with payors, including the Plaintiff, regarding the prices of diabetes medications;

h.       written and oral communications to the Plaintiff, including

marketing and solicitation material sent by the PBM Defendants regarding the existence, amount, or purpose of payments made by each Manufacturer Defendant to each PBM for the diabetes medications described herein and the purpose of the PBM Defendants' formularies;

i.    transmission of published prices to third parties and payors, including Plaintiff; and

j.    receipts of money on at least tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Insulin Pricing Scheme.

680.    Although Plaintiff pleads the dates of certain communications in allegations incorporated into this Count, it cannot allege the precise dates of others without access to books and records within each RICO Defendant's exclusive custody and control. Indeed, an essential part of the successful operation of the Insulin Pricing Scheme depended upon secrecy, and each Manufacturer Defendant and PBM Defendant took deliberate steps to conceal its wrongdoing.

## E.    Conduct of the Manufacturer-PBM Enterprises' Affairs

681.    Each Manufacturer and PBM Defendant participates in the operation and management of Manufacturer-PBM Enterprises with which it is associated and, in violation of Section 1962(c) of RICO, and conducts or participates in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly.

Such participation is carried out in the following ways, among others:

a.    Each Manufacturer Defendant directly controls the secret Manufacturer Payments it provides to the PBMs for its diabetes medications.

b.    Each PBM Defendant directly manages and controls its drug formularies and the placement of the at-issue diabetes medications on those formularies.

c.    Each PBM Defendant intentionally selects higher-priced diabetes medications for formulary placement and excludes lower priced ones in order to generate larger profits and coordinate with the Manufacturer Defendants to increase the availability and use of higher-priced medications because they are more profitable for both groups of Defendants.

d.    Each Manufacturer Defendant directly controls the publication of the false list prices generated by the Insulin Pricing Scheme.

e.    Each Manufacturer Defendant directly controls the creation and distribution of marketing, sales and other materials used to inform the PBMs of the profit potential from its diabetes medications.

f.    Each PBM Defendant directly controls the creation and distribution of marketing, sales, and other materials used to inform payors and the public of the benefits and cost-saving potential of each PBM's formularies and negotiations with the Manufacturers.

225

g.    Each PBM Defendant directs and controls each enterprise's direct relationships with payors such as the Plaintiff by negotiating the terms of and executing the contracts that govern those relationships.

h.    Each PBM Defendant directs and controls each enterprise's Insulin Pricing Scheme by hiding, obfuscating, and laundering Manufacturer Payments through its affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

i.    Each PBM Defendant distributes through the U.S. mail and interstate wire facilities promotional and other materials which claim that the Manufacturer Payments paid from each Manufacturer Defendant to the PBMs save Plaintiff and other payors money on the at-issue drugs.

j.    Each Manufacturer Defendant represented to the Plaintiff—by publishing and promoting false list prices without stating that these published prices differed substantially from the prices realized by each Manufacturer Defendant and PBM—that the published prices of diabetes medications reflected or approximated the actual price realized by Defendants and resulted from transparent and competitive fair market forces.

## F.    Defendants' Patterns of Racketeering Activity

682.  Each Manufacturer Defendant and PBM Defendant has conducted and

participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are unlawful under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

683. Each Manufacturer Defendant's and PBM Defendant's pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Insulin Pricing Scheme. Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which each Manufacturer Defendant and PBM Defendant intended to defraud Plaintiff.

684. By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments (made from each Manufacturer Defendant to the PBMs) and PBM Defendants' formulary construction, and by subsequently failing to disclose such practices to Plaintiff, each Manufacturer Defendant and PBM Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

685. Each Manufacturer Defendant's and PBM Defendant's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff.

686. Each separate use of the U.S. mails and/or interstate wire facilities employed by each Manufacturer Defendant and PBM Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

687. Each Manufacturer Defendant and PBM Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated in fact.

## G. The RICO Defendants' Motives

688. Each Manufacturer Defendant's and PBM Defendant's motives in creating and operating the Insulin Pricing Scheme and conducting the affairs of the Manufacturer-PBM Enterprises described herein was to control the market for diabetes medications, exclude competition, and maximize sales of, and profits from, diabetes medications.

689.  The Insulin Pricing Scheme was designed to, and did, encourage others, including payors like Plaintiff, to advocate the use of each Manufacturer Defendant's respective products and to pay for those diabetes medications based on a falsely inflated price. Each Manufacturer Defendant used the Insulin Pricing Scheme to obtain formulary placement to sell more of its drugs without having to cut into its profits. The PBM Defendants used the Insulin Pricing Scheme to falsely inflate the

price payors such as the Plaintiff paid for diabetes medications in order to profit off the Insulin Pricing Scheme, as discussed above.

**H.    The Manufacturer-PBM Enterprises' Insulin Pricing Scheme Injured Plaintiff**

690. Each Manufacturer-PBM Enterprise's violations of federal law and pattern of racketeering activity have directly and proximately caused the Plaintiff to be injured in its business or property.

691.  The prices the Plaintiff pays for the at-issue drugs are directly tied to the false list prices generated by the Insulin Pricing Scheme.

692. No other intermediary in the supply chain has control over or is responsible for the list prices on which nearly all Plaintiff's payments are based other than the Manufacturer-PBM Defendant Enterprises.

693. Defendants collectively set the prices that the Plaintiff paid for the at-issue diabetes medications.

694.  During the relevant period, Express Scripts and Medco provided PBM services to the Plaintiff and benefited therefrom.

695.   During the relevant period, the Plaintiff paid Express Scripts and Medco directly for the at-issue drugs.

696. Each Manufacturer-PBM Enterprise, including the CVS Caremark enterprises and OptumRx enterprises, controlled and participated in the Insulin Pricing Scheme, which was directly responsible for the false list prices upon which

the price Plaintiff paid was based.

697.  Thus, Plaintiff was damaged by reason of the Insulin Pricing Scheme. But for the misrepresentations and false prices created by the Insulin Pricing Scheme that each Manufacturer–PBM Enterprise employed, Plaintiff would have paid less for diabetes medications.

698.  Because the Insulin Pricing Scheme resulted in payors and consumers paying supra-competitive prices for the at-issue medications, the scheme could not have continued without each Manufacturer-PBM Enterprise's participation. In other words, if one of the Manufacturer-PBM Enterprises had opted not to participate in the scheme—and not inflated its list prices—the other enterprises could not have continued to overcharge their own clients. Each enterprise's participation in the scheme—and execution of its own pattern of racketeering activity—was essential to the overall scheme's survival and a direct cause of Plaintiff's injuries.

699.  While Defendants' scheme injured an enormous number of payors and plan members, Plaintiff's damages are separate and distinct from those of any other victim that was harmed by the Manufacturer–PBM Defendant Enterprises' Insulin Pricing Scheme.

700.  By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to the Plaintiff for three times the damages that were sustained, plus the costs of

bringing this suit, including reasonable attorneys' fees.

701. By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(a) of RICO, the Plaintiff seeks injunctive relief against each Manufacturer and PBM Defendant for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorneys' fees.

702. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff continues to purchase the at-issue diabetes medications. Plaintiff will continue to pay based on the Defendants' false list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiff seeks injunctive relief, including an injunction against each Manufacturer and PBM Defendant, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

### COUNT II
### Violations of RICO, 18 U.S.C. § 1962(d)
### by Conspiring to Violate 18 U.S.C. § 1962(c)
### (Against all Defendants)

703. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

704. Section 1962(d) of RICO provides that it "shall be unlawful for any

person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

705.   Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in the Insulin Pricing Scheme.

706.   As set forth in detail above, Defendants each knowingly agreed to facilitate the Insulin Pricing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants, and the PBMs' formulary construction; and the PBMs agreed to and did, in concert, request and receive larger Manufacturer Payments and higher prices in exchange for formulary placement.

707.   The nature of the above-described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall

pattern of racketeering activity.

708.    Defendants have engaged and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

      a.    multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

      b.    multiple instances of wire fraud in violations of 18 U.S.C. § 1343; and

      c.    multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

709.    Defendants' conspiracy to violate the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid more for the at-issue drugs than it would have but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

710.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff for three times the damages this District has sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT III**
**Common Law Fraud**
**(Against Express Scripts, Eli Lilly, Novo Nordisk, and Sanofi)**

711.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

712.    Plaintiff brings this claim against Express Scripts (as defined

collectively herein) and the Manufacturer Defendants. All are referred to collectively throughout Count III as "Defendants."

713.   As alleged extensively above, Defendants affirmatively misrepresented and/or concealed and suppressed material facts concerning: (a) the actual cost and/or price of the diabetes medications realized by Defendants; (b) the inflated and/or fraudulent nature of the reported prices set and/or charged by Defendants for the diabetes medications described herein; (c) the existence, amount, and/or purposes of Manufacturer Payments, discounts and/or payments offered and/or negotiated by Defendants for those products; and (d) the role that  Defendants' played in the price paid for the diabetes medications described herein, including but not limited to falsely representing that Defendants decrease the price of prescription drugs for payors like Plaintiff.

714.   In fact, PBM Defendants base their entire business model around representing—directly and indirectly—to payors, including Monmouth County, that they negotiate with Manufacturer Defendants, through rebates and formulary decisions, to lower the actual price that payors pays for diabetes medications.

715.   Defendants' fraud included the following:

   a.   The Manufacturer Defendants published prices for the at-issue drugs and, in doing so, held these prices out as the actual prices for these drugs despite knowing these prices were artificially inflated and untethered from the

234

cost of the drugs or the price the Manufacturers were paid for them—all with the PBM Defendants' knowledge, consent, and cooperation.

b.    The Manufacturer Defendants misrepresented and actively concealed the true reasons why they set and raised list prices—the truth being that it was to increase revenues and profits and to offer higher prices and larger Manufacturer Payments to the PBMs—all with the PBM Defendants' knowledge, consent, and cooperation.

c.    The PBM Defendants furthered the scheme by using the artificially inflated list prices to determine the inflated prices paid by payors, including Plaintiff and Plaintiff's Beneficiaries—all with the Manufacturer Defendants' knowledge, consent, and cooperation. At no point did the Defendants reveal that the prices for the at-issue drugs were not legal, competitive or at fair market value—rather, they coordinated to overtly mislead the public and payors, including Plaintiff, and undertook a concerted effort to conceal the truth. Defendants' representations are false, and Defendants knew they were false when they were made. Defendants knew that the prices they reported and utilized are artificially inflated for the purpose of maximizing revenues and profits pursuant to the Insulin Pricing Scheme. Defendants affirmatively withheld this truth from Plaintiff Monmouth County, even though these Defendants knew that the Plaintiff's intention was to pay

the lowest possible price for diabetes medications and expectation was to pay a legal, competitive price that resulted from transparent market forces.

d.    The PBM Defendants represented to payors, including Plaintiff, and to the public that they worked to generate savings with respect to the at-issue drugs and to promote the health of diabetics. Instead, directly counter to their representations, the PBMs drove up the prices of the at-issue drugs and damaged payors, including Plaintiff, by demanding ever-increasing Manufacturer Payments that, in turn, increased what otherwise would have been the retail prices for the at-issue drugs—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

e.    The PBM Defendants also misrepresented their formularies promoted the cost-savings to Plaintiff. These Defendants not only knew that the PBMs' formulary construction fueled the precipitous price increases that damaged Plaintiff's financial wellbeing, but coordinated in ways that made such harm inevitable—all for the sole purpose of generating more revenues and profits for both groups of Defendants.

f.    The PBM Defendants have hidden, obfuscated, and laundered these Manufacturer Payments through their affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff. Defendants made false and misleading

236

misrepresentations of fact related to the Manufacturer Payments and the negotiations that occurred between the PBM and Manufacturer Defendants.

g.     The PBM Defendants knowingly made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that the Manufacturer Payments lower the overall price of diabetes medications and reduce payor costs while promoting the health of diabetics. These representations were false, and Defendants knew they were false when they were made. The PBM Defendants knew that the Manufacturer Payments were not reducing the overall price of diabetes medications but rather are an integral part of the secret Insulin Pricing Scheme and are responsible for the inflated prices.

h.     The PBM Defendants intentionally selected higher-priced diabetes medications for formulary placement and excluded lower priced ones in order to generate larger profits and coordinated with the Manufacturer Defendants to increase the availability and use of higher priced medications because they are more profitable for both groups of Defendants.

i.     The PBM Defendants misled their payors, including Plaintiff, as to the true nature of value of the services they provided and reaped illicit profits exponentially greater than the fair market value of the services they purported to provide—all with the Manufacturer Defendants' knowledge, consent, and

cooperation.

  j.  The PBM Defendants owed a duty to disclose the true facts to their payor clients, including Plaintiff, but intentionally chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors, including Plaintiff—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

716. The Manufacturer Defendants and PBM Defendants make these misrepresentations for the sole purpose of inducing reliance by payors, including Monmouth County, into purchasing diabetes medications through PBM Defendants.

717. Defendants knew that their representations and omissions were false and misleading. They knew, for example, that the list prices for the at-issue drugs were excessive, inflated, and untethered to any competitive market price. They knew that these list prices were artificially inflated to fund kickbacks for the PBMs in exchange for preferred formulary placement. And they knew that the rebates and formulary positions agreed upon between Defendants did not lower the price Plaintiff paid for the at-issue drugs, but rather were primary factors driving the exponential increase in the amount that Monmouth County paid for those drugs during the relevant timeframe.

718. Defendants made these false representations directly to Monmouth County through, among other things, oral and written communications, the inclusion

of the reported price in Monmouth County's contracts as a determinant of the price for diabetes medications, marketing materials, presentations, publications of the artificially inflated reported price, and public statements and testimonies in the media, on various websites, in Defendants' governmental filings and at Congressional hearings.

719.    Defendants' false representations and omissions were material to Monmouth County.

720.    These Defendants intended that Plaintiff would rely on their misrepresentations and omissions. Through their scheme, Express Scripts leveraged formulary control for ever-increasing Manufacturer Payments while the Manufacturer Defendants maintained or increased their profit margins or sales volume as preferred formulary members. Defendants intended to profit at the expense of payors like Plaintiff.

721.    Monmouth County reasonably relied on Defendants' deception in paying for diabetes medications at inflated prices. Monmouth County had no way of discerning that Defendants were, in fact, deceiving it because Defendants possessed exclusive knowledge regarding the nature of the pricing of diabetes medications; intentionally concealed the foregoing from Monmouth County; and made false, fraudulent, incomplete, or negligent representations about the pricing of the diabetes medications and the Defendants' role in that pricing, while purposefully withholding

material facts from Monmouth County that contradicted those representations.

722.    Plaintiff relied on these Defendants' false list prices. Because of the Insulin Pricing Scheme, list prices have skyrocketed and the spread between list price and net price has ballooned in turn. Plaintiff is injured by this list and net price divergence. Through the scheme, these Defendants have forced payors, including Plaintiff, to pay not just for the drugs, but also for undisclosed kickbacks that are paid to PBMs.

723.    These Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to Plaintiff.

724.    These Defendants owed Plaintiff a duty to disclose, truthfully, all facts concerning the true cost of the at-issue medications and the inflated and fraudulent nature of their pricing; the existence, amount, flow, and purpose of rebates and discounts negotiated for those products; and the role that Defendants played in increasing the price of the at-issue drugs.

725.    These Defendants possessed superior knowledge of essential facts about the at-issue drugs and their prices. That information was peculiarly and exclusively in their control and not available to payors, including Plaintiff. In light of their misleading or incomplete representations, these Defendants also had an obligation to disclose facts related to the Insulin Pricing Scheme.

726.    These Defendants hatched their deceptive schemes and knew that Plaintiff did not know (and could not reasonably discover) that they sought to artificially inflate the price of the insulin medications. These Defendants not only concealed all the facts concerning the true cost of the at-issue medications but went further to make affirmative misrepresentations in marketing materials and other communications that these Defendants worked to lower the ultimate cost of prescription medications. These Defendants engaged in this fraudulent concealment at the expense of Plaintiff.

727.    Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and it would not have acted as it did, had it known the truth.

728.    As a direct and proximate result of these Defendants' fraudulent scheme, Plaintiff sustained damages, including but not limited to paying excessive and inflated prices for the at-issue medications.

729.    These Defendants valued their profits over the trust, health, and safety of Plaintiff Monmouth County and diabetics across the country. These Defendants repeatedly misrepresented the price of the at-issue drugs.

730.    Defendants'    actions,    representations,    and    misrepresentations demonstrate callous disregard for not only the rule of law but also public health, safety, and well-being.

731.    As a direct and proximate result of Defendants' fraudulent Insulin

Pricing Scheme, Monmouth County sustained damages, including but not limited to paying excessive and inflated prices for diabetes medications described herein.

732.   Defendants are liable to Monmouth for damages in an amount to be proven at trial. Moreover, because Defendants acted wantonly, maliciously, recklessly, deliberately, and with intent to defraud Monmouth County for the purpose of enriching themselves at Plaintiff's detriment, Defendants' conduct warrants punitive damages in an amount to be determined at trial.

## COUNT IV
### Violations of New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1, et seq.)
### (Against Express Scripts, Eli Lilly, Novo Nordisk, and Sanofi)

733.   Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

734.   Plaintiff brings this claim against Express Scripts (as defined collectively herein) and the Manufacturer Defendants. All are referred to collectively throughout Count IV as "Defendants.

735.   At all relevant times material hereto, Defendants conducted trade and commerce within the meaning of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq. ("New Jersey CFA").

736.   Plaintiff and each of the Defendants are "persons" within the meaning of, and subject to, N.J.S.A. 56:8-1(d).

737.   The at-issue diabetes drugs are "merchandise," which is defined to

include any objects, goods, and commodities offered, directly or indirectly, to the public for sale. N.J.S.A. § 56:8-1(c).

738.   Defendants each engaged in "sales" of "merchandise" within the meaning of N.J.S.A. § 56:8-1(c) and (d), which includes "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute," N.J.S.A. § 56:8-1(e), and therefore includes Defendants' sale of the at-issue diabetes drugs to Plaintiff.

739.   The New Jersey CFA protects consumers like Plaintiff against fraud, unlawful practices, and unconscionable commercial practices in connection with the sale of any merchandise.

740.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . . " N.J.S.A. § 56:8-2

741.   Defendants engaged in unfair, false, deceptive, and misleading practices that violated N.J.S.A. § 56:8-2, et seq., as described herein, through their creation of,

participation in, and effectuating the Insulin Pricing Scheme. In particular, and with respect to the Manufacturer Defendants, Express Scripts, and Monmouth County in this case:

a.    The Manufacturer Defendants published prices for the at-issue drugs and, in doing so, held these prices out as the actual prices for these drugs despite knowing these prices were artificially inflated and untethered from the cost of the drugs or the price the Manufacturers were paid for them—all with the PBM Defendants' knowledge, consent, and cooperation.

b.    The Manufacturer Defendants misrepresented and actively concealed the true reasons why they set and raised list prices—the truth being that it was to increase revenues and profits and to offer higher prices and larger Manufacturer Payments to the PBMs—all with the PBM Defendants' knowledge, consent, and cooperation.

c.    The PBM Defendants furthered the scheme by using the artificially inflated list prices to determine the inflated prices paid by payors, including Plaintiff—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

d.    The PBM Defendants represented to payors, including Plaintiff, and to the public that they worked to generate savings with respect to the at-issue drugs and to promote the health of diabetics. Express Scripts made such

representations to Plaintiff. Instead, directly counter to those representations, the PBM Defendants drove up the prices of the at-issue drugs and damaged payors, including Plaintiff, by demanding ever-increasing Manufacturer Payments that, in turn, increased what otherwise would have been the retail prices for the at-issue drugs—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

e.    The PBM Defendants have hidden, obfuscated, and laundered these Manufacturer Payments through their affiliated entities so as to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

f.    The PBM Defendants intentionally selected higher-priced diabetes medications for formulary placement and excluded lower priced ones in order to generate larger profits and coordinated with the Manufacturer Defendants to increase the availability and use of higher priced medications because they are more profitable for both the PBM and Manufacturer Defendants. Express Scripts engaged in such conduct here with respect to Plaintiff's formularies.

g.    The PBM Defendants misled their payors, including Plaintiff, as to the true nature of value of the services they provided and reaped illicit profits exponentially greater than the fair market value of the services they purported

to provide—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

h.    The PBM Defendants owed a duty to disclose the true facts to their payor clients, including Plaintiff, but intentionally chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors, including Plaintiff—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

742.    In addition, Defendants made numerous false and misleading statements of fact concerning the existence of, reasons for, and amounts of purported price reductions.

a.    A characteristic of every product in New Jersey is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value. The Manufacturer Defendants reported and published artificially inflated list prices for each at-issue drug and, in doing so, represented that the reported prices were reasonably related to the net prices for the at-issue drugs and otherwise reflected the fair market value for the drugs—all with the PBM Defendants' knowledge, consent, and cooperation.

b.    The PBM Defendants misrepresented to payors like Plaintiff and to the public that their formularies and the portion of the Manufacturer

Payments they disclosed have the characteristic and benefit of lowering the price of the at-issue drugs and promoting the health of diabetics when, in fact, the opposite is true.

c.     The PBM Defendants utilized the artificially inflated price—which they are directly responsible for inflating and which they know is untethered from the actual price—to make false and misleading statements regarding the amount of savings the PBMs generate for payors and the public.

d.     Defendants made false and misleading representations of fact that the prices for the at-issue diabetes medications were legal, competitive, and fair market value prices.

e.     At no point did the Defendants reveal that the prices for the at-issue drugs were not legal, competitive, or at fair market value—rather, they coordinated to overtly mislead the public and payors, including Plaintiff, and undertook a concerted effort to conceal the truth.

f.     At no point did these Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme—rather, they overtly misled the public and payors, including Plaintiff, and undertook a concerted effort to conceal the truth.

g.     At least once per year for each year during the relevant period, Manufacturer Defendants reported and published false prices for each at-issue

drug and in doing so represented that the list prices were the actual, legal, and fair prices for these drugs and resulted from competitive market forces when they knew that was not the case.

h.     By granting the at-issue drugs preferred formulary position (which PBM Defendants represent are reserved for reasonably priced drugs and which are purportedly designed to promote cost savings and the health of diabetics), the PBM Defendants knowingly and purposefully utilized the false prices that were generated by the Insulin Pricing Scheme—all with the Manufacturer Defendants knowledge, consent, and cooperation.

i.     By granting the at-issue diabetes medications preferred formulary positions, the PBM Defendants (here, Express Scripts) ensured that prices generated by the Insulin Pricing Scheme would harm Plaintiff—all with the Manufacturer Defendants knowledge, consent, and cooperation.

j.     The PBM Defendants (here, Express Scripts) also misrepresented their formularies promoted the cost-savings to Plaintiff.

k.     Defendants' representations are false and Defendants knew they were false when they were made. Defendants knew that the prices they reported and utilized are artificially inflated for the purpose of maximizing revenues and profits pursuant to the Insulin Pricing Scheme.

l.     Defendants not only knew that the PBMs' formulary construction

fueled the precipitous price increases that damaged Plaintiff's financial well-being, but coordinated in ways that made such harm inevitable—all for the sole purpose of generating more revenues and profits for both groups of Defendants.

m.    Defendants affirmatively withheld this truth from Plaintiff, even though these Defendants knew that the Plaintiff's intention was to pay the lowest possible price for diabetes medications and expectation was to pay a legal, competitive price that resulted from transparent market forces.

n.    Defendants made false and misleading misrepresentations of fact related to the Manufacturer Payments and the negotiations that occurred between the PBM and Manufacturer Defendants.

o.    PBM Defendants knowingly made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that the Manufacturer Payments lower the overall price of diabetes medications and reduce payor costs while promoting the health of diabetics.

p.    Defendants knew that these representations were false when they were made. Defendants knew that the Manufacturer Payments were not reducing the overall price of diabetes medications but rather are an integral part of the secret Insulin Pricing Scheme and are responsible for the inflated

prices.

q.    The PBM Defendants (here, Express Scripts) owed a duty to disclose the true facts to their payor clients, including Plaintiff, but intentionally chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors like Plaintiff—all with the intent of misrepresenting the characteristics and benefits of their services and the existence and nature of purported price reductions they obtained for those payors. All of this was done with the Manufacturer Defendants' knowledge, consent, and cooperation.

r.    Defendants continue to make these misrepresentations and to publish prices generated by the Insulin Pricing scheme, and Plaintiff continues to be constrained to purchase diabetes medications at exorbitant prices.

743.  Defendants' unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in payors like Plaintiff, and were likely to and did in fact deceive those payors.

744.  In addition, the acts and practices alleged herein are ongoing, repeated, and affect the public interest. The acts and practices alleged herein substantially harm the community of diabetics, their families, healthcare providers, consumers in general, and the public at large, and have caused substantial actual harm, including

to Plaintiff and its beneficiaries. Because of the Insulin Pricing Scheme, payors (including Plaintiff) and patients have paid inflated prices for the at-issue drugs. Beyond inflicting monetary harm, Defendants' conduct restricted affordable access to diabetes drugs, forcing diabetics to ration—or forego—necessary treatment. The Insulin Pricing Scheme has thus had a broad impact on consumers at large in New Jersey, including in Monmouth County.

745.   In purchasing the at-issue diabetes drugs, Plaintiff relied on the misrepresentations and/or omissions of Defendants.

746.   As a direct and proximate result of Defendants' wrongful conduct in violation of the New Jersey CFA, Plaintiff has suffered and continues to suffer harm as a purchaser of the at-issue drugs, and damages to be determined at trial, including but not limited to the Plaintiff paying excessive and inflated prices for diabetes medications described herein every time it paid for an at-issue drug.

747.   Additionally, Plaintiff did not receive the benefit of its bargain, or otherwise paid a price premium, for the at-issue diabetes medications because it paid an artificially inflated price due to these Defendants' illegal practices.

748.   As a result of Defendants' fraudulent and/or deceptive conduct, misrepresentations, and/or knowing omissions, Plaintiff is entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial. See N.J.S.A. § 56:8-19.

## COUNT V
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Express Scripts)

749.   Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

750.   Plaintiff brings this claim against Express Scripts (as defined collectively herein). Express Script is referred to throughout Count V as "Defendant."

751.   Implied in the pharmacy benefit management contracts ("PBM agreements") entered into between Monmouth County and Express Scripts (and, prior to Express Scripts, Medco) are covenants that the parties would deal with each other in good faith and would not engage in any conduct to destroy or injure the right of the other party to receive the benefits or fruits of the agreement.

752.   Express Scripts failed to perform its obligations in good faith under the PBM agreements by knowingly, intentionally, and secretly manipulating the prices of the at-issue drugs in order to benefit itself financially at the expense of Monmouth County—as alleged in detail herein.

753.   Express Scripts was aware that Plaintiff was willing to enter into the PBM agreements only in reliance on the integrity of Express Scripts.

754.   As Express Scripts knew, however, it was willfully coordinated with the Manufacturer Defendants to enrich itself at Plaintiff's expense by artificially inflating the costs of the at-issue drugs. And Express Scripts took additional steps to conceal

its arrangements with the Manufacturer Defendants so that payors like Plaintiff would not discover they were not receiving the benefit of its agreements. Express Scripts also coordinated with the Manufacturer Defendants to conceal portions of the Manufacturer Payments it received by relabeling rebates as "administrative fees" or other types of fees that would not be "passed through" to Plaintiff and by concealing payments it received from the Manufacturer Defendants through its affiliated rebate aggregators.

755.    Through its conduct, and the other conduct described in detail herein, Express Scripts deprived Plaintiff of its rights to receive the benefits of the PBM agreements.

756.    As a direct and proximate result of the Express Scripts' knowing, intentional and bad faith violation of the PBM agreements' implied covenants of good faith and fair dealing, Monmouth County sustained damages, including but not limited to paying excessive and inflated prices for diabetes medications described herein.

**<u>Count VI</u>**
**Civil Conspiracy**
**(Against all Defendants)**

757.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

758.    Defendants' conduct described herein constitutes an agreement between

two or more parties to commit an unlawful act or a lawful act by unlawful means and Defendants' overt acts in furtherance of this conspiracy caused Plaintiff's damages

759.    Defendants aided and abetted one another to violate federal laws and commit common law fraud.

760.    Each Defendant agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially and egregiously inflated the price of diabetes medications.

761.    Each PBM Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

762.    The Manufacturer Defendants agreed with each other and the PBM Defendants to intentionally raise their diabetes medication prices and then pay back a significant portion of those prices to the PBMs.

763.    In exchange for the Manufacturer Defendants inflating their prices and making large secret payments, the PBM Defendants agreed to and did grant preferred formulary status to the Manufacturer Defendants' diabetes medications.

764.    Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither the PBM Defendants nor the Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

765.    The PBM Defendants need the Manufacturer Defendants to inflate the

reported price of their diabetes medications and to make secret payments back to the PBM Defendants in order for the PBM Defendants to profit off the Insulin Pricing Scheme.

766. The Manufacturer Defendants need the PBM Defendants to grant their diabetes medications preferred formulary placement in order to maintain access to a majority of payors and diabetics.

767. As discussed throughout this Complaint, the Insulin Pricing Scheme resulted from explicit agreements, direct coordination, constant communication, and exchange of information between the PBMs and the Manufacturers.

768. In addition to the preceding direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that infers Defendants conspired to engage in fraudulent conduct:

a. Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

b. Numerous ongoing government investigations, hearings and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants, including:

i. In 2016, the Manufacturer Defendants received civil investigative demands from at least the State of Washington relating to the pricing of their insulin products and their relationships with the PBM Defendants;

ii.   In 2017, the Manufacturer Defendants received civil investigation demands from the States of Minnesota, California and Florida related to the pricing of their insulin products and their relationships with the PBMs;

iii.  Letters from numerous senators and representatives in recent years to the Justice Department and the Federal Trade Commission asking them to investigate potential collusion among Defendants;

iv.   A 2017 House Oversight committee investigation into the corporate strategies of drug companies, including Manufacturer Defendants, seeking information on the increasing price of drugs and manufacturers efforts to preserve market share and pricing power;

v.    A 2018 Senate report titled "Insulin: A Lifesaving Drug Too Often Out of Reach" aimed addressing the dramatic increase in the price of insulin; and

vi.   Several 2019 hearings before both the Senate Financing Committee and the House Oversight and Reform Committees on the Insulin Pricing Scheme and the collusion between the PBMs and the Manufacturers; and

vii.  Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs.

viii. The astronomical rise in the price of the at-issue drugs coincides with PBM Defendants' rise to power within the pharmaceutical pricing system starting in 2003.

769.  Plaintiff Monmouth County was and continues to be damaged by the conspiracy when it overpaid for the diabetes medications as result of Defendants' unlawful actions.

**COUNT VII**

256

## Unjust Enrichment
## (Against Express Scripts, Eli Lilly, Novo Nordisk, and Sanofi)

770.   Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

771.   This cause of action is alleged in the alternative to any claim Plaintiff may have for legal relief.

772.   It is a fundamental principle of fairness and justice that a person should not be unjustly enriched at the expense of another.

773.   A person should not be unjustly enriched at the expense of another even if that person's conduct is not tortious

774.   Plaintiff conferred a benefit upon Defendants Express Scripts, Eli Lilly, Novo Nordisk, and Sanofi (for purposes of Count VI, "Defendants").

775.   Plaintiff conferred a benefit on Defendants by purchasing the at-issue insulins at artificially and illegally inflated prices as established by the Insulin Pricing Scheme.

776.   Plaintiff conferred this benefit upon Defendants to Plaintiff's financial detriment.

777.   Defendants deceived Plaintiff and have received a financial windfall from the Insulin Pricing Scheme at Plaintiff's expense.

778.   Defendants wrongfully secured and retained a benefit in the form of amounts paid for diabetes medications, unearned fees, and other payments collected

based on the market forces and prices generated by the Insulin Pricing Scheme, and revenues that would not have been realized but for the Insulin Pricing Scheme.

779.    Defendants wrongfully secured and retained a benefit in the form of revenues and profits to which they were not entitled, which did not represent the fair market value of the goods or services they offered, and which were obtained at Plaintiff's expense.

780.    Defendants wrongfully secured and retained a benefit in the form of monies paid at artificially inflated prices for the at-issue medications that would not have existed but for the Defendants' misconduct.

781.    Defendants were aware of the benefit, voluntarily accepted it, and retained and appreciated the benefit, to which they were not entitled, all at Plaintiff's expense.

782.    Any Defendant's retention of any portion of any benefit obtained by way of the Insulin Pricing Scheme is unjust and inequitable regardless of the Insulin Pricing Scheme's legality.

783.    Each Defendant's retention of any portion of the benefit violates the fundamental principles of justice, equity, and good conscience. Even absent Plaintiff's ability to prove the elements of any other claim, it would be unfair, unjust, and inequitable for any Defendant to retain any portion of the benefit.

784.    Even absent legal wrongdoing by any or all Defendants, Plaintiff has a

better claim to the benefit than any Defendant.

785.   The benefit retained is in an amount not less than the difference between the reasonable or fair market value of the drugs for which Plaintiff paid and the actual value of the drugs Defendants delivered and, as to CVS Caremark and Express Scripts, the reasonable or fair market value of the services for which Plaintiff paid and the actual value of services rendered with respect to the at-issue drugs.

786.   Defendants should not be permitted to retain the benefit conferred upon them by Plaintiff and restitution is appropriate to prevent the unjust enrichment.

787.   Accordingly, Plaintiff seeks disgorgement of the benefit and seeks restitution, rescission, or such other relief as will restore to Plaintiff that to which it is entitled.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.   A judgment in favor of Plaintiff and against Defendants;

B.   Determining that the applicable Defendants have violated RICO, have conspired to violate RICO, have committed common-law fraud, have violated the New Jersey CFA, have breached the implied covenant of good faith and fair dealing, have engaged in a civil conspiracy, and have been unjustly enriched.

C.      Granting Plaintiff injunctive relief in accordance with the New Jersey CFA and 18 U.S.C. § 1964(a) that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein in violation of the New Jersey CFA and RICO, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.      Damages, treble damages, statutory damages, and punitive damages, where applicable;

E.      Restitution, disgorgement, and other just relief;

F.      An order awarding Plaintiff damages in an amount to be determined at trial for the wrongful acts of Defendants;

G.      Pre- and post-judgment interest on all amounts awarded;

H.      Reasonable attorneys' fees and costs, as allowed by law; and

I.      Such other or further relief as the Court may deem appropriate, just, equitable, and proper.

## JURY DEMAND

Plaintiff Monmouth County demands trial by jury on all issues so triable.

Dated:                             s/ _____
                                   Christopher A. Seeger
                                   David R. Buchanan
                                   Steven J. Daroci
                                   SEEGER WEISS LLP
                                   55 Challenger Road
                                   Ridgefield Park, New Jersey 07660
                                   (973) 639-9100
                                   cseeger@seegerweiss.com
                                   dbuchanan@seegerweiss.com
                                   sdaroci@seegerweiss.com

                                   OF COUNSEL:

                                   Benjamin J. Widlanski

                                   Tal J. Lifshitz
                                   Rachel Sullivan
                                   Daniel T. DiClemente
                                   KOZYAK TROPIN & THROCKMORTON
                                   LLP
                                   2525 Ponce de Leon Blvd., 9th Floor
                                   Coral Gables, Florida 33134
                                   (305) 372-1800
                                   bwidlanski@kttlaw.com
                                   tjl@kttlaw.com
                                   rs@kttlaw.com
                                   ddiclemente@kttlaw.com

                                   Brandon L. Bogle
                                   Matthew D. Schultz
                                   William F. Cash
                                   LEVIN, PAPANTONIO, PROCTOR,
                                   BUCHANAN, O'BRIEN, BARR &
                                   MOUGEY, P.A.
                                   316 S. Baylen St., Suite 600
                                   Pensacola, Florida 32502

(850) 435-7140
mschultz@levinlaw.com
bbogle@levinlaw.com
bcash@levinlaw.com

Troy A. Rafferty
RAFFERTY DOMNICK CUNNINGHAM
& YAFFA
815 S Palafox Street, 3rd Floor
Pensacola, Florida 32502
troy@pbglaw.com

# EXHIBIT 2

Christopher A. Seeger
David R. Buchanan
Steven J. Daroci
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
(973) 639-9100

*Attorneys for Plaintiff*
*County of Monmouth, New Jersey*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-3080 (BRM)(RLS) MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** *County of Monmouth, New Jersey v. Eli Lilly and Company, et al.*, Case No. 2:23-cv-03916 | **JUDGE BRIAN R. MARTINOTTI JUDGE RUKHSANAH L. SINGH** **JURY TRIAL DEMANDED** |

## ~~FIRST~~ SECOND AMENDED COMPLAINT

Plaintiff County of Monmouth, New Jersey ("Plaintiff" or "Monmouth County"), by and through undersigned counsel, alleges as follows:

## I.    INTRODUCTION

1.    The cost of diabetes medications has skyrocketed over the past 20 years. Over that time, while the average cost of consumer goods and services has risen 1.75-

fold, the cost of some diabetes medications has risen more than tenfold. These price increases do not derive from the rising cost of goods, production costs, investment in research and development, or competitive market forces. Instead, Defendants engineered them to exponentially increase their profits at the expense of payors like Plaintiff.

2.    Diabetes is widespread. According to the American Diabetes Association, the total estimated cost of diabetes in the United States in 2022 was over $412 billion (including $306.6 billion in direct medical costs and $106.3 billion in indirect costs)—up from $327 billion in 2017. Direct health care costs attributable to diabetes have increased by $80 billion over the past ten years—from $227 billion in 2012 to $306.6 billion in 2022. One in four healthcare dollars is spent caring for people with diabetes.

3.    In New Jersey alone, diabetes costs over $9 billion per year, including $6.6 billion in direct medical expenses and $2.5 billion in indirect costs.[1]

4.    Nearly 750,000 New Jerseyans—over 10% of the adult population—have diabetes.[2] In Monmouth County, approximately 7% of adults are living with

---

[1] *See* https://diabetes.org/sites/default/files/2024-03/adv_2024_state_fact_new_jersey.pdf (last visited Aug. 1, 2024).

[2] *Id*.

diabetes.[3]

5.    Defendants CVS Caremark, Express Scripts, and OptumRx (collectively, the "PBM Defendants" or "the PBMs") are pharmacy benefit managers that work in concert with the Manufacturers of the at-issue drugs to dictate the availability and price of the at-issue drugs for most of the U.S. market.[4] The PBM Defendants are, at once, (a) the three largest PBMs in the United States (controlling more than 80% of the PBM market); (b) the largest pharmacies in the United States (comprising three of the top five dispensing pharmacies in the U.S.); and (c) owned and controlled by entities that own three of the largest insurance companies in the United States—Aetna (CVS Caremark), Cigna (Express Scripts), and UnitedHealthcare (OptumRx).

6.    These conglomerate Defendants sit at 5th (UnitedHealth Group), 6th (CVS Health), and 15th (Cigna) on the Fortune 500 list.

**Figure 1: PBMs, PBM-Affiliated Insurers, and PBM-Affiliated Pharmacies**

| PBM | PBM-Affiliated Insurer | PBM-Affiliated Pharmacy |
|---|---|---|
| CVS Caremark | Aetna | CVS Pharmacy |

---

[3] New Jersey Dep't of Health, New Jersey State Health Assessment Data, *available at* https://www-doh.nj.gov/doh-shad/indicator/view/DiabetesPrevalence.County.html (last visited Aug. 1, 2024)

[4] The "at-issue drugs" or "at-issue medications" are those set forth in the table in Paragraph 27463.

| Express Scripts | Cigna | Express Scripts Pharmacy Inc. |
|---|---|---|
| Optum | UnitedHealthcare | OptumRx |

7.    For transactions in which the PBM Defendants control the insurer, the PBM, and the pharmacy (e.g., Aetna—CVS Caremark—CVS Pharmacy)—these middlemen capture as much as half of the money spent on each insulin prescription (up from 25% in 2014), even though they contribute nothing to the innovation, development, manufacture, or production of the drugs.

8.    The PBMs establish national formulary offerings (i.e., approved-drug lists) that determine which diabetes medications are covered by nearly every payor in the United States, including in New Jersey and, more specifically, Monmouth County.

9.    The Manufacturers and PBMs understand that the PBMs' national formularies drive drug utilization. The more accessible a drug is on the PBMs' national formularies, the more that drug will be purchased throughout the United States. Conversely, the exclusion of a drug from one or more of the PBMs' formularies can render the drug virtually inaccessible for millions of covered persons.

10.    Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical payment chain, both Defendant groups understand that the PBM Defendants wield enormous influence over drug prices and purchasing behavior.

11.   The Manufacturers set the initial list prices for their respective insulin medications. Over the last 20 years, list prices have sharply increased in lockstep, even though the cost of production has decreased. Insulins, which today cost Manufacturers as little as $2 per vial to produce, and which were priced at $20 per vial in the 1990s, now range in price from $300 to over $700.

12.   The Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, taking the same increases down to the decimal point within a few days of one another and, according to a U.S. Senate Finance Committee investigation, "sometimes mirroring" one another in "days or even hours."[5] Figure 2 below reflects the exponential rate at which Defendant Eli Lilly raised the list price of its analog insulin, Humalog, compared to the rate of inflation for other consumer goods and services during the period from 1997 through 2018.

---

[5] Charles E. Grassley & Ron Wyden, *Staff Report on Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, *Sen. Fin. Comm.*, at 6, 54, 55 (Jan. 2021), https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin %20Report%20FINAL%201).pdf (hereinafter "Senate Insulin Report").

**Figure 2: Price Increase of Insulin (Humalog) vs. Selected Consumer Goods, 1997-2018**



13.  And looking at the narrower timeframe between 2013 through 2018, prices for insulin products have increased at rates far exceeding inflation, as illustrated in the chart below from the Kaiser Family Foundation.

6

**Figure 3: Average annual price increases of insulins vs. inflation, 2013-2018**



14.    Today's exorbitant prices are contrary to the intent of insulin's inventors, who sold their original patent rights to the University of Toronto for $1 each, reasoning that "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly." One of the inventors, Sir Frederick Banting, stated that "[i]nsulin does not belong to me, it belongs to the world." But today, counter to its inventors' noble aims, insulin is the poster child for skyrocketing pharmaceutical prices.

15.    Little about these medications has changed over the past 100 years; today's $350 insulin is essentially the same product the Manufacturers sold for $20 in the 1990s.

### *How the Insulin Pricing Scheme Works*

16.    In the simplest terms, there are ~~three~~ four classes of participants in the

7

at-issue medication chain.

a. ***Health Insurance Plans.*** Health insurance plans, often funded by employers (here, Monmouth County), provide cost coverage and reimbursements for medical treatment and care of individuals. These plans often include pharmacy benefits, meaning that the health plan pays a substantial share of the purchase price of its beneficiaries' prescription drugs, which includes the at-issue diabetes medications. Operators of these plans may be referred to as payors, plan sponsors, or PBM clients. The three main types of payors are government/public payors, commercial payors, and private payors.

b. ***Pharmacy Benefit Managers.*** Payors like Monmouth County routinely engage pharmacy benefit managers to manage their prescription benefits, which includes negotiating prices with drug manufacturers and (supposedly) helping payors manage drug spending. Each pharmacy benefit manager maintains a formulary—a list of covered medications. A pharmacy benefit manager's power to include or exclude a drug from its formulary should theoretically incentivize manufacturers to lower their list prices. Pharmacy benefit managers also contract with pharmacies to dispense medications purchased by the plan's beneficiaries. Pharmacy benefit managers are compensated by retaining

a portion of what—again in theory—should be shared savings on the cost of medications.

c.    ***Rebate Aggregators.*** Rebate aggregators are group purchasing organizations that negotiate and collect rebates and other fees for pharmacy benefit manager clients. Each of the three PBM Defendants here established its own rebate aggregator GPO (Defendants Zinc, Ascent, and Emisar) between 2018 and 2022, to outsource the negotiation and collection of rebates and other fees to a subsidiary, and impose new fees on the Manufacturers, purportedly for the aggregator's services. The PBM Defendants' rebate aggregators allow the PBMs to further obfuscate the rebate payment trail and extract additional profits from their contracts with payors.

d.    ***Manufacturers.*** Manufacturers produce prescription medications, including the at-issue insulin medications.[6]  Each sets a list price for its

---

[6] There are three types of insulin medications. First are *biologics,* which are manufactured insulins derived from living organisms.  Second are *biosimilars*, which are "highly similar" copies of biologics. They are similar in concept to "generic" drugs, but in seeking approval, biosimilars use biologics (rather than drugs) as comparators. Third, the confusingly named *authorized generics* are not true generics—they are an approved brand-name drug marketed without the brand name on the label. The FDA approved the original insulins as drug products rather than biologics, so although there was a regulatory pathway to introduce biosimilars generally (i.e., copies of biologics), companies could not introduce insulin biosimilars because their comparators were "drugs" rather than "biologics." In 2020, the FDA

products. The term "list price" is often used interchangeably with "Wholesale Acquisition Cost" or "WAC." The Manufacturers self-report their list prices to publishing compendia such as First DataBank, Medi-Span, or Redbook, who then publish those prices.[7]

b.

~~c.~~ ***Manufacturers.*** ~~Manufacturers produce prescription medications, including the at-issue insulin medications.[8] Each sets a list price for its products. The term "list price" is often used interchangeably with "Wholesale Acquisition Cost" or "WAC." The~~

---

moved insulin to the biologic regulatory pathway, thereby opening the door to approval of biosimilars through an abbreviated approval process.

[7] The related "Average Wholesale Price" (AWP) is the published price for a drug sold by wholesalers to retailers.

[8] ~~There are three types of insulin medications. First are *biologics,* which are manufactured insulins derived from living organisms. Second are *biosimilars*, which are "highly similar" copies of biologics. They are similar in concept to "generic" drugs, but in seeking approval, biosimilars use biologics (rather than drugs) as comparators. Third, the confusingly named *authorized generics* are not true generics — they are an approved brand-name drug marketed without the brand name on the label. The FDA approved the original insulins as drug products rather than biologics, so although there was a regulatory pathway to introduce biosimilars generally (i.e., copies of biologics), companies could not introduce insulin biosimilars because their comparators were "drugs" rather than "biologics." In 2020, the FDA moved insulin to the biologic regulatory pathway, thereby opening the door to approval of biosimilars through an abbreviated approval process.~~

~~Manufacturers self-report their list prices to publishing compendia such as First DataBank, Medi-Span, or Redbook, who then publish those prices.[9]~~

17.   Given the PBMs' purchasing power and their control over formularies that dictate the availability of drugs, their involvement should theoretically drive down list prices because drug manufacturers normally compete for inclusion on the standard national formularies by lowering prices. For insulin, however, to gain access to the PBMs' formularies, the Manufacturers gain the PBMs' approval by artificially *inflating* their list prices and then paying a significant, yet undisclosed, portion of that inflated price back to the PBMs (collectively, the "Manufacturer Payments").[10] The Manufacturer Payments bear a variety of dubious labels, including rebates, discounts, credits, inflation/price protection fees, and administrative fees. But by whatever name, the inflated list prices and resulting Manufacturer Payments are a quid pro quo

---

~~[9] The related "Average Wholesale Price" (AWP) is the published price for a drug sold by wholesalers to retailers.~~

[10] In this Complaint, "Manufacturer Payments" is defined to include all payments or financial benefits of any kind conferred by the Manufacturer Defendants to the PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on a PBM Defendant's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, and any other form of consideration exchanged.

for inclusion and favorable placement on the PBMs' formularies.[11]

18.  Contracts between the PBM Defendants and payors like Plaintiff tie the definition of "rebates" to patient drug utilization. But the contracts between the PBMs and Manufacturers define "rebates" and other Manufacturer Payments differently, e.g., by calling rebates for formulary placement "administrative fees." Defendants consequently profit from the "rebates" and other Manufacturer Payments, which are shielded from payors' contractual audit rights, thereby precluding payors from verifying the components or accuracy of the "rebates" that payors receive.

18.19.  In recent years, the PBM Defendants have further obfuscated the rebate payment trail by forming group purchasing organizations ("GPOs") known as "rebate aggregators." These PBM subsidiaries—as relevant here, Defendants Zinc (CVS), Ascent (Express Scripts), and Emisar (OptumRx)—negotiate rebates and other fees on the PBMs' behalf and retain a portion of the rebates and fees collected. As a result, these fees are neither passed through to payors nor subject to audit under the terms of payors' sponsor agreements with the PBMs. Because the rebate aggregators are PBM subsidiaries, however, the PBMs secure additional profits from

---

[11] Favorable or preferred placement may, for example, involve placing a branded product in a lower cost-sharing tier or relaxing utilization controls (such as prior-authorization requirements or quantity limits). Favorable placement of a relatively more expensive drug encourages use of that drug and leads to higher out-of-pocket costs for payors and co-payors.

each drug purchase.

19.20.   The PBM Defendants' staggering revenues vastly exceed the fair market value of their services—both generally and with respect to the at-issue drugs.

20.21.   The Manufacturers' initial list prices for the at-issue drugs are not the result of free market competition for payors' business. To the contrary, their list prices are so exorbitant in comparison to the net prices they ultimately realize that the Manufacturers know that their list prices constitute false prices. These list prices reflect neither the Manufacturers' actual costs to produce the at-issue drugs nor the fair market value of those drugs. Rather, they are artificially inflated solely to facilitate the Insulin Pricing Scheme.[12]

21.22.   The PBM Defendants grant formulary status based on (a) the *highest inflated price*—which the PBMs know to be false—and (b) which diabetes medications generate the largest profits for themselves.

22.23.   The Insulin Pricing Scheme thus creates a "best of both worlds" scenario for Defendants. The PBMs get exorbitant secret Manufacturer Payments based on the Manufacturers' list prices, and the Manufacturers increase their sales

---

[12] "Net price" refers to the price the manufacturer ultimately realizes—that is, the list price less rebates, and other discounts (net sales divided by volume). At times, Defendants' representatives use "net price" to refer to the amount payors or plan members pay for medications. In this Complaint, "net price" refers to the former— the amount that the Manufacturers realize for the at-issue drugs, which is roughly the list price less Manufacturer Payments.

and revenues by being favorably placed on formularies. As the PBMs get larger and larger Manufacturer Payments, the Manufacturers simply increase their list prices further.

23.24.    The PBM Defendants profit off the Insulin Pricing Scheme in many ways, including by: (a) retaining a significant, yet secret, share of the Manufacturer Payments, either directly or through rebate aggregators like Defendants Zinc, Ascent, and Emisar, (b) using the prices produced by the Insulin Pricing Scheme to generate unwarranted profits from pharmacies, and (c) relying on those same artificial list prices to drive up the PBMs' margins and pharmacy-related fees, including those relating to their mail-order pharmacies. In addition, because the PBM Defendants claim that they can extract higher rebates due to their market power, ever-rising list prices increase demand for the PBMs' purported negotiation services.

24.25.    As detailed below, although the PBM Defendants represent both publicly and directly to clients like Monmouth County that they use their market power to drive *down* prices for diabetes medications, these representations are false and deceptive. Rather, the exact opposite is true: the PBMs intentionally work to incentivize the Manufacturers to *inflate* their list prices. The PBMs' "negotiations" intentionally drive up the price of the at-issue drugs and are directly responsible for the skyrocketing prices of diabetes medications, conferring unearned benefits upon the PBMs and Manufacturers alike and overcharging payors like Monmouth County.

25.26.   Because the purchase price of every at-issue diabetes medication flows from a false list price generated by Defendants' unfair and deceptive scheme, every payor in the United States that purchases these life-sustaining drugs, including Monmouth County, has been directly harmed by the Insulin Pricing Scheme.

26.27.   Even if temporary reductions in Monmouth County's costs for the at-issue drugs occur from time to time, those costs still remain significantly higher than costs that would have resulted from a transparent exchange in a free and open market.

27.28. As a payor for and purchaser of the at-issue drugs, Monmouth County has been overcharged millions of dollars during the relevant period as a direct result of the Insulin Pricing Scheme. Indeed, in the eight-year period between 2016 and 2023, Monmouth County spent about *$1 million per year* on the at-issue diabetes medications.

28.29. A substantial portion of this amount is attributable to the artificially inflated prices of the at-issue drugs, which arose not from transparent or competitive market forces, but from undisclosed, opaque, and unlawful conduct on the part of the Manufacturer Defendants and the PBM Defendants.

29.30. This action alleges that Defendants violated the Racketeer Influenced and Corrupt Organizations Act, the New Jersey Consumer Fraud Act, and New Jersey common law by engaging in the Insulin Pricing Scheme. The Insulin Pricing Scheme directly and foreseeably caused—and continues to cause—harm to Plaintiff.

~~30.~~31. This action seeks injunctive relief, restitution, disgorgement, actual damages, statutory damages and/or penalties, punitive damages, attorneys' fees and costs, and all other available relief to address and abate the harm caused by the Insulin Pricing Scheme.

~~31.~~32. The relevant period for the claims alleged is from 2003 through the present.

## II.    THE PARTIES

### A.    Monmouth County

~~32.~~33. Plaintiff the County of Monmouth, New Jersey, is a political subdivision of the State of New Jersey.

~~33.~~34. Monmouth County is the fifth most populous county in New Jersey, with its county seat in Freehold, New Jersey. Monmouth County has a population of 644,098, according to the latest estimates from the U.S. Census Bureau.

~~34.~~35. Monmouth County provides services that are designed to foster the safety, health, and well-being of its residents, including police, fire, and first responder services; law enforcement services; judiciary services; and public health, safety, and assistance services for families and persons in need.

~~35.~~36. Any increase in spending has a detrimental effect on Plaintiff's overall budget and, in turn, negatively impacts its ability to provide necessary services to the community.

36.37. The Insulin Pricing Scheme has had such an effect.

37.38. Monmouth County provides health benefits to its employees, retirees, and their dependents (collectively, "Beneficiaries"). One of the benefits Monmouth County offers its Beneficiaries is paying a substantial share of the purchase price of their pharmaceutical drugs, including the at-issue diabetes medications.

38.39. Monmouth County maintains self-insured health plans for its Beneficiaries. During the relevant time period, there were around 6,500 benefit-eligible employees (many of whom carried coverage for immediate family). Total enrollment fluctuated over time but generally ranged between 6,000 and just over 7,000 members.

39.40. Exclusive of the costs associated with providing diabetes medications at county-run facilities, such as correctional facilities, Monmouth County spends approximately $1 million per year on the costs of providing diabetes medications for its Beneficiaries. Accordingly, during the relevant period, and to the detriment of its Beneficiaries and taxpayers, Plaintiff has paid millions of dollars more for diabetes medications than it otherwise would have paid absent Defendants' conduct.

40.41. Plaintiff seeks relief for the harm suffered by Defendants' misrepresentations and omissions regarding their illegal Insulin Pricing Scheme.

**B.    Manufacturer Defendants**

41.42. **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana

corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

42.43. Eli Lilly is, and has been since 1962, registered to do business in the State of New Jersey.

43.44. In New Jersey and nationally, Eli Lilly manufactures, promotes, and distributes several at-issue diabetes medications, including: Humulin N (first U.S. approval in 1982), Humulin R (first U.S. approval in 1982), Humalog (first U.S. approval in 1996), Trulicity (first U.S. approval in 2014), and Basaglar (first U.S. approval in 2015).

44.45. Eli Lilly's domestic revenues from 2019 to 2021 were $11.9 billion from Trulicity, $4.48 billion from Humalog, $2.58 billion from Humulin and $2.31 billion from Basaglar.[13]

45.46. Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin, and $801 million from Basaglar.

46.47. Eli Lilly transacts business in New Jersey, including in Monmouth County, targeting these markets for its products, including the at-issue diabetes medications.

---

[13] Eli Lilly Annual Report (Form 10-K) (FYE Dec. 31, 2021).

47.48. Eli Lilly employs sales representatives throughout New Jersey to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

48.49. Eli Lilly also directs advertising and informational materials to New Jersey and to Monmouth County physicians and potential users of Eli Lilly's products for the specific purpose of selling the at-issue drugs in New Jersey and Monmouth County and profiting from the Insulin Pricing Scheme.

49.50. At all relevant times, in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices for the at-issue diabetes medications throughout New Jersey with the express knowledge that payment and reimbursement by Plaintiff would be based on those false list prices.

50.51. During the relevant period, Monmouth County purchased Eli Lilly's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

51.52. All Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New Jersey based on the specific false and inflated prices Eli Lilly caused to be published in New Jersey in furtherance of the Insulin Pricing Scheme.

52.53. **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

19

53.54. Sanofi manufactures, promotes, and distributes pharmaceutical drugs both in New Jersey and nationally, including Lantus (first U.S. approval in 2000), Apidra (first U.S. approval in April 2004), Toujeo (first U.S. marketing authorization in February 2015), and Soliqua (first U.S. approval in November 2016).

54.55.  Sanofi touts Lantus as one of its "flagship products" and "one of Sanofi's leading products, with net sales of €2,494 million" ($2.95 billion) in 2021, as well as net sales of €2,661million ($3.04 billion) in 2020, representing 7.4% of the company's net sales for 2020.[14]

55.56.  Sanofi's U.S. net sales in 2019 were $1.29 billion from Lantus, $323.7 million from Toujeo, and $51.5 million from Apidra.[15]

56.57. Sanofi transacts business in New Jersey and in Monmouth County, targeting these markets for its products, including the at-issue diabetes medications.

57.58. Sanofi employs sales representatives throughout New Jersey and in this District to promote and sell Lantus, Toujeo, Soliqua, and Apidra.

58.59. Sanofi also directs advertising and informational materials to New Jersey physicians and potential users of Sanofi's products for the specific purpose of selling the at-issue drugs in New Jersey and Monmouth County and profiting from

---

[14] Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2021); Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2020).

[15] Sanofi Annual Report (Form 20-F) (FYE Dec. 31, 2019).

the Insulin Pricing Scheme.

59.60. At all relevant times, in furtherance of the Insulin Pricing Scheme, Sanofi published its prices of its at-issue diabetes medications throughout New Jersey for the purpose of payment and reimbursement by payors, including Monmouth County.

60.61. During the relevant period, Monmouth County purchased Sanofi's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

61.62. All Sanofi diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New Jersey and Monmouth County based on the specific false and inflated prices Sanofi caused to be published in New Jersey in furtherance of the Insulin Pricing Scheme.

62.63. **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

63.64. Novo Nordisk manufactures, promotes, and distributes pharmaceutical drugs both in New Jersey and nationally, including Novolin R (first U.S. approval in 1991), Novolin N (first U.S. approval in 1991), Novolog (first U.S. approval in June 2002), Levemir (first U.S. approval in June 2005), Victoza (first U.S. approval in January 2010), Tresiba (first U.S. approval in 2015), and Ozempic (first U.S.

approval in 2017).

~~64.~~65. Novo Nordisk's combined net sales of these drugs in the United States from 2018 to 2020 totaled approximately $18.1 billion ($6.11 billion for Victoza alone).[16]

~~65.~~66. Novo Nordisk's global revenues for "total diabetes care" over that three-year period exceeded $41 billion.[17]

~~66.~~67. Novo Nordisk transacts business in New Jersey and in Monmouth County, targeting these markets for its products, including the at-issue diabetes medications.

~~67.~~68. Novo Nordisk employs sales representatives throughout New Jersey and Monmouth County to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

~~68.~~69. Novo Nordisk also directs advertising and informational materials to New Jersey and Monmouth County physicians and potential users of Novo Nordisk's products for the specific purpose of selling the at-issue drugs in New Jersey and Monmouth County and profiting from the Insulin Pricing Scheme.

~~69.~~70. At all relevant times relevant, in furtherance of the Insulin Pricing

---

[16] Novo Nordisk, Annual Report (Form 20-F) (Dec. 31, 2019).

[17] *Id*.

Scheme, Novo Nordisk published its prices of its at-issue diabetes medications throughout New Jersey for the purpose of payment and reimbursement by Monmouth County.

70.71. During the relevant period, Monmouth County purchased Novo Nordisk's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

71.72. All Novo Nordisk diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New Jersey based on the specific false and inflated prices Novo Nordisk caused to be published in New Jersey in furtherance of the Insulin Pricing Scheme.

72.73. As set forth above, Eli Lilly, Sanofi, and Novo Nordisk are referred to collectively as the "Manufacturer Defendants" or the "Manufacturers."

## C. PBM Defendants

### *CVS Caremark*

73.74. **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

74.75. CVS Health transacts business and has locations throughout the United States and New Jersey, including in Monmouth County.

75.76. CVS Health—through its executives and employees, including its Chief

23

Executive Officer, Chief Medical Officer, Executive Vice Presidents, Senior
Executives in Trade Finance, Senior Vice Presidents, and Chief Communication
Officers—is directly involved in creating and implementing the company policies
that inform its PBM services and formulary construction, including with respect to
the at-issue drugs involved in the Insulin Pricing Scheme.

76.77. CVS Health's conduct had a direct effect in New Jersey and damaged
Plaintiff as a payor and purchaser.

77.78. On a regular basis, CVS Health executives and employees communicate
with and direct its subsidiaries related to the at-issue PBM services and formulary
activities.

78.79. In annual reports filed with the SEC throughout the last decade, CVS
Health (or its predecessor) has repeatedly and explicitly stated that CVS Health itself:

a.    designs pharmacy benefit plans that minimize the costs to the
client while prioritizing the welfare and safety of the clients' members;

b.    negotiates with pharmaceutical companies to obtain discounted
acquisition costs for many of the products on CVS Health's drug lists, and
these negotiated discounts enable CVS Health to offer reduced costs to clients;
and

c.    utilizes an independent panel of doctors, pharmacists, and other
medical experts, referred to as its Pharmacy and Therapeutics Committee, to

select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.

79.80. CVS Health publicly represents that it lowers the cost of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including New Jersey, stating that CVS Health

> introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3,000 to $5,000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).[18]

80.81. A 2017 CVS Health report stated: "*CVS Health* pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."

81.82. In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, and mail-order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the

---

[18] CVS HEALTH, *CVS Health Introduces New "Transform Diabetes Care" Program to Improve Health Outcomes and Lower Overall Health Care Costs* (Dec. 13, 2016), https://cvshealth.com/newsroom/press-releases/cvs-health-introduces-new-transform-diabetes-care-program-improve-health.

PBM, and the pharmacies used by approximately 40 million Aetna members in the United States, including in New Jersey. CVS Health controls the entire drug payment chain for these 40 million Americans.

82.83. CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout New Jersey, including CVS Pharmacy, Inc., which is registered to do business in the state. These pharmacies dispensed and received payment for the at-issue diabetes medications throughout the relevant period. According to CVS Health's 2022 Form 10-K filed with the U.S. Securities and Exchange Commission, the company "maintains a national network of approximately 66,000 retail pharmacies, consisting of approximately 40,000 chain pharmacies (which include CVS Pharmacy locations) and approximately 26,000 independent pharmacies, in the United States."[19]

83.84. **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy—a wholly owned subsidiary of CVS Health—is, and has been since 1977, registered to do business int the State of New Jersey.

84.85. CVS Pharmacy is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout New Jersey

---

[19] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2022).

and is directly involved in these pharmacies dispensing and payment policies related to the at-issue diabetes medications.

85.86. CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, LLC.

86.87. CVS Pharmacy holds numerous pharmacy licenses (d/b/a CVS Health) in New Jersey.

87.88. During the relevant period, CVS Pharmacy provided retail pharmacy services in New Jersey that gave rise to the Insulin Pricing Scheme, which damaged payors, including Monmouth County.

88.89. **Defendant Caremark Rx, LLC** is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy-benefit-management and mail-order subsidiaries that engaged in the activities in New Jersey that gave rise to this action.

89.90. Caremark Rx, LLC is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health, and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

90.91. During the relevant period, Caremark Rx, LLC provided PBM and mail-order-pharmacy services in New Jersey that gave rise to the Insulin Pricing Scheme and damaged payors in New Jersey, including Monmouth County.

91.92. **Defendant Caremark, LLC** is a California limited liability company

whose principal place of business is at the same location as CVS Health.

~~92.~~93. Caremark, LLC is, and has been since 2009, registered to do business in New Jersey.

~~93.~~94. Caremark, LLC holds one or more wholesaler licenses and holds at least three pharmacy licenses in New Jersey.

~~94.~~95. Caremark, LLC is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health.

~~95.~~96. During the relevant period, Caremark, LLC provided PBM and mail-order pharmacy services in New Jersey and Monmouth County that gave rise to the Insulin Pricing Scheme, which damaged payors, including Monmouth County.

~~96.~~97. **Defendant CaremarkPCS Health, LLC ("CaremarkPCS Health")** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

~~97.~~98. CaremarkPCS Health is a subsidiary of CaremarkPCS, LLC, which is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health.

~~98.~~99. CaremarkPCS Health is, and has been since 2009, registered to do business in New Jersey.

~~99.~~100. CaremarkPCS Health, doing business as CVS Caremark, provides

pharmacy benefit management services.

101. During the relevant period, CaremarkPCS Health provided PBM services in the State of New Jersey, which gave rise to the Insulin Pricing Scheme and damaged payors, including Monmouth County.

102. **Defendant Zinc Health Services, LLC** ("Zinc") is a Delaware limited liability company with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

103. Zinc is a direct subsidiary of CVS Pharmacy, which is a direct subsidiary of CVS Health.

104. CVS Health established Zinc as a GPO for CVS Caremark's PBM business in March 2020. Zinc was founded, at least in part, to negotiate rebates with drug manufacturers for CVS Caremark.

~~100.~~105.    During the relevant period, Zinc negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in New Jersey.

~~101.~~106.    Defendants CaremarkPCS Health and Caremark, LLC, and Zinc are agents and/or alter egos of Caremark Rx, LLC, CVS Pharmacy, and CVS Health.

~~102.~~107.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control CaremarkPCS Health's and Caremark, LLC's operations, management, and business decisions related to the at-issue formulary

construction, Manufacturer Payments, and mail-order and retail pharmacy services—
to the ultimate detriment of Plaintiff. For example:

    a.    During the relevant period, these parents and subsidiaries have
had common officers and directors, including:

        i.    Thomas S. Moffatt, Vice President and Secretary of Caremark
Rx, LLC, CaremarkPCS Health, and Caremark, LLC, has also
served as Vice President, Assistant Secretary, and Senior Legal
Counsel at CVS Health and the Vice President, Secretary and
Senior Legal Counsel of CVS Pharmacy;

        ii.    Melanie K. Luker, Assistant Secretary of Caremark Rx, LLC,
CaremarkPCS Health, and Caremark, LLC, has also served as
Manager of Corporate Services at CVS Health;

        iii.    Carol A. Denale, Senior Vice President and Treasurer of
Caremark Rx, LLC, has also served as Senior Vice President,
Treasurer, and Chief Risk Officer at CVS Health Corporation;

        iv.    John M. Conroy has been Vice President of Finance at CVS
Health since 2011, and has also served as President and Treasurer
of Caremark, LLC and CaremarkPCS Health in 2019; and

        v.    Sheelagh Beaulieu has been the Senior Director of Income Tax at
CVS Health while also acting as the Assistant Treasurer at
CaremarkPCS Health and Caremark, LLC.

    b.    CVS Health owns all the stock of CVS Pharmacy, which owns
all the stock of Caremark Rx, LLC, which owns all the stock of Caremark
LLC. CVS Health directly or indirectly owns CaremarkPCS Health in its
entirety.

    c.    CVS Health, as a corporate unit, does not operate as separate

entities. Rather, its public filings, documents and statements present its subsidiaries—including CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC, and CaremarkPCS Health—as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." CVS Health's recent public filings also disclose that the company "operates a group purchasing organization that negotiates pricing for the purchase of pharmaceuticals and rebates with pharmaceutical manufacturers on behalf of its participants," without identifying Zinc by name.[20] The day-to-day operations of this corporate unit reflect these public statements. These entities constitute a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint.[21]

    d.    All executives of CaremarkPCS Health, Caremark, LLC, Caremark Rx, LLC, ~~and~~ CVS Pharmacy, and Zinc ultimately report to the executives at CVS Health, including its President and CEO.

    e.    As stated above, CVS Health's CEO, Chief Medical Officer,

---

[20] CVS Health Corp. Form 10-K, FYE Dec. 31, 2020, 2021, 2022, 2023.
[21] CVS Caremark/CVS Health, Annual Report (Form 10-K) (Dec. 31, 2009-2019); CVS Health, *Our Purpose*, https://cvshealth.com/about-cvs-health/our-purpose (last visited Sept. 9, 2022); CVS Health, *Quality of Care*, https://cvshealth.com/health-with-heart/improving-health-care/quality-of-care (last visited Sept. 9, 2022).

Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice
Presidents and Chief Communication Officers are directly involved in the
policies and business decisions by Caremark, LLC and CaremarkPCS Health
that give rise to Plaintiff's claims.

~~103.~~108.    Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC,
Caremark, LLC, Zinc, and CaremarkPCS Health, including all predecessor and
successor entities, are referred to collectively as "CVS Caremark."

~~104.~~109.    CVS Caremark is named as a Defendant in its capacities as a
PBM, a rebate aggregator, and ~~as~~ a mail-order pharmacy.

~~105.~~110.    In its capacity as a PBM, CVS Caremark coordinated with Novo
Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes
medications, as well as for the placement of these firms' diabetes medications on
CVS Caremark's formularies.

~~106.~~111.    CVS Caremark has the largest PBM market share based on total
prescription claims managed. Its pharmacy-services segment provides, among other
things, plan design offerings and administration, formulary management, retail
pharmacy network management services, mail-order pharmacy, specialty pharmacy
and infusion services, clinical services, and medical spend management. In 2021,
CVS Caremark's pharmacy services segment "surpassed expectations" and had a
"record selling season of nearly $9 billion in net new business wins for 2022." In

all, it generated just over $153 billion in total revenues (on top of total 2019-2020 segment revenues exceeding $283 billion).[22]

107.112.    At all relevant times, CVS Caremark offered pharmacy benefit services nationwide and to New Jersey payors, including Monmouth County, and derived substantial revenue from those services, and, in doing so, (a) made misrepresentations and omissions while concealing the Insulin Pricing Scheme, and (b) used the false prices generated by the Insulin Pricing Scheme.

108.113.    At all relevant times, CVS Caremark offered PBM services nationwide and maintained standard formularies that were used nationwide, including in New Jersey. Those formularies included diabetes medications, including those at issue in this action, and CVS Caremark participated in pricing the at-issue drugs based off the list prices it knew to be false.

109.114.    CVS Caremark purchased drugs directly from manufacturers for dispensing through its pharmacy network.

110.115.    During the relevant period, CVS Caremark made representations and omissions to Monmouth County through proposals to provide PBM services in response to Plaintiff's requests for proposals. In doing so, CVS Caremark reinforced the false list prices for the at-issue drugs generated by the

---

[22] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2021).

Insulin Pricing Scheme.

~~111.~~116.    Further, in its capacity as a retail pharmacy, CVS Caremark knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the spread between the acquisition cost for the at-issue drugs (an amount well below the list price generated by the Insulin Pricing Scheme) and the amounts it received from payors (amounts that were based on the false list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

~~112.~~117.    During the relevant period, CVS Caremark provided mail-order and retail pharmacy services nationwide and within the State of New Jersey and employed prices based on the false list prices generated by the Insulin Pricing Scheme.

~~113.~~118.    At all relevant times, CVS Caremark dispensed the at-issue medications nationwide and within the State of New Jersey through its mail-order and retail pharmacies and it derived substantial revenue from these activities in New Jersey.

~~114.~~119.    At all relevant times, CVS Caremark had express agreements with Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail-order pharmacies.

*Express Scripts*

115.120.    **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly

known as Express Scripts Holding Company, is a Delaware corporation with its

principal place of business at One Express Way, St. Louis, Missouri 63121.[23]

116.121.    Evernorth, through its executives and employees, including its

CEO and Vice Presidents, is directly involved in shaping the company policies that

inform its PBM services and formulary construction, including with respect to the at-

issue drugs, related to the Insulin Pricing Scheme.

117.122.    Evernorth's conduct has had a direct effect in New Jersey and on

Monmouth County.

118.123.    Evernorth executives and employees communicate with and

direct Evernorth's subsidiaries on a regular basis related to the at-issue PBM services

and formulary activities.

119.124.    Evernorth is the immediate or indirect parent of pharmacy and

PBM subsidiaries that operate throughout New Jersey, which engaged in the

activities that gave rise to this action.

120.125.    In 2018, Evernorth merged with Cigna in a $67 billion deal to

---

[23] Until 2021, Evernorth Health, Inc. conducted business under the name Express
Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to
Evernorth Health, Inc. and Express Scripts Holding Company.

consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies used by approximately 15 million Cigna members in the United States, including in New Jersey. Evernorth controls the entire drug payment chain for these 15 million Americans.

121.126.    In annual reports filed with the SEC throughout the last decade, Evernorth repeatedly and explicitly:

    a.    Acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest stand-alone PBM company in the United States."

    b.    Stated that Evernorth: "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."[24]

122.127.    Even after the merger with Cigna, Evernorth "operates various group purchasing organizations that negotiate pricing for the purchase of

---

[24] Express Scripts Annual Reports (FY 2009-2019); Cigna Annual Report (Form 10-K) FYE 2020 & 2021).

pharmaceuticals and formulary rebates with pharmaceutical manufacturers on behalf of their participants" and operates the company's Pharmacy Rebate Program while its subsidiary Express Scripts provides "formulary management services" that ostensibly "assist customers and physicians in choosing clinically-appropriate, cost-effective drugs and prioritize access, safety and affordability." In 2021, Evernorth reported adjusted revenues of $131.9 billion (representing 75.8% of Cigna Corporation's revenues), up from $116.1 billion in 2020.[25]

123.128.    **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

124.129.    Express Scripts, Inc. is, and has been since 1992, registered to do business in New Jersey.

125.130.    Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New Jersey that engaged in the conduct that gave rise to this action.[26]

126.131.    During the relevant period, Express Scripts Inc. was directly involved in the PBM and mail-order pharmacy services that gave rise to the Insulin Pricing Scheme and damaged payors, including Monmouth County.

---

[25] Cigna Annual Report (Form 10-K) (FYE Dec. 31, 2021).

[26] Express Scripts Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

127.132.    Indeed, Express Scripts, Inc. has provided pharmacy benefit services to Monmouth County since at least 2012 based on Monmouth County's reliance upon Express Scripts, Inc.'s (or its predecessor Medco Health Solutions') response to the County's request for proposals and upon other representations made in the formation and maintenance of the relationship.

128.133.    **Defendant Express Scripts Administrators, LLC**, doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth, and it has operated, during the relevant time period, at locations in Franklin Lakes, New Jersey, and Morris Plains, New Jersey.

129.134.    Express Scripts Administrators, LLC is registered to do business in New Jersey.

130.135.    During the relevant period, Express Scripts Administrators, LLC provided PBM services in New Jersey discussed in this Complaint that gave rise to the Insulin Pricing Scheme that damaged payors, including Monmouth County.

131.136.    **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at the same address as Evernorth. Until its acquisition by Express Scripts, Medco's principal place of business was in Franklin Lakes, New Jersey.

132.137.    In 2012, Express Scripts acquired Medco for $29 billion.

133.138.    Before the merger, Express Scripts and Medco were two of the largest PBMs in the United States and in New Jersey.

134.139.    Before the merger, Medco provided the at-issue PBM and mail-order services, which gave rise to and implemented the Insulin Pricing Scheme and damaged payors, including Plaintiff, within New Jersey.

135.140.    Following the merger, all of Medco's PBM and mail-order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers, including Monmouth County, becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

136.141.    At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, David Snow, then-CEO of Medco, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater purchasing volume discounts [i.e., Manufacturer Payments] from drug manufacturers and other suppliers."[27]

---

[27] Transcript available at https://www.judiciary.senate.gov/imo/media/doc/11-12-6SnowTestimony.pdf (last visited Apr. 5, 2024).

137.142.    At the same time, the then-CEO of Express Scripts, George Paz, provided written testimony to the Senate Judiciary Committee's Subcommittee on Antitrust, Competition Policy and Consumer Rights, stating: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines." First on Mr. Paz's list of "benefits of this merger" was "[g]enerating greater cost savings for patients and plan sponsors."[28]

138.143.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is the same location as Evernorth.

139.144.    ESI Mail Pharmacy Service, Inc. holds one or more wholesaler licenses and pharmacy licenses (d/b/a Express Scripts) in New Jersey.

140.145.    During the relevant period, ESI Mail Pharmacy Service, Inc. provided the mail-order pharmacy services in New Jersey discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged payors, including Monmouth County.

141.146.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express

---

[28] Transcript available at https://www.judiciary.senate.gov/imo/media/doc/11-12-6PazTestimony.pdf (last visited Apr. 4, 2024).

Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

142.147.    Express Scripts Pharmacy, Inc. is, and has been since 2013, registered to do business in New Jersey.

148.   During the relevant period, Express Scripts Pharmacy, Inc. provided the mail-order pharmacy services in New Jersey discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged payors, including Plaintiff.

143.

149. **Defendant Ascent Health Services LLC** ("Ascent") **is a Delaware limited liability company with its principal place of business at Mühlentalstrasse 36, 8200 Schaffhausen, Switzerland.**

150.  Ascent is part of Evernorth and a subsidiary of Cigna Corporation.

151.  Express Scripts established Ascent in 2019 as a GPO for Express Scripts' PBM business. Ascent was founded, at least in part, to negotiate rebates with drug manufacturers for Express Scripts and now performs this service for Express Scripts and third-party clients.

During the relevant period, Ascent negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in New Jersey.

144.152.    As a result of numerous interlocking directorships and shared executives, Evernorth (f/k/a Express Scripts Holding Company, Inc.) and Express

Scripts, Inc. control Express Scripts Administrators, LLC's, ESI Mail Pharmacy

Service, Inc.'s, Medco Health Solutions, Inc.'s, and Express Scripts Pharmacy, Inc.'s

operations, management, and business decisions related to the at-issue formulary

construction, negotiations, and mail-order pharmacy services to the ultimate

detriment of Plaintiff. For example:

    a.    During the relevant period, these entities have had common

officers and directors:

        i.    Officers and/or directors shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Managing Counsel; Dave Anderson, VP of Strategy; Matt Perlberg, President of Pharmacy Businesses; Bill Spehr, SVP of Sales; and Scott Lambert, Treasury Manager Director;

        ii.    Executives shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Senior Counsel;

        iii.    Officers and/or directors shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Senior Counsel; and Joanne Hart, Treasury Director; and

        iv.    Officers and/or directors shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Managing Counsel; Scott Lambert, Treasury Manager Director; and Joanne Hart, Treasury Director.

    b.    Evernorth directly or indirectly owns all the stock of or otherwise controls Express Scripts Administrators, LLC, Medco Health Solutions, Inc.,

ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc., and Ascent.[29]

c.    The Evernorth corporate family does not operate as separate entities. Evernorth's public filings, documents, and statements present its subsidiaries, including Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc., and Ascent, as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people," and which "includes a broad range of coordinated and point solution health services and capabilities, as well as those from partners across the health care system, in pharmacy solutions, benefits management solutions, care delivery and care management solutions and intelligence solutions to deliver custom and flexible solutions that meet the needs of our clients and customers."[30] The day-to-day operations of this corporate family reflect these public statements. All of these entities constitute a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.

---

[29] Express Scripts Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

d.     All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., ~~and~~ Express Scripts, Inc., and Ascent ultimately report to the executives, including the CEO, of Evernorth.

e.     As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., Ascent, and ~~and~~ Express Scripts, Inc. that gave rise to Plaintiff's claims in this Complaint.

~~145.~~153.     Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., ~~and~~ Express Scripts Pharmacy, Inc., and Ascent, including all predecessor and successor entities, are referred to collectively as "Express Scripts."

~~146.~~154.     Express Scripts is named as a Defendant in its capacities as a PBM, rebate aggregator, and mail-order pharmacy.

~~147.~~155.     In its capacity as a PBM, Express Scripts coordinates with Eli Lilly, Sanofi, and Novo Nordisk regarding the price of the at-issue diabetes medications, as well as for the placement of these Manufacturers' diabetes medications on Express Scripts' formularies.

~~148.~~156.     Before merging with Cigna in 2019, Express Scripts was the

largest independent PBM in the United States.[31] During the period covered by this Complaint, Express Scripts controlled up to 30% of the PBM market in the United States.

~~149.~~157.    The Express Scripts network offers more than 68,000 retail pharmacies nationwide, including in New Jersey.

~~150.~~158.    Express Scripts transacts business throughout the United States and New Jersey.

~~151.~~159.    At all relevant times, Express Scripts derived substantial revenue from providing retail and mail-order pharmacy benefits in New Jersey using prices based on the false list prices for the at-issue drugs.

~~152.~~160.    At all relevant times, and contrary to its express representations, Express Scripts knowingly insisted that its payor clients, including Monmouth County, use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

~~153.~~161.    At all relevant times, Express Scripts concealed its critical role in the generation of those false list prices.

~~154.~~162.    At all relevant times, Express Scripts maintained standard formularies that are used nationwide, including in New Jersey. Those formularies

---

[31] *Id.*

included drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications.

155.163.    During the relevant period, Express Scripts provided PBM services to Monmouth County. In doing so, Express Scripts set the price that Monmouth County paid for the at-issue drugs, at prices based on the false list prices generated by the Insulin Pricing Scheme, and Monmouth County paid Express Scripts directly for the at-issue drugs.

156.164.    In its capacity as a mail-order pharmacy, Express Scripts received payments from New Jersey payors (including Monmouth County)—and set the out-of-pocket price paid—for, the at-issue drugs based on the falsely inflated prices generated by the Insulin Pricing Scheme and, as a result, damaged Monmouth County.

157.165.    At all relevant times, Express Scripts offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in New Jersey. During the relevant period, those formularies included diabetes medications, including all of those at issue in this action.

158.166.    Express Scripts purchases drugs directly from manufacturers for dispensing through its mail-order pharmacy.

159.167.    At all relevant times, Express Scripts dispensed the at-issue medications nationwide and directly to Plaintiff and to Plaintiff's Beneficiaries

through its mail-order pharmacies and derived substantial revenue from these activities in New Jersey.

160.168.    During the relevant period, in addition to its critical role in the Insulin Pricing Scheme, which detrimentally affected all payors and purchasers of the at-issue drugs, Express Scripts also provided PBM services directly to Monmouth County.

161.169.    In addition, during certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. For example, in a February 2014 email released by the U.S. Senate in conjunction with the January 2021 Senate Insulin Report, Eli Lilly describes a "Russian nested doll situation" in which Express Scripts was negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (which later would become part of Express Scripts).[32]

162.170.    At all relevant times, Express Scripts had express agreements with Defendants Eli Lilly, Sanofi, and Novo Nordisk related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as

---

[32] Letter from Joseph B. Kelley to Charles E. Grassley & Ron Wyden, S. Fin. Comm., https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf (last visited Apr. 5, 2024).

agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' pharmacies.

### *OptumRx*

~~163.~~171.    **Defendant UnitedHealth Group, Inc**. **("UnitedHealth Group")** is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

~~164.~~172.    UnitedHealth Group, is a diversified managed healthcare company. Its total revenues in 2022 exceeded $324 billion. In 2021, its revenues exceeded $287 billion. Since 2020, its revenues have increased by more than $30 billion per year. The company currently sits fifth on the Fortune 500 list.[33]

~~165.~~173.    UnitedHealth Group offers a spectrum of products and services, including health insurance plans through its wholly owned subsidiaries and prescription drugs through OptumRx, its PBM. Over one-third of the overall revenues of UnitedHealth Group come from OptumRx, which operates a network of more than 67,000 pharmacies.

~~166.~~174.    UnitedHealth Group, through its executives and employees, is directly involved in the company policies that shape its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin

---

[33] UnitedHealth Group, Inc. Annual Report (Form 10-K) (FYE Dec. 31, 2022).

Pricing Scheme. For example, UnitedHealth Group executives structure, analyze, and direct the company's overarching policies, including as to PBM and mail-order services, as a means of maximizing profitability across the corporate organization.

167.175.    UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies—or drug lists—to ensure people get the right medications. [*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail-order pharmacies] . . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."[34]

168.176.    In addition to being a PBM and a mail-order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM, and the mail-order pharmacies used by approximately 26 million UnitedHealthcare members in the United States, including those in New Jersey. UnitedHealth Group controls the entire drug payment chain for these 26 million Americans.

---

[34] https://www.unitedhealthgroup.com/content/dam/UHG/PDF/sustainability/final/2020_SustainabilityReport.pdf (last visited Aug. 1, 2024).

169.177.    UnitedHealth Group's conduct had a direct effect in New Jersey and damaged Plaintiff.

170.178.    UnitedHealth Group states in its annual reports that UnitedHealth Group "uses Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience." Its 2022 annual report states plainly that it is "involved in establishing the prices charged by retail pharmacies, determining which drugs will be included in formulary listings and selecting which retail pharmacies will be included in the network offered to plan sponsors' members…." As of year-end 2022 and 2021, UnitedHealth Group's "total pharmaceutical manufacturer rebates receivable included in other receivables in the Consolidated Balance Sheets amounted to $8.2 billion and 7.2, respectively," up even from $6.3 billion in 2020."[35]

171.179.    **Defendant Optum, Inc.** is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.

---

[35] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2018); UnitedHealth Group Annual Report (Form 10-K, Ex. 21) (FYE Dec. 31, 2021); UnitedHealth Group Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2022).

~~172.~~180.    Optum, Inc. is, and has been since 2000, registered to do business in New Jersey.

~~173.~~181.    Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in New Jersey and damaged Monmouth County.

~~174.~~182.    For example, according to an Optum, Inc. press release, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payers, life sciences companies and consumers."[36] In this role, Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx,"[37] and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail-order activities.

~~175.~~183.    **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main Street, Irvine, California, 92614.

~~176.~~184.    OptumRx, Inc. operates as a subsidiary of OptumRx Holdings,

---

[36]https://www.sec.gov/Archives/edgar/data/731766/000119312511182325/dex991.htm.
[37] *Id.*

LLC, which, in turn, operates as a subsidiary of Defendant Optum, Inc.

177.185.    OptumRx, Inc. is, and has been since 2001, registered to do business in New Jersey.

178.186.    During the relevant period, OptumRx, Inc. provided the PBM and mail- order pharmacy services in New Jersey that gave rise to the Insulin Pricing Scheme, which damaged Monmouth County.

179.187.    **Defendant OptumInsight, Inc. ("OptumInsight")** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

180.188.    OptumInsight is, and since 1997 has been, registered to do business in New Jersey.

189.    OptumInsight is an integral part of the Insulin Pricing Scheme and, during the relevant time, period coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise the other Defendants as to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

190. **Defendant Emisar Pharma Services LLC** ("Emisar") is a Delaware limited liability company with its principal place of business 1 Optum Circle, Eden Prairie, Minnesota 55344 and operations in the United States and Ireland.

191.  Emisar is a wholly owned indirect subsidiary of UnitedHealth Group Inc.

192.  Optum established Emisar in June 2021 as a GPO for Optum's PBM business. Emisar negotiates rebates with drug manufacturers on behalf of Optum's commercial clients.

181.    During the relevant period, Emisar negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in New Jersey.

182.193.    As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC, and Optum, Inc are directly involved in the conduct of and control OptumInsight's and Optum Rx, Inc.'s operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services to the ultimate detriment of Plaintiff. For example:

    a.    These entities have common officers and directors, including:

      i.    Andrew Witty is the CEO and on the Board of Directors for UnitedHealth Group and previously served as CEO of Optum, Inc.;

      ii.    Dan Schumacher is Chief Strategy and Growth Officer at UnitedHealth Group and is CEO of Optum Insight, having previously served as president of Optum, Inc.;

      iii.    Dirk McMahon is President and COO of UnitedHealth Group. He served as President and COO of Optum from 2017 to 2019 and as CEO of OptumRx from 2011 to 2014.

      iv.    John Rex has been an Executive Vice President and CFO of UnitedHealth Group. since 2016 and previously served in the same roles at Optum beginning in 2012.

v.    Terry Clark is a senior vice president and has served as chief marketing officer at UnitedHealth Group since 2014 while also serving chief marketing and customer officer for Optum.

vi.    Tom Roos has served since 2015 as SVP and chief accounting officer for UnitedHealth Group and Optum, Inc.

vii.    Heather Cianfrocco joined UnitedHealth Group in 2008 and has held numerous leadership positions within the company while today she is CEO of OptumRx.

viii.    Peter Gill has served as SVP and Treasurer for UnitedHealth Group and also as Treasurer at OptumRx, Inc.

ix.    John Santelli led Optum Technology, the leading technology division of Optum, Inc. serving the broad customer base of Optum and UnitedHealthcare and also served as UnitedHealth Group's chief information officer.

x.    Eric Murphy, now retired, was the Chief Growth and Commercial Officer for Optum, Inc. and also was CEO of OptumInsight beginning in 2017.

b.    UnitedHealth Group directly or indirectly owns all the stock of Optum, Inc., OptumRx, Inc., ~~and~~ OptumInsight, and Emisar;

c.    The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group present its subsidiaries, including Optum, Inc., OptumRx, Inc., and OptumInsight as divisions, departments, or "segments" of a single company that is "a diversified family of businesses" and that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this

54

corporate family reflect these public statements. These entities constitute a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.[38]

d.    All executives of Optum, Inc., OptumRx, Inc., ~~and~~ OptumInsight, and Emisar ~~–~~ultimately report to the executives, including the CEO, of UnitedHealth Group.

e.    As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc., OptumRx, Inc., and OptumInsight, and Emisar that gave rise to Plaintiff's claims.

~~183.~~194.    Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., ~~and~~ Optum, Inc., and Emisar, including all predecessor and successor entities, are collectively referred to as "OptumRx."

~~184.~~195.    OptumRx is named as a Defendant in its capacities as a PBM, rebate aggregator, and mail-order pharmacy.

~~185.~~196.    OptumRx is a pharmacy benefit manager and, as such, coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these Manufacturers'

---

[38] UnitedHealth Group, Quarterly Report (Form 10-Q) (Mar. 31, 2017).

diabetes medications on OptumRx's drug formularies.

186.197.    OptumRx provides pharmacy care services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities. It is one of UnitedHealth Group Inc.'s "four reportable segments" (along with UnitedHealthcare, Optum Health, and OptumInsight).

187.198.    In 2022, OptumRx managed $124 billion in pharmaceutical spending.[39]

188.199.    For the years 2018-2022, OptumRx managed $91 billion, $96 billion, $105 billion, $112 billion, and $124 billion in pharmaceutical spending, respectively.[40]

189.200.    In 2019, OptumRx's revenue (excluding UnitedHealthcare) totaled $74 billion. By 2022, it had risen to more than $99 billion.[41]

190.201.    At all relevant times, OptumRx derived substantial revenue providing pharmacy benefits in New Jersey.

191.202.    During the relevant period, OptumRx made representations and omissions to Monmouth County through proposals to provide PBM services in

---

[39]  UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2022).

[40] *Id.*

[41] *Id.*

response to Plaintiff's requests for proposals. In doing so, OptumRx Caremark reinforced the false list prices for the at-issue drugs generated by the Insulin Pricing Scheme.

~~192.~~203.    At all relevant times, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in New Jersey. Those formularies included diabetes medications, including all of those at issue in this Complaint. Those formularies included diabetes medications, including those at issue in this action. OptumRx purchased drugs directly from manufacturers for dispensing through its pharmacy network.

~~193.~~204.    At all relevant times, and contrary to its express representations, OptumRx knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

~~194.~~205.    At all relevant times, OptumRx concealed its critical role in the generation of those false list prices.

~~195.~~206.    In its capacity as a mail-order pharmacy with a contracted network of retail pharmacies, OptumRx received payments from payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

~~196.~~207.    At all relevant times, OptumRx dispensed the at-issue

medications nationwide and in New Jersey through its mail-order pharmacies and derived substantial revenue from these activities in New Jersey.

197.208.    OptumRx purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail-order pharmacies and network of retail pharmacies.

198.209.    At all relevant times, OptumRx had express agreements with Eli Lilly, Sanofi, and Novo Nordisk related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx pharmacies.

## III.   JURISDICTION AND VENUE

### A.   Subject-Matter Jurisdiction

199.210.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367.

### B.   Personal Jurisdiction

200.211.    This Court has personal jurisdiction over each Defendant. Each Defendant: (a) transacts business and/or is admitted to do business within New Jersey; (b) maintains substantial contacts in New Jersey, and (c) committed the

violations of federal statutes, New Jersey statutes, and common law at issue in this action in whole or part within the State of New Jersey. This action arises out of and relates to each Defendant's contacts with this forum. The Insulin Pricing Scheme has been directed at, and has had the foreseeable and intended effect of causing injury to persons residing in, located in, or doing business in New Jersey, including Plaintiff. All of the at- issue transactions occurred in New Jersey and/or involved New Jersey residents.

201.212.    Each Defendant purposefully availed itself of the privilege of doing business within this State, including within this District. And each derived substantial financial gain from doing so. These continuous, systematic, and case-related business contacts—including the tortious acts described herein—are such that each Defendant should reasonably have anticipated being brought into this Court.

202.213.    Each Defendant submitted itself to jurisdiction through, among other things, pervasive marketing, encouraging the use of its products or services, and its purposeful cultivation of profitable relationships within the State of New Jersey.

203.214.    In short, each Defendant has systematically served a market in New Jersey relating to the Insulin Pricing Scheme and has caused injury in New Jersey such that there is a strong relationship among Defendants, this forum, and the litigation.

204.215.    This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

205.216.    This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the Court in a single action for a single trial.

### C.    Venue

206.217.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District and because a substantial part of the events or omissions giving rise to this action took place, or had their ultimate injurious impact, within this District. In particular, at all times during the relevant period, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold diabetes medications, or published prices of the at issue drugs in this District and caused injury to Plaintiff in this District.

207.218.    Venue is also proper in this District pursuant to 18 U.S.C. § 1965 because all Defendants reside, are found, have an agent, or transact their affairs in

this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## IV.   ADDITIONAL FACTUAL ALLEGATIONS

### A.   Diabetes and Insulin Therapy

#### 1. The Diabetes Epidemic

~~208.~~219.   Diabetes occurs when a person's blood glucose is too high. In people without diabetes, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to blood glucose. When insulin is lacking or when cells stop responding to insulin, however, blood sugar stays in the bloodstream. Over time, this can cause serious health problems, including heart disease, blindness, and kidney disease.

~~209.~~220.   There are two basic types of diabetes: Type 1 and Type 2. Approximately 5-10% of diabetics are Type 1, which occurs when a person's pancreas does not make—or makes very little—insulin. Those with Type 1 diabetes are treated with insulin injections and other diabetes drugs.

~~210.~~221.   Roughly 90-95% of diabetics are Type 2, which develops when a person does not produce enough insulin or has become resistant to the insulin they produce. Although Type 2 patients can initially be treated with tablets, most patients eventually must switch to insulin injections.

~~211.~~222.   Diabetes has been on the rise for decades. In 1958, only 1.6 million Americans had diabetes. By the turn of the century, however, that number

had grown to over ten million. Fourteen years later, that number had tripled. Today, more than 38 million Americans—approximately 12% of the country—live with the disease.

~~212.~~223.    Nearly 750,000 New Jerseyans—over 10% of the adult population—have diabetes.[42] In Monmouth County, approximately 7% of adults are living with diabetes.[43].

### 2.  Insulin: A Century-Old Drug

~~213.~~224.    Even though diabetes is the eighth leading cause of death in the United States, it is a treatable disease and has been for a century. Patients who follow a prescribed treatment plan consistently avoid severe health complications associated with the disease.

~~214.~~225.    In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. Banting and Best obtained a patent and then sold their patent rights to the University of Toronto for $1, reasoning that "[w]hen the details of the method of preparation are published anyone would be free

---

[42] *Id.*

[43] New Jersey Dep't of Health, New Jersey State Health Assessment Data, *available at* https://www-doh.nj.gov/doh-shad/indicator/view/DiabetesPrevalence.County.html (last visited Aug. 1, 2024)

to prepare the extract, but no one could secure a profitable monopoly."[44] Banting

stated further that "[i]nsulin does not belong to me, it belongs to the world."[45]

215.226.     After purchasing the patent, the University of Toronto contracted

with Defendants Eli Lilly and Novo Nordisk to scale its production. Under this

arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on

variations to the manufacturing process.

216.227.    The earliest insulin was derived from animals and, until the

1980s, was the only treatment for diabetes. Although effective, animal-derived

insulin created the risk of allergic reaction. This risk was reduced in 1982 when

synthetic insulin—known as human insulin because it mimics the insulin humans

make—was developed by Eli Lilly.  Compared to animal-derived insulin, human

insulin is cheaper to mass produce and causes fewer allergic reactions. Eli Lilly

marketed this insulin as Humulin.  The development of human insulin benefited

heavily from government and non-profit funding through the National Institutes of

Health and the American Cancer Society.

217.228.     In the mid-1990s, Eli Lilly introduced the first analog insulin—a

laboratory-grown and genetically altered insulin. These altered forms of human

---

[44] Michael Bliss, *The Discovery of Insulin* (2013).

[45] *Id.*

insulin are called "analogs" because they are analogous to the human body's natural pattern of insulin release and more quickly lower blood sugar. Eli Lilly released this analog in 1996 under the brand name Humalog at a cost of $21 per vial (equivalent to $40 in 2022).

218.229.    Other rapid-acting analogs include Novo Nordisk's Novolog and Sanofi's Apidra, which have similar profiles. Rapid-acting insulins are used in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

219.230.    The Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

220.231.    In 2015, Sanofi introduced Toujeo, another long-acting insulin similar to Lantus. Toujeo, however, is highly concentrated, reducing injection volume as compared to Lantus.

221.232.    In December 2015, Eli Lilly introduced Basaglar—a long-acting insulin that is biologically similar to Sanofi's Lantus.

222.233.    Most insulin presently used in the United States is analog insulin and not human insulin. In 2000, 96% of insulin users used human insulin versus 19% using analog insulin. By 2010, the ratio had switched; only 15% of patients used human insulin while 92% used analog insulin. In 2017, for example, less than 10% of the units of insulin dispensed under Medicare Part D were human insulins.

223.234.    Even though insulin was first extracted 100 years ago, and despite its profitability, Eli Lilly, Novo Nordisk, and Sanofi still make nearly all of the insulin sold in the United States. This did not happen by chance.

224.235.    Many of the at-issue medications are now off-patent. The Manufacturers maintain market domination through patent "evergreening." Drugs usually face generic competition when their 20-year patents expire. While original insulin formulas may technically be available for generic use, the Manufacturers "stack" patents around the original formulas, making new competition riskier and more costly. For example, Sanofi has filed more than 70 patents on Lantus—more than 95% of which were filed after the drug was approved by the FDA—potentially providing more than three additional decades of patent "protection" for the drug. The market therefore remains concentrated.

225.236.    In 2021, the U.S. House of Representatives Committee on Oversight and Reform issued a report following its investigation into drug pricing ("Drug Pricing Investigation").[46] It expressly included inquiry into the Manufacturer Defendants' insulin pricing strategies,[47] and concluded: "Every company in the

---

[46] *Drug Pricing Investigation: Majority Staff Report*, Comm. on Oversight and Reform, U.S. H.R., Dec. 2021, https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf (last visited Apr. 24, 2024).

[47] *Id.* at PDF 4, n.5.

Committee's investigation engaged in one or more strategies to suppress competition from generics or biosimilars, and keep prices high."[48] It continued:

> Insulin manufacturers have also used secondary patents to extend their market monopolies. A 2020 study by the State of Colorado found, "Many insulin products have received additional patents, exclusivities, and extensions, adding decades of protection and monopoly prices." According to this study, secondary patents enabled Eli Lilly to add 17 years of protection for Humalog, Novo Nordisk to add 27 years of protection for NovoLog, and Sanofi to add 28 years of protection for Lantus.[49]

### 3. The Current Insulin Landscape

226.237.    Although insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions about whether the overall efficacy of insulin has significantly improved over the last 20 years.

227.238.    For example, while long-acting analogs may have certain advantages over human insulins (e.g., they provide greater flexibility around mealtime planning), it has yet to be shown that analogs lead to better long-term outcomes. Recent work suggests that older human insulins may work as well as newer analog insulins for patients with Type 2 diabetes.

228.239.    Moreover, all insulins at issue in this case have either been

---

[48] *Id.* at PDF 13.

[49] *Id.* at PDF 103.

available in the same form since the late 1990s or early 2000s or are biologically

equivalent to insulins that were available then.

~~229.~~240.    As explained in the Journal of the American Medical Association

by Dr. Kasia Lipska, an endocrinologist at the Yale School of Medicine and Clinical

Investigator at the Yale-New Haven Hospital Center for Outcomes Research and

Evaluation:

> We're not even talking about rising prices for better products here.
> I want to make it clear that we're talking about rising prices for the
> same product . . . . [T]here's nothing that's changed about
> Humalog. It's the same insulin that's just gone up in price and now
> costs ten times more.[50]

~~230.~~241.    Moreover, production costs have decreased in recent years. A

September 2018 study in BMJ Global Health calculated that, based on production

costs, a reasonable and profitable price for a *one-year supply* of human insulin is

between $48 and $71 per person and between $78 and $133 for analog insulin.

Another recent study found that the Manufacturers could be profitable charging as

little as $2 per vial.[51] A third study, based on data collected through 2023, concluded

that sustainable cost-based prices "for treatment with insulin in a reusable pen device

could cost as little as $96 (human insulin) or $111 (insulin analogues) *per year* for a

---

[50] Natalie Shure, *The Insulin Racket,* AMERICAN PROSPECT (June 24, 2019),
https://prospect.org/health/insulin-racket/ (last visited Apr. 24, 2024).

[51] Gotham D, Barber MJ, Hill A., Production costs and potential prices for biosimilars
of human insulin and insulin analogues. BMJ GLOBAL HEALTH 2018;3:e000850.

basal-bolus regimen, $61 *per year* using twice-daily injections of mixed human insulin, and $50 (human insulin) or $72 (insulin analogues) *per year* for a once-daily basal insulin injection (for type 2 diabetes), including the cost of injection devices and needles."[52]

231.242.    Yet, in 2016, diabetics spent an average of $5,705 for insulin. According to a 2020 RAND report, the 2018 list price per vial across all forms of insulin was just $14.40 in Japan, $12.00 in Canada, $11.00 in Germany, $9.08 in France, $7.52 in the United Kingdom, and less than $7.00 in Australia—versus $98.70 in the United States.[53]

232.243.    RAND issued an updated report in 2024 using 2022 data. In its report, RAND explained that the gross (or list) price of insulin in the United States had "increased dramatically since the early 2010s in the United States."[54] The report pointed to studies showing that "manufacturer gross prices increased annually by an

---

[52] Melissa J. Barber, *et al.*, *Estimated Sustainable Cost-Based Prices for Diabetes Medicines*, JAMA NETWORK: OPEN, Mar. 27, 2024.

[53] *The Astronomical Price of Insulin Hurts American Families*, RAND (Jan. 6, 2021), https://www.rand.org/blog/rand-review/2021/01/the-astronomical-price-of-insulin-hurts-american-families.html (last visited Apr. 24, 2024).

[54] Andrew W. Mulcahy, Daniel Schwam, *Comparing Insulin Prices in the United States to Other Countries*, RAND Corporation at 1.

average of 13 percent from 2007 to 2018," which was "far above general inflation over the same periods."[55]

~~233.~~244.    The RAND report again found that insulin prices in the United States far exceeded insulin prices abroad. RAND found that U.S. manufacturer gross prices were 971% (or 9.71 times) higher than in the 33 countries who belong to the Organisation for Economic Co-operation and Development (OECD) combined.[56] In other words, insulin in the United States was more than nine times higher than in 33 middle- to high-income comparison countries.[57] Once rebates and other discounts were applied, net prices in the United States remained 2.33 times higher than in the OECD countries.[58] The gross price is the price paid by patients who are uninsured, in the deductible phase of their plan, or otherwise paying out-of-pocket for insulin.[59]

~~234.~~245.    Whereas research and development (also known as R&D) costs often contribute significantly to the price of a drug, the initial basic insulin research—original drug discovery and patient trials—occurred 100 years ago, and those costs have long since been recouped. And even recent costs, such as developing the

---

[55] *Id.*

[56] *Id.* at v, 22, 30.

[57] *Id.*

[58] *Id*. at v, 28, 30.

[59] *Id*. at vi.

recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago. In recent years, the lion's share of R&D costs is incurred in connection with the development of new insulin-related *devices and equipment*—not in connection with the drug formulations themselves.

235.246.    The House Committee on Oversight and Reform also found that R&D costs "d[id] not justify price increases." According to the Committee, "when drug companies did invest in R&D, those expenditures often went to research designed to protect existing market monopolies." The Committee also found that "drug companies often invested in development only after other research—much of it federally funded—demonstrated a high likelihood of financial success."

236.247.    In response to rising scrutiny, the Manufacturer Defendants recently announced limited pricing changes and out-of-pocket limits. On March 1, 2023, Eli Lilly announced that it would cap the prices of certain insulin medications at $35 per month, with additional reductions to follow later in the year. Specifically, Eli Lilly promised that it would list its Lispro injection at $25 per vial effective May 1, 2023, and slash the price of its Humalog and Humulin injections by 70% beginning in the fourth quarter of 2023. The price reductions to date are limited to these medications and do not apply to other Eli Lilly diabetes medications like Trulicity and Basaglar. These decisions indicate that, prior to March 1, 2023, the prices of these medications had not been raised to cover costs of research and development,

manufacture, distribution, or any other necessary expense.

237.248.    Two weeks after Eli Lilly announced that it would be implementing pricing changes, on March 14, 2023, Novo Nordisk announced that it would also lower the U.S. list prices of several insulin products by up to 75%—specifically, Levemir, Novolin, NovoLog, and NovoLog Mix 70/30. Novo Nordisk will also reduce the list price of unbranded biologics to match the lowered price of each respective branded insulin. The price reductions to date are limited to these medications and do not apply to other Novo Nordisk diabetes medications like Victoza and Ozempic. These changes went into effect on January 1, 2024, and, as with Eli Lilly's price reduction, indicate that the prices of these medications before that date were not increased to cover costs of research and development, manufacture, distribution, or any other necessary expense.

238.249.    Two days later, on March 16, 2023, Sanofi followed suit and announced that it would also cap the out-of-pocket cost of its most popular insulin, Lantus, at $35 per month for people with private insurance, effective January 1, 2024, and lower the list price of Lantus by 78% and Apidra, its short-acting insulin, by 70%. Sanofi already capped the price of Lantus at $35 for patients without insurance. The price reductions to date are limited to these medications and do not apply to other Sanofi diabetes medications like Toujeo and Soliqua. Sanofi's decisions, like Eli Lilly's and Novo Nordisk's, indicate that the prices of Sanofi's medications before

71

January 1, 2024, were not raised to cover costs of research and development, manufacture, distribution, or any other necessary expense.

~~239.~~250.    These three announcements (the "Price Cuts") are limited, prospective, and do not mitigate damages already incurred by payors like Plaintiff.

~~240.~~251.    The Price Cuts are limited to certain insulin medications, and do not encompass all at-issue medications. As part of the Insulin Pricing Scheme, PBMs provide preferred formulary placement to the most expensive insulins based on list prices. Accordingly, the Insulin Pricing Scheme will proceed, with the PBMs continuing to target the most expensive at-issue medications, which will likely be the at-issue medications not included in the Price Cuts.

~~241.~~252.    The Price Cuts are woefully insufficient. An Eli Lilly spokeswoman has represented that the current list price for a ten-milliliter vial of the fast-acting, mealtime insulin Humalog will drop to $66.40 from $274.70, and a ten-milliliter vial of Humulin will fall from $148.70 to $44.61.[60] These prices far exceed the Manufacturer Defendants' costs and remain significantly higher than prices for the same and similar drugs in other countries.

~~242.~~253.    To make matters worse, on November 8, 2023, before the 65%

_____

[60] Tom Murphy, *Lilly plans to slash some insulin prices, expand cost cap*, AP NEWS (Mar. 2, 2023) (available at https://apnews.com/article/insulin-diabetes-humalog-humulin-prescription-drugs-eli-lilly-lantus-419db92bfe554894bdc9c7463f 2f3183)

price cut for its long-acting insulin Levemir had taken effect, Novo Nordisk announced that it would be *discontinuing* Levemir in the United States, citing manufacturing constraints, formulary-placement issues, and "alternative treatments" for patients. Levemir is the *only* branded, long-acting insulin product for which Novo Nordisk announced a list price reduction and the *only* long-acting insulin FDA-approved for pregnancy. Yet, Novo Nordisk is discontinuing Levemir—before allowing the price reduction to take effect—with supply disruptions beginning in early 2024, followed by formal discontinuation of the Levemir FlexPen vial by the end of 2024.

### 4. Insulin Adjuncts: Type 2 Medications

243.254.    Over the past fifteen years, the Manufacturer Defendants have released several non-insulin medications that help control insulin levels. In 2010, Novo Nordisk released Victoza, and, thereafter, Eli Lilly released Trulicity, and Sanofi released Soliqua. Novo Nordisk further expanded their GLP-1 patent portfolio with the approval of Xultophy and Ozempic.[61] In 2022, Eli Lilly received approval for another GLP-1, Mounjaro. Each of these medications can be used in conjunction with insulins to control diabetes.

---

[61] Victoza, Trulicity, Ozempic, and Mounjaro are glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone produced in the body. Soliqua and Xultophy are combination long-acting insulin and GLP-1 drugs.

244.255.    The Manufacturers negotiate rebates and other fees with the PBMs for "bundles" of insulin and GLP-1 receptor agonist (GLP-1) medications, packaging them as a single class of diabetes medications. This practice is known as "bundling."

245.256.    The Manufacturer Defendants bundle medications to gain formulary access for multiple drugs in exchange for increased Manufacturer Payments to the PBMs.

246.257.    In 2013, Novo Nordisk tied its "exclusive" rebates for insulin to formulary access for GLP-1 medication, Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. In order to qualify for the exclusive rebate, the plans would also need to list Victoza on their formulary, exclude all competing insulin products, and ensure existing patients switch from competitor diabetes medications.[62]

247.258.    Upon information and belief, all Manufacturer Defendants negotiate the prices of insulin and GLP-1 medications through bundling.

248.259.    The first GLP-1 was approved by the FDA in 2005 and was indicated for the treatment of Type 2 diabetes. Currently, the GLP-1 market is

---

[62] Senate Insulin Report at 78, 79.

consolidated among a limited number of patent-holding entities, with Manufacturer Defendants Eli Lilly, Novo Nordisk, and Sanofi controlling much of this market.

249.260.    Through extensive patents and regulatory exclusivities, the Manufacturer Defendants have effectively barricaded competition from the GLP-1 market, giving them the ability to exercise comprehensive control over the price of GLP-1 medications.

250.261.    To date, no generic alternative exists for any GLP-1 medication. The Manufacturer Defendants will continue to enjoy patent protection of their respective GLP-1 agonist molecules through at least 2030, if not later.[63]

251.262.    Novo Nordisk developed and sells three GLP-1 drugs indicated for Type 2 diabetes: Victoza (liraglutide), Xultophy (insulin degludec/liraglutide), and Ozempic (semaglutide). Novo Nordisk holds 62 patents related to semaglutide and liragutide, 46 of which are device patents unrelated to the therapeutic molecule of the GLP-1.[64]

252.263.    Eli Lilly developed and sells two GLP-1 drugs indicated for Type 2 diabetes: Trulicity (dulaglutide) and Mounjaro (tirzepatide/GIP). Eli Lilly

---

[63] Rasha Alhiary, *et al.*, *Patents and Regulatory Exclusivities on GLP-1 Receptor Agonists*, J. OF THE AM. MED. ASS'N, Vol. 33o, at 650-57 (2023).

[64] Rasha Alhiary, *et al.*, *Delivery Device Patents on GLP-1 Receptor Agonists*, J. OF THE AM. MED. ASS'N, Vol. 331, at 794-796 (2024).

holds 18 patents related to dulaglutide and tirzepatide. Of the four patents related to tirzepatide, two are device patents unrelated to the therapeutic molecule of the GLP-1. Eli Lilly has applied for 78 patents related to dulaglutide, 17 of which have been granted to date.[65]

253.264.   Sanofi developed Adylxin (lixisenatide) and Soliqua (insulin glargine/lixisenatide) but currently only sells Soliqua in the United States. Sanofi holds 42 patents related to lixisenatide, 29 of which are device patents unrelated to the therapeutic molecule of the GLP-1.[66]

254.265.   This patent stacking and evergreening ensures that generic and other branded GLP-1 cannot enter the market and gives Novo Nordisk, Eli Lilly, and Sanofi disproportionate pricing power over GLP-1 medications.

255.266.   In addition to the limited competition in the GLP-1 landscape, the Manufacturer and PBM Defendants use this disproportionate pricing power to inflate the prices of GLP-1s, consistent with the broader Insulin Pricing Scheme.

---

[65] *Id.*

[66] *Id.*

**Figure 4: List and net prices of GLP-1 agonists**



256.267.    Counterintuitively, list and net prices increased as more GLP-1 medications were approved and introduced, as shown above. Between 2007 and 2017, the average list price of GLP-1s rose 15% per year despite the introduction of competing brands. The net price increased an average of 10% per year during the same time period.[67]

257.268.    The PBM Defendants are also central to these untethered price increases. As shown in the chart above, the growing disconnect between the list and net prices of these drugs further demonstrates the PBM Defendants' ill-gotten gains

---

[67] Ameet Sarpatwari, *et al.*, *Diabetes Drugs: List Price Increases Were Not Always Reflected In Net Price; Impact Of Brand Competition Unclear*, HEALTH AFFAIRS, Vol. 40, at 772-78 (2021).

through identical methods to those employed with respect to insulin in the Insulin Pricing Scheme.

258.269.    The absence of generics in the GLP-1 market allows the Manufacturers to keep prices artificially high. PBMs then realize the benefit of these artificially high prices through manufacturer payments in exchange for formulary placement. PBMs and Manufacturers are thus incentivized to increase prices or maintain high, untethered prices for GLP-1s.

259.270.    Like insulin, GLP-1s are significantly more expensive in the United States than in other countries, indicating that the increasing prices of GLP-1s are untethered to any legal, competitive, or fair market price. For example, in 2023, the list price for a one-month supply of Ozempic was about $936 in the United States—compared to $147 in Canada, $103 in Germany, $93 in the United Kingdom, $87 in Australia, and $83 in France.

260.271.    In 2018, Victoza's list price in the United States was more than double its average list price in 11 comparable countries and Trulicity's list price in the United States was more than six times its average list price in 11 comparable countries. One study found that drug companies could profitably sell certain GLP-1s, including Ozempic, for $0.89-$4.73 per month.

261.272.    In March 2024, PBM Defendant Evernorth entered into a financial guarantee agreement for GLP-1 spend with Manufacturer Defendants Novo Nordisk and Eli Lilly to limit the annual cost increase of GLP-1s to 15%.[68]

262.273.    Like the caps put in place for insulins, the agreement among Evernorth, Eli Lilly, and Novo Nordisk indicates that the prices of GLP-1s before March 2024 were not raised to cover costs of R&D, manufacturing, distribution, or any other necessary expense. Such cost caps and savings guarantees indicate that the increasing price of GLP-1s were untethered to any legal, competitive, or fair market price. Additionally, this agreement is prospective and does not mitigate damages already incurred by payors like Plaintiff.

263.274.    The following is a table of diabetes medications at issue in this lawsuit:

---

[68] Evernorth Health Services, Mar. 7, 2024 https://www.evernorth.com/articles/evernorth-announces-industry-first-financial-guarantee-glp-1-spend

| Insulin Type | Action | Name | Mfr. | FDA Appr. | Current/Recent List Price |
|---|---|---|---|---|---|
| **Human** | *Rapid-Acting* | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | *Intermediate* | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| **Analog** | *Rapid-Acting* | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | *Pre-mixed* | Humalog 50/50 | Eli Lilly | 1999 | $93 (vial) $180 (pens) |
| | | Humalog 75/25 | Eli Lilly | 1999 | $99 (vial) $140 (pens) |
| | | Novolog 70/30 | Novo Nordisk | 2001 | $203 (vial) $246 (pens) |
| | *Long-Acting* | Lantus | Sanofi | 2000 | $340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $370 (vial) $555 (pens) |

| | | Basaglar (Kwikpen) | Eli Lilly | 2015 | $392 (pens) |
|---|---|---|---|---|---|
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| **Type 2 Medications** | *GLP-1* | Trulicity (Dulaglutide) | Eli Lilly | 2014 | $1013 (pens) |
| | | Mounjaro (Tirzepatide/GIP) | Eli Lilly | 2022 | $1068 (pens) |
| | | Victoza (Liraglutide) | Novo Nordisk | 2010 | $813 (2 pens) $1220 (3 pens) |
| | | Xultophy (insulin degludec/liraglutide) | Novo Nordisk | 2016 | $1295 (pens) |
| | | Ozempic (Semaglutide) | Novo Nordisk | 2017 | $1022 (pens) |
| | | Rybelsus (semaglutide tablets) | Novo Nordisk | 2019 | $1029 (30 day supply) |
| | | Adlyxin (lixisenatide) | Sanofi | 2016 | Discontinued 2023 |
| | | Soliqua (insulin glargine/lixisenatide) | Sanofi | 2016 | $928 (pens) |

## B.    The Dramatic Rise in U.S. Prices for Diabetes Medications

~~264.~~275.    Over the past 25 years, the list price of certain insulins has

increased by more than 1,000% (10x). By comparison, $165 worth of consumer

goods and services in 1997 dollars would, in 2021, have cost $289 (1.75x).[69]

265.276.    Since 1997, Eli Lilly has raised the list price of a vial of Humulin R (500U/mL) from $165 to $1,784 in 2021 (10.8x).

**Figure 5: Rising list prices of Humulin R (500U/mL) from 1997-2021**



266.277.    Since 1996, Eli Lilly has raised the price for a package of Humalog pens from less than $100 to $663 (6.6x) and from less than $50 per vial to $342 (6.8x).

---

[69] https://www.bls.gov/data/inflation_calculator.htm (last visited July 3, 2023). The Consumer Price Index (CPI) measures "the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services." (https://www.bls.gov/cpi/).

**Figure 6: Rising list prices of Humalog vials and pens, 1996-2021**



267.278.    From 2006 to 2020, Novo Nordisk has raised Levemir's list price from $162 to $555 (3.4x) for pens and from under $100 to $370 per vial (3.7x).

**Figure 7: Rising list prices of Levemir, 2006-2021**



268.279.    From 2002 to 2021, Novo Nordisk raised Novolog's list price

from $108 to $671 (6.2x) for a package of pens and from less than $50 to $347 (6.9x) per vial.

**Figure 8: Rising list prices of Novolog vials and pens, 2002-2021**



269.280.    Sanofi has kept pace. It manufactures a top-selling analog insulin—Lantus—which has been and remains a flagship brand for Sanofi. Lantus has been widely prescribed nationally and within New Jersey, including to Plaintiff's Beneficiaries. Sanofi has raised the list prices for Lantus from less than $200 in 2006 to more than $500 in 2020 (2.5x) for a package of pens and from less than $50 to $340 per vial (6.8x).

**Figure 9: Rising list prices of Lantus vials and pens, 2001-2021**



270.281.    The Manufacturer Defendants have similarly increased the prices for non-insulin diabetes medications.

271.282.    Driven by these price hikes, payors' and diabetics' spending on these drugs has significantly increased, with totals in the tens of billions of dollars.

272.283.    In addition, the timing of the price increases demonstrates that the Manufacturers have not only dramatically increased prices for the at-issue treatments, but have also done so in lockstep.

273.284.    Between 2009 and 2015, for example, Sanofi and Novo Nordisk raised the list prices of their insulins in tandem 13 times, taking the same price increase down to the decimal point within days of each other (sometimes within a

few hours).[70]

274.285.    This practice, through which competitors communicate their intention not to price-compete against one another, is known as "shadow pricing."

275.286.    In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs represented the highest drug price increases in the pharmaceutical industry.

276.287.    Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 10 demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 11 demonstrates this behavior with respect to Novolog and Humalog.

---

[70] Senate Insulin Report at 53-54.

**Figure 10: Rising list prices of long-acting insulins**



**Figure 11: Rising list prices of rapid-acting insulins**



277.288.    Figure 12 demonstrates this behavior with respect to the human

insulins—Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 12: Rising list price increases for human insulins**



278.289.   Figure 13 below demonstrates Novo Nordisk and Eli Lilly's lockstep price increases for their Type 2 drugs Trulicity, Victoza, and Ozempic.

**Figure 13: Rising list prices of Type 2 drugs**



279.290.    Figures 14 and 15 below show how the Manufacturers have raised

the prices of insulin products in near-perfect unison.[71]

**Figures 14 and 15: Lockstep insulin price increases**





280.291.    There is clear evidence that these lockstep price increases were

carefully coordinated to preserve formulary placement for the at-issue drugs and to

---

[71]    https://www.pharmaceutical-technology.com/features/insulin-pricing-could-an-
e-commerce-approach-cut-costs/?cf-view&cf-closed

allow greater rebates to the PBMs, and further illustrate the perverse economics of competing by increasing prices in lockstep.

281.292.     Eli Lilly, for example. was not inclined to lower prices of its insulin products to compete with the other drug makers. Documents produced to the House Committee on Oversight and Reform[72] show that Eli Lilly regularly monitored competitors' pricing activity and viewed competitors' price increases as justification to raise the prices of their own products. On May 30, 2014, a senior vice president at Eli Lilly sent a proposal to Enrique Conterno—then-President of Lilly Diabetes—for June 2014 price increases for Humalog and Humulin. The executive reported that Novo Nordisk had just executed a 9.9% price increase across its insulin portfolio. Mr. Conterno remarked, "While the list price increase is higher than we had planned, I believe it makes sense from a competitive perspective." Eli Lilly took a 9.9% price increase shortly thereafter, on June 5, 2014.

282.293.     Six months later, on November 19, 2014, Mr. Conterno reported to then-CEO John Lechleiter that Novo Nordisk had taken another 9.9% price increase on NovoLog—the direct competitor to Eli Lilly's Humalog. Mr. Conterno wrote, "[a]s you are aware, we have assumed as part of our business plan a price increase of 9.9% for Humalog before the end of the year." The following Monday—

---

[72] Drug Pricing Investigation at PDF 162.

just days after Mr. Conterno's initial email to the CEO—Eli Lilly took price increases of 9.9% on all Humalog and Humulin products.

283.294.    Sanofi also closely monitored competitors' pricing activity and planned its own pricing decisions around Eli Lilly's and Novo Nordisk's price increases. Executives knew that Sanofi's long-acting insulin competitors— particularly Novo Nordisk—would match its pricing actions on long-acting insulin. In internal documents, Sanofi leaders welcomed competitors' price increases because they allowed Sanofi to claim it was maintaining pricing "parity" with competitors.

284.295.    Sanofi had no incentive or intention to compete to lower its insulin pricing. For example, on November 7, 2014, Sanofi executed a price increase of approximately 12% across its family of Lantus products. The following week, a Sanofi senior vice president sent an email asking, "[d]id Novo increase the price of Levemir following our price increase on Lantus last week? I just want to confirm we can still say that Lantus and Levemir are still priced at parity on a WAC [wholesale acquisition cost] basis." The head of Sanofi pricing responded that Novo Nordisk had not yet taken the price increase, but noted, "[o]ver the past four price increases on Lantus they have typically followed within 1 month." Novo Nordisk raised the price of Levemir by 12% the following week.

285.296.    An internal Sanofi chart shows that, between April 2013 and November 2014, each time Sanofi raised the price of Lantus, Novo Nordisk followed

suit for Levemir:

**Figure 16: Sanofi price-tracking**



286.297.    The Manufacturers used their competitors' price increases as justification for their own increases.  For example, before taking price increases on Lantus, Sanofi compared the new list price to the prices of competitor products. In an April 2018 email exchange about accelerating and increasing previously planned price increases for Lantus and Toujeo (from July to April, and from 3% on Lantus to 5.3%), one senior director requested, "[p]lease confirm how the new WAC of Lantus/Toujeo would compare with the WAC of Levemir/Tresiba." In reply, another senior Sanofi leader provided a chart comparing Sanofi prices to those of its competition.

287.298.    Sanofi also engaged in shadow pricing with its rapid-acting

insulin products, including Apidra. Sanofi was not the market leader in the fast-acting insulin space and typically did not act first to raise prices. But when its competitors raised prices on their fast-acting insulins, Sanofi quickly followed suit. As a Sanofi slide deck explained: "Over the past three years, we have executed a 'fast follower' strategy for Apidra and have executed price increases only after a price increase was announced."

288.299.    In December 2018, Sanofi's director of strategic pricing and planning emailed diabetes and cardiovascular pricing committee members seeking approval for across-the-board price increases for its rapid- and long-acting insulin products, including Lantus, Toujeo, and Apidra. The then-Senior Vice President and Head of Sanofi's North America General Medicines group forwarded the proposal to the then-Senior Vice President and Head of Sanofi's External Affairs and inquired, "[p]rior to my approval, just confirming that we are still on for these." The Head of Sanofi's External Affairs wrote back, "Yes. As of now I don't see any alternative. Not taking an increase won't solve the broader policy/political issues, and based on intel, believe many other manufacturers plan to take increases next year as well." He added, "[s]o while doing it comes with high political risk, I don't see any political upside to not doing it."

289.300.    Although Sanofi generally led price increases in the long-acting insulin market with its pricing for Lantus, Novo Nordisk often led in the rapid-acting

market with NovoLog. On May 8, 2017, Novo Nordisk CEO Lars Jorgenson learned that Eli Lilly had raised U.S. list prices by approximately 8% across its injectable diabetes drug portfolio. Mr. Jorgenson emailed this information to a Novo Nordisk executive and asked, "[w]hat is our price increase strategy?" The executive responded, "[Eli Lilly] followed our increase on NovoLog, so we're at parity here, so no action from us. They led with Trulicity and based on our strategy, we will follow which will likely be on June or July 1st."

290.301.    Further illustrating the anticompetitive scheme between the Manufacturers, rather than compete by lowering prices, Sanofi raised Lantus's list price to respond to rebate and discount competition from Novo Nordisk. Novo Nordisk manufactures two long-acting insulins called Levemir and Tresiba, as well as two rapid-acting insulins, NovoLog and Fiasp. In the long-acting insulin category, Sanofi's Lantus and Novo Nordisk's Levemir often compete to win the same accounts. According to internal memoranda, in 2013 Sanofi believed that Novo Nordisk was attempting to minimize the clinical difference between Lantus, and Levemir and was offering "increased rebates and/or portfolio offers for the sole purpose of removing Lantus from favorable formulary access." According to an internal Sanofi memo, "the strategy to close the price differential between the Lantus vial and pen before the LOE [loss of exclusivity] period was believed to be critical to the overall long-term success of the franchise."

291.302.    At the time, Sanofi faced increased pressure from its PBM clients to offer more generous rebates and price protection terms or face exclusion from formularies, developments that were described as "high risk for our business" that had "quickly become a reality." This market environment created an enormous challenge for Lantus and, in order to protect its flagship diabetes franchise, Sanofi increased Lantus's list price so that it could improve its rebate and discount offering to payors while maintaining net sales.

292.303.    Sanofi understood the risk of its decision and "went into 2013 with eyes wide open that the significant price increases planned would inflame [its] customers," and that its aggressive pricing would cause a quick reaction from Novo Nordisk. But Sanofi sought to make up for "shortfalls with Lantus demand generation and global profit shortfalls," which it said "put pressure on the US to continue with the price increases to cover gaps." The company conceded that it was "difficult to determine whether we would face these risks anyway if we hadn't taken the price increases."

293.304.    Novo Nordisk also engaged in shadow pricing with its long-acting insulin, Levemir, increasing Levemir's list price in lockstep with Lantus in a continued effort to offer increased rebates and discounts to payors and displace Lantus from preferred formulary placement. Novo Nordisk typically did not act first to raise prices. However, when its competitors raised prices, Novo Nordisk followed

suit. A March 2015 Novo Nordisk pricing committee presentation slide articulated this strategy: "Levemir price strategy is to follow market leader."

294.305.    On May 19, 2014, Novo Nordisk's pricing committee discussed how to price Levemir in response to Sanofi's 2013 pricing actions. Based on an internal presentation created for this meeting, Novo Nordisk's pricing committee discussed whether it should be a follower in the market in relation to Sanofi, and considered external factors like press coverage, payor reactions, profits, and performance. In each case, the company's strategic recommendation was to follow Sanofi's moves, rather than lead. Of note, the presentation shows that the pricing committee considered Levemir's performance, which was ahead of 2014's annual budgeting by $89 million, but that "overall company performance [was] behind." The presentation recommends following Sanofi's pricing actions if the brand's performance is the priority, and to lead if the company's performance is the priority. An excerpt of Novo Nordisk's presentation is shown below:

**Figure 17: Novo Nordisk pricing committee presentation**



295.306.    In alignment with this strategy, Novo Nordisk's pricing committee debated potential pricing scenarios based on Sanofi's actions, which they projected with a great deal of specificity. The presentation provided options regarding whether the company should follow Sanofi—and increase list price in July—or lead with a 9.9% increase in August which it considered "optically less aggressive." Based on internal memoranda, Novo Nordisk's pricing committee decided to revisit the issue with specific recommendations once Sanofi took action.

296.307.    Less than two weeks later, on May 30, 2014, Farruq Jafery, Vice President of Pricing, Contract Operations and Reimbursement, emailed Novo Nordisk's pricing committee to inform them that "Sanofi took a price increase on Lantus effective today: 16.1% vial and 9.9% pen." He further wrote that the pricing committee had "agreed that the best strategy for Levemir is to observe the market and

maintain list price parity to competitors." Mr. Jafery then requested that Novo Nordisk's committee vote "ASAP" to raise the list price of Levemir effective May 31, 2014 (the next day) from $191.28 to $222.08 for vials and from $303.12 to $333.12 for pens. Only a few hours after Sanofi took its list price increase, members of the pricing committee approved Mr. Jafery's request and Novo Nordisk moved forward with a 16.1% increase on Levemir vial, and a 9.9% increase on Levemir FlexPen and FlexTouch.

297.308.    Another series of emails shows that Novo Nordisk again shadowed Sanofi's price increase in November 2014, increasing Levemir's list price immediately after Sanofi increased Lantus vials and pens by 11.9%. On the morning of November 7, 2014, Novo Nordisk's pricing committee learned that Sanofi increased Lantus's list price overnight. By that afternoon they were asked to approve the same exact price increase for Levemir and did so hours later.

298.309.    The speed with which Novo Nordisk reacted to Sanofi's price changes is striking. Within 25 minutes of learning of Sanofi's price increase, Rich DeNunzio, Senior Director of Novo Nordisk's Strategic Pricing, emailed Novo Nordisk's pricing committee to alert them of the change and promise a recommendation the same afternoon after reviewing the financial impact of any move. By late afternoon, Mr. DeNunzio had requested Novo Nordisk's pricing committee to again "follow [Sanofi's] 11.9% [list price increase] on November 18th"

and vote to increase Levemir's list price, which was promptly approved by Novo Nordisk's Chief Financial Officer for U.S. operations, Lars Green.

299.310.    Novo Nordisk's pricing strategy for other diabetes products even became the subject of humorous exchanges among senior analysts within the company. After a Novo Nordisk analyst shared news of an Eli Lilly price increase for a diabetes product on December 24, 2015, a senior director of national accounts wrote, "[m]aybe Sanofi will wait until tomorrow morning to announce their price increase . . . that's all I want for Christmas." The first analyst responded, "I actually started a drinking game—I have to take a shot for every response that says 'what about Sanofi,'" and then said, "[m]y poor liver. . . .'" The senior director responded, "Ho Ho Ho!!!"

300.311.    The back-and-forth between Novo Nordisk officials underscores how closely it was monitoring Sanofi's actions and appears to mirror the approach laid out in a January 27, 2014 presentation regarding the company's bidding strategy that hinged on CVS Caremark's business. Novo Nordisk described its bids for the CVS Caremark business as "pivotal" and laid out a game of cat-and-mouse across different accounts in which company officials sought to have Levemir be the only therapeutic option on different PBM formularies. Novo Nordisk recognized that offering "attractive exclusive rebates to large, receptive customers" would "encourage a stronger response from Sanofi." However, Novo Nordisk was willing

to take this risk because it would result in "immediate volume and value" for the company and could lead to an exclusive deal for CVS's commercial formulary.

301.312.    The agreements the Manufacturers had with the PBM Defendants deterred competition on lowering prices. For example, following its April 2018 list price increase, Novo Nordisk began to face pressure from payors, the media, and Congress to reduce the prices of its insulin drugs. On May 29, 2018, Novo Nordisk's U.S. Pricing Committee debated whether it should reduce the list price of its insulin drugs by 50% after a string of news reports detailed how patients were struggling to afford their medications. Novo Nordisk understood that a 50% cut would be a meaningful reduction to patients, significantly narrow the list-to-net gap, head off negative press attention, and reduce "pressure" from Congressional hearings. But Novo Nordisk was more concerned that a list price reduction would pose significant financial risk to the company.

302.313.    The company's primary concerns were retributive action from PBMs and other entities in the pharmaceutical supply chain who derive payments that are based on a percentage of a drug's WAC price. A PowerPoint slide created for this meeting suggests that the reasons not to lower prices were that "many in the supply will be negatively affected ($) and may retaliate" and that its "[c]ompetitors may not follow putting [Novo Nordisk] at a disadvantage":

**Figure 18: Novo Nordisk presentation on reduced list prices**



303.314.    Despite these concerns, internal memoranda suggest that Novo Nordisk was still prepared to lower its list price by 2019 or 2020 if its "must haves" were met, which included an agreement from the PBMs that they would not retaliate against them by changing their formulary placement and would accept lower rebate percentages.

304.315.    According to internal memoranda, Novo Nordisk's board of directors voted against this strategy in June 2018 and recommended that the company continue its reactive posture. The rationale for this decision was the "$33 million downside identified (NovoLog only)," "risk of [PBM] backlash or demand for current rebate on new NDC," and "high likelihood of immediate pressure to take similar action on other products." Following the decision by its board of directors, on

August 30, 2018, Novo Nordisk decided to continue its strategy to "monitor the market . . . to determine if other major pharma companies are taking list price [increases]."

305.316.    Following years of rebate and list-price increases, the Manufacturers faced increased pressure from patients, payors, and the federal government to decrease insulin's list price. However, internal memoranda and correspondence suggest that the downstream impact of lowering the list prices presented hurdles for pharmaceutical companies.

306.317.    There is also evidence of direct communications between the Manufacturers and the PBM Defendants regarding lowering the prices of insulins. For example, a June 23, 2018 email memorializes a conversation Eli Lilly's President of the Diabetes Unit, Enrique Conterno, had with the CEO of OptumRx, who allegedly "re-stated that [OptumRx] would be fully supportive of Lilly pursuing a lower list price option," but indicated that OptumRx would encounter challenges, namely, "the difficulty of persuading many of their customers to update contracts without offering a lower net cost to them."

307.318.    In response, an Eli Lilly executive noted, "we wouldn't be able to lower our list price without impacting our net price," and counseled waiting until early 2020 to reduce prices. Two weeks before this email, Eli Lilly executives had raised the possibility that PBMs would object to a list price reset because it would (a)

result in a reduction in administrative fees for PBMs, (b) reduce rebates, which would impact PBMs' ability to satisfy rebate guarantees with some clients, and (c) impair their clients' ability to lower premiums for patients, thereby impacting their market competitiveness. An excerpt of this email is shown below:

**Figure 19: Eli Lilly internal email re potential price reductions**



308.319.    Insulin price increases were driven, in part, by tactics the PBMs employed in the early 2010s. At that time, the PBMs began to aggressively pressure the Manufacturers to raise list prices by implementing formulary exclusions in the insulin therapeutic class. When a drug is excluded, it means that it will not be covered by the insurer. Formulary exclusions effectively stop manufacturers from reaching large blocks of patients and require patients to either switch to a new product or pay significantly more to stay on their preferred medication. This tactic boosted the size

of rebates and catalyzed the upward march of list prices. The Manufacturers responded to these formulary-exclusion threats by raising list prices aggressively—increases that were closely timed with price changes by competitors.

~~309.~~320.    Internal memoranda and correspondence confirm that PBM formulary exclusion lists have contributed to higher rebates in the insulin therapeutic class. The Manufacturers have increased rebates in response to formulary exclusion threats, in order to preserve their revenue and market share through patient access. In addition, increases in rebates are associated with increased list prices, such that the PBM Defendants' demands for increased rebates directly contributed to rising insulin prices. As Eli Lilly's CEO, David Ricks, has explained, Eli Lilly agreed to raise list prices to fund higher rebates and fees for the PBMs:

> Getting on [a] formulary is the best way to ensure most people can access our medicines affordably—once again, that's how insurance is supposed to work. But that requires manufacturers to pay ever-increasing rebates and fees, which can place upward pressure on medicines' list prices. If we cannot offer competitive rebates, our medicines may be excluded from formularies, and people cannot access them. Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees. Last year, about eighty cents of every dollar spent on our insulins went to pay rebates and fees.

~~310.~~321.    Insulin was among the first classes of drugs to face PBM formulary exclusions, and the number of insulins excluded has increased over time.[73]

---

[73] Xcenda, *Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access* (May 2022), available at

In 2014, Express Scripts and CVS Caremark excluded six and seven insulins, respectively. OptumRx excluded four insulins in 2016, its first year with an exclusion list. As of 2022, *insulins have faced 193 total plan-years of exclusion* across the PBMs since 2014:

**Figure 20: Insulin exclusions by plan year**



311.322.    The Manufacturers have also made price-increase decisions due to countervailing pressures in their relationships with the PBMs. A higher list-price increases the dollar value of rebates, discounts, and other fees that a Manufacturer can offer to a PBM—all of which are based on a percentage of the list price. Internal documents show that the Manufacturers were sensitive not only to their own bottom lines, but also to the bottom lines of PBMs that set formularies, without which a

---

https://www.xcenda.com//media/ assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/ xcenda_pbm_exclusion_may_2022.pdf.

Manufacturer's product would lose significant market share.

~~312.~~323.    Exclusions, driven in part by perverse PBM incentives, have had a significant impact on patients' access to insulin. Lower list-priced insulins have been available since 2016—including follow-on insulins[74] (Admelog, Basaglar, Lyumjev, Fiasp), "authorized generic" insulins (Lispro, Insulin Aspart),[75] and, more recently, biosimilar insulins. But PBMs often exclude these insulins from their formularies in favor of products with *higher* list prices and larger rebates. For example, two of the three PBM Defendants have excluded the two insulin authorized generics since 2020, instead favoring the higher list-priced equivalents. Those PBM Defendants did so despite the fact that list prices for these authorized generic insulins

---

[74] The term "follow-on biologic" is a broad, overarching term. The designation of "biosimilarity" is a regulatory designation. "Follow-on biologics" are copies of originator innovator biologics. Those approved via the Biologics License Application (BLA) regulatory pathway (Public Health Service Act) are referred to as "biosimilars." Those approved via the New Drug Application (NDA) regulatory pathway (Food, Drug, and Cosmetic Act) retain the designation "follow-on" biologics.  *See* Richard Dolinar, *et al.*, *A Guide to Follow-on Biologics and Biosimilars with a Focus on Insulin*, 24 Endocrine Practice 195-204 (Feb. 2018), https://www.sciencedirect.com/science/article/abs/pii/S1530891X20353982#:~:text=Follow%2Don%20biologics%20are%20copies,regulations%20involving%20biologics%20are%20complex (last visited Jan. 5, 2024).

[75] An authorized generic medicine is a "brand name drug that is marketed without the brand name on its label." Additionally, "even though it is the same as the brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug."  *See Food and Drug Administration. FDA listing of authorized generics,* https://www.fda.gov/media/77725/download (last visited Jan. 5, 2024).

can be half the list price of the brand.[76]

313.324.    In addition to the exclusions of authorized generic insulins, lower list-priced biosimilar insulins have also faced PBM formulary exclusions. The first biosimilar insulin was launched in 2021. Due to prevailing market dynamics, two identical versions of the product were simultaneously introduced—one with a higher list price and large rebates, and one with a lower list price and limited rebates. All three PBMs excluded the lower list-priced version in 2022, instead choosing to include the identical product with the higher list price.[77]

314.325.    Excluding lower list-priced medicines from formularies can substantially increase out-of-pocket costs for patients in plans using deductibles or coinsurance, where cost-sharing is typically determined based on the medicine's full list price.[78] This trend of favoring higher list-priced products has dramatically affected patient affordability and access to insulins.

315.326.    The PBM Defendants and the Manufacturers are complicit in this.

---

[76] Tori Marsh, *Can't access generic Humalog? There's an even cheaper insulin option available*, GOODRX. (Aug. 26, 2019), https://www.goodrx.com/blog/admelog-now-cheaper-than-generic-humalog (last visited Jan. 5, 2024).

[77] Adam Fein, *Five takeaways from the big three PBMs' 2022 formulary exclusions* (Jan. 19, 2022), available at https://www.drugchannels.net/2022/01/five-takeaways-from-big-three-pbms-2022.html

[78] Adam Fein, *Express Scripts vs. CVS Health: five lessons from the 2020 formulary exclusions and some thoughts on patient impact* (Jan. 2020), available at https://www.drugchannels.net/2020/01/express-scripts-vs-cvs-health-five.html.

There has been little, if any, attempt by the PBM Defendants to discourage the Manufacturers from increasing the list price of their products. Instead, the PBMs used their size and aggressive negotiating tactics, such as the threat of excluding drugs from formularies, to extract even more generous Manufacturer Payments from the Manufacturers, who have increased their insulin list prices in lockstep.

316.327.    The PBMs worked to have the Manufacturers raise list prices because the rebates, discounts, and fees the PBMs receive are based on a percentage of a drug's list price—and the PBMs retain a large portion of what they negotiate. In fact, the Manufacturers have been dissuaded from decreasing list prices for their products, which would have lowered out-of-pocket costs for patients, due to concerns that the PBMs and health plans would react negatively.

317.328.    Diabetes medications have become unaffordable for many diabetics because of the Manufacturer and PBM Defendants' collusive price increases.

### C.    The Pharmaceutical Payment and Supply Chains

318.329.    The prescription drug industry is comprised of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include manufacturers, wholesalers, PBMs, pharmacies, payors, and patients.

319.330.    Given the complexities of the different parties involved in the

pharmaceutical industry, pharmaceuticals are distributed in many ways. Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of three ways: (a) from manufacturer to wholesaler (distributor), wholesaler to pharmacy, and pharmacy to patient; (b) from manufacturer to mail-order pharmacy to patient; or (c) from manufacturer to mail-order pharmacy, mail-order pharmacy to self-insured payor, and self-insured payor to patient.

320.331.    The pharmaceutical industry, however, is unique in that the payment chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity—that is, different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is necessarily tied to the price set by the manufacturer.

321.332.    Here is how the payment chain often works:[79]

**Figure 21: The pharmaceutical payment chain**



322.333.    The payment chain includes self-insured payors like Plaintiff paying PBMs directly. Here, Defendants Medco and Express Scripts invoiced Monmouth County, and Monmouth County paid Express scripts, for Monmouth County's purchases of the at-issue diabetes medications.

323.334.    But there is no transparency in this pricing system. Typically,

---

[79] *See* Karen Van Nuys, *et al.*, *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, JAMA HEALTH FORUM (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932.

there are two kinds of published prices. One is the WAC, which is a manufacturer's price for the drug to wholesalers (and excludes any discounts, rebates, or price reductions). The other is the AWP, which is the price wholesalers charge retailers for a drug. Both WAC and AWP, depending on the context, are sometimes colloquially referred to as "list price."[80]

~~324.~~335.    AWP is usually calculated by applying a significant mark-up (such as 20%) to the manufacturer's WAC.  AWP does not account for discounts available to various payers, nor is it based on actual sales transactions.

~~325.~~336.    Publishing compendia such as First DataBank report both the WAC and the AWP.

~~326.~~337.    As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used benchmark price in negotiating reimbursement and payment calculations for both payors and patients.

### D.    The PBMs' Role in the Pharmaceutical Payment Chain

~~327.~~338.    ~~The PBMs~~Pharmacy benefit managers are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 22 below.

---

[80] In general, when this complaint references Defendants' conspiracy to inflate "list prices," Plaintiff is referring to WAC. Because AWP is based on WAC, when a manufacturer raises its WAC, that necessarily results in an increase to the AWP.

**Figure 22: Insulin distribution and payment chain**



328.339.    Pharmacy benefit managers (including the PBM Defendants)
develop drug formularies, process claims, create a network of retail pharmacies, set
the prices in coordination with the Manufacturers that the payor will pay for
prescription drugs, and are paid by the payor for the drugs utilized by the payor's
beneficiaries.

329.340.    The PBMsPharmacy benefit managers also contract with a
network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay

fees back to pharmacy benefit managersthe PBMs. The PPharmacy benefit managersBMs reimburse pharmacies for the drugs dispensed.

330.341.    The PBM Defendants also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to patients by mail.

331.342.    Often—including for the at-issue drugs—the PBM Defendants purchase drugs directly from the Manufacturers and distribute them directly to the patients.

332.343.    Even where the PBM Defendants' mail-order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

333.344.    In addition, and of particular significance here, the PBM Defendants contract with drug manufacturers, including the Manufacturer Defendants. The PBMs extract from the Manufacturers rebates, fees, and other consideration that are paid back to the PBM, including the Manufacturer Payments related to the at-issue drugs.

334.345.    The Manufacturers also interact with the PBMs in connection with services outside the Insulin Pricing Scheme's scope, such as health and educational programs and patient and prescriber outreach with respect to drugs not at issue here.

335.346.    These relationships place PBMs at the center of the flow of pharmaceutical money and allow them to exert tremendous influence over what drugs are available nationwide, on what terms, and at what prices.

336.347.    Historically and today, the PBM Defendants:

    a.    negotiate the price that payors pay for prescription drugs (based on prices generated by the Insulin Pricing Scheme);

    b.    separately negotiate a different (and often lower) price that pharmacies in their networks receive for the same drug;

    c.    set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme);

    d.    set the price paid for each drug sold through their mail-order pharmacies (based on prices generated by the Insulin Pricing Scheme); and

    e.    negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme).

337.348.    Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the same drugs. This absence of transparency affords Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.

338.349.    In every interaction the PBMs have within the pharmaceutical payment chain, they stand to profit from the prices generated by the Insulin Pricing

114

Scheme.

## 1. The Rise of the PBMs in the Pharmaceutical Supply Chain

~~339.~~350.    In the 1960s, pharmacy benefit managers functioned largely as claims processors. Over time, however, they have assumed an ever-expanding role as power brokers in pharmaceutical payment and distribution chains.

~~340.~~351.    One key role pharmacy benefit managers took on was negotiating with drug manufacturers, ostensibly on behalf of payors. In doing so, pharmacy benefit managers affirmatively represented that they were using their leverage to *drive down* drug prices.

~~341.~~352.    In the early 2000s, pharmacy benefit managers started buying pharmacies, thereby creating an additional incentive to collude with manufacturers to keep certain prices high.

~~342.~~353.    These perverse incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families. Further recent consolidation in the industry has given the PBMs disproportionate market power.

~~343.~~354.    Nearly 40 pharmacy-benefit-manager entities combined into what are now the PBM Defendants, each of which now is affiliated with another significant player in the pharmaceutical chain—e.g., Express Scripts merged with Cigna; CVS bought Caremark (and now also owns Aetna); and UnitedHealth Group

acquired OptumRx.

344.355.    Figure 23 depicts this market consolidation.

## Figure 23: PBM consolidation



345.356.    After merging with or acquiring all competitors, and now backed

by multibillion-dollar corporations, the PBM Defendants have taken over the market

in the past decade, controlling more than 80% of drug benefits for more than 270

million Americans.

346.357.    Together, the PBM Defendants report more than $300 billion in

annual revenue.

347.358.    The PBMs use this market consolidation and the resulting

purchasing power as leverage when negotiating with other entities in the

pharmaceutical payment chain.

## 2.  The Insular Nature of the Pharmaceutical Industry

348.359.    The insular nature of the pharmaceutical industry has afforded
Defendants with ample opportunity for furtive contact and communication with their
competitors, as well as the other PBM and Manufacturer Defendants, which
facilitates their execution of the Insulin Pricing Scheme.

349.360.    For example, each Manufacturer Defendant is a member of the
industry-funded Pharmaceutical Research and Manufacturers of America
("PhRMA") and has routinely communicated through PhRMA meetings and
platforms in furtherance of the Insulin Pricing Scheme. According to PhRMA's 2019
IRS Form 990, it received more than $515 million in "membership dues." All
members are pharmaceutical companies.[81]

350.361.    David Ricks (Chair and CEO of Eli Lilly), Paul Hudson (CEO of
Sanofi), and Douglas Langa (President of Novo Nordisk and EVP of North American
Operations) serve on the PhRMA Board of Directors and/or part of the PhRMA
executive leadership team.

351.362.    The PBM Defendants also routinely communicate through direct

---

[81] PhRMA 2019 Form 990, https://projects.propublica.org/nonprofits/ organizations/
530241211/202043189349300519/full; PhRMA, *About PhRMA*, https://phrma.org/-
/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/A-C/About-PhRMA2.pdf
(last visited Jan. 4, 2023).

interaction with their competitors and the Manufacturers at trade associations and industry conferences.

352.363.    Each year during the relevant period, the main PBM trade association, the industry-funded Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.[82]

353.364.    The PCMA is governed by PBM executives. As of April 2024, the board of the PCMA included Adam Kautzner (President of Express Scripts), Patrick Conway (CEO of OptumRx), and David Joyner (Executive Vice President and President of Pharmacy Services at CVS Health).

354.365.    All PBM Defendants are members of the PCMA and, due to their leadership positions, wield substantial control over it.

355.366.    Additionally, the Manufacturer Defendants are affiliate members of the PCMA.

356.367.    Every year, high-level representatives and corporate officers from both the PBM and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing

---

[82] The PCMA's industry funding in the form of "membership dues" is set out in its 2019 Form 990, https://projects.propublica.org/nonprofits/organizations/383676760/2020429693493 01134/full (last visited Apr. 5, 2024).

Scheme.

357.368.    In fact, for at least the last eight years, all Manufacturer Defendants have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PBM conferences.

358.369.    Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."[83]

359.370.    Representatives from each Manufacturer Defendant have routinely met privately with representatives from each PBM Defendant during the annual Mmetings and business forum conferences held by the PCMA (and sponsored by the Manufacturers) each year.

360.371.    In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only

---

[83] PCMA, *The PCMA Annual Meeting 2021 Will Take Place at the Broadmoor in Colorado Springs, CO September 20 and 21,* https://www.pcmanet.org/pcma-event/annual-meeting-2021/ (an event "tailored specifically for senior executives from PBMs and their affiliated business partners" with "private reception rooms" and "interactions between PBM members, drug manufacturers, and other industry partners") (last visited July 3, 2023).

LinkedIn Group and online networking community."[84]

361.372.    As PCMA members, the PBM and Manufacturer Defendants undoubtedly used both PCMA-Connect, as well as the private meetings at the PCMA conferences, to exchange information and to reach agreements in furtherance of the Insulin Pricing Scheme.

362.373.    Key at-issue lockstep price increases occurred immediately after Defendants had convened at PCMA meetings. For example, on September 26 and 27, 2017, the PCMA held its annual meeting, at which each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Days later, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list price by 5.4%. Novo Nordisk recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.

363.374.    Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir a matter of hours after Sanofi made its list price increase on Lantus. These price hikes occurred just weeks after the 2014 PCMA spring conference in Washington, D.C., attended by representatives of all three PBM Defendants.

364.375.    The PBMs control the PCMA and have weaponized it to further

---

[84] PCMA, *PCMA-Connect*, https://www.pcmanet.org/contact/pcma-connect/ (last visited Apr. 5, 2024).

their interests and to conceal the Insulin Pricing Scheme. The PCMA has instituted numerous lawsuits and lobbying campaigns aimed at blocking drug-pricing transparency efforts, including recently suing the Department of Health and Human Services ("HHS") to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as direct-to-consumer discounts.

365.376.    Notably, the PCMA's 2019, 2020, and 2021 tax returns report annual revenue for "litigation support" totaling $1.01 million, $2.19 million, and $2.92 million respectively. Prior tax returns similarly reveal millions of dollars in revenue for "litigation support" (and tens of millions in revenue for "industry relations") year after year.[85]

366.377.    In addition, communications among the PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. For example:

a.    Mark Thierer worked as an executive at Caremark Rx, LLC (now CVS Caremark) prior to becoming the CEO of OptumRx in 2016 (and also served as Chairman of the Board for PCMA starting in 2012);

b.    CVS Health's current President and CEO Karen Lynch held an

---

[85] *See, e.g.*, PCMA 2019-2021 Form 990s and prior years' returns on ProPublica.

executive position at Cigna;

c.      Amar Desai served as President for Health Care Delivery at CVS Health before joining Optum Health, where he now serves as CEO.

d.      Trip Hofer served in leadership at CVS Health before becoming CEO of Behavioral Health for Optum Health.

e.      Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015 (and also served as a PCMA board member from 2015-2017 while with Aetna Rx);

f.      Derica Rice former EVP for CVS Health and President of CVS Caremark previously served as EVP and CFO for Eli Lilly;

g.      Duane Barnes was the Vice President of Medco (now Express Scripts) before becoming division President of Aetna Rx in 2006 (and also served as a PCMA board member);

h.      Everett Neville was the division President of Aetna Rx before becoming Senior Vice President of Express Scripts;

i.      Albert Thigpen was a Senior Vice President at CVS Caremark for eleven years before becoming a Senior Vice President at OptumRx in 2011;

j.      Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a Vice President at Aetna Rx in 2008; he also served as SVP Member Services Operations for CVS Caremark from

2020-2022; and

      k.    Bill Kiefer was a Vice President of Express Scripts for fourteen years before becoming Senior Vice President of Strategy at OptumRx in 2013.

## E. The Insulin Pricing Scheme

~~367.~~378.    The market for the at-issue diabetes medications is unique in that it is highly concentrated with no true generics and few biosimilar options. The drugs and biosimilars have similar efficacy and risk profiles.

~~368.~~379.    This affords the PBMs significant leverage that, in theory, could be used to negotiate with the Manufacturer Defendants to drive *down* list prices for the at-issue drugs through open competition.

~~369.~~380.    But the PBMs do not want the prices for diabetes medications to decrease. A 2022 report by the Community Oncology Alliance put it this way:

> Among the different sources of revenue, the most prolific by far is in the form of rebates from pharmaceutical manufacturers that PBMs extract in exchange for placing the manufacturer's product drug on a plan sponsor's formulary or encouraging utilization of the manufacturer's drugs. . . . [T]he growing number and scale of rebates is the primary fuel of today's high drug prices. The truth is that PBMs have a vested interest to have drug prices remain high, and to extract rebates off of these higher prices. PBM formularies tend to favor drugs that offer higher rebates over similar drugs with lower net costs and lower rebates.[86]

---

[86] Community Oncology Alliance & Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers, and Taxpayers* (Feb. 2022), https://communityoncology.org/research-publications/studies/pbm-dirty-tricks-expose/.

370.381.    The Manufacturer Defendants understand that they make more money as list prices increase. They also understand that PBM Defendants make more money as list prices increase. This is confirmed by the Senate Insulin Report after committee review of internal documents produced by the Manufacturer Defendants:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price.[87]

371.382.    The documents eventually released by the Senate Finance Committee indicate how the Manufacturer Defendants' pricing strategy *focuses on the PBMs' profitability*. In an internal August 6, 2015, email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.[88]

372.383.    The Manufacturer Defendants also understand that because of the

---

[87] Senate Insulin Report at 89.

[88] Letter from Raphael A. Prober, Counsel for Novo Nordisk Inc., to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Novo_ Redacted.pdf (last visited Apr. 24, 2024).

PBMs' market dominance, most payors accept the baseline national formularies offered by the PBMs with respect to the at-issue drugs.

373.384.    The Insulin Pricing Scheme was borne  from these understandings. Both sets of Defendants realized that if the Manufacturers artificially inflated their list prices to facilitate large, undisclosed Manufacturer Payments back to the PBMs, both the PBMs and Manufacturers would generate billions of unearned dollars. The plan worked.

374.385.    Over the past several years the Manufacturers have raised prices in unison and have paid correspondingly larger Manufacturer Payments to the PBMs.

375.386.    In exchange for the Manufacturers artificially inflating their prices and paying the PBMs substantial amounts in Manufacturer Payments, the PBM Defendants grant the Manufacturer Defendants' diabetes medications elevated prices and preferred status on their national formularies. During the relevant period, the rebate amounts (as a proportion of the list price) grew year-over-year while list prices themselves increased.

376.387.    For example, in July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. By 2018, five years later, Sanofi's rebates had ballooned to 56% for preferred placement. And in 2015, Sanofi offered OptumRx rebates up to 42% for Lantus for preferred formulary placement. That figure grew to *nearly 80%* by 2019. Similarly, in 2014,

Novo Nordisk offered Express Scripts 25% rebates for Levemir. That figure soared to 47% in 2017.

377.388.    Beyond increased rebate demands, the PBM Defendants have also sought and received larger and larger administrative fees from the Manufacturers during the relevant period.

378.389.    A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion. The study observed that although rebates were sent to payors during this period, PBMs retained the same volume of rebates in pure dollars, due to the overall growth in rebate volume, as well as increases in administrative fees and spread pricing (charging a client payor more for a drug than the PBM pays the pharmacy).

379.390.    Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) have caused, and continue to cause, precipitous price increases for the at-issue drugs.

380.391.    As a result of the Insulin Pricing Scheme, every payor, including Plaintiff, that pays or reimburses for the at-issue drugs has been overcharged.

381.392.    Moreover, the PBMs use this false price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system.

For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary."[89] Likewise, in April 2019, CVS Caremark president Derica Rice stated: "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."[90]

382.393.    In making these representations, the PBMs fail to disclose that the amount of "savings" generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical payment chain and which the Defendants themselves are directly responsible for artificially inflating.

383.394.    The Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants that created enormous profits for Defendants. Each of the Defendants agreed to and participated in the scheme. For example:

a.    The Manufacturers and the PBMs are in constant communication

---

[89] Surabhi Dangi-Garimella, *PBMs Can Help Bend the Cost Curve: Express Scripts' Tim Wentworth,* AJMC (Jan. 12, 2016), https://www.ajmc.com/view/pbms-can-help-bend-the-cost-curve-express-scripts-tim-wentworth (last visited Apr. 5, 2024).

[90] CVS Health, *CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation*, Helped Reduce Member Cost, and Improved Medication Adherence in 2018 (Apr. 11, 2019), https://www.cvshealth.com/news-and-insights/press-releases/cvs-health-pbm-solutions-blunted-the-impact-of-drug-price (last visited Apr. 5, 2024).

and regularly meet and exchange information to construct and refine the PBM formularies that form and fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also in determining the same for competing products. Though their communications and written contracts, the Manufacturers and the PBMs also agree to rebates, fees, and other payments—that is, kickbacks—in exchange for preferred formulary access.

b.      The Manufacturers and the PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug-utilization tracking efforts and mail-order pharmacy claims, internal medical efficacy studies, and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and to construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed, and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx (which utilizes OptumInsight and Optum Analytics).

c.      The Manufacturers and the PBMs engage in coordinated outreach

programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients. For example, the Grassley-Wyden committee recently released an email in which Eli Lilly discussed paying Defendant UnitedHealth Group and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. The email continued: "United's leadership committee made one ask of Lilly – that we are highly engaged in the communication/pull through plan.[91] I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the full breadth of Lilly resources. UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution."

384.395.    Rather than using their massive bargaining power to lower drug prices—as they claim to do—Defendants used their dominant positions to work together to generate billions of dollars in illicit profits at the expense of payors and

---

[91] "Pull through" is an industry term that refers to marketing to physicians by Manufacturers aimed at moving market share and increasing sales for a certain product following the PBM granting that product preferred placement on its formulary.

diabetics.

### F. The Manufacturers React to Threats of Formulary Exclusion by Increasing Rebates Offered to the PBMs

~~385.~~396.    Although the PBM Defendants have insisted they had no control over how the Manufacturers price their insulin products, their threats of formulary exclusion illustrate how they used new insulin competitors with lower prices to leverage even *higher rebates* on the existing insulin drugs.

~~386.~~397.    In the face of formulary exclusion threats based on new entrants in the insulin market, the Manufacturers have willingly met the PBM Defendants' demands for increased rebates in order to retain preferred formulary placement and block competitors. For example, in 2016, Sanofi and Novo Nordisk enhanced their rebate offers at the same time Eli Lilly introduced Basaglar, a follow-on biologic to Lantus.  Basaglar is a long-acting insulin and is "[c]linically . . . very similar" to Sanofi's Lantus. Because of its near clinical equivalence, Basaglar posed a competitive threat in the long-acting insulin market. The PBMs threatened to switch to Basaglar because it was priced lower and they expected Eli Lilly to offer larger discounts in response.

~~387.~~398.    A 2016 Sanofi memo describes the market dynamic whereby a threatened new market entrant would lead not to lower prices, but to greater rebates:

**Figure 24: Sanofi memo on introduction of Basaglar**

> • Lilly is actively engaged with Anthem for 2017 Medicare and commercial business.  Anthem believes they
> would not have significant challenges moving to Basaglar in 2017 if the WAC price and discounts are in
> line with what they are thinking (20% lower WAC and discounts >40% )

388.399.    In an attempt to avoid PBMs switching to Basaglar, Sanofi and Novo Nordisk increased their rebate bids to respond to Eli Lilly. For example, according to Sanofi internal memoranda, sometime around April 2016, Express Scripts requested bids for its 2017 national commercial formulary and indicated its desire to add only one insulin glargine product to its basal insulin category. Express Scripts communicated to Sanofi that "with the right competitive price, [it] would not have significant challenges moving [from Lantus and Toujeo] to Basaglar" and that Sanofi must enhance its current rebate rate of 42% to maintain access for their basal insulins.

389.400.    An internal Sanofi memo describes the dynamic where, at "the right competitive price," Express Scripts would not have a challenge moving Basaglar into a preferred position on its formulary:

**Figure 25: Sanofi memo on Basaglar pricing**



**Likely Competitive Approach and Response:**

- Lilly is actively engaged with ESI for 2017 commercial business. Pricing has not been confirmed however ESI has informed that the following assumptions pose a threat to Sanofi's glargine franchise:
  - Discounts for Basaglar in the mid 60's have been communicated by ESI to Sanofi. This is likely a starter for ESI to consider excluding Lantus and Toujeo. Modeling assumed 70%.
  - Basaglar WAC will be 15% to 25% less than the WAC price of Lantus. Sanofi modeling assumed 15%.
- ESI has signaled, with the right competitive price, they would not have significant challenges moving to Basaglar in 2017 despite a follow-on biologic (Basaglar) approval.
- In addition ESI has indicated that Novo must also enhance its current rate to <u>maintain</u> current access for their basal insulin(s). Novo is likely to enhance its current rebates given recent Tresiba addition to part D formulary.

~~390.~~401.    Rebate contracts confirm that Sanofi increased its offer up to almost 55% off its WAC of $248.51 for Lantus vials and $372.76 for Lantus pens.

~~391.~~402.    For the Manufacturers, the mere threat of exclusion has pressured them to offer substantially greater rebates to maintain formulary position. This is because formulary exclusions would cause significant loss of a Manufacturer's market share, leading to lower revenue. On the other hand, being the exclusive therapy on a formulary has the opposite effect, thereby incentivizing Manufacturers to offer large Manufacturer Payments to acquire or maintain such status. The use of formulary exclusions has thus led to a market dynamic in which Manufacturers offer ever-higher rebates to avoid exclusion, which has caused higher list prices.

~~392.~~403.    For example, before 2013, Sanofi offered an average rebate of 5% on Lantus. However, beginning in 2013, competitors sought to "[d]isplace Lantus in High Control Plans and Markets . . . through increased rebates" to capture market share. In response, Sanofi increased its rebate and discount offerings to remain on

their formulary. A Sanofi memo further explains this dynamic:

**Figure 26: Sanofi memo on increased rebates for Lantus**



393.404.    While the PBM Defendants have touted that using formulary exclusions in the insulin therapeutic class was a way to drive down costs for their clients, internal correspondence and memoranda show that increased use of formulary exclusions did exactly the opposite: WAC (list) prices have continued to increase, leading to higher costs for payors like Plaintiff and higher prices for patients at the pharmacy counter.

394.405.    For example, in 2013, when Express Scripts threatened to move patients to other diabetes drugs in order to "break even on [the] rebate line" unless Sanofi increased its Medicare Part D rebate offer for Lantus, Sanofi considered

increasing its rebate offer from 7.45% to 15% in order to prevent formulary exclusion. Sanofi also faced similar pressure to increase rebates for Express Scripts' commercial contracts. Internal Sanofi memoranda show that "Sanofi was notified by [Express Scripts] that Lantus was positioned to be removed from the formulary effective 2013 . . . [and as a result] rebates were re-negotiated." An excerpt from this memo, discussing the threat to Lantus, illustrates that the threats used by Express Scripts to drive up rebates on Sanofi's flagship insulin product Lantus:

**Figure 27: Sanofi presentation on formulary threats to Lantus**



**Lantus Contracting History with ESI**
Account Management and Contracting have worked closely together to maintain a 5% rebate for Commercial contracts through 2012. Sanofi was notified by ESI that Lantus was positioned to be removed from formulary effective 2013. Rebates were re-negotiated resulting in a 6% Lantus Vial & 9% Lantus SoloStar rebate (no price protection).

**Lantus Overall Threat**
The Commercial business is at additional threat due to competitive rebate pressures and changing formulary design as well as Lantus pricing actions.
- ESI has shared that Novo has been extremely aggressive the last few months and this has triggered the need to revise our offer.
  - For 2014 ESI made Humalog exclusive in the RAI category, moving Novolog to Not Covered and made Byetta & Bydureon the only options in the GLP1 category, moving Victoza to Not Covered.
- Comments during discussion with ESI confirmed that modeling has occurred and that the current contracted offer will result in a Not Covered position for 2015. This is based on competitive offers by Novo and client plans requesting exclusive offers for comparison.
- They have shared that the basal category is under consideration for exclusion list status for 2015. This interest in an exclusive offer is consistent with recent actions they have taken to reduce the number of branded options available to patients.
- Lantus price increases over the past two years have positioned Sanofi as a cost driver that has triggered significant attention from ESI.

~~395.~~406.    According to internal memoranda, in 2014, Express Scripts and its affiliated businesses managed the prescription drug claims of over 4.6 million people, representing 15% of the total business in the Medicare Part D channel. Rebate agreements confirm Sanofi renegotiated rebates and entered into an agreement to provide up to 10.625% for Lantus, effective January 1, 2014. Rebates were

renegotiated again that same year, and Sanofi increased its rebate offer up to 14.625%, effective October 1, 2014.

396.407.    CVS Caremark and OptumRx used similar formulary exclusion threats to drive up Lantus rebates. Around this same time, other PBMs learned that Sanofi had offered competitive rebates to Express Scripts which caused them to question their rebate status with Lantus. As a result, they too demanded higher rebates and threatened to exclude Lantus from their formulary to achieve this result.

397.408.    For example, in 2014, OptumRx threatened to remove Lantus from its commercial formulary. Sanofi offered an enhanced rebate for FY2015 in the 15% range, but OptumRx rejected Sanofi's offer and took steps to remove Lantus from its commercial formulary. Sanofi responded with a last-minute bid of a 45% rebate for Tier 2, which OptumRx countered with 45% for Tier 3. According to Sanofi, OptumRx's counteroffer was "ultimately accepted over access concerns to future products and the need to secure access to patient lives."

398.409.    Similarly, in 2016, Express Scripts threatened to remove Lantus and Toujeo from its Medicare Part D formulary and requested that Sanofi submit its "best and final offer" or else face formulary exclusion. According to internal memoranda, during negotiations, Express Scripts told Sanofi that it was justified in removing Lantus and Toujeo from its Medicare Part D formulary because it had allowed "quite a few years of price increases" and that Novo Nordisk's rebate offer

was more competitive. In response to Express Scripts' threat, Sanofi discussed revising its rebate offer up to 40% with 4% price protection for Lantus and Toujeo.

399.410.   Although contracts with PBMs included larger and larger rebates, the Manufacturers still expected to remain profitable. For example, on July 28, 2017, one Sanofi official wrote to colleagues after considering their offer to CVS Caremark for placement on the Part D formulary: "After inclusion of additional fees, we are still profitable up to an 89% rebate." The official included an analysis that assumed "CVS would need to shift 68.9% of [its] glargine volume to Novo to break even (at an assumed 81% rebate offer)." In its analysis, Sanofi compared various negotiation scenarios including a "no contract" scenario, which it determined would be more profitable to the company even with the resulting reduction in sales volume and revenue. One of the deciding factors was optics. As one colleague put bluntly: "How would it look to be removed from the largest Medicare plan?"

400.411.   As the PBMs expanded the practice of using formulary exclusions to extract greater rebates, Sanofi's counterstrategy was to bundle unrelated products that had been excluded—Lantus and an epinephrine injection called Auvi-Q—to win formulary inclusion for both. (Bundling is a practice where manufacturers offer rebates and discounts for multiple products, but only if certain conditions are met.)

401.412.   Sanofi faced significant financial pressure across all accounts and

sought to include bundling agreements in several of its contracts. While negotiating contracts for the 2015/16 plan year, Express Scripts advised Sanofi that it needed to be far more aggressive with rebate offers to gain access to the PBM's commercial book of business than in past years. Internally, Sanofi officials warned in a memo that "Novo, specifically Levemir, has changed the game with regard to rebates," and that Sanofi would "need to rebate aggressively." A separate presentation describes "[c]ontracts that increase Lantus rebates if Auvi-Q is added to [the] formulary thus creating a bundled arrangement," and notes that the company had even considered a "triple product bundle" with Toujeo, despite concerns about the arrangements triggering Medicaid best price.

402.413.    This counterstrategy was not limited to Sanofi. An internal memo shows that Sanofi's competitors were using the same strategy: "Lantus is losing accounts and share within the institutional channel because of aggressive discounting and bundled contract offerings from Novo Nordisk and Lilly."

403.414.    For example, Novo Nordisk secured contract terms from CVS Caremark's Part D business in 2013 that tied its "exclusive" rebates for insulin to formulary access for its Type 2 diabetes drug Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. To qualify for the exclusive rebate, the plans would also need to list Victoza, a GLP-

1 agonist, on their formulary, exclude all competing insulin products, and ensure "existing patients using a [c]ompeting [p]roduct may not be grandfathered."

## G. Defendants Downplay the Insulin Pricing Scheme and Its Resulting Harms

~~404.~~415.    On April 10, 2019, the U.S. House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[92]

~~405.~~416.    Representatives from all Defendants testified at the hearing and admitted that the price for insulin had increased exponentially over the past 15 years.

~~406.~~417.    Further, each Defendant conceded that the price that diabetics pay out-of-pocket for insulin is too high. For example:

  a. Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx since 2015, testified: "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

---

[92] Transcripts available at https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3 (last visited Apr. 24, 2024) (hereinafter *Priced Out of a Lifesaving Drug*).

b.      Thomas Moriarty, General Counsel for CVS admitted: "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, prices for insulin have increased nearly 50 percent. Over the last ten years, [the] list price of one product, Lantus, rose by 184 percent."

c.      Mike Mason, Senior Vice President of Eli Lilly, testified when discussing how much diabetics pay out-of-pocket for insulin: "[I]t's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications."

d.      Kathleen Tregoning, Executive Vice President for External Affairs at Sanofi, testified: "Patients are rightfully angry about rising out-of-pocket costs for many medicines and we all have a responsibility to address a system that is clearly failing too many people. . . . [W]e recognize the need to address the very real challenges of affordability. . . . [S]ince 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients."

e.      Doug Langa, Executive Vice President of Novo Nordisk, testified: "On the issue of affordability, . . . I will tell you that at Novo Nordisk we are accountable for the list prices of our medicines. We also know that list price matters to many, particularly those in high-deductible health plans and

those that are uninsured."

~~407.~~418.    None of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.

~~408.~~419.    Instead, the written testimony of Novo Nordisk President Doug Langa recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price. That means a pharmaceutical company fighting to remain on formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others." Likewise, Mr. Langa's responses to questions for the record conceded that "[t]he disadvantage of a system in which administrative fees are paid as a percentage of the list price is that there is increased pressure to keep list prices high." The hearing transcript records Mr. Langa's further comments in this regard:

> So as you heard from last week from Dr. Cefalu from the [American Diabetes Association], there is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And *we've been participating in that system* because the higher the list price, the higher the rebate. . . . There's a significant demand for rebates. . . . [*W*]*e're spending almost $18*

> *billion a year in rebates, discount, and fees, and we have people*
> *with insurance with diabetes that don't get the benefit of that.*
> (emphasis added)

409.420.    Eli Lilly admitted that it raises list prices as a quid pro quo for

formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior

Vice President of Eli Lilly, testified:

> Seventy-five percent of our list price is paid for rebates and discounts
> . . . . $210 of a vial of Humalog is paid for discounts and rebates. . . .
> We have to provide rebates [to PBMs] in order to provide and
> compete for that [formulary position] so that people can use our
> insulin.

In the very next question, Mr. Langa of Novo Nordisk was asked, "[H]ave you ever

lowered a list price?" His answer, "We have not."

410.421.    Sanofi's Executive Vice President for External Affairs, Kathleen

Tregoning, similarly testified:

> The rebates [are] how the system has evolved. . . . I think the system
> became complex and rebates generated through negotiations with
> PBMs are being used to finance other parts of the healthcare system
> and not to lower prices to the patient.

Her written response to questions for the record acknowledged that "it is clear that

payments based on a percentage of list price result in a higher margin [for PBMs]

for the higher list price product than for the lower list price product."

411.422.    The PBM Defendants also conceded at the April 2019

Congressional hearing that they grant preferred, or even exclusive, formulary

position because of higher Manufacturer Payments paid by the Manufacturer

Defendants.

~~412.~~423.    In her responses to questions for the record, Amy Bricker—former President of Express Scripts and a former PCMA board member—confirmed that "manufacturers lowering their list prices" would give patients "greater access to medications." Yet when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, she answered: "Manufacturers do give higher discounts [i.e., payments] for exclusive [formulary] position . . . ." When asked why the PBM would not include both costly and lower-priced insulin medications on its formulary, Ms. Bricker stated plainly, "We'll receive less discount in the event we do that."[93]

~~413.~~424.    As Dr. Dutta, Senior Vice President of OptumRx, reasoned, the cheaper list-priced alternative Admelog is not given preference on the formulary because "it would cost the payer more money to do that . . . [b]ecause the list price is

---

[93] Buried in Express Scripts' 2017 10-K is the following: "We maintain contractual relationships with numerous pharmaceutical manufacturers, which provide us with, among other things administrative fees for managing rebate programs, including the development and maintenance of formularies that include particular manufacturer's products . . . ." That is, the Manufacturers pay the PBMs to effectively participate in the creation of formularies that payors are required to adopt as a condition for obtaining PBM services. Express Scripts Annual Report (Form 10-K) (FYE Dec. 31, 2017) at 24. It also notes that its business would be "adversely affected" if it were to "lose [its] relationship with one or more key pharmaceutical manufacturers." *Id.*

not what the payer is paying. They are paying the net price."[94]

414.425.    But payors like Plaintiff do not pay the net price, even when rebates are passed through, because the PBMs receive and retain countless other forms of payments that drive up the gap between the list price and the net price retained by drug manufacturers. By giving preference to drugs with higher list prices based on the illusion of a lower net price, the PBMs are causing health plan payors and members to pay more while the PBMs keep greater profits for themselves. In other words, under the Insulin Pricing Scheme, PBMs and Manufacturers can make a drug with a lower list price effectively more expensive for payors and then ostensibly save payors from that artificially inflated price by giving preference to drugs that had higher list prices to begin with (yielding higher Manufacturer Payments to the PBMs).

415.426.    On May 10, 2023, the U.S. Senate Committee on Health, Education, Labor, and Pensions held a hearing titled, "The Need to Make Insulin Affordable for All Americans." At this hearing, the CEOs and presidents of the Manufacturer and PBM Defendants doubled down on their testimony from 2019. David Ricks, for example, the Chair and CEO of Eli Lilly, testified that his company raised list prices and agreed to pay ever-increasing rebates to secure formulary

---

[94] *Priced Out of a Lifesaving Drug* at lines 1394-95. As noted in the hearing, even the "cheaper" alternative Admelog "costs over $200 a bottle." *Id.* at lines 3121-26.

placement:

> Getting on formulary is the best way to ensure most people can access our medicines affordably . . . . But that requires manufacturers to pay ever-increasing rebates and fees, which can place upward pressure on medicines' list prices. . . . Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees.

416.427.    Paul Hudson, the CEO of Sanofi, likewise indicated that PBMs prefer drugs with higher list prices and that the manufacturers have responded accordingly. In discussing a drug Sanofi introduced with a lower list price, Hudson explained: "It just didn't get listed in any way. If price is really the motivator, it would have been listed."

417.428.    While all Defendants acknowledged before Congress their participation in conduct integral to the Insulin Pricing Scheme, none revealed its inner workings or the connection between their coordination and the economic harm that payors, like Plaintiff, as well as Plaintiff's Beneficiaries, were unwittingly suffering. Instead, to obscure the true reason for precipitous price increases, each Defendant group pointed the finger at the other as the responsible party.

418.429.    The PBM Defendants testified to Congress that the Manufacturer Defendants are solely responsible for their list price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

419.430.    This testimony is false. The amount the Manufacturers kick back

to the PBM Defendants *is directly correlated* to an increase in list prices. On average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in list price.[95]

Thus, reducing or eliminating Manufacturer Payments would lower prices and reduce out-of-pocket expenditures.

~~420.~~431.    Further, in large part because of the increased list prices and related Manufacturer Payments, the PBMs' profit per prescription has grown substantially over the same period that insulin prices have steadily increased. For example, since 2003, Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.[96]

~~421.~~432.    Novo Nordisk's President Doug Langa submitted written testimony to Congress in April 2019 acknowledging "there is no doubt that the WAC [list price] is a significant component" of "what patients ultimately pay at the pharmacy counter." Yet, the Manufacturers urged upon Congress the fiction that the PBMs were solely to blame for insulin prices because of their demands for rebates in

---

[95] Neeraj Sood, et al., *The Association Between Drug Rebates and List Prices*, USC Schaeffer Center for Health Policy and Economics (Feb. 11, 2020), https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/ (last visited Apr. 24, 2024).

[96] David Balto, *How PBMs Make the Drug Price Problem Worse*, THE HILL (Aug. 31, 2016, 5:51 p.m.), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse (last visited Apr. 24, 2024).

exchange for formulary placement. The Manufacturers claimed their hands were tied and sought to conceal their misconduct by falsely suggesting that they have not profited from rising insulin prices.

422.433.    Given the Manufacturers' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would decrease list prices if rebates were restricted or eliminated. The spokespersons for Eli Lilly, Novo Nordisk, and Sanofi all said only that they would "consider it."

423.434.    In addition, a 2020 study from the Institute of New Economic Thinking, titled "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that during the time insulin price increases were at their steepest, distributions to the Manufacturers' shareholders in the form of cash dividends and share repurchases totaled $122 billion. In fact, during this time, the Manufacturers spent a significantly lower proportion of profits on R&D compared to shareholder payouts. The paper also notes that "[t]he mean price paid by patients for insulin in the United States almost tripled between 2002 and 2013" and that "per-person spending on insulin by patients and insurance plans in the United States doubled between 2012 and 2016, despite only a marginal increase in insulin use."[97]

---

[97] Rosie Collington, *Profits, Innovation and Financialization in the Insulin Industry*, Inst. For New Econ. Thinking (Apr. 2020), https://www.ineteconomics.org/

~~424.~~435.　　The 2022 Community Oncology Alliance report found:[98]

> [T]here are several important ways that PBM rebates increase the costs of drugs for both plan sponsors and patients. . . . PBMs employ exceedingly vague and ambiguous contractual terms to recast monies received from manufacturers outside the traditional definition of rebates, which in most cases must be shared with plan sponsors. Rebate administration fees, *bona fide* service fees, and specialty pharmacy discounts/fees are all forms of money received by PBMs and rebate aggregators which may not be shared with (or even disclosed to) the plan sponsor. These charges serve to increase the overall costs of drugs, while providing no benefit whatsoever to plan sponsors. . . . The total drug spend of a plan sponsor, regardless of whether it is a federal or state governmental program or a self-funded employer, will inevitably increase because PBMs are incentivized to favor expensive drugs that yield high rebates. . . .

~~425.~~436.　　In January 2021, the Senate Finance Report detailed Congress's findings after reviewing more than 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna. The report concluded, among other things:

　　a.　　The Manufacturer Defendants *retain more revenue from insulin than they did in the 2000s*. For example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018.

　　b.　　The Manufacturer Defendants have aggressively raised the list

---

research/research-papers/　　profits-innovation-and-financialization-in-the-insulin-industry (last visited July 3, 2023).

[98] Community Oncology Alliance, *supra* note 72.

price of their insulin products absent significant advances in the efficacy of the drugs.

> c.    The Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs.

426.437.    The truth is that, despite their finger-pointing in front of Congress, the Manufacturers and PBMs are both responsible for their concerted efforts in creating and effectuating the Insulin Pricing Scheme.

## H. All Defendants Profit from the Insulin Pricing Scheme

427.438.    The Insulin Pricing Scheme affords the Manufacturer Defendants the ability to pay the PBM Defendants exorbitant, yet secret, Manufacturer Payments in exchange for formulary placement, which garners the Manufacturer Defendants greater revenues from sales without decreasing their profit margins. During the relevant period, the PBM Defendants granted national formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

428.439.    The Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated list price.

429.440.    Because of the increased list prices, and related Manufacturer Payments, the PBMs' profit per prescription has grown exponentially during the relevant period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased more than 150% from 2014 to 2018. In fact, for transactions in which the PBM Defendants control the PBM and the pharmacy (e.g., CVS Caremark-CVS pharmacy), these Defendants were capturing an astonishing 40% of the money spent on each insulin prescription (up from only 25% just four years earlier), despite the fact that they do not contribute to the development, manufacture, innovation, or production of the product.[99]

430.441.    The PBM Defendants profit from the artificially inflated prices created by the Insulin Pricing Scheme in several ways, including by: (a) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments, (b) using the inflated list price to generate profits from pharmacies, and (c) relying on the inflated list price to drive up the PBMs' margins through their own mail-order pharmacies.

### 1. The PBMs Pocket a Substantial Share of Manufacturers' Secret Payments

431.442.    The first way in which the PBMs profit from the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

---

[99] Van Nuys, *supra* n.65.

432.443.    The amount that the Manufacturers pay the PBMs has increased over time both in real dollars and as a proportion of the ever-increasing list prices.

433.444.    Historically, contracts between PBMs and payors allowed the PBMs to keep most or all of the rebates they received, rather than forwarding them to the payor.

434.445.    Over time, payors secured contract provisions guaranteeing that PBMs would pay them all or some portion of the rebates that the Manufacturers paid to the PBMs. Critically, however, "rebates" are only one aspect of the total secret Manufacturer Payments, particularly as "rebates" are narrowly defined and qualified by vague exceptions in the PBM Defendants' contracts with payors.

435.446.    Indeed, as described in the Senate Insulin Report, the PBMs and Manufacturers coordinate to determine the contract options made available to payors: "Contracts between PBMs and manufacturers provide a menu of options from which their health plan clients can choose certain terms and conditions."[100]

436.447.    The contracts between the PBMs and Manufacturers also "stipulate terms the plans must follow regarding factors such as formulary placement and competition from other drugs in the therapeutic class."[101] Thus, the

---

[100] Senate Insulin Report at 40.

[101] *Id.* at 44.

Manufacturers ultimately played a role in dictating the terms and conditions of the contracts that payors like Plaintiff entered into with PBMs. Of course, the payors were not involved in the coordination or the negotiation of the contracts between the PBMs and Manufacturers, and the PBMs disclosed only the fact that such relationships may exist. But the terms of the contracts, the consideration exchanged between the PBMs and Manufacturers, and the means of reaching these determinations all were—and remain—shrouded in secrecy.

437.448.    The PBM and Manufacturer Defendants thus created a "hide-the-ball" system where payors like Plaintiff are not privy to rebate negotiations or contracts between the Manufacturers and the PBMs. The consideration exchanged between Defendants (and not shared with payors) is continually labeled and relabeled. As more payors moved to contracts that required PBMs to remit some or all manufacturer "rebates" through to the payor, the PBMs renamed the Manufacturer Payments to shield them from scrutiny and from their payment obligations.

438.449.    Payments once called "rebates" in contracts with payors like Plaintiff were then termed "administrative fees," "volume discounts," "service fees," "inflation fees," or other industry terms designed to obfuscate the substantial sums being secretly exchanged between the PBM Defendants and the Manufacturers.

439.450.    Just last year, the Senate Commerce, Science and Transportation Committee released testimony from David Balto—a former antitrust attorney with

the Department of Justice and Policy Director for the Federal Trade Commission's

Bureau of Competition—from a hearing on fairness and transparency in drug pricing.

Mr. Balto's testimony describes how PBMs "transformed from 'honest brokers'

supposedly negotiating with drug companies to obtain lower costs for insurers and

patients into oligopolists using the rebates they extract from drug manufacturers and

pharmacies to enrich themselves." He further testified:

> The PBM rebate system turns competition on its head with PBMs
> seeking higher, not lower prices to maximize rebates and profits. In
> the past decade, PBM profits have increased to $28 billion annually.
> . . . . PBMs establish tremendous roadblocks to prevent payors from
> knowing the amount of rebates they secure. Even sophisticated
> buyers are unable to secure specific drug by drug rebate information.
> PBMs prevent payors from being able to audit rebate information.
> As the Council of Economic Advisors observed, the PBM market
> lacks transparency as "[t]he size of manufacturer rebates and the
> percentage of the rebate passed on to health plans and patients are
> secret." Without adequate transparency, plan sponsors cannot
> determine if the PBMs are fully passing on any savings, or whether
> their formulary choices really benefit the plan and subscribers.[102]

440.451.    The renamed, and still secret, Manufacturer Payments are

substantial. The use of "administrative fees" instead of "rebates" is one example. A

heavily redacted complaint filed by Defendant Express Scripts in 2017 revealed that

Express Scripts retains up to 13 times more in "administrative fees" than it remits to

payors in rebates. In fact, administrative fees can dwarf rebates. In just one alleged

invoice Express Scripts was seeking payment for in that lawsuit, "administrative

---

[102]    https://www.competitionpolicyinternational.com/pbms-the-middlemen-who-drive-up-drug-costs/ (last visited Apr. 5, 2024).

fees" were more than three-and-a-half times the amount billed for formulary rebates and price protection rebates *combined*.[103]

441.452.    Although the proportion of rebates retained by PBMs remains a secret, commentators have suggested that PBMs "designate as much as 25 or 30 percent of the negotiated rebates as fees to avoid sharing the rebates."[104]

442.453.    A review of Texas-mandated PBM disclosures also showed that PBMs retain a much greater percentage of Manufacturer rebates than they lead on.[105] Under Texas law, certain PBMs are required to report "aggregated rebates, fees, price protection payments, and any other payments collected from pharmaceutical drug manufacturers." Between 2016 and 2021, the PBMs reported that they retained between 9% and 21% of total manufacturer payments.[106] Administrative fees, the report estimated, grew from $3.8 billion in 2018 to $5.8 billion in 2022.

---

[103] *Express Scripts, Inc. v. Kaleo, Inc.*, No. 4:17-cv-01520-RLW (E.D. Mo. 2017); Balto, *supra* n.96.

[104] Joanna Shepherd, *Pharmacy Benefit Managers, Rebates, and Drug Prices: Conflicts of Interest in the Market for Prescription Drugs*, Yale Law & Policy Review, https://openyls.law.yale.edu/bitstream/handle/20.500.13051/17295/auto_convert.pdf?sequence=3&isAllowed=y (last visited Apr. 20, 2024).

[105] Adam Fein, *Texas Shows Us Where PBMs' Rebates Go*, Drug Channels (Aug. 9, 2022), https://www.drugchannels.net/2022/08/texas-shows-us-where-pbms-rebates-go.html (last visited Apr. 20, 2024).

[106] *Id.*

443. In an attempt to quantify the revenue PBMs receive from retained rebates, a 2023 report found that PBM compensation from rebates and other kickbacks doubled between 2018 and 2022, from $3.8 billion to $7.6 billion.[107] "This growth was fueled by increases in traditional administrative fees as well as the emergence of new data and PBM contracting entity fees."[108] Administrative fees, the report estimated, grew from $3.8 billion in 2018 to $5.8 billion in 2022.

444.454. These so-called aAdministrative fees typically are based on a percentage of the drug price—as opposed to a flat fee—such that even if the actual "administrative" cost associated with processing two drugs is the same, the "administrative fee" would be correspondingly higher for the higher-priced drug, which again creates (by design) a perverse incentive to give preference to more expensive drugs. Moreover, the PBM Defendants' contracts with payors narrowly define "rebates" by tying them to patient drug utilization. Thus, rebates for formulary placement (which are not tied to patient drug utilization) are characterized as "administrative fees" that are not remitted to payors. Such payments are beyond a

---

[107] Eric Percher, Trends in Profitability and Compensation of PBMs and PBM Contracting Entities, Nephron Research (Sept. 18, 2023), https://nephronresearch.bluematrix.com/sellside/AttachmentViewer.action?encrypt=1c65fc0e-f558-4f1d-891f-21c196a9f1ad&fileId=7276_04a77b17-d298-48a2-bd15-1c5ed22a6984&isPdf=false.

[108] Id.

payor's contractual audit rights because those rights are limited to "rebate" payments and these "administrative fees" have been carved out from the definition of "rebates."

445.455.    The opaque nature of these arrangements between the Manufacturers and PBM Defendants also makes it impossible for a given payor to discover, much less assess or confront, conflicts of interest that may affect it or its members. The Senate Insulin Report observed with respect to these arrangements that "[r]elatively little is publicly known about these financial relationships and the impact they have on insulin costs borne by consumers."[109]

446.456.    Not surprisingly, the PBMs have gone to great lengths to obscure these renamed Manufacturer Payments to avoid scrutiny from payors and others.

447.457.    For example, as to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

448.458.    In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" to increase the price of their diabetes medications. The thresholds for these payments are typically set at around 6% to 8%—if the Manufacturer Defendants raise their prices by more than the set percentage during a

---

[109] Senate Insulin Report at 4.

specified time period, then they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the list prices).

449.459.    For many of their clients, the PBMs have separate "price protection guarantees," providing that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will remit a portion of the amount to the client.

450.460.    The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 10%-15%.

451.461.    Thus, if the Manufacturers increase their list prices more than the 6% (or 8%) inflation fee rate, but less than the 10%-15% client price protection guarantee rate, then the PBMs keep all of these "inflation fee" payments. This is a win-win for the Manufacturers and PBM Defendants—they share and retain the entire benefit of these price increases while the PBM contracts with payors imply that payors are protected from price hikes by their price protection guarantees.

462.  The PBM Defendants also hide the renamed Manufacturer Payments with using "rebate aggregators." Rebate aggregators, sometimes also referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate rebates and fees with, for and collect payments from, drug manufacturers, including the Manufacturer Defendants, on behalf of a group of PBMs pharmacy benefit managers

(including the PBM Defendants) and ~~different~~ other entities that contract for pharmaceutical drugs.

463. Each PBM Defendant owns or is closely affiliated with at least one rebate aggregator. As relevant here, Express Scripts established and controls Ascent; CVS Caremark established and controls Zinc; and OptumRx established and controls Emisar.

464. The PBMs established these GPOs between 2018 and 2021, in response to mounting pressure from payors to pass through more rebates and other payments collected from the Manufacturers and anticipated Congressional action that would have required more transparency from the PBMs.

465. To avoid passing these rebates and other payments through to payors, the PBMs adjusted their business models by adding rebate aggregators to the pharmaceutical payment chain.

466. As summarized by the recent Community Oncology Alliance report:[110]

> PBMs have increasingly "delegated" the collection of manufacturer rebates to "rebate aggregators," which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. . . . Even some of the major PBMs (i.e., the "Big Three" PBMs) sometimes find themselves contracting with other PBMs' rebate aggregators for the collection of manufacturer rebates. . . . In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and rebate aggregators, as well as contracts between PBMs/rebate

---

[110] Community Oncology Alliance, *supra* note 72.

aggregators and pharmaceutical manufacturers) are not readily available to plan sponsors.

467. The rebate-aggregator GPOs perform the same commercial contracting function that the PBMs once handled themselves, including negotiating with and collecting rebates from the Manufacturers. They add no real value to the transactions they facilitate. The rebate aggregators, however, do retain a portion of the rebates they collect and impose additional fees on the Manufacturers, including new administrative and "data" fees, purportedly for their services.

468. Payors cannot trace these additional amounts, as they are negotiated and collected by the PBMs' affiliate-GPOs and not the PBM-entities that contract with payors. These amounts are not subject to audit, nor do the PBMs disclose the various "fees" the GPOs collect and retain to the SEC or elsewhere.

469. Additionally, further impeding adequate oversight, certain rebate aggregators are located offshore, including Defendant Ascent, in Switzerland, and Defendant Emisar, which has significant operations in Ireland.

470. All told, the advent of rebate aggregators in the already complicated chain of financial transactions between drug manufacturers, pharmacy benefit managers, and payors creates an additional veil obfuscating the rebate payment trail and facilitates the PBMs' extraction of mislabeled rebates and additional fees from the Manufacturers without adding any value.

471. In an attempt to quantify the revenue PBMs receive from retained

rebates, a 2023 report calculated PBM compensation from rebates and other kickbacks between 2018 and 2022 (the period during which rebate aggregators were introduced), and found that this compensation had *doubled*, from $3.8 billion to $7.6 billion.[111] "This growth was fueled by increases in traditional administrative fees as well as the emergence of new data and PBM contracting entity fees."[112] During the same period, "administrative fees" grew from $3.8 to $5.8 billion.[113]

472. And, as admitted by a former OptumRx executive who helped set up Emisar, OptumRx's rebate aggregator, "The intention of the G.P.O. [rebate aggregator] is to create a fee structure that can be retained and not passed on to a client."[114]

452.

453. Before establishing Emisar, OptumRx worked with another rebate aggregator, the Coalition for Advanced Pharmacy Services, or "CAPS." CAPS is also

---

[111] Eric Percher, Trends in Profitability and Compensation of PBMs and PBM Contracting Entities, Nephron Research (Sept. 18, 2023), https://nephronresearch.bluematrix.com/sellside/AttachmentViewer.action?encrypt=1c65fc0e-f558-4f1d-891f-21c196a9f1ad&fileId=7276_04a77b17-d298-48a2-bd15-1c5ed22a6984&isPdf=false (last visited Nov. 6, 2024).

[112] *Id.*

[113] Adam Fein, *Texas Shows Us Where PBMs' Rebates Go*, Drug Channels (Aug. 9, 2022), https://www.drugchannels.net/2022/08/texas-shows-us-where-pbms-rebates-go.html (last visited Nov. 6, 2024).

[114] Rebecca Robbins & Reed Abelson, *The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, N.Y. TIMES (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

a subsidiary of OptumRx, and ultimately of UnitedHealth Group. ~~These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc (CVS Caremark).~~

~~454. The PBM Defendants carefully guard the revenue streams from their rebate aggregator activities, concealing them through complex contractual relationships and not reporting them separately in their quarterly SEC filings.~~

~~455. Certain rebate-aggregator companies are located offshore, including, for example, in Switzerland (Express Scripts' affiliate Ascent Health) and Ireland (OptumRx's affiliate Emisar Pharma Services), thereby precluding adequate oversight.~~

~~456. As summarized by the recent Community Oncology Alliance report:[115]~~

> ~~PBMs have increasingly "delegated" the collection of manufacturer rebates to "rebate aggregators," which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. . . . Even some of the major PBMs (i.e., the "Big Three" PBMs) sometimes find themselves contracting with other PBMs' rebate aggregators for the collection of manufacturer rebates. . . . In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and rebate aggregators, as well as contracts between PBMs/rebate aggregators and pharmaceutical manufacturers) are not readily available to plan sponsors.~~

~~457.~~473.     ~~For example, A~~a 2017 audit conducted by a local governmental

---

~~[115] Community Oncology Alliance, *supra* note 72.~~

entity on ~~Defendant~~ OptumRx related to its PBM activities from 2013 to 2015 ~~concluded that the auditor~~ was unable to verify the percentage of rebates OptumRx remitted to its client payor because OptumRx would not allow the auditor access to its rebate contracts. The audit report explained:

> Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under this model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.[116]

~~458.~~474.    A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc. (ESI)."[117]

~~459.~~475.    In other words, according to this report, OptumRx contract~~ed~~s with its own affiliate aggregator, CAPS, which then contract~~ed~~s with OptumRx's co-conspirator Express Scripts, which then contract~~ed~~s with the Manufacturers for

---

[116] Laura Rogers & Stacey Thomas, Broward County Florida, Audit of Pharmacy Benefit Management Services Agreement, No. 18-13 (Dec. 7, 2017), available at https://cragenda.broward.org/docs/2018/CCCM/20180109_555/25990_2017_1212%20Exh1_OptumRx%20-%20Revised%20Item.pdf (last visited Apr. 24, 2024).

[117] *Id.* n.3.

rebates related to OptumRx's client's drug utilization. OptumRx then useds this complex relationship to mask the amount of Manufacturer Payments generated from its client's utilization.

460.476.    A subsequent audit by the same local entity, covering the period September 2017 to September 2018, concluded:

> Several material weaknesses in Broward's agreement with Optum were identified, many of which are commonplace across pharmacy benefit manager agreements in general. Due to contract weaknesses, a comparison of Broward's PBM agreement, including rebate amounts received, to the Consultant's marketplace data is not feasible. Broward could save an estimated $1,480,000 per year in net prescription drug benefit expenses (based upon minimum rebate guarantees) by switching from its current flawed agreement with Optum, to an agreement with its Coalition, which offers clearly defined terms, increased rebate guarantees and cost saving requirements.[118]

461.477.    Among other "loopholes" discovered in the contract were a number of "flawed" (i.e., vague and manipulable) definitions, including (a) the definition of "Rebates," which "allows the exclusion of monies that should be included" and (b) limitations with respect to "Pass Through Transparency Pricing."

462.478.    The January 2021 Senate Insulin Report summarized the Senate Finance Committee's findings from its two-year probe into the Insulin Pricing Scheme and contained the following observation on these rebate aggregators:

---

[118] Broward County, Florida, *Analysis of Broward County's Prescription Drug Coverage*, https://www.broward.org/Auditor/Reports/Reports/082019_Exh1_BCRxDrug_19-15.pdf (last visited July 3, 2023).

> [T]he recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.[119]

463.479.    Federal regulations governing Medicare attempt to capture all possible forms of Direct or Indirect Remuneration (DIR) to PBMs (and plan sponsors), defining the term as "any form of price concession" received by a plan sponsor or PBM "from any source," including "discounts, chargebacks, rebates, cash discounts, free goods contingent on a purchase agreement, up-front payments, coupons, goods in kind, free or reduced-price services, grants, legal judgment amounts, settlement amounts from lawsuits or other legal action, and other price concessions or similar benefits and specifically including "price concessions from and additional contingent payments to network pharmacies that cannot reasonably be determined at the point of sale."[120]

464.480.    The Department of Health and Human Services, Centers for Medicare & Medicaid Services (CMS) considers all of the following as DIR: rebates,

---

[119] Senate Insulin Report at 83.

[120] CMS, *Final Medicare Part D DIR Reporting Guidance for 2021* at 7, https://www.cms.gov/ files/document/final2021dirreportingreqsmemo508v3.pdf (last visited Jan. 15, 2023).

grants, reduced price administrative services, PBM-retained rebates, PBM rebate guarantee amounts, all post-point of sale payments by pharmacies that are not included in the negotiating price including dispensing incentive payments, prompt pay discounts, and payment adjustments. On the other hand, "bona fide service fees from pharmaceutical manufacturers" and "remuneration for administrative services with no impact on the sponsor's or PBM's drug cost (e.g., PBM incentive payments)" are *not* considered DIR *but only to the extent they reflect fair market value for services rendered.*[121]

465.481.    Because the PBM Defendants retain and conceal most of the secret Manufacturer Payments that they receive, they reap exorbitant profits from the Insulin Pricing Scheme.

482.  Even when payor clients receive a portion of the Manufacturer Payments from their PBM, the payors are significantly overcharged, given the extent to which Defendants have deceptively and egregiously inflated the prices of the at-issue drugs.

483.  On September 20, 2024, the Federal Trade Commission brought suit against the PBM Defendants and their affiliated rebate aggregators for violations of Section 5 of the Federal Trade Commission Act "for engaging in anticompetitive and unfair rebating practices that have artificially inflated the list price of insulin drugs,

---

[121] *Id.* at 6-7.

impaired patients' access to lower list price products, and shifted the cost of high insulin list prices to vulnerable patients."

484.  Specifically, the recent FTC Complaint revealed, among other things, (a) that the PBM Defendants' affiliated rebate aggregators "now perform the same commercial contracting function that the PBMs previously handled directly" and that the PBM Defendants "simply moved their commercial rebate contracting functions" to their affiliated rebate aggregators; (b) that the rebate aggregators solicit commercial bids from manufacturers using rebate grids "with different rebate rates for different levels of exclusivity: exclusive coverage (1 of 1 manufacturer), dual coverage with another manufacturer (1 of 2), and multiple manufacturers (1 of many)"; and (c) that the rebate aggregators extract WAC-based fees from drug manufacturers as part of commercial negotiations but "provide no additional services to justify the higher payout on higher list price drugs from the assortment of WAC-based fees" the rebate aggregators extract from the manufacturers.

466.

## 2. The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies

467.485.    A second way the PBM Defendants profit off the Insulin Pricing Scheme is by using the Manufacturers' inflated price to derive profit from the pharmacies with whom they contract nationwide.

468.486.    Each PBM Defendant decides which pharmacies are included in

the PBM's network and how much it will reimburse these pharmacies for each drug dispensed.

469.487.    The PBMs pocket the spread between the amount that the PBMs are paid by their clients, like Monmouth County, for the at-issue drugs (which are based on the prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less). In other words, the PBMs charge a client payor more for a drug than the PBM pays the pharmacy and pockets the difference.

470.488.    More specifically, the PBM Defendants negotiate with their client payors a reimbursement rate that the client pays the PBM for each prescription drug dispensed by a pharmacy. The PBM Defendants negotiate a separate rate that they pay to pharmacies for each drug dispensed.

471.489.    These rates are tied to AWP. For example, a PBM may purchase an insulin from the pharmacy at a rate of AWP-15%, and the client may reimburse the PBM at a rate of AWP-13%.  The PBM pockets the spread (2% of AWP in this example) between the rates.

472.490.    Because the PBM Defendants' revenue from the spread pricing is tied to AWP, the higher the AWP, the greater the amount of money made by the PBMs. In the above example, if the AWP is $100 for a drug, the PBM would make $2 on the spread, but if the AWP is $1000 for the same drug, the PBM would make

$20 on the spread from the same sale (AWP-15% = $850; AWP-13% = 870).

473.491.    When a PBM is affiliated with a retail pharmacy, the PBM earns the entire retail margin in addition to the pricing spread described above.

474.492.    The PBM Defendants, therefore, like the Manufacturers, directly benefit from inflated insulin prices.

475.493.    In addition, because the PBM Defendants' client payors pay for thousands of different prescription drugs, the client payors cannot practically keep track of the AWP for each prescription drug on a given formulary or how those prices change over time.  The client payors, therefore, are unlikely to independently observe the AWP inflation resulting from the Insulin Pricing Scheme. And the PBM Defendants have no incentive to alert their client payors to increasing AWPs since the PBM Defendants directly profit from those increases.

476.494.    In addressing this form of spread pricing, the National Association of Insurance Commissioners states: "Pharmacy pricing is complex, and the process is not transparent. Plan sponsors are often unaware of the difference between the amount they are billed and the pharmacy reimbursement."[122]

477.495.    A bipartisan bill introduced in the Senate in 2022 (the Pharmacy

---

[122] NAIC, Guide to Understanding Pharmacy Benefit Manager and Associated Stakeholder Regulation—NAIC White Paper Draft as of April 16, 2023, available at: https://content.naic.org/sites/default/files/inline-files/NACDS%20Comments _0.pdf (last visited Apr. 24, 2024).

Benefit Manager Transparency Act—S. 4293)—would have criminalized this practice of spread pricing, which the bill defined as "[c]harg[ing] a health plan or payer a different amount for a prescription drug's ingredient cost or dispensing fee than the amount the pharmacy benefit manager reimburses a pharmacy for the prescription drug's ingredient cost or dispensing fee where the pharmacy benefit manager retains the amount of any such difference." The bill has not yet been enacted.[123]

478.496.    The PBMs' industry-funded trade association, PCMA, spent $7.8 million on lobbying in 2021, $8.66 million on lobbying in 2022, and $15.43 million on lobbying in 2023.[124]

479.497.    The PBMs often disclose the general concept of spread pricing to payors, but only in vague terms that require no accountability. And because the spread-pricing revenue is not defined as a "rebate" in PBM contracts with payors, it falls outside payors' audit rights.

480.498.    This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment

---

[123] https://www.govtrack.us/congress/bills/117/s4293 (last visited Jan. 10, 2023). A new PBM Transparency Act (S.127) was introduced in July 3, 2023.

[124] OpenSecrets, *Client Profile: Pharmaceutical Care Management Ass'n Annual Lobbying Totals*, https://www.opensecrets.org/orgs/pharmaceutical-care-management-assn/lobbying?id=D000028342 (last visited Apr. 16, 2024).

from the PBM Defendants to consider the cost-effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

481.499.    The higher the Manufacturers' list prices, the more money the PBMs make off the spread. At the same time, a Beneficiary's out-of-pocket co-pay or deductible cost often is more than if the client had simply paid cash outside of his or her plan. On top of this, the PBM contracts generally allow no rebates to payors where the Beneficiary is responsible for 100% of the drug cost, e.g., under his or her deductible.

482.500.    The PBM Defendants also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR (Direct or Indirect Remuneration) fees, based on the list prices—and again, the higher the list price for each diabetes medication sold, the greater the fees the PBMs generate. They also apply "retrospective" discounts so, for example, a payor's (and member's co-pay or deductible) cost may be $100, but the price may be discounted post-purchase between the PBM and the (often self-owned) pharmacy to $90, with the spread going to the PBM.

483.501.    CMS addressed these and similar DIR issues in a proposed rule in 2017. While noting the growth of "pharmacy price concessions" that "are negotiated between pharmacies and their sponsors or PBMs," CMS nevertheless

concluded:

> When manufacturer rebates and pharmacy price concessions are not reflected in the price of a drug at the point of sale, beneficiaries might see lower premiums, but they do not benefit through a reduction in the amount they must pay in cost-sharing, and thus, end up paying a larger share of the actual cost of a drug. Moreover, given the increase in manufacturer rebates and pharmacy price concessions in recent years, the point-of-sale price of a drug that a Part D sponsor reports on a PDE record as the negotiated price is rendered less transparent . . . .[125]

CMS expressed further concern that when rebates and other price concessions are not reflected in the negotiated point-of-sale drug price, it "can impede beneficiary access to necessary medications, which leads to poorer health outcomes and higher medical care costs for beneficiaries . . . ."[126]

484.502.    So, the PBM Defendants make money "coming and going." In a pre-PBM world, a competitively priced drug might have a (hypothetical) net cost to a health plan of $50, and that is what it paid. Now, the PBMs coordinate with Manufacturers to increase the list price to $150. The PBMs then "negotiate" the inflated price down to $100 and take a $50 rebate, some of which may be forwarded to the payor, whose net cost is less than the inflated list price, but whose real-world cost is considerably more than if the PBMs were not involved.

---

[125] Medicare Program; Contract Year 2019 Policy and Technical Changes, 82 Fed. Reg. 56336 (Nov. 29, 2017), https://www.govinfo.gov/content/pkg/FR-2017-11-28/pdf/2017-25068.pdf.

[126] *Id.*

485.503.    At the same time, the PBMs receive "administrative fees" for including certain drugs on its formularies, which are not considered "rebates." The PBMs also receive "service fees" or other payment for "administrative services" provided to the Manufacturers such as "formulary compliance initiatives," "education services," or the sale of non-patient identifiable claim information. All of these revenue streams are outside the typical definition of "rebates" found in contracts between the PBM Defendants and payors.

486.504.    The PBMs then charge payors administrative fees for providing pharmacy benefit management services and charges for drug costs (a/k/a ingredient costs) and per-prescription dispensing fees, as well as additional administrative fees for services not included in the PBMs' general administrative obligations. The PBMs then receive rebates and/or discounts (pre-purchase or post-purchase) from the pharmacies, which the PBMs often own. These too are excluded from the definition of "rebates." These and other vaguely described revenue streams are sometimes disclosed, but only in hazy, overly generalized terms. And they are beyond a payor's contractual rights to audit for "transparency" purposes because they are not defined "rebates."

487.505.    Additionally, the PBMs may take months to pay rebates to payors and the PBMs retain all interest on, and the time-value of, the rebates pending payment. This is one example of a PBM "disclosure" excerpted from a payor's PBM

171

contract with Express Scripts:

> This disclosure provides an *overview* of the *principal* revenue sources of Express Scripts, Inc. and Medco Health Solutions, Inc. (individually and collectively referred to herein as "ESI"), as well as ESI's affiliates. In addition to administrative and dispensing fees paid to ESI by our clients for pharmaceutical benefit management ("PBM") services, ESI and its affiliates derive revenue from other sources, including arrangements with pharmaceutical manufacturers, wholesale distributors, and retail pharmacies. *Some* of this revenue relates to utilization of prescription drugs by members of the clients receiving PBM services. ESI *may* pass through certain manufacturer payments to its clients or *may* retain those payments for itself, depending on the contract terms between ESI and the client. . . . Formulary rebate amounts vary based on the volume of utilization as well as formulary position applicable to the drug or supplies, and adherence to *various* formulary management controls, benefit design requirements, claims volume, and *other similar factors*, and *in certain instances* also *may* vary based on the product's market-share. ESI *often* pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's PBM agreement terms. ESI retains the financial benefit of the use of any funds held until payment of formulary rebate amounts is made to the client. In addition, ESI provides administrative services to formulary rebate contracted manufacturers, which include, *for example*, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. (emphasis added)

488.506.    Payors have no access to, and no knowledge of, the intricacies of the dealings between the PBM Defendants and the Manufacturers that are shrouded by such vague "disclosures" (which vary in detail, but not in substance, in all three of the PBM Defendants' adhesive contracts). These disclosures could be summed up in a single sentence: "We pass along 'rebates' to our client payors, except when we

don't."

### 3. The Insulin Pricing Scheme Increases PBM Mail-Order Profits

~~489.~~507.    Another way the PBM Defendants profit from the Insulin Pricing Scheme is through their mail-order pharmacies. The higher the price that PBM Defendants can get customers to pay for diabetes medications, the greater the profits PBM Defendants realize through their mail-order pharmacies.

~~490.~~508.    Because the PBMs base the prices they charge for the at-issue diabetes medications on the Manufacturers' prices, the more the Manufacturers inflate their prices, the more money the PBMs make.

~~491.~~509.    When a PBM has its own mail-order pharmacy, its profits are even greater than when they are dispensed through its retail network pharmacies. When a PBM dispenses prescription drugs through its own mail-order pharmacy, it captures the entire retail margin as increased by the Insulin Pricing Scheme.

~~492.~~510.    The PBM Defendants have colluded with the Manufacturers so that the PBMs often know when the Manufacturers are going to raise their prices. The PBMs purchase a significant volume of the at-issue drugs before the price increase goes into effect. Then, after the Manufacturers raise their price, the PBMs charge their mail-order customers based on the increased prices and pocket the difference. The PBMs make significant amounts of money through this arbitrage scheme.

493.511.    The PBM Defendants also charge the Manufacturer Defendants fees related to their mail-order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the Manufacturers' price. Once again, the higher the price is, the more money the PBMs make on these fees.

494.512.    In sum, each way in which the PBM Defendants make money on diabetes medications *is tied directly to coordination with the Manufacturers to establish artificially higher prices and inducing ever-increasing secret Manufacturer Payments*. The PBMs are not lowering the price of diabetes medications as they represent publicly and directly to their payor clients like Monmouth County. On the contrary, they are making billions of dollars *at the expense of their clients* and their clients' Beneficiaries by fueling these skyrocketing prices.

## I. Monmouth County Purchased At-Issue Drugs Directly from Express Scripts

495.513.    As a government employer, Monmouth County serves its residents by providing public safety, emergency management, and health services, among other vital roles. As more federal and state responsibilities are passed on to local government, Monmouth County has a growing list of demands on a limited budget. Consequently, any significant increase in spending can have a severe detrimental effect on Monmouth County's overall budget and, in turn, negatively impact its ability to provide necessary services to the community.

496.514.    One benefit Monmouth County provides the Beneficiaries of its

healthcare plan is payment for a large portion of their pharmaceutical purchases. In this role, Monmouth County has spent significant amounts on the at-issue diabetes medications during the relevant period.

497.515.    Because Monmouth County maintains a self-funded plan, it does not rely on a third-party insurer to pay for its insured's medical care, pharmaceutical benefits, or prescription drugs. Rather, Monmouth County directly contracts with, and directly pays, PBMs (and their affiliated pharmacies) for pharmaceutical benefits and prescription drugs, including the at-issue medications.

498.516.    Specifically, during the relevant time period, Monmouth County contracted with Express Scripts and, prior to that time, Medco (now Express Scripts).

499.517.    Monmouth County is the only named party that pays the full purchase price for the at-issue drugs, and the only named party that has not knowingly participated in the Insulin Pricing Scheme. Neither the PBM Defendants nor the Manufacturer Defendants suffer losses from the Insulin Pricing Scheme. Instead, they both benefit from—and have conspired together to orchestrate—the scheme.

500.518.    As part of purchasing the at-issue drugs from Express Scripts (and its predecessor, Medco), Monmouth County directly pays and paid these PBMs artificially inflated costs resulting from the Insulin Pricing Scheme, including fees

like "claims reimbursements," "ingredient costs," "dispensing fees," "administrative fees," "inflation fees," "discounts," and more—all of which are associated with Plaintiff's purchase of the at-issue drugs from these PBMs. Because the at-issue drugs are potentially life-saving medications, and because the Defendants control the market for these drugs, Monmouth County has had no choice but to pay these exorbitant, artificially inflated prices directly to Express Scripts.

501.519.   Diabetes medications have consistently been a significant financial expense for Plaintiff. For example, in each year since 2016, Plaintiff has spent over $800,000, with costs for these drugs steadily increasing and eclipsing $1 million in each year since 2020.

502.520.   In addition to purchasing the at-issue drugs from Express Scripts, Monmouth County also relies (and has relied) on Express Scripts as an administrative agent, for the supposed purposes of limiting its administrative burden and controlling pharmaceutical drugs costs.

503.521.   In providing PBM services to Monmouth County, including developing and offering formularies for Monmouth County's prescription plan, constructing and managing Monmouth County's pharmacy network (which included the PBM's retail and mail-order pharmacies), processing pharmacy claims, and providing mail-order pharmacy services, Defendant Express Scripts—in direct coordination with the Manufacturer Defendants and utilizing the false prices

generated by the Insulin Pricing Scheme—set the amounts Monmouth County paid for the at-issue medications. Monmouth County paid Express Scripts directly for the at-issue drugs and to manage pharmacy benefits related to the at-issue drugs.

### J. Defendants Deceived Plaintiff

504.522.    At no time has either Defendant group disclosed the Insulin Pricing Scheme or the false list prices produced by it.

### 1. The Manufacturer Defendants Deceived Plaintiff

505.523.    At all relevant times, the Manufacturer Defendants knew that the list prices, net prices, and payors' net costs (purchase prices) generated by the Insulin Pricing Scheme were false, excessive, and untethered to any legal, competitive, or fair market price.

506.524.    The Manufacturer Defendants knew that these prices did not bear any rational relationship to the actual costs incurred or prices realized by Defendants, did not result from transparent or competitive market forces, and were artificially and arbitrarily inflated for the sole purpose of generating profits for Defendants.

507.525.    The insulin market, and Defendants' business arrangement relating to it, exhibits the key features of an oligopoly—the concentration of numerous competitors into a small group of firms that dominates the market, high barriers to entry, the ability to set and control prices, firm interdependence, and maximal revenues.

508.526.    The Manufacturer Defendants also knew that payors, including Plaintiff, relied on the false list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs.

509.527.    The Manufacturer and PBM Defendants further knew that Monmouth County—like any reasonable consumer and particularly one with fiduciary obligations to its Beneficiaries—expected to pay a price reflecting the lowest fair market value for the drugs (which was not necessarily the same as the lowest price in the market, given that all prices were inflated due to the Insulin Pricing Scheme).

510.528.    Despite this knowledge, the Manufacturer Defendants published list prices generated by the Insulin Pricing Scheme throughout the United States and New Jersey in publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain, and directly to pharmacies, who then used these prices to set the amount that the pharmacies charged for the at-issue drugs.

511.529.    The Manufacturer Defendants also published these prices to the PBMs, who then used them to charge diabetics and payors for the at-issue drugs.

512.530.    By publishing their prices in every U.S. state, the Manufacturers held each of these prices out as a reasonable price on which to base the prices payors actually pay for the at-issue drugs.

513.531.    These representations are false. The Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to their cost, their fair market value in a competitive market, or the net price received for the at-issue drugs.

514.532.    During the relevant period, the Manufacturer Defendants published prices in every state within the U.S. in the hundreds of dollars per dose for the same at-issue drugs that would have been profitable to Manufacturers at prices less than $10 per dose.

515.533.    The Manufacturer Defendants also have publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for Dave Ricks, Eli Lilly CEO, as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant period, executives from Sanofi and Novo Nordisk also falsely represented that research and development costs were key factors driving the at-issue price increases.[127]

516.534.    Contrary to the Manufacturer Defendants' representations, between 2005 and 2018, Eli Lilly spent $680 million on R&D costs related to Humalog while earning $31.35 billion in *net* sales during that same period. In other

---

[127] Drug Pricing Investigation at PDF 188-94.

words, Eli Lilly made more than 46 times its reported R&D costs on Humalog during this portion of the relevant period, i.e., R&D costs amounted to about 2% of *net* sales (whereas R&D costs for pharmaceuticals typically amount to around 20% of *total* revenues). Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.[128]

517.535.    The Senate Insulin Report found that the PBMs consider insulins to be "interchangeable" from "a clinical perspective" and that Manufacturers "focus their R&D efforts on new insulin-related devices, equipment, and other mechanical parts that are separate from insulin's formulation."[129]

518.536.    A House Oversight Committee staff report concluded that "drug companies' claims that reducing U.S. prescription drug prices will harm innovation is overblown" and that "[m]any drug companies spent a significant portion of their R&D budget on finding ways to suppress generic and biosimilar competition while continuing to raise prices, rather than on innovative research."[130]

519.537.    In sum, the Manufacturer Defendants affirmatively withheld the

---

[128] *Id.*

[129] Senate Insulin Report at 5, 17.

[130] U.S. House of Representatives, *Drug Pricing Investigation: Industry Spending on Buybacks, Dividends and Executive Compensation* (July 2021) at PDF 3, https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/COR%20Staff%20Report%20-%20Pharmaceutical%20Industry%20Buybacks%20Dividends%20Compared%20to%20Research.pdf (last visited Jan. 10, 2023).

truth from Plaintiff and specifically made misrepresentations in furtherance of the Insulin Pricing Scheme and to induce Plaintiff's reliance to purchase the at-issue drugs.

### 2. The PBM Defendants Deceived Plaintiff

520.538.    The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by preferring *the highest-priced at-issue drugs* for preferred formulary placement and by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

521.539.    The PBM Defendants perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom at the expense of payors nationwide.

522.540.    At all times relevant, the PBMs have purposefully, consistently, and routinely misrepresented that they negotiate with Manufacturer Defendants and construct formularies for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics. Representative examples include:

a.    CVS Caremark has for the past decade stated in its annual reports

that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness, and convenience of prescription drugs. CVS Caremark has further stated that it maintains an independent panel of doctors, pharmacists, and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of CVS Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

b.      Express Scripts has consistently represented that it works with clients, manufacturers, pharmacists, and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes. Its annual reports consistently claim that in making formulary recommendations, Express Scripts' Pharmacy & Therapeutics Committee considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy.

c.      OptumRx has stated in its annual reports over the past decade that OptumRx's rebate contracting and formulary management assist customers in

achieving a low-cost, high-quality pharmacy benefit. It has consistently claimed that it promotes lower costs by using formulary programs to produce better unit costs, encouraging patients to use drugs that offer improved value and that OptumRx's formularies are selected for health plans based on their safety, cost, and effectiveness.[131]

~~523.~~541.    In addition to these general misrepresentations, the PBM Defendants have purposefully, consistently, and routinely made misrepresentations about the at-issue diabetes medications. Representative examples include:

a.    In a public statement issued in November 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."[132]

b.    In 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark, stated on national television that "CVS is working to develop

---

[131] *See, e.g.*, CVS Health Annual Reports (Form 10-K) (FY 2010-2019); OptumRx Annual Reports (Form 10-K) (FY 2010-2019); Express Scripts Annual Reports (Form 10-K) (FY 2010-2017).

[132] Chain Drug Review, *CVS Expands Extracare for Diabetes Products* (May 11, 2010), https://www.chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/ (last visited Apr. 17, 2024).

programs to hold down [diabetes] costs."[133]

      c.     In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."[134]

      d.     In 2017, Express Scripts' CEO, discussing a program involving insulin, "disputed the idea that Express Scripts contributes to rising drug costs."[135]

      e.     In 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts, said in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients

---

[133] CBS News, Diabetes Epidemic Growing (June 22, 2010, 11:29 a.m.), https://www.cbsnews.com/news/diabetes-epidemic-growing/ (last visited Apr. 17, 2024).

[134] Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year*, WALL ST. J. (Nov. 8, 2012), Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year*, WALL ST. J. (Nov. 8, 2012), http://online.wsj.com/article/SB10001424127887324439804578107040729812454.html (last visited Apr. 17, 2024).

[135] Katie Thomas, *Express Scripts to Offer Cheaper Drugs for Uninsured Customers*, N.Y. TIMES, May 8, 2017, available at https://www.nytimes.com/2017/05/08/health/express-scripts-drug-prescriptions-prices.html (last visited Apr. 18, 2024).

prevail over cost and care challenges created by this terrible disease."[136] Mr. Stettin also claimed that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[137]

      f.     In a 2018 Healthline interview, Mark Merritt, long the President of the PBM trade association, PCMA, misrepresented that: "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."[138]

      g.     CVS Caremark's Chief Policy and External Affairs Officer claimed in the April 2019 hearings that CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best

---

[136] Angela Mueller, *Express Scripts Launches Program to Control Diabetes Costs,* ST. LOUIS BUS. J. (Aug. 31, 2016), https://www.bizjournals.com/stlouis/news/2016/08/31/express-scripts-launches-program-to-control.html (last visited Apr. 17, 2024).

[137] Express Scripts, PR NEWSWIRE, *Express scripts Launches Diabetes Care Value Program^SM, Guaranteeing More Affordable, High-Quality Diabetes Care*, Aug. 23, 2016, https://www.prnewswire.com/news-releases/express-scripts-launches-diabetes-care-value-program-guaranteeing-more-affordable-higher-quality-diabetes-care-300320485.html#:~:text=The%20new%20program%20%E2%80%93%20part%20of,anticipated%20increase%20in%20diabetes%2Ddrug (last visited Apr. 17, 2024).

[138] Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?*, Population Health Learning Network (Dec. 2016), https://www.hmpgloballearningnetwork. com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part (last visited Apr. 17, 2024).

possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."[139]

h.    Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."[140] In May 2023, OptumRX's CEO, Heather Cianfrocco, told the U.S. Senate Committee on Health, Education, Labor, and Pensions that OptumRx "has been at the forefront of efforts to improve access to affordable insulin and provide comprehensive care to patients with diabetes."[141]

i.    The PBM-funded trade association PCMA's website acknowledges that "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins," but then misleadingly claims that "PBMs work hard to drive

---

[139] *Priced Out of a Lifesaving Drug* at lines 715-18.

[140] *Id.* at lines 903-06.

[141] Heather Cianfrocco Written Testimony, *The Need to Make Insulin Affordable for All Americans* (May 10, 2023), https://www.help.senate.gov/imo/media/doc/Cianfrocco%20Written%20Testimony%20HELP%20Committee%20_Final.pdf.

down costs using formulary management and rebates."[142]

~~524.~~542.     The PBM Defendants falsely represent that they negotiate with the Manufacturer Defendants to lower the price of the at-issue diabetes medications not only for *payors*, but also for diabetic *patients*. For example:

a.     Express Scripts' code of conduct, effective beginning in 2015, states: "At Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable."[143]

b.     Amy Bricker—former President of Express Scripts and PCMA board member—testified before Congress in April 2019: "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs."[144]

---

[142] PCMA, *PCMA on National Diabetes Month: PBMs Lowering Insulin Costs, Providing Support to Patients* (Nov. 16, 2020), https://www.pcmanet.org/pcma-on-national-diabetes-month-pbms-lowering-insulin-costs-providing-support-to-patients/ (last visited Apr, 17, 2024); Visante, *Insulins: Managing Costs with Increasing Manufacturer Prices* (2020), https://www. pcmanet.org/ wp-content/uploads/ 2020/08/PCMA_Visante-Insulins-Prices-and-Costs-.pdf.

[143] Express Scripts, *Code of Conduct*, https://www.express-scripts.com/aboutus/ codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited Apr. 16, 2024).

[144] *Priced Out of a Lifesaving Drug* at lines 803-06.

c.    Ms. Bricker also testified that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications."[145]

d.    OptumRx CEO John Prince testified to the Senate: "We *reduce the costs of prescription drugs* [and] we are leading the way to ensure that *those discounts directly benefit consumers*. . . . OptumRx's pharmacy care services business is *achieving better health outcomes for patients*, *lowering costs* for the system, and *improving the healthcare experience for consumers*. . . . OptumRx negotiates better prices with drug manufacturers *for our customers and for consumers*.[146]

e.    In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . [I]n 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative."[147]

f.    The PCMA website touts PBMs as "the only entity in the prescription drug supply and payment chain dedicated to reducing drug costs"

---

[145] *Id*. at lines 838-40.

[146] Senate Insulin Report—*Hearing Transcript* at 174, available at https://www.finance.senate.gov/imo/media/doc/435631.pdf (last visited Apr. 17, 2024).

[147] CVS Health, *2017 Drug Trend Report* (Apr. 5, 2018), (last visited Apr. 17, 2024).

and (contradicting the PBM representatives' Congressional testimony), that "when new manufacturers enter the market at a lower list price, PBMs use the competition to drive costs down."[148]

~~525.~~543.    Not only have the PBM Defendants intentionally misrepresented that they use their market power to save payors money, but they have also specifically and falsely disavowed that their conduct drives prices higher. Representative examples include:

    a.    On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated: "Drugmakers set prices, and we exist to bring those prices down."[149]

    b.    Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017: "Any suggestion that PBMs are causing prices to rise is simply erroneous."[150]

    c.    In 2017, Express Scripts' Wentworth went on CBS News to argue

---

[148] PCMA, *PBMs Reduce Insulin Costs: PBMs are working to improve the lives of patients living with diabetes and their families,* https://www.pcmanet.org/insulin-managing-costs-with-increasing-manufacturer-prices/ (last visited Apr. 17, 2024).

[149] Samantha Liss, *Express Scripts CEO Addresses Drug Pricing 'Misinformation'*, St. Louis Post-Dispatch (Feb. 17, 2017), https://www.stltoday.com/business/local/express-scripts-ceo-addresses-drug-pricing-misinformation/article_8c65cf2a-96ef-5575-8b5c-95601ac51840.html (last visited Apr. 17, 2024).

[150] Lynn R. Webster, *Who Is To Blame For Skyrocketing Drug Prices?*, THE HILL (July 27, 2017, 11:40 AM), https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices (last visited Apr. 17, 2024).

that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[151]

d.    During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer Sumit Dutta answered, "we can't see a correlation just when rebates raise list prices."[152]

e.    In 2019, when testifying Congress on the rising price of insulins, Amy Bricker—then with Express Scripts, now with CVS—testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."[153]

526.544.    All of the PBM Defendants' public statements regarding insulin pricing have been consistent with the misrepresentations above and below. None has contradicted those misrepresentations or revealed the Insulin Pricing Scheme.

527.545.    Although Plaintiff's employees responsible for managing Monmouth County's health plans were not following the various Congressional hearings when they occurred and were not exposed to all the misrepresentations

---

[151] CBS News, *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices* (Feb. 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited Apr. 17, 2024).

[152] *Priced Out of a Lifesaving Drug* at lines 1019-22.

[153] *Id*. at lines 1016-17.

detailed above (or all of those detailed below), the ~~Defendants'~~ public

pronouncements ~~by Defendants were~~ have been consistent with those

misrepresentations.

~~528.~~546.    Monmouth County's direct interactions with the PBM

Defendants were consistent with those misrepresentations, which were made in

furtherance of, and in order to conceal, the Insulin Pricing Scheme.

~~529.~~547.    For example, in its recent 2023 response to Plaintiff's RFP,

Express Scripts represented to Monmouth County, among other things, that:

a.    Express Scripts was "look[ing] forward to renewing our

relationship and expanding the partnership we've built over 10 years to help

solve your toughest challenges in the pharmacy benefit [sic] today and in the

future."

b.    Express Scripts wanted "to continue our partnership and deliver

best in class service" to the County's members as the County's "trusted

advisor."

c.    Express Scripts' services make prescription drugs more

affordable.

d.    Express Scripts recognized its clients' need for cost solutions.

e.    Express Scripts "will collaborate with County of Monmouth . . .

and work with County of Monmouth to create goals and action plans related

to . . . cost containment" and "coordinates with internal partners and corporate resources to maximize County of Monmouth's success."

f.    Express Scripts would assign Monmouth County a financial analyst who would "assess County of Monmouth's program performance, including cost-effectiveness . . ."

g.    That Express Scripts' own "research has shown that most members want exactly with plan sponsors want: lower costs and optimal health."

h.    That Express Scripts' mission was "simple, affordable, and predictable."

~~530.~~548.    Express Scripts made similar representations to Monmouth County in connection with earlier-submitted RFP responses, which ultimately resulted in the continued renewal of Express Scripts' standing agreement with Monmouth County.

~~531.~~549.    Of course, Express Scripts has never revealed to Monmouth County that it had coordinated with the Manufacturers to determine the contract terms that would be presented to payors like Monmouth County, to create the formulary Monmouth County was required to adopt, and to set prices based upon the false list prices at Monmouth County's expense and in furtherance of the Insulin Pricing Scheme.

532.550.    While bombarding Monmouth County with misrepresentations and half-truths like those above, none of the PBMs revealed the details of their relationships with the Manufacturer Defendants or the existence of the Insulin Pricing Scheme.

533.551.    Throughout the relevant period, the PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with their payor clients; (b) they work to lower the price of the at-issue drugs and, in doing so, achieve substantial savings for diabetics and payors; and (c) that monies they receive from manufacturers and their formulary choices are for the benefit of payors and diabetics.

534.552.    Indeed, the PBM Defendants have promised to avoid conflicts of interest. For example, the PCMA has Principles of Professional and Ethical Conduct to which all PCMA members, including the three PBM Defendants, have agreed.[154] This code of ethics requires the PBM Defendants to "[a]void any and all conflicts of interest and advise all parties . . . of any situations where a conflict of interest exists."[155]

535.553.    Each PBM Defendant has also published a code of conduct

---

[154] *Principles of Professional and Ethical Conduct*, PCMA, https://www.pcma.org/about/principles-of-professional-and-ethical-conduct/ (last visited Apr. 20, 2024).

[155] *Id.*

requiring employees and entities to avoid conflicts of interest.[156] Despite these obligations, the PBM Defendants have substantial pecuniary interests that conflict with their duties to Monmouth County. The PBM Defendants artificially inflate the price of insulin for their profit, to the detriment of payors, including Monmouth County.

536.554.    The PBM Defendants understand that payors like Monmouth County rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve access to medications. Monmouth County did so. Indeed, Express Scripts' CEO told the U.S. Senate that PBMs "exist to help solve the challenge[]" of rising drug prices, including insulin, by "negotiating with large pharmaceutical manufacturers to lower the cost of drugs for employers, health plans, federal and state governments, and most importantly, patients."[157]

537.555.    Throughout the relevant period, the PBM Defendants also falsely

---

[156]    Code of Conduct, Express Scripts, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited Apr. 20, 2024); Code of Conduct, CVS Caremark, https://media.corporate-ir.net/media_files/irol/99/99533/corpgov/codeofconduct03.pdf (last visited Apr. 20, 2024); Code of Conduct, UnitedHealth Group, https://professionals.optumrx.com/content/dam/optum3/professional-optumrx/resources/FWA_CoCs_2018.pdf (last visited Apr. 20, 2024).

[157] Adam Kautzner, Testimony Before the U.S. S. Comm. on Health, Educ., Labor, and Pensions, *The Need to Make Insulin Affordable for All Americans* (May 10, 2023), https://www.help.senate.gov/imo/media/doc/Kautzner%20Express%20Scripts%20HELP%20Hearing%20Testimony%2005102023.pdf.

claimed they are transparent about the Manufacturer Payments and that the amounts remitted (or not) to payors. In fact, the PBM Defendants' disclosures of their ties to the Manufacturer Defendants were vague, equivocal, and misleading. Their manner of defining "rebates" in payor contracts is misleading and subject to undefined and indeterminable conditions and exceptions. The PBM Defendants thereby facilitated and obtained secret Manufacturer Payments far above and beyond the amounts of "rebates" remitted to payors.

538.556.    The PBM Defendants' internal processes and accounting were and are abstruse and opaque, allowing them to overtly mislead the public and payors like Plaintiff.

539.557.    In 2011, for example, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . . Every day we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."[158]

540.558.    In a 2017 CBS News interview, Express Scripts' CEO represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments they receive and that payors "know exactly how

---

[158] UnitedHealth Group, *Prescription Solutions by OptumRx Receives 4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards* (Sept. 13, 2011), https://web.archive.org/web/20210805182422/https://www.unitedhealthgroup.com/n ewsroom/2011/0913tipps.html (last visited Apr. 17, 2024).

the dollars flow" with respect to these Manufacturer Payments.[159]

541.559.    When testifying before the Senate Finance Committee, CVS Executive Vice President Derica Rice stated, "[A]s it pertains to transparency overall, we at CVS Caremark are very supportive. We provide full visibility to our clients of all our contracts and the discounts that we negotiate on their behalf. . . . And transparency—today we report and fully disclose not only to our clients, but to CMS [Medicare]."[160]

542.560.    At the same hearing, Steve Miller of Cigna (Express Scripts) testified: "we are really a strong proponent for transparency for those who pay for health care. So the patient should know exactly what they are going to pay. Our plan sponsors need to know exactly what is in their contract."[161]

543.561.    John Prince of OptumRx chimed in: "Senator, if our discounts were publicly available, it would hurt our ability to negotiate effectively. Our discounts are transparent to our clients."[162]

---

[159] CBS News, *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices* (Feb 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited Apr. 17, 2024).

[160] Senate Insulin Report Hearing Transcript at 28, 32, https://www.finance.senate.gov/imo/media/doc/ 435631.pdf (last visited Apr. 17, 2024).

[161] *Id.* at 32.

[162] *Id.*

544.562.    And when testifying before Congress in April 2019, Amy Bricker, then a Senior Vice President of Defendant Express Scripts, touted transparency with payors and echoed Mr. Prince's need for confidentiality around discounts:[163]

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . The reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> ***
>
> Mr. Sarbanes. Yeah, because it is a secret. What about if we made it completely transparent? Who would be for that?
>
> ***
>
> Ms. Bricker. Absolutely not . . . . It will hurt the consumer. . . because . . . prices will be held high.

563.  Consistent with the PBM Defendants' intention in creating these rebate aggregators—"to create a fee structure that can be retained and not passed on to a client"[164]—the PBMs also intentionally withhold information about their use of affiliated rebate aggregators (like Defendants Zinc, Ascent, and Emisar) to negotiate and collect rebates and additional fees from the Manufacturers. The PBMs use these GPOs to obfuscate the payment trail of rebates and these additional "fees," which are

---

[163] *Priced Out of a Lifesaving Drug* at lines 2469-2506.

[164] Robbins & Abelson, *supra* note 114.

promised to payors under their sponsor agreements with the PBMs. The PBMs do not disclose the amounts collected by or details about the rebate aggregators in their SEC filings, nor do they disclose their existence or activity to payors publicly, in sponsor agreements or RFP responses, or in other communications. These amounts are also not subject to audit because they are not classified as rebates collected by the PBMs.

545.564.    As recently as May 2022, JC Scott—President of the PBM trade group PCMA—testified before the Senate Commerce Committee:

> PBMs are proud of the work they do to reduce prescription drug costs, expand affordable access to medications, and improve patient outcomes. PBMs negotiate with drug companies to lower prescription drug costs PBMs advocate for patients in the fight to keep prescription drugs accessible and affordable.

Mirroring the PCMA website, Mr. Scott also testified, "The PBM industry is the only stakeholder in the chain dedicated to seeking lower costs."[165]

546.565.    During the relevant period—as seen above—the PBM Defendants, including Express Scripts, represented to Monmouth County that they constructed formularies and negotiated with the Manufacturer Defendants for the benefit of payors and patients to maximize drug cost savings while promoting the health of diabetics.

---

[165]    https://www.pcmanet.org/jc-scott-testifies-before-a-senate-panel-about-pbm-value/ (last visited Apr. 17, 2024).

547.566.    Throughout the relevant period, the PBMs consistently made similar misrepresentations directly to payors nationwide through bid proposals, member communications, invoices, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

548.567.    All such representations are false—the Manufacturer and PBM Defendants in fact coordinated to publish the false prices and to construct the PBM formularies, causing the price of the at-issue drugs to skyrocket. For example:

a.    In 2018, the United States spent $28 billion on insulin compared with $484 million in Canada. The average American insulin user spent $3,490 on insulin in 2018 compared with $725 among Canadians.[166]

b.    Diabetics who receive their medications from federal programs that do not use the PBMs also pay significantly less. In December 2021, the United States House of Representatives Committee on Oversight and Reform issued its Drug Pricing Investigation Report finding that federal health care programs that negotiate directly with the Manufacturers (like the Department of Veterans Affairs), and which are thus outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program, which relies on the PBM Defendants to set their at-

---

[166] Schneider, T., Gomes, T., Hayes, K. N., Suda, K. J., & Tadrous, M., Comparisons of Insulin Spending and Price Between Canada and the United States. *Mayo Clinic Proceedings*, *97*(3), 573–578 (2022).

issue drug prices.[167]

549.568.    Defendants knew that their representations were false when they made them and coordinated to withhold the truth from payors, including Plaintiff.

550.569.    Defendants concealed the falsity of their representations by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

551.570.    The Defendants have never revealed the full amount of any drug-specific Manufacturer Payments exchanged between them. Despite the claims of transparency to Plaintiff and to the public and despite Plaintiff's contracts with Express Scripts, Plaintiff does not know, and cannot learn, of the full extent of the Manufacturer Payments and other agreements between PBMs and the Manufacturer Defendants.

552.571.    The PBM Defendants do not disclose the terms of the agreements they make with the Manufacturers or the Manufacturer Payments they receive. Nor do they disclose the details related to their agreements (formal or otherwise) with pharmacies. All those revenue streams are beyond the scope of the payors' contractual audit rights.

---

[167]    https://www.fiercepharma.com/pharma/house-oversight-committee-blasts-pharma-for-outrageous-prices-and-anticompetitive-conduct (last visited Apr. 5, 2024).

553.572.    Further, although PBMs negotiate drug-specific rebates with Manufacturers,[168] the PBM rebate payments to payor clients and summaries of such payments are in the aggregate, rather than on a drug-by-drug basis. It is impossible for payors like Plaintiff to tease out drug-specific rebates, much less the other undisclosed Manufacturer Payments. This allowed the PBM Defendants to hide the large Manufacturer Payments that they receive for the at-issue diabetes medications.

554.573.    The PBM Defendants have gone so far as to sue governmental entities to block the release of details on their pricing agreements with the Manufacturers and pharmacies.

555.574.    Even when audited by payors, the PBM Defendants routinely refuse to disclose their agreements with the Manufacturers and pharmacies by relying on overly broad confidential agreements and claims of trade secrets and by erecting other unnecessary roadblocks and restrictions.

556.575.    Beneficiaries of the Plaintiff's health plans have no choice but to pay prices flowing from the Manufacturers' inflated list prices because Beneficiaries need these medications to survive and the Manufacturer Defendants produce virtually all diabetes medications available in the United States. The list prices generated by the Defendants' coordinated efforts directly impact out-of-pocket costs at the point of sale.

---

[168] Senate Insulin Report at 40.

557.576.    In sum, the entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers' misrepresentations related to the reasons behind the prices, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is both unconscionable, deceptive, and unfair and immensely lucrative for Defendants.

558.577.    Plaintiff did not know, because the Defendants affirmatively concealed, (a) that the Manufacturers and PBMs coordinated to create the PBM formularies in exchange for money and other consideration; (b) that the list prices were falsely inflated; (c) that the list prices were manipulated to satisfy PBM profit demands; (d) that the list prices and net costs (purchase prices) paid by Plaintiff bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBMs in coordinating their pricing; or (e) that the entire insulin pricing structure Defendants created was false.

### K. The Insulin Pricing Scheme Has Damaged Monmouth County

559.578.    Monmouth County provides health and pharmacy benefits to its Beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period.

560.579.    As stated above, one of the benefits that Monmouth County offers

its Beneficiaries through its employee health plans is payment of a significant portion of the Beneficiaries' prescription drug purchases.

561.580.    Monmouth County has for years interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications.

562.581.    Since 2012 through the present, Monmouth County has had a PBM service agreement in place with Express Scripts. Before then, Monmouth County had a PBM service agreement in place with Medco, until Medco was acquired by Express Scripts in 2012.

563.582.    In addition, Plaintiff interacted with CVS Caremark and OptumRx when they responded to requests for proposal by Monmouth County for PBM services. In providing those bids each made representations in furtherance of the Insulin Pricing Scheme.

564.583.    During the relevant time period, Monmouth County was unaware of the Insulin Pricing Scheme.

565.584.    Monmouth County relied on Defendants' statements and material omissions made in furtherance of the Insulin Pricing Scheme.

566.585.    Plaintiff relied on Defendants' misrepresentations in paying for the at-issue diabetes medications at prices that would have been lower but for the Insulin Pricing Scheme.

567.586.    Defendants' Insulin Pricing Scheme has cost Plaintiff millions of dollars in overcharges. Since 2016 alone, Monmouth County has spent more than *$7.4 million* on the at-issue diabetes medications.

568.587.    Express Scripts failed to adhere to principles of good faith and fair dealing in carrying out their PBM contracts with the County. Express Scripts' relationship with Monmouth County was inherently unbalanced and its contracts adhesive. Express Script had superior bargaining power and superior knowledge of its relationships with the Manufacturer Defendants, including those that ultimately dictate the drug costs Monmouth County incurred. Although Express Scripts was supplying a vital service of a quasi-public nature, it exploited its superior position to mislead Monmouth County and thwart its expectations, all at great expense to Monmouth County.

569.588.    These misrepresentations, omissions, and misconduct— including and as manifested in the Insulin Pricing Scheme—directly and proximately caused economic damage to Monmouth County as a payor/purchaser of Defendants' at-issue diabetes medications.

570.589.    A substantial proportion of the money Monmouth County spent on diabetes medications is attributable to Defendants' inflated prices, which did not arise from competitive market forces but, instead, exist solely by virtue of the Insulin Pricing Scheme.

571.590.    Because of Defendants' success in concealing the Insulin Pricing Scheme through act and omission, no payor, including Monmouth County, knew (or should have known) during the relevant period that the prices for the at-issue diabetes medications were (and are) artificially inflated due to the Insulin Pricing Scheme.

572.591.    As a result, despite receiving some rebates and incurring drug costs based on discounts off list prices, Monmouth County has unknowingly overpaid for the Manufacturer Defendants' diabetes medications, which would have cost far less but for the Insulin Pricing Scheme.

573.592.    In short, the Insulin Pricing Scheme has directly and proximately caused Plaintiff to substantially overpay for diabetes medications.

574.593.    Because Defendants continue to generate exorbitant, unfair, and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Plaintiff is ongoing.

## L. Defendants' Recent Efforts in Response to Rising Insulin Prices

575.594.    In reaction to mounting political and public outcry, Defendants have taken steps on Capitol Hill and in the public relations space to protect and further the Insulin Pricing Scheme.

576.595.    First, in response to public criticism, Defendants have increased their spending to spread their influence in Washington D.C.

577.596.    For example, in recent years Novo Nordisk's political action

committee has doubled its spending on federal campaign donations and lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, which (at that point) was its biggest ever investment in directly influencing U.S. policymakers. By 2023, that number had risen to over $5.1 million. Eli Lilly and Sanofi also have contributed millions of dollars through their PACs in recent years. In 2023, Eli Lilly spent over $8.4 million in lobbying and Sanofi spent over $5.4 million.

578.597.    Second, Defendants have recently begun publicizing programs ostensibly aimed at lowering the cost of insulins.

579.598.    These affordability measures fail to address the structural issues that caused the price hikes. Rather, these are public relations measures that do not solve the problem.

580.599.    For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

581.600.    At the time, Eli Lilly told the Senate Finance Committee that "we can provide a lower-priced insulin more quickly without disrupting access to branded Humalog, on which thousands of insured patients depend and which will remain available for people who want to continue accessing it through their current insurance

206

plans."[169]

~~582.~~601.      When it launched Lispro, its press release said the drug was the "same molecule" as Humalog yet would be sold at half the price of Humalog. Eli Lilly expressly said it was to help make insulin medications "more affordable."[170]

~~583.~~602.      What Eli Lilly failed to tell the Committee and the public was that its rebate deals with the PBMs incentivized them to exclude Lispro from their formularies. For example, even though Lispro at $137.50 would be available at half the price of Humalog, which remained on-formulary, Express Scripts' exclusion list for 2019[171] specifically blocked it from its formulary.[172]

~~584.~~603.      Likewise, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies. Following these news reports, the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug. The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's*

---

[169] Joseph B. Kelly Letter to S. Fin. Comm., Mar. 8, 2019.

[170] Eli Lilly and Co., March 4, 2019, Press Release, *Lilly to Introduce Lower-Priced Insulin*, available at https://investor.lilly.com/node/40881/pdf> (last viewed Apr. 17, 2024).

[171] *See* Express Scripts 2019 National Preferred Formulary Exclusions, https://www.express-scripts.com/art/pdf/Preferred_Drug_List_Exclusions2019.pdf

[172] Todd Boudreaux, *Express Scripts Won't Cover Lilly's Generic Insulin*, https://beyondtype1.org/express-scripts-wont-cover-generic-insulin/ (last visited Apr. 17, 2024).

*Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.[173]

~~585.~~604.     Eli Lilly did lower the price of Lispro by 40% effective January 1, 2022; but as of January 2023, Lispro did not appear on CVS Caremark's formulary and Humalog had been removed. The January 2023 formularies for Express Scripts and OptumRx expressly excluded Lispro.

~~586.~~605.     In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous. In any event, ReliOn is not included on any of the PBM Defendants' formularies as of January 2023.

~~587.~~606.     Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem and the PBMs continue to exclude drugs with lower list prices despite their assurances of cost-savings for payors and Beneficiaries.

---

[173] Sen. Elizabeth Warren & Sen. Richard Blumenthal, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, (Dec. 2019), https://www.warren.senate.gov/imo/media/doc/Inaccessible%20Insulin%20report.pdf (last visited Apr. 17, 2024).

## V.    TOLLING OF THE STATUTES OF LIMITATION

588.607.    Monmouth County has diligently pursued and investigated the claims asserted herein. Through no fault of its own, Monmouth County did not learn, and could not have learned, the factual bases for its claims or the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

### A.    Discovery Rule

589.608.    Monmouth County did not know about the Insulin Pricing Scheme until shortly before filing its original Complaint in this action. Monmouth County was unaware that it was economically injured and unaware that any economic injury was wrongfully caused. Nor did Monmouth County possess sufficient information concerning the injury complained of here, or its cause, to put Monmouth County or any reasonable person on inquiry notice to determine whether actionable conduct was involved.

590.609.    The PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants or the details of Defendants' negotiations and payments between each other or their pricing structures and agreements—Defendants labeled these trade secrets, shrouded them in confidentiality agreements, and circumscribed payor audit rights to protect them.

591.610.    Each Defendant group also affirmatively blamed the other for the price increases described herein, both during their Congressional testimonies and

through the media. All disavowed wrongdoing and falsely claimed that their dealings

with payors like Plaintiff were honest and transparent.

592.611.    Monmouth County did not discover until shortly before filing its

original Complaint facts sufficient to cause a reasonable person to suspect that

Defendants were engaged in the Insulin Pricing Scheme or that Monmouth County

had suffered economic injury as a result of any or all Defendants' wrongdoing. Nor

would diligent inquiry have disclosed the true facts had Monmouth County been

aware of any cause to undertake such an inquiry.

593.612.    Even today, lack of transparency in the pricing of diabetes

medications and the arrangements, relationships, and agreements between and among

the Manufacturer Defendants and the PBM Defendants, i.e., the essence of the Insulin

Pricing Scheme, continue to obscure Defendants' unlawful conduct from Plaintiff

and the general public. Indeed, a June 2024 *New York Times* report noted that PBM

Defendants "often escape attention, because they operate in the bowels of the health

care system and cloak themselves in such opacity and complexity that many people

don't even realize they exist."[174]

594.613.    A July 2024 FTC report similarly noted that "PBMs oversee

---

[174] *See, e.g.*, N.Y. Times, The Opaque Industry Secretly Inflating Prices for
Prescription Drugs (June 21, 2024),
https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

critical decisions about access to and affordability of medications without transparency or accountability to the public. Indeed, PBM business practices and their effects remain extraordinarily opaque."[175]

~~595.~~614.    For these reasons, the applicable statutes of limitations did not begin to run until 2022, at the earliest.

### B.    Fraudulent Concealment

~~596.~~615.    Through the acts, omissions, and misrepresentations alleged throughout this Complaint, Defendants fraudulently concealed the fact of Monmouth County's economic injury and its cause.

~~597.~~616.    Defendants cannot rely upon any statute-of-limitations defense because they purposefully concealed the Insulin Pricing Scheme, their generation of false list prices, and the fact that the prices for the at-issue diabetes medications were artificially inflated. The Defendants deliberately concealed their behavior and active role in the Insulin Pricing Scheme and other unlawful conduct.

~~598.~~617.    Defendants' acts, omissions, and misrepresentations were calculated to—and did—lull and induce payors, including Monmouth County, into forgoing legal action or any inquiry that might lead to legal action. Defendants' acts,

---

[175] Federal Trade Commission, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies, Interim Staff Report (July 2024), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

omissions, and representations were intended to and, in fact, did prevent Monmouth County from discovering its claims.

~~599.~~618.    Defendants knowingly and fraudulently concealed the facts alleged herein. Defendants knew of the wrongful acts set forth above, had information pertinent to their discovery, and concealed them from the public. As a result of Defendants' conduct, Monmouth County did not know, and could not have known through the exercise of reasonable diligence, of the existence or scope of the Insulin Pricing Scheme or of Monmouth County's causes of action.

~~600.~~619.    Defendants continually and secretly engaged in the Insulin Pricing Scheme. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

~~601.~~620.    As alleged herein, and among other things, Defendants affirmatively concealed: (a) that the Manufacturers and PBMs coordinated to create the PBM formularies in exchange for money and other consideration; (b) that the list prices were falsely inflated and manipulated; (c) that the list prices and net costs (purchase prices) paid by payors and patients bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBMs in coordinating their pricing; (d) that the at-issue insulin drugs were selected for inclusion or

preferred status on the formularies based on higher prices (and greater potential revenues for Defendants) rather than because of cost-effectiveness or because they were beneficial to payors' Beneficiaries; (e) the exchange of various payments and pricing agreements between the Manufacturers and PBMs; or (f) that the entire insulin pricing structure Defendants created was false.

602.621.    As alleged herein, the PBM Defendants have blocked drug pricing transparency efforts.

603.622.    As alleged herein, the Manufacturer Defendants have testified to Congress that they were not responsible for skyrocketing insulin prices, claiming that they had no control over the pricing, blaming the PBM Defendants for the high prices, and suggesting that they have not profited from astronomical insulin prices.

604.623.    Meanwhile, the PBM Defendants testified to Congress that the Manufacturer Defendants were solely responsible for the list price increases and that the payments that the PBMs receive from the Manufacturer Defendants are unrelated to rising insulin prices.

605.624.    As alleged herein, the PBM Defendants concealed the Insulin Pricing Scheme through vague and manipulable definitions of terms in their contracts, including by hiding the fees that the Manufacturer Defendants paid to the PBM Defendants and which the PBM Defendants retained and did not pass along to payors as Rebates.

606.625.     The PBM Defendants also concealed payments they received from the Manufacturer Defendants through their affiliated rebate aggregators, hiding them in complex contractual relationships—often with other Defendants—and not reporting them on their quarterly SEC filings.

607.626.     Defendants coordinated to affirmatively withhold the truth about the Insulin Pricing Scheme from payors, including Monmouth County, patients, and the public and concealed the falsity of representations made to payors, including Monmouth County, by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

608.627.     Monmouth County did not know, and could not reasonably have discovered, the full extent of agreements between the PBM Defendants and the Manufacturer Defendants or payments the Manufacturer Defendants made to the PBMs because Defendants actively concealed these agreements and payments.

609.628.     Despite the claims of transparency made to payors, including Monmouth County, and to the public, Defendants have never revealed the full amount of drug-specific payments they have exchanged or received.   Payors, including Monmouth County, and patients reasonably relied on Defendants' claims of transparency.

610.629.     Defendants intended that their actions and omissions would be

214

relied upon by the public, to include payors and patients. Monmouth County did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

611.630.    Payors, including Monmouth County, and patients reasonably relied on Defendants' affirmative statements to Congress and the public, and in contracts between PBMs and their clients, that Defendants were working to lower insulin prices and provide payors with cost savings.

612.631.    The purposes of the statute of limitations are satisfied because Defendants cannot claim any prejudice due to an alleged late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

613.632.    In light of the information set forth above, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

614.633.    Any applicable statutes of limitation therefore have been tolled.

## C.    Equitable Estoppel

615.634.    Defendants were under a continuous duty to disclose to Monmouth County the true character, quality, and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided—all of which would be and are now material to Monmouth County.

616.635.    Instead of disclosing these facts, Defendants knowingly misrepresented and concealed them with a reasonable expectation that Monmouth County would act upon the misrepresentations and omissions.

617.636.    Being unaware of the true facts and the economic harm it was suffering, and having no cause to inquire further, Plaintiff did indeed rely in good faith to its detriment on Defendants' misrepresentations and omissions.

618.637.    In short, through Defendants' acts, omissions, and misrepresentations as alleged throughout this Complaint, Defendants knowingly misrepresented and concealed material facts with the expectation that Monmouth County would act upon them, which Monmouth County did in good faith and to its detriment.

619.638.    Accordingly, Defendants are equitably estopped from relying on any statutes of limitations in defense of this action.

### D.    Continuing Violations

620.639.    The acts, omissions, and misrepresentations alleged throughout this Complaint have continued to the present day. Defendants' systematic misconduct constitutes a continuous, unbroken violation of the law that has caused, and continues to cause, continuous economic harm to Monmouth County.

621.640.    Accordingly, all applicable statutes of limitations are tolled.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)
### (Against all Defendants)

~~622.~~641.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

~~623.~~642.    Plaintiff brings this count against all Defendants for violations of 18 U.S.C. § 1962(c).

~~624.~~643.    Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are (1) culpable "persons" who (2) willfully and knowingly (3) committed and conspired to commit two or more acts of mail and wire fraud (4) through a "pattern" of racketeering activity that (5) involves an "association in fact" enterprise, (6) the results of which had an effect on interstate commerce.

### A.    Defendants Are Culpable "Persons" Under RICO

~~625.~~644.    Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark, separately, are "persons" as that term is defined in 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

~~626.~~645.    Each one of Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, OptumRx, and CVS Caremark are separate entities and "persons" that are

distinct from the RICO enterprises alleged below.

## B.    The Manufacturer-PBM RICO Enterprises

~~627.~~646.    For the purposes of this claim, the RICO enterprises are nine separate associations-in-fact consisting of one of each of the PBM Defendants and one of each of the Manufacturer Defendants, including those entities' directors, employees, and agents. They are the Eli Lilly-CVS Caremark Enterprise; the Eli Lilly-Express Scripts Enterprise; the Eli Lilly-OptumRx Enterprise; the Novo Nordisk-CVS Caremark Enterprise; the Novo Nordisk-Express Scripts Enterprise; the Novo Nordisk-OptumRx Enterprise; the Sanofi-CVS Caremark Enterprise; the Sanofi-Express Scripts Enterprise; and the Sanofi-OptumRx Enterprise.

~~628.~~647.    These association-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Enterprises."

~~629.~~648.    Each Manufacturer-PBM Enterprise is a separate, ongoing, and continuing business organization consisting of corporations and individuals associated for the common purpose of manufacturing, selling, and facilitating the purchase of the Manufacturer Defendants' products, including the at-issue drugs. For example:

a.    Each of the three Eli Lilly enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Eli Lilly medications including Prozac, Cymbalta, and Zyprexa, as well as

the at-issue Eli Lilly insulin and insulin-analog medications (Trulicity, Humulin N, Humulin R, Humalog, and Basaglar), which are Eli Lilly's primary source of revenue.

b.      Each of the three Novo Nordisk Enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Novo Nordisk medications for the treatment of obesity, hemophilia, and hormone imbalance, as well as the at-issue Novo Nordisk insulin and insulin-analog medications (Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic), which account for more than three-quarters of Novo Nordisk's revenue.

c.      Each of the three Sanofi Enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Sanofi medications including Ambien, Plavix, and Dupixent, as well as the at-issue Sanofi insulin and insulin-analog medications (Lantus, Toujeo, Apidra, and Soliqua).

630.649.    Each Manufacturer-PBM Enterprise engaged in the shared purpose of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs in order to control the market for diabetes medications and profit off diabetics and payors, including the Plaintiff.

631.650.    The members of each enterprise are bound by contractual

219

relationships, financial ties, and the ongoing coordination of activities.

632.651.    There is also a common communication network by which each Manufacturer-PBM Enterprise shares information and meets on a regular basis. These communications include, but are not limited to, communications relating to the use of false list prices for the at-issue diabetes medications and the regular flow of Manufacturer Payments from each Manufacturer Defendant to each PBM Defendant in exchange for formulary placement.

633.652.    Each Manufacturer-PBM Enterprise functions as a continuing but separate unit separate and apart from the pattern of racketeering activity in which it engages. Each Manufacturer-PBM Enterprise, for example, engages in the manufacture, distribution, and sale of medications and other products other than the at-issue insulin and insulin-analog medications. Additionally, each Manufacturer engages in conduct other than mail and wire fraud in furtherance of the Insulin Pricing Scheme.

634.653.    At all relevant times, each of the Manufacturer-PBM Enterprises was operated and conducted for unlawful purposes by each Manufacturer Defendant and PBM Defendant, namely, carrying out the Insulin Pricing Scheme.

635.654.    Each Manufacturer-PBM Enterprise derived secret profits from these activities that were greater than those any one of the Manufacturer Defendants or PBMs could obtain absent their misrepresentations regarding and collusion in

their pricing schemes.

636.655.    The Manufacturer-PBM Enterprises resulted in benefits for the Defendants that could not have been achieved absent the enterprises. For example, the Manufacturer Defendants achieved formulary access without real price reductions by raising list prices and paying kickbacks to the PBM Defendants. The PBM Defendants likewise could not have obtained inflated rebates, administrative fees, and other payments without colluding with the Manufacturers to raise list prices. In other words, each Manufacturer-PBM Enterprise engaged in a scheme to corrupt the insulin market by artificially inflating list prices in exchange for preferred formulary placement.

637.656.    To accomplish this common purpose, each Manufacturer Defendant periodically and systematically inflated the prices of the at-issue drugs and then secretly paid a significant, yet undisclosed, portion of this inflated price back to Express Scripts, CVS Caremark, and OputmRx in the form of Manufacturer Payments.

638.657.    Each Manufacturer-PBM Enterprise did so willfully and with knowledge that Plaintiff paid for the at-issue drugs at prices directly based on the false list prices.

639.658.    Each Manufacturer-PBM Enterprise's inflation of the list prices and secret Manufacturer Payments was a quid pro quo exchange for preferred

formulary placement.

640.659.    Each Manufacturer-PBM Enterprise concealed from Plaintiff that these false prices and secret Manufacturer Payments resulted in each Manufacturer gaining formulary access without requiring significant price reductions and resulted in higher profits for the PBM Defendants, whose earnings increase the more inflated the price is and the more payments they receive from each Manufacturer Defendant.

641.660.    Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating the use of the false list prices for the at-issue drugs as the basis for the price that payors, including the Plaintiff, and diabetics pay for diabetes medications.

642.661.    The Manufacturer Defendants would not be able to offer large pricing spreads to the PBMs in exchange for favorable formulary positions without the use of the false list prices as the basis for the price paid by diabetics and payors, including the Plaintiff, for the at-issue drugs.

643.662.    The PBM Defendants share this common purpose because nearly all profit and revenue generated from the at-issue drugs is tied to the false inflated prices generated by the Insulin Pricing Scheme. Without diabetics and payors, including Plaintiff, paying for diabetes medications based on the inflated list prices, their profits from the Insulin Pricing Scheme would decrease.

644.663.    As a result, CVS Caremark, Express Scripts, and OptumRx have, with the knowing and willful participation and assistance of each Manufacturer Defendant, engaged in hidden profit-making schemes falling into four general categories: (1) garnering undisclosed Manufacturer Payments from each Manufacturer Defendant that each PBM retains to a large extent; (2) generating substantial profits from pharmacies because of the falsely inflated prices; (3) generating profits on the diabetes medications sold through the PBMs' own mail-order and retail pharmacies; and (4) keeping secret discounts each Manufacturer Defendant provides in association with the PBMs' mail-order and retail operations.

645.664.    At all relevant times, each PBM and each Manufacturer Defendant has been aware of their respective Manufacturer-PBM Enterprise's conduct, has been a knowing and willing participant in and coordinator of that conduct and has reaped profits from that conduct.

646.665.    None of the PBMs or Manufacturers alone could have accomplished the purposes of the Manufacturer-PBM Enterprises without the other members of their respective enterprises.

### C.    The Enterprises Misrepresent and Fail to Disclose Material Facts in Furtherance of the Insulin Pricing Scheme

647.666.    Each Manufacturer-PBM Enterprise knowingly made material misrepresentations to the public and to the Plaintiff in furtherance of the Insulin Pricing Scheme, including publishing artificially inflated prices for insulin on

published indices and representing that:

> a.    the false list prices for the at-issue diabetes medications were reasonably related to the actual prices realized by Defendants and were a reasonable and fair basis on which to base the price Plaintiff paid for these drugs;

> b.    each Manufacturer priced its at-issue drugs according to each drug's value to the healthcare system and the need to fund innovation;

> c.    the Manufacturer Payments paid back to the PBMs for each at-issue drug were for Plaintiff's benefit;

> d.    all "rebates" and discounts negotiated by the PBMs with the Manufacturer Defendants were passed through to the Plaintiff;

> e.    the "rebates" negotiated by the members of each enterprise saved Plaintiff money;

> f.    each Manufacturer Defendant and PBM was transparent with Plaintiff regarding the Manufacturer Payments and the PBMs did not retain any funds associated with prescription drug rebates or any the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies; and

> g.    The PBM Defendants constructed formularies in a manner that lowered the price of the at-issue drugs and promoted the health and safety of

diabetics.

648.667.    Each false list price published by the Manufacturer Defendants constituted a material misrepresentation to Plaintiff and the public, in that each purported to be a fair market price for the medication at issue, and each failed to disclose the fraudulent spread between the list price and the net price of the medication or the basis therefor.

649.668.    Examples of other specific affirmative representations by each RICO Defendant in furtherance of each enterprise's Insulin Pricing Scheme are set forth in paragraphs 504-58, among others.

650.669.    At all times relevant to this Complaint, each Manufacturer-PBM Enterprise knew the above-described representations to be false.

651.670.    At all times relevant to this Complaint, each Manufacturer-PBM Enterprise intentionally made these representations for the purpose of inducing Plaintiff into paying artificially inflated prices for diabetes medications.

652.671.    Plaintiff relied on the material misrepresentations and omissions made by each Manufacturer-PBM Enterprise in paying prices for the at-issue diabetes medications based upon the false prices generated by Insulin Pricing Scheme.

653.672.    Additionally, each PBM-Manufacturer Enterprise relied on the list prices negotiated and published by the other PBM-Manufacturer enterprises in

setting their own list prices and determining the value of the kickbacks paid to the PBMs. Plaintiff was injured by the inflated prices that arose as a result.

654.673.    Express Scripts and Medco convinced Plaintiff to pay prices for the at-issue drugs based upon the false list prices by using the misrepresentations listed above to convince Plaintiff that they had secured lower prices when, in fact, they did the opposite, all while concealing the Insulin Pricing Scheme.

655.674.    Without these misrepresentations and each Defendant's failure to disclose the Insulin Pricing Scheme, each Manufacturer-PBM Enterprise could not have achieved its common purpose, as Plaintiff would not have been willing to pay these false list prices.

### D.    Defendants' Use of the U.S. Mails and Interstate Wire Facilities

656.675.    Each of the Manufacturer-PBM Enterprises engaged in and affected interstate commerce because each engaged in the following activities across state boundaries: the sale, purchase and/or administration of diabetes medications; the setting and publishing of the prices of these drugs; and/or the transmission of pricing information of diabetes medications; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission of diabetes medications through mail-order and retail pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of diabetes medications; and/or the negotiations and transmissions of contracts related to the

pricing of and payment for diabetes medications.

657.676.    Each Manufacturer-PBM Enterprise participated in the administration of diabetes medications to millions of individuals located throughout the United States, including in Monmouth County and elsewhere in New Jersey.

658.677.    Each Manufacturer Defendant's and PBM Defendant's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

659.678.    The nature and pervasiveness of the Insulin Pricing Scheme, which included each Manufacturer Defendant's and PBM Defendant's corporate headquarters operations, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with each other and with pharmacies, physicians, payors, and diabetics in Monmouth County and throughout New Jersey and the United States.

660.679.    Each Manufacturer-PBM Enterprise's use of the U.S. mails and interstate wire facilities to perpetrate the Insulin Pricing Scheme involved thousands of communications including:

    a.    marketing materials about the published prices for diabetes medications, which each Manufacturer Defendant sent to the PBM

Defendants located across the country, including in Monmouth County and throughout New Jersey;

b.    written and oral representations of the false list prices of diabetes medications that each Manufacturer Defendant and PBM Defendant made at least annually and, in many cases, several times during a single year to the public;

c.    thousands of written and oral communications discussing, negotiating, and confirming the placement of each Manufacturer Defendant's diabetes medications on the PBM Defendants' formularies;

d.    written and oral representations made by each Manufacturer Defendant regarding information or incentives paid back to each PBM Defendant for each diabetes medications sold and/or to conceal these incentives or the Insulin Pricing Scheme;

e.    written communications made by each Manufacturer Defendant, including checks, relating to Manufacturer Payments paid to the PBM Defendants to persuade them to advocate the at-issue diabetes medications;

f.    written and oral communications with U.S. government agencies that misrepresented what the published prices were or that were intended to deter investigations into the true nature of the published prices or to forestall changes to reimbursement based on something other than published prices;

g.      written and oral communications with payors, including the Plaintiff, regarding the prices of diabetes medications;

h.      written and oral communications to the Plaintiff, including marketing and solicitation material sent by the PBM Defendants regarding the existence, amount, or purpose of payments made by each Manufacturer Defendant to each PBM for the diabetes medications described herein and the purpose of the PBM Defendants' formularies;

i.      transmission of published prices to third parties and payors, including Plaintiff; and

j.      receipts of money on at least tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Insulin Pricing Scheme.

661.680.    Although Plaintiff pleads the dates of certain communications in allegations incorporated into this Count, it cannot allege the precise dates of others without access to books and records within each RICO Defendant's exclusive custody and control. Indeed, an essential part of the successful operation of the Insulin Pricing Scheme depended upon secrecy, and each Manufacturer Defendant and PBM Defendant took deliberate steps to conceal its wrongdoing.

**E.    Conduct of the Manufacturer-PBM Enterprises' Affairs**

662.681.    Each Manufacturer and PBM Defendant participates in the

operation and management of Manufacturer-PBM Enterprises with which it is associated and, in violation of Section 1962(c) of RICO, and conducts or participates in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation is carried out in the following ways, among others:

      a.    Each Manufacturer Defendant directly controls the secret Manufacturer Payments it provides to the PBMs for its diabetes medications.

      b.    Each PBM Defendant directly manages and controls its drug formularies and the placement of the at-issue diabetes medications on those formularies.

      c.    Each PBM Defendant intentionally selects higher-priced diabetes medications for formulary placement and excludes lower priced ones in order to generate larger profits and coordinate with the Manufacturer Defendants to increase the availability and use of higher-priced medications because they are more profitable for both groups of Defendants.

      d.    Each Manufacturer Defendant directly controls the publication of the false list prices generated by the Insulin Pricing Scheme.

      e.    Each Manufacturer Defendant directly controls the creation and distribution of marketing, sales and other materials used to inform the PBMs of the profit potential from its diabetes medications.

f.    Each PBM Defendant directly controls the creation and distribution of marketing, sales, and other materials used to inform payors and the public of the benefits and cost-saving potential of each PBM's formularies and negotiations with the Manufacturers.

g.    Each PBM Defendant directs and controls each enterprise's direct relationships with payors such as the Plaintiff by negotiating the terms of and executing the contracts that govern those relationships.

h.    Each PBM Defendant directs and controls each enterprise's Insulin Pricing Scheme by hiding, obfuscating, and laundering Manufacturer Payments through its affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

i.    Each PBM Defendant distributes through the U.S. mail and interstate wire facilities promotional and other materials which claim that the Manufacturer Payments paid from each Manufacturer Defendant to the PBMs save Plaintiff and other payors money on the at-issue drugs.

j.    Each Manufacturer Defendant represented to the Plaintiff—by publishing and promoting false list prices without stating that these published prices differed substantially from the prices realized by each Manufacturer Defendant and PBM—that the published prices of diabetes medications

reflected or approximated the actual price realized by Defendants and resulted from transparent and competitive fair market forces.

## F.    Defendants' Patterns of Racketeering Activity

663.682.    Each Manufacturer Defendant and PBM Defendant has conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are unlawful under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

664.683.    Each Manufacturer Defendant's and PBM Defendant's pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Insulin Pricing Scheme. Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which each Manufacturer Defendant and PBM Defendant intended to defraud Plaintiff.

665.684.    By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments (made from each Manufacturer Defendant to the PBMs) and PBM Defendants' formulary construction, and by subsequently failing to disclose such practices to Plaintiff, each

Manufacturer Defendant and PBM Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

666.685.    Each Manufacturer Defendant's and PBM Defendant's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff.

667.686.    Each separate use of the U.S. mails and/or interstate wire facilities employed by each Manufacturer Defendant and PBM Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

668.687.    Each Manufacturer Defendant and PBM Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated in fact.

### G. The RICO Defendants' Motives

669.688.    Each Manufacturer Defendant's and PBM Defendant's motives in creating and operating the Insulin Pricing Scheme and conducting the affairs of the Manufacturer-PBM Enterprises described herein was to control the market for diabetes medications, exclude competition, and maximize sales of, and profits from, diabetes medications.

670.689.    The Insulin Pricing Scheme was designed to, and did, encourage

others, including payors like Plaintiff, to advocate the use of each Manufacturer

Defendant's respective products and to pay for those diabetes medications based on

a falsely inflated price. Each Manufacturer Defendant used the Insulin Pricing

Scheme to obtain formulary placement to sell more of its drugs without having to

cut into its profits. The PBM Defendants used the Insulin Pricing Scheme to falsely

inflate the price payors such as the Plaintiff paid for diabetes medications in order to

profit off the Insulin Pricing Scheme, as discussed above.

### H. The Manufacturer-PBM Enterprises' Insulin Pricing Scheme Injured Plaintiff

~~671.~~690.    Each Manufacturer-PBM Enterprise's violations of federal law

and pattern of racketeering activity have directly and proximately caused the

Plaintiff to be injured in its business or property.

~~672.~~691.    The prices the Plaintiff pays for the at-issue drugs are directly

tied to the false list prices generated by the Insulin Pricing Scheme.

~~673.~~692.    No other intermediary in the supply chain has control over or is

responsible for the list prices on which nearly all Plaintiff's payments are based other

than the Manufacturer-PBM Defendant Enterprises.

~~674.~~693.    Defendants collectively set the prices that the Plaintiff paid for

the at-issue diabetes medications.

~~675.~~694.    During the relevant period, Express Scripts and Medco provided

PBM services to the Plaintiff and benefited therefrom.

676.695.     During the relevant period, the Plaintiff paid Express Scripts and Medco directly for the at-issue drugs.

677.696.     Each Manufacturer-PBM Enterprise, including the CVS Caremark enterprises and OptumRx enterprises, controlled and participated in the Insulin Pricing Scheme, which was directly responsible for the false list prices upon which the price Plaintiff paid was based.

678.697.     Thus, Plaintiff was damaged by reason of the Insulin Pricing Scheme. But for the misrepresentations and false prices created by the Insulin Pricing Scheme that each Manufacturer–PBM Enterprise employed, Plaintiff would have paid less for diabetes medications.

679.698.     Because the Insulin Pricing Scheme resulted in payors and consumers paying supra-competitive prices for the at-issue medications, the scheme could not have continued without each Manufacturer-PBM Enterprise's participation. In other words, if one of the Manufacturer-PBM Enterprises had opted not to participate in the scheme—and not inflated its list prices—the other enterprises could not have continued to overcharge their own clients. Each enterprise's participation in the scheme—and execution of its own pattern of racketeering activity—was essential to the overall scheme's survival and a direct cause of Plaintiff's injuries.

680.699.     While Defendants' scheme injured an enormous number of

payors and plan members, Plaintiff's damages are separate and distinct from those of any other victim that was harmed by the Manufacturer–PBM Defendant Enterprises' Insulin Pricing Scheme.

681.700.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to the Plaintiff for three times the damages that were sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

682.701.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(a) of RICO, the Plaintiff seeks injunctive relief against each Manufacturer and PBM Defendant for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorneys' fees.

683.702.    Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff continues to purchase the at-issue diabetes medications. Plaintiff will continue to pay based on the Defendants' false list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiff seeks injunctive relief, including an injunction against each Manufacturer and PBM Defendant, to prevent them from affirmatively misrepresenting and/or concealing and suppressing

material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

<u>**COUNT II**</u>
**Violations of RICO, 18 U.S.C. § 1962(d)**
**by Conspiring to Violate 18 U.S.C. § 1962(c)**
**(Against all Defendants)**

~~684.~~703.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

~~685.~~704.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

~~686.~~705.    Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in the Insulin Pricing Scheme.

~~687.~~706.    As set forth in detail above, Defendants each knowingly agreed to facilitate the Insulin Pricing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants, and the PBMs' formulary construction; and the PBMs agreed to and did, in concert, request and receive larger Manufacturer Payments and higher prices in exchange for

formulary placement.

688.707.    The nature of the above-described Defendant co-conspirators'
acts, material misrepresentations, and omissions in furtherance of the conspiracy
gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. §
1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they
were aware that their ongoing fraudulent and extortionate acts have been and are part
of an overall pattern of racketeering activity.

689.708.    Defendants have engaged and continue to engage in the
commission of overt acts, including the following unlawful racketeering predicate
acts:

    a.    multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

    b.    multiple instances of wire fraud in violations of 18 U.S.C. § 1343;
and

    c.    multiple instances of unlawful activity in violation of 18 U.S.C.
§ 1952.

690.709.    Defendants' conspiracy to violate the above federal laws and the
effects thereof detailed above are continuing and will continue. Plaintiff has been
injured in its property by reason of these violations: Plaintiff has paid more for the
at-issue drugs than it would have but for Defendants' conspiracy to violate 18 U.S.C.
§ 1962(c).

691.710.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants

are jointly and severally liable to Plaintiff for three times the damages this District

has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT III
### Common Law Fraud
### (Against Express Scripts, Eli Lilly, Novo Nordisk, and Sanofi)

692.711.    Plaintiff incorporates by reference all preceding paragraphs and

re-alleges them as if set forth fully herein.

693.712.    Plaintiff brings this claim against Express Scripts (as defined

collectively herein) and the Manufacturer Defendants. All are referred to collectively

throughout Count III as "Defendants."

694.713.    As alleged extensively above, Defendants affirmatively

misrepresented and/or concealed and suppressed material facts concerning: (a) the

actual cost and/or price of the diabetes medications realized by Defendants; (b) the

inflated and/or fraudulent nature of the reported prices set and/or charged by

Defendants for the diabetes medications described herein; (c) the existence, amount,

and/or purposes of Manufacturer Payments, discounts and/or payments offered

and/or negotiated by Defendants for those products; and (d) the role that Defendants'

played in the price paid for the diabetes medications described herein, including but

not limited to falsely representing that Defendants decrease the price of prescription

drugs for payors like Plaintiff.

695.714.    In fact, PBM Defendants base their entire business model around representing—directly and indirectly—to payors, including Monmouth County, that they negotiate with Manufacturer Defendants, through rebates and formulary decisions, to lower the actual price that payors pays for diabetes medications.

696.715.    Defendants' fraud included the following:

a.    The Manufacturer Defendants published prices for the at-issue drugs and, in doing so, held these prices out as the actual prices for these drugs despite knowing these prices were artificially inflated and untethered from the cost of the drugs or the price the Manufacturers were paid for them—all with the PBM Defendants' knowledge, consent, and cooperation.

b.    The Manufacturer Defendants misrepresented and actively concealed the true reasons why they set and raised list prices—the truth being that it was to increase revenues and profits and to offer higher prices and larger Manufacturer Payments to the PBMs—all with the PBM Defendants' knowledge, consent, and cooperation.

c.    The PBM Defendants furthered the scheme by using the artificially inflated list prices to determine the inflated prices paid by payors, including Plaintiff and Plaintiff's Beneficiaries—all with the Manufacturer Defendants' knowledge, consent, and cooperation. At no point did the Defendants reveal that the prices for the at-issue drugs were not legal,

competitive or at fair market value—rather, they coordinated to overtly mislead the public and payors, including Plaintiff, and undertook a concerted effort to conceal the truth. Defendants' representations are false, and Defendants knew they were false when they were made. Defendants knew that the prices they reported and utilized are artificially inflated for the purpose of maximizing revenues and profits pursuant to the Insulin Pricing Scheme. Defendants affirmatively withheld this truth from Plaintiff Monmouth County, even though these Defendants knew that the Plaintiff's intention was to pay the lowest possible price for diabetes medications and expectation was to pay a legal, competitive price that resulted from transparent market forces.

d.    The PBM Defendants represented to payors, including Plaintiff, and to the public that they worked to generate savings with respect to the at-issue drugs and to promote the health of diabetics. Instead, directly counter to their representations, the PBMs drove up the prices of the at-issue drugs and damaged payors, including Plaintiff, by demanding ever-increasing Manufacturer Payments that, in turn, increased what otherwise would have been the retail prices for the at-issue drugs—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

e.    The PBM Defendants also misrepresented their formularies promoted the cost-savings to Plaintiff. These Defendants not only knew that

241

the PBMs' formulary construction fueled the precipitous price increases that damaged Plaintiff's financial wellbeing, but coordinated in ways that made such harm inevitable—all for the sole purpose of generating more revenues and profits for both groups of Defendants.

f.    The PBM Defendants have hidden, obfuscated, and laundered these Manufacturer Payments through their affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff. Defendants made false and misleading misrepresentations of fact related to the Manufacturer Payments and the negotiations that occurred between the PBM and Manufacturer Defendants.

g.    The PBM Defendants knowingly made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that the Manufacturer Payments lower the overall price of diabetes medications and reduce payor costs while promoting the health of diabetics. These representations were false, and Defendants knew they were false when they were made. The PBM Defendants knew that the Manufacturer Payments were not reducing the overall price of diabetes medications but rather are an integral part of the secret Insulin Pricing Scheme and are responsible for the inflated prices.

h.    The PBM Defendants intentionally selected higher-priced

diabetes medications for formulary placement and excluded lower priced ones in order to generate larger profits and coordinated with the Manufacturer Defendants to increase the availability and use of higher priced medications because they are more profitable for both groups of Defendants.

i.      The PBM Defendants misled their payors, including Plaintiff, as to the true nature of value of the services they provided and reaped illicit profits exponentially greater than the fair market value of the services they purported to provide—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

j.      The PBM Defendants owed a duty to disclose the true facts to their payor clients, including Plaintiff, but intentionally chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors, including Plaintiff—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

697.716.    The Manufacturer Defendants and PBM Defendants make these misrepresentations for the sole purpose of inducing reliance by payors, including Monmouth County, into purchasing diabetes medications through PBM Defendants.

698.717.    Defendants knew that their representations and omissions were false and misleading. They knew, for example, that the list prices for the at-issue drugs were excessive, inflated, and untethered to any competitive market price. They

knew that these list prices were artificially inflated to fund kickbacks for the PBMs in exchange for preferred formulary placement. And they knew that the rebates and formulary positions agreed upon between Defendants did not lower the price Plaintiff paid for the at-issue drugs, but rather were primary factors driving the exponential increase in the amount that Monmouth County paid for those drugs during the relevant timeframe.

699.718.    Defendants made these false representations directly to Monmouth County through, among other things, oral and written communications, the inclusion of the reported price in Monmouth County's contracts as a determinant of the price for diabetes medications, marketing materials, presentations, publications of the artificially inflated reported price, and public statements and testimonies in the media, on various websites, in Defendants' governmental filings and at Congressional hearings.

700.719.    Defendants' false representations and omissions were material to Monmouth County.

701.720.    These Defendants intended that Plaintiff would rely on their misrepresentations and omissions. Through their scheme, Express Scripts leveraged formulary control for ever-increasing Manufacturer Payments while the Manufacturer Defendants maintained or increased their profit margins or sales volume as preferred formulary members. Defendants intended to profit at the expense

of payors like Plaintiff.

702.721.    Monmouth County reasonably relied on Defendants' deception in paying for diabetes medications at inflated prices. Monmouth County had no way of discerning that Defendants were, in fact, deceiving it because Defendants possessed exclusive knowledge regarding the nature of the pricing of diabetes medications; intentionally concealed the foregoing from Monmouth County; and made false, fraudulent, incomplete, or negligent representations about the pricing of the diabetes medications and the Defendants' role in that pricing, while purposefully withholding material facts from Monmouth County that contradicted those representations.

703.722.    Plaintiff relied on these Defendants' false list prices. Because of the Insulin Pricing Scheme, list prices have skyrocketed and the spread between list price and net price has ballooned in turn. Plaintiff is injured by this list and net price divergence. Through the scheme, these Defendants have forced payors, including Plaintiff, to pay not just for the drugs, but also for undisclosed kickbacks that are paid to PBMs.

704.723.    These Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to Plaintiff.

705.724.    These Defendants owed Plaintiff a duty to disclose, truthfully, all facts concerning the true cost of the at-issue medications and the inflated and fraudulent nature of their pricing; the existence, amount, flow, and purpose of

rebates and discounts negotiated for those products; and the role that Defendants played in increasing the price of the at-issue drugs.

706.725.    These Defendants possessed superior knowledge of essential facts about the at-issue drugs and their prices. That information was peculiarly and exclusively in their control and not available to payors, including Plaintiff. In light of their misleading or incomplete representations, these Defendants also had an obligation to disclose facts related to the Insulin Pricing Scheme.

707.726.    These Defendants hatched their deceptive schemes and knew that Plaintiff did not know (and could not reasonably discover) that they sought to artificially inflate the price of the insulin medications. These Defendants not only concealed all the facts concerning the true cost of the at-issue medications but went further to make affirmative misrepresentations in marketing materials and other communications that these Defendants worked to lower the ultimate cost of prescription medications. These Defendants engaged in this fraudulent concealment at the expense of Plaintiff.

708.727.    Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and it would not have acted as it did, had it known the truth.

709.728.    As a direct and proximate result of these Defendants' fraudulent scheme, Plaintiff sustained damages, including but not limited to paying excessive and inflated prices for the at-issue medications.

710.729.    These Defendants valued their profits over the trust, health, and safety of Plaintiff Monmouth County and diabetics across the country. These Defendants repeatedly misrepresented the price of the at-issue drugs.

711.730.    Defendants' actions, representations, and misrepresentations demonstrate callous disregard for not only the rule of law but also public health, safety, and well-being.

712.731.    As a direct and proximate result of Defendants' fraudulent Insulin Pricing Scheme, Monmouth County sustained damages, including but not limited to paying excessive and inflated prices for diabetes medications described herein.

713.732.    Defendants are liable to Monmouth for damages in an amount to be proven at trial. Moreover, because Defendants acted wantonly, maliciously, recklessly, deliberately, and with intent to defraud Monmouth County for the purpose of enriching themselves at Plaintiff's detriment, Defendants' conduct warrants punitive damages in an amount to be determined at trial.

## COUNT IV
### Violations of New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1, et seq.)
### (Against Express Scripts, Eli Lilly, Novo Nordisk, and Sanofi)

714.733.    Plaintiff incorporates by reference all preceding paragraphs and

re-alleges them as if set forth fully herein.

715.734.    Plaintiff brings this claim against Express Scripts (as defined collectively herein) and the Manufacturer Defendants. All are referred to collectively throughout Count IV as "Defendants.

716.735.    At all relevant times material hereto, Defendants conducted trade and commerce within the meaning of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq. ("New Jersey CFA").

717.736.    Plaintiff and each of the Defendants are "persons" within the meaning of, and subject to, N.J.S.A. 56:8-1(d).

718.737.    The at-issue diabetes drugs are "merchandise," which is defined to include any objects, goods, and commodities offered, directly or indirectly, to the public for sale. N.J.S.A. § 56:8-1(c).

719.738.    Defendants each engaged in "sales" of "merchandise" within the meaning of N.J.S.A. § 56:8-1(c) and (d), which includes "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute," N.J.S.A. § 56:8-1(e), and therefore includes Defendants' sale of the at-issue diabetes drugs to Plaintiff.

720.739.    The New Jersey CFA protects consumers like Plaintiff against fraud, unlawful practices, and unconscionable commercial practices in connection with the sale of any merchandise.

721.740.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . . " N.J.S.A. § 56:8-2

722.741.    Defendants engaged in unfair, false, deceptive, and misleading practices that violated N.J.S.A. § 56:8-2, et seq., as described herein, through their creation of, participation in, and effectuating the Insulin Pricing Scheme. In particular, and with respect to the Manufacturer Defendants, Express Scripts, and Monmouth County in this case:

      a.    The Manufacturer Defendants published prices for the at-issue drugs and, in doing so, held these prices out as the actual prices for these drugs despite knowing these prices were artificially inflated and untethered from the cost of the drugs or the price the Manufacturers were paid for them—all with the PBM Defendants' knowledge, consent, and cooperation.

      b.    The Manufacturer Defendants misrepresented and actively concealed the true reasons why they set and raised list prices—the truth being

that it was to increase revenues and profits and to offer higher prices and larger Manufacturer Payments to the PBMs—all with the PBM Defendants' knowledge, consent, and cooperation.

c.     The PBM Defendants furthered the scheme by using the artificially inflated list prices to determine the inflated prices paid by payors, including Plaintiff—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

d.     The PBM Defendants represented to payors, including Plaintiff, and to the public that they worked to generate savings with respect to the at-issue drugs and to promote the health of diabetics. Express Scripts made such representations to Plaintiff. Instead, directly counter to those representations, the PBM Defendants drove up the prices of the at-issue drugs and damaged payors, including Plaintiff, by demanding ever-increasing Manufacturer Payments that, in turn, increased what otherwise would have been the retail prices for the at-issue drugs—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

e.     The PBM Defendants have hidden, obfuscated, and laundered these Manufacturer Payments through their affiliated entities so as to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

f.    The PBM Defendants intentionally selected higher-priced diabetes medications for formulary placement and excluded lower priced ones in order to generate larger profits and coordinated with the Manufacturer Defendants to increase the availability and use of higher priced medications because they are more profitable for both the PBM and Manufacturer Defendants. Express Scripts engaged in such conduct here with respect to Plaintiff's formularies.

g.    The PBM Defendants misled their payors, including Plaintiff, as to the true nature of value of the services they provided and reaped illicit profits exponentially greater than the fair market value of the services they purported to provide—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

h.    The PBM Defendants owed a duty to disclose the true facts to their payor clients, including Plaintiff, but intentionally chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors, including Plaintiff—all with the Manufacturer Defendants' knowledge, consent, and cooperation.

~~723.~~742.    In addition, Defendants made numerous false and misleading statements of fact concerning the existence of, reasons for, and amounts of purported price reductions.

a.      A characteristic of every product in New Jersey is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value. The Manufacturer Defendants reported and published artificially inflated list prices for each at-issue drug and, in doing so, represented that the reported prices were reasonably related to the net prices for the at-issue drugs and otherwise reflected the fair market value for the drugs—all with the PBM Defendants' knowledge, consent, and cooperation.

b.      The PBM Defendants misrepresented to payors like Plaintiff and to the public that their formularies and the portion of the Manufacturer Payments they disclosed have the characteristic and benefit of lowering the price of the at-issue drugs and promoting the health of diabetics when, in fact, the opposite is true.

c.      The PBM Defendants utilized the artificially inflated price—which they are directly responsible for inflating and which they know is untethered from the actual price—to make false and misleading statements regarding the amount of savings the PBMs generate for payors and the public.

d.      Defendants made false and misleading representations of fact that the prices for the at-issue diabetes medications were legal, competitive, and fair market value prices.

e.    At no point did the Defendants reveal that the prices for the at-issue drugs were not legal, competitive, or at fair market value—rather, they coordinated to overtly mislead the public and payors, including Plaintiff, and undertook a concerted effort to conceal the truth.

f.    At no point did these Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme—rather, they overtly misled the public and payors, including Plaintiff, and undertook a concerted effort to conceal the truth.

g.    At least once per year for each year during the relevant period, Manufacturer Defendants reported and published false prices for each at-issue drug and in doing so represented that the list prices were the actual, legal, and fair prices for these drugs and resulted from competitive market forces when they knew that was not the case.

h.    By granting the at-issue drugs preferred formulary position (which PBM Defendants represent are reserved for reasonably priced drugs and which are purportedly designed to promote cost savings and the health of diabetics), the PBM Defendants knowingly and purposefully utilized the false prices that were generated by the Insulin Pricing Scheme—all with the Manufacturer Defendants knowledge, consent, and cooperation.

i.    By granting the at-issue diabetes medications preferred formulary

positions, the PBM Defendants (here, Express Scripts) ensured that prices generated by the Insulin Pricing Scheme would harm Plaintiff—all with the Manufacturer Defendants knowledge, consent, and cooperation.

j.      The PBM Defendants (here, Express Scripts) also misrepresented their formularies promoted the cost-savings to Plaintiff.

k.      Defendants' representations are false and Defendants knew they were false when they were made. Defendants knew that the prices they reported and utilized are artificially inflated for the purpose of maximizing revenues and profits pursuant to the Insulin Pricing Scheme.

l.      Defendants not only knew that the PBMs' formulary construction fueled the precipitous price increases that damaged Plaintiff's financial well-being, but coordinated in ways that made such harm inevitable—all for the sole purpose of generating more revenues and profits for both groups of Defendants.

m.      Defendants affirmatively withheld this truth from Plaintiff, even though these Defendants knew that the Plaintiff's intention was to pay the lowest possible price for diabetes medications and expectation was to pay a legal, competitive price that resulted from transparent market forces.

n.      Defendants made false and misleading misrepresentations of fact related to the Manufacturer Payments and the negotiations that occurred

between the PBM and Manufacturer Defendants.

o.    PBM Defendants knowingly made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that the Manufacturer Payments lower the overall price of diabetes medications and reduce payor costs while promoting the health of diabetics.

p.    Defendants knew that these representations were false when they were made. Defendants knew that the Manufacturer Payments were not reducing the overall price of diabetes medications but rather are an integral part of the secret Insulin Pricing Scheme and are responsible for the inflated prices.

q.    The PBM Defendants (here, Express Scripts) owed a duty to disclose the true facts to their payor clients, including Plaintiff, but intentionally chose instead to conceal them, both to further the Insulin Pricing Scheme and to conceal it from payors like Plaintiff—all with the intent of misrepresenting the characteristics and benefits of their services and the existence and nature of purported price reductions they obtained for those payors. All of this was done with the Manufacturer Defendants' knowledge, consent, and cooperation.

r.    Defendants continue to make these misrepresentations and to

publish prices generated by the Insulin Pricing scheme, and Plaintiff continues to be constrained to purchase diabetes medications at exorbitant prices.

724.743.    Defendants' unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in payors like Plaintiff, and were likely to and did in fact deceive those payors.

725.744.                                                                                  I n addition, the acts and practices alleged herein are ongoing, repeated, and affect the public interest. The acts and practices alleged herein substantially harm the community of diabetics, their families, healthcare providers, consumers in general, and the public at large, and have caused substantial actual harm, including to Plaintiff and its beneficiaries. Because of the Insulin Pricing Scheme, payors (including Plaintiff) and patients have paid inflated prices for the at-issue drugs. Beyond inflicting monetary harm, Defendants' conduct restricted affordable access to diabetes drugs, forcing diabetics to ration—or forego—necessary treatment. The Insulin Pricing Scheme has thus had a broad impact on consumers at large in New Jersey, including in Monmouth County.

726.745.    In purchasing the at-issue diabetes drugs, Plaintiff relied on the misrepresentations and/or omissions of Defendants.

727.746.                                                                                  A

s a direct and proximate result of Defendants' wrongful conduct in violation of the New Jersey CFA, Plaintiff has suffered and continues to suffer harm as a purchaser of the at-issue drugs, and damages to be determined at trial, including but not limited to the Plaintiff paying excessive and inflated prices for diabetes medications described herein every time it paid for an at-issue drug.

~~728.~~747.    Additionally, Plaintiff did not receive the benefit of its bargain, or otherwise paid a price premium, for the at-issue diabetes medications because it paid an artificially inflated price due to these Defendants' illegal practices.

~~729.~~748.    As a result of Defendants' fraudulent and/or deceptive conduct, misrepresentations, and/or knowing omissions, Plaintiff is entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial. See N.J.S.A. § 56:8-19.

## COUNT V
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against Express Scripts)**

~~730.~~749.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

~~731.~~750.    Plaintiff brings this claim against Express Scripts (as defined collectively herein). Express Script is referred to throughout Count V as "Defendant."

~~732.~~751.    Implied in the pharmacy benefit management contracts ("PBM agreements") entered into between Monmouth County and Express Scripts (and,

prior to Express Scripts, Medco) are covenants that the parties would deal with each other in good faith and would not engage in any conduct to destroy or injure the right of the other party to receive the benefits or fruits of the agreement.

733.752.    Express Scripts failed to perform its obligations in good faith under the PBM agreements by knowingly, intentionally, and secretly manipulating the prices of the at-issue drugs in order to benefit itself financially at the expense of Monmouth County—as alleged in detail herein.

734.753.    Express Scripts was aware that Plaintiff was willing to enter into the PBM agreements only in reliance on the integrity of Express Scripts.

735.754.    As Express Scripts knew, however, it was willfully coordinated with the Manufacturer Defendants to enrich itself at Plaintiff's expense by artificially inflating the costs of the at-issue drugs. And Express Scripts took additional steps to conceal its arrangements with the Manufacturer Defendants so that payors like Plaintiff would not discover they were not receiving the benefit of its agreements. Express Scripts also coordinated with the Manufacturer Defendants to conceal portions of the Manufacturer Payments it received by relabeling rebates as "administrative fees" or other types of fees that would not be "passed through" to Plaintiff and by concealing payments it received from the Manufacturer Defendants through its affiliated rebate aggregators.

736.755.    Through its conduct, and the other conduct described in detail

herein, Express Scripts deprived Plaintiff of its rights to receive the benefits of the PBM agreements.

737.756.    As a direct and proximate result of the Express Scripts' knowing, intentional and bad faith violation of the PBM agreements' implied covenants of good faith and fair dealing, Monmouth County sustained damages, including but not limited to paying excessive and inflated prices for diabetes medications described herein.

**Count VI**
**Civil Conspiracy**
**(Against all Defendants)**

738.757.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

739.758.    Defendants' conduct described herein constitutes an agreement between two or more parties to commit an unlawful act or a lawful act by unlawful means and Defendants' overt acts in furtherance of this conspiracy caused Plaintiff's damages

740.759.    Defendants aided and abetted one another to violate federal laws and commit common law fraud.

741.760.    Each Defendant agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially and egregiously inflated the price of diabetes medications.

742.761. Each PBM Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

743.762. The Manufacturer Defendants agreed with each other and the PBM Defendants to intentionally raise their diabetes medication prices and then pay back a significant portion of those prices to the PBMs.

744.763. In exchange for the Manufacturer Defendants inflating their prices and making large secret payments, the PBM Defendants agreed to and did grant preferred formulary status to the Manufacturer Defendants' diabetes medications.

745.764. Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither the PBM Defendants nor the Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

746.765. The PBM Defendants need the Manufacturer Defendants to inflate the reported price of their diabetes medications and to make secret payments back to the PBM Defendants in order for the PBM Defendants to profit off the Insulin Pricing Scheme.

747.766. The Manufacturer Defendants need the PBM Defendants to grant their diabetes medications preferred formulary placement in order to maintain access to a majority of payors and diabetics.

748.767.    As discussed throughout this Complaint, the Insulin Pricing Scheme resulted from explicit agreements, direct coordination, constant communication, and exchange of information between the PBMs and the Manufacturers.

749.768.    In addition to the preceding direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that infers Defendants conspired to engage in fraudulent conduct:

    a.    Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

    b.    Numerous ongoing government investigations, hearings and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants, including:

        i.    In 2016, the Manufacturer Defendants received civil investigative demands from at least the State of Washington relating to the pricing of their insulin products and their relationships with the PBM Defendants;

        ii.    In 2017, the Manufacturer Defendants received civil investigation demands from the States of Minnesota, California and Florida related to the pricing of their insulin products and their relationships with the PBMs;

        iii.    Letters from numerous senators and representatives in recent years to the Justice Department and the Federal Trade Commission asking them to investigate potential collusion among Defendants;

iv.    A 2017 House Oversight committee investigation into the corporate strategies of drug companies, including Manufacturer Defendants, seeking information on the increasing price of drugs and manufacturers efforts to preserve market share and pricing power;

v.    A 2018 Senate report titled "Insulin: A Lifesaving Drug Too Often Out of Reach" aimed addressing the dramatic increase in the price of insulin; and

vi.    Several 2019 hearings before both the Senate Financing Committee and the House Oversight and Reform Committees on the Insulin Pricing Scheme and the collusion between the PBMs and the Manufacturers; and

vii.    Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs.

viii.    The astronomical rise in the price of the at-issue drugs coincides with PBM Defendants' rise to power within the pharmaceutical pricing system starting in 2003.

750.769.    Plaintiff Monmouth County was and continues to be damaged by the conspiracy when it overpaid for the diabetes medications as result of Defendants' unlawful actions.

## COUNT VII
### Unjust Enrichment
### (Against Express Scripts, Eli Lilly, Novo Nordisk, and Sanofi)

751.770.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

752.771.    This cause of action is alleged in the alternative to any claim Plaintiff may have for legal relief.

753.772.    It is a fundamental principle of fairness and justice that a person should not be unjustly enriched at the expense of another.

754.773.    A person should not be unjustly enriched at the expense of another even if that person's conduct is not tortious

755.774.    Plaintiff conferred a benefit upon Defendants Express Scripts, Eli Lilly, Novo Nordisk, and Sanofi (for purposes of Count VI, "Defendants").

756.775.    Plaintiff conferred a benefit on Defendants by purchasing the at-issue insulins at artificially and illegally inflated prices as established by the Insulin Pricing Scheme.

757.776.    Plaintiff conferred this benefit upon Defendants to Plaintiff's financial detriment.

758.777.    Defendants deceived Plaintiff and have received a financial windfall from the Insulin Pricing Scheme at Plaintiff's expense.

759.778.    Defendants wrongfully secured and retained a benefit in the form of amounts paid for diabetes medications, unearned fees, and other payments collected based on the market forces and prices generated by the Insulin Pricing Scheme, and revenues that would not have been realized but for the Insulin Pricing Scheme.

760.779.    Defendants wrongfully secured and retained a benefit in the form of revenues and profits to which they were not entitled, which did not represent the

fair market value of the goods or services they offered, and which were obtained at Plaintiff's expense.

761.780.    Defendants wrongfully secured and retained a benefit in the form of monies paid at artificially inflated prices for the at-issue medications that would not have existed but for the Defendants' misconduct.

762.781.    Defendants were aware of the benefit, voluntarily accepted it, and retained and appreciated the benefit, to which they were not entitled, all at Plaintiff's expense.

763.782.    Any Defendant's retention of any portion of any benefit obtained by way of the Insulin Pricing Scheme is unjust and inequitable regardless of the Insulin Pricing Scheme's legality.

764.783.    Each Defendant's retention of any portion of the benefit violates the fundamental principles of justice, equity, and good conscience. Even absent Plaintiff's ability to prove the elements of any other claim, it would be unfair, unjust, and inequitable for any Defendant to retain any portion of the benefit.

765.784.    Even absent legal wrongdoing by any or all Defendants, Plaintiff has a better claim to the benefit than any Defendant.

766.785.    The benefit retained is in an amount not less than the difference between the reasonable or fair market value of the drugs for which Plaintiff paid and the actual value of the drugs Defendants delivered and, as to CVS Caremark and

Express Scripts, the reasonable or fair market value of the services for which Plaintiff

paid and the actual value of services rendered with respect to the at-issue drugs.

767.786.    Defendants should not be permitted to retain the benefit conferred

upon them by Plaintiff and restitution is appropriate to prevent the unjust enrichment.

768.787.    Accordingly, Plaintiff seeks disgorgement of the benefit and

seeks restitution, rescission, or such other relief as will restore to Plaintiff that to

which it is entitled.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court enter judgment against

Defendants as follows:

A.    A judgment in favor of Plaintiff and against Defendants;

B.    Determining that the applicable Defendants have violated RICO,

have conspired to violate RICO, have committed common-law fraud, have

violated the New Jersey CFA, have breached the implied covenant of good

faith and fair dealing, have engaged in a civil conspiracy, and have been

unjustly enriched.

C.    Granting Plaintiff injunctive relief in accordance with the New

Jersey CFA and 18 U.S.C. § 1964(a) that Defendants, their affiliates,

successors, transferees, assignees, and the officers, directors, partners, agents,

and employees thereof, and all other persons acting or claiming to act on their

behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein in violation of the New Jersey CFA and RICO, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.     Damages, treble damages, statutory damages, and punitive damages, where applicable;

E.     Restitution, disgorgement, and other just relief;

F.     An order awarding Plaintiff damages in an amount to be determined at trial for the wrongful acts of Defendants;

G.     Pre- and post-judgment interest on all amounts awarded;

H.     Reasonable attorneys' fees and costs, as allowed by law; and

I.     Such other or further relief as the Court may deem appropriate, just, equitable, and proper.

## JURY DEMAND

Plaintiff Monmouth County demands trial by jury on all issues so triable.

Dated:- ~~August 1, 2024~~                    s/ ~~David R. Buchanan~~

                                               Christopher A. Seeger
                                             David R. Buchanan
                                             Steven J. Daroci
                                             SEEGER WEISS LLP

55 Challenger Road
Ridgefield Park, New Jersey 07660
(973) 639-9100
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
sdaroci@seegerweiss.com


OF COUNSEL:

Benjamin J. Widlanski

Tal J. Lifshitz
Rachel Sullivan
Daniel T. DiClemente
KOZYAK TROPIN & THROCKMORTON
LLP
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
(305) 372-1800
bwidlanski@kttlaw.com
tjl@kttlaw.com
rs@kttlaw.com
ddiclemente@kttlaw.com

Brandon L. Bogle
Matthew D. Schultz
William F. Cash
LEVIN, PAPANTONIO, PROCTOR,
BUCHANAN, O'BRIEN, BARR &
MOUGEY, P.A.
316 S. Baylen St., Suite 600
Pensacola, Florida 32502
(850) 435-7140
mschultz@levinlaw.com
bbogle@levinlaw.com
bcash@levinlaw.com

Troy A. Rafferty, Esq.
RAFFERTY DOMNICK CUNNINGHAM
& YAFFA

267

TROY RAFFERTY LAW
815 S Palafox Street, 3rd Floor Pensacola, Florida 32502870 Green Hills Rd. Cantonment, FL 32533
(847) 682-7419
troy@pbglaw.comtroy@troyraffertylaw.com

# EXHIBIT 3

PUBLIC

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**       **Lina M. Khan, Chair**
                         **Rebecca Kelly Slaughter**
                         **Alvaro M. Bedoya**
                         **Melissa Holyoak**
                         **Andrew Ferguson**

| | |
|---|---|
| **In the Matter of** | |
| **Caremark Rx, LLC;** | |
| **Zinc Health Services, LLC;** | |
| **Express Scripts, Inc.;** | |
| **Evernorth Health, Inc.;** | **Docket No. 9437** |
| **Medco Health Services, Inc.;** | |
| **Ascent Health Services LLC;** | |
| **OptumRx, Inc.;** | |
| **OptumRx Holdings, LLC;** | |
|    and | |
| **Emisar Pharma Services LLC.** | |

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondents Caremark, ESI, and Optum (collectively "PBM Respondents"); and Zinc, Ascent, and Emisar (collectively "GPO Respondents") have engaged in conduct that violates Section 5 of the FTC Act, 15 U.S.C. § 45, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), stating its charges as follows:

# I.    NATURE OF THE CASE

1.     Americans pay too much for prescription drugs, including life-saving drugs like insulin. In fact, prescription drug prices in the U.S. are nearly three times higher than in other countries. In 2023, the U.S. spent over $722 billion on prescription drugs, nearly as much as the rest of the world combined. Many Americans struggle to afford the medications they need to survive.

2.     This country's prescription drug affordability crisis is partly driven by Respondents' manipulation of drug price competition for their own gain. Normally, companies compete by lowering prices. And normally, insurance systems function by the healthy subsidizing the sick. Respondents' conduct has turned these basic principles on their head. This case challenges their role in designing, directing, and overseeing a drug reimbursement system, which generates billions of dollars in rebates and fees for them while incentivizing drug manufacturers to *raise* (not lower) the sticker price (i.e., list price) of their drugs. As a result, many diabetics and other sick patients are stuck paying significantly more for life-saving medications like insulin.

3.     Pharmacy benefit managers (PBMs) act as middlemen, overseeing prescription drug coverage and reimbursement for health plans, health plan sponsors, and more than 200 million Americans. Through dozens of mergers, the PBMs have horizontally concentrated and vertically integrated. Three dominant pharmacy benefit managers—Caremark, ESI, and Optum—administer approximately 80% of all prescriptions in the United States.

4.     Positioned at the center of the intricate and opaque pharmaceutical distribution chain, the PBM Respondents wield significant influence over which drugs patients can access, and at what price. The PBM Respondents create drug formularies, which are lists of preferred and non-preferred drugs grouped by categories. Their clients—including companies and organizations that sponsor commercial health plans—use these formularies to steer insured patients to certain prescription drugs and away from others.

5.     About a decade ago, the PBM Respondents introduced restrictive formularies that completely exclude certain drugs from coverage. The introduction of these restrictive or exclusionary formularies was a game changer. Manufacturers now faced the significant risk that their products would be excluded outright from insurance coverage for tens of millions of patients. Leveraging this threat of exclusion, Respondents began demanding higher and higher rebates from drug manufacturers in exchange for placing those drugs on their restrictive formularies. In a single year, one PBM Respondent collected more than $███████ in rebates and an additional $███████ in associated fees.

6.     The race for higher rebates, in principle, should have reduced drug costs for patients. For many patients, however, the reality is quite different. To satisfy the PBM Respondents' insatiable demand for larger rebates—and to preserve the manufacturers' own profits—manufacturers have steadily increased the list price of their drugs, leading to artificially inflated list prices that are disconnected from the actual cost of the drugs to insurers. Yet, many patients' out-of-pocket expenses are directly or indirectly tied to these inflated prices. For example, uninsured patients may pay the full list price, while insured patients with high

deductibles or co-insurance face costs based on these inflated list prices. As a result, as rebates and list prices rise in tandem, these groups of patients are burdened with higher out-of-pocket costs for their medications.

7.      The harm caused by this broken system is far-reaching. Respondents have created an opaque drug pricing and reimbursement system, which benefits them, but which deliberately obscures the full scope of harm and financial cost from insurers and patients who may be unknowingly shouldering the burden of inflated list prices.

8.      Insulin is the poster child of Respondents' broken drug pricing system. Diabetes is among the most widespread diseases in the United States, afflicting an estimated 38.4 million Americans. In 2021, diabetes was the eighth leading cause of death in the United States. And the prevalence of diabetes continues to rise. In 2023, the Centers for Disease Control and Prevention (CDC) calculated that the number of adults diagnosed with diabetes has more than doubled in the past two decades. There is no cure for diabetes, but it can be managed. For many, the only way to manage the disease is with insulin injections. Insulin was first used as medication over a century ago, and today over 8 million Americans depend on insulin for their survival.

9.      For nearly 85 years, insulin medications were affordable. For example, in 1999, the average list price of Humalog, a widely used insulin, was only $21. Starting around 2012, however, the PBM Respondents began demanding increasingly higher rebates and fees from insulin manufacturers in exchange for exclusive placement on their formularies. This chase-the-rebate strategy proved highly effective (and profitable) for the PBM Respondents. Manufacturers paid rebates as steep as ███% off the list price to secure exclusive formulary coverage. But this approach had a profound consequence: as the Respondents demanded more rebates, insulin manufacturers sharply inflated the list prices of their products. By 2017, Humalog's price had soared to more than $274—a staggering increase of more than 1,200%. In the past ten years alone, spending on insulin in the United States has tripled—from $8 billion in 2012 to $22.3 billion in 2022.

10.     The rising list price of insulin has led to severe harm. By 2019, the PBM Respondents estimated that one out of every four insulin patients could not afford their medication. More than a million patients reported rationing their insulin, a dangerous practice that can lead to devastating health complications, including death.

11.     Worse, Respondents' tactics have effects beyond insulin. The Respondents' demand for larger rebates has also inflated list prices for other critical drugs including treatments for autoimmune diseases and inflammatory conditions. Patients whose out-of-pocket costs are tied to these inflated list prices may spend hundreds of dollars per prescription. In some cases, the patient may pay more at the pharmacy counter than the actual cost to their commercial insurer. In other words, the insurer functionally makes a profit from the prescription, instead of paying its share of the cost. This turns the normal insurance model on its head with the sick subsidizing the healthy, rather than the other way around. As one PBM manager bluntly put it:

████████████████████████████████████

PUBLIC

12.     It is time to put an end to the Respondents' unfair and unlawful business practices and to prevent their recurrence.

## II.     JURISDICTION

13.     Respondents are, and at all relevant times have been, corporations, as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

14.     Respondents' general business practices and the unfair methods of competition and unfair acts or practices alleged here are "in or affecting commerce" within the meaning of Sections 4 and 5 of the FTC Act, 15 U.S.C. §§ 44, 45.

## III.     RESPONDENTS

### A.     Caremark/Zinc Respondents

15.     Respondent Caremark Rx, LLC ("Caremark") is a Delaware limited liability company with its principal place of business at One CVS Drive, Woonsocket, Rhode Island. Caremark Rx, LLC is a wholly owned indirect subsidiary of CVS Health Corporation.

16.     Caremark is engaged in the business of providing pharmacy benefit services and is the largest PBM in the United States. In 2023, Caremark administered 2.3 billion—or approximately 34%—of total prescription claims in the United States. In 2022, Caremark recorded $169.2 billion in revenue.

17.     Respondent Zinc Health Services, LLC ("Zinc") is a Delaware limited liability company with its principal place of business at One CVS Drive, Woonsocket, Rhode Island. In 2020, CVS Health Corporation established Zinc as a group purchasing organization for Caremark's PBM business. CVS Health Corporation ████████████████████████████████████████████████ Zinc negotiates rebates with drug manufacturers on behalf of Caremark's and other third parties' commercial clients.

### B.     Express Scripts/Ascent Respondents

18.     Respondent Express Scripts, Inc. is a Delaware company with its principal place of business at One Express Way, St. Louis, Missouri. Express Scripts, Inc. is engaged in the business of providing pharmacy benefit services and is the second largest PBM in the United States. In 2023, Express Scripts, Inc. administered approximately 23% of total prescriptions in the U.S. Express Scripts, Inc. is a wholly owned direct subsidiary of Evernorth Health, Inc. and a wholly owned indirect subsidiary of Cigna Corporation.

19.     Respondent Evernorth Health, Inc. ("Evernorth") is a Delaware company with its principal place of business located at One Express Way, St. Louis, Missouri. In 2022, Evernorth earned $140.3 billion in revenue, the majority of which came from ESI. Evernorth is a wholly owned direct subsidiary of Cigna Corporation. Evernorth is involved in Express Scripts, Inc.'s provision of PBM services.

20.     Respondent Medco Health Services, Inc. ("Medco") is a Delaware corporation with its principal place of business at 100 Parsons Pond Drive, Franklin Lakes, New Jersey. Medco is a wholly owned indirect subsidiary of Cigna Corporation. Medco supports Cigna's PBM functions.

21.     Express Scripts, Inc., Medco Health Services, Inc., and Evernorth Health, Inc. are referred to collectively as "ESI" or "ESI Respondents."

22.     Ascent Health Services LLC ("Ascent") is a Delaware limited liability company with its principal place of business at Mühlentalstrasse 36, 8200 Schaffhausen, Switzerland. In 2019, ESI established Ascent as a group purchasing organization for ESI's PBM business. ESI co-owns Ascent and ████████████████████████████████████ ███████. Ascent negotiates rebates with drug manufacturers on behalf of ESI's and other third parties' commercial clients.

### C.     Optum/Emisar Respondents

23.     Respondent OptumRx, Inc. is a California corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota. OptumRx, Inc. is a wholly owned indirect subsidiary of UnitedHealth Group Inc. OptumRx, Inc. is responsible for supporting all PBM services provided by UnitedHealth Group Inc.

24.     Respondent OptumRx Holdings, LLC is a Delaware corporation with its principal place of business located at 11000 Optum Circle, Eden Prairie, Minnesota. OptumRx Holdings, LLC is a wholly owned indirect subsidiary of UnitedHealth Group Inc. and the direct parent company of OptumRx, Inc.

25.     OptumRx, Inc. and OptumRx Holdings, LLC are collectively referred to as "Optum" or "Optum Respondents."

26.     Optum is engaged in the business of providing pharmacy benefit services and is the third largest PBM in the United States. In 2023, Optum administered approximately 22% of total prescription in the U.S. In 2022, OptumRx recorded $99.8 billion in revenue.

27.     Respondent Emisar Pharma Services LLC ("Emisar") is a Delaware limited liability company with its principal place of business in Ireland. In 2021, Optum established Emisar as a group purchasing organization for Optum's PBM business. Emisar is a wholly owned indirect subsidiary of UnitedHealth Group Inc. Emisar negotiates rebates with drug manufacturers on behalf of Optum's commercial clients.

## IV.     <u>BACKGROUND</u>

### A.     PBMs are central actors in pharmaceutical transactions, influencing drug pricing, rebates, and sales

28.     PBMs administer pharmacy benefit management services on behalf of clients. These clients are also generally known as payers, and include employers, health insurer plans, labor unions, employer coalitions, and government entities. PBMs provide various services to

these payers including developing drug formularies, creating and managing networks of pharmacies, processing prescription drug claims, reporting drug expenditures, creating and administering clinical programs, and negotiating with pharmaceutical manufacturers for rebates on behalf of their clients.

29.    PBMs began by providing claims processing and administrative services for health insurance companies in the late 1960s. Over time, however, their services expanded and PBMs began acting as intermediaries between the various segments of the pharmaceutical supply chain. Over the last 20 years, PBMs have also become increasingly concentrated. Caremark, ESI, and Optum have all gained share in the provision of PBM services through mergers and acquisitions. For example, ESI acquired Medco Health Solutions in 2012—combining the then first and third largest PBMs; Optum acquired Catamaran in 2015—combining the then third and fourth largest PBMs; and Caremark merged with Aetna (which had its own PBM) in 2018—increasing the share of the largest PBM in the U.S. today.

30.    These PBMs have also become vertically integrated within large conglomerates that provide a broad range of services across the health care sector. The PBMs are integrated with private drug labelers, pharmacies, health care providers, GPOs, and insurance companies. This vertical integration has allowed the PBMs and their affiliates to leverage their power along every link in the pharmaceutical supply chain.

31.    These behemoth PBMs came to exert enormous influence over drug pricing and purchasing decisions. When a patient fills a prescription at a retail pharmacy, the patient's out-of-pocket cost for the drug can vary depending on several financial arrangements within the pharmaceutical chain. Today, PBMs are at the center of these financial arrangements, contracting with drug manufacturers, health plan sponsors, and pharmacies.

Payment flow between stakeholders for pharmacy benefit drugs:



## **Formulary Development**

32.    One of the key ways PBMs exert influence over drug pricing and purchasing decisions is by creating drug formularies. A drug formulary is a list of prescription drugs covered by a health plan. Formularies often separate drugs into multiple tiers, and drugs on "preferred" tiers are typically cheaper for patients. For example, a common formulary design has three tiers: tier 1 includes mostly generic drugs and has the lowest patient out-of-pocket cost; tier 2 includes

preferred branded drugs with a higher out-of-pocket cost; and tier 3 includes non-preferred branded drugs with the highest patient out-of-pocket cost. This formulary design drives prescriptions toward the lowest tiers, including generic or preferred branded drugs.

33.    Some drug formularies are more "open," meaning the formulary covers all or nearly all medications. Other formularies are relatively "closed," meaning the formulary includes only certain drugs, and excludes others, used to treat a specific condition. Generally, a health plan will not reimburse any part of the cost for an excluded drug. It follows that a physician is more likely to prescribe a drug that is covered on their patient's health plan formulary. Thus, a drug's formulary coverage dramatically impacts the drug's cost and utilization.

34.    The PBM Respondents all offer several standard commercial formularies with different drug exclusion levels, ranging from open to more closed. The most-utilized commercial formularies all have a significant number of drug exclusions.

35.    As of 2021, Caremark's flagship Standard Control Formulary, which excludes drugs, covered more than ▮▮▮▮▮ people. Caremark's more open Basic Control Formulary covered approximately ▮▮▮▮▮ people.

36.    As of 2023, ESI's flagship National Preferred Formulary, which excludes drugs, covered approximately ▮▮▮▮▮ people. ESI's more open Basic Formulary covered approximately ▮▮▮▮▮ people.

37.    As of 2023, Optum's flagship Premium Formulary, which excludes drugs, covered more than ▮▮▮▮▮ people. Optum's more open Select Formulary covered approximately ▮▮▮▮▮ people.

38.    Because formularies serve a crucial role in determining patient access to prescription drugs, PBMs' central role in formulary design gives them significant leverage to extract price concessions from drug manufacturers. If a PBM excludes a drug from its formulary, the manufacturer risks losing a significant portion of sales among patients covered by that formulary. Conversely, if a PBM "preferences" or "prefers" a drug by placing it on a more favorable tier compared to competing products, it can boost the drug's sales volume and market share.

**Rebate Negotiation**

39.    PBMs also exert influence over drug pricing and purchasing decisions by conditioning preferential treatment on their drug formularies on manufacturer rebates.

40.    Drug manufacturers pay rebates that are based on a percentage of the wholesale acquisition cost (WAC) of their product. Drug manufacturers set the WAC, which is often referred to as the drug's "list price."

41.    The list price of a drug minus any rebates and fees paid by the manufacturer is referred to hereinafter as the drug's "net price."

42.    In recent years, each PBM Respondent has created a group purchasing organization (GPO) to negotiate commercial rebates with drug manufacturers on behalf of the PBMs. These GPOs (Respondents Zinc, Ascent, and Emisar) now perform the same commercial contracting function that the PBMs previously handled directly. In fact, ████████████████

████████████████████████████████████████████████████████  The PBM Respondents simply moved their commercial rebate contracting functions to the GPO Respondents' corporate structure. Now, the GPO Respondents enter into commercial rebate contracts with drug manufacturers, and the PBM Respondents utilize these rebate rates for their commercial clients.

43.    PBM Respondents, now through GPO Respondents, solicit commercial bids from manufacturers using rebate grids. Manufacturers submit commercial bids by filling out these grids with different rebate rates for different levels of exclusivity: exclusive coverage (1 of 1 manufacturer), dual coverage with another manufacturer (1 of 2), and multiple manufacturers (1 of many).

44.    Generally, manufacturers are willing to pay higher rebates for more preferential treatment of their drugs on formularies. For example, in 2022, one insulin manufacturer, Sanofi-Aventis U.S., paid Optum base rebates of ████% of WAC for its insulin drug Lantus where Sanofi was the only long-acting insulin manufacturer on the formulary. In contrast, Sanofi paid Optum base rebates of only ████% of WAC for Lantus where Sanofi was one of many long-acting insulin manufacturers on the formulary.

45.    PBM Respondents, now through GPO Respondents, extract administrative fees from drug manufacturers as part of commercial rebate negotiations. PBMs attribute administrative fees to maintaining and overseeing the rebate program, negotiating and contracting with clients to participate in the rebate program, monitoring compliance with rebate eligibility requirements, and calculating and invoicing the rebates applicable to eligible drug utilization.

46.    Administrative fees are typically calculated as a percentage of a drug's WAC, ranging from ██% to ██%. For example, a 2022 rebate agreement between Emisar (Optum's GPO) and Eli Lilly, another insulin manufacturer, had an administrative fee of ████% of WAC. Because administrative fees are typically calculated as a percentage of WAC, the PBMs and GPOs collect higher fees on a drug with a higher WAC than a drug with a lower WAC even though the PBMs and GPOs provide the same services.

47.    PBM Respondents, now through GPO Respondents, also extract data fees from manufacturers as part of their commercial rebate negotiations. Nominally, a data fee grants manufacturers access to a portal that contains utilization and other data for the manufacturer's drugs.

48.    Data fees, sometimes referred to as ████████ fees or ████████████ fees, are typically calculated as a percentage of a drug's WAC, ranging from ████% to ████%. For example, a 2022 rebate agreement between ████████████████████ had a ████████ of ████% of WAC. Because data fees are calculated as a percentage of WAC, the PBMs and

GPOs collect higher fees on a drug with a higher WAC than on a drug with a lower WAC, even though the PBMs and GPOs provide the same data services.

49.    PBM Respondents, now through GPO Respondents, may also extract WAC-based fees from manufacturers in exchange 

Because these fees are typically calculated as a percentage of WAC, the PBMs and GPOs collect higher fees with a higher WAC drug than a drug with a lower WAC even though the PBMs and GPOs provide the same services.

50.    PBMs implement drug formularies for their payer clients. PBMs develop standard commercial formularies, including their flagship formularies identified in paragraphs 35-37, that clients can adopt "off the shelf." Each of the three PBM Respondents, ███████████, also allows clients to customize their own drug formularies. Custom formularies can range from a client making a few deviations to a standard PBM formulary to a fully customized formulary tailored to a client's specific needs. Many employers and commercial health plan sponsors lack the resources or pharmaceutical expertise necessary to develop their own formularies, so they outsource drug formulary decisions entirely to PBMs and accept the standard formularies that PBMs offer.

51.    PBMs also handle the flow of rebate payments from drug manufacturers to the commercial payers. PBMs claim they pass on the vast majority of the drug rebates to their payer clients, though almost never directly to the patients.

52.    In their May 2023 Congressional testimony, the PBM Respondents asserted that they pass on approximately 95% to 98% of the rebates they receive from drug manufacturers on behalf of the PBMs' clients. Industry reporting and data, however, suggest that these claims may be exaggerated, with PBMs actually retaining a larger portion of rebates and fees. According to the data that PBMs reported to the Texas Department of Insurance, fifteen PBMs collected a total of $4.39 billion in rebates, fees, and other payments from drug manufacturers in 2022 on health plans issued under Texas law. Of this, the PBMs kept $409 million—9.32%—for themselves.

53.    A 2022 Drug Channels analysis of the Texas Department of Insurance data found that the data from 2016 to 2021 "tell a compelling and fairly consistent tale about what happened to the manufacturers' payments to PBMs." The Drug Channels analysis concluded that between 2016 and 2021, the PBMs retained between 7% and 21% of manufacturers' total payments, totaling hundreds of millions of dollars.

54.    Payers' limited visibility into specific rebates and fees makes it difficult to verify pass-through. The formation of the GPO Respondents further exacerbated payers' ability to determine whether rebates and fees are actually being passed through, because the Respondents

do not disclose the amount of fees retained by the GPOs. Moreover, the GPO Respondents often make their rebate contracts with manufacturers available for payers' review only ███████████

█ further obscuring payers' visibility into pass-through. A former Optum executive who helped set up Emisar, Optum's GPO, candidly explained, "The intention of the G.P.O. is to create a fee structure that can be retained and not passed on to a client."

55.    Rebates that are passed on to the health plan may reduce the plan's (but not necessarily the patient's) overall net cost of a drug. Hereinafter, "net cost" refers to the actual cost to the payer, after factoring in the rebates and fees that are passed on to the payer. Payers then choose whether to retain the rebates or apply them at the point of sale (i.e., the pharmacy counter) when the patient purchases the drug that earns the rebate. According to the Texas Department of Insurance data, only 0.0002% of the collected rebates were shared directly with the patients who took the drugs.

**B.    Certain patients' out-of-pocket costs are tied to a drug's list price**

56.    Different patients may pay vastly different amounts for the very same drug. Patient cost depends on several factors, including whether the individual has health insurance, and if so, the drug benefits provided by that insurance.

57.    Uninsured or cash-paying patients may pay for the prescription based on a drug's full list price.[1] Because these patients are not covered by health insurance, they do not receive rebates or other price concessions that a PBM negotiates with the manufacturer. According to the CDC National Center for Health Statistics, 8.4% or 27.6 million Americans did not have health insurance in 2022.

58.    Most Americans have health insurance. But even among insured Americans, out-of-pocket costs greatly vary for the same drug. A patient's health insurance may be either commercial or government-sponsored (e.g., Medicare, Medicaid). Most Americans with commercial health insurance get coverage through their employer. According to U.S. Census Bureau data, over 183 million individuals were enrolled in employer-sponsored commercial insurance in 2019, compared to 33 million individuals with direct-purchase commercial plans and 58 million individuals enrolled in Medicare, the next largest category.

59.    Employers providing health insurance may be self-insured or fully insured. Self-insured employers assume the financial risk of providing health benefits to employees. Fully insured employers, on the other hand, outsource the financial risk to the health insurance company. In 2023, approximately 65% of employees were enrolled in self-insured employer plans. PBMs administer pharmacy benefits for both self-insured and fully insured clients.

---

[1] The price at the pharmacy counter that is used as the basis for calculating a patient's out-of-pocket cost is generally either the drug's usual and customary price (U&C) or a discounted Average Wholesale Price (AWP), rather than WAC. However, both U&C and discounted AWP are closely correlated to and often approximate WAC for branded drugs. For simplicity, we refer to WAC and other prices based on WAC as the "list price."

60.    How much an insured patient pays for a prescription is determined by the drug
benefit in the patient's health plan. A patient's cost for their drug benefits includes two
key components: monthly premiums and out-of-pocket expenses. A monthly insurance premium is a
fixed amount the patient must pay regardless of their drug purchases. Out-of-pocket expenses are
the costs the patient incurs when buying a prescription drug. Depending on the benefit design,
the out-of-pocket expense may be structured as a copayment (a flat amount, e.g., $25 per drug), a
coinsurance (a percentage of the total drug cost at the pharmacy, e.g., 30% of the cost), or a
deductible (an amount the patient must pay before the plan begins contributing to the drug cost,
e.g., $2,000).

61.    When an insured patient buys a prescription drug at a pharmacy, the pharmacy
charges the patient the out-of-pocket cost determined by the patient's benefit design. The
pharmacy then receives reimbursement for the remainder of the drug's cost. Using a simplified
example, if a drug costs $100 at the pharmacy, a patient with a $25 copay would pay $25, with
the health plan (through the PBM) paying the pharmacy the remaining $75. A patient with 30%
coinsurance would pay $30, with the payer covering $70, while a patient in the deductible phase
of their health insurance plan would pay the full $100.

62.    Patients with a copay—since they are responsible for a predetermined fixed
amount—are mostly indifferent to the drug's actual list price. However, patients with
coinsurance or those in the deductible phase typically have their out-of-pocket costs calculated
based on the drug's list price before any rebates are applied. As a result, these patients may end
up paying more out-of-pocket for drugs with higher list prices, even if the PBM and payer
receive significant rebates.

63.    According to KFF's (f/k/a Kaiser Family Foundation) 2023 Employer Health
Benefits annual survey, at least 23% of workers with employer-based drug coverage pay
coinsurance for second-tier drugs—generally, preferred branded drugs. The average coinsurance
for second-tier drugs, or preferred brands, in 2023 was 26%.

64.    With health insurance premiums rising far faster than inflation in recent years,
patients have increasingly enrolled in high deductible health plans (HDHPs) that require them to
meet a high deductible in exchange for somewhat more affordable monthly premiums. Per
Internal Revenue Service guidelines, HDHPs have deductibles between $1,600 and $8,050 for
self-only coverage and between $3,200 and $16,100 for family coverage in 2024. According to
KFF's 2023 Employer Health Benefits annual survey, 29% of adults with employer-based health
insurance were enrolled in a HDHP, up from 19% in 2012.

65.    Lower-income patients are more likely to enroll in HDHPs without accompanying
tax-advantaged health savings accounts. A 2017 National Health Interview Survey by the CDC
found that adults in the survey's lowest income category (where income levels ranged from
below the federal poverty line up to 138% of the federal poverty line) were the most likely of the
income categories to have HDHPs without health savings accounts.

66.    Health plans can mitigate some of their patients' exposure to high drug list prices
by applying drug rebates directly at the pharmacy counter when the patient purchases the drug
that earns the rebate, commonly known as a point-of-sale rebate. When all rebates from

manufacturers are applied to a drug at the point of sale, a patient's coinsurance or deductible payment for the drug is lower because it is effectively based on a measure closer to net price, rather than the list price.

67.    In most cases, however, payers opt not to implement point-of-sale rebates. According to the 2023 Milliman Medical Index industry report, point-of-sale rebates are rare. Consequently, deductibles and coinsurance may shift a larger portion of the drug cost from the health plan to the patient, particularly when the manufacturer pays substantial rebates on a drug.

68.    Indeed, for drugs with large rebates, a patient with out-of-pocket costs pegged to the list price may find themselves paying more at the pharmacy counter than the drug's actual net cost to the commercial payer. When a patient's out-of-pocket cost is tied to the list price, and the rebate is not passed on to the patient, the payer's "cost share" for the drug may be negative—that is, the commercial payer may functionally make money when a patient fills that prescription.

69.    A simplified example illustrates this dynamic, involving a drug with a $100 list price, and a 75% rebate:

| List price | $100 |
| --- | --- |
| Rebate Rate | 75% |
| Rebate Amount | $75 |
| **Rebated Price (net cost to the payer)** | **$25** |
| Coinsurance Rate | 30% |
| **Coinsurance Amount (what the patient pays)** | **$30** |

70.    In this example, despite being responsible for 30% coinsurance, the patient pays more for the drug ($30) than the rebated price ($25). Meanwhile, the commercial payer pays the pharmacy (through the PBM) the remaining $70 for the drug ($100 minus $30 coinsurance), but may ultimately receive $75 in rebates from the manufacturer (through the PBM), resulting in a $5 net gain from the prescription. With a $100 or more deductible, the cost burden may be even more pronounced, as the patient may bear the full $100 expense, while the commercial payer pays nothing and receives a rebate.

71.    An insured patient's drug benefit design determines the patient's out-of-pocket cost for the drug at the pharmacy counter. The drug benefit design is largely a combination of two key components: formulary tiering and the cost-sharing between the payer and the patient associated with the tiers.

72.    PBMs play a critical role in both of these components. Commercial payers frequently outsource their drug coverage decisions entirely to PBMs; PBMs create the drug formularies and place the drugs on the various formulary tiers. PBMs also heavily influence cost-sharing associated with formulary tiers. For example, PBMs often require health plans to adopt minimum copay or coinsurance differentials between formulary tiers. PBMs also offer strategy and benefit design consulting services to payers and may model the financial implications of benefit design choices. For example, ███████████████████████████████████████████████████

73.    PBMs may also assist in creating and distributing plan documents that describe a health plan's pharmaceutical benefit cost-sharing obligations, including whether patients are responsible for a copay, a percentage coinsurance, or a deductible.

**C.    Insulin is a life-saving medication for millions of diabetics**

74.    Naturally occurring insulin is a hormone produced by the pancreas and released into the body to turn blood sugar (or glucose) into energy. Without insulin, glucose builds up in the bloodstream leading to high blood sugar (or hyperglycemia).

75.    Diabetes is a chronic health condition that occurs when a person's body cannot produce enough insulin (type 1 diabetes) or cannot use insulin properly (type 2 diabetes). Untreated diabetes can cause serious health problems, such as heart disease, stroke, kidney disease, vision loss, nerve damage, life-threatening infection, and amputations. The CDC ranked diabetes as the eighth leading cause of death in the United States in 2021, with over 100,000 deaths in which diabetes was listed as the underlying cause.

76.    Diabetes is one of the most prevalent diseases in the United States. The National Diabetes Statistics Report estimated that in 2021, 29.4 million people in the United States, or 8.9% of the U.S. population, had diagnosed diabetes. The prevalence of diabetes continues to rise. In 2023, the CDC calculated that the number of adults diagnosed with diabetes has more than doubled in the past two decades.

77.    There is no cure for diabetes, but diabetics can manage their blood sugar in part by taking insulin medication. Insulin medication is a biologic injectable drug made from a living organism, designed to regulate the body's blood glucose levels. Insulin was first used as a medication in 1922. According to the American Diabetes Association, in 2022, 8.4 million diabetics in the United States relied on insulin drugs to survive. All patients with type 1 diabetes take insulin, because their bodies do not produce it.

78.    Four companies manufacture insulin for sale in the United States: Eli Lilly and Company ("Lilly"), Novo Nordisk Inc. ("Novo"), Sanofi-Aventis U.S. LLC ("Sanofi"), and Viatris Inc. (f/k/a Mylan). Lilly, Novo, and Sanofi have been selling insulin medications for over a century. Viatris is a far newer entrant, launching its first insulin drug, Semglee, in 2020. In 2022, Viatris Inc. sold its insulin portfolio to Biocon. Viatris and Biocon will be referred to collectively as "Viatris."

79.    Most insulin products are available in both vial and pen (pre-filled syringe) dosage forms. The CDC classifies insulin types based on how fast and how long the insulin works in the body. Rapid-acting and long-acting insulins are the two main insulin categories.

80.    Rapid-acting insulins lower blood sugar in approximately 15 minutes and continue to lower blood sugar for about two to four hours. Rapid-acting insulins are usually taken right before a meal to regulate the spike in blood glucose that occurs after eating. Between

PUBLIC

2017 and 2022, rapid-acting insulins accounted for approximately 38-42% of total insulin sales in the United States.

81.    Lilly sells Humalog and Lyumjev in the rapid-acting insulin category, with insulin lispro as the active ingredient.

82.    Novo sells Novolog and Fiasp in the rapid-acting insulin category, with insulin aspart as the active ingredient.

83.    Sanofi sells Admelog and Apidra in the rapid-acting insulin category, with insulin lispro and insulin glulisine, respectively, as the active ingredients.

84.    In April 2022, the approximate shares of rapid-acting insulin commercial sales broke down as follows: Humalog (including branded and unbranded) had a ▇% share; Novolog (including branded and unbranded) had a ▇% share; Fiasp had a ▇% share; Lyumjev had a less than ▇% share; and Admelog had less than ▇% share. Humalog and Novolog have had a combined share of over 90% of the rapid-acting insulin sales since 2010.



85.    Long-acting insulins, also known as basal insulins, lower blood sugar in approximately two hours and continue to lower blood sugar for up to 24 hours. Long-acting insulins are used to steadily regulate the body's blood glucose between mealtimes and overnight. Between 2017 and 2022, long-acting insulins accounted for approximately 46-48% of total insulin sales in the United States.

86.    Lilly sells Basaglar and Rezvoglar in the long-acting insulin category, with insulin glargine as the active ingredient.

87.    Novo sells Levemir and Tresiba in the long-acting insulin category, with insulin determir and insulin degludec, respectively, as the active ingredients.

88.    Sanofi sells Lantus and Toujeo in the long-acting insulin category, with insulin glargine as the active ingredient.

89.    Viatris, and now Biocon, sells Semglee in the long-acting insulin category, with insulin glargine as the active ingredient.

90.    In April 2022, the approximate shares of long-acting insulin commercial sales broke down as follows: Lantus had a ▮▮% share; Tresiba had a ▮▮% share; Basaglar had a ▮▮% share; Levemir had a ▮▮% share; Toujeo had a ▮▮% share; and Semglee had a ▮▮% share.



91.    An insulin patient may take a combination of insulin drugs to regulate blood glucose levels throughout the day.

**D.    High list prices have made insulin drugs unaffordable for many patients**

92.    For nearly 85 years, insulin medication was affordable. For example, in 1999, the average list price of Humalog was $21. Over the past decade and a half, however, list price increases for insulin products have far outpaced inflation, even though the core drug has remained the same:



93.    A 2022 report by the Department of Health and Human Services (HHS) found that the average list prices of insulin products nearly doubled between 2012 and 2016 alone. ████████████████████████████████████████████████████

94.    By comparison, between 2012 and 2018, the Consumer Price Index (CPI) rose only 9%, and the Prescription Drug CPI rose 20%.

95.    These list price increases have resulted in particularly high out-of-pocket insulin costs for patients with commercial insurance and the uninsured. HHS found that in 2019, about 33% of patients using insulin had commercial health insurance. For commercially insured patients, 19% of monthly insulin prescriptions required out-of-pocket costs exceeding $70 per prescription. For uninsured patients, 27% of monthly insulin prescriptions involved costs greater than $70.

96.    When patients cannot afford medication, they may be forced to ration their usage or abandon the therapy altogether. A peer-reviewed study published in the Annals of Internal Medicine found that 17% of total patients using insulin, and 18.8% of patients with commercial health insurance, reported rationing their insulin in 2021 because of its costs. Another peer-reviewed study in the Annals of Internal Medicine estimated that 1.3 million adults with diabetes in the United States rationed their use of insulin in 2021 by delaying refilling prescriptions, skipping doses, or taking smaller doses than needed. The study also found that rationing is more common among lower- and middle-income patients and among Black patients.

97.    Abandoning or rationing insulin can lead to serious adverse health outcomes for patients, including death. An American Diabetes Association working group reported in 2020

that "people with high cost-sharing are less adherent to recommended dosing, which results in short- and long-term harm to their health."

98.     One serious complication that can arise from rationing insulin is diabetic ketoacidosis, a condition where acids called ketones build up in the bloodstream and can cause a coma or even death. At an open meeting of the Commission in October 2021, the Commission heard directly from a mother who lost her 26-year-old son. After having difficulty affording his insulin, he tried to ration his insulin and died of diabetic ketoacidosis. The CDC reported that in 2020, 240,000 patients visited U.S. emergency rooms with diabetic ketoacidosis.

## V.     RESPONDENTS' UNLAWFUL CONDUCT

### A.     PBM Respondents developed exclusionary formularies, setting the stage for their chase-the-rebate strategy

99.     Before 2012, drug formularies generally covered all approved medications. Rather than excluding clinically effective products, the PBM Respondents' formularies preferred certain products by placing them on different tiers, each with different patient out-of-pocket costs. While drug manufacturers sometimes offered modest rebates to secure a preferential tier placement, they generally did not have to worry about being completely excluded from the formulary and losing access to patients.

100.     This dynamic changed around 2012 when the PBM Respondents sought ways to increase their leverage—and thus their profits—in negotiations with manufacturers. In part through a series of mergers and acquisitions, the PBM Respondents came to wield greater control over access to commercially insured patients. Accordingly, the PBM Respondents came to realize that they could extract more from manufacturers by threatening to exclude certain drugs from formularies.

101.     Given that the PBM Respondents served as gatekeepers, manufacturers could not dismiss such threats lightly. If a manufacturer were excluded from a formulary that included a competitor in the same drug class, it would lose access to nearly all patients covered by that formulary, leading to significant sales losses. Consequently, the manufacturers became willing to offer higher rebates to secure preferential treatment. This shift gave rise to the exclusionary formulary.

102.     The PBM Respondents began offering formularies that excluded clinically effective drugs from coverage. With these "closed" or exclusionary formularies, manufacturers faced the prospect of their product being entirely excluded. The PBM Respondents viewed these drug exclusions as ███████████████████████████████████
███████████████████████████████████████████████████████

103.     ███████████████████████████ Caremark became the first PBM to develop a commercial formulary with non-clinical drug exclusions. For example, in 2012, the predecessor to Caremark's Standard Control Formulary excluded all forms of Lilly's Humalog in favor of Novo's Novolog.

104. ESI initially thought that payers would resist Caremark's exclusion strategy as ███████████████████████████████ A mere two years later, however, ESI introduced its own closed formulary. ESI's chief trade relations officer described the drug exclusion strategy as ████████████████████████████████ An ESI Senior Account Executive characterized the new drug exclusions in its 2014 National Preferred Formulary—including ███████, and ███████—as ████████████████████████

105. In 2016, Optum introduced its own exclusionary drug formulary. As an Optum Project Manager explained to a plan's consultant, ████████████████████████████ ████████████████████████████████████

106. Exclusionary formularies have expanded and now dominate the commercial space. The PBM Respondents pursue clients by guaranteeing a large portion of the rebate payments to the payers and push their standard formularies, which are based on guaranteed rebate amounts. As a result, commercial payers increasingly focus on maximizing rebates. The PBM Respondents recognize that their clients and clients' consultants ███████████████████ ██████████████████

107. The PBM Respondents' most used commercial formularies all use drug exclusion strategies. Optum's Premium Formulary is "the most utilized of our standard formularies" and covers over ███████ people. Caremark's Standard Control Formulary covers more than ██ ███ people. ESI's National Preferred Formulary covers approximately ██████████ people—█████████████ ESI's open Basic Formulary.

108. The PBM Respondents market these flagship formularies ████████████ ████████████████████████████ For example, Optum presents its flagship Premium Formulary as having the "[m]ost rebates" (for payers). By comparison, Optum identifies its Select open formulary as providing the "[m]ost consumer choice" (for patients), and its Premium Value closed formulary as having the "[l]owest net spend" (for payers). Optum indicates that the Premium Value formulary, with 5-10% net spend savings over Premium, achieves this "lowest net cost" by "de-emphasizing rebates[.]"

109. Due to the presence of multiple competing manufacturers within each drug class, insulin products were a prime target for the PBM Respondents to extract rebate value from manufacturers in exchange for preferential formulary access.

110. Insulin products within the rapid-acting class are generally considered clinically substitutable. For example, in 2023, Caremark preferred Novo's rapid-acting insulins (Novolog and Fiasp) and excluded Lilly's rapid-acting insulins (Humalog and Lyumjev) from its flagship Standard Control Formulary. In the same year, ESI preferred Lilly's rapid-acting insulins (Humalog and Lyumjev) and excluded Novo's rapid-acting insulins (Novolog and Fiasp) from its flagship National Preferred Formulary.

111. Similarly, insulin products within the long-acting class are generally considered clinically interchangeable. For example, in 2023, Optum preferred Sanofi's long-acting insulins (Lantus and Toujeo) and excluded both Novo's long-acting insulins (Levemir and Tresiba) and

Lilly's long-acting insulin (Basaglar) from its flagship Premium Formulary. In the same year, though, Caremark and ESI both preferred Novo's Levemir and Tresiba and excluded Sanofi's Lantus from their flagship formularies.

**B.    Respondents demanded increasingly high rebates from manufacturers in exchange for favorable formulary placement**

112.    Insulin manufacturers need access to the PBM Respondents' formularies to effectively sell their insulin products. Novo estimated that, in 2021, ███ % of its entire insulin business was contracted through the PBM Respondents, with "the vast majority" of insured patients being "covered by those big three players." According to a Novo Senior Vice President responsible for strategic market access, securing coverage on the PBM Respondents' formularies was essential for reaching "large volumes of patients."

113.    The PBM Respondents leveraged their size and the threat of excluding drugs from their formularies—resulting in significant sales losses—to demand higher rebates from insulin manufacturers. 

███████████ Insulin manufacturers understood that "the magnitude of the rebate amount" was crucial and that they "had to compete for both net price and the amount of rebate in order to win access that PBMs prioritize." As a Novo Senior Vice President explained, "[t]he demands that PBMs have on insulin for rebates and discounts and fees have continued to increase over time." Lilly's then President of Diabetes echoed this sentiment, stating that rebates are "how you negotiate for formulary access."

114.    The PBM Respondents were "[e]nacting narrow formularies so that the demands [for more insulin rebates] actually had some teeth." An internal Sanofi Market Access Background presentation highlighted that "US payers continue to use formulary placement to drive higher rebates." In just one year—from 2019 to 2020—Caremark and ESI excluded 109 and 54 more drugs, respectively. As Sanofi's Head of General Medicines Market Access explained, "the narrower the formulary, the greater that discount that can be extracted from the manufacturer."

115.    To combat the "deep and real threat that [their] products would be removed from formularies at the largest PBMs," manufacturers dramatically increased the rebate rates on their insulin products.

116.    In 2011, before the PBM Respondents introduced exclusionary formularies, Novo's contracted rebate rate to Caremark for Novolog was ███ %. In 2012, Caremark introduced the predecessor formulary to its flagship Standard Control Formulary, and preferred only Novo's insulins in the rapid-acting insulin class. ████████████████████

117.    In 2010, before the PBM Respondents introduced exclusionary formularies, ESI's contractual rebate rate for exclusive coverage of Humalog was ███ %. In 2014, ESI introduced



118.    In 2012, before the PBM Respondents introduced exclusionary formularies, Sanofi's average contractual rebate rate to Optum for Lantus was ▮▮%. In 2016, Optum introduced its Premium Formulary, and preferred only Sanofi insulins in the long-acting insulin class. In exchange for this exclusive formulary coverage, Sanofi agreed to a rebate rate of ▮▮% for Lantus. By 2022, Optum's rebate rates for Lantus had risen to as high as ▮▮%.

### C.    Insulin manufacturers continually raised insulin list prices to counteract increasingly higher rebate demands

119.    Respondents' chase-the-rebate strategy led them to prioritize the magnitude of rebates received from drug manufacturers over lower list prices. To "offset some of the dramatic and rapid changes in the rebates" resulting from this strategy, insulin manufacturers dramatically increased list prices.

120.    Lilly increased the list price for Humalog U-100 from $122.60 in 2012 to $274.70 in 2017, an increase of 124%.

121.    Novo increased the list price for Novolog U-100 from $122.59 in 2012 to $289.36 in 2018, an increase of 136%.

122.    Sanofi increased the list price for Lantus U-100 from $114.15 in 2012 to $283.56 in 2019, an increase of 148%.

123.    Lilly's former President of Diabetes attributed these price hikes to Respondents' rebate demands, stating, "the reason you see these type[s] of price increases is as a way to compensate for the very high rebates that the company would offer."

124.    By 2018, diabetes had become the top category of drug spending for traditional (non-specialty) prescription drugs, according to a Drug Channels Institute analysis. Similarly, ESI's 2017 Drug Trend Report indicated that "diabetes medications were the most expensive among traditional therapies" and "the top diabetes drugs by spend continue to be insulins." In the third quarter of 2017, insulin was ▮▮▮▮ per-member spend for Optum's commercial clients.

125.    Generally, competition drives down prices as sellers try to win business. However, because the Respondents prioritized negotiating rebate amounts over net prices, manufacturers were able to *increase* list prices to offer larger rebates necessary to secure formulary access. Indeed, the insulin manufacturers often raised their list prices in lockstep, and many Americans found themselves paying drastically more money for the exact same drugs.

126.    Lilly and Novo—the closest competitors in the rapid-acting class—specifically sought to maintain list price parity for Humalog and Novolog. Lilly's then President of Diabetes

explained that "we felt that we had to take similar price increases in order to be competitive …
when Novo was taking price increases, if we didn't take similar price increases, we didn't think
we could be competitive for [formulary] access."

127.    Similarly, in the long-acting insulin class, Novo adjusted the list price of Levemir
to match that of Sanofi's Lantus, which was its closest competitor in the long-acting insulin
class.

128.    Respondents' chase-the-rebate strategy meant that insulin manufacturers were not
vying for favorable formulary access based on price, but instead based on higher rebates and fees
paid to Respondents.

129.    As list prices of insulin products continued to grow, they became wildly divergent
from actual post-rebate net prices. In response to questions from Congress in 2017, Lilly charted
the average list price and average net price of Humalog, revealing the growing disparity between
the two.



130.    Despite the growing rebates, the average net price of Humalog (after rebates and
fees) continued to rise following the PBM Respondents' introduction of their exclusionary
formularies—due to ever-escalating list prices. It took several years, around 2014-2015, for the
net price of Humalog and other insulin products to begin to decline.

131.    Although insulin net prices began to decline over time, patients whose out-of-
pocket costs are tied to the artificially inflated insulin list prices continued to pay more. For
example, Sanofi reported that from 2012 to 2022, "the net price in commercial and Medicare
Part D plans of our most prescribed insulin, Lantus [] 100 units/mL, has fallen approximately
55%." Despite this, "average out-of-pocket costs for Lantus patients with commercial insurance
and Medicare have risen approximately 45% over that same period." Sanofi highlighted that
"high cost-sharing, particularly for highly rebated therapies such as insulin, creates a financial
barrier for patients" to access treatments, noting that its ability to lower costs for patients was

limited because "PBMs and health plans ultimately decide what a patient pays at the pharmacy counter."

### D. Rather than reduce the list prices of their insulin products and face pushback from the Respondents, manufacturers introduced identical low WAC alternatives

132.    The skyrocketing insulin list prices drew significant criticism from the media, public, and Congress. Beginning in 2017, insulin manufacturers explored ways to reduce insulin list prices either by directly cutting the WAC of some of their existing insulins or by launching new, lower WAC unbranded versions of the same drugs.

133.    Lilly, Novo, and Sanofi all recognized that providing patients access to insulin with lower list prices would help address affordability concerns, create "positive media attention for providing a solution," and maybe even "becom[e] a catalyst for changing the dynamics with payers."

134.    Though the manufacturers considered reducing the list prices of their current insulin products, they knew that the PBM Respondents preferred to maintain competition for rebates and valued higher rebates over price cuts.

135.    Novo was concerned that if it decreased the list prices of its insulin drugs, "[c]ompetitors may not follow[,] putting [Novo] at a disadvantage." Novo's Senior Vice President of Market Access explained, "[i]f we were to reduce the WAC price of our products and subsequently reduce the rebate value and administrative fee value that was being provided, we would expect, based on the conversations we had had, to receive push-back from the payers" and risk being excluded from PBM drug formularies in favor of high list price, highly rebated rivals.

136.    This sentiment was shared by all three insulin manufacturers. In June 2018, Lilly executives individually met in person with representatives from each of the three PBM Respondents to present a proposal for a ▮▮▮% reduction in the list price of Humalog. This proposed reduction would keep the net price of Humalog the same but would reduce commercial and Medicare rebates for Humalog by an estimated $▮▮▮▮▮▮ over roughly three-and-a-half years. Unsurprisingly, Lilly received feedback that "the three PBMs were not interested in this proposal. It was that matter of fact." As Lilly's former President of Diabetes bluntly explained, if "you're cutting the rebates by ▮▮▮ percent, we're not going to win that business." By cutting the Humalog list price, "you have … lower rebate pool, and lower admin fees, do you think that the PBM is going to choose you? … If we were to do this, we likely ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ so the Lilly [sales] number would be zero."



137.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The following year, Sanofi evaluated the market prospects for a low WAC insulin product, finding a "loss of coverage with key rebate-driven customers is

anticipated, as a lower WAC price inhibits our ability to compete on rebates and increases competitors [sic] ability to create a financial upside for formulary change."

138.    For the PBM Respondents, list price cuts would mean the potential loss of rebate and fee revenue. The PBMs generally guarantee rebate payments to their clients, which means that the PBMs commit to paying a fixed amount of rebate for every prescription. If list prices fell, the rebates on those prescriptions would also fall. The PBM Respondents would in turn receive less in rebates from manufacturers, but still owe their clients the same fixed amount of rebates per prescription, making it costly for the PBMs to fulfill their guarantee commitments.

139.    Rather than cutting list prices on their existing insulin products and risking losing formulary access, Lilly, Novo, and Sanofi each launched new, unbranded low WAC products. These low WAC insulin versions were identical to the high WAC versions in all clinical respects. The only differences were that they did not include branding and were significantly lower list price.

140.    In May 2019, Lilly launched a low WAC version of Humalog, priced 50% below the WAC of branded Humalog.

141.    In January 2020, Novo launched a low WAC version of Novolog, priced 50% below the WAC of branded Novolog.

142.    In June 2022, Sanofi launched a low WAC version of Lantus, priced 60% below the WAC of branded Lantus.

143.    The insulin manufacturers continued to offer the high WAC, highly rebated versions while pricing their low WAC insulin at roughly "net price parity" with the branded versions. Essentially, although the low WAC version had a different list price, the smaller rebate it offered resulted in a net price roughly equivalent to that of its high WAC counterpart. Manufacturers adopted this pricing strategy "so that the payer would be neutral" or "indifferent" between the two versions.

     **E.**    **Despite the entry of low WAC alternatives, PBM Respondents continued to prefer high price, highly rebated insulins on their flagship formularies**

144.    The PBM Respondents, however, were not indifferent between the high WAC and low WAC insulin versions. Instead, they methodically disfavored the low WAC insulin products on their flagship commercial formularies, preferring only the high WAC versions, with high rebates and fees.

145.    In 2019, both ESI and Optum were exclusively preferring Lilly insulins in the rapid-acting insulin class on their flagship commercial formularies. In May of that year, Lilly launched low WAC Humalog. The ███████████████████████████████████████

███████████████████ Consistent with this feedback, in a monthly formulary consultant meeting, ESI explained to its client that it ███████████████████████████████████████████████ In fact, both ESI and Optum kept

high WAC Humalog as the only preferred rapid-acting insulin on their flagship formularies, excluding low WAC Humalog entirely.

146.    In 2020, Caremark was exclusively preferring Novo's rapid-acting insulin products (Novolog and Fiasp) on its flagship Standard Commercial Formulary. In January of that year, Novo launched low WAC Novolog. Despite this, Caremark kept high WAC Novolog and Fiasp as the only preferred rapid-acting insulins on its flagship formulary, excluding low WAC Novolog entirely.

147.    In 2022, Optum was exclusively preferring Sanofi long-acting insulin products (Lantus and Toujeo) on its flagship Premium Formulary. In June of that year, Sanofi launched low WAC Lantus. Nonetheless, Optum kept high WAC Lantus and Toujeo as the only preferred long-acting insulins on its flagship formulary, excluding low WAC Lantus entirely.

148.    Across the board, the PBM Respondents opted to exclude low WAC versions of insulin from their flagship formularies—even though including the low WAC versions would expand access to insulin for a swath of patients without impacting the rebate rates PBMs received for the high WAC versions. Instead, the contractual rebate rates the manufacturers offer depend on the number of manufacturers preferred on the formulary, not the number of individual insulin products. Thus, the PBM Respondents' contracts with manufacturers would allow them to include low WAC insulin versions while still receiving the same large rebate rates for the high WAC versions.



149.    For example, in ███████████ rebate contract with ███████████ highest rebate rate on high WAC ███████ for ██████ flagship formulary was ███ %. This rebate rate was ████████

150.    ████████████████████████████████████████
████████████████████████████████████████ For
example, ███████████████████████████████████████
████████████████████████ Indeed, the insulin manufacturers posited that the PBM Respondents were unwilling to cover the low WAC insulin products on their flagship commercial formularies due to concerns about a potential "loss of rebate stream."

151.    The PBM Respondents' preference for large rebates also impeded new entry into the insulin space. In August 2020, Viatris introduced its long-acting product, Semglee. Initially, Viatris tried to market Semglee at a single discounted list price point, 65% below the list price of Lantus, the most-utilized long-acting insulin, and at least 50% below other long-acting insulins on the market. However, Viatris soon discovered that the PBM Respondents did not reward Semglee's significantly lower list price with preferred formulary placement. Instead, Semglee failed to secure formulary coverage on any of the PBM Respondents' flagship commercial

formularies precisely because its lower list price could not deliver "rebate dollars comparable to existing brands." Viatris attributed the lack of "commercial uptake" for original Semglee to the "inability to replace current Lantus rebate flow."

152.    In July 2021, the Food and Drug Administration designated Semglee as interchangeable with Lantus, meaning that Semglee could be substituted for Lantus at the pharmacy without the doctor writing a new prescription. But Viatris still needed PBM formulary access to achieve sales. Having learned from the failed initial launch, Viatris introduced two versions of interchangeable Semglee: a high WAC version that could generate rebates necessary for commercial formulary coverage and a low WAC version that provided patient affordability in other, non-commercial drug channels (which did not prioritize rebate maximization).

153.    Viatris introduced this high WAC version of Semglee ████████████████ ██████████████ even though an internal model showed that ████████████ ██████████, the low WAC version was ████████████████ on a per unit basis. The model determined that low WAC Semglee is ████████████ to Viatris because it incurs ████████ WAC-based fees paid into the pharmaceutical distribution chain compared to the high WAC version. According to the model, while the "payer net" (i.e., the cost to the payer) for both high WAC and low WAC Semglee was nearly identical, Viatris's net margin for low WAC Semglee pens was $████████, in contrast to ████ $████ for high WAC Semglee.

154.    Viatris's pivot to a high WAC Semglee yielded immediate results. In ████████ 2021, ESI decided to include high WAC Semglee on its flagship National Preferred Formulary, while excluding low WAC Semglee. █████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████

155.    Viatris's new entry into the insulin market had the potential to shake up market dynamics by injecting more competition, and lower prices, into the long-acting insulin space. As a Sanofi Vice President observed, however, ████████████████████████████████ █████████████████████████████████ The well-recognized sentiment that rebates drive PBM formulary decisions led one Optum employee to quip: "[A]s long as [Viatris is] keeping the lower WAC they should price Semglee at twice the price of Lantus with a huge rebate and sell it to PBMs as a product that can cover their rebate guarantees #million dollar ideas."

156.    Though the high list price, highly rebated insulin versions were more lucrative for Respondents, the practical effect of the PBM Respondents' decisions to prefer the high WAC insulin, and exclude the lower list priced versions, from their flagship formularies was to deprive many patients who would have been able to better afford the low WAC insulins of that option.

157.    In addition to designing standard formularies, the PBM Respondents also assisted clients with making the decision to exclude low WAC drugs from their custom formularies. For instance, ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████



158.    Because of the PBM Respondents' systematic exclusion of low WAC insulins from their flagship commercial formularies, these products had limited uptake and "never achieved the same level of access as the branded [high WAC] version."

159.    In 2022, low WAC Humalog accounted for approximately ▮▮% of total Humalog volume. Lilly estimated that "only one out of three insured patients has access to [low WAC Humalog] through their insurance."

160.    Similarly, in 2022, low WAC Novolog accounted for approximately ▮▮% of total Novolog volume, and low WAC Semglee accounted for approximately ▮▮% of total Semglee volume. For low WAC Lantus, which launched in 2022, "coverage was low" and "[u]tilization was even lower."

161.    The insulin manufacturers were "disappointed" with the low commercial uptake of the low WAC insulins. But as a Novo Vice President bluntly observed, "low wac/low rebate [insulins] don't stand a chance in this system."

162.    Because of how the Respondents designed this system, many diabetics were left paying inflated prices for insulin.

F.    **Respondents financially benefit from artificially inflated list prices, rebates, and fees**

163.    The Respondents were focused on maximizing rebate value, not on lower list priced insulin products. Although the PBM Respondents understood that preferencing high WAC insulin products led to higher out-of-pocket costs for certain patients, the Respondents continued their chase-the-rebate strategy because it benefited them. In the words of a Novo Vice President, the Respondents, as well as commercial payers, have become "addicted to rebates."

164.    The Respondents benefit from the higher rebates and fees associated with high list prices and high WAC insulin products in two primary ways: first, the PBM Respondents and GPO Respondents retain a portion of the rebates and fees; and second, the PBM Respondents use high rebate numbers to attract clients.

165.    The PBM Respondents retain some of the rebates from drug manufacturers, collectively amounting to hundreds of millions of dollars per year from their commercial lines of business ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Additionally, the PBM Respondents and GPO Respondents retain a portion of the various WAC-based fees they charge drug manufacturers. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

And some fees, such as ▮▮▮▮▮▮▮ data fees, are ▮▮▮▮▮▮▮▮▮▮▮▮▮

166.    As insulin list prices increased, so did the WAC-based fees that the Respondents collected for insulin products. But the Respondents did not provide drug manufacturers any additional services. As Ascent's President noted, ███████████████. In other words, the Respondents extracted and pocketed ███████████████ dollars without providing any additional value.

167.    Retention of rebates and fees from drug manufacturers is a ███████ ███████████████ for the PBM Respondents and the GPO Respondents.

168.    This is particularly true for insulin products, which have been among the highest rebated drugs ███████████████. From 2017 to 2020, ███████████████. In the third quarter of 2019, rapid-acting and long-acting insulins were the ███████████████ by combined invoiced rebate dollars and administrative fees on ESI's flagship formulary. These rebates and administrative fees for insulin products totaled $███████████ in just one quarter.

169.    In 2020, rebates from insulin products comprised $███████ out of $███ —or ███%—of Optum's total commercial rebates. In 2020, Optum realized $███ in profit margin from insulin products. In 2021, an Optum Vice President of Industry Relations noted that ███████████████ "We can still drink down the tasty Lantus rebates."

170.    In addition to the higher rebates and fees Respondents retain, the PBM Respondents use the large rebates they receive from high price, highly rebated products to attract commercial payer clients. The PBM Respondents recognize that higher rebates ███████████████.

171.    The PBM Respondents' contract negotiations with commercial payers often focus on a guaranteed rebate amount. PBMs frequently compete for clients by trying to offer the highest minimum guaranteed rebate values. As ESI's Senior Vice President of Account Management for Commercial Accounts explained, the ███████████████.

172.    By offering a higher rebate guarantee, a PBM's bid is optically more attractive to a potential client. As Lilly's then President of Diabetes explained, PBMs use the rebate dollars they obtain from manufacturers "in their negotiations to get employers to choose their PBM services" and "the more … rebates they can get relative to their competitors, the more money they will have to go and win … employer's services." ███████████████.

173.    The PBM Respondents shaped competition for providing PBM services around guaranteed rebates. As a result, commercial payers prioritize the size of the rebate guarantee when selecting a PBM. ███████████████.



174.    Accordingly, commercial clients generally avoid formulary options that provide fewer rebates. Optum's Premium Value Formulary, which "de-emphasiz[es] rebates," had ▮▮▮▮▮ clients as of 2023. ESI's Flex formulary, which ▮▮▮▮▮▮▮▮▮▮▮▮▮ covered ▮▮▮▮▮▮▮▮▮▮▮ people in 2022.

175.    Commercial payers often focus on rebate guarantees ▮▮▮▮▮▮▮▮▮▮

176.    Consequently, many payers are unaware of the specific rebate amounts for individual drugs and are unable to calculate a rebated drug's true net cost. As the Department of Health and Human Services' Inspector General found, most health plans were unaware of all the contract terms that determine the rebates they receive from drug manufacturers. ▮▮▮▮▮

▮▮▮▮▮ Indeed, in April 2020, ▮▮▮▮▮

177.    By offering rebate guarantees, the PBM Respondents lock themselves into having to generate enough rebates to meet their guaranteed minimum rebate amounts. If they are unable to meet these rebate guarantees, they might be required to cover the shortfall from their own funds. These pressures incentivize the PBM Respondents to favor high WAC insulin products on their flagship formularies, as they generate larger rebates.

178.    The PBM Respondents recognized that switching to low WAC versions of insulin would result in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In evaluating the low WAC Humalog launch in 2019, ▮▮▮▮▮

179.    In fact, in 2020, ▮▮▮▮▮



180.    Optum conducted a financial analysis on the impact of the low WAC Humalog launch on its profit and loss statement. Optum found that if volume shifted from high WAC Humalog to low WAC Humalog, ████████████████████ Specifically, Optum identified a $██████████ rebate risk, with $██████████ representing a loss to Optum's profitability from retained rebates. The remaining $██████████ was ████████████████████████████████ "because we're so ████████████ Humalog to ██████████████████

181.    As a result, PBM Respondents largely neglected low WAC insulins in the commercial channels—even though these low WAC insulins could have meaningfully expanded drug access for diabetics. As the ESI executive who managed the company's relationship with Lilly candidly stated, ████████████████████████████████

## G.    PBM Respondents deliberately cause the burden of inflated list prices to shift onto certain patients

182.    The PBM Respondents claim to act in the best interests of patients. ESI's Vice President of Pharma Contracting and Strategy says he views his "role [a]s lowering the cost of drugs for patients and for our clients." Optum's former Market President of Health Plans described "patient affordability" as a "top organizational priority" for Optum and a "shared responsibility" between Optum and its clients. For Optum, "as a PBM – and I have said this multiple times before – our guiding principle is around doing what's best first and foremost for members, and secondly for our clients."

183.    In practice, however, the PBM Respondents knowingly engage in, and incentivize, conduct that causes certain patients to bear the burden of artificially inflated drug prices.

184.    The PBM Respondents are aware that commercial payers typically retain the rebates they receive, and do not pass them on directly at the point of sale to their member patients whose prescriptions generated the rebates. By retaining the rebates, the commercial payers may lower their own overall costs of covering health care benefits. This may in turn partially reduce the amount that employees have to contribute in premiums. But retaining the rebates also shifts the burden of expensive medications to chronically ill diabetics, who must pay out-of-pocket costs such as coinsurance and deductibles based on the inflated insulin list prices associated with higher rebates. As ████████████████████████████████

185.    Typically, insurance spreads risk among the insured population, with those who do not make claims effectively subsidizing those who do. Thus, for health insurance, the healthy generally subsidize the sick or those who need medical treatment. But the strategies that have

driven up list prices and rebates on insulin products, and shifted the brunt of that impact to list-price-sensitive patients, result in the opposite dynamic: diabetics subsidizing the healthy. Indeed,



186.    Nonetheless, the PBM Respondents intentionally design and market formularies that enable and exacerbate this cost-shifting by excluding low WAC insulin drugs in favor of high WAC, highly rebated products. As the PBM Respondents well know, low WAC products benefit patients in deductible and coinsurance plans by helping these patients pay less out of pocket at the point of sale.

187.

Indeed, in the deductible phase, when the member shoulders the full list price of the drug, the payer functionally makes money off the patient's prescription because it pays nothing but collects large rebates.

188.    The PBM Respondents widely recognize this phenomenon. In 2020,

In June 2019, ESI calculated that 33% of patients in HDHPs paid $▒▒▒ or more for a 30-day supply of insulin, and 13% of patients paid $▒▒▒ or more.

PUBLIC

189.    When Novo introduced an insulin affordability program that threatened to disrupt this established dynamic,



190.    Optum's financial models show a similar troubling dynamic with Lantus. A ████ model created for Optum's Formulary Management Committee identifies a $462 list price for high WAC Lantus vials—████████████████ According to the model, the payer collects a $███ rebate per prescription, transferring the burden of the high list price to patients with deductibles and coinsurance.

191.    Not only do the PBM Respondents knowingly design formularies that can shift costs on to patients by preferring high WAC, highly rebated drugs, they also incentivize and encourage commercial payers to select these types of formularies. In 2019,

192.    The PBM Respondents provide modeling and consulting services to their clients showing ███████                                                                For example,

193.    The PBM Respondents could mitigate the detrimental effects of exploitative cost-shifting by requiring that rebates be shared with member patients at the point of sale, but instead use their gatekeeper role to incentivize a mode of competition that is detrimental for patients while highly lucrative for themselves. The PBM Respondents are aware that point-of-sale rebates would reduce or eliminate exploitative cost-shifting, and offer voluntary point-of-sale rebate programs that specifically "target[] … the plans with high deductible or co-insurance"—i.e., those benefit designs that most impact patients whose out-of-pocket expenditures are based on list prices. For example, the member's out-of-pocket cost for the hypothetical prescription in

194.    Point-of-sale rebates, however, lower patient out-of-pocket costs at the expense of the payer. As reflected ████████████████████████████████████████████████████

██████████████

195.    The PBM Respondents do not require their clients to use point-of-sale rebates—in fact, the PBM Respondents' chase-the-rebate strategy disincentivizes payers from adopting them. Further, the PBM Respondents ████████████████████████████████████████████

██████████████████████████████

196.    Consequently, payers have failed to widely adopt point-of-sale rebating practices. Optum reported ████████████████████████████████████████████ And ESI found that ████████ ████████████████ have chosen to implement point-of-sale rebates.

197.    Industry studies confirm that commercial payers tend not to pass on rebates at the point of sale and instead retain most of the rebate value. Although these rebates may reduce the plan's overall cost of providing health care benefits, they may have little impact on the patient's premium. For example, according to the 2023 Milliman Medical Index, employers allocate 70% of rebates to reduce the corporate employers' own contributions to premiums, while only dedicating 30% to reducing employees' (patients') premiums. This study observed that none of the rebates were directed towards reducing patients' out-of-pocket drug costs.

198.    Payers have expressed concerns about the PBM Respondents' lack of transparency about drugs' true net cost, and some have specifically identified the impact on patients with high deductibles or coinsurance as a source of their concern. A 2020 internal

████████████████████████████████████████████████████████



199.    ████████████████████████████████████████████████████

██For example, in 2021,██████████████████████████████████

200.    High out-of-pocket patient costs that result from exploitative cost-shifting can lead to lower drug adherence, higher medical costs, and adverse health outcomes. The PBM Respondents know these impacts are particularly felt with insulin. In a 2019 press release, ESI acknowledged that "1 in 4 people with diabetes who use insulin admitted to cutting back on the use of insulin because of cost." In 2023, ESI's President admitted, ████████████

████████████████████████████████████████████████████████

Similarly, Caremark's website explains "when people can afford their medications, they are more likely to take them." Optum's website recognizes the "proven link between rising member cost share and lower medication adherence," and a UnitedHealth press release states that better adherence "contribut[es] to better health and reduc[es] total health care costs for clients and the health system overall."

201.    By denying clients access to drug net cost information, the Respondents prevent commercial payers from fully appreciating how plan designs that base patient cost-sharing on list price, such as coinsurance and deductibles, can cause this exploitative cost-shifting and harmful health effects. Payers may not realize that their patients pay out-of-pocket amounts that can exceed the entire net cost of highly rebated drugs. Respondents' lack of transparency accompanying their chase-the-rebate strategy precludes the payers' ability to make fully informed decisions and better protect their patients. This lack of transparency allows Respondents to avoid competing directly to win over clients based on the lowest net cost.

H.    **Even after regulatory changes forced manufacturers to lower some insulin list prices, Respondents sought to preserve the high rebates attributable to high list price insulin products**

202.    Despite the growing recognition of the harm to certain patients from high insulin list prices, manufacturers maintained the artificially inflated list prices of their high WAC insulins until a regulatory change forced price cuts.

203.    The American Rescue Plan of 2021 repealed the Average Manufacturer Price (AMP) Cap. Under Medicaid regulations, manufacturers must pay Medicaid rebates equal to the difference between the current average price of the drug paid by retail pharmacies and wholesalers and the inflation-adjusted list price of the drug (sometimes referred to as the Medicaid inflation penalty). If a drug's list price has increased faster than inflation, the manufacturer has to rebate the difference to Medicaid. The AMP Cap, in place since 2010, had capped the Medicaid rebate at 100% of the drug's average price, even if manufacturers continued to raise list prices. The repeal of the AMP Cap, however, took away this 100% rebate maximum. Thus, beginning in 2024, insulin manufacturers who had dramatically increased list prices (exceeding the inflation rate) would be required to pay a Medicaid rebate in excess of 100% of the drug's price on every unit dispensed in Medicaid.

204.    Humalog, Novolog, and Lantus, which had experienced up to sevenfold list price increases, were among ███████████████████ The insulin manufacturers projected incurring hundreds of millions of dollars in Medicaid liability due to the AMP Cap repeal. Because of the relationship between the AMP Cap and list price, however, manufacturers could mitigate the effect of the AMP Cap repeal by lowering list price.

205.    On March 1, 2023, Lilly announced that it would reduce the list price of high WAC Humalog by 70%, as well as set the price of its low WAC Humalog at $25 a vial.

206.    On March 14, 2023, Novo announced that it would reduce the list price of high WAC Novolog by 75% and Levemir by 65%. Since Novo cut the list price of high WAC

PUBLIC

Novolog down to the list price of low WAC Novolog, there is no longer a low WAC/high WAC Novolog distinction.

207.    On March 16, 2023, Sanofi announced that it would reduce the list price of high WAC Lantus by 78% and Apidra by 70%. Because the list price of high WAC Lantus was now lower than low WAC Lantus, Sanofi discontinued low WAC Lantus.

208.    The Respondents were concerned, ███████████████████████████████
████████████████████████████████████████████████████████████
████████    In other words, a list price reduction on insulin would also reduce WAC-based rebates and WAC-based fees, as well as the PBM Respondents' and GPO Respondents' profits.
████████████████████████████████████████████████████████████

209.    Optum projected that the WAC decreases on Lilly's rapid-acting insulin products would cost Optum $█████████ in profits and $█████████ in rebate dollars—██ % of its total rebates. Optum further expected to lose another ███ % of rebates from anticipated list cuts to long-acting insulins.

210.    However, the PBM Respondents were determined not to give up on their high list price, high rebate strategy after the AMP Cap repeal. They realized switching to newer insulin products, which would not be affected by the AMP Cap repeal, ████████████████████
████████    For example, in May 2022, Lilly gave a presentation to Optum ████████████
████████████████████████████████████████████    As a relatively new product that had not undergone dramatic price increases over time, the Humalog U-200 pen was not impacted by the AMP Cap repeal and thus not subject to list price cuts. Before the AMP Cap repeal, the Humalog U-100 and Humalog U-200 pens ████████████
████████████████████    After Lilly cut the list price of Humalog U-100 from $530.40 to $159.12, it would generate only a $████ rebate per prescription. However, the list price of Humalog U-200 would not change, leaving its $█████ rebate per prescription intact.

211.    ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

212.    In addition, in reaction to "drug manufacturers adjusting prices in response to public policy changes and … the launch of several Humira biosimilars," Caremark created a new "Choice" Formulary for 2024 that specifically favors higher WAC products with higher rebates.

Caremark explains that clients "can achieve low net cost with lower list price strategies when appropriate and applicable, or rebated product strategies with our new Choice formularies."

213.    Despite the recent list price cuts on some insulin products, the Respondents are determined to continue chasing the high price, highly rebated products for their commercial formularies and their own profit.

## VI.    RESPONDENTS' CONDUCT RESULTED IN HARM TO CONSUMERS AND COMPETITION

214.    Although the Respondents claim to prioritize patient well-being, their actions reveal a pattern of anticompetitive and unfair conduct. Respondents' practices, whether viewed individually or collectively, inflict serious harm on patients whose drug costs are calculated based on the inflated, unrebated list price and potentially on patients more broadly.

215.    The Respondents' chase-the-rebate strategy has flipped healthy price competition on its head. Respondents favor high list price, highly rebated drugs over low list price alternatives at a similar net price because the PBMs and GPOs retain more rebates and fees from the higher list price drugs. The Respondents use their size, scale, and position in the prescription drug transaction chain to pressure manufacturers to secure favorable formulary placement by prioritizing the size of the rebates. Respondents push manufacturers to achieve a lower net price *with the highest rebates and fees*. As one of Viatris's head PBM negotiators testified, what matters to the PBMs and their clients is "ultimately *how* they get to the net price" (emphasis added) via "smaller rebates or larger rebates." All else equal, many prefer getting to the net cost through larger rebates.

216.    The PBM Respondents' decision to prioritize highly rebated drugs on exclusionary formularies has incentivized insulin manufacturers to raise their list prices well over the rate of inflation to counteract the ever-increasing rebates and fees. A 2020 USC Schaeffer Center study found that for prescription drugs sold from 2016 to 2018, a $1 increase in rebates, on average, was associated with a $1.17 increase in WAC.

217.    These artificially inflated list prices create more rebates and fees for Respondents and their clients, but do little to reduce a drug's net cost. From 2012—when Caremark introduced the first exclusionary formulary—to 2017, manufacturers more than doubled the list prices of their primary insulin drugs (Lantus, Novolog, and Humalog). Absent the PBM Respondents' chase-the-rebate strategy, the net prices of insulin products, after rebates, may have been lower.

218.    The Respondents' conduct deterred insulin manufacturers from competing by lowering their list prices. Efforts to lower list prices was met with resistance by the Respondents. When manufacturers launched low WAC, low rebate versions of their insulins, the PBM Respondents systematically disadvantaged these products on formularies. Because of Respondents' conduct, many diabetics have been denied access to more affordable lower list price insulin products.

219.    In response to PBM Respondents' decisions, manufacturers introduced new insulin products with a high price and a high rebate to secure placement on the PBM

Respondents' flagship formularies. For instance, when Viatris launched Semglee, the first insulin biosimilar, with a lower list price than competing drugs, the PBM Respondents excluded it from their flagship formularies. Viatris secured formulary access for Semglee only after it relaunched the product with a high list price and high rebate. Similarly, Lilly launched Lyumjev with a high list price and a rebate ████████████████, because "counterintuitive[ly]," Lilly recognized that "[l]aunching at a list price discount to Humalog may present a barrier to formulary adoption."

220.    On the other side of the industry, the PBM Respondents' chase-the-rebate strategy and formulary decisions also encourage commercial payers to prioritize rebates and select formularies that exclude low list price drugs. The Respondents have leveraged the murkiness of prescription drug pricing to their own advantage, by intentionally obscuring drug-level information on rebates and net costs, requiring clients to use the total guaranteed rebate value as a primary financial metric for clients selecting a PBM. The PBM Respondents' focus on enlarging and promoting aggregate rebates helps keep payers "addicted to rebates."

221.    The PBM Respondents cause further harm by encouraging and incentivizing plan designs where patients' contributions are based on these inflated list prices, including coinsurance based on the unrebated price and deductibles that require payment of the full list price. As a result, a patient may end up paying more than the drug's entire net cost to the payer. This unfair and exploitative cost-shifting leads ████████████████████—at the expense of the patient who pays out of pocket based on the inflated list price. But because PBMs control the information on drug-level net costs, commercial payers—particularly smaller or less sophisticated employers—may not even realize the extent that cost-shifting is occurring.

222.    Respondents' conduct causes substantial injury to insulin patients whose out-of-pocket costs are based on artificially inflated list price. This injury is not limited to the direct increase in out-of-pocket costs for their medication at the pharmacy counter. When patients cannot afford their insulin, they may skip necessary doses or stop taking the medication altogether. Patients who do not take necessary insulin face a greater risk of hospitalization and of additional medical complications, all of which can substantially increase costs for the patient and the commercial payer. It can also lead to short-term or long-term serious adverse health effects for patients, including death.

223.    Patients have little ability to avoid the substantial injury incurred as a result of the PBM Respondents' anticompetitive and unfair practices. Switching plans would be ineffective as many plans are similarly affected by high list prices and high drug costs. Even if it were effective, patients cannot easily switch formularies, because the PBMs and GPOs do not contract directly with patients. Rather, patients must go through an insurer—often their employer—to benefit from the rates negotiated by the PBMs and GPOs. In at least one instance, Optum received a patient complaint from someone who had been switched from ESI to Optum but who "did not choose Optum."

224.    The Respondents' actions interfere with the free exercise of consumer decision-making and hinder marketplace self-correction with respect to the exclusion of low WAC insulin products and cost-shifting of high WAC, highly rebated insulin products onto list-price-sensitive patients. Even if patients could effectively switch plans or formularies, the PBM Respondents

have made the process so opaque that patients would be operating blindly. Many patients do not know what formulary undergirds their insurance options, so they cannot comparison-shop when making decisions about their insurance coverage. Moreover, patients often do not realize the extent to which cost-shifting is occurring. Patients generally have no knowledge of the rebates and fees received by the PBM Respondents and payers; payers rarely disclose their existence in plan documents and almost never disclose the rebate and fee amounts.

225.    Additionally, many plan documents are confusing, unclear, or elusive about the extent of the patient cost-sharing obligations. Thus, patients in deductible and coinsurance plans may be unaware that their "share" of the drug cost far exceeds the amount implied by their plan documents and may in fact exceed the payer's entire net cost.

226.    The substantial injury to consumers is not outweighed by any countervailing benefits to consumers or to competition. The PBM Respondents' systematic practice of excluding a low WAC drug in favor of an identical high WAC alternative from the same manufacturer does not lower net prices for the high WAC drug. While some rebates may serve to lower premiums across patients in a health plan, not all rebates are used to lower patient premiums. Some rebates are retained by the PBMs and GPOs, and the majority of the remaining rebates are retained by the commercial payer. For insulin patients forced to pay coinsurance and deductible payments based on the list price, dramatically higher out-of-pocket costs for insulin are significantly more harmful than the possibility of slightly lower premiums.

227.    Further, the increased risk of hospitalization and additional medical complications for patients who skip necessary insulin dosages result in higher expected costs for patients as well as commercial payers. The costs of hospitalization and further adverse health conditions are significantly greater than the cost of regularly taking insulin, and outweigh any potential small decrease in employee health premiums attributable to any rebates shared with the commercial payer.

228.    The hodge-podge of affordability programs offered by PBM Respondents do not provide an adequate solution for insulin patients. Since the focus on PBM practices by Congress and other entities, the PBM Respondents have each begun offering voluntary programs designed to cap patient out-of-pocket costs, but the program designs  As a result, and their benefits are largely illusory. To illustrate, ESI's "Patient Assurance Program" and Optum's "Critical Drug Affordability" program both purport to cap a patient's out-of-pocket costs—at $25 and $35, respectively—but each program Caremark's "RxZero" program purports to lower a patient's out-of-pocket costs to nothing,

229.

In its 2023 Employer Health Benefits annual survey, KFF (f/k/a Kaiser Family Foundation) estimated that, despite these programs, only 45% of all workers with employer-sponsored health insurance had reduced or no cost-sharing for chronic condition maintenance drugs, such as insulin for diabetes.

230.    Other PBM programs that claim to benefit patients are similarly illusory, as the PBM Respondents are focused on retaining payer clients. For instance, the PBM Respondents claim to encourage payers to provide point-of-sale rebates to their patients but ████████ ████████████████████████████████████████████████████ and by obscuring the details of the cost-shifting onto list-price-sensitive patients for highly rebated products. And ████████████████████ that a voluntary point-of-sale rebate program is unlikely to be adopted by the payer because point-of-sale rebates reduce the rebates kept by the payer.

231.    There are no valid justifications for the Respondents' prioritizing of rebates over lower net prices when negotiating to secure preferred formulary placement. Offering a product with a substantially similar net price but with much higher fees and higher out-of-pocket costs to patients is not offering a better product. The chase-the-rebate strategy has resulted in reduced options for patients who can more readily afford the low WAC options that are excluded from their formularies and incentivizes manufacturers to raise list prices.

232.    Although PBM Respondents and GPO Respondents collect more money from higher list price products, they do so simply because the rebates and fees are based on a percentage of list price—not because higher list price products can be administered more efficiently than lower list price products. The PBM Respondents and GPO Respondents provide no additional services to justify the higher payout on higher list price drugs from the assortment of WAC-based fees the PBM Respondents and GPO Respondents extract from manufacturers. As an Optum executive wrote, the ████████████████ for these fees, rather than a flat fee. Similarly, ESI's Vice President of Pharma Contracting and Strategy ████████████████████ ████████

233.    There is no justification for the PBM Respondents' using rebate value instead of net prices to attract clients. Despite the illusion of choice between different formulary options, the use of rebate value as a financial metric, coupled with the payers' incomplete information on cost, drives payers to each PBM Respondent's respective high WAC, high rebate flagship formulary. Nor does the additional rebate value on a high WAC product over a low WAC alternative with a substantially similar net price result in more efficient drug usage. For instance, when a formulary prefers high WAC Humalog over low WAC Humalog, the patient receives the exact same life-saving medication, just at a higher price.

## VII.    RESPONDENTS' CONDUCT IS ONGOING OR LIKELY TO RECUR

### A.    The list prices of some insulin products remain artificially high

234.    Despite recent list price decreases on some insulin products, the list prices of other insulin products remain high. In particular, newer insulins have entered the market at, and will likely remain at, artificially inflated prices due to the Respondents' chase-the-rebate strategy.

235.    Several insulin products in the long-acting category remain at artificially high prices. When Lilly launched its long-acting insulin Basaglar in 2017, Lilly specifically priced it at a "modest discount" off the list price of Sanofi's Lantus, which itself had been artificially

inflated from many years of price increases and high rebates. Lilly determined that a 10-15% discount off the Lantus price "str[uck] the optimal … balance between … meeting market expectations for list price with a modest cost reduction for some patients exposed to rising out of pocket costs" and gaining formulary access. Lilly decided against a greater discount, because "[a]t a significantly lower list price relative to Lantus, Basaglar's formulary access will likely be reduced due to PBM / Plans preference for rebate stream."

236.    Despite Lantus's subsequent list price decrease, Lilly continues to sell Basaglar at an artificially inflated price.

237.    When Sanofi launched its long-acting insulin Toujeo in 2015, Sanofi specifically set the list price at parity on a per unit basis with Lantus, which had an artificially inflated list price from many years of price increases and high rebates. Despite Lantus's subsequent list price decrease, Sanofi continues to sell Toujeo at an artificially inflated price.

238.    When Novo launched its long-acting insulin Tresiba in 2016, Novo set the list price at a 10% premium on a per unit basis over the list price of its other long-acting insulin product, Levemir, which had been artificially inflated from many years of price increases and high rebates. Despite Levemir's subsequent list price decrease, Novo continues to sell high WAC Tresiba at an artificially inflated list price.

239.    The same dynamic has occurred in the rapid-acting insulin class. When Novo launched its rapid-acting insulin Fiasp in 2017, Novo set Fiasp's list price at parity with its other rapid-acting insulin product, Novolog, which had an artificially inflated list price from many years of price increases and high rebates. Despite Novolog's subsequent list price decrease, Novo continues to sell Fiasp at an artificially inflated list price.

240.    When Lilly launched its Humalog U-200 pen in 2015, Lilly set the list price at parity on a per unit basis with Humalog U-100, which had an artificially inflated list price from many years of price increases and high rebates. Despite Humalog U-100's subsequent list price decrease, Lilly continues to sell Humalog U-200 at an artificially inflated list price.

241.    When Lilly launched its rapid-acting insulin Lyumjev in 2020, Lilly set the list price at parity with its other rapid-acting insulin product, Humalog, which had an artificially inflated list price from many years of price increases and high rebates. Despite Humalog U-100's subsequent list price decrease, Lilly continues to sell Lyumjev at an artificially inflated list price.

242.    While the repeal of the AMP Cap thwarted the manufacturers' price inflation and by extension the Respondents' chase-the-rebate strategy on some older insulin products, current and future insulin biosimilar entrants are not affected by the repeal and can launch with high list prices and high rebates, which Novo characterized as posing "a serious threat" to its ability to compete for formulary coverage. Due to how insulin products vie for favorable formulary coverage, Novo predicted that new biosimilars staying at a high WAC was the "likely scenario." And Viatris continues to offer a higher WAC version of Semglee, which was not affected by the AMP Cap repeal.

243.    The artificially inflated insulin list prices, with higher rebates and higher WAC-based fees, continue to benefit PBM Respondents and GPO Respondents, at the expense of list-price-sensitive diabetics.

## B.    The PBM Respondents continue to exclude low WAC insulin products in favor of their high WAC, highly rebated counterparts

244.    The PBM Respondents continue to prefer some high list price insulin products that generate high rebates and fees on their flagship formularies, while excluding low WAC alternatives.

245.    Caremark's 2024 flagship Standard Control Formulary prefers high WAC Tresiba and excludes low WAC Tresiba. Caremark's newly created 2024 Advanced Control Choice Formulary specifically focuses on high rebate products. It prefers high WAC Tresiba and excludes low WAC Tresiba, and prefers Fiasp and excludes the now lower-priced Novolog.

246.    ESI's 2024 flagship National Preferred Formulary prefers high WAC Tresiba and high WAC Semglee, excluding the low WAC version of each product.

247.    Optum's 2023 flagship Premium Formulary preferred high WAC versions of Humalog and Lantus and excluded their respective low WAC versions. While under regulatory scrutiny from the FTC's investigation, Optum changed its Premium Formulary such that its 2024 formulary now covers the low WAC versions of insulin products on the same formulary tier as the respective high WAC versions.

248.    The PBM Respondents have changed their formularies at least every year, sometimes in the middle of the year, and all three PBM Respondents have the opportunity and the incentive to prefer high WAC insulins over their low WAC alternatives in the future.

## C.    The PBM Respondents exclude low WAC versions of other drugs from formularies

249.    In addition to insulin, the PBM Respondents exclude or disadvantage low WAC versions of other drugs in favor of the high WAC versions. For example, in January 2019, Gilead Science (through a subsidiary) launched low WAC versions of its Hepatitis C medications Harvoni and Epclusa at significant discounts to the high WAC versions. Although brand companies sometimes offer low WAC versions of their drugs in response to competition from generic drugs, Gilead launched these low WAC versions unprompted by that prospect: Harvoni and Epclusa were years away from the threat of generic entry. The PBM Respondents all preferred the high WAC versions of both drugs on their 2024 flagship formularies and excluded the low WAC alternatives.

250.    The PBMs' practice of excluding the low WAC products in favor of high WAC versions is likely to continue for new products. For example, in January 2023, Amgen simultaneously launched high WAC and low WAC versions of Amjevita, pricing the two drugs respectively at 5% and 55% off Humira's list price. In July 2023, Boehringer Ingelheim launched high WAC Cyltezo and, in October 2023, a low WAC version, pricing them respectively at 5% and 81% off Humira's list price. In January 2024, ██████████████████████████████

███████████████████████████ and ESI preferred the high WAC version of Cyltezo and excluded the low WAC alternative, on their flagship formularies.

251.    The PBM Respondents retain the same incentives and opportunities to use low WAC formulary exclusion practices with future products. The PBM Respondents' continued use of this strategy is likely to cause substantial injury to consumers whose out-of-pocket costs are based on the list prices of drugs.

### D.    The PBM Respondents have the opportunity and incentive to continue causing the exploitative cost-shifting onto certain consumers

252.    The PBM Respondents and GPO Respondents benefit from the high rebates and high fees associated with the high list prices of pharmaceutical products. The PBM Respondents are likely to continue preferring high price, highly rebated products on their flagship formularies, and incentivizing commercial payers to shift the cost of high list price drugs onto certain patients.

253.    The list prices—and rebates—associated with product categories beyond just insulin have dramatically increased in recent years. For example, Amgen increased the list price of Enbrel, a high list price and highly rebated drug used to treat inflammatory conditions, 457% between 2002 and 2020. Additionally, █████████████████████████████ ████████

254.    The PBM Respondents' systematic preferencing of high price, highly rebated products incentivizes drug manufactures to compete using high list prices and high rebates and fees. It also leads to commercial payers adopting formularies preferring products with high list prices and high rebates and fees, while engaging in exploitative cost-shifting that forces list-price-sensitive patients to bear the burden of artificially inflated list prices. Respondents' continued conduct with respect to exploitative cost-shifting is likely to cause substantial injury to consumers whose out-of-pocket costs are based on the list prices of drugs.

## VIII.    VIOLATIONS OF THE FTC ACT

### COUNT I – Unfairly Competing by Rebate Preferencing

255.    The allegations of paragraphs 1-254 above are incorporated by reference as though fully set forth herein.

256.    The Respondents systematically prefer high list price insulin products, with high rebates and fees, over similar low list price products, with low rebates and fees, on formularies to inflate the perceived value of their commercial drug formularies and offer higher rebate guarantees. This systematic preferencing of products with a high rebate and fee value is a method of competition, not an inherent condition of the PBM or drug industry.

257.    The Respondents' favoring of high list price insulin products, with high rebates and fees, while disadvantaging or excluding similar versions with a lower list price and lower

rebates and fees and obscuring actual net cost, is unfair because it goes beyond competition on the merits.

258.    The Respondents' conduct is coercive, exploitative, and restrictive because it (1) induces rival manufacturers to compete for formulary placement by prioritizing rebates over lower net prices; (2) exploits and abuses vulnerable patient populations by denying them access to more affordable medications; and (3) restricts commercial payers' access to information on aggregated rebate numbers rather than drugs' actual net cost.

259.    The Respondents' conduct tends to negatively affect competitive conditions because (1) drug manufacturers are incentivized to compete for formulary placement by inflating list prices to counteract high rebates and fees and are deterred from lowering the artificially inflated list prices to compete with other products; (2) consumers are forced to purchase high list price products, and to pay higher out-of-pocket costs based on the artificially inflated list prices; and (3) price competition between Respondents is often limited to rebates, causing commercial payers to make decisions primarily based on the size of rebates and rebate guarantees.

260.    There is no valid or cognizable justification for the Respondents' unfair method of competition.

261.    The Respondents' conduct constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II – Unfair Practice of Formulary Exclusion
## of Low WAC Insulin Products

262.    The allegations of paragraphs 1-254 above are incorporated by reference as though fully set forth herein.

263.    Through their development of commercial formularies, the PBM Respondents have a significant role in controlling consumers' affordable access to prescription medications. The PBM Respondents' systematic exclusion of low WAC insulin products from their most-utilized commercial formularies and custom client formularies, in favor of identical high WAC insulin products, is an unfair act or practice.

264.    The PBM Respondents cause and are likely to continue to cause substantial injury to insulin consumers whose out-of-pocket costs are based on list prices. Respondents' practice limits consumers' choice, forcing them to purchase the high WAC versions of insulin products instead of the identical low WAC versions. As a result, some patients pay more for insulin than they would if the low WAC version were available on formulary. Higher prices also tend to lead to decreased adherence and adverse health outcomes for patients.

265.    Insulin consumers cannot reasonably avoid the harm caused by the PBM Respondents' unfair formulary exclusion practices. Patients cannot choose to discontinue purchasing insulin and cannot reasonably switch insulin products or health plans to avoid the harm.

266.    The harm to insulin consumers whose out-of-pocket costs are based on list prices is not outweighed by countervailing benefits to consumers or competition.

267.    The PBM Respondents' systematic exclusion of low WAC insulin products from their most utilized commercial formularies and custom formularies constitutes an unfair act or practice in violation of Section 5(a), (n) of the FTC Act, 15 U.S.C. § 45(a), (n).

### COUNT III – Unfair Practice of Exploitative Cost-Shifting

268.    The allegations of paragraphs 1-254 above are incorporated by reference as though fully set forth herein.

269.    The PBM Respondents unfairly create and implement the system of manufacturer rebates, construct exclusionary formularies that preference high-list priced and highly rebated insulin products, and assist in other aspects of plan design—the combined effect of which shifts the cost of high insulin prices of drugs onto certain insulin patients.

270.    The PBM Respondents are aware that their rebate and formulary practices result in those patients whose out-of-pockets costs are based on the unrebated list price—rather than the significantly lower, rebated net price—paying more out-of-pocket for their insulin drugs, sometimes even more than the entire net cost of the drug.

271.    The PBM Respondents' exploitative cost-shifting practices cause and are likely to continue to cause substantial injury to consumers by increasing the price of insulin products to certain patients. Higher insulin prices can also lead to decreased adherence and adverse health outcomes for patients.

272.    Insulin consumers cannot reasonably avoid the harm caused by the PBM Respondents' unfair cost-shifting practices. Patients cannot choose to discontinue purchasing insulin, cannot easily switch insulin products or health plans, cannot access confidential rebates to compare the cost-sharing provisions between health plans, and cannot negotiate plans' cost-sharing terms.

273.    The harm to insulin consumers whose out-of-pocket costs are based on drugs' list prices is not outweighed by countervailing benefits to consumers or competition.

274.    The PBM Respondents' involvement in cost-shifting of the high insulin list prices of drugs onto certain patients constitutes an unfair act or practice in violation of Section 5(a), (n) of the FTC Act, 15 U.S.C. § 45(a), (n).

### <u>NOTICE</u>

Notice is hereby given to the Respondents that the twenty-seventh day of August, 2025, at 10:00 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act to appear and show cause why an order

should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted. If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time provided above shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the last answering Respondent files its answer). Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving a Respondent's answer, to make certain initial disclosures without awaiting a discovery request.

## <u>NOTICE OF CONTEMPLATED RELIEF</u>

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Respondents' conduct violates Section 5 of the Federal Trade Commission Act, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1. Prohibit Respondents from excluding or disadvantaging low WAC versions of high WAC drugs made by the same manufacturers whenever the Respondent covers the high WAC drug on a formulary.

2. Prohibit Respondents from accepting compensation based on a drug's list price or a related benchmark.

**PUBLIC**

3. Prohibit Respondents from designing—or assisting with designing—a benefit plan that bases patients' deductibles or coinsurance on the list price, rather than the net cost after rebates.

4. Order any other relief appropriate to correct or remedy the Respondents' violations.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this twentieth day of September, 2024.

By the Commission, Commissioner Holyoak and Commissioner Ferguson recused.



April J. Tabor
Secretary

SEAL:

45