# Morgan Lewis

**Jason R. Scherr**
Partner
+1.202.373.6709
jr.scherr@morganlewis.com

February 5, 2025

**VIA ECF**

The Hon. Rukhsanah L. Singh
United States Magistrate Judge
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street Room 2020
Trenton, NJ 08608

Re:   <u>**In re: Insulin Pricing Litigation**</u>**, 2:23-md-03080-BRM-RLS (D.N.J.)**

Defendants Express Scripts, Inc., Medco Health Solutions, Inc., and Express Scripts Administrators, LLC (collectively, "Express Scripts") submit this letter, pursuant to the Court's Discovery Dispute Protocol (CMO #17, ECF 313), in response to Plaintiffs' January 28, 2025 letter submissions (ECF 397 & 398). Plaintiffs ask the Court to order Express Scripts to (i) extend the substantial-completion deadline for document discovery that Plaintiffs themselves sought and convinced the Court to adopt and (ii) adopt a particular TAR proposal setting specific benchmarks for validation at the beginning rather than the conclusion of the review. Plaintiffs also ask that Express Scripts comply with the relevant rules and orders of the Court, which just begs the question whether anyone has not already been so complying.

Express Scripts agrees that an extension of the substantial completion deadline is appropriate. Otherwise, Plaintiffs' letters merely serve to demonstrate the premature nature of the supposed discovery "disputes" identified and the ways in which Plaintiffs' own actions have stymied the document production process.

**I.   Express Scripts has Diligently Complied With Its Discovery Obligations.**

Before addressing Plaintiffs' particular requests, Express Scripts must first set the record straight about the parties' discovery-related correspondence and conferences. A complete timeline shows that Plaintiffs' recitation of the parties'

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 2

conferral process not only fails to take account of Plaintiffs' delays in implementing an efficient discovery process, it misstates the positions taken by Express Scripts during the parties' meet-and-confer process, omits key facts and interactions between the parties, and in some instances is simply inaccurate.

On **October 15, 2024**, the Court entered CMO #13 authorizing Plaintiffs to serve certain Master Discovery Requests on Defendants.  *See* ECF No. 313.

On **October 28, 2024**, Plaintiffs served  discovery requests on Express Scripts including 34 multi-part requests for production of documents and similarly broad interrogatories.  ES Ex. A.  On **November 27, 2024**, Express Scripts timely served its responses and objections to Plaintiffs' requests for production of documents.

After the Thanksgiving holiday, the parties held their first meet-and-confer regarding Express Scripts' responses and objections on **December 6, 2024**.  Express Scripts requested that Plaintiffs identify any perceived deficiencies in its responses, in advance of that meeting, to help facilitate the most efficient and productive conferral process.  Plaintiffs did not do so.  While the parties discussed Express Scripts' objections and responses to certain requests, during that call, the parties acknowledged that any discussion regarding custodians should follow service of Express Scripts' responses to Plaintiffs' interrogatories because those interrogatories would identify individuals with relevant knowledge regarding Plaintiffs' allegations.  On **December 12, 2024**, Express Scripts timely served its responses and objections to Plaintiffs' First Set of Master Interrogatories.

Two business days later, on **December 16, 2024** Express Scripts provided its Initial Disclosure Regarding Custodians and Search Procedures for Certain ESI, including search terms based on Plaintiffs' own prior proposals.  Pl. Exs. 3–4.  Express Scripts identified seven priority custodians that were most likely to possess responsive documents, and disclosed Express Scripts' intent to use Technology Assisted Review ("TAR"). *See* Pl. Ex. 3.[1]  The disclosure also noted the January 27, 2025 substantial completion deadline.  *See id.*

The parties held their second meet-and-confer on **December 19, 2024**.  In terms of an agenda, Plaintiffs stated that they wanted to meet and confer regarding "custodians and data sources, search terms, and Express Scripts' responses and

---

[1] Express Scripts includes a more detailed discussion regarding its TAR disclosures in the section below responding to Plaintiffs' request for the entry of its proposed TAR Protocol.

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 3

objections to Plaintiffs First Set of Master Discovery." ES Ex. B at 8. Instead of addressing the topics referenced in the agenda, Plaintiffs used the meet-and-confer primarily to ask detailed questions about how Express Scripts intends to implement TAR. Express Scripts explained that notice of the expected topics was necessary to permit Express Scripts to ensure individuals with the proper knowledge attend any conferences, and Express Scripts again requested that Plaintiffs provide questions regarding search terms and TAR in writing to make any live discussion more productive. See ES Ex. B at 1–2.

