# Morgan Lewis

**Jason R. Scherr**
Partner
+1.202.373.6709
jr.scherr@morganlewis.com

March 7, 2025

**VIA ECF**

The Hon. Rukhsanah L. Singh
United States Magistrate Judge
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Room 2020
Trenton, NJ 08608

Re: *In re: Insulin Pricing Litigation,* **2:23-md-03080-BRM-RLS (D.N.J.)**

Dear Judge Singh:

Pursuant to the Court's Discovery Dispute Protocol, Defendants Express Scripts, Inc., Medco Health Solutions, Inc., and Express Scripts Administrators, LLC (collectively, "Express Scripts") submit this response to Plaintiffs' February 28, 2025 request for the entry of an Order on TAR ECF No. 440, as well as Plaintiffs' March 5, 2025 supplemental letter on TAR ECF No 445 (collectively "Plaintiffs' TAR letters.").

At the last conference, the Court directed the parties to balance two competing principles for TAR. The Court directed Express Scripts to disclose "sufficient information" to enable Plaintiffs and "the Court to review whether that validation process is sufficient to meet the discovery obligations." Feb. 10 Hr'g Tr. at 36:9–14. But the Court also cautioned Plaintiffs that "transparency and a cooperative approach does not mean micromanagement by the parties." *Id.* at 36:21–23.

Express Scripts' TAR disclosures and proposed process more than meet this balance. Express Scripts' disclosures have provided Plaintiffs transparent information about how Express Scripts plans to proceed with TAR and TAR validation, but appropriately resists Plaintiffs' efforts to micromanage the review or TAR training process itself. The Court should thus reject Plaintiffs' proposed protocol, and direct Express Scripts to proceed with its TAR workflow in accordance with its proposal as outlined in this letter.

**I.    The Parties' Dispute Over Express Scripts' TAR Process Is Narrow.**

Plaintiffs' "opacity" claims aside, the TAR process that Express Scripts has disclosed to Plaintiffs tracks Plaintiffs' proposed Order *in almost every regard*. To be sure, Express Scripts does not agree to every provision Plaintiffs have demanded. But in each case Express Scripts has previously explained in writing why it disagrees and conferred with Plaintiffs about those disagreements on multiple occasions.

**Morgan, Lewis & Bockius LLP**

1111 Pennsylvania Avenue, NW
Washington, DC  20004         T +1.202.739.3000
United States                          F +1.202.739.3001

**VIA ECF**

The Hon. Rukhsanah L. Singh
March 7, 2025
Page 2

As outlined below, the parties agree on most aspects of Plaintiffs' proposed TAR process, but have identified, through the meet and confer process, disputes as to a few discrete topics.

| Topic | Plaintiffs' Proposed Order | Express Scripts' Position |
|---|---|---|
| **TAR Tool** | Express Scripts will use Reveal's Brainspace CCML Predictive Coding Software ("TAR"), which is a continuous active learning model, to identify documents for further review and potential production. | Express Scripts agrees. |
| **Documents Subject to TAR** | Express Scripts will apply [Plaintiffs' proposed search terms without modification] attached as Exhibit A to all agreed-upon custodial sources, and all documents that hit on those terms will be subject to TAR pursuant to Brainspace's criteria for identifying records subject to, and excluded from, TAR modeling. For those file formats/document types that Brainspace identifies as not amenable to TAR, reviewing attorneys will review those records without use of TAR. | Express Scripts agrees. |
| **Training** | A. Express Scripts will use attorneys familiar with this litigation to iteratively train a TAR model to identify potentially responsive ESI. All relevance-based coding decisions will be used for training, and Express Scripts will retrain the TAR system on a regular basis. | Express Scripts agrees to use *all or nearly all* relevance-based coding decisions, in order to permit flexibility for it to use only QC'd determinations at the tail end of the review to train the model, a proven method frequently implemented to improve model accuracy.<br><br>*Otherwise* Express Scripts agrees. |
| | B. Express Scripts will use Brainspace's conceptual diversity/diverse active training features and will do so in appropriate intervals throughout the review. | Express Scripts agrees. |
| **Stopping Criterion** | A. Express Scripts may cease its TAR review when it meets the criteria set forth in the ESI Order entered in *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, No. 3:23-md-0384, ECF 524, Section 8(a)(3) at pages 8-9. *See also* Grossman Declaration ¶13.<br><br>B. Once this point has been reached, Express Scripts may move onto validation. However, | Express Scripts believes that Plaintiffs' specific stopping criteria is unnecessary given the substantial validation disclosures Express Scripts has agreed to make, and further that Plaintiffs' criteria is derivative to, and an imperfect proxy for, the |

