# Exhibit B

FILED
Superior Court of California
County of Los Angeles

JUN 18 2024

David W. Slayton, Executive Officer/Clerk of Court
By: A. Rosas, Deputy

People of the State of California (23STCV00719)

Ruling Re: Demurrer

| | |
|---|---|
| Date: | 6/18/24 |
| Time: | 9:00 am |
| Moving Party: | CaremarkPCS Health, LLC ("CVS Caremark"), CVS Health Corp. ("CVS Health"), Express Scripts, Inc. ("Express Scripts"), and OptumRX, Inc. ("OptumRX") (collectively "PBM Defendants") |
| Opposing Party: | The People of the State of California (the "People") |
| Department: | 11 |
| Judge: | David S. Cunningham III |

## TENTATIVE RULING

*PBM Defendants' Request for Judicial Notice ("RJN")*

PBM Defendants' RJN is denied.

*PBM Defendants' Demurrer*

**Statutes of Limitations**

PBM Defendants' demurrer is sustained with leave to amend.

**Unfair Competition Law ("UCL")**

PBM Defendants' demurrer is overruled as to the safe-harbor issue, unfair-prong issue, unlawful-prong issue, and fraud-prong issue.

**Unjust Enrichment**

PBM Defendants' demurrer is sustained with leave to amend to assert a common count for restitution.

*CVS Health's Demurrer*

CVS Health's demurrer is sustained with leave to amend.

1

## BACKGROUND

The People filed this case against three manufacturers of insulin (Manufacturer Defendants), three pharmacy-benefit managers ("PBM Defendants" or "PBMs"), and a holding company (CVS Health).

At its core, this is a price-gouging case. The complaint alleges:

> 1. Millions of Californians suffer from diabetes. For many diagnosed with this condition, access to insulin to regulate their blood sugar levels is a matter of life and death. Yet, the excessive price of insulin undermines their access to this century-old, life-sustaining drug.
>
> 2. Inexplicably, list prices for insulin have risen several hundred percent over the last two decades. Today, California diabetics who require insulin to survive and who are exposed to insulin's full price, such as uninsured consumers and consumers with high deductible insurance plans, pay thousands of dollars per year for insulin.
>
> 3. The excessive price of insulin disproportionately harms low-income communities who must choose between paying for insulin or everyday necessities, such as housing and food. To stretch dollars and insulin supplies, many Californians have turned to the dangerous practice of rationing insulin or skipping doses despite the severe risks of loss of sight, limbs, or death. These harms are further compounded for Black, Hispanic, and low-income communities in California as they are more likely to be diagnosed with diabetes and to be uninsured or underinsured.
>
> 4. The United States insulin market is an oligopoly. The defendants include three insulin manufacturers (Manufacturer Defendants)—Eli Lilly, Novo Nordisk, and Sanofi—who make nearly all of the insulin sold in the United States.
>
> 5. Also named as defendants are the three pharmacy benefit managers (PBM Defendants) that dominate the PBM market—CVS Caremark, Express Scripts, and OptumRx. PBMs are entities that administer prescription drug programs, which are a part of the essential benefits that health insurance plans must cover. One aspect of the PBM's role is determining the prescription drugs a given health insurance plan covers (known as a formulary). Another aspect of the PBM's role is negotiating confidential contracts that provide for post-sale discounts (rebates) that a drug manufacturer will provide to the PBM, not the consumer, if a consumer fills a prescription for the manufacturer's drug.
>
> 6. The conduct at issue in this Complaint has two main components. First, the Manufacturer Defendants aggressively raise the list price of insulin in lockstep with each other to artificial levels. The inflated and artificial insulin price increases have significantly exceeded inflation and are not justified by advances in the efficacy of

the drugs or the cost of manufacturing. Insulin costs less than $10 a month to manufacture and its development costs have long been recouped.

7. Second, PBM Defendants obtain significant secret rebates, which are a percentage of the inflated and artificial list price, from the Manufacturer Defendants in exchange for favorable placement on the PBM's standard formularies. This rebating strategy incentivizes the Manufacturer Defendants to raise their list prices high and higher. The result is that the PBM Defendants' standard formularies promote the Manufacturer Defendants' high list-price insulin products over lower list-price insulins in California and nationwide.

