Exhibit C

1   ROB BONTA
    Attorney General of California
2   NELI PALMA
    Acting Senior Assistant Attorney General
3   EMILIO VARANINI
    Supervising Deputy Attorney General
4   DARCIE TILLY (SBN 239715)
    JOHN OHANESIAN (SBN 258938)
5   RYAN MCEWAN (SBN 285595)
    LAUREN ZWEIER (SBN 291361)
6   Deputy Attorneys General
      600 West Broadway, Suite 1800
7   San Diego, CA 92101
    P.O. Box 85266
8   San Diego, CA 92186-5266
    Telephone:  (619) 738-9559
9   Facsimile:  (619) 645-2012
    E-mail:  Darcie.Tilly@doj.ca.gov          *[EXEMPT FROM FILING FEES*
10                                            *PURSUANT TO GOVERNMENT CODE*
    *Attorneys for the People of the State of California*   *SECTION 6103]*
11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                      COUNTY OF LOS ANGELES

14

15
    PEOPLE OF THE STATE OF CALIFORNIA,       Case No. 23STCV00719
16
                                Plaintiff,   **FIRST AMENDED COMPLAINT FOR**
17                                           **PERMANENT INJUNCTION, CIVIL**
                    v.                       **PENALTIES, DISGORGEMENT, AND**
18                                           **OTHER EQUITABLE RELIEF**
    ELI LILLY AND COMPANY; NOVO
19  NORDISK INC.; SANOFI-AVENTIS U.S.        (Bus. & Prof. Code, § 17200, *et seq.*)
    LLC; CAREMARKPCS HEALTH, LLC;
20  CVS HEALTH CORP.; EXPRESS SCRIPTS,       [Verified Answer Required Pursuant to Civ.
    INC.; OPTUMRX, INC.; and DOES 1          Proc. Code, § 446]
21  through 100, inclusive,
                                             **Public-Redacts materials from**
22                              Defendants.   **conditionally sealed record**

23

24

25

26

27

28

**TABLE OF CONTENTS**

| | | | | Page |
|---|---|---|---|---|
| I. | | INTRODUCTION | | 5 |
| II. | | THE PARTIES | | 8 |
| | A. | The Plaintiff | | 8 |
| | B. | Defendants | | 8 |
| | | 1. | Manufacturer Defendants | 8 |
| | | | a. Eli Lilly | 8 |
| | | | b. Novo Nordisk | 9 |
| | | | c. Sanofi | 10 |
| | | 2. | PBM Defendants | 10 |
| | | | a. CVS Caremark | 11 |
| | | | b. Express Scripts | 12 |
| | | | c. OptumRx | 13 |
| | | 3. | Doe Defendants | 13 |
| | | 4. | Civil Conspiracy | 13 |
| III. | | JURISDICTION AND VENUE | | 14 |
| IV. | | BACKGROUND INFORMATION | | 14 |
| | A. | Diabetes In General | | 14 |
| | | 1. | The Prevalence Of Diabetes In California | 15 |
| | | 2. | The Discovery Of Insulin Over A Century Ago And The Development Of Modern Analog Insulin | 16 |
| | | 3. | The Analog Insulin Market Is Not A Freely Competitive Market | 18 |
| | | | a. There Are Significant Barriers To Entry For The Analog Insulin Market | 18 |
| | | | b. The Three Manufacturer Defendants Dominate The Insulin Market | 19 |
| | B. | How Consumers Obtain And Pay For Their Insulin | | 20 |
| | | 1. | Price-Setting And The Drug Distribution Chain | 21 |
| | | 2. | The Role Of Insurance On The Prices Consumers Pay For Drugs At Pharmacies | 22 |
| | | 3. | The Role Of PBMs On What Drug Insurers Cover And What Rebates Manufacturers Pay | 24 |
| | | | a. The PBM Market Is Highly Concentrated | 24 |
| | | | b. The PBM Defendants' Standard Formularies | 25 |
| | | | c. The PBM Defendants' Rebate Negotiations And Contracts, And The Secrecy Of The Rebates | 26 |

**TABLE OF CONTENTS**
(continued)

Page

V. THE DEFENDANTS ARTIFICIALLY INFLATE, MAINTAIN, AND
CONTROL THE PRICE OF ANALOG INSULIN........................................................ 27

    A. The Manufacturer Defendants Significantly Inflated Analog Insulin's List
Price In Lockstep With Each Other ..................................................................... 27

    B. The Manufacturer Defendants Artificially Maintain The Price Of Analog
Insulin................................................................................................................... 30

    C. The Manufacturer Defendants Artificially Control The Price Of Analog
Insulin Despite The Entrance Of Alternatives That Should Have Lowered
Prices.................................................................................................................... 32

    D. The PBM Defendants Drive The Artificial Inflation, Maintenance, And
Control Of The List Price Of Analog Insulin Through Rebates ........................... 34

        1. The Amount Of Rebates Paid On Analog Insulin Has Grown ................. 34

        2. Rebates Are Correlated To List Price Increases ....................................... 35

        3. The Manufacturer Defendants Agree To Pay The PBM Defendants
Large, Secret Rebates For Preferential Formulary Placement................. 35

        4. The PBM Defendants Facilitated Horizontal Rebate Information
Exchanges For The Manufacturer Defendants.......................................... 39

    E. The Price Of The Manufacturer Defendants' Analog Insulin Is Artificial ........... 39

        1. Analog Insulin's Price In The United States Is Not Justified By
Manufacturers' Costs Or Improvements In Insulin .................................. 40

        2. Consumers In The United States Pay Exorbitant Prices For Analog
Insulin Compared To Other Countries...................................................... 40

        3. Large, Secret Insulin Rebates Benefit Defendants................................... 42

            a. The Manufacturer Defendants Benefit From Large, Secret
Insulin Rebates ............................................................................. 42

            b. The PBM Defendants Benefit From Large, Secret Insulin
Rebates .......................................................................................... 42

    F. Defendants Know The Price Of Analog Insulin Is Too High............................... 44

VI. DEFENDANTS MAKE MISLEADING STATEMENTS TO SUPPORT AND
FURTHER THE INFLATION OF ANALOG INSULIN'S ARTIFICIAL LIST
PRICE ............................................................................................................................ 45

    A. The Manufacturer Defendants' Misleading Statements About Insulin's List
Price...................................................................................................................... 45

        1. The Manufacturer Defendants Misrepresent That Insulin List Price
Increases Are Unimportant Due to Alleged Declining Net Prices........... 45

        2. The Manufacturer Defendants Misrepresent Their Efforts To
Control Insulin Price Increases And Address Consumer
Affordability............................................................................................. 46

    B. The PBM Defendants' Misleading Statements About Insulin's List Price........... 48

**TABLE OF CONTENTS**
(continued)

Page

VII. CONSUMERS ARE HARMED BY EXPOSURE TO INSULIN'S INFLATED
CASH PRICE.................................................................................................... 49

    A. Diabetics Cannot Avoid Paying Excessive Amounts Due To Insulin's
Inflated And Artificial List Price ........................................................ 50

    B. Many Diabetics Who Require Insulin Cannot Afford Their Insulin,
Exacerbating The Harm Due To Insulin's Inflated And Artificial Price ............. 51

VIII. TOLLING OF THE STATUTE OF LIMITATIONS ....................................... 53

FIRST CAUSE OF ACTION (BUSINESS AND PROFESSIONS CODE SECTION
17200) ................................................................................................................. 54

SECOND CAUSE OF ACTION (COMMON COUNT - RESTITUTION) ............................... 56

PRAYER FOR RELIEF ........................................................................................... 56

-4-

**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, DISGORGEMENT, AND OTHER
EQUITABLE RELIEF (PUBLIC - REDACTED VERSION)**

Plaintiff, the People of the State of California, by and through Rob Bonta, Attorney General of the State of California, alleges the following on information and belief:

## I.    INTRODUCTION

1.    Millions of Californians suffer from diabetes. For many diagnosed with this condition, access to insulin to regulate their blood sugar levels is a matter of life and death. Yet, the excessive price of insulin undermines their access to this century-old, life-sustaining drug.

2.    Inexplicably, list prices for insulin have risen several hundred percent over the last two decades. California diabetics who require insulin to survive and who are exposed to insulin's full artificially inflated and unconscionably high price, such as uninsured consumers and consumers with high-deductible insurance plans, pay thousands of dollars per year for insulin.

3.    The excessive price of insulin disproportionately harms low-income communities who must choose between paying for insulin or everyday necessities, such as housing and food. To stretch dollars and insulin supplies, many Californians turn to the dangerous practice of rationing insulin or skipping doses despite the severe risks of loss of sight, limbs, or death. These harms are further compounded for Black, Hispanic, and low-income communities in California as they are more likely to be diagnosed with diabetes and to be uninsured or underinsured.

4.    The United States insulin market is an oligopoly. The defendants include three insulin manufacturers (Manufacturer Defendants)—Eli Lilly, Novo Nordisk, and Sanofi—who make nearly all of the insulin sold in the United States.

5.    Also named as defendants are the three pharmacy benefit managers (PBM Defendants) that dominate the PBM market—CVS Caremark, Express Scripts, and OptumRx. PBMs are entities that administer prescription drug programs, which are a part of the essential benefits that health insurance plans must cover. One aspect of the PBMs' role is determining the prescription drugs a given health insurance plan covers (known as a formulary). Another aspect of the PBMs' role is negotiating confidential contracts that provide for post-sale discounts (rebates) that a drug manufacturer will provide to the PBM, not the consumer, if a consumer fills a prescription for the manufacturer's drug.

6.      The conduct at issue in this First Amended Complaint (Complaint) has two main components. The first component is the Manufacturer Defendants inflating, maintaining, and controlling, the price of insulin at artificially high and unconscionable amounts. The second component is the PBM Defendants favoring insulins with higher prices over lower-priced insulins on standard formularies due to inflated rebates and administrative fees associated with higher-priced insulins.

7.      With respect to the first component: the Manufacturer Defendants aggressively raised the list price of insulin in lockstep with each other, exceeding inflation, to artificial and unconscionable levels. The Manufacturer Defendants thereafter have maintained, and controlled, their insulin prices in parallel with each other at artificial and unconscionable levels, through at least the filing of this action on January 12, 2023. The artificial and unconscionably high price of analog insulin is not justified by advances in the efficacy of the drugs or the cost of manufacturing. Insulin costs less than $10 a month to manufacture and its development costs have long been recouped.

8.      With respect to the second component: the PBM Defendants obtain significant secret rebates and fees, which are a percentage of the artificial and unconscionable list price, from the Manufacturer Defendants in exchange for favorable placement on the PBMs' standard formularies. This rebating strategy incentivized the Manufacturer Defendants to raise their list prices high and higher, in lock step, by rewarding the Manufacturer Defendants with the highest list prices and highest rebates with favorable placement on their standard formularies. This rebating strategy also has obstructed the price relief that might otherwise be seen from the introduction of new, lower priced, insulin products. During the period when the price of analog insulin has been unconscionably high, flat, and parallel, newer lower list priced insulins have become available. Yet, the PBM Defendants have not placed these lower list priced insulins on favorable positions on their standard formularies. Instead, the PBM Defendants have rewarded the Manufacturers Defendants' artificial and unconscionable prices with favorable formulary placement. Ongoing through at least January 12, 2023, the PBM Defendants' standard

1  formularies promote high list-price insulin products over lower list-price insulins in California

2  and nationwide.

3      9.      The Manufacturer Defendants participate in this conduct and conspiracy because

4  being listed on a PBM Defendant's standard national formulary is a financial boon. Like the

5  insulin market in the United States, the PBM market in the United States is also oligopolistic. The

6  PBM Defendants capture approximately 80% of the market. Being included on a PBM

7  Defendant's standard national formulary drives higher sales volume and revenue.

8      10.     The PBM Defendants participate in this conduct and conspiracy because their

9  revenue is related to the size of the secret rebates they negotiate. Larger list prices support larger

10  secret rebates because rebates are calculated as a percentage of the list price. Also, the PBM

11  Defendants have a perverse incentive for high list prices. The PBM Defendants claim they can

12  extract higher rebates due to their market power. If drug list prices grow and then remain inflated,

13  demand for their rebate negotiation services increases.

