## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE: INSULIN PRICING LITIGATION

**Case 2:23-md-03080**
**MDL No. 3080**

**JUDGE BRIAN R. MARTINOTTI**
**JUDGE RUKHSANAH L. SINGH**

**RETURNABLE: May 19, 2025**

**THIS DOCUMENT RELATES TO: ALL ACTIONS**


### MEMORANDUM OF LAW IN SUPPORT OF
### MOTION TO COMPEL RESPONSES
### TO COMPASS LEXECON SUBPOENA TO PRODUCE DOCUMENTS

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 3

    A.    The Carlton Report and its widespread publication. ........................... 3

    B.    The Carlton Report is highly relevant to this case. ............................. 7

    C.    Plaintiffs' attempts to obtain the information underlying the report ...................................................................................................... 9

ARGUMENT .......................................................................................................... 14

    A.    Production of the Carlton Report and underlying information is not barred by the attorney-client privilege or work-product doctrine. ........................................................................................... 14

          *1.*    *Attorney-client privilege and work-product protection do not apply because the Carlton Report was primarily prepared as a public relations tool, not for purposes of litigation.* ................................................................................... 16

          *2.*    *The PBM Defendants impliedly waived any attorney-client or work-product privilege by widely publicizing the report, using it in litigation, and employing it in legislative advocacy efforts.* ..................................................... 20

    B.    The Carlton Report materials are not protected under Rule 26(b)(4)(D), because that rule does not apply to document requests, the Carlton Report was not created primarily for purposes of litigation, and the PBM Defendants waived any protection. .......................................................................................... 25

    C.    The PBMs' "clone discovery" arguments should be rejected. .......... 31

CONCLUSION ...................................................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Aiellos v. Zisa,*
  2011 WL 13364386 (D.N.J. July 13, 2011) ................................................... 17, 19

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP,*
  2022 WL 17339035 (E.D. Pa. Nov. 30, 2022) ..................................................... 32

*Atari Corp. v. Sega of America,*
  161 F.R.D. 417 (N.D. Cal. 1994)........................................................................ 28

*Azar v. Allina Health Servs.,*
  587 U.S. 566 (2019)............................................................................................ 27

*Chevron Corp. v. Donziger,*
  2013 WL 3805140 (S.D.N.Y. July 19, 2013)........................................................ 2

*Citizens' State Bank v. Hawkins,*
  71 F. 369 (7th Cir. 1896) .................................................................................... 31

*Egiazaryan v. Zalmayev,*
  290 F.R.D. 421 (S.D.N.Y. Mar. 8, 2013) ............................................................ 19

*Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC,*
  2016 WL 11680950 (D.N.J. Nov. 30, 2016) ....................................................... 27

*Gruss v. Zwirn,*
  2013 WL 3481350 (S.D.N.Y. July 10, 2013)....................................................... 23

*Guiffre v. Maxwell,*
  2016 WL 1756918 (S.D.N.Y. May 2, 2016) ........................................................ 18

*In re Am. Med. Collection Agency Customer Data Sec. Breach Litig.,*
  2023 WL 8595741 (D.N.J. Oct. 16, 2023),
  *aff'd,* 2024 WL 5344456 (D.N.J. July 17, 2024) ................................................ 23

*In re B & C Seafood LLC,*
  431 F. Supp. 3d 533 (D.N.J. 2019)........................................................... 16, 27, 28

*In re Barshak*,
106 F.3d 501 (3d Cir. 1997) ...................................................................27

*In re Chevron Corp.*,
633 F.3d 153 (3d Cir. 2011) ...................................................................21

*In re Gabapentin Pat. Litig.*,
214 F.R.D. 178 (D.N.J. 2003) ................................................................16

*In re Grand Jury Proc.*,
219 F.3d 175 (2d Cir. 2000) ...................................................................22

*In re Grand Jury Subpoena Dated July 6, 2005*,
510 F.3d 180 (2d Cir. 2007) ...................................................................17

*In re Human Tissue Prods. Liab. Litig.*,
255 F.R.D. 151 (D.N.J. Dec. 12, 2008) ..................................................15

*In re Intel Corp. Microprocessor Antitrust Litig.*,
2008 WL 11233766 (D. Del. Mar. 6, 2008),
*R&R adopted*, 2008 WL 11231447 (D. Del. Mar. 20, 2008) ................28, 29, 30

*In re Kidder Peabody Sec. Litig.*,
168 F.R.D. 459 (S.D.N.Y. 1996) .......................................................3, 15, 24, 25

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2021 WL 3140050 (D.N.J. July 22, 2021) ................................................2, 19, 21

*In re Zofran (Ondansetron) Prods. Liab. Litig.*,
392 F. Supp. 3d 179 (D. Mass. 2019) .....................................................27

*Khartchenko v. Am. Oncologic Hosp., Inc.*,
2024 WL 4345277 (D.N.J. Sept. 30, 2024) ............................................16

*King County v. Eli Lilly*,
No. 2:23-md-03080-BRM-RLS, Second Amended Complaint (ECF No.
160) ....................................................................................................7, 8

*King County v. Eli Lilly,*
No. 23-20932, First Amended Consolidated Class Action Complaint
(ECF No. 17).......................................................................................7, 8

*NXIVM Corp. v. O'Hara*,
   241 F.R.D. 109, 142 (N.D.N.Y. 2007) ............................................................ 3, 21

*Paris v. R.P. Scherer Corp.*,
   2006 WL 1982876 (D.N.J. July 13, 2006) ........................................................ 16

*Pavelic & LeFlore v. Marvel Ent. Grp.*,
   493 U.S. 120 (1989) ............................................................................................ 26

*Peterson v. Wright Med. Tech., Inc.*,
   2013 WL 655527 (C.D. Ill. Feb. 21, 2013) ................................................. 32, 33

*Republic of Philippines v. Westinghouse Elec. Corp.*,
   132 F.R.D. 384 (D.N.J. 1990) ............................................................................ 22

*Sticht v. Wells Fargo Bank, N.A.*,
   2023 WL 2206641 (D. Conn. Feb. 24, 2023) .................................................... 33

*United States v. Coburn*,
   2022 WL 357217 (D.N.J. Feb. 1, 2022) ................................................. 15, 17, 19

*Urb. Box Off. Network, Inc. v. Interfase Managers, L.P.*,
   2004 WL 2375819 (S.D.N.Y. Oct. 21, 2004) ............................................... 22, 23

*Westinghouse Elec. Corp. v. Republic of Philippines*,
   951 F.2d 1414 (3d Cir. 1991) ....................................................................... 16, 17

*Westmoreland v. CBS, Inc.*,
   97 F.R.D. 703 (S.D.N.Y. 1983) ......................................................................... 22

*Whitman v. State Farm Life Ins. Co.*,
   2020 WL 5526684 (W.D. Wash. Sept. 15, 2020) .............................................. 32

*Younes v. 7-Eleven, Inc.*,
   2014 WL 1959246 (D.N.J. May 15, 2014) ......................................................... 20

*Ziner v. Cedar Crest College*,
   2006 WL 8409873 (E.D. Pa. May 30, 2005) ..................................................... 30

