# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: INSULIN PRICING LITIGATION | Case No. 2:23-MD-03080<br>MDL No. 3080<br><br>JUDGE BRIAN R. MARTINOTTI<br>JUDGE RUKHSANAH L. SINGH<br><br>**ORAL ARGUMENT REQUESTED** |

**THIS DOCUMENT RELATES TO:**
**ALL TRACKS AND ALL CASES**

## PBM DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING CONSTRUCTIVE NOTICE IN SUPPORT OF THEIR RULE 12(b)(6) MOTIONS TO DISMISS

(Counsel Listed on Next Pages)

Thomas P. Scrivo
Young Yu
**O'TOOLE SCRIVO, LLC**
14 Village Park Road
Cedar Grove, NJ 07009
T: (973) 239-5700
tscrivo@oslaw.com
yyu@oslaw.com

Brian D. Boone
**ALSTON & BIRD LLP**
1120 S. Tyron St., Ste. 300
Charlotte, NC 28203
T: (704) 444-1000
brian.boone@alston.com

Elizabeth Broadway Brown
**ALSTON & BIRD LLP**
1201 W. Peachtree St. NW, Ste. 4900 Atlanta, GA 30309
T: (404) 881-7000 liz.brown@alston.com

Kelley Connolly Barnaby
**ALSTON & BIRD LLP**
950 F. Street, NW
Washington, D.C. 20004
T: (202) 239-3300
kelley.barnaby@alston.com

*Counsel for Defendants UnitedHealth Group Incorporated; OptumRx, Inc.; Optum, Inc.; OptumInsight, Inc.; and Emisar Pharma Services LLC*

Jason R. Scherr
Patrick A. Harvey
Elise M. Attridge
Lindsey T. Levy
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
jr.scherr@morganlewis.com
patrick.harvey@morganlewis.com
elise.attridge@morganlewis.com
lindsey.levy@morganlewis.com
Tel: (202) 739-3000

*Counsel for Evernorth Health, Inc. (formerly known as Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Medco Health Solutions, Inc., Ascent Health Services LLC, and The Cigna Group.*

Kevin H. Marino
John D. Tortorella
**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, New Jersey 07928
T: (973) 824-9300
F: (973) 824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

Enu Mainigi
Craig Singer
R. Kennon Poteat III
A. Joshua Podoll
Benjamin Hazelwood
Daniel Dockery
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, D.C. 20024
T: (202) 434-5000
F: (202) 434-5029
emainigi@wc.com
csinger@wc.com
kpoteat@wc.com
apodoll@wc.com
bhazelwood@wc.com
ddockery@wc.com

*Counsel for CVS Health Corporation; Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; and Zinc Health Services, L.L.C.*

# **TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

LEGAL STANDARD ....................................................................................................................1

    I.    A STEADY DRUMBEAT OF MEDIA REPORTS AND CONGRESSIONAL ACTIVITY SHOULD HAVE ALERTED PLAINTIFFS TO THEIR CLAIMS. ..................................3

    II.   A CONGRESSIONAL DEMAND FOR A DOJ AND FTC INVESTIGATION IN 2016 ALSO PUT PLAINTIFFS ON CONSTRUCTIVE NOTICE............................................6

    III.  PARALLEL LAWSUITS IN 2017 CONFIRM THAT PLAINTIFFS HAD CONSTRUCTIVE NOTICE EARLIER. ....................................................................9

CONCLUSION.............................................................................................................................13

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*421-A Tenants Ass'n v. 125 Court St. LLC*,
  2017 WL 6612933 (E.D.N.Y. Nov. 2, 2017), *aff'd*, 760 F. App'x 44 (2d Cir. 2019) ............ 12

*Barbee v. Amira Nature Foods, Ltd.*,
  2023 WL 4627744 (D.N.J. July 19, 2023) ................................................................................ 3

*Cetel v. Kirwan Fin. Grp., Inc.*,
  460 F.3d 494 (3d Cir. 2006) ..................................................................................................... 1

*County of Hudson v. Janiszewski*,
  520 F. Supp. 2d 631 (D.N.J. 2007) ........................................................................................... 2

*DeBenedictis v. Merrill Lynch & Co.*,
  492 F.3d 209 (3d Cir. 2007) ..................................................................................................... 9

*Guarantee Tr. Life Ins. Co. v. Kribbs*,
  68 N.E. 3d 1046 (Il. Ct. App. 2016) ......................................................................................... 2

*Hawk Mt. LLC v. Ram Capital Grp., LLC*,
  689 Fed. Appx. 703 (3d Cir. 2017) .......................................................................................... 2

