## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
| --- | --- |
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-MD-03080**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH** |

**THIS DOCUMENT RELATES TO:**
**ALL TRACKS AND ALL CASES**

### DECLARATION OF THOMAS P. SCRIVO IN SUPPORT OF PBM DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING CONSTRUCTIVE NOTICE

I, THOMAS P. SCRIVO, hereby declare as follows:

1.      I am an attorney at law admitted to practice before this Court and partner at the law firm of O'Toole Scrivo, LLC, counsel for Defendants UnitedHealth Group Incorporated; OptumRx, Inc.; Optum, Inc.; OptumInsight, Inc.; and Emisar Pharma Services LLC  in the above-captioned matter.  As such, I am fully familiar with the facts set forth herein.

2.      I respectfully submit this Declaration in connection with the PBM Defendants'[1] supplemental briefing on the issue of constructive notice and in further support of the PBM Defendants' pending Rule 12(b)(6) motions to dismiss. I have personal knowledge of the matters stated herein and, if called to do so, I could and would testify competently hereto.

---

[1]      I refer collectively to all CVS, ESI, and OptumRx affiliates and parent corporations that are named in Plaintiffs' complaints—CVS Health Corporation; Caremark, LLC; CaremarkRx LLC; CaremarkPCS Health, LLC; Zinc Health Services, LLC; Evernorth Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc. (sued as ESI Mail Pharmacy Services, Inc.); Express Scripts Pharmacy Inc.; Medco Health Solutions, Inc.; Ascent Health Services LLC; UnitedHealth Group Incorporated; Optum, Inc.; OptumRx, Inc.; OptumInsight, Inc.; and Emisar Pharma Services LLC—as the PBM Defendants for convenience, even though certain of those entities are not PBMs.

3.      Attached hereto as **Exhibit 1** is a true and accurate copy of the *U.S. News & World Report* article, written by Julian E. Barnes, titled "When is a rebate a kickback?", published on August 12, 2002.

4.      Attached hereto as **Exhibit 2** is a true and accurate copy of the The Hill article, written by David Balto, titled "How PBMs make the drug price problem worse," published on August 31, 2016, *available online at* https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse/ (last visited May 2, 2025).

5.      Attached hereto as **Exhibit 3** is a true and accurate copy of the New York Times article, written by Kasla Lipska, titled "Break Up the Insulin Racket," published on February 20, 2016, *available online at* https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html (last visited May 2, 2025).

6.      Attached hereto as **Exhibit 4** is a true and accurate copy of the PBS News article, written by Ed Silverman, titled "What's Behind Skyrocketing Insulin Prices?", published on April 5, 2016, *available online at* https://www.pbs.org/newshour/health/whats-behind-skyrocketing-insulin-prices (last visited May 2, 2025).

7.      Attached hereto as **Exhibit 5** is a true and accurate copy of the November 3, 2016 letter to the Department of Justice and the Federal Trade Commission written by Senator Bernie Sanders and Representative Elijah Cummings, *available online at* https://www.sanders.senate.gov/wp-content/uploads/sanders-cummings-letter-to-doj-ftc-on-insulin.pdf (last visited May 2, 2025).

8.      Attached hereto as **Exhibit 6** is a true and accurate copy of the STAT article, written by Ed Silverman, titled "Insulin Prices Have Skyrocketed, Putting Drug Makers on the Defensive," published on April 5, 2016, *available online at*

2

https://www.statnews.com/pharmalot/2016/04/05/insulin-prices-skyrocketed-putting-drug-makers-defensive/ (last visited May 2, 2025).

9.      Attached hereto as **Exhibit 7** is a true and accurate copy of the Wall Street Journal article, written by Joseph Walker, titled "For Prescription Drug Makers, Price Increases Drive Revenue," published on October 5, 2015, *available online at* https://www.wsj.com/articles/for-prescription-drug-makers-price-increases-drive-revenue-1444096750 (last visited May 2, 2025).

10.     Attached hereto as **Exhibit 8** is a true and accurate copy of the Reuters article, written by Noel Randewich, titled "Mexico fines Eli Lilly, others for collusion," published on February 23, 2010, *available online at* https://www.reuters.com/article/world/europe/mexico-fines-eli-lilly-others-for-collusion-idUSN23107449/ (last visited May 2, 2025).

11.     Attached hereto as **Exhibit 9** is a true and accurate copy of the Bloomberg article, written by Robert Langreth, titled "Hot Drugs Show Sharp Price Hikes in Shadow Market," published on May 6, 2015, *available online at* https://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep (last visited May 2, 2025).

12.     Attached hereto as **Exhibit 10** is a true and accurate copy of the Wall Street Journal article, written by Denise Roland and Peter Loftus, titled "Middlemen Fuel Insulin Price Rise," published on October 10, 2016.

13.     Attached hereto as **Exhibit 11** is a true and accurate copy of the STAT article, written by Rebecca Robbins, titled "The insulin market is heading for a shakeup. But patients may not benefit," published on October 14, 2016, *available online at* https://www.statnews.com/2016/10/14/insulin-prices-generics/ (last visited May 2, 2025).

14.     Attached hereto as **Exhibit 12** is a true and accurate copy of the Law360 article, written by Jessica Corso, titled "Diabetes Patients Fire Off First Suit Over Insulin Drug Hike,"

published on January 30, 2017, *available online at* https://www.law360.com/articles/886365 (last visited May 2, 2025).

15.     Attached hereto as **Exhibit 13** is a true and accurate copy of the New York Times article, written by Katie Thomas, titled "Drug Makers Accused of Fixing Prices on Insulin," published on January 30, 2017, *available online at* https://www.nytimes.com/2017/01/30/health/drugmakers-lawsuit-insulin-drugs.html (last visited May 2, 2025).

16.     Attached hereto as **Exhibit 14** is a true and accurate copy of the Washington Post article, written by Carolyn Y. Johnson, titled "Diabetes patients sue insulin makers for 'pricing fraud'; Diabetes patients overpaid for insulin, lawsuit alleges," published on February 1, 2017, *available online at* https://www.washingtonpost.com/news/wonk/wp/2017/01/30/diabetes-patients-sue-insulin-makers-for-pricing-fraud (last visited May 2, 2025).

17.     Attached hereto as **Exhibit 15** is a true and accurate copy of the Form 10-Q filed by CVS Health Corporation with the Securities and Exchange Commission on August 8, 2017, *available online at* https://www.sec.gov/Archives/edgar/data/64803/000155837017006198/cvs-20170630x10q.htm (last visited May 2, 2025).

18.     Attached hereto as **Exhibit 16** is a true and accurate copy of the Form 10-Q filed by Eli Lilly and Company with the Securities and Exchange Commission on July 28, 2016, *available online at* https://www.sec.gov/Archives/edgar/data/59478/000005947816000399/lly-6302016x10q.htm (last visited May 2, 2025).

19.     Attached hereto as **Exhibit 17** is a true and accurate copy of the Form 10-Q filed by Express Scripts Holding Company with the Securities and Exchange Commission on October

25, 2016, *available online at* https://www.sec.gov/Archives/edgar/data/1532063/ 000153206316000026/esrx-09302016x10q.htm (last visited May 2, 2025).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Respectfully submitted,

By:    */s/ Thomas P. Scrivo*
Thomas P. Scrivo, Esq.
**O'TOOLE SCRIVO, LLC**
14 Village Park Road
Cedar Grove, New Jersey 07009
(973) 239-5700

*Attorney for Defendants UnitedHealth Group Incorporated; OptumRx, Inc.; Optum, Inc.; OptumInsight, Inc.; and Emisar Pharma Services LLC*

Dated: May 2, 2025

# EXHIBIT 1

# *When is a rebate a kickback?*

U.S. News & World Report

August 12, 2002

Copyright 2002 U.S. News & World Report

**Section:** MONEY & BUSINESS; Vol. 133 , No. 6; Pg. 31

**Length:** 1798 words

**Byline:** By Julian E. Barnes
**Highlight:** Discounts by pharmaceutical companies to middlemen are under fire

## Body

By the time the Senate defeated a measure last week to reduce prescription drug costs for senior citizens, Democrats and Republicans had squabbled over everything from the cost of the Medicare benefit to the role that bureaucrats would play. But there was one point on which everyone seemed to agree: All the proposals--and most likely any legislation that eventually emerges--would have vastly expanded the power of middlemen who tout themselves as the free-market solution to containing drug costs.

Already more than 70 percent of Americans with private health insurance buy their drugs indirectly through these pharmacy benefit managers, or PBMs. Working for employers and insurance companies, PBMs provide a wide range of services, including promoting lower-cost generics and running mail order pharmacies. Most important, however, they extract rebates from pharmaceutical manufacturers in exchange for putting the manufacturers' products on their lists of approved drugs. "We generate competition," says David Halbert, chief executive of AdvancePCS, the nation's biggest PBM. "We are in the business of lowering drug costs."

Except, that is, when they aren't. PBMs are coming under increasing attack by employers, state legislatures, and a federal investigation that is fast gathering steam. Their claims are essentially the same: that manufacturers' rebates are nothing but illegal kickbacks that the PBMs use to line their own pockets instead of to reduce costs to consumers. Critics say these secret payments add up to 10 percent of the $ 122 billion Americans spend on prescription drugs every year. "Are the PBMs driving up healthcare costs?" asks Gerry Purcell, a former PBM executive turned industry critic. "I think the answer is yes."

Favored products. The power of PBMs--the top four companies earn $ 57 billion a year in revenue--rests in their ability to decide which drugs an employer will pay for. Just as an HMO chooses a network of preferred doctors, the PBM compiles a list of favored drugs known as a formulary. If a doctor prescribes a drug that is not on the formulary, an employer or insurance company might refuse to pay for it. If another drug is "preferred" over one that a doctor prescribes, the PBM might call the doctor and ask him to switch it. In theory, PBMs push drugs that are not only effective but also less expensive.

In practice, however, prescribing decisions are often driven not by the price of a drug but rather by how much the drug company is paying the PBM to recommend it. Critics say drug companies are paying ever bigger chunks of money to PBMs to boost sales of expensive drugs that are no better than cheaper alternatives. And while some of that money is passed on to the PBM's clients--the insurance companies or employers--much, if not most, is kept by the PBMs themselves."The PBMs are driven by collecting rebates, not containing costs," says Chris Nee, a benefits consultant.

When is a rebate a kickback?

Now a spate of private lawsuits seeks to force the PBMs to share that rebate money with their clients and to open their books. According to Michael Ferrara, one of the lawyers suing the industry, PBMs owe $ 32 million to the health plan of the state of California alone.

Drug makers and PBMs guard their rebate deals jealously. But one arrangement is laid out in a lawsuit against drug giant Wyeth, the maker of Premarin, a leading estrogen therapy. Duramed Pharmaceuticals, a company that makes a cheaper estrogen product called Cenestin, contends that Wyeth signed agreements in 1999 with several PBMs, including industry leaders AdvancePCS, Express Scripts, and Caremark RX. At the same time, Wyeth raised the price of Premarin 12 percent. According to the lawsuit, Wyeth offered the PBMs broad rebates but in some cases agreed to pay only if the PBMs excluded Cenestin from their formularies. Unwilling to forgo millions in profits, says Stephen Susman, a lawyer for Duramed, the PBMs complied. In court filings, Wyeth denies the contracts were exclusive and says patients were free to buy Cenestin on their own.

In most markets, the price for an existing product falls when a new, better product is introduced. Not so with prescription drugs. Zocor, Merck's big-selling cholesterol drug, was introduced in 1991; its chief rival, Pfizer's Lipitor, was introduced in 1996. Lipitor was shown to be more effective. So what happened to the price of Zocor? From 1996 to 2001, it increased 22.2 percent. A similar situation occurred with Prilosec, the heartburn drug introduced in 1989. Its chief rival, Prevacid, was introduced in May 1995, and three similar medicines have been approved since. In response to this competition, the price of Prilosec increased 27 percent.

Perverse economics. Although the cause of these price increases is unknown, PBMs are a big part of the reason new products drive prices for existing drugs up instead of down. When a new drug comes out, the maker of the old drug often pays the PBMs more money to keep the existing drug on the formulary. The drug maker then passes on those fees to consumers in the form of higher prices. "This is a market structure based on reverse and perverse economics," says Stephen Schondelmeyer, a professor of pharmaceutical economics at the University of Minnesota. "PBMs get paid more for doing what increases drug spending."

It didn't always work this way. PBMs once earned most of their revenue from the administrative fees paid by corporate health plans. But these days, PBMs are far more reliant on drug-maker rebates. Medco, the nation's second-largest PBM, reported that it would not have been profitable for the past three years had it not been for rebates. But now that these payments have come under fire, critics say the companies have started hiding them from clients and auditors by calling them by other names. They might label them "educational grants," for instance, or "data sales fees," or "health management fees." When used legitimately, such fees are considered compensation to the PBMs for educating physicians about a drug makers' products or in exchange for prescription information about patients. (The latter practice has raised additional privacy concerns.)

Hiding the rebates also helps pharmaceutical companies maintain artificially high prices. How? By law, drug companies must give Medicaid their lowest retail price. This so-called best price must take into consideration the rebates and other incentives that manufacturers give PBMs. The more rebates a drug company has to pay, the lower the price of the drug. But if the manufacturers don't call their rebates "rebates," they don't have to factor them into their best-price calculations.

PBM executives insist that they pass along most of the rebate money to the corporate health plans, negotiating lower overall prices than corporations could get on their own. Being able to keep some of the rebate money gives PBMs an incentive to try to extract more savings from pharmaceutical companies, said Barrett Toan, the chief executive of Express Scripts. "We are part of the solution," Toan says. "Not part of the problem."

But as long as PBMs are paid to do the bidding of pharmaceutical companies, critics say they will never be able to curb rising drug costs. Purcell, the former PBM executive, cites the case of AstraZeneca and its popular heartburn medication Prilosec. AstraZeneca, Purcell says, has been paying PBMs $ 15 to $ 30 for every call they make to doctors urging them to switch from Prilosec to its new heartburn pill, Nexium. With 30 million Prilosec prescriptions written last year, that offer could be worth millions. Since Nexium is priced lower than Prilosec, switching may initially seem like a good deal. Yet AstraZeneca, Purcell says, is thinking much further down the road. Under state

When is a rebate a kickback?

laws, once Prilosec becomes generic, pharmacists will automatically switch most patients to the low-cost unbranded alternative. But AstraZeneca, Purcell says, is betting that former Prilosec users, by then happily taking Nexium, will not voluntarily switch.

A spokesman for AstraZeneca declined to divulge how much the company was paying PBMs to switch patients to Nexium, saying only that Purcell's estimate was too high. Toan said Express Scripts representatives made the calls only after asking clients' permission and disclosed to the doctors that the company was getting paid. He disputed Purcell's predictions, saying that once Prilosec became generic, the company would try to switch patients off Nexium.

Accounting tricks? Although the criticism of PBMs extends industrywide, much of it stems from the controversial practices of Medco and its parent company, pharmaceutical manufacturer Merck. Last month, Merck was forced to delay its spinoff of Medco after questions were raised about whether the unit inflated its size by claiming $ 12 billion in revenue from copayments by consumers to pharmacies--money that Medco never touched.

At the same time, several lawsuits argue that Medco pushed its clients to use more expensive drugs manufactured by Merck. Medco lawyers argue that even if the company favored more expensive drugs in some cases, it guarantees that it saves its clients money overall. Nevertheless, the Merck case has attracted the attention of Jim Sheehan, an assistant U.S. attorney for the Eastern District of Pennsylvania who has been conducting a wide-ranging inquiry into PBM practices for the past four years. Sheehan would not comment on the probe, but he is expected to lay out his case in a letter to Medco as early as this week. Sheehan is also attempting to question executives of AdvancePCS about rebates and drug switches.

Despite the growing criticism, Congress is expected to rely on the PBM model as it resumes debate on Medicare drug coverage this fall. Meanwhile, many state governments, their budgets squeezed by rising drug costs for public employees, have had enough. In June, Georgia's governor signed a law regulating PBMs. West Virginia has negotiated a deal with a PBM that would give the state a bigger share of rebates. And Vermont is leading a coalition of states that want to negotiate directly with drug makers, cutting out PBMs altogether. Says Vermont Senate President Peter Shumlin: "The days of PBMs' selling people savings while secretly lining their pockets are over."


The Drug Discount Game

[Drawing is not available.]

Drug manufacturers offer rebates to push their products.

Pharmacy Benefit Managers (PBMs) keep money critics say they should pass on to health plans.

[labels] Rebate dollars; Health plans; PBM

ILLUSTRATION BY DOUG STERN--USN&WR


Soaring drug costs

The prices of brand-name pharmaceuticals have more than doubled in a decade.

[Chart data are not available.]

[labels]1990'92'94'96'98'00

0

20

When is a rebate a kickback?

40

$ 60

Source: Kaiser Family Foundation; MARCELA MARTINEZ--USN&WR

## Graphic

Drawing, The Drug Discount Game (ILLUSTRATION BY DOUG STERN--USN&WR); Picture, "We're not part of the problem; we're part of the solution." BARRETT TOAN, chief executive officer of the benefits firm Express Scripts. Critics say PBMs increase costs by taking manufacturers' rebates to push higher-priced drugs. (BILL STOVER-- THE NEW YORK TIMES); Chart, Soaring drug costs (Kaiser Family Foundation; MARCELA MARTINEZ-- USN&WR)

## Classification

**Language:** ENGLISH

**Subject:** HEALTH CARE COSTS (90%); LEGISLATIVE BODIES (90%); MEDICARE (90%); SALES REBATES (90%); US REPUBLICAN PARTY (90%); DRUG PRICES (89%); US DEMOCRATIC PARTY (79%); US FEDERAL GOVERNMENT (79%); CONSUMERS (78%); GENERIC DRUGS (78%); INVESTIGATIONS (78%); LEGISLATION (78%); SENIOR CITIZENS (78%); GENERIC PRODUCTS (74%); EXECUTIVES (69%); NEGATIVE MISC NEWS (66%); FEDERAL INVESTIGATIONS (51%)

**Company:** ADVANCEPCS  (69%); ADVANCEPCS  (69%);    MEDICARE  (84%)

**Organization:** MEDICARE  (84%)

**Ticker:** ADVP (NASDAQ)  (69%)

**Industry:** SIC6411 INSURANCE AGENTS, BROKERS, & SERVICE  (69%); PHARMACY BENEFITS (93%); PHARMACEUTICAL PREPARATION MFG (92%); PHARMACEUTICALS & BIOTECHNOLOGY (92%); HEALTH CARE COSTS (90%); MANUFACTURING (90%); MEDICARE (90%); PHARMACEUTICALS INDUSTRY (90%); PRESCRIPTION DRUGS (90%); SALES REBATES (90%); DRUG PRICES (89%); INSURANCE (89%); PRESCRIPTION FORMULARIES (89%); GENERIC DRUGS (78%); MANAGED CARE ORGANIZATIONS (78%); PHARMACEUTICALS & BIOTECHNOLOGY REGULATION & POLICY (78%); PHARMACIES (78%); PRESCRIPTION DRUG INSURANCE (78%); GENERIC PRODUCTS (74%); RETAIL PHARMACEUTICALS (73%); MAIL ORDER RETAILING (70%); HEALTH MAINTENANCE ORGANIZATIONS (50%)

**Geographic:** UNITED STATES (92%)

**Load-Date:** August 6, 2002

When is a rebate a kickback?

**End of Document**

# EXHIBIT 2

HEALTHCARE

# How PBMs make the drug price problem worse

BY DAVID BALTO, CONTRIBUTOR - 08/31/16 5:51 PM ET





Thinkstock

Recent price increases on the lifesaving allergy drug EpiPen have spawned a conversation about how drug pricing works in this country. Unfortunately the focus on this one product by a one-note media and headline chasing polls has obscured a far bigger issue — the corrosive role of Pharmacy Benefit Managers (PBMs) who oversee drug prescription plans in driving up consumer prices.

Mylan, the manufacturer of EpiPen, for example, receives less than half the list price for an EpiPen 2-Pak. PBMs — who do not research, develop, create or manufacture any new

On a $600 EpiPen, the PBM is likely receiving close to $300 on each prescription.

The role of the PBM is to aggregate drug purchasing power from payers (insurance companies, small businesses, and consumers) and supposedly negotiate the lowest price from drug manufacturers and the lowest dispensing fee from pharmacies.

Their revenue mainly comes from rebates paid by drug manufacturers in order to be carried on a PBM's system, creating perverse incentives toward PBMs dispensing more, not less, expensive drugs.

But instead of lowering costs, the largest PBMs, Express Scripts, CVS Caremark and Optum Rx, are incentivized to inflate drug prices. The higher the price, the higher the rebate — and walk away with a bigger slice of the pie.

{mosads}Large employers who have some negotiating power may claw back some of that money — that's the idea of aggregating drug plans through a PBM — but small employers and consumers can't.

## Sign up for the Morning Report

The latest in politics and policy. Direct to your inbox.

| Email address | SUBSCRIBE |

By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, on-site notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc., and its affiliates

Meanwhile local pharmacies, which are the front lines of delivering health care and are the most trusted and accessible health care providers see their margins cut to the bone. On EpiPen they might get 4 percent, or $24, pennies compared to the PBM's profits, which can be to ten times greater. It's no wonder communities are seeing their local pharmacies disappear as PBMs rake in more and more of the available cash.

No other country has a private system of intermediaries to handle drug reimbursement in this way. And for good reason.

**Choice**

The PBM market is dominated by three mega-companies that capture over 70 percent of the market. New entry is extremely difficult due to the massive economies of scale enjoyed by these giants and their ability to demand unreasonably favorable "discounts" from manufacturers unavailable to upstarts and new players.

**Transparency**

A large portion of PBM profits are derived from rebates they receive from drug manufacturers, but don't pass on to their consumers. How big is the difference? Unfortunately, we don't know because the information has not been disclosed to the public.

PBMs fight tooth and nail to prevent anything that might exposure the true origins of their massive profits. Transparency is considered essential for other health care markets to work. Yet when state legislatures, the White House, consumer groups, unions and major employers have sought to secure transparency, the PBMs have objected; like the Wizard of Oz they cry out, "don't look behind the curtain!"

If there was transparency when prices increase employers could "follow the money" – they could figure out what rebates are being paid and who received them. Giving them that information would enable employers to bargain effectively and secure lower prices. That's the way markets are supposed to work.

**Conflicts**

PBMs own and operate mail order and specialty pharmacies, but considering their purpose is to control drug dispensing costs, it's hard to believe the fox can guard the henhouse. In a PBM's perfect world, there would be no independent pharmacy and no local pharmacist advocating to make sure patients do not overpay for drugs.

Little choice, no transparency, conflicts of interest — so what's the result? Rapidly escalating profits for PBMs and high drug prices for the consumer. Since 2003 Express Scripts has seen its profit per prescription increased over 500 percent per adjusted script. Often PBMs are making more on prescriptions than the pharmacy, crushing small businesses and driving up health care costs across the board.

A system that rewards middle men over those who develop new treatments and manufacture real products makes no sense. It imposes unnecessary costs on the system

vertical supply chain. Transparency and choice at all levels of the supply chain are vital for consumers to be protected against escalating drug costs. It's time to make the PBM market work for consumers.

*David Balto counsels a wide variety of Fortune 500 companies, small business and consumer advocates on antitrust and consumer protection compliance, strategic alliances, distribution issues, mergers and joint ventures.*

*The views expressed by contributors are their own and not the views of The Hill.*

**TAGS**  EPIPEN  PHARMACY BENEFIT MANAGERS

Copyright 2025 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.



## SPONSORED CONTENT

Privacy Policy

### Exciting New Retirement Village in Charlotte (Check Out the Cost)

Retirement Living | Search Ads | Sponsored          Read More

### Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask

WalletJump | Sponsored          Learn More

### Average Cost to Charter A Private Jet May Surprise You (See Prices)

Top Searcher Now | Business Class Discounts | Sponsored          Learn More

### The Disadvantages Of A Reverse Mortgage Might Surprise You

Top Searcher Now | Finance | Sponsored          Learn More

### 2024 Senior SUV Is A True Head Turner (You'll Love The Price)

Top Searcher Now | Auto | Sponsored          Learn More

# EXHIBIT 3

**The New York Times**

https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html

OPINION

# Break Up the Insulin Racket

**By Kasia Lipska**

Feb. 20, 2016

ONE of my patients — whom I will call Mrs. B — is a 78-year-old who has had Type 2 diabetes for over 30 years. She takes several injections of insulin each day. Her blood sugars have been running too high, but she doesn't want to increase the dose of her insulin. She told me she simply can't afford to.

Insulin has been around for almost a century. The World Health Organization considers it an essential medicine, which means it should be available "at a price the individual and the community can afford." So why is this product increasingly too expensive for many Americans?

In the United States, just three pharmaceutical giants hold patents that allow them to manufacture insulin: Eli Lilly, Sanofi and Novo Nordisk. Put together, the "big three" made more than $12 billion in profits in 2014, with insulin accounting for a large portion.

What makes this so worrisome is that the big three have simultaneously hiked their prices. From 2010 to 2015, the price of Lantus (made by Sanofi) went up by 168 percent; the price of Levemir (made by Novo Nordisk) rose by 169 percent; and the price of Humulin R U-500 (made by Eli Lilly) soared by 325 percent.

To make insulin affordable, we need more competition. Nothing would do this faster than a "generic" form of insulin. (Technically, because insulin is made using bacteria, it should be referred to as a "biosimilar" instead of a "generic.") Unfortunately, there isn't one available in the United States.

**Sign up for the Opinion Today newsletter** Get expert analysis of the news and a guide to the big ideas shaping the world every weekday morning. Get it sent to your inbox.

This is true, in no small part, because the big three have cleverly extended the lives of their patents, making incremental "improvements" to their insulin. It's not clear whether the newer insulin products are significantly safer or more effective than their predecessors, yet the strategy has been effective: There is no generic insulin, and over 90 percent of privately insured patients with Type 2 diabetes who are prescribed insulin get the newer and more expensive products.

But even a generic version of insulin might not solve all of Mrs. B's problems. Something else is most likely contributing to the rising price of insulin: a very powerful and largely invisible group of middlemen, known as pharmacy benefit managers, or P.B.M.s.

Benefit managers negotiate with drug companies on behalf of insurers, such as employer plans and government programs like Medicaid and Medicare Part D. In theory, their job is to bargain for lower drug prices.

The hitch is that the biggest P.B.M.s are out to make a buck. They get "rebates" from drug manufacturers — payments based on sales or other criteria, which look suspiciously similar to kickbacks. The rebates are not publicly disclosed, but they are sizable. Industry analysts estimate that those payments, and other back-room deals, amount to as much as 50 percent of the list price of insulin.

This, of course, creates a conflict of interest. Benefit managers are supposed to be driving down costs, but the system incentivizes them to choose the products with the largest rebates. It's not clear whether most of these "savings" are passed along to consumers or simply pocketed. Last month, a large insurer, Anthem, complained publicly that its P.B.M., Express Scripts, was not sharing enough of its savings.

What we do know is that business is booming for P.B.M.s. Together, the three biggest benefit managers — Express Scripts, CVS Health and OptumRx — bring in more than $200 billion a year in revenue. They also control over 80 percent of the P.B.M. market, involving 180 million insured people.

Where does this leave my patient? Mrs. B has Medicare Part D coverage. She is responsible for co-payments on her insulin. But every year, by early fall, she typically reaches a coverage gap (known as the doughnut hole) when she becomes responsible for paying for insulin out of pocket. So Mrs. B skimps on her medicine, allowing her blood sugar to rise to worrisome levels.

There is some hope that the insulin industry is about to become more competitive. The patent on Lantus (Sanofi's top-selling insulin) recently expired, allowing other companies to start preparing generic forms. The first generic competitor usually sets a price that is only slightly below the branded insulin. Research shows that once there are two manufacturers of a generic drug, the price typically drops by about half; with eight, it drops to about a fifth. But because insulin is a biosimilar, the decline may be more modest. And this will take time; additional testing is needed to ensure the safety and effectiveness of each new generic before it is approved.

IN the meantime, we need a fair and transparent system for setting prices. In much of Europe, insulin costs about a sixth of what it does here. That's because the governments play the role of pharmacy benefit managers. They negotiate with the manufacturer directly and have been very effective at driving down prices. In the United States, we rely on the private sector and a free market for drug pricing. But in order for this to work, we need to regulate it better and demand greater transparency.

Over the past 10 years, the Federal Trade Commission has brought only a single enforcement action against benefit managers, over an issue of patient privacy violations.

There are some short-term solutions in the hands of patients and doctors. After talking with Mrs. B, I prescribed an older, slightly cheaper version of insulin — known as "human" insulin — which worked just as well. In fact, it is more effective because she is actually taking it.

In general, our faith in newer and "better" drugs — coupled with our unwillingness to police this marketplace — has done little to help Americans like Mrs. B. Sure, we need to protect the intellectual capital of pharmaceutical companies so that they continue to invest in innovative new drugs. But those drugs should ultimately result in better health for patients, not just wider profit margins.

*Kasia Lipska is an endocrinologist at the Yale School of Medicine.*

*Follow The New York Times Opinion section on Facebook and Twitter, and sign up for the Opinion Today newsletter.*

A version of this article appears in print on , Section SR, Page 5 of the New York edition with the headline: Break Up the Insulin Racket

# EXHIBIT 4

# What's behind skyrocketing insulin prices?

**Health**    Apr 5, 2016 2:49 PM EDT

Here's a sticking point for diabetics: the cost of insulin more than tripled — from $231 to $736 a year per patient — between 2002 and 2013, according to a new **analysis**.

The increase reflected rising prices for a milliliter of insulin, which climbed 197 percent from $4.34 per to $12.92 during the same period. Meanwhile, the amount of money spent by each patient on other diabetes medications fell 16 percent, to $502 from $600, according to a research letter published Tuesday in the Journal of the American Medical Association.

"Insulin is a life-saving medication," said Dr. William Herman, a coauthor of the analysis and a professor of epidemiology at the University of Michigan School of Public Health. "There are people with type 1 diabetes who will die without insulin. And while there have been incremental benefits in insulin products, prices have been rising. So there are people who can't afford them. It's a real problem."

The analysis also found that the cost of various widely used oral diabetes drugs either dropped in price or did not rise nearly as significantly as insulin. Metformin, for instance, which is available as a generic, fell to 31 cents in 2013 from $1.24 per tablet in 2002. And the newer class of diabetes drugs known as DPP-4 inhibitors rose 34 percent since becoming available in 2006.

The researchers analyzed data from nearly 28,000 diabetes found in the Medical Expenditure Panel, a database on health care costs maintained by the US Department of Health and Human Services. About 1 in 4 people used insulin and two-thirds took a pill. Toward the end of the study period, a small percentage began taking new injectable medicines that are designed to complement pills.

There have been previous efforts to track insulin prices in recent years, but the researchers explained this is the first attempt to examine national pricing data in this way for an extended period of time. And the findings are likely to further fuel the hot-button national debate over the rising cost of prescription medicines, which has also become a talking point in the presidential campaign.

More than 29 million Americans, or 9.3 percent of the population, have some form of diabetes, according to the US Centers for Disease Control and Prevention. Not surprisingly, there are numerous companies competing to grab a share of the market and newer forms of insulin have been introduced, notably, analog insulins that are man-made and differ slightly from human insulin.

Payers report that unit costs are rising. One exception has been the widely used long-acting form of insulin called Lantus, which is marketed by Sanofi. The drug maker has been encountering pushback form insurers, and so the unit cost for the medicine fell nearly 14 percent last year, according to Express Scripts, the nation's largest pharmacy benefits manager.

More competition is expected for Lantus later this year when Eli Lilly is expected to launch a biosimilar version of the medication. But to what extent this drug will be affordable remains to be seen. Typically, when a generic version of a pill becomes available, the price drops 80 percent or more. But biosimilars are new to the United States and are forecast to cost about 20 percent to 30 percent less than a brand-name drug.

Meanwhile, some doctors say diabetic patients, who are typically 60 years old or more, have difficulty paying for drugs, especially those who have trouble once they hit the donut hole in the Medicare Part D program and have to cover costs themselves. "The cost of therapy is huge," said Dr. Jane Bridges, a diabetologist in Vincennes, Ind. "I have patients who tell me that they have to stretch out the use of their medicines."

But the Pharmaceutical Research and Manufacturers of America argued that focusing on list prices "misrepresents" reality. The industry trade group maintained that wholesale prices generally do not correspond to net prices — what companies, unions, and government agencies pay — because drug makers offer rebates. The group cited an analysis by SSR Health that net prices declined last year.

Spokespeople for Eli Lilly and Novo Nordisk, two of the largest manufacturers of diabetes medicines, echoed that argument and both companies noted that patient-assistance programs are available. The Novo spokesman added that "making comparisons between insulin and oral medications are not appropriate as each medication is designed to support a patient's specific glucose-control needs."

A Lilly spokeswoman maintained that the net price for its Humalog insulin rose an average of 1.6 percent annually from 2010 to 2015. However, she did not respond to questions about the rebates that were offered. Drug makers and pharmacy benefits managers are facing increasing criticism for their failure to disclose rebates and discounts.

One analyst, meanwhile, contended that rising prices may not have any impact on patient outcomes.

"I don't think you can draw a straight line from the rising cost of insulin to outcomes," said David Kliff, who publishes Diabetic Investor. "Very few patients pay out of pocket for cost of insulin. So I don't think prices truly impact the patient pocket book. There's only a small percentage who don't have insurance or enough insurance."

But another author of the analysis disagreed.

"High costs can lead to reduced compliance, but more importantly the cost-effectiveness of high cost therapies … should be assessed, so they produce a greater clinical benefit for the patient," Philip Clarke, a professor of health economics at the University of Melbourne in Australia. Other countries, he noted, routinely assess cost-effectiveness when setting prices for government-subsidized drugs.

*This article is reproduced with permission from **STAT**. It was first published on April 5, 2016. Find the original story **here**.*

# Federal funding for PBS News Hour is at risk

2X your impact for trusted journalism with a donation to Public Media Giving Days today.

**Donate** →

*By* — **Ed Silverman, STAT**

# EXHIBIT 5

# Congress of the United States
## Washington, DC 20510

November 3, 2016

The Honorable Loretta E. Lynch
Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

The Honorable Edith Ramirez
Chairwoman
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580

Dear Attorney General Lynch and Chairwoman Ramirez:

We write to ask the Department of Justice and the Federal Trade Commission to investigate whether pharmaceutical companies manufacturing insulin products have colluded or engaged in anticompetitive behavior in setting their drug prices.

The original insulin patent expired 75 years ago. Instead of falling prices, as one might expect after decades of competition, three drugmakers who make different versions of insulin have continuously raised prices on this life-saving medication. In numerous instances price increases have reportedly mirrored one another precisely.[1]

This is an issue of tremendous national significance. Diabetes, a group of diseases that involve problems with the pancreas' production of the hormone insulin, can lead to severe health problems, including heart disease and stroke, kidney failure, amputations, and vision loss. These health consequences are devastating for individuals and their families and costly to treat. Nearly 30 million Americans have diabetes. In 2012, diabetes and prediabetes cost the U.S. $322 billion in medical costs and reduced productivity.[2]

---

[1] Carolyn Johnson, "Why treating diabetes keeps getting more expensive," *Washington Post* (Oct. 31, 2016) (online at https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years); see also (Robert Langreth, "Hot Drugs Show Sharp Price Hikes in Shadow Market," *Bloomberg* (May 6, 2015) (online at http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep).

[2] Timothy Dall et al., "The Economic Burden of Elevated Blood Glucose Levels in 2012: Diagnosed and Undiagnosed Diabetes, Gestational Diabetes Mellitus, and Prediabetes," *Diabetes Care* (Dec. 2014) (online at http://care.diabetesjournals.org/content/37/12/3172); Centers for Disease Control and Prevention, "Diabetes: Working to Reverse the US Epidemic At a Glance 2016" (online at http://www.cdc.gov/chronicdisease/resources/publications/aag/diabetes.htm); see also American Diabetes Association "The Staggering Costs of Diabetes in America," (online at http://www.diabetes.org/diabetes-basics/statistics/infographics/adv-staggering-cost-of-diabetes.html).

The Honorable Loretta E. Lynch
The Honorable Edith Ramirez
Page 2

The prices of these medications have skyrocketed in recent years. The price of insulin more than tripled between 2002 and 2013—from $231 to $736 per year per patient.[3] From 2010 to 2014, Lantus, made by Sanofi, increased in price by 168 percent; Humalog, made by Eli Lilly, increased by 103 percent; and Januvia and Janumet, made by Merck & Co., both increased by 75 percent.[4] The top 10 diabetes drugs brought in more than $28 billion in sales in 2013.[5]

These high and still rising prices have a significant impact on federal spending. The American Diabetes Association estimates that the government pays for nearly two-thirds of diabetes care in the U.S. through various insurance programs.[6] In 2015, Medicare spent more per beneficiary on diabetes medications than on any other class of drugs, primarily due to rising prices.[7] The market entry price of "follow-on" insulin products, which largely duplicate existing drugs, are partially informed by the high prices of available therapies. Patients and taxpayers may not realize the savings that could be gained if existing insulin products were less expensive.

We have also heard from our constituents that the life-saving insulin they need is increasingly unaffordable. About six million Americans use insulin, and for many patients, switching between insulin brands can be difficult because the medicines are not completely interchangeable.[8]

Not only have these pharmaceutical companies raised insulin prices significantly— sometimes by double digits overnight—in many instances the prices have apparently increased in tandem. According to *Bloomberg*:

On May 30 last year, the price for a vial of the blockbuster diabetes medication Lantus went up by 16.1 percent. On the next day, Lantus's direct competitor, Levemir, also registered a price increase—of 16.1 percent.

The pattern repeated itself six months later when Lantus, from French drugmaker Sanofi, was marked up 11.9 percent, and Levemir, made by Novo Nordisk A/S, matched again exactly.

[3] Ed Silverman, "Insulin prices have skyrocketed, putting drug makers on the defensive," (Apr. 5, 2016) (online at https://www.statnews.com/pharmalot/2016/04/05/insulin-prices-skyrocketed-putting-drug-makers-defensive).
[4] Chris Canipe and Joseph Walker, "How Drug Company Revenue Is Driven by Price Increases," *Wall Street Journal* (Oct. 5, 2015) (online at http://graphics.wsj.com/price-hike-2015); see also Joseph Walker, "For Prescription Drug Makers, Price Increases Drive Revenue," *Wall Street Journal* (Oct. 5, 2015) (online at http://www.wsj.com/articles/for-prescription-drug-makers-price-increases-drive-revenue-1444096750).
[5] Eric Palmer, "The top 10 best-selling diabetes drugs of 2013," (June 17, 2014) (online at http://www.fiercepharma.com/pharma/top-10-best-selling-diabetes-drugs-of-2013).
[6] American Diabetes Association, "The Cost of Diabetes," (last updated June 22, 2015), (online at http://www.diabetes.org/advocacy/news-events/cost-of-diabetes.html).
[7] Express Scripts, "Express Scripts 2015 Drug Trend Report Medicare," (Mar. 2016) (online at https://lab.express-scripts.com/lab/drug-trend-report).
[8] Rebecca Robbins, "The insulin market is heading for a shakeup. But patients may not benefit," *STAT* (Oct. 14, 2016) (online at https://www.statnews.com/2016/10/14/insulin-prices-generics).

The Honorable Loretta E. Lynch
The Honorable Edith Ramirez
Page 3

**In 13 instances since 2009, prices of Lantus and Levemir**—which dominate the global market for long-acting injectable insulin with $11 billion in combined sales—**have gone up in tandem in the U.S.,** according to SSR Health, a market researcher in Montclair, New Jersey.[9]

From 2014 to 2015, the price of both Sanofi's Lantus and Novo Nordisk's Levemir reportedly went up by 29.9 percent, and each drug had a wholesale price of precisely $29.82 per milliliter. Eli Lilly, the manufacturer of Humalog, and Novo Nordisk, which makes Novolog, have also on several occasions increased prices in lockstep.[10]

The chart below from *STAT* shows how four different widely-prescribed insulin products have risen in price together:[11]



JEFFERY DELVISCIO/STAT

Source: Truven Health Analytics

In fact, Eli Lilly and other companies have been fined in Mexico for colluding on insulin pricing. Mexico's antitrust commission fined Eli Lilly Mexico and three other companies in 2010 for taking turns placing winning bids for government contracts to buy insulin—artificially inflating prices by agreeing not to compete.[12]

---

[9] Robert Langreth, "Hot Drugs Show Sharp Price Hikes in Shadow Market," *Bloomberg* (May 6, 2015) (online at http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep) (emphasis added); (http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep#media-2).
[10] *Id.*
[11] Rebecca Robbins, "The insulin market is heading for a shakeup. But patients may not benefit," *STAT* (Oct. 14, 2016) (online at https://www.statnews.com/2016/10/14/insulin-prices-generics).
[12] Noel Randewich, "Mexico fines Eli Lilly, others for collusion," *Reuters* (Feb. 23, 2010) (online at http://www.reuters.com/article/mexico-pharmaceutical-idUSN2310744920100223).

The Honorable Loretta E. Lynch
The Honorable Edith Ramirez
Page 4

We are concerned that the potential coordination by these drugmakers may not simply be a case of "shadow pricing," but may indicate possible collusion, and we believe this egregious behavior warrants a thorough investigation.

We urge the Justice Department and the Federal Trade Commission to investigate any anticompetitive conduct by insulin manufacturers and take any necessary action to protect consumers and taxpayers.

Thank you for your attention to this matter.

Sincerely,

Bernard Sanders
Ranking Member
Subcommittee on Primary Health
and Retirement Security
Committee on Health, Education,
Labor and Pensions
United States Senate

Elijah E. Cummings
Ranking Member
Committee on Oversight and
Government Reform
United States House of Representatives

# EXHIBIT 6

5/1/25, 3:54 PM
Insulin prices have skyrocketed, putting drug makers on the defensive
Case 2:23-md-03080-BRM-RLS   Document 534-1   Filed 05/02/25   Page 32 of 468
PageID: 15486

**Insulin prices have skyrocketed, putting drug makers on the defensive**



By [Ed Silverman](#)[1]April 5, 2016



According to a new analysis, some people cannot afford the cost of insulin, which has risen sharply. *Jean-Francois Monier/AFP/Getty Images*

Here's a sticking point for diabetics: the cost of insulin more than tripled — from $231 to $736 a year per patient — between 2002 and 2013, according to a new [analysis](#)[3].

The increase reflected rising prices for a milliliter of insulin, which climbed 197 percent from $4.34 per to $12.92 during the same period. Meanwhile, the amount of money spent by each patient on other diabetes medications fell 16 percent, to $502 from $600, according to a research letter published Tuesday in the Journal of the American Medical Association.

"Insulin is a life-saving medication," said Dr. William Herman, a coauthor of the analysis and a professor of medicine and epidemiology at the University of Michigan School of Public Health. "There are people with type 1 diabetes who will die without insulin. And while there have been incremental benefits in insulin products, prices have been rising. So there are people who can't afford them. It's a real problem."

The analysis also found that the cost of various widely used oral diabetes drugs either dropped in price or did not rise nearly as significantly as insulin. Metformin, for instance, which is available as a generic, fell to 31 cents in 2013 from $1.24 per tablet in 2002. And the newer class of diabetes drugs known as DPP-4 inhibitors rose 34 percent since becoming available in 2006.

The researchers analyzed data from nearly 28,000 diabetes patients found in the Medical Expenditure Panel, a database on health care costs maintained by the US Department of Health and Human Services. About 1 in 4 people used insulin and two-thirds took a pill. Toward the end of the study period, a small percentage began taking new injectable medicines that are designed to complement pills.

There have been previous efforts to track insulin prices in recent years, but the researchers explained this is the first attempt to examine national pricing data in this way for an extended period of time. And the findings are likely to further fuel the hot-button national debate over the rising cost of prescription medicines, which has also become a talking point in the presidential campaign.

More than 29 million Americans, or 9.3 percent of the population, have some form of diabetes, according to the US Centers for Disease Control and Prevention. Not surprisingly, there are numerous companies competing to grab a share of the market and newer forms of insulin have been introduced, notably, analog insulins that are man-made and differ slightly from human insulin.

Payers report that unit costs are rising. One exception has been the widely used long-acting form of insulin called Lantus, which is marketed by Sanofi. The drug maker has been encountering pushback from insurers, and so the unit cost for the medicine fell nearly 14 percent last year, according to Express Scripts, the nation's largest pharmacy benefits manager.

More competition is expected for Lantus later this year when Eli Lilly is expected to launch a biosimilar version of the medication. But to what extent this drug will be affordable remains to be seen. Typically, when a generic version of a pill becomes available, the price drops 80 percent or more. But

5/1/25, 3:54 PM
Case 2:23-md-03080-BRM-RLS Document 534-1 Filed 05/02/25 Page 33 of 468
Insulin prices skyrocketed, putting drug makers on the defensive
PageID: 15487

biosimilars are new to the United States and are forecast to cost about 20 percent to 30 percent less than a brand-name drug.

Meanwhile, some doctors say diabetic patients, who are typically 60 years old or more, have difficulty paying for drugs, especially those who have trouble once they hit the donut hole in the Medicare Part D program and have to cover costs themselves. "The cost of therapy is huge," said Dr. Jane Bridges, a diabetologist in Vincennes, Ind. "I have patients who tell me that they have to stretch out the use of their medicines."

But the Pharmaceutical Research and Manufacturers of America argued that focusing on list prices "misrepresents" reality. The industry trade group maintained that wholesale prices generally do not correspond to net prices — what companies, unions, and government agencies pay — because drug makers offer rebates. The group cited an analysis by SSR Health that net prices declined last year.

Spokespeople for Eli Lilly and Novo Nordisk, two of the largest manufacturers of diabetes medicines, echoed that argument and both companies noted that patient-assistance programs are available. The Novo spokesman added that "making comparisons between insulin and oral medications are not appropriate as each medication is designed to support a patient's specific glucose-control needs."

A Lilly spokeswoman maintained that the net price for its Humalog insulin rose an average of 1.6 percent annually from 2010 to 2015. However, she did not respond to questions about the rebates that were offered. Drug makers and pharmacy benefits managers are facing increasing criticism for their failure to disclose rebates and discounts.

One analyst, meanwhile, contended that rising prices may not have any impact on patient outcomes.

"I don't think you can draw a straight line from the rising cost of insulin to outcomes," said David Kliff, who publishes Diabetic Investor. "Very few patients pay out of pocket for cost of insulin. So I don't think prices truly impact the patient pocket book. There's only a small percentage who don't have insurance or enough insurance."

But another author of the analysis disagreed.

"High costs can lead to reduced compliance, but more importantly the cost-effectiveness of high cost therapies … should be assessed, so they produce a greater clinical benefit for the patient," Philip Clarke, a professor of health economics at the University of Melbourne in Australia. Other countries, he noted, routinely assess cost-effectiveness when setting prices for government-subsidized drugs.

### About the Author



**Ed Silverman**[1]

Pharmalot Columnist, Senior Writer

Ed Silverman, a senior writer and Pharmalot columnist at STAT, has been covering the pharmaceutical industry for nearly three decades.

ed.silverman@statnews.com [7]
@Pharmalot [8]
linkedin.com/in/edsilverman/ [9]

To submit a correction request, please visit our Contact Us page[12].

### Links

1. https://www.statnews.com/staff/ed-silverman/
2. https://www.parsintl.com/publications/stat/
3. http://jama.jamanetwork.com/article.aspx?articleid=2510902
4. http://us11.campaign-archive2.com/?u=f8609630ae206654824f897b6&id=c2b6541375
5. https://www.statnews.com/signup/
6. https://www.statnews.com/privacy/
7. https://www.statnews.com/pharmalot/2016/04/05/insulin-prices-skyrocketed-putting-drug-makers-defensive/mailto:ed.silverman@statnews.com
8. https://x.com/Pharmalot
9. https://www.linkedin.com/in/edsilverman/
10. https://www.statnews.com/topic/diabetes/
11. https://www.statnews.com/topic/drug-prices/
12. https://www.statnews.com/contact/

**1/3** FREE STORIES

# EXHIBIT 7

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For
non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

http://www.wsj.com/articles/for-prescription-drug-makers-price-increases-drive-revenue-1444096750

U.S.

# For Prescription Drug Makers, Price Increases Drive Revenue

Boosts outpace inflation and often are imposed even when demand for
a medication falls

By *Joseph Walker* [Follow]

*Oct. 5, 2015 9:59 pm ET*



Biogen raised the price of its Avonex drug for multiple sclerosis 21 times over a decade, an average of
16% a year, despite steadily falling prescription demand. Above, Biogen's headquarters in Cambridge,
Mass. PHOTO: JONATHAN WIGGS/BOSTON GLOBE/GETTY IMAGES

Demand for a drug called Avonex has declined every year for the past 10.

Not a problem for its manufacturer. U.S. revenue from the drug has more than
doubled in that time, to $2 billion last year.

The key: repeated price increases. The multiple sclerosis drug's maker, Biogen
Inc., raised its price an average of 16% a year throughout the decade—21 times in all.

It is an example of drug companies' unusual ability to boost prices beyond the
inflation rate to drive their revenue, even when demand for the drugs doesn't
cooperate.

A result of this pricing power is that across 30 top-selling drugs sold by pharmacies,
U.S. revenue growth has far outpaced demand in the past five years, according to a
Wall Street Journal analysis of corporate filings and industry data. Revenue growth
averaged 61%, three times the increase in prescriptions.

Attention has focused lately on new drugs with eye-popping prices and on a few
whose price a new owner abruptly raised several-fold. But what many drug
companies rely on for sales growth is a pattern of steady increases, year in and year
out, on older medicines. Wholesale-price increases for the 30 drugs analyzed by the
Journal averaged 76% over the five-year stretch from 2010 through 2014. That was
more than eight times general inflation.

For 20 leading global drug companies last year, 80% of growth in net profits stemmed from price increases in the U.S., according to a May report by Credit Suisse.

Pricing power helps some in the pharmaceutical industry to compensate for sluggish demand, new competition or weak product pipelines. "Pricing has covered up a multitude of other disappointments over the past 15 years" in the sector, said Geoffrey Porges, a biotech analyst at AllianceBernstein LP.

This is no cause for cheer, of course, to certain other market participants, notably the many large companies that pick up the tab for their employees' prescriptions. Drug pricing has helped drive up spending on benefits at Lowe's Cos., said Bob Ihrie, a senior vice president at the home-improvement retailer.

"It's one thing when you read about a new drug in the newspaper, and all the costs of launching it. But when it's drugs that have been on the market and you see these price increases, you go, 'Why would this be?' " Mr. Ihrie said. "I feel like we're really being taken advantage of."

Pharmaceutical companies defend their pricing as helping to finance development of innovative medicines, an expensive and risky enterprise they say wouldn't attract investment without the potential for large returns when a new drug succeeds.

Many in the industry also say a focus on drug prices is shortsighted because it overlooks drugs' role in helping to contain overall health-care costs by preventing disease complications.

Robert Zirkelbach, a spokesman for Pharmaceutical Research and Manufacturers of America, a trade group, said that eventually, prices for all drugs will decline sharply when they lose patent protection and go generic.

Avonex maker Biogen has noted the central role of price boosts in the drug's success. "For 2014 compared to 2013, the increase in U.S. Avonex revenues was primarily due to price increases, partially offset by a decrease in unit sales volume of 10%," Biogen said in its 2014 financial report. A similar note has appeared in its annual reports since 2005.

But Biogen points to the way this revenue funds its quest for new medicines. The company spent an average of $1.19 billion annually on R&D from 2005 through 2014, or 24% of total revenue. Besides Avonex, the company has brought out two other multiple sclerosis drugs and is studying a treatment to repair nerve damage from the disease.

"Over the past two decades, which is the life of Avonex, we've done more than any other company to improve the treatment of multiple sclerosis," said Daniel McIntyre, a Biogen senior vice president. "The reality is that revenues from therapies available today make this possible."

## Users and payers

What gives the pharmaceutical industry so much pricing power? Part of the reason is the patent protection drug makers have on new products, which keeps competitors from offering copies for up to two decades. "It's easier for consumers to substitute a car that meets their needs than it is to substitute a patented drug because no one else can make it," said Fiona M. Scott Morton, an economics professor at Yale University.

Another part of the answer is the insurance-based health system, in which consumers rarely feel the full brunt of price increases.

In most markets, products are ordered, paid for and consumed by the same party, notes Sara Fisher Ellison, a Massachusetts Institute of Technology economist. But prescription drugs are ordered by a physician, used by a patient and usually paid for by a third party, either an insurer or a large employer.

Neither doctors nor patients typically have much of a sense of drugs' prices. That blunts what economists call price sensitivity, the tendency of higher prices to curb demand.

"It confuses incentives and dampens the normal economic dynamics," Ms. Ellison said.

In addition, some drugs long on the market develop customer loyalty that provides a price umbrella. If patients who started on a drug such as Avonex a decade ago are happy with it, they or their doctors may see no reason to switch to a new one that comes along.

At an investment conference in 2009, Biogen's then-CEO James Mullen was asked whether the company could keep raising Avonex's price. He said he was surprised at "how unresistant the market has been to price increases."

Mr. Mullen declined to comment.

Until about a year ago, price increases were garnering little public attention because spending on drugs had moderated. U.S. expenditures for most prescription drugs grew by an average of 2.7% from 2007 through 2013, according to data from the Centers for Medicare and Medicaid Services. That was a slower growth rate than in several previous years, due largely to greater use of generics as some big-selling drugs lost patent protection.

The moderating price effect from generics now is tapering off. Pharmacy-benefits manager CVS Health Corp. said drug spending by its customers jumped 12.7% last year, more than triple the prior year's rise.

Price boosts represented more than 80% of this increase, CVS said.

Similarly, Medicare's spending on its prescription-drug benefit rose 8% last year on a per capita basis, after several years of averaging less than 1%. A leading reason for the surge was "price increases for both brand-name and generic drugs," Medicare's board of trustees said in a recent report.

The Journal examined 30 of last year's top drugs by revenue that are sold by U.S. pharmacies, looking at data from the start of 2010 through the end of 2014. The analysis used corporate financial statements, prescription figures from IMS Health Holdings Inc. and wholesale-pricing data provided by Truven Health Analytics. It excluded drugs that weren't yet on the market in 2010 or for which full data weren't available.

For 18 of these 30 drugs, both revenue and the number of dispensed prescriptions for them rose. But revenue rose twice as fast as prescriptions.

For the cancer drug Gleevec, from Novartis AG, prescriptions rose 2% over the five years, but the wholesale price doubled, to $102,000 for a year's supply at the end of

Case 2:23-md-03080-BRM-RLS   Document 534-1   Filed 05/02/25   Page 38 of 468
PageID: 15492

2014. The price increases helped to drive Novartis's U.S. revenue from the drug up
69% over the period, to $2.17 billion in 2014.

Gleevec is a strikingly effective drug that has been approved for more cancers since
its 2001 launch for chronic myeloid leukemia, or CML. Asked about the price increases
on Gleevec, Novartis said it is "a life-changing medicine" whose "success is funding
the next generation CML innovations."

Drug makers often give rebates from the wholesale prices—also called list prices—to
large purchasers such as insurers and pharmacy-benefit managers. Even so, the
wholesale prices are a meaningful measure because they are the starting point from
which rebates are given.

In competitive markets such as asthma and diabetes therapy, which have multiple
drugs that can be substituted for one another, manufacturers often give especially
large rebates as they seek better positioning on insurers' "formularies" of covered
drugs.

Take insulin, of which there are several brands, among them Humalog from Eli Lilly &
Co. The company gave rebates averaging 56% of its list price last year, Credit Suisse
estimates.

A spokeswoman for Eli Lilly said that although it doubled Humalog's price over five
years, steep rebates meant that its net price rose only 3%.

## Shallower discounts

With a drug that is harder to substitute for, such as Amgen Inc.'s arthritis treatment
Enbrel, discounts are shallower. Amgen raised Enbrel's wholesale price 88% over the
five years. The rebates it provided averaged 21% last year, Credit Suisse estimates.

Over the five years from 2010 through 2014, U.S. prescriptions for Enbrel rose 2%
while Amgen's revenue from it went up by a third.

Some rebates are locked in. Medicaid and the Veterans Health Administration are
legally entitled to rebates of at least 23.1% and 24%, respectively, on purchases of
patent-protected drugs. Drug companies must also pay additional rebates to the two
health programs if their drug prices exceed inflation.

Among the 30 retail drugs the Journal examined, 10 produced revenue increases for
their makers last year despite lower demand.

Prescriptions for these drugs declined an average of 17%. But their wholesale prices
went up an average of 80%. After discounts, revenue from the drugs rose 22%.

For two drugs in the 30, both revenue and demand fell. But revenue fell less.

For a different category of drugs—those usually administered in doctors' offices, such
as intravenous cancer drugs—prescription volumes aren't reliably tracked by
commercial databases. To assess these, the Journal identified last year's 10 top-
selling such drugs and analyzed 2010-2013 data on how much Medicare reimbursed
doctors for them. Medicare bases these reimbursements on the average price that
drug makers report receiving from customers, excluding certain government buyers
such as the Veterans Health Administration and Medicaid.

For four of the doctor-administered drugs, the number of billing claims from doctors fell, yet Medicare's outlays to doctors rose because prices went up.

For example, Medicare payments for Neulasta, an infection-fighting drug sold by Amgen, rose 12% over the four years, while claims from doctors who used it fell 8%.

The manufacturer reported that the average net price it received for this 13-year-old drug rose 24% over the four years, undergirding Medicare's higher payouts.

An Amgen spokeswoman said the company prices its products to "reflect the economic value that is delivered to patients, providers and payers."

Avonex, the drug with 21 price increases during a decade of falling demand, reached the U.S. market in 1996. It was just the second drug shown to delay symptoms of the most common form of multiple sclerosis.

The injected drug had been beaten to the market by one called Betaseron, now sold by Bayer AG. Both are genetically engineered versions of a protein called beta interferon. Avonex needed less-frequent injections and soon claimed half the market.



The wholesale price of the cancer drug Gleevec doubled over five years, while prescription demand rose just 2%, driving Novartis's revenue from the drug up 69% to over $2 billion last year. Above, Gleevec pills. PHOTO: MIKE BELLEME FOR THE WALL STREET JOURNAL

The maker of Avonex, Biogen, initially set its wholesale price at about $9,200 for a year of treatment. The strategy at that time focused on expanding the market, said a former Biogen vice president of sales, Michael Bonney. "We probably had pricing power, but we decided not to exercise it," he said.

As more MS drugs appeared, including some taken orally, (Avonex is injected), Avonex's share of the market steadily fell. Each year from 2005 through 2014, the company sold fewer units of Avonex, company financial statements show.

But Biogen's U.S. revenue from the drug kept growing as it raised the price up to three times a year. In the decade through 2014, the wholesale price, before discounts or rebates, more than quadrupled to an annual $62,000 per patient.

When former CEO Mr. Mullen was asked about the price increases at the 2009 investment conference, he said, according to a transcript: "If there's price increases that can be taken and delivered to shareholders, we'll go get it, but I do think we got to make sure we take a long enough view and you don't start to put this thing in a box, where you get the backlash."

Today, Avonex is among the least-popular MS drugs, said Clyde Markowitz, a specialist in the disease at the Hospital of the University of Pennsylvania, but it is still used by patients who have had good results. While costs for all MS drugs have skyrocketed in the past decade, Dr. Markowitz said, Avonex's price growth has been extraordinary.

"It's absolute insanity, what's happened," he said. "For a drug that's 20 years old, and they just keep jacking up the price."

Case 2:23-md-03080-BRM-RLS   Document 534-1   Filed 05/02/25   Page 40 of 468
PageID: 15494

**Write to** Joseph Walker at joseph.walker@wsj.com

# EXHIBIT 8

5/2/25, 11:51 AM Case 2:23-md-03080-BRM-RLS Document 584-1 Filed 05/02/25 Page 42 of 468
Mexico fines Eli Lilly, others for collusion | Reuters
PageID: 15496

Learn more about  

 My News  

# Mexico fines Eli Lilly, others for collusion

By **Reuters**

February 23, 2010 5:01 PM EST · Updated 15 years ago

## Summary

Eli Lilly fined for coordinating insulin tenders

Fresenius Kabi, Baxter fined for solution tenders

Eli Lilly denies wrongdoing

By Noel Randewich

MEXICO CITY, Feb 23 (Reuters) - Mexico's antitrust watchdog said on Tuesday it fined Eli Lilly and Co and other global medical companies for colluding to inflate prices in government tenders for medicine.

> The Reuters Tariff Watch newsletter is your daily guide to the latest global trade and tariff news. Sign up here.

Eli Lilly Mexico and three Mexican pharmaceutical companies took turns placing winning bids in government tenders to buy insulin from 2003 to 2006, eliminating competition and ensuring artificially high prices, the antitrust commission said.

A spokeswoman for Eli Lilly, which had global sales of $5.93 billion in the fourth quarter of 2009, told Reuters it would appeal the ruling. "Lilly completely denies any participation in coordinated action to fix bids with competitors," said Corporate Affairs Director Claudia Algorri.

The regulator also fined the Mexican units of Baxter International Inc , and Fresenius Kabi, controlled by German healthcare conglomerate Fresenius , for colluding to boost prices in government tenders for intravenous solutions.

"The companies that have been fined conspired for years to make badly needed medicine artificially expensive," commission head Eduardo Perez-Motta said in a statement.

The companies have been fined 22 million pesos ($1.7 million) each, the maximum allowed prior to 2006, when Mexico's competition laws were beefed up.

Executives at Baxter and Fresenius Kabi could not immediately be reached for comment.

Mexican President Felipe Calderon has vowed to improve competition in industries often dominated by big just one or two big companies, but progress has been very slow.

Mexico's antitrust watchdog is probing alleged price collusion in the cement industry by heavyweight Cemex but penalties for monopolistic practices tend to be paltry and are rarely applied.

Many U.S. drug makers have been hit with past fines in the hundreds of millions of dollars in the United States for a range of allegedly improper practices.

U.S. health officials have warned Indianapolis-based Eli Lilly about problems with the production of an ingredient used to make the company's Humalog insulin, a letter released on Tuesday said.

The U.S. Food and Drug Administration, in a Feb. 5 letter, said inspectors found deviations from manufacturing standards in the production of Lyspro Insulin Zinc Crystals.

($1 = 12.87 pesos)

Reporting by Noel Randewich; Additional reporting by Tomas Sarmiento; Editing by Richard Chang

Our Standards: **The Thomson Reuters Trust Principles.** 🔗

Suggested Topics:

[ Europe ]

[ Purchase Licensing Rights ]

---

## Read Next

United Kingdom

**Nigel Farage's Reform UK Party narrowly wins Runcorn parliamentary seat**

5:32 AM UTC

---

**How warning signs hinted at Spain's unprecedented power outage**

11:01 AM UTC

---

Europe

**German spy agency brands far-right AfD as 'extremist', opens way for closer surveillance**

2:07 PM UTC

---

United Kingdom

**Prince Harry loses legal fight with UK government over police protection**

1:49 PM UTC

---

## Sponsored Content

Dianomi ▷

E*TRADE
from Morgan Stanley
Morgan Stanley Private Bank
National Association, Member FDIC

**4.00**%APY
Member FDIC

E*TRADE PREMIUM
SAVINGS

[ GET STARTED ]

E*TRADE
from Morgan Stanley
Morgan Stanley Private Bank
National Association, Member FDIC

**3.00**%APY ⓘ
Member FDIC

E*TRADE MAX-RATE
CHECKING

[ GET STARTED ]

Sponsors of GOBankingRates          Advertiser Disclosure



**Contact a dedicated business specialist in your community.**

Sponsored by
Bank of America



**Know the Cyber Risks of AI for Your Business**

Sponsored by
Bank of America

Feedback

# EXHIBIT 9

Business

# Hot Drugs Show Sharp Price Hikes in Shadow Market



Tap to unmute

Bloomberg  ROBERT LANGRETH
BLOOMBERG NEWS

Why Diabetes Medication Is Soaring

By Robert Langreth
May 6, 2015 at 6:00 AM EDT

🔒 This article is for **subscribers only**.

On May 30 last year, the price for a vial of the blockbuster diabetes medication Lantus went up by 16.1 percent. On the next day, Lantus's direct competitor, Levemir, also registered a price increase -- of 16.1 percent.

The pattern repeated itself six months later when Lantus, from French drugmaker Sanofi, was marked up 11.9 percent, and Levemir, made by Novo Nordisk A/S, matched again exactly.

In 13 instances since 2009, prices of Lantus and Levemir -- which dominate the global market for long-acting injectable insulin with $11 billion in combined sales -- have gone up in tandem in the U.S., according to SSR

This article was gifted to you by a Bloomberg subscriber! Subscribe for unlimited insights



## Shadow Pricing

Prices for some competing drugs go up in lockstep, rising the same amount at about the same time.

Source: Bloomberg Intelligence analysis of Symphony Health Solutions data

Contrary to the consumer's ideal in which bare-knuckled rivals cut prices to grab market share, competitors in branded pharmaceuticals often drive each other's prices higher. This behavior, known as "shadow pricing," is one reason U.S. drug costs are surging. Prescription spending rose 13 percent last year to $374 billion, according to IMS Health Holdings Inc.

Sanofi sets the price of its drugs independently, according to a company statement. Novo Nordisk, based in Bagsvaerd, Denmark, said greater insulin demand is helping to drive price increases.

Within the last two years, Eli Lilly & Co.'s Humalog, a shorter-acting diabetes treatment, and Novo Nordisk's Novolog have matched three of each other's price increases, according to data compiled by Bloomberg. Eli Lilly, based in Indianapolis, declined to comment on its pricing moves.

### Catching the Newcomers

This article was gifted to you by a Bloomberg subscriber! Subscribe for unlimited insights

up with the prices of newcomers, researchers <u>reported</u> in April in the journa
Neurology.

Rising prices are causing affordability issues for some diabetes patients and
frustrating doctors. Many of the leading medications are forms of insulin,
which after nearly a century of use, has no generic form as a low-cost U.S.
alternative.

This article was gifted to you by a Bloomberg subscriber! Subscribe for
unlimited insights

# Hot Drugs, Big One-Year Price Jumps

Prices for many brand-name pharmaceuticals are soaring. Of 15 that saw 20%-plus price increases since last year, three are for diabetes.

| Drug<br>Dosage \| Quantity | Drugmaker | Condition | Quarterly Price | Price growth<br>Q1 2014–Q1 2015 |
|---|---|---|---|---|
| Welchol<br>625MG \| 1 pill or capsule | Daiichi Sankyo | High cholesterol | | 40.3% |
| EpiPen<br>0.3MG injection \| 1 EpiPen | Mylan | Allergic reactions | | 32.0% |
| Lantus<br>Vial injection \| 1 milliliter | Sanofi | Diabetes | | 29.9% |
| Levemir<br>Vial injection \| 1 milliliter | Novo Nordisk | Diabetes | | 29.9% |
| Aggrenox<br>25-200MG \| 1 pill or capsule | Boehringer Ingelheim | Stroke prevention | | 26.4% |
| Strattera<br>25MG \| 1 pill or capsule | Eli Lilly | ADHD | | 25.4% |
| Lovaza<br>1GM \| 1 pill or capsule | GlaxoSmithKline | High triglycerides | | 25.1% |
| Lamictal<br>100MG \| 1 pill or capsule | GlaxoSmithKline | Epilepsy | | 24.2% |
| Nasonex<br>500MCG/AC \| 1 gram | Merck & Co. | Allergies | | 24.1% |
| Forteo<br>SOL 600/2.4ML \| 1 milliliter | Eli Lilly | Osteoporosis | | 24.0% |
| Benicar<br>40MG \| 1 pill or capsule | Daiichi Sankyo | High blood pressure | | 23.8% |
| Celebrex<br>200MG \| 1 pill or capsule | Pfizer | Arthritis pain | | 22.5% |
| Viagra<br>25MG \| 1 pill or capsule | Pfizer | Erectile dysfunction | | 21.9% |
| Renvela<br>PAK 0.8GM \| 1 package | Sanofi | Kidney disease | | 20.9% |
| Novolog<br>Vial injection \| 1 milliliter | Novo Nordisk | Diabetes | | 20.9% |

Source: Analysis by DRX based on average wholesale prices
Note: See bottom of story for company comments

Five diabetes treatments were among 27 branded drugs showing price gains of at least 20 percent in typical dosages since the first quarter of 2014, a survey for Bloomberg found. Over five years, prices of dozens of drugs

This article was gifted to you by a Bloomberg subscriber! Subscribe for unlimited insights

Prices of Lantus and Levemir vials moved up in tandem by 30 percent over one year. Each carries an average wholesale price of $29.82 per milliliter, according to the survey by DRX, a unit of Connecture Inc. that provides price-comparison software to health plans.

## Staying Competitive

Sanofi and Novo "are taking the same price increase down to the decimal point within a few days of each other," said Richard Evans, an SSR analyst. "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."

Sanofi has increased Lantus discounts significantly to keep a favorable position on health plans' coverage lists, according to Mary Kathryn Steel, a spokeswoman. The company reported first-quarter U.S. Lantus sales declined 13 percent.

This article was gifted to you by a Bloomberg subscriber! Subscribe for unlimited insights

# Double the Price in Five Years

At least 30 brand-name pharmaceuticals have more than doubled their U.S. prices in the last 5 years. Three of the biggest gainers were diabetes drugs.

| Drug<br>Dosage \| Quantity | Drugmaker | Condition | Quarterly Price | Price growth<br>Q1 2010–Q1 2015 |
|---|---|---|---|---|
| Xyrem<br>500MG \| 1 milliliter | Jazz Pharmaceuticals | Narcolepsy symptoms | | 351% |
| Humulin R U-500<br>U-500 injection \| 1 milliliter | Eli Lilly | Diabetes | | 325% |
| EpiPen<br>0.3MG injection \| 1 EpiPen | Mylan | Allergic reactions | | 223% |
| Premarin Vaginal Cream<br>0.625MG \| 1 gram | Pfizer | Menopausal symptoms | | 218% |
| Levemir<br>Vial injection \| 1 milliliter | Novo Nordisk | Diabetes | | 169% |
| Lantus<br>Vial injection \| 1 milliliter | Sanofi | Diabetes | | 168% |
| Synthroid<br>25MCG \| 1 pill or capsule | AbbVie | Thyroid hormone | | 149% |
| Welchol<br>625MG \| 1 pill or capsule | Daiichi Sankyo | High cholesterol | | 139% |
| Aggrenox<br>25-200MG \| 1 pill or capsule | Boehringer Ingelheim | Stroke prevention | | 137% |
| Renvela<br>PAK 0.8GM \| 1 package | Sanofi | Kidney disease | | 135% |
| Cialis<br>10MG \| 1 pill or capsule | Eli Lilly | Erectile dysfunction | | 132% |
| Invega<br>3MG \| 1 pill or capsule | Johnson & Johnson | Schizophrenia | | 124% |
| Copaxone<br>20MG/ML kit \| 30 syringes | Teva Pharmaceutical Industries | Multiple sclerosis | | 122% |
| Gleevec<br>400MG \| 1 pill or capsule | Novartis | Leukemia | | 121% |
| Viagra<br>25MG \| 1 pill or capsule | Pfizer | Erectile dysfunction | | 118% |

Source: Analysis by DRX based on average wholesale prices
Note: See bottom of story for company comments

Rebates on all of Novo Nordisk's drugs in North America grew to about 50 percent of list prices in 2014, from around 35 percent in 2010, the company said. "We're always monitoring the pricing environment to stay competitive,'

This article was gifted to you by a Bloomberg subscriber! Subscribe for unlimited insights

Some of biggest price increases are coming from aging blockbusters, including Pfizer Inc.'s erectile dysfunction drug Viagra, according to the DRX survey for Bloomberg. EpiPen, Mylan NV's injection for allergic reactions, soared 32 percent in price last year and tripled over five years.

## Not Healthy

Branded prescription drugs "are basically not a competitive market," when it comes to prices, Stephen Schondelmeyer, a pharmacist and economist at the University of Minnesota, said.

A pattern of insulin makers matching each others price increases "certainly indicates a market that isn't competitively healthy," said David Balto, an antitrust lawyer and former Federal Trade Commission policy director. However, if two companies act independently to follow each other's price increases, it's not an antitrust violation, he said.

The survey covered drugs brands with U.S. sales of at least $350 million last year, according data compiled by Bloomberg. It focused on the average wholesale price, a benchmark that's roughly equivalent to what an uninsured patient might pay at the pharmacy without the 15 to 20 percent discounts that big health plans get, said Jim Yocum, executive vice president for DRX.

## Hitting the Donut Hole

Insulin treatment has remained generic resistant because incremental improvements over the years have received new patents, according to Jeremy Greene, an associate professor at the Johns Hopkins University School of Medicine.

"If any drug should be available generically, it should be insulin," Greene said. The new insulins are "not so much better that it justifies the presence of people who can't afford any drug." A Sanofi statement said "today's insulins are markedly improved" from those of a century ago.

Stan Lynam, a retired real-estate agent with diabetes in Riverbank,

This article was gifted to you by a Bloomberg subscriber! Subscribe for unlimited insights

first three months of the year, his prescriptions for the two drugs cost his
insurance plan $2,343, according to statements he received.

Lynam reached a coverage gap known as the <u>"donut hole"</u> in his Medicare
drug plan in early April, he said. That would mean he would have to pay 45
percent of the drugs' costs to continue using them.

**Hand Tremors**

"If I were to buy the Levemir or Novolog, I would have to stop eating and
turning on the lights," said Lynam, who is 70 and said he lives with his wife
on $3,000 a month, mostly Social Security. Later this month, he's planning
to switch to an older, cheaper insulin that is harder to use because it doesn't
come in a pen injector, and his hand tremors make him worried about
handling syringes.

Insulin manufacturers "are sticking it to us," he said. "They are not trying to
compete."

"How much a patient pays is based on a negotiation between the payer and
the pharmacy," said Novo Nordisk's Inchausti. He said the company couldn't
comment fully without knowing details of a patient's health plan.

The wholesale U.S. price for a five-pen, 15-milliliter pack of Lantus is almost
$450, or about $375 with a health-plan discount, according to DRX.

**Cheaper in France**

In France, the same amount -- which patients on higher doses might use in a
month -- costs 62.42 euros ($70), according to a French government website.
In Norway, Lantus pens cost

574.6 kronor ($76), according to the website of the Norwegian medicines
agency.

Some manufacturers have recently boosted discounts as insurers and
benefits managers have excluded more-expensive brands from lists of

This article was gifted to you by a Bloomberg subscriber! Subscribe for
unlimited insights

The Gilead case is an exception, according to DRX's Yocum. When discounts are given, he said later price rises on branded drugs, sometimes occurring twice a year, usually more than compensate for the prior markdowns.

Joel Zonszein, an endocrinologist at Montefiore Medical Center, in New York City, said he frequently sees patients who can't afford insulin. Co-payments have risen to as much as $50 a month from $5 or $10 five years ago, and the higher prices mean health plans sometimes restrict coverage, he said.

A number of his Medicare patients have stopped taking insulin when they reached the donut-hole coverage gap, Zonszein said. The problem "really has become more acute every year," he said. "I have these patients and I really don't know what to do for them."

* *

Companies had the following comments about the price increases in the DRX survey listed in accompanying tables.

AbbVie: Synthroid is priced comparably to other therapies in its class. Boehringer Ingelheim: Our products provide significant value to customers. Daiichi Sankyo: Welchol and Benicar prices are comparable to other brands. Eli Lilly: Price increases for Humulin R U-500 reflect steps to bring cost in line with less concentrated insulin forms.

GlaxoSmithKline: Bloomberg analysis does not account for discounts. Generic versions of Lovaza, Lamictal available. Jazz Pharmaceuticals: Initial list price assumed Xyrem approval for more patients; current price reflects costs of serving a smaller population. Johnson & Johnson: Invega's price is competitive with other agents in its category; discounts often reduce price.

Merck & Co.: Drugs are priced based on value to patients and payers. Committed to improving access to its medicines. Mylan: Deeply committed to ensuring EpiPen access with patient assistance programs. Novartis: Gleevec has the lowest price of U.S. pills for chronic myeloid leukemia. It

This article was gifted to you by a Bloomberg subscriber! Subscribe for unlimited insights

Novo Nordisk: Insulin price increases are a result of higher demand; company sells a lower-cost alternative. Pfizer: List prices do not reflect discounts. Price based on benefit to patients. Prices sometimes raised if a drug still provides good clinical value at higher price. Sanofi: Sets prices independently. Has significantly increased discounts for Lantus in second half of 2014. Teva Pharmaceutical: Copaxone list price is competitive with other multiple sclerosis drugs.

How easy or hard was it to use Bloomberg.com today?

**Share feedback** ⬈

---

©2025 Bloomberg L.P. All Rights Reserved.

---

This article was gifted to you by a Bloomberg subscriber! Subscribe for unlimited insights

# EXHIBIT 10

## *Middlemen Fuel Insulin Price Rise*

The Wall Street Journal

October 10, 2016 Monday

Copyright 2016 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2016 Dow Jones & Company, Inc. All Rights Reserved.

# THE WALL STREET JOURNAL.
**U.S. EDITION**

**Section:** Pg. B1

**Length:** 935 words

**Byline:** By Denise Roland and Peter Loftus

## Body

Insulin prices are soaring, creating pain for patients whose lives depend on the injectable drug -- yet most of the revenue from the increases isn't going to the drug manufacturers. It is largely the middlemen that benefit.

The major manufacturers of insulin -- Eli Lilly & Co. of Indianapolis, Novo Nordisk A/S of Denmark and Sanofi SA of France -- are collecting about the same or less than they did several years ago. The price increases -- top-selling insulins have more than doubled in price since 2011 -- reflect the growing role of middlemen known as pharmacy-benefit managers who negotiate rebates and fees based on list prices.

This convoluted payment system for drugs in the U.S. encourages high list prices and steep behind-the-scenes discounts, and is becoming a regular source of public outrage, most recently with Mylan NV's EpiPen, an emergency allergy treatment. The fragmented system offers some bill payers lower overall costs while uninsured patients and those with certain health plans pay more. Insulin, like EpiPen, is used by millions of Americans.

At the same time, higher overall costs are encouraging U.S. health insurers and employers to make patients contribute more to their health care. In part, their use of higher deductibles contributes to the cost shifting to patients. Higher drug list prices mean those patients most exposed to the price increases pay more before their plan coverage kicks in.

Drug companies have sharply boosted U.S. list prices for top-selling insulins -- Sanofi's Lantus, Eli Lilly's Humalog and Novo Nordisk's NovoLog -- since 2011, according to data provider Truven Health Analytics. Lantus, the top-selling insulin, now costs $248.51 a vial, up from $114.15 in 2011. A Sanofi spokeswoman said the company hasn't increased its list price in nearly two years.

"Prices for these products have increased," said Aaron Kesselheim, an associate professor at Harvard Medical School who has researched insulin costs. "It's also the case that there are more patients under high-deductible health plans and who may have a greater copay and coinsurance, and they're being exposed to a larger share of the prices as well."

Middlemen Fuel Insulin Price Rise

Net prices, or what drugmakers retain after discounts, have stayed the same or fallen in the past two years as the pharmaceutical companies compete to offer ever-deeper discounts to stay on the preferred drug lists at insurers and the PBM middlemen.

The reason drugmakers sharply raise list prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists, said Enrique Conterno, president of Lilly's diabetes business.

Eli Lilly has raised the list price of Humalog -- to $254.80 a vial, more than double the 2011 price. After rebates and discounts, Lilly on average in the U.S. collects less for its Humalog insulin than it did in 2009, Mr. Conterno said.

PBMs get to keep a portion of the rebates off list that they negotiate -- though they pass the rest on to clients -- and the administrative fees that PBMs collect from manufacturers are based on percentages of the list prices.

However, counters Steve Miller, chief medical officer of Express Scripts Holding Co., the largest U.S. PBM, "We never tell pharmaceutical companies we want high sticker prices. We want a low net price."

He acknowledges that "certain patients get caught in the middle of this, and we have got to figure out how to put guard rails around that," such as setting a maximum pharmacy price.

About six million Americans use insulin, according to the American Diabetes Association.

For Sanofi's Lantus, the average U.S. net price fell by 17% in 2015 and is on track to fall a further 10% this year, according to estimates by equity researchers at Sanford C. Bernstein & Co. The firm expects the net price of Novo Nordisk's Levemir insulin to fall 6% this year. Sanofi and Novo Nordisk have warned investors that falling prices in the U.S. will hurt profit growth.

America's Health Insurance Plans, an industry trade group, said drug companies control pricing, and when insulin prices rise, "patients end up paying more -- regardless of what kind of insurance plan they have."

Christie Tucker, a 45-year-old electrical contractor in Port Angeles, Wash., said the bill for a six-week supply of insulin for her son Preston has soared in the past two years.

When Preston was diagnosed, Mrs. Tucker paid $40 for a six-week supply. But the cost jumped to more than $600 in January because, instead of a fixed-dollar-amount copay, her insurance plan charges 30% of the pharmacy price of insulin, she said. Mrs. Tucker has saved on some prescriptions using coupons but expects to pay $650 for the next refill.

High-deductible insurance plans are causing sticker shock for many patients. About 23% of American workers with employer-sponsored health plans have annual deductibles of at least $2,000 a person, up from 7% in 2009, according to the Kaiser Family Foundation.

Jeff Dunlop, a 41-year-old mental-health case manager in Winter Haven, Fla., said he paid about $1,250 for a three-month supply of Lilly's Humalog earlier this year. Mr. Dunlop, who was diagnosed with Type 1 diabetes as a child, paid the full cost because his family insurance plan -- offered by his wife's employer -- now has a $4,000 annual deductible.

He can handle the cost for now but said he worries about the future.

"There's a lot of people out there that just can't afford it," he said. "I'm one or two unfortunate circumstances away from being in that boat. That's scary because I need that stuff to live. Without it, I die."

Middlemen Fuel Insulin Price Rise

---

# Pricing Pressure

As the list price for Sanofi's Lantus insulin has soared, the net price has risen much more modestly.

## Percentage change since 2007

█ List price    █ Net price



Sources: Truven Health Analytics (list prices) and Bernstein (net price estimates)

Middlemen Fuel Insulin Price Rise

## Notes

PUBLISHER: Dow Jones & Company, Inc.

## Classification

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Journal Code:** J

**Subject:** PRICE INCREASES (98%); PRICES (92%); DRUG PRICES (90%); PRICE CHANGES (90%); DIABETES (79%); DATA ANALYTICS (73%); COLLEGE & UNIVERSITY PROFESSORS (61%); ALLERGIES (53%); c314 Pricing (%); neqac Equities Asset Class News (%); nimage Images (%); reqrhc Suggested Reading Health Care (%); reqrin Suggested Reading Insurance (%); reqrph Suggested Reading Pharmaceuticals (%); c31 Marketing/Markets (%); ccat Corporate/Industrial News (%); ncat Content Types (%); nfact Factiva Filters (%); nfcpin C&E Industry News Filter (%); redit Selection of Top Stories/Trends/Analysis (%); reqr Suggested Reading Industry News (%); PROVIDER TERMS: ABO, AEQI, EWR, PIC, SGN, FCL, HCR, NND, SFR, TPT (%)

**Company:**  SANOFI SA (85%);  ELI LILLY & CO (85%);  NOVO NORDISK AS (84%);  MYLAN NV (83%); lilye Eli Lilly and Co; myln Mylan N.V.

**Ticker:** SNY (NASDAQ) (85%); SANF (BIT) (85%); SAN (PAR) (85%); LLY (SWX) (85%); LLY (PAR) (85%); LLY (NYSE) (85%); NVO (NYSE) (84%); NVO (LSE) (84%)

**Company-Number:** DJ Ticker: ABO, AEQI, EWR, PIC, SGN, FCL, HCR, NND, SFR, TPT; ISIN: ABO, AEQI, EWR, PIC, SGN, FCL, HCR, NND, SFR, TPT

**Industry:** NAICS325412 PHARMACEUTICAL PREPARATION MANUFACTURING (85%); NAICS325411 MEDICINAL & BOTANICAL MANUFACTURING (85%); SIC2834 PHARMACEUTICAL PREPARATIONS (85%); PRICE INCREASES (98%); DRUG PRICES (90%); HEALTH INSURANCE (90%); MANUFACTURING (90%); PHARMACEUTICAL PREPARATION MFG (90%); PHARMACEUTICALS INDUSTRY (90%); PRICE CHANGES (90%); INSURANCE (89%); INSURANCE DEDUCTIBLES (89%); PHARMACEUTICALS & BIOTECHNOLOGY (89%); PHARMACY BENEFITS (89%); PRESCRIPTION FORMULARIES (89%); INSURANCE COPAYMENTS (78%); UNDERINSURED & UNINSURED PATIENTS (78%); DATA ANALYTICS (73%); COLLEGE & UNIVERSITY PROFESSORS (61%); i257 Pharmaceuticals (%); i82002 Life Insurance (%); i82 Insurance (%); i951 Health Care/Life Sciences (%); iphmbn Pharmacy Benefit Management (%); ifinal Financial Services (%); iphhss Healthcare Support Services (%); igeneri Generic/Biosimilar Drugs (%); PROVIDER TERMS: ABO, AEQI, EWR, PIC, SGN, FCL, HCR, NND, SFR, TPT (%)

**Person:** ENRIQUE CONTERNO (58%)

Middlemen Fuel Insulin Price Rise

**Geographic:** INDIANAPOLIS, IN, USA (79%); INDIANA, USA (79%); MIDWEST USA (79%); UNITED STATES (93%); EUROPE (92%); NORTH AMERICA (79%); WESTERN EUROPE (79%); EUROPEAN UNION MEMBER STATES (77%); DENMARK (72%); usa United States; den Denmark; eurz Europe; fra France; usin Indiana; eecz European Union Countries; medz Mediterranean; namz North America; nordz Nordic Countries; scandz Scandinavia; usc Midwest U.S.; weurz Western Europe; PROVIDER TERMS: ABO, AEQI, EWR, PIC, SGN, FCL, HCR, NND, SFR, TPT

IP Codes: ABO, AEQI, EWR, PIC, SGN, FCL, HCR, NND, SFR, TPT

**Load-Date:** October 1, 2022

---

**End of Document**

# EXHIBIT 11

# The insulin market is heading for a shakeup. But patients may not benefit



By [Rebecca Robbins](#)Oct. 14, 2016



A high-speed production line of insulin at the Novo Nordisk factory in Chartres, France. *Francois Monier/AFP/Getty Images*

The insulin market, dominated by old drugs that have skyrocketed in price, is on the verge of a shakeup.

The first "follow-on" insulin for diabetics, similar to a generic medication for synthetic drugs, will hit the market in December. It's expected to be followed in the coming months and years by a wave of new follow-on and "biosimilar" insulins that have the same protein structures as brand-name products.

Experts predict that these new insulins will carry lower prices — but it's far from certain that the competition will drive down costs overall.

The stakes are high: About 6 million Americans with diabetes use insulin, either alone or in combination with an oral drug. The annual cost of insulin reached $736 per patient in 2013, up threefold since 2002. Diabetes medicines, including insulin, are the second most expensive category of prescription drugs, according to Express Scripts, the big pharmacy benefits manager.

Here's what you need to know about how insulin prices got so high — and what you should expect from the coming shifts in the market.

## What's on the market now?

The vast majority of diabetics who need insulin choose from a menu of a half-dozen "analog" brands, which are chemically altered from natural human insulin. They're manufactured by just three different drug makers: Novo Nordisk, Sanofi-Aventis, and Eli Lilly. Some are long-acting insulins, injected once or twice a day; others act rapidly and patients inject or deliver them with a pump as needed. Many patients use both.

A few of these products — like Novo Nordisk's Tresiba and Sanofi's Toujeo, which are both long-acting — have only been on the market a matter of months, and aren't yet widely used. But the others have generally been around for at least a decade, and sell for list prices in the neighborhood of $250 per

vial. (The actual price that consumers and insurance companies pay is often much lower.)

A small percentage of diabetics use lower-priced "human" insulin brands, which are manufactured to mimic the insulin naturally made by the human body. Walmart, for instance, sells such a product (under the brand name ReliOn) for less than $25 per vial. A Walmart spokesperson didn't respond to a query about how much of it the retailer sells.

## With all that competition, why aren't prices dropping?

You'd expect competition to lower prices, but it hasn't worked out that way in the insulin market. If you track the list price of the best-selling analog brands in recent years, you'll see something remarkable: Prices of directly competing brands have been going up in lockstep by the amount at about the same time, in a practice known as "shadow pricing."



STAT *Jeffery DelViscio/STAT* Source: Truven Health Analytics

So what's going on here? Experts say there are a number of factors at play.

Drug makers have said they don't collude on pricing in advance, but move to match their competitors' price hikes.

They point out that the net price — how much revenue they get from each sale — has been rising fairly modestly, as detailed in a recent report from the Wall Street Journal.

The list price has been going up more steeply, in part because the middlemen who stand between the manufacturer and the patient — such as pharmacy benefits managers — demand ever-larger rebates.

"Rest assured there is great competition on insulin pricing" — but that's taking place at the net pricing level, said Mike Mason, vice president of Lilly's US diabetes business.

Another key factor: Compared to other drug categories like cholesterol or pain relief medicines, there's an unusual degree of reluctance among patients and physicians to switch between insulin brands. "These products are not completely substitutable, and manufacturers perceive that, and so they exercise monopoly power over pricing," said Rena Conti, a health economist at the University of Chicago.

Other reasons that analog insulin prices have not declined: Demand is up. And there are increasing regulatory demands on the manufacturing process.

The cumulative effect of many gradual price hikes "snuck up on people," said Dr. William Herman, who practices internal medicine at the University of Michigan. "The prices just went up and up and up."

## Why are we only just now getting 'generic' insulin?

Insulin has been around for nearly a century. But it's hard to develop knock-off biological products, and for a long time there wasn't a lot of incentive to do so.

Key here is the difference between synthetic drugs like statins and those made from biological materials like insulin. It's easy to develop chemically equivalent copies, or generics, of the former. By contrast, biological materials are more variable and, as as result, more complicated to duplicate.

Patents have also a lot to do with it. For a long time, insulin makers have been able to make incremental improvements on their branded drugs that allowed them to extend the patent life on their products. But for some insulins, that gambit has run its course.

The patent expired last year on Sanofi's drug Lantus, known to scientists as glargine. And Lilly's rapid-acting insulin, sold as Humalog, saw its compound and formulation patents expire in 2013 and 2014, respectively.

With the patents expiring, some manufacturers are rushing to make "generic" versions of their competitors' branded insulin. Lilly, for instance, has made an approved version of Sanofi's glargine, known as Basaglar.

## What's going to happen when the first 'generic' insulin hits the market?

Basaglar will hit the market on Dec. 15. The company hasn't set a price yet, but analysts expect Basaglar to carry a list price 10 to 20 percent lower than Lantus, which is listed at about $250 per vial.

CVS and Express Scripts have both said they'll list Basaglar on their formularies. (CVS, notably, said it would no longer cover Lantus.)

Experts don't expect Basaglar's launch to mean much in the way of cost savings for patients, though they say it could mean big rebates and discounts for middlemen within the black box of drug pricing.

For patients without insurance or for those facing high deductibles or copays, "I don't think they're going to see major improvements," said Dr. Irl Hirsch,

an endocrinologist at the University of Washington.

## OK, then, will prices go down when more 'generic' insulins become available?

Don't bet on it, though we'll probably see slightly more savings.

The likeliest candidate to follow Basaglar onto the market is another follow-on glargine product, from Merck. The drug maker in August filed for approval with the Food and Drug Administration, and Merck spokeswoman Doris Li said the company expects to receive a decision in the first half of next year.

Sanofi is working on a follow-on insulin that would mimic Lilly's Humalog; that's in late-stage clinical trials, according to Sanofi spokeswoman Anna Robinson. Mylan also has several knockoff insulin products in the pipeline.

Meanwhile the so-far futile quest continues for what experts say would be a tremendous innovation — an insulin pill. Novo Nordisk, for instance, has such a molecule in early stage trials.

## So are insulin prices just going to keep going up forever?

Probably not; in fact, there are already signs they're tapering off. Express Scripts reported that the unit cost of Lantus dropped by nearly 14 percent last year.

"The manufacturers are beginning to feel the heat with respect to the prices of insulin," Herman said.

But Herman emphasized that questions remain unanswered about how to properly price a drug that many diabetics need to stay alive. "What is the value of insulin? It's the value of a human life," he said. "So how do you set a fair market price on it?"

## About the Author



**Rebecca Robbins**

Health Tech Correspondent

Rebecca covers health technology. She is the co-author of the newsletter STAT Health Tech.

@rebeccadrobbins

To submit a correction request, please visit our Contact Us page.

# EXHIBIT 12

## *Diabetes Patients Fire Off First Suit Over Insulin Drug Hike*

January 30, 2017



Copyright © 2025 Portfolio Media, Inc. All rights reserved.

**Author:** Jessica Corso

## Summary

A Seattle-based law firm representing diabetes patients Monday became the first to sue three top insulin manufacturers, bringing class claims that the companies colluded to drive up the drug's price and put diabetes patients nationwide at risk of heart disease and kidney failure.

## Body

A Seattle-based law firm representing diabetes patients Monday became the first to sue three top insulin manufacturers, bringing class claims that the companies colluded to drive up the drug's price and put diabetes patients nationwide at risk of heart disease and kidney failure.

The putative class action filed in Massachusetts federal court accuses Sanofi U.S., Novo Nordisk Inc. and Eli Lilly and Co. of running a Racketeer Influenced and Corrupt Organizations Act conspiracy that has caused insulin prices to increase at a rate of 150 percent over the past five years.

The lawsuit, filed by Seattle-based Hagens Berman Sobol Shapiro LLP, comes months after Sen. Bernie Sanders, I-Vt., and Rep. Elijah Cummings, D-Md., expressed concerns about the skyrocketing prices in a letter to the U.S. Department of Justice and Federal Trade Commission that called for an investigation into the insulin manufacturers. The suit is the first of its kind, the firm claimed in a statement Monday.

"People living with diabetes are practically imprisoned under the price hikes and sadly are resorting to extreme measures to afford the medication they need to live," Hagens Berman managing partner Steve Berman said in the statement.

Some patients are spending up to $900 dollar a month on a drug that used to cost $25 per prescription and now costs between $300 and $450 for every refill, according to the lawsuit.

The suit claims that diabetes patients are putting themselves at risk of serious medical emergencies that include heart disease, kidney failure, blindness and amputation because they have had to limit their insulin usage. Some have even intentionally put themselves at risk of a potentially deadly blood syndrome known as diabetic ketoacidosis to secure free insulin from local hospitals, according to the lawsuit.

Both Novo Nordisk and Sanofi denied the allegations in emailed statements Monday to Law360. Novo Nordisk spokesman Ken Inchausti said that the company has "a long-standing commitment to supporting patients' access to our medicines" but could not comment further due to the ongoing nature of the lawsuit.

Diabetes Patients Fire Off First Suit Over Insulin Drug Hike

Eli Lilly spokesman Gregory Andrew Kueterman said that the company "conducts business in a manner that ensures compliance with all applicable laws, and we adhere to the highest ethical standards." He added that the company was aware of the lawsuit and had no further comment as of Monday.

Novo Nordisk President Jakob Riis had pledged in November to take a series of steps intended to curtail price increases, but the company has also denied engaging in collusion to keep prices high.

"We believe the challenges that patients face are due to a complex health care system that continues to evolve," Riis said at the time.

Monday's lawsuit says the companies are using their power on the marketplace to make off-the-record deals with pharmacy benefit managers like CVS Health Corp. and Express Scripts Holding Co. that act as a middleman in negotiating drug prices between insurance companies and drug manufacturers.

The trouble, according to the lawsuit, is that drugmakers list one price to the public and offer a second, lower price to PBMs that buy the drugs in bulk then resell them to insurance companies and directly to customers at the listed price. Because PBMs take a cut of the price difference, they are more likely to take an offer from a manufacturer with a larger spread between the list price and the so-called "real price" given to direct purchasers, according to the suit.

The complaint says that this practice has created an "arms race" among the three top insulin manufacturers, listed in the complaint, who have raised prices for the drug in lock-step fashion to upbid one another.

"Patients' out-of-pocket payments for their medications are typically based on their drugs' reported benchmark prices, not their concealed real prices," the complaint states.

"As a result, defendants' benchmark-price arms race has saddled individuals living with diabetes — whether insured and paying benchmark prices before they hit their large deductibles, insured and paying increasingly common coinsurance, or uninsured and paying full benchmark prices for all drugs — with crushing out-of-pocket expenses," the complaint states.

The lawsuit names nine plaintiffs who live in Massachusetts, Washington, California, Florida and Georgia as well as a Jane and John Doe. Some of the plaintiffs are insured through Medicare or through state exchanges, while others receive health insurance through their employers, according to the complaint. A couple claim to have been uninsured and paying entirely out of pocket in the past, and most say that they are paying hundreds of dollars a month for their treatment even with insurance.

The putative class is represented by Thomas Sobol, Hannah Brennan and Steve Berman of Hagens Berman Sobol Shapiro LLP.

Counsel information for the drug companies was not immediately available.

The case is Chaires et al. v. Sanofi U.S. et al., case number 1:17-cv-10158, in the U.S. District Court for the District of Massachusetts.

--Additional reporting by Dani Kass. Editing by Edrienne Su.

**End of Document**

# EXHIBIT 13

## *Drug Makers Accused of Fixing Prices on Insulin*

The New York Times

January 30, 2017 Monday 00:00 EST

Copyright 2017 The New York Times Company All Rights Reserved

**Section:** HEALTH

**Length:** 900 words

**Byline:** KATIE THOMAS

**Highlight:** A lawsuit claims Sanofi, Novo Nordisk and Eli Lilly raised prices at the expense of patients' health.

# Body

A lawsuit filed Monday accused three makers of insulin of conspiring to drive up the prices of their lifesaving drugs, harming patients who were being asked to pay for a growing share of their drug bills.

The price of insulin has skyrocketed in recent years, with the three manufacturers — Sanofi, Novo Nordisk and Eli Lilly — raising the list prices of their products *in near lock step*, *prompting outcry from patient groups* and doctors who have pointed out that the rising prices appear to have little to do with increased production costs.

The *lawsuit*, filed in federal court in Massachusetts, accuses the companies of exploiting the country's opaque drug-pricing system in a way that benefits themselves and the intermediaries known as pharmacy benefit managers. It cites several examples of patients with *diabetes* who, unable to afford their insulin treatments, which can cost up to $900 a month, have resorted to injecting themselves with expired insulin or starving themselves to control their blood sugar. Some patients, the lawsuit said, intentionally allowed themselves to slip into *diabetic ketoacidosis* — a blood syndrome that can be fatal — to get insulin from hospital emergency rooms.

*A recent study* in The Journal of the American Medical Association found that the price of insulin nearly tripled from 2002 to 2013.

"People who have to pay out of pocket for insulin are paying enormous prices when they shouldn't be," said Steve Berman, a lawyer whose firm filed the suit on behalf of patients and is seeking to have it certified as a class action.

In a statement, Sanofi said, "We strongly believe these allegations have no merit, and will defend against these claims." Lilly said it had followed all laws, adding, "We adhere to the highest ethical standards."

A spokesman for Novo Nordisk said the company disagreed with the allegations in the suit and would defend itself. "At Novo Nordisk," the company's statement said, "we have a longstanding commitment to supporting patients' access to our medicines."

The rising costs of drugs has led to several hearings in Congress and has drawn the attention of President Trump, who this month pledged to address the issue and *said the industry was "getting away with murder."*

In December, *attorneys general in 20 states* accused several generic drug makers, including two of the biggest — Teva Pharmaceuticals and Mylan — of engaging in a price-fixing scheme in which executives coordinated at informal gatherings and through phone calls and text messages. Federal investigators are also said to be looking at the issue of drug prices, and several companies, including Valeant Pharmaceuticals International, have said they have received subpoenas.

Drug Makers Accused of Fixing Prices on Insulin

Several companies have recently *tried to head off criticism* by taking actions to address rising prices. In December, *Lilly said it would offer a 40 percent discount* off the list price of its insulin product, Humalog, for patients who are forced to pay full price. And Novo Nordisk, which makes Novolog, *has pledged to limit price increases* in the American market to less than 10 percent in a year.

The lawsuit filed Monday claimed that the three companies intentionally raised the list prices on their drugs to gain favorable treatment from pharmacy benefit managers, who work with health insurers and drug makers and help decide how a drug will be covered on a list of approved drugs.

Insurers do not pay the list prices that the drug makers set. Instead, the pharmacy benefit managers negotiate a rebate that is returned to them. The benefit managers, in turn, take a slice of that rebate for themselves, although the amount of the rebate, and the amount they keep, is not made public.

As a result, the drug manufacturers end up setting two prices for their drugs — the higher list price and the lower, secret, "real" price that insurers pay. The lawsuit claims that rather than competing with one another to offer a lower, "real" price to the insurers, the drug makers are vying to offer the best payment to the pharmacy benefit manager, which is why they have been raising the list price.

When the list price goes up, many patients see their out-of-pocket costs rise, even if they have *health insurance*. That's because plans increasingly carry high deductibles, which require patients to pay for their drug costs themselves until they hit a certain limit, as well as to pay a percentage of the list price even after their deductible is met.

While Mr. Berman accused the benefit managers of being complicit, he said the lawsuit focused on the drug makers because "they are playing the game, and they are the ones who publish the list price."

Michael Carrier, an antitrust professor at Rutgers Law School, described the filing of the lawsuit as "big news" and said it was interesting because it turned its attention to the inner workings of the pharmacy benefit managers, which until now "have floated under the radar of sustained drug pricing scrutiny."

Brian Henry, a spokesman for Express Scripts, the nation's largest pharmacy benefit manager, declined to comment on the lawsuit, but said, "Rebates don't raise drug prices, drug makers raise drug prices."

**Related Articles**

- *20 States Accuse Generic Drug Companies of Price Fixing*

- *Wary Drug Makers Move to Fend Off Further Attacks Under Donald Trump*

- *The Complex Math Behind Spiraling Prescription Drug Prices*

- *2 Former Drug Executives Charged With Price Fixing*

## Classification

**Language:** ENGLISH


**Document-Type:** News


**Publication-Type:** Web Blog

Drug Makers Accused of Fixing Prices on Insulin

**Subject:** LITIGATION (94%); SUITS & CLAIMS (93%); DIABETES (91%); PRICES (91%); CONSPIRACY (90%); DRUG PRICES (90%); PRICE CHANGES (90%); PRICE FIXING (90%); PRICE INCREASES (90%); DISABLED PERSONS (89%); NEGATIVE BUSINESS NEWS (89%); NEGATIVE NEWS (89%); NEGATIVE PERSONAL NEWS (89%); SUBPOENAS (89%); ANTITRUST & TRADE LAW (79%); BUSINESS TORTS (79%); CLASS ACTIONS (79%); GENERIC DRUGS (79%); BUSINESS & PROFESSIONAL ASSOCIATIONS (78%); EMERGENCY ROOMS (78%); ETHICS (78%); HEALTH CARE ACCESS (78%); MURDER (78%); PRICE MANAGEMENT (78%); PRODUCT PRICING (78%); US FEDERAL GOVERNMENT (75%); ATTORNEYS GENERAL (73%); STARVATION (73%); RESEARCH REPORTS (72%); ASSOCIATIONS & ORGANIZATIONS (71%); FEDERAL INVESTIGATIONS (70%); SPECIAL INVESTIGATIVE FORCES (70%); INVESTIGATIONS (68%); Antitrust Laws and Competition Issues (%); Eli Lilly and Company (%); Novo Nordisk A/S (%); Sanofi SA (%); Insulin (%); Diabetes (%); Suits and Litigation (Civil) (%); Drugs (Pharmaceuticals) (%); Prices (Fares, Fees and Rates) (%)

**Ticker:** Eli Lilly and Company; Eli Lilly and Company; Novo Nordisk A/S; Eli Lilly and Company; Novo Nordisk A/S; Sanofi SA

**Industry:** PHARMACEUTICAL PREPARATION MFG (92%); DRUG PRICES (90%); PHARMACEUTICALS INDUSTRY (90%); PRICE CHANGES (90%); PRICE FIXING (90%); PRICE INCREASES (90%); PHARMACEUTICALS & BIOTECHNOLOGY (89%); GENERIC DRUGS (79%); EMERGENCY ROOMS (78%); HEALTH CARE ACCESS (78%); MANUFACTURING (78%); PHARMACY BENEFITS (78%); PRICE MANAGEMENT (78%); PRODUCT PRICING (78%); ATTORNEYS GENERAL (73%); PRESCRIPTION DRUG AFFORDABILITY (73%); TEXT MESSAGING (50%)

**Geographic:** MASSACHUSETTS, USA (79%); UNITED STATES (79%)

**Load-Date:** February 1, 2017

---

**End of Document**

# EXHIBIT 14

## *Diabetes patients sue insulin makers for 'pricing fraud' ;  Diabetes patients overpaid for insulin, lawsuit alleges*

Washington Post.com

February 1, 2017

Copyright 2017 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2017, The Washington Post Co. All Rights Reserved.

The Washington Post

**Section:** WONKBLOG

**Length:** 840 words

**Byline:** By Carolyn Y. Johnson

## Body

A group of diabetes patients filed a lawsuit Monday against three drug companies for systematically increasing the list prices of insulin for years in an alleged fraudulent-pricing scheme that saddled patients with "crushing out-of-pocket expenses," according to the filing.

The insulin market is dominated by an oligopoly of companies that sell many billions of dollars worth of insulin each year - and have steadily raised the list prices of their drugs. A version of insulin called Humalog launched two decades ago with a sticker price of $21 a vial and has increased to $255 a vial.

Meanwhile, competition has appeared to work in a perverse way, with list prices of competing insulins often rising in concert. Last year, Sen. Bernie Sanders (I-Vt.) and Rep. Elijah E. Cummings (D-Md.) asked for a federal investigation into "possible collusion" on insulin prices.

The lawsuit, filed by 11 patients in U.S. District Court in Massachusetts, focuses on a common practice in the pharmaceutical industry: Drug companies compete for insurers' business by offering secret rebates on their drugs. Companies that negotiate drug prices for insurers, called pharmacy benefit managers, can place drugs on tiers that determine how much consumers pay for them - decisions that may be influenced by the size of the discount granted by the drug companies.

The lawsuit claims that drug companies have been increasing the list price of insulin in order to expand their discounts without lowering the overall price tag. The people stuck paying the balance: patients, particularly those without insurance or with high-deductible plans.  The lawsuit alleges those actions violate the Racketeer Influenced and Corrupt Organizations Act and state consumer protection laws.

"I think that publishing a price that you know is artificially inflated and is not a real price - other than to one group of people - is a fraud," said Steve Berman, a partner in the with Hagens Berman law firm who represents the plaintiffs.

Diabetes patients sue insulin makers for 'pricing fraud' Diabetes patients overpaid for insulin, lawsuit alleges

The lawsuit describes a patient who may need to have her foot amputated because she cannot afford her insulin. Others, it says, have intentionally allowed themselves to develop a potentially life-threatening syndrome so that they can be admitted to a hospital and obtain free insulin samples.

"This scheme directly and foreseeably causes consumers to overpay for these life-saving medications," the lawsuit states.

Insulin companies acknowledge that list prices have risen but argue that net prices - the amount drug companies are paid after rebates - haven't budged.

Eli Lilly "conducts business in a manner that ensures compliance with all applicable laws, and we adhere to the highest ethical standards," spokesman Greg Kueterman said in an email, declining to comment further.

A spokeswoman for Sanofi said that the company believes the allegations have no merit and will defend against them.

Novo Nordisk spokesman Ken Inchausti said in an email: "We are aware of the complaint and its characterization of the pharmaceutical supply chain. We disagree with the allegations made against the company and are prepared to vigorously defend the company in this matter."

The Pharmaceutical Care Management Association, a trade group that represents pharmacy benefit managers, said it is reviewing the lawsuit and pointed out that its companies are not defendants. But in a statement, the association said the lawsuit "inexplicably attacks prescription drug rebates, long used to reduce costs in public programs like Medicaid and in the commercial market."

Rising drug list prices have become a major issue for the biopharmaceutical industry as various pricing controversies triggered by list-price hikes have flared into congressional hearings and prompted other scrutiny over the past year and a half. Although drugmakers grant discounts off the list prices to pharmacy benefit companies, those may not always be passed through directly to consumers.

For example, people with high-deductible plans or co-insurance requiring them to pay a percentage of the drug cost can be directly affected by rising list prices. As more consumers are using health insurance that includes high deductibles, more patients are being exposed to the list price of a drug. In addition, insulin is a drug people take for a lifetime, so any gaps in health insurance or issues such as losing or breaking a vial of insulin could expose them to the list price of their medicine.

The lawsuit says pharmacy benefit managers that negotiate on drug prices for insurers play a role in the alleged scheme by telling the public the rebates were saving patients and insurers money, even when they know rebates aren't lowering the real price of the insulin.

Brian Henry, a spokesman for Express Scripts, one of the largest pharmacy benefit managers, declined to comment on the lawsuit, but he said in an email, "Rebates don't raise drug prices. Drugmakers raise drug prices."

Erin Britt, a spokeswoman for CVS Health said that the company passes more than 90 percent of its rebates back to customers.

## Notes

PUBLISHER: Washington Post

## Classification

Diabetes patients sue insulin makers for 'pricing fraud' Diabetes patients overpaid for insulin, lawsuit alleges

**Language:** ENGLISH

**Publication-Type:** Web Publication

**Journal Code:** WPCOM

**Subject:** DIABETES (94%); SUITS & CLAIMS (94%); LITIGATION (93%); INSULIN DRUGS (92%); PRICES (92%); FRAUD & FINANCIAL CRIME (91%); DRUG PRICES (90%); PRICE INCREASES (90%); PRICING STRATEGIES (90%); PRODUCT PRICING (90%); CONSUMERS (89%); NEGATIVE MISC NEWS (89%); CARTELS (78%); CONSUMER LAW (78%); CONSUMER PROTECTION (78%); CORRUPTION (78%); ETHICS (78%); FORTUNE 500 COMPANIES (78%); INVESTIGATIONS (78%); LAW & LEGAL SYSTEM (78%); NEGATIVE NEWS (78%); PHARMACEUTICAL DRUG & DEVICES LITIGATION (78%); PHARMACEUTICALS & BIOTECHNOLOGY REGULATORY COMPLIANCE (78%); US FEDERAL GOVERNMENT (78%); REGULATORY COMPLIANCE (77%); LAWYERS (75%); ASSOCIATIONS & ORGANIZATIONS (73%); FEDERAL INVESTIGATIONS (53%); gdias Diabetes (%); gcrim Crime/Legal Action (%); gcat Political/General News (%); ghea Health (%); gmed Medical Conditions (%)

**Industry:** INSULIN DRUGS (92%); PHARMACEUTICALS INDUSTRY (92%); DRUG PRICES (90%); PHARMACEUTICALS & BIOTECHNOLOGY (90%); PRICE INCREASES (90%); PRICING STRATEGIES (90%); PRODUCT PRICING (90%); INSURANCE (89%); INSURANCE DEDUCTIBLES (78%); PHARMACEUTICAL DRUG & DEVICES LITIGATION (78%); PHARMACEUTICALS & BIOTECHNOLOGY REGULATION & POLICY (78%); PHARMACEUTICALS & BIOTECHNOLOGY REGULATORY COMPLIANCE (78%); PHARMACY BENEFITS (78%); PRESCRIPTION DRUG INSURANCE (78%); PHARMACEUTICAL PREPARATION MFG (77%); LAWYERS (75%); PRESCRIPTION DRUG AFFORDABILITY (73%); i257 Pharmaceuticals (%); i951 Health Care/Life Sciences (%)

**Person:** ELIJAH E CUMMINGS (73%); BERNIE SANDERS (72%)

**Geographic:** MASSACHUSETTS, USA (79%); WASHINGTON DC, USA (79%); UNITED STATES (94%); NORTH AMERICA (79%); usdc Washington DC; namz North America; usa United States; uss Southern U.S.

IP Descriptors: wonkblog

**Load-Date:** January 30, 2025

---

End of Document

# EXHIBIT 15

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C.  20549**

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended June 30, 2017

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission File Number 001-01011

♥ **CVS**Health

# CVS HEALTH CORPORATION
*(Exact name of registrant as specified in its charter)*

| Delaware | 05-0494040 |
|---|---|
| *(State of Incorporation)* | *(I.R.S. Employer Identification Number)* |

One CVS Drive, Woonsocket, Rhode Island 02895
*(Address of principal executive offices)*

Registrant's telephone number, including area code: (401) 765-1500

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Common Stock, $0.01 par value, issued and outstanding at August 1, 2017:
1,016,564,728 shares

**INDEX**

|  |  | Page |
|---|---|---|
| **Part I** |  |  |
| Item 1. | Financial Statements | 3 |
|  | Condensed Consolidated Statements of Income (Unaudited) – Three and Six Months Ended June 30, 2017 and 2016 | 3 |
|  | Condensed Consolidated Statements of Comprehensive Income (Unaudited) – Three and Six Months Ended June 30, 2017 and 2016 | 4 |
|  | Condensed Consolidated Balance Sheets (Unaudited) – As of June 30, 2017 and December 31, 2016 | 5 |
|  | Condensed Consolidated Statements of Cash Flows (Unaudited) – Six Months Ended June 30, 2017 and 2016 | 6 |
|  | Notes to Condensed Consolidated Financial Statements (Unaudited) | 7 |
|  | Report of Independent Registered Public Accounting Firm | 22 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 39 |
| Item 4. | Controls and Procedures | 39 |
| **Part II** |  | 40 |
| Item 1. | Legal Proceedings | 40 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 40 |
| Item 6. | Exhibits | 41 |
| Signatures |  | 43 |

**CVS Health Corporation**
**Condensed Consolidated Statements of Income**
**(Unaudited)**

| *In millions, except per share amounts* | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Net revenues | $ 45,685 | $ 43,725 | $ 90,199 | $ 86,940 |
| Cost of revenues | 38,750 | 36,710 | 76,684 | 73,181 |
| Gross profit | 6,935 | 7,015 | 13,515 | 13,759 |
| Operating expenses | 4,818 | 4,658 | 9,605 | 9,217 |
| Operating profit | 2,117 | 2,357 | 3,910 | 4,542 |
| Interest expense, net | 247 | 280 | 499 | 563 |
| Loss on early extinguishment of debt | — | 542 | — | 542 |
| Other expense | 7 | 7 | 14 | 16 |
| Income before income tax provision | 1,863 | 1,528 | 3,397 | 3,421 |
| Income tax provision | 766 | 604 | 1,338 | 1,350 |
| Income from continuing operations | 1,097 | 924 | 2,059 | 2,071 |
| Income (loss) from discontinued operations, net of tax | 1 | — | (8) | — |
| Net income | 1,098 | 924 | 2,051 | 2,071 |
| Net income attributable to noncontrolling interest | — | — | (1) | (1) |
| Net income attributable to CVS Health | $ 1,098 | $ 924 | $ 2,050 | $ 2,070 |
| | | | | |
| Basic earnings per share: | | | | |
| Income from continuing operations attributable to CVS Health | $ 1.07 | $ 0.86 | $ 2.00 | $ 1.91 |
| Loss from discontinued operations attributable to CVS Health | $ — | $ — | $ (0.01) | $ — |
| Net income attributable to CVS Health | $ 1.07 | $ 0.86 | $ 1.99 | $ 1.91 |
| Weighted average shares outstanding | 1,019 | 1,070 | 1,024 | 1,081 |
| Diluted earnings per share: | | | | |
| Income from continuing operations attributable to CVS Health | $ 1.07 | $ 0.86 | $ 1.99 | $ 1.90 |
| Loss from discontinued operations attributable to CVS Health | $ — | $ — | $ (0.01) | $ — |
| Net income attributable to CVS Health | $ 1.07 | $ 0.86 | $ 1.98 | $ 1.90 |
| Weighted average shares outstanding | 1,024 | 1,075 | 1,029 | 1,087 |
| Dividends declared per share | $ 0.50 | $ 0.425 | $ 1.00 | $ 0.85 |

See accompanying notes to condensed consolidated financial statements.

**CVS Health Corporation**
**Condensed Consolidated Statements of Comprehensive Income**
**(Unaudited)**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| _In millions_ | **2017** | | **2016** | | **2017** | | **2016** | |
| Net income | $ | 1,098 | $ | 924 | $ | 2,051 | $ | 2,071 |
| Other comprehensive income: | | | | | | | | |
| Foreign currency translation adjustments, net of tax | | (10) | | 22 | | (2) | | 40 |
| Net cash flow hedges, net of tax | | — | | — | | 1 | | 1 |
| Total other comprehensive income (loss) | | (10) | | 22 | | (1) | | 41 |
| Comprehensive income | | 1,088 | | 946 | | 2,050 | | 2,112 |
| Comprehensive income attributable to noncontrolling interest | | — | | — | | (1) | | (1) |
| Comprehensive income attributable to CVS Health | $ | 1,088 | $ | 946 | $ | 2,049 | $ | 2,111 |

See accompanying notes to condensed consolidated financial statements.

4

**CVS Health Corporation**
**Condensed Consolidated Balance Sheets**
**(Unaudited)**

| *In millions, except per share amounts* | | June 30, 2017 | | December 31, 2016 |
|---|---|---|---|---|
| Assets: | | | | |
| Cash and cash equivalents | $ | 2,094 | $ | 3,371 |
| Short-term investments | | 75 | | 87 |
| Accounts receivable, net | | 12,274 | | 12,164 |
| Inventories | | 14,271 | | 14,760 |
| Other current assets | | 690 | | 660 |
| Total current assets | | 29,404 | | 31,042 |
| Property and equipment, net | | 10,073 | | 10,175 |
| Goodwill | | 38,130 | | 38,249 |
| Intangible assets, net | | 13,354 | | 13,511 |
| Other assets | | 1,564 | | 1,485 |
| Total assets | $ | 92,525 | $ | 94,462 |
| | | | | |
| Liabilities: | | | | |
| Accounts payable | $ | 7,874 | $ | 7,946 |
| Claims and discounts payable | | 9,708 | | 9,451 |
| Accrued expenses | | 8,133 | | 6,937 |
| Short-term debt | | 1,100 | | 1,874 |
| Current portion of long-term debt | | 42 | | 42 |
| Total current liabilities | | 26,857 | | 26,250 |
| Long-term debt | | 25,622 | | 25,615 |
| Deferred income taxes | | 4,210 | | 4,214 |
| Other long-term liabilities | | 1,689 | | 1,549 |
| | | | | |
| Shareholders' equity: | | | | |
| CVS Health shareholders' equity: | | | | |
| Preferred stock, par value $0.01: 0.1 shares authorized; none issued or outstanding | | — | | — |
| Common stock, par value $0.01: 3,200 shares authorized; 1,710 shares issued and 1,015 shares outstanding at June 30, 2017 and 1,705 shares issued and 1,061 shares outstanding at December 31, 2016 | | 17 | | 17 |
| Treasury stock, at cost: 694 shares at June 30, 2017 and 643 shares at December 31, 2016 | | (37,414) | | (33,452) |
| Shares held in trust: 1 share at June 30, 2017 and December 31, 2016 | | (31) | | (31) |
| Capital surplus | | 31,871 | | 31,618 |
| Retained earnings | | 40,005 | | 38,983 |
| Accumulated other comprehensive income (loss) | | (306) | | (305) |
| Total CVS Health shareholders' equity | | 34,142 | | 36,830 |
| Noncontrolling interest | | 5 | | 4 |
| Total shareholders' equity | | 34,147 | | 36,834 |
| Total liabilities and shareholders' equity | $ | 92,525 | $ | 94,462 |

See accompanying notes to condensed consolidated financial statements.

5

Table of Contents

**CVS Health Corporation**
**Condensed Consolidated Statements of Cash Flows**
**(Unaudited)**

| | Six Months Ended June 30, | |
|---|---|---|
| *In millions* | **2017** | **2016** |
| Cash flows from operating activities: | | |
| Cash receipts from customers | $ 88,343 | $ 84,324 |
| Cash paid for inventory and prescriptions dispensed by retail network pharmacies | (73,748) | (70,851) |
| Cash paid to other suppliers and employees | (7,000) | (7,019) |
| Interest received | 10 | 9 |
| Interest paid | (539) | (615) |
| Income taxes paid | (1,534) | (1,762) |
| Net cash provided by operating activities | 5,532 | 4,086 |
| | | |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (888) | (1,102) |
| Proceeds from sale of property and equipment and other assets | 13 | 11 |
| Acquisitions (net of cash acquired) and other investments | (315) | (168) |
| Purchase of available-for-sale investments | — | (39) |
| Maturities of available-for-sale investments | 16 | 67 |
| Net cash used in investing activities | (1,174) | (1,231) |
| | | |
| Cash flows from financing activities: | | |
| Increase (decrease) in short-term debt | (774) | 745 |
| Proceeds from issuance of long-term debt | — | 3,455 |
| Repayments of long-term debt | — | (3,579) |
| Purchase of noncontrolling interest in subsidiary | — | (39) |
| Dividends paid | (1,028) | (929) |
| Proceeds from exercise of stock options | 189 | 193 |
| Payments for taxes related to net share settlement of equity awards | (60) | (71) |
| Repurchase of common stock | (3,961) | (3,960) |
| Other | (1) | (4) |
| Net cash used in financing activities | (5,635) | (4,189) |
| Effect of exchange rate changes on cash and cash equivalents | — | 2 |
| Net decrease in cash and cash equivalents | (1,277) | (1,332) |
| Cash and cash equivalents at the beginning of the period | 3,371 | 2,459 |
| Cash and cash equivalents at the end of the period | $ 2,094 | $ 1,127 |
| | | |
| Reconciliation of net income to net cash provided by operating activities: | | |
| Net income | $ 2,051 | $ 2,071 |
| Adjustments required to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 1,242 | 1,236 |
| Goodwill impairment | 135 | — |
| Stock-based compensation | 108 | 107 |
| Loss on early extinguishment of debt | — | 542 |
| Deferred income taxes and other noncash items | 21 | 75 |
| Change in operating assets and liabilities, net of effects from acquisitions: | | |
| Accounts receivable, net | (114) | (1,279) |
| Inventories | 492 | (167) |
| Other current assets | (31) | (170) |
| Other assets | (38) | (53) |
| Accounts payable and claims and discounts payable | 180 | 1,164 |
| Accrued expenses | 1,345 | 555 |
| Other long-term liabilities | 141 | 5 |
| Net cash provided by operating activities | $ 5,532 | $ 4,086 |

See accompanying notes to condensed consolidated financial statements.

6

**CVS Health Corporation**
**Notes to Condensed Consolidated Financial Statements**
**(Unaudited)**

**Note 1 – Accounting Policies**

*Basis of Presentation*

The accompanying unaudited condensed consolidated financial statements of CVS Health Corporation and its subsidiaries (collectively, "CVS Health" or the "Company") have been prepared in accordance with the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") regarding interim financial reporting. In accordance with such rules and regulations, certain information and accompanying note disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been condensed or omitted, although the Company believes the disclosures included herein are adequate to make the information presented not misleading. These condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto, which are included in Exhibit 13 to the Company's Annual Report on Form 10-K for the year ended December 31, 2016 ("2016 Form 10-K").

In the opinion of management, the accompanying unaudited condensed consolidated financial statements include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the results for the interim periods presented. Because of the influence of various factors on the Company's operations, including business combinations, certain holidays and other seasonal influences, net income for any interim period may not be comparable to the same interim period in previous years or necessarily indicative of income for the full year.

*Principles of Consolidation*

The condensed consolidated financial statements include the accounts of the Company and its majority-owned subsidiaries and variable interest entities ("VIEs") for which the Company is the primary beneficiary. All material intercompany balances and transactions have been eliminated.

The Company continually evaluates its investments to determine if they represent variable interests in a VIE. If the Company determines that it has a variable interest in a VIE, the Company then evaluates if it is the primary beneficiary of the VIE. The evaluation is a qualitative assessment as to whether the Company has the ability to direct the activities of a VIE that most significantly impact the entity's economic performance. The Company consolidates a VIE if it is considered to be the primary beneficiary.

Assets and liabilities of VIEs for which the Company is the primary beneficiary were not significant to the Company's condensed consolidated financial statements. VIE creditors do not have recourse against the general credit of the Company.

*Fair Value of Financial Instruments*

The Company utilizes the three-level valuation hierarchy for the recognition and disclosure of fair value measurements. The categorization of assets and liabilities within this hierarchy is based upon the lowest level of input that is significant to the measurement of fair value. The three levels of the hierarchy consist of the following:

- Level 1 – Inputs to the valuation methodology are unadjusted quoted prices in active markets for identical assets or liabilities that the Company has the ability to access at the measurement date.

- Level 2 – Inputs to the valuation methodology are quoted prices for similar assets and liabilities in active markets, quoted prices in markets that are not active or inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the instrument.

- Level 3 – Inputs to the valuation methodology are unobservable inputs based upon management's best estimate of inputs market participants could use in pricing the asset or liability at the measurement date, including assumptions about risk.

As of June 30, 2017, the carrying value of cash and cash equivalents, short-term investments, accounts receivable, accounts payable, and the contingent consideration liability included in accrued expenses approximated their fair value due to the nature of these financial instruments. The Company invests in money market funds, commercial paper and time deposits that are classified as cash and cash equivalents within the accompanying condensed consolidated balance sheets, as these funds are highly liquid and readily convertible to known amounts of cash. These investments are classified within Level 1 of the fair value hierarchy because they are valued using quoted market prices. The Company's short-term investments of $75 million at June 30, 2017 consist of certificates of deposit with initial maturities of greater than three months when purchased that mature within one year from the balance sheet date. These investments, which are classified within Level 1 of the fair value hierarchy, are carried at fair value, which approximated historical cost at June 30, 2017. The carrying amount and estimated fair value of the Company's total long-term debt was $25.7 billion and $26.9 billion, respectively, as of June 30, 2017. The fair value of the Company's long-term debt was estimated based on quoted prices currently offered in active markets for the Company's debt, which is considered Level 1 of the fair value hierarchy.

### Related Party Transactions

The Company has an equity method investment in SureScripts, LLC ("SureScripts"), which operates a clinical health information network. The Pharmacy Services and Retail/LTC segments utilize this clinical health information network in providing services to its client plan members and retail customers. The Company expensed fees for the use of this network of approximately $8 million and $9 million in the three months ended June 30, 2017 and 2016, respectively, and expensed fees for the use of this network of approximately $25 million and $22 million in the six months ended June 30, 2017 and 2016, respectively. The Company's investment in and equity in earnings of SureScripts for all periods presented is immaterial.

The Company has an equity method investment in Heartland Healthcare Services ("Heartland"). Heartland operates several long-term care pharmacies in four states. Heartland paid the Company approximately $30 million and $32 million for pharmaceutical inventory purchases during the three months ended June 30, 2017 and 2016, respectively, and $70 million for pharmaceutical inventory purchases during the six months ended June 30, 2017 and 2016. Additionally, the Company performs certain collection functions for Heartland and then passes those customer cash collections back to Heartland. The Company's investment and equity in earnings of Heartland for all periods presented is immaterial.

### Discontinued Operations

In connection with certain business dispositions completed between 1991 and 1997, the Company retained guarantees on store lease obligations for a number of former subsidiaries, including Bob's Stores and Linens 'n Things, both of which subsequently filed for bankruptcy. See "Note 10 – Commitments and Contingencies" to the condensed consolidated financial statements. The Company's discontinued operations include lease-related costs which the Company believes it will likely be required to satisfy pursuant to its lease guarantees.

### New Accounting Pronouncements Recently Adopted

In July 2015, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2015-11, *Inventory* , which amends Accounting Standard Codification ("ASC") Topic 330. This ASU simplifies current accounting treatments by requiring entities to measure most inventories at "the lower of cost and net realizable value" rather than using lower of cost or market. This guidance does not apply to inventories measured using the last-in, first-out method or the retail inventory method. The Company adopted this standard effective January 1, 2017. The adoption of this new guidance did not have any impact on the Company's condensed consolidated results of operations, financial position or cash flows.

In March 2016, the FASB issued ASU No. 2016-09, *Improvements to Employee Share-Based Payment Accounting* , which amends the accounting for certain aspects of shared-based payments to employees in ASC Topic 718, *Compensation - Stock Compensation* . The new guidance eliminates the accounting for any excess tax benefits and deficiencies through equity, and requires all excess tax benefits and deficiencies related to employee share-based compensation arrangements to be recorded in the income statement. This aspect of the guidance is required to be applied prospectively. The guidance also requires the presentation of excess tax benefits on the statement of cash flows as an operating activity rather than a financing activity, a change which may be applied prospectively or retrospectively. The guidance further provides an accounting policy election to account for forfeitures as they occur rather than utilizing the

8

estimated amount of forfeitures at the time of issuance. The Company adopted this guidance effective January 1, 2017. The primary impact of adopting this guidance was the recognition of excess tax benefits in the income statement instead of recognizing them in equity. This income statement guidance was adopted on a prospective basis. As a result, a discrete tax benefit of $14 million and $33 million was recognized in the income tax provision in the three and six months ended June 30, 2017, respectively.

The Company elected to retrospectively adopt the guidance on the presentation of excess tax benefits in the statement of cash flows. The following is a reconciliation of the effect of the resulting reclassification of the excess tax benefits on the Company's condensed consolidated statement of cash flows for the six months ended June 30, 2016:

| In millions | As Previously Reported | Adjustments | As Revised |
|---|---|---|---|
| Cash paid to other suppliers and employees | $ (7,082) | $ 63 | $ (7,019) |
| Net cash provided by operating activities | 4,023 | 63 | 4,086 |
| Excess tax benefits from stock-based compensation | 63 | (63) | — |
| Net cash used in financing activities | (4,126) | (63) | (4,189) |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Accrued expenses | 492 | 63 | 555 |

The Company elected to continue to estimate forfeitures expected to occur to determine the amount of compensation cost to be recognized in each period. None of the other provisions in this guidance had a material impact on the Company's condensed consolidated financial statements.

In March 2017, the FASB issued ASU 2017-07, *Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost* , which amends ASC Topic 715, *Compensation – Retirement Benefits* . ASU 2017-17 requires entities to disaggregate the current service cost component from the other components of net benefit cost and present it with other current compensation costs for related employees in the income statement and present the other components of net benefit cost elsewhere in the income statement and outside of operating income. Only the service cost component of net benefit cost is eligible for capitalization. The guidance is effective for interim and annual periods beginning after December 15, 2017. Early adoption is permitted as of the beginning of any annual periods for which an entity's financial statements have not been issued. Entities are required to retrospectively apply the requirement for a separate presentation in the income statement of service costs and other components of net benefit cost and prospectively adopt the requirement to limit the capitalization of benefit costs to the service component. The Company adopted the income statement presentation aspects of this new guidance on a retrospective basis effective January 1, 2017. Nearly all of the Company's net benefit costs for the Company's defined benefit pension and postretirement plans do not contain a service cost component as most of these defined benefit plans have been frozen for an extended period of time. The following is a reconciliation of the effect of the reclassification of the net benefit cost from operating expenses to other expense in the Company's condensed consolidated statements of income for the three and six months ended June 30, 2016:

| In millions | As Previously Reported | Adjustments | As Revised |
|---|---|---|---|
| **Three Months Ended June 30, 2016** | | | |
| Operating expenses | $ 4,665 | $ (7) | $ 4,658 |
| Operating profit | 2,350 | 7 | 2,357 |
| Other expense | — | 7 | 7 |
| **Six Months Ended June 30, 2016** | | | |
| Operating expenses | 9,233 | (16) | 9,217 |
| Operating profit | 4,526 | 16 | 4,542 |
| Other expense | — | 16 | 16 |

In January 2017, the FASB issued ASU 2017-04, *Simplifying the Test for Goodwill Impairment* , which amends ASC Topic 350, *Intangibles – Goodwill and Other* . This ASU requires the Company to perform its annual, or applicable interim, goodwill impairment test by comparing the fair value of each reporting unit with its carrying amount. An impairment charge must be recognized at the amount by which the carrying amount exceeds the fair value of the reporting unit; however, the charge recognized should not exceed the total amount of goodwill allocated to that reporting unit. Income tax effects resulting from any tax deductible goodwill should be considered when measuring a goodwill impairment charge, if applicable. The guidance in ASU 2017-04 is effective for annual or interim goodwill impairment

9

Table of Contents

tests in fiscal years beginning after December 15, 2019. The Company elected to early adopt this standard as of January 1, 2017. At the date of adoption of this new guidance, the guidance did not have any impact on the Company's condensed consolidated results of operations, financial position or cash flows.

***New Accounting Pronouncements Not Yet Adopted***

In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers* (Topic 606). ASU 2014-09 outlines a single comprehensive model for companies to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. In March 2016, the FASB issued ASU 2016-08, " *Principal Versus Agent Considerations (Reporting Revenue Gross Versus Net)* ," which amends the principal-versus-agent implementation guidance and in April 2016 the FASB issued ASU 2016-10, " *Identifying Performance Obligations and Licensing* ," which amends the guidance in those areas in the new revenue recognition standard. Both ASUs were issued in response to feedback received from the FASB-International Accounting Standards Board joint revenue recognition transition resource group. This new standard could impact the timing and amounts of revenue recognized. The new revenue standard is effective for annual reporting periods (including interim reporting periods within those periods) beginning January 1, 2018. Early adoption of the standard in 2017 is permitted; however, the Company does not intend to early adopt the new standard. Companies have the option of using either a full retrospective or a modified retrospective approach to adopt the guidance. The Company intends to adopt the new standard on a modified retrospective basis. The Company formed a project team to assess and implement the new revenue standard, has prepared its preliminary accounting policy memorandums and is entering the final stages of its documentation related to the new standard. While the Company is currently finalizing its assessment of all of the potential impacts of the new standard, including the potential impact from recent acquisitions, the Company does not expect the implementation of the standard will have a material effect on the Company's consolidated results of operations, cash flows or financial position. The new standard will however require more extensive revenue-related disclosures.

In February 2016, the FASB issued ASU 2016-02, *Leases* (Topic 842). Lessees will be required to recognize a right-of-use asset and a lease liability for virtually all of their leases (other than leases that meet the definition of a short-term lease). The liability will be equal to the present value of lease payments. The asset will be based on the liability, subject to adjustment, such as for initial direct costs. For income statement purposes, a dual model was retained, requiring leases to be classified as either operating or finance leases. Operating leases will result in straight-line expense (similar to current operating leases) while finance leases will result in a front-loaded expense pattern (similar to current capital leases). Lessor accounting is similar to the current model, but updated to align with certain changes to the lessee model (e.g., certain definitions, such as initial direct costs, have been updated) and the new revenue recognition standard. The standard is effective for public companies for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018. Early adoption is permitted. The Company believes that the new standard will have a material impact on its consolidated balance sheet. The Company is currently evaluating the effect that implementation of this standard will have on the Company's consolidated results of operations, cash flows, financial position and related disclosures.

In August 2016, the FASB issued ASU No. 2016-15, *Classification of Certain Cash Receipts and Cash Payments* . ASU 2016-15 is intended to add or clarify guidance on the classification of certain cash receipts and payments in the statement of cash flows and to eliminate the diversity in practice related to such classifications. The guidance in ASU 2016-15 is required for annual reporting periods beginning after December 15, 2017, with early adoption permitted. The Company is currently evaluating the effect on its consolidated statement of cash flows of adopting this new accounting guidance.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows* , which amends ASC Topic 230. This ASU requires entities to show the changes in the total of cash, cash equivalents, restricted cash and restricted cash equivalents in the statement of cash flows. As a result, entities will no longer be required to present transfers between cash and cash equivalents and restricted cash and restricted cash equivalents in the statement of cash flows. When cash, cash equivalents, restricted cash and restricted cash equivalents are presented in more than one line item on the balance sheet, the new guidance requires a reconciliation of the totals in the statement of cash flows to the related captions in the balance sheet. Entities will also have to disclose the nature of their restricted cash and restricted cash equivalent balances. The guidance is effective for fiscal years beginning after December 15, 2017 and interim periods within those years. Early adoption is permitted. Entities are required to apply the guidance retrospectively. The Company is currently evaluating the effect of adopting this new accounting guidance.

**Note 2 – Goodwill**

Goodwill is not amortized, but is subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate there may be impairment. Goodwill is evaluated for possible impairment by comparing the fair value of a reporting unit to its carrying value, including the goodwill assigned to that reporting unit.

During the second quarter of 2017, the Company pursued various strategic alternatives for its RxCrossroads ("RxC") reporting unit. In connection with this ongoing effort, the Company performed an interim goodwill impairment test prior to the annual goodwill impairment test in the third quarter. In conjunction with the impairment test, the fair value of the RxC reporting unit was estimated to be lower than the carrying value resulting in a $135 million goodwill impairment charge within operating expenses. The fair value of the RxC reporting unit was determined using a combination of a discounted cash flow model and a comparable market transaction model. The Company also performed an impairment test of the intangible assets of the RxC reporting unit and none were impaired at June 30, 2017.

Below is a summary of the changes in the carrying value of goodwill by segment for the six months ended June 30, 2017:

| In millions | Pharmacy Services | Retail/LTC | Total |
|---|---|---|---|
| Balance, December 31, 2016 | $ 21,637 | $ 16,612 | $ 38,249 |
| Acquisitions | | 18 | 18 |
| Foreign currency translation adjustments | — | (2) | (2) |
| Impairment | — | (135) | (135) |
| Balance, June 30, 2017 | $ 21,637 | $ 16,493 | $ 38,130 |

**Note 3 – Share Repurchase Programs**

During the six months ended June 30, 2017, the Company had the following outstanding share repurchase programs, both of which had previously been authorized by the Company's Board of Directors:

*In billions*

| Authorization Date | Authorized | Remaining |
|---|---|---|
| November 2, 2016 ("2016 Repurchase Program") | $ 15.0 | $ 14.3 |
| December 15, 2014 ("2014 Repurchase Program") | 10.0 | — |

Each of the 2014 and 2016 Repurchase Programs, which were effective immediately, permitted the Company to effect repurchases from time to time through a combination of open market repurchases, privately negotiated transactions, accelerated share repurchase transactions, and/or other derivative transactions. Each of the repurchase programs could be modified or terminated by the Board of Directors at any time. The 2014 Repurchase Program was completed during the second quarter of 2017.

During the three months ended June 30, 2017, the Company repurchased an aggregate of approximately 14.3 million shares of common stock for approximately $340 million pursuant to the 2014 and 2016 Repurchase Programs. During the six months ended June 30, 2017, the Company repurchased an aggregate of approximately 50.4 million shares of common stock for approximately $4.0 billion pursuant to the 2014 and 2016 Repurchase Programs. This activity includes the accelerated share repurchase agreements ("ASRs") described below.

Pursuant to the authorization under the 2014 Repurchase Program, effective August 29, 2016, the Company entered into two fixed dollar ASRs with Barclays Bank PLC ("Barclays") for a total of $3.6 billion. Upon payment of the $3.6 billion purchase price on January 6, 2017, the Company received a number of shares of its common stock equal to 80% of the $3.6 billion notional amount of the ASRs or approximately 36.1 million shares, which were placed into treasury stock in January 2017. The ASRs were accounted for as an initial treasury stock transaction for $2.9 billion and a forward contract for $0.7 billion. In April 2017, the Company received 9.9 million shares of common stock, representing the remaining 20% of the $3.6 billion notional amount of the ASRs, thereby concluding the ASRs. The remaining 9.9 million shares of common stock delivered to the Company by Barclays were placed into treasury stock and the forward contract was reclassified from capital surplus to treasury stock in April 2017.

At the time they were received, the initial and final receipt of shares resulted in an immediate reduction of the outstanding shares used to calculate the weighted average common shares outstanding for basic and diluted earnings per share.

### Note 4 – Accumulated Other Comprehensive Income

Accumulated other comprehensive income consists of foreign currency translation adjustments, unrealized losses on cash flow hedges executed in previous years associated with the issuance of long-term debt, and changes in the net actuarial gains and losses associated with pension and other postretirement benefit plans. The following table summarizes the activity within the components of accumulated other comprehensive income.

Changes in accumulated other comprehensive income (loss) by component is shown on the below:

| In millions | Foreign Currency | Losses on Cash Flow Hedges | Pension and Other Postretirement Benefits | Total |
|---|---|---|---|---|
| **Three Months Ended June 30, 2017** [1] | | | | |
| Balance, March 31, 2017 | $ (119) | $ (4) | $ (173) | $ (296) |
| Other comprehensive income (loss) before reclassifications | (10) | — | — | (10) |
| Amounts reclassified from accumulated other comprehensive income [2] | — | — | — | — |
| Net other comprehensive income (loss) | (10) | — | — | (10) |
| Balance, June 30, 2017 | $ (129) | $ (4) | $ (173) | $ (306) |

| In millions | Foreign Currency | Losses on Cash Flow Hedges | Pension and Other Postretirement Benefits | Total |
|---|---|---|---|---|
| **Three Months Ended June 30, 2016** [1] | | | | |
| Balance, March 31, 2016 | $ (147) | $ (6) | $ (186) | $ (339) |
| Other comprehensive income before reclassifications | 22 | — | — | 22 |
| Amounts reclassified from accumulated other comprehensive income [2] | — | — | — | — |
| Net other comprehensive income | 22 | — | — | 22 |
| Balance, June 30, 2016 | $ (125) | $ (6) | $ (186) | $ (317) |

| In millions | Foreign Currency | Losses on Cash Flow Hedges | Pension and Other Postretirement Benefits | Total |
|---|---|---|---|---|
| **Six Months Ended June 30, 2017** [1] | | | | |
| Balance, December 31, 2016 | $ (127) | $ (5) | $ (173) | $ (305) |
| Other comprehensive income (loss) before reclassifications | (2) | — | — | (2) |
| Amounts reclassified from accumulated other comprehensive income [2] | — | 1 | — | 1 |
| Net other comprehensive income (loss) | (2) | 1 | — | (1) |
| Balance, June 30, 2017 | $ (129) | $ (4) | $ (173) | $ (306) |

| In millions | Foreign Currency | Losses on Cash Flow Hedges | Pension and Other Postretirement Benefits | Total |
|---|---|---|---|---|
| **Six Months Ended June 30, 2016** [1] | | | | |
| Balance, December 31, 2015 | $ (165) | $ (7) | $ (186) | $ (358) |
| Other comprehensive income before reclassifications | 40 | — | — | 40 |
| Amounts reclassified from accumulated other comprehensive income [2] | — | 1 | — | 1 |
| Net other comprehensive income | 40 | 1 | — | 41 |
| Balance, June 30, 2016 | $ (125) | $ (6) | $ (186) | $ (317) |

(1)  All amounts are net of tax.
(2)  The amounts reclassified from accumulated other comprehensive income for losses on cash flow hedges are recorded within interest expense, net on the condensed consolidated statements of income. The amounts reclassified from accumulated other comprehensive income for pension and other postretirement benefits are included in other expense on the condensed consolidated statements of income.

**Note 5 – Stock-Based Compensation**

A summary of stock-based compensation for each of the respective periods is as follows:

| _In millions_ | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2017 | 2016 | 2017 | 2016 |
| --- | --- | --- | --- | --- |
| Stock-based compensation: | | | | |
|   Stock options | $ 14 | $ 17 | $ 34 | $ 39 |
|   Restricted stock units | 39 | 33 | 74 | 68 |
|     Total stock-based compensation | $ 53 | $ 50 | $ 108 | $ 107 |

During the three months ended June 30, 2017, the Company granted approximately 4 million stock options with a weighted average fair value of $9.43 and a weighted average fair value exercise price of $78.05. The Company had approximately 23 million stock options outstanding as of June 30, 2017 with a weighted average exercise price of $73.10 and a weighted average contractual term of 3.98 years. During the three months ended June 30, 2017, the Company granted approximately 3 million restricted stock units with a weighted average fair value of $78.05. The Company had approximately 6 million restricted stock units unvested as of June 30, 2017 with a weighted average fair value of $86.79.

**Note 6 – Store Closures**

In December 2016, the Company announced an enterprise streamlining initiative designed to reduce costs and enhance operating efficiencies to allow the Company to be more competitive in the current health care environment. In connection with the enterprise streamlining initiative, the Company announced its intention to rationalize the number of retail stores by closing approximately 70 underperforming stores during the year ending December 31, 2017. During the three and six months ended June 30, 2017, the Company closed three and 63 retail stores, respectively, and recorded charges of $6 million and $205 million, respectively, within operating expenses in the Retail/LTC Segment. The charges are primarily comprised of provisions for the present value of noncancelable lease obligations.

The noncancelable lease obligations associated with stores closed during the six months ended June 30, 2017 extend through the year 2039. In connection with the enterprise streamlining initiative, the Company expects to record additional charges of approximately $15 million during the remainder of 2017 as it continues to rationalize the number of retail stores.

**Note 7 – Interest Expense, Net**

The following are the components of interest expense, net:

| _In millions_ | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2017 | 2016 | 2017 | 2016 |
| --- | --- | --- | --- | --- |
| Interest expense | $ 251 | $ 284 | $ 509 | $ 572 |
| Interest income | (4) | (4) | (10) | (9) |
|   Interest expense, net | $ 247 | $ 280 | $ 499 | $ 563 |

**Note 8 – Earnings Per Share**

Earnings per share is computed using the two-class method. Options to purchase 11.0 million and 9.4 million shares of common stock were outstanding, but were not included in the calculation of diluted earnings per share, for the three and six months ended June 30, 2017, respectively, because the exercise prices of the options were greater than the average market price of the common shares and, therefore, the effect would be antidilutive. For the same reason, options to purchase approximately 7.8 million and 5.7 million shares of common stock were outstanding, but were not included in the calculation of diluted earnings per share for the three and six months ended June 30, 2016, respectively.

The following is a reconciliation of basic and diluted earnings per share from continuing operations for the respective periods:

| In millions, except per share amounts | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Numerator for earnings per share calculation: | | | | |
| Income from continuing operations | $ 1,097 | $ 924 | $ 2,059 | $ 2,071 |
| Income allocated to participating securities | (3) | (4) | (8) | (10) |
| Net income attributable to noncontrolling interest | — | — | (1) | (1) |
| Income from continuing operations attributable to CVS Health | $ 1,094 | $ 920 | $ 2,050 | $ 2,060 |
| | | | | |
| Denominator for earnings per share calculation: | | | | |
| Weighted average shares, basic | 1,019 | 1,070 | 1,024 | 1,081 |
| Effect of dilutive securities | 5 | 5 | 5 | 6 |
| Weighted average shares, diluted | 1,024 | 1,075 | 1,029 | 1,087 |
| | | | | |
| Earnings per share from continuing operations: | | | | |
| Basic | $ 1.07 | $ 0.86 | $ 2.00 | $ 1.91 |
| Diluted | $ 1.07 | $ 0.86 | $ 1.99 | $ 1.90 |

**Note 9 – Segment Reporting**

The Company has three reportable segments: Pharmacy Services, Retail/LTC and Corporate. The Retail/LTC Segment includes the operating results of the Company's Retail Pharmacy and LTC/RxCrossroads operating segments as the operations and economic characteristics are similar. The Company's three reportable segments maintain separate financial information by which operating results are evaluated on a regular basis by the Company's chief operating decision maker in deciding how to allocate resources and in assessing performance.

The Company evaluates its Pharmacy Services and Retail/LTC segments' performance based on net revenue, gross profit and operating profit before the effect of nonrecurring charges and gains and certain intersegment activities. The Company evaluates the performance of its Corporate Segment based on operating expenses before the effect of nonrecurring charges and gains and certain intersegment activities. The chief operating decision maker does not use total assets by segment to make decisions regarding resources, therefore the total asset disclosure by segment has not been included.

The Pharmacy Services Segment provides a full range of pharmacy benefit management ("PBM") solutions including plan design offerings and administration, formulary management, Medicare Part D services, mail order, specialty pharmacy and infusion services, retail pharmacy network management services, prescription management systems, clinical services, disease management services and medical spend management. The Company's clients are primarily employers, insurance companies, unions, government employee groups, health plans, Medicare Part D, Managed Medicaid plans, plans offered on the public and private exchanges, and other sponsors of health benefit plans and individuals throughout the United States. Through the Company's SilverScript Insurance Company subsidiary, the Pharmacy Services Segment is a national provider of drug benefits to eligible beneficiaries under the federal government's Medicare Part D program. The Pharmacy Services Segment operates under the CVS Caremark ® Pharmacy Services, Caremark ®, CVS Caremark ™, CarePlus CVS Pharmacy ™, Accordant ®, SilverScript ®, Coram ®, CVS Specialty ™, NovoLogix ®, Navarro ® Health Services, Advanced Care Scripts and ACS Pharmacy names. As of June 30, 2017, the Pharmacy Services Segment operated 23 retail specialty pharmacy stores, 15 specialty mail order pharmacies, four mail service dispensing pharmacies, and 83 branches for infusion and enteral services, including approximately 73 ambulatory infusion suites and three centers of excellence, located in 41 states, Puerto Rico and the District of Columbia.

The Retail/LTC Segment sells prescription drugs and a wide assortment of general merchandise, including over-the-counter drugs, beauty products and cosmetics, personal care products, convenience foods, photo finishing services, seasonal merchandise and greeting cards. The Retail/LTC Segment also includes providing the distribution of prescription drugs, related pharmacy consulting and other ancillary services to chronic care facilities and other care settings, as well as commercialization services that are provided under the name RxCrossroads ®. The Retail/LTC Segment also provides health care services through its MinuteClinic ® health care clinics. MinuteClinics are staffed by

14

nurse practitioners and physician assistants who utilize nationally recognized protocols to diagnose and treat minor health conditions, perform health screenings, monitor chronic conditions and deliver vaccinations. As of June 30, 2017, our Retail/LTC Segment included 9,700 retail locations (of which 7,971 were the Company's stores that operated a pharmacy and 1,679 were the Company's pharmacies located within Target stores) located in 49 states, the District of Columbia, Puerto Rico and Brazil operating primarily under the CVS Pharmacy ®, CVS ®, CVS Pharmacy y más ®, Longs Drugs ®, Navarro Discount Pharmacy ® and Drogaria Onofre ™ names, 40 onsite pharmacies primarily operating under the CarePlus CVS Pharmacy ™, CarePlus ® and CVS Pharmacy ® names, 1,126 retail health care clinics operating under the MinuteClinic ® name (of which 1,119 were located in CVS Pharmacy and Target stores), and our online retail websites, CVS.com ®, Navarro.com ™ and Onofre.com.br ™. LTC operations are comprised of 149 spoke pharmacies that primarily handle new prescription orders, of which 31 are also hub pharmacies that use proprietary automation to support spoke pharmacies with refill prescriptions. LTC operates primarily under the Omnicare ® and NeighborCare ® names.

The Corporate Segment provides management and administrative services to support the Company. The Corporate Segment consists of certain aspects of executive management, corporate relations, legal, compliance, human resources, information technology and finance departments.

| In millions | Pharmacy Services Segment [1] | Retail/LTC Segment | Corporate Segment | Intersegment Eliminations [2] | Consolidated Totals |
|---|---|---|---|---|---|
| **Three Months Ended** | | | | | |
| June 30, 2017: | | | | | |
| Net revenues | $ 32,325 | $ 19,554 | $ — | $ (6,194) | $ 45,685 |
| Gross profit [3] | 1,469 | 5,675 | — | (209) | 6,935 |
| Operating profit (loss) [4][5] | 1,135 | 1,411 | (240) | (189) | 2,117 |
| June 30, 2016: | | | | | |
| Net revenues | 29,510 | 19,998 | — | (5,783) | 43,725 |
| Gross profit [3] | 1,367 | 5,837 | — | (189) | 7,015 |
| Operating profit (loss) [5][6] | 1,039 | 1,711 | (220) | (173) | 2,357 |
| **Six Months Ended** | | | | | |
| June 30, 2017: | | | | | |
| Net revenues | 63,548 | 38,895 | — | (12,244) | 90,199 |
| Gross profit [3] | 2,565 | 11,351 | — | (401) | 13,515 |
| Operating profit (loss) [4][5] | 1,919 | 2,822 | (466) | (365) | 3,910 |
| June 30, 2016: | | | | | |
| Net revenues | 58,275 | 40,110 | — | (11,445) | 86,940 |
| Gross profit [3] | 2,469 | 11,667 | — | (377) | 13,759 |
| Operating profit (loss) [5][6] | 1,823 | 3,495 | (432) | (344) | 4,542 |

(1)  Net revenues of the Pharmacy Services Segment include approximately $2.7 billion and $2.6 billion of retail co-payments for the three months ended June 30, 2017 and 2016, respectively, as well as $5.8 billion and $5.6 billion of retail co-payments for the six months ended June 30, 2017 and 2016, respectively.

(2)  Intersegment eliminations relate to intersegment revenue generating activities that occur between the Pharmacy Services Segment and the Retail/LTC Segment. These occur in the following ways: when members of Pharmacy Services Segment clients ("members") fill prescriptions at the Company's retail pharmacies to purchase covered products, when members enrolled in programs such as Maintenance Choice ® elect to pick up maintenance prescriptions at one of the Company's retail pharmacies instead of receiving them through the mail, or when members have prescriptions filled at the Company's long-term care pharmacies. When these occur, both the Pharmacy Services and Retail/LTC segments record the revenues, gross profit and operating profit on a standalone basis.

(3)  The Retail/LTC Segment gross profit for the three months ended June 30, 2017 and 2016 includes $5 million and $6 million, respectively, of acquisition-related integration costs. The Retail/LTC Segment gross profit for the six months ended June 30, 2017 and 2016 includes $5 million and $10 million, respectively, of acquisition-related integration costs. The integration costs in 2017 are related to the acquisition of Omnicare and the integration costs in 2016 are related to the acquisitions of Omnicare and the pharmacies and clinics of Target.

(4)  The Retail/LTC Segment operating profit for the three and six months ended June 30, 2017 includes a $135 million goodwill impairment charge (see "Note 2 – Goodwill" to the condensed consolidated financial statements). The Retail/LTC Segment operating profit for the three and six months ended June 30, 2017 also includes $6 million and $205 million, respectively, of charges associated with store closures (see "Note 6 – Store Closures" to the condensed consolidated financial statements).

(5)  The Retail/LTC Segment operating profit for the three months ended June 30, 2017 and 2016 includes $10 million and $81 million, respectively, of acquisition-related integration costs. The Retail/LTC Segment operating profit for the six months ended June 30, 2017 and 2016 includes $25 million and $142 million, respectively, of acquisition-related integration costs. The integration costs in 2017 are related to the acquisition of Omnicare and the integration costs in 2016 are related to the acquisitions of Omnicare and the pharmacies and clinics of Target.

(6)  Amounts revised to reflect the adoption of ASU 2017-07, Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost, which increased operating profit by $7 and $16 million for the three and six months ended June 30, 2016, respectively (see "Note 1 – Accounting Policies" to the condensed consolidated financial statements).

15

**Note 10 – Commitments and Contingencies**

*Lease Guarantees*

Between 1991 and 1997, the Company sold or spun off a number of subsidiaries, including Bob's Stores, Linens 'n Things, Marshalls, Kay-Bee Toys, Wilsons, This End Up and Footstar. In many cases, when a former subsidiary leased a store, the Company provided a guarantee of the store's lease obligations. When the subsidiaries were disposed of and accounted for as discontinued operations, the Company's guarantees remained in place, although each initial purchaser has agreed to indemnify the Company for any lease obligations the Company was required to satisfy. If any of the purchasers or any of the former subsidiaries were to become insolvent and failed to make the required payments under a store lease, the Company could be required to satisfy these obligations. As of June 30, 2017, the Company guaranteed approximately 86 such store leases (excluding the lease guarantees related to Linens 'n Things, which have been recorded as a liability on the condensed consolidated balance sheet), with the maximum remaining lease term extending through 2047.

In April 2016 and again in February 2017, Bob's Stores and its related and successor entities filed for Chapter 11 bankruptcy protection. As described above, the Company, through one or more of its affiliates, is alleged to have guaranteed certain of the Bob's Stores' leases (the "Bob's Leases"). Following these bankruptcy filings, in May 2017 the Company and SDI Stores, LLC ("SDI Stores"), entered into an agreement regarding the Bob's Leases (the "CVS/SDI Stores Agreement"). Pursuant to the CVS/SDI Stores Agreement, SDI Stores agreed to accept the assignment of the Bob's Leases and agreed to be bound by certain restrictions regarding renewals, extensions and modifications to the Bob's Leases, in exchange for a series of payments that are immaterial to the Company. SDI Stores has accepted the assignment of certain of the Bob's Leases, but at the present time, it is unclear whether all conditions to the CVS/SDI Stores Agreement will be satisfied and whether all of the Bob's Leases will be assumed and assigned to SDI Stores. The Company will continue to monitor the bankruptcy proceedings and the conditions to the CVS/SDI Stores Agreement.

*Legal Matters*

The Company is a party to legal proceedings, investigations and claims in the ordinary course of its business, including the matters described below. The Company records accruals for outstanding legal matters when it believes it is probable that a loss will be incurred and the amount can be reasonably estimated. The Company evaluates, on a quarterly basis, developments in legal matters that could affect the amount of any accrual and developments that would make a loss contingency both probable and reasonably estimable. If a loss contingency is not both probable and estimable, the Company does not establish an accrued liability. None of the Company's accruals for outstanding legal matters are material individually or in the aggregate to the Company's financial position.

Except as otherwise noted, the Company cannot predict with certainty the timing or outcome of the legal matters described below, and is unable to reasonably estimate a possible loss or range of possible loss in excess of amounts already accrued for these matters.

- *Indiana State District Council of Laborers and HOD Carriers Pension and Welfare Fund v. Omnicare, Inc.* et al. (U.S. District Court for the Eastern District of Kentucky). In February 2006, two substantially similar putative class action lawsuits were filed and subsequently consolidated. The consolidated complaint was filed against Omnicare, three of its officers and two of its directors and purported to be brought on behalf of all open-market purchasers of Omnicare common stock from August 3, 2005 through July 27, 2006, as well as all purchasers who bought shares of Omnicare common stock in Omnicare's public offering in December 2005. The complaint alleged violations of the Securities Exchange Act of 1934 and Section 11 of the Securities Act of 1933 and sought, among other things, compensatory damages and injunctive relief. After dismissals and appeals to the United States Court of Appeals for the Sixth Circuit, the United States Supreme Court remanded the case to the district court. In October 2016, Omnicare filed an answer to plaintiffs' third amended complaint, and discovery commenced.

- *FTC and Multi-State Investigation.* In March 2010, the Company learned that various State Attorneys General offices and certain other government agencies were conducting a multi-state investigation of certain of the Company's business practices similar to those being investigated at that time by the U.S. Federal Trade Commission ("FTC"). Twenty-eight states, the District of Columbia and the County of Los Angeles are known to be participating in this investigation. The prior FTC investigation, which commenced in August 2009, was

16

Table of Contents

officially concluded in May 2012 when the consent order entered into between the FTC and the Company became final. The Company has cooperated with the multi-state investigation.

- *United States* ex rel. *Jack Chin v. Walgreen Company* et al. (U.S. District Court for the Central District of California). In March 2010, the Company received a subpoena from the U.S. Department of Health and Human Services, Office of the Inspector General ("OIG") requesting information about programs under which the Company has offered customers remuneration conditioned upon the transfer of prescriptions for drugs or medications to the Company's pharmacies in the form of gift cards, cash, non-prescription merchandise or discounts or coupons for non-prescription merchandise. In October 2016, the U.S. District Court for the Central District of California unsealed a *qui tam* complaint, filed in April 2009 against CVS Pharmacy and other retail pharmacies, alleging that the Company violated the federal False Claims Act, and the False Claims Acts of several states, by offering such programs. The complaint was served on the Company in January 2017. The federal government has declined intervention in the case.

- *United States* ex rel. *James Banigan and Richard Templin v. Organon USA Inc.* et al. (U.S. District Court for the District of Massachusetts). In October 2010, the court unsealed a *qui tam* complaint, which had been under seal since 2007, against Organon, Omnicare, Inc. and PharMerica Corporation. The suit was brought by two former employees of Organon, as relators on behalf of the federal government and several state and local governments. The action alleges civil violations of the federal False Claims Act based on allegations that Organon and its affiliates paid Omnicare and several other long-term care pharmacies rebates, post-purchase discounts and other forms of remuneration in return for purchasing pharmaceuticals from Organon and taking steps to increase the purchase of Organon's drugs in violation of the Anti-Kickback Statute. The U.S. Department of Justice ("DOJ") declined to intervene in this action. In May 2017, the Company completed its previously announced settlement, and this matter was dismissed with prejudice.

- *United States* ex rel. *Anthony R. Spay v. CVS Caremark Corporation* et al. (U.S. District Court for the Eastern District of Pennsylvania). In January 2012, the court unsealed a first amended *qui tam* complaint filed in August 2011 by an individual relator, Anthony Spay, who is described in the complaint as having once been employed by a firm providing pharmacy prescription benefit audit and recovery services. The complaint seeks monetary damages and alleges that CVS Caremark's processing of Medicare claims on behalf of one of its clients violated the federal False Claims Act. The United States declined to intervene in the lawsuit. In September 2015, the Court granted CVS Caremark's motion for summary judgment in its entirety, and entered judgment in favor of CVS Caremark and against Spay. In October 2015, Spay filed a notice of appeal in the United States Court of Appeals for the Third Circuit; that court heard oral arguments on the appeal in November 2016.

- *State of Texas* ex rel. *Myron Winkelman and Stephani Martinson* et al. *v. CVS Health Corporation* (Travis County Texas District Court). In February 2012, the Attorney General of the State of Texas issued Civil Investigative Demands and has issued a series of subsequent requests for documents and information in connection with its investigation concerning the CVS Health Savings Pass program and other pricing practices with respect to claims for reimbursement from the Texas Medicaid program. In January 2017, the court unsealed a first amended petition. The amended petition alleges the Company violated the Texas Medicaid Fraud Prevention Act by submitting false claims for reimbursement to Texas Medicaid by, among other things, failing to use the price available to members of the CVS Health Savings Pass program as the usual and customary price. The amended petition was unsealed following the Company's filing of *CVS Pharmacy, Inc. v. Charles Smith* et al. (Travis County District Court), a declaratory judgment action against the State of Texas in December 2016 seeking a declaration that the prices charged to members of the CVS Health Savings Pass program do not constitute usual and customary prices under the Medicaid regulation. The State of Texas is also pursuing temporary injunctive relief.

- *California ReadyFill Subpoena*. In November 2012, the Company received a subpoena for documents from the OIG requesting information concerning automatic refill programs used by pharmacies to refill prescriptions for customers. The subpoena was issued in connection with an investigation conducted out of the U.S. Attorney's Office for the Central District of California. The Company produced documents and data.

- *Pure Services Subpoena*. In November 2013, Omnicare received a subpoena from the OIG seeking information regarding Omnicare's May 2008 acquisition of Pure Service Pharmacy. In May 2017, the Company completed its previously announced settlement, and this matter was dismissed with prejudice.

17

Table of Contents

- *Auto Label Subpoena.* In June 2014, Omnicare received a subpoena from the United States Attorney's Office for the District of New Jersey seeking information regarding Omnicare's Auto Label Verification system. In May 2017, the Company completed its previously announced settlement, and this matter was dismissed with prejudice.

- *Subpoena Concerning PBM Administrative Fees.* In March 2014, the Company received a subpoena from the United States Attorney's Office for the   District of Rhode Island, requesting documents and information concerning bona fide service fees and rebates received from pharmaceutical manufacturers in connection with certain drugs utilized under Medicare Part D, as well as the reporting of those fees and rebates to Part D plan sponsors. The Company has been cooperating with the government and providing documents and information in response to the subpoena.

- *ReadyFill Subpoena (Minnesota).* In May 2015, the Company received a subpoena from the OIG requesting information and documents concerning the Company's automatic refill programs, adherence outreach programs, and pharmacy customer incentives, particularly in connection with claims for reimbursement made to the Minnesota Medicaid program. The Company has been cooperating with the investigation and providing information in response to the subpoena.

- *Corcoran* et al. *v. CVS Health Corporation* (U.S. District Court for the Northern District of California) and *Podgorny* et al. *v. CVS Health Corporation* (U.S. District Court for the Northern District of Illinois). These putative class actions were filed against the Company in July and September 2015. The cases were consolidated in United States District Court in the Northern District of California. Plaintiffs seek damages and injunctive relief on behalf of a class of consumers who purchased certain prescription drugs under the consumer protection statutes and common laws of certain states. Several third-party payors filed similar putative class actions on behalf of payors captioned *Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Health Corp.* and *Plumbers Welfare Fund, Local 130 v. CVS Health Corporation* (both pending in the U.S. District Court for the District of Rhode Island) in February and August 2016. In all of these cases the plaintiffs allege the Company overcharged for certain prescription drugs by not submitting the price available to members of the CVS Health Savings Pass program as the pharmacy's usual and customary price. In the consumer case (Corcoran), the Court denied plaintiffs' motion for certification of an 11-state class without prejudice. The Company continues to defend these actions.

- *Omnicare DEA Subpoena.* In September 2015, Omnicare was served with an administrative subpoena by the U.S. Drug Enforcement Administration ("DEA"). The subpoena seeks documents related to controlled substance policies, procedures, and practices at eight pharmacy locations from May 2012 to the present. The Company has been cooperating and providing documents in response to this administrative subpoena.

- *Omnicare Cycle Fill CID.* In October 2015, Omnicare received a Civil Investigative Demand from the United States Attorney's Office for the Southern District of New York requesting information and documents concerning Omnicare's cycle fill process for assisted living facilities. The Company has been cooperating with the government and providing documents and information in response to the Civil Investigative Demand.

- *PBM Pricing CID.* In October 2015, the Company received from the DOJ a Civil Investigative Demand requesting documents and information in connection with a federal False Claims Act investigation concerning allegations that the Company submitted, or caused to be submitted, to the Medicare Part D program prescription drug event data that misrepresented true prices paid by the Company's PBM to pharmacies for drugs dispensed to Part D beneficiaries with prescription benefits administered by the Company's PBM. The Company has been cooperating with the government and providing documents and information in response to the Civil Investigative Demand.

- *United States* ex rel. *Sally Schimelpfenig and John Segura v. Dr. Reddy's Laboratories Limited and Dr. Reddy's Laboratories, Inc.* (U.S. District Court for the Eastern District of Pennsylvania). In November 2015, the court unsealed a second amended *qui tam* complaint filed in September 2015. The DOJ declined to intervene in this action. The relators allege that the Company, Walgreens, Wal-Mart, and Dr. Reddy's Laboratories violated the federal and various state False Claims Acts by dispensing prescriptions in unit dose packaging supplied by Dr. Reddy's that was not compliant with the Consumer Product Safety Improvement Act and the Poison Preventive

18

Packaging Act and thereby allegedly rendering the drugs misbranded under the Food, Drug and Cosmetic Act. In March 2017, the Court granted the Company's motion to dismiss with leave to file an amended complaint.

- *Barchock* et al. *v. CVS Health Corporation* et al. (U.S. District Court for the District of Rhode Island). In February 2016, a class action lawsuit was filed against the Company, the Benefit Plans Committee of the Company, and Galliard Capital Management, Inc., by Mary Barchock, Thomas Wasecko, and Stacy Weller, purportedly on behalf of the 401(k) Plan and the Employee Stock Ownership Plan of the Company (the "Plan"), and participants in the Plan. The complaint alleged that the defendants breached fiduciary duties owed to the plaintiffs and the Plan by investing too much of the Plan's Stable Value Fund in short-term money market funds and cash management accounts. The court recently granted the Company's motion to dismiss the plaintiffs' amended complaint. In May 2017, plaintiffs filed a notice of appeal from that ruling in the United States Court of Appeals for the First Circuit.

- *State of California* ex rel. *Matthew Omlansky v. CVS Caremark Corporation* (Superior Court of the State of California, County of Sacramento). In April 2016, the court unsealed a first amended *qui tam* complaint filed in July 2013. The government has declined intervention in this case. The relator alleges that the Company submitted false claims for payment to California Medicaid in connection with reimbursement for drugs available through the CVS Health Savings Pass program as well as certain other generic drugs. The case has been stayed pending the relator's appeal of the judgment against him in a similar case against another retailer.

- *Retail DEA Matters.* In July 2017, the Company finalized agreements with the U.S. Attorney's Office for the Eastern District of California and the DEA to resolve alleged violations of the Controlled Substances Act ("CSA") for $5 million. The Company has been also undergoing several audits by the DEA Administrator and is in discussions with the DEA and the U.S. Attorney's Office in several locations concerning allegations that the Company has violated certain requirements of the CSA.

- *West Virginia Opioid Litigation* . In March 2017, the Company was named as a defendant in four separate lawsuits filed in the U.S. District Court of the Southern District of West Virginia on behalf of counties in the state of West Virginia (Cabell, Fayette, Kanawha and Wayne counties), each of which alleges that CVS Indiana LLC, as well as various other distributors of controlled substances, caused a public nuisance related to opioid abuse by failing to detect and/or report purported suspicious orders of opioids distributed for dispensing in the plaintiff counties. Omnicare Distribution Center LLC also is named as a defendant in the complaint filed by Kanawha County. The Company is defending these lawsuits.

- *Cherokee Nation Opioid Litigation* . In April 2017, the Company was named as a defendant in an action filed on behalf of the Cherokee Nation in the District Court of Cherokee Nation (the "Cherokee Action"). The lawsuit asserts several causes of action arising from allegations that large retail pharmacies and wholesale distributors caused widespread opioid abuse among members of the Cherokee Nation by purportedly failing to comply with the Controlled Substances Act and/or otherwise failing to prevent the diversion of opioids. In June 2017, the Company filed a motion to dismiss the Cherokee Action. Also in June 2017, the six defendants in the Cherokee Action collectively filed a complaint in the U.S. District Court for the Northern District of Oklahoma, *McKesson* , et al. *v. Hembree* , et al., seeking a declaration and preliminary injunction prohibiting the District Court of Cherokee Nation from exercising jurisdiction over the Cherokee Action.

- *State of Mississippi v. CVS Health Corporation* et al. (Chancery Court of Desoto County, Mississippi, Third Judicial District). In July 2016, the Company was served with a complaint filed on behalf of the State of Mississippi alleging that CVS retail pharmacies in Mississippi submitted false claims for reimbursement to Mississippi Medicaid by not submitting the price available to members of the CVS Health Savings Pass program as the pharmacy's usual and customary price. The Company has responded to the complaint, filed a counterclaim, and moved to transfer the case to circuit court. The motion to transfer was granted, which the State has appealed, and the motion to dismiss remains pending.

- *Mayberry v. Walgreens Co.,* et al . (U.S. District Court for the Northern District of Illinois). In March 2017, a complaint was filed against the Company (and several other retail pharmacy defendants) alleging that the defendant pharmacies improperly submitted certain insulin claims through Medicare Part D rather than Part B. The Company is defending this action. The Company separately received in December 2016 a Civil Investigative Demand from the U.S. Attorney's Office for the Northern District of New York, requesting

19

documents and information in connection with a False Claims Act investigation concerning whether the Company's retail pharmacies improperly submitted certain insulin claims to Medicare Part D rather than Part B. The Company has been cooperating with the government and providing documents and information in response to the Civil Investigative Demand.

- *Cold Chain Logistics CID* . In September 2016, the Company received from the DOJ a Civil Investigative Demand in connection with an investigation as to whether the Company's handling of certain temperature-sensitive pharmaceuticals violates the federal Food, Drug and Cosmetic Act and the False Claims Act. The Company has been cooperating with the government and providing documents and information in response to the Civil Investigative Demand.

- *Amburgey* et al. *v. CaremarkPCS Health, L.L.C.* (U.S. District Court for the Central District of California). In March 2017, the Company was served with a complaint challenging the policies and procedures used by CVS Specialty pharmacies to ship temperature-sensitive medications. The case is similar to a matter already pending against the Company in the Superior Court of California (Los Angeles County), *Bertram v. Immunex Corp.* , et al., which was filed in October 2014. The Company is defending these lawsuits.

- *Barnett* et al. v. *Novo Nordisk Inc* ., et al. and *Boss* , et al. v. *CVS Health Corporation* , et al.(both pending in the U.S. District Court for the District of New Jersey). These putative class actions were filed against the Company and other PBMs and manufacturers of insulin in March 2017. Plaintiffs in both cases allege that the PBMs and manufacturers have engaged in a conspiracy whereby the PBMs sell access to their formularies by demanding the highest rebates, which in turn causes increased list prices for insulin. The primary claims are antitrust claims, claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), violations of state unfair competition and consumer protection laws and in Boss, claims pursuant to the Employee Retirement Income Security Act ("ERISA"). The *Barnett* plaintiffs seek to represent a nationwide class of all persons who paid any portion of the purchase prices for a prescription for certain insulin products at a price calculated by reference to a benchmark. The *Boss* plaintiffs purport to represent multiple nationwide classes including a non-ERISA Employee/Exchange Plan class, an ERISA class, a Medicare class and an uninsured class. The Company continues to defend these lawsuits.

- *Insulin Products Investigation.* In April 2017, the Company separately received a Civil Investigative Demand from the Attorney General of Washington, seeking documents and information regarding pricing and rebates for insulin products in connection with a pending investigation into unfair and deceptive acts or practice regarding insulin pricing. We have been notified by the Office of the Attorney General of Washington that information provided in response to the Civil Investigative Demand will be shared with the Attorneys General of California, Florida and Minnesota. In July 2017, the Company received a Civil Investigative Demand from the Attorney General of Minnesota, seeking documents and information regarding pricing and rebates for insulin and epinephrine products in connection with a pending investigation into unfair and deceptive acts or practices regarding insulin and epinephrine pricing.

- *Bewley* et al. v. *CVS Health Corporation* , et al. and *Prescott* , et al. v. *CVS Health Corporation* , et al. (both pending in the U.S. District Court for the Western District of Washington). These putative class actions were filed in May 2017 against the Company and other pharmacy benefit managers and manufacturers of glucagon kits (Bewley) and diabetes test strips (Prescott). Both cases allege that, by contracting for rebates with the manufacturers of these diabetes products, the Company and other PBMs caused list prices for these products to increase, thereby harming certain consumers. The primary claims are made under federal antitrust laws, RICO, state unfair competition and consumer protection laws, and ERISA. The Company is defending these class action lawsuits.

- *Klein* , et al. v. *Prime Therapeutics* , et al. (U.S. District Court for the District of Minnesota). In June 2017, a putative class action complaint was filed against the Company and other pharmacy benefit managers on behalf of ERISA plan members who purchased and paid for EpiPen or EpiPen Jr. Plaintiffs allege that the pharmacy benefit managers are ERISA fiduciaries to plan members and have violated ERISA by allegedly causing higher inflated prices for EpiPen through the process of negotiating increased rebates from EpiPen manufacturer, Mylan. The Company is defending these class action lawsuits.

20

- *Medicare Part D CID* . In May 2017, the United States Attorneys' Office for the Southern District of New York issued a Civil Investigative Demand to the Company concerning possible false claims submitted to Medicare in connection with reimbursements for prescription drugs under the Medicare Part D program. The Company has been cooperating with the government and providing documents and information in response to the Civil Investigative Demand.

The Company is also a party to other legal proceedings, government investigations, inquiries and audits, and has received and is cooperating with subpoenas or similar process from various governmental agencies requesting information, all arising in the normal course of its business, none of which is expected to be material to the Company. The Company can give no assurance, however, that its business, financial condition and results of operations will not be materially adversely affected, or that the Company will not be required to materially change its business practices, based on: (i) future enactment of new health care or other laws or regulations; (ii) the interpretation or application of existing laws or regulations as they may relate to the Company's business, the pharmacy services, specialty pharmacy, retail pharmacy, long-term care pharmacy or retail clinic industries or to the health care industry generally; (iii) pending or future federal or state governmental investigations of the Company's business or the pharmacy services, specialty pharmacy, retail pharmacy, long-term care pharmacy or retail clinic industry or of the health care industry generally; (iv) pending or future government enforcement actions against the Company; (v) adverse developments in any pending *qui tam* lawsuit against the Company, whether sealed or unsealed, or in any future *qui tam* lawsuit that may be filed against the Company; or (vi) adverse developments in pending or future legal proceedings against the Company or affecting the pharmacy services, specialty pharmacy, retail pharmacy, long-term care pharmacy or retail clinic industry or the health care industry generally.

21

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders
CVS Health Corporation:

We have reviewed the condensed consolidated balance sheet of CVS Health Corporation (the Company) as of June 30, 2017, the related condensed consolidated statements of income and comprehensive income for the three-month and six-month periods ended June 30, 2017 and 2016, and the condensed consolidated statements of cash flows for the six-month periods ended June 30, 2017 and 2016. These financial statements are the responsibility of the Company's management.

We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the condensed consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of CVS Health Corporation as of December 31, 2016, and the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for the year then ended (not presented herein), and we expressed an unqualified audit opinion on those consolidated financial statements in our report dated February 9, 2017. In our opinion, the accompanying condensed consolidated balance sheet of CVS Health Corporation as of December 31, 2016, is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ Ernst & Young LLP

August 8, 2017
Boston, Massachusetts

22

**Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Overview of Our Business**

CVS Health Corporation, together with its subsidiaries (collectively, "CVS Health," the "Company," "we," "our" or "us"), is a pharmacy innovation company helping people on their path to better health. At the forefront of a changing health care landscape, the Company has an unmatched suite of capabilities and the expertise needed to drive innovations that will help shape the future of health care.

We are currently the only integrated pharmacy health care company with the ability to impact consumers, payors, and providers with innovative, channel-agnostic solutions. We have a deep understanding of their diverse needs through our unique integrated model, and we are bringing them innovative solutions that help increase access to quality care, deliver better health outcomes and lower overall health care costs.

Through 9,700 retail locations, more than 1,100 walk-in health care clinics, a leading pharmacy benefits manager with nearly 90 million plan members, a dedicated senior pharmacy care business serving more than one million patients per year, expanding specialty pharmacy services and a leading stand-alone Medicare Part D prescription drug plan, we enable people, businesses, and communities to manage health in more affordable, effective ways. We are delivering break-through products and services, from advising patients on their medications at our CVS Pharmacy ® locations, to introducing unique programs to help control costs for our clients at CVS Caremark ®, to innovating how care is delivered to our patients with complex conditions through CVS Specialty ™, to improving pharmacy care for the senior community through Omnicare ®, or by expanding access to high-quality, low-cost care at CVS MinuteClinic ®.

We have three reportable segments: Pharmacy Services, Retail/LTC and Corporate.

*Pharmacy Services Segment*

Our Pharmacy Services business generates revenue from a full range of pharmacy benefit management ("PBM") solutions, including plan design and administration, formulary management, Medicare Part D services, mail order, specialty pharmacy and infusion services, retail pharmacy network management services, prescription management systems, clinical services, disease management services and medical spend management.

Our clients are primarily employers, insurance companies, unions, government employee groups, health plans, Medicare Part D plans, Managed Medicaid plans, plans offered on the public and private exchanges, other sponsors of health benefit plans and individuals throughout the United States. A portion of covered lives, primarily within the Managed Medicaid, health plan and employer markets have access to our services through public and private exchanges.

As a pharmacy benefits manager, we manage the dispensing of prescription drugs through our mail order pharmacies, specialty pharmacies, long-term care pharmacies and national network of more than 68,000 retail pharmacies, consisting of approximately 41,000 chain pharmacies (which includes our CVS Pharmacy ® pharmacies) and 27,000 independent pharmacies, to eligible members in the benefit plans maintained by our clients and utilize our information systems to perform, among other things, safety checks, drug interaction screenings and brand-to-generic substitutions.

Our specialty pharmacies support individuals who require complex and expensive drug therapies. Our specialty pharmacy business includes mail order and retail specialty pharmacies that operate under the CVS Caremark ®, CarePlus CVS Pharmacy ®, Navarro ® Health Services and Advanced Care Scripts or ACS names. The Pharmacy Services Segment also provides health management programs, which include integrated disease management for 18 conditions, through our Accordant ® rare disease management offering. In addition, through our SilverScript Insurance Company subsidiary, we are a national provider of drug benefits to eligible beneficiaries under the federal government's Medicare Part D program. The Pharmacy Services Segment operates under the CVS Caremark ® Pharmacy Services, Caremark ®, CVS Caremark ®, CarePlus CVS Pharmacy ®, Accordant ®, SilverScript ®, Coram ®, CVS Specialty ™, NovoLogix ®, Navarro ® Health Services and Advanced Care Scripts or ACS names. As of June 30, 2017, the Pharmacy Services Segment operated 23 retail specialty pharmacy stores, 15 specialty mail order pharmacies, four mail service dispensing pharmacies, and 83 branches for infusion and enteral services, including approximately 73 ambulatory infusion suites and three centers of excellence, located in 41 states, Puerto Rico and the District of Columbia.

*Retail/LTC Segment*

Our Retail/LTC Segment sells prescription drugs and a wide assortment of general merchandise, including over-the-counter drugs, beauty products and cosmetics, personal care products, convenience foods, photo finishing, seasonal merchandise and greeting cards through our CVS Pharmacy ®, CVS ®, Longs Drugs ®, Navarro Discount Pharmacy ® and Drogaria Onofre ™ retail locations and online through CVS.com ®, Navarro.com ™ and Onofre.com.br ™. The Retail/LTC Segment also includes providing the distribution of prescription drugs, related pharmacy consulting and other ancillary services to chronic care facilities and other care settings, as well as commercialization services that are provided under the name RxCrossroads ®. Our Retail/LTC Segment derives the majority of its revenues through the sale of prescription drugs, which are dispensed by our more than 31,000 pharmacists. Our Retail/LTC Segment also provides health care services through our MinuteClinic health care clinics. MinuteClinics are staffed by nurse practitioners and physician assistants who utilize nationally recognized protocols to diagnose and treat minor health conditions, perform health screenings, monitor chronic conditions and deliver vaccinations. As of June 30, 2017, our Retail/LTC Segment included 9,700 retail locations (of which 7,971 were the Company's stores that operated a pharmacy and 1,679 were the Company's pharmacies located within a Target store) located in 49 states, the District of Columbia, Puerto Rico and Brazil operating primarily under the CVS Pharmacy ®, CVS ®, CVS Pharmacy y más ®, Longs Drugs ®, Navarro Discount Pharmacy ® and Drogaria Onofre ™ names, 40 onsite pharmacies primarily operating under the CarePlus CVS Pharmacy ®, CarePlus ® and CVS Pharmacy ® names, 1,126 retail health care clinics operating under the MinuteClinic ® name (of which 1,119 were located in CVS Pharmacy and Target stores), and our online retail websites, CVS.com ®, Navarro.com ™ and Onofre.com.br ™. LTC operations are comprised of 149 spoke pharmacies that primarily handle new prescription orders, of which 31 are also hub pharmacies that use proprietary automation to support spoke pharmacies with refill prescriptions. LTC operates primarily under the Omnicare ® and NeighborCare ® names.

*Corporate Segment*

The Corporate Segment provides management and administrative services to support the Company. The Corporate Segment consists of certain aspects of our executive management, corporate relations, legal, compliance, human resources, information technology and finance departments.

**Results of Operations**

The following discussion explains the material changes in our results of operations for the three and six months ended June 30, 2017 and 2016, and the significant developments affecting our financial condition since December 31, 2016. We strongly recommend that you read our audited consolidated financial statements and notes thereto and Management's Discussion and Analysis of Financial Condition and Results of Operations included as Exhibit 13 to our 2016 Form 10-K along with this report.

24

**Summary of the Condensed Consolidated Financial Results:**

| In millions, except per share amounts | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Net revenues | $ 45,685 | $43,725 | $ 90,199 | $ 86,940 |
| Cost of revenues | 38,750 | 36,710 | 76,684 | 73,181 |
| Gross profit | 6,935 | 7,015 | 13,515 | 13,759 |
| Operating expenses | 4,818 | 4,658 | 9,605 | 9,217 |
| Operating profit | 2,117 | 2,357 | 3,910 | 4,542 |
| Interest expense, net | 247 | 280 | 499 | 563 |
| Loss on early extinguishment of debt | — | 542 | — | 542 |
| Other expense | 7 | 7 | 14 | 16 |
| Income before income tax provision | 1,863 | 1,528 | 3,397 | 3,421 |
| Income tax provision | 766 | 604 | 1,338 | 1,350 |
| Income from continuing operations | 1,097 | 924 | 2,059 | 2,071 |
| Income (loss) from discontinued operations, net of tax | 1 | — | (8) | — |
| Net income | 1,098 | 924 | 2,051 | 2,071 |
| Net income attributable to noncontrolling interest | — | — | (1) | (1) |
| Net income attributable to CVS Health | $ 1,098 | $ 924 | $ 2,050 | $ 2,070 |

### Net Revenues

Net revenues increased approximately $2.0 billion, or 4.5%, and $3.3 billion, or 3.7%, in the three and six months ended June 30, 2017, respectively, as compared to the prior year. The increase is due to increases in the Pharmacy Services Segment partially offset by decreases in the Retail/LTC Segment. The increase in the Pharmacy Services Segment was driven by pharmacy network claim volume growth primarily attributable to net new business as well as brand inflation and volume in specialty pharmacy, offset by an increase in the generic dispensing rate and continued price compression. The decrease in the Retail/LTC Segment was primarily due to a decline in same stores sales as a result of the previously-announced marketplace changes, which began to have an impact in the fourth quarter of 2016, that restrict CVS Pharmacy from participating in certain networks. The Retail/LTC Segment decrease was also due to continued reimbursement pressure and an increase in the generic dispensing rate. Generic prescription drugs typically have a lower selling price than brand name prescription drugs.

Please see the section entitled "Segment Analysis" below for additional information regarding net revenues.

### Gross Profit

Gross profit dollars decreased $80 million, or 1.1%, and $244 million, or 1.8%, in the three and six months ended June 30, 2017, respectively, as compared to the prior year. Gross profit dollars for the three months ended June 30, 2017, were negatively affected by continued reimbursement pressure as well as the loss of prescriptions in the Retail/LTC Segment. Gross profit as a percentage of net revenues decreased approximately 85 basis points in the three months ended June 30, 2017 to 15.2%, as compared to the prior year. Gross profit as a percentage of net revenues decreased approximately 85 basis points in the six months ended June 30, 2017 to 15.0%, as compared to the prior year. The decrease in gross profit as a percentage of net revenues was driven by the increased weighting toward the Pharmacy Services Segment, which has a lower gross profit than the Retail/LTC Segment.

Please see the section entitled "Segment Analysis" below for additional information regarding gross profit.

*Operating Expenses*

Operating expenses increased $160 million, or 3.4%, and $388 million, or 4.2%, in the three and six months ended June 30, 2017, respectively, as compared to the prior year. Operating expenses as a percentage of net revenues decreased approximately 10 basis points to 10.5% and remained flat at 10.6% in the three and six months ended June 30, 2017, respectively, as compared to the prior year. The increase in operating expenses in the three and six months ended June 30, 2017 was primarily due to the following:

- A goodwill impairment charge of $135 million in the three and six months ended June 30, 2017 in our RxCrossroads reporting unit within the Retail/LTC Segment (see "Note 2 – Goodwill" to our condensed consolidated financial statements).

- Charges of $6 million and $205 million in the three and six months ended June 30, 2017, respectively, associated with the closure of three and 63 retail stores, respectively, in connection with our enterprise streamlining initiative (see "Note 6 – Store Closures" to our condensed consolidated financial statements).

- An increase in operating expenses due to incremental store operating costs associated with operating more stores.

- These items were partially offset by a decrease in acquisition-related integration costs of $70 million and $112 million in the three and six months ended June 30, 2017, respectively, versus the same periods in the prior year.

Please see the section entitled "Segment Analysis" below for additional information regarding operating expenses.

*Interest Expense, net*

Interest expense, net, decreased $33 million and $64 million in the three and six months ended June 30, 2017, respectively, as compared to the prior year. The decrease in the three and six months ended was primarily due to the Company's debt issuance and debt tender offers that occurred in 2016 which resulted in overall more favorable interest rates on the Company's long-term debt.

For additional information on our financing activities, please see the "Liquidity and Capital Resources" section below.

*Income Tax Provision*

Our effective income tax rate was 41.1% and 39.4% for the three and six months ended June 30, 2017, respectively, compared to 39.5% and 39.4% for the three and six months ended June 30, 2016, respectively. The increase in the effective income tax rate was primarily due to the $135 million nondeductible goodwill impairment charge recognized in the three months ended June 30, 2017 which had a 280 basis point impact.

*Income (Loss) from Discontinued Operations*

The loss from discontinued operations of $8 million for the six months ended June 30, 2017, was primarily comprised of a $15 million charge (net of tax of $6 million) associated with lease guarantees the Company provided on store lease obligations of Bob's Stores, a former subsidiary of the Company that filed for bankruptcy subsequent to its disposition. See "Note 10 - Commitments and Contingencies" to the Company's condensed consolidated financial statements.

**Segment Analysis**

We evaluate the performance of our Pharmacy Services and Retail/LTC segments based on net revenue, gross profit and operating profit before the effect of nonrecurring charges and gains and certain intersegment activities. We evaluate the performance of our Corporate Segment based on operating expenses before the effect of nonrecurring charges and gains and certain intersegment activities. The following is a reconciliation of our segments to the condensed consolidated financial statements:

| In millions | Pharmacy Services Segment [1] | Retail/LTC Segment | Corporate Segment | Intersegment Eliminations [2] | Consolidated Totals |
|---|---|---|---|---|---|
| **Three Months Ended** | | | | | |
| June 30, 2017: | | | | | |
| Net revenues | $ 32,325 | $ 19,554 | $ — | $ (6,194) | $ 45,685 |
| Gross profit [3] | 1,469 | 5,675 | — | (209) | 6,935 |
| Operating profit (loss) [4][5] | 1,135 | 1,411 | (240) | (189) | 2,117 |
| June 30, 2016: | | | | | |
| Net revenues | 29,510 | 19,998 | — | (5,783) | 43,725 |
| Gross profit [3] | 1,367 | 5,837 | — | (189) | 7,015 |
| Operating profit (loss) [5][6] | 1,039 | 1,711 | (220) | (173) | 2,357 |
| **Six Months Ended** | | | | | |
| June 30, 2017: | | | | | |
| Net revenues | 63,548 | 38,895 | — | (12,244) | 90,199 |
| Gross profit [3] | 2,565 | 11,351 | — | (401) | 13,515 |
| Operating profit (loss) [4][5] | 1,919 | 2,822 | (466) | (365) | 3,910 |
| June 30, 2016: | | | | | |
| Net revenues | 58,275 | 40,110 | — | (11,445) | 86,940 |
| Gross profit [3] | 2,469 | 11,667 | — | (377) | 13,759 |
| Operating profit (loss) [5][6] | 1,823 | 3,495 | (432) | (344) | 4,542 |

(1) Net revenues of the Pharmacy Services Segment include approximately $2.7 billion and $2.6 billion of retail co-payments for the three months ended June 30, 2017 and 2016, respectively, as well as $5.8 billion and $5.6 billion of retail co-payments for the six months ended June 30, 2017 and 2016, respectively.

(2) Intersegment eliminations relate to intersegment revenue generating activities that occur between the Pharmacy Services Segment and the Retail/LTC Segment. These occur in the following ways: when members of Pharmacy Services Segment clients ("members") fill prescriptions at the Company's retail pharmacies to purchase covered products, when members enrolled in programs such as Maintenance Choice® elect to pick up maintenance prescriptions at one of the Company's retail pharmacies instead of receiving them through the mail, or when members have prescriptions filled at the Company's long-term care pharmacies. When these occur, both the Pharmacy Services and Retail/LTC segments record the revenues, gross profit and operating profit on a standalone basis.

(3) The Retail/LTC Segment gross profit for the three months ended June 30, 2017 and 2016 includes $5 million and $6 million, respectively, of acquisition-related integration costs. The Retail/LTC Segment gross profit for the six months ended June 30, 2017 and 2016 includes $5 million and $10 million, respectively, of acquisition-related integration costs. The integration costs in 2017 are related to the acquisition of Omnicare and the integration costs in 2016 are related to the acquisitions of Omnicare and the pharmacies and clinics of Target.

(4) The Retail/LTC Segment operating profit for the three and six months ended June 30, 2017 includes a $135 million goodwill impairment charge (see "Note 2 – Goodwill" to the condensed consolidated financial statements). The Retail/LTC Segment operating profit for the three and six months ended June 30, 2017 also includes $6 million and $205 million, respectively, of charges associated with store closures (see "Note 6 – Store Closures" to the condensed consolidated financial statements).

(5) The Retail/LTC Segment operating profit for the three months ended June 30, 2017 and 2016 includes $10 million and $81 million, respectively, of acquisition-related integration costs. The Retail/LTC Segment operating profit for the six months ended June 30, 2017 and 2016 includes $25 million and $142 million, respectively, of acquisition-related integration costs. The integration costs in 2017 are related to the acquisition of Omnicare and the integration costs in 2016 are related to the acquisitions of Omnicare and the pharmacies and clinics of Target.

(6) Amounts revised to reflect the adoption of ASU 2017-07, *Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost* , which increased consolidated operating profit by $7 million and $16 million in the three and six months ended June 30, 2016, respectively (see "Note 1 – Accounting Policies" to the condensed consolidated financial statements).

27

**Pharmacy Services Segment**

The following table summarizes our Pharmacy Services Segment's performance for the respective periods:

| In millions | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Net revenues | $ 32,325 | $ 29,510 | $ 63,548 | $ 58,275 |
| Gross profit | 1,469 | 1,367 | 2,565 | 2,469 |
| Gross profit % of net revenues | 4.5 % | 4.6 % | 4.0 % | 4.2 % |
| Operating expenses [1] | 334 | 328 | 646 | 646 |
| Operating expenses % of net revenues | 1.0 % | 1.1 % | 1.0 % | 1.1 % |
| Operating profit [1] | 1,135 | 1,039 | 1,919 | 1,823 |
| Operating profit % of net revenues | 3.5 % | 3.5 % | 3.0 % | 3.1 % |
| Net revenues: | | | | |
| Mail choice [2] | $ 11,512 | $ 10,646 | $ 22,360 | $ 20,796 |
| Pharmacy network [3] | 20,741 | 18,778 | 41,042 | 37,314 |
| Other | 72 | 86 | 146 | 165 |
| Pharmacy claims processed (90 Day = 3 prescriptions) [4][5]: | | | | |
| Total | 441.6 | 403.2 | 882.1 | 805.1 |
| Mail choice [2] | 65.6 | 62.3 | 129.3 | 123.3 |
| Pharmacy network [3] | 376.0 | 340.9 | 752.8 | 681.8 |
| Generic dispensing rate [4][5]: | | | | |
| Total | 87.2 % | 85.9 % | 87.1 % | 85.7 % |
| Mail choice [2] | 83.1 % | 81.2 % | 82.9 % | 80.8 % |
| Pharmacy network [3] | 87.9 % | 86.8 % | 87.8 % | 86.6 % |
| Mail choice penetration rate [4][5] | 14.9 % | 15.5 % | 14.7 % | 15.3 % |

(1) Amounts revised to reflect the adoption of ASU 2017-07, *Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost* , which decreased operating expenses and increased operating profit by $1 million for the three months ended June 30, 2016. For the six months ended June 30, 2016, the adoption of ASU 2017-07 decreased operating expenses and increased operating profit by $3 million.

(2) Mail choice is defined as claims filled at a Pharmacy Services mail facility, which includes specialty mail claims inclusive of Specialty Connect® claims picked up at retail, as well as prescriptions filled at our retail pharmacies under the Maintenance Choice ® program.

(3) Pharmacy network net revenues, claims processed and generic dispensing rates do not include Maintenance Choice activity, which is included within the mail choice category. Pharmacy network is defined as claims filled at retail and specialty retail pharmacies, including our retail pharmacies and long-term care pharmacies, but excluding Maintenance Choice activity.

(4) Includes the adjustment to convert 90-day prescriptions to the equivalent of three 30-day prescriptions. This adjustment reflects the fact that these prescriptions include approximately three times the amount of product days supplied compared to a normal prescription.

(5) The pharmacy claims processed, the generic dispensing rate and the mail choice penetration rate for the three and six months ended June 30, 2016 has been revised to reflect 90-day prescriptions to the equivalent of three 30-day prescriptions.

### Net Revenues

Net revenues in our Pharmacy Services Segment increased $2.8 billion, or 9.5%, to $32.3 billion in the three months ended June 30, 2017, as compared to the prior year. Net revenues in our Pharmacy Services Segment increased $5.2 billion, or 9.0%, to $63.5 billion in the six months ended June 30, 2017, as compared to the prior year. The increase is primarily due to increased pharmacy network claims as well as brand inflation and volume in specialty pharmacy, partially offset by increased generic dispensing and price compression. As you review our Pharmacy Services Segment's performance in this area, we believe you should consider the following important information about the business for the three and six months ended June 30, 2017:

- In the three months ended June 30, 2017, our mail choice claims processed increased 5.2%, on a 30-day equivalent basis, to 65.6 million claims compared to 62.3 million claims in the prior year. In the six months ended June 30, 2017, our mail choice claims processed increased 4.9%, on a 30-day equivalent basis, to 129.3 million claims compared to 123.3 million claims in the prior year. The increase in mail choice claims was primarily driven by the continued adoption of our Maintenance Choice offerings and an increase in specialty pharmacy claims.

- Our average revenue per mail choice claim increased by 2.8% and 2.5%, on a 30-day equivalent basis, in the three and six months ended June 30, 2017, respectively, compared to the prior year. This increase was primarily due to growth in specialty pharmacy.

- In the three months ended June 30, 2017, our pharmacy network claims processed increased 10.3%, on a 30-day equivalent basis, to 376.0 million claims compared to 340.9 million claims in the prior year. In the six months ended June 30, 2017, our pharmacy network claims processed increased 10.4%, on a 30-day equivalent basis, to 752.8 million claims compared to 681.8 million claims in the prior year. The increase in the pharmacy network claim volume was primarily due to net new business.

- Our average revenue per pharmacy network claim processed was flat and decreased 0.5%, on a 30-day equivalent basis, in the three and six months ended June 30, 2017, respectively, compared to the prior year.

- In the three months ended June 30, 2017, our total generic dispensing rate increased to 87.2%, compared to 85.9% in the prior year. In the six months ended June 30, 2017, our total generic dispensing rate increased to 87.1%, compared to 85.7% in the prior year. These continued increases in our generic dispensing rate were primarily due to the impact of new generic drug introductions, and our continuous efforts to encourage plan members to use generic drugs when they are available and clinically appropriate. We believe our generic dispensing rate will continue to increase in future periods, albeit at a slower pace. This increase will be affected by, among other things, the number of new brand and generic drug introductions and our success at encouraging plan members to utilize generic drugs when they are available and clinically appropriate.

### Gross Profit

Gross profit in our Pharmacy Services Segment includes net revenues less cost of revenues. Cost of revenues includes (i) the cost of pharmaceuticals dispensed, either directly through our mail service, specialty mail and specialty retail pharmacies or indirectly through our retail pharmacy networks, (ii) shipping and handling costs and (iii) the operating costs of our mail service dispensing pharmacies, customer service operations and related information technology support.

Gross profit increased $102 million, or 7.4%, to approximately $1.5 billion in the three months ended June 30, 2017, as compared to the prior year. Gross profit increased $96 million, or 3.9%, to approximately $2.6 billion in the six months ended June 30, 2017, as compared to the prior year. The increase in gross profit dollars was primarily due to the increase in pharmacy network volume, favorable purchasing economics and higher generic dispensing. Gross profit as a percentage of net revenues decreased to 4.5% in the three months ended June 30, 2017, compared to 4.6% in the prior year. Gross profit as a percentage of net revenues decreased to 4.0% in the six months ended June 30, 2017, compared to 4.2% in the prior year. The decrease in gross profit as a percentage of net revenues was primarily due to continued price compression and changes in the mix of our business, partially offset by favorable generic dispensing.

As you review our Pharmacy Services Segment's performance in this area, we believe you should consider the following important information about the business for the three and six months ended June 30, 2017:

- Our efforts to (i) retain existing clients, (ii) obtain new business and (iii) maintain or improve the rebates and/or discounts we received from manufacturers, wholesalers and retail pharmacies continue to have an impact on our gross profit dollars and gross profit as a percentage of net revenues. In particular, competitive pressures in the PBM industry have caused us and other PBMs to continue to share with clients a larger portion of rebates and/or discounts received from pharmaceutical manufacturers. In addition, market dynamics and regulatory changes have limited our ability to offer plan sponsors pricing that includes retail network "differential" or "spread," and we expect these trends to continue. The "differential" or "spread" is any difference between the drug price charged to plan sponsors, including Medicare Part D plan sponsors, by a PBM and the price paid for the drug by the PBM to the dispensing provider.

- Our gross profit as a percentage of revenues benefited from the increase in our total generic dispensing rate, as noted previously.

Table of Contents

*Operating Expenses*

Operating expenses in our Pharmacy Services Segment include selling, general and administrative expenses; depreciation and amortization related to selling, general and administrative activities; and expenses related to specialty retail pharmacies, which include store and administrative payroll, employee benefits and occupancy costs.

Operating expenses increased $6 million to $334 million, or 1.0% as a percentage of net revenues, in the three months ended June 30, 2017, compared to $328 million, or 1.1% as a percentage of net revenues, in the prior year. Operating expenses remained flat at $646 million, or 1.0% as a percentage of net revenues, in the six months ended June 30, 2017, compared to 1.1% as a percentage of net revenues, in the prior year. The improvement in operating expenses as a percentage of net revenues for the three and six months ended June 30, 2017 was primarily driven by expense leverage from our revenue growth.

30

**Retail/LTC Segment**

The following table summarizes our Retail/LTC Segment's performance for the respective periods:

| _In millions_ | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2017** | **2016** | **2017** | **2016** |
| Net revenues | $ 19,554 | $ 19,998 | $ 38,895 | $ 40,110 |
| Gross profit [1][2] | 5,675 | 5,837 | 11,351 | 11,667 |
|   Gross profit % of net revenues | 29.0 % | 29.2 % | 29.2 % | 29.1 % |
| Operating expenses [1][2][3][6][4] | 4,264 | 4,126 | 8,529 | 8,172 |
|   Operating expenses % of net revenues | 21.8 % | 20.6 % | 21.9 % | 20.4 % |
| Operating profit [4] | 1,411 | 1,711 | 2,822 | 3,495 |
|   Operating profit % of net revenues | 7.2 % | 8.6 % | 7.3 % | 8.7 % |
| Prescriptions filled (90 Day = 3 prescriptions) [5] | 301.6 | 300.9 | 604.7 | 606.0 |
| Net revenue increase (decrease): | | | | |
|   Total | (2.2)% | 16.0 % | (3.0)% | 17.3 % |
|   Pharmacy | (2.5)% | 21.2 % | (3.1)% | 22.4 % |
|   Front Store | (1.3)% | (0.6)% | (2.6)% | 1.0 % |
| Total prescription volume (90 Day = 3 prescriptions) [5] | 0.2 % | 23.2 % | (0.2)% | 24.8 % |
| Same store sales increase (decrease) [6]: | | | | |
|   Total | (2.6)% | 2.1 % | (3.7)% | 3.1 % |
|   Pharmacy | (2.8)% | 3.9 % | (3.7)% | 4.7 % |
|   Front Store | (2.1)% | (2.5)% | (3.5)% | (0.9)% |
|   Prescription volume (90 Day = 3 prescriptions) [5] | 0.0 % | 3.5 % | (0.7)% | 4.7 % |
| Generic dispensing rates | 87.6 % | 86.1 % | 87.6 % | 85.9 % |
| Pharmacy % of net revenues | 74.6 % | 74.8 % | 74.6 % | 74.7 % |

(1) Gross profit and operating expenses for the three months ended June 30, 2017 each include $5 million of acquisition-related integration costs. Gross profit and operating expenses for the six months ended June 30, 2017 include $5 million and $20 million, respectively, of acquisition-related integration costs. The integration costs are related to the acquisition of Omnicare.

(2) Gross profit and operating expenses for the three months ended June 30, 2016 include $6 million and $75 million, respectively, of acquisition-related integration costs. Gross profit and operating expenses for the six months ended June 30, 2016 include $10 million and $132 million, respectively, of acquisition-related integration costs. The integration costs are related to the acquisitions of Omnicare and the pharmacies and clinics of Target.

(3) Operating expenses for the three and six months ended June 30, 2017 include a $135 million goodwill impairment charge (see "Note 2 – Goodwill" to our condensed consolidated financial statements). Operating expenses for the three and six months ended June 30, 2017 also includes $6 million and $205 million, respectively, of charges associated with store closures (see "Note 6 – Store Closures" to our condensed consolidated financial statements).

(4) Amounts revised to reflect the adoption of ASU 2017-07, _Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost_ , which decreased operating expenses and increased operating profit by $6 million for the three months ended June 30, 2016. For the six months ended June 30, 2016, the adoption of ASU 2017-07 decreased operating expenses and increased operating profit by $13 million.

(5) Includes the adjustment to convert 90-day non-specialty prescriptions to the equivalent of three 30-day prescriptions. This adjustment reflects the fact that these prescriptions include approximately three times the amount of product days supplied compared to a normal prescription.

(6) Same store sales and prescriptions exclude revenues from MinuteClinic, and revenue and prescriptions from stores in Brazil, LTC operations and from commercialization services.

As of June 30, 2017, we operated 9,700 retail locations (of which 7,971 were our stores that operated a pharmacy and 1,679 were our pharmacies located within Target stores), compared to 9,652 retail locations as of June 30, 2016.

*Net Revenues*

Net revenues in our Retail/LTC Segment decreased $444 million, or 2.2%, to approximately $19.6 billion in the three months ended June 30, 2017, as compared to the prior year. Net revenues in our Retail/LTC Segment decreased $1.2 billion, or 3.0%, to approximately $38.9 billion in the six months ended June 30, 2017, as compared to the prior year. As you review our Retail/LTC Segment's performance in this area, we believe you should consider the following important information about the business for the three and six months ended June 30, 2017:

- Front store same store sales decreased by 2.1% and 3.5% for the three and six months ended June 30, 2017, respectively, compared to the prior year as the result of continued softer customer traffic and as promotional

31

strategies continue to be rationalized, partially offset by an increase in basket size. For the three months ended June 30, 2017, front store same store sales were positively impacted by approximately 75 basis points due to the shift of the Easter holiday from the first quarter of 2016 to the second quarter of 2017. For the six months ended June 30, 2017, front store same store sales were negatively impacted by approximately 50 basis points due to the absence of leap day in the current year.

- Pharmacy same store sales decreased 2.8% and 3.7% for the three and six months ended June 30, 2017, respectively, due to the negative impact of approximately 410 basis points and 450 basis points, respectively, of recent generic introductions. Same store prescription volumes were flat and declined 0.7%, on a 30-day equivalent basis, in the three and six months ended June 30, 2017, respectively. The previously-discussed marketplace changes that restrict CVS Pharmacy from participating in certain networks had an approximately 460 basis point negative impact on same store prescription volumes in both the three and six months ended June 30, 2017.

- Due to the previously-discussed marketplace changes that restrict CVS Pharmacy from participating in certain networks, we continue to expect prescription growth to be negatively impacted for the remainder of 2017.

- Pharmacy revenues continue to be negatively impacted by the conversion of brand name drugs to equivalent generic drugs, which typically have a lower selling price. The generic dispensing rate grew to 87.6% for both the three and six months ended June 30, 2017 compared to 86.1% and 85.9% in the prior year. In addition, our pharmacy revenue growth has also been affected by the mix of drugs sold, continued reimbursement pressure and the lack of significant new brand name drug introductions.

- Pharmacy revenue continued to benefit from our ability to attract and retain managed care customers, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care.

*Gross Profit*

Gross profit in our Retail/LTC Segment includes net revenues less the cost of merchandise sold in the period and the related purchasing costs, warehousing costs, delivery costs and actual and estimated inventory losses.

Gross profit decreased $162 million, or 2.8%, to $5.7 billion in the three months ended June 30, 2017, as compared to the prior year. Gross profit decreased $316 million, or 2.7%, to $11.4 billion in the six months ended June 30, 2017, as compared to the prior year. Gross profit as a percentage of net revenues decreased to 29.0% and increased to 29.2% in the three and six months ended June 30, 2017, respectively, compared to 29.2% and 29.1% in the prior year.

The decrease in gross profit dollars was primarily driven by the continued reimbursement pressure and loss of prescriptions due to previously discussed network restrictions. The decrease in gross profit as a percentage of net revenues in the three months ended June 30, 2017 was primarily due to continued reimbursement pressure. The increase in gross profit as a percentage of net revenues in the six months ended June 30, 2017 was primarily driven by increased front store margins. Front store margins increased due to changes in the mix of products sold and efforts to rationalize promotional strategies.

As you review our Retail/LTC Segment's performance in this area, we believe you should consider the following important information about the business for the three and six months ended June 30, 2017:

- Front store revenues as a percentage of total net revenues for the three and six months ended June 30, 2017 was 24.0% for both the three and six months ended June 30, 2017, compared to 23.8% and 23.9%, respectively, in the prior year. On average, our gross profit on front store revenues is higher than our gross profit on pharmacy revenues.

- Our pharmacy gross profit rates have been adversely affected by the efforts of managed care organizations, PBMs and governmental and other third-party payors to reduce their prescription drug costs, including the use of restrictive networks, as well as changes in the mix of our business within the pharmacy portion of the Retail/LTC Segment. In the event the reimbursement pressure accelerates, we may not be able to sustain our current rate of revenue growth and gross profit dollars could be adversely impacted. The increased use of generic drugs has positively impacted our gross profit but has resulted in third-party payors augmenting their

efforts to reduce reimbursement payments to retail pharmacies for prescriptions. This trend, which we expect to continue, reduces the benefit we realize from brand to generic product conversions.

*Operating Expenses*

Operating expenses in our Retail/LTC Segment include payroll and employee benefits, occupancy costs, selling expenses, advertising expenses, depreciation and amortization expense and certain administrative expenses.

Operating expenses increased $138 million to $4.3 billion, or 21.8% as a percentage of net revenues, in the three months ended June 30, 2017, as compared to $4.1 billion, or 20.6% as a percentage of net revenues, in the prior year. Operating expenses increased $357 million to $8.5 billion, or 21.9% as a percentage of net revenues, in the six months ended June 30, 2017, as compared to $8.2 billion, or 20.4% as a percentage of net revenues, in the prior year. The increase in operating expenses in the three and six months ended June 30, 2017 was primarily due to the following:

- A goodwill impairment charge of $135 million in the three and six months ended June 30, 2017 in the RxCrossroads reporting unit (see "Note 2 – Goodwill" to our condensed consolidated financial statements).

- Charges of $6 million and $205 million in the three and six months ended June 30, 2017, respectively, associated with the closure of three and 63 retail stores, respectively, in connection with our enterprise streamlining initiative (see "Note 6 – Store Closures" to our condensed consolidated financial statements).

- An increase in operating expenses due to incremental store operating costs associated with operating more stores.

- These items were partially offset by a decrease in acquisition-related integration costs of $70 million and $112 million in the three and six months ended June 30, 2017, respectively, versus the same periods in the prior year.

**Corporate Segment**

*Operating Expenses*

Operating expenses in our Corporate Segment include expenses from the Company's executive management, corporate relations, legal, compliance, human resources, information technology and finance departments.

Operating expenses increased $20 million, or 8.9%, to $240 million and $34 million, or 8.2%, to $466 million in the three and six months ended June 30, 2017, respectively, as compared to the prior year. The increase in operating expenses for the three and six months ended June 30, 2017 was primarily due to increased employee benefit costs and ongoing investment associated with strategic initiatives.

**Liquidity and Capital Resources**

We maintain a level of liquidity sufficient to allow us to cover our cash needs in the short-term. Over the long-term, we manage our cash and capital structure to maximize shareholder return, maintain our financial position and maintain flexibility for future strategic initiatives. We continuously assess our working capital needs, debt and leverage levels, capital expenditure requirements, dividend payouts, potential share repurchases and future investments or acquisitions. We believe our operating cash flows, commercial paper program, sale-leaseback program, as well as any potential future borrowings, will be sufficient to fund these future payments and long-term initiatives.

Table of Contents

The change in cash and cash equivalents is as follows:

| | Six Months Ended June 30, | |
|---|---|---|
| *In millions* | 2017 | 2016 |
| Net cash provided by operating activities | $ 5,532 | $ 4,086 |
| Net cash used in investing activities | (1,174) | (1,231) |
| Net cash used in financing activities | (5,635) | (4,189) |
| Effect of exchange rate changes on cash and cash equivalents | — | 2 |
| Net decrease in cash and cash equivalents | $ (1,277) | $ (1,332) |

***Net cash provided by operating activities*** was approximately $5.5 billion in the six months ended June 30, 2017, compared to $4.1 billion in the six months ended June 30, 2016. The $1.4 billion increase in cash provided by operating activities is primarily due to the timing of payments in our Medicare Part D operations.

***Net cash used in investing activities*** was approximately $1.2 billion in the six months ended June 30, 2017 and 2016. During the six months ended June 30, 2017 cash used for acquisitions and other investments increased approximately $0.2 billion from the prior year, which was offset by a decrease in capital expenditures of approximately $0.2 billion in the current year.

***Net cash used in financing activities*** was $5.6 billion in the six months ended June 30, 2017, compared to net cash used in financing activities of $4.2 billion in the six months ended June 30, 2016. The cash used in financing activities increased $1.4 billion primarily due to the $0.8 billion decrease in short-term debt in the six months ended June 30, 2017 versus the $0.7 billion increase in short-term debt in the six months ended June 30, 2016.

During the six months ended June 30, 2017, the Company had the following outstanding share repurchase programs, both of which had previously been authorized by the Company's Board of Directors:

*In billions*

| Authorization Date | Authorized | Remaining |
|---|---|---|
| November 2, 2016 ("2016 Repurchase Program") | $ 15.0 | $ 14.3 |
| December 15, 2014 ("2014 Repurchase Program") | 10.0 | — |

Each of the 2014 and 2016 Repurchase Programs, which were effective immediately, permitted the Company to effect repurchases from time to time through a combination of open market repurchases, privately negotiated transactions, accelerated share repurchase transactions, and/or other derivative transactions. Each of the repurchase programs could be modified or terminated by the Board of Directors at any time. The 2014 Repurchase Program was completed during the second quarter of 2017.

During the six months ended June 30, 2017, the Company repurchased an aggregate of approximately 50.4 million shares of common stock for approximately $4.0 billion pursuant to the 2014 and 2016 Repurchase Programs. This activity includes the accelerated share repurchase agreements ("ASRs") described below.

Pursuant to the authorization under the 2014 Repurchase Program, effective August 29, 2016, the Company entered into two fixed dollar ASRs with Barclays Bank PLC ("Barclays") for a total of $3.6 billion. Upon payment of the $3.6 billion purchase price on January 6, 2017, the Company received a number of shares of its common stock equal to 80% of the $3.6 billion notional amount of the ASRs or approximately 36.1 million shares, which were placed into treasury stock in January 2017. The ASRs were accounted for as an initial treasury stock transaction for $2.9 billion and a forward contract for $0.7 billion. In April 2017, the Company received 9.9 million shares of common stock, representing the remaining 20% of the $3.6 billion notional amount of the ASRs, thereby concluding the ASRs. The remaining 9.9 million shares of common stock delivered to the Company by Barclays were placed into treasury stock and the forward contract was reclassified from capital surplus to treasury stock in April 2017.

At the time they were received, the initial and final receipt of shares resulted in an immediate reduction of the outstanding shares used to calculate the weighted average common shares outstanding for basic and diluted net income per share.

The Company had $1.1 billion of commercial paper outstanding at a weighted average interest rate of 1.16% as of June 30, 2017. In connection with its commercial paper program, the Company maintains a $1.0 billion, 364-day unsecured back-up credit facility, which expires on May 17, 2018, a $1.25 billion, five-year unsecured back-up credit facility, which expires on July 24, 2019, a $1.25 billion, five-year unsecured back-up credit facility, which expires on July 1, 2020, and a $1.0 billion, five-year unsecured back-up credit facility, which expires on May 18, 2022. The credit facilities allow for borrowings at various rates that are dependent, in part, on the Company's public debt ratings and require the Company to pay a weighted average quarterly facility fee of approximately 0.02%, regardless of usage. As of June 30, 2017, there were no borrowings outstanding under the back-up credit facilities.

On January 3, 2017, the Company entered into a $2.5 billion revolving credit facility. The credit facility allowed for borrowings at various rates that are dependent, in part, on the Company's debt ratings and required the Company to pay a weighted average quarterly facility fee of approximately 0.03%, regardless of usage. The maximum available under this credit facility decreased by $750 million to $1.75 billion on March 31, 2017. The Company terminated this facility effective May 17, 2017.

Our back-up credit facilities and unsecured senior notes contain customary restrictive financial and operating covenants. These covenants do not include a requirement for the acceleration of our debt maturities in the event of a downgrade in our credit rating. We do not believe the restrictions contained in these covenants materially affect our financial or operating flexibility. As of June 30, 2017, the Company is in compliance with all debt covenants.

As of June 30, 2017, our long-term debt was rated by Moody's as "Baa1" with a stable outlook and by Standard & Poor's as "BBB+" with a stable outlook, and our commercial paper program was rated "P-2" by Moody's and "A-2" by Standard & Poor's. In assessing our credit strength, we believe that both Moody's and Standard & Poor's considered, among other things, our capital structure and financial policies as well as our consolidated balance sheet, our historical acquisition activity and other financial information. Although we currently believe our long-term debt ratings will remain investment grade, we cannot guarantee the future actions of Moody's and/or Standard & Poor's. Our debt ratings have a direct impact on our future borrowing costs, access to capital markets and new store operating lease costs.

**Off-Balance Sheet Arrangements**

In connection with executing operating leases, we provide a guarantee of the lease payments. We also finance a portion of our new store development through sale-leaseback transactions, which involve selling stores to unrelated parties and then leasing the stores back under leases that generally qualify and are accounted for as operating leases. We do not have any retained or contingent interests in the stores, and we do not provide any guarantees, other than a guarantee of the lease payments, in connection with the transactions. In accordance with GAAP, such operating leases are not reflected in our condensed consolidated balance sheet. See "Note 10 – Commitments and Contingencies" to our condensed consolidated financial statements for a detailed discussion of these guarantees.

**Critical Accounting Policies**

We prepare our consolidated financial statements in conformity with GAAP, which requires management to make certain estimates and apply judgment. We base our estimates and judgments on historical experience, current trends and other factors that management believes to be important at the time the condensed consolidated financial statements are prepared. On a regular basis, we review our accounting policies and how they are applied and disclosed in our condensed consolidated financial statements.

While we believe that the historical experience, current trends and other factors considered support the preparation of our condensed consolidated financial statements in conformity with GAAP, actual results could differ from our estimates and such differences could be material.

As discussed in "Note 2 – Goodwill" to our condensed consolidated financial statements, during the three months ended June 30, 2017, the Company decided to pursue various strategic alternatives for its RxCrossroads ("RxC") reporting unit. In connection with this decision, we performed an interim goodwill impairment test prior to the annual goodwill impairment test in the third quarter. In conjunction with the impairment test, the fair value of the RxC reporting unit was estimated to be lower than the carrying value resulting in a $135 million goodwill impairment charge. The fair value of the RxC reporting unit was determined using a combination of a discounted cash flow model and a comparable market

Table of Contents

transaction model. As of June 30, 2017, subsequent to recording the goodwill impairment charge, the RxC reporting unit had a remaining goodwill balance of $444 million.

The determination of the fair value of our reporting units requires the Company to make significant assumptions and estimates. These assumptions and estimates primarily include, but are not limited to, the selection of appropriate peer group companies; control premiums and valuation multiples appropriate for acquisitions in the industries in which the Company competes; discount rates, terminal growth rates; and forecasts of revenue, operating profit, depreciation and amortization, capital expenditures and future working capital requirements. When determining these assumptions and preparing these estimates, we consider each reporting unit's historical results and current operating trends and our consolidated revenues, profitability and cash flow results, forecasts and industry trends. Our estimates can be affected by a number of factors including, but not limited to, general economic and regulatory conditions, our market capitalization, efforts of customers and payers to reduce costs including their prescription drug costs and/or increase member co-payments, the continued efforts of competitors to gain market share and consumer spending patterns.

For a full description of our other critical accounting policies, please refer to Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our 2016 Form 10-K.

36

**Cautionary Statement Concerning Forward-Looking Statements**

The Private Securities Litigation Reform Act of 1995 (the "Reform Act") provides a safe harbor for forward-looking statements made by or on behalf of CVS Health Corporation. The Company and its representatives may, from time to time, make written or verbal forward-looking statements, including statements contained in the Company's filings with the U.S. Securities and Exchange Commission ("SEC") and in its reports to stockholders, press releases, webcasts, conference calls, meetings and other communications. Generally, the inclusion of the words "believe," "expect," "intend," "estimate," "project," "anticipate," "will," "should" and similar expressions identify statements that constitute forward-looking statements. All statements addressing operating performance of CVS Health Corporation or any subsidiary, events or developments that the Company expects or anticipates will occur in the future, including statements relating to corporate strategy; revenue growth; earnings or earnings per common share growth; adjusted earnings or adjusted earnings per common share growth; free cash flow; debt ratings; inventory levels; inventory turn and loss rates; store development; relocations and new market entries; retail pharmacy business, sales trends and operations; PBM business, sales trends and operations; specialty pharmacy business, sales trends and operations; LTC pharmacy business, sales trends and operations; the Company's ability to attract or retain customers and clients; Medicare Part D competitive bidding, enrollment and operations; new product development; and the impact of industry and regulatory developments, as well as statements expressing optimism or pessimism about future operating results or events, are forward-looking statements within the meaning of the Reform Act.

The forward-looking statements are and will be based upon management's then-current views and assumptions regarding future events and operating performance, and are applicable only as of the dates of such statements. The Company undertakes no obligation to update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

By their nature, all forward-looking statements involve risks and uncertainties. Actual results may differ materially from those contemplated by the forward-looking statements for a number of reasons as described in our SEC filings, including those set forth in the Risk Factors section within the 2016 Annual Report on Form 10-K, and including, but not limited to:

- *Risks relating to the health of the economy in general and in the markets we serve, which could impact consumer purchasing power, preferences and/or spending patterns, drug utilization trends, the financial health of our PBM and LTC clients, retail and specialty pharmacy payors or other payors doing business with the Company and our ability to secure necessary financing, suitable store locations and sale-leaseback transactions on acceptable terms.*

- *Efforts to reduce reimbursement levels and alter health care financing practices, including pressure to reduce reimbursement levels for generic drugs.*

- *The possibility of PBM and LTC client loss and/or the failure to win new PBM and LTC business, including as a result of failure to win renewal of expiring contracts, contract termination rights that may permit clients to terminate a contract prior to expiration and early or periodic renegotiation of pricing by clients prior to expiration of a contract.*

- *The possibility of loss of Medicare Part D business and/or failure to obtain new Medicare Part D business, whether as a result of the annual Medicare Part D competitive bidding process or otherwise.*

- *Risks related to the frequency and rate of the introduction of generic drugs and brand name prescription products.*

- *Risks of declining gross margins attributable to increased competitive pressures, increased client demand for lower prices, enhanced service offerings and/or higher service levels and market dynamics and, with respect to the PBM industry, regulatory changes that impact our ability to offer plan sponsors pricing that includes the use of retail "differential" or "spread" or the use of maximum allowable cost pricing.*

- *Regulatory changes, business changes and compliance requirements and restrictions that may be imposed by Centers for Medicare and Medicaid Services ("CMS"), Office of Inspector General or other government agencies relating to the Company's participation in Medicare, Medicaid and other federal and state government-funded programs, including sanctions and remedial actions that may be imposed by CMS on our Medicare Part D business.*

37

Table of Contents

- *Risks and uncertainties related to the timing and scope of reimbursement from Medicare, Medicaid and other government-funded programs, including the possible impact of sequestration, the impact of other federal budget, debt and deficit negotiations and legislation that could delay or reduce reimbursement from such programs and the impact of any closure, suspension or other changes affecting federal or state government funding or operations.*

- *Possible changes in industry pricing benchmarks used to establish pricing in many of our PBM and LTC client contracts, pharmaceutical purchasing arrangements, retail network contracts, specialty payor agreements and other third party payor contracts.*

- *Efforts to increase reimbursement rates in PBM pharmacy networks and to inhibit the ability of PBMs to audit network pharmacies for fraud, waste and abuse.*

- *Risks related to increasing oversight of PBM activities by state departments of insurance.*

- *A highly competitive business environment, including the uncertain impact of increased consolidation in the PBM industry, the possibility of combinations, joint ventures or other collaboration between PBMs and retailers, uncertainty concerning the ability of our retail pharmacy business to secure and maintain contractual relationships with PBMs and other payors on acceptable terms, uncertainty concerning the ability of our PBM business to secure and maintain competitive access, pricing and other contract terms from retail network pharmacies in an environment where some PBM clients are willing to consider adopting narrow or more restricted retail pharmacy networks, and the possibility of our retail stores or specialty pharmacies being excluded from narrow or restricted networks.*

- *The Company's ability to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our customers, or the failure or inability to obtain or offer particular categories of products.*

- *Risks relating to our ability to secure timely and sufficient access to the products we sell from our domestic and/or international suppliers, including limited distribution drugs.*

- *Reform of the U.S. health care system, including ongoing implementation of ACA and the possible repeal and replacement of all or parts of the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act (collectively, "ACA"), continuing legislative efforts, regulatory changes and judicial interpretations impacting our health care system and the possibility of shifting political and legislative priorities related to reform of the health care system in the future.*

- *Risks related to changes in legislation, regulation and government policy (including through the use of Executive Orders) that could significantly impact our business and the health care and retail industries, including the possibility of major developments in tax policy or trade relations, such as the imposition of unilateral tariffs on imported products.*

- *Risks relating to any failure to properly maintain our information technology systems, our information security systems and our infrastructure to support our business and to protect the privacy and security of sensitive customer and business information.*

- *Risks related to compliance with a broad and complex regulatory framework, including compliance with new and existing federal, state and local laws and regulations relating to health care, network pharmacy reimbursement and auditing, accounting standards, corporate securities, tax, environmental and other laws and regulations affecting our business.*

- *Risks related to litigation, government investigations and other legal proceedings as they relate to our business, the pharmacy services, retail pharmacy, LTC pharmacy or retail clinic industries, or to the health care industry generally.*

- *The risk that any condition related to the closing of any proposed acquisition may not be satisfied on a timely basis or at all, including the inability to obtain required regulatory approvals of any proposed acquisition, or on the terms*

38

*desired or anticipated; the risk that such approvals may result in the imposition of conditions that could adversely affect the resulting combined company or the expected benefits of any proposed transaction; and the risk that the proposed transactions fail to close for any other reason.*

- *The possibility that the anticipated synergies and other benefits from any acquisition by us will not be realized, or will not be realized within the expected time periods.*

- *The risks and uncertainties related to our ability to integrate the operations, products, services and employees of any entities acquired by us and the effect of the potential disruption of management's attention from ongoing business operations due to any pending acquisitions.*

- *The accessibility or availability of adequate financing on a timely basis and on reasonable terms.*

- *Risks related to the outcome of any legal proceedings related to, or involving any entity that is a part of, any proposed acquisition contemplated by us.*

- *Other risks and uncertainties detailed from time to time in our filings with the SEC.*

The foregoing list is not exhaustive. There can be no assurance that the Company has correctly identified and appropriately assessed all factors affecting its business. Additional risks and uncertainties not presently known to the Company or that it currently believes to be immaterial also may adversely impact the Company. Should any risks and uncertainties develop into actual events, these developments could have a material adverse effect on the Company's business, financial condition and results of operations. For these reasons, you are cautioned not to place undue reliance on the Company's forward-looking statements.

**Item 3.   Quantitative and Qualitative Disclosures About Market Risk**

As of June 30, 2017, the Company did not have any interest rate, foreign currency exchange rate or commodity derivative instruments in place and believes that as of June 30, 2017 its exposure to interest rate risk (inherent in the Company's debt portfolio), foreign currency exchange rate risk and commodity price risk is not material.

**Item 4.   Controls and Procedures**

**Evaluation of disclosure controls and procedures:** The Company's Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Securities Exchange Act Rules 13a-15(f) and 15d-15(f)) as of June 30, 2017, have concluded that as of such date the Company's disclosure controls and procedures were adequate and effective and designed to provide reasonable assurance that material information relating to the Company and its subsidiaries would be made known to such officers on a timely basis.

**Changes in internal control over financial reporting:** There have been no changes in our internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Securities Exchange Act Rule 13a-15 or Rule 15d-15 that occurred in the three months ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

39

Part II

**Item 1.  Legal Proceedings**

**I. Legal Proceedings**

We refer you to "Note 10 - Commitments and Contingencies" contained in the "Notes to the Condensed Consolidated Financial Statements" of our Quarterly Report on Form 10-Q for the three and six months ended June 30, 2017 for a description of our legal proceedings.

**Item 2.  Unregistered Sales of Equity Securities and Use of Proceeds**

(c) Stock Repurchases

The following table presents the total number of shares purchased in the three months ended June 30, 2017, the average price paid per share and the approximate dollar value of shares that still could have been purchased at the end of the applicable fiscal period, pursuant to the 2016 Repurchase Program. See "Note 3 - Share Repurchase Programs" contained in the "Notes to the Condensed Consolidated Financial Statements" of our Quarterly Report on Form 10-Q for the three months ended June 30, 2017.

| Fiscal Period | Total Number of Shares Purchased | Average Price Paid per Share | | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs | |
|---|---|---|---|---|---|---|
| April 1, 2017 through April 30, 2017 | 9,929,480 | $ | 72.93 | 9,929,480 | $ | 14,609,385,267 |
| May 1, 2017 through May 31, 2017 | 1,822,400 | $ | 76.82 | 1,822,400 | $ | 14,469,392,413 |
| June 1, 2017 through June 30, 2017 | 2,543,704 | $ | 78.63 | 2,543,704 | $ | 14,269,392,432 |
| | 14,295,584 | | | 14,295,584 | | |

40

**Item 6.  Exhibits**

Exhibits:

Exhibits marked with an asterisk (*) are hereby incorporated by reference to exhibits or appendices previously filed by the Registrant as indicated in brackets following the description of the exhibit.

3.1*         Amended and Restated Certificate of Incorporation of the Registrant [incorporated by reference to Exhibit 3.1 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1996 (Commission File No. 001-01011)].

3.1A*        Certificate of Amendment to the Amended and Restated Certificate of Incorporation, effective May 13, 1998 [incorporated by reference to Exhibit 4.1A to the Registrant's Registration Statement No. 333-52055 on Form S-3/A dated May 18, 1998 (Commission File No. 001-01001)].

3.1B*        Certificate of Amendment to the Amended and Restated Certificate of Incorporation [incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K dated March 22, 2007 (Commission File No. 001-01011)].

3.1C*        Certificate of Merger dated May 9, 2007 [incorporated by reference to Exhibit 3.1C to the Registrant's Quarterly Report on Form 10-Q dated November 1, 2007 (Commission File No. 001-01011)].

3.1D*        Certificate of Amendment to the Amended and Restated Certificate of Incorporation [incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K dated May 13, 2010 (Commission File No. 001-01011)].

3.1E*        Certificate of Amendment to the Amended and Restated Certificate of Incorporation [incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K dated May 10, 2012 (Commission File No. 001-01011)].

3.1F*        Certificate of Amendment to the Amended and Restated Certificate of Incorporation [incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K dated May 13, 2013 (Commission File No. 001-01011)].

3.1G*        Certificate of Amendment to the Amended and Restated Certificate of Incorporation [incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K dated September 3, 2014 (Commission File No. 001-01011)].

3.2*         By-laws of Registrant, as amended and restated [incorporated by reference to Exhibit 3.2 to the Registrant's Current Report on Form 8-K dated January 26, 2016 (Commission File No. 001-01011)].

10.1         364-Day Credit Agreement dated as of May 18, 2017 by and among the Registrant, the lenders party thereto, Bank of America, N.A. and Wells Fargo Bank, N.A., as Co-Syndication Agents, Barclays Bank PLC and JP Morgan Chase Bank, N.A., as Co-Documentation Agents, and the Bank of New York Mellon, as Administrative Agent.

10.2         Five Year Credit Agreement dated as of May 18, 2017 by and among the Registrant, the lenders party thereto, Barclays Bank PLC and JP Morgan Chase Bank, N.A., as Co-Syndication Agents, Bank of America, N.A. and Wells Fargo Bank, N.A., as Co-Documentation Agents, and the Bank of New York Mellon, as Administrative Agent.

10.3         The Registrant's Management Incentive Plan, as amended.

10.4         The Registrant's Executive Incentive Plan, as amended.

10.5         The Registrant's Long-Term Incentive Plan, as amended.

15.1         Letter re: Unaudited Interim Financial Information.

31.1         Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2         Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1         Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2    Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

101    The following materials from the CVS Health Corporation Quarterly Report on Form 10-Q for the three months ended June 30, 2017 formatted in Extensible Business Reporting Language (XBRL): (i) the Condensed Consolidated Statements of Income, (ii) the Condensed Consolidated Statements of Comprehensive Income, (iii) the Condensed Consolidated Balance Sheets, (iv) the Condensed Consolidated Statements of Cash Flows and (v) related Footnotes to the Condensed Consolidated Financial Statements.

Table of Contents

Signatures:

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Quarterly Report on Form 10-Q to be signed on its behalf by the undersigned, thereunto duly authorized.

CVS Health Corporation
*(Registrant)*

/s/ David M. Denton
David M. Denton
Executive Vice President and Chief Financial Officer
August 8, 2017

43

Exhibit 10.1

**EXECUTION VERSION**



**364-DAY CREDIT AGREEMENT**

by and among

**CVS HEALTH CORPORATION,**

**THE LENDERS PARTY HERETO,**

**BANK OF AMERICA, N.A., and WELLS FARGO BANK, N.A.,**
as Co-Syndication Agents,

**BARCLAYS BANK PLC and JPMORGAN CHASE BANK, N.A.,**
as Co-Documentation Agents,

and

**THE BANK OF NEW YORK MELLON,**
as Administrative Agent

_____

**Dated as of May 18, 2017**

_____

**THE BANK OF NEW YORK MELLON,**
**BARCLAYS BANK PLC,**

and

**JPMORGAN CHASE BANK, N.A.**
as Joint Lead Arrangers

**THE BANK OF NEW YORK MELLON,**
**BARCLAYS BANK PLC, JPMORGAN CHASE BANK, N.A.,**
**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**
and
**WELLS FARGO SECURITIES, LLC,**
as Joint Bookrunners

*Prepared by:*
**Bryan Cave LLP**
**1290 Avenue of the Americas**
**New York, New York 10104-3300**

TABLE OF CONTENTS

| | | |
|---|---|---|
| **1.** | ***DEFINITIONS AND PRINCIPLES OF CONSTRUCTION*** | 1 |
| | 1.1 **Definitions** | 1 |
| | 1.2 **Principles of Construction** | 19 |
| | | |
| **2.** | ***AMOUNT AND TERMS OF LOANS*** | 21 |
| | 2.1 **Revolving Credit Loans** | 21 |
| | 2.2 **Term-out Option** | 21 |
| | 2.3 **Notice of Borrowing Revolving Credit Loans** | 22 |
| | 2.4 **Competitive Bid Loans and Procedure** | 22 |
| | 2.5 **Use of Proceeds** | 25 |
| | 2.6 **Termination, Reduction or Increase of Commitments** | 25 |
| | 2.7 **Prepayments of Loans** | 27 |
| | 2.8 **Reserved** | 27 |
| | 2.9 **Reserved** | 27 |
| | 2.10 **Reserved** | 27 |
| | 2.11 **Notes** | 27 |
| | 2.12 **Extension of Commitment Termination Date** | 28 |
| | 2.13 **Defaulting Lenders** | 29 |
| | | |
| **3.** | ***PROCEEDS, PAYMENTS, CONVERSIONS, INTEREST, YIELD PROTECTION AND FEES*** | 30 |
| | 3.1 **Disbursement of the Proceeds of the Loans** | 30 |
| | 3.2 **Payments** | 31 |
| | 3.3 **Conversions; Other Matters** | 32 |
| | 3.4 **Interest Rates and Payment Dates** | 33 |
| | 3.5 **Indemnification for Loss** | 34 |
| | 3.6 **Reimbursement for Costs, Etc.** | 35 |
| | 3.7 **Illegality of Funding** | 36 |
| | 3.8 **Option to Fund; Substituted Interest Rate** | 36 |
| | 3.9 **Certificates of Payment and Reimbursement** | 37 |
| | 3.10 **Taxes; Net Payments** | 37 |
| | 3.11 **Facility Fees** | 41 |
| | 3.12 **Reserved** | 41 |
| | 3.13 **Replacement of Lender** | 41 |
| | | |
| **4.** | ***REPRESENTATIONS AND WARRANTIES*** | 42 |
| | 4.1 **Existence and Power** | 42 |
| | 4.2 **Authority; EEA Financial Institution** | 43 |
| | 4.3 **Binding Agreement** | 43 |
| | 4.4 **Litigation** | 43 |
| | 4.5 **No Conflicting Agreements** | 43 |
| | 4.6 **Taxes** | 44 |
| | 4.7 **Compliance with Applicable Laws; Filings** | 44 |

| | 4.8 | **Governmental Regulations** | 44 |
| | 4.9 | **Federal Reserve Regulations; Use of Proceeds** | 44 |
| | 4.10 | **No Misrepresentation** | 45 |
| | 4.11 | **Plans** | 45 |
| | 4.12 | **Environmental Matters** | 45 |
| | 4.13 | **Financial Statements** | 46 |
| | 4.14 | **Anti-Corruption Laws and Sanctions** | 46 |
| 5. | | ***CONDITIONS TO EFFECTIVENESS*** | 47 |
| | 5.1 | **Agreement** | 47 |
| | 5.2 | **Notes** | 47 |
| | 5.3 | **Corporate Action** | 47 |
| | 5.4 | **Opinion of Counsel to the Borrower** | 47 |
| | 5.5 | **Reserved.** | 47 |
| | 5.6 | **No Default and Representations and Warranties** | 47 |
| | 5.7 | **Fees** | 48 |
| | 5.8 | **Due Diligence; "Know Your Customer"** | 48 |
| 6. | | ***CONDITIONS OF LENDING - ALL LOANS*** | 48 |
| | 6.1 | **Compliance** | 48 |
| | 6.2 | **Requests** | 48 |
| 7. | | ***AFFIRMATIVE COVENANTS*** | 48 |
| | 7.1 | **Legal Existence** | 48 |
| | 7.2 | **Taxes** | 49 |
| | 7.3 | **Insurance** | 49 |
| | 7.4 | **Performance of Obligations** | 49 |
| | 7.5 | **Condition of Property** | 49 |
| | 7.6 | **Observance of Legal Requirements** | 49 |
| | 7.7 | **Financial Statements and Other Information** | 50 |
| | 7.8 | **Records** | 51 |
| | 7.9 | **Authorizations** | 52 |
| 8. | | ***NEGATIVE COVENANTS*** | 52 |
| | 8.1 | **Subsidiary Indebtedness** | 52 |
| | 8.2 | **Liens** | 52 |
| | 8.3 | **Dispositions** | 53 |
| | 8.4 | **Merger or Consolidation, Etc.** | 53 |
| | 8.5 | **Acquisitions** | 53 |
| | 8.6 | **Restricted Payments** | 53 |
| | 8.7 | **Limitation on Upstream Dividends by Subsidiaries** | 54 |
| | 8.8 | **Limitation on Negative Pledges** | 54 |
| | 8.9 | **Ratio of Consolidated Indebtedness to Total Capitalization** | 55 |

(ii)

CVS Health Corporation 2017 364-Day Credit Agreement

9.    *DEFAULT*                                                                          55
      9.1    **Events of Default**                                                        55
      9.2    **Remedies**                                                                 57

10.   *AGENT*                                                                             58
      10.1   **Appointment and Authority**                                                58
      10.2   **Rights as a Lender**                                                       58
      10.3   **Exculpatory Provisions**                                                   59
      10.4   **Reliance by Administrative Agent**                                         59
      10.5   **Delegation of Duties**                                                     60
      10.6   **Resignation of Administrative Agent**                                      60
      10.7   **Non-Reliance on Administrative Agent and Other Credit Parties**            61
      10.8   **No Other Duties, etc.**                                                    61

11.   *OTHER PROVISIONS*                                                                  61
      11.1   **Amendments, Waivers, Etc.**                                                61
      11.2   **Notices**                                                                  62
      11.3   **No Waiver; Cumulative Remedies**                                           65
      11.4   **Survival of Representations and Warranties**                               65
      11.5   **Payment of Expenses; Indemnified Liabilities**                             65
      11.6   **Lending Offices**                                                          66
      11.7   **Successors and Assigns**                                                   66
      11.8   **Counterparts; Electronic Execution of Assignments**                        69
      11.9   **Set-off and Sharing of Payments**                                          70
      11.10  **Indemnity**                                                                71
      11.11  **Governing Law**                                                            72
      11.12  **Severability**                                                             72
      11.13  **Integration**                                                              73
      11.14  **Treatment of Certain Information**                                         73
      11.15  **Acknowledgments**                                                          73
      11.16  **Consent to Jurisdiction**                                                  74
      11.17  **Service of Process**                                                       74
      11.18  **No Limitation on Service or Suit**                                         74
      11.19  **WAIVER OF TRIAL BY JURY**                                                  74
      11.20  **Patriot Act Notice**                                                       75
      11.21  **No Fiduciary Duty**                                                        75
      11.22  **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**     75

(iii)

CVS Health Corporation 2017 364-Day Credit Agreement

EXHIBITS

| | | |
|---|---|---|
| Exhibit | A | List of Commitments |
| Exhibit | B | Form of Note |
| Exhibit | C | Form of Borrowing Request |
| Exhibit | D-1 | Form of Opinion of Counsel to the Borrower |
| Exhibit | D-2 | Form of Opinion of Special Counsel to the Borrower |
| Exhibit | E | Form of Assignment and Assumption |
| Exhibit | F | Form of Competitive Bid Request |
| Exhibit | G | Form of Invitation to Bid |
| Exhibit | H | Form of Competitive Bid |
| Exhibit | I | Form of Competitive Bid Accept/Reject Letter |
| Exhibit | J | [reserved] |
| Exhibit | K | Form of Commitment Increase Supplement |

**364-DAY CREDIT AGREEMENT** , dated as of May 18, 2017, by and among *CVS HEALTH CORPORATION* , a Delaware corporation (the *"Borrower"* ), the lenders party hereto from time to time (each a *"Lender"* and, collectively, the *"Lenders"* ), *BANK OF AMERICA, N.A.* ( *"BofA"* ) and *WELLS FARGO BANK, N.A* . ( *"Wells Fargo" )* as co-syndication agents (in such capacity, each a *"Co-Syndication Agent"* and, collectively, the *"Co-Syndication Agents"* ), *BARCLAYS BANK PLC* ( *"Barclays")* and *JPMORGAN CHASE BANK, N.A* ., ( *"JPMC"* ), as co-documentation agents (in such capacity, each a *" Co-Documentation Agent "* and, collectively, the *" Co-Documentation Agents "* ), and *THE BANK OF NEW YORK MELLON* ( *"BNY Mellon"* ), as administrative agent for the Lenders (in such capacity, the *" Administrative Agent "* ).

1.    *DEFINITIONS AND PRINCIPLES OF CONSTRUCTION*

    1.1    *Definitions*

        When used in any Loan Document (as defined below), each of the following terms shall have the meaning ascribed thereto unless the context otherwise specifically requires:

        *"ABR Advances"* : the Revolving Credit Loans (or any portions thereof) at such time as they (or such portions) are made or are being maintained at a rate of interest based upon the Alternate Base Rate.

        *"Accumulated Funding Deficiency"* : as defined in Section 304 of ERISA.

        *"Acquisition"* : with respect to any Person, the purchase or other acquisition by such Person, by any means whatsoever, of (a) stock of, or other equity securities of, any other Person if, immediately thereafter, such other Person would be either a consolidated subsidiary of such Person or otherwise under the control of such Person, or (b) any business, going concern or division or segment thereof, or all or substantially all of the assets thereof; *provided* that no redemption, retirement, purchase or acquisition by any Person of the stock or other equity securities of such Person shall be deemed to constitute an Acquisition.

        *"Administrative Agent"* : as defined in the preamble.

        *"Administrative Questionnaire"* : an Administrative Questionnaire in a form supplied by the Administrative Agent.

        *"Affected Advance"* : as defined in <u>Section 3.8(b)</u> .

        *"Affiliate"* : with respect to any Person at any time and from time to time, any other Person (other than a wholly-owned subsidiary of such Person) which, at such time (a) controls such Person, (b) is controlled by such Person or (c) is under common control with such Person. The term *" control "* , as used in this definition with respect to any Person, means the power, whether direct or indirect through one or more intermediaries, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interests, by contract or otherwise.

"*Aggregate Commitment Amount*" : at any time, the sum of the Commitment Amounts of the Lenders at such time under this Agreement.  The Aggregate Commitment Amount on the Effective Date is $1,000,000,000.

"*Aggregate Credit Exposure*" : at any time, the sum at such time of (a) the aggregate Committed Credit Exposure of the Lenders at such time and (b) the aggregate outstanding principal balance of all Competitive Bid Loans at such time.

"*Agreement*" : this 364-Day Credit Agreement, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"*Alternate Base Rate*" : for any day, a rate per annum equal to the greatest of (i) the BNY Mellon Rate in effect on such day; (ii) the sum of (a) 1/2 of 1% per annum and (b) the Federal Funds Effective Rate in effect on such day; and (iii) the sum of (a) 1% per annum and (b) the One Month LIBOR Rate in effect on such day.  The Alternate Base Rate shall change as and when the greatest of the foregoing rates shall change.  Any change in the Alternate Base Rate shall become effective as of the opening of business on the day specified in the public announcement of such change.

"*Anti-Corruption Laws*" : all laws, rules, and regulations of any jurisdiction applicable to the Borrower or the Subsidiaries from time to time concerning or relating to bribery or corruption.

"*Applicable Margin*" : (i) with respect to the unpaid principal balance of ABR Advances, the applicable percentage set forth below in the column entitled "ABR Advances", (ii) with respect to the unpaid principal balance of Eurodollar Advances, the applicable percentage set forth below in the column entitled "Eurodollar Advances", and (iii) with respect to the Facility Fee, the applicable percentage set forth below in the column entitled "Facility Fee", in each case opposite the applicable Pricing Level:

| Pricing Level | ABR Advances | Eurodollar Advances | Facility Fee |
|---|---|---|---|
| Pricing Level I | 0.000% | 0.825% | 0.050% |
| Pricing Level II | 0.000% | 0.940% | 0.060% |
| Pricing Level III | 0.045% | 1.045% | 0.080% |
| Pricing Level IV | 0.150% | 1.150% | 0.100% |
| Pricing Level V | 0.375% | 1.375% | 0.125% |
| Pricing Level VI | 0.575% | 1.575% | 0.175% |

Decreases in the Applicable Margin resulting from a change in Pricing Level shall become effective upon the delivery by the Borrower to the Administrative Agent of a notice pursuant to Section 7.7(d) .  Increases in the Applicable Margin resulting from a change in Pricing Level shall become effective on the effective date of any downgrade or withdrawal in the rating by Moody's or S&P of the senior unsecured long term debt rating of the Borrower.

2

**"Approved Fund"** : any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

**"Assignment and Assumption"** : an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 11.7(b) ), and accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form approved by the Administrative Agent.

**"Bail-In Action"** : the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

**"Bail-In Legislation"** : with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

**"Barclays"** : as defined in the preamble.

**"BNY Mellon"** : as defined in the preamble.

**"BNY Mellon Rate"** : a rate of interest per annum equal to the rate of interest publicly announced in New York City by BNY Mellon from time to time as its prime commercial lending rate, such rate to be adjusted automatically (without notice) on the effective date of any change in such publicly announced rate.

**"BofA"** : as defined in the preamble.

**"Borrower"** : as defined in the preamble.

**"Borrower Materials"** : as defined in Section 7.7 .

**"Borrowing Date"** : (i) in respect of Revolving Credit Loans, any Domestic Business Day or Eurodollar Business Day, as the case may be, on which the Lenders shall make Revolving Credit Loans pursuant to a Borrowing Request, and (ii) in respect of Competitive Bid Loans, any Domestic Business Day on which a Lender shall make a Competitive Bid Loan pursuant to a Competitive Bid Request.

**"Borrowing Request"** : a request for Revolving Credit Loans in the form of Exhibit C .

**"Change of Control"** : any of the following:

(i)    any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), (a) shall have or acquire beneficial ownership of securities having 35% or more of the ordinary voting power of the Borrower or (b) shall possess,

3

directly or indirectly, the power to direct or cause the direction of the management and policies of the Borrower, whether through the ownership of voting securities, by contract or otherwise; or

(ii)    the Continuing Directors shall cease for any reason to constitute a majority of the board of directors of the Borrower then in office.

"*Co-Documentation Agent*" and "*Co-Documentation Agents*" : as defined in the preamble.

"*Co-Syndication Agent*" and "*Co-Syndication Agents*": as defined in the preamble.

"*Commitment*" : in respect of any Lender, such Lender's undertaking to make Revolving Credit Loans, subject to the terms and conditions hereof, in an aggregate outstanding principal amount not to exceed the Commitment Amount of such Lender.

"*Commitment Amount*" : at any time and with respect to any Lender, the amount set forth adjacent to such Lender's name under the heading " Commitment Amount " in Exhibit A at such time or, in the event that such Lender is not listed on Exhibit A , the " Commitment Amount " which such Lender shall have assumed from another Lender in accordance with Section 11.7 on or prior to such time, as the same may be adjusted from time to time pursuant to Section 2.6 and Section 11.7 .

"*Commitment Increase Supplement*" : a Commitment Increase Supplement substantially in the form of Exhibit K .

"*Commitment Percentage*" :  at any time and with respect to any Lender, a fraction the numerator of which is such Lender's Commitment Amount at such time, and the denominator of which is the Aggregate Commitment Amount at such time,    provided that in the event the Commitments shall have expired or otherwise terminated or been terminated, then Commitment Percentage shall be determined immediately prior thereto.

"*Commitment Period*" : the period commencing on the Effective Date and ending on the Commitment Termination Date, or on such earlier date as all of the Commitments shall have been terminated in accordance with the terms hereof.

"*Commitment Termination Date*" : the earlier of (i) May 17, 2018 (subject to extension as provided in Section 2.12 ) and (ii) the date on which the Loans shall become due and payable, whether by acceleration, notice of intention to prepay or otherwise.

"*Committed Credit Exposure*" : with respect to any Lender at any time, the sum at such time of the outstanding principal balance of such Lender's Revolving Credit Loans.

"*Compensatory Interest Payment*" : as defined in Section 3.4(c) .

"*Competitive Bid*" : an offer by a Lender, in the form of Exhibit H , to make one or more Competitive Bid Loans.

4

**"Competitive Bid Accept/Reject Letter"** : a notification made by the Borrower pursuant to Section 2.4(d) in the form of Exhibit I .

**"Competitive Bid Loan"** : as defined in Section 2.4(a) .

**"Competitive Bid Rate"** : as to any Competitive Bid made by a Lender pursuant to Section 2.4(b) , the fixed rate of interest (which shall be expressed in the form of a decimal to no more than four decimal places) offered by such Lender with respect thereto.

**"Competitive Bid Request"** : a request by the Borrower, in the form of Exhibit F , for Competitive Bids.

**"Competitive Interest Period"** : as to any Competitive Bid Loan, the period commencing on the date of such Competitive Bid Loan and ending on the date requested in the Competitive Bid Request with respect thereto, which shall not be earlier than 3 days after the date of such Competitive Bid Loan or later than 180 days after the date of such Competitive Bid Loan; *provided* that if any Competitive Interest Period would end on a day other than a Domestic Business Day, such Competitive Interest Period shall be extended to the next succeeding Domestic Business Day, unless such next succeeding Domestic Business Day would be a date on or after the Commitment Termination Date, in which case such Competitive Interest Period shall end on the next preceding Domestic Business Day.  Interest shall accrue from and including the first day of a Competitive Interest Period to but excluding the last day of such Competitive Interest Period.

**"Consolidated"** : the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP.

**"Contingent Obligation"** : as to any Person (the " secondary obligor " ), any obligation of such secondary obligor (a) guaranteeing or in effect guaranteeing any return on any investment made by another Person, or (b) guaranteeing or in effect guaranteeing any Indebtedness, lease, dividend or other obligation ( " primary obligation " ) of any other Person (the " primary obligor " ) in any manner, whether directly or indirectly, including any obligation of such secondary obligor, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the beneficiary of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) otherwise to assure or hold harmless the beneficiary of such primary obligation against loss in respect thereof, and (v) in respect of the Indebtedness of any partnership in which such secondary obligor is a general partner, except to the extent that such Indebtedness of such partnership is nonrecourse to such secondary obligor and its separate Property; *provided* that the term " Contingent Obligation " shall not include the indorsement of instruments for deposit or collection in the ordinary course of business.

**"Continuing Director"** : any member of the board of directors of the Borrower (i) who is a member of that board of directors on the Effective Date, (ii) who was nominated for

election by the board of directors a majority of whom were directors on the Effective Date or (iii) whose election or nomination for election was approved by one or more of such directors.

*"Control Person"* : as defined in <u>Section 3.6</u> .

*"Convert"* , *"Conversion"* and *"Converted"* : each, a reference to a conversion pursuant to <u>Section 3.3</u> of one Type of Revolving Credit Loan into the other Type of Revolving Credit Loan.

*"Costs"* : as defined in <u>Section 3.6</u> .

*"Co-Syndication Agent"* and *"Co-Syndication Agents"* : as defined in the preamble.

*"Credit Exposure"* : with respect to any Lender at any time, the sum at such time of (a) the Committed Credit Exposure of such Lender at such time and (b) the outstanding principal balance of all Competitive Bid Loans of such Lender at such time.

*"Credit Parties"* : the Administrative Agent and the Lenders.

*"Default"* : any of the events specified in <u>Section 9.1</u> , whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

*" Defaulting Lender "* : any Lender, as reasonably determined by the Administrative Agent, that has (a) failed to fund any portion of its Loans within two Domestic Business Days of the date required to be funded by it hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) notified the Borrower or any Credit Party in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit, unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied, (c) failed, two Domestic Business Days after written request by the Administrative Agent (based on the reasonable belief that it may not fulfill its funding obligation), to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; *provided* that such Lender shall cease to be a Defaulting Lender under this clause (c) upon receipt by the Administrative Agent of such confirmation, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Domestic Business Days of the date when due, unless the subject of a good faith dispute, or (e) (i) becomes or is insolvent or has a parent company that has become or is insolvent, (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, interim receiver, receiver and manager, administrator, liquidator, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the

subject of a bankruptcy or insolvency proceeding, or has had a receiver, interim receiver, receiver and manager, administrator, liquidator, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or (iii) becomes, or has a parent company that becomes, the subject of a Bail-in Action, *provided* that a Lender shall not qualify as a Defaulting Lender solely as a result of the acquisition or maintenance of an ownership interest in such Lender or its parent company, or of the exercise of control over such Lender or any Person controlling such Lender, by a Governmental Authority or instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any agreements made by such Lender.

       **"*Disposition*"** : with respect to any Person, any sale, assignment, transfer or other disposition by such Person by any means, of:

       (a)      the stock of, or other equity interests of, any other Person,

       (b)      any business, operating entity, division or segment thereof, or

       (c)      any other Property of such Person, other than (i) the sale of inventory (other than in connection with bulk transfers), (ii) the disposition of equipment and (iii) the sale of cash investments.

       **"*Dividend Restrictions*"** : as defined in <u>Section 8.7</u> .

       **"*Dollar*"** *or* **"$"** : lawful currency of the United States of America.

       **"*Domestic Business Day*"** : any day other than a Saturday, Sunday or a day which in New York City is a legal holiday or a day on which banking institutions are authorized or required by law or other governmental action to close.

       **"*EEA Financial Institution*"** : (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

       **"*EEA Member Country*"** : any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

       **"*EEA Resolution Authority*"** : any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

       **"*Effective Date*"** : as defined in <u>Section 5</u> .

"*Eligible Assignee*" : a Person that is a permitted assignee under Section 11.7(b) that has received the consent of each party whose consent is required under Section 11.7(b) .

"*Employee Benefit Plan*" : an employee benefit plan, within the meaning of Section 3(3) of ERISA, maintained, sponsored or contributed to by the Borrower, any Subsidiary or any ERISA Affiliate.

"*Environmental Laws*" : all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"*Environmental Liability*" : as to any Person, any statutory, common law or equitable liability, contingent or otherwise (including any liability for damages, costs of environmental investigation, sampling or remediation, fines, penalties or indemnities), of such Person directly or indirectly resulting from or based upon (i) violation of any Environmental Law, (ii) the generation, use, handling, transportation, storage, treatment, discharge or disposal of any Hazardous Materials, (iii) exposure to any Hazardous Materials, (iv) the release or threatened release of any Hazardous Materials into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*ERISA*" : the Employee Retirement Income Security Act of 1974, as amended from time to time, or any successor thereto, and the rules and regulations issued thereunder, as from time to time in effect.

"*ERISA Affiliate*" : when used with respect to an Employee Benefit Plan, ERISA, the PBGC or a provision of the Internal Revenue Code pertaining to employee benefit plans, any Person that is a member of any group of organizations within the meaning of Sections 414(b) or (c) of the Internal Revenue Code or, solely with respect to the applicable provisions of the Internal Revenue Code, Sections 414(m) or (o) of the Internal Revenue Code, of which the Borrower or any Subsidiary is a member.

"*ERISA Event*" :  (a) any "reportable event", as defined in Section 4043 of ERISA with respect to a Pension Plan (other than an event for which the 30-day notice period is waived); (b) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 or 432 of the Internal Revenue Code or Sections 303, 304 or 305 of ERISA; (c) the filing pursuant to the Internal Revenue Code or ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (d) the incurrence by the Borrower, any Subsidiary or an ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower, any Subsidiary or an ERISA Affiliate; (e) the receipt by the Borrower, any Subsidiary or an ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan;  (f) the incurrence by the Borrower, any Subsidiary or an ERISA Affiliate of any liability with respect to the withdrawal or partial

withdrawal from any Pension Plan or Multiemployer Plan; (g) any limits under Section 436 of the Internal Revenue Code become applicable; or (h) any failure to make any payment required by Section 430(j) of the Internal Revenue Code.

"*EU Bail-In Legislation Schedule*" : the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Eurodollar Advance*" : a portion of the Revolving Credit Loans selected by the Borrower to bear interest during a Eurodollar Interest Period selected by the Borrower at a rate per annum based upon a Eurodollar Rate determined with reference to such Eurodollar Interest Period, all pursuant to and in accordance with Section 2.1 or Section 3.3 .

"*Eurodollar Business Day*" : any Domestic Business Day, other than a Domestic Business Day on which banks are not open for dealings in Dollar deposits in the interbank eurodollar market.

"*Eurodollar Interest Period*" : the period commencing on any Eurodollar Business Day selected by the Borrower in accordance with Section 2.3 or Section 3.3 and ending one, two, three or six months thereafter, as selected by the Borrower in accordance with either such Sections, subject to the following:

      (i)      if any Eurodollar Interest Period would otherwise end on a day which is not a Eurodollar Business Day, such Eurodollar Interest Period shall be extended to the immediately succeeding Eurodollar Business Day unless the result of such extension would be to carry the end of such Eurodollar Interest Period into another calendar month, in which event such Eurodollar Interest Period shall end on the Eurodollar Business Day immediately preceding such day; and

      (ii)      if any Eurodollar Interest Period shall begin on the last Eurodollar Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Eurodollar Interest Period), such Eurodollar Interest Period shall end on the last Eurodollar Business Day of such latter calendar month.

" *Eurodollar Rate* " : with respect to any Eurodollar Advance or any ABR Advance, to the extent such ABR Advance is based on the Eurodollar Rate, for any Interest Period, an interest rate per annum equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"*Event of Default*" : any of the events specified in Section 9.1 , *provided* that any requirement for the giving of notice, the lapse of time, or both, or any other condition has been satisfied.

"*Excluded Taxes*" : with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or any other Loan Document, (a) Taxes imposed on or measured by its net income (however denominated), and franchise Taxes, in each case, (i) imposed on it by the jurisdiction (or any political subdivision thereof) under the laws of which it is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is

located, or (ii) that are Other Connection Taxes imposed on net profits Taxes imposed by the United States of America or that are Other Connection Taxes, (c) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under <u>Section 3.13</u>), any withholding Tax that (i) is imposed on amounts payable to such Lender at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to <u>Section 3.10</u>, or (ii) is attributable to such Lender's failure or inability (other than as a result of a Regulatory Change, except for a Regulatory Change relating to the implementation of FATCA) to comply with <u>Section 3.10</u> and (d) any Taxes imposed under FATCA.

   **"*Existing Commitment Termination Date*"** : as defined in <u>Section 2.12(a)</u>.

   **"*Existing 2014 Credit Agreement*"** : the Second Amended and Restated Credit Agreement, dated as of July 24, 2014, by and among the Borrower, the lenders party thereto from time to time, Barclays and JPMC, as co-syndication agents, BofA and Wells Fargo, as co-documentation agents, and BNY Mellon, as administrative agent, as the same may be amended, amended and restated, supplemented, replaced or otherwise modified from time to time.

   **"*Existing 2015 Credit Agreement*"** : the Credit Agreement, dated as of July 1, 2015, by and among the Borrower, the lenders party thereto from time to time, Barclays and JPMC, as co-syndication agents, BofA and Wells Fargo, as co-documentation agents, and BNY Mellon, as administrative agent, as the same may be amended, amended and restated, supplemented, replaced or otherwise modified from time to time.

   **"*Existing 2017 Credit Agreement*"** : the Credit Agreement, dated as of May 18, 2017, by and among the Borrower, the lenders party thereto from time to time, Barclays and JPMC, as co-syndication agents, BofA and Wells Fargo, as co-documentation agents, and BNY Mellon, as administrative agent, as the same may be amended, amended and restated, supplemented, replaced or otherwise modified from time to time.

   **"*Expiration Date*"** : the first date, occurring on or after the date the Commitments shall have terminated or been terminated in accordance herewith, upon which there shall be no Loans outstanding.

   **"*Extension Date*"** : as defined in <u>Section 2.12(a)</u>.

   **"*Extension Request*"** : as defined in <u>Section 2.12(a)</u>.

   **"*Facility Fee*"** : as defined in <u>Section 3.11</u>.

   **"*FATCA*"** : Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any applicable intergovernmental agreements with respect thereto, and any treaty, law, regulations, or other official guidance enacted in any other jurisdiction relating to such intergovernmental agreement.

**"Federal Funds Effective Rate"** : for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's (or, if such day is not a Domestic Business Day, the immediately preceding Domestic Business Day) federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Domestic Business Day by the Federal Reserve Bank of New York as the federal funds effective rate, or, if such rate is not so published for any day which is a Domestic Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

**"Fees"** : as defined in Section 3.2(a) .

**"Financial Statements"** : as defined in Section 4.13 .

**"Foreign Lender"** : any Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Internal Revenue Code.

**"GAAP"** : generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination, consistently applied; *provided* , *however* , that the accounting for operating leases and financing or capital leases under GAAP as in effect on the Effective Date (including, without limitation, Accounting Standards Codification 840) shall apply for determining compliance with the provisions of this Agreement.

**"Governmental Authority"** : any foreign, federal, state, municipal or other government, or any department, commission, board, bureau, agency, public authority or instrumentality thereof, or any court, arbitrator, regulatory body or central bank (including any supra-national bodies such as the European Union or the European Central Bank).

**"Hazardous Materials"** : all ignitable, explosive, reactive, corrosive or radioactive substances or wastes and all hazardous or toxic materials, substances, chemicals, wastes or other pollutants, including but not limited to petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes, hazardous biological agents, hazardous pharmaceutical substances and all other materials, substances, chemicals, wastes, contaminants or pollutants of any nature that are now or hereafter regulated pursuant to any Environmental Law, or are now or hereafter defined, listed or classified as a hazardous or toxic material, substance, chemical, waste, contaminant or pollutant in any Environmental Law.

**"Highest Lawful Rate"** : as to any Lender, the maximum rate of interest, if any, which at any time or from time to time may be contracted for, taken, charged or received on the Loans or the Notes or which may be owing to such Lender pursuant to this Agreement under the laws applicable to such Lender and this Agreement.

*"Impacted Interest Period"* : has the meaning assigned to it in the definition of *"LIBO Rate"*.

*"Increasing Lender"* : as defined in Section 2.6(d) .

*"Indebtedness"* : as to any Person at a particular time, all items of such Person which constitute, without duplication, (a) indebtedness for borrowed money or the deferred purchase price of Property (other than trade payables and accrued expenses incurred in the ordinary course of business), (b) indebtedness evidenced by notes, bonds, debentures or similar instruments, (c) indebtedness with respect to any conditional sale or other title retention agreement, (d) indebtedness arising under acceptance facilities and the amount available to be drawn under all letters of credit (excluding for purposes of Section 8.1 and Section 8.9 letters of credit obtained in the ordinary course of business by the Borrower or any Subsidiary) issued for the account of such Person and, without duplication, all drafts drawn thereunder to the extent such Person shall not have reimbursed the issuer thereof in respect of such issuer's payment of such drafts, (e) that portion of any obligation of such Person, as lessee, which in accordance with GAAP is required to be capitalized on a balance sheet of such Person, (f) all indebtedness described in (a) - (e) above secured by any Lien on any Property owned by such Person even though such Person shall not have assumed or otherwise become liable for the payment thereof (other than carriers', warehousemen's, mechanics', repairmen's or other like non-consensual Liens arising in the ordinary course of business), and (g) Contingent Obligations in respect of any indebtedness described in items (a) - (f) above; *provided* that, for purposes of this definition, Indebtedness shall not include Intercompany Debt and obligations in respect of interest rate caps, collars, exchanges, swaps or other, similar agreements.

*"Indemnified Amount"* : as defined in Section 11.10(b) .

*"Indemnified Liabilities"* : as defined in Section 11.5 .

*"Indemnified Person"* : as defined in Section 11.10(a) .

*"Indemnified Taxes"* : Taxes other than Excluded Taxes and Other Taxes.

*"Information"* : as defined in Section 11.14(b) .

*"Intangible Assets"* : at any date, the value, as shown on the most recent Consolidated balance sheet of the Borrower and the Subsidiaries as at the end of the fiscal quarter ending not more than 135 days prior to such date, prepared in accordance with GAAP, of: (i) all trade names, trademarks, licenses, patents, copyrights, service marks, goodwill and other like intangibles, (ii) organizational and development costs, (iii) deferred charges (other than prepaid items, such as insurance, taxes, interest, commissions, rents, pensions, compensation and similar items and tangible assets being amortized), and (iv) unamortized debt discount and expense, less unamortized premium.

*"Intercompany Debt"* : (i) Indebtedness of the Borrower to one or more of the Subsidiaries of the Borrower and (ii) Indebtedness of one or more of the Subsidiaries of the Borrower to the Borrower or any one or more of the other Subsidiaries of the Borrower.

"*Intercompany Disposition*" : a Disposition by the Borrower or any of the Subsidiaries of the Borrower to the Borrower or to any of the other Subsidiaries of the Borrower.

"*Interest Payment Date*" : (i) as to any ABR Advance, the last day of each March, June, September and December, commencing on the first of such days to occur after such ABR Advance is made or any Eurodollar Advance is converted to an ABR Advance, (ii) as to any Eurodollar Advance in respect of which the Borrower has selected a Eurodollar Interest Period of one, two or three months, the last day of such Eurodollar Interest Period, (iii) as to any Competitive Bid Loan in respect of which the Borrower has selected a Competitive Interest Period of 90 days or less, the last day of such Competitive Interest Period and (iv) as to any Eurodollar Advance or Competitive Bid Loan in respect of which the Borrower has selected an Interest Period greater than three months or 90 days, as the case may be, the last day of the third month or the 90th day, as the case may be, of such Interest Period and the last day of such Interest Period.

"*Interest Period*" : a Eurodollar Interest Period or a Competitive Interest Period, as the case may be.

"*Internal Revenue Code*" : the Internal Revenue Code of 1986, as amended from time to time, or any successor thereto, and the rules and regulations issued thereunder, as from time to time in effect.

"*Interpolated Rate*" :  in relation to determining the applicable LIBO Screen Rate, the rate which results from interpolating on a linear basis between:

      (a)     the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) which is shorter than the Impacted Interest Period of the applicable Eurodollar Advance; and

      (b)     the LIBO Screen Rate for the shortest period (for which that LIBO Screen Rate is available) which is longer than the Impacted Interest Period of such Eurodollar Advance,

each as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period; *provided* that in the event either of the two foregoing LIBO Screen Rates is not available at such time, then the *"Interpolated Rate"* with respect to such Eurodollar Advance for such Interest Period shall be the average of rates at which Dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered to major banks in the London interbank market by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Eurodollar Business Days prior to the commencement of such Interest Period.

"*Joint Bookrunners*": *BNY Mellon, ML, Barclays, JPMC and WFS.*

"*Joint Lead Arrangers*": *BNY Mellon, Barclays and JPMC.*

"*JPMC*" : as defined in the preamble.

"*Lender*" and "*Lenders*" : as defined in the preamble.

"*LIBO Rate*" : with respect to any Eurodollar Advance for any Interest Period, the rate per annum equal to the ICE Benchmark Administration Limited LIBOR Rate (or such successor thereto if the ICE Benchmark Administration Limited is no longer making such a rate available) appearing on the applicable Bloomberg screen (or other commercially available source as designated by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two (2) Eurodollar Business Days prior to the commencement of such Interest Period, as the rate for Dollar deposits with a maturity comparable to such Interest Period (in each case, the "*LIBO Screen Rate*" );  *provided* that (i) if the LIBO Screen Rate shall be less than zero, the LIBO Rate shall be deemed to be zero for the purposes of this Agreement, and (ii) if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "*Impacted Interest Period*" ) then the LIBO Rate shall be the Interpolated Rate, *provided* that if any Interpolated Rate shall be less than zero, such Interpolated Rate shall be deemed to be zero for purposes of this Agreement.

"*LIBO Screen Rate*" : has the meaning assigned to it in the definition of "*LIBO Rate*".

"*Lien*" : any mortgage, pledge, hypothecation, assignment, lien, deposit arrangement, charge, encumbrance or other security arrangement or security interest of any kind, or the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement.

"*Loan*" : a Revolving Credit Loan or a Competitive Bid Loan, as the case may be.

"*Loan Documents*" : this Agreement and, upon the execution and delivery thereof, the Notes, if any.

"*Loans*" : the Revolving Credit Loans and the Competitive Bid Loans.

"*Margin Stock*" : any " margin stock " , as said term is defined in Regulation U of the Board of Governors of the Federal Reserve System, as the same may be amended or supplemented from time to time.

"*Material Adverse*" : with respect to any change or effect, a material adverse change in, or effect on, as the case may be, (i) the financial condition, operations, business, or Property of the Borrower and the Subsidiaries taken as a whole, (ii) the ability of the Borrower to perform its obligations under the Loan Documents, or (iii) the ability of the Administrative Agent or any Lender to enforce the Loan Documents.

"*ML*" : Merrill Lynch, Pierce, Fenner & Smith Incorporated.

"*Moody's*" : Moody's Investors Service, Inc., or any successor thereto.

"*Multiemployer Plan*" : a Pension Plan which is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

14

CVS Health Corporation 2017 364-Day Credit Agreement

*"Net Tangible Assets"* : at any date, total assets as shown on the most recent Consolidated balance sheet of the Borrower and the Subsidiaries as at the end of the fiscal quarter ending not more than 135 days prior to such date, prepared in accordance with GAAP, less, without duplication (i) all current liabilities (due within one year) as shown on such balance sheet and (ii) Intangible Assets and liabilities relating thereto.

*"New Lender"* : as defined in Section 2.6(d) .

*"Non-Extending Lender"* : as defined in Section 2.12(b) .

*"Note"* : with respect to each Lender that has requested one in accordance with Section 2.11 , a promissory note evidencing such Lender's Loans payable to the order of such Lender (or, if required by such Lender, to such Lender and its registered assigns), substantially in the form of Exhibit B .

*"One Month LIBOR Rate"* : with respect to any ABR Advance for any day, the rate per annum equal to the ICE Benchmark Administration Limited LIBOR Rate (or such successor thereto if the ICE Benchmark Administration Limited is no longer making such a rate available) appearing on the applicable Bloomberg screen (or other commercially available source as designated by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, on such day (or, if such date is not a Eurodollar Business Day, the immediately preceding Eurodollar Business Day), as the rate for Dollar deposits with a maturity of approximately one month, *provided* that (a) in the event the *"One Month LIBOR Rate"* is not otherwise available, then the *"One Month LIBOR Rate"* with respect to such ABR Advance shall be the rate at which Dollar deposits of $5,000,000 and for a maturity of approximately one month are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, on such day, and (b) in the event that the *"One Month LIBOR Rate"* would otherwise be less than zero, such *"One Month LIBOR Rate"* shall be deemed to be zero for purposes of this Agreement.

" *Other Connection Taxes* " : with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or any other Loan Document, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

*"Other Taxes"* : all present or future stamp, court or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.13).

**"*Participant*"** : as defined in Section 11.7(a) .

**"*Participant Register*"** : as defined in Section 11.7(d) .

**"*Patriot Act*"** : as defined in Section 11.20 .

**"*PBGC*"** : the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, or any Governmental Authority succeeding to the functions thereof.

**"*Pension Plan*"** : at any time, any Employee Benefit Plan (including a Multiemployer Plan) subject to Section 302 of ERISA or Section 412 of the Internal Revenue Code, the funding requirements of which are, or at any time within the six years immediately preceding the time in question were, in whole or in part, the responsibility of the Borrower, any Subsidiary or an ERISA Affiliate.

**"*Person*"** : any individual, firm, partnership, limited liability company, joint venture, corporation, association, business trust, joint stock company, unincorporated association, trust, Governmental Authority or any other entity, whether acting in an individual, fiduciary, or other capacity, and for the purpose of the definition of " ERISA Affiliate " , a trade or business.

**"*Platform*"** : as defined in Section 7.7 .

**"*Pricing Level*"** : Pricing Level I, Pricing Level II, Pricing Level III, Pricing Level IV, Pricing Level V or Pricing Level VI, as the case may be.

**"*Pricing Level I*"** : any time when the senior unsecured  long term debt rating of the Borrower by (x) S&P is A or higher or (y) Moody's is A2 or higher.

**"*Pricing Level II*"** : any time when (i) the senior unsecured long term debt rating of the Borrower by (x) S&P is A- or higher or (y) Moody's is A3 or higher and (ii) Pricing Level I does not apply.

**"*Pricing Level III*"** : any time when (i) the senior unsecured long term debt rating of the Borrower by (x) S&P is BBB+ or higher or (y) Moody's is Baa1 or higher and (ii) neither Pricing Level I nor Pricing Level II applies.

**"*Pricing Level IV*"** : any time when (i) the senior unsecured  long term debt rating of the Borrower by (x) S&P is BBB or higher or (y) Moody's is Baa2 or higher and (ii) none of Pricing Level I, Pricing Level II or Pricing Level III applies.

**"*Pricing Level V*"** : any time when (i) the senior unsecured long term debt rating of the Borrower by (x) S&P is BBB- or higher or (y) Moody's is Baa3 or higher and (ii) none of Pricing Level I, Pricing Level II, Pricing Level III or Pricing Level IV applies.

**"*Pricing Level VI*"** : any time when none of Pricing Level I, Pricing Level II, Pricing Level III, Pricing Level IV or Pricing Level V applies.

Notwithstanding each definition of Pricing Level set forth above, if at any time the senior unsecured long term debt ratings of the Borrower by S&P and Moody's differ by more than one equivalent rating level, then the applicable Pricing Level shall be determined based upon the lower such rating adjusted upwards to the next higher rating level.

"*Proceeding*" : as defined in <u>Section 11.10(a)</u> .

" *Prohibited Transaction*" : a transaction that is prohibited under Section 4975 of the Internal Revenue Code or Section 406 of ERISA and not exempt under Section 4975 of the Internal Revenue Code, Section 408 of ERISA or any applicable administrative exemptions.

"*Property*" : in respect of any Person, all types of real, personal or mixed property and all types of tangible or intangible property owned or leased by such Person.

"*Regulatory Change*" : the occurrence, after the date hereof, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, implementation, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, in the case of each of clauses (i) and (ii), shall be deemed to be a "Regulatory Change", regardless of the date enacted, adopted or issued, but only if any such requirements are generally applicable to (and for which reimbursement is generally being sought by the Lenders in respect of) credit transactions similar to this transaction from similarly situated borrowers (which are parties to credit or loan documentation containing a provision similar to this definition), as determined by the Lenders in their respective reasonable discretion.

"*Register*" : as defined in <u>Section 11.7(c)</u> .

"*Related Parties*" : with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"*Replaced Lender*" : as defined in <u>Section 3.13</u> .

"*Replacement Lender*" : as defined in <u>Section 3.13</u> .

"*Required Lenders*" : (a) at any time prior to the Commitment Termination Date or such earlier date as all of the Commitments shall have terminated or been terminated in accordance herewith, Lenders having Commitment Amounts equal to or more than 51% of the Aggregate Commitment Amount, and (b) at all other times, Lenders having Credit Exposure equal to or more than 51% of the Aggregate Credit Exposure.

**"Restricted Payment"** : with respect to any of the following, whether direct or indirect: (a) the declaration or payment by such Person of any dividend or distribution on any class of stock of such Person, other than a dividend payable solely in shares of that class of stock to the holders of such class, (b) the declaration or payment by such Person of any distribution on any other type or class of equity interest or equity investment in such Person, and (c) any redemption, retirement, purchase or acquisition of, or sinking fund or other similar payment in respect of, any class of stock of, or other type or class of equity interest or equity investment in, such Person.

**"Restrictive Agreement"** : as defined in <u>Section 8.7</u>.

**"Revolving Credit Loan"** and **"Revolving Credit Loans"** : as defined in <u>Section 2.1(a)</u>.

**"Sanctioned Country"** : at any time, a country or territory which is the subject or target of any Sanctions.

**"Sanctioned Person"** : at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

**"Sanctions"** : economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

**"S&P"** : Standard & Poor's Ratings Services, a subsidiary of McGraw Hill Financial, Inc., or any successor thereto.

**"Special Counsel"** : such counsel as the Administrative Agent may engage from time to time.

**"Statutory Reserve Rate"** : a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of the Board of Governors of the Federal Reserve System, as amended). Such reserve percentages shall include those imposed pursuant to said Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under said Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

**"Subsidiary"** : at any time and from time to time, any corporation, partnership, limited liability company, joint venture or other business entity of which the Borrower and/or any

Subsidiary of the Borrower, directly or indirectly means either (a) in respect of a corporation, owns or controls more than 50% of the outstanding stock having ordinary voting power to elect a majority of the board of directors or similar managing body, irrespective of whether a class or classes shall or might have voting power by reason of the happening of any contingency, or (b) in respect of a partnership, limited liability company, joint venture or other business entity, is entitled to share in more than 50% of the profits and losses, however determined.

**"Taxes"** : all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

**"Termination Event"** : with respect to any Pension Plan, (a) an ERISA Event, (b) the termination of a Pension Plan under Section 4041(c) of ERISA, or the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, or the treatment of a Pension Plan amendment as a termination under Section 4041(e) of ERISA (except an amendment made after such Pension Plan satisfies the requirement for a standard termination under Section 4041(b) of ERISA), (c) the institution of proceedings by the PBGC to terminate a Pension Plan under Section 4042 of ERISA, or (d) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA.

**"Total Capitalization"** : at any date, the sum of the Borrower's Consolidated Indebtedness and shareholders' equity on such date, determined in accordance with GAAP.

**"Type"** : with respect to any Revolving Credit Loan, the characteristic of such Loan as an ABR Advance or a Eurodollar Advance, each of which constitutes a Type of Revolving Credit Loan.

**"Unqualified Amount"** : as defined in Section 3.4(c) .

**"Upstream Dividends"** : as defined in Section 8.7(a) .

**"U.S. Lender"** : as defined in Section 3.10(f) .

**"United States Tax Compliance Certificate"** : as defined in Section 3.10(f)(iii) .

**"Wells Fargo"** : as defined in the preamble.

" **WFS** ": Wells Fargo Securities, LLC.

**"Write-Down and Conversion Powers"** : with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2      **Principles of Construction**

(a)      All capitalized terms defined in this Agreement shall have the meanings given to such capitalized terms herein when used in the other Loan Documents or in any

certificate, opinion or other document made or delivered pursuant hereto or thereto, unless otherwise expressly provided therein.

(b)     Unless otherwise expressly provided herein, the word *"fiscal"* when used herein shall refer to the relevant fiscal period of the Borrower.  As used in the Loan Documents and in any certificate, opinion or other document made or delivered pursuant thereto, accounting terms not defined in Section 1.1 , and accounting terms partly defined in Section 1.1 , to the extent not defined, shall have the respective meanings given to them under GAAP as in effect from time to time; *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of, and any accounting term related thereto shall have the respective meaning given to it under, GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

(c)     The words *"hereof"* , *"herein"* , *"hereto"* and *"hereunder"* and similar words when used in each Loan Document shall refer to such Loan Document as a whole and not to any particular provision of such Loan Document, and Section, schedule and exhibit references contained therein shall refer to Sections thereof or schedules or exhibits thereto unless otherwise expressly provided therein.

(d)     All references herein to a time of day shall mean the then applicable time in New York, New York, unless otherwise expressly provided herein.

(e)     Section headings have been inserted in the Loan Documents for convenience only and shall not be construed to be a part thereof.  Unless the context otherwise requires, words in the singular number include the plural, and words in the plural include the singular.

(f)     Whenever in any Loan Document or in any certificate or other document made or delivered pursuant thereto, the terms thereof require that a Person sign or execute the same or refer to the same as having been so signed or executed, such terms shall mean that the same shall be, or was, duly signed or executed by (i) in respect of any Person that is a corporation, any duly authorized officer thereof, and (ii) in respect of any other Person (other than an individual), any analogous counterpart thereof.

(g)     The words *"include"* and *"including"* , when used in each Loan Document, shall mean that the same shall be included *"without limitation"* , unless otherwise specifically provided.

20

CVS Health Corporation 2017 364-Day Credit Agreement

2.      *AMOUNT AND TERMS OF LOANS*

### 2.1    *Revolving Credit Loans*

(a)     Subject to the terms and conditions hereof, each Lender severally (and not jointly) agrees to make loans in Dollars under this Agreement (each a *"Revolving Credit Loan"* and, collectively with each other Revolving Credit Loan of such Lender and/or with each Revolving Credit Loan of each other Lender, the *"Revolving Credit Loans"* ) to the Borrower from time to time during the Commitment Period, during which period the Borrower may borrow, prepay and reborrow in accordance with the provisions hereof.  Immediately after making each Revolving Credit Loan and after giving effect to all Competitive Bid Loans repaid on the same date, the Aggregate Credit Exposure will not exceed the Aggregate Commitment Amount.  With respect to each Lender, at the time of the making of any Revolving Credit Loan, the sum of (I) the principal amount of such Lender's Revolving Credit Loan constituting a part of the Revolving Credit Loans to be made and (II) the aggregate principal balance of all other Revolving Credit Loans (exclusive of Revolving Credit Loans which are repaid with the proceeds of, and simultaneously with the incidence of, the Revolving Credit Loans to be made) then outstanding from such Lender, will not exceed the Commitment of such Lender at such time.  At the option of the Borrower, indicated in a Borrowing Request, Revolving Credit Loans may be made as ABR Advances or Eurodollar Advances.

(b)     The aggregate outstanding principal balance of all Revolving Credit Loans shall be due and payable on the Commitment Termination Date (subject to Section 2.2 ) or on such earlier date upon which all of the Commitments shall have been terminated in accordance with Section 2.6 .

### 2.2    *Term-out Option*

The Borrower may, upon not less than 10 days' (and not  more than 60 days') notice to the Administrative Agent, elect to convert all of the Loans outstanding on the Commitment Termination Date in effect at such time into "term loans" in which case the outstanding Loans shall not be due on the Commitment Termination Date and shall instead be due and payable on the first anniversary of the Commitment Termination Date, with the effect that, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, all references in this Agreement and each other Loan Document to the Commitment Termination Date (other than as set forth in this Section 2.2 or Section 2.1 ) shall thereafter be deemed to refer to the date that is the first anniversary of the Commitment Termination Date; *provided* that (a) the Borrower shall have delivered an officer's certificate on the Commitment Termination Date certifying that the representations and warranties contained in this Agreement shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the Commitment Termination Date ( *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the Commitment Termination Date), except those which are expressly specified to be made as of an earlier date, (b) no Default shall have occurred and be continuing, and (c) the Borrower shall have paid to the Administrative Agent for the account of the Lenders a fee in the amount equal to (i) 0.75% multiplied by (ii) the aggregate outstanding principal amount of all Loans so converted. All

Loans converted into "term loans" pursuant to Page 15604 shall continue to constitute Loans under this Agreement and the other Loan Documents except that the Borrower may not reborrow such Loans pursuant to <u>Section 2.1</u> after all or any portion of such Loans have been prepaid pursuant to <u>Section 2.7</u> and no new Loans may be borrowed on or after the Commitment Termination Date.

2.3    ***Notice of Borrowing Revolving Credit Loans***

The Borrower agrees to notify the Administrative Agent, which notification shall be irrevocable, no later than (a) 12:00 Noon on the proposed Borrowing Date in the case of Revolving Credit Loans to consist of ABR Advances and (b) 12:00 Noon at least three Eurodollar Business Days prior to the proposed Borrowing Date in the case of Revolving Credit Loans to consist of Eurodollar Advances. Each such notice shall specify (i) the aggregate amount requested to be borrowed under the Commitments, (ii) the proposed Borrowing Date, (iii) whether a borrowing of Revolving Credit Loans is to be made as an ABR Advance, one or more Eurodollar Advances, or both, and the amount of each thereof, and (iv) the Eurodollar Interest Period for each such Eurodollar Advance. Each such notice shall be promptly confirmed by delivery to the Administrative Agent of a Borrowing Request. Each Eurodollar Advance to be made on a Borrowing Date, when aggregated with all amounts to be Converted to Eurodollar Advances on such date and having the same Interest Period as such Eurodollar Advance, shall equal no less than $10,000,000, or an integral multiple of $1,000,000 in excess thereof. Each ABR Advance made on each Borrowing Date shall equal no less than $5,000,000 or an integral multiple of $500,000 in excess thereof. The Administrative Agent shall promptly notify each Lender (by telephone or otherwise, such notification to be confirmed by fax, email or other writing) of each such Borrowing Request. Subject to its receipt of each such notice from the Administrative Agent and subject to the terms and conditions hereof, each Lender shall make immediately available funds available to the Administrative Agent at the address therefor set forth in <u>Section 11.2</u> not later than 1:00 P.M. on each Borrowing Date in an amount equal to such Lender's Commitment Percentage of the Revolving Credit Loans requested by the Borrower on such Borrowing Date.

2.4    ***Competitive Bid Loans and Procedure***

(a)    Subject to the terms and conditions hereof, the Borrower may request competitive bid loans in Dollars under this Agreement (each a ***"Competitive Bid Loan"***) during the Commitment Period. In order to request Competitive Bids, the Borrower shall deliver by hand, fax or email to the Administrative Agent a duly completed and executed Competitive Bid Request not later than 12:00 Noon, one Domestic Business Day before the proposed Borrowing Date therefor. A Competitive Bid Request that does not conform substantially to the format of <u>Exhibit F</u> may be rejected by the Administrative Agent in the Administrative Agent's reasonable discretion, and the Administrative Agent shall promptly notify the Borrower of such rejection by fax or email and by telephone. Each Competitive Bid Request shall specify (x) the proposed Borrowing Date for the Competitive Bid Loans then being requested (which shall be a Domestic Business Day) and the aggregate principal amount thereof and (y) the Competitive Interest Period or Competitive Interest Periods (which shall not exceed ten different Interest Periods in a single Competitive Bid Request), with respect thereto (which may not end after the Domestic Business Day immediately preceding the Commitment Termination Date). Promptly after its

receipt of each Competitive Bid Request that is not garbled as aforesaid, the Administrative Agent shall invite by fax or email (in the form of Exhibit G ) the Lenders (other than any Defaulting Lender) to bid, on the terms and conditions of this Agreement, to make Competitive Bid Loans pursuant to such Competitive Bid Request.

(b)    Each Lender (other than any Defaulting Lender), in its sole and absolute discretion, may make one or more Competitive Bids to the Borrower responsive to a Competitive Bid Request.  Each Competitive Bid by a Lender must be received by the Administrative Agent not later than 10:00 A.M. on the proposed Borrowing Date for the relevant Competitive Bid Loan.  Multiple bids will be accepted by the Administrative Agent.  Bids to make Competitive Bid Loans that, in the reasonable judgment of the Administrative Agent, do not conform to the Bids solicited by the related Competitive Bid Request shall be rejected by the Administrative Agent.  Bids to make Competitive Bid Loans that do not conform substantially to the format of Exhibit H may be rejected by the Administrative Agent after conferring with, and upon the instruction of, the Borrower, and the Administrative Agent shall notify the Lender making such nonconforming bid of such rejection as soon as practicable.  Each Competitive Bid shall be irrevocable and shall specify (x) the principal amount (which (1) shall be in a minimum principal amount of $10,000,000 or an integral multiple of $1,000,000 in excess thereof, and (2) may equal the entire principal amount requested by the Borrower) of the Competitive Bid Loan or Competitive Bid Loans that the Lender is willing to make to the Borrower, (y) the Competitive Bid Rate or Rates at which the Lender is prepared to make such Competitive Bid Loan or Competitive Bid Loans, and (z) the Competitive Interest Period with respect to each such Competitive Bid Loan and the last day thereof.  If any Lender shall elect not to make a Competitive Bid, such Lender shall so notify the Administrative Agent by fax or email not later than 10:00 A.M. on the proposed Borrowing Date therefor, *provided* that the failure by any Lender to give any such notice shall not obligate such Lender to make any Competitive Bid Loan in connection with the relevant Competitive Bid Request.

(c)    With respect to each Competitive Bid Request, the Administrative Agent shall (i) notify the Borrower by fax or email by 11:00 A.M. on the proposed Borrowing Date with respect thereto of each Competitive Bid made, the Competitive Bid Rate applicable thereto and the identity of the Lender that made such Competitive Bid, and (ii) send a list of all Competitive Bids to the Borrower for its records as soon as practicable after completion of the bidding process.  Each notice and list sent by the Administrative Agent pursuant to this Section 2.4(c) shall list the Competitive Bids in ascending yield order.

(d)    The Borrower may in its sole and absolute discretion, subject only to the provisions of this Section 2.4(d) , accept or reject any Competitive Bid made in accordance with the procedures set forth in this Section 2.4 , and the Borrower shall notify the Administrative Agent by telephone, confirmed by fax or email in the form of a duly completed and executed Competitive Bid Accept/Reject Letter, whether and to what extent it has decided to accept or reject any or all of such Competitive Bids not later than 12:00 Noon on the proposed Borrowing Date therefor; *provided* that the failure by the Borrower to give such notice shall be deemed to be a rejection of all such Competitive Bids.  In connection with each acceptance of one or more Competitive Bids by the Borrower:

(1)     the Borrower shall not accept a Competitive Bid of a given tenor made at a particular Competitive Bid Rate if the Borrower has decided to reject a Competitive Bid having the same tenor made at a lower Competitive Bid Rate unless the acceptance of such lower Competitive Bid would subject the Borrower to any requirement to withhold any taxes or deduct any amount from any amounts payable under the Loan Documents, in which case the Borrower may reject such lower Competitive Bid,

(2)      the aggregate amount of the Competitive Bids accepted by the Borrower shall not exceed the principal amount specified in the Competitive Bid Request therefor,

(3)      if the Borrower shall desire to accept a Competitive Bid made at a particular Competitive Bid Rate, it must accept all other Competitive Bids at such Competitive Bid Rate, except for any such Competitive Bid the acceptance of which would subject the Borrower to any requirement to withhold any taxes or deduct any amount from any amounts payable under the Loan Documents; *provided* that if the acceptance of all such other Competitive Bids would cause the aggregate amount of all such accepted Competitive Bids to exceed the amount requested, then such acceptance shall be made pro rata in accordance with the amount of each such Competitive Bid at such Competitive Bid Rate,

(4)      except pursuant to clause (3) above, no Competitive Bid shall be accepted unless the Competitive Bid Loan with respect thereto shall be in a minimum principal amount of $10,000,000 or an integral multiple of $1,000,000 in excess thereof, and

(5)      no Competitive Bid shall be accepted and no Competitive Bid Loan shall be made, if immediately after giving effect thereto, the Aggregate Credit Exposure would exceed the Aggregate Commitment Amount.

(e)     The Administrative Agent shall promptly fax or email to each bidding Lender (with a copy to the Borrower) a Competitive Bid Accept/Reject Letter advising such Lender whether its Competitive Bid has been accepted (and if accepted, in what amount and at what Competitive Bid Rate), and each successful bidder so notified will thereupon become bound, subject to the other applicable conditions hereof, to make the Competitive Bid Loan in respect of which each of its Competitive Bids has been accepted by making immediately available funds available to the Administrative Agent at its address set forth in  Section 11.2 not later than 1:00 P.M. on the Borrowing Date for such Competitive Bid Loan in the amount thereof.

(f)      Anything herein to the contrary notwithstanding, if the Administrative Agent shall elect to submit a Competitive Bid in its capacity as a Lender, it shall submit such bid directly to the Borrower not later than 9:30 A.M. on the relevant proposed Borrowing Date.

(g)     All notices required by this Section 2.4 shall be given in accordance with Section 11.2 .

(h)        Each Competitive Bid Loan shall be due and payable on the last day of the Interest Period applicable thereto or on such earlier date upon which the Loans shall become due and payable pursuant to the provisions hereof, whether by acceleration or otherwise.

### 2.5    *Use of Proceeds*

The Borrower agrees that the proceeds of the Loans shall be used solely for its general corporate purposes, but not inconsistent with this Section 2.5.  Notwithstanding anything to the contrary contained in any Loan Document, the Borrower further agrees that no part of the proceeds of any Loan will be used, directly or indirectly, and whether immediately, incidentally or ultimately (i) for a purpose which violates any law, rule or regulation of any Governmental Authority, including the provisions of Regulations U or X of the Board of Governors of the Federal Reserve System, as amended, or any provision of this Agreement, including, without limitation, the provisions of <u>Section 4.9</u> or (ii) to make a loan to any director or executive officer of the Borrower or any Subsidiary.

### 2.6    *Termination, Reduction or Increase of Commitments*

(a)        *Termination on Commitment Termination Date* .  Unless previously terminated, the Commitments shall terminate on the Commitment Termination Date.

(b)        *Voluntary Termination or Reductions* .   At the Borrower's option and upon at least one Domestic Business Day's prior irrevocable notice to the Administrative Agent, the Borrower may (i) terminate the Commitments at any time, or (ii) permanently reduce the Aggregate Commitment Amount in part at any time and from time to time, *provided* that (1) each such partial reduction shall be in an amount equal to at least $5,000,000 or an integral multiple of $1,000,000 in excess thereof, and (2) immediately after giving effect to each such reduction, the Aggregate Commitment Amount shall equal or exceed the Aggregate Credit Exposure, and *provided* , *further* that, notwithstanding the foregoing, a notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities (such notice to specify the proposed effective date), in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to such specified effective date) if such condition is not satisfied and the Borrower shall indemnify the Lenders in accordance with <u>Section 3.5</u> , if applicable.

(c)        *In General* .   Each reduction of the Aggregate Commitment Amount shall be made by reducing each Lender's Commitment Amount by an amount equal to the product of such Lender's Commitment Percentage and the amount of such reduction.

(d)        *Increase in Aggregate Commitment Amount.* The Borrower may at any time and from time to time prior to the 90 [th] day prior to the then applicable Commitment Termination Date, at its sole cost and expense, request any one or more of the Lenders having a Commitment to increase its Commitment Amount (the decision to increase the Commitment Amount of a Lender to be within the sole and absolute discretion of such Lender), or any other Eligible Assignee reasonably satisfactory to the Administrative Agent to provide a new Commitment, by submitting to the Administrative Agent a Commitment Increase Supplement, duly executed by the Borrower and each such Lender or other Eligible Assignee, as the case may

be.  Upon receipt of any such Commitment Increase Supplement, the Administrative Agent shall promptly execute such Commitment Increase Supplement and the Administrative Agent shall deliver a copy thereof to the Borrower and each such Lender or other Eligible Assignee, as the case may be.  Upon execution and delivery of such Commitment Increase Supplement by the Administrative Agent, (i) in the case of each such Lender (an **" *Increasing Lender* "** ), its Commitment Amount shall be increased to the amount set forth in such Commitment Increase Supplement, and (ii) in the case of each such other Eligible Assignee (a **" *New Lender* "** ), such New Lender shall become a party hereto and have the rights and obligations of a Lender under the Loan Documents and its Commitment shall be as set forth in such Commitment Increase Supplement; *provided* that:

(1)    immediately after giving effect thereto, the sum of all increases in the Aggregate Commitment Amount made pursuant to this Section 2.6(d) shall not exceed $250,000,000;

(2)    each such increase of the Aggregate Commitment Amount shall be in an amount not less than $25,000,000 or such amount plus an integral multiple of $5,000,000;

(3)    no Default shall have occurred or be continuing on the effective date of the increase;

(4)    the representations and warranties contained in this Agreement shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the effective date of such increase (provided that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such effective date), except those which are expressly specified to be made as of an earlier date;

(5)    in the case of each New Lender, the Commitment Amount assumed by such New Lender shall not be less than $25,000,000;

(6)    if Revolving Credit Loans would be outstanding immediately after giving effect to any such increase, then simultaneously with such increase (A) each such Increasing Lender, each such New Lender and each other Lender shall be deemed to have entered into a master assignment and assumption, in form and substance substantially similar to Exhibit E , pursuant to which each such other Lender shall have assigned to each such Increasing Lender and each such New Lender a portion of its Revolving Credit Loans necessary to reflect proportionately the Commitments as increased in accordance with this Section 2.6(d) , and (B) in connection with such assignment, each such Increasing Lender and each such New Lender shall pay to the Administrative Agent, for the account of each such other Lender, such amount as shall be necessary to reflect the assignment to it of Revolving Credit Loans, and in connection with such master assignment each such other Lender may treat the assignment of Eurodollar Advances as a prepayment of such Eurodollar Advances for purposes of Section 3.5 ;

26

(7)        each such New Lender shall have delivered to the Administrative Agent an Administrative Questionnaire and to the Administrative Agent and the Borrower all forms, if any, that are required to be delivered by such New Lender pursuant to <u>Section 3.10</u> ; and

(8)        the Administrative Agent shall have received such other certificates, resolutions and opinions as the Administrative Agent shall have reasonably requested.

2.7    ***Prepayments of Loans***

(a)        *Voluntary Prepayments* .  The Borrower may prepay Revolving Credit Loans and Competitive Bid Loans, in whole or in part, without premium or penalty, but subject to <u>Section 3.5</u> at any time and from time to time, by notifying the Administrative Agent, which notification shall be irrevocable, at least two Eurodollar Business Days, in the case of a prepayment of Eurodollar Advances, two Domestic Business Days, in the case of a prepayment of Competitive Bid Loans, or one Domestic Business Day, in the case of a prepayment of ABR Advances, prior to the proposed prepayment date specifying (i) the Loans to be prepaid, (ii) the amount to be prepaid, and (iii) the date of prepayment.  Upon receipt of each such notice, the Administrative Agent shall promptly notify each Lender thereof.  Each such notice given by the Borrower pursuant to this <u>Section 2.7</u> shall be irrevocable, *provided* that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by <u>Section 2.6</u> , then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with <u>Section 2.6</u> , and the Borrower shall indemnify the Lenders in accordance with <u>Section 3.5</u> .  Each partial prepayment under this <u>Section 2.7</u> shall be (A) in the case of Eurodollar Advances, in a minimum amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof, (B) in the case of ABR Advances, in a minimum amount of $1,000,000 or an integral multiple of $100,000 in excess thereof, and (C) in the case of Competitive Bid Loans, in a minimum amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof.

(b)        *In General* .  Simultaneously with each prepayment hereunder, the Borrower shall prepay all accrued interest on the amount prepaid through the date of prepayment and indemnify the Lenders in accordance with <u>Section 3.5</u> , if applicable.

2.8    ***Reserved***

2.9    ***Reserved***

2.10    ***Reserved***

2.11    ***Notes***

Any Lender may request that the Loans made by it be evidenced by a Note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Person or, if requested by such Person, such Person and its registered assigns.  Thereafter, all Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant

27

to Section 11.7 ) be represented by a Note in like form payable to the payee named therein and its registered assigns.

2.12    ***Extension of Commitment Termination Date***

(a)    *Request for Extension* .  The Borrower may, by notice to the Administrative Agent (which shall promptly notify the Lenders) not more than 60 days and not less than 30 days prior to the Commitment Termination Date (the " ***Extension Date*** ") request (an " ***Extension Request*** " ) that the Lenders extend the Commitment Termination Date then in effect (the " ***Existing Commitment Termination Date*** " ) for an additional 364-day period.  Each Lender, acting in its sole discretion, shall, by notice to the Borrower and the Administrative Agent given not later than the 20th day (or such later day as shall be acceptable to the Borrower) following the date of the Borrower's notice, advise the Borrower and the Administrative Agent whether or not such Lender agrees to such extension; *provided* that any Lender that does not so advise the Borrower and the Administrative Agent shall be deemed to have rejected such Extension Request.  The election of any Lender to agree to such extension shall not obligate any other Lender to so agree.

(b)    *Replacement of Non-Extending Lenders* .  The Borrower shall have the right at any time on or prior to the relevant Extension Date to replace any Lender which has not consented to the Extension Request (each, a ***"Non-Extending Lender"*** ) pursuant to Section 3.13 .

(c)    *Conditions to Effectiveness of Extension* .  Notwithstanding anything in this Agreement to the contrary, the extension of the Existing Commitment Termination Date on any Extension Date shall not be effective unless, immediately before and after giving effect to such extension on such Extension Date: (i) no Default shall have occurred and be continuing on such Extension Date and the representations and warranties contained in this Agreement shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on such Extension Date  ( *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such Extension Date), except those which are expressly specified to be made as of an earlier date, and the Administrative Agent shall have received a certificate, in form and substance reasonably satisfactory to the Administrative Agent, to such effect from the chief financial officer of the Borrower (or such other financial officer reasonably acceptable to the Administrative Agent), and (ii) the Administrative Agent shall have received such other certificates, resolutions and opinions as the Administrative Agent may reasonably request.

(d)    *Effectiveness of Extension* .  If (and only if) the conditions specified in Section 2.12(c) have been satisfied or waived with respect to the extension of the Existing Commitment Termination Date on the applicable Extension Date, then, effective as of such Extension Date, the Commitment Termination Date, with respect to the Commitment of each Lender that has agreed to so extend its Commitment and of each Replacement Lender that has assumed a Commitment of a Non-Extending Lender in connection with such Extension Request, shall be extended to the date falling 364-days after the Existing Commitment Termination Date (or, if such date is not a Domestic Business Day, the immediately preceding Domestic Business Day), and each such Replacement Lender shall thereupon become a "Lender" for all purposes of

28

this Agreement. Notwithstanding anything herein contained, (i) with respect to any portion of the Commitment of any Non-Extending Lender that has not been fully assumed by one or more Replacement Lenders, the Commitment Termination Date for such Lender with respect to such non-assumed portion of its Commitment shall remain unchanged, and (ii) with respect to any Loans of such Lender that have not been purchased by one or more Replacement Lenders, the applicable maturity date with respect to such non-purchased Loans shall remain unchanged and shall be repayable by the Borrower on such applicable maturity date without there being any requirement that any such repayment be shared with other Lenders. In addition, on the Extension Date, the Borrower agrees to pay all accrued and unpaid interest, fees and other amounts then due under this Agreement from the Borrower to each Lender consenting to the Extension Request, each Non-Extending Lender and each Replacement Lender. Solely for the purpose of calculating break funding payments under Section 3.5 , the assignment by any Non-Extending Lender of any Eurodollar Advance prior to the last day of the Interest Period applicable thereto in accordance with this Section 2.12 shall be deemed to constitute a prepayment by the Borrower of such Eurodollar Advance.

2.13    ***Defaulting Lenders***

Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    Facility Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 3.11 ;

(b)    the Commitment and Committed Credit Exposure of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 11.1 ); *provided* that any waiver, amendment or modification with respect to the following shall require the consent of such Defaulting Lender: (i) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender differently than other affected Lenders, (ii) any waiver, amendment or modification increasing the Commitment of such Defaulting Lender, (iii) any waiver, amendment or modification extending the Commitment Period with respect to such Defaulting Lender, (iv) any waiver, amendment or modification reducing the principal amount owed under the Loan Documents to such Defaulting Lender (other than by payment thereof), or (v) any waiver, amendment or modification extending the final maturity of sums owed to such Defaulting Lender, or (vi) a modification of this Section 2.13(b) ;

(c)    [reserved];

(d)    [reserved];

(e)    any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 11.9 but excluding Section 3.13 ) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in

a segregated account and, subject to any applicable requirement of law, be applied at such time or times as may be determined by the Administrative Agent (i) <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) <u>second</u>, to the funding of any Revolving Credit Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (iii) <u>third</u>, if so determined by the Administrative Agent and the Borrower, held in such account as cash collateral for future funding obligations of the Defaulting Lender in respect of any Revolving Credit Loans under this Agreement, (iv) <u>fourth</u>, to the payment of any amounts owing to the Lenders as a result of any final and non-appealable judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, (v) <u>fifth</u>, to the payment of any amounts owing to the Borrower as a result of any final and non-appealable judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, and (vi) <u>sixth</u>, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if such payment is (x) a prepayment of the principal amount of any Revolving Credit Loan and (y) made at a time when the conditions set forth in Section 6 are satisfied or waived, such payment shall be applied solely to prepay the Revolving Credit Loans of all non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans owed to any Defaulting Lender; and

(f)    The Borrower shall have the right at any time during which a Lender is a Defaulting Lender to replace such Defaulting Lender pursuant to <u>Section 3.13</u>.

## 3.    *PROCEEDS, PAYMENTS, CONVERSIONS, INTEREST, YIELD PROTECTION AND FEES*

### 3.1    *Disbursement of the Proceeds of the Loans*

The Administrative Agent shall disburse the proceeds of the Loans at its office specified in <u>Section 11.2</u> by crediting to the Borrower's general deposit account with the Administrative Agent the funds received from each Lender.  Unless the Administrative Agent shall have received prior notice from a Lender (by telephone or otherwise, such notice to be confirmed by fax, email or other writing) that such Lender will not make available to the Administrative Agent such Lender's Commitment Percentage of the Revolving Credit Loans, or the amount of any Competitive Bid Loan, to be made by it on a Borrowing Date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such Borrowing Date in accordance with this <u>Section 3.1</u>, *provided* that, in the case of a Revolving Credit Loan, such Lender received notice thereof from the Administrative Agent in accordance with the terms hereof, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such Borrowing Date a corresponding amount.  If and to the extent such Lender shall not have so made such amount available to the Administrative Agent, such Lender and the Borrower severally agree to pay to the Administrative Agent, forthwith on demand, such corresponding amount (to the extent not previously paid by the other), together with interest thereon for each day from the date such amount is made available to the Borrower until the date such amount is paid to the Administrative Agent, at a rate per annum equal to, in the case of the Borrower, the applicable interest rate set forth in <u>Section 3.4(a)</u> and, in the case of such Lender, the

Federal Funds Effective Rate (but not less than 0.0%) until the third day after such payment is due until the third day after such date and, thereafter, at the Federal Funds Effective Rate (but not less than 0.0%) *plus* 2%. Any such payment by the Borrower shall be without prejudice to its rights against such Lender. If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Loan as part of such Loans for purposes of this Agreement, which Loan shall be deemed to have been made by such Lender on the Borrowing Date applicable to such Loans.

3.2    ***Payments***

(a)    Each payment, including each prepayment, of principal and interest on the Loans and of the Facility Fee (collectively, together with all of the other fees to be paid to the Administrative Agent and the Lenders in connection with the Loan Documents, the ***"Fees"*** ), and of all of the other amounts to be paid to the Administrative Agent and the Lenders in connection with the Loan Documents (other than amounts payable to a Lender under Section 3.5 , Section 3.6 , Section 3.10 , Section 11.5 and Section 11.10 ) shall be made by the Borrower to the Administrative Agent at its office specified in Section 11.2 without setoff, deduction or counterclaim in funds immediately available in New York by 3:00 P.M. on the due date for such payment. The failure of the Borrower to make any such payment by such time shall not constitute a default hereunder, *provided* that such payment is made on such due date, but any such payment made after 3:00 P.M. on such due date shall be deemed to have been made on the next Domestic Business Day or Eurodollar Business Day, as the case may be, for the purpose of calculating interest on amounts outstanding on the Loans. If the Borrower has not made any such payment prior to 3:00 P.M., the Borrower hereby authorizes the Administrative Agent to deduct the amount of any such payment from such account(s) as the Borrower may from time to time designate in writing to the Administrative Agent, upon which the Administrative Agent shall apply the amount of such deduction to such payment. Promptly upon receipt thereof by the Administrative Agent, each payment of principal and interest on the: (i) Revolving Credit Loans shall be remitted by the Administrative Agent in like funds as received to each Lender (a) first, pro rata according to the amount of interest which is then due and payable to the Lenders, and (b) second, pro rata according to the amount of principal which is then due and payable to the Lenders and (ii) Competitive Bid Loans shall be remitted by the Administrative Agent in like funds as received to each applicable Lender. Each payment of the Facility Fee payable to the Lenders shall be promptly transmitted by the Administrative Agent in like funds as received to each Lender pro rata according to such Lender's Commitment Amount or, if the Commitments shall have terminated or been terminated, according to the outstanding principal amount of such Lender's Revolving Credit Loans.

(b)    If any payment hereunder or under the Loans shall be due and payable on a day which is not a Domestic Business Day or a Eurodollar Business Day, as the case may be, the due date thereof (except as otherwise provided in the definition of Eurodollar Interest Period or Competitive Interest Period) shall be extended to the next Domestic Business Day or Eurodollar Business Day, as the case may be, and (except with respect to payments in respect of the Facility Fee) interest shall be payable at the applicable rate specified herein during such extension.

3.3    *Conversions; Other Matters*

(a)    The Borrower may elect at any time and from time to time to Convert one or more Eurodollar Advances to an ABR Advance by giving the Administrative Agent at least one Domestic Business Day's prior irrevocable notice of such election, specifying the amount to be so Converted.  In addition, the Borrower may elect at any time and from time to time to Convert an ABR Advance to any one or more new Eurodollar Advances or to Convert any one or more existing Eurodollar Advances to any one or more new Eurodollar Advances by giving the Administrative Agent no later than 10:00 A.M. at least two Eurodollar Business Days' prior irrevocable notice of such election, specifying the amount to be so Converted and the initial Interest Period relating thereto, *provided* that any Conversion of an ABR Advance to an Eurodollar Advance shall only be made on a Eurodollar Business Day.  The Administrative Agent shall promptly provide the Lenders with notice of each such election.  Each Conversion of Loans shall be made pro rata according to the outstanding principal amount of the Loans of each Lender.  ABR Advances and Eurodollar Advances may be Converted pursuant to this Section 3.3 in whole or in part, *provided* that the amount to be Converted to each Eurodollar Advance, when aggregated with any Eurodollar Advance to be made on such date in accordance with Section 2.1 and having the same Interest Period as such first Eurodollar Advance, shall equal no less than $10,000,000 or an integral multiple of $1,000,000 in excess thereof.

(b)    Notwithstanding anything in this Agreement to the contrary, the Borrower shall not have the right to elect to Convert any existing ABR Advance to a Eurodollar Advance or to Convert any existing Eurodollar Advance to a new Eurodollar Advance if (i) a Default or Event of Default under Section 9.1(a) ,  Section 9.1(b) , Section 9.1(h), Section 9.1(i) or Section 9.1(j) shall then exist, or (ii) any other Event of Default shall then exist and the Administrative Agent shall have notified the Borrower at the request of the Required Lenders that no ABR Advance or Eurodollar Advance may be Converted to a new Eurodollar Advance.  In such event, such ABR Advance shall be automatically continued as an ABR Advance or such Eurodollar Advance shall be automatically Converted to an ABR Advance on the last day of the Interest Period applicable to such Eurodollar Advance.  The foregoing shall not affect any other rights or remedies that the Administrative Agent or any Lender may have under this Agreement or any other Loan Document.

(c)    Each Conversion shall be effected by each Lender by applying the proceeds of each new ABR Advance or Eurodollar Advance, as the case may be, to the existing ABR Advance or Eurodollar Advance (or portion thereof) being Converted (it being understood that such Conversion shall not constitute a borrowing for purposes of Section 4 or Section 6 ).

(d)    Notwithstanding any other provision of any Loan Document:

(1)    if the Borrower shall have failed to elect a Eurodollar Advance under Section 2.3 or this Section 3.3 , as the case may be, in connection with any borrowing of new Revolving Credit Loans or expiration of an Interest Period with respect to any existing Eurodollar Advance, the amount of the Revolving Credit Loans subject to such borrowing or such existing Eurodollar Advance shall thereafter be an ABR Advance until such time, if any, as the Borrower shall elect a new Eurodollar Advance pursuant to this Section 3.3 ,

(2)      the Borrower shall not be permitted to select a Eurodollar Advance the Interest Period in respect of which ends later than the Commitment Termination Date or such earlier date upon which all of the Commitments shall have been terminated in accordance with Section 2.6 , and

(3)      the Borrower shall not be permitted to have more than 15 Eurodollar Advances and Competitive Bid Loans, in the aggregate, outstanding at any one time; it being understood and agreed that each borrowing of Eurodollar Advances or Competitive Bid Loans pursuant to a single Borrowing Request or Competitive Bid Request, as the case may be, shall constitute the making of one Eurodollar Advance or Competitive Bid Loan for the purpose of calculating such limitation.

3.4      *Interest Rates and Payment Dates*

(a)      *Prior to Maturity* .  Except as otherwise provided in Section 3.4(b) and Section 3.4(c) , the Loans shall bear interest on the unpaid principal balance thereof at the applicable interest rate or rates per annum set forth below:

| LOANS | RATE |
|---|---|
| Revolving Credit Loans constituting ABR Advances | Alternate Base Rate *plus* the Applicable Margin. |
| Revolving Credit Loans constituting Eurodollar Advances | Eurodollar Rate applicable thereto *plus* the Applicable Margin. |
| Competitive Bid Loans | Fixed rate of interest applicable thereto accepted by the Borrower pursuant to Section 2.4(d) . |

(b)      *After Maturity, Late Payment Rate* .  After maturity, whether by acceleration, notice of intention to prepay or otherwise, the outstanding principal balance of each Loan shall bear interest at the applicable interest rate on such Loan *plus* 2% per annum until paid (whether before or after the entry of any judgment thereon).  Any payment of principal or interest on the Loans, Fees or other amounts payable by the Borrower under the Loan Documents not paid on the date when due and payable shall bear interest, in the case of principal or interest on a Loan, at the applicable interest rate on such Loan *plus* 2% per annum and, in the case of any Fees or other amounts, at the Alternate Base Rate *plus* the Applicable Margin *plus* 2% per annum, in each case from the due date thereof until the date such payment is made (whether before or after the entry of any judgment thereon).

(c)      *Highest Lawful Rate* .  Notwithstanding anything to the contrary contained in this Agreement, at no time shall the interest rate payable to any Lender on any of its Loans, together with the Fees and all other amounts payable hereunder to such Lender to the extent the same constitute or are deemed to constitute interest, exceed the Highest Lawful Rate.  If in respect of any period during the term of this Agreement, any amount paid to any Lender hereunder, to the extent the same shall (but for the provisions of this Section 3.4 ) constitute or be

deemed to constitute interest, would exceed the maximum amount of interest permitted by the Highest Lawful Rate during such period (such amount being hereinafter referred to as an **"Unqualified Amount"** ), then (i) such Unqualified Amount shall be applied or shall be deemed to have been applied as a prepayment of the Loans of such Lender, and (ii) if, in any subsequent period during the term of this Agreement, all amounts payable hereunder to such Lender in respect of such period which constitute or shall be deemed to constitute interest shall be less than the maximum amount of interest permitted by the Highest Lawful Rate during such period, then the Borrower shall pay to such Lender in respect of such period an amount (each a **"Compensatory Interest Payment"** ) equal to the lesser of (x) a sum which, when added to all such amounts, would equal the maximum amount of interest permitted by the Highest Lawful Rate during such period, and (y) an amount equal to the aggregate sum of all Unqualified Amounts *less* all other Compensatory Interest Payments.

(d)        *General* .   Interest shall be payable in arrears on each Interest Payment Date, on the Commitment Termination Date, to the extent provided in Section 2.7(b) , upon each prepayment of the Loans and, to the extent provided in Section 2.12(d), on the Extension Date.  Any change in the interest rate on the Loans resulting from an increase or a decrease in the Alternate Base Rate or any reserve requirement shall become effective as of the opening of business on the day on which such change shall become effective.  The Administrative Agent shall, as soon as practicable, notify the Borrower and the Lenders of the effective date and the amount of each change in the BNY Mellon Rate, but any failure to so notify shall not in any manner affect the obligation of the Borrower to pay interest on the Loans in the amounts and on the dates set forth herein.  Each determination by the Administrative Agent of the Alternate Base Rate, the Eurodollar Rate and the Competitive Bid Rate pursuant to this Agreement shall be conclusive and binding on the Borrower absent manifest error.  The Borrower acknowledges that to the extent interest payable on the Loans is based on the Alternate Base Rate, such rate is only one of the bases for computing interest on loans made by the Lenders, and by basing interest payable on ABR Advances on the Alternate Base Rate, the Lenders have not committed to charge, and the Borrower has not in any way bargained for, interest based on a lower or the lowest rate at which the Lenders may now or in the future make extensions of credit to other Persons.  All interest (other than interest calculated with reference to the BNY Mellon Rate) shall be calculated on the basis of a 360-day year for the actual number of days elapsed, and all interest determined with reference to the BNY Mellon Rate shall be calculated on the basis of a 365/366-day year for the actual number of days elapsed.

3.5      **Indemnification for Loss**

Notwithstanding anything contained herein to the contrary, if: (i) the Borrower shall fail to borrow a Eurodollar Advance or if the Borrower shall fail to Convert all or any portion of any Revolving Credit Loan constituting an ABR Advance to a Eurodollar Advance after it shall have given notice to do so in which it shall have requested a Eurodollar Advance pursuant to Section 2.3 or Section 3.3 , as the case may be, (ii) the Borrower shall fail to borrow a Competitive Bid Loan after it shall have accepted any offer with respect thereto in accordance with Section 2.4 , (iii) a Eurodollar Advance, Competitive Bid Loan shall be terminated for any reason prior to the last day of the Interest Period applicable thereto, (iv) any repayment or prepayment of the principal amount of a Eurodollar Advance or Competitive Bid Loan is made for any reason on a date which is prior to the last day of the Interest Period applicable thereto, (v) the Borrower shall have revoked a notice of

prepayment or notice of termination of the Commitments that is (v) conditioned upon the effectiveness of other credit facilities pursuant to Section 2.6 or Section 2.7 , or (vi) a Eurodollar Advance is assigned other than on the last day of the Interest Period applicable thereto as a result of an increase in the Aggregate Commitment Amount pursuant to Section 2.6(d) or a replacement of a Lender pursuant to clause (x) or (z) of Section 3.13 , then the Borrower agrees to indemnify each Lender against, and to pay on demand directly to such Lender the amount (calculated by such Lender using any method chosen by such Lender which is customarily used by such Lender for such purpose for borrowers similar to the Borrower) equal to any loss or expense suffered by such Lender as a result of such failure to borrow or Convert, or such termination, repayment, prepayment or revocation, including any loss, cost or expense suffered by such Lender in liquidating or employing deposits acquired to fund or maintain the funding of such Eurodollar Advance or Competitive Bid Loan, as the case may be, or redeploying funds prepaid or repaid, in amounts which correspond to such Eurodollar Advance or Competitive Bid Loan, as the case may be, and any reasonable internal processing charge customarily charged by such Lender in connection therewith for borrowers similar to the Borrower.

3.6    ***Reimbursement for Costs, Etc.***

If at any time or from time to time there shall occur a Regulatory Change and any Lender shall have reasonably determined that such Regulatory Change (i) shall have had or will thereafter have the effect of reducing (A) the rate of return on such Lender's capital or liquidity or the capital or liquidity of any Person directly or indirectly owning or controlling such Lender (each a ***"Control Person"*** ), or (B) the asset value (for capital or liquidity purposes) to such Lender or such Control Person, as applicable, of the Loans, or any participation therein, in any case to a level below that which such Lender or such Control Person could have achieved or would thereafter be able to achieve but for such Regulatory Change (after taking into account such Lender's or such Control Person's policies regarding capital or liquidity), (ii) will impose, modify or deem applicable any reserve, asset, special deposit or special assessment requirements on deposits obtained in the interbank eurodollar market in connection with the Loan Documents (excluding, with respect to any Eurodollar Advance, any such requirement which is included in the determination of the rate applicable thereto), or (iii) will subject such Lender or such Control Person, as applicable, to any tax (documentary, stamp or otherwise) with respect to this Agreement, any Note, or any other Loan Document (except, in the case of clause (iii) above, for any Indemnified Taxes, Excluded Taxes or Other Taxes) then, in each such case, within ten days after demand by such Lender, the Borrower shall pay directly to such Lender or such Control Person, as the case may be, such additional amount or amounts as shall be sufficient to compensate such Lender or such Control Person, as the case may be, for any such reduction, reserve or other requirement, tax, loss, cost or expense (excluding general administrative and overhead costs) (collectively, ***"Costs"*** ) attributable to such Lender's or such Control Person's compliance during the term hereof with such Regulatory Change, but only if such Costs are generally applicable to (and for which reimbursement is generally being sought by such Lender or such Control Person, as applicable, in respect of) credit transactions similar to this transaction from similarly situated borrowers (which are parties to credit or loan documentation containing a provision similar to this Section 3.6 ), as determined by such Lender, in its reasonable discretion.  Each Lender may make multiple requests for compensation under this Section 3.6 .

Notwithstanding the foregoing, the Borrower shall not be required to compensate any Lender for any Costs under this Section 3.6 arising prior to 45 days preceding the date of demand, unless the applicable Regulatory Change giving rise to such Costs is imposed retroactively. In the case of retroactivity, such notice shall be provided to the Borrower not later than 45 days from the date that such Lender learned of such Regulatory Change. The Borrower's obligation to compensate such Lender shall be contingent upon the provision of such timely notice (but any failure by such Lender to provide such timely notice shall not affect the Borrower's obligations with respect to (i) Costs incurred from the date as of which such Regulatory Change became effective to the date that is 45 days after the date such Lender reasonably should have learned of such Regulatory Change and (ii) Costs incurred following the provision of such notice).

3.7      *Illegality of Funding*

Notwithstanding any other provision hereof, if any Lender shall reasonably determine that any law, regulation, treaty or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for such Lender to make or maintain any Eurodollar Advance as contemplated by this Agreement, such Lender shall promptly notify the Borrower and the Administrative Agent thereof, and (a) the commitment of such Lender to make such Eurodollar Advances or Convert ABR Advances to such Eurodollar Advances shall forthwith be suspended, (b) such Lender shall fund its portion of each requested Eurodollar Advance as an ABR Advance and (c) such Lender's Loans then outstanding as such Eurodollar Advances, if any, shall be Converted automatically to an ABR Advance on the last day of the then current Interest Period applicable thereto or at such earlier time as may be required. If the commitment of any Lender with respect to Eurodollar Advances is suspended pursuant to this Section 3.7 and such Lender shall have obtained actual knowledge that it is once again legal for such Lender to make or maintain Eurodollar Advances, such Lender shall promptly notify the Administrative Agent and the Borrower thereof and, upon receipt of such notice by each of the Administrative Agent and the Borrower, such Lender's commitment to make or maintain Eurodollar Advances shall be reinstated. If the commitment of any Lender with respect to Eurodollar Advances is suspended pursuant to this Section 3.7 , such suspension shall not otherwise affect such Lender's Commitment.

3.8      *Option to Fund; Substituted Interest Rate*

(a)      Each Lender has indicated that, if the Borrower requests a Eurodollar Advance or a Competitive Bid Loan, such Lender may wish to purchase one or more deposits in order to fund or maintain its funding of its Commitment Percentage of such Eurodollar Advance or Competitive Bid Loan during the Interest Period with respect thereto; it being understood that the provisions of this Agreement relating to such funding are included only for the purpose of determining the rate of interest to be paid in respect of such Eurodollar Advance or Competitive Bid Loan and any amounts owing under Section 3.5 and Section 3.6 . Each Lender shall be entitled to fund and maintain its funding of all or any part of each Eurodollar Advance and Competitive Bid Loan in any manner it sees fit, but all such determinations hereunder shall be made as if such Lender had actually funded and maintained its Commitment Percentage of each Eurodollar Advance or Competitive Bid Loan, as the case may be, during the applicable Interest Period through the purchase of deposits in an amount equal to the amount of its Commitment Percentage of such Eurodollar Advance or Competitive Bid Loan, as the case may be, and having a maturity corresponding to such Interest Period. Each Lender may fund its Loans from

36

or for the account of any branch or office of such Lender as such Lender may choose from time to time, subject to Section 3.10 .

(b)     In the event that (i) the Administrative Agent shall have determined in good faith (which determination shall be conclusive and binding upon the Borrower) that Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period or if by reason of circumstances affecting the interbank eurodollar market adequate and reasonable means do not exist for ascertaining the Eurodollar Rate applicable pursuant to Section 2.3 or Section 3.3 , or (ii) the Required Lenders shall have notified the Administrative Agent that they have in good faith determined (which determination shall be conclusive and binding on the Borrower) that the applicable Eurodollar Rate will not adequately and fairly reflect the cost to such Lenders of maintaining or funding loans bearing interest based on such Eurodollar Rate with respect to any portion of the Revolving Credit Loans that the Borrower has requested be made as Eurodollar Advances or any Eurodollar Advance that will result from the requested Conversion of any portion of the Revolving Credit Loans into Eurodollar Advances (each, an **"Affected Advance"** ), the Administrative Agent shall promptly notify the Borrower and the Lenders (by telephone or otherwise, to be promptly confirmed in writing) of such determination on or, to the extent practicable, prior to the requested Borrowing Date or Conversion date for such Affected Advances.  If the Administrative Agent shall give such notice, (A) any Affected Advances shall be made as ABR Advances, (B) the Revolving Credit Loans (or any portion thereof) that were to have been Converted to Affected Advances shall be Converted to or continued as ABR Advances, and (C) any outstanding Affected Advances shall be Converted, on the last day of the then current Interest Period with respect thereto, to ABR Advances.  Until any notice under clauses (i) or (ii), as the case may be, of this Section 3.8(b) has been withdrawn by the Administrative Agent (by notice to the Borrower) promptly upon either (x) the Administrative Agent having determined that such circumstances affecting the relevant market no longer exist and that adequate and reasonable means do exist for determining the Eurodollar Rate pursuant to Section 2.3 or Section 3.3 , or (y) the Administrative Agent having been notified by the Required Lenders that circumstances no longer render the Loans (or any portion thereof) Affected Advances, no further Eurodollar Advances shall be required to be made by the Lenders nor shall the Borrower have the right to Convert all or any portion of the Revolving Credit Loans to Eurodollar Advances.

3.9     *Certificates of Payment and Reimbursement*

Each Lender agrees, in connection with any request by it for payment or reimbursement pursuant to Section 3.5 or Section 3.6 , to provide the Borrower with a certificate, signed by an officer of such Lender, as the case may be, setting forth a description in reasonable detail of any such payment or reimbursement and the applicable Section of this Agreement pursuant to and in accordance with which such request is made.  Each determination by such Lender of such payment or reimbursement shall be conclusive absent manifest error.

3.10     *Taxes; Net Payments*

(a)     *Payments Free of Taxes* .  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes,

*provided* that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.10 ) the Administrative Agent or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    *Payment of Other Taxes by the Borrower* .  Without limiting the provisions of paragraph (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    *Indemnification by the Borrower* .  The Borrower shall indemnify the Administrative Agent and each Lender within 30 days after demand therefor, for the full amount of any Indemnified Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.10 ) paid by the Administrative Agent or such Lender, as the case may be, and, without duplication, any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by such Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of such Lender shall be conclusive absent manifest error.  After any Lender learns of the imposition of any Indemnified Taxes or Other Taxes, such Lender will as soon as reasonably practicable notify the Borrower thereof; *provided* that the failure to provide Borrower with such notice shall not release the Borrower from its indemnification obligations under this Section 3.10 .

(d)    *Evidence of Payments* .  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    *Indemnification by the Lenders* .  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.7(d) relating to the maintenance of a Participant Register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set

off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     *Status of Lenders* .  Any Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is resident for Tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, any Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter (i) if such Foreign Lender shall determine that any applicable form or certification has expired or will then expire or has or will then become obsolete or incorrect or that an event has occurred that requires or will then require a change in the most recent form or certification previously delivered by it to the Borrower and the Administrative Agent and (ii) upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E claiming eligibility for benefits of an income Tax treaty to which the United States of America is a party,

(ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate (a **"United States Tax Compliance Certificate"** ) to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c) (3)(B) of the Internal Revenue Code, (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code nor (D) engaged in the conduct of a trade or business within the United States to which the interest payment is effectively connected and (y) duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E,

(iv)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), a complete and executed Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, Form W-8BEN, Form W-8BEN-E, a United States Tax Compliance

39

CVS Health Corporation 2017 364-Day Credit Agreement

Certificate, Internal Revenue Service Form W-9 and other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender shall provide a United States Tax Compliance Certificate, on behalf of such beneficial owner(s) in lieu of requiring each beneficial owner to provide its own certificate, or

(v)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.   Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Without limiting the foregoing, upon request of the Administrative Agent or the Borrower, each Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code that lends to the Borrower (each, a ***"U.S. Lender"*** )  shall deliver to the Administrative Agent and the Borrower two duly signed, properly completed copies of Internal Revenue Service Form W-9 on or prior to the Effective Date (or on or prior to the date it becomes a party to this Agreement), certifying that such U.S. Lender is entitled to an exemption from United States backup withholding, or any successor form.

(g)    *Treatment of Certain Refunds* .  If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this <u>Section 3.10</u> , it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this <u>Section 3.10</u> with respect to the Taxes or Other Taxes giving rise to such refund), net of all reasonable and documented out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such

refund or Tax credit to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(h)     *Designation of a Different Lending Office* .  If any Lender requests compensation under Section 3.6 , or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to this Section 3.10 , then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.6 or this  Section 3.10 , as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

(i)     *Survival* .  Each party's obligations under this Section 3.10 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

3.11    ***Facility Fees***

The Borrower agrees to pay to the Administrative Agent for the account of each Lender a fee (the ***"Facility Fee"*** ) during the period commencing on the Effective Date and ending on the Expiration Date, payable quarterly in arrears on the last day of each March, June, September and December of each year, commencing on the last day of the calendar quarter during which the Facility Fee shall commence to accrue, and on the Expiration Date, at a rate per annum equal to the Applicable Margin of (a) prior to the Commitment Termination Date or such earlier date upon which all of the Commitments shall have been terminated in accordance with Section 2.6 , the Commitment Amount of such Lender (whether used or unused), and (b) thereafter, the sum of the outstanding principal balance of all Revolving Credit Loans of such Lender.  Notwithstanding anything to the contrary contained in this Section 3.11 , on and after the Commitment Termination Date, the Facility Fee shall be payable upon demand.  In addition, upon each reduction of the Aggregate Commitment Amount, the Borrower shall pay the Facility Fee accrued on the amount of such reduction through the date of such reduction.  The Facility Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

3.12    ***Reserved***

3.13    ***Replacement of Lender***

If (x) the Borrower is obligated to pay to any Lender any amount under Section 3.6 or Section 3.10 , the Borrower shall have the right within 90 days thereafter, (y) any Lender shall be a Defaulting Lender, the Borrower shall have the right at any time during which such Lender shall remain a Defaulting Lender, or (z) any Lender shall have not consented to an Extension Request, the Borrower shall have the right at any time on the relevant Extension Date, in each case in

accordance with the requirements of Section 11.7(b) and only if no Default shall exist, to replace such Lender (the *"Replaced Lender"* ) with one or more Eligible Assignees (each a *"Replacement Lender"* ), reasonably acceptable to the Administrative Agent, *provided* that (i) at the time of any replacement pursuant to this Section 3.13 , the Replacement Lender shall enter into one or more Assignment and Assumptions pursuant to Section 11.7(b) (with the processing and recordation fee referred to in Section 11.7(b) payable pursuant to said Section 11.7(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire the Commitment and the outstanding Loans of the Replaced Lender and, in connection therewith, shall pay the following: (a) to the Replaced Lender, an amount equal to the sum of (A) the principal of, and all accrued interest on, all outstanding Loans of the Replaced Lender and (B) an amount equal to all accrued, but unpaid, fees owing to the Replaced Lender, and (b) to the Administrative Agent an amount equal to all amounts owed by such Replaced Lender to the Administrative Agent under this Agreement, including, without limitation, an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Replaced Lender, a corresponding amount of which was made available by the Administrative Agent to the Borrower pursuant to Section 3.1 and which has not been repaid to the Administrative Agent by such Replaced Lender or the Borrower, and (ii) all obligations of the Borrower owing to the Replaced Lender (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid) shall be paid in full to such Replaced Lender concurrently with such replacement.  Upon the execution of the respective Assignment and Assumptions and the payment of amounts referred to in clauses (i) and (ii) of this Section 3.13 , the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement that are intended to survive the termination of the Commitments and the repayment of the Loans which may be applicable to any such Replaced Lender prior to the date of its replacement.  Solely for the purpose of calculating break funding payments under Section 3.5 , the assignment by any Replaced Lender of any Eurodollar Advance prior to the last day of the Interest Period applicable thereto pursuant to clause (x) or (z) of this Section 3.13 shall be deemed to constitute a prepayment by the Borrower of such Eurodollar Advance.

4.      ***REPRESENTATIONS AND WARRANTIES***

        In order to induce the Administrative Agent and the Lenders to enter into this Agreement, and the Lenders to make the Loans, the Borrower hereby makes the following representations and warranties to the Administrative Agent and the Lenders:

    4.1     ***Existence and Power***

        Each of the Borrower and the Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation (except, in the case of the Subsidiaries, where the failure to be in such good standing could not reasonably be expected to have a Material Adverse effect), has all requisite corporate power and authority to own its Property and to carry on its business as now conducted, and is qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which it owns or leases real Property or in which the nature of its business requires it to be so qualified (except those jurisdictions where the failure to be so qualified or to be in good standing could not reasonably be expected to have a Material Adverse effect).

42

4.2    *Authority; EEA Financial Institution.*

The Borrower has full corporate power and authority to enter into, execute, deliver and perform the terms of the Loan Documents, all of which have been duly authorized by all proper and necessary corporate action and are not in contravention of any applicable law or the terms of its Certificate of Incorporation and By-Laws. No consent or approval of, or other action by, shareholders of the Borrower, any Governmental Authority, or any other Person (which has not already been obtained) is required to authorize in respect of the Borrower, or is required in connection with, the execution, delivery, and performance by the Borrower of the Loan Documents or is required as a condition to the enforceability of the Loan Documents against the Borrower. The Borrower is not an EEA Financial Institution.

4.3    *Binding Agreement*

The Loan Documents constitute the valid and legally binding obligations of the Borrower, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by equitable principles relating to the availability of specific performance as a remedy.

4.4    *Litigation*

As of the Effective Date, there are no actions, suits, arbitration proceedings or claims (whether purportedly on behalf of the Borrower, any Subsidiary or otherwise) pending or, to the knowledge of the Borrower, threatened against the Borrower or any Subsidiary or any of their respective Properties, or maintained by the Borrower or any Subsidiary, at law or in equity, before any Governmental Authority which could reasonably be expected to have a Material Adverse effect. There are no proceedings pending or, to the knowledge of the Borrower, threatened against the Borrower or any Subsidiary (a) which call into question the validity or enforceability of any Loan Document, or otherwise seek to invalidate, any Loan Document, or (b) which might, individually or in the aggregate, materially and adversely affect any of the transactions contemplated by any Loan Document.

4.5    *No Conflicting Agreements*

(a)    Neither the Borrower nor any Subsidiary is in default under any agreement to which it is a party or by which it or any of its Property is bound the effect of which could reasonably be expected to have a Material Adverse effect. No notice to, or filing with, any Governmental Authority is required for the due execution, delivery and performance by the Borrower of the Loan Documents.

(b)    No provision of any existing material mortgage, material indenture, material contract or material agreement or of any existing statute, rule, regulation, judgment, decree or order binding on the Borrower or any Subsidiary or affecting the Property of the Borrower or any Subsidiary conflicts with, or requires any consent which has not already been obtained under, or would in any way prevent the execution, delivery or performance, by the Borrower of the terms of, any Loan Document. Neither the execution and delivery, nor the performance, by the Borrower of the terms of each Loan Document will constitute a default

43

under, or result in the creation or imposition of, or obligation to create, any Lien upon the Property of the Borrower or any Subsidiary pursuant to the terms of any such mortgage, indenture, contract or agreement.

4.6    **Taxes**

The Borrower and each Subsidiary has filed or caused to be filed all tax returns, and has paid, or has made adequate provision for the payment of, all taxes shown to be due and payable on said returns or in any assessments made against them, the failure of which to file or pay could reasonably be expected to have a Material Adverse effect, and no tax Liens (other than Liens permitted under Section 8.2 ) have been filed against the Borrower or any Subsidiary and no claims are being asserted with respect to such taxes which are required by GAAP to be reflected in the Financial Statements and are not so reflected, except for taxes which have been assessed but which are not yet due and payable.  The charges, accruals and reserves on the books of the Borrower and each Subsidiary with respect to all federal, state, local and other taxes are considered by the management of the Borrower to be adequate, and the Borrower knows of no unpaid assessment which (a) could reasonably be expected to have a Material Adverse effect, or (b) is or might be due and payable against it or any Subsidiary or any Property of the Borrower or any Subsidiary, except such thereof as are being contested in good faith and by appropriate proceedings diligently conducted, and for which adequate reserves have been set aside in accordance with GAAP or which have been assessed but are not yet due and payable.

4.7    **Compliance with Applicable Laws; Filings**

Neither the Borrower nor any Subsidiary is in default with respect to any judgment, order, writ, injunction, decree or decision of any Governmental Authority which default could reasonably be expected to have a Material Adverse effect.  The Borrower and each Subsidiary is complying with all applicable statutes, rules and regulations of all Governmental Authorities, a violation of which could reasonably be expected to have a Material Adverse effect.  The Borrower and each Subsidiary has filed or caused to be filed with all Governmental Authorities all reports, applications, documents, instruments and information required to be filed pursuant to all applicable laws, rules, regulations and requests which, if not so filed, could reasonably be expected to have a Material Adverse effect.

4.8    **Governmental Regulations**

The Borrower is not subject to regulation under the Investment Company Act of 1940, as amended.

4.9    **Federal Reserve Regulations; Use of Proceeds**

The Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans has been or will be used, directly or indirectly, and whether immediately, incidentally or ultimately, for a purpose which violates the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended.  Anything in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to or on behalf of the Borrower in violation of any limitation or prohibition provided by any applicable law, regulation or

statute, including said Regulation U. Following application of the proceeds of each Loan, not more than 25% (or such greater or lesser percentage as is provided in the exclusions from the definition of " Indirectly Secured " contained in said Regulation U as in effect at the time of the making of such Loan) of the value of the assets of the Borrower and the Subsidiaries on a Consolidated basis that are subject to <u>Section 8.2</u> will be Margin Stock.  In addition, no part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, to make a loan to any director or executive officer of the Borrower or any Subsidiary.

4.10    ***No Misrepresentation***

No representation or warranty contained in any Loan Document and no certificate or written report furnished by the Borrower to the Administrative Agent or any Lender pursuant to any Loan Document contains, as of its date, a misstatement of a material fact, or omits to state, as of its date, a material fact required to be stated in order to make the statements therein contained, when taken as a whole, not materially misleading ( *provided* that any representation, warranty, statement or written report that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such date) in the light of the circumstances under which made (after giving effect to all supplements and updates with respect thereto) (it being understood that the Borrower makes no representation or warranty hereunder with respect to any projections or other forward looking information).

4.11    ***Plans***

The Borrower, each Subsidiary and each ERISA Affiliate have complied with the material requirements of Section 515 of ERISA with respect to each Pension Plan which is a Multiemployer Plan, except where the failure to so comply could not reasonably be expected to have a Material Adverse effect.  The Borrower, each Subsidiary and each ERISA Affiliate has, as of the date hereof, made all contributions or payments to or under each Pension Plan required by law or the terms of such Pension Plan or any contract or agreement, except where the failure to make such contributions or payments could not reasonably be expected to have a Material Adverse effect.  No liability to the PBGC has been, or is reasonably expected by the Borrower, any Subsidiary or any ERISA Affiliate to be, incurred by the Borrower, any Subsidiary or any ERISA Affiliate that could reasonably be expected to have a Material Adverse effect.  Liability, as referred to in this <u>Section 4.11</u>, includes any joint and several liability, but excludes any current or, to the extent it represents future liability in the ordinary course, any future liability for premiums under Section 4007 of ERISA.

4.12    ***Environmental Matters***

Neither the Borrower nor any Subsidiary (a) has received written notice or otherwise learned of any claim, demand, action, event, condition, report or investigation indicating or concerning any potential or actual liability which individually or in the aggregate could reasonably be expected to have a Material Adverse effect, arising in connection with (i) any non-compliance with or violation of the requirements of any applicable Environmental Law, or (ii) the release or threatened release of any Hazardous Material, (b) to the best knowledge of the Borrower, has any threatened or actual liability in connection with the release or threatened release of any Hazardous Material into the environment which individually or in the aggregate could reasonably be expected

to have a Material Adverse effect, (c) has received notice of any federal or state investigation evaluating whether any remedial action is needed to respond to a release or threatened release of any Hazardous Material into the environment for which the Borrower or any Subsidiary is or would be liable, which liability would reasonably be expected to have a Material Adverse effect, or (d) has received notice that the Borrower or any Subsidiary is or may be liable to any Person under the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. Section 9601 et seq ., or any analogous state law, which liability would reasonably be expected to have a Material Adverse effect. The Borrower and each Subsidiary is in compliance with the financial responsibility requirements of federal and state Environmental Laws to the extent applicable, including those contained in 40 C.F.R., parts 264 and 265, subpart H, and any analogous state law, except in those cases in which the failure so to comply would not reasonably be expected to have a Material Adverse effect.

4.13    *Financial Statements*

The Borrower has heretofore delivered to the Lenders through the Administrative Agent copies of the audited Consolidated Balance Sheet of the Borrower and its Subsidiaries as of December 31, 2016, and the related Consolidated Statements of Income, Comprehensive Income, Shareholders' Equity and Cash Flows for the fiscal year then ended. The financial statements referred to immediately above, including all related notes and schedules, are herein referred to collectively as the *"Financial Statements"* . The Financial Statements fairly present, in all material respects, the Consolidated financial condition and results of the operations of the Borrower and the Subsidiaries as of the dates and for the periods indicated therein and, except as noted therein, have been prepared in conformity with GAAP as then in effect. Neither the Borrower nor any of the Subsidiaries has any material obligation or liability of any kind (whether fixed, accrued, contingent, unmatured or otherwise) which, in accordance with GAAP as then in effect, should have been disclosed in the Financial Statements and was not. During the period from January 1, 2017 to and including the Effective Date, there was no Material Adverse change, including as a result of any change in law, in the Consolidated financial condition, operations, business or Property of the Borrower and the Subsidiaries taken as a whole.

4.14    *Anti-Corruption Laws and Sanctions*

The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, the Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, the Subsidiaries and their respective officers and employees and, to the knowledge of the Borrower, its directors are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Borrower, any Subsidiary or, to the knowledge of the Borrower or such Subsidiary, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

5.    ***CONDITIONS TO EFFECTIVENESS***

This Agreement shall become effective on and as of the date (the ***"Effective Date"*** ) that the following conditions shall have been satisfied:

5.1    ***Agreement***

The Administrative Agent shall have received counterparts of this Agreement executed by the Borrower, the Administrative Agent and each Lender.

5.2    ***Notes***

The Administrative Agent shall have received a Note, executed by the Borrower, for each Lender that shall have given at least three Domestic Business Days' prior written notice of its request for a Note.

5.3    ***Corporate Action***

The Administrative Agent shall have received a certificate, dated the Effective Date, of the Secretary or an Assistant Secretary of the Borrower (i) attaching a true and complete copy of the resolutions of its Board of Directors and of all documents evidencing all other necessary corporate action (in form and substance reasonably satisfactory to the Administrative Agent) taken by the Borrower to authorize this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, (ii) attaching a true and complete copy of its Certificate of Incorporation and By-Laws, (iii) setting forth the incumbency of the officer or officers of the Borrower who may sign this Agreement and the Loan Documents, and any other certificates, requests, notices or other documents required hereunder or thereunder, and (iv) attaching a certificate of good standing of the Secretary of State of the State of Delaware.

5.4    ***Opinion of Counsel to the Borrower***

The Administrative Agent shall have received (a) an opinion of Thomas Moffatt, assistant general counsel of the Borrower, dated the Effective Date, in the form of Exhibit D-1 , and (b) an opinion of Shearman & Sterling LLP, special counsel to the Borrower, dated the Effective Date, in the form of Exhibit D-2 .

5.5    ***Reserved.***

5.6    ***No Default and Representations and Warranties***

The Administrative Agent shall have received a certificate, dated the Effective Date, of the Senior Vice President and Treasurer of the Borrower certifying that there exists no Default and that the representations and warranties contained in this Agreement are true and correct in all material respects (provided that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the Effective Date).

5.7    *Fees*

The Administrative Agent shall have received all fees and other amounts due and payable to it on the Effective Date, including the upfront fees payable to the Lenders, in respect of this Agreement.

5.8    ***Due Diligence; "Know Your Customer"***

Each Lender shall have received such documents and information as it may have requested in order to comply with "know-your-customer" and other applicable Sanctions, anti-terrorism, anti-money laundering and similar rules and regulations and related policies, to the extent the Borrower shall have received written requests therefor at least ten (10) Domestic Business Days prior to the Effective Date.

## 6.    *CONDITIONS OF LENDING - ALL LOANS*

The obligation of each Lender on any Borrowing Date to make each Revolving Credit Loan and each Lender to make a Competitive Bid Loan are subject to the fulfillment of the following conditions precedent:

6.1    *Compliance*

On each Borrowing Date, and after giving effect to the Loans to be made on such Borrowing Date, (a) there shall exist no Default, and (b) the representations and warranties contained in this Agreement shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on such Borrowing Date ( *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such Borrowing Date), except those which are expressly specified to be made as of an earlier date.

6.2    *Requests*

The Administrative Agent shall have timely received from the Borrower on or before such Borrowing Date, as applicable, a duly executed Borrowing Request  and/or Competitive Bid Request (together with a duly executed Competitive Bid Accept/Reject Letter).

## 7.    *AFFIRMATIVE COVENANTS*

The Borrower covenants and agrees that on and after the Effective Date and until the later to occur of (a) the Commitment Termination Date and (b) the payment in full of the Loans, the Fees and all other sums payable under the Loan Documents (other than contingent obligations for which no claim has been made), the Borrower will:

7.1    *Legal Existence*

Except as may otherwise be permitted by Section 8.3 and Section 8.4 , maintain, and cause each Subsidiary to maintain, its corporate existence in good standing in the jurisdiction of its incorporation or formation and in each other jurisdiction in which the failure so to do could

reasonably be expected to have a Material Adverse effect, except that the corporate existence of Subsidiaries may be terminated if (i) such Subsidiaries operate closing or discontinued operations or (ii) if the Borrower determines in good faith that such termination is in the best interests of the Borrower and is not materially disadvantageous to the Lenders.

7.2    **Taxes**

Pay and discharge when due, and cause each Subsidiary so to do, all taxes, assessments, governmental charges, license fees and levies upon or with respect to the Borrower and such Subsidiary, and upon the income, profits and Property thereof unless, and only to the extent, that either (i)(a) such taxes, assessments, governmental charges, license fees and levies shall be contested in good faith and by appropriate proceedings diligently conducted by the Borrower or such Subsidiary, and (b) such reserve or other appropriate provision as shall be required by GAAP shall have been made therefor, or (ii) the failure to pay or discharge such taxes, assessments, governmental charges, license fees and levies could not reasonably be expected to have a Material Adverse effect.

7.3    **Insurance**

Keep, and cause each Subsidiary to keep, insurance with responsible insurance companies in such amounts and against such risks as is usually carried by the Borrower or such Subsidiary.

7.4    **Performance of Obligations**

Pay and discharge when due, and cause each Subsidiary so to do, all lawful Indebtedness, obligations and claims for labor, materials and supplies or otherwise which, if unpaid, could reasonably be expected to (a) have a Material Adverse effect, or (b) become a Lien on the Property of the Borrower or any Subsidiary, except those Liens permitted under Section 8.2 , *provided* that neither the Borrower nor such Subsidiary shall be required to pay or discharge or cause to be paid or discharged any such Indebtedness, obligation or claim so long as (i) the validity thereof shall be contested in good faith and by appropriate proceedings diligently conducted by the Borrower or such Subsidiary, and (ii) such reserve or other appropriate provision as shall be required by GAAP shall have been made therefor.

7.5    **Condition of Property**

Except for ordinary wear and tear, at all times, maintain, protect and keep in good repair, working order and condition, all material Property necessary for the operation of its business (other than Property which is replaced with similar Property) as then being operated, and cause each Subsidiary so to do.

7.6    **Observance of Legal Requirements**

(a)    Observe and comply in all material respects, and cause each Subsidiary so to do, with all laws, ordinances, orders, judgments, rules, regulations, certifications, franchises, permits, licenses, directions and requirements of all Governmental Authorities, which now or at

49

any time hereafter may be applicable to it or to such Subsidiary, a violation of which could reasonably be expected to have a Material Adverse effect; and

        (b)     Maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, the Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

      7.7     *Financial Statements and Other Information*

        Maintain, and cause each Subsidiary to maintain, a standard system of accounting in accordance with GAAP, and furnish to the Administrative Agent for distribution to the Lenders:

        (a)     As soon as available and, in any event, within 90 days after the close of each fiscal year, a copy of (x) the Borrower's 10-K in respect of such fiscal year, and (y) (i) the Borrower's Consolidated Balance Sheet as of the end of such fiscal year, and (ii) the related Consolidated Statements of Income, Comprehensive Income, Shareholders' Equity and Cash Flows, as of and through the end of such fiscal year, setting forth in each case in comparative form the corresponding figures in respect of the previous fiscal year, all in reasonable detail, and accompanied by a report of the Borrower's auditors, which report shall state that (A) such auditors audited such financial statements, (B) such audit was made in accordance with generally accepted auditing standards in effect at the time and provides a reasonable basis for such opinion, and (C) said financial statements have been prepared in accordance with GAAP;

        (b)     As soon as available, and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year, a copy of (x) the Borrower's 10-Q in respect of such fiscal quarter, and (y) (i) the Borrower's condensed Consolidated Balance Sheet as of the end of such quarter and (ii) the related condensed Consolidated Statements of Income, Comprehensive Income, Shareholders' Equity and Cash Flows for (A) such quarter and (B) the period from the beginning of the then current fiscal year to the end of such quarter, in each case in comparable form with the prior fiscal year, all in reasonable detail and prepared in accordance with GAAP (without footnotes and subject to year-end adjustments);

        (c)     Simultaneously with the delivery of the financial statements required by clauses (a) and (b) above, a certificate of the Chief Financial Officer or the Senior Vice President and Treasurer of the Borrower certifying that no Default shall have occurred or be continuing or, if so, specifying in such certificate all such Defaults, and setting forth computations in reasonable detail demonstrating compliance with Section 8.1 and Section 8.9.

        (d)     Prompt notice upon the Borrower becoming aware of any change in the applicability of a Pricing Level;

        (e)     As soon as practicable after becoming available, copies of all regular or periodic reports (including current reports on Form 8-K) which the Borrower or any Subsidiary may now or hereafter be required to file with or deliver to the Securities and Exchange Commission, or any other Governmental Authority succeeding to the functions thereof;

        (f)     Prompt written notice of: (i) any citation, summons, subpoena, order to show cause or other order naming the Borrower or any Subsidiary a party to any proceeding

before any Governmental Authority which could reasonably be expected to have a Material Adverse effect, and include with such notice a copy of such citation, summons, subpoena, order to show cause or other order, (ii) any lapse or other termination of any license, permit, franchise or other authorization issued to the Borrower or any Subsidiary by any Governmental Authority, (iii) any refusal by any Governmental Authority to renew or extend any license, permit, franchise or other authorization, and (iv) any dispute between the Borrower or any Subsidiary and any Governmental Authority, which lapse, termination, refusal or dispute, referred to in clause (ii), (iii) or (iv) above, could reasonably be expected to have a Material Adverse effect;

(g)     Prompt written notice of the occurrence of (i) each Default, (ii) each Event of Default and (iii) each Material Adverse change;

(h)     As soon as practicable following receipt thereof, copies of any audit reports delivered in connection with the statements referred to in Section 7.7(a);

(i)     From time to time, such other information regarding the financial position or business of the Borrower and the Subsidiaries as the Administrative Agent, at the request of any Lender, may reasonably request; and

(j)     Prompt written notice of such other information with documentation required by bank regulatory authorities under applicable "know your customer" and anti-money laundering laws, rules and regulations (including, without limitation, the Patriot Act), as from time to time may be reasonably requested by the Administrative Agent or any Lender.

Information required to be delivered pursuant to (x) this Section 7.7 shall be deemed to have been delivered if such information shall have been posted by the Administrative Agent on a Debtdomain, IntraLinks, Syndtrak or similar electronic system (the **"Platform"**) to which each Lender has been granted access and (y) clauses (a), (b) and (e) of this Section 7.7 shall be deemed delivered to the Administrative Agent and the Lenders when available on the Borrower's website at http://www.cvshealth.com or the website of the Securities and Exchange Commission at http://www.sec.gov.  Information delivered pursuant to this Section 7.7 may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

The Borrower hereby acknowledges that the Administrative Agent and/or the Joint Lead Arrangers and Joint Bookrunners will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, **"Borrower Materials"**) by posting the Borrower Materials on the Platform.

7.8     *Records*

Upon reasonable notice and during normal business hours and, if no Event of Default has occurred and is continuing, not more than once in each fiscal year, permit representatives of the Administrative Agent and each Lender to visit the offices of the Borrower and each Subsidiary, to examine the books and records (other than tax returns and work papers related to tax returns) thereof and auditors' reports relating thereto, to discuss the affairs of the Borrower and each Subsidiary with the respective officers thereof, and to meet and discuss the affairs of the Borrower and each Subsidiary with the Borrower's auditors.

7.9    *Authorizations*

Maintain and cause each Subsidiary to maintain, in full force and effect, all copyrights, patents, trademarks, trade names, franchises, licenses, permits, applications, reports, and other authorizations and rights, which, if not so maintained, would individually or in the aggregate have a Material Adverse effect.

## 8.    *NEGATIVE COVENANTS*

The Borrower covenants and agrees that on and after the Effective Date and until the later to occur of (a) the Commitment Termination Date and (b) the payment in full of the Loans, the Fees and all other sums payable under the Loan Documents (other than contingent obligations for which no claim has been made), the Borrower will not:

8.1    *Subsidiary Indebtedness*

Permit the Indebtedness of all Subsidiaries (excluding Indebtedness under capital leases incurred in connection with a sale leaseback transaction) to exceed (on a combined basis) 15% of Net Tangible Assets.

8.2    *Liens*

Create, incur, assume or suffer to exist any Lien against or on any Property now owned or hereafter acquired by the Borrower or any of the Subsidiaries, or permit any of the Subsidiaries so to do, except any one or more of the following types of Liens: (a) Liens in connection with workers' compensation, unemployment insurance or other social security obligations (which phrase shall not be construed to refer to ERISA or the minimum funding obligations under Section 412 of the Internal Revenue Code), (b) Liens to secure the performance of bids, tenders, letters of credit, contracts (other than contracts for the payment of Indebtedness), leases, statutory obligations, surety, customs, appeal, performance and payment bonds and other obligations of like nature, or to qualify to do business, maintain insurance or obtain other benefits, in each such case arising in the ordinary course of business, (c) mechanics', workmen's, carriers', warehousemen's, materialmen's, landlords' or other like Liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith and by appropriate proceedings diligently conducted, (d) Liens for taxes, assessments, fees or governmental charges the payment of which is not required under Section 7.2 or Section 7.4 , (e) easements, rights of way, restrictions, leases of Property to others, easements for installations of public utilities, title imperfections and restrictions, zoning ordinances and other similar encumbrances affecting Property which in the aggregate do not materially impair its use for the operation of the business of the Borrower or such Subsidiary, (f) Liens on Property of the Subsidiaries under capital leases and Liens on Property (including on the capital stock or other equity interests) of the Subsidiaries acquired (whether as a result of purchase, capital lease, merger or other acquisition) and either existing on such Property when acquired, or created contemporaneously with or within 12 months of such acquisition to secure the payment or financing of the purchase price of such Property (including the construction, development, substantial

52

repair, alteration or improvement thereof), and improvements thereof, *provided* that such Liens attach only to the Property so purchased or acquired (including any such construction, development, substantial repair, alteration or improvement thereof) and *provided further* that the Indebtedness secured by such Liens is permitted by <u>Section 8.1</u>, (g) statutory Liens in favor of lessors arising in connection with Property leased to the Borrower or any of the Subsidiaries, (h) Liens of attachments, judgments or awards against the Borrower or any of the Subsidiaries with respect to which an appeal or proceeding for review shall be pending or a stay of execution or bond shall have been obtained, or which are otherwise being contested in good faith and by appropriate proceedings diligently conducted, and in respect of which adequate reserves shall have been established in accordance with GAAP on the books of the Borrower or such Subsidiary, (i) Liens securing Indebtedness of a Subsidiary to the Borrower or another Subsidiary, (j) Liens (other than Liens permitted by any of the foregoing clauses) arising in the ordinary course of its business which do not secure Indebtedness and do not, in the aggregate, materially detract from the value of the business of the Borrower and its Subsidiaries, taken as a whole, (k) Liens in favor of the United States of America, or any state thereof, to secure partial, progress, advance or other payments pursuant to any contract or provisions of any statute, and (l) additional Liens securing Indebtedness of the Borrower and the Subsidiaries in an aggregate outstanding Consolidated principal amount not exceeding 15% of Net Tangible Assets.

### 8.3    *Dispositions*

Make any Disposition, or permit any of its Subsidiaries so to do, of all or substantially all of the assets of the Borrower and the Subsidiaries on a Consolidated basis.

### 8.4    *Merger or Consolidation, Etc.*

Consolidate with, be acquired by, or merge into or with any Person unless (x) immediately after giving effect thereto no Default shall or would exist and (y) either (i) the Borrower or (ii) a corporation organized and existing under the laws of one of the States of the United States of America shall be the survivor of such consolidation or merger, *provided* that if the Borrower is not the survivor, the corporation which is the survivor shall expressly assume, pursuant to an instrument executed and delivered to the Administrative Agent, and in form and substance reasonably satisfactory to the Administrative Agent, all obligations of the Borrower under the Loan Documents and the Administrative Agent shall have received such documents, opinions and certificates as it shall have reasonably requested in connection therewith.

### 8.5    *Acquisitions*

Make any Acquisition, or permit any of the Subsidiaries so to do, except any one or more of the following: (a) Acquisitions by the Borrower or any of the Subsidiaries in connection with Intercompany Dispositions not prohibited by <u>Section 8.3</u>, and (b) Acquisitions by the Borrower or any of the Subsidiaries, *provided* that immediately before and after giving effect to each such Acquisition no Event of Default shall or would exist.

### 8.6    *Restricted Payments*

Make any Restricted Payment or permit any of the Subsidiaries so to do, except any one or more of the following Restricted Payments: (a) any direct or indirect Subsidiary may make

dividends or other distributions to the Borrower or any other direct or indirect Subsidiary or otherwise ratably with respect to its stock or other equity interests, and (b) the Borrower may make Restricted Payments, *provided* that, in the case of this clause (b), immediately before and after giving effect thereto, no Event of Default shall or would exist.

8.7    ***Limitation on Upstream Dividends by Subsidiaries***

Permit or cause any of the Subsidiaries to enter into or agree, or otherwise be or become subject, to any agreement, contract or other arrangement (other than this Agreement) with any Person (each a ***"Restrictive Agreement"*** ) pursuant to the terms of which (a) such Subsidiary is or would be prohibited from declaring or paying any cash dividends on any class of its stock owned directly or indirectly by the Borrower or any of the other Subsidiaries or from making any other distribution on account of any class of any such stock (herein referred to as ***"Upstream Dividends"*** ), or (b) the declaration or payment of Upstream Dividends by a Subsidiary to the Borrower or another Subsidiary, on an annual or cumulative basis, is or would be otherwise limited or restricted ( ***"Dividend Restrictions"*** ).  Notwithstanding the foregoing, nothing in this Section 8.7 shall prohibit:

(a)    Dividend Restrictions set forth in any Restrictive Agreement in effect on the date hereof and any extensions, refinancings, renewals or replacements thereof; *provided* that the Dividend Restrictions in any such extensions, refinancings, renewals or replacements are no less favorable in any material respect to the Lenders than those Dividend Restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(b)    Dividend Restrictions existing with respect to any Person acquired by the Borrower or any Subsidiary and existing at the time of such acquisition, which Dividend Restrictions are not applicable to any Person or the property or assets of any Person other than such Person or its property or assets acquired, and any extensions, refinancings, renewals or replacements of any of the foregoing; *provided* that the Dividend Restrictions in any such extensions, refinancings, renewals or replacements are no less favorable in any material respect to the Lenders than those Dividend Restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(c)    Dividend Restrictions consisting of customary net worth, leverage and other financial covenants, customary covenants regarding the merger of or sale of stock or assets of a Subsidiary, customary restrictions on transactions with affiliates, and customary subordination provisions governing Indebtedness owed to the Borrower or any Subsidiary, in each case contained in, or required by, any agreement governing Indebtedness incurred by a Subsidiary in accordance with Section 8.1 ; or

(d)    Dividend Restrictions contained in any other credit agreement so long as such Dividend Restrictions are no more restrictive than those contained in this Agreement (including Dividend Restrictions contained in the Existing 2014 Credit Agreement, the Existing 2015 Credit Agreement and the Existing 2017 Credit Agreement).

8.8    ***Limitation on Negative Pledges***

Enter into any agreement (other than (i) this Agreement, (ii) any other credit agreement that is substantially similar to this Agreement, (iii) purchase money financings or capital leases permitted by this Agreement (provided that any prohibition or limitation therein shall only be

54

CVS Health Corporation 2017 364-Day Credit Agreement

effective against the assets financed thereby), (iv) customary restrictions and conditions contained in agreements relating to the Disposition of a Subsidiary, property or assets pending such Disposition, *provided* such restrictions and conditions apply only to such Subsidiary, property or assets, (v) restrictions and conditions contained in documentation relating to a Subsidiary acquired after the Effective Date, *provided* that such restriction or condition (x) existed at the time such Person became a Subsidiary and was not created in contemplation of or in connection with such Person becoming a Subsidiary and (y) applies only to such Subsidiary, and (vi) customary provisions in joint venture agreements, leases, licenses and other contracts restricting or conditioning the assignment or encumbrance thereof, including, without limitation, licenses and sublicenses of patents, trademarks, copyrights and similar intellectually property rights) or permit any Subsidiary so to do, which prohibits or limits the ability of the Borrower or such Subsidiary to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the obligations of the Borrower hereunder.

### 8.9 *Ratio of Consolidated Indebtedness to Total Capitalization*

Permit its ratio of Consolidated Indebtedness to Total Capitalization at the end of any fiscal quarter to exceed 0.6 : 1.0.

## 9. *DEFAULT*

### 9.1 *Events of Default*

The following shall each constitute an *"Event of Default"* hereunder:

(a)  The failure of the Borrower to make any payment of principal on any Loan when due and payable; or

(b)  The failure of the Borrower to make any payment of interest on any Loan or of any Fee on any date when due and payable and such default shall continue unremedied for a period of 5 Domestic Business Days after the same shall be due and payable; or

(c)  The failure of the Borrower to observe or perform any covenant or agreement contained in Section 2.5 , Section 7.1 , or in Section 8 ; or

(d)  The failure of the Borrower to observe or perform any other covenant or agreement contained in this Agreement, and such failure shall have continued unremedied for a period of 30 days after the Borrower shall have become aware of such failure; or

(e)  [Reserved]; or

(f)  Any representation or warranty of the Borrower (or of any of its officers on its behalf) made in any Loan Document, or made in any certificate or report or other document (other than an opinion of counsel) delivered on or after the date hereof in connection with any such Loan Document shall in any such case prove to have been incorrect or misleading (whether because of misstatement or omission) in any material respect when made; or

(g)        (i) Obligations in an aggregate Consolidated amount in excess of $125,000,000 of the Borrower (other than its obligations hereunder and under the Notes) and the Subsidiaries, whether as principal, guarantor, surety or other obligor, for the payment of any Indebtedness or any net liability under interest rate swap, collar, exchange or cap agreements, (A) shall become or shall be declared to be due and payable prior to the expressed maturity thereof, or (B) shall not be paid when due or within any grace period for the payment thereof, or (ii) any holder of any such obligations shall have the right to declare the Indebtedness evidenced thereby due and payable prior to its stated maturity; or

(h)        An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or

(i)        The Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 9.1 , (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or

(j)        The Borrower or any Subsidiary shall (i) generally not be paying its debts as such debts become due or (ii) admit in writing its inability to pay its debts as they become due; or

(k)        Judgments or decrees in an aggregate Consolidated amount in excess of $125,000,000 against the Borrower and the Subsidiaries shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of 60 days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment; or

(l)        After the Effective Date a Change of Control shall occur; or

(m)        (i) Any Termination Event shall occur (x) with respect to any Pension Plan (other than a Multiemployer Plan) or (y) with respect to any other retirement plan subject to Section 302 of ERISA or Section 412 of the Internal Revenue Code, which plan, during the five year period prior to such Termination Event, was the responsibility in whole or in part of the Borrower, any Subsidiary or any ERISA Affiliate, provided that this clause (y) shall only apply if, in connection with such Termination Event, it is reasonably likely that liability in an aggregate

Consolidated amount in excess of $125,000,000 would be imposed upon the Borrower; (ii) the failure to satisfy the minimum funding standards under Section 302 of ERISA or Section 412 of the Internal Revenue Code in an aggregate Consolidated amount in excess of $125,000,000 shall exist with respect to any Pension Plan for which the Borrower has responsibility (other than that portion of a Multiemployer Plan's Accumulated Funding Deficiency to the extent such Accumulated Funding Deficiency is attributable to employers other than Borrower); (iii) any Person shall engage in a Prohibited Transaction involving any Employee Benefit Plan in respect of which it is reasonably likely that liability in an aggregate Consolidated amount in excess of $125,000,000 will be imposed upon the Borrower; (iv) the Borrower shall fail to pay when due an amount which is payable by it to the PBGC or to a Pension Plan (including a Multiemployer Plan) under Title IV of ERISA; (v) the imposition on the Borrower of any tax under Section 4980(B)(a) of the Internal Revenue Code; or (vi) the assessment of a civil penalty on the Borrower with respect to any Employee Benefit Plan under Section 502(c) of ERISA; in each case, to the extent such event or condition would have a Material Adverse effect. In determining the Consolidated amount for any purpose pursuant to this Section 9.1(m), the liabilities, funding amounts, taxes and penalties referenced in the foregoing clauses of this Section 9.1(m) shall include those of the Subsidiaries and ERISA Affiliates of the Borrower to the extent the Borrower is obligated to pay any such liabilities, funding amounts, taxes and penalties.

9.2    ***Remedies***

(a)    Upon the occurrence of an Event of Default or at any time thereafter during the continuance of an Event of Default, the Administrative Agent, at the written request of the Required Lenders, shall notify the Borrower that the Commitments have been terminated and/or that all of the Loans, the Notes and all accrued and unpaid interest on any thereof and all other amounts owing under the Loan Documents have been declared immediately due and payable, *provided* that upon the occurrence of an Event of Default under Section 9.1(h), (i) or (j) with respect to the Borrower, the Commitments shall automatically terminate and all of the Loans, the Notes and all accrued and unpaid interest on any thereof and all other amounts owing under the Loan Documents shall become immediately due and payable without declaration or notice to the Borrower. To the fullest extent not prohibited by law, except for the notice provided for in the preceding sentence, the Borrower expressly waives any presentment, demand, protest, notice of protest or other notice of any kind in connection with the Loan Documents and its obligations thereunder. To the fullest extent not prohibited by law, the Borrower further expressly waives and covenants not to assert any appraisement, valuation, stay, extension, redemption or similar law, now or at any time hereafter in force which might delay, prevent or otherwise impede the performance or enforcement of the Loan Documents.

(b)    In the event that the Commitments shall have been terminated or all of the Loans and the Notes shall have become or been declared to be due and payable pursuant to the provisions of this Section 9.2 , the Administrative Agent and the Lenders agree, among themselves, that any funds received from or on behalf of the Borrower under any Loan Document by any Lender (except funds received by any Lender as a result of a purchase from such Lender pursuant to the provisions of Section 11.9(b) ) shall be remitted to the Administrative Agent, and shall be applied by the Administrative Agent in payment of the Loans and the other obligations of the Borrower under the Loan Documents in the following manner and order: (1) first, to the payment or reimbursement of the Administrative Agent and the

Lenders, in that order, for any fees, expenses or amounts due under the Borrower pursuant to the provisions of Section 11.5 , (2) second, to the payment of the Fees, (3) third, to the payment of any other fees, expenses or amounts (other than the principal of and interest on the Loans and the Notes) payable by the Borrower to the Administrative Agent or any of the Lenders under the Loan Documents, (4) fourth, to the payment, pro rata according to the outstanding principal balance of the Loans of each Lender, of interest due on the Loans, (5) fifth, to the payment, pro rata according to the sum of the aggregate outstanding principal balance of the Loans of each Lender of the aggregate outstanding principal balance of the Loans, and (6) sixth, any remaining funds shall be paid to whosoever shall be entitled thereto or as a court of competent jurisdiction shall direct.

(c)     In the event that the Loans and the Notes shall have been declared due and payable pursuant to the provisions of this Section 9.2 , the Administrative Agent upon the written request of the Required Lenders, shall proceed to enforce the rights of the holders of the Loans and the Notes by suit in equity, action at law and/or other appropriate proceedings, whether for payment or the specific performance of any covenant or agreement contained in the Loan Documents.  In the event that the Administrative Agent shall fail or refuse so to proceed, each Lender shall be entitled to take such action as the Required Lenders shall deem appropriate to enforce its rights under the Loan Documents.

## 10.    *AGENT*

### 10.1    *Appointment and Authority*

Each Credit Party hereby irrevocably appoints BNY Mellon to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Section 10 (other than Section 10.6 ) are solely for the benefit of the Administrative Agent and the Credit Parties and the Borrower shall have no rights as a third party beneficiary or otherwise of any of such provisions.

### 10.2    *Rights as a Lender*

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower, any of its Subsidiaries or any other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

10.3    ***Exculpatory Provisions***

(a)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(1)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(2)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(3)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any of its Subsidiaries or any Affiliate thereof that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 11.1 and Section 9 ) or (ii) in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

(c)    The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Section 5 or Section 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

10.4    ***Reliance by Administrative Agent***

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument,

59

document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent public accounting firms and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accounting firm or experts.

10.5     ***Delegation of Duties***

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section 10 shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

10.6     ***Resignation of Administrative Agent***

The Administrative Agent may at any time give notice of its resignation to the Credit Parties and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to, so long as no Default has occurred and is continuing, the consent of the Borrower (such consent not to be unreasonably withheld or delayed), to appoint a successor, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Credit Parties, appoint a successor Administrative Agent meeting the qualifications set forth above, subject to, so long as no Default has occurred and is continuing, the consent of the Borrower (such consent not to be unreasonably withheld or delayed); *provided* that if the Administrative Agent shall notify the Borrower and the Credit Parties that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Credit Party directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the

retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 10 and Section 11.5 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

10.7   ***Non-Reliance on Administrative Agent and Other Credit Parties***

Each Credit Party acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Credit Party or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Credit Party also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Credit Party or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

10.8   ***No Other Duties, etc.***

Anything herein to the contrary notwithstanding, none of the Joint Bookrunners, the Joint Lead Arrangers, the Co-Documentation Agents or the Co-Syndication Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender.

# 11.   **OTHER PROVISIONS**

11.1   ***Amendments, Waivers, Etc.***

With the written consent of the Required Lenders, the Administrative Agent and the Borrower may, from time to time, enter into written amendments, supplements or modifications of the Loan Documents (which, for the avoidance of doubt, shall require the prior written consent of the Borrower) and, with the written consent of the Required Lenders and the Borrower, the Administrative Agent on behalf of the Lenders may execute and deliver to any such parties a written instrument waiving or consenting to the departure from, on such terms and conditions as the Administrative Agent may specify in such instrument, any of the requirements of the Loan Documents or any Default and its consequences, *provided* that no such amendment, supplement, modification, waiver or consent shall (i) increase the Commitment Amount of any Lender without the consent of such Lender ( *provided* that no waiver of a Default shall be deemed to constitute such an increase), (ii) extend the Commitment Period without the consent of each Lender directly affected thereby, (iii) reduce the amount, or extend the time of payment, of the Fees without the consent of each Lender directly affected thereby, (iv) reduce the rate, or extend the time of payment

of, interest on any Revolving Credit Loan or any Note (other than the applicability of any post-default increase in such rate of interest) without the consent of each Lender directly affected thereby, (v) reduce the amount of, or extend the time of payment of, any payment of any principal on any Revolving Credit Loan or any Note without the consent of each Lender directly affected thereby, (vi) decrease or forgive the principal amount of any Revolving Credit Loan or any Note without the consent of each Lender directly affected thereby, (vii) consent to any assignment or delegation by the Borrower of any of its rights or obligations under any Loan Document without the consent of each Lender, (viii) change the provisions of this Section 11.1 without the consent of each Lender, (ix) change the definition of Required Lenders without the consent of each Lender, (x) change the several nature of the obligations of the Lenders without the consent of each Lender, or (xi) change the sharing provisions among Lenders without the consent of each Lender directly affected thereby.  Notwithstanding the foregoing, in addition to the receipt of the prior written consents of the Borrower and the Required Lenders, no such amendment, supplement, modification, waiver or consent shall (A) amend, modify or waive any provision of Section 10 or otherwise change any of the rights or obligations of the Administrative Agent under any Loan Document without the written consent of the Administrative Agent or (B) change the amount or the time of payment of any Competitive Bid Loan or interest thereon without the written consent of the Lender holding such Competitive Bid Loan.  Any such amendment, supplement, modification, waiver or consent shall apply equally to each of the Lenders and shall be binding upon the parties to the applicable Loan Document, the Lenders, the Administrative Agent and all future holders of the Loans and the Notes.  In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former position and rights under the Loan Documents, but any Default waived shall not extend to any subsequent or other Default, or impair any right consequent thereon.

11.2    ***Notices***

(a)    *Notices Generally.* Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

*If to the Borrower* :

CVS Health Corporation
1 CVS Drive
Woonsocket, Rhode Island 02895
Attention:    Carol A. DeNale
              Senior Vice President and Treasurer – Treasury Department
              Facsimile:    (401) 770-5768
              Telephone:    (401) 770-4407
Email:        carol.denale@cvshealth.com

62

with a copy, in the case of a notice of Default, to:

CVS Health Corporation
1 CVS Drive
Woonsocket, Rhode Island 02895
Attention:      Tom Moffatt
                Vice President, Assistant Secretary and Assistant General Counsel – Corporate
                Services
Facsimile:      (401) 216-3758
Telephone:      (401) 770-5409
Email:          thomas.moffatt@cvshealth.com

with a copy (in the case of a notice of Default and which shall not constitute notice under this
Agreement or any other Loan Document for any purpose) to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attention:      Gus M. Atiyah
Facsimile:      (646) 848-5227
Telephone:      (212) 848-5227
Email:          gus.atiyah@shearman.com

*If to the Administrative Agent* :

in the case of each Borrowing Request, each notice of prepayment under <u>Section 2.7</u> , each Competitive Bid
Request, each Competitive Bid, and each Competitive Bid Accept/Reject Letter:

BNY Mellon
Administrator Services
Client Services Delivery Loan Processing COE
Loan Administration
6023 Airport Road
Oriskany, New York 13424
Attention:      Lauren La Comb
Facsimile:      (315) 765-4533
Telephone:      (315) 765-4145
Email:          afasyndications@bnymellon.com

CVS Health Corporation 2017 364-Day Credit Agreement

and in all other cases:

> The Bank of New York Mellon
> 101 Barclay Street
> 14 th Floor West
> New York, New York 10286
> Attention:      H. Stephen Griffith
> Facsimile:      (212) 815-3749
> Telephone:      (212) 815-2214
> Email:              stephen.griffith@bnymellon.com
>
> and
>
> The Bank of New York Mellon
> 500 Grant Street
> Pittsburgh, Pennsylvania 15219
> Attention:      Clifford Mull
> Facsimile:      (412) 234-8087
> Telephone:      (412) 234-1346
> Email:             clifford.mull@bnymellon.com

*If to any Lender* : to it at its address (or facsimile number or email address) set forth in its Administrative Questionnaire.

(b)        *Electronic Communications* .  Notices and other communications to the Credit Parties hereunder may be delivered or furnished by electronic communication (including email and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Credit Party pursuant to <u>Section 2</u> or <u>Section 3.3</u> if such Credit Party has notified the Administrative Agent that it is incapable of receiving notices under such Sections by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" or "read requested" function, as available, return email or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Domestic Business Day for the recipient, and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its email address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)        *Change of Address.*  Any party hereto may change its address, facsimile number or email address for notices and other communications hereunder by notice to the other parties hereto (or, in the case of any Lender, by notice to the Administrative Agent and the

Borrower).  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt; *provided* that any such notice or communication that is not received on a Domestic Business Day during the normal business hours of the recipient shall be deemed received at the opening of business on the next Domestic Business Day.

11.3    *No Waiver; Cumulative Remedies*

No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges under the Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4    *Survival of Representations and Warranties*

All representations and warranties made in the Loan Documents and in any document, certificate or statement delivered pursuant thereto or in connection therewith shall survive the execution and delivery of the Loan Documents.

11.5    *Payment of Expenses; Indemnified Liabilities*

The Borrower agrees, as soon as practicable following presentation of a statement or invoice therefor setting forth in reasonable detail the items thereof, and whether any Loan is made, (a) to pay or reimburse the Administrative Agent and its Affiliates for all their reasonable and documented out-of-pocket costs and expenses actually incurred in connection with the development, syndication, preparation and execution of, and any amendment, waiver, consent, supplement or modification to, the Loan Documents, any documents prepared in connection therewith and the consummation of the transactions contemplated thereby, whether such Loan Documents or any such amendment, waiver, consent, supplement or modification to the Loan Documents or any documents prepared in connection therewith are executed and whether the transactions contemplated thereby are consummated, including the reasonable and documented out-of-pocket fees and disbursements of Special Counsel, (b) to pay, indemnify, and hold the Administrative Agent and the Lenders harmless from any and all recording and filing fees and any and all liabilities and penalties with respect to, or resulting from any delay (other than penalties to the extent attributable to the negligence of the Administrative Agent or the Lenders, as the case may be, in failing to pay such fees, liabilities or penalties when due) which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, the Loan Documents or any documents prepared in connection therewith, and (c) to pay, reimburse, indemnify and hold each Indemnified Person harmless from and against any and all other liabilities, obligations, claims, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable and documented out-of-pocket fees and disbursements of one counsel representing all of the Indemnified Persons, taken as a whole, and, if reasonably necessary, of a single local counsel for

65

each applicable jurisdiction (and, if reasonably necessary, one specialty counsel for each applicable specialty), representing all of the Indemnified Persons, taken as a whole (and, in the case of any actual or perceived conflict of interest where the Indemnified Person affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel, of another firm of counsel (and, if reasonably necessary, a single local counsel for each applicable jurisdiction (and, if reasonably necessary, one specialty counsel for each applicable specialty), for each such affected Indemnified Person))) actually incurred with respect to the enforcement, performance of, and preservation of rights under, the Loan Documents (all the foregoing, collectively, the *"Indemnified Liabilities"* ) and, if and to the extent that the foregoing indemnity may be unenforceable for any reason, the Borrower agrees to make the maximum payment permitted under applicable law. Notwithstanding anything to the contrary contained in this <u>Section 11.5</u> , the foregoing payment, indemnification and reimbursement obligations will not, as to any Person identified in this Section 11.5, apply to any losses, claims, damages, liabilities and related expenses to the extent arising (A) from the willful misconduct, gross negligence, fraud or bad faith of such Person, (B) from a material breach of the obligations hereunder of such Person, (C) out of or in connection with <u>Section 11.22</u> , or (D) out of or in connection with any claim, litigation, investigation or proceeding that does not involve an act or omission of the Borrower or any of its Affiliates and that is brought by any such Person against any such other Person (other than the Administrative Agent, in its capacity as such), in each case under clauses (A) through (D), to the extent determined by a final and non-appealable judgment of a court of competent jurisdiction. The agreements in this <u>Section 11.5</u> shall survive the termination of the Commitments and the payment of the Loans and the Notes and all other amounts payable under the Loan Documents.

11.6    *Lending Offices*

Each Lender shall have the right at any time and from time to time to transfer any Loan to a different office of such Lender, subject to <u>Section 3.10</u> .

11.7    *Successors and Assigns*

(a)    *Successors and Assigns Generally* .   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this <u>Section 11.7</u> , (ii) by way of participation in accordance with the provisions of paragraph (d) of this <u>Section 11.7</u> or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this <u>Section 11.7</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, the Participants to the extent provided in paragraph (d) of this <u>Section 11.7</u> and, to the extent expressly contemplated hereby, the Related Parties of each Credit Party) any legal or equitable right, remedy or claim under or by reason of this Agreement.

66

(b)    *Assignments by Lenders* .  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(1)    *Minimum Amounts* .

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment Amount and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in paragraph (b)(1)(A) of this Section 11.7 , the Commitment Amount (which for this purpose includes the Loans of the assigning Lender outstanding thereunder) or, if the Commitment of the assigning Lender is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of such "Trade Date") shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(2)    *Proportionate Amounts* .  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (2) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in respect of Competitive Bid Loans on a non-pro rata basis.

(3)    *Required Consents* .  No consent shall be required for any assignment except to the extent required by paragraph (b)(1)(B) of this Section 11.7 and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; and

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of an unfunded or revolving facility hereunder if such assignment is to a Person that is not a Lender with a Commitment in respect of such facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(4)    *Assignment and Assumption* .  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $4,500 ($7,500 in the case of an assignment by a Defaulting Lender) (which fee may be waived or reduced in the sole discretion of the Administrative

Agent), and the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(5)        *No Assignment to Certain Parties* .  No such assignment shall be made to the Borrower, any of its Subsidiaries or any of their respective Affiliates.

(6)        *No Assignment to Natural Persons* .  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this  Section 11.7 , from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of  Section 3.6, Section 3.7 , and  Section 11.10  with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this  Section 11.7 .

(c)        *Register* .  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York, New York a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the **"Register"** ).  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)        *Participations* .  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower, any of its Subsidiaries or any of their respective Affiliates) (each, a **" *Participant* "** ) in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and each Credit Party shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement

68

CVS Health Corporation 2017 364-Day Credit Agreement

and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver which requires the consent of all Lenders or all affected Lenders that directly affects such Participant. Subject to paragraph (e) of this <u>Section 11.7</u> , the Borrower agrees that each Participant shall be entitled to the benefits of <u>Section 3.5</u> , <u>Section 3.6</u> , <u>Section 3.7</u> and <u>Section 3.10</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this <u>Section 11.7</u> . To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 11.9(a)</u> as though it were a Lender, *provided* that such Participant agrees to be subject to <u>Section 11.9(b)</u> as though it were a Lender. Each Lender that sells a participation with respect to a Commitment or Loan shall, solely for the purposes of complying with the rules regarding registered form in the Internal Revenue Code, act as a non-fiduciary agent of the Borrower, maintaining a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Commitment and/or Loan (each a " ***Participant Register*** " ), and the entries in such Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall be required to disclose the existence of, or any of the information contained in, any Participant Register maintained by it to the Borrower or any other Person unless requested in writing by the Borrower, and only to the Internal Revenue Service to the extent such disclosure is required in order to comply with the rules requiring registered form pursuant to the Internal Revenue Code.

(e)     *Limitations upon Participant Rights* . A Participant shall not be entitled to receive any greater payment under <u>Section 3.6</u> , <u>Section 3.7</u> or <u>Section 3.10</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant shall not be entitled to the benefits of <u>Section 3.10</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with <u>Section 3.10(f)</u> as though it were a Lender.

(f)     *Certain Pledges* . Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

11.8     ***Counterparts; Electronic Execution of Assignments***

(a)     *Counterparts* . Each of the Loan Documents (other than the Notes) may be executed on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same agreement. It shall not be necessary in making proof of any Loan Document to produce or account for more than one counterpart signed by the party to be charged. A set of the copies of this Agreement signed by all of the parties hereto shall be lodged with each of the Borrower and the Administrative Agent. Delivery of an executed counterpart of a signature page of any Loan Document by fax or other electronic means (e.g.,

".pdf" or ".tif") shall be effective as delivery of a manually executed counterpart of such Loan Document.

(b)    *Electronic Execution of Assignments* .  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

11.9    ***Set-off and Sharing of Payments***

(a)    In addition to any rights and remedies of the Lenders provided by law, upon the occurrence of an Event of Default under Section 9.1(a) or Section 9.1(b) or upon the acceleration of the Loans, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower, to set-off and apply against any indebtedness or other liability, whether matured or unmatured, of the Borrower to such Lender arising under the Loan Documents, any amount owing from such Lender to the Borrower.  To the extent permitted by applicable law, the aforesaid right of set-off may be exercised by such Lender against the Borrower or against any trustee in bankruptcy, custodian, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor of the Borrower, or against anyone else claiming through or against the Borrower or such trustee in bankruptcy, custodian, debtor in possession, assignee for the benefit of creditors, receivers, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off shall not have been exercised by such Lender prior to the making, filing or issuance of, service upon such Lender of, or notice to such Lender of, any petition, assignment for the benefit of creditors, appointment or application for the appointment of a receiver, or issuance of execution, subpoena, order or warrant.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after each such set-off and application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

(b)    If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of its Loans or its Notes in excess of its pro rata share (in accordance with the outstanding principal balance of all Loans) of payments then due and payable on account of the Loans and Notes received by all the Lenders, such Lender shall forthwith purchase, without recourse, for cash, from the other Lenders such participations in their Loans and Notes as shall be necessary to cause such purchasing Lender to share the excess payment with each of them according to their pro rata share (in accordance with the outstanding principal balance of all Loans); *provided* that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery, together with an amount equal to such Lender's pro rata share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Borrower

70

agrees, to the fullest extent permitted by law, that each Lender purchasing a participation from another Lender pursuant to this Section 11.9 may exercise such rights to payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

11.10    ***Indemnity***

(a)    The Borrower shall indemnify each Credit Party and each Related Party thereof (each such Person being called an " ***Indemnified Person*** " ) against, and hold each Indemnified Person harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable and documented out-of-pocket fees and disbursements of one counsel representing all of the Indemnified Persons, taken as a whole, and, if reasonably necessary, of a single local counsel for each applicable jurisdiction (and, if reasonably necessary, one specialty counsel for each applicable specialty), representing all of the Indemnified Persons, taken as a whole (and, in the case of any actual or perceived conflict of interest where the Indemnified Person affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel, of another firm of counsel (and, if reasonably necessary, a single local counsel for each applicable jurisdiction (and, if reasonably necessary, one specialty counsel for each applicable specialty), for each such affected Indemnified Person)), actually incurred by any Indemnified Person arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any agreement or instrument contemplated thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated hereby or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds thereof, (iii) any actual or alleged presence or release of Hazardous Materials in, on, under or from any property owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of the Subsidiaries or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on statute, contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto.  Notwithstanding anything to the contrary contained in this Section 11.10(a) , the foregoing indemnity will not, as to any Indemnified Person, apply to any losses, claims, damages, liabilities and related expenses to the extent arising (A) from the willful misconduct, gross negligence, fraud or bad faith of such Indemnified Person, (B) from a material breach of the obligations hereunder of such Indemnified Person, (C) out of or in connection with Section 11.22 , or (D) out of or in connection with any claim, litigation, investigation or proceeding that does not involve an act or omission of the Borrower or any of its Affiliates and that is brought by an Indemnified Person against any other Indemnified Person (other than the Administrative Agent, in its capacity as such), in each case under clauses (A) through (D), to the extent determined by a final and non-appealable judgment of a court of competent jurisdiction. The Borrower shall not be liable for any settlement of any investigation, litigation or proceeding to which the indemnity in this Section 11.10(a) applies (any of the foregoing, a ***"Proceeding"*** ) effected without the Borrower's prior written consent (which consent shall not be unreasonably withheld or delayed, it being understood and agreed that the withholding or delaying of the Borrower's consent in connection with a settlement which does not include an unconditional release of the Borrower and the Subsidiaries from all liability or claims that are the subject matter of such Proceeding or which includes a statement as to any admission of fault by or on behalf of the Borrower or any Subsidiary shall not be deemed unreasonable), but if settled with the Borrower's prior written consent or if there is a final judgment

71

for the plaintiff in any such Proceeding, the Borrower agrees to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this <u>Section 11.10(a)</u>.  The Borrower shall not, without the prior written consent of an Indemnified Person, effect any settlement of any pending or threatened Proceeding against such Indemnified Person in respect of which indemnity could have been sought hereunder by such Indemnified Person unless such settlement (x) includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such Proceeding and (y) does not include any statement as to any admission of fault by or on behalf of such Indemnified Person.  Notwithstanding the above, the Borrower shall have no liability under clause (i) of this <u>Section 11.10(a)</u> to indemnify or hold harmless any Indemnified Person for any losses, claims, damages, liabilities and related expenses relating to income or withholding Taxes or any Tax in lieu of such Taxes.

(b)     To the extent that the Borrower fails to pay as soon as practicable any amount required to be paid by it to the Administrative Agent under subsection (a) of this <u>Section 11.10</u> (the **"Indemnified Amount"**), each Lender severally agrees to pay to the Administrative Agent an amount equal to the product of such unpaid amount *multiplied by* (i) at any time when no Loans are outstanding, its Commitment Percentage, and (ii) at any time when Loans are outstanding (x) if the Commitments then exist, its Commitment Percentage or (y) if the Commitments have been terminated or otherwise no longer exist, the percentage equal to the fraction, (A) the numerator of which is the sum of such Lender's Credit Exposure and (B) the denominator of which is the sum of the Aggregate Credit Exposure (in each case determined as of the time that the applicable Indemnified Amount is sought), *provided* that the Indemnified Amount was payable to the Administrative Agent in its capacity as such.

(c)     The obligations of the Borrower and the Lenders under this <u>Section 11.10</u> shall survive the termination of the Commitments and the payment of the Loans and the Notes and all other amounts payable under the Loan Documents.

(d)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct and actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement, instrument or other document contemplated thereby, the transactions contemplated hereby or any Loan or the use of the proceeds thereof.

11.11     ***Governing Law***

The Loan Documents and the rights and obligations of the parties thereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

11.12     ***Severability***

Every provision of the Loan Documents is intended to be severable, and if any term or provision thereof shall be invalid, illegal or unenforceable for any reason, the validity, legality and enforceability of the remaining provisions thereof shall not be affected or impaired thereby, and

any invalidity, illegality or unenforceability in any jurisdiction shall not affect the validity, legality or enforceability of any such term or provision in any other jurisdiction.

### 11.13    *Integration*

All exhibits to the Loan Documents shall be deemed to be a part thereof.  Each Loan Document embodies the entire agreement and understanding between or among the parties thereto with respect to the subject matter thereof and supersedes all prior agreements and understandings between or among the parties thereto with respect to the subject matter thereof.

### 11.14    *Treatment of Certain Information*

(a)    Each Credit Party agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party hereto, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 11.14 , to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (vii) to Gold Sheets and other similar bank trade publications, such information to consist of deal terms and other information customarily found in such publications, (viii) with the consent of the Borrower or (ix) to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section 11.14 or (2) becomes available to the Administrative Agent, any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower not known to such Credit Party to be prohibited from disclosing such Information.

(b)    For purposes of this Section 11.14 ,  *"Information"* means all information received from the Borrower or any of its Subsidiaries relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any other Credit Party on a non-confidential basis prior to disclosure by the Borrower or any of its Subsidiaries.

### 11.15    *Acknowledgments*

The Borrower acknowledges that (a) it has been advised by counsel in the negotiation, execution and delivery of the Loan Documents, (b) by virtue of the Loan Documents, the relationship among the Administrative Agent and the Lenders, on the one hand, and the

Borrower, on the other hand, is solely that of debtor and creditor, and (c) by virtue of the Loan Documents, no joint venture exists among the Lenders or among the Borrower and the Lenders.

11.16    ***Consent to Jurisdiction***

The Borrower irrevocably submits to the exclusive jurisdiction of any New York State or Federal Court sitting in the City of New York, Borough of Manhattan, over any suit, action or proceeding arising out of or relating to the Loan Documents.  The Borrower irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum.  The Borrower agrees that a final judgment in any such suit, action or proceeding brought in such a court, after all appropriate appeals, shall be conclusive and binding upon it.

11.17    ***Service of Process***

The Borrower agrees that process may be served against it in any suit, action or proceeding referred to in Section 11.16 by sending the same by first class mail, return receipt requested or by overnight courier service, with receipt acknowledged, to the address of the Borrower set forth or referred to in Section 11.2 .  The Borrower agrees that any such service (i) shall be deemed in every respect effective service of process upon it in any such suit, action, or proceeding, and (ii) shall to the fullest extent enforceable by law, be taken and held to be valid personal service upon and personal delivery to it.

11.18    ***No Limitation on Service or Suit***

Nothing in the Loan Documents or any modification, waiver, or amendment thereto shall affect the right of the Administrative Agent or any Lender to serve process in any manner permitted by law or limit the right of the Administrative Agent or any Lender to bring proceedings against the Borrower in the courts of any jurisdiction or jurisdictions.

11.19    ***WAIVER OF TRIAL BY JURY***

EACH OF THE CREDIT PARTIES AND THE BORROWER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY.  FURTHER, THE BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OF THE CREDIT PARTIES, OR COUNSEL TO ANY OF THE CREDIT PARTIES, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY OF THE CREDIT PARTIES WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.  THE BORROWER ACKNOWLEDGES THAT THE CREDIT PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, *INTER ALIA* , THE PROVISIONS OF THIS SECTION 11.19 .

11.20     ***Patriot Act Notice***

Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), as amended from time to time) (the ***"Patriot Act"*** ), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Patriot Act.

11.21     ***No Fiduciary Duty***

The Borrower agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Borrower and its Subsidiaries, on the one hand, and the Credit Parties, the Joint Lead Arrangers and Joint Bookrunners named on the cover page hereof, and their respective Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Credit Parties or such Joint Lead Arrangers and Joint Bookrunners, or their respective Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

11.22     ***Acknowledgement and Consent to Bail-In of EEA Financial Institutions***

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Balance of this page is intentionally Blank]

76

CVS Health Corporation 2017 364-Day Credit Agreement

*AS EVIDENCE* of the agreement by the parties hereto to the terms and conditions herein contained, each such party has caused this Agreement to be executed on its behalf.

**CVS HEALTH CORPORATION**

By:    /s/ Carol A. DeNale
Name: Carol A. DeNale
Title:   Senior Vice President and Treasurer

CVS Health Corporation 2017 364-Day Credit Agreement

**THE BANK OF NEW YORK MELLON,**
**as the Administrative Agent and a Lender**

By:     /s/ Clifford A. Mull
Name: Clifford A. Mull
Title:  First Vice President

CVS Health Corporation 2017 364-Day Credit Agreement

**BANK OF AMERICA, N.A.,**
**as a Co-Syndication Agent and a Lender**

By:    /s/ Carlos Medina
Name: Carlos Medina
Title:  Director

CVS Health Corporation 2017 364-Day Credit Agreement

**WELLS FARGO BANK, N.A.,**
**as a Co-Syndication Agent and a Lender**


By:      /s/ Christopher M. Johnson
Name:  Christopher M. Johnson
Title:   Vice President

CVS Health Corporation 2017 364-Day Credit Agreement

**BARCLAYS BANK PLC,**
**as a Co-Documentation Agent and a Lender**


By:  /s/ Ritam Bhalla
Name: Ritam Bhalla
Title: Director


CVS Health Corporation 2017 364-Day Credit Agreement

**JPMORGAN CHASE BANK, N.A.,**
**as a Co-Documentation Agent and a Lender**

By:    /s/ Robert D. Bryant
Name: Robert D. Bryant
Title: Executive Director

**MIZUHO BANK, LTD., as a Lender**

By:   /s/ Tracy Rahn
Name: Tracy Rahn
Title:  Authorized Signatory

**SUNTRUST BANK, as a Lender**

By: /s/ Johnetta Bush

Name: Johnetta Bush

Title: Director

CVS Health Corporation 2017 364-Day Credit Agreement

**GOLDMAN SACHS BANK USA, as a Lender**

By:     /s/ Annie Carr
Name:   Annie Carr
Title:  Authorized Signatory

CVS Health Corporation 2017 364-Day Credit Agreement

**U.S. BANK NATIONAL ASSOCIATION, as a Lender**

By:      /s/ Joyce P. Dorsett
Name:  Joyce P. Dorsett
Title:   Vice President

CVS Health Corporation 2017 364-Day Credit Agreement

**THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.,**
as a Lender


By:   /s/ Brian McNany
Name: Brian McNany
Title: Director


CVS Health Corporation 2017 364-Day Credit Agreement

**ROYAL BANK OF CANADA, as a Lender**

By:    /s/ Gordon MacArthur
_____
Name:  Gordon MacArthur
_____
Title:  Authorized Signatory
_____

CVS Health Corporation 2017 364-Day Credit Agreement

**KEYBANK NATIONAL ASSOCIATION, as a Lender**

By:     /s/ Marianne T. Meil
Name:   Marianne T. Meil
Title:  Senior Vice President

CVS Health Corporation 2017 364-Day Credit Agreement

**FIFTH THIRD BANK, as a Lender**

By:     /s/ Todd S. Robinson
Name: Todd S. Robinson
Title:  VP

**PNC BANK, NATIONAL ASSOCIATION,** as a Lender

By:      /s/ Michael A. Richards
Name:  Michael A. Richards
Title:   Senior Vice President

**SANTANDER BANK N.A.,** as a Lender

By:    /s/ Andres Barbosa
Name:  Andres Barbosa
Title:  Executive Director

**INDUSTRIAL AND COMMERCIAL BANK OF CHINA LIMITED, NEW YORK BRANCH,** as a Lender

By:    /s/ Hsiwei Chen
Name:  Hsiwei Chen
Title: VP


By:    /s/ Pinyen Shih
Name:  Pinyen Shih
Title: Executive Director


CVS Health Corporation 2017 364-Day Credit Agreement

**TD BANK, N.A.,** as a Lender

By:    /s/ Uk-Sun Kim

Name: Uk-Sun Kim

Title: Senior Vice President

**SUMITOMO MITSUI BANKING CORPORATION,**
as a Lender


By:     /s/ James Weinstein
Name: James Weinstein
Title:  Managing Director

**BANK OF CHINA, NEW YORK BRANCH,** as a
Lender


By:  /s/ Raymond Qiao
Name: Raymond Qiao
Title: Managing Director


CVS Health Corporation 2017 364-Day Credit Agreement

Exhibit 10.2

EXECUTION VERSION



**FIVE YEAR CREDIT AGREEMENT**

**by and among**

**CVS HEALTH CORPORATION,**

**THE LENDERS PARTY HERETO,**

**BARCLAYS BANK PLC and JPMORGAN CHASE BANK, N.A.,**
**as Co-Syndication Agents,**

**BANK OF AMERICA, N.A., and WELLS FARGO BANK, N.A.,**
**as Co-Documentation Agents,**

**and**

**THE BANK OF NEW YORK MELLON,**
**as Administrative Agent**

———————————

**Dated as of May 18, 2017**

———————————

**THE BANK OF NEW YORK MELLON,**
**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**
**and**
**WELLS FARGO SECURITIES, LLC,**
**as Joint Lead Arrangers**

**THE BANK OF NEW YORK MELLON,**
**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**
**BARCLAYS BANK PLC, JPMORGAN CHASE BANK, N.A.,**
**and**
**WELLS FARGO SECURITIES, LLC,**
**as Joint Bookrunners**

*Prepared by:*
**Bryan Cave LLP**
**1290 Avenue of the Americas**
**New York, New York 10104-3300**

# TABLE OF CONTENTS

1.  *DEFINITIONS AND PRINCIPLES OF CONSTRUCTION* ............................................ 1
    1.1    Definitions ................................................................................................. 1
    1.2    Principles of Construction ........................................................................ 22

2.  *AMOUNT AND TERMS OF LOANS* .................................................................... 23
    2.1    Revolving Credit Loans ........................................................................... 23
    2.2    Swing Line Loans .................................................................................... 24
    2.3    Notice of Borrowing Revolving Credit Loans and Swing Line Loans ..... 26
    2.4    Competitive Bid Loans and Procedure ..................................................... 26
    2.5    Use of Proceeds ....................................................................................... 29
    2.6    Termination, Reduction or Increase of Commitments .............................. 29
    2.7    Prepayments of Loans .............................................................................. 31
    2.8    Letter of Credit Sub-facility .................................................................... 32
    2.9    Letter of Credit Participation ................................................................... 33
    2.10   Absolute Obligation with respect to Letter of Credit Payments ............... 34
    2.11   Notes ........................................................................................................ 35
    2.12   Extension of Commitment Termination Date ........................................... 35
    2.13   Defaulting Lenders ................................................................................... 36

3.  *PROCEEDS, PAYMENTS, CONVERSIONS, INTEREST, YIELD PROTECTION AND FEES* ... 39
    3.1    Disbursement of the Proceeds of the Loans ............................................. 39
    3.2    Payments .................................................................................................. 39
    3.3    Conversions; Other Matters ..................................................................... 40
    3.4    Interest Rates and Payment Dates ............................................................ 41
    3.5    Indemnification for Loss .......................................................................... 43
    3.6    Reimbursement for Costs, Etc. ................................................................. 44
    3.7    Illegality of Funding ................................................................................ 45
    3.8    Option to Fund; Substituted Interest Rate ............................................... 45
    3.9    Certificates of Payment and Reimbursement ........................................... 46
    3.10   Taxes; Net Payments ............................................................................... 46
    3.11   Facility Fees ............................................................................................ 50
    3.12   Letter of Credit Participation Fee ............................................................ 50
    3.13   Replacement of Lender ............................................................................ 51

4.  *REPRESENTATIONS AND WARRANTIES* ........................................................... 52
    4.1    Existence and Power ................................................................................ 52
    4.2    Authority; EEA Financial Institution ...................................................... 52
    4.3    Binding Agreement .................................................................................. 52
    4.4    Litigation ................................................................................................. 52
    4.5    No Conflicting Agreements ...................................................................... 53
    4.6    Taxes ........................................................................................................ 53
    4.7    Compliance with Applicable Laws; Filings .............................................. 54

| | 4.8 | Governmental Regulations | 54 |
| | 4.9 | Federal Reserve Regulations; Use of Proceeds | 54 |
| | 4.10 | No Misrepresentation | 54 |
| | 4.11 | Plans | 55 |
| | 4.12 | Environmental Matters | 55 |
| | 4.13 | Financial Statements | 55 |
| | 4.14 | Anti-Corruption Laws and Sanctions | 56 |
| 5. | | *CONDITIONS TO EFFECTIVENESS* | 56 |
| | 5.1 | Agreement | 56 |
| | 5.2 | Notes | 56 |
| | 5.3 | Corporate Action | 56 |
| | 5.4 | Opinion of Counsel to the Borrower | 57 |
| | 5.5 | Termination of Existing 2013 Credit Agreement | 57 |
| | 5.6 | No Default and Representations and Warranties | 57 |
| | 5.7 | Fees | 57 |
| | 5.8 | Due Diligence; "Know Your Customer" | 57 |
| 6. | | *CONDITIONS OF LENDING - ALL LOANS AND LETTERS OF CREDIT* | 58 |
| | 6.1 | Compliance | 58 |
| | 6.2 | Requests | 58 |
| 7. | | *AFFIRMATIVE COVENANTS* | 58 |
| | 7.1 | Legal Existence | 58 |
| | 7.2 | Taxes | 59 |
| | 7.3 | Insurance | 59 |
| | 7.4 | Performance of Obligations | 59 |
| | 7.5 | Condition of Property | 59 |
| | 7.6 | Observance of Legal Requirements | 59 |
| | 7.7 | Financial Statements and Other Information | 60 |
| | 7.8 | Records | 61 |
| | 7.9 | Authorizations | 61 |
| 8. | | *NEGATIVE COVENANTS* | 62 |
| | 8.1 | Subsidiary Indebtedness | 62 |
| | 8.2 | Liens | 62 |
| | 8.3 | Dispositions | 63 |
| | 8.4 | Merger or Consolidation, Etc. | 63 |
| | 8.5 | Acquisitions | 63 |
| | 8.6 | Restricted Payments | 63 |
| | 8.7 | Limitation on Upstream Dividends by Subsidiaries | 64 |
| | 8.8 | Limitation on Negative Pledges | 64 |
| | 8.9 | Ratio of Consolidated Indebtedness to Total Capitalization | 65 |

(ii)

CVS Health Corporation 2017 Five Year Credit Agreement

9.   *DEFAULT*                                                                                              65
     9.1   Events of Default                                                                                65
     9.2   Remedies                                                                                         67

10.  *AGENT*                                                                                                68
     10.1  Appointment and Authority                                                                        68
     10.2  Rights as a Lender                                                                               68
     10.3  Exculpatory Provisions                                                                           69
     10.4  Reliance by Administrative Agent                                                                 70
     10.5  Delegation of Duties                                                                             70
     10.6  Resignation of Administrative Agent                                                              70
     10.7  Non-Reliance on Administrative Agent and Other Credit Parties                                    71
     10.8  No Other Duties, etc.                                                                            71

11.  *OTHER PROVISIONS*                                                                                     71
     11.1  Amendments, Waivers, Etc.                                                                        71
     11.2  Notices                                                                                          72
     11.3  No Waiver; Cumulative Remedies                                                                   75
     11.4  Survival of Representations and Warranties                                                       75
     11.5  Payment of Expenses; Indemnified Liabilities                                                     75
     11.6  Lending Offices                                                                                  76
     11.7  Successors and Assigns                                                                           76
     11.8  Counterparts; Electronic Execution of Assignments                                                80
     11.9  Set-off and Sharing of Payments                                                                  80
     11.10 Indemnity                                                                                        81
     11.11 Governing Law                                                                                    83
     11.12 Severability                                                                                     83
     11.13 Integration                                                                                      83
     11.14 Treatment of Certain Information                                                                 84
     11.15 Acknowledgments                                                                                  84
     11.16 Consent to Jurisdiction                                                                          84
     11.17 Service of Process                                                                               85
     11.18 No Limitation on Service or Suit                                                                 85
     11.19 WAIVER OF TRIAL BY JURY                                                                          85
     11.20 Patriot Act Notice                                                                               85
     11.21 No Fiduciary Duty                                                                                86
     11.22 Acknowledgement and Consent to Bail-In of EEA Financial Institutions                            86

(iii)

CVS Health Corporation 2017 Five Year Credit Agreement

EXHIBITS

Exhibit    A    List of Commitments
Exhibit    B    Form of Note
Exhibit    C    Form of Borrowing Request
Exhibit    D-1    Form of Opinion of Counsel to the Borrower
Exhibit    D-2    Form of Opinion of Special Counsel to the Borrower
Exhibit    E    Form of Assignment and Assumption
Exhibit    F    Form of Competitive Bid Request
Exhibit    G    Form of Invitation to Bid
Exhibit    H    Form of Competitive Bid
Exhibit    I    Form of Competitive Bid Accept/Reject Letter
Exhibit    J    Form of Letter of Credit Request
Exhibit    K    Form of Commitment Increase Supplement

(iv)

**FIVE YEAR CREDIT AGREEMENT** , dated as of May 18, 2017, by and among ***CVS HEALTH CORPORATION*** , a Delaware corporation (the ***"Borrower"*** ), the lenders party hereto from time to time (each a ***"Lender"*** and, collectively, the ***"Lenders"*** ), ***BARCLAYS BANK PLC*** ( ***"Barclays"*** )  and ***JPMORGAN CHASE BANK, N.A*** . , ( ***"JPMC"*** ) as co-syndication agents (in such capacity, each a ***"Co-Syndication Agent"*** and, collectively, the ***"Co-Syndication Agents"*** ), ***BANK OF AMERICA, N.A.*** ( ***"BofA"*** ) and ***WELLS FARGO BANK, N.A*** . ( ***"Wells Fargo"*** ) , as co-documentation agents (in such capacity, each a ***" Co-Documentation Agent "*** and, collectively, the ***" Co-Documentation Agents "*** ), and ***THE BANK OF NEW YORK MELLON*** ( ***"BNY Mellon"*** ), as administrative agent for the Lenders (in such capacity, the ***" Administrative Agent "*** ).

1.　　　**DEFINITIONS AND PRINCIPLES OF CONSTRUCTION**

　　1.1　　***Definitions***

　　　　　When used in any Loan Document (as defined below), each of the following terms shall have the meaning ascribed thereto unless the context otherwise specifically requires:

　　　　　***"ABR Advances"*** : the Revolving Credit Loans (or any portions thereof) at such time as they (or such portions) are made or are being maintained at a rate of interest based upon the Alternate Base Rate.

　　　　　***"Accumulated Funding Deficiency"*** : as defined in Section 304 of ERISA.

　　　　　***"Acquisition"*** : with respect to any Person, the purchase or other acquisition by such Person, by any means whatsoever, of (a) stock of, or other equity securities of, any other Person if, immediately thereafter, such other Person would be either a consolidated subsidiary of such Person or otherwise under the control of such Person, or (b) any business, going concern or division or segment thereof, or all or substantially all of the assets thereof; *provided* that no redemption, retirement, purchase or acquisition by any Person of the stock or other equity securities of such Person shall be deemed to constitute an Acquisition.

　　　　　***"Administrative Agent"*** : as defined in the preamble.

　　　　　***"Administrative Questionnaire"*** : an Administrative Questionnaire in a form supplied by the Administrative Agent.

　　　　　***"Affected Advance"*** : as defined in <u>Section 3.8(b)</u> .

　　　　　***"Affiliate"*** : with respect to any Person at any time and from time to time, any other Person (other than a wholly-owned subsidiary of such Person) which, at such time (a) controls such Person, (b) is controlled by such Person or (c) is under common control with such Person.  The term ＂ control ＂, as used in this definition with respect to any Person, means the power, whether direct or indirect through one or more intermediaries, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interests, by contract or otherwise.

"**_Aggregate Commitment Amount_**" : at any time, the sum of the Commitment Amounts of the Lenders at such time under this Agreement.  The Aggregate Commitment Amount on the Effective Date is $1,000,000,000.

"**_Aggregate Credit Exposure_**" : at any time, the sum at such time of (a) the aggregate Committed Credit Exposure of the Lenders at such time and (b) the aggregate outstanding principal balance of all Competitive Bid Loans at such time.

"**_Aggregate Letter of Credit Commitment_**" : at any time, the sum of the Letter of Credit Commitments of the Issuers at such time.  The Aggregate Letter of Credit Commitment on the Effective Date is $150,000,000.

"**_Agreement_**" : this Five Year Credit Agreement, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**_Alternate Base Rate_**" : for any day, a rate per annum equal to the greatest of (i) the BNY Mellon Rate in effect on such day; (ii) the sum of (a) 1/2 of 1% per annum and (b) the Federal Funds Effective Rate in effect on such day; and (iii) the sum of (a) 1% per annum and (b) the One Month LIBOR Rate in effect on such day.  The Alternate Base Rate shall change as and when the greatest of the foregoing rates shall change. Any change in the Alternate Base Rate shall become effective as of the opening of business on the day specified in the public announcement of such change.

"**_Anti-Corruption Laws_**" : all laws, rules, and regulations of any jurisdiction applicable to the Borrower or the Subsidiaries from time to time concerning or relating to bribery or corruption.

"**_Applicable Margin_**" : (i) with respect to the unpaid principal balance of ABR Advances, the applicable percentage set forth below in the column entitled "ABR Advances", (ii) with respect to the unpaid principal balance of Eurodollar Advances, the applicable percentage set forth below in the column entitled "Eurodollar Advances", (iii) with respect to the Facility Fee, the applicable percentage set forth below in the column entitled "Facility Fee", (iv) with respect to the Letter of Credit Participation Fee payable in respect of standby Letters of Credit, the applicable percentage set forth below in the column entitled "Participation Fee - Standby", and (v) with respect to the Letter of Credit Participation Fee payable in respect of commercial Letters of Credit, the applicable percentage set forth below in the column entitled "Participation Fee - Commercial", in each case opposite the applicable Pricing Level:

| Pricing Level | ABR Advances | Eurodollar Advances | Facility Fee | Participation Fee - Standby | Participation Fee – Commercial |
|---|---|---|---|---|---|
| Pricing Level I | 0.000% | 0.805% | 0.070% | 0.805% | 0.4025% |
| Pricing Level II | 0.000% | 0.915% | 0.085% | 0.915% | 0.4575% |
| Pricing Level III | 0.025% | 1.025% | 0.100% | 1.025% | 0.5125% |
| Pricing Level IV | 0.125% | 1.125% | 0.125% | 1.125% | 0.5625% |
| Pricing Level V | 0.325% | 1.325% | 0.175% | 1.325% | 0.6625% |
| Pricing Level VI | 0.500% | 1.500% | 0.250% | 1.500% | 0.7500% |

Decreases in the Applicable Margin resulting from a change in Pricing Level shall become effective upon the delivery by the Borrower to the Administrative Agent of a notice pursuant to Section 7.7(d) . Increases in the Applicable Margin resulting from a change in Pricing Level shall become effective on the effective date of any downgrade or withdrawal in the rating by Moody's or S&P of the senior unsecured long term debt rating of the Borrower.

"**Approved Fund**" : any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business that is administered or managed by (a) a

Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Assignment and Assumption**" : an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 11.7(b) ), and accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form approved by the Administrative Agent.

"**Bail-In Action**" : the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" : with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Barclays**" : as defined in the preamble.

"**BNY Mellon**" : as defined in the preamble.

"**BNY Mellon Rate**" : a rate of interest per annum equal to the rate of interest publicly announced in New York City by BNY Mellon from time to time as its prime commercial lending rate, such rate to be adjusted automatically (without notice) on the effective date of any change in such publicly announced rate.

CVS Health Corporation 2017 Five Year Credit Agreement

**"BofA"** : as defined in the preamble.

**"Borrower"** : as defined in the preamble.

**"Borrower Materials"** : as defined in <u>Section 7.7</u> .

**"Borrowing Date"** : (i) in respect of Revolving Credit Loans, any Domestic Business Day or Eurodollar Business Day, as the case may be, on which the Lenders shall make Revolving Credit Loans pursuant to a Borrowing Request or pursuant to a Mandatory Borrowing, (ii) in respect of Competitive Bid Loans, any Domestic Business Day on which a Lender shall make a Competitive Bid Loan pursuant to a Competitive Bid Request, (iii) in respect of Swing Line Loans, any Domestic Business Day on which the Swing Line Lender shall make a Swing Line Loan pursuant to a Borrowing Request and (iv) in respect of Letters of Credit, any Domestic Business Day on which an Issuer shall issue a Letter of Credit pursuant to a Letter of Credit Request.

**"Borrowing Request"** : a request for Revolving Credit Loans or Swing Line Loans in the form of <u>Exhibit C</u> .

**"Change of Control"** : any of the following:

(i)        any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), (a) shall have or acquire beneficial ownership of securities having 35% or more of the ordinary voting power of the Borrower or (b) shall possess, directly or indirectly, the power to direct or cause the direction of the management and policies of the Borrower, whether through the ownership of voting securities, by contract or otherwise; or

(ii)       the Continuing Directors shall cease for any reason to constitute a majority of the board of directors of the Borrower then in office.

**"Co-Documentation Agent"** and **"Co-Documentation Agents"** : as defined in the preamble.

**"Co-Syndication Agent"** and **"Co-Syndication Agents"** : as defined in the preamble.

**"Commercial Letter of Credit Commitment"** : at any time with respect to any Issuer, the commitment of such Issuer to issue commercial Letters of Credit in accordance with the terms hereof in an aggregate outstanding face amount not exceeding the lesser of (a) the amount set forth adjacent to such Issuer's name under the heading "Commercial Letter of Credit Commitment" in <u>Exhibit A</u> at such time or, if not listed on <u>Exhibit A</u> , the "Commercial Letter of Credit Commitment" which such Issuer shall have assumed from another Issuer in accordance with <u>Section 11.7</u> on or prior to such time, as the same may be adjusted from time to time pursuant to <u>Section 2.6</u> and <u>Section 11.7</u> , or (b) 25% of the Aggregate Commitment Amount as in effect at such time.

**"Commercial Letter of Credit Exposure"** : at any time in respect of any Issuer, an amount equal to such Issuer's Letter of Credit Exposure in respect of commercial Letters of Credit.

**"Commitment"** : in respect of any Lender, such Lender's undertaking to make Revolving Credit Loans, subject to the terms and conditions hereof, in an aggregate outstanding principal amount not to exceed the Commitment Amount of such Lender.

**"Commitment Amount"** : at any time and with respect to any Lender, the amount set forth adjacent to such Lender's name under the heading "Commitment Amount " in Exhibit A at such time or, in the event that such Lender is not listed on Exhibit A , the " Commitment Amount " which such Lender shall have assumed from another Lender in accordance with Section 11.7 on or prior to such time, as the same may be adjusted from time to time pursuant to Section 2.6 and Section 11.7 .

**"Commitment Increase Supplement"** : a Commitment Increase Supplement substantially in the form of Exhibit K .

**"Commitment Percentage"** : at any time and with respect to any Lender, a fraction the numerator of which is such Lender's Commitment Amount at such time, and the denominator of which is the Aggregate Commitment Amount at such time,   provided that in the event the Commitments shall have expired or otherwise terminated or been terminated, then Commitment Percentage shall be determined immediately prior thereto.

**"Commitment Period"** : the period commencing on the Effective Date and ending on the Commitment Termination Date, or on such earlier date as all of the Commitments shall have been terminated in accordance with the terms hereof.

**"Commitment Termination Date"** : the earlier of (i) May 18, 2022 (subject to extension as provided in Section 2.12 ) and (ii) the date on which the Loans shall become due and payable, whether by acceleration, notice of intention to prepay or otherwise.

**"Committed Credit Exposure"** : with respect to any Lender at any time, the sum at such time of (a) the outstanding principal balance of such Lender's Revolving Credit Loans, (b) the Swing Line Exposure of such Lender and (c) the Letter of Credit Exposure of such Lender.

**"Compensatory Interest Payment"** : as defined in Section 3.4(c) .

**"Competitive Bid"** : an offer by a Lender, in the form of Exhibit H , to make one or more Competitive Bid Loans.

**"Competitive Bid Accept/Reject Letter"** : a notification made by the Borrower pursuant to Section 2.4(d) in the form of Exhibit I .

**"Competitive Bid Loan"** : as defined in Section 2.4(a) .

**"Competitive Bid Rate"** : as to any Competitive Bid made by a Lender pursuant to Section 2.4(b) , the fixed rate of interest (which shall be expressed in the form of a decimal to no more than four decimal places) offered by such Lender with respect thereto.

**"Competitive Bid Request"** : a request by the Borrower, in the form of Exhibit F , for Competitive Bids.

5

**"Competitive Interest Period"** : as to any Competitive Bid Loan, the period commencing on the date of such Competitive Bid Loan and ending on the date requested in the Competitive Bid Request with respect thereto, which shall not be earlier than 3 days after the date of such Competitive Bid Loan or later than 180 days after the date of such Competitive Bid Loan; *provided* that if any Competitive Interest Period would end on a day other than a Domestic Business Day, such Competitive Interest Period shall be extended to the next succeeding Domestic Business Day, unless such next succeeding Domestic Business Day would be a date on or after the Commitment Termination Date, in which case such Competitive Interest Period shall end on the next preceding Domestic Business Day. Interest shall accrue from and including the first day of a Competitive Interest Period to but excluding the last day of such Competitive Interest Period.

**"Consolidated"** : the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP.

**"Contingent Obligation"** : as to any Person (the " secondary obligor " ), any obligation of such secondary obligor (a) guaranteeing or in effect guaranteeing any return on any investment made by another Person, or (b) guaranteeing or in effect guaranteeing any Indebtedness, lease, dividend or other obligation ( " primary obligation " ) of any other Person (the " primary obligor " ) in any manner, whether directly or indirectly, including any obligation of such secondary obligor, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the beneficiary of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) otherwise to assure or hold harmless the beneficiary of such primary obligation against loss in respect thereof, and (v) in respect of the Indebtedness of any partnership in which such secondary obligor is a general partner, except to the extent that such Indebtedness of such partnership is nonrecourse to such secondary obligor and its separate Property; *provided* that the term " Contingent Obligation " shall not include the indorsement of instruments for deposit or collection in the ordinary course of business.

**"Continuing Director"** : any member of the board of directors of the Borrower (i) who is a member of that board of directors on the Effective Date, (ii) who was nominated for election by the board of directors a majority of whom were directors on the Effective Date or (iii) whose election or nomination for election was approved by one or more of such directors.

**"Control Person"** : as defined in <u>Section 3.6</u> .

**"Convert"** , **"Conversion"** and **"Converted"** : each, a reference to a conversion pursuant to <u>Section 3.3</u> of one Type of Revolving Credit Loan into the other Type of Revolving Credit Loan.

**"Costs"** : as defined in <u>Section 3.6</u> .

**"Co-Syndication Agent"** and **"Co-Syndication Agents"** : as defined in the preamble.

*"Credit Exposure"* : with respect to any Lender at any time, the sum at such time of (a) the Committed Credit Exposure of such Lender at such time and (b) the outstanding principal balance of all Competitive Bid Loans of such Lender at such time.

*"Credit Parties"* : the Administrative Agent, the Swing Line Lender, the Issuers and the Lenders.

*"Default"* : any of the events specified in <u>Section 9.1</u> , whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

*" **Defaulting Lender** "* : any Lender, as reasonably determined by the Administrative Agent, that has (a) failed to fund any portion of its Loans or participations in Letters of Credit or Swing Line Loans within two Domestic Business Days of the date required to be funded by it hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) notified the Borrower or any Credit Party in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit, unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied, (c) failed, two Domestic Business Days after written request by the Administrative Agent (based on the reasonable belief that it may not fulfill its funding obligation), to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit and Swing Line Loans; *provided* that such Lender shall cease to be a Defaulting Lender under this clause (c) upon receipt by the Administrative Agent of such confirmation, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Domestic Business Days of the date when due, unless the subject of a good faith dispute, or (e) (i) becomes or is insolvent or has a parent company that has become or is insolvent, (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, interim receiver, receiver and manager, administrator, liquidator, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, interim receiver, receiver and manager, administrator, liquidator, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or (iii) becomes, or has a parent company that becomes, the subject of a Bail-in Action, *provided* that a Lender shall not qualify as a Defaulting Lender solely as a result of the acquisition or maintenance of an ownership interest in such Lender or its parent company, or of the exercise of control over such Lender or any Person controlling such Lender, by a Governmental Authority or instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or

7

writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any agreements made by such Lender.

"*Disposition*" : with respect to any Person, any sale, assignment, transfer or other disposition by such Person by any means, of:

      (a)     the stock of, or other equity interests of, any other Person,

      (b)     any business, operating entity, division or segment thereof, or

      (c)     any other Property of such Person, other than (i) the sale of inventory (other than in connection with bulk transfers), (ii) the disposition of equipment and (iii) the sale of cash investments.

"*Dividend Restrictions*" : as defined in Section 8.7 .

"*Dollar*" *or* "*$*" : lawful currency of the United States of America.

"*Domestic Business Day*" : any day other than a Saturday, Sunday or a day which in New York City is a legal holiday or a day on which banking institutions are authorized or required by law or other governmental action to close.

"*EEA Financial Institution*" : (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" : any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" : any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Effective Date*" : as defined in Section 5 .

" *Eligible Assignee* " : a Person that is a permitted assignee under Section 11.7(b) that has received the consent of each party whose consent is required under Section 11.7(b) .

"*Employee Benefit Plan*" : an employee benefit plan, within the meaning of Section 3(3) of ERISA, maintained, sponsored or contributed to by the Borrower, any Subsidiary or any ERISA Affiliate.

"*Environmental Laws*" : all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or

reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

*"Environmental Liability"* : as to any Person, any statutory, common law or equitable liability, contingent or otherwise (including any liability for damages, costs of environmental investigation, sampling or remediation, fines, penalties or indemnities), of such Person directly or indirectly resulting from or based upon (i) violation of any Environmental Law, (ii) the generation, use, handling, transportation, storage, treatment, discharge or disposal of any Hazardous Materials, (iii) exposure to any Hazardous Materials, (iv) the release or threatened release of any Hazardous Materials into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

*"ERISA"* : the Employee Retirement Income Security Act of 1974, as amended from time to time, or any successor thereto, and the rules and regulations issued thereunder, as from time to time in effect.

*"ERISA Affiliate"* : when used with respect to an Employee Benefit Plan, ERISA, the PBGC or a provision of the Internal Revenue Code pertaining to employee benefit plans, any Person that is a member of any group of organizations within the meaning of Sections 414(b) or (c) of the Internal Revenue Code or, solely with respect to the applicable provisions of the Internal Revenue Code, Sections 414(m) or (o) of the Internal Revenue Code, of which the Borrower or any Subsidiary is a member.

*" ERISA Event"* :  (a) any "reportable event", as defined in Section 4043 of ERISA with respect to a Pension Plan (other than an event for which the 30-day notice period is waived); (b) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 or 432 of the Internal Revenue Code or Sections 303, 304 or 305 of ERISA; (c) the filing pursuant to the Internal Revenue Code or ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (d) the incurrence by the Borrower, any Subsidiary or an ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower, any Subsidiary or an ERISA Affiliate; (e) the receipt by the Borrower, any Subsidiary or an ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan;  (f) the incurrence by the Borrower, any Subsidiary or an ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (g) any limits under Section 436 of the Internal Revenue Code become applicable; or (h) any failure to make any payment required by Section 430(j) of the Internal Revenue Code.

*"EU Bail-In Legislation Schedule"* : the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

*"Eurodollar Advance"* : a portion of the Revolving Credit Loans selected by the Borrower to bear interest during a Eurodollar Interest Period selected by the Borrower at a rate per

annum based upon a Eurodollar Rate determined in accordance with such Eurodollar Interest Period, all pursuant to and in accordance with <u>Section 2.1</u> or <u>Section 3.3</u> .

**"Eurodollar Business Day"** : any Domestic Business Day, other than a Domestic Business Day on which banks are not open for dealings in Dollar deposits in the interbank eurodollar market.

**"Eurodollar Interest Period"** : the period commencing on any Eurodollar Business Day selected by the Borrower in accordance with <u>Section 2.3</u> or <u>Section 3.3</u> and ending one, two, three or six months thereafter, as selected by the Borrower in accordance with either such Sections, subject to the following:

(i)        if any Eurodollar Interest Period would otherwise end on a day which is not a Eurodollar Business Day, such Eurodollar Interest Period shall be extended to the immediately succeeding Eurodollar Business Day unless the result of such extension would be to carry the end of such Eurodollar Interest Period into another calendar month, in which event such Eurodollar Interest Period shall end on the Eurodollar Business Day immediately preceding such day; and

(ii)        if any Eurodollar Interest Period shall begin on the last Eurodollar Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Eurodollar Interest Period), such Eurodollar Interest Period shall end on the last Eurodollar Business Day of such latter calendar month.

**" *Eurodollar Rate* "** : with respect to any Eurodollar Advance or any ABR Advance, to the extent such ABR Advance is based on the Eurodollar Rate, for any Interest Period, an interest rate per annum equal to (a) the LIBO Rate for such Interest Period <u>multiplied</u> by (b) the Statutory Reserve Rate.

**"Event of Default"** : any of the events specified in <u>Section 9.1</u> , *provided* that any requirement for the giving of notice, the lapse of time, or both, or any other condition has been satisfied.

**"Excluded Taxes"** : with respect to the Administrative Agent, any Lender, any Issuer or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or any other Loan Document, (a) Taxes imposed on or measured by its net income (however denominated), and franchise Taxes, in each case, (i) imposed on it by the jurisdiction (or any political subdivision thereof) under the laws of which it is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed by the United States of America or that are Other Connection Taxes, (c) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under <u>Section 3.13</u> ), any withholding Tax that (i) is imposed on amounts payable to such Lender at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to <u>Section 3.10</u> , or (ii) is attributable to such Lender's failure or inability (other

than as a result of a Regulatory Change, except for any regulatory change relating to the implementation of FATCA) to comply with Section 3.10 and (d) any Taxes imposed under FATCA.

**"Existing Commitment Termination Date"** : as defined in Section 2.12(a) .

**"Existing 2013 Credit Agreement"** : the Credit Agreement, dated as of May 23, 2013, by and among the Borrower, the lenders party thereto from time to time, Barclays and JPMC, as co-syndication agents, BofA and Wells Fargo, as co-documentation agents, and BNY Mellon, as administrative agent, as the same may be amended, amended and restated, supplemented, replaced or otherwise modified from time to time.

**"Existing 2014 Credit Agreement"** : the Second Amended and Restated Credit Agreement, dated as of July 24, 2014, by and among the Borrower, the lenders party thereto from time to time, Barclays and JPMC, as co-syndication agents, BofA and Wells Fargo, as co-documentation agents, and BNY Mellon, as administrative agent, as the same may be amended, amended and restated, supplemented, replaced or otherwise modified from time to time.

**"Existing 2015 Credit Agreement"** : the Credit Agreement, dated as of July 1, 2015, by and among the Borrower, the lenders party thereto from time to time, Barclays and JPMC, as co-syndication agents, BofA and Wells Fargo, as co-documentation agents, and BNY Mellon, as administrative agent, as the same may be amended, amended and restated, supplemented, replaced or otherwise modified from time to time.

**"Existing 364-Day Credit Agreement"** : the Credit Agreement, dated as of May 18, 2017, by and among the Borrower, the lenders party thereto from time to time, BofA and Wells Fargo, as co-syndication agents, Barclays and JPMC, as co-documentation agents, and BNY Mellon, as administrative agent, as the same may be amended, amended and restated, supplemented, replaced or otherwise modified from time to time.

**"Expiration Date"** : the first date, occurring on or after the date the Commitments shall have terminated or been terminated in accordance herewith, upon which there shall be no Loans, Reimbursement Obligations or Letters of Credit outstanding.

**"Extension Date"** : as defined in Section 2.12(a) .

**"Extension Request"** : as defined in Section 2.12(a) .

**"Facility Fee"** : as defined in Section 3.11 .

**"FATCA"** : Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any applicable intergovernmental agreements with respect thereto, and any treaty, law, regulations, or other official guidance enacted in any other jurisdiction relating to such intergovernmental agreement.

**"Federal Funds Effective Rate"** : for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's (or, if such day is not a Domestic Business Day, the immediately preceding Domestic Business Day) federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Domestic Business Day by the Federal Reserve Bank of New York as the federal funds effective rate, or, if such rate is not so published for any day which is a Domestic Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

**"Fees"** : as defined in Section 3.2(a) .

**"Financial Statements"** : as defined in Section 4.13 .

**"Foreign Lender"** : any Lender or any Issuer that is not a United States person within the meaning of Section 7701(a)(30) of the Internal Revenue Code.

**"GAAP"** : generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination, consistently applied; *provided* , *however* , that the accounting for operating leases and financing or capital leases under GAAP as in effect on the Effective Date (including, without limitation, Accounting Standards Codification 840) shall apply for determining compliance with the provisions of this Agreement.

**"Governmental Authority"** : any foreign, federal, state, municipal or other government, or any department, commission, board, bureau, agency, public authority or instrumentality thereof, or any court, arbitrator, regulatory body or central bank (including any supra-national bodies such as the European Union or the European Central Bank).

**"Hazardous Materials"** : all ignitable, explosive, reactive, corrosive or radioactive substances or wastes and all hazardous or toxic materials, substances, chemicals, wastes or other pollutants, including but not limited to petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes, hazardous biological agents, hazardous pharmaceutical substances and all other materials, substances, chemicals, wastes, contaminants or pollutants of any nature that are now or hereafter regulated pursuant to any Environmental Law, or are now or hereafter defined, listed or classified as a hazardous or toxic material, substance, chemical, waste, contaminant or pollutant in any Environmental Law.

**"Highest Lawful Rate"** : as to any Lender, the maximum rate of interest, if any, which at any time or from time to time may be contracted for, taken, charged or received on the Loans or the Notes or which may be owing to such Lender pursuant to this Agreement under the laws applicable to such Lender and this Agreement.

12

*"**Impacted Interest Period**"* : has the meaning assigned to it in the definition of *"LIBO Rate"*.

*"**Increasing Lender**"* : as defined in <u>Section 2.6(d)</u> .

*"**Indebtedness**"* : as to any Person at a particular time, all items of such Person which constitute, without duplication, (a) indebtedness for borrowed money or the deferred purchase price of Property (other than trade payables and accrued expenses incurred in the ordinary course of business), (b) indebtedness evidenced by notes, bonds, debentures or similar instruments, (c) indebtedness with respect to any conditional sale or other title retention agreement, (d) indebtedness arising under acceptance facilities and the amount available to be drawn under all letters of credit (excluding for purposes of <u>Section 8.1</u> and <u>Section 8.9</u> letters of credit obtained in the ordinary course of business by the Borrower or any Subsidiary) issued for the account of such Person and, without duplication, all drafts drawn thereunder to the extent such Person shall not have reimbursed the issuer thereof in respect of such issuer's payment of such drafts, (e) that portion of any obligation of such Person, as lessee, which in accordance with GAAP is required to be capitalized on a balance sheet of such Person, (f) all indebtedness described in (a) - (e) above secured by any Lien on any Property owned by such Person even though such Person shall not have assumed or otherwise become liable for the payment thereof (other than carriers', warehousemen's, mechanics', repairmen's or other like non-consensual Liens arising in the ordinary course of business), and (g) Contingent Obligations in respect of any indebtedness described in items (a) - (f) above; *provided* that, for purposes of this definition, Indebtedness shall not include Intercompany Debt and obligations in respect of interest rate caps, collars, exchanges, swaps or other, similar agreements.

*"**Indemnified Amount**"* : as defined in <u>Section 11.10(b)</u> .

*"**Indemnified Liabilities**"* : as defined in <u>Section 11.5</u> .

*"**Indemnified Person**"* : as defined in <u>Section 11.10(a)</u> .

*"**Indemnified Taxes**"* : Taxes other than Excluded Taxes and Other Taxes.

*"**Information**"* : as defined in <u>Section 11.14(b)</u> .

*"**Intangible Assets**"* : at any date, the value, as shown on the most recent Consolidated balance sheet of the Borrower and the Subsidiaries as at the end of the fiscal quarter ending not more than 135 days prior to such date, prepared in accordance with GAAP, of: (i) all trade names, trademarks, licenses, patents, copyrights, service marks, goodwill and other like intangibles, (ii) organizational and development costs, (iii) deferred charges (other than prepaid items, such as insurance, taxes, interest, commissions, rents, pensions, compensation and similar items and tangible assets being amortized), and (iv) unamortized debt discount and expense, less unamortized premium.

*"**Intercompany Debt**"* : (i) Indebtedness of the Borrower to one or more of the Subsidiaries of the Borrower and (ii) Indebtedness of one or more of the Subsidiaries of the Borrower to the Borrower or any one or more of the other Subsidiaries of the Borrower.

13

"***Intercompany Disposition***" : a Disposition by the Borrower or any of the Subsidiaries of the Borrower to the Borrower or to any of the other Subsidiaries of the Borrower.

"***Interest Payment Date***" : (i) as to any ABR Advance, the last day of each March, June, September and December, commencing on the first of such days to occur after such ABR Advance is made or any Eurodollar Advance is converted to an ABR Advance, (ii) as to any Swing Line Loan, the day on which the outstanding principal balance of such Swing Line Loan shall become due and payable in accordance with Section 2.2(a) , (iii) as to any Eurodollar Advance in respect of which the Borrower has selected a Eurodollar Interest Period of one, two or three months, the last day of such Eurodollar Interest Period, (iv) as to any Competitive Bid Loan in respect of which the Borrower has selected a Competitive Interest Period of 90 days or less, the last day of such Competitive Interest Period and (v) as to any Eurodollar Advance or Competitive Bid Loan in respect of which the Borrower has selected an Interest Period greater than three months or 90 days, as the case may be, the last day of the third month or the 90th day, as the case may be, of such Interest Period and the last day of such Interest Period.

"***Interest Period***" : a Eurodollar Interest Period, a Swing Line Interest Period or a Competitive Interest Period, as the case may be.

"***Internal Revenue Code***" : the Internal Revenue Code of 1986, as amended from time to time, or any successor thereto, and the rules and regulations issued thereunder, as from time to time in effect.

"***Interpolated Rate***" : in relation to determining the applicable LIBO Screen Rate, the rate which results from interpolating on a linear basis between:

      (a)     the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) which is shorter than the Impacted Interest Period of the applicable Eurodollar Advance; and

      (b)     the LIBO Screen Rate for the shortest period (for which that LIBO Screen Rate is available) which is longer than the Impacted Interest Period of such Eurodollar Advance,

each as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period; *provided* that in the event either of the two foregoing LIBO Screen Rates is not available at such time, then the *"Interpolated Rate"* with respect to such Eurodollar Advance for such Interest Period shall be the average of rates at which Dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered to major banks in the London interbank market by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Eurodollar Business Days prior to the commencement of such Interest Period.

"***issue***" *or* "***issuance***" : when used with respect to a Letter of Credit, shall be deemed to include any increase in the amount of such Letter of Credit.

"***Issuers***" : BNY Mellon, Barclays, BofA, JPMC and Wells Fargo; each an "***Issuer***" .

***"Joint Bookrunners": BNY Mellon, ML, Barclays, JPMC and WFS.***

***"Joint Lead Arrangers": BNY Mellon, ML and WFS.***

***"JPMC"*** : as defined in the preamble.

***"Lender"*** and ***"Lenders"*** : as defined in the preamble; such term to also include the Swing Line Lender and each Issuer where the context hereof requires or permits such inclusion.

***"Letter of Credit"*** and ***"Letters of Credit"*** : as defined in <u>Section 2.8(a)</u> .

***"Letter of Credit Application"*** :  an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the applicable Issuer.

***"Letter of Credit Commitment"*** : at any time with respect to any Issuer, the commitment of such Issuer to issue Letters of Credit (which, for the avoidance of doubt, shall include all standby letters of credit and all commercial letters of credit issued by such Issuer) in accordance with the terms hereof in an aggregate outstanding face amount not exceeding the lesser of (a) the amount set forth adjacent to such Issuer's name under the heading "Letter of Credit Commitment" in <u>Exhibit A</u> at such time or, if not listed on <u>Exhibit A</u> , the "Letter of Credit Commitment" which such Issuer shall have assumed from another Issuer in accordance with <u>Section 11.7</u> on or prior to such time, as the same may be adjusted from time to time pursuant to <u>Section 2.6</u> and <u>Section 11.7</u> , or (b) 20% of the Aggregate Commitment Amount as in effect at such time.

***"Letter of Credit Exposure"*** : at any time, (a) in respect of all Lenders, the sum, without duplication, of (i) the maximum aggregate amount which may be drawn under all unexpired Letters of Credit at such time (whether or not the conditions for drawing thereunder have or may be satisfied), (ii) the aggregate amount, at such time, of all unpaid drafts (which have not been dishonored) drawn under all Letters of Credit, and (iii) the aggregate unpaid principal amount of the Reimbursement Obligations at such time, (b) in respect of any Lender, an amount equal to such Lender's Commitment Percentage at such time multiplied by the amount determined under clause (a) of this definition, and (c) in respect of any Issuer, the amount determined under clause (a) of this definition in respect of a Letter of Credit issued by such Issuer.

***"Letter of Credit Participation Fee"*** : as defined in <u>Section 3.12</u> .

***"Letter of Credit Request"*** : a request in the form of <u>Exhibit J</u> .

***"LIBO Rate"*** : with respect to any Eurodollar Advance for any Interest Period, the rate per annum equal to the ICE Benchmark Administration Limited LIBOR Rate (or such successor thereto if the ICE Benchmark Administration Limited is no longer making such a rate available) appearing on the applicable Bloomberg screen (or other commercially available source as designated by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two (2) Eurodollar Business Days prior to the commencement of such Interest Period, as the rate for Dollar deposits with a maturity comparable to such Interest Period (in each case, the ***"LIBO Screen Rate"*** );  *provided* that (i) if

the LIBO Screen Rate shall be less than zero, the LIBO Rate shall be deemed to be zero for the purposes of this Agreement, and (ii) if the LIBO Screen Rate shall not be available at such time for such Interest Period (an *"Impacted Interest Period"* ) then the LIBO Rate shall be the Interpolated Rate, *provided* that if any Interpolated Rate shall be less than zero, such Interpolated Rate shall be deemed to be zero for purposes of this Agreement.

　　　　*"LIBO Screen Rate"* : has the meaning assigned to it in the definition of *"LIBO Rate"*.

　　　　*"Lien"* : any mortgage, pledge, hypothecation, assignment, lien, deposit arrangement, charge, encumbrance or other security arrangement or security interest of any kind, or the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement.

　　　　*"Loan"* : a Revolving Credit Loan, a Competitive Bid Loan or a Swing Line Loan, as the case may be.

　　　　*"Loan Documents"* : this Agreement and, upon the execution and delivery thereof, the Notes, if any, and the Reimbursement Agreements, if any.

　　　　*"Loans"* : the Revolving Credit Loans, the Competitive Bid Loans and the Swing Line Loans.

　　　　*"Mandatory Borrowing"* : as defined in Section 2.2(b) .

　　　　*"Margin Stock"* : any *" margin stock "* , as said term is defined in Regulation U of the Board of Governors of the Federal Reserve System, as the same may be amended or supplemented from time to time.

　　　　*"Material Adverse"* : with respect to any change or effect, a material adverse change in, or effect on, as the case may be, (i) the financial condition, operations, business, or Property of the Borrower and the Subsidiaries taken as a whole, (ii) the ability of the Borrower to perform its obligations under the Loan Documents, or (iii) the ability of the Administrative Agent, any Issuer or any Lender to enforce the Loan Documents.

　　　　*"ML"* : Merrill Lynch, Pierce, Fenner & Smith Incorporated.

　　　　*"Moody's"* : Moody's Investors Service, Inc., or any successor thereto.

　　　　*"Multiemployer Plan"* : a Pension Plan which is a multiemployer plan as defined in Section 4001(a) (3) of ERISA.

　　　　*"Negotiated Rate"* : with respect to each Swing Line Loan, the rate per annum agreed to in writing by the Borrower and the Swing Line Lender as the interest rate which such Swing Line Loan shall bear.

　　　　*"Net Tangible Assets"* : at any date, the total assets as shown on the most recent Consolidated balance sheet of the Borrower and the Subsidiaries as at the end of the fiscal quarter ending not more than 135 days prior to such date, prepared in accordance with GAAP,

less, without duplication (i) all current liabilities (due within one year) as shown on such balance sheet and (ii) Intangible Assets and liabilities relating thereto.

*"New Lender"* : as defined in Section 2.6(d) .

*"Non-Extending Lender"* : as defined in Section 2.12(b) .

*"Note"* : with respect to each Lender that has requested one in accordance with Section 2.11 , a promissory note evidencing such Lender's Loans payable to the order of such Lender (or, if required by such Lender, to such Lender and its registered assigns), substantially in the form of Exhibit B .

*"One Month LIBOR Rate"* : with respect to any ABR Advance for any day, the rate per annum equal to the ICE Benchmark Administration Limited LIBOR Rate (or such successor thereto if the ICE Benchmark Administration Limited is no longer making such a rate available) appearing on the applicable Bloomberg screen (or other commercially available source as designated by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, on such day (or, if such date is not a Eurodollar Business Day, the immediately preceding Eurodollar Business Day), as the rate for Dollar deposits with a maturity of approximately one month, *provided* that (a) in the event the *"One Month LIBOR Rate"* is not otherwise available, then the *"One Month LIBOR Rate"* with respect to such ABR Advance shall be the rate at which Dollar deposits of $5,000,000 and for a maturity of approximately one month are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, on such day, and (b) in the event that the *"One Month LIBOR Rate"* would otherwise be less than zero, such *"One Month LIBOR Rate"* shall be deemed to be zero for purposes of this Agreement.

*" Other Connection Taxes "* : with respect to the Administrative Agent, any Lender, any Issuer or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or any other Loan Document, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

*"Other Taxes"* : all present or future stamp, court or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.13).

*"Participant"* : as defined in Section 11.7(d) .

*"Participant Register"* : as defined in Section 11.7(d) .

***"Patriot Act"*** : as defined in Section 10.10 .

***"PBGC"*** : the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, or any Governmental Authority succeeding to the functions thereof.

***"Pension Plan"*** : at any time, any Employee Benefit Plan (including a Multiemployer Plan) subject to Section 302 of ERISA or Section 412 of the Internal Revenue Code, the funding requirements of which are, or at any time within the six years immediately preceding the time in question were, in whole or in part, the responsibility of the Borrower, any Subsidiary or an ERISA Affiliate.

***"Person"*** : any individual, firm, partnership, limited liability company, joint venture, corporation, association, business trust, joint stock company, unincorporated association, trust, Governmental Authority or any other entity, whether acting in an individual, fiduciary, or other capacity, and for the purpose of the definition of " ERISA Affiliate ", a trade or business.

***"Platform"*** : as defined in Section 7.7 .

***"Pricing Level"*** : Pricing Level I, Pricing Level II, Pricing Level III, Pricing Level IV, Pricing Level V or Pricing Level VI, as the case may be.

***"Pricing Level I"*** : any time when the senior unsecured  long term debt rating of the Borrower by (x) S&P is A or higher or (y) Moody's is A2 or higher.

***"Pricing Level II"*** : any time when (i) the senior unsecured long term debt rating of the Borrower by (x) S&P is A- or higher or (y) Moody's is A3 or higher and (ii) Pricing Level I does not apply.

***"Pricing Level III"*** : any time when (i) the senior unsecured long term debt rating of the Borrower by (x) S&P is BBB+ or higher or (y) Moody's is Baa1 or higher and (ii) neither Pricing Level I nor Pricing Level II applies.

***"Pricing Level IV"*** : any time when (i) the senior unsecured  long term debt rating of the Borrower by (x) S&P is BBB or higher or (y) Moody's is Baa2 or higher and (ii) none of Pricing Level I, Pricing Level II or Pricing Level III applies.

***"Pricing Level V"*** : any time when (i) the senior unsecured long term debt rating of the Borrower by (x) S&P is BBB- or higher or (y) Moody's is Baa3 or higher and (ii) none of Pricing Level I, Pricing Level II, Pricing Level III or Pricing Level IV applies.

***"Pricing Level VI"*** : any time when none of Pricing Level I, Pricing Level II, Pricing Level III, Pricing Level IV or Pricing Level V applies.

Notwithstanding each definition of Pricing Level set forth above, if at any time the senior unsecured long term debt ratings of the Borrower by S&P and Moody's differ by more than one equivalent rating level, then the applicable Pricing Level shall be determined based upon the lower such rating adjusted upwards to the next higher rating level.

*"Proceeding"* : as defined in Section 10(a).

" *Prohibited Transaction*" : a transaction that is prohibited under Section 4975 of the Internal Revenue Code or Section 406 of ERISA and not exempt under Section 4975 of the Internal Revenue Code, Section 408 of ERISA or any applicable administrative exemptions.

*"Property"* : in respect of any Person, all types of real, personal or mixed property and all types of tangible or intangible property owned or leased by such Person.

*"Regulatory Change"* : the occurrence, after the date hereof, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, implementation, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, in the case of each of clauses (i) and (ii), shall be deemed to be a "Regulatory Change", regardless of the date enacted, adopted or issued, but only if any such requirements are generally applicable to (and for which reimbursement is generally being sought by the Lenders in respect of) credit transactions similar to this transaction from similarly situated borrowers (which are parties to credit or loan documentation containing a provision similar to this definition), as determined by the Lenders in their respective reasonable discretion.

*"Register"* : as defined in Section 11.7(c) .

*"Reimbursement Agreement"* : as defined in Section 2.8(b) .

*"Reimbursement Obligations"* : all obligations and liabilities of the Borrower due and to become due (a) under the Reimbursement Agreements and (b) hereunder in respect of Letters of Credit.

*"Related Parties"* : with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

*"Replaced Lender"* : as defined in Section 3.13 .

*"Replacement Lender"* : as defined in Section 3.13 .

*"Required Lenders"* : (a) at any time prior to the Commitment Termination Date or such earlier date as all of the Commitments shall have terminated or been terminated in accordance herewith, Lenders having Commitment Amounts equal to or more than 51% of the Aggregate Commitment Amount, and (b) at all other times, Lenders having Credit Exposure equal to or more than 51% of the Aggregate Credit Exposure.

***"Restricted Payment"*** : with respect to any Person, any of the following, whether direct or indirect: (a) the declaration or payment by such Person of any dividend or distribution on any class of stock of such Person, other than a dividend payable solely in shares of that class of stock to the holders of such class, (b) the declaration or payment by such Person of any distribution on any other type or class of equity interest or equity investment in such Person, and (c) any redemption, retirement, purchase or acquisition of, or sinking fund or other similar payment in respect of, any class of stock of, or other type or class of equity interest or equity investment in, such Person.

***"Restrictive Agreement"*** : as defined in <u>Section 8.7</u> .

***"Revolving Credit Loan"*** and ***"Revolving Credit Loans"*** : as defined in <u>Section 2.1(a)</u> .

***"Sanctioned Country"*** : at any time, a country or territory which is the subject or target of any Sanctions.

***"Sanctioned Person"*** : at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

***"Sanctions"*** : economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

***"S&P"*** : Standard & Poor's Ratings Services, a subsidiary of McGraw Hill Financial, Inc., or any successor thereto.

***"Special Counsel"*** : such counsel as the Administrative Agent may engage from time to time.

***"Statutory Reserve Rate"*** : a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of the Board of Governors of the Federal Reserve System, as amended). Such reserve percentages shall include those imposed pursuant to said Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under said Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

***"Subsidiary"*** : at any time and from time to time, any corporation, partnership, limited liability company, joint venture or other business entity of which the Borrower and/or any

Subsidiary of the Borrower, directly or indirectly means either (a) in respect of a corporation, owns or controls more than 50% of the outstanding stock having ordinary voting power to elect a majority of the board of directors or similar managing body, irrespective of whether a class or classes shall or might have voting power by reason of the happening of any contingency, or (b) in respect of a partnership, limited liability company, joint venture or other business entity, is entitled to share in more than 50% of the profits and losses, however determined.

"*Swing Line Commitment*" : the commitment of the Swing Line Lender to make Swing Line Loans in accordance with the terms hereof in an aggregate outstanding principal amount not exceeding $100,000,000 (or, if less, the Aggregate Commitment Amount) at any time, as the same may be reduced pursuant to Section 2.6 .

"*Swing Line Commitment Period*" : the period from the Effective Date to, but excluding, the Swing Line Termination Date.

"*Swing Line Exposure*" : at any time, in respect of any Lender, an amount equal to the aggregate principal balance of such Lender's Swing Line Participation Amount.

"*Swing Line Interest Period*" : as to any Swing Line Loan, the period commencing on the date of such Swing Line Loan and ending on the date set forth by the Borrower in the Borrowing Request with respect to such Swing Line Loan; *provided* that the last day of any Swing Line Interest Period shall not be earlier than one day after the date of such Swing Line Loan or later than 7 days after the date of such Swing Line Loan and in no event later than the Swing Line Termination Date; *provided further* that if any Swing Line Interest Period would end on a day other than a Domestic Business Day, such Swing Line Interest Period shall be extended to the next succeeding Domestic Business Day. Interest shall accrue from and including the first day of a Swing Line Interest Period to but excluding the last day of such Swing Line Interest Period.

"*Swing Line Lender*" : BNY Mellon.

"*Swing Line Loan*" and "*Swing Line Loans*" : as defined in Section 2.2(a) .

"*Swing Line Maturity Date*" : as defined in Section 2.2(a) .

"*Swing Line Participation Amount*" : as defined in Section 2.2(c) .

"*Swing Line Termination Date*" : the date which is 7 Domestic Business Days prior to the Commitment Termination Date.

"*Taxes*" : all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Termination Event*" : with respect to any Pension Plan, (a) an ERISA Event, (b) the termination of a Pension Plan under Section 4041(c) of ERISA, or the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, or the treatment of a Pension Plan amendment as a termination under Section 4041(e) of ERISA (except an amendment made after such Pension Plan satisfies the requirement for a standard termination under Section 4041(b) of

ERISA), (c) the institution of proceedings by the PBGC to terminate a Pension Plan under Section 4042 of ERISA, or (d) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA.

       ***"Total Capitalization"*** : at any date, the sum of the Borrower's Consolidated Indebtedness and shareholders' equity on such date, determined in accordance with GAAP.

       ***"Type"*** : with respect to any Revolving Credit Loan, the characteristic of such Loan as an ABR Advance or a Eurodollar Advance, each of which constitutes a Type of Revolving Credit Loan.

       ***"Unqualified Amount"*** : as defined in <u>Section 3.4(c)</u> .

       ***"Upstream Dividends"*** : as defined in <u>Section 8.7(a)</u> .

       ***"U.S. Lender"*** : as defined in <u>Section 3.10(f)</u> .

       ***"United States Tax Compliance Certificate"*** : as defined in <u>Section 3.10(f)(iii)</u> .

       ***"Wells Fargo"*** : as defined in the preamble.

       " ***WFS*** ": Wells Fargo Securities, LLC.

       ***"Write-Down and Conversion Powers"*** : with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

    1.2    ***Principles of Construction***

       (a)    All capitalized terms defined in this Agreement shall have the meanings given to such capitalized terms herein when used in the other Loan Documents or in any certificate, opinion or other document made or delivered pursuant hereto or thereto, unless otherwise expressly provided therein.

       (b)    Unless otherwise expressly provided herein, the word *"fiscal"* when used herein shall refer to the relevant fiscal period of the Borrower.  As used in the Loan Documents and in any certificate, opinion or other document made or delivered pursuant thereto, accounting terms not defined in <u>Section 1.1</u> , and accounting terms partly defined in <u>Section 1.1</u> , to the extent not defined, shall have the respective meanings given to them under GAAP as in effect from time to time; *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of, and any accounting term related thereto shall have the respective meaning given to it under, GAAP as in effect and applied immediately before such

change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

(c)    The words *"hereof"* , *"herein"* , *"hereto"* and *"hereunder"* and similar words when used in each Loan Document shall refer to such Loan Document as a whole and not to any particular provision of such Loan Document, and Section, schedule and exhibit references contained therein shall refer to Sections thereof or schedules or exhibits thereto unless otherwise expressly provided therein.

(d)    All references herein to a time of day shall mean the then applicable time in New York, New York, unless otherwise expressly provided herein.

(e)    Section headings have been inserted in the Loan Documents for convenience only and shall not be construed to be a part thereof.  Unless the context otherwise requires, words in the singular number include the plural, and words in the plural include the singular.

(f)    Whenever in any Loan Document or in any certificate or other document made or delivered pursuant thereto, the terms thereof require that a Person sign or execute the same or refer to the same as having been so signed or executed, such terms shall mean that the same shall be, or was, duly signed or executed by (i) in respect of any Person that is a corporation, any duly authorized officer thereof, and (ii) in respect of any other Person (other than an individual), any analogous counterpart thereof.

(g)    The words *"include"* and *"including"* , when used in each Loan Document, shall mean that the same shall be included *"without limitation"* , unless otherwise specifically provided.

## 2.    *AMOUNT AND TERMS OF LOANS*

### 2.1    *Revolving Credit Loans*

(a)    Subject to the terms and conditions hereof, each Lender severally (and not jointly) agrees to make loans in Dollars under this Agreement (each a **"Revolving Credit Loan"** and, collectively with each other Revolving Credit Loan of such Lender and/or with each Revolving Credit Loan of each other Lender, the **"Revolving Credit Loans"** ) to the Borrower from time to time during the Commitment Period, during which period the Borrower may borrow, prepay and reborrow in accordance with the provisions hereof.  Immediately after making each Revolving Credit Loan and after giving effect to all Swing Line Loans and Competitive Bid Loans repaid and all Reimbursement Obligations paid on the same date, the Aggregate Credit Exposure will not exceed the Aggregate Commitment Amount.  With respect to each Lender, at the time of the making of any Revolving Credit Loan, the sum of (I) the principal amount of such Lender's Revolving Credit Loan constituting a part of the Revolving Credit Loans to be made, (II) the aggregate principal balance of all other Revolving Credit Loans (exclusive of Revolving Credit Loans

23

CVS Health Corporation 2017 Five Year Credit Agreement

which are repaid with the proceeds of, and simultaneously with the incidence of, the Revolving Credit Loans to be made) then outstanding from such Lender and (III) the product of (A) such Lender's Commitment Percentage and (B) the sum of (1) the aggregate principal balance of all Swing Line Loans (exclusive of Swing Line Loans which are repaid with the proceeds of, and simultaneously with the incurrence of, the Revolving Credit Loans to be made) then outstanding and (2) the Letter of Credit Exposure of all Lenders, will not exceed the Commitment of such Lender at such time. At the option of the Borrower, indicated in a Borrowing Request, Revolving Credit Loans may be made as ABR Advances or Eurodollar Advances.

(b)    The aggregate outstanding principal balance of all Revolving Credit Loans shall be due and payable on the Commitment Termination Date or on such earlier date upon which all of the Commitments shall have been terminated in accordance with Section 2.6 .

2.2    ***Swing Line Loans***

(a)    Subject to the terms and conditions hereof, the Swing Line Lender agrees to make loans in Dollars under this Agreement (each a ***"Swing Line Loan"*** and, collectively, the ***"Swing Line Loans"*** ) to the Borrower from time to time during the Swing Line Commitment Period. Swing Line Loans (i) may be repaid and reborrowed in accordance with the provisions hereof, (ii) shall not, immediately after giving effect thereto, result in the Aggregate Credit Exposure exceeding the Aggregate Commitment Amount, and (iii) shall not, immediately after giving effect thereto, result in the aggregate outstanding principal balance of all Swing Line Loans exceeding the Swing Line Commitment. The Swing Line Lender shall not be obligated to make any Swing Line Loan at a time when any Lender is a Defaulting Lender unless the Swing Line Lender has entered into arrangements satisfactory to it and the Borrower to eliminate the Swing Line Lender's risk with respect to such Defaulting Lender's participation in such Swing Line Loan. The Swing Line Lender will not make a Swing Line Loan if the Administrative Agent, or any Lender by notice to the Swing Line Lender and the Borrower no later than one Domestic Business Day prior to the Borrowing Date with respect to such Swing Line Loan, shall have determined that the conditions set forth in Section 6 have not been satisfied or waived and such conditions remain unsatisfied as of the requested time of the making of such Loan. Each Swing Line Loan shall be due and payable on the day (the ***"Swing Line Maturity Date"*** ) being the earliest of the last day of the Swing Line Interest Period applicable thereto, the date on which the Swing Line Commitment shall have been terminated in accordance with Section 2.6 , and the date on which the Loans shall become due and payable pursuant to the provisions hereof, whether by acceleration or otherwise. Each Swing Line Loan shall bear interest at the Negotiated Rate applicable thereto. The Swing Line Lender shall disburse the proceeds of Swing Line Loans at its office designated in Section 11.2 by crediting such proceeds to an account of the Borrower maintained with the Swing Line Lender.

(b)    On any Domestic Business Day, the Swing Line Lender may, in its sole discretion, give notice to the Lenders and the Borrower that such outstanding Swing Line Loan shall be funded with a borrowing of Revolving Credit Loans ( *provided* that such notice shall be deemed to have been automatically given upon the occurrence of a Default or an Event of Default under Section 9.1(h), (i) or (j) ), in which case a borrowing of Revolving Credit Loans made as ABR Advances (each such borrowing, a ***"Mandatory Borrowing"*** ) shall be made by all Lenders *pro rata* based on each such Lender's Commitment Percentage on the Domestic Business Day immediately succeeding the giving of such notice. The proceeds of each Mandatory Borrowing shall be remitted directly to the Swing Line Lender to repay such outstanding Swing Line Loan. Each Lender irrevocably agrees to make a Revolving Credit Loan

pursuant to each Mandatory Borrowing in the amount and in the manner specified in the preceding sentence and on the date specified in writing by the Swing Line Lender notwithstanding: (i) whether the amount of such Mandatory Borrowing complies with the minimum amount for Loans otherwise required hereunder, (ii) whether any condition specified in Section 6 is then unsatisfied, (iii) whether a Default then exists, (iv) the Borrowing Date of such Mandatory Borrowing, (v) the aggregate principal amount of all Loans then outstanding, (vi) the Aggregate Credit Exposure at such time and (vii) the amount of the Commitments at such time.

(c)     Upon each receipt by a Lender of notice from the Administrative Agent, such Lender shall purchase unconditionally, irrevocably, and severally (and not jointly) from the Swing Line Lender a participation in the outstanding Swing Line Loans (including accrued interest thereon) in an amount equal to the product of its Commitment Percentage and the outstanding balance of the Swing Line Loans (each, a *"Swing Line Participation Amount"* ).  Each Lender shall also be liable for an amount equal to the product of its Commitment Percentage and any amounts paid by the Borrower pursuant to this Section 2.2 that are subsequently rescinded or avoided, or must otherwise be restored or returned.  Such liabilities shall be unconditional and without regard to the occurrence of any Default or the compliance by the Borrower with any of its obligations under the Loan Documents.

(d)     In furtherance of Section 2.2(c) , upon each receipt by a Lender of notice from the Administrative Agent, such Lender shall promptly make available to the Administrative Agent for the account of the Swing Line Lender its Swing Line Participation Amount at the office of the Administrative Agent specified in Section 11.2 , in Dollars and in immediately available funds.  The Administrative Agent shall deliver the payments made by each Lender pursuant to the immediately preceding sentence to the Swing Line Lender promptly upon receipt thereof in like funds as received.  Each Lender hereby indemnifies and agrees to hold harmless the Administrative Agent and the Swing Line Lender from and against any and all losses, liabilities (including liabilities for penalties), actions, suits, judgments, demands, costs and expenses resulting from any failure on the part of such Lender to pay, or from any delay in paying, the Administrative Agent any amount such Lender is required by notice from the Administrative Agent to pay in accordance with this Section 2.2 (except in respect of losses, liabilities or other obligations suffered by the Administrative Agent or the Swing Line Lender, as the case may be, resulting from the gross negligence or willful misconduct of the Administrative Agent or the Swing Line Lender, as the case may be), and such Lender shall pay interest to the Administrative Agent for the account of the Swing Line Lender from the date such amount was due until paid in full, on the unpaid portion thereof, at a rate of interest per annum, whether before or after judgment, equal to (i) from the date such amount was due until the third day therefrom, the Federal Funds Effective Rate (but not less than 0.0%), and (ii) thereafter, the Federal Funds Effective Rate (but not less than 0.0%) *plus* 2%, payable upon demand by the Swing Line Lender.  The Administrative Agent shall distribute such interest payments to the Swing Line Lender upon receipt thereof in like funds as received.

(e)     Whenever the Administrative Agent is reimbursed by the Borrower for the account of the Swing Line Lender for any payment in connection with Swing Line Loans and such payment relates to an amount previously paid by a Lender pursuant to this Section 2.2 , the Administrative Agent will promptly remit such payment to such Lender.

2.3    *Notice of Borrowing Revolving Credit Loans and Swing Line Loans*

The Borrower agrees to notify the Administrative Agent (and with respect to a Swing Line Loan, the Swing Line Lender), which notification shall be irrevocable, no later than (a) 2:00 P.M., on the proposed Borrowing Date in the case of Swing Line Loans, (b) 12:00 Noon on the proposed Borrowing Date in the case of Revolving Credit Loans to consist of ABR Advances and (c) 12:00 Noon at least three Eurodollar Business Days prior to the proposed Borrowing Date in the case of Revolving Credit Loans to consist of Eurodollar Advances. Each such notice shall specify (i) the aggregate amount requested to be borrowed under the Commitments or the Swing Line Commitment, (ii) the proposed Borrowing Date, (iii) whether a borrowing of Revolving Credit Loans is to be made as an ABR Advance, one or more Eurodollar Advances, or both, and the amount of each thereof, (iv) the Eurodollar Interest Period for each such Eurodollar Advance and (v) the Swing Line Interest Period for, and the amount of, each Swing Line Loan. Each such notice shall be promptly confirmed by delivery to the Administrative Agent (and, with respect to a Swing Line Loan, the Swing Line Lender) of a Borrowing Request. Each Eurodollar Advance to be made on a Borrowing Date, when aggregated with all amounts to be Converted to Eurodollar Advances on such date and having the same Interest Period as such Eurodollar Advance, shall equal no less than $10,000,000, or an integral multiple of $1,000,000 in excess thereof. Each ABR Advance made on each Borrowing Date shall equal no less than $5,000,000 or an integral multiple of $500,000 in excess thereof. Each Swing Line Loan made on each Borrowing Date shall equal no less than $1,000,000 or an integral multiple of $500,000 in excess thereof. The Administrative Agent shall promptly notify each Lender (by telephone or otherwise, such notification to be confirmed by fax, email or other writing) of each such Borrowing Request. Subject to its receipt of each such notice from the Administrative Agent and subject to the terms and conditions hereof, (A) each Lender shall make immediately available funds available to the Administrative Agent at the address therefor set forth in Section 11.2 not later than 1:00 P.M. on each Borrowing Date in an amount equal to such Lender's Commitment Percentage of the Revolving Credit Loans requested by the Borrower on such Borrowing Date and/or (B) the Swing Line Lender shall make immediately available funds available to the Borrower on such Borrowing Date in an amount equal to the Swing Line Loan requested by the Borrower.

2.4    *Competitive Bid Loans and Procedure*

(a)    Subject to the terms and conditions hereof, the Borrower may request competitive bid loans in Dollars under this Agreement (each a *"Competitive Bid Loan"*) during the Commitment Period. In order to request Competitive Bids, the Borrower shall deliver by hand, fax or email to the Administrative Agent a duly completed and executed Competitive Bid Request not later than 12:00 Noon, one Domestic Business Day before the proposed Borrowing Date therefor. A Competitive Bid Request that does not conform substantially to the format of Exhibit F may be rejected by the Administrative Agent in the Administrative Agent's reasonable discretion, and the Administrative Agent shall promptly notify the Borrower of such rejection by fax or email and by telephone. Each Competitive Bid Request shall specify (x) the proposed Borrowing Date for the Competitive Bid Loans then being requested (which shall be a Domestic Business Day) and the aggregate principal amount thereof and (y) the Competitive Interest Period or Competitive Interest Periods (which shall not exceed ten different Interest Periods in a single Competitive Bid Request), with respect thereto (which may not end after the Domestic

26

Business Day immediately preceding the Commitment Termination Date). Promptly after its receipt of each Competitive Bid Request that is not rejected as aforesaid, the Administrative Agent shall invite by fax or email (in the form of Exhibit G) the Lenders (other than any Defaulting Lender) to bid, on the terms and conditions of this Agreement, to make Competitive Bid Loans pursuant to such Competitive Bid Request.

(b)     Each Lender (other than any Defaulting Lender), in its sole and absolute discretion, may make one or more Competitive Bids to the Borrower responsive to a Competitive Bid Request. Each Competitive Bid by a Lender must be received by the Administrative Agent not later than 10:00 A.M. on the proposed Borrowing Date for the relevant Competitive Bid Loan. Multiple bids will be accepted by the Administrative Agent. Bids to make Competitive Bid Loans that, in the reasonable judgment of the Administrative Agent, do not conform to the Bids solicited by the related Competitive Bid Request shall be rejected by the Administrative Agent. Bids to make Competitive Bid Loans that do not conform substantially to the format of Exhibit H may be rejected by the Administrative Agent after conferring with, and upon the instruction of, the Borrower, and the Administrative Agent shall notify the Lender making such nonconforming bid of such rejection as soon as practicable. Each Competitive Bid shall be irrevocable and shall specify (x) the principal amount (which (1) shall be in a minimum principal amount of $10,000,000 or an integral multiple of $1,000,000 in excess thereof, and (2) may equal the entire principal amount requested by the Borrower) of the Competitive Bid Loan or Competitive Bid Loans that the Lender is willing to make to the Borrower, (y) the Competitive Bid Rate or Rates at which the Lender is prepared to make such Competitive Bid Loan or Competitive Bid Loans, and (z) the Competitive Interest Period with respect to each such Competitive Bid Loan and the last day thereof. If any Lender shall elect not to make a Competitive Bid, such Lender shall so notify the Administrative Agent by fax or email not later than 10:00 A.M. on the proposed Borrowing Date therefor, *provided* that the failure by any Lender to give any such notice shall not obligate such Lender to make any Competitive Bid Loan in connection with the relevant Competitive Bid Request.

(c)     With respect to each Competitive Bid Request, the Administrative Agent shall (i) notify the Borrower by fax or email by 11:00 A.M. on the proposed Borrowing Date with respect thereto of each Competitive Bid made, the Competitive Bid Rate applicable thereto and the identity of the Lender that made such Competitive Bid, and (ii) send a list of all Competitive Bids to the Borrower for its records as soon as practicable after completion of the bidding process. Each notice and list sent by the Administrative Agent pursuant to this Section 2.4(c) shall list the Competitive Bids in ascending yield order.

(d)     The Borrower may in its sole and absolute discretion, subject only to the provisions of this Section 2.4(d), accept or reject any Competitive Bid made in accordance with the procedures set forth in this Section 2.4, and the Borrower shall notify the Administrative Agent by telephone, confirmed by fax or email in the form of a duly completed and executed Competitive Bid Accept/Reject Letter, whether and to what extent it has decided to accept or reject any or all of such Competitive Bids not later than 12:00 Noon on the proposed Borrowing Date therefor; *provided* that the failure by the Borrower to give such notice shall be deemed to be a rejection of all such Competitive Bids. In connection with each acceptance of one or more Competitive Bids by the Borrower:

(1)    the Borrower shall not accept a Competitive Bid of a given tenor made at a particular Competitive Bid Rate if the Borrower has decided to reject a Competitive Bid having the same tenor made at a lower Competitive Bid Rate unless the acceptance of such lower Competitive Bid would subject the Borrower to any requirement to withhold any taxes or deduct any amount from any amounts payable under the Loan Documents, in which case the Borrower may reject such lower Competitive Bid,

(2)    the aggregate amount of the Competitive Bids accepted by the Borrower shall not exceed the principal amount specified in the Competitive Bid Request therefor,

(3)    if the Borrower shall desire to accept a Competitive Bid made at a particular Competitive Bid Rate, it must accept all other Competitive Bids at such Competitive Bid Rate, except for any such Competitive Bid the acceptance of which would subject the Borrower to any requirement to withhold any taxes or deduct any amount from any amounts payable under the Loan Documents; *provided* that if the acceptance of all such other Competitive Bids would cause the aggregate amount of all such accepted Competitive Bids to exceed the amount requested, then such acceptance shall be made pro rata in accordance with the amount of each such Competitive Bid at such Competitive Bid Rate,

(4)    except pursuant to clause (3) above, no Competitive Bid shall be accepted unless the Competitive Bid Loan with respect thereto shall be in a minimum principal amount of $10,000,000 or an integral multiple of $1,000,000 in excess thereof, and

(5)    no Competitive Bid shall be accepted and no Competitive Bid Loan shall be made, if immediately after giving effect thereto, the Aggregate Credit Exposure would exceed the Aggregate Commitment Amount.

(e)    The Administrative Agent shall promptly fax or email to each bidding Lender (with a copy to the Borrower) a Competitive Bid Accept/Reject Letter advising such Lender whether its Competitive Bid has been accepted (and if accepted, in what amount and at what Competitive Bid Rate), and each successful bidder so notified will thereupon become bound, subject to the other applicable conditions hereof, to make the Competitive Bid Loan in respect of which each of its Competitive Bids has been accepted by making immediately available funds available to the Administrative Agent at its address set forth in Section 11.2 not later than 1:00 P.M. on the Borrowing Date for such Competitive Bid Loan in the amount thereof.

(f)    Anything herein to the contrary notwithstanding, if the Administrative Agent shall elect to submit a Competitive Bid in its capacity as a Lender, it shall submit such bid directly to the Borrower not later than 9:30 A.M. on the relevant proposed Borrowing Date.

(g)    All notices required by this Section 2.4 shall be given in accordance with Section 11.2 .

(h)      Each Competitive Bid Loan shall be due and payable on the last day of the Interest Period applicable thereto or on such earlier date upon which the Loans shall become due and payable pursuant to the provisions hereof, whether by acceleration or otherwise.

## 2.5      *Use of Proceeds*

The Borrower agrees that the proceeds of the Loans and Letters of Credit shall be used solely for its general corporate purposes, but not inconsistent with this Section 2.5.  Notwithstanding anything to the contrary contained in any Loan Document, the Borrower further agrees that no part of the proceeds of any Loan or Letter of Credit will be used, directly or indirectly, and whether immediately, incidentally or ultimately (i) for a purpose which violates any law, rule or regulation of any Governmental Authority, including the provisions of Regulations U or X of the Board of Governors of the Federal Reserve System, as amended, or any provision of this Agreement, including, without limitation, the provisions of Section 4.9 or (ii) to make a loan to any director or executive officer of the Borrower or any Subsidiary.

## 2.6      *Termination, Reduction or Increase of Commitments*

(a)      *Termination on Commitment Termination Date* .  Unless previously terminated, the Commitments and the Letter of Credit Commitment shall terminate on the Commitment Termination Date and the Swing Line Commitment shall terminate on the Swing Line Termination Date.

(b)      *Voluntary Termination or Reductions* .  At the Borrower's option and upon at least one Domestic Business Day's prior irrevocable notice to the Administrative Agent, the Borrower may (i) terminate the Commitments, the Swing Line Commitment and the Letter of Credit Commitment, at any time, or (ii) permanently reduce the Aggregate Commitment Amount, the Swing Line Commitment or the Letter of Credit Commitment, in part at any time and from time to time, *provided* that (1) each such partial reduction shall be in an amount equal to at least $5,000,000 or an integral multiple of $1,000,000 in excess thereof, and (2) immediately after giving effect to each such reduction, (A) the Aggregate Commitment Amount shall equal or exceed the Aggregate Credit Exposure, (B) the Swing Line Commitment shall equal or exceed the aggregate outstanding principal balance of all Swing Line Loans and (C) the Letter of Credit Commitment shall equal or exceed the Letter of Credit Exposure of all Lenders, and *provided* , *further* that, notwithstanding the foregoing, a notice of termination of the Commitments, the Swing Line Commitment and the Letter of Credit Commitment delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities (such notice to specify the proposed effective date), in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to such specified effective date) if such condition is not satisfied and the Borrower shall indemnify the Lenders in accordance with Section 3.5 ,  if applicable.

(c)      *In General* .  Each reduction of the Aggregate Commitment Amount shall be made by reducing each Lender's Commitment Amount by an amount equal to the product of such Lender's Commitment Percentage and the amount of such reduction.

(d)    *Increase in Aggregate Commitment Amount.* The Borrower may at any time and from time to time prior to the 90 th day prior to the then-applicable Commitment Termination Date, at its sole cost and expense, request any one or more of the Lenders having a Commitment to increase its Commitment Amount (the decision to increase the Commitment Amount of a Lender to be within the sole and absolute discretion of such Lender), or any other Eligible Assignee reasonably satisfactory to the Administrative Agent, the Swing Line Lender and each Issuer to provide a new Commitment, by submitting to the Administrative Agent a Commitment Increase Supplement, duly executed by the Borrower and each such Lender or other Eligible Assignee, as the case may be.  Upon receipt of any such Commitment Increase Supplement, the Administrative Agent, the Swing Line Lender and each Issuer shall promptly execute such Commitment Increase Supplement and the Administrative Agent shall deliver a copy thereof to the Borrower and each such Lender or other Eligible Assignee, as the case may be.  Upon execution and delivery of such Commitment Increase Supplement by the Administrative Agent, the Swing Line Lender and each Issuer, (i) in the case of each such Lender (an " *Increasing Lender* " ), its Commitment Amount shall be increased to the amount set forth in such Commitment Increase Supplement, and (ii) in the case of each such other Eligible Assignee (a " *New Lender* " ), such New Lender shall become a party hereto and have the rights and obligations of a Lender under the Loan Documents and its Commitment shall be as set forth in such Commitment Increase Supplement; *provided* that:

(1)    immediately after giving effect thereto, the sum of all increases in the Aggregate Commitment Amount made pursuant to this Section 2.6(d) shall not exceed $250,000,000;

(2)    each such increase of the Aggregate Commitment Amount shall be in an amount not less than $25,000,000 or such amount plus an integral multiple of $5,000,000;

(3)    no Default shall have occurred or be continuing on the effective date of the increase;

(4)    the representations and warranties contained in this Agreement shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the effective date of such increase (provided that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such effective date), except those which are expressly specified to be made as of an earlier date;

(5)    in the case of each New Lender, the Commitment Amount assumed by such New Lender shall not be less than $25,000,000;

(6)    if Revolving Credit Loans would be outstanding immediately after giving effect to any such increase, then simultaneously with such increase (A) each such Increasing Lender, each such New Lender and each other Lender shall be deemed to have entered into a master assignment and assumption, in form and substance substantially similar to Exhibit E , pursuant to which each such other Lender shall have assigned to

each such Increasing Lender and each such other Lender a portion of its Revolving Credit Loans necessary to reflect proportionately the Commitments as increased in accordance with this <u>Section 2.6(d)</u> , and (B) in connection with such assignment, each such Increasing Lender and each such New Lender shall pay to the Administrative Agent, for the account of each such other Lender, such amount as shall be necessary to reflect the assignment to it of Revolving Credit Loans, and in connection with such master assignment each such other Lender may treat the assignment of Eurodollar Advances as a prepayment of such Eurodollar Advances for purposes of <u>Section 3.5</u> ;

(7)        each such New Lender shall have delivered to the Administrative Agent an Administrative Questionnaire and to the Administrative Agent and the Borrower all forms, if any, that are required to be delivered by such New Lender pursuant to <u>Section 3.10</u> ; and

(8)        the Administrative Agent shall have received such other certificates, resolutions and opinions as the Administrative Agent shall have reasonably requested.

2.7    ***Prepayments of Loans***

(a)        *Voluntary Prepayments* .  The Borrower may prepay Revolving Credit Loans, Competitive Bid Loans and Swing Line Loans, in whole or in part, without premium or penalty, but subject to <u>Section 3.5</u> at any time and from time to time, by notifying the Administrative Agent, which notification shall be irrevocable, at least two Eurodollar Business Days, in the case of a prepayment of Eurodollar Advances, two Domestic Business Days, in the case of a prepayment of Competitive Bid Loans, or one Domestic Business Day, in the case of a prepayment of Swing Line Loans or ABR Advances, prior to the proposed prepayment date specifying (i) the Loans to be prepaid, (ii) the amount to be prepaid, and (iii) the date of prepayment.  Upon receipt of each such notice, the Administrative Agent shall promptly notify each Lender thereof.  Each such notice given by the Borrower pursuant to this <u>Section 2.7</u> shall be irrevocable, *provided* that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments, the Swing Line Commitment and the Letter of Credit Commitment as contemplated by <u>Section 2.6</u> , then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with <u>Section 2.6</u> , and the Borrower shall indemnify the Lenders in accordance with <u>Section 3.5</u> .  Each partial prepayment under this <u>Section 2.7</u> shall be (A) in the case of Eurodollar Advances, in a minimum amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof, (B) in the case of ABR Advances, in a minimum amount of $1,000,000 or an integral multiple of $100,000 in excess thereof, (C) in the case of Swing Line Loans, in a minimum amount of $500,000 or an integral multiple of $100,000 in excess thereof, and (D) in the case of Competitive Bid Loans, in a minimum amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof.

(b)        *In General* .  Simultaneously with each prepayment hereunder, the Borrower shall prepay all accrued interest on the amount prepaid through the date of prepayment and indemnify the Lenders in accordance with <u>Section 3.5</u> , if applicable.

2.8      *Letter of Credit Sub-facility*

(a)      Subject to the terms and conditions hereof and the payment by the Borrower to each Issuer of such fees as the Borrower and such Issuer shall have agreed in writing, each Issuer severally (and not jointly) agrees, in reliance on the agreement of the other Lenders set forth in Section 2.9 , to issue standby or commercial letters of credit (each a **"Letter of Credit"** and, collectively, the **"Letters of Credit"** )  during the Commitment Period for the account of the Borrower; *provided* that immediately after the issuance of each Letter of Credit (i) the Letter of Credit Exposure of all Lenders shall not exceed the Aggregate Letter of Credit Commitment, (ii) the Aggregate Credit Exposure shall not exceed the Aggregate Commitment Amount, (iii) the Letter of Credit Exposure of such Issuer shall not exceed the Letter of Credit Commitment of such Issuer, and (iv) the Commercial Letter of Credit Exposure of such Issuer shall not exceed the Commercial Letter of Credit Commitment of such Issuer.  Each Letter of Credit shall have an expiration date which shall be not later than, in the case of standby Letters of Credit, the earlier to occur of one year from the date of issuance thereof or 5 days prior to the Commitment Termination Date and, in the case of commercial Letters of Credit, the earlier to occur of 180 days from the date of issuance thereof or 5 days prior to the Commitment Termination Date.  No Letter of Credit shall be issued if the Administrative Agent, or any Lender by notice to the Administrative Agent and the proposed Issuer no later than 3:00 P.M. one Domestic Business Day prior to the requested date of issuance of such Letter of Credit, shall have determined that the conditions set forth in Section 6 have not been satisfied or waived.

(b)      Each Letter of Credit shall be issued at the request of the Borrower in support of an obligation of the Borrower or any Subsidiary in favor of a beneficiary who has requested the issuance of such Letter of Credit.  The Borrower shall give the Administrative Agent a Letter of Credit Request for the issuance of each Letter of Credit by 12:00 Noon at least two Domestic Business Days prior to the requested date of issuance.  Such Letter of Credit Request shall specify (i) whether such Letter of Credit is a standby or commercial Letter of Credit, (ii) the beneficiary of such Letter of Credit and the obligations of the Borrower or the Subsidiary in respect of which such Letter of Credit is to be issued, (iii) the Borrower's proposal as to the conditions under which a drawing may be made under such Letter of Credit and the documentation to be required in respect thereof, (iv) the maximum amount to be available under such Letter of Credit, (v) the requested date of issuance, and (vi) the name of the proposed Issuer thereof.  Upon receipt of such Letter of Credit Request from the Borrower, the Administrative Agent shall promptly notify the applicable Issuer and each Lender thereof.  Such Issuer shall, on the proposed date of issuance and subject to the other terms and conditions of this Agreement, issue the requested Letter of Credit; *provided* that in the event such Issuer fails to issue such Letter of Credit or is a Defaulting Lender, any other Issuer may (in its sole and absolute discretion, and notwithstanding that its Letter of Credit Exposure may exceed its Letter of Credit Commitment, but with (x) the consent of the Borrower and (y) notice to the Administrative Agent) issue such Letter of Credit otherwise in accordance with the terms hereof; *provided further* that immediately after the issuance thereof (A) the Letter of Credit Exposure of all Lenders shall not exceed the Aggregate Letter of Credit Commitment, and (B) the Aggregate Credit Exposure shall not exceed the Aggregate Commitment Amount.  Each

32

Letter of Credit shall be in form and substance reasonably satisfactory to the Issuer thereof, with such provisions with respect to the conditions under which a drawing may be made thereunder and the documentation required in respect of such drawing as such Issuer shall reasonably require. Each Letter of Credit shall be used solely for the purposes described therein. Each Letter of Credit Request and each Letter of Credit shall be subject to the standard terms and conditions for letters of credit of the Issuer thereof (each as amended, supplemented or replaced from time to time, a *"Reimbursement Agreement"* ) executed by the Borrower and delivered to such Issuer.

(c)    Each payment by an Issuer of a draft drawn under a Letter of Credit issued thereby shall give rise to the obligation of the Borrower to promptly (and in any event within one Domestic Business Day) reimburse such Issuer for the amount thereof. Such Issuer shall promptly notify the Borrower of such payment by such Issuer of a draft drawn under a Letter of Credit. In lieu of such notice, if the Borrower has not made reimbursement prior to the end of the Domestic Business Day following the day during which such Issuer made such payment of such draft, the Borrower hereby authorizes such Issuer to deduct the amount of any such reimbursement from such account(s) as the Borrower may from time to time designate in writing to such Issuer, upon which such Issuer shall apply the amount of such deduction to such reimbursement. If all or any portion of any Reimbursement Obligation in respect of a Letter of Credit shall not be paid on the date that the Issuer thereof shall have made payment of a draft drawn under such Letter of Credit, the amount of such Reimbursement Obligation shall bear interest, at a rate per annum equal to the Alternate Base Rate *plus* the Applicable Margin applicable to ABR Advances, from the date such Issuer made such payment of such draft until the end of the Domestic Business Day following the day during which such Issuer made such payment of such draft (whether at the stated maturity thereof, by acceleration or otherwise), and from and after such Domestic Business Day (whether at the stated maturity thereof, by acceleration or otherwise), such Reimbursement Obligation shall bear interest, payable upon demand, at a rate per annum equal to the Alternate Base Rate *plus* the Applicable Margin applicable to ABR Advances *plus* 2%, from such due date until paid in full (whether before or after the entry of a judgment thereon).

(d)    In the event of any conflict between the terms hereof and the terms of any Reimbursement Agreement or Letter of Credit Application, the terms hereof shall control.

2.9    *Letter of Credit Participation*

(a)    Each Lender hereby unconditionally and irrevocably, severally (and not jointly) takes an undivided participating interest in the obligations of each Issuer under and in connection with each Letter of Credit issued thereby in an amount equal to such Lender's Commitment Percentage (as in effect from time to time) of the amount of such Letter of Credit. Each Lender shall be liable to each Issuer for its Commitment Percentage of the unreimbursed amount of any draft drawn and honored under each Letter of Credit issued thereby. Each Lender shall also be liable for an amount equal to the product of its Commitment Percentage and any amounts paid by the Borrower pursuant to Section 2.8 that are subsequently rescinded or avoided, or must otherwise be restored or returned. Such liabilities shall be unconditional and without regard to the occurrence of any Default or the compliance by the Borrower with any of its obligations under the Loan Documents.

(b)    Each Issuer shall promptly notify the Administrative Agent, and the Administrative Agent shall promptly notify each Lender (which notice shall be promptly confirmed in writing), of the date and the amount of each draft paid under each Letter of Credit

33

issued by such Issuer with respect to which full reimbursement payment shall not have been made by the Borrower as provided in <u>Section 2.8(c)</u>, and forthwith upon receipt of such notice, such Lender shall promptly make available to the Administrative Agent for the account of such Issuer its Commitment Percentage of the amount of such unreimbursed draft at the office of the Administrative Agent specified in <u>Section 11.2</u> in Dollars and in immediately available funds.  The Administrative Agent shall distribute the payments made by each Lender pursuant to the immediately preceding sentence to such Issuer promptly upon receipt thereof in like funds as received.  Each Lender shall indemnify and hold harmless the Administrative Agent and each Issuer from and against any and all losses, liabilities (including liabilities for penalties), actions, suits, judgments, demands, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) resulting from any failure on the part of such Lender to provide, or from any delay in providing, the Administrative Agent with such Lender's Commitment Percentage of the amount of any payment made by such Issuer under a Letter of Credit issued by such Issuer in accordance with this clause (b) (except in respect of losses, liabilities or other obligations suffered by the Administrative Agent or such Issuer, as the case may be, resulting from the gross negligence or willful misconduct of the Administrative Agent or such Issuer, as the case may be).  If a Lender does not make available to the Administrative Agent when due an amount equal to such Lender's Commitment Percentage of any unreimbursed payment made by an Issuer under a Letter of Credit issued thereby, such Lender shall be required to pay interest to the Administrative Agent for the account of such Issuer on the unpaid portion of such amount at a rate of interest per annum equal to (i) from the date such Lender should have made such amount available until the third day therefrom, the Federal Funds Effective Rate, and (ii) thereafter, the Federal Funds Effective Rate *plus* 2%, in each case payable upon demand by such Issuer.  The Administrative Agent shall distribute such interest payments to such Issuer upon receipt thereof in like funds as received.

(c)      Whenever the Administrative Agent is reimbursed by the Borrower, for the account of an Issuer, for any payment under a Letter of Credit issued thereby and such payment relates to an amount previously paid by a Lender in respect of its Commitment Percentage of the amount of such payment under such Letter of Credit, the Administrative Agent (or such Issuer, if such payment by a Lender was paid by the Administrative Agent to such Issuer) will promptly pay over such payment to such Lender.

2.10     ***Absolute Obligation with respect to Letter of Credit Payments***

The Borrower's obligation to reimburse the Administrative Agent for the account of an Issuer for each payment under or in respect of each Letter of Credit issued thereby shall be absolute and unconditional under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment which the Borrower may have or have had against the beneficiary of such Letter of Credit, the Administrative Agent, such Issuer, the Swing Line Lender, any Lender or any other Person, including, without limitation, any defense based on the failure of any drawing to conform to the terms of such Letter of Credit, any drawing document proving to be forged, fraudulent or invalid, or the legality, validity, regularity or enforceability of such Letter of Credit, *provided* that, with respect to any Letter of Credit, the foregoing shall not relieve the Issuer thereof of any liability it may have to the Borrower for any actual damages sustained by the Borrower arising from a wrongful payment (or failure to pay) under such Letter of Credit made as a result of such Issuer's gross negligence or willful misconduct.

2.11     ***Notes***

Any Lender may request that the Loans made by it be evidenced by a Note. In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Person or, if requested by such Person, such Person and its registered assigns. Thereafter, all Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to <u>Section 11.7</u>) be represented by a Note in like form payable to the payee named therein and its registered assigns.

2.12     ***Extension of Commitment Termination Date***

(a)     *Request for Extension*.  The Borrower may, by notice to the Administrative Agent (which shall promptly notify the Lenders) not more than 90 days and not less than 30 days prior to each of the first, second, third, fourth and fifth anniversary of the Effective Date (each such anniversary date, an **" *Extension Date* "** ), request (each, an **" *Extension Request* "** ) that the Lenders extend the Commitment Termination Date then in effect (the **" *Existing Commitment Termination Date* "** ) for an additional one year period, *provided* that the Borrower may only effect one such extension of the Commitment Termination Date.  Each Lender, acting in its sole discretion, shall, by notice to the Borrower and the Administrative Agent given not later than the 20th day (or such later day as shall be acceptable to the Borrower) following the date of the Borrower's notice, advise the Borrower and the Administrative Agent whether or not such Lender agrees to such extension; *provided* that any Lender (which includes each Issuer and the Swing Line Lender) that does not so advise the Borrower and the Administrative Agent shall be deemed to have rejected such Extension Request.  The election of any Lender to agree to such extension shall not obligate any other Lender to so agree.

(b)     *Replacement of Non-Extending Lenders*.  The Borrower shall have the right at any time on or prior to the relevant Extension Date to replace any Lender which has not consented to the Extension Request (each, a ***"Non-Extending Lender"*** ) pursuant to <u>Section 3.13</u>.

(c)     *Conditions to Effectiveness of Extension*.  Notwithstanding anything in this Agreement to the contrary, the extension of the Existing Commitment Termination Date on any Extension Date shall not be effective unless, immediately before and after giving effect to such extension on such Extension Date: (i) no Default shall have occurred and be continuing on such Extension Date and the representations and warranties contained in this Agreement shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on such Extension Date ( *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such Extension Date), except those which are expressly specified to be made as of an earlier date, and the Administrative Agent shall have received a certificate, in form and substance reasonably satisfactory to the Administrative Agent, to such effect from the chief financial officer of the Borrower (or such other financial officer reasonably acceptable to the Administrative Agent), and (ii) the Administrative Agent shall have received such other certificates, resolutions and opinions as the Administrative Agent may reasonably request.

(d)     *Effectiveness of Extension*. Once all the conditions specified in Section 2.12(c) have been satisfied or waived with respect to the extension of the Existing Commitment Termination Date on the applicable Extension Date, then, effective as of such Extension Date, the Commitment Termination Date, with respect to the Commitment of each Lender that has agreed to so extend its Commitment and of each Replacement Lender that has assumed a Commitment of a Non-Extending Lender in connection with such Extension Request, shall be extended to the date falling one year after the Existing Commitment Termination Date (or, if such date is not a Domestic Business Day, the immediately preceding Domestic Business Day), and each such Replacement Lender shall thereupon become a "Lender" for all purposes of this Agreement.  Notwithstanding anything herein to the contrary, (i) with respect to any portion of the Commitment of any Non-Extending Lender that has not been fully assumed by one or more Replacement Lenders, the Commitment Termination Date for such Lender with respect to such non-assumed portion of its Commitment shall remain unchanged, and (ii) with respect to any Loans of such Lender that have not been purchased by one or more Replacement Lenders, the applicable maturity date with respect to such non-purchased Loans shall remain unchanged and shall be repayable by the Borrower on such applicable maturity date without there being any requirement that any such repayment be shared with other Lenders.   In addition, on the Extension Date, the Borrower agrees to pay all accrued and unpaid interest, fees and other amounts then due under this Agreement from the Borrower to each Lender consenting to the Extension Request, each Non-Extending Lender and each Replacement Lender.  Solely for the purpose of calculating break funding payments under Section 3.5 , the assignment by any Non-Extending Lender of any Eurodollar Advance prior to the last day of the Interest Period applicable thereto in accordance with this Section 2.12 shall be deemed to constitute a prepayment by the Borrower of such Eurodollar Advance.

2.13     ***Defaulting Lenders***

Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)     Facility Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 3.11 ;

(b)     the Commitment and Committed Credit Exposure of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 11.1 ); *provided* that any waiver, amendment or modification with respect to the following shall require the consent of such Defaulting Lender: (i) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender differently than other affected Lenders, (ii) any waiver, amendment or modification increasing the Commitment of such Defaulting Lender, (iii) any waiver, amendment or modification extending the Commitment Period with respect to such Defaulting Lender, (iv) any waiver, amendment or modification reducing the principal amount owed under the Loan Documents to such Defaulting Lender (other than by payment thereof), or (v) any waiver, amendment or modification extending the final maturity of sums owed to such Defaulting Lender, or (vi) a modification of this Section 2.13(b);

36

(c)     if any Swing Line Exposure or Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender then:

(1)     all or any part of such Defaulting Lender's Swing Line Exposure and Letter of Credit Exposure shall be reallocated among the non-Defaulting Lenders in accordance with their respective Commitment Percentages but only to the extent that (A) the sum of all non-Defaulting Lenders' Committed Credit Exposures plus , without duplication, the amount of such Defaulting Lender's Swing Line Exposure and Letter of Credit Exposure reallocated to such non-Defaulting Lenders, does not exceed the total of all non-Defaulting Lenders' Commitments and (B) with respect to each non-Defaulting Lender, the sum of such non-Defaulting Lender's Committed Credit Exposure plus , without duplication, the amount of such Defaulting Lender's Swing Line Exposure and Letter of Credit Exposure reallocated to such non-Defaulting Lender, does not exceed such non-Defaulting Lender's Commitment;

(2)     if the reallocation described in clause (1) above cannot, or can only partially, be effected, the Borrower shall within one Domestic Business Day following notice by the Administrative Agent (A) first, prepay such Swing Line Exposure and (B) second, cash collateralize such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (1) above) in a manner satisfactory to the Administrative Agent and the Issuers for so long as such Letter of Credit Exposure is outstanding;

(3)     if the Borrower cash collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.13(c) , the Borrower shall not be required to pay any Letter of Credit Participation Fees to such Defaulting Lender pursuant to Section 3.12 with respect to such Defaulting Lender's Letter of Credit Exposure during the period such Defaulting Lender's Letter of Credit Exposure is cash collateralized; and

(4)     if the Swing Line Exposure or Letter of Credit Exposure of such Defaulting Lender is reallocated pursuant to this Section 2.13(c) , then the fees payable to the Lenders pursuant to Section 3.11 and Section 3.12 shall be adjusted to give effect to such reallocation, and the Administrative Agent shall promptly notify the Lenders of any reallocation described in this Section 2.13(c) ;

(d)     so long as any Lender is a Defaulting Lender, the Swing Line Lender shall not be required to fund any Swing Line Loan and no Issuer shall be required to issue, amend, extend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Commitments of the non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 2.13(c) , and participating interests in any such newly issued or increased Letter of Credit or newly made Swing Line Loan shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.13(c)(1) (and Defaulting Lenders shall not participate therein);

(e)     any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise

37

CVS Health Corporation 2017 Five Year Credit Agreement

be payable to such Defaulting Lender pursuant to Section 11.07 (but excluding Section 3.13 ) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated account and, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Administrative Agent (i) first , to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) second , pro rata, to the payment of any amounts owing by such Defaulting Lender to the Issuers and the Swing Line Lender hereunder, (iii) third , if so determined by the Administrative Agent or requested by any Issuer or the Swing Line Lender, held in such account as cash collateral for future funding obligations of the Defaulting Lender in respect of any existing or future participating interest in any Swing Line Loan or Letter of Credit, (iv) fourth , to the funding of any Revolving Credit Loan (including any Mandatory Borrowing) in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (v) fifth , if so determined by the Administrative Agent and the Borrower, held in such account as cash collateral for future funding obligations of the Defaulting Lender in respect of any Revolving Credit Loans (including any Mandatory Borrowings) under this Agreement, (vi) sixth , to the payment of any amounts owing to the Lenders, the Issuers or the Swing Line Lender as a result of any final and non-appealable judgment of a court of competent jurisdiction obtained by any Lender, any Issuer or the Swing Line Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, (vii) seventh , to the payment of any amounts owing to the Borrower as a result of any final and non-appealable judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, and (viii) eighth , to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if such payment is (x) a prepayment of the principal amount of any Revolving Credit Loan (including any Mandatory Borrowing) or Reimbursement Obligations in respect of drawings under Letters of Credit paid by an Issuer with respect to which a Defaulting Lender has funded its participation obligations and (y) made at a time when the conditions set forth in Section 6 are satisfied or waived, such payment shall be applied solely to prepay the Revolving Credit Loans (including Mandatory Borrowings) of, and Reimbursement Obligations owed to, all non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans, or Reimbursement Obligations owed to, any Defaulting Lender;

(f)    The Borrower shall have the right at any time during which a Lender is a Defaulting Lender to replace such Defaulting Lender pursuant to Section 3.13 ; and

(g)    Subject to Section 11.22 , no reallocation pursuant to Section 2.13(c) shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from a Lender having become a Defaulting Lender, including any claim of a non-Defaulting Lender as a result of such non-Defaulting Lender's increased exposure following such reallocation.

3.    *PROCEEDS, PAYMENTS, CONVERSIONS, INTEREST, YIELD PROTECTION AND FEES*

### 3.1    *Disbursement of the Proceeds of the Loans*

The Administrative Agent shall disburse the proceeds of the Loans (other than the Swing Line Loans) at its office specified in Section 11.2 by crediting to the Borrower's general deposit account with the Administrative Agent the funds received from each Lender.  Unless the Administrative Agent shall have received prior notice from a Lender (by telephone or otherwise, such notice to be confirmed by fax, email or other writing) that such Lender will not make available to the Administrative Agent such Lender's Commitment Percentage of the Revolving Credit Loans, or the amount of any Competitive Bid Loan, to be made by it on a Borrowing Date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such Borrowing Date in accordance with this Section 3.1 ,   *provided* that, in the case of a Revolving Credit Loan, such Lender received notice thereof from the Administrative Agent in accordance with the terms hereof, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such Borrowing Date a corresponding amount.  If and to the extent such Lender shall not have so made such amount available to the Administrative Agent, such Lender and the Borrower severally agree to pay to the Administrative Agent, forthwith on demand, such corresponding amount (to the extent not previously paid by the other), together with interest thereon for each day from the date such amount is made available to the Borrower until the date such amount is paid to the Administrative Agent, at a rate per annum equal to, in the case of the Borrower, the applicable interest rate set forth in Section 3.4(a) and, in the case of such Lender, the Federal Funds Effective Rate (but not less than 0.0%) from the date such payment is due until the third day after such date and, thereafter, at the Federal Funds Effective Rate (but not less than 0.0%) *plus* 2%.  Any such payment by the Borrower shall be without prejudice to its rights against such Lender. If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Loan as part of such Loans for purposes of this Agreement, which Loan shall be deemed to have been made by such Lender on the Borrowing Date applicable to such Loans.

### 3.2    *Payments*

(a)    Each payment, including each prepayment, of principal and interest on the Loans and of the Facility Fee and the Letter of Credit Participation Fee (collectively, together with all of the other fees to be paid to the Administrative Agent, the Lenders, the Issuers and the Swing Line Lender in connection with the Loan Documents, the **"Fees"** ), and of all of the other amounts to be paid to the Administrative Agent and the Lenders in connection with the Loan Documents (other than amounts payable to a Lender under Section 3.5 ,    Section 3.6 , Section 3.10 ,   Section 11.5 and Section 11.10 ) shall be made by the Borrower to the Administrative Agent at its office specified in Section 11.2 without setoff, deduction or counterclaim in funds immediately available in New York by 3:00 P.M. on the due date for such payment.  The failure of the Borrower to make any such payment by such time shall not constitute a default hereunder, *provided* that such payment is made on such due date, but any such payment made after 3:00 P.M. on such due date shall be deemed to have been made on the next Domestic Business Day or Eurodollar Business Day, as the case may be, for the purpose of calculating interest on amounts outstanding on the Loans.  If the Borrower has not made any such payment prior to 3:00 P.M.,

39

the Borrower hereby authorizes the Administrative Agent to deduct the amount of any such payment from such account(s) as the Borrower may from time to time designate in writing to the Administrative Agent, upon which the Administrative Agent shall apply the amount of such deduction to such payment.  Promptly upon receipt thereof by the Administrative Agent, each payment of principal and interest on the: (i) Revolving Credit Loans shall be remitted by the Administrative Agent in like funds as received to each Lender (a) first, pro rata according to the amount of interest which is then due and payable to the Lenders, and (b) second, pro rata according to the amount of principal which is then due and payable to the Lenders, (ii) Competitive Bid Loans shall be remitted by the Administrative Agent in like funds as received to each applicable Lender and (iii) Swing Line Loans shall be remitted by the Administrative Agent in like funds as received to the Swing Line Lender.  Each payment of the Facility Fee and the Letter of Credit Participation Fee payable to the Lenders shall be promptly transmitted by the Administrative Agent in like funds as received to each Lender pro rata according to such Lender's Commitment Amount or, if the Commitments shall have terminated or been terminated, according to the outstanding principal amount of such Lender's Revolving Credit Loans.

(b)     If any payment hereunder or under the Loans shall be due and payable on a day which is not a Domestic Business Day or a Eurodollar Business Day, as the case may be, the due date thereof (except as otherwise provided in the definition of Eurodollar Interest Period or Competitive Interest Period) shall be extended to the next Domestic Business Day or Eurodollar Business Day, as the case may be,, and (except with respect to payments in respect of the Facility Fee and the Letter of Credit Participation Fee) interest shall be payable at the applicable rate specified herein during such extension.

3.3     *Conversions; Other Matters*

(a)     The Borrower may elect at any time and from time to time to Convert one or more Eurodollar Advances to an ABR Advance by giving the Administrative Agent at least one Domestic Business Day's prior irrevocable notice of such election, specifying the amount to be so Converted.  In addition, the Borrower may elect at any time and from time to time to Convert an ABR Advance to any one or more new Eurodollar Advances or to Convert any one or more existing Eurodollar Advances to any one or more new Eurodollar Advances by giving the Administrative Agent no later than 10:00 A.M. at least two Eurodollar Business Days' prior irrevocable notice of such election, specifying the amount to be so Converted and the initial Interest Period relating thereto, *provided* that any Conversion of an ABR Advance to an Eurodollar Advance shall only be made on a Eurodollar Business Day.  The Administrative Agent shall promptly provide the Lenders with notice of each such election.  Each Conversion of Loans shall be made pro rata according to the outstanding principal amount of the Loans of each Lender.  ABR Advances and Eurodollar Advances may be Converted pursuant to this <u>Section 3.3</u> in whole or in part, *provided* that the amount to be Converted to each Eurodollar Advance, when aggregated with any Eurodollar Advance to be made on such date in accordance with <u>Section 2.1</u> and having the same Interest Period as such first Eurodollar Advance, shall equal no less than $10,000,000 or an integral multiple of $1,000,000 in excess thereof.

(b)     Notwithstanding anything in this Agreement to the contrary, the Borrower shall not have the right to elect to Convert any existing ABR Advance to a Eurodollar Advance or to Convert any existing Eurodollar Advance to a new Eurodollar Advance if (i) a Default or

40

Event of Default under Section 9.1(a) , Section 9.1(g) , Section 9.1(h), Section 9.1(i) or Section 9.1(j) shall then exist, or (ii) any other Event of Default shall then exist and the Administrative Agent shall have notified the Borrower at the request of the Required Lenders that no ABR Advance or Eurodollar Advance may be Converted to a new Eurodollar Advance.  In such event, such ABR Advance shall be automatically continued as an ABR Advance or such Eurodollar Advance shall be automatically Converted to an ABR Advance on the last day of the Interest Period applicable to such Eurodollar Advance.  The foregoing shall not affect any other rights or remedies that the Administrative Agent or any Lender may have under this Agreement or any other Loan Document.

(c)    Each Conversion shall be effected by each Lender by applying the proceeds of each new ABR Advance or Eurodollar Advance, as the case may be, to the existing ABR Advance or Eurodollar Advance (or portion thereof) being Converted (it being understood that such Conversion shall not constitute a borrowing for purposes of Section 4 or Section 6 ).

(d)    Notwithstanding any other provision of any Loan Document:

(1)    if the Borrower shall have failed to elect a Eurodollar Advance under Section 2.3 or this Section 3.3 , as the case may be, in connection with any borrowing of new Revolving Credit Loans or expiration of an Interest Period with respect to any existing Eurodollar Advance, the amount of the Revolving Credit Loans subject to such borrowing or such existing Eurodollar Advance shall thereafter be an ABR Advance until such time, if any, as the Borrower shall elect a new Eurodollar Advance pursuant to this Section 3.3 ,

(2)    the Borrower shall not be permitted to select a Eurodollar Advance the Interest Period in respect of which ends later than the Commitment Termination Date or such earlier date upon which all of the Commitments shall have been terminated in accordance with Section 2.6 , and

(3)    the Borrower shall not be permitted to have more than 15 Eurodollar Advances and Competitive Bid Loans, in the aggregate, outstanding at any one time; it being understood and agreed that each borrowing of Eurodollar Advances or Competitive Bid Loans pursuant to a single Borrowing Request or Competitive Bid Request, as the case may be, shall constitute the making of one Eurodollar Advance or Competitive Bid Loan for the purpose of calculating such limitation.

3.4    *Interest Rates and Payment Dates*

(a)    *Prior to Maturity* .  Except as otherwise provided in Section 3.4(b) and Section 3.4(c) , the Loans shall bear interest on the unpaid principal balance thereof at the applicable interest rate or rates per annum set forth below:

| LOANS | RATE |
|---|---|
| Revolving Credit Loans constituting ABR Advances | Alternate Base Rate *plus* the Applicable Margin. |
| Revolving Credit Loans constituting Eurodollar Advances | Eurodollar Rate applicable thereto *plus* the Applicable Margin. |
| Competitive Bid Loans | Fixed rate of interest applicable thereto accepted by the Borrower pursuant to Section 2.4(d) . |

| | |
|---|---|
| Swing Line Loans | Negotiated Rate applicable thereto as provided in <u>Section 2.2(a)</u> . |

42

(b)        *After Maturity, Late Payment Rate.*  After maturity, whether by acceleration, notice of intention to prepay or otherwise, the outstanding principal balance of each Loan shall bear interest at the applicable interest rate on such Loan *plus* 2% per annum until paid (whether before or after the entry of any judgment thereon).  Any payment of principal or interest on the Loans, Fees or other amounts payable by the Borrower under the Loan Documents not paid on the date when due and payable shall bear interest, in the case of principal or interest on a Loan, at the applicable interest rate on such Loan *plus* 2% per annum and, in the case of any Fees or other amounts, at the Alternate Base Rate *plus* the Applicable Margin *plus* 2% per annum, in each case from the due date thereof until the date such payment is made (whether before or after the entry of any judgment thereon).

(c)        *Highest Lawful Rate* .  Notwithstanding anything to the contrary contained in this Agreement, at no time shall the interest rate payable to any Lender on any of its Loans, together with the Fees and all other amounts payable hereunder to such Lender to the extent the same constitute or are deemed to constitute interest, exceed the Highest Lawful Rate.  If in respect of any period during the term of this Agreement, any amount paid to any Lender hereunder, to the extent the same shall (but for the provisions of this <u>Section 3.4</u> ) constitute or be deemed to constitute interest, would exceed the maximum amount of interest permitted by the Highest Lawful Rate during such period (such amount being hereinafter referred to as an *"Unqualified Amount"* ), then (i) such Unqualified Amount shall be applied or shall be deemed to have been applied as a prepayment of the Loans of such Lender, and (ii) if, in any subsequent period during the term of this Agreement, all amounts payable hereunder to such Lender in respect of such period which constitute or shall be deemed to constitute interest shall be less than the maximum amount of interest permitted by the Highest Lawful Rate during such period, then the Borrower shall pay to such Lender in respect of such period an amount (each a *"Compensatory Interest Payment"* ) equal to the lesser of (x) a sum which, when added to all such amounts, would equal the maximum amount of interest permitted by the Highest Lawful Rate during such period, and (y) an amount equal to the aggregate sum of all Unqualified Amounts *less* all other Compensatory Interest Payments.

(d)        *General* .  Interest shall be payable in arrears on each Interest Payment Date, on the Commitment Termination Date, to the extent provided in <u>Section 2.7(b)</u> , upon each prepayment of the Loans and, to the extent provided in <u>Section 2.12(d),</u> on the Extension Date.  Any change in the interest rate on the Loans resulting from an increase or a decrease in the Alternate Base Rate or any reserve requirement shall become effective as of the opening of

43

CVS Health Corporation 2017 Five Year Credit Agreement

business on the day on which such change shall become effective. The Administrative Agent shall, as soon as practicable, notify the Borrower and the Lenders of the effective date and the amount of each change in the BNY Mellon Rate, but any failure to so notify shall not in any manner affect the obligation of the Borrower to pay interest on the Loans in the amounts and on the dates set forth herein. Each determination by the Administrative Agent of the Alternate Base Rate, the Eurodollar Rate and the Competitive Bid Rate pursuant to this Agreement shall be conclusive and binding on the Borrower absent manifest error. The Borrower acknowledges that to the extent interest payable on the Loans is based on the Alternate Base Rate, such rate is only one of the bases for computing interest on loans made by the Lenders, and by basing interest payable on ABR Advances on the Alternate Base Rate, the Lenders have not committed to charge, and the Borrower has not in any way bargained for, interest based on a lower or the lowest rate at which the Lenders may now or in the future make extensions of credit to other Persons. All interest (other than interest calculated with reference to the BNY Mellon Rate) shall be calculated on the basis of a 360-day year for the actual number of days elapsed, and all interest determined with reference to the BNY Mellon Rate shall be calculated on the basis of a 365/366-day year for the actual number of days elapsed.

3.5    ***Indemnification for Loss***

Notwithstanding anything contained herein to the contrary, if: (i) the Borrower shall fail to borrow a Eurodollar Advance or if the Borrower shall fail to Convert all or any portion of any Revolving Credit Loan constituting an ABR Advance to a Eurodollar Advance after it shall have given notice to do so in which it shall have requested a Eurodollar Advance pursuant to Section 2.3 or Section 3.3 , as the case may be, (ii) the Borrower shall fail to borrow a Competitive Bid Loan after it shall have accepted any offer with respect thereto in accordance with Section 2.4 or a Swing Line Loan after it shall have agreed to a Negotiated Rate with respect thereto in accordance with Section 2.2(a) , (iii) a Eurodollar Advance, Competitive Bid Loan or Swing Line Loan shall be terminated for any reason prior to the last day of the Interest Period applicable thereto (other than the termination of a Swing Line Loan resulting from a Mandatory Borrowing at a time when no Default shall exist), (iv) any repayment or prepayment of the principal amount of a Eurodollar Advance, Competitive Bid Loan or Swing Line Loan is made for any reason on a date which is prior to the last day of the Interest Period applicable thereto (other than the repayment or prepayment of a Swing Line Loan resulting from a Mandatory Borrowing at a time when no Default shall exist), (v) the Borrower shall have revoked a notice of prepayment or notice of termination of the Commitments, the Swing Line Commitment and the Letter of Credit Commitment that was conditioned upon the effectiveness of other credit facilities pursuant to Section 2.6 or Section 2.7 , or (vi) a Eurodollar Advance is assigned other than on the last day of the Interest Period applicable thereto as a result of an increase in the Aggregate Commitment Amount pursuant to Section  2.6(d) or a replacement of a Lender pursuant to clause (x) or (z) of Section 3.13 , then the Borrower agrees to indemnify each Lender against, and to pay on demand directly to such Lender the amount (calculated by such Lender using any method chosen by such Lender which is customarily used by such Lender for such purpose for borrowers similar to the Borrower) equal to any loss or expense suffered by such Lender as a result of such failure to borrow or Convert, or such termination, repayment, prepayment or revocation, including any loss, cost or expense suffered by such Lender in liquidating or employing deposits acquired to fund or maintain the funding of such Eurodollar Advance, Competitive Bid Loan or Swing Line Loan, as the case may be, or redeploying funds prepaid or repaid, in amounts which correspond to such Eurodollar Advance, Competitive Bid Loan

44

or Swing Line Loan, as the case may be, and any reasonable clerical processing charge customarily charged by such Lender in connection therewith for borrowers similar to the Borrower.

3.6     ***Reimbursement for Costs, Etc.***

If at any time or from time to time there shall occur a Regulatory Change and any Issuer or any Lender shall have reasonably determined that such Regulatory Change (i) shall have had or will thereafter have the effect of reducing (A) the rate of return on such Issuer's or such Lender's capital or liquidity or the capital or liquidity of any Person directly or indirectly owning or controlling such Issuer or such Lender (each a ***"Control Person"*** ), or (B) the asset value (for capital or liquidity purposes) to such Issuer, such Lender or such Control Person, as applicable, of the Reimbursement Obligations, or any participation therein, or the Loans, or any participation therein, in any case to a level below that which such Issuer, such Lender or such Control Person could have achieved or would thereafter be able to achieve but for such Regulatory Change (after taking into account such Issuer's, such Lender's or such Control Person's policies regarding capital or liquidity), (ii) will impose, modify or deem applicable any reserve, asset, special deposit or special assessment requirements on deposits obtained in the interbank eurodollar market in connection with the Loan Documents (excluding, with respect to any Eurodollar Advance, any such requirement which is included in the determination of the rate applicable thereto), or (iii) will subject such Issuer, such Lender or such Control Person, as applicable, to any tax (documentary, stamp or otherwise) with respect to this Agreement, any Note, any Reimbursement Agreement or any other Loan Document (except, in the case of clause (iii) above, for any Indemnified Taxes, Excluded Taxes or Other Taxes) then, in each such case, within ten days after demand by such Issuer or such Lender, as applicable, the Borrower shall pay directly to such Issuer, such Lender or such Control Person, as the case may be, such additional amount or amounts as shall be sufficient to compensate such Issuer, such Lender or such Control Person, as the case may be, for any such reduction, reserve or other requirement, tax, loss, cost or expense (excluding general administrative and overhead costs) (collectively, ***"Costs"*** ) attributable to such Issuer's, such Lender's or such Control Person's compliance during the term hereof with such Regulatory Change, but only if such Costs are generally applicable to (and for which reimbursement is generally being sought by such Issuer, such Lender or such Control Person, as applicable, in respect of) credit transactions similar to this transaction from similarly situated borrowers (which are parties to credit or loan documentation containing a provision similar to this <u>Section 3.6</u> ), as determined by such Issuer or such Lender, as applicable, in its reasonable discretion.  Each Issuer and each Lender may make multiple requests for compensation under this <u>Section 3.6</u> .

Notwithstanding the foregoing, the Borrower will not be required to compensate any Lender for any Costs under this <u>Section 3.6</u> arising prior to 45 days preceding the date of demand, unless the applicable Regulatory Change giving rise to such Costs is imposed retroactively.  In the case of retroactivity, such notice shall be provided to the Borrower not later than 45 days from the date that such Lender learned of such Regulatory Change.  The Borrower's obligation to compensate such Lender shall be contingent upon the provision of such timely notice (but any failure by such Lender to provide such timely notice shall not affect the Borrower's obligations with respect to (i) Costs incurred from the date as of which such Regulatory Change became effective to the date that is 45 days after the date such Lender reasonably should have learned of such Regulatory Change and (ii) Costs incurred following the provision of such notice).

3.7      ***Illegality of Funding***

Notwithstanding any other provision hereof, if any Lender shall reasonably determine that any law, regulation, treaty or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for such Lender to make or maintain any Eurodollar Advance as contemplated by this Agreement, such Lender shall promptly notify the Borrower and the Administrative Agent thereof, and (a) the commitment of such Lender to make such Eurodollar Advances or Convert ABR Advances to such Eurodollar Advances shall forthwith be suspended, (b) such Lender shall fund its portion of each requested Eurodollar Advance as an ABR Advance and (c) such Lender's Loans then outstanding as such Eurodollar Advances, if any, shall be Converted automatically to an ABR Advance on the last day of the then current Interest Period applicable thereto or at such earlier time as may be required.  If the commitment of any Lender with respect to Eurodollar Advances is suspended pursuant to this Section 3.7 and such Lender shall have obtained actual knowledge that it is once again legal for such Lender to make or maintain Eurodollar Advances, such Lender shall promptly notify the Administrative Agent and the Borrower thereof and, upon receipt of such notice by each of the Administrative Agent and the Borrower, such Lender's commitment to make or maintain Eurodollar Advances shall be reinstated.  If the commitment of any Lender with respect to Eurodollar Advances is suspended pursuant to this Section 3.7 , such suspension shall not otherwise affect such Lender's Commitment.

3.8      ***Option to Fund; Substituted Interest Rate***

(a)      Each Lender has indicated that, if the Borrower requests a Swing Line Loan, a Eurodollar Advance or a Competitive Bid Loan, such Lender may wish to purchase one or more deposits in order to fund or maintain its funding of its Commitment Percentage of such Eurodollar Advance or its Swing Line Loan or Competitive Bid Loan during the Interest Period with respect thereto; it being understood that the provisions of this Agreement relating to such funding are included only for the purpose of determining the rate of interest to be paid in respect of such Swing Line Loan, Eurodollar Advance or Competitive Bid Loan and any amounts owing under Section 3.5 and Section 3.6 .  The Swing Line Lender and each Lender shall be entitled to fund and maintain its funding of all or any part of each Swing Line Loan, Eurodollar Advance and Competitive Bid Loan in any manner it sees fit, but all such determinations hereunder shall be made as if such Lender had actually funded and maintained its Commitment Percentage of each Eurodollar Advance or its Swing Line Loan or Competitive Bid Loan, as the case may be, during the applicable Interest Period through the purchase of deposits in an amount equal to the amount of its Commitment Percentage of such Eurodollar Advance or the amount of such Swing Line Loan or Competitive Bid Loan, as the case may be, and having a maturity corresponding to such Interest Period.  Each Lender may fund its Loans from or for the account of any branch or office of such Lender as such Lender may choose from time to time, subject to Section 3.10 .

(b)       In the event that (i) the Administrative Agent shall have determined in good faith (which determination shall be conclusive and binding upon the Borrower) that Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period or if by reason of circumstances affecting the interbank eurodollar market adequate and reasonable means do not exist for ascertaining the Eurodollar Rate applicable pursuant to Section 2.3 or Section 3.3 , or (ii) the Required Lenders shall have notified the Administrative Agent that they have in good faith determined (which determination

46

shall be conclusive and binding on the Borrower that the applicable Eurodollar Rate will not adequately and fairly reflect the cost to such Lenders of maintaining or funding loans bearing interest based on such Eurodollar Rate with respect to any portion of the Revolving Credit Loans that the Borrower has requested be made as Eurodollar Advances or any Eurodollar Advance that will result from the requested Conversion of any portion of the Revolving Credit Loans into Eurodollar Advances (each, an **"Affected Advance"** ), the Administrative Agent shall promptly notify the Borrower and the Lenders (by telephone or otherwise, to be promptly confirmed in writing) of such determination on or, to the extent practicable, prior to the requested Borrowing Date or Conversion date for such Affected Advances.  If the Administrative Agent shall give such notice, (A) any Affected Advances shall be made as ABR Advances, (B) the Revolving Credit Loans (or any portion thereof) that were to have been Converted to Affected Advances shall be Converted to or continued as ABR Advances, and (C) any outstanding Affected Advances shall be Converted, on the last day of the then current Interest Period with respect thereto, to ABR Advances.  Until any notice under clauses (i) or (ii), as the case may be, of this Section 3.8(b) has been withdrawn by the Administrative Agent (by notice to the Borrower) promptly upon either (x) the Administrative Agent having determined that such circumstances affecting the relevant market no longer exist and that adequate and reasonable means do exist for determining the Eurodollar Rate pursuant to Section 2.3 or Section 3.3 , or (y) the Administrative Agent having been notified by the Required Lenders that circumstances no longer render the Loans (or any portion thereof) Affected Advances, no further Eurodollar Advances shall be required to be made by the Lenders nor shall the Borrower have the right to Convert all or any portion of the Revolving Credit Loans to Eurodollar Advances.

3.9    ***Certificates of Payment and Reimbursement***

Each Issuer and each Lender agrees, in connection with any request by it for payment or reimbursement pursuant to Section 3.5 or Section 3.6 , to provide the Borrower with a certificate, signed by an officer of such Issuer or such Lender, as the case may be, setting forth a description in reasonable detail of any such payment or reimbursement and the applicable Section of this Agreement pursuant to and in accordance with which such request is made.  Each determination by such Issuer and such Lender of such payment or reimbursement shall be conclusive absent manifest error.

3.10    ***Taxes; Net Payments***

(a)    *Payments Free of Taxes* .  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, *provided* that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.10 ) the Administrative Agent, the applicable Lender or the applicable Issuer, as the case may be, receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

47

(b)       *Payment of Other Taxes by the Borrower*.  Without limiting the provisions of paragraph (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)       *Indemnification by the Borrower* .  The Borrower shall indemnify the Administrative Agent, each Lender and each Issuer, within 30 days after demand therefor, for the full amount of any Indemnified Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.10 ) paid by the Administrative Agent, such Lender or such Issuer, as the case may be, and, without duplication, any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by such Lender or such Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of such Lender or such Issuer, shall be conclusive absent manifest error.  After any Lender or any Issuer (as the case may be) learns of the imposition of any Indemnified Taxes or Other Taxes, such Lender or such Issuer (as the case may be) will as soon as reasonably practicable notify the Borrower thereof; *provided* that the failure to provide Borrower with such notice shall not release the Borrower from its indemnification obligations under this Section 3.10 .

(d)       *Evidence of Payments* .  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)       *Indemnification by the Lenders* .  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.7(d) relating to the maintenance of a Participant Register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)       *Status of Lenders* .  Any Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is resident for Tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments

hereunder or under any other Loan Document payable to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, any Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter (i) if such Foreign Lender shall determine that any applicable form or certification has expired or will then expire or has or will then become obsolete or incorrect or that an event has occurred that requires or will then require a change in the most recent form or certification previously delivered by it to the Borrower and the Administrative Agent and (ii) upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)        duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E claiming eligibility for benefits of an income Tax treaty to which the United States of America is a party,

(ii)       duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate (a *"United States Tax Compliance Certificate"*) to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code nor (D) engaged in the conduct of a trade or business within the United States to which the interest payment is effectively connected and (y) duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E,

(iv)      to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), a complete and executed Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, Form W-8BEN, Form W-8BEN-E, a United States Tax Compliance Certificate, Internal Revenue Service Form W-9 and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender shall provide a United States Tax Compliance Certificate, on behalf of such beneficial owner(s) in lieu of requiring each beneficial owner to provide its own certificate, or

(v)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.   Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Without limiting the foregoing, upon request of the Administrative Agent or the Borrower, each Lender and each Issuer that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code that lends to the Borrower (each, a **"U.S. Lender"** ) shall deliver to the Administrative Agent and the Borrower two duly signed, properly completed copies of Internal Revenue Service Form W-9 on or prior to the Effective Date (or on or prior to the date it becomes a party to this Agreement), certifying that such U.S. Lender is entitled to an exemption from United States backup withholding, or any successor form.

(g)    *Treatment of Certain Refunds* .  If the Administrative Agent, a Lender or an Issuer determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 3.10 , it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.10 with respect to the Taxes or Other Taxes giving rise to such refund), net of all reasonable and documented out-of-pocket expenses of the Administrative Agent, such Lender or such Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of the Administrative Agent, such Lender or such Issuer, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or such Issuer in the event the Administrative Agent, such Lender or such Issuer is required to repay such refund or Tax credit to such Governmental Authority.   This paragraph shall not be construed to require the Administrative Agent, any Lender or any Issuer to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(h)    *Designation of a Different Lending Office* .  If any Lender requests compensation under Section 3.6 , or requires the Borrower to pay any additional amount to any

Lender or any Governmental Authority for the account of any Lender pursuant to this Section 3.10 , then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.6 or this   Section 3.10 , as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

(i)      *Survival* .  Each party's obligations under this Section 3.10 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

3.11     *Facility Fees*

The Borrower agrees to pay to the Administrative Agent for the account of each Lender a fee (the *"Facility Fee"* ) during the period commencing on the Effective Date and ending on the Expiration Date, payable quarterly in arrears on the last day of each March, June, September and December of each year, commencing on the last day of the calendar quarter during which the Facility Fee shall commence to accrue, and on the Expiration Date, at a rate per annum equal to the Applicable Margin of (a) prior to the Commitment Termination Date or such earlier date upon which all of the Commitments shall have been terminated in accordance with Section 2.6 , the Commitment Amount of such Lender (whether used or unused), and (b) thereafter, the sum of (i) the outstanding principal balance of all Revolving Credit Loans of such Lender, (ii) such Lender's Swing Line Exposure and (iii) such Lender's Letter of Credit Exposure.  Notwithstanding anything to the contrary contained in this Section 3.11 , on and after the Commitment Termination Date, the Facility Fee shall be payable upon demand.  In addition, upon each reduction of the Aggregate Commitment Amount, the Borrower shall pay the Facility Fee accrued on the amount of such reduction through the date of such reduction.  The Facility Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

3.12     *Letter of Credit Participation Fee*

The Borrower agrees to pay to the Administrative Agent for the pro rata account of each Lender a fee (the *"Letter of Credit Participation Fee"* ) with respect to the Letters of Credit during the period commencing on the Effective Date and ending on the Commitment Termination Date or, if later, the date when the Letter of Credit Exposure of all Lenders is $0, payable quarterly in arrears on the last day of each March, June, September and December of each year, commencing on the last day of the calendar quarter in which the Effective Date shall have occurred, and on the last date of such period, at a rate per annum equal to (i) in the case of standby Letters of Credit, the Applicable Margin of the average daily aggregate amount which may be drawn under all standby Letters of Credit during such period (whether or not the

51

conditions for drawing thereunder have or may be satisfied) multiplied by such Lender's Commitment Percentage, and (ii) in the case of commercial Letters of Credit, the Applicable Margin of the average daily aggregate amount which may be drawn under all commercial Letters of Credit during such period (whether or not the conditions for drawing thereunder have or may be satisfied) multiplied by such Lender's Commitment Percentage. The Letter of Credit Participation Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

3.13    ***Replacement of Lender***

If (x) the Borrower is obligated to pay to any Lender any amount under Section 3.6 or Section 3.10 , the Borrower shall have the right within 90 days thereafter, (y) any Lender shall be a Defaulting Lender, the Borrower shall have the right at any time during which such Lender shall remain a Defaulting Lender, or (z) any Lender shall have not consented to an Extension Request, the Borrower shall have the right at any time on the relevant Extension Date, in each case in accordance with the requirements of Section 11.7(b) and only if no Default shall exist, to replace such Lender (the ***"Replaced Lender"*** ) with one or more Eligible Assignees (each a ***"Replacement Lender"*** ), reasonably acceptable to the Administrative Agent, the Swing Line Lender and each Issuer, *provided* that (i) at the time of any replacement pursuant to this Section 3.13 , the Replacement Lender shall enter into one or more Assignment and Assumptions pursuant to Section 11.7(b) (with the processing and recordation fee referred to in Section 11.7(b) payable pursuant to said Section 11.7(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire the Commitment, the outstanding Loans, the Swing Line Exposure and the Letter of Credit Exposure of the Replaced Lender and, in connection therewith, shall pay the following: (a) to the Replaced Lender, an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans and Swing Line Participation Amounts of the Replaced Lender, (B) an amount equal to all drawings on all Letters of Credit that have been funded by (and not reimbursed to) such Replaced Lender, together with all then unpaid interest with respect thereto at such time, and (C) an amount equal to all accrued, but unpaid, fees owing to the Replaced Lender, (b) to each Issuer, an amount equal to such Replaced Lender's Commitment Percentage of all drawings  on Letters of Credit issued by such Issuer (which at such time remain unpaid drawings) to the extent such amount was not funded by such Replaced Lender, (c) to the Swing Line Lender, an amount equal to such Replaced Lender's Commitment Percentage of any Mandatory Borrowing to the extent such amount was not funded by such Replaced Lender, and (d) to the Administrative Agent an amount equal to all amounts owed by such Replaced Lender to the Administrative Agent under this Agreement, including, without limitation, an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Replaced Lender, a corresponding amount of which was made available by the Administrative Agent to the Borrower pursuant to    Section 3.1 and which has not been repaid to the Administrative Agent by such Replaced Lender or the Borrower, and (ii) all obligations of the Borrower owing to the Replaced Lender (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid) shall be paid in full to such Replaced Lender concurrently with such replacement. Upon the execution of the respective Assignment and Assumptions and the payment of amounts referred to in clauses (i) and (ii) of this Section 3.13 , the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement that are intended to survive the termination of the Commitments and the repayment of the Loans which may be applicable to any such Replaced Lender prior to the date of its replacement.  Solely for the purpose of calculating break funding payments under Section 3.5 , the assignment by any Replaced Lender of any Eurodollar Advance prior to the last day of the

Interest Period applicable thereto pursuant to clause (b) of this Section 3.13 shall be deemed to constitute a prepayment by the Borrower of such Eurodollar Advance.

4.    **REPRESENTATIONS AND WARRANTIES**

        In order to induce the Administrative Agent, the Lenders and the Issuers to enter into this Agreement, the Lenders to make the Loans and the Issuers to issue Letters of Credit, the Borrower hereby makes the following representations and warranties to the Administrative Agent, the Lenders and the Issuers:

    4.1    *Existence and Power*

        Each of the Borrower and the Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation (except, in the case of the Subsidiaries, where the failure to be in such good standing could not reasonably be expected to have a Material Adverse effect), has all requisite corporate power and authority to own its Property and to carry on its business as now conducted, and is qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which it owns or leases real Property or in which the nature of its business requires it to be so qualified (except those jurisdictions where the failure to be so qualified or to be in good standing could not reasonably be expected to have a Material Adverse effect).

    4.2    *Authority; EEA Financial Institution*

        The Borrower has full corporate power and authority to enter into, execute, deliver and perform the terms of the Loan Documents, all of which have been duly authorized by all proper and necessary corporate action and are not in contravention of any applicable law or the terms of its Certificate of Incorporation and By-Laws.  No consent or approval of, or other action by, shareholders of the Borrower, any Governmental Authority, or any other Person (which has not already been obtained) is required to authorize in respect of the Borrower, or is required in connection with, the execution, delivery, and performance by the Borrower of the Loan Documents or is required as a condition to the enforceability of the Loan Documents against the Borrower.  The Borrower is not an EEA Financial Institution.

    4.3    *Binding Agreement*

        The Loan Documents constitute the valid and legally binding obligations of the Borrower, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by equitable principles relating to the availability of specific performance as a remedy.

    4.4    *Litigation*

        As of the Effective Date, there are no actions, suits, arbitration proceedings or claims (whether purportedly on behalf of the Borrower, any Subsidiary or otherwise) pending or, to the knowledge of the Borrower, threatened against the Borrower or any Subsidiary or any of their respective Properties, or maintained by the Borrower or any Subsidiary, at law or in equity,

53

CVS Health Corporation 2017 Five Year Credit Agreement

before any Governmental Authority which could reasonably be expected to have a Material Adverse effect. There are no proceedings pending or, to the knowledge of the Borrower, threatened against the Borrower or any Subsidiary (a) which call into question the validity or enforceability of any Loan Document, or otherwise seek to invalidate, any Loan Document, or (b) which might, individually or in the aggregate, materially and adversely affect any of the transactions contemplated by any Loan Document.

4.5     **No Conflicting Agreements**

(a)     Neither the Borrower nor any Subsidiary is in default under any agreement to which it is a party or by which it or any of its Property is bound the effect of which could reasonably be expected to have a Material Adverse effect. No notice to, or filing with, any Governmental Authority is required for the due execution, delivery and performance by the Borrower of the Loan Documents.

(b)     No provision of any existing material mortgage, material indenture, material contract or material agreement or of any existing statute, rule, regulation, judgment, decree or order binding on the Borrower or any Subsidiary or affecting the Property of the Borrower or any Subsidiary conflicts with, or requires any consent which has not already been obtained under, or would in any way prevent the execution, delivery or performance, by the Borrower of the terms of, any Loan Document. Neither the execution and delivery, nor the performance, by the Borrower of the terms of each Loan Document will constitute a default under, or result in the creation or imposition of, or obligation to create, any Lien upon the Property of the Borrower or any Subsidiary pursuant to the terms of any such mortgage, indenture, contract or agreement.

4.6     **Taxes**

The Borrower and each Subsidiary has filed or caused to be filed all tax returns, and has paid, or has made adequate provision for the payment of, all taxes shown to be due and payable on said returns or in any assessments made against them, the failure of which to file or pay could reasonably be expected to have a Material Adverse effect, and no tax Liens (other than Liens permitted under Section 8.2 ) have been filed against the Borrower or any Subsidiary and no claims are being asserted with respect to such taxes which are required by GAAP to be reflected in the Financial Statements and are not so reflected, except for taxes which have been assessed but which are not yet due and payable. The charges, accruals and reserves on the books of the Borrower and each Subsidiary with respect to all federal, state, local and other taxes are considered by the management of the Borrower to be adequate, and the Borrower knows of no unpaid assessment which (a) could reasonably be expected to have a Material Adverse effect, or (b) is or might be due and payable against it or any Subsidiary or any Property of the Borrower or any Subsidiary, except such thereof as are being contested in good faith and by appropriate proceedings diligently conducted, and for which adequate reserves have been set aside in accordance with GAAP or which have been assessed but are not yet due and payable.

54

4.7    *Compliance with Applicable Laws; Filings*

Neither the Borrower nor any Subsidiary is in default with respect to any judgment, order, writ, injunction, decree or decision of any Governmental Authority which default could reasonably be expected to have a Material Adverse effect.  The Borrower and each Subsidiary is complying with all applicable statutes, rules and regulations of all Governmental Authorities, a violation of which could reasonably be expected to have a Material Adverse effect.  The Borrower and each Subsidiary has filed or caused to be filed with all Governmental Authorities all reports, applications, documents, instruments and information required to be filed pursuant to all applicable laws, rules, regulations and requests which, if not so filed, could reasonably be expected to have a Material Adverse effect.

4.8    *Governmental Regulations*

The Borrower is not subject to regulation under the Investment Company Act of 1940, as amended.

4.9    *Federal Reserve Regulations; Use of Proceeds*

The Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans or the Letters of Credit has been or will be used, directly or indirectly, and whether immediately, incidentally or ultimately, for a purpose which violates the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended.  Anything in this Agreement to the contrary notwithstanding, neither any Issuer nor any Lender shall be obligated to extend credit to or on behalf of the Borrower in violation of any limitation or prohibition provided by any applicable law, regulation or statute, including said Regulation U.  Following application of the proceeds of each Loan and the issuance of each Letter of Credit, not more than 25% (or such greater or lesser percentage as is provided in the exclusions from the definition of " Indirectly Secured " contained in said Regulation U as in effect at the time of the making of such Loan or issuance of such Letter of Credit) of the value of the assets of the Borrower and the Subsidiaries on a Consolidated basis that are subject to Section 8.2 will be Margin Stock.  In addition, no part of the proceeds of any Loan or Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, to make a loan to any director or executive officer of the Borrower or any Subsidiary.

4.10    *No Misrepresentation*

No representation or warranty contained in any Loan Document and no certificate or written report furnished by the Borrower to the Administrative Agent or any Lender pursuant to any Loan Document contains, as of its date, a misstatement of a material fact, or omits to state, as of its date, a material fact required to be stated in order to make the statements therein contained, when taken as a whole, not materially misleading ( *provided* that any representation, warranty, statement or written report that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such date) in the light of the circumstances under which made (after giving effect to all supplements and updates with

respect thereto) (it being understood that the Borrower makes no representation or warranty hereunder with respect to any projections or other forward looking information).

4.11    *Plans*

The Borrower, each Subsidiary and each ERISA Affiliate have complied with the material requirements of Section 515 of ERISA with respect to each Pension Plan which is a Multiemployer Plan, except where the failure to so comply could not reasonably be expected to have a Material Adverse effect.  The Borrower, each Subsidiary and each ERISA Affiliate has, as of the date hereof, made all contributions or payments to or under each Pension Plan required by law or the terms of such Pension Plan or any contract or agreement, except where the failure to make such contributions or payments could not reasonably be expected to have a Material Adverse effect.  No liability to the PBGC has been, or is reasonably expected by the Borrower, any Subsidiary or any ERISA Affiliate to be, incurred by the Borrower, any Subsidiary or any ERISA Affiliate that could reasonably be expected to have a Material Adverse effect.  Liability, as referred to in this <u>Section 4.11</u>, includes any joint and several liability, but excludes any current or, to the extent it represents future liability in the ordinary course, any future liability for premiums under Section 4007 of ERISA.

4.12    *Environmental Matters*

Neither the Borrower nor any Subsidiary (a) has received written notice or otherwise learned of any claim, demand, action, event, condition, report or investigation indicating or concerning any potential or actual liability which individually or in the aggregate could reasonably be expected to have a Material Adverse effect, arising in connection with (i) non-compliance with or violation of the requirements of any applicable Environmental Law, or (ii) the release or threatened release of any Hazardous Material, (b) to the best knowledge of the Borrower, has any threatened or actual liability in connection with the release or threatened release of any Hazardous Material into the environment which individually or in the aggregate could reasonably be expected to have a Material Adverse effect, (c) has received notice of any federal or state investigation evaluating whether any remedial action is needed to respond to a release or threatened release of any Hazardous Material into the environment for which the Borrower or any Subsidiary is or would be liable, which liability would reasonably be expected to have a Material Adverse effect, or (d) has received notice that the Borrower or any Subsidiary is or may be liable to any Person under the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. Section 9601 <u>et seq</u>., or any analogous state law, which liability would reasonably be expected to have a Material Adverse effect.  The Borrower and each Subsidiary is in compliance with the financial responsibility requirements of federal and state Environmental Laws to the extent applicable, including those contained in 40 C.F.R., parts 264 and 265, subpart H, and any analogous state law, except in those cases in which the failure so to comply would not reasonably be expected to have a Material Adverse effect.

4.13    *Financial Statements*

The Borrower has heretofore delivered to the Lenders through the Administrative Agent copies of the audited Consolidated Balance Sheet of the Borrower and its Subsidiaries as of December 31, 2016, and the related Consolidated Statements of Income,

Comprehensive Income, Shareholders' Equity and cash flow for the fiscal year then ended. The financial statements referred to immediately above, including all related notes and schedules, are herein referred to collectively as the **"Financial Statements"** . The Financial Statements fairly present, in all material respects, the Consolidated financial condition and results of the operations of the Borrower and the Subsidiaries as of the dates and for the periods indicated therein and, except as noted therein, have been prepared in conformity with GAAP as then in effect. Neither the Borrower nor any of the Subsidiaries has any material obligation or liability of any kind (whether fixed, accrued, contingent, unmatured or otherwise) which, in accordance with GAAP as then in effect, should have been disclosed in the Financial Statements and was not. During the period from January 1, 2017 to and including the Effective Date, there was no Material Adverse change, including as a result of any change in law, in the Consolidated financial condition, operations, business or Property of the Borrower and the Subsidiaries taken as a whole.

4.14    **Anti-Corruption Laws and Sanctions**

The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, the Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, the Subsidiaries and their respective officers and employees and, to the knowledge of the Borrower, its directors are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Borrower, any Subsidiary or, to the knowledge of the Borrower or such Subsidiary, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

5.    **CONDITIONS TO EFFECTIVENESS**

This Agreement shall become effective on and as of the date (the **"Effective Date"** ) that the following conditions shall have been satisfied:

5.1    **Agreement**

The Administrative Agent shall have received counterparts of this Agreement executed by the Borrower, the Administrative Agent, each Issuer and each Lender.

5.2    **Notes**

The Administrative Agent shall have received a Note, executed by the Borrower, for each Lender that shall have given at least three Domestic Business Days' prior written notice of its request for a Note.

5.3    **Corporate Action**

The Administrative Agent shall have received a certificate, dated the Effective Date, of the Secretary or an Assistant Secretary of the Borrower (i) attaching a true and complete copy of the resolutions of its Board of Directors and of all documents evidencing all other necessary

corporate action (in form and substance reasonably satisfactory to the Administrative Agent) taken by the Borrower to authorize this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, (ii) attaching a true and complete copy of its Certificate of Incorporation and By-Laws, (iii) setting forth the incumbency of the officer or officers of the Borrower who may sign this Agreement and the Loan Documents, and any other certificates, requests, notices or other documents required hereunder or thereunder, and (iv) attaching a certificate of good standing of the Secretary of State of the State of Delaware.

### 5.4     *Opinion of Counsel to the Borrower*

The Administrative Agent shall have received (a) an opinion of Thomas Moffatt, assistant general counsel of the Borrower, dated the Effective Date, in the form of Exhibit D-1 , and (b) an opinion of Shearman & Sterling LLP, special counsel to the Borrower, dated the Effective Date, in the form of Exhibit D-2 .

### 5.5     *Termination of Existing 2013 Credit Agreement*

After giving effect to the application of the proceeds of the Loans on the Effective Date, the Indebtedness under the Existing 2013 Credit Agreement shall have been fully repaid, the commitments under the Existing 2013 Credit Agreement shall have been canceled or terminated, and the Administrative Agent shall have received reasonably satisfactory evidence thereof.  In order to facilitate the termination of the commitments under the Existing 2013 Credit Agreement, the Borrower hereby gives notice that the Borrower wishes to terminate the commitments under the Existing 2013 Credit Agreement, effective as of the Effective Date.  Each Lender that is a party to the Existing 2013 Credit Agreement, by its execution hereof, waives any requirement of prior notice set forth therein as a condition to the right of the Borrower to terminate the commitments thereunder.

### 5.6     *No Default and Representations and Warranties*

The Administrative Agent shall have received a certificate, dated the Effective Date, of the Senior Vice President and Treasurer of the Borrower certifying that there exists no Default and that the representations and warranties contained in this Agreement are true and correct in all material respects (provided that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the Effective Date).

### 5.7     *Fees*

The Administrative Agent shall have received all fees and other amounts due and payable to it on the Effective Date, including the upfront fees payable to the Lenders, in respect of this Agreement.

### 5.8     *Due Diligence; "Know Your Customer"*

Each Lender shall have received such documents and information as it may have requested in order to comply with "know-your-customer" and other applicable Sanctions, anti-terrorism, anti-money laundering and similar rules and regulations and related policies, to the

extent the Borrower shall have received written request therefor at least ten (10) Domestic Business Days prior to the Effective Date.

6.    **CONDITIONS OF LENDING - ALL LOANS AND LETTERS OF CREDIT**

       The obligation of each Lender on any Borrowing Date to make each Revolving Credit Loan (other than a Revolving Credit Loan constituting a Mandatory Borrowing), the Swing Line Lender to make each Swing Line Loan, each Issuer to issue each Letter of Credit and each Lender to make a Competitive Bid Loan are subject to the fulfillment of the following conditions precedent:

    6.1    **Compliance**

       On each Borrowing Date, and after giving effect to the Loans to be made or the Letters of Credit to be issued on such Borrowing Date, (a) there shall exist no Default, and (b) the representations and warranties contained in this Agreement shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on such Borrowing Date ( *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such Borrowing Date), except those which are expressly specified to be made as of an earlier date.

    6.2    **Requests**

       The Administrative Agent shall have timely received from the Borrower on or before such Borrowing Date, as applicable, a duly executed Borrowing Request (together with, in the case of a request for a Swing Line Loan, a duly executed agreement as to the Negotiated Rate with respect to such Swing Line Loan), Letter of Credit Request (together with a duly executed Reimbursement Agreement with respect to the Letter(s) of Credit requested thereby) and/or Competitive Bid Request (together with a duly executed Competitive Bid Accept/Reject Letter).

7.    **AFFIRMATIVE COVENANTS**

       The Borrower covenants and agrees that on and after the Effective Date and until the later to occur of (a) the Commitment Termination Date and (b) the payment in full of the Loans, the Reimbursement Obligations, the Fees and all other sums payable under the Loan Documents (other than contingent obligations for which no claim has been made), the Borrower will:

    7.1    **Legal Existence**

       Except as may otherwise be permitted by <u>Section 8.3</u> and <u>Section 8.4</u> , maintain, and cause each Subsidiary to maintain, its corporate existence in good standing in the jurisdiction of its incorporation or formation and in each other jurisdiction in which the failure so to do could reasonably be expected to have a Material Adverse effect, except that the corporate existence of Subsidiaries may be terminated if (i) such Subsidiaries operate closing or discontinued operations or (ii) if the Borrower determines in good faith that such termination is in the best interests of the Borrower and is not materially disadvantageous to the Lenders.

7.2    **Taxes**

Pay and discharge when due, and cause each Subsidiary so to do, all taxes, assessments, governmental charges, license fees and levies upon or with respect to the Borrower and such Subsidiary, and upon the income, profits and Property thereof unless, and only to the extent, that either (i)(a) such taxes, assessments, governmental charges, license fees and levies shall be contested in good faith and by appropriate proceedings diligently conducted by the Borrower or such Subsidiary, and (b) such reserve or other appropriate provision as shall be required by GAAP shall have been made therefor, or (ii) the failure to pay or discharge such taxes, assessments, governmental charges, license fees and levies could not reasonably be expected to have a Material Adverse effect.

7.3    **Insurance**

Keep, and cause each Subsidiary to keep, insurance with responsible insurance companies in such amounts and against such risks as is usually carried by the Borrower or such Subsidiary.

7.4    **Performance of Obligations**

Pay and discharge when due, and cause each Subsidiary so to do, all lawful Indebtedness, obligations and claims for labor, materials and supplies or otherwise which, if unpaid, could reasonably be expected to (a) have a Material Adverse effect, or (b) become a Lien on the Property of the Borrower or any Subsidiary, except those Liens permitted under Section 8.2 , *provided* that neither the Borrower nor such Subsidiary shall be required to pay or discharge or cause to be paid or discharged any such Indebtedness, obligation or claim so long as (i) the validity thereof shall be contested in good faith and by appropriate proceedings diligently conducted by the Borrower or such Subsidiary, and (ii) such reserve or other appropriate provision as shall be required by GAAP shall have been made therefor.

7.5    **Condition of Property**

Except for ordinary wear and tear, at all times, maintain, protect and keep in good repair, working order and condition, all material Property necessary for the operation of its business (other than Property which is replaced with similar Property) as then being operated, and cause each Subsidiary so to do.

7.6    **Observance of Legal Requirements**

(a)    Observe and comply in all material respects, and cause each Subsidiary so to do, with all laws, ordinances, orders, judgments, rules, regulations, certifications, franchises, permits, licenses, directions and requirements of all Governmental Authorities, which now or at any time hereafter may be applicable to it or to such Subsidiary, a violation of which could reasonably be expected to have a Material Adverse effect; and

(b)    Maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, the Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

60

7.7     *Financial Statements and Other Information.*

Maintain, and cause each Subsidiary to maintain, a standard system of accounting in accordance with GAAP, and furnish to the Administrative Agent for distribution to the Lenders:

(a)     As soon as available and, in any event, within 90 days after the close of each fiscal year, a copy of (x) the Borrower's 10-K in respect of such fiscal year, and (y) (i) the Borrower's Consolidated Balance Sheet as of the end of such fiscal year, and (ii) the related Consolidated Statements of Income, Comprehensive Income, Shareholders' Equity and Cash Flows, as of and through the end of such fiscal year, setting forth in each case in comparative form the corresponding figures in respect of the previous fiscal year, all in reasonable detail, and accompanied by a report of the Borrower's auditors, which report shall state that (A) such auditors audited such financial statements, (B) such audit was made in accordance with generally accepted auditing standards in effect at the time and provides a reasonable basis for such opinion, and (C) said financial statements have been prepared in accordance with GAAP;

(b)     As soon as available, and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year, a copy of (x) the Borrower's 10-Q in respect of such fiscal quarter, and (y) (i) the Borrower's condensed Consolidated Balance Sheet as of the end of such quarter and (ii) the related condensed Consolidated Statements of Income, Comprehensive Income, Shareholders' Equity and Cash Flows for (A) such quarter and (B) the period from the beginning of the then current fiscal year to the end of such quarter, in each case in comparable form with the prior fiscal year, all in reasonable detail and prepared in accordance with GAAP (without footnotes and subject to year-end adjustments);

(c)     Simultaneously with the delivery of the financial statements required by clauses (a) and (b) above, a certificate of the Chief Financial Officer or the Senior Vice President and Treasurer of the Borrower certifying that no Default shall have occurred or be continuing or, if so, specifying in such certificate all such Defaults, and setting forth computations in reasonable detail demonstrating compliance with Section 8.1 and Section 8.9.

(d)     Prompt notice upon the Borrower becoming aware of any change in the applicability of a Pricing Level;

(e)     As soon as practicable after becoming available, copies of all regular or periodic reports (including current reports on Form 8-K) which the Borrower or any Subsidiary may now or hereafter be required to file with or deliver to the U.S. Securities and Exchange Commission, or any other Governmental Authority succeeding to the functions thereof;

(f)     Prompt written notice of: (i) any citation, summons, subpoena, order to show cause or other order naming the Borrower or any Subsidiary a party to any proceeding before any Governmental Authority which could reasonably be expected to have a Material Adverse effect, and include with such notice a copy of such citation, summons, subpoena, order to show cause or other order, (ii) any lapse or other termination of any license, permit, franchise or other authorization issued to the Borrower or any Subsidiary by any Governmental Authority, (iii) any refusal by any Governmental Authority to renew or extend any license, permit, franchise or other authorization, and (iv) any dispute between the Borrower or any Subsidiary and any

Governmental Authority, which lapse, termination or dispute, referred to in clause (ii), (iii) or (iv) above, could reasonably be expected to have a Material Adverse effect;

(g)    Prompt written notice of the occurrence of (i) each Default, (ii) each Event of Default and (iii) each Material Adverse change;

(h)    As soon as practicable following receipt thereof, copies of any audit reports delivered in connection with the statements referred to in Section 7.7(a) ;

(i)    From time to time, such other information regarding the financial position or business of the Borrower and the Subsidiaries as the Administrative Agent, at the request of any Lender, may reasonably request; and

(j)    Prompt written notice of such other information with documentation required by bank regulatory authorities under applicable "know your customer" and anti-money laundering laws, rules and regulations (including, without limitation, the Patriot Act), as from time to time may be reasonably requested by the Administrative Agent, any Issuer or any Lender.

Information required to be delivered pursuant to (x) this Section 7.7 shall be deemed to have been delivered if such information shall have been posted by the Administrative Agent on a Debtdomain, IntraLinks, Syndtrak or similar electronic system (the *"Platform"* ) to which each Lender and each Issuer has been granted access and (y) clauses (a), (b) and (e) of this Section 7.7 shall be deemed delivered to the Administrative Agent, the Issuers and the Lenders when available on the Borrower's website at http://www.cvshealth.com or the website of the U.S. Securities and Exchange Commission at http://www.sec.gov.  Information delivered pursuant to this Section 7.7 may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

The Borrower hereby acknowledges that the Administrative Agent and/or the Joint Lead Arrangers and Joint Bookrunners will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, " *Borrower Materials* " ) by posting the Borrower Materials on the Platform.

7.8    *Records*

Upon reasonable notice and during normal business hours and, if no Event of Default has occurred and is continuing, not more than once in each fiscal year, permit representatives of the Administrative Agent and each Lender to visit the offices of the Borrower and each Subsidiary, to examine the books and records (other than tax returns and work papers related to tax returns) thereof and auditors' reports relating thereto, to discuss the affairs of the Borrower and each Subsidiary with the respective officers thereof, and to meet and discuss the affairs of the Borrower and each Subsidiary with the Borrower's auditors.

7.9    *Authorizations*

Maintain and cause each Subsidiary to maintain, in full force and effect, all copyrights, patents, trademarks, trade names, franchises, licenses, permits, applications, reports, and

other authorizations and rights, which, if not so maintained, would individually or in the aggregate have a Material Adverse effect.

8.    **NEGATIVE COVENANTS**

The Borrower covenants and agrees that on and after the Effective Date and until the later to occur of (a) the Commitment Termination Date and (b) the payment in full of the Loans, the Reimbursement Obligations, the Fees and all other sums payable under the Loan Documents (other than contingent obligations for which no claim has been made), the Borrower will not:

8.1    **Subsidiary Indebtedness**

Permit the Indebtedness of all Subsidiaries (excluding Indebtedness under capital leases incurred in connection with a sale leaseback transaction) to exceed (on a combined basis) 15% of Net Tangible Assets.

8.2    **Liens**

Create, incur, assume or suffer to exist any Lien against or on any Property now owned or hereafter acquired by the Borrower or any of the Subsidiaries, or permit any of the Subsidiaries so to do, except any one or more of the following types of Liens: (a) Liens in connection with workers' compensation, unemployment insurance or other social security obligations (which phrase shall not be construed to refer to ERISA or the minimum funding obligations under Section 412 of the Internal Revenue Code), (b) Liens to secure the performance of bids, tenders, letters of credit, contracts (other than contracts for the payment of Indebtedness), leases, statutory obligations, surety, customs, appeal, performance and payment bonds and other obligations of like nature, or to qualify to do business, maintain insurance or obtain other benefits, in each such case arising in the ordinary course of business, (c) mechanics', workmen's, carriers', warehousemen's, materialmen's, landlords' or other like Liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith and by appropriate proceedings diligently conducted, (d) Liens for taxes, assessments, fees or governmental charges the payment of which is not required under Section 7.2 or Section 7.4, (e) easements, rights of way, restrictions, leases of Property to others, easements for installations of public utilities, title imperfections and restrictions, zoning ordinances and other similar encumbrances affecting Property which in the aggregate do not materially impair its use for the operation of the business of the Borrower or such Subsidiary, (f) Liens on Property of the Subsidiaries under capital leases and Liens on Property (including on the capital stock or other equity interests) of the Subsidiaries acquired (whether as a result of purchase, capital lease, merger or other acquisition) and either existing on such Property when acquired, or created contemporaneously with or within 12 months of such acquisition to secure the payment or financing of the purchase price of such Property (including the construction, development, substantial repair, alteration or improvement thereof), and any renewals thereof, *provided* that such Liens attach only to the Property so purchased or acquired (including any such construction, development, substantial repair, alteration or improvement thereof) and *provided further* that the Indebtedness secured by such Liens is permitted by Section 8.1, (g) statutory Liens in favor of lessors arising in connection with Property leased to the Borrower or any of the Subsidiaries, (h) Liens of attachments, judgments or awards against the Borrower or any of the Subsidiaries with respect to which an appeal or

proceeding for review shall be pending or a stay of execution or bond shall have been obtained, or which are otherwise being contested in good faith and by appropriate proceedings diligently conducted, and in respect of which adequate reserves shall have been established in accordance with GAAP on the books of the Borrower or such Subsidiary, (i) Liens securing Indebtedness of a Subsidiary to the Borrower or another Subsidiary, (j) Liens (other than Liens permitted by any of the foregoing clauses) arising in the ordinary course of its business which do not secure Indebtedness and do not, in the aggregate, materially detract from the value of the business of the Borrower and its Subsidiaries, taken as a whole, (k) Liens in favor of the United States of America, or any state thereof, to secure partial, progress, advance or other payments pursuant to any contract or provisions of any statute, and (l) additional Liens securing Indebtedness of the Borrower and the Subsidiaries in an aggregate outstanding Consolidated principal amount not exceeding 15% of Net Tangible Assets.

8.3     *Dispositions*

Make any Disposition, or permit any of its Subsidiaries so to do, of all or substantially all of the assets of the Borrower and the Subsidiaries on a Consolidated basis.

8.4     *Merger or Consolidation, Etc.*

Consolidate with, be acquired by, or merge into or with any Person unless (x) immediately after giving effect thereto no Default shall or would exist and (y) either (i) the Borrower or (ii) a corporation organized and existing under the laws of one of the States of the United States of America shall be the survivor of such consolidation or merger, *provided* that if the Borrower is not the survivor, the corporation which is the survivor shall expressly assume, pursuant to an instrument executed and delivered to the Administrative Agent, and in form and substance reasonably satisfactory to the Administrative Agent, all obligations of the Borrower under the Loan Documents and the Administrative Agent shall have received such documents, opinions and certificates as it shall have reasonably requested in connection therewith.

8.5     *Acquisitions*

Make any Acquisition, or permit any of the Subsidiaries so to do, except any one or more of the following: (a) Acquisitions by the Borrower or any of the Subsidiaries in connection with Intercompany Dispositions not prohibited by Section 8.3 , and (b) Acquisitions by the Borrower or any of the Subsidiaries, *provided* that immediately before and after giving effect to each such Acquisition no Event of Default shall or would exist.

8.6     *Restricted Payments*

Make any Restricted Payment or permit any of the Subsidiaries so to do, except any one or more of the following Restricted Payments: (a) any direct or indirect Subsidiary may make dividends or other distributions to the Borrower or to any other direct or indirect Subsidiary or otherwise ratably with respect to its stock or other equity interests, and (b) the Borrower may make Restricted Payments, *provided* that, in the case of this clause (b), immediately before and after giving effect thereto, no Event of Default shall or would exist.

64

CVS Health Corporation 2017 Five Year Credit Agreement

8.7    *Limitation on Upstream Dividends by Subsidiaries*

Permit or cause any of the Subsidiaries to enter into or agree, or otherwise be or become subject, to any agreement, contract or other arrangement (other than this Agreement) with any Person (each a *"Restrictive Agreement"* ) pursuant to the terms of which (a) such Subsidiary is or would be prohibited from declaring or paying any cash dividends on any class of its stock owned directly or indirectly by the Borrower or any of the other Subsidiaries or from making any other distribution on account of any class of any such stock (herein referred to as *"Upstream Dividends"* ), or (b) the declaration or payment of Upstream Dividends by a Subsidiary to the Borrower or another Subsidiary, on an annual or cumulative basis, is or would be otherwise limited or restricted ( *"Dividend Restrictions"* ).  Notwithstanding the foregoing, nothing in this <u>Section 8.7</u> shall prohibit:

(a)    Dividend Restrictions set forth in any Restrictive Agreement in effect on the date hereof and any extensions, refinancings, renewals or replacements thereof; *provided* that the Dividend Restrictions in any such extensions, refinancings, renewals or replacements are no less favorable in any material respect to the Lenders than those Dividend Restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(b)    Dividend Restrictions existing with respect to any Person acquired by the Borrower or any Subsidiary and existing at the time of such acquisition, which Dividend Restrictions are not applicable to any Person or the property or assets of any Person other than such Person or its property or assets acquired, and any extensions, refinancings, renewals or replacements of any of the foregoing; *provided* that the Dividend Restrictions in any such extensions, refinancings, renewals or replacements are no less favorable in any material respect to the Lenders than those Dividend Restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(c)    Dividend Restrictions consisting of customary net worth, leverage and other financial covenants, customary covenants regarding the merger of or sale of stock or assets of a Subsidiary, customary restrictions on transactions with affiliates, and customary subordination provisions governing Indebtedness owed to the Borrower or any Subsidiary, in each case contained in, or required by, any agreement governing Indebtedness incurred by a Subsidiary in accordance with <u>Section 8.1</u> ; or

(d)    Dividend Restrictions contained in any other credit agreement so long as such Dividend Restrictions are no more restrictive than those contained in this Agreement (including Dividend Restrictions contained in the Existing 364-Day Credit Agreement, the Existing 2014 Credit Agreement and the Existing 2015 Credit Agreement).

8.8    *Limitation on Negative Pledges*

Enter into any agreement (other than (i) this Agreement, (ii) any other credit agreement that is substantially similar to this Agreement, (iii) purchase money financings or capital leases permitted by this Agreement (provided that any prohibition or limitation therein shall only be effective against the assets financed thereby), (iv) customary restrictions and conditions contained in agreements relating to the Disposition of a Subsidiary, property or assets pending such Disposition,

65

*provided* such restrictions and conditions apply only to such Subsidiary, property or assets, (v) restrictions and conditions contained in documentation relating to a Subsidiary acquired after the Effective Date, *provided* that such restriction or condition (x) existed at the time such Person became a Subsidiary and was not created in contemplation of or in connection with such Person becoming a Subsidiary and (y) applies only to such Subsidiary, and (vi) customary provisions in joint venture agreements, leases, licenses and other contracts restricting or conditioning the assignment or encumbrance thereof, including, without limitation, licenses and sublicenses of patents, trademarks, copyrights and similar intellectually property rights) or permit any Subsidiary so to do, which prohibits or limits the ability of the Borrower or such Subsidiary to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the obligations of the Borrower hereunder.

### 8.9    *Ratio of Consolidated Indebtedness to Total Capitalization*

Permit its ratio of Consolidated Indebtedness to Total Capitalization at the end of any fiscal quarter to exceed 0.6 : 1.0.

## 9.    *DEFAULT*

### 9.1    *Events of Default*

The following shall each constitute an *"Event of Default"* hereunder:

(a)    The failure of the Borrower to make any payment of principal on any Loan or any reimbursement payment in respect of any Letter of Credit when due and payable; or

(b)    The failure of the Borrower to make any payment of interest on any Loan or of any Fee on any date when due and payable and such default shall continue unremedied for a period of 5 Domestic Business Days after the same shall be due and payable; or

(c)    The failure of the Borrower to observe or perform any covenant or agreement contained in Section 2.5 , Section 7.1 , or in Section 8 ; or

(d)    The failure of the Borrower to observe or perform any other covenant or agreement contained in this Agreement, and such failure shall have continued unremedied for a period of 30 days after the Borrower shall have become aware of such failure; or

(e)    [Reserved]; or

(f)    Any representation or warranty of the Borrower (or of any of its officers on its behalf) made in any Loan Document, or made in any certificate or report or other document (other than an opinion of counsel) delivered on or after the date hereof in connection with any such Loan Document shall in any such case prove to have been incorrect or misleading (whether because of misstatement or omission) in any material respect when made; or

(g)    (i) Obligations in an aggregate Consolidated amount in excess of $125,000,000 of the Borrower (other than its obligations hereunder and under the Notes) and the Subsidiaries, whether as principal, guarantor, surety or other obligor, for the payment of any

Indebtedness or any net liability under interest rate, commodity, exchange or cap agreements, (A) shall become or shall be declared to be due and payable prior to the expressed maturity thereof, or (B) shall not be paid when due or within any grace period for the payment thereof, or (ii) any holder of any such obligations shall have the right to declare the Indebtedness evidenced thereby due and payable prior to its stated maturity; or

(h)        An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or

(i)        The Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 9.1 , (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or

(j)        The Borrower or any Subsidiary shall (i) generally not be paying its debts as such debts become due or (ii) admit in writing its inability to pay its debts as they become due; or

(k)        Judgments or decrees in an aggregate Consolidated amount in excess of $125,000,000 against the Borrower and the Subsidiaries shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of 60 days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment; or

(l)        After the Effective Date a Change of Control shall occur; or

(m)        (i) Any Termination Event shall occur (x) with respect to any Pension Plan (other than a Multiemployer Plan) or (y) with respect to any other retirement plan subject to Section 302 of ERISA or Section 412 of the Internal Revenue Code, which plan, during the five year period prior to such Termination Event, was the responsibility in whole or in part of the Borrower, any Subsidiary or any ERISA Affiliate, provided that this clause (y) shall only apply if, in connection with such Termination Event, it is reasonably likely that liability in an aggregate Consolidated amount in excess of $125,000,000 will be imposed upon the Borrower; (ii) the failure to satisfy the minimum funding standards under Section 302 of ERISA or Section 412 of the Internal Revenue Code in an aggregate Consolidated amount in excess of $125,000,000 shall

exist with respect to any Pension Plan for which the Borrower has responsibility (other than that portion of a Multiemployer Plan's Accumulated Funding Deficiency to the extent such Accumulated Funding Deficiency is attributable to employers other than Borrower); (iii) any Person shall engage in a Prohibited Transaction involving any Employee Benefit Plan in respect of which it is reasonably likely that liability in an aggregate Consolidated amount in excess of $125,000,000 will be imposed upon the Borrower; (iv) the Borrower shall fail to pay when due an amount which is payable by it to the PBGC or to a Pension Plan (including a Multiemployer Plan) under Title IV of ERISA; (v) the imposition on the Borrower of any tax under Section 4980(B)(a) of the Internal Revenue Code; or (vi) the assessment of a civil penalty on the Borrower with respect to any Employee Benefit Plan under Section 502(c) of ERISA; in each case, to the extent such event or condition would have a Material Adverse effect. In determining the Consolidated amount for any purpose pursuant to this Section 9.1(m), the liabilities, funding amounts, taxes and penalties referenced in the foregoing clauses of this Section 9.1(m) shall include those of the Subsidiaries and ERISA Affiliates of the Borrower to the extent the Borrower is obligated to pay any such liabilities, funding amounts, taxes and penalties.

9.2     **Remedies**

(a)     Upon the occurrence of an Event of Default or at any time thereafter during the continuance of an Event of Default, the Administrative Agent, at the written request of the Required Lenders, shall notify the Borrower that the Commitments, the Swing Line Commitment and the Letter of Credit Commitment have been terminated and/or that all of the Loans, the Notes and the Reimbursement Obligations and all accrued and unpaid interest on any thereof and all other amounts owing under the Loan Documents have been declared immediately due and payable, *provided* that upon the occurrence of an Event of Default under Section 9.1(h), (i) or (j) with respect to the Borrower, the Commitments, the Swing Line Commitment and the Letter of Credit Commitment shall automatically terminate and all of the Loans, the Notes and the Reimbursement Obligations and all accrued and unpaid interest on any thereof and all other amounts owing under the Loan Documents shall become immediately due and payable without declaration or notice to the Borrower.  To the fullest extent not prohibited by law, except for the notice provided for in the preceding sentence, the Borrower expressly waives any presentment, demand, protest, notice of protest or other notice of any kind in connection with the Loan Documents and its obligations thereunder.  To the fullest extent not prohibited by law, the Borrower further expressly waives and covenants not to assert any appraisement, valuation, stay, extension, redemption or similar law, now or at any time hereafter in force which might delay, prevent or otherwise impede the performance or enforcement of the Loan Documents.

(b)     In the event that the Commitments, the Swing Line Commitment and the Letter of Credit Commitment shall have been terminated or all of the Loans, the Notes and the Reimbursement Obligations shall have become or been declared to be due and payable pursuant to the provisions of this Section 9.2 , (i) the Borrower shall forthwith deposit an amount equal to the Letter of Credit Exposure in a cash collateral account with and under the exclusive control of the Administrative Agent, and (ii) the Administrative Agent, the Issuers and the Lenders agree, among themselves, that any funds received from or on behalf of the Borrower under any Loan Document by any Issuer or any Lender (except funds received by any Issuer or any Lender as a result of a purchase from such Issuer or such Lender, as the case may be, pursuant to the provisions of Section 11.9(b) ) shall be remitted to the Administrative Agent, and shall be applied

68

by the Administrative Agent in payment of the Loans and Reimbursement Obligations and the other obligations of the Borrower under the Loan Documents in the following manner and order: (1) first, to the payment or reimbursement of the Administrative Agent, the Issuers and the Lenders, in that order, for any fees, expenses or amounts (other than the principal of and interest on the Reimbursement Obligations) due from the Borrower pursuant to the provisions of Section 11.5 and the Reimbursement Agreements, (2) second, to the payment of the Fees, (3) third, to the payment of any other fees, expenses or amounts (other than the principal of and interest on the Loans and the Notes and the Reimbursement Obligations) payable by the Borrower to the Administrative Agent, any Issuer or any of the Lenders under the Loan Documents, (4) fourth, to the payment, pro rata according to the outstanding principal balance of the Loans and the Letter of Credit Exposure of each Lender, of interest due on the Loans and the Reimbursement Obligations, (5) fifth, to the payment, pro rata according to the sum of (A) the aggregate outstanding principal balance of the Loans of each Lender *plus* (B) the aggregate outstanding balance of the Reimbursement Obligations of each Lender, of the aggregate outstanding principal balance of the Loans and the aggregate outstanding balance of the Reimbursement Obligations, and (6) sixth, any remaining funds shall be paid to whosoever shall be entitled thereto or as a court of competent jurisdiction shall direct.

(c)     In the event that the Loans and the Notes and the Reimbursement Obligations shall have been declared due and payable pursuant to the provisions of this Section 9.2 , the Administrative Agent upon the written request of the Required Lenders, shall proceed to enforce the Reimbursement Obligations and the rights of the holders of the Loans and the Notes by suit in equity, action at law and/or other appropriate proceedings, whether for payment or the specific performance of any covenant or agreement contained in the Loan Documents.  In the event that the Administrative Agent shall fail or refuse so to proceed, each Issuer and each Lender shall be entitled to take such action as the Required Lenders shall deem appropriate to enforce its rights under the Loan Documents.

10.    ***AGENT***

10.1    ***Appointment and Authority***

Each Credit Party hereby irrevocably appoints BNY Mellon to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Section 10 (other than Section 10.6 ) are solely for the benefit of the Administrative Agent and the Credit Parties and the Borrower shall have no rights as a third party beneficiary or otherwise of any of such provisions.

10.2    ***Rights as a Lender***

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender (which includes Issuer) as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.

Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower, any of its Subsidiaries or any other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

10.3    ***Exculpatory Provisions***

(a)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(1)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(2)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(3)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any of its Subsidiaries or any Affiliate thereof that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 11.1 and Section 9 ) or (ii) in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender or an Issuer.

(c)    The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Section 5 or

70

Section 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

10.4    ***Reliance by Administrative Agent***

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or such Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or such Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent public accounting firms and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accounting firm or experts.

10.5    ***Delegation of Duties***

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section 10 shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

10.6    ***Resignation of Administrative Agent***

The Administrative Agent may at any time give notice of its resignation to the Credit Parties and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to, so long as no Default has occurred and is continuing, the consent of the Borrower (such consent not to be unreasonably withheld or delayed), to appoint a successor, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Credit Parties, appoint a successor Administrative Agent meeting the qualifications set forth above, subject to, so long as no Default has occurred and is continuing, the consent of the Borrower (such consent not to be unreasonably withheld or delayed); *provided* that if the Administrative Agent shall notify the Borrower and the Credit Parties that no qualifying Person has accepted such appointment, then such resignation shall

71

nonetheless become effective in accordance with such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Credit Party directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 10 and Section 11.5 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

10.7    *Non-Reliance on Administrative Agent and Other Credit Parties*

Each Credit Party acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Credit Party or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Credit Party also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Credit Party or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

10.8    *No Other Duties, etc.*

Anything herein to the contrary notwithstanding, none of the Joint Bookrunners, the Joint Lead Arrangers, the Co-Documentation Agents or the Co-Syndication Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or an Issuer.

11.    **OTHER PROVISIONS**

11.1    *Amendments, Waivers, Etc.*

With the written consent of the Required Lenders, the Administrative Agent and the Borrower may, from time to time, enter into written amendments, supplements or modifications of the Loan Documents (which, for the avoidance of doubt, shall require the prior written consent of the Borrower) and, with the written consent of the Required Lenders and the Borrower, the Administrative Agent on behalf of the Lenders may execute and deliver to any such parties a written

instrument waiving or consenting to the departure therefrom, on such terms and conditions as the Administrative Agent may specify in such instrument, any of the requirements of the Loan Documents or any Default and its consequences, *provided* that no such amendment, supplement, modification, waiver or consent shall (i) increase the Commitment Amount of any Lender without the consent of such Lender ( *provided* that no waiver of a Default shall be deemed to constitute such an increase), (ii) extend the Commitment Period without the consent of each Lender directly affected thereby, (iii) reduce the amount, or extend the time of payment, of the Fees without the consent of each Lender directly affected thereby, (iv) reduce the rate, or extend the time of payment of, interest on any Revolving Credit Loan, any Note or any Reimbursement Obligation (other than the applicability of any post-default increase in such rate of interest) without the consent of each Lender directly affected thereby, (v) reduce the amount of, or extend the time of payment of, any payment of any Reimbursement Obligation or principal on any Revolving Credit Loan or any Note without the consent of each Lender directly affected thereby, (vi) decrease or forgive the principal amount of any Revolving Credit Loan, any Note or any Reimbursement Obligation without the consent of each Lender directly affected thereby, (vii) consent to any assignment or delegation by the Borrower of any of its rights or obligations under any Loan Document without the consent of each Lender, (viii) change the provisions of this Section 11.1 without the consent of each Lender, (ix) change the definition of Required Lenders without the consent of each Lender, (x) change the several nature of the obligations of the Lenders without the consent of each Lender, (xi) change the sharing provisions among Lenders without the consent of each Lender directly affected thereby, or (xii) extend the expiration date of a Letter of Credit beyond the Commitment Termination Date without the consent of each Lender.  Notwithstanding the foregoing, in addition to the receipt of the prior written consents of the Borrower and the Required Lenders, no such amendment, supplement, modification, waiver or consent shall (A) amend, modify or waive any provision of Section 10 or otherwise change any of the rights or obligations of the Administrative Agent, any Issuer or the Swing Line Lender under any Loan Document without the written consent of the Administrative Agent, such Issuer or the Swing Line Lender, as the case may be, (B) change the Letter of Credit Commitment, change the amount or the time of payment of any Letter of Credit or any commission or fee payable to the Issuer thereof in connection therewith, or change any other term or provision which relates to the Letter of Credit Commitment of such Issuer or the Letters of Credit issued thereby without the written consent of such Issuer, (C) change the Swing Line Commitment, change the amount or the time of payment of the Swing Line Loans or interest thereon or change any other term or provision which relates to the Swing Line Commitment or the Swing Line Loans without the written consent of the Swing Line Lender or (D) change the amount or the time of payment of any Competitive Bid Loan or interest thereon without the written consent of the Lender holding such Competitive Bid Loan.  Any such amendment, supplement, modification, waiver or consent shall apply equally to each of the Lenders and shall be binding upon the parties to the applicable Loan Document, the Lenders, the Issuers, the Administrative Agent and all future holders of the Loans, the Notes and the Reimbursement Obligations.  In the case of any waiver, the Borrower, the Lenders, the Issuers and the Administrative Agent shall be restored to their former position and rights under the Loan Documents, but any Default waived shall not extend to any subsequent or other Default, or impair any right consequent thereon.

11.2     ***Notices***

(a)        *Notices Generally.* Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other

73

communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

*If to the Borrower* :

    CVS Health Corporation
    1 CVS Drive
    Woonsocket, Rhode Island 02895
    Attention:      Carol A. DeNale
                    Senior Vice President and Treasurer – Treasury Department
                    Facsimile:      (401) 770-5768
                    Telephone:      (401) 770-4407
    Email:          carol.denale@cvshealth.com

with a copy, in the case of a notice of Default, to:

    CVS Health Corporation
    1 CVS Drive
    Woonsocket, Rhode Island 02895
    Attention:      Tom Moffatt
                    Vice President, Assistant Secretary and Assistant General Counsel – Corporate
                    Services
    Facsimile:      (401) 216-3758
    Telephone:      (401) 770-5409
    Email:          thomas.moffatt@cvshealth.com

with a copy (in the case of a notice of Default and which shall not constitute notice under this Agreement or any other Loan Document for any purpose) to:

    Shearman & Sterling LLP
    599 Lexington Avenue
    New York, New York 10022
    Attention:      Gus M. Atiyah
    Facsimile:      (646) 848-5227
    Telephone:      (212) 848-5227
    Email:          gus.atiyah@shearman.com

*If to the Administrative Agent or the Swing Line Lender* :

in the case of each Borrowing Request, each notice of prepayment under <u>Section 2.7</u> , each Letter of Credit Request, each Competitive Bid Request, each Competitive Bid, and each Competitive Bid Accept/Reject Letter:

74

CVS Health Corporation 2017 Five Year Credit Agreement

BNY Mellon
Administrator/ Issuer Services
Client Services Delivery Loan Processing COE
Loan Administration
6023 Airport Road
Oriskany, New York 13424
Attention:        Lauren La Comb
Facsimile:       (315) 765-4533
Telephone:      (315) 765-4145
Email:              afasyndications@bnymellon.com

and in all other cases:

The Bank of New York Mellon
101 Barclay Street
14 th Floor West
New York, New York 10286
Attention:    H. Stephen Griffith
Facsimile:    (212) 815-3749
Telephone:   (212) 815-2214
Email:         stephen.griffith@bnymellon.com

and

The Bank of New York Mellon
500 Grant Street
Pittsburgh, Pennsylvania 15219
Attention:     Clifford Mull
Facsimile:    (412) 234-8087
Telephone:   (412) 234-1346
Email:        clifford.mull@bnymellon.com

*If to any Lender or any Issuer* : to it at its address (or facsimile number or email address) set forth in its Administrative Questionnaire.

(b)        *Electronic Communications* .  Notices and other communications to the Credit Parties hereunder may be delivered or furnished by electronic communication (including email and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Credit Party pursuant to Section 2 or Section 3.3 if such Credit Party has notified the Administrative Agent that it is incapable of receiving notices under such Sections by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" or "read requested" function, as available, return email or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Domestic Business Day for the recipient, and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its email address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      *Change of Address.*  Any party hereto may change its address, facsimile number or email address for notices and other communications hereunder by notice to the other parties hereto (or, in the case of any Lender or any Issuer, by notice to the Administrative Agent and the Borrower).   All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt; *provided* that any such notice or communication that is not received on a Domestic Business Day during the normal business hours of the recipient shall be deemed received at the opening of business on the next Domestic Business Day.

11.3    *No Waiver; Cumulative Remedies*

No failure to exercise and no delay in exercising, on the part of the Administrative Agent, any Lender or any Issuer, any right, remedy, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges under the Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4    *Survival of Representations and Warranties*

All representations and warranties made in the Loan Documents and in any document, certificate or statement delivered pursuant thereto or in connection therewith shall survive the execution and delivery of the Loan Documents.

11.5    *Payment of Expenses; Indemnified Liabilities*

The Borrower agrees, as soon as practicable following presentation of a statement or invoice therefor setting forth in reasonable detail the items thereof, and whether any Loan is made or Letter of Credit is issued, (a) to pay or reimburse the Administrative Agent and its Affiliates for all their reasonable and documented out-of-pocket costs and expenses actually incurred in connection with the development, syndication, preparation and execution of, and any amendment, waiver, consent, supplement or modification to, the Loan Documents, any documents prepared in connection therewith and the consummation of the transactions contemplated thereby, whether such Loan Documents or any such amendment, waiver, consent, supplement or modification to the Loan Documents or any documents prepared in connection therewith are executed and whether the

transactions contemplated thereby are consummated, including the reasonable and documented out-of-pocket fees and disbursements of Special Counsel, (b) to pay, indemnify, and hold the Administrative Agent, the Lenders and the Issuers harmless from any and all recording and filing fees and any and all liabilities and penalties with respect to, or resulting from any delay (other than penalties to the extent attributable to the negligence of the Administrative Agent, the Lenders or the Issuers, as the case may be, in failing to pay such fees, liabilities or penalties when due) which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, the Loan Documents or any documents prepared in connection therewith, and (c) to pay, reimburse, indemnify and hold each Indemnified Person harmless from and against any and all other liabilities, obligations, claims, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable and documented out-of-pocket fees and disbursements of one counsel representing all of the Indemnified Persons, taken as a whole, and, if reasonably necessary, of a single local counsel for each applicable jurisdiction (and, if reasonably necessary, one specialty counsel for each applicable specialty), representing all of the Indemnified Persons, taken as a whole (and, in the case of any actual or perceived conflict of interest where the Indemnified Person affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel, of another firm of counsel (and, if reasonably necessary, a single local counsel for each applicable jurisdiction (and, if reasonably necessary, one specialty counsel for each applicable specialty), for each such affected Indemnified Person))) actually incurred with respect to the enforcement, performance of, and preservation of rights under, the Loan Documents (all the foregoing, collectively, the **"Indemnified Liabilities"**) and, if and to the extent that the foregoing indemnity may be unenforceable for any reason, the Borrower agrees to make the maximum payment permitted under applicable law. Notwithstanding anything to the contrary contained in this Section 11.5, the foregoing payment, indemnification and reimbursement obligations will not, as to any Person identified in this Section 11.5, apply to any losses, claims, damages, liabilities and related expenses to the extent arising (A) from the willful misconduct, gross negligence, fraud or bad faith of such Person, (B) from a material breach of the obligations hereunder of such Person, (C) out of or in connection with Section 11.22, or (D) out of or in connection with any claim, litigation, investigation or proceeding that does not involve an act or omission of the Borrower or any of its Affiliates and that is brought by any such Person against any such other Person (other than the Administrative Agent, in its capacity as such), in each case under clauses (A) through (D), to the extent determined by a final and non-appealable judgment of a court of competent jurisdiction. The agreements in this Section 11.5 shall survive the termination of the Commitments and the payment of the Loans and the Notes and all other amounts payable under the Loan Documents.

11.6    ***Lending Offices***

Each Lender shall have the right at any time and from time to time to transfer any Loan to a different office of such Lender, subject to Section 3.10.

11.7    ***Successors and Assigns***

(a)    *Successors and Assigns Generally*. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors

and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section 11.7 , (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section 11.7 or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section 11.7 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, the Participants to the extent provided in paragraph (d) of this Section 11.7 and, to the extent expressly contemplated hereby, the Related Parties of each Credit Party) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     *Assignments by Lenders* . Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans and obligations in respect of its Letter of Credit Exposure and Swing Line Exposure at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(1)     *Minimum Amounts* .

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment Amount or Swing Line Commitment and the Loans and obligations in respect of its Letter of Credit Exposure and Swing Line Exposure at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in paragraph (b)(1)(A) of this Section 11.7 , the Commitment Amount or Swing Line Commitment (which for this purpose includes the Loans of the assigning Lender outstanding thereunder and obligations in respect of its Letter of Credit Exposure and Swing Line Exposure at the time owing to it thereunder) or, if the Commitment or Swing Line Commitment of the assigning Lender is not then in effect, the principal outstanding balance of the Loans and the Letter of Credit Exposure and Swing Line Exposure of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of such "Trade Date") shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(2)     *Proportionate Amounts* . Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans, Letter of Credit Exposure and Swing Line Exposure or the Commitment assigned, except that this clause (2) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in respect of Competitive Bid Loans on a non-pro rata basis.

(3)    *Required Consents* . No consent shall be required for any assignment except to the extent required by paragraph (b)(1)(B) of this Section 11.7 and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of an unfunded or revolving facility hereunder if such assignment is to a Person that is not a Lender with a Commitment in respect of such facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)    the consent of each Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding) and the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment in respect of the revolving facility hereunder.

(4)    *Assignment and Assumption* .  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $4,500 ($7,500 in the case of an assignment by a Defaulting Lender) (which fee may be waived or reduced in the sole discretion of the Administrative Agent), and the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(5)    *No Assignment to Certain Parties* .  No such assignment shall be made to the Borrower, any of its Subsidiaries or any of their respective Affiliates.

(6)    *No Assignment to Natural Persons* .  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section 11.7 , from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 3.6, Section 3.7 , and Section 11.10 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender

79

of a participation in such rights and obligations in accordance with paragraph (d) of this <u>Section 11.7</u>.

(c)    *Register* .  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York, New York a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the **"Register"** ).  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Issuers and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Issuer and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    *Participations* .  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower, any of its Subsidiaries or any of their respective Affiliates) (each, a **" Participant "** ) in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment, Letter of Credit Exposure, Swing Line Exposure and/or the Loans, Letter of Credit Exposure or  Swing Line Exposure owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and each Credit Party shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.   Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver which requires the consent of all Lenders or all affected Lenders that directly affects such Participant.  Subject to paragraph (e) of this <u>Section 11.7</u> , the Borrower agrees that each Participant shall be entitled to the benefits of  <u>Section 3.5</u> ,   <u>Section 3.6</u> ,   <u>Section 3.7</u> and <u>Section 3.10</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this <u>Section 11.7</u> .  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 11.9(a)</u> as though it were a Lender, *provided* that such Participant agrees to be subject to <u>Section 11.9(b)</u> as though it were a Lender.  Each Lender that sells a participation with respect to a Commitment or Loan shall, solely for the purposes of complying with the rules regarding registered form in the Internal Revenue Code, act as a non-fiduciary agent of the Borrower, maintaining a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Commitment and/or Loan (each a **" Participant Register "** ), and the entries in such Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  No Lender shall be required to disclose the existence of, or any of the information contained in, any Participant Register maintained by it to the Borrower or any other Person unless requested in writing by the

Borrower, and only to the Internal Revenue Service, to the extent such disclosure is required in order to comply with the rules requiring registered form pursuant to the Internal Revenue Code.

(e)     *Limitations upon Participant Rights* .  A Participant shall not be entitled to receive any greater payment under <u>Section 3.6</u> ,  <u>Section 3.7</u> or <u>Section 3.10</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of <u>Section 3.10</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with <u>Section 3.10(f)</u> as though it were a Lender.

(f)     *Certain Pledges* .  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

### 11.8    *Counterparts; Electronic Execution of Assignments*

(a)     *Counterparts* .  Each of the Loan Documents (other than the Notes) may be executed on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same agreement.  It shall not be necessary in making proof of any Loan Document to produce or account for more than one counterpart signed by the party to be charged.  A set of the copies of this Agreement signed by all of the parties hereto shall be lodged with each of the Borrower and the Administrative Agent.  Delivery of an executed counterpart of a signature page of any Loan Document by fax or other electronic means (e.g., ".pdf" or ".tif") shall be effective as delivery of a manually executed counterpart of such Loan Document.

(b)     *Electronic Execution of Assignments* .  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

### 11.9    *Set-off and Sharing of Payments*

(a)     In addition to any rights and remedies of the Lenders and the Issuers provided by law, upon the occurrence of an Event of Default under <u>Section 9.1(a)</u> or <u>Section 9.1(b)</u> or upon the acceleration of the Loans, each Lender and each Issuer shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower, to set-off and apply against any indebtedness or other liability, whether matured or unmatured, of the Borrower to such Lender or such Issuer arising under the Loan Documents, any amount

owing from such Lender or such Issuer to the Borrower, to the extent permitted by applicable law, the aforesaid right of set-off may be exercised by such Lender or such Issuer against the Borrower or against any trustee in bankruptcy, custodian, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor of the Borrower, or against anyone else claiming through or against the Borrower or such trustee in bankruptcy, custodian, debtor in possession, assignee for the benefit of creditors, receivers, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off shall not have been exercised by such Lender or such Issuer prior to the making, filing or issuance of, service upon such Lender or such Issuer of, or notice to such Lender or such Issuer of, any petition, assignment for the benefit of creditors, appointment or application for the appointment of a receiver, or issuance of execution, subpoena, order or warrant. Each Lender and each Issuer agree promptly to notify the Borrower and the Administrative Agent after each such set-off and application made by such Lender or such Issuer, *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

(b)    If any Lender or any Issuer shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of its Loans or its Notes or the Reimbursement Obligations in excess of its pro rata share (in accordance with the outstanding principal balance of all Loans or the Reimbursement Obligations) of payments then due and payable on account of the Loans and Notes received by all the Lenders or the Reimbursement Obligations received by all Issuers, such Lender or such Issuer, as the case may be, shall forthwith purchase, without recourse, for cash, from the other Lenders or Issuers, as the case may be, such participations in their Loans and Notes or the Reimbursement Obligations as shall be necessary to cause such purchasing Lender or Issuer to share the excess payment with each of them according to their pro rata share (in accordance with the outstanding principal balance of all Loans and the Reimbursement Obligations); *provided* that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender or Issuer, such purchase from each Lender or Issuer shall be rescinded and each such Lender and Issuer shall repay to the purchasing Lender or Issuer the purchase price to the extent of such recovery, together with an amount equal to such Lender's or Issuer's pro rata share (according to the proportion of (i) the amount of such Lender's or Issuer's required repayment to (ii) the total amount so recovered from the purchasing Lender or Issuer) of any interest or other amount paid or payable by the purchasing Lender or Issuer in respect of the total amount so recovered. The Borrower agrees, to the fullest extent permitted by law, that any Lender or Issuer so purchasing a participation from another Lender or Issuer pursuant to this <u>Section 11.9</u> may exercise such rights to payment (including the right of set-off) with respect to such participation as fully as if such Lender or Issuer were the direct creditor of the Borrower in the amount of such participation.

11.10    ***Indemnity***

(a)    The Borrower shall indemnify each Credit Party and each Related Party thereof (each such Person being called an " ***Indemnified Person*** " ) against, and hold each Indemnified Person harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable and documented out-of-pocket fees and disbursements of one counsel representing all of the Indemnified Persons, taken as a whole, and, if reasonably necessary, of a single local counsel for each applicable jurisdiction (and, if reasonably necessary, one specialty

82

counsel for each applicable specialty), representing the Indemnified Persons, taken as a whole (and, in the case of any actual or perceived conflict of interest where the Indemnified Person affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel, of another firm of counsel (and, if reasonably necessary, a single local counsel for each applicable jurisdiction (and, if reasonably necessary, one specialty counsel for each applicable specialty), for each such affected Indemnified Person)), actually incurred by any Indemnified Person arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any agreement or instrument contemplated thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated hereby or any other transactions contemplated thereby, (ii) any Loan or Letter of Credit or the use of the proceeds thereof, (iii) any actual or alleged presence or release of Hazardous Materials in, on, under or from any property owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of the Subsidiaries or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on statute, contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto.  Notwithstanding anything to the contrary contained in this <u>Section 11.10(a)</u> , the foregoing indemnity will not, as to any Indemnified Person, apply to any losses, claims, damages, liabilities and related expenses to the extent arising (A) from the willful misconduct, gross negligence, fraud or bad faith of such Indemnified Person, (B) from a material breach of the obligations hereunder of such Indemnified Person, (C) out of or in connection with <u>Section 11.22</u> , or (D) out of or in connection with any claim, litigation, investigation or proceeding that does not involve an act or omission of the Borrower or any of its Affiliates and that is brought by an Indemnified Person against any other Indemnified Person (other than the Administrative Agent, in its capacity as such), in each case under clauses (A) through (D), to the extent determined by a final and non-appealable judgment of a court of competent jurisdiction. The Borrower shall not be liable for any settlement of any investigation, litigation or proceeding to which the indemnity in this <u>Section 11.10(a)</u> applies (any of the foregoing, a ***"Proceeding"*** ) effected without the Borrower's prior written consent (which consent shall not be unreasonably withheld or delayed, it being understood and agreed that the withholding or delaying of the Borrower's consent in connection with a settlement which does not include an unconditional release of the Borrower and the Subsidiaries from all liability or claims that are the subject matter of such Proceeding or which includes a statement as to any admission of fault by or on behalf of the Borrower or any Subsidiary shall not be deemed unreasonable), but if settled with the Borrower's prior written consent or if there is a final judgment for the plaintiff in any such Proceeding, the Borrower agrees to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this <u>Section 11.10(a)</u> .  The Borrower shall not, without the prior written consent of an Indemnified Person, effect any settlement of any pending or threatened Proceeding against such Indemnified Person in respect of which indemnity could have been sought hereunder by such Indemnified Person unless such settlement (x) includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such Proceeding and (y) does not include any statement as to any admission of fault by or on behalf of such Indemnified Person.  Notwithstanding the above, the Borrower shall have no liability under clause (i) of this <u>Section 11.10(a)</u> to indemnify or hold harmless any Indemnified Person for any losses, claims,

damages, liabilities and related expenses relating to Taxes or Withholding Taxes or any Tax in lieu of such Taxes.

(b)    To the extent that the Borrower fails to pay as soon as practicable any amount required to be paid by it to the Administrative Agent under subsection (a) of this Section 11.10 (the **"Indemnified Amount"** ), each Lender severally agrees to pay to the Administrative Agent an amount equal to the product of such unpaid amount *multiplied by* (i) at any time when no Loans are outstanding, its Commitment Percentage, and (ii) at any time when Loans are outstanding (x) if the Commitments then exist, its Commitment Percentage or (y) if the Commitments have been terminated or otherwise no longer exist, the percentage equal to the fraction, (A) the numerator of which is the sum of such Lender's Credit Exposure and (B) the denominator of which is the sum of the Aggregate Credit Exposure (in each case determined as of the time that the applicable Indemnified Amount is sought), *provided* that the Indemnified Amount was payable to the Administrative Agent in its capacity as such.

(c)    The obligations of the Borrower and the Lenders under this Section 11.10 shall survive the termination of the Commitments and the payment of the Loans and the Notes and all other amounts payable under the Loan Documents.

(d)    To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct and actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement, instrument or other document contemplated thereby, the transactions contemplated hereby or any Loan or any Letter of Credit or the use of the proceeds thereof.

11.11    *Governing Law*

The Loan Documents and the rights and obligations of the parties thereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

11.12    *Severability*

Every provision of the Loan Documents is intended to be severable, and if any term or provision thereof shall be invalid, illegal or unenforceable for any reason, the validity, legality and enforceability of the remaining provisions thereof shall not be affected or impaired thereby, and any invalidity, illegality or unenforceability in any jurisdiction shall not affect the validity, legality or enforceability of any such term or provision in any other jurisdiction.

11.13    *Integration*

All exhibits to the Loan Documents shall be deemed to be a part thereof.  Each Loan Document embodies the entire agreement and understanding between or among the parties thereto with respect to the subject matter thereof and supersedes all prior agreements and understandings between or among the parties thereto with respect to the subject matter thereof.

84

11.14    *Treatment of Certain Information*

(a)    Each Credit Party agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party hereto, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 11.14 , to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (vii) to Gold Sheets and other similar bank trade publications, such information to consist of deal terms and other information customarily found in such publications, (viii) with the consent of the Borrower or (ix) to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section 11.14 or (2) becomes available to the Administrative Agent, any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower not known to such Credit Party to be prohibited from disclosing such Information.

(b)    For purposes of this Section 11.14 ,    *"Information"* means all information received from the Borrower or any of its Subsidiaries relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any other Credit Party on a non-confidential basis prior to disclosure by the Borrower or any of its Subsidiaries.

11.15    *Acknowledgments*

The Borrower acknowledges that (a) it has been advised by counsel in the negotiation, execution and delivery of the Loan Documents, (b) by virtue of the Loan Documents, the relationship among the Administrative Agent, the Issuers and the Lenders, on the one hand, and the Borrower, on the other hand, is solely that of debtor and creditor, and (c) by virtue of the Loan Documents, no joint venture exists among the Lenders or among the Borrower and the Lenders.

11.16    *Consent to Jurisdiction*

The Borrower irrevocably submits to the exclusive jurisdiction of any New York State or Federal Court sitting in the City of New York, Borough of Manhattan, over any suit, action or proceeding arising out of or relating to the Loan Documents.  The Borrower irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been

brought in an inconvenient forum.  The Borrower agrees that a final judgment in any such suit, action or proceeding brought in such a court, after all appropriate appeals, shall be conclusive and binding upon it.

11.17    ***Service of Process***

The Borrower agrees that process may be served against it in any suit, action or proceeding referred to in Section 11.16 by sending the same by first class mail, return receipt requested or by overnight courier service, with receipt acknowledged, to the address of the Borrower set forth or referred to in Section 11.2 .  The Borrower agrees that any such service (i) shall be deemed in every respect effective service of process upon it in any such suit, action, or proceeding, and (ii) shall to the fullest extent enforceable by law, be taken and held to be valid personal service upon and personal delivery to it.

11.18    ***No Limitation on Service or Suit***

Nothing in the Loan Documents or any modification, waiver, or amendment thereto shall affect the right of the Administrative Agent, any Issuer or any Lender to serve process in any manner permitted by law or limit the right of the Administrative Agent, any Issuer or any Lender to bring proceedings against the Borrower in the courts of any jurisdiction or jurisdictions.

11.19    ***WAIVER OF TRIAL BY JURY***

EACH OF THE CREDIT PARTIES AND THE BORROWER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY.  FURTHER, THE BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OF THE CREDIT PARTIES, OR COUNSEL TO ANY OF THE CREDIT PARTIES, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY OF THE CREDIT PARTIES WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.  THE BORROWER ACKNOWLEDGES THAT THE CREDIT PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, *INTER ALIA* , THE PROVISIONS OF THIS SECTION 11.19 .

11.20    ***Patriot Act Notice***

Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), as amended from time to time) (the ***"Patriot Act"*** ), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Patriot Act.

11.21     *No Fiduciary Duty*

The Borrower agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Borrower and its Subsidiaries, on the one hand, and the Credit Parties, the Joint Lead Arrangers and Joint Bookrunners named on the cover page hereof, and their respective Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Credit Parties or such Joint Lead Arrangers and Joint Bookrunners, or their respective Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

11.22     ***Acknowledgement and Consent to Bail-In of EEA Financial Institutions***

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender or Issuer that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender or Issuer that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Balance of this Page is Intentionally Blank]

87

*AS EVIDENCE* of the agreement by the parties hereto to the terms and conditions herein contained, each such party has caused this Agreement to be executed on its behalf.

**CVS HEALTH CORPORATION**


By:    /s/ Carol A. DeNale
Name:  Carol A. DeNale
Title:  Senior Vice President and Treasurer


CVS Health Corporation 2017 Five Year Credit Agreement

**THE BANK OF NEW YORK MELLON, as the Administrative Agent, an Issuer, the Swing Line Lender and a Lender**

By:   /s/ Clifford A. Mull

Name: Clifford A. Mull

Title:  First Vice President

CVS Health Corporation 2017 Five Year Credit Agreement

**BANK OF AMERICA, N.A.,**
**as a Co-Documentation Agent, an Issuer and a Lender**


By:    /s/ Carlos Medina
Name: Carlos Medina
Title:  Director

CVS Health Corporation 2017 Five Year Credit Agreement

**WELLS FARGO BANK, N.A.,**
**as a Co-Documentation Agent, an Issuer and a Lender**


By:     /s/ Christopher M. Johnson
Name:  Christopher M. Johnson
Title:   Vice President

CVS Health Corporation 2017 Five Year Credit Agreement

**BARCLAYS BANK PLC,**
**as a Co-Syndication Agent, an Issuer and a Lender**


By:      /s/ Ritam Bhalla
Name: Ritam Bhalla
Title:   Director

CVS Health Corporation 2017 Five Year Credit Agreement

**JPMORGAN CHASE BANK, N.A.,**
**as a Co-Syndication Agent, an Issuer and a Lender**


By:    /s/ Robert D. Bryant
Name: Robert D. Bryant
Title:  Executive Director

---

CVS Health Corporation 2017 Five Year Credit Agreement

**MIZUHO BANK, LTD., as a Lender**

By:   /s/ Tracy Rahn

Name: Tracy Rahn

Title: Authorized Signatory

**SUNTRUST BANK, as a Lender**

By:      /s/ Johnetta Bush
Name: Johnetta Bush
Title:  Director

CVS Health Corporation 2017 Five Year Credit Agreement

**GOLDMAN SACHS BANK USA, as a Lender**

By:     /s/ Annie Carr

Name: Annie Carr

Title: Authorized Signatory

CVS Health Corporation 2017 Five Year Credit Agreement

**U.S. BANK NATIONAL ASSOCIATION, as a Lender**

By:    /s/ Joyce P. Dorsett
Name: Joyce P. Dorsett
Title:  Vice President

CVS Health Corporation 2017 Five Year Credit Agreement

**THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.** ,
as a Lender

By:   /s/ Brian McNany
Name: Brian McNany
Title:  Director

**ROYAL BANK OF CANADA, as a Lender**

By: /s/ Gordon MacArthur

Name: Gordon MacArthur

Title: Authorized Signatory

CVS Health Corporation 2017 Five Year Credit Agreement

**KEYBANK NATIONAL ASSOCIATION, as a Lender**

By:    /s/ Marianne T. Meil
Name: Marianne T. Meil
Title: Senior Vice President

CVS Health Corporation 2017 Five Year Credit Agreement

**FIFTH THIRD BANK** , as a Lender

By:    /s/ Todd S. Robinson

Name: Todd S. Robinson

Title:  VP

**PNC BANK, NATIONAL ASSOCIATION** , as a
Lender


By:   /s/ Michael A. Richards
Name: Michael A. Richards
Title:  Senior Vice President

**SANTANDER BANK N.A.** , as a Lender

By:    /s/ Andres Barbosa
Name: Andres Barbosa
Title: Executive Director

**INDUSTRIAL AND COMMERCIAL BANK OF
CHINA LIMITED, NEW YORK BRANCH** , as a
Lender

By:     /s/ Hsiwei Chen
Name: Hsiwei Chen
Title:  VP


By:     /s/ Pinyen Shih
Name: Pinyen Shih
Title:  Executive Director

**TD BANK, N.A.** , as a Lender

By:   /s/ Uk-Sun Kim
Name: Uk-Sun Kim
Title: Senior Vice President

CVS Health Corporation 2017 Five Year Credit Agreement

**SUMITOMO MITSUI BANKING CORPORATION** ,
as a Lender

By:  /s/ James Weinstein

Name: James Weinstein

Title:  Managing Director

**BANK OF CHINA, NEW YORK BRANCH** , as a
Lender

By:   /s/ Raymond Qiao
Name: Raymond Qiao
Title: Managing Director

CVS Health Corporation 2017 Five Year Credit Agreement

**BANK OF HAWAII** , as a Lender

By:      /s/ John McKenna
Name: John McKenna
Title:   Senior Vice President

CVS Health Corporation 2017 Five Year Credit Agreement

Commitment Increase Supplement

Exhibit 10.3



**CVS Health Corporation**
**Management Incentive Plan**

**I. Objectives and Summary**

CVS Health Corporation's Management Incentive Plan (the "MIP") is designed to reward incentive-eligible employees ("Eligible Participants") of CVS Health Corporation and its subsidiaries (together, "the Company") for their role in driving performance and to encourage Eligible Participants' continued employment with the Company. Funding for the payment of incentive awards will be based on actual results measured against pre-established financial goals. The amount of each incentive award paid will be based on the performance of the Company and the performance of the individual Eligible Participant.

The MIP shall be administered by the Management Planning and Development Committee (the "Committee") of the Board of Directors (the "Board") under the provisions herein and of the 2010 Incentive Compensation Plan or any successor plan (the "ICP"), and the Committee may delegate to officers of CVS Health the authority to perform administrative functions of the MIP as the Committee may determine and may appoint officers and others to assist it in administering the MIP.

**II. Plan Year**

The MIP is a calendar year plan, which runs from January 1 to December 31("Plan Year"). All dates in this document occur during the current Plan Year unless otherwise stated.

**III. Eligibility**

**A.    Eligibility for Participation**

The Chief Executive Officer of CVS Health Corporation ("CEO") or the CEO's designee determines those employees who are eligible to participate in the MIP except as set forth in Section III.B, below. In general, Eligible Participants include exempt employees who are not covered by any other incentive plans (including the Executive Incentive Plan) and who are employed on or before November 1 of the Plan Year.

The CEO may, for any reason and in his or her sole discretion, at any time during the Plan Year, determine an employee's eligibility for participation in the MIP except as set forth in Section III.B. Eligible Participants are subject to the terms and conditions relating to incentive awards set forth in the MIP.

**B.    Section 162(m) Eligible Participants**

The Committee shall determine the eligibility of employees who are or may be subject to Section 162(m) of the Internal Revenue Code (collectively, "Section 162(m) Eligible Participants", whom will also be included in the term "Eligible Participants" unless otherwise noted). Section 162(m) Eligible Participants shall be subject to the limitations required to comply with the provisions of Section 162(m). Subject to the requirements of Section 162(m), the Committee shall retain sole discretion to determine a Section 162(m) Eligible Participant's eligibility for an award, the target award, and the amount of the actual award. In no event shall a Section 162(m) Eligible Participant's award exceed the amount permitted by Section 162(m).

An employee who becomes a Section 162(m) Eligible Participant after January 1 of the Plan Year shall be eligible for an award under the MIP, only to the extent that such award does not violate the requirements of Section 162(m).

**C.    Newly-Eligible Employees**

The award, if any, to an Eligible Participant who became an Eligible Participant after the beginning of the Plan Year may be prorated based on the date of eligibility.

**D.    Position Change**

An employee who becomes an Eligible Participant on or before November 1 of the Plan Year as a result of a position change may be eligible for a prorated incentive award.  If a position change results in an employee becoming an Eligible Participant for part of the Plan Year and other incentives during other parts of the Plan Year, the employee may be eligible to receive a prorated award for the amount of time in each incentive eligible position, subject to the terms of each applicable incentive plan.  A position change from one MIP-eligible position to another MIP-eligible postion during the Plan Year does not result in a prorata award but rather an award funded on the base salary of the Eligible Participant on December 31 of the Plan Year and the individual award opportunity as of that date.

**E.    Demotions**

If a previously Eligible Participant is demoted to a non-incentive eligible position due to his or her violation of CVS Health policy or his or her performance, or if he or she voluntarily transfers to a non-incentive eligible position during the Plan Year, and is in the non-incentive eligible position on the last day of the Plan Year, he or she will not be eligible to earn an incentive award for the Plan Year under the MIP.

**F.    Terminations**

Unless otherwise stated in Section VII of the MIP, if an Eligible Participant's employment terminates prior to March 1 following a Plan Year, he or she will not be eligible to receive an incentive award under the MIP for the most recently completed Plan Year.

**G.    Rehires**

Employees who are rehired as Eligible Participants on or before November 1 of the Plan Year may be eligible for a prorated incentive award.  For purposes of proration, credit will only be given for time worked during the Plan Year in incentive-eligible positions.

**IV.  MIP Funding**

**A.    Consolidated Company Funding**

MIP funding is based on consolidated Company performance, measured by Earnings before Interest and Taxes (EBIT), and modified by performance measurements set forth in Exhibit A for a given Plan Year.  Achievement of the Company's EBIT target and MIP modifiers will determine the total funding (the "Total Pool") as described below.

**1.    EBIT**

EBIT may be adjusted by the financial adjustments as approved by the Committee prior to the end of the first fiscal quarter of the Plan Year (the "Financial Adjustments").

If EBIT is below the minimum performance threshhold , no formulaic funding will be made available for incentive awards, regardless of MIP modifier metrics performance, and there shall be no incentive awards paid under the MIP.

**B.    Total Pool Funding**

After the minimum threshold for EBIT has been achieved, performance of MIP modifiers to target will be calculated for the Plan Year.  The Total Pool for all business units will be fully based (100%) on consolidated Company performance .

The CEO (or, as to Section 162(m) Eligible Participants, the Committee) may, for any reason and in his or her (or Its) sole discretion, adjust the funding of the Total Pool based on (a) input from senior Company executives regarding their assessment of the overall performance of the

2

Company; and (b) assessment of the achievement of Company performance goals. In no case, however, can the CEO or the Committee increase Total Pool funding due solely to the results of the MIP modifiers.

### C.    Individual Performance

The Total Pool will be available for award to Eligible Participants under the MIP, taking into account the individual contribution of each Eligible Participant. The amount, if any, of the incentive award for an Eligible Participant shall be determined in the sole discretion of the Company, which shall be final, binding and conclusive as to all parties having an interest therein. The amount, if any, of the incentive award for a Section 162(m) Eligible Participant shall be determined in the sole discretion of the Committee, which shall be final, binding and conclusive as to all parties having an interest therein.

## V. Earnings and Payout

### A.    Timing

Incentive awards will be paid to Eligible Participants, as soon as administratively feasible following the date the Total Pool is determined and approved, but no later than March 15 of the calendar year immediately following the Plan Year. Incentive payments under the MIP may be subject to garnishments and other state or federal requirements.

### B.    Calculations

Calculations for full and partial awards will be based on each Eligible Participant's annual base salary and individual target opportunity, as of the last day of the Plan Year.

For purposes of proration under the MIP and except as otherwise provided in Section VII of the MIP, calculations will be based on the number of days that the employee was an Eligible Participant in the MIP during the Plan Year.

### C.    Award Opportunity

Individual target awards will be determined by position and may vary based on the Eligible Participant's level in the organization.

### D.    Obligation to Pay Out Percentage of Total Pool

Eligible Participants, as a group, have a right to receive an amount at least equal to the Total Pool, but no individual Eligible Participant shall be entitled to receive an award or any specific amount of the Total Pool. In no event will the aggregate of the total awards paid from the MIP be less than 92.5% of the Total Pool. To discourage unmerited litigation, any party or class asserting a challenge or claim against the Company under any provision of the MIP, including this Section V, shall bear their own costs relating to such challenge or claim, and if the challenge or claim is unsuccessful, such party or class shall reimburse the Company for all reasonable costs incurred by the Company in responding to such challenge or claim.

## VI. Corrections to Incentive Awards

Any requested corrections to incentive award calculations, must be submitted by the Human Resources Business Partner ("HRBP") to the Compensation Department, by April 15 of the calendar year immediately following the Plan Year.

## VII. Eligible Participant Status

### A.    Performance

Subject to the requirements of Section 162(m), the CEO or other designated executives have full discretion in determining the amount, if any, of an incentive awarded to an Eligible Participant, and the Participant's individual performance throughout the Plan Year will be considered by the Company in the final determination of the Eligible Participant's incentive award.

3

**B.    Leaves of Absence**

An Eligible Participant on a Company-approved leave of absence at any time during the Plan Year who remains employed in an eligible position as of the last day of the Plan Year will earn a prorated incentive award based on the number of days actively worked (including time compensated as vacation, myTime or Paid Time Off ("PTO")) during the Plan Year, provided he or she meets all other eligibility criteria for an incentive award.

**C.    Reduction in Force, Retirement and Death**

**1.    Reduction in Force**

If an Eligible Participant is separated from employment by the Company during the Plan Year due to a reduction in force, he or she may be eligible, at the Company's discretion, to receive a prorated incentive award based on the incentive targets in place immediately before the separation date, provided the Eligible Participant meets all other eligibility criteria for an incentive award.

**2.    Retirement**

If an Eligible Participant is at least age 55 and has a minimum of 10 years of service with CVS Health or a predecessor company/subsidiary <u>or</u> is at least age 60 and has a minimum of 5 years of service with CVS Health or a predecessor company/subsidiary <u>and</u> the Eligible Participant retires during the Plan Year, he/she may be eligible to receive a prorated incentive award based on the actual number of days worked during the Plan year and the incentive targets in place immediately before the termination date, provided he/she meets all other eligibility criteria for an incentive award.  Eligible Participants who do not meet the minimum retirement requirements under this Section VII at the time of retirement will <u>not</u> be eligible for an incentive award for the Plan Year.

**3.    Death**

In case of the death of an Eligible Participant, a prorated incentive award may be paid to the Eligible Participant's spouse, if living; otherwise, in equal shares to surviving children of the Eligible Participant.  If there are no surviving children, the benefit shall be paid to the Eligible Participant's estate.  The incentive award will be prorated based on the number of days the Eligible Participant worked during the Plan Year  and incentive targets in place immediately before the termination date.  The incentive award shall be paid as soon as administratively practicable, following the death of the Eligible Participant but no later than March 15 of the calendar year immediately following the Plan Year.

## VIII. Miscellaneous

**A. <u>No Promise of Continued Employment</u>**

The MIP does not create an express or implied contract of employment between CVS Heath and an Eligible Participant.  Both CVS Health and the Eligible Participant retain the right to terminate the employment relationship at will, at any time and for any reason.

**B. <u>Rights are Non-Assignable</u>**

Neither the Eligible Participant, nor any beneficiary, nor any other person shall have any right to assign, in whole or in part, the right to receive payments under the MIP.  Payments are non-assignable and non-transferable, whether voluntarily or involuntarily.

**C. <u>Compliance with Applicable Law</u>**

An Eligible Participant must comply with all applicable state and federal laws and CVS Health policies to be eligible to receive an incentive award under the MIP.

CVS Health will comply with all applicable laws concerning incentive awards; the MIP and its administration are not intended to conflict with any applicable state or federal law.

4

### D. **Change in Control**

In the event of a change in control of CVS Health, as defined in the ICP, the MIP shall remain in force. Any amendments, modifications, termination or dissolution of the MIP by the acquiring entity may only occur prospectively and will not affect incentive targets or awards or eligibility in place immediately before the date of the change in control or such later date as it may be modified or dissolved by the acquiring entity.

Provisions regarding the payment of annual incentive awards that are set forth in change in control agreements with Eligible Employees shall supersede those appearing in the MIP.

### E. **Withholding**

All required deductions will be withheld from the incentive awards prior to distribution. This includes all applicable federal, state, or local taxes, as well as any eligible 401(k) deductions and deferred compensation contributions, as defined by the applicable plans. Incentive awards that are deferred will be taxed according to applicable federal and state tax law. Each Eligible Participant shall be solely responsible for any tax consequences of his or her award hereunder.

### F. **MIP Amendment/Modification/Termination**

CVS Health retains the right to amend, modify, or terminate the MIP at any time on or before the last day of the Plan Year for any reason, with or without notice to Eligible Participants, provided that no changes shall be made with respect to a Section 162(m) Eligible Participant that would not comply with the requirements of Section 162(m).

### G. **MIP Interpretation**

All inquiries with respect to the MIP and any requests for interpretation of any provision in the MIP must be submitted to the appropriate HRBP in writing. Failure to submit a request for resolution of a dispute or question in writing within 30 days of distribution of the incentive award may result in a waiver of the Eligible Participant's rights to dispute the MIP provision or amount of the incentive award.

Capitalized terms not otherwise defined herein shall have the meaning assigned to such defined term(s) in the ICP. In the event of any conflict between the ICP and the MIP, the terms of the ICP shall govern.

### H. **Recoupment of Incentive Awards**

Each incentive award under the MIP shall be subject to the terms of the Company's Recoupment Policy as it exists from time to time, which may require the Eligible Employee to immediately repay to the Company the value of any pre-tax economic benefit that he or she may derive from the MIP.

### I. **Section 409A of the Internal Revenue Code**

The Company intends that the MIP not violate any applicable provision of, or result in any additional tax or penalty under, Section 409A of the Code, as amended, and the regulations and guidance thereunder (collectively, "Section 409A"), and that to the extent any provisions of the Plan do not comply with Section 409A the Company will make such changes as it deems reasonable in order to comply with Section 409A. Payments hereunder are intended to qualify as short-term deferral payments under Section 409A. In all events, the provisions of CVS Health Corporation's Universal 409A Definition Document are hereby incorporated by reference, and notwithstanding the any other provision of the Plan or any Award to the contrary, to the extent required to avoid a violation of the applicable rules under Section 409A by reason of Section 409A(a)(2)(B)(i) of the Code (requiring certain delays for "specified employees"), payment of any amounts subject to Section 409A shall be delayed until the first business day of the seventh (7th) month following the date of termination of employment. For purposes of any provision of the Plan providing for the payment of any amounts or benefits in connection with a termination of employment, references to an Eligible Person's "termination of employment" (and corollary

5

terms) shall be construed to refer to the Eligible Participant's "separation from service" with the Company as determined under Section 409A.

**J.  Restrictive Covenant Agreement**

Any award pursuant to the MIP is expressly subject to and contingent upon the requirement that the Eligible Participant shall have fully executed and delivered to the Company a Restrictive Covenant Agreement; *provided that* the Company in its sole discretion may waive such requirement.  Any applicable agreement containing the restrictive covenants the Company requires in connection with this award is referred to herein as the "Restrictive Covenant Agreement".

If the Company requires an Eligible Participant to execute and deliver a Restrictive Covenant Agreement in connection with any MIP award, the Company shall provide such Restrictive Covenant Agreement to the Eligible Participant and the Eligible Participant must execute and deliver such agreement by the deadline set forth by the Company.

The failure of an Eligible Participant to execute and return the Restrictive Covenant Agreement by the deadline set forth by the Company, if required, shall result in the immediate and irrevocable forfeiture of any MIP award.  This Section VIII.J of the MIP shall not constitute the Company's exclusive remedy for Eligible Participant's violation of the Restrictive Covenant Agreement.  The Company reserves all rights to seek all available legal or equitable remedies in the event of Eligible Participant's violation or threatened violation of the Restrictive Covenant Agreement, including injunctive relief.

MIP Plan Document

Exhibit 10.4



**CVS Health Corporation**
**Executive Incentive Plan**

**I. Objectives and Summary**

CVS Health Corporation's Executive Incentive Plan (the "Plan") governs annual incentive awards for certain key executive officers of CVS Health Corporation and its subsidiaries (together, "the Company"). The purpose of the Plan is to reward certain key executive officers of the Company for their material contributions to the Company and to motivate them to continue making such contributions in the future. The Plan is intended to provide performance-based compensation within the meaning of Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), and the provisions of the Plan shall be construed and interpreted to effectuate such intent.

The Management Planning and Development Committee (the "Committee") of the Board of Directors (the "Board") shall administer the Plan under the provisions herein and of the 2010 Incentive Compensation Plan or any successor plan (the "ICP") and shall have authority, without limitation, to determine the Participants (as defined in Section III), to determine the terms and conditions of any Award (as defined in Section III) and to interpret the Plan. Subject to the provisions of Section 162(m) of the Code, the Committee may, in its sole discretion, delegate to officers of CVS Health the authority to perform administrative functions of the Plan as the Committee may determine and may appoint officers and others to assist it in administering the Plan.

**II. Plan Year**

The Plan is a calendar year plan, which runs from January 1 to December 31 ("Plan Year").

**III. Eligible Participants**

Within 90 days after the start of the applicable Plan Year, the Committee shall designate the key executives of the Company who are eligible to participate in the Plan for the Plan Year (each, a "Participant") and to receive an award under the terms of the Plan (an "Award"). The Participants for the Plan Year shall be set forth in the Exhibit A to the Plan related to the Plan Year ("Exhibit A"). Except as the Committee may otherwise determine, it is intended that the Participants for any Plan Year shall include all employees who are treated as "covered employees" within the meaning of Section 162(m)(3) of the Code for that Plan Year and whose compensation for such Plan Year consequently may be subject to the limit on deductible compensation imposed by Section 162(m) of the Code. The Committee may designate a key executive as a Participant after the first 90 days of the applicable Plan Year, but only if the key executive is a new employee of the Company.

**IV. Bonus Pool**

A.      For each Plan Year, the Company will establish a pool of funds for that Plan Year in an amount equal to 0.5% of the Company's Adjusted Net Income for the Plan year (the "Bonus Pool"). For purposes of the Plan, "Adjusted Net Income" is defined as adjusted income from continuing operations attributable to CVS Health as reported by the Company in its year-end earnings. Within 90 days of the start of the Plan Year, the Committee may make provision for excluding from the calculation of the Bonus Pool the effect of extraordinary events and changes in accounting methods, practices or policies.

**B.**      Within 90 days of the start of each Plan Year, the Committee will designate a percentage of the Bonus Pool to be allocated to each Participant and a percentage to be reserved in the event the Committee wishes to allocate a percentage to a new Participant, if any, after the first 90 days of the applicable Plan Year.  The allocations will be set forth in the Exhibit A for the Plan Year.  The maximum allocation that may be made to any Participant for a Plan Year will be 40%, and in no event shall the allocations, in the aggregate, exceed 100% of the Bonus Pool.  Regardless of the foregoing, in no event shall any Participant be entitled to receive more than his or her individual cap as set forth in Exhibit A for the Plan Year.

## V. Awards

**A.** Following the completion of each Plan Year, the Committee shall certify in writing the amount of the Bonus Pool and the actual Award amount, if any, payable to each Participant for such Plan Year.   Subject to Section V.B, the actual Award amount payable to a Participant shall equal his or her allocable percentage of the Bonus Pool as certified by the Committee.

**B.** The Committee in its sole and exclusive discretion may reduce (including a reduction to zero) the Award to a Participant otherwise payable under the Plan for the Plan Year at any time prior to the payment of the Award to the Participant.  The exercise of such negative discretion with respect to one Participant shall not result in an increase in the amount payable to any other Participant.

## VI. Payment of Awards

**A.**      Subject to Section V, a Participant shall receive payment of an Award if he or she remains employed by the Company through the final determination of incentive awards for the Plan Year; provided, however, that no Participant shall be entitled to payment of an Award hereunder until the Committee makes the certification provided for in Section V. The final determination of incentive awards generally occurs in February of the year following the Plan Year.

**B.**      Awards shall be paid in cash or in any other form prescribed by the Committee and shall be paid to Participants as soon as administratively feasible following the date that annual bonuses are determined and approved for Company employees generally, but in any case on or before March 15 of the year immediately following the Plan Year.  Awards may be subject to garnishments and other state or federal tax withholding requirements.

**C.**      Calculations for full and partial awards will be based on each Participant's annual base salary and individual target opportunity as of December 31st of the Plan Year. For purposes of proration, the 15th of the month will be used to determine if the month is included or excluded from the incentive calculation, as follows:

1. If a Participant's employment is terminated on or before the 15th of the month and the employee is eligible for a prorated award under the Plan, then the full month will be excluded from incentive calculations.

2. If a Participant's employment is terminated after the 15th of the month and the employee is eligible for a prorated award under the Plan, then the full month will be included in the incentive calculations.

## VII. Retirement and Death

**A.**      If a Participant is at least age 55 and has a minimum of 10 years of service with the Company **or** is at least age 60 and has a minimum of 5 years of service with the Company **and** the Participant retires before the end of the Plan Year, he/she may be eligible to receive a prorated Award based on the number of months worked during the Plan Year, provided he/she meets all other eligibility criteria for

*2*

an Award.  Participants who do not meet the minimum retirement requirements under this section at the time of retirement and who retire before the end of the Plan Year will <u>not</u> be eligible for an Award.

**B.**        In the case of the death of a Participant before the end of the Plan Year, a prorated Award may be paid to the  Participant's spouse, if living; otherwise, a prorated Award may be paid in equal shares to surviving children of the Participant.  If there are no surviving children, a prorated Award may be paid to the Participant's estate.  If an Award is paid, the Award will be prorated based on the number of months the Participant worked during the Plan Year.

**VIII. Miscellaneous**

**A. <u>No Promise of Continued Employment</u>**

The Plan does not create an express or implied contract of employment between the Company and a Participant.  Both the Company and the Participant retain the right to terminate the employment relationship at will, at any time and for any reason.

**B. <u>Rights are Non-Assignable</u>**

Neither the Participant, nor any beneficiary, nor any other person shall have any right to assign, in whole or in part, the right to receive payments under the Plan.  Payments are non-assignable and non-transferable, whether voluntarily or involuntarily.

**C.  <u>Compliance with Applicable Law</u>**

A Participant must comply with all applicable state and federal law and the policies of the Company to be eligible to receive an Award under the Plan.

The Company will comply with all applicable laws concerning incentive awards; the Plan and its administration are not intended to conflict with any applicable state or federal law.

**D. <u>Change in Control</u>**

In the event of a change in control of the Company, as defined in the ICP, the Plan shall remain in full force and effect.  Any amendments, modifications, termination or dissolution of the Plan by the acquiring entity may only occur prospectively and will not affect incentive earnings or eligibility before the date of the change in control or such date as it may be modified or dissolved by the acquiring entity.

Provisions regarding the payment of annual incentive awards that are set forth in change in control agreements with Participants shall supersede those appearing in the Plan.

**E. <u>Withholding</u>**

All required deductions will be withheld from the Awards prior to distribution. This includes all applicable federal, state, or local taxes, as well as any eligible 401(k) deductions and deferred compensation contributions as defined by the applicable plans.  Awards that are deferred will be taxed according to applicable federal and state tax law. Each Participant shall be solely responsible for any tax consequences of his or her Award hereunder.

**F. Amendment/Modification/Termination**

The Company retains the right to amend, modify, or terminate the Plan at any time on or before the last day of the Plan Year for any reason, with or without notice to Participants, provided that no changes shall be made that would not comply with the requirements of Section 162(m) of the Code.

**G. <u>Interpretation</u>**

All inquiries with respect to the Plan and any requests for interpretation of any provision in the Plan must be submitted to the Committee in writing.  Failure to submit a request for resolution of a dispute

*3*

or question in writing within 30 days of distribution of the Award shall result in a waiver of the Participant's rights to dispute the Plan provision or amount of the Award.

Capitalized terms not otherwise defined herein shall have the meaning assigned to such defined term(s) in the ICP.  In the event of any conflict between the ICP and the Plan, the terms of the ICP shall govern.

**H. <u>Recoupment of Incentive Awards</u>**

Each Award under the Plan shall be subject to the terms of the Company's Recoupment Policy as it exists from time to time, which may require a Participant to immediately repay to the Company the value of any pre-tax economic benefit that he or she may derive from the Plan.

**I. <u>Section 409A of the Internal Revenue Code</u>**

The Company intends that the MIP not violate any applicable provision of, or result in any additional tax or penalty under, Section 409A of the Code, as amended, and the regulations and guidance thereunder (collectively, "Section 409A"), and that to the extent any provisions of the Plan do not comply with Section 409A the Company will make such changes as it deems reasonable in order to comply with Section 409A. Payments hereunder are intended to qualify as short-term deferral payments under Section 409A. In all events, the provisions of CVS Health Corporation's Universal 409A Definition Document are hereby incorporated by reference.  Notwithstanding any other provision of the Plan or any Award to the contrary, to the extent required to avoid a violation of Section 409A, payment of any amounts to "specified employees" shall be delayed until the first business day of the seventh (7th) month following the date of termination of employment.   References to an Eligible Person's "termination of employment" (and corollary terms) shall be construed to refer to the Eligible Person's "separation from service" with the Company as determined under Section 409A.

*4*



Exhibit 10.5

## CVS Health Corporation
## Long-Term Incentive Plan

1. **Purpose**

The purpose of the CVS Health Long-Term Incentive Plan (the "Plan") is to motivate select executives to focus on the long-term financial goals of CVS Health Corporation (the "Company") that enhance shareholder value, while simultaneously promoting executive retention and maintaining competitive levels of compensation.

2. **Administration**

The Plan shall be administered by the Management Planning and Development Committee (the "Committee") of the Board of Directors (the "Board") of the Company under the provisions of the 2010 Incentive Compensation Plan or any successor plan, as amended (the "ICP"), where applicable. The Committee shall have full and final authority, in each case subject to and consistent with the provisions of the Plan, to determine Eligible Persons, grant awards under the Plan (each, an "Award"), and determine the amount, terms and conditions and all other matters relating to Awards. In addition, the Committee shall have full and final authority, in each case subject to and consistent with the provisions of the Plan, to construe and interpret rules and regulations for the administration of the Plan, correct defects, supply omissions or reconcile inconsistencies therein, and to make all other decisions and determinations as the Committee may deem necessary or advisable for the administration of the Plan.

Capitalized terms not otherwise defined herein shall have the meaning assigned to such term(s) in the ICP.

3. **Eligibility**

Executives employed by the Company or its subsidiaries who are selected by the Committee or its designate shall be eligible to receive an Award under the Plan (an "Eligible Person").

The Committee may grant Awards under the Plan that are intended to qualify as performance-based compensation within the meaning of the rules under Section 162(m) of the Internal Revenue Code ("the Section 162(m) Rules") and Awards that are not intended to qualify as performance-based compensation under the Section 162(m) Rules. In each case, the terms of each Award shall be established pursuant to such procedures and methods as may be approved by the Committee or its designate.

If (a) the Award recipient is a member of the Company's Business Planning Committee at the time the Award is granted and (b) the Award recipient is expected to be a "covered employee" within the meaning of the Section 162(m) Rules for the calendar year in which the Award is settled, any Award granted under the Plan to the Award recipient shall qualify as performance-based compensation under the Section 162(m) Rules, and the initial grant and the terms of such Award, as established and approved by the Committee, shall comply with the Section 162(m) Rules.

4. **Awards**

**(a)** The Committee shall determine the Eligible Persons to whom Awards shall be granted and the terms and conditions relating to the Awards, including but not limited to the target amount of each Eligible Person's Award, the range of each Eligible Person's Award that may be earned based on the Company's performance, the performance period relating to such Awards, the performance criteria that will be used to determine if and to what

1

extent such Awards may be earned by Eligible Persons participating in the Plan and any other provisions as the Committee deems appropriate; *provided* , *however* , that performance criteria with respect to Awards intended to qualify as Section 162(m) performance-based compensation shall be consistent with the ICP, and such determination shall be made within the following time frames:

**(i)** At the beginning of any performance period and, if the Awards are intended to qualify as Section 162(m) performance-based compensation, not later than the earlier of 90 days after the start of the performance period and expiration of 25% of the performance period, or

**(ii)** If the Awards are not intended to qualify as Section 162(m) performance-based compensation, then with respect to any new employee, not later than the last day of the calendar year in which the employee commences his or her employment.

**(iii)** Subject to the requirements of Section 162(m), the Company has the right to apply negative discretion, at both the aggregate and individual award level and in determining the amount, if any, of an award to an Eligible Participant, and the Participant's individual performance throughout the Plan Year will be considered by the Company in the final determination of the Eligible Participant's incentive award.

**(b)** A "performance period" shall be defined by the Committee at the time the performance cycle for the Award is established but shall generally begin on January 1st of a calendar year and end on a December 31st of a succeeding calendar year (the "Performance Period").

**(i)** The Committee may establish, in its sole discretion, one or more periodic performance measurement periods within a Performance Period (an "Interim Performance Period").

**(ii)** Any Interim Performance Period(s) commencement and end date(s), corresponding performance criteria and other relevant factors will be established to allow the Company to deduct to the full extent possible under Section 162(m) any compensation paid as a performance award against such pre-determined goals.

**(c)** An Award is considered "earned" when the Committee certifies the Company's financial performance for the relevant performance period (an "Earned Award") which, with respect to Awards intended to qualify as Section 162(m) performance-based compensation, shall be consistent with the Section 162(m) Rules.

**(d)** *Settlement of Earned Awards.* At the end of a Performance Period, the Committee shall determine, in its sole discretion, the Earned Award that shall be distributed to each Eligible Person in shares of CVS Health common stock (the "Shares") based on the level of achievement of the relevant performance criteria.

Any Shares to be issued in connection with an Earned Award shall be issued pursuant to the ICP. The number of Shares issued shall be determined by dividing the Earned Award by the closing price of the Shares (the "Fair Market Value" or "FMV") on the date the Award is approved by the Committee, which shall be rounded down to the nearest whole share.

Subject to an Eligible Person's prior election to defer any or all of the Earned Award pursuant to Paragraph 5, the Shares payable in respect of an Earned Award will be paid to the Eligible Person as soon as practicable after the Earned Award is approved by the Committee and in no event later than March 15 following the completion of the relevant performance period. The Shares associated with the Earned Award will be settled through

2

the issuance to each Eligible Person of a certificate of Shares, or such other method of transfer of Shares as may be made in accordance with prevailing Company practice.

**5. Deferral Elections**

In accordance with the rules promulgated by the Committee, an Eligible Person may elect to defer any or all of such Earned Award.

**6. Termination of Employment**

(a) In the event an Eligible Person ceases to be employed by the Company and any subsidiary of the Company prior to the completion of a Performance Period due to an Eligible Person's voluntary termination of employment, or the termination of an Eligible Person by the Company for Cause, any Award granted but not yet earned for a Performance Period shall be forfeited. For this purpose, "Cause" shall be deemed to occur if the Eligible Person (A) willfully and materially breaches any of his or her obligations to the Company with respect to confidentiality, cooperation with regard to litigation, non-disparagement and non-solicitation; (B) is convicted of a felony involving moral turpitude; or (C) engages in conduct that constitutes willful gross neglect or willful gross misconduct in carrying out Eligible Person's duties to the Company, resulting, in either case, in material harm to the financial condition or reputation of the Company.

(b) In the event an Eligible Person ceases to be employed by the Company and any subsidiary of the Company prior to the completion of a Performance Period by reason of death, any Award not yet earned in accordance with Paragraph 4 shall be prorated pursuant to Paragraph 6(f) below.

(c) In the event an Eligible Person ceases to be actively employed by the Company and any subsidiary of the Company prior to the completion of a Performance Period due to an Eligible Person becoming totally and permanently disabled (as defined in the Company's Long-Term Disability Plan, or, if not defined in such plan, as defined by the Social Security Administration) while actively employed by Company or a subsidiary of the Company, an Award granted but not yet earned for a Performance Period shall be prorated pursuant to Paragraph 6(f) below.

(d) In the event an Eligible Person ceases to be employed by the Company and any subsidiary of the Company, due to a Termination by the Company without Cause (as defined above in Paragraph 6(a)) or a "Constructive Termination without Cause" (defined below), any Award granted but not yet earned for a Performance Period shall be prorated pursuant to Paragraph 6(f) below. "Constructive Termination without Cause" shall mean a termination of the Eligible Person's employment at his or her initiative as provided under the definition of either "Constructive Termination without Cause" or "Termination by Executive for Good Reason" set forth in the most recent Employment Agreement, as amended, Change in Control Agreement, or other comparable agreement, between the Company and the Eligible Person. If there is no such Agreement between the Company and the Eligible Person, then Constructive Termination without Cause shall have the same meaning for the Eligible Person as is defined for a similarly-situated Eligible Person in his or her Employment or Change in Control Agreement.

(e) In the event an Eligible Person's employment with the Company and any subsidiary of the Company terminates by reason of a "Qualified Retirement," an Award granted but not yet earned for a Performance Period shall be prorated pursuant to Paragraph 6(f) below. A "Qualified Retirement" shall mean termination of employment after attainment of age fifty-five (55) with at least ten (10) years of continuous service, or attainment of age sixty (60) with at least five (5) years of continuous service, provided that: (i) if Participant elects to

3

terminate his or her employment voluntarily, provided he has provided the Company with at least twelve (12) months advance notice of his or her retirement date or such other term of advance notice as is determined by the Chief Human Resources Officer of the Company; or (ii) if the Company elects to terminate Participant's employment, then such termination is without cause. Notwithstanding the forgoing, in the event an Eligible Person is a party to an Employment Agreement with the Company, a Qualified Retirement shall be deemed to occur under this Paragraph if the Eligible Person's termination of employment qualifies as a Normal Retirement or an Approved Early Retirement under such Employment Agreement.

**(f)**  Pro Rating

**(i)**  Subject to Paragraph 6(f)(ii), in the case of Paragraphs 6(b) and 6(c), the Award payable will be determined based on the Eligible Person's target award and, in the case of Paragraphs 6(d) and 6(e), the Award payable will be determined based on the Company's *actual performance* during the applicable Performance Period. The amount of the Award will be calculated by multiplying the Award amount (based on target or actual performance, as the case may be) by the following fraction: (A) the numerator shall be the number of months elapsed since the beginning of the Performance Period (including any partial month in which the Eligible Person worked as a whole month) and (B) the denominator shall be the total number of months in the Performance Period. Any payment to an Eligible Person under Paragraphs 6(b) and 6(c) shall be made within two and a half months of such death or disability, as the case may be, and any payment made under Paragraphs 6(d) and 6(e) will be made following completion of the performance period at the same time payment is made to other Eligible Persons in accordance with Paragraph 4(d).

**(ii)**  Notwithstanding the foregoing and subject to compliance with Section 409A of the Internal Revenue Code, the Committee may provide, in its sole discretion, that the amount payable following terminations described in Paragraphs 6(b) and 6(c) with respect to Awards subject to the Section 162(m) Rules will be determined based on the Company's *actual performance* during the applicable Performance Period and payable on the earlier of (i) the time payment is made to other Eligible Persons in accordance with Paragraph 4(d) and (ii) the Company's first taxable year when payment would not reasonably be anticipated to result in a loss of a tax deduction under the Section 162(m) Rules.

## 7. <u>Tax Withholding</u>

The Company will withhold from an Eligible Person's Earned Award, subject to an Eligible Person's election to defer all or a portion of the Earned Award, all required federal, state and local payroll taxes, including Medicare taxes. If an Eligible Person's Social Security wages have not reached the Social Security maximum taxable wage base at the time the Earned Award is paid or Shares are delivered, Social Security taxes will also be withheld from the Award.

If an Eligible Person elects to defer an Earned Award, the Company may require the Eligible Person to remit to the Company in advance of the actual deferral of such Earned Award, the required FICA withholding taxes, including Social Security and Medicare taxes, in order to ensure compliance with the Sarbanes-Oxley Act of 2002.

## 8.  <u>Change in Control of the Company</u>

Upon the occurrence of a change in control of the Company, as defined in Section 10(c) of the ICP (a "Change in Control"), the performance criteria for any outstanding Performance Period shall be deemed to have been fully satisfied at target and all outstanding Awards under the Plan shall be come immediately non-forfeitable Earned Awards. Each Eligible Person shall

receive the Target Award for each outstanding Performance Period, to be paid as soon as administratively possible within two and a half months  of the Change in Control, subject all applicable Plan provisions and federal regulations governing payment of such Award(s), including but not limited to the Eligible Person's deferral elections, and Sections 162(m), 4999 and 409A of the Internal Revenue Code.

### 9. Recoupment of Awards

Except as may be specifically provided in the Award, each Award under the Plan shall be subject to the terms of the Company's Recoupment Policy as it exists from time to time, which may require the Eligible Person to immediately repay to the Company the value of any pre-tax economic benefit that he or she may derive from the Plan.

### 10. Miscellaneous

**(a)** *Not a Contract of Employment.*  The adoption and maintenance of the Plan shall not be deemed to be a contract of between the Company and an Eligible Person and shall not be consideration for the employment of an Eligible Person.  Nothing contained herein shall be deemed to give an Eligible Person the right to be retained in the employ of the Company or to restrict the right of the Company to discharge an Eligible Person at any time nor shall the Plan be deemed to give the Company the right to require an Eligible Person to remain in the employ of the Company or to restrict an Eligible Person's right to terminate their employment at any time.

**(b)** *Non-Assignability of Benefits.*  No Eligible Person, Beneficiary or distributees of benefits under the Plan shall have any power or right to transfer, assign, anticipate, hypothecate or otherwise encumber any part or all of the amounts payable hereunder, which are expressly declared to be unassignable and nontransferable.  Any such attempted assignment or transfer shall be void.  No amount payable hereunder shall, prior to actual payment hereof, be subject to seizure by any creditor or any such Eligible Person, Beneficiary or other distributees for the payment of any debt judgment or other obligation, by a proceeding at law or in equity, nor transferable by operation of law in the event of the bankruptcy, insolvency or death of such Eligible Person, Beneficiary or other distributes hereunder.

**(c)** *Amendment and Termination.*  The Board may amend, alter, suspend, discontinue or terminate the Plan or the Committee's authority to grant Awards under the Plan without the consent of Eligible Persons, except that without the consent of an affected Eligible Person, no such Board action may materially and adversely affect the rights of such Eligible Person under any previously granted and outstanding Awards. The Committee may waive any conditions or rights under, or amend, alter, suspend, discontinue or terminate any Award(s) previously granted, except as otherwise provided in the Plan, provided that, without the consent of an affected Eligible Person, no such Committee action may materially and adversely affect the rights of such Eligible Person under such Award(s).

**(d)** *Compliance with Legal and Other Requirements.*  Notwithstanding any Plan provision to the contrary, the Committee may at any time impose such restrictions on the Plan and participation therein as the Committee may deem advisable from time to time in order to comply with or preserve compliance with any applicable laws, including any applicable federal and state securities laws and exemptions from registrations thereunder.

Further, to the extent it would not violate an applicable provision of Section 409A of the Internal Revenue Code the Company may, to the extent deemed necessary or advisable by the Committee, postpone the issuance or delivery of CVS Health stock or payment of other benefits under any Earned Award until completion of such registration or qualification of such stock or other required action under any federal or state law, rule or regulation,

listing or other required action with respect to any stock exchange or automated quotation system upon which such stock are listed or quoted, or compliance with any other obligation of the Company, as the Committee may consider appropriate, and may require any Eligible Person to make such representations, furnish such information and comply with or be subject to such other conditions as it may consider appropriate in connection with the issuance or delivery of stock or payment of other benefits in compliance with applicable laws, rules, and regulations, listing requirements, or other obligations.

**(e)**    *Section 409A.*  The Company intends that the Plan not violate any applicable provision of, or result in any additional tax or penalty under, Section 409A of the Internal Revenue Code, as amended, and the regulations and guidance thereunder (collectively, "Section 409A"), and that to the extent any provisions of the Plan do not comply with Section 409A the Company will make such changes as it deems reasonable in order to comply with Section 409A.  In all events, the provisions of CVS Health Corporation's Universal 409A Definitions Document are hereby incorporated by reference, and notwithstanding the any other provision of the Plan or any Award to the contrary, to the extent required to avoid a violation of the applicable rules under Section 409A by reason of Section 409A(a)(2)(B)(i) of the Internal Revenue Code (requiring certain delays for "specified employees"), payment of any amounts subject to Section 409A shall be delayed until the first business day of the seventh (7th) month following the date of termination of employment.  For purposes of any provision of the Plan providing for the payment of any amounts or benefits in connection with a termination of employment, references to an Eligible Person's "termination of employment" (and corollary terms) shall be construed to refer to the Eligible Person's "separation from service" with the Company as determined under Section 409A.

**(f)**    *Adjustments.*  In the event that any dividend or other distribution (whether in the form of cash, stock, or other property), re-capitalization, forward or reverse split, reorganization, merger, consolidation, spin-off, combination, repurchase, share exchange, liquidation, dissolution or other similar corporate transaction or event affects the stock such that an adjustment is appropriate under the Plan, then the Committee shall, in such manner as it may deem equitable, adjust the number and kind of Shares of stock subject to or deliverable in respect of outstanding Awards.

**(g)**    *Limitation on Rights Conferred by Awards Granted under Plan.*  Neither the Plan nor any action taken under the Plan shall be construed as conferring on an Eligible Person any of the rights of a shareholder of CVS Health until the Eligible Person is duly issued or transferred Shares in accordance with the terms of an Earned Award.

**(h)**    *Unfunded Status of Awards; Creation of Trusts.*  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation. With respect to any payments not yet made to an Eligible Person or obligation to deliver stock pursuant to an Award, nothing contained in any Award shall give any such Eligible Person any rights that are greater than those of a general creditor of CVS Health, provided that the Committee may authorize the creation of trusts and deposit therein cash, stock, other awards or other property, or make other arrangements to meet CVS Health's obligations under the Plan. Such trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Committee otherwise determines with the consent of each affected Eligible Person.

## 11. Governing Law

The validity, construction and effect of the Plan, and any rules and regulations under the Plan shall be determined in accordance with Delaware law, without giving effect to principles of conflicts of laws and applicable federal law.

**Letter re: Unaudited Interim Financial Information**

August 8, 2017

The Board of Directors and Shareholders:
CVS Health Corporation

We are aware of the incorporation by reference in the Registration Statements (Nos. 333-49407, 333-34927, 333-28043, 333-91253, 333-63664, 333-139470, 333-141481, 333-167746, 333-208805, and 333-217853 on Form S-8, Nos. 333-187440, 333-200217, and 333-217596 on Form S-3ASR, Nos. 333-205156 and 333-210872 on Form S-3 and No. 333-210873 on Form S-4) of CVS Health Corporation of our report dated August 8, 2017, relating to the unaudited condensed consolidated interim financial statements of CVS Health Corporation that are included in its Form 10-Q for the quarter ended June 30, 2017.

/s/ Ernst & Young LLP

Boston, Massachusetts

Exhibit 31.1

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Larry J. Merlo, President and Chief Executive Officer of CVS Health Corporation, certify that:

1. I have reviewed this quarterly report on Form 10-Q of CVS Health Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2017                    By:/s/ Larry J. Merlo
                                        Larry J. Merlo
                                        President and Chief Executive Officer

Exhibit 31.2

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, David M. Denton, Executive Vice President and Chief Financial Officer of CVS Health Corporation, certify that:

1. I have reviewed this quarterly report on Form 10-Q of CVS Health Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2017

By:  /s/ David M. Denton
    David M. Denton
    Executive Vice President and Chief Financial Officer

Exhibit 32.1

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

The certification set forth below is being submitted in connection with the Quarterly Report of CVS Health Corporation (the "Company") on Form 10-Q for the period ended June 30, 2017 (the "Report"), for the purpose of complying with Rule 13(a)-14(b) or Rule 15d-14(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code.

I, Larry J. Merlo, President and Chief Executive Officer of the Company, certify that, to the best of my knowledge:

    (1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

    (2)   The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: August 8, 2017

/s/ Larry J. Merlo
Larry J. Merlo
President and Chief Executive Officer

Exhibit 32.2

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

The certification set forth below is being submitted in connection with the Quarterly Report of CVS Health Corporation (the "Company") on Form 10-Q for the period ended June 30, 2017 (the "Report"), for the purpose of complying with Rule 13(a)-14(b) or Rule 15d-14(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code.

I, David M. Denton, Executive Vice President and Chief Financial Officer of the Company, certify that, to the best of my knowledge:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: August 8, 2017                                    /s/ David M. Denton
                                                        David M. Denton
                                                        Executive Vice President and Chief Financial Officer

# EXHIBIT 16

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-Q

### Quarterly Report Under Section 13 or 15(d) of the
### Securities Exchange Act of 1934

**FOR THE QUARTER ENDED JUNE 30, 2016**

**COMMISSION FILE NUMBER 001-6351**

# ELI LILLY AND COMPANY

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| INDIANA | 35-0470950 |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

LILLY CORPORATE CENTER, INDIANAPOLIS, INDIANA 46285
(Address of principal executive offices)

Registrant's telephone number, including area code (317) 276-2000

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒ No o

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of a "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer o          Non-accelerated filer o          Smaller reporting Company o

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes o No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☒ No o

The number of shares of common stock outstanding as of July 18, 2016:

| Class | Number of Shares Outstanding |
|---|---|
| Common | 1,103,843,444 |

**Eli Lilly and Company**

**Form 10-Q**
**For the Quarter Ended June 30, 2016**
**Table of Contents**

|  |  |  | **Page** |
|---|---|---|---|
| PART I. Financial Information |  |  | 4 |
|  |  |  |  |
| Item 1. | Financial Statements |  | 4 |
|  |  | Consolidated Condensed Statements of Operations | 4 |
|  |  | Consolidated Condensed Statements of Comprehensive Income | 5 |
|  |  | Consolidated Condensed Balance Sheets | 6 |
|  |  | Consolidated Condensed Statements of Cash Flows | 7 |
|  |  | Notes to Consolidated Condensed Financial Statements | 8 |
| Item 2. |  | Management's Discussion and Analysis of Results of Operations and Financial Condition | 33 |
|  |  | Executive Overview | 33 |
|  |  | Revenue | 39 |
|  |  | Gross Margin, Costs, and Expenses | 42 |
|  |  | Financial Condition | 43 |
|  | Financial Expectations |  | 43 |
|  | Available Information on our Website |  | 44 |
| Item 4. |  | Controls and Procedures | 44 |
|  |  |  |  |
| PART II. Other Information |  |  | 45 |
|  |  |  |  |
| Item 1. |  | Legal Proceedings | 45 |
| Item 1A. |  | Risk Factors | 45 |
| Item 2. |  | Unregistered Sales of Equity Securities and Use of Proceeds | 45 |
| Item 6. |  | Exhibits | 46 |
|  |  |  |  |
| Signatures |  |  | 47 |
| Index to Exhibits |  |  | 48 |

*Forward-Looking Statements*

This Quarterly Report on Form 10-Q includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 (Exchange Act). Forward-looking statements include all statements that do not relate solely to historical or current facts, and can generally be identified by the use of words such as "may," "believe," "will," "expect," "project," "estimate," "intend," "anticipate," "plan," "continue" or similar expressions.

In particular, information appearing under "Management's Discussion and Analysis of Financial Condition and Results of Operations" includes forward-looking statements. Forward-looking statements inherently involve many risks and uncertainties that could cause actual results to differ materially from those projected in these statements. Where, in any forward-looking statement, we ("Lilly" or the "company") express an expectation or belief as to future results or events, it is based on management's current plans and expectations, expressed in good faith and believed to have a reasonable basis. However, we can give no assurance that any such expectation or belief will result or will be achieved or accomplished.

More information on factors that could cause actual results or events to differ materially from those anticipated is included from time to time in our reports filed with the Securities and Exchange Commission (SEC), including our Annual Report on Form 10-K for the year ended December 31, 2015, particularly under the captions "Forward-Looking Statements" and "Risk Factors."

All forward-looking statements herein speak only as of the date of this report and are expressly qualified in their entirety by the cautionary statements included in or incorporated by reference into this report. Except as is required by law, we expressly disclaim any obligation to publicly release any revisions to forward-looking statements to reflect events after the date of this report.

# PART I. Financial Information

*Item 1. Financial Statements*

**Consolidated Condensed Statements of Operations**
**(Unaudited)**
**ELI LILLY AND COMPANY AND SUBSIDIARIES**
**(Dollars and shares in millions, except per-share data)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2016** | **2015** | **2016** | **2015** |
| Revenue | $ **5,404.8** | $ 4,978.7 | $ **10,269.9** | $ 9,623.4 |
| Costs, expenses, and other: | | | | |
| Cost of sales | **1,465.0** | 1,218.4 | **2,788.0** | 2,411.1 |
| Research and development | **1,335.9** | 1,169.5 | **2,556.9** | 2,208.8 |
| Marketing, selling, and administrative | **1,622.6** | 1,635.4 | **3,096.5** | 3,158.9 |
| Acquired in-process research and development (Note 3) | **—** | 80.0 | **—** | 336.0 |
| Asset impairment, restructuring, and other special charges (Note 5) | **58.0** | 72.4 | **189.4** | 180.4 |
| Other–net, (income) expense (Note 12) | **(21.2)** | 123.3 | **127.8** | 30.6 |
| | **4,460.3** | 4,299.0 | **8,758.6** | 8,325.8 |
| Income before income taxes | **944.5** | 679.7 | **1,511.3** | 1,297.6 |
| Income taxes (Note 8) | **196.8** | 78.9 | **323.5** | 167.3 |
| Net income | $ **747.7** | $ 600.8 | $ **1,187.8** | $ 1,130.3 |
| | | | | |
| Earnings per share: | | | | |
| Basic | $ **0.71** | $ 0.57 | $ **1.12** | $ 1.06 |
| Diluted | $ **0.71** | $ 0.56 | $ **1.12** | $ 1.06 |
| Shares used in calculation of earnings per share: | | | | |
| Basic | **1,057.7** | 1,061.7 | **1,058.8** | 1,063.0 |
| Diluted | **1,060.1** | 1,065.6 | **1,061.0** | 1,066.3 |
| | | | | |
| Dividends paid per share | $ **0.51** | $ 0.50 | $ **1.02** | $ 1.00 |

See notes to consolidated condensed financial statements.

4

**Consolidated Condensed Statements of Comprehensive Income**
**(Unaudited)**
**ELI LILLY AND COMPANY AND SUBSIDIARIES**
**(Dollars in millions)**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2016 | | 2015 | |
| Net income | $ | **747.7** | $ | 600.8 | $ | **1,187.8** | $ | 1,130.3 |
| Other comprehensive income (loss), net of tax (Note 11) | | **(106.5)** | | 254.3 | | **209.5** | | (411.4) |
| Comprehensive income | $ | **641.2** | $ | 855.1 | $ | **1,397.3** | $ | 718.9 |

See notes to consolidated condensed financial statements.

5

**Consolidated Condensed Balance Sheets**
**ELI LILLY AND COMPANY AND SUBSIDIARIES**
(Dollars in millions)

| | June 30, 2016 | December 31, 2015 |
|---|---|---|
| **Assets** | (Unaudited) | |
| *Current Assets* | | |
| Cash and cash equivalents (Note 6) | $ 3,238.0 | $ 3,666.4 |
| Short-term investments (Note 6) | 696.8 | 785.4 |
| Accounts receivable, net of allowances of **$39.3 (2016)** and $44.3 (2015) | 3,947.9 | 3,513.0 |
| Other receivables | 545.2 | 558.6 |
| Inventories | 3,759.9 | 3,445.8 |
| Prepaid expenses and other | 789.5 | 604.4 |
| Total current assets | 12,977.3 | 12,573.6 |
| *Other Assets* | | |
| Investments (Note 6) | 4,449.2 | 3,646.6 |
| Goodwill | 4,026.5 | 4,039.9 |
| Other intangibles, net | 4,806.3 | 5,034.8 |
| Sundry | 2,149.9 | 2,220.5 |
| Total other assets | 15,431.9 | 14,941.8 |
| *Property and Equipment* | | |
| Land, buildings, equipment, and construction in progress | 16,927.6 | 16,660.9 |
| Accumulated depreciation | (8,861.5) | (8,607.4) |
| Property and equipment, net | 8,066.1 | 8,053.5 |
| Total assets | $ 36,475.3 | $ 35,568.9 |
| **Liabilities and Equity** | | |
| *Current Liabilities* | | |
| Short-term borrowings and current maturities of long-term debt | $ 645.8 | $ 6.1 |
| Accounts payable | 1,207.8 | 1,338.2 |
| Employee compensation | 622.5 | 967.0 |
| Sales rebates and discounts | 3,098.8 | 2,560.1 |
| Dividends payable | 537.5 | 539.0 |
| Income taxes payable | 88.0 | 358.9 |
| Other current liabilities | 2,200.6 | 2,460.3 |
| Total current liabilities | 8,401.0 | 8,229.6 |
| *Other Liabilities* | | |
| Long-term debt | 8,685.5 | 7,972.4 |
| Accrued retirement benefits (Note 9) | 2,020.4 | 2,160.3 |
| Long-term income taxes payable | 805.1 | 868.9 |
| Other noncurrent liabilities | 1,907.1 | 1,747.4 |
| Total other liabilities | 13,418.1 | 12,749.0 |
| *Commitments and Contingencies (Note 10)* | | |
| *Eli Lilly and Company Shareholders' Equity (Note 7)* | | |
| Common stock | 690.3 | 691.3 |
| Additional paid-in capital | 5,587.8 | 5,552.1 |
| Retained earnings | 15,824.1 | 16,011.8 |
| Employee benefit trust | (3,013.2) | (3,013.2) |
| Accumulated other comprehensive loss (Note 11) | (4,371.2) | (4,580.7) |
| Cost of common stock in treasury | (80.5) | (90.0) |
| Total Eli Lilly and Company shareholders' equity | 14,637.3 | 14,571.3 |
| Noncontrolling interests | 18.9 | 19.0 |
| Total equity | 14,656.2 | 14,590.3 |
| Total liabilities and equity | $ 36,475.3 | $ 35,568.9 |

See notes to consolidated condensed financial statements.

6

**Consolidated Condensed Statements of Cash Flows**
**(Unaudited)**
**ELI LILLY AND COMPANY AND SUBSIDIARIES**
(Dollars in millions)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2016 | 2015 |
| **Cash Flows from Operating Activities** | | |
| Net income | $ 1,187.8 | $ 1,130.3 |
| **Adjustments to Reconcile Net Income to Cash Flows from Operating Activities:** | | |
| Depreciation and amortization | 759.2 | 726.0 |
| Change in deferred income taxes | 168.6 | (666.5) |
| Stock-based compensation expense | 127.0 | 104.7 |
| Net payments for terminations of interest rate swaps | (3.4) | (186.1) |
| Acquired in-process research and development | — | 336.0 |
| Other changes in operating assets and liabilities, net of acquisitions and divestitures | (1,399.9) | (887.8) |
| Other non-cash operating activities, net | 235.6 | 307.2 |
| **Net Cash Provided by Operating Activities** | 1,074.9 | 863.8 |
| **Cash Flows from Investing Activities** | | |
| Net purchases of property and equipment | (399.7) | (412.5) |
| Proceeds from sales and maturities of short-term investments | 925.4 | 1,285.3 |
| Purchases of short-term investments | (265.3) | (588.5) |
| Proceeds from sales of noncurrent investments | 919.3 | 1,750.5 |
| Purchases of noncurrent investments | (2,269.2) | (1,832.8) |
| Restricted cash released for acquisition | — | 5,405.6 |
| Cash paid for acquisitions, net of cash acquired | (45.0) | (5,276.7) |
| Proceeds from sale of product rights | — | 410.0 |
| Purchase of in-process research and development | — | (336.0) |
| Other investing activities, net | (31.8) | (61.7) |
| **Net Cash Provided by (Used for) Investing Activities** | (1,166.3) | 343.2 |
| **Cash Flows from Financing Activities** | | |
| Dividends paid | (1,079.5) | (1,067.7) |
| Net change in short-term borrowings | (1.4) | (2,679.3) |
| Proceeds from issuance of long-term debt | 1,206.6 | 4,454.6 |
| Repayment of long-term debt | (0.1) | (1,949.2) |
| Purchases of common stock | (300.1) | (435.5) |
| Other financing activities, net | (62.5) | 32.7 |
| **Net Cash Used for Financing Activities** | (237.0) | (1,644.4) |
| Effect of exchange rate changes on cash and cash equivalents | (100.0) | (118.7) |
| | | |
| Net decrease in cash and cash equivalents | (428.4) | (556.1) |
| Cash and cash equivalents at January 1 | 3,666.4 | 3,871.6 |
| **Cash and Cash Equivalents at June 30** | $ 3,238.0 | $ 3,315.5 |

See notes to consolidated condensed financial statements.

7

**Notes to Consolidated Condensed Financial Statements**
**(Tables present dollars in millions, except per-share data)**

**Note 1: Basis of Presentation**

We have prepared the accompanying unaudited consolidated condensed financial statements in accordance with the requirements of Form 10-Q and, therefore, they do not include all information and footnotes necessary for a fair presentation of financial position, results of operations, and cash flows in conformity with accounting principles generally accepted in the United States (GAAP). In our opinion, the financial statements reflect all adjustments (including those that are normal and recurring) that are necessary for a fair presentation of the results of operations for the periods shown. In preparing financial statements in conformity with GAAP, we must make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosures at the date of the financial statements and during the reporting period. Actual results could differ from those estimates.

The information included in this Quarterly Report on Form 10-Q should be read in conjunction with our consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2015. We issued our financial statements by filing with the Securities and Exchange Commission and have evaluated subsequent events up to the time of the filing.

Certain reclassifications have been made to prior periods in the consolidated condensed financial statements and accompanying notes to conform with the current presentation.

All per-share amounts, unless otherwise noted in the footnotes, are presented on a diluted basis, that is, based on the weighted-average number of outstanding common shares plus the effect of incremental shares from our stock-based compensation programs.

**Note 2: Implementation of New Financial Accounting Pronouncements**

The following table provides a brief description of accounting standards that have not yet been adopted and could have a material effect on our financial statements:

| Standard | Description | Effective Date | Effect on the financial statements or other significant matters |
|---|---|---|---|
| Accounting Standards Update 2014-09, *Revenue from Contracts with Customers* | This standard will replace existing revenue recognition standards and will require entities to recognize revenues to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. An entity can apply the new revenue standard retrospectively to each prior reporting period presented or with the cumulative effect of initially applying the standard recognized at the date of initial application in retained earnings. | This standard is effective January 1, 2018, but we are permitted to adopt this standard one year earlier if we choose. We intend to adopt this standard on January 1, 2018. | We are in the process of evaluating the impact of the adoption of the standard, but do not yet have enough information to estimate the anticipated impact on our consolidated financial statements. |

8

| Standard | Description | Effective Date | Effect on the financial statements or other significant matters |
|---|---|---|---|
| Accounting Standards Update 2016-01, *Financial Instruments - Overall: Recognition and Measurement of Financial Assets and Financial Liabilities* | This standard will require entities to recognize changes in the fair value of equity investments with readily determinable fair values in net income (except for investments accounted for under the equity method of accounting or those that result in consolidation of the investee). An entity should apply the new standard through a cumulative effect adjustment to retained earnings as of the beginning of the fiscal year of adoption. | This standard is effective January 1, 2018. Early adoption of the majority of the amendments in this standard is not permitted, however, early application of certain amendments is permitted. We intend to fully adopt this standard on January 1, 2018. | We are unable to estimate the impact of adopting this standard as the significance of the impact will depend upon our equity investments as of the date of adoption. |
| Accounting Standards Update 2016-02, *Leases* | This standard was issued to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities, including leases classified as operating leases under current GAAP, on the balance sheet and requiring additional disclosures about leasing arrangements. This standard requires a modified retrospective approach to adoption. | This standard is effective January 1, 2019, with early adoption permitted. We intend to adopt this standard on January 1, 2019. | We are in the process of determining our approach to adopting the standard, as well as the anticipated impact on our consolidated financial statements. |
| Accounting Standards Update 2016-09, *Compensation - Stock Compensation: Improvements to Employee Share-Based Payment Accounting* | This standard will require entities to recognize all excess tax benefits and tax deficiencies in the statement of operations as a discrete item in the reporting period in which they occur. The standard also allows an employer to withhold up to the maximum statutory tax rate and still qualify for equity classification. Classification of excess tax benefits on the statement of cash flows should be classified as an operating activity, and employee taxes paid when an employer withholds shares for tax-withholding purposes should be classified as a financing activity. The provisions that affect the statement of operations will be effective prospectively in the year of adoption and the provisions that affect the statement of cash flows will be effective retrospectively. | This standard is effective January 1, 2017. Early adoption is permitted. We are evaluating our anticipated date of adoption. | We do not believe the impact of adopting this standard will have a material impact on our consolidated financial statements. We cannot predict the impact on our consolidated financial statements in future reporting periods following adoption as this will be dependent upon various factors including the number of shares issued and changes in the price of our stock between the grant date and settlement date. |

9

**Note 3: Acquisitions**

On January 1, 2015, we completed the acquisition of Novartis Animal Health (Novartis AH). Additionally, on October 1, 2015, Bristol-Myers Squibb Company and E.R. Squibb (collectively, BMS) transferred to us their commercialization rights with respect to Erbitux® in the United States (U.S.) and Canada (collectively, North America) through a modification of our existing arrangement. We also had an immaterial acquisition of a business in April 2016. These transactions were accounted for as business combinations under the acquisition method of accounting. See Note 4 for additional information related to the Erbitux arrangement. The assets acquired and liabilities assumed were recorded at their respective fair values as of the acquisition date in our consolidated financial statements. The determination of estimated fair value required management to make significant estimates and assumptions. The excess of the purchase price over the fair value of the acquired net assets, where applicable, has been recorded as goodwill. The results of operations of these acquisitions are included in our consolidated condensed financial statements from the dates of acquisition.

In addition to the acquisitions of businesses, we also acquired assets in development in the six months ended June 30, 2015, which are further discussed in this note below in Asset Acquisitions. Upon acquisition, the acquired in-process research and development (IPR&D) related to these products was immediately written off as an expense because the products had no alternative future use. For the six months ended June 30, 2016, we recorded no acquired IPR&D charges. There were acquired IPR&D charges of $80.0 million and $336.0 million for the three and six months ended June 30, 2015, respectively. The 2015 charges included the transactions discussed below in Asset Acquisitions and the upfront fee of $200.0 million related to tanezumab. See Note 4 for additional information related to the tanezumab arrangement.

**Acquisition of a Business**

*Novartis AH Acquisition*

*Overview of Transaction*

On January 1, 2015, we acquired from Novartis AG all of the shares of certain Novartis subsidiaries and the assets and liabilities of other Novartis subsidiaries that were exclusively related to the Novartis AH business in an all-cash transaction for a total purchase price of $5.28 billion, $5.41 billion of which was funded by cash held in escrow at December 31, 2014.

As a condition to the clearance of the transaction under the Hart-Scott-Rodino Antitrust Improvements Act, following the closing of the acquisition of Novartis AH, we divested certain animal health assets in the U.S. related to the Sentinel® canine parasiticide franchise to Virbac Corporation for approximately $410 million.

The acquired Novartis AH business consisted of the research and development, manufacture, marketing, sale and distribution of veterinary products to prevent and treat diseases in pets, farm animals, and farmed fish. Under the terms of the agreement, we acquired manufacturing sites, research and development facilities, a global commercial infrastructure and portfolio of products, a pipeline of projects in development, and employees.

*Assets Acquired and Liabilities Assumed*

The following table summarizes the amounts recognized for assets acquired and liabilities assumed as of the acquisition date:

| Estimated Fair Value at January 1, 2015 | | |
|---|---|---:|
| Inventories | $ | 380.2 |
| Acquired in-process research and development | | 298.0 |
| Marketed products [1] | | 1,953.0 |
| Property and equipment | | 199.9 |
| Assets held for sale (primarily the U.S. Sentinel rights) | | 422.7 |
| Accrued retirement benefits | | (108.7) |
| Deferred income taxes | | (60.1) |
| Other assets and liabilities - net | | (73.0) |
| Total identifiable net assets | | 3,012.0 |
| Goodwill [2] | | 2,271.1 |
| Total consideration transferred - net of cash acquired | $ | 5,283.1 |

[1] These intangible assets, which are being amortized to cost of sales on a straight-line basis over their estimated useful lives, were expected to have a weighted average useful life of 19 years.

[2] The goodwill recognized from this acquisition is attributable primarily to expected synergies from combining the operations of Novartis AH with our legacy animal health business, future unidentified projects and products, and the assembled workforce of Novartis AH. Approximately $1.0 billion of the goodwill associated with this acquisition will be deductible for tax purposes.

**Asset Acquisitions**

The following table summarizes our asset acquisitions during the six months ended June 30, 2015 which are discussed in detail below. There were no asset acquisitions during the six months ended June 30, 2016.

| Counterparty | Compound(s) or Therapy | Acquisition Month | Phase of Development [1] | Acquired IPR&D Expense | |
|---|---|---|---|---|---:|
| Innovent Biologics, Inc. (Innovent) | Monoclonal antibody targeting protein CD-20 Immuno-oncology molecules cMet monoclonal antibody | March 2015 | Pre-clinical [2] | $ | 56.0 |
| Hanmi Pharmaceutical Co., Ltd. (Hanmi) | BTK Inhibitor - HM71224 | April 2015 | Phase I | | 50.0 |
| BioNTech AG (BioNTech) | Cancer immunotherapies | May 2015 | Pre-clinical | | 30.0 |

[1] The phase of development presented is as of the date of the arrangement.

[2] Prior to acquisition, Innovent's monoclonal antibody targeting protein CD-20 had received investigational new drug approval in China to begin Phase I development.

In connection with the arrangements described herein, our partners may be entitled to future royalties based on sales should these products be approved for commercialization and/or milestones based on the successful progress of the compounds through the development process.

Our collaboration agreement with Innovent is to develop and commercialize a portfolio of cancer treatments. In China, we will be responsible for the commercialization efforts, while Innovent will lead the development and manufacturing efforts. Innovent also has co-promotion rights in China. We will be responsible for development, manufacturing, and commercialization efforts of Innovent's pre-clinical immuno-oncology molecules outside of China. Separate from the collaboration, we will continue the development of our cMet monoclonal antibody gene outside of China.

Our collaboration agreement with Hanmi is to develop and commercialize Hanmi's compound being investigated for the treatment of autoimmune and other diseases. We have rights to the molecule for all indications on a worldwide basis excluding Korea. We will be responsible for leading development, regulatory, manufacturing, and commercial efforts in our territories.

Our research collaboration with BioNTech is to discover novel cancer immunotherapies.

**Note 4: Collaborations and Other Arrangements**

We often enter into collaborative and other similar arrangements to develop and commercialize drug candidates. Collaborative activities may include research and development, marketing and selling (including promotional activities and physician detailing), manufacturing, and distribution. These arrangements often require milestone and royalty or profit-share payments, contingent upon the occurrence of certain future events linked to the success of the asset in development, as well as expense reimbursements or payments to the collaboration partner. Elements within a collaboration are separated into individual units of accounting if they have standalone value from other elements within the arrangement. In these situations, the arrangement consideration is allocated to the elements on a relative selling price basis. Revenues related to products we sell pursuant to these arrangements are included in net product revenues, while other sources of revenue (e.g., royalties and profit-sharing due from our partner) are included in collaboration and other revenue.

The following table summarizes our collaboration and other revenue, which is included in revenue in the consolidated condensed statements of operations:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | **2016** | **2015** | **2016** | **2015** |
| Collaboration and other revenue | $ **208.5** | $ 233.4 | $ **390.8** | $ 429.5 |

Operating expenses for costs incurred pursuant to these arrangements are reported in their respective expense line item, net of any payments due to or reimbursements due from our collaboration partners, with such reimbursements being recognized at the time the party becomes obligated to pay. Each collaboration is unique in nature, and our more significant arrangements are discussed below.

Boehringer Ingelheim Diabetes Collaboration

We and Boehringer Ingelheim have a global agreement to jointly develop and commercialize a portfolio of diabetes compounds. Currently, included in the collaboration are Boehringer Ingelheim's oral diabetes products: Trajenta®, Jentadueto®, Jardiance®, Glyxambi®, and Synjardy®, as well as our basal insulin: Basaglar®.

The table below summarizes significant regulatory and commercialization events and milestones (received) paid for the compounds included in this collaboration:

| Product Family | Product Status | | | Milestones (Deferred) Capitalized [1] | |
| | U.S. | Europe | Japan | Year | Amount |
|---|---|---|---|---|---|
| Trajenta [2] | Launched 2011 | Launched 2011 | Launched 2011 | 2016 | $ — |
| | | | | 2015 | — |
| | | | | Cumulative [5] | 446.4 |
| Jardiance [3] | Launched 2014 | Launched 2014 | Launched 2015 | 2016 | — |
| | | | | 2015 | — |
| | | | | Cumulative [5] | 299.5 |
| Basaglar | Approved [4] | Launched 2015 | Launched 2015 | 2016 | (187.5) |
| | | | | 2015 | — |
| | | | | Cumulative [5] | (250.0) |

[1] In connection with the regulatory approvals of Basaglar in Europe and Japan, milestone payments received were recorded as deferred revenue and are being amortized through the term of the collaboration (2029) to collaboration and other revenue. In connection with the regulatory approvals of Trajenta and Jardiance, milestone payments made were capitalized as intangible assets and are being amortized to cost of sales.

[2] Jentadueto is included in the Trajenta family of product results.

[3] Glyxambi and Synjardy are included in the Jardiance family of product results.

[4] In September 2015, we entered into a settlement agreement to resolve patent infringement litigation filed by Sanofi-Aventis U.S. LLC, which markets Lantus® (insulin glargine). As part of the settlement agreement, the parties agreed that Basaglar can be launched in the U.S. beginning on December 15, 2016. Basaglar received U.S. Food and Drug Administration (FDA) approval in December 2015. As a result of receiving FDA approval, we received a $187.5 million milestone payment from Boehringer Ingelheim in the first quarter of 2016, which was recorded as deferred revenue and, upon product launch, will be amortized through the term of the collaboration to collaboration and other revenue.

[5] The cumulative amount represents the total amounts as of the end of the reporting period that have been (deferred) or capitalized since the start of this collaboration.

In the most significant markets, we and Boehringer Ingelheim share equally the ongoing development costs, commercialization costs and agreed upon gross margin for any product resulting from the collaboration. We record our portion of the gross margin associated with Boehringer Ingelheim's compounds as collaboration and other revenue. We record our sales of Basaglar to third parties as net product revenues with the payments made to Boehringer Ingelheim for their portion of the gross margin recorded as cost of sales. For all compounds under this collaboration, we record our portion of the development and commercialization costs as research and development expense and marketing, selling, and administrative expense, respectively. Each company will also be entitled to potential performance payments on sales of the molecules it contributes to the collaboration. These performance payments result in the owner of the molecule retaining a greater share of the agreed upon gross margin of that product.

The following table summarizes our collaboration and other revenue recognized with respect to the Trajenta and Jardiance families of products:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2016 | 2015 | 2016 | 2015 |
|---|---|---|---|---|
| Trajenta | $ 121.0 | $ 80.0 | $ 215.4 | $ 162.4 |
| Jardiance | 40.1 | 11.1 | 78.3 | 30.3 |

Our revenue related to Basaglar was not significant for the three and six months ended June 30, 2016.

Erbitux

We have several collaborations with respect to Erbitux. The most significant collaborations are or, where applicable, were in Japan, and prior to the transfer of commercialization rights in the fourth quarter of 2015, the U.S. and Canada (Bristol-Myers Squibb Company); and worldwide except North America (Merck KGaA). Certain rights to Erbitux outside North America will remain with Merck KGaA (Merck) upon expiration of that agreement.

The following table summarizes our revenue recognized with respect to Erbitux:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2016 | 2015 |
| Net product revenues - BMS | $        — | $      11.0 | $        — | $      24.8 |
| Net product revenues - third party | 158.4 | — | 299.9 | — |
| Collaboration and other revenue | 22.2 | 123.6 | 48.7 | 198.0 |
| Revenue | $    180.6 | $    134.6 | $    348.6 | $    222.8 |

*Bristol-Myers Squibb Company*

Pursuant to commercial agreements with BMS, we had been co-developing Erbitux in North America with BMS exclusively. A separate agreement grants co-exclusive rights among Merck, BMS, and us in Japan and expires in 2032. On October 1, 2015, BMS transferred their commercialization rights to us with respect to Erbitux in North America pursuant to a modification of our existing arrangement, and we began selling Erbitux at that time. This modification did not affect our rights with respect to Erbitux in other jurisdictions. In connection with the modification of terms, we will provide consideration to BMS based upon a tiered percentage of net sales of Erbitux in North America estimated to average 38 percent through September 2018. The transfer of the commercialization rights was accounted for as an acquisition of a business.

The following table summarizes the amounts recognized for assets acquired and liabilities assumed as of the acquisition date:

| Estimated Fair Value at October 1, 2015 | |
| --- | --- |
| Marketed products [1] | $    602.1 |
| Deferred tax asset | 232.2 |
| Deferred tax liability | (228.2) |
| Other assets and liabilities - net | 57.2 |
| Total identifiable net assets | $    663.3 |
| Total consideration - contingent consideration liability [2] | $    (663.3) |

[1] These intangible assets are being amortized to cost of sales using the straight-line method through the co-development period in North America as set forth in the original agreement, which was scheduled to expire in September 2018.

[2] See Note 6 for discussion on the estimation of the contingent consideration liability.

Including the Erbitux business as if we had acquired it on January 1, 2015, our combined consolidated unaudited pro forma revenue and total Erbitux revenue would have been approximately $5.1 billion and $230 million, respectively, for the three months ended June 30, 2015, and $9.8 billion and $405 million, respectively, for the six months ended June 30, 2015. This unaudited pro forma financial information adjusts the historical consolidated revenue to give effect to pro forma events that are directly attributable to the acquisition. There would have been no material change to our historical consolidated net income. The unaudited pro forma financial information is not necessarily indicative of what our consolidated revenues would have been had we completed the acquisition on January 1, 2015. In addition, the unaudited pro forma financial information does not attempt to project the future results of operations of our combined company.

Until the effective date of the transfer of the business, the arrangements between us and BMS were as set forth in this paragraph. Erbitux research and development and other costs were shared by both companies according to a predetermined ratio. Responsibilities associated with clinical and other ongoing studies were apportioned between the parties under the agreements. Collaborative reimbursements due to us for supply of clinical trial materials; for research and development; and for a portion of marketing, selling, and administrative expenses were recorded as a reduction to the respective expense line items on the consolidated statement of operations. We received a distribution fee in the form of a royalty from BMS, based on a percentage of net sales in North America, which was

14

recorded in collaboration and other revenue. Royalties due to third parties were recorded as a reduction of collaboration and other revenue, net of any royalty reimbursements due from third parties. We were responsible for the manufacture and supply of all requirements of Erbitux in bulk-form active pharmaceutical ingredient (API) for clinical and commercial use in North America, and BMS purchased all of its requirements of API from us, subject to certain stipulations per the agreement. Sales of Erbitux API to BMS were reported in net product revenues.

*Merck KGaA*

A development and license agreement grants Merck exclusive rights to market Erbitux outside of North America until December 2018. A separate agreement grants co-exclusive rights among Merck, BMS, and us in Japan and expires in 2032. This agreement was amended in 2015 to grant Merck exclusive commercialization rights in Japan but did not result in any changes to our rights.

Merck manufactures Erbitux for supply in its territory as well as for Japan. We receive a royalty on the sales of Erbitux outside of North America, which is included in collaboration and other revenue as earned. Royalties due to third parties are recorded as a reduction of collaboration and other revenue, net of any royalty reimbursements due from third parties.

Effient®

We are in a collaborative arrangement with Daiichi Sankyo Co., Ltd. (Daiichi Sankyo) to develop, market, and promote Effient. Marketing rights for major territories are shown below. We and Daiichi Sankyo each have exclusive marketing rights in certain other territories.

| Territory | Marketing Rights | Selling Party |
|---|---|---|
| U.S. | Co-promotion | Lilly |
| Major European markets | Co-promotion | Pre-January 1, 2016, Lilly<br>Post-January 1, 2016, Daiichi Sankyo |
| Japan | Exclusive | Daiichi Sankyo |

Beginning January 1, 2016, while major European markets continue to be a co-promotion territory under the terms of our arrangement, Daiichi Sankyo exclusively promotes Effient in these markets. The economic results for the major European markets continue to be shared in the same proportion as they were previously.

The parties share approximately 50/50 in the profits, as well as in the costs of development and marketing in the co-promotion territories. A third party manufactures bulk product, and we continue to produce the finished product for our exclusive and co-promotion territories, including the major European markets.

We record net product revenue in our exclusive and co-promotion territories where we are the selling party. Profit-share payments due to Daiichi Sankyo for co-promotion countries where we are the selling party are recorded as marketing, selling, and administrative expenses. Beginning January 1, 2016, any profit-share payments due to us from Daiichi Sankyo for the major European markets are recorded as collaboration and other revenue. We also record our share of the expenses in these co-promotion territories as marketing, selling, and administrative expenses. In our exclusive territories, we pay Daiichi Sankyo a royalty specific to these territories. All royalties due to Daiichi Sankyo and the third-party manufacturer are recorded in cost of sales.

The following table summarizes our revenue recognized with respect to Effient:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Revenue | $ 135.1 | $ 128.8 | $ 266.6 | $ 250.6 |

Baricitinib

We have a worldwide license and collaboration agreement with Incyte Corporation (Incyte) which provides us the development and commercialization rights to its Janus tyrosine kinase inhibitor compound, now known as baricitinib, and certain follow-on compounds, for the treatment of inflammatory and autoimmune diseases. Incyte has the right to receive tiered, double-digit royalty payments on future global sales with rates ranging up to 20 percent if the product is successfully commercialized. The agreement provides Incyte with options to co-develop these compounds on an indication-by-indication basis by funding 30 percent of the associated development costs from the initiation of a Phase IIb trial through regulatory approval in exchange for increased tiered royalties ranging

15

up to percentages in the high twenties. In 2010, Incyte exercised its option to co-develop baricitinib in rheumatoid arthritis. The agreement calls for payments associated with certain development, success-based regulatory, and sales-based milestones. In the first quarter of 2016, we incurred milestone-related expenses of $55.0 million in connection with regulatory submissions in the U.S. and Europe which were recorded as research and development expense. As of June 30, 2016, Incyte is eligible to receive up to $360.0 million of additional payments from us contingent upon certain development and success-based regulatory milestones, of which $180.0 million relates to regulatory decisions for a first indication. Incyte is also eligible to receive up to $150.0 million of potential sales-based milestones.

Solanezumab

We have an agreement with an affiliate of TPG-Axon Capital (TPG) whereby TPG funded a portion of the Phase III development of solanezumab. Under the agreement, TPG's obligation to fund solanezumab costs ended in 2011. In exchange for its funding, TPG is eligible to receive success-based sales milestones totaling approximately $70 million and mid-single digit royalties contingent upon the successful development of solanezumab. The royalties would be paid for approximately 10 years after launch of a product.

Tanezumab

In October 2013, we entered into a collaboration agreement with Pfizer Inc. (Pfizer) to jointly develop and globally commercialize tanezumab for the treatment of osteoarthritis pain, chronic low back pain and cancer pain. Under the agreement, the companies share equally the ongoing development costs and, if successful, in gross margins and certain commercialization expenses. Following the FDA's decision in March 2015 to lift the partial clinical hold on tanezumab, certain Phase III trials resumed in July 2015. Upon the FDA's lifting of the partial clinical hold and the decision to continue the collaboration with Pfizer, we paid an upfront fee of $200.0 million, which was expensed as acquired IPR&D in the first quarter of 2015. In addition to this fee, Pfizer is eligible to receive up to $350.0 million in success-based regulatory milestones and up to $1.23 billion in a series of sales-based milestones, contingent upon the commercial success of tanezumab.

BACE Inhibitor

In September 2014, we entered into a collaboration agreement with AstraZeneca UK Limited (AstraZeneca) for the worldwide co-development and co-commercialization of AstraZeneca's AZD3293, an oral beta-secretase cleaving enzyme (BACE) inhibitor being investigated for the potential treatment of Alzheimer's disease. We are responsible for leading development efforts, while AstraZeneca will be responsible for manufacturing efforts. If successful, both parties will take joint responsibility for commercialization. Under the agreement, both parties share equally in the ongoing development costs and, if successful, in gross margins and certain other costs associated with commercialization of the molecule. As a result of the molecule moving into Phase III testing in April 2016, we incurred a $100.0 million developmental milestone, which was recorded as research and development expense in the second quarter of 2016. AstraZeneca is eligible to receive up to an additional $350.0 million contingent upon the achievement of certain development and success-based regulatory milestones.

Summary of Commission and Profit-Share Payments

The following table summarizes our aggregate amount of marketing, selling, and administrative expense associated with our commission and profit-sharing obligations for the collaborations and other arrangements described above:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2016 | 2015 |
| Marketing, selling, and administrative | $ 47.3 | $ 53.5 | $ 96.3 | $ 102.8 |

**Note 5: Asset Impairment, Restructuring, and Other Special Charges**

The components of the charges included in asset impairment, restructuring, and other special charges in our consolidated condensed statements of operations are described below.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Severance: | | | | |
| Human pharmaceutical | $        — | $       8.2 | $        — | $      16.9 |
| Animal health | 19.2 | 13.9 | 28.7 | 36.3 |
| Total severance | 19.2 | 22.1 | 28.7 | 53.2 |
| Asset impairment and other special charges: | | | | |
| Human pharmaceutical | — | 17.2 | — | 17.2 |
| Animal health | 38.8 | 33.1 | 160.7 | 110.0 |
| Total asset impairment and other special charges | 38.8 | 50.3 | 160.7 | 127.2 |
| Total asset impairment, restructuring, and other special charges | $      58.0 | $      72.4 | $     189.4 | $     180.4 |

Severance costs recognized during the three months ended June 30, 2016 related primarily to the integration of Novartis AH. Severance costs recognized during the six months ended June 30, 2016 related primarily to the integration of Novartis AH, as well as our decision to close an animal health manufacturing plant in Ireland. Severance costs recognized during the three and six months ended June 30, 2015 related primarily to the acquisition of Novartis AH, as well as severance costs for actions taken to reduce our cost structure.

Asset impairment and other special charges recognized during the three months ended June 30, 2016 related primarily to integration costs related to our acquisition of Novartis AH. Asset impairment and other special charges recognized during the six months ended June 30, 2016 resulted primarily from $87.2 million of asset impairment and other charges related to our decision to close an animal health manufacturing plant in Ireland. The manufacturing plant was written down to its estimated fair value, which was based primarily on recent sales of similar assets. The remaining asset impairment and other special charges recognized during the six months ended June 30, 2016 consisted of integration costs related to our acquisition of Novartis AH. Asset impairment and other special charges recognized during the three and six months ended June 30, 2015 related primarily to integration costs and intangible asset impairments due to product rationalization resulting from our acquisition of Novartis AH.

**Note 6: Financial Instruments**

Financial instruments that potentially subject us to credit risk consist principally of trade receivables and interest-bearing investments. Wholesale distributors of life-science products account for a substantial portion of our trade receivables; collateral is generally not required. The risk associated with this concentration is mitigated by our ongoing credit-review procedures and insurance. A large portion of our cash is held by a few major financial institutions. We monitor our exposures with these institutions and do not expect any of these institutions to fail to meet their obligations. Major financial institutions represent the largest component of our investments in corporate debt securities. In accordance with documented corporate risk-management policies, we monitor the amount of credit exposure to any one financial institution or corporate issuer. We are exposed to credit-related losses in the event of nonperformance by counterparties to risk-management instruments but do not expect any counterparties to fail to meet their obligations given their high credit ratings.

Our derivative activities are initiated within the guidelines of documented corporate risk-management policies and offset losses and gains on the assets, liabilities, and transactions being hedged. Management reviews the correlation and effectiveness of our derivatives on a quarterly basis.

For derivative instruments that are designated and qualify as fair value hedges, the derivative instrument is marked to market with gains and losses recognized currently in income to offset the respective losses and gains recognized on the underlying exposure. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of gains and losses is reported as a component of accumulated other comprehensive loss and reclassified into earnings in the same period the hedged transaction affects earnings. For derivative and non-derivative instruments that are designated and qualify as net investment hedges, the effective portion of foreign currency translation gains or losses due to spot rate fluctuations are reported as a component of accumulated other comprehensive loss. Hedge ineffectiveness is immediately recognized in earnings. Derivative contracts that are not

designated as hedging instruments are recorded at fair value with the gain or loss recognized in current earnings during the period of change.

We may enter into foreign currency forward or option contracts to reduce the effect of fluctuating currency exchange rates (principally the euro, the British pound, Japanese yen, and the Swiss franc). Foreign currency derivatives used for hedging are put in place using the same or like currencies and duration as the underlying exposures. Forward and option contracts are principally used to manage exposures arising from subsidiary trade and loan payables and receivables denominated in foreign currencies. These contracts are recorded at fair value with the gain or loss recognized in other–net, (income) expense. We may enter into foreign currency forward and option contracts and currency swaps as fair value hedges of firm commitments. Forward contracts generally have maturities not exceeding 12 months. At June 30, 2016, we had outstanding foreign currency forward commitments to purchase 707.0 million U.S. dollars and sell 633.8 million euro, commitments to purchase 1.61 billion euro and sell 1.82 billion U.S. dollars, commitments to purchase 686.0 million U.S. dollars and sell 72.07 billion Japanese yen, commitments to purchase 246.4 million British pounds and sell 309.9 million euro, commitments to purchase 270.9 million U.S. dollars and sell 191.5 million British pounds, and commitments to purchase 228.6 million Swiss francs and sell 236.2 million U.S. dollars, which will all settle within 30 days.

Foreign currency exchange risk is also managed through the use of foreign currency debt and cross-currency interest rate swaps. Our foreign currency-denominated notes, which had carrying amounts of $3.52 billion and $2.27 billion as of June 30, 2016 and December 31, 2015, respectively, have been designated as, and are effective as, economic hedges of net investments in certain of our euro-denominated and Swiss franc-denominated operations. Our cross-currency interest rate swaps that convert a portion of our U.S. dollar-denominated floating rate debt to euro-denominated floating rate debt have also been designated as, and are effective as, economic hedges of net investments in certain of our euro-denominated foreign operations.

In the normal course of business, our operations are exposed to fluctuations in interest rates which can vary the costs of financing, investing, and operating. We address a portion of these risks through a controlled program of risk management that includes the use of derivative financial instruments. The objective of controlling these risks is to limit the impact of fluctuations in interest rates on earnings. Our primary interest-rate risk exposure results from changes in short-term U.S. dollar interest rates. In an effort to manage interest-rate exposures, we strive to achieve an acceptable balance between fixed- and floating-rate debt and investment positions and may enter into interest rate swaps or collars to help maintain that balance.

Interest rate swaps or collars that convert our fixed-rate debt to a floating rate are designated as fair value hedges of the underlying instruments. Interest rate swaps or collars that convert floating-rate debt to a fixed rate are designated as cash flow hedges. Interest expense on the debt is adjusted to include the payments made or received under the swap agreements. Cash proceeds from or payments to counterparties resulting from the termination of interest rate swaps are classified as operating activities in our consolidated condensed statement of cash flows. At June 30, 2016, substantially all of our total long-term debt is at a fixed rate. We have converted approximately 30 percent of our long-term fixed-rate notes to floating rates through the use of interest rate swaps.

We may enter into forward contracts and designate them as cash flow hedges to limit the potential volatility of earnings and cash flow associated with forecasted sales of available-for-sale securities.

In March 2015, we issued $600.0 million of 1.25 percent fixed-rate notes due March 1, 2018, $800.0 million of 2.75 percent fixed-rate notes due June 1, 2025, and $800.0 million of 3.70 percent fixed-rate notes due March 1, 2045, with interest to be paid semi-annually. The proceeds from the issuance of the notes were used primarily to repay outstanding commercial paper issued in connection with our January 2015 acquisition of Novartis AH.

In June 2015, we issued euro-denominated notes consisting of €600.0 million of 1.00 percent fixed-rate notes due June 2, 2022, €750.0 million of 1.63 percent fixed-rate notes due June 2, 2026, and €750.0 million of 2.13 percent fixed-rate notes due June 3, 2030, with interest to be paid annually. The net cash proceeds of the offering of $2.27 billion were used primarily to purchase and redeem certain higher interest rate U.S. dollar-denominated notes and to repay outstanding commercial paper. We paid $1.95 billion to purchase and redeem notes with an aggregate principal amount of $1.65 billion and a net carrying value of $1.78 billion in June 2015, resulting in a pretax debt extinguishment loss of $166.7 million, which was included in other–net, (income) expense in our consolidated condensed statement of operations during the three and six months ended June 30, 2015.

In May 2016, we issued Swiss franc-denominated notes consisting of Fr.200.0 million of 0.00 percent fixed-rate notes due May 24, 2018, Fr.600.0 million of 0.15 percent fixed-rate notes due May 24, 2024, and Fr.400.0 million of 0.45 percent fixed-rate notes due May 24, 2028, with interest to be paid annually. We plan to use the net cash proceeds of the offering of $1.21 billion for general corporate purposes, including the repayment or redemption prior to maturity of certain of our U.S. dollar denominated fixed-rate notes due March 2017.

18

We may enter into forward-starting interest rate swaps, which we designate as cash flow hedges, as part of any anticipated future debt issuances in order to reduce the risk of cash flow volatility from future changes in interest rates. Upon completion of a debt issuance and termination of the swap, the change in fair value of these instruments is recorded as part of other comprehensive income (loss) and is amortized to interest expense over the life of the underlying debt.

Upon issuance of our underlying U.S. dollar-denominated fixed-rate notes in March 2015, we terminated forward-starting interest rate contracts in designated cash flow hedging instruments with an aggregate notional amount of $1.35 billion and paid $206.3 million in cash to the counterparties for settlement. The settlement amount represented the fair value of the forward-starting interest rate contracts at the time of termination and was recorded in other comprehensive loss.

In connection with the June 2015 note purchase and redemption discussed above, we terminated certain interest rate swaps designated as fair value hedges with an aggregate notional amount of $876.0 million. As a result of the termination, we received cash of $20.2 million, which represented the fair value of the interest rate swaps at the time of termination. The related fair value adjustment was recorded as an increase to the carrying value of the underlying notes and was included as a component of the debt extinguishment loss.

*The Effect of Risk-Management Instruments on the Consolidated Condensed Statement of Operations*

The following effects of risk-management instruments were recognized in other–net, (income) expense:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Fair value hedges: | | | | |
| Effect from hedged fixed-rate debt | $ 35.8 | $ (99.2) | $ 111.1 | $ (40.3) |
| Effect from interest rate contracts | (35.8) | 99.2 | (111.1) | 40.3 |
| Cash flow hedges: | | | | |
| Effective portion of losses on interest rate contracts reclassified from accumulated other comprehensive loss | 3.7 | 3.6 | 7.4 | 6.3 |
| Net (gains) losses on foreign currency exchange contracts not designated as hedging instruments | 90.9 | (1.2) | 104.2 | 22.1 |

*The Effect of Risk-Management Instruments on Other Comprehensive Income (Loss)*

The effective portion of risk-management instruments that was recognized in other comprehensive income (loss) is as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Net investment hedges: | | | | |
| Foreign currency-denominated notes | $ 34.8 | $ (33.8) | $ (43.0) | $ (33.8) |
| Cross-currency interest rate swaps | 7.5 | — | 6.3 | — |
| Foreign currency exchange contracts | 31.9 | — | 31.9 | — |
| Cash flow hedges: | | | | |
| Forward-starting interest rate swaps | (3.4) | — | (3.4) | (56.7) |

During the next 12 months, we expect to reclassify from accumulated other comprehensive loss to earnings $15.2 million of pretax net losses on cash flow hedges of the variability in expected future interest payments on our floating rate debt.

During the six months ended June 30, 2016 and 2015, net losses related to ineffectiveness, as well as net losses related to the portion of our risk-management hedging instruments, fair value hedges, and cash flow hedges that were excluded from the assessment of effectiveness, were not material.

*Fair Value of Financial Instruments*

The following tables summarize certain fair value information at June 30, 2016 and December 31, 2015 for assets and liabilities measured at fair value on a recurring basis, as well as the carrying amount and amortized cost of certain other investments:

| | Carrying Amount | Cost [1] | Fair Value Measurements Using | | | Fair Value |
| | | | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | |
|---|---|---|---|---|---|---|
| **June 30, 2016** | | | | | | |
| Cash equivalents | $ 1,615.3 | $ 1,615.3 | $ 1,612.3 | $ 3.0 | $ — | $ 1,615.3 |
| | | | | | | |
| Short-term investments: | | | | | | |
| U.S. government and agency securities | $ 66.3 | $ 66.3 | $ 66.3 | $ — | $ — | $ 66.3 |
| Corporate debt securities | 624.4 | 623.7 | — | 624.4 | — | 624.4 |
| Asset-backed securities | 3.4 | 3.4 | — | 3.4 | — | 3.4 |
| Other securities | 2.7 | 2.7 | — | 2.7 | — | 2.7 |
| Short-term investments | $ 696.8 | | | | | |
| | | | | | | |
| Noncurrent investments: | | | | | | |
| U.S. government and agency securities | $ 465.6 | $ 461.3 | $ 465.6 | $ — | $ — | $ 465.6 |
| Corporate debt securities | 2,545.7 | 2,529.6 | — | 2,545.7 | — | 2,545.7 |
| Mortgage-backed securities | 197.2 | 194.8 | — | 197.2 | — | 197.2 |
| Asset-backed securities | 455.5 | 454.4 | — | 455.5 | — | 455.5 |
| Other securities | 155.7 | 105.5 | 12.5 | 7.1 | 136.1 | 155.7 |
| Marketable equity securities | 95.9 | 64.0 | 95.9 | — | | 95.9 |
| Cost and equity method investments [2] | 533.6 | | | | | |
| Noncurrent investments | $ 4,449.2 | | | | | |
| | | | | | | |
| **December 31, 2015** | | | | | | |
| Cash equivalents | $ 1,644.4 | $ 1,644.4 | $ 1,637.0 | $ 7.4 | $ — | $ 1,644.4 |
| | | | | | | |
| Short-term investments: | | | | | | |
| U.S. government and agency securities | $ 153.2 | $ 153.4 | $ 153.2 | $ — | $ — | $ 153.2 |
| Corporate debt securities | 625.8 | 626.9 | — | 625.8 | — | 625.8 |
| Asset-backed securities | 3.3 | 3.3 | — | 3.3 | — | 3.3 |
| Other securities | 3.1 | 3.1 | — | 3.1 | — | 3.1 |
| Short-term investments | $ 785.4 | | | | | |
| | | | | | | |
| Noncurrent investments: | | | | | | |
| U.S. government and agency securities | $ 284.5 | $ 286.0 | $ 283.5 | $ 1.0 | $ — | $ 284.5 |
| Corporate debt securities | 1,962.6 | 1,995.8 | — | 1,962.6 | — | 1,962.6 |
| Mortgage-backed securities | 153.3 | 154.7 | — | 153.3 | — | 153.3 |
| Asset-backed securities | 441.9 | 443.1 | — | 441.9 | — | 441.9 |
| Other securities | 137.1 | 97.3 | — | 4.1 | 133.0 | 137.1 |
| Marketable equity securities | 128.9 | 74.8 | 128.9 | — | — | 128.9 |
| Cost and equity method investments [2] | 538.3 | | | | | |
| Noncurrent investments | $ 3,646.6 | | | | | |

[1] For available-for-sale debt securities, amounts disclosed represent the securities' amortized cost.

[2] Fair value disclosures are not applicable for cost method and equity method investments.

| | | Fair Value Measurements Using | | | |
| | Carrying Amount | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Fair Value |
|---|---|---|---|---|---|
| **Long-term debt, including current portion** | | | | | |
| June 30, 2016 | $ (9,331.3) | $ — | $ (9,926.9) | $ — | $ (9,926.9) |
| December 31, 2015 | (7,978.5) | — | (8,172.0) | — | (8,172.0) |

| | | Fair Value Measurements Using | | | |
| | Carrying Amount | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Fair Value |
|---|---|---|---|---|---|
| **June 30, 2016** | | | | | |
| Risk-management instruments: | | | | | |
| Interest rate contracts designated as fair value hedges: | | | | | |
| Other receivables | $ 9.9 | $ — | $ 9.9 | $ — | $ 9.9 |
| Sundry | 170.9 | — | 170.9 | — | 170.9 |
| Cross-currency interest rate contracts designated as net investment hedges: | | | | | |
| Sundry | 5.9 | — | 5.9 | — | 5.9 |
| Foreign exchange contracts not designated as hedging instruments: | | | | | |
| Other receivables | 20.3 | — | 20.3 | — | 20.3 |
| Other current liabilities | (72.4) | — | (72.4) | — | (72.4) |
| Contingent consideration liabilities [1] | | | | | |
| Other current liabilities | (246.6) | — | — | (246.6) | (246.6) |
| Other noncurrent liabilities | (358.4) | — | — | (358.4) | (358.4) |
| | | | | | |
| **December 31, 2015** | | | | | |
| Risk-management instruments: | | | | | |
| Interest rate contracts designated as fair value hedges: | | | | | |
| Sundry | $ 70.1 | $ — | $ 70.1 | $ — | $ 70.1 |
| Other noncurrent liabilities | (0.4) | — | (0.4) | — | (0.4) |
| Foreign exchange contracts not designated as hedging instruments: | | | | | |
| Other receivables | 13.1 | — | 13.1 | — | 13.1 |
| Other current liabilities | (17.3) | — | (17.3) | — | (17.3) |
| Contingent consideration liabilities [1] | | | | | |
| Other current liabilities | (243.7) | — | — | (243.7) | (243.7) |
| Other noncurrent liabilities | (427.2) | — | — | (427.2) | (427.2) |

[1] Contingent consideration liabilities primarily relate to the Erbitux arrangement with BMS discussed in Note 4.

Risk-management instruments above are disclosed on a gross basis. There are various rights of setoff associated with certain of the risk-management instruments above that are subject to an enforceable master netting arrangement or similar agreements. Although various rights of setoff and master netting arrangements or similar agreements may exist with the individual counterparties to the risk-management instruments above, individually, these financial rights are not material.

We determine our Level 1 and Level 2 fair value measurements based on a market approach using quoted market values, significant other observable inputs for identical or comparable assets or liabilities, or discounted cash flow analyses. Level 3 fair value measurements for other investment securities are determined using unobservable inputs, including the investments' cost adjusted for impairments and price changes from orderly transactions. The fair value of cost and equity method investments is not readily available.

Contingent consideration liabilities primarily include contingent consideration related to Erbitux for which the fair value was estimated using a discounted cash flow analysis and Level 3 inputs, including projections representative of a market participant view for net sales in North America through September 2018 and an estimated discount rate. The amount to be paid is calculated as a tiered percentage of net sales (see Note 4) and will, therefore, vary directly with increases and decreases in net sales of Erbitux in North America. There is no cap on the amount that may be paid pursuant to this arrangement. The decrease in the fair value of the contingent consideration liabilities during the six months ended June 30, 2016 was due primarily to cash payments of $111.6 million related to Erbitux. The change in the fair value of the contingent consideration liabilities recognized in earnings during the three and six months ended June 30, 2016 was not material.

The table below summarizes the contractual maturities of our investments in debt securities measured at fair value as of June 30, 2016:

| | | | Maturities by Period | | |
| | Total | Less Than 1 Year | 2-5 Years | 6-10 Years | More Than 10 Years |
|---|---|---|---|---|---|
| Fair value of debt securities | $ 4,367.9 | $ 696.8 | $ 3,134.8 | $ 261.7 | $ 274.6 |

A summary of the fair value of available-for-sale securities in an unrealized gain or loss position and the amount of unrealized gains and losses (pretax) in accumulated other comprehensive loss follows:

| | June 30, 2016 | December 31, 2015 |
|---|---|---|
| Unrealized gross gains | $ 79.8 | $ 68.0 |
| Unrealized gross losses | 23.2 | 52.5 |
| Fair value of securities in an unrealized gain position | 3,550.8 | 764.5 |
| Fair value of securities in an unrealized loss position | 769.9 | 2,933.4 |

We periodically assess our investment securities for other-than-temporary impairment losses. Other-than-temporary impairment losses recognized during the three and six months ended June 30, 2016 totaled $15.9 million and $41.6 million, respectively. Impairment losses recognized during the three months ended June 30, 2016 related primarily to our marketable equity securities, while impairment losses recognized during the six months ended June 30, 2016 related primarily to our cost and equity method investments. Other-than-temporary impairment losses recognized during the three and six months ended June 30, 2015 totaled $6.2 million and $9.8 million, respectively.

For fixed-income securities, the amount of credit losses are determined by comparing the difference between the present value of future cash flows expected to be collected on these securities and the amortized cost. Factors considered in assessing credit losses include the position in the capital structure, vintage and amount of collateral, delinquency rates, current credit support, and geographic concentration.

For equity securities, factors considered in assessing other-than-temporary impairment losses include the length of time and the extent to which the fair value has been less than cost, the financial condition and near term prospects of the issuer, our intent and ability to retain the securities for a period of time sufficient to allow for recovery in fair value, and general market conditions and industry specific factors.

As of June 30, 2016, the securities in an unrealized loss position include primarily our marketable equity securities as well as fixed-rate debt securities of varying maturities. Marketable equity securities are sensitive to market price adjustments for general market conditions and industry or sector specific factors, and fixed-rate debt securities are sensitive to changes in the yield curve and other market conditions. Approximately 70 percent of the fixed-rate debt securities in a loss position are investment-grade debt securities. As of June 30, 2016, we do not intend to sell, and it is not more likely than not that we will be required to sell the securities in a loss position before the market values recover or the underlying cash flows have been received, and there is no indication of default on interest or principal payments for any of our debt securities.

Activity related to our investment portfolio, substantially all of which related to available-for-sale securities, was as follows:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2016 | | 2015 | | 2016 | | 2015 |
| Proceeds from sales | $ | 850.7 | $ | 1,900.1 | $ | 1,577.1 | $ | 2,869.9 |
| Realized gross gains on sales | | 3.4 | | 47.8 | | 5.2 | | 102.3 |
| Realized gross losses on sales | | 3.1 | | 1.7 | | 10.4 | | 2.4 |

Realized gains and losses on sales of investments are computed based upon specific identification of the initial cost adjusted for any other-than-temporary declines in fair value that were recorded in earnings.

*Accounts Receivable Factoring Arrangements*

We have entered into accounts receivable factoring agreements with financial institutions to sell certain of our non-U.S. accounts receivable. These transactions are accounted for as sales and result in a reduction in accounts receivable because the agreements transfer effective control over and risk related to the receivables to the buyers. Our factoring agreements do not allow for recourse in the event of uncollectibility, and we do not retain interest in the underlying accounts receivable once sold. We derecognized $731.9 million and $670.6 million of accounts receivable as of June 30, 2016 and December 31, 2015, respectively, under these factoring arrangements. The cost of factoring such accounts receivable on our consolidated results of operations for the six months ended June 30, 2016 and 2015 was not material.

**Note 7: Shareholders' Equity**

During the six months ended June 30, 2016 and 2015, we repurchased $300.1 million and $435.5 million of shares, respectively, associated with our $5.00 billion share repurchase program announced in October 2013. As of June 30, 2016, there were $2.65 billion of shares remaining in that program.

**Note 8: Income Taxes**

The U.S. examination of tax years 2010-2012 commenced during the fourth quarter of 2013. In December 2015, we executed a closing agreement with the Internal Revenue Service which effectively settled certain matters for tax years 2010-2012. Accordingly, we reduced our gross uncertain tax positions by approximately $320 million in 2015. During the first quarter of 2016, we effectively settled the remaining matters related to tax years 2010-2012. As a result of this resolution, our gross uncertain tax positions were further reduced by approximately $140 million, and our consolidated results of operations benefited from an immaterial reduction in income tax expense. During the six months ended June 30, 2016, we made cash payments of approximately $150 million related to tax years 2010-2012 after application of available tax credit carryforwards and carrybacks. We anticipate additional cash payments of approximately $10 million in 2016 related to the settlement. The U.S. examination of tax years 2013-2014 commenced during the first quarter of 2016; we expect the U.S. examination of 2015 to begin in the third quarter of 2016.

**Note 9: Retirement Benefits**

Net pension and retiree health benefit (income) cost included the following components:

| | Defined Benefit Pension Plans | | | |
| --- | --- | --- | --- | --- |
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2016 | 2015 | 2016 | 2015 |
| Components of net periodic benefit cost: | | | | |
| Service cost | $ 70.6 | $ 85.5 | $ 142.0 | $ 162.5 |
| Interest cost | 105.1 | 117.2 | 210.2 | 234.3 |
| Expected return on plan assets | (189.6) | (192.2) | (379.1) | (384.0) |
| Amortization of prior service (benefit) cost | (0.2) | 2.6 | 5.7 | 5.1 |
| Recognized actuarial loss | 74.0 | 90.9 | 142.4 | 183.3 |
| Net periodic benefit cost | $ 59.9 | $ 104.0 | $ 121.2 | $ 201.2 |

| | Retiree Health Benefit Plans | | | |
| --- | --- | --- | --- | --- |
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2016 | 2015 | 2016 | 2015 |
| Components of net periodic benefit income: | | | | |
| Service cost | $ 10.3 | $ 11.2 | $ 19.6 | $ 21.0 |
| Interest cost | 13.2 | 15.3 | 26.0 | 30.7 |
| Expected return on plan assets | (37.6) | (37.1) | (75.1) | (74.2) |
| Amortization of prior service benefit | (21.5) | (21.6) | (42.8) | (43.2) |
| Recognized actuarial loss | 5.2 | 9.5 | 10.3 | 18.9 |
| Net periodic benefit income | $ (30.4) | $ (22.7) | $ (62.0) | $ (46.8) |

We have contributed approximately $25 million required to satisfy minimum funding requirements to our defined benefit pension and retiree health benefit plans during the six months ended June 30, 2016. Additional discretionary funding in the aggregate was not material during the six months ended June 30, 2016. During the remainder of 2016, we expect to make contributions to our defined benefit pension and retiree health benefit plans of approximately $25 million to satisfy minimum funding requirements. Additional discretionary funding for the remainder of 2016 is not expected to be material.

**Note 10: Contingencies**

We are a party to various legal actions and government investigations. The most significant of these are described below. It is not possible to determine the outcome of these matters, and we cannot reasonably estimate the maximum potential exposure or the range of possible loss in excess of amounts accrued for any of these matters; however, we believe that, except as noted below with respect to the Alimta® patent litigation and administrative proceedings, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity, but could possibly be material to our consolidated results of operations in any one accounting period.

**Alimta Patent Litigation and Administrative Proceedings**

A number of generic manufacturers are seeking approvals in various countries to market generic forms of Alimta prior to the expiration of our vitamin regimen patents, alleging that those patents are invalid, not infringed, or both. We believe our Alimta vitamin regimen patents are valid and enforceable against these generic manufacturers. However, it is not possible to determine the ultimate outcome of the proceedings, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our future consolidated results of operations, liquidity, and financial position. We expect that a loss of exclusivity for Alimta would result in a rapid and severe decline in future revenues for the product in the relevant market.

24

<u>U.S. Patent Litigation and Administrative Proceedings</u>

We are engaged in various U.S. patent litigation matters involving Alimta brought pursuant to procedures set out in the Drug Price Competition and Patent Term Restoration Act of 1984 (the Hatch-Waxman Act). More than 10 Abbreviated New Drug Applications (ANDAs) seeking approval to market generic versions of Alimta prior to the expiration of our vitamin regimen patent (expiring in 2021 plus pediatric exclusivity expiring in 2022) have been filed by a number of companies, including Teva Parenteral Medicines, Inc. (Teva) and APP Pharmaceuticals, LLC (APP). These companies have also alleged the patent is invalid.

In October 2010, we filed a lawsuit in the U.S. District Court for the Southern District of Indiana against Teva, APP and two other defendants seeking rulings that the U.S. vitamin regimen patent is valid and infringed (the Teva/APP litigation). A trial occurred in August 2013; the sole issue before the district court at that time was to determine patent validity. In March 2014, the court ruled that the asserted claims of the vitamin regimen patent are valid. The U.S. District Court for the Southern District of Indiana held a hearing on the issue of infringement in May 2015. In September 2015, the district court ruled that the vitamin regimen patent would be infringed by the generic challengers' proposed products. Teva and APP appealed all of the district court's substantive decisions. The U.S. Court of Appeals for the Federal Circuit has scheduled a hearing for September 2016.

From 2012 through 2016, we filed similar lawsuits against other ANDA defendants seeking a ruling that our patents are valid and infringed. Some of these cases have been stayed pending the outcome of the Teva/APP litigation, and these parties have agreed to be bound by the outcome of the Teva/APP litigation. In February 2016, we filed a lawsuit alleging infringement against Dr. Reddy's Laboratories in response to its recently filed NDA for a salt form of pemetrexed product diluted in dextrose solution. Any remaining cases have been administratively closed.

In June 2016, the United States Patent and Trademark Office (USPTO) granted petitions by Neptune Generics, LLC and Sandoz Inc. seeking *inter partes* review (IPR) of our vitamin regimen patent. The final written IPR decisions are expected in mid-2017. Seven additional generic companies have filed petitions, seeking to join in these proceedings.

<u>European Patent Litigation and Administrative Proceedings</u>

Generic manufacturers filed an opposition to the European Patent Office's (EPO) decision to grant us a vitamin regimen patent. The Opposition Division of the EPO upheld the patent and the generic manufacturers lodged an appeal. In October 2015 the generic manufacturers withdrew the appeal. As a result, the original EPO decision upholding the patent is now final.

In addition, in the United Kingdom (U.K.), Actavis Group ehf and other Actavis companies (collectively, Actavis) filed litigation asking for a declaratory judgment that commercialization of certain salt forms of pemetrexed (the active ingredient in Alimta) diluted in saline solution would not infringe the vitamin regimen patents for Alimta in the U.K., Italy, France, and Spain. In May 2014, the trial court ruled that the vitamin regimen patents for Alimta would not be infringed by commercialization of alternative salt forms of pemetrexed, after expiration of the compound patents in December 2015. We appealed, and in June 2015, the U.K. Court of Appeal reversed the trial court's decision granting declarations of non-infringement over the Alimta vitamin regimen patents in those countries, ruling that the Alimta vitamin regimen patent would be indirectly infringed by commercialization of Actavis' products as proposed prior to the patent's expiration in June 2021. In February 2016, the U.K. Supreme Court granted our and Actavis' requests for permission to appeal different aspects of the judgment. A hearing is scheduled for April 2017.

In parallel proceedings, Actavis returned to the lower court seeking a declaration of non-infringement for a different proposed product diluted in dextrose solution. In February 2016, the trial court ruled that Actavis' commercialization of this product would not infringe the patent in the U.K., Italy, France, and Spain. We intend to appeal this ruling.

We commenced separate infringement proceedings against certain Actavis companies in Germany. Following a trial, in April 2014, the German trial court ruled in our favor. The defendants appealed, and after a hearing in March 2015, the German Court of Appeal overturned the trial court and ruled that our vitamin regimen patent in Germany would not be infringed by a dipotassium salt form of pemetrexed. In June 2016, the German Federal Supreme Court granted our appeal, vacating the prior decision denying infringement, and returned the case to the Court of Appeal to reconsider infringement based on its judgment.

In separate proceedings, in May 2016 and June 2016, the German courts confirmed preliminary injunctions against Hexal AG (Hexal), which had stated its intention to launch a generic disodium salt product diluted in saline solution in Germany, and ratiopharm GmbH, a subsidiary of Teva, which had stated its intention to launch a proposed alternative salt form of pemetrexed product diluted in dextrose solution. Hexal has separately filed a challenge to the validity of our vitamin regimen patent before the German Federal Patent court. We do not anticipate any generic

25

entry into the German market at least until the Court of Appeal proceedings against Actavis considers the issues remanded by the German Federal Supreme Court or the injunctions are lifted.

We are aware that at least one generic pemetrexed product has launched in a major European market.

Japanese Administrative Proceedings

Three separate demands for invalidation of our two vitamin regimen patents, involving several companies, have been filed with the Japanese Patent Office (JPO). In November 2015, the JPO issued written decisions in the invalidation trial initiated by Sawai Pharmaceutical Co., Ltd. (Sawai), which had been joined by three other companies, upholding both vitamin regimen patents. These patents provide intellectual property protection for Alimta until June 2021. Three companies, including Sawai, have filed appeals. The invalidation trials related to the other demands by Sawai are currently suspended.

Notwithstanding our patents, generic versions of Alimta were approved in Japan in February 2016. We filed for preliminary injunctions against the three generic competitors which received such approval, but we withdrew the requests for injunctions once those competitors agreed not to proceed to pricing approval.

We do not anticipate generic competitors to proceed to launch prior to the completion of the Sawai invalidation trial.

**Effient Patent Litigation and Administrative Proceedings**

We, along with Daiichi Sankyo, Daiichi Sankyo, Inc., and Ube Industries (Ube) are engaged in U.S. patent litigation involving Effient brought pursuant to procedures set out in the Hatch-Waxman Act. More than 10 different companies have submitted ANDAs seeking approval to market generic versions of Effient prior to the expiration of Daiichi Sankyo's and Ube's patents (expiring in 2023) covering methods of using Effient with aspirin, and alleging the patents are invalid. One of these ANDAs also alleges that the compound patent for Effient (expiring in April 2017 plus pediatric exclusivity for an additional six months) is invalid.

Beginning in March 2014, we filed lawsuits in the U.S. District Court for the Southern District of Indiana against these companies, seeking a ruling that the patents are valid and infringed. These cases have been consolidated. Four generic companies have agreed to be bound by the outcome of the consolidated case.

In 2015, several generic pharmaceutical companies filed petitions with the USPTO, requesting IPR of the method patents. In September 2015, the USPTO granted the generic pharmaceutical companies' request. A hearing was held in May 2016, and a written decision is expected in the third quarter of 2016. In light of these petitions, the district court in the consolidated lawsuit stayed the case with respect to all parties.

We believe the Effient patents are valid and enforceable against these generic manufacturers. However, it is not possible to determine the outcome of the proceedings, and accordingly, we can provide no assurance that we will prevail. We expect a loss of exclusivity for Effient would result in a rapid and severe decline in future revenues for the product in the relevant market.

**Actos® Product Liability Litigation**

We have been named along with Takeda Chemical Industries, Ltd., and Takeda affiliates (collectively, Takeda) as a defendant in approximately 6,500 product liability cases in the U.S. related to the diabetes medication Actos, which we co-promoted with Takeda in the U.S. from 1999 until 2006. In general, plaintiffs in these actions allege that Actos caused or contributed to their bladder cancer. Almost all of the active cases have been consolidated in federal multi-district litigation (MDL) in the Western District of Louisiana or are pending in a coordinated state court proceeding in California or a coordinated state court proceeding in Illinois.

In April 2015, Takeda announced they would pay approximately $2.4 billion to resolve the vast majority of the U.S. product liability lawsuits involving Actos, including the case of *Allen, et al. v. Takeda Pharmaceuticals, et al.,* no. 6:12-md-00064, in which a judgment of approximately $28 million was entered against Takeda and a judgment of approximately $9 million was entered against us. In September 2015, Takeda announced that more than 96 percent of eligible claimants had opted into the resolution program that was announced in April 2015. As a result of the resolution program, the *Allen* case has been fully resolved. Accordingly, the appeals filed by Allen, Takeda, and us in the U.S. Court of Appeals for the Fifth Circuit have been dismissed with prejudice.

Although most U.S. product liability lawsuits involving Actos are included in the resolution program, there may be additional cases pending against Takeda and us following its completion. Our agreement with Takeda calls for Takeda to defend and indemnify us against our losses and expenses with respect to the U.S. litigation arising out of the manufacture, use, or sale of Actos and other related expenses in accordance with the terms of the agreement.

26

We believe we are entitled to full indemnification of our losses and expenses in these cases; however, there can be no guarantee we will ultimately be successful in obtaining full indemnification.

We are also named along with Takeda as a defendant in four purported product liability class actions in Canada related to Actos, including two in Ontario (*Casseres et al. v. Takeda Pharmaceutical North America, Inc., et al. and Carrier et al. v. Eli Lilly et al.*), one in Quebec (*Whyte et al. v. Eli Lilly et al.*), and one in Alberta (*Epp v. Takeda Canada et al.*). We promoted Actos in Canada until 2009.

We believe these lawsuits are without merit, and we and Takeda are prepared to defend against them vigorously.

**Byetta® Product Liability Litigation**

We are named as a defendant in approximately 510 Byetta product liability lawsuits in the U.S. involving approximately 890 plaintiffs. Approximately 90 of these lawsuits, covering about 470 plaintiffs, are filed in California state court and coordinated in a Los Angeles Superior Court. Approximately 415 lawsuits, covering about 415 plaintiffs, are filed in federal court, the majority of which are coordinated in a multi-district litigation in the U.S. District Court for the Southern District of California. The remaining approximately five lawsuits, representing about five plaintiffs, are in various state courts. Approximately 465 of the lawsuits, involving approximately 700 plaintiffs, contain allegations that Byetta caused or contributed to the plaintiffs' cancer (primarily pancreatic cancer or thyroid cancer). The federal and state trial courts granted summary judgment in favor of us and co-defendants on the claims alleging pancreatic cancer; those rulings are being appealed by the plaintiffs. We are aware of approximately 10 additional claimants who have not yet filed suit. These additional claims allege damages for pancreatic cancer or thyroid cancer. We believe these lawsuits and claims are without merit and are prepared to defend against them vigorously.

**Cymbalta® Product Liability Litigation**

In October 2012, we were named as a defendant in a purported class-action lawsuit in the U.S. District Court for the Central District of California (*Saavedra et al v. Eli Lilly and Company*) involving Cymbalta. The plaintiffs, purporting to represent a class of all persons within the U.S. who purchased and/or paid for Cymbalta, asserted claims under the consumer protection statutes of four states, California, Massachusetts, Missouri, and New York, and sought declaratory, injunctive, and monetary relief for various alleged economic injuries arising from discontinuing treatment with Cymbalta. In December 2014, the district court denied the plaintiffs' motion for class certification. Plaintiffs filed a petition with the U.S. Court of Appeals for the Ninth Circuit requesting permission to file an interlocutory appeal of the denial of class certification, which was denied. Plaintiffs filed a second motion for certification under the consumer protection acts of New York and Massachusetts. The district court denied that motion for class certification in July 2015. The district court dismissed the suit and plaintiffs are appealing to the U.S. Court of Appeals for the Ninth Circuit.

Additionally, we have been named in approximately 140 lawsuits involving approximately 1,470 plaintiffs filed in various federal and state courts alleging injuries arising from discontinuation of treatment with Cymbalta. Counsel for plaintiffs in the federal court proceedings filed a petition seeking to have then-filed cases and an unspecified number of future cases coordinated into a federal MDL in the U.S. District Court for the Central District of California. In December 2014, the Judicial Panel on Multidistrict Litigation (JPML) denied the plaintiffs' petition for creation of an MDL. Plaintiffs' counsel subsequently filed a second petition seeking MDL consolidation, which petition was denied by the JPML in October 2015. There have been approximately 40 individual and multi-plaintiff cases filed in California state court. Most of those cases have been centralized in a California Judicial Counsel Coordination Proceeding pending in Los Angeles. The first individual product liability cases were tried in August 2015 and resulted in defense verdicts against four plaintiffs. The plaintiff in one of those cases is appealing the verdict. The other plaintiffs in those cases will not be appealing the judgment.

We believe these lawsuits and claims are without merit and are prepared to defend against them vigorously.

**Prozac® Product Liability Litigation**

We are named as a defendant in approximately five U.S. lawsuits primarily related to allegations that the antidepressant Prozac caused or contributed to birth defects in the children of women who ingested the drug during pregnancy. We are aware of approximately 400 additional claims related to birth defects, which have not yet been filed. We believe these lawsuits and claims are without merit and are prepared to defend against them vigorously.

**Brazil–Employee Litigation**

Our subsidiary in Brazil, Eli Lilly do Brasil Limitada (Lilly Brasil), is named in a lawsuit brought by the Labor Attorney for 15th Region in the Labor Court of Paulinia, State of Sao Paulo, Brazil, alleging possible harm to employees and

27

former employees caused by exposure to heavy metals at a former Lilly manufacturing facility in Cosmopolis, Brazil, operated by the company between 1977 and 2003. The plaintiffs allege that some employees at the facility were exposed to benzene and heavy metals; however, Lilly Brasil maintains that these alleged contaminants were never used in the facility. In May 2014, the labor court judge ruled against Lilly Brasil. The judge's ruling orders Lilly Brasil to undertake several actions of unspecified financial impact, including paying lifetime medical insurance for the employees and contractors who worked at the Cosmopolis facility more than six months during the affected years and their children born during and after this period. We cannot currently estimate the range of reasonably possible losses that could arise if we do not ultimately prevail in the litigation. The judge has estimated the total financial impact of the ruling to be approximately 1.0 billion Brazilian real (approximately $310 million as of June 30, 2016) plus interest. We strongly disagree with the decision and filed an appeal in May 2014.

We are also named in approximately 30 lawsuits filed in labor courts by individual former employees making similar claims. We believe these lawsuits are without merit and are prepared to defend against them vigorously.

**Product Liability Insurance**

Because of the nature of pharmaceutical products, it is possible that we could become subject to large numbers of product liability and related claims in the future. Due to a very restrictive market for product liability insurance, we are self-insured for product liability losses for all our currently marketed products.

**Note 11:   Other Comprehensive Income (Loss)**

The following tables summarize the activity related to each component of other comprehensive income (loss) during the three months ended June 30, 2016 and 2015:

| (Amounts presented net of taxes) | Foreign Currency Translation Gains (Losses) | | Unrealized Net Gains (Losses) on Securities | | Defined Benefit Pension and Retiree Health Benefit Plans | | Effective Portion of Cash Flow Hedges | | Accumulated Other Comprehensive Loss | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at April 1, 2016 | $ | (1,085.4) | $ | 17.9 | $ | (2,981.1) | $ | (216.1) | $ | (4,264.7) |
| Other comprehensive income (loss) before reclassifications | | (187.6) | | 8.8 | | 24.6 | | (2.2) | | (156.4) |
| Net amount reclassified from accumulated other comprehensive loss | | — | | 10.1 | | 37.4 | | 2.4 | | 49.9 |
| Net other comprehensive income (loss) | | (187.6) | | 18.9 | | 62.0 | | 0.2 | | (106.5) |
| Balance at June 30, 2016 | $ | (1,273.0) | $ | 36.8 | $ | (2,919.1) | $ | (215.9) | $ | (4,371.2) |

| (Amounts presented net of taxes) | Foreign Currency Translation Gains (Losses) | | Unrealized Net Gains (Losses) on Securities | | Defined Benefit Pension and Retiree Health Benefit Plans | | Effective Portion of Cash Flow Hedges | | Accumulated Other Comprehensive Loss | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at April 1, 2015 | $ | (1,294.4) | $ | 155.6 | $ | (3,293.1) | $ | (225.6) | $ | (4,657.5) |
| Other comprehensive income (loss) before reclassifications | | 256.8 | | (8.7) | | (24.6) | | — | | 223.5 |
| Net amount reclassified from accumulated other comprehensive loss | | — | | (25.9) | | 54.4 | | 2.3 | | 30.8 |
| Net other comprehensive income (loss) | | 256.8 | | (34.6) | | 29.8 | | 2.3 | | 254.3 |
| Balance at June 30, 2015 | $ | (1,037.6) | $ | 121.0 | $ | (3,263.3) | $ | (223.3) | $ | (4,403.2) |

The following tables summarize the activity related to each component of other comprehensive income (loss) during the six months ended June 30, 2016 and 2015:

| (Amounts presented net of taxes) | Foreign Currency Translation Gains (Losses) | Unrealized Net Gains (Losses) on Securities | Defined Benefit Pension and Retiree Health Benefit Plans | Effective Portion of Cash Flow Hedges | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|---|
| Balance at January 1, 2016 | $ (1,360.2) | $ 10.1 | $ (3,012.1) | $ (218.5) | $ (4,580.7) |
| Other comprehensive income (loss) before reclassifications | 12.7 | 13.0 | 20.5 | (2.2) | 44.0 |
| Net amount reclassified from accumulated other comprehensive loss | 74.5 | 13.7 | 72.5 | 4.8 | 165.5 |
| Net other comprehensive income (loss) | 87.2 | 26.7 | 93.0 | 2.6 | 209.5 |
| Balance at June 30, 2016 | $ (1,273.0) | $ 36.8 | $ (2,919.1) | $ (215.9) | $ (4,371.2) |

| (Amounts presented net of taxes) | Foreign Currency Translation Gains (Losses) | Unrealized Net Gains (Losses) on Securities | Defined Benefit Pension and Retiree Health Benefit Plans | Effective Portion of Cash Flow Hedges | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|---|
| Balance at January 1, 2015 | $ (498.4) | $ 99.7 | $ (3,402.0) | $ (191.1) | $ (3,991.8) |
| Other comprehensive income (loss) before reclassifications | (539.2) | 59.1 | 30.6 | (36.9) | (486.4) |
| Net amount reclassified from accumulated other comprehensive loss | — | (37.8) | 108.1 | 4.7 | 75.0 |
| Net other comprehensive income (loss) | (539.2) | 21.3 | 138.7 | (32.2) | (411.4) |
| Balance at June 30, 2015 | $ (1,037.6) | $ 121.0 | $ (3,263.3) | $ (223.3) | $ (4,403.2) |

The tax effects on the net activity related to each component of other comprehensive income (loss) were as follows:

| Tax benefit (expense) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Foreign currency translation gains (losses) | $ (26.0) | $ 11.8 | $ 1.7 | $ 11.8 |
| Unrealized net gains (losses) on securities | (10.2) | 18.6 | (14.4) | (11.4) |
| Defined benefit pension and retiree health benefit plans | (21.8) | (20.3) | (47.5) | (62.8) |
| Effective portion of cash flow hedges | (0.1) | (1.3) | (1.4) | 17.2 |
| Provision for income taxes allocated to other comprehensive income (loss) items | $ (58.1) | $ 8.8 | $ (61.6) | $ (45.2) |

Except for the tax effects of foreign currency translation gains and losses related to our foreign currency-denominated notes, cross-currency interest rate swaps, and other foreign currency exchange contracts designated as net investment hedges (see Note 6), income taxes were not provided for foreign currency translation. Generally, the assets and liabilities of foreign operations are translated into U.S. dollars using the current exchange rate. For those operations, changes in exchange rates generally do not affect cash flows; therefore, resulting translation adjustments are made in shareholders' equity rather than in the consolidated condensed statements of operations.

Reclassifications out of accumulated other comprehensive loss were as follows:

| Details about Accumulated Other Comprehensive Loss Components | Reclassifications Out of Accumulated Other Comprehensive Loss | | | | Affected Line Item in the Consolidated Condensed Statements of Operations |
|---|---|---|---|---|---|
| | Three Months Ended June 30, | | Six Months Ended June 30, | | |
| | 2016 | 2015 | 2016 | 2015 | |
| Amortization of retirement benefit items: | | | | | |
| Prior service benefits, net | $ (21.7) | $ (19.0) | $ (37.1) | $ (38.1) | [1] |
| Actuarial losses | 79.2 | 100.4 | 152.7 | 202.2 | [1] |
| Total before tax | 57.5 | 81.4 | 115.6 | 164.1 | |
| Tax benefit | (20.1) | (27.0) | (43.1) | (56.0) | Income taxes |
| Net of tax | 37.4 | 54.4 | 72.5 | 108.1 | |
| | | | | | |
| Unrealized gains/losses on available-for-sale securities: | | | | | |
| Realized (gains) losses, net before tax | (0.3) | (46.1) | 5.2 | (64.4) | Other–net, (income) expense |
| Impairment losses | 15.9 | 6.2 | 15.9 | 6.2 | Other–net, (income) expense |
| Total before tax | 15.6 | (39.9) | 21.1 | (58.2) | |
| Tax (benefit) expense | (5.5) | 14.0 | (7.4) | 20.4 | Income taxes |
| Net of tax | 10.1 | (25.9) | 13.7 | (37.8) | |
| Other, net of tax [2] | 2.4 | 2.3 | 79.3 | 4.7 | Other–net, (income) expense |
| Total reclassifications for the period (net of tax) | $ 49.9 | $ 30.8 | $ 165.5 | $ 75.0 | |

[1] These accumulated other comprehensive loss components are included in the computation of net periodic benefit (income) cost (see Note 9).

[2] Amount for the six months ended June 30, 2016 included primarily $74.5 million of foreign currency translation losses.

## Note 12: Other–Net, (Income) Expense

Other–net, (income) expense consisted of the following:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Interest expense | $ 43.2 | $ 36.8 | $ 86.6 | $ 77.7 |
| Interest income | (23.5) | (20.6) | (47.7) | (42.0) |
| Venezuela charge | — | — | 203.9 | — |
| Debt extinguishment loss (Note 6) | — | 166.7 | — | 166.7 |
| Other income | (40.9) | (59.6) | (115.0) | (171.8) |
| Other–net, (income) expense | $ (21.2) | $ 123.3 | $ 127.8 | $ 30.6 |

Due to the financial crisis in Venezuela and the significant deterioration of the bolívar, we changed the exchange rate used to translate the assets and liabilities of our subsidiaries in Venezuela which resulted in a first quarter of 2016 charge of $203.9 million. Prior to this change, we used the Supplementary Foreign Currency Administration System (SICAD) rate; however, this official rate was discontinued in the first quarter of 2016. After considering several factors, including the future uncertainty of the Venezuelan economy, published exchange rates, and the limited amount of foreign currency exchanged, we changed to the Divisa Complementaria (DICOM) rate.

**Note 13: Segment Information**

We have two operating segments—human pharmaceutical products and animal health. Our operating segments are distinguished by the ultimate end user of the product—humans or animals. Performance is evaluated based on profit or loss from operations before income taxes.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2016** | 2015 | **2016** | 2015 |
| Segment revenue—to unaffiliated customers: | | | | |
| Human pharmaceutical products: | | | | |
| Endocrinology: | | | | |
| *Humalog*® | $ **701.9** | $ 654.3 | $ **1,308.2** | $ 1,338.2 |
| *Humulin*® | **332.3** | 316.4 | **688.7** | 632.1 |
| *Forteo*® | **367.6** | 328.4 | **686.3** | 621.4 |
| *Trulicity*® | **201.3** | 44.3 | **344.9** | 62.6 |
| *Trajenta* | **121.0** | 80.0 | **215.4** | 162.4 |
| *Other Endocrinology* | **234.3** | 214.5 | **471.6** | 447.5 |
| Total Endocrinology | **1,958.4** | 1,637.9 | **3,715.1** | 3,264.2 |
| Oncology: | | | | |
| *Alimta* | **607.1** | 664.3 | **1,171.3** | 1,237.4 |
| *Erbitux* | **180.6** | 134.6 | **348.6** | 222.8 |
| *Cyramza*® | **147.0** | 87.7 | **278.0** | 155.2 |
| *Other Oncology* | **35.8** | 36.0 | **67.1** | 66.2 |
| Total Oncology | **970.5** | 922.6 | **1,865.0** | 1,681.6 |
| Cardiovascular: | | | | |
| *Cialis*® | **630.5** | 567.9 | **1,207.2** | 1,106.2 |
| *Effient* | **135.1** | 128.8 | **266.6** | 250.6 |
| *Other Cardiovascular* | **61.7** | 66.5 | **107.6** | 121.6 |
| Total Cardiovascular | **827.3** | 763.2 | **1,581.4** | 1,478.4 |
| Neuroscience: | | | | |
| *Cymbalta* | **236.5** | 274.1 | **435.2** | 561.1 |
| *Zyprexa*® | **210.7** | 253.7 | **423.4** | 473.2 |
| *Strattera*® | **224.6** | 191.8 | **412.7** | 365.5 |
| *Other Neuroscience* | **45.9** | 44.3 | **90.0** | 89.4 |
| Total Neuroscience | **717.7** | 763.9 | **1,361.3** | 1,489.2 |
| Other pharmaceuticals | **71.1** | 50.3 | **132.7** | 119.5 |
| Total human pharmaceutical products | **4,545.0** | 4,137.9 | **8,655.5** | 8,032.9 |
| Animal health | **859.8** | 840.8 | **1,614.4** | 1,590.5 |
| Revenue | $ **5,404.8** | $ 4,978.7 | $ **10,269.9** | $ 9,623.4 |

31

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2016 | 2015 |
| **Segment profits:** | | | | |
| Human pharmaceutical products | $ **959.4** | $ 1,016.8 | $ **1,886.3** | $ 2,099.9 |
| Animal health | **211.7** | 188.3 | **359.4** | 303.3 |
| Total segment profits | $ **1,171.1** | $ 1,205.1 | $ **2,245.7** | $ 2,403.2 |
| | | | | |
| **Reconciliation of total segment profits to consolidated income before taxes:** | | | | |
| Segment profits | $ **1,171.1** | $ 1,205.1 | $ **2,245.7** | $ 2,403.2 |
| Other profits (losses): | | | | |
| Acquired in-process research and development (Note 3) | **—** | (80.0) | **—** | (336.0) |
| Amortization of intangible assets | **(168.6)** | (151.9) | **(341.1)** | (304.6) |
| Asset impairment, restructuring, and other special charges (Note 5) | **(58.0)** | (72.4) | **(189.4)** | (180.4) |
| Venezuela charge (Note 12) | **—** | — | **(203.9)** | — |
| Debt repurchase charges, net [1] (Note 6) | **—** | (152.7) | **—** | (152.7) |
| Inventory fair value adjustment related to Novartis AH (Note 3) | **—** | (68.4) | **—** | (131.9) |
| Consolidated income before taxes | $ **944.5** | $ 679.7 | $ **1,511.3** | $ 1,297.6 |

[1] We recognized pretax net charges of $152.7 million for the three and six months ended June 30, 2015, attributable to the debt extinguishment loss of $166.7 million from the purchase and redemption of certain fixed-rate notes, partially offset by net gains from non-hedging interest rate swaps and foreign currency transactions associated with the related issuance of euro-denominated notes.

For internal management reporting presented to the chief operating decision maker, certain costs are fully allocated to our human pharmaceutical products segment and therefore are not reflected in the animal health segment's profit. Such items include costs associated with treasury-related financing, global administrative services, certain acquisition-related transaction costs, and certain manufacturing costs.

*Item 2. Management's Discussion and Analysis of Results of Operations and Financial Condition*

<u>**Results of Operations**</u>

**Executive Overview**

On July 27, 2016 we announced that David A. Ricks will assume the role of chief executive officer effective January 1, 2017, replacing John C. Lechleiter, who will retire at the end of 2016. Lechleiter will remain chairman of our board of directors through May 2017, and Ricks will assume the role of chairman effective June 1, 2017.

The remainder of this section provides an overview of our financial results, recent product and late-stage pipeline developments, and other matters affecting our company and the pharmaceutical industry. Earnings per share (EPS) data are presented on a diluted basis.

*Financial Results*

The following table summarizes our key operating results:

| | Three Months Ended June 30, | | Percent Change from | Six Months Ended June 30, | | Percent Change from |
|---|---|---|---|---|---|---|
| | **2016** | **2015** | **2015** | **2016** | **2015** | **2015** |
| Revenue | $ **5,404.8** | $ 4,978.7 | 9 | $ **10,269.9** | $ 9,623.4 | 7 |
| Gross margin | **3,939.8** | 3,760.3 | 5 | **7,481.9** | 7,212.3 | 4 |
| Gross margin as a percent of revenue | **72.9%** | 75.5% | | **72.9%** | 74.9% | |
| Operating expense [1] | $ **2,958.5** | $ 2,804.9 | 5 | $ **5,653.4** | $ 5,367.7 | 5 |
| Acquired in-process research and development | **—** | 80.0 | NM | **—** | 336.0 | NM |
| Asset impairment, restructuring, and other special charges | **58.0** | 72.4 | (20) | **189.4** | 180.4 | 5 |
| Net income | **747.7** | 600.8 | 24 | **1,187.8** | 1,130.3 | 5 |
| Earnings per share [2] | **0.71** | 0.56 | 27 | **1.12** | 1.06 | 6 |

[1] Operating expense consists of research and development and marketing, selling, and administrative expenses.

[2] Earnings per share benefited from a lower number of shares outstanding in 2016 compared with 2015.

NM - not meaningful

Revenue and gross margin increased for the three and six months ended June 30, 2016. The increase in operating expense for both periods was due to an increase in research and development expense, partially offset by a decrease in marketing, selling, and administrative expense. The increases in net income and EPS for the three months ended June 30, 2016 were driven by a higher gross margin, the 2015 charges related to the repurchase of debt, and lower acquired in-process research and development (IPR&D) charges, partially offset by higher operating expenses and higher income taxes. The increases in net income and EPS for the six months ended June 30, 2016 were driven by lower acquired IPR&D charges, a higher gross margin, and the 2015 charges related to the repurchase of debt, partially offset by higher operating expenses, the impact of the Venezuelan financial crisis, including the significant deterioration of the bolívar, and higher income taxes.

The following highlighted items affect comparisons of our financial results for the three and six months ended June 30, 2016 and 2015:

2016

Asset Impairment, Restructuring, and Other Special Charges (Note 5)

- We recognized charges of $58.0 million (pretax), or $0.04 per share, and $189.4 million (pretax), or $0.16 per share, for the three and six months ended June 30, respectively, related to the integration costs for our acquisition of Novartis Animal Health (Novartis AH), severance costs, and asset impairments. The charges for the six months ended June 30 also included charges related to the closure of an animal health manufacturing facility in Ireland.

Other–Net, (Income) Expense (Note 12)

- We recognized charges of $203.9 million (pretax), or $0.19 per share, in the first quarter, related to the impact of the Venezuelan financial crisis, including the significant deterioration of the bolívar.

2015

Acquisitions (Note 3)

- We recognized expense of $68.4 million (pretax), or $0.05 per share, and $131.9 million (pretax), or $0.09 per share, for the three and six months ended June 30, respectively, related to the fair value adjustments to Novartis AH acquisition date inventory that was sold.

Acquired In-Process Research & Development (Notes 3 and 4)

- We recognized acquired IPR&D charges of $80.0 million (pretax), or $0.05 per share, and $336.0 million (pretax), or $0.20 per share, for the three and six months ended June 30, respectively, related to upfront fees paid in connection with the collaboration agreements with BioNTech AG (BioNTech) and Hanmi Pharmaceutical Co., Ltd. (Hanmi). The charges for the first six months ended June 30 also related to upfront fees paid in connection with the collaboration agreements with Pfizer, Inc. (Pfizer) and Innovent Biologics, Inc. (Innovent).

Asset Impairment, Restructuring, and Other Special Charges (Note 5)

- We recognized charges of $72.4 million (pretax), or $0.05 per share, and $180.4 million (pretax), or $0.12 per share, for the three and six months ended June 30, respectively, related to integration costs, intangible asset impairments, and severance costs resulting from our acquisition of Novartis AH.

Debt Repurchase (Notes 6 and 12)

- We recognized net charges of $152.7 million (pretax), or $0.09 per share, for the three and six months ended June 30, attributable to the debt extinguishment loss of $166.7 million from the purchase and redemption of certain fixed-rate notes, partially offset by net gains from non-hedging interest rate swaps and foreign currency transactions associated with the related issuance of euro-denominated notes.

*Late-Stage Pipeline*

Our long-term success depends to a great extent on our ability to continue to discover and develop innovative pharmaceutical products and acquire or collaborate on molecules currently in development by other biotechnology or pharmaceutical companies. We currently have approximately 45 potential new drugs in human testing or under regulatory review, and a larger number of projects in preclinical research.

The following new molecular entities (NMEs) were approved by regulatory authorities in at least one of the major geographies for use in the diseases described. The quarter in which each NME initially was approved in any major geography for any indication is shown in parentheses:

**Ixekizumab\* (Taltz®) (Q1 2016)**—a neutralizing monoclonal antibody to interleukin-17A for the treatment of moderate-to-severe plaque psoriasis and psoriatic arthritis.

**Necitumumab\* (Portrazza®) (Q4 2015)**—an anti-epidermal growth factor receptor monoclonal antibody for the treatment of metastatic squamous non-small cell lung cancer (NSCLC).

The following NMEs have been submitted for regulatory review in at least one of the major geographies for potential use in the diseases described. The quarter in which each NME initially was submitted in any major geography for any indication is shown in parentheses:

**Baricitinib (Q1 2016)**—a Janus tyrosine kinase inhibitor for the treatment of moderately-to-severely active rheumatoid arthritis (in collaboration with Incyte Corporation).

**Olaratumab\* (Q1 2016)**—a human IgG1 monoclonal antibody for the treatment of advanced soft tissue sarcoma. In the United States (U.S.), olaratumab is protected by a compound patent (2027, not including possible patent extension), and by biologics data package protection (2028).

The following NMEs and diagnostic agent are currently in Phase III clinical trial testing for potential use in the diseases described. The quarter in which each NME and diagnostic agent initially entered Phase III for any indication is shown in parentheses:

**Abemaciclib (Q3 2014)**—a small molecule cell-cycle inhibitor, selective for cyclin-dependent kinases 4 and 6 for the treatment of metastatic breast cancer and NSCLC.

**BACE inhibitor (Q2 2016)**—an oral beta-secretase cleaving enzyme (BACE) inhibitor for the treatment of early Alzheimer's disease (in collaboration with AstraZeneca UK Limited).

**Galcanezumab\* (Q2 2015)**—a once-monthly subcutaneously injected calcitonin gene-related peptide (CGRP) antibody for the treatment of cluster headache and migraine prevention.

**Nasal glucagon\* (Q3 2013)**—a glucagon nasal powder formulation for the treatment of severe hypoglycemia in patients with diabetes treated with insulin.

**Solanezumab\* (Q2 2009)**—an anti-amyloid beta monoclonal antibody for the treatment of preclinical and mild Alzheimer's disease.

**Tanezumab\* (Q3 2008)**—an anti-nerve growth factor monoclonal antibody for the treatment of osteoarthritis pain, chronic low back pain, and cancer pain (in collaboration with Pfizer).

**Tau Imaging Agent\*\* (Q3 2015)**—a positron emission tomography (PET) tracer intended to image tau (or neurofibrillary) tangles in the brain, which are an indicator of Alzheimer's disease.

\*    Biologic molecule subject to the U.S. Biologics Price Competition and Innovation Act

\*\*   Diagnostic agent

The following table reflects the status of each NME and diagnostic agent within our late-stage pipeline and recently approved products including developments since January 1, 2016:

| Compound | Indication | U.S. | Europe | Japan | Developments |
|----------|-----------|------|--------|-------|--------------|
| **Endocrinology** | | | | | |
| Nasal glucagon | Severe hypoglycemia | | Phase III | | Development of commercial manufacturing process is ongoing. |
| **Immunology** | | | | | |
| Baricitinib | Rheumatoid arthritis | | Submitted | | Submitted to regulatory authorities in the U.S., Europe, and Japan in first quarter of 2016. |
| Taltz | Psoriasis | | Launched | Approved | Approved and launched in the U.S. in first and second quarters of 2016, respectively. Approved and launched in Europe in second and third quarters of 2016, respectively. Approved in Japan in third quarter of 2016. |
| | Psoriatic arthritis | | Phase III | Approved | Phase III studies are ongoing. Approved in Japan in third quarter of 2016. |
| **Neuroscience** | | | | | |
| BACE inhibitor | Early Alzheimer's disease | | Phase III | | Moved into the Phase III portion of the Phase II/III seamless study in April 2016. |
| Galcanezumab | Cluster headache | | Phase III | | Phase III studies are ongoing. |
| | Migraine prevention | | Phase III | | Initiated first Phase III study in January 2016. |
| Solanezumab | Preclinical Alzheimer's disease | | Phase III | | Phase III study is ongoing. |
| | Mild Alzheimer's disease | | Phase III | | Announced change in primary endpoint for Phase III study in March 2016. |
| Tanezumab | Osteoarthritis pain | | Phase III | | Phase III studies are ongoing. |
| | Chronic low back pain | | Phase III | | |
| | Cancer pain | | Phase III | | |
| Tau imaging agent | Alzheimer's disease | | Phase III | | Phase III study is ongoing. |
| **Oncology** | | | | | |
| Abemaciclib | Metastatic breast cancer | | Phase III | | Phase III studies are ongoing. |
| | NSCLC | | Phase III | | Phase III study is ongoing. |
| Olaratumab | Soft tissue sarcoma | | Submitted | Phase III | Received Breakthrough Therapy Designation[1] from the U.S. Food and Drug Administration (FDA) in 2015. Based on Phase II data, submitted to European regulatory authorities and completed rolling submission in the U.S. in first quarter of 2016. Granted Priority Review[2] from FDA in second quarter of 2016. Phase III study is ongoing. |
| Portrazza | Metastatic squamous NSCLC (first-line) | | Launched | Phase Ib/II | Approved and launched in Europe in first and second quarters of 2016, respectively. |

[1] The Breakthrough Therapy Designation is designed to expedite the development and review of potential medicines that are intended to treat a serious condition where preliminary clinical evidence indicates that the treatment may demonstrate substantial improvement over available therapy on a clinically significant endpoint.

[2] Priority Review is designed to expedite the review of potential medicines that, if approved, would be significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications.

**Other Matters**

*Patent Matters*

We depend on patents or other forms of intellectual-property protection for most of our revenues, cash flows, and earnings. We lost our data package protection for Cymbalta® in major European countries in 2014. In 2015, we saw the entry of generic competition in all major European markets. The loss of exclusivity for Cymbalta in the European markets has caused a rapid and severe decline in revenue for the product, which over time has, in the aggregate, had a material adverse effect on our consolidated results of operations and cash flows. We also lost patent exclusivity for the schizophrenia and bipolar mania indications in December 2015 and April 2016, respectively, for Zyprexa® in Japan. Generic versions of Zyprexa were launched in Japan in June 2016. We expect that the entry of generic competition for Zyprexa in Japan following the loss of effective patent protection will cause a rapid and severe decline in revenue for the product.

Additionally, as described in Note 10 to the consolidated condensed financial statements, the Alimta® vitamin regimen patents, which provide us with patent protection for Alimta through June 2021 in Japan and major European countries, and through May 2022 in the U.S., have been challenged in each of these jurisdictions. Our compound patent for Alimta will expire in the U.S. in January 2017, and expired in major European countries and Japan in December 2015. We expect that the entry of generic competition for Alimta following the loss of effective patent protection will cause a rapid and severe decline in revenue for the product, which will, in the aggregate, have a material adverse effect on our consolidated results of operations and cash flows. We are aware that at least one generic pemetrexed product has launched in a major European market. Notwithstanding our patents, generic versions of Alimta were also approved in Japan in February 2016. We filed for preliminary injunctions against the three generic competitors which received such approval. As described in Note 10 to the consolidated condensed financial statements, we withdrew the requests for injunctions once those competitors agreed not to proceed to pricing approval. We do not anticipate generic competitors to proceed to launch prior to the completion of the Sawai Pharmaceutical Co., Ltd. invalidation trial.

We will lose our patent protection for Strattera® in the U.S. in May 2017 and Cialis® in the U.S. and major European markets in November 2017. We expect that the entry of generic competition into these markets following the loss of effective patent protection will cause a rapid and severe decline in revenue for the affected products, which will, in the aggregate, have a material adverse effect on our consolidated results of operations and cash flows.

The U.S. compound patent for Humalog® expired in 2013. Thus far, the loss of compound patent protection for Humalog has not resulted in a rapid and severe decline in revenue. Global regulators have different legal pathways to approve similar versions of Humalog and to date none have been approved in the U.S. or Europe. We are aware that other manufacturers have efforts underway to develop a similar version of Humalog, and it is difficult to predict the timing and impact of these products entering the market.

*Foreign Currency Exchange Rates*

As a global company with substantial operations outside the U.S., we face foreign currency risk exposure from fluctuating currency exchange rates, primarily the U.S. dollar against the euro, Japanese yen, British pound, and Swiss franc, and the British pound against the euro. While we manage a portion of these exposures through hedging and other risk management techniques, significant fluctuations in currency rates can have a substantial impact, either positive or negative, on our revenue, cost of sales, and operating expenses. Over the past two years, we have seen significant foreign currency rate fluctuations between the U.S. dollar and several other foreign currencies, including the euro, British pound, and Japanese yen. While there is uncertainty in the future movements in foreign exchange rates, these fluctuations could negatively impact our future consolidated results of operations.

The impact of the Venezuelan financial crisis, including the significant deterioration of the bolívar, resulted in a charge of $203.9 million in the first quarter of 2016. See Note 12 to the consolidated condensed financial statements for additional information related to the charge. We anticipate that the revenue from Venezuela for the remainder of 2016 will be *de minimis*. As of June 30, 2016, our Venezuelan subsidiaries represented less than 0.2 percent of our consolidated assets and liabilities. We continue to monitor Venezuela's economy and other deteriorating economies. It is possible that additional charges may be recorded in the future. Any additional charges are not expected to have a material adverse effect on our future consolidated results of operations.

*Trends Affecting Pharmaceutical Pricing, Reimbursement, and Access*

*United States*

In the U.S., public concern over prices for specialty and brand name pharmaceuticals continues to drive the regulatory and legislative debate. These policy and political issues increase the risk that taxes, fees, rebates or other federal and state measures may be enacted. Key health policy proposals affecting biopharmaceuticals include a reduction in biologic data exclusivity, modifications to Medicare Parts B and D, language that would allow the Department of Health and Human Services to negotiate prices for biologics and drugs on the specialty tier in Part D, and state-level proposals to reduce the cost of pharmaceuticals purchased by government health care programs. Savings projected under these proposals are targeted as a means to fund both health care expenditures and non-health care initiatives, or to manage federal and state budgets.

In the U.S. private sector, consolidation and integration among U.S. healthcare providers is also a major factor in the competitive marketplace for human pharmaceuticals. Health plans and pharmaceutical benefit managers have been consolidating into fewer, larger entities, thus enhancing their purchasing strength and importance. Payers typically maintain formularies which specify coverage (the conditions under which drugs are included on a plan's formulary) and reimbursement (the associated out-of-pocket cost to the consumer). Formulary placement can lead to reduced usage of a drug for the relevant patient population due to coverage restrictions, such as prior authorizations and formulary exclusions, or due to reimbursement limitations which result in higher consumer out-of-pocket cost, such as non-preferred co-pay tiers, increased co-insurance levels and higher deductibles. Consequently, pharmaceutical companies compete for formula placement not only on the basis of product attributes such as greater efficacy, fewer side effects, or greater patient ease of use, but also by providing rebates. Price is an increasingly important factor in formulary decisions, particularly in treatment areas in which the payer has taken the position that multiple branded products are therapeutically comparable. These downward pricing pressures could negatively affect future consolidated results of operations.

The main coverage expansion provisions of the Affordable Care Act (ACA) are now in effect through both the launch of state-based exchanges and the expansion of Medicaid. An emerging trend has been the prevalence of benefit designs containing high out-of-pocket costs for patients, particularly for pharmaceuticals. In addition to the coverage expansions, many employers in the commercial market, driven in part by ACA changes such as the 2020 implementation of the excise tax on employer-sponsored health care coverage for which there is an excess benefit (the so-called "Cadillac tax"), continue to evaluate strategies such as private exchanges and wider use of consumer-driven health plans to reduce their healthcare liabilities over time. At the same time, the broader paradigm shift towards quality-based reimbursement and the launch of several value-based purchasing initiatives have placed demands on the pharmaceutical industry to offer products with proven real-world outcomes data and a favorable economic profile.

*International*

International operations also are generally subject to extensive price and market regulations. Cost-containment measures exist in a number of countries, including additional price controls and mechanisms to limit reimbursement for our products. Such policies are expected to increase in impact and reach, given the pressures on national and regional health care budgets that come from a growing aging population and ongoing economic challenges. In addition, governments in many emerging markets are becoming increasingly active in expanding health care system offerings. Given the budget challenges of increasing health care coverage for citizens, policies may be proposed that promote generics only and reduce current and future access to human pharmaceutical products.

*Tax Matters*

We are subject to income taxes in the U.S. and numerous foreign jurisdictions. Changes in the relevant tax laws, regulations, administrative practices, principles, and interpretations could adversely affect our future effective tax rates. The U.S. and a number of other countries are actively considering or enacting changes in this regard. For example, the Obama administration proposed changes to the manner in which the U.S. would tax the international income of U.S.-based companies, including unremitted earnings of foreign subsidiaries. Other tax proposals under discussion or introduced in the U.S. Congress could change the tax rate and manner in which U.S. companies would be taxed. Additionally, the Organisation for Economic Co-operation and Development issued its final recommendations of international tax reform proposals to influence international tax policy in major countries in which we operate. While outcomes of these initiatives continue to develop and remain uncertain, changes to key elements of the U.S. or international tax framework could have a material adverse effect on our consolidated operating results and cash flows.

*Legal Matters*

Information regarding contingencies relating to certain legal proceedings can be found in Note 10 to the consolidated condensed financial statements and is incorporated here by reference.

**Revenue**

The following tables summarize our revenue activity by jurisdiction:

| | Three Months Ended June 30, | | Percent Change from |
| | 2016 | 2015 | 2015 |
|---|---|---|---|
| U.S. [1] | $ 2,889.9 | $ 2,527.8 | 14 |
| Outside U.S. | 2,514.9 | 2,450.9 | 3 |
| Revenue | $ 5,404.8 | $ 4,978.7 | 9 |

| | Six Months Ended June 30, | | Percent Change from |
| | 2016 | 2015 | 2015 |
|---|---|---|---|
| U.S. [1] | $ 5,445.5 | $ 4,739.1 | 15 |
| Outside U.S. | 4,824.4 | 4,884.3 | (1) |
| Revenue | $ 10,269.9 | $ 9,623.4 | 7 |

[1] U.S. revenue includes revenue in Puerto Rico.

The following are components of the change in revenue compared with the prior year:

| | Three Months Ended June 30, 2016 vs. 2015 | | | Six Months Ended June 30, 2016 vs. 2015 | | |
| | U.S. | Outside U.S. | Consolidated | U.S. | Outside U.S. | Consolidated |
|---|---|---|---|---|---|---|
| Volume | 11% | 6 % | 8% | 12% | 4 % | 8 % |
| Price | 3% | (3)% | —% | 3% | (2)% | — % |
| Foreign exchange rates | —% | — % | —% | —% | (3)% | (1)% |
| Percent change | 14% | 3 % | 9% | 15% | (1)% | 7 % |

Numbers may not add due to rounding

In the U.S., for the three and six months ended June 30, 2016, the volume increase was driven by several pharmaceutical products, primarily Trulicity®, Erbitux®, and Humalog.

Outside the U.S., for the three and six months ended June 30, 2016, the volume increase was driven by several pharmaceutical products, primarily Cyramza®, Trulicity, and Humalog, partially offset by the loss of exclusivity for Cymbalta in Europe.

The following tables summarize our revenue activity by product:

| Product | | Three Months Ended June 30, 2016 | | | Three Months Ended June 30, 2015 | Percent Change from 2015 |
|---|---|---|---|---|---|---|
| | | U.S. [1] | Outside U.S. | Total | Total | |
| | | | | (Dollars in millions) | | |
| Humalog | $ | 420.0 | $ 281.9 | $ 701.9 | $ 654.3 | 7 |
| Cialis | | 383.2 | 247.3 | 630.5 | 567.9 | 11 |
| Alimta | | 291.0 | 316.1 | 607.1 | 664.3 | (9) |
| Forteo® | | 186.4 | 181.2 | 367.6 | 328.4 | 12 |
| Humulin® | | 204.3 | 128.0 | 332.3 | 316.4 | 5 |
| Cymbalta | | 60.5 | 176.0 | 236.5 | 274.1 | (14) |
| Strattera | | 143.5 | 81.1 | 224.6 | 191.8 | 17 |
| Zyprexa | | 14.5 | 196.2 | 210.7 | 253.7 | (17) |
| Trulicity | | 161.4 | 39.9 | 201.3 | 44.3 | NM |
| Erbitux | | 156.8 | 23.8 | 180.6 | 134.6 | 34 |
| Cyramza | | 67.9 | 79.1 | 147.0 | 87.7 | 68 |
| Effient® | | 116.8 | 18.3 | 135.1 | 128.8 | 5 |
| Trajenta® | | 48.6 | 72.4 | 121.0 | 80.0 | 51 |
| Other human pharmaceutical products | | 190.5 | 258.3 | 448.8 | 411.6 | 9 |
| Animal health products | | 444.5 | 415.3 | 859.8 | 840.8 | 2 |
| Revenue | $ | 2,889.9 | $ 2,514.9 | $ 5,404.8 | $ 4,978.7 | 9 |

| Product | | Six Months Ended June 30, 2016 | | | Six Months Ended June 30, 2015 | Percent Change from 2015 |
|---|---|---|---|---|---|---|
| | | U.S. [1] | Outside U.S. | Total | Total | |
| | | | | (Dollars in millions) | | |
| Humalog | $ | 781.6 | $ 526.6 | $ 1,308.2 | $ 1,338.2 | (2) |
| Cialis | | 707.2 | 500.0 | 1,207.2 | 1,106.2 | 9 |
| Alimta | | 554.1 | 617.2 | 1,171.3 | 1,237.4 | (5) |
| Humulin | | 444.4 | 244.3 | 688.7 | 632.1 | 9 |
| Forteo | | 334.5 | 351.8 | 686.3 | 621.4 | 10 |
| Cymbalta | | 83.8 | 351.4 | 435.2 | 561.1 | (22) |
| Zyprexa | | 52.4 | 371.0 | 423.4 | 473.2 | (11) |
| Strattera | | 260.1 | 152.6 | 412.7 | 365.5 | 13 |
| Erbitux | | 297.1 | 51.5 | 348.6 | 222.8 | 56 |
| Trulicity | | 280.8 | 64.1 | 344.9 | 62.6 | NM |
| Cyramza | | 139.5 | 138.5 | 278.0 | 155.2 | 79 |
| Effient | | 226.4 | 40.2 | 266.6 | 250.6 | 6 |
| Trajenta | | 87.0 | 128.4 | 215.4 | 162.4 | 33 |
| Other human pharmaceutical products | | 359.7 | 509.3 | 869.0 | 844.2 | 3 |
| Animal health products | | 836.9 | 777.5 | 1,614.4 | 1,590.5 | 1 |
| Revenue | $ | 5,445.5 | $ 4,824.4 | $ 10,269.9 | $ 9,623.4 | 7 |

[1] U.S. revenue includes revenue in Puerto Rico.

NM - not meaningful

40

Revenues of Humalog, our injectable human insulin analog for the treatment of diabetes, increased 5 percent in the U.S. during the second quarter of 2016 driven by increased demand, partially offset by lower realized prices. For the first six months of 2016, U.S. revenue decreased 5 percent driven by lower realized prices, partially offset by increased demand. The decrease in realized prices for the first six months of 2016 primarily resulted from a first quarter change in estimate for rebates and discounts. Revenues outside the U.S. increased 11 percent during the second quarter primarily driven by increased volume, partially offset by the unfavorable impact of foreign exchange rates. For the first six months of 2016, revenues outside the U.S. increased 2 percent driven by increased volume, largely offset by the unfavorable impact of foreign exchange rates.

Revenues of Cialis, a treatment for erectile dysfunction and benign prostatic hyperplasia, increased 24 percent and 27 percent in the U.S. during the second quarter and first six months of 2016, respectively, driven primarily by higher realized prices, and to a lesser extent, increased volume. Revenues outside the U.S. decreased 4 percent and 9 percent during the second quarter and first six months of 2016, respectively, primarily driven by the unfavorable impact of foreign exchange rates and decreased volume.

Revenues of Alimta, a treatment for various cancers, decreased 12 percent and 5 percent in the U.S. during the second quarter and first six months of 2016, respectively, driven primarily by decreased demand due to competitive pressure. For the first six months of 2016, the decrease in demand was partially offset by wholesaler buying patterns. Revenues outside the U.S. decreased 5 percent during the second quarter of 2016, driven by decreased volume and lower realized prices, partially offset by the favorable impact of foreign exchange rates. For the first six months of 2016, revenues outside the U.S. decreased 6 percent, driven by lower realized prices, decreased volume, and the unfavorable impact of foreign exchange rates. We are exposed to generic entry in multiple countries during 2016 that may erode revenues from current levels.

Revenues of Humulin, an injectable human insulin for the treatment of diabetes, increased 9 percent in the U.S. in the second quarter of 2016, driven by increased volume. For the first six months of 2016, revenues increased 21 percent in the U.S., driven by higher realized prices and, to a lesser extent, increased volume. The increase in our realized prices resulted from a first quarter change in estimate of a government rebate. Revenues outside the U.S. remained relatively flat in the second quarter of 2016. For the first six months of 2016, revenues outside the U.S. decreased 8 percent, driven by the unfavorable impact of foreign exchange rates and decreased volume.

Revenues of Forteo, an injectable treatment for osteoporosis in postmenopausal women and men at high risk for fracture and for glucocorticoid-induced osteoporosis in men and postmenopausal women, increased 29 percent and 25 percent in the U.S. in the second quarter and first six months of 2016, respectively, driven by higher realized prices. Revenues outside the U.S. increased 1 percent in the second quarter of 2016, driven by lower realized prices, largely offset by increased volume and the favorable impact of foreign exchange rates. For the first six months of 2016, revenues outside the U.S. decreased 1 percent, as lower realized prices were essentially offset by increased volume.

Revenues of Cymbalta, a product for the treatment of major depressive disorder, diabetic peripheral neuropathic pain, generalized anxiety disorder, and for the treatment of chronic musculoskeletal pain and the management of fibromyalgia, increased 49 percent and decreased 12 percent in the U.S. in the second quarter and first six months of 2016, respectively. The revenue increase in the second quarter of 2016 was driven by adjustments to the return reserve resulting from the expiration of the period to return expired product for credit. Revenues outside the U.S. decreased 25 percent outside the U.S. in the second quarter and first six months of 2016, driven by the loss of exclusivity in Europe in 2014.

Revenues of Zyprexa, a treatment for schizophrenia, acute mixed or manic episodes associated with bipolar I disorder, and bipolar maintenance, remained flat outside the U.S. in the second quarter of 2016 as lower realized prices and decreased volume were essentially offset by the favorable impact of foreign exchange rates. For the first six months of 2016, revenues outside the U.S. decreased 5 percent, due to lower realized prices and decreased volume, partially offset by the favorable impact of foreign exchange rates. We lost patent exclusivity for Zyprexa in Japan in December 2015 and generic competition launched in June 2016. Zyprexa revenues in Japan were $114.6 million and $208.2 million for the second quarter and first six months of 2016, respectively, compared with $106.4 million and $200.3 million for the second quarter and first six months of 2015, respectively.

Revenues of Strattera, a treatment for attention-deficit hyperactivity disorder, increased 19 percent and 13 percent in the U.S. in the second quarter and first six months of 2016, driven by higher realized prices and, to a lesser extent, increased demand. Revenues outside the U.S. increased 15 percent and 12 percent during the second quarter and first six months of 2016, respectively, driven by increased volume.

Revenues of Erbitux, a treatment for various cancers, increased 36 percent and 67 percent in the U.S. in the second quarter and first six months of 2016, respectively, due to the transfer of commercialization rights in the U.S. and Canada (collectively, North America) that occurred on October 1, 2015.

Revenues of Trulicity, a treatment for type 2 diabetes, were $161.4 million and $280.8 million in the U.S. during the second quarter and first six months of 2016, respectively, driven by growth in the GLP-1 market and increased share of market for Trulicity. Revenues of Trulicity outside the U.S. were $39.9 million and $64.1 million during the second quarter and first six months of 2016, respectively.

Revenues of animal health products increased 8 percent and 9 percent in the U.S. in the second quarter and first six months of 2016, respectively, due to wholesaler buying patterns and uptake of new companion animal products. The increase in revenues for companion animal products was partially offset by decreased revenues for food animal products in the second quarter of 2016. Revenues outside the U.S. decreased 3 percent and 5 percent in the second quarter and first six months of 2016, respectively, primarily due to the unfavorable impact of foreign exchange rates.

**Gross Margin, Costs, and Expenses**

Gross margin as a percent of revenue decreased 2.6 percentage points to 72.9 percent for the second quarter of 2016 compared with the second quarter of 2015 and decreased 2.0 percentage points to 72.9 percent for the first six months of 2016 compared with the first six months of 2015. The decline was primarily due to a lower benefit from foreign exchange rates on international inventories sold and, to a lesser extent, the transfer of Erbitux commercialization rights in North America, partially offset by 2015 inventory step-up costs related to the acquisition of Novartis AH.

Research and development expenses increased 14 percent to $1.34 billion for the second quarter of 2016 and increased 16 percent to $2.56 billion for the first six months of 2016. The increase was driven primarily by higher late-stage clinical development costs, including a $100.0 million charge related to a development milestone for AZD3293, a BACE inhibitor, in development with AstraZeneca UK Limited. The first six months of 2016 also included a charge of $55.0 million for milestone payments to Incyte Corporation for the regulatory submissions of baricitinib in the U.S. and Europe. See Note 4 to the consolidated condensed financial statements for additional information.

Marketing, selling, and administrative expenses decreased 1 percent to $1.62 billion for the second quarter of 2016 and decreased 2 percent to $3.10 billion for the first six months of 2016. The decrease was primarily due to lower litigation expenses and reduced spending on late life-cycle products, partially offset by expenses related to new products. For the first six months of 2016, the favorable impact of foreign exchange rates also contributed to the decrease.

There were no acquired IPR&D charges recognized in the second quarter and first six months of 2016, compared with charges of $80.0 million and $336.0 million for the second quarter of 2016 and first six months ended June 30, 2015, respectively. The charges for the second quarter of 2015 included a $50.0 million payment to Hanmi related to an exclusive license and collaboration agreement for Hanmi's oral Bruton's tyrosine kinase inhibitor and a $30.0 million payment to BioNTech related to the research collaboration to discover novel cancer immunotherapies. The first six months of 2015 also included a $200.0 million payment to Pfizer following an FDA decision allowing the resumption of Phase III clinical trials for tanezumab and a $56.0 million payment to Innovent associated with a collaboration to develop potential oncology therapies. See Notes 3 and 4 to the consolidated condensed financial statements for additional information.

We recognized asset impairment, restructuring, and other special charges of $58.0 million and $72.4 million in the second quarters of 2016 and 2015, respectively, related to integration costs for Novartis AH, severance costs, and asset impairments. For the first six months of 2016 and 2015, we recognized asset impairment, restructuring, and other special charges of $189.4 million and $180.4 million, respectively. The charges for the first six months of 2016 were associated with asset impairments related to the closure of an animal health manufacturing facility in Ireland as well as integration and severance costs related to the acquisition of Novartis AH. The 2015 charges primarily related to integration costs and intangible asset impairments due to product rationalization resulting from the acquisition of Novartis AH. See Note 5 to the consolidated condensed financial statements for additional information.

Other–net, (income) expense was income of $21.2 million and expense of $127.8 million for the second quarter and first six months of 2016, respectively, compared with expense of $123.3 million and $30.6 million for the same respective periods in 2015. Other expense during the first six months of 2016 was driven by a $203.9 million charge

42

related to the impact of the Venezuelan financial crisis, including the significant deterioration of the bolívar. Other expense during the second quarter and first six months of 2015 was driven by a net charge of $152.7 million related to the repurchase of $1.65 billion of debt. See Note 12 to the consolidated condensed financial statements for additional information.

The effective tax rates were 20.8 percent and 21.4 percent for the second quarter and first six months of 2016, respectively, compared with 11.6 percent and 12.9 percent for the same respective periods in 2015. The increase in the effective tax rates for the second quarter and first six months of 2016 as compared with the same respective periods of 2015 is primarily due to the tax impact of 2015 charges, including acquired IPR&D charges; asset impairment, restructuring, and other special charges; and a net charge related to the repurchase of debt.

**Financial Condition**

Cash and cash equivalents decreased to $3.24 billion as of June 30, 2016, compared with $3.67 billion as of December 31, 2015. Refer to the consolidated condensed statements of cash flows for additional details on the significant sources and uses of cash for the six months ended June 30, 2016 and 2015.

In addition to our cash and cash equivalents, we held total investments of $5.15 billion and $4.43 billion as of June 30, 2016 and December 31, 2015, respectively. See Note 6 to the consolidated condensed financial statements for additional details.

Total debt increased to $9.33 billion as of June 30, 2016, compared with $7.98 billion as of December 31, 2015. The increase was primarily due to the issuance of $1.21 billion of fixed-rate notes. See Note 6 to the consolidated condensed financial statements for additional details. At June 30, 2016, we had approximately $1.2 billion available to us under our corporate credit facility, which is available to support our commercial paper program. We believe that amounts accessible through existing commercial paper markets should be adequate to fund short-term borrowings.

During the six months ended June 30, 2016, we purchased $300.1 million of shares associated with our previously announced $5.00 billion share repurchase program.

We believe that cash generated from operations, along with available cash and cash equivalents, will be sufficient to fund our normal operating needs, including dividends, share repurchases, and capital expenditures. Various risks and uncertainties, including those discussed in "Forward-Looking Statements", may affect our operating results and cash generated from operations.

See "Other Matters—Patent Matters" for information regarding recent and upcoming losses of patent protection for Cymbalta (Europe), Alimta (U.S., Europe, and Japan), Zyprexa (Japan), Strattera (U.S.), and Cialis (U.S. and Europe).

Both domestically and abroad, we continue to monitor the potential impacts of the economic environment; the creditworthiness of our wholesalers and other customers, including foreign government-backed agencies and suppliers; the uncertain impact of health care legislation; various international government funding levels; and changes in foreign currency exchange rates (see "Other Matters—Foreign Currency Exchange Rates").

**Financial Expectations**

We have confirmed our 2016 financial guidance. Full-year 2016 EPS is still expected to be in the range of $2.68 to $2.78. We still expect 2016 revenue of between $20.6 billion and $21.1 billion.

Gross margin as a percent of revenue is still expected to be approximately 73 percent. Research and development expenses are still expected to be in the range of $4.9 billion to $5.1 billion. Marketing, selling, and administrative expenses are still expected to be in the range of $6.1 billion to $6.3 billion. Other—net, (income) expense is still expected to be in a range between $125 million and $200 million of expense.

The 2016 tax rate is still expected to be approximately 21 percent.

Capital expenditures are still expected to be approximately $1.1 billion.

Our financial expectations through the remainder of the decade include at least 5 percent average annual revenue growth driven by volume, along with an increase in gross margin as a percent of revenue, both on a constant currency basis. We also plan to return to annual dividend increases for shareholders and reaffirmed our commitment to achieve an operating expense-to-revenue ratio of 50 percent or less in 2018.

Various risks and uncertainties, including those discussed in "Forward-Looking Statements" may cause our actual results to differ materially from these forward-looking statements.

**Available Information on our Website**

We make available through our company website, free of charge, our company filings with the Securities and Exchange Commission (SEC) as soon as reasonably practicable after we electronically file them with, or furnish them to, the SEC. The reports we make available include annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements, registration statements, and any amendments to those documents.

The website link to our SEC filings is **http://investor.lilly.com/sec.cfm**.

### Item 4. Controls and Procedures

(a)   *Evaluation of Disclosure Controls and Procedures.* Under applicable SEC regulations, management of a reporting company, with the participation of the principal executive officer and principal financial officer, must periodically evaluate the company's "disclosure controls and procedures," which are defined generally as controls and other procedures of a reporting company designed to ensure that information required to be disclosed by the reporting company in its periodic reports filed with the SEC (such as this Form 10-Q) is recorded, processed, summarized, and reported on a timely basis.

Our management, with the participation of John C. Lechleiter, Ph.D., chairman, president, and chief executive officer, and Derica W. Rice, executive vice president, global services, and chief financial officer, evaluated our disclosure controls and procedures as of June 30, 2016, and concluded that they are effective.

(b)   *Changes in Internal Controls.* During the second quarter of 2016, there were no changes in our internal control over financial reporting that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

44

## PART II. Other Information

***Item 1. Legal Proceedings***

See "Notes to Consolidated Condensed Financial Statements—Note 10, Contingencies" for information on various legal proceedings, including but not limited to:

- The patent litigation and administrative proceedings involving Alimta and Effient.

- The product liability litigation involving Actos®, Byetta®, Cymbalta, and Prozac®.

- The employee litigation in Brazil.

That information is incorporated into this Item by reference.

This Item should be read in conjunction with the Legal Proceedings disclosures in our Annual Report on Form 10-K for the year ended December 31, 2015 (Part I, Item 3).

We are engaged in U.S. patent litigation involving Forteo brought pursuant to procedures set out in the Drug Price Competition and Patent Term Restoration Act of 1984. Teva Pharmaceuticals USA, Inc. has filed an Abbreviated New Drug Application with the FDA seeking approval to market generic versions of Forteo and has filed a notice alleging that a number of our patents covering various formulations and methods of use for Forteo are invalid and/or not infringed. In March 2016, we filed a patent infringement suit against Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. asserting six different patents with expiration dates ranging from December 2018 to August 2019.

We have received a civil investigative demand from the U.S. Attorney's Office for the Southern District of New York requesting documents and information relating to our contracts with, services performed by and payments to pharmacy benefit managers. We are cooperating with this investigation.

We are also a defendant in other litigation and investigations, including product liability, patent, employment, and premises liability litigation, of a character we regard as normal to our business.

***Item 1A. Risk Factors***

Our material risk factors are disclosed in Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2015. There have been no material changes from the risk factors previously disclosed in our Annual Report.

***Item 2. Unregistered Sales of Equity Securities and Use of Proceeds***

There were no share repurchases during the three months ended June 30, 2016.

**Item 6. Exhibits**

The following documents are filed as exhibits to this Report:

| | |
|---|---|
| EXHIBIT 3.1 | Amended Articles of Incorporation |
| EXHIBIT 3.2 | By-laws, as amended |
| EXHIBIT 12. | Statement re: Computation of Ratio of Earnings to Fixed Charges |
| EXHIBIT 31.1 | Rule 13a-14(a) Certification of John C. Lechleiter, Ph.D., Chairman, President, and Chief Executive Officer |
| EXHIBIT 31.2 | Rule 13a-14(a) Certification of Derica W. Rice, Executive Vice President, Global Services and Chief Financial Officer |
| EXHIBIT 32. | Section 1350 Certification |
| EXHIBIT 101. | Interactive Data File |

46

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned thereunto duly authorized.

<u>ELI LILLY AND COMPANY</u>
(Registrant)

Date:   July 28, 2016      /s/Bronwen L. Mantlo
                           Bronwen L. Mantlo
                           Corporate Secretary

Date:   July 28, 2016      /s/Donald A. Zakrowski
                           Donald A. Zakrowski
                           Vice President, Finance and Chief Accounting Officer

**Index to Exhibits**

The following documents are filed as a part of this Report:

<u>Exhibit</u>

| | |
|---|---|
| EXHIBIT 3.1 | Amended Articles of Incorporation are incorporated by reference to Exhibit 3.1 to the Company's Report on Form 10-K for the year ended December 31, 2013. |
| EXHIBIT 3.2 | By-laws, as amended, are incorporated by reference to Exhibit 99 to the Company's Report on Form 8-K filed February 27, 2012. |
| EXHIBIT 12. | Statement re: Computation of Ratio of Earnings to Fixed Charges |
| EXHIBIT 31.1 | Rule 13a-14(a) Certification of John C. Lechleiter, Ph.D., Chairman, President, and Chief Executive Officer |
| EXHIBIT 31.2 | Rule 13a-14(a) Certification of Derica W. Rice, Executive Vice President, Global Services and Chief Financial Officer |
| EXHIBIT 32. | Section 1350 Certification |
| EXHIBIT 101. | Interactive Data File |

EXHIBIT 12. Statement Re: Computation of Ratio of Earnings to Fixed Charges

ELI LILLY AND COMPANY AND SUBSIDIARIES

(Dollars in millions)

| | Six Months Ended June 30, | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
| | (Unaudited) | | | | | |
| Consolidated pretax income | $ 1,511.3 | $ 2,790.0 | $ 3,000.3 | $ 5,889.3 | $ 5,408.2 | $ 5,349.5 |
| Interest [1] | 114.0 | 216.0 | 187.1 | 184.2 | 198.8 | 211.7 |
| Less interest capitalized during the period | (27.4) | (54.8) | (38.3) | (24.1) | (21.0) | (25.7) |
| Earnings | $ 1,597.9 | $ 2,951.2 | $ 3,149.1 | $ 6,049.4 | $ 5,586.0 | $ 5,535.5 |
| Fixed charges | $ 114.0 | $ 216.0 | $ 187.1 | $ 184.2 | $ 198.8 | $ 211.7 |
| Ratio of earnings to fixed charges | 14.0 | 13.7 | 16.8 | 32.8 | 28.1 | 26.1 |

[1] Interest is based upon interest expense reported as such in the consolidated condensed statements of operations and does not include any interest related to unrecognized tax benefits, which is included in income tax expense.

EXHIBIT 31.1 Rule 13a-14(a) Certification of John C. Lechleiter, Chairman, President, and Chief Executive Officer

**CERTIFICATIONS**

I, John C. Lechleiter, certify that:

1.  I have reviewed this report on Form 10-Q of Eli Lilly and Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    July 28, 2016

By:    /s/John C. Lechleiter
       _____
       John C. Lechleiter, Ph.D.

       Chairman, President, and Chief Executive Officer

EXHIBIT 31.2 Rule 13a-14(a) Certification of Derica W. Rice, Executive Vice President, Global Services, and Chief Financial Officer

## CERTIFICATIONS

I, Derica W. Rice, certify that:

1. I have reviewed this report on Form 10-Q of Eli Lilly and Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    July 28, 2016


By:      /s/ Derica W. Rice
_____
         Derica W. Rice
         Executive Vice President, Global Services,
            and Chief Financial Officer

EXHIBIT 32. Section 1350 Certification

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of Eli Lilly and Company, an Indiana corporation (the "Company"), does hereby certify that, to the best of their knowledge:

The Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    July 28, 2016                            /s/John C. Lechleiter
                                                  _____
                                                  John C. Lechleiter, Ph.D.
                                                  Chairman, President, and Chief Executive Officer

Date:    July 28, 2016                            /s/Derica W. Rice
                                                  _____
                                                  Derica W. Rice
                                                  Executive Vice President, Global Services, and Chief    Financial
                                                  Officer

# EXHIBIT 17

10-Q 1 esrx-09302016x10q.htm 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

_____

## FORM 10-Q

_____

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2016.**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____.**

**Commission File Number: 1-35490**

_____

# EXPRESS SCRIPTS HOLDING COMPANY
### (Exact name of registrant as specified in its charter)

_____

|  |  |
|---|---|
| **Delaware** | **45-2884094** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Express Way, St. Louis, MO** | **63121** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (314) 996-0900**

_____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

|  |  |  |  |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |

☐ (Do not check if a smaller reporting company)

Non-accelerated filer                                    Smaller reporting company  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Common stock outstanding as of September 30, 2016:                  616,621,000    Shares

**EXPRESS SCRIPTS HOLDING COMPANY**

INDEX

| | | | |
|---|---|---|---|
| Part I | Financial Information | | |
| | Item 1. | Financial Statements (unaudited) | 3 |
| | | a) Unaudited Consolidated Balance Sheet | 3 |
| | | b) Unaudited Consolidated Statement of Operations | 4 |
| | | c) Unaudited Consolidated Statement of Comprehensive Income | 5 |
| | | d) Unaudited Consolidated Statement of Changes in Stockholders' Equity | 6 |
| | | e) Unaudited Consolidated Statement of Cash Flows | 7 |
| | | f) Notes to Unaudited Consolidated Financial Statements | 8 |
| | Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 28 |
| | Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 38 |
| | Item 4. | Controls and Procedures | 38 |
| Part II | Other Information | | |
| | Item 1. | Legal Proceedings | 39 |
| | Item 1A. | Risk Factors – (Not Applicable) | — |
| | Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 42 |
| | Item 3. | Defaults Upon Senior Securities – (Not Applicable) | — |
| | Item 4. | Mine Safety Disclosures – (Not Applicable) | — |
| | Item 5. | Other Information – (Not Applicable) | — |
| | Item 6. | Exhibits | 42 |
| Signatures | | | 43 |
| Index to Exhibits | | | 44 |

2

PART I. FINANCIAL INFORMATION

**Item 1.**        **Financial Statements**

**EXPRESS SCRIPTS HOLDING COMPANY**
**Unaudited Consolidated Balance Sheet**

| *(in millions)* | September 30, 2016 | December 31, 2015 |
|---|---|---|
| Assets | | |
| Current assets: | | |
| Cash and cash equivalents | $ 2,304.7 | $ 3,186.3 |
| Receivables, net | 6,967.0 | 6,721.3 |
| Inventories | 1,677.4 | 2,023.1 |
| Prepaid expenses and other current assets | 173.9 | 128.8 |
| Total current assets | 11,123.0 | 12,059.5 |
| Property and equipment, net | 1,255.5 | 1,291.3 |
| Goodwill | 29,278.3 | 29,277.3 |
| Other intangible assets, net | 9,099.1 | 10,469.7 |
| Other assets | 153.4 | 145.5 |
| Total assets | $ 50,909.3 | $ 53,243.3 |
| | | |
| Liabilities and stockholders' equity | | |
| Current liabilities: | | |
| Claims and rebates payable | $ 8,717.1 | $ 9,397.7 |
| Accounts payable | 3,791.1 | 3,451.8 |
| Accrued expenses | 2,286.3 | 2,659.4 |
| Current maturities of long-term debt | 1,184.0 | 1,646.4 |
| Total current liabilities | 15,978.5 | 17,155.3 |
| Long-term debt | 14,924.5 | 13,946.3 |
| Deferred taxes | 3,734.8 | 4,069.8 |
| Other liabilities | 662.5 | 691.4 |
| Total liabilities | 35,300.3 | 35,862.8 |
| Commitments and contingencies (Note 8) | | |
| Stockholders' equity: | | |
| Preferred stock, 15.0 shares authorized, $0.01 par value per share; no shares issued and outstanding | — | — |
| Common stock, 2,985.0 shares authorized, $0.01 par value; shares issued: 856.8 and 854.5, respectively; shares outstanding: 616.6 and 676.9, respectively | 8.6 | 8.5 |
| Additional paid-in capital | 23,175.7 | 22,204.7 |
| Accumulated other comprehensive loss | (9.6) | (14.0) |
| Retained earnings | 10,366.5 | 8,396.8 |
| | 33,541.2 | 30,596.0 |
| Common stock in treasury at cost, 240.2 and 177.6 shares, respectively | (17,940.9) | (13,223.2) |
| Total Express Scripts stockholders' equity | 15,600.3 | 17,372.8 |
| Non-controlling interest | 8.7 | 7.7 |
| Total stockholders' equity | 15,609.0 | 17,380.5 |
| Total liabilities and stockholders' equity | $ 50,909.3 | $ 53,243.3 |

*See accompanying Notes to Unaudited Consolidated Financial Statements*

Table of Contents

**EXPRESS SCRIPTS HOLDING COMPANY**
**Unaudited Consolidated Statement of Operations**

| (in millions, except per share data) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Revenues[1] | $ 25,410.1 | $ 25,222.6 | $ 75,424.2 | $ 75,576.4 |
| Cost of revenues[1] | 23,136.0 | 23,049.1 | 69,141.9 | 69,437.7 |
| Gross profit | 2,274.1 | 2,173.5 | 6,282.3 | 6,138.7 |
| Selling, general and administrative | 858.1 | 1,007.3 | 2,669.2 | 3,013.2 |
| Operating income | 1,416.0 | 1,166.2 | 3,613.1 | 3,125.5 |
| Other (expense) income: | | | | |
| Interest income and other | 8.3 | 7.8 | 27.4 | 19.1 |
| Interest expense and other | (273.4) | (128.4) | (548.8) | (377.1) |
| | (265.1) | (120.6) | (521.4) | (358.0) |
| Income before income taxes | 1,150.9 | 1,045.6 | 3,091.7 | 2,767.5 |
| Provision for income taxes | 422.4 | 378.2 | 1,103.9 | 1,046.9 |
| Net income | 728.5 | 667.4 | 1,987.8 | 1,720.6 |
| Less: Net income attributable to non-controlling interest | 5.6 | 5.7 | 18.1 | 17.7 |
| Net income attributable to Express Scripts | $ 722.9 | $ 661.7 | $ 1,969.7 | $ 1,702.9 |
| | | | | |
| Weighted-average number of common shares outstanding during the period: | | | | |
| Basic | 622.6 | 676.3 | 632.9 | 693.1 |
| Diluted | 627.1 | 682.2 | 637.4 | 699.5 |
| Earnings per share: | | | | |
| Basic | $ 1.16 | $ 0.98 | $ 3.11 | $ 2.46 |
| Diluted | $ 1.15 | $ 0.97 | $ 3.09 | $ 2.43 |

1    Includes retail pharmacy co-payments of $2,008.5 million and $2,161.5 million for the three months ended September 30, 2016 and 2015, respectively, and $6,685.9 million and $7,118.2 million for the nine months ended September 30, 2016 and 2015, respectively.

See accompanying Notes to Unaudited Consolidated Financial Statements

4

**EXPRESS SCRIPTS HOLDING COMPANY**
**Unaudited Consolidated Statement of Comprehensive Income**

| *(in millions)* | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2016 | 2015 |
| Net income | $ 728.5 | $ 667.4 | $ 1,987.8 | $ 1,720.6 |
| Other comprehensive income (loss): | | | | |
| Foreign currency translation adjustment | (1.7) | (7.3) | 4.4 | (12.8) |
| Comprehensive income | 726.8 | 660.1 | 1,992.2 | 1,707.8 |
| Less: Comprehensive income attributable to non-controlling interest | 5.6 | 5.7 | 18.1 | 17.7 |
| Comprehensive income attributable to Express Scripts | $ 721.2 | $ 654.4 | $ 1,974.1 | $ 1,690.1 |

*See accompanying Notes to Unaudited Consolidated Financial Statements*

5

**EXPRESS SCRIPTS HOLDING COMPANY**
**Unaudited Consolidated Statement of Changes in Stockholders' Equity**

| (in millions) | Number of Shares Common Stock | Common Stock | Additional Paid-in Capital | Accumulated Other Comprehensive Loss | Retained Earnings | Treasury Stock | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2015 | 854.5 | $ 8.5 | $ 22,204.7 | $ (14.0) | $ 8,396.8 | $ (13,223.2) | $ 7.7 | $ 17,380.5 |
| Net income | — | — | — | — | 1,969.7 | — | 18.1 | 1,987.8 |
| Other comprehensive income | — | — | — | 4.4 | — | — | — | 4.4 |
| Treasury stock acquired | — | — | 825.0 | — | — | (4,717.7) | — | (3,892.7) |
| Changes in stockholders' equity related to employee stock plans | 2.3 | 0.1 | 146.0 | — | — | — | — | 146.1 |
| Distributions to non-controlling interest | — | — | — | — | — | — | (17.1) | (17.1) |
| Balance at September 30, 2016 | 856.8 | $ 8.6 | $ 23,175.7 | $ (9.6) | $ 10,366.5 | $ (17,940.9) | $ 8.7 | $ 15,609.0 |

*See accompanying Notes to Unaudited Consolidated Financial Statements*

6

Table of Contents

## EXPRESS SCRIPTS HOLDING COMPANY
### Unaudited Consolidated Statement of Cash Flows

| | | Nine Months Ended September 30, | |
|---|---|---|---|
| *(in millions)* | | **2016** | **2015** |
| Cash flows from operating activities: | | | |
| Net income | $ | 1,987.8 | $ 1,720.6 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | | 1,611.2 | 1,727.7 |
| Deferred income taxes | | (334.0) | (270.5) |
| Employee stock-based compensation expense | | 81.9 | 86.8 |
| Other, net | | (19.1) | (45.3) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | | (270.7) | (1,468.7) |
| Inventories | | 345.7 | 382.7 |
| Other current and noncurrent assets | | (43.5) | (139.7) |
| Claims and rebates payable | | (680.7) | 250.4 |
| Accounts payable | | 348.0 | 172.2 |
| Accrued expenses | | (327.4) | (425.0) |
| Other current and noncurrent liabilities | | (28.7) | (16.9) |
| Net cash flows provided by operating activities | | 2,670.5 | 1,974.3 |
| Cash flows from investing activities: | | | |
| Purchases of property and equipment | | (237.6) | (177.1) |
| Other, net | | (7.6) | 19.2 |
| Net cash used in investing activities | | (245.2) | (157.9) |
| Cash flows from financing activities: | | | |
| Proceeds from long-term debt, net of discounts | | 5,986.8 | 5,500.0 |
| Repayment of long-term debt | | (5,395.0) | (3,353.3) |
| Treasury stock acquired | | (3,892.7) | (5,500.0) |
| Net proceeds from employee stock plans | | 56.0 | 155.0 |
| Excess tax benefit relating to employee stock-based compensation | | 11.1 | 53.0 |
| Other, net | | (75.7) | (58.8) |
| Net cash used in financing activities | | (3,309.5) | (3,204.1) |
| Effect of foreign currency translation adjustment | | 2.6 | (6.7) |
| Net decrease in cash and cash equivalents | | (881.6) | (1,394.4) |
| Cash and cash equivalents at beginning of period | | 3,186.3 | 1,832.6 |
| Cash and cash equivalents at end of period | $ | 2,304.7 | $ 438.2 |

*See accompanying Notes to Unaudited Consolidated Financial Statements*

7

**EXPRESS SCRIPTS HOLDING COMPANY**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1 - Summary of significant accounting policies**

      Our significant accounting policies, normally included in financial statements prepared in conformity with generally accepted accounting principles, have been omitted from this Form 10-Q pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). We believe the disclosures contained in this Form 10-Q are adequate to fairly state the information when read in conjunction with the Notes to the Consolidated Financial Statements included in our 2015 Annual Financial Statements for the year ended December 31, 2015, included in Item 8 - Consolidated Financial Statements and Supplementary Data for the year ended December 31, 2015, included on Form 10-K filed with the SEC on February 16, 2016. For a description of our accounting policies, refer to the Notes to the Consolidated Financial Statements included therein.

      We believe the accompanying unaudited consolidated financial statements reflect all adjustments (consisting of only normal recurring adjustments) necessary to state fairly the unaudited consolidated balance sheet as of September 30, 2016, the consolidated balance sheet as of December 31, 2015, the unaudited consolidated statement of operations and unaudited consolidated statement of comprehensive income for the three and nine months ended September 30, 2016 and 2015, the unaudited consolidated statement of changes in stockholders' equity for the nine months ended September 30, 2016, and the unaudited consolidated statement of cash flows for the nine months ended September 30, 2016 and 2015. Certain amounts in the prior year have been reclassified to conform to the current year presentation. Operating results for the three and nine months ended September 30, 2016 are not necessarily indicative of the results that may be expected for the year ending December 31, 2016.

      ***New accounting guidance***. In August 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2016-15, Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments. The guidance addresses the classification of cash flow related to (1) debt prepayment or extinguishment costs, (2) settlement of zero-coupon debt instruments or other debt instruments with coupon rates that are insignificant in relation to the effective interest rate of the borrowing, (3) contingent consideration payments made after a business combination, (4) proceeds from the settlement of insurance claims, (5) proceeds from the settlement of corporate-owned life insurance, including bank-owned life insurance, (6) distributions received from equity method investees and (7) beneficial interests in securitization transactions. The guidance also clarifies how the predominance principle should be applied when cash receipts and cash payments have aspects of more than one class of cash flows. The guidance will generally be applied retrospectively and is effective for financial statements issued for annual reporting periods beginning after December 15, 2017. Early application is permitted. We are currently evaluating the impact of this standard on our consolidated statement of cash flows.

      In March 2016, FASB issued ASU 2016-09, Improvements to Employee Share-Based Payment Accounting, which amends Accounting Standards Codification ("ASC") Topic 718, Compensation – Stock Compensation. The new standard simplifies the accounting for stock-based compensation, including amendments on how both taxes related to stock-based compensation and cash payments made to taxing authorities are recorded. These amendments are expected to impact net income, earnings per share ("EPS") and the consolidated statement of cash flows. The new guidance is effective for financial statements issued for annual reporting periods beginning after December 15, 2016, and early application is permitted, with any adjustments reflected as of the beginning of the fiscal year of adoption. We are currently evaluating the impact of this standard on our consolidated financial statements.

      In February 2016, FASB issued ASU 2016-02, Leases (ASC Topic 842), which supersedes ASC Topic 840, Leases. This ASU is intended to increase transparency and comparability of organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The new guidance is effective for financial statements issued for annual reporting periods beginning after December 15, 2018, and early application is permitted. We are currently evaluating the impact of this standard on our consolidated financial statements.

      In May 2014, FASB issued ASU 2014-09, Revenue from Contracts with Customers (ASC Topic 606), which supersedes ASC Topic 605, Revenue Recognition. The new standard requires companies to recognize revenues upon transfer of goods or services to customers in amounts that reflect the consideration which the company expects to receive in exchange for those goods or services. In July 2015, the FASB delayed the effective date of the standard by one year. The new guidance is effective for financial statements issued for annual reporting periods beginning after December 15, 2017, and early application is not permitted before the original effective date of annual reporting periods beginning after December 15, 2016. We are currently evaluating the impact of this standard on our consolidated financial statements.

Table of Contents

**Note 2 - Fair value measurements**

Authoritative guidance regarding fair value measurement establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets for identical assets or liabilities; Level 2, defined as inputs other than quoted prices for similar assets and liabilities in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs for which little or no market data exists, therefore requiring an entity to develop its own assumptions.

The fair values of cash and cash equivalents and investments (Level 1), accounts receivable, claims and rebates payable and accounts payable approximate carrying values due to the short-term maturities of these instruments. Financial assets accounted for at fair value on a recurring basis include cash equivalents (included in other assets and consisting primarily of mutual funds) of $29.5 million and $26.8 million as of September 30, 2016 and December 31, 2015, respectively. These assets are carried at fair value based on quoted prices in active markets for identical securities (Level 1). Cash equivalents include investments in AAA-rated money market mutual funds with original maturities of less than 90 days.

The fair values, which approximate the carrying values, of our 2015 two-year term loan and 2015 five-year term loan (Level 2) (as defined in Note 5 - Financing) were estimated using the current market rates for debt with similar maturities. The fair values of our senior notes are $13,695.0 million and $11,078.0 million as of September 30, 2016 and December 31, 2015, respectively. See Note 5 - Financing for further discussion of the carrying values of our debt. The fair values of our senior notes were estimated based on observable market information (Level 2). In determining the fair values of liabilities, we took into consideration the risk of nonperformance. Nonperformance risk refers to the risk the obligation will not be fulfilled and affects the value at which the liability would be transferred to a market participant. This risk did not have a material impact on the fair values of our liabilities.

9

Table of Contents

**Note 3 - Goodwill and other intangible assets**

Following is a summary of our goodwill and other intangible assets for our two reportable segments, Pharmacy Benefit Management ("PBM") and Other Business Operations.

| (in millions) | September 30, 2016 | | | December 31, 2015 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Goodwill | | | | | | |
| PBM | $ 29,287.8 | $ (106.9) | $ 29,180.9 | $ 29,286.7 | $ (106.8) | $ 29,179.9 |
| Other Business Operations | 97.4 | — | 97.4 | 97.4 | — | 97.4 |
| | $ 29,385.2 | $ (106.9) | $ 29,278.3 | $ 29,384.1 | $ (106.8) | $ 29,277.3 |
| Other intangible assets | | | | | | |
| PBM | | | | | | |
| Customer contracts | $ 17,570.7 | $ (8,629.9) | $ 8,940.8 | $ 17,570.3 | $ (7,290.0) | $ 10,280.3 |
| Trade names | 226.6 | (100.3) | 126.3 | 226.6 | (83.6) | 143.0 |
| Miscellaneous | 8.7 | (7.8) | 0.9 | 8.7 | (6.5) | 2.2 |
| | 17,806.0 | (8,738.0) | 9,068.0 | 17,805.6 | (7,380.1) | 10,425.5 |
| Other Business Operations | | | | | | |
| Customer relationships | 107.5 | (95.9) | 11.6 | 120.1 | (98.1) | 22.0 |
| Trade names | 35.7 | (16.2) | 19.5 | 35.7 | (13.5) | 22.2 |
| | 143.2 | (112.1) | 31.1 | 155.8 | (111.6) | 44.2 |
| Total other intangible assets | $ 17,949.2 | $ (8,850.1) | $ 9,099.1 | $ 17,961.4 | $ (7,491.7) | $ 10,469.7 |

Following is a summary of the change in the net carrying value of goodwill by reportable segment:

| (in millions) | PBM | Other Business Operations | Total |
| --- | --- | --- | --- |
| Balance at December 31, 2015 | $ 29,179.9 | $ 97.4 | $ 29,277.3 |
| Foreign currency translation | 1.0 | — | 1.0 |
| Balance at September 30, 2016 | $ 29,180.9 | $ 97.4 | $ 29,278.3 |

The aggregate amount of amortization expense of other intangible assets was $463.7 million and $432.9 million for the three months ended September 30, 2016 and 2015, respectively, and $1,370.7 million and $1,298.3 million for the nine months ended September 30, 2016 and 2015, respectively.

Included in total amortization expense is $55.4 million and $23.8 million for the three months ended September 30, 2016 and 2015, respectively, and $145.1 million and $71.4 million for the nine months ended September 30, 2016 and 2015, respectively, related to our 10-year contract with Anthem, Inc. ("Anthem") to provide PBM services to members of the affiliated health plans of Anthem, which amounts are included as an offset to revenues. When we executed our agreement with Anthem in 2009, we considered the overall structure of the agreement and the nature of our relationship with Anthem, including the complexity of the service level required, and attributed a reasonable likelihood of renewal at the end of its term in 2019. Accordingly, we amortized the agreement using a modified pattern of benefit over an estimated useful life of 15 years. However, due to the sequence of events regarding our discussions with Anthem, culminating in the filing of a lawsuit by Anthem on March 21, 2016, we felt it prudent to consider the increased likelihood of either non-renewal or renewal on substantially different terms such that, beginning in March 2016, we began amortizing our agreement with Anthem over the remaining term of the contract (i.e., using a life of 10 years from the time the agreement was executed in 2009). Previously, we amortized the agreement over 15 years. Therefore, the intangible asset amortization associated with the Anthem agreement will run through the remaining term of the contract at the end of 2019, reducing the previous amortization period by 5 years. This change increased intangible asset amortization by $10.5 million for the first quarter of 2016 and by approximately $32.0 million per quarter beginning in the second quarter of 2016.

The weighted-average amortization period of intangible assets subject to amortization is 15 years, and by major intangible asset class is 8 to 20 years for customer-related intangible assets, 10 years for trade names (excluding legacy Express Scripts, Inc. ("ESI") trade names which have an indefinite life) and 5 years for other intangible assets.

5/2/25, 1:32 PM    Document

Table of Contents

Following is a summary of the annual expected aggregate amortization of other intangible assets (in millions):

| Year Ended December 31, | Future Amortization |
|---|---:|
| 2016 | $ 1,833.0 |
| 2017 | 1,446.0 |
| 2018 | 1,436.0 |
| 2019 | 1,411.0 |
| 2020 | 762.0 |

## Note 4 - Earnings per share

Basic EPS is computed using the weighted-average number of common shares outstanding during the period. Diluted EPS is computed in the same manner as basic EPS, but adds the number of additional common shares that would have been outstanding for the period if the dilutive potential common shares had been issued. All shares are calculated under the "treasury stock" method. Following is the reconciliation between the number of weighted-average shares used in the basic and diluted EPS calculations:

| (in millions) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---:|---:|---:|---:|
| | 2016 | 2015 | 2016 | 2015 |
| Weighted-average number of common shares outstanding during the period—basic | 622.6 | 676.3 | 632.9 | 693.1 |
| Dilutive common stock equivalents:[1] | | | | |
| Outstanding stock options, restricted stock units and executive deferred compensation units | 4.5 | 5.9 | 4.5 | 6.4 |
| Weighted-average number of common shares outstanding during the period—diluted | 627.1 | 682.2 | 637.4 | 699.5 |

(1) Excludes equity awards of 8.6 million and 2.8 million for the three months ended September 30, 2016 and 2015, respectively, and 7.8 million and 2.2 million for the nine months ended September 30, 2016 and 2015, respectively. These were excluded because the effect is anti-dilutive.

11

**Table of Contents**

## Note 5 - Financing

Our debt, issued by us, ESI and Medco Health Solutions, Inc. ("Medco"), net of unamortized discounts, premiums and financing costs, consists of:

| Long-term Debt | Issuer | Basis Points[1] | September 30, 2016 | December 31, 2015 |
|---|---|---|---|---|
| | | | **Carrying Amount (in millions)** | |
| **Senior notes[2]** | | | | |
| $1,500.0 million, 3.125% senior notes due May 2016[3] | ESI | 20 | $ — | $ 1,498.7 |
| $1,500.0 million, 2.650% senior notes due February 2017[3] | Express Scripts | 35 | — | 1,494.4 |
| $500.0 million, 1.250% senior notes due June 2017[3] | Express Scripts | 10 | 499.3 | 498.6 |
| $1,200.0 million, 7.125% senior notes due March 2018[3] | Medco | 50 | 876.3 | 1,296.9 |
| $1,000.0 million, 2.250% senior notes due June 2019[3] | Express Scripts | 15 | 994.6 | 993.1 |
| $500.0 million, 7.250% senior notes due June 2019[3] | ESI | 50 | 336.1 | 497.4 |
| $500.0 million, 4.125% senior notes due September 2020[3] | Medco | 25 | 504.2 | 504.9 |
| $500.0 million, 3.300% senior notes due February 2021[3] | Express Scripts | 35 | 495.6 | — |
| $1,250.0 million, 4.750% senior notes due November 2021[3] | Express Scripts | 45 | 1,239.1 | 1,237.5 |
| $1,000.0 million, 3.900% senior notes due February 2022[3] | Express Scripts | 40 | 983.4 | 981.3 |
| $1,000.0 million, 3.000% senior notes due July 2023[3] | Express Scripts | 25 | 992.1 | — |
| $1,000.0 million, 3.500% senior notes due June 2024[3] | Express Scripts | 20 | 987.9 | 986.8 |
| $1,500.0 million, 4.500% senior notes due February 2026[3] | Express Scripts | 45 | 1,480.7 | — |
| $1,500.0 million, 3.400% senior notes due March 2027[4] | Express Scripts | 30 | 1,488.5 | — |
| $700.0 million, 6.125% senior notes due November 2041[3] | Express Scripts | 50 | 444.0 | 692.5 |
| $1,500.0 million, 4.800% senior notes due July 2046[3] | Express Scripts | 40 | 1,482.9 | — |
| Total senior notes | | | 12,804.7 | 10,682.1 |
| **Term loans** | | | | |
| $2,500.0 million, term loan due April 2017[5] | Express Scripts | N/A | 499.5 | 1,995.5 |
| $3,000.0 million, term loan due April 2020[5] | Express Scripts | N/A | 2,804.3 | 2,915.1 |
| Total term loans | | | 3,303.8 | 4,910.6 |
| Total debt | | | 16,108.5 | 15,592.7 |
| **Current maturities of debt** | | | | |
| $1,500.0 million, 3.125% senior notes due May 2016[2][3] | ESI | 20 | — | 1,498.7 |
| $500.0 million, 1.250% senior notes due June 2017[2][3] | Express Scripts | 10 | 499.3 | — |
| $2,500.0 million, term loan due April 2017[5] | Express Scripts | N/A | 499.5 | — |
| $3,000.0 million, term loan due April 2020[5] | Express Scripts | N/A | 185.2 | 147.7 |
| Total current maturities of long-term debt | | | 1,184.0 | 1,646.4 |
| Total long-term debt | | | $ 14,924.5 | $ 13,946.3 |

(1) All senior notes are redeemable prior to maturity at a price equal to the greater of (1) 100% of the aggregate principal amount of any notes being redeemed; or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the notes being redeemed discounted to the redemption date on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the treasury rate plus the basis points as indicated, plus in each case, unpaid interest on the notes being redeemed accrued to the redemption date.

(2) All senior notes are jointly and severally and fully and unconditionally (subject to certain customary release provisions, including sale, exchange, transfer or liquidation of the guarantor subsidiary) guaranteed on a senior unsecured basis by Express Scripts (if issued by either Medco or ESI) and by most of our current and future 100% owned domestic subsidiaries.

(3) Senior notes require interest to be paid semi-annually, commencing six months subsequent to issuance.

(4) Senior notes require interest to be paid semi-annually, commencing with September 2016.

(5) The 2015 two-year term loan and 2015 five-year term loan (each as defined below) had average interest rates of 1.62% and 1.74%, respectively, as of September 30, 2016 and 1.33% and 1.45%, respectively, as of December 31, 2015.

12

Table of Contents

**Bank credit facilities.** In April 2015, we entered into a credit agreement (the "2015 credit agreement") providing for a five-year $2,000.0 million revolving credit facility (the "2015 revolving facility"), a two-year $2,500.0 million term loan (the "2015 two-year term loan") and a five-year $3,000.0 million term loan (the "2015 five-year term loan"). At September 30, 2016, no amounts were outstanding under the 2015 revolving facility. We make quarterly principal payments on the 2015 five-year term loan.

The 2015 credit agreement requires interest to be paid, at our option, at LIBOR or an adjusted base rate, plus applicable margin. Depending on our consolidated leverage ratio, the applicable margin over LIBOR ranges from 0.900% to 1.300% for the 2015 revolving facility, 0.875% to 1.375% for the 2015 two-year term loan and 1.000% to 1.500% for the 2015 five-year term loan. The applicable margin over the adjusted base rate ranges from 0.000% to 0.300% for the 2015 revolving facility, 0.000% to 0.375% for the 2015 two-year term loan and 0.000% to 0.500% for the 2015 five-year term loan. We are required to pay commitment fees on the 2015 revolving facility, which range from 0.100% to 0.200% of the revolving loan commitments, depending on our consolidated leverage ratio.

We have two additional credit agreements, each providing for an uncommitted revolving credit facility: $150.0 million executed August 2015 and amended May 2016 with a termination date of May 2017, and $130.0 million executed December 2014 and amended October 2015 and April 2016 with a termination date of April 2017. At September 30, 2016, no amounts were drawn under either facility.

**Senior notes.** In February 2016, we issued senior notes (the "February 2016 Senior Notes") consisting of:

- $500.0 million aggregate principal amount of 3.300% senior notes due February 2021
- $1,500.0 million aggregate principal amount of 4.500% senior notes due February 2026

We used the net proceeds from the sale of the February 2016 Senior Notes to complete a tender offer and follow-on redemption of our 3.125% senior notes due May 2016 (which were fully redeemed in April 2016), to enter into an accelerated share repurchase program and for other general corporate purposes.

In March 2016, we completed the tender offer for $934.7 million of our $1,500.0 million aggregate principal amount of 3.125% senior notes due May 2016 using the proceeds of the February 2016 Senior Notes, and wrote off the associated amount of discounts and financing costs. In April 2016, we completed the redemption of the remaining $565.3 million aggregate principal. These notes were redeemed at a redemption price equal to the sum of the present values of the remaining scheduled payments of principal and interest on the notes being redeemed, not including unpaid interest accrued to the redemption date, discounted to the redemption date on a semiannual basis at the treasury rate plus 20 basis points, plus unpaid interest of the notes being redeemed accrued to the redemption date. Total cash payments, excluding accrued interest, related to these notes were $1,506.7 million, which included $6.7 million of repayment costs.

Financing costs of approximately $16.0 million for the issuance of the February 2016 Senior Notes are being amortized over a weighted-average period of 8.8 years.

In July 2016, we issued senior notes (the "July 2016 Senior Notes") consisting of:

- $1,000.0 million aggregate principal amount of 3.000% senior notes due July 2023
- $1,500.0 million aggregate principal amount of 3.400% senior notes due March 2027
- $1,500.0 million aggregate principal amount of 4.800% senior notes due July 2046

During the three months ended September 30, 2016, we used a portion of the net proceeds from the sale of the July 2016 Senior Notes for the following:

- To repay $1,500.0 of our $2,500.0 million aggregate principal 2015 two-year term loan (of which approximately $2,000.0 million was outstanding as of June 30, 2016).

- To complete a tender offer for $1,104.8 million and redeem the remaining $395.2 million of our $1,500.0 million aggregate principal amount of 2.650% senior notes due February 2017. These notes were redeemed at a redemption price equal to the sum of the present values of the remaining scheduled payments of principal and interest on the notes being redeemed, not including unpaid interest accrued to the redemption date, discounted to the redemption date on a semiannual basis at the treasury rate plus 35 basis points, plus unpaid interest of the notes being redeemed accrued to the redemption date.

- To complete a tender offer for $368.6 million of our $1,200.0 million aggregate principal amount of 7.125% senior notes due March 2018, $162.6 million of $500.0 million aggregate principal amount of 7.250% senior

13

Table of Contents

notes due June 2019 and $251.3 million of $700.0 million aggregate principal amount of 6.125% senior notes due November 2041.

In each of the above instances, we wrote off the associated amount of discounts, premiums and financing costs. Total cash payments related to the above, excluding accrued interest, were $3,919.6 million, which included approximately $136.0 million of repayment costs. We plan to use the remaining proceeds for general corporate purposes, which may include the repayment of our other indebtedness, working capital and repurchases of our common stock.

Financing costs of approximately $33.0 million for the issuance of the July 2016 Senior Notes are being amortized over a weighted-average period of 17.0 years.

*Covenants.* Our bank financing arrangements and senior notes contain certain customary covenants that restrict our ability to incur additional indebtedness, create or permit liens on assets and engage in mergers or consolidations. The covenants related to bank financing arrangements also include, among other things, a maximum leverage ratio. The 7.125% senior notes due March 2018 issued by Medco are also subject to an interest rate adjustment in the event of a downgrade in our credit ratings to below investment grade. At September 30, 2016, we were in compliance with all covenants associated with our debt instruments.

*Schedule of maturities.* Following is a schedule of maturities, excluding unamortized discounts, premiums and financing costs, for our long-term debt as of September 30, 2016 (in millions):

| Year Ended December 31, | Maturities of Long-term Debt | |
| --- | ---: | ---: |
| 2016[1] | $ | 37.5 |
| 2017 | | 1,225.0 |
| 2018 | | 1,206.4 |
| 2019 | | 2,537.4 |
| 2020 | | 1,475.0 |
| Thereafter | | 9,698.7 |
| Total | $ | 16,180.0 |

(1) Represents expected aggregate principal payments for the three months ending December 31, 2016.

## Note 6 - Common stock

*Accelerated share repurchases.* In January 2016, we settled the $5,500.0 million accelerated share repurchase agreement executed in April 2015 (the "2015 ASR Agreement") and received 9.1 million additional shares, resulting in a total of 64.2 million shares received under the 2015 ASR Agreement. The $825.0 million that had previously been recorded in additional paid-in capital in respect of the 2015 ASR Agreement was reclassified to treasury stock upon settlement of the 2015 ASR Agreement.

In February 2016, we entered into an accelerated share repurchase agreement (the "2016 ASR Agreement") to repurchase shares of our common stock for an initial payment (the "prepayment amount") of $2,800.0 million. Under the terms of the 2016 ASR Agreement, upon payment of the prepayment amount, we received an initial delivery of 32.1 million shares of our common stock at a price of $69.69 per share, which represented, based on the closing share price of our common stock on Nasdaq on February 25, 2016, approximately 80% of the prepayment amount. The final purchase price per share (the "forward price") and the final number of shares received were determined using the arithmetic mean of the daily volume-weighted average price per share of our common stock (the "VWAP") over the term of the 2016 ASR Agreement, less a discount and subject to adjustments pursuant to the terms of the 2016 ASR Agreement (including a cap on the forward price). In August 2016, we settled the 2016 ASR Agreement and received 6.2 million additional shares, resulting in a total of 38.3 million shares received under the 2016 ASR Agreement.

The 2016 ASR Agreement was accounted for as an initial treasury stock transaction and a forward stock purchase contract. We recorded an increase to treasury stock of $2,240.0 million and a decrease to additional paid-in capital of $560.0 million in the unaudited consolidated balance sheet. The $560.0 million recorded in additional paid-in capital was reclassified to treasury stock upon settlement of the 2016 ASR Agreement in August 2016. The forward stock purchase contract was classified as an equity instrument and was deemed to have a fair value of zero at the effective date of the 2016 ASR Agreement. The initial delivery of shares resulted in an immediate reduction of the outstanding shares used to calculate the weighted-average common shares outstanding for basic and diluted net income per share on the effective date of the 2016 ASR Agreement.

14

Table of Contents

*Treasury share repurchases.* Including the shares received under the 2016 ASR Agreement, we repurchased 14.1 million shares under our share repurchase program for $1,132.5 million during the three months ended September 30, 2016. There were no repurchases of the Company's common stock during the third quarter of 2015. Including the shares received under the 2016 ASR Agreement and upon settlement of the 2015 ASR Agreement, we repurchased 62.6 million shares and 55.1 million shares under our share repurchase program for $4,717.7 million and $4,675.0 million during the nine months ended September 30, 2016 and 2015, respectively. As of September 30, 2016, there were 26.0 million shares remaining under our share repurchase program. Additional share repurchases, if any, will be made in such amounts and at such times as we deem appropriate based upon prevailing market and business conditions and other factors.

## Note 7 - Stock-based compensation plans

In March 2016, our Board of Directors adopted the Express Scripts Holding Company 2016 Long-Term Incentive Plan (the "2016 LTIP"), which was approved by our stockholders in May 2016 and authorizes the grant of various equity awards with various terms to our officers, members of our Board of Directors and other key employees. The 2016 LTIP was approved by our stockholders and became effective on May 4, 2016. Under the 2016 LTIP, we may issue stock options, stock appreciation rights ("SARs"), restricted stock awards, restricted stock units, performance share awards and other types of awards. The maximum number of shares available for awards under the 2016 LTIP is 33.0 million. The maximum term of stock options, SARs, restricted stock awards, restricted stock units and performance shares granted under the 2016 LTIP is 10 years.

Effective May 4, 2016, no additional awards will be granted under the 2011 Long-Term Incentive Plan (the "2011 LTIP"), the Accredo Health, Incorporated 2002 Long-Term Incentive Plan (the "Accredo Plan"), the ESI 2000 Long-Term Incentive Plan (the "2000 LTIP") or the Medco 2002 Stock Incentive Plan (the "2002 SIP"), which authorized the grant of various equity awards with various terms to our officers, members of our Board of Directors and other key employees. However, the terms of these plans will continue to govern awards outstanding under these plans.

The provisions of the 2016 LTIP, the 2011 LTIP, the Accredo Plan, the 2000 LTIP and the 2002 SIP (collectively, the "stock incentive plans") allow employees to use shares to cover tax withholding on stock awards. Upon vesting of restricted stock and performance shares, employees have taxable income subject to statutory withholding requirements. The number of shares issued to employees may be reduced by the number of shares having a market value equal to our minimum statutory withholding for federal, state and local tax purposes.

Under the stock incentive plans, we have issued stock options, restricted stock units and performance shares. All such awards are settled by issuance of new shares.

Awards granted under the stock incentive plans are subject to accelerated vesting under certain specified circumstances, including upon a change in control and termination, and are also subject to forfeiture without consideration upon termination of employment under certain circumstances. The maximum term of stock options is generally 10 years.

We recognized stock-based compensation expense of $27.2 million and $32.4 million in the three months ended September 30, 2016 and 2015, respectively, and $81.9 million and $86.8 million in the nine months ended September 30, 2016 and 2015, respectively. Unamortized stock-based compensation as of September 30, 2016 was $45.4 million for stock options and $58.0 million for restricted stock units and performance shares.

*Stock options.* During the nine months ended September 30, 2016, we granted 4.2 million stock options with a weighted-average fair market value of $13.75 per share. Stock options granted generally have three-year graded vesting.

The fair value of stock options granted was estimated on the date of grant using a Black-Scholes multiple option-pricing model with the following weighted-average assumptions:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2016 | 2015 |
| Expected life of option | 3-5 years | 3-5 years | 3-5 years | 3-5 years |
| Risk-free interest rate | 0.9%-1.2% | 1.0%-1.6% | 0.9%-1.4% | 1.0%-1.7% |
| Expected volatility of stock | 20%-25% | 20%-25% | 20%-25% | 20%-26% |
| Expected dividend yield | None | None | None | None |

The Black-Scholes model requires subjective assumptions, including future stock price volatility and expected time to exercise, which affect the calculated values. The expected term and forfeiture rate of options granted is derived from historical data on employee exercises and post-vesting employment termination behavior as well as expected behavior on outstanding

**Table of Contents**

options. The risk-free rate is based on the United States Treasury rates in effect during the corresponding period of grant. The expected volatility is based on the historical volatility of our stock price. These factors could change in the future, which would affect the stock-based compensation expense recognized in future periods.

   ***Restricted stock units and performance shares.*** During the nine months ended September 30, 2016, we granted 1.0 million restricted stock units and performance shares with a weighted-average fair market value of $69.81 per share. Restricted stock units generally have three-year graded vesting. Performance shares generally have three-year cliff vesting. The number of performance shares that ultimately vest is dependent upon the achievement of specific performance metrics. The original grant of performance shares is subject to a multiplier of up to 2.5 based on the achievement of the performance metrics. Due to the achievement of certain performance metrics, during the nine months ended September 30, 2016, 0.1 million of common stock shares were issued in settlement of performance shares granted in March 2013.

## Note 8 - Commitments and contingencies

   We are subject to various legal proceedings, investigations, government inquiries and claims pending against us or our subsidiaries, including, but not limited to, those relating to regulatory, commercial, employment and employee benefits. We record accruals for certain of our outstanding legal proceedings, investigations and claims when we believe it is probable a liability will be incurred and the amount of loss can be reasonably estimated. On a quarterly basis, we evaluate developments in legal proceedings, investigations and claims that could affect the amount of any accrual, as well as any developments that would make a loss both probable and reasonably estimable.

   We record self-insurance accruals based on estimates of the aggregate liability of claim costs (including defense costs) in excess of our insurance coverage. The majority of these claims are legal claims and our liability estimate is primarily related to the cost to defend these claims. We do not accrue for settlements, judgments, monetary fines or penalties until such amounts are probable and estimable. If the range of possible loss is broad, and no amount within the range is more likely than any other, the liability accrual is based on the low end of the range.

   When a loss contingency is not believed to be both probable and estimable, we do not establish an accrued liability. However, if the loss (or an additional loss in excess of the accrual) is believed to be at least a reasonable possibility and material, then we disclose an estimate of the possible loss or range of loss, if such estimate can be made, or disclose an estimate cannot be made.

   The legal proceedings, investigations, government inquires and claims pending against us or our subsidiaries include multi-district litigation, class action lawsuits, antitrust allegations, qui tam lawsuits ("whistleblower" actions) and various governmental inquiries and informational subpoenas.

   The assessment of whether a loss is probable and reasonably estimable involves a series of complex judgments about future events. We are often unable to estimate a range of loss due to significant uncertainties, particularly where (i) the damages sought are unspecified or indeterminate; (ii) the proceedings are in the early stages; (iii) the matters involve novel or unsettled legal theories or a large number of parties; (iv) class action status may be sought and certified; (v) it is questionable whether asserted claims or allegations will survive dispositive motion practice; (vi) the impact of discovery on the legal process is unknown; (vii) the settlement posture of the parties has not been determined; or (viii) in the case of certain government agency investigations, whether a sealed qui tam lawsuit has been filed and whether the government agency makes a decision to intervene in the lawsuit following investigation. Accordingly, for many proceedings, we are currently unable to estimate the loss or a range of possible loss.

   For a limited number of proceedings, we may be able to reasonably estimate the possible range of loss in excess of any accruals. However, we believe such matters, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material adverse effect on our cash flow or financial condition. We also believe any amount that could be reasonably estimated in excess of accruals, if any, for such proceedings is not material. However, an unexpected adverse resolution of one or more of such matters could have a material adverse effect on our results of operations in a particular quarter or fiscal year.

   Subsequent to the acquisition of Medco, we have experienced an increase in the number of inquiries, subpoenas and qui tam lawsuits and in the volume of information requested related thereto. Certain data requests have included several years of information from legacy acquired systems that in some cases may not be readily available. The process of locating the data requested is time consuming and labor intensive, but is required to be responsive and cooperative with the various inquiries.

   We cannot predict the timing or outcome of the matters described below:

-  <u>Jerry Beeman, et al. v. Caremark, et al.</u> Plaintiffs allege that ESI and the other defendants failed to comply with statutory obligations to provide California clients with the results of a bi-annual survey of retail drug prices and have

filed a motion for class certification. In March 2014, after rejecting defendants' objections regarding plaintiffs' lack of standing and certain constitutionality issues, the Ninth Circuit Court of Appeals remanded the case to the district court for further proceedings. On August 26, 2016, defendants filed a motion to deny class certification. Plaintiffs filed a memorandum in opposition to the motion on September 16, 2016 and defendants filed a reply in support of the motion on October 3, 2016. A hearing on the motion to deny class certification was held on October 17, 2016 and we await the court's ruling.

- Brady Enterprises, Inc., et al. v. Medco Health Solutions, Inc., and North Jackson Pharmacy, Inc., et al. v. Express Scripts, Inc., et al. Plaintiffs assert claims for violation of the Sherman Antitrust Act. Currently, ESI's motion to decertify the class in the Brady Enterprises case is pending. Oral arguments were held in January 2012.

- Anthem, Inc. v. Express Scripts, Inc. Anthem filed this lawsuit alleging various breach of contract claims against ESI relating to the parties' rights and obligations under the periodic pricing review section of the pharmacy benefit management agreement between the parties, including allegations that ESI failed to negotiate new pricing concessions in good faith, as well as various alleged service issues. Anthem requests the court enter declaratory judgment that ESI is required to provide Anthem competitive benchmark pricing, that Anthem can terminate the agreement, and that ESI is required to provide Anthem with post-termination services at competitive benchmark pricing for one year following any termination by Anthem. Anthem claims it is entitled to $13,000.0 million in additional pricing concessions over the remaining term of the agreement as well as $1,800.0 million for one year following any contract termination by Anthem, and $150.0 million in damages for service issues. On April 19, 2016, in response to Anthem's complaint, ESI filed its answer denying Anthem's allegations in their entirety and asserting affirmative defenses and counterclaims against Anthem. Anthem filed a motion to dismiss two counts of ESI's amended counterclaims on July 8, 2016, and the Company filed a brief in opposition on August 5, 2016, which has been fully briefed.

- Melbourne Municipal Firefighters' Pension Trust Fund v. Express Scripts Holding Company, et al. Plaintiff filed this putative securities class action complaint on behalf of all persons or entities that purchased or otherwise acquired the Company's publicly traded common stock between February 24, 2015 and March 21, 2016 and alleges the Company and named individuals violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 by carrying out a scheme to defraud the investing public. Plaintiff seeks compensatory damages in favor of Plaintiff and other class members, attorneys' fees and costs, and equitable relief (for purposes of this Note 8, "Securities Action"). On July 27, 2016, the court appointed a lead plaintiff (for purposes of this Note 8, "Lead Plaintiff"). On August 15, 2016, the Company filed a motion to transfer venue to the Circuit Court of St. Louis County, Missouri, which was fully briefed as of September 8, 2016. On October 14, 2016, Lead Plaintiff filed an amended class action complaint.

- In re Express Scripts/Anthem ERISA Litigation (consolidated the following cases on August 1, 2016: John Doe One and John Doe Two v. Express Scripts, Inc., filed May 6, 2016, and Karen Burnett, Brendan Farrell, and Robert Shullich v. Express Scripts, Inc. and Anthem, Inc., filed June 24, 2016). Plaintiffs filed a First Amended Consolidated Class Action Complaint on behalf of health plan beneficiaries who are enrolled in health care plans that are insured or administered by Anthem. Plaintiffs allege that the Company and Anthem breached fiduciary duties and otherwise violated their legal obligations under ERISA, that ESI engaged in mail fraud, wire fraud and other racketeering activity through its invoicing system with Anthem, that ESI breached its contract with Anthem, that plaintiffs are entitled to equitable relief under theories including unjust enrichment, that ESI violated unfair and deceptive trade practices statutes, that Anthem breached the covenant of good faith and fair dealing implied in health plans, and that ESI violated the anti-discrimination provisions of the Affordable Care Act. Plaintiffs seek compensatory damages, declaratory relief, equitable relief and attorneys' fees and costs.

- Abraham Neufeld, derivatively on behalf of nominal defendant Express Scripts Holding Company v. George Paz, et al. Plaintiff filed this stockholder derivative lawsuit alleging certain current and former officers and directors of the Company breached certain fiduciary duties and were unjustly enriched. Plaintiff seeks damages on behalf of the Company from the named defendants, disgorgement of individual defendants' proceeds derived from sales of the Company's common stock, equitable relief, and attorneys' fees and costs. On July 28, 2016, a stipulation and order was entered staying the case until 45 days after Lead Plaintiff in the Securities Action files an amended class action complaint. Lead Plaintiff filed an amended consolidated complaint in the Securities Action on October 14, 2016.

- Robert Jessup, derivatively on behalf of Express Scripts Holding Company v. Timothy Wentworth, et al. Plaintiff filed this stockholder derivative lawsuit alleging certain current and former officers and directors of the Company breached certain fiduciary duties and were unjustly enriched. Plaintiff seeks damages on behalf of the Company from the named defendants, a stockholder vote for resolutions regarding amendments to the Company's by-laws or articles of incorporation with respect to corporate governance policies, equitable relief including a constructive trust restricting

**Table of Contents**

the individual defendants' stock trading activities, restitution and disgorgement of all profits or benefits obtained by the individual defendant's, and attorneys' fees and costs.

- <u>Richard Weisglas, derivatively on behalf of Express Scripts Holding Company v. Express Scripts Holding Company, et al.</u> Plaintiff filed this stockholder derivative lawsuit alleging certain current and former officers and directors of the Company breached fiduciary duties and were unjustly enriched. Plaintiff seeks damages on behalf of the Company from Individual Defendants, equitable injunctive relief, and attorneys' fees and costs.

- <u>M. Scott Brewer, et al., in their capacities as Trustees for the Carpenters Pension Fund of West Virginia, derivatively on behalf of Express Scripts Holding Company v. Maura C. Breen, et al.</u> Plaintiffs filed this stockholder derivative lawsuit alleging certain current and former officers and directors of the Company breached fiduciary duties and were unjustly enriched and also asserting a claim for corporate waste. Plaintiff seeks damages on behalf of the Company from the individual defendants, an accounting by the individual defendants for all damages, profits, special benefits and unjust enrichment and imposition of a constructive trust, judgment directing the Company to take all necessary actions to reform and improve its corporate governance and internal control procedures, punitive damages, and an award of attorneys' fees and costs.

- We are the subject of various qui tam matters:

  - <u>United States ex. rel. Steve Greenfield, et al. v. Medco Health Solutions, Inc., Accredo Health Group, Inc., and Hemophilia Health Services, Inc.</u> The complaint alleges defendants violated the federal False Claims Act, the Anti-Kickback Statute, the Civil Monetary Penalty Statute and various state and local false claims statutes. Greenfield filed an amended complaint in October 2014, and the Company filed an answer and affirmative defenses in November 2014. On May 6, 2016, the parties cross-filed motions for summary judgment, cross memoranda in opposition were filed on June 6, 2016, and cross replies were filed on June 27, 2016.

  - <u>United States of America ex. rel. Shane Lager v. CSL Behring, LLC, CSL Limited, Accredo Health, Inc., and Coram LLC.</u> The complaint, received on June 23, 2015, alleges Accredo violated the federal False Claims Act. On August 21, 2015, the Company filed a motion to dismiss the complaint under the public disclosure bar, for failure to state a claim, and for failure to plead fraud with particularity. Relator filed a response to the motion on October 21, 2015 and the Company filed a reply on November 12, 2015. On January 20, 2016, the Court granted the Company's motion, as well as motions filed by the other defendants, and the case was dismissed with prejudice. Lager appealed the Court's ruling and filed his opening Appellant's Brief on April 18, 2016 and Accredo filed its Defendant's Brief on June 17, 2016.

- We have received and intend to cooperate with various subpoenas from government agencies requesting information.

Investigations under the federal False Claims Act and most state false claims acts may be initiated by the applicable government investigative body or by a qui tam relator's filing of a complaint under court seal. If a qui tam relator's complaint remained under seal, applicable law would restrict our ability to disclose such a fact.

While we believe our services and business practices are in substantial compliance with applicable laws, rules and regulations in all material respects, we cannot predict the outcome of these actions at this time. An unfavorable outcome in one or more of these matters could result in the imposition of judgments, monetary fines or penalties or injunctive or administrative remedies.

18

**Note 9 - Segment information**

We report segments on the basis of products and services offered and have determined we have two reportable segments: PBM and Other Business Operations. Within the Other Business Operations segment, we have aggregated two operating segments that do not meet the quantitative and qualitative criteria to be separately reported.

Operating income is the measure used by our chief operating decision maker to assess the performance of each of our operating segments. Following is information about our reportable segments, including a reconciliation of operating income to income before income taxes for the three and nine months ended September 30, 2016 and 2015.

| (in millions) | PBM[1] | Other Business Operations | Total |
|---|---|---|---|
| **For the three months ended September 30, 2016** | | | |
| Product revenues: | | | |
| Network revenues[2] | $ 13,000.6 | $ — | $ 13,000.6 |
| Home delivery and specialty revenues[3] | 11,031.8 | — | 11,031.8 |
| Other revenues[4] | — | 922.2 | 922.2 |
| Service revenues | 377.0 | 78.5 | 455.5 |
| Total revenues | 24,409.4 | 1,000.7 | 25,410.1 |
| Depreciation and amortization expense | 529.9 | 7.8 | 537.7 |
| Operating income | 1,404.9 | 11.1 | 1,416.0 |
| Interest income and other | | | 8.3 |
| Interest expense and other | | | (273.4) |
| Income before income taxes | | | 1,150.9 |
| Capital expenditures | 74.3 | 4.8 | 79.1 |
| **For the three months ended September 30, 2015** | | | |
| Product revenues: | | | |
| Network revenues[2] | $ 13,747.2 | $ — | $ 13,747.2 |
| Home delivery and specialty revenues[3] | 10,331.8 | — | 10,331.8 |
| Other revenues[4] | — | 624.3 | 624.3 |
| Service revenues | 432.4 | 86.9 | 519.3 |
| Total revenues | 24,511.4 | 711.2 | 25,222.6 |
| Depreciation and amortization expense | 575.2 | 7.6 | 582.8 |
| Operating income | 1,150.8 | 15.4 | 1,166.2 |
| Interest income and other | | | 7.8 |
| Interest expense and other | | | (128.4) |
| Income before income taxes | | | 1,045.6 |
| Capital expenditures | 64.8 | 5.2 | 70.0 |

19

Table of Contents

| (in millions) | PBM[1] | Other Business Operations | Total |
|---|---|---|---|
| **For the nine months ended September 30, 2016** | | | |
| Product revenues: | | | |
| Network revenues[2] | $ 39,085.3 | $ — | $ 39,085.3 |
| Home delivery and specialty revenues[3] | 32,464.8 | — | 32,464.8 |
| Other revenues[4] | — | 2,578.3 | 2,578.3 |
| Service revenues | 1,047.2 | 248.6 | 1,295.8 |
| Total revenues | 72,597.3 | 2,826.9 | 75,424.2 |
| Depreciation and amortization expense | 1,587.3 | 23.9 | 1,611.2 |
| Operating income | 3,573.1 | 40.0 | 3,613.1 |
| Interest income and other | | | 27.4 |
| Interest expense and other | | | (548.8) |
| Income before income taxes | | | 3,091.7 |
| Capital expenditures | 224.6 | 13.0 | 237.6 |
| **For the nine months ended September 30, 2015** | | | |
| Product revenues: | | | |
| Network revenues[2] | $ 42,266.2 | $ — | $ 42,266.2 |
| Home delivery and specialty revenues[3] | 30,041.9 | — | 30,041.9 |
| Other revenues[4] | — | 1,809.7 | 1,809.7 |
| Service revenues | 1,213.9 | 244.7 | 1,458.6 |
| Total revenues | 73,522.0 | 2,054.4 | 75,576.4 |
| Depreciation and amortization expense | 1,705.2 | 22.5 | 1,727.7 |
| Operating income | 3,070.9 | 54.6 | 3,125.5 |
| Interest income and other | | | 19.1 |
| Interest expense and other | | | (377.1) |
| Income before income taxes | | | 2,765.5 |
| Capital expenditures | 158.0 | 19.1 | 177.1 |

(1)  PBM total revenues and operating income for the nine months ended September 30, 2016 and 2015 includes $106.6 million and $141.7 million, respectively, related to a large client. These amounts were realized in the second quarters of each of 2016 and 2015 due to the structure of the contract.

(2)  Includes retail pharmacy co-payments of $2,008.5 million and $2,161.5 million for the three months ended September 30, 2016 and 2015, respectively, and $6,685.9 million and $7,118.2 million for the nine months ended September 30, 2016 and 2015, respectively.

(3)  Includes home delivery and specialty, including drugs we distribute to other PBMs' clients under limited distribution contracts with pharmaceutical manufacturers and Freedom Fertility claims.

(4)  Includes other revenues related to drugs distributed through patient assistance programs.

PBM product revenues consist of revenues from the sale of prescription drugs by retail pharmacies in our retail pharmacy networks, revenues from the dispensing of prescription drugs from our home delivery pharmacies and revenues from the sale of certain fertility and specialty drugs. Other Business Operations product revenues consist of distribution services of specialty pharmaceuticals and consulting services for pharmaceutical, biotechnology and device manufacturers to collect scientific evidence to guide the safe, effective and affordable use of medicines. PBM service revenues include administrative fees associated with the administration of retail pharmacy networks contracted by certain clients, informed decision counseling services and specialty pharmacy services. Other Business Operations service revenues include revenues related to data analytics and research associated with our United BioSource business.

20

Table of Contents

Following is the summary of total assets by reportable segment:

| *(in millions)* | September 30, 2016 | | December 31, 2015 | |
|---|---|---|---|---|
| PBM | $ | 49,569.8 | $ | 52,174.9 |
| Other Business Operations | | 1,339.5 | | 1,068.4 |
| Total assets | $ | 50,909.3 | $ | 53,243.3 |

We have contracts with Anthem and the United States Department of Defense. These two clients represent 10% or greater of our consolidated revenues for the three and nine months ended September 30, 2016 and in the aggregate represent 29.6% and 29.8% of consolidated revenues for the three and nine months ended September 30, 2016, respectively.

Revenues earned by our international businesses totaled $22.2 million and $19.8 million for the three months ended September 30, 2016 and 2015, respectively, and $66.3 million and $61.1 million for the nine months ended September 30, 2016 and 2015, respectively. All other revenues were earned in the United States. Long-lived assets of our international businesses (consisting primarily of fixed assets) totaled $23.9 million and $21.8 million as of September 30, 2016 and December 31, 2015, respectively. All other long-lived assets are domiciled in the United States.

**Note 10 - Condensed consolidating financial information**

The senior notes issued by us, ESI and Medco are jointly and severally and fully and unconditionally (subject to certain customary release provisions, including sale, exchange, transfer or liquidation of the guarantor subsidiary) guaranteed by certain of our 100% owned domestic subsidiaries, other than certain regulated subsidiaries, and, with respect to notes issued by ESI and Medco, by us. The following condensed consolidating financial information has been prepared in accordance with the requirements for presentation of such information. The condensed consolidating financial information presented below is not indicative of what the financial position, results of operations or cash flows would have been had each of the entities operated as an independent company during the period for various reasons, including, but not limited to, intercompany transactions and integration of systems.

The following presentation reflects the structure that exists as of the most recent balance sheet date. The condensed consolidating financial information is presented separately for:

(i)   Express Scripts Holding Company (the Parent Company), the issuer of certain guaranteed obligations;
(ii)  ESI, guarantor, the issuer of additional guaranteed obligations;
(iii) Medco, guarantor, the issuer of additional guaranteed obligations;
(iv)  Guarantor subsidiaries, on a combined basis (but excluding ESI and Medco), as specified in the indentures related to Express Scripts Holding Company's, ESI's and Medco's obligations under the notes;
(v)   Non-guarantor subsidiaries, on a combined basis;
(vi)  Consolidating entries and eliminations representing adjustments to (a) eliminate intercompany transactions between or among Express Scripts Holding Company, ESI, Medco, the guarantor subsidiaries and the non-guarantor subsidiaries, (b) eliminate the investments in our subsidiaries and (c) record consolidating entries; and
(vii) Express Scripts Holding Company and its subsidiaries on a consolidated basis.

In 2015 and 2016, as part of an ongoing reorganization, certain subsidiaries have been merged within the structure defined above through non-cash transfers. Reorganizations that qualify as a transfer of ongoing business operations are reflected retrospectively in the condensed consolidating balance sheet, statement of operations and statement of cash flows. Reorganizations that qualify as a transfer of assets are reflected prospectively in the condensed consolidating balance sheet, statement of operations and statement of cash flows. These events had no impact on our consolidated balance sheet, consolidated statement of operations or consolidated statement of cash flows.

21

**Table of Contents**

## Condensed Consolidating Balance Sheet

| (in millions)<br>As of September 30, 2016 | Express Scripts Holding Company | Express Scripts, Inc. | Medco Health Solutions, Inc. | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ — | $ 1,772.7 | $ — | $ 44.6 | $ 487.4 | $ — | $ 2,304.7 |
| Receivables, net | — | 3,291.0 | 807.5 | 2,080.8 | 787.7 | — | 6,967.0 |
| Other current assets | — | 89.3 | — | 1,698.8 | 63.2 | — | 1,851.3 |
| Total current assets | — | 5,153.0 | 807.5 | 3,824.2 | 1,338.3 | — | 11,123.0 |
| Property and equipment, net | — | 763.9 | 3.5 | 466.6 | 21.5 | — | 1,255.5 |
| Investments in subsidiaries | 42,889.1 | 11,716.1 | 9,426.5 | — | — | (64,031.7) | — |
| Intercompany | — | — | 693.8 | 15,250.2 | 492.1 | (16,436.1) | — |
| Goodwill | — | 3,122.4 | 22,609.9 | 3,525.0 | 21.0 | — | 29,278.3 |
| Other intangible assets, net | — | 740.3 | 7,259.7 | 1,088.5 | 10.6 | — | 9,099.1 |
| Other assets | 7.5 | 238.0 | 25.8 | 9.3 | 8.6 | (135.8) | 153.4 |
| Total assets | $ 42,896.6 | $ 21,733.7 | $ 40,826.7 | $ 24,163.8 | $ 1,892.1 | $ (80,603.6) | $ 50,909.3 |
| Claims and rebates payable | $ — | $ 6,108.6 | $ 2,608.5 | $ — | $ — | $ — | $ 8,717.1 |
| Accounts payable | — | 987.6 | 44.7 | 2,684.8 | 74.0 | — | 3,791.1 |
| Accrued expenses | 93.7 | 1,048.1 | 334.1 | 218.7 | 591.7 | — | 2,286.3 |
| Current maturities of long-term debt | 1,184.0 | — | — | — | — | — | 1,184.0 |
| Total current liabilities | 1,277.7 | 8,144.3 | 2,987.3 | 2,903.5 | 665.7 | — | 15,978.5 |
| Long-term debt | 13,207.9 | 336.1 | 1,380.5 | — | — | — | 14,924.5 |
| Intercompany | 12,810.7 | 3,625.4 | — | — | — | (16,436.1) | — |
| Deferred taxes | — | — | 2,563.0 | 1,296.4 | 11.2 | (135.8) | 3,734.8 |
| Other liabilities | — | 371.9 | 262.8 | 9.6 | 18.2 | — | 662.5 |
| Non-controlling interest | — | — | — | — | 8.7 | — | 8.7 |
| Express Scripts stockholders' equity | 15,600.3 | 9,256.0 | 33,633.1 | 19,954.3 | 1,188.3 | (64,031.7) | 15,600.3 |
| Total liabilities and stockholders' equity | $ 42,896.6 | $ 21,733.7 | $ 40,826.7 | $ 24,163.8 | $ 1,892.1 | $ (80,603.6) | $ 50,909.3 |

22

### Condensed Consolidating Balance Sheet

| (in millions) | Express Scripts Holding Company | Express Scripts, Inc. | Medco Health Solutions, Inc. | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| **As of December 31, 2015** | | | | | | | |
| Cash and cash equivalents | $ — | $ 1,957.3 | $ 2.9 | $ 28.8 | $ 1,197.3 | $ — | $ 3,186.3 |
| Receivables, net | — | 3,445.9 | 1,123.5 | 1,768.3 | 383.6 | — | 6,721.3 |
| Other current assets | — | 34.2 | 3.2 | 2,080.6 | 33.9 | — | 2,151.9 |
| Total current assets | — | 5,437.4 | 1,129.6 | 3,877.7 | 1,614.8 | — | 12,059.5 |
| Property and equipment, net | — | 768.1 | 3.7 | 500.3 | 19.2 | — | 1,291.3 |
| Investments in subsidiaries | 40,819.1 | 11,191.6 | 9,500.4 | — | — | (61,511.1) | — |
| Intercompany | — | — | 1,009.5 | 14,429.4 | 231.7 | (15,670.6) | — |
| Goodwill | — | 3,122.4 | 22,609.9 | 3,525.0 | 20.0 | — | 29,277.3 |
| Other intangible assets, net | — | 893.7 | 8,265.2 | 1,298.8 | 12.0 | — | 10,469.7 |
| Other assets | 6.6 | 314.5 | 22.2 | 7.0 | 7.8 | (212.6) | 145.5 |
| Total assets | $ 40,825.7 | $ 21,727.7 | $ 42,540.5 | $ 23,638.2 | $ 1,905.5 | $ (77,394.3) | $ 53,243.3 |
| Claims and rebates payable | $ — | $ 5,543.7 | $ 3,854.0 | $ — | $ — | $ — | $ 9,397.7 |
| Accounts payable | — | 970.0 | 94.8 | 2,297.2 | 89.8 | — | 3,451.8 |
| Accrued expenses | 9.6 | 1,126.2 | 543.9 | 194.3 | 785.4 | — | 2,659.4 |
| Current maturities of long-term debt | 147.7 | 1,498.7 | — | — | — | — | 1,646.4 |
| Total current liabilities | 157.3 | 9,138.6 | 4,492.7 | 2,491.5 | 875.2 | — | 17,155.3 |
| Long-term debt | 11,647.1 | 497.4 | 1,801.8 | — | — | — | 13,946.3 |
| Intercompany | 11,648.3 | 4,022.3 | — | — | — | (15,670.6) | — |
| Deferred taxes | 0.2 | — | 2,833.2 | 1,442.9 | 6.1 | (212.6) | 4,069.8 |
| Other liabilities | — | 374.7 | 288.4 | 15.9 | 12.4 | — | 691.4 |
| Non-controlling interest | — | — | — | — | 7.7 | — | 7.7 |
| Express Scripts stockholders' equity | 17,372.8 | 7,694.7 | 33,124.4 | 19,687.9 | 1,004.1 | (61,511.1) | 17,372.8 |
| Total liabilities and stockholders' equity | $ 40,825.7 | $ 21,727.7 | $ 42,540.5 | $ 23,638.2 | $ 1,905.5 | $ (77,394.3) | $ 53,243.3 |

23

Table of Contents

**Condensed Consolidating Statement of Operations and Comprehensive Income**

| (in millions) | Express Scripts Holding Company | Express Scripts, Inc. | Medco Health Solutions, Inc. | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| **For the three months ended September 30, 2016** | | | | | | | |
| Revenues | $ — | $ 9,910.4 | $ 6,044.4 | $ 9,973.0 | $ 472.0 | $ (989.7) | $ 25,410.1 |
| Operating expenses | — | 9,148.0 | 5,699.5 | 9,770.7 | 365.6 | (989.7) | 23,994.1 |
| Operating income | — | 762.4 | 344.9 | 202.3 | 106.4 | — | 1,416.0 |
| Other (expense) income: | | | | | | | |
| Interest expense and other, net | (211.8) | (29.9) | (21.3) | — | (2.1) | — | (265.1) |
| Intercompany interest income (expense) | 132.8 | (66.4) | — | (66.4) | — | — | — |
| Other expense, net | (79.0) | (96.3) | (21.3) | (66.4) | (2.1) | — | (265.1) |
| Income (loss) before income taxes | (79.0) | 666.1 | 323.6 | 135.9 | 104.3 | — | 1,150.9 |
| Provision (benefit) for income taxes | (27.9) | 279.2 | 91.3 | 58.4 | 21.4 | — | 422.4 |
| Income (loss) before equity in earnings of subsidiaries | (51.1) | 386.9 | 232.3 | 77.5 | 82.9 | — | 728.5 |
| Equity in earnings (loss) of subsidiaries | 774.0 | 178.1 | (23.3) | — | — | (928.8) | — |
| Net income | 722.9 | 565.0 | 209.0 | 77.5 | 82.9 | (928.8) | 728.5 |
| Less: Net income attributable to non-controlling interest | — | — | — | — | 5.6 | — | 5.6 |
| Net income attributable to Express Scripts | 722.9 | 565.0 | 209.0 | 77.5 | 77.3 | (928.8) | 722.9 |
| Other comprehensive loss | (1.7) | (1.7) | — | — | (1.7) | 3.4 | (1.7) |
| Comprehensive income attributable to Express Scripts | $ 721.2 | $ 563.3 | $ 209.0 | $ 77.5 | $ 75.6 | $ (925.4) | $ 721.2 |
| **For the three months ended September 30, 2015** | | | | | | | |
| Revenues | $ — | $ 9,924.7 | $ 7,123.5 | $ 8,962.4 | $ 482.1 | $ (1,270.1) | $ 25,222.6 |
| Operating expenses | — | 9,188.6 | 7,060.2 | 8,699.6 | 378.1 | (1,270.1) | 24,056.4 |
| Operating income | — | 736.1 | 63.3 | 262.8 | 104.0 | — | 1,166.2 |
| Other (expense) income: | | | | | | | |
| Interest (expense) income and other, net | (90.5) | (17.5) | (12.5) | 2.0 | (2.1) | — | (120.6) |
| Intercompany interest income (expense) | 64.8 | (32.4) | — | (32.4) | — | — | — |
| Other expense, net | (25.7) | (49.9) | (12.5) | (30.4) | (2.1) | — | (120.6) |
| Income (loss) before income taxes | (25.7) | 686.2 | 50.8 | 232.4 | 101.9 | — | 1,045.6 |
| Provision (benefit) for income taxes | (9.1) | 256.9 | 37.9 | 77.7 | 14.8 | — | 378.2 |
| Income (loss) before equity in earnings of subsidiaries | (16.6) | 429.3 | 12.9 | 154.7 | 87.1 | — | 667.4 |
| Equity in earnings (loss) of subsidiaries | 678.3 | 288.0 | (51.9) | — | — | (914.4) | — |
| Net income (loss) | 661.7 | 717.3 | (39.0) | 154.7 | 87.1 | (914.4) | 667.4 |
| Less: Net income attributable to non-controlling interest | — | — | — | — | 5.7 | — | 5.7 |
| Net income (loss) attributable to Express Scripts | 661.7 | 717.3 | (39.0) | 154.7 | 81.4 | (914.4) | 661.7 |
| Other comprehensive loss | (7.3) | (7.3) | — | — | (7.3) | 14.6 | (7.3) |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive income (loss) attributable to Express Scripts | $ | 654.4 | $ | 710.0 | $ | (39.0) | $ | 154.7 | $ | 74.1 | $ | (899.8) | $ | 654.4 |

24

Table of Contents

**Condensed Consolidating Statement of Operations and Comprehensive Income**

| (in millions) | Express Scripts Holding Company | Express Scripts, Inc. | Medco Health Solutions, Inc. | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| **For the nine months ended September 30, 2016** | | | | | | | |
| Revenues | $ — | $ 29,302.2 | $ 18,519.0 | $ 28,866.0 | $ 1,641.1 | $ (2,904.1) | $ 75,424.2 |
| Operating expenses | — | 27,439.3 | 17,620.3 | 28,263.2 | 1,392.4 | (2,904.1) | 71,811.1 |
| Operating income | — | 1,862.9 | 898.7 | 602.8 | 248.7 | — | 3,613.1 |
| Other (expense) income: | | | | | | | |
| Interest (expense) income and other, net | (420.1) | (59.1) | (42.8) | 4.3 | (3.7) | — | (521.4) |
| Intercompany interest income (expense) | 262.4 | (131.2) | — | (131.2) | — | — | — |
| Other expense, net | (157.7) | (190.3) | (42.8) | (126.9) | (3.7) | — | (521.4) |
| Income (loss) before income taxes | (157.7) | 1,672.6 | 855.9 | 475.9 | 245.0 | — | 3,091.7 |
| Provision (benefit) for income taxes | (57.4) | 620.8 | 301.9 | 209.5 | 29.1 | — | 1,103.9 |
| Income (loss) before equity in earnings of subsidiaries | (100.3) | 1,051.8 | 554.0 | 266.4 | 215.9 | — | 1,987.8 |
| Equity in earnings (loss) of subsidiaries | 2,070.0 | 509.5 | (45.3) | — | — | (2,534.2) | — |
| Net income | 1,969.7 | 1,561.3 | 508.7 | 266.4 | 215.9 | (2,534.2) | 1,987.8 |
| Less: Net income attributable to non-controlling interest | — | — | — | — | 18.1 | — | 18.1 |
| Net income attributable to Express Scripts | 1,969.7 | 1,561.3 | 508.7 | 266.4 | 197.8 | (2,534.2) | 1,969.7 |
| Other comprehensive income | 4.4 | 4.4 | — | — | 4.4 | (8.8) | 4.4 |
| Comprehensive income attributable to Express Scripts | $ 1,974.1 | $ 1,565.7 | $ 508.7 | $ 266.4 | $ 202.2 | $ (2,543.0) | $ 1,974.1 |
| **For the nine months ended September 30, 2015** | | | | | | | |
| Revenues | $ — | $ 29,865.3 | $ 22,113.8 | $ 25,866.8 | $ 1,594.6 | $ (3,864.1) | $ 75,576.4 |
| Operating expenses | — | 27,913.7 | 21,857.3 | 25,196.1 | 1,347.9 | (3,864.1) | 72,450.9 |
| Operating income | — | 1,951.6 | 256.5 | 670.7 | 246.7 | — | 3,125.5 |
| Other (expense) income: | | | | | | | |
| Interest (expense) income and other, net | (256.4) | (57.1) | (41.0) | 2.7 | (6.2) | — | (358.0) |
| Intercompany interest income (expense) | 216.4 | (108.2) | — | (108.2) | — | — | — |
| Other expense, net | (40.0) | (165.3) | (41.0) | (105.5) | (6.2) | — | (358.0) |
| Income (loss) before income taxes | (40.0) | 1,786.3 | 215.5 | 565.2 | 240.5 | — | 2,767.5 |
| Provision (benefit) for income taxes | (14.4) | 677.0 | 120.8 | 240.6 | 22.9 | — | 1,046.9 |
| Income (loss) before equity in earnings of subsidiaries | (25.6) | 1,109.3 | 94.7 | 324.6 | 217.6 | — | 1,720.6 |
| Equity in earnings (loss) of subsidiaries | 1,728.5 | 1,037.6 | (513.1) | — | — | (2,253.0) | — |
| Net income (loss) | 1,702.9 | 2,146.9 | (418.4) | 324.6 | 217.6 | (2,253.0) | 1,720.6 |
| Less: Net income attributable to non-controlling interest | — | — | — | — | 17.7 | — | 17.7 |
| Net income (loss) attributable to Express Scripts | 1,702.9 | 2,146.9 | (418.4) | 324.6 | 199.9 | (2,253.0) | 1,702.9 |
| Other comprehensive loss | (12.8) | (12.8) | — | — | (12.8) | 25.6 | (12.8) |

| Comprehensive income (loss) attributable to Express Scripts | $ | 1,690.1 | $ | 2,134.1 | $ | (418.4) | $ | 324.6 | $ | 187.1 | $ | (2,227.4) | $ | 1,690.1 |

25

**Condensed Consolidating Statements of Cash Flows**

| (in millions) | Express Scripts Holding Company | Express Scripts, Inc. | Medco Health Solutions, Inc. | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| **For the nine months ended September 30, 2016** | | | | | | | |
| Net cash flows provided by (used in) operating activities | $ (1.4) | $ 2,136.0 | $ 21.8 | $ 908.6 | $ (394.5) | $ — | $ 2,670.5 |
| Cash flows from investing activities: | | | | | | | |
| Purchases of property and equipment | — | (177.4) | — | (53.8) | (6.4) | — | (237.6) |
| Other, net | — | 2.3 | — | (1.0) | (8.9) | — | (7.6) |
| Net cash used in investing activities | — | (175.1) | — | (54.8) | (15.3) | — | (245.2) |
| Cash flows from financing activities: | | | | | | | |
| Proceeds from long-term debt, net of discounts | 5,986.8 | — | — | — | — | — | 5,986.8 |
| Repayment of long-term debt | (3,363.8) | (1,662.5) | (368.7) | — | — | — | (5,395.0) |
| Treasury stock acquired | (3,892.7) | — | — | — | — | — | (3,892.7) |
| Net proceeds from employee stock plans | 56.0 | — | — | — | — | — | 56.0 |
| Excess tax benefit relating to employee stock-based compensation | — | 7.4 | 3.7 | — | — | — | 11.1 |
| Other, net | (49.0) | (15.0) | 28.6 | (9.7) | (30.6) | — | (75.7) |
| Net intercompany transactions | 1,264.1 | (475.4) | 311.7 | (828.3) | (272.1) | — | — |
| Net cash (used in) provided by financing activities | 1.4 | (2,145.5) | (24.7) | (838.0) | (302.7) | — | (3,309.5) |
| Effect of foreign currency translation adjustment | — | — | — | — | 2.6 | — | 2.6 |
| Net (decrease) increase in cash and cash equivalents | — | (184.6) | (2.9) | 15.8 | (709.9) | — | (881.6) |
| Cash and cash equivalents at beginning of period | — | 1,957.3 | 2.9 | 28.8 | 1,197.3 | — | 3,186.3 |
| Cash and cash equivalents at end of period | $ — | $ 1,772.7 | $ — | $ 44.6 | $ 487.4 | $ — | $ 2,304.7 |

26

**Condensed Consolidating Statements of Cash Flows**

| (in millions) | Express Scripts Holding Company | Express Scripts, Inc. | Medco Health Solutions, Inc. | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| **For the nine months ended September 30, 2015** | | | | | | | |
| Net cash flows provided by (used in) operating activities | $ 14.8 | $ 1,274.2 | $ 24.9 | $ 1,270.5 | $ (566.1) | $ (44.0) | $ 1,974.3 |
| Cash flows from investing activities: | | | | | | | |
| Purchases of property and equipment | — | (124.2) | — | (47.0) | (5.9) | — | (177.1) |
| Other, net | — | 17.8 | — | — | 1.4 | — | 19.2 |
| Net cash used in investing activities | — | (106.4) | — | (47.0) | (4.5) | — | (157.9) |
| Cash flows from financing activities: | | | | | | | |
| Proceeds from long-term debt, net of discounts | 5,500.0 | — | — | — | — | — | 5,500.0 |
| Repayment of long-term debt | (2,853.3) | — | (500.0) | — | — | — | (3,353.3) |
| Treasury stock acquired | (5,500.0) | — | — | — | — | — | (5,500.0) |
| Net proceeds from employee stock plans | 155.0 | — | — | — | — | — | 155.0 |
| Excess tax benefit relating to employee stock-based compensation | — | 20.5 | 32.5 | — | — | — | 53.0 |
| Other, net | (28.0) | — | — | (11.1) | (63.7) | 44.0 | (58.8) |
| Net intercompany transactions | 2,711.5 | (1,960.9) | 442.1 | (1,208.7) | 16.0 | — | — |
| Net used in financing activities | (14.8) | (1,940.4) | (25.4) | (1,219.8) | (47.7) | 44.0 | (3,204.1) |
| Effect of foreign currency translation adjustment | — | — | — | — | (6.7) | — | (6.7) |
| Net (decrease) increase in cash and cash equivalents | — | (772.6) | (0.5) | 3.7 | (625.0) | — | (1,394.4) |
| Cash and cash equivalents at beginning of period | — | 956.0 | 0.5 | 13.7 | 862.4 | — | 1,832.6 |
| Cash and cash equivalents at end of period | $ — | $ 183.4 | $ — | $ 17.4 | $ 237.4 | $ — | $ 438.2 |

27

**Item 2.**   **Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Forward Looking Statements and Associated Risks**

*Information we have included or incorporated by reference in this Quarterly Report on Form 10-Q, and information which may be contained in our other filings with the Securities and Exchange Commission ("the SEC") and our press releases or other public statements, contains or may contain forward-looking statements. These forward-looking statements include, among other things, statements of our plans, objectives, expectations (financial or otherwise) or intentions.*

*Our forward-looking statements involve risks and uncertainties. Our actual results may differ significantly from those projected or suggested in any forward-looking statements. We do not undertake any obligation to release publicly any revisions to such forward-looking statements to reflect events or circumstances occurring after the date hereof or to reflect the occurrence of unanticipated events. Any number of factors could cause our actual results to differ materially from those contemplated by any forward-looking statements, including, but not limited to, the risks associated with the following:*

- *our ability to remain profitable in a very competitive marketplace depends upon our continued ability to attract and retain clients while maintaining our margins, differentiate our products and services from those of our competitors, and develop and cross-sell new products and services to our existing clients*

- *our failure to anticipate and appropriately adapt to changes or trends within the rapidly changing healthcare industry*

- *changes in applicable laws, rules or regulations, or their interpretation or enforcement, or the enactment of new laws, rules or regulations, which apply to our business practices (past, present or future) or require us to spend significant resources for compliance*

- *a failure in the security or stability of our technology infrastructure or the infrastructure of one or more of our key vendors*

- *our failure to execute on, or other issues arising under, certain key client contracts*

- *significant changes within the pharmacy provider marketplace, including the loss of or adverse change in our relationship with one or more key pharmacy providers*

- *changes to the healthcare industry designed to manage healthcare costs or alter healthcare financing practices or changes to government policies in general*

- *a significant failure or disruption in service within our operations or the operations of our vendors*

- *changes relating to Medicare Part D, our failure to comply with CMS regulatory requirements, our failure to comply with CMS contractual requirements applicable to us as a Medicare Part D PDP sponsor or our failure to otherwise execute on our strategies related to Medicare Part D*

- *our failure to effectively execute on strategic transactions or successfully integrate the business operations or achieve the anticipated benefits from any acquired businesses*

- *a failure to adequately protect confidential health information received and used in our business operations*

- *the termination, loss, or unfavorable modification of our relationship with one or more key pharmaceutical manufacturers, or the significant reduction in payments made or discounts provided by pharmaceutical manufacturers*

- *results in pending and future litigation, investigations or other proceedings which could subject us to significant monetary damages or penalties and/or require us to change our business practices, or the costs incurred in connection with such proceedings*

- *our failure to attract and retain talented employees, or to manage succession and retention for our Chief Executive Officer or other key executives*

- *changes in drug pricing or industry pricing benchmarks*

- *the impact of our debt service obligations on the availability of funds for other business purposes, the terms of and our required compliance with covenants relating to our indebtedness and our access to the credit markets in general*

- *the delay, reduction, suspension or cancellation of government spending or appropriations relating to our business*

28

- *general economic conditions*

- *other risks described from time to time in our filings with the SEC*

  *See the more comprehensive description of risk factors under the captions "Forward Looking Statements and Associated Risks" contained in Item 1 - "Business" and Item 1A - "Risk Factors" of our Annual Report on Form 10-K for the year ended December 31, 2015, filed with the SEC on February 16, 2016.*

  *These and other relevant factors and any other information included or incorporated by reference in this Report, and information which may be contained in our other filings with the SEC, should be carefully considered when reviewing any forward-looking statement. We note these factors for investors as permitted under the Private Securities Litigation Reform Act of 1995. Investors should understand it is impossible to predict or identify all such factors or risks. As such, you should not consider either the foregoing list, or the risks identified in our SEC filings, to be a complete discussion of all potential risks or uncertainties.*

29

## OVERVIEW

As the largest stand-alone pharmacy benefit management ("PBM") company in the United States, we provide a full range of services to our clients, which include managed care organizations, health insurers, third-party administrators, employers, union-sponsored benefit plans, workers' compensation plans, government health programs, providers, hospitals and others. We report segments on the basis of products and services offered and have determined we have two reportable segments: PBM and Other Business Operations. Our integrated PBM services include clinical solutions to improve health outcomes, specialized pharmacy care, home delivery pharmacy services, specialty pharmacy services, retail network pharmacy administration, benefit design consultation, drug utilization review, drug formulary management, Medicare, Medicaid and Public Exchange offerings, administration of a group purchasing organization and consumer health and drug information.

Through our Other Business Operations segment, we provide distribution services of specialty pharmaceuticals and medical supplies to providers, clients and hospitals and provide consulting services for pharmaceutical, biotechnology and device manufacturers to collect scientific evidence to guide the safe, effective and affordable use of medicines.

Revenues generated by our segments can be classified as either tangible product revenues or service revenues. We earn tangible product revenues from the sale of prescription drugs by retail pharmacies in our retail pharmacy networks and from dispensing prescription drugs from our home delivery and specialty pharmacies. Service revenues include administrative fees associated with the administration of retail pharmacy networks contracted by certain clients, medication counseling services and certain specialty distribution services. Tangible product revenues generated by our PBM and Other Business Operations segments represented 98.2% and 97.9% for the three months ended September 30, 2016 and 2015, respectively, and 98.3% and 98.1% of revenues for the nine months ended September 30, 2016 and 2015, respectively.

## EXECUTIVE SUMMARY AND TREND FACTORS AFFECTING THE BUSINESS

We operate in a dynamic environment influenced by a number of marketplace forces including healthcare reform, increased regulation, macroeconomic factors and competition. We recognize continued consolidation within the broad healthcare sector could shift claims volume within the PBM industry, although the direction and degree of any impact remain unclear. Over the years, our claims volume has been impacted by certain in-group attrition and client losses. We also recognize that as the regulatory environment evolves, it may be necessary to make significant investments in order to prepare for and adapt to regulatory changes. We continue to execute our successful business model, which emphasizes the alignment of our financial interests with those of our clients and patients through greater use of generics and lower-cost brands delivered through home delivery, specialty and retail pharmacies. We also continue to benefit from better management of ingredient costs through renegotiation of supplier contracts, increased competition among generic manufacturers and a higher generic fill rate (85.4% for both the three and nine months ended September 30, 2016 as compared to 84.5% for both the three and nine months ended September 30, 2015). We have achieved higher generic fill rates as we continue to provide our clients with additional tools designed to proactively manage total drug spend by increasing lower cost alternatives. We expect these ongoing positive trends in our business will continue to offset the negative factors described above.

Revenues related to a large client were realized in the second quarters of each of 2016, 2015, 2014 and 2013 due to the structure of the contract. Quarterly performance trends may vary from historical periods as a result of variability, including timing, of our contractual revenue streams.

On March 21, 2016, Anthem filed a lawsuit setting forth certain allegations and claims for relief with respect to our pharmacy benefit management agreement with Anthem (see Part II - Item 1 - Legal Proceedings). We are confident in the strength of our legal position and believe that we have consistently acted in good faith and in accordance with the terms of the agreement and have a number of valid defenses to the claims asserted. We further believe Anthem's lawsuit is without merit. However, litigation and the potential outcome cannot be accurately or effectively predicted and at this time we are unable to provide a timetable or an estimate as to the potential outcome of this matter, which could result in a material adverse effect on our business and results of operations.

Notwithstanding our pending litigation, we continue to focus on providing exceptional service to Anthem and its clients with a view to helping Anthem grow its business and strengthening our business relationship. Our contract with Anthem expires at the end of 2019. Anthem may choose not to renew its contract or, if we do enter into a new contract with Anthem, it could be on terms less favorable to us than our current contract. Anthem's decision whether to enter into a new contract with us, the terms of any new contract and the impact of non-renewal or new contract terms on our business will depend on a number of factors that we cannot currently anticipate or control, and could result in a material adverse effect on our business and results of operations.

30

Table of Contents

In addition, when we executed our agreement with Anthem in 2009, we considered the overall structure of the agreement and the nature of our relationship with Anthem, including the complexity of the service level required, and attributed a reasonable likelihood of renewal at the end of its term in 2019. Accordingly, we amortized the agreement using a modified pattern of benefit over an estimated useful life of 15 years. However, due to the sequence of recent events regarding our discussions with Anthem, culminating in the filing of the lawsuit on March 21, 2016, we felt it prudent to consider the increased likelihood of either non-renewal or renewal on substantially different terms such that, beginning in March 2016, we began amortizing our agreement with Anthem over the remaining term of the contract (i.e., using a life of 10 years from the time the agreement was executed in 2009). Previously, we amortized the agreement over 15 years. Therefore, the intangible asset amortization associated with the Anthem agreement will run through the remaining term of the contract at the end of 2019, reducing the previous amortization period by 5 years. This change increases the quarterly intangible asset amortization by approximately $32.0 million and has no impact on EBITDA.

**RESULTS OF OPERATIONS**

Our core PBM services involve management of prescription drug utilization to drive high quality, cost effective pharmaceutical care. Throughout the contract life cycle and upon renewal, we consult with clients to assist in the selection of plan design features that balance clients' requirements for cost control with member choice and convenience. We focus our solutions to enable better decisions in four important and interrelated areas: benefit choices, drug choices, pharmacy choices and health choices. We offer innovative clinical programs to drive better health outcomes at lower cost. We consult with our clients on how best to structure and leverage the pharmacy benefit to meet plan objectives for access, safety and affordability.

Throughout the description below, reference is made to better management of supply chain. Management of supply chain includes negotiating pharmacy network contracts, pharmaceutical and wholesaler purchasing contracts, as well as manufacturer rebate contracts. Our comprehensive set of solutions, including better management of supply chain, has the ability to reduce the rate of increase of our clients' prescription drug spend and ultimately reduce our revenues while having a favorable impact on gross profit.

Throughout the description below, reference is made to the impact of generic fill rates. Generally, higher generic fill rates reduce PBM revenues, as generic drugs are generally priced lower than branded drugs. However, as ingredient cost on generic drugs is incrementally lower than the price charged, higher generic fill rates generally have a favorable impact on gross profit.

The home delivery generic fill rate is currently lower than the network generic fill rate as fewer generic substitutions are available among maintenance medications (e.g., therapies for chronic conditions) commonly dispensed from home delivery pharmacies as compared to acute medications which are primarily dispensed by pharmacies in our retail networks.

31

Table of Contents

*PBM OPERATING INCOME*

| (in millions) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Product revenues: | | | | |
| Network revenues[1] | $ 13,000.6 | $ 13,747.2 | $ 39,085.3 | $ 42,266.2 |
| Home delivery and specialty revenues[2] | 11,031.8 | 10,331.8 | 32,464.8 | 30,041.9 |
| Service revenues | 377.0 | 432.4 | 1,047.2 | 1,213.9 |
| Total PBM revenues | 24,409.4 | 24,511.4 | 72,597.3 | 73,522.0 |
| Cost of PBM revenues[1] | 22,177.9 | 22,386.2 | 66,451.3 | 67,530.7 |
| PBM gross profit | 2,231.5 | 2,125.2 | 6,146.0 | 5,991.3 |
| PBM SG&A | 826.6 | 974.4 | 2,572.9 | 2,920.4 |
| PBM operating income | $ 1,404.9 | $ 1,150.8 | $ 3,573.1 | $ 3,070.9 |
| Claims: | | | | |
| Network | 217.0 | 232.8 | 664.3 | 680.1 |
| Home delivery and specialty[2] | 29.9 | 29.9 | 89.4 | 89.9 |
| Total PBM claims | 246.9 | 262.7 | 753.7 | 770.0 |
| Adjusted network[3] | 224.5 | 240.8 | 688.6 | 692.8 |
| Adjusted home delivery and specialty[2][3] | 87.6 | 87.4 | 262.0 | 263.8 |
| Total adjusted PBM claims[3] | 312.1 | 328.2 | 950.6 | 956.6 |

(1) Includes retail pharmacy co-payments of $2,008.5 million and $2,161.5 million for the three months ended September 30, 2016 and 2015, respectively, and $6,685.9 million and $7,118.2 million for the nine months ended September 30, 2016 and 2015, respectively.

(2) Includes home delivery and specialty claims including drugs we distribute to other PBMs' clients under limited distribution contracts with pharmaceutical manufacturers and Freedom Fertility claims.

(3) Includes an adjustment to certain network claims to reflect an approximate 30-day equivalent fill and reflects home delivery claims multiplied by 3, as home delivery claims typically cover a time period 3 times longer than network claims.

**PBM revenues.** Network pharmacy revenues decreased $746.6 million, or 5.4%, in the three months ended September 30, 2016 from 2015. This decrease relates primarily to the expected roll off of certain clients, better management of supply chain, lower claims volume and an increase in the network generic fill rate, partially offset by inflation on branded drugs. Our network generic fill rate increased to 86.0% of network claims in the three months ended September 30, 2016 as compared to 85.1% in 2015.

Home delivery and specialty revenues increased $700.0 million, or 6.8%, in the three months ended September 30, 2016 from 2015. This increase relates primarily to inflation on branded drugs, partially offset by an increase in the home delivery generic fill rate. Our home delivery generic fill rate increased to 81.3% of home delivery claims in the three months ended September 30, 2016 as compared to 80.3% in 2015.

Network pharmacy revenues decreased $3,180.9 million, or 7.5%, in the nine months ended September 30, 2016 from 2015. This decrease relates primarily to the expected roll off of certain clients, better management of supply chain, lower claims volume and an increase in the network generic fill rate, partially offset by inflation on branded drugs. Our network generic fill rate increased to 86.1% of network claims in the nine months ended September 30, 2016 as compared to 85.2% in 2015.

Home delivery and specialty revenues increased $2,422.9 million, or 8.1%, in the nine months ended September 30, 2016 from 2015. This increase relates primarily to inflation on branded drugs, partially offset by lower claims volume and an increase in the home delivery generic fill rate. Our home delivery generic fill rate increased to 80.6% of home delivery claims in the nine months ended September 30, 2016 as compared to 79.6% in 2015.

**Cost of PBM revenues.** Cost of PBM revenues decreased $208.3 million, or 0.9%, in the three months ended September 30, 2016 from 2015. This decrease relates primarily to the expected roll off of certain clients, better management of supply chain, lower claims volume and an increase in the aggregate generic fill rate, partially offset by inflation on branded drugs.

Table of Contents

Cost of PBM revenues decreased $1,079.4 million, or 1.6%, in the nine months ended September 30, 2016 from 2015. This decrease relates primarily to the expected roll off of certain clients, better management of supply chain, lower claims volume and an increase in the aggregate generic fill rate, partially offset by inflation on branded drugs.

*PBM gross profit.* PBM gross profit increased $106.3 million, or 5.0%, for the three months ended September 30, 2016 from 2015. This increase is primarily due to $45.2 million of transaction and integration costs incurred during the three months ended September 30, 2015 as compared to no such costs for the three months ended September 30, 2016, as well as better management of supply chain and cost savings from the increase in the aggregate generic fill rate (85.4% for the three months ended September 30, 2016 as compared to 84.5% in 2015). This increase is partially offset by lower claims volume.

PBM gross profit increased $154.7 million, or 2.6%, for the nine months ended September 30, 2016 from 2015. This increase is primarily due to $140.6 million of transaction and integration costs incurred during the nine months ended September 30, 2015 as compared to no such costs for the nine months ended September 30, 2016, as well as better management of supply chain and cost savings from the increase in the aggregate generic fill rate (85.4% for the nine months ended September 30, 2016 as compared to 84.5% in 2015). This increase is partially offset by the realization of $106.6 million of revenues related to a client contract for the nine months ended September 30, 2016 as compared to $141.7 million for the nine months ended September 30, 2015 and by lower claims volume.

*PBM selling, general and administrative expense.* Selling, general and administrative expense ("SG&A") for our PBM segment decreased $147.8 million, or 15.2%, for the three months ended September 30, 2016 from 2015. This decrease relates primarily to $68.2 million of transaction and integration costs and $30.7 million of additional depreciation and amortization costs (related to certain retired assets) incurred during the three months ended September 30, 2015 as compared to no such costs for the three months ended September 30, 2016.

SG&A for our PBM segment decreased $347.5 million, or 11.9%, for the nine months ended September 30, 2016 from 2015. This decrease relates primarily to $197.2 million of transaction and integration costs, a $60.0 million legal settlement and $77.3 million of additional depreciation and amortization costs (related to certain retired assets) incurred during the nine months ended September 30, 2015 as compared to no such costs for the nine months ended September 30, 2016.

*PBM operating income.* PBM operating income increased $254.1 million, or 22.1%, and $502.2 million, or 16.4%, for the three and nine months ended September 30, 2016 from 2015, based on the various factors described above.

*OTHER BUSINESS OPERATIONS OPERATING INCOME*

| (in millions) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Product revenues | $ 922.2 | $ 624.3 | $ 2,578.3 | $ 1,809.7 |
| Service revenues | 78.5 | 86.9 | 248.6 | 244.7 |
| Total Other Business Operations revenues | 1,000.7 | 711.2 | 2,826.9 | 2,054.4 |
| Cost of Other Business Operations revenues | 958.1 | 662.9 | 2,690.6 | 1,907.0 |
| Other Business Operations gross profit | 42.6 | 48.3 | 136.3 | 147.4 |
| Other Business Operations SG&A | 31.5 | 32.9 | 96.3 | 92.8 |
| Other Business Operations operating income | $ 11.1 | $ 15.4 | $ 40.0 | $ 54.6 |
| Claims: | | | | |
| Other[1] | 0.1 | 0.1 | 0.4 | 0.5 |
| Total adjusted Other Business Operations claims | 0.1 | 0.1 | 0.4 | 0.5 |

(1) Includes claims related to drugs distributed through patient assistance programs.

Other Business Operations operating income decreased $4.3 million, or 27.9%, and $14.6 million, or 26.7%, for the three and nine months ended September 30, 2016 from 2015, respectively. These decreases are due primarily to timing and mix of business across the non-claims producing lines of business.

*OTHER (EXPENSE) INCOME, NET*

Net other expense increased $144.5 million in the three months ended September 30, 2016 from 2015. This increase is primarily due to $136.0 million of costs related the early repayment of debt and increased interest expense related to the issuance of

$2,000.0 million of senior notes in February 2016 and the issuance of $4,000.0 million of senior notes in July 2016.

33

Table of Contents

This increase is partially offset by decreased interest expense related to the repayment of debt during both the year ended December 31, 2015 and the nine months ended September 30, 2016.

Net other expense increased $163.4 million, or 45.6%, in the nine months ended September 30, 2016 from 2015. This increase is primarily due to $142.7 million of costs related to the early repayment of debt and increased interest expense related to the 2015 credit agreement (as defined below), the issuance of $2,000.0 million of senior notes in February 2016 and the issuance of $4,000.0 million of senior notes in July 2016. This increase is partially offset by decreased interest expense related to the repayment of debt during both the year ended December 31, 2015 and the nine months ended September 30, 2016.

*PROVISION FOR INCOME TAXES*

Our effective tax rate attributable to Express Scripts increased to 36.9% for the three months ended September 30, 2016 from 36.4% for the same period in 2015 and decreased to 35.9% for the nine months ended September 30, 2016 from 38.1% for the same periods in 2015 due to both recurring and discrete events. We believe it is reasonably possible our unrecognized tax benefits could decrease by approximately $587.0 million within the next twelve months due to the conclusion of various examinations as well as lapses in various statutes of limitations. Included in this $587.0 million is a $531.0 million potential tax benefit related to the disposition of PolyMedica Corporation (Liberty) for which no benefit has been recognized to date.

We recognized net discrete benefits of $2.2 million and $35.7 million for the three and nine months ended September 30, 2016, compared to net discrete benefits of $12.7 million and net discrete charges of $13.0 million for the same periods in 2015. Our 2016 net discrete benefits and our 2015 net discrete benefits primarily relate to changes in our unrecognized tax benefits.

*NET INCOME ATTRIBUTABLE TO NON-CONTROLLING INTEREST*

Net income attributable to non-controlling interest represents the share of net income allocated to members in our consolidated affiliates. These amounts are directly impacted by the profitability of our consolidated affiliates.

*NET INCOME AND EARNINGS PER SHARE ATTRIBUTABLE TO EXPRESS SCRIPTS*

Net income attributable to Express Scripts for the three and nine months ended September 30, 2016 increased $61.2 million, or 9.2%, and $266.8 million, or 15.7%, respectively, from 2015 due to the factors described above.

Basic and diluted earnings per share attributable to Express Scripts increased 18.4% and 18.6%, respectively, for the three months ended September 30, 2016 from 2015, and 26.4% and 27.2%, respectively, for the nine months ended September 30, 2016 from 2015. These increases are primarily due to reduced shares outstanding (a total of 240.2 million shares held in treasury on September 30, 2016, compared to 177.6 million shares held in treasury on September 30, 2015), as well as higher operating income.

34

Table of Contents

*EBITDA AND ADJUSTED EBITDA ATTRIBUTABLE TO EXPRESS SCRIPTS*

Provided below is a reconciliation of each of EBITDA attributable to Express Scripts ("EBITDA") and adjusted EBITDA attributable to Express Scripts ("Adjusted EBITDA") to net income attributable to Express Scripts, as we believe it is the most directly comparable measure calculated under U.S. generally accepted accounting principles ("GAAP"):

| **EBITDA**[(1)] | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| *(in millions, except per claim data)* | **2016** | **2015** | **2016** | **2015** |
| Net income attributable to Express Scripts | $ 722.9 | $ 661.7 | $ 1,969.7 | $ 1,702.9 |
| Provision for income taxes | 422.4 | 378.2 | 1,103.9 | 1,046.9 |
| Depreciation and amortization[(2)] | 537.7 | 582.8 | 1,611.2 | 1,727.7 |
| Other expense, net | 265.1 | 120.6 | 521.4 | 358.0 |
| EBITDA[(1)] | 1,948.1 | 1,743.3 | 5,206.2 | 4,835.5 |
| **Adjustments to EBITDA** | | | | |
| Transaction and integration costs[(2)] | — | 65.0 | — | 219.4 |
| Legal settlement | — | — | — | 60.0 |
| EBITDA/Adjusted EBITDA[(3)] | 1,948.1 | 1,808.3 | 5,206.2 | 5,114.9 |
| Total adjusted claims[(4)] | 312.2 | 328.3 | 951.0 | 957.1 |
| EBITDA/Adjusted EBITDA per adjusted claim[(5)] | $ 6.24 | $ 5.51 | $ 5.47 | $ 5.34 |

(1) EBITDA is net income before provision for income taxes, depreciation and amortization and other expense. EBITDA is a non-GAAP financial measure and should be considered in addition to, but not as a substitute for, or superior to, financial measures prepared in accordance with U.S. GAAP. EBITDA is a widely accepted indicator of a company's ability to service indebtedness and is frequently used to evaluate a company's performance. Management believes that EBITDA, considered along with the corresponding U.S. GAAP measure, provides management and investors with useful information about the earnings impact of certain non-operating expenses, which is useful for comparison of our earnings to those of other companies. We believe that EBITDA is also useful in assessing period-to-period performance trends. In addition, our definition and calculation of EBITDA may not be comparable to that used by other companies.

(2) Depreciation and amortization for the three and nine months ended September 30, 2016 includes an additional $31.7 million and $73.9 million, respectively, related to our decision to amortize our pharmacy benefit management agreement with Anthem over 10 years as opposed to 15 years. See Note 3 - Goodwill and other intangible assets for additional details. Depreciation and amortization presented above includes $48.4 million and $118.4 million for the three and nine months ended September 30, 2015, respectively, of depreciation related to the integration of Medco Health Solutions, Inc. ("Medco") which is not included in transaction and integration costs.

(3) Adjusted EBITDA is a non-GAAP financial measure and should be considered in addition to, but not as a substitute for, or superior to, financial measures prepared in accordance with U.S. GAAP. Adjusted EBITDA is EBITDA excluding transaction and integration costs and a legal settlement as these charges are not considered an indicator of ongoing company performance. Management believes that Adjusted EBITDA, considered along with the corresponding U.S. GAAP measure, provides management and investors with useful information about the earnings impact of certain non-operating expenses which is useful for comparison of our earnings to those of other companies. We believe that Adjusted EBITDA is also useful in assessing period-to-period performance trends. In addition, our definition and calculation of Adjusted EBITDA may not be comparable to that used by other companies.

(4) Includes an adjustment to certain network claims to reflect an approximate 30-day equivalent fill and reflects home delivery claims multiplied by 3, as home delivery claims typically cover a time period 3 times longer than network claims.

(5) EBITDA per adjusted claim and Adjusted EBITDA per adjusted claim are calculated by dividing EBITDA and Adjusted EBITDA, as applicable, by the adjusted claim volume for the period. This measure is used as an indicator of EBITDA and Adjusted EBITDA, as applicable, performance on a per unit basis. EBITDA and Adjusted EBITDA, as applicable, and, as a result, EBITDA and Adjusted EBITDA, as applicable, per adjusted claim, are each affected by the changes in claims volume between retail and home delivery and the relative representation of brand-name, generic and specialty pharmacy drugs, as well as the level of efficiency in the business.

Table of Contents

## LIQUIDITY AND CAPITAL RESOURCES

*CASH FLOW AND CAPITAL EXPENDITURES*

In the nine months ended September 30, 2016, net cash provided by operating activities increased $696.2 million to $2,670.5 million, due partially to an increase in net income of $267.2 million in 2016 from 2015. In addition, changes in working capital resulted in a cash outflow of $657.3 million in 2016 compared to a cash outflow of $1,245.0 million in 2015, resulting in a total change of $587.7 million.

In the nine months ended September 30, 2016, net cash used in investing activities increased $87.3 million to $245.2 million. Capital expenditures for purchases of property and equipment increased $60.5 million in 2016 from 2015. We intend to continue to invest in infrastructure and technology we believe will provide efficiencies in operations, facilitate growth and enhance the services we provide to our clients. Anticipated capital expenditures are expected to be funded primarily from operating cash flow or, to the extent necessary, with borrowings under our available credit sources, described below.

In the nine months ended September 30, 2016, net cash used in financing activities increased $105.4 million to $3,309.5 million. Cash outflows for 2016 include $5,395.0 million related to the repayment of debt and $3,892.7 million of treasury share repurchases, compared to outflows during the same period of 2015 of $3,353.3 million related to the repayment of debt and $5,500.0 million of treasury share repurchases. Cash inflows for 2016 include $5,986.8 million related to the issuance of the February 2016 Senior Notes and the July 2016 Senior Notes (defined below) compared to inflows during the same period of 2015 of $5,500.0 million related to the 2015 credit agreement (defined below).

We anticipate our current cash balances, cash flows from operations and our available credit sources will be sufficient to meet our cash needs and make scheduled payments for our contractual obligations and current capital commitments. However, if needs arise, we may decide to secure external capital to provide additional liquidity. New sources of liquidity may include additional lines of credit, term loans, or issuance of notes or equity, all of which are allowable, with certain limitations, under our credit agreements and other debt instruments. While our ability to secure debt financing in the short term at rates favorable to us may be moderated due to various factors, including existing debt levels, market conditions or other factors, we believe our liquidity options described above are sufficient to meet our anticipated cash flow needs.

*ACQUISITIONS AND RELATED TRANSACTIONS*

We regularly review potential acquisitions and affiliation opportunities. We believe available cash resources, bank financing or the issuance of debt or equity could be used to finance future acquisitions or affiliations. There can be no assurance we will enter into new acquisitions or establish new affiliations in the future.

*SHARE REPURCHASE PROGRAM*

In January 2016, we settled the $5,500.0 million accelerated share repurchase agreement executed in April 2015 (the "2015 ASR Agreement") and received 9.1 million additional shares, resulting in a total of 64.2 million shares received under the 2015 ASR Agreement. The $825.0 million that had previously been recorded in additional paid-in capital in respect of the 2015 ASR Agreement was reclassified to treasury stock upon settlement of the 2015 ASR Agreement.

In February 2016, we entered into an accelerated share repurchase agreement (the "2016 ASR Agreement") to repurchase shares of our common stock for an initial payment of $2,800.0 million. We recorded an increase to treasury stock of $2,240.0 million and a decrease to additional paid-in capital of $560.0 million in the unaudited consolidated balance sheet. In August 2016, we settled the 2016 ASR Agreement and received 6.2 million additional shares, resulting in a total of 38.3 million shares received under the 2016 ASR Agreement. The $560.0 million recorded in additional paid-in capital was reclassified to treasury stock upon settlement of the 2016 ASR Agreement in August 2016. See Note 6 - Common stock for additional details.

Including the shares received under the 2016 ASR Agreement, we repurchased 14.1 million shares under our share repurchase program for $1,132.5 million during the three months ended September 30, 2016. There were no repurchases of the Company's common stock during the third quarter of 2015. Including the shares received under the 2016 ASR Agreement and upon settlement of the 2015 ASR Agreement, we repurchased 62.6 million shares and 55.1 million shares under our share repurchase program for $4,717.7 million and $4,675.0 million during the nine months ended September 30, 2016 and 2015, respectively. As of September 30, 2016, there were 26.0 million shares remaining under our share repurchase program. Additional share repurchases, if any, will be made in such amounts and at such times as we deem appropriate based upon prevailing market and business conditions and other factors.

36

Table of Contents

*BANK CREDIT FACILITIES*

In April 2015, we entered into a credit agreement (the "2015 credit agreement") providing for a five-year $2,000.0 million revolving credit facility (the "2015 revolving facility"), a two-year $2,500.0 million term loan (the "2015 two-year term loan") and a five-year $3,000.0 million term loan (the "2015 five-year term loan"). At September 30, 2016, no amounts were outstanding under the 2015 revolving facility. We make quarterly principal payments on the 2015 five-year term loan. See Note 5 - Financing for additional details.

We have two additional credit agreements, each providing for an uncommitted revolving credit facility: $150.0 million executed August 2015 and amended May 2016 with a termination date of May 2017, and $130.0 million executed December 2014 and amended October 2015 and April 2016 with a termination date of April 2017. At September 30, 2016, no amounts were drawn under either facility.

*SENIOR NOTES*

In February 2016, we issued senior notes (the "February 2016 Senior Notes") consisting of:

- $500.0 million aggregate principal amount of 3.300% senior notes due February 2021
- $1,500.0 million aggregate principal amount of 4.500% senior notes due February 2026

We used the net proceeds from the sale of the February 2016 Senior Notes to complete a tender offer and follow-on redemption of $1,500.0 million aggregate principal amount of our 3.125% senior notes due May 2016 (which were fully redeemed in April 2016), to enter into an accelerated share repurchase program and for other general corporate purposes.

In July 2016, we issued senior notes (the "July 2016 Senior Notes") consisting of:

- $1,000.0 million aggregate principal amount of 3.000% senior notes due July 2023
- $1,500.0 million aggregate principal amount of 3.400% senior notes due March 2027
- $1,500.0 million aggregate principal amount of 4.800% senior notes due July 2046

We used the net proceeds from the sale of the July 2016 Senior Notes to repay a portion of our 2015 two-year term loan, to complete a tender offer and follow-on redemption for our 2.650% senior notes due February 2017, to complete a tender offer for a portion of each of our 7.125% senior notes due March 2018, our 7.250% senior notes due June 2019 and our 6.125% senior notes due November 2041 and we plan to use the remaining proceeds for general corporate purposes, which may include the repayment of our other indebtedness, working capital and repurchases of our common stock.

Our bank financing arrangements and senior notes contain certain customary covenants that restrict our ability to incur additional indebtedness, create or permit liens on assets and engage in mergers or consolidations. The covenants related to bank financing arrangements also include, among other things, a maximum leverage ratio. The 7.125% senior notes due March 2018 issued by Medco are also subject to an interest rate adjustment in the event of a downgrade in our credit ratings to below investment grade. At September 30, 2016, we were in compliance with all covenants associated with our debt instruments.

**IMPACT OF INFLATION**

Most of our contracts provide we bill clients based on a generally recognized price index for pharmaceuticals and accordingly, the rate of inflation, and our efforts to manage the impact of inflation for our clients, with respect to prescription drugs can affect our revenues and cost of revenues.

**OTHER MATTERS**

In August 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2016-15, Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments. The guidance addresses the classification of cash flow related to (1) debt prepayment or extinguishment costs, (2) settlement of zero-coupon debt instruments or other debt instruments with coupon rates that are insignificant in relation to the effective interest rate of the borrowing, (3) contingent consideration payments made after a business combination, (4) proceeds from the settlement of insurance claims, (5) proceeds from the settlement of corporate-owned life insurance, including bank-owned life insurance, (6) distributions received from equity method investees and (7) beneficial interests in securitization transactions. The guidance also clarifies how the predominance principle should be applied when cash receipts and cash payments have aspects of more than one class of cash flows. The guidance will generally be applied retrospectively and is effective for financial statements issued for annual reporting periods beginning after December 15, 2017. Early application is permitted. We are currently evaluating the impact of this standard on our consolidated statement of cash flows.

Table of Contents

In March 2016, FASB issued ASU 2016-09, Improvements to Employee Share-Based Payment Accounting, which amends Accounting Standards Codification ("ASC") Topic 718, Compensation – Stock Compensation. The new standard simplifies the accounting for stock-based compensation, including amendments on how both taxes related to stock-based compensation and cash payments made to taxing authorities are recorded. These amendments are expected to impact net income, earnings per share ("EPS") and the consolidated statement of cash flows. The new guidance is effective for financial statements issued for annual reporting periods beginning after December 15, 2016, and early application is permitted, with any adjustments reflected as of the beginning of the fiscal year of adoption. We are currently evaluating the impact of this standard on our consolidated financial statements.

In February 2016, FASB issued ASU 2016-02, Leases (ASC Topic 842), which supersedes ASC Topic 840, Leases. This ASU is intended to increase transparency and comparability of organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The new guidance is effective for financial statements issued for annual reporting periods beginning after December 15, 2018, and early application is permitted. We are currently evaluating the impact of this standard on our consolidated financial statements.

In May 2014, FASB issued ASU 2014-09, Revenue from Contracts with Customers (ASC Topic 606), which supersedes ASC Topic 605, Revenue Recognition. The new standard requires companies to recognize revenues upon transfer of goods or services to customers in amounts that reflect the consideration which the company expects to receive in exchange for those goods or services. In July 2015, the FASB delayed the effective date of the standard by one year. The new guidance is effective for financial statements issued for annual reporting periods beginning after December 15, 2017, and early application is not permitted before the original effective date of annual reporting periods beginning after December 15, 2016. We are currently evaluating the impact of this standard on our consolidated financial statements.

## CLIENTS

We are a provider of services to managed care organizations, health insurers, third-party administrators, employers, union-sponsored benefit plans, workers' compensation plans, government health programs, providers, clinics, hospitals and others. Refer to Note 9 - Segment information for a description of client concentration.

## CRITICAL ACCOUNTING POLICIES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Our estimates and assumptions are based upon a combination of historical information and various other assumptions believed to be reasonable under the particular circumstances. Actual results may differ from our estimates. For a description of our critical accounting policies, please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations – Critical Accounting Policies" included in our Annual Report on Form 10-K filed with the SEC on February 16, 2016.

**Item 3.**     **Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risk from changes in interest rates related to variable rate debt outstanding under the 2015 credit agreement. Our earnings are subject to change as a result of movements in market interest rates. At September 30, 2016, we had $3,312.5 million of gross obligations under our 2015 credit agreement which were subject to variable rates of interest. A hypothetical increase in interest rates of 1% would result in an increase in annual interest expense of approximately $33.1 million (pre-tax), assuming obligations subject to variable interest rates remained constant.

**Item 4.**     **Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act")) designed to provide reasonable assurance that information required to be disclosed in our filings under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based upon this evaluation, the Chief Executive Officer and the Chief Financial Officer concluded the design and operation of these disclosure controls and procedures are effective in providing reasonable assurance of the achievement of the objectives described above.

During the quarter ended September 30, 2016, there was no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

PART II. OTHER INFORMATION

**Item 1.**     **Legal Proceedings**

We and/or our subsidiaries are defendants in a number of lawsuits. We cannot ascertain with any certainty at this time the monetary damages or injunctive relief that any of the plaintiffs may recover. We also cannot provide any assurance the outcome of any of these matters, or some number of them in the aggregate, will not be materially adverse to our financial condition, results of operations, cash flows or business prospects. In addition, the expenses of defending these cases may have a material adverse effect on our financial results.

The following descriptions have been updated since the filing of our Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, relating to proceedings involving the Company:

- Jerry Beeman, et al. v. Caremark, et al. (United States District Court for the Central District of California, Case No.021327) (filed December 2002). A complaint was filed against Express Scripts, Inc. (for purposes of this Item 1, "ESI"), NextRX LLC f/k/a Anthem Prescription Management LLC, Medco Health Solutions, Inc. (for purposes of this Item 1, "Medco") and several other pharmacy benefit management companies by several California pharmacies as a putative class action, alleging rights to sue as a private attorney general under California law. Plaintiffs allege ESI and the other defendants failed to comply with statutory obligations under California Civil Code Section 2527 to provide California clients with the results of a bi-annual survey of retail drug prices, and seek money damages. In July 2004, the case was dismissed with prejudice due to lack of standing. In June 2006, the United States Court of Appeals for the Ninth Circuit reversed the district court's opinion on standing and remanded the case. The district court's denial of defendants' motion to dismiss on first amendment constitutionality grounds was appealed to the Ninth Circuit as discussed further below. Plaintiffs also filed a motion for class certification in 2007 that was never fully briefed.

  In July 2011, the Ninth Circuit affirmed the district court's denial of defendants' motion to dismiss. In June 2012, the Ninth Circuit en banc panel issued a decision certifying the question of constitutionality of California Civil Code Section 2527 to the California Supreme Court, requesting consideration of the issue and a ruling. In December 2013, the California Supreme Court held that California Civil Code Section 2527 does not infringe upon state constitutional free speech protections. In January 2014, the Ninth Circuit en banc panel issued a ruling vacating the prior panel opinion and remanded the case to the original Ninth Circuit three-judge panel to either consider the federal constitutional issues or remand the case to the district court. In March 2014, the Ninth Circuit entered an order lifting the stay and remanded the case to the district court for further proceedings. Defendants' objections based on plaintiffs' lack of standing and the unconstitutionality of the California law due to defendants' first amendment rights have been rejected by the courts and are not subject to further appeals.

  On August 26, 2016, defendants filed a motion to deny class certification. Plaintiffs filed a memorandum in opposition to the motion on September 16, 2016 and defendants filed a reply in support of the motion on October 3, 2016. A hearing on the motion to deny class certification was held on October 17, 2016 and we await the court's ruling.

- Anthem, Inc. v. Express Scripts, Inc. (United States District Court for the Southern District of New York) (filed March 21, 2016). Anthem, Inc. (for purposes of this Item 1, "Anthem") filed this lawsuit alleging various breach of contract claims against ESI relating to the parties' rights and obligations under the periodic pricing review section of the pharmacy benefit management agreement between the parties, including allegations that ESI failed to negotiate new pricing concessions in good faith, as well as various alleged service issues. Anthem requests the court enter declaratory judgment that ESI is required to provide Anthem competitive benchmark pricing, that Anthem can terminate the agreement, and that ESI is required to provide Anthem with post-termination services at competitive benchmark pricing for one year following any termination by Anthem. Anthem claims it is entitled to $13,000.0 million in additional pricing concessions over the remaining term of the agreement as well as $1,800.0 million for one year following any contract termination by Anthem, and $150.0 million in damages for service issues (for purposes of this Item 1, "Anthem's Allegations"). On April 19, 2016, in response to Anthem's complaint, ESI filed its answer denying Anthem's Allegations in their entirety and asserting affirmative defenses and counterclaims against Anthem. Among other things, ESI counterclaims that: (1) Anthem breached the agreement by failing to negotiate in good faith with respect to its own proposed new pricing terms; (2) Anthem breached the implied covenant of good faith and fair dealing under the agreement by disregarding the terms of the transaction in which it negotiated and accepted a $4,675.0 million cash payment in 2009; (3) ESI is entitled to a declaratory judgment that Anthem does not have a contractual right to any change in pricing under the agreement, that ESI has no contractual obligation to ensure that Anthem is receiving any specific level of pricing, and that ESI's sole obligation is to negotiate in good faith over any

39

pricing terms proposed by Anthem; (4) ESI is entitled to a declaratory judgment regarding the timing of when the periodic pricing review ripened under the agreement, such that the process begins on the dates provided in the agreement; (5) ESI is entitled to a declaratory judgment that Anthem does not have the right to terminate the agreement; and (6) in the alternative, Anthem has been unjustly enriched by the $4,675.0 million payment. Anthem filed a motion to dismiss two counts of ESI's amended counterclaims (items 2 and 6 as described above) on July 8, 2016, and the Company filed a brief in opposition on August 5, 2016, which has been fully briefed.

- <u>Melbourne Municipal Firefighters' Pension Trust Fund v. Express Scripts Holding Company, George Paz, Timothy Wentworth, Eric Slusser, David Queller, and James Havel</u> (United States District Court for the Southern District of New York) (filed May 4, 2016). Plaintiff filed this putative securities class action complaint on behalf of all persons or entities that purchased or otherwise acquired the Company's publicly traded common stock between February 24, 2015 and March 21, 2016 (for purposes of this Item 1, "Securities Action"). Plaintiff adopts many of Anthem's Allegations in support of its claims that the Company and certain of its current and former officers violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 by carrying out a scheme to defraud the investing public, including but not limited to engaging in the following alleged activities: deceiving the investing public, causing plaintiff and class members to purchase the Company's stock at artificially inflated prices, making untrue statements of material fact and/or omitting to state material facts, and engaging in acts, practices, and a course of business that operated as a scheme to defraud the investing public into paying inflated prices for the Company's stock. Plaintiff seeks compensatory damages in favor of Plaintiff and other class members, attorneys' fees and costs, and equitable relief. On July 27, 2016, the court appointed the Teachers Insurance and Annuity Association of America as the lead plaintiff (for purposes of this Item 1, "Lead Plaintiff"). Lead Plaintiff filed an amended class action complaint on October 14, 2016. On August 15, 2016, the Company filed a motion to transfer venue to the Circuit Court of St. Louis County, Missouri. Lead Plaintiff filed a brief in opposition on September 1, 2016, and the Company filed its reply brief on September 8, 2016.

- <u>In re Express Scripts/Anthem ERISA Litigation</u> (United States District Court for the Southern District of New York) (consolidated the following cases on August 1, 2016: <u>John Doe One and John Doe Two v. Express Scripts, Inc.</u>, filed May 6, 2016, and <u>Karen Burnett, Brendan Farrell, and Robert Shullich v. Express Scripts, Inc. and Anthem, Inc.</u>, filed June 24, 2016). On September 30, 2016, Plaintiffs filed a First Amended Consolidated Class Action Complaint on behalf of health plan beneficiaries who are enrolled in health care plans that are insured or administered by Anthem. Plaintiffs adopt many of Anthem's Allegations in support of its claims that the Company and Anthem breached fiduciary duties and otherwise violated their legal obligations under ERISA by failing to provide Anthem plan participants the benefit of competitive benchmark pricing, that ESI engaged in mail fraud, wire fraud and other racketeering activity through its invoicing system with Anthem, that ESI breached its contract with Anthem, that plaintiffs are entitled to equitable relief under theories including unjust enrichment, that ESI violated unfair and deceptive trade practices statutes, that Anthem breached the covenant of good faith and fair dealing implied in health plans, and that ESI violated the anti-discrimination provisions of the Affordable Care Act. Plaintiffs seek compensatory damages, declaratory relief, equitable relief and attorneys' fees and costs.

- <u>Abraham Neufeld, derivatively on behalf of nominal defendant Express Scripts Holding Company v. George Paz, Timothy Wentworth, Eric Slusser, David Queller, James M. Havel, Maura C. Breen, William J. DeLaney, Elder Granger, Nicholas J. LaHowchic, Thomas P. Mac Mahon, Frank Mergenthaler, Woodrow A. Myers, Jr., Roderick A. Palmore, William L. Roper, Seymour Sternberg, Gary Benanav, and Express Scripts Holding Company</u> (Circuit Court of St. Louis County, State of Missouri) (filed June 6, 2016). Plaintiff filed this stockholder derivative lawsuit alleging certain current and former officers and directors of the Company (collectively referred to as "Individual Neufeld Defendants") breached fiduciary duties and were unjustly enriched. Plaintiff adopts many of Anthem's Allegations in support of its claims that Individual Neufeld Defendants breached fiduciary duties of loyalty, good faith, candor, and due care, which caused the Company to issue false and misleading statements regarding the Company's relationship with Anthem, that Individual Neufeld Defendants breached fiduciary duties by selling the Company's stock and were unjustly enriched. Plaintiff seeks damages on behalf of the Company from Individual Neufeld Defendants, disgorgement of Individual Neufeld Defendants' proceeds derived from sales of the Company's common stock, equitable relief, and attorneys' fees and costs. On July 28, 2016, a stipulation and order was entered staying the case until 45 days after Lead Plaintiff in the Securities Action files an amended class action complaint. Lead Plaintiff filed an amended complaint on October 14, 2016.

- <u>Richard Weisglas, derivatively on behalf of Express Scripts Holding Company v. Express Scripts Holding Company, George Paz, Maura C. Breen, Gary G. Benanav, William J. DeLaney, Elder Granger, Nicholas J. LaHowchic, Thomas P. Mac Mahon, Frank Mergenthaler, Woodrow A. Myers, Jr., Roderick A. Palmore, William L. Roper, Seymour Sternberg, Timothy Wentworth, Eric Slusser, David Queller, and James M. Havel</u> (Circuit Court of St. Louis County, State of Missouri) (filed August 4, 2016). Plaintiff filed this stockholder derivative lawsuit alleging certain current and

40

Table of Contents

former officers and directors of the Company (collectively referred to as "Individual Weisglas Defendants") breached fiduciary duties and were unjustly enriched. Plaintiff adopts many of Anthem's Allegations in support of its claims that Individual Weisglas Defendants abused their control and breached fiduciary duties of loyalty, good faith and candor, which caused the Company to issue false and misleading statements regarding the Company's relationship with Anthem and unjustly enriched Individual Weisglas Defendants. Plaintiff seeks damages on behalf of the Company from Individual Weisglas Defendants, equitable injunctive relief, and attorneys' fees and costs.

- M. Scott Brewer, James E. Brown, Sr., Marcus Estlack, Keith McClanahan, Jeremy Jeffers, Glenn Jeffries, William Waterkotte, Andrew Wiseman, Denzil Malone and Gary R. Reed, in their capacities as Trustees for the Carpenters Pension Fund of West Virginia, derivatively on behalf of Express Scripts Holding Company v. Maura C. Breen, William J. DeLaney, Elder Granger, Nicholas J. LaHowchic, Thomas P. Mac Mahon, Frank Mergenthaler, Woodrow A. Myers, Jr., Roderick A. Palmore, George Paz, William L. Roper, Seymour Sternberg, Christopher A. McGinnis, David Queller, Eric R. Slusser, Timothy Wentworth, Gary G. Benanav, James M. Havel, Christopher K. Knibb, and Express Scripts Holding Company (United States District Court for the Southern District of New York) (filed September 26, 2016). Plaintiffs filed this stockholder derivative lawsuit alleging certain current and former officers and directors of the Company (collectively referred to as "Individual Brewer Defendants") breached fiduciary duties and were unjustly enriched. Plaintiffs adopt many of Anthem's Allegations in support of their claims that Individual Brewer Defendants breached fiduciary duties of loyalty, good faith, fair dealing, and candor, which caused the Company to issue false and misleading statements regarding the Company's relationship with Anthem and unjustly enriched Individual Brewer Defendants. Plaintiffs also assert a claim for corporate waste alleging the Company paid improper compensation, bonuses and other benefits to executives who breached their fiduciary duties to stockholders. Plaintiff seeks damages on behalf of the Company from the Individual Brewer Defendants, an accounting by the Individual Brewer Defendants for all damages, profits, special benefits and unjust enrichment, and imposition of a constructive trust, judgment directing the Company to take all necessary actions to reform and improve its corporate governance and internal control procedures, punitive damages, and an award of attorneys' fees and costs.

- On August 15, 2016, the Company received a civil investigative demand from the United States Attorney's Office for the Southern District of New York, requesting information regarding the Company's relationships with pharmaceutical manufacturers and prescription drug plan clients, and payments made to and from those entities. The Company intends to cooperate with the inquiry and is not able to predict with certainty the timing or outcome of this matter.

- On September 12, 2016, the Company received a subpoena duces tecum from the Department of Justice and United States Attorney's Office for the District of Massachusetts requesting information regarding relationships between pharmaceutical manufacturers, independent 501(c)(3) charitable foundations providing cost-sharing assistance to federal health care program beneficiaries, and specialty pharmacies. The Company intends to cooperate with the inquiry and is not able to predict with certainty the timing or outcome of this matter.

Investigations under the federal False Claims Act and most state false claims acts may be initiated by the applicable government investigative body or by a qui tam relator's filing of a complaint under court seal. If a qui tam relator's complaint remained under seal, applicable law would restrict our ability to disclose such a fact.

In addition to the foregoing matters there have arisen various legal proceedings, investigations or claims in the ordinary course of our business now pending against us or our subsidiaries. The effect of these actions on future financial results is not subject to reasonable estimation because the proceedings are in early stages and/or considerable uncertainty exists about the outcomes. Where insurance coverage is not available for such claims, or in our judgment, is not cost-effective, we maintain self-insurance accruals to reduce our exposure to future legal costs, settlements and judgments related to uninsured claims. Our self-insured accruals are based upon estimates of the aggregate liability for the costs of uninsured claims incurred and the retained portion of insured claims using certain actuarial assumptions followed in the insurance industry and our experience. It is not possible to predict with certainty the outcome of these claims, and we can give no assurance that any losses in excess of our insurance and any self-insurance accruals will not be material.

**Table of Contents**

**Item 2.**    **Unregistered Sales of Equity Securities and Use of Proceeds**

The following is a summary of our stock repurchasing activity during the three months ended September 30, 2016 (share data in millions):

| Period | Total number of shares purchased | Average price paid per share | Total number of shares purchased as part of a publicly announced program | Maximum number of shares that may yet be purchased under the program |
|---|---|---|---|---|
| 7/1/2016 - 7/31/2016 | 0.2 | $ 76.78 | 0.2 | 39.9 |
| 8/1/2016 - 8/31/2016 | 9.8 | 74.07 [1] | 9.8 | 30.1 |
| 9/1/2016 - 9/30/2016 | 4.1 | 71.55 | 4.1 | 26.0 |
| Third Quarter 2016 Total | 14.1 | $ 72.82 [1] | 14.1 | |

(1)  Average price paid per share excludes the effect of the 6.2 million shares that were delivered upon the settlement of the 2016 ASR Agreement in August 2016. These shares are included in the total number of shares purchased in August 2016 and reduce the remaining shares available to be purchased under the share repurchase program. See Note 6 - Common stock for further information regarding the 2016 ASR Agreement.

The repurchases disclosed in this table were made pursuant to the share repurchase program, originally announced in 2013. As of September 30, 2016, there were 26.0 million shares remaining under the share repurchase program. Additional share repurchases, if any, will be made in such amounts and at such times as we deem appropriate based upon prevailing market and business conditions and other factors.

**Item 6.**    **Exhibits**

(a) See Index to Exhibits below.

42

Table of Contents

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

EXPRESS SCRIPTS HOLDING COMPANY

(Registrant)

| | | |
|---|---|---|
| Date: October 25, 2016 | By: | /s/ Timothy Wentworth |
| | | Timothy Wentworth, President and Chief Executive Officer |
| Date: October 25, 2016 | By: | /s/ Eric Slusser |
| | | Eric Slusser, Executive Vice President and Chief Financial Officer |

43

**Table of Contents**

## INDEX TO EXHIBITS
### (Express Scripts Holding Company – Commission File Number 1-35490)

| Exhibit Number | Exhibit |
|---|---|
| 2.1[1] | Agreement and Plan of Merger, dated as of July 20, 2011, by and among Express Scripts, Inc., Medco Health Solutions, Inc., Aristotle Holding, Inc., Aristotle Merger Sub, Inc. and Plato Merger Sub, Inc., incorporated by reference to Exhibit 2.1 to Express Scripts, Inc.'s Current Report on Form 8-K filed July 22, 2011, File No. 000-20199. |
| 2.2 | Amendment No. 1 to Agreement and Plan of Merger, dated as of November 7, 2011, by and among Express Scripts, Inc., Medco Health Solutions, Inc., Aristotle Holding, Inc., Aristotle Merger Sub, Inc., and Plato Merger Sub, Inc., incorporated by reference to Exhibit 2.1 to Express Scripts, Inc.'s Current Report on Form 8-K filed November 8, 2011, File No. 000-20199. |
| 3.1 | Amended and Restated Certificate of Incorporation of the Company, incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed April 2, 2012. |
| 3.2 | Amended and Restated Bylaws of the Company, as amended on March 9, 2016, incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed March 10, 2016. |
| 11.1 | Statement regarding computation of earnings per share. (See Note 4 to the unaudited consolidated financial statements.) |
| 31.1[2] | Certification by Timothy Wentworth, as President and Chief Executive Officer of Express Scripts Holding Company, pursuant to Exchange Act Rule 13a-14(a). |
| 31.2[2] | Certification by Eric Slusser, as Executive Vice President and Chief Financial Officer of Express Scripts Holding Company, pursuant to Exchange Act Rule 13a-14(a). |
| 32.1[2] | Certification by Timothy Wentworth, as President and Chief Executive Officer of Express Scripts Holding Company, pursuant to 18 U.S.C. § 1350 and Exchange Act Rule 13a-14(b). |
| 32.2[2] | Certification by Eric Slusser, as Executive Vice President and Chief Financial Officer of Express Scripts Holding Company, pursuant to 18 U.S.C. § 1350 and Exchange Act Rule 13a-14(b). |
| 101.INS[2] | XBRL Taxonomy Instance Document. |
| 101.SCH[2] | XBRL Taxonomy Extension Schema Document. |
| 101.CAL[2] | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF[2] | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB[2] | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE[2] | XBRL Taxonomy Extension Presentation Linkbase Document. |

1  The Merger Agreement listed in Exhibit 2.1 (the "Agreement") is not intended to modify or supplement any factual disclosures about the parties thereto, including the Company, and should not be relied upon as disclosure about such parties without consideration of the periodic and current reports and statements that the parties thereto file with the SEC. The terms of the Agreement govern the contractual rights and relationships, and allocate risks, among the parties in relation to the transactions contemplated by the Agreement. In particular, the representations and warranties made by the parties in the Agreement reflect negotiations between, and are solely for the benefit of, the parties thereto and may be limited or modified by a variety of factors, including: subsequent events, information included in public filings, disclosures made during negotiations, correspondence between the parties and disclosure schedules and disclosure letters, as applicable, to the Agreement. Accordingly, the representations and warranties may not describe the actual state of affairs at the date they were made or at any other time and you should not rely on them as statements of fact. In addition, the representations and warranties made by the parties in the Agreement may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. The schedules to the Agreement have been omitted pursuant to Item 601(b)(2) of Regulation S-K and will be furnished supplementally to the SEC upon request.

2  Filed herein.