# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080** |
| | **MDL No. 3080** |
| | **JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH** |
| | **ORAL ARGUMENT REQUESTED** |

**THIS DOCUMENT RELATES TO: THE SELF-FUNDED PAYER TRACK**

## THE SELF-FUNDED PAYER TRACK'S
## <u>SUPPLEMENTAL BRIEF ON STATUTES OF LIMITATION</u>

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii

**INTRODUCTION** ..........................................................................................................1

**ARGUMENT** .................................................................................................................3

I.    The Accrual Date for Plaintiffs' Claims Is Fact-Intensive and Inappropriate for Resolution on the Pleadings. .............................................................................3

II.    Considerations Unique to Self-Funded Payers Preclude a Uniform Inquiry Notice Date. .8

A.    Self-funded payers were not on notice of their price inflation injuries because sources indicated that they were insulated from rising prices due to their receipt of rebates. ......9

B.    The self-funded payers suffered various injuries, including those involving mislabeled rebates and rebate aggregators, that must be analyzed separately...............................13

III.    Any Inquiry Notice Date Must Be Limited to Account for Reasonable Due Diligence, Various Tolling Doctrines, and the Separate Accrual Rule..............................................17

A.    Under the injury notice rule, all self-funded payers are entitled to rebut any alleged storm warnings with a showing of reasonable diligence to discover their injuries.......17

B.    Under various tolling doctrines, all self-funded payers are permitted to show that they are entitled to tolling of the statutes of limitations. ......................................................18

C.    Under the separate accrual rule, all self-funded payers are entitled to at least four years of damages from the date they filed suit......................................................................19

**CONCLUSION** ...........................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Adie v. Stewart*,
   2020 WL 7488897 (D.N.J. Dec. 21, 2020) ................................................................. 18

*Agency Holding Corp. v. Malley-Duff & Assocs.*,
   483 U.S. 143 (1987) ........................................................................................................ 3

*Alexander v. Sanford*,
   325 P.3d 341 (Wash. Ct. App. 2014) .......................................................................... 6

*Bankers Tr. Co. v. Rhoades*,
   859 F.2d 1096 (2d Cir. 1988) ................................................................................ 9, 13

*Benak v. All. Cap. Mgmt. L.P.*,
   435 F.3d 396 (3d Cir. 2006) ......................................................................................... 12

*Bingham v. Zolt*,
   66 F.3d 553 (2d Cir. 1995) .................................................................................. 19, 20

*Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*,
   2016 WL 6612804 (E.D. Pa. Nov. 9, 2016) ............................................................. 7

*Blue Cross Blue Shield v. GlaxoSmithKline LLC*,
   417 F. Supp. 3d 531 (E.D. Pa. 2019) ......................................................... 9, 13, 18

*Burroughs v. PHH Mortg. Corp.*,
   2016 WL 1389934 (D.N.J. Apr. 8, 2016) ................................................................ 20

*City of Miami v. Eli Lilly & Co.*,
   2022 WL 198028 (S.D. Fla. Jan. 21, 2022) ............................................................. 12

*Dockery v. Heretick*,
   2021 WL 3929707 (E.D. Pa. Sept. 1, 2021) ....................................................... 5, 13

*Dongelewicz v. PNC Bank*,
   104 F. App'x 811 (3d Cir. 2004) ................................................................................. 6

*Forbes v. Eagleson*,
   183 F.R.D. 440 (E.D. Pa. 1998) .................................................................................. 3

*Gary Miller Imports, Inc. v. Doolittle*,
   2020 WL 7027483 (W.D. Pa. Nov. 30, 2020) ........................................................ 16

*In re Ames Department Stores, Inc. Note Litigation*,
   991 F.2d 968 (2d Cir. 1993) ........................................................................................ 13

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
   795 F.3d 380 (3d Cir. 2015)................................................................................. 5

*In re Cmty. Bank of N. Va.*,
   622 F.3d 275 (3d Cir. 2010)........................................................................... 3, 19

*In re DaimlerChrysler AG Sec. Litig.*,
   269 F. Supp. 2d 508 (D. Del. 2003)................................................................ 3, 5

*In re EpiPen Direct Purchaser Litig.*,
   2021 WL 147166 (D. Minn. Jan. 15, 2021)......................................................... 7

*In re Fragrance Direct Purchaser Antitrust Litig.*,
   2025 WL 579639 (D.N.J. Feb. 21, 2025)............................................................. 5

*In re Generic Pharms. Pricing Antitrust Litig.*,
   368 F. Supp. 3d 814 (E.D. Pa. 2019).................................................................. 7

*In re Insulin Pricing Litig.*,
   2024 WL 416500 (D.N.J. Feb. 5, 2024)............................................................... 6

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   497 F. Supp. 3d 552 (N.D. Cal. 2020)................................................................ 7

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015)....................................................... 7

*In re Merck & Co., Sec., Derivative & ERISA Litig.*,
   543 F.3d 150 (3d Cir. 2008)...................................................................... 5, 9, 12

*In re Nat'l Prescription Opiate Litig.*,
   440 F. Supp. 3d 773 (N.D. Ohio 2020)............................................................... 7

*In re Processed Egg Prods. Antitrust Litig.*,
   2011 WL 5980001 (E.D. Pa. Nov. 30, 2011)..................................................... 17

*In re RenovaCare Sec. Litig.*,
   2024 WL 2815034 (D.N.J. June 3, 2024)............................................................ 4

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
   2009 WL 2043604 (D.N.J. July 10, 2009)........................................................... 7

*Khan v. Deutsche Bank AG*,
   978 N.E.2d 1020 (Ill. 2012)................................................................................. 7

