## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | Case No. 2:23-md-3080 (BRM)(RLS)<br><br>MDL No. 3080<br><br>**ORAL ARGUMENT REQUESTED** |

**THIS DOCUMENT RELATES TO ALL TRACKS**

<u>**MANUFACTURERS' BRIEF REGARDING CONSTRUCTIVE NOTICE**</u>

(Counsel listed on next page.)

**McCARTER & ENGLISH, LLP**
Brian W. Carroll, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Tel.:  (973) 639-2020

**DAVIS POLK & WARDWELL LLP**
James P. Rouhandeh, Esq. (*pro hac vice*)
David B. Toscano, Esq. (*pro hac vice*)
450 Lexington Avenue
New York, NY 10017
Tel.:  (212) 450-4000

**DAVIS POLK & WARDWELL LLP**
Neal A. Potischman, Esq. (*pro hac vice*)
Andrew Yaphe, Esq. (*pro hac vice*)
900 Middlefield Road, Suite 200
Redwood City, CA 94063
Tel.:  (650) 752-2000


*Attorneys for Defendant*
*Novo Nordisk Inc.*

**WALSH PIZZI O'REILLY FALANGA LLP**
Liza M. Walsh
Katelyn O'Reilly
Three Gateway Center
100 Mulberry St., 15th Floor
Newark, NJ 07102
Tel.:  (973) 757-1100

**JONES DAY**
Michael R. Shumaker (*pro hac vice*)
Julie E. McEvoy (*pro hac vice*)
William D. Coglianese (*pro hac vice*)
51 Louisiana Ave. NW
Washington, DC 20001
Tel.:  (202) 879-3939

*Attorneys for Defendant*
*Sanofi-Aventis U.S. LLC*

**REED SMITH LLP**
Melissa A. Geist
Julia A. López
506 Carnegie Center, Suite 300
Princeton, NJ 08540
Tel.:  (609) 514-5978

**KIRKLAND & ELLIS LLP**
James F. Hurst (*pro hac vice*)
Diana M. Watral (*pro hac vice*)
Ryan Moorman (*pro hac vice*)
Jason A. Feld (*pro hac vice*)
333 West Wolf Point Plaza
Chicago, IL 60654
Tel.:  (312) 862-2000

*Attorneys for Defendant*
*Eli Lilly and Company*

# TABLE OF CONTENTS

**Page**

PLAINTIFFS' COMPLAINTS ................................................................................ 2

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ........................................................................................................ 5

I.      PLAINTIFFS HAD CONSTRUCTIVE NOTICE OF THEIR CLAIMS BY 2016. ......... 5

      A.      There Were Public Reports About Every Aspect of the Alleged "Insulin Pricing Scheme" for Years Before Investigations and Lawsuits Began. ........................... 6

      B.      Members of Congress Publicly Called for Insulin Pricing Investigations in November 2016 ........................................................................................ 9

      C.      The 2017 Consumer Lawsuits Prove Constructive Notice Existed Before Then. 10

      D.      Other Events Confirm Plaintiffs Were on Constructive Notice .......................... 12

      E.      Plaintiffs' Attempts to Recharacterize Their Theory as About Disguised Rebates Do Not Undermine the Existence of Storm Warnings By 2016. .......................... 14

CONCLUSION .................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*421-A Tenants Ass'n Inc. v. 125 Ct. St. LLC*,
   2017 WL 6612933 (E.D.N.Y. Nov. 2, 2017)............................................................5

*Barbee v. Amira Nature Foods, Ltd.*,
   2023 WL 4627744 (D.N.J. July 19, 2023)...........................................................5, 12

*Benak v. Alliance Capital Mgmt. L.P.*,
   349 F. Supp. 2d 882 (D.N.J. 2004) .........................................................................4

*City of Bos. v. Express Scripts, Inc.*,
   2025 WL 457794 (D. Mass. Feb. 11, 2025) .............................................................5

*County of Hudson v. Janiszewski*,
   520 F. Supp. 2d 631 (D.N.J. 2007) .........................................................................6

*In re Exxon Mobil Corp. Sec. Litig.*,
   387 F. Supp. 2d 407 (D.N.J. 2005) .......................................................................15

*LabMD Inc. v. Boback*,
   47 F.4th 164 (3d Cir. 2022) .....................................................................................4

*Mathews v. Kidder, Peabody & Co.*,
   260 F.3d 239 (3d Cir. 2001).....................................................................................4

*Milo v. Galante*,
   2011 WL 1214769 (D. Conn. Mar. 28, 2011) .........................................................6

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002)...................................................................................4

*Pension Trust Fund for Operating Eng'rs v. Mortgage Asset Securitization Transactions, Inc.*,
   730 F.3d 263 (3d Cir. 2013)...................................................................................12

*In re Ultrafem Inc. Sec. Litig.*,
   91 F. Supp. 2d 678 (S.D.N.Y. 2000).......................................................................6

The Plaintiffs in this MDL include states, local governments, school districts, employers, unions, and other third-party payors, all pursuing claims based on an alleged nationwide "insulin pricing scheme." They contend that Manufacturers artificially raised the list prices of their insulins and paid PBMs a portion of those list prices as rebates to gain access to the PBMs' formularies, while the PBMs "disguised" the rebates as fees to avoid passing them on to Plaintiffs. The first insulin pricing case was filed more than **eight years ago**, in 2017, and additional cases continue to be filed through today. But widely publicized media reports, lawsuits, investigations, congressional actions, and Defendants' public statements provided more than sufficient "storm warnings" to put all potential plaintiffs on constructive notice of any claims no later than 2016.

