# Exhibit 21



# A TANGLED WEB

AN EXAMINATION OF THE DRUG SUPPLY AND PAYMENT CHAINS

Prepared by the Minority Staff of the U.S. Senate Committee on Finance

June 2018

person—that serves "to decrease the costs incurred under the Part D plan."[309]

DIR must be reported unless payments do not directly or indirectly affect drug costs regardless of whether the plan sponsor or PBM retains some or all of the remuneration,.[310] Some payments are excluded from the definition of DIR, however, including *bona fide* service fees received from manufacturers that are at or below fair market value.[311]

Some critics and organizations assert that PBMs designate payments from manufacturers and pharmacies as fees rather than rebates to prevent these funds from being passed on to plan sponsors.[312] These administrative fees are significant, and can total 25% to 30% of the negotiated price concession, according to the Pharmaceutical Research and Manufacturers of America (PHRMA), the major trade group for drug manufacturers.[313] HHS-OIG also found in a 2011 report that PBMs collect these fees but do not always pass them on to the Part D program.[314] Of particular concern, HHS-OIG found "limited information" regarding these fees—and the services for which they were provided—in relevant contracts.[315]

Categorizing rebates and other price concessions as "fees" may have important implications for patients and Part D spending. By designating price concessions from manufacturers and pharmacies as fair market value fees for services provided, PBMs may be reducing the dollars reported as DIR to CMS, preventing the Part D program and its beneficiaries from receiving the benefit of the payments from these negotiations. PBMs' treatment of payments as fees instead of DIR may also impact reinsurance payments and risk corridor calculations for plan sponsors. Further study is needed to understand whether plan sponsors may be also benefiting from these payment categorizations.

**Spread Pricing**

As payment for their services, PBMs may also negotiate with plan-sponsor clients to keep the spread, defined by one PBM as the difference "between the drug price charged to plan sponsors, including Medicare Part D plan sponsors, by a PBM and the price paid for the drug by the PBM to the dispensing provider."[316] Maximizing spread pricing can generate enormous revenues for PBMs. For example, one PBM charged a client $92.53 for a prescription for which the PBM had accepted just $26.91.[317]

Spread pricing may drive up costs for beneficiaries and the Part D program. Other entities in the drug payment and supply chain are unlikely to benefit from this practice because they lack information about PBMs' other financial arrangements. (For example, a plan sponsor does not know the amount paid by the PBM to the pharmacy, nor does a pharmacy know the amount at which the plan sponsor reimburses the PBM.)[318] Further, CMS does not include spread amounts in its calculation of DIR.[319] As a result, PBMs may be incentivized to set higher billed charges for the plan sponsor, driving up overall costs for plans and the Part D program.

**Maximum Allowable Cost Lists**. For generics and multi-source brand name drugs, PBMs may generate this spread through highly confidential "Maximum Allowable Cost" (MAC) lists, which describe the maximum payment the plan will pay for a particular drug.[320]

Associations representing generic manufacturers and PBMs contend that MAC lists encourage competition by incentivizing pharmacies to purchase the least expensive version of the generic drug or multi-source brand drug.[321] From a PBM's perspective, MACs keep the costs of generic products down by paying the same amount for clinically equivalent products.[322]

PBMs and plan sponsors strongly oppose efforts to clarify the process for setting MAC list prices and the market factors that drive changes to these

29