# Exhibit 25

## Critics Say Middlemen for Health Insurance Plans Are Driving Drug Costs Up

Knight Ridder Washington Bureau

February 7, 2003, Friday

Copyright 2003 Knight Ridder/Tribune Business News

Copyright 2003 Knight Ridder Washington Bureau

**Length:** 2227 words

**Byline:** By Tony Pugh

## Body

WASHINGTON -- To cut their prescription drug costs, America's health insurance plans sought a decade ago to win price breaks based on volume discounts.

For a while, the strategy worked. Middleman companies called pharmacy benefit managers played drug companies off against one another by promising them millions of the health plans' customers in return for the lowest possible prices.

By pressuring doctors to prescribe only drugs on which they'd gotten the best deals, pharmacy benefit managers, known as PBMs, cut pharmaceutical costs up to 30 percent for some health plans.

In short order, PBMs managed the prescription drug choices of more than 200 million Americans.

But the big savings have dwindled. Today, prescription drug spending is the fastest-growing sector of U.S. medical outlays. And critics now regard PBMs, the supposed cost cutters, as part of the problem.

Many PBMs that once earned most of their revenue by holding down drug costs for health plans now earn a large portion of their money from drug companies that pay them undisclosed rebates and other financial incentives for promoting certain medications. Sometimes, critics charge, those medications aren't the most cost-effective for the PBMs' clients.

"That's the crux of the issue," said Gerry Purcell, a pharmacy benefits consultant in Atlanta and a former PBM executive. "They're negotiating hidden deals for their own benefit, while at the same time telling employers 'we're here to represent you.' "

Critics Say Middlemen for Health Insurance Plans Are Driving Drug Costs Up

The side deals and undisclosed payments may account for as much as 10 percent of the $ 161 billion that Americans are estimated to have spent on prescription drugs in 2002, said Purcell, who has worked as a consultant for plaintiffs in several lawsuits against PBMs.

The legality of drug-company payments to PBMs and other PBM industry practices is in dispute and probably will be decided in court. The U.S. Attorney's office in Philadelphia has been investigating PBMs' business practices since 1998. The probe focuses on the cost and health effects of rebates on patients "and the broader cost effect on (employer health) plans," according to Assistant U.S. Attorney James Sheehan, who's leading the investigation.

One of the PBMs being investigated, AdvancePCS of Irving, Texas, wrote in a Securities and Exchange Commission filing last year that Sheehan's case centered on whether rebates and other drug-company payments to PBMs, or payments that PBMs make to retail pharmacies or others, "may violate the anti-kickback laws or other federal laws."

The SEC document says Advance believes its practices comply with all applicable federal laws and regulations. After initially challenging investigators' requests for documents and employee interviews, company officials are cooperating with the probe.

Officials of Medco Health Solutions, of Franklin Lakes, N.J., another focus of the investigation, wrote in similar SEC filings last year that they also believed they were complying with federal laws. But "different interpretations and enforcement of these laws could require us to make significant changes to our operations," the company wrote.

In numerous lawsuits across the country, health plan representatives want

PBMs to repay millions of dollars in rebates and other financial incentives that they claim should have been passed on to their health plans. Some of the lawsuits accuse PBMs of steering clients to higher-priced drugs for their own profit and of failing to act in their plans' best financial interests.

A suit filed by the West Virginia Public Employees Insurance Agency accuses

Medco, its former PBM, of, among other things, hiding drug company rebates by listing them as various fees.

"They were calling them 'data fees,' 'management fees' and 'administration fees.' Anything but rebates," said agency director Tom Susman.

Medco denies hiding any rebates and has sued the agency for nonpayment of $ 2 million. The company also denies Susman's claim that it improperly withheld about $ 12 million in rebates from 2000 to 2002.

Without admitting any wrongdoing, Medco and plaintiffs in five other lawsuits have agreed to a settlement that, among other things, calls for Medco to pay $ 42.5 million. A sixth plaintiff, represented by New Orleans lawyer Russ Herman, rejected the offer as inadequate. In court, Herman said analysts he hired to review Medco financial documents concluded that Medco withheld $ 2.85 billion in rebates from clients from 1995 to 1999.

Medco, which reported nearly $ 2 billion in rebates in 2000 and $ 2.5 billion in 2001, denies wrongfully withholding any funds from clients.

In response to clients' concerns about rebates, many PBMs, including Medco, now share a portion of the rebates with their clients, said LaVarne Burton, president of the Pharmaceutical Care Management Association, a trade group that represents the PBM industry.

PBM industry officials continue to say, however, that undisclosed rebates are legitimate and should remain confidential if they aren't covered in their clients' contracts.

"We have to make some money," said David Machlowitz, senior vice president and general counsel for Medco, the country's second-largest PBM. "I don't understand why they're asking us to be totally transparent.  . . . We don't claim to be not-for-profit.  . . . We're a business. We're not a charity hospital."

