# Exhibit 27

Case 2:23-md-03080-BRM-RLS   Document 536-29   Filed 05/02/25   Page 2 of 4 PageID: 16271

PEOPLE OF THE STATE OF NEW YORK, by Eliot..., 2004 WL 1792404...

2004 WL 1792404 (N.Y.Sup.) (Trial Pleading)
Supreme Court of New York.
Albany County

PEOPLE OF THE STATE OF NEW YORK, by Eliot Spitzer, Attorney General of the State of New York, New York State Department of Civil Service, and State of New York, Plaintiffs,
v.
EXPRESS SCRIPTS, INC., ESI Mail Pharmacy Service, Inc., Connecticut General Life Insurance Company, and Cigna Life Insurance Company of New York, Defendants.

No. 0000

August 4, 2004.

**Summons**

Eliot Spitzer, Attorney General of the State of New York, Attorney for Plaintiffs, Troy J. Oechsner, Assistant Attorney General of Counsel, The Capitol, Albany, New York

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED and required to serve upon plaintiffs' attorney an answer to the complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Albany County is designated as the place of trial on the basis of the location of the Attorney General's offices located at The Capitol, Albany, New York 12224, the State of New York's offices at The Capitol, Albany, New York 12224, and New York State Department of Civil Service's offices at Building One, State Campus, Albany 12239.

Dated: Albany, New York, August 4, 2004
ELIOT SPITZER, Attorney General of the State of New York, Attorney for Plaintiffs

Troy J. Oechsner, Assistant Attorney General of Counsel, The Capitol, Albany, New York 12224, (518) 474-8376

**COMPLAINT**

TO: THE SUPREME COURT OF THE STATE OF NEW YORK

The People of the State of New York, by their attorney, Eliot Spitzer, Attorney General of the State of New York, the New York State Department of Civil Service, and the State of New York, allege the following upon information and belief:

***PRELIMINARY STATEMENT***

1. Plaintiffs bring this action seeking injunctive relief, restitution, damages, indemnification and civil penalties resulting from defendants' breaches of contract, and for Express Scripts Inc. ("ESI")'s fraudulent, deceptive and illegal schemes to (a) conceal and retain millions of dollars in rebates and other payments from pharmaceutical manufacturers that belong to New

Case 2:23-md-03080-BRM-RLS    Document 536-29    Filed 05/02/25    Page 3 of 4 PageID: 16272

PEOPLE OF THE STATE OF NEW YORK, by Eliot..., 2004 WL 1792404...

78. ESI and CGL's misrepresentations of the average brand and generic discounts for the Empire Plan were material because the pharmacy reimbursement formulas of the RFP bidders were an important factor in comparing the bids and calculating the projected costs to the Empire Plan. A difference of a few percentage points in the pharmacy reimbursement rate represented millions of dollars in potential savings. As such, the pharmacy reimbursement formulas represented by ESI and CGL materially affected DCS's decision to award the 1999 Contract to CGL and ESI.

79. As a result of ESI and CGL's misrepresentations about brand and generic drug discounts, DCS was injured because (a) it contracted with ESI and CGL instead of competitors, and (b) it overpaid for drugs purchased during the contract period.

*ESI's Misappropriation of Manufacturer Rebates that Should Have Been Paid to The Empire Plan*

80. ESI is a party to contracts with drug manufacturers pursuant to which the manufacturers pay ESI rebates based on the utilization of that manufacturer's drugs by plan members.

81. The Empire Plan participates in ESI's Market Share rebate program, under which manufacturers agree to pay ESI a rebate if plans in the Market Share rebate program, in the aggregate, meet or exceed certain benchmarks. Typically, the manufacturer pays a rebate to ESI if, in the aggregate, plans participating in the program purchase a greater "market share" of that manufacturer's drugs than that drug's national market share.

82. In the years 1998 through 2003, DCS paid ESI $600,000 annually to administer the rebate program for the Empire Plan. This payment was in addition to the per claim fee that DCS paid ESI for processing the prescription drug claims of Empire Plan members.

83. Pursuant to the 1998 and 1999 Contracts and Subcontracts, ESI was required to pass on to DCS one hundred percent (100%) of all rebates received from drug manufacturers resulting from Empire Plan members' use of the manufacturers' drugs.

84. The 1998 Policy issued to DCS pursuant to the 1998 Contract, which was incorporated into the 1998 Contract and 1998 Subcontract, provided that CLIC would "pass on to the [State] 100 percent of the rebates received from the manufacturers through 12/15/99." In addition, pursuant to the 1998 Policy, DCS was guaranteed a minimum payment of $1.20 per claim, if such amount was greater than 100% of rebates.

85. In the 1999 Contract, the guaranteed minimum rebate savings were increased to $1.25 per claim. Although a group insurance policy was not issued in 1999, the 100% rebate pass-on requirement continued, and the parties understood and intended, as under prior policies and contracts, that 100% of the manufacturer rebates would be passed on to the State.

