# Exhibit 67

# The Crazy Math Behind Drug Prices

**B** bloomberg.com/news/articles/2017-06-29/the-crazy-math-behind-drug-prices

June 29, 2017



Intermediaries that negotiate to lower prices may cause them to increase, too.

This article is part of the July 3, 2017 issue of businessweek.



David Hernandez, a 44-year-old restaurant worker and Type 1 diabetic, didn't have insurance from 2011 through 2014 and often couldn't afford insulin—a workhorse drug whose list price has risen more than 270 percent over the past decade. As a result of his skimping on dosages, Hernandez in 2011 suffered permanent blindness in his left eye, and three years later he experienced kidney failure. He's since received a lifesaving kidney transplant covered by Medicare and has drug coverage under a New Jersey program for the disabled. But Hernandez's eligibility expires next January, at which time he'll have to pay about $300 a month out of pocket for insulin. "I don't really have that kind of money," he says.

That Hernandez is struggling to deal with big price hikes for insulin, a century-old medicine that for most of its history cost $15 a month or less, speaks volumes about America's failing battle to control drug prices. Key combatants are the secretive drug industry middlemen called pharmacy benefit managers (PBMs), who are hired by insurers, employers, and unions to negotiate discounts from drugmakers. Hernandez is a plaintiff in a lawsuit seeking to prove that dealings between those middlemen and drug companies instead have contributed to the cost of insulin rising, in part to make sure fees to the middlemen keep

going up. The same interaction inflates the prices of dozens of name-brand drugs, says Steven Berman, the Seattle-based plaintiffs' attorney who filed the suit in February in federal court in Trenton, N.J. "It's perverse," he says, "but that's the way it works."

Other plaintiffs' law firms have followed in Berman's wake, all of them alleging conspiracies in which the dominant insulin makers—Eli Lilly, Novo Nordisk, and Sanofi—continually raise list prices to curry favor with the largest PBMs: Express Scripts Holding, CVS Health, and OptumRx, a unit of UnitedHealth Group. The four cases pending in New Jersey, which are likely to be consolidated, constitute a threat of massive damages for Big Pharma—and could topple the branded-drug pricing system used in the U.S.

Federal prosecutors are also investigating relationships between PBMs and large drug companies. The U.S. Attorney's Office in Manhattan has ordered Lilly, Novo, and Sanofi to turn over documents regarding those relationships.

The three drug companies say they're cooperating with the government's document demands. The same companies and the three PBMs say the private suits are meritless. "It is a complete falsehood that we would prefer prices to go up," says Timothy Wentworth, chief executive officer of Express Scripts Holding Co. "We conduct business in a manner that ensures compliance with all applicable laws, and we adhere to the highest ethical standards," Eli Lilly & Co. said in a statement.

One of the main functions of PBMs is to elicit rebates from drug manufacturers on behalf of health plans. The incentive—or threat—is that if drug companies fail to pay rebates, they might not win spots on a list of preferred medications that the PBMs maintain. Absence from the list, known as a formulary, means that health plans won't cover the drugs in question, which would cut into the manufacturers' sales.

Rebates range from single-digit percentages of list prices to 50 percent or more, depending on whether there are competing drugs the PBMs can play off against one another. The PBMs say they keep a small portion of rebates to reward themselves and pass through the rest to their client health plans. The PBMs and plans keep the actual proportions private.

As a result, there are two prices for most brand-name drugs: the higher list price, which is public, and the lower after-rebate "net price," which is confidential. After agreeing to give rebates, drugmakers often raise their list prices to make up some of the lost revenue, according to David Balto, a PBM critic who's a former policy director of the Federal Trade Commission's Bureau of Competition.

Even though health plans benefit from the rebates under the system, higher list prices still matter, because many patients continue to pay list, or full, price. First, there are the uninsured. Even after enactment of the Affordable Care Act in 2010, some 29 million

Americans lack any meaningful coverage. They confront list prices every time they go to the pharmacy. If proposed Republican Obamacare repeal-and-replace legislation were to become law, millions more may end up without insurance.

In addition, the growing ranks of Americans whose insurance policies have high annual deductible limits—some as steep as $4,000 or $5,000—are subject to list prices for at least part of each year. An increasing proportion of those workers must pay the full cost of drugs before their coverage kicks in. Older people covered by Medicare make up a third category of patients exposed to list prices if their annual spending on drugs exceeds $3,700.

