# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH**<br><br>**ORAL ARGUMENT REQUESTED** |

**THIS DOCUMENT RELATES TO: THE SELF-FUNDED PAYER TRACK**

### THE SELF-FUNDED PAYER TRACK'S RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFS ON STATUTES OF LIMITATION

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ............................................................................................... ii

**INTRODUCTION** ............................................................................................................. 1

**ARGUMENT** ..................................................................................................................... 1

    I.    Defendants Fail to Establish Inquiry Notice as a Matter of Law. ......................... 1

          A.  Defendants Fail to Satisfy Their Burden to Establish Storm Warnings. ........................ 4

          B.  Defendants Ignore Reasonable Diligence. ................................................................. 10

**CONCLUSION** ............................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*Landy v. Mitchell Petroleum Technology Corp.*,
  734 F. Supp. 608 (S.D.N.Y. 1990) .................................................................................. 2

*Bankers Tr. Co. v. Rhoades*,
  859 F.2d 1096 (2d Cir. 1988) .......................................................................................... 3

*Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
  435 F.3d 396 (3d Cir. 2006) ............................................................................................ 7

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
  2016 WL 6612804 (E.D. Pa. Nov. 9, 2016) ................................................................ 7, 8

*Blue Cross Blue Shield v. GlaxoSmithKline LLC*,
  417 F. Supp. 3d 531 (E.D. Pa. 2019) ............................................................................... 3

*City of Miami v. Eli Lilly & Co.*,
  2022 WL 198028 (S.D. Fla. Jan. 21, 2022) ..................................................................... 8

*Dockery v. Heretick*,
  2021 WL 3929707 (E.D. Pa. Sept. 1, 2021) .................................................................... 3

*Entities AWP Litig.*,
  767 F. Supp. 2d 263 (D. Mass. 2011) ........................................................................... 10

*Freier v. Westinghouse Elec. Corp.*,
  303 F.3d 176 (2d Cir. 2002) ............................................................................................ 7

*In re Cmty. Bank of N. Va.*,
  795 F.3d 380 (3d Cir. 2015) .......................................................................................... 10

*In re DaimlerChrysler AC Sec. Litig.*,
  269 F. Supp. 2d 508 (D. Del. 2003) ............................................................................ 4, 8

*In re Direct Purchaser Insulin Pricing Litig.*,
  2021 WL 2886216 (D.N.J. July 9, 2021) ........................................................................ 5

*In re EpiPen Direct Purchaser Litig.*,
  2021 WL 147166 (D. Minn. Jan. 15, 2021) .................................................................... 7

*In re Fasteners Antitrust Litig.*,
  2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) .................................................................. 8

*In re Merck & Co. Sec., Derivative & "ERISA" Litig.*,
  543 F.3d 150 (3d Cir. 2008) ............................................................................................ 7

*In re Processed Egg Prods. Antitrust Litig.*,
   2011 WL 5980001 (E.D. Pa. Nov. 30, 2011) .................................................................. 2

*In re RenovaCare, Inc. Sec. Litig.*,
   2024 WL 2815034 (D.N.J. June 3, 2024) ....................................................................... 4

*Lapin v. Goldman Sachs Grp.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ............................................................................ 6

*Mathews v. Kidder, Peabody & Co.*,
   260 F.3d 239 (3d Cir. 2001) ................................................................................. 2, 3, 10

*O'Connor v. Boeing N. Am., Inc.*,
   311 F.3d 1139 (9th Cir. 2002) ........................................................................................ 7

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
   730 F.3d 263 (3d Cir. 2013) ........................................................................................... 2

*Polysciences, Inc. v. Masrud*,
   2023 WL 3377084 (3d Cir. May 11, 2023) ................................................................. 10

*Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*,
   359 F. 3d 226 (3d Cir. 2004) ..................................................................................... 3, 9

*Schmidt v. Skolas*,
   770 F.3d 241 (3d Cir. 2014) ......................................................................................... 10

*Sidney Hillman Health Ctr. v. Abbott*,
   782 F.3d 922 (7th Cir. 2015) .......................................................................................... 6

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008) ........................................................................................... 7

# INTRODUCTION

Defendants have flooded the Court with nearly one hundred exhibits—ranging from obscure journals to legislative records—hoping to create the impression that Plaintiffs must have known about the complex insulin pricing scheme at the heart of this case. Defendants contend that *any* reporting on insulin prices or rebates over the past twenty-five years should have put *all* potential plaintiffs on inquiry notice of their injuries. But most of the sources cited—including the Senate Insulin Report—state that self-funded payers were *not* injured by rising list prices because the PBMs were shielding them by maximizing and passing through rebates. The loudest reassurances came from the PBMs themselves, who constantly assured payers and the public that they were working to lower the amounts their clients spent on insulin. Defendants have identified, at best, "mere breadcrumbs" insufficient to compel an inquiry under any notice standard.

