# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-MD-03080**<br>**MDL No. 3080**<br><br>**JUDGE BRIAN R. MARTINOTTI**<br>**JUDGE RUKHSANAH L. SINGH**<br><br>**ORAL ARGUMENT REQUESTED** |

**THIS DOCUMENT RELATES TO:**
**ALL TRACKS AND ALL CASES**

## PBM DEFENDANTS' OPPOSITION TO MOTION TO COMPEL RESPONSES TO COMPASS LEXECON SUBPOENA <u>TO PRODUCE DOCUMENTS</u>

(Counsel Listed on Next Pages)

Thomas P. Scrivo
Young Yu
**O'TOOLE SCRIVO, LLC**
14 Village Park Road
Cedar Grove, NJ 07009
T: (973) 239-5700
tscrivo@oslaw.com
yyu@oslaw.com

Brian D. Boone
**ALSTON & BIRD LLP**
1120 S. Tyron St., Ste. 300
Charlotte, NC 28203
T: (704) 444-1000
brian.boone@alston.com

Elizabeth Broadway Brown
**ALSTON & BIRD LLP**
1201 W. Peachtree St. NW, Ste. 4900
Atlanta, GA 30309
T: (404) 881-7000
liz.brown@alston.com

Kelley Connolly Barnaby
**ALSTON & BIRD LLP**
950 F Street, NW
Washington, D.C. 20004
T: (202) 239-3300
kelley.barnaby@alston.com

*Counsel for Defendants OptumRx, Inc.*

Jason R. Scherr
Elise M. Attridge
Lindsey T. Levy
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
jr.scherr@morganlewis.com
elise.attridge@morganlewis.com
lindsey.levy@morganlewis.com
Tel: (202) 739-3000

*Counsel for Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Medco Health Solutions, Inc., Ascent Health Services LLC, and The Cigna Group*

Kevin H. Marino
John D. Tortorella
**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, New Jersey 07928
T: (973) 824-9300
F: (973) 824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

Enu Mainigi
Craig Singer
R. Kennon Poteat III
A. Joshua Podoll
Benjamin Hazelwood
Daniel Dockery
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, D.C. 20024
T: (202) 434-5000
F: (202) 434-5029
emainigi@wc.com
csinger@wc.com
kpoteat@wc.com
apodoll@wc.com
bhazelwood@wc.com
ddockery@wc.com

*Counsel for CVS Health Corporation;
Caremark Rx, L.L.C.; CaremarkPCS
Health, L.L.C.; Caremark, L.L.C.; and
Zinc Health Services, L.L.C.*

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ......................................................................................................1

BACKGROUND ......................................................................................................2

ARGUMENT ...........................................................................................................7

I.    THE COMPASS SUBPOENA SEEKS EXPANSIVE DISCOVERY
      THAT IS IRRELEVANT, DUPLICATIVE, OR BOTH..................................7

      A.    Plaintiffs improperly seek overbroad, duplicative data from a third
            party. ....................................................................................................7

      B.    Plaintiffs inappropriately seek cloned discovery................................11

      C.    The Subpoena seeks irrelevant and premature expert discovery. .......14

II.   PLAINTIFFS ARE NOT ENTITLED TO MATERIALS THAT ARE
      PRIVILEGED, ATTORNEY WORK PRODUCT, OR OTHERWISE
      PROTECTED FROM DISCLOSURE. .........................................................17

      A.    The Subpoena seeks information that is privileged and protected
            under the work product doctrine. .....................................................188

      B.    The PBM Defendants Have Not Waived Privilege............................23

CONCLUSION .....................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Micro Devices, Inc. v. Intel Corp.*,
2008 U.S. Dist. LEXIS 125410 (D. Del. Mar. 6, 2008) ....................................16

*Centrix Fin. Liquidating Tr. v. Nat'l Union Int'l Co. of Pittsburgh, P.A.*,
2012 U.S. Dist. LEXIS 179131 (D.N.J. Dec. 18, 2012)................................9, 10

*Chen v. AMPCO Sys. Parking*,
2009 U.S. Dist. LEXIS 71633 (S.D. Cal. Aug. 14, 2009)................................11

*Columbus Life Ins. Co. v. Wilmington Trust, N.A.*,
344 F.R.D. 207 (D.N.J. 2023).............................................................................8

*Cooper Health Sys. v. Virtua Health, Inc.*,
2009 U.S. Dist. LEXIS 142786 (D.N.J. July 1, 2009) ......................................10

*Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*,
2016 U.S. Dist. LEXIS 200346, at *4 (D.N.J. Nov. 29, 2016) .........................15

*Extenet Sys. v. Twp. of N. Bergen*,
2021 U.S. Dist. LEXIS 233875 (D.N.J. Dec. 7, 2021)........................................8

*Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*,
2019 U.S. Dist. LEXIS 17553 (D.N.J. Jan. 23, 2019).......................................15

*FTC v. Kroger Co.*,
2024 U.S. Dist. LEXIS 97032 (D. Or. May 31, 2024) ......................................15

*Grant St. Group, Inc. v. Realauction.com, LLC*,
2011 U.S. Dist. LEXIS 154876 (W.D. Pa. Sept. 30, 2011)...............................15

*Gruss v. Zwirn*,
2013 U.S. Dist. LEXIS 100012 (S.D.N.Y. July 10, 2013)................................27

*Guiffre v. Maxwell*,
2016 U.S. Dist. LEXIS 58204 (S.D.N.Y. May 2, 2016) ..............................21, 22

*Hendrych v. Sheltair Aviation LGA, LLC*,
2019 U.S. Dist. LEXIS 116441 (W.D. Pa. July 12, 2019) ................................14

*Housemaster SPV LLC v. Burke*,
    2022 U.S. Dist. LEXIS 231075 (D.N.J. Dec. 23, 2022) ......................................9

*In re Cendant Corp. Sec. Litig.*,
    343 F.3d 658 (3d Cir. 2003) ........................................................................18, 22

*In re Grand Jury Investigation*,
    599 F.2d 1224 (3d Cir. 1979) ............................................................................18

*In re Kidder Peabody Sec. Litig.*,
    168 F.R.D. 459 (S.D.N.Y. 1996) .............................................................16, 26, 27

*In re Linderboard Antitrust Litig.*,
    237 F.R.D. 373 (E.D. Pa. 2006).....................................................................24, 25

*In re Teleglobe Comms. Corp.*,
    493 F.3d 345 (3d Cir. 2007) ........................................................................18, 25

*In re von Bvlow*,
    828 F.2d 94 (2d Cir. 1987) ................................................................................24

