# EXHIBIT 1



**UNITED STATES OF AMERICA**
# Federal Trade Commission
WASHINGTON, D.C. 20580

Office of Commissioner
Rebecca Kelly Slaughter

# STATEMENT OF COMMISSIONER REBECCA KELLY SLAUGHTER
*Regarding the Use of Compulsory Process and Issuance of*
*6(b) Orders to Study Contracting Practices of Pharmacy Benefit Managers*

June 7, 2022

Yesterday, using its authority under Section 6(b) of the FTC Act, the Commission voted unanimously to authorize a study of the contracting practices of Pharmacy Benefit Managers ("PBMs"). The 5-0 vote underscores the consensus echoed by patients, independent pharmacies, and myriad other stakeholders: Something is rotten in the state of the U.S. pharmaceutical market, and it warrants serious investigation.

PBMs have become unavoidable intermediaries in U.S. pharmaceutical markets between the manufacturers who make prescription drugs and the patients who take them. PBMs contract on behalf of payers—including employers and health insurance companies—with pharmacies and drug manufacturers. Their commercial relationships with these entities affect which prescription drugs patients can access and how much they pay, as well as the profits and losses pharmacies accrue from dispensing prescriptions. The complexity of these systems obscures the root causes of high drug prices, limited prescription drug accessibility, and the demise of independent pharmacies. Untangling these complicated relationships is critical to understanding the rising costs of prescription drugs, the barriers patients face to accessing safe, cheaper alternatives and the incentives PBMs have to disadvantage pharmacies that compete with PBM affiliates.

I am glad the Commission has finally authorized using our Section 6(b) authority to evaluate whether and how PBMs contribute to competitive distortions in pharmaceutical markets. And I am particularly encouraged that the 6(b) study will investigate the urgent problems Americans have encountered in accessing and paying for insulin, among other drugs. At open meetings and listening fora attended by FTC leaders and at other venues, insulin patients have been vocal about the cripplingly high cost of insulin—a heightened burden for patients with high-deductible insurance plans or no insurance at all. In some cases, consumers with insurance have been forced to pay for branded insulin drugs because lower-cost alternatives are not covered under insurance formularies dictated by PBMs.[1] The grave consequences of these apparent distortions in insulin markets subject patients to insulin rationing and can lead to permanent, even fatal consequences. More disturbingly, because diabetes disproportionately affects lower income communities and communities of color, problems in insulin markets also exacerbate disparities in health equity.[2] This is unacceptable.

---

[1] Not all PBMs exclude cheaper alternatives to branded insulin from their formularies, but these occurrences are rare. *See, e.g.,* Paige Minemyer, *Express Scripts Puts Insulin Biosimilar Semglee on Preferred Formulary*, Fierce Healthcare (Oct. 20, 2021). Indeed, I hope that, by pulling back the curtain on what appear to be exclusionary practices, we will incentivize more PBMs to increase consumers' choices to include cheaper alternatives to branded insulins.

[2] *See, e.g.*, Centers for Disease Control and Prevention, *By the Numbers: Diabetes in America*, https://www.cdc.gov/diabetes/health-equity/diabetes-by-the-numbers.html (last visited June 6, 2022).

Americans deserve the benefit of fair competition in U.S. markets for insulin and other prescription drugs. The proposed PBM 6(b) study, therefore, is an important step towards helping the agency identify and understand what roles PBMs play in contributing to the opaque and complex web of challenges that adversely affect price, quality, consumer choice, and competition in the U.S. pharmaceutical market. It is not the only approach we should or will take on these issues; we must also pursue enforcement actions where we find law violations have occurred across the pharmaceutical ecosystem, and we must be vigilant in our approach to pharmaceutical mergers. But, unlike enforcement actions, the information the Commission uncovers in a 6(b) study can—and should—be presented to the public in a final report. This public-facing work product can help inform policy makers, other government agencies, academics, and the many market participants who are working to address punishing drug prices.

I wholeheartedly thank the staff and leadership of the Office of Policy Planning, Bureau of Economics, and Bureau of Competition who have worked diligently to craft the scope and specifications of this comprehensive empirical study. And I would like to particularly thank the former Director of the Bureau of Economics, Marta Wosinska, who laid the critical groundwork for the study we announce today. I look forward to the report the Commission will share with the public on the results of this investigation.