# Exhibit 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**STATE OF NEW JERSEY**
**DISTRICT OF NEW JERSEY**

_____

IN RE: INSULIN PRICING
LITIGATION

_____

CIVIL NUMBER:

2:23-md-03080-BRM-RLS

ORAL ARGUMENT ON CONSTRUCTIVE
NOTICE AND STATUTE OF
LIMITATIONS ISSUES

Frank R. Lautenberg Post Office and United States Courthouse
Two Federal Square
Newark, New Jersey 07102
July 9, 2025
Commencing at 11:00 a.m.

**B E F O R E:**          THE HONORABLE BRIAN R. MARTINOTTI
                         UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

      SEEGER WEISS, LLP
      BY: DAVID R. BUCHANAN, ESQUIRE
          55 Challenger Road
      Ridgefield Park, New Jersey  07660
      For the SFP Class Plaintiffs

      KOZYAK TROPIN & THROCKMORTON, LLP
      BY: BENJAMIN J. WIDLANSKI, ESQUIRE
      2525 Ponce de Leon Boulevard, 9th Floor
      Coral Gables, Florida  33134
      For the SFP Class Plaintiffs

      Proceedings recorded by mechanical stenography.
      Transcript produced by computer-aided transcription.

          **Tammera M. Witte, Official Court Reporter**
              **tammera_witte@njd.uscourts.gov**
                  **(973) 457-8230**

```
 1   A P P E A R A N C E S: - Cont'd

 2

 3       ROBERTS LAW FIRM, PA
         BY: ERICH P. SCHORK, ESQUIRE
 4       1920 McKinney Ave., Suite 700
         Dallas, Texas  75204
 5       For the TPP, PBM & DPP Class Plaintiffs

 6       LISTON & DEAS, PLLC
         BY: WILLIAM LISTON, III, ESQUIRE
 7       605 Crescent Boulevard, Suite 200
         Ridgeland, Mississippi  39157
 8       For the State AG Plaintiffs

 9       WALSH PIZZI O'REILLY FALANGA, LLC
         BY: LIZA M. WALSH, ESQUIRE
10           LAUREN R. MALAKOFF, ESQUIRE
         Three Gateway Center
11       100 Mulberry Street, 15TH Floor
         Newark, New Jersey  07102
12       For the Defendant Sanofi-Aventis U.S., LLC

13       JONES DAY
         BY: MELISSA L. PATTERSON, ESQUIRE
14           ELIZABETH FASSIH POSSE, ESQUIRE
             WILLIAM D. COGLIANESE, ESQUIRE
15       51 Louisiana Avenue, NW
         Washington, DC  20001
16       For the Defendant Sanofi-Aventis U.S., LLC

17       REED SMITH, LLP
         BY: BY: MELISSA A. GEIST, ESQUIRE
18       506 Carnegie Center, Suite 300
         Princeton, New Jersey  08540
19       For the Defendant, Eli Lilly and Company

20       KIRKLAND & ELLIS, LLP
         BY: RYAN J. MOORMAN, ESQUIRE
21           JASON FELD, ESQUIRE
         300 North LaSalle
22       Chicago, Illinois  60654
         For the Defendant Eli Lilly and Company

23

24

25
```

```
1   A P P E A R A N C E S: - Cont'd

2

3       DAVIS POLK & WARDWELL, LLP
        BY: PATRICK W. BLAKEMORE, ESQUIRE
4       1600 El Camino Road
        Menlo Park, California  94025
5       For the Defendant Novo Nordisk

6       DAVIS POLK & WARDWELL, LLP
        BY: JAMES P. ROUHANDEH, ESQUIRE
7       450 Lexington Avenue
        New York, New York  10017
8       For the Defendant Novo Nordisk, Inc.

9       McCARTER & ENGLISH, LLP
        BY: BRIAN W. CARROLL, ESQUIRE
10      250 West 55th Street, 13th Floor
        New York, New York  10019
11      For the Defendant Novo Nordisk, Inc.

12      ALSTON & BIRD, LLP
        BY: LIZ BROADWAY BROWN, ESQUIRE
13          JORDAN W. EDWARDS, ESQUIRE
        1201 West Peachtree Street
14      Atlanta, Georgia  30309
        For the Defendant Optum Rx
15
        O'TOOLE SCRIVO, LLC
16      BY: YOUNG YU, ESQUIRE
        14 Village Park Road
17      Cedar Grove, New Jersey  07009
        For the Defendant Optum Rx
18
        MORGAN LEWIS, COUNSELORS AT LAW
19      BY: JASON R. SCHERR, ESQUIRE
        1111 Pennsylvania Avenue, NW
20      Washington, DC  20004
        For the Express Scripts Defendants
21
        WILLIAMS & CONNOLLY
22      BY: NICHOLAS SUELLENTROP, ESQUIRE
        R. KENNON POTEAT, III, ESQUIRE
23      680 Maine Avenue SW
        Washington, DC  20024
24      For the CVS Defendants

25
```

1

<u>I N D E X</u>

2

**ORAL ARGUMENT**                                    **PAGE**

3

MR. MOORMAN                                    6,70
4  MS. BROADWAY BROWN                             29
MR. LISTON                                     40
5  MR. SCHORK                                     47
MR. WIDLANSKI                                  52,73

6

7

8

9

<u>I N D E X   T O   E X H I B I T S</u>

10

11  **EXHIBIT**                                     **IDENT**.

