**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW)** |
| | **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *ALL TRACKS AND ALL CASES* | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court are the parties' supplemental briefs,[1] submitted at the Court's request, regarding the issue of constructive notice. (ECF Nos. 533–38.) The parties each additionally submitted a responsive brief on the issue. (ECF Nos. 563–65, 568–69.) The parties appeared before this Court for oral argument on the issue of constructive notice on July 9, 2025. (*See* ECF No. 643.) During oral argument, the Court granted leave for each side (i.e., Plaintiffs and Defendants) to file a post-hearing supplemental brief (*see id.* at 74:1–3), which the parties filed on July 21, 2025 (ECF Nos. 666–67). Having reviewed and considered the submissions filed in connection with the issue of constructive notice, and for the reasons set forth below and for good cause having been shown, the Court determines that the date of constructive notice for all plaintiffs in the *In re Insulin Pricing Litigation* (Dkt. No. 2:23-md-3080) is **January 14, 2021**.

---

[1] The Court requested the parties submit supplemental briefs with regard to defendants' pending Federal Rule of Civil Procedure 12(b)(6) motions to dismiss (ECF Nos. 190, 249, 251) after determining the issue of constructive notice appears across all pending motions. (*See* ECF No. 516 at 9:8–21.)

# I.    BACKGROUND

As the factual and procedural backgrounds of this matter are well-known to the parties, the Court will address only the facts pertinent to this Opinion. This action arises out of Plaintiffs' challenge to Defendants' allegedly unfair and unconscionable pricing scheme for their analog insulin products. There are three groups of plaintiffs: (1) the Class Track Plaintiffs ("TPP Plaintiffs"),[2] the Self-Funded Payers[3] ("SFP Plaintiffs"), and the State Attorneys General[4] ("State AG Plaintiffs") (collectively, "Plaintiffs"). (ECF Nos. 158–60; 190-29; 190-50.)[5] (Dkt. No. 23-cv-20932, ECF No. 17.) Plaintiffs generally categorize each defendant into one of two groups: Manufacturer Defendants[6] or PBM Defendants[7] (collectively, "Defendants"). (ECF No. 158 ¶¶ 4–

---

[2] For purposes of this Opinion, the Class Track Plaintiffs are composed of direct purchaser plaintiffs Local No. 1 Health Fund, Plan of Benefits for the Local No. 1 Health Fund, and Local 837 Health and Welfare Plan. (ECF No. 533 at 1 n.2; *see also* Dkt. No. 23-cv-20932 (ECF No. 17 at 1).) Class Track Plaintiffs FWK Holdings, LLC and Professional Drug Company, Inc. have not joined in this briefing because Defendants have not moved to dismiss their claims on limitations grounds. (ECF No. 533 at 1 n.2.) Plaintiff RDC Liquidating Trust ("RDC") similarly does not join the submission of Class Track Plaintiffs because RDC's claims were tolled pursuant to the *American Pipe* doctrine. (*Id*. (citing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)).)

[3] The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

[4] The State AG Plaintiffs' brief was submitted on behalf of Arizona, Arkansas, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Mississippi, Montana, Oklahoma, Texas, and Utah. (ECF No. 538 at 7.)

[5] Unless otherwise stated, such as in the next parenthetical, all ECF document numbers refer to the master docket (Dkt. No. 23-md-3080).

[6] Manufacturer Defendants are comprised of defendants Eli Lilly and Company ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and Sanofi-Aventis U.S. LLC ("Sanofi") (together, "Manufacturer Defendants").

[7] PBM Defendants include Evernorth Health Inc. (formerly Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions (together, "Express Scripts"); CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark PCS Health, LLC, and

5; ECF No. 159 ¶¶ 4–5; ECF No. 160 ¶ 1; ECF No. 190-29 ¶¶ 5–6; ECF No. 190-50 ¶¶ 5–6; Dkt. No. 23-cv-20932, ECF No. 17 at 1–2.) Plaintiffs contend Manufacturer Defendants, who manufacture the vast majority of insulins and other diabetic medications available in the United States, worked together to artificially and willingly raise their list prices of insulin medications, and then paid an undisclosed portion of that price back to the PBM Defendants in order to gain formulary preference. (ECF No. 158 ¶¶ 4, 12, 17–18; ECF No. 159 ¶¶ 12, 14, 19–20; ECF No. 160 ¶¶ 10–13; ECF No. 190-29 ¶¶ 20, 22, 246; ECF No. 190-50 ¶¶ 19–20, 22, 24; Dkt. No. 23-cv-20932, ECF No. 17 ¶¶ 3, 4, 11–13.) Plaintiffs allege that over the relevant time period, Manufacturer Defendants often raised prices "in lockstep," despite the fact that the cost to produce these drugs decreased during the same time period. (ECF No. 158 ¶ 11; ECF No. 159 ¶ 12; ECF No. 160 ¶¶ 12–14;  ECF No. 190-29 ¶¶ 13, 275–81; ECF No. 190-50 ¶¶ 13, 270–77; Dkt. No. 23-cv-20932, ECF No. 17 ¶¶ 15–16.)

PBM Defendants are pharmacy benefit managers ("PBMs"), or third-party administrators that negotiate drug costs and payments between health insurance providers and drug manufacturers. (ECF No. 158 ¶ 5; ECF No. 159 ¶ 5; ECF No. 160 ¶ 16; ECF No. 190-29 ¶ 6; ECF No. 190-50 ¶ 6; Dkt. No. 23-cv-20932, ECF No. 17 ¶¶ 6, 8–10.) Drug manufacturers set the list prices for their prescription drugs, including insulin. (ECF No. 158 ¶ 11; ECF No. 159 ¶ 12; ECF No. 160 ¶¶ 1, 11; ECF No. 190-29 ¶ 20; ECF No. 190-50 ¶ 20; Dkt. No. 23-cv-20932, ECF No. 17 ¶ 5.) Here, Plaintiffs allege Manufacturer Defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin products so that they could offer rebates as a secret manufacturer payment to PBM Defendants in exchange for preferred

_____

Caremark, LLC (together, "CVS Caremark"); and UnitedHealth Group Incorporated, OptumRx Inc., and OptumInsight, Inc. (together, "OptumRx") (together with Express Scripts and CVS Caremark, "PBM Defendants").

formulary[8] placements, which Plaintiffs contend caused them to overpay for insulin products. (ECF No. 158 ¶¶ 18, 20, 22; ECF No. 159 ¶¶ 18–20; ECF No. 160 ¶¶ 1–2, 18; ECF No. 190-29 ¶¶ 19–22; ECF No. 190-50 ¶¶ 19–22; Dkt. No. 23-cv-20932, ECF No. 17 ¶¶ 30, 172, 196, 337–38.)

Relevant to this Opinion, Defendants filed motions to dismiss Plaintiffs' respective complaints. Pursuant to Case Management Order ("CMO") #6 (ECF No. 128), Manufacturer Defendants and PBM Defendants each filed their own motions to dismiss SFP Plaintiffs' amended complaints under Federal Rule of Civil Procedure 12(b)(6), in part, because Defendants maintained SFP Plaintiffs' claims were untimely (ECF Nos. 249–55). Pursuant to CMO #7 (ECF No. 141), Manufacturer Defendants and PBM Defendants respectively moved for dismissal of State AG Plaintiffs' complaints under Federal Rule of Civil Procedure 12(b)(6), again asserting State AG Plaintiffs' claims were barred by the statute of limitations (ECF No. 190). Finally, Manufacturer Defendants and PBM Defendants moved to dismiss TPP Plaintiffs' First Amended Consolidated Class Action Complaint, asserting TPP Plaintiffs' claims were time barred. (Dkt. No. 23-cv-20932, ECF Nos. 44–46.)

