<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW) MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *The State of Illinois, by Kwame Raoul, Illinois Attorney General v. Eli Lilly and Co., et al.* Case No. 2:23-cv-04242 | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendant CVS Health Corporation's ("CVS Health") Motion to Dismiss[1] Plaintiff the People of State of Illinois's (the "State") Complaint (Dkt. No. 2:23-cv-

---

[1] Pursuant to Case Management Order #7—Order Governing Motions to Dismiss in the State Attorney General Track ("State AG Track") (ECF No. 141), the State AGs were directed to refile, on the master docket, all Fed. R. Civ. P. 12 motions and related exhibits, responses, and replies in these two State AG Track cases: *Illinois ex rel. Raoul v. Eli Lilly & Co. et al.*, No. 2:23-cv-04242 (the "Illinois Action"), and *Montana ex rel. Knudsen v. Eli Lilly & Co. et al.,* No. 2:23-cv-04214 (the "Montana Action"). Consequently, in addition to this Motion, the following motions were filed in connection with the Illinois Action: (1) co-defendants Evernorth Health, Inc.'s (ECF No. 190-31) and UnitedHealth Group Incorporated and OptumInsight, Inc.'s (ECF No. 190-35) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and (2) Manufacturer Defendants' (ECF No. 190-37) and PBM Defendants' (ECF No. 190-39) motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). CVS Health joined PBM Defendants' Rule 12(b)(6) motion to dismiss, which is addressed in a separate opinion. The following motions were filed in connection with the Montana Action: (1) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by Evernorth Health, Inc. (ECF No. 190-14), UnitedHealth Group Incorporated and OptumInsight, Inc. (ECF No. 190-18), and CVS Health (ECF No. 190-16); and (2) motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) by Manufacturer Defendants (ECF No. 190-1) and PBM Defendants (ECF No. 190-12). This Opinion only resolves CVS Health's Motion to Dismiss pursuant to Rule 12(b)(2). (ECF No. 190-32.) The other motions filed pursuant to Case Management Order #7 will be addressed separately.

04242, ECF No. 1, Ex. A)[2] pursuant to Federal Rule of Civil Procedure 12(b)(2) (the "Motion") (ECF Nos. 190-32, 190-33). The State filed an Opposition to CVS Health's Motion to Dismiss, arguing the Motion to Dismiss should be denied but that, in the alternative, the State is entitled to jurisdictional discovery (ECF No. 190-42), and CVS Health filed its Reply (ECF No. 190-45). Having reviewed and considered the submissions filed in connection with the Motion, and for the reasons set forth below and for good cause having been shown, the State's request for jurisdictional discovery is **GRANTED**, and CVS Health's Motion to Dismiss is **DENIED** with leave to refile at the conclusion of jurisdictional discovery.

## I.    BACKGROUND

### A.  Factual History[3]

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

This action arises out of the State's challenge to CVS Health and Defendants'[4] allegedly unfair and unconscionable pricing scheme for their insulin medications (the "Insulin Pricing

---

[2] At the direction of the Court, pursuant to Case Management Order #7, the motion and briefs were refiled on the master docket at ECF Nos. 190-32, 190-33, 190-42, 190-45. *See supra* n.1. The Court will use the citations on the master docket unless otherwise indicated.

[3] The Court assumes the parties' familiarity with the factual and procedural history of this matter and therefore only includes the facts and procedural history necessary to decide this Motion.

[4] "Defendants" consist of Manufacturer Defendants and PBM Defendants. Manufacturer Defendants include defendants Eli Lilly and Company ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and Sanofi-Aventis U.S. LLC ("Sanofi") (together, "Manufacturer Defendants"). (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 5.) PBM Defendants include Evernorth Health Inc. (formerly Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and

Scheme"). (*See generally* Compl. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A).) The Attorney General of the State of Illinois, the Honorable Kwame Raoul, brings this action on behalf of the State of Illinois, under his authority to bring such actions to protect the health, safety, and welfare of the citizens of Illinois and to enforce the provisions of the Illinois Consumer Fraud Act ("ICFA"). (*Id*. ¶¶ 36, 37.) The State generally categorizes each defendant into one of two groups: Manufacturer Defendants or PBM Defendants. (*Id*. ¶¶ 5–6.) The State alleges CVS Health "is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme that gave rise to the State's claims." (*Id*. ¶ 78.) CVS Health is the direct or indirect parent company of several affiliate entities, including CVS Pharmacy, Inc.; Caremark Rx, LLC; Caremark LLC; and CaremarkPCS Health, LLC, all of whom are PBM Defendants. (*Id*. ¶¶ 85, 94, 96, 100.) The State alleges CVS Pharmacy, Inc. "owns and operates hundreds of pharmacies throughout Illinois that are directly involved in and profit from the Insulin Pricing Scheme," and that "[d]uring the relevant time period, CVS Pharmacy[, Inc.] provided retail pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme, which damaged Illinois diabetics and the State." (*Id*. ¶¶ 87, 91.) CVS Pharmacy, Inc. is the direct parent of Caremark Rx, LLC, who, in turn, is the parent company of Caremark LLC. (*Id*. ¶¶ 94, 96.) The State alleges both Caremark Rx, LLC and Caremark LLC "provided PBM and mail order pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme and damaged diabetics and payors[5] in Illinois." (*Id*. ¶¶ 95, 99.)

