**<u>NOT FOR PUBLICATION</u>**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW)** <br> **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *The State of Montana, ex. rel. Austin Knudsen, Attorney General v. Eli Lilly and Company, et al.* <br><br> Case No. 2:23-cv-04214 | |

**Martinotti, District Judge**

Before the Court is Defendant Evernorth Health, Inc.'s ("Evernorth") Motion to Dismiss[1]

Plaintiff State of Montana's (the "State") First Amended Complaint (Dkt. No. 2:23-cv-04214, ECF

---

[1] Pursuant to Case Management Order #7—Order Governing Motions to Dismiss in the State Attorney General Track ("State AG Track") (ECF No. 141), the State AG Track cases were directed to refile all Fed. R. Civ. P. 12 motions and related exhibits, responses, and replies in the following State AG Track cases: *Illinois ex rel. Raoul v. Eli Lilly & Co. et al.*, No. 2:23-cv-04242 (the "Illinois Action"), and *Montana ex rel. Knudsen v. Eli Lilly & Co. et al.,* No. 2:23-cv-04214 (the "Montana Action"). Consequently, in addition to this Motion, the following motions were filed in connection with the Montana Action: (1) CVS Health Corporation (ECF Nos. 190-15–16) and UnitedHealth Group Incorporated and OptumInsight, Inc.'s (ECF Nos. 190-17–18) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and (2) Manufacturer Defendants' (ECF Nos. 190-1–10) and PBM Defendants' (ECF Nos. 190-11–12) motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Evernorth joined PBM Defendants' Rule 12(b)(6) Motion to Dismiss, which is addressed in a separate opinion. The following motions are pending in the Illinois Action: motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by Evernorth (ECF No. 190-31), UnitedHealth Group Incorporated and OptumInsight, Inc. (ECF No. 190-35), and CVS Health Corporation (ECF No. 190-33), and motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) by Manufacturer Defendants (ECF No. 190-37) and PBM Defendants (ECF No. 190-39). This Opinion only resolves Evernorth's Motion to Dismiss pursuant to Rule 12(b)(2). (ECF Nos. 190-13–14.) The other motions filed pursuant to Case Management Order #7 will be addressed separately.

No. 40)[2] pursuant to Federal Rule of Civil Procedure 12(b)(2) (the "Motion") (ECF Nos. 190-13, 190-14). The State filed an Opposition to Evernorth's Motion (ECF No. 190-20), and Evernorth filed a Reply in support of its Motion (ECF No. 190-24). Having reviewed and considered the submissions filed in connection with the Motion, and for the reasons set forth below and for good cause having been shown, the State's request for jurisdictional discovery is **GRANTED**, and Evernorth's Motion to Dismiss is **DENIED** with leave to refile at the conclusion of jurisdictional discovery.

## I.    BACKGROUND

### A.  Factual History[3]

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the First Amended Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987).[4] "In ruling on a motion to dismiss under [Federal] Rule [of Civil Procedure] 12(b)(2) for lack of personal jurisdiction, a court may similarly consider

---

[2] At the direction of the Court, pursuant to Case Management Order #7, the motion and briefs were refiled on the master docket at ECF Nos. 190-13, 190-14, 190-20, 190-24. *See supra* n.1. The Court will use the citations on the master docket unless otherwise indicated.

[3] The Court assumes the parties' familiarity with the factual and procedural history of this matter and therefore only includes the facts and procedural history necessary to decide this Motion.

[4] Because the parties originally removed the case to the District of Montana, and merely refiled their Motion to Dismiss papers on the master docket (*see* ECF No. 141), the parties use Ninth Circuit law in their arguments. Accordingly, the Court analyzes the parties' arguments pursuant to Ninth Circuit law. *See In re Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020))).

'uncontroverted allegations in the complaint.'" *Lindstrom v. Polaris Inc.*, Civ. A. No. 23-00137, 2024 WL 4237732, at *1 (D. Mont. Aug. 9, 2024) (quoting *Nationwide Agribusiness Ins. Co. v. Buhler Barth GmbH*, Civ. A. No. 15-00582, 2015 WL 6689572, at *3 (E.D. Cal. Oct. 30, 2015)).

