<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW)** <br> **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *The State of Montana, ex. rel. Austin Knudsen, Attorney General v. Eli Lilly and Company, et al.* <br><br> Case No. 2:23-cv-04214 | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendants UnitedHealth Group Incorporated's ("UHG") and

OptumInsight, Inc.'s ("OptumInsight") (together, "Moving Defendants") Motion to Dismiss[1]

Plaintiff State of Montana's (the "State") First Amended Complaint (Dkt. No. 2:23-cv-04214, ECF

---

[1] Pursuant to Case Management Order #7—Order Governing Motions to Dismiss in the State Attorney General Track ("State AG Track") (ECF No. 141), the State AG Track cases were directed to refile all Fed. R. Civ. P. 12 motions and related exhibits, responses, and replies in the following State AG Track cases: *Illinois ex rel. Raoul v. Eli Lilly & Co. et al.*, No. 2:23-cv-04242 (the "Illinois Action"), and *Montana ex rel. Knudsen v. Eli Lilly & Co. et al.,* No. 2:23-cv-04214 (the "Montana Action"). Consequently, in addition to this Motion, the following motions were filed in connection with the Montana Action: (1) CVS Health Corporation (ECF Nos. 190-15–16) and Evernorth Health, Inc.'s (ECF Nos. 190-13–14) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and (2) Manufacturer Defendants' (ECF Nos. 190-1–10) and PBM Defendants' (ECF Nos. 190-11–12) motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Moving Defendants joined PBM Defendants' Rule 12(b)(6) Motion to Dismiss, which is addressed in a separate opinion. The following motions are pending in the Illinois Action: motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by Evernorth Health, Inc. (ECF No. 190-31), Moving Defendants (ECF No. 190-35), and CVS Health Corporation (ECF No. 190-33), and motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) by Manufacturer Defendants (ECF No. 190-37) and PBM Defendants (ECF No. 190-39). This Opinion only resolves Moving Defendants' Motion to Dismiss pursuant to Rule 12(b)(2). (ECF Nos. 190-17–18.) The other motions filed pursuant to Case Management Order #7 will be addressed separately.

No. 40)[2] pursuant to Federal Rule of Civil Procedure 12(b)(2) (the "Motion"). (ECF Nos. 190-17, 190-18.) The State filed an Opposition to Moving Defendants' Motion (ECF No. 190-19), and Moving Defendants filed a Reply in support of their Motion (ECF No. 190-25). Having reviewed and considered the submissions filed in connection with the Motion, and for the reasons set forth below and for good cause having been shown, the State's request for jurisdictional discovery is **GRANTED**, and Moving Defendants' Motion to Dismiss is **DENIED** with leave to refile at the conclusion of jurisdictional discovery.

## I.    BACKGROUND

### A.  Factual History[3]

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the First Amended Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987).[4] "In ruling on a motion to dismiss for lack of personal jurisdiction under [Federal] Rule [of Civil Procedure] 12(b)(2), a court may similarly

---

[2] At the direction of the Court, pursuant to Case Management Order #7, the motion and briefs were refiled on the master docket at ECF Nos. 190-17, 190-18, 190-19, 190-25. *See supra* n.1. The Court will use the citations on the master docket unless otherwise indicated.

[3] The Court assumes the parties' familiarity with the factual and procedural history of this matter and therefore only includes the facts and procedural history necessary to decide this Motion.

[4] Because the parties originally removed the case to the District of Montana, and merely refiled their Motion to Dismiss papers on the master docket (*see* ECF No. 141), the parties use Ninth Circuit law in their arguments. Accordingly, the Court analyzes the parties' arguments pursuant to Ninth Circuit law. *See In re Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020))).

consider 'uncontroverted allegations in the complaint.'" *Lindstrom v. Polaris Inc.*, Civ. A. No. 23-00137, 2024 WL 4237732, at *1 (D. Mont. Aug. 9, 2024) (quoting *Nationwide Agribusiness Ins. Co. v. Buhler Barth GmbH*, Civ. A. No. 15-00582, 2015 WL 6689572, at *3 (E.D. Cal. Oct. 30, 2015)).

This action arises out of Plaintiff State of Montana's challenge to Moving Defendants' allegedly unfair and unconscionable pricing scheme for their insulin medications (the "Insulin Pricing Scheme"). (*See generally* First Am. Compl. (Dkt. No. 2:23-cv-04214, ECF No. 40).) The sole plaintiff in this action is the State of Montana, brought in its name on relation of the Honorable Attorney General Austin Knudsen, pursuant to the Montana Unfair Trade Practices and Consumer Protection Act ("MCPA"). Mont. Code Ann. § 30-14-101, *et seq*. The State generally categorizes each defendant into one of two groups: Manufacturer Defendants or PBM Defendants.[5] (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 5–6.) The State alleges that "[d]uring the relevant time period, OptumRx, Inc. provided the PBM and mail-order pharmacy services in Montana that gave rise to the Insulin Pricing Scheme, which damaged diabetics and payors[6] in Montana." (*Id*. ¶ 200.) Although OptumRx, Inc. is not a party to this Motion, its activities are relevant because UHG "directly or indirectly owns all the stock of OptumRx, Inc. and OptumInsight[.]" (*Id*. ¶ 201.)

