<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW)** <br> **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *The State of Illinois, by Kwame Raoul, Illinois Attorney General v. Eli Lilly and Co., et al.* <br><br> Case No. 2:23-cv-04242 | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss (the "Motion") filed by Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC's, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc. (together, "Express Scripts"); CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark PCS Health, LLC, and Caremark, LLC (together, "CVS Caremark"); and UnitedHealth Group Incorporated, OptumRx, Inc., and OptumInsight, Inc. (together, "OptumRx") (collectively, "PBM Defendants"),[1] to dismiss Plaintiff the People of State of Illinois's (the "State") Complaint

---

[1] Certain PBM Defendants (Evernorth Health, Inc. ("Evernorth"); CVS Health Corporation ("CVS Health"); and UnitedHealth Group Incorporation and OptumInsight, Inc. (together, "UHG Defendants")) filed motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (ECF Nos. 190-30–35.) Pursuant to ECF Nos. 708–13, the Court granted the State's request for jurisdictional discovery and denied Evernorth, CVS Health, and UHG Defendants' motions to dismiss with leave to refile at the conclusions of jurisdictional discovery. Because jurisdictional discovery is ongoing, and it is not yet known whether Evernorth, CVS Health, and UHG Defendants are subject to jurisdiction in Illinois, the Court cannot yet address PBM Defendants' Rule 12(b)(6) Motion as to these defendants. *See Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103, 1104 (N.D. Ill. 2015) (addressing defendants' "personal jurisdiction argument first, because, if there is no *in personam* jurisdiction the Court will be unable to reach

pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] (ECF Nos. 190-38, 190-39.) The State filed an Opposition to Manufacturer Defendant's Motion to Dismiss (ECF No. 190-44), and PBM Defendants filed a Reply (ECF No. 190-48). Having reviewed and considered the submissions filed in connection with the Motion, and for the reasons set forth below and for good cause having been shown, PBM Defendants' Motion to Dismiss is **DENIED**.

I.    **BACKGROUND**

A.  **Factual History**

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips*

---

the Rule 12(b)(2) matter") (citing *be2 LLC v. Ivanov*, 642 F.3d 555, 557 (7th Cir. 2011) (holding judgments entered without personal jurisdiction are void)). Accordingly, the 12(b)(6) motions to dismiss filed by PBM Defendants Evernorth, CVS Health, or UHG Defendants are denied with leave to refile after jurisdictional discovery and the Court's determination regarding personal jurisdiction. Should the Court ultimately find personal jurisdiction exists over these defendants, they should be guided by this Opinion in the event they chose to refile their Rule 12(b)(6) motions.

[2] Pursuant to Case Management Order #7—Order Governing Motions to Dismiss in the State Attorney General Track ("State AG Track") (ECF No. 141), the State AGs were directed to refile, on the master docket, all Fed. R. Civ. P. 12 motions and related exhibits, responses, and replies in these two State AG Track cases: *Illinois ex rel. Raoul v. Eli Lilly & Co. et al.*, No. 2:23-cv-04242 (the "Illinois Action"), and *Montana ex rel. Knudsen v. Eli Lilly & Co. et al.,* No. 2:23-cv-04214 (the "Montana Action"). Consequently, in addition to this Motion, the following motions were filed in connection with the Illinois Action: (1) co-defendants Evernorth Health, Inc.'s (ECF No. 190-31), CVS Health Corporation's (ECF No. 190-33) and UnitedHealth Group Incorporated and OptumInsight, Inc.'s (ECF No. 190-35) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and (2) Manufacturer Defendants' (ECF No. 190-37) and motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The following motions were filed in connection with the Montana Action: (1) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by Evernorth Health, Inc. (ECF No. 190-14), UnitedHealth Group Incorporated and OptumInsight, Inc. (ECF No. 190-18), and CVS Health Corporation (ECF No. 190-16); and (2) motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) by the Manufacturer Defendants (ECF No. 190-1) and the PBM Defendants (ECF No. 190-12). This Opinion only resolves PBM Defendants' Motion to Dismiss pursuant to Rule 12(b)(6). (ECF No. 190-38.) The other motions filed pursuant to Case Management Order #7 will be addressed separately.

2

*v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).[3]

This action arises out of the State's challenge to Defendants'[4] allegedly unfair and unconscionable pricing scheme for their insulin medications. (*See generally* Compl. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A).) The sole plaintiff in this member action is the State, brought by the Honorable Kwame Raoul, Attorney General of the State of Illinois, who is authorized to bring such actions to protect the health, safety, and welfare of the citizens of Illinois and to enforce the provisions of the Illinois Consumer Fraud Act ("ICFA"). (*Id.* ¶¶ 36, 37.) The State generally categorizes each defendant into one of two groups: Manufacturer Defendants or PBM Defendants. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 5–6.) The State alleges that Manufacturer Defendants, who "manufacture the vast majority of insulins and other diabetic medications available in Illinois," worked "in tandem" to "artificially and willingly raise their list prices" of insulin medications, "and then pay a significant, yet undisclosed, portion of that price back to the PBM[ Defendants]," in order to gain formulary preference. (*Id.* ¶¶ 5, 10, 15, 20.) The State alleges

---

[3] Because the parties originally filed suit in the Northern District of Illinois, and merely refiled their Motion to Dismiss papers on the master docket (*see* ECF No. 141), the parties use Seventh Circuit law in their arguments. Accordingly, the Court analyzes the parties' arguments pursuant to Seventh Circuit law. *See In re Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020))).

[4] "Defendants" refer to Manufacturer Defendants and PBM Defendants. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 213.)  Manufacturer Defendants include defendants Eli Lilly and Company ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and Sanofi-Aventis U.S. LLC ("Sanofi") (together, "Manufacturer Defendants"). (*Id.* ¶ 5.)

that: "Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme,[5] Manufacturer Defendants have persistently raised the prices of their respective diabetes drugs in a lockstep manner despite the fact that the cost to produce these drugs has decreased during that same time period." (*Id*. ¶ 13.)

PBM Defendants are pharmacy benefit managers ("PBMs"), or third-party administrators that negotiate drug costs and payments between health insurance providers and drug manufacturers.[6] (*Id*. ¶¶ 290–92.) Drug manufacturers set the list price for their prescription drugs, including insulin, which is known as the Wholesale Acquisition Cost ("WAC"). (*Id*. ¶¶ 281–83.) The WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). The WAC serves as the reference point from which PBMs and drug manufacturers negotiate rebates. (*Id*. ¶¶ 294–300.) The WAC differs from, but is related to, the Average Wholesale Price ("AWP"), which refers to the "average price that wholesalers charge[] to providers like doctors and pharmacies."[7] *In re Pharm. Indus. Average*

---

[5] The State defines "Insulin Pricing Scheme" as "[t]he unfair and deceptive scheme at the root of [its] Complaint," wherein Manufacturer Defendants "artificially and willingly raise their list prices, and then pay a significant, yet undisclosed, portion of that price back to the PBM[ Defendant]s "to gain formulary access from the PBM Defendants for their diabetic treatments." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 12, 20.) As the State explains: "PBM[ Defendant]s then grant preferred status on their standard formularies based upon the largest Manufacturer Payment and the highest inflated list price, which the PBM[ Defendant]s know to be artificially inflated and which the PBM[ Defendant]s insist that their health plan payor clients use as the basis for the price they pay for the at-issue drugs." (*Id*. ¶ 22.)

[6] More specifically, PBM Defendants "develop drug formularies, process claims, create a network of retail pharmacies, [and] set [drug] prices in coordination with [m]anufacturers[.]" (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 291.)

[7] "Typically, AWP was a twenty percent markup over WAC." *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 87. "[M]ost manufacturers continued to report AWPs consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were

4

*Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass. 2008). Pharmaceutical manufacturers self-report the WAC to publishing compendiums such as First Databank, Redbook, and others. (*Id.* ¶ 283.)

Branded prescription drugs in the United States move through a complex distribution chain where pharmaceutical manufacturers typically sell their products to wholesalers at a negotiated price. (*Id.* ¶¶ 279–81.) Wholesalers then supply the medications to various providers such as pharmacies, hospitals, and clinics, who then distribute the pharmaceuticals to patients with prescriptions. (*Id.* ¶¶ 281–84.) Uninsured consumers ultimately pay the full price for medication, whereas insured consumers pay for a portion of a drug's price through out-of-pocket costs such as deductibles, copayments, or coinsurance. (*Id.* ¶¶ 286–87.) Upstream payments to the manufacturers include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates. (*Id.* ¶¶ 20–21.)