Nearly two weeks later,[2] on **New Years Eve,** Plaintiffs sent written questions regarding validation and testing of search terms and TAR, but still provided no alternative terms to the proposal Express Scripts had made, or any indication that Express Scripts' terms were objectionable or unacceptable. ES Ex. C at 1–2.; Pl. Ex. 5–6. Plaintiffs also provided a "non-exhaustive list" of *58 individuals* that Plaintiffs stated they believe "may possess" responsive information. Plaintiffs did not provide any explanation for why those individuals would be "the most likely" to have responsive information (as the ESI Order requires), or any recognition of the infeasibility of searching for and producing documents from that many custodians within the narrower scope of discovery indicated by a January 27 substantial completion deadline. See ES Ex. C.

On **January 9, 2025**, Express Scripts provided additional information regarding its proposed custodians as well as the requested written responses to Plaintiffs' questions regarding Express Scripts' anticipated use of TAR. Pl. Ex. 1.

Less than two weeks before the substantial completion deadline, and nearly a month after Express Scripts made its initial search term and custodian proposals, Plaintiffs made a custodian and search term ***counter***proposal on **January 15, 2025.** Plaintiffs sought to significantly expand the search terms Express Scripts had proposed a month earlier—even though Express Scripts proposed the very same search terms these same Plaintiff counsel had themselves requested on behalf of Plaintiff in a member case—and formally demanded that Express Scripts search for and produce documents from 58 custodians. ES Ex. D.

---

[2] Rather than prioritize resolution of the parties' custodian and search term negotiations, Plaintiffs elected to serve yet more discovery on Express Scripts' affiliated defendants. On December 20, 2024, Plaintiffs served "Master" requests for production on Ascent. And on December 27, 2024 Plaintiffs served additional requests for production and interrogatories on Express Scripts' parent entities and well as the Express Scripts Pharmacy defendants.

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 4

On **January 21, 2025**, Express Scripts provided a data proposal identifying certain non-custodial sources of relevant claims and/or rebate data responsive to Plaintiffs' requests. ES Ex. E. To date, Plaintiffs have not responded. The parties also held a meet-and-confer during which Express Scripts reiterated that the ESI Order only required disclosure of how TAR "would be implemented," rather than a negotiated adoption of any mutual workflow. Nonetheless, Express Scripts—in an effort to compromise—proposed a comprehensive solution on TAR, search terms, and custodians. In that proposal, Express Scripts proposed agreeing: to apply Plaintiffs' new January 15 proposed search terms *as-is*; to *expand* the proposed custodians to include all 25 individuals identified in Express Scripts' response to Plaintiffs' Interrogatory No. 1; to implement TAR validation in the requested form of a recall measurement; and further, to disclose the outcome of that measurement to Plaintiffs, conditioned only on Plaintiffs setting aside their further ongoing attempts to micromanage Express Scripts' implementation of TAR, which the ESI Order does not permit them to do. *See* ES Ex. F.

Rather than accept, on Friday afternoon, **January 24, 2025**, Plaintiffs demanded that Express Scripts agree instead to a more prescriptive "protocol" for TAR that reincorporated standards rejected in the ESI Order. Pl. Ex. 7.[3]

On **January 27, 2025**, having already responded to all of Plaintiffs' written questions concerning TAR, Express Scripts responded that it was "open to further input and will seriously consider any counter proposals from Plaintiffs," and Express Scripts re-invited Plaintiffs to pose outstanding questions in writing, but noted that it was not available to meet and confer on one business days' notice. *See* ES Ex. G. The next day, Plaintiffs opted to file the pending letters with the Court.

## II. The Court Should Extend the Substantial Completion Deadline.

Rather than admit the substantial completion deadline they championed in their initial discovery proposals was suitable only for a much narrower scope of discovery, Plaintiffs for the last couple of months have continued to simultaneously insist that the deadline was reasonable *and* that Express Scripts must agree to extremely voluminous custodial searches of 58 individuals first identified on December 31, 2024. Plaintiffs now state—for the first time in their submission to

---

[3] In the parties' competing proposals for an ESI agreement, Plaintiffs urged the Court to grant them oversight of the document review process employed by defendants who opted to utilize TAR. This Court properly declined to adopt such an approach in the ESI Order, consistent with the norm that discovery into discovery is generally unavailable absent some showing that the processes employed by a defendant are inadequate or unreliable.

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 5

the Court—that they "do not object to a reasonable extension" of the discovery period. Express Scripts agrees that an extension of the discovery period is appropriate here, especially since Plaintiffs have refused a narrower scope that is more in line with the discovery deadlines they sought.