**VIA ECF**

The Hon. Rukhsanah L. Singh
March 7, 2025
Page 3

| Topic | Plaintiffs' Proposed Order | Express Scripts' Position |
|---|---|---|
| | Express Scripts may choose to extend the review past this point at its discretion, should it believe that additional responsive documents may be identified at a proportionate use of resources.<br><br>C. To the extent Express Scripts believes there is good reason to cease the review prior to the presumptive stopping criteria in IV.A, Express Scripts will provide Plaintiffs with the information and basis for its belief, and the Parties will reasonably meet and confer to address Express Scripts' rationale. | recall requirement it next requires. |
| **Validation Process (V.A.)** | Express Scripts will validate their TAR process consistent with the validation process and recall calculation ordered in *In re Broiler Chicken Antitrust Litig.*, 2018 WL 1146371 (N.D. Ill. 2018), . . . | Express Scripts will validate their TAR process consistent with the <u>elusion set</u> validation process and <u>elusion set</u> recall calculation ordered in *In re Broiler Chicken Antitrust Litig.*, 2018 WL 1146371 (N.D. Ill. 2018),<br><br>*(but not, as noted below, the reviewer QC validation therein.)* |
| | . . . including the sampling of the full TAR document universe rather than just elusion sampling from the null set. *See also* Grossman Declaration ¶ 16. | Express Scripts disagrees that a QC validation of the tagging completed by human reviewers is appropriate or required for TAR workflow validation. |
| **Disclosure of Validation Documents (V.B)** | The recall estimate, along with the full calculation, will be provided to Plaintiffs. | Express Scripts agrees. |
| | At the same time, Express Scripts will provide Plaintiffs with all non-privileged responsive documents from the validation samples, including information concerning the stratum each such document was drawn from. | Express Scripts will produce to Plaintiffs all non-privileged responsive documents from the validation samples (and the TAR workflow) but Express Scripts disagrees that disclosure of a record's QC tagging, or even otherwise designating records by stratum or responsiveness criteria (its attorney work product) is |

**VIA ECF**

The Hon. Rukhsanah L. Singh
March 7, 2025
Page 4

| Topic | Plaintiffs' Proposed Order | Express Scripts' Position |
|---|---|---|
| | | warranted or consistent with the ESI Order. |
| **Validation Recall Target (V.C.)** | The Parties will target a reasonable and proportional recall rate between 70-80%, or higher. | Express Scripts agrees *if* this binds both Parties to the conclusion of 'reasonable and proportional.' Otherwise, Express Scripts will target a reasonable and proportional recall rate of 70% or higher. |
| **Post-Validation Steps (V.D)** | Once Plaintiffs have had the opportunity to review the recall calculation and estimate, and the non-privileged responsive documents from the validation samples, the Parties will meet and confer as to whether the recall estimate, and the quantity and nature of the responsive documents identified through the sampling process, indicate that the review is substantially complete. | Express Scripts agrees to meet and confer with Plaintiffs after making its validation disclosure. |

## II. Limited Flexibility to Utilize Quality Control Tagging May Enhance The Training of the Model.

The parties' dispute regarding the training of Express Scripts' TAR model is exceptionally narrow, but it also impinges on a core decision of how Express Scripts will conduct its review. Express Scripts has disclosed that it intends to use all reviewer determinations at the outset to expedite TAR model development and coverage. *See* ECF No. 440 at 16. Express Scripts, however, is not willing to agree to a provision categorically foreclosing Express Scripts' option to fine-tune the model's performance towards the end of the review by limiting training input to QC'd records only.

The selective and strategic use of using only QC-records is not an outliner position. Dr. Grossman's own writings explore, and cite, academic works measuring the decreased performance TAR classifiers may see when trained by non-authoritative trainers.[1] This concern has even driven

---

[1] *Assessor Disagreement and Text Classifier Accuracy*, William Webber and Jeremy Pickens, Proc. ACM-SIGIR, Dublin, Ireland, July 2013, pages 929—932 (finding that using [non-SME] assessors leads to a decrease in classifier quality.) *Accord*, and as cited by, Roegiest, Cormack, Grossman et al. *Impact of Surrogate Assessments on High-Recall Retrieval* Proceedings of the 38th International ACM SIGIR Conference on Research and Development in Information Retrieval.