8. The Manufacturer Defendants participate in this conduct because being listed on a PBM Defendant's standard national formulary is a financial boon. Like the insulin market in the United States, the PBM market in the United States is also oligopolistic. The PBM Defendants capture over 75% of the market. Being included on a PBM Defendant's standard national formulary drives higher sales volume and revenue.

9. The PBM Defendants participate in this conduct because their revenue is related to the size of the secret rebates they negotiate. Larger list prices support larger secret rebates because rebates are calculated as a percentage of the list price. Also, the PBM Defendants have a perverse incentive for ever-growing list prices. The PBM Defendants claim they can extract higher rebates due to their market power. If drug list prices grow, demand for their rebate negotiation services increases.

10. In addition to participating in conduct raising list prices, Defendants made misrepresentations about insulin prices and their actions in relation to insulin prices.

11. By increasing the list price of insulin, Defendants harm diabetic Californians who require insulin. They are exposed to insulin's unaffordable list price and do not benefit from the secret rebates.

12. Defendants are liable for the harms caused by their conduct under theories that protect consumers and competition. Defendants' conduct harms diabetic Californians who require insulin without a sufficient counterweighing benefit to them. Additionally, Defendants' conduct runs against several principles of honesty and fair dealing with competitors and consumers, including (a) prohibition on false discounts and prohibition on misleading statements made in furtherance of the false discounts, (b) prohibition on members of oligopolies abusing their market power in order to raise their product prices to unconscionable levels, (c) prohibition on middlemen in product distribution chains with large market share leveraging their market power to obtain secret rebates from manufacturers that are not granted to their smaller middlemen competitors, and (d) prohibition on members of oligopolies adopting practices that facilitate the coordination of price increases.

(Complaint, ¶¶ 1-12.)

The complaint contains two causes of action: (1) violation of the UCL; and (2) unjust enrichment.

Here, PBM Defendants and CVS Health demur to both causes of action.

## LAW

When considering demurrers, courts read the allegations liberally and in context, and "treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (Serrano v. Priest (1971) 5 Cal.3d 584, 591.) "A demurrer tests the pleadings alone and not the evidence or other extrinsic matters. Therefore, it lies only where the defects appear on the face of the pleading or are judicially noticed." (Hahn v. Mirda (2007) 147 Cal.App.4th 740, 747.) It is error "to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (Aubry v. Tri-City Hospital Dist. (1992) 2 Cal.4th 962, 967.)

## DISCUSSION

### *PBM Defendants' RJN*

PBM Defendants seek judicial notice of legislative reports and hearings (exhibits A through E) and rules published in the Federal Register (exhibits F through I).

The Court finds that the RJN should be denied because PBM Defendants failed to submit evidence authenticating the documents.

Alternatively, if defense counsel makes a successful offer of proof at the hearing, the Court's inclination would be to grant the RJN since the documents constitute legislative official acts.

### *Tentative Ruling Re: Manufacturer Defendants' Demurrer*

The Court incorporates the tentative ruling on Manufacturer Defendants' demurrer. For the most part, the analysis there applies equally here.

### *PBM Defendants' Demurrer*

#### Statutes of Limitations

A four-year limitations period applies to the UCL (see Stern, Business and Professions Code Section 17200 Practice (The Rutter Group March 2023 Update) ¶ 5:290), and either a three-year limitations period or a four-year limitations period applies to unjust enrichment. (See Federal Deposit Ins. Corp. v. Dintino (2008) 167 Cal.App.4th 333, 347 [finding a three-year limitations period applicable to fraud-based unjust enrichment]; see also Opposition, p. 33 [arguing that Code of Civil Procedure section 343's four-limitations period should apply because the People's claim is equity-based].)

4

PBM Defendants contend the demurrer should be sustained because both causes of action accrued prior to 2019, more than four years before the People filed their complaint. (See Demurrer, pp. 4-6.)

The People claim the allegations satisfy equitable exceptions, namely, the last-overt-act rule, the continuing-violation doctrine, and the continuous-accrual doctrine. (See Opposition, pp. 29-33.)

Manufacturer Defendants assert that the equitable exceptions do not apply. (See Demurrer, pp. 5-6; see also Reply, pp. 1-3.)