14      11.     In addition to participating in conduct raising list prices, and then maintaining and

15  controlling those prices, Defendants make misrepresentations about insulin prices and their

16  actions in relation to insulin prices.

17      12.     By increasing the list price of insulin, and maintaining and controlling it at an

18  artificially inflated and unconscionable price, Defendants harm diabetic Californians who require

19  insulin. They are exposed to insulin's unaffordable list price and do not benefit from the secret

20  rebates.

21      13.     Defendants are liable for the harms caused by their conduct under theories that

22  protect consumers and competition. Defendants' conduct harms diabetic Californians who require

23  insulin without a sufficient counterweighing benefit to them. Additionally, Defendants' conduct

24  runs against several principles of honesty and fair dealing with competitors and consumers,

25  including (a) prohibition on false discounts and prohibition on misleading statements made in

26  furtherance of the false discounts, (b) prohibition on members of oligopolies abusing their market

27  power in order to raise their product prices to unconscionable levels, (c) prohibition on

28  middlemen in product distribution chains with large market share leveraging their market power

-7-

to obtain secret rebates from manufacturers that are not granted to their smaller middlemen competitors, and (d) prohibition on members of oligopolies adopting practices that facilitate the coordination of price increases.

14. Defendants' actions therefore constitute unlawful, unfair, and deceptive acts and practices prohibited by the Unfair Competition Law (UCL), Business and Professions Code section 17200, and Defendants have received a benefit at the expense of the People that in equity and good conscience should be returned to the People.

## II. THE PARTIES

### A. The Plaintiff

15. Plaintiff is the People of the State of California. Rob Bonta is the Attorney General of the State of California and the chief law enforcement officer of the State under the California Constitution, article V, section 13.

### B. Defendants

16. Collectively, the Manufacturer Defendants, PBM Defendants, and Doe defendants (as defined below) are referred to as "Defendants."

#### 1. Manufacturer Defendants

17. Collectively, Eli Lilly, Novo Nordisk and Sanofi (as defined below) are referred to as "Manufacturer Defendants."

##### a. Eli Lilly

18. Defendant Eli Lilly and Company (Eli Lilly) is an Indiana Corporation. Eli Lilly states its principal place of business is at Lilly Corporate Center, Indianapolis, Indiana, 46285.

19. Several of Eli Lilly's pharmaceutical products are insulins, including products with insulin lispro and insulin glargine as the primary active ingredients.

20. Eli Lilly is registered to do business in California.

21. Eli Lilly has a research center in San Diego, California.

22. Eli Lilly holds three active wholesaler and nonresident wholesaler permits with the California Pharmacy Board (License Nos. OSD 5372, WLS 467, OSD 6920). These permits allow Eli Lilly to manufacture, distribute, and sell its insulins in California.

-8-

23.     Eli Lilly employs sales representatives throughout California to promote and sell its insulin products.

24.     Eli Lilly directs advertising and informational materials, including through the internet and telephone, to California physicians, payers, and diabetics for the specific purpose of selling more insulin in California.

25.     Eli Lilly attends conferences in California and promotes its insulins at those conferences.

26.     At all relevant times, Eli Lilly transacted and continues to transact business in California, including Los Angeles County.

### b.     Novo Nordisk

27.     Defendant Novo Nordisk Inc. (Novo Nordisk) is a Delaware corporation. Novo Nordisk states its principal place of business is at 800 Scudders Mill Road, Plainsboro, New Jersey, 08536.

28.     Several of Novo Nordisk's pharmaceutical products are insulins, including products with insulin aspart and insulin detemir as the primary active ingredients.

29.     Novo Nordisk is registered to do business in California.

30.     Novo Nordisk has a research center in the San Francisco Bay Area.

31.     Novo Nordisk employs sales representatives throughout California to promote and sell its insulin products.

32.     Novo Nordisk directs advertising and informational materials, including through the internet and telephone, to California physicians, payers, and diabetics for the specific purpose of selling more insulin.

33.     Novo Nordisk attends conferences in California and promotes its insulins at those conferences.

34.     At all relevant times, Defendant Novo Nordisk transacted and continues to transact business in California, including Los Angeles County.

### c. Sanofi

35.     Defendant Sanofi-Aventis U.S. LLC (Sanofi) is a Delaware limited liability company. Sanofi states its principal place of business is at 55 Corporate Drive, Bridgewater, New Jersey, 08807.

36.     Several of Sanofi's pharmaceutical products are insulins, including products with insulin lispro, insulin glulisine, and insulin glargine as the primary active ingredients.

37.     Sanofi holds an active nonresident wholesaler permits with the California Pharmacy Board (License Nos. OSD 5471). These permits allow Sanofi to manufacture, distribute, and sell its insulins in California.

38.     Sanofi employs sales representatives throughout California to promote and sell its insulin products.

39.     Sanofi directs advertising and informational materials, including through the internet and telephone, to California physicians, payers, and diabetics for the specific purpose of selling more insulin.

40.     Sanofi attends conferences in California and promotes its insulins at those conferences.

41.     At all relevant times, Sanofi transacted and continues to transact business in California, including Los Angeles County.

### 2.     PBM Defendants

42.     Collectively, CVS Caremark, Express Scripts, and OptumRx (as defined below) are referred to as "PBM Defendants."[1]

_____

[1] As discussed more fully in the body of the Complaint, this lawsuit relates to the unlawful, unfair, and fraudulent inflation of insulin's price and the relationship of that inflation to the PBM Defendants' market power. It does not challenge the creation of custom formularies for a federal officer, such as for any Federal Employees Health Benefits Act or TRICARE governed health benefits plan. Furthermore, it does not seek to recover moneys paid by the federal government pursuant to such plans, nor does it seek the recovery of federally mandated co-pays that were paid by such plans' patients. As such, the Complaint does not seek relief from any PBM Defendants that is governed by or available pursuant to any claim(s) involving a federal officer associated with any Federal Employees Health Benefits Act or TRICARE-governed health benefits plan.

### a. CVS Caremark

43.     Defendant CaremarkPCS Health, LLC is a Delaware limited liability company. CaremarkPCS Health, LLC states its principal place of business is One CVS Drive, Woonsocket, Rhode Island, 02895.

44.     CaremarkPCS Health, LLC is registered to do business in California.

45.     CaremarkPCS Health, LLC is registered as a PBM with California's Department of Managed Health Care.

46.     CaremarkPCS Health, LLC enters rebate contracts with Defendants Eli Lilly, Novo Nordisk, and Sanofi related to the purchase of insulins.

47.     Defendant CVS Health Corporation (CVS Health) is a Delaware limited liability company. CVS Health states its principal place of business is One CVS Drive, Woonsocket, Rhode Island, 02895.

48.     CaremarkPCS Health, LLC is a wholly owned subsidiary of CVS Health.

49.     CVS Health holds itself out as deliberately directing, and is therefore responsible for, CaremarkPCS Health, LLC's forum-related activities. Among other things:

        a.   Prior to 2014, CVS Health bore the name CVS Caremark Corporation. When announcing its name change in 2014, CVS Health stated that its PBM services would continue to be known as "CVS/Caremark."

        b.   CVS Health continues to use CVS Caremark to refer to its PBM services on its website and in other locations.

        c.   The website located at www.caremark.com bears the name CVS Caremark. The website is interactive. Among other things, it allows customers to enter personal information, such as addresses.

        d.   CVS Health states in its filings with the U.S. Securities and Exchange Commission that its "Pharmacy Services segment provides a full range of PBM solutions, including plan design offerings and administration, formulary management, retail pharmacy network management services and mail order pharmacy."

e. Likewise, CVS Health has stated that as part of its PBM services CVS Health: (a) designs pharmacy benefit plans; and (b) negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists.

f. CVS Health Corporation is defined as the contracting entity for the Terms of Use associated with www.cvshealth.com. The effective date of the Terms of Use is August 9, 2016. As described in paragraphs 228 - 229, and 241, *infra*, there are statements on www.cvshealth.com regarding drug prices and rebates.

50. Defendants CaremarkPCS Health, LLC and CVS Health are referred to as "CVS Caremark."

51. At all relevant times, CVS Caremark transacted and continues to transact business in California, including Los Angeles County.

**b.    Express Scripts**

52. Defendant Express Scripts, Inc. (Express Scripts) is a Delaware corporation. Express Scripts states its principal place of business is at 1 Express Way, St. Louis, Missouri, 63121.

53. Express Scripts describes itself as a PBM serving more than 100 million Americans.

54. Express Scripts is registered to do business in California.

55. Express Scripts is a registered PBM with California's Department of Managed Health Care.

56. Express Scripts enters rebate contracts with Eli Lilly, Novo Nordisk, and Sanofi related to the purchase of insulins.

57. At all relevant times, Express Scripts transacted and continues to transact business in California, including Los Angeles County.

### c. OptumRx

58.     Defendant OptumRx, Inc. (OptumRx) is a California corporation. OptumRx states its principal place of business is at 11000 Optum Circle, Eden Prairie, MN 55344.

59.     OptumRx is a registered PBM with California's Department of Managed Health Care.

60.     OptumRx enters rebate contracts with Eli Lilly, Novo Nordisk, and Sanofi related to the purchase of insulins.

61.     At all relevant times, OptumRx transacted and continues to transact business in California, including Los Angeles County.

### 3.     Doe Defendants

62.     Plaintiff is not aware of the true names and capacities of defendants sued herein as Does 1 through 100, inclusive, and, therefore, sues these defendants by such fictitious names. Each fictitiously named defendant is responsible in some manner for the violations of law alleged. Plaintiff will amend this Complaint to add the true names of the fictitiously named defendants once they are discovered. Whenever reference is made in this Complaint to "Defendants," such reference shall include Does 1 through 100 as well as the named defendants.

### 4.     Civil Conspiracy

63.     The Manufacturer Defendants—Eli Lilly, Novo Nordisk, and Sanofi—separately conspire with each PBM Defendant—CVS Caremark, Express Scripts, and OptumRx—to reap supra-competitive prices, which the Manufacturer Defendants share with the PBM Defendants in the form of secret rebates and administrative fees, and to commit the violations alleged in this Complaint. Specifically, Manufacturer Defendant Eli Lilly separately conspires with each PBM Defendant to artificially inflate the list prices of Eli Lilly's insulin products, and then maintain and control the prices at those artificially and unconscionably high levels while agreeing to provide secret rebates to each PBM Defendant in an attempt to obtain preferred positions on the respective PBM Defendant's standard drug formularies. Likewise, Novo Nordisk separately conspires with each PBM Defendant to artificially inflate the list prices of Novo Nordisk's insulin products, and then maintain and control the prices at those artificially and unconscionably high

-13-

levels, while agreeing to provide secret rebates to each PBM Defendant in an attempt to obtain preferred positions on the respective PBM Defendant's standard drug formularies. Finally, Sanofi separately conspires with each PBM Defendant to artificially inflate the list prices of Sanofi's insulin products, and then maintain and control the prices at those artificially and unconscionably high levels, while agreeing to provide secret rebates to each PBM Defendant in an attempt to obtain preferred positions on the respective PBM Defendant's standard drug formularies. Each Defendant has committed overt acts in furtherance of their respective conspiracies, including within the limitations period as described in paragraphs 258 - 259, *infra*. Defendants' conduct, and each conspiracy, continues to at least the initial filing of the original Complaint in this action on January 12, 2023. The parties to each conspiracy are jointly and severally liable for the harm resulting from that particular conspiracy.