**Other Authorities**

A. Scalia & B. Garner,
Reading Law 56 (2012) ........................................................................26

Alden Abbott,
*The FTC Takes On Pharmaceutical Benefit Managers*, FORBES (Oct. 3, 2024, 8:41 PM),
https://www.forbes.com/sites/aldenabbott/2024/10/03/the-ftc-takes-on-pharmaceutical-benefit-managers/ .........................................................5

Dennis W. Carlton,
*PBMs and Prescription Drug Distribution: An Economic Consideration of Criticisms Levied Against Pharmacy Benefit Managers*, COMPASS LEXECON (Oct. 9, 2024), https://www.compasslexecon.com/cases/pbms-and-prescription-drug-distribution-an-economic-consideration-of-criticisms-levied-against-pharmacy-benefit-managers................................passim

Letter from PCMA to Connecticut Legislature (Mar. 11, 2025),
https://www.cga.ct.gov/2025/hsdata/TMY/2025SB-00011-R000311-Hallemeier,%20Sam,%20Sr%20Director%20-%20State%20Affairs-PCMA-Opposes-TMY.PDF ...........................................................5, 23

Optum, LINKEDIN (Oct. 30, 2024),
https://www.linkedin.com/posts/optum_lets-bust-some-common-myths-about-pbms-activity-7257398345072025600-rdsZ?utm_source=share&utm_medium=member_desktop&rcm=ACoAA AoGskcBELoIfyxSlhjQ0cAdpd9jvQixBTs ("OptumRx LinkedIn Article") .............................................................................6, 17

*Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*,
FTC (July 2024), https://www.ftc.gov/reports/pharmacy-benefit-managers-report .............................................................................4

Summary of Report (Oct. 2024), https://carltonreport.org/summary-pbms-and-prescription-drug-distribution/..........................................7, 17, 21

**Rules**

Fed. R. Civ. P. 26(b)(4)(D) ..............................................................26, 27

## __INTRODUCTION__

In 2023, the PBM Defendants[1] commissioned the economic consulting firm Compass Lexecon, LLC to prepare a report focusing on PBMs and criticisms levied against them, including claims that they are responsible for high prescription drug costs. When the report was complete, the PBMs did not treat it as a confidential litigation document. Instead, they broadly published the report and featured it as part of a substantial marketing campaign. They directed Compass Lexecon to publish the report on the firm's website, ordered Compass Lexecon to create a unique website to feature the report for the general public, and posted about the report on their LinkedIn pages (which collectively have over one million followers). They also repeatedly cited to the report in public filings as if it were an independent objective source of factual information about PBMs and their role in drug pricing.

But when the MDL Plaintiffs[2] subpoenaed Compass Lexecon seeking background information underlying this publicly—and widely—available report,

---

[1] The "PBM Defendants" (also called the "PBMs" herein) are CVS Health Corporation, Caremark Rx, LLC, Caremark, LLC, Caremark PCS Health, LLC, Evernorth Health, Inc. (together, "CVS"), Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy Inc. (together, "Express Scripts"), United Health Group, Inc., Optum, Inc., OptumRx, Inc., and OptumInsight, Inc. (together, "OptumRx").

[2] "MDL Plaintiffs" refers to the State Attorney General Track Plaintiffs, the Class Action Track Plaintiffs (Case No. 2:23-cv-20932), and the Self-Funded Payer Track Plaintiffs.

including the data the PBMs provided to the firm, the PBMs balked. They claimed that Compass Lexecon was retained in anticipation of litigation and that the firm was acting as a PBM consulting expert. Accordingly, they objected to the production of *any* material related to the report, arguing that the information was shielded under the attorney-client privilege, work-product doctrine, and Rule 26(b)(4)(D)'s protection for non-testifying consulting experts.

The PBM Defendants cannot meet their burden of showing that they are entitled to protection under any of these doctrines for two basic reasons. First, to secure protection, the PBM Defendants must establish that the documents were "prepared primarily for the purpose of litigation." *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 3140050, at *7 (D.N.J. July 22, 2021) (quotation omitted). The PBM Defendants and the report itself, however, expressly state that the purpose of the report is to "inform the extensive debate that has formed around [PBMs]." And "as a general matter public relations advice, even if it bears on anticipated litigation, falls outside the ambit of protection[.]" *Chevron Corp. v. Donziger*, 2013 WL 3805140, at *3 (S.D.N.Y. July 19, 2013) (quotation omitted).

Second, even if the report was created primarily for purposes of litigation (it was not), the PBM Defendants have waived any protection. Courts refuse to permit litigants to make such reports "fodder for grand[] public discourse," then claim work product when an opponent seeks production of the report and underlying documents.

2

*NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 142 (N.D.N.Y. 2007). Put another way, a party cannot "use the substance of the documents as a sword while at the same time invoking . . . privilege as a shield to prevent disclosure." *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 472–73 (S.D.N.Y. 1996) . The PBM Defendants have done exactly what courts have warned against. They have deployed the report to shape public debate, to support their positions in litigation, and to urge legislators to reject legislation regulating PBMs. The PBMs cannot now reverse course and resist disclosure.

This transparent sword and shield strategy is impermissible. The Court should grant the Motion.

## FACTUAL BACKGROUND

### A.    The Carlton Report and its widespread publication.

On July 19, 2024, Compass Lexecon, a well-known economic consulting firm, published a report online that "focuses on the role of pharmacy benefit managers in the healthcare industry and investigates various claims that PBMs are causing increases in the cost of prescription drugs." Carlton Report at 117.[3] The

---

[3] Dennis W. Carlton, *PBMs and Prescription Drug Distribution: An Economic Consideration of Criticisms Levied Against Pharmacy Benefit Managers*, COMPASS LEXECON (Oct. 9, 2024), https://www.compasslexecon.com/cases/pbms-and-prescription-drug-distribution-an-economic-consideration-of-criticisms-levied-against-pharmacy-benefit-managers. While the original Report was published on July 19, 2024, it was updated in October of 2024. All quotes in this Motion are to

report—which was funded by PBM Defendants CVS Caremark, Express Scripts, and OptumRx—purports to be "a systematic study of data on prescriptions, rebates, PBM conduct, and the state of the pharmacy industry to evaluate common criticisms of the PBM industry." *Id.* at 1. Relying upon data provided by the PBMs, it unsurprisingly concludes that the "claims of critics are inconsistent with the empirical evidence." *Id.*

The Carlton Report was not published in a vacuum. Indeed, the timing of its publication was strategic—it came ten days after, and evidently in response to, the Federal Trade Commission's July 9, 2024 Interim Staff Report on Prescription Drug Middlemen ("FTC Report"), which "underscore[d] the impact [PBMs] have on the accessibility and affordability of prescription drugs."[4] According to the Carlton Report, "[m]uch of the data [it] analyze[d] was submitted to the FTC by Caremark, Express Scripts, and OptumRx in response to FTC's requests during is Section 6(b) study of PBMs." Carlton Report at 1. The FTC Report is critical of PBMs and their role in ever increasing drug prices; the Carlton Report takes the opposite view. For

_____

the October version, which is attached as **Ex. 9** to the Certification of Joanne Cicala filed herewith ("Cicala Certification").