*In re EpiPen Direct Purchaser Litig.*,
  2021 WL 147166 (D. Minn. Jan. 15, 2021) ......................................................................... 4, 5

*In re Insulin Pricing Litig.*,
  No. 17-cv-699 (D.N.J. Feb. 2, 2017) ................................................................................ 11, 13

*LabMD Inc. v. Boback*,
  47 F.4th 164 (3d Cir. 2022) ...................................................................................................... 9

*Mathews v. Kidder, Peabody & Co.*,
  260 F.3d 239 (3d Cir. 2001) ..................................................................................................... 2

*Parman v. Est. of Parman*,
  2024 WL 1734727 (Wash. Ct. App. Apr. 23, 2024) ................................................................. 2

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
  730 F.3d 263 (3d Cir. 2013) .......................................................................................... 2, 9, 12

*Riddle v. Bank of Am. Corp.*,
  2013 WL 6061363 (E.D. Pa. Nov. 18, 2013) ......................................................................... 12

*Sejin Precision Indus. Co. v. Citibank, N.A.*,
 235 F. Supp. 3d 542 (S.D.N.Y. 2017), *aff'd*, 726 F. App'x 27 (2d Cir. 2018) ....................... 12

*Statler v. Dell, Inc.*,
 841 F. Supp. 2d 642 (E.D.N.Y. 2012) ............................................................................. 2

**STATUTES**

N.Y. C.P.L.R. § 203(g) ............................................................................................................ 2

**OTHER AUTHORITIES**

Congressional Budget Office, *Prescription Drug Pricing in the Private Sector* (Jan. 1, 2007) ............................................................................................................................. 5

*Chaires et al. v. Sanofi U.S. et al.*,
 No. 17-cv-10158 (D. Mass. Jan. 30, 2017) ..................................................................... 10, 11

Hearing Before the Subcomm. On Intellectual Property, Competition, and the Internet,
 112 Cong. 58 (2011) ........................................................................................................ 5

*In re: Direct Purchaser Insulin Pricing Litigation*,
 No. 3:20-cv-3426 (March 15, 2021), ECF No. 139 ........................................................ 7

*In re: Insulin Pricing Litigation*,
 No. 2:23-md-3080 (Apr. 24, 2024), ECF No. 158 .......................................................... 6

*In re: Insulin Pricing Litigation*,
 No. 2:23-md-03080 (Apr. 24, 2024), ECF No. 159 ........................................................ 6

*Loc. No. 1 Health Fund v. Eli Lilly & Co.*,
 No. 23-cv-21160 (Oct. 13, 2023), ECF. No. 1 ................................................................ 7

*State of Montana et al. v. Eli Lilly and Company et al.*,
 No. 22-cv-00087 (Aug. 8, 2023), Dkt. No. 159 ............................................................. 10

# INTRODUCTION

For nearly two decades, legislators, the media, and litigants have challenged rebate agreements between drug manufacturers and pharmacy benefit managers. Congressional activity across the 2000s and 2010s focused on these business practices, and on drug pricing and insulin, in particular. And the media printed scores of articles addressing the same business practices starting in at least the early 2000s.

Against that backdrop, there is no serious question that Plaintiffs had constructive notice of their claims long before they filed suit. Even with the benefit of the doubt, and ignoring the public discussion about drug pricing throughout the early 2000s, a reasonable plaintiff certainly would have been on notice of claims related to insulin pricing no later than November 3, 2016— when a Congressional letter to the DOJ and FTC set forth the core of Plaintiffs' allegations across their Complaints in this litigation. After the November 2016 letter, Plaintiffs had all the information they needed to sue. And some did just that. Not even four months after the Congressional letter, on February 2, 2017, a putative class of plaintiffs filed a well-publicized lawsuit alleging the same "insulin pricing scheme" at issue in this MDL. Plaintiffs cannot hide from that lawsuit, which they admit laid out the "essential factual background" of the MDL.

While the PBM Defendants dispute the allegations in Plaintiffs' pleadings and in the various public sources that provided Plaintiffs with sufficient "storm warnings" about their alleged claims, those sources make clear that Plaintiffs had constructive notice by no later than November 3, 2016, such that their claims began accruing at that time.