*LLDVF, L.P. v. Dinicola*,
   2010 WL 3210613 (D.N.J. Aug. 12, 2010).......................................................... 4

*Love v. Nat'l Med. Enters.*,

230 F.3d 765 (5th Cir. 2000)..................................................................................... 17, 19

*Mathews v. Kidder, Peabody & Co.*,
260 F.3d 239 (3d Cir. 2001)...................................................................................... Passim

*Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*,
359 F.3d 226 (3d Cir. 2004)..................................................................................... 3, 5

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014)..................................................................................... 2, 4

*Spokane v. Nationwide Life Ins. Co.*,
617 F. Supp. 3d 290 (E.D. Pa. 2022) ...................................................................... 17

*Taylor v. Amazon.com, Inc.*,
2024 WL 3326430 (W.D. Wash. July 8, 2024) ...................................................... 12

*Van Buskirk v. Carey Can. Mines, Ltd.*,
760 F.2d 481 (3d Cir. 1985)..................................................................................... 4, 14

*Warrick v. New Jersey Off. of Att'y Gen.*,
2022 WL 1763855 (D.N.J. May 31, 2022) ............................................................. 19

## INTRODUCTION

The plaintiffs in the pending insulin pricing litigation include counties, municipalities, private employers, trade unions, school boards, and states, as payers and managers of self-funded health insurance plans; state attorneys general, bringing claims as *parens patriae* on behalf of their citizens and in their quasi-sovereign capacity; wholesalers of the at-issue drugs; and diabetic patients. All plaintiffs challenge the PBM and Manufacturer Defendants' scheme to artificially inflate the list prices of insulins and other diabetes medications. But although all cases challenge Defendants' scheme to inflate prices, each category of plaintiffs has a distinct relationship with Defendants, a tailored set of claims, and, as a result, seeks to recover on its own theory of harm. Not all plaintiffs, in other words, share a common injury. Nor do they share equal access to information that would shed light on their respective injuries.

These distinctions across plaintiffs come into sharp focus when considering the self-funded payers. The PBMs were initially formed for the very purpose of containing drug costs for payers. But over time, PBMs transformed from honest brokers negotiating with drug manufacturers to obtain lower costs into oligopolists using the payments they extract from the manufacturers to enrich themselves. Defendants shrouded their insulin pricing scheme in secrecy. Because self-funded payers, unlike other plaintiffs, do not pay the full list price—but only a net cost after rebates—rising list prices alone could not alert payers to their injuries. Indeed, self-funded payers became more and more *reliant* on PBMs to negotiate rebates in the face of these skyrocketing list prices so that the payers could contain costs for their beneficiaries. At the same time, the PBMs denied payers access to specific drug-by-drug rebate information, precluding them from determining the true net costs of specific drugs; repeatedly assured their payer-clients that the PBMs contained insulin prices by negotiating rebates; mislabeled rebates as "fees," "credits," and "discounts"; and obfuscated rebates using affiliated "rebate aggregators."

1

Defendants seek to capitalize on their successful concealment of their scheme—and deny plaintiffs an opportunity to challenge it—by arguing that all plaintiffs should have known of their claims years before they filed suit. But the nature of the plaintiffs' injuries, and their different relationships with Defendants, preclude such sweeping treatment at this preliminary stage. First, the issue of when these plaintiffs should have discovered their injuries "is extremely fact-specific," *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 250 (3d Cir. 2001), and ordinarily cannot be resolved "at the pleadings stage," *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). That is particularly true where, as here, plaintiffs—spanning states, cities, counties, wholesalers, unions, private companies, and consumers—bring a host of state-law causes of action asserting different injuries based on different interactions and transactional relationships with Defendants.

Second, even if Defendants were correct that there could be a uniform inquiry notice date for some plaintiffs, that date could not apply to the self-funded payers. Under RICO, inquiry notice hinges on "when the plaintiffs should have discovered *their injuries*," not "when [they] should have discovered the misrepresentations and wrong-doing of the defendants." *Mathews*, 260 F.3d at 251. While insulin's rising list prices may have alerted *some* plaintiffs to their injuries, the PBM Defendants repeatedly represented to self-funded payers that they were *protecting* them from rising list prices by negotiating rebates and other financial protections. And the self-funded payers suffer injuries beyond inflated prices—including those related to Defendants mislabeling rebates and concealing rebates through rebate aggregators—that were only recently brought to light.

Third, any inquiry notice date would leave fact-specific questions in any event. For one thing, even if there were storm warnings sufficient to trigger a duty to investigate, each plaintiff would be entitled to show that it had "exercised reasonable due diligence and yet [was] unable to discover [its] injuries." *Mathews*, 260 F.3d at 252. For another, each plaintiff is also entitled to

2

show tolling under various doctrines, another issue that "is not generally amenable to resolution on a Rule 12(b)(6) motion." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 301–02 (3d Cir. 2010). Finally, under RICO's separate accrual rule, "plaintiffs may recover for new injuries incurred within four years of filing suit." *Forbes v. Eagleson*, 183 F.R.D. 440, 444 (E.D. Pa. 1998).

For these reasons, and as set out more fully below, Plaintiffs' claims (and particularly those of the SFP Track Plaintiffs) are not barred by any applicable statute of limitations.

## ARGUMENT

### I.    The Accrual Date for Plaintiffs' Claims Is Fact-Intensive and Inappropriate for Resolution on the Pleadings.

When a statute of limitations begins to run is a highly fact-intensive inquiry that requires factual development beyond the pleadings. The statute of limitations for a RICO claim is four years. *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). In assessing when the statute of limitations begins to run, the Third Circuit has adopted an "injury discovery rule" under which "a RICO claim accrues when plaintiffs knew or should have known of their injury." *Mathews*, 260 F.3d at 250 (quotation omitted). "In addition to the injury, the plaintiffs must also have known or should have known of the source of their injury." *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004).