Those storm warnings were pervasive. Dozens of national media outlets have prominently covered insulin pricing—such as the *Wall Street Journal*, which reported in October 2016 that "drugmakers sharply raise list prices without a corresponding increase in net price [because] PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[1] In 2016, members of Congress issued highly publicized calls for the FTC and DOJ to investigate allegations that "pharmaceutical companies raised insulin prices significantly—sometimes by double digits overnight—[and] in many instances the prices have apparently increased in tandem."[2] And federal and state regulators have long examined and reported on the reasons for rising insulin list prices, including the roles of rebates and fees in formulary negotiations.

The Court need not take Manufacturers' word that the public record was sufficient to provide constructive notice no later than 2016. The direct purchaser plaintiffs, which are part of the Class Track, *conceded* "the statute of limitation was tolled until November 3, 2016, when members of Congress initially asked the Federal Trade Commission and Department of Justice to

---

[1] Ex. 1, D. Roland, *Insulin Prices Soar While Drugmakers' Share Stays Flat*, WSJ (Oct. 7, 2016).
[2] Ex. 2, Sen. Sanders & Hon. Cummings Letter to DOJ and FTC on Insulin (Nov. 3, 2016).

investigate conduct by Defendants related to insulin." *In re Direct Purchaser Insulin Pricing Litig.*, No. 20-cv-03426 (D.N.J. Mar. 15, 2021), ECF 139 at 68. In fact, consumers started filing nationwide "insulin pricing scheme" lawsuits in January 2017, quoting many of these same public sources. Those cases—brought by counsel who continue to file cases to this day—prove there was more than enough publicly available information to place Plaintiffs on constructive notice of their claims. And those complaints themselves, along with the nationwide news coverage they received, only further amplified the "storm warnings." Indeed, several State Attorneys General and health insurance payers acted on these same "warnings" by investigating or suing in 2017. There is no reason every other Plaintiff could not have done the same.

To be clear, Defendants dispute the allegations and assertions in these public sources. But the fact remains that those public sources—which the MDL Plaintiffs' complaints all parrot—provide an ample basis for this Court to find that all putative plaintiffs had constructive notice of their claims by 2016, without any need for discovery.[3]

## PLAINTIFFS' COMPLAINTS

As the Court observed in its first Case Management Order, "[s]ince 2017, plaintiffs around the country, in a variety of capacities, have been initiating separate federal civil actions involving the alleged [insulin] pricing scheme." ECF 5 at 3. The "litigation over these issues" was initially "concentrated" before this Court in the form of four lawsuits: a consolidated consumer class action filed in early 2017 and copycat lawsuits brought by the State of Minnesota, MSP Recovery Claims, and a group of direct purchasers. MDL No. 3080, ECF 91 at 1 & n.1. In the following years, states and local governments filed their own lawsuits "involving the alleged insulin pricing scheme" in other jurisdictions around the country. *Id.* at 1.

---

[3] Manufacturers reserve their rights to argue that certain plaintiffs had notice before 2016.

On August 3, 2023, the JPML created this MDL to coordinate pretrial proceedings of cases "concern[ing] an alleged scheme between insulin manufacturers and [PBMs] to artificially and fraudulently inflate the price of insulin and other diabetes medications." *Id.* at 1. The JPML observed that the "central factual allegations in support of the alleged insulin pricing scheme are the same in all actions: the insulin manufacturers negotiate with and pay secret rebates to PBMs to ensure preferential treatment of their insulin and diabetes medications on covered drug lists known as formularies, they arbitrarily raise the list prices for the products to cover these payments, and, as a result, the published list price of the drugs are fraudulent, in contrast to reflecting legitimate market forces." *Id.* at 4.

This Court then created three tracks for the MDL: (1) State Attorneys General; (2) self-funded health plans; and (3) putative class actions by wholesalers and health plans. After the MDL's formation, the number of cases exploded. In 2025 alone, more than 307 new plaintiffs have filed suit—mostly government, union, and employer health plans.