PBMs have resisted clients' attempts to audit those undisclosed rebates. "If it is not part of our deal with them, and they're getting what they contracted for, and it's not something we've done on their behalf, why would they be auditing that?" Machlowitz said.

More than 100 PBMs operate in the United States, but the industry is dominated by four: AdvancePCS (75 million people covered), Medco (65 million), Express Scripts, of St. Louis (40 million), and Caremark Rx, of Birmingham, Ala. (20 million).

With those numbers, said Purcell, the pharmacy benefits consultant, PBMs can essentially tell drug makers, "'If you want to market your drug, you have to do business with us or we're gonna shut you out of 40, 50 or 60 million lives. They have amassed so much power, you have to deal with them."

When the first PBMs appeared in 1969, they simply processed drug claims for health plans in return for a few cents per prescription. As drug spending soared in the '90s, PBMs began negotiating lower prices with drug companies

for their clients. The drugs on which they got the best deals were placed on a list of "preferred" drugs that the plans provided the highest level of coverage for, called a formulary. For medications that weren't on the formulary, the coverage level generally was lower or even nonexistent, depending on the plan.

Drug companies, hoping to increase sales, often offered rebates and other incentives to PBMs in return for placing their medications on drug plan formularies. PBMs also can receive rebates when drug sales increase due to greater usage by health plan members. In addition, drug makers sometimes pay PBMs to promote certain medications to doctors and patients.

In time, these incentives rivaled clients' fees as the prime revenue source for many PBMs. Drug companies, seeking to control the middleman, began buying PBMs in the early '90s. The Federal Trade Commission, concerned that PBMs owned by drug companies would favor medications made by their parent companies, acted to discourage the acquisitions. Today, Merck & Co. of Whitehouse Station, N.J., Medco's owner, is the only drug company that owns a PBM.

The Bush administration wants to restrict the financial incentives that drug companies give PBMs for promoting their products. The drug industry is fighting the measure, saying the changes would disrupt a time-honored system that isn't broken and doesn't need fixing.

Despite all the criticism, PBMs may be in for a new federal windfall. President Bush and congressional Republicans are keen to pass some kind of prescription drug coverage for 39 million Medicare recipients early next year. If they succeed, they want PBMs to administer the program.

Many doctors are staunchly resistant to PBMs, generally when PBM monitors ask them to change their prescriptions. This typically occurs when a physician prescribes a medication that's not preferred on the formulary.

Sometimes the prescription change is sought because the formulary drug is

cheaper than the one the doctor likes. But drug substitutions also might be requested because a PBM may have negotiated a better rebate for itself to promote another medication, said Dr. Martin Trichtinger of Jenkintown, Pa., a critic of the industry.

When a patient's prescription is switched to a similar but slightly different drug, adverse side effects can occur, according to the American Medical Association, which represents about 300,000 doctors. The risk is even greater for patients with chronic illnesses whose bodies have adapted to long-term use of a specific drug.

In one instance, Trichtinger said, he informed a PBM that he was prescribing a more expensive drug because his patient once had a bad reaction to the medication the PBM preferred. PBM representatives phoned twice urging him to switch to their drug. Each time Trichtinger refused. When the PBM called again on the weekend, another doctor OK'd the switch, unaware of the patient's history.

"Fortunately, the patient recognized the medication and didn't take it," Trichtinger said. "But I felt that it was duplicitous for the PBM to call on a Saturday when they had talked to me twice during the week. . . . PBMs are not one of my favorite things."

Last year, Trichtinger protested to the AMA that PBMs' practice of "hassling physicians and patients to switch to a less expensive alternative is unethical, immoral and dangerous to the health of the public."

Trichtinger said some PBMs changed patients' medications to different brands several times a year, depending on the savings they could get.

"When we're looking for ways to prevent errors and mistakes," said Trichtinger, "PBMs' constant flipping of medications to what is cheapest is an accident waiting to happen."

Burton, the Pharmaceutical Care Management Association president, said PBMs might suggest switching a patient to "an appropriate and less costly alternative prescription, but this is only a recommendation. "The physician always has the final say," she said.

The AMA, in a report on PBMs, countered that the phone calls and paperwork that were needed to challenge a PBM's decision could be so "administratively burdensome" that "physicians often will not pursue it. While this saves money in the drug budget for the PBM, the patient may not receive optimal therapy."

As Dr. Ron Davis, an AMA trustee from Detroit put it: "The hassle factor sometimes becomes unbearable. There are so many administrative burdens on physicians these days that every little bit can be quite painful."

For HMOs, health insurers and employers with self-insured drug plans, PBMs' undisclosed deals are the biggest complaint. But other lawsuits against PBMs allege other controversial practices.

For example, the lawsuit by the West Virginia Public Employees Insurance Agency claims the agency's drug costs rose from $ 65 million to $ 108 million from 2000 to 2002, in part because Medco allegedly steered plan members to more costly drugs made by Medco's parent company, Merck & Co.

Medco vice president Machlowitz denied the claim, saying West Virginia's costs increased because plan members' prescriptions increased and the state decided to lower the amount that enrollees paid for drugs, called a co-payment or co-pay.