86. For example, in quarterly transmission letters from ESI to DCS throughout the term of the 1999 Contract, ESI consistently represented to DCS that it was wire-transferring funds to DCS that reflected 100% of the manufacturers' reimbursement savings, or rebates.

87. In breach of the defendants' obligations under the 1998 Contract, Subcontract and Policy, and the 1999 Contract and Subcontract, to pass on to DCS 100% of all manufacturer rebates from 1998 through 2003, and contrary to ESI's representations that it was doing so, ESI retained for itself millions of dollars in manufacturer rebates attributable to the Empire Plan that should have been paid to the Plan.

88. In fact, ESI developed a scheme to hide a substantial portion of the rebates it was receiving from manufacturers. In contracts with manufacturers, the terms of which were kept secret from DCS, ESI disguised portions of the manufacturer rebates as "administrative fees," "data fees," "data management fees," "rebate administration fees," "formulary compliance fees," "performance fees," "professional services fees," and other names.

89. In an internal ValueRx document, "management fees" were deemed to be "the portion of the rebate that ValueRx keeps for itself. They can be called Admin. Fees, Data Fees, or Market Fees, but they are all the same . . . ."

Case 2:23-md-03080-BRM-RLS    Document 536-29    Filed 05/02/25    Page 4 of 4 PageID: 16273

PEOPLE OF THE STATE OF NEW YORK, by Eliot..., 2004 WL 1792404...

90. Many of these fees were duplicative of fees already paid by DCS or manufacturers, and were simply a method for ESI deceptively to divert manufacturer rebates from the Empire Plan and keep those rebates for itself.

91. For example, in contracts with certain manufacturers, ESI caused 25% of the rebate to be characterized as an "administrative fee" and kept that amount for itself, despite the fact that DCS was already paying ESI a $600,000 annual fee to administer the rebate program.

92. ESI's deception persisted throughout the terms of the 1998 and 1999 Contracts and Subcontracts. ESI routinely hid from DCS information related to manufacturer rebates, including information related to administrative, data and other fees. Despite repeated requests from the State, ESI refused to produce, for auditing purposes, rebate agreements with manufacturers.

93. The Empire Plan's utilization of drugs for which ESI had rebate agreements with manufacturers resulted in significant rebates being paid to ESI by the manufacturers, thereby conferring a benefit on ESI. By concealing and retaining a portion of the rebates as administrative and other fees, ESI unjustly enriched itself at the expense of DCS and the State.

*ESI's Unauthorized and Improper Sale of Empire Plan Data*

94. The 1999 Contract provided that "[a]ll forms, materials, data and publications developed by [CGL] specifically in connection with the [1999 Contract] shall be the property of the DCS." The 1999 Contract also stated that: "[t]he use of any material and information obtained by [CGL] in the performance of its duties under the [1999 Contract] shall be limited to purposes directly connected with such duties." In addition, the 1999 Contract provided that:
[a]ll [Empire Plan] prescription drug claims, data regarding State employees' workers' compensation accidents and employee and enrollment records relating to the [1999 Contract] are confidential and shall be used by [CGL] solely for the purpose of carrying out its obligations under the [1999 Contract] and for measuring the performance of [CGL] in accordance with the performance guarantees of the [1999 Contract].

95. The 1999 Contract then states that (subject to certain limited exceptions not relevant here) "no such records may be otherwise used or released to any third party by [CGL], employees, agents, or subcontractors [such as ESI] either during the term of the [1999 Contract] or in perpetuity thereafter." Finally, "[CGL] shall promptly advise the DCS of all requests made to [CGL] for information described in this Article XVII including, but not limited to, requests for any material and information provided by the DCS."

96. ESI entered into contracts with drug manufacturers, data collection services and others under which ESI received fees for providing data and services with respect to data associated with ESI's provision of PBM services to plans. The data and services ESI provided were used by manufacturers and others for marketing and other purposes.

97. In breach of contract, ESI sold, licensed or released such Empire Plan data to third parties without DCS's authorization. Such use of Empire Plan data was not necessary for ESI to carry out its obligations under the 1999 Contract.

98. ESI did not disclose to DCS that ESI was selling, licensing, otherwise using or releasing information and data belonging to DCS or derived from the Empire Plan. Moreover, DCS was not aware of and did not consent to ESI's sale, license, other use or release of data belonging to DCS or derived from ESI's services to the Empire Plan.

99. ESI's receipt of fees and compensation in exchange for providing Empire Plan data and other services with respect to Empire Plan data associated with ESI's provision of PBM services to the Empire Plan conferred a benefit on ESI. By concealing and accepting such fees and compensation, ESI unjustly enriched itself at the expense of DCS and the State.

*ESI's Schemes to Increase Generic Drug Prices for the Empire Plan in Order to Enrich Itself*