Insulin prices started rising in the 1990s after biotechnology replaced the extraction of insulin from cow and pig pancreases. These innovations and new methods of administering insulin led to new patents, helping to reduce competition. When Lilly introduced its diabetes medicine Humalog in 1996, it cost $21 a vial. Today the same vial lists for $275. Patients often use two vials a month. Annual insulin sales worldwide exceed $20 billion.

The Berman suit alleges that Lilly, Novo, and Sanofi have raised list prices of insulin products to ingratiate themselves with PBMs. Higher list prices mean larger-percentage rebates out of which PBMs take a slice. Speaking at an investment conference in June 2016, Lilly's then-CEO John Lechleiter referred to "the weird way the payment system can work in this country." He asserted that "higher rebates can be an incentive for a payer [PBM] to stick with essentially a higher-priced product."

"Rather than compete by lowering net prices, the drug companies compete by raising list prices," says Berman, the managing partner of Hagens Berman Sobol Shapiro LLP. He decided to name only the drug companies as defendants, because "they're the ones who publish the fraudulent list prices" that directly harm patients. The two other plaintiffs' firms that filed follow-on suits, New York-based Weitz & Luxenberg and Keller Rohrback LLP of Seattle, named both the insulin makers and the three big PBMs as defendants. All of the lawsuits describe the relationships between drug companies and PBMs as unlawful "enterprises" operating in violation of the Racketeer Influenced and Corrupt Organizations Act.

The suits are based on a "false premise" that drug companies and PBMs conspire on prices, says CVS Health spokeswoman Christine Cramer. She says the drugmakers alone are responsible for pricing.

While they strongly deny any legal liability, insulin manufacturers acknowledge that too many diabetics are overwhelmed by high list prices. Lars Fruergaard Jorgensen, CEO of Novo Nordisk A/S, the world's biggest maker of insulin drugs, says list prices are meant to be only the starting point for rebate negotiations with PBMs. "It was never the intention that individual patients should end up paying the list price," he says. Novo has pledged to limit future annual list price increases to single-digit percentages. Sanofi SA similarly promised in May to keep

its price hikes in the U.S. at or below the rate of health-care inflation. The drugmaker points out that it hasn't raised the U.S. price of Lantus, its popular long-acting insulin, since November 2014.

To ease the impact of higher insulin prices, Lilly announced in December that it would provide 40 percent discounts to patients paying out of pocket if they use an online service called Blink Health. But it's a partial remedy at best, as the reduced payments may not be counted toward patient deductibles. PBMs also are taking steps to help certain patients paying out of pocket. CVS Health Corp. is recommending that health plans exempt insulin from patient deductibles. And Express Scripts has formed a subsidiary to offer lower prices on drugs for diabetes and asthma.

Enrique Conterno, president of Lilly's diabetes business, says drugmakers' dealings with PBMs are competitive, "almost like an auction." But he adds that PBMs are more often using the threat of total exclusion from formularies to force drugmakers to pay ever-greater rebates. For Lilly's Humalog, a top-seller, rebates and other discounts rose to 74 percent of list price last year, up from less than 25 percent in 2009, according to an estimate by SSR Health LLC, an investment research firm. Because of rising discounts, the net price insurers pay for Humalog has actually declined during the same period, Conterno says, even as the list price has more than doubled.

The link between list prices and rebate negotiations shows why insulin makers shadow one another's price increases. According to Connecture Inc., which tracks drug prices, Lilly's Humalog and Novo's NovoLog marched in lockstep for 10 years, with 17 consecutive matching list price increases and a tripling overall in price. Conterno explains the pattern: Going into rebate negotiations with a lower list price could put Lilly at a disadvantage in offering big discounts to PBMs—and increase the danger of Lilly being excluded from formularies. Manufacturers seek to please the PBMs by maximizing rebates.

Yet Express Scripts executives say the main way PBMs can combat high prices is by driving hard bargains on rebates. In 2014, Gilead Sciences Inc. introduced Harvoni, which cures hepatitis C at a cost of $94,500 for a 12-week treatment. When Gilead offered only a 10 percent rebate, Express Scripts excluded Harvoni and substituted a cheaper drug from rival AbbVie Inc. Gilead got the message. It has said that rebates marketwide on Harvoni exceeded 50 percent in 2016—discounts unavailable to uninsured patients. Gilead declined to comment. —*With James Paton*