Yet Defendants contend that all plaintiffs should have discovered the insulin pricing scheme by November 2016. In doing so, they invoke the wrong standard and ignore the total mix of information available to each plaintiff. As a result, Defendants fail to analyze (as required) when each plaintiff should have known of its injuries and their source. Defendants' shotgun approach also overlooks their concealment of the insulin pricing scheme. And they claim that the hundreds of actual states, cities, counties, unions, school boards, and other employers who have sued in this case should have discovered their injuries and the sources of those injuries *years* before the U.S. Senate and the FTC published their findings or even initiated investigations into the PBM Defendants. Defendants' argument defies logic, is legally flawed, and must be rejected.

# ARGUMENT

## I. Defendants Fail to Establish Inquiry Notice as a Matter of Law.

In their Supplemental Briefs, Defendants misstate the relevant question for inquiry notice. This initial misstep undermines their resulting argument. Defendants argue that "the relevant

1

question for purposes of inquiry notice is 'when [a plaintiff] would have discovered general facts about the fraudulent scheme,' *not* 'specific facts about the fraud perpetrated on [plaintiff].'" PBM Br. at 2 (quoting *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013)). That is incorrect. The standard articulated by Defendants guides the inquiry-notice analysis in *securities fraud* cases (like *Operating Engineers*), which expect a higher degree of diligence from investor-plaintiffs than the law requires of other classes of litigants.[1] The Third Circuit distinguishes between the accrual of securities fraud claims and RICO claims, explaining that "a RICO claim accrues when the plaintiffs should have discovered *their injuries*," whereas "a securities fraud claim accrues when the plaintiffs should have discovered the misrepresentations and wrong-doing of the defendants." *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 251 (3d Cir. 2001).

The district court in *Landy v. Mitchell Petroleum Technology Corp.*, which the Third Circuit relied on in *Matthews*, put it simply: "The focus of accrual in a RICO action is different from that for a fraud claim where the focus is on the acts of defendants. In a RICO action, the focus is on the *injury to plaintiff* . . . . Thus, it is *the injury*, not the racketeering activity[,] which triggers the statute of limitation for a RICO action." 734 F. Supp. 608, 625 (S.D.N.Y. 1990) (emphasis added). In other words, "[t]he statute of limitations for the securities law violation focuses on plaintiffs' knowledge of defendants' *actions*, whereas the RICO statute of limitations focuses on plaintiffs' knowledge of *when they were actually harmed* by those actions." *Id.* (emphasis added).

The distinction between these two accrual rules "is subtle, but in some circumstances, it

---

[1] *See In re Processed Egg Prods. Antitrust Litig.*, 2011 WL 5980001, at *8 (E.D. Pa. Nov. 30, 2011) ("Whether a reasonable plaintiff would be expected to read regional newspapers or egg industry publications, akin to the reasonable securities investor who is expected to know of publicly available news articles about corporate activities, is simply not a question that can be resolved at this stage . . . because the answer would require looking to matters extraneous to the [complaint].").

2

can be dispositive." *Mathews*, 260 F.3d at 251. It is dispositive here because Defendants point to purported storm warnings that show—at most—wrongdoing by Defendants, but fail to identify "storm warnings with respect to the injur[ies] in question." *Blue Cross Blue Shield v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 549 (E.D. Pa. 2019) (cleaned up). Those injuries include, for example, rising net prices, the mislabeling of rebates, and the siphoning off of funds through rebate aggregators—each of which must be considered separately "in turn." *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988).

In the Third Circuit, RICO claims do not accrue until a plaintiff "knew or should have known of [its] injury" *and* the "source of [its] injury." *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F. 3d 226, 233 (3d Cir. 2004). Under the Third Circuit's inquiry-notice analysis, "the burden is on the defendant to show the existence of 'storm warnings.'" *Mathews*, 260 F.3d at 252–53. Then, if the defendant succeeds, the burden shifts to the plaintiff "to show that [it] exercised reasonable due diligence" and did not "discover [its] injuries." *Id.* Each step brings its own fact-intensive considerations. *See, e.g.*, *Dockery v. Heretick*, 2021 WL 3929707, at *27 (E.D. Pa. Sept. 1, 2021) ("[W]hether [plaintiffs] had enough storm warnings of culpable activity to be put on notice of their injury and who caused it . . . will depend upon the circumstances surrounding each [plaintiff's] transaction[.]"). Here, highly individualized interactions between each self-funded payer and Defendants—including bidding processes, requests for proposal, contract negotiations, and audits—make this a fact-specific inquiry not suitable for across-the-board treatment.