*JPC Merger Sub LLC v. Baker Eng'g & Risk Consultants, Inc.*,
    2013 U.S. Dist. LEXIS 84979 (D.N.J. June 18, 2013).......................................25

*Kelley v. Enhanced Recovery Co., LLC*,
    2016 U.S. Dist. LEXIS 140147 (D.N.J. 2016) ....................................................8

*King County v. Merrill Lynch & Co.*,
    2011 U.S. Dist. LEXIS 86775 (W.D. Wash. Aug. 5, 2011)........................11, 13

*McVicker v. Comacho*,
    2022 U.S. Dist. LEXIS 255746 (W.D. Pa. May 2, 2022) ............................14, 15

*Moore v. Morgan Stanley & Co.*,
    2008 U.S. Dist. LEXIS 88300 (N.D. Ill. May 30, 2008)...................................12

*MSP Recovery Claims v. Sanofi-Aventis U.S. LLC*,
    2022 U.S. Dist. LEXIS 243771 (D.N.J. Feb. 8, 2022) ......................................14

*New Park Entm't L.L.C. v. Elec. Factory Concerts, Inc.*,
    2000 U.S. Dist. LEXIS 531 (E.D. Pa. Jan.13, 2000)...........................................8

*O'Kinsky v. Perrone*,
  2012 U.S. Dist. LEXIS 146194 (E.D. Pa. Oct. 11, 2012) ...................................24

*Perry v. United States*,
  1997 U.S. Dist. LEXIS 23875 (N.D. Tex. Feb. 4, 1997) ...................................15

*Phillips v. C.R. Bard, Inc. (In re Grassi)*,
  2013 U.S. Dist. LEXIS 178528 (D. Mass. Dec. 13, 2013)................................15

*Rollstock, Inc. v. SupplyOne, Inc.*,
  2022 U.S. Dist. LEXIS 82229 (E.D. Pa. May 6, 2022).......................................8

*Sandra T.E. v. S. Berwyn Sch. Dist.*,
  600 F.3d 612 (7th Cir. 2010) .............................................................................21

*Schmulovich v. 1161 Rt. 9 LLC*,
  2007 U.S. Dist. LEXIS 59705 (D.N.J. Aug. 13, 2007) .......................................8

*Sporck v. Peil*,
  759 F.2d 312 (3d Cir. 1985) ........................................................................19, 20

*Spring Pharms., LLC v. Retrophin, Inc.*,
  2019 U.S. Dist. LEXIS 133316 (E.D. Pa. Aug. 7, 2019) ....................................9

*Stewart Title Guar. Co v. Owlett & Lewis, P.C.*,
  297 F.R.D. 232 (M.D. Pa. 2013) ......................................................................15

*Sullivan v. Warminster Tp.*,
  274 F.R.D. 147 (E.D. Pa. 2011).........................................................................21

*Travelpass Grp. v. Caesars Entm't Corp.*,
  2020 U.S. Dist. LEXIS 26558 (E.D. Tex. Jan. 16, 2020) ...........................11, 13

*Ziner v. Cedar Crest Coll.*,
  2006 U.S. Dist. LEXIS 34858 (E.D. Pa. 2006) .....................................23, 24, 27

**RULES**

Fed. R. Civ. P. 26 ...............................................................................................*passim*

# INTRODUCTION

For nearly two decades, drug manufacturers and pharmacy benefit managers (PBMs) have faced intense scrutiny for rising drug prices. This MDL consolidates multiple cases that challenge the pharmaceutical pricing practices specific to insulin and diabetes drugs of manufacturers Eli Lilly and Company, Novo Nordisk Inc., and Sanofi-Aventis U.S. LLC (the Manufacturer Defendants) together with PBMs Express Scripts, Inc., CVS Caremark, and OptumRx, Inc. (the PBM Defendants) in connection with their rebate agreements and related practices. Prior to and following the creation of this MDL, lawsuits and investigations have targeted the PBMs, the Manufacturer Defendants, and pharmaceutical drug pricing more generally.

In 2022, the Federal Trade Commission (FTC) launched an expansive inquiry into the PBM industry and the "affordability of prescription drugs" pursuant to Section 6(b) of the FTC Act.[1] The FTC announced publicly that the inquiry would include requests to multiple PBMs—including the PBM Defendants—for information and records regarding their business practices. Against that backdrop, counsel for the PBM Defendants engaged a prominent economist, Dr. Dennis Carlton, to work alongside and at the direction of counsel to assist the PBMs: (1) in connection with the FTC's inquiry, (2) with the analysis of anticipated disputes, and

---

[1] *See* FTC Launches Inquiry Into Prescription Drug Middlemen Industry, Federal Trade Commission (June 7, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drug-middlemen-industry.

(3) to ultimately provide expert testimony in connection with other, potentially broader litigation. Dr. Carlton's engagement, work, and the materials he considered span far beyond the scope of the issues relevant to this MDL.

The MDL Plaintiffs seek an order compelling production of not only the underlying data provided by the PBM Defendants to Dr. Carlton, but also the highly sensitive, privileged, and confidential communications between the expert and the PBMs' counsel in furtherance of that engagement—materials that plaintiffs in separate litigation would not even be able to obtain were Dr. Carlton disclosed as an expert. Plaintiffs' improper attempt to intrude upon the PBMs' legitimate protected interests should be squarely rejected. Fact discovery in this MDL is ongoing, and expert discovery has not yet begun. The Court should not countenance Plaintiffs' attempt to sidestep party discovery by instead seeking a mixture of duplicative, irrelevant, and protected documents from a third party. The motion should be denied.

## **BACKGROUND**

For years, plaintiffs and government entities across the country have wrongly targeted the PBMs for their work helping plans reduce costs through rebate negotiations with manufacturers and their alleged connection to increasing drug prices. Numerous state investigations, some of which resulted in litigation now consolidated in this MDL, date back nearly a decade. The first lawsuits regarding the alleged insulin pricing scheme at the heart of Plaintiffs' claims were filed in 2017.

*See Chaires et al. v. Sanofi U.S. et al.*, No. 17-cv-10158 (D. Mass. Jan. 30, 2017); *In re Insulin Pricing Litig.*, No. 17-cv-699 (D.N.J. Feb. 2, 2017) (the "IPP Case"). Various other state investigations have resulted in broader litigations against the PBMs. *See, e.g., State of Hawai'I ex. Rel. Anne E. Lopez, Attorney General, v. Caremark PCS Health, L.L.C. et al.*, D. Haw. Docket 1:23-cv-00464; *State of Vermont v. Evernorth Health, Inc., et al.*, D. Vt. Docket No. 2:24-cv-01103.