12  Defendants' Exhibit 1                            17
Plaintiffs' Exhibit 1                            52

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  So did I just waste everybody's time and

2    trees by doing this, by just saying:  We can't decide it at

3    this stage of the litigation?  See you in four years once we're

4    ready to do summary judgment?

5           MR. WIDLANSKI:  I certainly hope it's after the

6    four years, Judge.  No, I don't think you did waste anybody's

7    time because I think this is an important exercise.

8           Because I think it is important, and Your Honor is

9    going to and should give guidance to the parties about what it

10   looks like, what that notice might look like.  How the storm

11   warnings can be dissipated.  What storm warnings apply?

12          THE COURT:  Because I don't need plaintiff-specific

13   facts to determine what I deem the date of constructive notice

14   is.  Correct?

15          MR. WIDLANSKI:  Yes and no, Judge, because a large

16   part of the constructive notice test under *Mathews* and under a

17   whole host of cases are individual reassurances that dissipate

18   the storm warnings.

19          What was said by Express Scripts to Albany, CVS to

20   Lake County?  What did they say?  What did they tell them?

21   That's not the due diligence analysis, Judge.  That's the first

22   step.  That's the storm warning step.

23          Only once Your Honor is satisfied that the storm

24   warnings apply, do we move to the second step.  And that's the

25   due diligence analysis that Mr. Moorman was talking about.

1          We agree with the general framework, two-step process.

2   But the first step is incredibly fact specific.  They have been

3   making reassurances for decades.  Do their statements rise to

4   the level of storm warnings as to each and every plaintiff on

5   this side of the table?

6          Judge, we're talking about plaintiffs as varied as the

7   great state of California, and Monmouth County.  The case law

8   is very clear that when you look at storm warnings, you look at

9   how they apply to individual plaintiffs in their individual

10  situation.

11         California is obviously differently positioned than

12  Monmouth County, who is differently positioned than Local

13  Steamfitters Number 3.  These are different entities with

14  different sophistication levels.  They're different posture,

15  differentially positioned.  And they have different access and

16  ability to secure information as part of this process, Judge.

17         When a human resources department of a small county or

18  town engages in an RFP, they have every right to trust what is

19  in that response.  And let me -- I don't want to get too far

20  ahead of myself, Judge.

21         United States Congress and the FTC are still not

22  analyzing the timeline of the defendants.  They are still

23  themselves -- the greatest deliberative body in the world is

24  still not sure --

25         THE COURT:  Maybe.

1          MR. WIDLANSKI:  Maybe, Your Honor.  Well, they put you

2     on the bench, so they did something right.

3          But the greatest deliberative body in the world is

4     still not sure what's happening over there on that side of the

5     table.

6          So to say that Monmouth County, California, and Local

7     No. 4 could have or should have known of this conduct in 2016,

8     Judge, it's simply putting the cart before the horse and it's

9     too soon.  Not to say that we never can; it's just too soon.

10         THE COURT:  So little bit of housekeeping.  The fire

11    alarm is being tested at noon.  No need to evacuate, you can

12    stay here, and we will not get a demerit from the marshals for

13    not evacuating.

14         Correct?

15         Okay.

16         MR. MOORMAN:  Is that your way of keeping us to an

17    hour, Your Honor?

18         THE COURT:  You've already eaten up about 20 minutes

19    of your time.

20         So please disregard the fire alarm at noon.  Not the

21    one at 12:01.

22         Do you have anything you want to say in response to

23    any question I asked or in rebuttal to anything counsel said?

24    If the answer is yes, I'll hear you.  If not, then you can go

25    on to your argument.

1        The question is not could you have discovered and

2    proven your claim.  Right?  We don't hold plaintiffs to the

3    standard of filing a lawsuit once they're certain to win.  The

4    standard for *Merck*, the Third Circuit and other Third Circuit

5    cases is, would the investigation have yielded enough facts to

6    survive a motion to dismiss.  Right?

7        We don't have to hypothesize here whether there were

8    enough facts in the public domain to survive a motion to

9    dismiss.  The 2017 lawsuits brought by consumers, brought by

10   the State of Minnesota, brought by health plans like MSP

11   Recovery did file lawsuits alleging an insulin pricing scheme

12   based on the storm warnings that existed in 2016 and they did

13   survive motions to dismiss before Your Honor.  That's all that

14   is required under the Third Circuit law here.

15       Your Honor, I don't want to rehash all the exhibits in

16   our brief.  We have an appendix detailing all of the examples

17   where the insulin pricing scheme -- the alleged insulin pricing

18   scheme was discussed in the public domain.  That would take me

19   literally hours to do.  I'm sure you and your clerks have spent

20   quite a bit of time going through the voluminous submissions we

21   made.