Recognizing the statute of limitations issue affected all three tracks in this multi-district litigation ("MDL"), the Court requested each track file supplemental briefs on the issue of constructive notice. (*See* ECF No. 516 at 9:8–21.) The parties submitted their initial briefs on May 2, 2025 (ECF Nos. 533–38), and their response briefs on May 16, 2025 (ECF Nos. 563–66, 568–69). The parties appeared before this Court on July 9, 2025, for oral argument regarding

---

[8] Formularies are a ranked list of approved drugs that an insurance plan will cover. (ECF No. 158 ¶ 8; ECF No. 159 ¶ 8; ECF No. 160 ¶ 18; ECF No. 190-29 ¶ 7; ECF No. 190-50 ¶ 7; Dkt. No. 23-cv-20932, ECF No. 17 ¶¶ 6–7.) Drug manufacturers offer rebates (and other incentives) to PBMs to gain formulary access for their prescription drugs because they recognize that PBM formularies drive drug utilization. (ECF No. 158 ¶¶ 9, 17; ECF No. 159 ¶ 9; ECF No. 160 ¶¶ 19–20; ECF No. 190-29 ¶¶ 8–11; ECF No. 190-50 ¶¶ 8–11; Dkt. No. 23-cv-20932, ECF No. 17 ¶¶ 12–13, 19.)

constructive notice. (ECF No. 643.) During oral argument, the Court granted the parties leave to file post-hearing supplemental briefing. (*Id*. at 74:1–3.) On July 21, 2025, each side (i.e., Plaintiffs and Defendants) filed a five-page brief presenting any final arguments regarding constructive notice. (ECF Nos. 666–67.)

## II.    LEGAL STANDARD

"The courts in this Circuit follow the 'injury discovery rule' which holds that the limitations period begins to run when a plaintiff discovers, or reasonably should have discovered, its injury—not when a plaintiff learns of facts supporting each element of its RICO claim." *LifeScan, Inc. v. Smith*, Civ. A. No. 17-5552, 2024 WL 4913025, at *3 (D.N.J. Feb. 1, 2024) (citing *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 244–45 (3d. Cir. 2001)); *see also Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 274 (3d Cir. 2013) ("[T]he RICO statute of limitations is 'silent on the issue' of accrual, and for this reason, the general discovery accrual rule applies to a RICO claim, whereby the 'discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.'" (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 149 (2d Cir. 2012))).

"Application of the injury discovery rule to determine when Plaintiffs' cause of action accrued involves both a subjective and an objective consideration: first, whether Plaintiffs had actual knowledge of their alleged injury caused by Defendants; and, second, whether Plaintiffs had 'inquiry notice' of their injuries." *Cnty. of Hudson v. Janiszewski*, 520 F. Supp. 2d 631, 641 (D.N.J. 2007) (citing *Mathews*, 260 F.3d at 250–51). "Inquiry notice 'is not necessarily the point at which the plaintiff would have discovered . . . "facts constituting the violation,"' but rather, 'the point where the facts would lead a reasonably diligent plaintiff to investigate further.'" *In re*

*RenovaCare, Inc. Sec. Litig.*, Civ. A. No. 21-13766, 2024 WL 2815034, at *9 (D.N.J. June 3, 2024) (alteration in original) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 651 (2010)).

Inquiry notice should be analyzed in two steps: "[t]he first step requires that Defendants show the existence of 'storm warnings,'"[9] and at the second step, "the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." *Janiszewski*, 520 F. Supp. 2d at 641 (quoting *Mathews*, 260 F.3d at 252); *see also Del Sontro v. Cendant Corp., Inc.*, 223 F. Supp. 2d 563, 571 (D.N.J. 2002) (same). "Once placed on inquiry notice, [a] [p]laintiff has a 'duty to exercise reasonable diligence to uncover the basis for [its] claims, and [is] held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period.'" *Osio v. DeMane*, Civ. A. No. 05-2283, 2005 WL 8174880, at *5 (D.N.J. July 27, 2005) (third and fourth alterations in original) (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002)). Therefore, the inquiry by this Court is to determine the point at which Plaintiffs should have realized the statements and alleged omissions made by Defendants with respect to the pricing of insulin were in fact fraudulent in nature.

"The existence of storm warnings is a totally objective inquiry. Plaintiffs need not be aware of the suspicious circumstances or understand their import. It is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm

---

[9] Storm warnings "are essentially any information or accumulation of data 'that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.'" *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (quoting *Mathews*, 260 F.3d at 252). "[S]torm warnings may take numerous forms," such as "any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *Mathews*, 260 F.3d at 252 (internal quotations and citation omitted).

warning." *Mathews*, 260 F.3d at 252; *see also Pension Tr. Fund*, 730 F.3d at 272 ("[W]hether information is sufficient to excite storm warnings depends on 'whether a reasonable [plaintiff] of ordinary intelligence would have discovered the information and recognized it as a storm warning.'"). "[A] reasonably diligent plaintiff is on inquiry notice when she would have discovered general facts about the fraudulent scheme by the defendant rather than specific facts about the fraud perpetrated on her." *Pension Tr. Fund*, 730 F.3d at 272. The Third Circuit has held "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id*. at 275.

"Inquiry notice and storm warnings 'only play a supporting role because "the limitations period does not begin to run until the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation, . . . irrespective of whether the actual plaintiff undertook a reasonably diligent investigation."'" *In re RenovaCare*, 2024 WL 2815034, at *9 (alterations in original) (quoting *Pension Tr. Fund*, 730 F.3d at 275). As the Third Circuit has consistently recognized, "[r]eassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns." *In re Merck & Co., Inc. Sec., Derivative, & 'ERISA' Litig.*, 543 F.3d 150, 168 n.14 (3d Cir. 2008) (quoting *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 402 n.16 (3d Cir. 2006)). In determining whether reassuring statements are sufficient to dissipate a storm warning, courts look at "'how substantial are the "reassuring steps"' of management." *In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 515 (D. Del. 2003) (internal citations omitted).

III.    **DECISION**

A. **Parties' Arguments**

1.    **Manufacturer Defendants**

Manufacturer Defendants argue "the public record was sufficient to provide constructive notice no later than 2016." (ECF No. 536 at 1.) First, Manufacturer Defendants assert that "[t]he facts underlying Plaintiffs' claims have long been public knowledge," citing news articles dating as far back as 2002. (*Id*. at 6–9.) Manufacturer Defendants proclaim the "interplay between rebates and formulary access has been widely covered for years," citing a March 2011 study by the Department of Health and Human Services Office of Inspector General ("OIG") concerning PBMs, their formularies, and their methods of rebates. (*Id*. at 7–8.) Manufacturer Defendants contend media coverage of PBMs "intensified in 2015," but that, by 2016, "dozens of news outlets published stories . . . focusing on how these allege dynamics played out with respect to insulin specifically." (*Id*. at 8.)