---

Medco Health Solutions (together, "Express Scripts"); CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark PCS Health, LLC, and Caremark, LLC (together, "CVS Caremark"); and UnitedHealth Group Incorporated, OptumRx Inc., and OptumInsight, Inc. (together, "OptumRx") (together, with Express Scripts and CVS Caremark, "PBM Defendants"). (*Id*. ¶ 6.)

[5] The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

Finally, the State asserts CaremarkPCS Health, LLC, which is affiliated with CVS Health in some undisclosed manner, "holds an active pharmacy benefit manager license, and active third party administrator license, and an active third party prescription program license in Illinois," and "provided PBM services in Illinois, which gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Illinois, including the State." (*Id*. ¶¶ 100, 103–04; *see also id*. ¶ 101 ("CaremarkPCS Health LLC provides pharmacy benefit management services.").)

The State contends Manufacturer Defendants, who "manufacture the vast majority of insulins and other diabetic medications available in Illinois," worked "in tandem" to "artificially and willingly raise their list prices" of insulin medications, "and then pay a significant, yet undisclosed, portion of that price back to the PBM[ Defendants]," in order to gain formulary preference. (*Id*. ¶¶ 5, 10, 15, 20.) The State alleges: "Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, Manufacturer Defendants have persistently raised the prices of their respective diabetes drugs in a lockstep manner despite the fact that the cost to produce these drugs has decreased during that same time period." (*Id*. ¶ 13.)

PBM Defendants are pharmacy benefit managers ("PBMs"), or third-party administrators that negotiate drug costs and payments between health insurance providers and drug manufacturers.[6] (*Id*. ¶¶ 290–92.) Drug manufacturers set the list price for their prescription drugs, including insulin, which is known as the Wholesale Acquisition Cost ("WAC"). (*Id*. ¶¶ 281–83.) The WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or

---

[6] More specifically, PBM Defendants "develop drug formularies, process claims, create a network of retail pharmacies, [and] set [drug] prices in coordination with [m]anufacturers[.]" (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 291.)

reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). The WAC serves as the reference point from which PBMs and drug manufacturers negotiate rebates. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 294–300.) The WAC differs from, but is related to, the Average Wholesale Price ("AWP"), which refers to the "average price that wholesalers charge[] to providers like doctors and pharmacies."[7] *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass. 2008). Pharmaceutical manufacturers self-report the WAC to publishing compendiums such as First Databank, Redbook, and others. (*Id.* ¶ 283.)

Branded prescription drugs in the United States move through a complex distribution chain where pharmaceutical manufacturers typically sell their products to wholesalers at a negotiated price. (*Id.* ¶¶ 279–81.) Wholesalers then supply the medications to various providers such as pharmacies, hospitals, and clinics, who then distribute the pharmaceuticals to consumers with prescriptions. (*Id.* ¶¶ 281–84.) Uninsured consumers ultimately pay the full price for medication, whereas insured consumers pay for a portion of a drug's price through out-of-pocket costs such as deductibles, copayments, or coinsurance. (*Id.* ¶¶ 286–87.) Upstream payments to the manufacturers include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates. (*Id.* ¶¶ 20–21.)

The industry is unique because the way patients pay for prescription drugs vastly differs from the way wholesalers, PBMs, and health insurers pay for those same products. (*Id.* ¶ 281.) The prices for the products in the distribution chain differ for each participating entity—"different

---

[7] "Typically, AWP was a twenty percent markup over WAC." *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 87. "[M]ost manufacturers continued to report AWPs consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were not actually charging these prices to providers and thus that the AWP relied on by Medicare and the [third-party payors] was not a true average price charged by wholesalers." *Id.*

actors pay different prices set by different entities for the same drugs." (*Id.*) Manufacturers do not sell medications directly to the consumers and therefore do not set the consumer price for any particular medication; however, they do set the list price (WAC), and consumers usually pay for prescription drugs based on the manufacturer's list price. (*Id.* ¶ 282.)