This action arises out of Plaintiff State of Montana's challenge to Evernorth's allegedly unfair and unconscionable pricing scheme for their insulin medications (the "Insulin Pricing Scheme"). (*See generally* First Am. Compl. (Dkt. No. 2:23-cv-04214, ECF No. 40).) The sole plaintiff in this action is the State of Montana, brought in its name on relation of the Honorable Attorney General Austin Knudson, pursuant to the Montana Unfair Trade Practices and Consumer Protection Act. Mont. Code Ann. § 30-14-101, *et seq*. The State generally categorizes each defendant into one of two groups: Manufacturer Defendants or PBM Defendants.[5] (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 5–6.) The State alleges "Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Montana, which engaged in the activities that gave rise to this Complaint." (*Id*. ¶ 135.)

PBM Defendants are pharmacy benefit managers ("PBMs"), or third-party administrators that negotiate drug costs and payments between health insurance providers and drug manufacturers.[6] (*Id*. ¶¶ 296–97.) Drug manufacturers set the list price for their prescription drugs,

---

[5] Manufacturer Defendants include defendants Eli Lilly & Company, Novo Nordisk Inc., and Sanofi-Aventis U.S. LLC (together, "Manufacturer Defendants"). (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 5.) PBM Defendants include Evernorth Health Inc. (formerly Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions (together, "Express Scripts"); CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark PCS Health, LLC, and Caremark, LLC (together, "CVS Caremark"); and UnitedHealth Group Incorporated, OptumRx Inc., and OptumInsight, Inc. (together, "OptumRx") (together, with Express Scripts and CVS Caremark, "PBM Defendants"). (*Id*. ¶ 6.)

[6] More specifically, the PBM Defendants "develop drug formularies, process claims, create a network of retail pharmacies, [and] set [drug] prices in coordination with [m]anufacturers[.]" (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 296.)

including insulin, which is known as the Wholesale Acquisition Cost ("WAC"). (*Id.* ¶¶ 285–87.) WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). The WAC serves as the reference point from which PBMs and drug manufacturers negotiate rebates. (*Id.* ¶¶ 295–303.) The WAC differs from, but is related to, the Average Wholesale Price ("AWP"), which refers to the "average price that wholesalers charge[] to providers like doctors and pharmacies."[7] *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass. 2008). Pharmaceutical manufacturers self-report the WAC to publishing compendiums such as First Databank, Redbook, and others. (*Id.* ¶ 287.)

Branded prescription drugs in the United States move through a complex distribution chain where pharmaceutical manufacturers typically sell their products to wholesalers at a negotiated price. (*Id.* ¶ 286.) Wholesalers then supply the medications to various providers such as pharmacies, hospitals, and clinics, who then distribute the pharmaceuticals to patients with prescriptions. (*Id.* ¶¶ 283–86.) Uninsured consumers ultimately pay the full price for medication, whereas insured consumers pay for a portion of a drug's price through out-of-pocket costs such as deductibles, copayments, or coinsurance. (*Id.* ¶¶ 290–91.) Upstream payments to the manufacturers include rebates, administrative fees, inflation fees, pharmacy supplemental

---

[7] "Typically, AWP was a twenty percent markup over WAC." *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 87. "[M]ost manufacturers continued to report AWPs consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were not actually charging these prices to providers and thus that the AWP relied on by Medicare and the [third-party payors] was not a true average price charged by wholesalers." *Id.*

discounts, volume discounts, price or margin guarantees, price concessions, and indirect purchase fees. (*Id*. ¶ 20 n.3.)

The industry is unique because the way patients pay for prescription drugs vastly differs from the way wholesalers, PBMs, and health insurers pay for those same products. (*Id*. ¶ 285.) The prices for the products in the distribution chain differ for each participating entity—"different actors pay different prices set by different entities for the same drugs." (*Id*.) Manufacturers do not sell medications directly to the consumers and therefore do not set the consumer price for any particular medication; however, they do set the list price (WAC), and consumers usually pay for prescription drugs based on the manufacturer's list price. (*Id*. ¶ 286.)