---

[5] Manufacturer Defendants include defendants Eli Lilly & Company, Novo Nordisk Inc., and Sanofi-Aventis U.S. LLC (together, "Manufacturer Defendants"). (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 5.) PBM Defendants include Evernorth Health Inc. (formerly Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions (together, "Express Scripts"); CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark PCS Health, LLC, and Caremark, LLC (together, "CVS Caremark"); and UHG, OptumRx Inc., and OptumInsight. (together, "OptumRx") (together, with Express Scripts and CVS Caremark, "PBM Defendants"). (*Id*. ¶ 6.)

[6] The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

PBM Defendants are pharmacy benefit managers ("PBMs"), or third-party administrators that negotiate drug costs and payments between health insurance providers and drug manufacturers.[7] (*Id*. ¶¶ 296–97.) Drug manufacturers set the list price for their prescription drugs, including insulin, which is known as the Wholesale Acquisition Cost ("WAC"). (*Id*. ¶¶ 285–87.) WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). The WAC serves as the reference point from which PBMs and drug manufacturers negotiate rebates. (*Id*. ¶¶ 295–303.) The WAC differs from, but is related to, the Average Wholesale Price ("AWP"), which refers to the "average price that wholesalers charge[] to providers like doctors and pharmacies."[8] *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass. 2008). Pharmaceutical manufacturers self-report the WAC to publishing compendiums such as First Databank, Redbook, and others. (*Id*. ¶ 287.)

Branded prescription drugs in the United States move through a complex distribution chain where pharmaceutical manufacturers typically sell their products to wholesalers at a negotiated price. (*Id*. ¶ 286.) Wholesalers then supply the medications to various providers such as pharmacies, hospitals, and clinics, who then distribute the pharmaceuticals to patients with prescriptions. (*Id*. ¶¶ 283–86.) Uninsured consumers ultimately pay the full price for medication,

---

[7] More specifically, the PBM Defendants "develop drug formularies, process claims, create a network of retail pharmacies, [and] set [drug] prices in coordination with [m]anufacturers[.]" (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 296.)

[8] "Typically, AWP was a twenty percent markup over WAC." *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 87. "[M]ost manufacturers continued to report AWPs consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were not actually charging these prices to providers and thus that the AWP relied on by Medicare and the [third-party payors] was not a true average price charged by wholesalers." *Id*.

whereas insured consumers pay for a portion of a drug's price through out-of-pocket costs such as deductibles, copayments, or coinsurance. (*Id.* ¶¶ 290–91.) Upstream payments to the manufacturers include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, and indirect purchase fees. (*Id.* ¶ 20 n.3.)

The industry is unique because the way patients pay for prescription drugs vastly differs from the way wholesalers, PBMs, and health insurers pay for those same products. (*Id.* ¶ 285.) The prices for the products in the distribution chain differ for each participating entity—"different actors pay different prices set by different entities for the same drugs." (*Id.*) Manufacturers do not sell medications directly to the consumers and therefore do not set the consumer price for any particular medication; however, they do set the list price (WAC), and consumers usually pay for prescription drugs based on the manufacturer's list price. (*Id.* ¶ 286.)

Health insurers cover all or a portion of their insured customers' medications costs, submit payments to pharmacies on behalf of their members, and receive a reimbursement amount depending on whether and where the medication falls on their PBMs' formularies—the ranked list of approved drugs an insurance plan will cover. (*Id.* ¶ 7.) When insured patients purchase a prescription medication from a pharmacy, both the patient and their insurer pay a portion of the purchase price based on the price negotiated by the PBMs. (*Id.* ¶ 300–04.) Manufacturers understand that the PBMs' formularies drive drug utilization: "if Manufacturers want their drugs to be prescribed and paid for, they must obtain preferrable formulary position on the PBM Defendants' formularies." (*Id.* ¶ 10.) Drug manufacturers may offer rebates to an insurer's PBM to gain formulary access for their prescription drugs. (*Id.* ¶¶ 20 n.3, 22, 345.) PBMs determine

whether to pass along rebates to the health insurer, who in turn decide whether to share these cost-saving measures with consumers. (*Id*. ¶¶ 24–26.)

Here, the State alleges certain Manufacturer Defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin analog products so they could offer rebates as a "secret Manufacturer Payment[]"[9] to PBM Defendants in exchange for preferred formulary placement, which the State contends caused it and its constituents to overpay for insulin products. (*Id*. ¶¶ 380–402.) The State maintains these Manufacturer Defendants artificially inflated the list prices for their insulin products to compete for preferred positions on the PBMs' drug formularies by offering increased rebates to PBMs. (*Id*. ¶¶ 403–08.) The State further alleges that PBMs use their own mail-order and retail pharmacies to get customers to pay these artificially inflated prices for insulin products, resulting in higher profits for PBMs. (*Id*. ¶¶ 409–20.) The State asserts that "Montana diabetics and payors, including the State, relied on the artificially inflated list prices by purchasing diabetic medications at such prices." (*Id*. ¶ 422.) The State attributes this pricing scheme to the Manufacturer Defendants' "list prices for the at-issue drugs [becoming] detached completely from actual prices," resulting in the "list prices bec[oming] increasingly misrepresentative to the point of becoming unlawful." (*Id*. ¶ 425.)