The industry is unique because the way patients pay for prescription drugs vastly differs from the way wholesalers, PBMs, and health insurers pay for those same products. (*Id.* ¶ 281.) The prices for the products in the distribution chain differ for each participating entity—"different actors pay different prices set by different entities for the same drugs." (*Id.*) Manufacturers do not sell medications directly to the consumers and therefore do not set the consumer price for any particular medication; however, they do set the list price (WAC), and consumers usually pay for prescription drugs based on the manufacturer's list price. (*Id.* ¶ 282.)

---

not actually charging these prices to providers and thus that the AWP relied on by Medicare and the [third-party payors] was not a true average price charged by wholesalers." *Id.*

Health insurers cover all or a portion of their insured customers' medications costs, submit payments to pharmacies on behalf of their members, and receive a reimbursement amount depending on whether and where the medication falls on their PBMs' formularies—the ranked list of approved drugs an insurance plan will cover. (*Id*. ¶ 7.) When insured patients purchase a prescription medication from a pharmacy, both the patient and their insurer pay a portion of the purchase price based on the price negotiated by the PBMs. (*Id*. ¶¶ 296–300.) Manufacturers understand that the PBM's formularies drive drug utilization: "if Manufacturers want their drugs to be prescribed and paid for they must obtain preferrable formulary position on the PBM Defendants' formularies." (*Id*. ¶ 10.) Drug manufacturers may offer rebates to an insurer's PBM to gain formulary access for their prescription drugs. (*Id*. ¶¶ 21 n.3, 23, 344.) PBMs determine whether to pass along rebates to the health insurer, who in turn decide whether to share these cost-saving measures with consumers. (*Id*. ¶¶ 24–26.)

Here, the State alleges certain Manufacturer Defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin analog products so they could offer rebates as a "secret Manufacturer Payment[]" to PBM Defendants in exchange for preferred formulary placement, which the State contends caused it and its constituents to overpay for insulin products. (*Id*. ¶¶ 376–98.) The State maintains these Manufacturer Defendants artificially inflated the list prices for their insulin products to compete for preferred positions on the PBMs' drug formularies by offering increased rebates to PBMs. (*Id*. ¶¶ 399–404.) The State further alleges PBMs use their own mail-order and retail pharmacies to get customers to pay these artificially inflated prices for insulin products, resulting in higher profits

6

for PBMs. (*Id*. ¶¶ 405–09.) The State asserts "Illinois diabetics and payors[8] relied on the artificially inflated list prices by purchasing diabetic medications at such prices." (*Id*. ¶ 412.) The State attributes this pricing scheme to Manufacturer Defendants' "list prices for the at-issue drugs [becoming] detached completely from actual prices," resulting in the "list prices bec[oming] increasingly misrepresentative to the point of becoming unlawful." (*Id*. ¶ 415.)

According to the State, Manufacturer Defendants initiated an unfair and unconscionable scheme of competing for formulary access of the largest PBMs[9] by unjustifiably raising the list prices for the insulin analog products so they could offer the middlemen-PBMs bloated rebates— so-called "spreads" between list prices and net prices. (*Id*. ¶¶ 401–03.) "Net Prices" refers to the prices PBM Defendants knowingly negotiate and pay for Manufacturer Defendants' products after subtracting from the list prices the rebate amounts Manufacturer Defendants issued to them to gain formulary placement. (*Id*. ¶¶ 340, 345.) Net prices may fluctuate as they necessarily depend on PBM Defendants' negotiations with a particular manufacturer. (*Id*. ¶¶ 299, 345 n.10.) The State contends Illinois diabetics and payors, including the State, suffered monetary losses from overpaying for their insulin products because PBM Defendants' formularies are at the center of the allegedly unfair and unconscionable insulin pricing scheme. (*Id*. ¶¶ 335, 340.)

The State claims PBM rebates are part of an industry scheme to inflate the price of insulin products, whereby PBM Defendants use their leverage to set formularies and increase profits. (*Id*. ¶¶ 313, 332.) PBM Defendants allegedly: (1) negotiate prices payors pay for prescription drugs,

---

[8] The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

[9] The State asserts "PBM Defendants have taken over the market in the past decade—controlling over 80% of the market and managing pharmacy benefits for more than 270 million Americans." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 310.)

(2) separately negotiate a different (and often lower) price for in-network pharmacies, (3) set the amount in fees the pharmacy pays back to the PBM, (4) set the price paid for each drug sold through mail-order pharmacies, and (5) negotiate the amount manufacturers pay back to the PBMs. (*Id.* ¶ 298.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost; accordingly, using formularies gives PBM Defendants wide latitude to extract rebates from manufacturers. (*Id.* ¶¶ 311, 378–80.) The State argues manufacturers offer PBM Defendants higher spreads in exchange for preferred positions on their drug formularies, rather than lower their list prices for their prescription drugs. (*Id.* ¶¶ 399–401.) The State contends "[t]hese relationships allow PBM[ Defendants] to exert tremendous influence over what drugs are available throughout Illinois and at what prices." (*Id.* ¶ 297.) "[W]orking in coordination with the PBM[ Defendants]," Manufacturer Defendants "artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBM[ Defendants]," resulting in the State and diabetic Illinois residents being "overcharged millions of dollars a year," which "caused a substantial injury to Illinois diabetics and the State." (*Id.* ¶¶ 29, 340, 490.)

The State brings claims against PBM Defendants for violation of the ICFA, 815 ILCS 505/1, *et seq.* (Count One) and for unjust enrichment (Count Two). (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A.)[10]

---

[10] Concerning Count One, the State alleges PBM "Defendants have committed unfair and deceptive acts and practices in the conduct of trade or commerce within Illinois with the intent that Illinois diabetics rely on them as prohibited by the [ICFA]"; and, specifically, PBM "Defendants['] conduct in furtherance of the Insulin Pricing Scheme also violates Section 2 of the [ICFA] because it constitutes deceptive trade practices under the 'Uniform Deceptive Trade Practices Act' (815 ILCS 510/2) ("the IUDTPA"). (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 486, 489.)

### B. Procedural History

On December 2, 2022, the State filed a Complaint in the Circuit Court of Cook County, Illinois. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A.) The matter was removed to the United States District Court for the Northern District of Illinois, Eastern Division, on January 11, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 1.) A supplemental notice of removal was also filed on January 11, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 7.) On March 6, 2023, PBM Defendants filed their Motion to Dismiss for failure to state a claim. (Dkt. No. 2:23-cv-04242, ECF Nos. 61, 62.) The State filed its Opposition on April 6, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 87.) PBM Defendants filed their Reply in support of their Motion on May 4, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 103.)[11]

On May 9, 2023, prior to the District Court for the Northern District of Illinois deciding the pending Motion to Dismiss, the State, along with movants the States of Arkansas, Kansas, Mississippi, and Montana, filed their motion for transfer of actions pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings before the United States Judicial Panel on Multidistrict Litigation ("JPML"). (Dkt. No. 2:23-cv-04242, ECF No. 105.) On August 7, 2023, the JPML issued a Transfer Order, transferring this matter to this Court in the District of New Jersey. (Dkt. No. 2:23-cv-04242, ECF No. 110.) Pursuant to Case Management Order No. 7 (ECF No. 141), the parties re-filed their respective briefings on May 31, 2024 (ECF Nos. 190-38–39, 190-44, 190-48).

---

[11] At the direction of the Court, pursuant to Case Management Order #7, the motion and briefs were refiled on the master docket at ECF Nos. 190-38, 190-39, 190-44, 190-48. *See supra* n.1. The Court will use the citations on the master docket unless otherwise indicated.

## II.    LEGAL STANDARD

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court evaluating a Rule 12(b)(6) motion to dismiss must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded facts as true, and draw all reasonable inferences in the plaintiff's favor." *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). However, the court "need not accept as true statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

## III.    DECISION

### A.  Illinois Consumer Fraud Act Claim

PBM Defendants generally allege the State's ICFA claim is deficient and should be dismissed. (ECF No. 190-38 at 4–16.) As to the State's ICFA claims for unfair or deceptive practices, PBM Defendants argue the State fails to state a claim because the State's allegations do not satisfy Rule 9(b), the State's allegations fail to identify material misrepresentations or omissions, and the State fails to plead the falsity of any alleged statement with particularity or that

the statements were material. (*Id*. at 6–14.) As to the State's Section 2 ICFA claim for deceptive trade practices under the IUDTPA, PBM Defendants likewise argue the State fails to plead a claim for the same reasons. (*Id*. at 14–15.) Finally, PBM Defendants argue the State cannot allege a ICFA claim on its own behalf (*Id*. at 15–16.)