The reasonableness of any particular deadline, of course, must turn in significant part on the number of custodians. The parties have not reached an impasse on those discussions, in part because Plaintiffs have so far refused to budge from their demand for 58 custodians, and thus Express Scripts suggests the parties continue to meet and confer regarding custodians and that they propose appropriate deadlines for the conclusion of such production after either reaching an agreement or an impasse on the issue that requires the Court's intervention.

### III. Express Scripts Complied With Its Obligations Under the ESI Order to Identify Sources Most Likely to Possess Responsive Documents and Information.

The ESI Order requires a producing party to disclose "custodians, databases, and non-custodial sources that are *most likely* to possess responsive documents and information." ECF No. 208 ("ESI Order") at § V (emphasis added). Express Scripts made these disclosures regarding custodians and databases early in this process. Pl. Ex. 3; ES Ex. G. Plaintiffs appear to complain that Express Scripts has yet to make a disclosure regarding particular "non-custodial sources" other than databases. But at this early stage in the litigation, Express Scripts has not identified a non-custodial source that is "most likely to possess responsive documents and information," especially a source that would be non-duplicative of the targeted pulls it has already completed from such non-custodial sources, and the custodial searches it has proposed. If, as it continues its investigation, Express Scripts finds such a source, it will disclose it. But Express Scripts is not refusing to comply with the ESI Order.

### IV. The Court Should Not Compel Defendants to Enter Into Plaintiffs' Proposed TAR Protocol.

The ESI Order required the parties to "meet and confer in good faith" about the search procedures being utilized to find responsive ESI. ESI Order at § V. The ESI Order also included an overarching obligation on producing parties to be "*reasonably* transparent regarding the universe of documents subject to targeted collections, culling, or application of search terms." ESI Order at 8 (emphasis added). Concerning TAR specifically, the ESI Order requires a producing party to disclose its intent to *use* TAR, and to meet and confer with the other party

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 6

"regarding how such technologies will be implemented, before the Producing Party employs any TAR," but it declined to give receiving parties an oversight role into a Producing Party's management of its review process. ESI Order § V.B. Express Scripts has complied with the requirements in the ESI Order, and already has voluntarily provided more information than required, in an effort to avoid precisely this unnecessary dispute.

### A. Express Scripts Disclosed That It Intends to Use TAR and How It Will Implement the Technology.

Express Scripts made the following initial disclosure regarding its intended use and implementation of TAR:

> From [the universe of documents culled using the Mississippi proposed search terms], Express Scripts intends to use TAR to identify documents for further review and potential production. Express Scripts intends to use Morgan Lewis attorneys familiar with this litigation to iteratively train a TAR model to identify potentially responsive ESI. Morgan Lewis attorneys will validate Express Scripts' productions upon completion of such productions. Express Scripts presently intends to utilize Reveal's Brainspace predictive coding software in implementing such TAR modeling.

Pl. Ex. 3 at 2. Fifteen days later, on New Year's Eve, Plaintiffs sent in writing additional questions they had regarding Express Scripts' use of TAR. ES Ex. C (attaching Pl. Ex. 6). The very next week, Express Scripts responded to those questions. Pl. Ex. 1. This response answered many of Plaintiffs' particular questions, but also noted areas where Express Scripts did not believe such disclosure was required.

Plaintiffs asked Express Scripts to identify the TAR Tool "[s]pecfic[ing] the Brainspace TAR model [it] will be using (e.g., CAL/TAR2.0/pre-Reveal CMML)." Pl. Ex. 6. Express Scripts responded that it "intends to use the CMML model feature of the Brainspace software, and its conceptual diversity/diverse active training features, and also the Brainspace criteria for identifying records subject to, and excluded from, TAR modeling." Pl. Ex. 1.

Plaintiffs asked how Express Scripts will define the TAR Universe, and specially how it will deal with documents not suitable for modeling by TAR. Pl. Ex. 6. ("How will documents that are not well suited to TAR be excluded and how will

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 7

they be reviewed?"). Express Scripts responded that it would rely on the "Brainspace criteria for identifying records subject to, and excluded from, TAR modeling," and for such records, "reviewing attorneys will review" them. Pl. Ex. 1.

Plaintiffs sought information regarding the Training Workflow. Pl. Ex. 6. Express Scripts explained that it "intends to use Morgan Lewis attorneys familiar with this litigation to iteratively train a TAR model using Reveal's Brainspace predictive coding software, and Morgan Lewis attorneys will validate Express Scripts' productions upon completion of such productions." Pl. Ex. 1.