**VIA ECF**

The Hon. Rukhsanah L. Singh
March 7, 2025
Page 5

some regulatory bodies that routinely receive TAR productions to go so far as to preclude inclusion of first pass reviewer determinations in favor of only subject matter expert training in TAR.[2]

**III.     Express Scripts' Validation Proposal is Reasonable.**

    **A.     TAR Validation Should Validate TAR Rather Than Other Aspects of The Review.**

Express Scripts has committed from the start of its exchanges to validate its *TAR process*.[3] Plaintiffs, however, have further requested that beyond just a TAR process validation, Express Scripts also agree to a reviewer QC validation. Express Scripts has consistently committed to completing a *TAR* validation process, but does not agree to extend that to a reviewer QC validation process.

Under the *Broiler Chicken* order, a producing party using TAR will validate its use *of TAR* by performing a validation review of 2,000 documents selected at random from documents "excluded from manual review as a result of the TAR process." 2018 WL 1146371, at *4–*5. Express Scripts has consistently agreed to do this. Likewise, in accord with *Broiler Chicken*, Express Scripts will ensure the validation review is completed by subject-matter experts in the litigation who will not have knowledge of the prior tagging decisions. *See id.* at *5.

*Broiler Chicken*, however, further required the producing party to calculate reviewer QC reversals based on a review of two sets of 500 documents previously tagged by reviewers, to measure reviewer reversal rates. *See id.* at *5. This additional sampling seeks not to validate the TAR process, but to re-assess and reveal the work-product decisions of the attorneys completing the review. But, as former Magistrate Judge James (Jay) Francis IV put it, such a validation process is an "overreach" because "courts have generally not mandated the incorporation of such reviewer error in calculating the recall statistic in any of these scenarios." *In re Diisocyanates Antitrust Litig.*, 2021 WL 4295729, at *12 (W.D. Pa. Aug. 23, 2021).

To be clear, Express Scripts fully intends to perform quality control reviews and monitor reviewer performance on an ongoing basis. Express Scripts plans to reasonably QC and correct human error *before* validation. This would be the case whether Express Scripts uses TAR or an alternative search methodology. But a requesting party cannot usually peak behind the curtain to review the work-product of a producing party's quality control process. *See, e.g.*, *Kaye v. New York City Health & Hosps. Corp.*, 2020 WL 283702, at *2 (S.D.N.Y. Jan. 21, 2020) ("When documents are produced in discovery, whether they be produced electronically or otherwise, the Court does not believe that, in the first instance, the receiving party has a right to examine and evaluate the way the production was made or require collaboration in the review protocol and validation process."). That same rule applies regardless of whether a party uses TAR.

---

[2] U.S. Department of Justice, Antitrust Division "*Predictive Coding Model Agreement*" at II(c), III(d)

[3] *See* Feb. 25, 2025 J. Scherr Email to Plaintiffs, ECF No. 440 at 13 ("We reiterate here our disclosed intention to validate our TAR process via the exacting, blinded, recall measures of *Broiler Chicken's* elusion sampling, and reiterate also that we will, after performing that validation in that manner, transparently disclose in writing the resulting recall percent and precision measures (as calculated by *Broiler Chicken's* elusion sampling formulas).").

**VIA ECF**

The Hon. Rukhsanah L. Singh
March 7, 2025
Page 6

As *In re Diisocyanates* demonstrates, Plaintiffs are wrong (and overreach) when they claim that "the *only* way to calculate an independent and valid estimate for recall" is to include human error validation. ECF No. 440 at 5. Instead, "since there are alternative TAR methodologies that the defendants could utilize and that are reasonable, they should not be compelled to adopt the plaintiffs'." *In re Diisocyanates*, 2021 WL 4295729, at *13 (rejecting need for human error validation despite declaration from Dr. Grossman).

In short, TAR validation should thus be limited to validating TAR.

### B. TAR Validation Does Not Require Disclosure of The Documents Used for Validation.

Plaintiffs similarly overreach in demanding that after completion of the TAR review, Express Scripts report back to Plaintiffs which specific records were produced from elusion sampling sets (as opposed to other sampling, or other TAR rankings, or other required manual review). Lest there be any confusion, Express Scripts does, contrary to Plaintiffs' implication, agree that validation records shall be produced if they are determined to be responsive.

But Express Scripts objects to a heightened requirement that, beyond production, Express Scripts disclose the particular documents reversed upon validation. Especially where Plaintiffs seek QC validation of Express Scripts' human review, mandating such disclosure would reveal the responsiveness tagging of the quality-controller reviewers, once again permitting Plaintiffs an unwarranted intrusion into Express Scripts' review processes.