The demurrer is sustained with leave to amend. The complaint alleges a two-part conspiracy between two oligopolies – Manufacturer Defendants and PBM Defendants. In short, the People claim Manufacturer Defendants agree to artificially inflate list prices in order to fund large rebates to PBM Defendants "in exchange for favorable placement on" PBM Defendants' "standard formularies." (Complaint, ¶¶ 6, 7; see also id. at ¶¶ 4-5, 8-9, 62, 133-143, 147-176.) Allegedly, the large rebates "are a percentage of the inflated and artificial list price[s.]" (Id. at ¶ 7.) The problem is that the People's own chart shows prices flatlining since 2018 (see id. at ¶ 130), which, seemingly, if true, could have curtailed, if not ended, the purported rebate scheme. The People need to provide amended allegations to address this discrepancy and to show price increases and actionable conduct during the limitations period. (See Tentative Ruling Re: Manufacturer Defendants' Demurrer, pp. 4-7.)

This ruling applies to all three equitable exceptions. (See ibid.)

**UCL**

*Safe Harbor*

"If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination." (Klein v. Chevron U.S.A., Inc. (2012) 202 Cal.App.4th 1342, 1379 [quoting Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 182].) "When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (Ibid.)

This rule "does not . . . prohibit an action under the unfair competition law merely because some other statute on the subject does not . . . prohibit the challenged conduct." (Ibid.) "To forestall an action under the unfair competition law, another provision must . . . clearly permit the conduct. There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." (Ibid. [instructing that "a statute that does not 'affirmatively permit[ ] [a type of conduct] . . . does not preclude a court from deeming [such] conduct unfair under the unfair competition law'"].) Stated another way, "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair." (BBBB Bonding Corp. v. Caldwell (2021) 73 Cal.App.5th 349, 377.) "[T]o 'qualify for the "safe harbor" rule, the defendant must show that a statute "explicitly prohibit[s] liability for the defendant's acts or omissions" [citation] or "expressly precludes an action based on the conduct."'" (Ibid.) "If a statute does not 'explicitly prohibit liability' for a defendant's specific acts or omissions, the court may not create an 'implied safe harbor.'" (Ibid.)

5

PBM Defendants claim the safe harbor applies because federal and state law "protect[] manufacturers' ability to 'voluntarily make pricing decisions' and PBMs' right 'to negotiate discounts and rebates.'" (Demurrer, p. 8.) In support, PBM Defendants cite 42 U.S.C. sections 1320b-23(b), 1395w-3a(c)(6)(B), and 1396r-8(k)(1)(B)(i)(IV), Health and Safety Code section 127676(b)(2), and Business and Professions Code section 4441(e). (See Demurrer, pp. 7-9; see also Reply, pp. 4-5.)

Sections 1320b-23(b), 1395w-3a(c)(6)(B), and 127676(b)(2) do not help PBM Defendants. (See Tentative Ruling Re: Manufacturer Defendants' Demurrer, pp. 7-11.)

Section 1396r-8(k)(1)(B)(i)(IV) defines "average manufacturer price" and excludes "rebates or discounts" from the definition:

> **(k) DEFINITIONS**
>
> \* \* \*
>
> **(1) AVERAGE MANUFACTURER PRICE**
>
> \* \* \*
>
> **(B) Exclusion of customary prompt pay discounts and other payments**
>
> **(i) In general**
>
> The average manufacturer price for a covered outpatient drug shall exclude –
>
> \* \* \*
>
> **(IV)** payments received from, and rebates or discounts provided to, pharmacy benefit managers, managed care organizations, health maintenance organizations, insurers, hospitals, clinics, mail order pharmacies, long term care providers, manufacturers, or any other entity that does not conduct business as a wholesaler or a retail community pharmacy, unless the drug is an inhalation, infusion, instilled, implanted, or injectable drug that is not generally dispensed through a retail community pharmacy

(42 U.S.C. § 1396r-8, subd. (k)(1)(B)(i)(IV), emphasis in original.)

Section 4441(e) sets certain reporting requirements for PBMs:

> (e) The pharmacy benefit manager shall, on a quarterly basis, disclose, upon the request of the purchaser, the following information with respect to prescription product benefits specific to the purchaser:

6

(1) The aggregate wholesale acquisition costs from a pharmaceutical manufacturer or labeler for each therapeutic category of drugs containing three or more drugs, as outlined in the state's essential health benefits benchmark plan pursuant to Section 1367.005 of the Health and Safety Code.

(2) The aggregate amount of rebates received by the pharmacy benefit manager by therapeutic category of drugs containing three or more drugs, as outlined in the state's essential health benefits benchmark plan pursuant to Section 1367.005 of the Health and Safety Code. The aggregate amount of rebates shall include any utilization discounts the pharmacy benefit manager receives from a pharmaceutical manufacturer or labeler.