## III.    JURISDICTION AND VENUE

64.    This Court has original jurisdiction over this action pursuant to California Constitution article VI, section 10. Plaintiff's claims brought under the UCL, Business and Professions Code section 17200, *et seq.*, and for restitution, arise under the laws of the State of California, are not preempted by federal law, do not challenge conduct within any federal agency's exclusive domain, and are not statutorily assigned to any other trial court.

65.    Defendants engage in substantial business in or affecting the State of California, and the injuries sustained because Defendants' illegal conduct occurred and are occurring in part in California, rendering jurisdiction over Defendants proper.

66.    Venue in Los Angeles County Superior Court is proper pursuant to Code of Civil Procedure section 393, subdivision (a), because many of the acts giving rise to the claims asserted herein were committed in Los Angeles County and many of the injuries that have been sustained as a result of Defendants' illegal conduct occurred in part in Los Angeles County.

## IV.    BACKGROUND INFORMATION

### A.    Diabetes In General

67.    Diabetes is a health condition classified by chronic high blood sugar (called hyperglycemia). After eating, the human body breaks down food into sugar (glucose) and releases

the glucose into the bloodstream. When blood glucose levels rise, the pancreas releases insulin. Insulin instructs cells in the body to use blood glucose for energy.

68. The two main types of diabetes are type 1 and type 2.[2] According to the 2020 National Diabetes Statistics Report by the Centers for Disease Control and Prevention (CDC), approximately 5-10% of the total population diagnosed with diabetes have type 1 diabetes and the vast majority (90-95%) have type 2 diabetes.

69. Type 1 diabetes is thought to be caused by an autoimmune reaction, where the body attacks itself by mistake and kills the pancreas cells that produce insulin. Type 1 diabetes typically develops during childhood or adolescence but can develop at any age. There is no known way to prevent type 1 diabetes and there is no cure.

70. With type 2 diabetes, the body does not use insulin well and cannot keep blood sugar at normal levels. Type 2 diabetes is a progressive disease that usually develops over many years and is usually diagnosed in adults, although it can be diagnosed earlier.

71. Untreated type 1 diabetes triggers diabetic ketoacidosis. Diabetic ketoacidosis causes complications, including brain swelling, cardiac arrest, and kidney failure. These complications are acute. Untreated diabetic ketoacidosis is fatal in less than a week.

72. Over time, hyperglycemia from untreated type 2 diabetes can lead to heart disease, kidney disease, nerve damage (requiring amputation or causing blindness), and other problems with feet, oral health, vision, hearing, and mental health. These chronic conditions may cause premature death.

73. According to the American Diabetes Association, nationwide, average medical expenses are 2.3 times higher for those with diabetes. One national study indicates that improving medication adherence among people with diabetes could prevent nearly 700,000 emergency department visits, 341,000 hospitalizations, and save $4.7 billion annually.

### 1. The Prevalence Of Diabetes In California

74. Approximately 3 million Californians have diabetes. This is approximately 10% of the State's adult population.

_____
[2] There are other types of diabetes, including gestational and cystic fibrosis-related diabetes.

75.     According to the California Department of Public Health, the majority of persons with diabetes in the State are type 2 diabetics.

76.     The burden of diabetes is not equally distributed in California. The prevalence of type 2 diabetes increases with age; from one in twelve Californians under the age of 65, to one in six Californians over the age of 65. Also, when compared to White Californians, Hispanic and Black people are twice as likely to be diagnosed with type 2 diabetes and twice as likely to die as a result of complications from type 2 diabetes.

### 2.     The Discovery Of Insulin Over A Century Ago And The Development Of Modern Analog Insulin

77.     Until the early 1920s, type 1 diabetes was a fatal disease. In 1922, animal-derived insulin was first used to treat diabetes. The inventors assigned their patent rights to the University of Toronto for $1 each, reasoning that "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly." One of the inventors, Sir Frederick Banting, MD, stated that "[i]nsulin does not belong to me, it belongs to the world."

78.     After acquiring the patent rights, the University of Toronto contracted with Manufacturer Defendants Eli Lilly and Novo Nordisk to scale their production and distribute insulin to the millions of people diagnosed with diabetes around the globe.

79.     In 1978, a synthetic human insulin was developed by the City of Hope National Medical Center in Duarte, California, and Genentech, Inc. in South San Francisco, California. Compared to animal-derived insulin, human insulin is cheaper to mass-produce and causes fewer allergic reactions.

80.     The first human insulin was licensed to Defendant Eli Lilly and brought to market in 1982 as "Humulin."

81.     Later in the 1980s, Novo Nordisk launched its own human insulin, "Novolin."

82.     The advent of human insulin led to the decline in the use of the animal-based insulin products, which were subsequently removed from the United States market.

83. In the 1990s and early 2000s, scientists modified the structure of human insulin. These altered forms of human insulin are called "analogs" because they are analogous to the human body's natural pattern of insulin release.[3]

84. Today, insulin is categorized by whether the insulin is analog or human, how quickly it acts (onset), and how long it lasts before it wears off (duration). Rapid-acting analogs (categorized as prandial) are typically used before mealtime to control glucose spikes after meals. Long-acting analogs (categorized as basal) are used once or twice a day and help overnight glucose control. Variations of both rapid and long-acting insulins are offered by the Manufacturer Defendants, including, but not limited to:

| Type | Insulin Analog Molecule | Brand Name | Company | FDA Approval Year |
|---|---|---|---|---|
| Rapid-acting | insulin lispro | Humalog | Eli Lilly | 1996 |
| | insulin aspart | NovoLog | Novo Nordisk | 2000 |
| | insulin glulisine | Apidra | Sanofi | 2004 |
| Long-acting | insulin glargine | Lantus | Sanofi | 2000 |
| | insulin detemir | Levemir | Novo Nordisk | 2005 |
| | insulin degludec | Tresiba | Novo Nordisk | 2015 |

85. The large majority of insulin presently used in the United States is analog insulin and not human insulin. In 2000, 96% of insulin users used human insulin versus 19% using analog insulin. By 2010, the ratio had switched; only 15% of patients used human insulin while 92% used analog insulin. In 2017, less than 10% of the units of insulin dispensed under Medicare Part D were human insulins.

86. The People bring this action to challenge Defendants' conduct with respect to analog insulins and the Manufacturer Defendants' various rapid and long-acting insulin treatments.[4]

87. A typical vial of insulin contains 10 mL, or 1,000 "units" of insulin, although other concentrations are available. A typical injection pen of insulin contains 3 mL, or 300 "units" of

---

[3] While human insulins like Novolin and Humulin are available over-the-counter (OTC) without a prescription, analog insulin requires a prescription.

[4] The insulins discussed in this Complaint are injectable; inhaled insulin has failed to gain popular acceptance in the United States.

insulin. A diabetic who requires insulin will typically need 2,000 to 3,000 units of insulin per month, sometimes more, with the type of insulin needed depending on the type of diabetes the consumer has. A type 1 diabetic will require both rapid and long-acting insulins. Reports suggest that about 30% of type 2 diabetics require insulin.

88.     Many rapid-acting insulin analogs are similar enough to be therapeutically equivalent. Likewise, long-acting analog insulins are similar enough to be therapeutically equivalent.

### 3.     The Analog Insulin Market Is Not A Freely Competitive Market

89.     An oligopoly is a market in which a few sellers dominate the sales of a product and where entry of new sellers is difficult or impossible. The analog insulin market is such a market.

#### a.     There Are Significant Barriers To Entry For The Analog Insulin Market

90.     The United States patent and FDA regulatory approval process imposes significant cost and legal barriers to entry that make it difficult for new entrants to sell analog insulin in the United States and in California.

91.     A patent, issued by the U.S. Patent and Trademark Office (USPTO), grants an inventor the right, for a limited time, to exclude others from making, using, offering for sale, or selling the invention in the country and importing it to the United States. Through patent rights, a manufacturer that develops (or originates) a drug and secures a patent can exclude a follow-on, "copy-cat" drug during the period of exclusivity granted by the USPTO.

92.     Until recently, most analog insulin products were protected by USPTO-issued patent exclusivity. USPTO patent protection on the insulin analog molecules expired in 2013 for insulin lispro, in 2014 for insulin aspart, in 2015 for insulin glargine, in 2018 for insulin glulisine, and in 2019 for insulin detemir.

93.     The Food, Drug, and Cosmetic Act (FDCA) provides additional legal barriers to entry. The FDCA prohibits introducing "any new drug" into interstate commerce without prior approval by the FDA. (21 U.S.C., § 355, subd. (a).) Currently, there are several regulatory paths

-18-

through which new drugs may obtain FDA approval. One path is the submission of a "new drug application" or NDA. (21 U.S.C., § 355, subd. (b).) After the FDA approves the originator drug (brand product), other companies may seek approval to market a copy-cat drug (generic product) by filing an "abbreviated new drug application" or ANDA. (*Id.*, § 355, subd. (j).)

94. Different rules apply to the subset of drugs that are biological products. Unlike small molecule drugs which are chemically synthesized, biologic drug products are typically produced through natural processes, such as extraction from living cells. Under the Public Health Service Act, a company that seeks to market a new biologic must receive approval of a biological license application from the FDA. (42 U.S.C., § 262, subd. (a)(1).) Still, similar to small molecule drugs, once the FDA has approved the originator biologic, other companies may market a copy-cat drug (a biosimilar) after the approval of an abbreviated biological license application. (*Id.*, § 262, subd. (k).)[5]

95. The definition of biologic has changed over time. Prior to March 2020, insulin products were approved via the NDA/ANDA pathway. Since March 2020, insulin products are approved via the biologic/biosimilar framework.

96. In addition to imposing legal hurdles, the FDA approval pathway imposes significant costs. The investment needed for a generic is reportedly two years and $1 to $4 million, whereas a biosimilar requires over seven years and $100 million.

      **b.   The Three Manufacturer Defendants Dominate The Insulin Market**

97. The insulin market is highly concentrated. Three companies, Defendants Eli Lilly, Novo Nordisk, and Sanofi, manufacture the majority of the insulin sold in United States and the

---

[5] A difference between generics and biosimilars also deals with a pharmacist's ability to substitute medications. Generally, a pharmacist filling a prescription for a brand-name small molecule drug may typically substitute it with a generic without the patient's doctor writing a new prescription. (Bus. & Prof. Code, § 4073.) However, a pharmacist filling a prescription for a biologic drug may not substitute it with a biosimilar drug without the patient's doctor writing a new prescription. With biologic drugs, a pharmacist can only substitute drugs if the biosimilar has also been determined to be an "interchangeable" biosimilar by the FDA. (Bus. & Prof. Code, § 4073.5.) The FDA requires additional data for a biosimilar to be deemed an interchangeable biosimilar. (42 U.S.C., § 262, subd. (k)(4).)

world. By the early 2000s, Defendants Eli Lilly, Novo Nordisk, and Sanofi collectively captured over 95% of the insulin market globally.

98. In October 2020, according to a health and legal policy research fellow from Yale Law School, the Manufacturer Defendants' global insulin market shares were as follows:

| Manufacturer Defendant | Global Market Share (by volume) | Global Market Share (by revenue) |
|---|---|---|
| Eli Lilly | 23% | 23% |
| Novo Nordisk | 52% | 41% |
| Sanofi | 17% | 32% |

99. For years, through 2020, the Manufacturer Defendants were the only entities that manufactured injectable insulin for the United States market.

**B. How Consumers Obtain And Pay For Their Insulin**

100. The process of getting pharmaceuticals, like insulin, to consumers involves multiple interactions among various key entities.

101. The American Diabetes Association created the visual below, which captures the entities involved in the distribution and payment supply chain.