[4] *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, FTC (July 2024), https://www.ftc.gov/reports/pharmacy-benefit-managers-report.

example, the Carlton Report claims that, "[f]ar from being a source of increased costs, PBMs help to lower the cost of prescription drugs." *Id.* at 3.

Most critically for this Motion, the PBMs have not treated the Carlton Report as a confidential litigation document that should be shielded from disclosure. Far from it. Instead, the PBMs have widely publicized the report, making it publicly available on a website dedicated exclusively to the report (www.carltonreport.org), as well as on the Compass Lexecon website, the Pharmaceutical Care Management Association's ("PCMA") website, and other public fora. Since publication, the Carlton Report has been cited by national news sources such as Forbes and by the PCMA in public letters opposing proposed state legislation to regulate PBMs.[5] This far-reaching dissemination of the Carlton Report was knowing and intentional.

Further, the PBMs themselves have characterized the Carlton Report in terms that suggest it is not a litigation document but rather an objective resource of PBM facts for the general public. For example, Defendant OptumRx shared the Carlton Report on its LinkedIn page, which has more than one million followers, and wrote an article promoting it. In its post, OptumRx describes the Carlton Report as a

---

[5] *E.g.,* Alden Abbott, *The FTC Takes On Pharmaceutical Benefit Managers*, FORBES (Oct. 3, 2024, 8:41 PM), https://www.forbes.com/sites/aldenabbott/2024/10/03/the-ftc-takes-on-pharmaceutical-benefit-managers/; Letter from PCMA to Connecticut Legislature (Mar. 11, 2025), https://www.cga.ct.gov/2025/hsdata/TMY/2025SB-00011-R000311-Hallemeier,%20Sam,%20Sr%20Director%20-%20State%20Affairs-PCMA-Opposes-TMY.PDF.

"comprehensive overview of PBMs and their role in managing prescription drug costs" and a study that "challenges common PBM criticisms."[6] In its opening paragraph, the OptumRx LinkedIn Article describes the Carlton Report not as a report for litigation but as a means of addressing common critiques of PBMs:

> The pharmaceutical industry is often at the center of debates regarding drug pricing and distribution. [PBMs] have been a focal point in these discussions, with critics arguing that they contribute to high drug prices and limit access to generic medications. To address and refute these common critiques, Compass Lexecon—a leading economic consulting firm—conducted a comprehensive analysis of the PBM industry, led by Dr. Dennis Carlton (one of the country's preeminent economists), which spanned 16 months, and aimed to provide data-backed insights into the criticisms levied against PBMs.

*Id.*

In addition, on September 17, 2024, months after the report was published, Express Scripts sued the FTC seeking an order from the court "vacating and setting aside the [FTC Report]" and "requiring the [FTC] to remove the [FTC Report] from all [FTC] websites." *See Express Scripts v. FTC*, No. 4:24-cv-01263 (E.D. Mo. Sept. 17, 2024). The fundamental thesis of the Express Scripts suit is that the FTC Report is riddled with errors and is unreliable. *See id.* ¶ 3 ("Yet the Commission has now

---

[6] Optum, LINKEDIN (Oct. 30, 2024), https://www.linkedin.com/posts/optum_lets-bust-some-common-myths-about-pbms-activity-7257398345072025600-rdsZ?utm_source=share&utm_medium=member_desktop&rcm=ACoAAAoGskc BELoIfyxSlhjQ0cAdpd9jvQixBTs ("OptumRx LinkedIn Article") .

issued a fundamentally flawed and biased Report that simply ignores the evidence[.]"). In support of this thesis, Express Scripts repeatedly cites to the Carlton Report, claiming that it contains the objective, accurate facts regarding the role of PBMs in drug pricing. *See id.* at nn. 1, 2, 19, 112, 113, 115, 116, 118, 120.

### B.    The Carlton Report is highly relevant to this case.

The Carlton Report and the data underlying it lie at the core of this case. In writing the Report, Compass Lexecon analyzed common criticisms of PBMs, including (1) whether PBMs are "responsible for high drug prices" and (2) whether "PBMs fail to pass through manufacturer rebates and fees to plan sponsors." Summary of Report at 3.[7] These questions mirror many of the exact allegations in Plaintiffs' complaints. *See, e.g.*, Second Amended Complaint ("*King* SAC"), *King County v. Eli Lilly*, MDL No. 3080 (ECF No. 160); First Amended Consolidated Class Action Complaint ("Class Track FAC"), No. 23-20932 (ECF No. 17).

For example, the Carlton Report ostensibly responds to the critique that PBMs "act to maximize the dollar amount of retained rebates and thus have an incentive to permit—or even encourage—manufacturers to raise list prices." Carlton Report at 87. Plaintiffs levy this very critique in their complaints: that the Manufacturers and the PBM Defendants "have realized that they both benefit if, instead of forcing

---

[7] Summary of Report (Oct. 2024), https://carltonreport.org/summary-pbms-and-prescription-drug-distribution/. The Summary is attached as **Ex. 10** to the Cicala Certification.

the Manufacturer Defendants to sell their drugs for cheaper prices, the PBM Defendants induce the Manufacturer Defendants to compete by paying ever-increasing rebates and fees to the PBM Defendants." *See King* SAC ¶ 213; *see also* Class Track FAC ¶¶ 190–95 (same).

The Carlton Report also purports to respond to the claim that PBMs do not pass through all of the negotiated rebates to plan sponsors. Carlton Report at 76. It argues that, based on rebate data provided by the PBM Defendants, the average rebate pass-through rate was 98% in 2021. *Id.* at 76–77. Plaintiffs allege, however, that while the PBMs purport to pass rebates through to the payors, in reality they do not. *See, e.g., King* SAC ¶ 260 (alleging that PBMs have "moved to relabel [] manufacturer 'rebates' more broadly as various 'fees,' 'discounts,' and the like in order to better shield them from scrutiny and minimize their pass through obligations"); Class Track FAC ¶ 346 (alleging that, because PBMs report Manufacturer Payments in the aggregate, "PBM Defendants [can] hide the large payments that they receive for the Insulin Drugs").

MDL Plaintiffs bring a host of claims—including racketeering, common law fraud, and state deceptive and unfair practice claims—that rest at least in part on Defendants' misrepresentations. Those misrepresentations, again, are the very misstatements that the PBM Defendants have doubled down on in the Carlton Report, including claims that PBMs lower drug prices and pass through rebates. The

content of the Carlton Report is indisputably relevant to this litigation. And the data underlying the report—necessary to analyze the accuracy of Defendants' representations—can be produced with zero (or near zero) burden.[8]

### C. Plaintiffs' attempts to obtain the information underlying the report.

Given that the Carlton Report addresses the PBMs' role in drug pricing, that the PBMs are publicly and widely distributing the report as part of a PR campaign extolling the legitimacy of their conduct, and that the PBMs are citing the Carlton Report as objective fact contradicting the findings of the FTC—issues that are all at the heart of this litigation—on October 4, 2024, Plaintiffs served a subpoena on Compass Lexecon seeking materials and data related to the Carlton Report ("MDL Subpoena"). *See* **Ex. 1** to Cicala Certification. The MDL Subpoena seeks, in material part, the underlying materials and data used by Compass Lexecon in preparing the Carlton Report, information on payments to Compass Lexecon by the PBMs, agreements/retainers relating to the Carlton Report, and communications related to the Carlton Report, diabetes drugs, or manufacturer payments (including rebates).