# LEGAL STANDARD

A plaintiff is on inquiry notice and claims "accrue when plaintiffs knew or ***should have known*** of their injury." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (emphasis

added) (describing inquiry notice standard for RICO claims).[1] A plaintiff should know of its injury when "storm warnings" "would alert a reasonable person to the probability" of wrongdoing. *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001); *see also Hawk Mt. LLC v. Ram Capital Grp., LLC*, 689 Fed. Appx. 703, 706 (3d Cir. 2017) ("storm warnings" are "information that would have alerted a reasonable person that misleading statements or significant omissions were probably made"); *County of Hudson v. Janiszewski*, 520 F. Supp. 2d 631, 641 (D.N.J. 2007) (discussing inquiry notice in the context of an alleged bribery scheme). When, as here, a plaintiff alleges fraud, the relevant question for purposes of inquiry notice is "when she would have discovered general facts about the fraudulent scheme," ***not*** "specific facts about the fraud perpetrated on her." *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 272 (3d Cir. 2013)

Constructive notice is an objective inquiry. It looks to the public record—including disclosures, publicity, and similar lawsuits, to determine whether a reasonable person would be alerted to the possibility of wrongdoing. *See, e.g., Pension Tr. Fund*, 730 F.3d at 277-78 (affirming inquiry notice date based on other litigation with "substantially similar" allegations); *Janiszewski*, 520 F. Supp. 2d at 642 (a "reasonable person" would be on notice of claims because of an FBI investigation covered by three new organizations). And because constructive notice is an objective

---

[1] Courts apply the inquiry notice standard to a host of state law claims and in doing so reference Plaintiff's knowledge of injury, claim, wrong, and facts underlying a claim interchangeably. *See, e.g.*, N.Y. C.P.L.R. § 203(g) (codifying New York discovery rule as two years computed from the "time when facts were discovered or from the time when facts could have with reasonable diligence have been discovered."); *accord Guarantee Tr. Life Ins. Co. v. Kribbs*, 68 N.E. 3d 1046, 1055 (Il. Ct. App. 2016). Some Plaintiffs' claims have even stricter rules that look to when a Plaintiff could "establish each element of the action," whether they knew it or not. *See Parman v. Est. of Parman*, 2024 WL 1734727, at *10 (Wash. Ct. App. Apr. 23, 2024) (Washington unjust enrichment); *Statler v. Dell, Inc.*, 841 F. Supp. 2d 642, 648 (E.D.N.Y. 2012) (New York Consumer Protection).

2

inquiry, the Court does not require discovery to dismiss Plaintiffs' claims. *See, e.g.*, *Barbee v. Amira Nature Foods, Ltd.*, 2023 WL 4627744, at *6 (D.N.J. July 19, 2023) (dismissing claims at the motion-to-dismiss stage due to "inquiry notice" triggered by a prior class action). We note that discovery could later establish that an even *earlier* date for constructive notice should apply. *See, e.g.*, *In re EpiPen Direct Purchaser Litig.*, 2024 WL 3256475, at *4 (D. Minn. July 1, 2024) (holding based on the record developed during discovery that "Plaintiffs knew or should have known of their injuries long before 2016."). But that possibility does not prevent the Court from ruling now that all Plaintiffs had constructive notice of their claims by no later than November 3, 2016.

Of course, resolving the issue of constructive notice does not require resolving the issue of *actual* notice. The concept of "actual" notice focuses on a particular plaintiff's knowledge of certain facts. The objective focus of "constructive" notice, on the other hand, deals with when a reasonable plaintiff *should have* been on notice of their claims based on the public record. Actual notice could establish that a particular plaintiff's claims accrued *before* the date there were sufficient "storm warnings" to put all potential plaintiffs on constructive notice, but not *later*.

## ARGUMENT

### I. A STEADY DRUMBEAT OF MEDIA REPORTS AND CONGRESSIONAL ACTIVITY SHOULD HAVE ALERTED PLAINTIFFS TO THEIR CLAIMS.

For more than two decades, Congress and the media have addressed the issues underlying Plaintiffs' claims about rising insulin prices, the role of manufacturers and PBMs, rebates, and confidential rebate negotiations.[2] In fact, in their Complaints, Plaintiffs themselves cite to several

---

[2] *See, e.g.*, Ex. 1, J. Barnes, *When is a rebate a kickback?* U.S. News & World Report (August 12, 2002). The news coverage was not occurring in a vacuum but flowed from a drumbeat of inquiries and investigations by states, the federal government, and private plaintiffs making the same allegations made in this litigation.