The Third Circuit has suggested that "inquiry notice should be analyzed in two steps." *Mathews*, 260 F.3d at 252. "First, the burden is on the defendant to show the existence of storm warnings." *Id.* (cleaned up). Second, "if the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." *Id.* Each step involves "extremely fact-specific" considerations generally unsuitable for determination at the pleading stage. *Id.* at 250. The existence of storm warnings, for instance, depends on the "mix of information available" to each plaintiff, *In re*

*DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 514 (D. Del. 2003), and (critically) a defendant's "[r]eassurances can dissipate apparent storm warnings," *In re RenovaCare Sec. Litig.*, 2024 WL 2815034, at *10 (D.N.J. June 3, 2024).

Courts have thus recognized that "the point at which the [plaintiff] should reasonably be aware that [it] has suffered an injury is a factual issue best determined by the collective judgment, wisdom, and experience of jurors." *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) (cleaned up). "Since the applicability of the statute of limitations usually involves questions of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Van Buskirk v. Carey Can. Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985).

This heavy burden is further compounded by the fact that a statute of limitations is an "affirmative defense" that provides a basis for dismissal at the pleadings stage only where the defense is "apparent on the face of the complaint." *Schmidt*, 770 F.3d at 249. Indeed, "[o]n a motion to dismiss, unless [a] defendant[] can produce uncontroverted evidence that irrefutably demonstrates when [the] plaintiff discovered or should have discovered the fraudulent scheme, they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law." *LLDVF, L.P. v. Dinicola*, 2010 WL 3210613, at *3 (D.N.J. Aug. 12, 2010) (cleaned up).

This case highlights the difficulties of crafting a single constructive notice date, on the pleadings, across millions of plaintiffs and putative class members suing different combinations of defendants under various causes of action. At step one, Defendants cannot meet their burden of establishing a single date for "storm warnings" across all plaintiffs. *Mathews*, 260 F.3d at 252. The plaintiffs and putative class members in this litigation span cities, counties, states, unions, wholesalers, private employers, and consumers. The plaintiffs include, for example, some of the largest cities and states in the nation alongside small union health funds for sheet metal workers.

These differences across plaintiffs matter. *See In re Merck & Co., Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 171 (3d Cir. 2008) (holding that inquiry notice date for "investors" differed from date for "consumers"), *aff'd*, 559 U.S. 633 (2010). The plaintiffs in this case differ, for example, in their interactions and relationships with Defendants and the information they received and relied upon from Defendants. *Cf. Daimler*, 269 F. Supp. 2d at 514 (explaining that storm warnings depend on the "mix of information available to the plaintiffs," including the defendant's "positive statements"); *Dockery v. Heretick*, 2021 WL 3929707, at *27 (E.D. Pa. Sept. 1, 2021) ("[W]hether sellers had enough storm warnings of culpable activity to be put on notice of their injury and who caused it, . . . will depend upon the circumstances surrounding each seller's transaction and whether those circumstances should have put them on notice.").[1] They differ in their resources and sophistication. *Cf. Prudential*, 359 F.3d at 234 (stating that it was "important to note that" the plaintiff was "a very sophisticated company"). And they differ, as discussed below, in the very injuries they claim. The self-funded payers, for instance, are contractually entitled to prescription rebates and so, unlike other plaintiffs, could not have been alerted to their injuries by rising list prices alone. *See infra* at 8–17.

At step two, even if Defendants could somehow establish a single date on which storm warnings arose for all plaintiffs, each plaintiff would still be entitled to show that it had "exercised reasonable due diligence and yet [was] unable to discover [its] injuries." *Mathews*, 260 F.3d at 252. "[R]easonable diligence is generally a fact-specific inquiry." *In re Cmty. Bank of N. Va.*

---

[1] While consumers (for instance) ordinarily have no direct interaction with the PBMs, payers often directly contract with a PBM. Those contracts vary widely in rebate provisions, audit rights, and price protections. These contracts are often formed after a highly individualized PBM selection process—coordinated by a consulting firm—in which PBMs offer detailed guarantees and economic analyses of cost savings. The extent to which these relationships and interactions resulted in (or dissipated) storm warnings cannot be boiled down to a single date.

*Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 404 (3d Cir. 2015); *see also In re Fragrance Direct Purchaser Antitrust Litig.*, 2025 WL 579639, at *13 (D.N.J. Feb. 21, 2025) ("Issues of diligence and constructive notice, which are inherently factual, generally should not be decided on a motion to dismiss." (cleaned up)). That makes sense. Analyzing due diligence requires assessing what each plaintiff did, the obstacles each plaintiff confronted, the information each plaintiff found, and whether that information was enough for each plaintiff to discover its injuries and the sources of those injuries. These issues defy uniform treatment across all plaintiffs.

The Third Circuit's decision in *Dongelewicz v. PNC Bank*, 104 F. App'x 811 (3d Cir. 2004), highlights the difficulties in crafting a one-size-fits-all constructive notice date. In that case, the plaintiffs (lot purchasers in a real estate development) sued the managers of the development under RICO. *Id.* at 813. The "lot purchasers were told that the development would eventually include roads, a central sewer system, [and] an 18–hole golf course." *Id.* at 814 (cleaned up). None of that ever happened. *Id.* In affirming the district court's order decertifying a RICO class, the court explained that the injury discovery rule precluded a uniform constructive notice date across the class. *Id.* at 816. As the court put it, "setting the precise date for each plaintiff, given the differing circumstances of their purchase and ownership of the lots, [would] require[] an extremely fact-specific individualized inquiry." *Id.* (cleaned up). In this case, the factual permutations are multiplied by magnitudes. *See In re Insulin Pricing Litig.*, 2024 WL 416500, at *38, *43 (D.N.J. Feb. 5, 2024) (insulin pricing claims require "fact-specific individualized inquiries").