Every case in this MDL is premised on the exact same so-called "insulin pricing scheme." All Plaintiffs allege that prices have risen "in lockstep" and "unrelated to any increase in production or research and development costs." *E.g.*, King County Complaint, 23-md-3080, ECF 160 ("King Compl.") ¶¶ 5, 12–14, 21.[4] They all accuse PBMs of "extract[ing] ever-larger portions of rebates and other payments" from Manufacturers. *E.g.*, King Compl. ¶¶ 1, 18, 21.[5] And they all allege that PBMs misrepresent the rebates they pass through to payors and consumers by recharacterizing them as fees. *E.g.*, King Compl. ¶¶ 21, 38.[6]

---

[4] *Accord* Lake County Complaint, 23-md-3080, ECF 159 ("Lake Compl."), ¶¶ 2, 12–14; Albany County Complaint, 23-md-3080, ECF 158 ("Albany Compl."), ¶¶ 2, 11–13; TPP/DP Complaint, 23-md-3080, ECF 302 ("TPP/DP Compl."), ¶¶ 15–18; Montana AG Complaint, 2:23-cv-4214, ECF 40 ("Montana Compl."), ¶¶ 13–18.
[5] *Accord* Albany Compl. ¶¶ 10, 17, 23; TPP/DP Compl. ¶¶ 3, 10, 14; Montana Compl. ¶¶ 11, 20.
[6] *Accord* TPP/DP Compl. ¶¶ 10, 12, 206; Montana Compl. ¶¶ 20, 24, 352–53.

## LEGAL STANDARD

The limitations period "begins to run" when a plaintiff is on "'inquiry' notice"—also known as "constructive notice"—of "the misstatement or omission giving rise to the cause of action." *Benak v. Alliance Capital Mgmt. L.P.*, 349 F. Supp. 2d 882, 887, 889–90 (D.N.J. 2004); *see also LabMD Inc. v. Boback*, 47 F.4th 164, 179 (3d Cir. 2022). Whether plaintiffs "should have discovered the basis for their claim[s]" depends on whether they had "sufficient information … to excite 'storm warnings' of culpable activity." *Benak*, 349 F. Supp. 2d at 887 (news reports served as sufficient "storm warnings" to put plaintiffs on notice of their claims).

"Constructive notice" is an objective inquiry that looks to the public record. It focuses on whether a "reasonable [plaintiff] of ordinary intelligence would have discovered the information and recognized it as a storm warning." *In re NAHC, Inc. Sec. Litig*., 306 F.3d 1314, 1325 (3d Cir. 2002) (affirming that defendants' disclosures put "reasonable investor" on notice of their claims). "Storm warnings" are information or data "that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252-53 (3d Cir. 2001) (barring claims where plaintiffs did not "exercise[] reasonable due diligence" to investigate defendants' "numerous financial updates"). Storm warnings need not reveal "all of the details or 'narrow aspects'" of a claim to trigger the limitations period. *NAHC*, 306 F.3d at 1326 (citation omitted).

"[C]onstructive notice" is distinct from "actual notice." *Id.* at 1324. Actual notice is rooted in a plaintiff's own knowledge of the underlying facts. For example, a plaintiff's PBM contract would have put it on actual notice of the gap between list and net price because the plaintiff would know the public list price, how rebates are calculated under its contracts, and the amount of rebates passed through to it. *See* ECF 294-1 at 8–9 (showing that Albany, King, and Lake Counties' own

4

contracts with PBMs detailed their rebate structures and formulary placements). Actual notice could mean that a particular plaintiff's claim accrued *before* the date on which there were sufficient storm warnings to put all potential plaintiffs on constructive notice—but it could not push accrual to some point *after* the date of constructive notice, which sets an outer limit on when claims accrue.

Given the objective nature of the constructive notice inquiry, courts can—and do—resolve that issue without discovery. *See*, *e.g.*, *Barbee v. Amira Nature Foods, Ltd.*, 2023 WL 4627744, at *6–8 (D.N.J. July 19, 2023) (dismissing claims over objection to resolution "at this stage" because prior class action litigation involving "similar allegations" put plaintiffs on "inquiry notice"); *City of Bos. v. Express Scripts, Inc.*, 2025 WL 457794, at *7 (D. Mass. Feb. 11, 2025) (dismissing claims because plaintiffs were put on notice by parallel litigation filings and "widespread scrutiny" of defendants' role in the opioid epidemic); *421-A Tenants Ass'n Inc. v. 125 Ct. St. LLC*, 2017 WL 6612933, at *7 (E.D.N.Y. Nov. 2, 2017) (dismissing claims because prior state law action put plaintiffs on inquiry notice). If discovery were needed to resolve the issue of constructive notice, the "storm warning" doctrine would serve no purpose.

## ARGUMENT

## I.    PLAINTIFFS HAD CONSTRUCTIVE NOTICE OF THEIR CLAIMS BY 2016.

All Plaintiffs had constructive notice of their claims no later than 2016. By then, the national press had published dozens of articles regarding the supposed "insulin pricing scheme" and alleging the existence of an insulin "racket" between Manufacturers and PBMs. Based on this reporting, congressional leaders called for investigations in November 2016—a date that some Plaintiffs have *admitted* provided constructive notice. And if that were not enough, consumer plaintiffs provided a roadmap for these *same* allegations by filing widely publicized complaints in early 2017, providing further "storm warnings." All of the complaints that followed are variations on those same complaints, often liberally copying from them verbatim.