In 1998, the Federal Trade Commission found that Medco was favoring Merck drugs over those of its competitors. In a consent agreement, Merck admitted no wrongdoing, but Medco agreed to maintain an open formulary that includes drugs selected by doctors and pharmacists with no financial ties to Merck. The agreement also requires Medco to accept discounts and rebates from other drug companies in exchange for placing their drugs on Medco formularies. In addition, Merck and Medco agreed not to share information they receive from competitors, such as drug prices.

Medco spokesman Jeff Simek said Medco was adhering to the FTC agreement.

In an SEC filing last July, Medco acknowledged that it had a financial agreement to promote Merck products. The document said Medco had to pay damages to Merck "if we fail to maintain a market share for Merck products at specified levels."

Medco's damage-payment clause is unique to its agreement with Merck, Simek said. But Medco has similar market-share agreements -- minus the damage clause -- with other companies.

Simek said Medco doesn't steer its clients to higher-priced Merck drugs. He said industry competition was too great for Medco to favor Merck products at its clients' expense.

"If we were in arrangements that raised costs for our clients, that would quickly become evident and we would not have a (customer) retention rate in the mid-90 percent range," Simek said. " . . . Medco Health can succeed only by putting the needs of its clients and members first, and could never succeed if it improperly favored any single drug company's medication."

-----

## Classification

**Language:** ENGLISH

**Subject:** DRUG PRICES (90%); HEALTH CARE COSTS (90%); MANAGERS & SUPERVISORS (90%);

INVESTIGATIONS (89%); SALES REBATES (89%); US FEDERAL GOVERNMENT (89%); LAW & LEGAL SYSTEM (85%); BUSINESS NEWS (78%); COMPANY ACTIVITIES & MANAGEMENT (78%); INDUSTRY SECTOR PERFORMANCE (78%); PRICES (78%); BUSINESS INVESTIGATIONS (77%); EMPLOYMENT HISTORY (77%); BANKING & FINANCE REGULATION (72%); SUITS & CLAIMS (66%); US SECURITIES & EXCHANGE COMMISSION INVESTIGATIONS (66%); LITIGATION (62%); SECURITIES & OTHER INVESTMENTS (61%)

**Company:** ADVANCEPCS  (63%);  MEDCO HEALTH SOLUTIONS INC  (50%); ADVANCEPCS  (63%);  MEDCO HEALTH SOLUTIONS INC  (50%);    AMERICA'S HEALTH INSURANCE PLANS   (84%);  AMERICA'S HEALTH INSURANCE PLANS  (84%)

**Organization:** AMERICA'S HEALTH INSURANCE PLANS   (84%);  AMERICA'S HEALTH INSURANCE PLANS  (84%)

**Ticker:** MHS (NYSE)  (50%); ADVP

**Industry:** SIC6411 INSURANCE AGENTS, BROKERS, & SERVICE  (63%);  NAICS524292 THIRD PARTY ADMINISTRATION OF INSURANCE & PENSION FUNDS  (50%);  NAICS454110 ELECTRONIC SHOPPING AND MAIL-ORDER HOUSES  (50%);  NAICS446110 PHARMACIES & DRUG STORES  (50%);  SIC6371 PENSION, HEALTH & WELFARE FUNDS  (50%);  SIC5961 CATALOG & MAIL-ORDER HOUSES  (50%);  SIC5912 DRUG STORES & PROPRIETARY STORES  (50%); Pharmaceuticals  SIC6411 INSURANCE AGENTS, BROKERS, & SERVICE  (63%);  NAICS524292 THIRD PARTY ADMINISTRATION OF INSURANCE & PENSION FUNDS  (50%);  NAICS454110 ELECTRONIC SHOPPING AND MAIL-ORDER HOUSES  (50%);  NAICS446110 PHARMACIES & DRUG STORES  (50%);  SIC6371 PENSION, HEALTH & WELFARE FUNDS  (50%);  SIC5961 CATALOG & MAIL-ORDER HOUSES  (50%);  SIC5912 DRUG STORES & PROPRIETARY STORES  (50%); PHARMACY BENEFITS (94%); PRESCRIPTION DRUGS (93%); DRUG PRICES (90%); HEALTH CARE COSTS (90%); PHARMACEUTICALS & BIOTECHNOLOGY (90%); PHARMACEUTICALS INDUSTRY (90%); PRESCRIPTION DRUG INSURANCE (90%); SALES REBATES (89%); PHARMACIES (78%); RETAIL PHARMACEUTICALS (78%); CONSULTING SERVICES (73%); RETAIL & WHOLESALE TRADE (73%);

BANKING & FINANCE REGULATION (72%); US SECURITIES & EXCHANGE COMMISSION INVESTIGATIONS (66%); SECURITIES & OTHER INVESTMENTS (61%)

**Geographic:** PENNSYLVANIA, USA (79%); TEXAS, USA (79%); UNITED STATES (98%)

**Load-Date:** February 7, 2003

---

**End of Document**