For the reasons set forth in the SFP Plaintiffs' Supplemental Brief, the accrual date for Plaintiffs' claims cannot be resolved on the pleadings. *See* Pls. Supp. Br. [ECF No. 535] at 3–17. Regardless, Defendants have failed meet their burden to show storm warnings with respect to Plaintiffs' specific injuries. Nor have they explained how the reasonable diligence component of

3

the inquiry-notice test is susceptible to uniform treatment across all Plaintiffs in this MDL.

### A. Defendants Fail to Satisfy Their Burden to Establish Storm Warnings.

The existence of storm warnings (1) depends on the "mix of information available" to *each* plaintiff, *In re DaimlerChrysler AC Sec. Litig.*, 269 F. Supp. 2d 508, 514 (D. Del. 2003), and (2) is intertwined with—and offset by—any reassurances or denials of wrongdoing made publicly or to any plaintiff, *see In re RenovaCare, Inc. Sec. Litig.*, 2024 WL 2815034, at *10 (D.N.J. June 3, 2024) ("[R]eassurances can dissipate apparent storm warnings[.]"). As such, the question of whether storm warnings have triggered a duty to investigate is highly "fact intensive." *See De Vito v. Liquid Holdings Grp., Inc.*, WL 6891832, at *27 (D.N.J. Dec. 31, 2018). First, the mix of information available to each plaintiff is inherently fact-specific, and publicly available information overwhelmingly reported that payers were shielded from rising list prices. *See infra* at 5–6. Beyond that, there was no general consensus on the source of rising list prices—explanations ranging from manufacturer price fixing to research and development expenses. *Id.*

Second, the same mix of information included a barrage of representations from the PBM Defendants, media publications, and Congressional reports reassuring the SFP Plaintiffs that the PBMs were *protecting* them from rising list prices by maximizing rebates. These included, for example, a PBM-funded report stating that a "systematic study of data on prescriptions[] [and] rebates" shows that that the PBMs lower "the cost of prescription drugs," *see* Carlton Report [ECF No. 522-11] at 1; newspaper reports citing the "lower, secret, 'real' price that insurers pay," *see* PBM Ex. 13; and the Senate Insulin Report's suggestion that payers "accept list price increases" in light of "higher rebates and discounts," *see* Senate Insulin Report at 88. These reassurances also included the PBM Defendants' specific representations to their clients, which must be analyzed on a plaintiff-by-plaintiff basis. *See* Pls. Supp. Br. at 10; *see, e.g.*, AC ¶¶ 536–38.

4

To create the illusion of storm warnings, Defendants flood the record with articles, reports, and other sources that make any reference to prescription drug prices, the price of insulin, or the general concept of rebates. These sources—taken individually or in the aggregate—do not establish the requisite storm warnings with respect to the SFP Plaintiffs' injuries resulting from Defendants' inflation of net prices, mislabeling of rebates, formulary manipulation, siphoning of rebates and other payments by the PBM Defendants' affiliated rebate aggregators, or any other manner of deceit that damaged self-funded plans. *See In re Direct Purchaser Insulin Pricing Litig.*, 2021 WL 2886216, at *19 (D.N.J. July 9, 2021) (explaining that public reports that "provide breadcrumbs" are not sufficient to "trigger[] a duty of reasonable diligence as a matter of law").