The FTC began a broad investigation into the PBMs' businesses in 2022, including a 6(b) study.[2] On the same day the FTC initiated that study, two commissioners indicated that an enforcement action was inevitable. *See* Exhibit 1, June 7, 2022 Statement of Commissioner Slaughter. In the same month, the FTC issued Civil Investigative Demands targeting the PBMs. The FTC eventually filed a 2024 complaint regarding the PBMs' rebating practices.

---

[2] Section 6(b) give[s] the FTC broad subpoena power to request information from people, partnerships and corporations" which can later be used for many purposes. The FTC's 6(b) Study Authority: An Important Tool for Policymakers, Disruptive Competition Project (Apr. 9, 2019), https://project-disco.org/competition/040919-the-ftcs-6b-study-authority-an-important-tool-for-policymakers/; *see also* A Brief Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking Authority, FTC (May 2021), https://www.ftc.gov/about-ftc/mission/enforcement-authority. But far from being a benign tool to collect information, FTC 6(b) inquires "can also help with their enforcement mission," and "have been used effectively to inform enforcement proceedings." The FTC's 6(b) Study Authority: An Important Tool for Policymakers, Disruptive Competition Project (Apr. 9, 2019), https://project-disco.org/competition/040919-the-ftcs-6b-study-authority-an-important-tool-for-policymakers/; Federal Trade Commission Study of Pharmacy Benefit Managers, National Community Pharmacists Association (June 2022), https://ncpa.org/sites/default/files/2022-06/6b-one-pager.pdf.

Facing this barrage of unfounded lawsuits and investigations, in May 2023 three law firms representing the PBM Defendants retained Dr. Dennis Carlton, a prominent economist affiliated with Compass Lexecon ("Compass"), as an expert consultant in anticipation of future litigation.[3] *See* Exhibit 2 (Engagement Letter); Exhibit 3, Habash Decl. ¶ 4. The engagement letter specifically stated that Dr. Carlton was engaged ███████████████████████████████ ██████ and would work ███████████████████ *Id.* at 1. The letter further noted that Dr. Carlton may ████████████████████ and that ████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████ *Id.* at 1-2. As Dr. Carlton performed his work, the PBMs' outside counsel consulted with him regularly and were informed by his work to advise their clients in anticipation of litigation. *See* Ex. 3, Habash Decl. ¶ 5. Dr. Carlton analyzed certain confidential data that were obtained in consultation with the relevant attorneys and their clients, including data wholly unrelated to the claims in the MDL. Dr. Carlton prepared a report that does not specifically refer to diabetes medications, but rather examines a basket of many

---

[3] Dr. Carlton is the David McDaniel Keller Professor of Economics Emeritus at the Booth School of Business at the University of Chicago. He has served as an expert witness in hundreds of lawsuits, including dozens related to the U.S. healthcare industry. He also previously served as the Deputy Assistant Attorney General for Economic Analysis at the Antitrust Division in the United States Department of Justice from 2006 to 2008. *See* Dennis W. Carlton, Compass Lexecon (last accessed May 29, 2025), https://www.compasslexecon.com/professionals/dennis-w-carlton.

different drugs, the reimbursement terms and contracts between PBMs and pharmacies, and the pricing dynamics of prescription drugs in the U.S. healthcare system generally. *See* ECF No. 522-11. The Carlton Report also broadly examines the practices of PBMs, *see id.*, whereas this case focuses on an alleged insulin pricing scheme between PBMs and drug manufacturers.

The Carlton Report ultimately was released publicly. Ex. 3, Habash Decl. ¶ 6. Draft reports, attorneys' protected communications with Dr. Carlton, and confidential and sensitive underlying data were not publicly released. *See* Ex. 3, Habash Decl. ¶ 7. Similarly, PBM Defendants have not cited to or referred to the Carlton Report in this MDL.

Nonetheless, certain Plaintiffs issued a subpoena to Compass in this MDL on October 4, 2024, before serving discovery requests on the parties. The Compass subpoena seeks a wide variety of privileged documents and work product, including, among other things, "all Documents and Communications related to the Carlton Report," ECF No. 522-3 at 10 ("Subpoena"), Request No. 1, as well as "[a]ll Documents and Communications exchanged between Compass and any PBM Defendant or Manufacturer Defendant relating to" the Carlton Report, Manufacturer Payments, or the At-Issue Drugs. *Id.* at Requests No. 2-8. The Subpoena also requests documents and communications related to Compass's remuneration, a lawsuit between one of the PBM Defendants and the FTC, and certain of Compass's

policies and procedures. *Id.* at Requests No. 9–14. The PBMs asserted various objections to the Requests, including on the basis of privilege. *See* ECF No. 522-5. For that reason and other objections it asserted, Compass declined to produce any documents.

On October 28, 2024, a few weeks after issuing the Compass subpoena, Plaintiffs served document requests on the PBM Defendants. The requests asked for certain claims and rebate data related to diabetes medications—the only products subject to allegations in this case. Plaintiffs acknowledged the need for negotiation between the parties to come to agreement on the scope of the request, stating "[t]he parties shall meet and confer to address the identification, production, and production format for such data, as well as the data fields to be provided." ECF No. 411-1 at 23. PBM Defendants promptly responded to the discovery requests on November 27, 2024, agreeing to meet and confer with Plaintiffs to discuss the scope of claims and rebate data to be produced and the data fields to be provided. Following several meet-and-confers, and in an effort to satisfy Plaintiffs' discovery requests, the PBM Defendants provided data proposals early in 2025. The PBM Defendants' proposals identified the scope of the available claims and rebate data fields the PBM Defendants agreed to produce.

Instead of providing a counter, Plaintiffs continued to seek discovery from non-party Compass, requesting leave to file a motion to compel on February 28,

2025 (ECF No. 428) and moving to compel on April 25, 2025 (ECF No. 522-1, the "Motion"). In their Motion to Compel, Plaintiffs argue that the claims and rebate data underlying the Carlton Report "lie at the core of this case," (ECF No. 522-1 at 7). Yet Plaintiffs waited over four months to respond to the PBM Defendants' data proposals, identifying purported deficiencies in the PBM Defendants' proposals for the first time on May 23, 2025.