22       But as you can see on Slide 4, we just highlighted

23   some of the publications that we're discussing the key

24   allegations that plaintiffs make in their complaints now.  It's

25   such a stark contrast to the cases that plaintiffs cite in

1  their briefs.

2         This is not a situation where there was niche trade

3  journals or online blogs reporting about this.  This was

4  reported in the New York Times, the Philadelphia Inquirer, PBS,

5  CBS, Politico, NBC.  These were the loudest storm warnings in

6  any case that we've seen evaluated within this circuit.

7         I want to focus on a couple of, I think, the most

8  prominent storm warnings here.

9         If you go to Slide 5, Your Honor, this is the New York

10 Times Op-Ed "Break Up the Insulin Racket."  And I don't think

11 there's any disputes that, at least I don't understand there to

12 be a dispute, that the public reporting was reporting that

13 insulin prices were increasing; that what was driving the

14 increase in insulin prices were the rebates that plaintiffs --

15 that PBMs demanded from manufacturers, and that manufacturers

16 were allegedly retaining -- PBMs were allegedly retaining a

17 portion of that spread between the list price and the net

18 price.

19         What I hear from, particularly the self-funded payers,

20 is that last part:  Well, that wasn't clear from the storm

21 warnings.  That's just belied by the articles we cited in our

22 brief.

23         You can look at the New York Times article on Slide 5.

24 It says that what's driving the increase in insulin prices are

25 rebates demanded by PBMs.  It says that these look suspiciously

1    similar to kickbacks, something with which we disagree with but

2    that plaintiffs have alleged in this case.

3        And then it says exactly what the self-funded payers

4    allege in this case: it's not clear whether these savings are

5    passed along.

6        It also gives an example of a payer, just like the

7    self-funded payers in the self-funded payer track, who's made

8    that allegation that Express Scripts, one of the defendants in

9    this case, wasn't passing along the rebates that the payer

10   claimed they were entitled to.

11       That is, on all fours, the allegation that the

12   self-funded payers make in this case, loud and clear in one of

13   the most prominent publications in the country.

14       The Philadelphia Inquirer, on the next slide, said the

15   same thing: savings are not necessarily passed on to the

16   client, that's the payer, much less the patients.

17       And if you go to Slide 7, the Boston Globe, it's

18   virtually verbatim with the allegations in the complaints.

19       In contrast with drugmakers, a PBM may classify a

20   rebate it has negotiated as a type of fee, allowing the PBM to

21   keep it, rather than pass it on to the client because the

22   payers allege they get rebates.  That's exactly what the

23   self-funded payers are alleging in this case.

24       Your Honor, as you read the cases on constructive

25   notice, the exercise the Court ordinarily undertakes is an

1          MR. LISTON:  I will suggest, though, to Your Honor

2     that you cannot avoid applying the discovery rules that exist

3     under the law of each of the states.  And those discovery rules

4     require factual knowledge by a plaintiff as to the elements of

5     the causes of action alleged.

6          Now, one of those elements, and I would suggest to the

7     Court the essential element in this case, is the one of

8     causation.  That's going to be the one, I believe, that

9     presents the biggest question for a jury.  Causation.

10         That is why it is our position that the Senate insulin

11    report issued on January 14, 2021, has so much value.  It has

12    value for several reasons.

13         The first thing is, who the speaker was.  Credibility,

14    ethos, if you want to call it that.  It was a bipartisan Senate

15    committee that issued the statement.  It was not a report done

16    by one of the defendants whose profits happened to be

17    threatened by these claims or by an industry trade group that

18    may be connected to the defendants and biased in their favor.

19         And, second, the Senate insulin report was based on

20    actual evidence, not news articles by commentators without

21    data, speculating on what the causes of the insulin price

22    increases are.  The Senate committee obtained the defendants'

23    own documents, analyzed those documents, and then issued a

24    report with its findings based on the content of the

25    defendants' documents.

1          And I am unaware, despite everything -- exhibit,

2    everything the defendants cite, of any instance prior to

3    January 2021, where information that exists in the defendants'

4    documents made its way into the public domain.

5          THE COURT:  So I'm hearing you that that's the date of

6    constructive notice?

7          MR. LISTON:  If the Court is to choose a date, it's

8    the states' position that January 14, 2021, is the earliest

9    possible date.  And it is significant also because it is the

10   date that revealed that all of the assurances -- and there is

11   just as an extensive a record of reassurances, misdirection,

12   propaganda, that emanated from the defendants, all of which

13   happens to be false, and we know it's false now, it was all

14   dispelled by the Senate insulin report, including the argument

15   that some legitimate market force was at play, driving insulin

16   prices skyward.  So that's why we think it has tremendous

17   value.

18         Now, on the date that the defendants advocate,

19   November 3, 2016, to be quite candid with the Court, I and the

20   state suggest that it is rather nonsensical to pick a date

21   where governmental inquiries into this issue began, where they

22   began, and not the date that the governmental inquiry had

23   obtained enough information, verifiable information, because it

24   came from them, in which to issue what its findings were.