Should the Court not consider this public record sufficient to put Plaintiffs on notice of their claims, Manufacturer Defendants argue the November 3, 2016 letter from U.S. Senator Bernard Sanders and U.S. Representative Elijah Cummings (the "Sanders-Cummings Letter") urging the Federal Trade Commission ("FTC") and Department of Justice ("DOJ") to investigate insulin pricing, which "cited more than a dozen articles and reports on insulin pricing," constituted a sufficient storm warning. (*Id*. at 9–10.) Manufacturer Defendants note that the Sanders-Cummings Letter "received significant media attention." (*Id*. at 10.) Manufacturer Defendants further rely on arguments made by the plaintiffs in the *In re Direct Purchaser Insulin Pricing Litigation* action made in opposition to the defendants' motion to dismiss, wherein plaintiffs

argued "'the statute of limitation was tolled until November 3, 2016,' when the Sanders-Cummings letter was published." (*Id*. (quoting Civ. A. No. 20-3426 (Mar. 15, 2021), ECF No. 139 at 68).)

Manufacturer Defendants further argue, should the Court not find that storm warnings existed by 2016, "those doubts are erased by the 60-count putative nationwide class action filed on behalf of insulin consumers in January 2017." (*Id*. at 10–11 (citing *Chaires v. Sanofi U.S.*, Civ. A. No. 17-10158, 2017 WL 396254 (D. Mass. Jan. 30, 2017)).) The plaintiffs in that action made substantially similar claims to those made by Plaintiffs here. (*Id*. at 11.) Though this alone should have been sufficient to put Plaintiffs on constructive notice, Manufacturer Defendants further assert this case was covered by major news outlets, including the *New York Times*, *Washington Post*, *Business Insiders*, and *Boston Globe*. (*Id*.) Manufacturer Defendants contend that "[e]ven if there had been no other warnings, the January 2017 consumer lawsuit and national news coverage it generated were more than sufficient to place Plaintiffs on notice of their claims." (*Id*. at 12.)

Moreover, Manufacturer Defendants argue Plaintiffs were on inquiry notice of their claims by 2017 based on "[o]ther public developments, lawsuits, and investigations," including the filing of six federal consumer cases between January 2017 and May 2017. (*Id*. at 12–13.) Manufacturer Defendants further point to April 2019 Congressional testimony which is "feature[d] prominently in every MDL Plaintiff's complaint because—according to Plaintiffs—the Manufacturers supposedly admitted to the 'insulin-pricing scheme' at that hearing." (*Id*. at 13.) Manufacturer Defendants further cite to several Congressional reports and investigations into drug supply and payment chains and insulin pricing, which was covered by national news outlets. (*Id*.)

### 2. PBM Defendants

PBM Defendants argue storm warnings, "in the form of media reports and Congressional inquiries," should have alerted Plaintiffs to their claims at least as of November 3, 2016, but

"certainly *prior* to February 2, 2017." (ECF No. 534 at 3–13.) PBM Defendants rely on a variety of proposed storm warnings in the form of media reports and articles, congressional activity and investigation, and parallel lawsuits beginning as early as 2002. (*Id*.) In support of their argument, PBM Defendants cite to numerous news articles regarding insulin pricing, drug pricing generally, and other lawsuits regarding insulin pricing. (*Id*. at 3–6; *see also* Declaration of Thomas P. Scrivo in support of PBM Defendants' Supplemental Brief regarding Constructive Notice ("Scrivo Decl.") ECF No. 534-1 ¶¶ 3–6, 7–16.)

Despite these earlier reports and articles, PBM Defendants primarily rely on the November 3, 2016 Sanders-Cummings Letter to the DOJ and FTC "requesting that they specifically investigate whether pharmaceutical manufacturers were colluding or engaging in any anticompetitive behavior in setting insulin prices." (ECF No. 534 at 6–9.) PBM Defendants argue this letter is dispositive of constructive notice for two reasons: (1) the letter demonstrates "two congressman had enough public information to call for a DOJ and FTC investigation," meaning Plaintiffs should have known of their claims because they could access the same public information; and (2) the letter sets the "outer bound for constructive notice" because "a public letter from Congress to two law-enforcement agencies" would alert a reasonable person as to their claims "based on the allegations in the letter." (*Id*. at 6.) PBM Defendants point out the plaintiffs in *In re Direct Purchaser Insulin Pricing Litigation* argued, in response to the defendants' motion to dismiss, that "the statute of limitations was tolled until November 3, 2016, when members of Congress initially asked the Federal Trade Commission and Department of Justice to investigate conduct by Defendants related to insulin." (*Id*. at 7 (quoting Civ. A. No. 20-3426 (Mar. 15, 2021), ECF No. 139 at 68).)

If the Court does not find that Plaintiffs had constructive notice as of the Sanders-Cummings letter, PBM Defendants contend the "flood of litigation" following the Congressional demand was sufficient to provide inquiry notice of Plaintiffs' claims. (*Id.* at 9–13.) PBM Defendants first cite to the January 30, 2017 filing of a lawsuit by individual consumers who "filed a putative class action lawsuit against Sanofi, Novo Nordisk, and Eli Lilly in the District of Massachusetts challenging insulin pricing." (*Id.* at 9–10 (citing *Chaires v. Sanofi U.S.*, Civ. A. No. 17-10158, 2017 WL 396254 (D. Mass. Jan. 30, 2017)).) In addition, PBM Defendants point to a lawsuit filed in this District "alleging claims arising out of the same alleged conduct at issue in *Chaires*." (*Id.* at 10–11 (citing *In re Insulin Pricing Litig.*, Civ. A. No. 17-699 (D.N.J. Feb. 2, 2017) (the "IPP Case")).) PBM Defendants contend the plaintiffs in the IPP Case alleged "the very same pricing 'scheme' that Plaintiffs in this MDL now allege," asserting Plaintiffs' "complaints all copy heavily from the allegations in the IPP Case." (*Id.* at 11.)

### 3.    TPP Plaintiffs

TPP Plaintiffs contend the earliest possible date this Court could conclude they had constructive notice of the facts underlying their claims is January 14, 2021—the date the Senate Finance Committee published *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug* (the "Senate Insulin Report"). (ECF No. 533 at 1–2.) TPP Plaintiffs contend "the 89-page Senate [Insulin] Report revealed *for the first time* many facts underlying Defendants' fraudulent scheme to inflate the list prices for Insulin Drugs to fuel Manufacturer Defendants' extraordinary profits while also funding PBM Defendants' ever-increasing demands for bribes in exchange for formulary access." (*Id.* at 2.) TPP Plaintiffs argue the Senate Insulin Report put them on notice of the facts underlying their claims because the report "includes critical details of the

complex and systematic web of pricing strategies that drove up the costs of Insulin Drugs, as well as the surreptitious practices that concealed this illicit behavior." (*Id.*)

Notwithstanding the arguments raised by Manufacturer Defendants and PBM Defendants, TPP Plaintiffs contend:

> Pre-January 2021 statements made in connection with congressional hearings or investigations, prior unrelated cases, media attention, and TPP Plaintiffs' agreements with PBM Defendants were insufficient to place TPP Plaintiffs on constructive notice. Defendants do not come close to carrying their heavy burden to demonstrate that TPP Plaintiffs should be charged with constructive notice before the Senate [Insulin] Report was released.