Health insurers cover all or a portion of their insured customers' medications costs, submit payments to pharmacies on behalf of their insured members, and receive a reimbursement amount depending on whether and where the medication falls on their PBMs' formularies—the ranked list of approved drugs an insurance plan will cover. (*Id.* ¶ 7.) When insured consumers purchase a prescription medication from a pharmacy, both the consumer and their insurer pay a portion of the purchase price based on the price negotiated by the PBMs. (*Id.* ¶¶ 296–300.) Manufacturers understand the PBM's formularies drive drug utilization: "if Manufacturers want their drugs to be prescribed and paid for they must obtain preferrable formulary position on the PBM Defendants' formularies." (*Id.* ¶ 10.) Drug manufacturers may offer rebates to an insurer's PBM to gain formulary access for their prescription drugs. (*Id.* ¶¶ 21 n.3, 23, 344.) PBMs determine whether to pass along rebates to the health insurer, who in turn decides whether to share these cost-saving measures with consumers. (*Id.* ¶¶ 24–26.)

Here, the State alleges certain Manufacturer Defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin analog products so they could offer rebates as a "secret Manufacturer Payment[]"[8] to PBM Defendants in exchange for preferred formulary placement, which the State contends caused it and its constituents to overpay for insulin products. (*Id.* ¶¶ 376–98.) The State maintains these

---

[8] The State defines Manufacturer Payments as when "[t]he Manufacturers, knowing formulary position directly correlates to sales volume, simply raise their reported prices and then secretly kick back a significant portion of that price to the PBM Defendants." (ECF No. 190-42 at 3.)

Manufacturer Defendants artificially inflated the list prices for their insulin products to compete for preferred positions on the PBMs' drug formularies by offering increased rebates to PBM Defendants. (*Id*. ¶¶ 399–404.) The State further alleges that, while accepting these rebates from Manufacturer Defendants, PBM Defendants require customers using their own mail-order and retail pharmacies to pay these artificially inflated prices for insulin products, resulting in higher profits for PBM Defendants. (*Id*. ¶¶ 405–09.) The State asserts "Illinois diabetics and payors relied on the artificially inflated list prices by purchasing diabetic medications at such prices." (*Id*. ¶ 412.) The State attributes this pricing scheme to Manufacturer Defendants' "list prices for the at-issue drugs [becoming] detached completely from actual prices," resulting in the "list prices bec[oming] increasingly misrepresentative to the point of becoming unlawful." (*Id*. ¶ 415.)

According to the State, Manufacturer Defendants allegedly engaged in an unfair and unconscionable scheme of competing for formulary access of the largest PBMs[9] by unjustifiably raising the WAC for the insulin analog products so they could offer the middlemen-PBMs bloated rebates. (*Id*. ¶¶ 13, 20.) By raising the WACs, Manufacturer Defendants can increase the so-called "spreads" between list prices and net prices (the effective cost of the products for PBM Defendants after subtracting Manufacturer Defendants' rebates from the WAC), thereby increasing potential profits for PBM Defendants. (*Id*. ¶¶ 340, 345, 401–03.) Net prices may fluctuate as they necessarily depend on PBM Defendants' negotiations with a particular manufacturer. (*Id*. ¶¶ 299, 345 n.10.) The State contends Illinois diabetics and payors, including the State, suffered monetary losses from overpaying for their insulin products because PBM Defendants' formularies are at the center of the allegedly unfair and unconscionable Insulin Pricing Scheme. (*Id*. ¶¶ 335, 340.)

---

[9] The State asserts "PBM Defendants have taken over the market in the past decade—controlling over 80% of the market and managing pharmacy benefits for more than 270 million Americans." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 310.)

The State claims PBM rebates are part of an industry scheme to inflate the price of insulin products, whereby PBM Defendants use their leverage to set formularies and increase profits. (*Id.* ¶¶ 313, 332.) PBM Defendants allegedly: (1) negotiate prices payors (*i.e.*, insurers) pay for prescription drugs; (2) separately negotiate a different (and often lower) price for in-network pharmacies; (3) set the amount in fees the pharmacy pays back to the PBM; (4) set the price paid for each drug sold through mail-order pharmacies; and (5) negotiate the amount manufacturers pay back to the PBMs via rebates. (*Id.* ¶ 298.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost; accordingly, using formularies gives PBM Defendants strong leverage to extract rebates from manufacturers. (*Id.* ¶¶ 311, 378–80.) The State argues that, to secure preferred positions for their products on the formularies, Manufacturer Defendants offer PBM Defendants higher spreads by increasing the WACs and offering rebates, rather than lowering list prices for their prescription drugs. (*Id.* ¶¶ 399–401.) The State contends "[t]hese relationships allow PBM[ Defendants] to exert tremendous influence over what drugs are available throughout Illinois and at what prices." (*Id.* ¶ 297.) Manufacturer Defendants, "working in coordination with the PBM[ Defendants]," "artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBM[ Defendants]," resulting in the State and diabetic Illinois residents being "overcharged millions of dollars a year," which "caused a substantial injury to Illinois diabetics and the State." (*Id.* ¶¶ 29, 340, 490.)