Health insurers cover all or a portion of their insured customers' medications costs, submit payments to pharmacies on behalf of their members, and receive a reimbursement amount depending on whether and where the medication falls on their PBMs' formularies—the ranked list of approved drugs an insurance plan will cover. (*Id*. ¶ 7.) When insured patients purchase a prescription medication from a pharmacy, both the patient and their insurer pay a portion of the purchase price based on the price negotiated by the PBMs. (*Id*. ¶ 300–04.) Manufacturers understand that the PBMs' formularies drive drug utilization: "if Manufacturers want their drugs to be prescribed and paid for, they must obtain preferrable formulary position on the PBM Defendants' formularies." (*Id*. ¶ 10.) Drug manufacturers may offer rebates to an insurer's PBM to gain formulary access for their prescription drugs. (*Id*. ¶¶ 20 n.3, 22, 345.) PBMs determine whether to pass along rebates to the health insurers, who in turn decide whether to share these cost-saving measures with consumers. (*Id*. ¶¶ 24–26.)

Here, the State alleges certain manufacturer defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin analog

products so they could offer rebates as a "secret Manufacturer Payment[]"[8] to PBM Defendants in exchange for preferred formulary placement, which the State contends caused it and its constituents to overpay for insulin products. (*Id.* ¶¶ 380–402.) The State maintains these Manufacturer Defendants artificially inflated the list prices for their insulin products to compete for preferred positions on the PBMs' drug formularies by offering increased rebates to PBMs. (*Id.* ¶¶ 403–08.) The State further alleges that PBMs use their own mail-order and retail pharmacies to get customers to pay these artificially inflated prices for insulin products, resulting in higher profits for PBMs. (*Id.* ¶¶ 409–20.) The State asserts that "Montana diabetics and payors[9], including the State, relied on the artificially inflated list prices by purchasing diabetic medications at such prices." (*Id.* ¶ 422.) The State attributes this pricing scheme to the Manufacturer Defendants' "list prices for the at-issue drugs [becoming] detached completely from actual prices," resulting in the "list prices bec[oming] increasingly misrepresentative to the point of becoming unlawful." (*Id.* ¶ 425.)

According to the State, the Manufacturer Defendants allegedly engaged in an unfair and unconscionable scheme of competing for formulary access of the largest PBMs[10] by unjustifiably raising the list prices for the insulin analog products so they could offer the middlemen-PBMs bloated rebates—so-called "spreads" between list prices and net prices. (*Id.* ¶¶ 405–07.) "Net Prices" refers to the prices PBM Defendants negotiate and pay for Manufacturer Defendants'

---

[8] The State defines Manufacturer Payments as when "[t]he Manufacturers, knowing formulary position directly correlates to sales volume, simply raise their reported prices and then secretly kick back a significant portion of that price to the PBM Defendants." (ECF No. 190-20 at 4.)

[9] The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

[10] The State asserts "PBM Defendants have taken over the market—controlling more than 80% of the market and managing pharmacy benefits for more than 270 million Americans." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 313.)

products after subtracting from the list prices the rebate amounts Manufacturer Defendants issued to them in order to gain formulary placement. (*Id*. ¶¶ 344, 349.) Net prices may fluctuate as they necessarily depend on PBM Defendants' negotiations with a particular manufacturer. (*Id*. ¶ 303.) The State contends Montana diabetics and payors, including the State, suffered monetary losses from overpaying for their insulin products because of PBM Defendants' formularies, which are at the center of the allegedly unfair and unconscionable Insulin Pricing Scheme. (*Id*. ¶¶ 339, 344.)