According to the State, the Manufacturer Defendants allegedly engaged in an unfair and unconscionable scheme of competing for formulary access of the largest PBMs[10] by unjustifiably

---

[9] The State defines Manufacturer Payments as when "[t]he Manufacturers, knowing formulary position directly correlates to sales volume, simply raise their reported prices and then secretly kick back a significant portion of that price to the PBM Defendants." (ECF No. 190-19 at 5.)

[10] The State asserts "PBM Defendants have taken over the market—controlling more than 80% of the market and managing pharmacy benefits for more than 270 million Americans." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 313.)

raising the list prices for the insulin analog products so they could offer the middlemen-PBMs bloated rebates—so-called "spreads" between list prices and net prices. (*Id.* ¶¶ 405–07.) "Net Prices" refers to the prices PBM Defendants negotiate and pay for Manufacturer Defendants' products after subtracting from the list prices the rebate amounts Manufacturer Defendants issued to them to gain formulary placement. (*Id.* ¶¶ 344, 349.) Net prices may fluctuate as they necessarily depend on PBM Defendants' negotiations with a particular manufacturer. (*Id.* ¶ 303.) The State contends Montana diabetics and payors, including the State, suffered monetary losses from overpaying for their insulin products because of PBM Defendants' formularies, which are at the center of the allegedly unfair and unconscionable Insulin Pricing Scheme. (*Id.* ¶¶ 339, 344.)

The State claims PBM rebates are part of an industry scheme to inflate the price of insulin products, whereby PBM Defendants use their leverage to set formularies and increase profits. (*Id.* ¶¶ 316, 336, 536.) PBM Defendants allegedly: (1) negotiate prices payors pay for prescription drugs, (2) separately negotiate a different (and often lower) price for in-network pharmacies, (3) set the amount in fees the pharmacy pays back to the PBM, (4) set the price paid for each drug sold through mail-order pharmacies, and (5) negotiate the amount manufacturers pay back to the PBMs. (*Id.* ¶ 303.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost; accordingly, using formularies gives PBM Defendants wide latitude to extract rebates from manufacturers. (*Id.* ¶¶ 314, 383–85.) The State argues manufacturers offer PBM Defendants higher spreads in exchange for preferred positions on their drug formularies, rather than lower their list prices for their prescription drugs. (*Id.* ¶¶ 403–05.) The State contends "[t]hese relationships allow PBM[ Defendants] to exert tremendous influence over what drugs are available throughout Montana and at what prices." (*Id.* ¶ 302.) Manufacturer Defendants, "working in coordination with the PBM[ Defendants]," "artificially

inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBM[ Defendants]," resulting in the State and diabetic Montana residents being "overcharged millions of dollars a year," which "directly and proximately caused injuries to consumers in the State of Montana." (*Id.* ¶¶ 20, 28–29, 520.)

### B. Procedural History

On September 29, 2022, the State of Montana, through Attorney General Austin Knudsen, filed a Complaint in the Montana First Judicial District Court, Lewis and Clark County. (Dkt. No. 2:23-cv-04214, ECF No. 12.) The matter was removed to the United States District Court for the District of Montana, Helena Division, on November 14, 2022. (Dkt. No. 2:23-cv-04214, ECF No. 1.) A Supplemental Notice of Removal was filed on November 15, 2022. (Dkt. No. 2:23-cv-04214, ECF No. 2.) The State filed its First Amended Complaint on January 9, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 40.[11])

On February 23, 2023, Moving Defendants filed their Motion to Dismiss Montana's First Amended Complaint for lack of jurisdiction.[12] (Dkt. No. 2:23-cv-04214, ECF Nos. 94, 95.) The State filed its Opposition on March 31, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 109.) Moving Defendants filed their Reply in support of their Motion on April 28, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 129.) The court heard oral argument on the Motion on May 15, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 150.)

---

[11] The First Amended Complaint was refiled on the Insulin Pricing Litigation MDL docket at ECF No. 190-29 for purposes of the motions to dismiss.

[12] Moving Defendants similarly joined in the February 23, 2023 Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by Express Scripts, CVS Caremark, and OptumRx (Dkt. No. 2:23-cv-04214, ECF Nos. 96, 97), which is addressed in a separate opinion.

However, on May 9, 2023, prior to the District of Montana's oral argument, the State, along with movants the States of Arkansas, Illinois, Kansas, and Mississippi, filed with the Judicial Panel on Multidistrict Litigation ("JPML") their motion for transfer of actions pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings. (Dkt. No. 2:23-cv-04214, ECF No. 136.) On August 7, 2023, the JPML issued a Transfer Order, transferring this matter to this Court in the District of New Jersey. (Dkt. No. 2:23-cv-04214, ECF No. 160.) Pursuant to Case Management Order No. 7 (ECF No. 141), the parties re-filed their respective briefings on May 31, 2024 (ECF Nos. 190-17–19, 190-25).

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(2)

A court must have personal jurisdiction over all parties in a case. Fed. R. Civ. P. 12(b)(2). The burden is on the plaintiff to demonstrate that personal jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Specifically, when a defendant moves to dismiss the complaint for lack of personal jurisdiction, and the motion is based on written materials rather than the evidence presented, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)).