### 1.      The State's Claim for Unfair or Deceptive Practices Under the ICFA

PBM Defendants argue the State's claims for unfair or deceptive practices under the ICFA should be dismissed for three distinct reasons. First, PBM Defendants contend the State's "group pleading" fails to satisfy the heightened pleading requirement under Rule 9(b). (ECF No. 190-39 at 6–7.) Secondly, PBM Defendants assert the State fails to identify any actionable conduct by PBM Defendants, as mere puffery or opinion does not constitute fraudulent misrepresentation. (*Id*. at 8–13.) Finally, PBM Defendants insist the State fails to sufficiently plead the falsity of any alleged statement with particularly or that the alleged statements were material, arguing that "[t]he State must allege particularized facts explaining how a given statement is false." (*Id*. at 13–14.)

The State responds that it has sufficiently pled its ICFA claims based on unfair or deceptive practices. (ECF No. 190-44 at 8–23.) With regard to the allegations of group pleading, the State maintains this argument should be dismissed "out of hand," as the State has brought "over 70 allegations that set forth the specific conduct of each PBM Defendant in furtherance of the Insulin Pricing Scheme." (*Id*. at 16–18.) The State contends these specific allegations are sufficient to "put each PBM Defendant on notice of the State's claims against them," and further notes there is no prohibition against allegations against defendants collectively. (*Id*. at 17–18.) Additionally, the State asserts PBM Defendants' misrepresentations are more than puffery or aspirational statements, listing and citing to multiple allegations in the Complaint it contends are actionable statements, and observing PBM Defendants' arguments regarding puffery have been rejected in

11

analogous cases. (*Id*. at 21–22.) Finally, the State contends the facts establish PBM Defendants' statements are false and material, again pointing to specific false and materials allegations in the State's Complaint. (*Id*. at 23.)

As an initial matter, for the reasons set forth below, the Court finds the State did not engage in group pleading and has adequately pled its claim under the Rule 9(b) standard. Moreover, the Court finds that Rule 9(b)'s heightened pleading requirement only applies to the State's deception claim under the ICFA.[12]

To sufficiently allege deception under the ICFA, a plaintiff must satisfy the Rule 9(b) heightened pleading standard, which requires the circumstances of fraud be pled with particularity. Fed. R. Civ. P. 9(b); *see also Camasta v. Jos A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). This requires plaintiff to address the "who, what, when, where, and how of the fraud." *Camasta*, 761 F.3d at 737 (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011)). "As it relates to the 'who' of the fraud, in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of [the] alleged participation in the fraud.'" *Murrow v. Quincy Bioscience Holding Co., Inc.*, Civ. A. No. 23-14893, 2025 WL 446149, at *3 (N.D. Ill. Feb. 10, 2025) (quoting *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)).

---

[12] PBM Defendants allege Rule 9(b)'s heightened pleading standard applies to each of the State's claims (ECF No. 190-48 at 1–3), whereas the State argues Rule 9(b) only applies to the State's deception claims and not the State's unfairness claims (ECF No. 190-44 at 5–8.). This Court agrees with the State and will only apply Rule 9(b)'s heightened pleading standard to the State's deception claims under the ICFA. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) ("Because neither fraud nor mistake is an element of unfair conduct under [the ICFA], a cause of action for unfair practices under the [ICFA] need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in 9(b).").

"There 'is no "group pleading" doctrine, per se, that either permits or forbids allegations against defendants collectively.'" *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 955 (N.D. Ill. 2024) (quoting *Robles v. City of Chi.*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019)). Group pleading does not necessarily violate Rule 8, but it "can run headfirst into Rule 9(b)'s requirement for particularity for averments sounding in fraud or 'premised upon a course of fraudulent conduct.'" *Id.* at 956 (quoting *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)). This is because in fraud cases involving multiple defendants, the complaint must "adequately put[] Defendants on notice of the unlawful acts that she alleges both committed." *Id.* (quoting *Joseph v. TGI Friday's, Inc.*, Civ. A. No. 21-1340, 2022 WL 17251277, at *3 (N.D. Ill. Nov. 28, 2022)).

PBM Defendants contend "the Complaint refers to 'Defendants,' 'PBMs,' or 'PBM Defendants' collectively hundreds of times" and therefore "fails to identify the who, what, when, where, or how of the alleged misrepresentations for any particular Defendant" and fails to satisfy Rule 9(b). (ECF No. 190-39 at 6–7.) In response, the State points to over seventy specific allegations it contends gives PBM Defendants sufficient notice of the State's claims against them. (ECF No. 190-44 at 16–18.) PBM Defendants respond that the State "lumps together" several entities who do not provide PBM services as "PBM Defendants," making the alleged actions of these entities indistinguishable from the actions of the actual PBM Defendants. (ECF No. 190-48 at 3–4.)

Here, the Complaint sufficiently explains PBM Defendants' alleged role in the Insulin Pricing Scheme. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 78–84 (explaining CVS Health Corporation's alleged role in the Insulin Pricing Scheme); *id.* ¶ 88 (explaining CVS Pharmacy, Inc.'s alleged role in the Insulin Pricing Scheme); *id.* ¶¶ 89, 94–95 (explaining Caremark Rx,

LLC's alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 96, 98–99 (explaining Caremark LLC's alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 100, 104–05 (explaining CaremarkPCS Health, LLC's alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 121, 125–27, 129 (explaining Evernorth Health Inc.'s alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 133–34 (explaining Express Scripts, Inc.'s alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 135, 138 (explaining Express Scripts Administrators, LLC's alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 141, 144–47 (explaining Medco Health Solutions, Inc.'s alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 148, 151 (explaining ESI Mail Pharmacy Service, Inc.'s alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 152, 156, 159, 165, 168–74 (explaining Express Scripts Pharmacy, Inc.'s alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 179–82 (explaining UnitedHealth Group, Inc.'s alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 188-93 (explaining OptumInsight, Inc.'s alleged role in the Insulin Pricing Scheme); *id*. ¶¶ 196–97, 199–211 (explaining OptumRx, Inc.'s alleged role in the Insulin Pricing Scheme).

The Court finds the State has put each PBM Defendant on notice of the claims against them and therefore satisfies Rule 9(b)'s heightened pleading standard. *See Sloan*, 711 F. Supp. 3d at 956 (not dismissing claim for group pleading issue because "[t]he facts alleged throughout the complaint, including the specific statements made by Defendants in their marketing and in response to media inquiries about their products, provide sufficient detail to put defendants on notice of the unlawful acts Plaintiffs allege"); *see also In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 962 (E.D. Mich. 2022) (finding plaintiffs sufficiently alleged the roles of both defendants in the events at issue in the case).

### a. Deceptive Conduct

The ICFA prohibits:

> Unfair methods of competition and unfair or deceptive acts or practices, including . . . deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce[.]"

815 ILCS 505/2. To state a claim for deception under the ICFA, a plaintiff must allege: "(1) that the defendant engaged in a deceptive or unfair practice; (2) with the intent that the plaintiff (or others) rely on the deception; (3) that the act occurred in the course of trade or commerce; and (4) that the deception caused actual damages." *Kahn v. Walmart Inc.*, 107 F.4th 585, 598 (7th Cir. 2024). Under the ICFA, "a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober*, 246 F.3d at 938. To determine if deception has occurred under the ICFA, courts use a reasonable consumer standard, which requires a probability "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020); *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). Courts must consider the alleged false statements or omissions in the context of all information available to the plaintiff. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019). "Deceptive trade practice claims are generally not suitable for a motion to dismiss unless the challenged statement was not misleading as a matter of law." *Bruno v. Am. Textile Co., Inc.*, Civ. A. No. 22-02937, 2023 WL 6976826, at *3 (N.D. Ill. Oct. 23, 2023) (citing *Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 756 (N.D. Ill. 2015)).

The State alleges PBM Defendants engaged in deceptive conduct by "represent[ing] to the public, diabetics, and their clients that they work to lower the price of the at-issue drugs and to promote the health of diabetics," when, in fact, "the PBMs have driven up the at-issue prices and damaged the health of diabetics." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 488.) Specifically,

the State contends "PBM Defendants misrepresented that their formularies and the Manufacturer Payments they receive have the characteristic and benefit of lowering the price of the at-issue drugs and promoting the health of diabetics." (*Id*. ¶ 489.) Moreover:

> PBM Defendants utilized the artificially inflated price, which the PBMs are directly responsible for inflating and which the PBMs know is untethered from the actual price, to make false and/or misleading statements regarding the amount of savings that the PBMs generate for Illinois diabetics, payors, and the Illinois healthcare system.

(*Id*.) The Complaint further alleges "PBM Defendants also misrepresented to Illinois diabetics and payors that the Manufacturer Payments they received lowered the actual price of the at-issue drugs." (*Id*.)