Plaintiffs asked for additional information about how Express Scripts will ensure that the model will be trained with "unique and diverse concepts." Pl. Ex. 6. Express Scripts disclosed that it intends to use the "conceptual diversity/diverse active training features" that the Brainspace software makes available in its CMML model. Pl. Ex. 1.

Plaintiffs also asked if Express Scripts intended to engage in any "additional culling," such as using generative AI. Pl. Ex. 6. Express Scripts confirmed that it "does not intend to use generative AI to further cull beyond TAR." Pl. Ex. 1.

Plaintiffs also asked for additional information regarding richness assessments, review cutoffs, recall rates, and validation processes. Pl. Ex. 6. In response, Express Scripts expressed its belief that it is premature to discuss those issues and physically impossible to draw the requested samples, when Plaintiffs continued to dispute Express Scripts' custodial and search term proposals. Pl. Ex. 1. Nevertheless, in the hopes of further reaching an agreement, Express Scripts further disclosed that Morgan Lewis attorneys will validate the production through an assessment of recall and agreed to share in writing with Plaintiffs the outcome of that validation when complete. Pl. Ex. 8.

### B. Plaintiffs Have Not Shown the Need for a Further TAR Review Protocol Beyond the Existing ESI Order.

Although Express Scripts disclosed how TAR "will be implemented" prior to its review as required under the ESI Order, Plaintiffs pushed for Express Scripts to agree *at the outset* to commit to certain benchmarks and test methods and multiple rounds of disclosure of non-responsive records involved in training or sampling or validating. On Friday, January 24, 2025, Plaintiffs requested that Express Scripts agree to a "comprehensive proposal" requiring it to, among other things, implement the validation protocol entered in *In re Broiler Chicken Antitrust Litig.*, 2018 WL 1146371 (N.D. Ill. 2018), and agree at the outset to a recall of 80% before any TAR training results are even available. Pl. Ex. 7.

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 8

Despite only sending their proposal two business days before, and despite the numerous disclosures Express Scripts provided in response to Plaintiffs' questions, Plaintiffs filed their January 28 letter characterizing Express Scripts' approach as a "black-box" proposal. ECF No. 398. Plaintiffs insist the Court should enter "Plaintiffs' TAR proposal" as summarized by a declaration from their retained expert Maura R. Grossman, J.D., PhD. That declaration, however, is not in alignment with Plaintiffs' demands. For example, Dr. Grossman recognizes that "[r]ecall in the range of 70-80% is generally considered adequate," and that "Plaintiffs are not insisting, at this point, that Express Scripts reach this absolute target." Grossman Decl. ¶¶ 18–19.

Consistent with the ESI Order, Express Scripts has been more than transparent regarding how it intends to implement TAR. Express Scripts' disclosures are far from the "black-box" Plaintiffs decry, addressing each and every topic Plaintiffs raise, even if resisting Plaintiffs' demand that Express Scripts forfeit its own discretion to yield management of the process to Plaintiffs. Through its disclosures and conferences with Plaintiffs as summarized above, Express Scripts demonstrated that it is using modern TAR technologies designed to identify responsive records reasonably and efficiently with guidance from counsel deeply familiar with the technology and best practices, and further implementing a robust validation process using the same measure Plaintiffs demand. Yet Plaintiffs want more, and they want it now—and they want it sorted in a specific way at specific times with specific sample sizes that they want to dictate at the outset.

"Plaintiffs' insistence that [Express Scripts] must collaborate with them to establish a review protocol and validation process has no foothold in the federal rules governing discovery." *Livingston v. City of Chicago*, 2020 WL 5253848, at *3 (N.D. Ill. Sept. 3, 2020). As Magistrate Judge Andrew Peck recognized nearly a decade ago, "it is inappropriate to hold TAR to a higher standard than keywords or manual review." *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 129 (S.D.N.Y. 2015). Plaintiffs here seek to do precisely that—hold Express Scripts to such a higher standard.

Plaintiffs' Protocol demands similarly lack any footholds in the Federal Rules when they demand disclosure and production of **non-responsive** records, merely because such records were sampled in validation measures. *See* Pls. Ex. 6 ("[C]onfirm that you will disclose the full set of documents in [a richness assessment], including how many of those documents were deemed responsive and non-responsive."); *id*. ("Confirm that the full set of documents in the validation samples will be disclosed, including the universe from which the sample was pulled

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 9

and responsiveness coded."). But, of course, non-relevant information is beyond the proper scope of discovery. *See* Fed. R. Civ. P. 26(b)(1).