Further, this heightened categorization requirement is inconsistent with the "no per-discovery-request-designation requirement" provisions in this case's ESI Order. ECF No. 208 § XII. Under that order, responsive records are responsive, and no party must organize their production "to correspond to discovery requests." *Id.* The same logic applies here.

### C. Ex Ante Recall Targets are Unnecessary and Unfair Without Reciprocal Obligations on Plaintiffs.

Notwithstanding Plaintiffs' considerable spilled ink and 'black-box' aspersions regarding recall, the simple fact is that Express Scripts has made two consistent disclosures on recall targets from the start. As Plaintiffs concede, Express Scripts has disclosed from the very outset that it will attempt to achieve "a proportionality-informed high percentage recall target" in its TAR process. ECF No. 440 at 6. And as the Court knows from the prior briefing, Express Scripts contends that committing to a recall rate *ex ante* is unnecessary. *See* ECF No. 410 at 9.

In their proposal to the Court, Plaintiffs would require Express Scripts to "target" a recall rate of between 70-80% or higher. But upon inspection, it's not at all clear what purpose a "target" serves where Plaintiffs expressly reserve the right to dispute sufficiency regardless of what "target" Express Scripts achieves. Express Scripts certainly has the *goal* of reaching a recall rate of 70% or higher. Express Scripts even valued the certainty of such a target to offer a target in the middle of Plaintiffs range if that target would have mutual effect. But instead, Plaintiffs' inclusion of non-binding targets in an order of the Court only invites confusion. And if any order of the Court will include any "targets" or benchmarks, it should include reciprocal benchmarks that Plaintiffs will be held to, such as a presumption that Plaintiffs will not challenge the sufficiency and reasonableness of Express Scripts' search protocol.

**VIA ECF**

The Hon. Rukhsanah L. Singh
March 7, 2025
Page 7

### IV.     Stopping Point Criteria.

Express Scripts agrees that a key component of every TAR workflow is, at some point, *stopping*. That choice is an inherent tradeoff of further work and costs vs. completeness at any cost, a quintessential burden vs. benefit (or indeed, as FRCP 26 frames it, 'proportionality') analysis. *Accord* ECF No. 440 at 6 ("If the TAR review is stopped too early, a material number of responsive documents are left behind that could readily have been found. Conversely if the TAR review is not stopped at a reasonable point, the review becomes disproportionate."). Determining when to stop is also one best analyzed *at that point in time* with the facts of the actual in-process workflow and its progress in hand, rather than dictated by *ex ante* projections or rules of thumb. Express Scripts has consistently communicated that while it will be transparent and thorough about its validation, the choice of *when* to stop is Express Scripts'.

Determining when to stop is not itself a validation test, but simply a predecessor choice for when validation should begin. Here, Plaintiffs propose a stopping test requiring review of no less than 1000 consecutive records that are below 10% responsiveness before being allowed to stop and "proceed to validation."

As two simple hypotheticals show, this proxy stopping test bears tenuous relation to recall, and sometimes even *delays* discovery of a poor model performance until validation is undertaken. In the first instance, if broad search terms (such as those proposed by Plaintiffs) are used, initial responsiveness rates might well be below 10% out of the gate, and so achieving slightly sub-10% responsiveness is not a reason to stop—indeed one possibility is that the TAR model isn't working much better than random chance. At the opposite extreme, where the selected search terms were targeted, effective, and precise, initial responsiveness might well be materially higher (e.g., 80%,) and so working all the way down to slightly sub-10% responsiveness would reflect 87%+ recall, beyond even the upper end of Plaintiffs' stated recall target range and at quite possibly disproportionate cost.

Forcing a specific criterion that Express Scripts must meet before proceeding to validation that Express Scripts must also and further meet makes such a stopping criteria redundant. Express Scripts already lacks any incentive to proceed to validation prematurely; starting the validation process too early will lead to a low recall rate requiring either a resumption of the review or motion practice. But when to stop is best determined by considering the concrete facts at or near the conclusion of review, rather than by conjecture at the beginning of the process.

Express Scripts, therefore, declines to adopt Plaintiffs' proposed stopping test as an enforceable precondition test before recall validation.

### V.     Conclusion

The Court should reject Plaintiffs' proposed TAR protocol, and direct Express Scripts to proceed with its TAR workflow in accordance with its proposal as outlined in this letter. We thank the Court for its continued attention to this matter.

**VIA ECF**

The Hon. Rukhsanah L. Singh
March 7, 2025
Page 8

Respectfully submitted,

*/s/ Jason R. Scherr*

Jason R. Scherr


cc: Honorable Brian R. Martinotti, U.S.D.J.
All Counsel of Record