(3) Any administrative fees received from the pharmaceutical manufacturer or labeler.

(4) Whether the pharmacy benefit manager has a contract, agreement, or other arrangement with a pharmaceutical manufacturer to exclusively dispense or provide a drug to a purchaser's employees, insureds, or enrollees, and the application of all consideration or economic benefits collected or received pursuant to that arrangement.

(5) Prescription drug utilization information for the purchaser's enrollees or insureds that is not specific to any individual enrollee or insured.

(6) The aggregate of payments, or the equivalent economic benefit, made by the pharmacy benefit manager to pharmacies owned or controlled by the pharmacy benefit manager.

(7) The aggregate of payments made by the pharmacy benefit manager to pharmacies not owned or collected by the pharmacy benefit manager.

(8) The aggregate amount of the fees imposed on, or collected from, network pharmacies or other assessments against network pharmacies, and the application of those amounts collected pursuant to the contract with the purchaser.

(Cal. Bus. & Prof. Code § 4441, subd. (e).)

The Court agrees with the People that neither of these statutes provides a safe harbor as to the price-inflation/rebates conspiracy alleged in the complaint. (See Opposition, pp. 23-26; see also Tentative Ruling Re: Manufacturer Defendants' Demurrer, pp. 7-11 [analyzing safe-harbor issue and conspiracy allegations].)

The demurrer is overruled.

7

*Unfair Prong*

The UCL's unfair prong prohibits unfair business practices. Because the UCL is written in the disjunctive, "a business practice can be 'unfair' . . . even if it is not 'deceptive' and even if it is 'lawful.'" (Stern, supra, at ¶ 3:112.) "The 'unfair' standard is intentionally broad, allowing courts maximum discretion to prohibit new schemes to defraud." (Id. at ¶ 3:113.)

PBM Defendants contend the People's allegations fail under the UCL's balancing test, Federal Trade Commission post-1980 test, and tethering test. (See Demurrer, pp. 16-19; see also Reply, pp. 8-12.)

The Court disagrees. The allegations tend to show a price-collusion/rebate conspiracy between oligopolies. (See, e.g., Complaint, ¶¶ 4-9, 62, 133-143, 147-176.) They pass the tests (assuming, of course, that the People are able to amend to allege misconduct within the limitations period); thus, the demurrer is overruled. (See Tentative Ruling Re: Manufacturer Defendants' Demurrer, pp. 11-12.)

As a result of the People alleging a violation of the unfair prong, the Court does not need to reach the unlawful and fraud prongs. (See Durell v. Sharp Healthcare (2010) 183 Cal.App.4th 1350, 1359 [stating that, "[b]ecause the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition"]; see also Stern, supra, at ¶¶ 3:15-3:16.) The partial-demurrer rule prevents the Court from striking portions of the cause of action.

Nevertheless, the Court offers the following analysis.

*Unlawful Prong*

"[T]he UCL permits a cause of action to be brought if a practice violates some other law. In effect, the 'unlawful' prong . . . makes a violation of the underlying law a per se violation of [section] 17200." (Stern, supra, at ¶ 3:53.) "Virtually any law or regulation – federal or state, statutory or common law – can serve as predicate for" an unlawful claim. (Id. at ¶ 3:56.) "Thus, if a 'business practice' violates any law – literally – it also violates [section] 17200 and may be redressed under that section. [Citation.]" (Ibid.)

The underlying statute highlighted in the complaint is Civil Code section 1770(a)(13), the Consumer Legal Remedies Act ("CLRA"). (See Complaint, ¶ 229 [alleging that "Defendants' acts or practices are unlawful, as that term is used in the UCL, and include, but are not limited to, violating the [CLRA], Civil Code section 1770, subdivision (a), subpart (13), by making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions to analog insulin"].)

The People point out three alleged misstatements that they contend subsection (a)(13) covers:

8

\* in 2017, "CVS Caremark stated that it '[m]anage[s] formulary and leverage competition to negotiate for lowest-net cost' and its 'formulary and utilization management options helped reduce cost for antidiabetic drugs for clients'" (Complaint, ¶ 198; see also Opposition, p. 19);

\* in 2017, an Express Scripts executive told CBS News that "PBMs work to 'negotiate with drug companies to get the prices down'" and that Express Scripts's "mission [is] to make the use of prescription drugs safer and more affordable" (Complaint, ¶¶ 200, 201; see also Opposition, p. 19); and

\* "OptumRX's website" contains "a company video stating that PBMs like OptumRX 'negotiate with drug companies for the best medication prices[.]'" (Complaint, ¶ 202; see also Opposition, p. 19.)