**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, DISGORGEMENT, AND OTHER EQUITABLE RELIEF (PUBLIC - REDACTED VERSION)**

William T. Cefalu, et al., *Insulin Access and Affordability Working Group: Conclusions and Recommendations*, Diabetes Care (May 11, 2018), available at https://diabetesjournals.org/care/article/41/6/1299/36487/Insulin-Access-and-Affordability-Working-Group. The pathways in this visual will be discussed in the following section of the Complaint.

### 1. Price-Setting And The Drug Distribution Chain

102. In general, the main players involved in the drug distribution chain are manufacturers, wholesalers, pharmacies, and consumers.

103. Manufacturers typically sell their drugs through wholesale distributors. It is reported that 90 percent of prescription drugs in the United States are distributed through three wholesalers: Cencora (f/k/a AmerisourceBergen), Cardinal Health, and McKesson. Manufacturers set the drug's list price and wholesalers usually negotiate a discount off that list price. The wholesalers have stated that they have no control over pharmaceutical price changes and that they leave the setting of the list price of pharmaceuticals to the discretion of the manufacturers. Manufacturers request and receive payments for the branded pharmaceuticals sold to wholesalers multiple times in a year. Payments are based on the then-applicable price. The Manufacturer Defendants engage in conduct challenged in this action within the statute of limitations by overcharging for their analog insulins at artificial and unconscionable prices ongoing through at least January 12, 2023, including after January 12, 2020.

104. The term "wholesale acquisition cost" or WAC is typically used in reference to a drug's undiscounted list price. WAC is defined by federal law as "the manufacturer's list price for [a] drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price. . . ." (42 U.S.C., § 1395w-3a, subd. (c)(6)(B).) Manufacturers, including Eli Lilly, Novo Nordisk, and Sanofi publish WAC prices, including WAC prices for analog insulins, in compendium databases administered by third-party entities.

105. Wholesale distributors then sell the drugs to pharmacies. The sale price to pharmacies is based on the WAC.

106. Pharmacies then distribute the drugs to consumers. If a consumer lacks health insurance coverage for prescription drugs, the pharmacy charges the consumer the "cash price" for the drugs. A pharmacy's cash price is usually marked up from the price the pharmacy paid for the drug.

107. A December 2020 study from GoodRX, a company that tracks drug prices, showed that an increase in the WAC of a drug is correlated to an increase in the cash price of that drug.

108. Defendant Novo Nordisk has acknowledged that, for insulin, WAC is closely tied to the cash price. When testifying before the U.S. House of Representatives in April 2019, Doug Langa, President of Defendant Novo Nordisk stated that, "there is no doubt that the WAC price is a significant component" of "what patients ultimately pay at the pharmacy counter. . . ."

109. Likewise, as David Ricks, CEO of Defendant Eli Lilly testified to the U.S. Senate in May 2023: "Higher list prices allow for higher fees and rebates, which can increase patients' out-of-pocket costs. . . ."

**2.    The Role Of Insurance On The Prices Consumers Pay For Drugs At Pharmacies**

110. Health insurance in the United States is provided through a mix of public and private insurance, including for-profit and nonprofit insurers and health care providers.

111. The Kaiser Family Foundation reports that 47% of Californians in 2021 had health insurance through an employer, 7% had private coverage directly from an insurer, 27% benefit from Medi-Cal (California's Medicaid program), 12% benefit from Medicare, and 7% were uninsured. The Kaiser Family Foundation further reports that, in general, people of color are at higher risk of being uninsured.

112. This Complaint uses the following terminology when discussing prescription drug health insurance benefits:

a.  *Co-insurance*: The percentage share that an insured consumer pays for a product or service covered by the plan. For example, an insurer may charge

10% co-insurance for a $100 prescription drug, making the consumer's out-of-pocket cost $10. Co-insurance is a cost-sharing mechanism.

    b. *Co-payment or co-pay*: A fixed dollar amount that an insured consumer pays for a product or service covered by the plan. For example, an insurer may charge a $20 co-payment for a prescription drug. A co-pay is also a cost-sharing mechanism.

    c. *Deductible*: The amount an insured is required to pay for health care services or products before his or her insurance plan begins to provide coverage. An enrollee in a high-deductible health plan with a $2,000 deductible would be responsible for paying for the first $2,000 in health care services. A deductible is another cost-sharing mechanism.

    d. *Out-of-pocket maximum*: The maximum amount an insured consumer must pay in a year before their health insurance plan covers 100% of health benefits.

    e. *Formulary*: A list of prescription drugs covered by an insurance plan. The PBM Defendants publish revised standard formularies at least once a year, typically at the beginning of the calendar year, and sometimes the PBM Defendants update their formularies mid-year.

    f. *Formulary tier*: Some formularies have different levels of coverage, with the lower tiers (such as preferred tiers) associated with a lower out-of-pocket cost to the insured.

    g. *Exclusion list:* A list of drugs excluded from a formulary.

113. When a consumer with health insurance visits a pharmacy to fill a prescription, the amount the consumer pays out-of-pocket typically depends on the drug's WAC, whether the drug is on formulary or the formulary's exclusion list (and if it is on formulary, the formulary tier), the co-pay or co-insurance required by their insurance, whether the consumer has a deductible or out-of-pocket-maximum, and how much money the consumer has already paid. As discussed in paragraphs 240 - 246, *infra*, an insured consumer may be required to pay a drug's full cash price.

### 3. The Role Of PBMs On What Drug Insurers Cover And What Rebates Manufacturers Pay

114. Most health payers in the United States, including insurers, contract with PBMs to administer their prescription drug coverage benefits. Generally, PBMs develop a formulary and negotiate post-purchase discounts (or rebates) that brand-name drug manufacturers must pay the insurer when consumers fill prescriptions for their drugs. PBMs also maintain a network of pharmacies where plan beneficiaries can fill prescriptions. In addition, PBMs negotiate and process the insurance plans' payments to pharmacies for drugs dispensed.

### a. The PBM Market Is Highly Concentrated

115. In recent decades, the PBM industry has grown and consolidated dramatically. According to a market research firm, Health Industries Research Companies, the PBM Defendants captured significant market shares for prescription claims managed in 2020. In the United States, 34% of claims were administered by Defendant CVS Caremark, 24% by Defendant Express Scripts, and 21% by Defendant OptumRx.

116. In February 2019, a bipartisan U.S. Senate Finance Committee began to investigate why insulin medication was unaffordable. In January 2021, at the conclusion of its investigation, the Committee issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" (Senate Insulin Report).

117. The Senate Insulin Report included a chart referencing the number of insured persons (covered lives) associated with each PBM that reflects market shares similar to the estimates noted above:

| PBM | Covered Lives (as of 2019) |
|---|---|
| CVS Caremark | 105 million |
| Express Scripts | More than 80 million |
| OptumRx | More than 65 million |

Using the figures from the Senate Insulin Report, and an approximate United States population of 328 million persons in 2019, CVS Caremark was associated with 32% of the United States population, Express Scripts 24%, and OptumRx 20%.

-24-

118.     The PBM Defendants made sizable gains through consolidation. For example:

a.   In 2009, CVS Caremark merged with PBM AdvancePCS Inc. in a merger valued at $6 billion.

b.   In 2012, Express Scripts acquired PBM Medco Health Solutions, Inc. in a transaction valued at nearly $30 billion.

c.   In 2015, OptumRx acquired PBM Catamaran Corp. in a transaction valued at nearly $13 billion.

119.     PBM Defendants also work to enhance their market share, especially with respect to rebate negotiations (discussed below) through the use of "group purchasing organizations" or GPOs. Each PBM Defendant has set up a GPO. Express Scripts formed Ascent Health Services; CVS Caremark formed Zinc; and OptumRx formed Emisar Pharma Services. Ascent Health Services negotiates rebates on behalf of Express Scripts and a smaller PBM, Prime Therapeutics LLC, among others. Two of these GPOs were formed outside the United States (Ascent in Switzerland and Emisar in Ireland).

### b.     The PBM Defendants' Standard Formularies

120.     Each of the PBM Defendants offers standard (also known as off-the-shelf or template) formularies.

121.     Most PBM health plan customers adopt a standard formulary, but some adopt custom or partially custom formularies. PBM Defendants encourage their customers to adopt a standard formulary and give price concessions for use of a standard formulary.

122.     For many years, the PBM Defendants included nearly all available drugs in their standard formularies. That changed in and around 2014 when the PBM Defendants started excluding a growing number of drugs from their standard formularies.

123.     Because the PBM Defendants control a significant market share, a drug's exclusion from a standard formulary can significantly impact its sales. Drugs are most likely to be filled and purchased by an insured consumer if the drug is placed on the standard formulary.

**c.** **The PBM Defendants' Rebate Negotiations And Contracts, And The Secrecy Of The Rebates**

124.    The Manufacturer Defendants negotiate for and enter into contracts with the PBM Defendants that provide financial incentives for the PBMs' customers to use the manufacturers' drugs. These incentives include:

      a.    Base formulary post-sale discounts (rebates) for placing the manufacturer's brand-name drug on the PBM's standard formulary.

      b.    Formulary rebate enhancements for placing the manufacturer's brand-name drug on a preferred formulary tier and, potentially, excluding the drug's competitors on that tier.

      c.    Market-share rebates for higher usage of the manufacturer's brand-name drug.

      d.    Price protection rebates that require a manufacturer to pay the PBM additional rebates when the manufacturer raises the list price above an agreed-upon percentage or dollar threshold.

125.    Rebate contracts do not require PBMs to pass rebates directly onto consumers acquiring drugs at pharmacies, and usually PBMs do not pass the rebates directly onto the consumer acquiring the drug at the pharmacy.

126.    Rebate contracts usually include administration fees (including data fees) paid by the manufacturer to the PBM. These administration fees are typically reflected as a percentage of WAC. Administrative fees can result in significant payments to PBMs.

127.    The PBM market in general, and rebate negotiations and contracts specifically, are cloaked in secrecy. The rebate contracts between PBM Defendants and Manufacturer Defendants are confidential and non-public. Likewise, the actual rebate payments made by Manufacturer Defendants to the PBM Defendants are confidential and non-public.

128.    As a former attorney for the United States Justice Department and Federal Trade Commission testified to the Senate in mid-2022 during a hearing on drug prices:

PBMs establish tremendous roadblocks to prevent payors from knowing the amount of rebates they secure. Even sophisticated buyers are unable to secure specific drug by drug rebate information. PBMs prevent payors from being able to audit rebate information. As the Council of Economic Advisors observed, the PBM market lacks transparency as "[t]he size of manufacturer rebates and the percentage of the rebate passed on to health plans and patients are secret." Without adequate transparency, plan sponsors cannot determine if the PBMs are fully passing on any savings, or whether their formulary choices really benefit the plan and subscribers.

129. The Senate Insulin Report stated that PBM-Manufacturer rebate "contracts and subsequent amendments can stretch over hundreds of pages and cover multiple therapies offered by a manufacturer. The base contracts and subsequent amendments are updated frequently— sometimes multiple times a year. . . ." The Defendants engaged in conduct challenged in this action within the statute of limitations periods by executing new base contracts and/or amendments to base contracts on or after January 12, 2020.

## V. THE DEFENDANTS ARTIFICIALLY INFLATE, MAINTAIN, AND CONTROL THE PRICE OF ANALOG INSULIN

130. As described in this section, the PBM and Manufacturer Defendants have been successful in improperly inflating, maintaining, and controlling high list prices of the Manufacturer Defendants' analog insulin, including through January 12, 2023. Absent the PBM and Manufacturer Defendants' improper conduct, the list price of analog insulin that California consumers would have been exposed to would have been significantly lower.

### A. The Manufacturer Defendants Significantly Inflated Analog Insulin's List Price In Lockstep With Each Other

131. Drugstore ads from the 1960s published in The Washington Post advertised insulin for $1 to $2 per vial. In the late 1990s, insulin could be obtained for less than $25. That is no longer the case. Consumers needing insulin products pay hundreds of dollars for their monthly supply.