---

[8] PBM Defendants contend the Carlton Report is not relevant because it covers more than just diabetes drugs. That criticism is misguided. First, the report includes diabetes drugs as part of its analysis. Second, the report's claims about non-diabetes drugs generally mirror the issues in this MDL. And finally, data concerning other drugs is relevant as a point of contrast to diabetes medications.

On November 20, 2024, counsel for Compass Lexecon served boilerplate objections to the MDL Subpoena, including general assertions of attorney-client privilege, work-product protection, and common interest protection. **Ex. 2** to Cicala Certification. In these objections and responses, however, Compass Lexecon did not state that either Compass Lexecon or Dr. Carlton had been retained at any point as an expert or by the PBMs in anticipation of litigation.

Then, on November 22, 2024, nearly seven weeks after receiving notice of the subpoena, PBM counsel interjected objections for the first time, claiming that Compess Lexecon was retained to "support counsel in representing the PBM Defendants in connection with the FTC study of the PBM industry," that they retained Compass Lexecon "in anticipation of litigation," and that the requested information was subject to "the work-product protections provided by Rule 26(b)(4)(D) for non-testifying experts." **Ex. 3** to Cicala Certification.

Plaintiffs thereafter informed PBM counsel that at the very least Compass Lexecon should immediately produce the data that the authors of the Carlton Report relied on while the conferral process continued. **Ex. 4** to Cicala Certification. Plaintiffs explained that "[t]his data clearly is not privileged and the burden associated with its production would be minimal given that the data has already been compiled and produced." *Id.* As previously noted, by its own description, much of the data analyzed by the Carlton Report is the same data that the PBMs provided to

the FTC and therefore could be produced to Plaintiffs with little to no additional effort.

Counsel for the PBMs, however, quickly rejected the Plaintiffs' request. In fact, they asserted that the request was "without merit" and demanded that the MDL Subpoena be withdrawn. **Ex. 5** to Cicala Certification.

Plaintiffs, PBMs, and Compass Lexecon then conferred remotely on January 31, 2025. During the conference, Plaintiffs posed several questions to the PBMs:

- First, Plaintiffs asked the PBMs to identify the litigation that was anticipated when they hired Compass Lexecon so that Plaintiffs could assess the PBMs' claims to attorney-client and work-product protection.

- Second, the Plaintiffs asked whether the PBMs objected to the production of three specific categories of information that were described in OptumRx's LinkedIn Article as having formed the basis of the Carlton Report: PBM industry materials (including the documents and data that the PBMs provided to the FTC), third-party materials, and publicly available information.

- Third, given that the PBMs and Compass Lexecon objected to the subpoena on the grounds that the data they sought was duplicative of the data the PBMs claimed they were going to produce in this litigation, Plaintiffs asked the PBMs and Compass Lexecon to identify what specific data they were going to produce.

During the conference, counsel for the PBMs declined to provide specific answers to these and related questions.

Because the PBMs declined to answer these questions during the conference, immediately after the conference, Plaintiffs emailed counsel for the PBMs and

Compass Lexecon and set forth a detailed summary of the discussion. The email

included the questions that Plaintiffs had raised during the conference, such as

questions regarding the PBMs' claims that Compass Lexecon was retained in

anticipation of litigation. It also narrowed requests for certain categories of

information used by Compass Lexecon in preparing the Carlton Report. **Ex. 6** to

Cicala Certification.

With respect to the actual PBM-related data and material that had previously

been provided to Compass Lexecon and that was at the heart of the requests in the

MDL Subpoena, the Plaintiffs' summary email stated:

> Plaintiffs asked specific questions regarding the three
> categories of documents that CL has stated publicly were
> used to prepare the Carlton Report: (i) materials provided
> by the PBMs to the FTC; (ii) additional "confidential
> data" provided by the PBMs to CL; and (iii) certain
> publicly available information culled by CL in preparing
> the Report.
>
> (i)   FTC Materials: The PBMs said they would
>       consider the request and discuss with their clients;
> (ii)  "Confidential Data": In addressing the PBMs'
>       objection that Plaintiffs should not seek
>       information from CL that could be obtained from
>       the PBMs, Plaintiffs asked whether the
>       "confidential data" provided by the PBMs to CL
>       would be included in the PBMs' data production in
>       this MDL. The PBMs stated that the MDL data
>       production was currently being negotiated and thus
>       that question could not yet be answered. The
>       Plaintiffs emphasized that at the very least the data
>       provided to CL should be produced in this MDL,
>       and further emphasized that it is important for

Plaintiffs to understand what data was provided to CL in the context of the ongoing MDL data negotiations to help inform the Plaintiffs' data requests. Again, PBM counsel stated they would consult with their clients.

-To the extent there is a continuing burden objection to this production, Plaintiffs requested information regarding specifics of the burden, including cost.

(iii)   Public materials: Plaintiffs noted that this category would not be work product/privileged and should be produced. PBM and CL counsel said they would consult with their clients.

The PBMs also claimed in their 12/19 email and reiterated today that the data sought by the subpoena is duplicative given that each PBM has already agreed to produce relevant data in response to Master Discovery RFP No. 33. Plaintiffs ask you to identify what data you are producing in the MDL in response to that request that is similar to the data requested in the subpoena.

*Id.* The PBMs responded on February 21, 2025, purporting to answer certain of Plaintiffs' questions but largely reasserting their objections and refusing to provide any material sought by the MDL Subpoena. **Ex. 7** to Cicala Certification.

In response to the specific questions regarding which litigation was anticipated when Compass Lexecon was hired, the PBMs answered broadly. They stated that Compass Lexecon was hired in 2023 in response to a wave of investigations and lawsuits by private parties, State Attorneys General, and the FTC. *Id.* at 1–2. Importantly, however, the PBMs expressly *carved out* the Express Scripts suit against the FTC from this broad description. Specifically, the PBMs stated that,

13

"Compass was *not* retained in anticipation of the lawsuits filed by Express Scripts in September 2024 or the PBMs in November 2024." *Id.* at 2 n.3.[9]

The next business day, Compass Lexecon also responded, effectively adopting the PBMs' position and claiming that responding to the requests may be "time consuming and expensive." **Ex. 8** to Cicala Certification. At the same time, Compass Lexecon refused to provide any analysis of burden as Plaintiffs requested.

Plaintiffs thereafter sought—and were granted—leave to file this Motion to Compel. The facts and circumstances here do not support the PBMs' (and Compass Lexecon's) objections. The Court should order Compass Lexecon to respond fully to the MDL Subpoena.