3

insulin-specific articles that they suggest support their claims. *See, infra,* 8-9, n.15-19. Those articles illustrate not only the long-standing awareness the public at large had of Plaintiffs' theories, but also the media attention that reached a fever-pitch by 2016, when articles focused on concerns regarding drug prices. One such article insisted that "the largest PBMs, Express Scripts, CVS Caremark, and OptumRx, are incentivized to inflate drug prices," because "[t]he higher the price, the higher the rebate."[3]

Other articles in that period also parroted what Plaintiffs would eventually allege. For example, a February 2016 op-ed in the *New York Times* demanded that the government "break up the insulin racket," accusing manufacturers of "simultaneously hik[ing] their prices" and PBMs of requiring "rebates" that the author said they doubted were "passed along."[4] Likewise, an April 2016 PBS News report stated that insulin prices were increasing and that "wholesale prices generally do not correspond to net prices—what companies, unions, and government agencies pay—because drug makers offer rebates."[5] These and other insulin-specific articles are textbook "storm warnings" that would have alerted a reasonable person to Plaintiffs' claims.[6]

---

[3] *See* Ex. 2, D. Balto, *How PBMs Make the Drug Price Problem Worse*, The Hill (Aug. 31, 2016), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse/, *cited at In re: Insulin Pricing Litigation*, No. 2:23-md-3080 (Apr. 24, 2024), ECF No. 158, King SAC ¶ 244 n.138, *In re: Insulin Pricing Litigation*, No. 2:23-md-3080 (Apr. 24, 2024), ECF No. 160, Lake FAC ¶ 386 n.67, *In re: Insulin Pricing Litigation*, No. 2:23-md-03080 (Apr. 24, 2024), ECF No. 159.

[4] *See* Ex. 3, K. Lipska, *Break Up the Insulin Racket*, N.Y. Times (Feb. 20, 2016), https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html, *cited at* King SAC ¶ 33 n.29.

[5] *See* Ex. 4, E. Silverman, *What's Behind Skyrocketing Insulin Prices?*, PBS News (Apr. 5, 2016), https://www.pbs.org/newshour/health/whats-behind-skyrocketing-insulin-prices.

[6] In the *Direct Purchaser* case, the Court relied on the *EpiPen* decision to find certain articles "might reasonably be understood to provide breadcrumbs that might lead one to investigate the behavior of PBMs and drug manufacturers." 2021 WL 2886216, at *19 (D.N.J. July 9, 2021) (citing *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166 (D. Minn. Jan. 15, 2021). But these articles—unlike those at issue in the *Direct Purchaser* decision—are tied to insulin specifically. Indeed, it was the failure of media articles to tie a claim to a particular product that motivated the

But even if a specific article or the sheer *volume* of news coverage was somehow insufficient to put Plaintiffs on notice, Congress's parallel actions should have done so. As with the media, Congress has also highlighted Plaintiffs' theories for nearly two decades. For example, on January 1, 2007, the Congressional Budget Office issued a report titled "Prescription Drug Pricing in the Private Sector," which described the conduct underpinning Plaintiffs' allegations—that manufacturers "set their price to wholesalers and pharmacies with an eye toward the availability of other close substitutes on the market, keeping in mind that they will pay rebates" to PBMs along with other fees and payments, and that "PBMs negotiate with manufacturers for rebates in return for placing the manufacturers' drugs on their formularies or giving the drugs preferential placement on their formularies."[7] A few years later, in September 2011, a Senate Judiciary Subcommittee held a hearing about the proposed merger of Medco and Express Scripts.[8] That hearing focused in significant part on the alleged conduct at issue in Plaintiffs' Complaints. For example, the PBMs were accused of "accept[ing] rebates from manufacturers in return for placing higher-priced medications on prescription drug plan formularies,"[9] and comments suggested PBMs "already use[d] a lack of transparency, failing to pass through rebates from drug manufacturers to consumers and other payers, inflating drug costs for health plans and employers, and lowering payments to pharmacies for their own personal financial gain."[10] That hearing was

---

*Epipen* Court to deny a motion for to dismiss for inquiry notice. *See In re EpiPen*, 2021 WL 147166, at * 6 (noting that "[t]he articles were not specific to the EpiPen").

[7] *See* Congressional Budget Office, *Prescription Drug Pricing in the Private Sector*, 7, 10-12 (Jan. 1, 2007).

[8] *See* The Proposed Merger Between Express Scripts and Medco: Hearing Before the Subcomm. On Intellectual Property, Competition, and the Internet, 112 Cong. 58 (2011).

[9] *See id*. (Statement of Dennis Wiesner).

[10] *Id.*

public and, in fact, Plaintiffs cite it in certain of their Complaints. *See, e.g.*, Albany County Compl. ¶¶ 141–42 nn.19-20, ECF No. 158; Lake County Compl., ¶¶ 136–137 nn.17-18, ECF No. 159.

All of that information—in the form of media reports and Congressional inquiries—should have alerted Plaintiffs to their claims. At a minimum, they set the stage for deafening storm warnings in 2016 and 2017.