And that's just under RICO. The various plaintiffs also bring hundreds of state law causes of action with different accrual rules that often demand more than RICO before the limitations clock begins to run. For example, some claims, unlike RICO, require actual or constructive knowledge of—not just the injury and source—but all "essential elements of the cause of action."

*Alexander v. Sanford*, 325 P.3d 341, 352 (Wash. Ct. App. 2014) (Washington Consumer Protection Act); *see also Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 1028–29 (Ill. 2012) (discovery rule tolls claim accrual until the plaintiff knows or should know of the injury *and* that it was wrongfully caused). Others require actual knowledge of information sufficient to trigger a duty to inquire. *See, e.g.*, *In re Libor-Based Fin. Instruments Antitrust Litig.,* 2015 WL 4634541, at *115 (S.D.N.Y. Aug. 4, 2015) (addressing California law and concluding that "public awareness of a problem through media coverage alone" does not "create [ ] constructive suspicion").

For these reasons, MDL courts regularly reject statute of limitations defenses at the pleading stage. *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 852 (E.D. Pa. 2019) ("The question of whether any of Plaintiffs' claims are barred by the asserted statute of limitations defenses is more appropriate for resolution at a later stage of the proceedings following more particularized discovery."); *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d 773, 787 (N.D. Ohio 2020) ("The [statute of limitations] defense is more appropriately addressed in the context of a summary judgment motion or at trial if disputed issues of fact exist relating, for example, to accrual dates[.]"); *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 617 (N.D. Cal. 2020) (rejecting the defendant's statute of limitations defense and holding that the issue "can be addressed on summary judgment").

So do others. *See, e.g.*, *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *6 (D. Minn. Jan. 15, 2021) ("Under these circumstances, the timeliness of Plaintiffs' RICO claims cannot be resolved at the pleading stage."); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *22 (D.N.J. July 10, 2009) (holding that it was "not at all clear" that an "FDA warning letter," "public filings," and "newspaper articles reporting the Government's investigation" provided "warnings sufficient to put [p]laintiffs on notice of their

purported RICO claims"); *Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*, 2016 WL 6612804, at \*9 (E.D. Pa. Nov. 9, 2016) ("Factual issues remain as to whether the public disclosures [including media reports and government investigations] constituted storm warnings establishing inquiry notice, especially in light of [the defendant's] attempts to minimize [the issues.]").

*    *    *

The Court should reserve ruling on constructive notice given the "extremely fact-specific" nature of the relevant inquiry. *Mathews*, 260 F.3d at 250. In this case, resolving the question of whether there were storm warnings sufficient to trigger a duty to investigate will require assessing the mix of information available to each of the millions of plaintiffs in this case. That assessment will require individual analysis of each plaintiff's role in the insulin distribution chain, the nature of the plaintiff's injury, the extent of the plaintiff's access to pricing and rebate information, the plaintiff's sophistication, the information provided by any consultants, any representations and reassurances Defendants offered to particular plaintiffs, and the extent to which publicly available information described each plaintiff's injuries and their source. At that point, each plaintiff would then be entitled to raise its diligence in seeking to discover its injuries and their sources.

## II. Considerations Unique to Self-Funded Payers Preclude a Uniform Inquiry Notice Date.

Despite Defendants' suggestions to the contrary, considerations unique to self-funded payers undermine the feasibility of an across-the-board inquiry notice date. First, a plaintiff's inquiry notice hinges on "when the plaintiffs should have discovered *their injuries*," not "when [they] should have discovered the misrepresentations and wrong-doing of the defendants." *Mathews*, 260 F.3d at 251. Unlike other plaintiffs, self-funded payers contract with PBMs for the pass-through of rebates, such that a drug's list price alone tells self-funded payers little about the net costs they will ultimately incur. Self-funded payers lacked storm warnings that would have put

8

them on notice of their injuries from inflated insulin prices.

Second, different notice dates apply to different injuries. *See Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) ("[A] plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury."). The self-funded payers allege various injuries not suffered by other plaintiffs that must be evaluated separately. Beyond inflated prices, for example, the self-funded payers allege that Defendants "relabeled" rebates to shield them from payers. AC [ECF No. 158] ¶¶ 445–46. Defendants also used rebate aggregators—entities mainly formed starting in 2019—to "retain[] a significant, yet secret, share" of Manufacturer Payments. *Id.* ¶ 23. The date at which payers were put on notice of injuries resulting from these practices must be considered separately.

### A. Self-funded payers were not on notice of their price inflation injuries because sources indicated that they were insulated from rising prices due to their receipt of rebates.

The self-funded payers lacked storm warnings suggesting any injury because Defendants, Congress, the media, and other sources suggested that payers were insulated from rising insulin prices because they received rebates. A defendant bears the burden to show "storm warnings *with respect to the injury in question.*" *Blue Cross Blue Shield v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 549 (E.D. Pa. 2019) (cleaned up) (emphasis added). Put differently, a plaintiff's notice date hinges on "when the plaintiffs should have discovered *their injuries,*" not "when [they] should have discovered" another plaintiff's injuries or "the misrepresentations and wrong-doing of the defendants." *Mathews*, 260 F.3d at 251; *see also In re Merck*, 543 F.3d at 171 (notice of fraud directed at other plaintiffs was insufficient). As the Third Circuit has explained, this difference "is subtle, but in some circumstances, it can be dispositive." *Mathews*, 260 F.3d at 251.