Courts have set constructive notice dates on much thinner records. In *County of Hudson v. Janiszewski*, an FBI investigation covered by three news outlets (including only one national outlet) was enough to put a "reasonable person" on notice of his claims. 520 F. Supp. 2d 631, 642 (D.N.J. 2007). In *Milo v. Galante*, a handful of news articles (some regional) was enough. 2011 WL 1214769, at *5 (D. Conn. Mar. 28, 2011). And in *In re Ultrafem Inc. Sec. Litig.*, a single *Bloomberg News* article was held sufficient for constructive notice. 91 F. Supp. 2d 678, 692-93 (S.D.N.Y. 2000). Here, the volume of media reports, congressional and regulatory activity, and investigations far exceeds the evidence that established constructive notice in those cases.

A.    **There Were Public Reports About Every Aspect of the Alleged "Insulin Pricing Scheme" for Years Before Investigations and Lawsuits Began.**

The key facts underlying Plaintiffs' claims have long been public knowledge. For example, a January 2007 Congressional Budget Office ("CBO") report stated, "PBMs negotiate with manufacturers for rebates in return for placing the manufacturers' drugs on their formularies or giving the drugs preferential placement on their formularies," and manufacturers pay administrative fees (in addition to rebates), which "frequently equal to about 3 percent of wholesale list prices."[7] Explaining the well-known difference between net and list price, CBO noted that the list "price paid by wholesalers and pharmacies that buy directly from the manufacturers is not the final net price received by manufacturers" and that manufacturers set prices knowing "they will pay rebates to certain types of purchasers, such as a PBM working on behalf of a health plan."

Allegations that PBMs "disguise" manufacturer rebates as fees have also been around for decades. For instance, U.S. News and World Report reported in 2002 that PBMs were "under increasing attack by employers, state legislatures, and a federal investigation," each making claims that were "essentially the same: that manufacturers' rebates are nothing but illegal kickbacks that

---

[7] Ex. 3, CBO Pub. No. 2703, Prescription Drug Pricing in The Private Sector at 7, 11 (Jan. 2007).

the PBMs use to line their own pockets instead of to reduce costs to consumers" and "[h]iding the rebates also helps pharmaceutical companies maintain artificially high prices."[8]  In June 2008, the National Library of Medicine (an arm of the National Institutes of Health) wrote that PBMs "routinely disguis[e] [manufacturer payments] as incentive fees, data management fees, data-sharing fees, performance fees, rebate management/administration fees, access fees, formulary management fees, professional services fees, health management fees, educational grants/fees, and drug promotional/advertising fees."[9]  Mirroring Plaintiffs' allegations, the National Library of Medicine reported that, by

> reclassifying rebates and collecting greater administrative fees from manufacturers, a PBM can then tout the fact that they are passing through a large portion (up to 100%) of the rebate dollars to its clients, but in reality [the PBM] is still retaining major revenues for itself by shifting such dollars out of the rebate bucket and into the administrative fee bucket, of which it retains 100%.[10]

*Compare*, *e.g.*, King Compl. ¶ 260 (payments are "labeled and relabeled in order to allow the PBM[s] to retain an increasing percentage … while purporting to pass through increasing rebate amounts to [payors]"); TPP/DP Compl. ¶ 207 (similar); Lake Compl. ¶ 20 (similar).

The interplay between rebates and formulary access has been widely covered for years. For example, in March 2011, the Department of Health and Human Services Office of Inspector General ("OIG") published a study concerning "the contractual relationships between [payors] and PBMs," and the "extent to which [payors] receive rebates for [] drugs and pass them on to" beneficiaries.  OIG explained that rebates were "often larger" when PBMs gave "fewer competitors' drugs [] preference on the formulary," meaning "manufacturers pay more for less competition."  It also reported that PBMs received "fees" from manufacturers that "were structured

---

[8] Ex. 78, J. Barnes*, When is a Rebate a Kickback?* U.S. News & World Report (Aug. 12, 2002).
[9] Ex. 4, D. Calabrese, *Comparing Pharmacy Benefit Managers: Moving Well Beyond the Simple Spreadsheet Analysis*, Am. Health Drug Benefits at 13 (June 2008).
[10] *Id*.

like rebates in that they were generally based on a fixed percentage of WAC," and in some cases, "PBMs considered these fees to be for services they provided to the manufacturers and therefore they did not pass them on to the [payors]."[11]

Media coverage of these alleged dynamics intensified in 2015, tracking allegations that would appear in future complaints.  On May 6, 2015, *Bloomberg* reported that, "[c]ontrary to the consumer's ideal in which bare-knuckled rivals cut prices to grab market share, competitors in branded pharmaceuticals often drive each other's prices higher" to "keep a favorable position on health plans' [formularies]."[12]  *See*, *e.g.*, King Compl. ¶ 197 (by raising list prices "in tandem," Manufacturers send a "clear signal that [they] [don't] intend to price-compete").