***Media Reports.*** Defendants cite various media reports that they contend constitute storm warnings. These sources do not provide notice that self-funded payers were injured by the insulin pricing scheme. To the contrary, these sources repeatedly indicate that payers were protected from the skyrocketing prices of insulin because they were receiving rebates from their PBMs. *See, e.g.*, Mfr. Ex. 15 (contrasting the "the higher list price and the lower, secret, 'real' price that insurers pay"); Mfr. Ex. 23 ("[P]harmaceutical companies, including Lilly, have had to pay larger discounts in the form of rebates . . . [t]hat translate[] into insurance plans on balance paying a lower effective net price[.]"); Mfr. Ex. 67 ("Even though health plans benefit from the rebates under the system, higher list prices still matter, because many patients continue to pay list, or full, price."); PBM Ex. 7 (payers are uniquely insulated from rising list prices for diabetes drugs because "[i]n competitive markets such as asthma and diabetes therapy . . . manufacturers often give especially large rebates as they seek better positioning on insurers' 'formularies' of covered drugs").[2]

---

[2] *See also, e.g.*, PBM Ex. 4 ("[W]holesale prices generally do not correspond to net prices—what companies, unions, and government agencies pay—because drug makers offer rebates."); Mfr. Ex.

These media reports are also replete with reassurances by Defendants. *See, e.g.*, PBM Ex. 1 (Express Scripts CEO stating that it is "part of the solution, . . . [n]ot part of the problem"); PBM Ex. 10 (Express Scripts executive noting that Express Scripts "want[s] a low net price"). These reassurances further dissipated any storm warnings. *See Lapin v. Goldman Sachs Grp.*, 506 F. Supp. 2d 221, 235–36 (S.D.N.Y. 2006) (holding that, "even assuming that the press articles . . . constituted storm warnings," those storm warnings were dissipated because "investors were also being fed reassuring statements by [the defendant]," including "in th[e] article[s]" themselves). The articles also relay conflicting information, including that manufacturer price fixing and R&D costs (not PBMs) were responsible for rising list prices. *See, e.g.*, Mfr. Ex. 13, 63 ("price fixing"); Mfr. Ex. 48, 53 ("price collusion"); Mfr. Ex. 11 (R&D). This conflicting information further precludes storm warnings. *See Sidney Hillman Health Ctr. v. Abbott Lab'ys*, 782 F.3d 922, 929 (7th Cir. 2015) (no storm warnings where "sources present[ed] conflicting information").[3]

To the extent that *any* exhibit suggests payer injuries, those sources were equivocal or speculative, *see* Mfr. Ex. 9, 32, 33; buried in obscure journals, *see* Mfr. Ex. 4, 33; or not specific to insulin, *see* Mfr. Ex. 4, 9. Such equivocal, obscure, and untethered sources are insufficient to

---

1 (explaining that the system "offers some bill payers lower overall costs," that PBMs "pass [rebates] on to clients," and that "patients under high-deductible health plans . . . [are] being exposed to a larger share of the prices"); Mfr. Ex. 11 ("[I]nsurers hire [PBMs] to bargain for secret rebates and discounts off the list price."); Mfr. Ex. 17 ("Drug companies compete for insurers' business by offering secret rebates[.]"); Mfr. Ex. 55 ("[I]nsurance companies . . . don't pay that price. They negotiate discounts."); Mfr. Ex. 56 ("List prices tend not to reflect the actual price paid[.]"); Mfr. Ex. 66 ("These 'rebates' result in inflated list prices that the insurer never pays."); Mfr. Ex. 73 ("[I]nsurers that cover these medicines get huge 'rebates' from manufacturers.").

3 Defendants rely on a *New York Times* article entitled "Break Up the Insulin Pricing Racket," an op-ed piece in which the author questioned whether rebates were being "passed along." *See* PBM Supp. Br. at 4; Mfr. Supp. Br. at 8. But in this op-ed, the author only questioned whether rebates were being "passed along *to consumers* or simply pocketed." And the Anthem case cited in the article had to do with a repricing provision in a ten-year agreement between Anthem and ESI— nothing to do with insulin, rebates, or any other aspect of the Insulin Pricing Scheme.

trigger inquiry notice. *See, e.g.*, *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 210 (2d Cir. 2002) (no inquiry notice where defendants "provided abundant evidence of the existence of controversy" but "much of what they submitted was either equivocal . . . or contained outright denials"); *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1152 (9th Cir. 2002) (no inquiry notice where "media reports . . . were, at best, equivocal"); *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 402 (3d Cir. 2006) ("Speculation should not be given the same weight as reports of objective wrongdoing."); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 432 (2d Cir. 2008) ("obscure" sources and "specialty publication[s]" not sufficient); *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *6 (D. Minn. Jan. 15, 2021) (no notice where "articles were not specific to the EpiPen"). The few articles that mention rebate mislabeling suffer from one or more of these infirmities, largely predate the existence of the big three PBM Defendants, precede settlements presumably resolving the issue, and fail to link mislabeling to insulin. *See, e.g.*, Mfr. Ex. 25. And not a single report Defendants cite mentions their rebate aggregators—which were formed years after their proposed inquiry notice date. AC ¶ 432.