## ARGUMENT

## I.    THE COMPASS SUBPOENA SEEKS EXPANSIVE DISCOVERY THAT IS IRRELEVANT, DUPLICATIVE, OR BOTH.

### A.    Plaintiffs improperly seek overbroad, duplicative data from a third party.

Plaintiffs' Motion focuses heavily on Plaintiffs' demands for "the data the PBMs provided" to Compass. Mot. at 2.[4] Yet Plaintiffs have not explained why they need a third-party subpoena to obtain PBM data, all of whom are defendants in this action who have provided data proposals to the Plaintiffs and are actively participating in discovery. Plaintiffs could obtain the data relevant to this matter by negotiating in good faith with the PBMs without burdening a third party or wasting

---

[4] Plaintiffs' near-myopic emphasis on their data request throughout their brief suggests that it is Plaintiffs' primary focus, all but ignoring the extraordinary breadth of their demands for even more sensitive—and clearly privileged—materials. *See* Mot. at 13 ("The Carlton Report and the data underlying it lie at the core of this case."); *id.* at 15 ("And the data underlying the report— necessary to analyze the accuracy of Defendants' representations—can be produced with zero (or near zero) burden.") *id.* at 18 (describing "the actual PBM-related data and material" as "at the heart of [Plaintiffs'] requests"). The lack of support for the subpoena's other requests is addressed below. *See infra* § I.B.

the parties' collective resources on discovery that will be either duplicative or irrelevant.

There is a reason that in the Third Circuit, non-parties are entitled to greater protection from intrusive and burdensome discovery than parties. "[T]he standards for nonparty discovery require a stronger showing of relevance than for simple party discovery." *Kelley v. Enhanced Recovery Co., LLC*, 2016 U.S. Dist. LEXIS 140147, at *7 (D.N.J. 2016) (granting party's motion to quash nonparty subpoena); *see also Columbus Life Ins. Co. v. Wilmington Trust, N.A.*, 344 F.R.D. 207, 215 (D.N.J. 2023) ("Indeed, the standards for nonparty discovery require a stronger showing of relevance than for simple party discovery.") (internal quotation and alteration omitted). Courts here require that "[t]he party requesting discovery should be able to explain why it cannot obtain the same information or comparable information that would also satisfy its needs, from one of the parties to the litigation." *Rollstock, Inc. v. SupplyOne, Inc.*, 2022 U.S. Dist. LEXIS 82229, at *5 (E.D. Pa. May 6, 2022) (internal quotation omitted).[5] "Discovery from a non-party will be considered

---

[5] PBM Defendants have standing to oppose Plaintiffs' subpoena to Compass because the materials sought are PBMs' confidential information, over much of which they also have a claim of privilege. *See Schmulovich v. 1161 Rt. 9 LLC*, No. 07-597 (FLW), 2007 U.S. Dist. LEXIS 59705 at 5 (D.N.J. Aug. 13, 2007) ("[A] party to the action will have standing to quash or modify a non-party subpoena when it claims a privilege or privacy interest in the information sought from the non-party."); *New Park Entm't L.L.C. v. Elec. Factory Concerts, Inc.*, No. 98-775, 2000 U.S. Dist. LEXIS 531, at *14 (E.D. Pa. Jan.13, 2000) (finding a party had standing to oppose a third party subpoena because the defendant had "some personal right in the requested documentation, i.e., that the documents contain confidential research, development and commercial information."); *Extenet Sys. v. Twp. of N. Bergen*, 2021 U.S. Dist. LEXIS 233875 at *4-5 (D.N.J. Dec. 7, 2021)

unduly burdensome where the information sought has already been or can be obtained from other means." *Housemaster SPV LLC v. Burke*, 2022 U.S. Dist. LEXIS 231075, at *24 (D.N.J. Dec. 23, 2022); *see also Centrix Fin. Liquidating Tr. v. Nat'l Union Int'l Co. of Pittsburgh, P.A.*, 2012 U.S. Dist. LEXIS 179131, at *18 (D.N.J. Dec. 18, 2012) (quashing nonparty subpoenas where information was already available to defendants and thus would be duplicative); *Spring Pharms., LLC v. Retrophin, Inc.*, 2019 U.S. Dist. LEXIS 133316, at *10-11 (E.D. Pa. Aug. 7, 2019) ("Courts are particularly reluctant to require a non-party to provide discovery that can be produced by a party.").

Insofar as Plaintiffs claim to want "data" relevant to their claims, what makes such data relevant is that it comes from the PBM Defendants and bears on the diabetes medications at issue here, not that it is or may have been provided to Compass for another purpose. And assuming that some subset of the data PBMs provided to Compass includes diabetes medication claims, Plaintiffs already know that such data are in the PBM Defendants' possession because *it was the PBMs who provided it to Compass*.[6] There is no reason why Plaintiffs cannot seek any *relevant*[7]

---

(finding that a party had standing to challenge a third-party subpoena because it "asserted a colorable privacy interest" in information sought in the subpoena).

[6] For instance, the Subpoena seeks "all Documents and data that Compass collected, received, reviewed, or relied on," all of which would be in the possession of the PBM Defendants. ECF No. 522-3 at 10, Request No. 1.a.

[7] Given the breadth of the Carlton Report, the data in Compass's possession are not independently relevant to the MDL. The only purposes for seeking these data must be to either pursue a fishing expedition into PBMs commercially sensitive data, or to challenge the opinions in the Carlton

data from a party in this case, rather than from a third-party. Indeed, as Plaintiffs acknowledge, the parties are currently negotiating the scope of the PBMs' data productions following PBMs' proposals months ago. Mot. at 31; ECF No. 493 at 11-12; ECF No. 512 at 6.

Plaintiffs should not be permitted to short-circuit that process by running to a third-party. *Centrix Fin. Liquidating Tr.*, 2012 U.S. Dist. LEXIS 179131, at *19-20 (quashing nonparty subpoenas because information was already available to defendants and thus would be duplicative). Nor should Plaintiffs burden a non-party to produce such information. *See, e.g., Cooper Health Sys. v. Virtua Health, Inc.*, 2009 U.S. Dist. LEXIS 142786, at *9 (D.N.J. July 1, 2009) (denying motion to enforce subpoena where documents could be directly obtained from party defendant rather than third-party subpoena).

Any delay in the production of data in this litigation is of the Plaintiffs' own making. PBM Defendants have repeatedly engaged with Plaintiffs to facilitate a data production, while Plaintiffs have been unresponsive. The Parties started discussions regarding the PBM Defendants' data productions early in 2025, and each of the PBM Defendants provided Plaintiffs with detailed data proposals. Instead of engaging in

---

Report. Because the Carlton Report has not been disclosed in this litigation, it would be a waste of the parties' time and judicial resources to allow Plaintiffs to insert the Carlton Report into this litigation and invite Plaintiffs to challenge the opinions.

those discussions, the Plaintiffs did not respond to the PBM Defendants' data proposals until May 2025, after they had already filed this Motion to compel production from Compass. Plaintiffs' attempt to obtain data from Compass, rather than PBM Defendants, is characteristic of a fishing expedition aimed at sidestepping party discovery and should be rejected.