25         I know Minnesota filed an early case and I've read

1     that complaint very closely.  Minnesota had great instincts.

2     It knew there was a problem somewhere, but it didn't allege

3     what actually was going on.  It did not allege what the Senate

4     insulin report revealed, which was collusion between these two

5     sets of defendants to build a pricing system that was

6     intentionally designed to prevent competition on the price of

7     the drugs and to always force the price higher, which is the

8     primary thing the states contend constitutes a prohibited trade

9     practice.  So it just didn't see that part of the picture; it

10    only saw half of the picture.

11         I suggest that Minnesota case does not provide any

12    other state with enough notice, because states, under their

13    discovery rules, require actual knowledge of the evidence of

14    what the causation is.

15         I have heard a lot of comments about constructive

16    notice being an objective inquiry, but the attorneys who have

17    made those comments proceed to view the exhibits they have

18    offered in a completely subjective way.

19         Their own exhibits are filled with reassurances.

20    Those reassurances were contemporaneous with whatever the

21    commentator of the writer of the article was saying to the

22    point that once you read those exhibits, which I have, they

23    leave you quite confused about who was telling the truth and

24    what is really causing these problems.

25         I went through, in preparation for this, and just

1    picked out a few things.  And at the end of reading everything

2    they offered to the Court in the way of an exhibit, I am

3    convinced there was a tremendous controversy about this issue.

4    But that's all I'm convinced of, because I couldn't reach any

5    conclusion about the real cause until January 2021 when the

6    government spoke to the issue.

7         But here's just a few gems from the defendants in the

8    same mix of information that they're citing today.

9         In 2004, the PBMs were sued by the New York Attorney

10   General.  Their retort to that publicly was that these are

11   meritless allegations.  We have saved the state of New York

12   $2 billion over the last 10 years.

13        In 2015, Novo Nordisk blamed insulin price hikes on

14   increasing demand, which we now know because of the Senate

15   report that was not the case.

16        In 2016, all the manufacturers contended that the

17   insulin price hikes were necessary to fund the research and

18   development, and they made that statement over and over

19   throughout the period we're talking about.  We now know,

20   because of the Senate insulin report, that that was not the

21   case.

22        In 2016, Express Scripts started the blame game by

23   pointing the fingers at the manufacturers saying they have,

24   quote:  Broken a historical social contract to price their

25   products reasonably.

1        In 2016, multiple times thereafter, Eli Lilly came up

2    with this argument, it doesn't really make any sense, blaming

3    the prices that they set for their products on changes in

4    insurance plan designs and higher deductibles, and they

5    repeated that argument over and over for a number of years.

6        In 2016 and thereafter, there was a constant refrain

7    from the manufacturers.  And they still say it today; you heard

8    it today that, despite the list price increases in insulin,

9    their net prices have not increased.  They have stayed flat.

10   They have remained the same.

11       Your Honor, that's completely false.  And we know it's

12   false now.  And we began to appreciate how false it was when we

13   read -- guess what? -- the Senate insulin report which

14   addressed that very issue.

15       And now that we have their data in the case, we know

16   it's absolutely false, because it's contrary to their own data.

17   There were blanket denials in 2016 about the Senator

18   Sanders/Representative Cummings letter which it was the initial

19   request for a government inquiry.

20       In 2017, the defendants responded with denials and

21   words like "false premise" to the initial insulin lawsuits that

22   were filed in this district.

23       THE COURT:  All of this, doesn't that give rise to

24   storm warnings?

25       MR. LISTON:  According to the *RenovaCare* case in this

1    court, it has the opposite effect.  It dissipates the storm

2    warnings.

3         And what it does is it leaves someone trying to

4    determine whether or not they have a viable claim or a state

5    trying to determine can it prove all of its elements, including

6    causation, utterly and thoroughly confused.  So a state would

7    have to take a risk, like Minnesota did, that, yes, it

8    identified a real problem but it really didn't know what was

9    causing it.

10        They have offered a lot of exhibits, 80 some-odd

11   exhibits.  I would represent to the Court that the record of

12   their reassurances, which are false, are misrepresentative, are

13   meant to misdirect the public about the cause of this problem,

14   is extremely extensive; it's more extensive than any of the

15   cases I have read that discuss dissipation of storm warnings,

16   and it's apt reason for Your Honor to view them as completely

17   offsetting any storm warnings that arose prior to January 2021.

18        Thank you.

19        THE COURT:  January 14, 2021?  No?  Yes?

20        MR. SCHORK:  The class tracks' position is that

21   January 14, 2021, is the earliest possible date that the Court

22   could find to be a constructive notice date.

23        So while I begin, I want to take a step back.  I know

24   that my colleague noted and referenced the fact that we are at

25   the 12(b)(6) stage, and so the burden is extremely high for a

ruling like this.  I think the law in this circuit is clear

that dismissal is only warranted when the facts are so clear

from the face of the complaint that reasonable minds cannot

differ, that the plaintiffs reasonably should have been aware

of the storm warnings.