(*Id.*) TPP Plaintiffs argue this information could not have been known prior to 2021, as "[c]ertainly the Senate Finance Committee would not have waited to publish the Senate [Insulin] Report had the facts underlying Defendants' Insulin Drug Pricing and Kickback scheme had been known earlier." (*Id.* at 3.) TPP Plaintiffs assert they could not have known of the facts underlying their claims as of November 2016 (via the Sanders-Cummings Letter) because "[a] single letter requesting an investigation of certain Manufacturer Defendants was insufficient to put TPP Plaintiffs on constructive notice that PBM Defendants and Manufacturer Defendants were engaged in a fraudulent scheme predicated on the payment of bribes in exchange for favorable formulary treatment." (*Id.* at 3.) TPP Plaintiffs further contend the April 2019 Congressional testimony was insufficient to put them on notice of their claims because PBM Defendants and Manufacturer Defendants each blamed the other while claiming "the rebates and fees they received had nothing to do with the price increases." (*Id.* at 3–4.) TPP Plaintiffs claim "Defendants' misrepresentations, denials, reassurances, and attempts to shift blame in 2019 were insufficient to put TPP Plaintiffs on constructive notice of their RICO and RPA claims." (*Id.* at 4.)

TPP Plaintiffs dispute Manufacturer Defendants and PBM Defendants' arguments that Plaintiffs had constructive notice as of 2017 merely because "a few unrelated insulin pricing cases involving different injuries, claims, defendants, and putative plaintiffs were filed." (*Id.*) TPP Plaintiffs contend "persons and entities cannot possibly be expected to monitor the approximately 347,000 civil cases filed each year in federal courts to determine whether facts alleged in a few cases might be relevant to them." (*Id.*) Moreover, TPP Plaintiffs contend their agreements with PBM Defendants did not provide them notice of their claims, because none of the agreements disclosed that: (1) the list prices were artificially inflated, (2) PBM Defendants were colluding with Manufacturer Defendants to raise prices, or (3) PBM Defendants were receiving bribes and kickbacks related to insulin drugs, all of which are central to the claims asserted in this action. (*Id.* at 5.) Finally, TPP Plaintiffs assert "[t]he statute of limitations begins to accrue when each *plaintiff*, not its counsel, should have known about its injury and resulting claim." (*Id.*)

### 4.    SFP Plaintiffs

SFP Plaintiffs make three arguments regarding constructive notice: (1) the accrual date for Plaintiffs' claims is fact-intensive and therefore not appropriate for resolution on the pleadings; (2) there can be no uniform inquiry notice date for all Plaintiffs because each plaintiff has unique considerations; and (3) any inquiry notice date must be limited to account for reasonable due diligence, tolling doctrines, and the separate accrual rule. (*See generally* ECF No. 535.) Notably, SFP Plaintiffs assert:

> While insulin's rising list prices may have alerted some plaintiffs to their injuries, the PBM Defendants repeatedly represented to self-funded payers that they were protecting them from rising list prices by negotiating rebates and other financial protections. And the self-funded payers suffer injuries beyond inflated prices—including those related to Defendants mislabeling rebates and concealing rebates through rebate aggregators—that were only recently brought to light.

(*Id.* at 2.) SFP Plaintiffs contend the Third Circuit has set such a heavy burden of establishing inquiry notice as a matter of law such that dismissal at the pleadings stage is only appropriate where the statute of limitations affirmative defense is "apparent on the face of the complaint." (*Id.* at 4 (citation omitted).) SFP Plaintiffs highlight considerations unique to each plaintiff, which SFP Plaintiffs argue should be assessed by a jury. (*Id.* at 4–5.) "[E]ven if Defendants could somehow establish a single date on which storm warnings arose for all plaintiffs," SFP Plaintiffs argue each plaintiff would still be entitled to demonstrate it exercised reasonable due diligence, which "requires assessing what each plaintiff did, the obstacles each plaintiff confronted, the information each plaintiff found, and whether that information was enough for each plaintiff to discover its injuries and the sources of those injuries." (*Id.* at 5–6.) SFP Plaintiffs further maintain MDL courts routinely reject statute of limitations defenses at the motion to dismiss stage. (*Id.* at 6–8.) Therefore, "[t]he Court should reserve ruling on constructive notice given the 'extremely fact-specific' nature of the relevant inquiry." (*Id.* at 8 (quoting *Mathews*, 260 F.3d at 250).)

Considering the "extremely fact-specific nature" of the constructive notice inquiry, SFP Plaintiffs assert there cannot be a uniform inquiry notice date to all plaintiffs. (*Id.* at 8–16.) "Unlike other plaintiffs, self-funded payers contract with PBMs for the pass-through of rebates, such that a drug's list price alone tells self-funded payers little about the net costs they will ultimately incur." (*Id.* at 8.) Moreover, "different notice dates apply to different injuries," and SFP Plaintiffs "allege various injuries not suffered by other plaintiffs that must be evaluated separately." (*Id.* at 9.) SFP Plaintiffs argue they lacked any storm warnings because "Defendants, Congress, the media, and other sources suggested that [SFP Plaintiffs] were insulated from rising insulin prices because they received rebates." (*Id.*) SFP Plaintiffs, "unlike other plaintiffs, do not pay a drug's list price—they pay a lower, net price after their PBM's rebates have been passed through." (*Id.* at 10.) PBM

Defendants allegedly reassured SFP Plaintiffs "they were protecting their payer-clients from rising list prices by maximizing rebates," and "denied [SFP Plaintiffs] access to the very information they would have needed to detect their injuries." (*Id.*) Additionally, SFP Plaintiffs "suffered various injuries, including those involving mislabeled rebates and rebate aggregators, that must be analyzed separately. (*Id.* at 13–16.) SFP Plaintiffs "allege that the PBMs further obscured the rebates they received using 'rebate aggregators,' group purchasing organizations affiliated with PBMs—often based overseas—that negotiate rebates on behalf of groups of [PBMs]." (*Id.* at 14.)

Finally, even if they are subject to a uniform inquiry notice date, SFP Plaintiffs contend this date would be subject to three limitations: (1) SFP Plaintiffs would still be entitled to show that they exercised reasonable due diligence and were still unable to discover their injuries; (2) SFP Plaintiffs are entitled to assert various tolling doctrines; and (3) all SFP Plaintiffs are entitled to at least four years of damages from the date they filed suit under the separate accrual rule. (*Id.* at 17–20.)