### B.  Procedural History

On December 2, 2022, the State filed a Complaint in the Circuit Court of Cook County, Illinois. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A.) The matter was removed to the United States

District Court for the Northern District of Illinois, Eastern Division, on January 11, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 1.) A supplemental notice of removal was also filed on January 11, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 7.) On March 6, 2023, CVS Health filed its Motion to Dismiss for lack of personal jurisdiction. (Dkt. No. 2:23-cv-04242, ECF Nos. 52, 53.) The State filed its Opposition on April 6, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 85.) CVS Health filed its Reply in support of its Motion on May 4, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 100.)

On May 9, 2023, prior to the District Court for the Northern District of Illinois deciding the pending Motion to Dismiss, the State, along with movants the States of Arkansas, Kansas, Mississippi, and Montana, filed their motion for transfer of actions pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings before the United States Judicial Panel on Multidistrict Litigation ("JPML"). (Dkt. No. 2:23-cv-04242, ECF No. 105.) On August 7, 2023, the JPML issued a Transfer Order, transferring this matter to this Court in the District of New Jersey. (Dkt. No. 2:23-cv-04242, ECF No. 110.) Pursuant to Case Management Order No. 7 (ECF No. 141), the parties re-filed their respective briefings on May 31, 2024 (ECF Nos. 190-32–33, 190-42, 190-45).

## II.    LEGAL STANDARD

A plaintiff need not "alleg[e] personal jurisdiction in the complaint, but 'once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (quoting *Purdue Rsch. Found. v. Sanofi Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)).[10] In determining whether personal

---

[10] Because the parties originally filed suit in the Northern District of Illinois, and merely refiled their Motion to Dismiss papers on the master docket (*see* ECF No. 141), the parties use Seventh Circuit law in their arguments. Accordingly, the Court analyzes the parties' arguments pursuant to

jurisdiction exists, the court must accept all well-pleaded allegations in the complaint as true. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

"When the court rules on the motion without a hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction." *Shanghai Daisy, LLC v. PositivEnergy, Inc.*, Civ. A. No. 19-5901, 2020 WL 4365883, at *1 (N.D. Ill. July 30, 2020) (citing *Cent. States, Se. & Sw. Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 877–78 (7th Cir. 2006)). The court may consider materials submitted outside of the pleadings when ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *Purdue Rsch. Found.*, 338 F.3d at 783 ("[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction."). "[T]he plaintiff is entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor." *Id*.

## III.   DECISION

CVS Health argues the State's Complaint should be dismissed as to CVS Health because it is neither subject to general nor specific personal jurisdiction in Illinois. (ECF No. 190-33 at 1.) Rather, CVS Health urges that the majority of "the State's limited discussion of CVS Health appears in allegations about its status as a corporate parent of the PBM entity, CaremarkPCS Health, LLC," which is insufficient to support personal jurisdiction. (*Id*. at 5.) CVS Health contends "[t]he State's remaining references to CVS Health only underscore the State's failure to plead contacts sufficient to support a finding of specific jurisdiction." (*Id*.)

---

Seventh Circuit law. *See In re Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020))).

### A. General Jurisdiction

CVS Health argues it is not subject to general jurisdiction in Illinois because it is not at home in Illinois; rather, as the State alleges, CVS Health "is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895." (ECF No. 190-33 at 3–4 (citing Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 76).) The State does not dispute this and clarifies it is not asserting CVS Health is subject to general jurisdiction in Illinois. (ECF No. 190-42 at 13 n.11.) Accordingly, this Court finds CVS Health is not subject to general jurisdiction in Illinois.