The State contends PBM rebates are part of an industry scheme to inflate the price of insulin products, whereby PBM Defendants use their leverage to set formularies and increase profits. (*Id*. ¶¶ 316, 336, 536.) PBM Defendants allegedly: (1) negotiate prices payors pay for prescription drugs, (2) separately negotiate a different (and often lower) price for in-network pharmacies, (3) set the amount in fees the pharmacy pays back to the PBM, (4) set the price paid for each drug sold through mail-order pharmacies, and (5) negotiate the amount manufacturers pay back to the PBMs. (*Id*. ¶ 303.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost; accordingly, using formularies gives PBM Defendants wide latitude to extract rebates from manufacturers. (*Id*. ¶¶ 314, 383–85.) The State argues manufacturers offer PBM Defendants higher spreads in exchange for preferred positions on their drug formularies, rather than lowering their list prices for their prescription drugs. (*Id*. ¶¶ 403–05.) The State contends "[t]hese relationships allow PBM[ Defendants] to exert tremendous influence over what drugs are available throughout Montana and at what prices." (*Id*. ¶ 302.) Manufacturer Defendants, "working in coordination with the PBM[ Defendants]," "artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBM[ Defendants]," resulting in the State and diabetic Montana residents being "overcharged

millions of dollars a year," which "directly and proximately caused injuries to consumers in the State of Montana." (*Id*. ¶¶ 20, 28–29, 344.)

### B. Procedural History

On September 29, 2022, the State of Montana, through Attorney General Austin Knudsen, filed a Complaint in the Montana First Judicial District Court, Lewis and Clark County. (Dkt. No. 2:23-cv-04214, ECF No. 12.) The matter was removed to the United States District Court for the District of Montana, Helena Division, on November 14, 2022.[11] (Dkt. No. 2:23-cv-04214, ECF No. 1.) A Supplemental Notice of Removal was filed on November 15, 2022. (Dkt. No. 2:23-cv-04214, ECF No. 2.) The State filed its First Amended Complaint on January 9, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 40[12].)

On February 23, 2023, Evernorth filed its Motion to Dismiss the State's First Amended Complaint for lack of jurisdiction.[13] (Dkt. No. 2:23-cv-04214, ECF Nos. 86, 87.) The State filed its Opposition on March 31, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 110.) Evernorth filed its Reply in support of its Motion on April 28, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 128.) The court heard oral argument on the Motion on May 15, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 150.)

---

[11] Evernorth, along with co-defendants Express Scripts Administrators, LLC and Medco Health Solutions, Inc., filed their Answer to the State's Complaint in state court also on November 14, 2022. Evernorth filed this Answer on the federal docket on December 7, 2022. (Answer, Dkt. No. 2:23-cv-04214, ECF No. 15.)

[12] The First Amended Complaint was refiled on the Insulin Pricing Litigation MDL docket at ECF No. 190-29 for purposes of the motions to dismiss.

[13] Evernorth similarly joined in the February 23, 2023 Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by Express Scripts, CVS Caremark, and OptumRx, which is addressed in a separate opinion. (Dkt. No. 2:23-cv-04214, ECF Nos. 96, 97.)

However, on May 9, 2023, prior to the District of Montana's oral argument, the State, along with movants the States of Arkansas, Illinois, Kansas, and Mississippi, filed with the Judicial Panel on Multidistrict Litigation ("JPML") their motion for transfer of actions pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings. (Dkt. No. 2:23-cv-04214, ECF No. 136.) On August 7, 2023, the JPML issued a Transfer Order, transferring this matter to this Court in the District of New Jersey. (Dkt. No. 2:23-cv-04214, ECF No. 160.) Pursuant to Case Management Order No. 7 (ECF No. 141), the parties re-filed their respective briefings on May 31, 2024 (ECF Nos. 190-14, 190-20, 190-24).

## II.    LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(2)

A court must have personal jurisdiction over all parties in a case. Fed. R. Civ. P. 12(b)(2). The burden is on the plaintiff to demonstrate that personal jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Specifically, when a defendant moves to dismiss the complaint for lack of personal jurisdiction, and the motion is based on written materials rather than the evidence presented, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)).

The plaintiff may use the pleadings and any declarations to support facts warranting jurisdiction, but the plaintiff cannot solely use the allegations in the complaint to meet the jurisdictional burden. *Id*. The court accepts as true any uncontroverted allegations of the plaintiff. *Isakson v. Roberts Markel Weinberg Butler Hailey PC*, Civ. A. No. 23-00139, 2024 WL 1533957, at *4 (D. Mont. Apr. 9, 2024). Controverted allegations are resolved in favor of the plaintiff. *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022); *see also Isakson*, 2024 WL

1533957, at *2 ("[I]n the case of dueling affidavits, 'conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor.'" (citation omitted)).