The plaintiff may use the pleadings and any declarations to support facts warranting jurisdiction, but the plaintiff cannot solely use the allegations in the complaint to meet the jurisdictional burden. *Id*. The court accepts as true any uncontroverted allegations of the plaintiff. *Isakson v. Roberts Markel Weinberg Butler Hailey PC*, Civ. A. No. 23-00139, 2024 WL 1533957, at \*4 (D. Mont. Apr. 9, 2024). Controverted allegations are resolved in favor of the plaintiff. *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022); *see also Isakson*, 2024 WL

9

1533957, at \*2 ("[I]n the case of dueling affidavits, 'conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor.'" (citation omitted)).

When opposing a defendant's motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted). "Plaintiffs cannot 'rest' on the bare allegations of the [c]omplaint." *Cataraha v. Elemental Prism, LLC*, Civ. A. No. 17-00128, 2018 WL 3448283, at \*1 (D. Mont. July 17, 2018) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)); *see also Chem Lab Prods., Inc. v. Stepanek*, 554 F.2d 371, 372 (9th Cir. 1977) ("The mere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant."); *Data Disc., Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1284 (9th Cir. 1977) (noting courts in the Ninth Circuit "may not assume the truth of allegations in a pleading which are contradicted by affidavit"). Rather, the plaintiff is "obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction." *Amba Mktg. Sys.*, 551 F.2d at 787.

### B.  Montana Rule of Civil Procedure 4(b)(1)

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)); *see also Walden v. Fiore*, 571 U.S. 277, 283 (2014). In Montana, courts apply a two-step test to determine whether they have personal jurisdiction over a nonresident defendant. *Milky Whey, Inc. v. Dairy Partners, LLC*, 342 P.3d 13, 17 (Mont. 2015). Courts first consider whether personal jurisdiction exists under Montana's long-arm statute—Rule 4(b)(1) of the Montana Rules of Civil Procedure. *Id*. Second, courts must consider whether the

exercise of personal jurisdiction comports with due process.[13] *Milky Whey*, 342 P.3d at 17. Due process "depends on the defendants having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). "The defendant . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Id.* at 359 (alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "Accordingly, exercising specific personal jurisdiction over a defendant is only appropriate when both the defendant and the underlying controversy are appropriately affiliated with Montana." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 443 P.3d 407, 412 (Mont. 2019).

**III.   DECISION**

Moving Defendants argue the State's First Amended Complaint should be dismissed in its entirety, as the State has failed to establish either general or specific personal jurisdiction over UHG and OptumInsight. (ECF No. 190-18 at 1–3.) The State responds that Moving Defendants ignore key jurisdictional factual allegations, which are uncontested and must be accepted as true, thereby establishing prima facie personal jurisdiction over Moving Defendants. (ECF No. 190-19 at 12–27.) Alternatively, the State argues that should the Court find the State falls short of making its required showing of personal jurisdiction, it is entitled to jurisdictional discovery. (ECF No. 190-19 at 27–29.)

---

[13] However, "[i]f the requirements of Montana's long-arm statute are not met, the court needs not address due process." *Evens v. Connolly*, Civ. A. No. 20-00165, 2021 WL 1341866, at *2 (D. Mont. Feb. 24, 2021) (citing *Gulick v. Lynden, Inc.* Civ. A. No. 16-00039, 2016 WL 8674478, at *2 (D. Mont. Oct. 7, 2016)).

### A.  General Jurisdiction

Moving Defendants contend this Court lacks general jurisdiction over them because the State failed to allege that either entity is at home in Montana. (ECF No. 190-18 at 6–8.) The State responds that it "does not contend that this Court has general jurisdiction over [UHG] or OptumInsight." (Dkt. No. 2:23-cv-04214, ECF No. 40 at 20 n.4.) Therefore, the Court agrees that Moving Defendants are not subject to general jurisdiction.[14]

### B.  Specific Jurisdiction Under the Long-Arm Statute

Moving Defendants argue this Court lacks specific personal jurisdiction over them because "[t]he State does not allege facts showing that this suit arises from either company engaging in any of the activities enumerated in the statute." (ECF No. 190-18 at 8–12.) Specifically, Moving Defendants contend the State failed to allege "(1) that its claims arise from UHG's or OptumInsight's transacting business in Montana; (2) that its claims arise from a UHG or OptumInsight contract relating to Montana; or (3) that UHG's or OptumInsight's acts resulted in the accrual of torts in Montana on which this case is based." (*Id*. at 9.) The State counters that both UHG and OptumInsight are subject to personal jurisdiction in Montana under the long-arm statute. (ECF No. 190-19 at 15–16.) Regarding UHG, the State argues it is uncontroverted that UHG employees and executives were involved in the PBM services and formulary construction giving rise to its claims, and therefore UHG's "PBM services" "are substantial and constitute the

---

[14] The Court notes that even if it were to conduct a general jurisdiction analysis, it would find Moving Defendants are not subject to general jurisdiction in Montana, as the State alleges UHG and OptumInsight are both incorporated in Delaware with their principal places of business in Minnesota. (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 180, 189.) *See DeLeon v. BNSF Ry. Co.*, 426 P.3d 1, 4–5 (Mont. 2018) ("General personal jurisdiction exists when a corporation's affiliations with Montana are so continuous and systematic as to render it essentially at home in Montana. A corporation is essentially at home where it is incorporated; where it maintains its principal place of business; or, in exceptional cases, where its continuous and systematic affiliations with the state render it essentially at home[.]" (citations omitted)).