PBM Defendants argue these allegations, regarding PBM Defendants' "[g]eneralized aspirational statements—i.e., 'puffing' statements or 'puffery'—are vague expressions of opinion that '[can]not form the basis of an actionable claim under the [ICFA].'" (ECF No. 190-39 at 8–13 (quoting *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 925 (Ill. 2007)).) Specifically, the State's statements that: (1) "PBMs' interests 'are aligned with diabetics and payors'" (*id*. at 9); (2) "PBMs work to lower the price of the at-issue drugs" (*id*. at 9–10); and (3) "PBMs construct formularies designed to improve the health of diabetics" (*id*. at 10–11), are all examples of "classic puffery" (*id*. at 10). PBM Defendants contend these statements are nonactionable because "they are vague, nonspecific statements that courts routinely cast aside." (*Id*. at 9.) The State argues these misrepresentations are actionable, as they amount to "more than puffery or aspirational statements," listing out examples of specific PBM misrepresentation allegations from the Complaint. (ECF No. 190-44 at 18–22.) The State contend these examples "bear no resemblance to the jingle slogans and vague opinion statements found to be 'puffery' in the PBMs' cited

16

authority." (*Id*. at 20.) Finally, the State notes "three different federal courts have rejected the PBMs' 'puffery' argument in analogous cases." (*Id*. at 21.)

Puffery includes "vague, highly subjective, or exaggerated commercial statements or advertisements" and are nonactionable. *Evolve Biosystems, Inc. v. Abbott Lab'ys*, Civ. A. No. 19-5859, 2022 WL 846900, at *5 (N.D. Ill. Mar. 22, 2022); *see also In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (noting puffery consists of "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available"). "Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud." *Barbara's Sales*, 879 N.E.2d at 73 (quoting *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999)). "Statements are not puffery if they make 'objective' and verifiable claims and are 'specific enough to induce consumer reliance.'" *Sanchez v. Walmart Inc.*, 733 F. Supp. 3d 653, 672 (N.D. Ill. 2024) (quoting *Evolve Biosystems*, 2022 WL 846900, at *5); *see also Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 877 (N.D. Ill. 2023) ("Non-actionable puffery is neither concrete nor verifiable."); *Barbara's Sales*, 879 N.E.2d at 73 ("Puffing involves expressing opinions, not asserting something as fact." (quoting Black's Law Dictionary 1269 (8th ed. 1999))).

Indeed, the State identifies several objective and verifiable misrepresentations made on behalf of PBM Defendants, including:

> UnitedHealth Group's Sustainability Report states that OptumRx represents that it "works directly with pharmaceutical manufacturers *to secure discounts that lower the overall cost of medications* and create tailored formularies—or drug lists—to ensure people get the right medications."

> In January 2016, Express Scripts president Tim Wentworth stated that "[Express Scripts] *saved our clients more than $3 billion* through Express Scripts National Preferred Formulary."
>
> In April 2019, CVS Caremark President Derica Rice stated that "over the last three years . . . CVS Caremark *has helped our clients save more than $141 billion* by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the members' out-of-pocket spend."
>
> On May 11, 2010, CVS Caremark released a statement focused on diabetes to "help us add value for our PBM clients to improve the health of plan members . . . *a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures*."

(ECF No. 190-44 at 19–20 (alterations in original) (emphasis added) (quoting Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 180, 347, 431).) This non-exhaustive list of misrepresentations made by PBM Defendants are neither vague, exaggerated, or immeasurable. *See Evolve Biosystems,* 2022 WL 846900, at *5.

Furthermore, the State alleges these are material misrepresentations upon which PBM Defendants intended Illinois diabetics to rely in purchasing insulin at an artificially inflated price, thinking they were actually receiving a discount. (*See* Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 409 ("[E]very way that the PBMs make money on diabetes medications is directly tied to the artificially inflated list prices generated by the Insulin Pricing Scheme. PBMs are not lowering the price of diabetes medications as they publicly represent—rather they are making billions of dollars by fueling these skyrocketing prices."); *id.* ¶ 412 ("PBM Defendants knew that diabetics and payers relied on the artificially inflated list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs. That is, Illinois diabetics and payors relied on the artificially inflated list prices by purchasing diabetic medications at such prices."); *id.* ¶ 414 ("PBM Defendants knew that the artificially inflated list prices generated by the Insulin Pricing Scheme were false and

18

completely untethered from the net prices that the Manufacturer Defendants were paid for the drugs.").

Therefore, PBM Defendants' Motion to Dismiss the State's deception claims under the ICFA is **DENIED**.[13]

### b. *Unfair Conduct*

"A plaintiff may allege that conduct is unfair under ICFA without alleging that the conduct is deceptive." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). "To determine whether a practice is unfair, Illinois courts consider three factors: whether it 'offends public policy'; is 'immoral, unethical, oppressive, or unscrupulous'; or 'causes substantial injury to consumers.'" *Vanzant*, 934 F.3d at 738–39 (quoting *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014)). "A court may find unfairness even if the claim does not satisfy all three criteria." *Siegel*, 612 F.3d at 935. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002) (citation omitted). "[W]hether a practice is unfair depends on a case-by-case analysis." *Siegel*, 612 F.3d at 935. "[A]n unfair-practices claim has no fraud element and therefore is not subject to a heightened pleading standard." *Vanzant*, 934 F.3d at 739.

PBM Defendants first argue the State's unfairness claim should be dismissed because the State fails to allege that PBM Defendants' conduct violated public policy. (ECF No 190-48 at 8.)

---

[13] The Court acknowledges PBM Defendants' assertion that the alleged false representations that PBM Defendants made during congressional testimony are protected under the *Noerr-Pennington* doctrine. (ECF No. 190-39 at 11–12.) The State responds this argument is not appropriate at the pleading stage, as "PBM Defendants have yet to establish the predicate for invoking the *Noerr-Pennington* doctrine, and the State has had no opportunity to conduct discovery of such a predicate, if any." (ECF No. 190-44 at 22.) The Court declines to reach a conclusion as to this issue, as the Court agrees with the State's contention that it "has nonetheless sufficiently pled its ICFA claims based on factual allegations that do not arise from any congressional testimony given by the PBMs or their representatives." (*Id*. at 22–23.)

PBM Defendants contend the State's reference to "the 'swift passage' of a recent Illinois bill capping out of pocket insulin costs at $100 a month" and the June 16, 2022 Federal Trade Commission ("FTC") policy statement regarding the shifting of costs to payers and patients, both of which "came about in 2022," "undermine the argument that the PBM[ Defendant]s' allegedly unfair conduct 'over the course of the last fifteen years' violated a 'statute or common-law doctrine' in existence during that period." (*Id*. (quoting Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 340).) The State maintains it has sufficiently alleged PBM Defendants' conduct violates public policy through the Illinois bill capping insulin costs, regarding which "Illinois senator Andy Manar stated that the passage of the insulin bill 'shows that Illinoisans are united by the simple belief that no family should ever be forced to ration or go without life-saving medication," and the FTC policy statement. (ECF No. 190-44 at 13.)

To state a claim for unfair practices under the ICFA, "the plaintiffs must describe how the [unfair practice] is oppressive or violates public policy." *Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 65 (Ill. 2006). "A practice offends public policy if it violates a standard of conduct embodied in a statute, the common law, or otherwise, i.e., if 'it is within at least the penumbra of some common-law, statutory or other established concept of unfairness.'" *Leszanczuk v. Carrington Mortg. Servs., LLC*, 21 F.4th 933, 940–41 (7th Cir. 2021) (*Elder v. Coronet Ins. Co.*, 558 N.E.2d 1312, 1316 (1990)). "[D]efendant's conduct must violate public policy, be so oppressive as to leave the consumer with little alternative except to submit to it, and injure the consumer." *Robinson*, 775 N.E.2d at 961 (citing *Saunders v. Mich. Ave. Nat'l Bank*, 662 N.E.2d 602, 608 (Ill. App. Ct. 1996)).

"Charging unconscionably high prices is not, by itself, unfair within the meaning of the [ICFA]." *Rockford Mem'l Hosp.*, 858 N.E.2d at 65. "Where it is alleged that the failure to disclose

20

prices is unfair, the plaintiffs must describe how the lack of disclosure is oppressive or violates public policy. Without such a description, the complaint fails to state a cause of action." *Id.* (citing *Robinson*, 775 N.E.2d at 951; *Saunders*, 662 N.E.2d at 602).

The Court agrees the State has sufficiently pled that PBM Defendants' conduct violated public policy. The State has pled "[d]iabetes is an epidemic and a public health crisis in Illinois[,]" with approximately 13% of its population having been diagnosed with diabetes and "[a]n additional 3.6 million Illinois residents hav[ing] prediabetes[.]" (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 1.) The State further alleges "[d]iabetes is the leading cause of blindness, kidney failure, and lower limb amputation and is the seventh leading cause of death in Illinois despite the availability of effective treatment." (*Id.* ¶ 2.) The State contends PBM Defendants' participation in the Insulin Pricing Scheme have caused the cost of diabetes medication to skyrocket, leaving Illinois diabetes feeling "the physical, emotional, and financial tolls of paying such excessive prices." (*Id.* ¶ 28–30.) Moreover,

> In addition to the immeasurable human costs, the Insulin Pricing Scheme also adds substantial cost to the Illinois health care system by increasing preventable complications. For example, one national model found that all people with diabetes adhering to their diabetes medications would save $8.3 billion in direct medical costs per year by averting one million emergency department visits and 618,000 hospitalizations.