Take further Plaintiffs' desire to peek around the curtain into Express Scripts' review of a "seed set" to train the model. *See* Pl. Ex. 6 ("Describe any documents that will be used to kickstart the initial training"). Express Scripts disclosed it is using a CMML model, a model that can use but does not rely solely on a single-shot training seed set, but instead continues to train and model as additional documents are reviewed. Even a decade ago, Judge Peck recognized that disclosures over the "seed set is much less significant" when TAR uses "continuous active learning." *Id.* Indeed, Judge Peck even cited Plaintiffs' TAR expert, Dr. Grossman and her co-author, that "[d]isclosure of the set or training set offers false comfort to the requesting party." *Id.* (quoting Maura R. Grossman & Gordon V. Cormack, *Comments On "The Implications of Rule 26(g) on the Use of Technology–Assisted Review,"* 7 Fed. Cts. L.Rev. 285, 298 (2014)). When Plaintiffs complain that Express Scripts has "rebuffed" their questions, it was not because they were unanswered but, rather, because Express Scripts declined to concede fully on the details that Plaintiffs' own expert recognized as inapposite to modern TAR processes.

Similarly unwarranted is Plaintiffs' demand that Express Scripts commit to an 80 percent recall rate *now*. Plaintiffs point to no authority suggesting it is appropriate to commit to a recall percentage *before* starting TAR, much less that 80% is proportional *ex ante*. Plaintiffs demand that Express Scripts agree *now* to a recall rate that *even their own expert* acknowledges is above the commonly accepted threshold. Grossman Decl. ¶ 18 ("[A] target recall rate of 80% is at the upper end of the acceptable range"). Other Grossman work acknowledges that 65% recall may represent "a good result—approximately what we would expect if the entire collection were assessed by one subject matter expert."[4] Plaintiffs' demand for 80% recall despite the real-world variability in measured recall ignores Magistrate Judge Peck's exhortation that TAR should not be held to a higher standard than other technologies.

It may be that even though Plaintiffs put forward 80% in their proposal, they do not actually want to enforce this requirement, as supposedly "Plaintiffs are not

---

[4] Maura R. Grossman, J.D., PhD. and Gordon V. Cormack, Ph.D., *The eDiscovery Medicine Show*, 18.1 Ohio State Tech Law J. 1, 6–7 (2021), *available at* https://kb.osu.edu/server/api/core/bitstreams/78c4b0b3-f032-4a9d-a847-789c9f2201f5/content. Express Scripts does not cite this level of recall to suggest it is sufficient (or insufficient), but rather agrees with the article's greater point that achieved recall may be quite variable and, as this article posits, should be considered holistically.

**VIA ECF**

Hon. Rukhsanah L. Singh
February 5, 2025
Page 10

insisting, at this point, that Express Scripts reach this absolute target." *Id.* ¶ 19. To be clear, Express Scripts would *welcome* Plaintiffs not insisting, at this point, that Express Scripts reach this absolute target. Express Scripts is not opposed to attempting to achieve a proportionality-informed high percentage recall target in its TAR process, but it absolutely does object to such a target being *ex ante mandatory*, anomalously high, and unilaterally-dictated rather than chosen by ESI in its discretion at the time of completion when the most useful actual information about progress and costs and proportionality will be in hand—just as any Producing Party would exercise its judgment about the progress and sufficiency of its review using any technology at all, including manual review of keyword-generated document sets.  The standard here should be no different.

Plaintiffs' entire TAR Protocol is an effort to not only put the cart before the horse, but to further dictate the exact specifications of the cart.  Especially in light of the actual, and substantial, disclosures Express Scripts already has made regarding the TAR process it intends to use, Plaintiffs do not have a right to "require collaboration in the review protocol and validation process." *Kaye v. New York City Health & Hosps. Corp.*, 2020 WL 283702, at *2 (S.D.N.Y. Jan. 21, 2020).  Courts are "not normally in the business of dictating to parties the process that they should use when responding to discovery. If our focus were on paper discovery, we would not (for example) be dictating to a party the manner in which it should review documents for responsiveness or privilege, such as whether that review should be done by a paralegal, a junior attorney, or a senior attorney." *Dynamo Holdings Ltd. P'ship v. Comm'r*, 143 T.C. 183, 188 (2014).  Yet this is almost exactly what Plaintiffs are attempting to do here.  Express Scripts will continue to be reasonably transparent about its use of TAR, as with any process for finding and producing responsive documents.  But Plaintiffs demand way more than that, at an impractical time.  The Court should reject Plaintiffs' request to impose additional requirements on Express Scripts' review and production of documents.

Respectfully submitted,

*/s/ Jason R. Scherr*

Jason R. Scherr

cc: All Counsel of Record