PBM Defendants respond with three arguments. One, "the CLRA has its own safe harbor doctrine that independently bars the State's 'unlawful' claims." (Demurrer, p. 10.) Two, "PBMs engage in financial transactions with sophisticated health-plan clients; they do not transact with consumers or provide 'goods' or 'services' at all." (Ibid.; see also id. at pp. 11-13; Reply, pp. 6-7.) Three, the three alleged misstatements do not include "false or misleading statements about price decreases." (Demurrer, p. 10; see also id. at pp. 13-16; Reply, pp. 7-8.)

The first argument is unavailing. The CLRA safe harbor is inapplicable for the same reasons that the UCL safe harbor is inapplicable.

The second argument is persuasive. "The CLRA broadly applies to any transaction involving the sale or lease of goods or services to a 'consumer.'" (Stern, supra, at ¶ 10:16.) "The CLRA's substantive section . . . prohibits various unfair or deceptive acts . . . 'in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.'" (Ibid.) "The Act broadly defines 'transaction' as 'an agreement between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement.'" (Id. at ¶ 10:18.) "Broad as it is," though, "the CLRA only permits 'consumers' to sue." (Id. at ¶ 10:25.) A "consumer" is "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." (Id. at ¶ 10:26.) The Court's understanding is that PBM Defendants transact with "pharmaceutical manufacturers, health-plan payors, and retail pharmacies[,]" not with individual "consumers." (Demurrer, p. 11.) Given this distinction, the current allegations fail to render the CLRA applicable.

The third argument is also persuasive. The first and second alleged misstatements occurred in 2017; they are time-barred. The third alleged misstatement only concerns OptumRX and is merely a general statement about prescription drugs as opposed to a specific statement about reducing insulin prices. These allegations do not establish a violation of subsection (a)(13).

However, the Court is inclined to overrule the demurrer. The UCL cause of action incorporates all preceding allegations. (See Complaint, ¶ 225.) This means it incorporates the conspiracy allegations. (See, e.g., Complaint, ¶¶ 4-9, 62, 133-143, 147-176.) At the pleading stage, the Court

9

believes a civil conspiracy – the purported price-collusion/rebate scheme – can serve as the predicate. (See Stern, supra, at ¶ 3:56.)

That said, the Court favors granting leave to amend to give the People an opportunity (if they want) to include new statements under subsection (a)(13) and/or facts showing violations of a different underlying statute, common law, etc. (See Tentative Ruling Re: Manufacturer Defendants' Demurrer, p. 14.)

*Fraud Prong*

"The third type of conduct proscribed by [section] 17200 is 'fraudulent' business practices." (Id. at ¶ 3:153.) "A business practice is 'fraudulent' within the meaning of [section] 17200 if 'members of the public are likely to be deceived.'" (Id. at ¶ 3:154.) Indeed, "a plaintiff can prove a prima facie case that a business practice is 'fraudulent' without having to prove intent, scienter, actual reliance, or damage." (Id. at ¶ 3:157.) "Even actual deception is not required." (Ibid.) "If anything, the prohibition against 'fraudulent' business is broad[]" in that "it reaches practices that do not involve advertising [citation] and that involve no untrue statement. [Citation.]" (Id. at ¶ 3:158.)

Paragraph 231 alleges:

> 231. Defendants' acts or practices are fraudulent, as that term is used in the UCL, and include, but are not limited to:
>
> a. artificially inflating the list prices of analog insulin; or
>
> b. making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Manufacturer Defendants to PBM Defendants.

(Complaint, ¶ 231.)

PBM Defendants contend the artificial-inflation claim cannot be asserted against PBM Defendants because the list prices "are set unilaterally and exclusively by" Manufacturer Defendants, "and there is no allegation that" Manufacturer Defendants "misreported them." (Demurrer, p. 20; see also Reply, p. 13.)

PBM Defendants claim the failure-to-disclose-rebating-practices claim fails because the complaint lacks facts showing materiality and a duty to disclose. (See Demurrer, pp. 21-22; see also Reply, pp. 13-14.)