132. National Public Radio reported that in the past twenty years, the list price of the Manufacturer Defendants' analog insulins increased by more than 600%.

133.    Below is a visual depiction of that increase:[6]



REDACTED

134.    The Manufacturer Defendants raised the list prices of analog insulins in lockstep with each other.

135.    These lockstep increases are well recognized. Both scholars and the Senate Insulin Report determined that when one of the Manufacturer Defendants increases the price for a given insulin formulation, the other Manufacturer Defendants often increase their prices by a similar amount shortly thereafter.

136.    The lockstep nature of these list price increases was also recognized by the United States House of Representatives. In December 2021, the United States House of Representatives Committee on Oversight and Reform issued a Drug Pricing Investigation Report. The report included figures showing the tethered relationship between each of the Manufacturer Defendants' list prices for analog insulins.

137.    The Drug Pricing Investigation Report included a figure comparing price increases for Defendants Eli Lilly and Novo Nordisk's rapid-acting insulins.

---

[6] The comparison data is net monthly change data from the U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers, available at https://data.bls.gov/dataQuery/search.



Figure 6: Comparison of Rapid-Acting-Insulin Price Increases—Humalog (Eli Lilly) and Novolog (Novo Nordisk), 1996–2018

138.     The Drug Pricing Investigation Report also stated that "Sanofi also engaged in shadow pricing with its rapid-acting insulin products, including Apidra. . . . [W]hen its competitors raised prices on their fast-acting insulins, Sanofi followed suit."

139.     The Drug Pricing Investigation Report also included a figure comparing price increases for Defendants Sanofi and Novo Nordisk's long-acting insulins.

[CONTINUED ON THE NEXT PAGE]



Figure 7:  Comparison of Long-Acting-Insulin Price Increases—Lantus (Sanofi) and Levemir (Novo Nordisk), 2005–2019

**B.    The Manufacturer Defendants Artificially Maintain The Price Of Analog Insulin**

140.    In microeconomics, it is recognized that demand and price are typically inversely related, meaning as a product's price increases the demand for the product decreases. Therefore, there is typically a price for a product above which further price increases will harm profitability. This is because the loss in revenue from the drop in demand is greater than the increase in revenue from the price increase. While insulin is unlike a discretionary good that a consumer can go without, nevertheless, eventually there is a point where a consumer no longer has enough funds to bear insulin's price increases and also pay for everyday necessities, such as housing and food. As discussed in paragraphs 247 - 252, *infra*, the price of analog insulin increased to a level where a significant proportion of diabetics started to ration or skip doses.

141.    As discussed in paragraph 92, *supra*, the patents on most of the Manufacturer Defendants' analog insulins expired in the mid to late 2010s. But instead of lowering prices, ongoing through at least January 12, 2023, the Manufacturer Defendants maintained the unconscionable and artificial list price of analog insulin.

-30-

142.     The Manufacturer Defendants also launched purported "new" insulins at the inflated prices. These purported new products only contain minor modifications of the existing insulin products. In March 2015, Defendant Sanofi launched a higher dosage of long-acting insulin glargine, branded as Toujeo (insulin glargine). Toujeo is a higher concentration form of Lantus. In February 2018, Defendant Novo Nordisk released a rapid-acting insulin called Fiasp (insulin aspart). Fiasp is a slightly modified version of NovoLog. In and around June 2020, Defendant Eli Lilly launched a rapid-acting insulin called Lyumjev (insulin aspart). Lyumjev is a slightly modified version of Humalog. These products launched with list prices that were around the same as the older brands' list prices.

143.     This chart reflects the WAC of rapid-acting analog insulins, including the Manufacturer Defendants' "new" insulins.

REDACTED

144.    This chart reflects the WAC of long-acting analog insulins, including the Manufacturer Defendants' "new" insulins.

REDACTED

### C.    The Manufacturer Defendants Artificially Control The Price Of Analog Insulin Despite The Entrance Of Alternatives That Should Have Lowered Prices

145.    Scholars recognize that brand pharmaceutical manufacturers use unbranded copies of their branded pharmaceuticals to control, i.e., stave-off, price competition upon the expiration of drug patents. Scholars claim manufacturers attempt to control price competition through the launch of unbranded copies by taking market share from new entrants thereby eroding the financial incentives for new companies to enter the market and make competing copies of the pharmaceuticals (such as generics). The Manufacturer Defendants have engaged in such conduct ongoing through at least January 12, 2023.

146.    When the patent protection expired on Defendant Sanofi's long-acting Lantus (insulin glargine) and Defendant Eli Lilly's Humalog (insulin lispro), Defendant Eli Lilly

launched its version of insulin glargine called Basaglar in 2016, and Defendant Sanofi launched its version of insulin lispro called Admelog in 2018. These products launched at inflated list prices that were only approximately 15% lower than the originator brands' list prices, even though the prices of the originator brands had inflated 600% since launch. Additionally, although Basaglar launched at a slightly lower list price than Lantus, a 2022 study concluded that patients had higher out of pocket costs with Basaglar than with Lantus.

147.    The Manufacturer Defendants also launched unbranded versions of their products in recent years.

148.    Defendant Eli Lilly announced on March 4, 2019, it would offer unbranded insulin lispro at approximately $137 per 10 mL vial and $265 per five-pack of pens. Defendant Novo Nordisk announced on September 9, 2019, it would offer unbranded insulin aspart at approximately $145 per 10 mL vial and $269 per five-pack of pens. Defendant Sanofi launched an unbranded insulin glargine in June 2022 at approximately $113 per 10 mL vial.

149.    The launch list prices of the unbranded insulins were artificial and unconscionably high given the list price of the branded insulin increased 600% in prior years, *see supra* paragraphs 132 - 133, and these reductions for the unbranded insulins were only a small percentage of that increase.

150.    The launch list prices of the unbranded insulins were also artificial and unconscionably high when compared to the cost to produce the insulins and the significantly lower cost of insulin internationally. *See* paragraphs 181 - 188, *infra*.

151.    Soon after launch their launch, in October 2020, a health and legal policy research fellow published an article recognizing the Manufacturer Defendants' unbranded insulins "do not make insulin affordable to all who need it" because the small size of the discounts means that "insulin continues to be out of reach for many people with diabetes." The article further identified that several diabetes advocates worried that the unbranded insulins "will not make insulin any more affordable to consumers, as pharmacy benefit managers will be incentivized to negotiate a higher rebate for the more expensive originator product instead of taking a decreased profit on the" unbranded products. This concern was percipient. Because the Manufacturer Defendants

have maintained the inflated list prices of their branded analog insulins and contracted with PBMs for payment of inflated rebates based on preferred formulary placement of those branded insulins ongoing through at least January 12, 2023, this undermined any price relief that might have been available due to the Manufacturer Defendants' unbranded products. As discussed in paragraphs 167 - 172, *infra*, ongoing through at least January 12, 2023, the PBM Defendants have placed the Manufacturer Defendants' branded insulins in more favorable formulary positions than their unbranded insulins due to the inflated rebates the Manufacturer Defendants have agreed to provide on their branded insulins.

152.    Further undermining any price relief that might have been available due to the unbranded products was, and is, that Defendant Eli Lilly's unbranded insulin lispro was, and is, not easily available. In December 2019, U.S. Senator Elizabeth Warren (D-Mass.) and Senator Richard Blumenthal (D-Conn.) released a report showing that in 83% of pharmacies surveyed, generic insulin lispro was not in stock. Additionally, in most cases where the pharmacies indicated that they did not have the generic drug in stock they also indicated that they could not order the drug. Moreover, a 2023 report from Senators Warren, Blumenthal, and Reverend Raphael Warnock (D-Ga.), showed that although more pharmacies were carrying generic insulin lispro in 2023, it was about half the number of pharmacies as those that carried Humalog.

### D. The PBM Defendants Drive The Artificial Inflation, Maintenance, And Control Of The List Price Of Analog Insulin Through Rebates

#### 1. The Amount Of Rebates Paid On Analog Insulin Has Grown

153.    The Senate Insulin Report stated that, "in July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's client's commercial formulary. Five years later, in 2018, Sanofi rebates were as high as 56% for preferred formulary placement." The Senate Insulin Report further stated that, "in 2017, Novo Nordisk offered Express Scripts rebates up to 47% for Levemir for preferred formulary placement on their client's commercial formulary, compared to 25% in 2014."

154. Similarly, according to a 2020 study in the Journal of the American Medical Association, the insulin rebates for non-Medicaid consumers have grown from 13% of the list price in 2007 to 70% in 2018.

155. The insulin rebates remain in this range today. In May 2023, David Ricks, the CEO of Defendant Eli Lilly testified in prepared remarks before a Senate panel that 80% of Eli Lilly's insulin's list price goes towards the payment of rebates and fees. During the same hearing, Lars Jørgensen, the CEO of Defendant Novo Nordisk testified in prepared remarks that 75% of Novo Nordisk's insulin list price goes towards the payment of rebates and fees. Paul Hudson, the CEO of Defendant Sanofi, likewise testified in prepared remarks that 84% of Sanofi's insulin list price goes towards the payment of rebates.

### 2. Rebates Are Correlated To List Price Increases

156. According to a study conducted by the non-profit, nonpartisan Center for Medicine in the Public Interest, in 2015, rebates accounted for 77% of total manufacturer list price increases.

157. Similarly, according to a 2020 study by the University of Southern California Schaeffer Center, a $1 increase in formulary rebates on a drug equated to a $1.17 increase in list price of that drug.

158. A 2021 study with authors affiliated with multiple institutions, found that while drug manufacturers may increase list prices in order to offer larger rebates to insurers, such increases were associated with increased out-of-pocket costs, especially among individuals without insurance.

### 3. The Manufacturer Defendants Agree To Pay The PBM Defendants Large, Secret Rebates For Preferential Formulary Placement

159. The Senate Insulin Report revealed that the growth in insulin's list price was because PBM Defendants mandated ever growing rebates in exchange for formulary access.

160. The Senate Insulin Report confirmed as much, finding that:

Eli Lilly executives raised the possibility that PBMs would object to a list price reset because it would result in (1) a reduction in administrative fees for PBMs, (2) a reduction in rebates, which would impact PBMs' ability to satisfy rebate guarantees with some clients, and (3) impair their clients' ability to lower premiums for patients, thereby impacting their market competitiveness.

161. The Senate Insulin Report further stated that, "Novo Nordisk's board of directors voted down a proposed insulin price decrease due to financial downsides, risk of backlash from PBMs and payers, and expected pressure to take similar action on other products."

162. According to the Senate Insulin Report, "Sanofi also faced increased pressure from its payer and PBM clients to offer more generous rebates and price protection terms or face exclusion from formularies. . . ."

163. Each of the Manufacturer Defendants confirmed that insulin list price growth is to support rebates needed to secure formulary access.

164. In April 2019, testifying before Congress, Doug Langa, President of Defendant Novo Nordisk, issued a statement explaining these considerations:

Recently, pharmaceutical companies have come under pressure to explain the increasing out-of-pocket costs for certain medicines, including insulin. While increased competition in a marketplace would usually lead to lower prices, our current healthcare system is built on misaligned incentives that have led to rising costs in medicines. Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC price. That means a pharmaceutical company fighting to remain on formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others.

165. Also testifying before Congress in April 2019, Kathleen Tregoning, Executive Vice President of Sanofi, identified similar financial pressures. Tregoning stated: "The rebates [are] how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient."

166. Enrique Conterno, former senior vice president at Defendant Eli Lilly, told The Washington Post in 2015 that as the price of insulin increases, drug makers give deeper rebates to PBMs, and that if they do not, the drug maker might receive less-favorable formulary placement.

-36-

167.     Moreover, ongoing through at least January 12, 2023, none of the PBM
Defendants included the Manufacturer Defendants' unbranded insulins on their standard
formularies. Instead, the PBM Defendants included the higher list priced and higher rebated
analog insulin products.