## **ARGUMENT**

### A.    **Production of the Carlton Report and underlying information is not barred by the attorney-client privilege or work-product doctrine.**

The PBM Defendants argue that the material requested by the MDL Subpoena is protected under both the attorney-client privilege and work-product doctrine. But neither doctrine is applicable here. First, the Carlton Report was not

---

[9] The PBMs jointly sued the FTC in November 2024 (also in the Eastern District of Missouri) seeking to have the FTC's insulin drug pricing enforcement action (which was filed against the PBMs in October 2024) dismissed on constitutional and related grounds. While pending in the same federal district, this October 2024 suit is separate from the September 2024 lawsuit Express Scripts filed against the FTC and certain commissioners.

created primarily for purposes of litigation. It was published with the goal of rehabilitating the public's perception of PBMs following the FTC Report and discouraging states and Congress from enacting legislation to further regulate PBMs. The PBM Defendants—and the report itself—have acknowledged that the purpose of the report is to inform the extensive debate around the role of PBMs. *Cf. United States v. Coburn*, 2022 WL 357217, at *3 (D.N.J. Feb. 1, 2022) ("Advice that is predominantly concerned with . . . public relations is not protected.").

Second, "[p]rivilege may not be used both as sword and shield." *In re Human Tissue Prods. Liab. Litig.*, 255 F.R.D. 151, 158 (D.N.J. Dec. 12, 2008) . But that is exactly what the PBM Defendants seek to do here: the PBM Defendants have deployed the Carlton Report in the court of public opinion, in litigation against the FTC, and in legislative advocacy efforts. By refusing to produce documents in response to the MDL subpoena, the PBM Defendants seek to use allegedly privileged material as a sword when it serves them, while selectively invoking privilege as a shield when it does not. In so doing, the PBM Defendants are "guilty of the exact conduct that the subject matter waiver doctrine was formulated to address." *In re Kidder*, 168 F.R.D. at 472 (quotation omitted).

1.    *Attorney-client privilege and work-product protection do not apply because the Carlton Report was primarily prepared as a public relations tool, not for purposes of litigation.*

To start, attorney-client and work-product protections are inapplicable because the PBM Defendants primarily created the Carlton Report for purposes of a public-facing marketing campaign, not for litigation. "[T]he attorney-client privilege will apply only if the primary purpose of the communication was to aid in the provision of legal advice." *Khartchenko v. Am. Oncologic Hosp., Inc.*, 2024 WL 4345277, at *10 (D.N.J. Sept. 30, 2024) (quotation omitted). "The privilege protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423–24 (3d Cir. 1991) (cleaned up).

Similarly, "to qualify as work-product the dominant purpose in preparing the document must be the concern about potential litigation." *In re B & C Seafood LLC*, 431 F. Supp. 3d 533, 537 (D.N.J. 2019) . "Even where the reasonable anticipation of litigation is established, whether [a] document comes within the purview of the work product privilege . . . depends primarily on the reason or purpose for the documents' production." *In re Gabapentin Pat. Litig.*, 214 F.R.D. 178, 184 (D.N.J. 2003) . "A document that was prepared for other reasons that becomes useful for litigation does not meet the 'prepared primarily for litigation' standard." *Paris v. R.P. Scherer Corp.*, 2006 WL 1982876, at *3 (D.N.J. July 13, 2006) .

16

For both doctrines, it is the party asserting privilege that bears the "burden to establish applicability of attorney-client privilege and work-product doctrine." *Aiellos v. Zisa*, 2011 WL 13364386, at *2 (D.N.J. July 13, 2011). This is a "heavy burden." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007). Indeed, because these protections "obstruct[] the truth-finding process," they must be "construed narrowly." *Westinghouse*, 951 F.2d at 1423–24. And crucially, "[a]dvice that is predominantly concerned with . . . public relations is not protected." *United States v. Coburn*, 2022 WL 357217, at *3 (D.N.J. Feb. 1, 2022).

Both the PBM Defendants and Compass Lexecon have described the Carlton Report, not as a litigation document, but as a public facing marketing effort. The PBM Defendants, for instance, have stated that PBMs are "often at the center of debates regarding drug pricing," with "critics arguing that [PBMs] contribute to high drug prices," and that, "to address and refute these common critiques, Compass Lexecon . . . conducted a comprehensive analysis of the PBM industry . . . aimed to provide data-backed insights into the criticisms levied against PBMs." *See* OptumRx LinkedIn Article, *supra* note 4, at 1. Dr. Carlton likewise explained that the purpose of his report was "to analyze whether the data support common criticisms that have been made about PBMs and to inform the extensive debate that has formed around this topic." *See* Summary of Report at 2. The report, in other words, was created primarily to inform public debate, not for litigation.

17

In fact, Compass Lexecon, the Report itself, and the PBMs' statements about the Report have suggested that it was not prepared for anything other than public consumption. In these public-facing documents and releases, there is no mention of litigation, no suggestion that Compass Lexecon was or would be serving as a PBM expert, and no indication that that the report served any purpose other than informing public debate. Instead, the PBM Defendants have focused on using the report to burnish the reputation of PBMs in the eyes of the public. Essentially, the PBM Defendants have treated the Carlton Report for all intents and purposes like a lengthy and heavily footnoted pro-PBM press release.[10]

Courts have routinely rejected attempts to shield similar public relations documents (and related data and communications) from disclosure. Take *Guiffre v. Maxwell*, 2016 WL 1756918, at *9 (S.D.N.Y. May 2, 2016) , for example. There, the defendant resisted producing communications involving her attorney and a media agent, arguing that production was barred by the attorney-client privilege. *Id.* at *8–*9. The court disagreed, explaining that the defendant "failed to establish that the predominate purpose of the communications in question was the ultimate provision of legal advice." *Id.* at *8. Instead, "[t]hroughout the communications, [the consultant] [was] involved for public relations matters." *Id.* The same, of

---

[10] While the PBM Defendants cite to the Carlton Report in litigation against the FTC, the PBM Defendants have expressly stated that Compass Lexecon was not retained in anticipation of that litigation.

course, is true here. The PBM Defendants—by their own admission—predominately relied on Compass Lexecon and the Carlton Report for public relation matters. As a result, the Carlton Report and the materials underlying it are not protected from disclosure.

In similar cases, other courts have reached this same result. *See, e.g.*, *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 3140050, at *14 (D.N.J. July 22, 2021) (rejecting attorney-client and work-product protection over communications with a "public relations consulting firm" because the "services consisted of general public relations assistance, the primary purpose of which was to present a favorable public image of [the party], not to assist its attorneys in litigation"); *United States v. Coburn*, 2022 WL 357217, at *3 (D.N.J. Feb. 1, 2022) (holding that "communications with public relations firms . . . concerning public disclosure, communications, potential litigation, and related legal strategy . . . [were] not protected by either privilege because they [bore] too tenuous a connection to the provision of legal advice" (cleaned up)); *Egiazaryan v. Zalmayev*, 290 F.R.D. 421 (S.D.N.Y. Mar. 8, 2013) (rejecting protections for public relations materials and observing that "[a] media campaign is not a litigation strategy").