### II. A CONGRESSIONAL DEMAND FOR A DOJ AND FTC INVESTIGATION IN 2016 ALSO PUT PLAINTIFFS ON CONSTRUCTIVE NOTICE.

On November 3, 2016, Senator Bernie Sanders and Representative Elijah Cummings sent a letter to the DOJ and FTC requesting that they specifically investigate whether pharmaceutical manufacturers were colluding or engaging in any anticompetitive behavior in setting insulin prices.[11] The letter cited publicly available information and news articles.[12]

Congress's letter is dispositive here for two independent reasons. *First*, it shows that Plaintiffs were on constructive notice **before** November 2016. If two congressmen had enough public information to call for a DOJ and FTC investigation, plaintiffs—who had access to the same public information—should have known of their claims. *Second*, the letter sets the outer bound for constructive notice. Plaintiffs cannot possibly contend that a public letter from Congress to two law-enforcement agencies would not "alert a reasonable person" of claims based on the allegations in the letter. Indeed, other plaintiffs picked up on the letter and filed lawsuits making the same allegations Plaintiffs press here just four months later.

If the Court has any doubt about the significance of the November 2016 letter, it need look no further than Plaintiffs' *own* complaints and briefing. For example, in Local No. 1 Health Fund's

---

[11] *See* Ex. 5, Sen. Sanders & Hon. Cummings Letter to DOJ and FTC on Insulin (Nov. 3, 2016).
[12] *Compare id.* n. 8, 11 *with* Class Action FAC at ¶ 302 n. 131, King SAC ¶ 196 n.10 (both citing Robbins' article on the Insulin market, *infra* n. 18.

6

October 13, 2023 complaint, Local No. 1 alleged: "Local 1 and Class members had no knowledge of Defendants' unlawful conduct as alleged herein or of facts sufficient to place them on inquiry notice of the claims set forth herein, **until at least November of 2016**, when news sources began publishing information about the Senate investigation." Compl. ¶ 133, *Loc. No. 1 Health Fund v. Eli Lilly & Co.*, No. 23-cv-21160 (Oct. 13, 2023), ECF. No. 1 (emphasis added). And Plaintiffs in *In re Direct Purchaser Insulin Pricing Litig.* argued that "the statute of limitations was tolled **until November 3, 2016**, when members of Congress initially asked the Federal Trade Commission and Department of Justice to investigate conduct by Defendants related to insulin." Pls.' Opp. to Defendants' Motions to Dismiss, *In re: Direct Purchaser Insulin Pricing Litigation*, No. 3:20-cv-3426 (March 15, 2021), ECF No. 139 at 68 (emphasis added); *id.* at 76 ("Plaintiffs had no notice of their injury here **until** Congress's announcement of its investigation in **November 2016.**") (emphasis added). Those allegations and arguments make clear that any reasonably diligent plaintiff could and should have been on constructive notice of its claims by at least November 3, 2016.

And, of course, the Sanders/Cummings letter did not come out of nowhere—it was based on publicly available information, including earlier news articles from 2015 and 2016.[13] By November 2016, news coverage was persistent, consistent, and specifically included the "facts" that serve as the foundation of Plaintiffs' claims and alleged injuries. Indeed, in their own

---

[13] The Sanders/Cummings letter cited additional articles from national news outlets. *See* Sen. Sanders & Hon. Cummings Letter to DOJ and FTC on Insulin at nn. 1,3-4,12 (Nov. 3, 2016) (citing C. Johnson, *Why Treating Diabetes Keeps Getting More Expensive*, Washington Post (Oct. 31, 2016); Ex. 6, E. Silverman, *Insulin Prices Have Skyrocketed, Putting Drug Makers on the Defensive*, STAT (Apr. 5, 2016); Ex. 7, J. Walker, *For Prescription Drug Makers, Price Increases Drive Revenue*, Wall Street Journal (Oct. 5, 2015); Ex. 8, N. Randewich, *Mexico Fines Eli Lilly, Others for Collusion*, Reuters (Feb. 23, 2010)).

7

complaints, Plaintiffs cite articles published in national news outlets concerning the rising costs of insulin products and the use of rebates during this exact period, including:

- A **May 2015 article** describing a "pattern of insulin makers matching each other's price increases."[14]

- **February 2016 article** describing rebates received by PBMs as "suspiciously similar to kickbacks" and stating that "[i]t's not clear whether most of the[] 'savings'" achieved by PBMs "are passed along to consumers or simply pocketed."[15]

- An **August 2016 article** stating that "the largest PBMs, Express Scripts, CVS Caremark and OptumRx, are incentivized to inflate drug prices" because "[t]he higher the price, the higher the rebate."[16]

- An **October 2016 article** quoting the president of Eli Lilly's diabetes business as saying "[t]he reason drugmakers sharply raise list prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists," and concluding "net prices, or what drugmakers retain after discounts, have stayed the same" because "pharmaceutical companies compete to offer ever-deeper discounts to stay on the preferred drug lists at insurers and the PBM middlemen."[17]

- Another **October 2016 article** arguing that the introduction of generic insulin drugs may not lead to lower prices because of the role of rebates, stating, "[t]he list price has been

---

[14] *See, e.g.,* Ex. 9, R. Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2015), https://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep, *cited at* Class Action FAC ¶ 303 ¶ 132, King SAC ¶ 12 n.16.