The difference is dispositive here. The self-funded payers could not have reasonably suspected *their* injuries or the sources of *those* injuries based on rising list prices alone. List price

increases for diabetes drugs could not be shielded from the public domain, but self-funded payers, unlike other plaintiffs, do not pay a drug's list price—they pay a lower, net price after their PBM's rebates have been passed through. AC ¶ 492. The self-funded payers knew this not only through their PBM contracts, which required the PBMs to pass through most, if not all, rebates, *id.* ¶ 536, but also because the PBM Defendants repeatedly represented that they were protecting their payer-clients from rising list prices by maximizing rebates. In 2017, for example, Express Scripts told Albany County that it had insulated the county from rising list prices for diabetes medications:

> Aligning with your needs, we have taken on unprecedented challenges and created greater value for you and your members. Since 2014, we have protected you from the soaring costs of treating hepatitis C, high cholesterol, cancer, inflammatory conditions, and diabetes.

AC ¶ 536. In 2013, CVS similarly told Lake County that it engaged in "rigorous formulary management strategy, giving [its] clients the ability to achieve the lowest net cost." LC [ECF No. 159] ¶ 477. CVS also offered King County a formulary that (according to CVS) would have offset "higher list prices" with "correspondingly higher rebates." KC [ECF No. 160] ¶ 331. Optum likewise publicly represented that it offered "lowest net cost drug procurement" through "pharmaceutical manufacturer negotiations." *Id.* ¶ 211. In 2023, the PBMs also hired a consultant to conduct a "systematic study of data on prescriptions[] [and] rebates" and publish a report finding that the PBMs lower "the cost of prescription drugs." *See* Mot. to Compel [ECF No. 522-1].

Notably, at the same time the PBMs told payers that they contained (or lowered) net costs for diabetes drugs, Defendants also denied payers access to the very information they would have needed to detect their injuries. For example, Defendants denied payers access to "specific drug by drug rebate information," making it "impossible for [payers] to tease out drug-specific rebates" and thus the ultimate price they paid for specific drugs. AC ¶¶ 447, 558.

Moreover, the very sources that Defendants rely on as sources of inquiry notice suggest

that self-funded payers were spared from Defendants' scheme—not injured by it. First, Defendants

point to Congressional investigations. Mfr. MTD [ECF No. 294-1] at 11; PBM MTD [ECF No.

252] at 21. The Manufacturer Defendants, for instance, rely on a Congressional report stating that

PBMs provide "preferred placement on formularies" in exchange for "negotiated rebates." Mfr.

MTD at 11 (cleaned up). But rebates are the precise mechanism that Defendants claimed to deploy

to *protect* payers. Similarly, in January 2021, the Senate Finance Committee released its

groundbreaking insulin report, detailing the contours of Defendants' scheme for the first time.[2]

But even the Senate Insulin Report suggested that, while the scheme harmed patients and the

federal government, payers—including commercial and self-funded payers—may be different:

> These examples suggest that payers and PBMs accept list price increases as long as
> the increases do not affect their ability to collect higher rebates and discounts from
> manufacturers. However, this approach can lead to higher prices for the Federal
> government and individual consumer[s].

Senate Insulin Report at 88; *see also, e.g.*, *id.* at 5 ("[D]rug manufacturers increased insulins' WAC

in part to give them room to offer larger rebates to PBMs and health insurers[.]"). While the Senate

Insulin Report may have alerted self-funded payers to "wrong-doing of the defendants," it did not

alert payers to "*their injuries*." *Mathews*, 260 F.3d at 251.

Second, the media reports on which Defendants rely similarly undermine their position

with respect to the self-funded payers (Mfr. MTD at 10–11; PBM MTD at 21), with most of these

articles suggesting that rebates insulated self-funded payers from rising list prices. *See, e.g.*, Mfr.

Ex. 3 at 4 (discussing the "lower, secret, 'real' price that insurers pay"); Mfr. Ex. 4 at 2 (patients

are the "one group" paying "artificially inflated price"); Mfr. Ex. 5 at 4 (PBMs pass "lower, 'net'

prices" to insurers). Several of these articles even attributed rising list prices to rebates. *See, e.g.*,

---

[2] U.S. Senate Finance Committee, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug* (Jan. 14, 2021), https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf.

Mfr. Ex. 18 (list prices increase because PBMs "demand ever-larger rebates"); PBM MTD at 21 n.13 (list prices increase due to "sizeable" "rebates"). If growing rebates were bloating list prices, the self-funded payers understood that those rebates had been passed through. *See* AC ¶¶ 39, 445, 536; KC ¶¶ 2, 318–19, 323, 348, 359, 522, 538; LC ¶¶ 43, 163, 301, 345.

Third, Defendants cite other cases involving insulin pricing, focusing primarily on *In re Insulin Pricing Litigation*, No. 17-cv-699 (D.N.J.), where a putative class of consumers challenged high insulin prices. But unlike self-funded payers, consumers are directly injured by rising list prices; uninsured consumers, for example, "must pay the full [list] price every time they pick up their prescriptions" and consumers with high-deductible plans "must usually pay full [list] prices until they hit their deductibles." Compl. [ECF No. 1] ¶¶ 70–71, *In re Insulin Pricing Litig.*, No. 17-cv-699. The same was true for the Minnesota State AG action—which, at its core, sought to recover *parens patriae* for consumers. Compl. [ECF No. 2] ¶¶ 4–5, *Minnesota v. Sanofi-Aventis U.S. LLC*, No. 18-cv-14999 (D.N.J.).[3] As *In re Insulin* alleged, because PBMs "pass on" rebates "to their health insurer clients," the "only actors who actually pay the full drug [list] prices are consumers." Compl. ¶¶ 67–69, *In re Insulin Pricing Litig.*, No. 17-cv-699. None of these cases gave the self-funded payers any indication of "*their injuries.*" *Mathews*, 260 F.3d at 251.[4]

Courts have routinely recognized that "different concerns of [different plaintiffs] may call

---

[3] Although *MSP Recovery* was brought by third-party payers, that case involved plaintiffs who were assignees of Medicare Advantage plans, which operate under distinct government-regulated pricing and plan structures. Compl. [ECF No. 1], *MSP Recovery Claims Series, LLC v. Sanofi-Aventis U.S. LLC*, No. 18-cv-2211 (D.N.J.).