Against this backdrop, dozens of news outlets published stories in 2016 focusing on how these alleged dynamics played out with respect to insulin specifically.  *See* **Appendix A** (describing 2016 and 2017 Storm Warnings).  For example, a February 21, 2016 *New York Times* op-ed urged the government to "break up the insulin racket," attributed "hike[s]" in insulin list prices to "rebates" demanded by the three major PBMs, and questioned whether PBMs "pass[] along" the rebates they negotiate.[13]  On April 5, 2016, *PBS News* reported on PBMs' role in increasing insulin prices, stating that "wholesale prices generally do not correspond to net prices— what companies, unions, and government agencies pay—because drug makers offer rebates."[14]

The drumbeat continued over the summer and into the fall.  An August 2, 2016 *Boston Globe* insulin pricing article noted that, "in contracts with drug makers, a PBM may classify a rebate it has negotiated as a type of fee, allowing the PBM to keep it, rather than pass it on to the

---

[11] Ex. 5, *Concerns with Rebates in the Medicare Part D Program*, HHS at i, 15, 18–19 (Mar. 2011).
[12] Ex. 6, R. Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2015).
[13] Ex. 7, K. Lipska, *Break Up the Insulin Racket*, NYT (Feb. 21, 2016).
[14] Ex. 8, E. Silverman, *What's Behind Skyrocketing Insulin Prices?*, PBS News (Apr. 5, 2016).

client."[15]  On August 25, 2016, *CBS News* wrote about increasing list prices for insulin, reporting that "list prices misrepresent what patients actually pay because insurers and pharmacy benefit managers negotiate discounts."[16]  On October 7, 2016, the *Wall Street Journal* discussed these same issues in an article on the causes of "soaring" insulin prices.[17]  And on October 31, 2016, a *Washington Post* article on the scientific and economic evolution of insulin reported that:

> Drug companies have long argued that list prices are fiction.  Health insurers hire pharmacy benefit managers to bargain for secret rebates and discounts off the list price.  Insurance, and in some cases financial-assistance programs, then help patients with the rest of the tab.  All three drug companies that dominate the insulin market said that list-price inflation is deceiving for these reasons.  But increasingly, as drug prices have grown and insurance companies have changed how benefits are structured, they do matter.[18]

Manufacturers have long acknowledged these market dynamics.  In February 2016, for example, a Lilly spokeswoman stated, "[t]here is a wide and growing discrepancy between the published 'list price' Lilly sets and the 'net price' that Lilly actually receives," which "after all discounts and rebates are applied[,] is considerably less than the list price."[19]

These public statements are simply a few examples of the facts and circumstances that should have put any reasonably diligent plaintiff on notice of the claims in this MDL.

B.    **Members of Congress Publicly Called for Insulin Pricing Investigations in November 2016.**

As national media increasingly focused on insulin pricing and rebates, members of Congress amplified these same allegations.  On November 3, 2016, Senator Bernie Sanders and Representative Elijah Cummings urged the FTC and DOJ to investigate insulin pricing, using language indistinguishable from the allegations in Plaintiffs' complaints:

---

[15] Ex. 9, E. Silverman, *We Should Expect More of Drug Middlemen*, Boston Globe (Aug. 2, 2016).
[16] Ex. 10, *Soaring Insulin Prices Have Diabetics Feeling the Pain*, CBS News (Aug. 25, 2016).
[17] *Supra*, n.1.
[18] Ex. 11, *Why Treating Diabetes Keeps Getting More Expensive*, Wash. Post (Oct. 31, 2016).
[19] Ex. 12, M. Hoskins, *The High Cost of Insulin (And a Plea to Lilly)*, Healthline (Feb. 22, 2016).

> Instead of falling prices, as one might expect after decades of competition, three drugmakers who make different versions of insulin have continuously raised prices on this life-saving medication. In numerous instances price increases have reportedly mirrored one another precisely. This is an issue of tremendous national significance. … We are concerned that the potential coordination by these drugmakers may not simply be a case of "shadow pricing," but may indicate possible collusion, and we believe this egregious behavior warrants a thorough investigation.

The 2016 Sanders-Cummings letter cited more than a dozen articles and reports on insulin pricing and expressly called for the "investigation" of "insulin manufacturers" for "artificially inflating prices," including the impact on spending by "various insurance programs." The letter received significant media attention, including from the *Washington Post*, *PBS News*, and other outlets.[20]

There can be no reasonable dispute that sufficient "storm warnings" existed by the date of the Sanders-Cummings letter, at the latest. Indeed, some MDL Plaintiffs have *admitted* it provided notice of their claims. In opposing Defendants' motion to dismiss, the Direct Purchaser Plaintiffs argued "the statute of limitation was tolled until November 3, 2016," when the Sanders-Cummings letter was published. *Direct Purchaser*, No. 20-cv-03426, ECF 139 at 68. Other Plaintiffs cite the letter in their complaints as one of the "government investigations, hearings, and inquiries [that] have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants," conceding it forms the basis of their claims. *See*, *e.g.*, Lake Compl. ¶ 666.