The sources identified by Defendants fail to provide Plaintiffs with sufficient information to place them on inquiry notice of their injuries and the source of those injuries—particularly in light of the PBM Defendants' conflicting reassurances. *See, e.g.*, *In re Merck & Co. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 171–72 (3d Cir. 2008) (storm warnings created by NYT article and FDA letter were dissipated by the defendant's reassurances); *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 2016 WL 6612804, at *9 (E.D. Pa. Nov. 9, 2016) ("Factual issues remain as to whether the public disclosures [including media reports] constituted storm warnings establishing inquiry notice, especially in light of [the defendant's] attempts to minimize [the issues.]"); *In re DaimlerChrysler*, 269 F. Supp. 2d at 514 ("[W]here . . . negative statements

7

are tempered by positive statements from a company's management and others, courts have been reluctant to find that the plaintiffs had inquiry notice.").

In *DaimlerChrysler*, for example, the court found that "approximately 35 newspaper articles and press releases" were insufficient because they were "based on the skepticism of commentators" and "substantially off-set by other public reports and articles and by [d]efendants' assurances." 269 F. Supp. 2d at 511. The court explained that, given the defendants' reassurances, the defendants were "seeking to punish Plaintiffs for trusting their word." *Id.* Just so here. In short, any determination of whether "articles constituted sufficient 'red flags' . . . must await a more complete record," including "an evaluation of Plaintiffs' exposure to these articles, the circulation of various publications, and the likelihood that a reasonable plaintiff would have read such documents." *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at *6 (E.D. Pa. Aug. 12, 2011).

***Governmental Materials.*** Defendants also point to governmental reports and investigations. PBM Supp. Br. at 5–8; Mfr. Supp. Br. 9–10. These sources are insufficient to constitute storm warnings triggering Plaintiffs' duty of reasonable diligence. Payers—from counties to union health plans—cannot be expected to scour legislative records for any hint of a possible injury. *See, e.g.*, *Blue Cross Blue Shield*, at *10 (rejecting government "letter" and "investigation" where public reports on them were "minimal"); *cf. City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *11 (S.D. Fla. Jan. 21, 2022) (plaintiffs not required to "trawl court filings across the country"). In any event, none of these sources suffice to provide inquiry notice.

First, Defendants cite a 2007 Congressional Budget Office report, but that report merely states that "Manufacturers . . . pay rebates to PBMs working on behalf of health plans." *See* Mfr. Ex. 3. The Manufacturer Defendants also omitted critical portions of the report, which elsewhere makes clear that "PBMs . . . obtain discounted prices . . . in the form of rebates from manufacturers,

8

which are in turn shared with health plans or self-insured employers."

Second, the PBMs point to a single statement made to the House Judiciary Committee in 2011 at a hearing on the proposed merger between Express Scripts and Medco. *See* PBM Supp. Br. at 5. This testimony has nothing to do with insulin, and payers would have no reason to track hearings on a proposed merger—particularly where the witness was a pharmacist for a food-drug retailer, appearing on behalf of chain drug stores, and focusing primarily on the proposed merger's impact on "consumers and the nation's community pharmacies." 112 Cong. 58, 82 (2011).

Third, the Manufacturers cite a 2011 HHS OIG study about rebates in the Medicare context. Mfr. Supp. Br. at 7–8. The study, however, simply states that rebates—which self-funded payers assumed were being passed through to them—"can substantially reduce the cost of" prescription drugs in the Medicare Part D program. Mfr. Ex. 5 at i. It also noted that sponsors "had limited information about the rebate amounts they actually received for each drug" because their PBMs "provided aggregate [rebate] information . . . rather than by drug." *Id.* at 18.

Fourth, Defendants cite a June 2018 report by the Minority Staff of the Senate Finance Committee. Mfr. Supp. Br. at 13. The report notes that "[s]ome critics and organizations" claim that PBMs mislabel rebates, but concludes that "[f]urther study is needed" to ascertain whether "plan sponsors may . . . also benefit[] from these payment categorizations." Mfr. Ex. 21 at 29.