B.    **Plaintiffs inappropriately seek cloned discovery.**

The Subpoena effectively seeks the duplication of productions from another proceeding—a tactic that has been termed "cloned discovery" and is heavily disfavored by courts. *See, e.g., Travelpass Grp. v. Caesars Entm't Corp*., 2020 U.S. Dist. LEXIS 26558, at * 20 (E.D. Tex. Jan. 16, 2020) (holding that the requesting party is "not entitled to the wholesale reproduction of all of the FTC Documents . . . simply because there may be overlap between the issues in those cases and those in this case"); *King County v. Merrill Lynch & Co*., 2011 U.S. Dist. LEXIS 86775, at *7 (W.D. Wash. Aug. 5, 2011) (denying motion to compel and holding that clone discovery "is irrelevant and immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the subject case" because "without more, the Court cannot ascertain whether the documents requested actually related to Plaintiffs' claims and defenses"); *Chen v. AMPCO Sys. Parking*, 2009 U.S. Dist. LEXIS 71633 at *8–9 (S.D. Cal. Aug. 14, 2009) (denying motion to compel production of all discovery taken in state court cases without a

sufficient showing of relevance); *Moore v. Morgan Stanley & Co.*, 2008 U.S. Dist. LEXIS 88300 at *6, 14 (N.D. Ill. May 30, 2008) (holding that "[a] party's requested discovery must be tied to the particular claims at issue in the case" and that "just because the information was produced in another lawsuit . . . does not mean that it should be produced in this lawsuit").

Underlying the cloned discovery case law are two related concerns—introducing irrelevant materials and wasting the parties' resources sorting through duplicative discovery. Both of those concerns are present here. As discussed above, the Subpoena's requests for data about PBMs' rebate contracting overlap with Plaintiffs' discovery requests in this case, and therefore will result in unnecessary and confusing productions of multiple versions of the same data. To the extent the data would not be duplicative, they are almost certainly irrelevant. Even assuming the requests have the mere possibility to yield *some* relevant materials is not sufficient. Plaintiffs must demonstrate that the documents sought are sufficiently tied "to the particular claims at issue" here, and they cannot meet that burden. *Moore*, 2008 U.S. Dist. LEXIS 88300, at *6, 14 (holding that production of the cloned discovery would be unduly burdensome).

Plaintiffs further argue that PBM Defendants' objections "must be measured against the substance of what is being sought." Mot. at 32 (quotations omitted). The truth of that contention cuts directly against Plaintiffs' arguments. The Subpoena

seeks data and information provided to Compass to aid in the PBMs' response to the FTC's 6(b) order involving the PBM industry as a whole—a broad survey of the role of PBMs in drug pricing.[8] What's more, unlike this MDL, the 6(b) study related to a wide variety of drugs from a variety of manufacturers and other information relating to PBMs' relationships with pharmacies, which are beyond the scope of this MDL.

Given the expansive, industry wide scope of the 6(b) order and Dr. Carlton's engagement, Plaintiffs' Subpoena is overbroad and seeks the production of a significant amount of information outside the scope of discovery in this matter. *King County*, 2011 U.S. Dist. LEXIS 86775, at *7 (denying motion to compel because "without more, the Court cannot ascertain whether the documents requested actually related to Plaintiffs' claims and defenses."); *Travelpass Grp.*, 2020 U.S. Dist. LEXIS 26558, at *20 (holding that the requesting party is "not entitled to the wholesale reproduction of all of the FTC Documents . . . simply because there may be overlap between the issues in those cases and those in this case"). Accordingly, Plaintiffs' attempt to avoid party discovery and obtain a wide swath of irrelevant data and other discovery from a third party should be rejected. To the extent the PBM Defendants provided information related to insulin and diabetes medication pricing to Compass

---

[8] FTC Launches Inquiry Into Prescription Drug Middlemen Industry, FTC (June 7, 2022) https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drug-middlemen-industry (describing the 6(b) as relating to "pharmacy benefit managers' role at the center of the U.S. pharmaceutical system" unrelated to any particular drug).

(which would only be a small subset of that data given the scope of the 6(b) study), that information should be sought directly from the PBM Defendants.

### C.    The Subpoena seeks irrelevant and premature expert discovery.

PBM Defendants have not relied on the Carlton Report in this MDL and have not yet disclosed any expert witnesses, much less Dr. Carlton. The schedule for expert discovery in this case has not yet been set, nor has any trial date. *See* Case Management Order # 10 (ECF No 198). So, the Subpoena targets information related to an undisclosed expert report (*i.e.* not fact discovery), thereby prematurely inserting irrelevant expert discovery into this litigation.

Insofar as the Subpoena seeks categories of documents to which a plaintiff ever would be authorized, it is fundamentally a matter of expert rather than fact discovery—such as Plaintiffs' request for all documents Compass "relied on" in preparing the Carlton Report. *See* ECF No. 522-3 at 10, Request No. 1.a. Because expert discovery in this case has not yet begun, *any* requests for expert materials are premature. *See, e.g.*, *Hendrych v. Sheltair Aviation LGA, LLC*, 2019 U.S. Dist. LEXIS 116441, at *4-5, 9-10 (W.D. Pa. July 12, 2019) (denying motion to compel expert report and related documents because expert discovery had not yet begun and the report's author had not yet been designated as an expert).[9] And unless and until

---

[9] *Accord*, *MSP Recovery Claims v. Sanofi-Aventis U.S. LLC*, No. 2:18-cv-2211 (BRM)(LHG), 2022 U.S. Dist. LEXIS 243771, at *59 (D.N.J. Feb. 8, 2022) (Cavanaugh, S.M.) (denying in part motion to compel because "the information sought will be the subject of expert testimony"); *McVicker v. Comacho*, 2022 U.S. Dist. LEXIS 255746, at *7 (W.D. Pa. May 2, 2022) (denying as "premature"

Dr. Carlton is designated as a testifying expert in this case, the documents sought by Plaintiffs are protected by FRCP 26(b)(4)(D) [10] because Dr. Carlton is a consulting expert to the PBMs and their counsel.[11]

But more importantly, the Subpoena also seeks documents that would go well beyond what Plaintiffs would be entitled to obtain even in expert discovery. Fed. R. Civ. P. 26(b)(1). For example, the Subpoena requests "all documents and communications" between Compass and the PBM Defendants regarding a broad swath of topics, including the Carlton Report, Manufacturer Payments, and At-Issue

---

motion to compel production of documents where they related to expert discovery); *Phillips v. C.R. Bard, Inc. (In re Grassi)*, 2013 U.S. Dist. LEXIS 178528, at *5 (D. Mass. Dec. 13, 2013) (granting motion to quash subpoena because "plaintiff should have waited until after the deadline to designate experts"); *Perry v. United States*, 1997 U.S. Dist. LEXIS 23875 at *11 (N.D. Tex. Feb. 4, 1997) (granting motion for protective order regarding non-testifying expert when expert discovery had not yet begun); *FTC v. Kroger Co.*, 2024 U.S. Dist. LEXIS 97032, at *8 (D. Or. May 31, 2024) (denying motion to compel responses to interrogatories because they "prematurely seek expert discovery.")