THE COURT:  But I could do a two-step.  I can say this

is the date.  Now let's address plaintiff-specific

investigation or inquiry.

Right?  Or not even?

MR. SCHORK:  You can make a finding based upon the

complaints, the exhibits thereto, matters in public record or

documents that are integral to the complaint, based upon

constructive notice.  The issue today is whether we pled

ourselves out of court.

I know the defendants have pulled dozens and dozens of

articles over a 15-year time period.  The vast majority of

those -- I know we handled this in our supplemental brief --

are totally irrelevant to the issue with class plaintiffs.  I

think they identified one article that was cited in our

complaint, which in and of itself was insufficient to put

anybody on notice of anything.

Now, to take another step back, for RICO claims, which

I think is the focus of a lot of today's argument, RICO claims

accrue, and constructive notice is consistent with this, at the

time of damage.  So constructive notice is when somebody should

1  designed by the PBM conglomerates that exist in large part to

2  funnel money into the PBMs' pockets and to simultaneously allow

3  the manufacturers to avoid public scrutiny.

4           So, Judge, why does this matter in the context of a

5  constructive notice argument?  Why am I talking about this

6  today?

7           Because the scheme itself is not simply about raising

8  the prices of insulin causing the consumers, the plans, the

9  states different harms, but harms all the same, and accruing

10  massive monetary benefit for the PBMs and manufacturers.

11          That's not all the scheme is about.  The scheme is

12  also about doing so in a manner that defies understanding and

13  explanation.  The scheme itself is intended to cover its own

14  tracks.  It's intended to prevent exposure.

15          Judge, on the first slide I have there, this is of

16  last year.

17          (Fire alarm system test announcement.)

18          MR. WIDLANSKI:  I don't think the alarm likes my

19  argument, Judge.

20          THE COURT:  Go ahead.

21          MR. WIDLANSKI:  Judge, on the first slide you see,

22  this is of last year, the New York Times published an article

23  titled "The Opaque Industry Secretly Inflating Prices of

24  Prescription Drugs."  This is in June of 2024, almost exactly a

25  year ago.

1          And this article, Judge, was the first time that the

2    rebate aggregators -- I believe Ms. Broadway Brown called them

3    the GPOs, which are a big part of this case, this is the first

4    time getting any degree of public notoriety.  And it was worthy

5    of a headline in the paper of record, the most well-resourced

6    investigative unit in the country.  That's a year ago.

7          And not just the media, Judge, has a hard time seeing

8    what is going on.  The 2021 Senate report that my colleague

9    Mr. Liston mentioned has a footnote where it says they didn't

10   receive full and complete compliance in discovery.  They sent

11   out subpoenas and they weren't fully and adequately responded

12   to.

13         The FTC last year said the same thing, Judge.  If you

14   turn to the next page, the FTC actually did file a complaint,

15   right, in September of last year, September of '24.  And that

16   complaint, in many respects, tracks the allegations in this

17   case against the PBMs.

18         Judge, let's talk about this case, because that is why

19   we're here of course.

20         THE COURT:  But aren't you conflating notice and

21   knowledge versus conclusions?  In other words, the Senate had a

22   report, a conclusion.  They didn't get all the information.

23   The New York Times then prints an article.

24         But doesn't that belie the fact that the facts were

25   out there -- Minnesota was ahead of the curve -- that a

1  reasonable person should have known?  With all this reporting,

2  all this press, Senate investigations, Senate reports,

3  shouldn't a reasonable person have known?

4       MR. WIDLANSKI:  Well, Judge, I think there are a few

5  questions inherent in your question.  The first is, what is a

6  reasonable person?  But more importantly, what were they

7  saying?

8       Mr. Liston and Mr. Schork both mentioned reassurances.

9  Judge, I disagree strongly with the suggestion that

10 reassurances are part of step two of the *Mathews* test.  The

11 reassurances are part of step one.

12      Because if there are storm warnings that exist in a

13 vacuum, and then simultaneously, every time there is a storm

14 warning there's an equal and opposite reassurance from the

15 defendants in the media, from -- they published the Carlton

16 report, which is an expert report they paid for and now they

17 won't give us access to in discovery, that says they're doing

18 nothing wrong.

19      Judge, they're out there on their soapbox.

20      THE COURT:  Aren't you arguing the merits versus --

21 they say X, we say Y.  You should know --

22      (Fire alarm system test announcement.)

23      THE COURT:  Shouldn't that raise an inquiry as to --

24 or at least start an investigation, hey, something is going on

25 here?  And for all we know --

1    on my PowerPoint.

2          THE COURT:  I knew I shouldn't have given you a break.

3          MR. WIDLANSKI:  I would have gone back, Judge.  It's

4    somewhere in there.

5          Judge, I think it's important to note that the vast

6    majority of the cases cited by the defendants are securities

7    cases.  They're not RICO cases; they're not antitrust cases.