### 5.    State AG Plaintiffs

State AG Plaintiffs first assert that ten of the thirteen States in the State AG Track "are not subject to any limitations period under the *nullum tempus occurrit regi* doctrine," which is a "common-law rule which exempts States from the operation of statutes of limitation or repose and laches." (ECF No. 538 at 7 (citing *State v. Lombardo Bros. Mason Contractors*, 54 A.3d 1005, 1009 (Conn. 2012)).) In support of their argument, State AG Plaintiffs cite to statutes and case law from each of these ten States that are not subject to any limitations period. (*Id.* at 7–9.) State AG Plaintiffs next contend the States' "claims are preserved by the tolling doctrines of fraudulent concealment, estoppel, and continuing violations." (*Id.* at 9–10.) State AG Plaintiffs maintain the continuing violations and fraudulent concealment tolling doctrine applies in all States, and State

AG Plaintiffs discuss various tolling doctrines that are specifically applicable in various States.[10] (*Id.*)

State AG Plaintiffs further contend that storm warnings alone do not trigger statutes of limitations, but rather "a fact is not discovered until a reasonably diligent plaintiff has sufficient information about that fact to adequately plead it in a complaint with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." (*Id.* at 10 (cleaned up) (quoting *In re RenovaCare*, 2024 WL 2815034, at *9, *11).) Moreover, State AG Plaintiffs assert that "[p]rior lawsuits and media are questionable sources, and facts drawn therefrom may not withstand a Rule 12(b)(6) analysis." (*Id.* at 11–12.) Finally, State AG Plaintiffs argue most of the States' discovery rules require a plaintiff have knowledge of the factual elements of his causes of action, including causation, before the statute of limitations starts to run. (*Id.* at 12–13.) State AG Plaintiffs assert that January 14, 2021, the date the Senate Insulin Report was published ("along with thousands of pages of previously confidential Defendant documents"), "represents the first reliable disclosure of information by which a State could begin to appreciate that skyrocketing insulin prices were caused by the defendants' collective misconduct." (*Id.* at 13 ("Knowledge of this fact from a reliable source was essential to any cause of action which the States ultimately asserted against the defendants in their respective actions.").)

---

[10] The People of the State of California ("California") submitted its own Supplemental Brief Regarding Inquiry Notice (ECF No. 537) because of its then-pending Motion for Remand (*see* ECF No. 486). However, California raises similar arguments to the State AG Plaintiffs, arguing that its claims are saved by the last overt act doctrine, the continuing violation doctrine, and the continuous accrual doctrine. (ECF No. 537 at 2.) Should the Court find that none of these tolling doctrines apply, California argues inquiry notice "is a fact-intensive issue for the jury to resolve." (*Id.* (citing *Rushing v. Williams-Sonoma, Inc.*, Civ. A. No. 16-1421, 2022 WL 2833980, at *5 (N.D. Cal. July 20, 2022)).)

### B. Constructive Notice Date

### 1. 2016 Constructive Notice Date

While Defendants generally maintain Plaintiffs had constructive notice of their claims prior to 2016 (ECF No. 536 at 1–2; ECF No. 534 at 1; ECF No. 563 at 3–7; ECF No. 569 at 6–9; ECF No. 667 at 1–3), Defendants argue Plaintiffs had constructive notice of their claims by 2016 *at the latest* because "the national press had published dozens of articles regarding the supposed 'insulin pricing scheme'" (ECF No. 536 at 5), and the November 3, 2016 Sanders-Cummings Letter "plainly put Plaintiffs on notice of the general facts of the alleged fraudulent scheme on which their claims are based" (ECF No. 569 at 7). Defendants assert Plaintiffs must have had constructive notice of their claims by 2016 because multiple plaintiffs brought similar allegations of misrepresentations in 2017. (ECF No. 563 at 4.)

#### a. *Media Attention*

Defendants generally assert Plaintiffs were on constructive notice of their respective claims by 2016 at the latest (ECF No. 536 at 1; ECF No. 534 at 1) because "the national press had published dozens of articles regarding the supposed 'insulin pricing scheme' and alleging the existence of an insulin 'racket' between Manufacturers and PBMs." (ECF No. 536 at 5; *see also* ECF No. 534 at 3 ("For more than two decades, Congress and the media have addressed the issues underlying Plaintiffs' claims about rising insulin prices, the role of manufacturers and PBMs, rebates, and confidential rebate negotiations.").) Defendants contend Plaintiffs must have had notice of their claims by 2016 because Plaintiffs' complaints parrot the accusations and claims made in those national news articles. (ECF No. 534 at 4; ECF No. 536 at 8 ("Media coverage of these alleged dynamics intensified in 2015, tracking allegations that would appear in future complaints.").) Defendants further cite to Congressional activity, which they argue should have

given Plaintiffs notice earlier than 2016. (ECF No. 534 at 5 (citing a January 1, 2007 report entitled "Prescription Drug Pricing in the Private Sector" published by the Congressional Budget Office ("CBO") and a September 2011 Senate Judiciary Subcommittee hearing regarding the proposed merger of Medco and Express Scripts); ECF No. 536 (citing the January 2007 CBO report, a June 2008 National Library of Medicine report regarding PBM fees, and the March 2011 OIG study concerning the contractual relationships between PBMs and payers).)

Plaintiffs generally argue this Congressional activity and media attention was insufficient to put them on inquiry notice to start investigating their claims. (ECF No. 533 at 4–5; ECF No. 538 at 10–12.) Specifically, SFP Plaintiffs argue media attention could not have given rise to their claims at this time because "most of these articles suggest[ed] that rebates insulated self-funded payers from rising list prices." (ECF No. 535 at 11.) Plaintiffs also argue the consistent mixed messaging, finger pointing, and reassurances from both Manufacturer and PBM Defendants dissipated any potential "storm warning" this Congressional activity and media attention might have otherwise constituted. (*See, e.g.*, ECF No. 564 at 2 ("Throughout their submissions, Defendants conveniently fail to acknowledge their own public misrepresentations, denials, and reassurances that obfuscated their unlawful behavior. Defendants have repeatedly taken the position that Manufacturer Defendants are solely to blame for exorbitant [i]nsulin [d]rug prices and that they are responsible for lowering the cost of Insulin Drugs, while Manufacturer Defendants have claimed that PBM Defendants' demands for rebates are to blame for high Insulin Drug prices." (internal citations omitted)); ECF No. 666 at 3 ("In the face of equivocal reporting, conflicting information, and rampant reassurances, no plaintiff could have been expected to investigate rising list prices[.]").)

The Court agrees the media reports and Congressional activity are insufficient to have put Plaintiffs on constructive notice of their claims by 2016. While it is true the Complaint cites to specific articles to support Plaintiffs' claims (*see* ECF No. 534 at 3–4), it is not apparent from the face of the Complaint that Plaintiffs failed to comply with the limitations period. *See In re Fragrance Direct Purchaser Antitrust Litig.*, Civ. A. Nos. 23-2174, 23-3249, 23-16127, 2025 WL 579639, at *10 (D.N.J. Feb. 21, 2025) ("[A] court in this Circuit may grant a Rule 12(b)(6) motion to dismiss on statute of limitations grounds only if it is apparent from the face of the complaint that the cause of action alleged has not been brought within the statute of limitations."). Plaintiffs contend they were "inundated" with Defendants' "false reassurances by blame-shifting and by misrepresenting the cause of escalating insulin prices." (ECF No. 538 at 4–5.) As this Court has held before, "reassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns." *Merck*, 543 F.3d at 168 n.14; *see also In re RenovaCare*, 2024 WL 2815034, at *10 (same) (citing *Benak*, 435 F.3d at 402 n.16). For example, Plaintiffs assert:

(1) "In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products 'is one way the company helps manage costs for clients'" (Dkt. No. 2:23-cv-20932, ECF No. 17 ¶ 343);

(2) "[I]n 2016, CVS Health announced a new program to 'reduce overall spending in diabetes' that is available in all states, including Montana, stating: 'CVS Health introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, lower pharmacy costs [for diabetes medications] through aggressive trend management and decreased medical costs . . . [and that] participating clients could save between $3000 and $5000 per year for each member who successfully improves control of their diabetes'" (ECF No. 190-29 ¶ 88 (alterations in original));

(3) "[I]n January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts 'saved our clients more than $3 billion through the

Express Scripts National Preferred Formulary" (ECF No. 190-29 ¶ 351);

(4) "In 2017, CVS Health stated that 'CVS Health pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of nearly 10 percent, CVS Health kept drug price growth at a minimal 0.2 percent'" (ECF No. 190-29 at 89);

(5) "On March 12, 2019, OptumRx represented, 'OptumRx is uniquely able to deploy the broadest range of tools to rein in high drug prices, [which] demonstrates our commitment to delivering better prices for consumers'" (ECF No. 190-50 ¶ 432); and[11]

(6) "[I]n April 2019, CVS Caremark President and Executive Vice President of CVS Health, Derica Rice stated, 'Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the members' out-of-pocket spend.'" (ECF No. 190-29 ¶ 351.)