### B. Specific Jurisdiction

CVS Health contends the State fails to establish CVS Health is subject to specific jurisdiction in Illinois because the State has not adequately pled CVS Health "*expressly aim*[*ed*] its actions at the forum state with the knowledge that it would cause harm to the plaintiff there." (ECF No. 190-45 at 2–7 (citing *In re Sheehan*, 48 F.4th 513, 524–25 (7th Cir. 2022)).) Instead, CVS Health asserts it "is simply a holding company that issues stock, files reports with the SEC, and executes 'limited' related functions." (ECF No. 190-33 at 5.) Further, "[a]ll of [CVS Health's] operations relate to its functions as a holding company and none takes place in Illinois." (*Id.* (citing Dkt. No. 2:23-cv-04242, ECF No. 53-1 (Declaration of Thomas S. Moffatt in Support of CVS Health's Motion to Dismiss ("Moffatt Decl.")) ¶¶ 4–6).) CVS Health contends the State's allegations have primarily to do with its status as the corporate parent of CaremarkPCS Health, LLC, which is a PBM entity. (*Id.*)

The State asserts CVS Health has not offered any evidence "to contradict the State's allegations that it met and conspired with the Manufacturer Defendants numerous times, throughout the relevant time period, in furtherance of the Insulin Pricing Scheme." (ECF No. 190-

11

42 at 8–11.) The State contends the assertions made in the Moffatt Decl. regarding CVS Health's role as a holding company are belied by allegations in the Complaint, as well as by public court filings. (*Id*. at 9–10.) Therefore, the State asserts "the uncontroverted facts satisfy federal due process for specific personal jurisdiction," as CVS Health purposefully directed its activities at Illinois, its contacts with Illinois directly relate to the State's claims, and exercise of personal jurisdiction over CVS Health comports with fair play and substantial justice. (*Id*. at 14–21.)

"Specific personal jurisdiction depends on 'an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *In re Sheehan*, 48 F.4th at 522 (quoting *Bristol-Myers Squibb Co. v. Sup. Ct. of Ca.*, 582 U.S. 255, 262 (2017) (cleaned up)). A court has specific jurisdiction "when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010); *see also Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). The Seventh Circuit has summarized the three requirements for specific personal jurisdiction as follows:

> First, the defendant's contacts with the forum state must show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state. Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities. And finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice.

*NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 623 (7th Cir. 2022) (citation omitted); *see also Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010)). "If the plaintiff makes these three showings, he has established that the defendant 'purposefully directed' his activity at the forum state." *Felland*, 682 F.3d at 765.

"In assessing the existence of specific jurisdiction, courts first determine whether the defendant's contacts with the forum state demonstrate that it 'purposefully availed' itself of the 'privilege of conducting business in the forum state' or 'purposefully directed' its activities at the state." *Alipourian-Frascogna v. Etihad Airways*, Civ. A. No. 21-0001, 2022 WL 847559, at *3 (N.D. Ill. Mar. 22, 2022) (citing *Lexington Ins. Co. v. Hotai Ins. Co.*, 938 F.3d 874, 878 (7th Cir. 2019); *Tamburo*, 601 F.3d at 702). Purposeful availment or purposeful direction requires: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703 (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)).

For the Illinois long-arm statute to apply, *see* ILCS 5/2-209, it is insufficient for a plaintiff to "rely solely on a showing that the alleged harm was felt in Illinois"; rather, the plaintiff is additionally required to demonstrate defendants intended "to impinge upon an Illinois interest." *Hyperquest, Inc. v. NuGen I.T., Inc.*, 627 F. Supp. 2d 884, 894 (N.D. Ill. 2008). "[T]he mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 291 (2014); *see also Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, 881 F.3d 520, 522 (7th Cir. 2018) ("Knowing about a potential for harm in a particular state is not the same as acting *in* that state—and it takes the latter to permit personal jurisdiction under state law."); *Green Light Nat'l, LLC v. Kent*, Civ. A. No. 17-6370, 2018 WL 4384298, at *3 (N.D. Ill. Sept. 14, 2018) ("It is not enough that a defendant know that any injury resulting from alleged tortious conduct would be felt in the forum state." (citation omitted)). "This means that the contacts must not be based on the unilateral actions of another

13

party and must be such that a defendant could reasonably anticipate being haled into court in Illinois." *Hyperquest*, 627 F. Supp. 2d at 894.

Here, the State argues its allegations "are sufficient to support the exercise of specific personal jurisdiction over CVS Health based on its own involvement in the [Insulin Pricing] Scheme and contacts with Illinois." (ECF No. 190-42 at 13.) The State contends it sufficiently alleged that CVS Health had suit-related contacts in Illinois, but also that "CVS Health's actions taken elsewhere were purposely directed at Illinois and had a foreseeable and intended effect in Illinois, thus subjecting it to jurisdiction [t]here." (*Id*.) According to the State, "CVS Health specifically offered PBM services in Illinois and created formularies for use in Illinois. CVS Health also provided retail and mail order pharmacy services in Illinois." (*Id*. at 14–15 (internal citations omitted).) Despite CVS Health's contention it is merely a holding company, the State asserts "the court filings of the [Pharmaceutical Care Management Association ("PCMA") in another litigation] support the State's allegations and confirm that CVS Health is a PBM and 'administer[ed] pharmaceutical benefits on behalf of their customers' on a 'nationwide' basis." (*Id*. (citing Declaration of Brian McCarthy of PCMA, *Pharm. Care Mgmt. Ass'n*, Civ. A. No. 4:15-510 (E.D. Ark.), ECF No. 75-3, at ¶¶ 2, 3, 8 ("McCarthy Decl.")).)