When opposing a defendant's motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted). "Plaintiffs cannot 'rest' on the bare allegations of the [c]omplaint." *Cataraha v. Elemental Prism, LLC*, Civ. A. No. 17-00128, 2018 WL 3448283, at *1 (D. Mont. July 17, 2018) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)); *see also Chem Lab Prods., Inc. v. Stepanek*, 554 F.2d 371, 372 (9th Cir. 1977) ("The mere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant."); *Data Disc., Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1284 (9th Cir. 1977) (noting courts in the Ninth Circuit "may not assume the truth of allegations in a pleading which are contradicted by affidavit"). Rather, the plaintiff is "obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction." *Amba Mktg. Sys.*, 551 F.2d at 787.

### B.  Montana Rule of Civil Procedure 4(b)(1)

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)); *see also Walden v. Fiore*, 571 U.S. 277, 283 (2014). In Montana, courts apply a two-step test to determine whether they have personal jurisdiction over a nonresident defendant. *Milky Whey, Inc. v. Dairy Partners, LLC*, 342 P.3d 13, 17 (Mont. 2015). Courts first consider whether personal jurisdiction exists under Montana's long-arm statute—Rule 4(b)(1) of the Montana Rules of Civil Procedure. Second, courts must consider whether the

10

exercise of personal jurisdiction comports with due process.[14] *Milky Whey*, 342 P.3d at 17. Due process "depends on the defendants having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). "The defendant . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Id.* at 359 (alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "Accordingly, exercising specific personal jurisdiction over a defendant is only appropriate when both the defendant and the underlying controversy are appropriately affiliated with Montana." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 443 P.3d 407, 412 (Mont. 2019).

### III. DECISION

Evernorth argues that the State's First Amended Complaint should be dismissed in its entirety, as the State has failed to establish either general or specific personal jurisdiction over Evernorth. (ECF No. 190-14 at 3–8.) The State responds that its jurisdictional factual allegations are uncontested and must be accepted as true, thereby establishing prima facie personal jurisdiction over Evernorth. (ECF No. 190-20 at 11–22.) Alternatively, the State argues that should the Court find the State falls short of making its required showing of personal jurisdiction, it is entitled to jurisdictional discovery. (ECF No. 190-20 at 22–24.)

---

[14] However, "[i]f the requirements of Montana's long-arm statute are not met, the court needs not address due process." *Evens v. Connolly*, Civ. A. No. 20-00165, 2021 WL 1341866, at *2 (D. Mont. Feb. 24, 2021) (citing *Gulick v. Lynden, Inc.* Civ. A. No. 16-00039, 2016 WL 9674478, at *2 (D. Mont. Oct. 7, 2016)).

### A.  General Jurisdiction

Evernorth contends the State has not alleged sufficient facts to support general jurisdiction over Evernorth. (ECF No. 190-14 at 3–4.) The State disagrees and asserts that its allegations are sufficient to confer general jurisdiction. (ECF No. 190-20 at 11–12.)

"General personal jurisdiction exists when a corporation's affiliations with Montana are so continuous and systematic as to render it essentially at home in Montana." *DeLeon v. BNSF Ry. Co.*, 426 P.3d 1, 4 (Mont. 2018) (citing *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 412–13 (2017)); *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011). A corporation is essentially at home either where it is incorporated, where it maintains its principal place of business, or, in exceptional cases, where its continuous corporate affiliations are "so substantial and of such a nature as to justify suit . . . *on causes of action arising from dealings entirely distinct from those activities*." *Id*. (alteration in original) (quoting *Daimler*, 571 U.S. at 138–39).

Evernorth argues it is not subject to general jurisdiction in Montana because it is neither incorporated in nor has its principal place of business in Montana. (ECF No. 190-14 at 4.) Indeed, this Court agrees that Evernorth, which is incorporated in Delaware with its principal place of business in Missouri, is not subject to general personal jurisdiction in Montana. (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 127.)