transaction of business in Montana" and are directly related to the State's claims "because the business transacted by [UHG] *is* the carrying-out of the Insulin Pricing Scheme in Montana." (*Id.* at 16.) As to OptumInsight, the State argues the entity "implicitly admitted . . . that it is registered to do business in Montana and holds an active license with Montana Department of Insurance." (*Id.*)

Pursuant to Mont. R. Civ. P. 4(b)(1), Montana courts can exercise specific jurisdiction over any person if the claim "arises from the specific circumstances set forth in Montana's long-arm statute." *Buckles v. Cont'l Res., Inc.*, 402 P.3d 1213, 1217 (Mont. 2017). Parties are subject to specific jurisdiction "as to any claim for relief arising from the doing personally, or through an employee or agent, of any" of the following enumerated acts:

> (A) the transaction of any business within Montana;
>
> (B) the commission of any act resulting in accrual within Montana of a tort action;
>
> (C) the ownership, use, or possession of any property, or of any interest therein, situated within Montana;
>
> (D) contracting to insure any person, property, or risk located within Montana at the time of contracting;
>
> (E) entering into a contract for services to be rendered or for materials to be furnished in Montana by such person;
>
> (F) acting as director, manager, trustee, or other officer of a corporation organized under the laws of, or having its principal place of business within, Montana; or
>
> (G) acting as personal representative of any estate within Montana.

Mont. R. Civ. P. 4(b)(1). "A Montana court may assert specific personal jurisdiction over a nonresident defendant when the plaintiff's cause of action *arises from* the doing of any act set forth in M[ont]. R. Civ. P. 4(b)(1)." *Sw. Distrib. Co. v. Mont. Nineteenth Jud. Dist. Ct., Lincoln Cnty.*,

562 P.3d 199, 205 (Mont. 2024). "Specific, or 'case-linked,' jurisdiction depends on an affiliation between the forum and the underlying controversy, principally an activity or occurrence that takes place in the forum state and is therefore subject to the state's regulation." *Id.* (quoting *Tackett v. Duncan*, 334 P.3d 920, 925 (Mont. 2014)). Accordingly, "specific jurisdiction focuses on the 'relationship among the defendant, the forum, and the litigation,' and depends on whether the defendant's 'suit-related conduct' created a substantial connection with the forum state." *Tackett*, 334 P.3d at 925 (first quoting *Daimler*, 571 U.S. at 132–33, then quoting *Walden*, 571 U.S. at 284).

## 1. UHG

First addressing personal jurisdiction under Montana's long-arm statute as to UHG, UHG argues "there are no factual allegations that it 'transacted business' within Montana." (ECF No. 190-18 at 9.) However, the State maintains that it "specifically alleged the ways in which the [Insulin Pricing] Scheme executed by [UHG] and OptumInsight *in Montana* violated the MCPA, caused injury to Montana consumers, and unjustly enriched the Defendants." (ECF No. 190-19 at 17.) In support of its argument, the State cites to its allegations supporting its claim under the MCPA and its claim for unjust enrichment. (*Id.* (citing Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 510–33).)

In asserting UHG is subject to specific jurisdiction, the State seems to impute the actions of UHG's subsidiaries and other related entities onto UHG to give rise to personal jurisdiction in Montana.[15] The State alleges in conclusive fashion that "[UHG]'s conduct had a direct effect in

---

[15] Notably, the State does not raise any sort of agency or alter ego theory of liability to impute OptumRx, Inc.'s contacts with Montana onto UHG for purposes of establishing personal jurisdiction. *See Ranza*, 793 F.3d at 1070. "As in the context of corporate liability, the veil separating affiliated corporations may also be pierced to exercise personal jurisdiction over a foreign defendant in certain limited circumstances." *Id.* at 1071. However, it is clear from the State's allegations contained in the First Amended Complaint and its arguments made in opposition to Moving Defendants' Motion that it is not advancing an agency or alter-ego theory

Montana and damaged diabetics and payors in Montana and the State." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 188.) However, the State fails to allege that UHG *itself* took any action that would subject it to personal jurisdiction in Montana. Rather, it contends that "[d]uring the relevant time period, *OptumRx, Inc. provided the PBM and mail-order pharmacy services in Montana that gave rise to the Insulin Pricing Scheme*, which damaged diabetics and payors in Montana," attributing OptumRx, Inc.'s actions to that of UHG because "[UHG]'s executives and officers are directly involved in the policies and business decisions of OptumRx, Inc." and because "[m]ore than one-third of the overall revenues of [UHG] come from OptumRx[, Inc.] and OptumInsight."[16] (*Id.* ¶¶ 183, 200, 202 (emphasis added).)

The State does not sufficiently allege that UHG itself transacted any business in Montana to subject it to personal jurisdiction there. Other than conclusively alleging that "[UHG]'s conduct had a direct effect in Montana and damaged diabetics and payors in Montana and the State," the State has not made any other allegations linking UHG and Montana. (*See* Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 188.) The State neither alleges that UHG was registered to do business in Montana, had an office or any property in Montana, had any agents or employees living in Montana, entered into any contracts in Montana, or advertised in Montana. *See Milky Whey*, 342 P.3d at 18

---

of liability to establish personal jurisdiction over UHG; rather, the State contends that UHG itself transacted business in Montana. (ECF No. 190-19 at 16.)