(*Id.* ¶ 31.) Because of the increased price of insulin allegedly resulting from the Insulin Pricing Scheme, "many diabetics in Illinois have begun to engage in highly risky behaviors with respect to their disease," such as rationing insulin, skipping refills, using expired insulin, reusing needles, and skipping doctors' visits. (*Id.* ¶ 464.) Based on the State's allegations, it is apparent to this Court that these allegations assert PBM Defendants actions were "within at least the penumbra of some . . . other established concept of unfairness." *See Leszanczuk*, 21 F.4th at 940–41.

21

PBM Defendants further contend the State failed to allege PBM Defendants' conduct was oppressive. The State alleges PBM Defendants' conduct was oppressive because "diabetics need [insulin] to stay alive," and "the Manufacturers make nearly every vial of insulin available in Illinois, and the PBMs have near complete control of the insulin pricing system," giving Illinois diabetics "'little alternative except to submit' to the Insulin Pricing Scheme." (ECF No. 190-44 at 14 (quoting Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 452).) PBM Defendants respond by placing blame with Manufacturer Defendants and asserting "even 'an unconscionably high fee' is not sufficient to establish the type of oppressiveness required to state a claim under the [ICFA] premised on unfair conduct." (ECF No. 190-48 at 9.)

"[C]harging an unconscionably high price generally is insufficient to establish a claim for unfairness." *Robinson*, 775 N.E.2d at 951 (citing *Saunders*, 662 N.E. 2d at 608). "Seeking a profit is not inherently immoral, unethical, unscrupulous or oppressive; it is the essence of our free-market economy." *EBCF Enters., Inc. v. Erie Ins. Exchange*, 572 F. Supp. 3d 489, 498 (N.D. Ill. 2021); *see also Flores v. United Airlines*, 426 F. Supp. 3d 520, 531 (N.D. Ill. 2019) ("There is nothing immoral, oppressive, unscrupulous or unethical about charging a consumer a price she is willing to pay."). "That profit motive is not unethical, immoral or unscrupulous." *EBCF Enters.*, 572 F. Supp. 3d at 498.

However, "a practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 998 (N.D. Ill. 2016) (citation omitted); *see Leszanczuk*, 21 F.4th at 943 ("Conduct is oppressive under the ICFA if it 'leave[s] the consumer with little alternative except to submit to it.'" (alteration in original) (quoting *Robinson*, 775 N.E.2d at 943)); *cf. Flores*, 426 F. Supp. at 531 ("Offering a choice to a potential customer is not

immoral, unethical, oppressive or unscrupulous, which is to say offering a choice is not unfair for purposes of the ICFA."). "The rationale for that principle is that, unless there is some allegation of 'oppressiveness and lack of meaningful choice,' the plaintiff 'could have gone elsewhere' to purchase the good or service in question if the defendant charged an unfairly high price." *G.O.A.T. Climb & Cryo, LLC v. Twin City Fire Ins. Co.*, 548 F. Supp. 3d 688, 700 (N.D. Ill. 2021) (quoting *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 610 (7th Cir. 2013)).

Here, it is hard to see how the alleged exploitation of Illinois diabetics who require this life-saving insulin medication and have little to no choice but to purchase insulin through PBM Defendants would not be considered immoral, unethical, oppressive, or unscrupulous. The State noted the importance of insulin to Illinois diabetics, stating:

> Insulin treatments are a necessary part of life for those who have diabetes[,] and interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to a loss of consciousness and death within days.

(Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 223.)[14] As alleged in the State's Complaint as well as its opposition papers, diabetics require insulin to prevent medical complications, such as kidney failures and limb amputations, as well as death. (*Id.*; *id.* ¶¶ 2, 4, 213; ECF No. 190-44 at 14.) *See Eike v. Allergan, Inc.*, Civ. A. No. 12-1141, 2015 WL 603196, at *3 (S.D. Ill. Feb. 12, 2025) (finding defendant's practice immoral, unethical, oppressive or unscrupulous because "[p]laintiffs cannot simply forego a prescribed medication"). Moreover, the State has adequately alleged

---

[14] (*See also* Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 262 ("By 2016, the average price per month of the four most popular types of insulin rose to $450 – and costs continue to rise, so much so that now one in four diabetics are skimping on or skipping lifesaving doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.").)

Illinois diabetics lack a meaning choice in purchasing insulin from PBM Defendants, as the State alleges "the three PBM Defendants control 80% of the pharmacy benefit market, [so] unless they include a drug on one of their standard formularies, it is not available to 80% of Illinois'[s] citizens."[15] (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 9.) Because the State has alleged diabetics had no choice but to purchase PBM Defendants' insulin or face the threat of serious injury and/or death, the State has sufficiently alleged PBM Defendants' conduct throughout the Insulin Pricing Scheme was immoral, unethical, oppressive, and unscrupulous. *Cf. Lane v. Direct Energy Servs., LLC*, Civ. A. No. 19-00674, 2020 WL 3211435, at *4 (S.D. Ill. June 15, 2020) (dismissing plaintiffs' unfair conduct ICFA claims for price-gouging against an energy company because plaintiff had the option to cancel its contract and choose a different energy supplier); *Sevugan v. Direct Energy Servs., LLC*, Civ. A. No. 17-06569, 2018 WL 2267806, at *7 (N.D. Ill. May 17, 2018) (same) ("Because [plaintiff] had alternatives and could have reasonably avoided paying the variable rates, he fails to allege unfair conduct."); *Siegel*, 612 F.3d at 937 (affirming dismissal of plaintiff's unfairness claims despite defendant charging high gas prices because plaintiff cannot state a claim under the ICFA "absent proof that but for the defendants' conduct, he would not have purchased the defendants' gasoline").

Lastly, PBM Defendants argue the State fails to allege their conduct substantially injured Illinois diabetics because the State never alleges the "unfair practice" is not outweighed by any countervailing benefits. (ECF No. 190-39 at 13; ECF No. 190-48 at 14.) Rather, PBM Defendants

---

[15] (*See* Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 453 ("To make matters worse, Illinois diabetics *have no choice but to pay* based on Defendants' artificially inflated list prices because they *need these medications to survive*, the Manufacturer Defendants *make virtually all of the diabetes medications available in Illinois*, and the PBM Defendants completely dominate the pharmacy benefit services market and control nearly every Manufacturer Payment paid in the market." (emphasis added).)

contend their alleged conduct of "including a drug on their formulary offerings" ensures that the drug is "available to 80% of Illinois's citizens." (ECF No. 190-39 at 13 (quoting Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 9).)

However, according to Illinois law, "[a] practice causes substantial injury under the ICFA 'if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers.'" *Dolemba*, 213 F. Supp. 3d at 998 (quoting *Mussat*, 2014 WL 3610991, at *3); *see also Philips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016) ("A practice causes substantial injury 'if the injury is (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) one that consumers themselves could not reasonably have avoided.'" (quoting *Batson v. Live Entm't, Inc.*, 746 F.3d 827, 834 (7th Cir. 2014))). "Costs that are imposed on an unwilling consumer can constitute a substantial injury. . . . Even very small individual harms can be considered substantial, if they are part of a practice that, in the aggregate, causes substantial losses to the public as a whole." *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 780 (N.D. Ill. 2008) (citations omitted)).

Despite PBM Defendants' supposed "countervailing benefits" of making insulin more available, the State explicitly alleges that PBM Defendants' involvement in the Insulin Pricing Scheme made insulin less affordable and therefore less available to diabetics who need this medication. (*See* Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 354 ("A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans."); *id*. ¶ 360 ("I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient."); *id*. ¶ 464 ("Unable to afford Defendants' price increases, many

diabetics in Illinois have begun to engage in highly risky behaviors with respect to their disease such as rationing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits.").)

Construing the State's allegations in the light most favorable to the State, the Court finds that there is a substantial injury to consumers by stifling competition, raising prices, and making insulin more unavailable to consumers, causing them to turn to alternative and dangerous measures. (*See generally id.* ¶¶ 241, 262, 271–72, 354, 444, 464.)

Finding that the State has sufficiently stated a claim for unfairness under the ICFA, PBM Defendants' Motion to Dismiss the State's unfairness claim is **DENIED**.