On balance, the demurrer should be overruled. The artificial-inflation and failure-to-disclose-rebating-practices claims are both founded on PBM Defendants' purported civil conspiracy with Manufacturer Defendants – the alleged price-collusion/rebates plot. (See, e.g., Complaint, ¶¶ 4-9, 62, 133-143, 147-176.) According to the complaint, PBM Defendants' own conspiratorial conduct contributed to the inflated insulin pricing. (See id. at ¶¶ 149-162.) The Court agrees with the

10

People that, at this stage, at minimum, the allegations give rise to a duty to disclose and state an omissions-based fraud-prong claim. (See Opposition, pp. 21-22.)[1]

**Unjust Enrichment**

Unjust enrichment is an equitable doctrine. It "is based on the idea that 'one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly.'" (City of Oakland v. Oakland Raiders (2022) 83 Cal.App.5th 458, 478.) "The elements . . . are the 'receipt of a benefit and [the] unjust retention of the benefit at the expense of another.'" (Peterson v. Cellco Partnership (2008) 164 Cal.App.4th 1583, 1593.)

The demurrer is sustained. Unjust enrichment is not a standalone cause of action in the Second District. (See Tentative Ruling Re: Manufacturer Defendants' Demurrer, pp. 14-15.)

The Court grants the People leave to assert a common count for restitution based on unjust enrichment as an alternative in case the UCL cause of action gets dismissed down the road. (See ibid.)

**CVS Health**

CVS Health claims it "is not liable for the acts of its subsidiary[y,]" and the People fail to allege facts sufficient to pierce the corporate veil. (Demurrer, p. 24; see also Reply, p. 15.)

The People disagree. They contend the claims against CVS Health are "based on [CVS Health's] own conduct." (Opposition, p. 34.)

The demurrer is sustained with leave to amend. The People focus on paragraphs 48 and 181. (See ibid.) Paragraph 48 states:

> 48. CVS Health holds itself out as deliberately directing, and is therefore responsible for, CaremarkPCS Health, LLC's forum-related activities. Among other things:
>
> a. Prior to 2014, CVS Health bore the name CVS Caremark Corporation. When announcing its name change in 2014, CVS Health stated that its PBM services would continue to be known as "CVS/Caremark."
>
> b. CVS Health continues to use CVS Caremark to refer to its PBM services on its website and in other locations.

---

[1] To the extent the People intend to rely on the three alleged CLRA misstatements to allege a fraud-prong claim, the Court disagrees. Again, to the alleged misstatements are time-barred, and the third alleged misstatement does not specifically regard insulin prices.

11

    c. The website located at www.caremark.com bears the name CVS Caremark. The website is interactive. Among other things, it allows customers to enter personal information, such as addresses.

    d. CVS Health states in its filings with the U.S. Securities and Exchange Commission that its "Pharmacy Services segment provides a full range of PBM solutions, including plan design offerings and administration, formulary management, retail pharmacy network management services and mail order pharmacy."

    e. Likewise, CVS Health has stated that as part of its PBM services CVS Health: (a) designs pharmacy benefit plans; and (b) negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists.

(Complaint, ¶ 48.) Paragraph 181 states: "Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified to similar concerns. He stated, 'A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans.'" (Id. at ¶ 181.) These allegations do not show direct misconduct by CVS Health or that "CVS Health performs the challenged PBM services." (Reply, p. 15.) Additional facts need to be added.[2]

It is so Ordered.

Date: 6/18/2024

_David S. Cunningham III_

DAVID S. CUNNINGHAM III

---

[2] Mississippi ex rel. Fitch v. Eli Lilly and Co. (S.D.Miss. Aug. 29, 2022, No. 3:21-CV-674-KHJ-MTP) 2022 WL 18401603 ("Fitch") is distinguishable. (See Opposition, p. 34 [claiming the Fitch court found that similar allegations stated a claim against CVS Health under Mississippi law].) The Fitch complaint "alleged that CVS Health ... publicly represented that it constructs programs to lower the cost of the *at-issue diabetes medications*." (Fitch, supra, 2022 WL 18401603, at *5, emphasis added.) Paragraph 48 is broader and vaguer. It has a general reference to "many of the products on CVS Health's drug lists" but does not have a specific reference to insulin. (Complaint, ¶ 48.)

12