168.     For instance, the standard control formulary of Defendant Caremark for use in
2020 listed as covered Defendant Novo Nordisk's high priced (NovoLog) branded insulin aspart
product, but did not list the lower list price unbranded version. The standard formulary of
Defendant Express Scripts for use in 2021 covered Defendant Eli Lilly's high list price branded
insulin lispro product (Humalog), but not the lower list price unbranded version. The standard
formulary of Defendant OptumRx for use in 2021 covered one of Defendant Eli Lilly's high list
price branded insulin lispro products (Humalog), but not the lower list price unbranded version.

169.     As Mike Mason, Senior Vice President of Defendant Eli Lilly testified before
Congress in April 2019:

> Our experience to date, however, is that most PBMs continue to prefer
> branded Humalog even when the net cost is comparable because that option
> offers more total rebate dollars, and many of their health plan and employer
> clients value the total rebate dollars that they receive when their members
> purchase prescription medications. As described further below, those health
> plans and employers use the rebate dollars they receive to marginally reduce
> premiums for all of their insureds, rather than using them to reduce patients'
> out-of-pocket costs for insulin at the pharmacy counter. As a result, most
> PBMs have indicated that they are considering several approaches for
> Insulin Lispro, such as excluding Insulin Lispro entirely from formularies,
> offering the [proprietary generic] only on "niche" formularies, or placing the
> product on formulary but at a higher cost-sharing tier.

170.     As described in an April 12, 2022, Human Rights Watch report, the rate of
conversion of consumers from higher priced brand-name insulins towards the unbranded lower
priced rapid-acting analog insulins (insulin aspart and insulin lispro) was more than twice as slow
as it should have been when compared with non-insulin drugs. The Human Rights Watch
explained the slow rate of conversion to the lower priced products is likely due to Defendants Eli
Lilly's and Novo Nordisk's continued payment of inflated rebates to the PBM Defendants for
their higher priced branded insulins (Humalog and NovoLog). Like with unbranded insulin lispro
and insulin aspart, there was insignificant conversion of consumers from Lantus to Defendant

Sanofi's unbranded insulin glargine because Sanofi continued to pay inflated rebates on Lantus for formulary access. Sanofi has now discontinued its unbranded insulin glargine.

171. Even when a new company attempted to enter the insulin market, the Manufacturer Defendants' high list price branded insulins, with their high rebates, and the PBM Defendants' preference for high list price high rebated products has undermined that company's efforts. In 2020, the FDA approved an application by Viatris Inc. and its partner Biocon Biologics Ltd., allowing biosimilar insulin glargine to come to market in the United States. In late 2021, Biocon started offering both low and high list price versions, with the lower list priced version bearing a list price that was 65% less than the list price of Lantus. None of the PBM Defendants included that lower list price version on their standard formularies when it was launched in the United States. However, the higher list price version secured placement on Defendant Express Scripts' standard formulary.

172. As of mid-2023, despite Biocon offering an insulin glargine that has a lower list price than the Manufacturer Defendants' insulin glargines (e.g., Lantus, Basaglar, and Toujeo), Biocon reported only an 11% share of the U.S. insulin glargine market. The rate of conversion of consumers from higher priced Defendants Eli Lilly's and Sanofi's insulin glargine products towards the lower priced Biocon insulin glargine is slower than it should be if compared with non-insulin drugs when a cheaper, follow-on (copycat) drug is introduced.

173. Because the PBM-Manufacturer rebate contracts are secret—the contracts have been described by commentators as guarded as fiercely as Fort Knox—consumers are unaware of Defendants' conduct. For instance, consumers with insurance are unaware of why their insurance plans cover higher cost insulins in a more favorable position to lower cost insulin. As discussed in paragraphs 167 - 172, *supra,* covering higher cost insulin, in a more favorable position to lower cost insulin, can increase out-of-pocket costs for patients in plans using deductibles or coinsurance, where cost-sharing is determined based on the pharmaceutical's full cash price.

FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, DISGORGEMENT, AND OTHER EQUITABLE RELIEF (PUBLIC - REDACTED VERSION)

### 4. The PBM Defendants Facilitated Horizontal Rebate Information Exchanges For The Manufacturer Defendants

174.    The PBM Defendants facilitated and continue to facilitate coordination of Manufacturer Defendants' behavior regarding list prices by serving as a horizontal conduit for information exchanges involving rebates.[7]

175.    The PBM Defendants claim that they pit drug manufacturers, including the Manufacturer Defendants, against each other for formulary access.

176.    This description is misleading. The PBM Defendants' actions entrench the Manufacturer Defendants in a vicious cycle of ever-increasing list prices, maintaining those prices in parallel, and not decreasing those prices, in order to obtain access to the PBM Defendants' standard formularies.

177.    Further, the Senate Insulin Report identified an instance when, in 2016, Defendant Express Scripts communicated to Defendant Sanofi that Defendant Eli Lilly was offering rebates on its insulin glargine product in the mid-60 percent range.

178.    Such disclosures of a competitor's rebate offer ensure that the Manufacturer Defendants do not deviate from the high-WAC price and high-rebate strategy for insulin. Disclosing such information confirms the participation in this rebate conduct by others and encourages other Manufacturer Defendants to fall in line if they wish to secure placement on PBM Defendants' standard formularies.

### E. The Price Of The Manufacturer Defendants' Analog Insulin Is Artificial

179.    The fact the list prices for analog insulin increased in lockstep, and remained parallel, confirms that the list prices are artificial.

180.    There are also additional bases for the conclusion that the increase in, and the maintenance and control of the price of analog insulin is artificial.

---

[7] (Black's Law Dictionary (12th ed. 2024) [facilitating practice: "An activity that makes it possible or easier for business to coordinate pricing, distribution, or other behavior in ways that reduce or eliminate competition."].)

### 1. Analog Insulin's Price In The United States Is Not Justified By Manufacturers' Costs Or Improvements In Insulin

181. Insulin's high price is not justified by the Manufacturer Defendants' research and development costs. Indeed, the insulin molecules that are on the market have either been available in the same form for decades or are biologically equivalent to insulins that have been on the market for decades.

182. Nor is insulin's high price justified by the Manufacturer Defendants' manufacturing costs. A 2018 study published in BMJ Global Health calculated that insulin costs less than $10 a vial to manufacture. The study estimated that a reasonable price for a one-year supply—which accounts for profits to manufacturers—could cost a person between $78 and $133 for analog insulins.

183. In discussing the Manufacturer Defendants, the Senate Insulin Report stated that, "[i]nsulin [research and development, or R&D] spending was a fraction of manufacturers' revenue and sales and marketing expenses." The Senate Insulin Report further stated that, "[i]nsulin manufacturers appear to focus their R&D efforts on new insulin-related devices, equipment, and other mechanical parts which are separate from insulin's formulation."

184. In fact, in 2019, Sanofi announced it was ceasing research and development in the diabetes space, although it would continue selling analog insulin.

### 2. Consumers In The United States Pay Exorbitant Prices For Analog Insulin Compared To Other Countries

185. In 2020, a non-profit research organization, the RAND Corporation, compared insulin prices, using 2018 data, in the United States to those of other countries. The report found that, on average, U.S. consumers pay ten and eight times what those outside the U.S. pay for rapid- and long-acting insulin, respectively.

186. The RAND report noted that some United States payers, such as health insurance plans, do not pay the full list price for insulin. Rather, they may receive rebates or other discounts that are passed on by the PBMs. Even so, the RAND Report noted that what payers pay for

1  insulin is still several-fold more than the price consumers outside the United States pay for

2  insulin.

3       187.    The Rand Report was updated in February 2024 to look at data from 2022. This

4  update stated the average price of 100 units of rapid-acting analog insulin for countries in

5  Organization for Economic Co-operation and Development, but that are not the United States

6  (non-US OECD Countries), is $2.12. The average U.S. price is $24 per 100 units. The Rand

7  Report further stated that for non-US OECD Countries, the average price for 100 units of long-

8  acting analog insulin is $2.93, whereas the average U.S. price for 100 units is $24.20.

9       188.    A 2021 report from the World Health Organization also reported the price

10  disparity of analog insulin between the United States and other countries.



24       189.    That persons outside the United States pay less for the Manufacturer Defendants'

25  analog insulin is further confirmation that their prices are artificially and unconscionably high.

### 3.   Large, Secret Insulin Rebates Benefit Defendants

#### a.   The Manufacturer Defendants Benefit From Large, Secret Insulin Rebates

190.    As stated in the Senate Insulin Report, Manufacturer Defendants, by increasing their insulin prices to accommodate larger rebates, gain continued access to lucrative placement on PBM Defendants' standard formularies.

191.    Manufacturer Defendants profit from this arrangement. As the Senate Insulin Report uncovered, even after deducting manufacturer discounts and rebates from WAC list price, the moneys retained by the Manufacturer Defendants (the net price) is still higher than what they retained a decade ago.

192.    Similarly, according to the December 16, 2022 "Report to Congress on the Affordability of Insulin," the U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, stated: "[A] review of literature demonstrates that net prices of insulin (even after rebates) are high and have grown substantially over time."

193.    The Senate Insulin Report also indicates that although the Manufacturer Defendants' net prices have shrunk in recent years, these net prices would have been much less absent the conduct described in this Complaint.

194.    Further, the net price of insulin sold in the United States is still significantly higher than the price of insulin in other countries. A report suggests that although the United States comprises only 15% of the global insulin market, it accounts for almost 50% of the Manufacturer Defendants' insulin-related revenue.

#### b.   The PBM Defendants Benefit From Large, Secret Insulin Rebates

195.    Because rebates are a percentage of an insulin's list price, PBM Defendants retain more money when they place high list price insulins on formularies. This preference has caused a widening gap between insulin's artificially inflated list price and its net price (the amount retained by the Manufacturer Defendants). The widening gap between list price and net price is problematic because it enriches the PBM Defendants at the expense of consumers and competition.

-42-

196.    OptumRx's CEO admitted as much in an October 15, 2016, interview with Modern Healthcare, stating that the PBM Defendants "benefit from price increases."

197.    PBM Defendants' preference for high list price insulins creates a system that reinforces their control of the market at the expense of smaller PBMs:

    a.  PBM Defendants use their large size to extract higher secret rebates from the Manufacturer Defendants, compared to smaller PBMs. For instance, CVS Caremark has stated on its website: "We bring our size, scale and expertise as the largest purchaser of prescription drugs in the United States to the negotiating table – working to reach the lowest prices possible with drug manufacturers."

    b.  The secret rebating practices decrease competition related to rebate negotiations.

    c.  The PBM Defendants can offer larger rebate guarantees to their clients, health insurers, and other payers. For instance, the Senate Insulin Report references an instance where an Eli Lilly executive stated that PBMs may object to lowering the list price of insulin because it would result in "a reduction in rebates, which would impact PBMs ability to satisfy rebate guarantees with some clients." These larger rebate guarantees by the PBM Defendants hurt smaller PBMs.

198.    The PBM Defendants also benefit from insulin's inflated list price because of administrative fees, which are typically paid by the Manufacturer Defendants to the PBM Defendants, or members of their corporate families (e.g., GPOs), and are a percentage of a drug's list price. A recent report from the New York Times reflects that, with respect to all drugs (not just insulin) the amount of fees the PBM Defendants (or members of their corporate families, e.g., GPOs) retained doubled between 2018 and 2022. These fees are not passed back to the PBM Defendants' clients and therefore do not help lower the cost of consumers' healthcare costs.

199.    The PBM Defendants also benefit from insulin's inflated list price because they manage pharmacy networks and their payment processing. All PBM Defendants have been

accused of engaging in improper clawbacks from pharmacies. A clawback happens when a pharmacy receives more money from a consumer in the form of cost-sharing than the pharmacy paid to acquire the drug. The higher the list price of a drug, the more likely there will be a PBM clawback.