It is worth emphasizing that the party asserting privilege bears the heavy burden of showing that the doctrine applies. *Aiellos*, 2011 WL 13364386, at *2. The PBM Defendants have made no effort to carry this burden. Their letters and emails

over months of negotiations are devoid of any details beyond their bald assertion that Compass Lexecon was retained in anticipation of litigation. The PBMs have never even attempted to address the stark reality that the Carlton Report was obviously prepared for a public purpose other than litigation and that both OptumRx and Compass Lexecon itself have described it as a public document. Thus, the PBMs have not carried their burden. *See Younes v. 7-Eleven, Inc.*, 2014 WL 1959246, at *3 (D.N.J. May 15, 2014) (noting that "conclusory" or "boilerplate" assertions "are insufficient to establish that a privilege exists").[11]

> 2. *The PBM Defendants impliedly waived any attorney-client or work-product privilege by widely publicizing the report, using it in litigation, and employing it in legislative advocacy efforts.*

Even if attorney-client or work-product protection applied (they do not), the PBM Defendants have impliedly waived any privilege over the Carlton Report and underlying documents by publicly disclosing the Carlton Report, affirmatively using the Report in litigation, and deploying it to advance governmental lobbying efforts. A party impliedly waives attorney-client and word-product protection through the

---

[11] Even if the Court concluded that the materials used and considered by Compass Lexecon in preparing the Carlton Report deserve some measure of work product protection, that still would not end the inquiry. Under the Federal Rules of Civil Procedure, a court may order production of work product materials if the party seeking such materials demonstrates that it "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). That is precisely the case here.

"purposeful disclosure of the purportedly privileged material to a third-party." *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) .

The purpose of this rule is clear: a party may not use "privilege as a sword and then as a shield depending upon whether the revelation of arguably privileged [material] is beneficial to them or detrimental to them at a given time and in a given circumstance." *In re Valeant*, 2021 WL 2163463, at *6. "It is hypocritical to claim that a document is confidential one moment and then share such documents with a host of others to be used for something other than litigation." *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 142 (N.D.N.Y. 2007) .

While any one of their public disclosures would be sufficient to find waiver, the PBM Defendants have waived protection in at least three ways. First, a party waives attorney-client privilege and work-product protection when it releases material as "fodder for grander public discourse." *Id.* Here, the PBM Defendants have broadly published the Carlton Report for the express purpose of "inform[ing] the extensive debate" around PBMs. *See* Summary of Report at 2. As in *NXIVM*, the PBM Defendants shared information with a PR consultant in "a deliberate, affirmative[,] and selective strategic decision to disclose this information for another benefit other than aiding the lawyer pitched in the battle of litigation." *Id.* They did

so "for control of the airwaves and print media." *Id.* Having injected the information

into public debate, they cannot use privilege "as a shield and sword." *Id.*[12]

Second, "a party cannot waive [its] privilege selectively; voluntary disclosure

in one case waives the privilege with respect to the disclosed communications in all

subsequent cases." *Urb. Box Off. Network, Inc. v. Interfase Managers, L.P.*, 2004

WL 2375819, at *3 (S.D.N.Y. Oct. 21, 2004) . In other words, "when a party

discloses its work product in the course of any adversarial proceeding, . . . the party

waives its right to assert that privilege against any other party." *Republic of

Philippines v. Westinghouse Elec. Corp.*, 132 F.R.D. 384, 390 (D.N.J. 1990). That

is exactly what happened here. In its complaint against the FTC seeking to set aside

the FTC Report, Express Scripts repeatedly cited the Carlton Report. The PBM

Defendants "cannot be permitted to pick and choose among [their] opponents,

waiving the privilege for some and resurrecting the claim of confidentiality to

obstruct others, or to invoke the privilege as to communications whose

---

[12] *See, e.g.*, *In re Grand Jury Proc.*, 219 F.3d 175, 184 (2d Cir. 2000)  ("[W]here a corporation has disseminated information to the public that reveals parts of privileged communications or relies on privileged reports, courts have found the privilege waived."); *Westmoreland v. CBS, Inc.*, 97 F.R.D. 703, 706 (S.D.N.Y. 1983) ("CBS cannot at once hold out the . . . Report to the public as substantiating its accusations and, when challenged, decline to reveal the Report[.]").

confidentiality [they] already compromised for [their] own benefit." *Urb. Box Off.*, 2004 WL 2375819, at *4 (quotation omitted).[13]

Third, "[a]s a general matter, when a party selectively discloses attorney-client communications to an adverse government entity, the privilege is waived not only as to the materials provided, but also as to the underlying source materials." *Gruss v. Zwirn*, 2013 WL 3481350, at *12 (S.D.N.Y. July 10, 2013) . The PBM Defendants have relied on the Carlton Report in advocacy efforts. Those efforts include publishing the report to respond to the FTC's allegations. *See* Carlton Report at 114. Those efforts also include expressly citing—and relying on—the Carlton Report in a letter to the Connecticut General Assembly's Human Services Committee in which the PCMA opposed proposed legislation that would, among other things, delink PBM compensation from pharmaceutical list prices. *See supra* at n 5. Indeed, the Carlton Report directs "policymakers" to "consider" the report when assessing "the possibility of regulation of the PBM industry." Carlton Report at 5. By appealing to the report in government communications, the PBMs have waived protection.

---

[13] *See, e.g.*, *In re Am. Med. Collection Agency Customer Data Sec. Breach Litig.*, 2023 WL 8595741, at *12 (D.N.J. Oct. 16, 2023) (holding that a party's "intentional disclosure of [a consultant's] investigation and findings undermine[d] the purpose of both the work product and attorney-client privileges because such disclosures were made to third-parties that themselves were potential litigants and adversaries" and so "all underlying factual materials [the consultant] relied on in creating the Report" had to be produced), *aff'd*, 2024 WL 5344456 (D.N.J. July 17, 2024).

Faced with a similar panoply of public disclosures, courts have easily concluded that parties waived privilege. The court's analysis in *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459 (S.D.N.Y. 1996), is particularly instructive here. In that case, the plaintiffs (in a shareholder derivative action) sought documents "underlying" a report that the company's counsel put together in investigating fraud by a company insider. *Id.* at 461–62. The plaintiffs argued that the company impliedly waived protection over those "underlying documents" by (1) "release[ing] the [final] report to the public," (2) using the report in other "pending lawsuits and arbitrations," and (3) relying on the report "in connection with . . . investigations by the SEC and the United States Attorney." *Id.* at 468.

The court agreed. *Id.* at 473. First, the court concluded that the company's "public release" of the report resulted in a waiver of the "communications or portions of communications disclosed [or alluded to] in the report." *Id.* at 469. Second, by using the report in "pending lawsuits and arbitrations," the company waived protection over all underlying documents. *Id.* 472. Having "repeatedly proferred the [investigative] report not merely as a signal of its own good faith, but as a reliable, if not authoritative, source of data on which the court should rely," the company could not then "invoke a privilege to bar disclosure of [the underlying] documents." *Id.* Third, "[t]he submission of the draft report to the SEC at a time

24

when the Commission was considering the question of who was responsible for the scandal [also] suffice[d] to waive any privilege for the underlying documents." *Id.*

The same analysis applies here. As is evident from their publitization of and citation to the Carlton Report, the PBM Defendants seek to use the Report—and the underlying information and data used to support the Report—to advance their interests in the public eye. By extensively citing to the Carlton Report in its suit against the FTC, Express Scripts also put forth the Carlton Report as a reliable and authoritative source of information the court should rely on in finding for the company. And in relying on the report in the legislative sphere, the PBM Defendants have again used the report as a sword to further their own interests. Having chosen to do so, the PBM Defendants cannot invoke attorney-client or work-product privilege "to prevent disclosure of the very materials that [they have] repeatedly invited the courts [and others] to rely upon." *Id.* at 473.