[15] *See* Ex. 3, *cited at* King SAC ¶ 33 n. 29.

[16] *See* Ex. 2, *cited at* Albany SAC ¶ 428 n.82, King SAC ¶ 244 n. 138, Lake FAC ¶ 386 n.67. Notably, Express Scripts disclosed the following in a quarterly filing in September 2016: "On August 15, 2016, the Company received a civil investigative demand from the United States Attorney's Office for the Southern District of New York, requesting information regarding the Company's relationships with pharmaceutical manufacturers and prescription drug plan clients, and payments made to and from those entities. The Company intends to cooperate with the inquiry and is not able to predict with certainty the timing or outcome of this matter." Ex. 17, Express Scripts Holding Company, Quarterly Report (Form 10-Q) (September 30, 2016); *see also* Ex. 16, Eli Lilly and Company, Quarterly Report (Form 10-Q) (July 28, 2016) (disclosing Eli Lilly's receipt of a similar investigative demand). *See also* Montana FAC ¶ 536.

[17] *See* Ex. 10, D. Roland, et al., *Middlemen Fuel Insulin Price Rise*, WSJ (Oct. 10, 2016), *cited at* Class Action FAC ¶ 317 n.141.

8

going up more steeply, in part because the middlemen who stand between the manufacturer and the patient---such as pharmacy benefit mangers—demand ever-larger rebates."[18]

The Court need only look to the face of Plaintiffs' own Complaints to see that the very practices about which Plaintiffs complain have been well known and the topic of intense public scrutiny for many years. *See DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 218-19 (3d Cir. 2007) (holding based on news articles that plaintiff was on inquiry notice even though the articles were not specific to the defendant company); *LabMD Inc. v. Boback*, 47 F.4th 164, 180-81 (3d Cir. 2022) (considering storm warnings including "two news articles" and concluding that RICO claims were time-barred); *Pension Tr. Fund,*., 730 F.3d at 276-77 ("[A] reasonably diligent plaintiff would undertake an investigation based on the filing of related lawsuits, news articles and analyst's reports, and prospectuses, quarterly reports, and other information") (cleaned up). The Court can and should find Plaintiffs were on constructive notice at least by November 2016 on that basis.

### III. PARALLEL LAWSUITS IN 2017 CONFIRM THAT PLAINTIFFS HAD CONSTRUCTIVE NOTICE EARLIER.

Within months of the Congressional demand, multiple plaintiffs filed lawsuits related to insulin pricing. That flood of litigation was prompted by information already in the public record such as the media coverage and Congressional call for investigation, confirming that the information in the public record was already sufficient to provide inquiry notice of Plaintiffs' claims.

On January 30, 2017, individual consumers first filed a putative class action lawsuit against Sanofi, Novo Nordisk, and Eli Lilly in the District of Massachusetts challenging insulin pricing.

---

[18] *See* Ex. 11, R. Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/, *cited at* Class Action FAC at ¶ 302 n.131, King SAC ¶ 196 n.108.

*See Chaires et al. v. Sanofi U.S. et al.*, No. 17-cv-10158 (D. Mass. Jan. 30, 2017).[19] Media coverage observed that it came "months after Sen. Bernie Sanders, I-Vt., and Rep. Elijah Cummings, D-Md., expressed concerns about the skyrocketing prices in a letter to the U.S. Department of Justice and Federal Trade Commission that called for an investigation into the insulin manufacturers[,]"[20] confirming that any reasonably diligent plaintiff could and should have been on inquiry notice by that letter's date. Likewise, the press release from the law firm representing the plaintiffs in *Chaires* included virtually the same headline—"Insulin Manufacturers Hit with Class-Action Lawsuit Over Drug Price Inflation Scheme and RICO Violations – *Time to Break Up the Insulin Racket*"—as the February 2016 New York Times article[21] cited in certain Plaintiffs' Complaints, further confirming the ubiquitousness of the information giving rise to the at-issue conduct.[22] And if a reasonable plaintiff somehow remained oblivious of that prior coverage, the filing of the *Chaires* complaint generated significant national news coverage as well.[23]