[4] Even if prior litigation, media reports, or Congressional inquiries had exposed the self-funded payers' injuries (they did not), the law does not impose upon a plaintiff a duty to "trawl court filings across the country." *City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *11 (S.D. Fla. Jan. 21, 2022). Nor is "some public awareness of an issue through media coverage [sufficient to] trigger the discovery rule." *Taylor v. Amazon.com, Inc.*, 2024 WL 3326430, at *3 (W.D. Wash. July 8, 2024); *see also Benak v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 402 (3d Cir. 2006) ("News reports are not given weight by courts in a vacuum[.]").

for distinct inquiry notice dates for . . . two classes of [plaintiffs]." *In re Merck*, 543 F.3d at 171. In *In re Ames Department Stores, Inc. Note Litigation*, 991 F.2d 968 (2d Cir. 1993), the court held that a company's debtholders were not put on notice of their claims by "the filing of a fraud complaint" by the company's "stockholders." *Id.* at 970, 976, 980. As the court explained, "investors in equity securities . . . have different concerns from those of holders of debt securities." *Id.* at 980. While debtholders are concerned with whether the company can "meet its obligations on the debt instrument when due," stockholders "generally are concerned with a company's earning prospects." *Id.* Although the debtholders ultimately filed a complaint resting on the same scheme described in the stockholder class action, the court held that the debtholders lacked inquiry notice because those storm warnings did not put them on notice of *their* injury. *Id.* Just so here.

*    *    *

In short, the self-funded payers' claims are not susceptible to an across-the-board inquiry or constructive notice date. First, self-funded payers often have direct contracts and interactions with Defendants—and so the mix of information available to each of them will vary payer-by-payer. *See Dockery*, 2021 WL 3929707, at *27 (explaining that "storm warnings . . . depend upon the circumstances surrounding each [plaintiff's] transaction"). Second, self-funded payers were inundated with reassurances that they were uniquely shielded from rising diabetes drug prices. These reassurances silenced any storm warnings. *See, e.g.*, *Blue Cross*, 417 F. Supp. 3d at 550 ("storm warnings . . . dissipated by reassuring statements [the defendant] issued").

## B. The self-funded payers suffered various injuries, including those involving mislabeled rebates and rebate aggregators, that must be analyzed separately.

"[A] plaintiff's action accrues against a defendant for a *specific* injury on the date that plaintiff discovers or should have discovered *that* injury." *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) (emphasis added). In other words, where a plaintiff alleges "multiple

13

injuries," inquiry notice for each injury must be assessed "in turn." *Id.*; *see also Blue Cross*, 417 F. Supp. 3d at 549 ("[T]he Court must [inquire] into whether the defendant has met its burden to show . . . storm warnings *with respect to the injury in question*." (cleaned up) (emphasis added)).

In this case, the self-funded payers allege several injuries beyond price inflation that were uncovered only recently. First, the self-funded payers allege that, over time, as "payors moved to contracts that required PBMs to remit some or all manufacturer 'rebates' through to the payor, the PBMs renamed the Manufacturer Payments to shield them from scrutiny and from their payment obligations." AC ¶ 445. They did so by continually labeling and relabeling rebates as "fees," "credits," and "discounts," creating a "hide-the-ball" system through which the PBM Defendants retained *billions* of dollars in unearned profits. AC ¶¶ 445–46.

Second, the self-funded payers allege that the PBMs further obscured the rebates they received using "rebate aggregators," group purchasing organizations affiliated with PBMs—often based overseas—that negotiate rebates on behalf of groups of pharmacy benefit managers. AC ¶ 460; KC ¶¶ 271; LC ¶ 429. For example, rebate aggregators often collect all Manufacturer Payments but then give only a percentage of those dollars to the pharmacy benefit manager. KC ¶ 277. This allows the pharmacy benefit manager to state that it passes through all (or near all) rebates to the payer but "neglect[] to mention that the PBM rebate aggregator had [extracted a percentage] of the money out of the system." *Id.* A September 2023 report found that payments to rebate aggregators grew from nearly $0 in 2018 to over $1.7 billion in 2022. *Id.* ¶ 278.

Defendants have come nowhere close to satisfying their "heavy burden" to show that these claims are barred as a matter of law. *See Van Buskirk*, 760 F.2d at 498. In fact, Defendants never even address these aspects of their scheme. Mfr. MTD at 8–16; PBM MTD at 18–25. That is not surprising. The self-funded payers set out in detail the ways in which Defendants successfully

concealed this conduct. As to mislabeled rebates, for example, the self-funded payers explain that because payer "contractual audit rights" are generally "limited to rebate payments," the PBMs place these rebates "beyond a payor's contractual rights to audit" by calling them "fees," "credits," or "discounts." AC ¶¶ 452, 494. Payers also have "no access to" the contracts in which PBMs and Manufacturers label and relabel payments. AC ¶ 496.