### C.    The 2017 Consumer Lawsuits Prove Constructive Notice Existed Before Then.

If there were any doubt about the sufficiency of the "storm warnings" by 2016, those doubts are erased by the 60-count putative nationwide class action filed on behalf of insulin consumers in January 2017 (initially filed in the District of Massachusetts before being refiled in the District of

---

[20] *See*, *e.g.*, *supra*, n.2; Ex. 13, C. Johnson, *Bernie Sanders Wants the Feds to Investigate These Drug Companies for Possible Price Collusion*, Wash. Post. (Nov. 3, 2016); Ex. 14, E. Silverman, *Bernie Sanders Requests Federal Investigation of Insulin Makers for Price Collusion*, PBS News (Nov. 4, 2016).

New Jersey).  Just like the MDL Plaintiffs, the consumers alleged that Manufacturers raised the price of insulin "in perfect lock step" by "over 150%."  *Chaires v. Novo Nordisk Inc.*, No. 2:17-cv-00699 (D.N.J. Feb. 2, 2017), ECF 1 ("Consumer Compl."), ¶¶ 2, 8, 14.  They alleged that these "price hikes [were] unrelated to any jump in production or research and development costs," and Manufacturers increased list prices to meet demands from the PBMs—which had "enormous control over drug purchasing behavior"—to pay rebates for formulary placement.  *Id*. ¶¶ 4, 8, 66.  They claimed that Manufacturers "set two different prices":  the list price and a "real price" that accounts for rebates, and that PBMs "pocket" the "spread" "between the reported benchmark price and the undisclosed real price they secure" instead of passing them on to health plans or consumers.  *Id*. ¶¶ 4, 10, 94.  The consumer plaintiffs also called out the alleged impact of the supposed scheme on the "health plans" that later filed claims included in this MDL "[b]y intentionally and artificially inflating the [insulin] benchmark price, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, [Manufacturers] and the PBMs engaged in a fraudulent and unlawful course of conduct."  *Id.* ¶¶ 191, 233, 275.

In addition to demonstrating that would-be plaintiffs had sufficient information before 2017 to bring claims related to insulin pricing, the filing of the consumer lawsuit itself provided yet another warning that put Plaintiffs on constructive notice.  Major news outlets—including the *New York Times*, *Washington Post*, *Business Insider*, and *Boston Globe*—reported on the suit shortly after it was filed, emphasizing the theory underlying each and every subsequent complaint:

> [T]he drug manufacturers end up setting two prices for their drugs — the higher list price and the lower, secret, "real" price that insurers pay.  The lawsuit claims that rather than competing with one another to offer a lower, "real" price to the insurers, the drug makers are vying to offer the best payment to the pharmacy benefit manager, which is why they have been raising the list price.[21]

---

[21] *See*, *e.g.*, Ex. 15, K. Thomas, *Drug Makers Accused of Fixing Prices on Insulin*, NYT (Jan. 30, 2017); Ex. 16, L. Pflanzer, *The Makers of Insulin Are Being Accused of Price-Fixing in A Class-*
(….continued)

Even if there had been no other warnings, the January 2017 consumer lawsuit and the national news coverage it generated were more than sufficient to place Plaintiffs on notice of their claims. *See*, *e.g.*, *Barbee*, 2023 WL 4627744, at *6 (setting inquiry notice based on prior class action involving "similar allegations"); *Pension Trust Fund for Operating Eng'rs v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263, 277-78 (3d Cir. 2013) (affirming inquiry notice based on prior state court class action complaint making "substantially similar" allegations). Plaintiffs' counsel for the Class Track confirmed that "the underlying list price scheme, which was pleaded in the consumer case in 2017, is the essential factual background of every single complaint [in this MDL]." ECF 17, Initial Case Mgmt. Conf. Tr. at 44:15–17. To this day, Plaintiffs continue to copy the consumers' allegations, often word-for-word.[22]

### D.    Other Events Confirm Plaintiffs Were on Constructive Notice.

Other public developments, lawsuits, and investigations reinforce the conclusion that every Plaintiff was on inquiry notice of the basis for their claims by 2017. Between January 2017 and May 2017, consumers filed six cases in multiple federal courts, which were later consolidated with the original suit (*Chaires*). No. 2:17-cv-699, ECF 11, 84, 89. In January 2017, the Minnesota Attorney General served a civil investigative demand on Manufacturers and filed suit on October 16, 2018.[23] In April 2017, the Washington, New Mexico, Florida, and California AGs served civil investigative demands on certain Manufacturers and PBMs.[24] *See*, *e.g.*, Lake Compl. ¶ 666 (citing

---

Action Lawsuit, Business Insider (Jan. 30, 2017); Ex. 17, C. Johnson, *Diabetes Patients Sue Insulin Makers for 'Pricing Fraud'*, Wash. Post. (Jan. 30, 2017); Ex. 18, E. Silverman, *Lawsuit Alleges Collusion Over Insulin Pricing*, Boston Globe (Jan. 31, 2017).