Fifth, Defendants—at the core of their argument—rely on a November 2016 letter from Bernie Sanders and Elijah Cummings to the FTC. *See* PBM Supp. Br. at 6–9; Mfr. Supp. Br. at 9–10. Defendants anchor their constructive notice date for *all* plaintiffs to this letter. But the letter does not mention the PBMs, describe the insulin pricing scheme, or reference rebates. It instead suggests potential collusion to fix prices among only the insulin manufacturers. In short, the letter to the FTC does not describe the "source of [Plaintiffs'] injur[ies]." *Prudential*, 359 F. 3d at 233.

9

***Prior Litigation.*** Defendants cite other cases involving insulin pricing, focusing primarily on *In re Insulin Pricing Litigation*, No. 17-cv-699 (D.N.J.). *See* PBM Supp. Br. at 9–13; Mfr. Supp. Br. at 10–13. As stated in Plaintiffs' Supplemental Brief, however, none of these cases gave payers any indication of "*their injuries*." *Mathews*, 260 F.3d at 251; *see* SFP Pls. Br. at 12 & n.4.[4]

### B. Defendants Ignore Reasonable Diligence.

Even if Defendants could establish a date on which storm warnings arose for all self-funded payers, each plaintiff would still be entitled to show that it had "exercised reasonable due diligence and yet [was] unable to discover [its] injuries." *Mathews*, 260 F.3d at 252. The PBM Defendants acknowledged the reasonable-diligence component of the inquiry-notice analysis in their Motion to Dismiss, *see* PBM MTD at 23, but Defendants ignore this step in their Supplemental Briefs. This is not surprising, because "reasonable diligence is generally a fact-specific inquiry" not amenable to the one-size-fits all approach urged by Defendants. *In re Cmty. Bank of N. Va.*, 795 F.3d 380, 404 (3d Cir. 2015). Nor do Plaintiffs have any obligation to affirmatively plead diligence. *See Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014); *see also Polysciences, Inc. v. Masrud*, 2023 WL 3377084, at *3 (3d Cir. May 11, 2023) ("[R]equiring [the plaintiff] to make a showing of reasonable diligence was premature at the motion-to-dismiss stage." (cleaned up)).

### <u>CONCLUSION</u>

The Court should deny the motions to dismiss.

---

[4] Even if Defendants were correct that general knowledge of the scheme is all that is required, Defendants would nonetheless fall short because any information about the insulin pricing scheme was, among other things, (1) contradicted by reports blaming manufacturer price fixing and R&D for rising insulin prices, *see, e.g.*, Mfr. Ex. 13, 48, 53, 63; (2) quieted by reassurances from the PBMs, *see, e.g.*, AC ¶¶ 531–37; Mfr. Ex. 17, 25, 32, 33; and (3) grounded in little more than speculation until the Senate Insulin Report was published. *Cf. In re McKesson Govt. Entities AWP Litig.*, 767 F. Supp. 2d 263, 272 (D. Mass. 2011) ("In a market where drug pricing was notoriously opaque and where AWPs were frequently increased by manufacturers for various reasons, public payors could not possibly have known that a price increase was the result of fraud[.]").

Dated: May 16, 2025

Respectfully submitted,

| | |
|---|---|
| */s/ David R. Buchanan* <br> David R. Buchanan <br> **SEEGER WEISS LLP** <br> 55 Challenger Road <br> Ridgefield Park, New Jersey 07660 <br> 973-639-9100 <br> dbuchanan@seegerweiss.com | Benjamin J. Widlanski <br> **KOZYAK TROPIN & THROCKMORTON LLP** <br> 2525 Ponce de Leon Blvd., 9th Floor <br> Coral Gables, Florida 33134 <br> Telephone: (305) 372-1800 <br> bwidlanski@kttlaw.com |
| Brandon L. Bogle <br> **LEVIN, PAPANTONIO, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A**. <br> 316 S. Baylen St., Suite 600 <br> Pensacola, Florida 32502 <br> Tel: (850) 435-7140 <br> bbogle@levinlaw.com | Mark P. Pifko <br> **BARON & BUDD, P.C.** <br> 15910 Ventura Blvd #1600 <br> Los Angeles, California 91436 <br> Tel.: (818) 839-2333 <br> mpifko@baronbudd.com |

*Lead Counsel for the Self-Funded Payer Track*

David J. Ko
**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 428-0563
dko@kellerrohrback.com

*Counsel for Plaintiff King County*

11

## CERTIFICATE OF SERVICE

I certify that I am a registered attorney in the State of New Jersey and a Member of the Bar of this Court and that on this date a copy of this document was served on the counsel of record in the above-captioned matter via email.

*/s/David R. Buchanan*
David R. Buchanan

Dated: May 16, 2025