[10] Plaintiffs also argue that Rule 26(b)(4)(D) does not apply because Compass was not engaged in anticipation of litigation, and that such protections were waived by publication of the Carlton Report. Mot. at 28–31. As discussed in Section II., *infra*, those arguments should be rejected.

[11] Contrary to Plaintiffs' argument, courts in the Third Circuit apply the protections of Rule 26(b)(4)(D) to document requests as well as interrogatories and depositions. *See, Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 2019 U.S. Dist. LEXIS 17553, at *3-4 (D.N.J. Jan. 23, 2019) (applying 26(b)(4)(D) protections to deny motion to compel production of documents); *Grant St. Group, Inc. v. Realauction.com, LLC*, 2011 U.S. Dist. LEXIS 154876, at *12-13 (W.D. Pa. Sept. 30, 2011) (same); *Stewart Title Guar. Co. v. Owlett & Lewis, P.C*, 297 F.R.D. 232, 240 (M.D. Pa. 2013) (same). Plaintiffs cite a single contrary case from the Third Circuit, but the language they rely on is merely dicta, not the holding. Mot. at 27. In *Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*, defendants sought to modify a protective order to require disclosure of the names of experts to whom any party sought to share AEO-designated information or documents. 2016 U.S. Dist. LEXIS 200346, at *4 (D.N.J. Nov. 29, 2016). The court merely held that Rule 26(b)(4)(D) did not apply to an application to modify a protective order. *Id*. at *8-9. Accordingly, unlike Plaintiffs claim, that case does not operate to deny the protections of Rule 26(b)(4)(D) to document requests.

Drugs. ECF No. 522-3 at 10, Request No. 3–5. But the cases on which Plaintiffs primarily rely hold that parties are entitled only to materials relied upon, *i.e.* data— not to every communication between the parties and their experts. *See In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 474–75 (S.D.N.Y. 1996) (Court did not order productions of drafts and other documents that were beyond materials the expert relied upon); *Advanced Micro Devices, Inc. v. Intel Corp.*, 2008 U.S. Dist. LEXIS 125410, *37 (D. Del. Mar. 6, 2008) (only compelling production of the expert's report and "underlying documents"). In other words, even if Plaintiffs might be entitled to a subset of the data underlying the Carlton Report because he had been disclosed as an expert in this litigation, they would not be and are not under any circumstances entitled to Compass's external communications, such as those between the PBM Defendants and Compass, or to internal communications at Compass. *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. at 474–475.

Even in that circumstance, Plaintiffs only would be entitled to the materials underlying the expert opinions to be provided *in this litigation*.[12] Plaintiffs' Subpoena asks for the data underlying the Carlton Report, which has not been adopted, disclosed, or otherwise used at all in this litigation, and is broader in scope

---

[12] To that end, Plaintiffs' Subpoena functions as inappropriate gamesmanship as its breadth and scope effectively serves to foreclose Dr. Carlton from serving as an expert in this litigation, which is wholly inappropriate in its effort to prevent the PBM Defendants from choosing who they would use as an expert in this MDL.

in several ways than the issues presented by Plaintiffs in this case. Plaintiffs advance no supportable basis for needing information underlying the Carlton Report that would not be ultimately disclosed in an expert report in this litigation. Allowing Plaintiffs broad discovery into the Carlton Report would therefore result in burdensome production of irrelevant materials. Plaintiffs must instead wait until an expert is disclosed in this case, and, at that time, they will be able to receive expert materials relied upon in this litigation.

## II. PLAINTIFFS ARE NOT ENTITLED TO MATERIALS THAT ARE PRIVILEGED, ATTORNEY WORK PRODUCT, OR OTHERWISE PROTECTED FROM DISCLOSURE.

While Plaintiffs' Motion pervasively characterizes the Subpoena as seeking the "data" underlying the Carlton report, the Subpoena, in fact, seeks much more. The Subpoena also asks for privileged communications between PBMs and Compass, which were primarily with the PBMs' outside counsel in anticipation of litigation, including with the FTC. The Subpoena also asks for materials, such as draft reports and notes, that are clearly attorney work product and are outside the scope of expert discovery under FRCP 26. The Court should decline Plaintiffs' attempts to get to materials that are privileged or otherwise protected by obscuring those requests as part of their efforts to obtain data or other non-privileged documents.

A.    **The Subpoena seeks information that is privileged and protected under the work product doctrine.**

The attorney-client privilege "protects communications between attorneys and clients from compelled disclosure." *In re Teleglobe Comms. Corp.*, 493 F.3d 345, 359 (3d Cir. 2007). The privilege applies to "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." *Id.* (citing Restatement (Third) of the Law Governing Lawyers § 68 (2000)). That privilege extends beyond just attorneys and clients; a party may allow disclosure to an 'agent' assisting the attorney in giving legal advice to the client without waiving the privilege. 8 Wigmore, Evidence § 2301 at 583 (McNaughton rev 1961); McCormick on Evidence § 92 at 188 (West 1972).

The attorney-work-product doctrine protects "documents and tangible things [] prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3). That "protection extends to both tangible and intangible work product," and "beyond materials prepared by an attorney to include materials prepared by an attorney's agents and consultants." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003). "Indisputably, the work-product doctrine extends to material prepared or collected before litigation actually commences." *In re Grand Jury Investigation*, 599 F.2d 1224, 1229 (3d Cir. 1979).

Attorney work product that reflects the mental impressions, conclusions, opinions, or legal theories of an attorney or representative, also known as "opinion

18

work product" is "the most sacrosanct of all forms of work product," *In re Grand Jury*, 599 F.2d at 1231, and "is accorded an almost absolute protection from discovery because any slight factual content that such items may have is generally outweighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases," *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985).