8          And that's important.  Reasonable investors are

9    differently situated than reasonable plaintiffs.  The *Processed*

10   *Egg Products* litigation identifies this as an issue.  Right?

11         There are -- there is in fact the case, the *Landy* case

12   from SDNY, where a securities claim was kicked on a

13   constructive notice issue but the RICO case survived.

14         And this is important, Judge, because, and *Mathews*

15   identifies this, the difference is subtle but in some cases it

16   can be dispositive between RICO and securities.  And here, I

17   don't think it's that subtle.

18         In securities cases, investors, people that are

19   putting their money into things, they're buying something.

20   They're supposed to be reading prospectuses.

21         THE COURT:  Who are the plaintiffs here?

22         MR. WIDLANSKI:  The plaintiffs?  Well, that's a very

23   good question, Judge.  There's a lot of different kinds of

24   plaintiffs.

25         THE COURT:  Are you saying that the states and the

1  managers are not sophisticated as contrasted to Mr. and

2  Mrs. Jones?

3       MR. WIDLANSKI:  That's not what I'm saying, Judge.

4  What I'm saying is that each one is differently situated and

5  there's an individualized inquiry.  And that's on the next

6  couple of pages, Judge.  There's an individualized inquiry.

7       Yes, it's true that this is an objective standard.

8  But it's an objective standard that is fact-intensive and it's

9  an objective standard that depends a lot on how the individual

10  plaintiff is situated.

11       I do think, Judge, that there is a difference between

12  the HR director of a relatively small county or town and the HR

13  benefits coordinator for Walmart, say.  These are people in

14  different postures.  These are people with different access to

15  information.  These are people with different priorities.

16       The County of Monmouth, who is a plaintiff in this

17  litigation, does not have the wherewithal, frankly, Judge, to

18  devote resources that Aetna or Walmart does.  And so there is a

19  different situation.

20       And, Judge, all of this is just what the Third Circuit

21  is telling us -- and this is on Slide 5 -- that it's a

22  fact-specific and individualized analysis.  *Dongelewicz*.

23       THE COURT:  Isn't that almost like discrete, a step

24  two?  Step one is just, what's the date?  Now let's talk about

25  Walmart versus Monmouth or California versus Monmouth County.

1          MR. WIDLANSKI:  Judge, how do you find what that date

2    is?  You find that date by looking at storm warnings sufficient

3    to put a reasonable plaintiff on notice, and the reasonableness

4    of the plaintiff depends on what kind of plaintiff you are

5    talking about.

6          THE COURT:  That's the specific inquiry.  That's --

7          MR. WIDLANSKI:  Step one.

8          THE COURT:  -- step one is the date is today and you

9    are going to argue that, well, my plaintiff should have known

10   because they thought the fire alarm was for real and they never

11   came into the hearing; therefore, it's not their -- well, let's

12   assume four years ago.  So, yes, I think we're getting

13   plaintiff-specific versus objective.

14         Do you disagree with that?

15         MR. MOORMAN:  Your Honor, plaintiff-specific, I think

16   the plaintiffs had it wrong for a more fundamental reason.

17         THE COURT:  Objectively.  I think I asked you this

18   question in the argument he's making.  The objective answer is

19   this is the date.  Now some plaintiffs may come back and say:

20   We did a reasonable inquiry, diligent inquiry, and this is why

21   we didn't file within this date.

22         MR. MOORMAN:  Yes, that's exactly what *Mathews* said.

23         MR. WIDLANSKI:  No, it doesn't, Judge.  You are quite

24   intuitive.  Cases that the defendants have cited, like *Grant*

25   *Heilman,* which is on page 6, Judge, say that the test for storm

1  all about the list prices.  Taking the self-funded payer track

2  slightly separately from everybody else, we don't pay the list

3  prices.

4      So all these articles, all these articles that say

5  list prices are going up, Mr. Cecchi's complaint in 2017, that

6  was about consumers paying the list price.  The self-funded

7  plans.

8      Monmouth County and Walmart don't pay list price; they

9  hire the PBMs.  They hire them because the PBMs tell us that

10  it's their job to get us the best prices.

11      Judge, that's what we're talking about here.  We're

12  talking about a situation where the defendant PBMs particularly

13  are saying:  It's our job to get you the best prices.  Yeah, we

14  know list prices are going up but it's our job to make sure you

15  guys aren't harmed.  They're still saying that, Judge.  They're

16  still saying that today.

17      That's why -- and they're still doing what we're

18  complaining about.  That's why separate accrual is important,

19  because they're still committing the misconduct.  Judge, even

20  if you do find 2021 as the date, Judge, if you find 1900 as the

21  date that we are all supposed to be on notice, every plaintiff

22  plan that files tomorrow has a four-year lookback period under

23  separate accrual because they're still committing the

24  misconduct.  They're still doing it.