Plaintiffs provided even more examples of these reassurances during the July 9, 2025 oral argument regarding constructive notice, claiming:

In 2004, the PBMs were sued by the New York Attorney General. Their retort to that publicly was that these are meritless allegations. We have saved the State of New York $2 billion over the last 10 years.

In 2015, Novo Nordisk blamed insulin price hikes on increasing demand, which *we now know because of the Senate [Insulin] Report*, that was not the case.

In 2016, all the manufacturers contended that the insulin price hikes were necessary to fund the research and development, and they made that statement over and over throughout the period we're

---

[11] *See also* ECF No. 190-29 ¶ 431 ("Manufacturer Defendants have also publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for CEO Dave Ricks as a panelist at the 2017 Forbes Healthcare Summit included 'Reactive Key Messages' on pricing that emphasized the significant research and development costs for insulin. During the relevant time period, executives from Sanofi and Novo Nordisk also represented that research and development costs were key factors driving the at-issue price increases.").

talking about. We now know, *because of the Senate Insulin Report*, that that was not the case.

In 2016, Express Scripts started the blame game by pointing the fingers at the Manufacturers, saying they have . . . : "Broken a historical social contract to price their products reasonably."

In 2016, multiple times thereafter, Eli Lilly came up with this argument . . . blaming the prices that they set for their products on changes in insurance plan designs and higher deductibles, and they repeated that argument over and over for a number of years.

In 2016 and thereafter, there was a constant refrain from the Manufacturers. And they still say it today; you heard it today, that, despite the list price increases in insulin, their net prices have not increased. They have stayed flat. They have remained the same. . . . that's completely false. And we know it's false now. *And we began to appreciate how false it was when we read . . . the Senate Insulin Report* which addressed that very issue.

(ECF No. 643 at 45:9–46:14 (emphasis added).)

These statements, made by Defendants, are specific and quantifiable, often giving an explicit number of dollars that these entities have saved their clients. *See LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) ("[R]eassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern."). In fact, when Defendants contend Plaintiffs must have had constructive notice in 2016, CVS Health announced the introduction of a new program involving its PBMs and formulary decisions, which CVS Health represented "participating clients could save between $3000 and $5000 per year for each member." (ECF No. 190-29 ¶ 88.)

This Court is not surprised that Plaintiffs relied on these reassuring statements from Defendants, as the pharmaceutical industry is well-known to be complex and confusing. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 170 (1st Cir. 2009) (emphasizing the "complicated billing practices of the pharmaceutical industry"); *New York ex rel.*

*Schneiderman v. Actavis PLC*, 787 F.3d 638, 643 (2d Cir. 2015) (acknowledging the "idiosyncratic market characteristics of the complex and highly-regulated pharmaceutical industry"); *Nelson v. Biogen Idec, Inc.*, Civ. A. No. 12-7317, 2016 WL 3267286, at *4 (D.N.J. June 7, 2016) (addressing plaintiffs' proposed amendment to his complaint, which was "presented against a background of intricate scientific principals and heavy governmental regulation of a pharmaceutical industry where the rules and practices have been changing over time"); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 190–91 (S.D.N.Y. 2009) ("A lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry."). Counsel for TPP Plaintiffs even stated that this "case is about the most complicated and opaque payment flow in the history of the world. . . . It is so complicated that even the defendants themselves, the PBM Defendants themselves, in this litigation have disclaimed the ability to decipher or explain their own internal coding and record-keeping." (ECF No. 643 at 52:18–24.)

Moreover, Plaintiffs argue they hired PBM Defendants to negotiate lower prices on their behalf, and, as evidenced by the statements above, PBM Defendants continually reassured them they "were negotiating on [their] behalf." (ECF No. 643 at 50:10–16.) Put succinctly, "[t]he issue . . . is that the Manufacturers worked hand in hand with the PBMs; that is, the entities that the TPPs hired and trusted to negotiate lower drug prices on their behalf, to raise insulin prices."[12] (*Id.* at 49:23–50:6 (commenting that "rather than working on their clients' behalf as quasi-fiduciaries or fiduciaries . . . the PBMs sold out the TPPs in favor of getting rebates and unearned fees for

---

[12] *See also* ECF No. 643 at 57:6–14 ("[W]e are in a bizarre position . . . where the defendants are taking two completely contrasting positions and [are] diametrically opposed. They are saying 'there's so much information out there . . . there's so much that how could these [Plaintiffs] not have known?' How could they not have known that we are telling the people, 'oh, by the way, we are not terrible people'? 'We are doing everything right. We're out there. We're advocates for you. We're not middlemen. We're advocates.'" (discussing specific reassurances made directly to Plaintiffs and advertisements doing the same)).

themselves").) The Third Circuit has held, "[j]ust as we require investors to act upon public information indicating fraud, so, too, do we allow them to rely upon corporate statements discounting the possibility of malfeasance." *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 350 (3d Cir. 2009).

The Court finds it is not clear from the face of the Complaint that the news articles and studies from 2016 and prior, which were relied upon by Defendants, constituted a storm warning sufficient to constitute inquiry notice. *See Pension Tr. Fund*, 730 F.3d at 277 (holding "despite widely-publicized reports about widespread problems with underwriting standards . . . an investor of ordinary intelligence would reasonably rely on [defendant]'s reassurances that the particular loans [at issue] were not afflicted with the common ailment"); *see also Blue Cross Blue Shield Assoc. v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 551 (E.D. Pa. 2019) ("[W]here there is a mix of information available to the plaintiffs such that any negative statements are tempered by positive statements from a company's management and others, courts have been reluctant to find that the plaintiffs had inquiry notice of their claims." (quoting *In re DaimlerChrysler*, 269 F. Supp. 2d at 514)); *LC Cap. Partners*, 318 F.3d at 155 ("There are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management."); *DoubleLine Cap. LP v. Odebrecht Fin. Ltd.*, 323 F. Supp. 3d 393, 438 (S.D.N.Y. 2018) ("[E]xpress denials of the reported allegations could have allayed a reasonable investor's concerns.").

### b. *November 3, 2016 Sanders-Cummings Letter*

Even without considering the media and news articles, Defendants generally argue the November 3, 2016 Sanders-Cummings Letter to the DOJ and FTC demonstrates Plaintiffs had sufficient notice of their claims by that date. (ECF No. 534 at 6–8; ECF No. 536 at 9–10.)

Defendants argue this letter is dispositive because it demonstrates there was enough public information available for Plaintiffs to know of their claims and sets the "outer bound for constructive notice" because "Plaintiffs cannot possibly contend that a public letter from Congress to two law-enforcement agencies would not 'alert a reasonable person' of claims based on the allegations in the letter." (ECF No. 534 at 6.)