However, the State does not plead these allegations in its Complaint. It alleges CVS Health purposefully availed itself of conducting business in Illinois through its role as the parent company of CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark LLC, and CaremarkPCS Health, LLC, by contending that "CVS Health, through its executives and employees, . . . is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme that gave rise to the State's claims." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 78.) The State alleges CVS Health made false representations regarding its pharmacy programs and their cost effectiveness,

and that CVS Health met with leaders from Manufacturer Defendants "to discuss their coordinated efforts related to the at-issue drugs." (*Id*. ¶¶ 79–84.) However, the Complaint does not allege CVS Health actually provided the PBM services at issue.

Rather, the State asserts:

> Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control of CaremarkPCS Health, LLC's and Caremark, LLC's operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail order and retail pharmacy services to the ultimate detriment of diabetics and payors in Illinois.

(*Id*. ¶ 105.) The State alleges it is CVS Pharmacy, Inc. who "owns and operates hundreds of pharmacies throughout Illinois that are directly involved in and profit from the Insulin Pricing Scheme" (*id*. ¶ 88) and that, during the relevant time period, "CVS Pharmacy[, Inc.] provided retail pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme, which damaged Illinois diabetics and the State" (*id*. ¶ 91). CVS Pharmacy is the immediate and direct parent of Caremark Rx, LLC, which "provided PBM and mail order pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme and damaged diabetics and payors in Illinois." (*Id*. ¶¶ 89, 94, 95.) In turn, Caremark Rx, LLC is the parent corporation of Caremark LLC, which "holds an active pharmacy benefit manager license, an active third party administrator license, an active third party prescription program license, an active wholesale drug distributor license, four active pharmacy licenses, and three active controlled substance licenses in Illinois," and "provided PBM and mail order pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme, which damaged diabetics and payors in Illinois." (*Id*. ¶¶ 96, 98, 99.) CVS Health is also the direct or indirect parent company of CaremarkPCS Health, LLC, which "holds an active pharmacy benefit manager license, an active third party administrator license, and an active third party prescription program license in Illinois," and "provided PBM services in Illinois, which gave rise to the Insulin Pricing

Scheme and damaged diabetics and payors in Illinois, including the state." (*Id*. ¶¶ 103–04.) According to the Complaint, CVS Health engaged with executives from Manufacturer Defendants "in furtherance of the Insulin Pricing Scheme." (*Id*. ¶ 82.)

Despite arguing "CVS Health specifically offered PBM services in Illinois and created formularies for use in Illinois" (ECF No. 190-42 at 14), this is not what the State alleges in its Complaint, where the allegations about provision of PBM services in and to Illinois relate to Caremark Rx, LLC, Caremark LLC, and CaremarkPCS Health, LLC (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 95, 99, 104).[11] Accordingly, the State advances an "impact theory of minimum contacts, which mistakenly assumes that because defendants' alleged tortious conduct would be felt in Illinois, the defendants *must have* acted with an intent to affect an Illinois interest." *Hyperquest*, 627 F. Supp. 2d at 894 (rejecting impact theory of minimum contacts because "it is too speculative to show the requisite intent on behalf of the Defendants to affect an Illinois interest" (citing *Morgan v. GTECH Corp.*, Civ. A. No. 90-238, 1990 WL 251900, at *5 (N.D. Ill. Dec. 19, 1990))). "[M]ere adverse effects on a corporation which is present within a state are not enough." *Young v. Colgate-Palmolive Co.*, 790 F.2d 567, 572 (7th Cir. 1986).