### B.  Specific Jurisdiction

Evernorth argues it is not subject to specific personal jurisdiction in Montana because the State does not allege any Evernorth-specific contacts with the State. (ECF No. 190-14 at 4–8; ECF No. 190-24 at 3–7.) Evernorth contends the State does not allege Evernorth purposely directed any activities towards Montana both because "personal jurisdiction requires more than a suggestion that conduct ultimately had an effect in Montana," and because "the Court cannot bootstrap its

12

ability to exercise jurisdiction over Evernorth's subsidiaries or affiliates for the purpose of exercising jurisdiction over Evernorth." (ECF No. 190-14 at 5–6.) The State responds that Evernorth itself purposely directed its activities at Montana and that Evernorth's contacts with Montana directly relate to the State's claims against it, thereby making the exercise of jurisdiction over Evernorth for the State's claims "imminently reasonable" under a due process analysis. (ECF No. 190-20 at 15–22.) The State alternatively requests that this Court grant leave for jurisdictional discovery regarding Evernorth's Montana contacts, involvement in the Insulin Pricing Scheme, and corporate structure. (ECF No. 190-20 at 22–24.)

Pursuant to Mont. R. Civ. P. 4(b)(1), Montana courts can exercise specific jurisdiction over any person if the claim "arises from the specific circumstances set forth in Montana's long-arm statute." *Buckles v. Cont'l Res., Inc.*, 402 P.3d 1213, 1217 (Mont. 2017). Parties are subject to specific jurisdiction "as to any claim for relief arising from the doing personally, or through an employee or agent, of any" of the following enumerated acts:

> (A) the transaction of any business within Montana;
>
> (B) the commission of any act resulting in accrual within Montana of a tort action;
>
> (C) the ownership, use, or possession of any property, or of any interest therein, situated within Montana;
>
> (D) contracting to insure any person, property, or risk located within Montana at the time of contracting;
>
> (E) entering into a contract for services to be rendered or for materials to be furnished in Montana by such person;
>
> (F) acting as director, manager, trustee, or other officer of a corporation organized under the laws of, or having its principal place of business within, Montana; or
>
> (G) acting as personal representative of any estate within Montana.

Mont. R. Civ. P. 4(b)(1). "A Montana court may assert specific personal jurisdiction over a nonresident defendant when the plaintiff's cause of action *arises from* the doing of any act set forth in M[ont]. R. Civ. P. 4(b)(1)." *Sw. Distrib. Co. v. Mont. Nineteenth Jud. Dist. Ct., Lincoln Cnty.*, 562 P.3d 199, 205 (Mont. 2024). "Specific, or 'case-linked,' jurisdiction depends on an affiliation between the forum and the underlying controversy, principally an activity or occurrence that takes place in the forum state and is therefore subject to the state's regulation." *Id.* (quoting *Tackett v. Duncan*, 334 P.3d 920, 925 (Mont. 2014)). Accordingly, "specific jurisdiction focuses on the 'relationship among the defendant, the forum, and the litigation,' and depends on whether the defendant's 'suit-related conduct' created a substantial connection with the forum state." *Tackett*, 334 P.3d at 925 (first quoting *Daimler*, 571 U.S. at 132–33, then quoting *Walden*, 571 U.S. at 284).

When evaluating the first prong of the specific jurisdiction analysis, courts must determine whether the defendant has purposefully directed its activities towards the forum state, purposefully availed itself of the privilege of conducting activities in the forum state, or a combination of the two. *See Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205–06 (9th Cir. 2006). For claims sounding in tort, courts "most often employ a purposeful direction analysis," asking "whether a defendant 'purposefully direct[s] his activities' at the forum state." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (alteration in original) (first citing *Schwarzenegger*, 375 F.3d at 802; and then quoting *Yahoo!*, 433 F.3d at 1206); *see also Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020) ("Purposeful availment generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort."). The State's claims for violation of the Montana Unfair Trade

14

Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-101, *et seq.*, and unjust enrichment sound in tort, and therefore the Court will proceed to the purposeful direction analysis.