[16] Though the State argues "the PBM services provided by [UHG] throughout the State of Montana are substantial and constitute the transaction of business in Montana," this argument is seemingly contradicted by the State's allegations in the First Amended Complaint, which claim "*OptumRx, Inc.* provided the PBM and mail-order pharmacy services in Montana that gave rise to the Insulin Pricing Scheme." (ECF No. 190-19 at 16; Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 200 (emphasis added).) The State's First Amended Complaint suggests OptumRx, Inc. was actually providing PBM services, whereas UHG "is directly involved in the company policies that inform its PBM services and formulary construction." (*Id.* ¶ 184 ("For example, executives of [UHG] *structure, analyze, and direct the company's overarching, enterprise-wide policies, including PBM and mail-order services*, as a means of maximizing profits across the corporate family." (emphasis added).)

(considering factors "such as the defendant company's local negotiations for various types of commercial transactions, the solicitation of business within the state, prior litigations in the forum, the presence of agents in the state, and the existence of ongoing contractual relationships with residents of the forum state" (citation omitted)). The State alleges no facts that show any contact between UHG and Montana, and certainly nothing of the type of "'substantial' or 'systematic and continuous'" contacts that would create personal jurisdiction over UHG. *Id*. at 17.

The State further contends UHG is subject to personal jurisdiction under Montana's long-arm statute through "the commission of any act resulting in accrual within Montana of a tort action." (ECF No. 190-19 at 17–19; Mont. R. Civ. P. 4(b)(1)(B).) The State insists that the commission of the Insulin Pricing Scheme "*in Montana*" violated the MCPA and that defendants' conspiracy had an effect in Montana, subjecting UHG to personal jurisdiction in Montana. (ECF No. 190-19 at 18–19.) Moving Defendants counter that the State does not allege any tortious conduct by UHG that occurred in Montana and argues the State misstates case law it relies on to support its argument. (ECF No. 190-25 at 11–12.)

"[W]hether a tort accrued in Montana is highly fact-specific and dependent on the nature of the alleged tort at issue." *Groo v. Mont. Eleventh Jud. Dist. Ct.*, 537 P.3d 111, 119 (Mont. 2023). Montana courts' "analysis of accrual has focused on where the events giving rise to the claims occurred, rather than where the plaintiffs allegedly experienced or learned of their injuries." *Id*. at 118; *Tackett*, 334 P.3d at 928 ("In analyzing accrual in each of these cases, we focused on where the events giving rise to the tort claims occurred, rather than where the plaintiffs allegedly experienced or learned of their injuries."). "[J]urisdiction is not acquired through interstate communications solely by signing a contract to be performed in another state." *Groo*, 537 P.3d at 118; *Threlkeld v. Colorado*, 16 P.3d 359, 364–65 (Mont. 2000) (finding no long-arm jurisdiction

existed where the defendants' interstate communications related entirely to services to be performed out-of-state).

In the case *Bi-Lo Foods, Inc. v. Alpine Bank, Clifton*, Montana corporation Bi-Lo Foods ("Bi-Lo") negotiated the purchase of equipment from a Colorado supplier, who instructed Bi-Lo to make a deposit into an escrow account at Alpine Bank ("Alpine"). 955 P.2d 154, 155 (Mont. 1998). Instead, Alpine incorrectly deposited Bi-Lo's check directly into the seller's account. *Id*. After the transaction fell through, the seller would not return the escrow payment, and Bi-Lo filed suit against Alpine in Montana state court, arguing long-arm jurisdiction existed because "Alpine took voluntary actions which were calculated to have an effect in Montana, did cause injury in Montana to a Montana resident, and should have caused Alpine to reasonably anticipate being haled into court in Montana." *Id*. at 157. The *Bi-Lo* court therefore held the tort of negligence and breach of warranty accrued in Montana. *Id*. at 157. However, the court reiterated that the focus on the inquiry is the place of the alleged tortious conduct:

> [I]n the instant case, Alpine did not engage in any activity in Montana. All acts giving rise to Bi-Lo's claims of negligence and breach of warranty occurred in Colorado. Bi-Lo sent its check to Alpine in Colorado. Alpine deposited the check into the account of one of its customers in Colorado. Alpine's alleged mishandling of the check occurred in Colorado. Accordingly, Alpine's activities did not result in the accrual of a tort action in Montana.

*Id*. at 159.

The Montana Supreme Court again followed this principle in *Cimmaron*, after a Montana corporation entered into a collection agreement with a Pennsylvania corporation. 67 P.3d at 259. Plaintiff eventually filed suit against the Pennsylvania corporation, arguing jurisdiction was proper in Montana because, though the plaintiff conceded that defendant's actions giving rise to plaintiff's claims occurred outside of Montana, plaintiff was nonetheless "detrimentally affected within this

17

state by the [defendant's] actions," resulting in "the accrual of a tort action within Montana for purposes of Rule 4[(b)(1)(B)]." *Id*. at 261. The court rejected plaintiff's argument, clarifying "interstate communication is an almost inevitable accompaniment to doing business in the modern world, and cannot by itself be considered a 'contact' for justifying the exercise of personal jurisdiction." *Id*. (quoting *Edsall Constr. Co., Inc. v. Robinson*, 804 P.2d 1039, 1042 (Mont. 1991). The court ultimately concluded there was no personal jurisdiction over the Pennsylvania corporation because "the actions which gave rise to the alleged torts occurred outside of Montana." *Id*. at 261–62.