### 2.    The State's Claim for Deceptive Trade Practices Under IUDTPA

PBM Defendants assert the State fails to sufficiently plead PBM Defendants violated the ICFA by engaging in "deceptive trade practices" as defined by the IUDTPA. (ECF No. 190-39 at 14–15.) *See* 815 ILCS 510/2. PBM Defendants first contend the State did not plead IUDTPA violations "with the particularity that Rule 9(b) requires." (*Id*. at 14.) Moreover, PBM Defendants assert the State alleges the same conduct is in violation of the IUDTPA as the underlying violation of the ICFA, and therefore "the State's allegations regarding the [I]UDTPA fall short for the same reasons that the [ICFA] claims do." (*Id*. at 15.) The State responds that it "has sufficiently pled that the PBM[ Defendant]s have violated both the [I]UDTPA and, as a result, the ICFA." (ECF No. 190-44 at 23–24.)

"To state a claim under the [I]UDTPA, a plaintiff must allege a false, misleading, or deceptive representation made with the intent that the consumer rely on it." *Odle v. GameStop Corp.*, 774 F. Supp. 3d 982, 999 (S.D. Ill. 2025) (citing 815 ILCS 510/2; *Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997)). The State's IUDTPA claim hinges on the same

assertion as that of the ICFA: PBM Defendants made "false and/or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 489.) "Since a deceptive misrepresentation is a required element of both the [I]UDTPA and ICFA claims," *Odle*, 774 F. Supp. 3d at 999, and because the Court has already found the State sufficiently alleged deceptive misrepresentation, *see supra* Section III.A.i.a, PBM Defendants' Motion to Dismiss the State's IUDTPA claim along with the State's ICFA claim is **DENIED**.

### 3. The ICFA Claim on the State's Behalf

Finally, PBM Defendants contend this Court should dismiss the State's claim under the ICFA because the State failed to adequately state a claim on its own behalf. (ECF No. 190-39 at 15–16.) PBM Defendants note "[t]he State's Complaint seeks relief on behalf of the people of Illinois"; "[n]onetheless, the State at times asserts that the State itself has suffered an injury." (*Id*. (citing Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 32, 33, 456–61).) Consequently, "to the extent the State is pursuing a Consumer Fraud Act claim on its own behalf," PBM Defendants assert these allegations do not meet either of the pleading standards set forth in Rule 8 or Rule 9(b). (ECF No. 190-39 at 16.)

In response, the State clarifies that it has sufficiently alleged PBM Defendants' misconduct substantially injured *Illinois diabetics*. (ECF No. 190-44 at 14 (emphasis added).) Because the State does not purport to assert claims on its own behalf, PBM Defendants' Motion to Dismiss on this basis is **DENIED** as moot.

### B. The State's Unjust Enrichment Claim

PBM Defendants contend the State's unjust enrichment claim should be dismissed for three distinct reasons: (1) the State's allegations regarding express contracts foreclose any claim for

unjust enrichment, (2) the State lacks standing to pursue unjust enrichment claims on behalf of its citizens, and (3) the State's allegations fail to satisfy Rule 9(b)'s particularity requirement. (ECF No. 190-39 at 16–20.)

### 1.   Express Contracts

First, PBM Defendants contend the State is barred from bringing an unjust enrichment claim because of its allegations that PBM Defendants have contracts with manufacturers, payors, and pharmacies. (*Id*. at 16–18.) More specifically, PBM Defendants contend "[t]he Complaint also affirmatively alleges that CVS Caremark and Express Scripts provided at-issue PBM and pharmacy services to the State." (*Id*. at 17.) PBM Defendants address the State's allegation that "[t]here is no express contract governing the dispute-at-issue" by asserting this allegation is of no moment—"[a] contract can cover a dispute without being limited to the specific issue." (*Id*. (alterations in original).)

The State responds that "the PBM[ Defendant]s['] contract with the Manufacturer[ Defendant]s, pharmacies, and payors is irrelevant to the unjust enrichment claim because those contracts do not exist between the unjust enrichment claimant (here, Illinois diabetics) and the unjustly enriched beneficiaries (here, the PBMs)." (ECF No. 190-44 at 25.) Because there is no contract between the parties, the State argues its claims are not barred by any contract, as "no contract exists that governs the dispute at issue in this lawsuit." (*Id*.) PBM Defendants reply that a lack of express contract between the parties is irrelevant, as "this Court has recognized that contracts can govern the subject matter of a dispute even when the plaintiff is not a contracting party." (ECF No. 190-48 at 10–11 (citing *Villasenor v. Am. Signature, Inc.*, Civ. A. No. 06-5493, 2007 WL 2025739, at *7 n.1 (N.D. Ill. July 9, 2007 ("Accordingly, even though [Defendant] is not a party to a contract that governs the relationship between it and [Plaintiff], the unjust

28

enrichment claim must nevertheless be dismissed against [Defendant].”); *Yassin v. Capitol Indem. Corp.*, Civ. A. No. 94-50156, 1995 WL 30610, at *3 (N.D. Ill. Jan. 24, 1995)).

"Unjust enrichment is a 'quasi-contract' theory that permits courts to imply the existence of a contract where none exists in order to prevent unjust results." *Barrientos*, 749 F. Supp. 3d at 959 (quoting *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 622 (N.D. Ill. 2008)). "When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004); *see also People ex rel. Hartigan v. E&E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992) ("Because unjust enrichment is based on an implied contract, 'where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'" (citation omitted)). "The reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Id*. at 689. "An unjust enrichment claim may survive a motion to dismiss when the validity or the scope of the contract is difficult to determine, or if the claim at issue falls outside the contract." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 887 (7th Cir. 2022).

As the State correctly points out, each of the cases cited by PBM Defendants "involve contracts to which the litigants are parties." (ECF No. 190-44 at 25.) *See Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004) (dismissing plaintiff's unjust enrichment claim because plaintiff had entered into a contract with defendant for "an automobile insurance policy [which] governed the relationship of the parties"); *Cooper v. Durham Sch. Servs.*, Civ. A. No. 03-2431, 2003 WL 22232833, at *7 (N.D. Ill. Sept. 22, 2003) ("[Plaintiff]'s unjust enrichment claim does contain allegations that it entered into a contract with [defendant] which governed its

obligations. Thus, by its own pleadings, [plaintiff] established that an unjust enrichment action is inappropriate."); *First Midwest Bank v. Cobo*, 90 N.E.3d 567, 575 (Ill. App. Ct. 2017) (finding that plaintiff-bank assumed a mortgage and promissory note with plaintiff which governed "the allegations of defendants' violations and obligations").

In its Reply, PBM Defendants cite two cases where courts allegedly found "contracts can govern the subject matter of a dispute" even where the plaintiff is not a party to the contract. (ECF No. 190-48 at 10–11.) However, neither case stands for this proposition and are otherwise inapposite. In *Villasenor*, the court specifically noted "[t]he Complaint is far from clear as to which defendants are parties to any of the agreements at issue in this case," not because the defendants were obviously non-parties. 2007 WL 2025739, at *7 n.1; *but see Gociman,* 41 F.4th at 887 ("An unjust enrichment claim may survive a motion to dismiss when the validity or the scope of the contract is difficult to determine, or if the claim at issue falls outside the contract."). Moreover, the Court ultimately dismissed the claim because the complaint "still fail[ed] to state a claim against [defendant] because it d[id] not set forth factual allegations sufficient to establish a plausible entitlement to relief as against [defendant]." *Villasenor*, 2007 WL 2025739, at *7 n.1. In *Yassin*, the two plaintiffs co-owned a restaurant, and one of the plaintiff-owners had taken out an insurance contract with the defendant. 1995 WL 30610, at *1. The court found that an express contract between one plaintiff and the defendant "exist[ed] on the same subject matter which is the basis of the unjust enrichment claim," thereby barring pursuit of an unjust enrichment claim. *Id*. at 3. Though the other plaintiff-owner was not a party to this insurance contract, the rule barring unjust enrichment claims where an express contract exists was still applicable "because its rationale (that the doctrine of unjust enrichment and the quasi-contract remedy are not means for shifting risks the placement of which was negotiated under a contract)" was relevant to the plaintiff-owner. *Id.*

30

Because the plaintiff-owner could have been a party to the contract, she "would possess no right under a quasi-contract that will not be protected by the contract and the actual parties." *Id*. Said another way, the second plaintiff's recovery would be based on the express contract between the first plaintiff and the defendant, "not based on some shadow theory of quasi-contract." *Id*.