### F. Defendants Know The Price Of Analog Insulin Is Too High

200. In April 2019, before the U.S. House Energy and Commerce Committee meeting titled "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin," all Defendants testified that the price of insulin was, and including on that date, too high.

201. Mike Mason, Senior Vice President of Defendant Eli Lilly stated that, "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications. . . ."

202. Doug Langa, President of Defendant Novo Nordisk, stated, "[W]e do know that more patients are facing an affordability challenge." He further acknowledged that "the number of patients struggling to afford their medicines has grown in recent years."

203. Kathleen Tregoning, Executive Vice President at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs for many medicines and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . ."

204. Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified to similar concerns. He stated, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans."

205. Amy Bricker, Senior Vice President, Supply Chain, for Express Scripts also testified to facts depicting the urgent need. She said, "[O]ver seven million Americans diagnosed with diabetes use insulin. For some patients, the increasing price of insulin limits access and adherence."

206.     Dr. Sumit Dutta, Chief Medical Officer of OptumRx testified, "[T]he price of insulin remains too high." Dr. Dutta also acknowledged that the price increases "have a real impact on consumers in the form of higher out-of-pocket costs."

## VI.    DEFENDANTS MAKE MISLEADING STATEMENTS TO SUPPORT AND FURTHER THE INFLATION OF ANALOG INSULIN'S ARTIFICIAL LIST PRICE

207.     Each of the Defendants have made misleading statements in furtherance of their efforts to inflate insulin's list price.

### A.    The Manufacturer Defendants' Misleading Statements About Insulin's List Price

208.     The Manufacturer Defendants made two categories of misrepresentations to support insulin's excessively high price.

#### 1.    The Manufacturer Defendants Misrepresent That Insulin List Price Increases Are Unimportant Due to Alleged Declining Net Prices

209.     First, the Manufacturer Defendants have publicly represented that the prices for their analog insulins are justified because they claim insulin's net price is decreasing. For example, Defendant Eli Lilly included such a statement on its webpage for its 2023 Environmental, Social, and Governance Report. Defendant Sanofi included such a statement in its 2023 Pricing Principles Report. Novo Nordisk made such a statement to a Reuters reporter in response to the House Drug Pricing Investigation Report that was released in December 2021.

210.     These statements about insulin's net price are echoed by the Pharmaceutical Research and Manufacturers of America (PhRMA). PhRMA is a trade group for pharmaceutical manufacturers. Executives of each of the Manufacturer Defendants are on PhRMA's Board of Directors. PhRMA takes the position in advertisements that insulins are cheaper today than fifteen years ago because the net price has decreased.

211.     As discussed in paragraphs 191 - 194, *supra*, these statements are misleading. Net prices are inflated when compared to the Manufacturer Defendants' costs and the amounts paid by persons in other countries. Further, by focusing attention on net price trends, and not the increasing list price trend, Manufacturer Defendants obscure the fact that list price competition

has been undercut and that many consumers have had larger out-of-pocket costs imposed as a result.

### 2. The Manufacturer Defendants Misrepresent Their Efforts To Control Insulin Price Increases And Address Consumer Affordability

212.    Second, the Manufacturer Defendants have publicly represented that they are taking actions to address the public outcry about insulin affordability.

213.    Each of the Manufacturer Defendants claims to offer support programs, including coupons, to help consumers afford their insulin, that were advertised in a variety of manners.

214.    In and around March 2022, Defendant Eli Lilly posted on Twitter: "If you or someone you know has difficulty paying for Lilly insulin, we have a comprehensive suite of insulin affordability solutions available." Reference to terms and conditions for the solutions were in significantly smaller font than the reference to the existence of the program.

215.    In and around September 2020, Defendant Novo Nordisk ran a television advertisement titled "Diabetes Care." In the advertisement, the announcer stated: "If you need help paying for your diabetes medicine during this [COVID-19] time, we're here to help." The screen also showed the text: "NovoCare[:] Helping to keep insulin available and affordable." No reference to program restrictions were referenced. Also in September 2020, Defendant Novo Nordisk made a similar Facebook post stating: "We're working hard to keep Novo Nordisk insulin and other diabetes medicines available and affordable. Visit NovoCare.com."

216.    In and around 2018, Defendant Sanofi ran a television advertisement for Lantus titled "Stay Together." In the advertisement, the announcer stated: "Let's stay together with a Lantus $0 Copay." The restrictions and limitations on the $0 copay shown on the television screen were not in a prominence or shown for a sufficient time.

217.    In and around April 2019, Defendant Sanofi ran a television advertisement for Toujeo titled "Find Your Groove." On the screen, the commercial screen showed the following text: "$0* Copay first 3 fills and $10 on the next 12." The restrictions and limitations on the copay shown on the television screen were not sufficiently prominent.

218.    In March 2019, Defendant Eli Lilly announced that it would produce a proprietary biosimilar version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the proprietary generic] available in pharmacies as quickly as possible."

219.    But these statements are misleading.

220.    Despite having consumer support programs, not all consumers are eligible and studies, including a study published in October 2022, continue to report that many diabetics who require insulin cannot afford their insulin.

221.    Other reports from 2020 indicate that the Manufacturer Defendants do not sufficiently advertise such support programs, resulting in limited awareness by consumers. Studies also suggest that consumers have been turned away from insulin consumer assistance programs due to their strict eligibility requirements.

222.    GoodRX reports that for consumer assistance programs in general, "many see the sign-up process as deliberately confusing and tedious." Also, according to the December 16, 2022 "Report to Congress on the Affordability of Insulin," the U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, stated with respect to customer assistance programs: "the application processes are generally complex, with reading levels greater than those suggested for patients with low health literacy."

223.    A December 2021 Drug Pricing Investigation Majority Staff Report concluded that although patient assistance programs are ostensibly intended to help patients afford expensive drugs, companies use the programs as tools to garner positive public relations, increase sales, and raise revenue. Further the report found that companies' spending on patient assistance programs is minimal compared to the enormous amount of revenue brought in by the associated drugs.

224.    Also, as discussed in paragraph 152, *supra*, despite Eli Lilly's representations to the contrary, generic insulin lispro is not "available in pharmacies."

**B.      The PBM Defendants' Misleading Statements About Insulin's List Price**

225.      The PBM Defendants make misrepresentations that only reinforce insulin's excessive price by claiming to be interested in lowering costs for consumers by lowering insulin's net price.

226.      For instance, in its 2017 Drug Report, CVS Caremark stated that it "[m]anage[s] formulary and leverage competition to negotiate for lowest-net cost" and its "formulary and utilization management options helped reduce cost for antidiabetic drugs for clients." Allegedly with respect to insulin, CVS Caremark claimed it provided "[p]referred formulary placement for drugs with lower member out-of-pocket costs."

227.      Further, Larry Merlo, head of CVS Caremark stated in 2017 that "[a]ny suggestion that PBMs are causing prices to rise is simply erroneous."

228.      On www.cvshealth.com, there is an April 2018 post titled "The Myth about Drug Rebates and List Prices." The posting states that it is "entirely false" that "higher drug prices mean more rebates and greater profits for PBMs."

229.      There formerly was a domain within www.cvshealth.com at payorsolutions.cvshealth.com. On March 5, 2019, a Senior Vice President, Government and Public Affairs at CVS Health made a post stating: "At CVS Health. . . [w]e are committed to finding the right drug at the lowest possible cost for patients to ensure they are able to access and stay on the medications they need."

230.      Similarly, in 2017, Express Scripts' Chief Executive Officer Tim Wentworth stated on CBS News that PBMs play no role in rising drug prices, claiming that PBMs work to "negotiate with drug companies to get the prices down."

231.      Additionally, Express Scripts' publicly available code of conduct, that was available on its website through January 12, 2023, states that, "[a]t Express Scripts we're dedicated to keeping our promises to patients and clients . . . [A]ll our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable."

232.      On April 19, 2019, Express Scripts posted on Twitter: "Express Scripts negotiates with drug manufacturers to increase competition and lower costs for patients."

233.    Similarly, OptumRx's website has a company video, posted on or around September 4, 2018, stating that PBMs like OptumRx "negotiate with drug companies for the best medication prices. . . ."

234.    Likewise, there is another video on OptumRx's website, posted on August 18, 2019, stating OptumRx is "[h]elping millions of people get medication . . . at the best price."

235.    These statements are echoed by the Pharmaceutical Care Management Association (PCMA). PCMA is a trade group for PBMs. Executives of each of the PBM Defendants are on PCMA's Board of Directors. PCMA states on its website that it is dedicated to reducing the cost of insulin: "PBMs . . . are the only entity in the prescription drug supply and payment chain dedicated to reducing drug costs."

236.    As discussed in paragraphs 167 - 172 and 195 - 199, *supra*, as to analog insulin, these statements are misleading. The PBM Defendants fail to state that they benefit from higher insulin list prices and discourage competition on list prices.

237.    By focusing attention on net price trends instead of the increasing list price trend, PBM Defendants obscure the fact that they are actively driving up the price of insulin and maintaining and controlling it at that high price, while reinforcing their control of the market, at the expense of consumers who end up paying larger out-of-pocket costs. As stated in the December 2022 Report to Congress on the Affordability of Insulin, the "largest concern with growing list prices—even as rebates grow as well—is that patients do not benefit because rebates are not passed on to beneficiaries, meaning their out-of-pocket spending remains pegged to the very high list prices."

## VII.    CONSUMERS ARE HARMED BY EXPOSURE TO INSULIN'S INFLATED CASH PRICE

238.    Defendants' conduct and conspiracy has harmed, and is continuing to harm including ongoing through at least January 12, 2023, the People through insulin's inflated and artificial list price.

239.     Insulin's inflated and artificial list prices, and Defendants' maintenance and control of the list prices at such levels, has, and are, likely to deceive the People into paying more for insulin than they otherwise would have paid absent Defendants' conduct.

**A.     Diabetics Cannot Avoid Paying Excessive Amounts Due To Insulin's Inflated And Artificial List Price**

240.     Diabetics without insurance who require insulin must pay the full cash price of insulin every time they fill their prescriptions. As a result, uninsured patients have paid increasingly higher insulin prices for years on end and continue to do so.

241.     Even with health insurance, a consumer may be required to pay the full cash price of insulin due to their insurance's deductible phase. This is significant since a large and growing percentage of persons who receive health insurance through their employer have a high-deductible health plan.[8] The CDC stated that among persons with private health insurance, enrollment in high-deductible health plans has increased from 25.3% in 2010 to 45.8% in 2018. As the name reflects, the deductible in such plans is high—typically involving thousands of dollars. As stated by CVS Health in a January 29, 2020 posting titled "Addressing out-of-pocket costs for diabetes patients" on www.cvshealth.com: "Patients with a high-deductible health plan shoulder all of their medication costs while in the deductible phase of their insurance, which means they may be forced to make difficult decisions about whether they can afford their medications and fill their prescription."

242.     Co-insurance is another example of how a consumer may be exposed to the full inflated cash price of insulin. Many insurance plans require consumers to pay co-insurance (or a percentage of the total cost) for drugs instead of co-payments, meaning that they pay more as the list price (and consequently, cash price) increases.

243.     Similarly, diabetics with Medicare prescription drug coverage (Part D) who require insulin may also be exposed to insulin's inflated cash price at the pharmacy counter. Many Medicare Part D plans have a deductible phase and may require co-insurance during the

---

[8] For 2022, the Internal Revenue Service defined a high-deductible health plan as any plan with a deductible of at least $1,400 for an individual or $2,800 for a family.

coverage phase. Additionally, once the coverage phase limit is reached, the consumer enters the Medicare Part D coverage gap phase. In the coverage gap phase, the consumer either pays the full cash price or some discount percentage off the full cash price until they reach the threshold for the ensuing catastrophic phase. The deductible amount, thresholds between the different phases, and the amounts due under the coverage gap phase vary by year.