The PBM Defendants have impliedly waived any attorney client or work product privilege, and the Court should grant MDL Plaintiffs' Motion and order Compass Lexecon to respond to the subpoena.

**B.    The Carlton Report materials are not protected under Rule 26(b)(4)(D), because that rule does not apply to document requests, the Carlton Report was not created primarily for purposes of litigation, and the PBM Defendants waived any protection.**

The PBM Defendants have also claimed that the Carlton Report materials are protected because Compass Lexecon was retained originally to provide assistance

in connection with multiple investigative efforts, including those of the FTC and State attorney generals, and therefore are acting in a consulting expert capacity. *See* Fed. R. Civ. P. 26(b)(4)(D) . They have also suggested that Compass Lexecon may at some point also be retained as a consulting expert specifically for this case.

Specifically, at the January 31, 2025 meet and confer, counsel for Plaintiffs directly asked if Compass Lexecon had been retained for this MDL and were told that no such decision had been made yet. Yet in the PBM Defendants' February 21, 2025 letter, the PBM Defendants stated that Compass Lexecon was retained in 2023 following commencement of numerous lawsuits and investigations "aimed at PBMs, rebates and drug pricing." Ex. 7 at 1–2. Regardless of the status of Compass Lexecon *vis-a-vis* this MDL, however, non-testifying expert protection does not apply.

The rule does not apply for at least three reasons. First, by its own text, Rule 26(b)(4)(D)  is inapplicable. The rule generally provides that parties cannot seek certain discovery from non-testifying experts retained in anticipation of litigation:

> Ordinarily, a party may not, *by interrogatories or deposition*, discover facts known or opinions held by an expert who has been retained . . . by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.

Fed. R. Civ. P. 26(b)(4)(D)  (emphasis added). "We give the Federal Rules of Civil Procedure their plain meaning[.]" *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 123 (1989) ; *see generally* A. Scalia & B. Garner, Reading Law 56 (2012)

("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

The text of the rule is clear: the rule concerns only "interrogatories" and "deposition[s]." In this case, Plaintiffs served only a subpoena for the production of *documents*. The rule is thus inapplicable. *See, e.g.*, *Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*, 2016 WL 11680950, at *2 (D.N.J. Nov. 30, 2016) ("Rule 26(b)(4)(D), by its plain language, relates to the use of 'interrogatories or deposition[.]' Because the current issue is unrelated to a party's propounded interrogatories or depositions, Rule 26(b)(4)(D) is inapposite." (cleaned up)); *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 392 F. Supp. 3d 179, 186 (D. Mass. 2019) ("[T]he issue before the [c]ourt involves the production of documents, not interrogatories or a deposition. It therefore appears (at least on its face) that the protection of Rule 26(b)(4)(D) . . . do[es] not apply.").[14]

Second, the rule shields expert materials only if the expert was "retained . . . in anticipation of litigation." Fed. R. Civ. P. 26(b)(4)(D) . In other words, "the 'driving force' for retaining or employing the expert must be the anticipation of litigation." *B & C Seafood*, 431 F. Supp. 3d at 539. As set out above, the PBM

---

[14] While some courts have expanded Rule 26(b)(4)(D) to reach requests for the production of documents, those courts have incorrectly relied on atextual considerations. "[C]ourts aren't free to rewrite clear statutes under the banner of [their] own policy concerns." *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019); *accord In re Barshak*, 106 F.3d 501, 506 (3d Cir. 1997) .

Defendants did not retain Compass Lexecon for purposes of litigation but rather to craft a PR campaign to support the PBMs in the eyes of the public and legislators. "[B]ecause the Report was not primarily prepared in anticipation of litigation," the Carlton Report "is not protected." *Id.* at 539.

Third, even if Compass Lexecon had been retained primarily for purposes of litigation, the widespread broadcast of the Carlton Report and its continuing public availability render the underlying materials used to produce the Report discoverable. *See, e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig.*, 2008 WL 11233766, at *10 (D. Del. Mar. 6, 2008) (finding that any privilege afforded to a consulting expert was waived when the defendants published a press release describing the consultant's research study), *report and recommendation adopted*, 2008 WL 11231447 (D. Del. Mar. 20, 2008); *Atari Corp. v. Sega of America*, 161 F.R.D. 417, 418-20 (N.D. Cal. 1994) (holding that voluntarily providing a videotape of a non-testifying expert's interview and report waives privilege).

The facts in *In re Intel* are strikingly similar to those here. In that case, just like this one, a party retained an economic consulting firm as a non-testifying expert. *In re Intel*, 2008 WL 11233766, at *8. The economic consulting firm there prepared a report, just like Compass Lexecon did here. *Id.* The party publicized the findings and contents of the report in a press release and otherwise, just like the PBMs did here. *Id.* The opposing party subpoenaed the expert for the report and all supporting

materials, just like Plaintiffs here. *Id.* at *1. Objections to the subpoena were posed based on work product and the protections afforded non-testifying experts—in other words, the same objections posed by PBMs here. *Id.* at *4.

The court rejected the arguments against production. It first concluded that, "a long line of cases clearly establish that the safe-harbor afforded the non-designated expert can, in appropriate circumstances, be waived." *Id.* at *7. The court next concluded that by publicly broadcasting the findings of the report, any protections that otherwise would have applied (work product and consulting expert privilege) were waived, observing:

> [The defendant] voluntarily disclosed the existence of the report, the name of the expert/consultant who prepared it, the report's key findings and its methodology to the world. The basic policies underlying the protective safe-harbor provisions of Fed. R. Civ. P. 26(b)(4)(B) are in no way fostered by [the defendant's] actions. . . .
>
> [T]o afford Fed. R. Civ. P. 26(b)(4)(B) protection to [the alleged consulting expert], his report and its underlying documents would permit [the defendant] to hypocritically claim that they are confidential one moment and then so share such information with a host of others to be used for something other than litigation.