Compounding the impact of the *Chaires* filing, on February 2, 2017 (three days later), another lawsuit was filed in the District of New Jersey alleging claims arising out of the same

---

[19] Plaintiffs in that action voluntarily dismissed their lawsuit three days later. *See Chaires*, No. 17-cv-10158, Dkt. No. 6.
[20] *See* Ex. 12, Jessica Corso, Diabetes Patients Fire Off First Suit Over Insulin Drug Hike, Law360 (Jan. 30, 2017), https://www.law360.com/articles/886365.
[21] *See* K. Lipska, *supra* n. 4.
[22] Notably, attorneys representing Plaintiffs in certain MDL member cases had long been aware of that information. At a motion to dismiss hearing in *State of Montana et al. v. Eli Lilly and Company et al.*, counsel for Montana stated: ". . . my law firm, it took us **about five years** to try to understand it before we ever filed our first law enforcement involving PBMs or manufacturers." No. 22-cv-00087, Dkt. No. 159 at 30.
[23] *See, e.g.*, Ex. 13, K. Thomas, *Drug Makers Accused of Fixing Prices on Insulin*, N.Y. Times (Jan. 30, 2017), https://www.nytimes.com/2017/01/30/health/drugmakers-lawsuit-insulin-drugs.html; Ex. 14, C. Johnson, *Diabetes Patients Sue Insulin Makers for Pricing Fraud*, Wash. Post (Jan. 30, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/01/30/diabetes-patients-sue-insulin-makers-for-pricing-fraud.

alleged conduct at issue in *Chaires*. *See In re Insulin Pricing Litig.*, No. 17-cv-699 (D.N.J. Feb. 2, 2017) (the "IPP Case"). Significantly, the IPP Plaintiffs alleged in their lawsuit the very same pricing "scheme" that Plaintiffs in this MDL now allege. In fact, the SFP Track, Class Track, and State AG Track complaints all copy heavily from the allegations in the IPP Case.[24] As a member of Plaintiffs' own legal team acknowledged at the initial case management conference, "the underlying list price scheme, which was pleaded in the consumer case in 2017, is the *essential factual background of every single complaint* [in this MDL]." Initial Case Management Conference Tr. MDL ECF No. 17 at 44:15-17 (emphasis added).[25]

Other supposedly injured parties believed they had sufficient information to bring their claims and did. A parade of lawsuits followed *Chaires* and the IPP Case, including six cases filed in various federal courts between January 2017 and May 2017. And five State Attorneys General

---

[24] *Compare* IPP Compl. ¶¶ 21, 126 (alleging Manufacturer Defendants "unlawfully inflat[ed] the benchmark prices of rapid- and long-acting analog insulin drugs" and paid "the spread between the benchmark prices and real prices to PBMs" in order to "secure a position on the PBMs' formularies"), *with* Class Action FAC ¶ 394 ("Defendants systematically artificially inflated the list prices of the Insulin Drugs and Manufacturer and Manufacturer Defendants systematically paid bribes and kickbacks . . . to PBM Defendants in exchange for exclusive and/or favorable placement of their Insulin Drugs on the [PBMs'] formularies"), Albany SAC ¶ 383 ("In exchange for the Manufacturers artificially inflating their prices and paying the PBMs substantial amounts in Manufacturer Payments, the PBM Defendants grant the Manufacturer Defendants' diabetes medications elevated prices and preferred status on their national formularies."), King SAC ¶¶ 429, 434 (alleging Manufacturer Defendants "systematically inflated the prices of the at-issues drugs and then paid a significant, yet undisclosed, portion of this inflated price back" to the PBM Defendants "in exchange for favorable formulary positions"), Lake FAC ¶¶ 583, 588 (same), Illinois Compl. ¶ 344 ("In exchange for the Manufacturers inflating" the price of diabetes medications "and paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants grant Manufacturer Defendants' diabetes medications with the most elevated price and that are the most profitable to the PBMs preferred status on their standard formularies."), *and* Montana Am. Compl. ¶ 348 ("In exchange for the Manufacturers inflating" the price of diabetes medications "and paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants grant preferred status on their standard formularies to the Manufacturer Defendants' diabetes medications with the most elevated price and that are the most profitable to the PBMs.").
[25] Other complaints transferred to this Court named certain PBMs as Defendants as well, although those claims were voluntarily dismissed. *See Chaires*, ECF No. 239-1.