As to rebate aggregators, the PBM Defendants maintain that rebate aggregator contracts are "confidential and proprietary," place the relationship outside payer "audit[s]," and "carefully guard the revenue streams from their rebate aggregator activities." AC ¶ 462; KC ¶ 284. As with mislabeled rebates, until recently, there had been little to no reporting on the ways in which rebate aggregators harm payers. The 2021 Senate Insulin Report referenced rebate aggregators only once, suggesting that these "[n]ew arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress." *See* Senate Insulin Report at 83. It was not until June 2024 that the *New York Times* released an article reporting on this aspect of the scheme, quoting a former OptumRx executive as stating that "[t]he intention of the G.P.O. is to create a fee structure that can be retained and not passed on to a client."[5] And it was not until later in 2024 that the FTC issued a report on rebate aggregators and then administratively sued them.[6] Even there, the FTC explained that payers lacked visibility into pass-through and GPOs:

> Payers' limited visibility into specific rebates and fees makes it difficult to verify pass-through. The formation of the [rebate aggregators] further exacerbated payers' ability to determine whether rebates and fees are actually being passed through, because the [PBMs] do not disclose the amount of fees retained by the GPOs.

---

[5] Rebecca Robbins & Reed Abelson, *The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, N.Y. Times (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

[6] FTC, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs* (July 2024), https://www.ftc.gov/reports/pharmacy-benefit-managers-report; *In re Caremark Rx LLC*, No. 9437 (FTC Nov. 26, 2024) ("FTC Compl.").

FTC Compl. ¶ 88. Self-funded payers could not have reasonably been on notice of these injuries years before they filed their complaints.

Courts recognize that *different* injuries come with *different* inquiry notice dates and that the burden rests on the defendant to establish inquiry notice for *each* injury. In *Gary Miller Imports, Inc. v. Doolittle*, 2020 WL 7027483 (W.D. Pa. Nov. 30, 2020), for example, the plaintiff (a car dealership) sued various defendants (including former officers of the dealership) under RICO for (1) "transferring automobiles" to another dealership at a loss, (2) using the dealership's "cash to pay personal expenses," (3) failing to pay dealership credit card bills "thereby incurring late charges," and (4) "embezzl[ing] extra pay, unearned vacation pay, and unearned bonus payments." *Id.* at *4. The defendants moved for summary judgment on statute of limitations grounds—but addressed only the first injury (transferring cars at a loss). *Id.* at *9–*10.

The court denied the motion for summary judgment, explaining—as to the injuries the defendants had not addressed—that "[b]y choosing to limit their argument on statute of limitations to only a portion of the RICO claim, [the defendants] miss[ed] the mark." *Id.* at *9. "[A]ny analysis of the statute of limitations defense to a RICO claim must speak to all of the factual circumstances in which a reasonable person (here, the company) would have discovered its 'wounds' through due diligence." *Id.* at *10. So, "even if [the defendants] succeed[ed] in their statute of limitations defense," it would be "only as to a portion of the RICO claim" they addressed "and not the entire RICO claim." *Id.* As in *Gary Miller Imports*, Defendants here addressed only one aspect of a sweeping scheme (and, of course, the time to address any others at the pleading stage has passed). Having done so, they failed to meet their burden of addressing when Plaintiffs were on notice of "all parts of the far-reaching RICO claim." *Id.* at *9.

16

### III.    Any Inquiry Notice Date Must Be Limited to Account for Reasonable Due Diligence, Various Tolling Doctrines, and the Separate Accrual Rule.

Even if Defendants were correct that, notwithstanding each plaintiff's unique context and PBM relationship, self-funded payer cases were susceptible to an across-the-board date at which storm warnings indicating possible injuries became visible, any such inquiry notice date would be subject to three limitations. First, even "if the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." *Mathews*, 260 F.3d at 252. Second, each plaintiff is also entitled to show that various tolling doctrines apply. Third, under the separate accrual rule, each plaintiff is entitled, at a minimum, to damages for any injuries that occurred within "four years of the commencement of [its] suit." *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 773 (5th Cir. 2000).

### A.    Under the injury notice rule, all self-funded payers are entitled to rebut any alleged storm warnings with a showing of reasonable due diligence to discover their injuries.

Any inquiry notice date must give all plaintiffs the opportunity to show that they exercised reasonable due diligence to discover their injuries. As set out above, the Third Circuit has suggested that "inquiry notice should be analyzed in two steps." *Mathews*, 260 F.3d at 252. "First, the burden is on the defendant to show the existence of 'storm warnings.'" *Id.* Second, "if the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." *Id.* This second step "is both subjective and objective," requiring an assessment of how the plaintiff "investigated the suspicious circumstances" and "whether [those] efforts were adequate." *Id.*

The reasonableness of a plaintiff's diligence "may be cued to some degree from the defendants' conduct." *In re Processed Egg Prods. Antitrust Litig.*, 2011 WL 5980001, at *14 (E.D. Pa. Nov. 30, 2011). "Where plaintiff's inquiries are repeatedly met with misstatement by all the parties from whom information could be derived, his credulity is of course excused." *Id.* (quotation

omitted); *see also Spokane v. Nationwide Life Ins. Co.*, 617 F. Supp. 3d 290, 307–08 (E.D. Pa. 2022) (genuine issue as to diligence where parties involved "did not respond to [the] [p]laintiffs' requests for information"). "Whether a party should have known of his injury by exercising reasonable diligence is a factual determination, and should ordinarily be resolved by a jury." *Blue Cross*, 417 F. Supp. 3d at 549–50 (quotation omitted).