[22] *Compare*, *e.g.*, Consumer Compl. ¶ 55 ("The prescription drug industry consists of an opaque and complex network of entities engaged in multiple distribution and payment structures.") *with* Albany Compl. ¶ 326 ("The prescription drug industry is comprised of a deliberately opaque network of entities engaged in multiple distribution and payment structures.").

[23] Ex. 19, Sanofi Form 20-F at 183 (filed March 3, 2017); *State of Minnesota v. Eli Lilly et al.*, 2:18-cv-14999 (D.N.J. Oct. 16, 2018), ECF 2.

[24] Ex. 20, CVS Form 10-Q at 20 (filed Aug. 8, 2017).

these CIDs as support for their allegations).  On September 7, 2017, MSP sued Manufacturers, asserting claims on behalf of payers based on the same public information available in 2016—and in fact copying verbatim from the consumer complaints.  *See*, *e.g.*, MSP Compl. ¶ 21 ("Regardless of the label, the kickbacks are a *quid pro quo* to the PBM for formulary inclusion.").

Congress continued to amplify these allegations, too.  On June 1, 2018, the U.S. Senate Finance Committee Minority Staff released a study on drug supply and payment chains, noting that some "organizations assert that PBMs designate payments from manufacturers and pharmacies as fees rather than rebates to prevent these funds from being passed on to plan sponsors.  These administrative fees are significant, and can total 25% to 30% of the negotiated price concession."[25]  In February 2019, the Senate Finance Committee announced an insulin pricing investigation.[26]  On April 10, 2019, the U.S. House Energy and Commerce Committee held a hearing titled "Priced Out of a Lifesaving Drug:  Getting Answers on the Rising Cost of Insulin" at which executives from all Defendants testified.[27]  Each of these events was widely publicized, with outlets like the *New York Times* providing same-day coverage.[28]

Indeed, this April 2019 Congressional testimony features prominently in every MDL Plaintiff's complaint because—according to Plaintiffs—the Manufacturers supposedly admitted to the "insulin-pricing scheme" at that hearing.  *See*, *e.g.*, Albany Compl. at 128 (characterizing the testimony as concerning "the Insulin Pricing Scheme and Its Harms").  Plaintiffs state that Manufacturers attributed increases in insulin prices to "misaligned incentives," including "the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of [list]

---

[25] Ex. 21, U.S. Senate Comm. on Fin. Minority Staff, *A Tangled Web: An Examination of the Drug Supply and Payment Chains*, at 29 (June 1, 2018).

[26] Ex. 22, *Grassley, Wyden Launch Bipartisan Investigation into Insulin Prices* (Feb. 22, 2019).

[27] Ex. 23, *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin*, 116th Cong. (2019–2020) (statements of M. Mason, D. Langa, and K. Tregoning) (Apr. 10, 2019).

[28] Ex. 24, R. Pear, *Lawmakers in Both Parties Vow to Rein in Insulin Costs*, NYT (Apr. 10, 2019).

price," which constrains a manufacturer "fighting to remain on formulary" from "lowering [list] price[s]." *E.g.*, Albany Compl. ¶ 416; TPP/DP Compl. ¶ 220; Montana Compl. ¶ 362. And Plaintiffs allege that PBMs put higher-price, higher-rebate drugs on their formularies because they would "receive less discount [i.e., rebates] in the event" they included "lower-priced insulins" on formularies. *E.g.*, Albany Compl. ¶ 420. This highly publicized congressional testimony from 2019 is further proof that plaintiffs were on inquiry notice of their claims long ago.[29]

### E.    Plaintiffs' Attempts to Recharacterize Their Theory as About Disguised Rebates Do Not Undermine the Existence of Storm Warnings By 2016.

Some Plaintiffs have argued recently that the public sources discussed above were not enough to put them on constructive notice of one aspect of their allegations: that PBMs supposedly "disguise" rebates as "fees" to evade any obligation to pass through those payments to payors. *See*, *e.g.*, ECF 295, Pls.' Opp'n to MTD at 10; ECF 47, Pls' Opp'n to MTD at 17–18. That is simply wrong. On February 7, 2003, the West Virginia Public Employees Insurance Agency sued its PBM for "hid[ing] drug company rebates by listing them as various fees … calling them 'data fees,' 'management fees' and 'administration fees.' Anything but rebates."[30] On December 31, 2003, the New York State Health Insurance Program sued Express Scripts ("ESI"), alleging that ESI harmed its clients by retaining undisclosed rebates from drug manufacturers "without passing them on" and that it "secretly and subversively divert[ed] and convert[ed] a portion of the discounted drug price" offered by manufacturers.[31] On August 4, 2004, New York's Attorney General also sued ESI, alleging that it "developed a scheme to hide a substantial portion of the