Both the attorney-client privilege and the work-product doctrine protect materials underlying the Carlton Report here. Plaintiffs' subpoena seeks broad categories of information, including "Documents and *Communications* exchanged between Compass and any PBM Defendant relating to the Carlton Report." ECF No. 522-3 at 10, Request No. 3 (emphasis added). That information is protected by the attorney-client privilege. Dr. Carlton was retained by the PBMs' outside counsel (not by the PBMs themselves) and all of his work was performed at the direction of those counsel. Thus, Plaintiffs' request for communications between Compass and "any PBM Defendant" amounts to a demand for communications with the PBMs' outside counsel. Such communications, especially between attorneys and their expert consultant related to forthcoming litigation, are squarely privileged as they would

19

reveal "the mental impressions, conclusions, opinions, or legal theories of an attorney." *Sporck*, 759 F.2d at 316.[13]

Plaintiffs also ask for the "drafts, memoranda, reports, and any other work product generated relating to the Carlton Report." ECF No. 522-3 at 10, Request No. 1. It is hard to imagine something that is more clearly seeking protected work product than a request for the "work product" of a retained expert working at the direction of outside counsel in anticipation of litigation. And "drafts" in particular are sensitive documents that reveal protected mental impressions, which is why drafts are explicitly protected from disclosure by Rule 26, "regardless of the form in which the draft is recorded." Fed. R. Civ. P. 26(b)(4)(B).

Plaintiffs do not dispute that the materials requested in their Subpoena are privileged work product if prepared with an eye toward and in anticipation of litigation. But Plaintiffs insist that the Carlton Report was prepared as a public relations document. Mot. at 16-20. That is incorrect. Dr. Carlton's engagement letter is clear: he was retained in anticipation of litigation, including any litigation

---

[13] Moreover, Plaintiffs' request for all data provided to Dr. Carlton for his analysis also would reveal work product. "In selecting and ordering a few documents out of thousands counsel could not help but reveal important aspects of his understanding of the case. Indeed, in a case such as this . . . the process of selection and distillation is often more critical than pure legal research." *Sporck*, 759 F.2d at 316. So too here, where counsel's decisions regarding what scope of certain data to provide to Dr. Carlton, and counsel's communications with Dr. Carlton to help determine the appropriate scope of data necessary for his work, would reveal aspects of counsel's thinking about pending and future litigation.

stemming from the FTC's 6(b) order.[14] His work was to be ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ Ex. 2 at 1-2. Courts routinely credit such engagement

letters in determining whether the privilege attaches to retention of a third-party. *See,

e.g.*, *Sandra T.E. v. S. Berwyn Sch. Dist.*, 600 F.3d 612, 619 (7th Cir. 2010); *Sullivan

v. Warminster Tp.*, 274 F.R.D. 147, 151-53 (E.D. Pa. 2011).

Plaintiffs rely on two pieces of evidence to argue that the Carlton Report was

prepared as a "press release": (1) a post-publishing comment made by OptumRx

online, and (2) a short comment in the report stating that it could "inform the

extensive debate that has formed around this topic." These are factual statements

related to why the Carlton Report was ultimately *released*, but they do not speak to

why Dr. Carlton was retained or why he prepared the report. The engagement letter

speaks to the contemporaneous purpose of those communications: to prepare for

litigation.

Plaintiffs' primary authority, *Guiffre v. Maxwell*, 2016 U.S. Dist. LEXIS

58204 (S.D.N.Y. May 2, 2016), is inapposite. There, a defendant hired both a public

---

[14] Plaintiffs claim, in a footnote and without citation, that the "PBM Defendants have expressly stated that Compass was not retained in anticipation of" the litigation against the FTC. Mot. at 18 n. 10. That is incorrect. When Plaintiffs asked which litigations the PBMs anticipated when they engaged Compass, the PBMs pointed to the FTC study. *See* ECF No. 522-9 at 2-3.

relations firm and an attorney and communicated with both simultaneously regarding "something between business and personal advice, neither of which are privileged even when coming from counsel." *Id.* at *26. Here, by contrast, the PBMs' outside counsel retained Compass with an eye toward litigation and to support counsel in preparing for that litigation, and with a retainer letter that specifies all work was intended to be privileged.

There is no serious dispute that the communications underlying the Carlton Report are protected by the attorney-client privilege and the attorney-work-product doctrine. The PBMs' outside counsel retained Dr. Carlton in anticipation of litigation and exchanged communications with him to aid his data analysis (including interim drafts of the analysis), which illustrated their legal strategy and aided outside counsel in representation of their PBM clients. Such documents are at the heart of the attorney-client and work-product privileges. "[C]ore opinion or work product receives greater protection than ordinary work product and is discoverable only upon a showing of rare and exceptional circumstances." *In re Cendant Corp.*, 343 F.3d at 658. The PBMs have met their burden to show the hiring of Compass and communications concerning that engagement were in anticipation of litigation and thus privileged and protected.

B.    **The PBM Defendants Have Not Waived Privilege.**

Plaintiffs also assert that the PBMs waived privilege protections over the information Plaintiffs seek when they released the final report. Mot. at 20-25. Their arguments are unpersuasive. Indeed, taken at face value, Plaintiffs' position would eviscerate common-place privileges that underpin our legal system. For example, an opposing party would not be entitled to production of privileged communications regarding securities filings—drafted by attorneys—simply because the filings are filed with the Securities and Exchange Commission. Nor would a party be entitled to privileged drafts of opposing counsel's briefs, simply because the attorneys file the final on the docket. So too here—the public release of a report does not mean Plaintiffs are entitled to privileged documents exchanged in the drafting of the report.

At its core, Plaintiffs' argument is that the PBMs' disclosure of the final Carlton Report, either publicly in the media, by citing it in a complaint (in litigation unrelated to this MDL), or by citing it to a government considering legislation, constitutes a subject-matter waiver of all documents related to the report. But that is not the law. Plaintiffs' argument is, at most, a "partial waiver," argument, which occurs when a party discloses a portion of privileged materials but continues to assert privilege over other, related materials. *See Ziner v. Cedar Crest Coll.*, No. 04-3491, 2006 U.S. Dist. LEXIS 34858, at *16 (E.D. Pa. 2006) (holding that disclosure of an investigative report did not waive work product protection over "underlying notes,

communications . . . and documentary compilations" related to the report). The context matters, and the facts here firmly support no finding of waiver of the materials related to Compass's analysis, as any "waiver" via the publishing of the Carlton Report was extrajudicial, rather than in this litigation.