25      Now I don't think you can find 1900.  I don't think

```
 1   you can find 2021 because of the reassurances.  Think about
 2   what happened at the Senate report, at the Senate committee.
 3   You have the CEOs, the C-suite, the leadership of these
 4   companies standing up and saying nothing to see here.  Nothing
 5   to see.  And then you are in the position about, that
 6   DaimlerChrysler speaks about on Slide 8 here, Judge.
 7            (Fire alarm system test announcement.)
 8            MR. WIDLANSKI:  DaimlerChrysler says defendants are
 9   seeking to punish plaintiffs, trusting their word.  That's
10   exactly what we're here about.  Mr. Liston mentioned this.
11            If you go to page 9, Judge, they are taking out
12   articles, taking out ads in the New York Times and the Wall
13   Street Journals.  The very same journals, the publications that
14   they gave you a chart about, they're taking out ads:  We're
15   pharmacists.  We're clinicians.  We're researchers.  We're
16   negotiators.  We're caregivers.  That's not a middleman, that's
17   an advocate.
18            Now, Judge, I don't have great eyes, and this print is
19   kind of small:  We're 18,000 advocates who take pride in being
20   the last line of defense for millions of Americans against
21   rising health costs.
22            This is a perfect example of why reassurances
23   dissipate storm warnings.  They are telling us, simultaneously,
24   you should have sued us a decade ago, and we're helping you.
25            That's hutzpah.  That's nothing but hutzpah, Judge.
```

1    The articles they cite, if you go to page 10 -- Mr. Liston did

2    a great job talking about this -- the articles they cite, all

3    of them contain reassurances.  Page 11, same thing, they

4    contain reassurances.

5         The storm warnings that they talk about, about how

6    list prices are going up, which again is self-funded plans

7    don't pay, list prices are going up, the same articles have

8    reassurances.  And they're not just making these reassurances

9    Judge, in the vacuum, in the ether.  They're saying it to our

10   clients.  And I've talked about that on page 12.

11        Judge, you talked a lot about Mr. Schork, or

12   Mr. Schork talked a lot about --

13        (Fire alarm system test announcement.)

14        MR. WIDLANSKI:  Judge, the prior lawsuits were about

15   list prices and what people paid, the list prices.

16        THE COURT:  Go ahead.

17        MR. WIDLANSKI:  The prior lawsuits were about list

18   prices where people were paying for list prices.  Prior

19   lawsuits were not about mislabeling; they were not about the

20   rebate aggregators.  The PBMs were not defendants.  Yes, they

21   were mentioned in one suit but they were not developed.  And

22   that's what this is all about, Judge.  This is about developing

23   facts.  It's about the creation of a record.

24        I mean, I don't want to get too far into the 2016

25   letter.  I mean quite frankly, Judge, a letter that

1    Senator Sanders saying, Hey, you guys need to look at this big

2    company, they're making too much money, probably not that

3    unique, probably not putting that many people on notice of

4    anything.

5         And it is worth noting, by the way, that the FTC

6    eventually did bring a case.  Right?  They did bring a case

7    against the PBMs last year in 2024, in September of 2024, and

8    that's a law enforcement entity.  Right?  They have subpoena

9    power.  They have the ability to go out and get stuff.

10        THE COURT:  Is that the date?

11        MR. WIDLANSKI:  That could be a date, Judge.  I would

12   be okay with September of 2024.

13        THE COURT:  All right.

14        MR. WIDLANSKI:  I don't think, again, I don't think

15   you can do this right now because of the individualized nature

16   of this.  But if you say, gun to my head, Mr. Widlanski, can I

17   give you that date?  I'll give you that date.

18        Of course they've talked about due diligence.  Right?

19   That's another individualized issue.

20        But tolling, Judge, they have mentioned tolling

21   briefly.  I think it's important to talk about that just for a

22   moment.  There are a lot of different complaints in this case

23   with different state law and tolling is going to be different

24   under each of them.  Maybe there's *American Pipe* tolling with

25   the class case.  There's a lot of tolling going around here,

1    and, yeah, that's not necessarily part of the constructive

2    notice piece but that is still an important part.

3            THE COURT:  That's part two.

4            MR. WIDLANSKI:  Actually I think that would be part

5    three, but yes.

6            THE COURT:  Okay.

7            MR. WIDLANSKI:  But, yes.  The point is, Judge, the

8    constructive notice date right now, without full discovery, is

9    not necessarily going to be as useful to the parties and the

10   Court as a constructive notice date at some point in the future

11   after discovery has been more fulsome and everybody knows what

12   the lay of the land looks like.

13           THE COURT:  What's discovery going to tell us?

14           MR. WIDLANSKI:  What do they tell us?  What do they

15   say?  What were they trying to say?  Were they hiding things,

16   Judge?  I mean, we've asked for custodial files from their

17   public relations departments.  We have third-party subpoenas

18   with Pharma and PCMA, their trade groups.

19           We want to know what the messaging platform or the

20   strategy was.  Well, how much were they trying to hide?  What

21   were they trying to hide?  Why were they trying to hide it?

22   When did they decide they should start trying to hide it?

23   Those are all incredibly important facts, Judge, that are

24   relevant to this inquiry.