However, as Plaintiffs correctly assert, "the letter does not mention the PBMs, describe the insulin pricing scheme, or reference rebates. It instead suggests potential collusion to fix prices among only the insulin manufacturers." (ECF No. 568 at 9; *see also* ECF No. 666 at 4–5 ("[T]his letter did not reference PBMs, rebates, or net prices and had nothing to do with the scheme alleged here.").) Moreover, this letter specifically called for the FTC and DOJ to "investigate whether pharmaceutical companies manufacturing insulin products have colluded or engaged in anticompetitive behavior in setting their drug prices." (ECF No. 534-1 (Scrivo Decl.) Ex. 5.) Even after a U.S. Senator and U.S. Representative specifically requested the FTC, a federal agency uniquely designed to protect consumers and promote fair competition in the marketplace, investigate potential anticompetitive behavior in the insulin industry, it took the Senate over three-and-a-half years to announce its findings, and it took the FTC until September 20, 2024 (approximately three years after Plaintiffs filed suit) to bring charges against PBM Defendants. (ECF No. 643 at 54:13–17; ECF No. 666 at 5.)

As such, this Court cannot find as a matter of law that Plaintiffs had constructive notice of their claims via the November 3, 2016 Sanders-Cummings Letter. *See In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) ("[A] government investigation, without more, does not trigger a generalized duty to disclose."); *see also In re Merck*, 543 F.3d at 166 (finding—despite an FDA warning letter ordering Merck to send letters to doctors correcting any

false or misleading information, as well as news reports questioning Merck's statements and consumer lawsuits alleging negative effects from its medication—investors were not on inquiry notice of securities fraud).

### c. *Parallel Lawsuits*

Defendants contend Plaintiffs had constructive notice of their claims by 2017, when other plaintiffs "acted on these storm warnings" and filed lawsuits. (ECF No. 667 at 1–2.) Manufacturer Defendants claim that "[b]etween January 2017 and May 2017, consumers filed six cases in multiple federal courts, which were later consolidated with the original suit[.]" (ECF No. 536 at 12 (citing *In re Insulin Pricing Litig.*, Civ. A. No. 17-699 (D.N.J.).) PBM Defendants argue this "flood of litigation was prompted by information already in the public record such as the media coverage and Congressional call for investigation." (ECF No. 534 at 9.)

Though Defendants assert Plaintiffs' complaints mirror those filed in 2017 (*see* ECF No. 536 at 11), the Court finds these similar lawsuits do not give rise to constructive notice. "The mere filing of a similar lawsuit, without more, does not necessarily give 'good ground' because that suit might well be frivolous or baseless." *In re Beef Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979); *see also Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 555 (4th Cir. 2019) ("'[T]he mere availability of open and readily accessible public records'—such as legal filings—'may not suffice by itself to defeat a fraudulent-concealment claim,' particularly if a plaintiff lacks 'ample reason to look at these records.'" (quoting *Ruth v. Unifund CCR Partners*, 604 F.3d 908, 911 (6th Cir. 2010))). As correctly noted by TPP Plaintiffs, the supposedly similar cases cited by Defendants are "unrelated insulin pricing cases involving different injuries, claims, defendants, and putative plaintiffs." (ECF No. 533 at 4); *cf. TIAA-CREF Large-Cap Growth Fund v. Allergan PLC*, Civ. A. No. 17-11089, 2021 WL 4473156, at *8 (D.N.J. Sept. 30, 2021) (explaining the filing of

"substantially similar" claims could put a reasonably diligent plaintiff on notice under certain circumstances, but finding "the more plausible inference is that plaintiffs were not aware of their claims until . . . media reports surfaced indicating that DOJ charges . . . may be imminent").[13] Moreover, "[p]arties to the *Chaires* and other insulin cases . . . may have had access to discovery or other evidence produced in those cases, but others did not" because "the documents were subject to a protective order, and the proceedings were largely sealed." (ECF No. 538 at 3–4.)

This Court cannot find as a matter of law that the prior lawsuits either gave or confirmed constructive knowledge of Plaintiffs' claims. *See In re Mercedes-Benz Anti-Tr. Litig.*, 157 F. Supp. 2d 355, 373–74 (D.N.J. 2001) (rejecting defendants' argument plaintiffs should have been aware of the alleged fraudulent concealment through the filing of a similar lawsuit because "only by operation of a legal fiction could the filing of a private lawsuit by an unrelated party in a different vicinage put consumers on notice as a matter of law that a price-fixing conspiracy was afoot").

### 2.    2021 Senate Insulin Report

Plaintiffs generally argue the Senate Insulin Report released on January 14, 2021 "represents the first reliable disclosure of information by which a State could begin to appreciate that skyrocketing insulin prices were caused by the defendants' collective misconduct." (ECF No. 538 at 13.) This is because "[i]n the face of equivocal reporting, conflicting information, and

---

[13] The Court rejects Defendants' argument (*see* ECF No. 534 at 7; ECF No. 563 at 9; ECF No. 569 at 7) that Plaintiffs in this case should be bound by plaintiffs' admission in *In re Direct Purchaser Insulin Pricing Litigation*, wherein plaintiffs argued against defendants' motion to dismiss that the applicable statute of limitations was tolled until November 3, 2016 "when members of Congress initially asked the [FTC] and [DOJ] to investigate conduct by Defendants related to insulin" (Dkt. No. 2:20-cv-3246, ECF No. 139 at 68). Defendants provide no legal support for their conclusion that Plaintiffs here should be bound by plaintiffs in a separate case, and "federal courts are 'not bound to accept [a party's] concession.'" *See Haybarger v. Lawrence Cnty. Adult Probation & Parole*, 667 F.3d 408, 413 (3d Cir. 2012) (alteration in original) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 87 (1953)).

rampant reassurances, no plaintiff could have been expected to investigate rising list prices until the January 14, 2021 Senate Insulin Report provided clarity." (ECF No. 666 at 3.) Plaintiffs place emphasis on the fact a "bipartisan Senate committee" issued the report, meaning it "was not a report done by one of the defendants whose profits happened to be threatened by these claims or by an industry trade group that may be connected to the defendants and biased in their favor," and the fact that "the Senate Insulin Report was based on actual evidence, not news articles by commentators without data, speculating on what the causes of the insulin price increases are." (ECF No. 643 at 42:10–25.) Plaintiffs also contend the issuance of the Senate Insulin Report "revealed that all of the assurances . . . that emanated from the Defendants" were false. (*Id*. at 43:7–17.)

"Inquiry notice will . . . be triggered when plaintiffs 'should have discovered the general fraudulent scheme.'" *Alaska Elec. Pension Fund*, 554 F.3d at 347 (quoting *In re NAHC*, 306 F.3d at 1326); *In re NAHC*, 306 F.3d at 1326 ("Plaintiffs need not know all of the details or narrow aspects of the alleged fraud to trigger the limitations period; instead, the period begins to run from the time at which plaintiff should have discovered the general fraudulent scheme." (internal quotation marks omitted)); *see also Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Mkts., Inc.*, Civ. A. No. 11-5550, 2012 WL 13034154, at *8 (D.N.J. July 12, 2012) (noting plaintiff did not have inquiry notice of its claims without "knowledge of the allegedly 'fraudulent scheme'" and plaintiff asserted "it believed the Monorail's gradual failure to be the honest failing of a complex business, rather than due to an alleged fraud").