Even assuming, *arguendo*, the Complaint contained allegations that CVS Health provided PBM services in Illinois, "[w]here the injury alleged is economic in nature, rather than physical or

---

[11] Although the State has made clear it is arguing that its "allegations are sufficient to support the exercise of specific personal jurisdiction over CVS Health based on its own involvement in the [Insulin Pricing] Scheme and contacts with Illinois" (ECF No. 190-42 at 13), it is worth noting, "as a general rule, the jurisdictional contacts of a subsidiary corporation are not imputed to the parent." *Purdue Rsch. Found.*, 338 F.3d at 788 n.17 (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940, 943–44 (7th Cir. 2000) ("[C]onstitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary."); *cf. IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) ("Parents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent.").

emotional, . . . the plaintiff needs to show more than the harm was felt in Illinois, the plaintiff must also show an intent to affect an Illinois interest." *Hyperquest*, 627 F. Supp. 2d at 891; *see also Hang Glide USA, LLC v. Coastal Aviation Maintenance, LLC*, Civ. A. No. 16-6905, 2017 WL 1430617, at *3 (N.D. Ill. Apr. 18, 2017) ("There must be more than economic impact to support personal jurisdiction over [defendants] under the long-arm statute's due process requirement—a principle that our Court of Appeals has adhered to for at least three decades." (citing *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014); *Young*, 790 F.2d at 570–71)).

The State does not connect CVS Health's alleged activities with Illinois, beyond general assertions about their effect on Illinois itself. In examining the Illinois-specific allegations regarding CVS Health, the Complaint conclusively states: (1) "CVS Health transacts business and has locations throughout the United States and Illinois"[12]; (2) "in 2016, CVS Health announced a new program to 'reduce overall spending in diabetes' that is available in all states, including Illinois"; and (3) "CVS Health controls the entire drug pricing chain" for the "approximately 40 million Aetna members in the United States and Illinois." (*Id.* ¶¶ 76, 80, 85.) These broad statements do not identify an intent by CVS Health to affect an Illinois interest, and therefore the State has not sufficiently stated a prima facie basis for specific jurisdiction. *See Hyperquest*, 627 F. Supp. 2d at 895 ("[Plaintiff]'s bare assertion that the Defendants sought to affect an Illinois

---

[12] CVS Health declares, through the Moffatt Decl., that CVS Health "is a holding company" whose "primary functions are to issue stock that is traded on the New York Stock Exchange and to file reports with the Securities Exchange Commission." (Moffatt Decl., Dkt. No. 2:23-cv-04242, ECF No. 53-1 ¶ 4.) Without reaching the merits of the State's argument regarding the veracity of these statements (*see* ECF No. 190-42 at 8–11), the Court finds that the State has failed to establish specific jurisdiction over CVS Health because the State's allegations do not sufficiently state CVS Health purposefully directed its activities towards Illinois in furtherance of the alleged Insulin Pricing Scheme.

interest, without anything more, is insufficient to satisfy the tortious act provision of the Illinois long-arm statute, when the nonresident Defendant is alleged to have undertaken conduct that caused economic harm in Illinois.").

However, as discussed *infra* Section III.C, the Court notes the ambiguity surrounding the State's allegations regarding CVS Health's role in the Insulin Pricing Scheme (*see* Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 78 (alleging CVS Health was "directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme")) and the Moffat Decl., which maintains CVS Health is merely a holding company (ECF No. 190-33, Ex. A ¶ 4). Because the State's allegations depend on the extent of CVS Health's participation in the Insulin Pricing Scheme, which information the State contends is in the sole possession of CVS Health, the State has stated a colorable basis for jurisdiction. (*See* ECF No. 190-42 at 21.) As the record is unclear, the Court proceeds to the State's request for jurisdictional discovery before deciding the Motion to Dismiss.

### C.  Jurisdictional Discovery

In the alternative, the State asserts it is entitled to jurisdictional discovery regarding "CVS Health's involvement in the Insulin Pricing Scheme in Illinois," and "the corporate relationship or lack of corporate separateness between CVS Health and the CVS entities." (ECF No. 190-42 at 21–22.)

Courts have broad discretion to order jurisdictional discovery to ascertain whether personal jurisdiction exists over defendants. *Esquivel v. Airbus Ams., Inc.*, Civ. A. No. 20-7525, 2021 WL 4395815, at *1 (N.D. Ill. May 3, 2021). "To secure jurisdictional discovery, a plaintiff must, at a minimum, 'establish a colorable or prima facie showing of personal jurisdiction.'" *Gillam v. Abro Kalamazoo 3, Inc.*, 712 F. Supp. 3d 1079, 1082 (N.D. Ill. 2024) (quoting *Reimer Express*, 230 F.3d