Evernorth argues the State cannot establish personal jurisdiction over it because it did not purposefully direct any activities toward Montana. (ECF No. 190-14 at 5.) Evernorth points out that the State fails to allege any conduct in Montana or purposefully directed towards Montana, noting the State "does not allege that Evernorth has any offices in Montana, entered into any contracts with the State," "entered into any contract with any citizen of Montana," or "has a registered agent in Montana." (*Id.*) The State responds that it "has alleged that Evernorth through its executives and employees is directly involved in the PBM services and formulary construction giving rise to the State's claims for injuries to Montana." (ECF No. 190-20 at 12–13.) In support of its argument, the State cites to paragraphs 129 and 164 of the First Amended Complaint, which allege that "Evernorth . . . is directly involved in shaping the company policies that inform its PBM services and formulary construction . . . related to the Insulin Pricing Scheme" (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 129), and that Evernorth is directly involved in the conduct and control of Express Scripts' operations, management, business decisions, Manufacturer Payments, and mail-order pharmacy services "[a]s a result of numerous interlocking directorships and shared executives" (*Id.* ¶ 164).

Courts evaluate purposeful direction under the *Calder* effects test, *see Calder v. Jones*, 465 U.S. 783 (1984), which focuses on whether the effects of the defendant's actions were felt in the forum state. *See also Walden*, 571 U.S. at 286–88; *Burri Law PA v. Skurla*, 35 F.4th 1207, 1213 (9th Cir. 2022). Under this test, the defendant "must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo*, 647 F.3d at 1228.

15

An intentional act refers to "an intent to perform an actual, physical act in the real world," regardless of the intended consequences. *Schwarzenegger*, 375 F.3d at 806. "If the defendant knows his acts will reach a state and have a potential impact on the plaintiff, and defendant knows that the harm would be felt in that state, the acts are purposefully directed at the forum." *Doverspike v. Murphy*, Civ. A. No. 21-00029, 2021 WL 3604813, at *4 (D. Mont. Aug. 13, 2021) (citing *Calder*, 465 U.S. at 788–89).

The State maintains that Evernorth is subject to specific jurisdiction because it "is directly involved in shaping the company policies that inform its PBM services and formulary construction . . . related to the Insulin Pricing Scheme." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 129; 190-20 at 13–14.) The State asserts that "the Evernorth corporate family controls the health plan/insurer, the PBM and the mail order pharmacies utilized by approximately 15 million Cigna members in the United States and in Montana. Evernorth controls the entire drug pricing chain for these 15 million Americans." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 136.) However, it is unclear from the allegations in the First Amended Complaint whether the State contends Evernorth itself provided these services in Montana or whether merely its subsidiaries did.[15] Given the highly fact-specific

---

[15] The State further alleges that Evernorth's CEO served as a member of the Pharmaceutical Care Management Association's ("PCMA") Board of Directors. (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 322.) The State contends that "[t]he PCMA has brought numerous lawsuits and lobbying campaigns aimed at blocking drug pricing transparency efforts[.]" (*Id.* ¶ 334.) The State argues that the actions of the PCMA "plainly constitutes intentional acts by Evernorth." (ECF No. 190-20 at 17.) However, the State cited no authority supporting the proposition that the acts of a trade association, through its one shared officer of a corporation, imputes jurisdiction onto that corporation. Moreover, the State merely notes that the Evernorth CEO was a past member of the PCMA Board of Directors. (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 322.) It is not clear from the State's allegations whether Evernorth's CEO was on the PCMA Board of Directors at the relevant time. Further, the State makes clear that Evernorth did not have the "pervasive control" required to advance any alter-ego or agency theory of jurisdiction, as the State notes the PCMA Board of Directors is currently comprised of executives from Express Scripts, OptumRx, CVS Health, CVS Caremark, and potentially others. (*See id.*) *See also Ranza*, 793 F.3d at 1073 (recognizing the alter ego theory of jurisdiction necessitates demonstration of unity of interest and ownership between

nature of this inquiry, *see Groo*, 537 P.3d at 119, the Court cannot definitively say Evernorth's actions did not give rise to the accrual of a tort in Montana.

Because there are ambiguities in the record, and because the State has stated a colorable basis for jurisdiction, the Court proceeds to the State's request for jurisdictional discovery before deciding the motion to dismiss.