The Montana Supreme Court again revisited this principle more recently in *Philadelphia Indemnity Insurance Co. v. Leary*, wherein defendant-lawyers from a California law firm were sued for malpractice by its former Pennsylvania-based client. 557 P.3d 946, 948 (Mont. 2024). Plaintiff's claims originated from a Montana class action lawsuit brought by Montana hotel employees, who claimed that plaintiff's insured (and several Montana companies) failed to distribute to them service charges paid by customers. *Id*. The underlying Montana lawsuit ultimately settled, and the lawyer-defendants were sued for malpractice. *Id*. at 948–49. The court considered the issue of where the tort accrued, as the lawyer-defendants "never worked or communicated in Montana, and never undertook representation of [plaintiff] in any legal proceeding in Montana." *Id*. at 952 ("As alleged, the[ lawyer-defendants] provided, entirely from California, coverage advice to [plaintiff] in Pennsylvania and a letter delivered . . . in Ohio, on [plaintiff]'s behalf, denying coverage."). "Thus, the actions that 'gave rise to the alleged tort' of malpractice necessarily were committed elsewhere." *Id*. at 953.

Here, the State alleges UHG "is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related

18

to the Insulin Pricing Scheme." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 184.) The State furthers that UHG executives communicated on a regular basis with executive teams from each Manufacturer Defendant "to discuss their coordinated efforts in furtherance of the Insulin Pricing Scheme," listing specific examples. (*Id*. ¶ 186.) The State does not allege that any of this policy-making or communication took place *in Montana*. Instead, the State urges that "[UHG]'s conduct had a *direct effect* in Montana and damaged diabetics and payors in Montana and the State." (*Id*. ¶ 188 (emphasis added).) *See Tackett*, 334 P.3d at 929 ("[T]he mere fact that the plaintiff was detrimentally affected within Montana by the defendant's actions outside Montana is not sufficient to establish accrual of a tort action within this state.").

The State cites to *Doverspike* for the proposition that "the defendants' actions, based on a meeting of the minds," is sufficient to establish jurisdiction over civil conspiracy claims if that conspiracy had an effect in Montana. (ECF No. 190-19 at 18–19 (citing *Doverspike v. Murphy*, Civ. A. No. 21-00029, 2021 WL 3604813, at *3–4 (D. Mont. Aug. 13, 2021).) In *Doverspike*, the defendant allegedly engaged in a fraudulent transfer of a vehicle subject to a Montana state court receivership order. The court observed that the defendant "knew, before accepting transfer of the [v]ehicle, that it was subject to a receivership order." (*Id*. at *3.) The court further commented that "[m]uch of the evidence supporting the claim originates from contradictory, and potentially fraudulent, declarations *filed by [defendants] in Montana state courts or in response to the Montana state court receivership order*. The joint actions of the [d]efendants potentially deprived Doverspike of full relief in the underlying Montana lawsuit." *Id*. at *4 (emphasis added).

Here, it is unclear whether the alleged "meeting of the minds" occurred outside of Montana. (*See* Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 186.) The State alleges UHG's direct involvement in establishing and participating in the Insulin Pricing Scheme, and Moving Defendants do not refute

19

these allegations. (ECF No. 190-19 at 19 ("The State in reality specifically alleged the ways in which the [Insulin Pricing] Scheme executed by [Moving Defendants] *in Montana* violated the MCPA, caused injury to Montana consumers, and unjustly enriched the Defendants including [Moving Defendants].").) Because of these uncontroverted allegations, the Court finds the State made, at minimum, a colorable claim for specific jurisdiction.

### 2. OptumInsight

Moving Defendants similarly contend OptumInsight should be dismissed for lack of jurisdiction because (1) there is no allegation OptumInsight transacted any business in Montana, and (2) the State does not allege OptumInsight engaged in any tortious activity in Montana. (ECF No. 190-18 at 11–12.) The State counters that OptumInsight "is registered to do business in Montana and holds an active license with Montana Department of Insurance" and thereby transacted business in Montana. (ECF No. 190-19 at 16.) Moreover, the State reiterates that it "specifically alleged the ways in which the [Insulin Pricing] Scheme executed by [UHG] and OptumInsight *in Montana* violated the MCPA, caused injury to Montana consumers, and unjustly enriched the Defendants," citing to its allegations under the MCPA and for unjust enrichment in support of its argument. (ECF No. 190-19 at 17 (citing Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 510–33).) Moving Defendants retort that the State cited no authority for its proposition that a registration or license to do business satisfies the transacting business prong of specific jurisdiction and reiterate that the State failed to allege OptumInsight committed acts resulting in the accrual of a tort action in Montana. (ECF No. 190-25 at 9–12.)

Regarding the State's allegations that OptumInsight transacted business within Montana, the appointment of a registered agent on its own does not subject foreign corporations to personal jurisdiction. "In Montana, a foreign corporation registering to do business does not amount to

consent of personal jurisdiction." *First Nat'l Bank of Sioux Falls v. Est. of Carlson*, 448 F. Supp. 3d 1091, 1105 (D. Mont. 2020) (citing *DeLeon*, 426 P.3d at 9). "This includes the appointment of a registered agent." *Id.* (citing Mont. Code Ann. § 35-7-115).[17] Indeed, Montana's own Legislature codified this proposition, declaring that: "The appointment or maintenance in this state of a registered agent does not by itself create the basis for personal jurisdiction over the represented entity in this state." Mont. Code Ann. § 35-7-115.