Here, there is no contract that governs the dispute at issue in this lawsuit (the Insulin Pricing Scheme). PBM Defendants point to allegations in the State's Complaint that supposedly demonstrate the existence of a contract "cover[ing] the subject matter of the alleged Insulin Pricing Scheme." (*See* ECF No. 190-48 at 10 (alleging Illinois diabetics contract with the same payors and pharmacies to access the at-issue drugs in conjunction with PBM Defendants' contracts with the same payors and pharmacies to provide the at-issue drugs (citing Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 292, 246)).) However, the Court finds these allegations are bereft of any assertion Illinois diabetics *actually* contract with the payors or pharmacies. (*See* Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 292 ("PBMs also contract with a network of retail pharmacies often owned by the PBM. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. PBMs reimburse pharmacies for the drugs dispensed."); *id*. ¶ 346 ("Despite this knowledge, PBMs include this false price—often the AWP price—in their contracts as a basis to set the rate that payors pay for the at-issue drugs and pharmacies are reimbursed for the at-issue drugs.").) As it is not apparent any contract covers the subject matter of the Insulin Pricing Scheme, Plaintiff's claim for unjust enrichment survives a motion to dismiss. *See Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 671 (7th Cir. 2023) ("[N]ot every case involving a contract claim is clear cut, especially at the pleading stage. To create breathing room in such circumstances, we have recognized that plaintiffs may plead contract claims and unjust enrichment in the alternative."); *Troia v. N. Cent. Coll.*, Civ. A. No. 20-5229, 2023 WL 6065346, at *3 (N.D. Ill. Sept. 18, 2023) ("[T]he Seventh

31

Circuit noted that the parties' disagreement regarding 'whether the contract includes an implied promise to provide students in-person instruction and access to on-campus facilities' is alone 'enough for the students' unjust enrichment claim to survive a motion to dismiss.'" (quoting *Gociman*, 41 F.4th at 887)).

### 2.    Standing

Next, PBM Defendants assert the State lacks standing to pursue an unjust enrichment claim on behalf of its citizens. (ECF No. 190-39 at 18–19.) PBM Defendants contend "the only basis for the State to assert an action on behalf of the 'health and economic well-being of Illinois residents' and the 'State as a whole' is the common law," as "[n]o statute permits the State to bring an unjust enrichment cause of action on behalf of its citizens." (*Id*. at 18.) According to PBM Defendants, *parens patriae* suits are brought "generally to protect a 'quasi-sovereign interest belonging to the statute," and, therefore, "the relief available is most often injunctive, rather than damages." (*Id*. (quoting *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740, 744 (7th Cir. 2013)).) However, here, "[t]he State is attempting to recover monetary damages—a remedy that is plainly inconsistent with the *parens patriae* doctrine" according to PBM Defendants, and, therefore, the State lacks standing to pursue an unjust enrichment claim on behalf of Illinois citizens. (*Id*. at 19.)

The State responds that it "may assert claims in its *parens patriae* capacity if a defendant's misconduct harms the physical and economic health and well-being of its residents in general." (ECF No. 190-44 at 25–27.) The State maintains it may bring these claims which seek "restitution for the inequitable gains the PBMs have reaped through their unfair and deceptive misconduct." (*Id*. at 26.) The State further distinguishes the cases relied upon by PBM Defendants in making the argument that "courts have 'expressed skepticism at the notice of *parens patriae* standing for unjust-enrichment claims.'" (*Id*. (quoting ECF No. 190-39 at 19).) Finally, the State contends "the

32

PBM[ Defendant]s' argument that unjust enrichment is unavailable here overlooks the statutory powers granted to the Attorney General by the ICFA," which "authorizes the court to exercise all powers necessary, including awarding restitution, to carry out the statute's provisions." (*Id*. at 26–27 (citing 815 ILCS 505/7).)

"According to the Seventh Circuit, a state will have standing to sue as *parens patriae* 'where it can "articulate an interest apart from the interests of particular private parties" and "express a quasi-sovereign interest."'" *FTC v. Deere & Co.*, Civ. A. No. 25-50017, 2025 WL 1638474, at *10 (N.D. Ill. June 9, 2025) (quoting *LG Display Co., Ltd.*, *v. Madigan*, 665 F.3d 768, 771 (7th Cir. 2011)). For example, a state "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). "An 'alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* [if] the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *LG Display*, 665 F.3d at 771 (alteration in original) (quoting *Alfred L. Snapp & Son*, 458 U.S. at 607). The doctrine of *parens patriae* "does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Alfred L. Snapp & Son*, 458 U.S. at 600. "If that is the case, '*i.e.*, if the State is only a nominal party without a real interest of its own—then it will not have standing under the *parens patriae* doctrine.'" *LG Display*, 665 F.3d at 771 (quoting *Alfred L. Snapp & Son*, 458 U.S. at 600).

"[A] state is not automatically rendered a nominal party when it seeks *both* broad injunctive relief *and* monetary damages for injured residents, but rather may be found to be a real party in interest so long as the quasi-sovereign interest it asserts meets the 'substantial stake' test." *Illinois v. AU Optronics Corp.*, 794 F. Supp. 2d 845, 853 (N.D. Ill. 2011). Here, the State claims it is

33

"seeking restitution for the inequitable gains the PBMs have reaped through their unfair and deceptive misconduct" "on behalf of millions of Illinois residents whose physical and economic health and well-being have been damaged by the Insulin Pricing Scheme." (ECF No. 190-44 at 25–26.) "[T]he test is not whether the state alone will benefit, but whether the state has 'a substantial stake in the outcome of the case.'" *Illinois v. SDS W. Corp.*, 640 F. Supp. 2d 1047, 1052 (C.D. Ill. 2009) (quoting *Wisconsin v. Abbott Lab'ys*, 341 F. Supp. 2d 1057, 1061 (W.D. Wis. 2004)).

Here, the State has a substantial stake in the outcome of the suit. As an initial matter, "Illinois courts have held that when an Attorney General brings suit under the [ICFA], the State is not only the primary party in interest, but the *sole* party in interest." *People of Illinois v. LiveDeal, Inc.*, Civ. A No. 08-3287, 2009 WL 383434, at *3 (C.D. Ill. Feb. 12, 2009) (citing *People ex rel. Hartigan v. Lann*, 587 N.E.2d 521 (Ill. App. Ct. 1992)[16]); *see also SDS W. Corp.*, 640 F. Supp. 2d at 1050 ("Illinois seeks to exclude a company engaged in allegedly fraudulent activities from soliciting business within its domain. This implicates a well-established quasi-sovereign interest: securing an honest marketplace.") (collecting cases). Moreover, PBM Defendants provide no case law suggesting the State's claim for restitution necessarily bars it from bringing a claim for unjust enrichment under the *parens patriae* doctrine. *Cf. LiveDeal*, 2009 WL 383434, at *3 ("[I]t is clear that the relief sought primarily benefits the State. Although the State seeks restitution, it also asks

---

[16] *See Lann*, 587 N.E.2d at 524 ("Even though the transactions underlying this action arose between individual consumers and defendant, the action stems from the Attorney General's duty to enforce the Consumer Fraud Act. An action filed by the Attorney General under the Act is essentially a law enforcement action designed to protect the public, not to benefit private parties. . . . [A]lthough restitution may benefit aggrieved consumers, the remedy flows from the basic policy that those who engage in proscribed conduct or practices surrender all profits flowing therefrom. Because the nature and object of the Act and its remedies are indisputably the protection of the public interest, we believe that the legislature intended the State to be the only real party in interest . . . .").

for wide-ranging injunctive relief . . . . This weighs heavily in favor of finding a state interest. Further, even looking solely to monetary damages, the civil penalties alone may well dwarf any restitutionary recovery . . . ." (internal citations omitted)); *see also AU Optronics*, 794 F. Supp. 2d at 856 ("The State is not rendered a nominal party by virtue of the damages claims that it asserts on behalf of particular Illinois residents."). As such, here, this Court finds that the State has standing to assert an unjust enrichment claim.

### 3. Rule 9(b)'s Particularity Requirement

PBM Defendants argue the State's unjust enrichment claim must be dismissed because the State's allegations fail to satisfy Rule 9(b)'s particularity requirement. (ECF No. 190-39 at 19–20.) PBM Defendants contend the Court must dismiss the State's unjust enrichment claim because it is premised on the same conduct underlying the State's allegedly deficient ICFA claim and fails to satisfy the particularity requirements under Rule 9(b). (*Id*.) The State responds that Rule 9(b)'s particularity requirement does not apply to all of the State's claims. (ECF No. 190-44 at 5–8.)

"To state a claim for unjust enrichment under Illinois law, 'a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 720 (N.D. Ill. 2020) (quoting *Banco Panamericano, Inc. v. City of Peoria*, 880 F.3d 329, 333 (7th Cir. 2018)). "When an unjust enrichment claim 'sounds in fraud,' Rule 9(b)'s particularity requirement applies." *Id*. (quoting *Nieto v. Purdue Farms, Inc.*, Civ. A. No. 08-7399, 2010 WL 1031691, at *5 (N.D. Ill. Mar. 17, 2010)). "While an unjust enrichment claim may be pursued as an independent cause of action, where the claim 'rests on the same improper conduct alleged in another claim . . . [it] will stand or fall with the related claim.'" *Krug v. Am. Family Mut. Ins. Co.*, 227 F. Supp. 3d 942, 946 (N.D.