244.    Government plans, like Medicare, may offer qualifying consumers subsidies to help pay for their prescriptions. The income limits for government subsidies, however, are strict and many people do not qualify. Also, the subsidies do not help people with employer-provided health insurance.

245.    Indeed, because so many consumers are exposed to insulin's increasingly inflated list prices, the out-of-pocket cost to consumers has been significant. In 2019, the Health Care Cost Institute published a study of persons with employer sponsored health insurance that concluded that from 2012 to 2016 the annual out-of-pocket cost of insulin for type 1 diabetics doubled, increasing from $2,864 to $5,705.

246.    Similarly, diabetic participants in a 2020 study of the psychological effects of the high cost of insulin reported paying between $75 to over $2,000 a month for insulin, depending on their insulin needs and insurance coverage.

**B.    Many Diabetics Who Require Insulin Cannot Afford Their Insulin, Exacerbating The Harm Due To Insulin's Inflated And Artificial Price**

247.    In addition to financial losses due to overpayment, for many diabetic Californians who require insulin to survive, Defendants' conduct has also cost them their health and emotional well-being.

248.    Inability to afford insulin can force consumers to ration or skip insulin doses.

249.    During an April 2019 U.S. House of Representatives Energy & Commerce Oversight and Investigations Subcommittee hearing, a professor from Yale University reported that in the previous year, due to the price of insulin, 25% of people reported using less insulin than prescribed. That figure was reported in a 2019 article published by the Journal of the American Medical Association.

250. In May 2022, California's Health and Human Services Agency (CalHHS) echoed this figure, reporting that "[n]ational data suggests as many as 1 in 4 diabetics cannot afford their insulin, and thus ration or stop taking insulin altogether."

251. A 2021 nationwide study of type 1 diabetics found that more than 50% of survey respondents considered access to affordable insulin and diabetes drugs was their primary concern.

252. A study that was conducted in 2021, and published in October 2022, indicated that 16% of diabetics who require insulin ration insulin due to costs. The study found that younger persons (20.4%) were more likely to ration insulin than seniors (11.2%); middle-income persons (19.8%) were more likely to ration insulin than both higher-income persons (10.8%) and lower income persons (14.6%); Black persons (23.2%) were more likely to ration insulin than White and Hispanic persons (16%); uninsured (49.2%) were more likely to ration insulin than those with private insurance (18.8%), Medicare (13.5%), or Medicaid (11.6%).

253. Rationing or skipping insulin, however, is not recommended by medical professionals. As discussed in paragraphs 71 - 72, *supra*, they can lead to severe consequences. Taking less than the prescribed amount of insulin leads to poor blood sugar regulation, which can contribute to severe conditions, such as diabetic ketoacidosis, especially in type 1 diabetics, renal failure, loss of sight or limbs, and even death.

254. Moreover, insulin's inflated list price exacerbates disparities among people of color, lower-income communities, and other historically marginalized groups. For example, a recent study found that the share of Mexican Americans taking insulin who achieved good blood-sugar control sharply dropped to 10% during the period of 2013 to 2020 from 25% during 1988 to 1994. In contrast, the proportion of non-Hispanic White people with good blood-sugar management has stayed roughly the same, with 33% achieving it in the most recent period.

255. Those most affected by insulin's high list price are also most at risk of experiencing complications due to diabetes, which further limits a consumer's ability to work, earn an income, and lead healthy lives.

256. But even persons who do not ration or skip their insulin are affected by insulin's inflated list price. As stated by an author of the study referenced in paragraph 249, *supra*, "[t]hat

-52-

1    one-in-four number only reflects people who actually used less insulin because of costs, but other

2    people make trade-offs. . . . They may be spending less on food or other necessary items, even on

3    other medications."

4    **VIII. TOLLING OF THE STATUTE OF LIMITATIONS**

5        257.   To the extent Defendants claim the People's claims are barred by the statute of

6    limitations, the following tolling rules apply: the last overt act doctrine, the continuing violation

7    doctrine, and the continuous accrual doctrine.

8        258.   With respect to the Manufacturer Defendants, their acts within the limitations

9    period include, but are not limited to, decisions to maintain and control the price of insulin at

10   artificially and unconscionably high levels, overcharging for analog insulin at artificial and

11   unconscionable prices, consenting to the republication of artificially and unconscionably high

12   analog insulin prices in compendiums, offering unbranded analog insulins at artificially inflated

13   and unconscionable prices, negotiating and entering into new or amended rebate agreements with

14   the PBM Defendants that provide for the payment of inflated secret rebates based on the

15   exclusion or de-prioritization of other analog insulins, payment of inflated secret rebates and

16   administrative fees to the PBM Defendants for their listing of high priced insulins on favorable

17   positions on standard formularies, and making misstatements about programs aimed at helping

18   consumers afford analog insulin.

19       259.   With respect to the PBM Defendants, their acts within the limitations period

20   include, but are not limited to, negotiating and entering into new or amended rebate agreements

21   with the Manufacturer Defendants that provide for the payment of inflated secret rebates based on

22   the exclusion or de-prioritization of other analog insulins on standard formularies, the exclusion

23   or de-prioritization of lower list priced analog insulin on standard formularies, request for and

24   receipt of payment of inflated secret rebates and administrative fees from the Manufacturer

25   Defendants based on the PBM Defendants' listing of high priced insulins on favorable positions

26   on standard formularies, and making misstatements about their efforts to help consumers afford

27   analog insulin.

28

260.     The Defendants' actions within the limitations period are part of the same course of conduct as their earlier actions because during both periods the Manufacturer Defendants are sharing supra-competitive profits from the artificially inflated and unconscionable list prices of their analog insulins with the PBM Defendants in the form of secret rebates and administrative fees in exchange for favorable placement of their insulins on standard formularies, including in preference over lower priced insulins.

**FIRST CAUSE OF ACTION (BUSINESS AND PROFESSIONS CODE SECTION 17200)**

**UNLAWFUL, FRAUDULENT, AND UNFAIR PRONGS**

**(AGAINST ALL DEFENDANTS)**

261.     The People incorporate by reference and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.     Business and Professions Code section 17200, which is part of the UCL, prohibits any person engaged in business in California from engaging in "any unlawful, unfair or fraudulent business act or practice."

263.     Each Defendant is a "person" within the meaning of Business and Professions Code section 17201.

264.     Defendants are engaged in business in California and have engaged, aided and abetted, conspired to engage, and continue to engage in acts or practices that are unlawful, unfair, or fraudulent, and which constitute unfair competition within the meaning of Business and Professions Code section 17200.

265.     The Manufacturer Defendants' acts or practices are unlawful, as that term is used in the UCL, and include, but are not limited to, violating the California Consumer Legal Remedies Act, Civil Code section 1770, subdivision (a), subpart (13), by making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions to analog insulin. The PBM Defendants' acts or practices are unlawful, as that term is used in the UCL, and include, but are not limited to, violating Business and Professions Code section 17500, by making false or misleading statements of fact concerning their efforts to help Californians afford analog insulin.

266.     Defendants' acts or practices are unfair, as that term is used in the UCL, irrespective of the violation of any other law, and include, but are not limited to:

    a.  artificially inflating, maintaining, and controlling, artificially high list prices of analog insulin, and inflating, maintaining, and controlling, artificially high net prices of analog insulin, in a way that harms consumers and does not provide a sufficient offsetting benefit to the consumers that are injured by the price increase;

    b.  artificially inflating, maintaining, and controlling, artificially high list prices of analog insulin, and inflating, maintaining, and controlling, artificially high net prices of analog insulin at, unconscionable levels;

    c.  using secret rebates for analog insulin in a way that harms consumers and does not benefit competition; or

    d.  facilitating explicit or tacit collusion through facilitating practices, including the exchange or disclosure of competitively sensitive information.

267.     Defendants' acts or practices are fraudulent, as that term is used in the UCL, and include, but are not limited to:

    a.  artificially inflating, maintaining, and controlling, the list prices of analog insulin; or

    b.  making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Manufacturer Defendants to PBM Defendants.

268.     Accordingly, under Business and Professions Code section 17200, *et seq.*, the Attorney General seeks injunctive and other equitable relief to require Defendants to cease their illegal conduct, to restore fair competition, to deny Defendants the fruits of their illegal conduct—specifically, through restitution to the People, to prevent the resumption of that conduct or conduct with the same effect, to impose a civil penalty of two thousand five hundred dollars ($2,500) against Defendants for each violation of Business and Professions Code section 17200, and to impose such other relief as may be just and appropriate for Defendants' violations of the

-55-

UCL, including for after January 1, 2024, disgorgement of profits under Government Code section 12527.6.

### SECOND CAUSE OF ACTION (COMMON COUNT - RESTITUTION)

#### (AGAINST ALL DEFENDANTS)

269.     The People incorporate by reference and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270.     Defendants received and continue to receive money that was intended for the benefit of the People.

271.     Defendants knowingly accepted and retained such benefits, but have not used the money for the benefit of the People nor paid the People back such benefits.

272.     Defendants' financial windfall results from their unlawful, unfair, and deceptive conduct are economically traceable to overpayments for analog insulin products by the People. The People would not have overpaid for analog insulin if not for Defendants' conduct.

273.     It is inequitable for Defendants to retain these benefits.

274.     Accordingly, the People are entitled to the equitable relief of restitution.

### PRAYER FOR RELIEF

WHEREFORE, the People pray for judgment against Defendants, jointly and severally, as follows:

A.     Pursuant to Business and Professions Code section 17203, that Defendants, their successors, agents, representatives, employees, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition as defined in Business and Professions Code section 17200, including, but not limited to, the acts and practices alleged in this Complaint;

B.     Pursuant to Business and Professions Code section 17203, that the Court make such orders or judgments as may be necessary, including preliminary injunctive or ancillary relief, to prevent the use or employment by any Defendant of any act or practice that constitutes unfair competition;

C.     Pursuant to Business and Professions Code section 17203, that the Court make such orders or judgments as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by any Defendant through any act or practice that constitutes unfair competition;

D.     That the Court make an order awarding the People all equitable, restitutionary, monetary relief available from Defendants;

E.     Pursuant to Business and Professions Code section 17206, that the Court assess a civil penalty of $2,500 against each Defendant for each violation of Business and Professions Code section 17200 in an amount according to proof;

F.     Pursuant to Business and Professions Code section 17206.1, in addition to any penalties assessed under Business and Professions Code section 17206, that the Court assess a civil penalty of $2,500 against each Defendant for each violation of Business and Professions Code section 17200 perpetrated against a senior citizen or disabled person, in an amount according to proof;

G.     Pursuant to Business and Professions Code section 17206.2, except as disclaimed in Footnote 1 as to the PBM Defendants, in addition to any penalties assessed under Business and Professions Code section 17206, that the Court assess a civil penalty of $2,500 against each Defendant for each violation of Business and Professions Code section 17200 that occurred on or after its effective date, perpetrated against a service member or veteran, in an amount according to proof;

H.     For each violation of Business and Professions Code section 17200 that occurred on or after the January 1, 2024, effective date Government Code section 12527.6, an award of disgorgement of profits in an amount according to proof;

I.     That the People recover their costs of suit;

1    J.    That the People receive all other relief to which they are legally entitled; and

2    K.    For such other and further relief that the Court deems just and proper.

3  Dated:  August 2, 2024                    Respectfully submitted,

4                                            ROB BONTA
                                             Attorney General of California
5                                            NELI PALMA
                                             Acting Senior Assistant Attorney General
6                                            EMILIO VARANINI
                                             Supervising Deputy Attorney General
7
                                             /s/ Darcie Tilly
8                                            _____
                                             DARCIE TILLY
9                                            Deputy Attorney General
                                             *Attorneys for the People of the State of*
10                                           *California*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28