*Id.* at *8 (cleaned up). As the court explained, "whereas Fed. R. Civ. P. 26(b)(4)(B) encourages counsel to obtain necessary expert advice without fear that the adversary may obtain such information, here [the defendant] trumpeted the existence of the

expert and essentially what the expert had to say about a core issue in the litigation for all the world to see." *Id.*

Notwithstanding this compelling precedent that directly contradicts their position, the PBMs have persisted in arguing for protection of the Carlton Report's underlying materials and in support cited *Ziner v. Cedar Crest College*, 2006 WL 8409873 (E.D. Pa. May 30, 2005) . Yet that case, like the decisions addressing reports produced in the litigation context, is not analogous. In *Ziner*, one party produced an investigative report prepared by an attorney that was clearly privileged—but the party did not assert any privilege claim when producing the report. *Id.* Thereafter, the receiving party sought further discovery into notes and other materials underlying the report and the investigation. *Id.* The court determined that merely failing to assert privilege when producing the report did not waive privilege (or work product protection) as to the underlying materials. *Id.*

Those circumstances, of course, are a far cry from the facts before the Court. The Carlton Report indisputably is not privileged nor is it protected by work product. In fact, as noted multiple times, any person with access to the internet can read it today. OptumRx publicized it on LinkedIn, and Express Scripts used it as the primary factual foundation for its lawsuit against the FTC (and despite the repeated citations to the Carlton Report in that lawsuit has expressly confirmed that Compass Lexecon was *not* serving in a consulting expert role for Express Scripts there). The

issue is not whether waiver of the confidentiality or privileged nature of the Report operates as a further waiver of the underlying materials. The Carlton Report was never confidential nor privileged (nor protected by work product) in the first place. Thus, *Ziner* and decisions like it are not analogous and do not apply. *See Citizens' State Bank v. Hawkins*, 71 F. 369, 371 (7th Cir. 1896) ("[A party] cannot approbate and reprobate. It has received the benefits. It must bear the burdens.").

**C.    The PBMs' "clone discovery" arguments should be rejected.**

The PBMs also argue that the MDL Subpoena constitutes impermissible "clone discovery," as it seeks data the PBM Defendants already provided the FTC and that Plaintiffs will be receiving some portion of in this litigation. These misguided arguments can be rejected for at least two reasons.

First, the PBM Defendants have been unable to identify to Plaintiffs what data they are actually intending to produce in this case. During the course of the meet and confers, Plaintiffs specifically asked what aspect of the data sought in this Subpoena is duplicative. The response? "[T]he PBMs are unable to provide a response at this time to this question." Ex. 7 at 3. The PBMs have also been unable to identify or describe what data was produced to the FTC, other than generically that it was broad and confidential. These positions highlight the PBMs' non-transparent nature, in litigation and otherwise, and further undermines any notion that the information sought is duplicative. If there is no ability to compare and

identify data sets to determine the extent of the overlap between the two, the PBMs cannot make the proclamation that such data is duplicative.

Second, in any event, the information Plaintiffs seek is not the type of "clone" discovery that courts may decline to order produced. As courts in this circuit recognize, "there is no established standard for assessing so-called 'cloned' or 'piggyback' discovery requests for all discovery produced in prior litigation or investigations." *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 2022 WL 17339035 (E.D. Pa. Nov. 30, 2022) . Instead, the PBMs' boilerplate objection must be measured against the substance of what is being sought, as it should be. *Id.*

And courts allow such discovery that is related to other litigation where there is "significant factual and legal overlap" with a prior case and the request is not overbroad. *See Whitman v. State Farm Life Ins. Co*., 2020 WL 5526684, at *3 (W.D. Wash. Sept. 15, 2020) . Indeed, where so-called "cloned" discovery "seeks information that is relevant to plaintiff's claims and defendants' defenses and that . . . is reasonably calculated to lead to the discovery of admissible evidence," such information must be produced. *Peterson v. Wright Med. Tech., Inc*., 2013 WL 655527, at *6 (C.D. Ill. Feb. 21, 2013) (compelling the production of certain discovery where the information sought was "relevant to plaintiff's claims and defendants' defenses and . . . [was] reasonably calculated to lead to the discovery of admissible evidence on the questions [relevant to the case]"); *see also Sticht v. Wells*

32

*Fargo Bank, N.A.*, 2023 WL 2206641, at *6 (D. Conn. Feb. 24, 2023) (holding in a "cloned" discovery dispute that "[b]ecause of the similarity between the claims at issue in [a related case] and the claims in this case," the production of documents already produced is "proportional to the needs of this case").

Here, there is no doubt Plaintiffs' requests are focused on the relevant data underlying the Carlton Report, and not all discovery the PBMs may have produced in other litigation including to the FTC. As set out above, the Report purports to review "systematic evidence" and "data provided by the PBMs" in concluding that the critiques against PBMs for their role in increasing drug prices to be unfounded. That is at the heart of many Plaintiffs' claims in this litigation, and naturally, Plaintiffs seek the information underlying this bold proclamation. And they are entitled to it. "The very purpose of discovery is to give the parties the opportunity to learn what their opponents know about the issues in the case." *Peterson*, 2013 WL 655527, at *5. This is nowhere near the type of clone discovery courts disallow, and the PBMs should be compelled to produce this data, regardless of who or what entity the PBMs may have produced it to in the past.

## CONCLUSION

For these reasons, the Court should grant the Motion to Compel and order Compass Lexecon to fully respond to the MDL Subpoena.

Respectfully submitted, this the 25th day of April, 2025.

By:    */s/ Joanne Cicala*
Joanne Cicala
**The Cicala Law Firm PLLC**
101 College Street
Dripping Springs, Texas 78620
Tel: (512) 275-6550
Fax: (512) 858-1801
joanne@cicalapllc.com

Walter G. Watkins, III
**Forman Watkins & Krutz LLP**
210 E. Capitol Street, Suite 2200
Jackson, MS 39201-2375
Tel: (601) 960-8600
Fax: (601) 960-8613
trey.watkins@formanwatkins.com

W. Lawrence Deas
**Liston & Deas, PLLC**
605 Crescent Blvd., Suite 200
Ridgeland, MS 39157
Tel: (601) 981-1636
Fax: (601) 982-0371
lawrence@listondeas.com

Troy A. Rafferty
**Levin Papantonio Thomas Mitchell
Rafferty and Proctor, P.A.**
316 S. Baylen Street
Suite 600
Pensacola, FL 32502
Tel: (850) 435-7043
Fax: (850) 436-6102
trafferty@levinlaw.com

Russell W. Budd
**Baron & Budd PC**
3102 Oak Lawn Ave., Ste. 1100
Dallas, TX 75219-4281
Tel: (214) 521-3605
rbudd@baronbudd.com

*Counsel for the State Attorney General
Track*

Melissa Yeates
**Kessler Topaz**
**Meltzer & Check, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
myeates@ktmc.com

Michael L. Roberts
**Roberts Law Firm, P.A.**
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575
mikeroberts@robertslawfirm.us

Donald A. Ecklund
**Carella, Byrne, Cecchi,**
**Brody & Agnello, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
decklund@carellabyrne.com

*Counsel for the Class Track*

David R. Buchanan
dbuchanan@seegerweiss.com
**Seeger Weiss, LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
Telephone: (973) 639-9100

Mark P. Pifko
mpifko@baronbudd.com
**Baron & Budd, P.C.**
15910 Ventura Blvd #1600
Los Angeles, CA 91436
Telephone: (818) 839-2333

Benjamin J. Widlanski
bwidlanski@kttlaw.com
**Kozyak Tropin & Throckmorton LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

Brandon L. Bogle
bbogle@levinlaw.com
**Levin, Papantonio, Rafferty,
Proctor, Buchanan, O'Brien, Barr &
Mougey, P.A.**
316 S. Baylen St., Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7140

*Counsel for the Self-Funded Payor Track*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 25th, 2025, the above was served on all counsel of record via the Court's CM/ECF system and a copy was served on counsel for Compass Lexecon LLC via email.


*/s/ Joanne Cicala*
Joanne Cicala