11

served civil investigative demands on certain manufacturers and PBMs in the same time period.[26] While Plaintiffs—each with access to this same information—chose to stand by, Congress pressed forward, with the Senate Finance Committee announcing an insulin pricing investigation in February 2019 and the U.S. House Energy and Commerce Committee holding a hearing in April 2019 specifically regarding the rising price of insulin, at which executives from every defendant testified.[27] This hearing is highlighted in *every* MDL Plaintiff's complaint, specifically because it mirrors Plaintiffs' claims. Yet the majority of Plaintiffs sat on the sidelines for another half a decade or more despite the intense national focus on the purported injury for which they now seek redress.

Courts in this Circuit and elsewhere have repeatedly held that constructive notice is triggered by the filing of a substantially similar lawsuit. *See, e.g.*, *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 276-77 (3d Cir. 2013) ("[A] reasonably diligent plaintiff would undertake an investigation based on the filing of related lawsuits."); *Riddle v. Bank of Am. Corp.*, 2013 WL 6061363, at *7 (E.D. Pa. Nov. 18, 2013) (holding claims were time barred where "a number of cases alleging identical schemes" were filed years earlier); *Sejin Precision Indus. Co. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 551 (S.D.N.Y. 2017), *aff'd*, 726 F. App'x 27 (2d Cir. 2018) (granting motion to dismiss claims as time barred where plaintiffs were put on notice of their fraud claims by the filing of other lawsuits containing "quite similar" allegations); *421-A Tenants Ass'n v. 125 Court St. LLC*, 2017 WL 6612933, at *5 (E.D.N.Y. Nov. 2, 2017), *aff'd*, 760 F. App'x 44 (2d Cir. 2019) (granting motion to dismiss RICO claims as time barred because filing of earlier class action lawsuit "alleging substantially the same

---

[26] *See* Ex. 15, CVS Form 10-Q at 20 (filed Aug 8, 2017) (listing CIDs).

12

facts and fraudulent conduct" was sufficient to put plaintiffs on inquiry notice). Here, where the IPP Case was the subject of extensive contemporaneous reporting by national news outlets and serves as the blueprint for the follow-on litigation, the IPP Case confirms that all Plaintiffs were on inquiry notice before that date.

\* \* \*

All the storm warnings—two decades of public reporting, years of high-profile congressional inquiries and investigations (including the November 2016 demand for a DOJ/FTC investigation), the filing of the IPP Case and attendant national publicity, lead to the same inescapable conclusion: Plaintiffs were on inquiry notice of their purported injuries at least by November 3, 2016, and certainly *prior* to February 2, 2017. Indeed, the filing of two insulin pricing lawsuits in late early 2017 is objective evidence that the factual basis for the claims Plaintiffs now assert was discoverable *before* that date through the exercise of reasonable diligence. The Court should accordingly set November 3, 2016 as the cutoff for inquiry notice.

## CONCLUSION

The PBM Defendants respectfully request that the Court rule that Plaintiffs had inquiry notice of their alleged injuries by at least November 3, 2016, and bar any claims filed after the applicable statute of limitations as calculated from the date of inquiry notice.

Respectfully submitted,

Dated: May 2, 2025

| | |
|---|---|
| /s/Brian D. Boone | /s/Jason R. Scherr |
| Thomas P. Scrivo | Jason R. Scherr |
| Young Yu | Patrick A. Harvey |
| **O'TOOLE SCRIVO, LLC** | Elise M. Attridge |
| | Lindsey T. Levy |
| Brian D. Boone | **MORGAN, LEWIS & BOCKIUS LLP** |
| Elizabeth Broadway Brown | 1111 Pennsylvania Avenue, NW |

13

Kelley Connolly Barnaby
**ALSTON & BIRD LLP**

*Counsel for UnitedHealth Group Incorporated; OptumRx, Inc.; Optum, Inc.; OptumInsight, Inc.; and Emisar Pharma Services LLC*

Washington, D.C. 20004-2541
jr.scherr@morganlewis.com
patrick.harvey@morganlewis.com
elise.attridge@morganlewis.com
lindsey.levy@morganlewis.com
Tel: (202) 739-3000

*Counsel for Evernorth Health, Inc. (formerly known as Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Medco Health Solutions, Inc., Ascent Health Services LLC, and The Cigna Group.*

  /s/ R. Kennon Poteat III
Kevin H. Marino, Esq.
John D. Tortorella, Esq.
**Marino, Tortorella & Boyle, P.C.**

Enu Mainigi
Craig Singer
R. Kennon Poteat III
A. Joshua Podoll
Benjamin Hazelwood
Daniel Dockery
**Williams & Connolly LLP**

*Counsel for CVS Health Corporation; CVS Pharmacy, Inc., Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; and Caremark, L.L.C., and Zinc Health Services, LLC*

14