So even if it were possible to set an across-the-board date for storm warnings, each plaintiff would still be entitled to "show that they exercised reasonable due diligence and yet were unable to discover their injuries." *Mathews*, 260 F.3d at 252. As an initial matter, Defendants have precluded payers from discovering their injuries by meeting every inquiry with misstatement and denying payers the very information through which they could have discovered their injuries. AC ¶¶ 558, 598, 600; LC ¶¶ 497, 535; KC ¶¶ 283, 380. Regardless, the question of diligence hinges on the investigation *each* plaintiff conducted and must be assessed on an *individualized* basis.

### B. Under various tolling doctrines, all self-funded payers are permitted to show that they are entitled to tolling of the statutes of limitations.

Beyond showing due diligence, each plaintiff is also entitled to assert various tolling doctrines. Under RICO, that includes fraudulent concealment—an "extremely generous 'out' from the" injury discovery rule that turns on whether the plaintiff could have discovered its "claim" and not just its "injury." *Mathews*, 260 F.3d at 257 n.26. "Thus, if the defendant conceals *any* element of the offense, . . . the four-year period will be tolled." *Id.* Other state causes of action bring to bear a host of additional tolling doctrines—including the discovery rule, fraudulent concealment, equitable estoppel, the continuing violations doctrine, and nullum tempus (many of which employ different standards across states). *See* SFP Response to Mfr. MTD [ECF No. 295] at 14–17.

Tolling cannot be resolved on the pleadings. "At the motion to dismiss stage, . . . the court considers applicable tolling doctrines, and a plaintiff is not required to plead around an affirmative

defense in the complaint." *Adie v. Stewart*, 2020 WL 7488897, at *3 (D.N.J. Dec. 21, 2020). As a result, "when even a possibility of tolling applies, a complaint will not give rise to a statute-of-limitations defense that is ripe for resolution on a motion to dismiss." *Warrick v. New Jersey Off. of Att'y Gen.*, 2022 WL 1763855, at *6 (D.N.J. May 31, 2022). As the Third Circuit has explained, because tolling "generally requires consideration of evidence beyond the pleadings, such tolling is not generally amenable to resolution on a Rule 12(b)(6) motion." *In re Cmty.*, 622 F.3d at 301–02. In short, any constructive notice date would be subject to the application of tolling doctrines.

## C. Under the separate accrual rule, all self-funded payers are entitled to at least four years of damages from the date they filed suit.

The separate accrual rule affords the self-funded payers at least four years of damages. "When a pattern of RICO activity causes a continuing series of separate injuries, the separate accrual rule allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury." *Love*, 230 F.3d at 773 (cleaned up). In other words, "a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir. 1995). A plaintiff can thus "recover for injuries discovered or discoverable within four years of the time suit is brought." *Id.* at 560.

In *Love*, for example, an insurer sued psychiatric hospitals for fraudulent billing. 230 F.3d at 768. The scheme stretched on for years and involved the "submission of allegedly fraudulent insurance claims" both "within the limitations period" and "outside the period," all "stemming from the same alleged scheme to defraud." *Id.* at 775. The Fifth Circuit held that the fraudulent bills submitted within the limitations period were not barred, explaining that "[e]ach time [the insurer] became obligated to pay a fraudulent . . . insurance claim . . . , [it] suffered an injury" under RICO. *Id.* "Until it became so obligated, [the insurer] had *not* suffered an injury as the result

of the submission of that claim" and "could *not* have recovered damages for [such] claims." *Id.*

Applied here, Defendants have continuously engaged in conduct that has resulted in new injuries. Each time Defendants submit a bill to a payer with false prices, conceal rebates from a payer, or launder funds through rebate aggregators, for example, Defendants engage in a new predicate act and self-funded payers suffer new injuries with corresponding four-year limitations periods. *See, e.g.*, *Bingham*, 66 F.3d at 561 (holding that, where defendants "funnel[ed] royalty checks out of [an] estate," each "illegal diversion constituted a new and independent . . . injury," leading to "a new . . . cause of action . . . , with a corresponding four-year limitations period"); *Burroughs v. PHH Mortg. Corp.*, 2016 WL 1389934, at *4 (D.N.J. Apr. 8, 2016) ("Even though the initial charge for . . . insurance was before the four and five year statute of limitations . . . , [the defendant] charged plaintiffs . . . insurance fees several times within the applicable limitations periods for their claims, which is sufficient to defeat a time-bar defense to those claims.").

## <u>CONCLUSION</u>

The Court should deny the motions to dismiss on statute of limitations grounds and reserve ruling on constructive or inquiry notice.

[Signatures on following page]

20

Dated: May 2, 2025                                    Respectfully submitted,


*/s/ David R. Buchanan*                              Benjamin J. Widlanski
David R. Buchanan                                    **KOZYAK TROPIN &**
**SEEGER WEISS LLP**                                 **THROCKMORTON LLP**
55 Challenger Road                                   2525 Ponce de Leon Blvd., 9th Floor
Ridgefield Park, New Jersey 07660                    Coral Gables, Florida 33134
973-639-9100                                         Telephone: (305) 372-1800
dbuchanan@seegerweiss.com                            bwidlanski@kttlaw.com


Brandon L. Bogle                                     Mark P. Pifko
**LEVIN, PAPANTONIO, PROCTOR,**                      **BARON & BUDD, P.C.**
**BUCHANAN, O'BRIEN, BARR &**                        15910 Ventura Blvd #1600
**MOUGEY, P.A**.                                     Los Angeles, California 91436
316 S. Baylen St., Suite 600                         Tel.: (818) 839-2333
Pensacola, Florida 32502                             mpifko@baronbudd.com
Tel: (850) 435-7140
bbogle@levinlaw.com


*Lead Counsel for the Self-Funded Payer Track*

David J. Ko
**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 428-0563
dko@kellerrohrback.com


*Counsel for Plaintiff King County*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*/s/David R. Buchanan*
David R. Buchanan