---

[29] Government health plans—represented by the same counsel now representing several State Attorneys General—started filing claims in 2019, alleging a "secret payment game" involving PBMs "relabeling [rebate] payments in order to keep a more substantial portion of [the] money." *Harris County v. Eli Lilly et al.*, No. 19-cv-4994, Dkt. 1-1 at ¶¶ 264, 269 (S.D. Tex. Dec. 23, 2019).
[30] Ex. 25, T. Pugh, *Critics Say Middlemen for Health Insurance Plans are Driving Drug Costs Up*, Knight-Ridder Tribune (Feb. 7, 2003).
[31] Ex. 26, *Wagner v. Express Scripts, Inc.*, Docket No. 122235/03 (N.Y. Sup. Ct. 2003), ¶¶ 5, 28.

rebates it was receiving from manufacturers" by disguising rebates as "administrative fees."[32] Journalists and regulators also have publicly discussed these same allegations for years.[33]

These Plaintiffs' belated argument is also wrong. The first paragraph of many of their complaints borrows from the 2016 Sanders-Cummings letter and the original 2017 complaints, alleging that Defendants "engage in unfair and deceptive conduct designed to artificially inflate the list price of insulin and other diabetes medications and extract ever-larger portions of rebates and other payments." *See, e.g.*, King Compl. ¶ 1. Moreover, before the JPML, the SFP counsel admitted that, "[l]ike the [State AGs'] actions and those filed by [the Counties], the [2017 consumer plaintiffs] allege that … PBMs retain some of the manufacturers' rebates for their own benefit." MDL No. 3080, ECF 35 at 9. Indeed, they acknowledged that the "questions of fact" were "identical" "between" their cases and the earlier-filed actions that had been pending in the District of New Jersey for years. *Id.* at 10–11. In any event, even if some Plaintiffs could point to some new or different aspect of their allegations, that still would not render their claims timely. Constructive notice does not require plaintiffs to "know all of the details or narrow aspects of the alleged fraud to trigger the limitations period." *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 418 (D.N.J. 2005). All Plaintiffs were on constructive notice of their claims long ago.

## CONCLUSION

Manufacturer Defendants respectfully request that the Court hold that all Plaintiffs were on constructive notice of their claims by no later than 2016.

---

[32] Ex. 27, *State of New York et al. v. Express Scripts, Inc., et al.*, 2004 WL 1792404 (N.Y. Sup. Ct.), ¶¶ 88, 90–92; Ex. 28, *Mistrusting the Drug Managers*, NYT (Aug. 9, 2004); *see also* Ex. 29, Matt Pacenza, *Spitzer Accuses Firm of Fraud*, The Times Union (Aug. 5, 2004).

[33] *Supra*, n.7-8; *accord* Ex. 30, *Will Point-of-Sale Rebates Disrupt the PBM Business?*, Mercer (July 31, 2017) (PBMs retain "25-30% of the monies paid by pharma companies"); Ex. 31, FTC, Understanding Competition in Prescription Drug Markets: Entry and Supply Chain Dynamic Workshop (Nov. 8, 2017) ("Many PBM contracts allow PBMs to essentially relabel rebates.").

Dated: May 2, 2025

Respectfully submitted,

/s/ Brian W. Carroll

**McCARTER & ENGLISH, LLP**
Brian W. Carroll, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Tel.:  (973) 639-2020

**DAVIS POLK & WARDWELL LLP**
James P. Rouhandeh, Esq. (*pro hac vice*)
David B. Toscano, Esq. (*pro hac vice*)
450 Lexington Avenue
New York, NY 10017
Tel.:  (212) 450-4000

**DAVIS POLK & WARDWELL LLP**
Neal A. Potischman, Esq. (*pro hac vice*)
Andrew Yaphe, Esq. (*pro hac vice*)
1600 El Camino Real
Menlo Park, CA 94025
Tel.:  (650) 752-2000

*Attorneys for Defendant*
*Novo Nordisk Inc.*

/s/ Lisa M. Walsh

**WALSH PIZZI O'REILLY FALANGA LLP**
Liza M. Walsh
Katelyn O'Reilly
Three Gateway Center
100 Mulberry St., 15th Floor
Newark, NJ 07102
Tel.:  (973) 757-1100

**JONES DAY**
Michael R. Shumaker (*pro hac vice*)
Julie E. McEvoy (*pro hac vice*)
William D. Coglianese (*pro hac vice*)
51 Louisiana Ave. NW
Washington, DC 20001
Tel.:  (202) 879-3939

*Attorneys for Defendant*
*Sanofi-Aventis U.S. LLC*

Respectfully submitted,

*/s/ Melissa A. Geist*

**REED SMITH LLP**
Melissa A. Geist
Julia A. López
506 Carnegie Center, Suite 300
Princeton, NJ 08540
Tel.: (609) 514-5978

**KIRKLAND & ELLIS LLP**
James F. Hurst (*pro hac vice*)
Diana M. Watral (*pro hac vice*)
Ryan Moorman (*pro hac vice*)
Jason A. Feld (*pro hac vice*)
333 West Wolf Point Plaza
Chicago, IL 60654
Tel.: (312) 862-2000

*Attorneys for Defendant*
*Eli Lilly and Company*