Indeed, while Plaintiffs curiously state that the "Carlton Report and the data underlying it lie at the core of this case," Mot. at 13, the Report has played no role whatsoever in this case to date. No PBM has invoked the Carlton Report in this litigation; rather, Plaintiffs' motion to compel is the first time it has arisen. In these circumstances, courts have held that extrajudicial disclosure of otherwise privileged documents does not create a broader waiver. *See In re von Bvlow*, 828 F.2d 94, (2d Cir. 1987) (holding that "extrajudicial disclosure of an attorney-client communication—one not subsequently used by the client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication"); *O'Kinsky v. Perrone*, 2012 U.S. Dist. LEXIS 146194, at *6 (E.D. Pa. Oct. 11, 2012) ("Thus, because this is a case of an extrajudicial disclosure of an attorney-client communication that plaintiff is *not* affirmatively using in this litigation to his adversaries' prejudice, plaintiff does not waive the privilege as to all other undisclosed communications."); *In re Linderboard Antitrust Litig.*, 237 F.R.D. 373, 388-89 (E.D. Pa. 2006) ("[C]ourts have also held

that disclosure of a report—something equivalent to [a] White paper—does not require disclosure of documents memorializing the underlying facts.").

Even if there were a "partial" waiver, no further disclosure is warranted. Publication does not entitle Plaintiffs to communications between the PBM Defendants and Compass, or to internal Compass communications, or to communications between counsel for PBM Defendants and Compass. *See JPC Merger Sub LLC v. Baker Eng'g & Risk Consultants, Inc.*, 2013 U.S. Dist. LEXIS 84979, at *12–13 (D.N.J. June 18, 2013) (denying request for production of communications between the opposing party and its consulting experts). Additionally, the Third Circuit has held that the scope of any waiver must be limited to what is necessary to eliminate any *unfair advantage* to the opposing party. "[W]hen the disclosure does not create an unfair advantage, courts typically limit the waiver to the communications actually disclosed." *In re Teleglobe*, 493 F.3d at 361. In determining the scope of any waiver, the "touchstone is fairness." *Id.* Plaintiffs do not claim that Defendants have obtained any unfair advantage from the release of the Carlton Report. Nor could they. As discussed, Dr. Carlton has not been named an expert in *this* litigation. Nor have the PBM Defendants otherwise cited to or referenced the Carlton Report as a source of information upon which this Court should rely. Accordingly, there is no waiver—and in particular not the broad waiver

25

of "all Documents and Communications related to the Carlton Report" that Plaintiffs seek.

*In re Teleglobe* is instructive. In that case, the Bankruptcy Court BCE agreed to produce to the Debtors a certain subset of documents related to the BCE/Teleglobe joint representation, but not all the documents. The Third Circuit found no implied waiver of the remaining documents because BCE "agreed to produce documents falling within its understanding of the representation" and the Debtors have not argued any "improper benefit" from the limited disclosure. And Plaintiffs do not argue that the PBMs have any unfair advantage or that they are seeking any improper benefit.[15] Accordingly, this Court should find no waiver.

---

[15] Plaintiffs heavily rely on a distinguishable out-of-circuit district court case, *In re Kidder Peabody Securities Litigation*, 168 F.R.D. at 459. But it is distinguishable. That case dealt with a corporate brokerage firm that realized one of its most prominent traders had committed fraud. The brokerage firm hired a law firm to both draft a report upon which it would declare that the trader was responsible for any losses, as well as defend the company in any subsequent litigation. Relying largely on statements made both by the brokerage firm and the law firm at the time of the law firm's retention—and without considering any engagement letter—the Court found that the law firm had been engaged primarily for the purpose of drafting the relevant report, rather than for litigation purposes. That differs from the case here, where the engagement letter specifies that Dr. Carlton was engaged primarily for litigation purposes, and no statements made contemporaneously with Dr. Carlton's retention contradict that. In *Kidder Peabody*, the court also found (partial) waiver of underlying work product, in part because the brokerage firm had specifically relied on the report in question in a plethora of litigations, including the litigation at issue. That differs from the case here too, where the PBMs have not relied on the Carlton Report in this action, have not offered Dr. Carlton as an expert in this action, and cited the Carlton Report only in limited circumstances elsewhere. What's more, the court in *Kidder Peabody* found only a partial waiver of "purely factual" information, which differs in kind from the broad set of documents Plaintiffs demand in their subpoena.

Similarly, Plaintiffs' arguments about using the Report as a "selective waiver" are unavailing. *See* Mot. at 21–22. Selective waiver is only at issue when a party "has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications." *Ziner*, 2006 U.S. Dist. LEXIS 34858, at *16. That does not apply here because the PBMs have not disclosed the privileged communications with Dr. Carlton. Accordingly, there can be no selective waiver as it pertains to the Carlton Report, or the underlying communications, which have not been revealed or cited.

Moreover, the Subpoena requests information, including communications with outside counsel for the PBMs, that necessarily reflects opinion work product. Even in the cases Plaintiffs cite where Courts have found limited waivers, they did so only for factual material relied on in the report—here, the relevant data—and not categorical waivers for other documents, such as internal communications. *See In re Kidder Peabody*, 168 F.R.D. at 473 (limiting a finding of wavier to "purely factual summaries of witness statements" to "avoid any danger that the waiver might encompass core attorney mental processes, for which we are required to demonstrate particular solicitude."); *see also Gruss v. Zwirn*, 2013 U.S. Dist. LEXIS 100012, at *42 (S.D.N.Y. July 10, 2013) (ordering production of only certain factual work product, but not opinion work product, and collecting cases).

## <u>CONCLUSION</u>

For these reasons, the Motion should be denied.

Respectfully submitted,

Dated: May 30, 2025

 */s/ Kelley Connolly Barnaby*
Thomas P. Scrivo
Young Yu
**O'TOOLE SCRIVO, LLC**

Brian D. Boone
Elizabeth Broadway Brown
Kelley Connolly Barnaby
**ALSTON & BIRD LLP**

*Counsel for UnitedHealth Group Incorporated; OptumRx, Inc.; Optum, Inc.; OptumInsight, Inc.; and Emisar Pharma Services LLC*

 */s/  R. Kennon Poteat III*
Kevin H. Marino, Esq.
John D. Tortorella, Esq.
**Marino, Tortorella & Boyle, P.C.**

Enu Mainigi
Craig Singer
R. Kennon Poteat III
A. Joshua Podoll
Benjamin Hazelwood
Daniel Dockery
**Williams & Connolly LLP**

*Counsel for CVS Health Corporation; CVS Pharmacy, Inc., Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; and Caremark, L.L.C., and Zinc Health Services, LLC*

*/s/ Jason R. Scherr*
Jason R. Scherr
Elise M. Attridge
Lindsey T. Levy
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
jr.scherr@morganlewis.com
elise.attridge@morganlewis.com
lindsey.levy@morganlewis.com
Tel: (202) 739-3000

*Counsel for Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Medco Health Solutions, Inc., Ascent Health Services LLC, and The Cigna Group*