25           We talked about separate accrual.  I don't want to

1    talk too much about it.  It's on page 17.  I just think it's

2    important to note that separate accrual absolutely plays a role

3    here.

4         So, Judge, I think I'm almost done unless the alarm

5    goes off again.  I do want to be clear what I'm not saying,

6    because I've said a lot but I want to be clear what I'm not

7    saying, and I'm not suggesting that there's no possible dates

8    that we can find, that Your Honor can find at some point in the

9    future once the record is more developed.

10        It's an incredibly fact-intensive analysis.  The Third

11   Circuit says that.  It's generally inappropriate on a motion to

12   dismiss for all the reasons that my colleagues and I have

13   discussed.

14        And on the face of these complaints, Judge, on the

15   face of these complaints, looking at the articles they have

16   cited and the reassurances that are in the articles they have

17   cited, it's impossible, Judge, to say that there were storm

18   warnings.  It's impossible to say that all of the plaintiffs

19   were equally aware of all the storm warnings, Judge.

20        You know, I'm -- they're still, to this day, taking

21   out these news articles.  They're still defending the Carlton

22   report.  They're saying these things for years.  And now that a

23   group of plaintiffs, plans, unions, states, have had the wool

24   pulled from their eyes and now see clearly, they have the

25   audacity to come in and say -- and it is audacious to come in

1    say you don't have to file a lawsuit until you get civil

2    discovery.  The Third Circuit is, you just have to -- the

3    statute of limitations begins to run when you have inquiry that

4    an investigation is warranted.

5         On the plaintiff-specific differences between the

6    plaintiffs in the self-funded payer tracks.  Plaintiffs'

7    counsel for the self-funded payers put a lot of emphasis on

8    Walmart versus Monmouth County.  That argument was considered

9    and rejected by *Mathews*.

10        This is what the *Mathews* court said expressly:  We

11   reject the proposition that unsophisticated investors should be

12   held to a lower standard than sophisticated investors.  That

13   totally dispels that argument, and that's what *Mathews* says

14   when it talks about the objective inquiry.

15        Your Honor, I think you were getting at this point

16   with one of your earlier questions, but if consumers could

17   figure this all out and file a lawsuit in 2016, why couldn't

18   municipal governments?  Why couldn't big city governments?

19   Right?  It shows that there was sufficient information to

20   conduct an inquiry.

21        Your Honor, Your Honor I think is familiar with the

22   cases we cited in our brief that go to an earlier point I said.

23   Plaintiffs don't need all of the details before they are

24   obligated to file their lawsuit without the limitations period.

25   It's notice inquiry.  It's enough facts to file a complaint,

1    not prove liability.

2         And then, finally, Your Honor, just on this overhang

3    of discovery.  Nothing is going to change the objective step

4    one inquiry with any discovery.  The New York Times said what

5    the New York Times said.  Bernie Sanders wrote what he wrote.

6    The complaints filed in this courtroom were filed in this

7    courtroom.

8         Now in step two, if a plaintiff wants to say,

9    'Notwithstanding those storm warnings I ran into hurdles as

10   part of my investigation,' they have not made that showing.

11   They can make that showing.  But there's nothing that is going

12   to change the record on step one.

13        Thanks, Your Honor.

14        THE COURT:  Counsel, go ahead.

15        MR. WIDLANSKI:  Just one point, Judge.

16        THE COURT:  I saw the yellow pad.

17        MR. WIDLANSKI:  I'm not going to read it, Judge.

18        *Mathews* was 2001 and it was talking about securities

19   cases.  It was talking about investors.  *Dongelewicz*, which is

20   2004, also the Third Circuit, different circumstances, still

21   required extremely fact-specific and individualized.  That's

22   it, Judge.

23        MR. MOORMAN:  That's a class certification decision.

24   *Dongelewicz*, that's not a constructive notice case.

25        MR. WIDLANSKI:  I don't know about that.

1          THE COURT:  Thank you very much for a spirited

2    argument.  I would invite, if you want, a five-page

3    supplemental to be filed no later than next Friday.

4          MR. WIDLANSKI:  Judge, for clarity, that's five

5    pages --

6          THE COURT:  Five pages on that side and five pages on

7    this side.  Ten for me to read.  No exhibits.

8          MR. WIDLANSKI:  None from us.

9          THE COURT:  Just a regular font.

10         Anything further?

11         MS. WALSH:  Judge, for clarification, anything in

12   particular you would like us to address?

13         THE COURT:  Whatever they think is warranted.

14         MS. WALSH:  Great, thank you.

15         THE COURT:  Counsel, thank you very much.

16         For the clients that are here, you've been well served

17   by your lawyers.

18         I appreciate your preparedness and your advocacy and

19   yet civility.  You were smiling back and forth during the

20   arguments and I appreciate that.  And I apologize for the fire

21   alarms.

22         Thank you very much.

23         (Proceedings conclude at this time.)

24

25         -------------------------------------------------

1          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

2

3          I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6

7   /S/ Tammera M. Witte, CCR, CRCR, RMR   Dated this 07/10/2025

8   Official U.S. District Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25