The Court agrees with Plaintiffs that January 14, 2021—the date that the Senate Insulin Report was released—is the date by which they had constructive notice of their claims against

Defendants.[14] At the time the Senate Report was released, Plaintiffs had notice of actual claims that accrued against Defendants—not just rumors of price collusions which were vehemently denied to Plaintiffs by Defendants' representatives. *See Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 279 (S.D.N.Y. 2011) (accepting plaintiff's argument he could not have discovered the fraud before the Senate Report was issued); *cf. Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 570 (S.D.N.Y. 2012) (dismissing claims as untimely because plaintiffs could have discovered the basis from the claims from the Senate Report, which revealed details and findings of an investigation into the bank's actions "and revealed the basis for the claims Plaintiff now seeks to pursue" more than two years before they filed their complaint). The Senate Insulin Report was "the first reliable disclosure of information by which a State could begin to appreciate that

---

[14] To the extent Defendants argue that testimony from the April 2019 Congressional hearing was sufficient to entail constructive notice (ECF No. 536 at 13), the Court disagrees. Due to the conflicting information given and blame shifting, the Court finds this testimony would not have put a reasonable person on notice of their claims. (*See* ECF No. 533 at 3 ("At that hearing, PBM Defendants' executives claimed that Manufacturer Defendants were solely to blame for skyrocketing Insulin Drug list prices and that the rebates and fees they received had nothing to do with price increases . . . while Manufacturer Defendants' executives claimed that PBM Defendants' demands for rebates were solely to blame for rising Insulin Drug prices and that Manufacturer Defendants did not profit from such increases."); *see also* ECF No. 643 at 50:17–22 ("[In] 2019, [Defendants'] executives went before Congress and said the rebates and fees we negotiate on behalf of our clients are not the cause of rising insulin prices.").) Even now, Defendants are careful in discussing statements made at the April 2019 Congressional hearing, both arguing this hearing must have given Plaintiffs notice of their claims because Manufacturer Defendants admitted to the Insulin Pricing Scheme at the hearing, but again casting doubt on whether that was something Manufacturer Defendants actually admitted. (*See* ECF No. 536 at 13 ("Indeed, this April 2019 Congressional testimony features prominently in every MDL Plaintiffs' complaint because—according to Plaintiffs—the Manufacturers supposedly admitted to the 'insulin-pricing scheme' at that hearing.").) It is hard for the Court to see how Plaintiffs were expected to be on notice of these claims when Defendants are still maintaining Defendants did not make this concession during the April 2019 Congressional hearing. Given the conflicting information surrounding the April 2019 Congressional hearing and reassurances made during that hearing, the Court cannot find that the April 2019 Congressional hearing would have given Plaintiffs notice of their claims. *See In re RenovaCare*, 2024 WL 2815034, at *10 ("[R]eassurances can dissipate apparent storm warnings[.]" (quoting *Benak*, 435 F.3d at 402 n.16)).

skyrocketing insulin prices were caused by the [D]efendants collective misconduct."[15] (ECF No. 538 at 13.)

Given Defendants' finger pointing and consistent reassurances to Plaintiffs, along with the incredibly complicated pricing structures that come with the pharmaceutical industry, this Court finds a reasonable person would not have discovered their injury of being overcharged for the price of insulin until the Senate Insulin Report alerted them to that injury. *See In re RenovaCare*, 2024 WL 2815034, at *12 (finding the filing of "[t]he SEC Complaint was the first point at which a reasonably diligent plaintiff would have been provided with sufficient information to plead Defendants' scienter, manipulative market activity, and their false and misleading statements and material omissions"); *see also Abrams v. Nat'l Westminster Bank PLC*, Civ. A. No. 11-1667, 2012 WL 946792, at *4 (S.D.N.Y. Mar. 19, 2012) (finding the Senate Report and its accompanying media attention "was enough to put a person of ordinary intelligence on notice of the potentially fraudulent nature of [Defendant]'s loans" where "the Senate Report indicated that [Defendant] made loans in connection with [subject] transactions, and that those loans may have been sham loans"); *see also Adams v. Deutsche Bank AG & Deutsche Bank Sec., Inc.*, Civ. A. No. 11-1893, 2012 WL 12884365, at *4 (S.D.N.Y. Sept. 24, 2012) (finding aiding and abetting fraud claims untimely because "Plaintiffs were on notice of a potential fraud claim . . . at least as early as 2003, when the Senate Report was released"); *cf. Cupersmith v. Piaker & Lyons P.C.*, Civ. A. No. 14-

---

[15] TPP Plaintiffs further note "the Senate's report indicated that rising list prices do not implicate plans because 'the [list] price is not the amount . . . paid by . . . health insurers[] or employers' and does 'not affect their ability to collect higher rebates.'" (ECF No. 666 at 3–4 (quoting U.S. Senate Finance Committee, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug* (Jan. 14, 2021) (alterations in original)).) Because the Senate Insulin Report and "[o]ther sources routinely told plans that they were not injured," TPP Plaintiffs contend they had "no reason to investigate." (ECF No. 666 at 4.)

1303, 2016 WL 5394712, at *8 (N.D.N.Y. Sept. 27, 2016) (determining plaintiffs were placed on inquiry notice of defendants' purported involvement in the specific Ponzi scheme when the SEC commenced an enforcement action against defendant).[16]

## IV.    CONCLUSION

For the reasons set forth above, the Court finds the date of constructive notice in the *In re Insulin Pricing Litigation* MDL (Dkt. No. 2:23-md-3080) is **January 14, 2021**. Counsel are **ORDERED** to meet and confer to prepare and jointly submit a list of pending cases for the Court's review which specifies, for each Plaintiff, the date the original Complaint was filed and the applicable statute of limitations within thirty (30) days of this Opinion.


Date: September 5, 2025                    */s/ Brian R. Martinotti*
                                           **HON. BRIAN R. MARTINOTTI**
                                           **UNITED STATES DISTRICT JUDGE**

---

[16] To the extent TPP Plaintiffs contend that considerations unique to TPP Plaintiffs preclude a uniform inquiry notice date (ECF No. 535 at 8–9), the Court rejects this argument. *Fort Worth Emps. Ret. Fund v. J.P. Morgan & Chase Co.*, 301 F.R.D. 116, 133–34 (S.D.N.Y. 2014) ("'[P]ublicly available news stories do not create individualized knowledge,' and 'even assuming that the news reports provided some knowledge to investors, this information is subject to generalized proof.'" (alterations in original) (quoting *N.J. Carpenters Health Fund v. Res. Cap., LLC*, Civ. A. No. 08-8781, 2013 WL 6839093, at *4 (S.D.N.Y. Dec. 27, 2013))). "Whether the standard is inquiry notice or discovery by a reasonably diligent plaintiff, the proof of any statute of the statute of limitations defense will not require individualized inquires." *Id*. at 134; *see also Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 116 (S.D.N.Y. 2011) ("If the news reports, government investigations, public hearings, and civil complaints attached as exhibits to Defendants' moving papers were sufficient, either singly or in combination, to place a reasonable investor on inquiry notice of Defendants' alleged securities violations, then the claims of all class members are time-barred.").