at 946). Courts will typically grant such discovery if the plaintiff "can show that the factual record is at least ambiguous or unclear on the jurisdiction issue," but not if a plaintiff offers "bare, attenuated, or unsupported assertions of personal jurisdiction." *Gilman Opco LLC v. Lanman Oil Co., Inc.*, Civ. A. No. 13-7846, 2014 WL 1284499, at *6 (N.D. Ill. Mar. 28, 2024) (citations and internal quotation marks omitted); *see also Precision Dynamics Corp. v. Typenex Med., LLC*, Civ. A. No. 13-860, 2014 WL 12656904, at *2 (E.D. Wis. Feb. 13, 2014) ("Although the standard is low, a court should deny jurisdictional discovery when a plaintiff's request is only based upon bare, attenuated, or unsupported assertions of personal jurisdiction, or when a plaintiff's claim appears to be clearly frivolous."). "In ruling on a motion to take jurisdictional discovery, the Court accepts as true the factual allegations relevant to jurisdiction made in Plaintiff's complaint and draws all reasonable inferences in Plaintiff's favor." *Marks v. Worldwide Robotic Automated Parking, LLC*, Civ. A. No. 16-8656, 2017 WL 2985757, at *4 (N.D. Ill. July 13, 2017).

Here, the State contends it is seeking "any information that would further illuminate CVS Health's role in the [Insulin Pricing] Scheme and the corporate relationship or lack of corporate separateness between CVS Health and the other CVS entities." (ECF No. 190-42 at 21–22.) The Court agrees that jurisdictional discovery is warranted. There is an apparent dispute regarding the State's allegations concerning CVS Health's role in the Insulin Pricing Scheme (*see* Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 78 (alleging CVS Health was "directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme that gave rise to the State's claims")) and the declaration submitted on behalf of CVS Health, which asserts "CVS Health Corporation is a holding company" (ECF No. 190-33, Ex. A ¶ 4). Further, CVS Health proffers that its "primary functions are to issue stock that is traded on the New York Stock Exchange and to file reports with the Securities and Exchange Commission," and that it "also performs certain

19

other functions related to those primary functions." (ECF No. 190-33, Ex. A ¶ 4.) However, notably, the declaration does not elaborate on what these "certain other functions" are. (*See id.*)

Moreover, as asserted by the State in its request for jurisdictional discovery, "any information that would further illuminate CVS Health's role in the [Insulin Pricing] Scheme and the corporate relationship or lack of corporate separateness between CVS Health and other CVS entities is in the sole possession of those Defendants." (ECF No. 190-42 at 21.) Therefore, the Court grants jurisdictional discovery to the State because the State has made at least a colorable showing that CVS Health and other CVS entities may be the alter ego of one another so that the actions of one entity may be imputed to another. *See Deckers Outdoor Corp. v. Wolverine Grp. Pty. Ltd.*, Civ. A. No. 24-3164, 2025 WL 1222471, at *3 (N.D. Ill. Apr. 28, 2025) (finding "targeted jurisdictional discovery is warranted to resolve ambiguities as to the corporate structures and operations of the defendants"); *see also Esquivel*, 2021 WL 4395815, at *2 (allowing jurisdictional discovery given existing ambiguity as to which entity was responsible for designing, manufacturing, and selling allegedly defective product).

Because the State's request for jurisdictional discovery may demonstrate facts sufficient to constitute a basis for jurisdiction, the Court grants the State's request to conduct jurisdictional discovery.[13] *See Zurich Am. Ins. Co. v. Tangiers Int'l LLC*, Civ. A. No. 18-2115, at *2 (N.D. Ill. Aug. 9, 2018) ("Generally, courts grant jurisdictional discovery if the plaintiff can show that the factual record is at least ambiguous or unclear on the jurisdiction issue." (quoting *Ticketreserve, Inc. v. Viagogo, Inc.*, 656 F. Supp. 2d 775, 782 (N.D. Ill. 2009))); *see also Andersen v. Sportmart, Inc.*, 179 F.R.D. 236, 241 (N.D. Ind. 1998 ("A plaintiff must make a threshold or prima facie

---

[13] Counsel are directed to meet and confer and submit to the Court a proposed order outlining the scope of jurisdictional discovery and all related deadlines within thirty (30) days.

showing with some competent evidence demonstrating that personal jurisdiction might exist over a defendant in order to be entitled to jurisdictional discovery.").

## IV.    CONCLUSION

For the reasons set forth above, the State's request for jurisdictional discovery is **GRANTED**, and CVS Health's Motion to Dismiss (ECF Nos. 190-32–33, 190-45) pursuant to Federal Rule of Civil Procedure 12(b)(2) is **DENIED** with leave to refile at the conclusion of jurisdictional discovery. An appropriate Order follows.

Date: September 5, 2025                         */s/ Brian R. Martinotti*
                                               **HON. BRIAN R. MARTINOTTI**
                                               **UNITED STATES DISTRICT JUDGE**