### C. Jurisdictional Discovery

In the alternative, the State asserts it is entitled to jurisdictional discovery regarding "Evernorth's involvement in the Insulin Pricing Scheme," and "the corporate relationship or lack of corporate separateness between Evernorth and the Express Scripts entities." (ECF No. 190-20 at 22–23.)

"Jurisdictional discovery 'should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 507 (9th Cir. 2023) (quoting *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003)). Discovery is useful when "jurisdictional facts are contested or more facts are needed." *Laub*, 342 F.3d at 1093. However, "a mere hunch that discovery might yield jurisdictionally relevant facts, or bare allegations in the face of specific denials, are insufficient reasons for a court to grant jurisdictional discovery." *LNS Enters.*, 22 F.4th at 864–65 (cleaned up). "A district court is vested with broad discretion to permit or deny discovery, and a decision to deny discovery will not be disturbed except upon the clearest showing

---

the two entities, requiring "pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation" (internal citations and quotation marks omitted)).

17

that the denial of discovery results in actual and substantial prejudice to the complaining litigant." *Laub*, 342 F.3d at 1093 (internal quotation marks and citation omitted).

To justify discovery, a plaintiff must make a preliminary showing of jurisdiction, meaning the plaintiff must provide a "colorable basis" for personal jurisdiction, which is lower than the prima facie burden required to survive a motion to dismiss. *Isakson*, 2024 WL 1533957, at *8. The plaintiff then "must specify what facts they expect to uncover during discovery and how those facts would support personal jurisdiction." *First Nat'l Bank of Sioux Falls v. Est. of Carlson*, 448 F. Supp. 3d 1091, 1108 (D. Mont. 2020) (citation omitted).

Here, the State contends it is seeking "any information that would further illuminate Evernorth's role in the [Insulin Pricing] Scheme and the corporate relationship or lack of corporate separateness between Evernorth and the Express Scripts entities."[16] (ECF No. 190-20 at 23.) The Court agrees that jurisdictional discovery is warranted. There is an appreciable dispute regarding Evernorth's involvement in the alleged Insulin Pricing Scheme, as the State alleges "Evernorth . . . is directly involved in shaping the company policies that inform its PBM services and formulary construction" (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 129), while Evernorth maintains that it is merely "a holding company parent" of Express Scripts (ECF No. 190-12 at 1, 5–7). The Court grants jurisdictional discovery to the State because "[t]he record is simply not sufficiently developed to enable us to determine whether the alter ego or agency tests are met." *See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003)

---

[16] Specifically, the State identifies which "specific, discrete facts" it hopes to ascertain during jurisdictional discovery, including: (1) "Evernorth's involvement . . . in selecting pharmacy benefit plans and drug schedules"; (2) "Evernorth's participation and influence over the PCMA"; (3) "[h]ow Evernorth executives and employees shape and direct policies and strategic goals that guide Express Scripts PBM services"; and (4) "Evernorth's communications and coordination with Manufacturer Defendants at specific executive meetings." (ECF No. 190-20 at 23–24.)

(remanding the matter to allow jurisdictional discovery "to allow [plaintiff] the opportunity to develop the record and make a prima facie showing of jurisdictional facts with respect to [defendant's parent holding company]").

Because the State's request for jurisdictional discovery "might well demonstrate facts sufficient to constitute a basis for jurisdiction," the Court grants the State's request to conduct jurisdictional discovery.[17] *See id.*

## IV.    CONCLUSION

For the reasons set forth above, the State's request for jurisdictional discovery is **GRANTED**, and Evernorth's Motion to Dismiss (ECF Nos. 190-13–14, 190-24) pursuant to Federal Rule of Civil Procedure 12(b)(2) is **DENIED** with leave to refile at the conclusion of jurisdictional discovery. An appropriate Order follows.

Date: September 5, 2025                          */s/ Brian R. Martinotti*
                                                **HON. BRIAN R. MARTINOTTI**
                                                **UNITED STATES DISTRICT JUDGE**

---

[17] Counsel are directed to meet and confer and submit to the Court a proposed order outlining the scope of jurisdictional discovery and all related deadlines within thirty (30) days.