It is thereby evident that OptumInsight's license and registration by itself do not subject it to personal jurisdiction in Montana. Moreover, *see supra* Section II(B)(i), the State does not bring sufficient allegations to demonstrate contact between OptumInsight and Montana, let alone the "substantial" or "systematic and continuous" contacts that would create personal jurisdiction over OptumInsight.

With regard to the State's argument that OptumInsight is subject to personal jurisdiction in Montana because it committed an act resulting in accrual of a tort within Montana, the Court finds it is not clear whether the State sufficiently pled specific jurisdiction. The State alleges "[d]uring the relevant time period, OptumInsight partnered with OptumRx[, Inc.] to offer the at-issue pharmacy benefit data and cost analysis services that gave rise to the Insulin Pricing Scheme to Montana diabetics and payors." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 196.) It is not clear from the allegation whether the State contends that these actions took place in Montana—rather, the State is contending that OptumInsight's actions ultimately had an effect in Montana. Because there are ambiguities in the record, and because the State has stated a colorable basis for jurisdiction,

---

[17] *See also Lorentz v. Garrison Prop. & Cas. Ins. Co.*, Civ. A. No. 18-00082, 2018 WL 7107929, at *5 (D. Mont. Nov. 15, 2018) ("Accordingly, the Court finds AIS did not consent to personal jurisdiction in Montana by registering to do business in Montana and appointing a registered agent for service of process.").

the Court proceeds to the State's request for jurisdictional discovery before deciding the motion to dismiss.

### C.  Jurisdictional Discovery

In the alternative, the State asserts it is entitled to jurisdictional discovery regarding "[Moving Defendants'] involvement in the Insulin Pricing Scheme," and "the corporate relationship or lack of corporate separateness between [Moving Defendants] and related entities." (ECF No. 190-21 at 30–32.)

"Jurisdictional discovery 'should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 507 (9th Cir. 2023) (quoting *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003)). Discovery is useful when "jurisdictional facts are contested or more facts are needed." *Laub*, 342 F.3d at 1093. However, "a mere hunch that discovery might yield jurisdictionally relevant facts, or bare allegations in the face of specific denials, are insufficient reasons for a court to grant jurisdictional discovery." *LNS Enters.*, 22 F.4th at 864–65 (cleaned up). "A district court is vested with broad discretion to permit or deny discovery, and a decision to deny discovery will not be disturbed except upon the clearest showing that the denial of discovery results in actual and substantial prejudice to the complaining litigant." *Laub*, 342 F.3d at 1093 (internal quotation marks and citations omitted).

To justify discovery, a plaintiff must make a preliminary showing of jurisdiction, meaning the plaintiff must provide a "colorable basis" for personal jurisdiction, which is lower than the prima facie burden required to survive a motion to dismiss. *Isakson*, 2024 WL 1533957, at *8. The plaintiff then "must specify what facts they expect to uncover during discovery and how those

22

facts would support personal jurisdiction." *First Nat'l Bank of Sioux Falls*, 448 F. Supp. 3d at 1108 (citation omitted).

Here, the State contends it is seeking "any information that would further illuminate [Moving Defendants'] role in the [Insulin Pricing] Scheme and the corporate relationship or lack of corporate separateness between UHG, OptumInsight, and OptumRx, Inc." (ECF No. 190-40 at 18.) The Court agrees that jurisdictional discovery is warranted. There is an appreciable dispute regarding Moving Defendants' involvement in the alleged Insulin Pricing Scheme, as the State alleges UHG "is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme" (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 184), and that "OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy" by "analyz[ing] data and other information from the PBM and Manufacturer Defendants to advise Defendants with regard to the profitability of the Insulin Pricing Scheme" (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 193), while Moving Defendants maintain neither entity provides PBM services and that UHG is merely a holding company (ECF No. 190-26 at 1 (quoting *Teva Pharm. Indus. Ltd. v. UnitedHealthcare Servs.*, 341 F. Supp. 3d 475, 482 (E.D. Pa. 2018))). The Court grants jurisdictional discovery to the State because "[t]he record is simply not sufficiently developed to enable us to determine whether the alter ego or agency tests are met." *See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (remanding the matter to allow jurisdictional discovery "to allow [plaintiff] the opportunity to develop the record and make a prima facie showing of jurisdictional facts with respect to [defendant's parent holding company]").

Because the State's request for jurisdictional discovery "might well demonstrate facts sufficient to constitute a basis for jurisdiction," the Court grants the State's request to conduct jurisdictional discovery.[18] *See id.*

## IV.   CONCLUSION

For the reasons set forth above, the State's request for jurisdictional discovery is **GRANTED**, and UnitedHealth Group Incorporated and OptumInsight, Inc.'s Motion to Dismiss (ECF Nos. 190-17–18, 190-25) pursuant to Federal Rule of Civil Procedure 12(b)(2) is **DENIED** with leave to refile at the conclusion of jurisdictional discovery. An appropriate Order follows.

**Date: September 5, 2025**               */s/ Brian R. Martinotti*
                                           **HON. BRIAN R. MARTINOTTI**
                                           **UNITED STATES DISTRICT JUDGE**

---

[18] Counsel are directed to meet and confer and submit to the Court a proposed order outlining the scope of jurisdictional discovery and all related deadlines within thirty (30) days.