Ill. 2016) (alterations in original) (quoting *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011)).

Here, the State's unjust enrichment claim is premised on the same allegations as its underlying ICFA claim, which complies with Rule 9(b) for the reasons explained above. *See supra* Section III.A.1. Because the Court found the State's ICFA claim, which is based on the same improper conduct as the State's unjust enrichment claim, satisfied the heightened pleading standard under Rule 9(b), the State's unjust enrichment claim survives as well. *See Cleary*, 656 F.3d at 517 (stating where "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim"); *see also Stemm v. Tootsie Roll Indus., Inc.*, 374 F. Supp. 3d 734, 744 (N.D. Ill. 2019) (dismissing plaintiff's unjust enrichment after dismissing her ICFA claim).

### 4. Timeliness of Unjust Enrichment Claim

PBM Defendants argue the State's unjust enrichment claim must be dismissed as time-barred. (ECF No. 190-39 at 20–21.) The statute of limitations for the State's unjust enrichment claim is five years. 735 ILCS 5/13-205; *see also Tartan Constr., LLC v. New Equip. Servs. Corp.*, Civ. A. No. 17-5950, 2018 WL 4563079, at *2 (N.D. Ill. Sept. 24, 2018). However, this limitation period is subject to the discovery rule, meaning the statute of limitations does not begin to run until plaintiffs knew or reasonably should have known that they had been injured and that their injuries were wrongfully caused. *CitiMortgage, Inc. v. Parille*, 49 N.E.3d 869, 883 (Ill. App. Ct. 2016) (applying discovery rule to unjust enrichment claim); *see also Lewandowski v. Jelenski*, 929 N.E.2d 114, 119 (Ill. App. Ct. 2010) (finding discovery rule applies to unjust enrichment claims). Under the discovery rule, the statute of limitations period "begins when the injury could have been

36

discovered through the exercise of appropriate diligence, not discovery of the actual injury." *McWane, Inc. v. Crow Chi. Indus., Inc.*, 224 F.3d 582, 585 (7th Cir. 2000).

"The clock starts when a plaintiff has sufficient notice of his injury and its wrongful cause. Notice may be actual or constructive: actual notice is knowledge that the plaintiff possesses, while constructive notice 'is knowledge that the law imputes . . . whether or not [the plaintiff] had actual knowledge." *Khan v. Ocwen Loan Servicing, LLC*, Civ. A. No. 20-5833, 2021 WL 1192556, at *4 (N.D. Ill. Mar. 30, 2021) (alterations in original) (quoting *US Bank Nat'l Ass'n v. Villasenor*, 979 N.E.2d 451, 465 (Ill. App. Ct. 2012)); *see also Dahms v. Coloplast Corp.*, Civ. A. No. 19-6349, 2020 WL 5593279, at *2 (N.D. Ill. Sept. 18, 2020) ("To trigger the limitations period, the plaintiff must possess 'sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved,' but she need not know of a 'specific defendant's negligent act' or that any 'actionable wrong was [actually] committed." (alteration in original) (quoting *Hoffman v. Orthopedic Sys., Inc.*, 765 N.E.2d 116, 122 (Ill App. Ct. 2002))).

Here, as determined in ECF Nos. 706–07, the date of constructive notice for all plaintiffs in this Insulin multi-district litigation (Dkt. No. 2:23-md-3080) has been determined to be January 14, 2021—the date the Senate Finance Committee released the results and findings of its bipartisan investigation into the rising price of insulin. As this matter was originally filed on December 2, 2022 (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A.), the five-year limitations period for the State's unjust enrichment claim has not yet run.

Therefore, PBM Defendants' Motion to Dismiss the State's unjust enrichment claim is **DENIED**.

## C.  PBMs Defendants' Corporate Parents

Lastly, PBM Defendants contend the court must dismiss the State's misconduct claims against CVS Pharmacy, Inc. ("CVS Pharmacy"), as a parent corporation is not liable for the acts of its subsidiaries and because "the State has alleged insufficient facts demonstrating that the PBMs are alter egos of their corporate parents."[17] (ECF No. 190-39 at 22–24.) The State responds that it "has alleged claims against each of the PBM corporate parents based on their own conduct, not merely the conduct of their subsidiaries." (ECF No. 190-44 at 27.) The State asserts "each of these parents was directly involved in the Insulin Pricing Scheme." (*Id*. at 28.)

"[A] parent corporation may not be held to account for the liabilities of a subsidiary unless the legal separateness of parent and subsidiary has been disregarded in a wide range of corporate matters." *Esmark Inc. v. N.L.R.B.*, 887 F.2d 739, 753 (7th Cir. 1989); *see also Muir v. NBTY, Inc.*, Civ. A. No. 15-9835, 2016 WL 5234596, at *4 n.2 (N.D. Ill. Sept. 22, 2016) (same); *see Despot v. Combined Ins. Co. of Am.*, Civ. A. No. 03-7130, 2004 WL 1088361, at *1 (N.D. Ill. May 12, 2004) ("[T]he mere allegation of corporate parent status is not itself a basis of liability for a subsidiary's actions."); *see also Ernst v. Parkshore Club Apartments Ltd., P'Ship*, 863 F. Supp. 651, 655 (N.D. Ill. 1994) (same). Rather:

> The activities of a subsidiary may suffice to assert jurisdiction over the parent if there is some basis for piercing the corporate veil, such as the parent's unusual degree of control over the subsidiary, but this does not apply in the case of an ordinary parent-subsidiary relationship that observes corporate formalities.

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 733 (7th Cir. 2013) (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir.

---

[17] The Court only evaluates PBM Defendants' arguments regarding corporate parents as to CVS Pharmacy, Inc. *See supra* n.1.

2000); *Tiger Trash v. Browning-Ferris Indus., Inc.*, 560 F.2d 818, 823 (7th Cir. 1977) (acknowledging the parent's control over its subsidiary must be more extensive than the typical parent-subsidiary relationship to support to exercise of venue over the parent based on activities of the subsidiary)).

PBM Defendants contend the State's allegations are insufficient to state a claim against CVS Pharmacy, and the Complaint fails to allege CVS Pharmacy "itself was a PBM, or ever offered PBM services." (ECF No. 190-39 at 22–23.) Rather, "[t]he State alleges only that CVS Pharmacy retained the difference between the acquisition costs for the drugs at issue and the amounts received from payors"—which is a "standard practice" for retail pharmacies. (*Id*. at 23.) PBM Defendants further assert this Court must dismiss the allegations against CVS Pharmacy, "as another federal court found based on nearly identical allegations" that the claims against CVS Pharmacy were insufficient to plausibly plead its involvement in the alleged scheme. (*Id*. at 22.)

The Complaint sufficiently alleges CVS Pharmacy's participation in the Insulin Pricing Scheme. (*See* ECF No. 190-44 at 29.) Specifically, the Complaint sets forth that "[d]uring the relevant time period, CVS Pharmacy provided retail pharmacy services in Illinois that gave rise to the Insulin Pricing Scheme[.]" (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 91.) The State further alleges CVS Pharmacy worked "in conjunction with its corporate affiliate entities" to "knowingly assist[] the CVS Health family in profiting from the artificially inflated list prices . . . by pocketing the spread between acquisition cost for the drugs at issue . . . and the amounts received from payors," which were based on the "artificially inflated list prices . . . set by CVS Caremark in its capacity as a PBM." (*Id*. ¶ 88.) Though PBM Defendants contend it is "standard practice" for pharmacies to receive a profit based on the "difference between the amount at which a product is purchased and the amount for which it is sold," the State sufficiently alleges CVS Pharmacy's

involvement in the Insulin Pricing Scheme. (*See* ECF No. 190-39 at 23; ECF No. 190-48 at 14.) The State directly alleges CVS Pharmacy is "directly involved in the conduct of and control Caremark PCS Health, LLC's and Caremark, LLC's operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail order and retail pharmacy services to the ultimate detriment of diabetics and payors in Illinois." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 105.) It is clear from the State's allegations that "CVS Pharmacy was an integral part of the Insulin Pricing Scheme." (ECF No. 190-44 at 29.)

The Complaint alleges sufficient facts to state a claim as to CVS Pharmacy. *See* Fed. R. Civ. P. 12(b)(6). Therefore, PBM Defendants' Motion to Dismiss the State's claims against defendants CVS Pharmacy, Inc. is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, PBM Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF Nos. 190-38–39, 190-48) is **DENIED**. An appropriate Order follows.

Date: September 5, 2025

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**